**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEGRAIN WINSTON, MICHELLE STRICKLAND, VERNELL TIMS, I.V. NEWSON, Jr., SAMUEL PAGE, WILFORD FERGUSON, CECIL WILLIAMS, ANTHONY MANNING, DAVID WALKER, TYRONE MCGHEE and VICTOR SLAUGHTER, | ) ) ) ) ) ) ) ) ) | Case No. 18 cv-05726 Hon. Matthew F. Kennelly |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| SHERIFF OF COOK COUNTY THOMAS J. DART, in his Official Capacity, JOSEPH RANZINO, Individually and in his Official Capacity, GREGORY SHIELDS, Individually and in his Official Capacity, THOMAS NEAL, Individually and in his Official Capacity, CHRISTOPHER ROHLOFF, Individually and in his Official Capacity, and COUNTY OF COOK, ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# Exhibit A



## Planet Depos®
### We Make It *Happen*™

# Transcript of I.V. Newsom, Jr.

**Date:** July 6, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of I.V. Newsom, Jr.

1 (1 to 4)

Conducted on July 6, 2020

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHER DISTRICT OF ILLINOIS
 3              EASTERN DIVISION
 4    - - - - - - - - - - - - - x
 5  LEGRAIN WINSTON, MICHELLE    :
 6  STRICKLAND, VERNELL TIMS,    :
 7  I.V. NEWSOM, Jr.,           :
 8       Plaintiffs,       : Civil Action No:
 9       v.                 : 18-cv-05726
10  SHERIFF OF COOK COUNTY      :
11  THOMAS J. DART, in his      :
12  Official Capacity, JOSEPH   :
13  RANZINO, Individually and   :
14  in his Official Capacity,   :
15       Defendants,          :
16    - - - - - - - - - - - - - x
17  (Caption continued to next page)
18        Deposition of I.V. NEWSOM, Jr.
19            Conducted Virtually
20          Monday, July 6, 2020
21             9:54 a.m.
22  Job No.: 306408
23  Pages: 1 - 186
24  Reported By: Courtney Petros, RPR, CSR
```

**2**

```
 1  (Caption continued from previous page)
 2    - - - - - - - - - - - - x
 3  SAMUEL PAGE, WILFORD        :
 4  FERGUSON, CECIL WILLIAMS,   :
 5  ANTHONY MANNING, DAVID      :
 6  WALKER, TYRONE MCGHEE AND   : Civil Action No.
 7  VICTOR SLAUGHTER          : 18-cv-05726
 8       Plaintiffs,      :
 9       v.               :
10  THOMAS NEAL, Individually   :
11  and in his Official         :
12  Capacity, CHRISTOPHER       :
13  ROHLOFF, Individually and   :
14  in his Official Capacity,   :
15  and COUNTY OF COOK,         :
16  ILLINOIS,                   :
17       Defendants.        :
18    - - - - - - - - - - - - x
19    Deposition of I.V. NEWSOM, Jr., conducted
20  virtually:
21
22
23    Pursuant to notice, before Courtney Petros,
24  Notary Public in and for the State of Illinois.
```

**3**

```
 1          A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFFS:
 3      KELLY A. KRAUCHUN, ESQUIRE
 4      THE HERBERT LAW FIMR
 5      206 South Jefferson
 6      Suite 100
 7      Chicago, IL 60661
 8      (312) 655-7660
 9      kelly.krauchun@danherbertlaw.com
10
11  ON BEHALF OF THE DEFENDANTS:
12      ETHAN WHITE, ESQUIRE
13      EMERY LAW, LTD
14      2021 Midwest Road
15      Suite 200
16      Oak Brook, IL 60523
17      (630) 984-0339
18      ewhite@emerylawltd.com
19
20
21
22
23
24
```

**4**

```
 1    A P P E A R A N C E S   C O N T I N U E D
 2  ON BEHALF OF THE DEFENDANTS:
 3      JUSTIN L. LEINENWEBER, ESQUIRE
 4      LEINENWEBER BARONI & DAFFADA LLC
 5      Suite 2000
 6      120 North LaSalle Street
 7      Chicago, IL 60602
 8      (866) 786-3705
 9      justin@ilesq.com
10
11
12  ALSO PRESENT:
13      ASHBY EVERHART, REMOTE TECHNICIAN
14
15
16
17
18
19
20
21
22
23
24
```

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

2 (5 to 8)

---

**Page 5**

C O N T E N T S

1
2 EXAMINATION OF I.V. NEWSOM, Jr.          PAGE
3 BY MR. WHITE                          6
4 BY MS. KRAUCHUN                      167
5
6          E X H I B I T S
7     (Attached to transcript.)
8
9 NEWSOM DEPOSITION EXHIBITS            PAGE
10
11 Exhibit 1   Winston Complaint        58
12 Exhibit 2   June 7 Grievance         86
13 Exhibit 3   July 23rd Grievance      96
14 Exhibit 4   Newsom/Shields          114
15          Interrogatories
16 Exhibit 5   Newsom Medical Records   137
17 Exhibit 6   EEOC Charge             147
18 Exhibit 7   Newsom/Dart Interrogatories  148
19
20
21
22
23
24

---

**Page 6**

P R O C E E D I N G S

1
2     THE REPORTER: Will counsel please
3 stipulate that in lieu of formally swearing in the
4 witness, the reporter will instead ask the witness
5 to acknowledge that their testimony will be true
6 under the penalties of perjury, that counsel will
7 not object to the admissibility of the transcript
8 based on proceeding in this way, and that the
9 witness has verified that he is, in fact, I.V.
10 Newsom.
11     MS. KRAUCHUN: This is Kelly Krauchun,
12 attorney for plaintiff, and I agree.
13     MR. WHITE: This is Ethan White, Counsel
14 for the Sheriff defendants, and we agree as well.
15          I.V. NEWSOM, Jr.,
16 having been duly sworn, testified as follows:
17     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
18 BY MR. WHITE:
19     Q  Good morning, Mr. Newsom. Thanks for
20 bearing with us all as we work through this
21 virtually.
22     My name is Ethan White. As I said, I
23 represent the Cook County Sheriff Office,
24 defendants in this case, together with and Justin

---

**Page 7**

1 Leinenweber who is on as well.
2     First, let me ask you, have you ever given
3 a deposition before?
4     A  Yes, I have.
5     Q  Okay. Approximately, how many times?
6     A  Once.
7     Q  Okay. And what kind of a case was that?
8     A  It was a civil suit.
9     Q  Somebody was suing you, or you were just a
10 witness?
11     A  I was being sued.
12     Q  Okay. When was that?
13     A  I'm not sure. It's been some years ago.
14     Q  Okay. More than ten years?
15     A  Possibly.
16     Q  Was anybody -- who was suing you?
17     A  I can't recall. It was a participant in
18 the program.
19     Q  What do you mean by a participant in the
20 program?
21     A  He was on electronic monitoring.
22     Q  Okay. Was he a detainee?
23     A  Detainee, correct.
24     Q  Okay. And what was he suing you for?

---

**Page 8**

1 What was he claiming?
2     A  I don't recall. It's been a while back.
3     Q  Okay. Do you know the outcome of that
4 suit?
5     A  No.
6     Q  All right. Well, this deposition is
7 probably going to be pretty similar to that, but
8 let me go over a couple ground rules just so we're
9 on the same page. Okay?
10     The first is -- and this is going to be a
11 little bit harder, because we're doing this, you
12 know, via video conference -- but one of the most
13 important things is that you let me finish my
14 question before you start answering, and I will do
15 my best to let you finish your answer before I ask
16 you another question. Okay?
17     A  Yes.
18     Q  And I need you to answer out loud. We
19 can't have any nodding of the head, shrugging of
20 the shoulders, anything like that. Okay?
21     A  Yes.
22     Q  If you need to take a break, just let us
23 know. As long as there's no question pending,
24 we'll accommodate you if you need to use the

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

3 (9 to 12)

---

**9**

1 restroom, anything like that. Okay?

2    **A Yes.**

3    Q If I ask you a question and you don't

4 understand it, I need you to tell me, because if

5 you start answering, we're all going to assume you

6 understood exactly what I was asking. Okay?

7    **A Yes.**

8    Q Is there any reason you can't give full,

9 complete, truthful testimony today?

10   **A No.**

11   Q Are you -- is anybody in the room with

12 you?

13   **A No.**

14   Q Okay. Do you have any notes or anything

15 in front of you?

16   **A Yes.**

17   Q Okay. What kind of notes do you have in

18 front of you?

19   **A I have notes pertaining to the case filed,**

20 **the lawsuit, working in a hostile workplace.**

21   Q Okay. Is this something you created

22 yourself?

23   **A Along with witnesses, yes.**

24   Q What do you mean along with witnesses?

---

**10**

1   **A Well, to prove my statement that I made**

2 **and allegations I made towards the Sheriff's**

3 **Department.**

4   Q And this is something you've produced to

5 us in this lawsuit?

6   **A Yes.**

7   Q Okay. I don't have -- is this like

8 handwritten notes?

9   **A No, my counselor has it. It's not**

10 **written. Just stuff --**

11   MS. KRAUCHUN: If I can interject, are you

12 referring to the answers to interrogatories that

13 we produced? Can you hear me?

14   MR. LEINENWEBER: I can hear you, Kelly.

15   MS. KRAUCHUN: I.V., are you referring to

16 the interrogatories that we produced, the answers?

17   THE WITNESS: Yes.

18   MS. KRAUCHUN: Just to make that clear.

19   Q Okay. So you have the -- your answers to

20 the interrogatories in front of you; is that

21 correct?

22   **A Yes.**

23   Q Okay. Do you have any other documents in

24 front of you?

---

**11**

1   **A Yes.**

2   Q Okay. What else do you have in front of

3 you?

4   **A Just witnesses and a whistleblower that**

5 **previously worked for the Cook County Sheriff's**

6 **Department Electronic Monitoring.**

7   Q These are like statements, sir? I'm not

8 understanding.

9   **A When I say witness, one participant on**

10 **those cases that worked out dispatch was -- he had**

11 **documentation of witness, some of the incident**

12 **that was going on with different individuals that**

13 **they were sending us in different work areas**

14 **pertaining to other ones with less seniority.**

15   Q And this is stuff that you've given to

16 your attorney in this lawsuit as well?

17   **A Yes.**

18   Q And, as far as you know, that's been

19 produced to us?

20   **A Yes.**

21   Q Okay. Are you able to hold that up? I'm

22 not sure what you're talking about. If we were in

23 the room, I would just ask you to show it to me.

24 But are you able to hold that up for the camera so

---

**12**

1 that we can see what it is?

2   **A It's just pretty much scratches -- it's**

3 **just scratches, but it's pertaining to**

4 **interrogations. The questions you're about to ask**

5 **is pertaining to those questions.**

6   MR. WHITE: Okay. Kelly, do you know what

7 document we're talking about here? I'm kind of at

8 a loss.

9   MS. KRAUCHUN: So my understanding, I.V.,

10 correct me if I'm wrong, is that his notes that we

11 used to answer the interrogatories that were

12 propounded to us are what he is referring to, and

13 in those notes are any of the individuals that are

14 identified in his answers; is that correct, I.V.?

15   THE WITNESS: Yes.

16   Q Okay. Sir, I would just ask that you not

17 destroy those notes, because we'll probably ask

18 those to be produced as well. Okay?

19   **A Yes.**

20   Q And as far as the deposition today, you

21 understand this is your testimony, nobody can help

22 you with any of your answers, correct?

23   **A Yes.**

24   Q You can't look at your phone or, you know,

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

4 (13 to 16)

13

1 texts or anything for any information. Okay?
2   **A Yes.**
3   Q And you'll agree to not allow anybody to
4 give you any information while you're testifying
5 in this deposition. Okay?
6   **A Yes.**
7   Q Sir, did you do anything to prepare for
8 your deposition today?
9   **A Yes. I went over my documentation that I**
10 **submitted to my counsel.**
11   Q Okay. Anything else?
12   **A No.**
13   Q Okay. Approximately, how long did you
14 spend going over your documents?
15   **A Starting off -- I been going through it**
16 **throughout the time that the lawsuit was filed.**
17   Q Okay. In the past week, how much time
18 have you spent looking at those documents?
19   **A Probably about a day -- about two or three**
20 **days now. Last two or three days.**
21   Q Okay. But you didn't spend 24 or 48 hours
22 looking at them, you're saying over the past few
23 days you've kind of glanced through them?
24   **A Correct. Yes.**

14

1   Q Did you talk to anybody to prepare for
2 your deposition?
3   **A Other than my counsel, no.**
4   Q Okay. So you talked to your lawyer. I
5 don't want to know anything that you guys talked
6 about, but when did you speak with your lawyer?
7   **A Thursday I got the e-mail. I spoke with**
8 **her -- Monday and Tuesday -- I spoke with her**
9 **Thursday.**
10   Q Thursday of last week?
11   **A Yes.**
12   Q And, approximately, how long did you guys
13 talk for?
14   **A Approximately, about 45 minutes to an hour**
15 **or so.**
16   Q Okay. Did you look at any documents while
17 you were preparing?
18   **A No. I was at my primary job -- my**
19 **secondary job, so, no, I didn't have documents**
20 **with me at the job.**
21   Q Okay. Did you talk to any of the other
22 plaintiffs to prepare for your deposition?
23   **A No.**
24   Q All right. Why don't you -- let's talk a

15

1 little bit about your background. What's your
2 highest level of education?
3   **A Highest is high school and some electronic**
4 **-- DeVry electronic school for a short period of**
5 **time.**
6   Q Okay. Approximately, when did you do
7 those electronic courses? How long ago?
8   **A That's probably in the early '80s, late**
9 **'90s, early '80s.**
10   Q It's been a while?
11   **A Yeah, it's been a while.**
12   Q All right. And then when did you start
13 working at the Cook County Sheriff's Office?
14   **A 1990, February 17.**
15   Q 1990?
16   **A Yes.**
17   Q And can you walk me through what positions
18 you've held at the Sheriff Office?
19   **A I was prior in corrections until I was**
20 **transferred out to Electronic Monitoring in 2005.**
21   Q So you joined EM -- if I call it EM, we
22 both know we're talking about Electronic
23 Monitoring, right?
24   **A Correct. Yes.**

16

1   Q So you transferred to EM in 2005?
2   **A Yes.**
3   Q And before that, you were a correctional
4 officer?
5   **A Yes.**
6   Q Why did you transfer to EM? Did you have
7 a choice or that decision was made for you?
8   **A No. It was a bid that was posted, and we**
9 **had to bid and go through different formalities to**
10 **get qualified to go over there. It was a**
11 **specialized unit.**
12   Q And what was attractive to you about
13 joining EM?
14   **A Well, being on the street and**
15 **entercounting [sic] with people, individuals.**
16   Q Okay. And what position -- since 2005 --
17 I know we're talking about 15 years here -- but
18 what positions have you held within EM?
19   **A Investigator. That was it.**
20   Q You've always been an investigator?
21   **A Correct. Yes.**
22   Q Are you aware of the Cook County Sheriff
23 Office having a policy on discrimination?
24   **A Yes.**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

5 (17 to 20)

17

1    Q  Okay.  Have you recently reviewed that
2  policy?
3    A  Not since I retired, no.
4    Q  Okay.  When did you retire?
5    A  November 31st, 2019.
6    Q  All right.  Prior to your retirement, how
7  often did you look at that policy on
8  discrimination?
9    A  Well, I looked at it periodically, but
10  more often when I was being harassed, I looked at
11  the policy and procedures when it reflected to me
12  by write ups and things like that.
13    Q  And did you have training on
14  discrimination -- or I should say
15  antidiscrimination -- while you were working at
16  the Cook County Sheriff Office?
17    A  About witnessing or what -- what was your
18  question again?
19    Q  Sorry.  When you were working at the
20  Sheriff's Office, did you have training on
21  recognizing and combatting discrimination?
22    A  Yes.
23    Q  And how often did you have that training?
24    A  That was throughout my whole career.

18

1    Q  Yeah.  It was like every year or something
2  you had to go through another training module?
3    A  Yeah.  The first 10 to 15, I think it was
4  pretty much five days, then it went three days,
5  then it went to computers, just training on
6  computers.
7    Q  Okay.  But fair to say you had
8  discrimination training throughout your career at
9  the Sheriff Office?
10    A  Within policy and procedures, Sheriff's
11  Department, yes.
12    Q  Okay.  According to that policy, what were
13  you supposed to do if you witnessed
14  discrimination?
15    A  You report it to your immediate
16  supervisor.
17    Q  Okay.  And were you supposed to do
18  anything beyond report it to your immediate
19  supervisor?
20    A  Well, if you didn't report -- you report
21  to your immediate supervisor, you take it to the
22  next level.  Over there would probably be a deputy
23  chief or a chief.
24    Q  So you were supposed to take it to the

19

1  deputy chief or the chief or your immediate
2  supervisor was supposed to?
3    A  It depends on whether they took it to
4  them, then I initially would take it to them.
5    Q  Okay.  So if I understand, you take it to
6  your immediate supervisor, if you think they're
7  not doing anything, then you go to the deputy
8  chief or the chief?
9    A  Correct.  Yes.
10    Q  And what if you think they're not doing
11  anything about it?
12    A  Because of the certain time frame that
13  they had to respond to it.
14    Q  And where do you go, sir, if you think the
15  chief or deputy chief is not responding to it?
16    A  You go to the chief.
17    Q  The chief isn't doing anything, where do
18  you go?
19    A  You pretty much can file a grievance, and
20  then you can take it from there.
21    Q  Okay.  So you file a union -- you file a
22  grievance through your union?
23    A  Correct.
24    Q  What about if you yourself are

20

1  experiencing discrimination at the Sheriff's
2  Office, what do you do then?
3    A  About that I had been discriminated or
4  working at work in a hostile workplace?  I would
5  go through and file a grievance, same procedure,
6  we file -- we write -- supposed to file a
7  grievance and there had to address the grievances.
8    Q  So if you feel like you've personally been
9  discriminated against, you don't go to your
10  supervisor or the chief, you just file the
11  grievance?
12    A  You can, yes, file a grievance pertaining
13  to the issue, what happened, date, and time.
14    Q  And then it goes through the grievance
15  process, step one, step two, etc.?
16    A  Correct.
17    Q  What about retaliation?  So put
18  discrimination to one side.  Now, let's talk about
19  retaliation.  Did Cook County -- or did the
20  Sheriff's Office have a policy prohibiting
21  retaliation?
22    A  Yes.
23    Q  Okay.  And how familiar are you with that
24  policy?

Transcript of I.V. Newsom, Jr.

6 (21 to 24)

Conducted on July 6, 2020

---

**21**

1    A  Well, I would say I'm not familiar, but I
2  read it when it's -- when I feel that I'm being
3  retaliated, because I never pretty much got
4  written up, so there wasn't no need for me to read
5  it unless it happens to me, which it did.
6    Q  Okay.  And what kind of retaliation does
7  that policy prohibit?
8    A  It prohibits from discriminating and
9  working in different areas, bouncing out as far as
10  our roster management with our assignment sheets
11  that they assigned for our assignments when I was
12  an electronic monitor.
13    Q  But what did the policy say?  I mean, what
14  did it say?  You can't retaliate against people
15  for doing what?
16    A  Well, you can't retaliate people -- I
17  don't really -- let's see --
18    Q  Sir, and, sorry, I don't --
19    A  -- relating to race, gender.
20    Q  Okay.  And I should have said this at the
21  beginning.  We don't want you to guess.  So if you
22  don't remember something, just tell us you don't
23  remember.  Okay?
24    A  Yes.

---

**22**

1    Q  Okay.  What were you supposed to do if you
2  saw someone, another co-employee, being retaliated
3  against?
4    A  Oh, you mean go report -- if I was a
5  witness, you said?
6    Q  Yeah.  If you saw a co-worker being
7  retaliated against, what procedure were you
8  supposed to follow?
9    A  First, how would I know if he was being
10  retaliated, what he was being retaliated for?
11  You're saying when I see someone being retaliated,
12  how would I know if I didn't witness it?
13    Q  Okay.  Let's say you heard a supervisor
14  say, Mr. Coworker, you -- you made a report to the
15  EEOC, therefore, you're being disciplined.  What
16  would you do if you heard that happen?
17    A  I would -- I wouldn't do anything.  You
18  just report it to the EEOC.  That's up to them,
19  unless you want me as a witness.
20    Q  Okay.  So it's kind of not your problem if
21  it's not happening to you?
22    A  Well, I'm not going to say it wouldn't my
23  problem.  If the investigator wanted me as a
24  witness if I -- you know, if I witnessed it, then,

---

**23**

1  yes, I would, you know, be a witness.  I'm not
2  saying it wouldn't be my problem, because I
3  wouldn't want no one being retaliated based on
4  what they might think, which is the
5  administration.
6    Q  What about you, if you felt like you had
7  been retaliated against, what would be the
8  procedure to follow there?
9    A  Well, I would file a grievance.
10    Q  Okay.  Would you go to your supervisor or
11  the chief or deputy chief first or you just file
12  the grievance?
13    A  I would file a grievance based on the
14  person that I felt that was retaliating against
15  me.
16    Q  And is it your understanding that's the
17  procedure to follow is to file the grievance?
18    A  Yes.
19    Q  Do you know Legrain Winston?
20    A  Yes.
21    Q  And how long have you known Mr. Winston?
22    A  Well, since I've been over there in 2005.
23    Q  Okay.  So 15 years, plus or minus?
24    A  Yes.  Approximately, yes.

---

**24**

1    Q  Was he already working there when you
2  joined EM?
3    A  You know, he was on different shifts, so I
4  don't know exactly when he started.  When I got
5  over there, I don't remember -- I don't know when
6  he started, but I started seeing him.
7    Q  Did you know him before you moved into EM?
8    A  No.
9    Q  Okay.  So sometime around 2005 you first
10  met Mr. Winston?
11    A  Yes.
12    Q  Are you guys friends outside of work?
13    A  No.
14    Q  Okay.  So you don't kind of socialize with
15  Mr. Winston outside of work?
16    A  No.
17    Q  Do you still talk to him now that you're
18  retired?
19    A  Yes.
20    Q  How often do you talk to him?
21    A  He pretty much calls me, asks me how I'm
22  doing with retirement, periodically.
23    Q  Okay.  Just kind of checking in?
24    A  Yes.  Because I've been gone since '19, so

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

**25**

1  guy's usually pretty good.  Just calls to check in
2  and see how I'm doing.
3      Q  While you were working there, how often do
4  you think you talked to him?
5      A  Pretty much depends on the days or the day
6  he worked.  We would be passing through -- speak
7  if we happened to be in the same locker room.  So
8  if we seeing each other, crossing each other,
9  speak to each other.  He was on one shift -- I was
10  on 7:00 to 3:00.  He was on 3:00 to 11:00.  We was
11  on two different shifts.
12      Q  So maybe you guys would cross over in the
13  locker room when he's getting off shift and you're
14  getting on or vice versa, I guess?
15      A  Yeah.  Vice versa.  He would be crossing
16  me.  When I would be getting off, he would be
17  coming on.
18      Q  Okay.  Would that happen on a daily basis
19  almost or a couple times a week?
20      A  It varies.  I'm not sure when his -- his
21  days off.  We might have different days off, so
22  that varied.  So --
23      Q  But is it fair to say you probably talked
24  to him several times a week?

---

**26**

1      A  It's possible.
2      Q  And what would you guys talk about, just
3  small talk, what's going on at work, that kind of
4  stuff?
5      A  We would talk about a variety of different
6  things, family members, just chitchatting about
7  different things, the cars and administration,
8  stuff like that, basic stuff.
9      Q  Did you ever work the same shift as
10  Mr. Winston?
11      A  No.
12      Q  Okay.  And you would not have been in roll
13  call with Mr. Winston, right?
14      A  No.
15      Q  Because you guys were in different roll
16  calls?
17      A  Yes.
18      Q  Did you ever -- I mean, if you didn't work
19  the shift with him, I think this is obvious, but
20  did you ever partner with him?
21      A  I'd partner with him -- if I was working
22  overtime, I might have partnered with him.  But
23  not -- I was never assigned to his shift.  If I
24  work overtime on his shift, sometime I might

---

**27**

1  partner with him.
2      Q  Do you have any specific memory of being
3  partnered with him?
4      A  Yeah.  He was a good investigator.  He
5  knew his -- he knew his directions better than I
6  did, you know, with his memory.  I always go to
7  the phone.  So that's what -- memory and just
8  chitchat about life itself.
9      Q  How often do you think you ended up
10  partnering with Mr. Winston over the years?
11      A  I can't remember, because it's --
12      Q  I mean, do you think -- I'm just trying to
13  figure out how often, was it less than then times?
14      A  You asked -- when did I work with Winston?
15  Maybe about four to five times.
16      Q  Oh, okay.  So it was pretty rare?
17      A  Correct.  It's not rare, but it happens,
18  but I just, you know, don't have the accurate
19  numbers that you're requesting for, so, you know,
20  if I worked with him, I don't keep a time frame
21  that -- when we worked together.
22      Q  No, I understand.  I guess I'm just trying
23  to figure out, you know, over 15 years, you know,
24  were you working with him, you know, several times

---

**28**

1  each month or was it once a year?  I just -- I
2  want a general ballpark, not a number.
3      A  My general ballpark would be any number.
4  Like I said, maybe 5, 10 times, 11 times.  I don't
5  have an -- just assuming that those numbers can be
6  possibly accurate.
7      Q  And how would we figure out the accurate
8  number?  We'd have to look at when you worked
9  overtime?
10      A  Yes.  Yeah.  Contact Electronic Monitoring
11  service department or have a copy of the roster.
12  A roster is where we would be assigned when we
13  work a shift.
14      Q  You were on the -- no.  And I didn't write
15  your name next to it.  You were on the 7:00 to
16  3:00 or 3:00 to 11:00?
17      A  7:00 to 3:00 shift.
18      Q  7:00 to 3:00.  Okay.  Who, typically,
19  conducted your roll calls?
20      A  We had several people.
21      Q  Sorry.  Let me give you a time frame.
22  Le's say within the last five years, who typically
23  conducted your roll calls?
24      A  We had Chief Boyle, Chief Gaines, Chief

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

29

1  **Cortez, Deputy Chief Logan, Deputy Chief Loggins,**
2  **and Sergeant Passas.**
3      Q  How do you spell that last one?
4      **A  Passas?**
5      Q  Yeah.
6      **A  I want to say, P-A-S-S-A-S.  I'm not sure.**
7      Q  Okay.  What about Chief Ranzino, did he
8  ever do your roll calls?
9      **A  He might have worked on our shift a few**
10  **times, but I never had too much interaction with**
11  **him.**
12      Q  Okay.  So you -- Ranzino didn't regularly
13  do your roll calls?
14      **A  He was on 3:00 to 11:00 shift.**
15      Q  Okay.  All right.  And what about Chief
16  Shields, how often did you interact with him?
17      **A  Basically, seen him on 7:00 to 3:00 shift.**
18  **He'll pop in daily or pass us by or sometimes he**
19  **would address roll call.  Not often.  We'd be**
20  **leaving, going out.**
21      Q  So you didn't see him every day?
22      **A  No.**
23      Q  All right.  Were you in -- give me just a
24  second.

30

1          Were you in a meeting in July 2015 with
2  Mr. Winston and Director Shields?
3      **A  July?**
4      Q  July of 2015.
5      **A  July '15.  With Winston?**
6      Q  With Winston and Shields.  I don't have
7  any reason to think you were there.  I'm not
8  trying to trick you.  I'm just asking the
9  question.
10      **A  Oh.  Oh, no.  I don't remember that.**
11      Q  Okay.  And what about in August of 2015,
12  do you remember being in a meeting with Winston
13  and Shields?
14      **A  I don't relate -- I don't remember.  I**
15  **don't recall.**
16      Q  Again, I don't have any reason to think
17  you were there.  I'm just trying to confirm who
18  attended.
19      **A  Right.**
20      Q  All right.  Let's talk about Chief
21  Ranzino.  Sounds like you had pretty limited
22  interaction with him day to day?
23      **A  Yes.**
24      Q  Based on that, what's your opinion, do you

31

1  think he was good at his job?
2      **A  I never -- I don't think I can -- he**
3  **wasn't very friendly, so as far as the roster, I**
4  **never heard anything good about him.**
5      Q  Okay.  What about your personal
6  experience, did you have enough personal
7  experience to say one way or another whether he
8  was good at his job?
9      **A  I don't think he was good at his job,**
10  **because his -- no, I don't think he was good at**
11  **his job.**
12      Q  Okay.  And what do you base that -- why do
13  you think he was bad at his job?
14      **A  It was based on things that, you know, I**
15  **would hear.  And just interacting with him, he**
16  **wasn't friendly.  He was just pretty much -- how**
17  **do I describe Ranzino?  That's basically it.  That**
18  **I -- from my experience with him, I wouldn't just**
19  **cross him, he wasn't friendly, he wasn't sociable.**
20      Q  You said things you would hear.  Let's
21  break that down a little bit.  What kind of things
22  did you hear?
23      **A  Well, from previous people, how he would**
24  **do different things pertaining to -- I guess, on**

32

1  **their shift roster putting people to certain areas**
2  **where -- according to the roster, he would put**
3  **certain people in the western suburbs as opposed**
4  **to the south side of Chicago where there's more**
5  **high crime here, which is Englewood and west side.**
6  **And most of the time I heard they was getting most**
7  **of the lockups, and others would go western**
8  **suburbs, mostly white, where there would be less**
9  **crime.**
10      Q  Who did you hear that from?  You said,
11  previous people.
12      **A  I mean, that would just be floating around**
13  **the people that was on the shift.  Various**
14  **officers and investigators that worked the shift.**
15      Q  Who specifically?
16      **A  Well, I can't -- I heard that from --**
17  **shoot, I don't -- pretty much all the people**
18  **that's Black that was on the shift were included**
19  **into the Winston and other guys that's in the**
20  **lawsuit.**
21      Q  So you'd hear from the Black men who were
22  in the lawsuit that Ranzino was doing these kinds
23  of things?
24      **A  Yes.**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

9 (33 to 36)

---

33

1    Q  Okay.  Did you hear it from anybody else?
2    A  Yeah.  Lopez.  He was on they shift.  He
3  was bouncing back and forth to different shifts,
4  so he was on they shift.
5    Q  And Lopez -- sorry.  What's his first
6  name -- his or her first name?
7    A  His.  Jesse Lopez.
8    Q  Jesse.  Okay.  Is Jesse Lopez African
9  American?
10    A  Hispanic.
11    Q  Okay.  And you heard from Mr. Lopez that
12  some people were being assigned to high-incident
13  areas and some people were assigned to
14  low-incident areas?
15    A  Yes.
16    Q  Okay.
17    A  And he had -- and also -- hello?
18    Q  Go ahead.
19    A  And, also, he was willing to be a
20  whistleblower.  He would actually work on my
21  shift, same incidents on -- that happened -- that
22  was going on on their shift was going on on our
23  shift, on 7:00 to 3:00, the same procedures.  We
24  had rosters.

---

34

1    Q  And You said -- sorry.  I lost you there.
2  You said something about a whistleblower?
3    A  Yes.  He witnessed -- he worked out of
4  dispatch.  Our dispatchers were the ones that
5  dispatch our assignments to work, and he would
6  hear things from Director Shields and different
7  things to Webb pertaining to our shift.  For
8  instance, he stated to -- we'll put them over
9  there in their hood, Black neighborhood, that's
10  where they belong.  That was per him per -- coming
11  from -- this is Director Webb.
12    Q  All right.  So let me break that down a
13  little bit.  So you're saying Mr. Lopez told you
14  he heard Mr. Webb say, put them on their shifts,
15  that's where they belong or something?
16    A  In our areas.
17    Q  In your areas?
18    A  South side is mostly African American, and
19  west side, which was the high-crime areas.  Most
20  of us African Americans worked in those areas.  We
21  never -- at times -- we wouldn't go to the western
22  suburbs.  Or if there was lockups, they would give
23  us the lockups without any backup.  You had to
24  request for backups.  Only doing, what I say,

---

35

1  warrants, VFWs, warrants.  Or if one of the
2  administration order a reincarceration for various
3  reasons, we would have to request for backups in
4  order to get a backup.
5    Q  When did Mr. Lopez tell you that he heard
6  Mr. Webb say this?
7    A  Well, you'd have -- it's about maybe --
8  prior to him hearing about the case, he just
9  started stating to me, and he had talked to others
10  as well.
11    Q  So when did Mr. Lopez told you that he
12  heard Mr. Webb say this?
13    A  It was sometime in 2019.
14    Q  Okay.  And tell me about that
15  conversation.  Where did it take place?
16    A  Webb's and I locker room.
17    Q  You and Lopez were in the locker room?
18    A  Yes.  He was on -- at that time, he was on
19  our shift, 7:00 to 3:00 shift, he was the
20  dispatcher.
21    Q  What month did it take place?
22    A  Like I said, it was sometime in that year,
23  2019.  So I don't remember exactly.
24    Q  Summer?  Fall?

---

36

1    A  It could even any time in 2019, because,
2  you know, he had talked about a variety of things
3  throughout the whole year about the
4  administration.  So --
5    Q  Who else was present when you had this
6  conversation?
7    A  No one.  Just me and him.
8    Q  All right.  And what did you say to him,
9  and what did he say to you?
10    A  No, he just told me that he heard about
11  our case and that he wanted to be a whistleblower,
12  because he didn't want to be retaliated against
13  about administration.
14    Q  I'm not understanding.  What did he think
15  he was blowing a whistle on?
16    A  A whistleblower is a person that has
17  information that he wants to remain anonymous,
18  different information that he had pertaining
19  working on the dispatch.  He sees all -- he sees
20  all the different jobs that's being dispatched.
21  He knows what area the job was going to, the
22  person, based on what his supervisor tell him to
23  dispatch different jobs.  If they tell him
24  dispatch a job this to a certain area or western

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

10 (37 to 40)

---

**37**

1  suburbs, then he do that.
2      But, normally, he just dispatch the jobs
3  based on, you know, the priority -- more priority,
4  like reincarcerations, and stuff like that, and
5  going out doing different jobs versus curfews, you
6  know, questioning an individual why they were back
7  home late or why they got --left too early or they
8  were reincarceration.  He was the one that
9  dispatched the jobs.  He was on the 7:00 to 3:00
10 shift.
11     Q  So he worked -- he was not an
12 investigator, he worked in dispatch?
13     A  Yes.  He wasn't an investigator.  He was a
14 dispatch.
15     Q  Okay.  And, to your knowledge, did
16 Mr. Lopez ever blow the whistle on these things he
17 believed were happening?
18     A  Well, he had other incidents, but I wasn't
19 aware of different things that -- if he did.
20 Because different things could have possibly been
21 on his 3:00 to 11:00 shift.  He was -- he would be
22 on different shifts to shifts, so I was always on
23 day shift.
24     Q  Sure.  But the situation you're talking --

**38**

1  telling me about, this, you know, locker room
2  conversation in 2019, to your knowledge, did he
3  ever actually blow the whistle on this wrongdoing
4  he thought was going.
5      A  He hadn't at that time, no.
6      Q  And do you know to date -- you know, as we
7  sit here today, do you know if he's blown the
8  whistle on this?
9      A  No.
10     Q  What did he tell you -- in that
11 conversation, what did he tell you Mr. Webb said?
12     A  Like I said earlier, he stated that to put
13 them -- you know, he stated put them in the area
14 where he belonged.  He's referring to Black
15 people.
16     Q  And how do you know?
17     A  Because he stated to me, Lopez did.
18     Q  So Lopez said to you, Director Webb said,
19 keep them in the area where they belong, referring
20 to Black investigators?
21     A  Yes, sir.
22     Q  Do you remember anything else about that
23 conversation?
24     A  No.  Other than he said he had other

**39**

1  documents that he wanted to be able to turn
2  over --
3      Q  And did you --
4      A  -- which was documents pertaining to our
5  roster would verify how they -- the disparity, how
6  they work, separating us, having certain
7  individuals working certain areas with more high
8  crime with African Americans as opposed to
9  Caucasians.  We had -- he had rosters.  I had a
10 lot of documents about rosters as well pertaining
11 how often I was working in that area which was
12 south side.  I don't know if you're familiar with
13 the south side of Chicago.  Probably heard about
14 -- a lot about it on the news.  Englewood and the
15 west side are all the murders, so that explains
16 it.
17     Q  Okay.  Did you ever get any documents from
18 Mr. Lopez?
19     A  Documents?
20     Q  You said --
21     A  Yes.  He did give me certain -- yes, he
22 did give me documents.  I got the documents here
23 pertaining to -- I was on the job with -- the
24 document, I was sent to a house where someone had

**40**

1  scabies --
2      Q  Yeah.
3      A  -- that was one of the things where --
4  that me and my partner were sent to a house where
5  Webb and other supervisors knew that the
6  participant had scabies, and we didn't realize
7  that until we got in the house where the
8  participant stated to us that he had scabies.  And
9  he had documents on that.
10     And, also -- and then the following week
11 later with that same participant in the program on
12 the south side of Chicago, they dispatched another
13 -- when I came off -- they had dispatched two
14 other African Americans to that same house after
15 knowing that they had been giving this individual
16 permission to go in and out of the house to wash
17 his clothes due to the fact that he had scabies.
18 And I just happened to be at work that day, and I
19 had to individually call those two investigators
20 and let them know that that individual that you're
21 about to enter that residence has scabies.
22     The administration continued to send
23 people to that house, that location, knowing that
24 that individual had scabies, and they was giving

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

**41**

1 them permission to go and clean his clothes, and
2 they was continuing to send us there. My
3 question, why do you keep sending us there if
4 you're giving him permission to keep his clothes
5 clean? Because when we got in there, the mother
6 and the father had scabies that they related to
7 us.
8    Q And we'll talk more about the scabies
9 incident later on, but I appreciate that.
10    What I was trying to understand is, you
11 know, you testified that Mr. Lopez said, I have
12 documents, and I'm trying to figure out what of
13 those documents he claimed to have he gave to you?
14    A That was one of the --
15    Q Okay. He gave you those documents?
16    A -- he gave me those documents, and there
17 was other documents that we spoke about pertaining
18 to -- I went to a home on 1737 93rd Street. It's
19 in there as well, whereas, me and my partner had
20 to go to this location where -- we were checking
21 on his whereabouts, and that we was going there to
22 -- a reincar -- lock him up.
23    Once we got there, we couldn't ever gain
24 entrance to the participant, so we had to call

**42**

1 back to our dispatch -- I think Boyle at that time
2 was the chief. So we didn't get any information,
3 but they wanted to try to find him, so we
4 contacted Chicago Police Department. They sent a
5 unit over there along with the fire department.
6 They stated that that individual had already went
7 to the hospital later that night, so that our
8 administration did know, or if they didn't, they
9 never sent a car, so they sent us over there that
10 morning. That's one incident.
11    And along with -- so at that time I was
12 requesting for a backup for that lockup as well in
13 route over there. And I think Hulak and his
14 partner was in route there to assist us in the
15 reincarceration.
16    Q Sir, if I -- I don't mean to interrupt
17 you. If I could just ask you not to tap the pen.
18    A Yeah. You're right. I'm sorry. I
19 apologize.
20    Q That's okay. That's okay. So what about
21 that incident was troubling to you?
22    A The troubling thing was the fact that I
23 requested for backup, because it was a
24 reincarceration, we never know what type of house

**43**

1 we're going into. So we requested for a backup.
2 Our backup was called off per Director Webb that
3 called it off while the investigators were in
4 route to assist them. They was possibly around
5 the corner, and he called it off, and then he came
6 back over there and stated that it was just an old
7 man. That was over there per Webb. And then --
8 and after that -- then at that time it was our
9 system director and our chief -- system director
10 was Walls at the time -- he came onto the scene
11 and Chief Gaines, and they assisted me.
12    Q And when did this incident take place?
13    A I have it in my documents. I don't know
14 the exact date, but I have the documents, and my
15 counselor has them.
16    Q So as far as you know, those documents
17 have been given to your lawyer and they've been
18 produced in this case?
19    A As far as -- yes.
20    Q As far as you know. Okay. Any other
21 documents Mr. Lopez provided to you?
22    A No, but he said he has others --
23    Q Okay.
24    A -- he didn't specify. Just those two

**44**

1 incidents -- he was on duty at the times that the
2 last two that I just stated to you.
3    Q All right. We got a little off track
4 there, but I want to get back to talk about --
5    A Got to be specific, you know?
6    Q I appreciate it. I appreciate it. So
7 let's talk about Director Ranzino. We were
8 talking about him. I understand you don't have a
9 lot of interaction with him. Do you think -- did
10 you think, do you think he is racist?
11    A Based on -- from my experience, as far as
12 him being racist, I mean, I never experienced it.
13    Q Okay. And that's what I want to be clear.
14 I understand, you know, you didn't think he was
15 very friendly, it doesn't sound like you thought
16 he was a particularly good leader, but there's a
17 difference, I guess, that I'm trying to figure
18 out, between being a jerk and being a racist. So
19 do you have any personal knowledge to support a
20 claim that he's racist?
21    A Well, you probably pretty much have to
22 talk to the 3:00 to 11:00 shift pertaining to
23 that.
24    Q And that's fine, sir. I'm just trying to

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

45

1  figure out what you know.
2  **A  No, that's -- I don't know, I never worked**
3  **-- like I said, I only worked on that shift**
4  **overtime.**
5  Q  Okay.  Did you ever hear Mr. Ranzino use
6  the N-word?
7  **A  No.**
8  Q  Did you ever hear him make -- and, again,
9  I realize you had limited interaction with him,
10  but did you ever hear him made racist jokes,
11  anything like that?
12  **A  No.**
13  Q  All right.  Michelle Strickland.  Do you
14  know Michelle Strickland?
15  **A  Yes.**
16  Q  How long have you known Ms. Strickland?
17  **A  I think she was over there a short period**
18  **of time before she been out, so it wasn't long.**
19  Q  So you knew her through EM, though?
20  **A  Right.**
21  Q  Are you guys friends outside of work?
22  **A  No.**
23  Q  Do you still talk to her today?
24  **A  No.**

---

46

1  Q  Okay.  So you just kind of knew her as a
2  coworker for the period of time she was in EM?
3  **A  Yes.**
4  Q  Was she on your shift?
5  **A  She's on our shift, and she been on the**
6  **3:00 to 11:00 shift.**
7  Q  But to your knowledge, she was only in EM
8  for a short period of time?
9  **A  I don't -- I don't know that.  I don't**
10  **know how long she was there.  How long she was --**
11  **she never -- I wasn't keeping up.**
12  Q  Okay.  So how long do you think she was on
13  your shift when she was in EM?
14  **A  I really don't know.**
15  Q  Okay.  Do you have -- do you remember
16  being in roll call with her?
17  **A  Yes.  I remember being in roll call with**
18  **her.**
19  Q  Do you remember -- did you ever partner
20  with her?
21  **A  I don't recall working with her.**
22  Q  Okay.  Did she -- even when she was in EM
23  or on your shift, were you guys -- did you guys
24  talk outside of work, or it was just strictly a

---

47

1  work relationship?
2  **A  It was strictly a work relationship.**
3  Q  Did she ever complain to you that she felt
4  she was being discriminated against?
5  **A  No.  Strickland was quiet.  She kept to**
6  **herself, so I never talked to her pertaining to**
7  **anything that was going on.**
8  Q  Do you think -- just based on your own
9  personal knowledge, do you think Shields
10  discriminates against female investigators?  Do
11  you see anything that leads you to believe that
12  was the case?
13  **A  Females?  I think that Shields -- my**
14  **personal opinion, Shields and Webb discriminated**
15  **against females, Black, and male, Black, African**
16  **Americans.**
17  Q  Okay.
18  **A  Which --**
19  Q  Let's break that down then.  What evidence
20  do you have to support your opinion that Shields
21  discriminates against African American females?
22  **A  Because it's male and female.  We're his**
23  **subordinates versus Webb and Boyle.  Like I said,**
24  **they put us, as well as females, in high-crime**

---

48

1  **areas whether it be west side of Chicago or the**
2  **south side.**
3  Q  So you don't think the discrimination was
4  based on gender, it was based on race.
5  **A  I think it was based on gender and race.**
6  Q  So that's what I'm trying to get at, sir.
7  If you're saying that, you know, they assigned
8  male and female African Americans to high-incident
9  areas, what facts do you have to say that they
10  specifically discriminated against females?
11  **A  Again, they worked in those high-crime**
12  **areas.  They never worked in the west suburbs.**
13  Q  Mm-hmm.  But so did African American
14  males, right?
15  **A  Both -- yes.**
16  Q  So do you have any facts to say that
17  females were treated differently than males?
18  **A  Based on -- as black females working in a**
19  **hostile workplace is being treated differently.**
20  Q  I'm not -- I need you to explain that to
21  me.  I'm not following.
22  **A  Well, to your previous questions is that**
23  **African American, whether it be males or females,**
24  **gender, male or female, we all worked in pretty**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

13 (49 to 52)

---

49

1  much the south side of Chicago and west side.
2      Q  Okay.  What about Chief Ranzino?  Do you
3  believe that he discriminated against female
4  investigators on the basis of their gender?
5      A  I didn't work too much with Ranzino.  That
6  would be someone that worked with him.  I worked
7  day shift.
8      Q  Okay.  You're familiar with Tom Neal?
9      A  Yes.
10     Q  Now, I'm -- do you remember his title?  He
11 was chief of patrol or something like that?
12     A  He was on 3:00 to 11:00 shift.
13     Q  Okay.  So he was not on your shift either?
14     A  Correct.
15     Q  Do you have any reason to think Mr. Neal
16 discriminates against female investigators based
17 on their gender?
18     A  I have no -- I have no knowledge of it.
19     Q  And you're familiar with Christopher
20 Rohloff who, I believe, was a deputy chief?
21     A  Yes.
22     Q  Was he on your shift?
23     A  No.
24     Q  Okay.  Do you have any reason to think

---

50

1  that he discriminates against female
2  investigators?
3      A  I have no knowledge of that.  Not on my
4  shift.
5      Q  It's easy when you don't know the person,
6  right?  All right.  Let's talk about another
7  plaintiff, Vernell Tims; do you know Mr. Tims?
8      A  Yes.  He worked our shift.
9      Q  He worked your shift?
10     A  Yes.
11     Q  Okay.  Now, we got someone you can
12 actually talk about.  How long have you known
13 Mr. Tims?
14     A  Since he been in EM.  I don't have a
15 number -- date and time, he started.
16     Q  Yeah.  No, that's fair.  But do you think
17 -- I mean, has it been five years, ten years, do
18 you have any idea how long you worked with him?
19     A  Maybe five years, ten, give or take.
20     Q  Okay.  But whenever he started in EM,
21 that's when you got to know him?
22     A  Correct.  Yes.
23     Q  And I apologize I'm asking you the same
24 questions about everybody, but we just got to

---

51

1  figure out what you know.
2      Are you friends with him outside of work?
3      A  Yeah.  We pretty much friends outside of
4  work.
5      Q  Okay.  What kind of stuff do you guys do
6  outside of work?
7      A  We bike ride.  Ride bikes on trails.
8      Q  Okay.  So you guys are friends, you would
9  say?
10     A  I would say, associate.
11     Q  Okay.  What's the difference between an
12 associate and a friend?
13     A  The difference between -- a friend is a
14 person I can call and say, I need -- an associate
15 is a person you know and you just hang out
16 with them, but not personal.
17     Q  Okay.  Got it.  Okay.  So you do some
18 stuff with him, but you wouldn't -- if you're in a
19 bind, you're not calling Vernell Tims?
20     A  When I say I'm not in a bind as far as --
21 like I said, he's an associate.  So it's somebody
22 -- we just -- we both bike rid with one another
23 and just socialize, and other than that, that's
24 it.

---

52

1      Q  Okay.  How often a week do you talk to
2  him?
3      A  Since I've been retired or while I was
4  there?
5      Q  Let's say while you were working first.
6      A  Well, we talked a lot, because we worked a
7  lot together.  We was partners at one time.
8      Q  Okay.  What about now, now that you're
9  retired, how often do you talk to him?
10     A  I talk to him, check on him periodically
11 because he has medical issues, so I call to check
12 on him.
13     Q  How's he doing, do you know?
14     A  Well, he's doing as well as expected.
15     Q  Yeah.  Okay.  Was he always on your shift,
16 as far as you know?
17     A  Well, Tims was on my shift.  Yeah.
18     Q  Okay.  So you were -- whenever you were
19 working and he was working, I guess, you would be
20 in roll call together, you think?
21     A  Yeah.  Yes.  Based on -- depending on days
22 off.  Because I have more seniority than him, so I
23 would be off -- he might get a weekday off where I
24 get a weekend off, so -- because of seniority.

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

14 (53 to 56)

53

1    Q  Sure.  How often did you partner with
2  Mr. Tims?
3    A  Well, we were partners for almost a year,
4  year and a half.
5    Q  Approximately, what year was that?
6    A  We was partners in 2019, 2018, maybe off
7  and on, I think, in 2019.  Excuse me.  We was
8  partners for a while.
9    Q  Okay.  And I suppose when you're partner,
10 I mean, you spend a lot of time together, right?
11   A  Yes.
12   Q  You probably, just by necessity, being
13 cooped up together, you probably talk a lot,
14 right?
15   A  Certain things.
16   Q  Yeah.  Did he ever tell you he heard
17 Ranzino use the N-word?
18   A  Yes.
19   Q  When did he tell you that?
20   A  You know what, I don't remember -- recall
21 exactly when.  It was sometime last year.
22   Q  Sometime in 2019?
23   A  '19 or '18.  I'm not sure.
24   Q  Okay.  And where were you guys when you

54

1  had this conversation?
2    A  We could have been somewhere in the
3  building on Rockwell.  I'm not sure exactly where
4  it was at.
5    Q  Okay.  I mean, do you remember a specific
6  conversation or you're just kind of guessing?
7    A  No, I'm not guessing.  I pretty much
8  memorized the fact -- like I said, he might have
9  stated it while we was in the car or we just in --
10 after roll call.
11   Q  Okay.  Who else was present when he said
12 this to you?
13   A  Just between me and him.
14   Q  So just the two of you were part of the
15 conversation?
16   A  Yes.
17   Q  And what did he say to you, what did you
18 say to him?
19   A  Well, he just stated that -- the fact that
20 he heard him say nigger on the call.  He thought
21 -- they had thought that he had hung up the phone.
22   Q  Okay.  And who did he tell you was on the
23 call?
24   A  He just stated Rohloff -- not Rohloff, but

55

1    Ranzino or Rohloff.  One of them or both.  I'm not
2  sure exactly.
3    Q  Okay.  And what did you say to him?
4    A  I was just listening, I'm like man, that's
5  -- that's not good.
6    Q  But you didn't -- having known that, you
7  don't think Ranzino is racist?
8    A  I don't know if he's racist or not.  Like,
9  again, I haven't worked with him.  I'm only basing
10 things that I heard on my shift, 7:00 to 3:00
11 shift.
12   Q  Do you think that a supervisor in EM, a
13 white supervisor, could use the N-word and not be
14 racist?
15   A  No.  I don't think -- if you use the word
16 -- the N-word, that pretty much -- that's a
17 derogatory statement towards other African
18 Americans.  Yes.  I believe that, yes.  If you
19 feel comfortable staying that word in a negative
20 way, yes, I do believe that.
21   Q  And that's what I'm trying to figure out,
22 sir, because now you're telling me that Tims told
23 Ranzino used the N-word, but you're also telling
24 me you don't have any reason to think Ranzino is a

56

1  racist?
2    A  No.  What I'm saying is is that what I
3  believe, and what the question you asked, I said I
4  might have said that, but I believe he a racist
5  stating that Tims said to me and, in fact, he said
6  what he said on the call, yes, I do believe that.
7  I can't base that based on my experience.  I only
8  base it on the experience that I heard it through
9  him.
10   Q  I want to show you an exhibit.
11     MR. WHITE:  And I'm going to have to ask
12 for so assistance here through our coordinator.
13 I'm not sure the right way to do this, but I want
14 to show the witness the complaint.  It should have
15 been one of the exhibits that I uploaded.
16     THE TECHNICIAN:  It was marked Exhibit
17 Winston Complaint?
18     MR. WHITE:  Correct.
19   Q  Okay.  Mr. Newsom, can you see the
20 complaint in front of you here, or at least a
21 document in front of you here?
22   A  Yes, I see it.
23   Q  Okay.  What I would like to do is to go to
24 paragraph 43 of the complaint.

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

57

1    A   Okay.
2    Q   And he's going to scroll down there for
3  you.  There we go.
4        And, first, sir, let me ask you, this is
5  the complaint that you filed in this case as far
6  as you know, right?
7    A   Yes.
8        MR. WHITE:  And if we could scroll up just
9  a little bit to the top of this page.
10   Q   You see there, sir, this is the file stamp
11 from the courthouse with the case number, the
12 document, the date, et cetera; do you see that?
13   A   Yes.
14   Q   Okay.  Let's go back now to paragraph 43,
15 and I'm going to read this, sir.  I'm going to
16 tell you, I'm not comfortable using the N-word, so
17 I'm going to say N-word when I read this, but you
18 can read it for yourself.  It says, In and around
19 2012, Chief Ranzino said on a recorded call to
20 Director Shields that Tims was the dumb ass Johnny
21 Cochran N-word while Tims was on the line; do you
22 see that, sir?
23   A   Yes.
24   Q   But it's your recollection that Mr. Tims

---

58

1  didn't tell you about this conversation until
2  2019?
3    A   Or around '18.  Somewhere around there,
4  yes.
5    Q   Six years after it happened, he told you
6  about it?
7    A   Possibly, yes.
8    Q   Okay.  And that was the first time you had
9  heard about it, six years after he said it
10 happened?
11   A   Or it could have been sooner.  I mean, I
12 don't have an exact time or year that it actually
13 happened.  It could have been sooner.  I mean, I
14 don't know.  I don't remember the exact years that
15 he said it.  I'm just giving an estimate, but I
16 know he -- we talked about it then.  It could have
17 been sooner that we spoke on it.
18   Q   All right.  We can put that exhibit aside,
19 please.  And, sorry, I should have been clear.
20 I'm getting the hang of this.  Let's please mark
21 that as Exhibit 1, the complaint.
22       (Newsom Deposition Exhibit 1 marked for
23 identification and attached to the transcript.)
24       MS. KRAUCHUN:  Hey, Ethan, would this be a

---

59

1  good time for us to take a break, because it's
2  10:53, and I've got to jump on that other --
3        MR. WHITE:  Sure.
4        MS. KRAUCHUN:  -- is that okay?
5        MR. WHITE:  That's totally fine.  Yeah.  I
6  don't know -- and maybe our host can help us
7  figure out -- what's the best way to do this?
8  Should with all just mute our microphones and
9  cameras until Kelly comes back?
10       THE TECHNICIAN:  Yeah.  That's what we
11 usually do.  And if Counsel needs a room, we have
12 breakout rooms which are private rooms within Zoom
13 if you need a place to talk within Zoom.
14       MR. WHITE:  Yeah.  If you could put Justin
15 and I in a breakout room, that would be great.
16       THE TECHNICIAN:  Sure.
17       MR. WHITE:  And, Kelly, you'll just let us
18 know when you're back.  Okay?
19       MS. KRAUCHUN:  Perfect.  Thanks, guys.
20       (A recess was taken.)
21 BY MR. WHITE:
22   Q   Mr. Newsom, back on the record.  Thanks
23 for your patience there.  You understand you are
24 still under oath?

---

60

1    A   Yes.
2    Q   Okay.  Did you talk to anyone during that
3  break about your testimony?
4    A   No.
5    Q   Okay.  Did you text or otherwise
6  communicate with anybody during that break about
7  your testimony?
8    A   No.
9    Q   Okay.  So one thing, you know, as I was
10 looking back through my notes, I wanted to ask
11 you, when we were talking about Michelle
12 Strickland, one of the things you said was you
13 believe she was working in a hostile work
14 environment, or you said something to that effect;
15 what did you mean by that?
16   A   She was working in --
17   Q   And maybe I got it wrong.  I had in my
18 notes that you believed she was working in a
19 hostile work environment.  Maybe I misheard you.
20   A   No, you was correct.  As far as she
21 working -- as far as hostile, well, she was
22 working in our unit with -- can you repeat that
23 question?  You said working --
24   A   Sure.  I thought that you said -- and I'm

Transcript of I.V. Newsom, Jr.

16 (61 to 64)

Conducted on July 6, 2020

---

61

1  not trying to put words in your mouth -- I thought
2  that you said Michelle Strickland was working in a
3  hostile work environment, and I wanted to know
4  what you meant by that.
5      **A  When I said working in a hostile, same**
6  **thing as putting us or her in a peculiar position**
7  **working on the south side of Chicago as well as**
8  **the west side of Chicago.**
9      Q  Okay.  So if you meant -- or if you said
10  she was working in a hostile working environment,
11  it had to do with these assignments to a
12  high-crime area?
13      **A  Yes.**
14      Q  Okay.  Now, getting back on track, we were
15  talking about this conversation you had with
16  Mr. Tims about Ranzino using the N-word; do you
17  recall that testimony?
18      **A  Yes.**
19      Q  Okay.  Did you report the allegation of
20  Chief Ranzino using the N-word to anyone in CCSO
21  -- sorry -- in EM?
22      **A  No.**
23      Q  Why not?
24      **A  Because we were just having a general**

---

62

1  **conversation, we were just venting.**
2      Q  But you'd agree that Chief Ranzino using
3  the N-word, if he did, would be a violation of
4  probably a number of policies, right?
5      **A  Yes.**
6      Q  But you didn't think that important enough
7  to report to anybody, those violations of policy?
8      **A  Well, it was -- the time that he stated to**
9  **me was during the time that it was going on that**
10  **he had already filed -- I guess he had filed**
11  **grievances already pertaining to that.**
12      Q  Did Tims tell you that he had already
13  filed grievances related to that?
14      **A  I believe so.**
15      Q  Okay.  Did he tell you that?
16      **A  At this time, I really can't remember, but**
17  **I believe he did.**
18      Q  But you didn't file a grievance or report
19  the use of the N-word because you believed Tims
20  already had done so?
21      **A  Right.**
22      Q  Did Tims tell you he heard -- ever tell
23  you he heard Shields use the N-word?
24      **A  He said that on -- I think the initial --**

---

63

1      **no, I don't recall him telling me that he might**
2  **have used it.  It's possible he did, but I don't**
3  **recall.**
4      Q  All right.  So Director Shields -- not
5  director.  Executive Director Shields, you know,
6  we talked about how you didn't have -- you had a
7  little bit of interaction with him.  What was your
8  relationship with him like while you were working
9  there, friendly, professional, combative?
10      **A  Just professional.**
11      Q  Did you often have detailed conversations
12  with him or was it more just conversations in
13  passing?
14      **A  Passing.  I really didn't try -- I avoided**
15  **-- I didn't really want to have a conversation**
16  **with him, to be honest with you.**
17      Q  Okay.  Why is that?
18      **A  I just -- based on things that his**
19  **administration that he never tried to correct and**
20  **he allowed to continue.**
21      Q  What kinds of things are you talking
22  about?
23      **A  Working in a hostile workplace and us**
24  **working, he was aware of all that.  So he never**

---

64

1  **did try to change it.  And I don't know if he had**
2  **been there, whereas, at one given time, he might**
3  **have been there with something pertaining to Chief**
4  **Cortez, whereas, initially, I wasn't talking to**
5  **Cortez, I was talking to Deputy Chief Logan and**
6  **somewhere, not in a deposition, that I requesting**
7  **to not work with Investigator Rohloff.**
8      **And at that time I think -- Director**
9  **Shields might have been standing by my shoulder**
10  **when I was talking to Deputy Chief Logan about**
11  **reassignment to someone else, because I didn't**
12  **feel comfortable working with him.  And Director**
13  **Shields asked me why I didn't want to do it, and**
14  **he ordered me to write a to/from why, and then I**
15  **wrote a to/from the following day, because I was**
16  **in route to go to the streets, to Deputy Chief**
17  **Loggins.  And two or three days later after him**
18  **receiving the to/from that he requested it, he**
19  **ordered Deputy Chief Cortez to write me up for**
20  **insubordination.**
21      MS. KRAUCHUN:  Can you do me a favor?  Can
22  we be put in a breakout room for just a second, if
23  you don't mind -- I don't know who knows how to do
24  that -- so I can have a word with my client

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

17 (65 to 68)

65

1 privately?
2      (An off-the-record discussion was held.)
3 BY MR. WHITE:
4    Q  Mr. Newsom, we are back on the record.
5 You understand you're still under oath?
6    **A  Yes, sir.**
7    Q  We took a short break there.  You had a
8 chance to talk to your attorney.  Is there
9 anything you want to change about your testimony?
10   **A  No.**
11   Q  You were telling me about Shields, I guess
12 -- and I understand you were telling me about this
13 grievance involving Cortez.  We'll get to that
14 eventually.  But one of the things you were
15 telling me about is Shields's administration
16 basically continuing a hostile workplace; is that
17 having to do with these assignments of Black
18 investigators to high-incident areas?
19   **A  Yes.**
20   Q  Anything else that you believe Shields did
21 to contribute to a hostile workplace, as you
22 called it?
23   **A  No, not that I can recall.**
24   Q  I think I probably already know the answer

66

1 to this, but do you think Shields was good at his
2 job?
3    **A  No.**
4    Q  Okay.  And tell me a little bit about why
5 you think he was not good at his job -- or is not
6 good at his job?
7    **A  I think that you as a lead person that's**
8 **head of your subordinates is a product of you, so**
9 **you lead by example.**
10   Q  Okay.  So you thought he set a bad example
11 for his subordinates?
12   **A  Yes.**
13   Q  How so?  Is this getting back to the
14 assignments to high-incident areas or was there
15 something else?
16   **A  Yeah.  Pretty much the high incident.**
17   Q  Do you think he was racist?
18   **A  Do I think Shields was racist?**
19   Q  Was or is.
20   **A  I'm not sure.**
21   Q  Do you have any facts that support a
22 conclusion that he is racist?
23   **A  Not that I can recall at this time.**
24   Q  Have you ever heard Shields refer to a

67

1 Black employee, whether investigator or whatever,
2 as boy in a racial sense?
3    **A  No.**
4    Q  Okay.  Have you ever heard him use
5 racially offensive language?
6    **A  No.**
7    Q  Okay.  Samuel Page.  Do you know Mr. Page?
8    **A  Yes.**
9    Q  How do you know Mr. Page?
10   **A  Just passing him by.  He worked 3:00 to**
11 **11:00 shift.**
12   Q  So he was not on your shift?
13   **A  No.**
14   Q  Did you ever work with him -- did you ever
15 work a shift with him, I should say?
16   **A  Not really, because he was always in**
17 **dispatch.**
18   Q  Were you guys friendly at all outside of
19 work?
20   **A  No.**
21   Q  So you don't talk to him on the phone
22 regularly or anything like that?
23   **A  No.**
24   Q  When you talk to him, I think as you said

68

1 it was just in passing, was this just, hey, how
2 you doing, that kind of stuff?
3    **A  Yes.**
4    Q  Have you ever had a conversation with him
5 about hostile workplace or racism at EM?
6    **A  No.**
7    Q  Wilford Ferguson, do you know
8 Mr. Ferguson?
9    **A  Yes.**
10   Q  Does Mr. Ferguson work your shift or the
11 3:00 to 11:00?
12   **A  3:00 to 11:00 shift.**
13   Q  We've only found one person so far you
14 worked with here, but -- okay.  Do you -- are you
15 friendly with Mr. Ferguson outside of work?
16   **A  No.**
17   Q  Is it kind of like Mr. Page, you just kind
18 of say hello in passing?
19   **A  Yes.**
20   Q  Do you recall ever partnering with
21 Mr. Ferguson?
22   **A  No, I can't recall.  No.**
23   Q  Do you recall ever even working the same
24 shift as him?

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

18 (69 to 72)

69

1     A  I might have worked a shift, but I don't
2  recall working with him.
3     Q  Okay.  Did Mr. Ferguson ever complain to
4  you about excessive discipline at EM?
5     A  No.
6     Q  Do you recall him ever complaining to you
7  about anything at all really?
8     A  No.
9     Q  Cecil Williams, do you know Mr. Williams?
10    A  Yes.
11    Q  Did you ever work on the same shift with
12 Mr. Williams?
13    A  No.
14    Q  Okay.  How do you know him, just kind of
15 in passing?
16    A  Passing by if I worked over on their shift
17 overtime.
18    Q  Do you ever talk to him outside of work?
19 Are you friendly with him outside of work?
20    A  No.
21    Q  How often do you think you worked on the
22 same shift as him?
23    A  I don't recall.
24    Q  Rarely?

70

1     A  I mean, probably worked on his shift, but
2  I wasn't keeping up how often I was working on his
3  shift.  Overtime would just come and go, so it
4  varies.  It wasn't consistent.
5     Q  Do you recall Mr. Williams ever
6  complaining to you about assignments?
7     A  No.  I can't recall.  No.
8     Q  Did Mr. Williams ever complain to you
9  about excessive discipline to him?
10    A  No.
11    Q  Anthony Manning, do you know Anthony
12 Manning?
13    A  Not at all.
14    Q  Not at all.  Okay.  Do you even know what
15 his job was or anything like that?
16    A  Know nothing of him.
17    Q  Nothing other than the name?
18    A  Other than the name.
19    Q  David Walker.  Do you know Mr. Walker?
20    A  Yes.
21    Q  How do you know Mr. Walker?
22    A  He worked my shift.
23    Q  All right.  So he worked the 7:00 to 3:00
24 shift.  Was he an investigator?

71

1     A  Yes.
2     Q  Did you ever partner with him?
3     A  Yes.
4     Q  How often did you partner with him?
5     A  Maybe once.  Maybe three times,
6  approximately.
7     Q  Were you guys friends outside of work?
8     A  No.
9     Q  And even at work, did you talk to him
10 much, or was it just kind of friendly?
11    A  Just friendly.
12    Q  Small talk?
13    A  Small -- yes.
14    Q  Did Walker ever complain to you about
15 assignments?
16    A  Not that I can recall.
17    Q  Did he ever complain to you about
18 excessive discipline in EM?
19    A  Not that I can recall.
20    Q  Okay.  Tyrone McGhee, do you know
21 Mr. McGhee?
22    A  Yes, from 3:00 to 11:00 shift.
23    Q  Okay.  How long have you known Mr. McGhee?
24    A  I'm not sure how long I known him.  You

72

1  know, it's been some years.
2     Q  Did he join EM after you were already
3  working there?
4     A  Like I said, I was passing by.  I don't
5  know when he started or -- he was there -- I don't
6  know when he got there, because he was on another
7  shift.  He never worked my shift.
8     Q  Okay.  He was never on the 7:00 to 3:00
9  shift, as far as you know?
10    A  No.
11    Q  So I assume you never partnered with him?
12    A  Did I partner with McGhee?  No, not that I
13 can recall.
14    Q  The only way you would have partnered with
15 him would be in an overtime situation for him?
16    A  All those -- yes.
17    Q  Did Mr. McGhee ever complain to
18 assignments about you?
19    A  No.
20    Q  Do you remember him coming to you with any
21 complaints of anything at all?
22    A  No.
23    Q  Victor Slaughter, do you know
24 Mr. Slaughter?

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

73

1    A  Yes.
2    Q  How long have you known Mr. Slaughter?
3    A  Since he been on EM.
4    Q  Okay.  And has that been a while?
5    A  Yeah, it's been a while.
6    Q  Was he there when you started or he came
7  after?
8    A  I'm not sure.  Like I said, I'm not sure
9  if he came before I did.
10    Q  Was he on your shift --
11    A  No.
12    Q  -- or the 3:00 to 11:00?
13    A  Yes.
14    Q  Sorry.  We talked over each other.  He's
15  on the 3:00 to 11:00 shift?
16    A  Yes.
17    Q  Are you guys friends outside of work?
18    A  No.
19    Q  You don't regularly talk to him on the
20  phone or anything like that?
21    A  No.
22    Q  Did Mr. Slaughter complain to you about
23  assignments in EM?
24    A  No, not that I recall.

74

1    Q  Did he complain to you about discipline in
2  EM?
3    A  No.
4    Q  To your knowledge, does EM have a
5  progressive discipline policy?
6    A  Yes.
7    Q  Can you tell me a little bit about it?
8  Describe it for me, how it works.
9    A  Well, you start off -- I mean, they write
10  someone up in the progress of, you know, grievance
11  steps one, two, three, and four.
12    Q  So is it just like you can file a
13  grievance against them, they can file a grievance
14  against you?
15    A  No, we file a grievance.  They write us
16  up, and we file a grievance.
17    Q  Okay.  And then how does that work in
18  terms of progressive discipline?  Do they have to
19  follow certain steps leading up to potentially
20  termination?
21    A  Yeah.  Depending on the write ups, they
22  would recommend days of suspension, and then you
23  go to the next step, to step two, and then they
24  pretty much can make a decision, or they pass it

75

1  on to three and they make a decision, or they pass
2  it to four.  When it starts getting to four, it
3  goes to someone up -- up into the Sheriff, but it
4  never makes it there.  It goes to -- it just keeps
5  going up about four steps before we go across the
6  street to Division 5 to our hearing.
7    Q  So if I understand right, what you're
8  talking about is management -- let's say
9  management can write you up for something, and if
10  you agree with that, you know, let's say they
11  write you up and say five-day suspension, if you
12  agree with that, it ends right there, right, you
13  just take the five-day suspension?
14    A  Yeah.
15    Q  But if you disagree with that, then it
16  goes to step one, step two, etc., correct?
17    A  Yes.
18    Q  Okay.  So the steps are basically you or
19  anybody else contesting the discipline that's been
20  recommended; is that right?
21    A  Yes.
22    Q  Is that whole process, the whole step
23  process, determined by the union contract?
24    A  Yes.

76

1    Q  Would you agree that OPR determines --
2  initially determines the discipline?
3    A  Well, no.
4    Q  Okay.  Who initially determines the
5  discipline?
6    A  It would start off with the -- the second
7  you file a grievance, it would go to the deputy
8  chief or the chief before it gets to Assistant
9  Director Webb.
10    Q  But you're talking about -- are you
11  talking about the grievance process?
12    A  No.  I'm talking about the discipline when
13  I filed the grievance.  Those are the particular
14  chiefs, a deputy chief and chief, that goes up to
15  Webb would be the final over that unit before it
16  goes across the street.
17    Q  What about OPR, though?  What's OPR's role
18  for discipline?
19    A  They don't really have -- OPR -- OPR is a
20  case that you pretty much can file an individual
21  investigation pertaining to if something is going
22  on in your unit or the department so you file
23  grievances -- file a complaint on your OPR.
24    Q  So when you or anybody else receives an

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

77

1 employee disciplinary action form, are you
2 familiar with that kind of a form?
3    **A   Say it again.**
4    Q   The employee disciplinary action form.
5    **A   Yes.**
6    Q   You're saying -- who determines the
7 recommended action that comes out of that form?
8    **A   It depends on if -- once you file a
9 grievance, if you go to the next step, they can
10 suspend and offer you one day or two day or reduce
11 the time.  If not, you say you disagree with them,
12 so it goes up -- or they want you to make a
13 statement, they just pass it on or sign off or not
14 and it goes to the next step.  It continues to
15 those different steps.**
16    Q   Sure.  No, and I understand what you're
17 saying which is the grievance process on
18 discipline.  But what I'm trying to get at is who
19 makes the decision on what discipline is to be
20 imposed in the first place before any of the
21 steps?
22    **A   Again, it depends on if it -- I'm going to
23 the deputy chief, he can make a decision, or he
24 can pass it on.  It varies.  He might have made a**

---

78

1 **decision at the first step, and then you said, no,
2 I'm going to file a grievance, because I'm not in
3 agreement with that you're saying.  Then it will
4 go to the next step.  Same thing until someone
5 makes a decision over whether you go to four or
6 all the way up to the undersheriff.**
7    Q   Who makes the -- before any steps --
8 okay -- before any single step, who makes that
9 first initial determination about whether this is
10 going to be a one day, a two day, a five day, who
11 decides?
12    **A   It would go to -- for instance, it depends
13 on who writes you up.  If a supervisor writes you
14 up, then he wouldn't be the one to read it first,
15 that would have to be the deputy chief.  If the
16 deputy chief writes you up, then it would have to
17 be the chief, because you can't go in a grievance
18 with someone that wrote you up.**
19    Q   Right.  Okay.  But anyone really could
20 write you up?  Any management above your level
21 could write you up; is that fair?
22    **A   Yes.**
23    Q   And that person -- anyone in that
24 management level making that decision to write you

---

79

1 up, they -- you're saying they get to decide what
2 the initial discipline is?
3    **A   They initially write the report, they
4 recommendations, yes.**
5    Q   Okay.  And then you grieve that
6 recommendation, basically?
7    **A   Yes.**
8    Q   So the grievance process, I guess, is to
9 address what -- what an employee or an
10 investigator thinks is unfair discipline?
11    **A   Yes.**
12    Q   And that grievance process is baked into
13 the union contract, right?
14    **A   Yes.**
15    Q   That's something the union negotiated,
16 this is the process how we're going to address
17 discipline?
18    **A   Yes.**
19    Q   So really those protections, your ability
20 to grieve, those are negotiated by the union,
21 right?
22    **A   Yes.**
23    Q   Do you believe the grievance process is --
24 was, I guess I should say, you're not there now,

---

80

1 was followed when you were at EM?
2    **A   Yes.  The grievance procedure was
3 followed.**
4    Q   At some point in time, you had an incident
5 where a prisoner got out of your car; is that
6 correct?
7    **A   Yes.**
8    Q   When did that happen?
9    **A   Maybe September, October.  Somewhere
10 around there.  I'm not sure.**
11    Q   Of 2019?
12    **A   It was in 2019.  Yes.**
13    Q   Okay.  Last year.  Okay.  Where did this
14 happen?
15    **A   It was somewhere on 51st -- we actually
16 was on -- about 52nd -- 53rd and Ashland.**
17    Q   Okay.  So in the city?
18    **A   In the city, yes.**
19    Q   What happened?
20    **A   Well, initially, we got a call on curfew,
21 and we went there to interview the person.  And
22 after we further investigated, we decided to
23 reincarcerate the guy.  And so he had escaped on
24 Ashland, but I think the next block over was just**

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

21 (81 to 84)

---

81

1 east -- I'm not sure what that street is. That
2 was initially where we reincar, but we went over
3 to 52nd and Ashland for me to do the paperwork on
4 our MDT that we have in the cars. And while doing
5 the initial report, somehow there was a thump or
6 the guy say he can't breathe or something, and I
7 guess my partner cracked the window or something,
8 and all I heard was the thump, because he took off
9 running.
10     Q    Okay. Did they eventually catch him?
11     A    Next day. Chicago Police caught him.
12     Q    Got him the next day?
13     A    Right. Because we initially had squad
14 cars that had cages in the rear to prevent
15 participants from reaching outside the window and
16 unlocking their doors, but they took those
17 vehicles from us and gave them to security, so we
18 had no -- they had no protection in the rear where
19 the individual participant was able to go out,
20 because they took the cars that had cages from us
21 and gave them over to security. We couldn't
22 understand why.
23     Q    How did you get the cuffs off; do you
24 know?

---

82

1     A    In the scuff and all that type of stuff, I
2 don't recall how he got out.
3     Q    So he somehow gets out of the cuffs, he
4 gets out of the window, and he runs?
5     A    Yes.
6     Q    Did you guys chase after him?
7     A    Yes.
8     Q    What was he -- do you know what he was in
9 the program for, I mean, what crime he was alleged
10 to have committed?
11     A    No.
12     Q    Okay. So it was a dangerous situation
13 though, right?
14     A    As far as what? All incidents are
15 dangerous when you're locking up someone.
16     Q    Right. And you've got -- I mean, you got
17 a guy who you guys are trying to reincarcerate and
18 he's on the loose in the public, it's not a good
19 situation, right?
20     A    It's not.
21     Q    Did you get any discipline out of that
22 event?
23     A    Absolutely.
24     Q    What discipline did you get?

---

83

1     A    I got written up for escape and
2 transferred out of the unit to go back over to
3 Division 5 without due process. I just -- I got a
4 call while I was at work to report to somewhere,
5 but I didn't know what was going on, and I tried
6 to contact them. I forgot the lady e-mailed me
7 about the report -- not to report back to EM.
8 That, you know -- and that's why I ended up going
9 back over to Division 5.
10     Q    What's Division 5?
11     A    That's back to the jail.
12     Q    Okay. So back to being like a --
13     A    Across the street. No. I was still an
14 investigator, but I had a pending OPR case, so I
15 was transferred pending my case with OPR.
16     Q    What do you mean pending your OPR case?
17     A    Because they wrote me up for escape which
18 they consider as a major.
19     Q    So how is -- so that went to OPR. Why
20 does other discipline not go to OPR?
21     A    I think it depends on severity of it,
22 because it was an escape. Someone got away from
23 you.
24     Q    Okay. So you go back over to Division 5.

---

84

1 Did you grieve that write up?
2     A    Yes. Yes. I grieved it. Yes.
3     Q    What -- did it go through the various
4 steps?
5     A    Well, they automatically send it straight
6 to OPR. We didn't go to procedures. They write
7 it, they sent it straight to OPR, and they took me
8 out of the unit. Not normal, but they kicked me
9 and my partner --
10     Q    Well, you said you grieved it, so who did
11 you grieve it through? How did that work?
12     A    I went through the union.
13     Q    Okay. Is that still going on?
14     A    I'm not no longer there. No. I'm not
15 sure. I retired.
16     Q    Okay. So as far as you know, once you
17 retired, that was kind of dead in the water?
18     A    Yes.
19     Q    Okay. Did you think that was fair that
20 they transferred you out of the unit?
21     A    I think that was unfair, because it never
22 happened before. We usually just get written up
23 there in the unit and then we file our grievance.
24 It was the first time of me being over there that

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

85

1  -- we had several escapes -- and no one was never,
2  you know, literally called, e-mailed, while you're
3  off and to report don't come there, but go
4  straight to Division 5 and work.
5      Q  And why do you think, you know, that, in
6  your mind, you were treated different than these
7  other escapes?
8      A  I have no knowledge of why.
9      Q  Did you retire because of the OPR
10 investigation?
11     A  No.
12     Q  Why did you retire?
13     A  Because I called down there and that -- I
14 had enough time on the books to retire before my
15 prior day that I was supposed to retire, and I
16 used the time that I already had on the books to
17 retire, you know, to leave early.
18     Q  But were you -- I mean, were you fed up
19 getting put out of EM and back to Division 5, you
20 just say enough is enough?
21     A  No.
22     Q  No?  Did you have plans to retire when you
23 were still in EM?
24     A  Yes.

86

1      Q  When were you planning on retiring?  Same
2  time?
3      A  No.  My out date was February of '20.  The
4  17th, I think it was.
5      Q  It was three or four months ahead of time
6  you retired?
7      A  Yes.
8      Q  But you don't know what was the outcome of
9  that OPR investigation, as you sit here today?
10     A  No.
11     Q  Okay.  I'm going to show you another
12 exhibit.
13        MR. WHITE:  This one is marked Exhibit
14 June 7 Grievance, if I could have some help with
15 that.  Okay.
16        Mr. Newsom, you should see in front of you
17 there a document.  It's about seven pages.  We'll
18 go through it.  This was produced to us in this
19 litigation.  It is -- well, to be honest, it's --
20 and, sorry, we'll mark this as Exhibit 2.
21        (Newsom Deposition Exhibit 2 marked for
22 identification and attached to the transcript.)
23     Q  It was produced to us not in date order,
24 so the Bates stamps at the bottom are not in

87

1  order.  I put it in date order, so I'll refer to
2  the Bates stamp pages as we look at it here.
3        The first one is P146.  This is a memo
4  dated June 7, 2016, to Antonio Cortez from Cedric
5  Logan regarding incident ref Investigator I.V.
6  Newsom No. 6032.  Do you see this document in
7  front of you, sir?
8      A  Yeah.  I see the memo.
9      Q  Have you seen this memo before?
10     A  Yes.
11     Q  Okay.  And was this in connection with the
12 grievance you were talking to me about earlier
13 about being forced to partner with somebody?
14     A  Yes.
15     Q  Okay.  I'm going to read it through here,
16 and I just want to ask you, you know, if you agree
17 with these statements.  It says, On or about 09:00
18 on 7 June 2016, I observed Investigator I.V.
19 Newsom No. 6032 speaking with Assistant Chief
20 A. Cortez complaining that he did not want to work
21 incident calls with Investigator Allen Cholewa
22 No. 6000.  Do you see that, sir?
23     A  Yes.
24     Q  I believe when we were talking earlier you

88

1  thought the issue was working with Rohloff maybe,
2  but it looks like it was, in fact, with
3  Investigator Cholewa?
4      A  No.  I didn't say Rohloff, I said Cholewa.
5  I can never pronounce the name.  Not Rohloff.
6      Q  Sorry.  I must have misheard you.  Okay.
7  So this is correct, though, that this was the
8  investigator you did not want to work with?
9      A  Yes.
10     Q  Okay.  And that was because, the memo
11 continues, your concern was due to Mr. Cholewa's
12 inattentive behavior in the field?
13     A  Yes.
14     Q  It says, This conversation was also heard
15 by Executive Director G. Shields.  And that
16 matches what your recollection was as well,
17 correct?
18     A  No.
19     Q  No?  You don't believe the conversation
20 was heard by Shields?
21     A  Yes.  It was heard by Shields.
22     Q  And then Shields ordered you to write a
23 memo stating the safety reasons for not wanting to
24 work with Investigator Cholewa; do you agree with

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

89

1  that?
2  **A  Yes.**
3     Q  And then it says, Investigator Newsom
4  refused to write a memo regarding this issue; do
5  you agree with that?
6     **A  No.  Yes, I disagree with that, because I**
7  **didn't refuse it.**
8     Q  Okay.  And then it ends with Executive
9  Director Shields ordering Cortez to submit a
10  summary punishment action request addressing this
11  incident; do you see that?
12    **A  Yes, I see that.**
13    Q  Okay.  So you didn't want to work with
14  Investigator Cholewa, I'm probably saying that
15  wrong, but you know who I'm talking about, right?
16    **A  Yes.**
17    Q  Because you thought he was inattentive?
18    **A  Yes.**
19    Q  Do you -- as an investigator, did you get
20  to decide who you're partnered with?
21    **A  On some occasions, yes.**
22    Q  Okay.  But at the end of the day, it's up
23  to the deputy chief or chief or executive director
24  to determine who you're partnered with, correct?

90

1     **A  Yes.**
2     Q  In this memo dated June 7th, it says,
3  Director Shields ordered you to write a memo,
4  correct?
5     **A  Yes.**
6     Q  You did not write a memo that day,
7  correct?
8     **A  No.**
9     Q  You wrote it the next day?
10    **A  Yes.**
11    Q  And you gave it not to Director Shields
12  but to Director Logan instead, correct?
13    **A  No.  Incorrect.**
14    Q  Who did you give it to?
15    **A  I gave to Deputy Chief Loggins --**
16    Q  Loggins.  I apologize.
17    **A  -- which was actually when everything**
18  **happened.  And to correct that statement that you**
19  **read, Cortez was the initial person that I spoke**
20  **with.  There's been a reversal.  Actually, Chief**
21  **Logan, but Director Webb -- not Director Webb --**
22  **but Director Shields ordered Cortez to write me**
23  **up.  I initially was talking to Deputy Chief Logan**
24  **about the request for reassignment.**

91

1     Q  Okay.  So where Logan says in this memo
2  that he observed you speaking with Cortez, that's
3  not correct?
4     **A  No.**
5     Q  You were, in fact, speaking to Logan,
6  that's your testimony?
7     **A  Yes.**
8     Q  Okay.  Why don't we turn to the next page
9  which is entitled, Cook County Department of
10  Corrections Disciplinary Action Form.  This is
11  another document you guys produced to us, and it
12  is marked P31.  Take your time and look this over,
13  sir, and let us know if you need to scroll down.
14  I'll just ask, have you seen this document before?
15    **A  Yes, I have seen it before.**
16    Q  Okay.  And is this something that you
17  drafted?
18    **A  No.  That was a write up that Cortez**
19  **wrote.**
20    Q  Sorry.  You're right.  Yeah.  Sorry.  I
21  thought this was the grievance.  So this is the
22  one Cortez wrote up, as far as you know?
23    **A  Yes.**
24    Q  Okay.  In the first line it says, In

92

1  summary, Investigator I.V. Newsom reported to
2  Assistant Chief A. Cortez that he did not want to
3  work with his assigned partner, Investigator
4  Cholewa, complaining that he was -- that it was
5  not safe.  Do you see that, sir?
6     **A  What was the last -- yeah, refused to**
7  **work.  Right.**
8     Q  But you disagree with that?
9     **A  Yes.**
10    Q  Instead, you believe that you reported to
11  Chief Logan?
12    **A  I did report to Deputy Chief Logan.**
13    Q  Okay.  And let's scroll down to the bottom
14  of this same document where we see some
15  signatures.  So it looks like the initiating
16  supervisor signature is Chief Cortez; is that
17  right?
18    **A  Yes.**
19    Q  He was also the shift commander, correct?
20    **A  Yes.**
21    Q  And then superintendent is crossed out.
22  It says, Director signature, and that looks like
23  it's John Webb?
24    **A  Yes.**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

24 (93 to 96)

93

1    Q  And then underneath that is employee
2  signature, and you signed there, correct?
3    A  Yes.
4    Q  And your signature is dated, it looks
5  like, June 22nd, 2016; is that right?
6    A  Yes.
7    Q  And all the other signatures are dated
8  June 8th, 2016, correct?
9    A  Yes.
10    Q  Do you know why you would have been
11  signing this, whatever, a week and a half or two
12  weeks after they created this document?
13    A  Yes.  We have so many days to respond to
14  the write up.
15    Q  Got it.  Okay.  Let's go to the next page
16  in this exhibit, in Exhibit 2.  Okay.  And this
17  looks like this is the step one grievance
18  submitted through your union; is that right?
19    A  Yeah.
20    Q  And this is -- you can't see it, but down
21  in the right-hand corner it is Bates stamped P37,
22  and this is another document we received from
23  plaintiffs in this litigation.  Have you seen this
24  document before?

94

1    A  Yes.
2    Q  Did you write up this document or did
3  someone else?
4    A  I wrote it up.
5    Q  Okay.  So what does RI stand for?
6    A  Reporting investigator.
7    Q  Okay.  So reporting investigator wrote
8  to/from the following day pertaining working with
9  Inu Cholewa, the to/from is attached.  The to/from
10  was given to D/C Logan 6-8-16 violation Article
11  13, Section 13.1.  Is that your writing?
12    A  Yes.
13    Q  So if I can put it in so many words, it
14  sounds like the incident date at the top is dated
15  6-7, and you're saying you did do the to/from and
16  gave it to Logan on 6-8?
17    A  Say that one more time.
18    Q  Okay.  So the incident with you
19  complaining about the partner happened on June 7,
20  correct?
21    A  Yes.
22    Q  And it was on June 7 that Shields ordered
23  you to do a to/from, correct?
24    A  Yes.

95

1    Q  And on June 8, you did the to/from, right?
2    A  Yes.
3    Q  Okay.  Did this go through more steps,
4  step two, step three.
5    A  Yes, it did.
6    Q  Do you know what the ultimate outcome of
7  this grievance was?
8    A  They threw it out.
9    Q  They threw out your grievance, or they
10  through out the discipline?
11    A  They threw out the discipline.
12    Q  Okay.  So that was a good outcome for you,
13  I guess?
14    A  Yes.
15    Q  At any point, was your grievance heard by
16  Shields?
17    A  No, it never reached him.
18    Q  Do you believe this incident, only this
19  incident, this partner with Cholewa, do you
20  believe it was racially motivated at all?
21    A  No.
22    Q  Okay.  We can put Exhibit 2 aside.  I'm
23  going to show you what we will mark as Exhibit 3.
24  This is titled, July 23rd Grievance.

96

1    (Newsom Deposition Exhibit 3 marked for
2  identification and attached to the transcript.)
3    Q  Okay.  Sir, we'll get this in front of
4  you.  Take a chance -- give it a read, and let me
5  know when you're ready to talk about it.
6    A  Yes.  I'm ready to talk about it.
7    Q  Okay.  So this is -- sorry.  Let me just
8  make a note here.  So this is an employee
9  disciplinary action form, and it says the date of
10  an incident was July 23rd, 2017; do you see that?
11    A  Yes.
12    Q  And the narrative here says -- sorry, I
13  was just seeing if I need to read the whole thing.
14  So it says, This reporting deputy chief advised
15  Investigator Newsom that no changes would be made
16  to the duty roster at this time.  Sorry.  You know
17  what, sir, I should have just read the whole
18  thing.  Let me start over.
19    In summary, on or about the above-noted
20  date and time, Investigator I.V. Newsom No. 6032
21  entered the CCSEMU patrol supervisor's office and
22  requested a change of partner.  Do you agree with
23  that, sir, that that happened on that date?
24    A  Some of it.  Not all of it.

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

97

1    Q  Okay.  Well, on that day July 23rd, 2017,
2  did you request a change of partner?
3    A  Yes.
4    Q  Who were you assigned to work with?
5    A  I think it might have been Investigator
6  Lera.
7    Q  Do you know how to spell the last name?
8    A  L-E-R-A.
9    Q  Okay.  And why did you not want to work
10  with Investigator Lera on that day?
11    A  I think that because he was working with
12  Andrews or something pertaining to that.  So I
13  just -- something was going on with them, so I
14  just requested to work with someone else.
15    Q  Okay.  What do you mean something was
16  going on with them?
17    A  I don't know.  Pertaining to -- I'm not
18  sure.
19    Q  Well, I -- sir, there must have been some
20  reason you didn't want to work with Investigator
21  Lera.
22    A  That was the reason.  One of the reasons
23  that -- we pretty much didn't get along.
24    Q  Okay.

98

1    A  Pertaining to --
2    Q  Sorry.
3    A  -- as far as taking different views on
4  different things, you know, you can request to
5  work with someone.
6    Q  So was the problem that Lera had something
7  going on with Andrews or that you just didn't like
8  work with Lera?
9    A  Just didn't like working with Andrews.
10    Q  You didn't like working with Andrews?
11    A  No, Lera.
12    Q  Lera didn't like working with Andrews, but
13  you didn't like working with Lera?
14    A  Well, I might have said Andrews.  I don't
15  know.  Everybody had issues with Lera, so
16  pertaining to me, I didn't want to go through that
17  that day.  And if I can believe, I'm not sure,
18  Andrews didn't have a partner, so I requested to
19  work with Andrews, because he didn't have a
20  partner that day.  And I was scheduled to work
21  with Lera, so I requested to work with Andrews.
22  He's a single-man unit, and that he didn't want to
23  work single-man units.
24    Q  Okay.  So you didn't want to work with

99

1  Lera, because you didn't like working with him,
2  you wanted to work with Andrews instead, because
3  Andrews was on a single-man unit?
4    A  Yes.
5    Q  Okay.  And let's go back to Exhibit 3.
6  The second sentence says, This reporting deputy
7  chief advised Investigator Newsom that no changes
8  would be made to the duty roster at this time.
9  When it says deputy chief, does that mean Deputy
10  Chief Logan?
11    A  Yes, sir.
12    Q  Okay.  And do you agree with that
13  statement that at the date and time Deputy Chief
14  Logan told you there would be no changes to the
15  duty roster?
16    A  Yes.
17    Q  And it continues, Investigator Newsom was
18  insubordinate when he stated, you're an asshole;
19  do you agree with that?
20    A  No, I don't agree with that.
21    Q  Did you call him an asshole at that time?
22    A  No, I did not.
23    Q  Did you call him any names?
24    A  No, I did not.

100

1    Q  What did you say when he told you there
2  would be no changes to the duty roster?
3    A  I just walked out of his office.
4    Q  No words, just walked out?
5    A  Just walked out.
6    Q  Was anybody else present in his office at
7  that time?
8    A  Me -- it was me, Lera, and Tims.
9    Q  You, Lera, and Tims were in his office?
10    A  Yeah.  Tims was a unit rep, yes.
11    Q  Why would Tims be in his office as a unit
12  rep at that time?
13    A  I mean, when the conversation took place,
14  they was already in the office --
15    Q  They were --
16    A  -- right.  I wasn't going behind his back.
17  I just wanted to address it with Lera being there
18  along with Tims just happened to be in the office,
19  you know, various reasons, might have requested
20  something.
21    Q  So they were in there for something
22  totally unrelated to your request?
23    A  Tims was.  Lera was in there because I was
24  addressing it with him in there.

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

**101**

1    Q  Okay.  Was he already in there when you
2  came into the office -- was Lera already in there
3  when you came into the office?
4    **A  I'm not sure how to -- it could have been**
5  **or not.  I'm not sure.  They were in the office.**
6  **I don't know.**
7    Q  Did you tell Lera -- before you went to
8  talk to Logan, did you tell Lera, you know,
9  something like, I don't want to work with you, I'm
10  going to go talk to Logan?
11    **A  No.**
12    Q  Okay.  So you don't know how Lera ended up
13  in the office?
14    **A  No.**
15    Q  Exhibit 3 continues, R/DC asked
16  Investigator Newsom if he knew what he was saying;
17  do you agree with that statement?
18    **A  Do I agree with -- repeat it again.**
19    Q  Sure.  So it says, R/DC.  What is -- is
20  that reporting deputy chief?
21    **A  Mm-hmm.**
22    Q  Asked Investigator Newsom if he knew what
23  he was saying, referring to the you're an asshole
24  comment.  Do you agree that Logan asked you if you

**102**

1  knew what you were saying?
2    **A  Yes.**
3    Q  Okay.  Then it says, Investigator Newsom
4  reiterated by replying, you heard what I said,
5  you're a fucking asshole; do you agree that you
6  said that?
7    **A  I did not say that.**
8    Q  Finally, it says, This incident occurred
9  in the presence of several other investigators who
10  were in and around the patrol office; do you think
11  that is referring to Lera and Tims?
12    **A  Yes.**
13    Q  Do you think it's referring to anybody
14  else?
15    **A  I don't recall.  Just remember seeing**
16  **those two.**
17    Q  Had you worked -- had you partnered with
18  Lera in the past?
19    **A  Yes.**
20    Q  Had you asked to change from being a
21  partner with him in the past?
22    **A  Well, he initially started it, so -- he**
23  **initially started it.  I request -- but I didn't**
24  **want to work with him for various reasons.  Just**

**103**

1  some people just can't work together.  So --
2    Q  So you said he started it.  Are you saying
3  that Lera requested not to work with you in the
4  past?
5    **A  Certain times he had, yes.**
6    Q  So it sounds like there was just bad blood
7  between you guys?
8    **A  Right.  But he -- every time Lera would**
9  **ask for -- if he working with me, he would change**
10  **it.**
11    Q  What do you mean by that?
12    **A  He would change his partner.  Lera ended**
13  **up working by himself, and I would work with**
14  **someone else.**
15    Q  Okay.  On that date and time, did you
16  request to work a one-man unit?
17    **A  Yes.**
18    Q  But I thought you were saying you
19  requested to work with Andrews?
20    **A  I requested to work with one man, but**
21  **deputy chief said no, and that Andrews was working**
22  **by himself, then I asked, can I work with Andrews.**
23    Q  Okay.  So if I understand this correctly,
24  you said, I want to work alone, they said no, you

**104**

1  said, well, why don't I work with Andrews, and
2  they said no?
3    **A  Correct.**
4    Q  Who did you end up working with that day?
5    **A  Who did I -- I don't recall.  I don't know**
6  **if I ended up working by myself or did they keep**
7  **me with Lera.  I don't really -- I have to look at**
8  **the roster.**
9    Q  So you don't remember who you eventually
10  ended up working with that day?
11    **A  No.**
12    Q  It could have been Lera?
13    **A  I doubt it.  I have to look at the roster.**
14    Q  Okay.  All right.  What was the -- so did
15  you grieve this discipline?
16    **A  Yes, I did.**
17    Q  And do you know the ultimate outcome of
18  this discipline?
19    **A  Something.  It wasn't a reprimand.  It was**
20  **just -- I forgot what they call it -- but it**
21  **wasn't -- it might have been a reprimand or**
22  **something above that.**
23    Q  Actually, sir, I realize I have it here.
24  If we can go to the final page of this exhibit, I

Transcript of I.V. Newsom, Jr.

27 (105 to 108)

Conducted on July 6, 2020

105

1  think it's the next page. Yeah. So this is
2  marked -- this is a grievance form, it's marked in
3  the bottom right-hand corner as P36, and if we
4  could scroll down just a little bit.
5      It looks like, sir, where it says,
6  Disposition/employee's response, no violation of
7  the CBA --
8      A  Yes.
9      Q  -- does that mean then it would go to the
10 next step?
11     A  It's possible, yeah, because we ended up
12 going to arbitration.
13     Q  Oh, you did go to arbitration on this?
14     A  Yes.
15     Q  Do you have any documents? Because these
16 are the only documents I have on this incident.
17 Do you have other documents related to that
18 grievance?
19     A  You know what, if I'm not mistaken, I
20 think where the final call was, I got a reprimand.
21 I'm trying to see. Was that the same -- I might
22 have some documents. I don't know if you prefer
23 to look down there, because I had a witness which
24 was Tims.

106

1      Q  Okay. So you grieved this all the way to
2  arbitration; is that right?
3      A  Yes.
4      Q  And then in arbitration the outcome was a
5  reprimand, you believe?
6      A  Yes.
7      Q  Do you believe that this discipline was
8  racially motivated?
9      A  No.
10     Q  What is TSS?
11     A  STSS [sic] is in a basement where they
12 process participants to go out on the program.
13     Q  Do you know what TSS stands for?
14     A  No. I used to, but not now.
15     Q  Okay. All right. Is it sometimes -- I
16 mean, you kind of already said it -- but is it
17 sometimes called the basement?
18     A  Well, TSS is in the basement of Division
19 5. Yes.
20     Q  Would you agree that some investigators
21 prefer to be in TSS?
22     A  I have no knowledge of that.
23     Q  Okay. You don't prefer to be in TSS?
24     A  Well, I was on day shift. I wasn't in

107

1  TSS. We didn't have TSS.
2      Q  Oh, you never had to worry about TSS?
3      A  No, we worked on the street.
4      Q  Okay. So being assigned to TSS has
5  nothing to do with you?
6      A  No.
7      Q  Okay. Would you agree that being in TSS
8  is safer than being on the streets?
9      A  I have no knowledge of that. Like I said,
10 I was on the street.
11     Q  Did you ever work in TSS?
12     A  Maybe once or twice.
13     Q  Okay. I guess what I was getting at is, I
14 mean, TSS, you're basically doing paperwork and
15 stuff on the computer and stuff like that, right?
16     A  Yes.
17     Q  Would you agree that that is less
18 dangerous than the work you were doing out on the
19 streets, you know, going up to people's doors
20 where you don't know what's going on behind the
21 door?
22     A  It's basically the same, because the
23 participants that -- is the ones that have to go
24 out on the street that they process in TSS.

108

1  That's what they do on the 3:00 to 11:00 shift.
2  So I -- they could have issues in the jail or
3  outdoors. It don't make a difference.
4      Q  In TSS, are the participants usually
5  handcuffed?
6      A  No. They come down in mass --
7  participants -- they would be placed in a bullpen
8  to get processed.
9      Q  And when they're being processed are they
10 -- and if you don't know, sir, because you don't
11 work down there, just tell me. But when they were
12 being processed, were they being processed
13 individually?
14     A  Yes.
15     Q  And are they -- when they're getting
16 processed, are they sitting with an investigator?
17     A  No. They sit in the bullpen.
18     Q  Okay. So they're doing it on the other
19 side of a cage or the other side of glass?
20     A  Yeah. Until they -- once they called out
21 to process, then they come out of the cage, and
22 you're there with them face to face.
23     Q  Okay. And when they're there with them
24 face to face out of the bullpen, are they cuffed?

---

109

1    A  No.
2    Q  Would you consider being assigned to TSS a
3  bad assignment?
4    A  Would I consider doing it?
5    Q  Yeah.  Like if they said -- if all the
6  rules had changed and they said, Mr. Newsom, you
7  know, now you're assigned to TSS, would that be a
8  good thing or a bad thing?
9    A  It wouldn't make me any difference.
10   Q  Doesn't matter.  Okay.  All right.
11      So one of the things you had talked about
12  earlier a lot I want to dig into a little bit is
13  being assigned to higher incident areas.  Do you
14  remember talking about that?
15   A  Yes.
16   Q  Okay.  Would you agree that the areas you
17  were assigned to are not based on your seniority?
18   A  Say that one more time.
19   Q  Let me ask it a different way.
20      What do you believe your assignment was
21  supposed to be based on?
22   A  Well, CBA is based on a rotation roster.
23   Q  So you think the CBA determines where
24  you're assigned?

---

110

1    A  No.  The director or the -- whoever makes
2  assignments determines that, but they supposed to
3  abide by the CBA or the union contract, what we
4  call roster management.
5    Q  So you think there's a provision within
6  the CBA or the union contract that determines
7  where you should be assigned?
8    A  I'm not sure, but I know, as far as our
9  roster, we used to have to be assigned by our
10  supervisors -- the immediate supervisor on that
11  day that you work.
12   Q  So it's the supervisor who makes the
13  decision about where you're going to be assigned?
14   A  Yes.
15   Q  Do you know what they base that decision
16  on?
17   A  It could be upon our union contract.
18   Q  You think it's in the union contract?
19   A  Correct.
20   Q  Do you know that or you're just kind of
21  making an assumption?
22   A  Well, it was on our -- it was on the
23  roster.  It's on one of the policy contracts.  I'm
24  not sure which one it's under.

---

111

1    Q  You called it, what, a roster something?
2    A  Roster management.
3    Q  Roster management.  So you think the
4  roster management provision kind of sets the rules
5  and then the supervisors got to work within those
6  rules?
7    A  Or what they should do, yes.
8    Q  Would you agree that most of the areas for
9  EM investigators are high incident?
10   A  I would think -- yes.
11   Q  Because you're dealing with -- I mean,
12  you're dealing with potentially dangerous people
13  charged with crimes, convicted of crimes, that
14  kind of stuff?
15   A  Yes.
16   Q  Would you agree that sometimes watch
17  commanders did assignments in high-incident areas?
18   A  Did they -- actually, the watch
19  commanders done assignments in areas?
20   Q  Yeah.
21   A  It's possible.  I'm not sure.
22   Q  What about supervisors, did they ever do
23  assignments in high-incident areas?
24   A  It's possible.  I'm not sure.

---

112

1    Q  Would you agree that investigators are
2  assigned to areas they might be familiar with?
3    A  I don't know what they base on why they
4  assign you.
5    Q  So you have no -- you have no idea why
6  they assigned you to a particular area?
7    A  Other than, like I stated earlier, it was
8  high-crime areas.  Again, I never -- I worked
9  maybe -- not often in the western suburbs.
10   Q  Do you have any personal knowledge of why
11  a supervisor assigns you to a particular area?
12   A  Do I have any what?  Can you repeat the
13  question?
14   Q  Do you have any personal knowledge, so
15  facts known to you, to tell us why a supervisor
16  assigned you to a particular area?
17   A  Other than -- I mean, like I stated prior
18  before, because they felt that we fit in in a
19  particular neighborhood to do the assignment as
20  opposed to any other nationality.
21   Q  Were the neighborhoods that you were
22  assigned to predominantly African American?
23   A  Yes.
24   Q  Were you familiar with any of the areas --

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

29 (113 to 116)

---

113

1  something just changed on my screen here.  Okay.
2  We're good.
3      Were you familiar with any of the areas
4  that you were you were assigned to?
5      **A  Yes.**
6      Q  And why did you have that familiarity?
7      **A  I'm from the south side.**
8      Q  Okay.  Where did you grow up?
9      **A  I grew up in the Robert Taylor Homes.**
10     Q  That was over by Comiskey Park?
11     **A  Not too far.**
12     Q  Okay.  And you were assigned often over to
13  that kind of area?
14     **A  That and the west side, yes.**
15     Q  Were you familiar at all with the west
16  side?
17     **A  A little bit, but I didn't -- I was from**
18  **the south side, so I'm not familiar with the west**
19  **side.**
20     Q  Okay.  Have you ever heard of guys --
21  investigators, I should say, wanting to be
22  assigned to an area where they would be close to
23  home?
24     **A  No.**

---

114

1      Q  That had nothing to do with it, guys
2  wanting to be assigned to a neighborhood that's
3  closer to where they lived?
4      **A  I don't know what they -- speak for what**
5  **someone else wanted.**
6      Q  Okay.  What about you?
7      **A  I wanted -- yes.  I wanted to work in the**
8  **areas, so I could be familiarized with working in**
9  **all areas of the county of Cook opposed to one**
10  **particular area.**
11     Q  All right.  We're going to look at another
12  -- are you okay?  Do you need a break at all?  Do
13  you want to keep going?
14     **A  I'm fine.**
15     Q  Okay.  We're going to look at what we will
16  mark as Exhibit 4.
17        MR. WHITE:  And this -- for our
18  technician, this is labeled Exhibit Newsom/Shields
19  Interrogatories.
20        (Newsom Deposition Exhibit 4 marked for
21  identification and attached to the transcript.)
22     Q  Sir, this is maybe what you have in front
23  of you already, but this is your objections and
24  answers to Defendant Gregory Shields's first set

---

115

1  of interrogatories.
2      The first thing I want to do is go to the
3  very last page.  And there we have a verification
4  where you verify that the answers are true to the
5  best of your knowledge, information, and belief,
6  and you declare under penalty of perjury that the
7  foregoing is true and correct.  Is that your
8  signature there, sir?
9      **A  Yes.**
10     Q  You signed this on February 10th, 2020?
11     **A  Yes.**
12     Q  You verified all the information was
13  correct in here before you signed it?
14     **A  Yes.**
15     Q  You understood you were doing that under
16  penalty of perjury?
17     **A  Yes.**
18     Q  Okay.  Let's go to page 2 and look at
19  response No. 2.  There we go.  And this says, sir,
20  Identify all assignments you received that you
21  allege were discriminatory as alleged in paragraph
22  46 of the complaint and forms the basis of your
23  complaint, and explain who was involved in the
24  assignment, what the stated reason for the

---

116

1  assignment was, whether or not you agreed with
2  that reason, and if you disagreed, why you
3  disagreed with the assignment, what assignment you
4  contend you should have received instead, what
5  specifically was discriminatory and
6  disproportionate about the assignment, and explain
7  how you were damaged by the assignment.
8      And, sir, your response was, Investigation
9  continues and plaintiff reserves the right to
10  supplement that response.  Is that -- you don't
11  have a single assignment you can identify for us
12  as being discriminatory?
13     **A  Yes.  I provided documents that could**
14  **probably be incorrect.  I have documents.**
15     Q  Well, I'm not asking for documents, sir.
16  This interrogatory required you to give us all
17  assignments you believed were discriminatory, and
18  you didn't give us a single one.  So I guess the
19  question is, do you have a single one that you can
20  point to that you allege is discriminatory?
21     **A  I do have them.**
22     Q  And what is it?
23     **A  It's been provided to the counselor.  It's**
24  **called a roster.**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

30 (117 to 120)

117

1   Q  Go ahead.
2   **A  No, I was done.**
3   Q  Okay.  So, I mean, I get that you may have
4  given your counsel some documents, but we asked
5  you to identify all assignments, and you haven't
6  given us a single one.  Do you have one?
7   **A  What do you mean by a single assignment?**
8   Q  So your complaint -- you know what, why
9  don't we look at the complaint.  Maybe that will
10 make things easier.
11      So let's look at Exhibit 1 again, and
12 we'll look at paragraph 46.  Paragraph 46 says,
13 Plaintiff I.V. Newsom Jr., filed numerous
14 complaints regarding the consistent assignments he
15 received in high-incident areas as opposed to the
16 nonminority officers not receiving the same
17 assignments even though they had less seniority
18 and the assignments were to be rotated.
19      What assignments, specifically, are you
20 referring to there?
21  **A  The assignment work that I have complained**
22 **to the supervisors, and I had copies of that, but**
23 **they never addressed it.**
24  Q  Okay.  What was the first time you

118

1  complained about an assignment?
2   **A  I've been doing that prior to the time --**
3  **about -- approximately, 2006 or '07.**
4   Q  Okay.  So every shift since 2006 or 2007
5  you've complained about your assignment?
6   **A  Not every shift --**
7      MS. KRAUCHUN:  I'm going object.  That
8  misstates testimony.
9   Q  So which assignments did you complain
10 about assignments -- sorry.
11      Which shifts did you complain about
12 assignments?
13  **A  What shift?  7:00 to 3:00 shift.**
14  Q  What date did you complain about an
15 assignment?
16  **A  I don't have no recollection of dates and**
17 **times.**
18  Q  Okay.  So you don't know, with any
19 specifics, when you complained about assignments?
20  **A  I have complained, but I don't remember**
21 **specifics, no.**
22  Q  Okay.  Okay.  Let's go back to, I believe,
23 is Exhibit 4 which is the interrogatories.  Yeah.
24 Okay.  Great.  Let's look at No. 4.  So here we

119

1  asked for -- asked you to identify the other
2  nonminority officers who did not receive the same
3  assignments as you were assigned to as alleged in
4  paragraph 46 of the complaint including what
5  employees were involved, who was responsible for
6  supervising the employee, who was responsible for
7  making the decision as to the employee's
8  assignment, what assignment the employee received,
9  what assignment was made, whether or not any
10 grievance was filed, and, if so, the status or
11 outcome of the grievance, what the employee's
12 response to the assignment was, and whether or not
13 anyone else was involved.
14      And you responded.  You stated that
15 investigators -- well, let's go through the list.
16 This is the list of nonminority officers who did
17 not receive the same assignments as you.  You
18 identified Investigator Nickle.  What race is
19 Investigator Nickle?
20  **A  Well, I stand correct on that.  Those were**
21 **not the individuals.  They worked on 3:00 to 11:00**
22 **shift.  There was other individuals that were on**
23 **7:00 to 3:00 shift.**
24  Q  I'm not sure I understand, sir.  This

120

1  list, you're saying, is not the right list?
2   **A  No, that's incorrect.**
3   Q  Okay.  Did you review this before you
4  signed it?
5   **A  Yes.**
6   Q  Okay.  So who is this list of people?
7   **A  Those are investigators that was working**
8  **the 3:00 to 11:00 shift.**
9   Q  Okay.  Why would you have put their names
10 in here?
11  **A  It was a mistake.**
12  Q  Okay.  Do you have a list of people who
13 should have been in here?
14  **A  Yes.  They belong -- I have a copy of the**
15 **rosters, yes.**
16  Q  So you could correct this and give us the
17 correct response here?
18  **A  Yes, sir.**
19  Q  Okay.  Looking down at No. 5 just below
20 that.  So we asked you to explain the basis of
21 your contention that the assignments were to be
22 rotated as alleged in paragraph 46 of the
23 complaint, including whether or not that was to be
24 done pursuant to any contract, rule, law, or

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

121

1  regulation and identify specifically what
2  assignments you were referring to.
3       And, again, you didn't give us anything.
4  You just said, Investigation continues.  So what
5  do you base that notion on that assignments were
6  to be rotated?
7       **A  Based on our roster and our policy with**
8  **the -- our contract with the teamsters.  So it was**
9  **an ongoing thing as far as the rosters would**
10 **change on a day-to-day basis.**
11      Q  Okay.  So your basis that assignments were
12 to be rotated you believe comes from the union
13 contract?
14      **A  Yes.  Within the -- within agreement with**
15 **the Sheriff's Department.**
16      Q  Okay.  The union agreement with the
17 Sheriff?
18      **A  Yes.**
19      Q  Let's look at No. 6.  We asked you to
20 identify each and every complaint you made
21 regarding the behavior alleged in paragraph 46 of
22 your complaint, including when the complaint was
23 made, to whom, what form or format the complaint
24 took, for example, verbal, phone call, written,

122

1  e-mail, or letter, what the response to the
2  complaint was, whether or not you contend you
3  suffered any retaliation for these complaints,
4  and, if so, what retaliation you suffered, when
5  you suffered it, and who was responsible for
6  retaliating against you, and how you were damaged
7  by the alleged retaliation.
8       And you pointed to the June 7th, 2016,
9  incident with Investigator Cholewa, correct?
10      **A  Yes.**
11      Q  That incident with Mr. -- Investigator
12 Cholewa didn't have anything to do with assignment
13 to a high-incident area, correct?
14      **A  It was, and it was that I would be working**
15 **with Investigator Cholewa, and we worked in a**
16 **high-crime area.  Like I stated, the request why**
17 **-- why I requested not to work with him, because**
18 **we attempted to work together in high-crime area**
19 **in deference to his statement as well so as mine.**
20      Q  And did you -- I mean, we've looked
21 through grievances.  There wasn't anything in
22 there about high-crime area, was that just
23 something you said verbally?
24      **A  What do you mean it wasn't in the**

123

1  grievance?
2       Q  We can go back and look at it.  Let's see.
3  Yeah.  So let's go back and look at -- now, I
4  don't know what I marked this.  Maybe Exhibit 2.
5  Yeah.  That's the right one.  Exhibit 2.  And I'm
6  happy to have you scroll through this with the
7  technician's assistance, but I don't see anything
8  in here that refers to concerns about a
9  high-incident area.
10      **A  Okay.  If I can just pretty much add that**
11 **correction.  But that was the main purpose.  But**
12 **it was -- it was there, but the main possibility**
13 **was because of the security of me working in a**
14 **high-crime area with him, but I probably didn't**
15 **put it in the statement.**
16      Q  Okay.  Let's look at -- sorry.  Let's go
17 back to the interrogatories.  All right.  No. 9.
18 So -- all right.  Sorry.  Let's switch back to the
19 complaint, Exhibit 1, and look at paragraph 84.
20 That will give us some context.
21      So in paragraph 84, the plaintiffs believe
22 Director Shields threatened the plaintiffs -- so
23 that includes you -- that he would have fired them
24 if they filed grievances for the discipline they

124

1  received.  Did Director Shields ever threaten to
2  fire you?
3       **A  No.**
4       Q  Okay.  Let's go back to Exhibit 4 and look
5  at interrogatory No. 10.  We asked you:  If not
6  already answered above, identify each and every
7  instance in which any of the defendants used
8  offensive, derogatory, or racist language towards
9  you as alleged in the complaint.
10      And, again, you just responded,
11 Investigation continues.  Can you provide any
12 instance in which a defendant used offensive,
13 derogatory, or racist language towards you?
14      **A  No.**
15      Q  No. 11 starts at the bottom of the page
16 there.  We asked you to identify all discipline
17 you received that you allege was discriminatory,
18 and your response was, Investigation continues.
19      Can you identify all discipline you
20 received that you allege was discriminatory?  Did
21 that ever happen?
22      **A  Say that one more time.**
23      Q  Do you contend that you were ever
24 disciplined for discriminatory reasons?  Did you

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

32 (125 to 128)

125

1 receive discipline because of your race?
2    A  No.  Not that I can recall.
3    Q  And then let's go down to interrogatory
4 No. 18 in this same exhibit.  Here we asked you to
5 identify all defendants' acts or omissions you
6 allege resulted in plaintiffs being treated
7 differently than other similarly situated
8 individuals.
9        And you responded, Plaintiff states that
10 chief would grant certain requests when asked by
11 white investigators and deny the same request made
12 by African American investigators.  What requests
13 are you referring to there?
14    A  Requesting for the -- to work in other
15 areas other than high-crime areas.
16    Q  Okay.  So this gets back to the working in
17 high-incident areas versus non-high-incident
18 areas, correct?
19    A  Yes.
20    Q  So you're saying here that if a white
21 investigator asked to work on the south side, they
22 would be assigned to the south side?
23    A  I can't speak for what a white person
24 asked for.  I can only speak for what I requested

126

1 for.
2    Q  Well, sir, that can't be the case, though,
3 because you said here under penalty of perjury
4 that the chief would grant certain requests when
5 asked by white investigators.  So you're saying
6 here you know what white investigators asked for.
7        MS. KRAUCHUN:  Objection.  Misstates the
8 testimony.
9    Q  You can answer.
10       THE WITNESS:  I'm sorry.  Did you say
11 something, Counselor Kelly?
12    Q  She objected, but you still have to
13 answer.
14    A  Oh, okay.  What was your question again?
15    Q  So this response that you wrote here says,
16 Plaintiff states that chief would grant certain
17 requests when asked by white investigators.  So
18 I'm simply asking you, what requests did white
19 investigators make?
20    A  They requested to work in the western
21 suburbs.
22    Q  Were they ever -- did they ever request to
23 work on the south side?
24    A  No.  Because they always worked on there,

127

1    and once they got -- continued -- they'd have to
2    continue to ask, but they'd continue to keep them
3    in that area.
4       Q  How do you know that white investigators
5    asked to work in the western suburbs?  Were you
6    there for the conversation?
7       A  Yeah, I heard several occasions.
8       Q  Okay.  Tell me about the first one.  When
9    did it happen?
10      A  Just they requested to work in areas for
11   various reasons.  I don't recall exactly what they
12   were saying.  But I was not -- I was there.  I was
13   pretty much overhearing them work in those areas,
14   and they kept them in those areas.
15      Q  But you said, sir, you were there for
16   several times when white investigators asked to
17   work in the western suburbs, so when was the first
18   time that happened?
19      A  I don't recall exactly when was the first
20   time that it happened.  But, like I said, I would
21   hear it passing by or passing by their office that
22   they was working in where the deputy chief was and
23   overhearing it.  I wasn't literally --
24      Q  What -- who was present for the

128

1    conversation?
2       A  I don't recall exactly who was present.
3       Q  Okay.  What was said in the conversation
4    the first time?
5       A  Just that they wanted to work in the area.
6    They didn't specify.
7       Q  But you don't know who said that or when?
8       A  It's several people.  But like I said, I
9    have a roster.  It's been so long since I've
10   worked with them.  I've got to see the roster.  I
11   got a roster of individuals I was scheduled at
12   times to work with and those individuals that
13   requested it.
14      Q  But I guess what I'm trying to get at,
15   sir, is you're saying you recall specific
16   conversations?
17      A  Right.  I overheard specific
18   conversations.  They requesting to work by me
19   passing by.  I wasn't specifically in the room on
20   the day.  I was passing by or sometime they come
21   in there, for instance -- it's been so long.  I
22   have to look at the -- I have copies of all the
23   rosters, and those individuals that I have a copy
24   of the rosters has those individuals that you're

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

---

129

1 pertaining to requests in those areas and figure
2 out that they didn't work in the south side or the
3 west side.
4    Q  Can you -- as you sit here today, can you
5 identify a single individual that you witnessed,
6 overheard the conversation where they were
7 requesting -- a white investigator was requesting
8 to work on the west side -- sorry -- the western
9 suburbs.
10    A  Yes.  If I can -- it's been so long.  I
11 got a copy of the rosters if I'm allowed to get
12 it.
13    Q  I guess the problem with that, sir, is
14 that will just tell us who was working that day.
15 That won't tell us who you overheard a
16 conversation from.
17    A  Like I said, it was so long -- it was
18 happening.  Particular -- certain individuals that
19 it would happen.  I didn't keep a calendar of it
20 that was going on.  Like I said, I was passing by
21 when it was going on.  And I don't remember
22 exactly, but I do have a copy of the roster to
23 substantiate my statement that I'm making.  I just
24 don't offhand know their names, but I have proof

---

130

1 of the roster that it was going on.
2    Q  Well, and I don't dispute, sir, that a
3 roster exists with a bunch of names on it of all
4 the people who were assigned to work that day, but
5 that's very different than specific individuals
6 having conversations.  So I don't know what
7 looking at the roster is going to do for us,
8 unless you say Joe Smith said this to Director
9 Shields.
10    A  I could give you the names of the
11 individuals.  For instance, Dicumas --
12    Q  What are you reading from now, sir?
13    A  My roster.
14    Q  Okay.
15    A  Dicumas.  Several pages of going back.
16 Those are particular that I witnessed.  Dicumas
17 wanted to work in the western suburbs or
18 something.  But I don't remember the specific
19 times -- and dates and times that it actually
20 happened.
21    Q  So is it your contention that you've
22 overheard conversations with every one of those
23 white investigators requesting to be assigned to
24 the western suburbs?

---

131

1    A  Yes.  Not every -- yes.  But some of them
2 were partners, so both of them didn't come in and
3 ask, just maybe one of them, just a partner of
4 that person came in and asked.  Or, for instance,
5 if one particular officer working single-man unit,
6 he would go and request.
7    Q  Who?
8    A  Dicumas, for instance.
9    Q  When did that happen?
10    A  It happened quite frequently.  I don't
11 remember exactly the dates and times that it
12 happened.
13    Q  What did he say?
14    A  Put him in the area.
15    Q  Put me in the western suburbs?
16    A  Yes.
17    Q  How often did you ask to be put in the
18 western suburbs?
19    A  I asked pretty often to get a break out of
20 the western suburbs, but they already there, the
21 other investigators.  Then I have to stay on the
22 south side.
23    Q  And when was the last time you heard this
24 Investigator Dicumas ask to be assigned to the

---

132

1 western suburbs?
2    A  I don't recall exactly the dates and times
3 that it happened, but it had happened on several
4 occasions.
5    Q  When was the first time?
6    A  Again, I don't recall the exact dates and
7 times that it happened.
8    Q  More than ten years ago?
9    A  No.  It's been since 2019.  I was there
10 before I left to go to Division 5.
11    Q  That was the very first time that it
12 happened?
13    A  No.  I'm saying it's -- that was the last
14 time that -- that I previously remember before I
15 left the unit, prior -- before that, it was
16 happening all the time.
17    Q  You were just always walking by when they
18 happened to be talking about this?
19    A  I wasn't always walking by.  I'm only
20 talking about the time that I was walking by.  I
21 didn't walk by all the time, because our office --
22 their office was right across where you got our
23 equipment at.  So it wasn't not hard to overhear
24 someone talk.  Right across the hall -- they might

---

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

133

1 be in the hallway while passing through.
2    Q  Have you ever heard of an African American
3 officer being assigned to the western suburbs?
4    A  It's possible.  I doubt it.  I'm not sure.
5    Q  You're not sure.  Okay.  Do you know what
6 percentage of the EM unit investigators are
7 African American?
8    A  Pretty much large amount of us.
9    Q  All right.  Do you need a break?  Do you
10 want to take a five-minute break, or do you want
11 to keep going?
12    MS. KRAUCHUN:  I think a five-minute break
13 will be great, if you guys don't mind.
14    MR. WHITE:  Yeah.  No problem.
15    MS. KRAUCHUN:  Okay.  Perfect.
16    MR. WHITE:  We'll come back at about 1:06.
17    (A recess was taken.)
18 BY MR. WHITE:
19    Q  All right.  Mr. Newsom, we are back on the
20 record.  Do you understand you are still under
21 oath?
22    A  Yes, sir.
23    Q  Okay.  Backing up a little bit.  Earlier,
24 you know, we talked about this one lawsuit that

134

1 you were a part of long ago.  Have you ever been a
2 part of any other lawsuit, legal proceeding,
3 anything like that?
4    A  No.
5    Q  Have you ever gotten injured on the job,
6 on duty?
7    A  Yes.  Yeah.  I got injured, but it wasn't
8 -- yes.
9    Q  Okay.  Did you file a workers' comp claim
10 for it?
11    A  No.
12    Q  Okay.  Tell me just a little bit about the
13 injury.  When did it happen?
14    A  I mean, I didn't file it.  It just -- did
15 I -- was I -- I don't know.  I think I might have
16 hurt my hand one time.
17    Q  Hurt your hand?
18    A  Yes.
19    Q  How did you hurt your hand?
20    A  I might have -- trying -- someone was
21 resisting.
22    Q  Someone was resisting and you hurt your
23 hand?
24    A  Yes.  Resisting to arrest.

135

1    Q  Any other times that you remember you got
2 hurt on the job?
3    A  Like I said, I probably did before, but
4 did I report it?  No, I didn't.  I might have
5 reported it once or -- once.
6    Q  Okay.  And even times you didn't report
7 it, can you recall other times you were hurt on
8 the job?
9    A  That was quite frequently.  You know,
10 resist was resisting.  But it wasn't serious as to
11 -- whereas I had to go to the hospital or
12 something.
13    Q  Okay.  All right.  I want to get back to
14 talking about the assignments.  So the
15 high-incident, high-crime area assignments versus
16 the low-incident, low-crime areas.  Okay?  In
17 terms of job duties, was anything different
18 between, say, being assigned to the western
19 suburbs versus the south side?
20    A  Yes.
21    Q  Okay.  What was different about the job
22 duties?
23    A  Well, I think that like I said in -- most
24 of them on the south side or west side were more

136

1 severe cases that they're fighting, murderers, and
2 all that stuff, there's more of that on the south
3 side and the west side than in the western
4 suburbs, but they were there it the west, it was
5 just more on the south side than the western
6 suburbs.
7    Q  So I guess what I'm getting at, though, is
8 not necessarily participant population or
9 demograph.  I'm talking about investigator job
10 duties.  They were doing the same job in the
11 western suburbs as they were doing on the south
12 side, right?
13    A  Yes.
14    Q  The pay was the same?
15    A  Yes.
16    Q  The hours were the same?
17    A  Yes.
18    Q  Promotions, is there a process for
19 promotions in EM?
20    A  It was.
21    Q  And maybe I should be specific.  Let's
22 talk about the last five years, for example, what
23 was the process for promotions?
24    A  Well, it was promotions.  I mean, I never

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

35 (137 to 140)

---

137

1 really got into promotions. I didn't really think
2 of it much then. I wasn't involved in that,
3 because I wasn't interested.
4    Q  Okay. So you never applied for a
5 promotion?
6    A  No.
7    Q  Okay. Let's talk about the scabies
8 incident you referred to earlier. Okay? When did
9 that occur?
10    A  I'm not sure exactly when it occurred. I
11 just know what happened.
12    Q  Okay. Bear with me just a second. Okay.
13      MR. WHITE: Mr. Technician, if we could go
14 to exhibit -- I think I uploaded it. It's titled
15 Exhibit Newsom Medical Records. There we go.
16 Okay.
17      (Newsom Deposition Exhibit 5 marked for
18 identification and attached to the transcript.)
19    Q  Sir, so we see here on the first page it
20 says, triage, patient reports him and partner
21 exposed to scabies from suspect under arrest. And
22 this is dated at the top 12-27-2016; does that
23 refresh your memory that that is probably the date
24 on which this happened?

138

1    A  It's possible.
2    Q  Well, have you gone to the hospital for
3 treatment for scabies at other times?
4    A  No.
5    Q  Sorry to be personal.
6    A  I didn't even know scabies existed.
7    Q  Yeah. Okay. So this person on -- so it
8 looks like December 27, 2016. First of all, did
9 you go to the ER the same day you interacted with
10 this suspect?
11    A  Yes.
12    Q  Okay. And this was a person that was on
13 house arrest, correct?
14    A  Yes.
15    Q  And is it -- and the participant called EM
16 because he had a doctor's appointment; is that
17 right?
18    A  No. He was a -- me and my partner were
19 assigned there because of a curfew violation.
20    Q  Okay. So his electronic monitoring showed
21 he was out when he wasn't supposed to be; is that
22 right?
23    A  That's what they allege, yes.
24    Q  Okay. So dispatch called you and assigned

139

1 -- told you and Tims to go, what, check on him?
2    A  Yeah. Investigate it, yes.
3    Q  Okay. Did you look on the computer at his
4 file, profile, before you went in the house?
5    A  My partner was doing the paperwork. He
6 viewed it.
7    Q  Okay. And did Tims not tell you that the
8 record showed that this person had scabies?
9    A  I don't think he -- I'm not sure if he
10 noticed that until once we got up there when we
11 was about to reincarcerate him.
12    Q  Okay. But it was in the file, you could
13 have seen that at any time that this person had
14 scabies?
15    A  Like I said, I wasn't -- I was driving, so
16 I didn't have access to that. The computer was on
17 my partner's side. He was doing the paperwork.
18 He would say something pertaining to that, but we
19 still had to go in there to do the job.
20    Q  So you knew the person had scabies before
21 you went in the house?
22    A  No. We had knew that the person had been
23 in and out of the house. As far as it's possible
24 that I -- I didn't know. He might have told me,

140

1 but we came for his curfew violation, so I don't
2 know if he pulled the documentation going back as
3 far as when he looked at the incidents and when it
4 happened and everything prior to us going there.
5    Q  So if I understand you, you may or may not
6 have known if the person had scabies before you
7 went in the house?
8    A  Yes.
9    Q  And you testified that dispatch sent you
10 to this address, right?
11    A  Yes.
12    Q  It was not Director Shields that called
13 and told you to go to this address; right?
14    A  No, it was not.
15    Q  You told me earlier that you believe
16 Director Webb knew this person had scabies?
17    A  Yes.
18    Q  How do you know that?
19    A  Because once we were at the ER and once I
20 got to work and I happened to see him and he
21 stated that, yeah, we knew that, that he had
22 scabies, and I asked him, why didn't you, you
23 know, let us know, and he just shut it off.
24    Q  Do you think he knew that because it was

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

36 (141 to 144)

141

1  in the file on this participant that you and Tims
2  had access to?
3      **A  I don't know what his access was, why he**
4  **had it, but all I knew that he knew because I**
5  **confronted him.**
6      Q  Again, dispatch sent you there, though,
7  Webb did not send you there, correct?
8      **A  Yes.  But when I -- like I said, when I**
9  **passed him up and asked him about it, and he said**
10 **that he was aware that the incident -- that they**
11 **had given the subsequent permission to go back and**
12 **forth to the laundromat to keep their clothes**
13 **cleaned, they have to keep the contamination down,**
14 **he stated to me.**
15     Q  Did he tell you that they sent you and
16 Tims there because they wanted you to catch
17 scabies?
18     **A  No.  No.**
19     Q  What evidence do you have that Boyle knew
20 this participant had scabies?
21     **A  I don't know if -- if Boyle or whoever**
22 **knew.  I just knew I was dispatched.  When I**
23 **confronted, I asked Boyle -- not Boyle -- but**
24 **Webb, and Webb stated that he was aware of it.**

142

1      Q  Okay.  You never actually got scabies,
2  correct?
3      **A  No.**
4      Q  Did you -- and you were prescribed one
5  medication, correct?
6      **A  Yes.**
7      Q  It was like a skin cream?
8      **A  Yes.**
9      Q  Did you ever end up using it?
10     **A  Yes.**
11     Q  Why did you use it?
12     **A  Because it was something that prevents you**
13 **from having it if you already have the scabies, so**
14 **they recommend.  They didn't find none, but you**
15 **use the cream.  For contaminates, you throw away**
16 **the clothing.**
17     Q  Okay.  But you never actually yourself had
18 any evidence of scabies?
19     **A  No.**
20     Q  Did you have to pay any money related to
21 going to the ER?
22     **A  No, it was up under insurance.**
23     Q  Did you have to pay for the skin cream?
24     **A  Yeah, a co-pay.**

143

1      Q  Okay.  How much was your co-pay?
2      **A  I think it might have been $5 or $10.**
3      Q  Did you miss any work related to this
4  scabies incident?
5      **A  Yes.  For precautionary, I was off three**
6  **days.**
7      Q  Sorry.  I missed the first part of that.
8      **A  For precautionary, they recommended I was**
9  **off for three days to make sure.**
10     Q  Was that something that the ER doc
11 recommended -- or that was -- EM recommended that?
12     **A  No, that was something that I recommended**
13 **based I think on you feel that, you know, you had**
14 **something you got automatic work up to three days**
15 **paid and then you could take off.**
16     Q  Got it.  So you were paid for that time
17 that you were off for three days?
18     **A  Right.  Then I came back on the fourth**
19 **day.**
20     Q  Got it.  Okay.  We can put that exhibit
21 aside.  We are going to look at exhibit titled,
22 EEOC Charge.  Okay.
23     MR. WHITE:  Can we just scroll down to the
24 bottom, please?

144

1      Q  So, sir, I believe that's your signature
2  there down at the bottom under I.V. Newsom?
3      **A  Yes.**
4      Q  And is this a copy of the EEOC charge you
5  filed, it looks like, in October of 2017?
6      **A  Yeah.  It's kind of dark, but --**
7      Q  I know.  This is the copy I have as well.
8  If we scroll up to the top of it, you'll see
9  that's the EEOC charge number.  It looks like
10 there's a stamp there October 11 of 2017; do you
11 see that?
12     **A  Yes.**
13     Q  Okay.  So as far as you know, this is the
14 EEOC charge you filed in October 2017?
15     **A  Yes.**
16     MR. WHITE:  Okay.  If we could scroll down
17 to kind of the middle of the page, please.
18     Q  We see here it says, Date discrimination
19 took place; do you see that on the right-hand side
20 of the document?  It's underneath the box for
21 county.
22     **A  Oh, yes.**
23     Q  Okay.  So it says, Date discrimination
24 took place, and there's an area for earliest and

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

145

1  latest; do you see that?
2      A  Yes.
3      Q  So the earlier you listed as late 2005,
4  correct?  That's when you contend the
5  discrimination began?
6      A  Yes.
7      Q  So why did you wait 12 years to file an
8  EEOC charge if discrimination began in 2005?
9      A  Because, you know, I pretty much thought
10 things would change.  And as things got up and
11 started getting written up for particular things,
12 and things didn't get no better, so that's when I
13 decided to take action.
14     Q  12 years later?
15     A  Well, 12 years later, we had things happen
16 before that that I didn't put in a complaint.
17     Q  A lot of the defendants in this case
18 weren't even working for EM in 2005, right?
19     A  I don't know what they was working.  I
20 just know when I was working.
21     Q  Sorry.  But I'm talking about, you know,
22 the defendants like Shields and Ranzino and Neal,
23 Rohloff they weren't even if their management
24 positions in 2005, correct?

146

1      A  Yes, they were.
2      Q  Was Shields the executive director in
3  2005?
4      A  He was at some high capacity there.  I
5  don't know if he was a director, but he was still
6  up there.
7      Q  What about Neal?
8      A  Neal worked on another shift, so I don't
9  know -- I just know what shift he was on.  I don't
10 know what his capacity was.  I never interacted
11 with Neal.
12     Q  Is it your contention that the same people
13 making decisions in 2018 were the same people
14 making those decisions in 2005?
15     A  Yeah.  They always had rank.
16     Q  Same group?
17     A  Yeah.  Other people added on to that
18 during that time that came over from, you know,
19 various units that was working there, but those --
20 that's the persons that initially -- when I
21 started that was there.
22     Q  So, obviously, you know, no -- no adverse
23 employment action that happened more than 300 days
24 before your charge is at issue here, so why does

147

1  this talk about stuff that was in 2005?
2      A  Because -- you said prior -- after 2005?
3  I'm sorry.  I didn't understand your question.
4      Q  I'm just trying to figure out if, you
5  know, your claim can't be for anything before 300
6  days before you filed this, so we're talking
7  nothing before December 2016, so why do we have
8  all this stuff in here about 2005 if we can't
9  legally do anything about it.
10     A  Because I had issues.  I was over at the
11 jail over at that time.  At that time, I was in
12 Electronic Monitoring.  Before that, I was in Cook
13 County Jail before I came to Electronic Monitoring
14 in 2005.  That's when it started happening.
15     Q  Okay.  Let's look at -- so, sorry.  We
16 should have marked this Exhibit 5.  I'm not sure.
17     THE TECHNICIAN:  I believe this is Exhibit
18 6, Counsel.
19     MR. WHITE:  Exhibit 6.  Thank you.
20     (Newsom Deposition Exhibit 6 marked for
21 identification and attached to the transcript.)
22     Q  So now let's turn to what we will mark as
23 Exhibit 7 which are the -- how did I label this?
24 These are the Newsom/Dart Interrogatories.

148

1      (Newsom Deposition Exhibit 7 marked for
2  identification and attached to the transcript.)
3      Q  And, sir, these are the interrogatories --
4  answers that we got back from you to Defendant
5  Sheriff of Cook County Thomas J. Dart's
6  interrogatories, and if we could turn to the last
7  page.  And, again, this is your signature under
8  penalty of perjury that the answers are true to
9  the best of your knowledge, information, and
10 belief, correct?
11     A  Yes, sir.
12     Q  And you signed this on February 10th,
13 2020?
14     A  Yes, sir.
15     Q  Okay.  Let's turn to page 3 -- sorry.
16 Page 2.  And then it's going to turn over into
17 page 3.  So we asked you in interrogatory No. 3 to
18 identify and provide a detailed computation of
19 each and every category of damages that you claim
20 to have suffered as a result of defendants'
21 alleged actions.  Defendant specifically requests
22 that you provide an explanation of damages for the
23 calculation of each dollar amount for each
24 category.

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

149

1        And your answer starts on page 3, sir,
2 where you say you seek compensation for a number
3 of things, and I'd like to go through those. The
4 first thing is you say you seek compensation for
5 lost wages. What wages did you lose?
6      **A I don't even see that on here.**
7      Q Look on -- see where it says, Response:
8 See plaintiffs' initial Rule 26(a)(1) disclosures?
9      **A No. I'm on page 2.**
10      Q Look on the next page then.
11      **A It's not one there yet.**
12      Q Oh, okay. He's bringing it up for you.
13        Do you see where it says, Response, at the
14 top of the page?
15      **A Yes, I see it now.**
16      Q Okay. So the second sentence you say,
17 Plaintiff seeks compensation for a number of
18 things, and I want to talk through each of those.
19        So the first thing you say is, plaintiff
20 seeks compensation for lost wages. What wages do
21 you contend you lost out on?
22      **A Can you repeat that one more time?**
23      Q You tell us that the way you -- as a
24 result of the discrimination you allege in this

150

1 lawsuit, okay, you were damaged in certain ways.
2 One of the ways you were damaged is you said you
3 have lost wages. I'm asking you, what wages did
4 you lose? It may be none. I'm just asking the
5 question because you wrote it.
6      **A No, I don't recall losing wages.**
7      Q The second thing you list here is you seek
8 compensation for opportunities. What
9 opportunities did you lose?
10      **A I don't see any, because I never --**
11      Q You're not aware of any opportunities you
12 lost?
13      **A No. Other than -- just, I would say,**
14 **probably punitive damage and mental/emotional**
15 **anguish and distress.**
16      Q Okay. So let's go through each of these,
17 though. So you're saying you're not aware of any
18 opportunities you missed, right?
19      **A Yes.**
20      Q Okay. And we know you didn't miss out on
21 any promotions, because you said you never went
22 for any, right?
23      **A Yes.**
24      Q Do you believe you missed out on any

151

1 raises?
2      **A No.**
3      Q Do you believe you missed out on any
4 benefits?
5      **A Well, let's go back -- I'm sorry. Go back**
6 **to promotions. The reason why I didn't, because I**
7 **didn't think that I would be looked over anyway**
8 **for the promotions.**
9      Q Okay. But you never tried?
10      **A No. Because I didn't believe that I would**
11 **get any promotion, because at that -- when I was**
12 **there, they wasn't -- they kept changing**
13 **promotions -- change the criteria of the**
14 **promotion. The EM unit and they filed the**
15 **grievances, so they had the change the promotion**
16 **again going back and forth. So, pretty much, that**
17 **was the reason why I didn't have an opportunity to**
18 **get a promotion.**
19      Q Okay. But to be clear, you never applied
20 for a promotion?
21      **A No. The reason why was the reason why I**
22 **just stated to you, because they kept changing the**
23 **criteria back and forth. And then it had to go**
24 **through the union, and the union had to rectify,**

152

1 **and they had to rectify that they was under**
2 **different stipulations that was in compliance with**
3 **the union, so they had to modify it.**
4      Q Would you agree you need to apply for a
5 promotion to be considered for a promotion?
6      **A Yes.**
7      Q Do you believe you -- are you seeking
8 compensation for benefits? Do you believe you
9 lost any benefits?
10      **A No, I didn't lose any benefits.**
11      Q Do you believe you lost any future
12 retirement income?
13      **A No.**
14      Q Okay. Damages for humiliation, mental and
15 emotional anguish, and distress. Do you believe
16 you have suffered any of that as a result of
17 your alleged --
18      **A Yes. Damages, distress, emotional,**
19 **working in a hostile workplace. Yes.**
20      Q Okay. What are your symptoms like?
21      **A While there, just was stressful. I mean,**
22 **just to continue to request, battle for**
23 **assignments, and different things of that nature.**
24 **It was a continuous battle with the**

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

153

1  administration, nonstop.
2    Q  Have you seen any mental health treaters
3  for your stress?
4    A  No.  I know once I left, the stress was
5  gone.  So --
6    Q  Did you -- so were you suffering from this
7  stress since you started there in 2005?
8    A  No.  I never had that.  No.
9    Q  Okay.  When did the stress start?
10   A  It started -- I'm not sure what -- the
11 time that I was over there it was happening.  I
12 don't have an exact time or a year.
13   Q  I'm trying to figure out, if it wasn't in
14 2005, did it start five years later, ten years
15 later, did it start last year?
16   A  It possibly could have -- it pretty much
17 started maybe a year later or so once I got, you
18 know -- I don't have the exact time when it
19 started -- when the harassment -- not the
20 harassment but the assignments and different
21 things like that that I started noticing and
22 requesting.
23   Q  Do you feel humiliated?
24   A  Yes.

154

1    Q  Okay.  Apart from stress, do you have any
2  other physical symptoms?
3    A  No.
4    Q  Have you ever taken any medicine for your
5  stress?
6    A  I took -- no.  No.
7    Q  Let's go down to No. 5 in Exhibit 7.  So
8  this -- I'm going to kind of summarize it here,
9  but we asked you if you received any kind of
10 medical or mental health care treatment related --
11 as a result of defendants' conduct.  Okay?  And
12 your answer is actually on the next page.  So
13 let's go to page 4.  And here you refer to the
14 scabies incident.  You said, The ER doctor
15 examined me and prescribed me a couple of
16 different medications.  That's not correct, right?
17 You were only prescribed one medication?
18   A  You know what, it could have been one or
19 two.  I'm not sure what the document said.
20   Q  Okay.  Well, let's go back to the record.
21   A  I know it was some cream.  It could have
22 been one sort of cream.  I'm not sure.
23   Q  Okay.  Do you want to go back and look at
24 the medical records?  Do you remember anything

155

1  other than that one cream?
2    A  I vividly remember the cream.
3    Q  Okay.  Let's go back and look at the
4  medical records then.  It must be -- now, let's
5  see.  There we go.  All right.  What exhibit is
6  this?
7    THE TECHNICIAN:  This is Exhibit 5.
8    Q  So, Mr. Newsom, we are looking at
9  Exhibit 5 which is the medical records we
10 previously looked at.  Let's scroll down.  I think
11 it's on the last page.  No, second to -- wait.
12 Let's see.  Page -- give me just a second.  I'm
13 looking at my copy here.  Okay.  So it is on page
14 2, actually.
15      And it looks like you've already got it
16 there.  So it says, Current outpatient
17 prescriptions medication, permethrin, over the
18 counter name is ELEMITE, five percent topical
19 cream.  There's no other prescriptions listed
20 there.  Do you believe you got any other
21 medicines?
22   A  No.  If that's what they prescribed, then
23 that's what I took.
24   Q  Okay.  Great.  Do you have any social

156

1  media accounts?
2    A  No.
3    Q  Do you have a Facebook, a LinkedIn,
4  Instagram?
5    A  No.
6    Q  Nothing?
7    A  No.
8    Q  Not a big social media guy, huh?
9    A  Absolutely not.
10   Q  I'm the same way.  All right.  Let's look
11 at -- go back to Exhibit 7, the interrogatories.
12   MR. WHITE:  Can we please switch to
13 Exhibit 7?
14   THE TECHNICIAN:  I'm on Exhibit 7,
15 Counsel.  Do you not see the switch?
16   MR. WHITE:  Sorry.  I'm seeing the medical
17 records in front of me which I thought were
18 Exhibit 5.
19   MS. KRAUCHUN:  I had the interrogatories.
20   MR. WHITE:  Yeah.  I got it now.  Sorry
21 about that, guys.  Okay.  There we go.  Sorry
22 about that.  Too many windows open.  All right.
23 So let's go to No. 12, please.
24   Q  So we asked you to identify the basis of

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

157

1 your contention that the Cook County Sheriff fails
2 to adequately discipline, supervise, and control
3 its supervisory officers. We asked you to
4 identify each supervisor at issue.
5     And in response you said, Plaintiff states
6 that supervisors in the EM unit arbitrarily issued
7 discipline to the African American investigators,
8 were never held accountable for issuing erroneous
9 discipline after EM investigators filed numerous
10 grievances and complaints, putting the department
11 on notice of illegal practices.
12     What supervisors are you claiming
13 arbitrarily issued discipline to African
14 Americans?
15   **A  Well, you have Boyle, Passas, Logan.**
16 **Pretty much those three.**
17   Q  Okay. Those three? Do you claim that you
18 received discipline that was based on your race?
19   **A  No.**
20   Q  Okay. Looking at No. 13. We asked you to
21 identify all misconduct by supervisory officers
22 you allege was not properly and fully investigated
23 as alleged in your complaint.
24     And in response you said, Subject to and

158

1 without waiving the foregoing objection, plaintiff
2 states: See complaint. Does that mean all of
3 your claims of misconduct by supervisory officers
4 are in the complaint?
5   **A  That I can relate to, yes.**
6   Q  No. 14, we asked you to identify all facts
7 supporting your contention that defendants,
8 Ranzino, Shields, Neal, and Rohloff were unfit for
9 supervisory positions. And, again, you referred
10 us to the complaint. Does that mean that all of
11 your allegations supporting that are in the
12 complaint?
13   **A  Well, I didn't work that shift, so I could**
14 **only speak for Shields. He was in control of the**
15 **rosters.**
16   Q  So you don't know -- I mean, those guys
17 don't have anything to do with you, right?
18   **A  No. Can you raise it up, because I can't**
19 **really see it, the response?**
20   Q  Sure. Yeah. If we could scroll to page
21 7. There you go. There at the top of the page is
22 your response. It says, Objection, this
23 interrogatory calls for a narrative response.
24 Subject to and without waiving the foregoing

159

1 objection, plaintiff states: See complaint.
2   **A  Yes.**
3   Q  Okay. No. 15, we asked you to identify
4 all facts supporting your contention that the
5 disciplinary process and procedures do not
6 provide, quote, meaningful opportunity for an
7 unbiased determination of disciplinary actions.
8 And, again, you refer us to the complaint. Does
9 that mean all of your allegations related to
10 disciplinary actions are in the complaint?
11   **A  Say it one more time. I'm sorry.**
12   Q  So we asked you to identify all facts
13 supporting your contention that the disciplinary
14 process and procedures do not provide, quote,
15 meaningful opportunity for an unbiased
16 determination of disciplinary actions. That's
17 what you claim in the complaint. You referred us
18 to the complaint. Does that mean all of your
19 facts that support that contention are in the
20 complaint?
21   **A  Yes.**
22   Q  Okay. Let's turn to No. 17. We asked
23 you, Have you or anyone acting on your behalf had
24 any conversations, or do you know of any

160

1 statements with or by any person at any time with
2 regard to the matters referenced in your
3 complaint? And your response was, No. So you
4 never talked to anyone about allegations of
5 discrimination at EM, correct?
6   **A  No, that's not correct. I changed that.**
7 **I might have spoke with Tims about a different --**
8 **that I feel that was going on in the unit.**
9   Q  Did you talk to anybody besides Tims?
10   **A  No.**
11   Q  When did you have this conversation with
12 Tims?
13   **A  I don't remember exactly the year or**
14 **month.**
15   Q  Okay. Where did the conversation take
16 place?
17   **A  While we were working together in a car.**
18   Q  Okay. Who was present, if anyone, besides
19 you two?
20   **A  Just me and Tims.**
21   Q  What did he say to you? What did you say
22 to him?
23   **A  Other than, you know, different things**
24 **that he might have had in common with the**

161

1 administration, because he was a unit rep.
2    Q   What kind of stuff?
3    A   Different things going on.  Like I said,
4 based on the assignments, things of that nature.
5    Q   So we talked about the assignments, what
6 are the other things of that nature?
7    A   That's pretty much it.
8    Q   Assignments.  Okay.  I mean, you're saying
9 in your charge, at least, that this stuff started
10 back in late 2005, right?
11    A   Yes.
12    Q   Your testimony is in the intervening 15
13 years, you didn't talk to anybody about it besides
14 Tims?
15    A   I might have talked to people, but not in
16 detail.  So I might have talked to quite a few
17 people, you know, just by passing by, just by
18 conversation, but I would think that it would have
19 stopped, so -- we had investigators come and go,
20 so I might have spoke to people pertaining to it.
21    Q   So, sir, if you remember, you verified
22 under penalty of perjury that these answers were
23 true and correct to the best of your ability.
24    A   Yes.  I have.

162

1    Q   So I need more than, you know -- it says
2 here, no, I didn't speak to anybody, and, now,
3 you're telling me over the years there's all sorts
4 of people you talked to.  Which one is it?
5    A   I changed it to a yes.
6    Q   Yes.  And now we need to go through each
7 conversation.
8    A   Right.  The one that I can remember is
9 Tims.
10    Q   Okay.  So you don't remember specifically
11 talking to anybody else?
12    A   I might have spoken with someone, but, I
13 mean, I don't remember exactly who.  Just passing
14 by, just, you know, conversations we might have
15 had with different individuals.  So I don't recall
16 exactly the dates and times.  I'm sorry.  I didn't
17 hear you.
18    Q   Sorry.  I may have interrupted you.  I was
19 saying, these conversations you're saying you had
20 in passing, were they about African Americans
21 being assigned to the south and west side while
22 White investigators were assigned to the suburbs?
23    A   Yes.
24    Q   Okay.  But you don't remember who you

163

1 talked to, when you talked to, what you guys said?
2    A   I might have talked to Lopez.
3    Q   Is that the conversation we already talked
4 about in the locker room?
5    A   Yes.
6    Q   Anybody else besides Tims and Lopez?
7    A   No.
8    Q   All right.  Let's look at No. 20.  Here we
9 asked you if you'd ever been involved in any civil
10 action apart from this case either as a plaintiff
11 or a defendant.  And you said, None.  But we know
12 that's not true, right, because you were in this
13 case with a participant you already told me about?
14    A   Yes.
15    Q   Was that Charles Knowles?
16    A   I don't recall the participant's name.
17    Q   Okay.  So it looks like Charles Knowles to
18 you and JV Fairman in 1992; does that sound
19 familiar at all?
20       MS. KRAUCHUN:  Sorry, Ethan.  Can I just
21 interrupt you?  What number, specifically, are you
22 looking at?
23       MR. WHITE:  No. 20.
24       MS. KRAUCHUN:  Okay.  And you just said

164

1 his answer was no.  I'm not going to object that
2 that's not accurate.  His response was not no.
3       MR. WHITE:  His response was he denies the
4 same.  Fine.
5    Q   But we know that's not right, sir, because
6 we already know about this one lawsuit.  Do you
7 know who JW Fairman is?
8       MS. KRAUCHUN:  I'm just going to put
9 another objection.  This is improper impeaching,
10 and it doesn't correctly reflect the response in
11 No. 20, but go ahead.
12    Q   Sir.  In No. 20, are contending -- is your
13 answer there, subject to and without waiving this
14 objection plaintiffs denies the same; did you
15 intend that to mean, I was in a lawsuit in 1992?
16    A   I'm sorry.  Are you talking to me?  I
17 didn't hear.  I thought you was talking to Kelly.
18 What was your question again?
19    Q   So your answer to this question asking
20 with you if you've ever been in a civil action as
21 a plaintiff or a defendant you said, Plaintiff
22 denies the same.  And I'm asking you, did you mean
23 that to mean, I was a defendant in a lawsuit in
24 1992?

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

42 (165 to 168)

165

1    A   Yeah.  I was in -- I don't remember
2 exactly who it was, but I was a part of it.
3    Q   And why didn't you list that here?
4    A   There was no particular reason.  It wasn't
5 -- because it was -- oh, shoot.
6    Q   We can still hear you.
7    MS. KRAUCHUN:  We can hear you, I.V.
8    A   I don't know.  Because it never went
9 anywhere.
10   Q   Okay.  So I guess what we're -- we can
11 agree that it should have been included in No. 20,
12 right?
13   A   Yes.  Like I said, I didn't -- it had been
14 so long ago, so I didn't recall.
15   Q   Do you -- I --
16   A   In '92?  In '92?
17   MS. KRAUCHUN:  So approximately 30 years
18 ago.  Anyway, go ahead.
19   THE WITNESS:  I don't recall 30 years ago.
20   Q   Do you remember who JW Fairman is?
21   A   He was the director of the jail.  I don't
22 even remember -- that's a while back.
23   Q   Any other lawsuits, civil actions?
24   A   Not that I can recall at this time.

166

1 That's the same person that I had interviewed
2 with.
3    Q   Let's see.  So if we could go to No. 22,
4 we asked you to please state, list, and itemize
5 each item of expense, monetary loss, or any other
6 damage claimed by you in this action.
7    THE WITNESS:  Can I take five minutes,
8 because this iPad is about to die.
9    MR. WHITE:  You need five minutes?  That's
10 fine.  You want to take five minutes?
11   THE WITNESS:  Yes.  I need to charge.
12   MR. WHITE:  Let's take five minutes.
13 We'll come back on at 1:55.
14   (A recess was taken.)
15 BY MR. WHITE:
16   Q   Okay.  Mr. Newsom, we took a short break
17 there.  You understand you are still under oath?
18   A   Yes, sir.
19   Q   Okay.  Let's look again at Exhibit 7.  And
20 let's go to No. 22.  It looks like it's already up
21 on the screen there.  We asked you to please
22 state, list, and itemize each item of expense,
23 monetary loss, or any other damage claimed by you
24 in this action, other than lost income or wages as

167

1 described above, and with respect to each item,
2 provide some information.  You didn't provide us
3 anything, so is it true that you are not aware of
4 any other expense, monetary loss, or any other
5 damage claimed?
6    A   Yes.
7    Q   And, sir, if we were in a conference room
8 back in the old days and you had documents in
9 front of you, we would have just asked you to give
10 those to us so that we can photocopy them.  I'm
11 going to ask that you, you know, set those aside
12 so you can get them to your attorney so that she
13 can produce a copy of those to us to the extent
14 that we don't already have it, but we can follow
15 up with her with that.  But with that, I don't
16 have any further questions for you, and I
17 appreciate your time.
18   A   Thank you.  What do I do now?
19   MS. KRAUCHUN:  Sure.  So I'm actually just
20 going to ask a few clarification questions.  So
21 just bear with me here as I scroll through my
22 notes.
23   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
24 BY MS. KRAUCHUN:

168

1    Q   So Mr. Newsom, going back to -- Counsel
2 asked you if you believed that Ranzino was racist,
3 and I just want to clarify.  You stated that
4 didn't believe he was racist and that was based on
5 your personal knowledge, correct?
6    MR. WHITE:  Objection.  Leading.
7    A   Yes.
8    Q   I'm sorry.  What was your answer to that?
9    A   Yes.
10   Q   And then further on you also testified
11 that after your conversation with Tims you
12 answered that you did believe he was racist.  Was
13 that based on the information you learned from
14 Tims?
15   A   Yes.
16   Q   Okay.  And Counsel also asked you some
17 questions about the County's discrimination
18 policy; do you recall those questions?
19   A   Yes.
20   Q   And one specific question Counsel asked
21 you was if you had ever heard Ranzino use the
22 N-word; do you remember being asked that question?
23   A   Yes.
24   Q   And do you remember answering no to that

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

43 (169 to 172)

169

1 question?
2    A  Yes.
3    Q  And your answer no was based on you
4 personally hearing that, correct?
5    A  Yes.
6       MR. WHITE:  Objection.  Leading.
7    Q  Did you eventually come to learn that
8 Ranzino used the N-word in front of your
9 coworkers?
10   A  Yes.
11   Q  And you would agree with me that it's not
12 appropriate to file a grievance when you learned
13 information that was not firsthand; is that
14 correct?
15   A  Yes.
16   Q  Okay.  And then Counsel asked you a lot of
17 questions about discipline write ups.  Can you
18 explain to me who specifically writes up any
19 alleged discipline or policy violations?
20   A  The immediate supervisors, the supervisor,
21 the deputy chief, and the chief.
22   Q  So, basically, it's any supervisor that's
23 above you; is that correct?
24   A  Yeah.  Yes, ma'am.

170

1    Q  Okay.  And can you describe to me exactly
2 what a discipline write up looks like?
3    A  It basically was a -- first step of the
4 write up, dates, times, and then it goes into a
5 narrative.  Then after that --
6    Q  Okay -- sorry.  Go ahead.
7    A  -- then you wait for it, you know, you get
8 a next step.
9    Q  And just generally speaking, would you
10 have knowledge of other investigators receiving
11 discipline?
12   A  Yes.
13   Q  And, specifically, Black investigators?
14   A  Yes.
15      MR. WHITE:  Objection to foundation.
16   Q  And what about white investigators, would
17 you have knowledge of discipline they received?
18      MR. WHITE:  Objection to foundation.
19   A  Yes.  I would know the outcome.
20   Q  And based on your personal knowledge, do
21 you believe that Black investigators received more
22 discipline than white investigators for similar
23 violations?
24      MR. WHITE:  Objection to foundation.

171

1    A  Yes.
2    Q  And then I want to direct your attention
3 specifically to this incident that occurred in
4 October of 2019.  Counsel asked you a lot of
5 questions about a prisoner that got out -- got out
6 of your control, for lack of a better word, do you
7 know of any other investigators who had detainees
8 that escaped?
9    A  Yes.
10   Q  And do you know if they -- were they Black
11 investigators?
12      MR. WHITE:  Objection to foundation.
13   A  No, it's -- it's been whites, but once
14 they're written up, you heard nothing else about
15 it.
16   Q  So my question is, do you know of any
17 white investigators that had a detainee escape
18 from them that were removed from the EM unit?
19      MR. WHITE:  Object to form and foundation.
20   A  No.
21   Q  Do you believe that you were removed from
22 the EM unit because of this incident?
23   A  Yes.
24   Q  To your knowledge, did any of the

172

1 detainees -- any of the white investigators that
2 had detainees escape, did they end up with an OPR
3 case?
4    A  No --
5       MR. WHITE:  Objection to foundation.
6    A  -- I never heard of that.
7    Q  So you have no personal knowledge of any
8 white investigators ending up in OPR?
9    A  No.
10   Q  And then Counsel asked you questions about
11 why you waited so many days to sign that one
12 specific document, I believe that was Exhibit 2
13 regarding an incident on June 7th, 2016; do you
14 recall that questioning?
15   A  June of '17?
16   Q  June 7th of 2016.  It was a memo about an
17 incident that the narrative was not correct as you
18 testified earlier; do you remember what I'm
19 talking about?
20   A  The scabies incident or --
21   Q  No.  Exhibit 2.
22      MS. KRAUCHUN:  If we can have Exhibit 2 on
23 the screen, please.
24   A  Yes.

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

173

1    Q  Okay.  So my specific question is, when
2 you saw this, you testified that this did not
3 accurately reflect what transpired that day,
4 correct?
5    **A  Yes.**
6    Q  Okay.  So if you disagree with the author
7 of a write up and the narrative that they drafted,
8 how -- what is your remedy for that?  What can you
9 do to correct that, if anything?
10   **A  You just continue to go up the grievance**
11 **steps until someone higher up makes a decision.**
12   Q  And did you ever feel that there was a
13 meaningful process for that?
14      MR. WHITE:  Objection.  Asked and
15 answered.
16   **A  Can you repeat the question again?**
17   Q  So just did you ever feel that you could
18 challenge that and somebody take your challenge
19 seriously?
20      MR. WHITE:  Objection.  Asked and
21 answered.
22   **A  No, they never did.  They just kept**
23 **sending it up the chain of command.**
24   Q  Okay.  And then Counsel asked you a lot of

174

1 questions about your complaint about working with
2 Investigator Lera, I believe --
3    **A  Yes.**
4    Q  -- do you remember that -- do you remember
5 that question -- that line of questioning?
6    **A  Yes.**
7    Q  So let me ask you, why is it so important
8 to you to have a partner that you get along with
9 and trust?
10   **A  Because it's a safety issue when you're**
11 **working with someone that's going to pretty much**
12 **be on the same page that you are as far as safety**
13 **for both parties.**
14   Q  Okay.  And maybe you can expand on that a
15 little bit.  When you say safety, what exactly do
16 you mean by that?
17   **A  Well, when I say safety, when you get into**
18 **an altercation or you have to get into a physical**
19 **altercation that you feel that, you know, someone**
20 **has your back and you feel safe that they have**
21 **your back when you get into an incident or you get**
22 **into a conversation with an individual when they**
23 **get hostile, and then, you know, you feel that you**
24 **have that support when you're working with an**

175

1 individual investigator.
2    Q  And, to your knowledge, was -- were
3 changes of partners routinely granted to white
4 investigators?
5      MR. WHITE:  Objection to foundation.
6    **A  Yes.  Yes.**
7    Q  And how would you know that?  Would it
8 just have been something that you heard?  Or just
9 describe how you would know that they were granted
10 those changes.
11   **A  Based on heard, passing by, and along with**
12 **our roster with our assignments, copies of the**
13 **roster.**
14   Q  So would you have seen a roster before an
15 investigator requested a change?
16   **A  No.  They were asked prior before the**
17 **roster was made.**
18   Q  Okay.  And there was a lot of discussion
19 about the high-incident crime area.  I think --
20 digressing back, let me first -- strike that.
21      Let me start off, describe your process
22 when you get to work.  Where did you start your
23 tour of duty?
24      MR. WHITE:  Objection to form.

176

1    **A  On Rockwell.  23rd and Rockwell on the 6th**
2 **floor -- no, on the first floor.**
3    Q  Describe what happens.  When you get to
4 work -- when you first get to work -- what would
5 you do?
6    **A  When I first get to Rockwell, I go into**
7 **the locker room, and then I change.  Before we**
8 **would go on the sixth floor, but things changed,**
9 **so they brought us down to the first floor because**
10 **of asbestos on the sixth floor, so they started**
11 **having roll call on first floor.**
12   Q  Okay.  So you would have roll call, and
13 then what happened happen next?
14   **A  Then next then we would go out to our**
15 **cars, get our equipment, and go out to the streets**
16 **to work.**
17   Q  So regardless of where you live, you still
18 had to come to Rockwell first for roll call and to
19 start your tour of duty, right?
20   **A  Yes, ma'am.**
21   Q  Okay.  And you would agree with me that
22 the south side and west side is very much
23 different than the western suburbs or even Tinley
24 Park, correct?

Transcript of I.V. Newsom, Jr.

45 (177 to 180)

Conducted on July 6, 2020

177

1        MR. WHITE: Objection. Leading. Form.
2    **A  Yes.**
3     Q  And, sorry, bear with me.  I've got a
4  couple notebooks going here.  Would you say that
5  Black investigators were only assigned to Black
6  neighborhoods?
7        MR. WHITE: Objection to foundation.
8    **A  Yes.**
9     Q  So describe to me the types of detainees
10 that lived in the south and west sides.
11       MR. WHITE: Objection to form.
12   **A  Well, on the south side, that was more of**
13 **murders, but it's more of us on the program**
14 **opposed to in the western suburbs, so it's more**
15 **Blacks on there for murder and rape and things**
16 **like that.**
17    Q  So is it fair to say that the types of
18 detainees on the south and west side were more
19 violent criminals?
20   **A  Yes.**
21    Q  And you would agree -- would you agree
22 with me that the detainees in the western suburbs
23 or far south suburbs like Tinley Park and those
24 areas would be less violent detainees?

178

1        MR. WHITE: Objection to foundation.
2    **A  Yes.**
3     Q  And I believe you testified -- and I'm not
4  sure if it was clear -- but do you agree that you
5  regularly complained about assignments not being
6  appropriately rotated?
7    **A  Yes.**
8     Q  And where did you get the idea that these
9  assignments should be rotated?
10       MR. WHITE: Objection.  Asked and
11 answered.
12   **A  It was in the policy -- our deal and**
13 **cosigned with the Sheriff's Department.**
14    Q  Okay.  So that was in your CBA, correct?
15   **A  Yes.**
16    Q  And I think I asked this, but I'm not
17 sure, so I just want to -- so working close to
18 home didn't matter, because you had to go into the
19 office first for roll call, right?
20   **A  Yes.**
21       MR. WHITE: Objection. Leading.
22 Misstates prior testimony.
23    Q  So any assignments in regards to being
24 familiar with the area is not really how the

179

1  assignments were given?
2        MR. WHITE: Objection.
3     Q  Is that fair to say?  I'm sorry.  I didn't
4  hear you, I.V.
5    **A  Yes.**
6     Q  Okay.  And was it a regular practice that
7  the white investigators were the only ones
8  assigned to the suburbs?
9    **A  Yes.**
10       MR. WHITE: Objection to foundation.
11    Q  And of the white investigators that worked
12 on your tour of duty, how many of them had more
13 seniority than you?
14       MR. WHITE: Objection to foundation.
15   **A  None of them.**
16    Q  And did you ever challenge the assignment
17 based on seniority with your union?
18   **A  Yes.**
19    Q  And did you -- was there any outcome to
20 that challenge?
21   **A  No.**
22    Q  Do you recall what, if anything, you
23 learned when you grieved that?
24       MR. WHITE: Objection to form and

180

1  foundation.
2    **A  No.**
3     Q  And then, specifically, Counsel asked you
4  questions about Director Shields ever threatening
5  to fire you.  Did Director Shields ever threaten
6  you personally to fire you?
7        MR. WHITE: Objection.  Asked and
8  answered.
9    **A  No.**
10    Q  Okay.  But did you learn of him
11 threatening other Black investigators that he was
12 going to fire them --
13       MR. WHITE: Objection.  Foundation.
14    Q  -- or threaten to fire, rather?
15   **A  I might have.  I'm not sure.**
16    Q  And you testified earlier that you never
17 heard offensive language being used directly at
18 you, but did you come to learn that there was
19 offensive language, i.e., racial slurs used
20 towards other Black investigators?
21       MR. WHITE: Objection to foundation.
22 Leads testimony.
23   **A  Yes.**
24    Q  Okay.  And then in regards to the volume

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

46 (181 to 184)

181

1 of detainees on the south and west side, was the
2 volume of the detainees in those, what we have
3 called, high-incident areas more than that in the
4 western suburbs?
5     MR. WHITE: Objection. Form and
6 foundation.
7     A Yes.
8     Q And just by the nature of the detainees on
9 the south and west side, would you agree with me
10 that the assignments were more dangerous
11 situations?
12     A Yes.
13     Q And you were asked about why your EEOC
14 documents went back to 2005. Would you agree with
15 me that there was a culture in the EM unit that
16 treated Black investigators different from the
17 time you moved to that unit?
18     A Yes.
19     MR. WHITE: Objection. Leading,
20 foundation, form.
21     Q You recall Counsel asked you a lot of
22 questions about this scabies incident, right?
23     A Yes.
24     Q And you testified that you were off for

182

1 three days after that scabies exposure; is that
2 correct?
3     A Yes.
4     Q Did you have to take sick days for those
5 three days?
6     MR. WHITE: Objection. Asked and
7 answered.
8     A No.
9     Q So how were you compensated for those
10 three days?
11     MR. WHITE: Objection. Asked and
12 answered.
13     A Those was a part of -- I think our CBA
14 allowed three days off unless you go on disability
15 after that.
16     Q Okay. And then Counsel asked you a lot of
17 questions about promotions and applying for
18 promotions. Can you explain to me why you felt
19 there was no point in you applying for promotions?
20     MR. WHITE: Objection. Asked and
21 answered.
22     A Yes. One reason why I didn't is because
23 promotion, they have criteria based on whether
24 they felt others can pass the test. For instance,

183

1 they would take out people able -- they could take
2 the written test, but they couldn't pass the
3 physical, so they take that out to accommodate the
4 ones that they wanted in order to get promoted.
5 And so they went back and they had to change the
6 status of their promotion.
7     Q So did you feel it was meaningless for you
8 to try and apply for a promotion?
9     A Yes.
10     Q And based on your personal experience,
11 would you agree that Black investigators are
12 written up more often than white investigators?
13     MR. WHITE: Objection. Foundation.
14     A I didn't hear you. I'm sorry, Counselor.
15     Q So based on your personal knowledge and
16 experience, do you feel that Black investigators
17 were written up for alleged discipline violations
18 more than white investigators?
19     MR. WHITE: Objection to foundation.
20     A Yes. And the beginning part, it wasn't
21 appointment by supervisor. It was appointed for
22 years. They appointed who they wanted to be in
23 there, and it wasn't many of us being appointed
24 until the union filed a grievance and something to

184

1 that effect. I'm not sure. And they came up with
2 some test that they had to redo again.
3     Q So let me kind of parse it out. So when
4 you first arrived in the EM unit, supervisors were
5 appointed to their positions; is that what you
6 said?
7     A Yes.
8     Q Okay. I don't think I have any other
9 questions for right now.
10     MS. KRAUCHUN: So, Counsel, I don't know
11 if you have any follow up to that.
12     MR. WHITE: Just a few.
13     RE-EXAMINATION BY COUNSEL FOR THE DEFENDANTS
14 BY MR. WHITE:
15     Q Mr. Newsom, Counsel asked you, you know,
16 how you learned -- at some point in time you
17 learned Ranzino used the N-word, she said, in
18 front of coworkers. Is that referring to the
19 incident with Tims you've told us about?
20     A Yes.
21     Q Okay. When you got transferred -- when
22 you were transferred out of EM to Division 5, was
23 there any change in your pay?
24     A No. There wasn't no change in the pay,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

47 (185 to 188)

185

1  but what they did do was I had days that was
2  approved prior over there, and I had to go through
3  an aggravation where I had days I had already been
4  approved prior before the incident happened.  When
5  I went over to Division 5, they canceled all my
6  approved days, so, therefore, I had to go all over
7  there and get my approved days over there, and
8  they wouldn't approve my days, so I had to go
9  through -- when I was over there in Division 5,
10 because I had approved days from EM, but they
11 canceled all my days that were already approved
12 already.
13      MR. WHITE:  Thank you.  That's all I have.
14      MS. KRAUCHUN:  I have nothing else.
15      MR. WHITE:  All right.  We appreciate your
16 time, sir.
17      (Off the record at 2:24 p.m.)
18
19
20
21
22
23
24

186

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2
3      I, Courtney Petros, Registered
4  Professional Reporter, Certified Shorthand
5  Reporter and Notary Public, the officer before
6  whom the foregoing deposition was taken, do hereby
7  certify that the foregoing transcript is a true
8  and correct record of the testimony given; that
9  said testimony was taken by me and thereafter
10 reduced to typewriting under my direction; that
11 reading and signing was not requested; and that I
12 am neither counsel for, related to, nor employed
13 by any of the parties to this case and have no
14 interest, financial or otherwise, in its outcome.
15      IN WITNESS WHEREOF, I have hereunto signed
16 this 6th day of July, 2020.
17 My commission expires May 6th, 2023.
18
19
20      COURTNEY PETROS, RPR, CSR
21      NOTARY PUBLIC IN AND FOR THE
22      STATE OF ILLINOIS
23
24

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                        48

| A | | | |
|---|---|---|---|
| **a)(1** | 96:9, 145:13, | 34:20, 39:8, | **agree** |
| 149:8 | 146:23, 163:10, | 40:14, 47:15, | 6:12, 6:14, |
| **abide** | 164:20, 166:6, | 47:21, 48:8, | 13:3, 62:2, |
| 110:3 | 166:24 | 48:13, 48:23, | 75:10, 75:12, |
| **ability** | **actions** | 55:17, 112:22, | 76:1, 87:16, |
| 79:19, 161:23 | 148:21, 159:7, | 125:12, 133:2, | 88:24, 89:5, |
| **able** | 159:10, 159:16, | 133:7, 157:7, | 96:22, 99:12, |
| 11:21, 11:24, | 165:23 | 157:13, 162:20 | 99:19, 99:20, |
| 39:1, 81:19, | **acts** | **after** | 101:17, 101:18, |
| 183:1 | 125:5 | 40:14, 43:8, | 101:24, 102:5, |
| **above** | **actually** | 54:10, 58:5, | 106:20, 107:7, |
| 78:20, 104:22, | 33:20, 38:3, | 58:9, 64:17, | 107:17, 109:16, |
| 124:6, 167:1, | 50:12, 58:12, | 72:2, 73:7, | 111:8, 111:16, |
| 169:23 | 80:15, 90:17, | 80:22, 82:6, | 112:1, 152:4, |
| **above-noted** | 90:20, 104:23, | 93:12, 147:2, | 165:11, 169:11, |
| 96:19 | 111:18, 130:19, | 157:9, 168:11, | 176:21, 177:21, |
| **absolutely** | 142:1, 142:17, | 170:5, 182:1, | 178:4, 181:9, |
| 82:23, 156:9 | 154:12, 155:14, | 182:15 | 181:14, 183:11 |
| **access** | 167:19 | **again** | **agreed** |
| 139:16, 141:2, | **add** | 17:18, 30:16, | 116:1 |
| 141:3 | 123:10 | 45:8, 48:11, | **agreement** |
| **accommodate** | **added** | 55:9, 77:3, | 78:3, 121:14, |
| 8:24, 183:3 | 146:17 | 77:22, 101:18, | 121:16 |
| **according** | **address** | 112:8, 117:11, | **ahead** |
| 18:12, 32:2 | 20:7, 29:19, | 121:3, 124:10, | 33:18, 86:5, |
| **accountable** | 79:9, 79:16, | 126:14, 132:6, | 117:1, 164:11, |
| 157:8 | 100:17, 140:10, | 141:6, 148:7, | 165:18, 170:6 |
| **accounts** | 140:13 | 151:16, 158:9, | **all** |
| 156:1 | **addressed** | 159:8, 164:18, | 6:20, 8:6, 9:5, |
| **accurate** | 117:23 | 166:19, 173:16, | 14:24, 15:12, |
| 27:18, 28:6, | **addressing** | 184:2 | 17:6, 29:15, |
| 28:7, 164:2 | 89:10, 100:24 | **against** | 29:23, 30:20, |
| **accurately** | **adequately** | 20:9, 21:14, | 32:17, 34:12, |
| 173:3 | 157:2 | 22:3, 22:7, | 36:8, 36:19, |
| **acknowledge** | **administration** | 23:7, 23:14, | 36:20, 39:15, |
| 6:5 | 23:5, 26:7, | 36:12, 47:4, | 44:3, 45:13, |
| **across** | 35:2, 36:4, | 47:10, 47:15, | 48:24, 50:6, |
| 75:5, 76:16, | 36:13, 40:22, | 47:21, 48:10, | 58:18, 59:8, |
| 83:13, 132:22, | 42:8, 63:19, | 49:3, 49:16, | 63:4, 63:24, |
| 132:24 | 65:15, 153:1, | 50:1, 74:13, | 67:18, 69:7, |
| **acting** | 161:1 | 74:14, 122:6 | 70:13, 70:14, |
| 159:23 | **admissibility** | **aggravation** | 70:23, 72:16, |
| **action** | 6:7 | 185:3 | 72:21, 78:6, |
| 1:8, 2:6, 77:1, | **adverse** | **ago** | 81:8, 82:1, |
| 77:4, 77:7, | 146:22 | 7:13, 15:7, | 82:14, 93:7, |
| 89:10, 91:10, | **advised** | 132:8, 134:1, | 95:20, 96:24, |
| | 96:14, 99:7 | 165:14, 165:18, | 104:14, 106:1, |
| | **african** | 165:19 | 106:15, 109:5, |
| | 33:8, 34:18, | | |

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

49

109:10, 113:15,
114:9, 114:11,
114:12, 115:12,
115:20, 116:16,
117:5, 123:17,
123:18, 124:16,
124:19, 125:5,
128:22, 130:3,
132:16, 132:21,
133:9, 133:19,
135:13, 136:2,
138:8, 141:4,
147:8, 155:5,
156:10, 156:22,
157:21, 158:2,
158:6, 158:10,
159:4, 159:9,
159:12, 159:18,
162:3, 163:8,
163:19, 185:5,
185:6, 185:11,
185:13, 185:15

**allegation**
61:19

**allegations**
10:2, 158:11,
159:9, 160:4

**allege**
115:21, 116:20,
124:17, 124:20,
125:6, 138:23,
149:24, 157:22

**alleged**
82:9, 115:21,
119:3, 120:22,
121:21, 122:7,
124:9, 148:21,
152:17, 157:23,
169:19, 183:17

**allen**
87:21

**allow**
13:3

**allowed**
63:20, 129:11,
182:14

**almost**
25:19, 53:3

**alone**
103:24

**along**
9:23, 9:24,
42:5, 42:11,
97:23, 100:18,
174:8, 175:11

**already**
24:1, 42:6,
62:10, 62:11,
62:12, 62:20,
65:24, 72:2,
85:16, 100:14,
101:1, 101:2,
106:16, 114:23,
124:6, 131:20,
142:13, 155:15,
163:3, 163:13,
164:6, 166:20,
167:14, 185:3,
185:11, 185:12

**also**
4:12, 33:17,
33:19, 40:10,
55:23, 88:14,
92:19, 168:10,
168:16

**altercation**
174:18, 174:19

**always**
16:20, 27:6,
37:22, 52:15,
67:16, 126:24,
132:17, 132:19,
146:15

**american**
33:9, 34:18,
47:21, 48:13,
48:23, 112:22,
125:12, 133:2,
133:7, 157:7

**americans**
34:20, 39:8,
40:14, 47:16,
48:8, 55:18,
157:14, 162:20

**amount**
133:8, 148:23

**andrews**
97:12, 98:7,
98:9, 98:10,
98:12, 98:14,
98:18, 98:19,
98:21, 99:2,
99:3, 103:19,
103:21, 103:22,
104:1

**anguish**
150:15, 152:15

**anonymous**
36:17

**another**
8:16, 18:2,
22:2, 31:7,
40:12, 50:6,
51:22, 72:6,
86:11, 91:11,
93:22, 114:11,
146:8, 164:9

**answer**
8:15, 8:18,
12:11, 65:24,
126:9, 126:13,
149:1, 154:12,
164:1, 164:13,
164:19, 168:8,
169:3

**answered**
124:6, 168:12,
173:15, 173:21,
178:11, 180:8,
182:7, 182:12,
182:21

**answering**
8:14, 9:5,
168:24

**answers**
10:12, 10:16,
10:19, 12:14,
12:22, 114:24,
115:4, 148:4,
148:8, 161:22

**anthony**
2:5, 70:11

**antidiscrimination**
17:15

**antonio**
87:4

**any**
8:19, 9:8,
9:14, 10:23,
12:13, 12:22,
13:1, 13:4,
14:16, 14:21,
27:2, 28:3,
30:7, 30:16,
34:23, 36:1,
39:17, 42:2,
43:20, 44:19,
48:16, 49:15,
49:24, 50:18,
55:24, 66:21,
72:20, 77:20,
78:7, 78:8,
78:20, 82:21,
95:15, 99:23,
105:15, 109:9,
112:10, 112:12,
112:14, 112:20,
112:24, 113:3,
118:18, 119:9,
120:24, 122:3,
124:7, 124:11,
134:2, 135:1,
139:13, 142:18,
142:20, 143:3,
150:10, 150:11,
150:17, 150:21,
150:22, 150:24,
151:3, 151:11,
152:9, 152:10,
152:11, 152:16,
153:2, 154:1,
154:4, 154:9,
155:20, 155:24,
159:24, 160:1,
163:9, 165:23,
166:5, 166:23,
167:4, 167:16,
169:18, 169:22,
171:7, 171:16,
171:24, 172:1,
172:7, 178:23,
179:19, 184:8,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    50

184:11, 184:23,
186:13
**anybody**
7:16, 9:11,
13:3, 14:1,
33:1, 60:6,
62:7, 75:19,
76:24, 100:6,
102:13, 160:9,
161:13, 162:2,
162:11, 163:6
**anyone**
60:2, 61:20,
78:19, 78:23,
119:13, 159:23,
160:4, 160:18
**anything**
8:20, 9:1,
9:14, 13:1,
13:7, 13:11,
14:5, 18:18,
19:7, 19:11,
19:17, 22:17,
31:4, 38:22,
45:11, 47:7,
47:11, 65:9,
65:20, 67:22,
69:7, 70:15,
72:21, 73:20,
121:3, 122:12,
122:21, 123:7,
134:3, 135:17,
147:5, 147:9,
154:24, 158:17,
167:3, 173:9,
179:22
**anyway**
151:7, 165:18
**anywhere**
165:9
**apart**
154:1, 163:10
**apologize**
42:19, 50:23,
90:16
**applied**
137:4, 151:19
**apply**
152:4, 183:8

**applying**
182:17, 182:19
**appointed**
183:21, 183:22,
183:23, 184:5
**appointment**
138:16, 183:21
**appreciate**
41:9, 44:6,
167:17, 185:15
**appropriate**
169:12
**appropriately**
178:6
**approve**
185:8
**approved**
185:2, 185:4,
185:6, 185:7,
185:10, 185:11
**approximately**
7:5, 13:13,
14:12, 14:14,
15:6, 23:24,
53:5, 71:6,
118:3, 165:17
**arbitrarily**
157:6, 157:13
**arbitration**
105:12, 105:13,
106:2, 106:4
**area**
36:21, 36:24,
38:13, 38:19,
39:11, 61:12,
112:6, 112:11,
112:16, 113:13,
113:22, 114:10,
122:13, 122:16,
122:18, 122:22,
123:9, 123:14,
127:3, 128:5,
131:14, 135:15,
144:24, 175:19,
178:24
**areas**
11:13, 21:9,
32:1, 33:13,

33:14, 34:16,
34:17, 34:19,
34:20, 39:7,
48:1, 48:9,
48:12, 65:18,
66:14, 109:13,
109:16, 111:8,
111:17, 111:19,
111:23, 112:2,
112:8, 112:24,
113:3, 114:8,
114:9, 117:15,
125:15, 125:17,
125:18, 127:10,
127:13, 127:14,
129:1, 135:16,
177:24, 181:3
**around**
24:9, 32:12,
43:4, 57:18,
58:3, 80:10,
102:10
**arrest**
134:24, 137:21,
138:13
**arrived**
184:4
**article**
94:10
**asbestos**
176:10
**ashby**
4:13
**ashland**
80:16, 80:24,
81:3
**aside**
58:18, 95:22,
143:21, 167:11
**asked**
27:14, 56:3,
64:13, 101:15,
101:22, 101:24,
102:20, 103:22,
117:4, 119:1,
120:20, 121:19,
124:5, 124:16,
125:4, 125:10,

125:21, 125:24,
126:5, 126:6,
126:17, 127:5,
127:16, 131:4,
131:19, 140:22,
141:9, 141:23,
148:17, 154:9,
156:24, 157:3,
157:20, 158:6,
159:3, 159:12,
159:22, 163:9,
166:4, 166:21,
167:9, 168:2,
168:16, 168:20,
168:22, 169:16,
171:4, 172:10,
173:14, 173:20,
173:24, 175:16,
178:10, 178:16,
180:3, 180:7,
181:13, 181:21,
182:6, 182:11,
182:16, 182:20,
184:15
**asking**
9:6, 30:8,
50:23, 116:15,
126:18, 150:3,
150:4, 164:19,
164:22
**asks**
24:21
**ass**
57:20
**asshole**
99:18, 99:21,
101:23, 102:5
**assign**
112:4
**assigned**
21:11, 26:23,
28:12, 33:12,
33:13, 48:7,
92:3, 97:4,
107:4, 109:2,
109:7, 109:13,
109:17, 109:24,
110:7, 110:9,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020
51

110:13, 112:2,
112:6, 112:16,
112:22, 113:4,
113:12, 113:22,
114:2, 119:3,
125:22, 130:4,
130:23, 131:24,
133:3, 135:18,
138:19, 138:24,
162:21, 162:22,
177:5, 179:8
**assignment**
21:10, 109:3,
109:20, 112:19,
115:24, 116:1,
116:3, 116:6,
116:7, 116:11,
117:7, 117:21,
118:1, 118:5,
118:15, 119:8,
119:9, 119:12,
122:12, 179:16
**assignments**
21:11, 34:5,
61:11, 65:17,
66:14, 70:6,
71:15, 72:18,
73:23, 110:2,
111:17, 111:19,
111:23, 115:20,
116:17, 117:5,
117:14, 117:17,
117:18, 117:19,
118:9, 118:10,
118:12, 118:19,
119:3, 119:17,
120:21, 121:2,
121:5, 121:11,
135:14, 135:15,
152:23, 153:20,
161:4, 161:5,
161:8, 175:12,
178:5, 178:9,
178:23, 179:1,
181:10
**assigns**
112:11
**assist**
42:14, 43:4

**assistance**
56:12, 123:7
**assistant**
76:8, 87:19,
92:2
**assisted**
43:11
**associate**
51:10, 51:12,
51:14, 51:21
**assume**
9:5, 72:11
**assuming**
28:5
**assumption**
110:21
**attached**
5:7, 58:23,
86:22, 94:9,
96:2, 114:21,
137:18, 147:21,
148:2
**attempted**
122:18
**attended**
30:18
**attention**
171:2
**attorney**
6:12, 11:16,
65:8, 167:12
**attractive**
16:12
**august**
30:11
**author**
173:6
**automatic**
143:14
**automatically**
84:5
**avoided**
63:14
**aware**
16:22, 37:19,
63:24, 141:10,
141:24, 150:11,
150:17, 167:3

**away**
83:22, 142:15

**B**

**back**
8:2, 33:3,
37:6, 42:1,
43:6, 44:4,
57:14, 59:9,
59:18, 59:22,
60:10, 61:14,
65:4, 66:13,
83:2, 83:7,
83:9, 83:11,
83:12, 83:24,
85:19, 99:5,
100:16, 118:22,
123:2, 123:3,
123:17, 123:18,
124:4, 125:16,
130:15, 133:16,
133:19, 135:13,
140:2, 141:11,
143:18, 148:4,
151:5, 151:16,
151:23, 154:20,
154:23, 155:3,
156:11, 161:10,
165:22, 166:13,
167:8, 168:1,
174:20, 174:21,
175:20, 181:14,
183:5
**background**
15:1
**backing**
133:23
**backup**
34:23, 35:4,
42:12, 42:23,
43:1, 43:2
**backups**
34:24, 35:3
**bad**
31:13, 66:10,
103:6, 109:3,
109:8
**baked**
79:12

**ballpark**
28:2, 28:3
**baroni**
4:4
**base**
31:12, 56:7,
56:8, 110:15,
112:3, 121:5
**based**
6:8, 23:3,
23:13, 30:24,
31:14, 36:22,
37:3, 44:11,
47:8, 48:4,
48:5, 48:18,
49:16, 52:21,
56:7, 63:18,
109:17, 109:21,
109:22, 121:7,
143:13, 157:18,
161:4, 168:4,
168:13, 169:3,
170:20, 175:11,
179:17, 182:23,
183:10, 183:15
**basement**
106:11, 106:17,
106:18
**basic**
26:8
**basically**
29:17, 31:17,
65:16, 75:18,
79:6, 107:14,
107:22, 169:22,
170:3
**basing**
55:9
**basis**
25:18, 49:4,
115:22, 120:20,
121:10, 121:11,
156:24
**bates**
86:24, 87:2,
93:21
**battle**
152:22, 152:24

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

52

**bear**
137:12, 167:21,
177:3
**bearing**
6:20
**because**
8:11, 9:4,
12:17, 19:12,
21:3, 23:2,
24:24, 26:15,
27:11, 31:10,
36:1, 36:12,
37:20, 38:17,
41:5, 42:23,
47:22, 52:6,
52:11, 52:22,
52:24, 55:22,
59:1, 61:24,
62:19, 64:11,
64:15, 67:16,
72:6, 78:2,
78:17, 81:8,
81:13, 81:20,
83:17, 83:22,
84:21, 85:9,
85:13, 88:10,
89:6, 89:17,
97:11, 98:19,
99:1, 99:2,
100:23, 105:11,
105:15, 105:23,
107:22, 108:10,
111:11, 112:18,
122:17, 123:13,
125:1, 126:3,
126:24, 132:21,
137:3, 138:16,
138:19, 140:19,
140:24, 141:4,
141:16, 142:12,
145:9, 147:2,
147:10, 150:5,
150:10, 150:21,
151:6, 151:10,
151:11, 151:22,
158:18, 161:1,
163:12, 164:5,
165:5, 165:8,

166:8, 171:22,
174:10, 176:9,
178:18, 182:22,
185:10
**been**
6:16, 7:13,
8:2, 11:18,
13:15, 15:10,
15:11, 16:20,
20:3, 20:8,
23:7, 23:22,
24:24, 26:12,
37:20, 40:15,
43:17, 45:18,
46:5, 50:14,
50:17, 52:3,
54:2, 56:15,
58:11, 58:13,
58:17, 58:19,
64:2, 64:3,
64:9, 72:1,
73:3, 73:4,
73:5, 75:19,
90:20, 93:10,
97:5, 97:19,
101:4, 104:12,
104:21, 116:23,
118:2, 120:13,
128:9, 128:21,
129:10, 132:9,
134:1, 139:22,
143:2, 154:18,
154:22, 163:9,
164:20, 165:11,
165:13, 171:13,
175:8, 185:3
**before**
2:23, 7:3,
8:14, 8:15,
16:3, 24:7,
45:18, 73:9,
75:5, 76:8,
76:15, 77:20,
78:7, 78:8,
84:22, 85:14,
87:9, 91:14,
91:15, 93:24,
101:7, 112:18,

115:13, 120:3,
132:10, 132:14,
132:15, 135:3,
139:4, 139:20,
140:6, 145:16,
146:24, 147:5,
147:6, 147:7,
147:12, 147:13,
175:14, 175:16,
176:7, 185:4,
186:5
**began**
145:5, 145:8
**beginning**
21:21, 183:20
**behalf**
3:2, 3:11, 4:2,
159:23
**behavior**
88:12, 121:21
**behind**
100:16, 107:20
**being**
7:11, 16:14,
17:10, 21:2,
22:2, 22:6,
22:9, 22:10,
22:11, 22:15,
23:3, 27:2,
30:12, 33:12,
36:20, 44:12,
44:18, 46:16,
46:17, 47:4,
48:19, 53:12,
83:12, 84:24,
87:13, 100:17,
102:20, 107:4,
107:7, 107:8,
108:9, 108:12,
109:2, 109:13,
116:12, 125:6,
133:3, 135:18,
162:21, 168:22,
178:5, 178:23,
180:17, 183:23
**belief**
115:5, 148:10
**believe**
47:11, 49:3,

49:20, 55:18,
55:20, 56:3,
56:4, 56:6,
60:13, 62:14,
62:17, 65:20,
79:23, 87:24,
88:19, 92:10,
95:18, 95:20,
98:17, 106:5,
106:7, 109:20,
118:22, 121:12,
123:21, 140:15,
144:1, 147:17,
150:24, 151:3,
151:10, 152:7,
152:8, 152:11,
152:15, 155:20,
168:4, 168:12,
170:21, 171:21,
172:12, 174:2,
178:3
**believed**
37:17, 60:18,
62:19, 116:17,
168:2
**belong**
34:10, 34:15,
38:19, 120:14
**belonged**
38:14
**below**
120:19
**benefits**
151:4, 152:8,
152:9, 152:10
**besides**
160:9, 160:18,
161:13, 163:6
**best**
8:15, 59:7,
115:5, 148:9,
161:23
**better**
27:5, 145:12,
171:6
**between**
44:18, 51:11,
51:13, 54:13,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                          53

103:7, 135:18
**beyond**
18:18
**bid**
16:8, 16:9
**big**
156:8
**bike**
51:7, 51:22
**bikes**
51:7
**bind**
51:19, 51:20
**bit**
8:11, 15:1,
31:21, 34:13,
57:9, 63:7,
66:4, 74:7,
105:4, 109:12,
113:17, 133:23,
134:12, 174:15
**black**
32:18, 32:21,
34:9, 38:14,
38:20, 47:15,
48:18, 65:17,
67:1, 170:13,
170:21, 171:10,
177:5, 180:11,
180:20, 181:16,
183:11, 183:16
**blacks**
177:15
**block**
80:24
**blood**
103:6
**blow**
37:16, 38:3
**blowing**
36:15
**blown**
38:7
**books**
85:14, 85:16
**both**
15:22, 48:15,
51:22, 55:1,

131:2, 174:13
**bottom**
86:24, 92:13,
105:3, 124:15,
143:24, 144:2
**bouncing**
21:9, 33:3
**box**
144:20
**boy**
67:2
**boyle**
28:24, 42:1,
47:23, 141:19,
141:21, 141:23,
157:15
**break**
8:22, 31:21,
34:12, 47:19,
59:1, 60:3,
60:6, 65:7,
114:12, 131:19,
133:9, 133:10,
133:12, 166:16
**breakout**
59:12, 59:15,
64:22
**breathe**
81:6
**bringing**
149:12
**brook**
3:16
**brought**
176:9
**building**
54:3
**bullpen**
108:7, 108:17,
108:24
**bunch**
130:3

---
**C**
---
**cage**
108:19, 108:21
**cages**
81:14, 81:20

**calculation**
148:23
**calendar**
129:19
**call**
15:21, 26:13,
29:19, 40:19,
41:24, 46:16,
46:17, 51:14,
52:11, 52:20,
54:10, 54:20,
54:23, 56:6,
57:19, 80:20,
83:4, 99:21,
99:23, 104:20,
105:20, 110:4,
121:24, 176:11,
176:12, 176:18,
178:19
**called**
43:2, 43:3,
43:5, 65:22,
85:2, 85:13,
106:17, 108:20,
111:1, 116:24,
138:15, 138:24,
140:12, 181:3
**calling**
51:19
**calls**
24:21, 25:1,
26:16, 28:19,
28:23, 29:8,
29:13, 87:21,
158:23
**came**
40:13, 43:5,
43:10, 73:6,
73:9, 101:2,
101:3, 131:4,
140:1, 143:18,
146:18, 147:13,
184:1
**camera**
11:24
**cameras**
59:9
**can't**
7:17, 8:19,

9:8, 12:24,
21:14, 21:16,
27:11, 32:16,
56:7, 62:16,
68:22, 70:7,
78:17, 81:6,
93:20, 103:1,
125:23, 126:2,
147:5, 147:8,
158:18
**canceled**
185:5, 185:11
**capacity**
1:12, 1:14,
2:12, 2:14,
146:4, 146:10
**caption**
1:17, 2:1
**car**
42:9, 54:9,
80:5, 160:17
**care**
154:10
**career**
17:24, 18:8
**cars**
26:7, 81:4,
81:14, 81:20,
176:15
**case**
6:24, 7:7,
9:19, 35:8,
36:11, 43:18,
47:12, 57:5,
57:11, 76:20,
83:14, 83:15,
83:16, 126:2,
145:17, 163:10,
163:13, 172:3,
186:13
**cases**
11:10, 136:1
**catch**
81:10, 141:16
**category**
148:19, 148:24
**caucasians**
39:9

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    54

caught
81:11
cba
105:7, 109:22,
109:23, 110:3,
110:6, 178:14,
182:13
ccsemu
96:21
ccso
61:20
cecil
2:4, 69:9
cedric
87:4
certain
19:12, 32:1,
32:3, 36:24,
39:6, 39:7,
39:21, 53:15,
74:19, 103:5,
125:10, 126:4,
126:16, 129:18,
150:1
certificate
186:1
certified
186:4
certify
186:7
cetera
57:12
chain
173:23
challenge
173:18, 179:16,
179:20
chance
65:8, 96:4
change
64:1, 65:9,
96:22, 97:2,
102:20, 103:9,
103:12, 121:10,
145:10, 151:13,
151:15, 175:15,
176:7, 183:5,
184:23, 184:24

changed
109:6, 113:1,
160:6, 162:5,
176:8
changes
96:15, 99:7,
99:14, 100:2,
175:3, 175:10
changing
151:12, 151:22
charge
5:17, 143:22,
144:4, 144:9,
144:14, 145:8,
146:24, 161:9,
166:11
charged
111:13
charles
163:15, 163:17
chase
82:6
check
25:1, 52:10,
52:11, 139:1
checking
24:23, 41:20
chicago
3:7, 4:7, 32:4,
39:13, 40:12,
42:4, 48:1,
49:1, 61:7,
61:8, 81:11
chief
18:23, 19:1,
19:8, 19:15,
19:16, 19:17,
20:10, 23:11,
28:24, 29:1,
29:7, 29:15,
30:20, 42:2,
43:9, 43:11,
49:2, 49:11,
49:20, 57:19,
61:20, 62:2,
64:3, 64:5,
64:10, 64:16,
64:19, 76:8,

76:14, 77:23,
78:15, 78:16,
78:17, 87:19,
89:23, 90:15,
90:20, 90:23,
92:2, 92:11,
92:12, 92:16,
96:14, 99:7,
99:9, 99:10,
99:13, 101:20,
103:21, 125:10,
126:4, 126:16,
127:22, 169:21
chiefs
76:14
chitchat
27:8
chitchatting
26:6
choice
16:7
cholewa
87:21, 88:3,
88:4, 88:24,
89:14, 92:4,
94:9, 95:19,
122:9, 122:12,
122:15
cholewa's
88:11
christopher
2:12, 49:19
city
80:17, 80:18
civil
1:8, 2:6, 7:8,
163:9, 164:20,
165:23
claim
44:20, 134:9,
147:5, 148:19,
157:17, 159:17
claimed
41:13, 166:6,
166:23, 167:5
claiming
8:1, 157:12
claims
158:3

clarification
167:20
clarify
168:3
clean
41:1, 41:5
cleaned
141:13
clear
10:18, 44:13,
58:19, 151:19,
178:4
client
64:24
close
113:22, 178:17
closer
114:3
clothes
40:17, 41:1,
41:4, 141:12
clothing
142:16
co-employee
22:2
co-pay
142:24, 143:1
co-worker
22:6
cochran
57:21
com
3:9, 3:18, 4:9
combative
63:9
combatting
17:21
come
70:3, 85:3,
108:6, 108:21,
128:20, 131:2,
133:16, 161:19,
166:13, 169:7,
176:18, 180:18
comes
59:9, 77:7,
121:12
comfortable
55:19, 57:16,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                                55

64:12
**coming**
25:17, 34:10,
72:20
**comiskey**
113:10
**command**
173:23
**commander**
92:19
**commanders**
111:17, 111:18
**comment**
101:24
**commission**
186:17
**committed**
82:10
**common**
160:24
**communicate**
60:6
**comp**
134:9
**compensated**
182:9
**compensation**
149:2, 149:4,
149:17, 149:20,
150:8, 152:8
**complain**
47:3, 69:3,
70:8, 71:14,
71:17, 72:17,
73:22, 74:1,
118:9, 118:11,
118:14
**complained**
117:21, 118:1,
118:5, 118:19,
118:20, 178:5
**complaining**
69:6, 70:6,
87:20, 92:4,
94:19
**complaint**
5:11, 56:14,
56:17, 56:20,

56:24, 57:5,
58:21, 76:23,
115:22, 115:23,
117:8, 117:9,
119:4, 120:23,
121:20, 121:22,
121:23, 122:2,
123:19, 124:9,
145:16, 157:23,
158:2, 158:4,
158:10, 158:12,
159:1, 159:8,
159:10, 159:17,
159:18, 159:20,
160:3, 174:1
**complaints**
72:21, 117:14,
122:3, 157:10
**complete**
9:9
**compliance**
152:2
**computation**
148:18
**computer**
107:15, 139:3,
139:16
**computers**
18:5, 18:6
**concern**
88:11
**concerns**
123:8
**conclusion**
66:22
**conduct**
154:11
**conducted**
1:19, 2:19,
28:19, 28:23
**conference**
8:12, 167:7
**confirm**
30:17
**confronted**
141:5, 141:23
**connection**
87:11

**consider**
83:18, 109:2,
109:4
**considered**
152:5
**consistent**
70:4, 117:14
**contact**
28:10, 83:6
**contacted**
42:4
**contaminates**
142:15
**contamination**
141:13
**contend**
116:4, 122:2,
124:23, 145:4,
149:21
**contending**
164:12
**contention**
120:21, 130:21,
146:12, 157:1,
158:7, 159:4,
159:13, 159:19
**contesting**
75:19
**context**
123:20
**continue**
63:20, 127:2,
152:22, 173:10
**continued**
1:17, 2:1,
40:22, 127:1
**continues**
77:14, 88:11,
99:17, 101:15,
116:9, 121:4,
124:11, 124:18
**continuing**
41:2, 65:16
**continuous**
152:24
**contract**
75:23, 79:13,
110:3, 110:6,

110:17, 110:18,
120:24, 121:8,
121:13
**contracts**
110:23
**contribute**
65:21
**control**
157:2, 158:14,
171:6
**conversation**
35:15, 36:6,
38:2, 38:11,
38:23, 54:1,
54:6, 54:15,
58:1, 61:15,
62:1, 63:15,
68:4, 88:14,
88:19, 100:13,
127:6, 128:1,
128:3, 129:6,
129:16, 160:11,
160:15, 161:18,
162:7, 163:3,
168:11, 174:22
**conversations**
63:11, 63:12,
128:16, 128:18,
130:6, 130:22,
159:24, 162:14,
162:19
**convicted**
111:13
**cook**
1:10, 2:15,
6:23, 11:5,
15:13, 16:22,
17:16, 20:19,
91:9, 114:9,
147:12, 148:5,
157:1
**cooped**
53:13
**coordinator**
56:12
**copies**
117:22, 128:22,
175:12

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

56

**copy**
28:11, 120:14,
128:23, 129:11,
129:22, 144:4,
144:7, 155:13,
167:13
**corner**
43:5, 93:21,
105:3
**correct**
7:23, 10:21,
12:10, 12:14,
12:22, 13:24,
15:24, 16:21,
19:9, 19:23,
20:16, 27:17,
49:14, 50:22,
56:18, 60:20,
63:19, 75:16,
80:6, 88:7,
88:17, 89:24,
90:4, 90:7,
90:12, 90:18,
91:3, 92:19,
93:2, 93:8,
94:20, 94:23,
104:3, 110:19,
115:7, 115:13,
119:20, 120:16,
120:17, 122:9,
122:13, 125:18,
138:13, 141:7,
142:2, 142:5,
145:4, 145:24,
148:10, 154:16,
160:5, 160:6,
161:23, 168:5,
169:4, 169:14,
169:23, 172:17,
173:4, 173:9,
176:24, 178:14,
182:2, 186:8
**correction**
123:11
**correctional**
16:3
**corrections**
15:19, 91:10

**correctly**
103:23, 164:10
**cortez**
29:1, 64:4,
64:5, 64:19,
65:13, 87:4,
87:20, 89:9,
90:19, 90:22,
91:2, 91:18,
91:22, 92:2,
92:16
**cosigned**
178:13
**could**
36:1, 37:20,
42:17, 54:2,
55:13, 57:8,
58:11, 58:13,
58:16, 59:14,
78:19, 78:21,
86:14, 101:4,
104:12, 105:4,
108:2, 110:17,
114:8, 116:13,
120:16, 130:10,
137:13, 139:12,
143:15, 144:16,
148:6, 153:16,
154:18, 154:21,
158:13, 158:20,
166:3, 173:17,
183:1
**couldn't**
41:23, 81:21,
183:2
**counsel**
6:2, 6:6, 6:13,
6:17, 13:10,
14:3, 59:11,
117:4, 147:18,
156:15, 167:23,
168:1, 168:16,
168:20, 169:16,
171:4, 172:10,
173:24, 180:3,
181:21, 182:16,
184:10, 184:13,
184:15, 186:12

**counselor**
10:9, 43:15,
116:23, 126:11,
183:14
**counter**
155:18
**county**
1:10, 2:15,
6:23, 11:5,
15:13, 16:22,
17:16, 20:19,
91:9, 114:9,
144:21, 147:13,
148:5, 157:1
**county's**
168:17
**couple**
8:8, 25:19,
154:15, 177:4
**courses**
15:7
**court**
1:1
**courthouse**
57:11
**courtney**
1:24, 2:23,
186:3, 186:20
**coworker**
22:14, 46:2
**coworkers**
169:9, 184:18
**cracked**
81:7
**cream**
142:7, 142:15,
142:23, 154:21,
154:22, 155:1,
155:2, 155:19
**created**
9:21, 93:12
**crime**
32:5, 32:9,
39:8, 82:9,
175:19
**crimes**
111:13
**criminals**
177:19

**criteria**
151:13, 151:23,
182:23
**cross**
25:12, 31:19
**crossed**
92:21
**crossing**
25:8, 25:15
**csr**
1:24, 186:20
**cuffed**
108:24
**cuffs**
81:23, 82:3
**culture**
181:15
**curfew**
80:20, 138:19,
140:1
**curfews**
37:5
**current**
155:16
**cv**
1:9, 2:7

**D**

**daffada**
4:4
**daily**
25:18, 29:18
**damage**
150:14, 166:6,
166:23, 167:5
**damaged**
116:7, 122:6,
150:1, 150:2
**damages**
148:19, 148:22,
152:14, 152:18
**dangerous**
82:12, 82:15,
107:18, 111:12,
181:10
**dark**
144:6
**dart**
1:11, 5:18,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

57

147:24
**dart's**
148:5
**date**
20:13, 38:6,
43:14, 50:15,
57:12, 86:3,
86:23, 87:1,
94:14, 96:9,
96:20, 96:23,
99:13, 103:15,
118:14, 137:23,
144:18, 144:23
**dated**
87:4, 90:2,
93:4, 93:7,
94:14, 137:22
**dates**
118:16, 130:19,
131:11, 132:2,
132:6, 162:16,
170:4
**david**
2:5, 70:19
**day**
13:19, 25:5,
29:21, 30:22,
37:23, 40:18,
49:7, 64:15,
77:10, 78:10,
81:11, 81:12,
85:15, 89:22,
90:6, 90:9,
94:8, 97:1,
97:10, 98:17,
98:20, 104:4,
104:10, 106:24,
110:11, 128:20,
129:14, 130:4,
138:9, 143:19,
173:3, 186:16
**day-to-day**
121:10
**days**
13:20, 13:23,
18:4, 25:5,
25:21, 52:21,
64:17, 74:22,

93:13, 143:6,
143:9, 143:14,
143:17, 146:23,
147:6, 167:8,
172:11, 182:1,
182:4, 182:5,
182:10, 182:14,
185:1, 185:3,
185:6, 185:7,
185:8, 185:10,
185:11
**dc**
101:15, 101:19
**dead**
84:17
**deal**
178:12
**dealing**
111:11, 111:12
**december**
138:8, 147:7
**decide**
79:1, 89:20
**decided**
80:22, 145:13
**decides**
78:11
**decision**
16:7, 74:24,
75:1, 77:19,
77:23, 78:1,
78:5, 78:24,
110:13, 110:15,
119:7, 173:11
**decisions**
146:13, 146:14
**declare**
115:6
**defendant**
114:24, 124:12,
148:4, 148:21,
163:11, 164:21,
164:23
**defendants**
1:15, 2:17,
3:11, 4:2, 6:14,
6:17, 6:24,
124:7, 125:5,

145:17, 145:22,
148:20, 154:11,
158:7, 184:13
**deference**
122:19
**demograph**
136:9
**denies**
164:3, 164:14,
164:22
**deny**
125:11
**department**
10:3, 11:6,
18:11, 28:11,
42:4, 42:5,
76:22, 91:9,
121:15, 157:10,
178:13
**depending**
52:21, 74:21
**depends**
19:3, 25:5,
77:8, 77:22,
78:12, 83:21
**deposition**
1:18, 2:19,
5:9, 7:3, 8:6,
12:20, 13:5,
13:8, 14:2,
14:22, 58:22,
64:6, 86:21,
96:1, 114:20,
137:17, 147:20,
148:1, 186:6
**deputy**
18:22, 19:1,
19:7, 19:15,
23:11, 29:1,
49:20, 64:5,
64:10, 64:16,
64:19, 76:7,
76:14, 77:23,
78:15, 78:16,
89:23, 90:15,
90:23, 92:12,
96:14, 99:6,
99:9, 99:13,

101:20, 103:21,
127:22, 169:21
**derogatory**
55:17, 124:8,
124:13
**describe**
31:17, 74:8,
170:1, 175:9,
175:21, 176:3,
177:9
**described**
167:1
**destroy**
12:17
**detail**
161:16
**detailed**
63:11, 148:18
**detainee**
7:22, 7:23,
171:17
**detainees**
171:7, 172:1,
172:2, 177:9,
177:18, 177:22,
177:24, 181:1,
181:2, 181:8
**determination**
78:9, 159:7,
159:16
**determine**
89:24
**determined**
75:23
**determines**
76:1, 76:2,
76:4, 77:6,
109:23, 110:2,
110:6
**devry**
15:4
**dicumas**
130:11, 130:15,
130:16, 131:8,
131:24
**die**
166:8
**difference**
44:17, 51:11,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    58

51:13, 108:3,
109:9
**different**
11:12, 11:13,
16:9, 21:9,
24:3, 25:11,
25:21, 26:5,
26:7, 26:15,
31:24, 33:3,
34:6, 36:18,
36:20, 36:23,
37:5, 37:19,
37:20, 37:22,
77:15, 85:6,
98:3, 98:4,
109:19, 130:5,
135:17, 135:21,
152:2, 152:23,
153:20, 154:16,
160:7, 160:23,
161:3, 162:15,
176:23, 181:16
**differently**
48:17, 48:19,
125:7
**dig**
109:12
**digressing**
175:20
**direct**
171:2
**direction**
186:10
**directions**
27:5
**directly**
180:17
**director**
30:2, 34:6,
34:11, 38:18,
43:2, 43:9,
44:7, 57:20,
63:4, 63:5,
64:8, 64:12,
76:9, 88:15,
89:9, 89:23,
90:3, 90:11,
90:12, 90:21,

90:22, 92:22,
110:1, 123:22,
124:1, 130:8,
140:12, 140:16,
146:2, 146:5,
165:21, 180:4,
180:5
**disability**
182:14
**disagree**
75:15, 77:11,
89:6, 92:8,
173:6
**disagreed**
116:2, 116:3
**disciplinary**
77:1, 77:4,
91:10, 96:9,
159:5, 159:7,
159:10, 159:13,
159:16
**discipline**
69:4, 70:9,
71:18, 74:1,
74:5, 74:18,
75:19, 76:2,
76:5, 76:12,
76:18, 77:18,
77:19, 79:2,
79:10, 79:17,
82:21, 82:24,
83:20, 95:10,
95:11, 104:15,
104:18, 106:7,
123:24, 124:16,
124:19, 125:1,
157:2, 157:7,
157:9, 157:13,
157:18, 169:17,
169:19, 170:2,
170:11, 170:17,
170:22, 183:17
**disciplined**
22:15, 124:24
**disclosures**
149:8
**discriminated**
20:3, 20:9,

47:4, 47:14,
48:10, 49:3
**discriminates**
47:10, 47:21,
49:16, 50:1
**discriminating**
21:8
**discrimination**
16:23, 17:8,
17:14, 17:21,
18:8, 18:14,
20:1, 20:18,
48:3, 144:18,
144:23, 145:5,
145:8, 149:24,
160:5, 168:17
**discriminatory**
115:21, 116:5,
116:12, 116:17,
116:20, 124:17,
124:20, 124:24
**discussion**
65:2, 175:18
**disparity**
39:5
**dispatch**
11:10, 34:4,
34:5, 36:19,
36:23, 36:24,
37:2, 37:12,
37:14, 42:1,
67:17, 138:24,
140:9, 141:6
**dispatched**
36:20, 37:9,
40:12, 40:13,
141:22
**dispatcher**
35:20
**dispatchers**
34:4
**disposition**
105:6
**disproportionate**
116:6
**dispute**
130:2
**distress**
150:15, 152:15,

152:18
**district**
1:1, 1:2
**division**
1:3, 75:6,
83:3, 83:9,
83:10, 83:24,
85:4, 85:19,
106:18, 132:10,
184:22, 185:5,
185:9
**doc**
143:10
**doctor**
154:14
**doctor's**
138:16
**document**
12:7, 39:24,
56:21, 57:12,
86:17, 87:6,
91:11, 91:14,
92:14, 93:12,
93:22, 93:24,
94:2, 144:20,
154:19, 172:12
**documentation**
11:11, 13:9,
140:2
**documents**
10:23, 13:14,
13:18, 14:16,
14:19, 39:1,
39:4, 39:10,
39:17, 39:19,
39:22, 40:9,
41:12, 41:13,
41:15, 41:16,
41:17, 43:13,
43:14, 43:16,
43:21, 105:15,
105:16, 105:17,
105:22, 116:13,
116:14, 116:15,
117:4, 167:8,
181:14
**doing**
8:11, 19:7,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                                  59

19:10, 19:17,
21:15, 24:22,
25:2, 32:22,
34:24, 37:5,
52:13, 52:14,
68:2, 81:4,
107:14, 107:18,
108:18, 109:4,
115:15, 118:2,
136:10, 136:11,
139:5, 139:17
**dollar**
148:23
**done**
62:20, 111:19,
117:2, 120:24
**door**
107:21
**doors**
81:16, 107:19
**doubt**
104:13, 133:4
**down**
31:21, 34:12,
47:19, 57:2,
85:13, 91:13,
92:13, 93:20,
105:4, 105:23,
108:6, 108:11,
120:19, 125:3,
141:13, 143:23,
144:2, 144:16,
154:7, 155:10,
176:9
**drafted**
91:17, 173:7
**driving**
139:15
**due**
40:17, 83:3,
88:11
**duly**
6:16
**dumb**
57:20
**during**
60:2, 60:6,
62:9, 146:18

**duties**
135:17, 135:22,
136:10
**duty**
44:1, 96:16,
99:8, 99:15,
100:2, 134:6,
175:23, 176:19,
179:12

---
**E**
---
**e-mail**
14:7, 122:1
**e-mailed**
83:6, 85:2
**each**
25:8, 25:9,
28:1, 73:14,
121:20, 124:6,
148:19, 148:23,
149:18, 150:16,
157:4, 162:6,
166:5, 166:22,
167:1
**earlier**
38:12, 87:12,
87:24, 109:12,
112:7, 133:23,
137:8, 140:15,
145:3, 172:18,
180:16
**earliest**
144:24
**early**
15:8, 15:9,
37:7, 85:17
**easier**
117:10
**east**
81:1
**eastern**
1:3
**easy**
50:5
**education**
15:2
**eeoc**
5:17, 22:15,

22:18, 143:22,
144:4, 144:9,
144:14, 145:8,
181:13
**effect**
60:14, 184:1
**either**
49:13, 163:10
**electronic**
7:21, 11:6,
15:3, 15:4,
15:7, 15:20,
15:22, 21:12,
28:10, 138:20,
147:12, 147:13
**elemite**
155:18
**else**
11:2, 13:11,
33:1, 36:5,
38:22, 54:11,
64:11, 65:20,
66:15, 75:19,
76:24, 94:3,
97:14, 100:6,
102:14, 103:14,
114:5, 119:13,
162:11, 163:6,
171:14, 185:14
**em**
15:21, 16:1,
16:6, 16:13,
16:18, 24:2,
24:7, 45:19,
46:2, 46:7,
46:13, 46:22,
50:14, 50:20,
55:12, 61:21,
68:5, 69:4,
71:18, 72:2,
73:3, 73:23,
74:2, 74:4,
80:1, 83:7,
85:19, 85:23,
111:9, 133:6,
136:19, 138:15,
143:11, 145:18,
151:14, 157:6,

157:9, 160:5,
171:18, 171:22,
181:15, 184:4,
184:22, 185:10
**emery**
3:13
**emotional**
150:14, 152:15,
152:18
**employed**
186:12
**employee**
67:1, 77:1,
77:4, 79:9,
93:1, 96:8,
119:6, 119:8
**employee's**
105:6, 119:7,
119:11
**employees**
119:5
**employment**
146:23
**end**
89:22, 104:4,
142:9, 172:2
**ended**
27:9, 83:8,
101:12, 103:12,
104:6, 104:10,
105:11
**ending**
172:8
**ends**
75:12, 89:8
**englewood**
32:5, 39:14
**enough**
31:6, 62:6,
85:14, 85:20
**enter**
40:21
**entercounting**
16:15
**entered**
96:21
**entitled**
91:9

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                          60

entrance
41:24
environment
60:14, 60:19,
61:3, 61:10
equipment
132:23, 176:15
er
138:9, 140:19,
142:21, 143:10,
154:14
erroneous
157:8
escape
83:1, 83:17,
83:22, 171:17,
172:2
escaped
80:23, 171:8
escapes
85:1, 85:7
esquire
3:3, 3:12, 4:3
estimate
58:15
et
57:12
etc
20:15, 75:16
ethan
3:12, 6:13,
6:22, 58:24,
163:20
even
36:1, 46:22,
68:23, 70:14,
71:9, 117:17,
135:6, 138:6,
145:18, 145:23,
149:6, 165:22,
176:23
event
82:22
eventually
65:14, 81:10,
104:9, 169:7
ever
7:2, 26:9,

26:18, 26:20,
29:8, 37:16,
38:3, 39:17,
41:23, 45:5,
45:8, 45:10,
46:19, 47:3,
53:16, 62:22,
66:24, 67:4,
67:14, 68:4,
68:20, 68:23,
69:3, 69:6,
69:11, 69:18,
70:5, 70:8,
71:2, 71:14,
71:17, 72:17,
107:11, 111:22,
113:20, 124:1,
124:21, 124:23,
126:22, 133:2,
134:1, 134:5,
142:9, 154:4,
163:9, 164:20,
168:21, 173:12,
173:17, 179:16,
180:4, 180:5
everhart
4:13
every
18:1, 29:21,
103:8, 118:4,
118:6, 121:20,
124:6, 130:22,
131:1, 148:19
everybody
50:24, 98:15
everything
90:17, 140:4
evidence
47:19, 141:19,
142:18
ewhite@emerylawl-
td
3:18
exact
43:14, 58:12,
58:14, 132:6,
153:12, 153:18
exactly
9:6, 24:4,

35:23, 53:21,
54:3, 55:2,
127:11, 127:19,
128:2, 129:22,
131:11, 132:2,
137:10, 160:13,
162:13, 162:16,
165:2, 170:1,
174:15
examination
5:2, 6:17,
167:23
examined
154:15
example
66:9, 66:10,
121:24, 136:22
excessive
69:4, 70:9,
71:18
excuse
53:7
executive
63:5, 88:15,
89:8, 89:23,
146:2
exhibit
5:11, 5:12,
5:13, 5:14,
5:16, 5:17,
5:18, 56:10,
56:16, 58:18,
58:21, 58:22,
86:12, 86:13,
86:20, 86:21,
93:16, 95:22,
95:23, 96:1,
99:5, 101:15,
104:24, 114:16,
114:18, 114:20,
117:11, 118:23,
123:4, 123:5,
123:19, 124:4,
125:4, 137:14,
137:15, 137:17,
143:20, 143:21,
147:16, 147:17,
147:19, 147:20,

147:23, 148:1,
154:7, 155:5,
155:7, 155:9,
156:11, 156:13,
156:14, 156:18,
166:19, 172:12,
172:21, 172:22
exhibits
5:9, 56:15
existed
138:6
exists
130:3
expand
174:14
expected
52:14
expense
166:5, 166:22,
167:4
experience
31:6, 31:7,
31:18, 44:11,
56:7, 56:8,
183:10, 183:16
experienced
44:12
experiencing
20:1
expires
186:17
explain
48:20, 115:23,
116:6, 120:20,
169:18, 182:18
explains
39:15
explanation
148:22
exposed
137:21
exposure
182:1
extent
167:13

F

face
108:22, 108:24

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    61

facebook
156:3
fact
6:9, 40:17,
42:22, 54:8,
54:19, 56:5,
88:2, 91:5
facts
48:9, 48:16,
66:21, 112:15,
158:6, 159:4,
159:12, 159:19
fails
157:1
fair
18:7, 25:23,
50:16, 78:21,
84:19, 177:17,
179:3
fairman
163:18, 164:7,
165:20
fall
35:24
familiar
20:23, 21:1,
39:12, 49:8,
49:19, 77:2,
112:2, 112:24,
113:3, 113:15,
113:18, 163:19,
178:24
familiarity
113:6
familiarized
114:8
family
26:6
far
11:18, 12:20,
21:9, 31:3,
43:16, 43:19,
43:20, 44:11,
51:20, 52:16,
57:5, 60:20,
60:21, 68:13,
72:9, 82:14,
84:16, 91:22,

98:3, 110:8,
113:11, 121:9,
139:23, 140:3,
144:13, 174:12,
177:23
father
41:6
favor
64:21
february
15:14, 86:3,
115:10, 148:12
fed
85:18
feel
20:8, 21:2,
55:19, 64:12,
143:13, 153:23,
160:8, 173:12,
173:17, 174:19,
174:20, 174:23,
183:7, 183:16
felt
23:6, 23:14,
47:3, 112:18,
182:18, 182:24
female
47:10, 47:22,
48:8, 48:24,
49:3, 49:16,
50:1
females
47:13, 47:15,
47:21, 47:24,
48:10, 48:17,
48:18, 48:23
ferguson
2:4, 68:7,
68:8, 68:10,
68:15, 68:21,
69:3
few
13:22, 29:9,
161:16, 167:20,
184:12
field
88:12
fighting
136:1

figure
27:13, 27:23,
28:7, 41:12,
44:17, 45:1,
51:1, 55:21,
59:7, 129:1,
147:4, 153:13
file
19:19, 19:21,
20:5, 20:6,
20:10, 20:12,
23:9, 23:11,
23:13, 23:17,
57:10, 62:18,
74:12, 74:13,
74:15, 74:16,
76:7, 76:20,
76:22, 76:23,
77:8, 78:2,
84:23, 134:9,
134:14, 139:4,
139:12, 141:1,
145:7, 169:12
filed
9:19, 13:16,
57:5, 62:10,
62:13, 76:13,
117:13, 119:10,
123:24, 144:5,
144:14, 147:6,
151:14, 157:9,
183:24
fimr
3:4
final
76:15, 104:24,
105:20
finally
102:8
financial
186:14
find
42:3, 142:14
fine
44:24, 59:5,
114:14, 164:4,
166:10
finish
8:13, 8:15

fire
42:5, 124:2,
180:5, 180:6,
180:12, 180:14
fired
123:23
first
7:2, 8:10,
18:3, 22:9,
23:11, 24:9,
33:5, 33:6,
52:5, 57:4,
58:8, 77:20,
78:1, 78:9,
78:14, 84:24,
87:3, 91:24,
114:24, 115:2,
117:24, 127:8,
127:17, 127:19,
128:4, 132:5,
132:11, 137:19,
138:8, 143:7,
149:4, 149:19,
170:3, 175:20,
176:2, 176:4,
176:6, 176:9,
176:11, 176:18,
178:19, 184:4
firsthand
169:13
fit
112:18
five
18:4, 27:15,
28:22, 50:17,
50:19, 78:10,
136:22, 153:14,
155:18, 166:7,
166:9, 166:10,
166:12
five-day
75:11, 75:13
five-minute
133:10, 133:12
floating
32:12
floor
176:2, 176:8,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                      62

176:9, 176:10,
176:11
**follow**
22:8, 23:8,
23:17, 74:19,
167:14, 184:11
**followed**
80:1, 80:3
**following**
40:10, 48:21,
64:15, 94:8
**follows**
6:16
**forced**
87:13
**foregoing**
115:7, 158:1,
158:24, 186:6,
186:7
**forgot**
83:6, 104:20
**form**
77:1, 77:2,
77:4, 77:7,
91:10, 96:9,
105:2, 121:23,
171:19, 175:24,
177:1, 177:11,
179:24, 181:5,
181:20
**formalities**
16:9
**formally**
6:3
**format**
121:23
**forms**
115:22
**forth**
33:3, 141:12,
151:16, 151:23
**found**
68:13
**foundation**
170:15, 170:18,
170:24, 171:12,
171:19, 172:5,
175:5, 177:7,

178:1, 179:10,
179:14, 180:1,
180:13, 180:21,
181:6, 181:20,
183:13, 183:19
**four**
27:15, 74:11,
75:2, 75:5,
78:5, 86:5
**fourth**
143:18
**frame**
19:12, 27:20,
28:21
**frequently**
131:10, 135:9
**friend**
51:12, 51:13
**friendly**
31:3, 31:16,
31:19, 44:15,
63:9, 67:18,
68:15, 69:19,
71:10, 71:11
**friends**
24:12, 45:21,
51:2, 51:3,
51:8, 71:7,
73:17
**front**
9:15, 9:18,
10:20, 10:24,
11:2, 56:20,
56:21, 86:16,
87:7, 96:3,
114:22, 156:17,
167:9, 169:8,
184:18
**fucking**
102:5
**full**
9:8
**fully**
157:22
**further**
80:22, 167:16,
168:10
**future**
152:11

**G**

**gain**
41:23
**gaines**
28:24, 43:11
**gave**
41:13, 41:15,
41:16, 81:17,
81:21, 90:11,
90:15, 94:16
**gender**
21:19, 48:4,
48:5, 48:24,
49:4, 49:17
**general**
28:2, 28:3,
61:24
**generally**
170:9
**getting**
25:13, 25:14,
25:16, 32:6,
58:20, 61:14,
66:13, 75:2,
85:19, 107:13,
108:15, 136:7,
145:11
**give**
9:8, 13:4,
28:21, 29:23,
34:22, 39:21,
39:22, 50:19,
90:14, 96:4,
116:16, 116:18,
120:16, 121:3,
123:20, 130:10,
155:12, 167:9
**given**
7:2, 11:15,
43:17, 64:2,
94:10, 117:4,
117:6, 141:11,
179:1, 186:8
**giving**
40:15, 40:24,
41:4, 58:15
**glanced**
13:23

**glass**
108:19
**goes**
20:14, 75:3,
75:4, 75:16,
76:14, 76:16,
77:12, 77:14,
170:4
**going**
8:7, 8:10, 9:5,
11:12, 13:14,
13:15, 22:22,
26:3, 29:20,
33:22, 36:21,
37:5, 38:4,
41:21, 43:1,
47:7, 56:11,
57:2, 57:15,
57:17, 62:9,
75:5, 76:21,
77:22, 78:2,
78:10, 79:16,
83:5, 83:8,
84:13, 86:11,
87:15, 95:23,
97:13, 97:16,
98:7, 100:16,
101:10, 105:12,
107:19, 107:20,
110:13, 114:11,
114:13, 114:15,
118:7, 129:20,
129:21, 130:1,
130:7, 130:15,
133:11, 140:2,
140:4, 142:21,
143:21, 148:16,
151:16, 154:8,
160:8, 161:3,
164:1, 164:8,
167:11, 167:20,
168:1, 174:11,
177:4, 180:12
**gone**
24:24, 138:2,
153:5
**good**
6:19, 25:1,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

63

27:4, 31:1,
31:4, 31:8,
31:9, 31:10,
44:16, 55:5,
59:1, 66:1,
66:5, 66:6,
82:18, 95:12,
109:8, 113:2
**gotten**
134:5
**grant**
125:10, 126:4,
126:16
**granted**
175:3, 175:9
**great**
59:15, 118:24,
133:13, 155:24
**gregory**
114:24
**grew**
113:9
**grievance**
5:12, 5:13,
19:19, 19:22,
20:5, 20:7,
20:11, 20:12,
20:14, 23:9,
23:12, 23:13,
23:17, 62:18,
65:13, 74:10,
74:13, 74:15,
74:16, 76:7,
76:11, 76:13,
77:9, 77:17,
78:2, 78:17,
79:8, 79:12,
79:23, 80:2,
84:23, 86:14,
87:12, 91:21,
93:17, 95:7,
95:9, 95:15,
95:24, 105:2,
105:18, 119:10,
119:11, 123:1,
169:12, 173:10,
183:24
**grievances**
20:7, 62:11,

62:13, 76:23,
122:21, 123:24,
151:15, 157:10
**grieve**
79:5, 79:20,
84:1, 84:11,
104:15
**grieved**
84:2, 84:10,
106:1, 179:23
**ground**
8:8
**group**
146:16
**grow**
113:8
**guess**
21:21, 25:14,
27:22, 31:24,
44:17, 52:19,
62:10, 65:11,
79:8, 79:24,
81:7, 95:13,
107:13, 116:18,
128:14, 129:13,
136:7, 165:10
**guessing**
54:6, 54:7
**guy**
80:23, 81:6,
82:17, 156:8
**guy's**
25:1
**guys**
14:5, 14:12,
24:12, 25:12,
26:2, 26:15,
32:19, 45:21,
46:23, 51:5,
51:8, 53:24,
59:19, 67:18,
71:7, 73:17,
82:6, 82:17,
91:11, 103:7,
113:20, 114:1,
133:13, 156:21,
158:16, 163:1

**H**

**half**
53:4, 93:11

**hall**
132:24
**hallway**
133:1
**hand**
134:16, 134:17,
134:19, 134:23
**handcuffed**
108:5
**handwritten**
10:8
**hang**
51:15, 58:20
**happen**
22:16, 25:18,
80:8, 80:14,
124:21, 127:9,
129:19, 131:9,
134:13, 145:15,
176:13
**happened**
20:13, 25:7,
33:21, 40:18,
58:5, 58:10,
58:13, 80:19,
84:22, 90:18,
94:19, 96:23,
100:18, 127:18,
127:20, 130:20,
131:10, 131:12,
132:3, 132:7,
132:12, 132:18,
137:11, 137:24,
140:4, 140:20,
146:23, 176:13,
185:4
**happening**
22:21, 37:17,
129:18, 132:16,
147:14, 153:11
**happens**
21:5, 27:17,
176:3
**happy**
123:6
**harassed**
17:10
**harassment**
153:19, 153:20

**hard**
132:23
**harder**
8:11
**he'll**
29:18
**head**
8:19, 66:8
**health**
153:2, 154:10
**hear**
10:13, 10:14,
31:15, 31:20,
31:22, 32:10,
32:21, 33:1,
34:6, 45:5,
45:8, 45:10,
127:21, 162:17,
164:17, 165:6,
165:7, 179:4,
183:14
**heard**
22:13, 22:16,
31:4, 32:6,
32:16, 33:11,
34:14, 35:5,
35:12, 36:10,
39:13, 53:16,
54:20, 55:10,
56:8, 58:9,
62:22, 62:23,
66:24, 67:4,
81:8, 88:14,
88:20, 88:21,
95:15, 102:4,
113:20, 127:7,
131:23, 133:2,
168:21, 171:14,
172:6, 175:8,
175:11, 180:17
**hearing**
35:8, 75:6,
169:4
**held**
15:18, 16:18,
65:2, 157:8
**hello**
33:17, 68:18

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

64

**help**
12:21, 59:6,
86:14
**herbert**
3:4
**here**
12:7, 16:17,
32:5, 38:7,
39:22, 56:12,
56:20, 56:21,
68:14, 86:9,
87:2, 87:15,
96:8, 96:12,
104:23, 113:1,
115:13, 118:24,
120:10, 120:13,
120:17, 123:8,
125:4, 125:20,
126:3, 126:6,
126:15, 129:4,
137:19, 144:18,
146:24, 147:8,
149:6, 150:7,
154:8, 154:13,
155:13, 162:2,
163:8, 165:3,
167:21, 177:4
**hereby**
186:6
**hereunto**
186:15
**herself**
47:6
**hey**
58:24, 68:1
**high**
15:3, 32:5,
39:7, 66:16,
111:9, 146:4
**high-crime**
34:19, 47:24,
48:11, 61:12,
112:8, 122:16,
122:18, 122:22,
123:14, 125:15,
135:15
**high-incident**
33:12, 48:8,

65:18, 66:14,
111:17, 111:23,
117:15, 122:13,
123:9, 125:17,
135:15, 175:19,
181:3
**higher**
109:13, 173:11
**highest**
15:2, 15:3
**himself**
103:13, 103:22
**hispanic**
33:10
**hold**
11:21, 11:24
**home**
37:7, 41:18,
113:23, 178:18
**homes**
113:9
**honest**
63:16, 86:19
**hood**
34:9
**hospital**
42:7, 135:11,
138:2
**host**
59:6
**hostile**
9:20, 20:4,
48:19, 60:13,
60:19, 60:21,
61:3, 61:5,
61:10, 63:23,
65:16, 65:21,
68:5, 152:19,
174:23
**hour**
14:14
**hours**
13:21, 136:16
**house**
39:24, 40:4,
40:7, 40:14,
40:16, 40:23,
42:24, 138:13,

139:4, 139:21,
139:23, 140:7
**how's**
52:13
**huh**
156:8
**hulak**
42:13
**humiliated**
153:23
**humiliation**
152:14
**hung**
54:21
**hurt**
134:16, 134:17,
134:19, 134:22,
135:2, 135:7

**I**

**idea**
50:18, 112:5,
178:8
**identification**
58:23, 86:22,
96:2, 114:21,
137:18, 147:21,
148:2
**identified**
12:14, 119:18
**identify**
115:20, 116:11,
117:5, 119:1,
121:1, 121:20,
124:6, 124:16,
124:19, 125:5,
129:5, 148:18,
156:24, 157:4,
157:21, 158:6,
159:3, 159:12
**il**
3:7, 3:16, 4:7
**illegal**
157:11
**illinois**
1:2, 2:16,
2:24, 186:22
**immediate**
18:15, 18:18,

18:21, 19:1,
19:6, 110:10,
169:20
**impeaching**
164:9
**important**
8:13, 62:6,
174:7
**imposed**
77:20
**improper**
164:9
**inattentive**
88:12, 89:17
**incident**
11:11, 41:9,
42:10, 42:21,
43:12, 66:16,
80:4, 87:5,
87:21, 89:11,
94:14, 94:18,
95:18, 95:19,
96:10, 102:8,
105:16, 109:13,
111:9, 122:9,
122:11, 137:8,
141:10, 143:4,
154:14, 171:3,
171:22, 172:13,
172:17, 172:20,
174:21, 181:22,
184:19, 185:4
**incidents**
33:21, 37:18,
44:1, 82:14,
140:3
**included**
32:18, 165:11
**includes**
123:23
**including**
119:4, 120:23,
121:22
**income**
152:12, 166:24
**incorrect**
90:13, 116:14,
120:2

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

65

**individual**
37:6, 40:15,
40:20, 40:24,
42:6, 76:20,
81:19, 129:5,
174:22, 175:1
**individually**
1:13, 2:10,
2:13, 40:19,
108:13
**individuals**
11:12, 12:13,
16:15, 39:7,
119:21, 119:22,
125:8, 128:11,
128:12, 128:23,
128:24, 129:18,
130:5, 130:11,
162:15
**information**
13:1, 13:4,
36:17, 36:18,
42:2, 115:5,
115:12, 148:9,
167:2, 168:13,
169:13
**initial**
62:24, 78:9,
79:2, 81:5,
90:19, 149:8
**initially**
19:4, 64:4,
76:2, 76:4,
79:3, 80:20,
81:2, 81:13,
90:23, 102:22,
102:23, 146:20
**initiating**
92:15
**injured**
134:5, 134:7
**injury**
134:13
**instagram**
156:4
**instance**
34:8, 78:12,
124:7, 124:12,

128:21, 130:11,
131:4, 131:8,
182:24
**instead**
6:4, 90:12,
92:10, 99:2,
116:4
**insubordinate**
99:18
**insubordination**
64:20
**insurance**
142:22
**intend**
164:15
**interact**
29:16
**interacted**
138:9, 146:10
**interacting**
31:15
**interaction**
29:10, 30:22,
44:9, 45:9, 63:7
**interest**
186:14
**interested**
137:3
**interject**
10:11
**interrogations**
12:4
**interrogatories**
5:15, 5:18,
10:12, 10:16,
10:20, 12:11,
114:19, 115:1,
118:23, 123:17,
147:24, 148:3,
148:6, 156:11,
156:19
**interrogatory**
116:16, 124:5,
125:3, 148:17,
158:23
**interrupt**
42:16, 163:21
**interrupted**
162:18

**intervening**
161:12
**interview**
80:21
**interviewed**
166:1
**inu**
94:9
**investigate**
139:2
**investigated**
80:22, 157:22
**investigation**
76:21, 85:10,
86:9, 116:8,
121:4, 124:11,
124:18
**investigator**
16:19, 16:20,
22:23, 27:4,
37:12, 37:13,
64:7, 67:1,
70:24, 79:10,
83:14, 87:5,
87:18, 87:21,
88:3, 88:8,
88:24, 89:3,
89:14, 89:19,
92:1, 92:3,
94:6, 94:7,
96:15, 96:20,
97:5, 97:10,
97:20, 99:7,
99:17, 101:16,
101:22, 102:3,
108:16, 119:18,
119:19, 122:9,
122:11, 122:15,
125:21, 129:7,
131:24, 136:9,
174:2, 175:1,
175:15
**investigators**
32:14, 38:20,
40:19, 43:3,
47:10, 49:4,
49:16, 50:2,
65:18, 102:9,

106:20, 111:9,
112:1, 113:21,
119:15, 120:7,
125:11, 125:12,
126:5, 126:6,
126:17, 126:19,
127:4, 127:16,
130:23, 131:21,
133:6, 157:7,
157:9, 161:19,
162:22, 170:10,
170:13, 170:16,
170:21, 170:22,
171:7, 171:11,
171:17, 172:1,
172:8, 175:4,
177:5, 179:7,
179:11, 180:11,
180:20, 181:16,
183:11, 183:12,
183:16, 183:18
**involved**
115:23, 119:5,
119:13, 137:2,
163:9
**involving**
65:13
**ipad**
166:8
**issue**
20:13, 88:1,
89:4, 146:24,
157:4, 174:10
**issued**
157:6, 157:13
**issues**
52:11, 98:15,
108:2, 147:10
**issuing**
157:8
**item**
166:5, 166:22,
167:1
**itemize**
166:4, 166:22
**itself**
27:8

**J**

**jail**
83:11, 108:2,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    66

147:11, 147:13,
165:21
**jefferson**
3:5
**jerk**
44:18
**jesse**
33:7, 33:8
**job**
1:22, 14:18,
14:19, 14:20,
31:1, 31:8,
31:9, 31:11,
31:13, 36:21,
36:24, 39:23,
66:2, 66:5,
66:6, 70:15,
134:5, 135:2,
135:8, 135:17,
135:21, 136:9,
136:10, 139:19
**jobs**
36:20, 36:23,
37:2, 37:5, 37:9
**joe**
130:8
**john**
92:23
**johnny**
57:20
**join**
72:2
**joined**
15:21, 24:2
**joining**
16:13
**jokes**
45:10
**joseph**
1:12
**jr**
1:7, 1:18,
2:19, 5:2, 6:15,
117:13
**july**
1:20, 5:13,
30:1, 30:3,
30:4, 30:5,

95:24, 96:10,
97:1, 186:16
**jump**
59:2
**june**
5:12, 86:14,
87:4, 87:18,
90:2, 93:5,
93:8, 94:19,
94:22, 95:1,
122:8, 172:13,
172:15, 172:16
**justin**
4:3, 6:24,
59:14
**justin@ilesq**
4:9
**jv**
163:18
**jw**
164:7, 165:20

**K**

**keep**
27:20, 38:19,
41:3, 41:4,
104:6, 114:13,
127:2, 129:19,
133:11, 141:12,
141:13
**keeping**
46:11, 70:2
**keeps**
75:4
**kelly**
3:3, 3:9, 6:11,
10:14, 12:6,
59:9, 59:17,
126:11, 164:17
**kept**
47:5, 127:14,
151:12, 151:22,
173:22
**kicked**
84:8
**kind**
7:7, 9:17,
12:7, 13:23,

21:6, 22:20,
24:14, 24:23,
26:3, 31:21,
46:1, 51:5,
54:6, 68:2,
68:17, 69:14,
71:10, 77:2,
84:17, 106:16,
110:20, 111:4,
111:14, 113:13,
144:6, 144:17,
154:8, 154:9,
161:2, 184:3
**kinds**
32:22, 63:21
**knew**
27:5, 40:5,
45:19, 46:1,
101:16, 101:22,
102:1, 139:20,
139:22, 140:16,
140:21, 140:24,
141:4, 141:19,
141:22
**knowing**
40:15, 40:23
**knowledge**
37:15, 38:2,
44:19, 46:7,
47:9, 49:18,
50:3, 74:4,
85:8, 106:22,
107:9, 112:10,
112:14, 115:5,
148:9, 168:5,
170:10, 170:17,
170:20, 171:24,
172:7, 175:2,
183:15
**knowles**
163:15, 163:17
**known**
23:21, 45:16,
50:12, 55:6,
71:23, 71:24,
73:2, 112:15,
140:6
**knows**
36:21, 64:23

**krauchun**
3:3, 5:4, 6:11,
10:11, 10:15,
10:18, 12:9,
58:24, 59:4,
59:19, 64:21,
118:7, 126:7,
133:12, 133:15,
156:19, 163:20,
163:24, 164:8,
165:7, 165:17,
167:19, 167:24,
172:22, 184:10,
185:14
**krauchun@danherb-
ertlaw**
3:9

**L**

**l-e-r-a**
97:8
**label**
147:23
**labeled**
114:18
**lack**
171:6
**lady**
83:6
**language**
67:5, 124:8,
124:13, 180:17,
180:19
**large**
133:8
**lasalle**
4:6
**last**
13:20, 14:10,
28:22, 29:3,
44:2, 53:21,
80:13, 92:6,
97:7, 115:3,
131:23, 132:13,
136:22, 148:6,
153:15, 155:11
**late**
15:8, 37:7,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    67

145:3, 161:10
**later**
40:11, 41:9,
42:7, 64:17,
145:14, 145:15,
153:14, 153:15,
153:17
**latest**
145:1
**laundromat**
141:12
**law**
3:4, 3:13,
120:24
**lawsuit**
9:20, 10:5,
11:16, 13:16,
32:20, 32:22,
133:24, 134:2,
150:1, 164:6,
164:15, 164:23
**lawsuits**
165:23
**lawyer**
14:4, 14:6,
43:17
**le's**
28:22
**lead**
66:7, 66:9
**leader**
44:16
**leading**
74:19, 168:6,
169:6, 177:1,
178:21, 181:19
**leads**
47:11, 180:22
**learn**
169:7, 180:10,
180:18
**learned**
168:13, 169:12,
179:23, 184:16,
184:17
**least**
56:20, 161:9
**leave**
85:17

**leaving**
29:20
**left**
132:10, 132:15,
153:4
**legal**
134:2
**legally**
147:9
**legrain**
1:5, 23:19
**leinenweber**
4:3, 4:4, 7:1,
10:14
**lera**
97:6, 97:10,
97:21, 98:6,
98:8, 98:11,
98:12, 98:13,
98:15, 98:21,
99:1, 100:8,
100:9, 100:17,
100:23, 101:2,
101:7, 101:8,
101:12, 102:11,
102:18, 103:3,
103:8, 103:12,
104:7, 104:12,
174:2
**less**
11:14, 27:13,
32:8, 107:17,
117:17, 177:24
**let's**
14:24, 20:18,
21:17, 22:13,
30:20, 31:20,
44:7, 47:19,
50:6, 52:5,
57:14, 58:20,
75:8, 75:10,
92:13, 93:15,
99:5, 115:18,
117:11, 118:22,
118:24, 119:15,
121:19, 123:2,
123:3, 123:16,
123:18, 124:4,

125:3, 136:21,
137:7, 147:15,
147:22, 148:15,
150:16, 151:5,
154:7, 154:13,
154:20, 155:3,
155:4, 155:10,
155:12, 156:10,
156:23, 159:22,
163:8, 166:3,
166:12, 166:19,
166:20
**letter**
122:1
**level**
15:2, 18:22,
78:20, 78:24
**lieu**
6:3
**life**
27:8
**limited**
30:21, 45:9
**line**
57:21, 91:24,
174:5
**linkedin**
156:3
**list**
119:15, 119:16,
120:1, 120:6,
120:12, 150:7,
165:3, 166:4,
166:22
**listed**
145:3, 155:19
**listening**
55:4
**literally**
85:2, 127:23
**litigation**
86:19, 93:23
**little**
8:11, 15:1,
31:21, 34:13,
44:3, 57:9,
63:7, 66:4,
74:7, 105:4,

109:12, 113:17,
133:23, 134:12,
174:15
**live**
176:17
**lived**
114:3, 177:10
**llc**
4:4
**location**
40:23, 41:20
**lock**
41:22
**locker**
25:7, 25:13,
35:16, 35:17,
38:1, 163:4,
176:7
**locking**
82:15
**lockup**
42:12
**lockups**
32:7, 34:22,
34:23
**logan**
29:1, 64:5,
64:10, 87:5,
90:12, 90:21,
90:23, 91:1,
91:5, 92:11,
92:12, 94:10,
94:16, 99:10,
99:14, 101:8,
101:10, 101:24,
157:15
**loggins**
29:1, 64:17,
90:15, 90:16
**long**
8:23, 13:13,
14:12, 15:7,
23:21, 45:16,
45:18, 46:10,
46:12, 50:12,
50:18, 71:23,
71:24, 73:2,
128:9, 128:21,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

68

129:10, 129:17,
134:1, 165:14
**longer**
84:14
**look**
12:24, 14:16,
17:7, 28:8,
87:2, 91:12,
104:7, 104:13,
105:23, 114:11,
114:15, 115:18,
117:9, 117:11,
117:12, 118:24,
121:19, 123:2,
123:3, 123:16,
123:19, 124:4,
128:22, 139:3,
143:21, 147:15,
149:7, 149:10,
154:23, 155:3,
156:10, 163:8,
166:19
**looked**
17:9, 17:10,
122:20, 140:3,
151:7, 155:10
**looking**
13:18, 13:22,
60:10, 120:19,
130:7, 155:8,
155:13, 157:20,
163:22
**looks**
88:2, 92:15,
92:22, 93:4,
93:17, 105:5,
138:8, 144:5,
144:9, 155:15,
163:17, 166:20,
170:2
**loose**
82:18
**lopez**
33:2, 33:5,
33:7, 33:8,
33:11, 34:13,
35:5, 35:11,
35:17, 37:16,

38:17, 38:18,
39:18, 41:11,
43:21, 163:2,
163:6
**lose**
149:5, 150:4,
150:9, 152:10
**losing**
150:6
**loss**
12:8, 166:5,
166:23, 167:4
**lost**
34:1, 149:5,
149:20, 149:21,
150:3, 150:12,
152:9, 152:11,
166:24
**lot**
39:10, 39:14,
44:9, 52:6,
52:7, 53:10,
53:13, 109:12,
145:17, 169:16,
171:4, 173:24,
175:18, 181:21,
182:16
**loud**
8:18
**low-crime**
135:16
**low-incident**
33:14, 135:16

---

**M**

**ma'am**
169:24, 176:20
**made**
10:1, 10:2,
16:7, 22:14,
45:10, 77:24,
96:15, 99:8,
119:9, 121:20,
121:23, 125:11,
175:17
**main**
123:11, 123:12
**major**
83:18

**make**
10:18, 45:8,
74:24, 75:1,
77:12, 77:23,
96:8, 108:3,
109:9, 117:10,
126:19, 143:9
**makes**
75:4, 77:19,
78:5, 78:7,
78:8, 110:1,
110:12, 173:11
**making**
78:24, 110:21,
119:7, 129:23,
146:13, 146:14
**male**
47:15, 47:22,
48:8, 48:24
**males**
48:14, 48:17,
48:23
**man**
43:7, 55:4,
103:20
**management**
21:10, 75:8,
75:9, 78:20,
78:24, 110:4,
111:2, 111:3,
111:4, 145:23
**manning**
2:5, 70:11,
70:12
**many**
7:5, 93:13,
94:13, 156:22,
172:11, 179:12,
183:23
**mark**
58:20, 86:20,
95:23, 114:16,
147:22
**marked**
56:16, 58:22,
86:13, 86:21,
91:12, 96:1,
105:2, 114:20,

123:4, 137:17,
147:16, 147:20,
148:1
**mass**
108:6
**matches**
88:16
**matter**
109:10, 178:18
**matters**
160:2
**maybe**
25:12, 27:15,
28:4, 35:7,
50:19, 53:6,
59:6, 60:17,
60:19, 71:5,
80:9, 88:1,
107:12, 112:9,
114:22, 117:9,
123:4, 131:3,
136:21, 153:17,
174:14
**mcghee**
2:6, 71:20,
71:21, 71:23,
72:12, 72:17
**mdt**
81:4
**mean**
7:19, 9:24,
21:13, 22:4,
26:18, 27:12,
32:12, 42:16,
44:12, 50:17,
53:10, 54:5,
58:11, 58:13,
60:15, 70:1,
74:9, 82:9,
82:16, 83:16,
85:18, 97:15,
99:9, 100:13,
103:11, 105:9,
106:16, 107:14,
111:11, 112:17,
117:3, 117:7,
122:20, 122:24,
134:14, 136:24,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                     69

152:21, 158:2,
158:10, 158:16,
159:9, 159:18,
161:8, 162:13,
164:15, 164:22,
164:23, 174:16
**meaningful**
159:6, 159:15,
173:13
**meaningless**
183:7
**meant**
61:4, 61:9
**media**
156:1, 156:8
**medical**
5:16, 52:11,
137:15, 154:10,
154:24, 155:4,
155:9, 156:16
**medication**
142:5, 154:17,
155:17
**medications**
154:16
**medicine**
154:4
**medicines**
155:21
**meeting**
30:1, 30:12
**members**
26:6
**memo**
87:3, 87:8,
87:9, 88:10,
88:23, 89:4,
90:2, 90:3,
90:6, 91:1,
172:16
**memorized**
54:8
**memory**
27:2, 27:6,
27:7, 137:23
**men**
32:21
**mental**
150:14, 152:14,

153:2, 154:10
**met**
24:10
**michelle**
1:5, 45:13,
45:14, 60:11,
61:2
**microphones**
59:8
**middle**
144:17
**midwest**
3:14
**might**
23:4, 25:21,
26:22, 26:24,
29:9, 52:23,
54:8, 56:4,
63:1, 64:2,
64:9, 69:1,
77:24, 97:5,
98:14, 100:19,
104:21, 105:21,
112:2, 132:24,
134:15, 134:20,
135:4, 139:24,
143:2, 160:7,
160:24, 161:15,
161:16, 161:20,
162:12, 162:14,
163:2, 180:15
**mind**
64:23, 85:6,
133:13
**mine**
122:19
**minus**
23:23
**minutes**
14:14, 166:7,
166:9, 166:10,
166:12
**misconduct**
157:21, 158:3
**misheard**
60:19, 88:6
**miss**
143:3, 150:20

**missed**
143:7, 150:18,
150:24, 151:3
**misstates**
118:8, 126:7,
178:22
**mistake**
120:11
**mistaken**
105:19
**mm-hmm**
48:13, 101:21
**modify**
152:3
**module**
18:2
**monday**
1:20, 14:8
**monetary**
166:5, 166:23,
167:4
**money**
142:20
**monitor**
21:12
**monitoring**
7:21, 11:6,
15:20, 15:23,
28:10, 138:20,
147:12, 147:13
**month**
28:1, 35:21,
160:14
**months**
86:5
**more**
7:14, 17:10,
32:4, 37:3,
39:7, 41:8,
52:22, 63:12,
94:17, 95:3,
109:18, 124:22,
132:8, 135:24,
136:2, 136:5,
146:23, 149:22,
159:11, 162:1,
170:21, 177:12,
177:13, 177:14,

177:18, 179:12,
181:3, 181:10,
183:12, 183:18
**morning**
6:19, 42:10
**most**
8:12, 32:6,
34:19, 111:8,
135:23
**mostly**
32:8, 34:18
**mother**
41:5
**motivated**
95:20, 106:8
**mouth**
61:1
**moved**
24:7, 181:17
**much**
12:2, 13:17,
18:4, 19:19,
21:3, 24:21,
25:5, 29:10,
31:16, 32:17,
44:21, 49:1,
49:5, 51:3,
54:7, 55:16,
66:16, 71:10,
74:24, 76:20,
97:23, 123:10,
127:13, 133:8,
137:2, 143:1,
145:9, 151:16,
153:16, 157:16,
161:7, 174:11,
176:22
**murder**
177:15
**murderers**
136:1
**murders**
39:15, 177:13
**must**
88:6, 97:19,
155:4
**mute**
59:8

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

70

**myself**
104:6

### N

**n-word**
45:6, 53:17,
55:13, 55:16,
55:23, 57:16,
57:17, 57:21,
61:16, 61:20,
62:3, 62:19,
62:23, 168:22,
169:8, 184:17
**name**
6:22, 28:15,
33:6, 70:17,
70:18, 88:5,
97:7, 155:18,
163:16
**names**
99:23, 120:9,
129:24, 130:3,
130:10
**narrative**
96:12, 158:23,
170:5, 172:17,
173:7
**nationality**
112:20
**nature**
152:23, 161:4,
161:6, 181:8
**nd**
80:16, 81:3,
93:5
**neal**
2:10, 49:8,
49:15, 145:22,
146:7, 146:8,
146:11, 158:8
**necessarily**
136:8
**necessity**
53:12
**need**
8:18, 8:22,
8:24, 9:4, 21:4,
48:20, 51:14,

59:13, 91:13,
96:13, 114:12,
133:9, 152:4,
162:1, 162:6,
166:9, 166:11
**needs**
59:11
**negative**
55:19
**negotiated**
79:15, 79:20
**neighborhood**
34:9, 112:19,
114:2
**neighborhoods**
112:21, 177:6
**neither**
186:12
**never**
21:3, 26:23,
29:10, 31:2,
31:4, 34:21,
42:9, 42:24,
44:12, 45:2,
46:11, 47:6,
48:12, 63:19,
63:24, 72:7,
72:8, 72:11,
75:4, 84:21,
85:1, 88:5,
95:17, 107:2,
112:8, 117:23,
136:24, 137:4,
142:1, 142:17,
146:10, 150:10,
150:21, 151:9,
151:19, 153:8,
157:8, 160:4,
165:8, 172:6,
173:22, 180:16
**news**
39:14
**newsom**
1:7, 1:18,
2:19, 5:2, 5:9,
5:14, 5:16,
5:18, 6:10,
6:15, 6:19,

56:19, 58:22,
59:22, 65:4,
86:16, 86:21,
87:6, 87:19,
89:3, 92:1,
96:1, 96:15,
96:20, 99:7,
99:17, 101:16,
101:22, 102:3,
109:6, 114:18,
114:20, 117:13,
133:19, 137:15,
137:17, 144:2,
147:20, 147:24,
148:1, 155:8,
166:16, 168:1,
184:15
**next**
1:17, 18:22,
28:15, 74:23,
77:9, 77:14,
78:4, 80:24,
81:11, 81:12,
90:9, 91:8,
93:15, 105:1,
105:10, 149:10,
154:12, 170:8,
176:13, 176:14
**nickle**
119:18, 119:19
**nigger**
54:20
**night**
42:7
**nobody**
12:21
**nodding**
8:19
**non-high-incident**
125:17
**none**
142:14, 150:4,
163:11, 179:15
**nonminority**
117:16, 119:2,
119:16
**nonstop**
153:1

**normal**
84:8
**normally**
37:2
**north**
4:6
**norther**
1:2
**notary**
2:24, 186:1,
186:5, 186:21
**note**
96:8
**notebooks**
177:4
**notes**
9:14, 9:17,
9:19, 10:8,
12:10, 12:13,
12:17, 60:10,
60:18, 167:22
**nothing**
70:16, 70:17,
107:5, 114:1,
147:7, 156:6,
171:14, 185:14
**notice**
2:23, 157:11
**noticed**
139:10
**noticing**
153:21
**notion**
121:5
**november**
17:5
**number**
28:2, 28:3,
28:8, 50:15,
57:11, 62:4,
144:9, 149:2,
149:17, 163:21
**numbers**
27:19, 28:5
**numerous**
117:13, 157:9

### O

**oak**
3:16

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

71

oath
59:24, 65:5,
133:21, 166:17
object
6:7, 118:7,
164:1, 171:19
objected
126:12
objection
126:7, 158:1,
158:22, 159:1,
164:9, 164:14,
168:6, 169:6,
170:15, 170:18,
170:24, 171:12,
172:5, 173:14,
173:20, 175:5,
175:24, 177:1,
177:7, 177:11,
178:1, 178:10,
178:21, 179:2,
179:10, 179:14,
179:24, 180:7,
180:13, 180:21,
181:5, 181:19,
182:6, 182:11,
182:20, 183:13,
183:19
objections
114:23
observed
87:18, 91:2
obvious
26:19
obviously
146:22
occasions
89:21, 127:7,
132:4
occur
137:9
occurred
102:8, 137:10,
171:3
october
80:9, 144:5,
144:10, 144:14,
171:4

off-the-record
65:2
offensive
67:5, 124:8,
124:12, 180:17,
180:19
offer
77:10
offhand
129:24
office
6:23, 15:13,
15:18, 16:23,
17:16, 17:20,
18:9, 20:2,
20:20, 96:21,
100:3, 100:6,
100:9, 100:11,
100:14, 100:18,
101:2, 101:3,
101:5, 101:13,
102:10, 127:21,
132:21, 132:22,
178:19
officer
16:4, 131:5,
133:3, 186:5
officers
32:14, 117:16,
119:2, 119:16,
157:3, 157:21,
158:3
official
1:12, 1:14,
2:11, 2:14
often
17:7, 17:10,
17:23, 24:20,
25:3, 27:9,
27:13, 29:16,
29:19, 39:11,
52:1, 52:9,
53:1, 63:11,
69:21, 70:2,
71:4, 112:9,
113:12, 131:17,
131:19, 183:12
oh
22:4, 27:16,

30:10, 105:13,
107:2, 126:14,
144:22, 149:12,
165:5
old
43:6, 167:8
omissions
125:5
once
7:6, 28:1,
41:23, 71:5,
77:8, 84:16,
107:12, 108:20,
127:1, 135:5,
139:10, 140:19,
153:4, 153:17,
171:13
one
8:12, 11:9,
20:15, 20:18,
23:3, 25:9,
29:3, 31:7,
35:1, 36:7,
37:8, 40:3,
41:14, 42:10,
51:22, 52:7,
55:1, 56:15,
60:9, 60:12,
64:2, 65:14,
68:13, 74:11,
75:16, 77:10,
78:10, 78:14,
85:1, 86:13,
87:3, 91:22,
93:17, 94:17,
97:22, 103:20,
109:11, 109:18,
110:23, 110:24,
114:9, 116:18,
116:19, 117:6,
123:5, 124:22,
127:8, 130:22,
131:3, 131:5,
133:24, 134:16,
142:4, 149:11,
149:22, 150:2,
154:17, 154:18,
154:22, 155:1,

159:11, 162:4,
162:8, 164:6,
168:20, 172:11,
182:22
one-man
103:16
ones
11:14, 34:4,
107:23, 179:7,
183:4
ongoing
121:9
only
34:24, 45:3,
46:7, 55:9,
56:7, 68:13,
72:14, 95:18,
105:16, 125:24,
132:19, 154:17,
158:14, 177:5,
179:7
open
156:22
opinion
30:24, 47:14,
47:20
opportunities
150:8, 150:9,
150:11, 150:18
opportunity
151:17, 159:6,
159:15
opposed
32:3, 39:8,
112:20, 114:9,
117:15, 177:14
opr
76:1, 76:17,
76:19, 76:23,
83:14, 83:15,
83:16, 83:19,
83:20, 84:6,
84:7, 85:9,
86:9, 172:2,
172:8
opr's
76:17
order
35:2, 35:4,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                          72

86:23, 87:1,
183:4
**ordered**
64:14, 64:19,
88:22, 90:3,
90:22, 94:22
**ordering**
89:9
**other**
10:23, 11:14,
14:3, 14:21,
25:8, 25:9,
32:19, 37:18,
38:24, 40:5,
40:14, 41:17,
43:20, 51:23,
55:17, 59:2,
70:17, 70:18,
73:14, 83:20,
85:7, 93:7,
102:9, 105:17,
108:18, 108:19,
112:7, 112:17,
112:20, 119:1,
119:22, 125:7,
125:14, 125:15,
131:21, 134:2,
135:1, 135:7,
138:3, 146:17,
150:13, 154:2,
155:1, 155:19,
155:20, 160:23,
161:6, 165:23,
166:5, 166:23,
166:24, 167:4,
170:10, 171:7,
180:11, 180:20,
184:8
**others**
32:7, 35:9,
43:22, 182:24
**otherwise**
60:5, 186:14
**out**
8:18, 11:10,
15:20, 21:9,
27:13, 27:23,
28:7, 29:20,

34:3, 37:5,
40:16, 41:12,
44:18, 45:1,
45:18, 51:1,
51:15, 55:21,
59:7, 77:7,
80:5, 81:19,
82:2, 82:3,
82:4, 82:21,
83:2, 84:8,
84:20, 85:19,
86:3, 92:21,
95:8, 95:9,
95:10, 95:11,
100:3, 100:4,
100:5, 106:12,
107:18, 107:24,
108:20, 108:21,
108:24, 129:2,
131:19, 138:21,
139:23, 147:4,
149:21, 150:20,
150:24, 151:3,
153:13, 171:5,
176:14, 176:15,
183:1, 183:3,
184:3, 184:22
**outcome**
8:3, 86:8,
95:6, 95:12,
104:17, 106:4,
119:11, 170:19,
179:19, 186:14
**outdoors**
108:3
**outpatient**
155:16
**outside**
24:12, 24:15,
45:21, 46:24,
51:2, 51:3,
51:6, 67:18,
68:15, 69:18,
69:19, 71:7,
73:17, 81:15
**over**
8:8, 13:9,
13:14, 13:22,

16:10, 18:22,
23:22, 24:5,
25:12, 27:10,
27:23, 34:8,
39:2, 42:5,
42:9, 42:13,
43:6, 43:7,
45:17, 69:16,
73:14, 76:15,
78:5, 80:24,
81:2, 81:21,
83:2, 83:9,
83:24, 84:24,
91:12, 96:18,
113:10, 113:12,
146:18, 147:10,
147:11, 148:16,
151:7, 153:11,
155:17, 162:3,
185:2, 185:5,
185:6, 185:7,
185:9
**overhear**
132:23
**overheard**
128:17, 129:6,
129:15, 130:22
**overhearing**
127:13, 127:23
**overtime**
26:22, 26:24,
28:9, 45:4,
69:17, 70:3,
72:15
**own**
47:8

| P |
| --- |

**p-a-s-s-a-s**
29:6
**page**
1:17, 2:1, 2:3,
5:2, 5:9, 8:9,
57:9, 67:7,
67:9, 68:17,
91:8, 93:15,
104:24, 105:1,
115:3, 115:18,

124:15, 137:19,
144:17, 148:7,
148:15, 148:16,
148:17, 149:1,
149:9, 149:10,
149:14, 154:12,
154:13, 155:11,
155:12, 155:13,
158:20, 158:21,
174:12
**pages**
1:23, 86:17,
87:2, 130:15
**paid**
143:15, 143:16
**paperwork**
81:3, 107:14,
139:5, 139:17
**paragraph**
56:24, 57:14,
115:21, 117:12,
119:4, 120:22,
121:21, 123:19,
123:21
**park**
113:10, 176:24,
177:23
**parse**
184:3
**part**
54:14, 134:1,
134:2, 143:7,
165:2, 182:13,
183:20
**participant**
7:17, 7:19,
11:9, 40:6,
40:8, 40:11,
41:24, 81:19,
136:8, 138:15,
141:1, 141:20,
163:13
**participant's**
163:16
**participants**
81:15, 106:12,
107:23, 108:4,
108:7

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                                73

particular
76:13, 112:6,
112:11, 112:16,
112:19, 114:10,
129:18, 130:16,
131:5, 145:11,
165:4
particularly
44:16
parties
174:13, 186:13
partner
26:20, 26:21,
27:1, 40:4,
41:19, 42:14,
46:19, 53:1,
53:9, 71:2,
71:4, 72:12,
81:7, 84:9,
87:13, 92:3,
94:19, 95:19,
96:22, 97:2,
98:18, 98:20,
102:21, 103:12,
131:3, 137:20,
138:18, 139:5,
174:8
partner's
139:17
partnered
26:22, 27:3,
72:11, 72:14,
89:20, 89:24,
102:17
partnering
27:10, 68:20
partners
52:7, 53:3,
53:6, 53:8,
131:2, 175:3
pass
29:18, 74:24,
75:1, 77:13,
77:24, 182:24,
183:2
passas
29:2, 29:4,
157:15

passed
141:9
passing
25:6, 63:13,
63:14, 67:10,
68:1, 68:18,
69:15, 69:16,
72:4, 127:21,
128:19, 128:20,
129:20, 133:1,
161:17, 162:13,
162:20, 175:11
past
13:17, 13:22,
102:18, 102:21,
103:4
patience
59:23
patient
137:20
patrol
49:11, 96:21,
102:10
pay
136:14, 142:20,
142:23, 184:23,
184:24
peculiar
61:6
pen
42:17
penalties
6:6
penalty
115:6, 115:16,
126:3, 148:8,
161:22
pending
8:23, 83:14,
83:15, 83:16
people
16:15, 21:14,
21:16, 28:20,
31:23, 32:1,
32:3, 32:11,
32:13, 32:17,
33:12, 33:13,
38:15, 40:23,

103:1, 111:12,
120:6, 120:12,
128:8, 130:4,
146:12, 146:13,
146:17, 161:15,
161:17, 161:20,
162:4, 183:1
people's
107:19
percent
155:18
percentage
133:6
perfect
59:19, 133:15
period
15:4, 45:17,
46:2, 46:8
periodically
17:9, 24:22,
52:10
perjury
6:6, 115:6,
115:16, 126:3,
148:8, 161:22
permethrin
155:17
permission
40:16, 41:1,
41:4, 141:11
person
23:14, 36:16,
36:22, 50:5,
51:14, 51:15,
66:7, 68:13,
78:23, 80:21,
90:19, 125:23,
131:4, 138:7,
138:12, 139:8,
139:13, 139:20,
139:22, 140:6,
140:16, 160:1,
166:1
personal
31:5, 31:6,
44:19, 47:9,
47:14, 51:16,
112:10, 112:14,

138:5, 168:5,
170:20, 172:7,
183:10, 183:15
personally
20:8, 169:4,
180:6
persons
146:20
pertaining
9:19, 11:14,
12:3, 12:5,
20:12, 31:24,
34:7, 36:18,
39:4, 39:10,
39:23, 41:17,
44:22, 47:6,
62:11, 64:3,
76:21, 94:8,
97:12, 97:17,
98:1, 98:16,
129:1, 139:18,
161:20
petros
1:24, 2:23,
186:3, 186:20
phone
12:24, 27:7,
54:21, 67:21,
73:20, 121:24
photocopy
167:10
physical
154:2, 174:18,
183:3
place
35:15, 35:21,
43:12, 59:13,
77:20, 100:13,
144:19, 144:24,
160:16
placed
108:7
plaintiff
6:12, 50:7,
116:9, 117:13,
125:9, 126:16,
149:17, 149:19,
157:5, 158:1,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

74

159:1, 163:10,
164:21
**plaintiffs**
1:8, 2:8, 3:2,
14:22, 93:23,
123:21, 123:22,
125:6, 149:8,
164:14, 167:23
**planning**
86:1
**plans**
85:22
**please**
6:2, 58:19,
58:20, 143:24,
144:17, 156:12,
156:23, 166:4,
166:21, 172:23
**plus**
23:23
**point**
80:4, 95:15,
116:20, 182:19,
184:16
**pointed**
122:8
**police**
42:4, 81:11
**policies**
62:4
**policy**
16:23, 17:2,
17:7, 17:11,
18:10, 18:12,
20:20, 20:24,
21:7, 21:13,
62:7, 74:5,
110:23, 121:7,
168:18, 169:19,
178:12
**pop**
29:18
**population**
136:8
**position**
16:16, 61:6
**positions**
15:17, 16:18,

145:24, 158:9,
184:5
**possibility**
123:12
**possible**
26:1, 63:2,
105:11, 111:21,
111:24, 133:4,
138:1, 139:23
**possibly**
7:15, 28:6,
37:20, 43:4,
58:7, 153:16
**posted**
16:8
**potentially**
74:19, 111:12
**practice**
179:6
**practices**
157:11
**precautionary**
143:5, 143:8
**predominantly**
112:22
**prefer**
105:22, 106:21,
106:23
**prepare**
13:7, 14:1,
14:22
**preparing**
14:17
**prescribed**
142:4, 154:15,
154:17, 155:22
**prescriptions**
155:17, 155:19
**presence**
102:9
**present**
4:12, 36:5,
54:11, 100:6,
127:24, 128:2,
160:18
**pretty**
8:7, 12:2,
18:4, 19:19,

21:3, 24:21,
25:1, 25:5,
27:16, 30:21,
31:16, 32:17,
44:21, 48:24,
51:3, 54:7,
55:16, 66:16,
74:24, 76:20,
97:23, 123:10,
127:13, 131:19,
133:8, 145:9,
151:16, 153:16,
157:16, 161:7,
174:11
**prevent**
81:14
**prevents**
142:12
**previous**
2:1, 31:23,
32:11, 48:22
**previously**
11:5, 132:14,
155:10
**primary**
14:18
**prior**
15:19, 17:6,
35:8, 85:15,
112:17, 118:2,
132:15, 140:4,
147:2, 175:16,
178:22, 185:2,
185:4
**priority**
37:3
**prisoner**
80:5, 171:5
**private**
59:12
**privately**
65:1
**probably**
8:7, 12:17,
13:19, 15:8,
18:22, 25:23,
39:13, 44:21,
53:12, 53:13,

62:4, 65:24,
70:1, 89:14,
116:14, 123:14,
135:3, 137:23,
150:14
**problem**
22:20, 22:23,
23:2, 98:6,
129:13, 133:14
**procedure**
20:5, 22:7,
23:8, 23:17,
80:2
**procedures**
17:11, 18:10,
33:23, 84:6,
159:5, 159:14
**proceeding**
6:8, 134:2
**process**
20:15, 75:22,
75:23, 76:11,
77:17, 79:8,
79:12, 79:16,
79:23, 83:3,
106:12, 107:24,
108:21, 136:18,
136:23, 159:5,
159:14, 173:13,
175:21
**processed**
108:8, 108:9,
108:12, 108:16
**produce**
167:13
**produced**
10:4, 10:13,
10:16, 11:19,
12:18, 43:18,
86:18, 86:23,
91:11
**product**
66:8
**professional**
63:9, 63:10,
186:4
**profile**
139:4

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    75

program
7:18, 7:20,
40:11, 82:9,
106:12, 177:13
progress
74:10
progressive
74:5, 74:18
prohibit
21:7
prohibiting
20:20
prohibits
21:8
promoted
183:4
promotion
137:5, 151:11,
151:14, 151:15,
151:18, 151:20,
152:5, 182:23,
183:6, 183:8
promotions
136:18, 136:19,
136:23, 136:24,
137:1, 150:21,
151:6, 151:8,
151:13, 182:17,
182:18, 182:19
pronounce
88:5
proof
129:24
properly
157:22
propounded
12:12
protection
81:18
protections
79:19
prove
10:1
provide
124:11, 148:18,
148:22, 159:6,
159:14, 167:2
provided
43:21, 116:13,

116:23
provision
110:5, 111:4
public
2:24, 82:18,
186:1, 186:5,
186:21
pulled
140:2
punishment
89:10
punitive
150:14
purpose
123:11
pursuant
2:23, 120:24
put
20:17, 32:2,
34:8, 34:14,
38:12, 38:13,
47:24, 58:18,
59:14, 61:1,
64:22, 85:19,
87:1, 94:13,
95:22, 120:9,
123:15, 131:14,
131:15, 131:17,
143:20, 145:16,
164:8
putting
32:1, 61:6,
157:10

**Q**

qualified
16:10
question
8:14, 8:16,
8:23, 9:3,
17:18, 30:9,
41:3, 56:3,
60:23, 112:13,
116:19, 126:14,
147:3, 150:5,
164:18, 164:19,
168:20, 168:22,
169:1, 171:16,

173:1, 173:16,
174:5
questioning
37:6, 172:14,
174:5
questions
12:4, 12:5,
48:22, 50:24,
167:16, 167:20,
168:17, 168:18,
169:17, 171:5,
172:10, 174:1,
180:4, 181:22,
182:17, 184:9
quiet
47:5
quite
131:10, 135:9,
161:16
quote
159:6, 159:14

**R**

race
21:19, 48:4,
48:5, 119:18,
125:1, 157:18
racial
67:2, 180:19
racially
67:5, 95:20,
106:8
racism
68:5
racist
44:10, 44:12,
44:18, 44:20,
45:10, 55:7,
55:8, 55:14,
56:1, 56:4,
66:17, 66:18,
66:22, 124:8,
124:13, 168:2,
168:4, 168:12
raise
158:18
raises
151:1

rank
146:15
ranzino
1:13, 29:7,
29:12, 30:21,
31:17, 32:22,
44:7, 45:5,
49:2, 49:5,
53:17, 55:1,
55:7, 55:23,
55:24, 57:19,
61:16, 61:20,
62:2, 145:22,
158:8, 168:2,
168:21, 169:8,
184:17
rape
177:15
rare
27:16, 27:17
rarely
69:24
rather
180:14
rd
5:13, 41:18,
80:16, 95:24,
96:10, 97:1,
176:1
re-examination
184:13
reached
95:17
reaching
81:15
read
21:2, 21:4,
57:15, 57:17,
57:18, 78:14,
87:15, 90:19,
96:4, 96:13,
96:17
reading
130:12, 186:11
ready
96:5, 96:6
realize
40:6, 45:9,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                          76

104:23
**really**
21:17, 46:14,
62:16, 63:14,
63:15, 67:16,
69:7, 76:19,
78:19, 79:19,
104:7, 137:1,
158:19, 178:24
**rear**
81:14, 81:18
**reason**
9:8, 30:7,
30:16, 49:15,
49:24, 55:24,
97:20, 97:22,
115:24, 116:2,
151:6, 151:17,
151:21, 165:4,
182:22
**reasons**
35:3, 88:23,
97:22, 100:19,
102:24, 124:24,
127:11
**reassignment**
64:11, 90:24
**recall**
7:17, 8:2,
30:15, 46:21,
53:20, 61:17,
63:1, 63:3,
65:23, 66:23,
68:20, 68:22,
68:23, 69:2,
69:6, 69:23,
70:5, 70:7,
71:16, 71:19,
72:13, 73:24,
82:2, 102:15,
104:5, 125:2,
127:11, 127:19,
128:2, 128:15,
132:2, 132:6,
135:7, 150:6,
162:15, 163:16,
165:14, 165:19,
165:24, 168:18,

172:14, 179:22,
181:21
**receive**
119:2, 119:17,
125:1
**received**
93:22, 115:20,
116:4, 117:15,
119:8, 124:1,
124:17, 124:20,
154:9, 157:18,
170:17, 170:21
**receives**
76:24
**receiving**
64:18, 117:16,
170:10
**recently**
17:1
**recess**
59:20, 133:17,
166:14
**recognizing**
17:21
**recollection**
57:24, 88:16,
118:16
**recommend**
74:22, 142:14
**recommendation**
79:6
**recommendations**
79:4
**recommended**
75:20, 77:7,
143:8, 143:11,
143:12
**record**
59:22, 65:4,
133:20, 139:8,
154:20, 185:17,
186:8
**recorded**
57:19
**records**
5:16, 137:15,
154:24, 155:4,
155:9, 156:17

**rectify**
151:24, 152:1
**redo**
184:2
**reduce**
77:10
**reduced**
186:10
**ref**
87:5
**refer**
66:24, 87:1,
154:13, 159:8
**referenced**
160:2
**referred**
137:8, 158:9,
159:17
**referring**
10:12, 10:15,
12:12, 38:14,
38:19, 101:23,
102:11, 102:13,
117:20, 121:2,
125:13, 184:18
**refers**
123:8
**reflect**
164:10, 173:3
**reflected**
17:11
**refresh**
137:23
**refuse**
89:7
**refused**
89:4, 92:6
**regard**
160:2
**regarding**
87:5, 89:4,
117:14, 121:21,
172:13
**regardless**
176:17
**regards**
178:23, 180:24
**registered**
186:3

**regular**
179:6
**regularly**
29:12, 67:22,
73:19, 178:5
**regulation**
121:1
**reincar**
41:22, 81:2
**reincarcerate**
80:23, 82:17,
139:11
**reincarceration**
35:2, 37:8,
42:15, 42:24
**reincarcerations**
37:4
**reiterated**
102:4
**relate**
30:14, 158:5
**related**
41:6, 62:13,
105:17, 142:20,
143:3, 154:10,
159:9, 186:12
**relating**
21:19
**relationship**
47:1, 47:2,
63:8
**remain**
36:17
**remedy**
173:8
**remember**
21:22, 21:23,
24:5, 27:11,
30:10, 30:12,
30:14, 35:23,
38:22, 46:15,
46:17, 46:19,
49:10, 53:20,
54:5, 58:14,
62:16, 72:20,
102:15, 104:9,
109:14, 118:20,
129:21, 130:18,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                    77

131:11, 132:14,
135:1, 154:24,
155:2, 160:13,
161:21, 162:8,
162:10, 162:13,
162:24, 165:1,
165:20, 165:22,
168:22, 168:24,
172:18, 174:4
**remote**
4:13
**removed**
171:18, 171:21
**rep**
100:10, 100:12,
161:1
**repeat**
60:22, 101:18,
112:12, 149:22,
173:16
**replying**
102:4
**report**
18:15, 18:18,
18:20, 22:4,
22:14, 22:18,
61:19, 62:7,
62:18, 79:3,
81:5, 83:4,
83:7, 85:3,
92:12, 135:4,
135:6
**reported**
1:24, 92:1,
92:10, 135:5
**reporter**
6:2, 6:4,
186:1, 186:4,
186:5
**reporting**
94:6, 94:7,
96:14, 99:6,
101:20
**reports**
137:20
**represent**
6:23
**reprimand**
104:19, 104:21,

105:20, 106:5
**request**
34:24, 35:3,
89:10, 90:24,
97:2, 98:4,
100:22, 102:23,
103:16, 122:16,
125:11, 126:22,
131:6, 152:22
**requested**
42:23, 43:1,
64:18, 96:22,
97:14, 98:18,
98:21, 100:19,
103:3, 103:19,
103:20, 122:17,
125:24, 126:20,
127:10, 128:13,
175:15, 186:11
**requesting**
27:19, 42:12,
64:6, 125:14,
128:18, 129:7,
130:23, 153:22
**requests**
125:10, 125:12,
126:4, 126:17,
126:18, 129:1,
148:21
**required**
116:16
**reserves**
116:9
**residence**
40:21
**resist**
135:10
**resisting**
134:21, 134:22,
134:24, 135:10
**respect**
167:1
**respond**
19:13, 93:13
**responded**
119:14, 124:10,
125:9
**responding**
19:15

**response**
105:6, 115:19,
116:8, 116:10,
119:12, 120:17,
122:1, 124:18,
126:15, 149:7,
149:13, 157:5,
157:24, 158:19,
158:22, 158:23,
160:3, 164:2,
164:3, 164:10
**responsible**
119:5, 119:6,
122:5
**restroom**
9:1
**result**
148:20, 149:24,
152:16, 154:11
**resulted**
125:6
**retaliate**
21:14, 21:16
**retaliated**
21:3, 22:2,
22:7, 22:10,
22:11, 23:3,
23:7, 36:12
**retaliating**
23:14, 122:6
**retaliation**
20:17, 20:19,
20:21, 21:6,
122:3, 122:4,
122:7
**retire**
17:4, 85:9,
85:12, 85:14,
85:15, 85:17,
85:22
**retired**
17:3, 24:18,
52:3, 52:9,
84:15, 84:17,
86:6
**retirement**
17:6, 24:22,
152:12

**retiring**
86:1
**reversal**
90:20
**review**
120:3
**reviewed**
17:1
**ri**
94:5
**rid**
51:22
**ride**
51:7
**right**
8:6, 14:24,
15:12, 15:23,
17:6, 26:13,
29:15, 29:23,
30:19, 30:20,
34:12, 36:8,
42:18, 44:3,
45:13, 45:20,
48:14, 50:6,
53:10, 53:14,
56:13, 57:6,
58:18, 62:4,
62:21, 63:4,
70:23, 75:7,
75:12, 75:20,
78:19, 79:13,
79:21, 81:13,
82:13, 82:16,
82:19, 89:15,
91:20, 92:7,
92:17, 93:5,
93:18, 95:1,
100:16, 103:8,
104:14, 106:2,
106:15, 107:15,
109:10, 114:11,
116:9, 120:1,
123:5, 123:17,
123:18, 128:17,
132:22, 132:24,
133:9, 133:19,
135:13, 136:12,
138:17, 138:22,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                                    78

140:10, 140:13,
143:18, 145:18,
150:18, 150:22,
154:16, 155:5,
156:10, 156:22,
158:17, 161:10,
162:8, 163:8,
163:12, 164:5,
165:12, 176:19,
178:19, 181:22,
184:9, 185:15

**right-hand**
93:21, 105:3,
144:19

**road**
3:14

**robert**
113:9

**rockwell**
54:3, 176:1,
176:6, 176:18

**rohloff**
2:13, 49:20,
54:24, 55:1,
64:7, 88:1,
88:4, 88:5,
145:23, 158:8

**role**
76:17

**roll**
26:12, 26:15,
28:19, 28:23,
29:8, 29:13,
29:19, 46:16,
46:17, 52:20,
54:10, 176:11,
176:12, 176:18,
178:19

**room**
9:11, 11:23,
25:7, 25:13,
35:16, 35:17,
38:1, 59:11,
59:15, 64:22,
128:19, 163:4,
167:7, 176:7

**rooms**
59:12

**roster**
21:10, 28:11,
28:12, 31:3,
32:1, 32:2,
39:5, 96:16,
99:8, 99:15,
100:2, 104:8,
104:13, 109:22,
110:4, 110:9,
110:23, 111:1,
111:2, 111:3,
111:4, 116:24,
121:7, 128:9,
128:10, 128:11,
129:22, 130:1,
130:3, 130:7,
130:13, 175:12,
175:13, 175:14,
175:17

**rosters**
33:24, 39:9,
39:10, 120:15,
121:9, 128:23,
128:24, 129:11,
158:15

**rotated**
117:18, 120:22,
121:6, 121:12,
178:6, 178:9

**rotation**
109:22

**route**
42:13, 42:14,
43:4, 64:16

**routinely**
175:3

**rpr**
1:24, 186:20

**rule**
120:24, 149:8

**rules**
8:8, 109:6,
111:4, 111:6

**running**
81:9

**runs**
82:4

---
**S**
---

**s**
15:8, 15:9

**safe**
92:5, 174:20

**safer**
107:8

**safety**
88:23, 174:10,
174:12, 174:15,
174:17

**said**
6:22, 21:20,
22:5, 28:4,
31:20, 32:10,
34:1, 34:2,
35:22, 38:11,
38:12, 38:18,
38:24, 39:20,
41:11, 43:22,
45:3, 47:23,
51:21, 54:8,
54:11, 56:3,
56:4, 56:5,
56:6, 57:19,
58:9, 58:15,
60:12, 60:14,
60:23, 60:24,
61:2, 61:5,
61:9, 62:24,
67:24, 72:4,
73:8, 78:1,
84:10, 88:4,
98:14, 102:4,
102:6, 103:2,
103:21, 103:24,
104:1, 104:2,
106:16, 107:9,
109:5, 109:6,
121:4, 122:23,
126:3, 127:15,
127:20, 128:3,
128:7, 128:8,
129:17, 129:20,
130:8, 135:3,
135:23, 139:15,
141:8, 141:9,
147:2, 150:2,
150:21, 154:14,
154:19, 157:5,
157:24, 161:3,

**163:1, 163:11,**
163:24, 164:21,
165:13, 184:6,
184:17, 186:9

**same**
8:9, 20:5,
25:7, 26:9,
33:21, 33:23,
40:11, 40:14,
50:23, 61:5,
68:23, 69:11,
69:22, 78:4,
86:1, 92:14,
105:21, 107:22,
117:16, 119:2,
119:17, 125:4,
125:11, 136:10,
136:14, 136:16,
138:9, 146:12,
146:13, 146:16,
156:10, 164:4,
164:14, 164:22,
166:1, 174:12

**samuel**
2:3, 67:7

**saw**
22:2, 22:6,
173:2

**say**
11:9, 17:14,
18:7, 21:1,
21:13, 21:14,
22:13, 22:14,
22:22, 25:23,
28:22, 29:6,
31:7, 34:14,
34:24, 35:6,
35:12, 36:8,
36:9, 48:9,
48:16, 51:9,
51:10, 51:14,
51:20, 52:5,
54:17, 54:18,
54:20, 55:3,
57:17, 67:15,
68:18, 75:8,
75:10, 75:11,
77:3, 77:11,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                      79

79:24, 81:6,
85:20, 88:4,
94:17, 100:1,
102:7, 109:18,
113:21, 124:22,
126:10, 130:8,
131:13, 135:18,
139:18, 149:2,
149:4, 149:16,
149:19, 150:13,
159:11, 160:21,
174:15, 174:17,
177:4, 177:17,
179:3
**saying**
13:22, 22:11,
23:2, 34:13,
48:7, 56:2,
77:6, 77:17,
78:3, 79:1,
89:14, 94:15,
101:16, 101:23,
102:1, 103:2,
103:18, 120:1,
125:20, 126:5,
127:12, 128:15,
132:13, 150:17,
161:8, 162:19
**says**
57:18, 87:17,
88:14, 89:3,
90:2, 91:1,
91:24, 92:22,
96:9, 96:12,
96:14, 99:6,
99:9, 101:19,
102:3, 102:8,
105:5, 115:19,
117:12, 126:15,
137:20, 144:18,
144:23, 149:7,
149:13, 155:16,
158:22, 162:1
**scabies**
40:1, 40:6,
40:8, 40:17,
40:21, 40:24,
41:6, 41:8,

137:7, 137:21,
138:3, 138:6,
139:8, 139:14,
139:20, 140:6,
140:16, 140:22,
141:17, 141:20,
142:1, 142:13,
142:18, 143:4,
154:14, 172:20,
181:22, 182:1
**scene**
43:10
**scheduled**
98:20, 128:11
**school**
15:3, 15:4
**scratches**
12:2, 12:3
**screen**
113:1, 166:21,
172:23
**scroll**
57:2, 57:8,
91:13, 92:13,
105:4, 123:6,
143:23, 144:8,
144:16, 155:10,
158:20, 167:21
**scuff**
82:1
**second**
29:24, 64:22,
76:6, 99:6,
137:12, 149:16,
150:7, 155:11,
155:12
**secondary**
14:19
**section**
94:11
**security**
81:17, 81:21,
123:13
**see**
12:1, 21:17,
22:11, 25:2,
29:21, 47:11,
56:19, 56:22,

57:10, 57:12,
57:22, 86:16,
87:6, 87:8,
87:22, 89:11,
89:12, 92:5,
92:14, 93:20,
96:10, 105:21,
123:2, 123:7,
128:10, 137:19,
140:20, 144:8,
144:11, 144:18,
144:19, 145:1,
149:6, 149:7,
149:8, 149:13,
149:15, 150:10,
155:5, 155:12,
156:15, 158:2,
158:19, 159:1,
166:3
**seeing**
24:6, 25:8,
96:13, 102:15,
156:16
**seek**
149:2, 149:4,
150:7
**seeking**
152:7
**seeks**
149:17, 149:20
**seen**
29:17, 87:9,
91:14, 91:15,
93:23, 139:13,
153:2, 175:14
**sees**
36:19
**send**
40:22, 41:2,
84:5, 141:7
**sending**
11:13, 41:3,
173:23
**seniority**
11:14, 52:22,
52:24, 109:17,
117:17, 179:13,
179:17

**sense**
67:2
**sent**
39:24, 40:4,
42:4, 42:9,
84:7, 140:9,
141:6, 141:15
**sentence**
99:6, 149:16
**separating**
39:6
**september**
80:9
**sergeant**
29:2
**serious**
135:10
**seriously**
173:19
**service**
28:11
**set**
66:10, 114:24,
167:11
**sets**
111:4
**seven**
86:17
**several**
25:24, 27:24,
28:20, 85:1,
102:9, 127:7,
127:16, 128:8,
130:15, 132:3
**severe**
136:1
**severity**
83:21
**sheets**
21:10
**sheriff**
1:10, 6:14,
6:23, 15:18,
16:22, 17:16,
18:9, 75:3,
121:17, 148:5,
157:1
**sheriff's**
10:2, 11:5,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

80

15:13, 17:20,
18:10, 20:1,
20:20, 121:15,
178:13
**shields**
5:14, 29:16,
30:2, 30:6,
30:13, 34:6,
47:9, 47:13,
47:14, 47:20,
57:20, 62:23,
63:4, 63:5,
64:9, 64:13,
65:11, 65:20,
66:1, 66:18,
66:24, 88:15,
88:20, 88:21,
88:22, 89:9,
90:3, 90:11,
90:22, 94:22,
95:16, 114:18,
123:22, 124:1,
130:9, 140:12,
145:22, 146:2,
158:8, 158:14,
180:4, 180:5
**shields's**
65:15, 114:24
**shift**
25:9, 25:13,
26:9, 26:19,
26:23, 26:24,
28:13, 28:17,
29:9, 29:14,
29:17, 32:1,
32:13, 32:14,
32:18, 33:2,
33:4, 33:21,
33:22, 33:23,
34:7, 35:19,
37:10, 37:21,
37:23, 44:22,
45:3, 46:4,
46:5, 46:6,
46:13, 46:23,
49:7, 49:12,
49:13, 49:22,
50:4, 50:8,

50:9, 52:15,
52:17, 55:10,
55:11, 67:11,
67:12, 67:15,
68:10, 68:12,
68:24, 69:1,
69:11, 69:16,
69:22, 70:1,
70:3, 70:22,
70:24, 71:22,
72:7, 72:9,
73:10, 73:15,
92:19, 106:24,
108:1, 118:4,
118:6, 118:13,
119:22, 119:23,
120:8, 146:8,
146:9, 158:13
**shifts**
24:3, 25:11,
33:3, 34:14,
37:22, 118:11
**shoot**
32:17, 165:5
**short**
15:4, 45:17,
46:8, 65:7,
166:16
**shorthand**
186:1, 186:4
**should**
17:14, 21:20,
56:14, 58:19,
59:8, 67:15,
79:24, 86:16,
96:17, 110:7,
111:7, 113:21,
116:4, 120:13,
136:21, 147:16,
165:11, 178:9
**shoulder**
64:9
**shoulders**
8:20
**show**
11:23, 56:10,
56:14, 86:11,
95:23

**showed**
138:20, 139:8
**shrugging**
8:19
**shut**
140:23
**sic**
16:15, 106:11
**sick**
182:4
**side**
20:18, 32:4,
32:5, 34:18,
34:19, 39:12,
39:13, 39:15,
40:12, 48:1,
48:2, 49:1,
61:7, 61:8,
108:19, 113:7,
113:14, 113:16,
113:18, 113:19,
125:21, 125:22,
126:23, 129:2,
129:3, 129:8,
131:22, 135:19,
135:24, 136:3,
136:5, 136:12,
139:17, 144:19,
162:21, 176:22,
177:12, 177:18,
181:1, 181:9
**sides**
177:10
**sign**
77:13, 172:11
**signature**
92:16, 92:22,
93:2, 93:4,
115:8, 144:1,
148:7
**signature-1qbi6**
186:18
**signatures**
92:15, 93:7
**signed**
93:2, 115:10,
115:13, 120:4,
148:12, 186:15

**signing**
93:11, 186:11
**similar**
8:7, 170:22
**similarly**
125:7
**simply**
126:18
**since**
16:16, 17:3,
23:22, 24:24,
50:14, 52:3,
73:3, 118:4,
128:9, 132:9,
153:7
**single**
78:8, 116:11,
116:18, 116:19,
117:6, 117:7,
129:5
**single-man**
98:22, 98:23,
99:3, 131:5
**sir**
11:7, 12:16,
13:7, 19:14,
21:18, 38:21,
42:16, 44:24,
48:6, 55:22,
57:4, 57:10,
57:15, 57:22,
65:6, 87:7,
87:22, 91:13,
92:5, 96:3,
96:17, 96:23,
97:19, 99:11,
104:23, 105:5,
108:10, 114:22,
115:8, 115:19,
116:8, 116:15,
119:24, 120:18,
126:2, 127:15,
128:15, 129:13,
130:2, 130:12,
133:22, 137:19,
144:1, 148:3,
148:11, 148:14,
149:1, 161:21,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

81

164:5, 164:12,
166:18, 167:7,
185:16
**sit**
38:7, 86:9,
108:17, 129:4
**sitting**
108:16
**situated**
125:7
**situation**
37:24, 72:15,
82:12, 82:19
**situations**
181:11
**six**
58:5, 58:9
**sixth**
176:8, 176:10
**skin**
142:7, 142:23
**slaughter**
2:7, 72:23,
72:24, 73:2,
73:22
**slurs**
180:19
**small**
26:3, 71:12,
71:13
**smith**
130:8
**sociable**
31:19
**social**
155:24, 156:8
**socialize**
24:14, 51:23
**some**
7:13, 11:11,
15:3, 33:12,
33:13, 51:17,
72:1, 80:4,
86:14, 89:21,
92:14, 96:24,
97:19, 103:1,
105:22, 106:20,
117:4, 123:20,

131:1, 146:4,
154:21, 167:2,
168:16, 184:2,
184:16
**somebody**
7:9, 51:21,
87:13, 173:18
**somehow**
81:5, 82:3
**someone**
22:2, 22:11,
39:24, 49:6,
50:11, 64:11,
74:10, 75:3,
78:4, 78:18,
82:15, 83:22,
94:3, 97:14,
98:5, 103:14,
114:5, 132:24,
134:20, 134:22,
162:12, 173:11,
174:11, 174:19
**something**
9:21, 10:4,
18:1, 21:22,
34:2, 34:15,
49:11, 60:14,
64:3, 66:15,
75:9, 76:21,
79:15, 81:6,
81:7, 91:16,
97:12, 97:13,
97:15, 98:6,
100:20, 100:21,
101:9, 104:19,
104:22, 111:1,
113:1, 122:23,
126:11, 130:18,
135:12, 139:18,
142:12, 143:10,
143:12, 143:14,
175:8, 183:24
**sometime**
24:9, 26:24,
35:13, 35:22,
53:21, 53:22,
128:20
**sometimes**
29:18, 106:15,

106:17, 111:16
**somewhere**
54:2, 58:3,
64:6, 80:9,
80:15, 83:4
**sooner**
58:11, 58:13,
58:17
**sorry**
17:19, 21:18,
28:21, 33:5,
34:1, 42:18,
58:19, 61:21,
73:14, 86:20,
88:6, 91:20,
96:7, 96:12,
96:16, 98:2,
118:10, 123:16,
123:18, 126:10,
129:8, 138:5,
143:7, 145:21,
147:3, 147:15,
148:15, 151:5,
156:16, 156:20,
156:21, 159:11,
162:16, 162:18,
163:20, 164:16,
168:8, 170:6,
177:3, 179:3,
183:14
**sort**
154:22
**sorts**
162:3
**sound**
44:15, 163:18
**sounds**
30:21, 94:14,
103:6
**south**
3:5, 32:4,
34:18, 39:12,
39:13, 40:12,
48:2, 49:1,
61:7, 113:7,
113:18, 125:21,
125:22, 126:23,
129:2, 131:22,

135:19, 135:24,
136:2, 136:5,
136:11, 162:21,
176:22, 177:10,
177:12, 177:18,
177:23, 181:1,
181:9
**speak**
14:6, 25:6,
25:9, 114:4,
125:23, 125:24,
158:14, 162:2
**speaking**
87:19, 91:2,
91:5, 170:9
**specialized**
16:11
**specific**
27:2, 44:5,
54:5, 128:15,
128:17, 130:5,
130:18, 136:21,
168:20, 172:12,
173:1
**specifically**
32:15, 48:10,
116:5, 117:19,
121:1, 128:19,
148:21, 162:10,
163:21, 169:18,
170:13, 171:3,
180:3
**specifics**
118:19, 118:21
**specify**
43:24, 128:6
**spell**
29:3, 97:7
**spend**
13:14, 13:21,
53:10
**spent**
13:18
**spoke**
14:7, 14:8,
41:17, 58:17,
90:19, 160:7,
161:20

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                                    82

spoken
162:12
squad
81:13
st
17:5, 80:15
stamp
57:10, 87:2,
144:10
stamped
93:21
stamps
86:24
stand
94:5, 119:20
standing
64:9
stands
106:13
start
8:14, 9:5,
15:12, 74:9,
76:6, 96:18,
153:9, 153:14,
153:15, 175:21,
175:22, 176:19
started
24:4, 24:6,
35:9, 50:15,
50:20, 72:5,
73:6, 102:22,
102:23, 103:2,
145:11, 146:21,
147:14, 153:7,
153:10, 153:17,
153:19, 153:21,
161:9, 176:10
starting
13:15
starts
75:2, 124:15,
149:1
state
2:24, 166:4,
166:22, 186:22
stated
34:8, 38:12,
38:13, 38:17,

40:8, 42:6,
43:6, 44:2,
54:9, 54:19,
54:24, 62:8,
99:18, 112:7,
112:17, 115:24,
119:14, 122:16,
140:21, 141:14,
141:24, 151:22,
168:3
statement
10:1, 55:17,
77:13, 90:18,
99:13, 101:17,
122:19, 123:15,
129:23
statements
11:7, 87:17,
160:1
states
1:1, 125:9,
126:16, 157:5,
158:2, 159:1
stating
35:9, 56:5,
88:23
status
119:10, 183:6
stay
131:21
staying
55:19
step
20:15, 74:23,
75:16, 75:22,
77:9, 77:14,
78:1, 78:4,
78:8, 93:17,
95:4, 105:10,
170:3, 170:8
steps
74:11, 74:19,
75:5, 75:18,
77:15, 77:21,
78:7, 84:4,
95:3, 173:11
still
24:17, 45:23,

59:24, 65:5,
83:13, 84:13,
85:23, 126:12,
133:20, 139:19,
146:5, 165:6,
166:17, 176:17
stipulate
6:3
stipulations
152:2
stopped
161:19
straight
84:5, 84:7,
85:4
street
4:6, 16:14,
41:18, 75:6,
76:16, 81:1,
83:13, 107:3,
107:10, 107:24
streets
64:16, 107:8,
107:19, 176:15
stress
153:3, 153:4,
153:7, 153:9,
154:1, 154:5
stressful
152:21
strickland
1:6, 45:13,
45:14, 45:16,
47:5, 60:12,
61:2
strictly
46:24, 47:2
strike
175:20
stss
106:11
stuff
10:10, 11:15,
26:4, 26:8,
37:4, 51:5,
51:18, 68:2,
82:1, 107:15,
111:14, 136:2,

147:1, 147:8,
161:2, 161:9
subject
157:24, 158:24,
164:13
submit
89:9
submitted
13:10, 93:18
subordinates
47:23, 66:8,
66:11
subsequent
141:11
substantiate
129:23
suburbs
32:3, 32:8,
34:22, 37:1,
48:12, 112:9,
126:21, 127:5,
127:17, 129:9,
130:17, 130:24,
131:15, 131:18,
131:20, 132:1,
133:3, 135:19,
136:4, 136:6,
136:11, 162:22,
176:23, 177:14,
177:22, 177:23,
179:8, 181:4
sued
7:11
suffered
122:3, 122:4,
122:5, 148:20,
152:16
suffering
153:6
suing
7:9, 7:16, 7:24
suit
7:8, 8:4
suite
3:6, 3:15, 4:5
summarize
154:8
summary
89:10, 92:1,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

83

**summer**
96:19
35:24
**superintendent**
92:21
**supervise**
157:2
**supervising**
119:6
**supervisor**
18:16, 18:19,
18:21, 19:2,
19:6, 20:10,
22:13, 23:10,
36:22, 55:12,
55:13, 78:13,
92:16, 110:10,
110:12, 112:11,
112:15, 157:4,
169:20, 169:22,
183:21
**supervisor's**
96:21
**supervisors**
40:5, 110:10,
111:5, 111:22,
117:22, 157:6,
157:12, 169:20,
184:4
**supervisory**
157:3, 157:21,
158:3, 158:9
**supplement**
116:10
**support**
44:19, 47:20,
66:21, 159:19,
174:24
**supporting**
158:7, 158:11,
159:4, 159:13
**suppose**
53:9
**supposed**
18:13, 18:17,
18:24, 19:2,
20:6, 22:1,
22:8, 85:15,

109:21, 110:2,
138:21
**sure**
7:13, 11:22,
25:20, 29:6,
37:24, 53:1,
53:23, 54:3,
55:2, 56:13,
59:3, 59:16,
60:24, 66:20,
71:24, 73:8,
77:16, 80:10,
81:1, 84:15,
97:18, 98:17,
101:4, 101:5,
101:19, 110:8,
110:24, 111:21,
111:24, 119:24,
133:4, 133:5,
137:10, 139:9,
143:9, 147:16,
153:10, 154:19,
154:22, 158:20,
167:19, 178:4,
178:17, 180:15,
184:1
**suspect**
137:21, 138:10
**suspend**
77:10
**suspension**
74:22, 75:11,
75:13
**swearing**
6:3
**switch**
123:18, 156:12,
156:15
**sworn**
6:16
**symptoms**
152:20, 154:2
**system**
43:9

**T**

**take**
8:22, 18:21,

18:24, 19:4,
19:5, 19:20,
35:15, 35:21,
43:12, 50:19,
59:1, 75:13,
91:12, 96:4,
133:10, 143:15,
145:13, 160:15,
166:7, 166:10,
166:12, 173:18,
182:4, 183:1,
183:3
**taken**
59:20, 133:17,
154:4, 166:14,
186:6, 186:9
**taking**
98:3
**talk**
14:1, 14:13,
14:21, 14:24,
20:18, 24:17,
24:20, 26:2,
26:3, 26:5,
30:20, 41:8,
44:4, 44:7,
44:22, 45:23,
46:24, 50:6,
50:12, 52:1,
52:9, 52:10,
53:13, 59:13,
60:2, 65:8,
67:21, 67:24,
69:18, 71:9,
71:12, 73:19,
96:5, 96:6,
101:8, 101:10,
132:24, 136:22,
137:7, 147:1,
149:18, 160:9,
161:13
**talked**
14:4, 14:5,
25:4, 25:23,
35:9, 36:2,
47:6, 52:6,
58:16, 63:6,
73:14, 109:11,

133:24, 160:4,
161:5, 161:15,
161:16, 162:4,
163:1, 163:2,
163:3
**talking**
11:22, 12:7,
15:22, 16:17,
37:24, 44:8,
60:11, 61:15,
63:21, 64:4,
64:5, 64:10,
75:8, 76:10,
76:11, 76:12,
87:12, 87:24,
89:15, 90:23,
109:14, 132:18,
132:20, 135:14,
136:9, 145:21,
147:6, 162:11,
164:16, 164:17,
172:19
**tap**
42:17
**taylor**
113:9
**teamsters**
121:8
**technician**
4:13, 56:16,
59:10, 59:16,
114:18, 137:13,
147:17, 155:7,
156:14
**technician's**
123:7
**tell**
9:4, 21:22,
35:5, 35:14,
36:22, 36:23,
38:10, 38:11,
53:16, 53:19,
54:22, 57:16,
58:1, 62:12,
62:15, 62:22,
66:4, 74:7,
101:7, 101:8,
108:11, 112:15,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

84

127:8, 129:14,
129:15, 134:12,
139:7, 141:15,
149:23
**telling**
38:1, 55:22,
55:23, 63:1,
65:11, 65:12,
65:15, 162:3
**ten**
7:14, 50:17,
50:19, 132:8,
153:14
**termination**
74:20
**terms**
74:18, 135:17
**test**
182:24, 183:2,
184:2
**testified**
6:16, 41:11,
140:9, 168:10,
172:18, 173:2,
178:3, 180:16,
181:24
**testifying**
13:4
**testimony**
6:5, 9:9,
12:21, 60:3,
60:7, 61:17,
65:9, 91:6,
118:8, 126:8,
161:12, 178:22,
180:22, 186:8,
186:9
**text**
60:5
**texts**
13:1
**th**
86:4, 115:10,
148:12
**thank**
147:19, 167:18,
185:13
**thanks**
6:19, 59:19,

59:22
**thereafter**
186:9
**therefore**
22:15, 185:6
**they'd**
127:1, 127:2
**thing**
42:22, 60:9,
61:6, 78:4,
96:13, 96:18,
109:8, 115:2,
121:9, 149:4,
149:19, 150:7
**things**
8:13, 17:12,
26:6, 26:7,
31:14, 31:20,
31:21, 31:24,
32:23, 34:6,
34:7, 36:2,
37:16, 37:19,
37:20, 40:3,
53:15, 55:10,
60:12, 63:18,
63:21, 65:14,
98:4, 109:11,
117:10, 145:10,
145:11, 145:12,
145:15, 149:3,
149:18, 152:23,
153:21, 160:23,
161:3, 161:4,
161:6, 176:8,
177:15
**think**
18:3, 19:6,
19:10, 19:14,
23:4, 25:4,
26:19, 27:9,
27:12, 30:7,
30:16, 31:1,
31:2, 31:9,
31:10, 31:13,
36:14, 42:1,
42:13, 44:9,
44:10, 44:14,
45:17, 46:12,

47:8, 47:9,
47:13, 48:3,
48:5, 49:15,
49:24, 50:16,
52:20, 53:7,
55:7, 55:12,
55:15, 55:24,
62:6, 62:24,
64:8, 65:24,
66:1, 66:5,
66:7, 66:17,
66:18, 67:24,
69:21, 80:24,
83:21, 84:19,
84:21, 85:5,
86:4, 97:5,
97:11, 102:10,
102:13, 105:1,
105:20, 109:23,
110:5, 110:18,
111:3, 111:10,
133:12, 134:15,
135:23, 137:1,
137:14, 139:9,
140:24, 143:2,
143:13, 151:7,
155:10, 161:18,
175:19, 178:16,
182:13, 184:8
**thinks**
79:10
**thomas**
1:11, 2:10,
148:5
**thought**
38:4, 44:15,
54:20, 54:21,
60:24, 61:1,
66:10, 88:1,
89:17, 91:21,
103:18, 145:9,
156:17, 164:17
**threaten**
124:1, 180:5,
180:14
**threatened**
123:22
**threatening**
180:4, 180:11

**three**
13:19, 13:20,
18:4, 64:17,
71:5, 74:11,
75:1, 86:5,
95:4, 143:5,
143:9, 143:14,
143:17, 157:16,
157:17, 182:1,
182:5, 182:10,
182:14
**threw**
95:8, 95:9,
95:11
**through**
6:20, 13:15,
13:23, 15:17,
16:9, 18:2,
19:22, 20:5,
20:14, 25:6,
45:19, 56:8,
56:12, 60:10,
84:3, 84:11,
84:12, 86:18,
87:15, 93:18,
95:3, 95:10,
98:16, 119:15,
122:21, 123:6,
133:1, 149:3,
149:18, 150:16,
151:24, 162:6,
167:21, 185:2,
185:9
**throughout**
13:16, 17:24,
18:8, 36:3
**throw**
142:15
**thump**
81:5, 81:8
**thursday**
14:7, 14:9,
14:10
**time**
13:16, 13:17,
15:5, 19:12,
20:13, 27:20,
28:21, 32:6,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

85

35:18, 36:1,
38:5, 42:1,
42:11, 43:8,
43:10, 45:18,
46:2, 46:8,
50:15, 52:7,
53:10, 58:8,
58:12, 59:1,
62:8, 62:9,
62:16, 64:2,
64:8, 66:23,
77:11, 80:4,
84:24, 85:14,
85:16, 86:2,
86:5, 91:12,
94:17, 96:16,
96:20, 99:8,
99:13, 99:21,
100:7, 100:12,
103:8, 103:15,
109:18, 117:24,
118:2, 124:22,
127:18, 127:20,
128:4, 131:23,
132:5, 132:11,
132:14, 132:16,
132:20, 132:21,
134:16, 139:13,
143:16, 146:18,
147:11, 149:22,
153:11, 153:12,
153:18, 159:11,
160:1, 165:24,
167:17, 181:17,
184:16, 185:16
**times**
7:5, 25:19,
25:24, 27:13,
27:15, 27:24,
28:4, 29:10,
34:21, 44:1,
71:5, 103:5,
118:17, 127:16,
128:12, 130:19,
131:11, 132:2,
132:7, 135:1,
135:6, 135:7,
138:3, 162:16,

170:4
**tims**
1:6, 50:7,
50:13, 51:19,
52:17, 53:2,
55:22, 56:5,
57:20, 57:21,
57:24, 61:16,
62:12, 62:19,
62:22, 100:8,
100:9, 100:10,
100:11, 100:18,
100:23, 102:11,
105:24, 139:1,
139:7, 141:1,
141:16, 160:7,
160:9, 160:12,
160:20, 161:14,
162:9, 163:6,
168:11, 168:14,
184:19
**tinley**
176:23, 177:23
**title**
49:10
**titled**
95:24, 137:14,
143:21
**today**
9:9, 12:20,
13:8, 38:7,
45:23, 86:9,
129:4
**together**
6:24, 27:21,
52:7, 52:20,
53:10, 53:13,
103:1, 122:18,
160:17
**told**
34:13, 35:11,
36:10, 55:22,
58:5, 99:14,
100:1, 139:1,
139:24, 140:13,
140:15, 163:13,
184:19
**tom**
49:8

**took**
19:3, 65:7,
81:8, 81:16,
81:20, 84:7,
100:13, 121:24,
144:19, 144:24,
154:6, 155:23,
166:16
**top**
57:9, 94:14,
137:22, 144:8,
149:14, 158:21
**topical**
155:18
**totally**
59:5, 100:22
**tour**
175:23, 176:19,
179:12
**towards**
10:2, 55:17,
124:8, 124:13,
180:20
**track**
44:3, 61:14
**trails**
51:7
**training**
17:13, 17:20,
17:23, 18:2,
18:5, 18:8
**transcript**
5:7, 6:7,
58:23, 86:22,
96:2, 114:21,
137:18, 147:21,
148:2, 186:7
**transfer**
16:6
**transferred**
15:20, 16:1,
83:2, 83:15,
84:20, 184:21,
184:22
**transpired**
173:3
**treated**
48:17, 48:19,

85:6, 125:6,
181:16
**treaters**
153:2
**treatment**
138:3, 154:10
**triage**
137:20
**trick**
30:8
**tried**
63:19, 83:5,
151:9
**troubling**
42:21, 42:22
**true**
6:5, 115:4,
115:7, 148:8,
161:23, 163:12,
167:3, 186:7
**trust**
174:9
**truthful**
9:9
**try**
42:3, 63:14,
64:1, 183:8
**trying**
27:12, 27:22,
30:8, 30:17,
41:10, 41:12,
44:17, 44:24,
48:6, 55:21,
61:1, 77:18,
82:17, 105:21,
128:14, 134:20,
147:4, 153:13
**tss**
106:10, 106:13,
106:18, 106:21,
106:23, 107:1,
107:2, 107:4,
107:7, 107:11,
107:14, 107:24,
108:4, 109:2,
109:7
**tuesday**
14:8

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020                                              86

turn
39:1, 91:8,
147:22, 148:6,
148:15, 148:16,
159:22
twice
107:12
two
13:19, 13:20,
20:15, 25:11,
40:13, 40:19,
43:24, 44:2,
54:14, 64:17,
74:11, 74:23,
75:16, 77:10,
78:10, 93:11,
95:4, 102:16,
154:19, 160:19
type
42:24, 82:1
types
177:9, 177:17
typewriting
186:10
typically
28:18, 28:22
tyrone
2:6, 71:20

**U**

ultimate
95:6, 104:17
unbiased
159:7, 159:15
under
6:6, 59:24,
65:5, 110:24,
115:6, 115:15,
126:3, 133:20,
137:21, 142:22,
144:2, 148:7,
152:1, 161:22,
166:17, 186:10
underneath
93:1, 144:20
undersheriff
78:6
understand
9:4, 12:21,

19:5, 27:22,
41:10, 44:8,
44:14, 59:23,
65:5, 65:12,
75:7, 77:16,
81:22, 103:23,
119:24, 133:20,
140:5, 147:3,
166:17
understanding
11:8, 12:9,
23:16, 36:14
understood
9:6, 115:15
unfair
79:10, 84:21
unfit
158:8
union
19:21, 19:22,
75:23, 79:13,
79:15, 79:20,
84:12, 93:18,
110:3, 110:6,
110:17, 110:18,
121:12, 121:16,
151:24, 152:3,
179:17, 183:24
unit
16:11, 42:5,
60:22, 76:15,
76:22, 83:2,
84:8, 84:20,
84:23, 98:22,
99:3, 100:10,
100:11, 103:16,
131:5, 132:15,
133:6, 151:14,
157:6, 160:8,
161:1, 171:18,
171:22, 181:15,
181:17, 184:4
united
1:1
units
98:23, 146:19
unless
21:5, 22:19,

130:8, 182:14
unlocking
81:16
unrelated
100:22
until
15:19, 40:7,
58:1, 59:9,
78:4, 108:20,
139:10, 173:11,
183:24
uploaded
56:15, 137:14
ups
17:12, 74:21,
169:17
use
8:24, 45:5,
53:17, 55:13,
55:15, 62:19,
62:23, 67:4,
142:11, 142:15,
168:21
using
57:16, 61:16,
61:20, 62:2,
142:9
usually
25:1, 59:11,
84:22, 108:4

**V**

varied
25:22
varies
25:20, 70:4,
77:24
variety
26:5, 36:2
various
32:13, 35:2,
84:3, 100:19,
102:24, 127:11,
146:19
vehicles
81:17
venting
62:1

verbal
121:24
verbally
122:23
verification
115:3
verified
6:9, 115:12,
161:21
verify
39:5, 115:4
vernell
1:6, 50:7,
51:19
versa
25:14, 25:15
versus
37:5, 47:23,
125:17, 135:15,
135:19
vfws
35:1
via
8:12
vice
25:14, 25:15
victor
2:7, 72:23
video
8:12
viewed
139:6
views
98:3
violation
62:3, 94:10,
105:6, 138:19,
140:1
violations
62:7, 169:19,
170:23, 183:17
violent
177:19, 177:24
virtually
1:19, 2:20,
6:21
vividly
155:2

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

87

| | | | |
|---|---|---|---|
| volume | 168:3, 171:2, | we've | 177:18, 181:1, |
| 180:24, 181:2 | 178:17 | 68:13, 122:20 | 181:9 |
| **W** | wanted | webb | western |
| wages | 22:23, 36:11, | 34:7, 34:11, | 32:3, 32:7, |
| 149:5, 149:20, | 39:1, 42:3, | 34:14, 35:6, | 34:21, 36:24, |
| 150:3, 150:6, | 60:10, 61:3, | 35:12, 38:11, | 112:9, 126:20, |
| 166:24 | 99:2, 100:17, | 38:18, 40:5, | 127:5, 127:17, |
| wait | 114:5, 114:7, | 43:2, 43:7, | 129:8, 130:17, |
| 145:7, 155:11, | 128:5, 130:17, | 47:14, 47:23, | 130:24, 131:15, |
| 170:7 | 141:16, 183:4, | 76:9, 76:15, | 131:18, 131:20, |
| waited | 183:22 | 90:21, 92:23, | 132:1, 133:3, |
| 172:11 | wanting | 140:16, 141:7, | 135:18, 136:3, |
| waiving | 88:23, 113:21, | 141:24 | 136:5, 136:11, |
| 158:1, 158:24, | 114:2 | webb's | 176:23, 177:14, |
| 164:13 | wants | 35:16 | 177:22, 181:4 |
| walk | 36:17 | week | whatever |
| 15:17, 132:21 | warrants | 13:17, 14:10, | 67:1, 93:11 |
| walked | 35:1 | 25:19, 25:24, | whenever |
| 100:3, 100:4, | wash | 40:10, 52:1, | 50:20, 52:18 |
| 100:5 | 40:16 | 93:11 | whereabouts |
| walker | watch | weekday | 41:21 |
| 2:6, 70:19, | 111:16, 111:18 | 52:23 | whereas |
| 70:21, 71:14 | water | weekend | 41:19, 64:2, |
| walking | 84:17 | 52:24 | 64:4, 135:11 |
| 132:17, 132:19, | way | weeks | whereof |
| 132:20 | 6:8, 31:7, | 93:12 | 186:15 |
| walls | 55:20, 56:13, | went | whether |
| 43:10 | 59:7, 72:14, | 13:9, 18:4, | 19:3, 31:7, |
| want | 78:6, 106:1, | 18:5, 41:18, | 48:1, 48:23, |
| 14:5, 21:21, | 109:19, 149:23, | 42:6, 80:21, | 67:1, 78:5, |
| 22:19, 23:3, | 156:10 | 81:2, 83:19, | 78:9, 116:1, |
| 28:2, 29:6, | ways | 84:12, 101:7, | 119:9, 119:12, |
| 36:12, 44:4, | 150:1, 150:2 | 139:4, 139:21, | 120:23, 122:2, |
| 44:13, 56:10, | we'll | 140:7, 150:21, | 182:23 |
| 56:13, 63:15, | 8:24, 12:17, | 165:8, 181:14, | whistle |
| 64:13, 65:9, | 34:8, 41:8, | 183:5, 185:5 | 36:15, 37:16, |
| 77:12, 87:16, | 65:13, 86:17, | weren't | 38:3, 38:8 |
| 87:20, 88:8, | 86:20, 96:3, | 145:18, 145:23 | whistleblower |
| 89:13, 92:2, | 117:12, 133:16, | west | 11:4, 33:20, |
| 97:9, 97:20, | 166:13 | 32:5, 34:19, | 34:2, 36:11, |
| 98:16, 98:22, | we're | 39:15, 48:1, | 36:16 |
| 98:24, 101:9, | 8:8, 8:11, 9:5, | 48:12, 49:1, | white |
| 102:24, 103:24, | 12:7, 15:22, | 61:8, 113:14, | 3:12, 5:3, |
| 109:12, 114:13, | 16:17, 43:1, | 113:15, 113:18, | 6:13, 6:18, |
| 115:2, 133:10, | 47:22, 79:16, | 129:3, 129:8, | 6:22, 12:6, |
| 135:13, 149:18, | 113:2, 114:11, | 135:24, 136:3, | 32:8, 55:13, |
| 154:23, 166:10, | 114:15, 147:6, | 136:4, 162:21, | 56:11, 56:18, |
| | 165:10 | 176:22, 177:10, | 57:8, 59:3, |

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

88

59:5, 59:14,
59:17, 59:21,
65:3, 86:13,
114:17, 125:11,
125:20, 125:23,
126:5, 126:6,
126:17, 126:18,
127:4, 127:16,
129:7, 130:23,
133:14, 133:16,
133:18, 137:13,
143:23, 144:16,
147:19, 156:12,
156:16, 156:20,
162:22, 163:23,
164:3, 166:9,
166:12, 166:15,
168:6, 169:6,
170:15, 170:16,
170:18, 170:22,
170:24, 171:12,
171:17, 171:19,
172:1, 172:5,
172:8, 173:14,
173:20, 175:3,
175:5, 175:24,
177:1, 177:7,
177:11, 178:1,
178:10, 178:21,
179:2, 179:7,
179:10, 179:11,
179:14, 179:24,
180:7, 180:13,
180:21, 181:5,
181:19, 182:6,
182:11, 182:20,
183:12, 183:13,
183:18, 183:19,
184:12, 184:14,
185:13, 185:15
**whites**
171:13
**whoever**
110:1, 141:21
**whole**
17:24, 36:3,
75:22, 96:13,
96:17

**wilford**
2:3, 68:7
**williams**
2:4, 69:9,
69:12, 70:5,
70:8
**willing**
33:19
**window**
81:7, 81:15,
82:4
**windows**
156:22
**winston**
1:5, 5:11,
23:19, 23:21,
24:10, 24:15,
26:10, 26:13,
27:10, 27:14,
30:2, 30:5,
30:6, 30:12,
32:19, 56:17
**within**
16:18, 18:10,
28:22, 59:12,
59:13, 110:5,
111:5, 121:14
**without**
34:23, 83:3,
158:1, 158:24,
164:13
**witness**
6:4, 6:9, 7:10,
10:17, 11:9,
11:11, 12:15,
22:5, 22:12,
22:19, 22:24,
23:1, 56:14,
105:23, 126:10,
165:19, 166:7,
166:11, 186:15
**witnessed**
18:13, 22:24,
34:3, 129:5,
130:16
**witnesses**
9:23, 9:24,
11:4

**witnessing**
17:17
**word**
55:15, 55:19,
64:24, 171:6
**words**
61:1, 94:13,
100:4
**worked**
11:5, 11:10,
25:6, 27:20,
27:21, 28:8,
29:9, 32:14,
34:3, 34:20,
37:11, 37:12,
45:2, 45:3,
48:11, 48:12,
48:24, 49:6,
50:8, 50:9,
50:18, 52:6,
55:9, 67:10,
68:14, 69:1,
69:16, 69:21,
70:1, 70:22,
70:23, 72:7,
102:17, 107:3,
112:8, 119:21,
122:15, 126:24,
128:10, 146:8,
179:11
**workers**
134:9
**working**
9:20, 15:13,
17:15, 17:19,
20:4, 21:9,
24:1, 25:3,
26:21, 27:24,
36:19, 39:7,
39:11, 46:21,
48:18, 52:5,
52:19, 60:13,
60:16, 60:18,
60:21, 60:22,
60:23, 61:2,
61:5, 61:7,
61:10, 63:8,
63:23, 63:24,

64:12, 68:23,
69:2, 70:2,
72:3, 88:1,
94:8, 97:11,
98:9, 98:10,
98:12, 98:13,
99:1, 103:9,
103:13, 103:21,
104:4, 104:6,
104:10, 114:8,
120:7, 122:14,
123:13, 125:16,
127:22, 129:14,
131:5, 145:18,
145:19, 145:20,
146:19, 152:19,
160:17, 174:1,
174:11, 174:24,
178:17
**workplace**
9:20, 20:4,
48:19, 63:23,
65:16, 65:21,
68:5, 152:19
**works**
74:8
**worry**
107:2
**wouldn't**
22:17, 22:22,
23:2, 23:3,
31:18, 34:21,
51:18, 78:14,
109:9, 185:8
**write**
17:12, 20:6,
28:14, 64:14,
64:19, 74:9,
74:15, 74:21,
75:9, 75:11,
78:20, 78:21,
78:24, 79:3,
84:1, 84:6,
88:22, 89:4,
90:3, 90:6,
90:22, 91:18,
93:14, 94:2,
169:17, 170:2,

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020
89

170:4, 173:7
**writes**
78:13, 78:16,
169:18
**writing**
94:11
**written**
10:10, 21:4,
83:1, 84:22,
121:24, 145:11,
171:14, 183:2,
183:12, 183:17
**wrong**
12:10, 60:17,
89:15
**wrongdoing**
38:3
**wrote**
64:15, 78:18,
83:17, 90:9,
91:19, 91:22,
94:4, 94:7,
126:15, 150:5

**Y**

**yeah**
15:11, 18:1,
18:3, 22:6,
25:15, 27:4,
28:10, 29:5,
33:2, 40:2,
42:18, 50:16,
51:3, 52:15,
52:17, 52:21,
53:16, 59:5,
59:10, 59:14,
66:16, 73:5,
74:21, 75:14,
87:8, 91:20,
92:6, 93:19,
100:10, 105:1,
105:11, 108:20,
109:5, 111:20,
118:23, 123:3,
123:5, 127:7,
133:14, 134:7,
138:7, 139:2,
140:21, 142:24,

144:6, 146:15,
146:17, 156:20,
158:20, 165:1,
169:24
**year**
18:1, 28:1,
35:22, 36:3,
53:3, 53:4,
53:5, 53:21,
58:12, 80:13,
153:12, 153:15,
153:17, 160:13
**years**
7:13, 7:14,
16:17, 23:23,
27:10, 27:23,
28:22, 50:17,
50:19, 58:5,
58:9, 58:14,
72:1, 132:8,
136:22, 145:7,
145:14, 145:15,
153:14, 161:13,
162:3, 165:17,
165:19, 183:22
**yourself**
9:22, 19:24,
57:18, 142:17

**Z**

**zoom**
59:12, 59:13

**$**

**$10**
143:2
**$5**
143:2

**0**

**00**
25:10, 28:15,
28:16, 28:17,
28:18, 29:14,
29:17, 33:23,
35:19, 37:9,
37:21, 44:22,
46:6, 49:12,

55:10, 67:10,
67:11, 68:11,
68:12, 70:23,
71:22, 72:8,
73:12, 73:15,
87:17, 108:1,
118:13, 119:21,
119:23, 120:8
**0339**
3:17
**05726**
1:9, 2:7
**06**
133:16
**07**
118:3
**09**
87:17

**1**

**1**
133:16, 166:13
**10**
18:3, 28:4,
59:2, 115:10,
124:5, 148:12
**100**
3:6
**11**
25:10, 28:4,
28:16, 29:14,
37:21, 44:22,
46:6, 49:12,
67:11, 68:11,
68:12, 71:22,
73:12, 73:15,
108:1, 119:21,
120:8, 124:15,
144:10
**114**
5:14
**12**
137:22, 145:7,
145:14, 145:15,
156:23
**120**
4:6
**13**
94:11, 157:20

**13.1**
94:11
**137**
5:16
**14**
158:6
**146**
87:3
**147**
5:17
**148**
5:18
**15**
16:17, 18:3,
23:23, 27:23,
30:5, 159:3,
161:12
**16**
94:10
**167**
5:4
**17**
15:14, 86:4,
159:22, 172:15
**1737**
41:18
**18**
1:9, 2:7,
53:23, 58:3,
125:4
**186**
1:23
**19**
24:24, 53:23
**1990**
15:14, 15:15
**1992**
163:18, 164:15,
164:24

**2**

**2**
185:17
**20**
86:3, 163:8,
163:23, 164:11,
164:12, 165:11
**200**
3:15

Transcript of I.V. Newsom, Jr.
Conducted on July 6, 2020

90

**2000**
4:5
**2005**
15:20, 16:1,
16:16, 23:22,
24:9, 145:3,
145:8, 145:18,
145:24, 146:3,
146:14, 147:1,
147:2, 147:8,
147:14, 153:7,
153:14, 161:10,
181:14
**2006**
118:3, 118:4
**2007**
118:4
**2012**
57:19
**2015**
30:1, 30:4,
30:11
**2016**
87:4, 87:18,
93:5, 93:8,
122:8, 137:22,
138:8, 147:7,
172:13, 172:16
**2017**
96:10, 97:1,
144:5, 144:10,
144:14
**2018**
53:6, 146:13
**2019**
17:5, 35:13,
35:23, 36:1,
38:2, 53:6,
53:7, 53:22,
58:2, 80:11,
80:12, 132:9,
171:4
**2020**
1:20, 115:10,
148:13, 186:16
**2021**
3:14
**2023**
186:17

**206**
3:5
**22**
93:5, 166:3,
166:20
**23**
5:13, 95:24,
96:10, 97:1,
176:1
**24**
13:21, 185:17
**26**
149:8
**27**
137:22, 138:8

— **3** —

**3**
25:10, 28:16,
28:17, 28:18,
29:14, 29:17,
33:23, 35:19,
37:9, 37:21,
44:22, 46:6,
49:12, 55:10,
67:10, 68:11,
68:12, 70:23,
71:22, 72:8,
73:12, 73:15,
108:1, 118:13,
119:21, 119:23,
120:8
**30**
165:17, 165:19
**300**
146:23, 147:5
**306408**
1:22
**31**
17:5, 91:12
**312**
3:8
**36**
105:3
**37**
93:21
**3705**
4:8

— **4** —

**43**
56:24, 57:14
**45**
14:14
**46**
115:22, 117:12,
119:4, 120:22,
121:21
**48**
13:21

— **5** —

**51**
80:15
**52**
80:16, 81:3
**53**
59:2, 80:16
**54**
1:21
**55**
166:13
**58**
5:11

— **6** —

**6-7**
94:15
**6-8**
94:10, 94:16
**6000**
87:22
**6032**
87:6, 87:19,
96:20
**60523**
3:16
**60602**
4:7
**60661**
3:7
**630**
3:17
**655**
3:8
**6th**
176:1, 186:16,

186:17

— **7** —

**7**
25:10, 28:15,
28:17, 28:18,
29:17, 33:23,
35:19, 37:9,
55:10, 70:23,
72:8, 118:13,
119:23
**7660**
3:8
**786**
4:8
**7th**
90:2, 122:8,
172:13, 172:16

— **8** —

**80**
15:8, 15:9
**84**
123:19, 123:21
**86**
5:12
**866**
4:8
**8th**
93:8

— **9** —

**9**
1:21
**90**
15:9
**92**
165:16
**93**
41:18
**96**
5:13
**984**
3:17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LEGRAIN WINSTON, et al.                    )
                                           ) Case No. 18-cv-05726
    Plaintiffs,                         )
                                           ) Hon. Matthew F. Kennelly
v.                                         )
                                           )
THOMAS J. DART, et al.                     )
                                           )
    Defendants.

### PLAINTIFF I.V. NEWSON, JR'S OBJECTIONS AND ANSWERS TO DEFENDANT GREGORY SHIELDS' FIRST SET OF INTERROGATORIES

NOW COMES, Plaintiff, I.V. Newson, Jr., and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

### GENERAL OBJECTIONS

1.  These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2.  Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3.  Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.



Exhibit #

Newsom 4

7/06/20

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:       I.V. Newson, Jr.**
**246 Owen Street**
**Matteson, IL 60443**
**(773) 580-8219**

**Undersigned Counsel**

2.     Identify all assignments you received that you allege were discriminatory as alleged in Paragraph 46 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:       Investigation continues and Plaintiff reserves the right to supplement this response.**

3.     Explain specifically what you mean by "high incident areas" as alleged in Paragraph 46 of the Complaint and explain what was dangerous about your assignment.

**Response:       "High incident area" refers to areas in Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative or unfavorable actions can take place.  Investigation continues and Plaintiff reserves the right to supplement this response.**

2

4.     Identify the other "non-minority officers" who did not receive the same assignments as you were assigned to as alleged in Paragraph 46 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to the employee's assignment, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:     Plaintiff Newson states that Investigators Nickle, Bieniek, Shedor, Bosques, Pemonte, Folkers, Vasques, Lopez, Rico and Hurtado were rarely assigned to TSS. The on-duty shift commander was responsible for the daily roster and assignments. The above-named investigators were assigned to either the office or patrol in very low risk areas or assigned to patrol jobs with minimal work such as doing home checks on inmates. Investigation continues and Plaintiff reserves the right to supplement this response.**

5.     Explain the basis of your contention that the assignments were to be rotated as alleged in Paragraph 46 of the Complaint, including whether or not that was to be done pursuant to any contract, rule, law, or regulation, and identify specifically what assignments you are referring to.

**Response:     Investigation continues and Plaintiff reserves the right to supplement this response.**

6.     Identify each and every complaint you made regarding the behavior alleged in Paragraph 46 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints,

3

and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response: Plaintiff Newson states that on or about June 7, 2016, he asked Assistant Chief Cortez to switch his current partner assignment with Investigator Cholewa. As a result of making this request, he was written up for allegedly refusing an order from a superior. See June 7, 2016 Disciplinary Action Form and Bates Stamped _____**

7.      Identify all facts regarding your allegation that Defendant Shields assigned you to a location "where a family had scabies" as alleged in Paragraph 79 of the Complaint, including when the incident occurred, whether or not any other Defendants were involved, where you believe you should have been assigned instead, who "the non-minority officers on the earlier watch" are that you believe should have been assigned there instead of you, why you believe your race was a factor in the assignment, and how you were damaged by the assignment.

**Response: On or about December 27, 2016, Plaintiff Newson was assigned to a house where the subject had scabies. Director Webb and Boyle had knowledge that the subject had scabies. I sought medical treatment after I learned that I had been exposed to scabies. See Rush Hospital records and Bates Stamped _____ through _____**

8.      Identify each and every complaint you made regarding the behavior alleged in Paragraph 79 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

9.      Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

10.      If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

11.      Identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what

the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

12.     If not already answered above, identify the duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**Response:** **TSS or Technical Services Section assignment is not a desirable assignment because it is located in the basement of Division 5; and, it has poor ventilation or windows, and home to mice and cockroaches. Answering further, TSS is not a desirable assignment because you are not provided proper lunch breaks and often are forced to work overtime. Investigation continues and Plaintiff reserves the right to supplement this response.**

13.     Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you

were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response: "High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative and unfavorable actions can take place. Investigation continues and Plaintiff reserves the right to supplement this response.**

14.     If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:     Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

15.     If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:     Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

16.     Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection: See Complaint.  Investigation continues and Plaintiff reserves the right to supplement this response.**

17.     Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection: See Complaint.  Investigation continues and Plaintiff reserves the right to supplement this response.**

18.     Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response:     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection: See Complaint.  Answering further, Plaintiff states that Chief would grant certain requests when asked by White investigators and deny the same request made by African-American investigators.   Investigation continues and Plaintiff reserves the right to supplement this response.**

4816-0678-1876, v. 1

19.     Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response:     Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection, Plaintiff states policies, practices and decisions pertaining to assignments and placement of investigators based on race; response given to certain requests asked of African-American investigators compared to white investigators. Investigation continues and Plaintiff reserves the right to supplement this response.**

Respectfully Submitted,

By:     /s/ Kelly A. Krauchun
        KELLY A. KRAUCHUN
        The Herbert Law Firm
        206 S. Jefferson, Suite 100
        Chicago, IL 60661
        (312) 655-7660
        Kelly.krauchun@danherbertlaw.com

4816-0678-1876, v. 1

## **VERIFICATION**

I, I.V. Newson, Jr., state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2-10-2020

_____
I.V. Newson, Jr.

# Exhibit B



# Transcript of David A. Walker

**Date:** July 13, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of David A. Walker

1 (1 to 4)

Conducted on July 13, 2020

---

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2               EASTERN DIVISION

3  LEGRAIN WINSTON, MICHELLE )
   STRICKLAND, VERNELL TIMS, )
4  I.V. NEWSON, JR., SAMUEL  )
   PAGE, WILFORD FERGUSON,   )
5  CECIL WILLIAMS, ANTHONY   )
   MANNING, DAVID WALKER,    )
6  TYRONE MCGHEE and VICTOR  )
   SLAUGHTER,                )
7              Plaintiffs,   )
                             )
8        -vs-                )  No. 18 cv-05726
                             )
9  SHERIFF OF COOK COUNTY    )
   THOMAS J. DART, in his    )
10 Official Capacity, JOSEPH )
   RANZINO, Individually and )
11 in his Official Capacity, )
   GREGORY SHIELDS,          )
12 Individually and in his   )
   Official Capacity, THOMAS )
13 NEAL, Individually and in )
   his Official Capacity,    )
14 CHRISTOPHER ROHLOFF,      )
   Individually and in his   )
15 Official Capacity and     )
   COUNTY OF COOK, ILLINOIS, )
16              Defendants.)

17

18        Deposition of DAVID A. WALKER, appearing via

19 Zoom, taken before CYNTHIA A. SPLAYT, CSR, pursuant to

20 the Federal Rules of Civil Procedure for the United

21 States District Courts pertaining to the taking of

22 depositions.  The witness is located at 2561 West 79th

23 Place, Chicago, Illinois, commencing at the hour of

24 9:59 a.m. on the 13th day of July, A.D., 2020.
```

---

**Page 2**

```
1  APPEARANCES:

2       THE HERBERT LAW FIRM
        By:  MS. KELLY A. KRAUCHUN
3       206 South Jefferson Street, Suite 100
        Chicago, IL  60661
4       (312) 655-7660, (312) 655-7661 (Fax)
        kelly.krauchun@danherbertlaw.com
5
            Appeared via Zoom on behalf of the
6           Plaintiffs,

7
        LEINENWEBER, BARONI & DAFFADA, LLC
8       By:  MR. JUSTIN L. LEINENWEBER
        120 N. LaSalle Street, Suite 2000
9       Chicago, IL  60602
        (312) 380-6635, (800) 896-2193 (Fax)
10      justin@ilesq.com
                -and-
11      EMERY LAW
        By:  MR. ETHAN WHITE
12      2021 Midwest Road, Suite 200
        Oak Brook, IL  60523
13      (630) 984-0339
        ewhite@emerylawltd.com
14
            Appeared via Zoom on behalf of the
15          Defendants.

16
   ALSO PRESENT:
17
        MS. ANNIE BROWN - Planet Depos tech
18

19

20

21

22

23  REPORTED BY:  CYNTHIA A. SPLAYT, CSR

24  CSR NO.:  084.003295
```

---

**Page 3**

```
1                 EXAMINATION INDEX

2
   WITNESS                              PAGE

3  DAVID A. WALKER

4

5  Direct Examination by Mr. Leinenweber      5
   Cross-Examination by Ms. Krauchun        213
6  Redirect Examination by Mr. Leinenweber  224

7

8

9                  EXHIBIT INDEX

10           MARKED FOR IDENTIFICATION

11 WALKER DEPOSITION EXHIBIT

12 No. 1  Complaint                          71

13 No. 2  Plaintiff David Walker's Objections and
          Answers to Defendant Gregory Shields First
14        Set of Interrogatories            113

15 No. 3  Plaintiff David Walker's Objections and
          Answers to Defendant Sheriff of Cook County,
16        Thomas J. Dart's First Set of
          Interrogatories                   135

17
   No. 4  Informal Inquiry of Inv. David Walker
18        dated 4-29-15                     158

19 No. 5  Cook County Sheriff's Office Witness
          Statement dated 2-9-16            163
20

21 NOTE:  Exhibits 1-5 attached.

22

23

24
```

---

**Page 4**

```
1        MS. BROWN:  Thank you to everyone for
2  attending this proceeding remotely, which we
3  anticipate will run smoothly.  Please be aware that we
4  are recording this proceeding for backup purposes.
5  Any off-the-record discussions should be had away from
6  the computer.  Please remember to mute your microphone
7  for those conversations.  Please have your video
8  enabled to help the reporter identify who is speaking.
9  If you are unable to connect with video and are
10 connecting via phone, please identify yourself each
11 time before speaking.  We will provide a complimentary
12 unedited recording of this deposition with the
13 purchase of a transcript if you are interested.  I
14 apologize in advance for any technical-related
15 interruptions.  Thank you.
16        THE COURT REPORTER:  Before we proceed, I
17 will ask counsel to agree on the record that under the
18 current National Emergency pursuant to Section 319 of
19 the Public Health Service Act, there is no objection
20 to this deposition officer administering a binding
21 oath to the witness remotely via Zoom.  Please state
22 your name and your agreement on the record starting
23 with the noticing attorney.
24        MR. LEINENWEBER:  Justin Leinenweber, and
```

Transcript of David A. Walker

2 (5 to 8)

Conducted on July 13, 2020

---

5

1 yes, I agree.
2          MS. KRAUCHUN: Kelly Krauchun, and yes, I
3 agree.
4          MR. WHITE: And in case you need it,
5 Ethan White, yes, I agree.
6          THE COURT REPORTER: Okay. Mr. Walker,
7 please raise your right hand.
8          (Witness sworn.)
9          DAVID A. WALKER,
10 called as a witness herein, having been first duly
11 sworn, was examined upon oral interrogatories and
12 testified as follows:
13          THE COURT REPORTER: Thank you.
14          DIRECT EXAMINATION
15 BY MR. LEINENWEBER:
16    Q.   Thanks very much. Good morning, Mr. Walker.
17 My name is Justin Leinenweber, and I am one of the
18 attorneys representing the Defendants in this matter.
19          Could you please state and spell your
20 name for the record.
21    **A.   My name is David A. Walker. A is the middle**
22 **initial. David, capital D-a-v-i-d. Capital A, middle**
23 **initial. Last name, Walker, capital W-a-l-k-e-r.**
24    Q.   And have you -- thank you, Mr. Walker.

---

6

1          Have you ever had your deposition
2 taken?
3    **A.   I've taken a deposition before.**
4    Q.   Okay. Roughly how long ago was it? It
5 doesn't have to be exact, but --
6    **A.   Maybe in around 2002.**
7    Q.   Okay.
8    **A.   2003.**
9    Q.   Okay. So it's been a little while, so let
10 me just go over a couple of sort of ground rules for
11 us today. The first is it's -- Cindy is our court
12 reporter, and she's going to be taking down everything
13 that I say and everything that you say and everything
14 that your attorney says. Because she's doing that
15 very important job, it's really important that we not
16 talk over each other, so when I'm asking a question,
17 please just let me finish before you answer your
18 question -- before you answer the question, and I will
19 try and do the same for you when you're giving an
20 answer. Is that fair to say?
21    **A.   I can do that.**
22    Q.   Okay. And it's -- I'm sure we'll have a few
23 mess ups along the way, so I apologize in advance for
24 that, but we'll do the best we can under these

---

7

1 circumstances.
2          So one thing that I want to point out
3 is, and I am guilty of doing this all the time, is
4 sometimes I'll nod or shake my head or say um or
5 uh-huh. Unfortunately, the court reporter can't take
6 down those kinds of things, so when you are answering
7 a question, we're going to say yes or no,
8 essentially to give a verbal answer instead of a shake
9 of the head. Is that acceptable?
10    **A.   It is acceptable.**
11    Q.   All right. And then we're happy -- we're
12 going to be here for a while today. Hopefully, no
13 longer than absolutely necessary, but if at any time
14 you need to take a break, we're happy to accommodate
15 that so long as no question is pending. Is that
16 acceptable to you as well?
17    **A.   Yes.**
18    Q.   Okay. If you don't understand a question
19 I'm asking, it's perfectly okay to say you don't
20 understand and ask me to rephrase it, but if you do
21 answer a question I ask, we're all going to assume
22 that you understood the question. Is that acceptable
23 as well?
24    **A.   It is.**

---

8

1    Q.   Okay.
2    **A.   It is acceptable.**
3    Q.   Great.
4          Is there any reason that you can't give
5 a full and complete and honest testimony today?
6    **A.   I don't know a reason why I can't.**
7    Q.   So is it fair to say there aren't any
8 reasons?
9    **A.   No, there are not.**
10    Q.   Okay. Sounds good.
11          So since we're not all together in a
12 conference room, let me just ask you a couple
13 questions. Is there anyone in the room with you right
14 now?
15    **A.   No.**
16    Q.   Okay. Do you have any notes in front of
17 you?
18    **A.   I do not.**
19    Q.   Okay. Do you have anything with you at all
20 to aid your testimony?
21    **A.   No, I don't.**
22    Q.   Okay. And you understand that no one can
23 provide you with answers today? They have to come
24 from you, right?

Transcript of David A. Walker
Conducted on July 13, 2020

3 (9 to 12)

9

1    A.    I do understand that.
2    Q.    Okay.  So you're not going to look at your
3 phone or a text message or anything like that to aid
4 your testimony here, right?
5    A.    No.
6    Q.    Okay.  And you're not -- you're not going to
7 allow anyone else to give you information about your
8 testimony other than if you need to talk to your
9 attorney, but no one else is going to be giving you
10 information to aid your -- your deposition today,
11 right?
12    A.    No one else will give me aid in my testimony
13 for today.
14    Q.    Okay.  Could you tell me what, if anything,
15 did you do to prepare for your deposition today?
16    A.    Well, I go through paperwork that I have,
17 and, basically, I have a strong memory of events that
18 occurred in my career that has expanded almost 30
19 years now.
20    Q.    When you say "paperwork," what are you
21 referring to?
22    A.    Past memos in the office, maybe old
23 disciplinary action, personal journals, personal
24 journals that I had about the incident just to remind

10

1 me.
2    Q.    And with these memos and the old discipline,
3 are those things that you provided to your attorney
4 for production in this lawsuit?
5    A.    Yes.
6    Q.    Okay.  And what about the personal journals,
7 did you turn those over to your attorney for review in
8 production?
9    A.    No, I have not.
10    Q.    Okay.  Okay.  So other than reviewing these
11 materials, this paperwork, did you do anything else to
12 prepare for your deposition today?
13    A.    No, I haven't.
14    Q.    Okay.  Did you meet with your attorney at
15 all?
16    A.    I haven't met with my attorney in person.
17    Q.    Okay.  What about did you -- oh, sorry.  I
18 didn't mean to interrupt.  Go ahead.
19    A.    I met with my attorney maybe a couple months
20 ago, but not lately.
21    Q.    Okay.  Did you guys have any phone calls or
22 conferences or Zooms?
23    A.    No.
24    Q.    Okay.  Have you discussed your deposition,

11

1 the fact that you were going to take this deposition,
2 have you discussed that with anyone?
3    A.    No.
4    Q.    Okay.  Did you talk to any of the other
5 Plaintiffs prior to this deposition about your
6 testimony?
7    A.    No, I haven't.  No, I have not.
8    Q.    Okay.  Did you talk to anyone at all and
9 tell them that you were having this deposition taken
10 today?
11    A.    Sure.  I let my mother know so I wouldn't be
12 disturbed.
13    Q.    Okay.  Understandable.  Okay.
14       And then other than the memos, the old
15 disciplinary paperwork and then the personal journals,
16 was there any other documents that you reviewed?
17    A.    Not that I can remember at this time.
18    Q.    Okay.  And if you do remember, will you just
19 let me know if you remember something else?
20    A.    I will do that.
21    Q.    Okay.  Thank you.  Okay.
22       Let's talk a little bit about your
23 background.  Where do you -- where do you live?
24    A.    I live in Chicago, Illinois.  I gave the

12

1 address.  2561 West 79th Place, and I've been staying
2 at this residence for approximately 23 plus years.
3    Q.    Okay.  What's your highest level of
4 education?
5    A.    I have an associate's degree in electronic
6 technology that I received -- I received from DeVry
7 Institute.
8    Q.    Okay.  Do you remember approximately when
9 you received that associate's degree?
10    A.    February of 1983.
11    Q.    Okay.  So since February 1983, have you
12 participated in any kind of higher education, any
13 additional associate's -- sorry, junior college or
14 college course work?
15    A.    Well, I have -- I went into the military,
16 and I also was in different academies.  You know, I
17 used to be a police officer with Markham.  Of course,
18 I went through the Sheriff's Academy, so in the
19 in-service, sometimes you get accredited with
20 different certified hours for attending classes in
21 those schools, but nothing on a formal basis as a
22 full-time or part-time student.
23    Q.    Okay.  You said you were in the military.
24 When did -- are you still in the military or when did

Transcript of David A. Walker
Conducted on July 13, 2020

4 (13 to 16)

---

13

1  your career in the military end?
2  **A.  It ended about 1985. I was in the National**
3  **Guard.**
4  Q.  So is that Army?
5  **A.  That's correct.**
6  Q.  Okay. So U.S. Army, and you finished in
7  1985. Were you honorably discharged?
8  **A.  Yes, I was.**
9  Q.  Okay. Okay. And then I think you
10 said -- well, we'll get to that in a sec, but
11 let's -- well, okay.
12       So in 1985, after you left the
13 Army -- well, let me do this a different way. What
14 year did you join the Cook County Sheriff's Office?
15 **A.  Well, I joined the Sheriff's Office**
16 **February 1st, 1991, and I went into a correctional**
17 **academy. After I graduated from the academy, I was a**
18 **valedictorian of the academy, also, outstanding**
19 **officer of the academy, assault master on the range,**
20 **also was the class vice-president.**
21 Q.  And between your discharge from the U.S.
22 Army and joining the Cook County Sheriff's Office in
23 1991, what, if anything, did you do for work?
24 **A.  Well, I started off in security I'd say**

---

14

1  **around 1988. I was with Palmer House security**
2  **downtown, and that was approximately for a year. I**
3  **went from Palmer House security to a Markham police**
4  **officer where I went through the Tinley Jail, O'Connor**
5  **Training Center, which is Chicago, for metropolitan**
6  **class. I was a Markham police officer for almost**
7  **about a year-and-a-half, two years before I got hired**
8  **by the Sheriff's Department.**
9  Q.  So you went directly from Markham Police
10 Department to the Sheriff's Office?
11 **A.  Yes. I came -- that was my next job.**
12 Q.  Got it. Okay. What was the -- did you
13 resign from Markham Police Department?
14 **A.  That's correct. They had residency**
15 **requirements, and I did not live in Markham.**
16 Q.  Okay. So were you forced to resign or
17 anything or you just left on your own choosing?
18 **A.  Well, I always wanted to get a better job,**
19 **and I assumed that the Sheriff's Office would be a**
20 **better job for me.**
21 Q.  And then -- let's see. It said -- so you
22 said February 1st, '91 is when you joined the
23 Sheriff's Office. What --
24 **A.  Yes.**

---

15

1  Q.  -- division did you start in?
2  **A.  Division 6 as a cadet. I went to Division 2**
3  **for a couple of months, and then I got requested to**
4  **return back to Division 6 by Lieutenant Pinson because**
5  **he liked the work that I did at the time, and it was**
6  **approved by the director at the time. The acting**
7  **director was Mr. English.**
8  Q.  And Division 6, what is that?
9  **A.  That was maximum security at that time.**
10 **There were two maximum security division, which was 1**
11 **and 6.**
12 Q.  And so, basically, that's working in the
13 actual jail, right?
14 **A.  That's working where at?**
15 Q.  In the actual jail.
16 **A.  That's correct.**
17 Q.  Okay. Okay. So you went from -- so you
18 were in 6 until approximately when?
19 **A.  I was in 6 until I got promoted to**
20 **Electronic Monitoring, which was November 5th of 1992.**
21 Q.  And then have you been in Electronic
22 Monitoring ever since?
23 **A.  Yes, I have.**
24 Q.  Okay. Are you still in Electronic

---

16

1  Monitoring?
2  **A.  I am, indeed.**
3  Q.  Okay. What shifts do you currently work in
4  Electronic Monitoring?
5  **A.  I currently work the 7:00 to 3:00, 7:00 a.m.**
6  **to 3:00 p.m. shift with Saturday and Sunday being my**
7  **days off.**
8  Q.  Which -- what's the -- what is that shift
9  referred to as?
10 **A.  They call that second watch.**
11 Q.  Second watch. Have you always been on
12 second watch in, say, the last five years?
13 **A.  No. The majority of my career, I worked**
14 **third watch, which it started out as 4:00 to 12:00.**
15 **At one time, it was afternoon to 8:00 in the evening,**
16 **and it end up becoming 3:00 p.m. until 11:00 p.m.**
17 Q.  Okay. So approximately -- well, let's see.
18 We'll come back to that.
19       Who -- currently, who is your
20 supervisor?
21 **A.  My supervisor currently on second watch, I**
22 **have a couple supervisors. We'll start off with**
23 **Deputy Chief Logan. It would be a Sergeant Passas,**
24 **and it also would be a Sergeant Gaynor.**

---

Transcript of David A. Walker
Conducted on July 13, 2020

5 (17 to 20)

---

17

1  Q.  Can you spell those last two names?  I had a
2 hard time kind of hearing them.
3  **A.  Passas would be P "Paul," -a "Adam," -s**
4 **"Sam," -s "Sam," -a "Adam," -s "Sam."**
5  Q.  Okay.
6  **A.  Gaynor would be G "George," -a "Adam," -y**
7 **"Yankee," -n "Nora," -o "Oscar," -r "Robert."**
8  Q.  Got it.  Okay.
9     What about when you were on third
10 watch, who were your supervisors?
11  **A.  I had a varied amount of supervisors.  That**
12 **was the most time I've been at EM.  We'll start with**
13 **Chief Neal.  Do you need me to spell his last name,**
14 **also?**
15  Q.  No.  I think that's okay.
16  **A.  Okay.  It would be Chief Ranzino.  It would**
17 **be Deputy Chief Rohloff, and, well, of course, the**
18 **directors come in and out all the time.  It would be**
19 **Director Webb and, at the time, Executive Director**
20 **Shields.**
21  Q.  Okay.  And then who did you -- did you have
22 a set partner that you worked with or did you rotate
23 when you were on third watch?
24  **A.  Well, primarily most of my career, I was in**

---

18

1 **a basement part of the jail called TSS, and so I**
2 **worked with pretty much the same amount of individuals**
3 **every day, and so it's not just a partner.  It might**
4 **be a team.  Maybe five or six people, and also, I**
5 **neglected to tell you that those people I named that**
6 **were my supervisors, I had at least seven or eight**
7 **more assistant directors in there, also.**
8  Q.  You mean there were other assistant
9 directors that kind of came and went along the way
10 or --
11  **A.  Exactly.  You know, they might have stayed a**
12 **year or so, whatever.  You know, I've been -- like I**
13 **said, I've been in my unit since 1992, so I've been**
14 **through at least eight or nine different directors.**
15  Q.  All right.  Well, this is definitely not a
16 memory test exactly.
17  **A.  Okay.**
18  Q.  It is in some ways, but I'm not going to ask
19 you to go through and try and recall each and every
20 one of those, but, you know, as we go along and if you
21 think that, you know, you need to identify any of
22 them, certainly feel free to do so.
23     Okay.  So you were hired in -- sorry.
24 You were just referring to something called TSS.  T as

---

19

1 in "Tom," -S as in "Sam," -S as in "Sam"?
2  **A.  Like Technical Service Unit.  They call it**
3 **TSU.  We called it TSS.**
4  Q.  Okay.  And that -- that's an assignment
5 within Electronic Monitoring?
6  **A.  That's correct.**
7  Q.  Okay.  And you also, I think, referred to it
8 as the basement.  That's -- when you use the term
9 "basement" and "TSS," you are using those
10 interchangeably?
11  **A.  That's a lower level inside the jail.**
12  Q.  Okay.
13  **A.  So that would -- if you entered the jail,**
14 **you would have to go in the basement, which would be**
15 **the lower level from the first floor.**
16  Q.  And that's the physical location of TSS?
17  **A.  That's correct, and that location had**
18 **changed through my career in TSS from Division 6,**
19 **office in the basement there, to receiving, which is a**
20 **more open setting towards the central part of the**
21 **jail.**
22  Q.  Okay.  How did you end up getting hired with
23 the Sheriff's Office?
24  **A.  How did I get hired?**

---

20

1  Q.  Yeah.
2  **A.  I found out they were giving applications**
3 **out downtown and decided to come early to the county**
4 **building, on the county side of city hall, and I stood**
5 **in line in the morning from like maybe 5:00 in the**
6 **morning until 8:00 o'clock when they passed -- it was**
7 **a long line of people there -- passed out the**
8 **applications.  I got an application.  I took the test.**
9 **At the time, you took it at the county, and what they**
10 **did was they called your name if you didn't pass the**
11 **test.  You left the room, and everybody that stayed in**
12 **the room, you passed the test.  Then you become**
13 **certified, and what had happened was I became**
14 **certified maybe in 1989, but because of the politics**
15 **at the time, I believe the sheriff then was O'Grady.**
16 **You know, they said that, you know, some -- those**
17 **people were getting in, so I kept getting leaped over,**
18 **so as I was finding out they was enforcing residency**
19 **at Markham, I remember I had put in an application at**
20 **the county; in which I contacted the county, and they**
21 **were, like, you've been certified for over two years,**
22 **and under the Sheriff Sheehan's regime, I got hired**
23 **because all they did was recertify me, and once they**
24 **find out I was certified, they hired me as a**

Transcript of David A. Walker
Conducted on July 13, 2020

6 (21 to 24)

---

21

1 correctional officer. They didn't know why it took so
2 long for me to get on there, so they couldn't answer
3 that.
4 Q. Okay. Let me ask you as part of -- you sort
5 of referenced a little bit earlier taking additional
6 course work and taking things like that. While you've
7 worked at the Cook County Sheriff's Office, you've
8 undergone training pretty regularly, right?
9 A. That's correct.
10 Q. Okay. And one of the trainings that you've
11 undergone is discrimination training, right?
12 A. Discrimination, harassment and retaliation.
13 Q. Okay. What -- so you're aware of the facts
14 that the Cook County Sheriff's Office has a policy
15 prohibiting discrimination, harassment and
16 retaliation, right?
17 A. They have a policy. I am aware of it.
18 Q. Okay. And you've been trained on it, in
19 fact?
20 A. That's correct.
21 Q. Okay.
22 A. You go to training now, it's through a
23 computer, LMS training.
24 Q. Sure. Sure. It may be in person or it may

---

22

1 be over a computer, but you've had training into
2 discrimination, harassment and retaliation?
3 A. I have.
4 Q. Okay. And then what are you supposed to do
5 if you witness discrimination, harassment or
6 retaliation? What are you supposed to do?
7 A. As a witness or as a person being -- the
8 person that's being harassed? Which one?
9 Q. I'd say both, I guess. Why don't you tell
10 me what you're supposed to do if you witness it first,
11 and then we'll talk about if you're a victim next.
12 A. Well, if you witness it, the first thing you
13 are supposed to approach the harasser and tell him
14 that, you know, you're not comfortable with what
15 they're doing. Whether the person that they're
16 harassing is comfortable or not, it could also affect
17 you. Now, once you tell them personally and they
18 still persist with that action, you ought to go to a
19 supervisor and report it.
20 Q. Okay. Anything else you're supposed to do
21 after you report to the supervisor?
22 A. Well, if you report to the supervisor, it
23 all depends if the supervisor is going to act on it or
24 not.

---

23

1         THE COURT REPORTER: I'm sorry. Is what or
2 not?
3         THE WITNESS: Will act on that complaint or
4 not of their grievance.
5 BY MR. LEINENWEBER:
6     Q. Okay. So let's say that the supervisor is
7 going to act on it and you have witnessed
8 discrimination or retaliation or harassment, what does
9 your role become as that allegation is investigated?
10    A. Well, you will be a witness.
11    Q. Okay. And as a witness, is it fair to say
12 you might be asked to give statements?
13    A. It's fair to say that if that's what -- if
14 they act within the policy, but then, of course, if
15 the administration would take your grievance, if they
16 would take you seriously or not.
17    Q. Right. And we're saying -- for purposes of
18 this question, I'm saying that the allegation is being
19 investigated, what -- and you are participating as a
20 witness, then you may actually give an interview, is
21 that correct?
22    A. That's correct. I mean, and it went from
23 Internal Affairs, IAD, to now it's called OPR.
24    Q. Okay.

---

24

1     A. Office of Professional Review.
2     Q. And then you might also give an interview to
3 like human resources, I assume?
4     A. Well, you know, I've never gave an interview
5 to human resources. Most of the time, it's either
6 Internal Affairs Department or it's OPR. It says in
7 the policy that you can go to human resources. I've
8 never seen it done that way, not by myself or anybody
9 else I know that might have had a complaint or been a
10 witness.
11    Q. Okay. And if you were a victim of
12 discrimination or harassment or retaliation as opposed
13 to just seeing it happen to somebody else, is this
14 process basically the same or is there something
15 different?
16    A. Well, over the years, I mean, when I first
17 came in, it wasn't even a known policy. As you know,
18 I've been in EM since 1992, so as the Sheriff
19 Department has evolved, they start putting certain
20 things in place, so a lot of things when I came in
21 that were active problems were just common things
22 happening in the office. As the unit got more
23 professional, they came up with policies, I mean,
24 because you had lawsuits coming up, and I could think

---

Transcript of David A. Walker
7 (25 to 28)
Conducted on July 13, 2020

25

1  of one that hits my mind clear is one with director of
2  personnel, a Marty Walsh.
3     Q.   Well, let me --
4     A.   And he --
5     Q.   Let me stop you for a second because I think
6  you raised kind of an important point which is the
7  timing, so -- and I'm not necessarily interested in
8  every, you know, single thing that happens in your
9  long career because, as you said, you've been there
10 now almost 30 years.
11    A.   Right.
12    Q.   Let's talk about so since 2010, if you are a
13 witness, is this the procedure that you follow, the
14 one you just described is the procedure you follow?
15    A.   That's correct.
16    Q.   Okay.  And what about if you are a victim,
17 is it the same procedure since 2010?
18    A.   Yes, it will be.
19    Q.   Okay.
20    A.   I mean, we keep getting updates.  It doesn't
21 change that much, but we keep on having to get
22 certified in the new policy changes they do through
23 Lexipol and the LMS training.
24         THE COURT REPORTER:  And what?

26

1         THE WITNESS:  Lexipol and the LMS, which is
2  active now.  L "Lincoln," -M "Mike," -S "Sam," type of
3  training we get to certify on.
4  BY MR. LEINENWEBER:
5     Q.   I'd like to ask you a couple questions about
6  assignments within Electronic Monitoring, and I think
7  just for clarity's sake, I just want to mention if I
8  say EM or EMU, we're talking about the Electronic
9  Monitoring Unit, right?  Those three terms would be
10 interchangeable?
11    A.   Yes.
12    Q.   Okay.  So what types -- sorry.
13    A.   Also referred to as House Arrest.
14    Q.   House Arrest.  Sure.  Okay.
15         What types of assignments are there in
16 Electronic Monitoring since, say, 2010?
17    A.   Since 2010, the assignments would be TSS,
18 which is working in the basement of -- of the jail.
19 2010, they had just moved from Division 6 office to
20 receiving, and what you do down there is where the
21 pretrial detainees will come, and it's like a
22 verification process down there where you find out if
23 they're going to go out or not.  They already been
24 approved to go out, but you have to find out if they

27

1  have a place to stay, who they going to stay with,
2  they don't have an order of protection there.
3         Once you establish all that, then you
4  do the process where you band them, put the band on
5  their legs, and you give them the equipment to go out.
6         At one time, they showed a movie down
7  there about the ins and outs and the do's and don'ts
8  of Electronic Monitoring.
9         You'll prepare them on next shift,
10 which would normally be the third watch, and they'll
11 be taken out either at the latter part of the third
12 watch or on midnights.  That's been changed over the
13 years because sometimes they take them out in the
14 daytime.  Depends on if there are a court order that
15 he immediately has to be taken out, but, normally,
16 over the past ten years or so, it's done on the first
17 watch, the delivery.
18         You have delivery units, which is
19 Patrol, and Patrol, what they do is they go to the
20 houses.  If the equipment has malfunctions or if there
21 is a situation where the host is the person which is
22 accepting the person there withdraws their consent,
23 they don't have a place to go.  You might have to
24 reincarcerate them, bring them to jail.  Of course, we

28

1  have violators that check on the violations.  It's a
2  certain amount of things that you do on Patrol, but
3  it's basically to make sure that they go by the rules
4  and regulations of the program while they are out in
5  the different areas of Cook County.
6         You also have the people that work in
7  the office.  Now, those people take the calls, and
8  they deal with pulling the fax or the court orders or
9  the updates, of course, or monitor work and school.
10        And, actually, Patrols, they also go to
11 people's jobs and their schools if they're gainfully
12 employed and check the schedules.
13        But the office is more so the
14 administrative part that deal with incoming calls,
15 late court orders, you know, anything that might have
16 to do with office work with the county.
17        We also have another unit.  They're in
18 a different union, but they always were a part of EM,
19 and it's called the Fugitive Unit, and their
20 assignment is, basically, the people that have escaped
21 on house arrest or are not going by the terms and no
22 longer at the residence they say they're at, they're
23 like the team that goes out to try and find out their
24 whereabouts to bring them back to jail.

Transcript of David A. Walker

8 (29 to 32)

Conducted on July 13, 2020

29

1    Q.   Okay.  Anything else besides TSS, Patrol,
2 office and Fugitive Unit?
3    A.   **Technical Service.  No, that's basically**
4 **most of all the different functions I can think of**
5 **right now.**
6    Q.   Okay.  So -- and since 2010, have you been
7 eligible for any of those four assignments?
8    A.   **Well, for the first part of my career, I was**
9 **basically in TSS, which involved maybe doing all of**
10 **that.  It just changed where you had different**
11 **departments of where people do maybe start back as**
12 **early as, I'll say, 1998, and what's considered the**
13 **least, the least position you want to be in is where**
14 **they put you at is TSS.  Normally, when you put there,**
15 **that means you're going to work harder, your access**
16 **to, you know, getting personal lunch or, you**
17 **know -- you have no windows down there.  You're**
18 **dealing with inmates.  A lot of tension is down**
19 **there because that's where they come down and they're**
20 **trying to get out.  So you sometimes have to tell guys**
21 **you not going to make it out because nobody want you**
22 **to get out, so you sometimes have use of force down**
23 **there.  You have pretrial detainees, they get upset**
24 **because they're not going home.  They see other people**

30

1 **going home, and for the most part, you're down there**
2 **by yourself and have to figure it out by yourself.**
3 **There's supposed to be a supervisor down there, but,**
4 **normally, the supervisor is the most senior officer,**
5 **and you call back if you have a problem.**
6    Q.   Okay.  So I'll want to talk a little bit
7 more about TSS in a little bit, but just back to my
8 question, which is really, you know, were you
9 eligible, in other words, were you qualified to work
10 in any of those four assignments since 2010?
11    A.   **Oh, yeah.  Oh, without a doubt.**
12    Q.   Okay.
13    A.   **Without a doubt.**
14    Q.   Okay.  And did you, in fact, work in all
15 those different assignments since 2010?
16    A.   **Well, it was not my choice, you know.  Your**
17 **assignment is what's given to you by the supervisory**
18 **staff.  I mean, you can complain about it, but that's**
19 **where they going to put you at for the day, you know,**
20 **and the problem is that people always request.  If I**
21 **got seniority, why do I have to keep on going down**
22 **here?  And in my case and example, you know, I was**
23 **down there for practically more than 20 years of my**
24 **career.  I found out about Patrol by accident.  I knew**

31

1 **what they did, but one day, they let me work on the**
2 **streets, which I was not familiar with because I**
3 **hadn't done it in so long, and I was like, oh, they**
4 **don't do any work compared to what I do, so once I**
5 **found out about that, I'm like I want to be on Patrol.**
6    Q.   You want to be on Patrol?
7    A.   **So because of my seniority, it was not**
8 **answered right away, but I say the last four or five**
9 **years, I've been in Patrol two years -- wait, three**
10 **years on third watch and maybe a year-and-a-half or so**
11 **because I just came to the day shift at the latter**
12 **part of my career, but it was definitely an assignment**
13 **that's better than an assignment if you work in TSS.**
14 **I wouldn't say that you have a choice that you could**
15 **just go to Patrol.**
16    Q.   Yeah.
17    A.   **That was -- that was already decided when**
18 **they made the roster up for that day.**
19    Q.   But do you --
20        MS. KRAUCHUN:  Can I just interject for a
21 second?
22        MR. LEINENWEBER:  Sure.
23        MS. KRAUCHUN:  Can we go into, my client and
24 I, into a breakout room for a minute?

32

1        MS. BROWN:  Absolutely.  Let me open one up
2 here.
3        MS. KRAUCHUN:  Great.  Thanks.
4        MR. LEINENWEBER:  Ethan, do we need to chat
5 while we're --
6        THE COURT REPORTER:  I'm off the record now,
7 right?
8        MR. LEINENWEBER:  Yeah.  Please.
9            (Off the record at 10:36 a.m.)
10            (Resumed at 10:46 a.m.)
11 BY MR. LEINENWEBER:
12    Q.   Mr. Walker, we just took a short break.  Do
13 you -- any -- you understand you are still under oath?
14    A.   **Yes.**
15    Q.   Okay.  Do you need to change any of your
16 testimony based on taking that break?
17    A.   **No, I don't.**
18    Q.   Okay.  Let me move to the idea of
19 progressive discipline.  Can you explain to me
20 what -- what is the progressive discipline policy
21 within the Electronic Monitoring Unit since 2010?
22    A.   **Step 1 would be a verbal reprimand.  Step 2**
23 **would be a written reprimand, which is a counselor's**
24 **statement.  Next would be disciplinary with days off,**

Transcript of David A. Walker
Conducted on July 13, 2020

9 (33 to 36)

33

1 and that could go from days off leading up to possibly
2 termination.
3    Q.   Okay. And that's all set out in a union
4 contract, right?
5    A.   That's correct.
6    Q.   What's your union?
7    A.   Teamsters.
8         THE COURT REPORTER: Say it again.
9 BY MR. LEINENWEBER:
10    Q.   Teamsters?
11    A.   Teamsters 700.
12    Q.   And who makes the determination of which
13 level of discipline, whether it be a verbal
14 written -- a verbal reprimand, a written reprimand or
15 discipline with days off or ultimately termination,
16 who is responsible for making those decisions for an
17 investigator like yourself in Electronic Monitoring?
18    A.   Well, the initial discipline would probably
19 be taken -- done by the director, executive director.
20 You also have sometimes your supervisors that might
21 deal with the write ups and the counseling form, but
22 anything above them days I would imagine would come
23 from upper administration.
24    Q.   Okay. And if you are wanting to challenge

34

1 some form of discipline, whether it be any of these
2 four, you would file a grievance, right?
3    A.   Correct.
4    Q.   Okay. And who hears grievances?
5    A.   The grievances were -- that process is
6 normally done with someone at South Campus, and it all
7 depends how bad the grievance is. I believe the
8 sheriff has a legal counsel, and that's like at the
9 fourth step. The step before that, because I'm not
10 familiar with, I haven't been in that process in a
11 while, so I can't tell you what happens after the
12 legal consult, but I know the findings are recommended
13 from the legal counsel and I imagine the directors,
14 and you got the Loudermill hearings and the merit
15 board.
16         THE COURT REPORTER: I'm sorry. You got a
17 lot of what?
18         THE WITNESS: Loudermill hearings and the
19 merit board.
20 BY MR. LEINENWEBER:
21    Q.   And Loudermill I think is it, what;
22 l-a-u-d-e-r-m-i-l-l?
23    A.   I believe Loudermill is L-o-u --
24         MS. KRAUCHUN: L-o-u.

35

1         THE WITNESS: -- -d-e-r-m-i-l-l.
2 BY MR. LEINENWEBER:
3    Q.   Okay. So if you were going to -- you
4 mentioned steps, so there's steps to a grievance. So
5 if you were to file a step 1 grievance, who hears
6 that? Who does that get filed with and who hears it?
7    A.   You would probably contact the union. They
8 give you a union rep, and you'll go before, I believe
9 maybe it's somebody that's at least a lieutenant or
10 above, but in our case, it was normally with a
11 director.
12    Q.   Okay. And is the purpose of filing a
13 grievance to say that, hey, the contract wasn't
14 followed regarding progressive discipline?
15    A.   Or you don't agree with the charge that
16 they're -- or the accusation that they're bringing
17 against you. You believe it's unfounded.
18    Q.   Okay. So it could either be that the actual
19 allegation is unfounded or something is wrong with the
20 process of the way they did it?
21    A.   Correct.
22    Q.   Okay. And the grievance process is meant to
23 be used to correct a problem with either of those?
24    A.   That's what the grievance process is for.

36

1    Q.   Okay.
2    A.   Normally.
3    Q.   Okay. Okay. And you had -- well, okay. So
4 let's talk a little bit about TSS. Okay. We've
5 talked a little bit about it, and you referred to it
6 also as the basement because that's the physical
7 location of TSS, right?
8    A.   Yes.
9    Q.   Okay. And isn't it true that some people
10 actually prefer to work in TSS?
11    A.   If so, I don't know many people that prefer.
12    Q.   Okay. And you -- okay. What is the
13 difficulty -- sorry. Strike that.
14         Do you currently consider TSS to be a
15 bad assignment or a less desirable assignment?
16    A.   I consider TSS to be the worst assignment in
17 the unit.
18    Q.   Okay. And why is that?
19    A.   The stress that I was elaborating before
20 about what goes on down there. You're most likely to
21 receive some type of write up for something you have
22 no control over.
23    Q.   Okay. So you said stress and chances of
24 write ups. Any other reason why you consider it to be

**37**

1 the worst assignment?
2    **A.** **No supervision. It's an enclosed setting**
3 **where it's not sanitary. No windows, and especially**
4 **with the situation with the COVID-19 now, these guys**
5 **coming from different tiers and cells, you don't know**
6 **what they have, and you're exposed to all of that.**
7    Q. So prior to COVID-19, though, you considered
8 it to be the worst assignment already, right?
9    **A.** **It's the worst assignment that became**
10 **worser.**
11    Q. Okay. And so you said there's no
12 supervision. Does that mean there's no supervisor
13 assigned to TSS?
14    **A.** **There's supposed to be. That's what's**
15 **written in the policy.**
16    Q. And is that not the case? You are saying
17 there is never a supervisor in TSS?
18    **A.** **No.**
19    Q. Okay. Who do you work with when you're in
20 TSS? I think you said there's a team of, like, five
21 of you guys.
22    **A.** **Right. You want me to list the names of**
23 **some of the people I work with?**
24    Q. No. That's all right, but let me just ask

**38**

1 you the five people that are down there, these are all
2 investigators like yourself?
3    **A.** **They are investigators.**
4    Q. Okay. And so you're never alone down there,
5 right?
6    **A.** **That's correct.**
7    Q. Okay. And you said it's not sanitary. Is
8 that because it's an enclosed area without windows, is
9 that what you meant or is there some other reason it's
10 not sanitary?
11    **A.** **It's an enclosed area without windows, and**
12 **you have guys that come down there, and they do things**
13 **that you, you know -- they urinate on the floors, you**
14 **know, sick, throw up, and you don't have any of the**
15 **staff coming to clean that area that you're working in**
16 **for the most part on the shift that you're working.**
17    Q. So it's not that it's never cleaned; it's
18 just that sometimes it may not be cleaned while you're
19 currently on that shift?
20    **A.** **That's correct.**
21    Q. Okay.
22    **A.** **And then you have to divide the people that**
23 **are going home from the ones that aren't going home,**
24 **so there's like mass confusion down there. It's very**

**39**

1 **loud because you're talking on the phone trying to**
2 **verify cards and telling people they have to be quiet**
3 **so they can hear their name called. It's a lot of**
4 **different functions that go on down there.**
5    Q. Yeah. Were you good at that job?
6    **A.** **I believe I worked it very well.**
7    Q. You mentioned -- so you said there's no
8 supervisor there. If you were in a patrol car, would
9 you have a supervisor with you?
10    **A.** **You have -- you don't have a supervisor**
11 **riding with you, but you have your radio and you have**
12 **your phone that you can probably use.**
13    Q. Well, what about when you are in TSS, do you
14 have a radio or a phone you could use?
15    **A.** **The radios don't work down there, and the**
16 **phones you have, if you got a phone call up, you got**
17 **to hope they answer the phone in time. I mean, it's**
18 **just that they can't respond to you in a timely manner**
19 **down there with the situation we might have.**
20    Q. Well, is it fair to say that the -- you
21 know, if you needed backup, it's a lot easier to get
22 backup? It's going to take a lot less time to get
23 backup to TSS than it is to some random corner of Cook
24 County, right?

**40**

1    **A.** **No, no.**
2    Q. That's not --
3    **A.** **It's not. It's easier to get backup on the**
4 **street. People can hear where you're going. They**
5 **have GPS in the car. You can call for the local**
6 **agency or jurisdiction you in to back you up. Down in**
7 **TSS, by the time a supervisor get over there, we**
8 **talking about literally maybe at least as early as 30**
9 **minutes. The situation is over with. You probably**
10 **have to call for somebody in the jail, and they not**
11 **going to get to you that quick any because that's like**
12 **an abandoned part of the jail right now, so, you know,**
13 **you mostly have to rely on your body camera and your**
14 **common sense to try to deal with the situation.**
15    Q. Did you ever get hurt in TSS?
16    **A.** **I received -- I received injuries. I have.**
17    Q. How often?
18    **A.** **Not often, but, you know, sometimes the**
19 **participants fight each other, so you have to break up**
20 **fights. You have to handcuff people and take them**
21 **back to wherever they came from, so it's a lot of**
22 **physicalness sometimes that you try to avoid by, you**
23 **know, just separating the ones that's going home from**
24 **the ones that's not going home.**

Transcript of David A. Walker
Conducted on July 13, 2020

41

1   Q.   So in your opinion, then, Patrol is a much
2   safer place to be than TSS?
3   A.   Without a doubt.
4   Q.   Okay.  Have you ever been injured on Patrol?
5   A.   Yes, I have.
6   Q.   Okay.  So you've been injured while in TSS
7   and you've also been injured on Patrol?
8   A.   Yes, I have.
9   Q.   Did you file workers' comp claims for either
10  of those?
11  A.   For -- for the -- when I was on Patrol, I
12  put a workman's comp.  It actually was a duty injury
13  that end up being settled, so yes.
14  Q.   Okay.
15  A.   To answer your question.
16  Q.   So that's -- so yes for the injury, one of
17  the injuries you received on Patrol, you did file
18  workers' comp?
19  A.   Well, I didn't -- I filed duty injury.
20  Q.   You filed a duty injury.  Okay.  So you put
21  in that you had been injured on duty?
22  A.   That's correct.
23  Q.   Okay.  Did you ever do that for an injury
24  you received at TSS?

42

1   A.   No, I haven't.
2   Q.   Okay.
3   A.   The injuries at TSS, I went to Cermak
4   Hospital.
5   Q.   You don't bid for assignments in Electronic
6   Monitoring, right?
7   A.   No.  You bid for a shift.
8   Q.   Okay.  But we're talking about assignments,
9   not shifts right now, so you don't bid for
10  assignments, right?
11  A.   No, you don't.
12  Q.   I'm sorry.  Just going back to something you
13  said a second ago.  You said that after an injury in
14  TSS, you went to Cermak Hospital.
15  A.   That's correct.
16  Q.   Okay.  When was this?
17  A.   It had to be in early 2000.
18  Q.   I'm sorry.  Did you say early 2000 or early
19  2000s?
20  A.   Early 2000.
21  Q.   Okay.  I guess if -- I'm confused.  Why
22  didn't you file that you were hurt on duty related to
23  that injury in TSS that you went to Cermak Hospital
24  for in 2000?

43

1   A.   Because it was a superficial wound.  They
2   just put a Band-Aid over my eye.  I had cut the corner
3   of my eye.
4   Q.   Okay.  How did you cut that corner of your
5   eye?
6   A.   Trying to take a pretrial detainee back to
7   his -- he didn't want to go, so he started fighting.
8   Q.   Okay.
9   A.   It was a use of force that was involved.
10  Q.   Okay.  Let's see.  Okay.  So you don't bid
11  for assignment but you can bid for your shift, your
12  watch?
13  A.   Yes.
14  Q.   Okay.  And the word "shift" and "watch"
15  would be interchangeable, right?
16  A.   Yes.
17  Q.   Okay.  And you don't have any right to a
18  particular assignment, right?
19  A.   No.  It's not stated that you should have a
20  right to assignment.
21  Q.   Okay.  One of the things that you claim is
22  that Shields and other supervisors within Electronic
23  Monitoring make assignment decisions based on race?
24  A.   Yes.  I believe that.

44

1   Q.   Okay.  What evidence do you have to support
2   that?
3   A.   First of all, the visual evidence of who you
4   see down there every day, and it's no reason even if
5   you applied seniority that it would wind up that way.
6   You're going past practices, you know, and it's like
7   you could complain about your assignment, and it's
8   people with lesser time that are white time that won't go
9   down there and do what you're doing now.  They could
10  be brand-new in the unit, and they go straight to
11  Patrol.  They're not trained in Patrol.  They're not
12  trained in anything, so why would you send them to a
13  better assignment coming in than the guy that's been
14  there.
15  Q.   Well, one reason could be that Patrol is a
16  safer assignment than TSS, right?  I mean, you don't
17  want to put a new guy fresh out of the academy
18  straight into TSS, right, because that's a more
19  dangerous assignment than Patrol?
20  A.   But that's past practices.  They always done
21  that.  When I came there, I went straight to TSS.
22  When you're black, you go --
23  Q.   You're talking about -- you're talking back
24  in 2000?

Transcript of David A. Walker
Conducted on July 13, 2020

12 (45 to 48)

**45**

1    A.  I'm talking about all the way back to 2010
2 until now.  If you're black, you go straight to TSS.
3 If you're white, you go to Patrol, so there's two
4 people that just came in.  Why is the black guy going
5 to TSS and why is the white guy going to Patrol?
6    Q.  Okay.  So can I have -- what are the names
7 of these individuals you are talking about, black and
8 white, who are new, the people you are referring to,
9 who are new and the black guy goes to TSS but the
10 white guy goes to Patrol?  Who are these people?
11    A.  Well, relatively new at the time.  You got
12 Slaughter who is black.  You have Spivey who is black.
13       THE COURT REPORTER:  I'm sorry.  Who?
14       THE WITNESS:  Spivey, S-p-i-v-e-y, and then
15 you have guys that are white like Bienik, Messina,
16 Folkers.
17 BY MR. LEINENWEBER:
18    Q.  What was the last one?
19    A.  Folkers, F-o-l-k-e-r-s.
20    Q.  Anyone else?
21    A.  If I can remember, I'll tell you.  That's
22 all I can remember for right now.
23    Q.  Okay.  So you're saying, just so I'm clear,
24 that Slaughter and Spivey are black investigators who

**46**

1 when they were new were sent straight to TSS, but
2 Bienik, Messina and Folkers are white investigators
3 who when they were new were never sent to TSS?
4    A.  That's correct.
5    Q.  Okay.  And when -- do you know have Bienik,
6 Messina or Folkers, have they ever worked in TSS?
7    A.  They might have worked maybe one, two days
8 in a three- or four-year period, but not -- not -- put
9 it this way.  If it's 365 days, they might have worked
10 two days.  The other guys always worked all the other
11 days.
12    Q.  Okay.  So it's not that no white people work
13 in TSS because you're saying these three would have
14 actually worked in TSS, it's just that they don't work
15 as much in TSS as these other -- as Slaughter and
16 Spivey?
17    A.  They don't work frequently.  There would
18 have to be a personnel issue if they come down there.
19    Q.  Okay.
20    A.  Because nobody else at the job, so somebody
21 has to come down there.
22    Q.  Okay.  So other than you're saying visually,
23 you have seen the fact that Slaughter and Spivey work
24 down in TSS like all the time, and you've only seen

**47**

1 Bienik, Messina and Folkers down there a couple times,
2 other than that visual evidence, what other evidence
3 do you have that supervisors like Shields and others
4 are making decisions about assignments based on race?
5    A.  Because people at TSS have went straight to
6 Shields, Director Shields at the time and
7 Chief Ranzino, and they told them that they didn't
8 want to work down there, and they were told that it's
9 just an assignment.  That's your job.  Take it.
10    Q.  Right, but there's a difference between
11 saying, hey, I don't want to work down in TSS, okay,
12 and Shields or one of the other supervisors saying I'm
13 only putting black people in TSS, right?  There's a
14 difference?
15    A.  There is no difference.  There is no
16 difference just because they didn't say it but they do
17 it.  Actions speaks louder than words to me.  You see
18 what's going on.  You know the grievance.  You can
19 spread it around.  If you've been told, it's not like
20 you haven't been told.  That's a morale issue.  So if
21 you know you going to get the worst assignment every
22 day you come to work, that's going to be more stress.
23    Q.  So other than the visual evidence you talked
24 about and now the fact that you -- sorry.  Who did you

**48**

1 say made these complaints to Shields about being put
2 down in TSS saying that they didn't want to go to TSS,
3 they wanted a different assignment, who did that?
4    A.  Well, from my knowledge, it was Spivey and
5 Slaughter, and it got to be a couple more people.
6 That's just from my knowledge off the top of my
7 thinking right now.
8    Q.  Okay.  And you actually saw them say this to
9 Shields?
10    A.  I seen them say it directly to Ranzino,
11 Chief Ranzino, and Ranzino said he was going to go to
12 Shields, but Shields not going to do nothing about it
13 because he agrees with like he agreed.  That's what
14 Ranzino said.
15    Q.  When did Spivey go to Ranzino with this
16 complaint?
17    A.  I can't give you the dates, but it would be
18 sometime between 2010 and 2015.
19    Q.  And then what about Slaughter, when did
20 Slaughter go to Ranzino?  When did you see Slaughter
21 go to Ranzino and make this comment?
22    A.  They both did it at the same time.
23    Q.  Okay.  And this was between 2010 and 2015?
24    A.  That's correct.

Transcript of David A. Walker
Conducted on July 13, 2020

13 (49 to 52)

49

1    Q.    Okay.  And they said we don't -- we want a
2  different assignment, essentially; we don't want to
3  work in TSS?
4    A.    We want the opportunity to work the streets.
5  That was from what they told me they told him.
6    Q.    Well, did they tell you they told him or did
7  you actually hear them tell Ranzino?
8    A.    I actually heard them tell him that they
9  want to work another assignment.
10    Q.    Okay.  And Ranzino's response was I'll tell
11  Shields but he's not going to do anything about it?
12    A.    That's correct, and I'm going to send you
13  there because it's just an assignment.  That's what
14  you here to work for.
15    Q.    Okay.  So you didn't actually hear Shields
16  say anything about either of these complaints?
17    A.    No, not directly.
18    Q.    Okay.  And you didn't hear Tom Neal say
19  anything about these complaints?
20    A.    Yes, I did.  I spoke to Chief Neal a lot of
21  times.
22    Q.    Okay.  Well, we're talking about these two
23  specific complaints right now.  Okay.  So when did you
24  hear Tom Neal say something about Spivey and

50

1  Slaughter's complaint about having to work a TSS
2  assignment?
3    A.    Well, I didn't have to hear them.  When they
4  told Chief Ranzino, Chief Neal was standing right next
5  to him.
6    Q.    Oh, okay.  And did Spivey and Slaughter, did
7  they say, hey, you know, you're making this decision
8  because of our race?
9    A.    No, they didn't say that at the time.
10    Q.    Okay.  And this was between 2010 and 2015.
11  Okay.
12         So other than your comment that
13  visually you see more black people in -- working TSS
14  than white people and hearing these complaints from
15  Spivey and Slaughter between 2010 and 2015, what other
16  evidence do you have that Shields or other supervisors
17  are making assignment decisions based on race?
18    A.    Evidence -- evidence like what?  I don't
19  know what you're referring to.  You have to elaborate
20  on that.
21    Q.    Okay.  So that's what you're here to testify
22  about, though, so what other evidence do you have,
23  what other facts do you have that demonstrate that
24  Shields or other supervisors are making assignment

51

1  decisions based on race?
2    A.    Because when they're told about it's race,
3  they don't respond.
4    Q.    Right, but -- oh, go ahead.  Sorry.  I
5  didn't mean to interrupt you.
6    A.    Things eventually escalate until it
7  was -- they didn't put it down on paper, but it was
8  told that, you know, this is racist.  They hear the
9  word "racist," that means they got to know it's race.
10    Q.    So if you -- I'm not following here.  So
11  you're saying that -- because I asked you if
12  they -- if Spivey or Slaughter mentioned to Ranzino
13  that this was being done because of their race and you
14  said no, they didn't.
15    A.    Well, you know, then I need to retract that
16  statement.  They didn't -- that one -- at the time
17  when they were grieving it, they didn't say race, but
18  then as days go by and their grievance wasn't
19  responded to, they told them, they said this is
20  racist.  Y'all racist around here.  That was told to
21  Ranzino and Chief Neal.
22    Q.    And when was this conversation?
23    A.    It had to be no later than maybe two weeks
24  after the initial grievance was put in when they see

52

1  that no action was taken on that.
2    Q.    And you were present for this conversation?
3    A.    Oh, yes.  It was in roll call.
4    Q.    Okay.  So at roll call, Spivey and Slaughter
5  said to Ranzino that this is race -- this is because
6  of our race?
7    A.    Right, and they didn't say just to Ranzino.
8  They also said it to Chief Neal.
9    Q.    To Chief Neal?
10    A.    You can get -- you get a lineup in roll call
11  of where your assignment is going to be.
12    Q.    And you said that they filed a grievance?
13    A.    They said they were going to file a
14  grievance, and I assumed they did file a grievance.  I
15  wasn't there to see them write it up, but they told me
16  personally they put a grievance in.
17    Q.    But you don't have a right to any
18  assignment, right, under the contract?
19    A.    No, it doesn't stipulate that.  I'm just
20  going by past practices.
21    Q.    But so -- and just help me understand this
22  here.  How can you file a grievance about an
23  assignment when assignments are not covered by the
24  collective bargaining agreement?

Transcript of David A. Walker

14 (53 to 56)

Conducted on July 13, 2020

---

53

1    A.   That would be something you would have to
2  speak with the union, but it seems to me that the
3  union took their grievance seriously because they
4  filed it, so, evidently, somebody can speak better on
5  it than me from the union where that was a violation
6  where they shouldn't be given the same assignment all
7  the time if there is other people available for it.
8    Q.   What was the resolution of their grievance?
9    A.   No resolution because they were still going
10 down to TSS. I don't think it ever got heard. That's
11 another thing with the grievance procedure. Some
12 grievances, they take right away. Some might take
13 three, four years.
14   Q.   And you don't know for a fact that this
15 grievance was filed, right? You just believe that it
16 was?
17   A.   Right. I heard them say they filed it. I
18 seen them with papers in their hand, and I know that
19 they met with the union.
20   Q.   Okay. But as far as you know, the union's
21 response could have been this is not covered under the
22 contract so we can't do anything about it?
23   A.   It was nothing stated, no type of memo, so I
24 don't know what the union said happened. For all I

---

54

1  know, the grievance is still -- they're waiting to
2  hear it.
3    Q.   Or it was never filed as far as you know?
4    A.   Or it was never filed.
5    Q.   Okay. So other than -- what other evidence
6  do you have that Shields or other supervisors make
7  assignment decisions based on race?
8    A.   Can you repeat that question?
9    Q.   Sure.
10        What other evidence do you have that
11 Shields and other supervisors make assignment
12 decisions based on race?
13   A.   Because I personally seen Shields, who was
14 executive director, speak to his supervisory staff and
15 tell them why do you have that person working there.
16 I heard this, and this was sometime between 2010 and
17 2014, and they adjust the roster accordingly.
18   Q.   Who was Shields talking about?
19   A.   I don't know who he was talking about
20 directly, but I know the roster was adjusted because
21 of what he said to them over there, so he didn't say
22 exactly the person. He pointed at something, and they
23 changed it.
24   Q.   Is it unusual to change a roster?

---

55

1    A.   Yes. Very much unusual for a director to
2  have anything to do with the everyday goings on in the
3  office. Most directors are self captains. They're
4  not in the building that we work in.
5        UNIDENTIFIED VOICE: David?
6        THE WITNESS: I'm on the phone.
7  BY MR. LEINENWEBER:
8    Q.   Okay. So in your experience, it's extremely
9  rare to have any adjustment made to the roster?
10   A.   Made by a director, yes.
11   Q.   And do you see the roster or did you have
12 any responsibility in reviewing the roster other than
13 what your own assignment is?
14   A.   Well, if I'm in the office, they're talking
15 about who is in today, and they make the roster up, so
16 I'm privy to see what they do.
17   Q.   Okay. Do you have any responsibility for
18 the roster?
19   A.   Myself, not -- you know what, yes, I do
20 because sometimes they might say who is here, and I be
21 like this person is here, and so, then, according to
22 how they feel, maybe they might want to listen to what
23 my recommendation might be, so not normally, but it
24 has been times that they asked me who else do you need

---

56

1  down there. Because I be like we only got three guys
2  here. We need at least two more people down there.
3    Q.   So they may ask you who else you want to
4  work with you down in TSS?
5    A.   They don't ask me who else I want to work.
6  They ask me how many more guys I need.
7    Q.   Okay. But you just said -- you just said I
8  thought that they might ask your opinion, you might
9  weigh in on whether or not additional guys are needed
10 and who those guys should be?
11   A.   Yes, but I never said who they should be.
12   Q.   Okay.
13   A.   They asked me how many I needed, and if
14 there was black guys, they'll send a black guy. It
15 was nothing about I could pick and say I want these
16 white guys to come down there today because I couldn't
17 do that. They just going to fill the hole up, fill
18 the personnel up.
19   Q.   What's the racial breakdown of EM?
20   A.   Breakdown is, what? For the EM staff?
21   Q.   For the investigators. Yeah, the
22 investigators.
23   A.   Investigators? I will say if we
24 have -- well, you know what, I don't know that

---

Transcript of David A. Walker
15 (57 to 60)
Conducted on July 13, 2020

57

1  offhand, but if you want me just to give you a
2  percentage that I believe, I could do that, but I
3  wouldn't be factual and say that I have -- I would
4  actually need the roster, and I could point out and
5  tell you what --
6      Q.   What's your -- sorry.  I thought you were
7  finished.
8      A.   Go ahead.
9      Q.   What's your sense of the racial breakdown of
10 the investigators in EM?
11     A.   All right.  For Shields, I would say that if
12 we have 30 investigators, maybe 10 are black.
13     Q.   And what about the rest?
14     A.   The rest may be white, Hispanic.
15     Q.   So you think there's 10 out of 30
16 investigators in EM are black and the rest are either
17 white or Hispanic?
18     A.   That's right.  I can't be held to that.
19     Q.   Okay.
20     A.   But that's what I would say it might be.
21     Q.   Would it surprise you to hear that the
22 majority of people in EM are black?
23     A.   Yes, it will.
24     Q.   Okay.  All right.  Other than this time you

58

1  heard -- oh, sorry.
2          Who was the employee -- you don't know
3  who the employee Shields was talking about when he
4  made the adjustment to the roster?
5      A.   No.
6      Q.   And was this the only time you saw Shields
7  make an adjustment to the roster?
8      A.   No.  There might have been another time that
9  I don't know, but I know it's been done because I
10 heard Chief Neal tell me that he can't go down here.
11 Shields is not going to let him go down here.
12     Q.   But that wasn't my question.  My question
13 was about Shields making adjustments to the roster.
14 How many times did you see Shields make adjustments to
15 the roster?
16     A.   Several times.
17     Q.   Okay.  More than five?
18     A.   Several two or three.
19     Q.   Two or three.  Okay.  And you saw those in
20 person?
21     A.   Yes.
22     Q.   Okay.  Did you ever hear him refer to
23 someone's race when he was making those adjustments?
24     A.   No.

59

1      Q.   Okay.  So other than your sort of visual
2  overview of who was working in TSS, the complaints
3  that you heard Spivey and Slaughter made to Ranzino,
4  the possible grievance that they told you they were
5  filing and then this adjustment that you saw Shields
6  make in between 2010 and 2014, what other evidence do
7  you have that Shields and other supervisors make
8  assignment decisions based on race?
9      A.   Well, I had an encounter with Shields as a
10 supervisor, and it last -- it left a lasting
11 impression on me of how he feel about black people.
12     Q.   Okay.  When was that?
13     A.   That was around 2005, 2004.
14     Q.   2004 or 2005.  Where was this?
15     A.   It was in the TSS office, and, in fact, let
16 me make that 2002, 2003.
17     Q.   And who was present?
18     A.   At least eight investigators.
19     Q.   And since this is '02 to '03, is it fair to
20 say you may not remember who those eight investigators
21 are?
22     A.   Can you repeat that?
23     Q.   Since this was so long ago, you maybe don't
24 know who the investigators were that were present?

60

1      A.   No.  I could name at least six, seven
2  investigators because there's a picture that's
3  thoroughly in my mind.
4      Q.   Okay.
5      A.   I could name the investigators that were
6  down there.
7      Q.   All right.  Who else was there?
8      A.   It was Fred Davis, Beverly Jones,
9  Frank Ratkovic, Miller Boles, Emma Box,
10 Cheryl Patterson and I believe Wilford Ferguson.
11     Q.   Okay.  And what did Shields do?
12     A.   Well, we on a break.  I was involved in a
13 conversation with Frank Ratkovic, and he literally
14 tried to kick my chair from underneath me.
15     Q.   Shields did?
16     A.   That's correct.
17     Q.   Okay.
18     A.   He physically kicked my chair while I was in
19 it as if kicking it from underneath me while I was
20 sitting down.
21     Q.   Okay.  And what happened?  Did you fall
22 down?
23     A.   I got up.  I was going to respond
24 physically, but I was -- they held me back, the

Transcript of David A. Walker
Conducted on July 13, 2020

16 (61 to 64)

61

1 personnel that was in the office. Said he's not worth
2 it. He was a deputy chief at the time, and it was
3 because of a federal lawsuit I was involved in where I
4 was a witness. I believe that's why he was upset at
5 me.
6    Q.   Okay. And did he say anything when he
7 kicked the chair?
8    A.   No. He just kicked the chair as if he was
9 mad at me. I filed a grievance, and we had to go to
10 Internal Affairs about it. He got no time for what he
11 did either.
12   Q.   Okay. And then other than that encounter,
13 is there anything else that supports your belief that
14 Shields and other supervisors make assignment
15 decisions based on race?
16   A.   Oh, yeah. I mean, it's not going to be
17 nothing that's just blatant out in the open. They're
18 going to try to cover, you know, what they do. I
19 mean, consider I was a supervisor then, after the
20 incident, that was taken away. My name didn't appear
21 as supervisor anymore. Even though they moved him to
22 another section in the department, it's like I've been
23 harassed and retaliated ever since. In fact, I've
24 been told by other employees there that as long as I'm

62

1 with the Sheriff's Department, I'll never be a
2 supervisor again.
3    Q.   Okay. Help me out here because you kind of
4 put a lot of stuff in here. You just said your being
5 a supervisor was taken away after the incident. Is
6 the incident the chair kicking? Is that what you
7 talking about?
8    A.   That's correct.
9    Q.   Okay. And so in terms of when this
10 happened, this was back in '02, '03?
11   A.   Where they took -- they took -- well, they
12 didn't officially do it, but my name never appeared on
13 memos or paperwork as a supervisor. It was just
14 investigator.
15   Q.   Right. But when did that happen?
16   A.   I say around 2003, 2004.
17   Q.   Okay. Other than your name being -- the
18 word "supervisor" being taken off on paperwork like
19 that, what else changed about your position, if
20 anything?
21   A.   I didn't receive the compensatory time that
22 I was getting. As a supervisor, you get an hour a
23 week compensatory time, which comes out to ten days a
24 year. Also, I was --

63

1    Q.   So you get -- go ahead.
2    A.   Also, I was in plain uniform --
3 plainclothes. I had to revert back to being in
4 uniform.
5    Q.   Well, why would you wear plainclothes in
6 TSS?
7    A.   Because I was a supervisor, and that's
8 what -- the supervisors didn't have to wear a uniform
9 at that time.
10   Q.   Okay. So you had to go back from
11 plainclothes to uniform, you lost one hour per week
12 compensatory time and your name didn't indicate you
13 were a supervisor anymore on paperwork. Anything else
14 change?
15   A.   Which was humiliating for me to be a
16 supervisor for seven years to also get it taken back,
17 taken away from me for whatever reason. There was
18 never a reason stated.
19   Q.   Who made the decision to take your being a
20 supervisor away?
21   A.   I don't know. If you can find that answer,
22 I be glad for you to let me know. I still have an
23 I.D. that say I'm a supervisor.
24   Q.   Okay. Okay. Other than the things we've

64

1 now talked about at length here, any other evidence
2 you have that supports your belief that Shields or
3 other supervisors make assignment decisions based on
4 race?
5    A.   The only thing I can say is just it's so
6 common past practices, it's just a normal thing now.
7    Q.   Okay. Any other evidence that you can give
8 me today that supports your belief that Shields and
9 other supervisors make assignment decisions based on
10 race?
11   A.   Look at the roster every day of who is
12 assigned to TSS.
13   Q.   Okay. But we've already talked about that,
14 right?
15   A.   Well, I don't know if we talked about it.
16 I'm saying the roster for the years from 2010 to
17 present and look at the color of the people that go
18 down to TSS. I believe that state for itself.
19   Q.   Okay. Other than the racial breakdown of
20 who goes to TSS and other than the things we've just
21 talked about, do you have any other evidence to
22 support your contention that Shields or other
23 supervisors make assignment decisions based on race?
24   A.   Well, not assignments, but promotions also.

Transcript of David A. Walker
Conducted on July 13, 2020

17 (65 to 68)

65

1    Q.   We'll get to promotions, but we're talking
2  about assignments now, and I just want to make sure.
3  This is not a gotcha question.  I'm just trying
4  to -- you know, I'm just trying to get to the bottom
5  here where you say that's it, you know, that's all I
6  have, so is there anything else you have that supports
7  your belief that Shields or other supervisors make
8  assignment decisions based on race?
9    A.   No.  That's all I have at this time.
10   Q.   Okay.  Does anybody need a break?  I'm going
11 to move on to a different area, but I thought I'd
12 check and just see if anyone needs a break?
13   A.   I'm good.
14   Q.   Okay.
15      MS. KRAUCHUN:  I'm okay for right now.
16      MR. LEINENWEBER:  Cindy, are you doing okay?
17      THE COURT REPORTER:  I'm good.
18      MR. LEINENWEBER:  Okay.  Annie, are you
19 okay?
20      MS. BROWN:  I am, yeah.  Although if we have
21 a second, Mr. Walker, I keep having this issue where
22 when you lean into the camera, I lose your face on the
23 recording.
24      THE WITNESS:  You want me to sit still?

66

1       MS. BROWN:  That's perfect right there where
2  you are, yeah, and as long as you can still hear
3  Mr. Leinenweber's questions.  If you can just, you
4  know, any time that you lean in, remember to kind of
5  lean back again, that will be perfect.
6       THE WITNESS:  Okay.
7       MS. BROWN:  Thank you so much.
8       THE WITNESS:  All right.
9  BY MR. LEINENWEBER:
10   Q.   One of the things you mentioned just
11 wrapping up something on assignments was that they
12 would ask you how many more guys you need in TSS?
13   A.   They would ask me all the time, but where we
14 had short personnel and I told we need more people
15 down there to do the verifying, they would be like,
16 well, how many more do you need.  You know, I would be
17 like we need at least two or three more, and they
18 would supply the personnel according to that, but I
19 didn't get to pick who they sent down there.  It was
20 just how many more bodies I need to work down there.
21   Q.   Okay.  And that -- that's fair to
22 characterize that as an operational need, right?
23   A.   Correct.
24   Q.   Okay.  So in that case, an assignment

67

1  decision is at least being made, in part, on an
2  operational need?
3    **A.   Well, you still thinking who you're sending**
4  **down there, though.**
5    Q.   Sure.  But I mean, you're doing that
6  regardless of who you send down, right?
7    **A.   I mean, but how it happens that you going to**
8  **always send somebody black versus just somebody that**
9  **might be available that's white.**
10   Q.   Your Complaint talks a fair amount about
11 being assigned to, quote-unquote, higher incident
12 areas.  Does that apply to you as well?  You view TSS
13 as a higher incident area?
14   **A.   Without a doubt.  It is a higher incident.**
15   Q.   Okay.  So for you, then, higher incident
16 area, you're not talking about geographical regions in
17 Cook County; you're talking about the TSS assignment?
18   **A.   I'm talking about the location of that**
19 **assignment in the jail.**
20   Q.   Okay.  All right.  You mentioned promotions.
21 Let's talk about that real quick.  What's the process
22 for promotions?
23   **A.   Well, it used to didn't be a process.**
24 **People just got selected based on whatever, you know.**

68

1  **Sometimes certain people get sent to different**
2  **schoolings, you know, to get, you know, accredited in**
3  **this, but how did you get picked the person to go to**
4  **that school.  You never knew.**
5       **They developed a process where we have**
6  **EM sergeants now, and that process of having EM**
7  **sergeants, they developed that you had to take a power**
8  **test, you supposed to take a psychological and then**
9  **you go before an oral board -- or oral interview with**
10 **a director.  Now, what happened is when they put it**
11 **out, you know, everybody that wanted to be a sergeant,**
12 **you had to pass a power test, but we the only unit**
13 **there that you take a power test to get a promotion to**
14 **sergeant, so that was being challenged, but they still**
15 **put it out.**
16      **So I took the power test, and I was**
17 **able to complete everything, but my run was two**
18 **minutes too long, so I didn't pass the run, which made**
19 **me ineligible for the power -- rather, to be an EM**
20 **sergeant, but they had two more factors that they want**
21 **to do after that.  They also wanted you to do an oral**
22 **interview and take a written exam, and because so many**
23 **people -- few people passed the power test, they**
24 **didn't even have -- the people that are in there now**

Transcript of David A. Walker
18 (69 to 72)
Conducted on July 13, 2020

69

1 didn't even have to take the oral interview or the
2 written exam, which that was part of the statement on
3 the application. These are the three things you have
4 to complete, so anybody that completed the power test
5 became a sergeant.
6     Q.   Are you using the word "power test"?
7     A.   Yes.
8     Q.   What's a power test?
9     A.   It's like four different exercises you have
10 to do. You have to bench a certain amount of your
11 weight according to your age, so many situps, a sit
12 and reach and a final part is a one-and-a-half mile
13 run.
14    Q.   And that's the part that dinged you was that
15 your run took too long?
16    A.   I completed it, but I finished it two
17 minutes too late.
18    Q.   Got it. Okay.
19         And so in terms of promotions that you
20 could apply for within EM, there's sergeant. Is there
21 anything else that you could apply for to be promoted
22 to?
23    A.   No, and they just brought that up in the
24 last five years or so. I mean, other than that, you

70

1 got appointed, and it was no basis or nobody knew how
2 you got appointed.
3     Q.   Okay. And so the way that you would go
4 about getting a promotion to EM sergeant would be to
5 essentially apply for it by taking this power test,
6 taking a psychology exam and taking an oral interview?
7     A.   That's correct.
8     Q.   Okay. And you're saying that some people
9 got those promotions without doing those three things?
10    A.   They all got it without doing those three
11 things. Anybody that got promoted got it for just
12 passing the power test. They never took a written
13 exam or oral interview for the position at that time.
14    Q.   And how do you know that?
15    A.   I know that for a fact.
16    Q.   Yeah. How?
17    A.   I spoke with them.
18    Q.   Okay. When did this happen?
19    A.   This had to happen in -- I imagine --
20 because we just got EM sergeants within the last five
21 years or so, so I say maybe five years ago. 2015,
22 2014.
23    Q.   Okay. And, now, you have to take a test,
24 right? There's an exam as well you are saying?

71

1     A.   Well, you had to take the test then. They
2 just didn't have them do it because so many
3 people -- so few people passed the power test. It's
4 written right on the application all the three things
5 you have to do to get the position.
6     Q.   Okay. Anything -- so since 2015 when this
7 happened, have you applied for any other promotions?
8     A.   No, I have not.
9         MR. LEINENWEBER: Okay. Let's go ahead and
10 let's bring up Exhibit 1. Let's mark it as Exhibit 1,
11 if that's possible, Annie.
12        MS. BROWN: It's been marked. I will share
13 it on screen.
14        (Walker Exhibit 1 marked for
15          identification.)
16        MS. BROWN: It should be up now.
17 BY MR. LEINENWEBER:
18    Q.   Mr. Walker, can you take a look at what's
19 been marked as Exhibit 1 and has now been put up on
20 your screen, and could you tell us what that is?
21    A.   It says Complaint.
22    Q.   Okay. Is it your understanding that this is
23 the Complaint you filed in this lawsuit?
24    A.   Yes, sir.

72

1     Q.   Okay. And then let's go to paragraph 66,
2 which, Annie, I believe is on page 10 of the document.
3 Yeah, that's it. And do you see here, could you just
4 take a minute, Mr. Walker, and review paragraph 66
5 through 69 there below where it says, "Facts
6 particular to David Walker."
7     A.   Yes. Okay.
8     Q.   And then let me know when you've had a
9 chance to review that.
10    A.   All right. I'm finished. I just finished.
11    Q.   Okay. So paragraph 69 there, it talks about
12 supervisors giving you assignments that they didn't
13 give to non-minorities, and it says "regardless of his
14 seniority or work experience." Do you see that
15 paragraph?
16    A.   Yes, yes.
17    Q.   Are you referring here to what we discussed,
18 just discussed about the fact that you believe people
19 were assigned to TSS based on their race?
20    A.   That's actually part of it, but there's also
21 another part regarding that.
22    Q.   Okay. What's the other part?
23    A.   Okay. As a supervisor, I developed a reject
24 list of the participants or pretrial detainees that

Transcript of David A. Walker

19 (73 to 76)

Conducted on July 13, 2020

73

1 were not going to go home, and I did this on a daily
2 basis, so if you get 100 people down there and only 70
3 people go out, there's a list that you provide of the
4 people that didn't go out and why they didn't go out.
5 Well, on this particular day, I was not the supervisor
6 that did the reject list. Another supervisor that was
7 white did the reject list, but I got a ten-day write
8 up for rejecting somebody. This is something that I
9 do in the normal cause of my work every day of
10 rejecting an inmate from going home.
11    Q.  Can I stop you for a sec because I think
12 you're talking about something different than I am.
13 I'm talking about paragraph 69 regarding assignments
14 to positions, and I think you're talking about
15 paragraph 68 about discipline, which we'll get to in a
16 minute.  Is that --
17    A.  Okay.
18    Q.  Am I correct?  Are we talking about two
19 different things?  Yeah.  Let's -- let's start with
20 paragraph 69, and what I want to know is that
21 paragraph there 69 regarding supervisors assigning you
22 to positions non-minority officers were not assigned
23 to regardless of your seniority or work experience.
24    A.  That's TSS.  That's referring to TSS.  I'm

74

1 sorry.
2    Q.  Okay.  So that's everything we just talked
3 about regarding TSS, right?
4    A.  That's correct.
5    Q.  One thing I wanted to note here, it says
6 "regardless of your seniority or work experience."  Is
7 it your understanding that seniority plays a role in
8 where you get assigned?
9    A.  Yes.  It has always played a role.  Past
10 practices.
11    Q.  Okay.  And what's that based on?  You said
12 past practices.
13    A.  Right.  The years -- the people that get the
14 more preferable assignments are the people that have
15 most time.  That's what has been done all the time
16 until recently where you got people with less time
17 going to the places that people with more time
18 normally would get those positions.
19    Q.  Isn't it true that, though, we talked about
20 earlier that assignments, you don't have a right to
21 bid for an assignment, right?
22    A.  No, not that I -- that I know of, but I, you
23 know, like I said, it's probably a grievance issue now
24 with the union.

75

1    Q.  Well, didn't you -- in the contract, you
2 used to be able to bid for an assignment, right?
3    A.  No.
4    Q.  No.  All right --
5       THE COURT REPORTER:  I'm sorry.  Can you
6 repeat that?  You were speaking over.  Mr. Walker?
7       THE WITNESS:  What was that again?
8 BY MR. LEINENWEBER:
9    Q.  Mr. Walker, can you repeat your answer that
10 you just gave for the court reporter.
11    A.  As long as I've been in Electronic
12 Monitoring, you could never bid for assignment.  That
13 was never a policy in EM.
14    Q.  Okay.  So, then, what is the basis of your
15 belief that seniority would have a role in where you
16 get assigned?
17    A.  Because of past practices on what they
18 just -- because you couldn't bid means that they
19 didn't give you what you -- what you earned on your
20 seniority.  It was done all the time.  It just stopped
21 being done it seems like when the black people got
22 seniority, and they start bringing more white
23 individuals into the unit, they would get the
24 positions that normally would have been held for

76

1 somebody with seniority.
2    Q.  So your basis -- you keep saying something
3 called past practices.  What are you referring to?
4    A.  Right.
5    Q.  What is past practices?
6    A.  Past practices of how people got assignments
7 before in the unit.  Once you were in the unit so
8 long, you went to another -- another position in the
9 unit.
10    Q.  Okay.  And where is that -- where is that
11 written down that that's the way it works?  Is it
12 written down anywhere?
13    A.  It's not written down.  It's just something
14 that was done.
15    Q.  Okay.  And how do you know it was done?
16    A.  From people that got moved to those
17 positions and me being there, you know, in the
18 position I was still in.
19    Q.  Okay.  But, really, positions, though, we're
20 talking about -- you're talking about Patrol, right?
21 So you're saying people got assigned to Patrol based
22 on seniority?
23    A.  Right.  Patrol or to the office.
24    Q.  Patrol or to the office.  Okay.  So you're

Transcript of David A. Walker

Conducted on July 13, 2020

---

**77**

1  saying that once you attained seniority, you got to go
2  to Patrol or to the office?
3    **A.   That's correct.**
4    Q.   Okay.  And that's based on what again?
5    **A.   Your years in service.**
6    Q.   I'm sorry.  Let me withdraw that question.
7          Your belief that that's the way it
8  worked, that you get a certain amount of seniority and
9  you get to go to the office or Patrol, what is that
10  belief based on?
11    **A.   It was based on your preferential of**
12  **assignment because, now, you have the years to be put**
13  **someplace else.**
14    Q.   And who told you this?
15    **A.   Supervisor.**
16    Q.   Which supervisor?
17    **A.   All supervisors.  Anybody that was**
18  **supervising there.  From Neal to Ranzino, they know**
19  **how it went normally.**
20    Q.   And when did they tell you this that once
21  you get a certain level of seniority, you get to go to
22  a different assignment than TSS?
23    **A.   I can't pick the exact date, but it was**
24  **common knowledge.  It was common talk about, you know,**

**78**

1  **once you earn your years, you'll be working here.  You**
2  **won't have to go down to TSS.  TSS was used,**
3  **basically, as a punishment.**
4    Q.   What does it mean to earn your years?  How
5  many years do you need before you can get moved?
6    **A.   Well, I would assume probably at least four**
7  **or five years.  I couldn't put an exact number on it,**
8  **what they call experience or not, you know.  To break**
9  **you in was putting you down in TSS, but, eventually,**
10  **once you knew it and other people came in, they would**
11  **get broke in.  That was the way they broke most new**
12  **investigators in.  If -- they knew they would have to**
13  **be an investigator, so they would put them there, and**
14  **they didn't -- they didn't know that it was better one**
15  **place than another until you worked there for a while.**
16    Q.   Okay.  And that's because you believe that
17  TSS, that -- you believe they put people in TSS
18  because that was a form of punishment you said and to
19  break them in?
20    **A.   Well, you learned the job, a lot more of the**
21  **job by being down there.  You dealing with the people**
22  **every day, and believe me, it's very stressful when**
23  **you got people that throw phones and slam phones, and**
24  **you don't have any supervisor down there, so you,**

**79**

1  **basically, when you respond or do something, you'll**
2  **have higher standards even though there's no**
3  **supervisor down there.**
4    Q.   Isn't it possible that they put people who
5  were just good at TSS down in TSS?
6          MS. KRAUCHUN:  I object.  Calls for
7  speculation.  Go ahead.
8  BY MR. LEINENWEBER:
9    Q.   You can answer the question, Mr. Walker.
10    **A.   All right.  I'm quite sure they might have**
11  **thought that, but, eventually, you going to burn your**
12  **good people out.**
13    Q.   Okay.  And as you said, you were pretty good
14  at TSS, right?
15    **A.   Yes.  When I was down there, I was.**
16    Q.   Okay.  Okay.  Let's talk about paragraph 68
17  here.  It says you received discipline when similarly
18  situated non-minority officers did not.
19    **A.   Yes.**
20    Q.   Do you see that paragraph there, paragraph
21  68 of the Complaint?
22    **A.   Yes.  I see it.**
23    Q.   When did you receive discipline that you are
24  referring to in this paragraph?

**80**

1    **A.   It had to be around 2003.**
2    Q.   Okay.  What happened?  What kind of
3  discipline did you receive?
4    **A.   Ten days with no options because a**
5  **participant was rejected from a reject list that a**
6  **supervisor signed, and, normally, that would be me or**
7  **Supervisor Malone.  On this day, it was**
8  **Supervisor Malone that did a reject list, but because**
9  **the guy got rejected, I received the ten days from a**
10  **director I hadn't seen in three years.  He wasn't even**
11  **in the office.  His name was Petrowski, but I believe**
12  **it's all related to the lawsuit that I was involved in**
13  **against the Sheriff and Shields.**
14    Q.   Okay.  So you said in 2003, you received a
15  ten-day suspension because you rejected a participant
16  from home meaning?
17    **A.   Right.  Something at the time which was**
18  **totally ridiculous.  Something we did every day.**
19    Q.   Okay.  Now, isn't it true, though, that if
20  you reject someone, you had to document that in some
21  kind of a memo or a report?
22    **A.   Not at that time, you didn't.  You just had**
23  **to sign your name at the bottom of the reject list.**
24    Q.   Okay.

Transcript of David A. Walker
Conducted on July 13, 2020

---

81

1    A.    And, once again, I didn't even sign it.  It
2  was somebody else that signed the reject list as the
3  supervisor.
4    Q.    Okay.  So who is the similarly situated
5  non-minority officer who didn't get disciplined
6  related to this infraction?
7    A.    It would be Supervisor Malone.
8    Q.    Okay.  Okay.  What other discipline are you
9  referring to in paragraph 68 besides the 2003 ten-day
10  suspension?
11    A.    Well, it just was a lot of little things.  I
12  can't think of any one item, but it's like, you know,
13  I got removed because of the incident with Shields to
14  work in Records for six months, and I did nothing
15  wrong.  That never happened to any other supervisor
16  that was white that I know of, you know.  It's like
17  because what I was involved in and I got sent
18  someplace else, and when I requested through a
19  grievance to come back to my position, that's when I
20  was no longer on paperwork as a supervisor.
21    Q.    When was this?
22    A.    This had to be about 2000 -- between
23  2000 -- about 2004.
24    Q.    Okay.  And you said you were removed to

---

82

1  Records?
2    A.    That's correct, which was referred to
3  Records.
4    Q.    Okay.  The ten-day suspension, did you
5  actually serve the ten days?
6    A.    Yes.
7    Q.    Okay.  And when you went to Records, did
8  your pay change at all?
9    A.    No, it did not.  In fact, I still was a
10  supervisor.  It didn't change.  My title didn't change
11  until I requested to come back.
12    Q.    And how long were you assigned to Records?
13    A.    About six months.
14    Q.    Isn't it true that you got removed because
15  of numerous reports of use of force against detainees?
16    A.    That wasn't the reason that they told me
17  they removed me.  I never got anything in writing
18  about why I was being removed.
19    Q.    So you were never told that you were under
20  investigation for use of force against detainees?
21    A.    No.  I went to Internal Affairs a few times,
22  and I always wrote it up correctly, and I always got
23  exonerated whatever I was there for, so I never
24  received any discipline regarding that.  As I say,

---

83

1  when you work in TSS, you in a more intensive place
2  and fights happen all the time, so that was almost
3  part of the job at the time to effectively work it,
4  you know.  It was all alleged.  It was nothing
5  verified.
6    Q.    And Records, I assume, was a lot safer than
7  TSS?
8    A.    Well, Records was like administration.  You
9  dealing with just fax and IDs.
10    Q.    Okay.  I mean, that must have been pretty
11  good, then, from that standpoint, right?
12    A.    I mean, if your used to being in the area,
13  anything that you're not familiar with, you have to
14  get used to.  I guess you can look at it you don't
15  have to worry about dealing with inmates anymore, but,
16  you know, as I said, you worked -- you working with
17  different people, and you have a different, total
18  different assignment.
19    Q.    Yeah.  Yeah.  Just so we're clear, are you
20  denying that you were investigated for use of force?
21    A.    No.  I never said that.
22    Q.    Okay.  So you were investigated for use of
23  force?
24    A.    I went to Internal Affairs at the time,

---

84

1  which is OPR now, and I answered what needed to be
2  answered.  I was always found not to be guilty or
3  anything.
4    Q.    And -- okay.  But it's your understanding
5  that being moved to Records was discipline?
6    A.    Yes, it was because it was an environment I
7  was not familiar with.  I went there, and, you know,
8  I'm pretty much a hands-on person, you know.  It
9  was in an office that I don't know people and consider
10  that they took me from a spot that I had been in for
11  at least 12, 13 years at the time, I mean, it's going
12  to be a different change for me.
13    Q.    It had to be less stressful than dealing
14  with detainees on a daily basis who you didn't know
15  who you allege are, you know, capable of attacking you
16  at kind of any moment's notice, right?
17    A.    Yeah, I guess you can look at it that way.
18  Yes.
19    Q.    What other discipline have you received that
20  you are talking about in paragraph 68?
21    A.    That's it.  I've been kind of free of any
22  discipline.
23    Q.    What about didn't you get -- oh, go ahead.
24  Sorry.

---

Transcript of David A. Walker
Conducted on July 13, 2020

---

85

1    A.  I did have to give a day for my Taser that
2  got discharged in the hallway, and they had me sign up
3  because the Taser got a negative discharge in the
4  hallway, but other than that, that was it.
5    Q.  What year was that?
6    A.  That might have been 2016.
7    Q.  Okay.  And is it your contention that that
8  discipline for discharging your Taser in the hallway
9  was because of your race?
10    A.  Yes.
11    Q.  Okay.
12    A.  Because I can tell you of people that Taser
13  discharge that were white and didn't do any time for
14  it.
15    Q.  Okay.  And who are the white individuals who
16  discharged their Taser in the hallway and didn't get
17  any discipline?
18    A.  Investigator Cholewah.
19        THE COURT REPORTER:  I'm sorry.  Say that --
20  BY MR. LEINENWEBER:
21    Q.  What's the name?
22    A.  Investigator Cholewah.  I might have to
23  spell it for you.
24    Q.  Please.

---

86

1    A.  C as in "Charles," -h as in "Henry," -o as
2  in "Oscar," -l as in "Lincoln," -e as in "Edward," -w
3  as in "Washington," -a as in "Adam," -h as in "Henry."
4  Cholewah.
5    Q.  And is Investigator Cholewah white?
6    A.  That's correct.  Yes, he is.
7    Q.  Okay.  And when did he discharge his Taser?
8    A.  It might have been maybe three or four
9  months after I discharged mine.
10    Q.  And did you see that happen?
11    A.  No, I didn't witness it, but I heard of the
12  incident.  He told me.  Some other investigators told
13  me.
14    Q.  Who told you about it?
15    A.  Investigators on day shift.  It would
16  be -- well, I can tell you Supervisor Deputy
17  Chief Logan.  I'm trying to think of the people that
18  worked there because I didn't work day shift at the
19  time.  Investigator Glass.  A few investigators that
20  worked that shift.  That's all I can think of right
21  now.
22    Q.  Okay.  And they told you that
23  Investigator Cholewah discharged his Taser and didn't
24  get any discipline?

---

87

1    A.  That he discharged his weapon, and he didn't
2  get disciplined, and they were recommending for him to
3  go ahead and retire.
4    Q.  Okay.  Any other way you learned about this
5  Investigator Cholewah incident?
6    A.  No.
7    Q.  Okay.
8    A.  That was it.
9    Q.  ****  Any other white or non-African-American
10  individuals who did not receive discipline for
11  discharging their Tasers?
12    A.  Not that I know of.  If I could think of
13  one, I'll let you know.
14    Q.  And your discharge was in 2016?
15    A.  Approximately around 2016.
16    Q.  And when I say "discharge," just so the
17  record is clear, I'm talking about discharging your
18  Taser.
19    A.  That means that the probe that's in the
20  Taser, it got ejected.  I was doing a test on it, and
21  during the test, one of the probes, it shot in the
22  hallway, in the hallway, the wall.  It hit the wall.
23    Q.  And this is the hallway at where exactly?
24    A.  The hallway is in our building at 2323 South

---

88

1  Rockwell, the 6th floor.  It's the hallway before you
2  get into the roll call.
3    Q.  Okay.  All right.  So one-day suspension is
4  what you received.  Did you serve the suspension?
5    A.  No.  They just took the day away from the
6  time I had accrued.
7    Q.  Did you grieve that suspension?
8    A.  No, I did not.
9    Q.  Okay.  Okay.  Other than this Taser
10  incident, any other discipline that you are referring
11  to in paragraph 68?
12    A.  None that I am aware of.
13    Q.  Okay.  All right.  Let's turn to
14  paragraph -- sorry.  Was someone interrupting?  Okay.
15  Maybe it was just feedback.
16        Page 11, the next page, and under the
17  heading "Facts relevant to multiple plaintiffs."
18    A.  Yes, I see it.
19    Q.  Okay.  So can you -- go ahead and review
20  paragraph 77 through 80 there, and let me know when
21  you're finished.
22    A.  Okay.  I just read it.
23    Q.  Okay.  Let's talk about paragraph 77.  You
24  said -- or it says here that essentially progressive

---

Transcript of David A. Walker
Conducted on July 13, 2020

23 (89 to 92)

89

1 discipline is not followed, right?
2 **A. Correct.**
3 Q. Okay. And that's related to the discipline
4 you were talking about that we just talked about,
5 right, the different --
6 **A. Yes.**
7 Q. I guess it's three. You have three
8 different incidents of discipline, and you are saying
9 that progressive discipline wasn't followed in those
10 three, right?
11 **A. Well, they wouldn't be in the Taser incident**
12 **because I just went ahead and signed for the day, but**
13 **in the other two, progressive discipline was not**
14 **followed.**
15 Q. Okay. So that's the ten-day suspension for
16 rejecting a home monitoring participant and then '04
17 when you were removed to Records?
18 **A. Correct.**
19 Q. Okay. All right. 78, I think
20 we -- paragraph 78, we talked about this quite a bit.
21 You were saying that TSS is the high incident area
22 that you're placed into regardless of seniority over
23 non-minority officers, right?
24 **A. Correct.**

90

1 Q. Okay. Paragraph 79, it refers to an
2 incident where some folks had to go, some
3 investigators had to go to a house that had scabies,
4 scabies, I guess, scabies. That doesn't apply to you,
5 right?
6 **A. No, it does not.**
7 Q. Okay. And then paragraph 80 here, it says
8 Shields and supervisors regularly called plaintiffs
9 the "N" word, crooks and other derogatory and racist
10 comments.
11 **A. Well, I never heard Shields say that, but I**
12 **heard other supervisors say at one time or another. I**
13 **can't give you the date, but I know they said it**
14 **before.**
15 Q. Okay. So, then, this doesn't apply to you
16 at least as regarding Shields? You never heard
17 Shields use the "N" word?
18 **A. No, not to me directly.**
19 Q. And he never used the words crooks or other
20 derogatory or racist comments towards you?
21 **A. I didn't hear him directly toward me --**
22 Q. Okay.
23 **A. -- so I can't say.**
24 Q. What about Ranzino, did you ever hear

91

1 Ranzino use the "N" word?
2 **A. Yes. Many times.**
3 Q. Okay. When was the first time you heard
4 Ranzino use the "N" word?
5 **A. It was at the end of a roll call, and I**
6 **believe him and I believe Investigator Winston had**
7 **gotten into a verbal altercation, and it was used then**
8 **in roll call. I mean, it was literally at least**
9 **probably 20 people out there could hear it, and then,**
10 **you know, on occasions that we spoke, you know, just**
11 **in general conversation, it might come out.**
12 Q. When was the altercation with Winston at
13 roll call?
14 **A. It would have to be sometime when Ranzino**
15 **was still there, so it had to be between I say 2012**
16 **and 2014.**
17 Q. And you were physically present?
18 **A. Yes, I was.**
19 Q. Okay. And you heard Ranzino use the "N"
20 word towards Mr. Winston?
21 **A. He used it in his conversation with him --**
22 Q. So he wasn't --
23 **A. -- at roll call.**
24 Q. So he wasn't directing it towards him, he

92

1 was just using the word in general? Well, what
2 did -- let me stop. Let me withdraw the question.
3 What did Mr. Ranzino say exactly as you
4 can best remember?
5 **A. I can best remember it was something**
6 **involving an assignment, and from what I recall,**
7 **Winston was, like, why do we always get these**
8 **assignments, and it was certain regards to, you know,**
9 **those your niggers, something like that. You can work**
10 **with them better. Something to that extent.**
11 Q. So Ranzino said those your "N" words?
12 **A. Right.**
13 Q. Meaning that Winston could work with those
14 guys?
15 **A. Right because he was.**
16 Q. Okay. Okay. And was it just that one time
17 in this incident or was there something else in this
18 incident?
19 **A. No. It was just something that I told you**
20 **at roll call, sometime could get heated based on just**
21 **the assignments. Like I was telling you, you know. I**
22 **done see any roll calls go as far as to say you don't**
23 **send them down here, referring to some investigators I**
24 **named, and, you know, then they'd get into a whole**

Transcript of David A. Walker
Conducted on July 13, 2020

24 (93 to 96)

93

1 other thing, so, you know, as I said, Ranzino was a
2 different type of guy.
3     Q.   And when you heard Ranzino use the "N" word
4 with Mr. Winston, what did you do?  What did you say
5 or do?
6     A.   First of all, I was surprised that he would
7 do that, especially in an open roll call, which means
8 that Winston must have got underneath his skin some
9 type of way, but it was something that he knew he
10 shouldn't have said, but it's something that I heard
11 him say before when it wasn't that many people around.
12     Q.   And so you were surprised, but what did you
13 say or do after you heard him use the "N" word?
14     A.   Well, my first thing was to calm Winston
15 down.  I didn't say anything directly to him.
16     Q.   Okay.  And then what happened?
17     A.   And then went to my assignment, and, you
18 know, we talked about what was said and that I believe
19 a grievance was put in about that.
20     Q.   Okay.  And did you report that to anyone?
21     A.   I believe I signed the grievance as a
22 witness.
23     Q.   Okay.  And then what happened?
24     A.   I don't know if anything happened, but I

94

1 know not too much long later, they removed Ranzino
2 from the office, and he's over in the court building
3 right now.
4     Q.   Okay.  So Ranzino was actually removed at
5 this point?
6     A.   Yes.
7     Q.   Okay.
8     A.   And that's all I know as far as if that's
9 discipline, he was removed.  I don't know if he got
10 any days for it.
11     Q.   Okay.
12     A.   But I know he was removed.
13     Q.   Other than this altercation at roll call,
14 when else did you hear Ranzino use the "N" word?
15     A.   In casual conversation I might have with
16 him, you know, in the building, you know, it might
17 just kind of slip out, you know.
18     Q.   I have to say no, I don't know because I
19 don't know how a word that is that loaded can just
20 slip out, and I would think that it's a fairly
21 memorable event when it does.
22     A.   Like I say, in general conversation, maybe
23 he thought he was comfortable with me as to say it,
24 you know, and I wouldn't react to it, but I used to

95

1 always tell him, I say you know you shouldn't talk
2 like that.
3     Q.   Okay.  So you tell him you know you
4 shouldn't talk like that?
5     A.   Correct.
6     Q.   Okay.  And approximately how many times did
7 he use the "N" word in casual conversation with you?
8     A.   Maybe two times, two or three times.
9     Q.   Okay.  And did you ever notify any
10 supervisors that Ranzino had used this word?
11     A.   No, because I didn't -- I didn't really
12 think that I could really prove it or it would go any
13 place.  I mean, you looking at probably a kangaroo
14 court.  The people that are judging him are friends of
15 his.
16     Q.   So just to be clear, you said two to three
17 times you heard Ranzino use the "N" word?
18     A.   That's correct.
19     Q.   And that's over the course of your 30-year
20 career?
21     A.   That's correct.
22     Q.   Okay.  And you never reported it because you
23 didn't think it would go anywhere?
24     A.   That's correct.

96

1     Q.   Okay.  Who -- did you ever -- you referred
2 to Shields and supervisors here in paragraph 80.  What
3 other supervisors are you talking about other than
4 Ranzino?
5     A.   Well, white supervisors, I mean, how
6 far -- just going back to 2010, correct?
7     Q.   So in paragraph 80 of your complaint, you
8 say that Director Shields and his subordinate
9 supervisors in the Electronic Monitoring Unit
10 regularly called you the "N" word.  Okay.  And so far
11 what we've heard from you is that Shields never said
12 it, but Ranzino said it once during roll call to
13 Winston, not to you, and that he said it maybe two to
14 three times in casual conversation with you.  Okay?
15     A.   Correct.
16     Q.   So what I want to know is what other times
17 did one of Shields' subordinate supervisors use the
18 "N" word towards you?
19     A.   Okay.  I'm going back a while, but it would
20 be Chief Pellegrini.
21     Q.   All right.  And when was this approximately?
22     A.   It was probably around 2006.
23     Q.   Okay.  Anyone else?
24     A.   Nobody else I could think of right now.

Transcript of David A. Walker

25 (97 to 100)

Conducted on July 13, 2020

97

1    Q.   Okay.  Okay.  All right.  Let's turn the
2  page to page 12, and I'd like you to review paragraphs
3  81 through 86, and let me know when you're finished
4  with that.
5    A.   Okay.  I just read it.
6    Q.   Okay.  Let's see.  All right.  Paragraph 81.
7  Let's see.  Paragraph 81, Director Shields and his
8  subordinate supervisors assigned non-minority officers
9  to office positions and assigned Plaintiffs to
10  assignments in the basement or higher incident areas.
11  Is that the TSS assignments we already talked about?
12    A.   Yes, sir.
13    Q.   Okay.  Let's see.  Paragraph 82,
14  assigned -- Director Shields and his supervisors
15  assigned duties to EM investigators based on their
16  race.  Of what evidence, if any, do you have that they
17  assigned duties based on race?
18    A.   Well, for instance, if you work in Patrol
19  and you happen to be black, you're going to definitely
20  work the higher risk areas, which are the west side
21  and the south side, Englewood and 15th District.  If
22  you're white, they going to probably try to put you in
23  a suburban area, and this is, like, this common
24  practice that they do.  Also, with regards to the

98

1  going down to TSS.  I mean, there's times that they
2  can't avoid it and they have to put a white person
3  down there or anyone -- but if it's somebody black,
4  you're working it, and, you know, it also goes
5  with -- well, that's not going to answer that
6  question.  That would be another question -- answer,
7  so that's what I have for you for now.
8    Q.   Okay.  So you're saying that the location of
9  your patrol assignment if you're black is going to be
10  the west side or the south side?
11    A.   Right.
12    Q.   And you didn't really work Patrol, though,
13  right?
14    A.   Well, I worked -- I've been working Patrol
15  now the last -- I say the last four or five years.
16    Q.   Oh, so you got out of TSS four or five years
17  ago?
18    A.   About four years ago.
19    Q.   Oh, I didn't realize that.  Why were you
20  moved out of TSS?
21    A.   Because, eventually, I requested it, and
22  they really had no choice.  They could find other
23  black people to put down there other than me.  I had
24  more seniority than the black people that were down

99

1  there.
2    Q.   So -- well, I guess I'm just confused then.
3  So your claim that you were assigned to TSS based on
4  your race ended four years ago?
5    A.   Ended about four years ago, yes.
6    Q.   Okay.  And since that time, you've been
7  working Patrol?
8    A.   That's correct.
9    Q.   Okay.
10    A.   About two years on the third watch and a
11  year-and-a-half on the -- on the second watch.
12    Q.   Who makes the decision about where -- which
13  patrol section you got?
14    A.   Who makes the decision on what patrol
15  assignment you get?
16    Q.   Yeah.
17    A.   It would be the on-duty -- normally, it's
18  the on-duty supervisor that would do that.
19    Q.   Okay.  And who is that for you?
20    A.   Currently -- right now?
21    Q.   Well, you're saying that in paragraph 82,
22  okay, that you were given, I guess, patrol assignments
23  based on your race.
24    A.   Right.

100

1    Q.   So who made the decision to give you patrol
2  assignments based on your race?
3    A.   Well, normally, it would be the supervisor
4  which would be Passas, Logan or Gaynor, but sometimes
5  it's made out by the director for whatever reason.
6    Q.   Who is the first name you said before Logan?
7    A.   Right.  The deputy chief.
8    Q.   No, no.  Who was the first name you said
9  before Logan?  Was it Passas?
10    A.   Passas.
11    Q.   Okay.  So Passas, Logan or Gaynor made the
12  decision about which Patrol area you received?
13    A.   Well, now, if you're going back then, they
14  weren't the supervisors.  I'm talking about present.
15    Q.   Well, when -- when are you talking about
16  that these three were the ones making the patrol
17  assignment decisions?
18    A.   When Shields was there, he would be involved
19  with that.  I'm going present now, but if we go back
20  to when he was there until he retired, it was Shields
21  that was responsible for what names went on the list
22  to wherever.
23    Q.   Okay.  So you're saying that Shields made
24  the decision about where to assign you for Patrol?

Transcript of David A. Walker
Conducted on July 13, 2020

26 (101 to 104)

---

101

1    A.    Right.  Sometimes they would do it, but if
2 he was there, then him or Director Webb would do it.
3    Q.    I thought you said that it was pretty rare
4 that Shields would make a change to the roster?
5    A.    He wouldn't make a change.  He'll make out
6 the roster.  It's rare that he would come in once the
7 roster was made up, then make a change.
8    Q.    Okay.  So you're saying that Shields made a
9 decision about which area you would go out on Patrol?
10    A.    Well, I mean, he would probably let him
11 know.  Then they'll put it down, but he would be
12 responsible if he didn't think he wanted you there.
13 Because what happened is he was kind of accessible.
14 There's guys that would go directly to Shields, and
15 he'll let the supervisor know.
16    Q.    How do you know that Shields made the
17 decision to assign you to one patrol location or
18 another?
19    A.    Because he will let you know.
20    Q.    Okay.  So when did he let you know that he
21 made the decision to assign you to a particular patrol
22 area?
23    A.    When you spoke with him, you know, he'll let
24 you know.

102

1    Q.    All right.  Well, when did this happen?
2    A.    This would happen sometime between 2015 and
3 2018.
4    Q.    Okay.  So when is the first time that
5 Shields came to you and said that he was putting you
6 in a particular patrol area?
7    A.    He wouldn't come to you like that.  It would
8 be like are you happy with where you at?  Then you be
9 like no, and you would still get where you at.  Or let
10 me see what I can do about it, and he wouldn't do
11 nothing.
12    Q.    Okay.  And how do you know that he was
13 making the decision about where to assign you based on
14 your race?
15    A.    So he told you directly.  He said, well, I
16 can remedy that for you.  He'll speak to the
17 supervisor.
18    Q.    I'm not following you, and I don't think you
19 are answering my question.  My question is how -- you
20 say that Shields made these decisions based on your
21 race.  Okay.  He assigned you to the more dangerous
22 areas you said based on your race.  Okay.  How do you
23 know that Shields made the decision to assign you to a
24 particular patrol area because of your race?

103

1    A.    Because the supervisor would go to him, and
2 he'll get a final okay on it.
3    Q.    Did Shields ever say to you that he was
4 assigning you to a particular patrol area?
5    A.    The supervisor told me that --
6    Q.    That's not answering my question.  My
7 question is did Shields ever come to you and say that
8 he is assigning you to a particular patrol area?
9    A.    No.
10    Q.    Okay.  And you're saying other supervisors
11 would come to you regarding telling you where you're
12 being assigned for patrol?
13    A.    The supervisors would tell me I wouldn't
14 work a certain area because Shields didn't -- said I
15 couldn't work there.  That's what they told me.
16    Q.    Okay.  And these supervisors are Passas,
17 Logan and Gaynor?
18    A.    Well, it would be -- at the time, it would
19 be Logan, Ranzino and Neal.
20    Q.    So I guess one thing I'm confused about is
21 you are saying that getting assigned to certain areas,
22 that that was a higher -- that there were higher
23 incident areas, is that what you are saying?
24    A.    Different type of calls.  Like I mean, if

104

1 you in Patrol, it might like a reincarceration --
2       THE COURT REPORTER:  I'm sorry.  I'm sorry.
3 Mr. Walker, can you repeat that?  I'm having trouble
4 hearing.
5       THE WITNESS:  A reincarceration is a higher
6 risk call because that entails you have to lock
7 somebody up and return them to jail, and
8 disproportionately, the black patrol officers would
9 get the most amount of lockups, which is higher risk
10 in itself, versus the white investigators at EM.
11 BY MR. LEINENWEBER:
12    Q.    Okay.  How do you know that black
13 investigators get a disproportionate amount of
14 reincarnation -- reincarcerations?
15    A.    You could hear it on the air how many
16 lockups you got today versus they start comparing the
17 different calls, and it was obvious.
18    Q.    So you keep kind of saying, well, it's
19 obvious, it's obvious, but I need to know what your
20 personal knowledge is.  Do you have personal knowledge
21 of the number of reincarceration assignments that go
22 to African-American investigators versus white
23 investigators?
24    A.    I can't put a number on it.  I mean, I can

Transcript of David A. Walker
Conducted on July 13, 2020

---

105

1 only put a percentage on it from what I know about and
2 how many lockups we get, but that's the direct result
3 of what the supervisors give you.
4     Q.   And what -- so your knowledge of this is
5 strictly based on what you hear over the radio, is
6 that what you were saying?
7     A.   What I hear, what I see and what I do, what
8 I perform, how many lockups I get, how many -- I have
9 no problem asking my white counterparts when was the
10 last time you did a lockup, and they be, like, man, I
11 didn't do a lockup all this week; whereas, I might
12 have did ten.
13    Q.   Okay.  And -- okay.  When did you have this
14 conversation with the white colleague?
15    A.   I do that maybe on every two, three days.
16    A.   So --
17    A.   I still do that now.
18    Q.   So every two to three days, you ask a white
19 colleague how many lockups they've had?
20    A.   Right.
21    Q.   Okay.  And who is this white colleague or
22 colleagues that you're referring to?
23    A.   It would be Bienik, Messina, Folkers.  There
24 are people I currently work with now, Prskalo,

---

106

1 Caccavallo, Nadolski, Klieminski.
2     Q.   I think you were going pretty fast there, so
3 let's go through this list again.  You said Bienik,
4 Messina.
5     A.   Correct.
6     Q.   Who after Messina?
7     A.   Folkers.
8     Q.   Folkers.
9     A.   Caccavallo.
10    Q.   Caccavallo.
11    A.   Nadolski.
12    Q.   Okay.  Who else?
13    A.   Klieminski.
14    Q.   Klieminski.
15    A.   Wisniewski.
16    Q.   Okay.
17    A.   Some of the Latino guys, Rivero.
18    Q.   Okay.
19    A.   Martinez.
20    Q.   Okay.
21    A.   Did I already say Nadolski?
22    Q.   Yes.
23    A.   All right.  That's -- that's about it.
24    Q.   Okay.  So every two to three days, you talk

---

107

1 to these guys to compare numbers on how many lockups
2 you've each had?
3     A.   I do.
4     Q.   Okay.  And your testimony is that they will
5 say they've had none and you will have had ten?
6     A.   For the most part, yes.
7     Q.   Okay.  And when did these conversations take
8 place?  Beginning when?
9     A.   Around from since I've been in Patrol until
10 present.
11    Q.   And when did you start Patrol again?
12    A.   Sometime in the middle part of 2016.
13    Q.   Okay.  And then do white employees get
14 assigned to do lockups?
15    A.   Do they still do lockups, is that the
16 question?
17    Q.   Do white employees get assigned to do
18 lockups?
19    A.   You keep on getting distorted.  I hear
20 lockup.  I don't hear the word before lockup.
21    Q.   Do white employees receive assignments to
22 perform lockups?
23    A.   Yes, they do.
24    Q.   All right.  Let's talk about paragraph 83,

---

108

1 this references disproportionate discipline, and I
2 just want to confirm that that is in reference to the
3 discipline that we already talked about, the 2003 ten
4 days that you received, the 2004 removal to Records
5 and the 2016 one-day suspension for discharging a
6 Taser in the hallway?
7     A.   Yes.  That's the -- that's the only thing I
8 could attest to.
9     Q.   Okay.  Paragraph 84, it says that
10 Director Shields threatened that he would have you
11 fired if you filed grievances for discipline you
12 received.  Does that apply to you?  Did you ever
13 have -- did Shields ever threaten you that he would
14 get you fired if you filed a grievance for a
15 discipline you received?
16    A.   No.
17    Q.   Okay.  Paragraph 85, it says the discipline
18 process doesn't provide meaningful opportunity for an
19 unbiased determination of disciplinary actions.  Is
20 that just -- that one and paragraph 86 regarding the
21 grievance process, is that essentially just your
22 feelings about the process of challenging either the
23 substance of discipline or the process by which you
24 received discipline?

---

Transcript of David A. Walker
Conducted on July 13, 2020

28 (109 to 112)

109

1    A.    That's not my feelings.  The actuality.
2 Because in a discipline process, you can grieve
3 something, and they could give you the discipline and
4 you still grieving it, and so, in essence, by the time
5 you try to get your time back, you already served the
6 time for which you're grieving, so it's a backward
7 process.
8    Q.    Okay.  And for you, though, your evidence
9 about this is related exclusively to the 2004 removal
10 to Records and the 2003 ten-day suspension, right?
11   A.    That's correct.
12   Q.    Okay.  Because you didn't file a grievance
13 about the 2016 Taser discharge?  I mean, you actually
14 discharged the Taser, right?  You accepted that one?
15   A.    No, I did not.
16       MS. KRAUCHUN:  Objection.  Sorry.  Go ahead.
17 Objection.  Misstates testimony.
18 BY MR. LEINENWEBER:
19   Q.    You did not accept that or you did not
20 discharge the Taser?
21   A.    I did -- the Taser did discharge.
22   Q.    Okay.  And you accepted the one-day
23 discipline?
24   A.    And the person that gave it to me was

110

1 Director Shields.
2    Q.    But you accepted the discipline, right?
3    A.    I signed off on it.
4    Q.    I'm sorry.  I didn't understand that.  Could
5 you repeat that?
6    A.    I signed the one-day suspension.
7    Q.    Okay.  You accepted it, in other words?  You
8 did not challenge it?
9    A.    I did not challenge it.
10       MR. LEINENWEBER:  Okay.  I think that
11 answers my question.  Okay.  So that's 85 and 86.  Why
12 don't we -- you guys want to take a couple
13 breaks -- or a couple minute break?  We've been going
14 for a little while, and this is probably a good place
15 for me to take a break, if you want.
16       MS. KRAUCHUN:  Yeah.  That works for me.
17       MR. LEINENWEBER:  Okay.  Does anyone need a
18 lunch break or do you want to keep it to a shorter
19 one?  I mean, my sense is that this will be similar,
20 Kelly, in the length to the last one, so I'm thinking
21 like, you know, early mid afternoon depending on how
22 things go.
23       MS. KRAUCHUN:  That's fine.  We could -- I
24 don't know what do you guys want?  15 minutes.  Is

111

1 that good enough?  I would be fine with that.
2       MR. LEINENWEBER:  Yeah.  That's fine with
3 me, I guess, unless Annie or Cindy, if you guys have
4 any other requests for the amount of time here.
5       MS. BROWN:  I'm okay with anything.
6       THE COURT REPORTER:  I'm good with whatever.
7       MR. LEINENWEBER:  All right.  Let's do 15,
8 so we'll come back at -- let's see.  It's 37 now, so I
9 don't know.  You want to just say 52, 12:52?
10       MS. KRAUCHUN:  Perfect.
11       MR. LEINENWEBER:  Okay.  Annie, can
12 you -- can you put me and Ethan in a room briefly?
13       MS. BROWN:  You should still have access to
14 the same breakout rooms that I had invited you to.
15 Wait. Hang on.
16       MR. LEINENWEBER:  Nice.  I think so.
17       MS. BROWN:  The only thing is since
18 Mr. Walker had --
19       MR. LEINENWEBER:  I think Ethan just jumped
20 to the breakout room.
21       MS. BROWN:  Yeah, I think he did.
22       MR. LEINENWEBER:  So can I just hit join
23 breakout room?
24       MS. BROWN:  Yes, you should be able to, and,

112

1 Miss Krauchun, did you want me to reassign Mr. Walker
2 to the room that you both had been assigned to
3 previously?
4       MS. KRAUCHUN:  You can, but I don't think we
5 need to jump in the breakout room right now.  David,
6 so if you want to just take your -- the break?
7       MS. BROWN:  Okay.  Yeah.  So, then, I
8 think -- I think he might have just joined the room
9 with the audio, so he might not be able to hear us
10 anymore, but -- but I guess he is going to just take
11 his break, so we'll see what happens in 15 minutes.
12       MS. KRAUCHUN:  Great.  Thank you.
13       MS. BROWN:  Thank you.
14             (Off the record at 12:37 p.m.)
15             (Resumed at 12:56 p.m.)
16 BY MR. LEINENWEBER:
17    Q.    Okay.  Mr. Walker, do you
18 understand -- taking a small break, but do you
19 understand that you are still under oath for the
20 testimony today?
21    A.    I do.
22       MR. LEINENWEBER:  Okay.  Let's pull
23 up -- Annie, if you could pull up Exhibit 2.
24       MS. BROWN:  Please stand by.

Transcript of David A. Walker
Conducted on July 13, 2020

29 (113 to 116)

113

1        MR. LEINENWEBER:  Mr. Walker, when this
2  document comes up, I'd just like you to take a look at
3  it, and we're going to take a little bit about it.
4        (Walker Exhibit 2 marked for
5              identification.)
6  BY MR. LEINENWEBER:
7    Q.   Can everybody see that?
8    A.   Yes, I can.
9    Q.   Okay.  So this is what we've marked as
10 Exhibit 2.  It's Plaintiff David Walker's Objections
11 and Answers to Defendant Gregory Shields' First Set of
12 Interrogatories.  Do you see that, Mr. Walker?
13   A.   Yes.
14   Q.   Okay.  And then, Annie, if we could scroll
15 to the very last page of the document.  Okay.
16        Mr. Walker, do you see this
17 verification page here?
18   A.   Yes.
19   Q.   Could you just -- could you take a second to
20 review that and then let me know when you're finished?
21   A.   Okay.  I read it.
22   Q.   Okay.  So this is your statement under
23 penalty of perjury regarding these interrogatories
24 from Gregory Shields, right?

114

1    A.   Yes.
2    Q.   Okay.  And that's your signature on this
3  page?
4    A.   Yes, it is.
5    Q.   And it's dated February 19th, 2020?
6    A.   Correct.
7    Q.   Okay.  All right.  Let's go back to page 2,
8  then, Annie, if we could, and then pull up question 2.
9  Just kind of scroll down to just question 2, I guess,
10 and the answer.  Okay.
11        So, Mr. Walker, do you see question 2
12 here?  Can you take a second to review that question
13 and then your response?
14   A.   Okay.  I read it.
15   Q.   Okay.  So this question here is asking you
16 to identify discipline you received that you claim was
17 discriminatory, right?
18   A.   That's correct.
19   Q.   Okay.  And in response, you state that you
20 received write ups, disciplinary days off work,
21 unsatisfactory work performance assessments and
22 ostracized at work.  Other than what we talked about
23 regarding discipline today concerning the 2003 ten-day
24 suspension you received, the 2004 removal to the

115

1  Records Department and the 2016 one-day suspension for
2  discharging your Taser in the hallway, is there any
3  other discipline that should be listed here?
4    A.   Well, they do an assessment that they used
5  to do annually.  They haven't done it in a while where
6  they were giving out lower scores, assessment scores
7  on your work performance, and me being -- me being
8  black, I assume that -- well, I didn't assume.  I knew
9  that my nationality have a lot to do with it because I
10 looked at the scores.  Like I said, we compare scores,
11 and I couldn't do much more, but it was, like, you
12 know, Director Shields and I believe at the time
13 Deputy Director Petrowski, they would sign off on
14 these assessment scores and that would be one way that
15 they would promote you in itself.
16   Q.   Okay.  So you're talking about performance
17 evaluations?
18   A.   That's correct.
19   Q.   Okay.  Let's stick with discipline for a
20 second because a performance evaluation isn't
21 discipline, right?
22   A.   Well, not directly, no.
23   Q.   Okay.  So other than the three discipline
24 incidents that we talked about at length, is there any

116

1  other discipline you received that should be listed
2  here in response to question 2?
3    A.   Not that I can recall at this time.
4    Q.   Okay.  And then you wrote here investigation
5  continues and you reserve the right to supplement this
6  response?
7    A.   Can you repeat that question, please?
8    Q.   Yeah.  The last sentence of the response
9  here, it says investigation continues.
10   A.   Yes, it does.
11   Q.   Okay.  Is there any other investigation that
12 you are doing or need to do in order to determine what
13 discipline you received at the Sheriff's Office?
14   A.   Well, they removed my -- all my time from
15 me, and that was on May 28th of 2015.  I was on
16 vacation --
17   Q.   Let's -- we're going to talk about that in a
18 second, but I just want you to focus on the question
19 I'm asking which is it says the investigation
20 continues here.  Is there any other investigation you
21 need to do in order to determine what discipline you
22 allege you received because of your race?
23   A.   No.
24   Q.   Okay.

Transcript of David A. Walker
Conducted on July 13, 2020

---

117

1    A.    Not at the moment that I am aware of.
2    Q.    Okay.  Great.  And then you talked about
3   work performance assessments and you said that you've
4   compared scores.  When is the last time you received a
5   work performance assessment that you've compared your
6   scores on?  I think you said that they used to do
7   them, but they don't really do them anymore?
8    A.    Right.  Over five years ago.
9    Q.    Okay.  And what was -- what scores did you
10  receive at the time?
11   A.    I believe I got like a 78.
12   Q.    Okay.  Out of what?
13   A.    Out of 100.
14   Q.    Okay.  And what do you think you should have
15  received?
16   A.    Recently, I used to get 90s.
17   Q.    Okay.
18   A.    So I didn't think I should get anything
19  lower than a 90.
20   Q.    Okay.  And why do you think you got a 78?
21  Why do you believe you received a 78?  You think it's
22  because of your race?
23   A.    That's correct, and it would help not
24  getting me promoted.

---

118

1    Q.    Why -- what -- what evidence do you have
2   that demonstrates that the 78 you got was because of
3   your race?
4    A.    Because I didn't agree with the assessment
5   based on how they -- how they graded it.
6    Q.    All right.  Anything else?
7    A.    I had supervisors tell me that my score
8   should have been higher.
9    Q.    Which supervisor?
10   A.    Neal, and believe it or not, Ranzino at the
11  time.
12   Q.    Okay.  And they told you your score should
13  be higher.  What -- did anybody tell you, you know,
14  that this had something to do with your race?
15   A.    No, not directly, no.
16   Q.    Okay.  What about indirectly, did somebody
17  indirectly tell you that this had something to do with
18  your race, getting the 78?
19   A.    Maybe Chief Neal suggested it indirectly.
20   Q.    Okay.  And when was that conversation?
21   A.    It would have to be sometime between 2012
22  and 2014.
23   Q.    Okay.  How did your job change after
24  receiving this performance review, if at all?

---

119

1    A.    Well, my job didn't change at all.  It
2   changed as far as me trying to be advanced going
3   into -- returning back to a supervisory position.
4    Q.    So we talked about, though, that promotions,
5   the only promotion you could get was to a sergeant,
6   right?
7    A.    Yes.
8    Q.    Okay.  And you failed the power test, so you
9   couldn't get the promotion, right?
10       MS. KRAUCHUN:  Objection.  Misstates
11  testimony.
12  BY MR. LEINENWEBER:
13   Q.    Can you answer the question?
14   A.    What was that again?  Can you repeat the
15  question?
16   Q.    Sure.
17       You said that you didn't get a
18  promotion in 2015 because you failed the power test,
19  which was one of the requirements.
20   A.    I said that I didn't complete the run in
21  enough time.  I passed everything on the power test,
22  but I didn't complete the run in the specific amount
23  of time.
24   Q.    Okay.  And that's why you didn't get the

---

120

1   promotion to sergeant?
2    A.    That's correct because of the two minutes I
3   didn't run.
4    Q.    Okay.
5    A.    But there were other things involved also
6   that nobody else did.
7    Q.    There were other things involved that nobody
8   else did.  What does that mean?
9    A.    The written exam and also the oral
10  interview.
11   Q.    Okay.  Are you aware of anybody who didn't
12  pass the power test who did receive the promotion to
13  sergeant?
14   A.    Yes.
15   Q.    Who?
16   A.    Well, I'm aware that they didn't pass, but
17  they said they went back and took it again and passed,
18  but I was told that they didn't pass initially.  It
19  would be Lieutenant Hill who is a -- Lieutenant Hill
20  who was a sergeant then.
21   Q.    But he passed on the second go-around?
22  Basically, he passed the power test on the second
23  go-around?
24   A.    That's what they said.

---

121

1   Q.   Okay.  All right.  Anybody else?
2   A.   That is it.
3   Q.   Okay.  Okay.  So how did the performance
4   review, the unsatisfactory -- the 78 you received, did
5   that have any role in denying you the promotion to
6   sergeant?
7   A.   No, no.
8   Q.   Okay.
9   A.   They changed the whole policy.  These
10  supervisors now, it's a new position that they just
11  developed within the last five years.
12  Q.   Okay.  So are there any promotions that you
13  did not receive because of the 78 you received on your
14  performance evaluation?
15  A.   They have some people deputy chiefs because
16  that's what they got promoted to then, deputy chief.
17  Q.   Were you up for a promotion to deputy chief?
18  A.   I mean, you don't know what you up for
19  because there's no -- there's no written policy on how
20  you get promoted.  Just you get a letter one day that
21  say you a deputy chief.
22  Q.   I thought we talked earlier that the process
23  for promotion involved these three different steps,
24  the power test, the psychology exam, the oral

122

1   interview?
2   A.   That was for EM sergeant.
3   Q.   Right.
4   A.   That wasn't -- before that, there was no
5   policy or no promotion for police staff.  It's just
6   you got a letter one day that said that you were
7   promoted.
8   Q.   So what other positions could you be
9   promoted to other than EM sergeant?
10  A.   Can you repeat that question?
11  Q.   Sure.
12      What other positions could you have
13  been promoted to other than EM sergeant?
14  A.   Well, before EM sergeant, you could be
15  promoted to director.  You could be promoted to chief.
16  Q.   Okay.  In theory, in theory, right?
17  A.   Right.  I mean, that was in reality.  I
18  mean, it's nothing that anybody that had a position
19  above me did that I didn't know how to do.  I've been
20  in the unit since '92.
21  Q.   Okay.  Did you ever apply for any promotions
22  other than the EM sergeant?
23  A.   There was nothing to apply for.
24  Q.   Okay.

123

1   A.   There was nothing ever posted.
2   Q.   Okay.  So the only position promotion you
3   ever applied for was the EM sergeant position?
4   A.   That's correct.
5   Q.   Okay.  It also says here -- well, let's go
6   to number 4.  Can we go to the next page of the
7   document, page 3 and number 4.  All right.  This
8   one -- the fourth question here is asking you to
9   identify complaints you made regarding discipline you
10  received, and in here, in your response, you talk
11  about this issue where you went to an arbitration
12  related to some missing time in May 2015?
13  A.   That's correct.
14  Q.   Okay.  So -- and feel free to take a second
15  here to review your response, if you need to, and then
16  I have a couple questions about it.
17  A.   All right.  You could ask me.  I'm very
18  familiar with that.
19  Q.   Okay.  Who made the decision to remove your
20  time?
21  A.   It was done by allegedly somebody in
22  resources.  I got contacted by Renee Fine, and I was
23  on vacation at the time.  They called me and said that
24  they did an audit on my time, and my time was being

124

1   accrued, and they zeroed out all of my time.  That
2   means my time due hours, holiday, vacation, medical.
3   Any time I had got zeroed out to zero.  This wasn't
4   put on the memo, and this wasn't put in an e-mail.
5   This was just word-of-mouth over a phone that also I
6   had no time.  If I didn't come back to work that day,
7   I would be docked, so, of course, I was in Florida at
8   the time, and when I went on vacation, I had over
9   four-and-a-half weeks.  My timekeeper at the time was
10  Erica Fowler, and so they made it where I could finish
11  my vacation, but, now, I was in the negative on
12  medical time, so I came back with actually less than
13  zero hours.  I was in the negative.  I spoke with the
14  boss, whoever was the supervisor over Renee Fine.
15  When I got back, I spoke to my timekeeper, and she
16  said they zeroed out my time even with her, and to
17  this day, they haven't gave me a memo or an e-mail on
18  why they did it.  They just did -- they did some type
19  of audit on a select group of individuals, and I think
20  I got picked just because I'm black and I had a former
21  lawsuit against them.  Now, that was filed -- the
22  grievance was filed on May 28th, 2015.  It went into
23  arbitration September 4th of 2018.  It's been in
24  arbitration since then.  I spoke with the union.  They

---

**125**

1  keep saying that the arbitrator is going to decide and
2  give me my time back, and so he told me 30 days or
3  less, and here we are going on two years, so I'm still
4  going through that process. Now, I'm speaking with
5  the union attorney who said I should be first on the
6  docket, and her name is Nicole Chaney because I'm set
7  to retire within the next year, and this is actually
8  like stealing time from me. We talking over 60
9  medical days, 450 hours time due, two-and-a-half weeks
10  vacation, five holidays that's just been taken from
11  me, so, basically, with my time, it's like I'm a new
12  officer starting all the way from 2015 instead of
13  having the current time I have. I explained all this
14  to my grievance. It's another David Walker I believe
15  they have me confused with and, now, he's even in the
16  unit as an investigator. In fact, they getting me
17  confused with this other guy. I've been going to OPR,
18  which is the Office of Professional Review, for some
19  discipline that wasn't for -- was for him, and I go to
20  OPR, and they said you lie. We got you on video
21  hitting this guy in Division 10. Mind you, I've never
22  been in Division 10 my whole life, and the other
23  David Walker is white, so he find the mistake, and he
24  says it's a human resource problem, but yet I'm

**126**

1  getting all these threatening e-mails, so that's
2  harassment in itself. Nobody said I'm sorry or
3  anything.
4      Q.  So we're getting -- oh, sorry. Go ahead. I
5  thought you were finished.
6      A.  So -- so I'm upset about a few things. You
7  know, my point is that I know I can't go any further
8  with Electronic Monitoring even though I know
9  basically everything there is to do. I'm not a bad
10  employee. I get along with all my other co-workers
11  very well, but for whatever reason, I can't get
12  promoted, and I don't know the real reason why other
13  than it has to be some type of racism and something
14  dealing from the lawsuit that I have put in before,
15  some type of retaliation.
16      Q.  So you -- we're getting kind of far afield
17  from my question which is who made the decision to
18  take the time from you?
19      A.  I met somebody in -- I still don't know. I
20  can't tell you that right now. All I know is the
21  person for the time Renee Fine contacted -- I don't
22  even know who did the audit, so I can't tell you who
23  that person is.
24      Q.  Okay. And what did -- did Director Shields

**127**

1  have anything to do with you losing your time?
2      A.  I asked him personally, and he told me he
3  did not.
4      Q.  What about -- what about Defendant Ranzino?
5      A.  I didn't speak to him about the issue.
6      Q.  Did he have anything to do with you losing
7  this time?
8      A.  I don't know.
9      Q.  What about Thomas Neal?
10      A.  I don't know.
11      Q.  And then what about Mr. Rohloff?
12      A.  I don't know.
13      Q.  Okay. And you said that that has gone to
14  arbitration, went to arbitration, and you
15  presumably -- you testified at an arbitration back in
16  2018?
17      A.  That's correct.
18      Q.  Okay. And you are waiting on a decision on
19  that?
20      A.  That's correct.
21      Q.  Okay. Let's see. Let's go to page 6,
22  number 10 and take a look at that one, and we already
23  talked about this. This was the -- you said that
24  Defendant Ranzino had used the "N" word in casual

**128**

1  conversation with you about two to three times.
2      A.  That's correct.
3      Q.  Okay. Anything else to add to this
4  response?
5      A.  No, I have nothing to add at this time.
6      Q.  Okay. Let's see. Let's go to the bottom of
7  page 7 and the top of page 8. Okay. So this one is
8  asking you to identify adverse employment actions that
9  you suffered, and the one I want to ask you about here
10  is and you've referenced this a few times, and I just
11  want to make sure I'm clear on this demotion. You say
12  that in or around 2004, you were demoted from the,
13  quote, supervisor position in the EM unit?
14      A.  That's correct.
15      Q.  Okay. And the pay that you lost for that
16  was actually you said I think that you got an hour of
17  compensatory time a week for being a supervisor?
18      A.  That's correct.
19      Q.  So you weren't docked any money or anything
20  like that?
21      A.  No, but if I had aspirations for a higher
22  position, which I was on track to be a deputy chief, I
23  mean, my money -- I have the supervisor taken away,
24  and, basically, even if allowed, have them start all

129

1  over again.
2      Q.  Okay.  Let's see.  Let's look at page 8,
3  number 15, and this asked you to identify what you
4  think is unsafe about your work environment, and you
5  said that "Comradery and trust are exceptionally
6  important in the law enforcement context.  When being
7  assigned to work in the high incident areas but not
8  having faith that your supervisors or anyone within
9  your unit will provide you with backup should you
10 require it causes an enormous amount of additional
11 stress on what is normally a stressful work
12 environment just by the nature of the job."  Do you
13 have anything else to add to that section?
14     A.  No.  It pretty much speaks for itself.
15     Q.  Yeah.  Okay.  Let's see.  Let's take a break
16 from that one for a second, that document.  We can
17 take that off.
18         And the other lawsuit that you're
19 talking about, you've said a couple times that you
20 think some things happened to you because of the
21 lawsuit that you had?
22     A.  That's correct.
23     Q.  Okay.  And what was the name of that
24 lawsuit, do you remember?

130

1      A.  I can't recall the name of the lawsuit, but
2  I know it was a federal lawsuit, and I know some
3  things about that came as a result that
4  Director Shields was never supposed to be directly in
5  my chain of command.  At the time, he was a deputy
6  chief, and since then, he has been promoted --
7         THE COURT REPORTER:  I'm sorry.  Promoted to
8  what?
9         THE WITNESS:  He has been promoted three
10 times since then from deputy chief, from chief to
11 director to executive director, and so along the road,
12 I've always had some type of contact with him in one
13 way or the other.
14 BY MR. LEINENWEBER:
15     Q.  And -- okay.  So I just want to back up here
16 because that doesn't exactly answer my question,
17 but -- so you had a lawsuit against -- you were a
18 plaintiff in a lawsuit against Defendant Shields and
19 some others at the Sheriff's Office, right?
20     A.  Right.
21     Q.  What was the outcome of that lawsuit?
22     A.  That they didn't find in the finding of us,
23 but that didn't mean that the county wasn't liable.
24 We just didn't prove our case.  That was their

131

1  decision, that our case wasn't proved.  Not that we
2  weren't right.  The case just was not proved, so it
3  was dismissed.
4      Q.  Okay.  So the Court dismissed the lawsuit?
5      A.  That's correct.
6      Q.  And you guys actually -- you guys actually
7  appealed the decision, right?
8      A.  I imagine that -- I'm not aware of the
9  appeal or not or anything.
10     Q.  Okay.  And the Court ruled against you,
11 though, in part, because it found that your testimony
12 was contradictory at times and sort of implausible at
13 times.  Does that ring a bell at all?
14     A.  Not in my testimony.
15         MS. KRAUCHUN:  Objection.
16 BY MR. LEINENWEBER:
17     Q.  Okay.
18     A.  Not in my testimony.
19     Q.  Go ahead.
20     A.  Some of the Plaintiffs' testimony involved.
21 My testimony was found to be truthful, but overall, in
22 what they were getting done, that was because it was,
23 I guess, so many people on there that had different
24 grievances.

132

1      Q.  Well, what about -- what about the testimony
2  you gave about receiving a 29-day suspension because
3  the firearm that you owned ended up in the hands of
4  the Chicago Police Department?  Does that sound
5  familiar?
6      A.  Right.  Since you remind me, yes.  It was a
7  weapon I had in a lockbox in my vehicle.
8      Q.  Yeah.  And the Chicago Police ended up with
9  it, right?
10     A.  Right.
11     Q.  And then -- yeah.  How -- and what's your
12 testimony today as to how that happened?
13     A.  How the police weapon -- evidently, they
14 found a weapon on somebody.  It got stolen from me.  I
15 made a report out.
16     Q.  Yeah.  Yeah.  But when you made the report
17 out, though, that was in 2001, but the police had
18 actually already had the weapon in 1999, right?
19     A.  I don't know anything of that.  You're
20 telling me something that I am not aware of.
21     Q.  Okay.
22     A.  I made a --
23     Q.  And then you also, though -- didn't you at
24 the disciplinary hearing that you -- sorry.  At the

Transcript of David A. Walker

34 (133 to 136)

Conducted on July 13, 2020

---

133

1  disciplinary hearing, didn't you testify in your
2  defense that you mistakenly reported the gun as
3  stolen?
4          MS. KRAUCHUN: Objection. Form. Misstates
5  testimony. Relevance.
6  BY MR. LEINENWEBER:
7      Q.   Can you answer that question, sir?
8      A.   **I'm not aware of any of that, what you speak**
9  **of. I'm aware of filing a police report and that the**
10 **weapon that got stolen, two weapons got stolen, in**
11 **fact, so --**
12          (Technical interruption.)
13 BY MR. LEINENWEBER:
14     Q.   We're getting some audio somewhere. Is
15 everybody okay? Can everybody hear still?
16         MS. BROWN: So sorry about that. I think
17 that may have been me.
18 BY MR. LEINENWEBER:
19     Q.   That's all right.
20         Okay. So you don't remember anything
21 about that and you can't really explain that as you
22 sit here today?
23     A.   **No, I can't unless you show me exactly what**
24 **you are referring to.**

---

134

1      Q.   Didn't you also -- didn't the department
2  also find that you failed to follow an order from
3  Director -- Deputy Chief Shields?
4      A.   **No. What order is that? Can you --**
5      Q.   Well, yeah. Weren't you sort of tussling
6  with a detainee and you had him in handcuffs and
7  Deputy Chief Shields ordered you to remove the
8  handcuffs and you refused?
9          MS. KRAUCHUN: Objection. Form.
10         THE WITNESS: I never refused a direct order
11 ever since I've been at the Sheriff's Office.
12 BY MR. LEINENWEBER:
13     Q.   Okay. But the department found that you
14 did, though, right?
15     A.   **No.**
16         MS. KRAUCHUN: Objection. Asked and
17 answered.
18 BY MR. LEINENWEBER:
19     Q.   Did you ever make the statement that you
20 hate all white people?
21     A.   **That I hate white people?**
22     Q.   Yeah.
23     A.   **I never made that statement by itself. An**
24 **inmate told me you act like you don't like me, and I**

---

135

1  **told him I don't like black people, I don't like white**
2  **people, I don't like any people that give me a hard**
3  **time, so if you take it in a content, I told him I**
4  **didn't -- I hate -- dislike everybody that gave me a**
5  **hard time.**
6      Q.   Isn't that what led to you being reassigned
7  to TSS?
8      A.   **No, because I believe the deputy chief at**
9  **the time, he's retired, I explained in context what I**
10 **told the inmate, and he said -- said he was good with**
11 **what I told him because he didn't hear about it in**
12 **context, and I got moved. There was nothing told to**
13 **me about why I was moved, but since you brought it up,**
14 **he did write it up after I was over there. I can**
15 **recall that now.**
16         MR. LEINENWEBER: Okay. Let's bring up
17 Exhibit 3, please.
18         THE WITNESS: Okay
19         MS. BROWN: Please stand by.
20         (Walker Exhibit 3 marked for
21          identification.)
22 BY MR. LEINENWEBER:
23     Q.   And then, Annie, when that gets brought up,
24 can you -- oh, well, I guess we'll look at the first

---

136

1  page first.
2          Okay. And, Mr. Walker, this has been
3  marked as Exhibit 3, and the title of this document is
4  Plaintiff David Walker's Objections and Answers to
5  Defendant Sheriff of Cook County Thomas J. Dart's
6  First Set of Interrogatories. Do you see that?
7      A.   **Yes.**
8      Q.   Okay. And then, Annie, could we go to the
9  last page of this document, and this is -- if you
10 could just take a second to review that, Mr. Walker,
11 and this is another verification page, right?
12     A.   **I just hit the wrong button all of a sudden.**
13 **I can't see anybody right now.**
14     Q.   I think you got to hit that Zoom button
15 again.
16     A.   **It looks like I got to go all the way out**
17 **and come back in.**
18         THE COURT REPORTER: Do you want to go off
19 the record for a minute?
20         MR. LEINENWEBER: Yeah. Why don't we go off
21 the record for a sec.
22         (Off the record at 1:32 p.m.)
23         (Resumed at 1:32 p.m.)
24         THE WITNESS: All right.

---

Transcript of David A. Walker

35 (137 to 140)

Conducted on July 13, 2020

137

1  BY MR. LEINENWEBER:
2      Q.   Okay.  So do you see the verification page
3  here?
4      A.   Yeah.
5      Q.   Okay.  And this is your signature, right?
6      A.   Yes, it is.
7      Q.   Okay.  And it's dated February 19th, 2020
8  just like the other verification page?
9      A.   Yes.
10     Q.   Okay.  And let's go to interrogatory 20.
11  Okay.  And this interrogatory here, Mr. Walker, is
12  asking if you've ever been involved in any civil
13  action, and your response is that Plaintiff states
14  that he was involved in litigation back in 2001
15  against the Cook County Sheriff's Department in
16  regards to counts similar to the counts at issue in
17  this litigation.  Do you see that there?
18     A.   Yes.
19     Q.   And that's the lawsuit we were just talking
20  about, right?
21     A.   Yes.
22     Q.   That's the federal lawsuit that was
23  dismissed by the Court?
24     A.   Yes.

138

1      Q.   Okay.  Is there any other litigation that
2  you've been involved in?
3      A.   Not that I am aware of as a plaintiff or
4  defendant that I am aware of.
5      Q.   Okay.  What about have you ever filed for
6  bankruptcy?
7      A.   Oh, yes, I have.
8      Q.   Okay.  When is the most recent time you
9  filed for bankruptcy?
10     A.   Maybe five years ago.
11     Q.   Five years ago, so 2015 you think?
12     A.   Maybe a little bit before then, 2013, '14.
13     Q.   Okay.  And do you know -- okay.  2013 or
14  2014.  Okay.  And is there a reason you didn't list
15  that here in response to this question?
16     A.   I didn't think of bankruptcy as being part
17  of a lawsuit.  I didn't know bankruptcy was considered
18  as a lawsuit.
19     Q.   Any other litigation that wasn't included
20  that you'd like to add now?
21     A.   It would just be bankruptcies.  I filed more
22  than one bankruptcy before.
23     Q.   Okay.  And the most recent, though, again is
24  2013, 2014.

139

1      A.   That's correct.
2      Q.   Okay.  And has that been discharged, do you
3  know?
4      A.   Yes, it has.
5      Q.   Okay.  So you have no active bankruptcies at
6  all?
7      A.   No, I don't.
8      Q.   Do you know when that last one was
9  discharged?
10     A.   Sometime in 2018.
11     MR. LEINENWEBER:  2018.  Kelly, I'd just
12  like to ask, I guess, that you after, you know, the
13  dep at some point get with Mr. Walker and confirm both
14  that that's the most recent bankruptcy and also that
15  it was discharged.
16     MS. KRAUCHUN:  Sure.
17     THE WITNESS:  I've got paperwork.
18     MR. LEINENWEBER:  That's fine.  We don't
19  need to go through your paperwork now, but if -- if
20  your attorney thinks it's necessary to do so, she'll
21  do that, and then, Kelly, if you'd follow up with us
22  on that, that would be great.
23     MS. KRAUCHUN:  Sure.
24     MR. LEINENWEBER:  Okay.  Thank you.

140

1  BY MR. LEINENWEBER:
2      Q.   Okay.  Let's go to on Exhibit 3,
3  interrogatory number 3, which is the bottom of page 2
4  and then also the response is on the top of page 3.
5  Yeah, there it is.
6          Okay.  So, Mr. Walker, this is asking
7  you to identify what your damages are for this
8  lawsuit, and you wrote down "Plaintiff seeks
9  compensation for lost wages, opportunities,
10  promotions, raises, benefits and future retirement
11  income, litigation expenses, including attorneys' fees
12  and other compensatory and punitive damages for
13  humiliation, mental and emotional anguish and
14  distress."
15     A.   Yes.
16     Q.   Okay.  So what is the amount of lost wages
17  that you claim to have suffered in relation to this
18  lawsuit?
19     A.   Well, first of all, we have to go with if I
20  got promoted, you figure that's lost wages right
21  there, and we starting all the way from 2004 to when I
22  got the supervisor taken away from me until now.  I
23  mean, I can't put an exact dollar figure on it, but I
24  would believe it would be in excess of a normal amount

Transcript of David A. Walker
Conducted on July 13, 2020

36 (141 to 144)

141

1  that would be comparable to my salary times -- times
2  the years that I haven't gotten that salary, so I'm
3  not an accountant.
4      Q.   Okay.  So you -- you can't give me a figure,
5  though, of what your lost wages are other than what
6  you missed out on as a result of losing this
7  supervisor position in '04?
8      A.   All right.  Let me take a minute, and I'm
9  about to compute it myself.  All right.  I come up
10 with lost wages of at least $200,000.
11     Q.   Right.  And what's that based on?
12     A.   That's based on me going to the deputy chief
13 which is the difference of $10,000 per year of my
14 salary that I have right now, and if you go from 2004
15 until 2020, that's $160,000 right there.
16     Q.   Okay.  So you're saying that in 2004, you
17 should have been promoted to deputy chief but you
18 weren't?
19     A.   That's correct.
20     Q.   Okay.  And who made the decision -- well,
21 first of all, did you ever apply to become a deputy
22 chief?
23     A.   There was no process in how you applied to
24 be a deputy chief.  It was something you just got

142

1  appointed to.
2      Q.   Okay.  Who made the decision to appoint
3  someone to deputy chief?
4      A.   I would believe that probably be somebody
5  that's over the director, the sheriff or -- well, you
6  got directors that would do it, but at least a
7  director or above.
8      Q.   Can you identify anyone who received deputy
9  chief position -- promotion, excuse me, in 2004
10 instead of you?
11     A.   Well, there's a lot of people that got
12 promoted to deputy chief.
13     Q.   Yeah, but that's not what I'm asking.  I'm
14 asking in 2004, you say you should have been promoted
15 to the deputy chief position.  Okay.
16     A.   Right.
17     Q.   What I'm asking you is who got the promotion
18 instead of you?
19     A.   Well, it would be -- you have Malone.
20     Q.   I'm sorry.  Who?
21     A.   Malone.
22     Q.   Malone?
23     A.   Right.
24     Q.   Who is Malone?  What's Malone's first name?

143

1      A.   Rotonda.
2      Q.   Rotonda?
3      A.   That's correct.
4      Q.   Rotonda Malone was promoted to deputy chief?
5      A.   That's correct, and Christopher Rohloff.
6      Q.   When did -- is Malone, is that a man or a
7  woman?
8      A.   It's a female.
9      Q.   Okay.  And is she black or white, Asian,
10 Hispanic?
11     A.   She's black.
12     Q.   Okay.  And she was promoted when?
13     A.   I imagine around 2006.
14     Q.   Okay.  And then Christopher Rohloff, he's
15 one of the Defendants in this case, when was he
16 promoted?
17     A.   Same year, 2006.
18     Q.   Okay.  So these two individuals got promoted
19 instead of you?
20     A.   That's correct.  In fact, they were supposed
21 to go back to the jail as correctional officers
22 because we had a layoff of investigators in EM, and
23 for them not to go back, because you went back based
24 on your seniority, they promoted them instead where

144

1  they got to stay.
2      Q.   Okay.  And who made the decision to promote
3  Rotonda Malone?
4      A.   I don't know.
5      Q.   Who made the decision to promote
6  Christopher Rohloff?
7      A.   I don't know.
8      Q.   What evidence do you have that either of
9  them were chosen instead of you because of your race?
10     A.   The only evidence I have is that they were
11 supposed to go back with the other people that went
12 back, and somehow they got chosen to be deputy chiefs
13 instead of going back.  I was available for the spot.
14 I had the education for the spot.  I didn't know that
15 the spot was even available.  It's something that they
16 did behind their closed doors on how they decide who
17 they want to promote or not promote, but it was not in
18 my best interest to get anything as far as their
19 concern if I was in a lawsuit about that.
20     Q.   What do you mean if you were in a lawsuit
21 about that?
22     A.   If I was involved in a lawsuit about
23 promotion, harassment, retaliation and that didn't
24 bode well for me, I guess, with the powers that be.

Transcript of David A. Walker
Conducted on July 13, 2020

37 (145 to 148)

145

1    Q.   You're talking about that previous lawsuit?
2    A.   That's correct.
3    Q.   Okay.  So you think that previous lawsuit
4    had something to do with you not being promoted to
5    deputy chief?
6    A.   Yes, sir.
7    Q.   Okay.  Okay.  Other than that promotion to
8    deputy chief that we just talked about, what other
9    promotions do you think you missed out on?
10   A.   Well, the promotional thing aside, I missed
11   out on a lot of things when I got hurt on duty, and it
12   was retaliation that they didn't even pay me for four
13   months.
14   Q.   So -- okay.  Let's stick with promotions for
15   a second, though.  What other promotions did you miss
16   out on, do you allege you missed out on?
17   A.   I'm not aware of because they don't list
18   anything.  They don't post anything.  It's not nothing
19   you can even interview for, so whatever promotions
20   were made, I missed out on that promotion because as I
21   can tell you right now, I feel like I should have been
22   eligible to be a director by now.
23   Q.   Okay.  Okay.  So the ones that you have
24   identified are the -- the sergeant position, which we

146

1    talked about, and then the deputy chief position, and
2    those are the only two that you have been able to tell
3    me about today?
4    A.   Yes, sir.
5    Q.   Okay.  And you calculate that your damages
6    are lost wages of $200,000, 160,000 of which is for
7    not getting the deputy chief position.  What's the
8    other $40,000?
9    A.   Well, the penalty of damages for I got hurt
10   on the job.  I drove myself to an emergency room on
11   duty in a squad car, and because they wouldn't, for
12   whatever reason, sign off on my duty injury that
13   happened while I was working, I eventually end up
14   losing a home that I had built from the ground up and
15   being divorced soon after that.  In fact, they didn't
16   pay me until I came back to work that January, and
17   then they settled on the lawsuit I had to get for not
18   giving me anything for my duty injury.  In fact, I had
19   to work four months extra because they didn't pay into
20   my pension during that time, and this is not normal
21   when you get hurt on duty, so I have to think that was
22   because of not only my skin color but because of prior
23   litigation I had with the Sheriff's Office.
24   Q.   And when did this happen?

147

1    A.   In 2007, September of 2007, and I didn't
2    return back to work until January, early January of
3    2008.
4    Q.   What other lost wages do you allege are a
5    result of Defendants' actions in this lawsuit?
6    A.   I can't think of anything else at this time.
7    Q.   Okay.
8    A.   The past suit, my injury time and promotion
9    if I would have been promoted properly.
10   Q.   Okay.  And then you also talk about
11   humiliation, mental and emotional anguish and
12   distress.  Did you see any kind of medical providers
13   related to emotional anguish and distress, mental and
14   emotional anguish and distress?
15   A.   Well, we were told in the academy that if
16   you stressed out, you need to use your medical time.
17   I was a person that had a bunch of medical time that
18   once I filed a lawsuit with different things they did
19   to me at work, I started having to use it just for
20   stress.  I also when I was off because I was so upset
21   with the job that I figured I gave so much for, I did
22   take anger management classes and that helped a whole
23   lot.  I also happened to workout and that helps me
24   deal a lot with the stress, so, you know, I'm at the

148

1    end now.  It's nowhere like it used to be, but for a
2    time from 2004 until maybe 2017, 2018, it was always
3    something stressful about the job when I came to work.
4    Q.   But you didn't see any psychologist or
5    therapists or psychiatrists related to that stress?
6    A.   I said I had anger management that I seen
7    the therapist about the stress that I had at work.
8    Q.   When did you get anger management training
9    or therapy?
10   A.   It would have to be around 2010 to 2011,
11   sometime in there.
12   Q.   Regarding interrogatory number 8 on page 5,
13   it asked if you're presently taking any medications,
14   and you just wrote investigation continues.  Are you
15   taking any medications?
16   A.   Am I taking any medication as of now?
17   Q.   Yeah.
18   A.   No.
19   Q.   What about in the last five years?
20   A.   No.
21   Q.   Okay.  And then interrogatory number 9 on
22   page 5, can you just confirm that's the only e-mail
23   address you have is this dawalker69dw@gmail.com?
24   A.   That's correct.

Transcript of David A. Walker
Conducted on July 13, 2020

---

149

1  Q.  Okay.  Did you look in that e-mail address
2  for any communications that would be responsive to
3  documents we asked for?
4  **A.  I mean, I looked at my e-mail every day.**
5  **The only person that ever e-mailed me was from is**
6  **Kelly other than normal e-mails I get.**
7  Q.  Okay.  Yeah.  And I'm not interested in
8  anything that you and Kelly e-mailed each other, but
9  any communications you had with any of the other
10 Plaintiffs in this case via e-mail?
11 **A.  No.**
12 Q.  Okay.  What about cell phone, that's your
13 cell phone number right there?
14 **A.  Yes, it is.**
15 Q.  Okay.  Do you use it for text messages?
16 **A.  Yes, I do.**
17 Q.  Do you ever text with any of the other
18 Plaintiffs in this case?
19 **A.  No, I don't.**
20 Q.  Do you ever text about this case at all?
21 **A.  No, I don't.**
22 Q.  Do you ever send anybody any e-mails or
23 texts about any of the allegations in this case?
24 **A.  No.**

---

150

1  Q.  Okay.  All right.  And I think you said you
2  only have a -- you have a Facebook page, and that's
3  it, right?
4  **A.  That's correct.**
5  Q.  And you have never -- you've never sent any
6  messages to any of the other Plaintiffs in this case
7  via Facebook Messenger?
8  **A.  No, I haven't.**
9  Q.  Okay.  Have you ever received any?
10 **A.  No, I haven't.**
11 Q.  Okay.  And let's see.  Are there any other
12 types of damages you are claiming other than the wages
13 that you lost as a result of not receiving the deputy
14 chief promotion, losing the supervisor position in '04
15 and then not getting this -- having to use your injury
16 time in 2007?
17 **A.  Not at this time.**
18 Q.  Okay.  All right.  Can we pull Exhibit 1
19 back up for a second.
20     MS. BROWN:  Stand by.
21     MR. LEINENWEBER:  And then, Annie, if you
22 could go to page 12, paragraph 88.
23 BY MR. LEINENWEBER:
24 Q.  So, Mr. Walker, in this section here, it

---

151

1  says that Defendants subjected Plaintiffs to a hostile
2  work environment, and other than the things that we
3  have talked about, is there any other evidence you
4  have of a hostile work environment that you claim as
5  part of this lawsuit?
6  **A.  We pretty much covered it up until this**
7  **point.**
8  Q.  Okay.  So did anybody try and intimidate you
9  at all?
10 **A.  Can you repeat that question?**
11 Q.  Did anybody try and intimidate you at all?
12 **A.  I mean, when you say intimidation, I mean, I**
13 **don't really get intimidated physically other than**
14 **you're intimidated by people's position of authority,**
15 **you know.  You know what they can do if they don't**
16 **like and what you might have to go through, the**
17 **unnecessary things in retaliation and harassment that**
18 **they do through other people.**
19 Q.  Anybody threaten -- I'm sorry.  Go ahead.  I
20 thought you were finished.
21 **A.  It might not be directly from that person to**
22 **you, but they might use a supervisor to do it through.**
23 **That's what Ranzino, he was the intimidator, for the**
24 **most part, of what Director Shields wanted to get done**

---

152

1  **or how he wanted to get it done.  He had no problems**
2  **being that way.**
3  Q.  Okay.  And how did he -- how did he create a
4  hostile work environment for you other than what we've
5  already talked about?
6  **A.  It's the way that he spoke to you, you know.**
7  **He basically told you, you know, lump it or get out.**
8  **Do it or --**
9  Q.  Yeah.
10 **A.  You'll get gone.  You know, it was his way**
11 **or no other way, you know.  He talked to you as if you**
12 **were a child.  Get the job done.  If you don't, don't**
13 **come to work.**
14 Q.  You -- you got along fairly well with him,
15 though, right?
16 **A.  Yeah.  We had a pretty decent relationship.**
17 **You know, there were some times that we didn't get**
18 **along, but for the most part, you know, I could get**
19 **along with anybody to get the job done.**
20 Q.  Yeah.
21 **A.  It's only eight hours.**
22 Q.  Yeah.  And I mean, Ranzino was pretty much
23 that way with all the employees, right, in EM?
24 **A.  Yes.  He had a way of getting underneath a**

---

Transcript of David A. Walker
Conducted on July 13, 2020

39 (153 to 156)

---

153

1  lot of people's skin.
2      Q.   Yeah.  Even if -- I mean, black people and
3  white people, he could get under their skin about
4  work, right?
5      A.   I seen him get underneath both people's
6  skin, both persuasions, more black than white, but
7  I've seen him get under white peoples skin, also.
8      Q.   Okay.  Let's go to paragraph 106, which I
9  think is on page 15, bottom of page 15.
10         So, Mr. Walker, this paragraph is
11 asking you what protected activity you engaged in.  Is
12 there any protected activity that you engaged in that
13 we haven't discussed here today?
14     A.   What do you mean protected activity?
15     Q.   Sure.  That's a fair question.  Sorry.
16 Sometimes I forget to explain things, but, basically,
17 you had said here in paragraph 106 that you as a
18 Plaintiff engaged in protected activity by filing
19 internal complaints, grievances, memorandums and
20 incident reports.
21     A.   All right.  If you mean my grievances or my
22 lawsuit, I would think that if I'm on record with
23 something, that it should be protected against
24 retaliation.

---

154

1      Q.   Yeah.
2      A.   And -- and from what I found out, it's the
3  opposite.  It seems like I've been retaliated from
4  ever since the lawsuit was filed in early 2000 until
5  present, and sometime -- you know, it doesn't have to
6  be the exact person retaliating.  Maybe I don't know
7  where it's coming from, I just know it's coming, you
8  know.  It's not -- I can't just come to work and work
9  and go back to work.  There's always some extra work
10 that involves me like there's a star by my name or
11 something.
12     Q.   Did you ever file any complaints with anyone
13 saying that you were being retaliated against?
14     A.   I mean, it's hard to file about retaliation
15 if you don't know where it's coming from.
16     Q.   Well, but you had training in retaliation,
17 right?
18     A.   Yes, I had training in retaliation, but --
19     Q.   And we talked about there's a procedure to
20 follow.
21     A.   There's a procedure, but it's perceived as
22 window dressing.
23     Q.   By you?
24

---

155

1      A.   Like when I talked to people that I engaged
2  with the people you're talking to, so it's like
3  talking to a person that's not on your side, so a lot
4  of times, it's not followed up.  That's why a lot of
5  times people filed a federal lawsuit so that they
6  could get somebody that's outside the county.  It's
7  not like it's an inspector general we can go to.  You
8  go to OPR.  You talk to the people that's giving you
9  the harassment.
10     Q.   Okay.  So it's -- I don't think you exactly
11 answered my question, but you never filed any kind of
12 an internal complaint saying that you were being
13 retaliated against or discriminated against?
14     A.   Not of recent, no, I have not.
15     Q.   Well, I mean, you never have, right, other
16 than the federal complaint?
17     A.   No, I haven't.
18     Q.   Okay.  And some of the Plaintiffs in this
19 case filed a charge of discrimination with the Equal
20 Employment Opportunity Commission, and I'm just
21 wondering -- I know you didn't do that.  Is there a
22 reason you didn't file a charge for discrimination?
23     A.   Because what they do to me is not of a
24 persistent nature.  Maybe because of my seniority.

---

156

1  They have random times that they do it, and like I
2  say, I'm getting towards the end of my career, and
3  it's like beating a dead horse.  You know, I tried and
4  I tried.  I really just want to get out what I'm due,
5  and so, you know, I'm pretty much tired of the whole
6  situation.
7      Q.   So -- okay.  Is there any other internal
8  complaints regarding discrimination based on your race
9  or retaliation that you ever made, any other kinds of
10 complaints that you haven't told us about?
11     A.   Not as of this moment, but you never would
12 know what might happen from day-to-day.
13     Q.   Sure.  Yeah.  I don't mean what will happen
14 in the future.  I mean exclusively what has happened
15 until today.
16     A.   Not at this present time.
17         MR. LEINENWEBER:  Okay.  That's fine.  And
18 then -- all right.  Why don't we take one more break
19 here, and then I'm going to see if I can streamline
20 what I have left.  There's a couple things I still
21 want to go through, but we're getting there.  So we
22 can go off the record.
23         (Off the record at 2:00 p.m.)
24         (Resumed at 2:15 p.m.)

---

Transcript of David A. Walker

40 (157 to 160)

Conducted on July 13, 2020

157

1 BY MR. LEINENWEBER:
2    Q.    Mr. Walker, hopefully not too much left here
3 this afternoon.  We'll go through a couple more
4 things.  You understand you are still under oath?
5    A.    Yes, I do.
6    Q.    Okay.  So one of the things I want to
7 clarify is so you have spoken -- you said you were a
8 witness to some of these incidents, specifically the
9 incident between Ranzino and Winston that led to
10 Ranzino being removed from the department, right?
11    A.    That's correct.
12    Q.    Okay.  And you were asked to participate in
13 investigations of that incident, right?
14    A.    Yes, I was a witness on the grievance.
15    Q.    Okay.  But in not just the grievance but
16 when there was an internal investigation into the
17 allegations, you participated and gave an interview,
18 right?
19    A.    I believe I gave a statement.
20    Q.    Okay.  You have some memory of doing that?
21    A.    Vaguely.
22    Q.    Okay.
23    A.    Vaguely from what I can assess for.
24        MR. LEINENWEBER:  Okay.  Can we pull up

158

1 Exhibit 6.
2        MS. BROWN:  Counsel, would you like it
3 marked as 6 or would you like it marked as 4?
4        MR. LEINENWEBER:  Oh, good question.  Didn't
5 end up using 4 or 5, so let's just go ahead and mark
6 it as Exhibit 4, and I will learn how to read a
7 different number here.
8        MS. BROWN:  All right.  Please stand by.
9        (Walker Exhibit 4 marked for
10             identification.)
11 BY MR. LEINENWEBER:
12    Q.    Okay.  And, Mr. Walker, maybe we can make
13 this a little bit bigger for you.  Go ahead and take a
14 few moments here and review this document.
15    A.    Okay.  I remember it now.
16    Q.    Okay.  So, Mr. Walker, we're looking at
17 what's been marked as Exhibit 4, and, Annie, can you
18 scroll down to the bottom so we can get the Bates
19 number on the record of this document.  It is
20 Winston_CCSO011531 through 532, so it's a two-page
21 document.  Okay.  And at the top of this page here,
22 Mr. Walker, it says it's an informal inquiry of
23 Investigator David Walker.  That's you, right?
24    A.    Right.

159

1    Q.    No reason to suspect this is the other
2 David Walker you referenced?
3    A.    No, because he wasn't over there at that
4 time.
5    Q.    Gotcha.  Okay.  And this is dated
6 April 29th, 2015, and it says that you were present as
7 well as Joseph V. Consolo, correct?
8    A.    Yes.
9    Q.    Okay.  And it says the location is the human
10 resources conference room?
11    A.    Right.
12    Q.    Okay.  And in here, it says, the first
13 sentence says that this is an informal inquiry as to a
14 complaint filed by an employee whereas he, meaning
15 you, David Walker, is named as a witness who may have
16 information as to the substance of the complaint.  Do
17 you see that?
18    A.    Yes.
19    Q.    Okay.  And then in the second paragraph, it
20 has -- it says, "Below is a summary of
21 Investigator Walker's informal statement of inquiry,"
22 and it says, "Investigator Walker was in roll call on
23 April 9th, 2015.  The roster sheets do not always
24 reflect who is on duty.  In the past, David Walker

160

1 told Chief Ranzino if someone was not there when he
2 asked for them, Chief Ranzino would tell him you are
3 not the chief.  On April 9th, 2015, Chief Ranzino
4 asked if McGhee was present.  Investigator LeGrain
5 Winston told him that Investigator McGhee was not
6 there.  Chief Ranzino said all you guys look alike.  A
7 lot of investigators present in roll call did not
8 appreciate it.  Investigator Winston said he would
9 write" -- up -- "the incident after roll call."  Do
10 you see that?
11    A.    Yes, I do.
12    Q.    Okay.  Does this refresh your recollection
13 about the incident that led to Chief Ranzino
14 leaving -- or being removed from the Electronic
15 Monitoring Unit?
16    A.    It improved my memory to a certain extent,
17 yes, it does.
18    Q.    Okay.  So, in fact, what he said to Winston
19 was actually all you guys look alike, right?
20    A.    That's what it seems like the statement
21 says, yes.
22    Q.    That's what it seems like your statement
23 says, right?
24    A.    Yes, yeah.

Transcript of David A. Walker
Conducted on July 13, 2020

41 (161 to 164)

---

161

1    Q.    Okay.  And it does not say that he used the
2    "N" word with Investigator Winston, right?
3    **A.    Not at that time.**
4    Q.    Okay.
5    **A.    You're correct.**
6    Q.    And, in fact, if we go a little bit farther,
7    it does say, second paragraph there -- or sorry, this
8    is the third paragraph, "Investigator Walker
9    considered it a racial comment.  Investigator Walker
10   said there is an accumulation of things with
11   Chief Ranzino.  It is either Chief Ranzino's way or
12   you are wrong.  Investigator Walker stated his
13   relationship with Chief Ranzino is better than most.
14   Investigator Walker can respect" -- the -- "chain of
15   command."  So that's pretty consistent with what he
16   talked about what you explained earlier, right?
17   **A.    Yes, sir.**
18   Q.    Okay.  And then it says, "Chief Ranzino is
19   the same with everyone.  Chief Ranzino is consistent
20   no matter who he is talking to.  Chief Ranzino would
21   say if the investigators are not mad at me, then I am
22   not doing my job," right?
23   **A.    That's correct.**
24   Q.    Okay.  Any reason to doubt that what you

---

162

1    told HR is true?
2    **A.    No, but it's something I could probably add**
3    **to that.**
4    Q.    Well, you -- you could have told them
5    anything, right?
6    **A.    But I didn't.  No, so there's nothing I need**
7    **to say about that statement.**
8    Q.    Okay.  So there's nothing you need to change
9    here?
10   **A.    What was that again?**
11   Q.    There's nothing you need to change about
12   this statement?
13   **A.    Not about that statement, no.**
14   Q.    Okay.  And it says that this statement,
15   again, was given on April 29th, 2015 and that the
16   incident was on April 9th, 2015, right?
17   **A.    Yes.**
18   Q.    So just about three weeks after the fact?
19   **A.    Yes.**
20   Q.    Okay.  Is that a yes?  Sorry.
21   **A.    Yes, yes.**
22        MR. LEINENWEBER:  Okay.  Okay.  All right.
23   We can set that one aside for a second.  Can you pull
24   up Exhibit 5 -- sorry.  Annie, strike that.

---

163

1        Can you pull up what I had originally
2    marked as Exhibit 7, which we are going to now mark as
3    Exhibit 5.
4        MS. BROWN:  Please stand by.
5             (Walker Exhibit 5 marked for
6             identification.)
7    BY MR. LEINENWEBER:
8    Q.    Okay.  Mr. Walker, now we're showing you
9    what's been marked as Exhibit 5, and for
10   identification purposes, at the bottom of the page,
11   there's a Bates number.  It is Winston_CCSO011537, and
12   if we could go back to the top of the statement here,
13   so this says it is a witness statement, right?
14   **A.    Uh-huh.**
15   Q.    Okay.
16   **A.    I'm looking -- yeah, yeah.**
17   Q.    Yeah.  At the top, it says, "Witness
18   Statement?"
19   **A.    Yes.**
20   Q.    And then on the left side, it says,
21   "Witness's name, Investigator David Walker."
22   **A.    Right.**
23   Q.    Okay.  So this is you, right?
24   **A.    Yes, it is.**

---

164

1    Q.    Okay.  No reason to suspect it's the other
2    David Walker that you were mistaken for at least once,
3    right?
4    **A.    Yes.**
5    Q.    Okay.  And it says here that this is an
6    interview with the Office of Professional Review,
7    right?
8    **A.    Right.**
9    Q.    And that's OPR, what you referenced earlier
10   as OPR, right?
11   **A.    Yes.**
12   Q.    Okay.  And I think the other term you used
13   for it was like Internal Investigations?
14   **A.    Right.**
15   Q.    Okay.  All right.  So it says that this is
16   an interview with you in the Office of Professional
17   Review, and it occurred on February 9th, 2016, is that
18   correct?
19   **A.    That's correct.**
20   Q.    Okay.  And then here, it says below
21   statement is a summary and is not verbatim, and the
22   first paragraph there, it says, Investigator -- excuse
23   me, "Investigator Walker said on April 9th, 2015,
24   Chief Ranzino asked if Investigator McGhee was on

---

Transcript of David A. Walker
Conducted on July 13, 2020

42 (165 to 168)

---

165

1 duty, and Investigator Walker responded that it was
2 Investigator McGhee's off day. Investigator Walker
3 said" -- he -- "heard Chief Ranzino state 'you know
4 you all look alike.' Investigator Walker said he was
5 offended by the comment Chief Ranzino made," right?
6    **A.    Right.**
7    Q.    Okay. So this is the same incident, then,
8 right, as the other Exhibit 4 that we were looking at
9 with your statement to HR?
10   **A.    It looks like it is.**
11   Q.    Okay. And then it says in the next
12 paragraph, "Investigator Walker said that he didn't
13 talk to Chief Ranzino about the comment or about what
14 he meant when he said it. Investigator Walker stated
15 Chief Ranzino often talks down to investigators in the
16 unit, and he couldn't name one investigator in the
17 unit, black or white, who actually like
18 Chief Ranzino," is that correct?
19   **A.    That's correct.**
20   Q.    Okay. And then it says,
21 "Investigator Walker said he felt the comment was
22 'racist' and totally unprofessional.
23 Investigator Walker said Chief Ranzino joked around a
24 lot with investigators in the unit and talked to them

---

166

1 like they are children," which I think you had said
2 earlier today even that they talked to you sometimes
3 like you're a child?
4    **A.    Right.**
5    Q.    And then next, it says, Investigator Walker
6 said Chief Ranzino never used the word -- the "N" word
7 in a conversation at work, is that correct?
8    **A.    That's what it says.**
9    Q.    Okay. So this is what you told the Office
10 of Professional Review regarding this incident, right?
11   **A.    Right.**
12   Q.    Okay. Any reason you couldn't have
13 been -- any reason to suspect this wasn't your
14 truthful statement to the Office of Professional
15 Review?
16   **A.    Well, that's what I told them, and what I
17 recalled is telling them a little bit different
18 so -- but that's the statement I gave them.**
19   Q.    Okay. And this is the statement you gave
20 back in 2016, right?
21   **A.    I assume so. That's what they have now.**
22   Q.    Okay. And so that's just ten -- eight
23 months -- no. Wait. That's about ten months after
24 the April 9th, 2015 incident, right?

---

167

1    **A.    Yes.**
2    Q.    Okay. All right. You can set that one
3 aside now, and I just want to go over a few more
4 things. Okay. Let's talk about some of the other
5 Plaintiffs in this case. LeGrain Winston, how do you
6 know Mr. Winston?
7    **A.    Co-worker.**
8    Q.    Co-worker. Are you guys friends?
9    **A.    We're pretty good friends.**
10   Q.    Do you guys hang out outside of work?
11   **A.    Not -- not usually, no.**
12   Q.    Not usually because of the pandemic or not
13 usually prepandemic?
14   **A.    Not usually prepandemic.**
15   Q.    Okay. So you don't really socialize
16 together outside? You wouldn't go to, like, a bar
17 together or a cookout or anything like that?
18   **A.    If I known him 20 years, we might have done
19 it maybe less than five times.**
20   Q.    Okay. Do you talk to him often outside of
21 work?
22   **A.    No, I don't. We're on different shifts now,
23 so we rarely talk.**
24   Q.    Okay. What about when you were on the same

---

168

1 shift, did you guys talk a lot at work?
2    **A.    Yeah, we have discussions.**
3    Q.    Okay. How often would you say, since this
4 is kind of a tough question maybe to estimate, but how
5 long were you guys on the same shift would you say?
6 How many months or years?
7    **A.    Well, like I say, I just came to Patrol, so
8 I was down in TSS a lot. Maybe -- maybe ten years.**
9    Q.    Okay. But when you were at TSS, you
10 wouldn't be like in roll call with him and stuff like
11 that?
12   **A.    No.**
13   Q.    Okay.
14   **A.    It wasn't like that. We were in a
15 separate -- we had separate roll calls then.**
16   Q.    So when you were in TSS, you had a separate
17 roll call?
18   **A.    For the most part until we moved to the
19 building there. When we used to have our office in
20 Division 6, we never attended the roll call. Roll
21 calls worked as a unit. When we moved to Rockwell is
22 when everybody had to come to Rockwell for roll call.**
23   Q.    All right. Do you remember about when that
24 happened?

---

Transcript of David A. Walker
Conducted on July 13, 2020

43 (169 to 172)

169

1    A.   I would say maybe around 2012, 2013.
2    Q.   Okay.  And remind me when did you kind of
3  get reassigned from TSS to Patrol?  Was that -- what
4  year was that?
5    A.   2000 -- the middle part of 2016.
6    Q.   Okay.  2016.  Okay.  So -- and we talked
7  about you referenced or we talked about your
8  statements to OPR and human resources where you
9  overheard this comment made by Chief Ranzino where as
10 you reported it to OPR and HR, he said, you know, you
11 all look alike or something to that effect, right?
12   A.   Yes, yes.
13   Q.   Okay.  Do you ever remember being in a
14 meeting where Shields and Winston got into any kind of
15 an altercation?
16   A.   I heard about it.  I was not there.
17   Q.   Okay.  So no firsthand personal knowledge
18 about it; you were not there?
19   A.   No, but bad news travels.
20   Q.   Sure.  What did you hear about it?
21   A.   I heard that -- they got some type of verbal
22 altercation, and then Director Shields approached
23 Winston like he was going to put his hands on him, and
24 Winston told him something to the effect I wouldn't

170

1  suggest you do that, and there was another
2  Director Brady that told Shields he better not do
3  that, and he was able to stop it from becoming a
4  physical altercation from a verbal one.  That's what I
5  heard.
6    Q.   Okay.
7    A.   I also heard that Chief Loggans was up
8  there.  He's retired now, and he told Shields you were
9  wrong for that.  You shouldn't walk up on that man
10 like that, so that's the gist of what I heard about
11 the incident.
12   Q.   What was that individual's name?
13   A.   Chief Loggans.
14   Q.   Loggans, okay.
15       So anything you heard about that
16 incident, though, came from other people?
17   A.   Well, from hearsay, but I mean, those were
18 the people there.  I heard a lot about it.
19   Q.   Were you ever in a meeting where you heard
20 Shields threaten to fire Winston?
21   A.   No, I was not there.  I was not privy to
22 that.
23   Q.   Did you hear about that at all?
24   A.   I heard -- I heard about it, but like I say,

171

1  you know, they talk about the instance, and I think
2  that, you know, pretty much people went up there.
3  Clearer heads were saying whatever they were saying.
4    Q.   Okay.
5    A.   Everybody was very mad on all sides.
6    Q.   Okay.  Did you ever have a conversation with
7  Mr. Winston about this lawsuit?
8    A.   About the what?
9    Q.   This lawsuit.
10   A.   No.  Nothing more than that we were going to
11 be in a lawsuit.
12   Q.   That you were going to be in a lawsuit?
13   A.   Right.  You know, that things happened to a
14 lot of people in our shift racism-wise, and we felt,
15 effectively, we could get things to stop if we have
16 this lawsuit, but we never talked in-depth
17 about -- in-depth about the lawsuit.
18   Q.   Okay.  What about Michelle Strickland, do
19 you know her?
20   A.   Yes, I do.
21   Q.   All right.  How do you know Miss Strickland?
22   A.   She was an investigator in EM for like a
23 year-and-a-half, two years.
24   Q.   Okay.  Were you guys friends at all?

172

1    A.   Was I what again?
2    Q.   Were you guys friends at all?
3    A.   We were co-workers.  We weren't friends.  We
4  were just co-workers.  I see her.  I speak to her.  I
5  only worked with her maybe one time in all my time at
6  the unit.
7    Q.   Okay.  So you guys weren't really -- you
8  didn't socialize outside of work together?
9    A.   Oh, no.  Never.
10   Q.   Okay.  And you only worked together like one
11 time, is that what you said?
12   A.   Right.  No more than two times.  I mean, she
13 wasn't there for a long length of time.  She might
14 have been there, at most, two years.  Two years we
15 might have worked together twice.
16   Q.   Did she ever talk to you about
17 discrimination she was experiencing?
18   A.   She told me that the place wasn't right, you
19 know.  They showed a whole lot of favoritism, and she
20 just wasn't -- she wasn't -- she let me know that she
21 wasn't happy about being there, and that's probably
22 why she went ahead and transferred.
23   Q.   Did she say what it was about it that made
24 her unhappy or what type of favoritism was going on?

Transcript of David A. Walker
Conducted on July 13, 2020

44 (173 to 176)

173

1    A.  No.  She didn't really go in depth.  Like I
2  said, I didn't know her that well to go in depth, but
3  I understood her plight.  I mean, she mentioned
4  Shields, and she didn't go in depth about it, but she
5  say he was behind it with the supervisor, so, you
6  know, I had a lot of my own problems, so me trying to
7  tell her what she needed to do, I wasn't at liberty to
8  do that.
9    Q.  What did you mean -- you said something
10 about Shields with the other supervisors.  What did
11 you mean by that?
12   A.  Because she was getting discriminated by
13 because of the way they talked to her, some things
14 they did.  She didn't go into depth, and I
15 wasn't -- actually, just to tell you the truth, I
16 wasn't even really trying to hear all that from
17 somebody I hadn't worked with that long.  I mean, you
18 know, I try to get through the day the best way I
19 could.
20   Q.  She was kind of like an over sharer?
21   A.  That's correct.  I didn't know her like
22 that, so I wasn't comfortable speaking about my
23 experience in the midst of all of her experience.
24   Q.  Okay.  And do you remember anything she said

174

1  specifically about what kinds of discriminatory things
2  were being done to her?
3    A.  I can't remember, but I know she was visibly
4  upset.
5    Q.  Okay.  Often or on one particular occasion
6  are you referring to?
7    A.  No.  She was often upset every time she came
8  there about, you know, whatever little thing they
9  might have been doing to her.  She had a regular
10 partner.  I was not her regular partner.
11   Q.  Who was her partner?
12   A.  Wasn't going into depth what she might have
13 been mad about.
14   Q.  Do you know who her regular partner was?
15   A.  It was a guy named Kevin Martin.
16   Q.  Kevin Martin?
17   A.  That's correct.
18   Q.  Do you have any reason to believe that
19 Shields discriminated against her or anyone else on
20 the basis of being female?
21   A.  Not that I know of.
22   Q.  Okay.  What about Ranzino, do you have any
23 reason to believe that he discriminated against anyone
24 on the basis of being female?

175

1    A.  Well, like I said, he wasn't -- he wasn't
2  really good with anybody.  He just -- I guess because
3  there's more black people, it's going to show that he
4  does it more against black people.
5    Q.  What about Tom Neal, do you think -- any
6  reason to believe that he discriminates against
7  females within EM?
8    A.  No, not -- not -- you know, not unless
9  somebody told him to do something, but I wasn't aware
10 of it.  I didn't see it.  You know, he might have
11 shown some favoritism on some things, but like I said,
12 I'm not aware of what he might have did directly to
13 her or with her.
14   Q.  Okay.  What about Mr. Rohloff, any reason to
15 think that he discriminates against females?
16   A.  No.  Like I say, I don't know the direct
17 relationship that they had supervisor to investigator
18 to speak on that.  I just know she was upset a lot.
19   Q.  What about Vernell Tims, do you know him?
20   A.  I know him, yes.
21   Q.  Okay.  How long have you known him?
22   A.  I really know him just basically casually.
23 I just came to the shift a couple years ago,
24 year-and-a-half ago, and that's really where I

176

1  started -- I would see him, but because we worked
2  different watches, we never did anything more than
3  spoke to each other.  I mean, because I was on the
4  shift for six months, and I found out he was a union
5  steward, so that let's you know how much I knew him.
6    Q.  Okay.  So you guys didn't really talk too
7  much?
8    A.  Not at all.
9    Q.  Okay.  Did he ever talk to you about any
10 discrimination or retaliation he was experiencing?
11   A.  I mean, it was the basic by me not knowing
12 him, I just knew they were unhappy with certain
13 events, and the way they gave out assignments, you
14 know, what everybody pretty much knew, but by me being
15 new on the shift, you know, a lot of those guys, even
16 though I've been working there for a year, they been
17 working for years, we didn't have a relationship, but
18 we never worked together, so, you know, I would not be
19 privy to all the information of what has happened with
20 them in the Sheriff's Office.
21   Q.  Sure.  No.  And that's understandable, but
22 do you have any recollection of Mr. Tims telling you
23 anything specifically related to use of the "N" word,
24 for example, anything like that?

Transcript of David A. Walker
Conducted on July 13, 2020

45 (177 to 180)

177

1    A.   I can't recall at this time.  I mean, so
2  much happens.  He might have spoke about it, and
3  that's a sad statement to make in itself.  That should
4  ring a bell any time that happens, but like I say, it
5  went on more than it didn't go on.
6    Q.   What about Mr. Newson, I.V. Newson?
7    A.   It would be the same.  These are all day
8  shift people that works on day shift for a long time,
9  and like I said, I just came to the shift.  I actually
10 know more about the people on the third watch than the
11 people on the second watch.
12   Q.   Sure.  No.  That makes a lot of sense.  Did
13 you ever have any conversations with Mr. Newson about
14 any discrimination or retaliation he was experiencing?
15   A.   Well, the only time I spoke with him at
16 depth is when he was fired.  Him and another
17 investigator were involved in an incident that
18 somebody ran away, and he got moved from our
19 department to another unit.  He wasn't charged with
20 anything.  For all I know, he wasn't -- he just got
21 removed from the unit.  He was not happy about that.
22   Q.   And when you say somebody ran away, you are
23 talking about like a detainee escaped?
24   A.   He jumped out the back seat of a squad car.

178

1  Somebody had to bring him back to custody.
2    Q.   A detainee did?
3    A.   That's correct.
4    Q.   Okay.  What about Samuel Page?
5    A.   I know -- now, I happen to know him very
6  well, even though we didn't work together, but he has
7  been in EM for a very long time, so we seen each other
8  a lot.
9    Q.   Okay.  And you say you know him very well.
10 How long have you known him?
11   A.   I might have known him since -- I'm going to
12 say '93.
13   Q.   Okay.
14   A.   '92, '93.  1992, 1993.
15   Q.   And are you guys friends?  Do you socialize
16 outside of work?
17   A.   We're friends, but we really don't
18 socialize.
19   Q.   Okay.  How often do you talk to Mr. Page
20 would you say?
21   A.   Since he has been retired, maybe once a
22 year.
23   Q.   When did he retire?
24   A.   I want to say at least two years now.

179

1    Q.   Oh, okay.  And did he work on the same shift
2  with you when you came over to Patrol?
3    A.   Yes.  He worked -- no.  He worked afternoon
4  shift.
5    Q.   Okay.
6    A.   When I worked afternoon shift.  When I
7  worked the day shift, he was retired already.
8    Q.   Were you guys ever partners?
9    A.   In the beginning, we were partnered a couple
10 times, but in the last ten years, we might have been
11 partners one or two times.
12   Q.   Okay.
13   A.   I just know him from his length of time he
14 been at work.
15   Q.   Okay.  Did he ever complain to you about
16 Ranzino?
17   A.   Oh, all the time.
18   Q.   What did he tell you about Ranzino?
19   A.   That he don't know how to talk to people,
20 and he just give somebody any type of assignment.  At
21 the time, Page, though, he used to work the office, so
22 he used to see Ranzino more than I would see him
23 because after roll call, I'm on the street or whatever
24 or in TSS.  Page would be up there in the office with

180

1  him most of the day.
2    Q.   Okay.  Do you remember anything specific
3  that he told you about Ranzino other than what you
4  just indicated?
5    A.   I have nothing specific.  Like I said, most
6  people didn't have many kind words to say for him, so
7  he was always on somebody lips about doing something
8  to them.
9    Q.   Yeah.  What about his assignments, would
10 Mr. Page ever complain about the assignments he
11 received?
12   A.   Oh, yeah.  When he came down to TSS, he
13 definitely would complain because, like I said, it's
14 the -- it's the worst assignment in EM, and it's the
15 most stress.
16   Q.   Yeah.
17   A.   Like I say, there's really a lack of
18 supervision down there and things like on a daily
19 basis always happened.  You get no break down there.
20   Q.   Did -- how often did Mr. Page work in TSS?
21   A.   I want to say at least half the time that he
22 was there from 2013 on.  Like I said, once he got
23 close to retiring, he started being in the office a
24 lot.  I think somebody -- somebody might have retired

Transcript of David A. Walker
Conducted on July 13, 2020

46 (181 to 184)

181

1 in the office, so instead of him coming down to TSS a
2 lot, he ended up going to office maybe his last year
3 of work or so.
4    Q.   Do you know how he ended up getting assigned
5 to TSS?
6    A.   Well, I figured the way we all get assigned.
7 You a black guy, you go down to TSS.
8    Q.   So you have no specific knowledge about how
9 he ended up getting assigned to TSS when he came to
10 work in TSS?
11    A.   No, because if anybody might have want to be
12 down there, I don't know about it.  It was a place
13 that a lot of people when they look at the roster
14 sheet, they automatically are in distress because they
15 know what goes on down there.  Like I say, I was down
16 there so long, I just became used to it.
17    Q.   What about Wilford Ferguson?
18    A.   What do you need to know about Mr. Ferguson?
19    Q.   Do you know him, first of all?
20    A.   Yes, I do.
21    Q.   Okay.  How long have you known him?
22    A.   I've known him pretty much almost since as
23 long as I've been in the Sheriff's Office.
24    Q.   Okay.  And are you guys friendly?

182

1    A.   Are we friends?
2    Q.   Yeah.
3    A.   Yes, yeah.  You could call -- he's a friend
4 of mine.
5    Q.   Do you guys socialize outside of work?
6    A.   Yes, we have been over to each other's house
7 before, yeah.
8    Q.   Okay.  How often do you talk to
9 Mr. Ferguson?
10    A.   Once or twice a week.
11    Q.   Okay.  And do you guys ever talk about the
12 lawsuit?
13    A.   We don't go in depth about it.  We know
14 we're in a lawsuit.
15    Q.   Okay.  Do you recall anything that you said
16 to him or he said to you about the lawsuit?
17    A.   No, not at this time.
18    Q.   Okay.  Did you ever work the same shift as
19 Mr. Ferguson?
20    A.   Yes, I have.
21    Q.   All right.  When?  Tell me about that.  When
22 have you worked the same shift as him?
23    A.   I worked the same shift as him pretty much
24 as long as I have been in EM, but he was working in

183

1    Patrol at one time, but I was always in TSS, and then
2 when they brought us together, then he start working
3 in TSS, so maybe from about I say 1999, early 2000
4 until -- until maybe just recently like the last two
5 years.  Like I say, I went to the day shift, and he
6 has been -- we've been working together for the
7 majority of the time from 2000 until I say 2016.
8    Q.   Okay.  Would you be in roll call with
9 Mr. Ferguson at all during that time?
10    A.   Would I be where?
11    A.   In roll call with him.
12    A.   Yes.
13    Q.   Okay.  How often would you say you'd be in
14 roll call with him?
15    A.   We pretty much had the same days off, so any
16 day that we worked, we'd probably be in roll call
17 together.  There's a time in 2000 until 2005 when he
18 was in Patrol that he wasn't in TSS that we didn't
19 work together, but other than that, we pretty much
20 seen each other all the time.
21    Q.   Were you guys partners ever?
22    A.   Sometimes on the street.  All the time down
23 in TSS.
24    Q.   How often did he work in TSS?

184

1    A.   He worked in TSS almost every day.  I pretty
2 much say every day.
3    Q.   Meaning every day -- meaning every day that
4 you were there?
5    A.   Every day that he worked, he worked at TSS.
6    Q.   Okay.  And did he ever complain to you about
7 that?
8    A.   Sometimes.
9    Q.   What would he say?
10    A.   That I'm getting tired of this, at least I
11 know what I have to do down here, and he don't
12 affect -- you know, I was trying to tell him if
13 he -- if he came to Patrol, he could work with me.  We
14 worked well together when we did work.
15    Q.   You said that he would say at least I know
16 what I'm doing -- dealing with down here?
17    A.   Right.
18    Q.   Meaning TSS?
19    A.   Right.  He was resigned to the fact that if
20 he had to come down here, just let him do what he
21 needs to do because, like I said, it's stressful down
22 there.  You got different jobs that different people
23 do, and if you get the right team down there, you can
24 work effectively, but what made it not work was when

Transcript of David A. Walker
Conducted on July 13, 2020

47 (185 to 188)

---

185

1 people didn't want to be down there, so they put more
2 work on another person.
3    Q.    Was Mr. Ferguson pretty good at TSS?
4    A.    One of the best down there.
5    Q.    What about Mr. Page, was he pretty good at
6 TSS, too?
7    A.    When he wanted to be, but, once again, he
8 was a supervisor.  They took that away from him, and
9 then he had a lot of seniority.  He was just wondering
10 why he end up down there.
11    Q.    Did anybody not have their supervisorship
12 title taken away?
13    A.    When they took it, they took it -- they
14 officially took it from everybody when they came over
15 to EM sergeant test, so everybody kept theirs up until
16 then, and they were being told that they could take
17 their EM sergeant test to be a supervisor again, but,
18 once again, if you didn't pass the power test, you
19 weren't going to be a supervisor, and the other parts
20 of the test, they never had them do because so few
21 people passed the power test.
22    Q.    Did Mr. Ferguson ever complain to you about
23 discipline he received?
24    A.    Well, he think they discriminate and

---

186

1 retaliating against him on certain things that
2 happened, but yes.
3    Q.    And what specific -- what specifically did
4 he complain to you about with discipline?
5    A.    He complained about the grievance process.
6    Q.    What about the grievance process?
7    A.    He didn't think it was fair.  He thought it
8 was a kangaroo court.
9    Q.    Okay.  Anything else that he would complain
10 about with discipline?
11    A.    Well, the charges were frivolous, that you
12 had to go through the process to disprove it.  You
13 know, with your seniority, it seemed like the job
14 would get easier.  It seemed like the job gets harder
15 the more time you have on.
16    Q.    Any other complaints you remember
17 Mr. Ferguson making to you?
18    A.    No.  That's it.  We tried not to talk about
19 the job.
20    Q.    Okay.  What about Cecil Williams, do you
21 know Mr. Williams?
22    A.    Yes, I do.
23    Q.    All right.  How long have you known
24 Mr. Williams?

---

187

1    A.    Known him for a while.  I haven't worked
2 with him hardly ever, but I've known him for a while.
3    Q.    Okay.  Are you guys friends, socialize
4 outside of work or anything?
5    A.    We're friends, but we don't socialize.
6    Q.    Okay.  How often would you say you talk to
7 him?
8    A.    Once a month.
9    Q.    And what sort of stuff -- well, strike that.
10         Do you guys ever talk about the
11 lawsuit?
12    A.    Never, never, and when I say talk to him, I
13 mean, I see him, and I say what's going on, how's it
14 going.
15    Q.    Yeah.
16    A.    Just make it to the finish line.  That's it.
17 No in-depth conversation at all.
18    Q.    Okay.  Are you in -- were you ever in roll
19 call with him?
20    A.    Yes, I had.
21    Q.    Okay.  How often would you guys be in roll
22 call together?
23    A.    Well, when I came to Patrol, it would be
24 every day he worked that I worked.  I think his days

---

188

1 off are Friday, Saturday.  My days off were either
2 Sunday, Monday or Saturday, Sunday, so at least three
3 days out of the week if he came to work, we worked.
4    Q.    And were you guys partners ever?
5    A.    I can count on one hand how many times we
6 were partners.  Maybe two times.
7    Q.    Okay.  Did Mr. Williams ever complain to you
8 about assignments he received?
9    A.    Oh, he always complained about the
10 assignments he got, and he complained about splitting
11 up partners.
12    Q.    Anything else?
13    A.    That's about it to my recollection.
14    Q.    So he would complain to you about
15 assignments he received you said always, so,
16 basically, regardless of what he was getting assigned
17 to, he was complaining to you about it?
18    A.    Well, he used to work with a steady partner,
19 so then they start, you know, sending him downstairs
20 and giving him different partners, and if you know the
21 job, you know if you and your partner get a feel for
22 each other, it makes your job easier.
23    Q.    Do you know why they started to split up
24 partners?

---

Transcript of David A. Walker
Conducted on July 13, 2020

48 (189 to 192)

---

189

1    A.   Well, it seemed like they used to harass and
2  retaliate on certain issues, and I didn't know what
3  was right and what was wrong, but I know they were
4  upset about that.
5    Q.   Do you know why, though, the decision was
6  made at all to split up partners?
7    A.   No, I don't.  I'm not privy to that.
8    Q.   Okay.
9    A.   They just do what they want to do sometimes.
10   Q.   How often did Mr. Williams work in TSS?
11   A.   Well, in the beginning, it wasn't a lot, but
12 then it became more than usual.
13   Q.   And help me out with some time frame there.
14   A.   I can't really go into time frames.  I was
15 down there all the time.  It's just like because he
16 used to be in Patrol.  Then, all of a sudden, started
17 getting sent downstairs.  Maybe starting in 2012, he
18 went from not being down there to being down there at
19 least twice a week.
20   Q.   Okay.  And did he complain to you about
21 coming to work in TSS?
22   A.   Yes.  Oh, yes.
23   Q.   What would he say?
24   A.   He let it be known that he didn't want to go

---

190

1  down there.  He wasn't familiar with how you worked
2  down there, so, you know, and, in fact, he's very much
3  less effective down there because it's not like they
4  trained you.  You go down there, and you get in what
5  you fit in.
6    Q.   What -- was he good at his job in TSS?
7    A.   I mean, any job you can learn what to do,
8  but if you really don't want to do it, I mean, you're
9  not putting forth maximum effort.  I mean, because you
10 just stressful being in that position, but he do what
11 he was required to do.
12   Q.   I mean, it seems like you're certainly the
13 person that I've heard of who worked in TSS the most
14 it seems like.  Is that fair to say do you think?
15   A.   Pretty much, pretty much.  I started in EM.
16 EM was only three years old --
17   Q.   Okay.
18   A.   -- when I came there and started, and I was
19 there in '92, so I remember when everything was done
20 out of the same office.
21   Q.   Yeah.
22   A.   So I've seen the evolution of where it is
23 now, so I have a lot of knowledge about what goes on
24 down there since, basically, I haven't got released

---

191

1  from down there until 2016, and believe me, had I
2  known that where I would be at would be this much
3  different from what I did, I would have made that move
4  at least 15 years ago if I had a choice.
5    Q.   Were -- did Mr. Winston ever work in TSS?
6    A.   Yes.  He was told -- he had to come down
7  there sometimes.
8    Q.   Yeah.  And was he any good at it?
9    A.   He knew what to do.  He knew how to band
10 people.  He knew how to -- like I said, the job is not
11 hard.  It's just getting your mind set from down here,
12 I might as well do what I'm supposed to do.
13   Q.   How often would you say that Mr. Winston
14 works down in TSS?  And I'm talking about the time
15 when you were there basically full-time it sounds
16 like.
17   A.   Maybe once a week.
18   Q.   Okay.  Are you aware of him ever getting
19 injured down there or anything?
20   A.   What was that word you used?
21   Q.   Injured.  Did Mr. Winston ever get injured
22 in an incident down there?
23   A.   I can't recall it right now.
24   Q.   Okay.  Did any of the Plaintiffs -- well,

---

192

1  let me keep going here.
2          What about Michelle Strickland, did she
3  ever work TSS?
4    A.   I don't recall her ever being down there,
5  but if she was, it couldn't have been much more but a
6  handful of times when I was there.
7    Q.   What about Mr. Tims?
8    A.   What was the question now?  Was he ever down
9  there?
10   Q.   Yeah.  Did he ever work in TSS during that
11 period when you were down there most of the time?
12   A.   Well, he wouldn't work down there because he
13 worked a different shift.
14   Q.   Okay.
15   A.   I came from the 3:00, 11:00 shift.  He
16 worked the 7:00 to 3:00 shift.
17       THE COURT REPORTER:  I'm sorry.  Can you
18 repeat that?
19       THE WITNESS:  I came from the 3:00 to 11:00
20 shift, and Mr. Tims worked the 7:00 to 3:00 p.m.
21 shift, 7:00 a.m. to 3:00 p.m.
22 BY MR. LEINENWEBER:
23   Q.   What about Mr. Page, I think you said that
24 there was at least a couple of times where he came

---

Transcript of David A. Walker
Conducted on July 13, 2020

49 (193 to 196)

193

1  down to TSS?
2     A.  Yes.
3     Q.  Okay.  How often would he work in TSS would
4  you say?
5     A.  From 2010 on or before 2010?
6     Q.  You tell me.
7     A.  Before 2010, he was down there every day.
8  At around 20 -- I'll say -- '15 -- in fact, he went to
9  Patrol I believe from 2010 to maybe 2014, '15.  Then
10  when he came back down there, it was at least two or
11  three times a week.  Then he end up getting a position
12  in the office, and he came down there at the most once
13  a week.
14     Q.  Okay.  What about Wilford Ferguson, you said
15  that he was there almost every day, right?
16     A.  Right.  He was there as much as I was down
17  there.
18     Q.  Okay.
19     A.  In fact, we were like -- we were like a
20  cabinet down there.  I'll talk to them, and he'll put
21  them on the phones or vice versa.
22     Q.  Okay.  And was he pretty good at his job at
23  TSS?
24     A.  Oh, definitely, definitely.

194

1     Q.  What about -- let's see.  Oh,
2  Anthony Manning, do you know Anthony Manning?
3     A.  Doesn't ring a bell at all.
4     Q.  Okay.  Tyrone --
5     A.  Is that an investigator?
6     Q.  I don't -- let me just say I don't know, and
7  I'm not exactly surprised that you don't know
8  Mr. Manning, but if he doesn't ring a bell, then
9  that's fine, and we can move on.
10     A.  No.
11     Q.  What about Tyrone McGhee?
12     A.  Yes, I know him.
13     Q.  Okay.  How long have you known him?
14     A.  Maybe 15 years, but I'm not a big
15  acquaintance of his.
16     Q.  So just co-workers, not friends?
17     A.  Right.  That's it.
18     Q.  Okay.  Did you ever work the same shift as
19  Mr. McGhee?
20     A.  Yes.
21     Q.  Okay.  How often would you say?
22     A.  Maybe -- when I was down there, maybe about
23  every day of the week if I was down there because he
24  eventually became one of the guys they used to send

195

1  down there all the time.
2     Q.  In TSS?
3     A.  That's correct.
4     Q.  Okay.  So McGhee at some point -- around
5  when did he start going to TSS every day?
6     A.  I imagine around 2013, 2014.
7     Q.  Okay.  And did he transfer out at any point
8  or did he all the way through the present keep going
9  to TSS basically all the time?
10     A.  Can you repeat that?
11     Q.  Sure.
12         You said in about 2013 is when he
13  started to come to TSS almost every assignment.  Did
14  that change at any point or is that continuing up
15  until this day?
16     A.  That never changed.
17     Q.  Okay.  Is he pretty good at TSS?
18     A.  Yes.  Once you start coming down there
19  regularly, you going to become good.
20     Q.  Yeah.
21     A.  You going to have no --
22     Q.  Let's see.  Did he ever complain about his
23  assignment to you?
24     A.  All the time.  Like I say, I don't know

196

1  anybody that was happy about coming down there.
2     Q.  Did he ever give you any specifics about
3  what he was complaining about?
4     A.  No.  Just the normal stuff that anybody
5  complain about.  Dealing with the detainees is enough
6  to make your head hurt sometime.
7     Q.  Make your head hurt sometimes, is that what
8  you said?
9     A.  That's correct.  Yes.
10     Q.  Okay.  What about Victor Slaughter?
11     A.  Yes, he became one of the regulars down
12  there.
13     Q.  When did that start?
14     A.  I would say around 2014.  You know, they
15  all, McGhee, Slaughter and Spivey started all around
16  the same time coming down there.  I tell you that's
17  what eventually got me out because they all came down.
18  They were like the replacements.
19     Q.  How long have you known Mr. Slaughter?
20     A.  Maybe since 2012.
21     Q.  And are you guys friends outside of work at
22  all?
23     A.  No, we're not.
24     Q.  Okay.  Just co-workers?

Transcript of David A. Walker
Conducted on July 13, 2020

50 (197 to 200)

197

1    A.    That's correct.

2    Q.    And you guys would work together sometimes

3 down at TSS?

4    A.    Anytime I worked down there, he'll be down

5 there.

6    Q.    Okay.  And was he pretty good at it?

7    A.    Yes, he was.

8    Q.    Now, what sort of complaints did you hear

9 him make about his assignments?

10   A.    Just that he never had an opportunity to

11 work on the street.  He wanted to come to Patrol,

12 also.  You know, once you find out the less stress you

13 deal with when you just deal with three, four, five

14 calls a day versus dealing with 30 to 60 people you're

15 talking to every day, I mean, it's a big difference.

16       MS. BROWN:  If I could interrupt for just a

17 moment.  Mr. Walker, can I have you tip your camera

18 back a little bit, please.

19       THE WITNESS:  Sure.

20       MS. BROWN:  That's perfect.  Thank you.

21       THE WITNESS:  I'm sorry.

22       MS. BROWN:  That's okay.  No problem.

23 BY MR. LEINENWEBER:

24   Q.    Did Mr. Slaughter ever complain to you about

198

1 discipline he received?

2    A.    No.  Like I said, we didn't speak to each

3 other much.

4    Q.    Okay.  Okay.  Let's see.  You said that

5 Ranzino kind of treated everybody like

6 childs -- children a little bit.  Did -- you know, did

7 you think he was good at his job at all?

8    A.    Put it this way, he knew how to do his job,

9 and I would never say you good at your job if you got

10 low morale of the people that represent you, so he

11 knew how to do his job, but no, he was not good at his

12 job.

13   Q.    Okay.  Do you think he's -- do you consider

14 him to be a racist?

15   A.    Yes.

16   Q.    And is that based on -- oh, sorry.  I didn't

17 mean to interrupt you.  Go ahead.

18   A.    Maybe not the normal term racist that a

19 person would go out and put a hood on their head and

20 want to hang somebody, not like that, but racism, what

21 he thinks about -- about you, and, you know, he treats

22 everybody bad.  He treats the people that really it

23 would -- you could really see what he's doing.  It

24 looks even worse when he treat them that way because

199

1 he treats them like that more often than he would

2 treat the white guys because, for whatever reason, I

3 guess, his interaction or disputes would be more with

4 the black people, but like I said, I have seen him

5 treat white guys bad, also, but it was mostly black

6 guys that had the biggest problem with him, you know,

7 because, I mean, I'm not going to say we're thin skin

8 because it's just the truth of what's happening, you

9 know.  You get tired at a certain extent, especially

10 where any job, you don't expect that to happen.  You

11 don't expect nobody to say some of the things he was

12 saying, and then, you know, he's a supervisor at that.

13 I mean, you can think what you want to think, but what

14 you actually do is two different things.

15   Q.    I just want to say for the record that my

16 co-counsel, Mr. White, had to drop off to take care of

17 a couple things, so I don't think he'll make it back

18 on before we're finished, but I just want to make that

19 clear for the record.

20       Mr. Walker, your comments about

21 Mr. Ranzino, are they based on any incidents that you

22 have not shared with us today?

23   A.    No.  I knew how to avoid the drama with

24 Chief Ranzino.  You know, I might have been as upset

200

1 as other people in the beginning, but I wouldn't let

2 him be the focus of me.  Let him focus on somebody

3 else.  You know, I heard what he said.  It went in one

4 ear, and it went out the other one because I just get

5 the job done, you know.  I assumed he wasn't going to

6 change, you know, and I really didn't think it was a

7 way to make him change because if we knew about him,

8 the administration had to know about him, and,

9 evidently, they wanted that type of supervisor in the

10 spot he was in.  That's the way I looked at it, so he

11 focused on other people because, you know, once you

12 don't give anybody nothing for you the response or get

13 mad at, they keep it moving, and that's what he did.

14 He kept it moving with me.

15   Q.    And he was in that position until he was

16 removed as a result of that investigation into his

17 comment about all you guys look alike?

18   A.    That's correct.

19   Q.    Okay.  Mr. Shields, Greg Shields, any

20 additional interactions you had with him that we

21 haven't discussed today that relate to your

22 discrimination allegations against yourself?

23   A.    Not at this time, no.

24   Q.    Okay.  You had the one run-in with him years

Transcript of David A. Walker
Conducted on July 13, 2020

51 (201 to 204)

---

201

1 ago when he kicked your chair, right?

2    A.   Right, right.

3    Q.   And we talked at length about that, but is

4 there anything else to add in that vein, in that type

5 of allegation?

6    A.   Not that he would have a direct hand in that

7 I could -- that I could just put out to you that I

8 know he did for sure, but my statement would be he was

9 aware of everything that was done or being done to me,

10 discipline, promotion, whatever-wise.

11   Q.   Okay.  Do you think -- do you consider him

12 to be a racist?

13   A.   There's different degrees of racism.  I

14 considered him as more of a retaliatory-type person,

15 and if you happen to be black, then it just be worse,

16 you know.  We had our one run-in, and I believe our

17 relationship never recovered since then.

18   Q.   Okay.

19   A.   So it was a personal issue, and I also

20 happened to be black, which was easier to deny some

21 things to me.

22   Q.   Did you ever hear -- you never heard him use

23 the "N" word, right?

24   A.   No, I haven't.

---

202

1    Q.   Okay.  Did you ever hear him use any other

2 racist terms towards anybody?

3    A.   Well, I heard him say some stuff that along

4 the line of that could be considered racist.  We had

5 an investigator that I knew named Marcus Jackson, and

6 his son is hearing impaired, and he got sick, so he

7 had to leave the office, and this is when he was

8 deputy chief, and he was like, oh, oh, he left because

9 of that deaf boy.  You know, it was just something

10 that, you know, shouldn't have been said.  First of

11 all, his son was sick, and then he was just a deaf

12 boy, not his hearing-impaired child, so --

13   Q.   Yeah.

14   A.   -- you know, it was his lack of concern for

15 the individual that was black that was going to see

16 about his son.

17   Q.   So insensitive I guess you could

18 characterize it as?

19   A.   Definitely insensitive.

20   Q.   Okay.  What about Tom Neal, what was your

21 relationship with -- with Mr. Neal like?

22   A.   Well, my relationship with Mr. Neal was

23 pretty good.  It's just that, you know, Chief Neal had

24 a few problems.  He was actually a great supervisor,

---

203

1 but he used to ask for a lot of money, you know.

2 Don't know if he had a drug problem or alcohol

3 problem, whatever, but he borrowed.  In fact, his

4 supervisor told him to stop borrowing money from the

5 investigators, and that's what made him so

6 controllable because they had something on him that,

7 you know, they'd give him stuff to tell us to do, and

8 he know it wouldn't be right, but, you know, hey, what

9 can you say when you owe people money.

10   Q.   Okay.  Did he ever borrow money from you?

11   A.   Yes, he did.

12   Q.   He did.  About how much money?

13   A.   But he always returned the money back to me,

14 you know.  No more than 50 bucks, 100 bucks, $100.

15   Q.   What was the --

16   A.   But there's numerous other people that he

17 borrowed money from that they told me he didn't pay

18 them back.

19   Q.   Okay.  When is the last time he borrowed

20 money from you, would you say?

21   A.   Well, he hasn't worked there.  He's retired

22 now.  Might have been -- if he retired in 2017, he

23 probably borrowed money from me in 2016.

24   Q.   Okay.  Do you think he is a racist at all?

---

204

1    A.   I mean, when you say "racist," you look at

2 him and be like, well, he's black, how can he be

3 racist, but that's how they can facilitate what they

4 do.  Have him put racist statements or whatever

5 because he owed them, so he really has no choice, you

6 know.  You can't call it racism if you put a black

7 face on it, but believe it or not, it is a lot of

8 blacks that, you know, they do the work of other

9 people.

10   Q.   Uh-huh.  Did -- did Mr. Neal have any role

11 in any of the discipline that you told us that you

12 received?

13   A.   No, no.  In fact, as I said, we had a pretty

14 good relationship, and he was a very intelligent guy.

15 He just had some type of problem, river boat, whatever

16 it might have been, you know, and it was known.  It

17 was known through the whole roster of investigators.

18 Don't loan him no money, you know, and, you know,

19 that's bad when you supposed to be a boss but then you

20 ask somebody for some money so they could turn,

21 manipulate you a certain way, so.

22   Q.   Did -- did he -- did Mr. Neal have any role

23 in your assignments at TSS?

24   A.   Did he have any what?

---

Transcript of David A. Walker
Conducted on July 13, 2020

52 (205 to 208)

---

205

1    Q.    Did he have any role in your assignments at
2  TSS?
3    A.    Other than giving us the roster where we had
4  to go, no.
5    Q.    Okay.
6    A.    Because he never -- he never came down
7  there.  You know, like I said, there's supposed to be
8  a supervisor down there at all times.  Only supervisor
9  I knew that was a chief ever came down was a chief
10 named A.C. (phonetic) because he didn't mind coming
11 down because he had problems with administration.  He
12 was one of the brass that kind of knew what we were
13 going through down there.
14   Q.    So A.C. is a supervisor who frequently came
15 down to TSS?
16   A.    That's correct, and that was only at the
17 latter part of his career.
18   Q.    Okay.  What about did you ever hear Mr. Neal
19 use the "N" word or any racist language?
20   A.    Neal?
21   Q.    Yeah.
22   A.    I'm quite sure he probably did, but, you
23 know, not to put a date or time and tell you
24 explicitly what he said.  I mean, you know, you

---

206

1  shouldn't use it at all, but I guess by him being
2  black, he figured he could say it.  It wouldn't be
3  taken the same way.
4    Q.    So you wouldn't take it the same way if Neal
5  says it to you versus if Shields or Ranzino said it to
6  you?
7    A.    I mean, I don't like it both ways, but one
8  would excite me a little bit more than the other.
9    Q.    Okay.
10   A.    I would let them both go about it.  That's
11 not the way we should have our discourse with each
12 other.
13   Q.    Okay.  Got it.  Can you do us a favor, can
14 you just scoot back a little bit because I think
15 you're -- yeah.  That's perfect.  I think you were
16 losing the camera angle there.
17   A.    All right.
18         MS. BROWN:  Thank you, counsel.
19         MR. LEINENWEBER:  Sure.  Sorry about that
20 interruption.
21 BY MR. LEINENWEBER:
22   Q.    Okay.  And let's see.  What about
23 Mr. Rohloff, he's someone I haven't heard you really
24 mention too much today.  What was your relationship

---

207

1  like with Mr. Rohloff?
2    A.    We -- we got along pretty good for
3  investigator/supervisor.  I don't have much negativity
4  to say.  He definitely was somebody that he respected
5  my seniority because I'm there longer than him, you
6  know.  Like I say, he's one of the people that was
7  supposed to go back that they made a deputy chief, so
8  they couldn't go back, so, you know, I really didn't
9  have any -- any run-ins or give you information on
10 whether I liked or disliked him, you know.  He gave me
11 a job to do and I did it, which I did for most
12 everybody.  It's just a certain way that you'll want
13 your supervisor to hear your grievances to a certain
14 extent so they can make, you know, the atmosphere
15 better, so like I say, just because somebody doesn't
16 like somebody don't mean I don't like them either.
17   Q.    Did -- Mr. Rohloff, did he have any role in
18 the discipline that we talked about earlier?
19   A.    Well, all deputy chiefs could discipline.
20 They could write you up.
21   Q.    But your discipline specifically that we
22 talked about, the discipline that you received, did he
23 have any role in that discipline?
24   A.    Oh, not that I know of.

---

208

1    Q.    Okay.
2    A.    I mean, you never know, but he never
3  intimated to me that he was part of it.
4    Q.    Okay.  And I know that he was made into a
5  deputy chief, but did he have any role in the being
6  denied a promotion to deputy chief or a promotion to
7  EM sergeant?
8    A.    No, no.  He would have no say, so that would
9  have to be done at a higher level.
10   Q.    Okay.  What about assignments, did
11 Mr. Rohloff have a role in assignments?
12   A.    He could have an influence on what
13 assignment you went to, yes.
14   Q.    Okay.  And so was he responsible for
15 assigning you to TSS ever?
16   A.    I mean, if he was the chief that day, yes.
17 He was passing out the roster.
18   Q.    And do you think that he ever assigned you
19 to TSS because of your race?
20   A.    I figured he did what he was told to do.  I
21 mean, he had no choice.
22   Q.    Okay.  What about do you think -- was he
23 your supervisor at all while you were in Patrol?
24   A.    Rohloff?

---

Transcript of David A. Walker
Conducted on July 13, 2020

53 (209 to 212)

209

1   Q.   Yeah.
2   A.   Yeah.
3   Q.   And did he have any role in selecting the
4  different geographical regions in Cook County that you
5  would be assigned to?
6   A.   Yes.
7   Q.   Okay.  And do you think he did that based on
8  your race at all?
9   A.   Yes.  I mean, you've been told to do what
10 you're told to do.
11      THE COURT REPORTER:  I'm sorry.  Repeat
12 that.
13      THE WITNESS:  You're being told to do what
14 you're told to do, so he had no choice.
15 BY MR. LEINENWEBER:
16   Q.   And do you have any idea who was telling him
17 what kind of assignments to make?
18   A.   I would assume that it would have to be at
19 least the level of director.
20   Q.   Did -- give me one sec.
21      Oh, I know what I was going to ask you.
22 What are the different regions or, you know, you
23 talked about being assigned to sort of different areas
24 in Patrol.  What are the different -- what are the

210

1  names for the different regions of Cook County that
2  you could be assigned to on Patrol?
3   A.   Well, they got -- they're called zones now.
4  Zone 1 through Zone 9, but they used to be areas then.
5  Area 1, which would be the west side.  Area 2, the
6  southwest side.  Area 3, the Southeast Side.  Area 4,
7  the North Side, and that would also be north side and
8  north suburbs.  2 and 3 would be south side, southwest
9  side, southwest suburbs.  Area 3, southeast side and
10 the southeast suburbs, and west area, Area 3 would be
11 west side and the western suburbs.
12   Q.   I thought you said Area 1 is the west side?
13   A.   Yeah.  Area 1.  I'm sorry.
14   Q.   Okay.  Area 1 is the west side and the
15 suburbs out west?  Area 2 --
16   A.   Right.
17   Q.   -- is the southwest side plus the suburbs
18 down there?
19   A.   Right.
20   Q.   Area 3 is the southeast side plus the
21 suburbs down there?
22   A.   Right.
23   Q.   And then Area 4 is the north side plus the
24 suburbs, is that correct?

211

1   A.   That's correct.
2   Q.   When did they -- when did they go -- make
3  the move from areas to zones?
4   A.   They went to zones.  Well, we have a new
5  director.  She been the director for about a little
6  bit over a year.  Now, we're in areas now -- rather,
7  zones.
8   Q.   So until like early 2019?
9   A.   Like early -- like maybe middle 2019 to
10 present.
11   Q.   Got it.  Okay.  And then now, since then,
12 you're in nine zones, so you went from four areas to
13 nine zones?
14   A.   Right.
15   Q.   And the zones, they cover the same
16 geographic region, though?  All of Cook County,
17 essentially, right?
18   A.   Exactly.
19      MR. LEINENWEBER:  Okay.  Okay.  Can we just
20 take like a two-minute break, and I'll just double
21 check that I don't have anything else, but I think I'm
22 basically finished.
23      MS. KRAUCHUN:  That's fine.  We'll just take
24 two minutes.

212

1      MR. LEINENWEBER:  We can go off the record.
2          (Off the record at 3:27 p.m.)
3          (Resumed at 3:32 p.m.)
4  BY MR. LEINENWEBER:
5   Q.   Mr. Walker, I just have a couple more
6  questions for you, and you understand you are still
7  under oath, right?
8   A.   Yes.
9   Q.   Okay.  The Areas 1 through 4 that we talked
10 about that were used for Patrol until say mid 2019,
11 which of those are the high-crime areas?
12   A.   It would be 1, 2, and 3 would be west side
13 and south side in the city.  Suburbs was really not
14 high crime.  4 is the area that is not much crime at
15 all.
16   Q.   Okay.  Isn't it true that some guys kind of
17 want to be assigned to an area that's closer to their
18 house?
19   A.   Or closer to the neighborhood they know,
20 yes, that's true.
21      MR. LEINENWEBER:  All right.  I don't have
22 any other questions at this time other than I would
23 like to just say, Mr. Walker, thank you very much for
24 your time today and your patience with some of the

Transcript of David A. Walker
Conducted on July 13, 2020

54 (213 to 216)

213

1 technical issues we've had. I really do appreciate
2 you taking the time to be here today and to answer my
3 questions as best as you could.
4        THE WITNESS: You're welcome.
5        MR. LEINENWEBER: Thank you.
6              CROSS EXAMINATION
7 BY MS. KRAUCHUN:
8    Q.   I just have a couple of clarification
9 questions but not many.
10        So just to clarify, you testified an
11 awful lot about TSS being the worst assignment, so can
12 you explain specifically is that throughout the EM
13 unit the investigators considered TSS the worst
14 assignment?
15    A.   That's correct. Every investigator, common
16 knowledge is if you go to the TSS, that means somebody
17 doesn't like you or you're on punishment for
18 something.
19    Q.   And there was a lot of questioning, I don't
20 know if you remember counsel asking you questions
21 about evidence of -- of those assignments. Would
22 roster sheets show the consistent TSS assignments
23 being given to the black investigators?
24        MR. LEINENWEBER: Objection to foundation.

214

1        THE WITNESS: Without a doubt. That's the
2 best way to find out the attendance and where your
3 assignment was.
4 BY MS. KRAUCHUN:
5    Q.   And, again, those are in the roster sheets
6 specifically?
7    A.   In the roster sheet specifically. I'm
8 sorry.
9    Q.   Okay. And there was a lot of questions
10 about there not being any bid for assignments and
11 specifically in relation to your collective bargaining
12 agreement. Do you remember that line of questioning?
13    A.   I do.
14    Q.   Okay. To your knowledge, is there any
15 guidance in your union contract about seniority and
16 assignments?
17    A.   To my knowledge, I think it's expressed that
18 seniority has the first preference or choice of
19 assignment.
20    Q.   And so based on your personal experience, do
21 you believe that that was followed in assigning
22 investigators within your unit?
23        MR. LEINENWEBER: Objection to form and
24 foundation.

215

1 BY MS. KRAUCHUN:
2    Q.   Sorry. Go ahead, David. You can answer
3 that.
4    A.   I feel like it's violated every day to
5 present.
6    Q.   And did you ever -- and you or any other
7 investigators to your knowledge ever file grievances
8 in regards to that seniority issue?
9    A.   I believe there was a grievance filed. I
10 don't know the exact number, but I believe there was a
11 grievance filed as of a debate on that issue of
12 assignments.
13    Q.   So if you filed a grievance in regards to
14 your assignments, who are you technically complaining
15 about?
16    A.   Complaining to or complaining about?
17    Q.   Well, complaining about.
18        MR. LEINENWEBER: Objection to form and
19 foundation.
20        THE WITNESS: You're complaining about the
21 location that you're sent every day and the stress
22 related to that assignment.
23 BY MS. KRAUCHUN:
24    Q.   But I'm asking you who is the person that

216

1 has control over those assignments? Who are you
2 complaining about, whose actions?
3    A.   We complaining about your direct supervisors
4 all the way up to the director, the chain of command.
5    Q.   And when you file a grievance, who hears
6 those grievances?
7    A.   It would be the exact person that you're
8 complaining about. That person, that director would
9 be the one that would hear your grievance.
10    Q.   Okay. And there was a lot of talk about TSS
11 and then also on Patrol the high-incident areas. Do
12 you remember those terminology -- that terminology
13 being used?
14    A.   Yes, I do.
15    Q.   So you talked about how TSS is very
16 stressful and busy. Would you agree that it leads to
17 more like potential -- there's more potential for
18 dangerous situations in TSS?
19        MR. LEINENWEBER: Objection to form,
20 foundation. Also leading.
21 BY MS. KRAUCHUN:
22    Q.   You can answer, David. Sorry.
23    A.   Yes. I believe that there is the potential
24 for more incidents and also more major incidents, and

Transcript of David A. Walker
Conducted on July 13, 2020

55 (217 to 220)

---

217

1 you really don't have -- and you don't really have a
2 supervisor that can respond in a timely manner for
3 that incident as if you were on the street.
4    Q.  And when you say "an incident," would an
5 incident also potentially prompt more either order
6 violations or potential discipline?
7    A.  That's correct.  You're talking about use of
8 force.  You're talking about people thinking their
9 rights have been taken from them and just the
10 procedure being violated of how you supposed to have
11 your discourse with a pretrial detainee.
12    Q.  So -- so you -- so I guess it would be fair
13 to say it's like a more adversarial position, right?
14       MR. LEINENWEBER:  Objection to form,
15 foundation and leading.
16       THE COURT REPORTER:  I didn't hear the
17 answer.
18       THE WITNESS:  Yes, there are.  I believe
19 that it's going to be adversarial because you're
20 steadily rejecting people that want to go home, and,
21 now, you're sending them back to jail, and that's not
22 going to make anybody happy, so you deal with that on
23 a daily basis, you know, your tolerance level is going
24 to go down, and theirs is going to go up, so --

---

218

1 BY MS. KRAUCHUN:
2    Q.  And since the time you've been assigned in
3 Patrol, what specific areas have you been assigned to?
4    A.  Well, I consistently get assigned to the
5 south side.  It started off as mostly the west side,
6 and I'm always in the high incident, high crime area,
7 high incident of violations of the program, high
8 reincarceration rate of the program, so, you know,
9 pretty much my day is going to be interesting the
10 moment I know I go out there.
11    Q.  Let me ask you this.  How many -- to your
12 knowledge, do you know how many officers in the EM
13 unit on patrol have less seniority than you?
14    A.  Well, if we have 80 investigators right now,
15 I'm in the top 5.
16    Q.  Okay.  So pretty much everybody you work
17 with has less seniority than you?
18    A.  That's correct.
19    Q.  Okay.  And then we were talking about how
20 detainees, you know, regarding reincarceration.  Would
21 the roster sheets show your assignments to detainees
22 that are going to be reincarcerated?
23    A.  No, it won't.  That's dictated by the
24 office, and the supervising office would give the

---

219

1 assignments out to the dispatch to give to county over
2 the air.
3    Q.  So the supervisors give those assignments?
4    A.  That's correct.
5    Q.  Okay.  And then there was a lot of talk
6 about promotions, and I just want to make it really
7 clear.  I just want you to clarify this for me.  What
8 is the promotion as an EM investigator that you can
9 apply for?
10    A.  The only promotion you can apply for
11 presently is EM sergeant, and it's a nonmerit
12 position.
13    Q.  So how does one become a lieutenant in the
14 EM unit?
15    A.  You have to be appointed.
16    Q.  And how does one become a deputy chief in
17 that unit?
18    A.  You have to be appointed.
19    Q.  How does one become a chief in that unit?
20    A.  You have to be appointed.
21    Q.  So if your supervisors don't like you or
22 treat you a different way or keep giving you bad
23 assignments, what are the chances that you are going
24 to become a supervisor?

---

220

1       MR. LEINENWEBER:  Objection to form,
2 foundation, leading and calls for speculation.
3       THE WITNESS:  You really have no chance of
4 becoming a supervisor without some type of person in
5 administration taking a liking to you and going to
6 some other unknown person to get the approval for the
7 appointment.  There's nothing that you know how they
8 do it.  You just know it gets done.
9 BY MS. KRAUCHUN:
10    Q.  And your experience in the EM unit, were
11 there more white officers promoted than black
12 officers?
13       MR. LEINENWEBER:  Objection to foundation.
14       MS. BROWN:  Counsel, if I could interrupt.
15 Oh, there we go.  Thank you.  We just lost
16 Mr. Walker's video for a moment.
17       THE WITNESS:  There are definitely more
18 white officers promoted, but in the last year or so,
19 it's been a few more blacks.
20 BY MS. KRAUCHUN:
21    Q.  Is that --
22    A.  But overall -- overall from 2000 until 2017,
23 it was -- it was -- it was mostly white officers that
24 being promoted.  We have a new director now.

---

Transcript of David A. Walker
Conducted on July 13, 2020

56 (221 to 224)

221

1    Q.    And you said that most recently, there's
2    been some black supervisors promoted in EM, correct?
3    A.    That's correct.
4    Q.    And has that been since the filing of this
5    lawsuit?
6    A.    Yes, it has.
7    Q.    And then just a couple -- a couple more
8    things. Do you recall that counsel asked you some
9    questions about filing an internal complaint in
10   regards to, you know, discrimination? Do you remember
11   that question?
12   A.    Yes.
13   Q.    Who would you have filed that complaint with
14   if you were to file something?
15   A.    Internally?
16   Q.    Yes.
17   A.    I would believe I probably have to go to
18   OPR.
19   Q.    And did you go to OPR for any other issues
20   through your career?
21   A.    No, I haven't.
22   Q.    And that issue that you have with
23   your -- the vacation time and time on the books that
24   you had, you've been fighting that for over five

222

1    years, correct?
2    A.    That's correct.
3    Q.    And you still have no outcome on that?
4    A.    None.
5    Q.    I think I'm almost -- so you were talking
6    about -- counsel asked you questions about your
7    co-Plaintiff Wilford Ferguson.
8    A.    Yes.
9    Q.    And I believe you testified that he was one
10   of the best officers down in TSS, right?
11   A.    That's correct.
12   Q.    Has he ever received a promotion?
13       MR. LEINENWEBER: Objection to foundation.
14       THE WITNESS: No. Nothing.
15   BY MS. KRAUCHUN:
16   Q.    I'm sorry, David, what did you say?
17   A.    No.
18   Q.    Okay. So counsel asked you a lot of
19   questions and, you know, talked about you having a lot
20   of experience and knowledge of TSS. Do you remember
21   that questioning?
22   A.    Yes.
23   Q.    And your personal -- based on your personal
24   experience working with other officers in TSS, were

223

1    there any other officers that worked down there that
2    were as good at their job as you were or comparable?
3    A.    I think --
4        MR. LEINENWEBER: Objection to foundation.
5        THE COURT REPORTER: I'm sorry. What was
6    the answer?
7        THE WITNESS: I considered myself to be the
8    best person to ever work down there in TSS. I did it
9    for the longest. I was able to maintain order, and
10   it's not a job simple for everybody. Based on that, I
11   should get promoted of all the years that I worked
12   down there.
13   BY MS. KRAUCHUN:
14   Q.    But you were never promoted?
15   A.    Never.
16   Q.    And do you believe that Ranzino treated
17   black officers differently than white officers?
18       MR. LEINENWEBER: Objection to foundation.
19       THE WITNESS: I do.
20   BY MS. KRAUCHUN:
21   Q.    Do you believe that Shields treated black
22   officers worse than white officers?
23       MR. LEINENWEBER: Same objection.
24       THE WITNESS: Who was that person?

224

1    BY MS. KRAUCHUN:
2    Q.    Shields.
3    A.    Definitely.
4    Q.    Do you believe that Neal treated black
5    officers worse than white officers?
6        MR. LEINENWEBER: Same objection.
7        THE WITNESS: Definitely.
8    BY MS. KRAUCHUN:
9    Q.    And do you believe that Rohloff treated
10   black officers worse than white officers?
11       MR. LEINENWEBER: Same objection.
12       THE WITNESS: I'm neutral on that. I seen
13   him try to be the same with everybody.
14       MS. KRAUCHUN: I have no further questions.
15          REDIRECT EXAMINATION
16   BY MR. LEINENWEBER:
17   Q.    I just have a couple follow-ups.
18       So you talked about -- you just gave
19   testimony about who you file a grievance with, your
20   supervisor and the chain of command, right?
21   A.    Right.
22   Q.    Okay. And that process is established via
23   collective bargaining, right?
24   A.    Yes.

Transcript of David A. Walker
Conducted on July 13, 2020

57 (225 to 228)

225

1    Q.    In other words, your Teamsters Local 700
2  Union helped craft that policy of evaluating
3  grievances?
4    A.    Or agreed upon the existing policy.
5    Q.    So is that a yes?
6    A.    Yes.  I mean, we're in a different unit.
7    Q.    Sorry.  I can't read my handwriting.
8         Oh, you would agree with me, though,
9  you talked a little bit about certain areas having
10  more reincarcerations that need to be processed,
11  right, in certain areas of the county?
12    A.    That's correct.
13    Q.    Okay.  And it's reasonable, isn't it, for
14  the Sheriff's Office to put resources where they're
15  needed, right?
16    A.    That's reasonable.
17    Q.    Okay.  Did you ever request backup for an
18  incident in TSS?
19    A.    Yes, I have.
20    Q.    And what happened?
21    A.    They didn't get there in time.  The incident
22  was over with.  We had to adapt and write everything
23  up ourself afterward, so it was done against policy.
24  There was no supervisor there because only one

226

1  supervisor was at work or one was on the street.
2    Q.    When was this?
3    A.    I can't pick the date, but all type of
4  incidents from -- basically, from I was down there
5  from in the new office from 2010 until when I came out
6  2016 and before that, but before that, we had
7  supervisors that were in the office all the time.
8  That's when we was in the office of Division 6.
9    Q.    Did anyone ever get hurt or injured as a
10  result of you not having backup in time?
11    A.    Did anybody say they were injured?  What do
12  you mean?  An officer?
13    Q.    Yeah.  I'll clarify.  So did anybody ever
14  get hurt, any -- whether they be a detainee or an
15  investigator, did anybody ever get injured because
16  backup did not arrive in time?
17    A.    All the time.  We had people going on duty
18  injury.  You had inmates claim injuries.  Sometimes
19  they had to go to --
20    Q.    I understand -- sorry.  Go ahead.  I don't
21  want to interrupt you.  I understand certainly that
22  people get injured frequently.  I just am wondering
23  was there ever an injury you can point to and say this
24  is because backup did not arrive in time?

227

1    A.    Yes.  If a supervisor is not down there, you
2  could have the person removed right away.  We're not
3  at liberty to just take a guy from down there and take
4  him back to where he's going.  That's a supervisor's
5  decision.  That's why we do it all -- do them all at
6  the same time at the end of our processing, but if a
7  supervisor is down like they supposed to, we can
8  instantly get that guy out of there so it won't
9  escalate and to him and possibly other people becoming
10  upset.
11    Q.    So when you refer to backup, are you talking
12  having a supervisor physically be present?
13    A.    That's correct, to say that it's okay to
14  refuse this guy house arrest now.  Send him back to
15  his division.  That's what a supervisor does.
16    Q.    Okay.
17    A.    If a supervisor is not down there, you
18  cannot reject.  They have a sheet down there for the
19  supervisors to sign for the reject list.  Just like I
20  was saying in Division 6, the supervisor supposed to
21  be there.  Every person that's rejected from going out
22  is shipped back to their division with a supervisor
23  signature saying that he has been notified.
24    Q.    And are you saying that you tell people, you

228

1  tell detainees if they're getting sent home or if
2  they're getting sent back to the jail, do you tell
3  them that in like realtime like or do you tell them
4  that all at once at the end?
5    A.    Tell them that realtime.  You verify you can
6  go to the next bullpen.  You go in the bullpen where
7  the people verify that.  They know exactly if they're
8  going home because they be going from bullpen 2 to
9  bullpen 1.  If you still in bullpen 2, that means
10  you're still trying to get out.  They standing against
11  the gate watching you call on the phone to their
12  people seeing if their people going to say yes or no.
13  Like we constantly tell them have a seat.  We'll let
14  you know if you're good.  They want to look at them
15  like the people going to change their mind and they
16  not going to get out.  What they say?  What she say?
17  Trying to hear what you saying to them.
18    Q.    So it's pretty important to have people down
19  there who know what they're doing, right?
20    A.    Oh, yeah.  You got to have people watch the
21  bullpen.  You got people that put the packs together.
22  Then you have to band the people that's going out, so
23  if you got 50 people down and 35 go home, there's 15
24  people that's going back.  You know they feel a

Transcript of David A. Walker
Conducted on July 13, 2020

58 (229 to 232)

229

1  certain type of way.
2     Q.  I just have one more question.  You said you
3  mentioned that EM sergeant is a nonmerit position, is
4  that right?
5     A.  That's correct.
6     Q.  Is investigator a merit position?
7     A.  No.  That's an appointed position, also, but
8  when I got the job, it was a promotion.  Now, you can
9  be in for Electronic Monitoring as long as you pass
10  the power test and whatever other test they giving,
11  they give out now.
12     Q.  So when counsel was asking you about how you
13  get all these different appointments, you're saying
14  that to become an EM investigator, you actually needed
15  an appointment as well, right?
16     A.  You have to bid for it and then you have to
17  pass their testing.
18     Q.  Yeah, but when -- when did that start?
19     A.  Oh, maybe about 15 years ago.
20     Q.  Oh, okay.  I misunderstood something, then,
21  I think, but I thought you just said a minute ago that
22  it's a nonmerit position, so you have to be appointed
23  to it?
24     A.  That's correct.  When I first came here, you

230

1  weren't appointed to it.  You -- it was a promotion.
2     Q.  What's the difference between a promotion
3  and an appointment, I guess, because I think you were
4  using those terms interchangeably?
5     A.  Well, a promotion means that you are given
6  the position, and you are given it with a raise, and
7  you are given it with a letter, a letter saying
8  congratulations, you've been appointed -- you've been
9  promoted, rather, and an appointment is something that
10  they give to you.  You don't know how you got it.  You
11  just -- you got appointed to it.
12     Q.  All right.  I don't understand, but that's
13  okay.  It's not the first time I never understood
14  something.
15     A.  And it's logical that people don't
16  understand it because it should be a process how you
17  make a move from any place to another place.  I agree
18  with you.
19      MR. LEINENWEBER:  All right.  I don't have
20  any further questions.
21      MS. KRAUCHUN:  I don't have any other
22  questions either.
23      THE COURT REPORTER:  Signature?
24      MS. KRAUCHUN:  We can waive.

231

1      THE COURT REPORTER:  And are you ordering,
2  Mr. Leinenweber?
3      MR. LEINENWEBER:  Yeah.  We'll order.  Yes,
4  please.
5      MS. KRAUCHUN:  And I'm not just yet.
6      THE COURT REPORTER:  Okay.  Mr. Leinenweber,
7  would you like e-tran?
8      MR. LEINENWEBER:  Yeah.  That should be
9  fine.
10  FURTHER DEPONENT SAITH NOT AT 3:55 P.M.
11
12
13
14
15
16
17
18
19
20
21
22
23
24

232

1        COURT REPORTER CERTIFICATE
2          * * * * * *
3      I, Cynthia A. Splayt, CSR, do hereby certify
4  that the witness was duly sworn by me via Zoom to
5  testify to the whole truth and that the foregoing
6  deposition was recorded stenographically by me and was
7  reduced to computerized transcript under my direction
8  and that the said deposition constitutes a true record
9  of the testimony given by said witness.
10     I FURTHER CERTIFY that the reading and
11  signing of the deposition was waived.
12     I FURTHER CERTIFY that I am not a relative
13  or employee or attorney or counsel of any of the
14  parties, or a relative or employee of such attorney or
15  counsel, or financially interested directly or
16  indirectly in this action.
17     IN WITNESS WHEREOF, I have hereunto set my
18  hand this 20th day of July, 2020.
19
20
21
22
23  _____
24     CYNTHIA A. SPLAYT, CSR
    License No. 084.003295

Transcript of David A. Walker
Conducted on July 13, 2020

59

**A**

**abandoned**
40:12
**able**
68:17, 75:2,
111:24, 112:9,
146:2, 170:3,
223:9
**above**
33:22, 35:10,
122:19, 142:7
**absolutely**
7:13, 32:1
**academies**
12:16
**academy**
12:18, 13:17,
13:18, 13:19,
44:17, 147:15
**accept**
109:19
**acceptable**
7:9, 7:10,
7:16, 7:22, 8:2
**accepted**
109:14, 109:22,
110:2, 110:7
**accepting**
27:22
**access**
29:15, 111:13
**accessible**
101:13
**accident**
30:24
**accommodate**
7:14
**according**
55:21, 66:18,
69:11
**accordingly**
54:17
**accountant**
141:3
**accredited**
12:19, 68:2
**accrued**
88:6, 124:1

**accumulation**
161:10
**accusation**
35:16
**acquaintance**
194:15
**act**
4:19, 22:23,
23:3, 23:7,
23:14, 134:24
**acting**
15:6
**action**
9:23, 22:18,
52:1, 137:13,
232:16
**actions**
47:17, 108:19,
128:8, 147:5,
216:2
**active**
24:21, 26:2,
139:5
**activity**
153:11, 153:12,
153:14, 153:18
**actual**
15:13, 15:15,
35:18
**actuality**
109:1
**actually**
23:20, 28:10,
36:10, 41:12,
46:14, 48:8,
49:7, 49:8,
49:15, 57:4,
72:20, 82:5,
94:4, 109:13,
124:12, 125:7,
128:16, 131:6,
132:18, 160:19,
165:17, 173:15,
177:9, 199:14,
202:24, 229:14
**adam**
17:3, 17:4,
17:6, 86:3

**accumulation**

**adapt**
225:22
**add**
128:3, 128:5,
129:13, 138:20,
162:2, 201:4
**additional**
12:13, 21:5,
56:9, 129:10,
200:20
**address**
12:1, 148:23,
149:1
**adjust**
54:17
**adjusted**
54:20
**adjustment**
55:9, 58:4,
58:7, 59:5
**adjustments**
58:13, 58:14,
58:23
**administering**
4:20
**administration**
23:15, 33:23,
83:8, 200:8,
205:11, 220:5
**administrative**
28:14
**advance**
4:14, 6:23
**advanced**
119:2
**adversarial**
217:13, 217:19
**adverse**
128:8
**affairs**
23:23, 24:6,
61:10, 82:21,
83:24
**affect**
22:16, 184:12
**afield**
126:16
**african-american**
104:22

**after**
13:12, 13:17,
22:21, 34:11,
42:13, 51:24,
61:19, 62:5,
68:21, 86:9,
93:13, 106:6,
118:23, 135:14,
139:12, 146:15,
160:9, 162:18,
166:23, 179:23
**afternoon**
16:15, 110:21,
157:3, 179:3,
179:6
**afterward**
225:23
**again**
33:8, 62:2,
66:5, 75:7,
77:4, 81:1,
106:3, 107:11,
119:14, 120:17,
129:1, 136:15,
138:23, 162:10,
162:15, 172:1,
185:7, 185:17,
185:18, 214:5
**against**
35:17, 80:13,
82:15, 82:20,
124:21, 130:17,
130:18, 131:10,
137:15, 153:23,
154:13, 155:13,
174:19, 174:23,
175:4, 175:6,
175:15, 186:1,
200:22, 225:23,
228:10
**age**
69:11
**agency**
40:6
**ago**
6:4, 10:20,
42:13, 59:23,
70:21, 98:17,

98:18, 99:4,
99:5, 117:8,
138:10, 138:11,
175:23, 175:24,
191:4, 201:1,
229:19, 229:21
**agree**
4:17, 5:1, 5:3,
5:5, 35:15,
118:4, 216:16,
225:8, 230:17
**agreed**
48:13, 225:4
**agreement**
4:22, 52:24,
214:12
**agrees**
48:13
**ahead**
10:18, 51:4,
57:8, 63:1,
71:9, 79:7,
84:23, 87:3,
88:19, 89:12,
109:16, 126:4,
131:19, 151:19,
158:5, 158:13,
172:22, 198:17,
215:2, 226:20
**aid**
8:20, 9:3,
9:10, 9:12
**air**
104:15, 219:2
**alcohol**
203:2
**alike**
160:6, 160:19,
165:4, 169:11,
200:17
**allegation**
23:9, 23:18,
35:19, 201:5
**allegations**
149:23, 157:17,
200:22
**allege**
84:15, 116:22,

145:16, 147:4
**alleged**
83:4
**allegedly**
123:21
**allow**
9:7
**allowed**
128:24
**almost**
9:18, 14:6,
25:10, 83:2,
181:22, 184:1,
193:15, 195:13,
222:5
**alone**
38:4
**along**
6:23, 18:9,
18:20, 126:10,
130:11, 152:14,
152:18, 152:19,
202:3, 207:2
**already**
26:23, 31:17,
37:8, 64:13,
97:11, 106:21,
108:3, 109:5,
127:22, 132:18,
152:5, 179:7
**also**
2:29, 12:16,
13:18, 13:20,
16:24, 17:14,
18:4, 18:7,
19:7, 22:16,
24:2, 26:13,
28:6, 28:10,
28:17, 33:20,
36:6, 41:7,
52:8, 62:24,
63:2, 63:16,
64:24, 68:21,
72:20, 97:24,
98:4, 120:5,
120:9, 123:5,
124:5, 132:23,
134:1, 134:2,

139:14, 140:4,
147:10, 147:20,
147:23, 153:7,
170:7, 197:12,
199:5, 201:19,
210:7, 216:11,
216:20, 216:24,
217:5, 229:7
**altercation**
91:7, 91:12,
94:13, 169:15,
169:22, 170:4
**although**
65:20
**always**
14:18, 16:11,
28:18, 30:20,
44:20, 46:10,
67:8, 74:9,
82:22, 84:2,
92:7, 95:1,
130:12, 148:2,
154:9, 159:23,
180:7, 180:19,
183:1, 188:9,
188:15, 203:13,
218:6
**amount**
17:11, 18:2,
28:2, 67:10,
69:10, 77:8,
104:9, 104:13,
111:4, 119:22,
129:10, 140:16,
140:24
**anger**
147:22, 148:6,
148:8
**angle**
206:16
**anguish**
140:13, 147:11,
147:13, 147:14
**annie**
2:31, 65:18,
71:11, 72:2,
111:3, 111:11,
112:23, 113:14,

114:8, 135:23,
136:8, 150:21,
158:17, 162:24
**annually**
115:5
**another**
28:17, 49:9,
53:11, 58:8,
61:22, 72:21,
73:6, 76:8,
78:15, 90:12,
98:6, 101:18,
125:14, 136:11,
170:1, 177:16,
177:19, 185:2,
230:17
**answer**
6:17, 6:18,
6:20, 7:8, 7:21,
21:2, 39:17,
41:15, 63:21,
75:9, 79:9,
98:5, 98:6,
114:10, 119:13,
130:16, 133:7,
213:2, 215:2,
216:22, 217:17,
223:6
**answered**
31:8, 84:1,
84:2, 134:17,
155:11
**answering**
7:6, 102:19,
103:6
**answers**
3:17, 3:20,
8:23, 110:11,
113:11, 136:4
**anthony**
1:8, 194:2
**anticipate**
4:3
**anybody**
24:8, 65:10,
69:4, 70:11,
77:17, 118:13,
120:11, 121:1,

Transcript of David A. Walker
Conducted on July 13, 2020

61

122:18, 136:13,
149:22, 151:8,
151:11, 151:19,
152:19, 175:2,
181:11, 185:11,
196:1, 196:4,
200:12, 202:2,
217:22, 226:11,
226:13, 226:15
**anymore**
61:21, 63:13,
83:15, 112:10,
117:7
**anyone**
8:13, 9:7,
11:2, 11:8,
45:20, 65:12,
93:20, 96:23,
98:3, 110:17,
129:8, 142:8,
154:12, 174:19,
174:23, 226:9
**anything**
8:19, 9:3,
9:14, 10:11,
13:23, 14:17,
22:20, 28:15,
29:1, 33:22,
44:12, 49:11,
49:16, 49:19,
53:22, 55:2,
61:6, 61:13,
62:20, 63:13,
65:6, 69:21,
71:6, 82:17,
83:13, 84:3,
93:15, 93:24,
111:5, 117:18,
118:6, 126:3,
127:1, 127:6,
128:3, 128:19,
129:13, 131:9,
132:19, 133:20,
144:18, 145:18,
146:18, 147:6,
149:8, 162:5,
167:17, 170:15,
173:24, 176:2,

176:23, 176:24,
177:20, 180:2,
182:15, 186:9,
187:4, 188:12,
191:19, 201:4,
211:21
**anytime**
197:4
**anywhere**
76:12, 95:23
**apologize**
4:14, 6:23
**appeal**
131:9
**appealed**
131:7
**appear**
61:20
**appearances**
2:1
**appeared**
2:9, 2:26,
62:12
**appearing**
1:32
**application**
20:8, 20:19,
69:3, 71:4
**applications**
20:2, 20:8
**applied**
44:5, 71:7,
123:3, 141:23
**apply**
67:12, 69:20,
69:21, 70:5,
90:4, 90:15,
108:12, 122:21,
122:23, 141:21,
219:9, 219:10
**appoint**
142:2
**appointed**
70:1, 70:2,
142:1, 219:15,
219:18, 219:20,
229:7, 229:22,
230:1, 230:8,

230:11
**appointment**
220:7, 229:15,
230:3, 230:9
**appointments**
229:13
**appreciate**
160:8, 213:1
**approach**
22:13
**approached**
169:22
**approval**
220:6
**approved**
15:6, 26:24
**approximately**
12:2, 12:8,
14:2, 15:18,
16:17, 87:15,
95:6, 96:21
**april**
159:6, 159:23,
160:3, 162:15,
162:16, 164:23,
166:24
**arbitration**
123:11, 124:23,
124:24, 127:14,
127:15
**arbitrator**
125:1
**area**
38:8, 38:11,
38:15, 65:11,
67:13, 67:16,
83:12, 89:21,
97:23, 100:12,
101:9, 101:22,
102:6, 102:24,
103:4, 103:8,
103:14, 210:5,
210:6, 210:9,
210:10, 210:12,
210:13, 210:14,
210:15, 210:20,
210:23, 212:14,
212:17, 218:6

**areas**
28:5, 67:12,
97:10, 97:20,
102:22, 103:21,
103:23, 129:7,
209:23, 210:4,
211:3, 211:6,
211:12, 212:9,
212:11, 216:11,
218:3, 225:9,
225:11
**aren't**
8:7, 38:23
**army**
13:4, 13:6,
13:13, 13:22
**around**
6:6, 14:1,
47:19, 51:20,
59:13, 62:16,
80:1, 87:15,
93:11, 96:22,
107:9, 128:12,
143:13, 148:10,
165:23, 169:1,
193:8, 195:4,
195:6, 196:14,
196:15
**arrest**
26:13, 26:14,
28:21, 227:14
**arrive**
226:16, 226:24
**asian**
143:9
**aside**
145:10, 162:23,
167:3
**asked**
23:12, 51:11,
55:24, 56:13,
127:2, 129:3,
134:16, 148:13,
149:3, 157:12,
160:2, 160:4,
164:24, 221:8,
222:6, 222:18
**asking**
6:16, 7:19,

Transcript of David A. Walker
Conducted on July 13, 2020

62

105:9, 114:15,
116:19, 123:8,
128:8, 137:12,
140:6, 142:13,
142:14, 142:17,
153:11, 213:20,
215:24, 229:12
**aspirations**
128:21
**assault**
13:19
**assess**
157:23
**assessment**
115:4, 115:6,
115:14, 117:5,
118:4
**assessments**
114:21, 117:3
**assign**
100:24, 101:17,
101:21, 102:13,
102:23
**assigned**
37:13, 64:12,
67:11, 72:19,
73:22, 74:8,
75:16, 76:21,
82:12, 97:8,
97:9, 97:14,
97:15, 97:17,
99:3, 102:21,
103:12, 103:21,
107:14, 107:17,
112:2, 129:7,
181:4, 181:6,
181:9, 188:16,
208:18, 209:5,
209:23, 210:2,
212:17, 218:2,
218:3, 218:4
**assigning**
73:21, 103:4,
103:8, 208:15,
214:21
**assignment**
19:4, 28:20,
30:17, 31:12,

31:13, 36:15,
36:16, 37:1,
37:8, 37:9,
43:11, 43:18,
43:20, 43:23,
44:7, 44:13,
44:16, 44:19,
47:9, 47:21,
48:3, 49:2,
49:9, 49:13,
50:2, 50:17,
50:24, 52:11,
52:18, 52:23,
53:6, 54:7,
54:11, 55:13,
59:8, 61:14,
64:3, 64:9,
64:23, 65:8,
66:24, 67:17,
67:19, 74:21,
75:2, 75:12,
77:12, 77:22,
83:18, 92:6,
93:17, 98:9,
99:15, 100:17,
179:20, 180:14,
195:13, 195:23,
208:13, 213:11,
213:14, 214:3,
214:19, 215:22
**assignments**
26:6, 26:15,
26:17, 29:7,
30:10, 30:15,
42:5, 42:8,
42:10, 47:4,
52:23, 64:24,
65:2, 66:11,
72:12, 73:13,
74:14, 74:20,
76:6, 92:8,
92:21, 97:10,
97:11, 99:22,
100:2, 104:21,
107:21, 176:13,
180:9, 180:10,
188:8, 188:10,
188:15, 197:9,

204:23, 205:1,
208:10, 208:11,
209:17, 213:21,
213:22, 214:10,
214:16, 215:12,
215:14, 216:1,
218:21, 219:1,
219:3, 219:23
**assistant**
18:7, 18:8
**associate's**
12:5, 12:9,
12:13
**assume**
7:21, 24:3,
78:6, 83:6,
115:8, 166:21,
209:18
**assumed**
14:19, 52:14,
200:5
**atmosphere**
207:14
**attached**
3:29
**attacking**
84:15
**attained**
77:1
**attendance**
214:2
**attended**
168:20
**attending**
4:2, 12:20
**attest**
108:8
**attorney**
4:23, 6:14,
9:9, 10:3, 10:7,
10:14, 10:16,
10:19, 125:5,
139:20, 232:13,
232:14
**attorneys**
5:18, 140:11
**audio**
112:9, 133:14

**audit**
123:24, 124:19,
126:22
**authority**
151:14
**automatically**
181:14
**available**
53:7, 67:9,
144:13, 144:15
**avoid**
40:22, 98:2,
199:23
**aware**
4:3, 21:13,
21:17, 88:12,
117:1, 120:11,
120:16, 131:8,
132:20, 133:8,
133:9, 138:3,
138:4, 145:17,
175:9, 175:12,
191:18, 201:9
**away**
4:5, 31:8,
53:12, 61:20,
62:5, 63:17,
63:20, 88:5,
128:23, 140:22,
177:18, 177:22,
185:8, 185:12,
227:2
**awful**
213:11

**B**

**back**
15:4, 16:18,
28:24, 29:11,
30:5, 30:7,
40:6, 40:21,
42:12, 43:6,
44:23, 45:1,
60:24, 62:10,
63:3, 63:10,
63:16, 66:5,
81:19, 82:11,
96:6, 96:19,

Transcript of David A. Walker
Conducted on July 13, 2020

63

100:13, 100:19,
109:5, 111:8,
114:7, 119:3,
120:17, 124:6,
124:12, 124:15,
125:2, 127:15,
130:15, 136:17,
137:14, 143:21,
143:23, 144:11,
144:12, 144:13,
146:16, 147:2,
150:19, 154:9,
163:12, 166:20,
177:24, 178:1,
193:10, 197:18,
199:17, 203:13,
203:18, 206:14,
207:7, 207:8,
217:21, 227:4,
227:14, 227:22,
228:2, 228:24

**background**
11:23

**backup**
4:4, 39:21,
39:22, 39:23,
40:3, 129:9,
225:17, 226:10,
226:16, 226:24,
227:11

**backward**
109:6

**bad**
34:7, 36:15,
126:9, 169:19,
198:22, 199:5,
204:19, 219:22

**band**
27:4, 191:9,
228:22

**band-aid**
43:2

**bankruptcies**
138:21, 139:5

**bankruptcy**
138:6, 138:9,
138:16, 138:17,
138:22, 139:14

**bar**
167:16

**bargaining**
52:24, 214:11,
224:23

**baroni**
2:12

**based**
32:16, 43:23,
47:4, 50:17,
51:1, 54:7,
54:12, 59:8,
61:15, 64:3,
64:9, 64:23,
65:8, 67:24,
72:19, 74:11,
76:21, 77:4,
77:10, 77:11,
92:20, 97:15,
97:17, 99:3,
99:23, 100:2,
102:13, 102:20,
102:22, 105:5,
118:5, 141:11,
141:12, 143:23,
156:8, 198:16,
199:21, 209:7,
214:20, 222:23,
223:10

**basement**
18:1, 19:8,
19:9, 19:14,
19:19, 26:18,
36:6, 97:10

**basic**
176:11

**basically**
9:17, 15:12,
24:14, 28:3,
28:20, 29:3,
29:9, 78:3,
79:1, 120:22,
125:11, 126:9,
128:24, 152:7,
153:16, 175:22,
188:16, 190:24,
191:15, 195:9,
211:22, 226:4

**basis**
12:21, 70:1,
73:2, 75:14,
76:2, 84:14,
174:20, 174:24,
180:19, 217:23

**bates**
158:18, 163:11

**beating**
156:3

**became**
20:13, 37:9,
69:5, 181:16,
189:12, 194:24,
196:11

**become**
20:12, 23:9,
141:21, 195:19,
219:13, 219:16,
219:19, 219:24,
229:14

**becoming**
16:16, 170:3,
220:4, 227:9

**been**
5:10, 6:9,
12:1, 15:21,
16:11, 17:12,
18:12, 18:13,
20:21, 21:18,
24:9, 24:18,
25:9, 26:23,
27:12, 29:6,
31:9, 34:10,
41:4, 41:6,
41:7, 41:21,
44:13, 47:19,
47:20, 53:21,
55:24, 58:8,
58:9, 61:22,
61:24, 71:12,
71:19, 74:15,
75:11, 75:24,
83:10, 84:10,
84:21, 85:6,
86:8, 98:14,
99:6, 107:9,
110:13, 112:2,

**basis**
118:8, 122:13,
122:19, 124:23,
125:10, 125:17,
125:22, 130:6,
130:9, 133:17,
134:11, 136:2,
137:12, 138:2,
139:2, 141:17,
142:14, 145:21,
146:2, 147:9,
154:3, 158:17,
163:9, 166:13,
172:14, 174:9,
174:13, 176:16,
178:7, 178:21,
179:10, 179:14,
181:23, 182:6,
182:24, 183:6,
192:5, 199:24,
202:10, 203:22,
204:16, 209:9,
211:5, 217:9,
218:2, 218:3,
220:19, 221:2,
221:4, 221:24,
227:23, 230:8

**before**
1:33, 4:11,
4:16, 6:3, 6:17,
6:18, 14:7,
34:9, 35:8,
36:19, 68:9,
76:7, 78:5,
88:1, 90:14,
93:11, 100:6,
100:9, 107:20,
122:4, 122:14,
126:14, 138:12,
138:22, 182:7,
193:5, 193:7,
199:18, 226:6

**beginning**
107:8, 179:9,
189:11, 200:1

**behalf**
2:9, 2:26

**behind**
144:16, 173:5

Transcript of David A. Walker
Conducted on July 13, 2020

64

**being**
16:6, 22:7,
22:8, 23:18,
41:13, 48:1,
51:13, 62:4,
62:17, 62:18,
63:3, 63:19,
67:1, 67:11,
68:14, 75:21,
76:17, 78:21,
82:18, 83:12,
84:5, 103:12,
115:7, 123:24,
128:17, 129:6,
135:6, 138:16,
145:4, 146:15,
152:2, 154:13,
155:12, 157:10,
160:14, 169:13,
172:21, 174:2,
174:20, 174:24,
176:14, 180:23,
185:16, 189:18,
190:10, 192:4,
201:9, 206:1,
208:5, 209:13,
209:23, 213:11,
213:23, 214:10,
216:13, 217:10,
220:24
**belief**
61:13, 64:2,
64:8, 65:7,
75:15, 77:7,
77:10
**believe**
20:15, 34:7,
34:23, 35:8,
35:17, 39:6,
43:24, 53:15,
57:2, 60:10,
61:4, 64:18,
72:2, 72:18,
78:16, 78:17,
78:22, 80:11,
91:6, 93:18,
93:21, 115:12,
117:11, 117:21,

118:10, 125:14,
135:8, 140:24,
142:4, 157:19,
174:18, 174:23,
175:6, 191:1,
193:9, 201:16,
204:7, 214:21,
215:9, 215:10,
216:23, 217:18,
221:17, 222:9,
223:16, 223:21,
224:4, 224:9
**bell**
131:13, 177:4,
194:3, 194:8
**below**
72:5, 159:20,
164:20
**bench**
69:10
**benefits**
140:10
**besides**
29:1, 81:9
**best**
6:24, 92:4,
92:5, 144:18,
173:18, 185:4,
213:3, 214:2,
222:10, 223:8
**better**
14:18, 14:20,
31:13, 44:13,
53:4, 78:14,
92:10, 161:13,
170:2, 207:15
**between**
13:21, 47:10,
48:18, 48:23,
50:10, 50:15,
54:16, 59:6,
81:22, 91:15,
102:2, 118:21,
157:9, 230:2
**beverly**
60:8
**bid**
42:5, 42:7,

42:9, 43:10,
43:11, 74:21,
75:2, 75:12,
75:18, 214:10,
229:16
**bienik**
45:15, 46:2,
46:5, 47:1,
105:23, 106:3
**big**
194:14, 197:15
**bigger**
158:13
**biggest**
199:6
**binding**
4:20
**bit**
11:22, 21:5,
30:6, 30:7,
36:4, 36:5,
89:20, 113:3,
138:12, 158:13,
161:6, 166:17,
197:18, 198:6,
206:8, 206:14,
211:6, 225:9
**black**
44:22, 45:2,
45:4, 45:7,
45:9, 45:12,
45:24, 47:13,
50:13, 56:14,
57:12, 57:16,
57:22, 59:11,
67:8, 75:21,
97:19, 98:3,
98:9, 98:23,
98:24, 104:8,
104:12, 115:8,
124:20, 135:1,
143:9, 143:11,
153:2, 153:6,
165:17, 175:3,
175:4, 181:7,
199:4, 199:5,
201:15, 201:20,
202:15, 204:2,

204:6, 206:2,
213:23, 220:11,
221:2, 223:17,
223:21, 224:4,
224:10
**blacks**
204:8, 220:19
**blatant**
61:17
**board**
34:15, 34:19,
68:9
**boat**
204:15
**bode**
144:24
**bodies**
66:20
**body**
40:13
**boles**
60:9
**books**
221:23
**borrow**
203:10
**borrowed**
203:3, 203:17,
203:19, 203:23
**borrowing**
203:4
**boss**
124:14, 204:19
**both**
22:9, 48:22,
112:2, 139:13,
153:5, 153:6,
206:7, 206:10
**bottom**
65:4, 80:23,
128:6, 140:3,
153:9, 158:18,
163:10
**box**
60:9
**boy**
202:9, 202:12
**brady**
170:2

Transcript of David A. Walker
Conducted on July 13, 2020                                    65

**brand-new**
44:10
**brass**
205:12
**break**
7:14, 32:12,
32:16, 40:19,
60:12, 65:10,
65:12, 78:8,
78:19, 110:13,
110:15, 110:18,
112:6, 112:11,
112:18, 129:15,
156:18, 180:19,
211:20
**breakdown**
56:19, 56:20,
57:9, 64:19
**breakout**
31:24, 111:14,
111:20, 111:23,
112:5
**breaks**
110:13
**briefly**
111:12
**bring**
27:24, 28:24,
71:10, 135:16,
178:1
**bringing**
35:16, 75:22
**broke**
78:11
**brook**
2:22
**brought**
69:23, 135:13,
135:23, 183:2
**brown**
2:31, 4:1,
32:1, 65:20,
66:1, 66:7,
71:12, 71:16,
111:5, 111:13,
111:17, 111:21,
111:24, 112:7,
112:13, 112:24,

133:16, 135:19,
150:20, 158:2,
158:8, 163:4,
197:16, 197:20,
197:22, 206:18,
220:14
**bucks**
203:14
**building**
20:4, 55:4,
87:24, 94:2,
94:16, 168:19
**built**
146:14
**bullpen**
228:6, 228:8,
228:9, 228:21
**bunch**
147:17
**burn**
79:11
**busy**
216:16
**button**
136:12, 136:14

**C**

**cabinet**
193:20
**caccavallo**
106:1, 106:9,
106:10
**cadet**
15:2
**calculate**
146:5
**call**
16:10, 19:2,
30:5, 39:16,
40:5, 40:10,
52:3, 52:4,
52:10, 78:8,
88:2, 91:5,
91:8, 91:13,
91:23, 92:20,
93:7, 94:13,
96:12, 104:6,
159:22, 160:7,

160:9, 168:10,
168:17, 168:20,
168:22, 179:23,
182:3, 183:8,
183:11, 183:14,
183:16, 187:19,
187:22, 204:6,
228:11
**called**
5:10, 18:1,
18:24, 19:3,
20:10, 23:23,
28:19, 39:3,
76:3, 90:8,
96:10, 123:23,
210:3
**calls**
10:21, 28:7,
28:14, 79:6,
92:22, 103:24,
104:17, 168:15,
168:21, 197:14,
220:2
**calm**
93:14
**came**
14:11, 18:9,
24:17, 24:20,
24:23, 31:11,
40:21, 44:21,
45:4, 78:10,
102:5, 124:12,
130:3, 146:16,
148:3, 168:7,
170:16, 174:7,
175:23, 177:9,
179:2, 180:12,
181:9, 184:13,
185:14, 187:23,
188:3, 190:18,
192:15, 192:19,
192:24, 193:10,
193:12, 196:17,
205:6, 205:9,
205:14, 226:5,
229:24
**camera**
40:13, 65:22,

197:17, 206:16
**campus**
34:6
**can't**
7:5, 8:4, 8:6,
34:11, 39:18,
48:17, 53:22,
57:18, 58:10,
77:23, 81:12,
90:13, 90:23,
98:2, 104:24,
126:7, 126:11,
126:20, 126:22,
130:1, 133:21,
133:23, 136:13,
140:23, 141:4,
147:6, 154:8,
174:3, 177:1,
189:14, 191:23,
204:6, 225:7,
226:3
**cannot**
227:18
**capable**
84:15
**capacity**
1:18, 1:20,
1:23, 1:25, 1:28
**capital**
5:22, 5:23
**captains**
55:3
**car**
39:8, 40:5,
146:11, 177:24
**cards**
39:2
**care**
199:16
**career**
9:18, 13:1,
16:13, 17:24,
19:18, 25:9,
29:8, 30:24,
31:12, 95:20,
156:2, 205:17,
221:20
**case**
5:4, 30:22,

Transcript of David A. Walker
Conducted on July 13, 2020

66

35:10, 37:16,
66:24, 130:24,
131:1, 131:2,
143:15, 149:10,
149:18, 149:20,
149:23, 150:6,
155:19, 167:5
**casual**
94:15, 95:7,
96:14, 127:24
**casually**
175:22
**cause**
73:9
**causes**
129:10
**cecil**
1:8, 186:20
**cell**
149:12, 149:13
**cells**
37:5
**center**
14:5
**central**
19:20
**cermak**
42:3, 42:14,
42:23
**certain**
24:19, 28:2,
68:1, 69:10,
77:8, 77:21,
92:8, 103:14,
103:21, 160:16,
176:12, 186:1,
189:2, 199:9,
204:21, 207:12,
207:13, 225:9,
225:11, 229:1
**certainly**
18:22, 190:12,
226:21
**certificate**
232:1
**certified**
12:20, 20:13,
20:14, 20:21,

20:24, 25:22
**certify**
26:3, 232:3,
232:10, 232:12
**chain**
130:5, 161:14,
216:4, 224:20
**chair**
60:14, 60:18,
61:7, 61:8,
62:6, 201:1
**challenge**
33:24, 110:8,
110:9
**challenged**
68:14
**challenging**
108:22
**chance**
72:9, 220:3
**chances**
36:23, 219:23
**chaney**
125:6
**change**
25:21, 32:15,
54:24, 63:14,
82:8, 82:10,
84:12, 101:4,
101:5, 101:7,
118:23, 119:1,
162:8, 162:11,
195:14, 200:6,
200:7, 228:15
**changed**
19:18, 27:12,
29:10, 54:23,
62:19, 119:2,
121:9, 195:16
**changes**
25:22
**characterize**
66:22, 202:18
**charge**
35:15, 155:19,
155:22
**charged**
177:19

**charges**
186:11
**charles**
86:1
**chat**
32:4
**check**
28:1, 28:12,
65:12, 211:21
**cheryl**
60:10
**chicago**
1:37, 2:5,
2:15, 11:24,
14:5, 132:4,
132:8
**chief**
16:23, 17:13,
17:16, 17:17,
47:7, 48:11,
49:20, 50:4,
51:21, 52:8,
52:9, 58:10,
61:2, 86:17,
96:20, 100:7,
118:19, 121:16,
121:17, 121:21,
122:15, 128:22,
130:6, 130:10,
134:3, 134:7,
135:8, 141:12,
141:17, 141:22,
141:24, 142:3,
142:9, 142:12,
142:15, 143:4,
145:5, 145:8,
146:1, 146:7,
150:14, 160:1,
160:2, 160:3,
160:6, 160:13,
161:11, 161:13,
161:18, 161:19,
161:20, 164:24,
165:3, 165:5,
165:13, 165:15,
165:18, 165:23,
166:6, 169:9,
170:7, 170:13,

199:24, 202:8,
202:23, 205:9,
207:7, 208:5,
208:6, 208:16,
219:16, 219:19
**chiefs**
121:15, 144:12,
207:19
**child**
152:12, 166:3,
202:12
**children**
166:1, 198:6
**childs**
198:6
**choice**
30:16, 31:14,
98:22, 191:4,
204:5, 208:21,
209:14, 214:18
**cholewah**
85:18, 85:22,
86:4, 86:5,
86:23, 87:5
**choosing**
14:17
**chosen**
144:9, 144:12
**christopher**
1:26, 143:5,
143:14, 144:6
**cindy**
6:11, 65:16,
111:3
**circumstances**
7:1
**city**
20:4, 212:13
**civil**
1:34, 137:12
**claim**
43:21, 99:3,
114:16, 140:17,
151:4, 226:18
**claiming**
150:12
**claims**
41:9

Transcript of David A. Walker
Conducted on July 13, 2020                                      67

clarification
213:8
clarify
157:7, 213:10,
219:7, 226:13
clarity's
26:7
class
13:20, 14:6
classes
12:20, 147:22
clean
38:15
cleaned
38:17, 38:18
clear
25:1, 45:23,
83:19, 87:17,
95:16, 128:11,
199:19, 219:7
clearer
171:3
client
31:23
close
180:23
closed
144:16
closer
212:17, 212:19
co-counsel
199:16
co-plaintiff
222:7
co-worker
167:7, 167:8
co-workers
126:10, 172:3,
172:4, 194:16,
196:24
colleague
105:14, 105:19,
105:21
colleagues
105:22
collective
52:24, 214:11,
224:23

college
12:13, 12:14
color
64:17, 146:22
com
2:7, 2:17,
2:24, 148:23
come
8:23, 16:18,
17:18, 20:3,
26:21, 29:19,
33:22, 38:12,
46:18, 46:21,
47:22, 56:16,
81:19, 82:11,
91:11, 101:6,
102:7, 103:7,
103:11, 111:8,
124:6, 136:17,
141:9, 152:13,
154:8, 168:22,
184:20, 191:6,
195:13, 197:11
comes
62:23, 113:2
comfortable
22:14, 22:16,
94:23, 173:22
coming
24:24, 37:5,
38:15, 44:13,
154:7, 154:15,
181:1, 189:21,
195:18, 196:1,
196:16, 205:10
command
130:5, 161:15,
216:4, 224:20
commencing
1:37
comment
48:21, 50:12,
161:9, 165:5,
165:13, 165:21,
169:9, 200:17
comments
90:10, 90:20,
199:20

commission
155:20
common
24:21, 40:14,
64:6, 77:24,
97:23, 213:15
communications
149:2, 149:9
comp
41:9, 41:12,
41:18
comparable
141:1, 223:2
compare
107:1, 115:10
compared
31:4, 117:4,
117:5
comparing
104:16
compensation
140:9
compensatory
62:21, 62:23,
63:12, 128:17,
140:12
complain
30:18, 44:7,
179:15, 180:10,
180:13, 184:6,
185:22, 186:4,
186:9, 188:7,
188:14, 189:20,
195:22, 196:5,
197:24
complained
186:5, 188:9,
188:10
complaining
188:17, 196:3,
215:14, 215:16,
215:17, 215:20,
216:2, 216:3,
216:8
complaint
3:15, 23:3,
24:9, 48:16,
50:1, 67:10,

71:21, 71:23,
79:21, 96:7,
155:12, 155:16,
159:14, 159:16,
221:9, 221:13
complaints
48:1, 49:16,
49:19, 49:23,
50:14, 59:2,
123:9, 153:19,
154:12, 156:8,
156:10, 186:16,
197:8
complete
8:5, 68:17,
69:4, 119:20,
119:22
completed
69:4, 69:16
complimentary
4:11
compute
141:9
computer
4:6, 21:23,
22:1
computerized
232:7
comradery
129:5
concern
144:19, 202:14
concerning
114:23
conference
8:12, 159:10
conferences
10:22
confirm
108:2, 139:13,
148:22
confused
42:21, 99:2,
103:20, 125:15,
125:17
confusion
38:24
congratulations
230:8

Transcript of David A. Walker
Conducted on July 13, 2020
68

connect
4:9
connecting
4:10
consent
27:22
consider
36:14, 36:16,
36:24, 61:19,
84:9, 198:13,
201:11
considered
29:12, 37:7,
138:17, 161:9,
201:14, 202:4,
213:13, 223:7
consistent
161:15, 161:19,
213:22
consistently
218:4
consolo
159:7
constantly
228:13
constitutes
232:8
consult
34:12
contact
35:7, 130:12
contacted
20:20, 123:22,
126:21
content
135:3
contention
64:22, 85:7
context
129:6, 135:9,
135:12
continues
116:5, 116:9,
116:20, 148:14
continuing
195:14
contract
33:4, 35:13,

52:18, 53:22,
75:1, 214:15
contradictory
131:12
control
36:22, 216:1
controllable
203:6
conversation
51:22, 52:2,
60:13, 91:11,
91:21, 94:15,
94:22, 95:7,
96:14, 105:14,
118:20, 128:1,
166:7, 171:6,
187:17
conversations
4:7, 107:7,
177:13
cook
1:16, 1:29,
3:20, 3:26,
13:14, 13:22,
21:7, 21:14,
28:5, 39:23,
67:17, 136:5,
137:15, 209:4,
210:1, 211:16
cookout
167:17
corner
39:23, 43:2,
43:4
correct
13:5, 14:14,
15:16, 19:6,
19:17, 21:9,
21:20, 23:21,
23:22, 25:15,
33:5, 34:3,
35:21, 35:23,
38:6, 38:20,
41:22, 42:15,
46:4, 48:24,
49:12, 60:16,
62:8, 66:23,
70:7, 73:18,

74:4, 77:3,
82:2, 86:6,
89:2, 89:18,
89:24, 95:5,
95:18, 95:21,
95:24, 96:6,
96:15, 99:8,
106:5, 109:11,
114:6, 114:18,
115:18, 117:23,
120:2, 123:4,
123:13, 127:17,
127:20, 128:2,
128:14, 128:18,
129:22, 131:5,
139:1, 141:19,
143:3, 143:5,
143:20, 145:2,
148:24, 150:4,
157:11, 159:7,
161:5, 161:23,
164:18, 164:19,
165:18, 165:19,
166:7, 173:21,
174:17, 178:3,
195:3, 196:9,
197:1, 200:18,
205:16, 210:24,
211:1, 213:15,
217:7, 218:18,
219:4, 221:2,
221:3, 222:1,
222:2, 222:11,
225:12, 227:13,
229:5, 229:24
correctional
13:16, 21:1,
143:21
correctly
82:22
could
5:19, 9:14,
22:16, 24:24,
31:14, 33:1,
35:18, 39:14,
44:7, 44:9,
44:15, 53:21,
56:15, 57:2,

57:4, 60:1,
60:5, 69:20,
69:21, 71:20,
72:3, 75:12,
87:12, 91:9,
92:13, 92:20,
95:12, 96:24,
98:22, 104:15,
108:8, 109:3,
110:4, 110:23,
112:23, 113:14,
113:19, 114:8,
119:5, 122:8,
122:12, 122:14,
122:15, 123:17,
124:10, 136:8,
136:10, 150:22,
152:18, 153:3,
155:6, 162:2,
162:4, 163:12,
171:15, 173:19,
182:3, 184:13,
185:16, 197:16,
198:23, 201:7,
202:4, 202:17,
204:20, 206:2,
207:19, 207:20,
208:12, 210:2,
213:3, 220:14,
227:2
couldn't
21:2, 56:16,
75:18, 78:7,
103:15, 115:11,
119:9, 165:16,
166:12, 192:5,
207:8
counsel
4:17, 34:8,
34:13, 158:2,
206:18, 213:20,
220:14, 221:8,
222:6, 222:18,
229:12, 232:13,
232:15
counseling
33:21
counselor's
32:23

Transcript of David A. Walker
Conducted on July 13, 2020

69

count
188:5
counterparts
105:9
counts
137:16
county
1:16, 1:29,
3:20, 3:26,
13:14, 13:22,
20:3, 20:4,
20:9, 20:20,
21:7, 21:14,
28:5, 28:16,
39:24, 67:17,
130:23, 136:5,
137:15, 155:6,
209:4, 210:1,
211:16, 219:1,
225:11
couple
6:10, 8:12,
10:19, 15:3,
16:22, 26:5,
47:1, 48:5,
110:12, 110:13,
123:16, 129:19,
156:20, 157:3,
175:23, 179:9,
192:24, 199:17,
212:5, 213:8,
221:7, 224:17
course
12:14, 12:17,
17:17, 21:6,
23:14, 27:24,
28:9, 95:19,
124:7
court
1:1, 4:16, 5:6,
5:13, 6:11, 7:5,
23:1, 25:24,
27:14, 28:8,
28:15, 32:6,
33:8, 34:16,
45:13, 65:17,
75:5, 75:10,
85:19, 94:2,

95:14, 104:2,
111:6, 130:7,
131:4, 131:10,
136:18, 137:23,
186:8, 192:17,
209:11, 217:16,
223:5, 230:23,
231:1, 231:6,
232:1
courts
1:35
cover
61:18, 211:15
covered
52:23, 53:21,
151:6
covid
37:4, 37:7
craft
225:2
create
152:3
crime
212:14, 218:6
crooks
90:9, 90:19
cross
213:6
cross-examination
3:8
csr
1:33, 2:37,
2:38, 232:3,
232:24
current
4:18, 125:13
currently
16:3, 16:5,
16:19, 16:21,
36:14, 38:19,
99:20, 105:24
custody
178:1
cut
43:2, 43:4
cv
1:14
cynthia
1:33, 2:37,

232:3, 232:24

**D**

d-a-v-i-d
5:22
d-e-r-m-i-l-l
35:1
daffada
2:12
daily
73:1, 84:14,
180:18, 217:23
damages
140:7, 140:12,
146:5, 146:9,
150:12
dangerous
44:19, 102:21,
216:18
dart
1:17
dart's
3:21, 136:5
date
77:23, 90:13,
205:23, 226:3
dated
3:25, 3:27,
114:5, 137:7,
159:5
dates
48:17
david
1:9, 1:32, 3:5,
3:16, 3:19,
3:24, 5:9, 5:21,
5:22, 55:5,
72:6, 112:5,
113:10, 125:14,
125:23, 136:4,
158:23, 159:2,
159:15, 159:24,
163:21, 164:2,
215:2, 216:22,
222:16
davis
60:8
dawalkerdw@gmail
148:23

day
1:38, 18:3,
30:19, 31:1,
31:11, 31:18,
44:4, 47:22,
64:11, 73:5,
73:9, 78:22,
80:7, 80:18,
85:1, 86:15,
86:18, 88:5,
89:12, 121:20,
122:6, 124:6,
124:17, 132:2,
149:4, 165:2,
173:18, 177:7,
177:8, 179:7,
180:1, 183:5,
183:16, 184:1,
184:2, 184:3,
184:5, 187:24,
193:7, 193:15,
194:23, 195:5,
195:15, 197:14,
197:15, 208:16,
215:4, 215:21,
218:9, 232:18
day-to-day
156:12
days
16:7, 32:24,
33:1, 33:15,
33:22, 46:7,
46:9, 46:10,
46:11, 51:18,
62:23, 80:4,
80:9, 82:5,
94:10, 105:15,
105:18, 106:24,
108:4, 114:20,
125:2, 125:9,
183:15, 187:24,
188:1, 188:3
daytime
27:14
dead
156:3
deaf
202:9, 202:11

Transcript of David A. Walker
Conducted on July 13, 2020                              70

deal
28:8, 28:14,
33:21, 40:14,
147:24, 197:13,
217:22
dealing
29:18, 78:21,
83:9, 83:15,
84:13, 126:14,
184:16, 196:5,
197:14
debate
215:11
decent
152:16
decide
125:1, 144:16
decided
20:3, 31:17
decision
50:7, 63:19,
67:1, 99:12,
99:14, 100:1,
100:12, 100:24,
101:9, 101:17,
101:21, 102:13,
102:23, 123:19,
126:17, 127:18,
131:1, 131:7,
141:20, 142:2,
144:2, 144:5,
189:5, 227:5
decisions
33:16, 43:23,
47:4, 50:17,
51:1, 54:7,
54:12, 59:8,
61:15, 64:3,
64:9, 64:23,
65:8, 100:17,
102:20
defendant
3:17, 3:20,
113:11, 127:4,
127:24, 130:18,
136:5, 138:4
defendants
1:30, 2:27,

5:18, 143:15,
147:5, 151:1
defense
133:2
definitely
18:15, 31:12,
97:19, 180:13,
193:24, 202:19,
207:4, 220:17,
224:3, 224:7
degree
12:5, 12:9
degrees
201:13
delivery
27:17, 27:18
demonstrate
50:23
demonstrates
118:2
demoted
128:12
demotion
128:11
denied
208:6
deny
201:20
denying
83:20, 121:5
dep
139:13
department
14:8, 14:10,
14:13, 24:6,
24:19, 61:22,
62:1, 115:1,
132:4, 134:1,
134:13, 137:15,
157:10, 177:19
departments
29:11
depending
110:21
depends
22:23, 27:14,
34:7
deponent
231:10

depos
2:31
deposition
1:32, 3:14,
4:12, 4:20, 6:1,
6:3, 9:10, 9:15,
10:12, 10:24,
11:1, 11:5,
11:9, 232:6,
232:8, 232:11
depositions
1:36
depth
173:1, 173:2,
173:4, 173:14,
174:12, 177:16,
182:13
deputy
16:23, 17:17,
61:2, 86:16,
100:7, 115:13,
121:15, 121:16,
121:17, 121:21,
128:22, 130:5,
130:10, 134:3,
134:7, 135:8,
141:12, 141:17,
141:21, 141:24,
142:3, 142:8,
142:12, 142:15,
143:4, 144:12,
145:5, 145:8,
146:1, 146:7,
150:13, 202:8,
207:7, 207:19,
208:5, 208:6,
219:16
derogatory
90:9, 90:20
described
25:14
desirable
36:15
detainee
43:6, 134:6,
177:23, 178:2,
217:11, 226:14
detainees
26:21, 29:23,

72:24, 82:15,
82:20, 84:14,
196:5, 218:20,
218:21, 228:1
determination
33:12, 108:19
determine
116:12, 116:21
developed
68:5, 68:7,
72:23, 121:11
devry
12:6
dictated
218:23
difference
47:10, 47:14,
47:15, 47:16,
141:13, 197:15,
230:2
different
12:16, 12:20,
13:13, 18:14,
24:15, 28:5,
28:18, 29:4,
29:10, 30:15,
37:5, 39:4,
48:3, 49:2,
65:11, 68:1,
69:9, 73:12,
73:19, 77:22,
83:17, 83:18,
84:12, 89:5,
89:8, 93:2,
103:24, 104:17,
121:23, 131:23,
147:18, 158:7,
166:17, 167:22,
176:2, 184:22,
188:20, 191:3,
192:13, 199:14,
201:13, 209:4,
209:22, 209:23,
209:24, 210:1,
219:22, 225:6,
229:13
differently
223:17

Transcript of David A. Walker
Conducted on July 13, 2020

71

**difficulty**
36:13
**dinged**
69:14
**direct**
3:7, 5:14,
105:2, 134:10,
175:16, 201:6,
216:3
**directing**
91:24
**direction**
232:7
**directly**
14:9, 48:10,
49:17, 54:20,
90:18, 90:21,
93:15, 101:14,
102:15, 115:22,
118:15, 130:4,
151:21, 175:12,
232:15
**director**
15:6, 15:7,
17:19, 25:1,
33:19, 35:11,
47:6, 54:14,
55:1, 55:10,
68:10, 80:10,
96:8, 97:7,
97:14, 100:5,
101:2, 108:10,
110:1, 115:12,
115:13, 122:15,
126:24, 130:4,
130:11, 134:3,
142:5, 142:7,
145:22, 151:24,
169:22, 170:2,
209:19, 211:5,
216:4, 216:8,
220:24
**directors**
17:18, 18:7,
18:9, 18:14,
34:13, 55:3,
142:6
**discharge**
13:21, 85:3,

85:13, 86:7,
87:14, 87:16,
109:13, 109:20,
109:21
**discharged**
13:7, 85:2,
85:16, 86:9,
86:23, 87:1,
109:14, 139:2,
139:9, 139:15
**discharging**
85:8, 87:11,
87:17, 108:5,
115:2
**disciplinary**
9:23, 11:15,
32:24, 108:19,
114:20, 132:24,
133:1
**discipline**
10:2, 32:19,
32:20, 33:13,
33:15, 33:18,
34:1, 35:14,
73:15, 79:17,
79:23, 80:3,
81:8, 82:24,
84:5, 84:19,
84:22, 85:8,
85:17, 86:24,
87:10, 88:10,
89:1, 89:3,
89:8, 89:9,
89:13, 94:9,
108:1, 108:3,
108:11, 108:15,
108:17, 108:23,
108:24, 109:2,
109:3, 109:23,
110:2, 114:16,
114:23, 115:3,
115:19, 115:21,
115:23, 116:1,
116:13, 116:21,
123:9, 125:19,
185:23, 186:4,
186:10, 198:1,
201:10, 204:11,

207:18, 207:19,
207:21, 207:22,
207:23, 217:6
**disciplined**
81:5, 87:2
**discourse**
206:11, 217:11
**discriminate**
185:24
**discriminated**
155:13, 173:12,
174:19, 174:23
**discriminates**
175:6, 175:15
**discrimination**
21:11, 21:12,
21:15, 22:2,
22:5, 23:8,
24:12, 155:19,
155:22, 156:8,
172:17, 176:10,
177:14, 200:22,
221:10
**discriminatory**
114:17, 174:1
**discussed**
10:24, 11:2,
72:17, 72:18,
153:13, 200:21
**discussions**
4:5, 168:2
**dislike**
135:4
**disliked**
207:10
**dismissed**
131:3, 131:4,
137:23
**dispatch**
219:1
**disproportionate**
104:13, 108:1
**disproportionate-**
**ly**
104:8
**disprove**
186:12
**disputes**
199:3

**distorted**
107:19
**distress**
140:14, 147:12,
147:13, 147:14,
181:14
**district**
1:1, 1:2, 1:35,
97:21
**disturbed**
11:12
**divide**
38:22
**division**
1:3, 15:1,
15:2, 15:4,
15:8, 15:10,
19:18, 26:19,
125:21, 125:22,
168:20, 226:8,
227:15, 227:20,
227:22
**divorced**
146:15
**do's**
27:7
**docked**
124:7, 128:19
**docket**
125:6
**document**
72:2, 80:20,
113:2, 113:15,
123:7, 129:16,
136:3, 136:9,
158:14, 158:19,
158:21
**documents**
11:16, 149:3
**doing**
6:14, 7:3,
22:15, 29:9,
44:9, 65:16,
67:5, 70:9,
70:10, 87:20,
116:12, 157:20,
161:22, 174:9,
180:7, 184:16,

Transcript of David A. Walker
Conducted on July 13, 2020

72

198:23, 228:19
**dollar**
140:23
**don'ts**
27:7
**done**
24:8, 27:16,
31:3, 33:19,
34:6, 44:20,
51:13, 58:9,
74:15, 75:20,
75:21, 76:14,
76:15, 92:22,
115:5, 123:21,
131:22, 151:24,
152:1, 152:12,
152:19, 167:18,
174:2, 190:19,
200:5, 201:9,
208:9, 220:8,
225:23
**doors**
144:16
**double**
211:20
**doubt**
30:11, 30:13,
41:3, 67:14,
161:24, 214:1
**downstairs**
188:19, 189:17
**downtown**
14:2, 20:3
**drama**
199:23
**dressing**
154:22
**drop**
199:16
**drove**
146:10
**drug**
203:2
**due**
124:2, 125:9,
156:4
**duly**
5:10, 232:4

**during**
87:21, 96:12,
146:20, 183:9,
192:10
**duties**
97:15, 97:17
**duty**
41:12, 41:19,
41:20, 41:21,
42:22, 145:11,
146:11, 146:12,
146:18, 146:21,
159:24, 165:1,
226:17

E

**e**
86:2
**e-mail**
124:4, 124:17,
148:22, 149:1,
149:4, 149:10
**e-mailed**
149:5, 149:8
**e-mails**
126:1, 149:6,
149:22
**e-tran**
231:7
**each**
4:10, 6:16,
18:19, 40:19,
107:2, 149:8,
176:3, 178:7,
182:6, 183:20,
188:22, 198:2,
206:11
**ear**
200:4
**earlier**
21:5, 74:20,
121:22, 161:16,
164:9, 166:2,
207:18
**early**
20:3, 29:12,
40:8, 42:17,
42:18, 42:20,

110:21, 147:2,
154:4, 183:3,
211:8, 211:9
**earn**
78:1, 78:4
**earned**
75:19
**easier**
39:21, 40:3,
186:14, 188:22,
201:20
**eastern**
1:3
**education**
12:4, 12:12,
144:14
**edward**
86:2
**effect**
169:11, 169:24
**effective**
190:3
**effectively**
83:3, 171:15,
184:24
**effort**
190:9
**eight**
18:6, 18:14,
59:18, 59:20,
152:21, 166:22
**either**
24:5, 27:11,
35:18, 35:23,
41:9, 49:16,
57:16, 61:11,
108:22, 144:8,
161:11, 188:1,
207:16, 217:5,
230:22
**ejected**
87:20
**elaborate**
50:19
**elaborating**
36:19
**electronic**
12:5, 15:20,

15:21, 15:24,
16:4, 19:5,
26:6, 26:8,
26:16, 27:8,
32:21, 33:17,
42:5, 43:22,
75:11, 96:9,
126:8, 160:14,
229:9
**eligible**
29:7, 30:9,
145:22
**else**
9:7, 9:9, 9:12,
10:11, 11:19,
22:20, 24:9,
24:13, 29:1,
45:20, 46:20,
55:24, 56:3,
56:5, 60:7,
61:13, 62:19,
63:13, 65:6,
69:21, 77:13,
81:2, 81:18,
92:17, 94:14,
96:23, 96:24,
106:12, 118:6,
120:6, 120:8,
121:1, 128:3,
129:13, 147:6,
174:19, 186:9,
188:12, 200:3,
201:4, 211:21
**em**
17:12, 24:18,
26:8, 28:18,
56:19, 56:20,
57:10, 57:16,
57:22, 68:6,
68:19, 69:20,
70:4, 70:20,
75:13, 97:15,
104:10, 122:2,
122:9, 122:13,
122:14, 122:22,
123:3, 128:13,
143:22, 152:23,
171:22, 175:7,

Transcript of David A. Walker
Conducted on July 13, 2020                                          73

178:7, 180:14,
182:24, 185:15,
185:17, 190:15,
190:16, 208:7,
213:12, 218:12,
219:8, 219:11,
219:14, 220:10,
221:2, 229:3,
229:14
**emergency**
4:18, 146:10
**emery**
2:19
**emma**
60:9
**emotional**
140:13, 147:11,
147:13, 147:14
**employed**
28:12
**employee**
58:2, 58:3,
126:10, 159:14,
232:13, 232:14
**employees**
61:24, 107:13,
107:17, 107:21,
152:23
**employment**
128:8, 155:20
**emu**
26:8
**enabled**
4:8
**enclosed**
37:2, 38:8,
38:11
**encounter**
59:9, 61:12
**end**
13:1, 16:16,
19:22, 41:13,
91:5, 146:13,
148:1, 156:2,
158:5, 185:10,
193:11, 227:6,
228:4
**ended**
13:2, 99:4,

99:5, 132:3,
132:8, 181:2,
181:4, 181:9
**enforcement**
129:6
**enforcing**
20:18
**engaged**
153:11, 153:12,
153:18, 155:1
**englewood**
97:21
**english**
15:7
**enormous**
129:10
**enough**
111:1, 119:21,
196:5
**entails**
104:6
**entered**
19:13
**environment**
84:6, 129:4,
129:12, 151:2,
151:4, 152:4
**equal**
155:19
**equipment**
27:5, 27:20
**erica**
124:10
**escalate**
51:6, 227:9
**escaped**
28:20, 177:23
**especially**
37:3, 93:7,
199:9
**essence**
109:4
**essentially**
7:8, 49:2,
70:5, 88:24,
108:21, 211:17
**establish**
27:3

**established**
224:22
**estimate**
168:4
**ethan**
2:20, 5:5,
32:4, 111:12,
111:19
**evaluating**
225:2
**evaluation**
115:20, 121:14
**evaluations**
115:17
**even**
24:17, 44:4,
61:21, 68:24,
69:1, 79:2,
80:10, 81:1,
124:16, 125:15,
126:8, 126:22,
128:24, 144:15,
145:12, 145:19,
153:2, 166:2,
173:16, 176:15,
178:6, 198:24
**evening**
16:15
**event**
94:21
**events**
9:17, 176:13
**eventually**
51:6, 78:9,
79:11, 98:21,
146:13, 194:24,
196:17
**ever**
6:1, 15:22,
40:15, 41:4,
41:23, 46:6,
53:10, 58:22,
61:23, 90:24,
95:9, 96:1,
103:3, 103:7,
108:12, 108:13,
122:21, 123:1,
123:3, 134:11,

134:19, 137:12,
138:5, 141:21,
149:5, 149:17,
149:20, 149:22,
150:9, 154:4,
154:12, 156:9,
169:13, 170:19,
171:6, 172:16,
176:9, 177:13,
179:8, 179:15,
180:10, 182:11,
182:18, 183:21,
184:6, 185:22,
187:2, 187:10,
187:18, 188:4,
188:7, 191:5,
191:18, 191:21,
192:3, 192:4,
192:8, 192:10,
194:18, 195:22,
196:2, 197:24,
201:22, 202:1,
203:10, 205:9,
205:18, 208:15,
208:18, 215:6,
215:7, 222:12,
223:8, 225:17,
226:9, 226:13,
226:15, 226:23
**every**
18:3, 18:19,
25:8, 44:4,
47:21, 64:11,
73:9, 78:22,
80:18, 105:15,
105:18, 106:24,
149:4, 174:7,
184:1, 184:2,
184:3, 184:5,
187:24, 193:7,
193:15, 194:23,
195:5, 195:13,
197:15, 213:15,
215:4, 215:21,
227:21
**everybody**
20:11, 68:11,
113:7, 133:15,

135:4, 168:22,
171:5, 176:14,
185:14, 185:15,
198:5, 198:22,
207:12, 218:16,
223:10, 224:13
**everyday**
55:2
**everyone**
4:1, 161:19
**everything**
6:12, 6:13,
68:17, 74:2,
119:21, 126:9,
190:19, 201:9,
225:22
**evidence**
44:1, 44:3,
47:2, 47:23,
50:16, 50:18,
50:22, 54:5,
54:10, 59:6,
64:1, 64:7,
64:21, 97:16,
109:8, 118:1,
144:8, 144:10,
151:3, 213:21
**evidently**
53:4, 132:13,
200:9
**evolution**
190:22
**evolved**
24:19
**ewhite@emerylawl-
td**
2:24
**exact**
6:5, 77:23,
78:7, 140:23,
154:6, 215:10,
216:7
**exactly**
18:11, 18:16,
54:22, 87:23,
92:3, 130:16,
133:23, 155:10,
194:7, 211:18,

228:7
**exam**
68:22, 69:2,
70:6, 70:13,
70:24, 120:9,
121:24
**examination**
3:1, 3:7, 3:9,
5:14, 213:6,
224:15
**examined**
5:11
**example**
30:22, 176:24
**exceptionally**
129:5
**excess**
140:24
**excite**
206:8
**exclusively**
109:9, 156:14
**excuse**
142:9, 164:22
**executive**
17:19, 33:19,
54:14, 130:11
**exercises**
69:9
**exhibit**
3:12, 3:14,
71:10, 71:14,
71:19, 112:23,
113:4, 113:10,
135:17, 135:20,
136:3, 140:2,
150:18, 158:1,
158:6, 158:9,
158:17, 162:24,
163:2, 163:3,
163:5, 163:9,
165:8
**exhibits**
3:29
**existing**
225:4
**exonerated**
82:23

**expanded**
9:18
**expect**
199:10, 199:11
**expenses**
140:11
**experience**
55:8, 72:14,
73:23, 74:6,
78:8, 173:23,
214:20, 220:10,
222:20, 222:24
**experiencing**
172:17, 176:10,
177:14
**explain**
32:19, 133:21,
153:16, 213:12
**explained**
125:13, 135:9,
161:16
**explicitly**
205:24
**exposed**
37:6
**expressed**
214:17
**extent**
92:10, 160:16,
199:9, 207:14
**extra**
146:19, 154:9
**extremely**
55:8
**eye**
43:2, 43:3,
43:5

**F**

**f-o-l-k-e-r-s**
45:19
**face**
65:22, 204:7
**facebook**
150:2, 150:7
**facilitate**
204:3
**fact**
11:1, 21:19,

30:14, 46:23,
47:24, 53:14,
59:15, 61:23,
70:15, 72:18,
82:9, 125:16,
133:11, 143:20,
146:15, 146:18,
160:18, 161:6,
162:18, 184:19,
190:2, 193:8,
193:19, 203:3,
204:13
**factors**
68:20
**facts**
21:13, 50:23,
72:5, 88:17
**factual**
57:3
**failed**
119:8, 119:18,
134:2
**fair**
6:20, 8:7,
23:11, 23:13,
39:20, 59:19,
66:21, 67:10,
153:15, 186:7,
190:14, 217:12
**fairly**
94:20, 152:14
**faith**
129:8
**fall**
60:21
**familiar**
31:2, 34:10,
83:13, 84:7,
123:18, 132:5,
190:1
**far**
53:20, 54:3,
92:22, 94:8,
96:6, 96:10,
119:2, 126:16,
144:18
**farther**
161:6

Transcript of David A. Walker
Conducted on July 13, 2020

75

fast
106:2
favor
206:13
favoritism
172:19, 172:24,
175:11
fax
2:6, 2:16,
28:8, 83:9
february
12:10, 12:11,
13:16, 14:22,
114:5, 137:7,
164:17
federal
1:34, 61:3,
130:2, 137:22,
155:5, 155:16
feedback
88:15
feel
18:22, 55:22,
59:11, 123:14,
145:21, 188:21,
215:4, 228:24
feelings
108:22, 109:1
fees
140:11
felt
165:21, 171:14
female
143:8, 174:20,
174:24
females
175:7, 175:15
ferguson
1:7, 60:10,
181:17, 181:18,
182:9, 182:19,
183:9, 185:3,
185:22, 186:17,
193:14, 222:7
few
6:22, 68:23,
71:3, 82:21,
86:19, 126:6,

128:10, 158:14,
167:3, 185:20,
202:24, 220:19
fight
40:19
fighting
43:7, 221:24
fights
40:20, 83:2
figure
30:2, 140:20,
140:23, 141:4
figured
147:21, 181:6,
206:2, 208:20
file
34:2, 35:5,
41:9, 41:17,
42:22, 52:13,
52:14, 52:22,
109:12, 154:12,
154:14, 155:22,
215:7, 216:5,
221:14, 224:19
filed
35:6, 41:19,
41:20, 52:12,
53:4, 53:15,
53:17, 54:3,
54:4, 61:9,
71:23, 108:11,
108:14, 124:21,
124:22, 138:5,
138:9, 138:21,
147:18, 154:4,
155:5, 155:11,
155:19, 159:14,
215:9, 215:11,
215:13, 221:13
filing
35:12, 59:5,
133:9, 153:18,
221:4, 221:9
fill
56:17
final
69:12, 103:2
financially
232:15

find
20:24, 26:22,
26:24, 28:23,
63:21, 98:22,
125:23, 130:22,
134:2, 197:12,
214:2
finding
20:18, 130:22
findings
34:12
fine
110:23, 111:1,
111:2, 123:22,
124:14, 126:21,
139:18, 156:17,
194:9, 211:23,
231:9
finish
6:17, 124:10,
187:16
finished
13:6, 57:7,
69:16, 72:10,
88:21, 97:3,
113:20, 126:5,
151:20, 199:18,
211:22
fire
170:20
firearm
132:3
fired
108:11, 108:14,
177:16
firm
2:2
first
3:17, 3:21,
5:10, 6:11,
19:15, 22:10,
22:12, 24:16,
27:16, 29:8,
44:3, 91:3,
93:6, 93:14,
100:6, 100:8,
102:4, 113:11,
125:5, 135:24,

136:1, 136:6,
140:19, 141:21,
142:24, 159:12,
164:22, 181:19,
202:10, 214:18,
229:24, 230:13
firsthand
169:17
fit
190:5
five
16:12, 18:4,
31:8, 37:20,
38:1, 58:17,
69:24, 70:20,
70:21, 78:7,
98:15, 98:16,
117:8, 121:11,
125:10, 138:10,
138:11, 148:19,
167:19, 197:13,
221:24
floor
19:15, 88:1
floors
38:13
florida
124:7
focus
116:18, 200:2
focused
200:11
folkers
45:16, 45:19,
46:2, 46:6,
47:1, 105:23,
106:7, 106:8
folks
90:2
follow
25:13, 25:14,
134:2, 139:21,
154:20
follow-ups
224:17
followed
35:14, 89:1,
89:9, 89:14,

Transcript of David A. Walker
Conducted on July 13, 2020

76

155:4, 214:21
**following**
51:10, 102:18
**follows**
5:12
**force**
29:22, 43:9,
82:15, 82:20,
83:20, 83:23,
217:8
**forced**
14:16
**foregoing**
232:5
**forget**
153:16
**form**
33:21, 34:1,
78:18, 133:4,
134:9, 214:23,
215:18, 216:19,
217:14, 220:1
**formal**
12:21
**former**
124:20
**forth**
190:9
**found**
20:2, 30:24,
31:5, 84:2,
131:11, 131:21,
132:14, 134:13,
154:2, 176:4
**foundation**
213:24, 214:24,
215:19, 216:20,
217:15, 220:2,
220:13, 222:13,
223:4, 223:18
**four**
29:7, 30:10,
31:8, 34:2,
53:13, 69:9,
78:6, 86:8,
98:15, 98:16,
98:18, 99:4,
99:5, 145:12,

146:19, 197:13,
211:12
**four-and-a-half**
124:9
**four-year**
46:8
**fourth**
34:9, 123:8
**fowler**
124:10
**frame**
189:13
**frames**
189:14
**frank**
60:9, 60:13
**fred**
60:8
**free**
18:22, 84:21,
123:14
**frequently**
46:17, 205:14,
226:22
**fresh**
44:17
**friday**
188:1
**friend**
182:3
**friendly**
181:24
**friends**
95:14, 167:8,
167:9, 171:24,
172:2, 172:3,
178:15, 178:17,
182:1, 187:3,
187:5, 194:16,
196:21
**frivolous**
186:11
**front**
8:16
**fugitive**
28:19, 29:2
**full**
8:5

**full-time**
12:22, 191:15
**functions**
29:4, 39:4
**further**
126:7, 224:14,
230:20, 231:10,
232:10, 232:12
**future**
140:10, 156:14

---
G
---

**gainfully**
28:11
**gate**
228:11
**gave**
11:24, 24:4,
75:10, 109:24,
124:17, 132:2,
135:4, 147:21,
157:17, 157:19,
166:18, 166:19,
176:13, 207:10,
224:18
**gaynor**
16:24, 17:6,
100:4, 100:11,
103:17
**general**
91:11, 92:1,
94:22, 155:7
**geographic**
211:16
**geographical**
67:16, 209:4
**george**
17:6
**getting**
19:22, 20:17,
25:20, 29:16,
62:22, 70:4,
103:21, 107:19,
117:24, 118:18,
125:16, 126:1,
126:4, 126:16,
131:22, 133:14,
146:7, 150:15,

152:24, 156:2,
156:21, 173:12,
181:4, 181:9,
184:10, 188:16,
189:17, 191:11,
191:18, 193:11,
228:1, 228:2
**gist**
170:10
**give**
7:8, 8:4, 9:7,
9:12, 23:12,
23:20, 24:2,
27:5, 35:8,
48:17, 57:1,
64:7, 72:13,
75:19, 85:1,
90:13, 100:1,
105:3, 109:3,
125:2, 135:2,
141:4, 179:20,
196:2, 200:12,
203:7, 207:9,
209:20, 218:24,
219:1, 219:3,
229:11, 230:10
**given**
30:17, 53:6,
99:22, 162:15,
213:23, 230:5,
230:6, 230:7,
232:9
**giving**
6:19, 9:9,
20:2, 72:12,
115:6, 146:18,
155:8, 188:20,
205:3, 219:22,
229:10
**glad**
63:22
**glass**
86:19
**go-around**
120:21, 120:23
**goes**
28:23, 36:20,
45:9, 45:10,

Transcript of David A. Walker
Conducted on July 13, 2020

77

64:20, 98:4,
181:15, 190:23
**goings**
55:2
**gone**
127:13, 152:10
**good**
5:16, 8:10,
39:5, 65:13,
65:17, 79:5,
79:12, 79:13,
83:11, 110:14,
111:1, 111:6,
135:10, 158:4,
167:9, 175:2,
185:3, 185:5,
190:6, 191:8,
193:22, 195:17,
195:19, 197:6,
198:7, 198:9,
198:11, 202:23,
204:14, 207:2,
223:2, 228:14
**gotcha**
65:3, 159:5
**gotten**
91:7, 141:2
**gps**
40:5
**graded**
118:5
**graduated**
13:17
**great**
8:3, 32:3,
112:12, 117:2,
139:22, 202:24
**greg**
200:19
**gregory**
1:21, 3:17,
113:11, 113:24
**grievance**
23:4, 23:15,
34:2, 34:7,
35:4, 35:5,
35:13, 35:22,
35:24, 47:18,

51:18, 51:24,
52:12, 52:14,
52:16, 52:22,
53:3, 53:8,
53:11, 53:15,
54:1, 59:4,
61:9, 74:23,
81:19, 93:19,
93:21, 108:14,
108:21, 109:12,
124:22, 125:14,
157:14, 157:15,
186:5, 186:6,
215:9, 215:11,
215:13, 216:5,
216:9, 224:19
**grievances**
34:4, 34:5,
53:12, 108:11,
131:24, 153:19,
153:21, 207:13,
215:7, 216:6,
225:3
**grieve**
88:7, 109:2
**grieving**
51:17, 109:4,
109:6
**ground**
6:10, 146:14
**group**
124:19
**guard**
13:3
**guess**
22:9, 42:21,
83:14, 84:17,
89:7, 90:4,
99:2, 99:22,
103:20, 111:3,
112:10, 114:9,
131:23, 135:24,
139:12, 144:24,
175:2, 199:3,
202:17, 206:1,
217:12, 230:3
**guidance**
214:15

**guilty**
7:3, 84:2
**gun**
133:2
**guy**
44:13, 44:17,
45:4, 45:5,
45:9, 45:10,
56:14, 80:9,
93:2, 125:17,
125:21, 174:15,
181:7, 204:14,
227:3, 227:8,
227:14
**guys**
10:21, 29:20,
37:4, 37:21,
38:12, 45:15,
46:10, 56:1,
56:6, 56:9,
56:10, 56:14,
56:16, 66:12,
92:14, 101:14,
106:17, 107:1,
110:12, 110:24,
111:3, 131:6,
160:6, 160:19,
167:8, 167:10,
168:1, 168:5,
171:24, 172:2,
172:7, 176:6,
176:15, 178:15,
179:8, 181:24,
182:5, 182:11,
183:21, 187:3,
187:10, 187:21,
188:4, 194:24,
196:21, 197:2,
199:2, 199:5,
199:6, 200:17,
212:16

**H**

**h**
86:1, 86:3
**half**
180:21
**hall**
20:4

**hallway**
85:2, 85:4,
85:8, 85:16,
87:22, 87:23,
87:24, 88:1,
108:6, 115:2
**hand**
5:7, 53:18,
188:5, 201:6,
232:18
**handcuff**
40:20
**handcuffs**
134:6, 134:8
**handful**
192:6
**hands**
132:3, 169:23
**hands-on**
84:8
**handwriting**
225:7
**hang**
111:15, 167:10,
198:20
**happen**
24:13, 62:15,
70:18, 70:19,
83:2, 86:10,
97:19, 102:1,
102:2, 146:24,
156:12, 156:13,
178:5, 199:10,
201:15
**happened**
20:13, 53:24,
60:21, 62:10,
68:10, 71:7,
80:2, 81:15,
93:16, 93:23,
93:24, 101:13,
129:20, 132:12,
146:13, 147:23,
156:14, 168:24,
171:13, 176:19,
180:19, 186:2,
201:20, 225:20
**happening**
24:22, 199:8

Transcript of David A. Walker
Conducted on July 13, 2020

78

happens
25:8, 34:11,
67:7, 112:11,
177:2, 177:4
happy
7:11, 7:14,
102:8, 172:21,
177:21, 196:1,
217:22
harass
189:1
harassed
22:8, 61:23
harasser
22:13
harassing
22:16
harassment
21:12, 21:15,
22:2, 22:5,
23:8, 24:12,
126:2, 144:23,
151:17, 155:9
hard
17:2, 135:2,
135:5, 154:14,
191:11
harder
29:15, 186:14
hardly
187:2
hate
134:20, 134:21,
135:4
he'll
101:5, 101:15,
101:23, 102:16,
103:2, 193:20,
197:4, 199:17
head
7:4, 7:9,
196:6, 196:7,
198:19
heading
88:17
heads
171:3
health
4:19

hear
39:3, 40:4,
49:7, 49:15,
49:18, 49:24,
50:3, 51:8,
54:2, 57:21,
58:22, 66:2,
90:21, 90:24,
91:9, 94:14,
104:15, 105:5,
105:7, 107:19,
107:20, 112:9,
133:15, 135:11,
169:20, 170:23,
173:16, 197:8,
201:22, 202:1,
205:18, 207:13,
216:9, 217:16,
228:17
heard
49:8, 53:10,
53:17, 54:16,
58:1, 58:10,
59:3, 86:11,
90:11, 90:12,
90:16, 91:3,
91:19, 93:3,
93:10, 93:13,
95:17, 96:11,
165:3, 169:16,
169:21, 170:5,
170:7, 170:10,
170:15, 170:18,
170:19, 170:24,
190:13, 200:3,
201:22, 202:3,
206:23
hearing
17:2, 50:14,
104:4, 132:24,
133:1, 202:6
hearing-impaired
202:12
hearings
34:14, 34:18
hears
34:4, 35:5,
35:6, 216:5

hearsay
170:17
heated
92:20
held
57:17, 60:24,
75:24
help
4:8, 52:21,
62:3, 117:23,
189:13
helped
147:22, 225:2
helps
147:23
henry
86:1, 86:3
herbert
2:2
here
7:12, 9:4,
30:22, 32:2,
49:14, 50:21,
51:10, 51:20,
52:22, 55:20,
55:21, 56:2,
58:10, 58:11,
62:3, 62:4,
64:1, 65:5,
72:3, 72:17,
74:5, 78:1,
79:17, 88:24,
90:7, 92:23,
96:2, 111:4,
113:17, 114:12,
114:15, 115:3,
116:2, 116:4,
116:9, 116:20,
123:5, 123:8,
123:10, 123:15,
125:3, 128:9,
130:15, 133:22,
137:3, 137:11,
138:15, 150:24,
153:13, 153:17,
156:19, 157:2,
158:7, 158:14,
158:21, 159:12,

162:9, 163:12,
164:5, 164:20,
184:11, 184:16,
184:20, 191:11,
192:1, 213:2,
229:24
hereby
232:3
herein
5:10
hereunto
232:17
hey
35:13, 47:11,
50:7, 203:8
high
89:21, 129:7,
212:14, 218:6,
218:7
high-crime
212:11
high-incident
216:11
higher
12:12, 67:11,
67:13, 67:14,
67:15, 79:2,
97:10, 97:20,
103:22, 104:5,
104:9, 118:8,
118:13, 128:21,
208:9
highest
12:3
hill
120:19
hired
14:7, 18:23,
19:22, 19:24,
20:22, 20:24
hispanic
57:14, 57:17,
143:10
hit
87:22, 111:22,
136:12, 136:14
hits
25:1

Transcript of David A. Walker
Conducted on July 13, 2020

79

**hitting**
125:21
**hole**
56:17
**holiday**
124:2
**holidays**
125:10
**home**
29:24, 30:1,
38:23, 40:23,
40:24, 73:1,
73:10, 80:16,
89:16, 146:14,
217:20, 228:1,
228:8, 228:23
**honest**
8:5
**honorably**
13:7
**hood**
198:19
**hope**
39:17
**hopefully**
7:12, 157:2
**horse**
156:3
**hospital**
42:4, 42:14,
42:23
**host**
27:21
**hostile**
151:1, 151:4,
152:4
**hour**
1:37, 62:22,
63:11, 128:16
**hours**
12:20, 124:2,
124:13, 125:9,
152:21
**house**
14:1, 14:3,
26:13, 26:14,
28:21, 90:3,
182:6, 212:18,

227:14
**houses**
27:20
**how's**
187:13
**hr**
162:1, 165:9,
169:10
**human**
24:3, 24:5,
24:7, 125:24,
159:9, 169:8
**humiliating**
63:15
**humiliation**
140:13, 147:11
**hurt**
40:15, 42:22,
145:11, 146:9,
146:21, 196:6,
196:7, 226:9,
226:14

**I**

**iad**
23:23
**idea**
32:18, 209:16
**identification**
3:13, 71:15,
113:5, 135:21,
158:10, 163:6,
163:10
**identified**
145:24
**identify**
4:8, 4:10,
18:21, 114:16,
123:9, 128:8,
129:3, 140:7,
142:8
**ids**
83:9
**il**
2:5, 2:15, 2:22
**illinois**
1:2, 1:29,
1:37, 11:24

**imagine**
33:22, 34:13,
70:19, 131:8,
143:13, 195:6
**immediately**
27:15
**impaired**
202:6
**implausible**
131:12
**important**
6:15, 25:6,
129:6, 228:18
**impression**
59:11
**improved**
160:16
**in-depth**
171:16, 171:17,
187:17
**in-service**
12:19
**incident**
9:24, 61:20,
62:5, 62:6,
67:11, 67:13,
67:14, 67:15,
81:13, 86:12,
87:5, 88:10,
89:11, 89:21,
90:2, 92:17,
92:18, 97:10,
103:23, 129:7,
153:20, 157:9,
157:13, 160:9,
160:13, 162:16,
165:7, 166:10,
166:24, 170:11,
170:16, 177:17,
191:22, 217:3,
217:4, 217:5,
218:6, 218:7,
225:18, 225:21
**incidents**
89:8, 115:24,
157:8, 199:21,
216:24, 226:4
**included**
138:19

**including**
140:11
**income**
140:11
**incoming**
28:14
**indeed**
16:2
**index**
3:1, 3:12
**indicate**
63:12
**indicated**
180:4
**indirectly**
118:16, 118:17,
118:19, 232:16
**individual**
202:15
**individual's**
170:12
**individually**
1:19, 1:22,
1:24, 1:27
**individuals**
18:2, 45:7,
75:23, 85:15,
87:10, 124:19,
143:18
**ineligible**
68:19
**influence**
208:12
**informal**
3:24, 158:22,
159:13, 159:21
**information**
9:7, 9:10,
159:16, 176:19,
207:9
**infraction**
81:6
**initial**
5:22, 5:23,
33:18, 51:24
**initially**
120:18
**injured**
41:4, 41:6,

Transcript of David A. Walker
Conducted on July 13, 2020

80

41:7, 41:21,
191:19, 191:21,
226:9, 226:11,
226:15, 226:22
**injuries**
40:16, 41:17,
42:3, 226:18
**injury**
41:12, 41:16,
41:19, 41:20,
41:23, 42:13,
42:23, 146:12,
146:18, 147:8,
150:15, 226:18,
226:23
**inmate**
73:10, 134:24,
135:10
**inmates**
29:18, 83:15,
226:18
**inquiry**
3:24, 158:22,
159:13, 159:21
**ins**
27:7
**insensitive**
202:17, 202:19
**inside**
19:11
**inspector**
155:7
**instance**
97:18, 171:1
**instantly**
227:8
**instead**
7:8, 125:12,
142:10, 142:18,
143:19, 143:24,
144:9, 144:13,
181:1
**institute**
12:7
**intelligent**
204:14
**intensive**
83:1

**interaction**
199:3
**interactions**
200:20
**interchangeable**
26:10, 43:15
**interchangeably**
19:10, 230:4
**interest**
144:18
**interested**
4:13, 25:7,
149:7, 232:15
**interesting**
218:9
**interject**
31:20
**internal**
23:23, 24:6,
61:10, 82:21,
83:24, 153:19,
155:12, 156:7,
157:16, 164:13,
221:9
**internally**
221:15
**interrogatories**
3:18, 3:22,
5:11, 113:12,
113:23, 136:6
**interrogatory**
137:10, 137:11,
140:3, 148:12,
148:21
**interrupt**
10:18, 51:5,
197:16, 198:17,
220:14, 226:21
**interrupting**
88:14
**interruption**
133:12, 206:20
**interruptions**
4:15
**interview**
23:20, 24:2,
24:4, 68:9,
68:22, 69:1,

70:6, 70:13,
120:10, 122:1,
145:19, 157:17,
164:6, 164:16
**intimated**
208:3
**intimidate**
151:8, 151:11
**intimidated**
151:13, 151:14
**intimidation**
151:12
**intimidator**
151:23
**inv**
3:24
**investigated**
23:9, 23:19,
83:20, 83:22
**investigation**
82:20, 116:4,
116:9, 116:11,
116:19, 116:20,
148:14, 157:16,
200:16
**investigations**
157:13, 164:13
**investigator**
33:17, 62:14,
78:13, 85:18,
85:22, 86:5,
86:19, 86:23,
87:5, 91:6,
125:16, 158:23,
159:21, 159:22,
160:4, 160:5,
160:8, 161:2,
161:8, 161:9,
161:12, 161:14,
163:21, 164:22,
164:23, 164:24,
165:1, 165:2,
165:4, 165:12,
165:14, 165:16,
165:21, 165:23,
166:5, 171:22,
175:17, 177:17,
194:5, 202:5,

207:3, 213:15,
219:8, 226:15,
229:6, 229:14
**investigators**
38:2, 38:3,
45:24, 46:2,
56:21, 56:22,
56:23, 57:10,
57:12, 57:16,
59:18, 59:20,
59:24, 60:2,
60:5, 78:12,
86:12, 86:15,
86:19, 90:3,
92:23, 97:15,
104:10, 104:13,
104:22, 104:23,
143:22, 160:7,
161:21, 165:15,
165:24, 203:5,
204:17, 213:13,
213:23, 214:22,
215:7, 218:14
**invited**
111:14
**involved**
29:9, 43:9,
60:12, 61:3,
80:12, 81:17,
100:18, 120:5,
120:7, 121:23,
131:20, 137:12,
137:14, 138:2,
144:22, 177:17
**involves**
154:10
**involving**
92:6
**issue**
46:18, 47:20,
65:21, 74:23,
123:11, 127:5,
137:16, 201:19,
215:8, 215:11,
221:22
**issues**
189:2, 213:1,
221:19

Transcript of David A. Walker
Conducted on July 13, 2020

81

| | | | |
|---|---|---|---|
| **item**<br>81:12<br>**itself**<br>64:18, 104:10,<br>115:15, 126:2,<br>129:14, 134:23,<br>177:3 | **join**<br>13:14, 111:22<br>**joined**<br>13:15, 14:22,<br>112:8<br>**joining**<br>13:22<br>**joked**<br>165:23<br>**jones**<br>60:8 | 110:20, 139:11,<br>139:21, 149:6,<br>149:8<br>**kept**<br>20:17, 185:15,<br>200:14<br>**kevin**<br>174:15, 174:16<br>**kick**<br>60:14 | **knowledge**<br>48:4, 48:6,<br>77:24, 104:20,<br>105:4, 169:17,<br>181:8, 190:23,<br>213:16, 214:14,<br>214:17, 215:7,<br>218:12, 222:20 |

**J**

**jackson**
202:5
**jail**
14:4, 15:13,
15:15, 18:1,
19:11, 19:13,
19:21, 26:18,
27:24, 28:24,
40:10, 40:12,
67:19, 104:7,
143:21, 217:21,
228:2
**january**
146:16, 147:2
**jefferson**
2:4
**job**
6:15, 14:11,
14:18, 14:20,
39:5, 46:20,
47:9, 78:20,
78:21, 83:3,
118:23, 119:1,
129:12, 146:10,
147:21, 148:3,
152:12, 152:19,
161:22, 186:13,
186:14, 186:19,
188:21, 188:22,
190:6, 190:7,
191:10, 193:22,
198:7, 198:8,
198:9, 198:11,
198:12, 199:10,
200:5, 207:11,
223:2, 223:10,
229:8
**jobs**
28:11, 184:22

**joseph**
1:18, 159:7
**journals**
9:23, 9:24,
10:6, 11:15
**jr**
1:6
**judging**
95:14
**july**
1:38, 232:18
**jump**
112:5
**jumped**
111:19, 177:24
**junior**
12:13
**jurisdiction**
40:6
**justin**
2:13, 4:24,
5:17
**justin@ilesq**
2:17

**K**

**kangaroo**
95:13, 186:8
**keep**
25:20, 25:21,
30:21, 65:21,
76:2, 104:18,
107:19, 110:18,
125:1, 192:1,
195:8, 200:13,
219:22
**kelly**
2:3, 2:7, 5:2,

**kicked**
60:18, 61:7,
61:8, 201:1
**kicking**
60:19, 62:6
**kind**
12:12, 17:2,
18:9, 25:6,
62:3, 66:4,
80:2, 80:21,
84:16, 84:21,
94:17, 101:13,
104:18, 114:9,
126:16, 147:12,
155:11, 168:4,
169:2, 169:14,
173:20, 180:6,
198:5, 205:12,
209:17, 212:16
**kinds**
7:6, 156:9,
174:1
**klieminski**
106:1, 106:13,
106:14
**knew**
30:24, 68:4,
70:1, 78:10,
78:12, 93:9,
115:8, 176:5,
176:12, 176:14,
191:9, 191:10,
198:8, 198:11,
199:23, 200:7,
202:5, 205:9,
205:12
**knowing**
176:11

**known**
24:17, 167:18,
175:21, 178:10,
178:11, 181:21,
181:22, 186:23,
187:1, 187:2,
189:24, 191:2,
194:13, 196:19,
204:16, 204:17
**krauchun**
2:3, 3:8, 5:2,
31:20, 31:23,
32:3, 34:24,
65:15, 79:6,
109:16, 110:16,
110:23, 111:10,
112:1, 112:4,
112:12, 119:10,
131:15, 133:4,
134:9, 134:16,
139:16, 139:23,
211:23, 213:7,
214:4, 215:1,
215:23, 216:21,
218:1, 220:9,
220:20, 222:15,
223:13, 223:20,
224:1, 224:8,
224:14, 230:21,
230:24, 231:5
**krauchun@danherb-**
**ertlaw**
2:7

**L**

**l**
86:2
**l-a-u-d-e-r-m-i--**
**l-l**
34:22

Transcript of David A. Walker
Conducted on July 13, 2020                                    82

l-o-u
34:23, 34:24
lack
180:17, 202:14
language
205:19
lasalle
2:14
last
5:23, 16:12,
17:1, 17:13,
31:8, 45:18,
59:10, 69:24,
70:20, 98:15,
105:10, 110:20,
113:15, 116:8,
117:4, 121:11,
136:9, 139:8,
148:19, 179:10,
181:2, 183:4,
203:19, 220:18
lasting
59:10
late
28:15, 69:17
lately
10:20
later
51:23, 94:1
latino
106:17
latter
27:11, 31:11,
205:17
law
2:2, 2:19,
129:6
lawsuit
10:4, 61:3,
71:23, 80:12,
124:21, 126:14,
129:18, 129:21,
129:24, 130:1,
130:2, 130:17,
130:18, 130:21,
131:4, 137:19,
137:22, 138:17,
138:18, 140:8,

140:18, 144:19,
144:20, 144:22,
145:1, 145:3,
146:17, 147:5,
147:18, 151:5,
153:22, 154:4,
155:5, 171:7,
171:9, 171:11,
171:12, 171:16,
171:17, 182:12,
182:14, 182:16,
187:11, 221:5
lawsuits
24:24
layoff
143:22
leading
33:1, 216:20,
217:15, 220:2
leads
216:16
lean
65:22, 66:4,
66:5
leaped
20:17
learn
158:6, 190:7
learned
78:20, 87:4
least
18:6, 18:14,
29:13, 35:9,
40:8, 56:2,
59:18, 60:1,
66:17, 67:1,
78:6, 84:11,
90:16, 91:8,
141:10, 142:6,
164:2, 178:24,
180:21, 184:10,
184:15, 188:2,
189:19, 191:4,
192:24, 193:10,
209:19
leave
202:7
leaving
160:14

led
135:6, 157:9,
160:13
left
13:12, 14:17,
20:11, 59:10,
156:20, 157:2,
163:20, 202:8
legal
34:8, 34:12,
34:13
legrain
1:4, 160:4,
167:5
legs
27:5
leinenweber
2:12, 2:13,
3:7, 3:9, 4:24,
5:15, 5:17,
23:5, 26:4,
31:22, 32:4,
32:8, 32:11,
33:9, 34:20,
35:2, 45:17,
55:7, 65:16,
65:18, 66:9,
71:9, 71:17,
75:8, 79:8,
85:20, 104:11,
109:18, 110:10,
110:17, 111:2,
111:7, 111:11,
111:16, 111:19,
111:22, 112:16,
112:22, 113:1,
113:6, 119:12,
130:14, 131:16,
133:6, 133:13,
133:18, 134:12,
134:18, 135:16,
135:22, 136:20,
137:1, 139:11,
139:18, 139:24,
140:1, 150:21,
150:23, 156:17,
157:1, 157:24,
158:4, 158:11,

162:22, 163:7,
192:22, 197:23,
206:19, 206:21,
209:15, 211:19,
212:1, 212:4,
212:21, 213:5,
213:24, 214:23,
215:18, 216:19,
217:14, 220:1,
220:13, 222:13,
223:4, 223:18,
223:23, 224:6,
224:11, 224:16,
230:19, 231:2,
231:3, 231:6,
231:8
leinenweber's
66:3
length
64:1, 110:20,
115:24, 172:13,
179:13, 201:3
less
36:15, 39:22,
74:16, 84:13,
124:12, 125:3,
167:19, 190:3,
197:12, 218:13,
218:17
lesser
44:8
let's
11:22, 13:11,
14:21, 16:17,
23:6, 25:12,
36:4, 43:10,
67:21, 71:9,
71:10, 72:1,
73:19, 79:16,
88:13, 88:23,
97:1, 97:6,
97:7, 97:13,
106:3, 107:24,
111:7, 111:8,
112:22, 114:7,
115:19, 116:17,
123:5, 127:21,
128:6, 129:2,

Transcript of David A. Walker
Conducted on July 13, 2020
83

129:15, 135:16,
137:10, 140:2,
145:14, 150:11,
153:8, 158:5,
167:4, 176:5,
194:1, 195:22,
198:4, 206:22
**letter**
121:20, 122:6,
230:7
**level**
12:3, 19:11,
19:15, 33:13,
77:21, 208:9,
209:19, 217:23
**lexipol**
25:23, 26:1
**liable**
130:23
**liberty**
173:7, 227:3
**license**
232:25
**lie**
125:20
**lieutenant**
15:4, 35:9,
120:19, 219:13
**life**
125:22
**liked**
15:5, 207:10
**likely**
36:20
**liking**
220:5
**lincoln**
26:2, 86:2
**line**
20:5, 20:7,
187:16, 202:4,
214:12
**lineup**
52:10
**lips**
180:7
**list**
37:22, 72:24,

73:3, 73:6,
73:7, 80:5,
80:8, 80:23,
81:2, 100:21,
106:3, 138:14,
145:17, 227:19
**listed**
115:3, 116:1
**listen**
55:22
**literally**
40:8, 60:13,
91:8
**litigation**
137:14, 137:17,
138:1, 138:19,
140:11, 146:23
**little**
6:9, 11:22,
21:5, 30:6,
30:7, 36:4,
36:5, 81:11,
110:14, 113:3,
138:12, 158:13,
161:6, 166:17,
174:8, 197:18,
198:6, 206:8,
206:14, 211:5,
225:9
**live**
11:23, 11:24,
14:15
**llc**
2:12
**lms**
21:23, 25:23,
26:1
**loaded**
94:19
**loan**
204:18
**local**
40:5, 225:1
**located**
1:36
**location**
19:16, 19:17,
36:7, 67:18,

98:8, 101:17,
159:9, 215:21
**lock**
104:6
**lockbox**
132:7
**lockup**
105:10, 105:11,
107:20
**lockups**
104:9, 104:16,
105:2, 105:8,
105:19, 107:1,
107:14, 107:15,
107:18, 107:22
**logan**
16:23, 86:17,
100:4, 100:6,
100:9, 100:11,
103:17, 103:19
**loggans**
170:7, 170:13,
170:14
**logical**
230:15
**long**
6:4, 7:15,
20:7, 21:2,
25:9, 31:3,
59:23, 61:24,
66:2, 68:18,
69:15, 75:11,
76:8, 82:12,
94:1, 168:5,
172:13, 173:17,
175:21, 177:8,
178:7, 178:10,
181:16, 181:21,
181:23, 182:24,
186:23, 194:13,
196:19, 229:9
**longer**
7:13, 28:22,
81:20, 207:5
**longest**
223:9
**look**
9:2, 64:11,

64:17, 71:18,
83:14, 84:17,
113:2, 127:22,
129:2, 135:24,
149:1, 160:6,
160:19, 165:4,
169:11, 181:13,
200:17, 204:1,
228:14
**looked**
115:10, 149:4,
200:10
**looking**
95:13, 158:16,
163:16, 165:8
**looks**
136:16, 165:10,
198:24
**lose**
65:22
**losing**
127:1, 127:6,
141:6, 146:14,
150:14, 206:16
**lost**
63:11, 128:15,
140:9, 140:16,
140:20, 141:5,
141:10, 146:6,
147:4, 150:13,
220:15
**lot**
24:20, 29:18,
34:17, 39:3,
39:21, 39:22,
40:21, 49:20,
62:4, 78:20,
81:11, 83:6,
115:9, 142:11,
145:11, 147:23,
147:24, 153:1,
155:3, 155:4,
160:7, 165:24,
168:1, 168:8,
170:18, 171:14,
172:19, 173:6,
175:18, 176:15,
177:12, 178:8,

Transcript of David A. Walker
Conducted on July 13, 2020

84

180:24, 181:2,
181:13, 185:9,
189:11, 190:23,
203:1, 204:7,
213:11, 213:19,
214:9, 216:10,
219:5, 222:18,
222:19
**loud**
39:1
**louder**
47:17
**loudermill**
34:14, 34:18,
34:21, 34:23
**low**
198:10
**lower**
19:11, 19:15,
115:6, 117:19
**lump**
152:7
**lunch**
29:16, 110:18

**M**

**m**
26:2
**mad**
61:9, 161:21,
171:5, 174:13,
200:13
**made**
31:18, 48:1,
55:9, 55:10,
58:4, 63:19,
67:1, 68:18,
100:1, 100:5,
100:11, 100:23,
101:7, 101:8,
101:16, 101:21,
102:20, 102:23,
121:15, 123:9,
123:19, 124:10,
126:17, 132:15,
132:16, 132:22,
134:23, 141:20,
142:2, 144:2,

144:5, 145:20,
156:9, 165:5,
169:9, 172:23,
184:24, 189:6,
191:3, 203:5,
207:7, 208:4
**maintain**
223:9
**major**
216:24
**majority**
16:13, 57:22,
183:7
**make**
28:3, 29:21,
43:23, 48:21,
54:6, 54:11,
55:15, 58:7,
58:14, 59:3,
59:6, 59:7,
59:16, 61:14,
64:3, 64:9,
64:23, 65:2,
65:7, 101:4,
101:5, 101:7,
128:11, 134:19,
158:12, 177:3,
187:16, 196:6,
196:7, 197:9,
199:17, 199:18,
200:7, 207:14,
209:17, 211:2,
217:22, 219:6,
230:17
**makes**
33:12, 99:12,
99:14, 177:12,
188:22
**making**
33:16, 47:4,
50:7, 50:17,
50:24, 58:13,
58:23, 100:16,
102:13, 186:17
**malfunctions**
27:20
**malone**
80:7, 80:8,

81:7, 142:19,
142:21, 142:22,
142:24, 143:4,
143:6, 144:3
**malone's**
142:24
**man**
105:10, 143:6,
170:9
**management**
147:22, 148:6,
148:8
**manipulate**
204:21
**manner**
39:18, 217:2
**manning**
1:9, 194:2,
194:8
**many**
36:11, 56:6,
56:13, 58:14,
66:12, 66:16,
66:20, 68:22,
69:11, 71:2,
78:5, 91:2,
93:11, 95:6,
104:15, 105:2,
105:8, 105:19,
107:1, 131:23,
168:6, 180:6,
188:5, 213:9,
218:11, 218:12
**marcus**
202:5
**mark**
71:10, 158:5,
163:2
**marked**
3:13, 71:12,
71:14, 71:19,
113:4, 113:9,
135:20, 136:3,
158:3, 158:9,
158:17, 163:2,
163:5, 163:9
**markham**
12:17, 14:3,

14:6, 14:9,
14:13, 14:15,
20:19
**martin**
174:15, 174:16
**martinez**
106:19
**marty**
25:2
**mass**
38:24
**master**
13:19
**materials**
10:11
**matter**
5:18, 161:20
**maximum**
15:9, 15:10,
190:9
**maybe**
6:6, 9:22,
10:19, 18:4,
20:5, 20:14,
29:9, 29:11,
31:10, 35:9,
40:8, 46:7,
51:23, 55:22,
57:12, 59:23,
70:21, 86:8,
88:15, 94:22,
95:8, 96:13,
105:15, 118:19,
138:10, 138:12,
148:2, 154:6,
155:24, 158:12,
167:19, 168:4,
168:8, 169:1,
172:5, 178:21,
181:2, 183:3,
183:4, 188:6,
189:17, 191:17,
193:9, 194:14,
194:22, 196:20,
198:18, 211:9,
229:19
**mcghee**
1:10, 160:4,

mcghee's
165:2
mean
10:18, 18:8,
23:22, 24:16,
24:23, 25:20,
30:18, 37:12,
39:17, 44:16,
51:5, 61:16,
61:19, 67:5,
67:7, 69:24,
78:4, 83:10,
83:12, 84:11,
91:8, 95:13,
96:5, 98:1,
101:10, 103:24,
104:24, 109:13,
110:19, 120:8,
121:18, 122:17,
122:18, 128:23,
130:23, 140:23,
144:20, 149:4,
151:12, 152:22,
153:2, 153:14,
153:21, 154:14,
155:15, 156:13,
156:14, 170:17,
172:12, 173:3,
173:9, 173:11,
173:17, 176:3,
176:11, 177:1,
187:13, 190:7,
190:8, 190:9,
190:12, 197:15,
198:17, 199:7,
199:13, 204:1,
205:24, 206:7,
207:16, 208:2,
208:16, 208:21,
209:9, 225:6,
226:12
meaning
92:13, 159:14,
184:3, 184:18
meaningful
108:18

means
29:15, 51:9,
75:18, 87:19,
93:7, 124:2,
213:16, 228:9,
230:5
meant
35:22, 38:9,
165:14
medical
124:2, 124:12,
125:9, 147:12,
147:16, 147:17
medication
148:16
medications
148:13, 148:15
meet
10:14
meeting
169:14, 170:19
memo
53:23, 80:21,
124:4, 124:17
memorable
94:21
memorandums
153:19
memory
9:17, 18:16,
157:20, 160:16
memos
9:22, 10:2,
11:14, 62:13
mental
140:13, 147:11,
147:13
mention
26:7, 206:24
mentioned
35:4, 39:7,
51:12, 66:10,
67:20, 173:3,
229:3
merit
34:14, 34:19,
229:6
mess
6:23

message
9:3
messages
149:15, 150:6
messenger
150:7
messina
45:15, 46:2,
46:6, 47:1,
105:23, 106:4,
106:6
met
10:16, 10:19,
53:19, 126:19
metropolitan
14:5
michelle
1:4, 171:18,
192:2
microphone
4:6
mid
110:21, 212:10
middle
5:21, 5:22,
107:12, 169:5,
211:9
midnights
27:12
midst
173:23
midwest
2:21
might
18:3, 18:11,
23:12, 24:2,
24:9, 27:23,
28:15, 33:20,
39:19, 46:7,
46:9, 53:12,
55:20, 55:22,
55:23, 56:8,
57:20, 58:8,
67:9, 79:10,
85:6, 85:22,
86:8, 91:11,
94:15, 94:16,
104:1, 105:11,

message
112:8, 112:9,
151:16, 151:21,
151:22, 156:12,
167:18, 172:13,
172:15, 174:9,
174:12, 175:10,
175:12, 177:2,
178:11, 179:10,
180:24, 181:11,
191:12, 199:24,
203:22, 204:16
mike
26:2
mile
69:12
military
12:15, 12:23,
12:24, 13:1
miller
60:9
mind
25:1, 60:3,
125:21, 191:11,
205:10, 228:15
mine
86:9, 182:4
minute
31:24, 72:4,
73:16, 110:13,
136:19, 141:8,
229:21
minutes
40:9, 68:18,
69:17, 110:24,
112:11, 120:2,
211:24
miss
112:1, 145:15,
171:21
missed
141:6, 145:9,
145:10, 145:16,
145:20
missing
123:12
misstates
109:17, 119:10,
133:4

Transcript of David A. Walker
Conducted on July 13, 2020

86

**mistake**
125:23
**mistaken**
164:2
**mistakenly**
133:2
**misunderstood**
229:20
**moment**
117:1, 156:11,
197:17, 218:10,
220:16
**moment's**
84:16
**moments**
158:14
**monday**
188:2
**money**
128:19, 128:23,
203:1, 203:4,
203:9, 203:10,
203:12, 203:13,
203:17, 203:20,
203:23, 204:18,
204:20
**monitor**
28:9
**monitoring**
15:20, 15:22,
16:1, 16:4,
19:5, 26:6,
26:9, 26:16,
27:8, 32:21,
33:17, 42:6,
43:23, 75:12,
80:16, 89:16,
96:9, 126:8,
160:15, 229:9
**month**
187:8
**months**
10:19, 15:3,
81:14, 82:13,
86:9, 145:13,
146:19, 166:23,
168:6, 176:4
**morale**
47:20, 198:10

**more**
18:7, 19:20,
24:22, 28:13,
30:7, 30:23,
44:18, 47:22,
48:5, 50:13,
56:2, 56:6,
58:17, 66:12,
66:14, 66:16,
66:17, 66:20,
68:20, 74:14,
74:17, 75:22,
78:20, 83:1,
98:24, 102:21,
115:11, 138:21,
153:6, 156:18,
157:3, 167:3,
171:10, 172:12,
175:3, 175:4,
176:2, 177:5,
177:10, 179:22,
185:1, 186:15,
189:12, 192:5,
199:1, 199:3,
201:14, 203:14,
206:8, 212:5,
216:17, 216:24,
217:5, 217:13,
220:11, 220:17,
220:19, 221:7,
225:10, 229:2
**morning**
5:16, 20:5,
20:6
**most**
17:12, 17:24,
24:5, 29:4,
30:1, 30:4,
36:20, 38:16,
55:3, 74:15,
78:11, 104:9,
107:6, 138:8,
138:23, 139:14,
151:24, 152:18,
161:13, 168:18,
172:14, 180:1,
180:5, 180:15,
190:13, 192:11,

193:12, 207:11,
221:1
**mostly**
40:13, 199:5,
218:5, 220:23
**mother**
11:11
**move**
32:18, 65:11,
191:3, 194:9,
211:3, 230:17
**moved**
26:19, 61:21,
76:16, 78:5,
84:5, 98:20,
135:12, 135:13,
168:18, 168:21,
177:18
**movie**
27:6
**moving**
200:13, 200:14
**much**
5:16, 18:2,
25:21, 41:1,
46:15, 55:1,
66:7, 84:8,
94:1, 115:11,
129:14, 147:21,
151:6, 152:22,
156:5, 157:2,
171:2, 176:5,
176:7, 176:14,
177:2, 181:22,
182:23, 183:15,
183:19, 184:2,
190:2, 190:15,
191:2, 192:5,
193:16, 198:3,
203:12, 206:24,
207:3, 212:14,
212:23, 218:9,
218:16
**multiple**
88:17
**must**
83:10, 93:8
**mute**
4:6

**myself**
24:8, 55:19,
141:9, 146:10,
223:7

**N**

**n**
17:7, 90:9,
90:17, 91:1,
91:4, 91:19,
92:11, 93:3,
93:13, 94:14,
95:7, 95:17,
96:10, 96:18,
127:24, 161:2,
166:6, 176:23,
201:23, 205:19
**nadolski**
106:1, 106:11,
106:21
**name**
4:22, 5:17,
5:20, 5:21,
5:23, 17:13,
20:10, 39:3,
60:1, 60:5,
61:20, 62:12,
62:17, 63:12,
80:11, 80:23,
85:21, 100:6,
100:8, 125:6,
129:23, 130:1,
142:24, 154:10,
163:21, 165:16,
170:12
**named**
18:5, 92:24,
159:15, 174:15,
202:5, 205:10
**names**
17:1, 37:22,
45:6, 100:21,
210:1
**national**
4:18, 13:2
**nationality**
115:9
**nature**
129:12, 155:24

Transcript of David A. Walker
Conducted on July 13, 2020

87

neal
1:24, 17:13,
49:18, 49:20,
49:24, 50:4,
51:21, 52:8,
52:9, 58:10,
77:18, 103:19,
118:10, 118:19,
127:9, 175:5,
202:20, 202:21,
202:22, 202:23,
204:10, 204:22,
205:18, 205:20,
206:4, 224:4
necessarily
25:7
necessary
7:13, 139:20
need
5:4, 7:7, 7:14,
9:8, 17:13,
18:21, 32:4,
32:15, 51:15,
55:24, 56:2,
56:6, 57:4,
65:10, 66:12,
66:14, 66:16,
66:17, 66:20,
66:22, 67:2,
78:5, 104:19,
110:17, 112:5,
116:12, 116:21,
123:15, 139:19,
147:16, 162:6,
162:8, 162:11,
181:18, 225:10
needed
39:21, 56:9,
56:13, 84:1,
173:7, 225:15,
229:14
needs
65:12, 184:21
negative
85:3, 124:11,
124:13
negativity
207:3

neglected
18:5
neighborhood
212:19
neutral
224:12
never
24:4, 24:8,
37:17, 38:4,
38:17, 46:3,
54:3, 54:4,
56:11, 62:1,
62:12, 63:18,
68:4, 70:12,
75:12, 75:13,
81:15, 82:17,
82:19, 82:23,
83:21, 90:11,
90:16, 90:19,
95:22, 96:11,
125:21, 130:4,
134:10, 134:23,
150:5, 155:11,
155:15, 156:11,
166:6, 168:20,
171:16, 172:9,
176:2, 176:18,
185:20, 187:12,
195:16, 197:10,
198:9, 201:17,
201:22, 205:6,
208:2, 223:14,
223:15, 230:13
new
25:22, 44:17,
45:8, 45:9,
45:11, 46:1,
46:3, 78:11,
121:10, 125:11,
176:15, 211:4,
220:24, 226:5
news
169:19
newson
1:6, 177:6,
177:13
next
14:11, 22:11,

27:9, 32:24,
50:4, 88:16,
123:6, 125:7,
165:11, 166:5,
228:6
nice
111:16
nicole
125:6
niggers
92:9
nine
18:14, 211:12,
211:13
nobody
29:21, 46:20,
70:1, 96:24,
120:6, 120:7,
126:2, 199:11
nod
7:4
non-african-amer-
ican
87:9
non-minorities
72:13
non-minority
73:22, 79:18,
81:5, 89:23,
97:8
none
88:12, 107:5,
222:4
nonmerit
219:11, 229:3,
229:22
nora
17:7
normal
64:6, 73:9,
140:24, 146:20,
149:6, 196:4,
198:18
normally
27:10, 27:15,
29:14, 30:4,
34:6, 35:10,
36:2, 55:23,

74:18, 75:24,
77:19, 80:6,
99:17, 100:3,
129:11
north
210:7, 210:8,
210:23
northern
1:2
note
3:29, 74:5
notes
8:16
nothing
12:21, 48:12,
53:23, 56:15,
61:17, 81:14,
83:4, 102:11,
122:18, 122:23,
123:1, 128:5,
135:12, 145:18,
162:6, 162:8,
162:11, 171:10,
180:5, 200:12,
220:7, 222:14
notice
84:16
noticing
4:23
notified
227:23
notify
95:9
november
15:20
nowhere
148:1
number
78:7, 104:21,
104:24, 123:6,
123:7, 127:22,
129:3, 140:3,
148:12, 148:21,
149:13, 158:7,
158:19, 163:11,
215:10
numbers
107:1

Transcript of David A. Walker
Conducted on July 13, 2020

88

**numerous**
82:15, 203:16

**O**

**o**
17:7, 86:1
**o'clock**
20:6
**o'connor**
14:4
**o'grady**
20:15
**oak**
2:22
**oath**
4:21, 32:13,
112:19, 157:4,
212:7
**object**
79:6
**objection**
4:19, 109:16,
109:17, 119:10,
131:15, 133:4,
134:9, 134:16,
213:24, 214:23,
215:18, 216:19,
217:14, 220:1,
220:13, 222:13,
223:4, 223:18,
223:23, 224:6,
224:11
**objections**
3:16, 3:19,
113:10, 136:4
**obvious**
104:17, 104:19
**occasion**
174:5
**occasions**
91:10
**occurred**
9:18, 164:17
**off-the-record**
4:5
**offended**
165:5
**offhand**
57:1

**office**
3:26, 9:22,
13:14, 13:15,
13:22, 14:10,
14:19, 14:23,
19:19, 19:23,
21:7, 21:14,
24:1, 24:22,
26:19, 28:7,
28:13, 28:16,
29:2, 55:3,
55:14, 59:15,
61:1, 76:23,
76:24, 77:2,
77:9, 80:11,
84:9, 94:2,
97:9, 116:13,
125:18, 130:19,
134:11, 146:23,
164:6, 164:16,
166:9, 166:14,
168:19, 176:20,
179:21, 179:24,
180:23, 181:1,
181:2, 181:23,
190:20, 193:12,
202:7, 218:24,
225:14, 226:5,
226:7, 226:8
**officer**
4:20, 12:17,
13:19, 14:4,
14:6, 21:1,
30:4, 81:5,
125:12, 226:12
**officers**
73:22, 79:18,
89:23, 97:8,
104:8, 143:21,
218:12, 220:11,
220:12, 220:18,
220:23, 222:10,
222:24, 223:1,
223:17, 223:22,
224:5, 224:10
**official**
1:18, 1:20,
1:23, 1:25, 1:28

**officially**
62:12, 185:14
**often**
40:17, 40:18,
165:15, 167:20,
168:3, 174:5,
174:7, 178:19,
180:20, 182:8,
183:13, 183:24,
187:6, 187:21,
189:10, 191:13,
193:3, 194:21,
199:1
**oh**
10:17, 30:11,
31:3, 50:6,
51:4, 52:3,
58:1, 61:16,
84:23, 98:16,
98:19, 126:4,
135:24, 138:7,
158:4, 172:9,
179:1, 179:17,
180:12, 188:9,
189:22, 193:24,
194:1, 198:16,
202:8, 207:24,
209:21, 220:15,
225:8, 228:20,
229:19, 229:20
**old**
9:22, 10:2,
11:14, 190:16
**on-duty**
99:17, 99:18
**once**
20:23, 22:17,
27:3, 31:4,
76:7, 77:1,
77:20, 78:1,
78:10, 81:1,
96:12, 101:6,
147:18, 164:2,
178:21, 180:22,
182:10, 185:7,
185:18, 187:8,
191:17, 193:12,
195:18, 197:12,

**200:11, 228:4**
**one**
5:17, 7:2,
8:22, 9:9, 9:12,
16:15, 18:20,
21:10, 22:8,
25:1, 25:14,
27:6, 31:1,
32:1, 41:16,
43:21, 44:15,
45:18, 46:7,
47:12, 51:16,
63:11, 66:10,
74:5, 78:14,
81:12, 87:13,
87:21, 90:12,
92:16, 96:17,
101:17, 103:20,
108:20, 109:14,
110:19, 110:20,
115:14, 119:19,
121:20, 122:6,
123:8, 127:22,
128:7, 128:9,
129:16, 130:12,
138:22, 139:8,
143:15, 156:18,
157:6, 162:23,
165:16, 167:2,
170:4, 172:5,
172:10, 174:5,
179:11, 183:1,
185:4, 188:5,
194:24, 196:11,
200:3, 200:4,
200:24, 201:16,
205:12, 206:7,
207:6, 209:20,
216:9, 219:13,
219:16, 219:19,
222:9, 225:24,
226:1, 229:2
**one-and-a-half**
69:12
**one-day**
88:3, 108:5,
109:22, 110:6,
115:1

Transcript of David A. Walker
Conducted on July 13, 2020                                     89

**ones**
38:23, 40:23,
40:24, 100:16,
145:23
**only**
46:24, 47:13,
56:1, 58:6,
64:5, 68:12,
73:2, 105:1,
108:7, 111:17,
119:5, 123:2,
144:10, 146:2,
146:22, 148:22,
149:5, 150:2,
152:21, 172:5,
172:10, 177:15,
190:16, 205:8,
205:16, 219:10,
225:24
**open**
19:20, 32:1,
61:17, 93:7
**operational**
66:22, 67:2
**opinion**
41:1, 56:8
**opportunities**
140:9
**opportunity**
49:4, 108:18,
155:20, 197:10
**opposed**
24:12
**opposite**
154:3
**opr**
23:23, 24:6,
84:1, 125:17,
125:20, 155:8,
164:9, 164:10,
169:8, 169:10,
221:18, 221:19
**options**
80:4
**oral**
5:11, 68:9,
68:21, 69:1,
70:6, 70:13,

**order**
120:9, 121:24
27:2, 27:14,
116:12, 116:21,
134:2, 134:4,
134:10, 217:5,
223:9, 231:3
**ordered**
134:7
**ordering**
231:1
**orders**
28:8, 28:15
**originally**
163:1
**oscar**
17:7, 86:2
**ostracized**
114:22
**other's**
182:6
**others**
47:3, 130:19
**ought**
22:18
**ourself**
225:23
**out**
7:2, 16:14,
17:18, 20:2,
20:3, 20:7,
20:18, 20:24,
26:22, 26:23,
26:24, 27:5,
27:11, 27:13,
27:15, 28:4,
28:23, 29:20,
29:21, 29:22,
30:2, 30:24,
31:5, 33:3,
44:17, 57:4,
57:15, 61:17,
62:3, 62:23,
68:11, 68:15,
73:3, 73:4,
79:12, 91:9,
91:11, 94:17,
94:20, 98:16,

98:20, 100:5,
101:5, 101:9,
115:6, 117:12,
117:13, 124:1,
124:3, 124:16,
132:15, 132:17,
136:16, 141:6,
145:9, 145:11,
145:16, 145:20,
147:16, 152:7,
154:2, 156:4,
167:10, 176:4,
176:13, 177:24,
188:3, 189:13,
190:20, 195:7,
196:17, 197:12,
198:19, 200:4,
201:7, 208:17,
210:15, 214:2,
218:10, 219:1,
226:5, 227:8,
227:21, 228:10,
228:16, 228:22,
229:11
**outcome**
130:21, 222:3
**outs**
27:7
**outside**
155:6, 167:10,
167:16, 167:20,
172:8, 178:16,
182:5, 187:4,
196:21
**outstanding**
13:18
**over**
6:10, 6:16,
10:7, 20:17,
20:21, 22:1,
24:16, 27:12,
27:16, 36:22,
40:7, 40:9,
43:2, 54:21,
75:6, 89:22,
94:2, 95:19,
105:5, 117:8,
124:5, 124:8,

124:14, 125:8,
129:1, 135:14,
142:5, 159:3,
167:3, 173:20,
179:2, 182:6,
185:14, 211:6,
216:1, 219:1,
221:24, 225:22
**overall**
131:21, 220:22
**overheard**
169:9
**overview**
59:2
**owe**
203:9
**owed**
204:5
**own**
14:17, 55:13,
173:6
**owned**
132:3

---

**P**

**packs**
228:21
**page**
1:7, 3:3, 72:2,
88:16, 97:2,
113:15, 113:17,
114:3, 114:7,
123:6, 123:7,
127:21, 128:7,
129:2, 136:1,
136:9, 136:11,
137:2, 137:8,
140:3, 140:4,
148:12, 148:22,
150:2, 150:22,
153:9, 158:21,
163:10, 178:4,
178:19, 179:21,
179:24, 180:10,
180:20, 185:5,
192:23
**palmer**
14:1, 14:3

Transcript of David A. Walker
Conducted on July 13, 2020

90

**pandemic**
167:12
**paper**
51:7
**papers**
53:18
**paperwork**
9:16, 9:20,
10:11, 11:15,
62:13, 62:18,
63:13, 81:20,
139:17, 139:19
**paragraph**
72:1, 72:4,
72:11, 72:15,
73:13, 73:15,
73:20, 73:21,
79:16, 79:20,
79:24, 81:9,
84:20, 88:11,
88:14, 88:20,
88:23, 89:20,
90:1, 90:7,
96:2, 96:7,
97:6, 97:7,
97:13, 99:21,
107:24, 108:9,
108:17, 108:20,
150:22, 153:8,
153:10, 153:17,
159:19, 161:7,
161:8, 164:22,
165:12
**paragraphs**
97:2
**part**
18:1, 19:20,
21:4, 27:11,
28:14, 28:18,
29:8, 30:1,
31:12, 38:16,
40:12, 67:1,
69:2, 69:12,
69:14, 72:20,
72:21, 72:22,
83:3, 107:6,
107:12, 131:11,
138:16, 151:5,

151:24, 152:18,
168:18, 169:5,
205:17, 208:3
**part-time**
12:22
**participant**
80:5, 80:15,
89:16
**participants**
40:19, 72:24
**participate**
157:12
**participated**
12:12, 157:17
**participating**
23:19
**particular**
43:18, 72:6,
73:5, 101:21,
102:6, 102:24,
103:4, 103:8,
174:5
**parties**
232:14
**partner**
17:22, 18:3,
174:10, 174:11,
174:14, 188:18,
188:21
**partnered**
179:9
**partners**
179:8, 179:11,
183:21, 188:4,
188:6, 188:11,
188:20, 188:24,
189:6
**parts**
185:19
**pass**
20:10, 68:12,
68:18, 120:12,
120:16, 120:18,
185:18, 229:9,
229:17
**passas**
16:23, 17:3,
100:4, 100:9,

100:10, 100:11,
103:16
**passed**
20:6, 20:7,
20:12, 68:23,
71:3, 119:21,
120:17, 120:21,
120:22, 185:21
**passing**
70:12, 208:17
**past**
9:22, 27:16,
44:6, 44:20,
52:20, 64:6,
74:9, 74:12,
75:17, 76:3,
76:5, 76:6,
147:8, 159:24
**patience**
212:24
**patrol**
27:19, 28:2,
29:1, 30:24,
31:5, 31:6,
31:9, 31:15,
39:8, 41:1,
41:4, 41:7,
41:11, 41:17,
44:11, 44:15,
44:19, 45:3,
45:5, 45:10,
76:20, 76:21,
76:23, 76:24,
77:2, 77:9,
97:18, 98:9,
98:12, 98:14,
99:7, 99:13,
99:14, 99:22,
100:1, 100:12,
100:16, 100:24,
101:9, 101:17,
101:21, 102:6,
102:24, 103:4,
103:8, 103:12,
104:1, 104:8,
107:9, 107:11,
168:7, 169:3,
179:2, 183:1,

183:18, 184:13,
187:23, 189:16,
193:9, 197:11,
208:23, 209:24,
210:2, 212:10,
216:11, 218:3,
218:13
**patrols**
28:10
**patterson**
60:10
**paul**
17:3
**pay**
82:8, 128:15,
145:12, 146:16,
146:19, 203:17
**pellegrini**
96:20
**penalty**
113:23, 146:9
**pending**
7:15
**pension**
146:20
**people's**
28:11, 151:14,
153:1, 153:5
**peoples**
153:7
**perceived**
154:21
**percentage**
57:2, 105:1
**perfect**
66:1, 66:5,
111:10, 197:20,
206:15
**perfectly**
7:19
**perform**
105:8, 107:22
**performance**
114:21, 115:7,
115:16, 115:20,
117:3, 117:5,
118:24, 121:3,
121:14

Transcript of David A. Walker
Conducted on July 13, 2020

91

**period**
46:8, 192:11
**perjury**
113:23
**persist**
22:18
**persistent**
155:24
**person**
10:16, 21:24,
22:7, 22:8,
22:15, 27:21,
27:22, 54:15,
54:22, 55:21,
58:20, 68:3,
84:8, 98:2,
109:24, 126:21,
126:23, 147:17,
149:5, 151:21,
154:6, 155:3,
185:2, 190:13,
198:19, 201:14,
215:24, 216:7,
216:8, 220:4,
220:6, 223:8,
223:24, 227:2,
227:21
**personal**
9:23, 10:6,
11:15, 29:16,
104:20, 169:17,
201:19, 214:20,
222:23
**personally**
22:17, 52:16,
54:13, 127:2
**personnel**
25:2, 46:18,
56:18, 61:1,
66:14, 66:18
**persuasions**
153:6
**pertaining**
1:35
**petrowski**
80:11, 115:13
**phone**
4:10, 9:3,

**10:21, 39:1,**
39:12, 39:14,
39:16, 39:17,
55:6, 124:5,
149:12, 149:13,
228:11
**phones**
39:16, 78:23,
193:21
**phonetic**
205:10
**physical**
19:16, 36:6,
170:4
**physically**
60:18, 60:24,
91:17, 151:13,
227:12
**physicalness**
40:22
**pick**
56:15, 66:19,
77:23, 226:3
**picked**
68:3, 124:20
**picture**
60:2
**pinson**
15:4
**place**
1:37, 12:1,
24:20, 27:1,
27:23, 41:2,
78:15, 83:1,
95:13, 107:8,
110:14, 172:18,
181:12, 230:17
**placed**
89:22
**places**
74:17
**plain**
63:2
**plainclothes**
63:3, 63:5,
63:11
**plaintiff**
3:16, 3:19,

**113:10, 130:18,**
136:4, 137:13,
138:3, 140:8,
153:18
**plaintiffs**
1:12, 2:10,
11:5, 88:17,
90:8, 97:9,
131:20, 149:10,
149:18, 150:6,
151:1, 155:18,
167:5, 191:24
**planet**
2:31
**played**
74:9
**plays**
74:7
**please**
4:3, 4:6, 4:7,
4:10, 4:21, 5:7,
5:19, 6:17,
32:8, 85:24,
112:24, 116:7,
135:17, 135:19,
158:8, 163:4,
197:18, 231:4
**plight**
173:3
**plus**
12:2, 210:17,
210:20, 210:23
**point**
7:2, 25:6,
57:4, 94:5,
126:7, 139:13,
151:7, 195:4,
195:7, 195:14,
226:23
**pointed**
54:22
**police**
12:17, 14:3,
14:6, 14:9,
14:13, 122:5,
132:4, 132:8,
132:13, 132:17,
133:9

**policies**
24:23
**policy**
21:14, 21:17,
23:14, 24:7,
24:17, 25:22,
32:20, 37:15,
75:13, 121:9,
121:19, 122:5,
225:2, 225:4,
225:23
**politics**
20:14
**position**
29:13, 62:19,
70:13, 71:5,
76:8, 76:18,
81:19, 119:3,
121:10, 122:18,
123:2, 123:3,
128:13, 128:22,
141:7, 142:9,
142:15, 145:24,
146:1, 146:7,
150:14, 151:14,
190:10, 193:11,
200:15, 217:13,
219:12, 229:3,
229:6, 229:7,
229:22, 230:6
**positions**
73:14, 73:22,
74:18, 75:24,
76:17, 76:19,
97:9, 122:8,
122:12
**possible**
59:4, 71:11,
79:4
**possibly**
33:1, 227:9
**post**
145:18
**posted**
123:1
**potential**
216:17, 216:23,
217:6

Transcript of David A. Walker
Conducted on July 13, 2020
92

potentially
217:5
power
68:7, 68:12,
68:13, 68:16,
68:19, 68:23,
69:4, 69:6,
69:8, 70:5,
70:12, 71:3,
119:8, 119:18,
119:21, 120:12,
120:22, 121:24,
185:18, 185:21,
229:10
powers
144:24
practically
30:23
practice
97:24
practices
44:6, 44:20,
52:20, 64:6,
74:10, 74:12,
75:17, 76:3,
76:5, 76:6
prefer
36:10, 36:11
preferable
74:14
preference
214:18
preferential
77:11
prepandemic
167:13, 167:14
prepare
9:15, 10:12,
27:9
present
2:29, 52:2,
59:17, 59:24,
64:17, 91:17,
100:14, 100:19,
107:10, 154:5,
156:16, 159:6,
160:4, 160:7,
195:8, 211:10,

215:5, 227:12
presently
148:13, 219:11
presumably
127:15
pretrial
26:21, 29:23,
43:6, 72:24,
217:11
pretty
18:2, 21:8,
79:13, 83:10,
84:8, 101:3,
106:2, 129:14,
151:6, 152:16,
152:22, 156:5,
161:15, 167:9,
171:2, 176:14,
181:22, 182:23,
183:15, 183:19,
184:1, 185:3,
185:5, 190:15,
193:22, 195:17,
197:6, 202:23,
204:13, 207:2,
218:9, 218:16,
228:18
previous
145:1, 145:3
previously
112:3
primarily
17:24
prior
11:5, 37:7,
146:22
privy
55:16, 170:21,
176:19, 189:7
probably
33:18, 35:7,
39:12, 40:9,
74:23, 78:6,
91:9, 95:13,
96:22, 97:22,
101:10, 110:14,
142:4, 162:2,
172:21, 183:16,

203:23, 205:22,
221:17
probe
87:19
probes
87:21
problem
30:5, 30:20,
35:23, 105:9,
125:24, 197:22,
199:6, 203:2,
203:3, 204:15
problems
24:21, 152:1,
173:6, 202:24,
205:11
procedure
1:34, 25:13,
25:14, 25:17,
53:11, 154:19,
154:21, 217:10
proceed
4:16
proceeding
4:2, 4:4
process
24:14, 26:22,
27:4, 34:5,
34:10, 35:20,
35:22, 35:24,
67:21, 67:23,
68:5, 68:6,
108:18, 108:21,
108:22, 108:23,
109:2, 109:7,
121:22, 125:4,
141:23, 186:5,
186:6, 186:12,
224:22, 230:16
processed
225:10
processing
227:6
production
10:4, 10:8
professional
24:1, 24:23,
125:18, 164:6,

164:16, 166:10,
166:14
program
28:4, 218:7,
218:8
progressive
32:19, 32:20,
35:14, 88:24,
89:9, 89:13
prohibiting
21:15
promote
115:15, 144:2,
144:5, 144:17
promoted
15:19, 69:21,
70:11, 117:24,
121:16, 121:20,
122:7, 122:9,
122:13, 122:15,
126:12, 130:6,
130:7, 130:9,
140:20, 141:17,
142:12, 142:14,
143:4, 143:12,
143:16, 143:18,
143:24, 145:4,
147:9, 220:11,
220:18, 220:24,
221:2, 223:11,
223:14, 230:9
promotion
68:13, 70:4,
119:5, 119:9,
119:18, 120:1,
120:12, 121:5,
121:17, 121:23,
122:5, 123:2,
142:9, 142:17,
144:23, 145:7,
145:20, 147:8,
150:14, 201:10,
208:6, 219:8,
219:10, 222:12,
229:8, 230:1,
230:2, 230:5
promotional
145:10

Transcript of David A. Walker
Conducted on July 13, 2020

93

promotions
64:24, 65:1,
67:20, 67:22,
69:19, 70:9,
71:7, 119:4,
121:12, 122:21,
140:10, 145:9,
145:14, 145:15,
145:19, 219:6
prompt
217:5
properly
147:9
protected
153:11, 153:12,
153:14, 153:18,
153:23
protection
27:2
prove
95:12, 130:24
proved
131:1, 131:2
provide
4:11, 8:23,
73:3, 108:18,
129:9
provided
10:3
providers
147:12
prskalo
105:24
psychiatrists
148:5
psychological
68:8
psychologist
148:4
psychology
70:6, 121:24
public
4:19
pull
112:22, 112:23,
114:8, 150:18,
157:24, 162:23,
163:1

pulling
28:8
punishment
78:3, 78:18,
213:17
punitive
140:12
purchase
4:13
purpose
35:12
purposes
4:4, 23:17,
163:10
pursuant
1:33, 4:18
put
20:19, 27:4,
29:14, 30:19,
41:12, 41:20,
43:2, 44:17,
46:8, 48:1,
51:7, 51:24,
52:16, 62:4,
68:10, 68:15,
71:19, 77:12,
78:7, 78:13,
78:17, 79:4,
93:19, 97:22,
98:2, 98:23,
101:11, 104:24,
105:1, 111:12,
124:4, 126:14,
140:23, 169:23,
185:1, 193:20,
198:8, 198:19,
201:7, 204:4,
204:6, 205:23,
225:14, 228:21
putting
24:19, 47:13,
78:9, 102:5,
190:9

**Q**

qualified
30:9
question
6:16, 6:18,

7:7, 7:15, 7:18,
7:21, 7:22,
23:18, 30:8,
41:15, 54:8,
58:12, 65:3,
77:6, 79:9,
92:2, 98:6,
102:19, 103:6,
103:7, 107:16,
110:11, 114:8,
114:9, 114:11,
114:12, 114:15,
116:2, 116:7,
116:18, 119:13,
119:15, 122:10,
123:8, 126:17,
130:16, 133:7,
138:15, 151:10,
153:15, 155:11,
158:4, 168:4,
192:8, 221:11,
229:2
questioning
213:19, 214:12,
222:21
questions
8:13, 26:5,
66:3, 123:16,
212:6, 212:22,
213:3, 213:9,
213:20, 214:9,
221:9, 222:6,
222:19, 224:14,
230:20, 230:22
quick
40:11, 67:21
quiet
39:2
quite
79:16, 89:20,
205:22
quote
128:13
quote-unquote
67:11

**R**

r
17:7

race
43:23, 47:4,
50:8, 50:17,
51:1, 51:2,
51:9, 51:13,
51:17, 52:5,
52:6, 54:7,
54:12, 58:23,
59:8, 61:15,
64:4, 64:10,
64:23, 65:8,
72:19, 85:9,
97:16, 97:17,
99:4, 99:23,
100:2, 102:14,
102:21, 102:22,
102:24, 116:22,
117:22, 118:3,
118:14, 118:18,
144:9, 156:8,
208:19, 209:8
racial
56:19, 57:9,
64:19, 161:9
racism
126:13, 198:20,
201:13, 204:6
racism-wise
171:14
racist
51:8, 51:9,
51:20, 90:9,
90:20, 165:22,
198:14, 198:18,
201:12, 202:2,
202:4, 203:24,
204:1, 204:3,
204:4, 205:19
radio
39:11, 39:14,
105:5
radios
39:15
raise
5:7, 230:6
raised
25:6
raises
140:10

Transcript of David A. Walker
Conducted on July 13, 2020

94

**ran**
177:18, 177:22
**random**
39:23, 156:1
**range**
13:19
**ranzino**
1:19, 17:16,
47:7, 48:10,
48:11, 48:14,
48:15, 48:20,
48:21, 49:7,
50:4, 51:12,
51:21, 52:5,
52:7, 59:3,
77:18, 90:24,
91:1, 91:4,
91:14, 91:19,
92:3, 92:11,
93:1, 93:3,
94:1, 94:4,
94:14, 95:10,
95:17, 96:4,
96:12, 103:19,
118:10, 127:4,
127:24, 151:23,
152:22, 157:9,
157:10, 160:1,
160:2, 160:3,
160:6, 160:13,
161:11, 161:13,
161:18, 161:19,
161:20, 164:24,
165:3, 165:5,
165:13, 165:15,
165:18, 165:23,
166:6, 169:9,
174:22, 179:16,
179:18, 179:22,
180:3, 198:5,
199:21, 199:24,
206:5, 223:16
**ranzino's**
49:10, 161:11
**rare**
55:9, 101:3,
101:6
**rarely**
167:23

**rate**
218:8
**rather**
68:19, 211:6,
230:9
**ratkovic**
60:9, 60:13
**reach**
69:12
**react**
94:24
**read**
88:22, 97:5,
113:21, 114:14,
158:6, 225:7
**reading**
232:10
**real**
67:21, 126:12
**reality**
122:17
**realize**
98:19
**really**
6:15, 30:8,
76:19, 95:11,
95:12, 98:12,
98:22, 117:7,
133:21, 151:13,
156:4, 167:15,
172:7, 173:1,
173:16, 175:2,
175:22, 175:24,
176:6, 178:17,
180:17, 189:14,
190:8, 198:22,
198:23, 200:6,
204:5, 206:23,
207:8, 212:13,
213:1, 217:1,
219:6, 220:3
**realtime**
228:3, 228:5
**reason**
8:4, 8:6,
36:24, 38:9,
44:4, 44:15,
63:17, 63:18,

82:16, 100:5,
126:11, 126:12,
138:14, 146:12,
155:22, 159:1,
161:24, 164:1,
166:12, 166:13,
174:18, 174:23,
175:6, 175:14,
199:2
**reasonable**
225:13, 225:16
**reasons**
8:8
**reassign**
112:1
**reassigned**
135:6, 169:3
**recall**
18:19, 92:6,
116:3, 130:1,
135:15, 177:1,
182:15, 191:23,
192:4, 221:8
**recalled**
166:17
**receive**
36:21, 62:21,
79:23, 80:3,
87:10, 107:21,
117:10, 120:12,
121:13
**received**
12:6, 12:9,
40:16, 41:17,
41:24, 79:17,
80:9, 80:14,
82:24, 84:19,
88:4, 100:12,
108:4, 108:12,
108:15, 108:24,
114:16, 114:20,
114:24, 116:1,
116:13, 116:22,
117:4, 117:15,
117:21, 121:4,
121:13, 123:10,
142:8, 150:9,
180:11, 185:23,

188:8, 188:15,
198:1, 204:12,
207:22, 222:12
**receiving**
19:19, 26:20,
118:24, 132:2,
150:13
**recent**
138:8, 138:23,
139:14, 155:14
**recently**
74:16, 117:16,
183:4, 221:1
**recertify**
20:23
**recollection**
160:12, 176:22,
188:13
**recommendation**
55:23
**recommended**
34:12
**recommending**
87:2
**record**
4:17, 4:22,
5:20, 32:6,
32:9, 87:17,
112:14, 136:19,
136:21, 136:22,
153:22, 156:22,
156:23, 158:19,
199:15, 199:19,
212:1, 212:2,
232:8
**recorded**
232:6
**recording**
4:4, 4:12,
65:23
**records**
81:14, 82:1,
82:3, 82:7,
82:12, 83:6,
83:8, 84:5,
89:17, 108:4,
109:10, 115:1
**recovered**
201:17

Transcript of David A. Walker
Conducted on July 13, 2020

95

**redirect**
3:9, 224:15
**reduced**
232:7
**refer**
58:22, 227:11
**reference**
108:2
**referenced**
21:5, 128:10,
159:2, 164:9,
169:7
**references**
108:1
**referred**
16:9, 19:7,
26:13, 36:5,
82:2, 96:1
**referring**
9:21, 18:24,
45:8, 50:19,
72:17, 73:24,
76:3, 79:24,
81:9, 88:10,
92:23, 105:22,
133:24, 174:6
**refers**
90:1
**reflect**
159:24
**refresh**
160:12
**refuse**
227:14
**refused**
134:8, 134:10
**regarding**
35:14, 72:21,
73:13, 73:21,
74:3, 82:24,
90:16, 103:11,
108:20, 113:23,
114:23, 123:9,
148:12, 156:8,
166:10, 218:20
**regardless**
67:6, 72:13,
73:23, 74:6,

89:22, 188:16
**regards**
92:8, 97:24,
137:16, 215:8,
215:13, 221:10
**regime**
20:22
**region**
211:16
**regions**
67:16, 209:4,
209:22, 210:1
**regular**
174:9, 174:10,
174:14
**regularly**
21:8, 90:8,
96:10, 195:19
**regulars**
196:11
**regulations**
28:4
**reincarcerate**
27:24
**reincarcerated**
218:22
**reincarceration**
104:1, 104:5,
104:21, 218:8,
218:20
**reincarcerations**
104:14, 225:10
**reincarnation**
104:14
**reject**
72:23, 73:6,
73:7, 80:5,
80:8, 80:20,
80:23, 81:2,
227:18, 227:19
**rejected**
80:5, 80:9,
80:15, 227:21
**rejecting**
73:8, 73:10,
89:16, 217:20
**relate**
200:21

**related**
42:22, 80:12,
81:6, 89:3,
109:9, 123:12,
147:13, 148:5,
176:23, 215:22
**relation**
140:17, 214:11
**relationship**
152:16, 161:13,
175:17, 176:17,
201:17, 202:21,
202:22, 204:14,
206:24
**relative**
232:12, 232:14
**relatively**
45:11
**released**
190:24
**relevance**
133:5
**relevant**
88:17
**rely**
40:13
**remedy**
102:16
**remember**
4:6, 11:17,
11:18, 11:19,
12:8, 20:19,
45:21, 45:22,
59:20, 66:4,
92:4, 92:5,
129:24, 133:20,
158:15, 168:23,
169:13, 173:24,
174:3, 180:2,
186:16, 190:19,
213:20, 214:12,
216:12, 221:10,
222:20
**remind**
9:24, 132:6,
169:2
**remotely**
4:2, 4:21

**removal**
108:4, 109:9,
114:24
**remove**
123:19, 134:7
**removed**
81:13, 81:24,
82:14, 82:17,
82:18, 89:17,
94:1, 94:4,
94:9, 94:12,
116:14, 157:10,
160:14, 177:21,
200:16, 227:2
**renee**
123:22, 124:14,
126:21
**rep**
35:8
**repeat**
54:8, 59:22,
75:6, 75:9,
104:3, 110:5,
116:7, 119:14,
122:10, 151:10,
192:18, 195:10,
209:11
**rephrase**
7:20
**replacements**
196:18
**report**
22:19, 22:21,
22:22, 80:21,
93:20, 132:15,
132:16, 133:9
**reported**
2:37, 95:22,
133:2, 169:10
**reporter**
4:8, 4:16, 5:6,
5:13, 6:12, 7:5,
23:1, 25:24,
32:6, 33:8,
34:16, 45:13,
65:17, 75:5,
75:10, 85:19,
104:2, 111:6,

Transcript of David A. Walker
Conducted on July 13, 2020

96

130:7, 136:18,
192:17, 209:11,
217:16, 223:5,
230:23, 231:1,
231:6, 232:1
**reports**
82:15, 153:20
**represent**
198:10
**representing**
5:18
**reprimand**
32:22, 32:23,
33:14
**request**
30:20, 225:17
**requested**
15:3, 81:18,
82:11, 98:21
**requests**
111:4
**require**
129:10
**required**
190:11
**requirements**
14:15, 119:19
**reserve**
116:5
**residence**
12:2, 28:22
**residency**
14:14, 20:18
**resign**
14:13, 14:16
**resigned**
184:19
**resolution**
53:8, 53:9
**resource**
125:24
**resources**
24:3, 24:5,
24:7, 123:22,
159:10, 169:8,
225:14
**respect**
161:14

**respected**
207:4
**respond**
39:18, 51:3,
60:23, 79:1,
217:2
**responded**
51:19, 165:1
**response**
49:10, 53:21,
114:13, 114:19,
116:2, 116:6,
116:8, 123:10,
123:15, 128:4,
137:13, 138:15,
140:4, 200:12
**responsibility**
55:12, 55:17
**responsible**
33:16, 100:21,
101:12, 208:14
**responsive**
149:2
**rest**
57:13, 57:14,
57:16
**result**
105:2, 130:3,
141:6, 147:5,
150:13, 200:16,
226:10
**resumed**
32:10, 112:15,
136:23, 156:24,
212:3
**retaliate**
189:2
**retaliated**
61:23, 154:3,
154:13, 155:13
**retaliating**
154:6, 186:1
**retaliation**
21:12, 21:16,
22:2, 22:6,
23:8, 24:12,
126:15, 144:23,
145:12, 151:17,

153:24, 154:14,
154:16, 154:18,
156:9, 176:10,
177:14
**retaliatory-type**
201:14
**retire**
87:3, 125:7,
178:23
**retired**
100:20, 135:9,
170:8, 178:21,
179:7, 180:24,
203:21, 203:22
**retirement**
140:10
**retiring**
180:23
**retract**
51:15
**return**
15:4, 104:7,
147:2
**returned**
203:13
**returning**
119:3
**revert**
63:3
**review**
10:7, 24:1,
72:4, 72:9,
88:19, 97:2,
113:20, 114:12,
118:24, 121:4,
123:15, 125:18,
136:10, 158:14,
164:6, 164:17,
166:10, 166:15
**reviewed**
11:16
**reviewing**
10:10, 55:12
**ridiculous**
80:18
**riding**
39:11
**rights**
217:9

**ring**
131:13, 177:4,
194:3, 194:8
**risk**
97:20, 104:6,
104:9
**river**
204:15
**rivero**
106:17
**road**
2:21, 130:11
**robert**
17:7
**rockwell**
88:1, 168:21,
168:22
**rohloff**
1:26, 17:17,
127:11, 143:5,
143:14, 144:6,
175:14, 206:23,
207:1, 207:17,
208:11, 208:24,
224:9
**role**
23:9, 74:7,
74:9, 75:15,
121:5, 204:10,
204:22, 205:1,
207:17, 207:23,
208:5, 208:11,
209:3
**roll**
52:3, 52:4,
52:10, 88:2,
91:5, 91:8,
91:13, 91:23,
92:20, 92:22,
93:7, 94:13,
96:12, 159:22,
160:7, 160:9,
168:10, 168:15,
168:17, 168:20,
168:22, 179:23,
183:8, 183:11,
183:14, 183:16,
187:18, 187:21

Transcript of David A. Walker
Conducted on July 13, 2020

97

room
8:12, 8:13,
20:11, 20:12,
31:24, 111:12,
111:20, 111:23,
112:2, 112:5,
112:8, 146:10,
159:10
rooms
111:14
roster
31:18, 54:17,
54:20, 54:24,
55:9, 55:11,
55:12, 55:15,
55:18, 57:4,
58:4, 58:7,
58:13, 58:15,
64:11, 64:16,
101:4, 101:6,
101:7, 159:23,
181:13, 204:17,
205:3, 208:17,
213:22, 214:5,
214:7, 218:21
rotate
17:22
rotonda
143:1, 143:2,
143:4, 144:3
roughly
6:4
ruled
131:10
rules
1:34, 6:10,
28:3
run
4:3, 68:17,
68:18, 69:13,
69:15, 119:20,
119:22, 120:3
run-in
200:24, 201:16
run-ins
207:9

**S**

s
17:3, 17:4,

19:1, 26:2
s-p-i-v-e-y
45:14
sad
177:3
safer
41:2, 44:16,
83:6
saith
231:10
sake
26:7
salary
141:1, 141:2,
141:14
sam
17:4, 19:1,
26:2
same
6:19, 18:2,
24:14, 25:17,
48:22, 53:6,
111:14, 143:17,
161:19, 165:7,
167:24, 168:5,
177:7, 179:1,
182:18, 182:22,
182:23, 183:15,
190:20, 194:18,
196:16, 206:3,
206:4, 211:15,
223:23, 224:6,
224:11, 224:13,
227:6
samuel
1:6, 178:4
sanitary
37:3, 38:7,
38:10
saturday
16:6, 188:1,
188:2
saw
48:8, 58:6,
58:19, 59:5
saying
23:17, 23:18,
37:16, 45:23,

46:13, 46:22,
47:11, 47:12,
48:2, 51:11,
64:16, 70:8,
70:24, 76:2,
76:21, 77:1,
89:8, 89:21,
98:8, 99:21,
100:23, 101:8,
103:10, 103:21,
103:23, 104:18,
105:6, 125:1,
141:16, 154:13,
155:12, 171:3,
199:12, 227:20,
227:23, 227:24,
228:17, 229:13,
230:7
says
6:14, 24:6,
71:21, 72:5,
72:13, 74:5,
79:17, 88:24,
90:7, 108:9,
108:17, 116:9,
116:19, 123:5,
125:24, 151:1,
158:22, 159:6,
159:9, 159:12,
159:13, 159:20,
159:22, 160:21,
160:23, 161:18,
162:14, 163:13,
163:17, 163:20,
164:5, 164:15,
164:20, 164:22,
165:11, 165:20,
166:5, 166:8,
206:5
scabies
90:3, 90:4
schedules
28:12
school
28:9, 68:4
schoolings
68:2
schools
12:21, 28:11

scoot
206:14
score
118:7, 118:12
scores
115:6, 115:10,
115:14, 117:4,
117:6, 117:9
screen
71:13, 71:20
scroll
113:14, 114:9,
158:18
seat
177:24, 228:13
sec
13:10, 73:11,
136:21, 209:20
second
16:10, 16:11,
16:12, 16:21,
25:5, 31:21,
42:13, 65:21,
99:11, 113:19,
114:12, 115:20,
116:18, 120:21,
120:22, 123:14,
129:16, 136:10,
145:15, 150:19,
159:19, 161:7,
162:23, 177:11
section
4:18, 61:22,
99:13, 129:13,
150:24
security
13:24, 14:1,
14:3, 15:9,
15:10
see
14:21, 16:17,
29:24, 43:10,
44:4, 47:17,
48:20, 50:13,
51:24, 52:15,
55:11, 55:16,
58:14, 65:12,
72:3, 72:14,

Transcript of David A. Walker
Conducted on July 13, 2020

98

79:20, 79:22,
86:10, 88:18,
92:22, 97:6,
97:7, 97:13,
102:10, 105:7,
111:8, 112:11,
113:7, 113:12,
113:16, 114:11,
127:21, 128:6,
129:2, 129:15,
136:6, 136:13,
137:2, 137:17,
147:12, 148:4,
150:11, 156:19,
159:17, 160:10,
166:8, 172:4,
175:10, 176:1,
179:22, 187:13,
194:1, 195:22,
198:4, 198:23,
202:15, 206:22
**seeing**
24:13, 228:12
**seeks**
140:8
**seemed**
186:13, 186:14,
189:1
**seems**
53:2, 75:21,
154:3, 160:20,
160:22, 190:12,
190:14
**seen**
24:8, 46:23,
46:24, 48:10,
53:18, 54:13,
80:10, 148:6,
153:5, 153:7,
178:7, 183:20,
190:22, 199:4,
224:12
**select**
124:19
**selected**
67:24
**selecting**
209:3

**self**
55:3
**send**
44:12, 49:12,
56:14, 67:6,
67:8, 92:23,
149:22, 194:24,
227:14
**sending**
67:3, 188:19,
217:21
**senior**
30:4
**seniority**
30:21, 31:7,
44:5, 72:14,
73:23, 74:6,
74:7, 75:15,
75:20, 75:22,
76:1, 76:22,
77:1, 77:8,
77:21, 89:22,
98:24, 143:24,
155:24, 185:9,
186:13, 207:5,
214:15, 214:18,
215:8, 218:13,
218:17
**sense**
40:14, 57:9,
110:19, 177:12
**sent**
46:1, 46:3,
66:19, 68:1,
81:17, 150:5,
189:17, 215:21,
228:1, 228:2
**sentence**
116:8, 159:13
**separate**
168:15, 168:16
**separating**
40:23
**september**
124:23, 147:1
**sergeant**
16:23, 16:24,
68:11, 68:14,

68:20, 69:5,
69:20, 70:4,
119:5, 120:1,
120:13, 120:20,
121:6, 122:2,
122:9, 122:13,
122:14, 122:22,
123:3, 145:24,
185:15, 185:17,
208:7, 219:11,
229:3
**sergeants**
68:6, 68:7,
70:20
**seriously**
23:16, 53:3
**serve**
82:5, 88:4
**served**
109:5
**service**
4:19, 19:2,
29:3, 77:5
**set**
3:18, 3:21,
17:22, 33:3,
113:11, 125:6,
136:6, 162:23,
167:2, 191:11,
232:17
**setting**
19:20, 37:2
**settled**
41:13, 146:17
**seven**
18:6, 60:1,
63:16
**several**
58:16, 58:18
**shake**
7:4, 7:8
**share**
71:12
**shared**
199:22
**sharer**
173:20
**she'll**
139:20

**sheehan's**
20:22
**sheet**
181:14, 214:7,
227:18
**sheets**
159:23, 213:22,
214:5, 218:21
**sheriff**
1:16, 3:20,
20:15, 20:22,
24:18, 34:8,
80:13, 136:5,
142:5
**sheriff's**
3:26, 12:18,
13:14, 13:15,
13:22, 14:8,
14:10, 14:19,
14:23, 19:23,
21:7, 21:14,
62:1, 116:13,
130:19, 134:11,
137:15, 146:23,
176:20, 181:23,
225:14
**shields**
1:21, 3:17,
17:20, 43:22,
47:3, 47:6,
47:12, 48:1,
48:9, 48:12,
49:11, 49:15,
50:16, 50:24,
54:6, 54:11,
54:13, 54:18,
57:11, 58:3,
58:6, 58:11,
58:13, 58:14,
59:5, 59:7,
59:9, 60:11,
60:15, 61:14,
64:2, 64:8,
64:22, 65:7,
80:13, 81:13,
90:8, 90:11,
90:16, 90:17,
96:2, 96:8,

Transcript of David A. Walker
Conducted on July 13, 2020

99

96:11, 96:17,
97:7, 97:14,
100:18, 100:20,
100:23, 101:4,
101:8, 101:14,
101:16, 102:5,
102:20, 102:23,
103:3, 103:7,
103:14, 108:10,
108:13, 110:1,
113:11, 113:24,
115:12, 126:24,
130:4, 130:18,
134:3, 134:7,
151:24, 169:14,
169:22, 170:2,
170:8, 170:20,
173:4, 173:10,
174:19, 200:19,
206:5, 223:21,
224:2
**shift**
16:6, 16:8,
27:9, 31:11,
38:16, 38:19,
42:7, 43:11,
43:14, 86:15,
86:18, 86:20,
168:1, 168:5,
171:14, 175:23,
176:4, 176:15,
177:8, 177:9,
179:1, 179:4,
179:6, 179:7,
182:18, 182:22,
182:23, 183:5,
192:13, 192:15,
192:16, 192:20,
192:21, 194:18
**shifts**
16:3, 42:9,
167:22
**shipped**
227:22
**short**
32:12, 66:14
**shorter**
110:18

**shot**
87:21
**should**
4:5, 43:19,
56:10, 56:11,
71:16, 111:13,
111:24, 115:3,
116:1, 117:14,
117:18, 118:8,
118:12, 125:5,
129:9, 141:17,
142:14, 145:21,
153:23, 177:3,
206:11, 223:11,
230:16, 231:8
**shouldn't**
53:6, 93:10,
95:1, 95:4,
170:9, 202:10,
206:1
**show**
133:23, 175:3,
213:22, 218:21
**showed**
27:6, 172:19
**showing**
163:8
**shown**
175:11
**sick**
38:14, 202:6,
202:11
**side**
20:4, 97:20,
97:21, 98:10,
155:3, 163:20,
210:5, 210:6,
210:7, 210:8,
210:9, 210:11,
210:12, 210:14,
210:17, 210:20,
210:23, 212:12,
212:13, 218:5
**sides**
171:5
**sign**
80:23, 81:1,
85:2, 115:13,

146:12, 227:19
**signature**
114:2, 137:5,
227:23, 230:23
**signature-p1kal**
232:21
**signed**
80:6, 81:2,
89:12, 93:21,
110:3, 110:6
**signing**
232:11
**similar**
110:19, 137:16
**similarly**
79:17, 81:4
**simple**
223:10
**since**
8:11, 12:11,
15:22, 18:13,
24:18, 25:12,
25:17, 26:16,
26:17, 29:6,
30:10, 30:15,
32:21, 59:19,
59:23, 61:23,
71:6, 99:6,
107:9, 111:17,
122:20, 124:24,
130:6, 130:10,
132:6, 134:11,
135:13, 154:4,
168:3, 178:11,
178:21, 181:22,
190:24, 196:20,
201:17, 211:11,
218:2, 221:4
**single**
25:8
**sir**
71:24, 97:12,
133:7, 145:6,
146:4, 161:17
**sit**
65:24, 69:11,
133:22
**sitting**
60:20

**situated**
79:18, 81:4
**situation**
27:21, 37:4,
39:19, 40:9,
40:14, 156:6
**situations**
216:18
**situps**
69:11
**six**
18:4, 60:1,
81:14, 82:13,
176:4
**skin**
93:8, 146:22,
153:1, 153:3,
153:6, 153:7,
199:7
**slam**
78:23
**slaughter**
1:11, 45:12,
45:24, 46:15,
46:23, 48:5,
48:19, 48:20,
50:6, 50:15,
51:12, 52:4,
59:3, 196:10,
196:15, 196:19,
197:24
**slaughter's**
50:1
**slip**
94:17, 94:20
**small**
112:18
**smoothly**
4:3
**socialize**
167:15, 172:8,
178:15, 178:18,
182:5, 187:3,
187:5
**some**
18:18, 20:16,
34:1, 36:9,
36:21, 37:23,

Transcript of David A. Walker
Conducted on July 13, 2020

100

38:9, 39:23,
53:11, 53:12,
70:8, 80:20,
86:12, 90:2,
92:23, 93:8,
106:17, 121:15,
123:12, 124:18,
125:18, 126:13,
126:15, 129:20,
130:2, 130:12,
130:19, 131:20,
133:14, 139:13,
152:17, 154:9,
155:18, 157:8,
157:20, 167:4,
169:21, 173:13,
175:11, 189:13,
195:4, 199:11,
201:20, 202:3,
204:15, 204:20,
212:16, 212:24,
220:4, 220:6,
221:2, 221:8
**somebody**
24:13, 35:9,
40:10, 46:20,
53:4, 67:8,
73:8, 76:1,
81:2, 98:3,
104:7, 118:16,
123:21, 126:19,
132:14, 142:4,
155:6, 173:17,
175:9, 177:18,
177:22, 178:1,
179:20, 180:7,
180:24, 198:20,
200:2, 204:20,
207:4, 207:15,
207:16, 213:16
**somehow**
144:12
**someone**
34:6, 80:20,
88:14, 142:3,
160:1, 206:23
**someone's**
58:23

**someplace**
77:13, 81:18
**something**
11:19, 18:24,
24:14, 35:19,
36:21, 42:12,
49:24, 53:1,
54:22, 66:11,
73:8, 73:12,
76:2, 76:13,
79:1, 80:17,
80:18, 92:5,
92:9, 92:10,
92:17, 92:19,
93:9, 93:10,
109:3, 118:14,
118:17, 126:13,
132:20, 141:24,
144:15, 145:4,
148:3, 153:23,
154:11, 162:2,
169:11, 169:24,
173:9, 175:9,
180:7, 202:9,
203:6, 213:18,
221:14, 229:20,
230:9, 230:14
**sometime**
48:18, 54:16,
91:14, 92:20,
102:2, 107:12,
118:21, 139:10,
148:11, 154:5,
196:6
**sometimes**
7:4, 12:19,
27:13, 29:20,
29:22, 33:20,
38:18, 40:18,
40:22, 55:20,
68:1, 100:4,
101:1, 153:16,
166:2, 183:22,
184:8, 189:9,
191:7, 196:7,
197:2, 226:18
**somewhere**
133:14

**son**
202:6, 202:11,
202:16
**soon**
146:15
**sorry**
10:17, 12:13,
18:23, 23:1,
26:12, 34:16,
36:13, 42:12,
42:18, 45:13,
47:24, 51:4,
57:6, 58:1,
74:1, 75:5,
77:6, 84:24,
85:19, 88:14,
104:2, 109:16,
110:4, 126:2,
126:4, 130:7,
132:24, 133:16,
142:20, 151:19,
153:15, 161:7,
162:20, 162:24,
192:17, 197:21,
198:16, 206:19,
209:11, 210:13,
214:8, 215:2,
216:22, 222:16,
223:5, 225:7,
226:20
**sort**
6:10, 21:4,
59:1, 131:12,
134:5, 187:9,
197:8, 209:23
**sound**
132:4
**sounds**
8:10, 191:15
**south**
2:4, 34:6,
87:24, 97:21,
98:10, 210:8,
212:13, 218:5
**southeast**
210:6, 210:9,
210:10, 210:20
**southwest**
210:6, 210:8,

210:9, 210:17
**speak**
53:2, 53:4,
54:14, 102:16,
127:5, 133:8,
172:4, 175:18,
198:2
**speaking**
4:8, 4:11,
75:6, 125:4,
173:22
**speaks**
47:17, 129:14
**specific**
49:23, 119:22,
180:2, 180:5,
181:8, 186:3,
218:3
**specifically**
157:8, 174:1,
176:23, 186:3,
207:21, 213:12,
214:6, 214:7,
214:11
**specifics**
196:2
**speculation**
79:7, 220:2
**spell**
5:19, 17:1,
17:13, 85:23
**spivey**
45:12, 45:14,
45:24, 46:16,
46:23, 48:4,
48:15, 49:24,
50:6, 50:15,
51:12, 52:4,
59:3, 196:15
**splayt**
1:33, 2:37,
232:3, 232:24
**split**
188:23, 189:6
**splitting**
188:10
**spoke**
49:20, 70:17,

Transcript of David A. Walker
Conducted on July 13, 2020                                    101

| | | | |
|---|---|---|---|
| 91:10, 101:23, 124:13, 124:15, 124:24, 152:6, 176:3, 177:2, 177:15 | **starting** 4:22, 125:12, 140:21, 189:17 | **steps** 35:4, 121:23 | **stress** 36:19, 36:23, 47:22, 129:11, 147:20, 147:24, 148:5, 148:7, 180:15, 197:12, 215:21 |
| **spoken** 157:7 | **state** 4:21, 5:19, 64:18, 114:19, 165:3 | **steward** 176:5 | |
| **spot** 84:10, 144:13, 144:14, 144:15, 200:10 | **stated** 43:19, 53:23, 63:18, 161:12, 165:14 | **stick** 115:19, 145:14 | **stressed** 147:16 |
| **spread** 47:19 | **statement** 3:27, 32:24, 51:16, 69:2, | **still** 12:24, 15:24, 22:18, 32:13, 53:9, 54:1, 63:22, 65:24, 66:2, 67:3, 68:14, 76:18, 82:9, 91:15, 102:9, 105:17, 107:15, 109:4, 111:13, 112:19, 125:3, 126:19, 133:15, 156:20, 157:4, 212:6, 222:3, 228:9, 228:10 | **stressful** 78:22, 84:13, 129:11, 148:3, 184:21, 190:10, 216:16 |
| **squad** 146:11, 177:24 | 113:22, 134:19, 134:23, 157:19, 159:21, 160:20, 160:22, 162:7, | | **strickland** 1:5, 171:18, 171:21, 192:2 |
| **staff** 30:18, 38:15, 54:14, 56:20, 122:5 | 162:12, 162:13, 162:14, 163:12, 163:13, 163:18, 164:21, 165:9, 166:14, 166:18, 166:19, 177:3, 201:8 | | **strictly** 105:5 |
| **stand** 112:24, 135:19, 150:20, 158:8, 163:4 | | | **strike** 36:13, 162:24, 187:9 |
| **standards** 79:2 | | **stipulate** 52:19 | **strong** 9:17 |
| **standing** 50:4, 228:10 | **statements** 23:12, 169:8, 204:4 | **stolen** 132:14, 133:3, 133:10 | **student** 12:22 |
| **standpoint** 83:11 | **states** 1:1, 1:35, 137:13 | **stood** 20:4 | **stuff** 62:4, 168:10, 187:9, 196:4, 202:3, 203:7 |
| **star** 154:10 | **stay** 27:1, 144:1 | **stop** 25:5, 73:11, 92:2, 170:3, 171:15, 203:4 | **subjected** 151:1 |
| **start** 15:1, 16:22, 17:12, 24:19, 29:11, 73:19, 75:22, 104:16, 107:11, 128:24, 183:2, 188:19, 195:5, 195:18, 196:13, 229:18 | **stayed** 18:11, 20:11 | | **subordinate** 96:8, 96:17, 97:8 |
| | **staying** 12:1 | **stopped** 75:20 | **substance** 108:23, 159:16 |
| | **steadily** 217:20 | **straight** 44:10, 44:18, 44:21, 45:2, 46:1, 47:5 | **suburban** 97:23 |
| | **steady** 188:18 | **streamline** 156:19 | **suburbs** 210:8, 210:9, 210:10, 210:11, 210:15, 210:17, 210:21, 210:24, 212:13 |
| **started** 13:24, 16:14, 43:7, 147:19, 176:1, 180:23, 188:23, 189:16, 190:15, 190:18, 195:13, 196:15, 218:5 | **stealing** 125:8 | **street** 2:4, 2:14, 40:4, 179:23, 183:22, 197:11, 217:3, 226:1 | |
| | **stenographically** 232:6 | | **sudden** 136:12, 189:16 |
| | **step** 32:22, 34:9, 35:5 | **streets** 31:2, 49:4 | **suffered** 128:9, 140:17 |

Transcript of David A. Walker
Conducted on July 13, 2020

102

suggest
170:1
suggested
118:19
suit
147:8
suite
2:4, 2:14, 2:21
summary
159:20, 164:21
sunday
16:6, 188:2
superficial
43:1
supervising
77:18, 218:24
supervision
37:2, 37:12,
180:18
supervisor
16:20, 16:21,
22:19, 22:21,
22:22, 22:23,
23:6, 30:3,
30:4, 37:12,
37:17, 39:8,
39:9, 39:10,
40:7, 59:10,
61:19, 61:21,
62:2, 62:5,
62:13, 62:18,
62:22, 63:7,
63:13, 63:16,
63:20, 63:23,
72:23, 73:5,
73:6, 77:15,
77:16, 78:24,
79:3, 80:6,
80:7, 80:8,
81:3, 81:7,
81:15, 81:20,
82:10, 86:16,
99:18, 100:3,
101:15, 102:17,
103:1, 103:5,
118:9, 124:14,
128:13, 128:17,
128:23, 140:22,

141:7, 150:14,
151:22, 173:5,
175:17, 185:8,
185:17, 185:19,
199:12, 200:9,
202:24, 203:4,
205:8, 205:14,
207:3, 207:13,
208:23, 217:2,
219:24, 220:4,
224:20, 225:24,
226:1, 227:1,
227:7, 227:12,
227:15, 227:17,
227:20, 227:22
supervisor's
227:4
supervisors
16:22, 17:10,
17:11, 18:6,
33:20, 43:22,
47:3, 47:12,
50:16, 50:24,
54:6, 54:11,
59:7, 61:14,
63:8, 64:3,
64:9, 64:23,
65:7, 72:12,
73:21, 77:17,
90:8, 90:12,
95:10, 96:2,
96:3, 96:5,
96:9, 96:17,
97:8, 97:14,
100:14, 103:10,
103:13, 103:16,
105:3, 118:7,
121:10, 129:8,
173:10, 216:3,
219:3, 219:21,
221:2, 226:7,
227:19
supervisorship
185:11
supervisory
30:17, 54:14,
119:3
supplement
116:5

supply
66:18
support
44:1, 64:22
supports
61:13, 64:2,
64:8, 65:6
supposed
22:4, 22:6,
22:10, 22:13,
22:20, 30:3,
37:14, 68:8,
130:4, 143:20,
144:11, 191:12,
204:19, 205:7,
207:7, 217:10,
227:7, 227:20
sure
6:22, 11:11,
21:24, 26:14,
28:3, 31:22,
54:9, 65:2,
67:5, 79:10,
119:16, 122:11,
128:11, 139:16,
139:23, 153:15,
156:13, 169:20,
176:21, 177:12,
195:11, 197:19,
201:8, 205:22,
206:19
surprise
57:21
surprised
93:6, 93:12,
194:7
suspect
159:1, 164:1,
166:13
suspension
80:15, 81:10,
82:4, 88:3,
88:4, 88:7,
89:15, 108:5,
109:10, 110:6,
114:24, 115:1,
132:2
sworn
5:8, 5:11,

232:4

**T**

take
7:5, 7:14,
11:1, 23:15,
23:16, 27:13,
28:7, 39:22,
40:20, 43:6,
47:9, 53:12,
63:19, 68:7,
68:8, 68:13,
68:22, 69:1,
70:23, 71:1,
71:18, 72:4,
107:7, 110:12,
110:15, 112:6,
112:10, 113:2,
113:19, 114:12,
123:14, 126:18,
127:22, 129:15,
129:17, 135:3,
136:10, 141:8,
147:22, 156:18,
158:13, 185:16,
199:16, 206:4,
211:20, 211:23,
227:3
taken
1:33, 6:2, 6:3,
11:9, 27:11,
27:15, 33:19,
52:1, 61:20,
62:5, 62:18,
63:16, 63:17,
125:10, 128:23,
140:22, 185:12,
206:3, 217:9
taking
1:35, 6:12,
21:5, 21:6,
32:16, 70:5,
70:6, 112:18,
148:13, 148:15,
148:16, 213:2,
220:5
talk
6:16, 9:8,

Transcript of David A. Walker
Conducted on July 13, 2020
103

11:4, 11:8,
11:22, 22:11,
25:12, 30:6,
36:4, 67:21,
77:24, 79:16,
88:23, 95:1,
95:4, 106:24,
107:24, 113:3,
116:17, 123:10,
147:10, 155:8,
165:13, 167:4,
167:20, 167:23,
168:1, 171:1,
172:16, 176:6,
176:9, 178:19,
179:19, 182:8,
182:11, 186:18,
187:6, 187:10,
187:12, 193:20,
216:10, 219:5
**talked**
36:5, 47:23,
64:1, 64:13,
64:15, 64:21,
74:2, 74:19,
89:4, 89:20,
93:18, 97:11,
108:3, 114:22,
115:24, 117:2,
119:4, 121:22,
127:23, 145:8,
146:1, 151:3,
152:5, 152:11,
154:19, 155:1,
161:16, 165:24,
166:2, 169:6,
169:7, 171:16,
173:13, 201:3,
207:18, 207:22,
209:23, 212:9,
216:15, 222:19,
224:18, 225:9
**talking**
26:8, 39:1,
40:8, 42:8,
44:23, 45:1,
45:7, 49:22,
54:18, 54:19,

55:14, 58:3,
62:7, 65:1,
67:16, 67:17,
67:18, 73:12,
73:13, 73:14,
73:18, 76:20,
84:20, 87:17,
89:4, 96:3,
100:14, 100:15,
115:16, 125:8,
129:19, 137:19,
145:1, 155:2,
155:3, 161:20,
177:23, 191:14,
197:15, 217:7,
217:8, 218:19,
222:5, 227:11
**talks**
67:10, 72:11,
165:15
**taser**
85:1, 85:3,
85:8, 85:12,
85:16, 86:7,
86:23, 87:18,
87:20, 88:9,
89:11, 108:6,
109:13, 109:14,
109:20, 109:21,
115:2
**tasers**
87:11
**team**
18:4, 28:23,
37:20, 184:23
**teamsters**
33:7, 33:10,
33:11, 225:1
**tech**
2:31
**technical**
19:2, 29:3,
133:12, 213:1
**technical-related**
4:14
**technically**
215:14
**technology**
12:6

**tell**
9:14, 11:9,
18:5, 22:9,
22:13, 22:17,
29:20, 34:11,
45:21, 49:6,
49:7, 49:8,
49:10, 54:15,
57:5, 58:10,
71:20, 77:20,
85:12, 86:16,
95:1, 95:3,
103:13, 118:7,
118:13, 118:17,
126:20, 126:22,
145:21, 146:2,
160:2, 173:7,
173:15, 179:18,
182:21, 184:12,
193:6, 196:16,
203:7, 205:23,
227:24, 228:1,
228:2, 228:3,
228:5, 228:13
**telling**
39:2, 92:21,
103:11, 132:20,
166:17, 176:22,
209:16
**ten**
27:16, 62:23,
80:4, 80:9,
82:5, 105:12,
107:5, 108:3,
166:22, 166:23,
168:8, 179:10
**ten-day**
73:7, 80:15,
81:9, 82:4,
89:15, 109:10,
114:23
**tension**
29:18
**term**
19:8, 164:12,
198:18
**termination**
33:2, 33:15

**terminology**
216:12
**terms**
26:9, 28:21,
62:9, 69:19,
202:2, 230:4
**test**
18:16, 20:8,
20:11, 20:12,
68:8, 68:12,
68:13, 68:16,
68:23, 69:4,
69:6, 69:8,
70:5, 70:12,
70:23, 71:1,
71:3, 87:20,
87:21, 119:8,
119:18, 119:21,
120:12, 120:22,
121:24, 185:15,
185:17, 185:18,
185:20, 185:21,
229:10
**testified**
5:12, 127:15,
213:10, 222:9
**testify**
50:21, 133:1,
232:5
**testimony**
8:5, 8:20, 9:4,
9:8, 9:12, 11:6,
32:16, 107:4,
109:17, 112:20,
119:11, 131:11,
131:14, 131:18,
131:20, 131:21,
132:1, 132:12,
133:5, 224:19,
232:9
**testing**
229:17
**text**
9:3, 149:15,
149:17, 149:20
**texts**
149:23
**th**
1:36, 1:38,

Transcript of David A. Walker
Conducted on July 13, 2020

104

12:1, 97:21,
114:5, 116:15,
124:22, 137:7,
159:6, 162:15,
232:18
**thank**
4:1, 4:15,
5:13, 5:24,
11:21, 66:7,
112:12, 112:13,
139:24, 197:20,
206:18, 212:23,
213:5, 220:15
**thanks**
5:16, 32:3
**theirs**
185:15, 217:24
**theory**
122:16
**therapist**
148:7
**therapists**
148:5
**therapy**
148:9
**they'd**
92:24, 203:7
**thin**
199:7
**thing**
7:2, 22:12,
25:8, 53:11,
64:5, 64:6,
74:5, 93:1,
93:14, 103:20,
108:7, 111:17,
145:10, 174:8
**things**
7:6, 10:3,
21:6, 24:20,
24:21, 28:2,
38:12, 43:21,
51:6, 63:24,
64:20, 66:10,
69:3, 70:9,
70:11, 71:4,
73:19, 81:11,
110:22, 120:5,

120:7, 126:6,
129:20, 130:3,
145:11, 147:18,
151:2, 151:17,
153:16, 156:20,
157:4, 157:6,
161:10, 167:4,
171:13, 171:15,
173:13, 174:1,
175:11, 180:18,
186:1, 199:11,
199:14, 199:17,
201:21, 221:8
**think**
13:9, 17:15,
18:21, 19:7,
24:24, 25:5,
26:6, 29:4,
34:21, 37:20,
53:10, 57:15,
73:11, 73:14,
81:12, 86:17,
86:20, 87:12,
89:19, 94:20,
95:12, 95:23,
96:24, 101:12,
102:18, 106:2,
110:10, 111:16,
111:19, 111:21,
112:4, 112:8,
117:6, 117:14,
117:18, 117:20,
117:21, 124:19,
128:16, 129:4,
129:20, 133:16,
136:14, 138:11,
138:16, 145:3,
145:9, 146:21,
147:6, 150:1,
153:9, 153:22,
155:10, 164:12,
166:1, 171:1,
175:5, 175:15,
180:24, 185:24,
186:7, 187:24,
190:14, 192:23,
198:7, 198:13,
199:13, 199:17,

200:6, 201:11,
203:24, 206:14,
206:15, 208:18,
208:22, 209:7,
211:21, 214:17,
222:5, 223:3,
229:21, 230:3
**thinking**
48:7, 67:3,
110:20, 217:8
**thinks**
139:20, 198:21
**third**
16:14, 17:9,
17:23, 27:10,
27:11, 31:10,
99:10, 161:8,
177:10
**thomas**
1:17, 1:23,
3:21, 127:9,
136:5
**thoroughly**
60:3
**thought**
56:8, 57:6,
65:11, 79:11,
94:23, 101:3,
121:22, 126:5,
151:20, 186:7,
210:12, 229:21
**threaten**
108:13, 151:19,
170:20
**threatened**
108:10
**threatening**
126:1
**three**
26:9, 31:9,
46:8, 46:13,
53:13, 56:1,
58:18, 58:19,
66:17, 69:3,
70:9, 70:10,
71:4, 80:10,
86:8, 89:7,
89:10, 95:8,

95:16, 96:14,
100:16, 105:15,
105:18, 106:24,
115:23, 121:23,
128:1, 130:9,
162:18, 188:2,
190:16, 193:11,
197:13
**through**
9:16, 12:18,
14:4, 18:14,
18:19, 19:18,
21:22, 25:22,
72:5, 81:18,
88:20, 97:3,
106:3, 125:4,
139:19, 151:16,
151:18, 151:22,
156:21, 157:3,
158:20, 173:18,
186:12, 195:8,
204:17, 205:13,
210:4, 212:9,
221:20
**throughout**
213:12
**throw**
38:14, 78:23
**tiers**
37:5
**timekeeper**
124:9, 124:15
**timely**
39:18, 217:2
**times**
47:1, 49:21,
55:24, 58:14,
58:16, 82:21,
91:2, 95:6,
95:8, 95:17,
96:14, 96:16,
98:1, 128:1,
128:10, 129:19,
130:10, 131:12,
131:13, 141:1,
152:17, 155:4,
155:5, 156:1,
167:19, 172:12,

Transcript of David A. Walker
Conducted on July 13, 2020

105

179:10, 179:11,
188:5, 188:6,
192:6, 192:24,
193:11, 205:8
**timing**
25:7
**tims**
1:5, 175:19,
176:22, 192:7,
192:20
**tinley**
14:4
**tip**
197:17
**tired**
156:5, 184:10,
199:9
**title**
82:10, 136:3,
185:12
**today**
6:11, 7:12,
8:5, 8:23, 9:10,
9:13, 9:15,
10:12, 11:10,
55:15, 56:16,
64:8, 104:16,
112:20, 114:23,
132:12, 133:22,
146:3, 153:13,
156:15, 166:2,
199:22, 200:21,
206:24, 212:24,
213:2
**together**
8:11, 167:16,
167:17, 172:8,
172:10, 172:15,
176:18, 178:6,
183:2, 183:6,
183:17, 183:19,
184:14, 187:22,
197:2, 228:21
**told**
47:7, 47:8,
47:19, 47:20,
49:5, 49:6,
50:4, 51:2,

51:8, 51:19,
51:20, 52:15,
59:4, 61:24,
66:14, 77:14,
82:16, 82:19,
86:12, 86:14,
86:22, 92:19,
102:15, 103:5,
103:15, 118:12,
120:18, 125:2,
127:2, 134:24,
135:1, 135:3,
135:10, 135:11,
135:12, 147:15,
152:7, 156:10,
160:1, 160:5,
162:1, 162:4,
166:9, 166:16,
169:24, 170:2,
170:8, 172:18,
175:9, 180:3,
185:16, 191:6,
203:4, 203:17,
204:11, 208:20,
209:9, 209:10,
209:13, 209:14
**tolerance**
217:23
**tom**
19:1, 49:18,
49:24, 175:5,
202:20
**took**
20:8, 20:9,
21:1, 32:12,
53:3, 62:11,
68:16, 69:15,
70:12, 84:10,
88:5, 120:17,
185:8, 185:13,
185:14
**top**
48:6, 128:7,
140:4, 158:21,
163:12, 163:17,
218:15
**total**
83:17

**totally**
80:18, 165:22
**tough**
168:4
**toward**
90:21
**towards**
19:20, 90:20,
91:20, 91:24,
96:18, 156:2,
202:2
**track**
128:22
**trained**
21:18, 44:11,
44:12, 190:4
**training**
14:5, 21:8,
21:11, 21:22,
21:23, 22:1,
25:23, 26:3,
148:8, 154:16,
154:18
**trainings**
21:10
**transcript**
4:13, 232:7
**transfer**
195:7
**transferred**
172:22
**travels**
169:19
**treat**
198:24, 199:2,
199:5, 219:22
**treated**
198:5, 223:16,
223:21, 224:4,
224:9
**treats**
198:21, 198:22,
199:1
**tried**
60:14, 156:3,
156:4, 186:18
**trouble**
104:3

**true**
36:9, 74:19,
80:19, 82:14,
162:1, 212:16,
212:20, 232:8
**trust**
129:5
**truth**
173:15, 199:8,
232:5
**truthful**
131:21, 166:14
**try**
6:19, 18:19,
28:23, 40:14,
40:22, 61:18,
97:22, 109:5,
151:8, 151:11,
173:18, 224:13
**trying**
29:20, 39:1,
43:6, 65:3,
65:4, 86:17,
119:2, 173:6,
173:16, 184:12,
228:10, 228:17
**tsu**
19:3
**turn**
10:7, 88:13,
97:1, 204:20
**tussling**
134:5
**twice**
172:15, 182:10,
189:19
**two**
14:7, 15:10,
17:1, 20:21,
31:9, 45:3,
46:7, 46:10,
49:22, 51:23,
56:2, 58:18,
58:19, 66:17,
68:17, 68:20,
69:16, 73:18,
89:13, 95:8,
95:16, 96:13,

Transcript of David A. Walker
Conducted on July 13, 2020

106

99:10, 105:15,
105:18, 106:24,
120:2, 125:3,
128:1, 133:10,
143:18, 146:2,
171:23, 172:12,
172:14, 178:24,
179:11, 183:4,
188:6, 193:10,
199:14, 211:24
**two-and-a-half**
125:9
**two-minute**
211:20
**two-page**
158:20
**type**
26:2, 36:21,
53:23, 93:2,
93:9, 103:24,
124:18, 126:13,
126:15, 130:12,
169:21, 172:24,
179:20, 200:9,
201:4, 204:15,
220:4, 226:3,
229:1
**types**
26:12, 26:15,
150:12
**tyrone**
1:10, 194:4,
194:11

**U**

**uh-huh**
7:5, 163:14,
204:10
**ultimately**
33:15
**um**
7:4
**unable**
4:9
**unbiased**
108:19
**under**
4:17, 6:24,

20:22, 32:13,
52:18, 53:21,
82:19, 88:16,
112:19, 113:22,
153:3, 153:7,
157:4, 212:7,
232:7
**undergone**
21:8, 21:11
**underneath**
60:14, 60:19,
93:8, 152:24,
153:5
**understand**
7:18, 7:20,
8:22, 9:1,
32:13, 52:21,
110:4, 112:18,
112:19, 157:4,
212:6, 226:20,
226:21, 230:12,
230:16
**understandable**
11:13, 176:21
**understanding**
71:22, 74:7,
84:4
**understood**
7:22, 173:3,
230:13
**unedited**
4:12
**unfortunately**
7:5
**unfounded**
35:17, 35:19
**unhappy**
172:24, 176:12
**unidentified**
55:5
**uniform**
63:2, 63:4,
63:8, 63:11
**union**
28:18, 33:3,
33:6, 35:7,
35:8, 53:2,
53:3, 53:5,

53:19, 53:24,
74:24, 124:24,
125:5, 176:4,
214:15, 225:2
**union's**
53:20
**unit**
18:13, 19:2,
24:22, 26:9,
28:17, 28:19,
29:2, 32:21,
36:17, 44:10,
68:12, 75:23,
76:7, 76:9,
96:9, 122:20,
125:16, 128:13,
129:9, 160:15,
165:16, 165:17,
165:24, 168:21,
172:6, 177:19,
177:21, 213:13,
214:22, 218:13,
219:14, 219:17,
219:19, 220:10,
225:6
**united**
1:1, 1:34
**units**
27:18
**unknown**
220:6
**unless**
111:3, 133:23,
175:8
**unnecessary**
151:17
**unprofessional**
165:22
**unsafe**
129:4
**unsatisfactory**
114:21, 121:4
**until**
15:18, 15:19,
16:16, 20:6,
45:2, 51:6,
74:16, 78:15,
82:11, 100:20,

107:9, 140:22,
141:15, 146:16,
147:2, 148:2,
151:6, 154:4,
156:15, 168:18,
183:4, 183:7,
183:17, 185:15,
191:1, 195:15,
200:15, 211:8,
212:10, 220:22,
226:5
**unusual**
54:24, 55:1
**updates**
25:20, 28:9
**upper**
33:23
**ups**
6:23, 33:21,
36:24, 114:20
**upset**
29:23, 61:4,
126:6, 147:20,
174:4, 174:7,
175:18, 189:4,
199:24, 227:10
**urinate**
38:13
**use**
19:8, 29:22,
39:12, 39:14,
43:9, 82:15,
82:20, 83:20,
83:22, 90:17,
91:1, 91:4,
91:19, 93:3,
93:13, 94:14,
95:7, 95:17,
96:17, 147:16,
147:19, 149:15,
150:15, 151:22,
176:23, 201:22,
202:1, 205:19,
206:1, 217:7
**using**
19:9, 69:6,
92:1, 158:5,
230:4

Transcript of David A. Walker
Conducted on July 13, 2020

107

usual
189:12
usually
167:11, 167:12,
167:13, 167:14

**V**

vacation
116:16, 123:23,
124:2, 124:8,
124:11, 125:10,
221:23
vaguely
157:21, 157:23
valedictorian
13:18
varied
17:11
vehicle
132:7
vein
201:4
verbal
7:8, 32:22,
33:13, 33:14,
91:7, 169:21,
170:4
verbatim
164:21
verification
26:22, 113:17,
136:11, 137:2,
137:8
verified
83:5
verify
39:2, 228:5,
228:7
verifying
66:15
vernell
1:5, 175:19
versa
193:21
versus
67:8, 104:10,
104:16, 104:22,
197:14, 206:5

via
1:32, 2:9,
2:26, 4:10,
4:21, 149:10,
150:7, 224:22,
232:4
vice
193:21
vice-president
13:20
victim
22:11, 24:11,
25:16
victor
1:10, 196:10
video
4:7, 4:9,
125:20, 220:16
view
67:12
violated
215:4, 217:10
violation
53:5
violations
28:1, 217:6,
218:7
violators
28:1
visibly
174:3
visual
44:3, 47:2,
47:23, 59:1
visually
46:22, 50:13
voice
55:5
vs
1:14

**W**

w
86:2
w-a-l-k-e-r
5:23
wages
140:9, 140:16,

140:20, 141:5,
141:10, 146:6,
147:4, 150:12
wait
31:9, 111:15,
166:23
waiting
54:1, 127:18
waive
230:24
waived
232:11
walk
170:9
walker
1:9, 1:32, 3:5,
3:14, 3:24, 5:6,
5:9, 5:16, 5:21,
5:23, 5:24,
32:12, 65:21,
71:14, 71:18,
72:4, 72:6,
75:6, 75:9,
79:9, 104:3,
111:18, 112:1,
112:17, 113:1,
113:4, 113:12,
113:16, 114:11,
125:14, 125:23,
135:20, 136:2,
136:10, 137:11,
139:13, 140:6,
150:24, 153:10,
157:2, 158:9,
158:12, 158:16,
158:22, 158:23,
159:2, 159:15,
159:22, 159:24,
161:8, 161:9,
161:12, 161:14,
163:5, 163:8,
163:21, 164:2,
164:23, 165:1,
165:2, 165:4,
165:12, 165:14,
165:21, 165:23,
166:5, 197:17,
199:20, 212:5,

212:23
walker's
3:16, 3:19,
113:10, 136:4,
159:21, 220:16
wall
87:22
walsh
25:2
want
7:2, 26:7,
29:13, 29:21,
30:6, 31:5,
31:6, 37:22,
43:7, 44:17,
47:8, 47:11,
48:2, 49:1,
49:2, 49:4,
49:9, 55:22,
56:3, 56:5,
56:15, 57:1,
65:2, 65:24,
68:20, 73:20,
96:16, 108:2,
110:12, 110:15,
110:18, 110:24,
111:9, 112:1,
112:6, 116:18,
128:9, 128:11,
130:15, 136:18,
144:17, 156:4,
156:21, 157:6,
167:3, 178:24,
180:21, 181:11,
185:1, 189:9,
189:24, 190:8,
198:20, 199:13,
199:15, 199:18,
207:12, 212:17,
217:20, 219:6,
219:7, 226:21,
228:14
wanted
14:18, 48:3,
68:11, 68:21,
74:5, 101:12,
151:24, 152:1,
185:7, 197:11,

200:9
**wanting**
33:24
**washington**
86:3
**watch**
16:10, 16:11,
16:12, 16:14,
16:21, 17:10,
17:23, 27:10,
27:12, 27:17,
31:10, 43:12,
43:14, 99:10,
99:11, 177:10,
177:11, 228:20
**watches**
176:2
**watching**
228:11
**way**
6:23, 13:13,
18:9, 24:8,
35:20, 44:5,
45:1, 46:9,
70:3, 76:11,
77:7, 78:11,
84:17, 87:4,
93:9, 115:14,
125:12, 130:13,
136:16, 140:21,
152:2, 152:6,
152:10, 152:11,
152:23, 152:24,
161:11, 173:13,
173:18, 176:13,
181:6, 195:8,
198:8, 198:24,
200:7, 200:10,
204:21, 206:3,
206:4, 206:11,
207:12, 214:2,
216:4, 219:22,
229:1
**ways**
18:18, 206:7
**we'll**
6:22, 6:24,
13:10, 16:18,

16:22, 17:12,
22:11, 65:1,
73:15, 111:8,
112:11, 135:24,
157:3, 211:23,
228:13, 231:3
**we're**
7:7, 7:11,
7:14, 7:21,
8:11, 23:17,
26:8, 32:5,
42:8, 49:22,
65:1, 76:19,
83:19, 113:3,
116:17, 126:4,
126:16, 133:14,
156:21, 158:16,
163:8, 167:9,
167:22, 178:17,
182:14, 187:5,
196:23, 199:7,
199:18, 211:6,
225:6, 227:2
**we've**
36:4, 63:24,
64:13, 64:20,
96:11, 110:13,
113:9, 152:4,
183:6, 213:1
**weapon**
87:1, 132:7,
132:13, 132:14,
132:18, 133:10
**weapons**
133:10
**wear**
63:5, 63:8
**webb**
17:19, 101:2
**week**
62:23, 63:11,
105:11, 128:17,
182:10, 188:3,
189:19, 191:17,
193:11, 193:13,
194:23
**weeks**
51:23, 124:9,

125:9, 162:18
**weigh**
56:9
**weight**
69:11
**welcome**
213:4
**went**
12:15, 12:18,
13:16, 14:3,
14:4, 14:9,
15:2, 15:17,
18:9, 23:22,
42:3, 42:14,
42:23, 44:21,
47:5, 76:8,
77:19, 82:7,
82:21, 83:24,
84:7, 89:12,
93:17, 100:21,
120:17, 123:11,
124:8, 124:22,
127:14, 143:23,
144:11, 171:2,
172:22, 177:5,
183:5, 189:18,
193:8, 200:3,
200:4, 208:13,
211:4, 211:12
**weren't**
100:14, 128:19,
131:2, 134:5,
141:18, 172:3,
172:7, 185:19,
230:1
**west**
1:36, 12:1,
97:20, 98:10,
210:5, 210:10,
210:11, 210:12,
210:14, 210:15,
212:12, 218:5
**western**
210:11
**whatever**
18:12, 63:17,
67:24, 82:23,
100:5, 111:6,

126:11, 145:19,
146:12, 171:3,
174:8, 179:23,
199:2, 203:3,
204:4, 204:15,
229:10
**whatever-wise**
201:10
**whereabouts**
28:24
**whereas**
105:11, 159:14
**whereof**
232:17
**wherever**
40:21, 100:22
**whether**
22:15, 33:13,
34:1, 56:9,
207:10, 226:14
**white**
2:20, 5:4, 5:5,
44:8, 45:3,
45:5, 45:8,
45:10, 45:15,
46:2, 46:12,
50:14, 56:16,
57:14, 57:17,
67:9, 73:7,
75:22, 81:16,
85:13, 85:15,
86:5, 87:9,
96:5, 97:22,
98:2, 104:10,
104:22, 105:9,
105:14, 105:18,
105:21, 107:13,
107:17, 107:21,
125:23, 134:20,
134:21, 135:1,
143:9, 153:3,
153:6, 153:7,
165:17, 199:2,
199:5, 199:16,
220:11, 220:18,
220:23, 223:17,
223:22, 224:5,
224:10

Transcript of David A. Walker
Conducted on July 13, 2020

109

| | | | |
|---|---|---|---|
| **whoever** | 70:20, 121:11, | **word** | 26:18, 38:15, |
| 124:14 | 125:7, 129:8, | 43:14, 51:9, | 38:16, 50:13, |
| **whole** | 175:7, 214:22 | 62:18, 69:6, | 54:15, 59:2, |
| 92:24, 121:9, | **without** | 90:9, 90:17, | 78:1, 83:16, |
| 125:22, 147:22, | 30:11, 30:13, | 91:1, 91:4, | 98:4, 98:14, |
| 156:5, 172:19, | 38:8, 38:11, | 91:20, 92:1, | 99:7, 146:13, |
| 204:17, 232:5 | 41:3, 67:14, | 93:3, 93:13, | 176:16, 176:17, |
| **wilford** | 70:9, 70:10, | 94:14, 94:19, | 182:24, 183:2, |
| 1:7, 60:10, | 214:1, 220:4 | 95:7, 95:10, | 183:6, 222:24 |
| 181:17, 193:14, | **witness** | 95:17, 96:10, | **workman's** |
| 222:7 | 1:36, 3:3, | 96:18, 107:20, | 41:12 |
| **williams** | 3:26, 4:21, 5:8, | 127:24, 161:2, | **workout** |
| 1:8, 186:20, | 5:10, 22:5, | 166:6, 176:23, | 147:23 |
| 186:21, 186:24, | 22:7, 22:10, | 191:20, 201:23, | **works** |
| 188:7, 189:10 | 22:12, 23:3, | 205:19 | 76:11, 110:16, |
| **wind** | 23:10, 23:11, | **word-of-mouth** | 177:8, 191:14 |
| 44:5 | 23:20, 24:10, | 124:5 | **worry** |
| **window** | 25:13, 26:1, | **words** | 83:15 |
| 154:22 | 34:18, 35:1, | 30:9, 47:17, | **worse** |
| **windows** | 45:14, 55:6, | 90:19, 92:11, | 198:24, 201:15, |
| 29:17, 37:3, | 61:4, 65:24, | 110:7, 180:6, | 223:22, 224:5, |
| 38:8, 38:11 | 66:6, 66:8, | 225:1 | 224:10 |
| **winston** | 75:7, 86:11, | **worked** | **worser** |
| 1:4, 91:6, | 93:22, 104:5, | 16:13, 17:22, | 37:10 |
| 91:12, 91:20, | 130:9, 134:10, | 18:2, 21:7, | **worst** |
| 92:7, 92:13, | 135:18, 136:24, | 39:6, 46:6, | 36:16, 37:1, |
| 93:4, 93:8, | 139:17, 157:8, | 46:7, 46:9, | 37:8, 37:9, |
| 93:14, 96:13, | 157:14, 159:15, | 46:10, 46:14, | 47:21, 180:14, |
| 157:9, 160:5, | 163:13, 163:17, | 77:8, 78:15, | 213:11, 213:13 |
| 160:8, 160:18, | 192:19, 197:19, | 83:16, 86:18, | **worth** |
| 161:2, 167:5, | 197:21, 209:13, | 86:20, 98:14, | 61:1 |
| 167:6, 169:14, | 213:4, 214:1, | 168:21, 172:5, | **wouldn't** |
| 169:23, 169:24, | 215:20, 217:18, | 172:10, 172:15, | 11:11, 31:14, |
| 170:20, 171:7, | 220:3, 220:17, | 173:17, 176:1, | 57:3, 89:11, |
| 191:5, 191:13, | 222:14, 223:7, | 176:18, 179:3, | 94:24, 101:5, |
| 191:21 | 223:19, 223:24, | 179:6, 179:7, | 102:7, 102:10, |
| **winston_ccso** | 224:7, 224:12, | 182:22, 182:23, | 103:13, 146:11, |
| 158:20, 163:11 | 232:4, 232:9, | 183:16, 184:1, | 167:16, 168:10, |
| **wisniewski** | 232:17 | 184:5, 184:14, | 169:24, 192:12, |
| 106:15 | **witness's** | 187:1, 187:24, | 200:1, 203:8, |
| **withdraw** | 163:21 | 188:3, 190:1, | 206:2, 206:4 |
| 77:6, 92:2 | **witnessed** | 190:13, 192:13, | **wound** |
| **withdraws** | 23:7 | 192:16, 192:20, | 43:1 |
| 27:22 | **woman** | 197:4, 203:21, | **wrapping** |
| **within** | 143:7 | 223:1, 223:11 | 66:11 |
| 19:5, 23:14, | **wondering** | **workers** | **write** |
| 26:6, 32:21, | 155:21, 185:9, | 41:9, 41:18 | 33:21, 36:21, |
| 43:22, 69:20, | 226:22 | **working** | 36:24, 52:15, |
| | | 15:12, 15:14, | |

Transcript of David A. Walker
Conducted on July 13, 2020

110

73:7, 114:20,
135:14, 160:9,
207:20, 225:22
**writing**
82:17
**written**
32:23, 33:14,
37:15, 68:22,
69:2, 70:12,
71:4, 76:11,
76:12, 76:13,
120:9, 121:19
**wrong**
35:19, 81:15,
136:12, 161:12,
170:9, 189:3
**wrote**
82:22, 116:4,
140:8, 148:14

**Y**

**y**
17:6
**y'all**
51:20
**yankee**
17:7
**yeah**
20:1, 30:11,
31:16, 32:8,
39:5, 56:21,
61:16, 65:20,
66:2, 70:16,
72:3, 73:19,
83:19, 84:17,
99:16, 110:16,
111:2, 111:21,
112:7, 116:8,
129:15, 132:8,
132:11, 132:16,
134:5, 134:22,
136:20, 137:4,
140:5, 142:13,
148:17, 149:7,
152:9, 152:16,
152:20, 152:22,
153:2, 154:1,
156:13, 160:24,

163:16, 163:17,
168:2, 180:9,
180:12, 180:16,
182:2, 182:3,
182:7, 187:15,
190:21, 191:8,
192:10, 195:20,
202:13, 205:21,
206:15, 209:1,
209:2, 210:13,
226:13, 228:20,
229:18, 231:3,
231:8
**year**
13:14, 14:2,
18:12, 62:24,
85:5, 95:19,
125:7, 141:13,
143:17, 169:4,
176:16, 178:22,
181:2, 211:6,
220:18
**year-and-a-half**
14:7, 31:10,
99:11, 171:23,
175:24
**years**
9:19, 12:2,
14:7, 16:12,
20:21, 24:16,
25:10, 27:13,
27:16, 30:23,
31:9, 31:10,
53:13, 63:16,
64:16, 69:24,
70:21, 74:13,
77:5, 77:12,
78:1, 78:4,
78:5, 78:7,
80:10, 84:11,
98:15, 98:16,
98:18, 99:4,
99:5, 99:10,
117:8, 121:11,
125:3, 138:10,
138:11, 141:2,
148:19, 167:18,
168:6, 168:8,

171:23, 172:14,
175:23, 176:17,
178:24, 179:10,
183:5, 190:16,
191:4, 194:14,
200:24, 222:1,
223:11, 229:19
**yourself**
4:10, 30:2,
33:17, 38:2,
200:22

**Z**

**zero**
124:3, 124:13
**zeroed**
124:1, 124:3,
124:16
**zone**
210:4
**zones**
210:3, 211:3,
211:4, 211:7,
211:12, 211:13,
211:15
**zoom**
1:33, 2:9,
2:26, 4:21,
136:14, 232:4
**zooms**
10:22

**$**

**$10,000**
141:13
**$100**
203:14
**$160,000**
141:15
**$200,000**
141:10, 146:6
**$40,000**
146:8

**0**

**00**
16:5, 16:6,
16:14, 16:15,

16:16, 20:5,
20:6, 156:23,
192:15, 192:16,
192:19, 192:20,
192:21
**011531**
158:20
**011537**
163:11
**02**
59:19, 62:10
**03**
59:19, 62:10
**0339**
2:23
**04**
89:16, 141:7,
150:14
**05726**
1:14
**084.003295**
2:38, 232:25

**1**

**1**
136:22, 136:23
**1-5**
3:29
**10**
32:9, 32:10,
57:12, 57:15,
72:2, 125:21,
125:22, 127:22
**100**
2:4, 73:2,
117:13, 203:14
**106**
153:8, 153:17
**11**
16:16, 88:16,
192:15, 192:19
**113**
3:18
**12**
16:14, 84:11,
97:2, 111:9,
112:14, 112:15,
150:22

Transcript of David A. Walker
Conducted on July 13, 2020                     111

**120**
2:14
**13**
1:38, 84:11
**135**
3:22
**14**
138:12
**15**
3:25, 97:21,
110:24, 111:7,
112:11, 129:3,
153:9, 156:24,
191:4, 193:8,
193:9, 194:14,
228:23, 229:19
**158**
3:25
**16**
3:27
**160,000**
146:6
**163**
3:27
**18**
1:14
**19**
37:4, 37:7,
114:5, 137:7,
178:14
**1983**
12:10, 12:11
**1985**
13:2, 13:7,
13:12
**1988**
14:1
**1989**
20:14
**1991**
13:16, 13:23
**1992**
15:20, 18:13,
24:18, 178:14
**1993**
178:14
**1998**
29:12

**1999**
132:18, 183:3
**1st**
13:16, 14:22

**2**
2
156:23, 156:24
**2-9**
3:27
**20**
30:23, 91:9,
137:10, 167:18,
193:8, 232:18
**200**
2:21
**2000**
2:14, 42:17,
42:18, 42:19,
42:20, 42:24,
44:24, 81:22,
81:23, 154:4,
169:5, 183:3,
183:7, 183:17,
220:22
**2001**
132:17, 137:14
**2002**
6:6, 59:16
**2003**
6:8, 59:16,
62:16, 80:1,
80:14, 81:9,
108:3, 109:10,
114:23
**2004**
59:13, 59:14,
62:16, 81:23,
108:4, 109:9,
114:24, 128:12,
140:21, 141:14,
141:16, 142:9,
142:14, 148:2
**2005**
59:13, 59:14,
183:17
**2006**
96:22, 143:13,

143:17
**2007**
147:1, 150:16
**2008**
147:3
**2010**
25:12, 25:17,
26:16, 26:17,
26:19, 29:6,
30:10, 30:15,
32:21, 45:1,
48:18, 48:23,
50:10, 50:15,
54:16, 59:6,
64:16, 96:6,
148:10, 193:5,
193:7, 193:9,
226:5
**2011**
148:10
**2012**
91:15, 118:21,
169:1, 189:17,
196:20
**2013**
138:12, 138:13,
138:24, 169:1,
180:22, 195:6,
195:12
**2014**
54:17, 59:6,
70:22, 91:16,
118:22, 138:14,
138:24, 193:9,
195:6, 196:14
**2015**
48:18, 48:23,
50:10, 50:15,
70:21, 71:6,
102:2, 116:15,
119:18, 123:12,
124:22, 125:12,
138:11, 159:6,
159:23, 160:3,
162:15, 162:16,
164:23, 166:24
**2016**
85:6, 87:14,

87:15, 107:12,
108:5, 109:13,
115:1, 164:17,
166:20, 169:5,
169:6, 183:7,
191:1, 203:23,
226:6
**2017**
148:2, 203:22,
220:22
**2018**
102:3, 124:23,
127:16, 139:10,
139:11, 148:2
**2019**
211:8, 211:9,
212:10
**2020**
1:38, 114:5,
137:7, 141:15,
232:18
**2021**
2:21
**206**
2:4
**213**
3:8
**2193**
2:16
**224**
3:9
**23**
12:2
**2323**
87:24
**2561**
1:36, 12:1
**27**
212:2
**28**
116:15, 124:22
**29**
3:25, 132:2,
159:6, 162:15

**3**
3
16:5, 16:6,

Transcript of David A. Walker
Conducted on July 13, 2020                                    112

16:16, 192:15,
192:16, 192:19,
192:20, 192:21,
212:2, 212:3,
231:10
**30**
9:18, 25:10,
40:8, 57:12,
57:15, 95:19,
125:2, 197:14
**312**
2:6, 2:16
**319**
4:18
**32**
136:22, 136:23,
212:3
**35**
228:23
**36**
32:9
**365**
46:9
**37**
111:8, 112:14
**380**
2:16

---
**4**
---
**4**
16:14
**4-**
3:25
**450**
125:9
**46**
32:10
**4th**
124:23

---
**5**
---
**5**
20:5
**50**
203:14, 228:23
**52**
111:9
**532**
158:20

**55**
231:10
**56**
112:15
**59**
1:38
**5th**
15:20

---
**6**
---
**60**
125:8, 197:14
**60523**
2:22
**60602**
2:15
**60661**
2:5
**630**
2:23
**655**
2:6
**66**
72:1, 72:4
**6635**
2:16
**68**
73:15, 79:16,
79:21, 81:9,
84:20, 88:11
**69**
72:5, 72:11,
73:13, 73:20,
73:21, 148:23
**6th**
88:1

---
**7**
---
**7**
16:5, 192:16,
192:20, 192:21
**70**
73:2
**700**
33:11, 225:1
**71**
3:15
**7660**
2:6

**7661**
2:6
**77**
88:20, 88:23
**78**
89:19, 89:20,
117:11, 117:20,
117:21, 118:2,
118:18, 121:4,
121:13
**79**
1:36, 12:1,
90:1

---
**8**
---
**8**
16:15, 20:6
**80**
88:20, 90:7,
96:2, 96:7,
218:14
**800**
2:16
**81**
97:3, 97:6,
97:7
**82**
97:13, 99:21
**83**
107:24
**84**
108:9
**85**
108:17, 110:11
**86**
97:3, 108:20,
110:11
**88**
150:22
**896**
2:16

---
**9**
---
**9**
1:38
**90**
117:16, 117:19
**91**
14:22

**92**
122:20, 178:14,
190:19
**93**
178:12, 178:14
**984**
2:23
**9th**
159:23, 160:3,
162:16, 164:17,
164:23, 166:24

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LEGRAIN WINSTON, et al. | ) |
| | ) Case No. 18-cv-05726 |
| Plaintiffs, | ) |
| | ) Hon. Matthew F. Kennelly |
| v. | ) |
| | ) |
| THOMAS J. DART, et al. | ) |
| | ) |
| Defendants. | |

**PLAINTIFF DAVID WALKER'S OBJECTIONS AND ANSWERS TO DEFENDANT
GREGORY SHIELDS FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, David Walker, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1. These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2. Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3. Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.



Exhibit #

Walker 2

07/13/20 - AB

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

      **Response:**    **David Walker**
                         **2561 W. 79th Place**
                         **Chicago, IL 60652**
                         **(773) 502-9686**

                         **Undersigned Counsel**

2.     Identify all discipline you received that you allege was discriminatory as alleged in Paragraph 68 of the Complaint and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what rule or regulation did you supposedly violate, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

      **Response:**    **Plaintiff states that he received write-ups, disciplinary days off work, unsatisfactory work performance assessments and ostracized at work; whereas, other white investigators did not receive for comparable situations. Investigation continues and Plaintiff reserves the right to supplement this response.**

3.     If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed

2

with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

4. Identify each and every complaint or grievance you made regarding the discipline alleged in Paragraph 68 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:** **Plaintiff states that the grievances were filed through the union procedures as provided. Plaintiff states further that he went to arbitration for the grievance filed relating to the issue of time missing from May 2015. The arbitration hearing was held on September 4, 2018. At that time, the arbitrator advised Plaintiff that he would receive a decision in 30 days. As of today's date, Plaintiff states that he still has not received a decision on this arbitration hearing for the issue dating back to May 2015. Investigation continues and Plaintiff reserves the right to supplement this response.**

5. Identify the "similarly situated non-minority officers" who did not receive discipline in the same proportion as you did as alleged in Paragraph 68 of the Complaint, including what employees were involved, who was responsible for supervising the employees, who was responsible for making the decision as to whether or not to discipline the employees, what the

4811-7057-4260, v. 1

underlying incident was, when the underlying incident happened, what rule or regulation was purportedly violated, whether or not any investigation was conducted, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response was to the incident or discipline was, whether or not anyone else was involved, and whether or not anyone else witnessed the underlying incident.

**Response:** **See Response to Interrogatory No. 2; investigation continues and Plaintiff reserves the right to supplement this response.**

6.    Identify all assignments that you allege were discriminatory as alleged in Paragraph 68 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:** **Plaintiff states that he was sent to the basement or TSS when new, white investigators that came to the unit were never sent to the basement, or TSS. Plaintiff further states that his on the street assignments are only to high incident areas, whereas white investigators with less seniority do not get assigned to the same areas.**

7.    Identify the other "non-minority officers" who were not assigned to the positions you were assigned to as alleged in Paragraph 69 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to what position the employee was assigned, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or

4

outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:** **Investigators Messina, Folkers, Bienek, Bosquez, Shedor and investigation continues; Plaintiff reserves the right to supplement this response.**

8.    If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**Response:** **See Response to Interrogatory No. 6; Investigation continues and Plaintiff reserves the right to supplement this response.**

9.    Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response:** **Plaintiff states, in and around 2002, Director Shields (who was a Deputy Chief at the time) kicked the chair he was sitting in. There were at least 8 witnesses to this incident. Specifically, Wilford Ferguson, Beverly Jones (retired), Miller Boles**

5

(retired), **Cheryl Patterson (retired), Frank Ratkovic, Emma Box (retired), Fred Davis (retired). Shields never received any disciplinary action for this incident and continued to receive promotions after this incident. I believe the only reason Shields kicked my chair at that time was because of my race and our pending lawsuit against Cook County for allegations similar to the case at hand. Investigation continues; Plaintiff reserves the right to supplement this response.**

10.     If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:     Plaintiff responds that there were multiple occasions where he witnessed offensive, derogatory, or racist language used towards African-American investigators in the E/M unit. Investigation continues and Plaintiff reserves the right to supplement this response.**

11.     Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

6

**Response:** **"High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative or unfavorable actions can take place.**

12. If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

13. If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

14. Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:** Plaintiff states that in and around 2004, he was demoted from his supervisor position in the E/M unit which resulted in a loss of pay. Plaintiff further states that he has been passed over for promotions even though he is the most senior and qualified. Plaintiff further states in May 2015 that he had 50 medical days, approximately 4 vacation weeks, 5 holiday days, 1 personal day and 450 hours of comp time removed from his time accrued record in his personnel file. Plaintiff states he filed a grievance for this lost time immediately in 2015; the grievance went to arbitration on September 4, 2018 and he still has not received a decision on the arbitration hearing, almost two years later. Investigation continues and Plaintiff reserves the right to supplement this response.

15. Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:** Comradery and trust are exceptionally important in the law enforcement context. When being assigned to work in the high incident areas but not having faith that your supervisors or anyone within your unit will provide you with back-up should you require it, causes an enormous amount of additional stress on what is normally a stressful work environment just by the nature of the job.

16. Identify all Defendants' acts or omissions you allege resulted in Plaintiffs' being treated differently than other similarly situated individuals.

**Response:** All of the foregoing for the specific responses above; and, generally speaking, the lack of attentiveness to any complaint to OPR, human resources made by any

4811-7057-4260, v. 1

**and all of the Plaintiffs; and, failure to correct any of the behavior complained of and committed by Director Shields, Chief Ranzino, and Chief Neal.**

17.     Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response:     Director Shields, Chief Ranzino and Chief Neal maintained an informal process and procedure of preventing African-American investigators in the Electronic Monitoring Unit from advancing or being eligible for promotions by treating them differently in regards to job assignments and disciplinary measures taken against them.  Similarly situated white investigators did not receive discipline for same or similar actions that the plaintiffs did receive discipline for.**

Respectfully Submitted,

By:     /s/ Kelly A. Krauchun
        KELLY A. KRAUCHUN
        The Herbert Law Firm
        206 S. Jefferson, Suite 100
        Chicago, IL 60661
        (312) 655-7660
        Kelly.krauchun@danherbertlaw.com

4811-7057-4260, v. 1

## **VERIFICATION**

I, David Walker, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated:

_____
David Walker

2 - 19 2020

INFORMAL INQUIRY OF

INV. DAVID WALKER

Date: April 29, 2015

Present: Inv. David Walker

Joseph V. Consolo

Time: 4:18 PM

Location: Human Resources Conference Room

Inv. David Walker, assigned to EM, was informed that this was an informal inquiry as to a complaint filed by an employee wherein he is named as a witness who may have information as to the substance of the complaint. Inv. Walker was made aware of the following: I am part of Human Resources; I am not with OPR; I am an attorney; this is a process being conducted as an informal inquiry to alleviate concerns raised by an employee complaint; Human Resources does not have the right to discipline; this is not a compelled statement; OPR can sustain or not sustain a case; Human Resources can address things that may not be sustained as a hostile work environment; the Cook County Sheriff's Office prohibits harassment based on sex, race, age and other protected rights; the office has a policy against retaliation of any kind; Inv. Walker should contact me if he is retaliated against in any way; this matter is confidential, but we cannot guarantee 100 percent confidentiality because we may have to do an informal inquiry with others who have information pertinent to the complaint.

Below is a Summary of Inv. Walker's informal statement of inquiry:

Investigator Walker was in roll call on April 9, 2015. The roster sheets do not always reflect who is on duty. In the past, David Walker told Chief Ranzino if someone was not there when he asked for them. Chief Ranzino would tell him you are not the chief. On April 9, 2015, Chief Ranzino asked if McGhee was present. Investigator Legrain Winston told him that Investigator McGhee was not there. Chief Ranzino said all you guys look alike. A lot of the investigators present in roll call did not appreciate it. Investigator Winston said he would write the incident up after roll call.

Investigator Walker considered it a racial comment. Investigator Walker said there is an accumulation of things with Chief Ranzino. It is either Chief Ranzino's way or you are wrong. Investigator Walker stated his relationship with Chief Ranzino is better than most. Investigator Walker can respect chain of command. Chief Ranzino is the same with everyone. Chief Ranzion is consistent no matter who he is talking to. Chief Ranzino would say if the investigators are not mad at me, then I am not doing my job.

Inv. David Walker was told a written summary for his signature of approval would be provided once it was typed up. He was also told that we would conduct a further inquiry, if we deemed it necessary. If we deemed this a matter for a formal disciplinary investigation, it would be turned over to OPR.



WINSTON_CCSO011531

I, Inv. David Walker, have read and reviewed the summary of the informal inquiry conducted on April 29, 2015. My signature below indicates my approval of the contents of this statement as a fair and accurate summary of what I said.

_____     Date:_____

David Walker

WINSTON_CCSO011532

**Cook County Sheriff's Office**
Office of Professional Review

**Witness Stateme**

| OPR Case Number: | Reporting Unit: | | |
|---|---|---|---|
| 2015-0167 | Squad 1 | | |
| **Primary Investigator** | **Secondary Investigator** | | |
| Carl James Singletary Sr. | Ryan Killacky | | |
| **Witness's Name** | **Assignment** | | |
| Inv. David Walker | CCDOC-Electronic Monitoring Unit | | |
| **Interview Location** | **Date** | **Start Time** | **End Time** |
| Office of Professional Review | 02/09/2016 | 1500 hours | 1535 hours |

**\*Below Statement is in summary and is not verbatim\***

Inv. Walker said on April 09, 2015, Chief Ranzino asked if Inv. Mc Ghee was on duty and Inv. Walker responded that it was Inv. McGee's, off day. Inv. Walker said heard Chief Ranzino, state *"You know you all look alike"*. Inv. Walker said he was offended by the comment Chief Ranzino made.

Inv. Walker said that he didn't talk to Chief Ranzino about the comment or about what he meant, when he said it. Inv. Walker stated Chief Ranzino often talks down to Investigators in the unit, and he couldn't name one Investigator in the unit, black or white who actually like Chief Ranzino.

Inv. Walker said he felt the comment was *"racist"* and totally unprofessional. Inv. Walker said Chief Ranzino joked around a lot with Investigators in the unit, and talked to them, like they are children. Inv. Walker said Chief Ranzino never used the word *"Nigger"* in a conversation at work.

This report is being submitted for information.

| Investigator Name and Signature: | | Date: | Reviewer: |
|---|---|---|---|
| Carl James Singletary Sr. | *Carl James Singletary Sr.* | 02/09/2016 | |


Exhibit #
Walker 5
07/13/20 - AB

# Exhibit C



# Transcript of Cecil Williams

**Date:** July 14, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION

- - - - - - - - - - - - -x
LEGRAIN WINSTON,          :
et al.,                   :

       Plaintiffs,        :

v.                        :   Case No. 18-cv-05726

THOMAS J. DART,           :
et al.,                   :

       Defendants.        :

- - - - - - - - - - - - -x

        Deposition of CECIL WILLIAMS

            Conducted Virtually

           Tuesday, July 14, 2020

             10:10 a.m. CST


Job No.: 307999
Pages: 1 - 317
Reported By: Beth A. Wakenight,
             B.A., CSR, RPR, CRR
```

**Page 2**

```
    Deposition of CECIL WILLIAMS, conducted

virtually.




    Pursuant to notice, before Beth A. Wakenight,

a Certified Shorthand Reporter, Registered

Professional Reporter, and Certified Realtime

Reporter, in and for the State of Illinois.
```

**Page 3**

```
            A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    Ms. Kelly A. Krauchun, Esquire

    THE HERBERT LAW FIRM

    206 South Jefferson Street

    Suite 100

    Chicago, Illinois 60661
    312-655-7660


ON BEHALF OF THE DEFENDANTS:

    Mr. Ethan E. White, Esquire

    EMERY LAW

    2021 Midwest Road

    Suite 200

    Oak Brook, Illinois 60523
    630-984-0339


ON BEHALF OF THE DEFENDANTS:

    Mr. Justin L. Leinenweber, Esquire

    LEINENWEBER, BARONI & DAFFADA, LLC

    120 North LaSalle Street

    Suite 2000

    Chicago, Illinois 60602
    866-786-3705


ALSO PRESENT:  IT Technician Annie Brown
```

**Page 4**

```
                I N D E X


WITNESS:  Cecil Williams

EXAMINATION                                 PAGE
By Mr. Leinenweber                            7
By Ms. Krauchun                             293
By Mr. Leinenweber                          311


              E X H I B I T S


NUMBER        DESCRIPTION                   PAGE

  1   Complaint                              73

  2   Plaintiff Cecil Williams'            122
      Objections and Answers to Defendant
      Gregory Shields' First Set of
      Interrogatories

  3   Plaintiff Cecil Williams'            179
      Objections and Answers to Defendant
      Sheriff of Cook County, Thomas J.
      Dart's First Set of Interrogatories

  4   Complaint Register                   235
      (Bates Winston__CCSO 017406-17407)


      Cook County Sheriff's Office         243
      Discrimination/Harassment/Sexual
      Harassment Complaint Form
      (Bates Winston__CCSO 017408-017409)


      Informal Inquiry of Investigator     248
      Cecil Williams dated 4/16/15
      (Bates Winston__CCSO 017420-421)


      (Original exhibits retained by
      Mr. Leinenweber.  Copies of exhibits
      provided electronically.)
```

Transcript of Cecil Williams
Conducted on July 14, 2020

---

**Page 5**

R E Q U E S T S

Medical records                              193

Medical records from Dr. Mohammed            195
and Dr. Podrielski

Charge filed with EEOC                       205

Records re: Bankruptcies                     234

---

**Page 7**

1   THE REPORTER:  Oh, okay.
2       MR. LEINENWEBER:  So I just didn't know
3   if you needed to --
4       THE REPORTER:  I can swear in addition if
5   you'd like.
6       MR. LEINENWEBER:  It's up to you --
7       THE REPORTER:  Okay.
8       MR. LEINENWEBER:  -- whatever you normally
9   would do.
10      CECIL WILLIAMS, called as a witness
11  herein, having been first duly sworn on oath, was
12  examined and testified as follows:
13      MR. LEINENWEBER:  Thank you.
14          EXAMINATION
15  BY MR. LEINENWEBER:
16  Q  Uh, good morning, uh, Mr. Williams.  My
17  name is Justin Leinenweber.  I'm one of the
18  attorneys for the defendants in this lawsuit.  Uh,
19  my co-counsel, Ethan White, is also, uh, counsel
20  for the defendants, and is on this call as well.
21      Um, I'm going to be taking the deposition
22  today.  So I have a number of questions for you.
23  Uh, one of the first questions I'll ask you is
24  if you have ever had your deposition taken before?

---

**Page 6**

TRANSCRIPT OF PROCEEDINGS
1
2       THE REPORTER:  Will counsel please
3   stipulate that in lieu of formally swearing in
4   the witness, the reporter will instead ask the
5   witness to acknowledge that their testimony will
6   be true under the penalties of perjury, that
7   counsel will not object to the admissibility of
8   the transcript based on proceeding in this way,
9   and that the witness has verified that he is, in
10  fact, Cecil Williams.  All agree?  Counsel agree?
11      MS. KRAUCHUN:  Yes.
12      MR. LEINENWEBER:  This is Justin
13  Leinenweber, yes.
14      MR. WHITE:  Yes, if you need it from me.
15      THE REPORTER:  Okay.  Do you hereby
16  acknowledge that your testimony will be true
17  under the penalties of perjury?
18      THE WITNESS:  Yes.
19      THE REPORTER:  You may proceed.
20      MR. LEINENWEBER:  Do you need to swear
21  in the witness or is that what you just did?
22      THE REPORTER:  Oh, that's what I just --
23      MR. LEINENWEBER:  Yesterday -- okay.
24  Yesterday they had him raise his right hand.

---

**Page 8**

1   A  No.
2   Q  Okay.  So, um, since you haven't had your
3   deposition taken, and really even if you had had
4   it, this would probably be the first time via
5   Zoom like this, um.  So I want to go over just
6   kind of a few ground rules that will help, um,
7   make sure that we get a clear transcript.
8       So the court reporter is, uh, taking
9   down all of the words that each of us are saying.
10  In order for her to be able to do that, it's
11  important that we not talk over each other, um,
12  which can be kind of hard to do sometimes; but
13  I'm going to do my best to allow you to finish
14  when you're talking; and I just ask that you do
15  the same for me; is that, uh, okay?
16  A  Yes.
17  Q  Okay.  And one of the things that happens
18  sometimes is, you may anticipate what question I'm
19  asking, kind of where I'm going with the question,
20  and want to interject with the answer.  It's, you
21  know, naturally done in conversation; but, again,
22  in order for the court reporter to get down a
23  clear transcript, I just ask that you let me
24  finish my question before attempting to answer it,

---

Transcript of Cecil Williams
Conducted on July 14, 2020

9

1 okay?
2  **A (Witness nods head.) Yes.**
3    Q  And that actually brings up one other
4 point, um, which is that sometimes I will do this,
5 too, is, I'll nod or shake my head in agreement or
6 disagreement; but the court reporter can't take
7 that down.
8  **A Okay.**
9    Q  We need you to -- we need you to verbally
10 respond with a "yes" or "no," um, if that's what
11 is required.  Does that sound okay?
12  **A Yes.**
13    Q  Okay.  Um, we can take a break anytime you
14 need to, as long as there is no question pending,
15 um; which means, uh, if there is a question
16 pending, I just ask that you answer it and then
17 we can take a break.  Does that sound okay?
18  **A Okay, uh-huh.  Yes, yes, yes, yes.**
19    Q  Good catch, um.  If you don't understand
20 one of the questions that I'm asking, that's
21 totally fine.  It's completely reasonable.  I just
22 ask that you let me know that, uh, maybe just
23 either say you don't understand or ask me to
24 rephrase it, um.  And -- and I will try to do so.

10

1 If you do answer a question, though, we're all
2 going to assume that you understood the question.
3 Do you agree to that?
4  **A Yes.**
5    Q  Okay, um.  Is there any reason that you
6 can't give full and complete and honest testimony
7 today?
8  **A No.**
9    Q  Okay, um.  Since this is, uh -- this
10 deposition is being conducted via Zoom, you know,
11 typically we'd all being in the same conference
12 room, and we'd know exactly who was there and what
13 was in front of us.  But since this is over the
14 Internet, I just have a few questions, uh, about
15 that.  So the first question I have is:  Is anyone
16 in the room with you?
17  **A No.**
18    Q  Okay.  Do you have any notes in front of
19 you?
20  **A No.**
21    Q  Okay.  Do you have any other documents in
22 front of you at all?
23  **A Uh, no, not -- I have, uh, my -- my normal**
24 **paperwork, yes.**

11

1    Q  Okay.  What -- what do you mean by your
2 normal paperwork?
3  **A Uh, a pad to write on.**
4    Q  Oh, okay.
5  **A Something to write on.**
6    Q  Just something to jot down notes if you
7 need it?
8  **A Right.**
9    Q  Okay, um.  And you understand that no one
10 can provide you with answers to these questions,
11 right?  They have to come from you?
12  **A Yes.**
13    Q  Okay, great.  Uh, and you're not going to
14 look at your phone or texts or e-mails for
15 information about this?
16  **A No.**
17    Q  Okay, uh.  So you're not going to allow
18 anybody else to give you information, um, about
19 your deposition during the deposition today?
20  **A No.**
21    Q  Okay.  Uh, did you do anything to prepare
22 for your deposition today?
23  **A No.**
24    Q  Okay, um.  Did you meet with your attorney

12

1 or have any phone calls with your attorney?
2  **A Uh, I haven't -- had a phone call with my**
3 **attorney a while back, yes.**
4    Q  Okay.  But, um -- and I'm not interested
5 in anything that your attorney told you or you
6 told your attorney, um; but did you have any, uh,
7 calls with your attorney to prepare for this
8 deposition?
9  **A Not to prepare for it, but we talked about**
10 **it.  Yes, you can say that.**
11    Q  Okay.  About how long did you guys talk
12 for, would you say?
13  **A I -- I have not -- I can't answer that.**
14 **I'm not sure.**
15    Q  Okay.  And that's -- that's -- that's a,
16 um, uh, good point.  It brings up a good point,
17 which is, you know, if you don't, um, know
18 something one way or the other, it's -- it's
19 perfectly fine to say, "I don't know."  We
20 do not want you to guess, okay?
21  **A (Witness nods head.)**
22    Q  Is that a "yes"?
23  **A Okay, yes.**
24    Q  Okay, good.  Um, let's see.  Did you talk

13

1 about your deposition, um, with anybody else?
2    **A  No.**
3    Q  Okay.  Did you review any documents to
4 prepare for your deposition today?
5    **A  No.**
6    Q  Okay.  All right.  Let's talk a little bit
7 about your background.  Could you just tell us:
8 Uh, where do you live?
9    **A  Uh, 12256 South Racine, Chicago, Illinois,**
10 **60643.**
11    Q  Okay, um.  What is your highest level of
12 education?
13    **A  Uh, second year of college.**
14    Q  Second year of college?
15    **A  Uh-huh, two years.**
16    Q  Okay, um.  Where was that?
17    **A  Oliver (sic) Harvey.**
18    THE REPORTER:  I'm sorry.  Can you
19 repeat, please.
20    THE WITNESS:  Olive-Harvey, it went blank.
21 BY MR. LEINENWEBER:
22    Q  Oliver Harvey?
23    **A  Uh-huh.**
24    Q  You probably -- the screen might have gone

14

1 blank because the court reporter, um, interrupted
2 to ask for clarification.  Are you on an iPhone?
3    **A  No, I'm on an iPad, yes.**
4    Q  iPad, okay, um.  There may also be a view,
5 if you prefer, where you can have all the faces up
6 at the same time.  Right now you're probably on,
7 um, the sort of speaker view.  So whoever is
8 active is going to be --
9    **A  Right.  How do you -- how do you hit that?**
10    TECH BROWN:  If you look in the top right
11 corner of your screen, Mr. Williams, there should
12 be a button that looks --
13    THE WITNESS:  It says participant?  It
14 Says participant?
15    TECH BROWN:  No, no, there should be a
16 button that'll say -- I'm not sure if it'll say
17 Gallery View when you're on an iPad, but it's a
18 little 3 X 3 grid.  It's in the top right corner.
19    THE WITNESS:  I see visual background,
20 raising hand, meet and chat.
21    TECH BROWN:  It sounds like you're in your
22 settings.
23    THE WITNESS:  Okay.
24    TECH BROWN:  If you want to go back out to

15

1 the -- to the, uh, video screen?
2    THE WITNESS:  Okay.
3    TECH BROWN:  And I think in the top
4 right-hand corner on an iPad, there should be the
5 Gallery View button, a little 3 X 3 square?
6    THE WITNESS:  Uh, yeah, yeah.
7    TECH BROWN:  Small grid?
8    THE WITNESS:  Okay.  There we go.
9    TECH BROWN:  Now, you should be able to
10 see everyone, right?
11    THE WITNESS:  Yes.
12    TECH BROWN:  Perfect.
13 BY MR. LEINENWEBER:
14    Q  Perfect, okay.  So you said two years of
15 college at Oliver Harvey, but no degree from
16 there, right?
17    **A  Correct.**
18    Q  So your highest degree then would be a
19 high school degree?
20    **A  High school, yes.**
21    Q  Okay.  Got it, um.  All right.  And, um,
22 what year did you, um, complete those two years at
23 Oliver Harvey?
24    **A  '82, '-3 -- '84.**

16

1    Q  Okay.  And then what year did you join
2 the, uh -- the sheriff's office?
3    **A  '93.**
4    Q  Okay.  So between, um, 1984 and 1993,
5 where did you work?
6    **A  Uh, I did a little -- little traveling.**
7 **I worked in Michigan.  I worked in Miami, Florida.**
8 **So I had odds and odds jobs as I went along.**
9    Q  Um, what sort of jobs?
10    **A  Um, factory jobs, dispatchers, stuff like**
11 **that.**
12    Q  Okay.  What job did you have immediately
13 prior to joining the sheriff's office in '93?
14    **A  Uh, I worked for, uh, Soft Sheen on**
15 **93rd and -- 95th and Cottage Grove.**
16    Q  And what was that entity again?
17    **A  Uh, Soft Sheen, it was a factory job.**
18    Q  Okay.  So, no, um, law enforcement jobs
19 prior to joining the sheriff's office?
20    **A  No prior law enforcement, no.**
21    Q  No, uh, security jobs prior to that?
22    **A  No, no.**
23    Q  Uh, any military experience?
24    **A  No.**

Transcript of Cecil Williams
Conducted on July 14, 2020

5 (17 to 20)

17

1    Q  Okay, um.  In '93, um, you -- says you
2  were hired in '93, uh.  Tell us about that.  When
3  did you -- or, sorry, uh, strike that.  Where did
4  you first work at the sheriff's office?
5    **A  Division two.**
6    Q  Okay.  What's division two?
7    **A  Uh, it's a -- it's division where the**
8  **inmates is.  I was inside the jail working as a**
9  **corrections officer.**
10    Q  Okay.  Did you go through an academy prior
11  to, um, going into division two?
12    **A  Yes.**
13    Q  Okay.  What and, uh -- when did you start
14  in the academy?  Was that in '93?
15    **A  Uh, March of '93.**
16    Q  Okay.  Got it.  Okay.  So March of '93,
17  you started at the academy.  Then you moved --
18  your first assignment after the academy was
19  division two, which is in the jail?
20    **A  Correct.**
21    Q  Uh, and then, uh, where did you go after
22  division two?
23    **A  In '96, I went to external operations,**
24  **'96 to 2005.**

18

1    Q  And what's external operations?
2    **A  That's the, uh, external unit that works**
3  **outside on the -- the -- the surrounding of the**
4  **jail, external, outside of the jail.**
5    Q  So for someone who is not super familiar
6  with the operations of a jail and certainly not as
7  familiar as you are, does that --
8    **A  Uh-huh.**
9    Q  Is that essentially -- is that kind of
10  what I think about when I think of maybe a guard
11  sort of on the wall?
12    **A  Uh, yeah, you outside escorting people,**
13  **checking people coming in, going -- doing hospital**
14  **details, uh, doing surroundings of the jail,**
15  **as far as driving around the jail, make sure all**
16  **the security -- basically you're outside security**
17  **of the inside for the jail.**
18    Q  Got it, okay.  So you're responsible for
19  everything outside of the jail.  But, you know,
20  if somebody then transfers into the jail, they go
21  through a process; and you're not involved in that
22  other than being --
23    **A  Right.  Sometimes -- it depends.**
24  **Sometimes I might be involved in the search out**

19

1  there, yes.
2    Q  Okay.  Okay.  And then, um, after -- you
3  said that was in '96 through 2005; you were in
4  external operations.  Where did you go next?
5    **A  Uh, electronic monitoring.**
6    Q  Okay.  So that was '05?
7    **A  In '05, yes.**
8    Q  Okay.  And are you still in electronic
9  monitoring?
10    **A  Correct.**
11    Q  Okay.  How did it come to be that you
12  transferred into electronic monitoring?
13    **A  Well, it was a bidding procedure.  Uh,**
14  **it's a test you take, physical tests.  And it's a**
15  **bidding procedure.**
16    THE REPORTER:  I'm sorry.  Did you say
17  "bidding procedure"?
18    THE WITNESS:  Yes, correct.
19    THE REPORTER:  Okay.
20  BY MR. LEINENWEBER:
21    Q  And then you said also physical test?
22    **A  Yes, you have to run, yes.**
23    Q  Okay.  Anything else involved in that?
24    **A  Uh, what else we do?  Uh, took some exams,**

20

1  yes, exams.
2    Q  Okay.
3    **A  That's about it.**
4    Q  So like a written exam?
5    **A  Yes.**
6    Q  Okay, um.  What was your, uh, position,
7  um, in EM?  What was it?  Were you an
8  investigator?
9    **A  Yeah, electronic -- electronic**
10  **investigator; that's correct.**
11    Q  When you were in, um, external ops
12  immediately before going to EM -- if I say EM,
13  you understand, I'm talking about electronic
14  monitoring?
15    **A  Yes, correct.**
16    Q  Okay, um.  So if -- or, sorry.
17  Immediately before you went to EM, what was
18  your last position or rank in external operations?
19    **A  A correction officer.**
20    Q  Okay.  And then, um, when you came
21  into EM what was your assignment?
22    **A  Assignment, I was, uh, an investigator,**
23  **basically doing deliveries, checking on people,**
24  **going in there.  I mean, checking on people, uh;**

Page 21

1  that's basically what we do.
2     Q  Is that what would be referred to as
3  patrol?
4     A  Yes, patrol, correct.
5     Q  Okay.  Have you always been in patrol in
6  EM?
7     A  Yes, yes, patrol and deliveries is one
8  complete thing, yes.
9     Q  Can you tell me, if you know, um:  What
10 assignments are available in the EM unit?
11    A  Could you express that a little bit
12 different?
13    Q  Yeah.  So, um, let's say since, um, 2010.
14 What are -- are there different assignments that
15 you could -- you could get?  I know you mentioned
16 patrol.  Is there anything else that you could
17 be --
18    A  You got -- you got --
19    Q  -- asked to do?
20    A  You got patrol.  You got deliveries.
21 You got TSS.
22    Q  Are patrol and delivery two separate
23 things?
24    A  Uh, yes.

Page 22

1     Q  Okay.  So it's patrol, delivery, TSS,
2  which we'll talk about in a second, um.  Anything
3  else?
4     A  That's it unless you work in the office.
5     Q  Okay.
6     A  That's it.
7     Q  Or office, okay.  Okay, um.  And you said
8  that you did do patrol, right?
9     A  Yeah.
10    Q  Okay.  So since 2010 you've done patrol,
11 um, in some form?
12    A  Correct, yes.
13    Q  And you've done, um, delivery as well in
14 some form?
15    A  Yes, yes.
16    Q  And have you worked in TSS since --
17    A  Yes.
18    Q  -- 2010 at all?
19    A  Yes.
20    Q  Okay.  And then what about the office?
21 Have you ever worked in the office since 2010?
22    A  No.
23    Q  Okay.  Are you qualified to work in the
24 office?

Page 23

1     A  You know, that's -- that's an answer
2  that's broad because qualification doesn't fit
3  the office.  It's who they -- let's just say,
4  that's a broad answer.
5     Q  Um, is there -- let me ask it this way:
6  Is there any reason that you could not work in
7  the office?
8     A  No.
9     Q  Okay.  Have you ever requested to work in
10 the office?
11    A  No.
12    Q  Okay, um.
13    A  I don't request an assignment.
14    Q  That -- that brings up a good question.
15 You kind of anticipated my next question.  Who
16 determines what your assignment is within --
17    A  Supervisor.
18    Q  -- EM?  Supervisor?
19    A  Supervisor.
20    Q  Okay.  So since 2010, um, who -- who have
21 been your supervisors?  And I know this might be a
22 long list; and it also might, uh, depend on which
23 shift, you know, you're on.  Um, so if you think
24 there is a -- you know, a better way to get at

Page 24

1  this, um, I'm -- I'm happy to -- to listen to
2  however you think is best to explain it.
3     A  Uh, I got Neal, Thomas Neal.  Uh, uh, ooh,
4  wow, Collins -- uh, dang, oh, Heal (sic).  Uh,
5  God, what is this guy's name?  God, he -- he
6  retired, uh, Chris Rohloff.  Uh, what is his name?
7  What is his name?  What is his name?  Ranzino, um,
8  um, oh, God, um, God.
9     Q  That's okay.  Some of them -- you know,
10 the other thing is, some of them might come to
11 you later as we're talking.
12    A  Right.
13    Q  And that's totally fine.  This is -- you
14 know, this a memory test in that I'm interested
15 in knowing what you, you know, remember, but I'm
16 definitely not --
17    A  Logan, Loggins, Logan, Loggins, uh, Smith,
18 uh; God, we done have so many come and go.  Uh,
19 Gaynor, uh, oh, God.  I -- like I said, I had so
20 many come and go.  They all ain't crossing my mind
21 right now.
22    Q  Okay, um.  What shifts have you worked on
23 since, uh, 2010?
24    A  3:00 to 11:00.

Transcript of Cecil Williams
Conducted on July 14, 2020

25

1    Q  3:00 to 11:00 the entire time?
2    **A  The entire time.**
3    Q  Okay.  Well, that should make it a little
4  bit easier for us because I imagine if you did
5  different shifts, you'd have different supervisors
6  to add into that as well?
7    **A  Correct.**
8    Q  Yeah, um, okay.  So one of these
9  supervisors would make the decision regarding
10  which assignment you received?
11    **A  Correct.**
12    Q  And is that done on a daily basis, a
13  weekly basis, a monthly basis?
14    **A  Daily basis.**
15    Q  Okay.  So from each day -- from day to
16  day you could receive, uh, an assignment from
17  one of these supervisors?
18    **A  Correct.**
19    Q  And one day it might be patrol.  Another
20  day it might be delivery.  Another day it might be
21  TSS?
22    **A  Correct.**
23    Q  Okay.  And since you, uh, said that you --
24  you know, when I asked you kind of what -- what

26

1  your position is, or what your assignment has been
2  within EM since '05, I think you said: patrol and
3  deliveries.  So is it fair to say that the
4  majority of the time that you've been in EM,
5  you've done patrol and deliveries?
6    **A  Patrol, delivery and TSS, correct.**
7    Q  All three of those?
8    **A  Yes.**
9    Q  What's the -- is there a breakdown in
10  your mind of how much you've done of one versus
11  the other?
12    **A  Really for my first five years, six years,**
13  **I did deliveries.  And then I was off and on.**
14  **When -- when we broke up, we went from -- so as**
15  **far as time limit, I can't give you an exact**
16  **amount of time where I was at one specific place**
17  **at one time --**
18    Q  Uh-huh.
19    **A  -- but it -- it averages out, one over the**
20  **other, yes.**
21    Q  And you said your first five years you did
22  mainly deliveries?
23    **A  Yes.**
24    Q  Okay, um.  All right.  Let me ask you a

27

1  few other questions.  Let's talk about some of
2  the policies, um.  Are you aware of whether or
3  not the sheriff's office has a policy on, uh,
4  discrimination, retaliation and harassment?
5    **A  Correct.**
6    Q  Okay.
7    **A  Yes.**
8    Q  They do, okay, um.  And could you tell us
9  a little bit about: What do you know about that
10  policy?
11    **A  Shouldn't be discriminated against, uh,**
12  **race, assignments, politician, political, and**
13  **basically, uh, who you are.  Can't discriminate**
14  **against you for your job, basically who you are.**
15    Q  Okay, uh.  So decision -- is it fair to
16  say that decisions for assignments, um, in theory
17  at least, should be based on the needs of the
18  sheriff's office?
19    **A  Correct.**
20    Q  Okay.  So if, you know, one day there
21  are more deliveries needed than patrol, probably
22  they will be able to put more officers on
23  delivery; is that fair to say?
24    **A  Correct.**

28

1    MS. KRAUCHUN:  Objection; foundation.
2  BY MR. LEINENWEBER:
3    Q  Um, what are you supposed to do if you
4  witness discrimination or retaliation or
5  harassment?
6    **A  Report it.**
7    Q  Okay.  And who would you report it to?
8    **A  The immediate supervisor.**
9    Q  And, um, what if your immediate supervisor
10  was the one that you were going to be complaining
11  about; or, sorry, strike that.  What if your
12  immediate supervisor was the one that you
13  witnessed discriminating, harassing or
14  retaliating?
15    **A  Go to the next supervisor above.**
16    Q  So, uh, would it be fair to say then, you
17  go to the next level of the chain of command?
18    **A  Correct.**
19    Q  Okay.  And how do you actually report that
20  you had witnessed discrimination or harassment or
21  retaliation?
22    **A  By, um, now, it's by e-mail; but normally**
23  **it's a verbal or to/from.**
24    Q  When you say "to/from," what do you mean

Page 29

1 by that?
2   **A  That's, uh, basically writing it down on**
3 **paper and giving it to him.**
4   Q  Okay.  So you could do a verbal report,
5 uh; or a to/from, which is a written report; or
6 now with the prevalence of e-mail, you could also
7 do it via e-mail?
8   **A  Correct.**
9   Q  Okay.  And, um, do you know what, uh --
10 what is the person that you report it to?  What
11 are they supposed to do?
12   **A  Uh, as far as I know of, they are supposed**
13 **to take care of it directly -- I mean, direct the**
14 **problem.  As far as I know of, they are supposed**
15 **-- uh, what's the best word for me to say?  They**
16 **are supposed to, uh, confront the problem.**
17   Q  Um, and as part of the supervisor
18 confronting the problem, as you described it,
19 would -- would any of that involve, um, either
20 HR or Internal Affairs doing investigations?
21   **A  Correct.**
22   Q  Okay.  And I use the term Internal
23 Affairs.  I think you guys have a different name
24 for it.  Is it, um --

Page 30

1   **A  OPR.**
2   Q  OPR, okay.  And that's Office of
3 Professional Review?
4   **A  Correct.**
5   Q  Okay.  So as part then of the sheriff's
6 policy regarding complaints of discrimination,
7 harassment, retaliation; HR or OPR could do
8 investigations, right?
9   **A  Correct.**
10   Q  Okay.  And as a witness what would your
11 role in that investigation be, if you know?
12   **A  Can -- can you explain that question a**
13 **little bit better, please.**
14   Q  Sure.  If, um -- say that somebody had
15 reported that discrimination, harassment or
16 retaliation occurred, and you're listed as a
17 witness; and either HR or OPR, uh, launches an
18 investigation.  What's your role in that
19 investigation as a witness?
20   **A  Tell the truth of what happened.**
21   Q  Um, let me go back to assignments for a
22 second.  Are you able to, um, bid for assignments
23 at all?
24   **A  No.**

Page 31

1   Q  Were you ever able to bid for assignments?
2   **A  Uh, yes.  Back in 2005 when I first came**
3 **over there, you bid it for patrol, TSS, or --**
4 **patrol, TSS or deliveries, yes.**
5   Q  Okay.  And when did it stop that you could
6 no longer -- strike that.  When, um -- so, okay.
7 You used to be able to bid for assignments, um:
8 patrol, delivery, TSS.  Um, when did that bidding
9 process stop?  When did you guys not -- when were
10 you not able to do that anymore?
11   **A  I don't remember the exact year, but it**
12 **did change somewhere around -- I want to say**
13 **around '10.**
14   Q  Okay.
15   **A  I'm giving an estimate.  I might -- I'm**
16 **not sure.  I'm giving an estimate, around that**
17 **time.**
18   Q  Yeah, that's totally fine.  That's --
19 that's -- that's fine, um.  And do you have an
20 understanding as to why that changed?
21   **A  No, I don't.  Actually, I'm not in**
22 **administration.  So I don't know why they make**
23 **their decisions.**
24   Q  Okay.  Do you know if it had anything to

Page 32

1 do with a collective bargaining agreement?
2   **A  I'm not -- I'm -- I'm a member of the**
3 **union.  I'm not familiar of why decisions are**
4 **made.**
5   Q  Sure, um.  And you said you're a member of
6 the union.  What union is it?
7   **A  Teamsters.**
8   Q  Okay, um.  And do you have an
9 understanding that the Teamsters have a
10 collective bargaining agreement with the sheriff's
11 office?
12   **A  I do, yes.**
13   Q  Okay.  And they have a collective
14 bargaining agreement for your position, right,
15 as an EM investigator?
16   **A  Correct, yes.**
17   Q  Okay.  And do you know, one way or the
18 other, if bidding was a part of the collective
19 bargaining agreement?
20   **A  Like I say, I was not on the -- uh,**
21 **what's -- what's the word I'm looking for?**
22 **I wasn't on the table -- at the table when they**
23 **was making the decision.  So I cannot answer that**
24 **question.**

Transcript of Cecil Williams
Conducted on July 14, 2020

9 (33 to 36)

**33**

1  Q  Okay.  What I want to get at is something
2  slightly different.  I just want to know if you're
3  familiar with the collective bargaining agreement,
4  uh, enough to know if bidding was, at one point,
5  included in that agreement, not -- not the
6  negotiation of it, but the agreement that the
7  union ended up approving, um.  Did -- was bidding
8  involved -- or, sorry.  Was bidding provided for
9  in the collective bargaining agreement at some
10 point?
11 **A  And I'm gonna answer the question the same**
12 **way again.  I was not there when they -- so I'm**
13 **not a part of administration.  So I cannot answer**
14 **that question.**
15 Q  Okay.  So you just don't know one way or
16 the other?
17 **A  No, I don't know how they --**
18 Q  Okay.
19 **A  -- make their decisions.  I'm -- I'm not**
20 **an administrator.  So I can't answer that**
21 **question.**
22 Q  Okay, understood, um.  All right then.
23 So what is your understanding of the sheriff's
24 office, um, policy regarding progressive

**34**

1  discipline?
2  **A  There -- there should never be progressive**
3  **discipline.  I know that there is a process of --**
4  of -- and I (inaudible) -- there is a process of
5  where you go through to get to exactly to a
6  specific thing, unless you are a major.  You got
7  minor, major, and then there is progressive.
8  Q  Okay.  So when you say "major and minor,"
9  you're talking about types of infractions?
10 **A  Correct.**
11 Q  Okay.  So there is minor infractions.
12 There is major infractions, um.  And -- well,
13 let me ask it this way:  What is progressive
14 discipline in your mind?
15 **A  Going past -- going past, uh, uh, the**
16 **process of what you supposed to do, first step,**
17 **second step, third step.  You process -- you going**
18 **completely through everything, going straight to**
19 **the -- straight to it.**
20 Q  Okay.  So progressive discipline has
21 different steps sort of along the way?
22 **A  No, progressive -- progressive is going**
23 **straight to the -- to major.**
24 Q  Okay.  So you're saying, progressive

**35**

1  discipline in your mind would be going straight
2  to a major infraction?
3  **A  Correct.**
4  Q  Okay.  And what would the punishment,
5  I guess -- or not punishment.  It's not
6  punishment.  It's discipline.  What would the
7  discipline, uh, be?
8  **A  It depends.  It can start from three days**
9  **to 29 days to suspension.**
10 Q  Okay.
11 **A  Loss of jobs.**
12 Q  Okay.  Do you know if -- does the union
13 contract provide for a progressive discipline
14 process?
15 **A  Uh, is there a -- as far as procedure that**
16 **is in writing on which way we go?**
17 Q  Yeah.
18 **A  Yes.**
19 Q  That's what I'm asking.
20 **A  Yes.**
21 Q  Okay, uh.  Who makes the determination of
22 what level of discipline to hand out for an
23 infraction?
24 **A  The director.**

**36**

1  Q  And what is your -- anybody else?  Sorry?
2  **A  No.  Well, when you say "anybody else,"**
3  **what are -- what are you saying as far as who else**
4  **gives out the discipline?  The discipline starts**
5  **from the director and works his way down.  That's**
6  **the best way I can answer that question.**
7  Q  Okay.  So in your understanding, the
8  director makes the decision that this is the level
9  of discipline for this infraction?
10 **A  Correct.**
11 Q  Okay.  And, um, is anyone else -- well,
12 strike that.  What, um -- what's the basis of
13 your understanding that that's the way it works;
14 that discipline is determined by the director?
15 **A  Because his name is signed on the top of**
16 **it.**
17 Q  Okay.  His -- his name is signed on the
18 top of a disciplinary form of some kind?
19 **A  Correct.**
20 Q  Okay.
21 **A  Correct.**
22 Q  Okay.  And, um, who else?  You said then,
23 it kind of flows down.  So who else would be
24 involved in, um, sort of, uh, processing

Transcript of Cecil Williams
Conducted on July 14, 2020

37

1  discipline?
2  **A  I guess the chain of command from top to**
3  **bottom.**
4      Q  Okay.  And, um, what is your remedy
5  as a -- as -- strike that.  As an investigator in
6  EM, if you disagree with discipline, what can you
7  do about that?
8  **A  A grievance procedure.**
9          THE REPORTER:  I'm sorry.  Can you repeat.
10 BY MR. LEINENWEBER:
11     Q  Okay.  So there is a grievance procedure,
12 uh.  What is the grievance procedure?
13 **A  You have -- first step is with the**
14 **immediately supervisor.  Second step is, uh --**
15 **if I'm not mistaken, uh, the director.  Third**
16 **step, uh, uh, I say merit board, one of them.**
17 **I might be, uh, putting it in the wrong**
18 **directions, but it's within that process.**
19     Q  Okay.  So one of, uh, the steps is
20 immediate supervisor, um.  One of the steps is
21 the director.  One of the steps is the merit
22 board.  Are there any other steps that you're
23 aware of at all?
24 **A  Um, you got one, two, three procedures,**

38

1  **uh.  Hum, it's -- OPR is in there somewhere,**
2  **depends; and the merit board and then, uh,**
3  **downtown.**
4      Q  What's downtown?
5  **A  You got the merit board downtown and,**
6  **uh -- what is it -- the merit board and -- hold**
7  **on.  Let me make sure it don't fall -- my club**
8  **don't fall out.**
9      Q  Oh, sure.
10 **A  Uh, basically that's it.  I -- I can't**
11 **think of the name, is not right off, but I can't**
12 **think of it right off; but it's the merit board.**
13 **Once you go down to -- the merit board is**
14 **downtown, so.**
15     Q  So when you reference --
16 **A  Due process.**
17     Q  Okay, sorry.  When you referenced
18 downtown, you're referring to the merit board?
19 **A  Correct.**
20     Q  Okay, got it.  And, um, you mentioned due
21 process.  So what, uh -- so you're able -- if you
22 disagree with, um, the facts that gave rise to
23 discipline, the grievance process allows you to
24 challenge that, right?

39

1      **A  It's supposed to, yes.**
2      Q  Okay.  And then if you disagree with, say,
3  the procedure, the way the, uh, discipline was
4  sort of handed down to you, uh, you can use the
5  grievance process to -- to disagree with that as
6  well, right?
7      **A  Correct.**
8      Q  Okay, uh.  And -- okay.  So if, um -- so
9  essentially if the progressive disciplinary
10 process is not followed, there is a procedure by
11 which an investigator like yourself can challenge
12 it via the grievance process?
13     **A  Yes.**
14     Q  Okay, um.  And I think you had said -- you
15 said something along the lines of "supposed to."
16 Uh, you're supposed to have this process.  What
17 did you mean by that?
18     **A  Sometimes it doesn't go that way.**
19     Q  And what -- what do you mean by "sometimes
20 it doesn't go that way"?
21     **A  Sometimes they will, uh, go straight to a**
22 **point and -- and give you days; and then you fight**
23 **it after you get the days.  I have saw it done.**
24     Q  Okay, um.  All right.  Well, we'll come

40

1  back to discipline a little bit later; but let me
2  ask you, um, about a few other things.  Now, one
3  of the assignments you mentioned was, uh, TSS,
4  right?
5      **A  Correct.**
6      Q  What does TSS stand for?
7      **A  Uh, it's basically, uh -- don't get me**
8  **(inaudible).  I know it's processing.**
9      Q  (Laughs.)
10     **A  (Laughs.)**
11     Q  Okay.  All right.
12     **A  I don't know -- I don't know the exact**
13 **terms, but I know it's processing.**
14     Q  That's fine.  That's fine.  Let me -- let
15 me ask you this:  In your mind what is -- what is
16 the TSS assignment all about?  What do you do?
17 If you came in on Wednesday and you had TSS, what
18 is your day like?  What are you doing?
19     **A  You -- you're reporting down in the**
20 **basement of division five.  You process the guys**
21 **that's coming in, and you get them ready to go**
22 **out.**
23     Q  And you say you process the guys that are
24 coming in and get them ready to go out.  So

Transcript of Cecil Williams
Conducted on July 14, 2020

11 (41 to 44)

**41**

1 presumably you're talking about detainees?
2 **A Correct.**
3 Q Is house arrest another way to describe
4 what TSS is doing?
5 **A Uh, house -- TSS is the beginning of, uh,**
6 **house arrest.**
7 Q So you're --
8 **A That's the first process of going through**
9 **house arrest.**
10 Q Okay. So you're moving guys -- TSS is
11 helping to move detainees from the jail to house
12 arrest?
13 **A Correct.**
14 Q Okay. And, um, what -- what is that
15 process like? What -- what do you do during that
16 process?
17 **A Uh, you check, uh -- you check paperwork,**
18 **uh. You do the paperwork. You put the band on**
19 **their leg. You make the phone calls to make sure**
20 **they can go where they're supposed to go, uh.**
21 **You check the files, make sure they don't have**
22 **nothing in their files that will violate them from**
23 **going to certain places. You make sure you -- if**
24 **they don't have no warrants -- process basically.**

**42**

1 Q So is it fair to say that you're sort of
2 checking and double-checking and triple-checking
3 that it is okay, uh, to move one of these
4 detainees from the jail to a location for house
5 arrest?
6 **A Correct.**
7 Q Okay. And as part of that, you said there
8 is -- you're checking, uh -- there is paper that
9 you're checking. What kind of paper are you
10 checking?
11 **A Documents, lawyers' documents, court**
12 **documents.**
13 Q Okay. So there could be, like, an order
14 from the Court saying: Joe Smith is to be placed
15 on house arrest?
16 **A It doesn't say "placed on house arrest."**
17 **It says: "Eligible for house arrest."**
18 Q Got it. Okay. Thank you. That's --
19 that's an important distinction, I'm sure, um.
20 Okay. So -- so if Joe Smith comes down to TSS,
21 uh, he needs to have a piece of paper with him
22 that says he's eligible for, uh, electronic
23 monitoring?
24 **A He don't have anything with him. We -- we**

**43**

1 **do -- we handle all the paperwork.**
2 Q Sure, yeah.
3 **A And the paperwork that come down, it has**
4 **to get -- it comes from the attorney that states**
5 **that he has to be eligible for house arrest. He's**
6 **not automatically put on house arrest. He has to**
7 **be -- he has to have somewhere to go. He has to**
8 **not have no domestics or any -- anything at that**
9 **specific area, he cannot go to.**
10 Q Okay.
11 **A So basically he cannot go somewhere that**
12 **he's not allowed to. So if he cannot find a place**
13 **to go, he can't go.**
14 Q Got it. Okay. So you -- you brought up a
15 couple of important things, I think. So one is,
16 that we talked about, you need to have this legal
17 document that says: Joe Smith is eligible.
18 That's one thing he needs, right?
19 **A Correct.**
20 Q Okay. And then, um, he needs an address,
21 somewhere that he can -- he says: This is the
22 address that I call home, um, that I would like
23 to be placed at?
24 **A Correct.**

**44**

1 Q Okay. And then you need to check, um,
2 to make sure that there is no, um, orders of
3 protection or things of that nature related to
4 that address that would say: Joe Smith can't go
5 here?
6 **A Correct.**
7 Q Okay. So, for example, if Joe Smith had
8 an order of protection, um, related to a domestic
9 battery at the address he wanted to go to, you
10 wouldn't, uh, say he's eligible for, uh,
11 electronic monitoring at that address?
12 **A Correct.**
13 Q Okay. You mentioned phone calls. What is
14 the phone call process? What's that about?
15 **A We call to verify, um, the residence.**
16 Q Okay. So he -- this is again -- so
17 Joe Smith comes, says: This is the address where
18 I'd like to go. Here is the phone number of the
19 person who lives there. And you contact that
20 person to make sure it's okay that Joe Smith can
21 come and be there on electronic monitoring?
22 **A Correct.**
23 Q Okay, um. You also mentioned, uh, file
24 checking -- checking files. I think we've

Transcript of Cecil Williams
Conducted on July 14, 2020

45

1  probably covered that, but are there any other
2  types of files that you're -- you're reviewing or
3  checking other than, you know, the protective
4  orders and then that order from the legal order
5  saying they're eligible?
6      A  Just, that's basically it.
7      Q  Okay.  And then, um -- oh, you also said
8  you check for any outstanding warrants?
9      A  Correct.
10     Q  What -- what does that mean?  What --
11 like, what would that process mean?
12     A  That -- that comes on -- that comes on a
13 paperwork that they bring downstairs.
14     Q  Oh, okay.  Um, so you're double-checking
15 to make sure that maybe even though, uh, Cook
16 County says it's okay for this guy to be eligible
17 for electronic monitoring, it might be that Lake
18 County has a warrant out for his arrest or
19 something?
20     A  Correct.
21     Q  Okay.  And then, uh, you also mentioned
22 putting a band on the leg.  So what -- what's that
23 process like?
24     A  Uh, process is, uh, cutting the band for

46

1  to fit his leg.  It's an XMT.
2      THE REPORTER:  I'm sorry.  It's a what?
3      THE WITNESS:  It's called an XMT.
4  BY MR. WHITE:
5      Q  XM -- so X as in X-ray; M as in Michael;
6  T as in Tom?
7      A  Correct, but we have switched over to GPS,
8  correct.
9      Q  Okay, um.  And so when you're working in
10 TSS, is there anything else you're doing other
11 than this process?
12     A  Well, basically doing -- uh, keeping them
13 in order.
14     Q  Okay, keeping them in order.  Are you
15 actually transporting any of these individuals
16 either from the jail to TSS or from TSS back to
17 the jail?
18     A  Yes.
19     Q  You do that as well?
20     A  Yes.
21     Q  Okay.  And then what about transporting
22 individuals from TSS to the actual home, um, that
23 they're going to be on house arrest?
24     A  That's called deliveries.

47

1      Q  That's deliveries, okay.  So delivery is
2  separate from TSS?
3      A  Yes.
4      Q  Okay.  It's part of the process, but it's
5  separate?
6      A  Correct.
7      Q  Okay.  Got it, um.  And the process of
8  transporting to/from the jail, um, how does that
9  work?
10     A  As -- uh, can you elaborate on that a
11 little bit better?
12     Q  Sure.  So when you report to TSS, are the
13 detainees already there, or do you have a list of
14 detainees that you need to go pick up from the
15 jail and bring over to TSS?
16     A  Okay.  You get a list on the computer.
17 They be over in -- they be over at the jail.
18 You walk over to the jail, pick them up, bring
19 them back to division five in the basement, put
20 them in a cage and process them.
21     Q  Okay.  And, um, is this all done on foot?
22 You just walk over and -- and pick them up and
23 then bring them back or are you in a vehicle?
24     A  No, all on foot.

48

1      Q  All on foot, okay.  And, uh, you said put
2  them in a cage, and you also mentioned --
3      A  Well --
4      Q  -- keeping order?  No, I know.
5      A  Well, that's -- that's -- that's the
6  politically incorrect word; but inside the --
7  we call them -- well, inside the, uh, lockers.
8  I mean, not the lockers.  Wow, I'm really going
9  off now.  Uh, inside the, uh --
10     Q  The cell?
11     A  -- the bars, inside the cells, yes.
12     Q  Okay.
13     A  Inside the cells.
14     Q  Yeah.
15     A  I'm sorry, wrong word used.  I'm sorry.
16     Q  I -- I believe me, no -- no judgment,
17 uh, is being cast from -- from us regarding your
18 terminology.  It sounds like a very important job,
19 so, um.  So you said -- okay, so in the cell.
20 We'll refer to it as the cell.  Um, and -- and you
21 also mentioned kind of keeping order.  So when the
22 guy -- when you bring the detainees over, you're
23 putting them in the cell, um.  Is it one big cell?
24 Is it a dozen individual cells?  What's that like?

Transcript of Cecil Williams
Conducted on July 14, 2020

13 (49 to 52)

---

**49**

1    **A  Well, the best way to explain it is:**
2    **You have three -- you have three cells.  Everybody**
3    **go into one cell.  You being processed.  The next**
4    **cell, you going back.  The next cell, you've been**
5    **processed.**
6    Q  Okay.  So let me just try and clarify and
7    make sure I understand what you're saying.  So
8    everybody starts in cell one, we'll call it?
9    **A  Correct.**
10    Q  And then you guys start on this process of
11    checking paperwork and making the phone calls; is
12    that right?
13    **A  Correct.**
14    Q  Okay.
15    **A  Correct.**
16    Q  Presumably it turns out that some
17    people -- some detainees are going to be eligible
18    and actually get to go on electronic monitoring.
19    So you move them into cell two, we'll call it?
20    **A  Correct.**
21    Q  And then some people -- some detainees,
22    uh, it turns out, either have an order of
23    protection, have an additional warrant, or maybe
24    nobody is at that address anymore.  So they have

**50**

1    to go back to jail because they're not going to be
2    sent on electronic monitoring?  And --
3    **A  Correct.**
4    Q  -- they're -- and they're moved to cell
5    three?
6    **A  Correct.**
7    Q  Okay.  Got it.  That makes perfect sense
8    to me now, uh.  And that's actually -- that's the
9    best way I've heard it explained, uh, so far.  So
10    thanks for educating us a little bit, um.  And --
11    and you said you worked, I think, 3:00 to 11:00;
12    is that right?
13    **A  Correct.**
14    Q  Is your role -- well, I guess, okay.
15    When do people then -- so you've done a day's
16    work, right?  So you've -- you've -- you've gone.
17    You've gotten the detainees.  You've moved them
18    through one -- through cell one into cells two and
19    three.  So now cell one is empty.  And we have a
20    group of detainees that are going out on
21    electronic monitoring, and a group of detainees
22    that are going back to the jail.  What happens
23    next?
24    **A  The ones that's going back is taken back.**

**51**

1    **The ones that's going home will be placed on a --**
2    **in a van and sent to 31st Street for delivery.**
3    Q  Are you taking the guys going back to the
4    jail?  Do you actually walk them back to the jail?
5    **A  Correct.**
6    Q  Okay.  And then the guys going out on
7    electronic monitoring, you said they have to get
8    to 31st Street, um?
9    **A  No, not 31st, I apologize, 23rd and**
10    **Rockwell.  I apologize, wrong address.**
11    Q  Okay, 23rd and Rockwell.  So do you
12    physically walk them over there or do they --
13    **A  No, you drive them over there in a van.**
14    Q  Okay.  And that's something that you would
15    do?
16    **A  Yes.**
17    Q  Okay.  Got it.  Okay.  Is there any other,
18    uh, part of the job of TSS that either I haven't
19    asked about, or you have in your mind as:  Well,
20    this is something else that we do.  Anything you
21    can think of?
22    **A  No.**
23    Q  Okay.  So that's basically the entire
24    process of a day's shift from picking the

**52**

1    detainees up, to doing the process of determining
2    who is going home and who's going back to the
3    jail, to then actually emptying the cells and
4    moving guys back to the jail, and moving guys to
5    the homes for electronic monitoring?
6    **A  Correct.**
7    Q  Okay, uh.  Did you, uh -- did you like
8    doing that work, or how did you feel about that
9    job?
10    **A  Honestly (laughs), no, I don't.**
11    Q  Okay.  What -- what didn't you like about
12    it?
13    **A  But it's part of my job; I mean, it's part**
14    **of my job.  It's part of my job.**
15    Q  Sure, sure, understood.  Um, what didn't
16    you like about it?
17    **A  It was stuffy inside the jail.  It's hot.**
18    **It's nasty.  You dealing with much more violence**
19    **with them in the basement than you is on patrol.**
20    **You just dealing with much more mentally,**
21    **physically, than you would if you was out on the**
22    **street.**
23    Q  And, uh, why do you say that?  Like,
24    what's different about being out on the street?

Transcript of Cecil Williams
Conducted on July 14, 2020

53

1    A   What would be different will be, the guys
2   would come downstairs.  If they're not going, now
3   they getting physical and irate.  If they're going
4   home, they are -- they just nervous; they just --
5   just crazy.  It's just like a warpath down there.
6   You got -- you got your drug addicts.  You got
7   this.  You got that.  You got everybody that's all
8   mixed up in one.
9       Q   Uh-huh.
10    A   And everybody that's clowning; then you
11  got John Joe over here that's not going home.
12  He aggravating the guy that's going home.  So it's
13  a mental mess.
14      Q   Okay, um.  How many employees are
15  typically working in TSS on a given day?
16    A   Five.
17      Q   Okay.
18    A   And -- five, and you might get 50 people.
19      Q   Um, what about in terms of transporting
20  detainees to and from the jail, either in the
21  morning when they're coming over to TSS, or at
22  the end of the shift when they're heading back
23  to the jail?  Do you have help with that?
24    A   No.  Well -- well, let -- let me -- let me

54

1   rephrase.  Rephrase that question so that I can
2   answer it in a better way.
3       Q   Um, well, do you understand what I was
4   trying to ask?
5    A   That's why I said: Rephrase the question.
6       Q   Okay.  All right, um.  So basically what
7   I'm wondering is:  You've got these five guys who
8   are assigned to TSS.  You start your shift at
9   3:00.  Do all five of you go over to the jail
10  to pick up the detainees that are coming over?
11  I mean, do five guys go over to get the 50
12  detainees and march them all back over?
13    A   No, you might have two people.
14      Q   You might have two people?
15    A   Uh-huh.
16      Q   Okay.  And are you on the grounds of the
17  jail the entire time, or are you -- do you have
18  to physically leave the jail and then --
19    A   No, you still on the grounds of the jail;
20  that's correct.
21      Q   Okay.  So with those, uh -- would there
22  be other security officers around or correctional
23  officers around?
24    A   It depends.  From point A to point B is

55

1   just you and your partner.  But when you get to
2   point A where -- where you picking them up, of
3   course, you have correction officers over there.
4   But from point A to point B, it's just you and
5   whoever you're going with; and then when you get
6   back over there, now it's you and the other three.
7   So it's a total of five with 50.
8       Q   Okay.  And, um, who, um -- are they
9   shackled when they're walking from --
10    A   No.
11      Q   -- the jail to TSS?
12    A   No.
13      Q   Do they have handcuffs on?
14    A   No.
15      Q   Nothing?
16    A   Nothing.
17      Q   Do you guys have weapons?
18    A   Inside, no.
19      Q   Okay, um.  And so -- well, I guess I'm
20  just curious.  It sounds like you must have to
21  maintain order.  How do you maintain order during
22  that?
23    A   I mean, I guess, uh, use your
24  professional, uh -- use your professional --

56

1   what you was taught basically, what you taught to
2   do, and on how to handle a situation.  That's the
3   best way I can answer that.
4       Q   Yeah.  I mean, are guys mostly -- at
5   least on the way over, are they on best behavior
6   because they're, like:  Hey, I'm about to get on
7   electronic monitoring?
8    A   No.
9       Q   I don't want to screw this up?
10    A   No, no.
11      Q   Um, do you have the ability to send them
12  back if they're, uh, acting out?
13    A   No.
14      Q   You don't?
15    A   No, supervisors make that decision.
16      Q   Okay.  And do you have the ability to
17  check with a supervisor if, uh -- say, Joe Smith,
18  you know, ended up -- I don't know -- trying to
19  run away or something while you're making this
20  walk from the jail to TSS?
21    A   So are you saying: Who would I ask?
22  Would I speak to the supervisor?
23      Q   Yeah.  What you would do?  If -- if
24  somebody tries to break away or start a fight,

Transcript of Cecil Williams
Conducted on July 14, 2020

15 (57 to 60)

---

57

1  what do you do?
2      A  Notify -- well, take control of the
3  situation, notify the supervisor.
4      Q  And how do you do that?
5      A  Whatever the problem is:  Separate
6  everybody from the situation, control the
7  situation, calm the situation down.  And then
8  in the process, have a supervisor notify while
9  the process is going on.
10     Q  How do you notify the supervisor?
11     A  By radio.
12     Q  Okay.  So you do have a radio when you're
13 making this walk from the jail to TSS?
14     A  Correct.
15     Q  Okay, uh.  How long is the walk from the
16 jail to TSS?
17     A  Maybe ten minutes, give or take.
18     Q  Ten minutes, okay.
19     A  Give or take.
20     Q  So would you say it's, uh, less than half
21 a mile?
22     A  Depends on the doors you go through.  So
23 I really never calculated up how long it is.
24     Q  Okay.

---

58

1      A  It's a nice little walk.  It's a nice --
2      Q  Yeah.
3      A  -- little walk.
4      Q  Okay, um.  Are there, uh, any correctional
5  officers sort of -- you know, my kind of, uh,
6  layman's understanding of jails is that lots of
7  times there is towers with armed guards.  Is
8  that, uh --
9      A  There's no --
10     Q  -- you don't have that or --
11     A  There is no weapons inside the jail.
12     Q  Okay, um.  Did you ever have an incident
13 where, uh -- did you ever have an incident with
14 detainees during the walk from the jail to TSS?
15     A  Yes, it have happened.
16     Q  What sort of incidents have you had?
17     A  Uh, they get feisty.  They want to get
18 upset because they going back.  Are you talking
19 about the ones you locking up or the ones that
20 you bringing to?
21     Q  So I'm talking about:  When you start
22 your shift and you have to go over and get these
23 detainees and bring them to TSS for processing,
24 uh, have you ever had an incident, uh, with any of

---

59

1  the detainees?
2      A  Yeah.  Some of them come.  They -- they --
3  they out.  They too excited.  Some of them be
4  too excited.  Some of them be high off of drugs.
5  Some of them have some mental -- mental illness.
6  So, I mean, there's a lot of reasons that things
7  occur.  Maybe the person in front of him walked
8  too slow.  He pushed him.  Anything can occur.
9      Q  Yeah.  And what, uh -- have you ever been
10 injured as a result of one of those incidents?
11     A  Yes, I have.
12     Q  What sort of injuries?
13     A  Well, I had a -- what -- what happened,
14 I -- I basically had an accident.  I mean, it
15 wasn't major, but I got hit in the face.
16     Q  You're hit in the face by a detainee?
17     A  Yes.
18     Q  Okay, uh.  And you said it wasn't major;
19 meaning were you seriously injured, or was it just
20 kind of, like, a bruise or --
21     A  Just a -- a simple push, a slap or
22 something like that, when -- while in the process;
23 that's about it.
24     Q  Okay, um.  Anything worse than that?

---

60

1      A  Not -- not at this -- up to this date --
2  date, thank God, no.
3      Q  Yeah, yeah, okay.  What about -- so when
4  you bring them inside TSS, they're locked up in
5  the cells, uh.  Have you ever had an incident, um,
6  where you've been injured, um, within TSS?
7      A  Me, no, personally, no.  Have it happened?
8  Yes.
9      Q  Okay.  And what about when you're taking,
10 uh, detainees, uh, either back to the jail or over
11 to the facility that's actually going to take them
12 home?  Have you ever been injured, uh, on either
13 of those?
14     A  To me, no.
15     Q  Okay.
16     A  Have it happened?  Yes.
17     Q  Um, okay.  So other than, um, your
18 comments about, you know, it's dark, or I think
19 you said "dark" or "sort of dingy in TSS," um; and
20 other than the interactions, the -- the danger of
21 interactions with the detainees, is there anything
22 else about TSS that you don't like?
23     A  I don't like it.  I mean, that's,
24 like -- like I made the statement before; that's

---

Transcript of Cecil Williams

16 (61 to 64)

Conducted on July 14, 2020

61

1  a broad answer that I cannot answer because, I
2  mean, there's things down there that's -- I
3  wasn't -- that's not what I applied for.  And I'm
4  over there; so I accept the job.  That's the best
5  way I can put it.  There's things that I don't
6  like down there, of course.
7      Q  When you say, that's not what you applied
8  for, what do you mean by that?
9      A  Well, when I applied for the job it was,
10  uh, patrol, then before they switched it all over;
11  but that's part of the job.
12     Q  Is the -- when you say "before they
13  switched it all over," are you talking about how
14  you used to be able to bid for an assignment and
15  no longer you can?  You no longer --
16     A  Correct.
17     Q  -- can?  Okay.
18     A  Correct.
19     Q  Okay.  Um, let's see.  Are there security
20  cameras in TSS?
21     A  Yes.
22     Q  And those are monitored?
23     A  By the jail.
24     Q  By the jail?  What about the -- the space

62

1  that you're walking from the jail to TSS?  Is that
2  surveilled by any kind of video?
3      A  Uh, you might have one over here
4  (indicating), and then you might have one down
5  there (indicating).  So in between, the sheriff's
6  got videos all over.  So I cannot tell you exactly
7  where they're at.
8      Q  Okay, um.  What did you like about patrol?
9      A  What do I like about patrol?
10     Q  Yeah.  You said -- I mean, because you
11  said, you know, "TSS isn't what I" -- I think you
12  said, "It's not what I applied for."  You had -- to
13  it's not really what you wanted to do, um.  It
14  sounds like you did mostly patrol and deliveries,
15  at the beginning at least.
16        So I'm just curious:  What -- what sort of
17  things about patrol make it a better job than TSS?
18     A  Patrol, you out and about; you're working
19  out in the streets.  You're dealing with different
20  environments.  You're not dealing with 50 people
21  at one time.  So patrol is more -- I'm out doing
22  a job that's different from processing and down
23  in the basement; and that's the difference.
24     Q  Yeah.  You're -- you're actually --

63

1      A  So --
2      Q  -- in -- in a patrol car driving around?
3      A  Correct.
4      Q  I mean, so even, you know, something
5  small, like being able to roll your window down
6  and catch a breeze on a summer day, is, you know,
7  an advantage of patrol?
8      A  It's that simple.
9      Q  Yeah, okay, uh.  What about, uh -- and
10  you said that you might do as many as 50 --
11  process as many as 50 detainees on a given day
12  in TSS.  When you're doing patrol on a shift how
13  many -- how many assignments, I guess, or, uh,
14  jobs are you doing during that shift?
15     A  Between four and six.
16     Q  And what types of, uh, jobs are you doing
17  for those --
18     A  Strap (inaudible).
19     Q  -- four to six?
20     A  Strap tampers.
21        THE REPORTER:  I'm sorry.  Can you repeat,
22  please.
23        THE WITNESS:  I'm sorry.  Can you repeat
24  that.

64

1  BY MR. LEINENWEBER:
2      Q  Yeah, I don't think she could hear what
3  your answer was.  You said -- started to say
4  something called strap something, I think?
5      A  Yeah, they're called strap tampers when
6  the band is wrong or left during curfews, uh, a
7  reincarceration, a relocation, uh.  Wow, I mean,
8  they -- they -- they go from just a home check,
9  or, uh, that's basically -- that's -- them
10  the basic majors.
11     Q  And just to clarify, I think you said
12  strap tamper; like --
13     A  Yes.
14     Q  -- T as in Tom; A as in apple,
15  M as in Michael; P as in Paul; E as in Edward;
16  R as in Robert?
17     A  Correct.
18     Q  So that's tampering with the actual band,
19  like, maybe cutting it off or something?
20     A  Correct.
21     Q  Okay.  So the strap tampers, um, home
22  checks?
23     A  Unauthorized leaves; reincarcerations; uh,
24  warrants, which is a part of reincarceration; uh,

**65**

1 relocation.

2    Q What is re- --

3    A Domestic.

4    Q Oh, sorry.

5    A Domestic; relocation is moving from one

6 place, one house to another.

7    Q Got it. Okay. So maybe the first house

8 doesn't want the detainee there anymore. And so

9 they get another location, or maybe the --

10    A Correct.

11    Q -- first one was just temporary until the

12 second one was ready?

13    A Correct.

14    Q Okay. Uh, okay. So you said domestic.

15 Um, any other types of jobs you'd be doing during

16 a typical shift on patrol?

17    A No, they -- they varies. I mean, they're

18 not on the top of my head right now, but they

19 varies.

20    Q Okay. But that's a pretty good overall

21 gist of what you are expected to do during any

22 given shift on patrol?

23    A Correct.

24    Q Okay, um. And, um, what are the

**66**

1 locations? Like, okay, so you come in on

2 Wednesday. And you're told you're on patrol, um.

3 And you're going to have these -- I think you said

4 four to six jobs, um, maybe, is what you could

5 expect that day. How do you -- how is it

6 determined where those four to six jobs are going

7 to take place? In other --

8    A Dispatch.

9    Q -- words -- oh, sorry. Go ahead.

10    A I'm sorry for speaking over. Go ahead.

11    Q That's all right, um. How -- yeah,

12 where -- where could -- let's say it's a home

13 check, okay. How is it determined where in the

14 county the home check that you are going to work

15 on is?

16    A So -- so -- so -- so I can clarify, your

17 question is: Where do the assignment come from

18 basically, right?

19    Q Well, not only, where does it come from,

20 but then also: Where geographically is it? I

21 mean, I think you're -- you're -- have a good

22 point. Let's talk about who -- who decides which

23 job you're getting?

24    A Your supervisors and the dispatch.

**67**

1    Q Okay. Okay. So supervisor and dispatch

2 could say, um: Cecil Williams, we need you to go

3 do a home check?

4    A Correct.

5    Q Okay, um. And on any given shift, that

6 decision to give you that job, that home check,

7 is going to be made by, uh, the supervisor in

8 dispatch?

9    A Correct.

10    Q Okay. And how does that get communicated

11 to you?

12    A A radio.

13    Q Okay.

14    A County radio.

15    Q And where will you be at that time

16 typically?

17    A Depends on my last assignment.

18    Q What if it's the first assignment of the

19 day?

20    A Uh, we'll leave. We'll be off on --

21 normally we on -- we on 23rd and Rockwell when

22 we first come out.

23    Q Okay. So you're at 23rd and Rockwell at

24 the start of your shift. Um, you go through, I

**68**

1 guess, roll call, right?

2    A Correct.

3    Q And is that when you get your assignment

4 for the day?

5    A No. Well, you get the person that you

6 working with and the delivery of everything that's

7 going on through the day. That's what roll call

8 is.

9    Q What do you mean, the person that you're

10 working with: your partner?

11    A Yeah.

12    Q Okay. So you get partnered up at roll

13 call. And then do they give you the assignments

14 at that point, or, you know, patrol --

15    A No.

16    A -- office?

17    A No.

18    Q When is that -- when is that communicated

19 to you?

20    A That's communicated to you over the radio.

21    Q Prior to roll call or after roll call?

22    A After roll call.

23    Q Okay. So you come in. You go through

24 roll call. And, um, what do you do next?

Transcript of Cecil Williams
Conducted on July 14, 2020

18 (69 to 72)

69

1    A  You go get your equipment.  You get the
2  things that you need.  You check your e-mail.
3  Now, you check your e-mail, and then you go to
4  the patrol car.  You get everything.  Like I said,
5  you get all your equipment you needed, uh, your
6  radio, your (inaudible) -- well, that stuff you
7  take home; your camera, the keys to the vehicle,
8  the MVT.  You go to the car, see if you need gas
9  and check the car out to make sure there's no
10 dents, no bumps, or nothing on it before the start
11 of the shift, report it, And then wait on your
12 assignment.
13   Q  Okay.  So you hang out in the car.  And
14 then they'll come over the radio -- dispatch will
15 come over the radio and say, uh:  Cecil Williams,
16 we need you to go do a home check?
17   A  Correct.
18   Q  Okay, um.  How is it determined where in
19 the county you're going to be doing that home
20 check?  Does that make sense?  Like, what I'm
21 trying to get at is:  Could you receive an
22 assignment anywhere in Cook County, or are you
23 guys broken up into different geographical regions
24 for the day?

70

1    A  You can receive anywhere.
2    Q  Okay.  So as far as you know, it's not
3  like:  Cecil Williams, you and your partner are
4  assigned to this wedge of Cook County today.
5  Uh, you could get a job anywhere in the county?
6    A  No, how -- how -- if I may explain, know
7  how --
8    Q  Please.
9    A  -- it works is, how it works is:  They
10 send you one direct place.  99.9 percent of the
11 time you going to be in that place all day on
12 that specific area.  If they send me in Englewood,
13 I'm going to be in Englewood all day.  If they
14 send me in the suburbs, I'm going to be in the
15 suburbs all day.
16   Q  Okay.  I think I get what you're saying.
17 So when -- when they send you out to that first
18 job of the day, 99.9 percent of the time you will
19 have those remaining three to five jobs, will be
20 in that same general area?
21   A  Correct.
22   Q  Okay.  Got it.  Do you have an
23 understanding of whether or not the county is
24 broken down into any kind of, um, geographical

71

1  regions?
2    A  Yes, it is.
3    Q  How -- what is the breakdown?
4    A  Uh, I don't know the exact districts, but
5  it's broke down.  It's broke down into areas and
6  districts.  The numbers, I cannot give you, but
7  they're broke down, areas and districts.
8    Q  Okay.  Um, okay.  And then, um, let's talk
9  a little bit about, um, your understanding of, uh,
10 promotions within, um, electronic monitoring.  Um,
11 what -- so you came over as an investigator, um.
12 Since 2010 what are the types of positions, um,
13 that you could potentially be -- you or anyone
14 else -- could potentially be promoted to, if you
15 know?
16   A  Uh, well, now sergeant, lieutenant, uh,
17 chief.
18   Q  Anything else?
19   A  That's it.
20   Q  Okay.  So you're an investigator.  You
21 could potentially be promoted to sergeant,
22 lieutenant or chief?
23   A  Yeah.
24   Q  Okay.  Do you have to progress through

72

1  those rankings and otherwise -- in other words,
2  do you have to be a sergeant first before you can
3  be promoted to a lieutenant?
4    A  No.
5    Q  You don't?  Okay.
6    A  No.
7    Q  So you could go from investigator to any
8  of those three?
9    A  You could go from investigator to
10 director.
11   Q  Okay.
12   A  If they like you -- I'm sorry.
13   Q  How are, uh -- well, first of all, have
14 you ever received a promotion in electronic
15 monitoring?
16   A  No.
17   Q  Okay.  Have you ever applied for any kind
18 of a promotion in electronic monitoring?
19   A  I wouldn't apply because I know I wouldn't
20 get it because I wasn't one of them.
21   Q  Um, is it fair to say, if you don't apply
22 for a promotion, you can't be promoted?
23   A  Yeah, you can say that.
24   MR. LEINENWEBER:  Um, is everybody doing

Transcript of Cecil Williams
Conducted on July 14, 2020

73

1  okay?  We've been going for a while now.  If
2  anybody needs a five-minute break, I'm happy to,
3  uh, take one.
4      THE WITNESS:  I'm okay.
5      MS. KRAUCHUN:  I'm fine for right now,
6  Justin.  Thanks.
7      MR. LEINENWEBER:  Okay.  Annie?  Beth?
8  Are you guys doing okay?
9      THE REPORTER:  Yeah, I'm okay.
10     TECH BROWN:  Yeah, I'm fine.  Thank you.
11     MR. LEINENWEBER:  All right.  I don't care
12  about Ethan, just so we're clear.
13     MR. WHITE:  (Laughs.)  Nobody does.
14     MR. LEINENWEBER:  (Inaudible.)
15     MR. WHITE:  Nobody does.  I'm just staying
16  quiet here in the corner.
17  BY MR. LEINENWEBER:
18     Q  Um, okay.  Let me just see then if there
19  was anything else I want to ask you about here.
20  Okay.  Let's, um -- let's go ahead.
21     MR. LEINENWEBER:  Can we pull up
22  Exhibit 1, um, which is the, uh, complaint.
23     TECH BROWN:  Please stand by.
24     (Exhibit 1 was marked for identification.)

74

1      MR. LEINENWEBER:  Um.
2      TECH BROWN:  It should be -- oh, sorry.
3  Go ahead.
4      MR. LEINENWEBER:  That's all right.
5      Q  Mr. Williams, can you, uh, just take a
6  look at this document?  Um, I'll represent to you
7  that it's the complaint that, uh, was filed
8  related to this litigation.  And you'll see your
9  name sort of in the top left corner of the page.
10     A  Correct.
11     Q  Um, and then, um --
12     MR. LEINENWEBER:  Annie, can we turn to
13  page nine?  And then if you could just kind of
14  make the section related to Mr. Williams a little
15  bit bigger?  Yeah, perfect.
16     Q  Okay.  So, Mr. Williams, can you just take
17  a second to review this, and then let me know when
18  you're finished.
19     A  Oh, let's go back.  Okay.
20     Q  Um, okay.  So here we have, um, the
21  section entitled Facts Particular To Cecil
22  Williams, right?
23     A  Correct.
24     Q  Okay.  And Paragraph 58 says, you began,

75

1  uh, at the sheriff's office on or about March 2nd,
2  uh, 1993.  And then Paragraph 59 says you
3  eventually moved to the electronic monitoring unit
4  and you currently still work there, right?
5      A  Correct.
6      Q  Okay, um.  Let's talk about Paragraph 60
7  here.  Paragraph 60 says that, um, "Plaintiff,
8  Cecil Williams received discipline when
9  similarly situated nonminority officers did not."
10  Uh, do you see that?
11     A  Yes, I do.
12     Q  Okay.  What, uh, discipline are you
13  referring to here?
14     A  Uh, well, I -- I personally got wrote up
15  for walking on the floor, uh; because it was my
16  previous day off.  And I come back.  They waxed
17  the floor.  And I had -- I had no knowledge that
18  the floor was waxed, and all of my uniforms was
19  in my locker.  I got a day -- I got two days taken
20  away from me for that one.
21         Secondly, I got a -- a discipline for
22  bringing keys -- taking keys home when there is
23  other officers that have took keys, radios home,
24  and did not receive no discipline.

76

1         Uh, well, me personally, I am never late.
2  I'm always on time.  I never had any problem,
3  but I have seen officers that come in late.  Some
4  get pat on the back: Hey, don't do it no more.
5  Other ones get two, three days.
6         Um, I mean, there ranges from if someone
7  escape, certain officers get pushed into another.
8  They get completely taken out of the unit.  And
9  then some officers just get -- get, like, nothing
10  happened.  So when I say "some officers," I mean
11  minority -- majority of the officers that get
12  pushed out, anything major that happens, the
13  majority of the African-American officers are
14  disciplined heavier than majority of the white
15  and other ethnic groups are.
16     Q  So I want to, um -- I want to talk
17  specifically about discipline you've received.
18  And I think you started off talking about that,
19  and then kind of moved into some other areas that
20  we'll get to; um, but, uh, let me just make sure
21  I understand what discipline that you're talking
22  about here related to you in Paragraph 60, okay?
23  Um, so the first thing you said was walking on
24  a -- a -- a waxed floor.  And you said you

Transcript of Cecil Williams
Conducted on July 14, 2020

20 (77 to 80)

**77**

1  received two days for that, right?

2      **A  Correct, from Shields.**

3      Q  Okay.  And then --

4          THE REPORTER:  I'm sorry.  From what?

5      I'm sorry.  From what?

6          THE WITNESS:  He asked me, I received two

7      days?  I said:  Yes, from Director Shields.

8          THE REPORTER:  Okay.

9      BY MR. LEINENWEBER:

10     Q  And then, um, the second thing you

11     mentioned was taking keys home?

12     **A  Right, um.**

13     Q  And what was the discipline you received

14     related to that?

15     **A  I received a day off for that.**

16     Q  Okay.  And who, um -- well, we'll come

17     back to that but -- and then what was the third

18     thing you mentioned?

19     **A  As far as, uh --**

20     Q  Discipline that you've received and are

21     referencing in paragraph 60 here?

22     **A  I received discipline, uh, for one time a**

23     **guy ran, but we wind up catching him.  I received,**

24     **uh, a day for that.  We wind up catching him.**

**78**

1      **But, I mean, other officers, if you catch them,**

2      **okay, okay, everything is good because they --**

3      **they went into it into a point where you didn't**

4      **do this right, you ain't do this right; but**

5      **everything is done proper.**

6      Q  Okay, um.  Okay.  So we have the waxed

7      floor; taking the keys home; and then I'll refer

8      to that as an escapee, I guess, a detainee who

9      kind of --

10     **A  Right.**

11     Q  -- got away?  Any -- anything else besides

12     those three that you're referring to here?

13     **A  Me personally, no.**

14     Q  Correct.  Personally, no?  Okay, um.

15     Let's start with the waxed floor.  Could you tell

16     me:  When did that incident, um, happen?

17     **A  On an exact date, I'm not exactly sure,**

18     **but I -- I want to say two thousand and thirt- --**

19     **2014.**

20     Q  Okay.

21     **A  What happened was, um, I come off my**

22     **regular RDO, which is my regular off days.  And**

23     **evidently my off days, the letter was put up**

24     **before I went -- I mean, after my off days.  The**

**79**

1      **letter was put up.  And with that being said is,**

2      **I come back on Sunday.  And all my uniforms is**

3      **in my locker because I keep my uniforms.  One that**

4      **I clean, I take home.  I mean, that's dirty, I**

5      **take home.  And I keep uniforms in my locker.**

6      **I don't wear my uniform home.  So I come back and**

7      **I see a sign that says Wet Floor.  So instead of**

8      **walking that way, I walk all the way around, go**

9      **up to the sixth floor, walk all the way back**

10     **around to the sixth floor, and come back down on**

11     **the other side to get to my uniforms.**

12     **Instead of me making 15 steps one way, I**

13     **made two steps another way.  That's by going**

14     **upstairs and going all the way around.  So I**

15     **put two steps on the floor because there was no**

16     **other way I was going to get my uniforms.**

17     Q  Okay.  And this was, you said,

18     approximately in 2014.  And Director Shields gave

19     you two days of discipline?

20     **A  Correct.**

21     Q  Okay.  And then, um, uh, what about the

22     taking the keys home?  When did that happen?

23     **A  Uh, that had to happen around -- we still**

24     **in 2014, 2015.**

**80**

1      Q  Okay.  And who gave you the discipline,

2      um, for taking the keys home?

3      **A  All discipline come from the director.**

4      Q  Okay.  So that was Shields?

5      **A  Yes.**

6      Q  Okay.  And then what about the escapee?

7      When did that happen?

8      **A  That had to happen while I was working**

9      with Merchant (phonetic) (inaudible).  That had to

10     be around '13, between '13 and '14.  I don't --

11     I'm not exactly sure of the dates.

12     Q  That's all right.

13     **A  Around '13, '14.**

14     Q  Uh, and, um, you said -- I think you were

15     referencing who you were working with or something

16     at the time.  Is that --

17     **A  Well, at that time my first -- okay.  I**

18     **had two partners since I been over there.  I had**

19     investigator Murchison (phonetic), which has

20     retired; and Winston.  The majority of my career

21     over there, I been working with investigator

22     Winston.

23     Q  Okay, um.  And who made the decision, uh,

24     to give you discipline for the escapee?

Transcript of Cecil Williams
Conducted on July 14, 2020

---

81

1     **A  Shields.**
2        Q  Shields, okay.  And then, um, with the
3  waxed floor, you said you got two days, uh.
4  Did you file a grievance related to that one?
5     **A  I filed a grievance, but it didn't go**
6  **nowhere.  By the time the procedure -- I had the**
7  **time already taken away from me before I was able**
8  **to file a grievance and it was processed.**
9        Q  Okay.
10    **A  They had already took my time from my**
11 **books.**
12       Q  So did you, in fact, lose two days related
13 to the waxed floor incident?
14    **A  Yes, I did.  I lost two holidays.**
15       Q  Two holidays, okay.
16    **A  You have an option to give and take.**
17       Q  Right.  And I think what you're getting
18 at is, like, if you have -- say, you have 15 days
19 in the bank that you could use.  Instead of
20 actually taking a day off to serve the suspension,
21 you could take one from your bank, kind of?
22    **A  Correct.**
23       Q  Okay.  Got it, um.  And then taking the
24 keys home, you said that was a one-day suspension.

---

82

1  Did you actually lose a day for that one?
2     **A  Yes.**
3        Q  Did you file a grievance related to that
4  one?
5     **A  Yes.**
6        Q  And what happened with that grievance?
7     **A  I got the time before -- before the**
8  **grievance went through.**
9        Q  Well, even if you got the time removed
10 before it went through, you could always -- if the
11 grievance --
12    **A  No, I didn't -- I didn't say "removed."**
13 **I said I got the time.  In other words, they took**
14 **it from me.**
15       Q  Right, but couldn't they give it back to
16 you?
17    **A  Yeah, they could, but I never received it**
18 **back.**
19       Q  Okay.  So for the waxed floor incident,
20 you never received any of those two days back --
21    **A  No.**
22       Q  -- into your account?  Okay.
23    **A  No, I didn't.**
24       Q  And then, um, for the taking the keys

---

83

1  home, same thing?  You were docked one day's time
2  and never received that back?
3     **A  Correct.**
4        Q  Okay, um.  And then the escapee, did you
5  actually get one day for that one?
6     **A  I got a written warning.**
7        Q  So that wasn't a one-day suspension?
8     **A  No, that was a written warning.**
9        Q  Okay.  Was it originally a one-day
10 suspension and was it reduced?
11    **A  Well, actually -- actually, they was going**
12 **for 29 days.**
13       Q  Okay.
14    **A  But the union beat it, too.  At that time**
15 **the union fought for me to get one, a written**
16 **warning.**
17       Q  So when you say the union fought for you,
18 is that through the grievance process?
19    **A  Yeah.**
20       Q  Okay.  So via a grievance, the escapee
21 incident, the discipline you received was a
22 written warning?
23    **A  Correct.**
24       Q  Okay.  Okay.  Good, good, good.  Okay.

---

84

1  Let's take a look -- oh, sorry, just before
2  I move on:  Any other discipline that you're
3  referring to here other than the three incidents
4  we talked about in relation to Paragraph 60 of
5  your complaint?  Anything else you're talking
6  about here?
7     **A  No, not right off, I can't think of**
8  **nothing right off.**
9        Q  Okay, um.  All right.  Paragraph 61, um.
10       MR. LEINENWEBER:  And, uh, Annie, do you
11 mind?  Could you scroll down just a little bit
12 where I have my, uh, pictures now is -- that's
13 perfect.  That's perfect.  Okay.
14       Q  Okay.  So Paragraph 61 says:  "Plaintiff,
15 Cecil Williams' supervisors assigned him to
16 positions nonminority officers were not assigned
17 to regardless of his seniority or work
18 experience."
19       Do you see that paragraph, Mr. Williams?
20    **A  Yes, I do.**
21       Q  Okay, um.  What assignments or -- well,
22 you say "assigned to positions."  Um, we were kind
23 of talking about patrol, office, deliveries, TSS
24 being, uh, assignments.  Are you referring to

---

Transcript of Cecil Williams
Conducted on July 14, 2020

85

1 those as positions here?
2    A  Uh, when I say "positions," I'm -- a
3 position is if you work in TSS.  Basically what
4 they do is, if they get upset at you, you don't
5 do something they want, they'll put you in the
6 basement.  Okay.  They know a lot of people don't
7 want to work down there (inaudible).  Okay.  The
8 other thing is:  Most areas, when I considered
9 positions in areas, it's, like, okay.  We know
10 Englewood, high crime rate.  We know Lawndale,
11 high crime rate.  We know, you know, the high
12 crime rates.  We know that if you go out to
13 Palatine, your crime rate is low.
14      If you go out to some south suburbs, the
15 crime rates are low.  So basically what I'm
16 saying is, your -- you put the majority of the
17 African-Americans in the low (sic) crime rates,
18 when you send the majority of the white officers
19 out to the south and north far suburbs where
20 they're not in the areas where the high crime
21 rate are.
22    Q  So when you're using the words "positions"
23 here, you're talking about geographic regions that
24 you get assigned to patrol?

86

1    A  Correct, and also --
2    Q  And TSS?
3    A  -- TSS.  Correct.
4    Q  Okay.  Anything else you're referring to
5 here?
6    A  What, positions?  Well, I mean, of course,
7 I -- I prefer to the majority of the -- just until
8 recently, majority of your supervisors were all,
9 uh, white males.
10    Q  Okay.  So my -- my question -- I just
11 want to make sure that I'm understanding what
12 you're alleging in the complaint here, um.  And
13 you're saying that supervisors assigned you to
14 positions that nonminority officers were not
15 assigned to.  And we just talked about the -- the
16 -- the two things that you said you're referring
17 to there, are high crime areas of Cook County, and
18 TSS, right?
19    A  Correct.
20    Q  Okay.  Are there any other types of
21 positions that you're referring to in that
22 paragraph?
23    A  Well, a lot of them will sit up in --
24 well, a lot of them will be in the office, you

87

1 know.  They -- they give them office positions
2 where they don't work outside, you know or, like,
3 they -- they doing office work; or they -- they --
4 they doing the simple stuff that's not putting
5 them in a position that they're putting me in.
6    Q  Okay, um.  Okay.  Anything else?
7    A  And majority of the officers that done
8 that is less experienced than I am.
9    Q  Okay.  Any other types of positions you're
10 referring to here in Paragraph 61?
11    A  Them -- them the only positions.
12    Q  Okay.  All right.  Uh, let's see.  Okay.
13      MR. LEINENWEBER:  If we could go, uh,
14 Annie -- if we could move to page 11; and if you
15 could scroll down to Facts Relevant To Multiple
16 Plaintiffs, so that that's at the top.  That's
17 perfect, um.
18    Q  Mr. Williams, could you take a look -- and
19 we'll take these one at a time here; but, um, why
20 don't you take a look at Paragraph 77 here?
21      It says:  "Director Shields and
22 subordinate supervisors in EM failed to follow
23 progressive discipline when they chose to
24 discipline the plaintiffs"?

88

1    A  Correct.
2    Q  Okay.  And the discipline that you
3 did not receive, progressive discipline -- or
4 sorry.  Strike that, um.  Are you saying then that
5 the three discipline incidents we talked about,
6 that progressive discipline was not followed for
7 those three?
8    A  Correct.
9    Q  Okay.  So that's the waxed floor, taking
10 the keys home, and then the escapee?
11    A  Correct.
12    Q  Okay.  And anything else you're referring
13 to, any other type of discipline that you received
14 that progressive discipline wasn't followed, um,
15 in Paragraph 77?
16    A  No, that's it.
17    Q  Okay.  Uh, let's take a look at
18 Paragraph 78, uh.  "Director Shields and his
19 subordinate supervisors in EM placed plaintiffs
20 in higher incident areas regardless of their
21 seniority over nonminority officers"?
22    A  Correct.
23    Q  Okay.  And, um, when you're saying
24 "higher incident areas" here, um, are you

Transcript of Cecil Williams
Conducted on July 14, 2020

23 (89 to 92)

89

1 referring to the sort of high crime areas of
2 Cook County that you referred to a minute ago?
3 **A Correct.**
4 Q Okay. Anything else you're referring to
5 there?
6 **A No.**
7 Q Okay, um. And then Paragraph 79, uh, take
8 a look at this one. I don't think this applies to
9 you; but if you just read Paragraph 79, I want to
10 know if, um, you're alleging that this happened to
11 you at all?
12 **A Well, if -- if -- if I'm looking at it**
13 **correctly, what it's saying is that: Have it**
14 **happened to me? Have they sent me somewhere that**
15 **they know that there's going to be a problem, but**
16 **they send you by yourself in the chance that**
17 **you're going to get hurt? Yes.**
18 Q Okay. So Paragraph 79 says that "Director
19 Shields intentionally waited until plaintiffs Tims
20 and Newsom began their tour of duty to assign them
21 to a location where a family had scabies instead
22 of sending the nonminority officers on the earlier
23 watch."
24 **A Well --**

90

1 Q Do you see that language?
2 **A I see that language; but as far as**
3 **scabies, no, it never happened to me.**
4 Q Okay. So the --
5 **A But as far as something that will --**
6 **I'm -- I'm not saying scabies; but what I'm saying**
7 **is, as far as: You know that this incident might**
8 **change into something that you're not sending me**
9 **to? Yes, I agree with that.**
10 Q Okay. So Paragraph 79, though, you were
11 not included in this scabies --
12 **A No, I was not included.**
13 Q -- incident that's referenced here?
14 **A No, I was not. No, no, I was not.**
15 Q Got it. Got it. Got it. Okay. All
16 right. And then, uh, let's look at Paragraph 80.
17 Paragraph 80 says: "Director Shields and
18 his subordinate supervisors in the EM regularly
19 called plaintiffs words such as the N-word (sic),
20 'crooks,' and other derogatory and racist
21 comments"?
22 **A Yes, I was called by that by, uh, Ranzino.**
23 Q Okay, uh. Let me -- let's break this down
24 here then for a second. Did Shields ever call you

91

1 the N-word?
2 **A Shields never called me one; but I, uh,**
3 **had knowledge of him calling my partner one,**
4 **which I was working with at the time, which is**
5 **Winston; but, uh, Ranzino is -- who is my**
6 **complaint of is, he called me one. And I went**
7 **to OPR on it.**
8 Q Well, we'll get to that. I'm going to ask
9 you about that, but, um, I -- it's important just
10 for a clear record that I kind of do this one step
11 at a time, um. Did Shields ever call you a crook?
12 **A No, he's never called me anything like**
13 **that, not me personally.**
14 Q Got it, okay. Did Shields ever use any
15 other derogatory or racist comments towards you?
16 **A Not towards me, but he came in roll call**
17 **and said, "If you can't speak -- if they can't**
18 **speak English, they don't go out on house arrest."**
19 **He had made that statement at roll call.**
20 Q Okay. Okay, um. And then, um, Ranzino,
21 you said, did call you the N-word?
22 **A Yes, he did.**
23 Q Okay. Did Ranzino ever call you a crook?
24 **A No, he called me a nigger. I'm sorry, the**

92

1 N-word. I'm sorry.
2 Q That's all right. Uh, did Ranzino ever
3 call you any other derogatory or racist, uh, names
4 or comments?
5 **A When he said: "You all people look**
6 **alike."**
7 Q Okay. Anything else that Ranzino -- um,
8 any other racist or derogatory comments that
9 Ranzino called you?
10 **A Uh, not right off; I -- I can't think.**
11 **It's -- it's so -- I mean, right now I can't**
12 **answer that question.**
13 Q Um, well, is there -- is there sometime
14 you would be able to answer that question?
15 **A Basically when you say: Is there anything**
16 **else he called me? Those words was enough but --**
17 Q Yeah, and I'm not -- I -- please do not --
18 do not interpret my questions as -- as meaning to,
19 um, you know, minimize anything that was said to
20 you along the way or anything like that. I'm not
21 here to pass any kind of judgment like that.
22 All I'm trying to do is to understand.
23 I -- I don't say "anything else" meaning, like:
24 That's not a big deal, you know. Wasn't there

Transcript of Cecil Williams
Conducted on July 14, 2020

93

1 anything else?
2      My question is simply getting at:  Okay.
3 You've said this happened, that the N-word was
4 used; and that "you people all look alike" was
5 used.  And I'm just trying to find out if Ranzino
6 ever made any other comments that you're alleging,
7 um, were racist and derogatory towards you?
**8      A  Not right off, no.**
9      Q  Okay, um.  What about, um, uh, Mr. Neal?
10 Did Neal ever call you the N-word?
**11      A  Neal is an African-American.  So his --**
**12 his terms he's using is -- I'm not -- no, I'm not**
**13 going to use it that way.  The question is, yes**
**14 and no.  And I'm saying "yes and no" is because**
**15 it depends on the terms that -- how can I put it?**
**16      Neal -- Neal did stuff different.  He**
**17 wouldn't use the racist word.  But he'd -- he'd --**
**18 he'd use -- he'd use other words, like, "You all**
**19 are getting on my nerves," or, "You all slow," or**
**20 try to downgrade you in a way that you're not**
**21 doing your job or -- you know.  It was always**
**22 something to make you feel that you less of a man.**
23      Q  So he might be using sort of mean
24 language, I guess for lack of a better term, but

94

1 not really, like, racist, derogatory terms?
**2      A  He -- he use terms to downgrade you, to**
**3 disgrace you, yes.**
4      Q  Okay.  And those would be, like, the
5 examples you just gave, "You all are slow," or
6 things of that nature?
**7      A  Correct.**
8      Q  Okay, uh.  Did he ever call you a crook?
**9      A  Neal, no.**
10      Q  Okay.  And, um, any other derogatory or
11 racist terms that you recall Mr. Neal using
12 towards you?
**13      A  No.**
14      Q  Okay.  What about Mr. Rohloff?  Did he
15 ever use the N-word towards you?
**16      A  Rohloff used words as: "you people."**
**17 That's his terms, was "you people."**
18      Q  So did he ever use the N-word with you?
**19      A  No, but his term is "you people."  Might**
**20 as well say it.**
21      Q  Did he ever call you a crook?
**22      A  No.**
23      Q  Okay, um.  Other than "you people," did,
24 uh, Mr. Rohloff ever use any other derogatory or

95

1 racist words towards you?
**2      A  No, not towards me, no.**
3      Q  Okay.  Um, okay.  Any other, um, incidents
4 where -- and we'll -- we'll talk in greater detail
5 about some of these.  But any other -- other
6 than the ones we've talked about here regarding,
7 um, Mr. Shields, Mr. Ranzino and Mr. Neal,
8 Mr. Rohloff; are there any other supervisors
9 you're alleging in Paragraph 80 called you the
10 N-word, crooks, or other derogatory or racist
11 comments?
**12      A  No.**
13      Q  Okay.  Um, let's take a look at
14 Paragraph 81.  And, uh, this paragraph says, um:
15 "Director Shields and his subordinate supervisors
16 in the EM regularly and systemically assigned
17 nonminority officers to office positions and
18 assigned the plaintiffs to assignments in the
19 basement or higher incident areas"?
**20      A  Yes.**
21      Q  Okay.  And is that, um, what we've already
22 talked about, essentially the assignment to, um --
**23      A  High crime areas.**
24      Q  -- higher -- high crime areas of Cook

96

1 County and TSS?
**2      A  Correct.**
3      Q  And you use the term "basement" here in
4 Paragraph 81.  Is it fair to say that "basement"
5 and TSS are the same thing?
**6      A  Correct.**
7      Q  Okay.  Um, let's go back for a second.
8 I want to ask you a question.  Are you aware of
9 any other, um, nonminority employees who, uh --
10 who walked across a waxed floor or a refinished
11 floor, uh, like the discipline, um -- like the
12 incident for which you were disciplined for
13 two days, um, but did not receive any discipline?
**14      A  I don't know if it happened to anyone**
**15 else.  But two days for walking across the floor;**
**16 you took -- you took $600 out of my pocket for**
**17 walking across the floor.  Really?  No --**
18      Q  Okay.
**19      A  -- I don't know no one that did.**
20      Q  Okay.  So there is no other nonminority
21 officers that you can name or point me to today
22 who -- who did something like that but didn't
23 receive discipline?
**24      A  I don't -- I cannot say that.**

97

1    Q  Okay.  Uh, what about taking the keys
2  home?  Are there any nonminority officers --
3    **A  Yes.**
4    Q  -- you're aware of who took --
5    **A  Yes.**
6    Q  Let me -- let me finish my question, just
7  so we have a clear record, okay?  Um, are there
8  any other nonminority officers that you can
9  identify who, um, did the same thing as you
10  regarding taking the keys home and didn't receive
11  discipline?
12    **A  Yes.**
13    Q  Okay.  Uh, tell me about that.  Who is
14  that individual?
15    **A  Uh, Bieniek; um, Messina, uh, uh; they**
16  **took radios home, uh.  Wow, uh, them are the only**
17  **two off the top of my head; and those are white**
18  **officers.**
19    Q  So Bieniek?
20    **A  Got Lopez.  Uh, wow.  I mean, it was --**
21  **man, I can't -- I can't -- those -- those two,**
22  **I know off the top of my head.**
23    Q  So Bieniek and Messina?
24    **A  Right.**

98

1    Q  And they took keys home?
2    **A  Yes.**
3    Q  And they did not receive any discipline
4  for taking keys home?
5    **A  No.**
6    Q  Okay.  Uh, and what's the basis of your
7  knowledge that they took keys home and didn't
8  receive any discipline?
9    **A  Because they told me.**
10    Q  Okay.
11    **A  They told me they forgot the keys.**
12  **"Oh, I'll bring them back tomorrow."**
13      THE REPORTER:  Can you spell the -- uh,
14  not the -- Bieniek, but the other one, person's
15  name?
16      THE WITNESS:  Messina?
17      THE REPORTER:  Yeah.
18      THE WITNESS:  I cannot spell his name.
19  I think it's M-I-N-S-I-N-A (sic).
20  BY MR. LEINENWEBER:
21    Q  Uh, let's start with, uh, Mr. Bieniek.
22  Uh, okay.  So you said that he told you, he took
23  keys home?
24    **A  No, Messina told me he took the keys home,**

99

1    **that he --**
2    Q  I'm asking about Bie- -- I'm asking about
3  Bieniek.
4    **A  Okay.  Bieniek, I -- he brought them back.**
5  **I seen him bring them back the next day because**
6  **they asked him:  Did he have the keys when he came**
7  **back to work.  And I seen him pull the keys out of**
8  **his pocket and give it to him, and that's at the**
9  **beginning of the shift.**
10    Q  Okay.  So Bieniek -- you're saying you saw
11  someone ask him if he had his -- well, first of
12  all, let me ask a basic question here:  What kind
13  of keys are we talking about?  What is --
14    **A  Car keys, car keys, car keys, car keys.**
15    Q  Car keys, okay.  These are car keys, okay.
16  Okay.  So you're saying that, um, you saw
17  someone ask Bieniek if he had these car keys,
18  and you saw him take them out of his pocket?
19    **A  Yes, never had -- yes.**
20    Q  Okay.  When did that happen?
21    **A  I want to say '15, '16.**
22    Q  And, um, who, um -- where did this happen
23  that you saw this interaction?
24    **A  Uh, in roll call.**

100

1    Q  Okay.  And who asked him, um, if he had
2  the keys?
3    **A  Uh, uh, Ranzino.**
4    Q  And what's the basis of your knowledge
5  that Bieniek didn't receive any discipline for
6  that?
7    **A  What's the basis of my knowledge?  Uh,**
8  **because I asked him and he said he didn't.**
9    Q  You asked him?
10    **A  I asked him because I -- I know it had**
11  **happened before, and I know what happened with me.**
12  **And I asked him:  "What did they do?"  He says,**
13  **"They ain't do nothing to me.  They gave me a**
14  **write-up."**
15    Q  Oh, so he did get some form of discipline?
16    **A  Yes, but --**
17    Q  Okay.
18    **A  That goes to the progressive of, uh,**
19  **discipline.**
20    Q  Okay.  So Bieniek -- just so I can make
21  sure I understand this.  Bieniek, in 2015 to 2016,
22  um, at roll call, was asked by Ranzino if he had
23  the car keys.  And he took them out of his pocket
24  and gave them to him?

Transcript of Cecil Williams
Conducted on July 14, 2020

101

1    **A  Correct.**
2    Q  Okay.  And you spoke with Bieniek and
3  asked him if he received any discipline, and
4  he said that he got a write-up?
5    **A  Right.**
6    Q  Okay.  Um, did he tell you anything else
7  about this incident?
8    **A  No.**
9    Q  Okay.
10    **A  We just -- we just -- actually, it**
11  **happened one day.  We was working together.**
12    Q  Okay.
13    **A  And, um -- and it just -- it came up in a**
14  **brief conversation.**
15    Q  Got it.  Okay.  And then Messina, when,
16  um, did Messina take car keys home?
17    **A  Messina left.  He's no longer with us.**
18  **He left, uh.  So this had to be -- a lot of stuff**
19  **happened around fourt- -- between '13 and '15,**
20  **when a lot a -- '16; a lot of stuff occurred.**
21    Q  So you think it was between 2013 and 2015
22  that Messina took the keys home?
23    **A  Uh-huh.**
24    Q  Okay.  And, um, sorry.  What was Bieniek's

102

1  position?
2    **A  He's an investigator.**
3    Q  He's an investigator, okay.  And same
4  thing; Messina is an investigator?
5    **A  Yes.**
6    Q  And they're both white?
7    **A  Yes.**
8    Q  Okay.  Um, okay.  How do you know that,
9  uh, Messina took keys home at some point between
10  2013 and 2015?
11    **A  Because he -- what -- I want to say he had**
12  **them with him, and they called.  I was at -- I was**
13  **in the office one day.  And he called -- uh, who**
14  **was that?  Collins called him and asked him, did**
15  **he have the keys?  He say:  Yeah.  That's**
16  **Lieutenant Collins.**
17    Q  So you overheard a phone conversation
18  between Lieutenant Collins and Messina where
19  Collins asked if he had car keys?
20    **A  Yes.  And how do I -- how do I know if**
21  **he received anything?  I don't, but I don't think**
22  **he did.**
23    Q  My question is actually a little bit
24  different than that.  How were you able to

103

1  overhear what Lieutenant Collins was asking him?
2    **A  Because I was in the office trying to**
3  **take care of some other business with her, while**
4  **I was waiting on the phone.  I was waiting,**
5  **standing by, waiting to take care of my business**
6  **while she was on the phone.  So I overheard it.**
7    Q  Okay.  So she -- uh, was she on
8  speakerphone?
9    **A  No.**
10    Q  Okay.  So were you able to hear actually
11  both sides of the conversation or just what
12  Messina was saying?
13    **A  I just heard what Collins was saying, say,**
14  **"Bring the keys back."**
15    Q  Oh, Collins was in the office?
16    **A  Yes.**
17    Q  Okay.  I misunderstood.  I'm sorry.
18  So you overheard Collins call someone -- call
19  Messina.  How did you know he (sic) was calling
20  Messina?
21    **A  Because she had asked:  Has anybody seen**
22  **the keys?  And she said she was going -- the**
23  **last person that signed the keys out was Messina**
24  **because he signed the keys out.**

104

1    Q  Okay.  So she called, uh, Messina.
2  Collins called Messina and asked her (sic) if
3  she had the car keys.  And what did Messina say,
4  if you know?
5    **A  I'm not exactly sure.  I know he said -- I**
6  **know she said -- I know she said, "Return the keys**
7  **back."  So what exactly he said, I'm not sure.**
8    Q  And, um, did Messina receive any
9  discipline, um, related to the keys?
10    **A  Not to my knowledge.**
11    Q  Do you know one way or the other?
12    **A  I do not know one way or the other.**
13    Q  Okay.  And, again, related to the keys,
14  you're saying you were docked one day?
15    **A  Yes, because, uh, it was -- it happened**
16  **on my -- off my -- my RDO.  So I was gone for two**
17  **days before I came back to work.**
18    Q  So the keys were with you for a couple
19  days, you mean?
20    **A  Just for one day.**
21    Q  And the one day, though, it was your
22  regular day off?  Is that what you're saying?
23    **A  Yes.**
24    Q  How long were the keys gone when Bieniek,

Transcript of Cecil Williams
Conducted on July 14, 2020

27 (105 to 108)

105

1  uh, had them?
2      A  I have no knowledge.
3      Q  What about Messina?  How long were the
4  keys gone --
5      A  I have no knowledge.
6      Q  -- when Messina had them?
7      A  I have no knowledge.
8      Q  Okay.  And when you had the keys, they
9  were gone for how long?
10     A  Maybe 24 hours.
11     Q  Okay.  Um, okay.  Let's talk about the
12  escapee incident; and then maybe we can take a
13  break after this, um -- this one, if that's good.
14  Um, okay.  So between 2013 and 2014, you, uh, had
15  an incident with an escapee where somebody escaped
16  from your custody?
17     A  Correct.
18     Q  Okay.  And you received a written, uh,
19  reprimand for that?
20     A  Correct.
21     Q  Okay, um.  Who are the other nonminority
22  officers, um, that you contend had an escapee but
23  didn't receive any discipline?
24     A  Uh, Messina, uh, now I -- when -- when I

106

1  say these names, basically what I'm saying is:
2  I know they had an escape, but, to my knowledge,
3  they did not receive any time off.  Messina, him
4  and Folkner (sic), Bieniek and Nickles, uh, uh,
5  on my shift -- on my shift, those two on my shift.
6      Q  Which two were on your shift?
7      A  Uh, Bieniek and Folk- -- I mean, Bieniek
8  and Nickles, Messina and Folkner.
9      Q  Oh, those -- those two partner groups is
10  what you're saying?
11     A  Yes, yes.
12     Q  Got it.  Okay.  Anyone else besides those
13  two partner groups?
14     A  Uh, I can't think of any right off.
15     Q  Okay.  Um, Messina and Folkner, tell me
16  about their incident.  When did that happen?
17     A  That happened between '14 and '16, uh --
18  the guy -- I wasn't there.  So I can't
19  specifically say exactly how -- how it processed.
20  I cannot say that, but he did escape.  And I --
21  I think they just sent it to AWOL and made him an
22  AWOL.  I mean, they wind up catching him on AWOL;
23  but as far as the process of it happening, it was
24  an escape.

107

1      Q  Okay.  And do you know if Messina or
2  Folkner -- if they, um, did anything against, um,
3  rules and regulations when that person escaped?
4      A  I can't answer that question because I
5  wasn't the supervisor that was there to dictate
6  what happened.
7      Q  Okay.
8      A  I don't -- I don't see their recording.
9  So I cannot answer that question.
10     Q  Okay.  And do you know whether or not they
11  received any discipline at all for that?
12     A  To my knowledge, they did not.  To my
13  knowledge, they did not.
14     Q  Okay.  What's the basis of your belief
15  that they did not receive any discipline for the
16  escapee?
17     A  Because, uh, normally they either give you
18  a day or written up; and the majority of us around
19  there, we communicate with each other.  We talk to
20  each other.  Some of us, we talk to each other.
21  So we know what we going to fight.  And then I was
22  very familiar with the union steward.  So I could
23  kind of know a lot of stuff that was going on
24  through the union steward.

108

1      Q  So, in other words --
2      A  I kind of knew -- you know, I kind of --
3  the best way to say it is, a communication with
4  others.
5      Q  Okay.  So, in other words, you did not
6  hear from anyone that they received discipline?
7      A  Correct.
8      Q  So your assumption is that they did not
9  receive any discipline?
10     A  Correct.
11     Q  Okay.  Got it, um.  And do you know, um --
12  well, how do you know that they had an escapee?
13     A  Because it was the day that I was at work
14  and it goes across the radio when stuff happens.
15     Q  Got it.
16     A  Everything -- everything that happens goes
17  across county radio.  So everybody in the county
18  can hear what's going on.
19     Q  Okay, um.  Let me go back to the keys for
20  one second.  Um, did Director Shields know that
21  Bieniek or Messina took the car keys home?
22     A  I -- that is not my knowledge to know, but
23  what I know is, every discipline that is given
24  come directly from him.

Transcript of Cecil Williams
Conducted on July 14, 2020

28 (109 to 112)

109

1    Q  Okay.
2    A  He's the one that, uh, directed the
3  discipline to be done.  So if he knew directly
4  or indirectly, I don't know.
5    Q  Okay, uh.  What about Ranzino, Neal and
6  Rohloff?  Do you know whether or not they knew
7  that, uh, Bieniek or Messina took the keys home?
8    A  Same answer; I would not know that
9  because, you know, that's processed on Who, What
10  and When.  I have no knowledge of that.
11    Q  Got it, okay.  Um, okay.  So you knew --
12  getting back to the Messina and Folkner escapee;
13  you knew that someone escaped because you heard
14  it over the radio?
15    A  Correct.
16    Q  Okay.  And, uh -- and I think I had asked
17  you if you knew if they got any discipline.  And
18  you said, um -- you didn't hear anybody talk about
19  them receiving discipline.  So you're assuming
20  that they did not receive any discipline?
21    A  Right, because normally if -- if -- if an
22  incident occurred, we hear about it.  Somebody get
23  wrote up, you'll hear about it.
24    Q  Okay.

110

1    A  Just like, now, if someone get wrote up,
2  they -- or an escape, they just move you
3  completely out of the unit.  That's the punishment
4  now.
5    Q  Do you know if, um, Shields, Rohloff,
6  Ranzino or Neal, um, knew about this escapee
7  incident with Messina and Folkner?
8    A  Of course, they do.  Of course, they do.
9    Q  What's -- what's the basis of your
10  knowledge?
11    A  Because any escapee goes through a -- a
12  process of the supervisor, the lieutenant, the
13  chief, the director; everybody knows about an
14  incident like that because that is considered a
15  major incident.
16    Q  Okay.  So your understanding that those
17  four supervisors would have known about this
18  incident is based on your understanding of the
19  process of --
20    A  Correct.
21    Q  -- what happens when an escape happens?
22    A  Correct.
23    Q  Got it, okay.  Um, let's talk about
24  Bieniek and Nickles then.  When did they have an

111

1  escapee?
2    A  Same time, between '14 and '16.
3    Q  Okay.  And, uh, what happened?
4    A  Uh, answered the same question; do I know
5  exactly how they process and how he escaped?  No,
6  I do not.  Uh, do I know if they received
7  anything?  Same process, it wasn't no
8  communication on if they received anything or not;
9  but as far as I'm concerned, uh, through the --
10  through the terms of communication among
11  investigators, no, they haven't received anything.
12    Q  Okay.  So for Bieniek and -- and Nickles,
13  uh, it's your understanding that somebody did
14  escape, um.  Is that because you heard that on
15  the radio as well?
16    A  Correct.
17    Q  Got it, okay.  And, um, you don't know the
18  details of what happened, um; but you again assume
19  that there was no discipline because you never
20  heard anyone tell you that these guys got
21  disciplined?
22    A  Right, because, like I say, normally when
23  you -- when someone get -- we -- we a small unit.
24  On any given day you got 30 people there.  We're a

112

1  very small unit.  So people -- out of 30 people,
2  we know what's going on.
3    Q  Okay, um.  And do you have any knowledge
4  as to whether or not, uh, Shields, Rohloff,
5  Ranzino or Neal, um, knew about Bieniek and
6  Nickles' escapee?
7    A  Of course.
8    Q  Okay.  And that's because, again, your
9  understanding of the process is that the entire --
10    A  The chain of command.
11    Q  -- chain of command would be notified?
12    A  Correct, correct.
13    Q  Okay.  Um, all right.
14    MR. LEINENWEBER:  Why don't we take a
15  break now?  It's 12:06.  Does anybody need a break
16  for lunch?
17    THE WITNESS:  Wow, it's 12:00 already?
18    MR. LEINENWEBER:  Yeah, yeah.  Times flies
19  when you're having fun.  We can be off the record,
20  Beth.
21    (Discussion off the record commencing at
22  12:06 p.m. and concluding at 12:07.)
23    (A brief recess was taken commencing at
24  12:06 and concluding at 12:28 p.m.)

Transcript of Cecil Williams
Conducted on July 14, 2020

113

1    MR. LEINENWEBER: All right. We can go
2 back on the record then.
3    Q Uh, Mr. Williams, do you understand that
4 you are still under oath?
5    A Yes.
6    Q Okay. And we've taken a little bit of a
7 break here; but, um, we were talking about, uh,
8 some of the allegations in the complaint, um.
9 I'm trying to remember which one we left off on,
10 um.
11    MR. LEINENWEBER: Annie, can we pull the
12 complaint back up?
13    TECH BROWN: Absolutely, stand by.
14    MR. LEINENWEBER: And I think it was page
15 11, I think, 12. Okay. That's perfect, um.
16    Q And let's see. We talked about, um, the
17 assignments, um. I think that's actually where
18 we left off was, we were talking about the
19 assignments. So let's go to Paragraph 82,
20 Mr. Williams. If you could just review that, and
21 then we'll talk about that one for a minute.
22    So it says, uh: "Director Shields and
23 his subordinate supervisors assigned duties to
24 EM investigators based on their race and not based

114

1 on their seniority or work experience."
2    Uh, my question, Mr. Williams is here:
3 When you use the term "duties," are we talking
4 about TSS here essentially still?
5    A Yes.
6    Q Okay. Anything else that you're referring
7 to in Paragraph 82?
8    A Uh, back to high crime areas.
9    Q Okay.
10    A South suburbs, north suburbs, uh, north
11 side of Chicago, west side of Chicago; I'm talking
12 more of the areas where your high crime rates are.
13    Q Okay. So in Paragraph 82 when you're
14 talking about investigators being assigned duties,
15 you're referencing essentially the conversation
16 that we've already had about getting assigned to
17 TSS and getting assigned about higher crime areas of
18 the, um -- the city?
19    A Correct.
20    Q The county, excuse me. Okay.
21    A Correct.
22    Q Okay. Anything else that you want to --
23 um, that you would add to that or is that it right
24 now?

115

1    A That's it.
2    Q Okay. Um, then Paragraph 83, um, it says:
3 "Director Shields and his subordinate supervisors
4 gave disproportionate discipline to the plaintiffs
5 as opposed to nonminority officers." And I think
6 that that's kind of what we were actually wrapping
7 up with right before the break was the three
8 incidents of discipline that you had?
9    A Correct.
10    Q Okay. Is there any other discipline that
11 you're referring to here?
12    A Not right off, no.
13    Q Okay. And then, um, Paragraph 84:
14 "Director Shields threatened the plaintiffs that
15 he would have them fired if they filed grievances
16 for the discipline they received." Um, did
17 Director Shields ever threaten to have you fired?
18    A Director Shields would say: "Go to your
19 union. I don't know. I have you fired. Go to
20 your union." That's his terms: "Go to your
21 union. Go to your union."
22    THE REPORTER: I'm sorry. Are you saying
23 "unit" or "union" -- "union"?
24    THE WITNESS: Union.

116

1    THE REPORTER: Okay. Thank you.
2 BY MR. LEINENWEBER:
3    Q And did --
4    THE WITNESS: You're welcome.
5 BY MR. LEINENWEBER:
6    Q Sorry, don't want us to talk over.
7 Um, did Director Shields ever, uh, threaten you
8 that he would have you fired?
9    A Me in direct, no.
10    Q Okay.
11    A But have I heard it? No.
12    Q Um, and then Paragraph 85 here, it says,
13 um: "The defendants' (sic) disciplinary process
14 (sic) and procedures provide no meaningful
15 opportunity for the plaintiffs to an unbiased
16 determination of disciplinary actions"?
17    A True.
18    Q And then Paragraph 86, it says: "The
19 defendants' grievance processes and procedures
20 provide no significant remedy for plaintiffs as
21 their concerns and complaints are heard by the
22 wrongdoers"?
23    A Correct. The person that's giving the
24 punishment is the person that's giving you the

Transcript of Cecil Williams
Conducted on July 14, 2020

117

1 punishment. I mean, the person that's doing the
2 grievance is the person that's giving you the
3 punishment.
4 Q Okay. Is there anything -- are there any
5 other policies or procedures that you're referring
6 to here other than the issuance of discipline and
7 the use of the grievance process to challenge that
8 discipline?
9 A Uh, no.
10 Q Okay. Okay. And then you, um, had
11 indicated, though Director Shields never
12 threatened you, to have you fired, you've heard
13 that he threatened others, to have them fired?
14 A Yes, I -- I heard that he put his finger
15 in Winston's face and told him: "I have you
16 fired," from Winston.
17 Q Okay. So Winston told you that Shields
18 put his finger in his face and threatened to have
19 him fired?
20 A Yes.
21 Q Okay. When, uh, if you recall, was that?
22 A It had to be about '15 or '16. Me and
23 Winston was partners --
24 Q Okay.

118

1 A -- for nine years.
2 Q '15 to '16?
3 A No, me and Winston was partners from
4 '10, till about the ending of this year when they
5 start separating us.
6 Q Okay, sorry. I didn't mean, um, that you
7 guys were partners in '15 to '16. I meant that
8 this -- when Winston told you this, you recall --
9 A Yes.
10 Q -- it happening between '15 and '16?
11 A Correct.
12 Q Okay. So you didn't actually observe it.
13 That's just what Winston told you?
14 A Yes.
15 Q Okay. Do you recall what Winston said,
16 precipitated that, uh, confrontation?
17 A Well, he was kind of upset that day.
18 So he took a half a day that day, but, uh, there
19 was a few people that was in the office with him.
20 Uh, Loggins, uh, and it was a director, Brady;
21 they was in the office when this incident
22 occurred. So that would be his witness on that
23 part. So as far as that specific day, he was kind
24 of upset.

119

1 So he didn't -- he kind of went home that
2 day. So I think the following time he just
3 elaborated that, uh, Shields came at him about a
4 situation and put his finger in his face and told
5 him, he would fire him. And that came from him
6 and he told me about that.
7 Q Okay. And, to your knowledge, was any
8 kind of an investigation or complaint made to OPR,
9 human resources, about that?
10 A Yes, he did go to OPR about that, yes.
11 Q Okay. Were you a witness in that
12 proceeding at all?
13 A I wasn't a witness in that procedure, no.
14 Q Okay. Do you know what the resolution of
15 that OPR --
16 A No --
17 Q -- investigation was?
18 A -- I do not. I have no knowledge of that.
19 Q Okay. Um, any other times that you heard
20 of Director Shields threatening to have someone
21 fired?
22 A Uh, he got into it with, uh -- I'm trying
23 to see, who was that. Uh, I heard about, uh, Tims
24 briefly. So I can't -- I can't -- I can't

120

1 describe exactly what I -- I can't describe
2 exactly word for word verbatim. I can't describe,
3 but I can -- like I say, again, we are a small
4 unit. So we talk.
5 So things is not -- when you working with
6 30 people, less than on any given day, we all
7 sit around and we talking. So the best way I
8 can say is, uh: Tims had a problem with him, uh,
9 uh. He retired. Uh, God, oh, God, uh. Page, uh,
10 Alloter (phonetic), uh, I.V., Slaughter; I mean
11 everybody that's basically -- we all had problems
12 with it. So it wasn't directed at one person.
13 It was the majority of the African-American
14 officers.
15 Q And specifically in terms of you alleging
16 in the complaint that Shields threatened to fire
17 plaintiffs if they filed grievances for discipline
18 they received; other than the interaction with
19 Winston we talked about, um, are you aware of
20 whether or not that happened with any of these
21 other, um, individuals you're naming?
22 A Uh, I'm aware through communication, yes.
23 I cannot put my finger on exactly time and date,
24 no.

Transcript of Cecil Williams
Conducted on July 14, 2020

31 (121 to 124)

121

1    Q  Okay.  Um, what do you recall?  Who -- who
2  do you recall telling you that, uh --
3    **A  I.V.**
4    Q  -- Shields threatened to fire him?
5    **A  I.V.**
6    Q  I.V., that's I.V. Newsom?
7    **A  Yes, I.V. --**
8    Q  One of the --
9    **A  -- told me before he retired.  I mean,**
10 **he retired after Shields was gone; but I.V. was**
11 **having major problems with the way he threatened**
12 **his job.  I.V. told me that, uh, it was a**
13 **situation that occurred with -- I want to say**
14 **again, with an escape.  I'm not -- I'm not**
15 **specifically sure about the example of what**
16 **happened; but that's an example of an**
17 **African-American investigator getting dealt with**
18 **a different way.**
19   Q  Um, do you know what the -- do you know
20 any other details about the interaction with
21 Mr. Newsom, um, between Shields and Newsom, other
22 than what you just said?
23   **A  No, but what I do know is, a lot of stuff**
24 **that have occurred with a lot of invest- -- black**

122

1  investigators that's now (inaudible).  Before
2  Shields became a director, he had, I guess, bias
3  towards them at that time.  And I just fell right
4  into the process because of that; but before --
5  before that time, before he was a director, he was
6  an investigator.
7    Q  Uh-huh.
8    **A  So I give him that he earned his way to**
9  **the top; but, you know, I think he took his**
10 **hatreds with him, but that's -- that's just my**
11 **opinion.**
12   Q  Do you have any personal knowledge about
13 what you were just referring to, um, or is this
14 just kind of what you've heard along the way
15 coming up?
16   **A  Like I -- uh, that's -- that's more of**
17 **what I heard through the investigators that was**
18 **there when he was there because they started with**
19 **him as an investigator.  And I came over after all**
20 **those guys.**
21   Q  Okay, um.  Okay.
22     MR. LEINENWEBER:  Let's go ahead and mark,
23 um, or bring up what's been marked as Exhibit 2.
24     (Exhibit 2 was marked for identification.)

123

1      TECH BROWN:  Stand by.
2  BY MR. LEINENWEBER:
3    Q  Okay.  Mr. Williams, we've handed you
4  what's been marked as Exhibit 2.  And the title
5  to this document is Plaintiff Cecil Williams'
6  Objections and Answers to Defendant Gregory
7  Shields' First Set of Interrogatories.
8  Um, could you, um --
9      MR. LEINENWEBER:  Annie, could you go to
10 the last page of the document, um, which should be
11 the verification page?
12   Q  And, Mr. Williams, could you just take a
13 second to review this?  Uh, Annie will make it a
14 little bit bigger for you if she can.  And, um,
15 just, uh, confirm for me that that's your
16 signature?
17   **A  Yes.**
18   Q  That -- that is your signature here?
19   **A  Correct.**
20   Q  Okay.  And this is essentially the
21 verification saying that you're declaring, under
22 penalty of perjury, that the foregoing is true and
23 correct, right?
24   **A  Correct.**

124

1    Q  Okay.  And it's dated March 12th of this
2  year?
3    **A  Correct.**
4    Q  Okay.
5      MR. LEINENWEBER:  And then if, Annie, you
6  could go to page two of the document?  And then
7  if you could scroll down to question two and the
8  response; there we go, perfect.
9    Q  Okay.  So, uh, Mr. Williams, uh, I'd like
10 you to take a second and review, uh, question two
11 and your response to it.  This question is aimed
12 at identifying the discipline that you allege was
13 discriminatory.  So I'll just give you a second
14 to review that, and just let me know when you've
15 had a chance to do that.
16   **A  Okay.**
17   Q  So, um, okay.  So here, um, you state that
18 you received a one-day suspension because you
19 walked on the freshly waxed floor.  We talked at
20 length about that earlier, right?
21   **A  Correct.**
22   Q  I think previously you had said it was a
23 two-day, um, suspension?
24   **A  Okay.  I -- okay.  I -- I knew it was one**

Transcript of Cecil Williams
Conducted on July 14, 2020

32 (125 to 128)

125

1 or two, but I knew I had lost -- I lost time.
2     Q   Okay.
3     A   I lost time.
4     Q   It's -- yeah.  Does this refresh your
5 recollection that maybe it was a one-day
6 suspension?
7     A   It was a one-day suspension.
8     Q   Okay.
9     A   If I said it was a one-day, I lost.
10 I lost.  I didn't have the paper in front of me,
11 but I did spend --
12     Q   Understood.
13     A   I did lose time.  I lost time.
14     Q   Okay.  And then, um, the second type of
15 discipline you talk about here is, um, the key
16 incident that we talked about.  You say that you
17 received a one-day suspension because you turned
18 in a key later.  Um, and that's what you've
19 testified to earlier, right?
20     A   Correct.
21     Q   Okay.  And then, um, you state a little
22 bit further on, um: "Supervisors would call an
23 inmate to check if my partner and I were there,
24 even after we reported our arrival to dispatch."

126

1 Can you just tell me a little bit about what
2 you're referring to there?
3     A   Okay.  Basically what I'm referring is,
4 we are dispatcher -- we are dispatched an
5 assignment over the radio.  When we are dispatched
6 an assignment, uh, the inmate would be called
7 before we get there or when we get there.  If
8 they -- when we'd go down on the radio, it's
9 called a 23.  And when we go down with a 23,
10 that means we have arrived at -- at the residence.
11 They will call the plaintiff.  They will call
12 the detainee and say, "Is an officer there?"
13         And so basically what you doing is, you
14 letting this guy know:  We either in front of the
15 house or we getting ready to knock on the door,
16 and if it's anything -- our job is to surprise,
17 not -- not for you to know we're there.
18     Q   So, okay.  So essentially I think then
19 what you're saying is that somebody was contacting
20 the detainees and essentially giving them a heads
21 up that you were coming?
22     A   Correct.
23     Q   Okay.  Who was doing that?
24     A   Well, normally it would be, uh, either

127

1 the dispatcher at the time or it would be, uh,
2 one -- Shields -- I mean Passa, uh, which was a
3 supervisor, uh.
4         THE REPORTER:  I'm sorry.  Can you repeat
5 the name for me, please.
6         THE WITNESS:  Passa.
7 BY MR. LEINENWEBER:
8     Q   That's P as in Paul, right?
9     A   P as in Paul; A as in apple; Sam;
10 Sam; A.
11     Q   So, um, okay.  So they would -- so either
12 dispatch or Passa -- Passa would contact the
13 detainee.  What was the purpose of them contacting
14 the detainee?
15     A   There is no purpose.  They have no reason
16 to contact the detainee at all.  That was our
17 purpose of going there.
18     Q   Okay.
19     A   We was to deal with that and give them a
20 solution to our job, not for them to let the
21 detainee know we were there.
22     Q   How were you aware that the dispatcher or
23 Passa had contacted the detainee prior --
24     A   Because --

128

1     Q   -- to your arrival?
2     A   Because the detainee would say, "Hey, I
3 just got a phone call."  That's what he would say:
4 "I just got a phone call."  I say, "From who?"
5 "Your supervisor just called me and said you all
6 was on the way," or, "Have they -- have they got
7 there yet?"
8     Q   And how often did that happen?
9     A   It happened numerous times.
10     Q   Okay.  And so other than the detainee
11 telling you that they had received a phone call
12 from, um, someone, uh, is there any other -- do
13 you have any other knowledge that this was being
14 done?
15     A   Do I have any other knowledge?
16     Q   Yeah, this this was being done?
17     A   All I need was the detainee to tell me.
18 If he tell me it's done; I mean, how would he know
19 I'm at the door, or I'm -- I'm -- how would he
20 know that I'm there before I get there?  That's
21 not his knowledge to know when I get there.  His
22 knowledge is, when I get there, you open the door
23 and let me do my assignment.
24     Q   You mean, it's possible that he saw you

Transcript of Cecil Williams
Conducted on July 14, 2020

129

1  out the window, right?
2  **A  Why would he -- okay.**
3  MS. KRAUCHUN:  Objection; calls for
4  speculation.
5  BY MR. LEINENWEBER:
6  Q  You can answer the question, sir.
7  MS. KRAUCHUN:  You can answer.
8  THE WITNESS:  Huh?
9  BY MR. LEINENWEBER:
10  Q  You can answer the question.
11  **A  It's possible.  Yes, it's possible.**
12  Q  Okay, um.  So other than -- just to
13  clarify:  Other than the detainees telling you
14  that they had just received a phone call, um,
15  from the sheriff's office --
16  **A  Can I cut you off?  He will all -- he will**
17  **all say because he have to ask their name, who it**
18  **is, and they will give him his name.**
19  Q  I'm sorry.  Can you be a little more
20  specific?  I'm not sure who -- who you're talking
21  about.
22  **A  If Pass -- what -- what he would do is,**
23  **he'll call.  "This is Supervisor Passa."  And he**
24  **will give his name, and then the detainee know**

130

1  **exactly who he was talking to.**
2  Q  Okay.  Is it inappropriate for, um, a
3  supervisor to contact a detainee, just in general?
4  MS. KRAUCHUN:  Objection; found- --
5  objection; foundation; go ahead.
6  BY MR. LEINENWEBER:
7  Q  If you know?
8  **A  Is it -- is it what now?**
9  Q  Well, is it -- I mean, is it -- I'll just
10  strike the question.  Um, did, um, anything ever
11  happen to you, um, because of one of these phone
12  calls other than the detainee being at the door
13  and -- and saying, "I just got off the phone"?
14  Did anything ever happen because of it?
15  **A  It's not that nothing happened.  It's the**
16  **possibility that something can happen.**
17  Q  Okay.  But nothing did happen, right?
18  You're not saying that --
19  **A  Nothing didn't happen, but it's a**
20  **possibility that something can happen.**
21  Q  Okay.
22  **A  You are -- you are putting -- you**
23  **basically putting my life in danger by contacting**
24  **him before I get there.  You're basically telling**

131

1  **him, if he want to run, if he want to -- if he got**
2  **something he trying to hide, or my purpose there**
3  **is to catch him doing something, you done already**
4  **notified him that I was there.  So whatever he got**
5  **to hide or something he want to do, it's over**
6  **with.**
7  Q  So you thought this was pretty dangerous?
8  **A  Yes, correct.**
9  Q  Did you go to OPR with this?
10  **A  Uh, no, I directed it to the supervisor**
11  **there on that one.**
12  Q  Did you file a grievance about this?
13  **A  That's -- no, I did not.**
14  Q  So you didn't file a grievance about it.
15  You didn't go to OPR about it.  Um, you said you
16  went to the supervisor about it?
17  **A  I went to Passa about it direct.**
18  Q  Okay.  So as far as you know, is Passa the
19  only one that did this?
20  **A  To me personally, yes.**
21  Q  Okay, um.  And do you know whether or not
22  Passa ever did it to any other, uh, officers or
23  investigators?
24  **A  I have no -- I have no knowledge of that,**

132

1  **but that -- that is -- you are still putting my**
2  **life in danger.  I have no knowledge of that.**
3  Q  Okay.  But as far as you know, he could
4  have done this with other, um, uh, investigators,
5  including nonminority investigators?
6  **A  With that being said, he's putting -- he**
7  **putting everybody's life in danger, but this is a**
8  **supervisor.  A supervisor shouldn't put your life**
9  **in danger.**
10  Q  But as far as you know, he could have done
11  this with nonminority officers as well?
12  **A  I don't know that, no.  Do I know as far**
13  **as I know, if he could have done it, yes.**
14  Q  Okay.  So you don't know one way or the
15  other.  He could have done it or maybe he didn't.
16  You just don't know?
17  **A  I don't know.**
18  Q  Okay, um.  And, um, I guess I'm curious.
19  Why didn't you go to OPR with something that you,
20  you know, are clearly, um, you know, still to this
21  day, pretty upset about, I think?  Um, why didn't
22  you go to OPR with this?
23  **A  Because I -- my -- my point with this was,**
24  **is to direct it to the person that was doing it.**

Transcript of Cecil Williams
Conducted on July 14, 2020

34 (133 to 136)

133

1   My -- my way of doing it was probably not the
2   correct way of doing it, but I feel that as a
3   supervisor, we can solve this problem.  Sometimes
4   I -- try to solve the problem without going, but
5   it never worked.  How is that?
6       Q  Okay.  Did Passa, uh, say, "Oh, geez,
7   you're right," or what was his explanation for why
8   this was being done?
9       A  "I'm a supervisor; I do what I want."
10      Q  Okay, um.  Okay.  And did it happen to you
11  again after that fact?
12      A  Yes.
13      Q  And what did you do that time?  Did you
14  go to OPR at that point?
15      A  I -- I went above his head, which was
16  Neal.
17      Q  Okay.  And what happened when you went
18  to Neal?
19      A  He said -- Neal say he had a right to do
20  it, which he did not.
21      Q  So in Neal's opinion, he had a -- Passa
22  had a right to be making those phone calls?
23      A  Correct.
24      Q  Okay.  What was the purpose of the phone

134

1   calls, do you think?
2       A  Honestly, I don't know.  Honestly, I -- I
3   can't -- honestly, I don't know.  Why would you do
4   something like that to put my life in jeopardy?
5   I wouldn't know.
6       Q  Well, I mean, but here in your
7   interrogatory you say that he "would call an
8   inmate to check if my partner and I were there,"
9   right?
10      A  Correct.
11      Q  "Even after we reported our arrival to
12  dispatch"?
13      A  Correct.
14      Q  So isn't it possible that they were trying
15  to keep tabs on where the investigators were?
16      MS. KRAUCHUN:  Objection; calls for
17  speculation; foundation.
18  BY MR. LEINENWEBER:
19      Q  You can answer the question.
20      A  No.
21      Q  It's not possible?
22      A  No.
23      Q  Why isn't that possible?
24      A  Because there is no other investigat- --

135

1   I -- because it's not possible, you trying to keep
2   up with -- is it only certain investigators you
3   keeping up with?
4       Q  That's not the question, sir.  The
5   question is:  Isn't it possible that the phone
6   calls were being placed to make sure that you
7   were where you were supposed to be?
8       A  Yes.
9       Q  And have you ever heard of investigators
10  reporting that they were in one place when, in
11  fact, they were actually somewhere else?
12      A  No, I haven't heard of that.
13      Q  You never heard of that?
14      A  No.
15      Q  Never in your entire career in -- in
16  electronic monitoring have you ever heard -- let
17  me finish my question -- have you ever heard of
18  an officer saying, "I'm at such-and-such
19  location," when, in fact, they were actually
20  somewhere else?
21      A  I'm going to say "no" because I can't
22  direct nobody that exactly did it.  So I can't put
23  my finger on it.
24      Q  Okay.  But you never heard that through

136

1   the grapevine from your colleagues at all?
2       A  No.
3       Q  Never -- never heard that anybody got
4   caught, for example, saying that they were at a
5   particular location when, in fact, they were still
6   in the parking lot of the EM unit?
7       A  No, I cannot -- I can -- I cannot answer
8   that question because -- I cannot put that on a
9   specific person.  So I can't answer that question.
10      Q  Regardless -- regardless of whether you
11  can, quote, "put it on a specific person," have
12  you ever heard of that type of thing happening?
13      A  No.
14      Q  Okay, um.  The next thing you say, if you
15  turn the page here.
16      MR. LEINENWEBER:  To the top of page
17  three, Annie:  "On another occasion, plaintiff
18  was" -- at the top of that one, yeah, right there.
19      Q  "On another occasion, plaintiff was
20  accused of damaging a county vehicle that he did
21  not sign out"?
22      A  Correct, it was a van.
23      Q  Okay.  I don't think we talked about this
24  one.  Did you receive discipline for this?

137

1    A  Uh, actually, I did not.  Actually, I
2  did not.  I was just accused of a van that I was
3  not driving.  So, actually, I did not receive any
4  discipline for that at all.
5    Q  Okay.  And who accused you of damaging the
6  vehicle?
7    A  Uh, I guess it had to be the supervisor
8  because they assumed --
9    Q  Which one?
10    A  Uh, at the time I think it was Neal.
11  I don't have the report exactly, but I think it
12  was Neal.
13    Q  And, um, what year was this?
14    A  Uh, in -- in or around 2014.
15    Q  And, um, did you report that to, uh, OPR,
16  HR or anything?
17    A  No, because they -- they threw it out.
18    Q  Okay.  So, um, when you say "they threw it
19  out," that means no discipline was done?  It was
20  essentially dropped?
21    A  Correct.
22    Q  Okay.  So you did not receive any time off
23  or -- or dock in pay?
24    A  No, I didn't receive anything for that,

138

1  no.
2    Q  Okay, um.  Let's go to -- okay.
3      MR. LEINENWEBER:  Number four, um, on this
4  same page, Annie.
5    Q  Um, so this interrogatory asked you to
6  identify complaints or grievances you made
7  regarding this discipline, um.  And your response
8  was: "Investigation continues," um.
9    A  I never got --
10    Q  Go ahead.
11    A  I'm sorry.  Go ahead.
12    Q  That's all right.  Go ahead.
13    A  I never got any -- uh, uh, I never got,
14  uh, a final answer for my grievance.
15    Q  Okay.  So you did file grievances
16  regarding, um -- I think you grieved all three of
17  the discipline incidents that we talked about,
18  right?
19    A  Correct.
20    Q  Okay.  So you -- you grieved the waxed
21  floor, the taking of the keys home, and the
22  escapee?
23    A  Correct.
24    Q  Okay.  And you -- did you make any other,

139

1  um, internal complaints regarding the discipline
2  that you received?
3    A  Explain yourself, what you mean by
4  "internal."
5    Q  Yeah.  I mean, did you -- did you, you
6  know, file any -- I mean, we talked earlier
7  about the process for reporting discrimination,
8  harassment or retaliation.  Did you use that
9  process to report that any of this discipline was,
10  um, discriminatory or retaliatory or harassment?
11    A  What our report was that the, uh -- the --
12  the discipline was aggressive.
13    Q  Okay.  And --
14    A  Without going through due process, I
15  reported that to my union.
16    Q  Okay.  So it was through the grievance
17  process?
18    A  Yes.
19    Q  Okay.  Got it, um.  And -- okay.  And
20  then, um, number five here, if we could go to the
21  bottom of page three?  Yeah.  Okay.  So this
22  question asked you to identify the similarly
23  situated nonminority officers who did not receive
24  discipline.  And I think we already talked about

140

1  these folks.
2      MR. LEINENWEBER:  But if we can just
3  scroll down, Annie, a little bit to get the
4  answer, the response?
5      THE WITNESS:  Yes.
6  BY MR. LEINENWEBER:
7    Q  Okay.
8    A  (Inaudible.)  I missed a few names.
9  I missed a few names.
10    Q  Okay.  So prior to this, we talked about,
11  um -- well, one, for the waxed floor incident,
12  you're not aware of any other investigators who
13  had a similar incident, right?
14    A  Correct.
15    Q  Okay.  For taking the keys home, you
16  identified Bieniek and Messina?
17    A  Correct.
18    Q  Okay, um.  And then for the escapee, you
19  identified Messina and Folkner and Bieniek and
20  Nickles, right?
21    A  Correct.
22    Q  Okay.  And then there is a few other, um,
23  people listed here.  So my question is:  What,
24  if any, discipline -- or, sorry.  What, if any,

Transcript of Cecil Williams
Conducted on July 14, 2020

36 (141 to 144)

141

1  violations did these folks engage in for which
2  they did not receive discipline?
3      **A  Okay.  The names that you have up here**
4  **are investigators that would never go down to TSS.**
5      Q  All right.  I don't want to talk about --
6  I -- I -- let me just stop you there for a second
7  because I see that that's what's in your answer
8  here; but the --
9      **A  Uh-huh.**
10     Q  -- question is actually about discipline.
11 So I don't want to talk about the assignment right
12 now.  I want to talk about these folks.  What
13 violations did they commit for which they did not
14 receive discipline?
15     **A  Well, besides the escape, uh -- uh, shoot,**
16 **I can't -- I can't put -- I can't answer that**
17 **question because it's not on the top of my head.**
18 **But that -- that is basically, I got a few people**
19 **here that I got; but the other ones explained**
20 **the, uh -- explains what -- why their name is on**
21 **here.  You're -- you're trying to put one thing**
22 **with another, but I got that one done on that**
23 **specific subject right there.**
24     Q  Okay, so, um.  Just so we're clear, I

142

1  just want to make sure that I understand.  Do you
2  allege that any of these individuals committed the
3  same types of infractions as you, but did not
4  receive discipline?
5      **A  And the ones that I did, uh, give you,**
6  **the ones -- the names that I gave you are on**
7  **there.**
8      Q  Right, right.  Correct, correct.
9      **A  Okay, correct.  The names that I gave you**
10 **are on there.**
11     Q  Yeah, okay.  So we've got Nickle and
12 Bieniek and Folkers.  And I think -- I don't see
13 Messina on here.
14     **A  Right.**
15     Q  But, um -- but other than those four --
16     **A  Folkner is Messina's partner.  He was his**
17 **partner.**
18     Q  Okay.  And I had Folkers spelled
19 incorrectly, I think, um.  There should be an O
20 in there or is it spelled correctly?  No, it is.
21 Okay.  All right.  So just to clarify then:
22 Nickle, Bieniek, Folkers, and Messina, who is not
23 listed, are the ones you allege committed
24 infractions similar to the ones you were accused

143

1  of, but received no or less discipline, right?
2      **A  Correct.**
3      Q  Okay.  So then for these other
4  individuals, like Shedor, Bosques, Pemote (sic) --
5  Pemonte, uh, Vasques, Lopez, Rico, Hurtado; you're
6  not saying that they committed these infractions
7  but didn't receive discipline, right?  You're
8  talking about --
9      **A  No.**
10     Q  -- assignments for them?
11     **A  Correct.**
12     Q  Okay.  All right.  That's fine, thanks.
13 Um, okay.  Okay.  So let's talk a little bit
14 about, um, kind of what I think you were getting
15 at with this question -- or, sorry -- with this
16 answer, which is that you're saying, these folks
17 did not, uh -- you say they were rarely assigned
18 to TSS, right?
19     **A  Correct.**
20     Q  Okay.  And did any of these people ever
21 work in TSS?
22     **A  Not as much, yes.**
23     Q  I understand that -- that you -- you don't
24 think that they worked there as much as you or

144

1  maybe some other --
2      **A  Well, yeah, yeah, yes, yes, Vasques --**
3  **Vasques never worked down there.**
4      Q  Let me -- let me just finish -- let me
5  just finish my question, so we have a clear
6  record.
7      **A  Okay.**
8      Q  Okay?  Did Nickle ever work in TSS?
9      **A  Yes.**
10     Q  Okay.  Did Bieniek ever work in TSS?
11     **A  Yes.**
12     Q  Okay.  Shedor ever work in TSS?
13     **A  No.**
14     Q  Bos- -- Bosques -- Bosques ever work in
15 TSS?
16     **A  No.**
17     Q  Pemonte, or -- yeah, Pemonte --
18     **A  No.**
19     Q  -- ever work in TSS?  Folkers ever work
20 in TSS?
21     **A  No.**
22     Q  Vasques ever work in TSS?
23     **A  Yes.**
24     Q  Lopez ever work in TSS?

Transcript of Cecil Williams
Conducted on July 14, 2020

145

1   A No.
2   Q Rico ever work in TSS?
3   **A Yes.**
4   Q Hurtado ever work in TSS?
5   **A Yes.**
6   Q What about Messina?
7   **A No.**
8   Q Okay. Okay, um. Did you work the same
9 shift as all these folks?
10   **A Yes.**
11   Q Okay, um. Since two thousand and, um,
12 ten, did you always work the same shift as these
13 folks?
14   **A Yes.**
15   Q What about days off? Did your days off
16 line up with all these folks?
17   A No.
18   Q Okay, um. What is, um -- let's go through
19 this real quick. What is Nickle's race?
20   **A Uh, uh, white.**
21   Q Okay. Bieniek?
22   **A White.**
23   Q Shedor?
24   **A White.**

146

1   Q Bosques?
2   **A White.**
3   Q Pemonte?
4   **A White.**
5   Q Folkers?
6   **A White.**
7   Q Vasques?
8   **A Hispanic.**
9   Q Lopez?
10   **A Hispanic.**
11   Q Rico?
12   **A Hispanic.**
13   Q Hurtado?
14   **A Hispanic.**
15   Q Messina?
16   **A White.**
17   Q Okay. And, um, did, uh -- let me just
18 clarify then, um. These individuals, um, worked
19 sometimes when you weren't there, right?
20   **A Yes.**
21   Q Okay. On, um, days that you were not
22 there, how do you know that these individuals,
23 like Shedor and the others that you named that
24 you say never worked in TSS, how do you know that

147

1 they didn't work in TSS on days that --
2   **A Because Slaughter worked those -- because,**
3 **uh, Investigator Slaughter worked those days, and**
4 **he -- and he was normally down there every day.**
5   Q Okay.
6   **A My days that I was --**
7   THE REPORTER: I'm sorry. Can you repeat
8 that name. Can you repeat that name again.
9 Sorry?
10   THE WITNESS: Slaughter, he's on the --
11 Investigator Slaughter is on the complaint.
12 BY MR. LEINENWEBER:
13   Q Okay. So how -- help me understand this
14 here then, um. How -- the fact that Slaughter was
15 there every day, as you say; um, how does that
16 lead you to believe or to know that these
17 individuals never worked in TSS on days which you
18 were not at work?
19   **A Because we have a roster.**
20   Q Okay.
21   **A And the roster -- the roster shows your**
22 **assignment, exactly when you are assigned to TSS**
23 **and when you're not.**
24   Q Okay. And, um, those rosters, um, you

148

1 would review them for days even when you weren't
2 working?
3   **A Well, it's, like I say, back to a small**
4 **unit. And Slaughter is, uh, someone that I talked**
5 **to. That's how I would know, through Slaughter,**
6 **yes.**
7   Q Okay. So Slaughter told you that these
8 guys never worked in TSS?
9   **A Yes, they would never work down there a**
10 **lot of times, yes.**
11   Q Well, they would never work down there at
12 all, right?
13   **A Well, the majority of them, no.**
14   Q Okay. And your understanding of the facts
15 that they did not work in TSS ever is based on the
16 days that you were in TSS, you never worked with
17 them. And the days you weren't working, you
18 checked with Slaughter, and Slaughter told you
19 they weren't working in TSS?
20   **A Yes, he -- he will -- he will keep the**
21 **roster of the days that when he was working, and**
22 **they was down there.**
23   Q Okay.
24   **A When I say they never worked down there,**

Transcript of Cecil Williams
Conducted on July 14, 2020

149

1  yeah.
2     Q  Okay, um.  Why were these individuals --
3  well, first of all, who made the decision not to
4  assign these individuals, uh, to TSS?
5     A  Supervisors.
6     Q  Which supervisors?
7     A  Uh, the supervisors for the day; uh, Neal,
8  uh, Ranzino, Chris Rohloff, Collins, uh, all --
9  all -- all the supervisors on the shift.
10    Q  Okay.  And those decisions to not include
11 or assign these individuals to TSS were made
12 because of their race, right?
13    A  I would say that because all of them would
14 get the lighter assignments.  Yes, I would say
15 that, yes.
16    Q  Okay.
17    A  Lower risk areas, yes.
18    Q  Okay.  But we're not talking about lower
19 risk areas right now; we're talking about TSS.
20    A  I mean, we talking about TSS.  I would --
21 I would say that.  I would say that because they
22 would not -- they would not go down there because
23 of the supervisors would assign them down there --
24 wouldn't assign them down there.

150

1     Q  And you believe that the reason for that
2  is because they were white or Hispanic?
3     A  Yes.
4     Q  Okay, um.  Just to clarify:  Do you
5  contend that Hispanic is not a minority?
6     A  I agree; Hispanic is a minority, but
7  there's -- I agree that Hispanic is minority.
8     Q  Okay.
9     A  I'm not saying they're not.
10    Q  Okay, um.  And, again -- oh, sorry, did I
11 interrupt someone?
12       MS. KRAUCHUN:  No, no, that was me.
13 You're fine.
14 BY MR. LEINENWEBER:
15    Q  Okay, um.  Okay.  So these individuals,
16 though, you're saying were not assigned to TSS
17 because of their race.  And you and others,
18 African-Americans, were assigned to TSS by their
19 race, right?
20    A  The majority of the -- majority of the
21 investigators in TSS was African-Americans, yes.
22    Q  Okay.  How do you know -- let's take one
23 person, for example, okay?  Shedor, who made the
24 decision not to assign Shedor to TSS ever?

151

1        MS. KRAUCHUN:  Objection --
2        THE WITNESS:  Supervisor.
3        MS. KRAUCHUN:  -- foundation.
4  BY MR. LEINENWEBER:
5     Q  Okay, supervisors in general.  Um, do
6  you know specifically who made the decision that
7  Shedor was not going to work in TSS?
8     A  All I know is, the supervisors makes --
9  makes the assignments.
10    Q  Okay.  Do you know why the supervisors
11 decided that Shedor would not work in TSS?
12    A  I can't answer that question.
13       MS. KRAUCHUN:  Objection; foundation.
14 BY MR. LEINENWEBER:
15    Q  You can't answer that question.  Why?
16    A  Because I don't know the reason why they
17 did it; but I know it leads them to, that every
18 time, it was African-Americans only in TSS.
19    Q  Okay.
20    A  So I cannot lead to that point.
21    Q  Did any of the supervisors ever tell you
22 that they would only assign African-Americans to
23 TSS?
24    A  Of course, they would not say that.

152

1     Q  Okay.  Okay, um.  And did any of these
2  individuals ever tell you, like, Shedor, um, or
3  the other white individuals -- did they ever tell
4  you:  I don't have to work in TSS because I'm
5  white?
6     A  No.
7     Q  Okay.  So your belief that, um, white
8  people were not assigned to TSS is based on your
9  observation, right, that it seemed to you that
10 mostly African-Americans worked in TSS; is that
11 fair to say?
12    A  Correct.
13    Q  Okay.  Is there any other evidence that
14 leads you to believe, other than your observation,
15 that white people were not assigned to TSS, and
16 black people were assigned to TSS because of their
17 race?
18    A  Just look at the roster.
19    Q  Okay.
20    A  That's the best way I can answer that
21 question.
22    Q  Sure, okay.
23    A  Look at the roster.
24    Q  Okay.  So based on your review of the

Transcript of Cecil Williams
Conducted on July 14, 2020

153

1  roster, your observation when you were working
2  down there, it seems like, to you, only
3  African-Americans were assigned to work there?
4      A  Correct.
5      Q  Okay, um.  And, um -- so, you, for
6  instance -- you don't know if there was some
7  very good reason why Shedor or some of these
8  other white individuals were not assigned to TSS,
9  right?
10      MS. KRAUCHUN:  Objection; foundation;
11  calls for speculation.
12      THE WITNESS:  Could you ask that question
13  again.
14  BY MR. LEINENWEBER:
15      Q  Sure.  You don't know whether or not there
16  was some very good reason why someone like Shedor
17  or some of these other white investigators were
18  not assigned to TSS?
19      A  No, I don't know.  I can't answer that
20  question.  I don't know the answer to that
21  question.
22      Q  Okay.  Let's turn to, um, interrogatory
23  ten, which is on page six.  And if you could, take
24  a second to review that question and your

154

1  response.
2      A  Yes.  Go ahead.
3      Q  Okay, um.  So this question asked you
4  identify incidents where the defendants used, um,
5  offensive language, um.  Actually, let me stop
6  that for a second and let me go back to TSS for
7  one second for assignments.  Um, as far as you
8  know, is it possible that the people who are
9  assigned to work in TSS were just very good at
10  working in TSS?
11      A  No.
12      MS. KRAUCHUN:  Objection; foundation.
13      THE WITNESS:  I disagree with that.
14  BY MR. LEINENWEBER:
15      Q  You disagree with that?
16      A  I disagree with that.
17      Q  Okay.  But do you know if supervisors
18  thought that the people who were working in TSS
19  were good at working in TSS?
20      A  I disagree --
21      MS. KRAUCHUN:  Objection; foundation.
22      THE WITNESS:  -- with that.
23  BY MR. LEINENWEBER:
24      Q  I'm not asking if you agree or agree with

155

1  it.  I'm asking if you know.
2      A  No, no, no.
3      Q  So I need to ask the question again, so
4  we have a clear record, okay?  So do you know
5  whether or not supervisors thought that the people
6  that they assigned to work in TSS were good at
7  working in TSS?
8      A  No.
9      Q  Okay.  You don't know, right?
10      A  No.
11      Q  Okay, um.  Sorry, just one second.  I need
12  to capture my train of thought.  Okay.  Let's move
13  on to this one then.  Okay.  So you state here --
14  this question was asking you to identify instances
15  where the defendants used, um, sort of racially
16  charged language with you.  And we talked a little
17  bit -- we talked quite a bit about this, actually,
18  earlier this morning, um.
19      And the one incident you, um -- well,
20  there were a few incidents that you referenced.
21  One, you said that Shields never called you the
22  N-word, but you heard from Winston, um, that he
23  had used the N-word towards Winston, right?
24      A  Correct.

156

1      Q  Okay.  And you said that Ranzino did call
2  you the N-word?
3      A  Correct.
4      Q  Okay.  And also that he had said, "All you
5  people look alike"?
6      A  Correct.
7      Q  Okay.  Um, Neal, you had sort of indicated
8  that he is African-American; and that he had not
9  really used racist language with you, but kind of
10  used language to talk down to you.  Like, you
11  know, "You all are slow," or, "You're getting on
12  my nerve"?
13      A  Correct.
14      Q  Okay.  And Rohloff, you said he never used
15  the N-word with you, but that he had said "you
16  people"?
17      A  Correct.
18      Q  Okay, um.  Here you talk about a few
19  different incidents, um; some of which we've
20  talked about and some of which we haven't.  So
21  here, um, you say that, uh, Ranzino told McGhee
22  out loud in front of everyone at roll call that,
23  quote, "You people all look alike," right?
24      A  Correct.

Transcript of Cecil Williams
Conducted on July 14, 2020

157

1    Q  Okay.  And that's what we talked about
2  earlier this morning, is that incident, right?
3    A  Correct.
4    Q  Okay.  And then you say that "Plaintiff,"
5  uh, "further states that Ranzino pulled him aside
6  and threatened him and his job, and called him
7  the N-word (sic)," right?
8    A  That was me, correct.
9    Q  Yeah.  And we talked about that one
10  earlier today, too, right?
11    A  Correct.
12    Q  Okay, um.  And you state that after the
13  incident you immediately went to OPR to file a
14  report against Ranzino; is that right?
15    A  Correct.
16    Q  Okay.  And that Ranzino later told you
17  that you had no right to go to OPR, right?
18    A  Correct.
19    Q  And then he sent you and your partner to
20  the basement?
21    A  Correct.
22    Q  Okay.  And then it also says,
23  "Investigation continues" here, right?
24    A  Right, never -- never -- never received a

158

1  response because Ranzino is no longer employed
2  with the county.
3    Q  So when you say, "Investigation
4  continues," what are you referring to?
5    A  I never received a response of the final
6  decision of my complaint.
7    Q  Okay.  So you're not saying that you need
8  to do something else in order to be able to answer
9  this question?
10    A  No, it's nothing else I can do.
11    Q  Okay.
12    A  My -- the response comes from them.
13    Q  Okay.  So between the things we talked
14  about this morning regarding, uh, Shields,
15  Ranzino, Neal, and Rohloff; and the things that we
16  just referenced here in Response Ten, are there
17  any other, uh, incidents that you allege where
18  one of the defendants used, uh, this racist
19  language towards you?
20    A  Not to my knowledge at this time.
21    Q  Okay, um.  All right.  Let's talk about
22  question 12 on page seven.  Mr. Williams, this
23  question was asking you to identify all protected
24  activities you engaged in.  And we talked a little

159

1  bit about this, this morning as well; so meaning,
2  you know, any internal complaints or grievances
3  that you had, uh, referenced.  So here in this
4  one it says:  "Subject to and without waiving this
5  objection, see complaint."  Okay.
6        And that's actually the context in which
7  we talked about this before this morning was
8  regarding the paragraph in the complaint, um.
9  Just find it, if I can do that for a sec.  Looks
10  like it was -- let me just strike that and start
11  over because I'm not -- I do not see it.  Okay.
12        So interrogatory number 12 here it says,
13  "See complaint."  Uh, other than what we've talked
14  about, are there any other instances where you
15  engaged in protected activity by complaining to
16  somebody that, um, you were being discriminated
17  against, retaliated against, or, uh, harassed?
18    A  No.
19    Q  Okay.  And, um, question 13 asked you
20  identify every instance of retaliation that you
21  experienced related to, um, engaging in protected
22  activities; so what retal- -- how you were
23  retaliated against for complaining about
24  discrimination or harassment or retaliation, okay.

160

1  And your response to interrogatory 13 is, "See
2  complaint," right?
3    A  Correct.
4    Q  Okay.  Is there any other retaliation
5  that you allege was a result of you engaging in
6  protected activity, like, complaining about
7  discrimination or harassment or hostile work
8  environment?
9    A  No.
10    Q  Okay, um.  What retaliation do you allege
11  you experienced?
12    A  Well, difficult getting time off when
13  supervisors are supposed to give you time off, uh.
14  Continue to be put in high crime areas; placed
15  down in TSS; non-promotion.  If I tried to take
16  the test, I already knew that I wouldn't be -- I
17  wouldn't be promoted.
18    Q  Anything else?
19    A  That's it.
20    Q  Okay.  And then, um, interrogatory 14
21  asked you to identify adverse employment actions
22  that you suffered, um, as a result of this
23  retaliation.  So my question, I guess, is:
24  Other than having difficulty with time off

Transcript of Cecil Williams
Conducted on July 14, 2020

41 (161 to 164)

161

1 requests, being assigned to high crime areas,
2 being assigned to TSS, not receiving promotions,
3 um, and then --
4    **A Loss of income, I'm sorry. Go ahead.**
5    Q Yeah. What's -- what's the -- what do you
6 mean, loss of income? Is that related to the
7 discipline, the days off --
8    **A Yeah.**
9    Q -- you got?
10    **A Uh, when -- when I give up a day, it's**
11 **just, like, I go to work and I work for free.**
12 **If I give you a day, I work for free. I'm giving**
13 **you a holiday, and I still got to come to work.**
14 **I lost that holiday that I could have got paid**
15 **for longer down the line.**
16    Q Well, wouldn't it be more accurate to say,
17 though -- I mean, because you actually do get paid
18 for whatever you work, right? So you don't --
19    **A Uh-huh.**
20    Q -- actually go and do a day's work and
21 not get paid for it, right?
22    **A Correct.**
23    Q You -- you build up -- you accumulate, um,
24 compensatory days, whether they be sick days or

162

1 holiday days or --
2    **A Correct, correct.**
3    Q Uh, what's the word I'm looking for?
4 Vacation days?
5    **A Correct.**
6    Q And that's what gets docked, right?
7    **A Right, I lose that day. Let's say I want**
8 **a holiday tomorrow. I lost that holiday because**
9 **I had to pay for my -- for -- for a grievance or**
10 **time off.**
11    Q Right.
12    **A So if I come to work that day, I lose that**
13 **day because I gave up a day. So I'm giving you**
14 **two for one.**
15    Q Okay, um. Let's see. Um, okay.
16 Interrogatory 15, it asks you to identify what you
17 consider to be unsafe about your working
18 environment. And again you just say:
19 "See complaint." Um, when we looked at the
20 complaint's -- let's see where -- well, let me
21 just ask you. What -- what do you consider --
22 it just says, "See complaint," so, in the
23 complaint; is not exactly specified, but what --
24 what is unsafe about your work environment?

163

1    **A What's unsafe? When -- when a supervisor**
2 **will call and let an inmate know you're coming,**
3 **uh; when you doing a reincarceration, and you have**
4 **maybe one person doing it; two people locking up**
5 **one person; when certain investigators would get**
6 **three and four people that help them out. Uh,**
7 **like I say, back to, uh, certain people going**
8 **certain areas that they work in, and then certain**
9 **people will never see that area, uh. So basically**
10 **that's around the same discussion that we had**
11 **before, basically a high risk.**
12    Q Okay. And I guess -- I mean, one thing
13 I'm confused about is: I mean, you got to take
14 the detainees where they go, right?
15    **A Correct.**
16    Q Okay. So since a lot of these detainees
17 are -- well --
18    **A Uh, uh, uh, go ahead.**
19    Q Yeah, yeah. Let me just -- so you're
20 saying that patrol is dangerous and TSS is
21 dangerous?
22       MS. KRAUCHUN: I'm going to object;
23 mis- -- misstates testimony.
24 BY MR. LEINENWEBER:

164

1    Q I'm just trying to clarify. I mean,
2 are -- are you saying that TS -- you're saying
3 that TSS is dangerous, but it also sounds like
4 you're saying patrol is dangerous?
5    **A I'm not saying patrol is dangerous. What**
6 **I'm saying is: In certain areas of the county,**
7 **you -- you worry less in one area than you worry**
8 **in another area. If I'm in Englewood, I got to**
9 **worry about if a gun is coming across my head.**
10 **If I'm out in Palatine, I got to worry about what**
11 **I'm eating today.**
12    Q What is the comparative amount of
13 detainees who come or go, I guess I should say,
14 back to Palatine versus going back to Englewood?
15    **A Quite a few, quite a few.**
16       MS. KRAUCHUN: Object.
17 BY MR. LEINENWEBER:
18    Q What does that mean?
19       MS. KRAUCHUN: Objection; found- --
20 objection; foundation; go ahead.
21 BY MR. LEINENWEBER:
22    Q Yeah, we're -- we're all talking over each
23 other. So let's just make sure. Let me just --
24 let me just strike that and we'll just do it

Transcript of Cecil Williams
Conducted on July 14, 2020

42 (165 to 168)

---

165

1 again, so that Kelly's objection is clear and my
2 question is as well.
3      Um, do you have any sense of the amount of
4 detainees who come from an area like Palatine
5 versus who come from an area like Englewood?
6    **A  So with that answer being made is that**
7 **you're trying to say is:  Okay, most of the crimes**
8 **are committed in cities.  So most of people go to**
9 **the city.  That's true.  But the same people that**
10 **violate home -- home monitoring in the city is**
11 **the same type of people that violate home**
12 **monitoring in the suburbs.**
13     **So when you say the amount of people that**
14 **goes to one part of the city, and the amount of**
15 **people that goes to another part of the city as**
16 **being -- okay, you saying:  Well, the people in**
17 **the suburbs don't -- don't -- don't do no wrong,**
18 **but only the people in the city do wrong, which**
19 **is an incorrect answer.  So all of them commit a**
20 **crime once they get on house arrest.  All of them**
21 **violate house arrest.  So if --**
22    Q  Uh-huh.
23    **A  -- if -- if the majority of the time,**
24 **the only ones that -- the only time you send me**

---

166

1 **-- I mean, the only time that I am going out to a**
2 **suburb is to lock somebody up; or if I'm only --**
3 **the only time -- most of the time I'm in the city,**
4 **is the -- is the -- most of the crimes that's**
5 **done, when you got most of your white**
6 **investigators are out in suburbs doing the same**
7 **work I'm doing.  I got 28 years, but I got**
8 **somebody with four years on the job being in a**
9 **more secure area.**
10     **With my seniority, I should be out there**
11 **way being more safe than the one that's coming in**
12 **and most of them are the white investigators.**
13 **That's my opinion.**
14    Q  Do you think it makes sense to put new
15 investigators in the more dangerous area as
16 opposed to maybe the safer area?
17     MS. KRAUCHUN:  Objection; foundation; go
18 ahead.
19     THE WITNESS:  No, I don't.  No, I don't
20 because they have to earn exactly what I earn, the
21 right to work in certain areas.  If I've been on
22 the job 28 years, I should have the right to work
23 in a certain area than somebody that's just
24 starting and don't know the job.

---

167

1 BY MR. LEINENWEBER:
2    Q  Well, and you used to have that right,
3 right?
4    **A  Uh.**
5     MS. KRAUCHUN:  Objection.
6     THE WITNESS:  When I first came over
7 there -- when I first came over there, I worked
8 there.  I worked the hood.  I worked in the
9 neighborhoods where the crime was at.  When I
10 first came over there, I did that.  When the
11 projects was up, I did that.  Now, it's -- it's --
12 you know, the ones that's coming over here, white
13 officers, the first place they send them is out
14 in the suburbs.  They don't know nothing about
15 the area.
16     They can't even tell you how to get from
17 Lakeside to -- to -- to Walnut.  They can't tell
18 you because they don't work that area.  So if they
19 work that area, they know it.  I earn the right
20 for a simple reason; I got out there.  I was in
21 the neighborhood.  I wasn't in the suburbs.  I was
22 in the neighborhoods where the high crime is at.
23 That's where I always been.  That's where they
24 always put me.

---

168

1     That's where they always put the black
2 investigators, in -- in that neighborhood; and
3 send all the white investigators out to
4 Schaumburgs, out to Palatines, out to Mattesons.
5 They send them out there where the crime rates
6 are low.  And who -- who does that decisions?
7 It's your supervisors.
8 BY MR. LEINENWEBER:
9    Q  But you used to have the right to bid for
10 your assignments, right?
11    **A  When we first came over there --**
12     MS. KRAUCHUN:  I --
13     THE WITNESS:  -- yes.  We -- no, we didn't
14 bid for our assignments.  We bidded for, uh, three
15 things.  You bidded for TSS, which was deliveries
16 and TSS was together; and patrol.  That's what you
17 bid it for: deliveries, TSS and patrol, when I
18 first came over --
19 BY MR. LEINENWEBER:
20    Q  Right.
21    **A  -- there in 2005.  They deceased that to**
22 **a point where the supervisors take total control:**
23 **I put you where I want to put you at.**
24    Q  So I understand what you're saying; and

---

Transcript of Cecil Williams
Conducted on July 14, 2020

**169**

1  in some sense, I suppose, I sympathize with you.
2  You have 20-plus years on the job, and you want to
3  go to the safer areas, right?
4      **A  I can go with that, yes, not -- not all**
5  **the time, but I earn my right to be out there**
6  **to --**
7      Q  Sure.
8      **A  -- to, you know -- to have -- have it left**
9  **easier than somebody that come over here with five**
10 **years that don't know the job, have not earned the**
11 **right to do what I do.**
12     Q  I get it.  In -- in your mind it -- it
13 makes sense that:  Look, I earned my stripes, and
14 I should get to -- why am I getting the hardest
15 assignments, right?
16     **A  Correct.**
17     Q  Is there any policy you're aware of that,
18 um, requires supervisors to make assignments based
19 on seniority?
20     **A  No, that's -- but that's one we used to**
21 **have.  See, that's when they took it away.  They**
22 **took -- they took -- you bid in a position.  When**
23 **they took it away, now you no longer bid in that**
24 **position.  The supervisor had the authority to**

**170**

1  **put who they want where they want and how they do**
2  **it.  That's when they took that away.**
3      **That's when the supervisors are able to**
4  **move you around the way you want to move around.**
5  **And the majority of the supervisors, which is**
6  **Caucasians at the time -- excuse my French if I**
7  **pronounced that wrong.  I apologize, but the**
8  **majority of the supervisors are white.**
9      **And with that being said, majority of the**
10 **white supervisors send the majority of the white**
11 **officers out in the south suburbs or the north**
12 **suburbs or the Palatines, the Schaumburgs.  They**
13 **wouldn't be in the neighborhoods that I would be**
14 **in.**
15     Q  I mean, it must have been pretty
16 frustrating to have had the sort of right to have
17 seniority considered at one point and to no longer
18 have that?
19     MS. KRAUCHUN:  Objection.
20     MR. LEINENWEBER:  That's all right.
21 I'll strike that question.
22     Q  Let's talk about interrogatory 16, um.
23 This asked you to identify, uh, acts and omissions
24 that you allege resulted in you being treated

**171**

1  differently, um.  And you put:  "See complaint."
2  And then:  "Answering further, plaintiff states
3  that plaintiff would grant certain requests when asked
4  by white investigators and deny the same request
5  made by African-American investigators."  Uh.
6      **A  They --**
7      Q  Hang on one second.  I haven't asked a
8  question yet.
9      **A  Okay.**
10     Q  All right.  So my first question --
11     **A  I thought that was a question.**
12     Q  No, that's all right.  I just -- I want to
13 make sure we're on the same page and that we have
14 a clear record, so.  Um, so I just want to make
15 sure.  Other than the things we've talked about
16 and we're going to get to this sort of next
17 section about these requests, okay?  Other --
18 leaving the requests aside, we've talked about a
19 lot of different things that you allege were done
20 as a result of your race, right, assignments,
21 discipline, things of that nature.
22     Is there anything else you want to add to
23 that, um, uh, that type of treatment other than
24 the requests, which I want to ask about next?

**172**

1      **A  So your question is:  Is it -- what was**
2  **the request that I was denied?**
3      Q  It was a terrible question.  Let me --
4  let me -- let me just -- let me just do it that
5  way.  I think it would be easier to do that.  Um,
6  okay.  So you said that the chief would grant
7  requests when white investigators would ask, but
8  not when African-American investigators asked?
9      **A  True.**
10     Q  So --
11     **A  True.**
12     Q  Yeah, okay.  So let's -- let's talk about
13 that.  So, first of all, who is the chief you're
14 talking about?
15     **A  We're talking Ranzino.  We're talking,**
16 **uh, uh, Neal.  We're talking, uh — them was**
17 **basically my chiefs.  So everything -- Shields**
18 **was the director.  So Shields would be -- and**
19 **non-direct -- but those two right there.  And most**
20 **of the time, I had to go through Shields -- I mean**
21 **Ranzino to get things that I needed done.**
22     Q  What are the --
23     **A  And what I mean by "request" is, I'm going**
24 **to answer that question, and maybe I'm going a**

Transcript of Cecil Williams
Conducted on July 14, 2020

44 (173 to 176)

173

1  little bit too far.  Is that -- I'm going to go
2  back to seniority.  I got 28 years on the job.
3  At the time I'm not going to say I had -- let's
4  just say I had 20-plus years on the job.  I put
5  in for the day, the same time one of the white
6  investigators, which was one of their buddies,
7  put in.  I will get pushed to a side, and he got
8  less time than me; but he put in for the day of
9  the same day that I put it in.  I would be denied
10 and he got it.  That's what I mean by requests.
11     Q  So the request means time off here?
12     A  Yes.
13     Q  Okay.  So -- so you're requesting a day
14 off, and you're saying that some less senior white
15 investigators got priority over you?
16     A  Yes, correct.
17     Q  Okay.  Any -- any other types of requests
18 or just the time off really?
19     A  Uh, let me see, uh.  One time what -- what
20 -- I can't think of nothing right off right now.
21     Q  Okay.
22     A  But that was -- that was the majority of
23 my beef.
24     Q  And, um, this was through Ranzino or Neal

174

1  or both?
2     A  Majority Ranzino.
3     Q  Okay.  And, um, how often did this happen?
4     A  Often, I can't put no numbers on it.
5  I can just say: often.
6     Q  Okay.  And how would you be aware -- well,
7  let me strike that.  How do you submit a request
8  for time off?
9     A  Well, at the time we did -- we did it by
10 paper, and we would stamp it and turn it in.  And
11 let's say both of us stamped it at the same time.
12 Me, as being the highest seniority, I should have
13 the right to have that day before the one with
14 less seniority do.  But if your -- it was certain
15 people that would give a day off, and they would
16 extend the calendars some days just for that
17 officer to have it off.  But then some days, you
18 would not extend the calendar.
19     Q  When did --
20     A  So on certain people, they would do
21 certain things for, and then others, they -- they
22 would not.
23     Q  When, uh -- when are you talking about
24 here?  When -- give me a time frame for this.

175

1     A  I mean, we still talking majority of the
2  time between '13 and '16.
3     Q  And how would you be aware of a white
4  investigator had put in for the same day?
5     A  Because it would be put on the calendar;
6  we have a calendar that sit outside, what a
7  calendar on the day that you take off.
8     Q  So the calendar that says who's got the
9  day off?
10     A  Correct.
11     Q  Okay.  And -- and obviously you know the
12 names.  You know these individuals.  So you know
13 if someone is -- presumably know if someone is
14 white or not?  Uh.
15     A  Correct.
16     Q  So you would look at it, and then -- but
17 your contention is that these folks had less
18 seniority than you, and you should have gotten
19 the day off because you had more seniority?
20     A  Okay.  The process is, 61 days to do it.
21 And at the same time, we will do it at the same
22 time because you are stamping, and you know when
23 you did it.
24     Q  Well, I mean, if you're stamping a piece

176

1  of paper, isn't it -- it's basically -- is there
2  -- where -- where do you stamp it?  Is it, like --
3  like, a time slot where you slide a paper in and
4  it just stamps what time it was?
5     A  Yes.
6     Q  So you actually do the stamping?
7     A  Yes.
8     Q  Okay.  So, I mean, it's -- it's impossible
9  for two people then to submit at the exact same
10 time, right?
11     A  Well, yes, it's impossible.
12     Q  Okay.  So if -- but, say, you know, say
13 somebody beat you by one minute.  You're saying
14 that by seniority, you should have been able to
15 take priority over them if they were less --
16     A  Yes.
17     Q  -- senior?
18     A  Yes.
19        MS. KRAUCHUN:  (Inaudible.)
20        THE WITNESS:  If I'm putting --
21        THE REPORTER:  I'm sorry.  Was that
22 "objection"?
23        MS. KRAUCHUN:  Yeah, objection.
24        MR. LEINENWEBER:  Give your attorney a

Transcript of Cecil Williams
Conducted on July 14, 2020

45 (177 to 180)

177

1 chance to interject. Go ahead, Kelly.
2     MS. KRAUCHUN: It misstates testimony.
3 Go ahead.
4 BY MR. LEINENWEBER:
5    Q All right. Let's just -- let's just go
6 back and just real quick to clarify, but did
7 you -- you -- you physically stamped the paper,
8 right?
9    **A Correct.**
10   Q Okay. And we said that it's not possible
11 for two people to stamp the paper at the exact
12 same moment because that's just not the way these
13 stamp machines work, right?
14   **A Correct.**
15   Q So you're alleging, though, that because
16 you have more seniority, you should get the day
17 off over someone who requested the same day off
18 and has less seniority than you?
19   **A Correct.**
20   Q Even if -- even if they beat you to the
21 stamper?
22   **A But it's the same day, okay. Okay.**
23 **Correct.**
24   Q Okay, um. And these were mainly requests

178

1 made to Ranzino but some to Neal?
2   **A Correct.**
3   Q Okay. So my question is: How many times
4 were you not given the day off you wanted when a
5 white investigator got it?
6   **A Numerous of times.**
7   Q Can you give me an estimate.
8   **A I -- I -- I know I missed plenty of home**
9 **-- home gatherings. I mean, I can't get the**
10 **numbers together, but I know I missed plenty of**
11 **home gatherings.**
12   Q Well, is it more than 50 or less than 50?
13   **A Uh, I say less than 50, more than 30.**
14   Q Okay. So somewhere between 30 and 50
15 then, okay.
16   **A Uh-huh.**
17   Q Got it. Do you know why -- well, you
18 believe Ranzino made this decision because of
19 your race, these 30 to 50 times?
20   **A Yeah, I believe so.**
21   Q Okay. Ranzino or Neal, um; and, um, is
22 there a policy, um, or does the collective
23 bargaining agreement cover who gets the day off
24 when two people request the same day?

179

1   A Yes. Normally how it works is, if the
2 same people request the same day, the one with the
3 most seniority shall receive the day.
4   Q And where -- where is that from?
5   A That's -- that's in the, uh -- in the
6 collective bargaining union --
7   Q Okay.
8   A -- contract. That goes back to a point,
9 if -- if we go to being laid off, if two people
10 laid off at the same date, the one with the
11 highest seniority would stay. The other one would
12 leave.
13   Q Okay, um. What's the basis of your belief
14 that Ranzino made these decisions based on your
15 race?
16   **A He's a supervisor, and it's retaliation**
17 **when you don't do what he wants you to do.**
18   Q Okay, um. Same thing for Neal? Why --
19   **A Correct.**
20   Q -- what happens -- okay. Um, okay.
21 Let's go to, um, Exhibit 3.
22     TECH BROWN: Stand by.
23     (Exhibit 3 was marked for identification.)
24 BY MR. LEINENWEBER:

180

1   Q All right. Mr. Williams, we've handed
2 you what's been marked as Exhibit 3. This, uh --
3 the title of this document is Plaintiff Cecil
4 Williams' Objections and Answers to Defendant
5 Sheriff of Cook County, Thomas J. Dart's First Set
6 of Interrogatories.
7     MR. LEINENWEBER: Um, and then, Annie, if
8 we could turn to the last page, the verification
9 page?
10   Q Uh, Mr. Williams, can you just take a look
11 at this and confirm that this is your signature?
12   **A Correct.**
13   Q Okay. And it's dated March 12th of this
14 year?
15   **A Correct.**
16   Q And, again, this is verification that
17 what you were putting in this document, you're
18 declaring under penalty of perjury that it's true
19 and correct, right?
20   **A Correct.**
21   Q Um, let's go to interrogatory number
22 three. It's at the bottom of page two. Okay.
23 And here, um, Mr. Williams, I'm asking you to
24 provide a -- an account of the damages that

Transcript of Cecil Williams
Conducted on July 14, 2020

---

181

1  you claim you've suffered as a result of the
2  defendants in this case, um.  And your answer is
3  that, uh, you're seeking damages for lost wages,
4  opportunities, promotions, raises, benefits,
5  retirement income, litigation expenses, including
6  attorneys' fees, uh, and other compensatory and
7  punitive damages for humiliation, mental and
8  emotional anguish and distress; is that right?
9       That's what you're seeking in this
10 lawsuit?
11 **A  Correct.**
12   Q  Okay.  How do you calculate the amount of
13 lost wages attributable to defendants in this
14 case?
15 **A  I -- my -- my belief is any dollar loss**
16 **is a dollar.  I can't put a dollar sign on it.**
17 **I just say:  If I lost any money, it's because of**
18 **them that I lost it.**
19   Q  Okay.  So let's talk -- let's -- let's
20 just try and expand on that a little bit for lost
21 wages here.  What wages do you allege that you've
22 lost as a result of the defendants?
23 **A  When I have to use a day or two for a**
24 **suspension or something like that, that's when I**

182

1  **consider a loss of wages.**
2    Q  Okay.  So that's the days for the
3  suspensions, for the discipline we talked about,
4  right?
5  **A  Correct.**
6    Q  Okay.  Got it.  I'm with you.  Any other
7  types of wages you've lost, um, as a result of the
8  defendants?
9  **A  Uh, I guess calling off sick.  I mean, I**
10 **mean, no.  I mean, besides being -- uh, no, I**
11 **mean, loss of wages is loss of wages, I guess.**
12   Q  Um, what opportunities are you referring
13 to here?
14 **A  If I would have had opportunities that**
15 **I wasn't being put in a category as a messed-up**
16 **employee or a lazy employee or "this nigger don't**
17 **work right"; or if I wasn't put in that category,**
18 **I wouldn't -- every time a supervisor, somebody**
19 **new come over, the first thing they -- they --**
20 **they look at you and say, "Oh, I heard about you,"**
21 **you know; or they -- they wouldn't say it**
22 **directly, but they have you doing something that**
23 **you been normally doing, you know.  You're not --**
24 **you're not -- you're not getting an opportunity to**

183

1  **do nothing different because you been put in the**
2  **category.**
3    Q  So, um, can -- can you expand on that a
4  little bit because I'm just -- I mean, I
5  understand, you know, generally, I think, what
6  you're saying.  But what I'm not getting is:
7  Like, are there specific opportunities you're
8  talking about, you lost out on?
9  **A  Well, specific opportunities as far as**
10 **promotions.**
11   Q  Okay.
12 **A  If I'm put in a category -- if I'm put in**
13 **a category, that means I already got a stamp on**
14 **my head that there is no need.  That promotion is**
15 **not something that you would get.**
16   Q  Okay.
17 **A  That promotion is not something -- you're**
18 **not fit for that promotion.  So that's an**
19 **opportunity, is that promotion; you won't get**
20 **that.**
21   Q  Okay.
22 **A  Because of that reason because you put in**
23 **a category.**
24   Q  Okay.  So when you say "opportunity," it

184

1  sounds like to me, you're talking about
2  opportunities for advancement via promotion?
3  **A  Correct.**
4    Q  Okay, um.  And what promotions, um, are
5  you referring to that you missed out on as a
6  result of defendants' conduct?
7  **A  Uh, I missed out on being a supervisor or**
8  **I missed out on advancing in certain areas of the**
9  **program, of going to TSS or going -- I mean, not**
10 **TSS -- but going to fugitives.  I apologize, not**
11 **to TSS -- fugitives or a unit like that, going --**
12 **going to another unit when I was younger and**
13 **aggressive.**
14   Q  Fugitive unit, that's different, uh.
15 Is that part of EM?
16 **A  It was part of EM, but it was only by**
17 **people that they knew.  I mean, people that they**
18 **wanted to send over there.  So that's a whole**
19 **different conversation.**
20   Q  Are they investigators in fugitive?
21 **A  Yes, they are.  Yes, they are.**
22   Q  Is the rate of pay different for fugitive
23 unit investigators?
24 **A  Yes, it is.  Yes, it is.**

Transcript of Cecil Williams
Conducted on July 14, 2020

185

1    Q  Okay.  How so?

2    A  Uh, I think they probably make a dollar or
3 two more.

4    Q  They make a dollar or two more per hour?

5    A  Yes.

6    Q  You think?  Okay.  And what's that based
7 on?

8    A  Don't -- don't -- don't -- don't count,
9 calculate it, but I know they make more than us.

10   Q  Okay.  So you believe that they make more
11 than you?

12   A  Yes.

13   Q  They make more than you, is what you're
14 saying?

15   A  Uh-huh, uh-huh.  (Witness nods head.)

16   Q  And you said it used to be part of EM, but
17 it's not anymore?

18   A  Right.  At -- at the -- well, within the
19 last year, year-and-a-half, they disbanded it,
20 yes.

21   Q  Okay.  So who does that work?

22   A  They didn't disbanded it.  They just moved
23 it away from us.

24   Q  Oh, okay.  And, um, what's the process for

186

1 an EM investigator to get into the fugitive unit?

2    A  I like you.  You go (inaudible).

3      THE REPORTER:  I'm sorry.  Can you repeat,
4 please.

5      THE WITNESS:  There's no process.  It's --
6 it's -- they promote -- they promote who they want
7 to promote.  There is no due process.

8 BY MR. LEINENWEBER:

9    Q  Is it a promotion to go to the fugitive
10 unit or are they the same?

11   A  Any --

12   Q  Go ahead, sir.

13   A  Anytime -- anytime you can get a dollar
14 more is a promotion.

15   Q  Okay, um.  And do you know who made the
16 decision to put employees in the fugitive unit or
17 not?

18   A  Shields.

19   Q  Okay.  Anyone else?

20   A  Well, I guess Shields was the director of
21 the fugitive unit.

22   Q  Okay.  And how do you know that Shields
23 made the decision of who went to fugitive unit?

24   A  Because he had the final say of who goes

187

1 where.

2    Q  Okay, um.  Did, uh, you ever ask to go to
3 the fugitive unit?

4    A  I wouldn't ask because why would I ask for
5 something that I know you're not going to give me
6 because you done already put me in a category?

7    Q  Okay, um.  Any other promotions that you
8 believe you missed out on?

9    A  That's the only promotion over there, no.

10   Q  Okay, um.  What about raises?  Uh, what
11 raises did you miss out on as a result of
12 defendants' conduct?

13   A  That -- that goes back to promotion.
14 Promotions is raises.

15   Q  Yeah.  And I think, um, going back to
16 promotion for a second; I think you mentioned
17 supervisor.  You -- you were never --

18   A  Yeah.

19   Q  -- promoted to supervisor?

20   A  Right.  A supervisor did not have no test
21 to take.  A supervisor was promoted by Shields.

22   Q  Okay.  And, um, did supervisors make more
23 money than --

24   A  Yeah.

188

1    Q  -- investigators?

2    A  Yes, they make an hour more.

3    Q  One hour more per day, per week, per
4 month?

5    A  I think it's a day.  They make more.

6    Q  And Shields made the decision as to who
7 would be a supervisor and who wouldn't be?

8    A  Correct.

9    Q  And, uh, did you ever ask to be made into
10 a supervisor or same answer as the fugitive unit?

11   A  Same answer.

12   Q  Okay.  Any other promotions other than
13 supervisor and then the fugitive unit that we just
14 talked about?

15   A  No.

16   Q  Okay.  What about benefits?  What benefits
17 do you contend you lost out on because of
18 defendants' conduct in this lawsuit?

19   A  Back to promotion, back to opportunities;
20 all that is part of benefits and future retirement
21 because at the end of -- because by the end,
22 whatever you make the last four years is what you
23 get on your retirement.

24   Q  Okay.

Transcript of Cecil Williams
Conducted on July 14, 2020

48 (189 to 192)

---

189

1    A  So all that -- all that goes back to
2  opportunities and promotions.
3    Q  Okay.  So, um, for benefits and future
4  retirement income, you're talking about, uh, that
5  the benefits and future retirement income that
6  would have come with the supervisor or the
7  fugitive unit promotions that you missed out on?
8    A  Correct.
9    Q  Okay, um.  Litigation expenses, do you
10 have any litigation expenses related to this case?
11   A  I'm paying my attorney.
12   Q  Okay, um.  Are you paying by the hour?
13   A  Flat fee, how she charge, you know.  Her
14 fee is -- is her fee, I mean.  Do I have to tell
15 you?  I don't know, I mean, how to answer that
16 question right there because --
17   Q  Sure.
18   A  -- I'm telling --
19      MS. KRAUCHUN:  And I'm going --
20      THE WITNESS:  -- you her fee.
21      MS. KRAUCHUN:  -- to object that that's
22 privileged, so.
23      MR. LEINENWEBER:  Well, one, I don't think
24 it is privileged.  And, two, I -- Kelly, as you

---

190

1  know me, I certainly don't want to get into
2  anything that, um, you guys have disclosed to
3  each other.  And so I certainly want to respect
4  the attorney-client boundary.
5      I guess one question I would have, that
6  if, um, you would -- would allow it, because I
7  think this does goes to damages, is, you know,
8  whether or not Mr. Williams is paying out of
9  pocket for attorneys' fees, or if this is a
10 contingent case?
11      MS. KRAUCHUN:  It's a contingent case, to
12 answer that but --
13      MR. LEINENWEBER:  I mean, I'll accept
14 that.  I mean, I think that --
15      MS. KRAUCHUN:  Yeah.
16      MR. LEINENWEBER:  -- that's fine.
17   Q  Um, so, Mr. Williams, just back to you.
18      MR. LEINENWEBER:  And, Kelly, I'll just
19 give you a heads up.  I'm staying here for, like,
20 one more second.  So feel free to jump in, um.
21   Q  So, are you actually paying any, uh --
22 currently, like today, are you actually paying any
23 money to your attorneys, um, or do you have this
24 contingent fee arrangement?

---

191

1    A  I pay -- I paid a fee coming in --
2    Q  Okay.
3    A  -- if that's your question.  Did I pay
4  anything coming in?  Yes, I did pay something
5  coming in.
6    Q  Got it, okay.  All right.  That's fine.
7      MR. LEINENWEBER:  Kelly, I'm done with
8  that.
9      MS. KRAUCHUN:  Okay.  Perfect.
10 BY MR. LEINENWEBER:
11   Q  Okay.  Uh, Mr. Williams, then you also
12 talk about compensatory and punitive damages, um.
13 And those seem to be related to humiliation,
14 mental and emotional anguish and distress.
15 Um, how do you quantify the amount of damages
16 you have suffered as a result of mental, emotional
17 distress?
18   A  I -- I had -- had nervous pills.  I --
19 I -- I take, uh, pills for my nerves.  I had a
20 lung collapse; I -- I been in the hospital.
21 I've been stressed out coming home from work,
22 emotionally distracted, uh.  Emotionally, I mean,
23 leaving workdays so stressed out, I could kill
24 myself; but I would not do that.  Let's clear

---

192

1  that up.  But leaving some days so stressed out
2  from trying to do a job and being dehumanized from
3  doing what I do, and then being talked down and
4  being disgraded (phonetic) and just treating me
5  like I'm a piece of trash.
6    Q  Uh-huh.
7    A  So am I being -- was I being humiliated?
8  Yes, I was.
9    Q  Okay.  Well, I hear, um -- I hear what
10 you're saying.  And I'm -- I'm very sorry to hear
11 that you, um, are having these -- these -- these
12 feelings and this experience, um.  And, um, one
13 question I guess I'd like to clarify is -- if
14 that's all right -- is:  Do you allege that, um,
15 all of that is a result of defendants' conduct?
16 Um.
17   A  Yes.
18   Q  For example, let me just, um, clarify.
19 You said you had a lung collapse.  And I think
20 that was January of this year, um, according to
21 your answer here.  And, um, that sounds -- I mean,
22 frankly, that sounds terrifying, um, especially
23 given, you know, the pandemic we're in now.
24 Um, do you allege that the collapse of your lung

---

Transcript of Cecil Williams
Conducted on July 14, 2020

49 (193 to 196)

---

193

1 was somehow caused by defendants' behavior in this
2 lawsuit?
3     **A  Build-up of stress, yes.**
4     Q  Okay.
5     **A  Stress, yes.  Stress is a part of -- of,**
6 **uh, the heart and all of that.  That always is a**
7 **part of stress; yes, I think so.**
8     Q  Okay.
9         MR. LEINENWEBER:  Um, Kelly, I'm just
10 going to ask that, um -- I don't think any medical
11 records related to that have been produced, um.
12 So I'm going to ask that those be produced.  And
13 if you guys need us to, uh, prepare any kind of a
14 waiver for Mr. Williams to sign, we're happy to do
15 that, um, because if he is claiming that, for
16 example, his collapsed lung or any of his other
17 medical issues were, um, related to defendants'
18 conduct, we'd like to review those records.
19         MS. KRAUCHUN:  That's fine.
20 BY MR. LEINENWEBER:
21     Q  Okay, um.  And then, um -- okay.  Other
22 than those things that you had just enumerated,
23 um, are there any other types of, uh, emotional,
24 mental, um, anguish or distress that you're

---

194

1 seeking damages for?
2     **A  Stress.**
3     Q  Okay.  And the only physician you've seen
4 is, uh, Dr. Mohammed, your primary care physician?
5     **A  That's my primary doctor, but my lung**
6 **doctor was, uh, someone else.**
7     Q  Who was your lung doctor?
8     **A  Uh, his name is, uh -- ooh, I don't have**
9 **my paper in front of me, uh.**
10     Q  That's all right.  Let me ask you to --
11     **A  His name should be on -- his name should**
12 **be on the -- on the complaint.**
13     Q  I don't think it's on here, uh.
14     **A  Okay.  That's my primary doctor.**
15     Q  Oh, wait, wait.  Maybe it is.  Wait, yes,
16 it is.  Yes, it is.  I'm sorry.  You did put it,
17 um, yeah.
18         MR. LEINENWEBER:  And, uh, Annie, if you
19 could go down to the bottom of page four and the
20 top of page five?
21     Q  It looks like Dr. Francis J. Podrielski?
22     **A  Yeah, that's -- that's -- that's my lung**
23 **doctor.**
24     Q  Okay.

---

195

1         MR. LEINENWEBER:  So, um -- so, Kelly,
2 I guess we'd request then the records from
3 Dr. Mohammed and then Dr. Podrielski.  Um, is
4 that -- that, uh, clear, I guess, what we're
5 asking for?
6         MS. KRAUCHUN:  That's fine.  And we can
7 just circle back, um, in an e-mail.  So --
8         MR. LEINENWEBER:  Yeah, yeah.
9         MS. KRAUCHUN:  -- I have it in here after
10 we're done.
11         MR. LEINENWEBER:  Okay.
12     Q  And then, Mr. Williams, just to confirm:
13 Are there any other treating physicians or
14 therapists or psychiatrists or psychologists
15 that -- that have, uh, treated you for this --
16 this stress or any of these related, uh, injuries
17 or illnesses?
18     **A  Just my -- just my primary doctor and my**
19 **lung doctor.**
20     Q  Okay, understood.  And it looks like
21 you're on some anti-anxiety medication, um, and
22 then a few other things here, um, at the top of
23 page five.
24         MR. LEINENWEBER:  Annie, if you could

---

196

1 scroll down a little bit, yeah, right there.
2     Q  So it looks like Amlodipian (sic),
3 Metrolot (sic) Tartrate, Meloxicam and
4 Hydrocodone?
5     **A  Yes, that's the medication I have.**
6     Q  Okay.  And, um, which of these medications
7 are you, uh, taking, um, related to defendants'
8 conduct?
9     **A  All this -- all this medication is**
10 **medication I was taking as far as my lung**
11 **collapse.**
12     Q  Okay.  Prior to your lung collapse, were
13 you taking any medication?
14     **A  I -- I had some, um -- I was given**
15 **Tylenols for to calm down nerves --**
16     Q  Got you.
17     **A  -- and stuff like that, nerve pills to**
18 **calm down.**
19     Q  And who would have given you those nerve
20 pills?
21     **A  Uh, Dr. Mohammed.**
22     Q  Dr. Mohammed, okay.  So any medication
23 you received prior to the lung collapse would be
24 in Dr. Mohammed's records presumably?

---

Transcript of Cecil Williams
Conducted on July 14, 2020

197

1      A  Correct.

2      Q  Okay.

3      A  Correct.

4      Q  Did Dr. Mohammed or Dr. Podrielski or any

5   other physician or doctor tell you that any of

6   these medical issues were caused by defendants'

7   conduct?

8      A  They say stress can cause it if that's the

9   question.

10     Q  Okay.

11     A  Can stress cause the problem?  Yes, it

12  can.

13     Q  Okay.  But nothing, um, specifically

14  related -- you were not informed of any of these

15  issues, uh, being specifically caused by something

16  defendants did; is that correct?

17     A  I cannot answer that question.

18        MS. KRAUCHUN:  Objection; foundation.

19  BY MR. LEINENWEBER:

20     Q  Why can't you answer that question?

21     A  Because it's a medical question that I

22  cannot answer because I'm not a doctor.  All I

23  can say is:  They told me this is a part of

24  stress, and I got stress from work.

198

1      Q  Okay.  And that's all I'm trying to

2   clarify is -- is:  Did they tell you, this is

3   because this could be part of stress, or did they

4   say:  This is because, uh, Chief Ranzino said

5   something to you?  Is there a difference?

6      A  Of course, they're not -- of course -- of

7   course, they're not going to say it's directly

8   because it came straight out of his mouth, of

9   course not; but it comes from the buildup of the

10  stress of the job of dealing with Ranzino.  Yes,

11  I can put it that way.  But if it's coming

12  directly; of course, they're not going to say:

13  Well, Ranzino caused that.  No, they're not going

14  to say that.

15     Q  I -- I understand that, and -- and I hope

16  you'll excuse me for sometimes having to ask

17  questions that maybe seem silly; but it's really

18  just to try and get a clear record, um.  And so

19  let me just try and clarify.  What I think you're

20  saying is that Dr. Mohammed, Dr. Podrielski, said

21  that some of your issues were caused by stress?

22     A  Correct.

23     Q  Is that fair to say?

24        MS. KRAUCHUN:  I --

199

1         THE WITNESS:  Correct.

2   BY MR. LEINENWEBER:

3      Q  Okay.  Did they give you any more

4   specificity than that?

5         MS. KRAUCHUN:  Objection; asked and

6   answered; go ahead, Cecil.

7         THE WITNESS:  Are you saying:  Did they

8   give me any more details on it?

9   BY MR. LEINENWEBER:

10     Q  Any more specificity than stress could

11  have played a role in these illnesses?

12     A  I don't -- I can't answer that.  I don't

13  know.  I mean, they -- they -- I'm just going

14  by -- they gave me options of things that causes

15  this situation.

16     Q  Okay.  Were there other options they said

17  could have caused it?  Like, for example, did they

18  say to you at all that your lung collapse could

19  possibly be genetic?

20        MS. KRAUCHUN:  Objection.

21        THE WITNESS:  No.

22        MS. KRAUCHUN:  Calls for speculation.

23        THE WITNESS:  Answer?

24  BY MR. LEINENWEBER:

200

1      Q  I think you did.  You said "no."

2         THE WITNESS:  Kelly?  Kelly?

3         MS. KRAUCHUN:  Yeah, go ahead.  Sorry, go

4   ahead.  (Inaudible.)

5         THE WITNESS:  No.

6   BY MR. LEINENWEBER:

7      Q  I think, just to clarify:  Your answer is

8   "no," they didn't tell you that either -- any of

9   these issues could be genetic?

10     A  Correct.

11     Q  Okay, um.  Were you a smoker, by chance?

12     A  Yeah, I smoked.  I haven't smoked a

13  cigarette in five years, yes.

14     Q  Okay, uh.  How -- how long did you smoke

15  for, would you say?

16     A  Maybe 10 years, 10, 15 years, I smoked

17  beforehand.

18     Q  How many, uh, cigarettes a day?

19     A  Oh, wow.  It's been so long.  I don't even

20  remember.  Maybe I was smoking a lot.  Maybe I was

21  smoking less.  I'm not sure.  But the question is:

22  Was I a smoker?  Yes, I was a smoker.

23     Q  Okay, um.  Okay.  Give me just -- gather

24  my thoughts for a second and see, um.  Why did you

Transcript of Cecil Williams
Conducted on July 14, 2020

201

1  quit smoking?

2    **A   I got tired of the prices.**

3    Q   (Laughs.)  Cook County, huh?

4    **A   Yes, ten dollars for a pack of cigarettes.**

5    Q   Yeah, um.  Any other reason?

6    **A   Just -- just got tired of smoking.**

7    **Smoking wasn't -- it didn't -- it was nasty to me.**

8    Q   Did your doctor ever tell you to quit

9  smoking?

10    **A   Of course, the doctor always tell you to**

11  **quit smoking.**

12    Q   Yeah.  My brother is a doctor, and he

13  definitely has always said that, um.  Back to the,

14  um, expenses, um; I think you said that you paid a

15  legal fee to -- to come into the case, like, a

16  flat fee.  What was the amount of that fee?

17    THE WITNESS:  Kelly?

18    MS. KRAUCHUN:  That wasn't paid to me.

19  That was to a different attorney.  So that was --

20  I believe -- correct me if I'm wrong, when they

21  filed EEOC charges; but there's no flat fee from

22  our firm, to make that clear.

23    THE WITNESS:  Thank you.

24    MR. LEINENWEBER:  So I guess the only --

202

1  and, thank you, Kelly, for explaining that, um.

2  The only thing I'm confused about is:  I don't

3  think Mr. Williams filed an EEOC charge.

4    THE WITNESS:  Yes, I did.  I did file.

5  We did file an EEOC charge at the beginning.

6  We had an EEOC charge for, uh -- ooh, back in '15,

7  we filed the EEOC charge; me and investigator

8  Winston.  Um, I can't think of who else.  We filed

9  a total different EEOC charge on -- ooh, I

10  can't -- it's not clicking in my head exactly.

11    MR. LEINENWEBER:  Did you guys attach that

12  to the complaint, Kelly?  Maybe let's go off the

13  record for just a second, just to clarify, if

14  that's all right.

15    THE REPORTER:  Okay.

16    (Discussion off the record commencing at

17  2:06 p.m. and concluding at 2:08 p.m.)

18    MR. LEINENWEBER:  All right.  Okay.

19  So, Beth, we can go back on the record --

20    THE REPORTER:  Okay.

21    MR. LEINENWEBER:  -- whenever you're

22  ready.

23    THE REPORTER:  Sure, go ahead.

24  BY MR. LEINENWEBER:

203

1    Q   Okay.  So, Mr. Williams, um, we just had a

2  brief conversation off the record.  So I just kind

3  of want to just sort of note a few things for the

4  record, um.  Your attorney, uh, will probably be

5  able to kind of agree to these.  So I'm not

6  actually asking you a question just yet.

7    MR. LEINENWEBER:  Uh, so it sounds like

8  the witness, Mr. Williams, paid a flat fee to a

9  prior attorney that is not currently representing

10  him, does not have an appearance in this case; um,

11  related to some conduct at the sheriff's office,

12  um; and that, uh, it was not attached to the

13  complaint when, um, the Herbert Law Firm filed

14  the complaint because it was determined to be, um,

15  not timely with this complaint; is that correct,

16  Kelly?

17    MS. KRAUCHUN:  Yeah, that's correct.

18    MR. LEINENWEBER:  And if you want to

19  correct anything I said or add to it, um, I'd be

20  happy to allow you to do that.

21    MS. KRAUCHUN:  No, I think that's

22  reflective of our conversation and what -- and

23  what happened --

24    MR. LEINENWEBER:  Okay.

204

1    MS. KRAUCHUN:  -- or the circumstances,

2  yeah.

3    MR. LEINENWEBER:  Yeah.  And then the

4  only other thing I'd add to that, for the record,

5  is that, um, I -- I don't have any interest in

6  knowing what that fee paid to the prior attorney

7  was, or that arrangement with the prior attorney,

8  if the witness is not claiming that as part of the

9  damages in this case.

10    MS. KRAUCHUN:  And I think that's --

11  that's fair, that, um, given that it's separate

12  attorneys and representations that, uh, we

13  wouldn't be looking for that as damages.

14    MR. LEINENWEBER:  Okay.  And if that

15  changes at some point, you'll let us -- or if

16  that understanding was for some reason incorrect,

17  you'll let us know.  And we would just reserve

18  the right to, you know, briefly follow up on those

19  issues with Mr. Williams.

20    MS. KRAUCHUN:  Perfect.

21    MR. LEINENWEBER:  And then --

22    MS. KRAUCHUN:  Agreed.

23    MR. LEINENWEBER:  Thank you.  And then the

24  only other thing I'll add is that we would just

Transcript of Cecil Williams
Conducted on July 14, 2020

52 (205 to 208)

205

1  request if you do have a copy -- either you or
2  the witness have a copy of the -- I think he or
3  you had said 2015 -- charge filed with the EEOC,
4  we'd like to see a copy of that.
5      MS. KRAUCHUN:  Agreed, we'll get that to
6  you if we have one, yeah.
7      MR. LEINENWEBER:  All right.  Thanks very
8  much, Kelly.
9      Q  And, uh, thanks for your patience there,
10 Mr. Williams; just some legal stuff we need to,
11 um, have on the record.
12     MR. LEINENWEBER:  So, um, we can go back,
13 uh, Annie, if you could pull up that same exhibit,
14 uh, that same page, and just kind of scroll down
15 to question nine.
16     Q  Um, I just want to confirm a little info
17 here, Mr. Williams.
18     MR. LEINENWEBER:  Yeah, just scroll down a
19 little bit here, um.
20     Q  You see, there is an e-mail address that
21 you had listed here, cmo196487@gmail.com?
22     **A  Correct.**
23     Q  That's your, uh, e-mail address, your
24 personal e-mail address?

206

1      **A  Yeah, that's my personal.**
2      Q  Okay.  Do you have any other personal
3  e-mail addresses?
4      **A  Yes.**
5      Q  Okay.  What other ones do you have?
6      **A  I have the same index with the yahoo.com.**
7      Q  Okay.  Any others?
8      **A  No.**
9      Q  Okay, um.  Did you look in either of those
10 e-mail accounts for documents that would be what
11 we had asked for, documents we asked for?
12     **A  Any documents that you guys sent me or my**
13 **attorney?**
14     Q  Not that we sent you; and, again, just to
15 clarify, I'm not interested and I'm not talking
16 about correspondence that you would have with
17 your attorney, with Kelly, at all.  Um, what I'm
18 curious about is if you looked in these accounts
19 to see if you had any, uh, e-mails to anyone other
20 than your attorneys about the case?
21     **A  No.**
22     Q  No, you didn't look, or, no, you don't
23 have those?
24     **A  No, I don't have anything from nobody**

207

1      **about my case at all.**
2      Q  Okay.  So you have not received any
3  e-mails from anybody other than your attorneys
4  about the lawsuit or the allegations in the
5  lawsuit, right?
6      **A  No.**
7      Q  Okay.
8      **A  No.**
9      Q  And you've never sent any e-mails to
10 anybody other than your attorneys about the
11 lawsuit or the allegations in the lawsuit?
12     **A  Correct.**
13     Q  Okay, great, um.  And that goes for both
14 the Gmail account and the Yahoo account?
15     **A  Correct.**
16     Q  Okay, uh.  What about the cell phone
17 number here?  Is this your cell phone?
18     **A  Correct.**
19     Q  And, um, do you send text messages ever?
20     **A  Uh, to whom?**
21     Q  Anyone; some people don't text.  I'm just
22 wondering:  Are you a texter?  Do you text?
23     **A  Do I text?  Yeah, I text sometimes.**
24     Q  Okay.  And have you had any texts with any

208

1  of the other plaintiffs in this case?
2      **A  No.**
3      Q  Okay.  So none of the other -- you have
4  not had any texts with any of the other plaintiffs
5  in this case?
6      **A  No.**
7      Q  Okay.  What about any of the defendants?
8  Did you ever text any of the supervisors at all?
9      **A  No.**
10     Q  Okay, um.  And I'm talking regardless of
11 subject here.  I'm not talking about just
12 related --
13     **A  Not to my knowledge have I ever texted any**
14 **of the supervisors concerning anything outside the**
15 **county.**
16     Q  Okay.  And what about, uh, the other
17 plaintiffs?  Have you texted with any of the other
18 plaintiffs about anything ever?
19     **A  Anything ever?  When you say "ever," I**
20 **mean, you know.  Of course, we might text**
21 **each other as coworkers.**
22     Q  Okay.
23     **A  But as far as texting, as far as our --**
24 **our -- our, uh, complaint here, no; we work**

Transcript of Cecil Williams
Conducted on July 14, 2020

53 (209 to 212)

209

1 together.
2    Q  Okay.  So you say that you may have texted
3 with some of the other plaintiffs, uh?
4    **A  I never said I texted with the plaintiffs**
5 **about anything about our job -- I mean, about**
6 **the -- I never said that I texted them about**
7 **anything about the case.  Never did I say that.**
8    Q  I'm -- I'm not saying that you did.  You,
9 uh, interrupted me while I was, uh -- before I
10 could finish.  What I was going to say --
11    **A  I apologize.**
12    Q  That's all right.  It happens.  I've done
13 it to you.  You've done it to me.  It happens.
14 It happens all the time, um.  And, uh, you have
15 sent -- you have, in some capacity, sent texts to
16 the other -- some of the other plaintiffs?
17    **A  Can I ask you a question when you ask that**
18 **question?**
19    Q  Of course, yes.
20    **A  Is -- is -- is that concerning the case or**
21 **is that personal?**
22    Q  Yeah, I'm just trying to kind of start
23 just with the general proposition, the general
24 question of whether, regardless of the subject

210

1 matter, even if it was, like:  Hey, I saw a blue
2 cat on the street today.  Have you ever sent a
3 text message to any of the other plaintiffs?
4    **A  I'm going to ask my attorney for a side**
5 **bar.**
6    Q  That's fine.  I don't have a problem with
7 that.
8       MS. KRAUCHUN:  Okay.  We'll go into a
9 breakout room real quick.
10       MR. LEINENWEBER:  Yeah, that's -- that's
11 fine.  Go ahead.  I'm not trying to be difficult
12 with this.  I just want to, you know, get an
13 understanding --
14       MS. KRAUCHUN:  Yeah.
15       MR. LEINENWEBER:  -- of what kind of text
16 messages are going on.
17       (A brief recess was taken off commencing
18 at 2:15 p.m. and concluding at 2:18 p.m.)
19       MR. LEINENWEBER:  All right.  Then, Beth
20 and Annie, whenever you guys are ready, just give
21 me the green light.
22       THE REPORTER:  Uh, I'm ready.
23       TECH BROWN:  I'm ready.
24 BY MR. LEINENWEBER:

211

1    Q  Okay, um.  Mr. Williams, we're back on
2 the record.  Uh, you've had a brief time to, um,
3 consult with your attorney, um.  Is there any
4 testimony that you need to change, uh, at this
5 time?
6    **A  The question you asked:  Have I ever**
7 **texted, uh, any of my employees -- I mean, anybody**
8 **on the case?  I would say, yes, we are buddies.**
9 **We hang out together.  We're friends.  We, you**
10 **know -- one of the guys, me and him went to high**
11 **school together.  Me and Winston are partners.**
12 **Hey, Merry Christmas, Happy New Year's, how is**
13 **your day?  How is your wife?  How is your kids?**
14 **Yes.**
15    Q  Okay.  And, um, if I understand your
16 testimony, it's -- you guys have not, uh -- well,
17 let me strike that.  Did you look through the text
18 messages that you have with Mr. Winston or any
19 of the other plaintiffs, to see if you have any
20 texts or have sent or received, uh, related to the
21 allegations in the lawsuit?
22    **A  No, we have not discussed the (inaudible)**
23 **of the texts.  We talk -- we might talk.  Me --**
24 **well, all of us are plaintiffs together, you know.**

212

1 Is it illegal for -- no.
2    Q  Okay.  So let me just clarify my --
3    **A  Is that --**
4       THE WITNESS:  Kelly?
5       MS. KRAUCHUN:  Yeah, just answer Justin's
6 question directly.
7 BY MR. LEINENWEBER:
8    Q  Yeah, just -- just listen.
9       MS. KRAUCHUN:  Yeah.
10 BY MR. LEINENWEBER:
11    Q  Yeah, you're expanding a little bit.
12 And just let me --
13    **A  No.**
14    Q  -- let me ask the question again.  Did you
15 look through the text messages that you have?  You
16 know, like, if you have an iPhone, you can scroll
17 through the text messages.  Did you look through
18 those text messages you have with Mr. Winston or
19 any of the other plaintiffs to check and see if
20 you guys had exchanged any text messages that
21 discuss anything related to the allegations in the
22 complaint?
23    **A  No, we had not.**
24    Q  That's -- again, though, that's not my

Transcript of Cecil Williams
Conducted on July 14, 2020

54 (213 to 216)

213

1  question.  My question is: Did you actually look?
2  Have you --
3      A  Yes.
4      Q  -- gone, since you filed this lawsuit, and
5  looked through the text messages to see if there
6  is anything related to the complaint?
7      A  No, there is nothing in there related to
8  the complaint.
9      Q  And you've checked, is what you're saying?
10     A  Yes.
11     Q  Okay.  That's all I'm asking you to
12 confirm, is that you have gone and looked through
13 those text messages to confirm that?
14     A  Yes.
15     Q  Okay.  So you've done that?
16     A  Yes.
17     Q  Okay, um.  It sounded like you were saying
18 that you may have had some conversations with the
19 other plaintiffs about the lawsuit?
20     A  Yes, that's us as a group, yes.
21     Q  Okay.  And, uh, I'm not trying to get at
22 anything you were discussing with, uh, your
23 attorneys, um.  Is there anything, uh -- given
24 that directive, you know, that -- that I'm not

214

1  looking for things that you guys all, for example,
2  were talking to your attorney at the same time.
3  Is there anything that you have talked about with
4  any of the other plaintiffs related to the
5  lawsuit?
6      A  No, not as far as, no, no, because I'm not
7  understanding the question really.  I'm asking --
8  answering your question like this here: Have we
9  talked about the lawsuit, the group of us?  Yes.
10 Have we all got together and talked about it?
11 Yes, if that's the answer to the question, yes.
12     Q  Okay.  And, um, was that in the presence
13 of either your current attorneys or your prior
14 attorneys?
15     A  Among us.
16     Q  Okay.  When, um -- were these
17 conversations in person or over the phone or
18 Zoom or -- or what?
19     A  They're mostly -- most of the time in
20 person.
21     Q  Okay, um.  Where would those conversations
22 be held?
23     A  After work or when we just talk about it.
24     Q  Okay, um.  And after work, like, in the

215

1  office or in the parking lot on the way to the
2  car?
3      A  Off of county property.
4      Q  Okay, um.  Would you guys meet at, like,
5  a restaurant or a bar or someone's house or
6  anything?
7      A  I mean, we all friends.  So we might hang
8  out.
9      Q  Okay, uh.  And about how many times would
10 you say you guys have met to discuss the lawsuit?
11     A  We -- we don't discuss it.  Like, I mean,
12 we haven't met to discuss the conversation like
13 that.  Maybe, you know, if we talking, we just
14 talking about a (inaudible), a question that might
15 be asked here or a question might be asked there,
16 like that.  He might -- I might ask him a
17 question.  He might ask me a question, something
18 like that.  That's about it.
19     Q  When was the last time you had one of
20 these, um, meetings where you guys discussed, um,
21 something related to the lawsuit?
22     MS. KRAUCHUN: I'm going to object as
23 mischaracterizes his testimony.  I don't think he
24 testified that they had meetings, but go ahead,

216

1  Cecil.
2      THE WITNESS:  I mean, we never had no
3  meetings.  We might, uh -- months ago, before
4  everything -- I mean, of course, see, that's --
5  see, that's the confusing of the questioning
6  because we talk.  And, of course, it's all -- if
7  all of us involved in the same case, and we all
8  are on the same case, we talk about the case.
9  BY MR. LEINENWEBER:
10     Q  Okay.  And, um -- and, again, I'm not --
11 you know, what you guys discuss with your
12 attorneys and what your attorneys discuss with
13 you, I'm not interested in, um.  What I am
14 wondering is if you can pin down a little bit
15 better the last time you guys had, um, a chance to
16 discuss the allegations in the lawsuit in person?
17     A  We work together every day.  So we talk
18 every day.  The subject -- things comes up in
19 brief conversations of -- a conversation come up
20 among us every day.  We work together every day.
21     Q  Okay.  So, I mean, it sounds like what
22 you're saying is that somewhat frequently you talk
23 to the other plaintiffs because you guys are
24 coworkers; is that fair to say?

Transcript of Cecil Williams
Conducted on July 14, 2020

217

1    A  Correct, correct.

2    Q  And some of those conversations concern

3  allegations related to the lawsuit?

4    A  Correct.

5    Q  Okay, uh.  Did you guys, uh -- and

6  woman -- there is one woman in the case, um.

7  Did you have any conversations about what each of

8  you should say regarding any of the --

9    A  No.

10    Q  -- issues in the case?

11    A  No, no.

12    Q  Okay.

13    A  Everybody is telling their -- their

14  personal opinion, no.

15    Q  Okay, uh.  Did you guys take the

16  opportunity at all to tell each other what

17  experiences you guys have had?

18    A  No.  Have we talked to each other about

19  the experience?  Yes.  Have we -- have we, uh,

20  seen it direct?  Yes.

21    Q  Um, all right.  Let me ask you, um:

22  Do you have any social media accounts?

23    A  I -- I -- I have a Facebook account, a

24  family Facebook account.  I know I said I didn't,

218

1  but I do.

2    Q  Okay.  And you said it's a family Facebook

3  account.  What is that?

4    A  Yes, it's a family -- it's my family.

5  It's my family, uh, high school, uh, Teamsters and

6  that type of thing.  I did say I didn't have it,

7  but I do have it.

8    Q  Okay.  Is there any reason that you didn't

9  say that you have it?

10    A  It slipped my mind.  It --

11    Q  Okay.

12    A  -- slipped my mind about, uh, uh, Facebook

13  and all that stuff.  I didn't -- you know, like,

14  yeah, I got a family one.

15    Q  Okay.

16    A  You know, I keep up with the family stuff

17  and like that.

18    Q  Okay, sure.  Did you ever use the

19  Facebook, uh, to post anything about the Cook

20  County Sheriff's Office?

21    A  Never.

22    Q  And I'm not just talking about the

23  lawsuit.  I'm just talking about the Cook County's

24  Sheriff's Office in general.

219

1    A  Never, never, never, never.

2    Q  And you've never posted anything about

3  this lawsuit then, right?

4    A  Never.

5    Q  Okay.  Have you used the Facebook

6  messenger function ever?

7    A  With family, yes.

8    Q  Okay.  What about, uh, to discuss, uh,

9  anything related to the lawsuit or your damages?

10    A  No, no.

11    Q  Okay.

12    A  Nothing I discussed is on Facebook

13  about -- with Facebook, family, no, never, never.

14    Q  I'm curious.  When did you first learn

15  about the potential of getting together with, um,

16  the rest of the plaintiffs for a lawsuit?

17    A  We all start complaining back in '14, '15,

18  when the case started because all of us had

19  complaints.  And all of us was not getting --

20  getting -- so I want to say '14, '15, around '13,

21  '14, around that time.

22    Q  Okay, um.  And, um, did you approach

23  someone?  Did someone approach you with the idea

24  of -- of elevating it to a lawsuit?

220

1    A  We all had a discussion.  So it wasn't

2  no in direct, one person.  We all had a

3  discussion.

4    Q  Okay.  Where was that discussion held?

5    A  Off of county property.

6    Q  Do you remember where?

7    A  No, I don't remember exactly where.

8    Q  Okay, um.  And what, uh -- all the

9  plaintiffs were there?

10    A  Yes.

11    Q  Um, and I assume that Anthony Manning was

12  not there?

13    A  I'm not sure.  I don't remember.

14    Q  Okay.

15    A  I don't recall.

16    Q  Do you know who Anthony Manning is?

17    A  Yes, I know exactly who Anthony Manning

18  is.

19    MR. LEINENWEBER:  Oh, am I thinking of the

20  wrong person, Kelly?

21    MS. KRAUCHUN:  He's the one that's

22  dismissed.  We're going to dismiss out Anthony

23  Manning.

24    MR. LEINENWEBER:  Okay.  I'll get to it in

Transcript of Cecil Williams
Conducted on July 14, 2020

56 (221 to 224)

221

1 a minute, but if I have any follow-up, but --
2     Q  Um, so whose idea was it to file the
3 lawsuit?
4     **A  Like I said, it was everyone's.  Everybody**
5 **came together as one.**
6     Q  Okay, um.
7     **A  So it wasn't no direct person.**
8     Q  Okay.  And was it any kind of a vote or
9 was it just, everybody already wanted to do the
10 lawsuit?
11    **A  We all just got together and made a**
12 **decision.**
13    Q  Um, who found the attorney?
14    **A  Uh, you know what?  That's a good**
15 **question.  I think Winston found the attorney.**
16 **That's a good question.**
17    Q  And is that the prior attorney or is that,
18 uh, Kelly's firm, the Herbert Law Firm?
19    **A  The Herbert Law Firm.**
20    Q  Okay.  Okay, um.  Okay.  Let me ask you,
21 um.
22         MR. LEINENWEBER:  Interrogatory 12, if we
23 could pull that one back up, Annie?
24         TECH BROWN:  Stand by.

222

1         MR. LEINENWEBER:  Perfect, thanks.
2     Q  Um, Mr. Williams, this interrogatory asks
3 you to -- you know, one of your claims is that
4 the -- the Cook County Sheriff's Office fails to
5 adequately discipline, supervise and control the
6 supervisors, um.  And what I'd like to know is:
7 Other than the, uh -- well, give me one sec.
8 Do you need a break for a sec?
9     **A  Yes, one minute, please.**
10    Q  Yeah, that's no problem.  Uh, do you want
11 five minutes or how much time do you need?
12    **A  Just give me -- give me five minutes.**
13    Q  Okay.
14         MS. KRAUCHUN:  Yeah, we'll take five
15 minutes.
16         MR. LEINENWEBER:  Okay.
17         MS. KRAUCHUN:  And then I can address
18 something here.  Thanks.
19         MR. LEINENWEBER:  Okay.  Can you --
20 Ethan, can we go into the breakout?
21         (A brief recess was taken commencing at
22 2:31 p.m. and concluding at 2:39 p.m.)
23         MR. LEINENWEBER:  Okay.  I'm ready to go
24 back on the record whenever, um, everybody else

223

1 is.
2         MS. KRAUCHUN:  I'm good.
3         TECH BROWN:  I'm good.
4         MR. LEINENWEBER:  Okay.
5         THE WITNESS:  Good.
6 BY MR. LEINENWEBER:
7     Q  Um, all right.  Mr. Williams, uh, we took
8 a short break here, um.  Do you understand that
9 you're still under oath?
10    **A  Yes.**
11    Q  Okay.  And I know it seems as though, uh,
12 another person came to your residence, um.
13 Just to clarify:  That person is not, uh, going
14 to be assisting you with your testimony?
15    **A  No, no, I changed rooms.  I relocated.**
16 **See, look at the back there.**
17    Q  It's -- it's different; I can tell, yeah,
18 so.  Okay, no problem.  Thank you for, um -- for
19 that.  And let's see if we can sort of streamline
20 things, and get this wrapped up in a short amount
21 of time as possible.  Um, okay.
22         Any other -- when we took a break we were
23 talking about interrogatory 12, um, of Exhibit 3.
24         MR. LEINENWEBER:  If -- Annie, if you

224

1 could just pull that back up.
2     Q  And, um, okay.  And, Mr. Williams, it
3 says here that, um, you contend that supervisors
4 in the EM unit arbitrarily issued discipline to
5 African-American investigators like yourself,
6 um, and were not held accountable for issuing
7 erroneous discipline after grievances were filed.
8 Is that, um -- do you see that language there?
9     **A  Yes.**
10    Q  Okay, um.  Are you talking about any
11 incidents other than the discipline that we've
12 discussed today?
13    **A  Only that discipline, correct.**
14    Q  Okay, um.  Let's go to 13 there at the
15 bottom.  And this is misconduct by supervisory
16 officers, um.  And then the response is at the top
17 of page seven.  And here, uh, Mr. Williams, you
18 had said:  "See complaint."  Um, and so my
19 question is:  Other than the allegations you've
20 made about assignments, um, discipline, um --
21 what's the word I'm looking for -- high crime
22 areas, um, and the requests of days off, is there
23 any other misconduct that you're alleging that
24 supervisors engaged in related to this lawsuit?

Transcript of Cecil Williams
Conducted on July 14, 2020

57 (225 to 228)

225

1    A  No.
2    Q  Okay.  And number 14, um, oh, wait.  What
3  is 14?  Okay, yeah.  Uh, this is -- you're saying
4  that Ranzino, Shields, Neal and Rohloff were unfit
5  for supervisory positions, um.  And your response
6  says: "See complaint."  Any other allegations
7  you're making against these, uh, four defendants
8  other than what we've talked about so far today?
9    A  No.
10    Q  Okay.  And then let's see.
11      MR. LEINENWEBER:  Let's go to number 20.
12  Actually, can we go back up to 17 for a second?
13  Thanks.
14      (Whereupon, there was a cell phone
15  interruption.)
16      THE WITNESS:  Go ahead.
17  BY MR. LEINENWEBER:
18    Q  Yeah.  All right.  Uh, question 17 asked
19  if you had any conversations with anyone about the
20  matters referenced in the complaint, um.  Your
21  response here is: "No, investigation continues,
22  and plaintiff reserves the right to supplement
23  this response."
24    Uh, given what we talked about shortly

226

1  before our break, um, do you, uh -- you want to
2  add anything to this interrogatory response here?
3    A  No.
4    Q  Okay.  So, um, I mean, do you have an
5  understanding that the gathering or -- meeting
6  is, you know, maybe a formal term; but the
7  gathering of you and the other plaintiffs to
8  discuss the details of the lawsuit and the effort
9  to file a lawsuit would be something that should
10  be disclosed in response to this question?
11    A  Yes.  Well, I can add that we did have a
12  conversation at the beginning of it, if that's --
13    Q  Okay.
14    A  -- if that's the question, yes.
15    Q  Uh, Mr. Williams, can I ask you -- is it
16  possible for you to tip the -- yeah, just kind of
17  refocus the camera because we're only getting your
18  nose down, I think.
19    A  Are you getting me now?
20    Q  There, yes, I think better.
21      MR. LEINENWEBER:  Annie, is that good with
22  you?
23      TECH BROWN:  Um, if it would be possible
24  to tip it back even just a tiny bit more, or have

227

1  you scooch a little bit away, that would be great.
2  But, uh, if you're limited by where you're
3  sitting -- oh, that's perfect.  Thank you.
4  BY MR. LEINENWEBER:
5    Q  Um, okay.  So you mentioned, um -- I think
6  you characterized it at the beginning, a meeting
7  or a gathering at the beginning.  Is that -- that
8  what you just said?
9    A  Yes, we all talked about it, correct.
10    Q  Okay, um.  And, um --
11    A  (Inaudible.)
12    Q  -- you have --
13      (Whereupon, there was a cell phone
14  interruption.)
15  BY MR. LEINENWEBER:
16    Q  Go ahead.
17      (Discussion off the record commencing at
18  2:45 p.m. and concluding at 2:45 p.m.)
19      THE WITNESS:  Okay.  Go ahead.
20  BY MR. LEINENWEBER:
21    Q  Okay, um.  Do you have an approximation of
22  when that conversation occurred?
23    A  I don't know the exact date honestly.
24    Q  Okay, um.  And you don't recall where that

228

1  conversation occurred?
2    A  No, I don't remember.
3    Q  Okay, um.  You believe that the rest of
4  the plaintiffs were present for that conversation?
5    A  The majority of the complainants that's on
6  there, yes.
7    Q  Okay.  And this was an oral conversation
8  because it was in person, right?
9    A  Correct.
10    Q  Did anybody make any kind of recording or
11  memorialization of that conversation?
12    A  No.
13    Q  Okay, um.  And the things you discussed
14  were the allegations of the lawsuit.  Is that fair
15  to say?
16    A  You can say that, correct.
17    Q  Okay.  And, um -- and, also, the decision
18  to move forward with the lawsuit?
19    A  Correct.
20    Q  Okay.  Anything else that you guys talked
21  about related to the lawsuit?
22    A  That's about it.  That's it.
23    Q  Okay.  About how long was the
24  conversation?

Transcript of Cecil Williams
Conducted on July 14, 2020

58 (229 to 232)

229

1    A  I can't recall.
2    Q  Okay, um.  Okay.  And then let's go down
3  to 20.  This question here asked you to identify
4  civil litigation, civil actions that you'd been
5  involved in, um, at any time.  And you identified
6  a divorce proceeding in Cook County, right?
7    A  Correct.
8    Q  Okay.  Are there any other lawsuits that
9  you have brought, um, against, uh -- or strike
10 that.  Are there any other lawsuits in which
11 you've either been a plaintiff or a defendant?
12   A  No.
13   Q  Um, and other than the charge of
14 discrimination, um, that we discussed a
15 little bit ago that you filed with the previous
16 attorney, have you filed any other charges of
17 discrimination?
18   A  No.
19   Q  Okay.  Have you ever filed something with
20 the Illinois Human Rights, um, uh, Commission?
21   A  No.
22   Q  Okay, um.  And have you only filed the
23 one charge with the Equal Employment Opportunity
24 Commission?

230

1    A  Yes.
2    Q  Okay.  Um, is it possible that, like, back
3  in 2008, you filed something with the Human
4  Rights, uh, Department?
5    A  No.  2008?  Not to my knowledge, I don't
6  remember.
7    Q  Okay, um.  Have you ever filed for
8  bankruptcy?
9    A  Yes.
10   Q  When did you file for bankruptcy?
11   A  2005.
12   Q  Okay.
13   A  Was during my divorce time, yes.
14   Q  Okay.  How many times have you filed for
15 bankruptcy?
16   A  Maybe once or twi- -- maybe twice.
17   Q  Okay, um.  And, uh, when -- when was the
18 last time you filed for bankruptcy?
19   A  2014, I think.  2013, '14, I think.
20   Q  And do you know, um:  Was that, uh,
21 bankruptcy discharged?
22   A  I'm not sure.  I'm still working on that
23 situation right now.  I'm not sure.
24   Q  When you say that you're still working on

231

1  that situation, what do you mean?
2    A  Uh, I had -- uh, I don't know exactly
3  what happened.  I need to talk to my attorney
4  about that, my personal attorney.  I have some
5  litigations going on with that.
6    Q  Um, can you just expand on that a little
7  bit?  What do you mean, you have some litigations
8  going on with that?
9    A  I missed a payment.
10   Q  Ah.
11   A  So I have to catch up on my payments.
12   Q  Okay.  With the bankruptcy, um, uh --
13   A  Court.
14   Q  -- plan?
15   A  Yeah, yes.
16   Q  So do you still have an active bankruptcy?
17   A  No.
18   Q  Okay.
19   A  Not to my knowledge.
20   Q  Okay.  And, um, okay.  Um, so was -- just
21 trying to figure out what else I need to ask here,
22 um -- oh, one follow-up question.  The gathering
23 that you guys had, um, that you talked about where
24 you discussed, um, moving forward with the

232

1  lawsuit; was anyone besides the named plaintiffs
2  present for that?
3    A  Only -- only us.
4    Q  Okay.  So, no attorneys present?
5    A  No.
6    Q  Okay.  And there were no individuals who
7  said:  You know, I'm out.  You guys, good luck to
8  you, but I'm not going to go forward?
9    A  No.
10   Q  Okay.  And, um, nobody brought, like, a
11 spouse or a significant other or anything like
12 that?
13   A  No, no, not to my knowledge, no.
14   Q  Okay.  And, I mean, you recognized
15 everybody who was there, right?
16   A  Right.  I mean, it was -- it was
17 coworkers.
18   Q  Got it, okay.  And then, um, back to
19 the bankruptcy for a second; um, do you have an
20 understanding as to whether or not, um, your
21 bankruptcy was discharged?
22   A  I put it like this here.  I haven't had a
23 problem with it right now.  It haven't came up.
24 So I'm not sure if it was discharged or not, if

Transcript of Cecil Williams
Conducted on July 14, 2020

59 (233 to 236)

233

1 that's the question. No, I'm not sure. I can't
2 answer that question. I'm not sure.
3    Q  Did you disclose, um, this lawsuit as part
4 of your bankruptcy?
5    A  No.
6    Q  Is there any reason why you wouldn't have
7 done that?
8    A  Because, uh, the lawsuit had -- this
9 lawsuit have nothing to do with my bankruptcy.
10 The bankruptcy is my personal finance.
11    Q  Okay. Do you have, um, like, case numbers
12 related to your bankruptcy?
13    A  Oh, wow. I have to look for it. I'm not
14 sure exactly where it's at.
15    Q  Okay. And you said that you have a
16 different attorney representing you in the
17 bankruptcy?
18    A  Yes.
19    Q  Okay.
20    MR. LEINENWEBER: Um, Kelly, I guess, uh,
21 at this point I just put in a request that you,
22 um, at some point here confer with Mr. Williams
23 regarding, um, whether or not there are any active
24 bankruptcies, and whether or not this lawsuit was

234

1 disclosed as a part of the last bankruptcy.
2    MS. KRAUCHUN: Sure.
3    MR. LEINENWEBER: Okay, thanks.
4    THE WITNESS: It was not.
5 BY MR. LEINENWEBER:
6    Q  Have you had any other employment besides,
7 uh, the sheriff's office since 2015?
8    A  No.
9    Q  Okay. Um, let's see.
10    A  No.
11    Q  All right.
12    MR. LEINENWEBER: Um, can we pull up what
13 we're going to mark as Exhibit 4, which should be
14 the file -- let me get you the file number, one
15 sec here. All right, one sec, guys. I just --
16 let's see. Okay. Annie, it's, um -- the file
17 name, 17406-07.
18    TECH BROWN: And you want that marked as
19 Exhibit 4?
20    MR. LEINENWEBER: Please.
21    TECH BROWN: Thank you.
22    THE WITNESS: What is that?
23    TECH BROWN: Stand by.
24 BY MR. LEINENWEBER:

235

1    Q  It's coming up. You'll see it in a sec
2 here. We're going to bring it up on the screen,
3 just like we did the, uh, interrogatories.
4    (Exhibit 4 was marked for identification.)
5 BY MR. LEINENWEBER:
6    Q  Okay. And we'll -- we'll give you a
7 chance to kind of scroll through this, um, with
8 Annie's help, um, so that you can see this. But,
9 um, I'm just going to describe it for the record
10 and then give you a chance to review it. Uh,
11 Mr. Williams, we've handed you what's been marked
12 as Exhibit 4, which is a two-page document with
13 the Bates number Winston underscore, CCSO 017406
14 through 17407.
15    Could you just take a second to review
16 that and let me know when you've had a chance to
17 do so?
18    A  Okay. It won't go.
19    Q  You're going to have to ask Annie to kind
20 of scroll through it for you, so.
21    THE WITNESS: Annie, can you scroll
22 through it?
23    TECH BROWN: Actually, Counsel, I think
24 that I can give Mr. Williams control. You should

236

1 be able to scroll now, sir.
2    MR. LEINENWEBER: Oh, even better.
3    THE WITNESS: It's not moving. It's not
4 moving.
5    TECH BROWN: Try clicking on your screen
6 and then see if you can do it. Now you should be
7 able to drag.
8    THE WITNESS: It's -- it's stuck.
9    TECH BROWN: All right.
10    THE WITNESS: Am I doing something wrong?
11    TECH BROWN: I'm not sure of how the
12 controls differ with an iPad versus a laptop,
13 but, um, I can go ahead and I can scroll for you
14 here.
15    MR. LEINENWEBER: Yeah, maybe we can kind
16 of break it down into thirds or something like
17 that.
18    TECH BROWN: Yeah, this is the second half
19 of page one.
20    THE WITNESS: Okay. It was some writing.
21 That was my complaint that, uh, I had.
22    TECH BROWN: Are you ready for me to
23 scroll down?
24    THE WITNESS: Yes, please. Okay.

Transcript of Cecil Williams
Conducted on July 14, 2020

60 (237 to 240)

237

1  "On April 16th, while during roll call" --
2  (inaudible). Yes, this is me.
3  BY MR. LEINENWEBER:
4     Q  You've had a chance to look at that?
5     A  Yes.
6     Q  Okay. And then, um, you'll see, there is
7  a signature here. Is that your signature?
8     A  Yes.
9     Q  Okay. And, uh, it's dated April 17th,
10 2015?
11    A  Correct.
12    Q  And it's actually notarized?
13    A  Correct. That's -- that's -- that's my
14 old PR case that I never got an answer to.
15    Q  Okay, um. And then it says here -- above
16 your signature it says: "I have read this
17 statement that I have voluntarily made, consisting
18 of two pages, and I solemnly swear that the facts
19 and allegations contained within are true and
20 correct to the best of my knowledge," right?
21    A  Correct.
22    Q  Okay.
23       MR. LEINENWEBER: So if, Annie, can we
24 scroll back up to the top for a sec? Yeah,

238

1  exactly, thank you.
2     Q  Um, and let's see. Okay. So this is a
3  complaint register; is that right?
4     A  Correct.
5     Q  And it's from the Office of Professional
6  Review?
7     A  Correct.
8     Q  Okay. And here it says, um, on the top
9  left-hand corner: "Complainant information."
10 And then it has your name and address, right?
11    A  Correct.
12    Q  Okay, um. And then it says: "Complaint
13 (sic) information." And it says: Date of
14 incident, April 16th, 2015, right?
15    A  Correct.
16    Q  Um, and then it says the name of against
17 whom you're filing the complaint, and it's
18 Chief Ranzino, right?
19    A  Correct.
20    Q  So then let's go down to page two,
21 beginning with, "On April 16." Okay. And then
22 let's talk about this. So, um, this says:
23 "On April 16th, while during roll call, RI" --
24 is that reporting investigator?

239

1     A  Yes.
2     Q  Okay. So that's you in this case?
3     A  Uh-huh.
4     Q  Okay. "Reporting investigator responded
5  to Chief Ranzino statement about" -- um, I think
6  that's G-O; is that right?
7     A  General order, yes.
8     Q  Okay. "General order on uniform
9  inspections"; so this was an incident you had
10 with Ranzino related to, um, your uniform
11 inspection, I guess?
12    A  Uh-huh.
13    Q  Okay. And it occurred at roll call, it
14 looks like?
15    A  Uh-huh.
16    Q  Okay, um. And it says here that -- let's
17 see: Responding investigator asked the chief why
18 you didn't have a complete copy of the S.O.G.O. --
19 something, something, general order?
20    A  Sheriff's office general order.
21       THE REPORTER: I'm sorry. Can you repeat
22 that, please. What standard?
23       THE WITNESS: Sheriff's office general
24 order.

240

1       THE REPORTER: Okay. Thank you.
2  BY MR. LEINENWEBER:
3     Q  "Chief Ranzino stated: Why don't you copy
4  them," um, "of your e-mail? Responding
5  investigator was requested to step around the
6  corner to finish the (sic) conversation. That
7  is (sic) when the (sic) Chief Ranzino stated:
8  'I'm (sic) not scared of you,' in a threatening
9  voice."
10       That's your allegation, right?
11    A  Yeah, and that's when he made that --
12 that, uh, nigger statement, yes.
13    Q  Uh, then it says, uh: "Responding
14 investigator then turned (sic) around and walked
15 (sic) straight to OPR"?
16    A  Correct.
17    Q  Okay, uh. "Responding investigator
18 returned (sic) back to the office of (sic) Chief
19 Ranzino." And then it looks like -- are you
20 trying to say, he asked you where you were?
21    A  Okay. For going, uh -- Ranzino stated,
22 want to know, mess with me, and threaten RI with a
23 write-up for going to south campus. RI call
24 Carena -- oh, shoot -- in OPR, Corona in OPR.

Transcript of Cecil Williams
Conducted on July 14, 2020

---

241

1  That's -- okay, Corona in OPR in order to make a
2  complaint.
3      Q  So this is your complaint related to the
4  incident with Ranzino that we discussed earlier
5  today?
6      A  Correct.
7      Q  Okay, um.  And it's a little bit
8  different, though, in that, um, you did not put
9  in here that he called you the N-word, right?
10     A  That's when I walked away, when he was
11  saying it.
12     Q  Okay.  But my question is: You didn't put
13  that in this complaint?
14     A  No, I did not put it in there.  No, I did
15  not put it in there.
16     Q  Okay, um.  And is there a reason you
17  didn't put it in here?
18     A  I was -- I -- I can't even remember why
19  I didn't put it in there.
20     Q  Okay, um.  And it looks like you signed
21  this on April 17th.  That was the day after the
22  incident with Ranzino, right?
23     A  Right, but I went over there that day.
24  I went over that day.  I wasn't able to talk to

242

1  nobody that day.  And then that's when I got in
2  touch with Corona Pun.  And then he told me, come
3  back the next day.  And that's when I filled this
4  out.
5      Q  Okay.
6      A  But I was over there that day.
7      Q  Now, you -- you could have put in here
8  that he called you the N-word, right?
9      A  I was upset.  I forgot it, but he did call
10  me that.
11     Q  But you could have put that in here,
12  right?
13     A  Yes.
14     Q  Okay, um.  And, uh, wouldn't you think
15  that that would be an important piece of
16  information for OPR to have about this complaint
17  against Ranzino?
18     A  Yes.
19     Q  Okay, um.  Okay.  Let's set that one aside
20  for a second.  Let's see.
21        MR. LEINENWEBER:  And then, Annie, let's
22  pull up 17408-09.  And we can mark that as
23  Exhibit 5, please.
24        TECH BROWN:  Stand by.

---

243

1        (Exhibit 5 was marked for identification.)
2  BY MR. LEINENWEBER:
3      Q  Okay.  Mr. Williams, um, we've handed you
4  what's been marked as Exhibit 5.  I'll identify it
5  for -- or I'll refer to it for identification
6  purpose -- sorry, strike that, um.  It is a
7  two-page document Bates labeled Winston underscore
8  CCSO 017409, um, and the second page is actually
9  the Bates number before that, 17408.  Um, so if
10  you can take a second and review this, and let me
11  know when you're finished.
12     A  Could you open it up, so I can --
13        TECH BROWN:  Would you like me to --
14        THE WITNESS:  -- scroll up?
15  BY MR. LEINENWEBER:
16     Q  This is the top of the document.  There's
17  more to -- below it.
18     A  That's what I'm trying to get to the
19  bottom.
20     Q  Okay.
21        TECH BROWN:  Let me know when you would
22  like me to scroll, Mr. Williams.
23        THE WITNESS:  Okay, please.  All right.
24  Okay.

244

1  BY MR. LEINENWEBER:
2      Q  Um, excuse me.  Do you recognize this
3  document -- document, Mr. Williams?
4      A  Yes, that's my handwriting.
5      Q  Okay.  This is your handwriting.  Um, is
6  that your signature on the first page?
7      A  Yes, it is.
8      Q  Okay.  And it looks like it's dated
9  April 17th, 2015?
10     A  Correct.
11     Q  Okay.  So, again, this is the day after,
12  uh, the incident with Ranzino occurred?
13     A  Correct.
14     Q  Okay, um.  And what -- this -- this
15  document at the top, it says, Cook County
16  Sheriff's Office, Discrimination/Harassment/Sexual
17  Harassment Complaint Form?
18     A  Correct.
19     Q  Um, do you remember completing this form?
20     A  Yes.
21     Q  Okay.  Who did you give it to when you
22  completed it?
23     A  Uh, Carlos Rom- -- Rom- -- his name is
24  on there, on the complaint.

Transcript of Cecil Williams
Conducted on July 14, 2020

245

1    Q  Okay.  So this is another form related to
2  the Office of Professional Review?
3    A  Correct.
4    Q  Okay.  All right.  And in this one in
5  the written summary section, it says, um, you
6  were asked to provide a detailed summary of the
7  alleged discrimination, harassment, sexual
8  harassment incident.  Um, let's see.  And
9  you wrote, uh: "On April 16th, 2015, while
10  during roll call, reporting investigator responded
11  to Chief Ranzino statement about general orders on
12  uniform inspection."  So far that's accurate,
13  right?
14    A  Correct.
15    Q  Okay, um.  "Reporting investigator asked
16  (sic) chief" -- that would be Ranzino?
17    A  Correct.
18    Q  Okay, uh.  "Why we have not received a
19  complete general order book of sheriff's office
20  general orders.  Chief Ranzino stated:  Why don't
21  I copy them off my e-mail?  Reporting investigator
22  was requested to step around the corner to finish
23  conversation."  Uh, and then "That's (sic) when
24  Chief Ranzino stated: 'I am not scared of you,'

246

1  in a threatening voice."  Do you see that?
2    A  Correct.
3    Q  Is that -- that's what Chief Ranzino said
4  to you at that time?
5    A  Right.
6    Q  Okay.  And then it says: "Reporting
7  investigator then turned (sic) around and walked
8  (sic) out straight to OPR"?
9    A  Correct.
10    Q  "Reporting investigator returned (sic)
11  back to the office and Chief Ranzino asked, where
12  was I?  I stated, 'South campus,' which time (sic)
13  he responded was: 'You sure you want to mess with
14  me,' in a threatening voice"?
15    A  Correct.
16    Q  Okay, um.  "Also, for Chief Ranzino to
17  stop threatening responding investigator, to be
18  relocated to new shift due to work environment."
19  And then page two, it says, "Threatening to write
20  up (sic) reporting investigator.  Reporting
21  investigator return phone call."
22    A  Pon was the person that I was dealing with
23  over at OPR.
24    Q  Okay, um.  "Chief Ranzino has (sic)

247

1  continued to make the (sic) work environment
2  hostile by intimidating with write-up and (sic)
3  retaliation against reporting investigator."
4  Okay, um.  So this is the same incident, right?
5    A  Correct.
6    Q  Okay.  And, again, here there is no
7  mention of, uh, Chief Ranzino calling you the
8  N-word, right?
9    A  Correct.
10    Q  Okay, um.  And, uh, you could have
11  indicated in here that Chief Ranzino called you
12  the N-word, right?
13    A  Correct.
14    Q  And it would have been important
15  information to provide to OPR, right?
16    A  Correct.
17    Q  But you did not provide that to OPR?
18    A  I forgot it, yes.
19    Q  Okay.  All right.  We can set that one
20  aside.  And then, um -- let's see one thing here.
21    A  Wow, 3:00?  Wow.
22    MR. LEINENWEBER:  Okay, um.  Annie, can
23  we pull up, uh, the third document?  So this will
24  be Exhibit 6, which is titled 17420-21.

248

1    TECH BROWN:  Stand by.
2    MR. LEINENWEBER:  Thanks.
3    (Exhibit 6 was marked for identification.)
4  BY MR. LEINENWEBER:
5    Q  Okay.  Mr. Williams, we've handed you
6  what's been marked as Exhibit 6.  It's a two-page
7  document.
8    A  I didn't see this.
9    Q  Bates number is Winston underscore CCSO
10  017420 through -421, and I'll give you, um, some
11  time to review that.
12    A  Human resource is OPR, right?  Okay.
13    Q  Okay.  So, um, we're at the top of this
14  document, uh.  Let's stay at the top of page one.
15    MR. LEINENWEBER:  Thanks, Annie.
16    Q  And this says it's an Informal Inquiry
17  of Investigator Cecil Williams, uh.  And it says:
18  "Present, Investigator Cecil Williams," and then
19  "Joseph V. Consolo"; is that correct?
20    A  Correct, that's -- that's him, yes.
21    Q  Do you remember who Mr. Consolo is?
22    A  Yeah, he at OPR.
23    Q  He's at OPR?
24    A  Right, he's on 31st Street, OPR.

Transcript of Cecil Williams
Conducted on July 14, 2020

63 (249 to 252)

249

1   Q  Okay.  And it says, "Location, South
2  Campus, Building Two, HR Conference Room"?
3   A  Yeah, that's --
4   Q  Okay.
5   A  -- the OPR.
6   Q  Okay, um.  And, well, it says here in
7  the third line, though.  It says: "I am part of
8  human resources; I am not with OPR," right?
9   A  Well, I thought he was part of OPR, but
10 maybe that's -- that card, when I was on 31st
11 Street, I thought all that was OPR.  That -- that
12 -- that was my knowledge that all that was OPR.
13 I didn't know it was a difference.
14   Q  Okay, um.  Mr. Williams, can you either
15 just back up or tilt your camera again because
16 we're losing sight of you in the --
17   A  Okay.  Can you see me?
18   Q  Yep, and I understand it's tricky because,
19 you know, it's small text here and stuff.  So
20 we'll, um -- we'll work with you to make sure that
21 you get to read this if you need it bigger or
22 anything.  Um, okay.  So let's see.
23       Uh, this says -- so then here in kind of
24 middle of the page it says:  "Below is a summary

250

1  of Investigator Cecil Williams' informal statement
2  of inquiry."  And then there is a summary, right?
3   A  Uh-huh.
4   Q  And then if we scroll all the way to the
5  bottom, it says on the -- sorry, next page, yep.
6  Keep going.  It says: "I, Investigator Cecil
7  Williams, have read and reviewed the summary of
8  the informal inquiry conducted on April 16th,
9  2015."
10      THE REPORTER:  I'm sorry.  Can you slow
11 down just a little bit?  I know you're reading
12 but --
13      MR. LEINENWEBER:  Yeah, my apologies.
14 I'll start over.
15   Q  "I, Investigator Cecil Williams, have read
16 and reviewed the summary of the informal inquiry
17 conducted on April 16th, 2015.  My signature below
18 indicates my approval of the contents of this
19 statement as a fair and accurate summary of what
20 I said."  Um, and then your signature is there,
21 right, Mr. Williams?
22   A  Correct.
23   Q  And it's dated April 28th, 2015?
24   A  Correct.

251

1   Q  Okay.
2       MR. LEINENWEBER:  So then, Annie, if
3  we could just scroll back up to where it says:
4  "Below is a summary."
5   Q  Okay.  And let's just go through this,
6  Mr. Williams.  It says: "On April 16th, 2015,
7  a conversation came up at roll call about general
8  orders.  Uniform inspection was coming up.
9  Investigator Williams told Chief Ranzino that he
10 never received a complete set of the general
11 orders.  Investigator Williams stated that they
12 get them piecemeal.  Investigator Williams asked
13 for a complete set.  Chief Ranzino stated that
14 'You are supposed to go on the website and print
15 them out.  That is how you receive them.  If you
16 do not like it, then we write you up for violating
17 the uniform provisions of the general orders.'
18 Investigator Williams responded, 'Are you
19 threatening me?'  Chief Ranzino said, 'Step back.
20 This is not part of the floor.'  Chief Ranzino
21 said to Investigator Williams, 'I am not scared of
22 you.'  Investigator Williams said nothing and just
23 kept on going.  Investigator Williams went
24 straight to OPR to file a complaint."

252

1       Um, Mr. Williams, you -- this is the same
2  incident we're talking about again, right?
3   A  Correct.
4   Q  And this is a statement that you gave to
5  human resources that same day, right?
6   A  Correct.
7   Q  And, here again, you did not mention that
8  Chief Ranzino called you the N-word, right?
9   A  No, I did not.
10   Q  Okay, um.  And you could have included
11 that here, right?
12   A  Yes, yes, I could have.
13   Q  Nothing prevented you from including that
14 allegation in any of these reports?
15   A  Correct.
16   Q  Um, and --
17   A  (Inaudible) not lying about that.  Okay.
18 Go ahead.
19   Q  No, I'm sorry.  I don't want to interrupt
20 you.  If you have something to add, that's fine.
21   A  All I'm saying is, I'm not telling no
22 story about him calling me that, but go ahead.
23   Q  Okay.
24   A  (Inaudible.)

Transcript of Cecil Williams

64 (253 to 256)

Conducted on July 14, 2020

253

1    Q  And, um, here it says that he -- sorry,
2  strike that, um.  Do you think it would have been
3  important for HR to be informed that Chief Ranzino
4  called you the N-word?
5    **A  Yes.**
6    Q  Uh, why didn't you tell HR that he called
7  you the N-word?
8    **A  I just -- I mean, it was -- I was under**
9  **stress at the time.  I'm not sure.**
10   Q  Okay.  So you forgot to include it in this
11 one as well?
12   **A  I forgot to put -- see that is -- he --**
13 **that right there is what he printed out exactly**
14 **what I said.**
15   Q  Right.  And I'm just trying to clarify.
16 You're saying you forgot to include the allegation
17 that Ranzino called you the N-word?
18   **A  Uh-huh.**
19   Q  Um, because you actually had a chance to
20 review this, right, and then sign it?
21   **A  Yes.**
22   Q  Um, okay.  We can put that one aside.
23   **A  Wow.**
24   Q  You seem, um, sort of disturbed by those

254

1  documents?
2    **A  Because I know what he's --**
3      MS. KRAUCHUN:  Object; there is no
4  question pending and --
5      THE WITNESS:  Okay.
6      MS. KRAUCHUN:  Counsel, your question is,
7  I don't think, appropriate.
8      MR. LEINENWEBER:  Um, all right.
9    Q  Let's go to -- let me ask you a few
10 questions, um, uh.
11     THE WITNESS:  Kelly, can I talk to you?
12     MR. LEINENWEBER:  You guys want to take --
13     MS. KRAUCHUN:  Sorry.  Yeah, we'll just --
14 we'll go into a breakout room for a minute.
15     MR. LEINENWEBER:  Yeah, that's fine, um.
16 It's 3:15, um.  Do you guys want until 3:20?
17     MS. KRAUCHUN:  That's fine.
18     MR. LEINENWEBER:  Okay.  Ethan, do you
19 want to jump in one real quick?  Oh, I guess he
20 already --
21     MR. WHITE:  Yeah, sure.
22     MR. LEINENWEBER:  Okay.
23     (A brief recess was taken commencing at
24 3:15 and concluding at 3:24 p.m.)

255

1      TECH BROWN:  Do we have everyone back?
2      THE REPORTER:  Yes.
3      THE WITNESS:  Yes.
4      MS. KRAUCHUN:  Yes.
5      TECH BROWN:  Terrific.
6      MR. LEINENWEBER:  Beth and Annie, are you
7  guys good to go?
8      TECH BROWN:  I'm ready.
9      THE REPORTER:  Yes, thank you.
10     MR. LEINENWEBER:  All right.  Kelly and
11 Mr. Ranzino.
12     MS. KRAUCHUN:  Yep.
13 BY MR. LEINENWEBER:
14   Q  Okay, um.  Mr. Williams, we're back on the
15 record.  You understand you're still under oath,
16 right?
17   **A  Yes.**
18   Q  Okay, um.  I wanted to ask you, um:
19 Do you know Michelle Strickland?
20   **A  Yes, I do.**
21   Q  How long have you known her?
22   **A  Uh, she came over to EM with me in 2005.**
23   Q  Okay.  So she was in, um --
24   **A  I think -- I might be mistaken.  I think**

256

1  she came over with my class.
2    Q  Okay.
3    **A  Or after my class.**
4    Q  Is she still in EM?
5    **A  No, she bid it out.**
6    Q  Okay.  What does that mean:  She bid it
7  out?
8    **A  She bid it to another department.**
9    Q  Okay.  And do you know what other
10 department?
11   **A  Transportation.**
12   Q  Okay.  Do you know about when that was?
13   **A  I'm not sure.**
14   Q  Okay.  Did she work the same shift as you?
15   **A  Yes.**
16   Q  Okay.  And, um, would you say, are you
17 guys friends?  Do you socialize outside of work?
18   **A  No, we're friends, coworkers.**
19   Q  And, um, so did you -- okay.  So your
20 recollection is that she came over in your EM
21 class, which I think you said you came to EM in,
22 like --
23   **A  I came over in two-five.  She either**
24 **came over in 2005 or after.  I'm not exactly sure**

Transcript of Cecil Williams
Conducted on July 14, 2020

65 (257 to 260)

257

1  she was in my class or not, but I know she was
2  definitely over there with me.  I'm not --
3      Q  Okay.
4      A  -- sure if she was in my class or not
5      Q  Okay.  Were you ever partnered with her?
6      A  We never worked together, no.
7      Q  Okay, um.  And when you say you never
8  worked together, you mean, um --
9      A  Have we ever been a partner before?
10     Q  Been partners, yeah?
11     A  You know what?  I really -- I really can't
12 answer that because they switched us around so
13 much.  It's really hard to say who I worked with
14 and who I didn't work with.
15     Q  Okay.  But you don't -- sitting here
16 today, you don't have any specific recollection
17 of having been --
18     A  No.
19     Q  -- partners with her?
20     A  No, not right -- I'm not sure.
21     Q  Okay, um.  And, uh, did she ever complain
22 to you about discrimination?
23     A  I have no knowledge of that.  I mean, I
24 have -- as far as her complaining, I'm not sure

258

1  if it was when we all met together or not.
2      Q  Okay, um.  Prior to you guys -- when I say
3  "you guys," I mean, um -- let me strike that.
4  Prior to the plaintiffs all getting together, um,
5  to discuss moving forward with the lawsuit, uh,
6  do you have any recollection of Michelle
7  Strickland complaining to you about any type of
8  discrimination?
9      A  Prior to that?
10     Q  Yes.
11     A  We all had complaints.  I'd say, yes, we
12 all had complaints.  And what it was, I'm not
13 sure, but we all had them, yes.
14     Q  I understand you may have all had
15 complaints, but my question is a little bit
16 different than that.  I'm just trying to clarify,
17 um.  Do you remember Michelle Strickland coming to
18 you with complaints about discrimination?
19     A  Well, we had -- we -- we -- when we had
20 our little conversation, that's when that was
21 discussed.  Prior to our little conversation,
22 I'm not sure.
23     Q  Okay.
24     A  But when we had our little conversation,

259

1  that's when everything was discussed among us.
2      Q  Got it, okay.  I think I understand what
3  you're saying, um.  Do you believe that, uh,
4  Director Shields discriminates against women?
5      A  I can't -- I don't know that answer.
6      Q  Okay, um.  What about, uh, Chief Ranzino?
7  Do you believe that he discriminates against
8  women?
9      A  I don't know that answer.
10     Q  Um, Chief Neal?
11     A  I don't know that answer.
12     Q  Okay.  And, um, Deputy Chief Rohloff?
13     A  I don't know that answer.
14     Q  Okay.  Let's see.  Vernell Tims, uh,
15 do you know Mr. Tims?
16     A  Yes, I know Tims.
17     Q  Okay.  How long have you known Mr. Tims?
18     A  Me and Tims came over since two thousand
19 -- well, I met Tims in two thousand and -- oh, I
20 met Tims in '94.
21     Q  '94?  So you've known him a long time?
22     A  Right.
23     Q  Um, are you guys friends?
24     A  We're associates.

260

1      Q  Okay.  So you don't really socialize
2  outside of work?
3      A  No.
4      Q  Okay, um.  Back to Ms. Strickland for one
5  second; um, I forgot to ask you.  Did she work in
6  TSS?
7      A  Yes.
8      Q  Okay, um.  Did she do patrol?
9      A  Yes.
10     Q  Okay, um.  Office?
11     A  No.
12     Q  Okay.
13     A  Not to my knowledge, not to my knowledge;
14 I can't remember that because she bid it out.
15 She bid it out about five, six years, maybe more
16 -- more time ago.  She bid it out a while back.
17 So I'm not sure --
18     Q  Yeah, and --
19     A  -- what her assign.
20     Q  And -- and just to clarify, I'm only
21 trying to get at your understanding of where she
22 worked, um, you know.  It may be that there are --
23 that she says she did something else, and you
24 didn't know about that.  And that's entirely fine.

Transcript of Cecil Williams
Conducted on July 14, 2020

66 (261 to 264)

261

1  I'm just trying to understand your knowledge of
2  it.
3      A  Okay.
4      Q  Uh, okay.  So, Mr. Tims, uh, you've known
5  since '94, uh.  Do you guys -- do you consider
6  each other friends?
7      A  Associates, work associates.
8      Q  Okay.  But you don't really socialize
9  outside of work?
10     A  I mean, we might run into each other off
11 and on, but associates, if that's the term.
12     Q  Um, were you guys partners ever?
13     A  No, Tims worked day shift.
14     Q  So he was on day shift?
15     A  At the time, yeah, he went to days, yeah.
16     Q  Okay.  And do you know, um -- did he ever
17 work in TSS, do you know?
18     A  Uh, I don't know if they worked TSS on
19 days or not.  So I can't answer that question.
20     Q  Okay, um.  And then do you know if he did
21 patrol or office?
22     A  Yeah, he did patrol.  Now, office, I don't
23 know.
24     Q  Okay, um.  Do you recall him ever telling

262

1  you that he was experiencing discrimination?
2      A  In our little meeting.
3      Q  And, again, prior to that meeting do you
4  have any memories of him -- of Mr. Tims telling
5  you that he was being discriminated against?
6      A  Not to my knowledge.
7      Q  Okay.  Do you ever remember him telling
8  you that Ranzino had used the N-word with him?
9      A  Not to my knowledge.
10     Q  Okay.  What about Shields?  Do you have
11 any recollection of him telling you that Shields
12 had used the N-word with him?
13     A  Not to my knowledge; I don't -- I don't
14 remember.  So, I mean, we talking ten years, five,
15 six, seven, eight years ago.
16     Q  Okay.  What about I.V. Newsom, Junior?
17 And that's "I" as in --
18     A  "I" and V.
19     Q  What is "I" and --
20     A  That's "I."
21     Q  Okay.
22     A  And that's his name, I.V.
23     Q  Yeah, I.V., just the letters.
24     THE REPORTER:  Oh, okay.  Thank you.

263

1      MR. LEINENWEBER:  Yeah.  Sorry, Beth, I
2  was trying to clarify for you.
3      THE REPORTER:  Yeah, I caught that.
4      MR. LEINENWEBER:  I could not think of
5  what "I" would be for, though.
6      THE REPORTER:  Thank you.
7      MR. LEINENWEBER:  V as in Victor, I know
8  that, um.
9      THE WITNESS:  Right, "I" in Ida; V in
10 Victor.
11 BY MR. LEINENWEBER:
12     Q  "I" in Ida, okay.  That's what I was
13 missing, um.  How long have you known Mr. Newsom?
14     A  Since I came over to EM in 2005.
15     Q  Okay.  And are you guys friends?
16     A  We're associates.
17     Q  Okay, uh.  Socialize outside of work?
18     A  No, same thing.
19     Q  Okay.
20     A  Coworkers.
21     Q  Did he work the same shift as you?
22     A  He worked day shift.
23     Q  He was days, okay, uh.  Do you have any
24 knowledge about whether he worked TSS?

264

1      A  I don't know exactly on days or not.
2      Q  Got you, um.  What about patrol?  Do you
3  know if he worked patrol?
4      A  He probably worked patrol.
5      Q  Okay, um.  So you never were partnered
6  with him presumably?
7      A  No.
8      Q  Now, do you have any recollection of him
9  complaining to you about discrimination?
10     A  Not to my knowledge; when we all had that
11 little conversation put together, that's when.
12 Prior to that, I can't say.
13     Q  Okay.  Did, uh -- do you have a
14 recollection of him ever telling you if Ranzino
15 had used the N-word?
16     A  Not to my knowledge; the only -- only
17 during our conversations, during the group time
18 when we all had our group conversations.
19     Q  Okay, uh.  What about Shields?  Do you
20 have any recollection of him telling you if
21 Shields had used the N-word with him?
22     A  Same answer.
23     Q  Okay, uh.  Mr. Page, Samuel Page, you know
24 Mr. Page?

Transcript of Cecil Williams
Conducted on July 14, 2020

265

1    A  Yes, I met Page when I came over there.
2    Q  Came over to EM?
3    A  Yeah.
4    Q  Okay, um.  How long have you known
5  Mr. Page?
6    A  Like, I probably know Page for about -- I
7  met Page in about two years before I came over
8  there, so, uh, since 2000, about 2000.
9    Q  Okay, uh.
10    A  Give or take.
11    Q  Do you consider yourself friends?
12    A  Associates.
13    Q  Okay.  So he's not in your social group
14  outside of work?
15    A  I mean, when I say "associates," we all
16  get together sometimes and we don't.  So I don't
17  consid- -- it depends on what you put the level of
18  friends.  That's work -- work, you know.
19    Q  Uh-huh, okay, um.  Did you work the same
20  shift as Mr. Page?
21    A  Yes.
22    Q  And, um, did you ever serve as partners?
23    A  Page was a supervisor.
24    Q  Page was a supervisor?

266

1    A  Well, he was a -- yes, a supervisor.
2    Q  Okay, um.  Is he still in EM?
3    A  No, he retired.
4    Q  When did he retire, do you know?
5    A  Uh, not exactly sure, maybe a few
6  years ago.  I'm not sure exactly what date and
7  time.
8    Q  Was he a supervisor when he retired?
9    A  No.
10    Q  Okay.  Do you know when he served as a
11  supervisor?
12    A  Uh, he was a supervisor basically for
13  about three years when I came over there.  And
14  then they broke all the supervisors down and then
15  they picked them again.
16    Q  So this was quite a while ago then that he
17  was a supervisor?
18    A  Right.
19    Q  Back when you first joined EM?
20    A  Right.  When I first came over there,
21  right.
22    Q  Okay, um.  Do you, um -- do you have a
23  recollection of Page complaining to you about any
24  discrimination he was experiencing?

267

1    A  Before?  No.
2    Q  Before the EM, before the --
3    A  I can't -- I can't say before.  I know --
4  all I'm saying is, when we all got together, we
5  had discussion.
6    Q  Okay.  But sitting here today, you have
7  no specific recollection of talking to Mr. Page
8  about discrimination he was experiencing prior to
9  the plaintiffs all getting together?
10    A  Not to my knowledge.
11    Q  Okay, uh.  You ever hear him complain
12  about his assignments ever?
13    A  Yes, I mean, to my knowledge, we all
14  complained.
15    Q  Okay, um.  When you say "we all
16  complained," are you talking about the plaintiffs
17  or are you talking about EM investigators?
18    A  I'm talking about the plaintiffs.
19    Q  Okay, um.  Did any of your coworkers in
20  EM, who are not plaintiffs, complain about their
21  job assignments ever?
22    A  I'm not sure.
23    Q  You're not sure?
24    A  Huh-uh.  (Witness shakes head.)

268

1    Q  Did you ever hear anybody, you know,
2  else --
3    A  I'm not --
4    Q  -- complain about --
5    A  I don't -- I don't -- I don't remember.
6  It depends on certain people complaining; certain
7  people did not.  So we had a variety that
8  complained and didn't get what they get.  Then
9  we had a variety that got what they post and got,
10  and they didn't complain.
11    Q  Okay.  All right, uh.  Mr. Ferguson, uh,
12  Wilford Ferguson; do you know Mr. Ferguson?
13    A  Yes, I know Ferguson.
14    Q  Okay.  How long have you known him?
15    A  Since I came over to EM.
16    Q  Okay.  And, uh, are you guys friends?
17    A  Associates.
18    Q  Um, do you guys, uh -- do you guys
19  socialize together at all?
20    A  During work periods, like that, all that,
21  yeah.
22    Q  Okay.
23    A  Same as everybody else, work -- work
24  communication.

Transcript of Cecil Williams
Conducted on July 14, 2020

269

1    Q  Got you, okay, um.  And do you have a
2  recollection of -- well, let me ask you this:
3  Did you work on the same shift as Mr. Page?
4    A  You mean Ferguson?
5    Q  I'm sorry, yes.  You're correct, yeah.
6  Mr. Ferguson?
7    A  Yes.
8    Q  And were you guys ever partners?
9    A  We worked together maybe once or twice.
10   Q  Okay.  Do you ever remember hearing him
11 complain about assignments he was receiving?
12   A  Yes.
13   Q  And what sort of complaints?
14   A  That he was -- "Ferg" was always down in
15 TSS.  They permanently put him down there, and
16 he didn't like it.
17   Q  Do you remember what he said he didn't
18 like about it?
19   A  I -- I -- I don't remember.
20   Q  Okay, um.  Do you, uh -- strike that, um.
21 Back to Mr. Page for a second, uh; did Mr. Page
22 work in TSS ever?
23   A  Yes.
24   Q  Okay.  And, uh, did he, um -- did he ever

270

1  complain to you about his assignments?
2    A  It's always, uh, same, same answer.
3    Q  Okay.  So no specific recollection of him
4  complaining about why he didn't want to go to TSS?
5    A  Right.  I mean, no, not -- not -- I mean,
6  he probably did, but I don't remember.
7    Q  Okay.
8    A  I don't remember.
9    Q  Okay, um.  Let's see.  David Walker, do
10 you know Mr. Walker?
11   A  Yes.
12   Q  And, oh, sorry.  Let me back up for one
13 second.  I forgot to ask about Mr. Ferguson.
14 Did he ever complain to you about discipline he
15 received?
16   A  To my knowledge, I don't recall.
17   Q  Okay, um.  You said you do know
18 Mr. Walker.  About how long have you known him?
19   A  I've known Walker since I came over to EM.
20   Q  Okay.  And, um, you consider yourself
21 friends?
22   A  Associates.
23   Q  Okay, um.  Did you guys work the same
24 shift?

271

1    A  For a while, when all this was going on,
2  he was on our shift.  Then he went to days.
3    Q  Do you recall when he moved to days?
4    A  I don't recall exact date.
5    Q  What about ballpark year?
6    A  Our last bid -- our last two bids -- as a
7  matter of fact, our last three bids, I want to say
8  maybe two years ago, maybe -- no, maybe five.
9  I'm not sure exactly what date.  I don't recall
10 the bid that he actually bidded on the days.
11   Q  What do you mean by "our last three bids"?
12 What does that mean?
13   A  That mean we bid every -- well, we
14 supposed to bid every year; but sometimes we bid
15 less than every year or more than every year.  We
16 haven't bid it now in a while.  So it's been --
17 it's been four, five years.  He been on days for
18 a minute.  So I don't recall when he bidded to
19 days.
20   Q  And the bid is for the shift?
21   A  Yeah, shift.
22   Q  Okay.  Got it, okay, um.  Did Mr. Walker
23 work in TSS with you?
24   A  Yes, when he was on the shift, yes.

272

1    Q  And, uh, do you ever remember him
2  complaining to you about assignments?
3    A  Same answer, don't recall.
4    Q  Okay, um.  Do you remember him complaining
5  to you about discipline?
6    A  Don't recall.
7    Q  Did, um -- what did you think about his
8  performance in TSS since you worked with him
9  there?  What do you think about him?
10   A  I'm not a supervisor.  I do not judge
11 nobody's performance.  So I cannot answer that
12 question.  He did what he was supposed to do,
13 to do the job.  I can't answer that question as
14 far as judgment.
15   Q  He did what he was supposed to do, to do
16 the job?
17   A  Yeah, I can't judge him.
18   Q  Right, um.  I guess what I'm curious
19 about, though, is:  You know, everybody has worked
20 with, you know, a coworker who doesn't really
21 carry their fair share of the load, um.  And,
22 you know, that might cause you to pick up the
23 slack -- have to pick up the slack, even though
24 you're not a supervisor, um.  Do you have any

Transcript of Cecil Williams
Conducted on July 14, 2020

69 (273 to 276)

273

1  opinion about whether or not --
2     A  No.
3     Q  Hang on.  Let me finish my question --
4  whether or not you enjoyed working with Mr. Walker
5  in TSS?
6     A  I have no opinion on that.
7     Q  So one way or the other, you didn't care
8  about working with him there?  It was --
9     A  We can work together.  I can work with
10 anybody.  I have no problem with that.
11    Q  Was there anybody in -- uh, strike that.
12 Um, Anthony Manning, we talked briefly about him,
13 but, um, who is Anthony Manning?
14    A  Uh, I'm not -- Manning works in
15 transportation.  That's all I know about him.
16 I don't know much about him.
17    Q  How long have you known him?
18    A  I never -- I met Manning maybe twice.
19 I can't get no time or date.
20    Q  Where did you meet him?
21    A  Uh, he worked in transportation crossing.
22 He's -- he's the one that's --
23       MS. KRAUCHUN:  Yeah, I was going to
24 interject, Justin.  He's the one that's going

274

1  to -- that dropped out of the litigation, if that
2  means anything for your questioning.
3        MR. LEINENWEBER:  Thanks.  Uh, you know,
4  thank you for that info.
5     Q  Do you have any recollection of where you
6  would have met Mr. Manning?
7     A  Through the jail, through the --
8     Q  In the jail?
9     A  Yeah, just working.
10    Q  So during work?
11    A  Right.
12    Q  Okay.  Mr. McGhee, Tyrone McGhee?
13    A  Yeah, I know Tyrone.
14    Q  How long have you known him?
15    A  Since I came over to EM.
16    Q  All right.  And, um, did you work the same
17 shift as Mr. McGhee?
18    A  Yes.
19    Q  And were you guys ever partners?
20    A  Off and on we worked together.
21    Q  Okay.  So that would be on patrol, you
22 guys would be partners?
23    A  Patrol, down in TSS.
24    Q  Do you have partners in TSS, or you kind

275

1  of consider all five of you guys partners, or how
2  does that work?
3     A  It's just everybody down there doing their
4  job.
5     Q  Yeah, um.  And did Mr. McGhee work in TSS?
6     A  Yes.
7     Q  Okay.  And, um, how often would you say --
8  well, strike that.  Um, did you ever hear him
9  complain about working in TSS?
10    A  Same thing.
11    Q  Okay.  So -- so no specific recollections
12 of him complaining --
13    A  Right.
14    Q  -- about working at TSS?
15    A  (Inaudible.)  Yeah.
16    Q  Okay.
17       THE REPORTER:  I'm sorry.  Can you repeat
18 your answer, please.
19       THE WITNESS:  Same -- same answer:
20 I -- I don't recollect -- recollect.
21       THE REPORTER:  Okay.  Thank you.
22 BY MR. LEINENWEBER:
23    Q  Yeah.  And let me just give you a friendly
24 reminder, Mr. Williams, to, uh, wait for me to

276

1  finish my question, so that Beth can take down,
2  um, both what I say and what you say, okay?
3     A  I apologize.  I don't know what happened.
4     Q  It happens.  It happens all the time.
5  It's natural for conversation to want to talk
6  over each other a little bit.  Um, all right.
7  So back to Mr. McGhee; um, no specific
8  recollections about complaints he made to
9  you about assignments or TSS?
10    A  No.
11    Q  Any opinion about working with him in TSS?
12 Did you enjoy that?  Did you not enjoy it?
13    A  I can work with anybody.  I have no
14 problem with McGhee.
15    Q  Okay.  What about Mr. Slaughter, Victor
16 Slaughter?  Do you know Mr. Slaughter?
17    A  I been knowing Slaughter since high
18 school.
19    Q  Oh, really?  Okay.  Did you guys grow up
20 together or something like kind of?
21    A  No, we just went to the same high school.
22    Q  Okay, uh.  So are you guys friends?
23    A  Associates.
24    Q  Okay, um.  And did you guys work the same

Transcript of Cecil Williams
Conducted on July 14, 2020

277

1  shift?
2     A  Yes.
3     Q  Okay.  Were you guys ever partners?
4     A  Off and on.
5     Q  Okay, um.  Did, uh, you, um, work together
6  in TSS?
7     A  Yes.
8     Q  In patrol as well?
9     A  Yes.
10    Q  Okay, um.  Any recollection about
11 Mr. Slaughter complaining about assignments he
12 received?
13    A  Same answer.
14    Q  Okay.  And by that when you're saying,
15 "same answer," you mean that you have no
16 specific --
17    A  No knowledge of -- knowledge of, I don't
18 remember.
19    Q  Okay.  You have no specific recollection,
20 uh?
21    A  Exactly, date and things to say, no, I
22 don't.
23    Q  Okay.  All right, um.  And do you have any
24 recollection of him complaining about discipline

278

1  that he received?
2     A  Same thing; I don't have no -- I can't
3  remember.
4     Q  Okay, um.  Let's go back.  I think I
5  skipped.  Mr. Winston, LeGrain Winston, um, how
6  long have you known Mr. Winston?
7     A  Since I been over there, since 2005.
8     Q  Okay.  Are you guys friends outside of
9  work?
10    A  We was partners for nine years, yes.
11    Q  Okay, uh.  Wow, that's a long time.
12 All right.  And that's nine years on patrol or
13 in TSS or --
14    A  Both.
15    Q  Both, okay, um.  So -- so you didn't
16 really exclusively work in TSS?  You worked, you
17 know, some in TSS, some in patrol?  Is that fair
18 to say?
19    A  Yes.
20    Q  Okay, um.  And do you have any
21 recollection of Mr. Winston, uh, complaining to
22 you about, um, discrimination he was experiencing?
23    A  Yes, all the time we worked together, yes.
24    Q  Okay.  What do you remember him telling

279

1  you?
2     A  I can't remember everything, but I
3  remember the incident with Shields.  I remember
4  Ranzino.  I can't -- I can't put my hands on all
5  the incidents, but I do remember because we worked
6  together.
7     Q  Okay.  So you said, um, incident with
8  Shields and an incident with Ranzino, uh.
9     A  Neal.
10    Q  All right.  Hang on one second.
11    A  (Inaudible.)
12    Q  Hang on one second.  Hang on.  Other
13 than the incidents you recall discussing with
14 Mr. Winston about, um, an incident he had with
15 Mr. Shields and with Mr. Ranzino, do you recall
16 any other, um, discrimination he complained to
17 you about?
18    A  Rohloff, Neal; yeah, all the supervisors,
19 they mess with us.
20    Q  Okay.  Let's start with Mr. Shields.
21 Okay.  What do you recall, um, Mr. Winston
22 complaining to you about, um, Mr. Shields?
23    A  The incident in his office, that's all
24 I remember.  There was an incident in his office

280

1  that him and Shields got into it about.
2     Q  Incident in Shields' office or, uh,
3  Winston's?
4     A  Shields' office.
5     Q  Okay.
6     A  I don't -- I only got brief details of it.
7  I don't -- I don't recall everything.
8     Q  That's okay.  Tell -- tell me what you
9  remember.
10    A  I remember him telling me that, uh,
11 Shields put his finger in his face.
12    Q  Anything else?
13       (Whereupon, there was a cell phone
14 interruption.)
15       THE WITNESS:  Could you hold on one
16 minute?
17 BY MR. LEINENWEBER:
18    Q  Yeah.
19       (Discussion off the record commencing at
20 3:48 p.m. and concluding at 3:48 p.m.)
21       MR. LEINENWEBER:  We can go off the
22 record, Beth.
23       THE REPORTER:  Okay.
24       (A brief recess was taken commencing at

Transcript of Cecil Williams
Conducted on July 14, 2020

71 (281 to 284)

---

281

1  3:48 p.m. and concluding at 3:54 p.m.)
2      MR. LEINENWEBER:  Everybody good to go
3  back on the record?
4      THE REPORTER:  Yes, thank you.
5      TECH BROWN:  Yes.
6      THE WITNESS:  Yes.
7      TECH BROWN:  Sounds good.
8      MS. KRAUCHUN:  Yes.
9  BY MR. LEINENWEBER:
10    Q  Okay.  All right.  Mr. Williams, just have
11 a few questions left for you here.  You
12 understand, you're still under oath, right?
13    **A  Yes.**
14    Q  Okay.  When we took a break we were
15 talking about an incident that Mr. Winston
16 reported to you where Director Shields pointed
17 his -- put his finger in Mr. Winston's face, as
18 you described it, I think?
19    **A  (Inaudible.)  Correct.**
20    Q  Okay.  What else do you recall about that
21 incident?
22    **A  He just gave me a brief, that, uh,**
23 **conversation.  I don't remember everything; but**
24 **I do remember that he said Shields -- him and**

---

282

1  **Shields, they got -- whatever happened, Shields**
2  **put his hand in his face.  I do remember that.**
3  **Exactly what led up to that point, I don't know.**
4      Q  Okay.  So you don't know what the cause of
5  the dispute between the two of them was?
6      **A  No, I don't know what the cause of it was.**
7  **No, I don't.**
8      Q  Okay.  And do you know what, uh,
9  Mr. Shields said to Mr. Winston in that, um,
10 dispute?
11    **A  No, I don't recall.**
12    Q  Okay.  And do you know what Mr. Winston
13 said in response?
14    **A  I wasn't there.  So I can't say**
15 **specifically what was said.**
16    Q  Okay.  Do you have any other information
17 about what, uh, happened in that incident?
18    **A  All I know is that it -- all I know is**
19 **that he put -- I was told, "He put his hand in**
20 **my face."  That was it.  And I didn't -- I cannot**
21 **recall anything else about that conversation, but**
22 **I do remember that much.**
23    Q  Okay.  And you don't know if there was
24 any discipline meted out to anyone as a result of

---

283

1  that?
2    **A  I -- I can't recall.**
3    Q  Okay, um.  Any other incidents, uh, with
4  Shields that you remember Winston telling you
5  about?
6    **A  Well --**
7    Q  And, again, these are -- just for
8  clarification, I'm talking about incidents or
9  disputes that Winston had with Shields.
10   **A  I can't recall them all, but I know it was**
11 **a numerous of them.  I can't recall them.  I**
12 can't recall them (inaudible) word for word, or
13 verbatim.  I cannot recall everything that was
14 said, but I know that that was it.
15   Q  Okay.  Do you know what the subject of any
16 other disputes between Winston and Shields were?
17   **A  No, I don't.**
18   Q  Do you know what was said by Shields or by
19 Winston in any of those disputes?
20   **A  I was not in there.  So I cannot put the**
21 **word verbatim.**
22   Q  Okay.  And do you know when any of these
23 disputes between Shields and Winston occurred?
24   **A  I cannot remember exact date.**

---

284

1    Q  Even an estimate, can you even give an
2  estimate of a date?
3    **A  Uh, around '14, between '14 and '16.**
4    Q  Okay.  Anything else you recall, uh,
5  Winston telling you about, um, issues he was
6  having with Shields?
7    **A  I can't recall.**
8    Q  Okay, um.  You also mentioned an incident
9  with -- uh, between Winston and Ranzino.  Um, tell
10 me about that one.
11   **A  Same thing, I can't recall exactly what**
12 **was said because I wasn't in the room; but I do**
13 **remember him complaining about that, yes.  See,**
14 **me and Winston was partners.  So we worked every**
15 **day.  I don't recall everything that our**
16 **conversation was.  I don't recall everything.**
17   Q  Okay, um.  Were you present for a dispute
18 between Ranzino and Winston where Ranzino said
19 something along the lines of:  You all look alike?
20   **A  Yeah, that happened in roll call.**
21   Q  Okay.
22   **A  Everybody was there.  That happened in**
23 **roll call.**
24   Q  Okay.  And what do you remember about

---

Transcript of Cecil Williams
Conducted on July 14, 2020

72 (285 to 288)

285

1 that?

2    **A Ranzino asked the question because he was**
3 **talking to one investigator, and he was talking**
4 **about another investigator. He says, "No, I**
5 **forgot. You all look alike." I remember that.**

6    Q What else do you remember about that
7 incident?

8    **A That -- that was in roll call. I can't**
9 **recall everything that happened that day.**

10    Q Um, do you know if an investigation of
11 any kind was conducted into that, uh, incident?

12    **A I can't recall.**

13    Q Okay. Do you know if you were a
14 participant in the investigation as a witness?

15    **A You know what? I'm not sure. I think**
16 **I -- I'm not sure. I'm not sure.**

17    Q Okay, um. Anything else you remember
18 about that incident with Ranzino?

19    **A I'm not -- I can't recall.**

20    Q Okay, um. Any other incidents between
21 Mr. Ranzino and Mr. Winston that you remember
22 hearing about from Mr. Winston?

23    **A I can't recall.**

24    Q Okay, um. What about, uh -- you mentioned

286

1 Rohloff, uh. What did, um -- what did Winston
2 ever complain to you about, um, regarding
3 Mr. Rohloff?

4    **A Sometimes he -- he was the one who wanted**
5 **to make the assignments, and he was the one that**
6 **put everything together. And, I mean, it was --**
7 **he was just a part of the supervisor's -- uh, the**
8 **supervisor's crew. That's all.**

9    Q Anything else you remember?

10    **A That's it.**

11    Q Okay, um. Do you ever remember
12 Mr. Winston saying that Mr. Rohloff had used
13 any kind of, uh, derogatory, racist language
14 with him?

15    **A I don't want to say "no," and I don't want**
16 **to say "yes." So I don't recall.**

17    Q Okay. That's fair, um. Any other details
18 about any incidents between Mr. Rohloff and
19 Mr. Winston that you recall hearing about?

20    **A If they had happened, but I don't recall**
21 **it.**

22    Q Okay. So sitting here today, you can't
23 give me any details about any --

24    **A I can't give no details.**

287

1    Q Just one sec. Let me -- let me just
2 finish, so I have a clear record.

3    MS. KRAUCHUN: Yeah, just wait.

4    MR. LEINENWEBER: Thanks.

5    Q Sitting here today, you can't tell me
6 about any other incidents or issues between
7 Mr. Rohloff and Mr. Winston, um, that you heard
8 about?

9    **A I can't recall right off. I can't say**
10 **"no." I can't say "yes."**

11    Q Okay, um. What about Mr. Neal? Do you
12 remember, uh, Mr. Winston ever telling you, uh,
13 complaining to you about any issues he was having
14 with Mr. Neal?

15    **A Yeah, they was also the same supervisor,**
16 **supervisor-type stuff. I can't recall exactly**
17 **what happened; but I do remember, there was**
18 **complaints about it.**

19    Q What sort of complaints, if you remember?

20    **A That I can't -- I can't recall exactly**
21 **what it was.**

22    Q Were, um, Neal and -- Neal and Rohloff,
23 were they deputy chiefs?

24    **A Yes.**

288

1    Q Okay. Were there any other deputy chiefs?

2    **A No, Neal was the chief. Rohloff was a**
3 **deputy chief.**

4    Q Okay. Were there any other chiefs or
5 deputy chiefs besides Ranzino, Rohloff and Neal
6 that, uh, worked on your shift?

7    **A No. Them was all supervisors on our**
8 **shift.**

9    Q So there were no other, like, lieutenants
10 or anything like that?

11    **A At the time, no.**

12    Q Okay. And when you say "at the time,"
13 when are you referencing?

14    **A Between, uh, '13 and '16.**

15    Q Okay. What about since --

16    **A (Inaudible.)**

17    Q What about since 2016 to the present?

18    **A Well, to the present it's a whole new**
19 **regime.**

20    Q Okay. And, um, are you alleging that
21 any of the, quote, unquote, "new regime," um,
22 engaged in any discrimination against you?

23    **A Well, there's only -- only two people that**
24 **is left from the old regime there. So, it's --**

Transcript of Cecil Williams
Conducted on July 14, 2020

---

289

1 like I say, sometimes you get stuff that's brought
2 over. So I can say "yes," and I can say "no."
3  Q Um, anything, uh, specifically that you
4 can tell me about, any issues that you are
5 alleging, um, are discriminatory acts by any of
6 your current supervisors?
7  A No.
8  Q Um, and then back to Mr. Neal; any other
9 recollections of Mr. Winston complaining to you
10 about things that Mr. Neal said or did?
11  A Yeah, they was -- it was complaints.
12 I just can't remember them all. It was
13 complaints. There was definitely complaints.
14  Q And you just can't remember what they were
15 about?
16  A I can't remember what they was about.
17 We're talking years ago. So I can't remember
18 everything.
19  Q Do you have any recollection of what you
20 personally heard Mr. Neal say to Mr. Winston?
21  A Uh, wow. I -- I -- I know it was
22 something. I can't remember it right now. I
23 can't remember it.
24  Q Um, what about Mr. Rohloff? Any

---

290

1 recollection of any, uh -- did you hear -- do
2 you have any recollect- -- strike that.
3   For Mr. Rohloff, do you have any
4 recollection of hearing Mr. Rohloff say anything,
5 uh, to Mr. Winston that you consider to be
6 derogatory or racist or offensive?
7  A I cannot remember that right now. It's
8 been so long.
9  Q Okay, um. Other than Ranzino's comment
10 about "you all look alike," do you have any
11 recollection of hearing Mr. Ranzino make any
12 comments to Mr. Winston that you consider to be
13 racist or discriminatory or offensive?
14  A I can't recall that. I'm not saying "no."
15 I'm not saying "yes." I just can't recall it.
16  Q Understood, understood, um. What about
17 with -- sorry, strike that. With regards to
18 Mr. Shields, do you remember hearing Mr. Shields
19 say anything to Mr. Winston that you considered
20 to be racist or derogatory or offensive?
21  A I cannot remember that. I can't say
22 "yes." I can't say "no."
23  Q Okay, um. Any other complaints that you
24 recall Mr. Winston making to you, um, about

---

291

1 treatment he was experiencing at the sheriff's
2 office?
3  A Yeah, harassment; and I can't recall
4 exactly dates and times and specific words, but
5 I definitely recall that it was said.
6  Q That harassment was said?
7  A Yes.
8  Q Okay. That Mr. Winston felt that he was
9 being harassed?
10  A Also, yes.
11  Q Okay. But sitting here today, you have
12 no specific recollection about the details of that
13 alleged harassment?
14  A I can't remember right off today.
15  Q Okay.
16  A It's not on the top of my head.
17  Q I understand, um. Let's see, um. The
18 meeting that you and the other plaintiffs had,
19 um -- and I'm using the term "meeting," not with
20 any specific connotation. Again, I'm not trying
21 to make it out to be something that you don't
22 represent it to be.
23   The gathering, the meeting, whatever you'd
24 like to call it, um; I'd like to try and talk to

---

292

1 you just a little bit more about that and see if
2 you recall when that occurred.
3  A I do not recall the specific date.
4  Q Okay.
5  A But I can tell you that, uh, the first
6 time -- I want to say it was in between. The
7 exact date and time, I don't remember. I do not
8 remember the exact date and time.
9  Q Okay. Could you estimate a year that it
10 occurred?
11  A Uh, I want to say '13.
12  Q 2013?
13  A I might be mistaken, but I think it was
14 '13 --
15  Q Okay.
16  A -- when we first started talking about it.
17  Q Okay.
18   MR. LEINENWEBER: Kelly, just give me a
19 sec to go over my, uh, outline, and I think
20 that I may be finished.
21   MS. KRAUCHUN: Sounds good.
22   MR. LEINENWEBER: So we can go off the
23 record for a sec, but I'm --
24   THE REPORTER: Okay.

---

Transcript of Cecil Williams
Conducted on July 14, 2020

74 (293 to 296)

293

1      MR. LEINENWEBER: -- just going to stay
2 here and look at this real quickly.
3      THE REPORTER: Okay.
4      (A brief recess was taken commencing at
5 4:07 p.m. and concluding at 4:08 p.m.)
6      MR. LEINENWEBER: We can go back on the
7 record.
8      THE REPORTER: Okay.
9 BY MR. LEINENWEBER:
10   Q Mr. Williams, at this time I have no
11 further questions for you. I do want to just
12 thank you very much for your time today and, um,
13 your sitting here and doing this virtually, um.
14 I know it's a little bit of a learning experience
15 for all of us. So I appreciate your patience and
16 your, um -- your cooperation today.
17   A All right. Thank you.
18   Q Thank you.
19      EXAMINATION
20 BY MS. KRAUCHUN:
21   Q And, uh, Cecil, I'm just going to ask you
22 a few clarification questions. So I'm going to
23 take us back all the way to the beginning of our
24 deposition, um, sometime ago. Um, you identified,

294

1 um, four sections of the EM unit. And just, um --
2 it was patrol, delivery, TSS and office; is that
3 correct?
4   A Correct.
5   Q Okay. And you identified that you worked
6 in patrol, right?
7   A Correct.
8   Q You identified that you worked in
9 delivery, right?
10   A Correct.
11   Q And you identified that you worked in
12 TSS, right?
13   A Correct, correct.
14   Q Um, did you ever work in the office?
15   A No.
16   Q So who usually, um, in the EM, out of
17 EM investigators, usually gets assigned to work
18 in the office?
19      MR. LEINENWEBER: Objection to form and
20 foundation.
21 BY MS. KRAUCHUN:
22   Q Based on the roster sheets, who gets
23 assigned to work in the office?
24   A Most of the white officers.

295

1   Q And would those white officers have less
2 seniority than you?
3   A Yes.
4      MR. LEINENWEBER: Same objection.
5 BY MS. KRAUCHUN:
6   Q Um, is there any reason why you could not
7 work in the office?
8   A No.
9   Q So any officers that are assigned to work
10 in the office, are they, um -- you have the same
11 training to do the same type of jobs; is that
12 correct?
13   A Correct.
14      MR. LEINENWEBER: Objection to form and
15 foundation.
16 BY MS. KRAUCHUN:
17   Q And to your knowledge and, uh, based on
18 your experience with the roster assignments, um,
19 have there been officers or investigators in the
20 EM unit that have only been assigned to work in
21 the office?
22   A Yes.
23   Q And what would their race -- what race are
24 they?

296

1   A White.
2   Q Okay, um. And then just kind of, um,
3 moving forward a little bit: Counsel asked you
4 a lot of questions about the grievance procedure,
5 um, and when you received discipline. Do you
6 remember that line of questioning?
7   A Yes.
8   Q So who would issue discipline to you?
9   A Shields.
10   Q And Shields, what was his title?
11   A The director.
12   Q And you had an opportunity to grieve
13 discipline issued to you, correct?
14   A Correct.
15   Q And when you grieved discipline who was
16 in charge of hearing those grievances?
17   A First it would be -- uh, it would go
18 directly to Shields.
19   Q And then what would happen after Shields
20 heard that grievance?
21   A A decision.
22   Q And would there ever be a time where
23 you would file a grievance and you would be
24 grieving -- strike that. Let me restart that, um.

Transcript of Cecil Williams

75 (297 to 300)

Conducted on July 14, 2020

297

1      Was there a potential that you could file
2 a grievance, uh, challenging discipline to the
3 person who issued it?
4      MR. LEINENWEBER:  Objection.
5 BY MS. KRAUCHUN:
6    Q  Does that make sense?  Is that clear?
7 I know what I'm trying to ask.  Okay.
8    **A  So basically what you're saying is, the**
9 **person that issued the punishment is the person**
10 **that's giving you the -- giving you the**
11 **punishment?**
12    Q  Right.  So the person issuing the
13 discipline, you said, is Shields, correct?
14    **A  Right.**
15    Q  So when you grieve the discipline that
16 you're issued, that grievance -- the person that
17 hears that grievance is Shields as well; is that
18 correct?
19    **A  Correct.**
20    Q  Okay, um.  And then you talked about being
21 down in TSS, um.  Would you say TSS is a -- is a
22 dangerous assignment?
23      MR. LEINENWEBER:  Objection to form and
24 foundation.

298

1      THE WITNESS:  Yes.
2 BY MS. KRAUCHUN:
3    Q  And specifically what makes that more
4 dangerous than, say, working in the office?
5    **A  You got less people --**
6      MR. LEINENWEBER:  Objection.
7      THE WITNESS:  -- more inmates.
8      THE REPORTER:  I'm sorry.  Can you repeat
9 your -- can you repeat -- can you repeat your
10 answer, please.
11      THE WITNESS:  Me?
12      THE REPORTER:  Yes, please.
13      THE WITNESS:  Less officer, more inmates.
14 BY MS. KRAUCHUN:
15    Q  Um, and so what would be -- from your
16 experience, uh, working in TSS, would you have --
17 would there be more of an opportunity, um, for
18 injury?
19    **A  Yes.**
20      MR. LEINENWEBER:  Objection to form and
21 foundation.
22 BY MS. KRAUCHUN:
23    Q  Um, working in patrol and, um,
24 reincarcerating detainees, would there be more

299

1 of a chance, um, for injury?
2      MR. LEINENWEBER:  Same objection.
3      THE WITNESS:  Yes.
4 BY MS. KRAUCHUN:
5    Q  Working in delivery, delivering detainees
6 that were just recently released, um, is there
7 more of a chance of injury?
8      MR. LEINENWEBER:  Same objection.
9      THE WITNESS:  No.
10 BY MS. KRAUCHUN:
11    Q  Working in the office, is there any chance
12 of injury?
13    **A  None.**
14      MR. LEINENWEBER:  Same objection.
15 BY MS. KRAUCHUN:
16    Q  Uh, based on your experience in the EM
17 unit for as long as you've been there, um, did you
18 feel that the assignments were given out -- given
19 out fairly?
20    **A  No.**
21      MR. LEINENWEBER:  Objection to form and
22 foundation.
23 BY MS. KRAUCHUN:
24    Q  And what was based -- the way the

300

1 assignments were given out, what do you believe
2 it was based on?
3    **A  Race.**
4    Q  And then, um, kind of moving along; you
5 talked about, um, the -- the walking on the wax
6 floors and how you received discipline for that.
7 I know we kind of hashed it through pretty
8 extensively; but do you know any other officers,
9 uh -- specifically white investigators -- that
10 ever received, like, discipline for -- for
11 minuscule things such as walking on a waxed floor?
12    **A  No.**
13      MR. LEINENWEBER:  Objection to form and
14 foundation.
15 BY MS. KRAUCHUN:
16    Q  Um, and you testified earlier that there
17 was approximately 30 investigators in the EM unit,
18 correct?
19    **A  Correct, per shift --**
20    Q  And so --
21    **A  -- yes.**
22    Q  Per shift, there is 30 investigators?
23    **A  Yes.**
24    Q  And do you tend to kind of know everybody

Transcript of Cecil Williams
Conducted on July 14, 2020

301

1  else's business, so to speak, because you are a
2  smaller unit?
3      MR. LEINENWEBER: Objection to --
4      THE WITNESS: Yes.
5      MR. LEINENWEBER: -- form and foundation.
6  BY MS. KRAUCHUN:
7      Q  So if other investigators received
8  discipline, it kind of makes it through the rumor
9  mill, um; is that fair to say?
10     **A  Yes.**
11     MR. LEINENWEBER: Objection; foundation;
12 also, leading.
13 BY MS. KRAUCHUN:
14     Q  Um, and then moving on to this -- this
15 incident; I believe you said it was in 2013, 2014.
16 Uh, you said you had a detainee that, um, escaped
17 and you recaptured him. Do you remember talking
18 about that?
19     **A  Yes.**
20     Q  Do you recall what the original discipline
21 was that you received before you grieved it?
22     **A  Uh, they was pending 29.**
23     Q  That's pending 29 days' suspension?
24     **A  Yes, yes.**

302

1      Q  And who would have issued that 29 --
2  days' suspension to you?
3      **A  Shields.**
4      Q  And do you know of any other white
5  investigators that had detainees escape? Do you
6  know of any of them receiving a 29 days'
7  suspension for similar circumstances?
8      **A  No.**
9      MR. LEINENWEBER: Objection to form and
10 foundation; also, leading.
11 BY MS. KRAUCHUN:
12     Q  And you testified that you ended up with a
13 written reprimand after that, um -- that incident,
14 correct?
15     **A  Correct.**
16     Q  And that was after you went through the
17 grievance procedure; is that correct?
18     **A  Correct.**
19     Q  And do you recall who ultimately made the
20 determination to reduce that to a written
21 reprimand?
22     **A  Shields.**
23     Q  Um, and then, if you recall, uh, counsel
24 was asking you some questions about, um, your

303

1  experience working in EM, um. How did you learn
2  to do your job in EM?
3      **A  On-hand experience; I mean, we had a**
4  **little training through class and then, uh, put us**
5  **on the streets.**
6      Q  So you learned by getting thrown into the
7  fire, so to speak?
8      **A  Basically, basically, yes.**
9      Q  And during your time in EM, how many black
10 supervisors did you have?
11     **A  Two.**
12     Q  And how many supervisors would you have as
13 a whole in the EM unit?
14     **A  As a whole? About 15.**
15     Q  Okay. And, um, I know you testified
16 earlier that there was, um, some more black
17 supervisors in the EM unit currently; is that
18 correct?
19     **A  Yes, at the recently, they -- they**
20 **promoted them, yes.**
21     Q  And was that before or after this lawsuit
22 was filed?
23     **A  After.**
24     Q  Um, and then just moving along, um; there

304

1  was testimony earlier about Rohloff in roll call,
2  I believe, uh, stating that "You -- you people all
3  look alike"; is that correct?
4      **A  Yeah, that was Ranzino.**
5      Q  That was Ranzino. I'm sorry. Thank you
6  for correcting me on that. Um, when he -- when
7  Ranzino used the term "you all look alike," what
8  did you interpret that to mean?
9      **A  That he meant that all black people look**
10 **alike.**
11     Q  Were you offended by that?
12     **A  Yes, I was.**
13     Q  What kind of, um, culture did that kind of
14 set out for your unit under Ranzino?
15     MR. LEINENWEBER: Objection to form;
16 vague; foundation.
17     THE WITNESS: Separation.
18 BY MS. KRAUCHUN:
19     Q  Did that make you trust Ranzino as your
20 supervisor?
21     **A  No.**
22     Q  And then, um, there was a lot of questions
23 as to how you know what kind of discipline, um,
24 white investigators received for different

Transcript of Cecil Williams
Conducted on July 14, 2020

77 (305 to 308)

305

1  incidents.  Do most of the investigators in EM --
2  do you guys discuss discipline, um, that you
3  receive from the job?
4       MR. LEINENWEBER:  Objection; foundation.
5       THE WITNESS:  Barbados (phonetic), we --
6  we -- we hear through rumors among one anothers.
7  BY MS. KRAUCHUN:
8    Q  Have you -- would you, um -- is it fair to
9  say that all races discuss their discipline?
10   A  Sometimes, yes.
11   Q  Sorry, guys.  I'm just going through all
12 my scribbled notes here.  So just give me a
13 minute.
14      MR. LEINENWEBER:  No worries.
15 BY MS. KRAUCHUN:
16   Q  And you talked extensively about, um,
17 having a supervisor call a detainee ahead of time,
18 um, when you would be going out to do a check on
19 them on their house arrest.  Do you remember that
20 questioning and that conversation?
21   A  Yes.
22   Q  So could you explain for me more in depth?
23 Why is that problematic?
24   A  Because, one, you are jeopardizing my

306

1  life.  You're letting the inmate know.  It's not
2  like he's -- he's locked up for church.  He's --
3  he's locked up.  He's just an inmate that's out
4  at home.  So if he's doing something, he got
5  anything planned; he decide to run, anything like
6  that, he's got an upper hand to do it.  If he want
7  to hurt us, he got enough time to get enough
8  people together to hurt us.
9    Q  So did you feel that that put you more in
10 -- at risk of being injured or a dangerous
11 situation?
12   A  Yes.
13   Q  And counsel asked you about whether
14 nonminority officers experienced a supervisor
15 calling a detainee.  Do you remember that --
16   A  Yes.
17   Q  -- question?  And I believe you responded
18 that you don't know, um.  How often were white
19 investigators dispatched in -- to -- to check on
20 house arrest detainees?
21      MR. LEINENWEBER:  Objection to form and
22 foundation.
23      THE WITNESS:  All the time.
24 BY MS. KRAUCHUN:

307

1    Q  And so, to your knowledge, that -- that
2  situation never happened with white investigators?
3    A  That's correct.
4    Q  And I know you were asked at length
5  about whether you filed complaints or grieved
6  disciplinary actions, um.  Were you ever hesitant
7  to file any grievances or -- or complaints?
8    A  No.
9    Q  And then I know there was a lot of, um,
10 talk about, um, bidding.  Did you ever have the
11 option to bid -- to bid to a specific, um, duty?
12 And what I mean by that is:  Did you have the
13 option to bid to work in the office, to work in
14 TSS, to work in patrol, or to work in delivery?
15   A  At the beginning when I first came over
16 there, there was a bidding procedure; after they
17 cut it off, no.
18   Q  And then you recall the documents, um,
19 counsel showed you regarding, um, the complaint
20 you made to OPR, correct?  I believe it was
21 Exhibit 5 -- 4, 5 and 6?
22   A  Correct.
23   Q  Do you remember those docs?  Okay, um.
24 When you filed that complaint, can you walk

308

1  through how that happened?  What happened when
2  you filed that complaint?
3    A  I left the office.  I was upset.  I was
4  nervous.  I was -- I was up- -- upset.  So I went
5  over there.  I got to file the complaint that day.
6  I wrote it down that day and took it back the
7  following day.
8    Q  And, um, do you recall ever communicating
9  to, um, the member of OPR -- and I don't recall
10 his name.  Was it Calderone or --
11   A  Calderone.
12   Q  Um, uh, do you ever recall telling him
13 that, uh, Ranzino called you the N-word?
14   A  Yes.
15   Q  And do you -- strike that.  Outside of
16 your initial complaint, to your knowledge, was
17 any investigation done in relation to that
18 complaint you filed?
19   A  To my knowledge, I haven't received a
20 final answer to it.
21   Q  So do you have any knowledge that there
22 was any, um, interviews done in relation to your
23 complaint?
24   A  No, I have no knowledge, but I know

Transcript of Cecil Williams
Conducted on July 14, 2020

309

1 Ranzino was removed.

2    Q  And so he was -- Ranzino was eventually

3 removed from the electronic monitoring unit; is

4 that correct?

5    A  Correct, correct.

6    Q  Do you know when exactly Ranzino was

7 removed?

8    A  '15, thirt- -- '15 and '16, one or the

9 other.

10    Q  Do you know where he -- Ranzino went to

11 after he left the EM unit?

12    A  He went over to courts.

13    Q  Um, and then back to those documents and,

14 um, your omission of the N-word in there, um;

15 did you intentionally omit that or do you believe

16 that was a mistake?

17    A  That was -- I believe that was a mistake.

18    Q  And you believe you -- you told the OPR

19 investigator that that word was used?

20    A  Correct.

21    Q  Um, counsel asked you a lot about your

22 co-plaintiffs' complaints about discipline and

23 assignments, um.  I just want to clarify.  Your

24 testimony is that you were aware that your

310

1 co-plaintiffs had complaints, but that you

2 couldn't specify exact dates and times; is -- is

3 that correct?

4    A  That's correct.

5    Q  Did you ever hear or witness, um, Shields

6 treating white investigators in a manner similar

7 to those that involved Winston?

8    A  I have seen --

9       MR. LEINENWEBER:  Objection to form;

10 foundation; vague.

11       THE WITNESS:  The difference, yes.

12 BY MS. KRAUCHUN:

13    Q  Sorry, let me clarify that.  Shields

14 treated white investigators different than in the

15 manner that, uh, Winston was treated?

16    A  Yes.

17    Q  And do you recall during your meeting with

18 the other co-plaintiffs, um, that all of you

19 discussed that you felt that black investigators

20 were being treated differently in the EM unit?

21    A  Yes.

22       MR. LEINENWEBER:  Objection to foundation;

23 also, leading.

24 BY MS. KRAUCHUN:

311

1    Q  And in your personal opinion, do you

2 feel that hearing a supervisor, uh -- or multiple

3 supervisors even -- using racially derogatory

4 comments, um, creates some sort of, uh, hostile

5 environment?

6    A  Yes, I do.

7       MR. LEINENWEBER:  Objection to form;

8 foundation.

9 BY MS. KRAUCHUN:

10    Q  Um, and I don't think I have anything

11 else.  Let me just scroll through these real

12 quick here.  I think that's all I have.

13 Thank you.

14            EXAMINATION

15 BY MR. LEINENWEBER:

16    Q  Mr. Williams, I just have two quick

17 follow-ups for you.  Um, Mr., uh, Ranzino, he made

18 the comment that you found distasteful of, you

19 know:  "You all look alike," right?

20    A  Correct.

21    Q  Do you know why he was removed from EM?

22    A  No, I do not know why he was removed, no,

23 but I know he was removed.  I don't know the

24 reason why.  I never got nothing in writing that

312

1 said:  This is the reason why.  No, I don't.

2    Q  Um, and, uh, he was never your supervisor

3 again after that, right?

4    A  Correct.

5    Q  Okay.  And, um, just one thing here; you

6 said recently there's been some promotions of

7 African-American, um, employees to supervisors.

8 Do you know who made the decision to promote those

9 individuals?

10    A  Well, there is a new director there.

11 So that's a whole different -- there -- there is

12 an African-American female director there now.

13    Q  Okay.  And so --

14    A  That's -- that's a different director

15 there.

16    Q  Okay.  And so your understanding is that

17 she is the one who made those decisions on

18 promotions?

19    A  Uh, as far as I know of, when they was

20 promoted, she was there.  Shields was gone by the

21 time she was promoted -- the promotions was done.

22 So up under her, this is who she promoted.  Under

23 him, this is who he promoted.  So I don't know.

24    Q  Okay.  Do you have any understanding

Transcript of Cecil Williams
Conducted on July 14, 2020

79 (313 to 316)

313

1  whether this lawsuit played any role in the
2  promotion of any of those individuals?
3      **A  I cannot answer that question.  I don't**
4  **know.**
5      Q  Okay.  That's all I had.
6      MS. KRAUCHUN:  Great, I think we're
7  officially done, Mr. Williams.
8      MR. LEINENWEBER:  Off the record, right?
9      (Discussion off the record commencing at
10 4:29 p.m. and concluding at 4:30 p.m.)
11     THE REPORTER:  Did you want to order the
12 transcript?
13     MR. LEINENWEBER:  Yeah, we'll order the
14 transcript.
15     THE REPORTER:  Okay.  What specifics do
16 you like?  Do you like the hard copy, electronic?
17     MR. LEINENWEBER:  Electronic, yeah.
18     THE REPORTER:  Electronic, okay.
19     MR. LEINENWEBER:  Ethan, did you have any
20 specifics or --
21     MR. WHITE:  No, just electronic, regular
22 delivery would be great.
23     MR. LEINENWEBER:  Yeah.
24     THE REPORTER:  Okay.  And Kelly?

314

1      MS. KRAUCHUN:  Yeah, I'm not going to
2  order right now, but I'm sure we will.
3      THE REPORTER:  Okay, very good.
4  Thank you.
5      MR. LEINENWEBER:  Do we need signature?
6      THE REPORTER:  Sure.
7      MS. KRAUCHUN:  We can waive signature.
8      THE REPORTER:  Oh, okay.
9      MR. LEINENWEBER:  Um, Kelly, do you want
10 to stay on for a second?  We can talk about
11 Thursday, or I haven't checked my e-mails at all.
12 So maybe you guys have worked it out already
13 but --
14     MS. KRAUCHUN:  Yeah, I think we did but --
15     MR. LEINENWEBER:  Oh, okay.
16     MS. KRAUCHUN:  You can check through them,
17 yeah.
18     MR. LEINENWEBER:  No, we don't have to
19 if -- unless you want, so.
20     MS. KRAUCHUN:  No, no, I'm good.
21     MR. LEINENWEBER:  Okay.
22     MS. KRAUCHUN:  I'm good; just if you guys
23 don't mind sending me an e-mail.  I have my notes,
24 but what additional documents, um, that we need to

315

1  provide to you, would be good.
2      MR. LEINENWEBER:  I think the main things
3  were the EEOC and the bankruptcy, I think.
4      MS. KRAUCHUN:  Right.  That's what I have
5  in my notes, so.
6      MR. WHITE:  Medical records as well.
7      MR. LEINENWEBER:  Oh, yeah, medical
8  records.
9      MR. WHITE:  We may just -- I mean, we can
10 subpoena those if you can give us a HIPAA waiver
11 or however you want to do that.
12     MR. LEINENWEBER:  Yeah.
13     MS. KRAUCHUN:  That's fine, um.  I'll
14 send you guys an e-mail kind of following up with
15 that.
16     MR. LEINENWEBER:  Sounds good.
17     MR. WHITE:  Okay.  Sounds good.
18     MS. KRAUCHUN:  All right.  Sounds good.
19 All right.  Good job, Cecil.  I'll talk to you
20 guys.
21     MR. LEINENWEBER:  Thanks, Mr. Williams.
22 Thank you, uh, Beth and Annie.
23     THE REPORTER:  Thank you.
24     MR. LEINENWEBER:  It was a good experience

316

1  again today.  So we're, uh --
2      THE REPORTER:  Okay, great.
3      MR. LEINENWEBER:  We've got a good run of,
4  uh, technical -- uh, technical competence and
5  no issues, so great.
6      MR. WHITE:  Thanks, guys.
7      MR. LEINENWEBER:  Yeah.
8      TECH BROWN:  Thank you very much.
9      MR. LEINENWEBER:  All right.  Take care,
10 everyone.
11     MS. KRAUCHUN:  Thank you.
12     MR. LEINENWEBER:  Bye-bye.
13     MS. KRAUCHUN:  Thanks.
14     (Concluded at 4:31 p.m.)
15     (Original exhibits retained by
16 Mr. Leinenweber.  Copies of exhibits provided
17 electronically.)
18
19
20
21
22
23
24

317

1      CERTIFICATE OF COURT REPORTER
2
3      I, Beth A. Wakenight, Certified Shorthand
4    Reporter No. 084.003605, B.A., CSR, RPR, CRR, for
5    the County of Kane, State of Illinois, the officer
6    before whom the foregoing deposition was taken, do
7    hereby certify that the foregoing transcript is a
8    true and correct record of the testimony given;
9    that said testimony was taken by me
10   stenographically and thereafter reduced to
11   typewriting under my direction; that reading and
12   signing was not requested; and that I am neither
13   counsel for, related to, nor employed by any of
14   the parties to this case and have no interest,
15   financial or otherwise, in its outcome.
16     Dated this 27th day of July, 2020.
17
18
19
20   _____
      BETH A. WAKENIGHT, CSR/RPR/CRR
21    CSR No. 084.003605
22
23
24

**A**

**ability**
56:11, 56:16
**able**
8:10, 15:9,
27:22, 30:22,
31:1, 31:7,
31:10, 38:21,
61:14, 63:5,
81:7, 92:14,
102:24, 103:10,
158:8, 170:3,
176:14, 203:5,
236:1, 236:7,
241:24
**above**
28:15, 133:15,
237:15
**absolutely**
113:13
**academy**
17:10, 17:14,
17:17, 17:18
**accept**
61:4, 190:13
**accident**
59:14
**according**
192:20
**account**
82:22, 180:24,
207:14, 217:23,
217:24, 218:3
**accountable**
224:6
**accounts**
206:10, 206:18,
217:22
**accumulate**
161:23
**accurate**
161:16, 245:12,
250:19
**accused**
136:20, 137:2,
137:5, 142:24
**acknowledge**
6:5, 6:16

**across**
96:10, 96:15,
96:17, 108:14,
108:17, 164:9
**acting**
56:12
**actions**
116:16, 160:21,
229:4, 307:6
**active**
14:8, 231:16,
233:23
**activities**
158:24, 159:22
**activity**
159:15, 160:6
**acts**
170:23, 289:5
**actual**
46:22, 64:18
**actually**
9:3, 28:19,
31:21, 46:15,
49:18, 50:8,
51:4, 52:3,
60:11, 62:24,
81:20, 82:1,
83:5, 83:11,
101:10, 102:23,
103:10, 113:17,
115:6, 118:12,
135:11, 135:19,
137:1, 137:3,
141:10, 154:5,
155:17, 159:6,
161:17, 161:20,
176:6, 190:21,
190:22, 203:6,
213:1, 225:12,
235:23, 237:12,
243:8, 253:19,
271:10
**add**
25:6, 114:23,
171:22, 203:19,
204:4, 204:24,
226:2, 226:11,
252:20

**addicts**
53:6
**addition**
7:4
**additional**
49:23, 314:24
**address**
43:20, 43:22,
44:4, 44:9,
44:11, 44:17,
49:24, 51:10,
205:20, 205:23,
205:24, 222:17,
238:10
**addresses**
206:3
**adequately**
222:5
**administration**
31:22, 33:13
**administrator**
33:20
**admissibility**
6:7
**advancement**
184:2
**advancing**
184:8
**advantage**
63:7
**adverse**
160:21
**affairs**
29:20, 29:23
**african-american**
76:13, 93:11,
120:13, 121:17,
156:8, 171:5,
172:8, 224:5,
312:7, 312:12
**african-americans**
85:17, 150:18,
150:21, 151:18,
151:22, 152:10,
153:3
**after**
17:18, 17:21,
19:2, 39:23,

**68:21, 68:22,**
78:24, 105:13,
121:10, 122:19,
125:24, 133:11,
134:11, 157:12,
195:9, 214:23,
214:24, 224:7,
241:21, 244:11,
256:3, 256:24,
296:19, 302:13,
302:16, 303:21,
303:23, 307:16,
309:11, 312:3
**again**
8:21, 16:16,
33:12, 44:16,
104:13, 111:18,
112:8, 120:3,
121:14, 133:11,
147:8, 150:10,
153:13, 155:3,
162:18, 165:1,
180:16, 206:14,
212:14, 212:24,
216:10, 244:11,
247:6, 249:15,
252:2, 252:7,
262:3, 266:15,
283:7, 291:20,
312:3, 316:1
**against**
27:11, 27:14,
107:2, 157:14,
159:17, 159:23,
225:7, 229:9,
238:16, 242:17,
247:3, 259:4,
259:7, 262:5,
288:22
**aggravating**
53:12
**aggressive**
139:12, 184:13
**ago**
89:2, 216:3,
229:15, 260:16,
262:15, 266:6,
266:16, 271:8,

289:17, 293:24
**agree**
6:10, 10:3,
90:9, 150:6,
150:7, 154:24,
203:5
**agreed**
204:22, 205:5
**agreement**
9:5, 32:1,
32:10, 32:14,
32:19, 33:3,
33:5, 33:6,
33:9, 178:23
**ah**
231:10
**ahead**
66:9, 66:10,
73:20, 74:3,
122:22, 130:5,
138:10, 138:11,
138:12, 154:2,
161:4, 163:18,
164:20, 166:18,
177:1, 177:3,
186:12, 199:6,
200:3, 200:4,
202:23, 210:11,
215:24, 225:16,
227:16, 227:19,
236:13, 252:18,
252:22, 305:17
**aimed**
124:11
**ain't**
24:20, 78:4,
100:13
**al**
1:7, 1:12
**alike**
92:6, 93:4,
156:5, 156:23,
284:19, 285:5,
290:10, 304:7,
304:10, 311:19
**alike"**
304:3
**allegation**
240:10, 252:14,

253:16
**allegations**
113:8, 207:4,
207:11, 211:21,
212:21, 216:16,
217:3, 224:19,
225:6, 228:14,
237:19
**allege**
124:12, 142:2,
142:23, 158:17,
160:5, 160:10,
170:24, 171:19,
181:21, 192:14,
192:24
**alleged**
245:7, 291:13
**alleging**
86:12, 89:10,
93:6, 95:9,
120:15, 177:15,
224:23, 288:20,
289:5
**alloter**
120:10
**allow**
8:13, 11:17,
190:6, 203:20
**allowed**
43:12
**allows**
38:23
**along**
16:8, 34:21,
39:15, 92:20,
122:14, 284:19,
300:4, 303:24
**already**
47:13, 81:7,
81:10, 95:21,
112:17, 114:16,
131:3, 139:24,
160:16, 183:13,
187:6, 221:9,
254:20, 314:12
**also**
3:26, 7:19,
14:4, 19:21,

23:22, 29:6,
44:23, 45:7,
45:21, 48:2,
48:21, 66:20,
86:1, 156:4,
157:22, 164:3,
191:11, 228:17,
246:16, 284:8,
287:15, 291:10,
301:12, 302:10,
310:23
**always**
21:5, 76:2,
82:10, 93:21,
145:12, 167:23,
167:24, 168:1,
193:6, 201:10,
201:13, 269:14,
270:2
**amlodipian**
196:2
**among**
111:10, 214:15,
216:20, 259:1,
305:6
**amount**
26:16, 164:12,
165:3, 165:13,
165:14, 181:12,
191:15, 201:16,
223:20
**anguish**
181:8, 191:14,
193:24
**annie**
3:26, 73:7,
74:12, 84:10,
87:14, 113:11,
123:9, 123:13,
124:5, 136:17,
138:4, 140:3,
180:7, 194:18,
195:24, 205:13,
210:20, 221:23,
223:24, 226:21,
234:16, 235:19,
235:21, 237:23,
242:21, 247:22,

248:15, 251:2,
255:6, 315:22
**annie's**
235:8
**another**
25:19, 25:20,
41:3, 65:6,
65:9, 76:7,
79:13, 136:17,
136:19, 141:22,
164:8, 165:15,
184:12, 223:12,
245:1, 256:8,
285:4
**anothers**
305:6
**answer**
8:20, 8:24,
9:16, 10:1,
12:13, 23:1,
23:4, 32:23,
33:11, 33:13,
33:20, 36:6,
54:2, 56:3,
61:1, 64:3,
92:12, 92:14,
107:4, 107:9,
109:8, 129:6,
129:7, 129:10,
134:19, 136:7,
136:9, 138:14,
140:4, 141:7,
141:16, 143:16,
151:12, 151:15,
152:20, 153:19,
153:20, 158:8,
165:6, 165:19,
172:24, 181:2,
188:10, 188:11,
189:15, 190:12,
192:21, 197:17,
197:20, 197:22,
199:12, 199:23,
200:7, 212:5,
214:11, 233:2,
237:14, 257:12,
259:5, 259:9,
259:11, 259:13,

Transcript of Cecil Williams
Conducted on July 14, 2020                                    83

261:19, 264:22,
270:2, 272:3,
272:11, 272:13,
275:18, 275:19,
277:13, 277:15,
298:10, 308:20,
313:3
**answered**
111:4, 199:6
**answering**
171:2, 214:8
**answers**
4:14, 4:19,
11:10, 123:6,
180:4
**anthony**
220:11, 220:16,
220:17, 220:22,
273:12, 273:13
**anti-anxiety**
195:21
**anticipate**
8:18
**anticipated**
23:15
**anybody**
11:18, 13:1,
36:1, 36:2,
73:2, 103:21,
109:18, 112:15,
136:3, 207:3,
207:10, 211:7,
228:10, 268:1,
273:10, 273:11,
276:13
**anymore**
31:10, 49:24,
65:8, 185:17
**anyone**
10:15, 36:11,
71:13, 96:14,
106:12, 108:6,
111:20, 186:19,
206:19, 207:21,
225:19, 232:1,
282:24
**anything**
11:21, 12:5,

19:23, 21:16,
22:2, 31:24,
42:24, 43:8,
46:10, 51:20,
59:8, 59:24,
60:21, 71:18,
73:19, 76:12,
78:11, 84:5,
86:4, 87:6,
88:12, 89:4,
91:12, 92:7,
92:15, 92:19,
92:20, 92:23,
93:1, 101:6,
102:21, 107:2,
111:7, 111:8,
111:11, 114:6,
114:22, 117:4,
126:16, 130:10,
130:14, 137:16,
137:24, 160:18,
171:22, 190:2,
191:4, 203:19,
206:24, 208:14,
208:18, 208:19,
209:5, 209:7,
212:21, 213:6,
213:22, 213:23,
214:3, 215:6,
218:19, 219:2,
219:9, 226:2,
228:20, 232:11,
249:22, 274:2,
280:12, 282:21,
284:4, 285:17,
286:9, 288:10,
289:3, 290:4,
290:19, 306:5,
311:10
**anytime**
9:13, 186:13
**anywhere**
69:22, 70:1,
70:5
**apologies**
250:13
**apologize**
51:9, 51:10,

170:7, 184:10,
209:11, 276:3
**appearance**
203:10
**apple**
64:14, 127:9
**applied**
61:3, 61:7,
61:9, 62:12,
72:17
**applies**
89:8
**apply**
72:19, 72:21
**appreciate**
293:15
**approach**
219:22, 219:23
**appropriate**
254:7
**approval**
250:18
**approving**
33:7
**approximately**
79:18, 300:17
**approximation**
227:21
**april**
237:1, 237:9,
238:14, 238:21,
238:23, 241:21,
244:9, 245:9,
250:8, 250:17,
250:23, 251:6
**arbitrarily**
224:4
**area**
43:9, 70:12,
70:20, 163:9,
164:7, 164:8,
165:4, 165:5,
166:9, 166:15,
166:16, 166:23,
167:15, 167:18,
167:19
**areas**
71:5, 71:7,

76:19, 85:8,
85:9, 85:20,
86:17, 88:20,
88:24, 89:1,
95:19, 95:23,
95:24, 114:8,
114:12, 114:17,
149:17, 149:19,
160:14, 161:1,
163:8, 164:6,
166:21, 169:3,
184:8, 224:22
**armed**
58:7
**around**
18:15, 31:12,
31:13, 31:16,
54:22, 54:23,
63:2, 79:8,
79:10, 79:14,
79:23, 80:10,
80:13, 101:19,
107:18, 120:7,
137:14, 163:10,
170:4, 219:20,
219:21, 240:5,
240:14, 245:22,
246:7, 257:12,
284:3
**arrangement**
190:24, 204:7
**arrest**
41:3, 41:6,
41:9, 41:12,
42:5, 42:15,
42:16, 42:17,
43:5, 43:6,
45:18, 46:23,
91:18, 165:20,
165:21, 305:19,
306:20
**arrival**
125:24, 128:1,
134:11
**arrived**
126:10
**aside**
157:5, 171:18,

Transcript of Cecil Williams
Conducted on July 14, 2020

84

242:19, 247:20,
253:22
**asked**
21:19, 25:24,
51:19, 77:6,
99:6, 100:1,
100:8, 100:9,
100:10, 100:12,
100:22, 101:3,
102:14, 102:19,
103:21, 104:2,
109:16, 138:5,
139:22, 154:3,
159:19, 160:21,
170:23, 171:3,
171:7, 172:8,
199:5, 206:11,
211:6, 215:15,
225:18, 229:3,
239:17, 240:20,
245:6, 245:15,
246:11, 251:12,
285:2, 296:3,
306:13, 307:4,
309:21
**asking**
8:19, 9:20,
35:19, 99:2,
103:1, 154:24,
155:1, 155:14,
158:23, 180:23,
195:5, 203:6,
213:11, 214:7,
302:24
**asks**
162:16, 222:2
**assign**
89:20, 149:4,
149:11, 149:23,
149:24, 150:24,
151:22, 260:19
**assigned**
54:8, 70:4,
84:15, 84:16,
84:22, 85:24,
86:13, 86:15,
95:16, 95:18,
113:23, 114:14,

114:16, 114:17,
143:17, 147:22,
150:16, 150:18,
152:8, 152:15,
152:16, 153:3,
153:8, 153:18,
154:9, 155:6,
161:1, 161:2,
294:17, 294:23,
295:9, 295:20
**assignment**
17:18, 20:21,
20:22, 23:13,
23:16, 25:10,
25:16, 26:1,
40:16, 61:14,
66:17, 67:17,
67:18, 68:3,
69:12, 69:22,
95:22, 126:5,
126:6, 128:23,
141:11, 147:22,
297:22
**assignments**
21:10, 21:14,
27:12, 27:16,
30:21, 30:22,
31:1, 31:7,
40:3, 63:13,
68:13, 84:21,
84:24, 95:18,
113:17, 113:19,
143:10, 149:14,
151:9, 154:7,
168:10, 168:14,
169:15, 169:18,
171:20, 224:20,
267:12, 267:21,
269:11, 270:1,
272:2, 276:9,
277:11, 286:5,
295:18, 299:18,
300:1, 309:23
**assisting**
223:14
**associates**
259:24, 261:7,
261:11, 263:16,

265:12, 265:15,
268:17, 270:22,
276:23
**assume**
10:2, 111:18,
220:11
**assumed**
137:8
**assuming**
109:19
**assumption**
108:8
**attach**
202:11
**attached**
203:12
**attempting**
8:24
**attorney**
11:24, 12:1,
12:3, 12:5,
12:6, 12:7,
43:4, 176:24,
189:11, 201:19,
203:4, 203:9,
204:6, 204:7,
206:13, 206:17,
210:4, 211:3,
214:2, 221:13,
221:15, 221:17,
229:16, 231:3,
231:4, 233:16
**attorney-client**
190:4
**attorneys**
7:18, 181:6,
190:9, 190:23,
204:12, 206:20,
207:3, 207:10,
213:23, 214:13,
214:14, 216:12,
232:4
**attributable**
181:13
**authority**
169:24
**automatically**
43:6

**available**
21:10
**averages**
26:19
**aware**
27:2, 37:23,
96:8, 97:4,
120:19, 120:22,
127:22, 140:12,
169:17, 174:6,
175:3, 309:24
**away**
56:19, 56:24,
75:20, 78:11,
81:7, 169:21,
169:23, 170:2,
185:23, 227:1,
241:10
**awol**
106:21, 106:22

**B**

**back**
12:3, 14:24,
30:21, 31:2,
40:1, 46:16,
47:19, 47:23,
49:4, 50:1,
50:22, 50:24,
51:3, 51:4,
52:2, 52:4,
53:22, 54:12,
55:6, 56:12,
58:18, 60:10,
74:19, 75:16,
76:4, 77:17,
79:2, 79:6,
79:9, 79:10,
82:15, 82:18,
82:20, 83:2,
96:7, 98:12,
99:4, 99:5,
99:7, 103:14,
104:7, 104:17,
108:19, 109:12,
113:2, 113:23,
114:8, 148:3,
154:6, 163:7,

Transcript of Cecil Williams
Conducted on July 14, 2020

85

164:14, 173:2,
177:6, 179:8,
187:13, 187:15,
188:19, 189:1,
190:17, 195:7,
201:13, 202:6,
202:19, 205:12,
211:1, 219:17,
221:23, 222:24,
223:16, 224:1,
225:12, 226:24,
230:2, 232:18,
237:24, 240:18,
242:3, 246:11,
249:15, 251:3,
251:19, 255:1,
255:14, 260:4,
260:16, 266:19,
269:21, 270:12,
276:7, 278:4,
281:3, 289:8,
293:6, 293:23,
308:6, 309:13
**background**
13:7, 14:19
**ballpark**
271:5
**band**
41:18, 45:22,
45:24, 64:6,
64:18
**bank**
81:19, 81:21
**bankruptcies**
5:9, 233:24
**bankruptcy**
230:8, 230:10,
230:15, 230:18,
230:21, 231:12,
231:16, 232:19,
232:21, 233:4,
233:9, 233:10,
233:12, 233:17,
234:1, 315:3
**bar**
210:5, 215:5
**barbados**
305:5

**bargaining**
32:1, 32:10,
32:14, 32:19,
33:3, 33:9,
178:23, 179:6
**baroni**
3:20
**bars**
48:11
**based**
6:8, 27:17,
110:18, 113:24,
148:15, 152:8,
152:24, 169:18,
179:14, 185:6,
294:22, 295:17,
299:16, 299:24,
300:2
**basement**
40:20, 47:19,
52:19, 62:23,
85:6, 95:19,
96:3, 96:4,
157:20
**basic**
64:10, 99:12
**basically**
18:16, 20:23,
21:1, 27:13,
27:14, 29:2,
38:10, 40:7,
41:24, 43:11,
45:6, 46:12,
51:23, 54:6,
56:1, 59:14,
64:9, 66:18,
85:3, 85:15,
92:15, 106:1,
120:11, 126:3,
126:13, 130:23,
130:24, 141:18,
163:9, 163:11,
172:17, 176:1,
266:12, 297:8,
303:8
**basis**
25:12, 25:13,
25:14, 36:12,

98:6, 100:4,
100:7, 107:14,
110:9, 179:13
**bates**
4:23, 4:29,
4:33, 235:13,
243:7, 243:9,
248:9
**battery**
44:9
**beat**
83:14, 176:13,
177:20
**became**
122:2
**beef**
173:23
**been**
7:11, 21:5,
23:21, 26:1,
26:4, 49:4,
59:9, 60:6,
60:12, 73:1,
80:18, 80:21,
122:23, 123:4,
166:21, 167:23,
170:15, 176:14,
180:2, 182:23,
183:1, 191:20,
191:21, 193:11,
200:19, 229:4,
229:11, 235:11,
243:4, 247:14,
248:6, 253:2,
257:9, 257:10,
257:17, 271:16,
271:17, 276:17,
278:7, 290:8,
295:19, 295:20,
299:17, 312:6
**before**
2:8, 7:24,
8:24, 20:12,
20:17, 60:24,
61:10, 61:12,
69:10, 72:2,
78:24, 81:7,
82:7, 82:10,

84:1, 100:11,
104:17, 115:7,
121:9, 122:1,
122:4, 122:5,
126:7, 128:20,
130:24, 159:7,
163:11, 174:13,
209:9, 216:3,
226:1, 243:9,
257:9, 265:7,
267:1, 267:2,
267:3, 301:21,
303:21, 317:6
**beforehand**
200:17
**began**
74:24, 89:20
**beginning**
41:5, 62:15,
99:9, 202:5,
226:12, 227:6,
227:7, 238:21,
293:23, 307:15
**behalf**
3:2, 3:10, 3:18
**behavior**
56:5, 193:1
**being**
10:10, 10:11,
18:22, 48:17,
49:3, 52:24,
63:5, 79:1,
84:24, 114:14,
128:13, 128:16,
130:12, 132:6,
133:8, 135:6,
159:16, 161:1,
161:2, 165:6,
165:16, 166:8,
166:11, 170:9,
170:24, 174:12,
179:9, 182:10,
182:15, 184:7,
192:2, 192:3,
192:4, 192:7,
197:15, 262:5,
291:9, 297:20,
306:10, 310:20

Transcript of Cecil Williams
Conducted on July 14, 2020                                      86

**belief**
107:14, 152:7,
179:13, 181:15
**believe**
48:16, 147:16,
150:1, 152:14,
178:18, 178:20,
185:10, 187:8,
201:20, 228:3,
259:3, 259:7,
300:1, 301:15,
304:2, 306:17,
307:20, 309:15,
309:17, 309:18
**below**
243:17, 249:24,
250:17, 251:4
**benefits**
181:4, 188:16,
188:20, 189:3,
189:5
**besides**
78:11, 106:12,
141:15, 182:10,
232:1, 234:6,
288:5
**best**
8:13, 24:2,
29:15, 36:6,
49:1, 50:9,
56:3, 56:5,
61:4, 108:3,
120:7, 152:20,
237:20
**beth**
1:27, 2:8,
73:7, 112:20,
202:19, 210:19,
255:6, 263:1,
276:1, 280:22,
315:22, 317:3,
317:21
**better**
23:24, 30:13,
47:11, 54:2,
62:17, 93:24,
216:15, 226:20,
236:2

**between**
16:4, 62:5,
63:15, 80:10,
101:19, 101:21,
102:9, 102:18,
105:14, 106:17,
111:2, 118:10,
121:21, 158:13,
175:2, 178:14,
282:5, 283:16,
283:23, 284:3,
284:9, 284:18,
285:20, 286:18,
287:6, 288:14,
292:6
**bias**
122:2
**bid**
30:22, 31:1,
31:3, 31:7,
61:14, 168:9,
168:14, 168:17,
169:22, 169:23,
256:5, 256:6,
256:8, 260:14,
260:15, 260:16,
271:6, 271:10,
271:13, 271:14,
271:16, 271:20,
307:11, 307:13
**bidded**
168:14, 168:15,
271:10, 271:18
**bidding**
19:13, 19:15,
19:17, 31:8,
32:18, 33:4,
33:7, 33:8,
307:10, 307:16
**bids**
271:6, 271:7,
271:11
**bie**
99:2
**bieniek**
97:15, 97:19,
97:23, 98:14,
98:21, 99:3,

99:4, 99:10,
99:17, 100:5,
100:20, 100:21,
101:2, 104:24,
106:4, 106:7,
108:21, 109:7,
110:24, 111:12,
112:5, 140:16,
140:19, 142:12,
142:22, 144:10,
145:21
**bieniek's**
101:24
**big**
48:23, 92:24
**bigger**
74:15, 123:14,
249:21
**bit**
13:6, 21:11,
25:4, 27:9,
30:13, 40:1,
47:11, 50:10,
71:9, 74:15,
84:11, 102:23,
113:6, 123:14,
125:22, 126:1,
140:3, 143:13,
155:17, 159:1,
173:1, 181:20,
183:4, 196:1,
205:19, 212:11,
216:14, 226:24,
227:1, 229:15,
231:7, 241:7,
250:11, 258:15,
276:6, 292:1,
293:14, 296:3
**black**
121:24, 152:16,
168:1, 303:9,
303:16, 304:9,
310:19
**blank**
13:20, 14:1
**blue**
210:1
**board**
37:16, 37:22,

38:2, 38:5,
38:6, 38:12,
38:13, 38:18
**book**
245:19
**books**
81:11
**bos**
144:14
**bosques**
143:4, 144:14,
146:1
**both**
102:6, 103:11,
174:1, 174:11,
207:13, 276:2,
278:14, 278:15
**bottom**
37:3, 139:21,
180:22, 194:19,
224:15, 243:19,
250:5
**boundary**
190:4
**brady**
118:20
**break**
9:13, 9:17,
56:24, 73:2,
90:23, 105:13,
112:15, 113:7,
115:7, 222:8,
223:8, 223:22,
226:1, 236:16,
281:14
**breakdown**
26:9, 71:3
**breakout**
210:9, 222:20,
254:14
**breeze**
63:6
**brief**
101:14, 112:23,
203:2, 210:17,
211:2, 216:19,
222:21, 254:23,
280:6, 280:24,

Transcript of Cecil Williams
Conducted on July 14, 2020                                    87

281:22, 293:4
**briefly**
119:24, 204:18,
273:12
**bring**
45:13, 47:15,
47:18, 47:23,
48:22, 58:23,
60:4, 98:12,
99:5, 103:14,
122:23, 235:2
**bringing**
58:20, 75:22
**brings**
9:3, 12:16,
23:14
**broad**
23:2, 23:4,
61:1
**broke**
26:14, 71:5,
71:7, 266:14
**broken**
69:23, 70:24
**brook**
3:15
**brother**
201:12
**brought**
43:14, 99:4,
229:9, 232:10,
289:1
**brown**
3:26, 14:10,
14:15, 14:21,
14:24, 15:3,
15:7, 15:9,
15:12, 73:10,
73:23, 74:2,
113:13, 123:1,
179:22, 210:23,
221:24, 223:3,
226:23, 234:18,
234:21, 234:23,
235:23, 236:5,
236:9, 236:11,
236:18, 236:22,
242:24, 243:13,

243:21, 248:1,
255:1, 255:5,
255:8, 281:5,
281:7, 316:8
**bruise**
59:20
**buddies**
173:6, 211:8
**build**
161:23
**build-up**
193:3
**building**
249:2
**buildup**
198:9
**bumps**
69:10
**business**
103:3, 103:5,
301:1
**button**
14:12, 14:16,
15:5
**bye-bye**
316:12

---
**C**
---

**cage**
47:20, 48:2
**calculate**
181:12, 185:9
**calculated**
57:23
**calderone**
308:10, 308:11
**calendar**
174:18, 175:5,
175:6, 175:7,
175:8
**calendars**
174:16
**call**
7:20, 12:2,
43:22, 44:14,
44:15, 48:7,
49:8, 49:19,
68:1, 68:7,

68:13, 68:21,
68:22, 68:24,
90:24, 91:11,
91:16, 91:19,
91:21, 91:23,
92:3, 93:10,
94:8, 94:21,
99:24, 100:22,
103:18, 125:22,
126:11, 128:3,
128:4, 128:11,
129:14, 129:23,
134:7, 156:1,
156:22, 163:2,
237:1, 238:23,
239:13, 240:23,
242:9, 245:10,
246:21, 251:7,
284:20, 284:23,
285:8, 291:24,
304:1, 305:17
**called**
7:10, 46:3,
46:24, 64:4,
64:5, 90:19,
90:22, 91:2,
91:6, 91:12,
91:24, 92:9,
92:16, 95:9,
102:12, 102:13,
102:14, 104:1,
104:2, 126:6,
126:9, 128:5,
155:21, 157:6,
241:9, 242:8,
247:11, 252:8,
253:4, 253:6,
253:17, 308:13
**calling**
91:3, 103:19,
182:9, 247:7,
252:22, 306:15
**calls**
12:1, 12:7,
41:19, 44:13,
49:11, 129:3,
130:12, 133:22,
134:1, 134:16,

135:6, 153:11,
199:22
**calm**
57:7, 196:15,
196:18
**came**
20:20, 31:2,
40:17, 71:11,
91:16, 99:6,
101:13, 104:17,
119:3, 119:5,
122:19, 167:6,
167:7, 167:10,
168:11, 168:18,
198:8, 221:5,
223:12, 232:23,
251:7, 255:22,
256:1, 256:20,
256:21, 256:23,
256:24, 259:18,
263:14, 265:1,
265:2, 265:7,
266:13, 266:20,
268:15, 270:19,
274:15, 307:15
**camera**
69:7, 226:17,
249:15
**cameras**
61:20
**campus**
240:23, 246:12,
249:2
**can't**
9:6, 10:6,
12:13, 26:15,
27:13, 33:20,
38:10, 38:11,
43:13, 44:4,
72:22, 84:7,
91:17, 92:10,
92:11, 97:21,
106:14, 106:18,
107:4, 119:24,
120:1, 120:2,
134:3, 135:21,
135:22, 136:9,
141:16, 151:12,

Transcript of Cecil Williams
Conducted on July 14, 2020

88

151:15, 153:19,
167:16, 167:17,
173:20, 174:4,
178:9, 181:16,
197:20, 199:12,
202:8, 202:10,
229:1, 233:1,
241:18, 257:11,
259:5, 260:14,
261:19, 264:12,
267:3, 272:13,
272:17, 273:19,
278:2, 279:2,
279:4, 282:14,
283:2, 283:10,
283:11, 283:12,
284:7, 284:11,
285:8, 285:12,
285:19, 285:23,
286:22, 286:24,
287:5, 287:9,
287:10, 287:16,
287:20, 289:12,
289:14, 289:16,
289:17, 289:22,
289:23, 290:14,
290:15, 290:21,
290:22, 291:3,
291:14
**cannot**
32:23, 33:13,
43:9, 43:11,
43:12, 61:1,
62:6, 71:6,
96:24, 98:18,
106:20, 107:9,
120:23, 136:7,
136:8, 151:20,
197:17, 197:22,
272:11, 282:20,
283:13, 283:20,
283:24, 290:7,
290:21, 313:3
**capacity**
209:15
**capture**
155:12
**car**
63:2, 69:4,

69:8, 69:9,
69:13, 99:14,
99:15, 99:17,
100:23, 101:16,
102:19, 104:3,
108:21, 215:2
**card**
249:10
**care**
29:13, 73:11,
103:3, 103:5,
194:4, 273:7,
316:9
**career**
80:20, 135:15
**carena**
240:24
**carlos**
244:23
**carry**
272:21
**case**
1:10, 181:2,
181:14, 189:10,
190:10, 190:11,
201:15, 203:10,
204:9, 206:20,
207:1, 208:1,
208:5, 209:7,
209:20, 211:8,
216:7, 216:8,
217:6, 217:10,
219:18, 233:11,
237:14, 239:2,
317:14
**cast**
48:17
**cat**
210:2
**catch**
9:19, 63:6,
78:1, 131:3,
231:11
**catching**
77:23, 77:24,
106:22
**category**
182:15, 182:17,

183:2, 183:12,
183:13, 183:23,
187:6
**caucasians**
170:6
**caught**
136:4, 263:3
**cause**
197:8, 197:11,
272:22, 282:4,
282:6
**caused**
193:1, 197:6,
197:15, 198:13,
198:21, 199:17
**causes**
199:14
**ccso**
235:13, 243:8,
248:9
**cecil**
1:17, 2:1, 4:3,
4:13, 4:18,
4:32, 6:10,
7:10, 67:2,
69:15, 70:3,
74:21, 75:8,
84:15, 123:5,
180:3, 199:6,
216:1, 248:17,
248:18, 250:1,
250:6, 250:15,
293:21, 315:19
**cell**
48:10, 48:19,
48:20, 48:23,
49:3, 49:4,
49:8, 49:19,
50:4, 50:18,
50:19, 207:16,
207:17, 225:14,
227:13, 280:13
**cells**
48:11, 48:13,
48:24, 49:2,
50:18, 52:3,
60:5
**certain**
41:23, 76:7,

135:2, 163:5,
163:7, 163:8,
164:6, 166:21,
166:23, 171:3,
174:14, 174:20,
174:21, 184:8,
268:6
**certainly**
18:6, 190:1,
190:3
**certificate**
317:1
**certified**
2:9, 2:10,
317:3
**certify**
317:7
**chain**
28:17, 37:2,
112:10, 112:11
**challenge**
38:24, 39:11,
117:7
**challenging**
297:2
**chance**
89:16, 124:15,
177:1, 200:11,
216:15, 235:7,
235:10, 235:16,
237:4, 253:19,
299:1, 299:7,
299:11
**change**
31:12, 90:8,
211:4
**changed**
31:20, 223:15
**changes**
204:15
**characterized**
227:6
**charge**
5:7, 189:13,
202:3, 202:5,
202:6, 202:7,
202:9, 205:3,
229:13, 229:23,

296:16
**charged**
155:16
**charges**
201:21, 229:16
**chat**
14:20
**check**
41:17, 41:21,
44:1, 45:8,
56:17, 64:8,
66:13, 66:14,
67:3, 67:6,
69:2, 69:3,
69:9, 69:16,
69:20, 125:23,
134:8, 212:19,
305:18, 306:19,
314:16
**checked**
148:18, 213:9,
314:11
**checking**
18:13, 20:23,
20:24, 42:2,
42:8, 42:9,
42:10, 44:24,
45:3, 49:11
**checks**
64:22
**chicago**
3:7, 3:23,
13:9, 114:11
**chief**
71:17, 71:22,
110:13, 171:3,
172:6, 172:13,
198:4, 238:18,
239:5, 239:17,
240:3, 240:7,
240:18, 245:11,
245:16, 245:20,
245:24, 246:3,
246:11, 246:16,
246:24, 247:7,
247:11, 251:9,
251:13, 251:19,
251:20, 252:8,

253:3, 259:6,
259:10, 259:12,
288:2, 288:3
**chiefs**
172:17, 287:23,
288:1, 288:4,
288:5
**chose**
87:23
**chris**
24:6, 149:8
**christmas**
211:12
**church**
306:2
**cigarette**
200:13
**cigarettes**
200:18, 201:4
**circle**
195:7
**circumstances**
204:1, 302:7
**cities**
165:8
**city**
114:18, 165:9,
165:10, 165:14,
165:15, 165:18,
166:3
**civil**
229:4
**claim**
181:1
**claiming**
193:15, 204:8
**claims**
222:3
**clarification**
14:2, 283:8,
293:22
**clarify**
49:6, 64:11,
66:16, 129:13,
142:21, 146:18,
150:4, 164:1,
177:6, 192:13,
192:18, 198:2,

198:19, 200:7,
202:13, 206:15,
212:2, 223:13,
253:15, 258:16,
260:20, 263:2,
309:23, 310:13
**class**
256:1, 256:3,
256:21, 257:1,
257:4, 303:4
**clean**
79:4
**clear**
8:7, 8:23,
73:12, 91:10,
97:7, 141:24,
144:5, 155:4,
165:1, 171:14,
191:24, 195:4,
198:18, 201:22,
287:2, 297:6
**clearly**
132:20
**clicking**
202:10, 236:5
**clowning**
53:10
**club**
38:7
**cmo@gmail**
205:21
**co-counsel**
7:19
**co-plaintiffs**
309:22, 310:1,
310:18
**collapse**
191:20, 192:19,
192:24, 196:11,
196:12, 196:23,
199:18
**collapsed**
193:16
**colleagues**
136:1
**collective**
32:1, 32:10,
32:13, 32:18,

33:3, 33:9,
178:22, 179:6
**college**
13:13, 13:14,
15:15
**collins**
24:4, 102:14,
102:16, 102:18,
102:19, 103:1,
103:13, 103:15,
103:18, 104:2,
149:8
**com**
205:21, 206:6
**come**
11:11, 19:11,
24:10, 24:18,
24:20, 39:24,
43:3, 44:21,
53:2, 59:2,
66:1, 66:17,
66:19, 67:22,
68:23, 69:14,
69:15, 75:16,
76:3, 77:16,
78:21, 79:2,
79:6, 79:10,
80:3, 108:24,
161:13, 162:12,
164:13, 165:4,
165:5, 169:9,
182:19, 189:6,
201:15, 216:19,
242:2
**comes**
42:20, 43:4,
44:17, 45:12,
158:12, 198:9,
216:18
**coming**
18:13, 40:21,
40:24, 53:21,
54:10, 122:15,
126:21, 163:2,
164:9, 166:11,
167:12, 191:1,
191:4, 191:5,
191:21, 198:11,

Transcript of Cecil Williams
Conducted on July 14, 2020

90

235:1, 251:8,
258:17
**command**
28:17, 37:2,
112:10, 112:11
**commencing**
112:21, 112:23,
202:16, 210:17,
222:21, 227:17,
254:23, 280:19,
280:24, 293:4,
313:9
**comment**
290:9, 311:18
**comments**
60:18, 90:21,
91:15, 92:4,
92:8, 93:6,
95:11, 290:12,
311:4
**commission**
229:20, 229:24
**commit**
141:13, 165:19
**committed**
142:2, 142:23,
143:6, 165:8
**communicate**
107:19
**communicated**
67:10, 68:18,
68:20
**communicating**
308:9
**communication**
108:3, 111:8,
111:10, 120:22,
268:24
**comparative**
164:12
**compensatory**
161:24, 181:6,
191:12
**competence**
316:4
**complain**
257:21, 267:11,
267:20, 268:4,

268:10, 269:11,
270:1, 270:14,
275:9, 286:2
**complainant**
238:9
**complainants**
228:5
**complained**
267:14, 267:16,
268:8, 279:16
**complaining**
28:10, 159:15,
159:23, 160:6,
219:17, 257:24,
258:7, 264:9,
266:23, 268:6,
270:4, 272:2,
272:4, 275:12,
277:11, 277:24,
278:21, 279:22,
284:13, 287:13,
289:9
**complaint**
4:12, 4:22,
4:28, 73:22,
74:7, 84:5,
86:12, 91:6,
113:8, 113:12,
119:8, 120:16,
147:11, 158:6,
159:5, 159:8,
159:13, 160:2,
162:19, 162:22,
162:23, 171:1,
194:12, 202:12,
203:13, 203:14,
203:15, 208:24,
212:22, 213:6,
213:8, 224:18,
225:6, 225:20,
236:21, 238:3,
238:12, 238:17,
241:2, 241:3,
241:13, 242:16,
244:17, 244:24,
251:24, 307:19,
307:24, 308:2,
308:5, 308:16,

308:18, 308:23
**complaint's**
162:20
**complaints**
30:6, 116:21,
138:6, 139:1,
159:2, 219:19,
258:11, 258:12,
258:15, 258:18,
269:13, 276:8,
287:18, 287:19,
289:11, 289:13,
290:23, 307:5,
307:7, 309:22,
310:1
**complete**
10:6, 15:22,
21:8, 239:18,
245:19, 251:10,
251:13
**completed**
244:22
**completely**
9:21, 34:18,
76:8, 110:3
**completing**
244:19
**computer**
47:16
**concern**
217:2
**concerned**
111:9
**concerning**
208:14, 209:20
**concerns**
116:21
**concluded**
316:14
**concluding**
112:22, 112:24,
202:17, 210:18,
222:22, 227:18,
254:24, 280:20,
281:1, 293:5,
313:10
**conduct**
184:6, 187:12,

188:18, 192:15,
193:18, 196:8,
197:7, 203:11
**conducted**
1:18, 2:1,
10:10, 250:8,
250:17, 285:11
**confer**
233:22
**conference**
10:11, 249:2
**confirm**
123:15, 180:11,
195:12, 205:16,
213:12, 213:13
**confront**
29:16
**confrontation**
118:16
**confronting**
29:18
**confused**
163:13, 202:2
**confusing**
216:5
**connotation**
291:20
**consid**
265:17
**consider**
162:17, 162:21,
182:1, 261:5,
265:11, 270:20,
275:1, 290:5,
290:12
**considered**
85:8, 110:14,
170:17, 290:19
**consisting**
237:17
**consolo**
248:21
**consolo"**
248:19
**consult**
211:3
**contact**
44:19, 127:12,

127:16, 130:3
**contacted**
127:23
**contacting**
126:19, 127:13,
130:23
**contained**
237:19
**contend**
105:22, 150:5,
188:17, 224:3
**contention**
175:17
**contents**
250:18
**context**
159:6
**contingent**
190:10, 190:11,
190:24
**continue**
160:14
**continued**
247:1
**continues**
138:8, 157:23,
158:4, 225:21
**contract**
35:13, 179:8
**control**
57:2, 57:6,
168:22, 222:5,
235:24
**controls**
236:12
**conversation**
8:21, 101:14,
102:17, 103:11,
114:15, 184:19,
203:2, 203:22,
215:12, 216:19,
226:12, 227:22,
228:1, 228:4,
228:7, 228:11,
228:24, 240:6,
245:23, 251:7,
258:20, 258:21,
258:24, 264:11,

276:5, 281:23,
282:21, 284:16,
305:20
**conversations**
213:18, 214:17,
214:21, 216:19,
217:2, 217:7,
225:19, 264:17,
264:18
**cook**
4:20, 4:26,
45:15, 69:22,
70:4, 86:17,
89:2, 95:24,
180:5, 201:3,
218:19, 218:23,
222:4, 229:6,
244:15
**cooperation**
293:16
**copies**
4:36, 316:16
**copy**
205:1, 205:2,
205:4, 239:18,
240:3, 245:21,
313:16
**corner**
14:11, 14:18,
15:4, 73:16,
74:9, 238:9,
240:6, 245:22
**corona**
240:24, 241:1,
242:2
**correcting**
304:6
**correction**
20:19, 55:3
**correctional**
54:22, 58:4
**corrections**
17:9
**correctly**
89:13, 142:20
**correspondence**
206:16
**cottage**
16:15

**could**
13:7, 21:11,
21:15, 21:16,
23:6, 25:16,
27:8, 29:4,
29:6, 30:7,
31:5, 42:13,
64:2, 66:4,
66:12, 67:2,
69:21, 70:5,
71:13, 71:14,
71:21, 72:7,
72:9, 74:13,
78:15, 81:19,
81:21, 82:10,
82:17, 84:11,
87:13, 87:14,
87:15, 87:18,
107:22, 113:20,
123:8, 123:9,
123:12, 124:6,
124:7, 132:3,
132:10, 132:13,
132:15, 139:20,
153:12, 153:23,
161:14, 180:8,
191:23, 194:19,
195:24, 198:3,
199:10, 199:17,
199:18, 200:9,
205:13, 209:10,
221:23, 224:1,
235:15, 242:7,
242:11, 243:12,
247:10, 251:3,
252:10, 252:12,
263:4, 280:15,
292:9, 295:6,
297:1, 305:22
**couldn't**
82:15, 310:2
**counsel**
6:2, 6:7, 6:10,
7:19, 235:23,
254:6, 296:3,
302:23, 306:13,
307:19, 309:21,
317:13

**count**
185:8
**county**
4:20, 4:26,
45:16, 45:18,
66:14, 67:14,
69:19, 69:22,
70:4, 70:5,
70:23, 86:17,
89:2, 96:1,
108:17, 114:20,
136:20, 158:2,
164:6, 180:5,
201:3, 208:15,
215:3, 218:20,
220:5, 222:4,
229:6, 244:15,
317:5
**county's**
218:23
**couple**
43:15, 104:18
**course**
55:3, 61:6,
86:6, 110:8,
112:7, 151:24,
198:6, 198:7,
198:9, 198:12,
201:10, 208:20,
209:19, 216:4,
216:6
**court**
1:1, 8:8, 8:22,
9:6, 14:1,
42:11, 42:14,
231:13, 317:1
**courts**
309:12
**cover**
178:23
**covered**
45:1
**coworker**
272:20
**coworkers**
208:20, 208:21,
216:24, 232:17,
256:18, 263:20,

267:19
**crazy**
53:5
**creates**
311:4
**crew**
286:8
**crime**
85:10, 85:11,
85:12, 85:13,
85:15, 85:17,
85:20, 86:17,
89:1, 95:23,
95:24, 114:8,
114:12, 114:17,
160:14, 161:1,
165:20, 167:9,
167:22, 168:5,
224:21
**crimes**
165:7, 166:4
**crook**
91:11, 91:23,
94:8, 94:21
**crooks**
90:20, 95:10
**crossing**
24:20, 273:21
**crr**
1:28, 317:4,
317:21
**csr**
1:28, 317:4,
317:21, 317:22
**cst**
1:20
**culture**
304:13
**curfews**
64:6
**curious**
55:20, 62:16,
132:18, 206:18,
219:14, 272:18
**current**
214:13, 289:6
**currently**
75:4, 190:22,

203:9, 303:17
**custody**
105:16
**cut**
129:16, 307:17
**cutting**
45:24, 64:19
**cv**
1:10

**D**

**daffada**
3:20
**daily**
25:12, 25:14
**damages**
180:24, 181:3,
181:7, 190:7,
191:12, 191:15,
194:1, 204:9,
204:13, 219:9
**damaging**
136:20, 137:5
**dang**
24:4
**danger**
60:20, 130:23,
132:2, 132:7,
132:9
**dangerous**
131:7, 163:20,
163:21, 164:3,
164:4, 164:5,
166:15, 297:22,
298:4, 306:10
**dark**
60:18, 60:19
**dart**
1:11
**dart's**
4:21, 180:5
**date**
60:1, 60:2,
78:17, 120:23,
179:10, 227:23,
238:13, 266:6,
271:4, 271:9,
273:19, 277:21,

283:24, 284:2,
292:3, 292:7,
292:8
**dated**
4:32, 124:1,
180:13, 237:9,
244:8, 250:23,
317:16
**dates**
80:11, 291:4,
310:2
**david**
270:9
**day**
25:15, 25:16,
25:19, 25:20,
27:20, 40:18,
53:15, 63:6,
63:11, 66:5,
67:19, 68:4,
68:7, 69:24,
70:11, 70:13,
70:15, 70:18,
75:16, 75:19,
77:15, 77:24,
81:20, 82:1,
83:5, 99:5,
101:11, 102:13,
104:14, 104:20,
104:21, 104:22,
107:18, 108:13,
111:24, 118:17,
118:18, 118:23,
119:2, 120:6,
132:21, 147:4,
147:15, 149:7,
161:10, 161:12,
162:7, 162:12,
162:13, 173:5,
173:8, 173:9,
173:13, 174:13,
174:15, 175:4,
175:7, 175:9,
175:19, 177:16,
177:17, 177:22,
178:4, 178:23,
178:24, 179:2,
179:3, 181:23,

188:3, 188:5,
200:18, 211:13,
216:17, 216:18,
216:20, 241:21,
241:23, 241:24,
242:1, 242:3,
242:6, 244:11,
252:5, 261:13,
261:14, 263:22,
284:15, 285:9,
308:5, 308:6,
308:7, 317:16
**day's**
50:15, 51:24,
83:1, 161:20
**days**
35:8, 35:9,
39:22, 39:23,
75:19, 76:5,
77:1, 77:7,
78:22, 78:23,
78:24, 79:19,
81:3, 81:12,
81:18, 82:20,
83:12, 96:13,
96:15, 104:17,
104:19, 145:15,
146:21, 147:1,
147:3, 147:6,
147:17, 148:1,
148:16, 148:17,
148:21, 161:7,
161:24, 162:1,
162:4, 174:16,
174:17, 175:20,
182:2, 192:1,
224:22, 261:15,
261:19, 263:23,
264:1, 271:2,
271:3, 271:10,
271:17, 271:19,
301:23, 302:2,
302:6
**deal**
92:24, 127:19
**dealing**
52:18, 52:20,
62:19, 62:20,

198:10, 246:22
**dealt**
121:17
**deceased**
168:21
**decide**
306:5
**decided**
151:11
**decides**
66:22
**decision**
25:9, 27:15,
32:23, 36:8,
56:15, 67:6,
80:23, 149:3,
150:24, 151:6,
158:6, 178:18,
186:16, 186:23,
188:6, 221:12,
228:17, 296:21,
312:8
**decisions**
27:16, 31:23,
32:3, 33:19,
149:10, 168:6,
179:14, 312:17
**declaring**
123:21, 180:18
**defendant**
4:14, 4:19,
123:6, 180:4,
229:11
**defendants**
1:14, 3:10,
3:18, 7:18,
7:20, 116:13,
116:19, 154:4,
155:15, 158:18,
181:2, 181:13,
181:22, 182:8,
184:6, 187:12,
188:18, 192:15,
193:1, 193:17,
196:7, 197:6,
197:16, 208:7,
225:7
**definitely**
24:16, 201:13,

257:2, 289:13,
291:5
**degree**
15:15, 15:18,
15:19
**dehumanized**
192:2
**deliveries**
20:23, 21:7,
21:20, 26:3,
26:5, 26:13,
26:22, 27:21,
31:4, 46:24,
47:1, 62:14,
84:23, 168:15,
168:17
**delivering**
299:5
**delivery**
21:22, 22:1,
22:13, 25:20,
26:6, 27:23,
31:8, 47:1,
51:2, 68:6,
294:2, 294:9,
299:5, 307:14,
313:22
**denied**
172:2, 173:9
**dents**
69:10
**deny**
171:4
**department**
230:4, 256:8,
256:10
**depend**
23:22
**depends**
18:23, 35:8,
38:2, 54:24,
57:22, 67:17,
93:15, 265:17,
268:6
**deposition**
1:17, 2:1,
7:21, 7:24, 8:3,
10:10, 11:19,

11:22, 12:8,
13:1, 13:4,
293:24, 317:6
**depth**
305:22
**deputy**
259:12, 287:23,
288:1, 288:3,
288:5
**derogatory**
90:20, 91:15,
92:3, 92:8,
93:7, 94:1,
94:10, 94:24,
95:10, 286:13,
290:6, 290:20,
311:3
**describe**
41:3, 120:1,
120:2, 235:9
**described**
29:18, 281:18
**description**
4:11
**detail**
95:4
**detailed**
245:6
**details**
18:14, 111:18,
121:20, 199:8,
226:8, 280:6,
286:17, 286:23,
286:24, 291:12
**detainee**
59:16, 65:8,
78:8, 126:12,
127:13, 127:14,
127:16, 127:21,
127:23, 128:2,
128:10, 128:17,
129:24, 130:3,
130:12, 301:16,
305:17, 306:15
**detainees**
41:1, 41:11,
42:4, 47:13,
47:14, 48:22,

49:17, 49:21,
50:17, 50:20,
50:21, 52:1,
53:20, 54:10,
54:12, 58:14,
58:23, 59:1,
60:10, 60:21,
63:11, 126:20,
129:13, 163:14,
163:16, 164:13,
165:4, 298:24,
299:5, 302:5,
306:20
**determination**
35:21, 116:16,
302:20
**determined**
36:14, 66:6,
66:13, 69:18,
203:14
**determines**
23:16
**determining**
52:1
**dictate**
107:5
**differ**
236:12
**difference**
62:23, 198:5,
249:13, 310:11
**different**
21:12, 21:14,
25:5, 29:23,
33:2, 34:21,
52:24, 53:1,
62:19, 62:22,
69:23, 93:16,
102:24, 121:18,
156:19, 171:19,
183:1, 184:14,
184:19, 184:22,
201:19, 202:9,
223:17, 233:16,
241:8, 258:16,
304:24, 310:14,
312:11, 312:14
**differently**
171:1, 310:20

Transcript of Cecil Williams
Conducted on July 14, 2020

94

difficult
160:12, 210:11
difficulty
160:24
dingy
60:19
direct
29:13, 70:10,
116:9, 131:17,
132:24, 135:22,
217:20, 220:2,
221:7
directed
109:2, 120:12,
131:10
direction
317:11
directions
37:18
directive
213:24
directly
29:13, 108:24,
109:3, 182:22,
198:7, 198:12,
212:6, 296:18
director
35:24, 36:5,
36:8, 36:14,
37:15, 37:21,
72:10, 77:7,
79:18, 80:3,
87:21, 88:18,
89:18, 90:17,
95:15, 108:20,
110:13, 113:22,
115:3, 115:14,
115:17, 115:18,
116:7, 117:11,
118:20, 119:20,
122:2, 122:5,
172:18, 186:20,
259:4, 281:16,
296:11, 312:10,
312:12, 312:14
dirty
79:4
disagree
37:6, 38:22,

39:2, 39:5,
154:13, 154:15,
154:16, 154:20
disagreement
9:6
disbanded
185:19, 185:22
discharged
230:21, 232:21,
232:24
disciplinary
36:18, 39:9,
116:13, 116:16,
307:6
disciplined
76:14, 96:12,
111:21
disclose
233:3
disclosed
190:2, 226:10,
234:1
discriminate
27:13
discriminated
27:11, 159:16,
262:5
discriminates
259:4, 259:7
discriminating
28:13
discrimination
4:27, 27:4,
28:4, 28:20,
30:6, 30:15,
139:7, 159:24,
160:7, 229:14,
229:17, 244:16,
245:7, 257:22,
258:8, 258:18,
262:1, 264:9,
266:24, 267:8,
278:22, 279:16,
288:22
discriminatory
124:13, 139:10,
289:5, 290:13
discuss
212:21, 215:10,

215:11, 215:12,
216:11, 216:12,
216:16, 219:8,
226:8, 258:5,
305:2, 305:9
discussed
211:22, 215:20,
219:12, 224:12,
228:13, 229:14,
231:24, 241:4,
258:21, 259:1,
310:19
discussing
213:22, 279:13
discussion
112:21, 163:10,
202:16, 220:1,
220:3, 220:4,
227:17, 267:5,
280:19, 313:9
disgrace
94:3
disgraded
192:4
dismiss
220:22
dismissed
220:22
dispatch
66:8, 66:24,
67:1, 67:8,
69:14, 125:24,
127:12, 134:12
dispatched
126:4, 126:5,
306:19
dispatcher
126:4, 127:1,
127:22
dispatchers
16:10
disproportionate
115:4
dispute
282:5, 282:10,
284:17
disputes
283:9, 283:16,

283:19, 283:23
distasteful
311:18
distinction
42:19
distracted
191:22
distress
181:8, 191:14,
191:17, 193:24
district
1:1, 1:2
districts
71:4, 71:6,
71:7
disturbed
253:24
division
1:3, 17:5,
17:6, 17:7,
17:11, 17:19,
17:22, 40:20,
47:19
divorce
229:6, 230:13
dock
137:23
docked
83:1, 104:14,
162:6
docs
307:23
doctor
194:5, 194:6,
194:7, 194:14,
194:23, 195:18,
195:19, 197:5,
197:22, 201:8,
201:10, 201:12
document
43:17, 74:6,
123:5, 123:10,
124:6, 180:3,
180:17, 235:12,
243:7, 243:16,
244:3, 244:15,
247:23, 248:7,
248:14

Transcript of Cecil Williams
Conducted on July 14, 2020                                    95

**documents**
10:21, 13:3,
42:11, 42:12,
206:10, 206:11,
206:12, 254:1,
307:18, 309:13,
314:24
**doing**
18:13, 18:14,
20:23, 29:20,
40:18, 41:4,
46:10, 46:12,
52:1, 52:8,
62:21, 63:12,
63:14, 63:16,
65:15, 69:19,
72:24, 73:8,
87:3, 87:4,
93:21, 117:1,
126:13, 126:23,
131:3, 132:24,
133:1, 133:2,
163:3, 163:4,
166:6, 166:7,
182:22, 182:23,
192:3, 236:10,
275:3, 293:13,
306:4
**dollar**
181:15, 181:16,
185:2, 185:4,
186:13
**dollars**
201:4
**domestic**
44:8, 65:3,
65:5, 65:14
**domestics**
43:8
**done**
8:21, 22:10,
22:13, 24:18,
25:12, 26:5,
26:10, 39:23,
47:21, 50:15,
78:5, 87:7,
109:3, 128:14,
128:16, 128:18,

131:3, 132:4,
132:10, 132:13,
132:15, 133:8,
137:19, 141:22,
166:5, 171:19,
172:21, 187:6,
191:7, 195:10,
209:12, 209:13,
213:15, 233:7,
308:17, 308:22,
312:21, 313:7
**door**
126:15, 128:19,
128:22, 130:12
**doors**
57:22
**double-checking**
42:2, 45:14
**down**
8:9, 8:22, 9:7,
11:6, 29:2,
36:5, 36:23,
38:13, 39:4,
40:19, 42:20,
43:3, 53:5,
57:7, 61:2,
61:6, 62:4,
62:22, 63:5,
70:24, 71:5,
71:7, 79:10,
84:11, 85:7,
87:15, 90:23,
124:7, 126:8,
126:9, 140:3,
141:4, 144:3,
147:4, 148:9,
148:11, 148:22,
148:24, 149:22,
149:23, 149:24,
153:2, 156:10,
160:15, 161:15,
192:3, 194:19,
196:1, 196:15,
196:18, 205:14,
205:18, 216:14,
226:18, 229:2,
236:16, 236:23,
238:20, 250:11,

266:14, 269:14,
269:15, 274:23,
275:3, 276:1,
297:21, 308:6
**downgrade**
93:20, 94:2
**downstairs**
45:13, 53:2
**downtown**
38:3, 38:4,
38:5, 38:14,
38:18
**dozen**
48:24
**dr**
5:4, 5:5,
194:4, 194:21,
195:3, 196:21,
196:22, 196:24,
197:4, 198:20
**drag**
236:7
**drive**
51:13
**driving**
18:15, 63:2,
137:3
**dropped**
137:20, 274:1
**drug**
53:6
**drugs**
59:4
**due**
38:16, 38:20,
139:14, 186:7,
246:18
**duly**
7:11
**during**
11:19, 41:15,
55:21, 58:14,
63:14, 64:6,
65:15, 65:21,
230:13, 237:1,
238:23, 245:10,
264:17, 268:20,
274:10, 303:9,

310:17
**duties**
113:23, 114:3,
114:14
**duty**
89:20, 307:11

**E**

**e-mail**
28:22, 29:6,
29:7, 69:2,
69:3, 195:7,
205:20, 205:23,
205:24, 206:3,
206:10, 240:4,
245:21, 314:23,
315:14
**e-mails**
11:14, 206:19,
207:3, 207:9,
314:11
**each**
8:9, 8:11,
25:15, 107:19,
107:20, 164:22,
190:3, 208:21,
217:7, 217:16,
217:18, 261:6,
261:10, 276:6
**earlier**
89:22, 124:20,
125:19, 139:6,
155:18, 157:2,
157:10, 241:4,
300:16, 303:16,
304:1
**earn**
166:20, 167:19,
169:5
**earned**
122:8, 169:10,
169:13
**easier**
25:4, 169:9,
172:5
**eastern**
1:3
**eating**
164:11

Transcript of Cecil Williams
Conducted on July 14, 2020

96

educating
50:10
education
13:12
edward
64:15
eeoc
5:7, 201:21,
202:3, 202:5,
202:6, 202:7,
202:9, 205:3,
315:3
effort
226:8
eight
262:15
either
9:23, 29:19,
30:17, 46:16,
49:22, 51:18,
53:20, 60:10,
60:12, 107:17,
126:14, 126:24,
127:11, 200:8,
205:1, 206:9,
214:13, 229:11,
249:14, 256:23
elaborate
47:10
elaborated
119:3
electronic
19:5, 19:8,
19:12, 20:9,
20:13, 42:22,
44:11, 44:21,
45:17, 49:18,
50:2, 50:21,
51:7, 52:5,
56:7, 71:10,
72:14, 72:18,
75:3, 135:16,
309:3, 313:16,
313:17, 313:18,
313:21
electronically
4:37, 316:17
elevating
219:24

eligible
42:17, 42:22,
43:5, 43:17,
44:10, 45:5,
45:16, 49:17
else
11:18, 13:1,
19:23, 19:24,
21:16, 22:3,
36:1, 36:2,
36:3, 36:11,
36:22, 36:23,
46:10, 51:20,
60:22, 71:14,
71:18, 73:19,
78:11, 84:5,
86:4, 87:6,
88:12, 89:4,
92:7, 92:16,
92:23, 93:1,
96:15, 101:6,
106:12, 114:6,
114:22, 135:11,
135:20, 158:8,
158:10, 160:18,
171:22, 186:19,
194:6, 202:8,
222:24, 228:20,
231:21, 260:23,
268:2, 268:23,
280:12, 281:20,
282:21, 284:4,
285:6, 285:17,
286:9, 311:11
else's
301:1
em
20:7, 20:12,
20:17, 20:21,
21:6, 21:10,
23:18, 26:2,
26:4, 32:15,
37:6, 87:22,
88:19, 90:18,
95:16, 113:24,
136:6, 184:15,
184:16, 185:16,
186:1, 224:4,

255:22, 256:4,
256:20, 256:21,
263:14, 265:2,
266:2, 266:19,
267:2, 267:17,
267:20, 268:15,
270:19, 274:15,
294:1, 294:16,
294:17, 295:20,
299:16, 300:17,
303:1, 303:2,
303:9, 303:13,
303:17, 305:1,
309:11, 310:20,
311:21
emery
3:12
emotional
181:8, 191:14,
191:16, 193:23
emotionally
191:22
employed
158:1, 317:13
employee
182:16
employees
53:14, 96:9,
186:16, 211:7,
312:7
employment
160:21, 229:23,
234:6
empty
50:19
emptying
52:3
end
53:22, 188:21
ended
33:7, 56:18,
302:12
ending
118:4
enforcement
16:18, 16:20
engage
141:1

engaged
158:24, 159:15,
224:24, 288:22
engaging
159:21, 160:5
englewood
70:12, 70:13,
85:10, 164:8,
164:14, 165:5
english
91:18
enjoy
276:12
enjoyed
273:4
enough
33:4, 92:16,
306:7
entire
25:1, 25:2,
51:23, 54:17,
112:9, 135:15
entirely
260:24
entitled
74:21
entity
16:16
enumerated
193:22
environment
160:8, 162:18,
162:24, 246:18,
247:1, 311:5
environments
62:20
equal
229:23
equipment
69:1, 69:5
erroneous
224:7
escape
76:7, 106:2,
106:20, 106:24,
110:2, 110:21,
111:14, 121:14,
141:15, 302:5

Transcript of Cecil Williams
Conducted on July 14, 2020

97

escaped
105:15, 107:3,
109:13, 111:5,
301:16
escapee
78:8, 80:6,
80:24, 83:4,
83:20, 88:10,
105:12, 105:15,
105:22, 107:16,
108:12, 109:12,
110:6, 110:11,
111:1, 112:6,
138:22, 140:18
escorting
18:12
especially
192:22
esquire
3:3, 3:11, 3:19
essentially
18:9, 39:9,
95:22, 114:4,
114:15, 123:20,
126:18, 126:20,
137:20
estimate
31:15, 31:16,
178:7, 284:1,
284:2, 292:9
et
1:7, 1:12
ethan
3:11, 7:19,
73:12, 222:20,
254:18, 313:19
ethnic
76:15
even
8:3, 45:15,
63:4, 82:9,
125:24, 134:11,
148:1, 167:16,
177:20, 200:19,
210:1, 226:24,
236:2, 241:18,
272:23, 284:1,
311:3

eventually
75:3, 309:2
ever
7:24, 22:21,
23:9, 31:1,
58:12, 58:13,
58:24, 59:9,
60:5, 60:12,
72:14, 72:17,
90:24, 91:11,
91:14, 91:23,
92:2, 93:6,
93:10, 94:8,
94:15, 94:18,
94:21, 94:24,
115:17, 116:7,
130:10, 130:14,
131:22, 135:9,
135:16, 135:17,
136:12, 143:20,
144:8, 144:10,
144:12, 144:14,
144:19, 144:22,
144:24, 145:2,
145:4, 148:15,
150:24, 151:21,
152:2, 152:3,
187:2, 188:9,
201:8, 207:19,
208:8, 208:13,
208:18, 208:19,
210:2, 211:6,
218:18, 219:6,
229:19, 230:7,
257:5, 257:9,
257:21, 261:12,
261:16, 261:24,
262:7, 264:14,
265:22, 267:11,
267:12, 267:21,
268:1, 269:8,
269:10, 269:22,
269:24, 270:14,
272:1, 274:19,
275:8, 277:3,
286:2, 286:11,
287:12, 294:14,
296:22, 300:10,

307:6, 307:10,
308:8, 308:12,
310:5
every
108:23, 147:4,
147:15, 151:17,
159:20, 182:18,
216:17, 216:18,
216:20, 271:13,
271:14, 271:15,
284:14
everybody
49:2, 49:8,
53:7, 53:10,
57:6, 72:24,
108:17, 110:13,
120:11, 217:13,
221:4, 221:9,
222:24, 232:15,
268:23, 272:19,
275:3, 281:2,
284:22, 300:24
everybody's
132:7
everyone
15:10, 156:22,
255:1, 316:10
everyone's
221:4
everything
18:19, 34:18,
68:6, 69:4,
78:2, 78:5,
108:16, 172:17,
216:4, 259:1,
279:2, 280:7,
281:23, 283:13,
284:15, 284:16,
285:9, 286:6,
289:18
evidence
152:13
evidently
78:23
exact
26:15, 31:11,
40:12, 71:4,
78:17, 176:9,

177:11, 227:23,
271:4, 283:24,
292:7, 292:8,
310:2
exactly
10:12, 34:5,
62:6, 78:17,
80:11, 104:5,
104:7, 106:19,
111:5, 120:1,
120:2, 120:23,
130:1, 135:22,
137:11, 147:22,
162:23, 166:20,
202:10, 220:7,
220:17, 231:2,
233:14, 238:1,
253:13, 256:24,
264:1, 266:5,
266:6, 271:9,
277:21, 282:3,
284:11, 287:16,
287:20, 291:4,
309:6
exam
20:4
examination
4:4, 7:14,
293:19, 311:14
examined
7:12
example
44:7, 121:15,
121:16, 136:4,
150:23, 192:18,
193:16, 199:17,
214:1
examples
94:5
exams
19:24, 20:1
exchanged
212:20
excited
59:3, 59:4
exclusively
278:16
excuse
114:20, 170:6,

Transcript of Cecil Williams
Conducted on July 14, 2020

98

198:16, 244:2
**exhibit**
73:22, 73:24,
122:23, 122:24,
123:4, 179:21,
179:23, 180:2,
205:13, 223:23,
234:13, 234:19,
235:4, 235:12,
242:23, 243:1,
243:4, 247:24,
248:3, 248:6,
307:21
**exhibits**
4:35, 4:36,
316:15, 316:16
**expand**
181:20, 183:3,
231:6
**expanding**
212:11
**expect**
66:5
**expected**
65:21
**expenses**
181:5, 189:9,
189:10, 201:14
**experience**
16:23, 84:18,
114:1, 192:12,
217:19, 293:14,
295:18, 298:16,
299:16, 303:1,
303:3, 315:24
**experienced**
87:8, 159:21,
160:11, 306:14
**experiences**
217:17
**experiencing**
262:1, 266:24,
267:8, 278:22,
291:1
**explain**
24:2, 30:12,
49:1, 70:6,
139:3, 305:22

**explained**
50:9, 141:19
**explaining**
202:1
**explains**
141:20
**explanation**
133:7
**express**
21:11
**extend**
174:16, 174:18
**extensively**
300:8, 305:16
**external**
17:23, 18:1,
18:2, 18:4,
19:4, 20:11,
20:18

**F**

**face**
59:15, 59:16,
117:15, 117:18,
119:4, 280:11,
281:17, 282:2,
282:20
**facebook**
217:23, 217:24,
218:2, 218:12,
218:19, 219:5,
219:12, 219:13
**faces**
14:5
**facility**
60:11
**fact**
6:10, 81:12,
133:11, 135:11,
135:19, 136:5,
147:14, 271:7
**factory**
16:10, 16:17
**facts**
38:22, 74:21,
87:15, 148:14,
237:18
**failed**
87:22

**fails**
222:4
**fair**
26:3, 27:15,
27:23, 28:16,
42:1, 72:21,
96:4, 152:11,
198:23, 204:11,
216:24, 228:14,
250:19, 272:21,
278:17, 286:17,
301:9, 305:8
**fairly**
299:19
**fall**
38:7, 38:8
**familiar**
18:5, 18:7,
32:3, 33:3,
107:22
**family**
89:21, 217:24,
218:2, 218:4,
218:5, 218:14,
218:16, 219:7,
219:13
**far**
18:15, 26:15,
29:12, 29:14,
35:15, 36:3,
50:9, 70:2,
77:19, 85:19,
90:2, 90:5,
90:7, 106:23,
111:9, 118:23,
131:18, 132:3,
132:10, 132:12,
154:7, 173:1,
183:9, 196:10,
208:23, 214:6,
225:8, 245:12,
257:24, 272:14,
312:19
**fee**
189:13, 189:14,
189:20, 190:24,
191:1, 201:15,
201:16, 201:21,

203:8, 204:6
**feel**
52:8, 93:22,
133:2, 190:20,
299:18, 306:9,
311:2
**feelings**
192:12
**fees**
181:6, 190:9
**feisty**
58:17
**fell**
122:3
**felt**
291:8, 310:19
**female**
312:12
**ferg**
269:14
**ferguson**
268:11, 268:12,
268:13, 269:4,
269:6, 270:13
**few**
8:6, 10:14,
27:1, 40:2,
118:19, 140:8,
140:9, 140:22,
141:18, 155:20,
156:18, 164:15,
195:22, 203:3,
254:9, 266:5,
281:11, 293:22
**fight**
39:22, 56:24,
107:21
**figure**
231:21
**file**
44:23, 81:4,
81:8, 82:3,
131:12, 131:14,
138:15, 139:6,
157:13, 202:4,
202:5, 221:2,
226:9, 230:10,
234:14, 234:16,

Transcript of Cecil Williams
Conducted on July 14, 2020

99

251:24, 296:23,
297:1, 307:7,
308:5
**filed**
5:7, 74:7,
81:5, 115:15,
120:17, 201:21,
202:3, 202:7,
202:8, 203:13,
205:3, 213:4,
224:7, 229:15,
229:16, 229:19,
229:22, 230:3,
230:7, 230:14,
230:18, 303:22,
307:5, 307:24,
308:2, 308:18
**files**
41:21, 41:22,
44:24, 45:2
**filing**
238:17
**filled**
242:3
**final**
138:14, 158:5,
186:24, 308:20
**finance**
233:10
**financial**
317:15
**find**
43:12, 93:5,
159:9
**fine**
9:21, 12:19,
24:13, 31:18,
31:19, 40:14,
73:5, 73:10,
143:12, 150:13,
190:16, 191:6,
193:19, 195:6,
210:6, 210:11,
252:20, 254:15,
254:17, 260:24,
315:13
**finger**
117:14, 117:18,

119:4, 120:23,
135:23, 280:11,
281:17
**finish**
8:13, 8:24,
97:6, 135:17,
144:4, 144:5,
209:10, 240:6,
245:22, 273:3,
276:1, 287:2
**finished**
74:18, 243:11,
292:20
**fire**
119:5, 120:16,
121:4, 303:7
**fired**
115:15, 115:17,
115:19, 116:8,
117:12, 117:13,
117:16, 117:19,
119:21
**firm**
3:4, 201:22,
203:13, 221:18,
221:19
**first**
4:15, 4:21,
7:11, 7:23, 8:4,
10:15, 17:4,
17:18, 26:12,
26:21, 31:2,
34:16, 37:13,
41:8, 65:7,
65:11, 67:18,
67:22, 70:17,
72:2, 72:13,
76:23, 80:17,
99:11, 123:7,
149:3, 167:6,
167:7, 167:10,
167:13, 168:11,
168:18, 171:10,
172:13, 180:5,
182:19, 219:14,
244:6, 266:19,
266:20, 292:5,
292:16, 296:17,

307:15
**fit**
23:2, 46:1,
183:18
**five**
26:12, 26:21,
40:20, 47:19,
53:16, 53:18,
54:7, 54:9,
54:11, 55:7,
70:19, 139:20,
169:9, 194:20,
195:23, 200:13,
222:11, 222:12,
222:14, 260:15,
262:14, 271:8,
271:17, 275:1
**five-minute**
73:2
**flat**
189:13, 201:16,
201:21, 203:8
**flies**
112:18
**floor**
75:15, 75:17,
75:18, 76:24,
78:7, 78:15,
79:7, 79:9,
79:10, 79:15,
81:3, 81:13,
82:19, 88:9,
96:10, 96:11,
96:15, 96:17,
124:19, 138:21,
140:11, 251:20,
300:11
**floors**
300:6
**florida**
16:7
**flows**
36:23
**folk**
106:7
**folkers**
142:12, 142:18,
142:22, 144:19,

146:5
**folkner**
106:4, 106:8,
106:15, 107:2,
109:12, 110:7,
140:19, 142:16
**folks**
140:1, 141:1,
141:12, 143:16,
145:9, 145:13,
145:16, 175:17
**follow**
87:22, 204:18
**follow-up**
221:1, 231:22
**follow-ups**
311:17
**followed**
39:10, 88:6,
88:14
**following**
119:2, 308:7,
315:14
**follows**
7:12
**foot**
47:21, 47:24,
48:1
**foregoing**
123:22, 317:6,
317:7
**forgot**
98:11, 242:9,
247:18, 253:10,
253:12, 253:16,
260:5, 270:13,
285:5
**form**
4:28, 22:11,
22:14, 36:18,
100:15, 244:17,
244:19, 245:1,
294:19, 295:14,
297:23, 298:20,
299:21, 300:13,
301:5, 302:9,
304:15, 306:21,
310:9, 311:7

Transcript of Cecil Williams
Conducted on July 14, 2020

100

| | | | |
|---|---|---|---|
| **formal**<br>226:6<br>**formally**<br>6:3<br>**forward**<br>228:18, 231:24,<br>232:8, 258:5,<br>296:3<br>**fought**<br>83:15, 83:17<br>**found**<br>130:4, 164:19,<br>221:13, 221:15,<br>311:18<br>**foundation**<br>28:1, 130:5,<br>134:17, 151:3,<br>151:13, 153:10,<br>154:12, 154:21,<br>164:20, 166:17,<br>197:18, 294:20,<br>295:15, 297:24,<br>298:21, 299:22,<br>300:14, 301:5,<br>301:11, 302:10,<br>304:16, 305:4,<br>306:22, 310:10,<br>310:22, 311:8<br>**four**<br>63:15, 63:19,<br>66:4, 66:6,<br>110:17, 138:3,<br>142:15, 163:6,<br>166:8, 188:22,<br>194:19, 225:7,<br>271:17, 294:1<br>**fourt**<br>101:19<br>**frame**<br>174:24<br>**francis**<br>194:21<br>**frankly**<br>192:22<br>**free**<br>161:11, 161:12,<br>190:20<br>**french**<br>170:6 | **frequently**<br>216:22<br>**freshly**<br>124:19<br>**friendly**<br>275:23<br>**friends**<br>211:9, 215:7,<br>256:17, 256:18,<br>259:23, 261:6,<br>263:15, 265:11,<br>265:18, 268:16,<br>270:21, 276:22,<br>278:8<br>**front**<br>10:13, 10:18,<br>10:22, 59:7,<br>125:10, 126:14,<br>156:22, 194:9<br>**frustrating**<br>170:16<br>**fugitive**<br>184:14, 184:20,<br>184:22, 186:1,<br>186:9, 186:16,<br>186:21, 186:23,<br>187:3, 188:10,<br>188:13, 189:7<br>**fugitives**<br>184:10, 184:11<br>**full**<br>10:6<br>**fun**<br>112:19<br>**function**<br>219:6<br>**further**<br>125:22, 157:5,<br>171:2, 293:11<br>**future**<br>188:20, 189:3,<br>189:5<br><br>--- **G** ---<br>**g-o**<br>239:6<br>**gallery**<br>14:17, 15:5 | **gas**<br>69:8<br>**gather**<br>200:23<br>**gathering**<br>226:5, 226:7,<br>227:7, 231:22,<br>291:23<br>**gatherings**<br>178:9, 178:11<br>**gave**<br>38:22, 79:18,<br>80:1, 94:5,<br>100:13, 100:24,<br>115:4, 142:6,<br>142:9, 162:13,<br>199:14, 252:4,<br>281:22<br>**gaynor**<br>24:19<br>**geez**<br>133:6<br>**general**<br>70:20, 130:3,<br>151:5, 209:23,<br>218:24, 239:7,<br>239:8, 239:19,<br>239:20, 239:23,<br>245:11, 245:19,<br>245:20, 251:7,<br>251:10, 251:17<br>**generally**<br>183:5<br>**genetic**<br>199:19, 200:9<br>**geographic**<br>85:23<br>**geographical**<br>69:23, 70:24<br>**geographically**<br>66:20<br>**getting**<br>53:3, 66:23,<br>81:17, 93:2,<br>93:19, 109:12,<br>114:16, 114:17,<br>121:17, 126:15,<br>143:14, 156:11, | 160:12, 169:14,<br>182:24, 183:6,<br>219:15, 219:19,<br>219:20, 226:17,<br>226:19, 258:4,<br>267:9, 303:6<br>**gist**<br>65:21<br>**give**<br>10:6, 11:18,<br>26:15, 39:22,<br>57:17, 57:19,<br>67:6, 68:13,<br>71:6, 80:24,<br>81:16, 82:15,<br>87:1, 99:8,<br>107:17, 122:8,<br>124:13, 127:19,<br>129:18, 129:24,<br>142:5, 160:13,<br>161:10, 161:12,<br>174:15, 174:24,<br>176:24, 178:7,<br>187:5, 190:19,<br>199:3, 199:8,<br>200:23, 210:20,<br>222:7, 222:12,<br>235:6, 235:10,<br>235:24, 244:21,<br>248:10, 265:10,<br>275:23, 284:1,<br>286:23, 286:24,<br>292:18, 305:12,<br>315:10<br>**given**<br>53:15, 63:11,<br>65:22, 67:5,<br>108:23, 111:24,<br>120:6, 178:4,<br>192:23, 196:14,<br>196:19, 204:11,<br>213:23, 225:24,<br>299:18, 300:1,<br>317:8<br>**gives**<br>36:4<br>**giving**<br>29:3, 31:15, |

Transcript of Cecil Williams
Conducted on July 14, 2020

101

31:16, 116:23,
116:24, 117:2,
126:20, 161:12,
162:13, 297:10
**gmail**
207:14
**god**
24:5, 24:8,
24:18, 24:19,
60:2, 120:9
**goes**
100:18, 108:14,
108:16, 110:11,
165:14, 165:15,
179:8, 186:24,
187:13, 189:1,
190:7, 207:13
**gone**
13:24, 50:16,
104:16, 104:24,
105:4, 105:9,
121:10, 213:4,
213:12, 312:20
**gonna**
33:11
**good**
7:16, 9:19,
12:16, 12:24,
23:14, 65:20,
66:21, 78:2,
83:24, 105:13,
153:7, 153:16,
154:9, 154:19,
155:6, 221:14,
221:16, 223:2,
223:3, 223:5,
226:21, 232:7,
255:7, 281:2,
281:7, 292:21,
314:3, 314:20,
314:22, 315:1,
315:16, 315:17,
315:18, 315:19,
315:24, 316:3
**gotten**
50:17, 175:18
**gps**
46:7

**grant**
171:3, 172:6
**grapevine**
136:1
**great**
11:13, 207:13,
227:1, 313:6,
313:22, 316:2,
316:5
**greater**
95:4
**green**
210:21
**gregory**
4:15, 123:6
**grid**
14:18, 15:7
**grievance**
37:8, 37:11,
37:12, 38:23,
39:5, 39:12,
81:4, 81:5,
81:8, 82:3,
82:6, 82:8,
82:11, 83:18,
83:20, 116:19,
117:2, 117:7,
131:12, 131:14,
138:14, 139:16,
162:9, 296:4,
296:20, 296:23,
297:2, 297:16,
297:17, 302:17
**grievances**
115:15, 120:17,
138:6, 138:15,
159:2, 224:7,
296:16, 307:7
**grieve**
296:12, 297:15
**grieved**
138:16, 138:20,
296:15, 301:21,
307:5
**grieving**
296:24
**ground**
8:6

**grounds**
54:16, 54:19
**group**
50:20, 50:21,
213:20, 214:9,
264:17, 264:18,
265:13
**groups**
76:15, 106:9,
106:13
**grove**
16:15
**grow**
276:19
**guard**
18:10
**guards**
58:7
**guess**
12:20, 35:5,
37:2, 50:14,
55:19, 55:23,
63:13, 68:1,
78:8, 93:24,
122:2, 132:18,
137:7, 160:23,
163:12, 164:13,
182:9, 182:11,
186:20, 190:5,
192:13, 195:2,
195:4, 201:24,
233:20, 239:11,
254:19, 272:18
**gun**
164:9
**guy**
45:16, 48:22,
53:12, 77:23,
106:18, 126:14
**guy's**
24:5
**guys**
12:11, 29:23,
31:9, 40:20,
40:23, 41:10,
49:10, 51:3,
51:6, 52:4,
53:1, 54:7,

54:11, 55:17,
56:4, 69:23,
73:8, 111:20,
118:7, 122:20,
148:8, 190:2,
193:13, 202:11,
206:12, 210:20,
211:10, 211:16,
212:20, 214:1,
215:4, 215:10,
215:20, 216:11,
216:15, 216:23,
217:5, 217:15,
217:17, 228:20,
231:23, 232:7,
234:15, 254:12,
254:16, 255:7,
256:17, 258:2,
258:3, 259:23,
261:5, 261:12,
263:15, 268:16,
268:18, 269:8,
270:23, 274:19,
274:22, 275:1,
276:19, 276:22,
276:24, 277:3,
278:8, 305:2,
305:11, 314:12,
314:22, 315:14,
315:20, 316:6

**H**

**half**
57:20, 118:18,
236:18
**hand**
6:24, 14:20,
35:22, 282:2,
282:19, 306:6
**handcuffs**
55:13
**handed**
39:4, 123:3,
180:1, 235:11,
243:3, 248:5
**handle**
43:1, 56:2
**hands**
279:4

Transcript of Cecil Williams
Conducted on July 14, 2020

102

**handwriting**
244:4, 244:5
**hang**
69:13, 171:7,
211:9, 215:7,
273:3, 279:10,
279:12
**happen**
78:16, 79:22,
79:23, 80:7,
80:8, 99:20,
99:22, 106:16,
128:8, 130:11,
130:14, 130:16,
130:17, 130:19,
130:20, 133:10,
174:3, 296:19
**happened**
30:20, 58:15,
59:13, 60:7,
60:16, 76:10,
78:21, 82:6,
89:10, 89:14,
90:3, 93:3,
96:14, 100:11,
101:11, 101:19,
104:15, 106:17,
107:6, 111:3,
111:18, 120:20,
121:16, 128:9,
130:15, 133:17,
203:23, 231:3,
276:3, 282:1,
282:17, 284:20,
284:22, 285:9,
286:20, 287:17,
307:2, 308:1
**happening**
106:23, 118:10,
136:12
**happens**
8:17, 50:22,
76:12, 108:14,
108:16, 110:21,
179:20, 209:12,
209:13, 209:14,
276:4
**happy**
24:1, 73:2,

193:14, 203:20,
211:12
**harassed**
159:17, 291:9
**harassing**
28:13
**harassment**
4:27, 4:28,
27:4, 28:5,
28:20, 30:7,
30:15, 139:8,
139:10, 159:24,
160:7, 244:16,
244:17, 245:7,
245:8, 291:3,
291:6, 291:13
**hard**
8:12, 257:13,
313:16
**hardest**
169:14
**harvey**
13:17, 13:22,
15:15, 15:23
**hashed**
300:7
**hatreds**
122:10
**he'll**
129:23
**head**
9:2, 9:5,
12:21, 65:18,
97:17, 97:22,
133:15, 141:17,
164:9, 183:14,
185:15, 202:10,
267:24, 291:16
**heading**
53:22
**heads**
126:20, 190:19
**heal**
24:4
**hear**
64:2, 103:10,
108:6, 108:18,
109:18, 109:22,

109:23, 192:9,
192:10, 267:11,
268:1, 275:8,
290:1, 305:6,
310:5
**heard**
50:9, 103:13,
109:13, 111:14,
111:20, 116:11,
116:21, 117:12,
117:14, 119:19,
119:23, 122:14,
122:17, 135:9,
135:12, 135:13,
135:16, 135:17,
135:24, 136:3,
136:12, 155:22,
182:20, 287:7,
289:20, 296:20
**hearing**
269:10, 285:22,
286:19, 290:4,
290:11, 290:18,
296:16, 311:2
**hears**
297:17
**heart**
193:6
**heavier**
76:14
**held**
214:22, 220:4,
224:6
**help**
8:6, 53:23,
147:13, 163:6,
235:8
**helping**
41:11
**herbert**
3:4, 203:13,
221:18, 221:19
**hereby**
6:15, 317:7
**herein**
7:11
**hesitant**
307:6

**hey**
56:6, 76:4,
128:2, 210:1,
211:12
**hide**
131:2, 131:5
**high**
15:19, 15:20,
59:4, 85:10,
85:11, 85:20,
86:17, 89:1,
95:23, 95:24,
114:8, 114:12,
160:14, 161:1,
163:11, 167:22,
211:10, 218:5,
224:21, 276:17,
276:21
**higher**
88:20, 88:24,
95:19, 95:24,
114:17
**highest**
13:11, 15:18,
174:12, 179:11
**hipaa**
315:10
**hired**
17:2
**hispanic**
146:8, 146:10,
146:12, 146:14,
150:2, 150:5,
150:6, 150:7
**hit**
14:9, 59:15,
59:16
**hold**
38:6, 280:15
**holiday**
161:13, 161:14,
162:1, 162:8
**holidays**
81:14, 81:15
**home**
43:22, 46:22,
51:1, 52:2,
53:4, 53:11,

53:12, 60:12,
64:8, 64:21,
66:12, 66:14,
67:3, 67:6,
69:7, 69:16,
69:19, 75:22,
75:23, 77:11,
78:7, 79:4,
79:5, 79:6,
79:22, 80:2,
81:24, 83:1,
88:10, 97:2,
97:10, 97:16,
98:1, 98:4,
98:7, 98:23,
98:24, 101:16,
101:22, 102:9,
108:21, 109:7,
119:1, 138:21,
140:15, 165:10,
165:11, 178:8,
178:9, 178:11,
191:21, 306:4
**homes**
52:5
**honest**
10:6
**honestly**
52:10, 134:2,
134:3, 227:23
**hood**
167:8
**hope**
198:15
**hospital**
18:13, 191:20
**hostile**
160:7, 247:2,
311:4
**hot**
52:17
**hour**
185:4, 188:2,
188:3, 189:12
**hours**
105:10
**house**
41:3, 41:5,

41:6, 41:9,
41:11, 42:4,
42:15, 42:16,
42:17, 43:5,
43:6, 46:23,
65:6, 65:7,
91:18, 126:15,
165:20, 165:21,
215:5, 305:19,
306:20
**however**
24:2, 315:11
**hr**
29:20, 30:7,
30:17, 137:16,
249:2, 253:3,
253:6
**huh**
129:8, 201:3
**huh-uh**
267:24
**hum**
38:1
**human**
119:9, 229:20,
230:3, 248:12,
249:8, 252:5
**humiliated**
192:7
**humiliation**
181:7, 191:13
**hurt**
89:17, 306:7,
306:8
**hurtado**
143:5, 145:4,
146:13
**hydrocodone**
196:4

---

**I**

**ida**
263:9, 263:12
**idea**
219:23, 221:2
**identification**
73:24, 122:24,
179:23, 235:4,

243:1, 243:5,
248:3
**identified**
140:16, 140:19,
229:5, 293:24,
294:5, 294:8,
294:11
**identify**
97:9, 138:6,
139:22, 154:4,
155:14, 158:23,
159:20, 160:21,
162:16, 170:23,
229:3, 243:4
**identifying**
124:12
**illegal**
212:1
**illinois**
1:2, 2:11, 3:7,
3:15, 3:23,
13:9, 229:20,
317:5
**illness**
59:5
**illnesses**
195:17, 199:11
**imagine**
25:4
**immediate**
28:8, 28:9,
28:12, 37:20
**immediately**
16:12, 20:12,
20:17, 37:14,
157:13
**important**
8:11, 42:19,
43:15, 48:18,
91:9, 242:15,
247:14, 253:3
**impossible**
176:8, 176:11
**inappropriate**
130:2
**incident**
58:12, 58:13,
58:24, 60:5,

78:16, 81:13,
82:19, 83:21,
88:20, 88:24,
90:7, 90:13,
95:19, 96:12,
101:7, 105:12,
105:15, 106:16,
109:22, 110:7,
110:14, 110:15,
110:18, 118:21,
125:16, 140:11,
140:13, 155:19,
157:2, 157:13,
238:14, 239:9,
241:4, 241:22,
244:12, 245:8,
247:4, 252:2,
279:3, 279:7,
279:8, 279:14,
279:23, 279:24,
280:2, 281:15,
281:21, 282:17,
284:8, 285:7,
285:11, 285:18,
301:15, 302:13
**incidents**
58:16, 59:10,
84:3, 88:5,
95:3, 115:8,
138:17, 154:4,
155:20, 156:19,
158:17, 224:11,
279:5, 279:13,
283:3, 283:8,
285:20, 286:18,
287:6, 305:1
**include**
149:10, 253:10,
253:16
**included**
33:5, 90:11,
90:12, 252:10
**including**
132:5, 181:5,
252:13
**income**
161:4, 161:6,
181:5, 189:4,

Transcript of Cecil Williams
Conducted on July 14, 2020

104

189:5
**incorrect**
48:6, 165:19,
204:16
**incorrectly**
142:19
**index**
206:6
**indicated**
117:11, 156:7,
247:11
**indicates**
250:18
**indicating**
62:4, 62:5
**indirectly**
109:4
**individual**
48:24, 97:14
**individuals**
46:15, 46:22,
120:21, 142:2,
143:4, 146:18,
146:22, 147:17,
149:2, 149:4,
149:11, 150:15,
152:2, 152:3,
153:8, 175:12,
232:6, 312:9,
313:2
**info**
205:16, 274:4
**informal**
4:31, 248:16,
250:1, 250:8,
250:16
**information**
11:15, 11:18,
238:9, 238:13,
242:16, 247:15,
282:16
**informed**
197:14, 253:3
**infraction**
35:2, 35:23,
36:9
**infractions**
34:9, 34:11,

34:12, 142:3,
142:24, 143:6
**initial**
308:16
**injured**
59:10, 59:19,
60:6, 60:12,
306:10
**injuries**
59:12, 195:16
**injury**
298:18, 299:1,
299:7, 299:12
**inmate**
125:23, 126:6,
134:8, 163:2,
306:1, 306:3
**inmates**
17:8, 298:7,
298:13
**inquiry**
4:31, 248:16,
250:2, 250:8,
250:16
**inside**
17:8, 18:17,
48:6, 48:7,
48:9, 48:11,
48:13, 52:17,
55:18, 58:11,
60:4
**inspection**
239:11, 245:12,
251:8
**inspections"**
239:9
**instance**
153:6, 159:20
**instances**
155:14, 159:14
**instead**
6:4, 79:7,
79:12, 81:19,
89:21
**intentionally**
89:19, 309:15
**interaction**
99:23, 120:18,

121:20
**interactions**
60:20, 60:21
**interest**
204:5, 317:14
**interested**
12:4, 24:14,
206:15, 216:13
**interject**
8:20, 177:1,
273:24
**internal**
29:20, 29:22,
139:1, 139:4,
159:2
**internet**
10:14
**interpret**
92:18, 304:8
**interrogatories**
4:16, 4:21,
123:7, 180:6,
235:3
**interrogatory**
134:7, 138:5,
153:22, 159:12,
160:1, 160:20,
162:16, 170:22,
180:21, 221:22,
222:2, 223:23,
226:2
**interrupt**
150:11, 252:19
**interrupted**
14:1, 209:9
**interruption**
225:17, 227:14,
280:14
**interviews**
308:22
**intimidating**
247:2
**invest**
121:24
**investigat**
134:24
**investigation**
30:11, 30:18,

30:19, 119:8,
119:17, 138:8,
157:23, 158:3,
225:21, 285:10,
285:14, 308:17
**investigations**
29:20, 30:8
**investigator**
4:31, 20:8,
20:10, 20:22,
32:15, 37:5,
39:11, 71:11,
71:20, 72:7,
72:9, 80:19,
80:21, 102:2,
102:3, 102:4,
121:17, 122:6,
122:19, 147:3,
147:11, 175:4,
178:5, 186:1,
202:7, 238:24,
239:4, 239:17,
240:5, 240:14,
240:17, 245:10,
245:15, 245:21,
246:7, 246:10,
246:17, 246:20,
246:21, 247:3,
248:17, 248:18,
250:1, 250:6,
250:15, 251:9,
251:11, 251:12,
251:18, 251:21,
251:22, 251:23,
285:3, 285:4,
309:19
**investigators**
111:11, 113:24,
114:14, 122:1,
122:17, 131:23,
132:4, 132:5,
134:15, 135:2,
135:9, 140:12,
141:4, 150:21,
153:17, 163:5,
166:6, 166:12,
166:15, 168:2,
168:3, 171:4,

Transcript of Cecil Williams
Conducted on July 14, 2020

105

171:5, 172:7,
172:8, 173:6,
173:15, 184:20,
184:23, 188:1,
224:5, 267:17,
294:17, 295:19,
300:9, 300:17,
300:22, 301:7,
302:5, 304:24,
305:1, 306:19,
307:2, 310:6,
310:14, 310:19
**involve**
29:19
**involved**
18:21, 18:24,
19:23, 33:8,
36:24, 216:7,
229:5, 310:7
**ipad**
14:3, 14:4,
14:17, 15:4,
236:12
**iphone**
14:2, 212:16
**irate**
53:3
**issuance**
117:6
**issue**
296:8
**issued**
224:4, 296:13,
297:3, 297:9,
297:16, 302:1
**issues**
193:17, 197:6,
197:15, 198:21,
200:9, 204:19,
217:10, 284:5,
287:6, 287:13,
289:4, 316:5
**issuing**
224:6, 297:12
**it'll**
14:16

---
**J**

---
**jail**
17:8, 17:19,

18:4, 18:6,
18:14, 18:15,
18:17, 18:19,
18:20, 41:11,
42:4, 46:16,
46:17, 47:8,
47:15, 47:17,
47:18, 50:1,
50:22, 51:4,
52:3, 52:4,
52:17, 53:20,
53:23, 54:9,
54:17, 54:18,
54:19, 55:11,
56:20, 57:13,
57:16, 58:11,
58:14, 60:10,
61:23, 61:24,
62:1, 274:7,
274:8
**jails**
58:6
**january**
192:20
**jefferson**
3:5
**jeopardizing**
305:24
**jeopardy**
134:4
**job**
1:25, 16:12,
16:17, 27:14,
48:18, 51:18,
52:9, 52:13,
52:14, 61:4,
61:9, 61:11,
62:17, 62:22,
66:23, 67:6,
70:5, 70:18,
93:21, 121:12,
126:16, 127:20,
157:6, 166:8,
166:22, 166:24,
169:2, 169:10,
173:2, 173:4,
192:2, 198:10,
209:5, 267:21,

272:13, 272:16,
275:4, 303:2,
305:3, 315:19
**jobs**
16:8, 16:9,
16:10, 16:18,
16:21, 35:11,
63:14, 63:16,
65:15, 66:4,
66:6, 70:19,
295:11
**joe**
42:14, 42:20,
43:17, 44:4,
44:7, 44:17,
44:20, 53:11,
56:17
**john**
53:11
**join**
16:1
**joined**
266:19
**joining**
16:13, 16:19
**joseph**
248:19
**jot**
11:6
**judge**
272:10, 272:17
**judgment**
48:16, 92:21,
272:14
**july**
1:19, 317:16
**jump**
190:20, 254:19
**junior**
262:16
**justin**
3:19, 6:12,
7:17, 73:6,
273:24
**justin's**
212:5

---
**K**

---
**kane**
317:5

**keep**
79:3, 79:5,
134:15, 135:1,
148:20, 218:16,
250:6
**keeping**
46:12, 46:14,
48:4, 48:21,
135:3
**kelly**
3:3, 177:1,
189:24, 190:18,
191:7, 193:9,
195:1, 200:2,
201:17, 202:1,
202:12, 203:16,
205:8, 206:17,
212:4, 220:20,
233:20, 254:11,
255:10, 292:18,
313:24, 314:9
**kelly's**
165:1, 221:18
**kept**
251:23
**key**
125:15, 125:18
**keys**
69:7, 75:22,
75:23, 77:11,
78:7, 79:22,
80:2, 81:24,
82:24, 88:10,
97:1, 97:10,
98:1, 98:4,
98:7, 98:11,
98:23, 98:24,
99:6, 99:7,
99:13, 99:14,
99:15, 99:17,
100:2, 100:23,
101:16, 101:22,
102:9, 102:15,
102:19, 103:14,
103:22, 103:23,
103:24, 104:3,
104:6, 104:9,
104:13, 104:18,

Transcript of Cecil Williams
Conducted on July 14, 2020

106

104:24, 105:4,
105:8, 108:19,
108:21, 109:7,
138:21, 140:15
**kids**
211:13
**kill**
191:23
**kind**
8:6, 8:12,
8:19, 18:9,
23:15, 25:24,
36:18, 36:23,
42:9, 48:21,
58:5, 59:20,
62:2, 70:24,
72:17, 74:13,
76:19, 78:9,
81:21, 84:22,
91:10, 92:21,
99:12, 107:23,
108:2, 115:6,
118:17, 118:23,
119:1, 119:8,
122:14, 143:14,
156:9, 193:13,
203:2, 203:5,
205:14, 209:22,
210:15, 221:8,
226:16, 228:10,
235:7, 235:19,
236:15, 249:23,
274:24, 276:20,
285:11, 286:13,
296:2, 300:4,
300:7, 300:24,
301:8, 304:13,
304:23, 315:14
**knew**
108:2, 109:3,
109:6, 109:11,
109:13, 109:17,
110:6, 112:5,
124:24, 125:1,
160:16, 184:17
**knock**
126:15
**knowing**
24:15, 204:6,

276:17
**knowledge**
75:17, 91:3,
98:7, 100:4,
100:7, 104:10,
105:2, 105:5,
105:7, 106:2,
107:12, 107:13,
108:22, 109:10,
110:10, 112:3,
119:7, 119:18,
122:12, 128:13,
128:15, 128:21,
128:22, 131:24,
132:2, 158:20,
208:13, 230:5,
231:19, 232:13,
237:20, 249:12,
257:23, 260:13,
261:1, 262:6,
262:9, 262:13,
263:24, 264:10,
264:16, 267:10,
267:13, 270:16,
277:17, 295:17,
307:1, 308:16,
308:19, 308:21,
308:24
**known**
110:17, 255:21,
259:17, 259:21,
261:4, 263:13,
265:4, 268:14,
270:18, 270:19,
273:17, 274:14,
278:6
**knows**
110:13

**L**

**labeled**
243:7
**lack**
93:24
**laid**
179:9, 179:10
**lake**
45:17

**lakeside**
167:17
**language**
90:1, 90:2,
93:24, 154:5,
155:16, 156:9,
156:10, 158:19,
224:8, 286:13
**laptop**
236:12
**lasalle**
3:21
**last**
20:18, 67:17,
103:23, 123:10,
180:8, 185:19,
188:22, 215:19,
216:15, 230:18,
234:1, 271:6,
271:7, 271:11
**late**
76:1, 76:3
**later**
24:11, 40:1,
125:18, 157:16
**laughs**
40:9, 40:10,
52:10, 73:13,
201:3
**launches**
30:17
**law**
3:4, 3:12,
16:18, 16:20,
203:13, 221:18,
221:19
**lawndale**
85:10
**lawsuit**
7:18, 181:10,
188:18, 193:2,
207:4, 207:5,
207:11, 211:21,
213:4, 213:19,
214:5, 214:9,
215:10, 215:21,
216:16, 217:3,
218:23, 219:3,

219:9, 219:16,
219:24, 221:3,
221:10, 224:24,
226:8, 226:9,
228:14, 228:18,
228:21, 232:1,
233:3, 233:8,
233:9, 233:24,
258:5, 303:21,
313:1
**lawsuits**
229:8, 229:10
**lawyers**
42:11
**layman's**
58:6
**lazy**
182:16
**lead**
147:16, 151:20
**leading**
301:12, 302:10,
310:23
**leads**
151:17, 152:14
**learn**
219:14, 303:1
**learned**
303:6
**learning**
293:14
**least**
27:17, 56:5,
62:15
**leave**
54:18, 67:20,
179:12
**leaves**
64:23
**leaving**
171:18, 191:23,
192:1
**led**
282:3
**left**
64:6, 74:9,
101:17, 101:18,
113:9, 113:18,

169:8, 281:11,
288:24, 308:3,
309:11
**left-hand**
238:9
**leg**
41:19, 45:22,
46:1
**legal**
43:16, 45:4,
201:15, 205:10
**legrain**
1:6, 278:5
**length**
124:20, 307:4
**less**
57:20, 87:8,
93:22, 120:6,
143:1, 164:7,
173:8, 173:14,
174:14, 175:17,
176:15, 177:18,
178:12, 178:13,
200:21, 271:15,
295:1, 298:5,
298:13
**let's**
12:24, 13:6,
21:13, 23:3,
27:1, 61:19,
66:12, 66:22,
71:8, 73:20,
74:19, 75:6,
78:15, 84:1,
87:12, 88:17,
90:16, 90:23,
95:13, 96:7,
98:21, 105:11,
110:23, 113:16,
113:19, 122:22,
138:2, 143:13,
145:18, 150:22,
153:22, 155:12,
158:21, 162:7,
162:15, 162:20,
164:23, 170:22,
172:12, 173:3,
174:11, 177:5,

179:21, 180:21,
181:19, 191:24,
202:12, 223:19,
224:14, 225:10,
225:11, 229:2,
234:9, 234:16,
238:2, 238:20,
238:22, 239:16,
242:19, 242:20,
242:21, 245:8,
247:20, 248:14,
249:22, 251:5,
254:9, 259:14,
270:9, 278:4,
279:20, 291:17
**letter**
78:23, 79:1
**letters**
262:23
**letting**
126:14, 306:1
**level**
13:11, 28:17,
35:22, 36:8,
265:17
**lieu**
6:3
**lieutenant**
71:16, 71:22,
72:3, 102:16,
102:18, 103:1,
110:12
**lieutenants**
288:9
**life**
130:23, 132:2,
132:7, 132:8,
134:4, 306:1
**light**
210:21
**lighter**
149:14
**limit**
26:15
**limited**
227:2
**line**
145:16, 161:15,

249:7, 296:6
**lines**
39:15, 284:19
**list**
23:22, 47:13,
47:16
**listed**
30:16, 140:23,
142:23, 205:21
**listen**
24:1, 212:8
**litigation**
74:8, 181:5,
189:9, 189:10,
229:4, 274:1
**litigations**
231:5, 231:7
**little**
13:6, 14:18,
15:5, 16:6,
21:11, 25:3,
27:9, 30:13,
40:1, 47:11,
50:10, 58:1,
58:3, 71:9,
74:14, 84:11,
102:23, 113:6,
123:14, 125:21,
126:1, 129:19,
140:3, 143:13,
155:16, 158:24,
173:1, 181:20,
183:4, 196:1,
205:16, 205:19,
212:11, 216:14,
227:1, 229:15,
231:6, 241:7,
250:11, 258:15,
258:20, 258:21,
258:24, 262:2,
264:11, 276:6,
292:1, 293:14,
296:3, 303:4
**live**
13:8
**lives**
44:19
**llc**
3:20

**load**
272:21
**location**
42:4, 65:9,
89:21, 135:19,
136:5, 249:1
**locations**
66:1
**lock**
166:2
**locked**
60:4, 306:2,
306:3
**locker**
75:19, 79:3,
79:5
**lockers**
48:7, 48:8
**locking**
58:19, 163:4
**logan**
24:17
**loggins**
24:17, 118:20
**long**
9:14, 12:11,
23:22, 57:15,
57:23, 104:24,
105:3, 105:9,
200:14, 200:19,
228:23, 255:21,
259:17, 259:21,
263:13, 265:4,
268:14, 270:18,
273:17, 274:14,
278:6, 278:11,
290:8, 299:17
**longer**
31:6, 61:15,
101:17, 158:1,
161:15, 169:23,
170:17
**look**
11:14, 14:10,
74:6, 84:1,
87:18, 87:20,
88:17, 89:8,
90:16, 92:5,

Transcript of Cecil Williams
Conducted on July 14, 2020

108

93:4, 95:13,
152:18, 152:23,
156:5, 156:23,
169:13, 175:16,
180:10, 182:20,
206:9, 206:22,
211:17, 212:15,
212:17, 213:1,
223:16, 233:13,
237:4, 284:19,
285:5, 290:10,
293:2, 304:3,
304:7, 304:9,
311:19
**looked**
162:19, 206:18,
213:5, 213:12
**looking**
32:21, 89:12,
162:3, 204:13,
214:1, 224:21
**looks**
14:12, 159:9,
194:21, 195:20,
196:2, 239:14,
240:19, 241:20,
244:8
**lopez**
97:20, 143:5,
144:24, 146:9
**lose**
81:12, 82:1,
125:13, 162:7,
162:12
**losing**
249:16
**loss**
35:11, 161:4,
161:6, 181:15,
182:1, 182:11
**lost**
81:14, 125:1,
125:3, 125:9,
125:10, 125:13,
161:14, 162:8,
181:3, 181:13,
181:17, 181:18,
181:20, 181:22,

182:7, 183:8,
188:17
**lot**
59:6, 85:6,
86:23, 86:24,
101:18, 101:20,
107:23, 121:23,
121:24, 136:6,
148:10, 163:16,
171:19, 200:20,
215:1, 296:4,
304:22, 307:9,
309:21
**lots**
58:6
**loud**
156:22
**low**
85:13, 85:15,
85:17, 168:6
**lower**
149:17, 149:18
**luck**
232:7
**lunch**
112:16
**lung**
191:20, 192:19,
192:24, 193:16,
194:5, 194:7,
194:22, 195:19,
196:10, 196:12,
196:23, 199:18
**lying**
252:17

---

**M**

**m-i-n-s-i-n-a**
98:19
**machines**
177:13
**made**
32:4, 60:24,
67:7, 79:13,
80:23, 91:19,
93:6, 106:21,
119:8, 138:6,
149:3, 149:11,

150:23, 151:6,
165:6, 171:5,
178:1, 178:18,
179:14, 186:15,
186:23, 188:6,
188:9, 221:11,
224:20, 237:17,
240:11, 276:8,
302:19, 307:20,
311:17, 312:8,
312:17
**main**
315:2
**mainly**
26:22, 177:24
**maintain**
55:21
**major**
34:6, 34:7,
34:8, 34:12,
34:23, 35:2,
59:15, 59:18,
76:12, 110:15,
121:11
**majority**
26:4, 76:11,
76:13, 76:14,
80:20, 85:16,
85:18, 86:7,
86:8, 87:7,
107:18, 120:13,
148:13, 150:20,
165:23, 170:5,
170:8, 170:9,
170:10, 173:22,
174:2, 175:1,
228:5
**majors**
64:10
**make**
8:7, 18:15,
25:3, 25:9,
31:22, 33:19,
38:7, 41:19,
41:21, 41:23,
44:2, 44:20,
45:15, 49:7,
56:15, 62:17,

69:9, 69:20,
74:14, 76:20,
86:11, 93:22,
100:20, 123:13,
135:6, 138:24,
142:1, 164:23,
169:18, 171:13,
171:14, 185:2,
185:4, 185:9,
185:10, 185:13,
187:22, 188:2,
188:5, 188:22,
201:22, 228:10,
241:1, 247:1,
249:20, 286:5,
290:11, 291:21,
297:6, 304:19
**makes**
35:21, 36:8,
50:7, 151:8,
151:9, 166:14,
169:13, 298:3,
301:8
**making**
32:23, 49:11,
56:19, 57:13,
79:12, 133:22,
225:7, 290:24
**males**
86:9
**man**
93:22, 97:21
**manner**
310:6, 310:15
**manning**
220:11, 220:16,
220:17, 220:23,
273:12, 273:13,
273:14, 273:18,
274:6
**many**
24:18, 24:20,
53:14, 63:10,
63:11, 63:13,
178:3, 200:18,
215:9, 230:14,
303:9, 303:12
**march**
17:15, 17:16,

Transcript of Cecil Williams
Conducted on July 14, 2020                                        109

54:12, 75:1,
124:1, 180:13
**mark**
122:22, 234:13,
242:22
**marked**
73:24, 122:23,
122:24, 123:4,
179:23, 180:2,
234:18, 235:4,
235:11, 243:1,
243:4, 248:3,
248:6
**matter**
210:1, 271:7
**matters**
225:20
**mattesons**
168:4
**maybe**
9:22, 18:10,
45:15, 49:23,
57:17, 59:7,
64:19, 65:7,
65:9, 66:4,
105:10, 105:12,
125:5, 132:15,
144:1, 163:4,
166:16, 172:24,
194:15, 198:17,
200:16, 200:20,
202:12, 215:13,
226:6, 230:16,
236:15, 249:10,
260:15, 266:5,
269:9, 271:8,
273:18, 314:12
**mcghee**
156:21, 274:12,
274:17, 275:5,
276:7, 276:14
**meaning**
59:19, 92:18,
92:23, 159:1
**meaningful**
116:14
**means**
9:15, 126:10,

137:19, 173:11,
183:13, 274:2
**meant**
118:7, 304:9
**media**
217:22
**medical**
5:3, 5:4,
193:10, 193:17,
197:6, 197:21,
315:6, 315:7
**medication**
195:21, 196:5,
196:9, 196:10,
196:13, 196:22
**medications**
196:6
**meet**
11:24, 14:20,
215:4, 273:20
**meeting**
226:5, 227:6,
262:2, 262:3,
291:18, 291:19,
291:23, 310:17
**meetings**
215:20, 215:24,
216:3
**meloxicam**
196:3
**member**
32:2, 32:5,
308:9
**memorialization**
228:11
**memories**
262:4
**memory**
24:14
**mental**
53:13, 59:5,
181:7, 191:14,
191:16, 193:24
**mentally**
52:20
**mention**
247:7, 252:7
**mentioned**
21:15, 38:20,

40:3, 44:13,
44:23, 45:21,
48:2, 48:21,
77:11, 77:18,
187:16, 227:5,
284:8, 285:24
**merchant**
80:9
**merit**
37:16, 37:21,
38:2, 38:5,
38:6, 38:12,
38:13, 38:18
**merry**
211:12
**mess**
53:13, 240:22,
246:13, 279:19
**message**
210:3
**messages**
207:19, 210:16,
211:18, 212:15,
212:17, 212:18,
212:20, 213:5,
213:13
**messed-up**
182:15
**messenger**
219:6
**messina**
97:15, 97:23,
98:16, 98:24,
101:15, 101:16,
101:17, 101:22,
102:4, 102:9,
102:18, 103:12,
103:19, 103:20,
103:23, 104:1,
104:2, 104:3,
104:8, 105:3,
105:6, 105:24,
106:3, 106:8,
106:15, 107:1,
108:21, 109:7,
109:12, 110:7,
140:16, 140:19,
142:13, 142:22,

145:6, 146:15
**messina's**
142:16
**met**
215:10, 215:12,
258:1, 259:19,
259:20, 265:1,
265:7, 273:18,
274:6
**meted**
282:24
**metrolot**
196:3
**miami**
16:7
**michael**
46:5, 64:15
**michelle**
255:19, 258:6,
258:17
**michigan**
16:7
**middle**
249:24
**midwest**
3:13
**might**
13:24, 18:24,
23:21, 23:22,
24:10, 25:19,
25:20, 31:15,
37:17, 45:17,
53:18, 54:13,
54:14, 62:3,
62:4, 63:10,
90:7, 93:23,
94:19, 208:20,
211:23, 215:7,
215:14, 215:15,
215:16, 215:17,
216:3, 255:24,
261:10, 272:22,
292:13
**mile**
57:21
**military**
16:23
**mill**
301:9

mind
24:20, 26:10,
34:14, 35:1,
40:15, 51:19,
84:11, 169:12,
218:10, 218:12,
314:23
minimize
92:19
minor
34:7, 34:8,
34:11
minority
76:11, 150:5,
150:6, 150:7
minuscule
300:11
minute
89:2, 113:21,
176:13, 221:1,
222:9, 254:14,
271:18, 280:16,
305:13
minutes
57:17, 57:18,
222:11, 222:12,
222:15
mis
163:23
mischaracterizes
215:23
misconduct
224:15, 224:23
miss
187:11
missed
140:8, 140:9,
178:8, 178:10,
184:5, 184:7,
184:8, 187:8,
189:7, 231:9
missing
263:13
misstates
163:23, 177:2
mistake
309:16, 309:17
mistaken
37:15, 255:24,

292:13
misunderstood
103:17
mixed
53:8
mohammed
5:4, 194:4,
195:3, 196:21,
196:22, 197:4,
198:20
mohammed's
196:24
moment
177:12
money
181:17, 187:23,
190:23
monitored
61:22
monitoring
19:5, 19:9,
19:12, 20:14,
42:23, 44:11,
44:21, 45:17,
49:18, 50:2,
50:21, 51:7,
52:5, 56:7,
71:10, 72:15,
72:18, 75:3,
135:16, 165:10,
165:12, 309:3
month
188:4
monthly
25:13
months
216:3
more
27:21, 27:22,
52:18, 52:20,
62:21, 76:4,
114:12, 122:16,
129:19, 161:16,
166:9, 166:11,
166:15, 175:19,
177:16, 178:12,
178:13, 185:3,
185:4, 185:9,

185:10, 185:13,
186:14, 187:22,
188:2, 188:3,
188:5, 190:20,
199:3, 199:8,
199:10, 226:24,
243:17, 260:15,
260:16, 271:15,
292:1, 298:3,
298:7, 298:13,
298:17, 298:24,
299:7, 303:16,
305:22, 306:9
morning
7:16, 53:21,
155:18, 157:2,
158:14, 159:1,
159:7
most
85:8, 165:7,
165:8, 166:3,
166:4, 166:5,
166:12, 172:19,
179:3, 214:19,
294:24, 305:1
mostly
56:4, 62:14,
152:10, 214:19
mouth
198:8
move
41:11, 42:3,
49:19, 84:2,
87:14, 110:2,
155:12, 170:4,
228:18
moved
17:17, 50:4,
50:17, 75:3,
76:19, 185:22,
271:3
moving
41:10, 52:4,
65:5, 231:24,
236:3, 236:4,
258:5, 296:3,
300:4, 301:14,
303:24

much
26:10, 52:18,
52:20, 143:22,
143:24, 205:8,
222:11, 257:13,
273:16, 282:22,
293:12, 316:8
multiple
87:15, 311:2
murchison
80:19
must
55:20, 170:15
mvt
69:8
myself
191:24

_____
N

n-word
90:19, 91:1,
91:21, 92:1,
93:3, 93:10,
94:15, 94:18,
95:10, 155:22,
155:23, 156:2,
156:15, 157:7,
241:9, 242:8,
247:8, 247:12,
252:8, 253:4,
253:7, 253:17,
262:8, 262:12,
264:15, 264:21,
308:13, 309:14
name
7:17, 24:5,
24:6, 24:7,
29:23, 36:15,
36:17, 38:11,
74:9, 96:21,
98:15, 98:18,
127:5, 129:17,
129:18, 129:24,
141:20, 147:8,
194:8, 194:11,
234:17, 238:10,
238:16, 244:23,
262:22, 308:10

Transcript of Cecil Williams
Conducted on July 14, 2020

111

**named**
146:23, 232:1
**names**
92:3, 106:1,
140:8, 140:9,
141:3, 142:6,
142:9, 175:12
**naming**
120:21
**nasty**
52:18, 201:7
**natural**
276:5
**naturally**
8:21
**nature**
44:3, 94:6,
171:21
**neal**
24:3, 93:9,
93:10, 93:11,
93:16, 94:9,
94:11, 95:7,
109:5, 110:6,
112:5, 133:16,
133:18, 133:19,
137:10, 137:12,
149:7, 156:7,
158:15, 172:16,
173:24, 178:1,
178:21, 179:18,
225:4, 259:10,
279:9, 279:18,
287:11, 287:14,
287:22, 288:2,
288:5, 289:8,
289:10, 289:20
**neal's**
133:21
**need**
6:14, 6:20,
9:9, 9:14, 11:7,
43:16, 44:1,
47:14, 67:2,
69:2, 69:8,
69:16, 112:15,
128:17, 155:3,
155:11, 158:7,

183:14, 193:13,
205:10, 211:4,
222:8, 222:11,
231:3, 231:21,
249:21, 314:5,
314:24
**needed**
7:3, 27:21,
69:5, 172:21
**needs**
27:17, 42:21,
43:18, 43:20,
73:2
**negotiation**
33:6
**neighborhood**
167:21, 168:2
**neighborhoods**
167:9, 167:22,
170:13
**neither**
317:12
**nerve**
156:12, 196:17,
196:19
**nerves**
93:19, 191:19,
196:15
**nervous**
53:4, 191:18,
308:4
**never**
34:2, 57:23,
76:1, 76:2,
82:17, 82:20,
83:2, 90:3,
91:2, 91:12,
99:19, 111:19,
117:11, 133:5,
135:13, 135:15,
135:24, 136:3,
138:9, 138:13,
141:4, 144:3,
146:24, 147:17,
148:8, 148:9,
148:11, 148:16,
148:24, 155:21,
156:14, 157:24,

158:5, 163:9,
187:17, 207:9,
209:4, 209:6,
209:7, 216:2,
218:21, 219:1,
219:2, 219:4,
219:13, 237:14,
251:10, 257:6,
257:7, 264:5,
273:18, 307:2,
311:24, 312:2
**new**
166:14, 182:19,
211:12, 246:18,
288:18, 288:21,
312:10
**newsom**
89:20, 121:6,
121:21, 262:16,
263:13
**next**
19:4, 23:15,
28:15, 28:17,
49:3, 49:4,
50:23, 68:24,
99:5, 136:14,
171:16, 171:24,
242:3, 250:5
**nice**
58:1
**nickle**
142:11, 142:22,
144:8
**nickle's**
145:19
**nickles**
106:4, 106:8,
110:24, 111:12,
112:6, 140:20
**nigger**
91:24, 182:16,
240:12
**nine**
74:13, 118:1,
205:15, 278:10,
278:12
**nobody**
49:24, 73:13,

73:15, 135:22,
206:24, 232:10,
242:1
**nobody's**
272:11
**nod**
9:5
**nods**
9:2, 12:21,
185:15
**non-direct**
172:19
**non-promotion**
160:15
**none**
208:3, 299:13
**nonminority**
75:9, 84:16,
86:14, 88:21,
89:22, 95:17,
96:9, 96:20,
97:2, 97:8,
105:21, 115:5,
132:5, 132:11,
139:23, 306:14
**normal**
10:23, 11:2
**normally**
7:8, 28:22,
67:21, 107:17,
109:21, 111:22,
126:24, 147:4,
179:1, 182:23
**north**
3:21, 85:19,
114:10, 170:11
**northern**
1:2
**nose**
226:18
**notarized**
237:12
**note**
203:3
**notes**
10:18, 11:6,
305:12, 314:23,
315:5

Transcript of Cecil Williams
Conducted on July 14, 2020

112

**nothing**
41:22, 55:15,
55:16, 69:10,
76:9, 84:8,
100:13, 130:15,
130:17, 130:19,
158:10, 167:14,
173:20, 183:1,
197:13, 213:7,
219:12, 233:9,
251:22, 252:13,
311:24
**notice**
2:8
**notified**
112:11, 131:4
**notify**
57:2, 57:3,
57:8, 57:10
**nowhere**
81:6
**number**
4:11, 7:22,
44:18, 138:3,
139:20, 159:12,
180:21, 207:17,
225:2, 225:11,
234:14, 235:13,
243:9, 248:9
**numbers**
71:6, 174:4,
178:10, 233:11
**numerous**
128:9, 178:6,
283:11

**O**

**oak**
3:15
**oath**
7:11, 113:4,
223:9, 255:15,
281:12
**object**
6:7, 163:22,
164:16, 189:21,
215:22, 254:3
**objection**
28:1, 129:3,

130:4, 130:5,
134:16, 151:1,
151:13, 153:10,
154:12, 154:21,
159:5, 164:19,
164:20, 165:1,
166:17, 167:5,
170:19, 176:22,
176:23, 197:18,
199:5, 199:20,
294:19, 295:4,
295:14, 297:4,
297:23, 298:6,
298:20, 299:2,
299:8, 299:14,
299:21, 300:13,
301:3, 301:11,
302:9, 304:15,
305:4, 306:21,
310:9, 310:22,
311:7
**objections**
4:14, 4:19,
123:6, 180:4
**observation**
152:9, 152:14,
153:1
**observe**
118:12
**obviously**
175:11
**occasion**
136:17, 136:19
**occur**
59:7, 59:8
**occurred**
30:16, 101:20,
109:22, 118:22,
121:13, 121:24,
227:22, 228:1,
239:13, 244:12,
283:23, 292:2,
292:10
**odds**
16:8
**offended**
304:11
**offensive**
154:5, 290:6,

290:13, 290:20
**office**
4:26, 16:2,
16:13, 16:19,
17:4, 22:4,
22:7, 22:20,
22:21, 22:24,
23:3, 23:7,
23:10, 27:3,
27:18, 30:2,
32:11, 33:24,
68:16, 75:1,
84:23, 86:24,
87:1, 87:3,
95:17, 102:13,
103:2, 103:15,
118:19, 118:21,
129:15, 203:11,
215:1, 218:20,
218:24, 222:4,
234:7, 238:5,
239:20, 239:23,
240:18, 244:16,
245:2, 245:19,
246:11, 260:10,
261:21, 261:22,
279:23, 279:24,
280:2, 280:4,
291:2, 294:2,
294:14, 294:18,
294:23, 295:7,
295:10, 295:21,
298:4, 299:11,
307:13, 308:3
**officer**
17:9, 20:19,
126:12, 135:18,
174:17, 298:13,
317:5
**officers**
27:22, 54:22,
54:23, 55:3,
58:5, 75:9,
75:23, 76:3,
76:7, 76:9,
76:10, 76:11,
76:13, 78:1,
84:16, 85:18,

86:14, 87:7,
88:21, 89:22,
95:17, 96:21,
97:2, 97:8,
97:18, 105:22,
115:5, 120:14,
131:22, 132:11,
139:23, 167:13,
170:11, 224:16,
294:24, 295:1,
295:9, 295:19,
300:8, 306:14
**officially**
313:7
**often**
128:8, 174:3,
174:4, 174:5,
275:7, 306:18
**oh**
6:22, 7:1,
11:4, 24:4,
24:8, 24:19,
38:9, 45:7,
45:14, 65:4,
66:9, 74:2,
74:19, 84:1,
98:12, 100:15,
103:15, 106:9,
120:9, 133:6,
150:10, 182:20,
185:24, 194:15,
200:19, 220:19,
225:2, 227:3,
231:22, 233:13,
236:2, 240:24,
254:19, 259:19,
262:24, 270:12,
276:19, 314:8,
314:15, 315:7
**old**
237:14, 288:24
**olive-harvey**
13:20
**oliver**
13:17, 13:22,
15:15, 15:23
**omission**
309:14

Transcript of Cecil Williams
Conducted on July 14, 2020

113

omissions
170:23
omit
309:15
on-hand
303:3
once
38:13, 165:20,
230:16, 269:9
one-day
81:24, 83:7,
83:9, 124:18,
125:5, 125:7,
125:9, 125:17
ones
50:24, 51:1,
58:19, 76:5,
95:6, 141:19,
142:5, 142:6,
142:23, 142:24,
165:24, 167:12,
206:5
only
66:19, 87:11,
97:16, 131:19,
135:2, 151:18,
151:22, 153:2,
165:18, 165:24,
166:1, 166:2,
166:3, 184:16,
187:9, 194:3,
201:24, 202:2,
204:4, 204:24,
224:13, 226:17,
229:22, 232:3,
260:20, 264:16,
280:6, 288:23,
295:20
ooh
24:3, 194:8,
202:6, 202:9
open
128:22, 243:12
operations
17:23, 18:1,
18:6, 19:4,
20:18
opinion
122:11, 133:21,

166:13, 217:14,
273:1, 273:6,
276:11, 311:1
opportunities
181:4, 182:12,
182:14, 183:7,
183:9, 184:2,
188:19, 189:2
opportunity
116:15, 182:24,
183:19, 183:24,
217:16, 229:23,
296:12, 298:17
opposed
115:5, 166:16
opr
30:1, 30:2,
30:7, 30:17,
38:1, 91:7,
119:8, 119:10,
119:15, 131:9,
131:15, 132:19,
132:22, 133:14,
137:15, 157:13,
157:17, 240:15,
240:24, 241:1,
242:16, 246:8,
246:23, 247:15,
247:17, 248:12,
248:22, 248:23,
248:24, 249:5,
249:8, 249:9,
249:11, 249:12,
251:24, 307:20,
308:9, 309:18
ops
20:11
option
81:16, 307:11,
307:13
options
199:14, 199:16
oral
228:7
order
8:10, 8:22,
42:13, 44:8,
45:4, 46:13,

46:14, 48:4,
48:21, 49:22,
55:21, 158:8,
239:7, 239:8,
239:19, 239:20,
239:24, 241:1,
245:19, 313:11,
313:13, 314:2
orders
44:2, 45:4,
245:11, 245:20,
251:8, 251:11,
251:17
original
4:35, 301:20,
316:15
originally
83:9
others
108:4, 117:13,
146:23, 150:17,
174:21, 206:7
otherwise
72:1, 317:15
out
14:24, 18:24,
26:19, 35:22,
36:4, 38:8,
40:22, 40:24,
45:18, 49:16,
49:22, 50:20,
51:6, 52:21,
52:24, 56:12,
59:3, 62:18,
62:19, 62:21,
67:22, 69:9,
69:13, 70:17,
76:8, 76:12,
85:12, 85:14,
85:19, 91:18,
93:5, 96:16,
99:7, 99:18,
100:23, 103:23,
103:24, 110:3,
112:1, 129:1,
136:21, 137:17,
137:19, 156:22,
163:6, 164:10,

166:1, 166:6,
166:10, 167:13,
167:20, 168:3,
168:4, 168:5,
169:5, 170:11,
183:8, 184:5,
184:7, 184:8,
187:8, 187:11,
188:17, 189:7,
190:8, 191:21,
191:23, 192:1,
198:8, 211:9,
215:8, 220:22,
231:21, 232:7,
242:4, 246:8,
251:15, 253:13,
256:5, 256:7,
260:14, 260:15,
260:16, 274:1,
282:24, 291:21,
294:16, 299:18,
299:19, 300:1,
304:14, 305:18,
306:3, 314:12
outcome
317:15
outline
292:19
outside
18:3, 18:4,
18:12, 18:16,
18:19, 87:2,
175:6, 208:14,
256:17, 260:2,
261:9, 263:17,
265:14, 278:8,
308:15
outstanding
45:8
over
8:5, 8:11,
10:13, 26:19,
31:3, 46:7,
47:15, 47:17,
47:18, 47:22,
48:22, 51:12,
51:13, 53:11,
53:21, 54:9,

Transcript of Cecil Williams
Conducted on July 14, 2020                                    114

54:10, 54:11,
54:12, 55:3,
55:6, 56:5,
58:22, 60:10,
61:4, 61:10,
61:13, 62:3,
62:6, 66:10,
68:20, 69:14,
69:15, 71:11,
80:18, 80:21,
88:21, 109:14,
116:6, 122:19,
126:5, 131:5,
159:11, 164:22,
167:6, 167:7,
167:10, 167:12,
168:11, 168:18,
169:9, 173:15,
176:15, 177:17,
182:19, 184:18,
187:9, 214:17,
241:23, 241:24,
242:6, 246:23,
250:14, 255:22,
256:1, 256:20,
256:23, 256:24,
257:2, 259:18,
263:14, 265:1,
265:2, 265:7,
266:13, 266:20,
268:15, 270:19,
274:15, 276:6,
278:7, 289:2,
292:19, 307:15,
308:5, 309:12
**overall**
65:20
**overhear**
103:1
**overheard**
102:17, 103:6,
103:18

**P**

**pack**
201:4
**pad**
11:3

**page**
4:4, 4:11,
74:9, 74:13,
87:14, 113:14,
120:9, 123:10,
123:11, 124:6,
136:15, 136:16,
138:4, 139:21,
153:23, 158:22,
171:13, 180:8,
180:9, 180:22,
194:19, 194:20,
195:23, 205:14,
224:17, 236:19,
238:20, 243:8,
244:6, 246:19,
248:14, 249:24,
250:5, 264:23,
264:24, 265:1,
265:5, 265:6,
265:7, 265:20,
265:23, 265:24,
266:23, 267:7,
269:3, 269:21
**pages**
1:26, 237:18
**paid**
161:14, 161:17,
161:21, 191:1,
201:14, 201:18,
203:8, 204:6
**palatine**
85:13, 164:10,
164:14, 165:4
**palatines**
168:4, 170:12
**pandemic**
192:23
**paper**
29:3, 42:8,
42:9, 42:21,
125:10, 174:10,
176:1, 176:3,
177:7, 177:11,
194:9
**paperwork**
10:24, 11:2,
41:17, 41:18,

43:1, 43:3,
45:13, 49:11
**paragraph**
74:24, 75:2,
75:6, 75:7,
76:22, 77:21,
84:4, 84:9,
84:14, 84:19,
86:22, 87:10,
87:20, 88:15,
88:18, 89:7,
89:9, 89:18,
90:10, 90:16,
90:17, 95:9,
95:14, 96:4,
113:19, 114:7,
114:13, 115:2,
115:13, 116:12,
116:18, 159:8
**parking**
136:6, 215:1
**part**
29:17, 30:5,
32:18, 33:13,
42:7, 47:4,
51:18, 52:13,
52:14, 61:11,
64:24, 118:23,
165:14, 165:15,
184:15, 184:16,
185:16, 188:20,
193:5, 193:7,
197:23, 198:3,
204:8, 233:3,
234:1, 249:7,
249:9, 251:20,
286:7
**participant**
14:13, 14:14,
285:14
**particular**
74:21, 136:5
**parties**
317:14
**partner**
55:1, 68:10,
70:3, 91:3,
106:9, 106:13,

125:23, 134:8,
142:16, 142:17,
157:19, 257:9
**partnered**
68:12, 257:5,
264:5
**partners**
80:18, 117:23,
118:3, 118:7,
211:11, 257:10,
257:19, 261:12,
265:22, 269:8,
274:19, 274:22,
274:24, 275:1,
277:3, 278:10,
284:14
**pass**
92:21, 129:22
**passa**
127:2, 127:6,
127:12, 127:23,
129:23, 131:17,
131:18, 131:22,
133:6, 133:21
**past**
34:15
**pat**
76:4
**patience**
205:9, 293:15
**patrol**
21:3, 21:4,
21:5, 21:7,
21:16, 21:20,
21:22, 22:1,
22:8, 22:10,
25:19, 26:2,
26:5, 26:6,
27:21, 31:3,
31:4, 31:8,
52:19, 61:10,
62:8, 62:9,
62:14, 62:17,
62:18, 62:21,
63:2, 63:7,
63:12, 65:16,
65:22, 66:2,
68:14, 69:4,

Transcript of Cecil Williams
Conducted on July 14, 2020                                        115

84:23, 85:24,
163:20, 164:4,
164:5, 168:16,
168:17, 260:8,
261:21, 261:22,
264:2, 264:3,
264:4, 274:21,
274:23, 277:8,
278:12, 278:17,
294:2, 294:6,
298:23, 307:14
**paul**
64:15, 127:8,
127:9
**pay**
137:23, 162:9,
184:22, 191:1,
191:3, 191:4
**paying**
189:11, 189:12,
190:8, 190:21,
190:22
**payment**
231:9
**payments**
231:11
**pemonte**
143:5, 144:17,
146:3
**pemote**
143:4
**penalties**
6:6, 6:17
**penalty**
123:22, 180:18
**pending**
9:14, 9:16,
254:4, 301:22,
301:23
**people**
18:12, 18:13,
20:23, 20:24,
49:17, 49:21,
50:15, 53:18,
54:13, 54:14,
62:20, 85:6,
92:5, 93:4,
94:16, 94:17,

94:19, 94:23,
111:24, 112:1,
118:19, 120:6,
140:23, 141:18,
143:20, 152:8,
152:15, 152:16,
154:8, 154:18,
155:5, 156:5,
156:16, 156:23,
163:4, 163:6,
163:7, 163:9,
165:8, 165:9,
165:11, 165:13,
165:15, 165:16,
165:18, 174:15,
174:20, 176:9,
177:11, 178:24,
179:2, 179:9,
184:17, 207:21,
268:6, 268:7,
288:23, 298:5,
304:2, 304:9,
306:8
**percent**
70:10, 70:18
**perfect**
15:12, 15:14,
50:7, 74:15,
84:13, 87:17,
113:15, 124:8,
191:9, 204:20,
222:1, 227:3
**perfectly**
12:19
**performance**
272:8, 272:11
**periods**
268:20
**perjury**
6:6, 6:17,
123:22, 180:18
**permanently**
269:15
**person**
29:10, 44:19,
44:20, 59:7,
68:5, 68:9,
103:23, 107:3,

116:23, 116:24,
117:1, 117:2,
120:12, 132:24,
136:9, 136:11,
150:23, 163:4,
163:5, 214:17,
214:20, 216:16,
220:2, 220:20,
221:7, 223:12,
223:13, 228:8,
246:22, 297:3,
297:9, 297:12,
297:16
**person's**
98:14
**personal**
122:12, 205:24,
206:1, 206:2,
209:21, 217:14,
231:4, 233:10,
311:1
**personally**
60:7, 75:14,
76:1, 78:13,
78:14, 91:13,
131:20, 289:20
**phone**
11:14, 12:1,
12:2, 41:19,
44:13, 44:14,
44:18, 49:11,
102:17, 103:4,
103:6, 128:3,
128:4, 128:11,
129:14, 130:11,
130:13, 133:22,
133:24, 135:5,
207:16, 207:17,
214:17, 225:14,
227:13, 246:21,
280:13
**phonetic**
80:9, 80:19,
120:10, 192:4,
305:5
**physical**
19:14, 19:21,
53:3

**physically**
51:12, 52:21,
54:18, 177:7
**physician**
194:3, 194:4,
197:5
**physicians**
195:13
**pick**
47:14, 47:18,
47:22, 54:10,
272:22, 272:23
**picked**
266:15
**picking**
51:24, 55:2
**pictures**
84:12
**piece**
42:21, 175:24,
192:5, 242:15
**piecemeal**
251:12
**pills**
191:18, 191:19,
196:17, 196:20
**pin**
216:14
**place**
26:16, 43:12,
65:6, 66:7,
70:10, 70:11,
135:10, 167:13
**placed**
42:14, 42:16,
43:23, 51:1,
88:19, 135:6,
160:14
**places**
41:23
**plaintiff**
4:13, 4:18,
75:7, 84:14,
123:5, 126:11,
136:17, 136:19,
157:4, 171:2,
180:3, 225:22,
229:11

Transcript of Cecil Williams
Conducted on July 14, 2020

116

**plaintiffs**
1:9, 3:2,
87:16, 87:24,
88:19, 89:19,
90:19, 95:18,
115:4, 115:14,
116:15, 116:20,
120:17, 208:1,
208:4, 208:17,
208:18, 209:3,
209:4, 209:16,
210:3, 211:19,
211:24, 212:19,
213:19, 214:4,
216:23, 219:16,
220:9, 226:7,
228:4, 232:1,
258:4, 267:9,
267:16, 267:18,
267:20, 291:18
**plan**
231:14
**planned**
306:5
**played**
199:11, 313:1
**please**
6:2, 13:19,
30:13, 63:22,
70:8, 73:23,
92:17, 127:5,
186:4, 222:9,
234:20, 236:24,
239:22, 242:23,
243:23, 275:18,
298:10, 298:12
**plenty**
178:8, 178:10
**plus**
169:2, 173:4
**pocket**
96:16, 99:8,
99:18, 100:23,
190:9
**podrielski**
5:5, 194:21,
195:3, 197:4,
198:20

**point**
9:4, 12:16,
33:4, 33:10,
39:22, 54:24,
55:2, 55:4,
66:22, 68:14,
78:3, 96:21,
102:9, 132:23,
133:14, 151:20,
168:22, 170:17,
179:8, 204:15,
233:21, 233:22,
282:3
**pointed**
281:16
**policies**
27:2, 117:5
**policy**
27:3, 27:10,
30:6, 33:24,
169:17, 178:22
**political**
27:12
**politically**
48:6
**politician**
27:12
**pon**
246:22
**position**
20:6, 20:18,
26:1, 32:14,
85:3, 87:5,
102:1, 169:22,
169:24
**positions**
71:12, 84:16,
84:22, 85:1,
85:2, 85:9,
85:22, 86:6,
86:14, 86:21,
87:1, 87:9,
87:11, 95:17,
225:5
**possibility**
130:16, 130:20
**possible**
128:24, 129:11,

134:14, 134:21,
134:23, 135:1,
135:5, 154:8,
177:10, 223:21,
226:16, 226:23,
230:2
**possibly**
199:19
**post**
218:19, 268:9
**posted**
219:2
**potential**
219:15, 297:1
**potentially**
71:13, 71:14,
71:21
**pr**
237:14
**precipitated**
118:16
**prefer**
14:5, 86:7
**prepare**
11:21, 12:7,
12:9, 13:4,
193:13
**presence**
214:12
**present**
3:26, 228:4,
232:2, 232:4,
248:18, 284:17,
288:17, 288:18
**presumably**
41:1, 49:16,
175:13, 196:24,
264:6
**pretty**
65:20, 131:7,
132:21, 170:15,
300:7
**prevalence**
29:6
**prevented**
252:13
**previous**
75:16, 229:15

**previously**
124:22
**prices**
201:2
**primary**
194:4, 194:5,
194:14, 195:18
**print**
251:14
**printed**
253:13
**prior**
16:13, 16:19,
16:20, 16:21,
17:10, 68:21,
127:23, 140:10,
196:12, 196:23,
203:9, 204:6,
204:7, 214:13,
221:17, 258:2,
258:4, 258:9,
258:21, 262:3,
264:12, 267:8
**priority**
173:15, 176:15
**privileged**
189:22, 189:24
**probably**
8:4, 13:24,
14:6, 27:21,
45:1, 133:1,
185:2, 203:4,
264:4, 265:6,
270:6
**problem**
29:14, 29:16,
29:18, 57:5,
76:2, 89:15,
120:8, 133:3,
133:4, 197:11,
210:6, 222:10,
223:18, 232:23,
273:10, 276:14
**problematic**
305:23
**problems**
120:11, 121:11
**procedure**
19:13, 19:15,

Transcript of Cecil Williams
Conducted on July 14, 2020

117

19:17, 35:15,
37:8, 37:11,
37:12, 39:3,
39:10, 81:6,
119:13, 296:4,
302:17, 307:16
**procedures**
37:24, 116:14,
116:19, 117:5
**proceed**
6:19
**proceeding**
6:8, 119:12,
229:6
**proceedings**
6:1
**process**
18:21, 31:9,
34:3, 34:4,
34:16, 34:17,
35:14, 37:18,
38:16, 38:21,
38:23, 39:5,
39:10, 39:12,
39:16, 40:20,
40:23, 41:8,
41:15, 41:16,
41:24, 44:14,
45:11, 45:23,
45:24, 46:11,
47:4, 47:7,
47:20, 49:10,
51:24, 52:1,
57:8, 57:9,
59:22, 63:11,
83:18, 106:23,
110:12, 110:19,
111:5, 111:7,
112:9, 116:13,
117:7, 122:4,
139:7, 139:9,
139:14, 139:17,
175:20, 185:24,
186:5, 186:7
**processed**
49:3, 49:5,
81:8, 106:19,
109:9

**processes**
116:19
**processing**
36:24, 40:8,
40:13, 58:23,
62:22
**produced**
193:11, 193:12
**professional**
2:10, 30:3,
55:24, 238:5,
245:2
**program**
184:9
**progress**
71:24
**progressive**
33:24, 34:2,
34:7, 34:13,
34:20, 34:22,
34:24, 35:13,
39:9, 87:23,
88:3, 88:6,
88:14, 100:18
**projects**
167:11
**promote**
186:6, 186:7,
312:8
**promoted**
71:14, 71:21,
72:3, 72:22,
160:17, 187:19,
187:21, 303:20,
312:20, 312:21,
312:22, 312:23
**promotion**
72:14, 72:18,
72:22, 183:14,
183:17, 183:18,
183:19, 184:2,
186:9, 186:14,
187:9, 187:13,
187:16, 188:19,
313:2
**promotions**
71:10, 161:2,
181:4, 183:10,

184:4, 187:7,
187:14, 188:12,
189:2, 189:7,
312:6, 312:18,
312:21
**pronounced**
170:7
**proper**
78:5
**property**
215:3, 220:5
**proposition**
209:23
**protected**
158:23, 159:15,
159:21, 160:6
**protection**
44:3, 44:8,
49:23
**protective**
45:3
**provide**
11:10, 35:13,
116:14, 116:20,
180:24, 245:6,
247:15, 247:17,
315:1
**provided**
4:37, 33:8,
316:16
**provisions**
251:17
**psychiatrists**
195:14
**psychologists**
195:14
**pull**
73:21, 99:7,
113:11, 205:13,
221:23, 224:1,
234:12, 242:22,
247:23
**pulled**
157:5
**pun**
242:2
**punishment**
35:4, 35:5,

35:6, 110:3,
116:24, 117:1,
117:3, 297:9,
297:11
**punitive**
181:7, 191:12
**purpose**
127:13, 127:15,
127:17, 131:2,
133:24, 243:6
**pursuant**
2:8
**push**
59:21
**pushed**
59:8, 76:7,
76:12, 173:7
**put**
27:22, 41:18,
43:6, 47:19,
48:1, 61:5,
78:23, 79:1,
79:15, 85:5,
85:16, 93:15,
117:14, 117:18,
119:4, 120:23,
132:8, 134:4,
135:22, 136:8,
136:11, 141:16,
141:21, 160:14,
166:14, 167:24,
168:1, 168:23,
170:1, 171:1,
173:4, 173:7,
173:8, 173:9,
174:4, 175:4,
175:5, 181:16,
182:15, 182:17,
183:1, 183:12,
183:22, 186:16,
187:6, 194:16,
198:11, 232:22,
233:21, 241:8,
241:12, 241:14,
241:15, 241:17,
241:19, 242:7,
242:11, 253:12,
253:22, 264:11,

265:17, 269:15,
279:4, 280:11,
281:17, 282:2,
282:19, 283:20,
286:6, 303:4,
306:9
**putting**
37:17, 45:22,
48:23, 87:4,
87:5, 130:22,
130:23, 132:1,
132:6, 132:7,
176:20, 180:17

**Q**

**qualification**
23:2
**qualified**
22:23
**quantify**
191:15
**questioning**
216:5, 274:2,
296:6, 305:20
**questions**
7:22, 7:23,
9:20, 10:14,
11:10, 27:1,
92:18, 198:17,
254:10, 281:11,
293:11, 293:22,
296:4, 302:24,
304:22
**quick**
145:19, 177:6,
210:9, 254:19,
311:12, 311:16
**quickly**
293:2
**quiet**
73:16
**quit**
201:1, 201:8,
201:11
**quite**
155:17, 164:15,
266:16
**quote**
136:11, 156:23,

288:21

**R**

**race**
27:12, 113:24,
145:19, 149:12,
150:17, 150:19,
152:17, 171:20,
178:19, 179:15,
295:23, 300:3
**races**
305:9
**racially**
155:15, 311:3
**racine**
13:9
**racist**
90:20, 91:15,
92:3, 92:8,
93:7, 93:17,
94:1, 94:11,
95:1, 95:10,
156:9, 158:18,
286:13, 290:6,
290:13, 290:20
**radio**
57:11, 57:12,
67:12, 67:14,
68:20, 69:6,
69:14, 69:15,
108:14, 108:17,
109:14, 111:15,
126:5, 126:8
**radios**
75:23, 97:16
**raise**
6:24
**raises**
181:4, 187:10,
187:11, 187:14
**raising**
14:20
**ran**
77:23
**ranges**
76:6
**rank**
20:18

**rankings**
72:1
**ranzino**
24:7, 90:22,
91:5, 91:20,
91:23, 92:2,
92:7, 92:9,
93:5, 95:7,
100:3, 100:22,
109:5, 110:6,
112:5, 149:8,
156:1, 156:21,
157:5, 157:14,
157:16, 158:1,
158:15, 172:15,
172:21, 173:24,
174:2, 178:1,
178:18, 178:21,
179:14, 198:4,
198:10, 198:13,
225:4, 238:18,
239:5, 239:10,
240:3, 240:7,
240:19, 240:21,
241:4, 241:22,
242:17, 244:12,
245:11, 245:16,
245:20, 245:24,
246:3, 246:11,
246:16, 246:24,
247:7, 247:11,
251:9, 251:13,
251:19, 251:20,
252:8, 253:3,
253:17, 259:6,
262:8, 264:14,
279:4, 279:8,
279:15, 284:9,
284:18, 285:2,
285:18, 285:21,
288:5, 290:11,
304:4, 304:5,
304:7, 304:14,
304:19, 308:13,
309:1, 309:2,
309:6, 309:10,
311:17
**ranzino's**
290:9

**rarely**
143:17
**rate**
85:10, 85:11,
85:13, 85:21,
184:22
**rates**
85:12, 85:15,
85:17, 114:12,
168:5
**rd**
16:15, 51:9,
51:11, 67:21,
67:23
**rdo**
78:22, 104:16
**read**
89:9, 237:16,
249:21, 250:7,
250:15
**reading**
250:11, 317:11
**ready**
40:21, 40:24,
65:12, 126:15,
202:22, 210:20,
210:22, 210:23,
222:23, 236:22,
255:8
**real**
145:19, 177:6,
210:9, 254:19,
293:2, 311:11
**really**
8:3, 26:12,
48:8, 57:23,
62:13, 94:1,
96:17, 156:9,
173:18, 198:17,
214:7, 257:11,
257:13, 260:1,
261:8, 272:20,
276:19, 278:16
**realtime**
2:10
**reason**
10:5, 23:6,
127:15, 150:1,

Transcript of Cecil Williams
Conducted on July 14, 2020

119

151:16, 153:7,
153:16, 167:20,
183:22, 201:5,
204:16, 218:8,
233:6, 241:16,
295:6, 311:24,
312:1
**reasonable**
9:21
**reasons**
59:6
**recall**
94:11, 117:21,
118:8, 118:15,
121:1, 121:2,
220:15, 227:24,
229:1, 261:24,
270:16, 271:3,
271:4, 271:9,
271:18, 272:3,
272:6, 279:13,
279:15, 279:21,
280:7, 281:20,
282:11, 282:21,
283:2, 283:10,
283:11, 283:12,
283:13, 284:4,
284:7, 284:11,
284:15, 284:16,
285:9, 285:12,
285:19, 285:23,
286:16, 286:19,
286:20, 287:9,
287:16, 287:20,
290:14, 290:15,
290:24, 291:3,
291:5, 292:2,
292:3, 301:20,
302:19, 302:23,
307:18, 308:8,
308:9, 308:12,
310:17
**recaptured**
301:17
**receive**
25:16, 69:21,
70:1, 75:24,
88:3, 96:13,

96:23, 97:10,
98:3, 98:8,
100:5, 104:8,
105:23, 106:3,
107:15, 108:9,
109:20, 136:24,
137:3, 137:22,
137:24, 139:23,
141:2, 141:14,
142:4, 143:7,
179:3, 251:15,
305:3
**received**
25:10, 72:14,
75:8, 76:17,
77:1, 77:6,
77:13, 77:15,
77:20, 77:22,
77:23, 82:17,
82:20, 83:2,
83:21, 88:13,
101:3, 102:21,
105:18, 107:11,
108:6, 111:6,
111:8, 111:11,
115:16, 120:18,
124:18, 125:17,
128:11, 129:14,
139:2, 143:1,
157:24, 158:5,
196:23, 207:2,
211:20, 245:18,
251:10, 270:15,
277:12, 278:1,
296:5, 300:6,
300:10, 301:7,
301:21, 304:24,
308:19
**receiving**
109:19, 161:2,
269:11, 302:6
**recently**
86:8, 299:6,
303:19, 312:6
**recess**
112:23, 210:17,
222:21, 254:23,
280:24, 293:4

**recognize**
244:2
**recognized**
232:14
**recollect**
275:20, 290:2
**recollection**
125:5, 256:20,
257:16, 258:6,
262:11, 264:8,
264:14, 264:20,
266:23, 267:7,
269:2, 270:3,
274:5, 277:10,
277:19, 277:24,
278:21, 289:19,
290:1, 290:4,
290:11, 291:12
**recollections**
275:11, 276:8,
289:9
**record**
91:10, 97:7,
112:19, 112:21,
113:2, 144:6,
155:4, 171:14,
198:18, 202:13,
202:16, 202:19,
203:2, 203:4,
204:4, 205:11,
211:2, 222:24,
227:17, 235:9,
255:15, 280:19,
280:22, 281:3,
287:2, 292:23,
293:7, 313:8,
313:9, 317:8
**recording**
107:8, 228:10
**records**
5:3, 5:4, 5:9,
193:11, 193:18,
195:2, 196:24,
315:6, 315:8
**reduce**
302:20
**reduced**
83:10, 317:10

**refer**
48:20, 78:7,
243:5
**reference**
38:15
**referenced**
38:17, 90:13,
155:20, 158:16,
159:3, 225:20
**referencing**
77:21, 80:15,
114:15, 288:13
**referred**
21:2, 89:2
**referring**
38:18, 75:13,
78:12, 84:3,
84:24, 86:4,
86:16, 86:21,
87:10, 88:12,
89:1, 89:4,
114:6, 115:11,
117:5, 122:13,
126:2, 126:3,
158:4, 182:12,
184:5
**refinished**
96:10
**reflective**
203:22
**refocus**
226:17
**refresh**
125:4
**regarding**
25:9, 30:6,
33:24, 48:17,
95:6, 97:10,
138:7, 138:16,
139:1, 158:14,
159:8, 217:8,
233:23, 286:2,
307:19
**regardless**
84:17, 88:20,
136:10, 208:10,
209:24
**regards**
290:17

Transcript of Cecil Williams
Conducted on July 14, 2020

120

**regime**
288:19, 288:21,
288:24
**regions**
69:23, 71:1,
85:23
**register**
4:22, 238:3
**registered**
2:9
**regular**
78:22, 104:22,
313:21
**regularly**
90:18, 95:16
**regulations**
107:3
**reincarcerating**
298:24
**reincarceration**
64:7, 64:24,
163:3
**reincarcerations**
64:23
**related**
44:3, 44:8,
74:8, 74:14,
76:22, 77:14,
81:4, 81:12,
82:3, 104:9,
104:13, 159:21,
161:6, 189:10,
191:13, 193:11,
193:17, 195:16,
196:7, 197:14,
203:11, 208:12,
211:20, 212:21,
213:6, 213:7,
214:4, 215:21,
217:3, 219:9,
224:24, 228:21,
233:12, 239:10,
241:3, 245:1,
317:13
**relation**
84:4, 308:17,
308:22
**released**
299:6

**relevant**
87:15
**relocated**
223:15, 246:18
**relocation**
64:7, 65:1,
65:5
**remaining**
70:19
**remedy**
37:4, 116:20
**remember**
24:15, 31:11,
113:9, 200:20,
220:6, 220:7,
220:13, 228:2,
230:6, 241:18,
244:19, 248:21,
258:17, 260:14,
262:7, 262:14,
268:5, 269:10,
269:17, 269:19,
270:6, 270:8,
272:1, 272:4,
277:18, 278:3,
278:24, 279:2,
279:3, 279:5,
279:24, 280:9,
280:10, 281:23,
281:24, 282:2,
282:22, 283:4,
283:24, 284:13,
284:24, 285:5,
285:6, 285:17,
285:21, 286:9,
286:11, 287:12,
287:17, 287:19,
289:12, 289:14,
289:16, 289:17,
289:22, 289:23,
290:7, 290:18,
290:21, 291:14,
292:7, 292:8,
296:6, 301:17,
305:19, 306:15,
307:23
**reminder**
275:24

**removed**
82:9, 82:12,
309:1, 309:3,
309:7, 311:21,
311:22, 311:23
**repeat**
13:19, 37:9,
63:21, 63:23,
127:4, 147:7,
147:8, 186:3,
239:21, 275:17,
298:8, 298:9
**rephrase**
9:24, 54:1,
54:5
**report**
28:6, 28:7,
28:19, 29:4,
29:5, 29:10,
47:12, 69:11,
137:11, 137:15,
139:9, 139:11,
157:14
**reported**
1:27, 30:15,
125:24, 134:11,
139:15, 281:16
**reporter**
2:9, 2:10,
2:11, 6:2, 6:4,
6:15, 6:19,
6:22, 7:1, 7:4,
7:7, 8:8, 8:22,
9:6, 13:18,
14:1, 19:16,
19:19, 37:9,
46:2, 63:21,
73:9, 77:4,
77:8, 98:13,
98:17, 115:22,
116:1, 127:4,
147:7, 176:21,
186:3, 202:15,
202:20, 202:23,
210:22, 239:21,
240:1, 250:10,
255:2, 255:9,
262:24, 263:3,

263:6, 275:17,
275:21, 280:23,
281:4, 292:24,
293:3, 293:8,
298:8, 298:12,
313:11, 313:15,
313:18, 313:24,
314:3, 314:6,
314:8, 315:23,
316:2, 317:1,
317:4
**reporting**
40:19, 135:10,
139:7, 238:24,
239:4, 245:10,
245:15, 245:21,
246:6, 246:10,
246:20, 247:3
**reports**
252:14
**represent**
74:6, 291:22
**representations**
204:12
**representing**
203:9, 233:16
**reprimand**
105:19, 302:13,
302:21
**request**
23:13, 171:4,
172:2, 172:23,
173:11, 174:7,
178:24, 179:2,
195:2, 205:1,
233:21
**requested**
23:9, 177:17,
240:5, 245:22,
317:12
**requesting**
173:13
**requests**
161:1, 171:3,
171:17, 171:18,
171:24, 172:7,
173:10, 173:17,
177:24, 224:22

Transcript of Cecil Williams
Conducted on July 14, 2020

121

required
9:11
requires
169:18
reserve
204:17
reserves
225:22
residence
44:15, 126:10,
223:12
resolution
119:14
resource
248:12
resources
119:9, 249:8,
252:5
respect
190:3
respond
9:10
responded
239:4, 245:10,
246:13, 251:18,
306:17
responding
239:17, 240:4,
240:13, 240:17,
246:17
response
124:8, 124:11,
138:7, 140:4,
154:1, 158:1,
158:5, 158:12,
158:16, 160:1,
224:16, 225:5,
225:21, 225:23,
226:2, 226:10,
282:13
responsible
18:18
rest
219:16, 228:3
restart
296:24
restaurant
215:5

result
59:10, 160:5,
160:22, 171:20,
181:1, 181:22,
182:7, 184:6,
187:11, 191:16,
192:15, 282:24
resulted
170:24
retained
4:35, 316:15
retal
159:22
retaliated
159:17, 159:23
retaliating
28:14
retaliation
27:4, 28:4,
28:21, 30:7,
30:16, 139:8,
159:20, 159:24,
160:4, 160:10,
160:23, 179:16,
247:3
retaliatory
139:10
retire
266:4
retired
24:6, 80:20,
120:9, 121:9,
121:10, 266:3,
266:8
retirement
181:5, 188:20,
188:23, 189:4,
189:5
return
104:6, 246:21
returned
240:18, 246:10
review
13:3, 30:3,
74:17, 113:20,
123:13, 124:10,
124:14, 148:1,
152:24, 153:24,

193:18, 235:10,
235:15, 238:6,
243:10, 245:2,
248:11, 253:20
reviewed
250:7, 250:16
reviewing
45:2
ri
238:23, 240:22,
240:23
rico
143:5, 145:2,
146:11
right"
182:17
right-hand
15:4
rights
229:20, 230:4
rise
38:22
risk
149:17, 149:19,
163:11, 306:10
road
3:13
robert
64:16
rockwell
51:10, 51:11,
67:21, 67:23
rohloff
24:6, 94:14,
94:16, 94:24,
95:8, 109:6,
110:5, 112:4,
149:8, 156:14,
158:15, 225:4,
259:12, 279:18,
286:1, 286:3,
286:12, 286:18,
287:7, 287:22,
288:2, 288:5,
289:24, 290:3,
290:4, 304:1
role
30:11, 30:18,

50:14, 199:11,
313:1
roll
63:5, 68:1,
68:7, 68:12,
68:21, 68:22,
68:24, 91:16,
91:19, 99:24,
100:22, 156:22,
237:1, 238:23,
239:13, 245:10,
251:7, 284:20,
284:23, 285:8,
304:1
rom
244:23
room
10:12, 10:16,
210:9, 249:2,
254:14, 284:12
rooms
223:15
roster
147:19, 147:21,
148:21, 152:18,
152:23, 153:1,
294:22, 295:18
rosters
147:24
rpr
1:28, 317:4,
317:21
rules
8:6, 107:3
rumor
301:8
rumors
305:6
run
19:22, 56:19,
131:1, 261:10,
306:5, 316:3

S

safe
166:11
safer
166:16, 169:3

Transcript of Cecil Williams
Conducted on July 14, 2020

122

**sam**
127:9, 127:10
**same**
8:15, 10:11,
14:6, 33:11,
70:20, 83:1,
96:5, 97:9,
102:3, 109:8,
111:2, 111:4,
111:7, 138:4,
142:3, 145:8,
145:12, 163:10,
165:9, 165:11,
166:6, 171:4,
171:13, 173:5,
173:9, 174:11,
175:4, 175:21,
176:9, 177:12,
177:17, 177:22,
178:24, 179:2,
179:10, 179:18,
186:10, 188:10,
188:11, 205:13,
205:14, 206:6,
214:2, 216:7,
216:8, 247:4,
252:1, 252:5,
256:14, 263:18,
263:21, 264:22,
265:19, 268:23,
269:3, 270:2,
270:23, 272:3,
274:16, 275:10,
275:19, 276:21,
276:24, 277:13,
277:15, 278:2,
284:11, 287:15,
295:4, 295:10,
295:11, 299:2,
299:8, 299:14
**samuel**
264:23
**saw**
39:23, 99:10,
99:16, 99:18,
99:23, 128:24,
210:1
**saying**
8:9, 34:24,

36:3, 42:14,
45:5, 49:7,
56:21, 70:16,
85:16, 86:13,
88:4, 88:23,
89:13, 90:6,
93:14, 99:10,
99:16, 103:12,
103:13, 104:14,
104:22, 106:1,
106:10, 115:22,
123:21, 126:19,
130:13, 130:18,
135:18, 136:4,
143:6, 143:16,
150:9, 150:16,
158:7, 163:20,
164:2, 164:4,
164:5, 164:6,
165:16, 168:24,
173:14, 176:13,
183:6, 185:14,
192:10, 198:20,
199:7, 209:8,
213:9, 213:17,
216:22, 225:3,
241:11, 252:21,
253:16, 259:3,
267:4, 277:14,
286:12, 290:14,
290:15, 297:8
**says**
14:13, 14:14,
17:1, 42:17,
42:22, 43:17,
43:21, 44:17,
45:16, 74:24,
75:2, 75:7,
79:7, 84:14,
87:21, 89:18,
90:17, 95:14,
100:12, 113:22,
115:2, 116:12,
116:18, 157:22,
159:4, 159:12,
162:22, 175:8,
224:3, 225:6,
237:15, 237:16,

238:8, 238:12,
238:13, 238:16,
238:22, 239:16,
240:13, 244:15,
245:5, 246:6,
246:19, 248:16,
248:17, 249:1,
249:6, 249:7,
249:23, 249:24,
250:5, 250:6,
251:3, 251:6,
253:1, 260:23,
285:4
**scabies**
89:21, 90:3,
90:6, 90:11
**scared**
240:8, 245:24,
251:21
**schaumburgs**
168:4, 170:12
**school**
15:19, 15:20,
211:11, 218:5,
276:18, 276:21
**scooch**
227:1
**screen**
13:24, 14:11,
15:1, 235:2,
236:5
**screw**
56:9
**scribbled**
305:12
**scroll**
84:11, 87:15,
124:7, 140:3,
196:1, 205:14,
205:18, 212:16,
235:7, 235:20,
235:21, 236:1,
236:13, 236:23,
237:24, 243:14,
243:22, 250:4,
251:3, 311:11
**search**
18:24

**sec**
159:9, 222:7,
222:8, 234:15,
235:1, 237:24,
287:1, 292:19,
292:23
**second**
13:13, 13:14,
22:2, 30:22,
34:17, 37:14,
65:12, 74:17,
77:10, 90:24,
96:7, 108:20,
123:13, 124:10,
124:13, 125:14,
141:6, 153:24,
154:6, 154:7,
155:11, 171:7,
187:16, 190:20,
200:24, 202:13,
225:12, 232:19,
235:15, 236:18,
242:20, 243:8,
243:10, 260:5,
269:21, 270:13,
279:10, 279:12,
314:10
**secondly**
75:21
**section**
74:14, 74:21,
171:17, 245:5
**sections**
294:1
**secure**
166:9
**security**
16:21, 18:16,
54:22, 61:19
**see**
12:24, 14:19,
15:10, 61:19,
69:8, 73:18,
74:8, 75:10,
79:7, 84:19,
87:12, 90:1,
90:2, 107:8,
113:16, 119:23,

141:7, 142:12,
159:5, 159:11,
159:13, 160:1,
162:15, 162:19,
162:20, 162:22,
163:9, 169:21,
171:1, 173:19,
200:24, 205:4,
205:20, 206:19,
211:19, 212:19,
213:5, 216:4,
216:5, 223:16,
223:19, 224:8,
224:18, 225:6,
225:10, 234:9,
234:16, 235:1,
235:8, 236:6,
237:6, 238:2,
239:17, 242:20,
245:8, 246:1,
247:20, 248:8,
249:17, 249:22,
253:12, 259:14,
270:9, 284:13,
291:17, 292:1
**seeking**
181:3, 181:9,
194:1
**seem**
191:13, 198:17,
253:24
**seemed**
152:9
**seems**
153:2, 223:11
**seen**
76:3, 99:5,
99:7, 103:21,
194:3, 217:20,
310:8
**send**
56:11, 70:10,
70:12, 70:14,
70:17, 85:18,
89:16, 165:24,
167:13, 168:3,
168:5, 170:10,
184:18, 207:19,

315:14
**sending**
89:22, 90:8,
314:23
**senior**
173:14, 176:17
**seniority**
84:17, 88:21,
114:1, 166:10,
169:19, 170:17,
173:2, 174:12,
174:14, 175:18,
175:19, 176:14,
177:16, 177:18,
179:3, 179:11,
295:2
**sense**
50:7, 69:20,
165:3, 166:14,
169:1, 169:13,
297:6
**sent**
50:2, 51:2,
89:14, 106:21,
157:19, 206:12,
206:14, 207:9,
209:15, 210:2,
211:20
**separate**
21:22, 47:2,
47:5, 57:5,
204:11
**separating**
118:5
**separation**
304:17
**sergeant**
71:16, 71:21,
72:2
**seriously**
59:19
**serve**
81:20, 265:22
**served**
266:10
**set**
4:15, 4:21,
123:7, 180:5,

242:19, 247:19,
251:10, 251:13,
304:14
**settings**
14:22
**seven**
158:22, 224:17,
262:15
**sexual**
4:27, 244:16,
245:7
**shackled**
55:9
**shake**
9:5
**shakes**
267:24
**shall**
179:3
**share**
272:21
**shedor**
143:4, 144:12,
145:23, 146:23,
150:23, 150:24,
151:7, 151:11,
152:2, 153:7,
153:16
**sheen**
16:14, 16:17
**sheets**
294:22
**sheriff**
4:20, 180:5
**sheriff's**
4:26, 16:2,
16:13, 16:19,
17:4, 27:3,
27:18, 30:5,
32:10, 33:23,
62:5, 75:1,
129:15, 203:11,
218:20, 218:24,
222:4, 234:7,
239:20, 239:23,
244:16, 245:19,
291:1
**shields**
4:15, 77:2,

77:7, 79:18,
80:4, 81:1,
81:2, 87:21,
88:18, 89:19,
90:17, 90:24,
91:2, 91:11,
91:14, 95:7,
95:15, 108:20,
110:5, 112:4,
113:22, 115:3,
115:14, 115:17,
115:18, 116:7,
117:11, 117:17,
119:3, 119:20,
120:16, 121:4,
121:10, 121:21,
122:2, 123:7,
127:2, 155:21,
158:14, 172:17,
172:18, 172:20,
186:18, 186:20,
186:22, 187:21,
188:6, 225:4,
259:4, 262:10,
262:11, 264:19,
264:21, 279:3,
279:8, 279:15,
279:20, 279:22,
280:1, 280:2,
280:4, 280:11,
281:16, 281:24,
282:1, 282:9,
283:4, 283:9,
283:16, 283:18,
283:23, 284:6,
290:18, 296:9,
296:10, 296:18,
296:19, 297:13,
297:17, 302:3,
302:22, 310:5,
310:13, 312:20
**shift**
23:23, 51:24,
53:22, 54:8,
58:22, 63:12,
63:14, 65:16,
65:22, 67:5,
67:24, 69:11,

Transcript of Cecil Williams
Conducted on July 14, 2020

124

99:9, 106:5,
106:6, 145:9,
145:12, 149:9,
246:18, 256:14,
261:13, 261:14,
263:21, 263:22,
265:20, 269:3,
270:24, 271:2,
271:20, 271:21,
271:24, 274:17,
277:1, 288:6,
288:8, 300:19,
300:22
**shifts**
24:22, 25:5
**shoot**
141:15, 240:24
**short**
223:8, 223:20
**shorthand**
2:9, 317:3
**shortly**
225:24
**should**
14:11, 14:15,
15:4, 15:9,
25:3, 27:17,
34:2, 74:2,
123:10, 142:19,
164:13, 166:10,
166:22, 169:14,
174:12, 175:18,
176:14, 177:16,
194:11, 217:8,
226:9, 234:13,
235:24, 236:6
**shouldn't**
27:11, 132:8
**showed**
307:19
**shows**
147:21
**sic**
13:17, 24:4,
85:17, 90:19,
98:19, 103:19,
104:2, 106:4,
116:13, 116:14,

143:4, 157:7,
196:2, 196:3,
238:13, 240:6,
240:7, 240:8,
240:14, 240:15,
240:18, 245:16,
245:23, 246:7,
246:8, 246:10,
246:12, 246:20,
246:24, 247:1,
247:2
**sick**
161:24, 182:9
**side**
79:11, 114:11,
173:7, 210:4
**sides**
103:11
**sight**
249:16
**sign**
79:7, 136:21,
181:16, 193:14,
253:20
**signature**
123:16, 123:18,
180:11, 237:7,
237:16, 244:6,
250:17, 250:20,
314:5, 314:7
**signature-kbm1e**
317:18
**signed**
36:15, 36:17,
103:23, 103:24,
241:20
**significant**
116:20, 232:11
**signing**
317:12
**silly**
198:17
**similar**
140:13, 142:24,
302:7, 310:6
**similarly**
75:9, 139:22
**simple**
59:21, 63:8,

87:4, 167:20
**simply**
93:2
**since**
8:2, 10:9,
10:13, 21:13,
22:10, 22:16,
22:21, 23:20,
24:23, 25:23,
26:2, 71:12,
80:18, 145:11,
163:16, 213:4,
234:7, 259:18,
261:5, 263:14,
265:8, 268:15,
270:19, 272:8,
274:15, 276:17,
278:7, 288:15,
288:17
**sir**
129:6, 135:4,
186:12, 236:1
**sit**
86:23, 120:7,
175:6
**sitting**
227:3, 257:15,
267:6, 286:22,
287:5, 291:11,
293:13
**situated**
75:9, 139:23
**situation**
56:2, 57:3,
57:6, 57:7,
119:4, 121:13,
199:15, 230:23,
231:1, 306:11,
307:2
**six**
26:12, 63:15,
63:19, 66:4,
66:6, 153:23,
260:15, 262:15
**sixth**
79:9, 79:10
**skipped**
278:5

**slack**
272:23
**slap**
59:21
**slaughter**
120:10, 147:2,
147:3, 147:10,
147:11, 147:14,
148:4, 148:5,
148:7, 148:18,
276:15, 276:16,
276:17, 277:11
**slide**
176:3
**slightly**
33:2
**slipped**
218:10, 218:12
**slot**
176:3
**slow**
59:8, 93:19,
94:5, 156:11,
250:10
**small**
15:7, 63:5,
111:23, 112:1,
120:3, 148:3,
249:19
**smaller**
301:2
**smith**
24:17, 42:14,
42:20, 43:17,
44:4, 44:7,
44:17, 44:20,
56:17
**smoke**
200:14
**smoked**
200:12, 200:16
**smoker**
200:11, 200:22
**smoking**
200:20, 200:21,
201:1, 201:6,
201:7, 201:9,
201:11

Transcript of Cecil Williams
Conducted on July 14, 2020                                    125

**social**
217:22, 265:13
**socialize**
256:17, 260:1,
261:8, 263:17,
268:19
**soft**
16:14, 16:17
**solemnly**
237:18
**solution**
127:20
**solve**
133:3, 133:4
**some**
19:24, 22:11,
22:14, 24:9,
24:10, 27:1,
33:9, 36:18,
49:16, 49:17,
49:21, 59:2,
59:3, 59:4,
59:5, 76:3,
76:9, 76:10,
76:19, 85:14,
95:5, 100:15,
102:9, 103:3,
107:20, 113:8,
144:1, 153:6,
153:7, 153:16,
153:17, 156:19,
156:20, 169:1,
173:14, 174:16,
174:17, 178:1,
192:1, 195:21,
196:14, 198:21,
203:11, 204:15,
204:16, 205:10,
207:21, 209:3,
209:15, 209:16,
213:18, 217:2,
231:4, 231:7,
233:22, 236:20,
248:10, 278:17,
302:24, 303:16,
311:4, 312:6
**somebody**
18:20, 30:14,

56:24, 105:15,
109:22, 111:13,
126:19, 159:16,
166:2, 166:8,
166:23, 169:9,
176:13, 182:18
**somehow**
193:1
**someone**
18:5, 76:6,
99:11, 99:17,
103:18, 109:13,
110:1, 111:23,
119:20, 128:12,
148:4, 150:11,
153:16, 175:13,
177:17, 194:6,
219:23
**someone's**
215:5
**something**
11:5, 11:6,
12:18, 33:1,
39:15, 45:19,
51:14, 51:20,
56:19, 59:22,
63:4, 64:4,
64:19, 80:15,
85:5, 90:5,
90:8, 93:22,
96:22, 130:16,
130:20, 131:2,
131:3, 131:5,
132:19, 134:4,
158:8, 181:24,
182:22, 183:15,
183:17, 187:5,
191:4, 197:15,
198:5, 215:17,
215:21, 222:18,
226:9, 229:19,
230:3, 236:10,
236:16, 239:19,
252:20, 260:23,
276:20, 284:19,
289:22, 291:21,
306:4
**sometime**
92:13, 293:24

**sometimes**
8:12, 8:18,
9:4, 18:23,
18:24, 39:18,
39:19, 39:21,
133:3, 146:19,
198:16, 207:23,
265:16, 271:14,
286:4, 289:1,
305:10
**somewhat**
216:22
**somewhere**
31:12, 38:1,
43:7, 43:11,
43:21, 89:14,
135:11, 135:20,
178:14
**sorry**
13:18, 17:3,
19:16, 20:16,
28:11, 33:8,
36:1, 37:9,
38:17, 46:2,
48:15, 63:21,
63:23, 65:4,
66:9, 66:10,
72:12, 74:2,
77:4, 77:5,
84:1, 88:4,
91:24, 92:1,
101:24, 103:17,
115:22, 116:6,
118:6, 127:4,
129:19, 138:11,
140:24, 143:15,
147:7, 147:9,
150:10, 155:11,
161:4, 176:21,
186:3, 192:10,
194:16, 200:3,
239:21, 243:6,
250:5, 250:10,
252:19, 253:1,
254:13, 263:1,
269:5, 270:12,
275:17, 290:17,
298:8, 304:5,

305:11, 310:13
**sort**
14:7, 16:9,
18:11, 34:21,
36:24, 39:4,
42:1, 58:5,
58:16, 59:12,
60:19, 62:16,
74:9, 89:1,
93:23, 155:15,
156:7, 170:16,
171:16, 203:3,
223:19, 253:24,
269:13, 287:19,
311:4
**sound**
9:11, 9:17
**sounded**
213:17
**sounds**
14:21, 48:18,
55:20, 62:14,
164:3, 184:1,
192:21, 192:22,
203:7, 216:21,
281:7, 292:21,
315:16, 315:17,
315:18
**south**
3:5, 13:9,
85:14, 85:19,
114:10, 170:11,
240:23, 246:12,
249:1
**space**
61:24
**speak**
56:22, 91:17,
91:18, 301:1,
303:7
**speaker**
14:7
**speakerphone**
103:8
**speaking**
66:10
**specific**
26:16, 34:6,

Transcript of Cecil Williams
Conducted on July 14, 2020

126

43:9, 70:12,
118:23, 129:20,
136:9, 136:11,
141:23, 183:7,
183:9, 257:16,
267:7, 270:3,
275:11, 276:7,
277:16, 277:19,
291:4, 291:12,
291:20, 292:3,
307:11
**specifically**
76:17, 106:19,
120:15, 121:15,
151:6, 197:13,
197:15, 282:15,
289:3, 298:3,
300:9
**specificity**
199:4, 199:10
**specifics**
313:15, 313:20
**specified**
162:23
**specify**
310:2
**speculation**
129:4, 134:17,
153:11, 199:22
**spell**
98:13, 98:18
**spelled**
142:18, 142:20
**spend**
125:11
**spoke**
101:2
**spouse**
232:11
**square**
15:5
**st**
51:2, 51:8,
51:9, 248:24,
249:10
**stamp**
174:10, 176:2,
177:11, 177:13,

183:13
**stamped**
174:11, 177:7
**stamper**
177:21
**stamping**
175:22, 175:24,
176:6
**stamps**
176:4
**stand**
40:6, 73:23,
113:13, 123:1,
179:22, 221:24,
234:23, 242:24,
248:1
**standard**
239:22
**standing**
103:5
**start**
17:13, 35:8,
49:10, 54:8,
56:24, 58:21,
67:24, 69:10,
78:15, 98:21,
118:5, 159:10,
209:22, 219:17,
250:14, 279:20
**started**
17:17, 64:3,
76:18, 122:18,
219:18, 292:16
**starting**
166:24
**starts**
36:4, 49:8
**state**
2:11, 124:17,
125:21, 155:13,
157:12, 317:5
**stated**
240:3, 240:7,
240:21, 245:20,
245:24, 246:12,
251:11, 251:13
**statement**
60:24, 91:19,

237:17, 239:5,
240:12, 245:11,
250:1, 250:19,
252:4
**states**
1:1, 43:4,
157:5, 171:2
**stating**
304:2
**stay**
179:11, 248:14,
293:1, 314:10
**staying**
73:15, 190:19
**stenographically**
317:10
**step**
34:16, 34:17,
37:13, 37:14,
37:16, 91:10,
240:5, 245:22,
251:19
**steps**
34:21, 37:19,
37:20, 37:21,
37:22, 79:12,
79:13, 79:15
**steward**
107:22, 107:24
**still**
19:8, 54:19,
75:4, 79:23,
113:4, 114:4,
132:1, 132:20,
136:5, 161:13,
175:1, 223:9,
230:22, 230:24,
231:16, 255:15,
256:4, 266:2,
281:12
**stipulate**
6:3
**stop**
31:5, 31:9,
141:6, 154:5,
246:17
**story**
252:22

**straight**
34:18, 34:19,
34:23, 35:1,
39:21, 198:1,
240:15, 246:8,
251:24
**strap**
63:18, 63:20,
64:4, 64:5,
64:12, 64:21
**streamline**
223:19
**street**
3:5, 3:21,
51:2, 51:8,
52:22, 52:24,
210:2, 248:24,
249:11
**streets**
62:19, 303:5
**stress**
193:3, 193:5,
193:7, 194:2,
195:16, 197:8,
197:11, 197:24,
198:3, 198:10,
198:21, 199:10,
253:9
**stressed**
191:21, 191:23,
192:1
**strickland**
255:19, 258:7,
258:17, 260:4
**strike**
17:3, 28:11,
31:6, 36:12,
37:5, 88:4,
130:10, 159:10,
164:24, 170:21,
174:7, 211:17,
229:9, 243:6,
253:2, 258:3,
269:20, 273:11,
275:8, 290:2,
290:17, 296:24,
308:15
**stripes**
169:13

stuck
236:8
stuff
16:10, 69:6,
87:4, 93:16,
101:18, 101:20,
107:23, 108:14,
121:23, 196:17,
205:10, 218:13,
218:16, 249:19,
287:16, 289:1
stuffy
52:17
subject
141:23, 159:4,
208:11, 209:24,
216:18, 283:15
submit
174:7, 176:9
subordinate
87:22, 88:19,
90:18, 95:15,
113:23, 115:3
subpoena
315:10
suburb
166:2
suburbs
70:14, 70:15,
85:14, 85:19,
114:10, 165:12,
165:17, 166:6,
167:14, 167:21,
170:11, 170:12
such-and-such
135:18
suffered
160:22, 181:1,
191:16
suite
3:6, 3:14, 3:22
summary
245:5, 245:6,
249:24, 250:2,
250:7, 250:16,
250:19, 251:4
summer
63:6

sunday
79:2
super
18:5
supervise
222:5
supervisor
23:17, 23:18,
23:19, 28:8,
28:9, 28:12,
28:15, 29:17,
37:14, 37:20,
56:17, 56:22,
57:3, 57:8,
57:10, 67:1,
67:7, 107:5,
110:12, 127:3,
128:5, 129:23,
130:3, 131:10,
131:16, 132:8,
133:3, 133:9,
137:7, 151:2,
163:1, 169:24,
179:16, 182:18,
184:7, 187:17,
187:19, 187:20,
187:21, 188:7,
188:10, 188:13,
189:6, 265:23,
265:24, 266:1,
266:8, 266:11,
266:12, 266:17,
272:10, 272:24,
287:15, 304:20,
305:17, 306:14,
311:2, 312:2
supervisor's
286:7, 286:8
supervisor-type
287:16
supervisors
23:21, 25:5,
25:9, 25:17,
56:15, 66:24,
84:15, 86:8,
86:13, 87:22,
88:19, 90:18,
95:8, 95:15,

110:17, 113:23,
115:3, 125:22,
149:5, 149:6,
149:7, 149:9,
149:23, 151:5,
151:8, 151:10,
151:21, 154:17,
155:5, 160:13,
168:7, 168:22,
169:18, 170:3,
170:5, 170:8,
170:10, 187:22,
208:8, 208:14,
222:6, 224:3,
224:24, 266:14,
279:18, 288:7,
289:6, 303:10,
303:12, 303:17,
311:3, 312:7
supervisory
224:15, 225:5
supplement
225:22
suppose
169:1
supposed
28:3, 29:11,
29:12, 29:14,
29:16, 34:16,
39:1, 39:15,
39:16, 41:20,
135:7, 160:13,
251:14, 271:14,
272:12, 272:15
sure
8:7, 12:14,
14:16, 18:15,
30:14, 31:16,
32:5, 38:7,
38:9, 41:19,
41:21, 41:23,
42:19, 43:2,
44:2, 44:20,
45:15, 47:12,
49:7, 52:15,
69:9, 76:20,
78:17, 80:11,
86:11, 100:21,

104:5, 104:7,
121:15, 129:20,
135:6, 142:1,
152:22, 153:15,
164:23, 169:7,
171:13, 171:15,
189:17, 200:21,
202:23, 218:18,
220:13, 230:22,
230:23, 232:24,
233:1, 233:2,
233:14, 234:2,
236:11, 246:13,
249:20, 253:9,
254:21, 256:13,
256:24, 257:4,
257:20, 257:24,
258:13, 258:22,
260:17, 266:5,
266:6, 267:22,
267:23, 271:9,
285:15, 285:16,
314:2, 314:6
surprise
126:16
surrounding
18:3
surroundings
18:14
surveilled
62:2
suspension
35:9, 81:20,
81:24, 83:7,
83:10, 124:18,
124:23, 125:6,
125:7, 125:17,
181:24, 301:23,
302:2, 302:7
suspensions
182:3
swear
6:20, 7:4,
237:18
swearing
6:3
switched
46:7, 61:10,

61:13, 257:12
**sworn**
7:11
**sympathize**
169:1
**systemically**
95:16

**T**

**table**
32:22
**tabs**
134:15
**take**
9:6, 9:13,
9:17, 19:14,
29:13, 57:2,
57:17, 57:19,
60:11, 66:7,
69:7, 73:3,
74:5, 74:16,
79:4, 79:5,
81:16, 81:21,
84:1, 87:18,
87:19, 87:20,
88:17, 89:7,
95:13, 99:18,
101:16, 103:3,
103:5, 105:12,
112:14, 123:12,
124:10, 150:22,
153:23, 160:15,
163:13, 168:22,
175:7, 176:15,
180:10, 187:21,
191:19, 217:15,
222:14, 235:15,
243:10, 254:12,
265:10, 276:1,
293:23, 316:9
**taken**
7:24, 8:3,
50:24, 75:19,
76:8, 81:7,
112:23, 113:6,
210:17, 222:21,
254:23, 280:24,
293:4, 317:6,

317:9
**taking**
7:21, 8:8,
51:3, 60:9,
75:22, 77:11,
78:7, 79:22,
80:2, 81:20,
81:23, 82:24,
88:9, 97:1,
97:10, 98:4,
138:21, 140:15,
196:7, 196:10,
196:13
**talk**
8:11, 12:11,
12:24, 13:6,
22:2, 27:1,
66:22, 71:8,
75:6, 76:16,
95:4, 105:11,
107:19, 107:20,
109:18, 110:23,
113:21, 116:6,
120:4, 125:15,
141:5, 141:11,
141:12, 143:13,
156:10, 156:18,
158:21, 170:22,
172:12, 181:19,
191:12, 211:23,
214:23, 216:6,
216:8, 216:17,
216:22, 231:3,
238:22, 241:24,
254:11, 276:5,
291:24, 307:10,
314:10, 315:19
**talked**
12:9, 43:16,
84:4, 86:15,
88:5, 95:6,
95:22, 113:16,
120:19, 124:19,
125:16, 136:23,
138:17, 139:6,
139:24, 140:10,
148:4, 155:16,
155:17, 156:20,

157:1, 157:9,
158:13, 158:24,
159:7, 159:13,
171:15, 171:18,
182:3, 188:14,
192:3, 214:3,
214:9, 214:10,
217:18, 225:8,
225:24, 227:9,
228:20, 231:23,
273:12, 297:20,
300:5, 305:16
**talking**
8:14, 20:13,
24:11, 34:9,
41:1, 58:18,
58:21, 61:13,
76:18, 76:21,
84:5, 84:23,
85:23, 99:13,
113:7, 113:18,
114:3, 114:11,
114:14, 120:7,
129:20, 130:1,
143:8, 149:18,
149:19, 149:20,
164:22, 172:14,
172:15, 172:16,
174:23, 175:1,
183:8, 184:1,
189:4, 206:15,
208:10, 208:11,
214:2, 215:13,
215:14, 218:22,
218:23, 223:23,
224:10, 252:2,
262:14, 267:7,
267:16, 267:17,
267:18, 281:15,
283:8, 285:3,
289:17, 292:16,
301:17
**tamper**
64:12
**tampering**
64:18
**tampers**
63:20, 64:5,

64:21
**tartrate**
196:3
**taught**
56:1
**teamsters**
32:7, 32:9,
218:5
**tech**
14:10, 14:15,
14:21, 14:24,
15:3, 15:7,
15:9, 15:12,
73:10, 73:23,
74:2, 113:13,
123:1, 179:22,
210:23, 221:24,
223:3, 226:23,
234:18, 234:21,
234:23, 235:23,
236:5, 236:9,
236:11, 236:18,
236:22, 242:24,
243:13, 243:21,
248:1, 255:1,
255:5, 255:8,
281:5, 281:7,
316:8
**technical**
316:4
**technician**
3:26
**tell**
13:7, 17:2,
21:9, 27:8,
30:20, 62:6,
78:15, 97:13,
101:6, 106:15,
111:20, 126:1,
128:17, 128:18,
151:21, 152:2,
152:3, 167:16,
167:17, 189:14,
197:5, 198:2,
200:8, 201:8,
201:10, 217:16,
223:17, 253:6,
280:8, 284:9,

287:5, 289:4,
292:5
**telling**
121:2, 128:11,
129:13, 130:24,
189:18, 217:13,
252:21, 261:24,
262:4, 262:7,
262:11, 264:14,
264:20, 278:24,
280:10, 283:4,
284:5, 287:12,
308:12
**temporary**
65:11
**ten**
57:17, 57:18,
145:12, 153:23,
158:16, 201:4,
262:14
**tend**
300:24
**term**
29:22, 93:24,
94:19, 96:3,
114:3, 226:6,
261:11, 291:19,
304:7
**terminology**
48:18
**terms**
40:13, 53:19,
93:12, 93:15,
94:1, 94:2,
94:11, 94:17,
111:10, 115:20,
120:15
**terrible**
172:3
**terrific**
255:5
**terrifying**
192:22
**test**
19:14, 19:21,
24:14, 160:16,
187:20
**testified**
7:12, 125:19,

215:24, 300:16,
302:12, 303:15
**testimony**
6:5, 6:16,
10:6, 163:23,
177:2, 211:4,
211:16, 215:23,
223:14, 304:1,
309:24, 317:8,
317:9
**tests**
19:14
**text**
207:19, 207:21,
207:22, 207:23,
208:8, 208:20,
210:3, 210:15,
211:17, 212:15,
212:17, 212:18,
212:20, 213:5,
213:13, 249:19
**texted**
208:13, 208:17,
209:2, 209:4,
209:6, 211:7
**texter**
207:22
**texting**
208:23
**texts**
11:14, 207:24,
208:4, 209:15,
211:20, 211:23
**th**
16:15, 124:1,
180:13, 237:1,
237:9, 238:14,
238:23, 241:21,
244:9, 245:9,
250:8, 250:17,
250:23, 251:6,
317:16
**thank**
7:13, 42:18,
60:2, 73:10,
116:1, 201:23,
202:1, 204:23,
223:18, 227:3,

234:21, 238:1,
240:1, 255:9,
262:24, 263:6,
274:4, 275:21,
281:4, 293:12,
293:17, 293:18,
304:5, 311:13,
314:4, 315:22,
315:23, 316:8,
316:11
**thanks**
50:10, 73:6,
143:12, 205:7,
205:9, 222:1,
222:18, 225:13,
234:3, 248:2,
248:15, 274:3,
287:4, 315:21,
316:6, 316:13
**theory**
27:16
**therapists**
195:14
**thereafter**
317:10
**thing**
21:8, 24:10,
34:6, 43:18,
76:23, 77:10,
77:18, 83:1,
85:8, 96:5,
97:9, 102:4,
136:12, 136:14,
141:21, 163:12,
179:18, 182:19,
202:2, 204:4,
204:24, 218:6,
247:20, 263:18,
275:10, 278:2,
284:11, 312:5
**things**
8:17, 21:23,
40:2, 43:15,
44:3, 59:6,
61:2, 61:5,
62:17, 69:2,
86:16, 94:6,
120:5, 158:13,

158:15, 168:15,
171:15, 171:19,
171:21, 172:21,
174:21, 193:22,
195:22, 199:14,
203:3, 214:1,
216:18, 223:20,
228:13, 277:21,
289:10, 300:11,
315:2
**thinking**
220:19
**third**
34:17, 37:15,
77:17, 247:23,
249:7
**thirds**
236:16
**thirt**
78:18, 309:8
**thomas**
1:11, 4:20,
24:3, 180:5
**thought**
131:7, 154:18,
155:5, 155:12,
171:11, 249:9,
249:11
**thoughts**
200:24
**thousand**
78:18, 145:11,
259:18, 259:19
**threaten**
115:17, 116:7,
240:22
**threatened**
115:14, 117:12,
117:13, 117:18,
120:16, 121:4,
121:11, 157:6
**threatening**
119:20, 240:8,
246:1, 246:14,
246:17, 246:19,
251:19
**three**
26:7, 35:8,

Transcript of Cecil Williams
Conducted on July 14, 2020

130

37:24, 49:2,
50:5, 50:19,
55:6, 70:19,
72:8, 76:5,
78:12, 84:3,
88:5, 88:7,
115:7, 136:17,
138:16, 139:21,
163:6, 168:14,
180:22, 266:13,
271:7, 271:11
**threw**
137:17, 137:18
**through**
17:10, 18:21,
19:3, 34:5,
34:18, 41:8,
50:18, 57:22,
67:24, 68:7,
68:23, 71:24,
82:8, 82:10,
83:18, 107:24,
110:11, 111:9,
111:10, 120:22,
122:17, 135:24,
139:14, 139:16,
145:18, 148:5,
172:20, 173:24,
211:17, 212:15,
212:17, 213:5,
213:12, 235:7,
235:14, 235:20,
235:22, 248:10,
251:5, 274:7,
300:7, 301:8,
302:16, 303:4,
305:6, 305:11,
308:1, 311:11,
314:16
**thrown**
303:6
**thursday**
314:11
**till**
118:4
**tilt**
249:15
**timely**
203:15

**times**
58:7, 112:18,
119:19, 128:9,
148:10, 178:3,
178:6, 178:19,
215:9, 230:14,
291:4, 310:2
**tims**
89:19, 119:23,
120:8, 259:14,
259:15, 259:16,
259:17, 259:18,
259:19, 259:20,
261:4, 261:13,
262:4
**tiny**
226:24
**tip**
226:16, 226:24
**tired**
201:2, 201:6
**title**
123:4, 180:3,
296:10
**titled**
247:24
**today**
7:22, 10:7,
11:19, 11:22,
13:4, 70:4,
96:21, 157:10,
164:11, 190:22,
210:2, 224:12,
225:8, 241:5,
257:16, 267:6,
286:22, 287:5,
291:11, 291:14,
293:12, 293:16,
316:1
**together**
101:11, 168:16,
178:10, 209:1,
211:9, 211:11,
211:24, 214:10,
216:17, 216:20,
219:15, 221:5,
221:11, 257:6,
257:8, 258:1,

258:4, 264:11,
265:16, 267:4,
267:9, 268:19,
269:9, 273:9,
274:20, 276:20,
277:5, 278:23,
279:6, 286:6,
306:8
**told**
12:5, 12:6,
66:2, 98:9,
98:11, 98:22,
98:24, 117:15,
117:17, 118:8,
118:13, 119:4,
119:6, 121:9,
121:12, 148:7,
148:18, 156:21,
157:16, 197:23,
242:2, 251:9,
282:19, 309:18
**tom**
46:6, 64:14
**tomorrow**
98:12, 162:8
**took**
19:24, 75:23,
81:10, 82:13,
96:16, 97:4,
97:16, 98:1,
98:7, 98:22,
98:24, 100:23,
101:22, 102:9,
108:21, 109:7,
118:18, 122:9,
169:21, 169:22,
169:23, 170:2,
223:7, 223:22,
281:14, 308:6
**top**
14:10, 14:18,
15:3, 36:15,
36:18, 37:2,
65:18, 74:9,
87:16, 97:17,
97:22, 122:9,
136:16, 136:18,
141:17, 194:20,

195:22, 224:16,
237:24, 238:8,
243:16, 244:15,
248:13, 248:14,
291:16
**total**
55:7, 168:22,
202:9
**totally**
9:21, 24:13,
31:18
**touch**
242:2
**tour**
89:20
**towards**
91:15, 91:16,
93:7, 94:12,
94:15, 95:1,
95:2, 122:3,
155:23, 158:19
**towers**
58:7
**train**
155:12
**training**
295:11, 303:4
**transcript**
6:1, 6:8, 8:7,
8:23, 313:12,
313:14, 317:7
**transferred**
19:12
**transfers**
18:20
**transportation**
256:11, 273:15,
273:21
**transporting**
46:15, 46:21,
47:8, 53:19
**trash**
192:5
**traveling**
16:6
**treated**
170:24, 195:15,
310:14, 310:15,

treating
192:4, 195:13,
310:6
treatment
171:23, 291:1
tricky
249:18
tried
160:15
tries
56:24
triple-checking
42:2
true
6:6, 6:16,
116:17, 123:22,
165:9, 172:9,
172:11, 180:18,
237:19, 317:8
trust
304:19
truth
30:20
try
9:24, 49:6,
93:20, 133:4,
181:20, 198:18,
198:19, 236:5,
291:24
trying
54:4, 56:18,
69:21, 92:22,
93:5, 103:2,
113:9, 119:22,
131:2, 134:14,
135:1, 141:21,
164:1, 165:7,
192:2, 198:1,
209:22, 210:11,
213:21, 231:21,
240:20, 243:18,
253:15, 258:16,
260:21, 261:1,
263:2, 291:20,
297:7
ts
164:2

310:20

tuesday
1:19
turn
74:12, 136:15,
153:22, 174:10,
180:8
turned
125:17, 240:14,
246:7
turns
49:16, 49:22
twi
230:16
twice
230:16, 269:9,
273:18
two
13:15, 15:14,
15:22, 17:5,
17:6, 17:11,
17:19, 17:22,
21:22, 37:24,
49:19, 50:18,
54:13, 54:14,
75:19, 76:5,
77:1, 77:6,
78:18, 79:13,
79:15, 79:19,
80:18, 81:3,
81:12, 81:14,
81:15, 82:20,
86:16, 96:13,
96:15, 97:17,
97:21, 104:16,
106:5, 106:6,
106:9, 106:13,
124:6, 124:7,
124:10, 125:1,
145:11, 162:14,
163:4, 172:19,
176:9, 177:11,
178:24, 179:9,
180:22, 181:23,
185:3, 185:4,
189:24, 237:18,
238:20, 246:19,
249:2, 259:18,
259:19, 265:7,

271:6, 271:8,
282:5, 288:23,
303:11, 311:16
two-day
124:23
two-five
256:23
two-page
235:12, 243:7,
248:6
tylenols
196:15
type
88:13, 125:14,
136:12, 165:11,
171:23, 218:6,
258:7, 295:11
types
34:9, 45:2,
63:16, 65:15,
71:12, 86:20,
87:9, 142:3,
173:17, 182:7,
193:23
typewriting
317:11
typical
65:16
typically
10:11, 53:15,
67:16
tyrone
274:12, 274:13

U

uh-huh
9:18, 13:15,
13:23, 18:8,
26:18, 53:9,
54:15, 101:23,
122:7, 141:9,
161:19, 165:22,
178:16, 185:15,
192:6, 239:3,
239:12, 239:15,
250:3, 253:18,
265:19
ultimately
302:19

unauthorized
64:23
unbiased
116:15
under
6:6, 6:17,
113:4, 123:21,
180:18, 223:9,
253:8, 255:15,
281:12, 304:14,
312:22, 317:11
underscore
235:13, 243:7,
248:9
understand
9:19, 9:23,
11:9, 20:13,
49:7, 54:3,
76:21, 92:22,
100:21, 113:3,
142:1, 143:23,
147:13, 168:24,
183:5, 198:15,
211:15, 223:8,
249:18, 255:15,
258:14, 259:2,
261:1, 281:12,
291:17
understanding
31:20, 32:9,
33:23, 36:7,
36:13, 58:6,
70:23, 71:9,
86:11, 110:16,
110:18, 111:13,
112:9, 148:14,
204:16, 210:13,
214:7, 226:5,
232:20, 260:21,
312:16, 312:24
understood
10:2, 33:22,
52:15, 125:12,
195:20, 290:16
unfit
225:4
uniform
79:6, 239:8,

Transcript of Cecil Williams
Conducted on July 14, 2020

239:10, 245:12,
251:8, 251:17
**uniforms**
75:18, 79:2,
79:3, 79:5,
79:11, 79:16
**union**
32:3, 32:6,
33:7, 35:12,
83:14, 83:15,
83:17, 107:22,
107:24, 115:19,
115:20, 115:21,
115:23, 115:24,
139:15, 179:6
**unit**
18:2, 21:10,
75:3, 76:8,
110:3, 111:23,
112:1, 115:23,
120:4, 136:6,
148:4, 184:11,
184:12, 184:14,
184:23, 186:1,
186:10, 186:16,
186:21, 186:23,
187:3, 188:10,
188:13, 189:7,
224:4, 294:1,
295:20, 299:17,
300:17, 301:2,
303:13, 303:17,
304:14, 309:3,
309:11, 310:20
**united**
1:1
**unless**
22:4, 34:6,
314:19
**unquote**
288:21
**unsafe**
162:17, 162:24,
163:1
**until**
65:11, 86:7,
89:19, 254:16
**upper**
306:6

**upset**
58:18, 85:4,
118:17, 118:24,
132:21, 242:9,
308:3, 308:4
**upstairs**
79:14
**use**
29:22, 39:4,
55:23, 55:24,
81:19, 91:14,
93:13, 93:17,
93:18, 94:2,
94:15, 94:18,
94:24, 96:3,
114:3, 117:7,
139:8, 181:23,
218:18
**using**
85:22, 93:12,
93:23, 94:11,
291:19, 311:3
**usually**
294:16, 294:17

**V**

**vacation**
162:4
**vague**
304:16, 310:10
**van**
51:2, 51:13,
136:22, 137:2
**varies**
65:17, 65:19
**variety**
268:7, 268:9
**vasques**
143:5, 144:2,
144:3, 144:22,
146:7
**vehicle**
47:23, 69:7,
136:20, 137:6
**verbal**
28:23, 29:4
**verbally**
9:9

**verbatim**
120:2, 283:13,
283:21
**verification**
123:11, 123:21,
180:8, 180:16
**verified**
6:9
**verify**
44:15
**vernell**
259:14
**versus**
26:10, 164:14,
165:5, 236:12
**via**
8:4, 10:10,
29:7, 39:12,
83:20, 184:2
**victor**
263:7, 263:10,
276:15
**video**
15:1, 62:2
**videos**
62:6
**view**
14:4, 14:7,
14:17, 15:5
**violate**
41:22, 165:10,
165:11, 165:21
**violating**
251:16
**violations**
141:1, 141:13
**violence**
52:18
**virtually**
1:18, 2:2,
293:13
**visual**
14:19
**voice**
240:9, 246:1,
246:14
**voluntarily**
237:17

**vote**
221:8

**W**

**wages**
181:3, 181:13,
181:21, 182:1,
182:7, 182:11
**wait**
69:11, 194:15,
225:2, 275:24,
287:3
**waited**
89:19
**waiting**
103:4, 103:5
**waive**
314:7
**waiver**
193:14, 315:10
**waiving**
159:4
**wakenight**
1:27, 2:8,
317:3, 317:21
**walk**
47:18, 47:22,
51:4, 51:12,
56:20, 57:13,
57:15, 58:1,
58:3, 58:14,
79:8, 79:9,
307:24
**walked**
59:7, 96:10,
124:19, 240:14,
241:10, 246:7
**walker**
270:9, 270:10,
270:18, 270:19,
271:22, 273:4
**walking**
55:9, 62:1,
75:15, 76:23,
79:8, 96:15,
96:17, 300:5,
300:11
**wall**
18:11

Transcript of Cecil Williams
Conducted on July 14, 2020

133

**walnut**
167:17
**want**
8:5, 8:20,
12:20, 14:24,
31:12, 33:1,
33:2, 56:9,
58:17, 65:8,
73:19, 76:16,
78:18, 85:5,
85:7, 86:11,
89:9, 96:8,
99:21, 102:11,
114:22, 116:6,
121:13, 131:1,
131:5, 133:9,
141:5, 141:11,
141:12, 142:1,
162:7, 168:23,
169:2, 170:1,
170:4, 171:12,
171:14, 171:22,
171:24, 186:6,
190:1, 190:3,
203:3, 203:18,
205:16, 210:12,
219:20, 222:10,
226:1, 234:18,
240:22, 246:13,
252:19, 254:12,
254:16, 254:19,
270:4, 271:7,
276:5, 286:15,
292:6, 292:11,
293:11, 306:6,
309:23, 313:11,
314:9, 314:19,
315:11
**wanted**
44:9, 62:13,
178:4, 184:18,
221:9, 255:18,
286:4
**wants**
179:17
**warning**
83:6, 83:8,
83:16, 83:22

**warpath**
53:5
**warrant**
45:18, 49:23
**warrants**
41:24, 45:8,
64:24
**watch**
89:23
**wax**
300:5
**waxed**
75:16, 75:18,
76:24, 78:6,
78:15, 81:3,
81:13, 82:19,
88:9, 96:10,
124:19, 138:20,
140:11, 300:11
**way**
6:8, 12:18,
23:5, 23:24,
32:17, 33:12,
33:15, 34:13,
34:21, 35:16,
36:5, 36:6,
36:13, 39:3,
39:18, 39:20,
41:3, 49:1,
50:9, 54:2,
56:3, 56:5,
61:5, 79:8,
79:9, 79:12,
79:13, 79:14,
79:16, 92:20,
93:13, 93:20,
104:11, 104:12,
108:3, 120:7,
121:11, 121:18,
122:8, 122:14,
128:6, 132:14,
133:1, 133:2,
152:20, 166:11,
170:4, 172:5,
177:12, 198:11,
215:1, 250:4,
273:7, 293:23,
299:24

**we'll**
22:2, 39:24,
48:20, 49:8,
49:19, 67:20,
76:20, 77:16,
87:19, 91:8,
95:4, 113:21,
164:24, 205:5,
210:8, 222:14,
235:6, 249:20,
254:13, 254:14,
313:13
**we're**
10:1, 24:11,
73:12, 111:24,
126:17, 141:24,
149:18, 149:19,
164:22, 171:13,
171:16, 172:15,
172:16, 192:23,
193:14, 195:4,
195:10, 208:20,
211:1, 211:9,
220:22, 226:17,
234:13, 235:2,
248:13, 249:16,
252:2, 255:14,
256:18, 259:24,
263:16, 289:17,
313:6, 316:1
**we've**
44:24, 73:1,
95:6, 95:21,
113:6, 114:16,
123:3, 142:11,
156:19, 159:13,
171:15, 171:18,
180:1, 224:11,
225:8, 235:11,
243:3, 248:5,
316:3
**weapons**
55:17, 58:11
**wear**
79:6
**website**
251:14
**wedge**
70:4

**wednesday**
40:17, 66:2
**week**
188:3
**weekly**
25:13
**welcome**
116:4
**went**
13:20, 16:8,
17:23, 20:17,
26:14, 78:3,
78:24, 82:8,
82:10, 91:6,
119:1, 131:16,
131:17, 133:15,
133:17, 157:13,
186:23, 211:10,
241:23, 241:24,
251:23, 261:15,
271:2, 276:21,
302:16, 308:4,
309:10, 309:12
**weren't**
146:19, 148:1,
148:17, 148:19
**west**
114:11
**wet**
79:7
**whatever**
7:8, 57:5,
131:4, 161:18,
188:22, 282:1,
291:23
**whenever**
202:21, 210:20,
222:24
**whereupon**
225:14, 227:13,
280:13
**whether**
27:2, 70:23,
107:10, 109:6,
112:4, 120:20,
131:21, 136:10,
153:15, 155:5,
161:24, 190:8,

Transcript of Cecil Williams
Conducted on July 14, 2020

134

209:24, 232:20,
233:23, 233:24,
263:24, 273:1,
273:4, 306:13,
307:5, 313:1
**white**
3:11, 6:14,
7:19, 46:4,
73:13, 73:15,
76:14, 85:18,
86:9, 97:17,
102:6, 145:20,
145:22, 145:24,
146:2, 146:4,
146:6, 146:16,
150:2, 152:3,
152:5, 152:7,
152:15, 153:8,
153:17, 166:5,
166:12, 167:12,
168:3, 170:8,
170:10, 171:4,
172:7, 173:5,
173:14, 175:3,
175:14, 178:5,
254:21, 294:24,
295:1, 296:1,
300:9, 302:4,
304:24, 306:18,
307:2, 310:6,
310:14, 313:21,
315:6, 315:9,
315:17, 316:6
**whoever**
14:7, 55:5
**whole**
184:18, 288:18,
303:13, 303:14,
312:11
**wife**
211:13
**wilford**
268:12
**williams**
1:17, 2:1, 4:3,
4:13, 4:18,
4:32, 6:10,
7:10, 7:16,

14:11, 67:2,
69:15, 70:3,
74:5, 74:14,
74:16, 74:22,
75:8, 84:15,
84:19, 87:18,
113:3, 113:20,
114:2, 123:3,
123:5, 123:12,
124:9, 158:22,
180:1, 180:4,
180:10, 180:23,
190:8, 190:17,
191:11, 193:14,
195:12, 202:3,
203:1, 203:8,
204:19, 205:10,
205:17, 211:1,
222:2, 223:7,
224:2, 224:17,
226:15, 233:22,
235:11, 235:24,
243:3, 243:22,
244:3, 248:5,
248:17, 248:18,
249:14, 250:1,
250:7, 250:15,
250:21, 251:6,
251:9, 251:11,
251:12, 251:18,
251:21, 251:22,
251:23, 252:1,
255:11, 255:14,
275:24, 281:10,
293:10, 311:16,
313:7, 315:21
**wind**
77:23, 77:24,
106:22
**window**
63:5, 129:1
**winston**
1:6, 80:20,
80:22, 91:5,
117:16, 117:17,
117:23, 118:3,
118:8, 118:13,
118:15, 120:19,

155:22, 155:23,
202:8, 211:11,
211:18, 212:18,
221:15, 235:13,
243:7, 248:9,
278:5, 278:6,
278:21, 279:14,
279:21, 281:15,
282:9, 282:12,
283:4, 283:9,
283:16, 283:19,
283:23, 284:5,
284:9, 284:14,
284:18, 285:21,
285:22, 286:1,
286:12, 286:19,
287:7, 287:12,
289:9, 289:20,
290:5, 290:12,
290:19, 290:24,
291:8, 310:7,
310:15
**winston's**
117:15, 280:3,
281:17
**winston__ccso**
4:23, 4:29,
4:33
**within**
23:16, 26:2,
37:18, 60:6,
71:10, 185:18,
237:19
**without**
133:4, 139:14,
159:4
**witness**
4:3, 6:4, 6:5,
6:9, 6:18, 6:21,
7:10, 9:2,
12:21, 13:20,
14:13, 14:19,
14:23, 15:2,
15:6, 15:8,
15:11, 19:18,
28:4, 30:10,
30:17, 30:19,
46:3, 63:23,

73:4, 77:6,
98:16, 98:18,
112:17, 115:24,
116:4, 118:22,
119:11, 119:13,
127:6, 129:8,
140:5, 147:10,
151:2, 153:12,
154:13, 154:22,
166:19, 167:6,
168:13, 176:20,
185:15, 186:5,
189:20, 199:1,
199:7, 199:21,
199:23, 200:2,
200:5, 201:17,
201:23, 202:4,
203:8, 204:8,
205:2, 212:4,
216:2, 223:5,
225:16, 227:19,
234:4, 234:22,
235:21, 236:3,
236:8, 236:10,
236:20, 236:24,
239:23, 243:14,
243:23, 254:5,
254:11, 255:3,
263:9, 267:24,
275:19, 280:15,
281:6, 285:14,
298:1, 298:7,
298:11, 298:13,
299:3, 299:9,
301:4, 304:17,
305:5, 306:23,
310:5, 310:11
**witnessed**
28:13, 28:20
**woman**
217:6
**women**
259:4, 259:8
**wondering**
54:7, 207:22,
216:14
**word**
29:15, 32:21,

Transcript of Cecil Williams
Conducted on July 14, 2020

135

48:6, 48:15,
93:17, 120:2,
162:3, 224:21,
283:12, 283:21,
309:19
**words**
8:9, 66:9,
72:1, 82:13,
85:22, 90:19,
92:16, 93:18,
94:16, 95:1,
108:1, 108:5,
291:4
**workdays**
191:23
**worked**
16:7, 16:14,
22:16, 22:21,
24:22, 50:11,
133:5, 143:24,
144:3, 146:18,
146:24, 147:2,
147:3, 147:17,
148:8, 148:16,
148:24, 152:10,
167:7, 167:8,
257:6, 257:8,
257:13, 260:22,
261:13, 261:18,
263:22, 263:24,
264:3, 264:4,
269:9, 272:8,
272:19, 273:21,
274:20, 278:16,
278:23, 279:5,
284:14, 288:6,
294:5, 294:8,
294:11, 314:12
**working**
17:8, 46:9,
53:15, 62:18,
68:6, 68:10,
80:8, 80:15,
80:21, 91:4,
101:11, 120:5,
148:2, 148:17,
148:19, 148:21,
153:1, 154:10,

154:18, 154:19,
155:7, 162:17,
230:22, 230:24,
273:4, 273:8,
274:9, 275:9,
275:14, 276:11,
298:4, 298:16,
298:23, 299:5,
299:11, 303:1
**works**
18:2, 36:5,
36:13, 70:9,
179:1, 273:14
**worries**
305:14
**worry**
164:7, 164:9,
164:10
**worse**
59:24
**wouldn't**
44:10, 72:19,
93:17, 134:5,
149:24, 160:16,
160:17, 161:16,
170:13, 182:18,
182:21, 187:4,
188:7, 204:13,
233:6, 242:14
**wow**
24:4, 48:8,
64:7, 97:16,
97:20, 112:17,
200:19, 233:13,
247:21, 253:23,
278:11, 289:21
**wrapped**
223:20
**wrapping**
115:6
**write**
11:3, 11:5,
246:19, 251:16
**write-up**
100:14, 101:4,
240:23, 247:2
**writing**
29:2, 35:16,

236:20, 311:24
**written**
20:4, 29:5,
83:6, 83:8,
83:15, 83:22,
105:18, 107:18,
245:5, 302:13,
302:20
**wrong**
37:17, 48:15,
51:10, 64:6,
165:17, 165:18,
170:7, 201:20,
220:20, 236:10
**wrongdoers**
116:22
**wrote**
75:14, 109:23,
110:1, 245:9,
308:6

| X |
| --- |

**x**
1:5, 1:16
**x-ray**
46:5
**xm**
46:5
**xmt**
46:1, 46:3

| Y |
| --- |

**yahoo**
206:6, 207:14
**year**
13:13, 13:14,
15:22, 16:1,
31:11, 118:4,
124:2, 137:13,
180:14, 185:19,
192:20, 271:5,
271:14, 271:15,
292:9
**year's**
211:12
**year-and-a-half**
185:19
**years**
13:15, 15:14,

15:22, 26:12,
26:21, 118:1,
166:7, 166:8,
166:22, 169:2,
169:10, 173:2,
173:4, 188:22,
200:13, 200:16,
260:15, 262:14,
262:15, 265:7,
266:6, 266:13,
271:8, 271:17,
278:10, 278:12,
289:17
**yep**
249:18, 250:5,
255:12
**yesterday**
6:23, 6:24
**younger**
184:12
**yourself**
39:11, 89:16,
139:3, 224:5,
265:11, 270:20

| Z |
| --- |

**zoom**
8:5, 10:10,
214:18

| $ |
| --- |

**$600**
96:16

| 0 |
| --- |

**00**
24:24, 25:1,
50:11, 54:9,
112:17, 247:21
**017406**
4:23, 235:13
**017408**
4:29
**017409**
4:29, 243:8
**017420**
4:33, 248:10
**0339**
3:16

**05**
19:6, 19:7,
26:2
**05726**
1:10
**06**
112:15, 112:22,
112:24, 202:17
**07**
112:22, 234:17,
293:5
**08**
202:17, 293:5
**084.003605**
317:4, 317:22
**09**
242:22

---
**1**

**10**
1:20, 31:13,
118:4, 200:16
**100**
3:6
**11**
24:24, 25:1,
50:11, 87:14,
113:15
**12**
112:15, 112:17,
112:22, 112:24,
113:15, 124:1,
158:22, 159:12,
180:13, 221:22,
223:23
**120**
3:21
**122**
4:13
**12256**
13:9
**13**
80:10, 80:13,
101:19, 159:19,
160:1, 175:2,
219:20, 224:14,
288:14, 292:11,
292:14

**14**
1:19, 80:10,
80:13, 106:17,
111:2, 160:20,
219:17, 219:20,
219:21, 225:2,
225:3, 230:19,
284:3
**15**
4:32, 79:12,
81:18, 99:21,
101:19, 117:22,
118:2, 118:7,
118:10, 162:16,
200:16, 202:6,
210:18, 219:17,
219:20, 254:16,
254:24, 303:14,
309:8
**16**
4:32, 99:21,
101:20, 106:17,
111:2, 117:22,
118:2, 118:7,
118:10, 170:22,
175:2, 237:1,
238:14, 238:21,
238:23, 245:9,
250:8, 250:17,
251:6, 284:3,
288:14, 309:8
**17**
225:12, 225:18,
237:9, 241:21,
244:9
**17406**
234:17
**17407**
4:23, 235:14
**17408**
242:22, 243:9
**17420**
247:24
**179**
4:18
**18**
1:10, 210:18
**193**
5:3

**195**
5:4
**196487**
205:21
**1984**
16:4
**1993**
16:4, 75:2

---
**2**

**2**
202:17, 210:18,
222:22, 227:18
**20**
169:2, 173:4,
225:11, 229:3,
254:16
**200**
3:14
**2000**
3:22, 265:8
**2005**
17:24, 19:3,
31:2, 168:21,
230:11, 255:22,
256:24, 263:14,
278:7
**2008**
230:3, 230:5
**2010**
21:13, 22:10,
22:18, 22:21,
23:20, 24:23,
71:12
**2013**
101:21, 102:10,
105:14, 230:19,
292:12, 301:15
**2014**
78:19, 79:18,
79:24, 105:14,
137:14, 230:19,
301:15
**2015**
79:24, 100:21,
101:21, 102:10,
205:3, 234:7,
237:10, 238:14,

**244:9, 245:9,**
250:9, 250:17,
250:23, 251:6
**2016**
100:21, 288:17
**2020**
1:19, 317:16
**2021**
3:13
**205**
5:7
**206**
3:5
**21**
247:24
**23**
51:9, 51:11,
67:21, 67:23,
126:9
**234**
5:9
**235**
4:22
**24**
105:10, 254:24
**243**
4:26
**248**
4:31
**27**
317:16
**28**
112:24, 166:7,
166:22, 173:2,
250:23
**29**
35:9, 83:12,
301:22, 301:23,
302:1, 302:6,
313:10
**293**
4:6
**2nd**
75:1

---
**3**

**3**
15:24, 24:24,

Transcript of Cecil Williams
Conducted on July 14, 2020

137

25:1, 50:11,
54:9, 247:21,
254:16, 254:24,
280:20, 281:1
**30**
111:24, 112:1,
120:6, 178:13,
178:14, 178:19,
300:17, 300:22,
313:10
**307999**
1:25
**31**
51:2, 51:8,
51:9, 222:22,
248:24, 249:10,
316:14
**311**
4:7
**312**
3:8
**317**
1:26
**3705**
3:24
**39**
222:22

---
**4**
---
**4**
293:5, 313:10,
316:14
**421**
4:33, 248:10
**45**
227:18
**48**
280:20, 281:1

---
**5**
---
**50**
53:18, 54:11,
55:7, 62:20,
63:10, 63:11,
178:12, 178:13,
178:14, 178:19
**54**
281:1

**58**
74:24
**59**
75:2

---
**6**
---
**60**
75:6, 75:7,
76:22, 77:21,
84:4
**60523**
3:15
**60602**
3:23
**60643**
13:10
**60661**
3:7
**61**
84:9, 84:14,
87:10, 175:20
**630**
3:16
**655**
3:8

---
**7**
---
**73**
4:12
**7660**
3:8
**77**
87:20, 88:15
**78**
88:18
**786**
3:24
**79**
89:7, 89:9,
89:18, 90:10

---
**8**
---
**80**
90:16, 90:17,
95:9
**81**
95:14, 96:4
**82**
15:24, 113:19,

114:7, 114:13
**83**
115:2
**84**
15:24, 115:13
**85**
116:12
**86**
116:18
**866**
3:24

---
**9**
---
**93**
16:3, 16:13,
16:15, 17:1,
17:2, 17:14,
17:15, 17:16
**94**
259:20, 259:21,
261:5
**95**
16:15
**96**
17:23, 17:24,
19:3
**984**
3:16
**99.9**
70:10, 70:18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

LEGRAIN WINSTON, et al.                )
                                       ) Case No. 18-cv-05726
     Plaintiffs,                      )
                                       ) Hon. Matthew F. Kennelly
v.                                     )
                                       )
THOMAS J. DART, et al.                 )
                                       )
     Defendants.                      )

## PLAINTIFF CECIL WILLIAM'S OBJECTIONS AND ANSWERS TO DEFENDANT GREGORY SHIELDS FIRST SET OF INTERROGATORIES

NOW COMES, Plaintiff, Cecil Williams, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

## GENERAL OBJECTIONS

1. These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2. Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3. Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.



Exhibit #

**Williams 2**

07/14/20 - AB

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:**     **Cecil Williams**
**12256 S. Racine**
**Chicago, IL 60643**
**(773) 543-6478**

**Undersigned Counsel**

2.     Identify all discipline you received that you allege was discriminatory as alleged in Paragraph 60 of the Complaint and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what rule or regulation did you supposedly violate, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:**     **Plaintiff states that he received a one-day suspension because he walked on "fresh waxed floor" but in order to get to his locker, Plaintiff had to walk on those floors. Any type of suspension under that circumstance was not warranted. Plaintiff further states that he received a one-day suspension because he turned in a key later. However, he witnessed white investigators returning keys late, but they only received verbal warnings. Additionally, Plaintiff states that supervisors would call an inmate to check if my partner and I were there even after we reported our arrival to dispatch; that was never done to white**

2

investigators.  **On another occasion, Plaintiff was accused of damaging a county vehicle that he did not sign out.  Investigation continues and Plaintiff reserves the right to supplement this response.**

3.      If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline.  Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:      See response to interrogatory No. 2; Investigation continues and Plaintiff reserves the right to supplement this response.**

4.      Identify each and every complaint or grievance you made regarding the discipline alleged in Paragraph 60 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:      Investigation continues; Plaintiff reserves the right to supplement this response.**

5.      Identify the "similarly situated non-minority officers" who did not receive discipline in the same proportion as you did as alleged in Paragraph 60 of the Complaint, including what employees were involved, who was responsible for supervising the employees, who was

responsible for making the decision as to whether or not to discipline the employees, what the underlying incident was, when the underlying incident happened, what rule or regulation was purportedly violated, whether or not any investigation was conducted, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response was to the incident or discipline was, whether or not anyone else was involved, and whether or not anyone else witnessed the underlying incident.

**Response:** **See response to interrogatory No. 2; Plaintiff further states that Investigators Nickle, Bieniek, Shedor, Bosques, Pemonte, Folkers, Vasques, Lopez, Rico and Hurtado were rarely assigned to TSS. The above-named investigators were assigned to either the office or patrol in very low risk areas or assigned to patrol jobs with minimal work such as doing home checks on inmates. Investigation continues and Plaintiff reserves the right to supplement this response.**

6.      Identify all assignments that you allege were discriminatory as alleged in Paragraph 61 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:** **See response to interrogatory No. 5; Investigation continues and Plaintiff reserves the right to supplement this response.**

7.      Identify the other "non-minority officers" who were not assigned to the positions you were assigned to as alleged in Paragraph 61 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the

4

decision as to what position the employee was assigned, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:** **See response to interrogatory No. 5; Investigation continues and Plaintiff reserves the right to supplement this response.**

8.     If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**Response:** **See response to interrogatory No. 5; Investigation continues and Plaintiff reserves the right to supplement this response.**

9.     Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

4810-3635-6532, v. 1

**Response:** **Investigation continues; Plaintiff reserves the right to supplement this response.**

10.     If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:** **Plaintiff states that Deputy Chief Ranzino came to roll call one day and spoke to investigator McGhee about an assignment that was for Investigator McCall. When McGhee corrected DC Ranzino, he told McGhee (out loud and in front of everyone at roll call) that "you people all look alike". Plaintiff further states that DC Ranzino pulled him aside and threatened him and his job and called him a "nigger." Plaintiff states that after that incident he immediately went to OPR to file a report against Ranzino; Ranzino later told Plaintiff that he had no right to go to OPR and sent Plaintiff and his partner to the basement (TSS). Investigation continues and Plaintiff reserves the right to supplement this response.**

11.     Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response:** "High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative and unfavorable actions can take place. Investigation continues and Plaintiff reserves the right to supplement this response.

12.     If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:** Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.

13.     If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:** Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.

14.     Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action

was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

15. Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

16. Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Answering further, Plaintiff states that Chief would grant certain requests when asked by white investigators and deny the same request made by African-American investigators. Investigation continues and Plaintiff reserves the right to supplement this response.**

17. Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

4810-3635-6532, v. 1

**Response:**     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection, Plaintiff states policies, practices and decisions pertaining to assignments and placement of investigators based on race; response given to certain requests asked of African-American investigators compared to white investigators. Investigation continues and Plaintiff reserves the right to supplement this response.

Respectfully Submitted,

By:     /s/ Kelly A. Krauchun
        KELLY A. KRAUCHUN
        The Herbert Law Firm
        206 S. Jefferson, Suite 100
        Chicago, IL 60661
        (312) 655-7660
        Kelly.krauchun@danherbertlaw.com

4810-3635-6532, v. 1

## <u>VERIFICATION</u>

I, Cecil Williams, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/12/2020

Cecil Williams



# SHERIFF'S OFFICE OF COOK COUNTY
## OFFICE OF PROFESSIONAL REVIEW
## COMPLAINT REGISTER

**Complainant Information**

NAME (Last, First, M.I.): Williams, Cecil

AGE: 51

DATE OF BIRTH: 3-25-1964

HOME #: 773,545-6478

HOME ADDRESS: 12256 S. Racine

CITY: Chicago

WORK/OTHER #:

STATE: Chicago

ZIP CODE: IL

STATE I.D /D.L. #:

STATE OF ISSUANCE:

I HAVE BEEN NOTIFIED THAT, PURSUANT TO 50 ILCS 725/3.8(b), ANYONE FILING A COMPLAINT AGAINST A SWORN PEACE OFFICER MUST HAVE THE COMPLAINT SUPPORTED BY A SWORN AFFIDAVIT.

**Complaint Information**

DATE OF INCIDENT: 4-16-15

TIME OF INCIDENT: 1520

LOCATION OF INCIDENT: 2300 S. Rockwell

PROVIDE NAMES, BADGE NUMBERS, SQUAD NUMBER or LICENSE PLATE, and/or PHYSICAL DESCRIPTION OF THE OFFICER AGAINST WHOM YOU WISH TO FILE A COMPLAINT:

CHIEF KANIRINO

**Witnesses**

ARE THERE ANY WITNESSES YOU WISH TO BE CONTACTED DURING THE INVESTIGATION? ☐ YES ☐ NO
IF YES, PROVIDE CONTACT INFORMATION.

| NAME | ADDRESS/CITY/STATE/ZIP | HOME PHONE # |
|---|---|---|
| Bosques 6103 | | |
| Koch 6042 | | |
| Norman 6081 | | |
| Spivey 6089 | | |

**Narrative**

PROVIDE A FULL DETAILED ACCOUNT OF YOUR COMPLAINT AND THE NATURE OF THE INCIDENT.

SEE COOK County SHERiFF OFFICE Discrimination / Harassment / Sexual Harassment Complain FORM

FOR OFFICE USE ONLY
DATE COMPLAINT RECEIVED: _____

RECEIVED BY: _____

IAD/OG #: _____

☐ CONTINUED ON REVERSE



Exhibit #

Williams 4

07/14/20 - AB

**Complaint Narrative (Continued)**

ON April 16 2015 WHILE During Roll Call RI Responed to Chief Ranzino STATEMENT ABOUT 60 or uniform Inspection RI ASK Chief why WE HAVE NOT Recived a complete copy of the S.O.GO Chief Ranzino STATED why Dont you Copy them of YOUR EMAIL. RI WAS Requested To Step Around the corner to Finish conversation, THAT when Chief Ranzino STATED I Not Scared of you IN A threating voice, RI then Turn Around and WALK Straight to OPR. RI Return Back to the OFFICE an Chief Ranzino WHERES WAS I, RI STATED I WENT TO South Campus, WHICH At that time, Ranzino STATED You SORE WANT To MESS WITH ME, AND threating RI with A WRITE UP FOR going to South Campus RI CALL CAMERON PON in OPR. ALSO CONTACT JOE IN HR.

PLEASE BE AWARE THAT IF YOU ALLEGE INJURIES AS A RESULT OF THIS INCIDENT, DUE TO FEDERAL PRIVACY LAWS ON THE RELEASE OF MEDICAL RECORDS, YOU MUST PROVIDE COPIES OF YOUR RELEVANT MEDICAL RECORDS REGARDING ANY EXAMINATION OR TREATMENT TO THE SHERIFF'S OFFICE INVESTIGATING UNIT TO BE MADE PART OF THE INVESTIGATION.

I have read this statement that I have voluntarily made, consisting of __2__ pages, and I solemnly swear that the facts and allegations contained within are true and correct to the best of my knowledge. _CECIL WILLIAMS_
(Print Name)

Complainant's Signature: _Cecil Williams_

State of Illinois )
County of Cook )

Date: _4-17-15_

Signed and sworn to before me on _April 17. 2015_ by _Cecil Williams_
(date)

"OFFICIAL SEAL"
Cameron Pon
Notary Public, State of Illinois
My Commission Expires 11/18/2018

_Cecil Williams_
(signature of making statement)

"OFFICIAL SEAL"
Cameron Pon
Notary Public, State of Illinois
My Commission Expires 11/18/2018

(signature of notary public)

A person commits PERJURY when, under oath or affirmation, in a proceeding or in any matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. PERJURY IS A CLASS 3 FELONY.

Please mail your completed, **signed and notarized**, complaint form to:
**Cook County Sheriff's Office of Professional Review**
3026 S. California
Chicago, IL 60608



**COOK COUNTY SHERIFF'S OFFICE**
Discrimination/Harassment/Sexual Harassment Complaint Form

THIS FORM MUST BE SUBMITTED TO EITHER A MEMBER IN YOUR CHAIN OF COMMAND, DIRECTOR OF PERSONNEL OR THE OFFICE OF PROFESSIONAL REVIEW

| COMPLAINANT | WITNESS | SUPERVISOR |
|---|---|---|

| COMPLAINANT NAME | STAR (if applicable) | JOB NUMBER | | ASSIGNMENT | JOB TITLE |
|---|---|---|---|---|---|
| CECIL WILLIAMS, | 6061 | | | EM | INV |

| DEPARTMENT | LOCATION OF INCIDENT | DATE OF INCIDENT | TIME OF INCIDENT |
|---|---|---|---|
| DOC | 2330 S. Rockwell (Roll CALL) | 4-16-15 | 1530 |

**WRITTEN SUMMARY**

Provide a detailed summary of the alleged discrimination/harassment/sexual harassment incident. Include the name(s) of the person(s) committing the alleged discrimination/harassment/sexual harassment and name(s) of any witnesses, if known. Attach additional pages to continue summary if necessary. Attach additional written material related to the alleged complaint.

ON April 16, 2015 WHILE During Roll CALL R.I Responded To Chief Ranzino STATEMENT About C.O. ON UNIFORM Inspection. R.I ASK Chief why SO GO. Chief Ranzino STATED why Don't I Copy them off of My EMAIL, R.I was Refused To Step Around the corner to Finish Conversation. THAT when Chief Ranzino STATED I AM not Scared of you in A threeating voice. R.I Than turn Around and walk out STraich To OPR. R.I Return Back to South Campus. Which time his he Responed WAS "You Sure YOU want to mess with Me, IN A theating voice. Also

**WHAT IS YOUR REQUESTED REMEDY TO THIS COMPLAINT?** (to be completed by the Complainant only)

FOR Chief Ranzino to STop threeating R.I. To Be Relocated To new SHIFT Due To Work Envir.onmen T

| SIGNATURE UPON COMPLETION | STAR (if applicable) | DATE | TIME |
|---|---|---|---|
| Cecil Williams | 6061 | 4-17-15 | |

**SUPERVISORY REVIEW**

| SUPERVISOR (Print) | SIGNATURE | | |
|---|---|---|---|
| DEPARTMENT HEAD (Print) | SIGNATURE | | DATE |
| REVIEWING OPR STAFF (Print) | SIGNATURE | ASSIGNED OPR NUMBER | DATE |

(FCN-19)(JUL 11)

PAGE 1/2



Exhibit #

**Williams 5**

07/14/20 - AB

WINSTON_CCSO017409

Threating To WRITE RI up. RI Retuen phone
CALL CAREERON Pon at OPR,
Chief RANZINO hAUE Continue To make
WORK ENVIRONMENT HOSTILE. By Intimidating
With WRITE up, AN RetaLiation against.
RI.

PAGE 2/2

WINSTON_CCSO017408

INFORMAL INQUIRY OF
INV. CECIL WILLIAMS

Date: April 16, 2015                    Present: Inv. Cecil Williams
                                                 Joseph V. Consolo

Time: 4:34 PM                           Location: South Campus, Bldg 2, HR Conference Room

Cecil Williams, an Investigator currently assigned to the Electronic Monitoring Unit, was informed that this was an informal inquiry as to a complaint filed by him (HR 2015-0166) Inv. Williams was made aware of the following: I am part of Human Resources: I am not with OPR; I am an attorney; this is a process being conducted as an informal inquiry to alleviate concerns raised by his complaint; Human Resources does not have the right to discipline; this is not a compelled statement; OPR can sustain or not sustain a case; Human Resources can address things that may not be sustained as a hostile work environment; the Cook County Sheriff's Office prohibits harassment based on sex, race, age and other protected rights; the office has a policy against retaliation of any kind; Inv. Willliams should contact me if he is retaliated against in any way; this matter is confidential, but we cannot guarantee 100 percent confidentiality because we may have to do an informal inquiry with others who have information pertinent to her complaint.

Below is a Summary of Inv. Cecil Williams's informal statement of inquiry:

On April 16, 2015, a conversation came up at roll call about the General Orders. Uniform inspection was coming up. Inv. Williams told Chief Ranzino that he never received a complete set of the General Orders. Inv. Williams stated that they get them piece meal. Inv. Williams asked for a complete set. Chief Ranzino stated that you are supposed to go on the web site and print them out. That is how you receive them. If you do not like it, then we write you up for violating the uniform provisions of the General Orders. Inv. Williams responded "Are you threatening me"? Chief Ranzino said step back. This is not part of the floor. Chief Ranzino said to Inv. Williams "I am not scared of you". Inv. Williams said nothing and just kept on going. Inv. Williams went straight to OPR to file a complaint.

Inv. Williams stated that Chief Ranzino has a history of making biased racial statements. The other day Chief Ranzino told Inv. Winston that "You all look alike". Inv. Williams did not actually hear the comment himself. Inv. Winston told him about the comment. Chief Ranzino's demeanor towards the investigators is downgrading. The situation with Inv. Williams happened during roll call so he does not know who heard it.

Inv. Williams has heard that Chief Ranzino makes racial comments. Inv. Williams and his partner, Inv. Legrain Winston, have been together seven years. Inv. Williams stated that Chief Ranzino separates partners when he gets mad. Chief Ranzino follows the general orders to the extreme.

2015-0166                                                                           Page 1



On April 17, 2015, Inv. Williams called to state that on April 16, 2015, Chief Ranzino told him "You do not want to mess with me". Inv. Williams put in for time due when he came back from seeing OPR. Chief Ranzino asked where Inv. Williams went when he disappeared. Inv. Williams stated that he went to South Campus. Inv. Williams has been told that Chief Ranzino is writing him up for several infractions. Inv. Williams feels that Chief Ranzino realizes that he went to OPR. Inv. Williams feels this is retaliation for going to OPR.

Inv. Cecil Williams was told a written summary for his signature would be provided for his signature of approval once it was typed up. He was also told that we would conduct a further inquiry, if we deem it necessary. If we deem this a matter for a formal disciplinary investigation, it would be turned over to OPR.

I, Inv. Cecil Williams, have read and reviewed the summary of the informal inquiry conducted on April 16, 2015. My signature below indicates my approval of the contents of this statement as a fair and accurate summary of what I said.

_____      Date: 4-25-15
**Cecil Williams**

WINSTON_CCSO017421

# Exhibit D



# Transcript of Samuel Page

**Date:** August 10, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------

LeGrain Winston, Michelle Strickland,
Vernell Tims, I.V. Newson, Jr.,
Samuel Page, Wilford Ferguson,
Cecil Williams, Anthony Manning,
David Walker, Tyrone McGhee and
Victor Slaughter,

    Plaintiffs,

  vs.        Case No. 18-cv-05726

Sheriff of Cook County, et al.,

    Defendants.

-----------------------------------------------------

   *    *    *    *    *

DEPOSITION OF SAMUEL PAGE, CONDUCTED VIRTUALLY

Taken on the 10th Day of August, 2020

10:00 A.M. CST

   *    *    *    *    *

Taken before Ann Marie Holland, CSR

## Page 2

APPEARANCES:

    KELLY KRAUCHUN, ESQ., of THE HERBERT LAW
FIRM, 206 South Jefferson Street, Suite 100,
Chicago, Illinois 60661, phone: (312) 655-7660,
email: elizabeth.fleming@danherbertlaw.com and
kelly.krauchun@danherbertlaw.com, appeared remotely
representing the Plaintiffs.

    ETHAN E. WHITE, ESQ., of the firm of EMERY LAW,
LTD., 2021 Midwest Road, Suite 200, Oak Brook, Illinois
60523, (630) 984-0339, email: ewhite@emerylawltd.com,
appeared remotely representing the Defendants.

    JUSTIN L. LEINENWEBER, ESQ., of the firm of
LEINENWEBAR, BARONI & DAFFADA, LLC, 120 N. LaSalle
Street, Suite 2000, Chicago, Illinois 60602, email:
justin@ilesq.com, appeared remotely representing the
Defendants.

Also Present:

    Kevin Offett/Planet Depos Video Host

## Page 3

I N D E X

EXAMINATION                           PAGE

of: SAMUEL PAGE

Examination by Mr. Leinenweber.............Page 5
Examination by Ms. Krauchun................Page 195

E X H I B I T S

Exhibit No.     Description          Page

Exhibit 1         Complaint.................Page 59
Exhibit 2         Objections And Responses..Page 108
Exhibit 3         Objections And Answers....Page 157
Exhibit 4         Charge of Discrimination..Page 191

      *Request For All Notes And Documents

  *All Exhibits Marked Electronically By Video Host

## Page 4

1     VIDEO HOST: I would like to thank
2 everyone for attending this proceeding remotely, which
3 we anticipate will run smoothly. Please be aware that
4 we are recording this proceeding for backup purposes
5 only. Any off the record discussions should be held
6 away from the computer. Please remember to mute your
7 mic for those conversations. Please have your video
8 enabled to help the reporter identify who is speaking.
9 If you are unable to connect with video and are
10 connected via phone, please identify yourself each
11 time before speaking. We will provide a complimentary
12 unedited recording of this deposition with the purchase
13 of a transcript, if you are interested. I apologize
14 in advance for any technical-related interruptions.
15 I will hand it off to the court reporter.
16     COURT REPORTER: Will counsel please
17 stipulate that in lieu of formally swearing in the
18 witness, the reporter will instead ask the witness to
19 acknowledge that their testimony will be true under the
20 penalties of perjury, that counsel will not object to
21 the admissibility of the transcript based on proceeding
22 in this way, and that the witness has verified that
23 he is in fact Samuel Page. Do all counsel agree?
24     ALL COUNSEL: Yes.

5

1        COURT REPORTER: Do you hereby
2 acknowledge that your testimony will be true under the
3 penalties of perjury?
4        THE WITNESS: Yes.
5        (Off the record.)
6
7        SAMUEL PAGE,
8     The Witness in the above-entitled
9     matter after having been first duly
10    sworn deposes and says as follows:
11
12        EXAMINATION
13 BY MR. LEINENWEBER:
14    Q.    Good morning, Mr. Page.  My name is a
15 Justin Leinenweber.  I am one of the attorneys for
16 the Defendants, the Cook County Sheriff's Office.
17        Could you please state and spell your name
18 for the record.
19    **A.    Samuel Page.  S-A-M-U-E-L  P-A-G-E.**
20    Q.    Okay.  Mr. Page, have you ever had your
21 deposition taken before?
22    **A.    No.**
23    Q.    Okay.  Let me go over a few of the ground
24 rules that will help us get through today with as little

7

1    Q.    Okay.  If you don't understand one of my
2 questions, please just let me know.  Frequently
3 attorneys can be somewhat inarticulate and say things
4 that they think makes sense, but maybe don't.  So, if
5 there is something I ask that you don't understand,
6 please just let me know and ask me to rephrase the
7 question.  Okay?
8    **A.    Okay.**
9    Q.    And if you do answer a question though,
10 I'm going to assume, we are all going to assume that
11 you understood the question.  Okay?
12    **A.    Yes, sir.**
13    Q.    Alright.  Is there any reason that you
14 can't give full and complete and accurate testimony
15 today?
16    **A.    Full and complete?  No, there shouldn't be.**
17    Q.    Okay.  To the best of your abilities?
18    **A.    To the best of my knowledge, yes.**
19    Q.    Okay.  Since we're doing this via Zoom
20 and not in person, there is a couple just additional
21 questions I will ask you.
22        Is there anyone in the room with you today?
23    **A.    My granddaughter and my daughter.**
24    Q.    Okay.  And they're not going to be

6

1 difficulty as possible.
2        Because of the fact that we are taking this
3 deposition over Zoom, it's even more important that we
4 don't talk over each other.  So, there will be times
5 when you may anticipate what my question is or I may
6 anticipate what your answer is, and it is just really
7 important that you allow me to finish asking my question
8 and I allow you to finish your answer, so that the Court
9 Reporter, Ann Marie, so that she can take down a clear
10 record of what was said.
11        Is that acceptable to you?
12    **A.    Yes, sir.**
13    Q.    Okay.  Good.  Again, because this is a
14 virtual deposition, the Court Reporter cannot record
15 any nonverbal answer, so sometimes you might want to
16 shake your head or nod and the Court Reporter can't
17 record that, so we will need a verbal answer to any
18 of the questions.  Okay?
19    **A.    Yes, sir.**
20    Q.    Alright.  We can take a break any time you
21 need one.  The only stipulation I would ask is that if
22 there is a question pending, that you answer that before
23 we take a break.  Is that okay with you?
24    **A.    Yes.**

8

1 participating or helping you in any way though, right?
2    **A.    Well, my daughter, she's the technical**
3 **person, so she's got me hooked up to the computer.**
4 **If that's okay?**
5    Q.    Okay.
6    **A.    So that's why she's here.**
7    Q.    Okay.  Fair point.  So, you may get some
8 technical assistance there, but nothing related to your
9 testimony will be aided by any of those individuals?
10    **A.    No.  My granddaughter is only twelve years**
11 **old, so.**
12    Q.    Okay.  Do you have any notes or documents
13 with you at this time?
14    **A.    I tried to jot down just a few things.**
15 **I'm just looking for them now, so that's about it.**
16    Q.    What sort of notes are you talking about?
17    **A.    Things that happened related to the case.**
18    Q.    Okay.  When did you create those notes?
19    **A.    Last night and early part of the day.**
20 **Now I can't even find what I wrote.**
21    Q.    And what was the purpose of creating those
22 notes?
23    **A.    To bring -- so that I could bring back my**
24 **memory so that I could -- everything that happened,**

Transcript of Samuel Page
Conducted on August 10, 2020

**9**

1  dealing with the sheriff's department, a lot of it
2  wasn't written down, so it's to my recollection.
3      Q.  Alright.
4      A.  I don't know what I did with it.
5      Q.  Okay.  But did you use anything to -- well,
6  let me strike that and ask it this way.
7          Where did you get the information that you
8  wrote down on the notes?
9      A.  From my -- from my memory.
10     Q.  From your memory, okay.  So, you were just
11 thinking about things and jotting them down?
12     A.  Right.
13     Q.  Okay.  Other than those notes, any other
14 materials you have with you?
15     A.  No.
16     Q.  Okay.  And you understand that no one can
17 provide you with your answers, right?  They have to come
18 from you?
19     A.  Okay.
20     Q.  That's a yes?  You understand that?
21     A.  Yes.  Yes.
22     Q.  Okay.  And you are not going to look at
23 your phone or e-mails or texts or anything like that
24 to help you get information today, right?

**10**

1      A.  No.
2      Q.  Okay.  Did you do anything to prepare for
3  your deposition today?
4      A.  Other than talk to my attorney Friday, no.
5      Q.  Okay.  So you spoke with your attorney,
6  Ms. Krauchun, on Friday?
7      A.  Who?
8      Q.  Kelly?
9      A.  Yes.
10     Q.  Okay.
11     A.  Yes.
12     Q.  And about how long did you guys prepare on
13 Friday?
14     A.  Maybe about -- I don't know, maybe about --
15 I don't know.
16     Q.  Okay.  Did you discuss your deposition
17 with anyone else other than your attorney?
18     A.  No.
19     Q.  Okay.  Did you talk to any of the other
20 Plaintiffs in this case about your deposition today?
21     A.  Since Friday, no.
22     Q.  At all?  Not just since Friday.  At all?
23     A.  When you say did I talk to anybody, in
24 what way do you mean?  I'm still friends with Winston.

**11**

1  So, we talked about other things other than this case.
2      Q.  Okay.  Let's start with just the general
3  question of other than your attorney, have you spoken
4  with anyone about your deposition at any time?
5      A.  No.
6      Q.  No?
7      A.  No.  Other than -- other than I have to
8  give it, that's it.  Nothing that's detailed about it,
9  no.
10     Q.  Okay.  So you may have said to, you know,
11 a relative, "Yeah, I'm in a deposition on Monday, I
12 can't do 'X'"?  But you didn't talk to someone and say
13 or discuss what you would be testifying about?
14     A.  No.  No, sir.  No, sir.  No, no.
15     Q.  Okay.  Did you review any documents in
16 preparation for your deposition today?
17     A.  Just the ones that my -- my attorney gave
18 me.  That's -- that's it.
19     Q.  Okay.  And what documents were those?
20     A.  I guess when we talked in person, the
21 questions and answers that I gave her.  That's it.
22     Q.  Would those be the interrogatory responses?
23     A.  Uh-huh.
24     Q.  Is that a yes?  Sorry.

**12**

1      A.  Yes.
2      Q.  Okay.
3      A.  Yes.
4      Q.  Okay.  Anything else?
5      A.  That's it.
6      Q.  Okay.  Alright.
7      A.  Somebody moved my papers?
8      Q.  Do you need a second?
9      A.  No, no.  I'm fine.
10     Q.  Okay.  What is your highest level of
11 education, Mr. Page?
12     A.  I got a bachelors of science from Lewis
13 University.
14     Q.  And when did you get that degree?
15     A.  Was it '80 -- I want to say '85/'86.
16 Around there.  Wait, wait.  Wait a minute.  Oh, I'm
17 going to have to go look at my diploma.  I think it's --
18 I know it was in the eighties.  Maybe '82?
19     Q.  Okay.  That's fine.  But 1980's?
20     A.  Yeah, it's about '82.
21     Q.  And you said a bachelor of science?
22     A.  Yes.
23     Q.  Okay.  Any specific area that you were
24 studying in?

Transcript of Samuel Page
Conducted on August 10, 2020

4 (13 to 16)

13

1    A.  Aviation technical management.
2    Q.  Okay.  When did you start working with the
3  Cook County Sheriff's Office?
4    A.  '86.  April of '86.
5    Q.  Okay.
6        (Off the record.)
7  BY MR. LEINENWEBER:
8    Q.  And prior to beginning to work with the
9  Cook County Sheriff's Office where did you work?
10   A.  CTA.  Chicago Transit Authority.
11   Q.  And what sort of work did you do for CTA?
12   A.  I was a bus operator.
13   Q.  And how many years did you work at the CTA?
14   A.  For the time of about -- I think it was
15  about two or three years.
16   Q.  Okay.  I think you said two to three years;
17  is that right?
18   A.  Full-time, yes.  I actually stopped working
19  for them in '77, because I was going to college.
20       (Off the record.)
21       MR. LEINENWEBER:  It is breaking up a
22  little bit.  Kevin, is there anything that you recommend
23  we do to try and improve the audio?
24       VIDEO HOST:  My recommendations are,

14

1  if at all possible, the laptop that Mr. Page is on,
2  if it could be connected to an Ethernet cable.  If
3  that's not possible, maybe Mr. Page could sit closer
4  to the laptop and speak up.
5        (Off the record.)
6  BY MR. LEINENWEBER:
7    Q.  So, Mr. Page, can you just try and keep
8  your voice up and speak directly into the laptop, so
9  that Ann Marie can hear you?
10   A.  Okay.  Is this better?
11   Q.  That's pretty good for me.
12       MR. LEINENWEBER:  Ann Marie, does that
13  sound okay?
14       COURT REPORTER:  Much better.
15       MR. LEINENWEBER:  Okay.  We will try
16  that, and if the need be, maybe you could call in, if
17  things don't work out.
18  BY MR. LEINENWEBER:
19   Q.  So, prior to working as a bus operator for
20  the CTA, Mr. Page, where did you work?
21   A.  Well, I was still in school.
22   Q.  Okay.
23   A.  It was other part-time positions that I
24  took.

15

1    Q.  Okay.  And you said you began with the
2  Sheriff's Office in '86.  Where did you -- which
3  division or what type of job did you have first with
4  the Sheriff's Office?
5    A.  I was a corrections officer, Division Five.
6  Cadet.
7    Q.  Okay.  Correctional officer, Division Five?
8    A.  Yes.  Cadet.
9    Q.  And what sort of work were you doing?
10   A.  Just monitoring the inmates.
11   Q.  Okay.  So essentially a guard; is that fair
12  to say?
13   A.  A corrections officer.  A correctional
14  guard, yes.
15   Q.  Okay.  And then when did you begin in
16  electronic monitoring?
17   A.  I want to say it was '92.  It might have
18  been 1992.
19   Q.  Okay.  And am I correct that you are
20  currently retired?
21   A.  Yes.
22   Q.  Okay.  When did you retire?
23   A.  Technically -- actual retirement date was
24  September 1st of -- of 20 -- I want to say 2018.

16

1    Q.  Okay.  So September 1st, 2018?
2    A.  Yes.
3    Q.  Okay.  And are you currently employed at
4  all or just straight retired?
5    A.  Straight retired.
6    Q.  Okay.  Since you have retired from the
7  Sheriff's Office have you held any employment?
8    A.  No.
9    Q.  Okay.  Let's see.  In between 1992, when
10  you started in EM, if I say "EM," you understand that
11  means electronic monitoring, right?
12   A.  Yes.
13   Q.  Okay.  So, since 1992, when you started in
14  EM, up until you retired in September of 2018, did you
15  work in EM for that entire time?
16   A.  Yes.
17   Q.  Okay.  And what was your position within
18  EM?
19   A.  Initially I was just a -- well, I was an
20  investigator.
21   Q.  Okay.
22   A.  And then I was promoted to supervisor.
23   Q.  When you retired what was your position?
24   A.  Investigator.

17

1    Q.   Okay.  Did you consistently work a
2 particular shift?
3    A.   Yes.
4    Q.   Okay.  What shift did you work?
5    A.   At the time it was 2000 -- I'm trying to
6 remember, it was either 3:00 to -- 4:00 to 12:00 or
7 3:00 to 11:00, and then it changed.
8    Q.   Okay.  So, is it fair to call that, I
9 guess, the evening shift?  Would that be it?
10    A.   Well, we called it third shift.
11    Q.   Third shift, Okay.  And you said at some
12 point it changed.  Did you just mean it changed from
13 4:00 to 12:00 to 3:00 to 11:00?
14    A.   Right.  Yes, I want to say it went to
15 3:00 to 11:00.  And I know it changed to the jail's
16 time.  Because we was off time with the jail.
17    Q.   Okay.
18    A.   For the hour.
19    Q.   Okay.  And how did you end up getting hired
20 by the Sheriff's Office?
21    A.   I don't understand.
22    Q.   What was the process like for you to get
23 hired with the Sheriff's Office?  What process did you
24 go through to get hired to the Sheriff's Office?

18

1    A.   I took a written exam.  Once you passed
2 the written exam, you had to interview.  Once you had
3 your interview, you had to take a urine drop.
4    Q.   Okay.  Anything else?
5    A.   That was it.
6    Q.   Okay.  What about going from correctional
7 officer to EM?  How did that come about that you ended
8 up moving over to EM as an investigator?
9    A.   I had a reference letter from a -- from
10 Lamont Carter, deceased, and that helped me move into
11 the EM.
12    Q.   So, would it be fair to say that you sought
13 out, you tried to move into EM?
14    A.   Correct.
15    Q.   Okay.  And why was that?
16    A.   To get on the street and more money.
17    Q.   Anything else?
18    A.   No, that's basically it.
19    Q.   Okay.  Were there any issues when you were
20 working as a correctional officer that you had to move
21 out of Division Five or anything like that?
22    A.   No, sir.
23    Q.   Okay.  Let's see.  And you said you worked
24 third shift.  Was that your entire time at EM, you

19

1 basically worked the third shift?
2    A.   Yes.
3    Q.   Okay.  Since let's say between 2010 and
4 when you retired in 2018 who were the supervisors in
5 EM on the third shift that you worked with?
6    A.   All of them?
7    Q.   Well, let's start this way, about how many
8 supervisors would there be?
9    A.   Now, are you referring to me as an
10 investigator or me as a supervisor?
11    Q.   Well, okay.  So, that's a fair question.
12       So let me -- what I'm trying to understand
13 is who is above you on that shift?  Regardless of
14 whether you were an investigator or a supervisor,
15 who were you reporting up to on third shift, between
16 2010 and 2018?
17    A.   Alright.  That would be Chief Sedgwick
18 Logan, Deputy Chief Ranzino.  If he stayed over, it
19 would be Deputy Chief Lougheren (phonetic).  There
20 is one that retired.  I can't remember his name.
21 A deputy chief, DC.  Deputy Chief Neal.  He retired.
22 Loggins -- not Loggins -- Gaines (phonetic).  Gaines.
23    Q.   James (phonetic)?
24    A.   Gaines, uh-huh.  Lieutenant Collins.  I

20

1 can't think -- it was a Hispanic guy.  I can't think
2 of his name.  He left.  Oh, Deputy Chief Rohloff.
3    Q.   Okay.
4    A.   I think that's -- that's about it.  Like I
5 said, I can't think of the one that left or the one that
6 retired.
7    Q.   So you identified a Chief, a Deputy Chief,
8 a Lieutenant.  Were you ever supervised by any
9 Sergeants?
10    A.   I think my last year, when they promoted
11 the non-merit sergeant, it was two.  I can't remember
12 their names.  Because they just got there, so I was
13 leaving out.  I can't -- I think one of them was Gainor
14 (phonetic).  Sergeant Gainor.  I think that's his name.
15 And then it was a -- I can't think of this other one's
16 name.  Because he was just there periodically.  Mostly
17 colleagues ran the watch by themselves.
18    Q.   Okay.  And then you said that for a period
19 of time you served as a supervisor.  When did you first
20 begin serving as a supervisor?  What year?
21    A.   Oh, that I don't know.  Let me say this,
22 the last, I want to say four, five years after -- after
23 I was promoted, it was fourteen years as a supervisor.
24 So, I couldn't really give you the time span, but it

Transcript of Samuel Page
Conducted on August 10, 2020

21

1 was about 14 years.
2     Q.  When did you -- strike that.  When did you
3 stop working as a supervisor?
4     A.  I want to say it was either four or five
5 years before I retired.
6     Q.  So that would be approximately 2013 or
7 2014?
8     A.  I'm trying to do the math in my head here.
9 Yeah, that sounds about right.
10     Q.  Okay.  Let's talk for a second about the
11 investigator position.  What were your job
12 responsibilities as an investigator in EM?
13     A.  Give me a time frame you are looking for.
14     Q.  Did you have different responsibilities
15 depending on the year you were there?
16     A.  Exactly.
17     Q.  Okay.
18     A.  I did, yes.
19     Q.  Okay.  So, let's say after you stopped
20 serving as the supervisor in approximately 2013 or 2014
21 up until your retirement, what were your job duties and
22 responsibilities as an EM investigator?
23     A.  I was put in monitoring.  Excuse me, that's
24 inmate movement.  And I also worked -- did work/school.

22

1 That's dealing with permissions for them to basically
2 go to work or school.
3     Q.  Okay.  So you said, "inmate movement," and
4 then "work/school"?
5     A.  Uh-huh.
6     Q.  Is that a "yes"?
7     A.  Yes.
8     Q.  Okay.  Any other duties during that period
9 between 2013 or '14 and 2018?
10     A.  Yes.  Sometimes I would be sent to the TSS.
11     Q.  What does "TSS" stand for?
12     A.  Technical Service something.  It's when we
13 process the inmates to go out on electronic monitoring.
14     Q.  Okay.  So, in addition to inmate movement,
15 work/school, TSS, any other duties or responsibilities
16 you had during that time period?
17     A.  As far as what?  Where I was placed?
18     Q.  What do you mean by where you were
19 "placed"?
20     A.  Well, a couple of times I got new positions
21 that I wasn't appointed with, such as listening to
22 the director's Yahoo account for inmate complaints.
23 I     was -- I was given that assignment once, or twice
24 really.  I was also put into -- I forget the name.  She

23

1 was a deputy chief, supposed to monitor.
2     Hello?
3     Q.  Yes.  Sorry, I thought you were still
4 finishing.
5     A.  No.
6     Q.  What did you mean by monitoring the
7 director's Yahoo account for inmate complaints?  What is
8 that?
9     A.  Inmates, that was -- I don't know if they
10 was either in the jail or at home that had some kind of
11 complaint about EM, as far as a investigator or why they
12 were not put on the program.  They would call into this
13 service and it would be a recorded message, and I would
14 have to go through there and see, you know, and log them
15 or delete them, to see if they was, I don't want to say
16 credible, but if they could be addressed by the unit.
17     Q.  So, this was -- it sounds like what you are
18 describing is almost like kind of feedback from the
19 detainees about the EM program itself?
20     A.  Feedback and why they not -- why they can't
21 be an EM.  Some of them was inside the jail calling.
22     Q.  So it was a Voice-Mail essentially?
23     A.  Exactly.
24     Q.  Okay.  Any other types of job duties or

24

1 responsibilities you had during that time period?
2     A.  No.  Occasionally they put me back on the
3 street.
4     Q.  Okay.  Anything else?
5     A.  That was it.
6     Q.  Okay.  So, what was "inmate movement"?
7 What is that category?
8     A.  Well, you got -- you know, how can I say
9 this?  Okay, let me start from work/school.  Work/school
10 is just what it means.  Inmates would fax over a school
11 schedule and I would put a window in there for them,
12 enough time for them to get from school to back home.
13 If they had a job, the job would have to fax a
14 letterhead stating that this is the hours they could
15 work.  Once again, I would find out whether they were
16 going by car or going by public transportation.
17     Now, the rest of the movement was dealing
18 with when they went to court, went to the doctor, the
19 dentist, things like that.
20     Q.  So, in other words, inmate movement, as
21 you are describing it, involves kind of monitoring their
22 schedule and making sure that if they're saying, "I need
23 to go to work," that there is an actual employer that
24 they're going to work for?

Transcript of Samuel Page
Conducted on August 10, 2020

7 (25 to 28)

25

1    A.   Correct.
2    Q.   Okay.  And then you are coordinating that
3  in the sense of saying, "Okay, it's going to take
4  approximately 30 minutes to get there, 30 minutes to get
5  back, so this is the window of time that you can be out
6  of home confinement"?
7    A.   Exactly.
8    Q.   Okay.  And TSS, you said that's processing.
9  What is that?  Could you just describe a little bit more
10 what TSS is?
11   A.   Okay.  The jail, when the judge has decided
12 to put somebody on house arrest, the jail has to pull
13 them, pull the inmates from different divisions and
14 bring them over to us, where we verify through a phone
15 that they can come to wherever location they can go to
16 within Cook County.  A special Court Order allowed them
17 to get placed outside of Cook County.  So, we verify —
18 excuse me.  We verify their location, with somebody
19 on the other end of the phone, usually a parent or a
20 guardian, then we proceed to put a band on them and
21 check the equipment and get them ready for delivery.
22   Q.   Okay.  Did you ever do delivery?
23   A.   Oh, yes.
24   Q.   You did?  So, would that be kind of a

26

1  separate duty that you had?
2    A.   Well, see, now you going all of the way
3  back to when it started.
4    Q.   Okay.
5    A.   When I -- yeah, so when I started rather.
6  And you had two, you had two units -- well, within the
7  EM unit, you had the delivery unit and you had the
8  patrol unit.  And then the patrol unit had two
9  different -- you had the one going here and then you
10 had the one going there.  The delivery was -- So I
11 started in patrol and then I think within a year I went
12 to deliveries, and I stayed in deliveries for a long
13 time.  So yes, I have done the deliveries.
14   Q.   Okay.  But prior to 2013 you were -- you
15 didn't do deliveries after 2013?
16   A.   Sometimes on special occasions, yes.
17   Q.   Okay.  So maybe just kind of one-offs,
18 every once in a while you would work on a delivery?
19   A.   Some special ones, yes.
20   Q.   Okay.  And you said that occasionally you
21 were also on the street.  What did you mean by that?
22 What kind of assignment is being on the street?
23   A.   We had in the last -- before I left, the
24 last four to five years they had came up with special

27

1  releases, let me put it that way.  Sex offenders, people
2  with violent crimes and stuff that had to be checked on,
3  they had to be physically checked on.  So they would
4  assign a car and the investigator to go check on these
5  people throughout the county.  And occasionally, if
6  somebody was short or whoever was the person in charge
7  assigned me, I had to go there, so.
8    Q.   Okay.  Alright.  Let me ask you a couple
9  of questions about the Sheriff's Office policies.
10       Are you aware of whether or not the
11 Sheriff's Office has a policy concerning discrimination?
12   A.   Oh, I think it's — (inaudible).
13   Q.   Yes, we couldn't hear that at all.
14       MR. LEINENWEBER:  Do you think --
15       THE WITNESS:  I'm sorry, go ahead.
16       MR. LEINENWEBER:  Alright.  Why don't
17 we try one more.  I think if it -- if it gets bad again,
18 would you be able to dial in with your phone, if Kevin
19 kind of walks you through that?
20       THE WITNESS:  Okay.
21       MR. LEINENWEBER:  Alright.  Let's try
22 it one more time, and then if we have an issue again,
23 let's have you call in.  Okay?
24       VIDEO HOST:  You could also maybe

28

1  try to leave the meeting and then rejoin and try to
2  establish a better connection?
3        MR. LEINENWEBER:  That's fine with me,
4  if you want to try to do that.
5        (Off the record.)
6  BY MR. LEINENWEBER:
7    Q.   So, let's talk about policies within the
8  Sheriff's Office.  Okay?
9        Are you aware of whether    or not the
10 Sheriff's Office has a policy concerning discrimination?
11   A.   Yes.
12   Q.   Okay.  What is your understanding of that?
13   A.   Well, you know, it came out in a general
14 order and it was sent out about race, color and stuff,
15 to that magnitude, that's basically what I understood
16 about it.
17   Q.   And you understood that it is prohibited,
18 right?
19   A.   Yes.
20   Q.   It is prohibited to discriminate against
21 anyone because of their race, for example?
22   A.   Yes, sir.
23   Q.   Okay.  What is your understanding of what
24 you are supposed to do if you are a witness of

Transcript of Samuel Page
Conducted on August 10, 2020

29

1 discrimination?
2      A.   Good question.  I think you are supposed
3 to report it to your immediate supervisor, the way I
4 understood it.
5      Q.   Anything else?
6      A.   And then I think after that, I think you
7 are supposed to go to the -- I can't think of the name
8 of the -- the unit that deals with discrimination.
9      Q.   Okay.
10      A.   The formal -- the formal, lodge it
11 formally.
12      Q.   Lodge it formally, like lodge a formal
13 complaint?
14      A.   Right.  Exactly.
15      Q.   Okay.  If I said the name, "Office of
16 Professional Review" or "OPR," would that be consistent
17 with what you were trying to think of?
18      A.   Yes.
19      Q.   Okay.  Anything else that you are supposed
20 to do if you witness discrimination?
21      A.   No.
22      Q.   Okay.  What are you -- what do you believe
23 you are supposed to do if you are the victim of
24 discrimination?  If you had been subjected to some sort

30

1 of discriminatory treatment, what is your understanding
2 of what you are supposed to do?
3      A.   Um, supposed to go to the next guy up the
4 chain and file a complaint.  And if it's not rectified
5 within the -- I forgot the duration of time, then you
6 are supposed to go to one of those units that you just
7 mentioned.
8      Q.   Okay.  So, if you are the victim of
9 discrimination, you believed you could go up your chain
10 of command and file a complaint?
11      A.   Yes.
12      Q.   Okay.  And you could also go to OPR to file
13 a complaint?
14      A.   Right.
15      Q.   Okay.  What about retaliation?  Are you
16 aware of whether or not there is a policy at the
17 Sheriff's Office regarding retaliation?
18      A.   Yes.  I -- I remember briefly reading that,
19 but I can't recall all of that now.
20      Q.   Okay.  Do you have any recollection of what
21 you are supposed to do under that policy, if you either
22 see or are a victim of retaliation?
23      A.   Well, I would -- no, I guess I don't know.
24 Actually, the correct response is no, I don't know.

31

1      Q.   Okay.  Let's see.  Other than the -- the
2 job duties we were talking about regarding inmate
3 movement, TSS, reviewing the sort of complaint hotline,
4 being on the street and working in delivery, are there
5 other assignments within EM that you are aware of?
6      A.   You know, that's kind of vague because I
7 don't really know whether what assignments -- we did
8 bond forfeitures.  Like I say, all of that is in the
9 course of the regular working the street.
10      Q.   What do you mean by that?
11      A.   Somebody didn't show up for court, we go
12 and lock them back up because a bench warrant was
13 issued.
14      Q.   Okay.  And that would kind of fall under
15 that "street assignment," as you called it?
16      A.   Exactly.  Exactly.
17      Q.   Okay.  Anything else that you are aware of?
18 Any other types of assignments within EM?
19      A.   Oh, again, when you work the street, you
20 assign different things day-by-day, so you might have
21 to go see somebody in the hospital, that's again working
22 the street.  So, like I said, I don't understand what
23 kind of -- what kind of answer are you looking for?
24      Q.   Well, let's get a little bit more basic

32

1 with it.
2      So, there is one sort of bucket of
3 assignments, I guess, that would be sort of street duty,
4 right?
5      A.   Uh-huh.
6      Q.   And then there is another that would be
7 TSS, as you said?
8      A.   Okay.
9      Q.   What else might you be assigned to work,
10 other than TSS or on the street?
11      A.   Well, like I said, the monitoring office,
12 that was -- that was another, I mean separate part of
13 it, too.
14      Q.   Okay.  Alright.  So, there is the street,
15 there is TSS, there is the monitoring office?
16      A.   Yes.
17      Q.   Any other locations that you could be
18 assigned to work?
19      A.   No.
20      Q.   Okay.  And did you work in all three of
21 those areas or locations?
22      A.   Yes.
23      Q.   Okay.  So, you did perform the street
24 assignment at some point?

Transcript of Samuel Page
Conducted on August 10, 2020

33

1    A.   Yes.
2    Q.   You did perform the TSS assignment?
3    A.   Yes.
4    Q.   And you did perform the monitoring office
5  assignment?
6    A.   Yes.
7    Q.   Okay.  Are there any other locations of
8  assignments or types of assignments that you are aware
9  of within EM?
10   A.   No.
11   Q.   Okay.  So, that's basically the universe of
12 what EM does, these sort of three separate types of
13 assignments?
14   A.   Correct.
15   Q.   Okay.  Were you qualified to perform all of
16 those assignments?
17   A.   Yes.
18   Q.   Okay.  Were there any types of assignments
19 that you were not qualified for within EM?
20   A.   Well, I -- I didn't receive training on
21 a few of them.  When I was sent to the -- I want to give
22 you her name, but I can't think of her name, her office,
23 like I said, to monitor phone messages and pull files.
24 I wasn't trained on how to do that.

34

1        What else?  There's one more.  Especially,
2  when I come in -- well, I came in from days off and
3  I wasn't trained on this system on answering the
4  director's Yahoo account.  So, that was two areas that
5  I wasn't trained on, but they threw me in there any way.
6    Q.   Okay.  And that was the office; is that
7  right?
8    A.   Yes.  Listen to the verbal complaints, you
9  know, so.
10   Q.   Okay.  Let's get back to a few policies
11 within the Sheriff's Office.
12       What is your understanding of whether or
13 not the Sheriff's Office in EM had a policy concerning
14 progressive discipline?
15   A.   Okay.  Would you rephrase that?  Would you
16 repeat that one more time, please?
17   Q.   Yes.  Sure.  No problem.
18       Did the sheriff -- well, do you know what
19 "progressive discipline" is?
20   A.   With my unit?
21   Q.   Correct.
22   A.   Yes.
23   Q.   What is "progressive discipline" then in
24 your understanding?

35

1    A.   Well, it's when I was there, it was a
2  verbal -- I mean --
3        VIDEO HOST:  I'm sorry, Kevin.  Can
4  I stop this?  It is just going to get worse.
5        (Off the record.)
6        (Whereupon, the witness switched his audio
7  from laptop to cell phone.)
8  BY MR. LEINENWEBER:
9    Q.   Mr. Page, before we had some technical
10 issues there we were talking about progressive
11 discipline and I was asking you what is your
12 understanding of what "progressive discipline" is?
13   A.   Okay.  It goes through stages, as far as
14 written reprimand -- I mean, I'm sorry, verbal, then
15 written, and then a merit hearing, and then disciplinary
16 action.
17   Q.   And that's all set up through a union
18 contract, right?
19   A.   Yes.
20   Q.   Okay.  So you were a member of a union
21 while serving in EM, right?
22   A.   Yes.
23   Q.   What union was it?
24   A.   Oh, wow.

36

1    Q.   Is it --
2    A.   I don't know.
3    Q.   Is it Teamsters?
4    A.   It might -- teamsters.  I mean we had -- we
5  went through a whole bunch of different unions, so yeah,
6  I think the last one was Teamsters.
7    Q.   Okay.  I definitely wasn't trying to catch
8  you off guard there.  But if you don't remember
9  something, that's totally fine.  I'm just trying to
10 kind of confirm.
11   A.   Okay.
12   Q.   And what's your understanding of who makes
13 the decision regarding discipline within EM?
14   A.   Um, my understanding is that it starts
15 with the deputy chief, the chief and the director.
16   Q.   Okay.  So, your understanding is that the
17 deputy chief, the chief and the director are the ones
18 who make decisions regarding discipline?
19   A.   Yes.
20   Q.   Okay.  What, if any, role does OPR have in
21 issuing discipline?
22   A.   That's a good question.  Well, I -- I'm
23 just guessing that they -- they review the findings
24 and make a judgment.

**37**

1    Q.   Okay.  So, you said that they would --
2  you're guessing, but you think that they maybe review
3  the findings and make a judgment?
4    **A.   Correct.  And then they either give the**
5  **person time off or whatever disciplinary action needs**
6  **to be done.  I --**
7    Q.   Okay.  Sorry, I didn't hear the last thing
8  you said.
9    **A.   Oh, I just said -- I was asking was I clear**
10 **on the way that I think it goes on.**
11   Q.   Oh, okay.
12      Let me ask you, if you believe, say you
13 were to receive discipline, but you believed it was not
14 appropriate discipline, is there a mechanism for you to
15 challenge the discipline?
16   **A.   Yeah.  You would go to OPR and then -- then**
17 **actually file a complaint.**
18   Q.   When you say, "file a complaint," what do
19 you mean by that?
20   **A.   You know, you would write up two forms for**
21 **them and I guess you would say that the findings was**
22 **unjustified.  I never really went in front of them, so**
23 **I really couldn't tell you.**
24   Q.   Okay.  You never really went in front of

**38**

1  who?  Who are you talking about that you never went in
2  front of really?
3    **A.   OPR.**
4    Q.   Got it.  Okay.  What about with your union,
5  were you able to file a grievance related to discipline
6  that could be assessed to employees in the EM?
7    **A.   Okay, could you make that a little more**
8  **clear?**
9    Q.   Well, what role, if any, did your union
10 have in reviewing discipline?
11   **A.   Okay, they was kind of representative to**
12 **either the hearing board or to the OPR itself, if it**
13 **was some kind of problem, and the representative, the**
14 **union representative.**
15   Q.   And the union representative would be there
16 on your behalf or on the employee's behalf, right?
17   **A.   This is -- well, yeah, whoever is being**
18 **disciplined, on their behalf, yes.**
19   Q.   Okay.  Did you ever receive any discipline
20 during your time in the EM unit?
21   **A.   When you say, "discipline," could you be**
22 **more specific?**
23   Q.   Sure.  I mean did you ever -- you talked
24 about, you know, there is progressive discipline, there

**39**

1  is verbal, there's written, there's a hearing, and then
2  there is the actual, you know, issuance of disciplinary
3  action.  Did you ever have any of that type of
4  discipline issued against you at all?
5    **A.   And the time frame would be what?**
6    Q.   At any time while you were working at EM?
7    **A.   Yeah, I -- well, it never went to review,**
8  **but I had got two letters of discipline when I was**
9  **supervisor.**
10   Q.   Okay.  And we decided that you stopped
11 being a supervisor in approximately 2013 or 2014, right?
12   **A.   I didn't stop, I was -- I was -- they**
13 **stopped us.**
14   Q.   So, were you no longer a supervisor as
15 of -- regardless of how it happened, 2013 or 2014,
16 right?
17   **A.   Correct.**
18   Q.   Okay.  And after you were no longer a
19 supervisor, did you receive any discipline at all?
20   **A.   Other than verbally, no.**
21   Q.   And you say, "other than verbally," what do
22 you mean by that?
23   **A.   I was threatened to be written up if**
24 **something continued or if I didn't follow certain**

**40**

1  guidelines.
2      **Is that kind of vague or is that clear?**
3    Q.   I'll follow up.  Hang on one second.
4      Okay.  You mentioned that you received two
5  letters regarding discipline when you were a supervisor?
6    **A.   Yes.**
7    Q.   What were those concerning?
8    **A.   I had a -- I had one of the units punished**
9  **me, it was both times escape on the van.**
10   Q.   So, a detainee actually escaped the van?
11   **A.   Yeah an inmate escaped from the van.  And**
12 **then me, as the supervisor on duty, received a letter,**
13 **it reprimanded me as failure to supervise.**
14   Q.   Okay.  Got it.  Other than the letter of
15 reprimand was there any other discipline associated with
16 those escapes for you?
17   **A.   No, no.**
18   Q.   Okay.  So, you didn't lose any days for
19 either of those instances?
20   **A.   No.**
21   Q.   Okay.  And then after you stopped serving
22 as a supervisor, you said that you didn't receive any
23 discipline other than verbally, right?
24   **A.   Correct.**

**41**

1      Q.   Okay.  And you said that you were
2    threatened a couple of times with a write-up if either
3    certain things continued or guidelines weren't followed?
4      **A.   Correct.**
5      Q.   Okay.  Who made those threats or those
6    assessments about possible discipline?
7      **A.   Chief Ranzino.  He was the chief at that**
8    **time.**
9      Q.   Okay.  Alright.  Let's talk about TSS for a
10   second.
11          You talked a little bit about TSS and you
12   said that this is essentially I think where detainees
13   are processed to go out on home monitoring?
14     **A.   Correct.**
15     Q.   And after you stopped serving as a
16   supervisor, but prior to your retirement, did you work
17   in TSS at all?
18     **A.   Yes.**
19     Q.   Okay.  And walk us through, what is a
20   typical job assignment like in TSS since say 2010,
21   up until your retirement?
22     **A.   Repeat that, please?**
23     Q.   Sure.  So, between 2010 and your retirement
24   in 2018 what is a typical assignment like within TSS for

**42**

1    you, as you experienced it?
2      **A.   In TSS?**
3      Q.   Yes.
4      **A.   Basically you get new -- the new people**
5    **getting ready to go out on EM, you give them**
6    **assignments, I'm sorry, you give them a card to fill**
7    **out stating where they want to go, the people to contact**
8    **and the phone number, and they give references to be**
9    **verified as people that know them and saying that they**
10   **live at the certain residence.  We get the cards back.**
11   **We call to verify whether or not they can come there.**
12   **We need to talk to either the owner or the lease holder**
13   **or the person in charge of the household.**
14          **Once that's verified, we -- what else do**
15   **we do?  We put the band on them and check the equipment**
16   **on the person.  There's something else we do.  I'm**
17   **trying to think.  We scan them out.  I scan them out,**
18   **they fingerprint them out.  But it's one of those things**
19   **has to be done before they leave the jail itself.  And**
20   **when they're ready for pick up, we march them out to**
21   **the -- to the back of Division Five usually, and they're**
22   **picked up by a delivery unit.**
23     Q.   Okay.  Anything else?
24     **A.   Not that I can recall about it.**

**43**

1      Q.   Okay.  When you would show up at TSS were
2    the detainees who were being considered for release on
3    electronic monitoring, were they already there or did
4    you have to go pick them up?
5      **A.   Sometimes both.**
6      Q.   Okay.
7      **A.   So we just -- I'm sorry.**
8      Q.   No, that's alright.  Go ahead.
9      **A.   Yeah, no, what you just said, sometimes it**
10   **will be a bunch of them.  Sometimes we had to go to the**
11   **bullpen of -- I don't know who the building receiving**
12   **was.  I know it was the new building, had to go pick**
13   **them up.  And sometimes we had to call divisions to get**
14   **them to bring the area van to bring them over to us.**
15   **But sometimes they was already there.**
16     Q.   Okay.  And what was your personal feeling
17   about TSS?  Did you enjoy doing that job or did you not
18   like that job?
19     **A.   To me, it was an adjustment because there**
20   **was no windows for ventilation.  Unfortunately, you got**
21   **vermin that runs through there, you know.  It was like**
22   **being put in somebody's abandoned basement.**
23     Q.   Okay.  So, other than the sort of physical
24   environment, was there anything else about it that you

**44**

1    didn't like or was that basically it?
2      **A.   Well, it was depressing, you know.**
3    **Somebody's abandoned basement, yeah.  No, I didn't like**
4    **it.  No.**
5      Q.   Okay.  Any other reason that you didn't
6    like it?
7      **A.   No, not really.**
8      Q.   Okay.  Was there any particular assignment
9    that you preferred?
10     **A.   Oh, patrol.  Patrol was, you know, you are**
11   **out in the open, and that's why -- why I initially came**
12   **to the unit, to be in, to get out of the jail setting**
13   **and get into the street.  So, being out on the street**
14   **was much better preferred, yes.**
15     Q.   What's your understanding of who made the
16   decision regarding what your assignment would be within
17   EM since 2010?
18     **A.   Whoever did the roll call, whoever was in**
19   **charge of the shift did the assignments.**
20     Q.   Okay.  So, whoever was in charge of roll
21   call is the one who, in your understanding, made the
22   assignment decisions?
23     **A.   Well, let me rephrase that.  Usually --**
24   **usually whoever did roll call had the watch.  But**

Transcript of Samuel Page
Conducted on August 10, 2020

---

45

1 sometimes if the chief was off, the deputy chief would
2 be there and he would fill out the assignments or he
3 would let one of them fill out the assignments, you
4 know. So, the supervisors did the assignments, let's
5 put it to you that way.
6     Q. And "the supervisors," meaning the chiefs
7 or the deputy chiefs? Sorry.
8     A. Yes.
9     Q. The "supervisors," meaning the chiefs or
10 the deputy chiefs?
11    A. Exactly.
12    Q. Okay. When you served as a supervisor
13 within EM, did you ever make the assignments?
14    A. Yes.
15    Q. You did?
16    A. Yes.
17    Q. Okay. And who would you make assignments
18 for?
19    A. The watch.
20    Q. Okay. So, you would divide up whoever was
21 on that watch to, "You are on patrol. You are going to
22 be in TSS. You're going to be in the office"?
23    A. No, when I was -- when I was supervisor, I
24 was supervisor patrol, period. So there was -- I didn't

46

1 do TSS, because TSS had its own supervisors, its own
2 investigators. We were separated into two units, patrol
3 and deliveries.
4     Q. Okay. So, you couldn't say, when you were
5 a supervisor, you didn't get to say, "You're on TSS
6 today. You're on patrol," but you did have the ability
7 to say, "If you're on patrol, this is where you are
8 going today"?
9     A. Yes.
10    Q. Okay. So, you might decide who is going
11 to a different patrol assignment from the unit that's
12 working under you?
13    A. Is that -- well, there is a county, I would
14 put them in areas.
15    Q. Okay.
16    A. Uh-huh.
17    Q. And how did you make those decisions?
18    A. Basically what I did was, so that everybody
19 could learn the county, I would put, if a team was
20 working all of the time, I would put them,
21 say if they work in four, that would be the North Side,
22 that would encompass everything north of -- everything
23 north of North Avenue (phonetic), all of the way through
24 the northern suburbs, I would put a unit up there for a

47

1 couple of weeks. And then from there I would move them
2 to the western suburbs, to the southern suburbs, all
3 areas of Chicago, north, south and east side of Chicago,
4 until they, you know, until they would be familiar with
5 the areas. And then sometimes, you know, someone would
6 ask for special areas and I would just say, "Okay."
7 But they would have to do a rotation, so they would,
8 you know, know the areas first of the county. Not all
9 of the streets, but the areas.
10        Do you follow?
11    Q. In your experience why would a particular
12 investigator ask for a specific area?
13    A. They might be close to their home, they
14 want to stop in at their house, you know. You know,
15 for personal reasons they might need to be in a certain
16 area, so.
17    Q. Okay. And do you -- let's go took TSS
18 for a second. You would agree that you did not have
19 the right to choose your own assignment, right?
20    A. Correct.
21    Q. Okay. Did you at some point have the right
22 to bid for an assignment?
23    A. Now, again, what's the time frame?
24    Q. At any time while you were in EM?

48

1     A. Yeah. When I first started, you could
2 either request TSS, deliveries or patrol.
3     Q. And that was pursuant to your union
4 contract?
5     A. No, that was --
6     Q. What?
7     A. That was within the unit itself.
8     Q. So, within electronic monitoring you could
9 request a particular assignment and it would either be
10 TSS, patrol, or what was the third one you said?
11    A. Well, back then it was -- it was -- again,
12 it was patrol, delivery, work/school, and I'm pretty
13 sure they did call themselves TSS. TSS. And TSS back
14 then, they would, excuse me, they would pull the records
15 and find people eligible for it. Work/school was a
16 separate department. That's all they did was
17 work/school. And deliveries did deliveries and patrol
18 did patrol.
19    Q. What's your understanding of why you were
20 able to bid for an assignment?
21    A. Why was I?
22    Q. Yes. Why were you able to bid for one of
23 those assignments?
24    A. Well, it wasn't a bid, it was a request.

Transcript of Samuel Page
Conducted on August 10, 2020

49

1  Excuse me, when I first started, it was a request,
2  because as the supervisors didn't like to work, they
3  could punch it to some other file or EM file. So that's
4  why I feel it's a request. Later on it became a bid,
5  that you could bid for your shift and where you wanted,
6  where what was open, deliveries or patrol, because only
7  two, deliveries and patrol. And then at the end of my
8  work career, there was no -- other than bid for the
9  shift, you had no choice in your assignment.
10     Q. Do you understand when that change occurred
11 that you could no longer bid for an assignment?
12     A. No, sir, I couldn't.
13     Q. Did you understand why that change
14 occurred?
15     A. Why it happened? No. I wasn't in the
16 thought process of why they took that away, no.
17     Q. Okay. You say, "they took that away."
18 Who took it away?
19     A. The administration.
20     Q. Okay. Do you know if the union
21 participated in that decision?
22     A. No, I don't.
23     Q. Okay. Do you know if that was covered by
24 a Collective Bargaining Agreement?

50

1     A. No, I don't.
2     Q. Okay. And when you were saying bidding
3  for one of those assignments, when there was a period
4  of time where you were able to bid for an assignment,
5  what was that bid based on? Was it your seniority?
6     A. That I couldn't answer you. Because here's
7  the thing, some people wanted patrol and some people
8  wanted deliveries. The reason why they wanted delivery
9  was you, back then, was because you had weekends and
10 holidays off, but delivery was only Monday through
11 Friday.
12     Q. Okay. And regarding the decision for
13 assignment, again, what was your understanding of who
14 made the decision as to what your assignment would be
15 on a given day? Since you no longer had this ability to
16 bid for an assignment, who was making those decisions?
17     A. Again, it was either the chief of the watch
18 or one of his designees, like the deputy chief, either
19 one of those, he could do it or he could have one of
20 them do it.
21     Q. Okay. And what is the basis of your
22 knowledge of that?
23     A. I don't understand the question.
24     Q. How do you know that that's the case?

51

1     A. How do I know?
2     Q. Uh-huh.
3     A. Because they would have to type it out on
4  the assignment sheet and sign it.
5     Q. Okay. So, the chief or the deputy chief
6  would actually type out the assignment sheet and sign
7  it and say, "This is the assignments for tonight"?
8     A. Yes.
9     Q. Okay. And what factors went into their
10 deciding who would be assigned where?
11     A. That was just it, I don't know what -- what
12 they thought. I don't know how they thought.
13     Q. Okay. So, you don't know how they made
14 the decisions as to who would be assigned where?
15     A. No.
16     Q. Okay.
17     A. I just know that it was going one -- that
18 it started to go one-sided for a long time.
19     Q. What do you mean by, "it started to go
20 one-sided for a long time"?
21     A. Well, it started to be the only people that
22 was working TSS for awhile was the blacks and the
23 Latinos. Everybody else, the Caucasians, all of them
24 was working patrol down the street or getting a special

52

1  assignment, that's about it. Checking on the pedophiles
2  and all of that kind of, you know, stuff like that.
3     Q. Okay. And when are you talking about?
4     A. Oh, I am talking about the last -- my last
5  four years of being there. Four to five years of being
6  there, the last four or five, when the new people came
7  in.
8     Q. So, since around 2013 or 2014, up until
9  your retirement in 2018, only blacks and Latinos were
10 assigned in TSS and whites were assigned to patrol?
11     A. Yes. Correct.
12     Q. And who made those decisions?
13     A. The white commander and white deputies.
14     Q. And how do you know that?
15     A. Because you got assignment sheets.
16     Q. So, you would see assignment sheets when
17 you were at work?
18     A. Yes. Everybody's got one.
19     Q. Okay.
20     A. That's how you knew where your assignment
21 was.
22     Q. Okay. How many days a week did you work
23 during this period?
24     A. How many days a week? I think I was

Transcript of Samuel Page
Conducted on August 10, 2020

14 (53 to 56)

53
1  working five days a week. I want to say it was five.
2  Yeah. Yeah, it was five days a week. Yeah.
3      Q.  Okay. And the days that you weren't there,
4  would you see the assignment sheets?
5      A.  The days I worked there or wasn't there?
6      Q.  The days that you were not at work, would
7  you see that day's assignment sheet?
8      A.  No. No.
9      Q.  And between 2013 and 2018 did you work at
10  all of the different assignments that we talked about
11  earlier or did you only work at one?
12      A.  No, I -- I moved around. I did move
13  around. Uh-huh.
14      Q.  Okay. So you did some TSS?
15      A.  Uh-huh. Some TSS, some monitoring. Every
16  now and then some patrol. Some patrol.
17      Q.  Okay. And what's the -- how do you know
18  that only blacks and Latinos worked in TSS during this
19  period?
20      A.  How do I know?
21      Q.  Yes.
22      A.  I've seen the assignment sheets. On the
23  dates I worked, I seen my assignment sheet.
24      Q.  Okay. And so you would look at it and see

54
1  there is no white people assigned to TSS?
2      A.  Correct. And then -- and then on occasions
3  one or two would go, they would send one or two over
4  there and -- it was like they was punishing them for
5  whatever, I don't know, something went on. I really
6  don't know. I can't really speculate on what's the
7  reason why, but maybe one or two would go there for like
8  a week or two.
9      Q.  Sorry, I'm just a little confused. Are you
10  saying that sometimes some white people were assigned
11  to TSS?
12      A.  Yeah, one. Because usually it would be
13  some kind of -- something they did. Because when I was
14  in the office, I would hear a lot of things, and it
15  would be sometimes something somebody did, while they
16  would send them over to TSS as a punishment.
17      Q.  So, they would punish white people by
18  making them work in TSS is what you are saying?
19      A.  That's just my speculation as to why they
20  did. I really couldn't tell you why. But like I said,
21  the majority, the last four or five years that I was
22  working there, it was just Hispanics and blacks were
23  over there to work. There was no -- this was -- none
24  of the new people they had was mandatory for them to go

55
1  over there.
2      Q.  And you said that all of the new people
3  coming in? What did you mean by that?
4      A.  Well, you know, the more people, as the
5  unit lost people, they started to replenish, so they was
6  bringing new people over. And normally the new people
7  would get the grunt work. Well, it didn't happen, you
8  know. They was put straight on patrol. They didn't
9  ride with nobody that had been there for awhile, as in
10  the previous years we used to do that, so that they
11  would learn the transition, from working in the jail
12  to working on the street. You usually put them with
13  somebody on a ride-along. Like a -- it wasn't FTOs,
14  but they would have somebody to show them things about
15  working on the street. Well, the last four or five
16  years, that did not happen.
17      Q.  And this was done for new people that came
18  over?
19      A.  Correct.
20      Q.  And were all of the new people white?
21      A.  No. No, not all.
22      Q.  So, this was done for new people, including
23  white people, black people and Latino people?
24      A.  Yes.

56
1      Q.  Okay. Alright. Let me ask you, did you
2  ever apply for any promotions within electronic
3  monitoring?
4      A.  Apply? No.
5      Q.  Did you ever ask for a promotion?
6      A.  Yes.
7      Q.  Okay. Who did you ask?
8      A.  I asked the director.
9      Q.  Director who?
10      A.  Director Shields. I asked Deputy Chief --
11  no, it was chief then, O'Malley. Charles Ghee
12  (phonetic). Anybody with -- that I thought had the
13  authority to move me from supervisor to DC, deputy
14  chief, I asked them. Because there was no merit test
15  for it. It was -- I don't know if you could say verbal
16  promotion or whatever, but that's who promoted you, was
17  the director, assistant director or somebody in that
18  office.
19      Q.  So, you wanted to move from supervisor to
20  deputy chief?
21      A.  Yes.
22      Q.  Okay. So, this would have been prior to
23  2013 or 2014, when you were no longer a supervisor,
24  right?

Transcript of Samuel Page
Conducted on August 10, 2020

15 (57 to 60)

57

1    A.    No, this was when I was a supervisor.  I
2  wanted to move up.
3    Q.  Yes.
4    A.    Yes.  Prior to that, yes.
5    Q.  So since you stopped serving as a
6  supervisor, did you ever apply for any promotions?
7    A.    No, because there was -- there was no
8  promotional exam at the time.  It wasn't until my last
9  year that they decided to have non-merit sergeants.
10 And the first thing they do was to pass a physical,
11 and I was in no shape to pass a physical.
12    Q.  And since you were no longer serving as a
13 as supervisor in 2013/2014 did you ever ask anyone for
14 a promotion after that point?
15    A.    No, because they said there was to be no
16 more supervisors.
17    Q.  Oh, okay.  So, there weren't going to be
18 any more supervisors?  Is that what you said?
19    A.    Right.
20    Q.  Okay.  So, when you were no longer serving
21 as a supervisor, it's not just that you, yourself, were
22 no longer serving as a supervisor, there were no more
23 supervisors, right?
24    A.    Correct.

58

1    Q.  Okay.  Let me ask you, what does the term
2  "High incident area" mean to you?
3    A.    High-incident area?  That would be an area
4  where there is a lot of gang and drug activities.
5    Q.  Within Cook County?
6    A.    Yes.
7    Q.  Okay.  And if there is an area with a lot
8  of gang and drug activity, is it fair to say that that's
9  an area that a lot of detainees come from?
10    A.    Correct.
11    THE WITNESS:  Just go ahead, I got it
12 now.
13    (Off the record.)
14    MR. LEINENWEBER:  Why don't we -- can
15 we take a break for just a couple of minutes?
16    THE WITNESS:  Okay.
17    MR. LEINENWEBER:  Is that alright,
18 guys?
19    THE WITNESS:  I muted it.
20    MS. KRAUCHUN:  That's fine with me.
21    MR. LEINENWEBER:  Okay.
22    (Off the record.)
23    MR. LEINENWEBER:  It's 11:27, do you
24 want to just take five or ten minutes?

59

1    MS. KRAUCHUN:  Yes.  Ten minutes is
2  fine.  And then, Sam, if you have to go to the bathroom
3  or anything, go ahead.
4    MR. LEINENWEBER:  Okay.  So we will be
5  back at 11:37.
6    MS. KRAUCHUN:  Okay.  Thanks.
7    MR. LEINENWEBER:  Thank you.
8    (Off the record.)
9    (Whereupon, a short recess was taken.)
10    MR. LEINENWEBER:  Kevin, could you pull
11 up Exhibit 1, please.
12    (PAGE Deposition Exhibit 1 marked for
13 identification.)
14 BY MR. LEINENWEBER:
15    Q.  Mr. Page, we've handed you what has been
16 marked as Page Exhibit 1.  Do you recognize this
17 document?
18    A.    I'm sorry, you say what now?
19    Q.  Do you recognize this document?
20    A.    Yes.
21    Q.  Okay.  And it is the complaint in this
22 case, right?
23    A.    Yes.
24    Q.  Okay.

60

1    MR. LEINENWEBER:  And so I just screwed
2  up my video and can't get the document.  One second,
3  please.  Here it is, okay.
4  BY MR. LEINENWEBER:
5    Q.  And then, Kevin, if you could turn to,
6  let's see, paragraph 47, which is on Page 8 I think.
7    A.    Okay.
8    Q.  Mr. Page, just take a second here, and
9  if you could review this section that says, "Facts
10 particular to Samuel Page."  Let me know when you have
11 had a chance to review that.  Okay?
12    A.    (Reviewing.)  So, okay.
13    Q.  Again, the title of this section is "Facts
14 particular to Samuel Page."  Okay.  We see here on
15 paragraph 47 it says you began working for the Sheriff's
16 Office on or about April 16th, 1986, which I think is
17 almost exactly to the day which you testified to
18 earlier; is that correct?
19    A.    Yes.
20    Q.  And it says it looks like you began working
21 in the Electronic Monitoring Unit in and around December
22 of 1992?
23    A.    Okay.  Yes, sir.
24    Q.  And then it looks like it says in 1998 you

Transcript of Samuel Page

16 (61 to 64)

Conducted on August 10, 2020

**61**

1  received a promotion to patrol supervisor for the third
2  watch, for the Electronic Monitoring Unit?
3  **A.  Yes, that still should be about right.**
4  Q.  And it says in the next paragraph here,
5  paragraph 50, 5-0, "Plaintiff Samuel Page was
6  arbitrarily removed from his position as a patrol
7  supervisor."  And we talked about your removal from
8  the patrol supervisor position and you indicated that
9  that happened in about 2013 or 2014 you thought?
10  **A.  Yeah.**
11  Q.  And it says you were never reinstated --
12  sorry.  Strike that.  Let's see.
13       It says you brought a grievance to
14  arbitration and was successful?
15  **A.  I -- I -- when I say that, I said I talked**
16  **to Director Shields about that, and I want to say in --**
17  **I don't know if Chief O'Malley was there or not, and**
18  **they would -- they told me they would get back to me**
19  **about that, and they never did.**
20  Q.  And you were never reinstated into the
21  position as patrol supervisor, right?
22  **A.  Correct.**
23  Q.  Okay.  Let's back up here for a second
24  then.

**62**

1       Who made the decision to remove you from
2  the supervisor position?
3  **A.  I -- I really don't know.**
4  Q.  So, do you have any knowledge whether
5  Director Shields made the decision?
6  **A.  No, I don't -- I don't know.  I don't know.**
7  **Oh, I can't think of this man's name, but he came over**
8  **and he attended some of our roll calls.  I can't**
9  **remember his name.  And then the decision was made**
10  **that supervisors would no longer be in the -- no**
11  **supervisors.  They said that.**
12  Q.  Okay.  And do you know if Chief Ranzino or
13  Deputy Chief Rohloff or Chief Neal had any role in that
14  decision?
15  **A.  That, I don't know.  All I know is that**
16  **Chief Ranzino was the one that gave me the order that I**
17  **was no longer a supervisor.**
18  Q.  Okay.
19  **A.  And Rohloff was not a chief.  He was a**
20  **deputy chief.**
21  Q.  Okay.  And what about what was the
22  consequence for you of losing the supervisor position?
23  What did you lose when that position was taken away?
24  **A.  Well, personally, my -- my self-esteem went**

**63**

1  **down because, you know, it was a promotion and it was**
2  **taken from me and, you know, it made me feel some kind**
3  **of way.  And then my activity, you know, we was no**
4  **longer getting our -- our hour a week that we was**
5  **granted, you know, because at times we stayed over,**
6  **we was getting overtime and stuff like that, so, and**
7  **all of that was taken away from us.**
8  Q.  How were you informed about the removal of
9  the supervisor position?
10  **A.  Chief Ranzino.**
11  Q.  And what did he say?
12  **A.  He just told us that starting next week,**
13  **we wore the old uniform, you know, not a supervisor.**
14  Q.  And you said, "He told us."  Who was he
15  talking to?  Was this you individually or a group?
16  **A.  He told all of the supervisors that was**
17  **what we called supervisors, just that they're no longer**
18  **supervisors, just deputy chiefs and chief.**
19  Q.  Okay.  Did he give you a reason for that
20  decision?  Did he say why that was being done?
21  **A.  None that I remember.  And it was nothing,**
22  **it was no kind of formal writing that they presented to**
23  **us either.**
24  Q.  Okay.  And when you were serving as this

**64**

1  patrol supervisor were you still considered an
2  investigator?
3  **A.  No.**
4  Q.  No, you weren't?  It was just a totally
5  separate thing in your understanding?
6  **A.  I was a supervisor, yes.**
7  Q.  You were a supervisor.  Were you paid
8  differently, other than the one hour per week extra
9  time?
10  **A.  You said were we paid?**
11  Q.  Yes.  Was it the same rate of pay as the
12  investigator position?
13  **A.  Yes.**
14  Q.  Okay.  And you don't know why the decision
15  was made to remove the patrol supervisor position?
16  **A.  No, sir, I don't.**
17  Q.  Okay.  And did you personally file a
18  grievance regarding the removal of your supervisor
19  position?
20  **A.  Well, all of the supervisors got together.**
21  **Did I do it personally?  No.**
22  Q.  Okay.  And it sounded like you started to
23  say that all of the supervisors got together and filed
24  one?

Transcript of Samuel Page
Conducted on August 10, 2020

65

1    A.  Yes.
2    Q.  Tell me a little bit more about that.
3    A.  We just -- we just filed a grievance that,
4  you know, why we being, you know, demoted, with no
5  basis, no reason, you know.  And we sent it to
6  administration.
7    Q.  And who actually did the grievance?
8    A.  Oh, I don't really know, because two of
9  them died and I don't know if they're the ones that
10 proposed it or not.  It might have been Dart, Supervisor
11 Dart.  I really don't know who wrote it.
12   Q.  Your understanding is that somebody from
13 the supervisor group went ahead and filed a grievance
14 about that, as you called it, demotion?
15   A.  Correct.
16   Q.  Okay.  And you don't recall who
17 specifically did that?
18   A.  No, sir.  That's over seven years,
19 I don't remember who it was.
20   Q.  And it's your --
21   A.  I got.
22   Q.  I'm sorry, go ahead.
23   A.  No, go ahead.
24   Q.  And it's your understanding that the person

66

1  who did file the grievance did so on behalf of all of
2  the supervisors?
3    A.  Correct.
4    Q.  And what happened with that grievance?
5    A.  Never heard.  Other than -- nothing.
6  Basically nothing was done.  Nothing was done.  Fast
7  forward to the year before I left, they decide to
8  promote non-merit sergeants.  Like I say, that's nothing
9  I ever heard of, a non-merit sergeant, but that was our
10 replacement.
11   Q.  In paragraph 50 here of the complaint,
12 though, it says that you brought a grievance to
13 arbitration.  So, is it your understanding that the
14 grievance that was filed on behalf of the supervisors
15 went to arbitration?
16   A.  Yes, sir.
17   Q.  Okay.  And what happened at the
18 arbitration?
19   A.  Had no verdict.
20   Q.  Did you participate in the arbitration?
21   A.  No, I didn't.
22   Q.  Did you participate in the grievance?
23   A.  Yes.
24   Q.  How so?

67

1    A.  I signed my name.
2    Q.  What did you sign your name to?
3    A.  It was a grievance letter that was written,
4  like I said, I want to say to Supervisor Dart, and it
5  had the thing that all of the supervisors wrote and
6  signed their name to and we submitted it.  I want to say
7  it was him that did it, but it's like I said, I don't
8  really remember.
9    Q.  Okay.  Did you appear at the arbitration?
10   A.  No.
11   Q.  Okay.  Did you testify at arbitration?
12   A.  No.
13   Q.  Did you submit an affidavit on behalf of
14 the arbitration -- the grievance?
15   A.  No.
16   Q.  Okay.  Did you attend the arbitration?
17   A.  To be honest, I think I was on a case, and
18 when it happened, I don't remember.  I don't remember
19 the date that it happened.  No.  Because we -- we worked
20 in all the -- we were still union employees, but I don't
21 even know if the union addressed it or not.
22   Q.  So, when you were in the supervisor
23 position, you were still in the union?
24   A.  Yes.

68

1    Q.  Okay.  And you say here in paragraph 50
2  that the arbitration was successful, the grievance taken
3  to arbitration was successful.  What do you mean by
4  that?  What was successful about it?
5    A.  Well, it went forward and -- and the people
6  that needed to hear it, heard it.  But they still wasn't
7  able to give us no basis on why, you know, we were
8  demoted.  So, because it wasn't nothing that we did to
9  cause us to be demoted.  So, I mean that's what I was
10 saying.
11   Q.  So, when you say it wasn't anything that
12 you guys did, it wasn't like you had done something
13 inappropriate and this was a mass discipline?
14   A.  Exactly.
15   Q.  Okay.  This was a decision, it sounds like,
16 made by someone at the Sheriff's Office to eliminate
17 that supervisor position?
18   A.  I would say so.
19   Q.  Okay.  And your understanding was that the
20 grievance in arbitration was successful, but you're not
21 really sure what specifically was ordered as a result
22 of that arbitration?
23   A.  No, I don't.
24   Q.  Okay.  And you never were returned or

Transcript of Samuel Page
Conducted on August 10, 2020

69

1 reinstated to the position of patrol supervisor, right?
2     **A. No, sir.**
3     Q. Okay. In paragraph 52 here you say that
4 Chief Ranzino threatened to write you up any time you
5 spoke up.
6       When did this happen?
7     **A. Um, okay, at the time I was in monitoring,**
8 **so when I questioned some of the assignments, you know,**
9 **because at the time I was still working in monitoring,**
10 **and they put me at the supervisor's desk to run the --**
11 **run the office. So, when he gave me, let's say, an**
12 **order that I wasn't sure of and I spoke to him about it,**
13 **you know, he would have a negative response to me or**
14 **he would threaten to write me up. That's what I mean.**
15     Q. Okay. And did you in fact ever get written
16 up by Chief Ranzino?
17     **A. I am thinking about that, and I don't think**
18 **so.**
19     Q. Okay. In paragraph 53 here it says that
20 you received work assignments that non-minority officers
21 with less seniority never received. What are you
22 referring to here?
23     **A. Well, I was thinking about when they sent**
24 **me to do the director's e-mail and the TSS, keep sending**

70

1 **me over to the TSS office, you know, three times a week,**
2 **four times a week, you know, and the Caucasian officers,**
3 **like I said, they went straight to patrol, and they just**
4 **got there.**
5     Q. So, is it your understanding that seniority
6 played some role in who could be assigned where?
7     **A. Well, going by past practices, like I said,**
8 **when you just travel with the unit, to the unit, you**
9 **went out with somebody who had been there for awhile and**
10 **you had to learn the process and everything from the**
11 **ground up, because you are the new -- you're the new**
12 **hiree. So, to my understanding, you are supposed to**
13 **start from the ground up.**
14     Q. And you are talking about past practice,
15 meaning your experience, when you started?
16     **A. Yes.**
17     Q. Okay. And that, again, was back in 1992?
18     **A. I'm sorry?**
19     Q. That was back in 1992?
20     **A. Yes.**
21     Q. Sorry. Hang on one second.
22     **A. Okay.**
23     (Off the record.)
24     MR. LEINENWEBER: Okay. Sorry about

71

1 that.
2 BY MR. LEINENWEBER:
3     Q. Am I correct that having seniority would be
4 relevant, if you were bidding for an assignment?
5     **A. Connect.**
6     Q. So, in other words, the period of time in
7 which investigators in EM were allowed to bid for an
8 assignment, one of the important criteria for that would
9 be your seniority level?
10     **A. Yes.**
11     Q. Okay. And then the remainder of this
12 paragraph here, you talk about consistently being
13 assigned to work in the basement. When you use that
14 term, "basement, are you referring to TSS?
15     **A. Correct.**
16     Q. Okay. Other than the issues we talked
17 about earlier about, I think you even described the
18 basement like an abandoned basement or a dungeon,
19 without windows -- oh, I just lost you. Oh, there you
20 go.
21     MR. LEINENWEBER: Sorry, I lost the
22 video here.
23 BY MR. LEINENWEBER:
24     Q. Other than the fact that it didn't have

72

1 windows and the ventilation, and I think you said there
2 were vermin, was there any other reason that you didn't
3 like working in there?
4     **A. Well, yeah, because it was total isolation.**
5 **Because one holiday I went to the -- I was assigned to**
6 **work over there by myself. It was no -- it was -- it**
7 **was a needless assignment because there was no movement**
8 **for that day.**
9     Q. Okay. Meaning that they weren't putting
10 anyone out on monitoring?
11     **A. Yeah. I'm sorry, yeah, did not put nobody**
12 **on.**
13     Q. And you say you were consistently assigned
14 to work in the basement. And I think you just said a
15 minute ago that you were assigned to work there three
16 or four times per week?
17     **A. Yeah.**
18     Q. Over what period of time did you work there
19 three to four times per week?
20     **A. During that time that I worked there that,**
21 **I want to say maybe '15, '14, '15 -- 2016, 2015,**
22 **something like that. I was sent over there to,**
23 **you know. It got -- it got real bad for awhile, and**
24 **then it was like it eased up a little bit.**

Transcript of Samuel Page
Conducted on August 10, 2020

73

1    Q.   Meaning between 2015 and -- I'm sorry,
2  since 2015 and 2016 you ended up working in TSS more
3  often; is that what you're saying?
4    **A.   I was there more often than I was in**
5  **monitoring, yes.**
6    Q.   Okay.  And when you say, "in monitoring,"
7  what are you referring to?
8    **A.   Monitoring is where inmate movement.**
9    Q.   Inmate movement, okay.  So that's where --
10  and, again, inmate movement, that's kind of like what we
11  talked about earlier, where you are, you know, calling
12  to confirm that someone is in school or calling to
13  confirm that someone is actually employed at this place
14  that they are going to work?
15    **A.   Yes.**
16    Q.   Okay.  And you say here in paragraph 53
17  still that, "Less senior non-minority officers were
18  never assigned to work in the basement"?
19    **A.   Say -- repeat that?**
20    Q.   It says here at the end of paragraph 53
21  that, "Less senior, non-minority officers were never
22  assigned to work in the basement"?
23    **A.   Yes.**
24    Q.   Okay.  But we talked about a little while

74

1  ago that actually some white officers did work in the
2  basement, right?
3      MS. KRAUCHUN:  Objection;
4  mischaracterizes testimony.  Go ahead.
5  BY MR. LEINENWEBER:
6    Q.   You can answer that, sir.
7    **A.   Okay, when I said that it happened**
8  **occasionally, like I said, that was after the direction**
9  **of time that, you know, we started complaining about**
10  **nobody of Caucasian was assigned over there.  You know,**
11  **we brought it to his attention that it seems like you**
12  **only sending blacks and Latinos over there, and then he**
13  **maybe slowly started to put maybe one or two, to stop**
14  **us, you know, from telling him about he's never sending**
15  **those Caucasian officers over there.  So, we had to**
16  **first bring it to his attention that it was none being**
17  **brought over there.**
18    Q.   Who are you talking about, sir?
19    **A.   Chief Ranzino basically.**
20    Q.   And when did you bring this to Chief
21  Ranzino's attention?
22    **A.   This happened maybe after the new people**
23  **had got there, and it went on for a few months that,**
24  **you know, that just the backs and Latinos was being sent**

75

1  **over there, and we just brought to his attention that,**
2  **you know, why, you know, why they keep going to the**
3  **street and they haven't been over to the TSS.  And we**
4  **brought it up a couple of times in roll call.**
5    Q.   And when was this?
6    **A.   That, again, I couldn't give you exact**
7  **dates, sir, but I know it had to happen between**
8  **either -- whenever -- whenever they brought them over**
9  **there, that's the year that it happened.**
10    Q.   That's what I don't understand.  I mean you
11  keep saying whenever they brought all of these new
12  people over.  But I mean throughout your tenure there
13  there were presumably new people coming and going,
14  right?
15    **A.   A large group came in, oh, man, like I**
16  **said, I didn't keep none of the assignment sheets, I**
17  **threw them away at the end of the watch.  But I want to**
18  **say maybe '14, 2014, maybe 2015, a large group came over**
19  **of new investigators.**
20    Q.   And it was short --
21    **A.   And out of --**
22    Q.   Sorry.  Go ahead.
23    **A.   And out of that group, it was almost 50/50**
24  **black and white and Latino -- well, I can't say 50/50,**

76

1  **it was like 30 percent each, you know, Latinos, black**
2  **and white.  And out of that percentage, only the blacks**
3  **and Latinos went to TSS, like the first almost -- I want**
4  **to say a half a year.**
5    Q.   And this was in 2014 or 2015 you think?
6    **A.   I think it was then, yes, sir.**
7    Q.   Okay.  And you don't think that any of the
8  white employees were sent to TSS during that period?
9    **A.   That's -- not the first like six months.**
10    Q.   Okay.  And why was that?
11    **A.   That I don't know.  But I know in roll call**
12  **we would ask a question, you know, why, you know, people**
13  **started being assigned over there, and some people**
14  **wanted to go on the street, that had more time, and was**
15  **never allowed to.**
16    Q.   And you don't know the reason that the
17  decision was made to send one person to TSS versus
18  sending another on the street?
19    **A.   Well, I -- the actual reason why it**
20  **happened?  No.  But I know that it was an argument in**
21  **the office with one of them and the next day they was**
22  **down there.**
23    Q.   Who are you talking about?
24    **A.   The exact name?**

**Page 77**

1    Q.  Yes.  Who are you talking about?

2    **A.  I think his name was Bieniek.**

3    Q.  Bieniek?

4    **A.  Yeah, I think they sent him over there.  I**

5    **think he was one of the first ones they sent over there.**

6    Q.  And he is a Caucasian employee?  Is that

7    what you're saying?

8    **A.  Yes.  Correct.**

9    Q.  And he was sent to TSS?

10   **A.  Correct.**

11   Q.  When you guys brought it up to Ranzino at

12   roll call what did he say?

13   **A.  His -- his famous words were, "It's just**

14   **an assignment, Dude."**

15   Q.  "It's just an assignment, Dude"?

16   **A.  Uh-huh.  Any time somebody challenged**

17   **or -- I ain't going to say, "challenged," but questioned**

18   **the assignment, that was -- that was his answer.**

19   Q.  Okay.  And you received the same amount of

20   money, pay regardless of where your assignment was,

21   right?

22   **A.  Correct.  Yes, sir.**

23   Q.  Okay.  But you're saying that you guys

24   brought this up to Ranzino in roll call in either 2014

**Page 78**

1    or 2015 and --

2    **A.  Uh-huh.**

3    Q.  -- that his response was, "It's just an

4    assignment, Dude"?

5    **A.  Correct.**

6    Q.  And then after that, it sounded like you

7    said that this Bieniek, white officer, was in fact sent

8    over to TSS?

9    **A.  Correct.  Well, no, no, I said it was an**

10   **argument, him and one of the Chiefs got into an**

11   **argument, and I said I don't know what the argument was**

12   **about, about something, and next thing I know he was**

13   **over there, so.**

14   Q.  That's Bieniek?

15   **A.  Yes.  I think -- I think that was the first**

16   **one they sent over there.**

17   Q.  Okay.  So, Bieniek in your understanding

18   was the first white officer to work in TSS?

19   **A.  Correct.**

20   Q.  Now are you saying ever?  He was the first

21   white officer to ever work in TSS?

22   **A.  No, I'm not.  I'm not saying that.**

23   Q.  I didn't think so, but I just wanted to

24   clarify it, because it could have been interpreted that

**Page 79**

1    way.

2        And he argued with one of the chiefs.  Do

3    you know which chief?

4    **A.  No, I don't.**

5    Q.  Do you know where this argument happened?

6    **A.  It was in -- I know it was in monitoring.**

7    **It might have been the back office or something like**

8    **that.  It was some kind of words exchanged.**

9    Q.  But you were there?

10   **A.  Yes, I was.**

11   Q.  Okay.  And what did Bieniek say?

12   **A.  I couldn't -- I couldn't hear the**

13   **conversation.  I just know that it was an argument**

14   **because it was some -- some yelling, and then he walked**

15   **out of the office, and I was like okay.  So I tried not**

16   **to listen to anything, you know.**

17   Q.  Okay.  So you don't really know what the

18   argument was about?

19   **A.  No idea what the argument was about.**

20   Q.  Okay.  And you don't remember who Bieniek

21   was arguing with?

22   **A.  No.  It was more than one supervisor back**

23   **then at the time.**

24   Q.  Okay.  So I mean as far as you know, they

**Page 80**

1    could be arguing about anything?

2    **A.  Anything.**

3    Q.  And you don't know if the reason that

4    Bieniek started working at TSS was related to this

5    argument, right?

6    **A.  No idea.**

7    Q.  Okay.  Let's go to paragraph 77 of the

8    complaint.

9        MR. LEINENWEBER:  Kevin, if you could

10   do that, which is on Page 11.

11   BY MR. LEINENWEBER:

12   Q.  So, Mr. Page, let me ask you about some

13   of these allegations that you make here.

14       Paragraph 77, it says that, "Director

15   Shields and his subordinate supervisors in EM failed

16   to follow progressive discipline when they chose to

17   discipline the Plaintiffs."  Do you see that paragraph?

18   **A.  (Reviewing.)  That's my statement?**

19   Q.  I'm sorry, say that again?

20   **A.  That's my statement?**

21   Q.  Yes.  It says, "Facts relative to multiple

22   Plaintiffs," and it's the first paragraph under that?

23   **A.  Okay.**

24   Q.  So, does this relate to you?  And it could

**81**

1  be that it doesn't, but did Director Shields fail to
2  follow progressive discipline when he disciplined you?
3      **A.  That wasn't me.**
4      Q.  Okay.  What about the second paragraph
5  here -- I'm sorry, 78.  Paragraph 78.  "Director Shields
6  and his subordinate supervisors in EM placed the
7  Plaintiffs in higher incident areas regardless of their
8  seniority over non-minority officers."  Does that apply
9  to you?
10     **A.  Yes.**
11     Q.  Okay.  So, what are you talking about here?
12     **A.  Like I said, they would keep the blacks the**
13  **most in high-crime areas and then they would send the**
14  **Caucasians out to the north and south suburbs.  And when**
15  **I say the black officers, I'm talking about also the**
16  **Latinos, too.**
17     Q.  And when are you talking about here?
18     **A.  During the -- during the process of patrol**
19  **or sometime during deliveries.**
20     Q.  I'm sorry, but I asked when.  When are you
21  talking about?  What year?
22     **A.  Oh, when?  When?  You want a date now?**
23     Q.  Yes.  What year are you talking about here?
24  When did this happen?

**82**

1      **A.  It had to be around the '13, and when I say**
2  **'13, it was 2013 to 2016, right around in there.**
3      Q.  Okay.  And you say, "Regardless of their
4  seniority over non-minority officers."  Is it your
5  understanding that seniority should play a role as to
6  which area of the county you get assigned to?
7      **A.  Well, like I said earlier, you know, when**
8  **they came up with the special assignments and special**
9  **things, a lot of times they tried to give it to the**
10  **veteran officers, because they don't work the field**
11  **mostly, and give the newer officers the strenuous tasks,**
12  **so that they could learn the job.  That's how -- that's**
13  **what past practices were.**
14     Q.  So, other than this idea of past practice,
15  was there a requirement that the officers with more
16  seniority go to lower-incident areas?
17     **A.  Could you repeat the question?**
18     Q.  Sure.  Was there a requirement anywhere
19  that officers would be, more senior officers, the
20  officers with more seniority would be sent to lower
21  incident areas?  Is that what you are saying should
22  happen?
23     **A.  No, no, I'm not saying it should happen.**
24  **No.  Again, going back to what I said initially, when**

**83**

1      **you first came over, you were given a city officer to**
2  **go out on the street with you, so that you could learn**
3  **these areas.  But like I said, when newer people came**
4  **over in '13, they put them together and sent them into**
5  **the low-risk areas.  And that's something I didn't**
6  **quite understand why it would be changed back.**
7      Q.  I'm sorry.  I need to take a break for just
8  literally one minute.
9          (Off the record.)
10         MR. LEINENWEBER:  Kevin, could we pull
11  that paragraph 78 back up, of Exhibit 1.
12         (Off the record.)
13  BY MR. LEINENWEBER:
14     Q.  So, Mr. Page, just back to paragraph 78 for
15  a second here because I'm trying to understand what it
16  is that you are actually saying here.
17         And I think you said that you are not
18  suggesting that the officers with more seniority should
19  not be sent to higher-incident areas, right?
20     **A.  Oh, okay, again, it's kind of getting**
21  **confusing for me.  Say again now?**
22     Q.  You are not saying that just because an
23  officer has more seniority, does not mean they shouldn't
24  be sent to a higher-incident area, right?

**84**

1      **A.  Correct.**
2      Q.  Okay.  So, I mean it would seem to me to
3  be logical, if you have more seniority, sorry, if you
4  have more experience, to send the officer with more
5  experience to, you know, maybe the more dangerous areas
6  because they have the experience and the wisdom to
7  rely on?  Is that fair to say?
8      **A.  It --**
9          MS. KRAUCHUN:  Objection; form.
10  Objection; form, calls for speculation, foundation.
11  Sorry, go ahead.
12  BY MR. LEINENWEBER:
13     Q.  So, you can answer the question, Mr. Page.
14     **A.  Okay.  What I'm saying, sir, the past**
15  **practice we have always taught the new officers on how**
16  **to deal with high-risk areas.  With that being said,**
17  **when you bring new people in and you force the senior**
18  **officers to stay in these areas, you know, we like to**
19  **get a break, too.  So, the thing was that because you**
20  **didn't separate these people at the beginning, they**
21  **don't even know how to deal with a high-risk area,**
22  **because they're not put in the situations yet.  And**
23  **the ones with seniority had to learn.  They wasn't**
24  **always at seniority.  They had to learn from somebody**

Transcript of Samuel Page
Conducted on August 10, 2020

---

85

1 else.
2     Q.  So, I'm still a little bit confused about
3 this.  Because you started in '92, right?
4     A.  Okay.
5     Q.  And you are saying that somebody in 2013,
6 2014, that past practice of what happened in the early
7 nineties should dictate how they are assigned in 2013
8 and 2014?
9         MS. KRAUCHUN:  I'm going to object.
10 That mischaracterizes his testimony.  I don't think he
11 testified to a time frame for past practices, but go
12 ahead.
13        MR. LEINENWEBER:  I asked that question
14 earlier and I believe that's what he testified to.
15 BY MR. LEINENWEBER:
16     Q.  But, Mr. Page, why don't you tell me where
17 I am mistaken here, because it sounds like maybe I'm
18 mistaken.
19     A.  Okay.  Okay, say they're -- and I will
20 bring another unit in to -- to try to clarify what I'm
21 saying.  When state police or the CPD puts new officers
22 on the street, they ride with the -- you've heard of
23 FTOs, right?
24     Q.  I have no idea what "FTO" is.

---

86

1     A.  Field training officers.
2     Q.  Okay.
3     A.  I'm talking about the seniority.  They put
4 them with the senior state police -- the senior state
5 police officer and they showed them how to work areas
6 and the things to look out for in areas.  And so does
7 Chicago.  They do the same things.  They send the
8 training officer out with the new people so they don't
9 go out there and hopefully don't get themselves hurt.
10        That's what I'm trying to clarify and say,
11 is that in past practice, you also sent a senior officer
12 out with a rookie officer to learn the ropes.
13     Q.  I mean you weren't a rookie officer,
14 though.  So, if somebody would complain about that,
15 wouldn't it be the rookie officer, who is not
16 benefitting from being able to go with this field
17 training officer?
18        MS. KRAUCHUN:  Objection; foundation,
19 argumentative, speculation.
20 BY MR. LEINENWEBER:
21     Q.  You can answer the question.  When your
22 attorney inserts an objection, you still have to answer
23 the question.  Okay.
24     A.  Okay.  I'm just waiting on you.

---

87

1     Q.  Okay.  I just wanted to make that clear
2 because there is a few objections.
3     A.  Would you repeat your question now?
4 Because it threw me off again.
5     Q.  Yes, I understand.
6        MR. LEINENWEBER:  Ann Marie, could you
7 read that question back?
8        (Whereupon the requested portion of the
9 record was read aloud by the Court Reporter.)
10        MR. LEINENWEBER:  So please answer that
11 question, Mr. Page.
12        THE WITNESS:  Okay.  Well, let me
13 say this, and I don't know if I'm fully answering the
14 question, but you have different officers in the street
15 and not, and I believe they think they know what they're
16 doing without being instructed.  All I'm saying is that
17 by my personal experience is that when I first hit the
18 street, I was nervous and quite scared, because I didn't
19 know what to expect.  I didn't know where I was going
20 and exactly the whole nature of the job itself, you
21 know.  So, I was happy to have a more experienced
22 officer with me.  So, if I ran into something, that he
23 would be able to guide me, send me or tell me to call
24 the supervisor to get a better clarification.

---

88

1        The new officers that's coming out now,
2 that's coming out of the academy and everything, and
3 this goes for even Chicago and everybody else, they
4 think they have all of the answers, and they don't.
5 So, you are asking should they have been the one to
6 ask for an experienced officer?  Yeah, they should
7 have been, but they didn't.
8     Q.  Okay.  Thank you.  I think that does answer
9 my question.  The one thing I'm confused about here
10 though is what -- well, who made the decision to -- who
11 made the decision to send someone to a higher incident
12 area?
13     A.  Once again, whoever made out the assignment
14 sheet.
15     Q.  Okay.  So whoever made the assignment sheet
16 is the one who decided.
17        Now, how is Cook County divided up for
18 patrol?
19     A.  You are talking about then or are you
20 talking about the whole Cook County period?  Because
21 you know that -- you got police and you got other units
22 within Cook County, too.
23     Q.  I'm only talking about EM investigators,
24 that's what you have been since 1992.  Okay?

Transcript of Samuel Page
Conducted on August 10, 2020

23 (89 to 92)

89

1    A.  Okay.
2    Q.  So, you are saying that certain officers
3  were sent to hire incident areas and that presumably
4  other officers were sent to lower incident areas? Okay?
5    A.  Okay.
6    Q.  So my question is how is it that Cook
7  County is divided up?
8    A.  Okay.  Cook County is decided into two main
9  sections, and in each section there are small sections,
10 you have a north and you have a south.  Within that you
11 have certain areas, such as three, four, five, six and
12 seven.  Three would be like the West Side.  Three and
13 four -- four would be the North Side.  I'm trying to
14 remember all of the areas.  Six and seven might have
15 been South Side.  Seven would be the outlying areas.
16    The outlying areas, when I say, "high
17 risk," it's low risk.  You know, you have the low area,
18 it's not the inner city.  The inner city would be the
19 high risk areas, like I stated before, like the West
20 Side or South Side, places of that nature.
21    Q.  Okay.  So, there is different areas within
22 Cook County.  And a couple of them you named were I
23 think three, four and seven I heard you say.  Is it --
24 sorry.

90

1    Is Cook County divided up into seven areas?
2  It sounded like seven was the highest number you used?
3    A.  It's down -- you know, like I said, I would
4  have to see them, you know.  We have a map in the office
5  and I'm thinking that it was seven was the highest.
6    Q.  Okay.  And do you remember where -- do you
7  remember where Area One is?
8    A.  Area One, I think, I want to say it was
9  towards State and Madison, almost the lower part of it,
10 I think.  I'm not sure.  I think it was.
11    Q.  That's fine.  If you don't know --
12    A.  I don't know.  It's been a long time.
13    Q.  Okay.  And if you don't remember, I don't
14 want you to guess.  I am just trying to understand what
15 you do remember.
16    A.  Okay.
17    Q.  Alright.  Do you remember where Area Two
18 is?
19    A.  Area Two had to be I think the south -- the
20 southeast side.
21    Q.  Okay.
22    A.  I think that's the southeast side.
23    Q.  What about Area Three?
24    A.  Three was definitely the West Side.

91

1    Q.  Okay.  Four?
2    A.  I want to say four was north of -- off
3  of -- not off -- no, south of eighth.  I think it was
4  north of Armitage.  I think it was Armitage.  North of
5  Armitage I think.
6    COURT REPORTER:  I can't hear that.
7  North of what?
8    Q.  Just a second.  To clarify for Ann Marie,
9  I think you are saying, "Armitage Avenue,"
10 A-R-M-I-T-A-G-E; is that right?
11    A.  Yeah.  Armitage is what, 2000 -- I don't
12 even know.  I want to say -- about 2400 north, I think
13 that's Armitage.
14    Q.  Yes, that would be close to it?
15    A.  Yes, or Fullerton.  Fullerton is 24.  I
16 know Armitage is like a street before you get to
17 Fullerton.
18    Q.  Alright.  What about Area Five?
19    A.  I want to say Area Five was south.  South
20 suburbs I want to say.  But, again, I would have to see
21 a map because it has been a long time since I did all
22 of these areas.  I used to know them when I was a
23 supervisor, but you know.
24    Q.  What about Area Six?

92

1    A.  Six, I want to say that would be -- six --
2  I don't -- I don't remember.  I would -- I would say,
3  I'm guessing it would be the southwest suburbs.
4  Southwest suburbs.
5    Q.  Okay.
6    A.  I want to say.  Like I said, I can't really
7  remember them.  I can't really remember all of them.
8    Q.  What about Area Seven?
9    A.  Seven used to be the outlying -- outlying
10 counties, other than Cook County.  And if I remember
11 correctly, you would have to -- well, you went to
12 outlying counties, when we first -- when I first
13 started, in order to go, you had to have a court order
14 to go there.  Because you might go to DuPage, McHenry
15 or Will County, or something like that, you know, so
16 you've got to have a Court Order from the judge saying
17 that you could go there.
18    Q.  Okay.  And which of these do you consider
19 to be the higher incident areas?
20    A.  Oh, the inner city.  The inner city and
21 the lower end, South Side.
22    Q.  Okay.  And when you say, "higher incident
23 areas," you mean that that's where more of the drug and
24 gang activity is?

93

1    **A.  Exactly.**

2    Q.  Okay.  And do you have any understanding

3    of the number of detainees that were sent to each of

4    these different areas since say 2010?

5        MS. KRAUCHUN: Objection; foundation.

6    BY MR. LEINENWEBER:

7    Q.  I am asking if you -- if you have any

8    knowledge?

9    **A.  You say the number?**

10   Q.  Yes.

11   **A.  I couldn't give you no round number.**

12   Q.  Do you know what percentage of detainees

13   go, for example, to Area Three versus Area Four?

14   **A.  Oh, wow.  Well, all I can really -- the**

15   **only way I can answer that question is that -- that the**

16   **inner city, Chicago, of course, has the highest than any**

17   **of the, let's say, Schaumburg.  Schaumburg you might**

18   **have four or five or maybe six, and the rest might have**

19   **at the most 14.  And in the inner city, that's all of**

20   **your numbers right there, you know.  All of your numbers**

21   **is in the inner city.  So, you know, some might have**

22   **seven or eight, you know, stuff like that, the**

23   **surrounding villages have less, way less than Chicago.**

24   Q.  Is it fair to say that the areas like the

94

1    inner city, that have more of the gang and drug

2    activity, are going to have more of the detainees?

3    **A.  Oh, most definitely.**

4    Q.  Okay.  And if in an area that has most of

5    the detainees, you are going to, correspondingly, you're

6    going to have more detainees sent on home confinement in

7    those areas, right?

8    **A.  I would assume, yes.**

9    Q.  Okay.  One of the things you said was,

10   well, I'm curious, where do you live in Chicago?

11   It sounds like you are pretty familiar with Chicago.

12   Do you live in Chicago?

13   **A.  Yes.**

14   Q.  Whereabouts?

15   **A.  I'm at 72nd and Washtenaw.**

16   Q.  72nd and Washtenaw?

17   **A.  Washtenaw, uh-huh.**

18   Q.  And what is that area considered?

19   **A.  This is -- is this Eighth?  I think it's**

20   **Eighth District Police.  I'm in Marquette Park.**

21   Q.  Marquette Park?

22   **A.  Yes, Marquette Park area.  West Lawn.**

23   Q.  And is that the South Side, the West Side,

24   the North Side?

95

1    **A.  Yeah, you got -- you got two sets of South**

2    **Side.  You got the southeast side, you got the southwest**

3    **side.  And then you got the south -- you got the**

4    **southeast suburbs, you got the southwest suburbs.**

5    Q.  But where are you?  I'm just trying to

6    clarify.

7    **A.  Well, Oak Lawn/Hills.**

8    Q.  All I'm trying to do is clarify.  In your

9    mind do you live on --

10   **A.  Southwest.**

11   Q.  You are on the southwest side?

12   **A.  Correct.**

13   Q.  Alright.  Thank you.  Let me -- so, back

14   to paragraph 78 for a second here.

15        Do you know why Director Shields or one

16   of his subordinate supervisors, do you know the reason

17   that they selected one officer for Area Three, for

18   example, versus sending someone to Area Four?  Do you

19   know why they did that?

20   **A.  No, I don't.**

21   Q.  Okay.  And you believe that it was because

22   of race?

23   **A.  Oh, most definitely.**

24   Q.  Okay.  But yet you don't know why the

96

1    decision was made to send one officer --

2    **A.  No.**

3    Q.  -- to the South Side versus sending one

4    officer to the North Side?

5    **A.  No, maybe I didn't know but -- but it**

6    **seemed like it was racial to me.**

7    Q.  Okay.  And that's based on what?

8    **A.  Black officers being assigned to the high**

9    **crime areas and the white officers being assigned to the**

10   **suburbs.**

11   Q.  Okay.  So, were you ever assigned to

12   suburbs?

13   **A.  Now, when you say that, are you talking**

14   **about initially, when I was assigned to them, or during**

15   **that time frame that you put in there?**

16   Q.  Well, see, you've said this several times,

17   and I'm confused here because it is your complaint,

18   right?

19   **A.  Uh-huh.**

20   Q.  It is your complaint.  And you are saying

21   that officers were assigned to higher incident areas,

22   you are saying minority officers were assigned to higher

23   incident areas and Caucasian officers were assigned to

24   presumably lower incident areas, right?  That's what you

Transcript of Samuel Page
Conducted on August 10, 2020

25 (97 to 100)

97

1 are saying?
2    A.  Correct.
3    Q.  When are you saying that happened?
4    A.  Okay, well, another thing, well, let's
5 go back then.  Because when I first got to EM, my
6 supervisor was Danny Spivey (phonetic).  He is deceased
7 now.  And, again, as a practice, you got to learn the
8 whole county.  So with that being said, I worked the
9 North Side, the north suburbs, all of the way to Forest
10 Lake (phonetic).  Alright?  I worked the south suburbs,
11 all of the way to University Park.  I worked the western
12 suburbs, all of the way to -- I can't think of that
13 suburb.  It starts with an M.  And I worked in the inner
14 city.  I worked every one of them.  And then that's how
15 it was, all while I was a supervisor, all while my
16 supervisors were there.  And things changed, like I
17 said, in '13.  You know, we was required to learn -- we
18 had to learn the county.  We didn't have GPS back then.
19 So, if another officer needed help, you had to at least
20 know the direction to go to go help another officer.
21       Does that clarify it?
22    Q.  So, you are saying that before 2013 all
23 officers, regardless of their race, had to rotate
24 through the county?

98

1    A.  That's what we did.
2    Q.  Okay.  And you are saying after that the
3 officers no longer rotated through the various areas of
4 the county?
5    A.  No.  When I say they didn't rotate, again,
6 until we started complaining about it, was nothing
7 changed.
8    Q.  Okay.  So, you stopped working then on
9 the, what you term as lower incident areas?  You only
10 worked exclusively on the South and the West Side doing
11 patrol after 2013?
12    A.  Well, like I said, I didn't patrol, I
13 wasn't out there that much, but when I did work, it
14 was -- well, let me think.  Let me think.  Most of the
15 times when I did have to do deliveries, it was on the
16 South Side of Chicago.  As far as patrol was, it was
17 everything had changed anyway, so the incidents was all
18 over the county then, so wherever the incident occurred,
19 we had to go.
20    Q.  "Wherever the incident occurred, we had to
21 go," is that what you said?
22    A.  Yes, I did.
23    Q.  And given that you lived on the South Side,
24 would you say you were more familiar with that area?

99

1    A.  No, sir, I was on the West Side.
2    Q.  Well, how long have you lived on the South
3 Side?
4    A.  Since '92.
5    Q.  Oh, okay.  So, I mean you've lived on the
6 South Side for 20 -- what is that?  28 years?
7    A.  Whatever the number comes to.  I guess 28?
8 Yeah, 28.
9    Q.  Okay.  So you're pretty familiar with the
10 South Side?
11    A.  West Side, too.
12    Q.  Okay.  So you are pretty familiar with the
13 South Side?
14    A.  South Side, West Side.
15    Q.  Did you ever request to do patrol on the
16 South Side or the West Side?
17    A.  No.  As far as I know, like I said, my
18 supervisors, you know, made me familiar with the areas
19 and where it was going, it really didn't matter to me.
20    Q.  It didn't matter where you would go?
21    A.  No, it didn't matter because I mean it --
22 like I said, when I said it didn't matter, I didn't want
23 to go in certain areas, but I wasn't not familiar with
24 the area.  So, I was very flexible as far as the

100

1 assignment, but I didn't want to go to certain areas,
2 no, no.  I would rather be up in the northern suburbs,
3 you know, where there is -- it's grass and it's peaceful
4 up there, you know.  You don't hear fire engines and
5 police cars and shootings, like in the inner city, as
6 much as you do.  In the North Side, because I like to
7 be.  But, you know, I was familiar with it because, like
8 I said, I was trained in all areas.
9       Do you follow what I'm saying?
10    Q.  Yes.  I follow what you are saying, but
11 the thing I'm confused with is, I mean you don't get to
12 choose?  We have already established you don't get to
13 choose where you go, right?
14    A.  No, I don't.
15    Q.  And you said you've got to go where the
16 incidents are, right?
17    A.  Correct.
18    Q.  So then, by its very nature, an area that
19 is, quote/unquote, higher incident, you are going to
20 have to go there more often than you are going to have
21 to go to a lower incident area, right?
22    A.  You have to go there more than -- I would
23 basically, yeah, but if you are assigned to the North
24 Side, your incidents are fewer up there than it is down

**101**

1  there.

2      Q.  Right.  But then there is fewer people
3  assigned to the North Side than are assigned to the
4  South Side, right?

5      A.  The fewer people assigned to the North
6  Side?  Not all -- I mean when they -- everybody -- we --
7  see, again, it's -- it's so many different factors that
8  you're saying.  And because we no longer do what we call
9  routine areas, we do mostly a county.  And they are
10  dispatched from county dispatch.  But the majority of
11  ours are, you know, inner city because that's where the
12  majority of your people are at.

13      Q.  Right.  So the majority of the assignments
14  are in the higher incident areas, right?

15      A.  Pretty much, yes.

16      Q.  Okay.  And you said that you would get
17  assignments from dispatch, I think you just said?

18      A.  Correct.  Unless you were put on one of
19  the special details -- that's -- that's what I was
20  referencing to.  The special details, the -- the people
21  that was being monitored for, let's say, child abuse
22  and stuff like that, a majority of them people was in
23  the suburbs.

24          Do you follow me?  Am I making sense to

**102**

1  you?

2      Q.  I -- I mean my feelings are not relevant,
3  so. I think used answered my question though.  And it
4  sounds like dispatch has a role, though, in making
5  assignments, right?  That's fair to say?

6      A.  They do.  They do.

7      Q.  Okay.  And do you know why dispatch sends
8  an officer to one area versus another?

9      A.  That -- that, I don't know why they do it,
10  but they -- the reason that they send a car there, the
11  reason they send a car there is because they've got a
12  monitor screen in front of them and they see what jobs
13  needs to be addressed.

14      Q.  Okay.  And they see a monitor screen?  Is
15  that what you said?

16      A.  Yes.  It's a computer screen.  I think
17  it's -- I think it's called protocol.  They put the jobs
18  on the screen and monitor it and that tells where they
19  have to be assigned.  Not where they have to be
20  assigned, but they put the jobs on the desk and the --
21  the -- the person in the office decides which cars has
22  to go to which assignment.

23      Q.  Okay.  So, they will have a list of the
24  assignments and a list of the cars, so then they will

**103**

1  dispatch the cars to handle the assignments?

2      A.  True.

3      Q.  Okay.  In paragraph 79, this one, I just
4  want to confirm that this one does not apply to you,
5  right?  Can you read paragraph 79 on the screen?

6      A.  That's 79?

7      Q.  Correct.

8      A.  (Reviewing.)  I have no idea about this.

9      Q.  Okay.  That -- that doesn't apply to you,
10  right?

11      A.  No, that's Tims and Newson.  I don't --
12  that's on their watch.

13      Q.  Okay.  Paragraph 80, could you review that
14  paragraph there.  It says, "Director Shields and his
15  subordinate supervisors in the EM regularly called
16  Plaintiffs words, such as the N word and crooks and
17  other derogatory and racist comments."  (Reading.)

18      A.  Now what's your question again?

19      Q.  Do you see that paragraph?  Paragraph 80?

20      A.  Uh-huh.

21      Q.  Okay.  So, my question is did Director
22  Shields or his subordinate supervisors regularly call
23  you the N word?

24      A.  No.

**104**

1      Q.  Okay.  What about "crooks"?

2      A.  No.  You say did they call me that?  No.

3      Q.  Okay.  What about did they ever use any
4  other derogatory or racist comments towards you?

5      A.  Other than "You people," no.

6      Q.  Okay.  Let's look at paragraph 81 here, on
7  the next page.

8          MR. LEINENWEBER:  Thanks.

9  BY MR. LEINENWEBER:

10      Q.  Okay.  So, Mr. Page, here it says in
11  paragraph 81 that, "Director Shields and his subordinate
12  supervisors in the EM regularly and systematically
13  assigned non-minority officers to office positions and
14  assigned the Plaintiffs to assignments in the basement
15  or higher incident areas"; is that right?

16      A.  Yes.

17      Q.  And the "basement" here is TSS?

18      A.  Yes.

19      Q.  And the higher incident areas are the South
20  and the West Side?

21      A.  Correct.

22      Q.  Okay.  Anything else that you are talking
23  about here in this paragraph?

24      A.  No.

Transcript of Samuel Page

27 (105 to 108)

Conducted on August 10, 2020

105

1 Q. Okay. And then let's see, paragraph 82,
2 "Director Shields and his subordinate supervisors
3 assigned duties to EM investigators based on their race
4 and not based on their seniority or work experience."
5 Do you see that?
6 A. Correct.
7 Q. What is the basis of your knowledge that
8 that's the case?
9 A. Well, my knowledge would be during the
10 time I worked in the monitoring and I received the
11 assignments or I would have to fax the assignment over
12 to county dispatch, and I would look and see where
13 certain people were going, and I would be like, "Wow,
14 really?" You know, "They just got here. Why would you
15 send them over there?" It wasn't on me to question
16 them, but it was just a question of county dispatch,
17 you know, county dispatch, knowing what units they would
18 send out on the table.
19 Q. So you have seen the assignment sheets?
20 A. Yes, sir.
21 Q. Any other basis of your knowledge for this
22 paragraph?
23 A. No.
24 Q. Okay. And you never heard Director

106

1 Shields, for example, or any of the other Defendants
2 in this case say that they were assigning duties to
3 investigators based on their race?
4 A. No.
5 Q. Okay. Paragraph 83. "Director Shields
6 and his subordinate supervisors gave disproportional
7 discipline to the Plaintiffs as opposed to non-minority
8 officers." Do you see that paragraph?
9 A. Okay.
10 Q. Does this paragraph apply to you? Were you
11 disproportionally disciplined?
12 A. Other than verbally, no.
13 Q. When you say, "verbally," what are you
14 talking about here?
15 A. When I say, "verbally," it was always the
16 threat of a write-up.
17 Q. Okay. So, there is a difference between
18 the threat of a write-up and a write-up, right?
19 A. Yes, sir.
20 Q. Okay. And you in fact were actually --
21 you were never written up, right?
22 A. No.
23 Q. Okay. Let's go to paragraph 84. "Director
24 Shields threatened the Plaintiffs that he would have

107

1 them fired if they filed grievances for the discipline
2 they received." This doesn't apply to you, right?
3 You were never threatened by Director Shields with
4 termination, right?
5 A. No.
6 Q. Okay. Paragraph 85. "The disciplinary
7 process and procedures provide no meaningful opportunity
8 for the Plaintiffs to an unbiased determination of
9 disciplinary actions." Do you see that?
10 A. Okay.
11 Q. This, again, wouldn't really apply to you,
12 right, because you didn't really have any disciplinary
13 issues?
14 A. No.
15 Q. That's correct then? This doesn't apply to
16 you?
17 A. No. No.
18 Q. Okay. Paragraph 86, "The grievance
19 processes and procedures provide no significant remedy
20 for Plaintiffs"? The grievance procedure then, since
21 you didn't really receive any discipline, the grievance
22 procedure didn't really apply to you, other than
23 participating in that grievance you indicated earlier
24 regarding the supervisor position being removed?

108

1 A. Correct.
2 Q. Alright. Okay. Thanks. We can take that
3 exhibit down. And then I'm going to turn to the next
4 exhibit.
5 MR. LEINENWEBER: Before we do that,
6 why don't we go off the record for just a second.
7 (Off the record.)
8 (Whereupon, a lunch recess was taken.)
9 BY MR. LEINENWEBER:
10 Q. Mr. Page, we are back on the record here.
11 You understand that you are still under oath, right?
12 A. Yes, sir.
13 Q. Okay. We have handed you what has been
14 marked as Page Exhibit 2.
15 (PAGE Deposition Exhibit 2 marked for
16 identification.)
17 BY MR. LEINENWEBER:
18 Q. If you could just take a look at this
19 document and tell me what it is.
20 A. (Reviewing.)
21 Q. So, these are your objections and responses
22 to the interrogatories, right?
23 A. Yes.
24 Q. Okay.

---

**109**

1          MR. LEINENWEBER:  And if we could go
2  all of the way to the last page, Kevin.  I think it is
3  the last page.  Yes, that one right there.
4  BY MR. LEINENWEBER:
5      Q.  You see here, Mr. Page, it says,
6  "Verification."  It says, "I, Samuel Page, state that
7  I have read these interrogatories and my answers to
8  those interrogatories, which are true to the best of
9  my knowledge, information and belief.  I declare under
10 penalty of perjury that the foregoing is true and
11 correct," right?
12     **A.  Yes.**
13     Q.  And then that's your signature?
14     **A.  Yes.**
15     Q.  And it's dated February 10th, 2020?
16     **A.  Yes.**
17     Q.  Okay.  Alright.
18          MR. LEINENWEBER:  So, if we could go to
19 interrogatory No. 2, Kevin, please.  Yes, right there.
20 BY MR. LEINENWEBER:
21     Q.  So, a fair amount of this, Mr. Page, we
22 have already discussed, so I will try and streamline
23 this here.
24          But in question two here, we asked you

**110**

1  to identify the facts regarding your removal from the
2  patrol supervisor position.  And you stated that in
3  response here that, "Plaintiff Page states that Chief
4  Ranzino removed him from the position or at least he
5  was the supervisor who informed him that he was being
6  removed," right?
7      **A.  Correct.**
8      Q.  And we already talked about that, right?
9  You don't know who actually made the specific decision,
10 but you do know that Chief Ranzino told you and the
11 other supervisors in a meeting that you guys were no
12 longer going to be supervisors, right?
13     **A.  He told me, yes.**
14     Q.  And there were others present, right?  The
15 other supervisors?
16     **A.  Maybe two more.**
17     Q.  Okay.  And then it says, "Plaintiff Page
18 states further that he was never provided a reason or
19 basis for the removal of his supervisor position"?
20     **A.  Correct.**
21     Q.  Okay.  So, in your recollection no one ever
22 told you, "Hey, Investigator Page, you and the other
23 supervisors, we're removing the supervisor position"?
24 You have no idea why that decision was made?

---

**111**

1      **A.  No, I don't.**
2      Q.  Nobody told you or gave you a reason or
3  basis for that decision?
4      **A.  No.**
5      Q.  Okay.
6          MR. LEINENWEBER:  And then if we could
7  go to interrogatory No. 3.  Yes, this one goes over the
8  two pages there.  That's perfect.
9  BY MR. LEINENWEBER:
10     Q.  In interrogatory No. 3 it asks you to
11 identify all facts regarding the grievance and
12 arbitration regarding your removal of the patrol
13 supervisor position.
14     **A.  What was that?**
15     Q.  Sorry.  I will ask the question here in a
16 second.
17          Do you see paragraph three here?
18     **A.  Uh-huh.**
19     Q.  Okay.  And your response to this question
20 was, "The grievance filed went to arbitration and the
21 arbitrator found in his favor."  Do you see that?
22     **A.  Yes.**
23     Q.  Does that jog your memory at all about the
24 arbitration?  It doesn't change your testimony from

**112**

1  earlier, right?
2      **A.  Yes -- no, I -- like I said, I don't**
3  **remember because I wasn't there but, you know, like**
4  **I said, the one that wrote it up, they took it -- took**
5  **it to the -- to somebody, I'm assuming it was the**
6  **arbitrator, and they was not given an answer.**
7      Q.  And then here in the next sentence it says,
8  "The administration never returned you back to your
9  former rank as a supervisor"?
10     **A.  True.**
11     Q.  Now, is it your understanding that the
12 patrol supervisor, that that was a rank?
13     **A.  True.**
14     Q.  It is?  Okay.  "Plaintiff Page further
15 states that this really caused himself severe mental
16 anguish," and you talked about that a little bit
17 earlier.  And we'll get to that in a little bit more --
18 okay, we can go on to four, interrogatory No. 4.
19          Okay.  It says here that it asked you to
20 identify the supervisors referenced in paragraph 51 of
21 the complaint.  And you say here, in response, that
22 after you were stripped of the supervisor title, Chief
23 Ranzino would ask and expect you to make supervisory
24 decisions?  (Reading.)

Transcript of Samuel Page
Conducted on August 10, 2020

113

1    A. Correct.
2    Q. What sort of supervisory decisions were you
3 expected to make according to Chief Ranzino?
4    A. Okay, when he stepped out of the office and
5 it was just like me and him there, he would go to lunch,
6 and then everything fell onto me as supervisor. Well,
7 I'm not a supervisor anymore, so, you know, I had to
8 make a decision at that point, you know, when he went
9 to lunch, and I'm like, well, I'm not a supervisor, who
10 do I talk to? So, I made a decision. Because they were
11 calling my name for jobs and, you know, and what to do
12 about certain inmates, and this, that and the other,
13 and I was like stuck in the middle.
14       And then at the end of the watch, the book,
15 it's been changed now, but the book used to say,
16 "Supervisor Monitoring." Well, when I used to have
17 access to sign the book keys, sometimes they would say,
18 "Well, you sign it." And I would say, "Well, I'm no
19 longer supervisor no more, so I can't sign it." Well,
20 they would say, "Sign it," and I would say, "Well, I'm
21 not going to falsify a document saying I'm a supervisor.
22 I'm not."
23    Q. Okay. And in here you also talk about
24 being threatened to be written up. Is that the same

114

1 situation you were talking about earlier today, when
2 you said that --
3    A. Yes.
4    Q. -- Chief Ranzino would threaten to write
5 you up sometimes?
6    A. True.
7    Q. But you never actually got written up? We
8 talked about that, right?
9    A. No, I didn't. No, I didn't.
10    Q. Okay. Let's see.
11       MR. LEINENWEBER: Can we look at No. 5.
12 BY MR. LEINENWEBER:
13    Q. And question five here asks to have you
14 explain how your compensation changed as a result of
15 no longer being a patrol supervisor.
16    A. Like I said earlier, that we would get an
17 hour a week additional. That was one of the benefits.
18 And then the other benefits was that we wasn't required
19 to wear a uniform. So that was -- that was another
20 benefit of being a supervisor. But after so many hours
21 of compensatory time on the books, they had to stop
22 paying you for your overtime.
23    Q. Okay. Now, do you see here in this
24 response it says, "In and around 2011, when he was

115

1 stripped of his supervisory role"?
2    A. Uh-huh.
3    Q. Does that refresh your recollection that it
4 was actually 2011 when you lost the supervisory role?
5    A. 2011? Like I said, that being almost what?
6 14 years -- like I said, it was 14 years, around 14
7 years of me being a supervisor. I'm trying to do the
8 math because I really can't remember.
9    Q. That would mean that you started in about
10 '97 as a supervisor I think?
11    A. I'm sorry?
12    Q. That would mean you started in about '97
13 as the supervisor? About five years after you came to
14 electronic monitoring?
15    A. That would be '97? That's 2021 -- I don't
16 know. Like I said, I would have to go look at my
17 paperwork and see exactly when I was -- when did I --
18 when the -- when the supervisor position was taken.
19 But that's -- that seems about right. It seems about
20 right.
21    Q. Okay. So it could have very well been
22 2011?
23    A. It could have been.
24    Q. Okay. Let's go to No. 6.

116

1       VIDEO HOST: I will use this chance
2 to ask Mr. Page to put down his laptop camera.
3       Mr. Page, can you hear me?
4       THE WITNESS: Yeah, go ahead. What did
5 you say, sir?
6       Can you put your laptop screen down,
7 so I can see your face? I can't really see your face.
8       THE WITNESS: (Indicating.)
9       VIDEO HOST: Thank we go. Thank you so
10 much.
11       Alright. You said No. 6, Counsel?
12       MR. LEINENWEBER: Yes, please.
13 BY MR. LEINENWEBER:
14    Q. Okay. So here, Mr. Page, you are saying
15 that, I asked you to identify each time that Ranzino
16 threatened to write you up. And your response was that,
17 "Every time he asked Chief Ranzino about anything, he
18 was sent to the basement." Do you see that testimony?
19    A. Yes, I see the line. Yes.
20    Q. Okay. And is that accurate?
21    A. Yes.
22    Q. Okay. And what sorts of questions were
23 you asking Chief Ranzino when he would send you to the
24 basement?

Transcript of Samuel Page
Conducted on August 10, 2020

30 (117 to 120)

---

117

1    A.   Oh, you know, job -- job assignments
2  basically.
3    Q.   Okay.  Job assignments basically?
4    A.   Uh-huh.
5    Q.   And when did this happen?
6    A.   Well, it had to be between 2013 and 2015.
7  Oh, no, it really went '13 to like -- until he -- until
8  they finally moved him really.
9    Q.   Okay.  And was anyone else present for
10 these times you would ask him questions and then he
11 would respond by sending you to the basement?
12   A.   Sometimes.
13   Q.   Who else would have been present?
14   A.   We had a civilian aide named Linda Sorano
15 (phonetic).  She might have been there a few times when
16 the situations got a little verbal.
17   Q.   Okay.  Anyone else?
18   A.   I want to say Supervisor Passis (phonetic).
19 He wasn't a -- he was a supervisor, not a sergeant.
20 Passis (phonetic) might have been there, I'm not
21 certain, when some of the confrontations went down.
22 Sometimes Deputy Chief Rohloff might have been present,
23 too.
24        (Off the record.)

---

118

1  BY MR. LEINENWEBER:
2    Q.   So, I think the Deputy's name was Rohloff,
3  who is one of the Defendants, right?
4    A.   Correct.
5    Q.   Okay.  And then the other I think you said
6  was Supervisor Passis (phonetic)?
7    A.   Yeah.
8    Q.   Can you spell his name for us?
9    A.   Not at all.
10   Q.   Okay.  We will work with the Court Reporter
11 in trying to get a spelling on that.
12        MR. LEINENWEBER:  Okay.  Let's go to No. 7
13 here.
14 BY MR. LEINENWEBER:
15   Q.   Okay.  Question seven here asked you to
16 identify all of the assignments that you received that
17 you allege are discriminary.  And here you state that
18 you had to work the post that should have been assigned
19 to less senior officers.  Which post are you talking
20 about there?
21   A.   The TSS, that was one.  Working in the
22 Deputy Chief's office monitoring the phones was another.
23 Listening to the Director's Voice-mail.  That was
24 another.

---

119

1    Q.   So let me clarify.  Are you finished?  Were
2  you finished, sir?
3    A.   Oh, no.  I was -- the one, the couple of
4  times during the holiday, I was at TSS and there was no
5  court and stuff, and I had to sit over there by myself,
6  you know, and stuff like that.
7    Q.   So, the job assignment of monitoring the
8  Director's phone and the assignment of listening to the
9  Voice-Mails that detainees would leave, those are not
10 listed in your interrogatory responses, right?
11   A.   That I don't -- I don't think so.  I didn't
12 read all of it.
13   Q.   Well, I mean question seven here is
14 specifically asking you to identify the assignments
15 that you allege were discriminary, right?
16   A.   Okay.
17   Q.   And in your response you don't list either
18 of those other assignments, right?
19   A.   I don't see nothing, no, but I thought I
20 did, with the Director's phone.
21   Q.   And I'm just curious, why would you not
22 have included that in your interrogatory response?
23   A.   That, I thought I did, but I guess I
24 didn't.  That's my -- as my memory comes back, I started

---

120

1  to remember a little bit more, but if that's not in my
2  response, it's just Division Five.
3    Q.   Okay.
4        MR. LEINENWEBER:  Let's go to
5  Interrogatory 8 now, Kevin, please.  Okay.
6  BY MR. LEINENWEBER:
7    Q.   And here we are talking about the basement
8  and TSS, right?
9    A.   Yes, sir.
10   Q.   And then you -- it looks like you had
11 already given the majority of this information, you
12 provided the majority of this information here
13 today.  The only thing different I see is that you say,
14 answering further, "TSS is not a desirable assignment
15 because you are subjected to uncontrollable heat and
16 air-conditioning settings, you are not provided proper
17 lunch breaks and are often forced to work overtime"?
18   A.   Correct.
19   Q.   And if you are forced to work overtime,
20 what is your rate of pay for that?
21   A.   Rate of pay?  Well --
22   Q.   It would be time and a half, right?
23   A.   Yeah, I think it's time and a half.  I want
24 to say it might be time and a half.

---

Transcript of Samuel Page
Conducted on August 10, 2020

31 (121 to 124)

---

121

1    Q.  And you were always compensated for working
2  overtime, right?
3    A.  In TSS, yes.
4    Q.  Okay.  And then here at the end of this
5  answer it says, "Investigation continues."  Do you see
6  that?
7    A.  What's that now?
8    Q.  It says, "Investigation continues"?  That's
9  the last sentence of this response?
10   A.  Okay.  Okay.
11   Q.  What investigation have you done into this
12 response since February of this year?
13   A.  What investigation?  Oh, that's like I
14 said, I was looking at some of the past assignments
15 that I had and then I remembered some of them.  And I
16 have some paperwork dealing with -- with my promotion
17 and my -- my supervisor classes that I did.  I was
18 looking -- I was looking those things up.
19   Q.  Where did you get these materials?
20   A.  I got -- I got a few of them, yeah.
21   Q.  Where did you get?
22   A.  Where did I get them?
23   Q.  Yes.
24   A.  They was given to me.

---

122

1    Q.  Okay.  By whom?
2    A.  The classes I attended.  Every supervisor
3  class I went to, I got a certificate.
4    Q.  Okay.  And you said some of like assignment
5  documents that you have or something like that?
6    A.  I -- I threw most of them in the garbage,
7  but I do have some letters, promotional letters that I
8  have when I was promoted to supervisor, stuff like that.
9    Q.  Did you provide these materials to your
10 attorney?
11   A.  No, I don't think I did.  But -- because I
12 just went through my papers and found a lot of them.
13   Q.  Okay.  When did you do that?
14   A.  I just did it.
15   Q.  Right.  When?
16   A.  I think about two or three days ago.
17   Q.  Okay.
18       MR. LEINENWEBER:  So, Kelly, I'm going
19 to ask that you get a copy of all of those materials
20 and that they be produced.  And I think that I want
21 to reserve our rights to, you know, potentially recall
22 Mr. Page for further testimony, depending on what is
23 in those materials.  It's entirely possible that they
24 have already been produced and this might be moot, but

---

123

1  I just think that we have a right to see these materials
2  that he's talking about and we would request that you
3  produce them?
4        MS. KRAUCHUN:  That's fine.  I have
5  no -- no issue with that.
6        MR. LEINENWEBER:  Okay.  Thanks.
7  BY MR. LEINENWEBER:
8    Q.  So, is there any other investigation that
9  you have done other than looking at these documents that
10 you have?
11   A.  No.
12   Q.  Okay.  Let's go to interrogatory 9.  And
13 this one asks you to identify the other non-minority
14 officers who were not assigned to the basement.  And
15 you say in response to that, "Plaintiff Page states
16 that he was sent to the basement for TSS when new white
17 investigators that came to the unit were never sent
18 to the basement or TSS."  Do you see that, Mr. Page?
19   A.  Okay.  Yes, I do.
20   Q.  Who are the non-minority investigators that
21 you are referring to here?
22   A.  Their names?
23   Q.  Correct.
24   A.  Oh, I think one of their names was Messina,

---

124

1  Folkers (phonetic).
2    Q.  And let me just interject for a second,
3  because Ann Marie is going to have a hard time taking
4  down these names, if you don't annunciate.  And also,
5  if you could try to spell their names as best you can,
6  even if it's just phonetically, so that we can get these
7  names down.
8    A.  Okay.  Okay, Folkers.  I couldn't -- I
9  would have to go and look and see if I got some
10 paperwork with his name on it.  I got his number in
11 there, but I can't get to my phone right now.
12   Messina is M-E-S-S-I-N-A I think.
13 Cabarello (phonetic).  I can't -- I can't -- like I
14 said, I can't spell their names, see.
15   Q.  Alright.  But even if you could just sort
16 of phonetically do it, that would be helpful.
17   A.  C-A-B-A-L-O-R-Y or something.  Cabarello
18 (phonetic).  Like I said, Bieniek.  B-A-N, something.
19 I'm trying to remember who all was there.  Like I said,
20 it's been years now.  Lougheren.  Yeah, Lougheren.
21 He's deceased now.
22       (Off the record.)
23   A.  Okay.  Give me a minute.
24   Q.  Can I just ask to clarify?  Are you looking

---

Transcript of Samuel Page
Conducted on August 10, 2020

32 (125 to 128)

125

1  at something?
2      A.  No, I'm trying to think right now.
3      Q.  Oh, okay.  Sorry.  I will give you a
4  second.  It's alright.
5      A.  There is nothing -- there's nothing down
6  here.
7      Q.  Okay.  That's fine.  It looked like you
8  were hunched over your phone and I was just curious.
9      A.  No, I was just thinking.  Nothing down
10 here.  Just trying to think.  Trying to think.
11     Q.  Okay.  That's fine.  I believe you.
12     A.  Oh, I can't think of the name.  He went
13 to sheriff, police now.  He had a punk hairdo.  I can't
14 think of his name.  Rode a motorcycle.  I can't really
15 think.  Sorry.  I will have to look and find out their
16 names because I can't remember all of them names.
17     Q.  Okay.  But these are -- these are going to
18 be new white investigators who came over that you were
19 referencing earlier, right?
20     A.  Yes.  Yes.
21     Q.  Okay.  And it's your testimony that those
22 new white officers that came into the unit, what year
23 did they come in, as best you can recall?
24     A.  Let me think.  Maybe 2013, 2014.

126

1      Q.  Okay.  So, you are saying that these folks
2  who came over were never assigned to TSS, right?  That
3  is your testimony?
4      A.  My testimony is that not for the first six
5  months.  They wasn't, like I said, until we started
6  complaining, and then they started putting them over
7  this, but other than that, they was never being assigned
8  over there.
9      Q.  So, when you said the first six months,
10 you mean the first six months that they came to the
11 unit?
12     A.  Correct.  Six to eight, six to ten,
13 somewhere around in there.  You know, the complaints
14 would start, the minorities started complaining to the
15 brass, you know, "Why is it just minorities being sent
16 over there, and you have all of these new people that
17 have never been over there?"
18     Q.  Okay.  And those complaint were made to
19 whom?
20     A.  I'm sorry?
21     Q.  Those complaints were made to whom?
22     A.  To Ranzino, to Shields, DC Neal, when he
23 was there, you know, why they was assigning it like
24 they were.  We -- we complained about it.

127

1      Q.  And their response to you was what?
2      A.  It was just an assignment.
3      Q.  Okay.  If you go to --
4      A.  I --
5      Q.  I'm sorry, go ahead.
6      A.  No, I mean just they were, all of the time
7  their response would be it's just our assignment.
8      Q.  Okay.  Can we go to No. 10.  And here, I
9  think I stand a little bit corrected here because this
10 question asked about discriminatory duties of your
11 assignments.  And you say in here that, "Ranzino was
12 responsible for giving us the assignments and he
13 assigned the African-American investigators only to
14 the basement or TSS.  I also remember being assigned
15 to listen to audio complaints for my entire shift"?
16     A.  I thought it mentioned that, yes.
17     Q.  Okay.  So this is what you were referring
18 to there?
19     A.  Uh-huh.
20     Q.  And you say, "I never saw any white
21 investigators get assigned to listen to audio
22 complaints"?
23     A.  Exactly.
24     Q.  Okay.  When were you assigned to listen

128

1  to audio complaints?
2      A.  These statements, like I said, I didn't
3  write none of this down, so I'm just speculating on
4  the dates.  Because I can't give you exact dates.
5      Q.  Can you give an approximate date or a year?
6      A.  I want to say it was around '14 or 15.
7  2014 or 2015.
8      Q.  Okay.  And where physically were you
9  located when you listened to these audio complaints?
10     A.  There was a little cubicle that they put
11 to the side.  And this was total, again, isolation.  It
12 is small.  It is maybe like a eight-by-ten petitioned
13 room that you sit in.
14     Q.  And where is that?
15     A.  That would be in one of the back offices.
16     Q.  And where is that office located?  Like
17 geographically where is that?  What's the address?
18     A.  I think the address of mine is 2323 South
19 Rockwell.  I think 2323 Rockville.  I think that's what
20 it is.
21     Q.  And this is what you would consider the
22 electronic monitoring office?
23     A.  This would be the office.
24     Q.  Okay.  Whose job was it normally to listen

129

1  to these audio complaints?
2      A.  It was no -- I don't know when it was
3  created because, like I said, they hit me with it when I
4  came back in from being off, so I don't know when it was
5  created.  I have no idea.
6      Q.  What do you mean -- what do you mean that
7  they hit you with it when you came back from being off?
8      A.  You know, you work five off, two, and you
9  come back to work and my first assignment is to go
10  there.
11      Q.  Okay.
12      A.  You know.  I really couldn't tell you
13  when it started and who they had listening to it prior.
14  I'm speculating that it was probably a civilian tech
15  listening to it because it was almost like a
16  non-essential, to me.  To me it was non-essential
17  to listen to the call monitoring.
18      Q.  Okay.  And what is the basis of your
19  statement that you never saw any white investigators
20  get assigned to listen to any audio complaints?
21      A.  Well, like I said, when I was assigned
22  to monitoring, and we still had to sign up and run it,
23  nobody got -- nobody that I seen went back there that
24  was Caucasian.  I didn't -- I didn't see none.

130

1      Q.  But you had no idea who was assigned to
2  listen to those audio complaints?
3      A.  No, sir.  It's just three watches and I
4  only work one, so I really wouldn't know on the other
5  watches who might be assigned.  No, I don't.
6      Q.  So then it's entirely possible, isn't it,
7  that a white investigator was assigned to listen to
8  audio complaints at some point?
9          MS. KRAUCHUN:  Objection; foundation,
10  speculation, form.
11          THE WITNESS:  It's possible.
12  BY MR. LEINENWEBER:
13      Q.  I couldn't hear your answer, Mr. Page.
14      A.  It's possible.
15      Q.  It's possible, okay.
16          Let's go to No. 11.  And this asks you to
17  identify each and every complaint you made regarding
18  the behavior alleged in the complaint.  And you said,
19  "Continually made complaints to Chief Ranzino, but
20  nothing ever changed.  Continually made oral complaints
21  to Chief Ranzino," right?  Do you see that?
22      A.  Yes.
23      Q.  And are you able to give us any specifics
24  at all regarding these oral complaints you made?

131

1      A.  Well, basically what I -- what I stated
2  to you earlier about signing that supervisor law, and I
3  wasn't a supervisor, and I would complain to him.  I
4  said, "Well, sir, you need to sign-off."  And I would
5  tell him, "No, I'm not going to be signing and I'm not
6  going to sign-off."  It was not my job.  And I would
7  tell him, "It's not my job as a supervisor to do that."
8  So, eventually, I would say about maybe a year went by,
9  they took that supervisor part off and just said
10  monitoring investigator.  They changed the wording.
11      Q.  Alright.  And other than that commentary,
12  are you able to give us any more details about
13  complaints that you made to Chief Ranzino regarding
14  the behavior that you allege in your complaint?
15      A.  Again, it was about going over to TSS and
16  there was no movement, you know.  They had assigned over
17  there with -- with sometime working overtime, you know,
18  but overtime according to the union is supposed to
19  rotate what is being mandated.
20      Q.  And you never made these complaints to
21  Deputy Chief Rohloff, right?
22      A.  No, just -- just to Ranzino.
23      Q.  So not to Shields or to Neal either, right?
24      A.  Not to who?  I'm sorry?

132

1      Q.  Director Shields or Chief Neal?
2      A.  Well, Neal -- Neal would be the -- I don't
3  know, because he stayed sick, but I might have said,
4  but I don't recall ever telling Neal.  And I -- if I
5  told Shields, it was something in passing, when he was
6  walking through the office.  I might have talked to him
7  about it.  But mostly it was Chief Ranzino.
8      Q.  Sorry, I was muted.
9          MR. LEINENWEBER:  Can we go to No. 12,
10  Kevin.  Okay.
11  BY MR. LEINENWEBER:
12      Q.  This interrogatory asks you to identify
13  the instance where Defendant Shields threatened to fire
14  you.  And as we talked about, Director Shields never
15  told you that he was going to threaten to fire you,
16  right?
17      A.  No.
18      Q.  Okay.  And you say here that he said this
19  to many of the other African-American investigators?
20      A.  I'm sorry?
21      Q.  It says also here, "but that Director
22  Shields said this to many other African-American
23  investigators," right?
24      A.  Oh, the way I remember Director Shields

Transcript of Samuel Page
Conducted on August 10, 2020

133

1 addressing that, it was something about something that
2 happened with Winston and some of the other black
3 investigators, and they was trying to do some kind
4 of disciplinary action to them. The specifics I don't
5 really know about, but I just remember that it came up
6 while the roll call -- it wasn't during roll call, it
7 was sometime after roll call, and I heard it in passing.
8 But a lot of things happen in that office that you hear
9 in passing.
10      Q. So when you say you heard it in passing,
11 does that mean that you actually heard this exchange
12 between Shields and Winston or that somebody reported
13 that to you?
14      A. No, well -- okay, I didn't -- I didn't hear
15 it between him and Winston, but it was -- they was like
16 I said, when they walking back to Director Shields'
17 office, you could hear some of the words coming out.
18 I couldn't tell possibly what was being said, but you
19 know, falsifying something and wrongful termination,
20 you know, words like that came out.
21      Q. Okay. I mean it sounds like what you
22 are describing a discussion between these two
23 individuals, Shields and Winston; is that fair to say?
24      A. No, I didn't say it was between Shields and

134

1 Winston. I think he was talking to Ranzino about it
2 going back to his office. Roll call was conducted in
3 front of the office, we have a roll call area there.
4 Then when you are assigned to monitoring, they come
5 through there because they've got to go through
6 Director Shields' office, and in passing they say it,
7 they're talking to one another.
8      Do you follow what I'm saying?
9      Q. Let me ask this, you are saying that
10 you are aware that Shields said to many other
11 African-American investigators that he was threatening
12 to terminate them, right? That's what you said in your
13 response here, right?
14      A. Okay, that's what I -- okay, I'm just
15 trying to clarify what I meant by that. Is that I heard
16 it in passing that falsifying documents is grounds for
17 termination.
18      Q. Okay. Thanks. Okay. Let's go to 13.
19      A. 13?
20      Q. Yes. 13 here asks you to identify each
21 and every instance in which any of the Defendants used
22 offensive or racist language to you. And we already
23 talked about this, right? That you never had any of the
24 Defendants use racist or derogatory language with you,

135

1 right?
2      A. Oh, well, not -- not in the words you spoke
3 of, no.
4      Q. Well, what words are you referring to then?
5      A. You know, "You people."
6      Q. Okay. Alright. The comment "You people"?
7      A. Yeah. And I was like, "What do you mean
8 by 'You people?'" And then it was like a pause and then
9 he would walk away.
10      Q. Alright. Anything else besides that
11 comment?
12      A. No.
13      Q. I'm sorry, it broke up there. Did you say,
14 "No"?
15      A. No.
16      Q. Okay. So, and you say here in your answer
17 in 13 as well that Ranzino would frequently ask you how
18 you became a supervisor?
19      A. True.
20      Q. Okay. When was the last time approximately
21 that he asked you that?
22      A. I don't know. It might have been a
23 conversation we had when two people in the office went
24 to lunch at the same time and he accused me of sending

136

1 them. And I said, "No, I didn't send them, they just up
2 and left." And I said that I didn't, you know. And
3 then he might have just said to me at that point, "You
4 know, I don't even know how you became a supervisor,"
5 so.
6      Q. Okay. Let's go to No. 14. So, we already
7 talked quite a bit about how Ranzino would sort of
8 verbally reprimand you sometimes?
9      A. Uh-huh.
10      Q. Is it fair to say he did that with several
11 people in the office, with several investigators?
12      A. Yes. You know, it was -- between his desk
13 and the mine there was no door or wall there, so you
14 can almost sometimes hear some of the things that he was
15 saying, but a lot of the times I would just get up and
16 really walk out of the office because I didn't really
17 want to hear it.
18      Q. Okay. And is it your testimony that he
19 would only do that to black investigators or that he
20 would verbally reprimand everybody?
21      A. During roll call, if investigators came up
22 with questions, and then I don't know if he didn't like
23 the question or what, he would -- a lot of times he
24 would dress the officer down in front of everybody.

Transcript of Samuel Page
Conducted on August 10, 2020

35 (137 to 140)

137

1  Where it is when a Caucasian officer asked it, he would
2  actually say, "Let's come in the office and talk about
3  it."
4      A couple of times, like I said, it got very
5  verbal with a few officers in roll call, that he had to
6  ask the officers to leave roll call.  And I am talking
7  about the black officers and a couple of Hispanic
8  officers.
9      Q.  So, he would reprimand the black officers
10 and Latino officers in roll call, but not the white
11 officers?  Is that your testimony?
12     A.  That's my testimony.
13     Q.  Okay.  And instead of reprimanding white
14 officers in roll call, he would have them come into his
15 office and he would reprimand them there?
16     A.  "Reprimand," I can't say "reprimand," they
17 would talk about it, but it would be more of a not
18 public display.
19     Q.  Okay.  Now, he also had you into his
20 office, though, to have a conversation about it or to
21 reprimand you or whatever, right?
22     A.  Yes.  Yeah, but that's because when it
23 happened the few times that it did happen, I was in
24 monitoring, so it wasn't out there in roll call.  But

138

1  yes, a few times I did propose questions in roll call
2  and they wasn't answered to me appropriately.  They
3  was -- it was of a belittling effect to me, the way
4  he answered the question.
5      Q.  It was a belittling effect?  Did you
6  consider it to be discrimination or racist or what?
7      A.  Well, I considered it racist because that's
8  because if something comes the way he brought it, he
9  could have waited until I was in the office or
10 monitoring and addressed it again, instead of
11 broadcasting it in roll call.
12     Q.  So, you thought that Ranzino was being
13 racist in making these comments to you?
14     A.  Well, yes.
15     Q.  Why didn't you file a complaint about it?
16     A.  Do you know why?  Because, one, I was too
17 short.  And second of all, it was always rumored that
18 he wasn't going to be there too long.
19     Q.  What was the first thing you said?  It was
20 "too short"?  You were too short?
21     A.  Yeah, I only had like a couple more years
22 to go and, you know, I was too close to the end and,
23 you know, I wanted to leave the Sheriff's Department
24 in good standing, you know.  And then it was always a

139

1  rumor that he was just there temporarily, but he lasted
2  quite a long time.
3      Q.  So, you never complained because you were
4  getting close to retirement and you thought that Ranzino
5  wasn't going to be there that long?
6      A.  Yeah, that was basically it.  And a lot of
7  the complaints, you tell them to his supervisor, and a
8  lot of the times, "Okay, I'll talk to him about it,"
9  or something like that conversation, and just, to me,
10 it never went nowhere.  I never really thought about
11 going to OPR about it, I really didn't.
12     Q.  Yeah, I mean you never tried, right?
13     A.  No, I didn't.
14     Q.  Okay.  And you would agree, right, that
15 if you don't tell OPR that something discriminatory
16 was being done to you, OPR can't do anything about it,
17 right?
18     A.  True.
19         MS. KRAUCHUN:  Objection; foundation.
20 BY MR. LEINENWEBER:
21     Q.  Okay.  Who are the -- who are the white
22 officers that you say never got verbally reprimanded
23 by Ranzino in front of the others?
24     A.  Bieniek would be one of them.  Lougheren.

140

1  Folkers.  I think that's -- I'm thinking it was the
2  officers that was Caucasian.  Nick -- his name was
3  Nickle.  I think that was his last name.
4      Q.  Did you work the same shift as all of these
5  white officers?
6      A.  Yes.
7      Q.  And did you work the same days as these
8  officers?
9      A.  No.
10     Q.  You didn't?
11     A.  Not all of them, no.
12     Q.  So, it's possible then that they were
13 reprimanded in front of others at roll call and you just
14 weren't there, right?
15     A.  Yes, it is possible.
16     Q.  Okay.  Just one second here.  Let's look
17 at interrogatory No. 15.  This one asked you to identify
18 assignments which you allege were discriminatory.
19         We already talked about this.  Anything
20 else that you would like to add to that?  Any other
21 discriminatory assignments that you received?
22     A.  No.
23     Q.  Okay.  And then 16, it is information about
24 the high-incident areas.  Other than what we talked

Transcript of Samuel Page
Conducted on August 10, 2020

141

1 about today, anything else that you would add to this
2 about high-incident areas?
3     A.  No.
4     Q.  Let's go to No. 17.
5         MS. KRAUCHUN:  You can show me.
6 BY MR. LEINENWEBER:
7     Q.  17 asks you to identify protected
8 activities that you engaged in, including making
9 internal complaints, filing grievances, memorandums,
10 incident reports, and you just said, "Investigation
11 continues and Plaintiff reserves the right to supplement
12 this response."  Do you see that?
13     A.  Yes.
14     Q.  Okay.  And we have established that you did
15 not make any complaints to OPR, right?
16     A.  Correct.
17     Q.  Okay.  Did you make any complaints to human
18 resources?
19     A.  No.
20     Q.  Okay.  Other than the conversations you had
21 with Ranzino, did you make any other kinds of internal
22 complaints?
23     A.  Only to DC, like I said, Neal was there.
24 Even told Sedgwick Logan, you know, but again, they --

142

1 they was right below him.  So, you know, I did not ever
2 talk -- I might have even talked to Neal a couple of
3 times, you know.
4     Q.  Okay.
5     A.  So that was it.
6     Q.  And, again, what do you remember about
7 these complaints that you made?  What was the actual
8 complaint?
9     A.  About basically the job assignments, about
10 being threatened to be written up for positions that,
11 you know, I wasn't instructed on how to, you know,
12 perform duties at these positions.  And then I just was
13 threatened with a write-up, you know, if I go back
14 again, if I do it again or if I did it, if it was the
15 first time.  It wasn't right.  And I said, "Well, if I
16 wasn't instructed how to do it, how was I supposed to
17 know, you know, how to function?"  So, you know,
18 Detective Neal or whatever, pointed it to their
19 attention, you know, for them threatening to write me
20 up over it, and then sometimes they just said, "Don't
21 worry about it."  And I just kept moving.
22     Q.  And what were those job duties that you
23 were talking about?  Was that the phone call, like
24 monitoring the director's phone and listening to those

143

1 Voice-Mails?
2     A.  Right.  Because you know at the time --
3 nobody tell me, you know, they didn't show me to listen
4 and write it in a logbook.  But I spoke to -- at least
5 one time I heard, I know that the first, I think the
6 first time, and it was still at a shift, they asked did
7 I delete the messages, and I said, "No, I just would
8 write the numbers down," you know.  So, I would have
9 to go back and delete the messages and stuff.  But,
10 you know, again, because you know, get the job right
11 and make sure you do the job right.  But nobody
12 explained to me how to do the job.
13     Q.  Alright.  I mean it sounds like that,
14 though, didn't have anything, your complaint about that
15 didn't have anything to do with your race, right?
16     A.  My what?
17     Q.  Your complaint about not being trained
18 on how to listen to those Voice-Mails and log them, that
19 didn't have anything to do with your race, right?
20     A.  My race?
21     Q.  Yes.
22     A.  Well, it was the threat part that I didn't
23 appreciate, you know.  Why would you threaten me on the
24 job that I never -- I never did before, instead of

144

1 taking the time to instruct, you know.  You come back
2 with a threat of a write-up because, you know, I was
3 never instructed.  I mean that didn't seem right to me.
4     Q.  Yes, that's not really answering my
5 question though.  My question is about your complaint.
6 Okay?
7         Did you say that, "I am," you know, "being
8 unfairly targeted for my performance in this job that
9 I was never trained on because I'm African-American?"
10 Or something to that effect?
11     A.  No.
12     Q.  Okay.  So, your complaints that you made
13 regarding those other assignments, for which you were
14 not trained, weren't really about your race, right?
15 They were more about, "How can I be, you know, written
16 up for not performing something I was never trained
17 for," right?
18     A.  No, it was race because, again, I never
19 seen Caucasian officers given these assignments.  That's
20 why -- that's why I thought it was racial.
21     Q.  Okay.  We already established, though, that
22 you don't know if white employees were asked to do those
23 same jobs, right?
24     A.  Right.  I don't know because I wasn't there

145

1  all the time it was open, so.

2      Q.  Alright.  And it could very well be that

3  white employees were also not trained to do those jobs

4  and were also yelled at, right?

5      **A.  If you say so, yeah.**

6      Q.  Well, it's not if I say so.  What do you

7  think?  Is it possible or not?

8      **A.  Well --**

9          MS. KRAUCHUN:  Objection; foundation.

10 Go ahead.

11         THE WITNESS:  Yeah, it's possible.

12 BY MR. LEINENWEBER:

13     Q.  Okay.  Are you alleging that you were

14 retaliated against by the Sheriff's Office or any one

15 of the Defendants?

16     **A.  Was I retaliated against?  No.**

17     Q.  You were not?

18     **A.  No.**

19     Q.  Okay.  Let's see.  And interrogatory No. 19

20 here, it asks you to identify the adverse actions that

21 you suffered.  And you responded that you lost the

22 supervisory role and the wages associated with the

23 supervisory position?

24     **A.  Correct.**

146

1      Q.  Other than that, was there any other

2  adverse action you suffered that you contend was

3  discriminatory?

4      **A.  Okay, can you rephrase that question?**

5      Q.  Yes.  So, you were not disciplined, right?

6  At all?

7      **A.  No.**

8      Q.  You were never suspended?

9      **A.  No.**

10     Q.  You never lost pay because you received a

11 suspension, right?

12     **A.  No.**

13     Q.  Okay.  You were never terminated?

14     **A.  No.**

15     Q.  And you were never written up?

16     **A.  Other than I told you about those escapes,**

17 **no.**

18     Q.  Right.  The two escapes, that's right.

19 You mentioned receiving a written reprimand for the

20 two escapes while you were serving in the supervisory

21 position, right?

22     **A.  Correct.**

23     Q.  Okay.  So, other than losing the

24 supervisory role and the one hour per week wage that

147

1  came with that, are there any other employment actions

2  that you contend were discriminatory?  In other words,

3  were done to you because of your race?

4      **A.  Well, are you talking about the assignment**

5  **of going to TSS and the other things, all that to me was**

6  **race related.**

7      Q.  Okay.  So, you are saying the assignments

8  to TSS and then the assignments to particular areas of

9  Cook County for patrol?

10     **A.  Yes.**

11     Q.  Okay.  So, those two, combined with the

12 loss of the supervisory role, are the adverse actions

13 that you are complaining about?

14     **A.  Correct.**

15     Q.  Okay.  You also indicate here that there

16 was a hostile work environment and you were harassed

17 by supervisors.  What are you referring to here?

18     **A.  Well, we shared, like I said, we shared the**

19 **office and, you know, conversations we would have,**

20 **the orders he would give me, you know, it was like,**

21 **"Get it done," you know, or "Get it right," you know.**

22 **And that's I recall one time just I was in the office**

23 **by myself and I was trying to do three things at once,**

24 **and then, you know, it was like, "You are not finished**

148

1  **yet?  Hurry up."  Or a couple of times a mistake was**

2  **made in the book and it caused me to go overtime and**

3  **he would tell me sometimes that he wouldn't sign my**

4  **overtime still.  So, I was like, "Okay, well, I will**

5  **get somebody else to sign it then," you know.**

6          **But his negative attitude personally**

7  **towards me I don't -- I didn't know the man, for him**

8  **to exhibit that kind of hostile attack on me.  And,**

9  **you know, I didn't know the man.  You know?  He doesn't**

10 **know about me.**

11     Q.  Who are you talking about?

12     **A.  Chief Ranzino.**

13     Q.  Okay.  So, you are saying that Chief

14 Ranzino is the one who was kind of creating a hostile

15 work environment?

16     **A.  Yes, sir, I am.**

17     Q.  Okay.  And you were exposed to that you

18 said because you worked in the electronic monitoring

19 office sometimes?

20     **A.  Sometimes.  Exactly.**

21     Q.  Okay.  So, you did actually physically work

22 in the electronic monitoring office?

23     **A.  Yes, I did.**

24     Q.  Okay.  And it sounds like you did it

Transcript of Samuel Page
Conducted on August 10, 2020

149

1 somewhat frequently?
2     A.  Like I said, it was I worked work/school,
3 in the monitoring, dispatch, all of that is in the
4 office.
5     Q.  Okay.  And you did that all of the way up
6 until your retirement in some form, right?
7     A.  Yes.
8     Q.  Okay.
9     A.  But I -- but not there, but at TSS, you
10 know, wherever the assignment sent me, that's where I
11 had to go.
12     Q.  Okay.  And were there any other black
13 investigators working in the office or were you the only
14 one?
15     A.  Oh, the last -- I want to say the last --
16 maybe the last two years before I retired, before I
17 retired, excuse me, Investigator Skathe (phonetic)
18 worked there.  And I can't think of her name.  She was
19 pregnant at the time.  They kept her in there because
20 she was pregnant.  Once she had the baby, they put her
21 back on the street.  I think her name is -- Sharon.  Her
22 first name is Sharon something.  Cox (phonetic).  Her
23 last name is Cox.  She worked in there temporarily.
24     Q.  And --

150

1     A.  I'm sorry.
2     Q.  And both of these women were
3 African-American?
4     A.  No, just one woman, one man.
5     Q.  And who was the man?
6     A.  Skathe (phonetic).  Samuel Skathe and the
7 woman was Sharon Cox, which the last, I think the last
8 two years, two or three years of me being, before I
9 retired, they worked in the office.
10     Q.  Okay.  So, at least two other
11 African-Americans worked in the office as far as you
12 know?
13     A.  Worked there occasionally, yes.  Again,
14 we had different off days and stuff.
15     Q.  Okay.  And then let's see, and so that's
16 how you were exposed to kind of some of Ranzino's
17 behaviors; is that accurate?
18     A.  I'm sorry, say that again?
19     Q.  So, you observed some of Ranzino's kind of
20 harassing behavior while working in the office; is that
21 right?
22     A.  Yes.
23     Q.  Okay.  And he would have that same kind
24 of harassing behavior to like everybody in the office,

151

1 right?
2     A.  Again, can you repeat the last part?
3     Q.  He had that same kind of harassing behavior
4 to everybody in the office, right?
5     A.  No, I wouldn't say that.
6     Q.  Why not?
7     A.  Because he didn't -- just didn't do that to
8 everybody.
9     Q.  Okay.  Did he do it to other people besides
10 you?
11     A.  I think he and Sharon had some words once
12 and he and Skathe (phonetic) had some words a couple of
13 times.
14     Q.  Alright.  How about anyone else in the
15 office?
16     A.  The only other person in the office would
17 be a civilian (phonetic).  And no, I don't remember him
18 ever coming hard at him, no.
19     Q.  So, you're saying there are only four
20 people working in the office at a time?
21     A.  When you say four, including him?
22     Q.  Yes, including him.  So, you're saying
23 four, not including him; is that right?
24     A.  No, I'm not saying that.  I can't give

152

1 you an exact number because every time it would change,
2 you know, according to your manpower per day.  If you
3 had more people, you could have more, you could get some
4 more people assigned in the office, but if you have less
5 people, then you use less people there.  And sometimes
6 it was only two people in the office.  Sometimes it was
7 three -- it was six people in the office.  I mean it
8 always varied the manpower per watch.
9     Q.  Okay.  So, I'm confused because -- so you
10 are saying that on some occasions it would be you and
11 two other black officers and Chief Ranzino in the
12 office, and that's it?
13     A.  No, sir, that's not what I'm saying.  I'm
14 saying --
15     Q.  Then I'm confused then.
16     A.  Okay.  It would go back to the manpower of
17 the watch.  Sometimes it would be just two investigators
18 in there and Ranzino.  Sometimes it would be more than
19 two.  Sometimes it would be six people in there with
20 Ranzino.  Alright?  Sometimes Rohloff would be there,
21 he would be in the office.  When he worked as a street
22 supervisor, he was an office supervisor, so he would
23 work in the office sometimes.  Okay?  So, the numbers
24 would vary, you know, depending on the manpower per day.

Transcript of Samuel Page
Conducted on August 10, 2020

153

1    Q.   Okay.  So, there would be white people and
2 black people in the office, right?
3    **A.   Well, yes.  Sometimes, yes.  Sometimes.**
4 **Not all of the time.**
5    Q.   Okay.  And did you ever have an attitude
6 with any of the white employees?
7    **A.   No, I didn't.**
8        MR. WHITE:  With any of the white
9 employees?
10        THE WITNESS:  No.
11 BY MR. LEINENWEBER:
12    Q.   Not once?
13    **A.   I didn't, no.**
14    Q.   Would it surprise you to learn that he did
15 yell at white employees as well?
16    **A.   It surely would.  It surely would.**
17    Q.   Okay.  So, if some of your colleagues and
18 co-plaintiffs say that he did yell at white employees,
19 are they lying?
20    **A.   No, I can't tell you they're lying.  If he**
21 **did and I wasn't there, I could never say that.**
22    Q.   Okay.  So you just don't know?
23    **A.   Just not in front of me.**
24    Q.   Alright.  That's fair.  So, you just don't

154

1 know what happened when you weren't there?
2    **A.   Exactly.**
3    Q.   Okay.  Alright.  You talked a fair amount
4 about high-incident areas.  I'm wondering did you ever
5 have an incident while on patrol where you were injured?
6    **A.   Okay, now you -- now are you talking about**
7 **when?  Since I've been working in EM?**
8    Q.   No, since you've been working for EM and
9 gone out on patrol since 1992, have you ever been
10 injured on patrol?
11    **A.   Yes.**
12    Q.   What happened?
13    **A.   I fell down some stairs in the**
14 **neighborhood.**
15    Q.   Okay.  How did you fall down?
16    **A.   During the delivery.  When I left a lady's**
17 **house, they cut the lights off and I hit a patch of ice**
18 **on the steps, and I went down the steps and I had to go**
19 **to the hospital.**
20    Q.   Okay.  Any other times that you were hurt?
21    **A.   Not -- not that I -- not that I can**
22 **remember right now, no.**
23    Q.   And that injury, that could have happened
24 in a high-incident area, it could have happened in a

155

1 low-incident area, right?  It could have happened
2 anywhere?
3    **A.   It was a low-incident area because I said**
4 **the neighborhood.**
5    Q.   But I am asking it could have happened
6 anywhere, right?
7    **A.   Correct.**
8    Q.   So, you have never actually been injured
9 because of being assigned to a high-incident area,
10 right?
11    **A.   No.**
12    Q.   Alright.  Let's go to interrogatory No. 21.
13        MR. LEINENWEBER:  Kevin, can you take
14 us to interrogatory No. 21?  Thanks.  There might have
15 been a lag.
16 BY MR. LEINENWEBER:
17    Q.   SO, request 21 here, Mr. Page, it asks you
18 to identify acts or omissions that you allege resulted
19 in Plaintiffs being treated differently than other
20 similarly situated individuals.  Okay?
21        So my question is two questions.  Your
22 response is, "All of the foregoing for the specific
23 responses above and generally speaking the lack of
24 attentiveness to any complaints to OPR, human resources

156

1 made by any and all of the Plaintiffs."  Do you see
2 that?
3    **A.   Uh-huh.  Yes.**
4    Q.   Okay.  This doesn't apply to you though,
5 right?  This provision where it says, "the lack of
6 attentiveness to complaints to OPR or human resources,"
7 right?
8    **A.   No.**
9    Q.   Because you never made any complaints to
10 OPR or human resources, right?
11    **A.   Correct.**
12    Q.   Okay.  And you are saying that other
13 similarly situated individuals were treated differently
14 than you?  Do you know what I mean by that?
15    **A.   No, sir.**
16    Q.   So, you are saying that other white
17 investigators were treated differently than you, right?
18    **A.   Yes.**
19    Q.   Other than the names you gave us today,
20 are you able to identify other white officers -- sorry.
21 Strike that.
22        Other than the names you gave us earlier
23 today, are you able to identify any other white
24 investigators that you allege are similarly situated

157

1  to you and that were treated differently than you?
2      **A.  Oh, like I said, I see their faces, but I**
3  **can't remember their names.  Again, they came later,**
4  **like the last five, six years before I retired, so I**
5  **guess I just can't recall all of these names.**
6      Q.  Okay.  Alright.  Let's see.  You can put
7  that one away.  Alright.  Let's pull up Exhibit 3.
8          (PAGE Deposition Exhibit 3 marked for
9  identification.)
10 BY MR. LEINENWEBER:
11     Q.  Okay.  Mr. Page, we are handing you what
12 has been marked as Page Exhibit 3.  And the title of
13 this document is "Plaintiff Samuel Page's Objections
14 and Answers to Defendant Sheriff of Cook County, Thomas
15 J. Dart's, First Set of Interrogatories."
16     Do you see that?
17     **A.  Okay.**
18     Q.  And do you recognize this document?
19     **A.  Okay.**
20     Q.  Is that a "yes"?  You do recognize this
21 document?
22     **A.  What now?**
23     Q.  Do you recognize this document?
24     **A.  Yes.**

158

1      Q.  Okay.  In fact, it is one of the documents
2  that you reviewed to prepare for this deposition, right?
3      **A.  Yes.**
4      Q.  Along with Exhibit 2, which is the other
5  set of interrogatories, you reviewed both of those
6  to prepare for your deposition, right?
7      **A.  Yes.**
8          MR. LEINENWEBER:  And Kevin, can you
9  scroll to the last page, to the verification page.
10 BY MR. LEINENWEBER:
11     Q.  And this verification page is the same as
12 the other one.  It says, "I, Samuel Page, state that I
13 have read Defendant Sheriff of Cook County, Thomas J.
14 Dart's, First Set of Interrogatories and my Answers to
15 those interrogatories, which are true to the best of
16 my knowledge, information and belief.  I declare under
17 penalty of perjury that the foregoing is true and
18 correct," right?
19     **A.  Correct.**
20     Q.  Okay.  And that's your signature?
21     **A.  Yes.**
22     Q.  And it is dated February 10th of this year?
23     **A.  Yes.**
24     Q.  Okay.  So, let's talk a little bit about

159

1  the damages that you allege that you've suffered in this
2  case.
3      What kind of wages have you lost as a
4  result of the Defendants' actions in this case?
5      **A.  Okay, the actions, are you talking about of**
6  **my supervisor position?**
7      Q.  I am talking about anything at all that you
8  contend that you -- any damages that you have suffered
9  as a result of Defendants' actions.  And specifically
10 I want to start with wages.  Okay?
11     So, what wages have you lost as a result of
12 Defendants' actions in this case?
13     **A.  When you say, "actions," are you talking**
14 **about supervisors or just his actions of talking down to**
15 **me?**
16     Q.  So, that question isn't for me to answer
17 because it's your complaint, your lawsuit, and you are
18 alleging that the Defendants harmed you, right?  Isn't
19 that what you are saying?
20     **A.  Okay.  Yes.**
21     Q.  Okay.  And what I want to know is what
22 wages did you lose as a result of Defendants' actions?
23     **A.  The hourly, the hourly, as a supervisor,**
24 **not being able to get overtime.  And me, I did lose the**

160

1  **wage, because I had to go to another supervisor to get**
2  **it, the signature, for the overtime.  I did work, but he**
3  **refused to sign my overtime slip, so I guess that would**
4  **be it.**
5      Q.  So the one hour per week as supervisor?
6      **A.  Yes.**
7      Q.  And you allege that that's the wages that
8  you lost in this case?
9      **A.  Yes.**
10     Q.  Okay.  Nothing else?  You didn't lose any
11 other wages in this case?
12     **A.  No.**
13     Q.  Okay.  What opportunities have you lost as
14 a result of Defendants' actions in this case?
15     **A.  Well, the next stage up would have been DC,**
16 **so I never got the opportunity to be a deputy chief.**
17 **So that was another.  That was about it.**
18     Q.  Okay.  So, the deputy chief position, you
19 were never able to achieve the rank or the position of
20 deputy chief?
21     **A.  Correct.**
22     Q.  Okay.  And who made the decision to not
23 allow you to become a deputy chief?
24     **A.  Again, that was -- it was a promotion that**

Transcript of Samuel Page
Conducted on August 10, 2020

161

1  was granted through the director, assistant director
2  **and approved through the chief, so I never was granted**
3  **the opportunity to move up.**
4      Q.  Alright.  And who was responsible for
5  denying you that opportunity to move up?
6      **A.  All of the bosses, from the chiefs all of**
7  **the way up to the director and assistant director.**
8      Q.  Let me ask you this question:  Who made
9  the decision to promote someone to deputy chief within
10 electronic monitoring?
11     **A.  It would either be the director or**
12 **assistant director and they would talk to the chief of**
13 **patrol and see, you know, if that person was favorable.**
14     Q.  Okay.  And what's the basis of your
15 knowledge of that?
16     **A.  A conversation between all three.**
17     Q.  All three being?
18     **A.  Assistant director, director and the chief**
19 **of patrol.**
20     Q.  Right.  But how do you know that that is
21 how the decision to promote someone to deputy chief was
22 made?
23     **A.  Well, because there was no merit test.**
24         (Off the record.)

162

1  BY MR. LEINENWEBER:
2      Q.  "Merit test" I believe you said, right?
3      **A.  Yes, merit test.  Written test.**
4      Q.  Alright.  So, because of the fact there was
5  no written test, it is your understanding that the
6  director, the deputy director and the chief of patrol
7  made the decision?
8      **A.  Correct.**
9      Q.  Okay.  And do you know how an employee who
10 wants to be considered for the deputy chief position
11 does so?
12         MS. KRAUCHUN:  Object to foundation.
13         THE WITNESS:  No.
14 BY MR. LEINENWEBER:
15     Q.  What was your answer to that, sir?
16     **A.  No, I don't.**
17     Q.  Okay.  And what raises did you miss out on
18 as a result of the Defendants' conduct in this case?
19     **A.  Raise from supervisor to -- to deputy**
20 **director, deputy chief is, I don't know, I don't know**
21 **the exact amount, but it's more money per hour.**
22     Q.  Okay.  So, it would be the difference
23 between the investigator position and the deputy chief
24 position?

163

1      **A.  Correct.**
2      Q.  Okay.  What benefits did you lose out on as
3  a result of the action of Defendants in this case?
4      **A.  Benefits?  Other than being in charge, I**
5  **don't see no really -- really no other benefit other**
6  **than more money.**
7      Q.  Okay.  What about retirement income?
8      **A.  That, of course, yes.  More money makes it,**
9  **you know, more for your retirement it would be, most**
10 **definitely.**
11     Q.  Have you suffered or had you paid for any
12 litigation expenses?
13     **A.  For this?**
14     Q.  Related to this lawsuit?  Yes, have you had
15 to pay for any litigation expenses related to this
16 lawsuit?
17     **A.  Did I have to pay the lawyer?  Yes.**
18     Q.  Did you have to pay for any expenses,
19 litigation expenses related to this lawsuit?  That's the
20 question.
21     **A.  I'm still not clear.  If you are asking if**
22 **I paid my lawyer, yes.  I don't know of any additional**
23 **money that might be spent, no.**
24     Q.  Okay.  You said you had to pay your lawyer.

164

1  Are you talking about your current attorneys?
2      **A.  Yes.  Yeah, the one we started with that**
3  **was downtown, I had to give him some money to start the**
4  **case, yes.**
5      Q.  Okay.  And are you -- who is the attorney
6  you are talking about?  What is his name or her name?
7      **A.  Oh, I had it written down on a paper.  I**
8  **had his number.  Like I said, it's all in my folder,**
9  **but I don't have that in front of me now.**
10         MS. KRAUCHUN:  Justin, if I can just
11 jump in?
12         MR. LEINENWEBER:  Please.
13         MS. KRAUCHUN:  That was in regards to
14 the EEOC charge.
15         MR. LEINENWEBER:  Okay.
16         MS. KRAUCHUN:  That doesn't have
17 anything to do with this current lawsuit.  That was the
18 EEOC charge leading to this.  That was the previous
19 attorney.  That's not our firm.
20         THE WITNESS:  Oh, okay.
21         MS. KRAUCHUN:  Just to clarify that.
22         MR. LEINENWEBER:  Kelly, just to
23 clarify then, you guys didn't represent him at the EEOC
24 charge stage?  I think that's what you're saying?

165

1          MS. KRAUCHUN:  Correct.
2          MR. LEINENWEBER:  Okay.
3    BY MR. LEINENWEBER:
4          Q.   Mr. Page, are you claiming any damages,
5    compensatory damages related to suffering any mental or
6    emotional anguish or distress?
7          **A.   Did you say am I claiming any?**
8          Q.   Yes.  Are you seeking -- are you seeking
9    any?
10         **A.   Oh, as far as emotional distress?  Yes.**
11         Q.   Okay.  What is the basis of those damages?
12         **A.   The idea of being unjustly demoted,**
13   **self-esteem, the prestige of being in somewhat of a**
14   **command authority, all of that.**
15         Q.   Okay.  And did you consult with any
16   therapist or psychiatrist related to that emotional pain
17   and suffering that you are describing?
18         **A.   No, I didn't.**
19         Q.   You did not?
20         **A.   No, I didn't.**
21         Q.   You did?
22         **A.   No, sir, I didn't.**
23         Q.   You didn't, okay.  You are saying you did
24   not.

166

1          So I'm clear, are you claiming that you
2    are entitled to any of the litigation expenses or the
3    attorneys' fees that you paid the prior attorney?
4    Are you claiming that you are entitled to any of those
5    as a result of this lawsuit?
6          **A.   I don't quite understand what that means,**
7    **sir.**
8          Q.   Well, basically, you are saying you paid
9    some money to a different attorney, right?  When you
10   filed your EEOC charge?
11         **A.   Correct.**
12         Q.   Okay.  Are you saying that Defendants are
13   responsible for paying any of those fees back to you or
14   expenses back to you?
15         **A.   Well, I don't -- I don't know.**
16         Q.   You don't know?  Okay.
17         **A.   I don't.**
18         Q.   And just to clarify, you have not spoken
19   with any therapist, psychiatrist or other medical
20   providers concerning any kind of mental pain or
21   suffering, right?
22         **A.   No, no.  I just -- my -- my doctor,**
23   **you know, my blood pressure went up a little bit, but**
24   **that was my normal doctor.  But other than that, no I**

167

1    haven't.
2          Q.   Okay.
3          MR. LEINENWEBER:  And I think, Kevin,
4    if you could pull Exhibit 3 back up for a second and go
5    to interrogatory No. 5.  And this one we asked you,
6    "Have you received any kind of medical or mental health
7    care or treatment for any injuries you allege that you
8    suffered as a result of Defendants' conduct?"  And you
9    state here in response, on the next page, "Dr. Raymond
10   Weiss, primary care physician.  Hypertension levels
11   increased significantly during the time he was demoted.
12   Investigation continues."
13         **A.   Yes, that's what I just said.  High blood**
14   **pressure.**
15         Q.   Right.  Okay, so you are saying that your
16   high blood pressure was caused by Defendants' conduct in
17   this?
18         **A.   Oh, I don't know exactly what caused it --**
19         MS. KRAUCHUN:  Objection.  That
20   mischaracterizes his testimony.  Sorry, Sam, go ahead.
21         THE WITNESS:  I'm sorry.  I'm not
22   saying that that -- that it caused it.  I'm saying that
23   it, during that time my blood pressure went up.  That's
24   what I said.  I didn't say it directly caused it, but

168

1    I'm saying it did go up.
2    BY MR. LEINENWEBER:
3          Q.   Okay.  And are you saying that Defendants
4    are responsible for causing your blood pressure to go
5    up?
6          **A.   Not -- I couldn't honestly say that was the**
7    **reason, no.  I'm just saying that during that time my**
8    **blood pressure was up.**
9          Q.   Okay.  And it could have been for any
10   number of other reasons that cause one's blood pressure
11   to go up?
12         MS. KRAUCHUN:  Objection; calls for
13   speculation.  Go ahead.
14   BY MR. LEINENWEBER:
15         Q.   Well, I will need to know if you are
16   claiming that you suffered any medical or psychological
17   injuries as a result of Defendants' actions.  Okay?
18   And you have identified here in response to a question
19   asking you what injuries you've suffered, medical
20   injuries you've suffered as a result of Defendants'
21   conduct, and your response is that the hypertension
22   levels increased.  Okay?
23         So, I just want to make sure, are you
24   saying, yes or no, that your hypertension increased as

Transcript of Samuel Page
Conducted on August 10, 2020

43 (169 to 172)

169

1  a result of Defendants' conduct?
2      A.  Is that the question to me now?
3      Q.  Yes.
4      A.  What I'm -- what I'm saying is that during
5  that time that my blood pressure did increase.
6      Q.  And you just don't know if it's affected by
7  Defendants' conduct?
8      A.  Correct.
9      Q.  And it says that this was during the time
10 that you were demoted.  So, it would be fair to say then
11 that this was in that 2011 period, when you said that
12 you had been demoted?
13     A.  Correct.
14     Q.  Okay.
15     A.  Like I said, I didn't say '11 or '13.  I
16 said I would have to look and see.
17     Q.  I remember that, but your interrogatory
18 answer does say 2011, right?
19     A.  Yeah, that's true.
20     Q.  Okay.  Let's look at interrogatory 9 here
21 for a second.  This question asked you to identify your
22 e-mail address and your cellular telephone number.  And
23 you identified one e-mail address and one phone number.
24 Is that accurate?

170

1      A.  Yes, sir.
2      Q.  Okay.  Did you review that e-mail account
3  to see if you had any e-mails regarding this lawsuit?
4  Other than any e-mail correspondence with your attorney?
5      A.  I got the one that stated the changes in my
6  deposition.
7      Q.  So, let me back up for a second and just
8  preface my question this way.
9          So, I'm not interested in any e-mails that
10 you sent or received from your attorney.  Okay?  Other
11 than communications with your attorney or attorneys,
12 did you use that Yahoo e-mail address to have any
13 conversations with anyone else regarding this lawsuit?
14     A.  No, sir.  No, sir.
15     Q.  Okay.  And that cell phone, do you use your
16 cell phone for text messages?
17     A.  Yes.
18     Q.  Okay.  And did you use that cell phone to
19 text with anyone regarding this lawsuit?
20     A.  Only the date of my deposition.
21     Q.  Okay.  Would that be with your attorney?
22     A.  No, I told Winston that I had a deposition
23 coming up, and that was it.
24     Q.  Okay.  Why did you tell him that?

171

1      A.  Because I never did it before and I was
2  asking, you know, who was going to contact me.  And he
3  said, "Well, this Kelly is going to call you and let you
4  know about your deposition."  And I said, "Oh, Okay."
5  And that was the end of the conversation.
6      Q.  What was the exact question you asked,
7  Mr. Winston?
8      A.  The exact question?
9      Q.  Yes.
10     A.  I told him that -- I said, "Well, according
11 to" -- "to my e-mail, somebody is contacting me saying
12 my deposition was supposed to be last month, I think the
13 30th of last month."  And he said, "Okay, well, they
14 will -- our attorneys will call you and let you know
15 that, when your deposition is."  And that was the --
16 that was the bulk of everything, right there.
17     Q.  Why did you ask Mr. Winston that instead of
18 asking your attorneys?
19     A.  Well, because one, like I said, told you
20 earlier, me and Winston are still, you know, we are
21 friends and everything, so I talk to him off and on.
22 So, when he called me, I brought it up.  I said, "Well,
23 yeah, they just contacted me," and he said, "Oh, okay."
24     Q.  So wait.  I'm confused.  Was this a phone

172

1  call or was this a text message?
2      A.  It was a phone call.  It was a phone call.
3      Q.  Okay.  Because I had asked you about text
4  messages?
5      A.  No, I don't -- I don't subsequently text
6  anybody, other than for locations and stuff, where we
7  was going or parties and stuff, when I was going out.
8  But I don't usually use my text to contact anybody
9  because I'm not that good at typing, so.
10     Q.  Did you look --
11     A.  I --
12     Q.  Did you look --
13     A.  I thought you asked if I communicated with
14 anybody and I said, "Yes, Winston."
15     Q.  Okay.  Maybe I did.  Let me ask you this.
16     A.  Okay.
17     Q.  Have you used your phone to send any text
18 messages or receive any text messages from anyone
19 regarding this lawsuit?
20     A.  No.
21     Q.  Okay.
22         (Whereupon, a cell phone rings.)
23     A.  Just a minute.
24     Q.  Your phone hears us talking about it,

Transcript of Samuel Page
Conducted on August 10, 2020

44 (173 to 176)

173

1   I guess.
2          (Off the record.)
3          THE WITNESS:  This is something else.
4   Okay.  Go ahead.  I'm sorry.
5          MR. LEINENWEBER:  That's alright.
6   BY MR. LEINENWEBER:
7       Q.  Let's talk about who have you had
8   conversations with, other than your attorneys, about
9   this lawsuit?
10      **A.  Conversations?  My daughter.  I told my**
11  **ex-wife that I got to give a deposition today and that I**
12  **was in a lawsuit and whatever.  And that's mostly it.**
13      Q.  What about the other Plaintiffs?  Have you
14  had conversations with the other Plaintiff's about this
15  lawsuit?
16      **A.  No.  Like I said, other than talking to**
17  **Winston on occasion, that's the only person.  Because**
18  **some of the other complaints that's on there, I don't**
19  **even have their phone numbers.**
20      Q.  How did you become a part of this lawsuit?
21      **A.  Well, I think it started off with -- who**
22  **was that?  Slaughter and Winston complaining about**
23  **Ranzino, and we just got an attorney to represent us.**
24  **I -- you know, who exactly initiated it, I couldn't even**

174

1   tell you.  I know because there was quite a few people
2   that -- that would give opinions during roll call and
3   that they was the ones that went to, I guess went to
4   the EEOC, or whatever, and stuff and filed a formal
5   complaint.  So that's how I got on it.
6       Q.  Did you have a meeting with any of the
7   other Plaintiffs in this case ever outside of work?
8       **A.  Other than --**
9       Q.  Hang on one second.  You broke up and I
10  couldn't hear the first part of that answer.
11      **A.  You say in a meeting opposite from our**
12  **attorney that was downtown?**
13      Q.  My question is did you ever have a meeting
14  with the other Plaintiffs in this case outside of work?
15  Meaning did you guys ever gather somewhere else, outside
16  of work, to meet and discuss this litigation?
17      **A.  No.  That's -- not that I recall.**
18      Q.  So, you never recall getting together with
19  a bunch of people, coworkers, the other Plaintiffs in
20  this case, sitting around a table or gathering in a room
21  and discussing whether or not to file this lawsuit?
22      **A.  Other than me and Winston talking about it,**
23  **I don't remember gathering nobody.  The first time I**
24  **knew some of the people that was involved in the lawsuit**

175

1   **was the first day we went down there to the attorney's**
2   **office and I seen all of the people show up.  That's**
3   **when I knew it was more than just me, him and Slaughter.**
4   **I didn't even know that Kelly was involved until, you**
5   **know, we went down and seen Ms. Kelly.**
6       Q.  Who is "Shelly"?
7       **A.  What?**
8       Q.  Who is "Shelly"?
9       **A.  Ms. Kelly.**
10      Q.  Your attorney?
11      **A.  Yes.**
12      Q.  Oh, okay.  Alright.  Sorry, I
13  misunderstood.  Okay.
14          Let's see.  Have you ever been involved in
15  any other litigation?
16      **A.  What kind of litigation?**
17      Q.  Any kind?  Have you ever been involved at
18  all with any kind of litigation?  I know you said you
19  had an ex-wife.  I assume maybe you guys went through
20  a divorce proceeding?
21      **A.  Divorce, child support, stuff like that you**
22  **mean?**
23      Q.  Anything.  Like that, but also anything
24  else?

176

1       **A.  Yes.  Just divorce and that, and child**
2   **support, yes.**
3       Q.  Okay.  Have you ever been sued by a
4   detainee?
5       **A.  I'm sorry?**
6       Q.  Have you ever been sued by a detainee?
7       **A.  You know what, I would like to say no, but**
8   **I remember a couple of incidents that I don't know if I**
9   **was ever named in the lawsuit or not, but I never had**
10  **to give no kind of testimony.**
11      Q.  Okay.  What kind of incidents do you
12  remember?
13      **A.  I think when I was a supervisor, I'm trying**
14  **to remember, I think just one of the inmates was hurt**
15  **on the van, and he named me -- he might have named me.**
16  **I don't know if he just named the Sheriff's Department**
17  **or was I named in the lawsuit or not.  But I -- I**
18  **never -- I don't remember ever giving a statement.**
19      Q.  Okay.
20      **A.  This -- this happened way back.  I know**
21  **the location that it happened in and -- and some of the**
22  **people involved with it, but I really couldn't tell you**
23  **whether I had to give a deposition.  I know I had to --**
24  **I never gave this.  This is the first time I ever did**

Transcript of Samuel Page
Conducted on August 10, 2020

45 (177 to 180)

---

177

1  this. I might have had to write something to the deputy
2  chief. But it's been so long ago, I basically don't
3  remember. I just remember the location or some of the
4  circumstances around it.
5      Q. Okay. Let me ask you, you said that you
6  are friends with Legrain Winston?
7      A. Yes.
8      Q. Okay. How long have you guys known each
9  other?
10     A. Well, they say his daughter was two -- I
11 don't know her age now. I think she's like 20 something
12 now, so. I want to say it's over 20 years.
13     Q. Okay. And do you guys see each other?
14     A. Not -- not -- you know, since I left, we
15 don't see each other as much as we used to.
16     Q. Okay. What have you guys talked about in
17 relation to this lawsuit or in the allegations of this
18 lawsuit?
19     A. I don't even -- we -- the only thing we
20 ever talked about was -- oh, what was that? The --
21 oh, who all was involved in that? That case with him
22 and -- and somebody else that supposedly went to court
23 and Director Shields had to have it adjudicated, that
24 case that Shields brought up about two or three years

---

178

1  ago, about him with the Court, with the Court thing.
2  But that's the only thing we ever talked about. The
3  Court documents that happened with him in -- I think
4  his name was Shakur (phonetic), not Shakur. It was him
5  and the Spanish guy and this white guy that was -- they
6  had to testify in court, but that's the only thing we
7  ever really talked about. And that the case was still
8  going on.
9      Q. Okay. So this is an allegation, right,
10 that Mr. Winston and some of the other folks that you
11 just named were involved in some kind of an improper --
12 improper claim of time that they were working when they
13 may have not been working, right? That's the claim?
14     A. Yeah. I'm trying to think of the name.
15 They were supposed to go to testify in Court and the
16 state's attorney just dismissed them and she said they
17 falsified some time or something. You know, I don't
18 know, but I just know the case was old and I just asked
19 him. And I said, "Well, that should be over with now,"
20 and he said, "No, it's is still going on." Shedor,
21 that's his name. Shedor, Ferguson, Winston, and a
22 Spanish guy. I can't think of his name. Yeah, that's
23 what it would have been.
24     And this case here, you know, I obviously

---

179

1  didn't think this case was going to go this far.
2  Because, you know, everything gets dismissed so fast,
3  you know. I don't know.
4      Q. So what have you and Mr. Winston spoken
5  about about this case?
6      A. We haven't spoken --
7      MS. KRAUCHUN: Objection. I was going
8  to say objection; asked and answered. Go ahead. Sorry.
9      MR. LEINENWEBER: Go ahead, Mr. Page.
10     THE WITNESS: Okay. We never talked
11 about this particular case right here. Like I said,
12 my thing was with him, I was worried about him, you
13 know, losing his job over this thing, over this
14 falsifying court time, because that's something that
15 you can get fired for; falsifying time. So, that's the
16 only thing.
17     This case in particular here, I -- I really
18 didn't, you know, pay too much attention.
19     Q. Okay. So, did Mr. Winston ever tell you
20 that any of the Defendants called him the N word,
21 for example?
22     A. Did he ever tell me that? You talking
23 about, again, are you talking about this case or the one
24 with him and the Court?

---

180

1      Q. So, my question is did Mr. Winston ever
2  tell you that he had been called the N word by one of
3  the Defendants in this case?
4      A. I don't remember.
5      Q. You don't ever remember that happening,
6  right?
7      A. I don't remember, no.
8      Q. Okay. And what about, you do remember this
9  incident, right, with Ranzino? You mentioned earlier
10 where he said, "You all look alike," right?
11     A. Yeah, I'm searching my mind and I'm trying
12 to remember if it was just something in the office or
13 if it was something that I just heard him. I really
14 can't remember if it was said at roll call where it was
15 said. But I do remember that it did happen because he
16 was called in for -- well, yes, he was called in for,
17 it was a McGhee and McCall (phonetic), and then when
18 he said that, you know, well, that's what they said,
19 and I was like, "Okay."
20     Q. But you're not sure if you personally heard
21 that or if you just heard about that story?
22     A. Yeah, the last few nights I was trying to
23 remember if I heard it during roll call and I just don't
24 remember, sir.

Transcript of Samuel Page
Conducted on August 10, 2020

46 (181 to 184)

181

1    Q.   Okay.  Any other -- well, let me ask you,
2  you didn't participate in any kind of OPR or HR
3  investigation into that incident, right?
4    A.   No, I was never called in.
5    Q.   Okay.  And you never went to OPR and you
6  never went to HR and said, "Hey, I've got something to
7  tell you about this," right?
8    A.   No, I didn't.
9    Q.   Alright.  And you never went to -- sorry.
10  Strike that.
11   Do you ever remember Winston telling you
12  about any other kind of incident he had with any of the
13  another Defendants in this case?
14   A.   Any incidents that he had with any other?
15  Other than Ferguson?
16   Q.   With any of the other Defendants in this
17  case?  So, Shields or Rohloff?  We talked about the
18  Ranzino incident.  Did Mr. Winston ever tell you that
19  he had any other types of incidents with any of the
20  other Defendants, whether it be Ranzino or Shields or
21  Rohloff or Neal?
22   A.   Okay.  Did he ever say that he -- I was
23  there when they got into it about overtime.  I know they
24  kept mandating delivery units to work over, and him and

182

1  Neal had some words, but I don't know if he was -- if
2  Neal was one of the Defendants on there, too?  I don't
3  know.
4    Q.   Yes, I mean it's your lawsuit, so it is
5  a little bit surprising that you wouldn't know who one
6  of the Defendants is in this case?
7      MS. KRAUCHUN:  Objection.  There is
8  no -- argumentative.  What is the question?  I don't
9  think there is a question pending.
10  BY MR. LEINENWEBER:
11   Q.   Do you have any recollection of when this
12  discussion between Neal and Winston happened concerning
13  overtime?
14   A.   That was way back when I was still  -- I
15  think I was still a supervisor then.
16   Q.   Okay.  What about Michelle Strickland, do
17  you know her?
18   A.   Yes.
19   Q.   Okay.  And how well do you know her?
20   A.   She came over, I don't know, maybe like
21  four years before I retired or five years before I
22  retired.  I don't know her that well, no.
23   Q.   Okay.  Did she ever tell you that she was
24  being discriminated against?

183

1    A.   Basically, I think -- I don't know which
2  Defendant called her "nappy head," or something.  This
3  is what she said to me.  Called her "nappy head" or
4  something.  But it happened so long ago.  Being
5  discriminated against for being a woman.  A lot of
6  times they would try to put them in the office and
7  stuff.  They wouldn't let them go out on the street.
8  That was about the only part of the discrimination part
9  that I knew about.
10   Q.   How long ago was this that you would have
11  spoken to her about that?
12   A.   I'm sorry?
13   Q.   How long ago would this conversation with
14  her have taken place?
15   A.   That would have had to happen back in --
16  that had to happen in either '14 or -- between '13 and
17  '16.  2013 to 2016, somewhere back then.  Because I know
18  she got -- she transferred in -- she transferred out to
19  transportation and she got hurt, and that's it.  And I
20  think she was off for a year or two and then she was
21  gone.  She was gone longer than, you know, she never --
22  she never came back up to the division because by then
23  I had already retired.
24   Q.   Okay.  Did you ever observe her being

184

1  discriminated against personally or observe her
2  personally being harassed?
3    A.   No.
4    Q.   Okay.  What about Winston, other than the
5  incident where Ranzino said, "You people all look
6  alike," did you ever see him being discriminated against
7  or harassed?
8    A.   Well, they changed the words at roll call
9  sometimes.
10   Q.   So is that a "yes" or is that a "no"?  I'm
11  a little confused.
12   A.   Yes.
13   Q.   Okay.  And what are you talking about?
14   A.   Oh, some incidents would happen in roll
15  call where someone would ask a question and Ranzino
16  would respond in -- he would respond in a negative kind
17  of tone.
18   Q.   Okay.  And what would Ranzino say?
19   A.   What he would say verbatim, I couldn't even
20  tell you.  It was just a nasty way to address somebody
21  who is asking a proper question.
22   Q.   Okay.  Was it racist?  Did he use racist
23  language?
24   A.   No.  No, not this -- no.  I would say no,

Transcript of Samuel Page
Conducted on August 10, 2020

185

1  not racist.
2      Q.  What about anything else besides these
3  sort of negative interactions?  Did you ever see
4  anything you considered to be discriminatory, harassing,
5  personally observed against Winston?
6      **A.  No, I never did.**
7      Q.  Okay.  Vernell Tims, do you know Mr. Tims?
8      **A.  I know Tims, but I don't know him like**
9  **that.**
10     Q.  Okay.  Did you work on the same shift?
11     **A.  No, he worked days.  I worked with him --**
12 **he worked overtime one time and I think I worked with**
13 **him that one time he worked overtime with me.  But I**
14 **mean he might have worked overtime before, but I don't**
15 **really know him that well, no.**
16     Q.  Do you have any personal knowledge about
17 Mr. Tims being discriminated against or harassed by
18 any of the Defendants?
19     **A.  No, I don't.**
20     Q.  Okay.  I.V. Newson, Jr.?  Do you know
21 Mr. Newson?
22     **A.  Yes.**
23     Q.  Okay.  Did you guys work the same shift?
24     **A.  When he first came in, I was his**

186

1  supervisor.
2      Q.  Okay.  Are you guys friends?
3      **A.  No.**
4      Q.  Do you have any personal knowledge about
5  Mr. Newson being discriminated against, harassed or
6  being discriminated against?
7      **A.  No, I don't.**
8      Q.  So, you never saw anyone use the N word
9  with Mr. Tims or with Mr. Newson?
10     **A.  No.**
11     Q.  Alright.  Let's see.  Mr. Cecil Williams.
12 Do you know Mr. Williams?
13     **A.  Yes, I do.**
14     Q.  Did you guys work the same shift?
15     **A.  Yes.**
16     Q.  Okay.  What about Mr. Williams?  Do you
17 have any personal knowledge about Mr. Williams being
18 discriminated against or harassed or retaliated against?
19     **A.  Retaliated, and again, the roll call, a**
20 **question asked and Ranzino would have a negative**
21 **response to him.**
22     Q.  Okay.  The same kind of thing as with
23 Winston?
24     **A.  Exactly.  So they was part of it for**

187

1  awhile, yes.
2      Q.  Okay.  But, again, no racist language used
3  with Mr. Williams by Mr. Ranzino?
4      **A.  No.**
5      Q.  Okay.  Wilford Ferguson, do you know him?
6      **A.  Yes.**
7      Q.  Okay.  What about him?  Do you have any
8  personal knowledge of Mr. Ferguson being discriminated
9  against, harassed or retaliated against?
10     **A.  Oh, well, again, talking to some of the**
11 **people on the job, I heard that he got put in some --**
12 **they sent him back to the jail or something.  That was**
13 **the only thing I had known about him.  I known Ferguson**
14 **more than I know Winston, but we are not close friends.**
15     Q.  Okay.  And you never heard Ranzino or
16 Rohloff or Neal or Shields use any racist language with
17 him?
18     **A.  No.**
19     Q.  Okay.  David Walker?  Do you know Mr.
20 Walker?
21     **A.  Yes.**
22     Q.  Did you guys work the same shift?
23     **A.  Yes.**
24     Q.  You did?

188

1      **A.  But he transferred to the day shift.  Yes,**
2  **we did.**
3      Q.  Okay.  Do you have any personal knowledge
4  of Mr. Walker being discriminated against or harassed
5  or retaliated against?
6      **A.  It was -- it was over at TSS that I heard**
7  **that he and Shields got into it again.  That's the only**
8  **thing.  It was a -- a -- how do you say it?  Third**
9  **person telling me that him and Shields got into it one**
10 **time.**
11     Q.  And what is it that they were supposed to
12 have said to each other?
13     **A.  Some kind of argument, because Shields was**
14 **over there.  He wasn't just a rep then, he was the**
15 **supervisor in charge of deliveries, and him and Walker**
16 **had words.  And I don't know -- I don't know the gist of**
17 **it, but I just know that him and Shields got into it**
18 **over there.**
19     Q.  Okay.  And you never heard any of the
20 Defendants use any racist language with Walker?
21     **A.  No, I didn't.**
22     Q.  Okay.  Anthony Manning, do you know him?
23     **A.  Who?**
24     Q.  Anthony Manning?

Transcript of Samuel Page
Conducted on August 10, 2020

48 (189 to 192)

189

1    A.    I have no idea who that is.
2    Q.    Okay.  Tyrone McGhee?
3    A.    Yes.
4    Q.    Did you guys work together?
5    A.    Yes.
6    Q.    The same shift?
7    A.    Yes.
8    Q.    Okay.  Do you have any personal knowledge
9  about discrimination or harassment or retaliation that
10 McGhee experienced as a result of Defendants?
11   A.    No, I don't.
12   Q.    Okay.  Did you ever hear anyone use any
13 racist language against him?
14   A.    No, I haven't.
15   Q.    Okay.  What about Victor Slaughter?
16   A.    Okay.
17   Q.    Do you know him?
18   A.    Yes, I do.
19   Q.    Okay.  And did you guys work on the same
20 shift?
21   A.    Yes, we did.
22   Q.    Okay.  And do you have any personal
23 knowledge about him having experienced any
24 discrimination, harassment or retaliation?

190

1    A.    Well, I thought he was another person that
2  during roll call sometimes would ask a question and,
3  again, you know, the response would be harsh.  I will
4  put it to you that way.
5    Q.    Okay.
6    A.    And that's --
7    Q.    Sorry, I think I interrupted you.  Sorry.
8    A.    No, basically, you know, like I said,
9  once again, it was the same thing.  And, you know, it
10 was sometimes it seemed like it turned into a debate,
11 you know, but.
12   Q.    So, a debate, and these would have been,
13 all of these kind of arguments at roll call, they would
14 have been about assignments or job duties or shifts or
15 overtime?
16   A.    Oh, yes.  Yes.  Sometimes, you know, other
17 things, as far as, you know, assignments out on the
18 street and stuff like that.
19   Q.    Yes, like an assignment, right?
20   A.    Exactly.
21   Q.    Okay.  But, again, this wasn't like racist
22 language used against him at these types of roll call
23 events?
24   A.    No, I wouldn't say.

191

1    Q.    Okay.  And did you ever hear anyone use any
2  racist language with Slaughter?  Did any of the
3  Defendants use any racist language with him?
4    A.    No.
5    Q.    Okay.  Let's see.  Can we pull up Exhibit
6  4.
7          (PAGE Deposition Exhibit 4 marked for
8  identification.)
9  BY MR. LEINENWEBER:
10   Q.    Okay.  Mr. Page, we have pulled up Exhibit
11 4.  It says, "Charge of Discrimination" at the top and
12 it has your name on it.  Can you confirm at the bottom
13 left-hand corner, is that your signature?
14   A.    (Reviewing.)  Yes.
15   Q.    Okay.  And it looks like it is dated June
16 6th, 2016?  Does that sound right?
17   A.    It sounds about right.
18   Q.    Okay.  And it says, "I declare under
19 penalty of perjury that the foregoing is true and
20 correct," and your signature is there, right?
21   A.    Okay.
22   Q.    That's correct, right?
23   A.    Yes.
24   Q.    Okay.  So, the second paragraph here it

192

1  says, "Beginning in mid-2009 and continuing through
2  the present I believe that I have been harassed and
3  discriminated against based on my race,
4  African-American, and color"?
5    A.    Yes.
6    Q.    Okay.  Are there any other facts which
7  you allege support that claim of harassment and
8  discrimination, other than what we've talked about
9  today?
10   A.    No.  That's about it.
11   Q.    Sorry, you broke up a little bit.  Could
12 you say that again?
13   A.    I said, "That's about it."
14   Q.    Okay.  And then you say, "Further, my
15 direct supervisor, Shields and Ranzino, continue to
16 discriminate against me and some have made derogatory
17 comments to me"?
18   A.    Yes.
19   Q.    What are you referring to there?
20   A.    Derogatory comments?
21   Q.    Yes.
22   A.    Like the one he made about how did I ever
23 become a supervisor.
24   Q.    Okay.

Transcript of Samuel Page
Conducted on August 10, 2020

193

1      A.  Who promoted, you know, who promoted me to
2  supervisor.
3      Q.  Okay.
4      A.  Like that.
5      Q.  Okay.  And then you talk about having
6  been demoted from a supervisor to an investigator.
7  And then you say here that you've been retaliated
8  against for complaining of being discriminated against
9  and being treated differently than Caucasian
10 investigators.  (Reading.)  Do you see that?
11     A.  Okay.
12     Q.  So, earlier I asked you if you were
13 claiming that you had been retaliated against and
14 you said no.  So, are you saying that you have been
15 retaliated against?  Because in your interrogatory
16 answers, I believe you answered no, or at least you
17 testified earlier no?
18     A.  I got what you are saying.  I'm saying the
19 thing that I'm trying -- I guess I'm trying to get you
20 to understand, any time you get those assignments that
21 I was getting, I feel that it might have been a
22 retaliatory strike against me, because it was a garbage
23 assignment, you know.  That's how I feel, it was a
24 garbage assignment.  So, it could have been a

194

1  retaliatory thing or, like you said, it could have
2  been just an assignment.  But to me it was a strike
3  because he had no real grounds to write up, but he
4  was threatening me with a write-up anyway.
5      Q.  Okay.  So, anything else that -- that you
6  are referencing here regarding retaliation?
7      A.  No.
8      Q.  Okay.  Alright.  You can set that one
9  aside.
10         MR. LEINENWEBER:  Why don't we take
11 five minutes, a five-minute break, and then let me see
12 if I can -- I might just have a couple more to wrap up,
13 and then your attorney may have some questions for you,
14 Mr. Page, but I think we are getting closer to the end.
15 But why don't we come back in, let's say, five minutes?
16 It is 3:12 now.
17         MS. KRAUCHUN:  3:15.
18         MR. LEINENWEBER:  Yes, like 3:15, 3:17,
19 I will be as quick as possible.
20         MS. KRAUCHUN:  Okay.
21         (Off the record.)
22 BY MR. LEINENWEBER:
23     Q.  Mr. Page, we are back on the record.  I
24 don't have any further questions for you.  I just want

195

1  to say thank you very much for your time today and your
2  participation here.  I do want to ask your attorney
3  to see about reviewing and turning over the notes and
4  documents that Mr. Page referenced earlier today, as
5  they can be responsive to our document request.  And if
6  they are, turn them over.  I think that's everything
7  from my end.  So, Kelly, I will turn it over to you.
8         MS. KRAUCHUN:  Sounds good.  And I will
9  work with my client to get that stuff turned over to you
10 guys, so, just on the record.
11         MR. LEINENWEBER:  Thank you.
12
13         EXAMINATION
14 BY MS. KRAUCHUN:
15     Q.  I just have a few questions, Sam, to
16 clarify a few things.
17         Do you recall during your testimony that
18 you testified that the term "You people" was addressed
19 to you.  When someone says, quote, "You people," what
20 do you think that means?
21     A.  To me discrimination.
22         MR. LEINENWEBER:  Objection;
23 foundation.
24     A.  Do I answer?

196

1         (Off the record.)
2      A.  Do I answer now?
3      Q.  Yes.  Go ahead, you can answer.
4      A.  To me it is negative, it is very negative.
5  To me it is racial, to me, you know, when you categorize
6  "you people."  Because we're all people, you know.
7  So, when you say, "You people," to me, it specifies a
8  certain race of people.
9      Q.  And specifically African-American people?
10     A.  Minorities, yes.
11     Q.  Okay.  And there was a lot of talk about
12 seniority with assignments.  And would you agree with me
13 that seniority always was typically taken into account
14 when assigning job duties?
15         MR. LEINENWEBER:  Objection to form,
16 foundation, and also leading.
17     Q.  You can answer it.
18     A.  Yes.
19     Q.  And just give me a minute because my notes
20 are all over the place, so bear with me.
21         And you testified about black investigators
22 getting assigned to high-incident areas.  Does that
23 prevent new white officers from getting assigned to
24 those areas, if only the black investigators are getting

197

1 assigned to the high-incident areas?
2          MR. LEINENWEBER: Same objections.
3          THE WITNESS: Yes.
4 BY MS. KRAUCHUN:
5      Q. I'm sorry, what was your answer?
6      **A. Yes.**
7      Q. Okay. And you testified that there were
8 no racist comments directed specifically to you, but
9 were you aware that there were racist comments being
10 made to other officers?
11          MR. LEINENWEBER: Objection to form,
12 foundation. Also misstates prior testimony.
13          THE WITNESS: What does that mean?
14 Okay, do I answer the question now?
15          MS. KRAUCHUN: Yes.
16 BY MS. KRAUCHUN:
17      **A. Okay. And your question was did I hear**
18 **or -- or -- I'm sorry, could you repeat it one more**
19 **time?**
20      Q. Were you made aware that other black
21 investigators had racist comments made to them?
22      **A. Yes. Like I said, the word "You people,"**
23 **was certainly used around me, we're talking the black**
24 **investigators.**

198

1      Q. Okay. And you talked a lot about how
2 Ranzino threatened to write you up all of the time.
3 Do you believe that this treatment was different than
4 the way Ranzino treated white officers?
5      **A. Yes.**
6      Q. So, you've had a pretty long career with
7 the Sheriff's Department, correct?
8      **A. Correct.**
9      Q. And did you have any discipline issues or
10 did you ever have issues with the things you described,
11 as far as roll call and asking questions, with any other
12 supervisors prior to Shields and Ranzino?
13      **A. The -- are you speaking about my whole**
14 **years at the County or just EM?**
15      Q. In EM specifically?
16      **A. No, I didn't. No, just -- just those two.**
17      Q. Did you ever receive any complaints from
18 your supervisors about your job performance?
19      **A. Okay, when you say that, are you talking**
20 **about me as a supervisor or me just as an investigator?**
21      Q. As an investigator, during your career,
22 did you receive any complaints that you weren't getting
23 the job done?
24      **A. No.**

199

1      Q. Do you feel that under Shields' supervision
2 and administration that black investigators were treated
3 differently?
4          MR. LEINENWEBER: Objection to form and
5 foundation.
6      Q. You can answer.
7      **A. Okay. Yes.**
8      Q. Okay. Just give me a minute to just scroll
9 through here. (Reviewing.)
10          And then there were some questions about
11 overtime, being required to work overtime when you were
12 assigned to TSS.
13          Do you remember that line of questioning?
14      **A. Yes.**
15      Q. And when you say you are required to work
16 overtime, does that mean you are ordered to work
17 overtime?
18      **A. Okay, can I elaborate on that?**
19      Q. Yes. But -- yes. Absolutely.
20      **A. Okay. I say, okay, sometimes if I was**
21 **assigned to monitoring and the count wasn't correct,**
22 **I would have to stay there until the count was cleared.**
23 **So, I had to make sure that all of the books in the**
24 **computers were cleared out and that would generate the**

200

1 overtime.
2      Q. And what would happen if you didn't do
3 that?
4      **A. I couldn't. I had to do the count.**
5 **Sometimes the roll call supervisor would help me, but**
6 **you know, but the third watch, before we turned over to**
7 **the first watch, you had to make sure that the count**
8 **was correct, so again, that generated the overtime.**
9      Q. And if you didn't do that, could you have
10 received discipline for it?
11      **A. Yes.**
12      Q. Did you ever make any complaints about
13 having to finish those duties before you finished your
14 tour of duty?
15      **A. Yes.**
16      Q. And what was the response to those
17 complaints?
18      **A. "You better stay there until it's cleared."**
19 **It was if they were getting off, I had to stay. It was**
20 **just that simple.**
21      Q. And when you made those complaints did
22 you feel that it caused more problems for you in respect
23 to making your -- making your job more tense or hostile?
24      **A. Yes.**

Transcript of Samuel Page
Conducted on August 10, 2020

---

**201**

1        MS. KRAUCHUN:  I don't think I have

2  anything else.  If you guys just want to give me a

3  minute, I will scroll through those.

4        MR. LEINENWEBER:  No problem.

5        (Off the record.)

6  BY MS. KRAUCHUN:

7     Q.  Other than your race, were there -- did you

8  believe that there was any other like legitimate purpose

9  why things were said to black investigators in roll call

10 as opposed to not being said to white investigators in

11 roll call?

12        MR. LEINENWEBER:  Objection to form and

13 foundation.

14 BY MS. KRAUCHUN:

15    Q.  Do you understand what I am asking you?

16    **A.  No, I don't.**

17    Q.  So, you talked about in roll call, if a

18 black investigator asked a question and they were kind

19 of -- I believe your testimony was, you know, the

20 response was very hostile and it was done right in front

21 of everybody at roll call.  Do you remember testifying

22 to that?

23    **A.  Yes.**

24    Q.  Okay.  Other than your difference in race,

---

**202**

1  between the white officers that were then brought

2  into the office to discuss their questions, do you

3  think there was any other reason why that was done that

4  way besides race?

5     **A.  No, I don't.  I don't know -- I don't**

6  **really think -- to me the questions are legitimate.**

7  **I don't see no other reason why.**

8     Q.  So, based on that, do you feel that you

9  were treated differently than white officers?

10    **A.  Oh, yes.  Most definitely.**

11        MS. KRAUCHUN:   Justin, I don't think

12 I have anything further.  If you have anything?

13        MR. LEINENWEBER:  I don't have

14 anything.

15        Did you, Ethan?  Do you have anything

16 you want me to follow up on?  I think we are good,

17 right?

18        MR. WHITE:  I think we are good.

19

20        (Off the record.)

21

22        MS. KRAUCHUN:  I am going to wait

23 to order, but we will likely order, and it will be

24 electronic when we do.

---

**203**

1        COURT REPORTER:  So, no order for now,

2  correct?

3        MS. KRAUCHUN:  For now, right.  I will

4  circle back with you when we are ready to order.

5

6        (Whereupon, the deposition was

7  concluded at 3:25 p.m.)

---

**204**

1        STATE OF MINNESOTA
2  COUNTY OF WASHINGTON          CERTIFICATE
3
4
5        I, Ann Marie Holland, hereby certify that I
   reported remotely the deposition of SAMUEL PAGE,
6  virtually conducted on the 10th day of August 2020,
   and that the witness was by me first duly sworn to
7  tell the truth and nothing but the truth concerning
   the matter in controversy aforesaid;
8        That I was then and there a Notary Public in
   and for the County of Washington, State of Minnesota,
9  and that by virtue thereof, I was duly authorized to
   administer an oath;
10
       That the foregoing transcript is a true and
11 correct transcript of my stenographic notes in said
   matter, transcribed under my direction and control to
12 the best of my ability;
13       That the cost of the original has been charged
   to the party who noticed the deposition and that all
14 parties who ordered copies have been charged at the
   same rate for such copies;
15
       That the reading and signing of the deposition
16 was not waived;
17       That I am not related to any of the parties
   hereto, nor interested in the outcome of the action and
18 have no contract with any parties, attorneys or persons
   with an interest in the action that has a substantial
19 tendency to affect my impartiality;
20       WITNESS MY HAND AND SEAL this 28th day of
   September, 2020.
21
22
23 _____
   Ann M. Holland, CSR
24       Notary Public

Transcript of Samuel Page
Conducted on August 10, 2020

52

| **A** | acknowledge | 102:13, 138:10, | 31:19, 31:21, |
|---|---|---|---|
| a-r-m-i-t-a-g-e | 4:19, 5:2 | 195:18 | 47:23, 48:11, |
| 91:10 | action | addressing | 50:13, 50:17, |
| abandoned | 35:16, 37:5, | 133:1 | 60:13, 70:17, |
| 43:22, 44:3, | 39:3, 133:4, | adjudicated | 73:10, 75:6, |
| 71:18 | 146:2, 163:3, | 177:23 | 80:19, 82:24, |
| abilities | 204:28, 204:30 | adjustment | 83:20, 83:21, |
| 7:17 | actions | 43:19 | 87:4, 88:13, |
| ability | 107:9, 145:20, | administer | 91:20, 97:7, |
| 46:6, 50:15, | 147:1, 147:12, | 204:14 | 98:5, 101:7, |
| 204:19 | 159:4, 159:5, | administration | 103:18, 107:11, |
| able | 159:9, 159:12, | 49:19, 65:6, | 128:11, 131:15, |
| 27:18, 38:5, | 159:13, 159:14, | 112:8, 199:2 | 138:10, 141:24, |
| 48:20, 48:22, | 159:22, 160:14, | admissibility | 142:6, 142:14, |
| 50:4, 68:7, | 168:17 | 4:21 | 143:10, 144:18, |
| 86:16, 87:23, | activities | advance | 150:13, 150:18, |
| 130:23, 131:12, | 58:4, 141:8 | 4:14 | 151:2, 157:3, |
| 156:20, 156:23, | activity | adverse | 160:24, 179:23, |
| 159:24, 160:19 | 58:8, 63:3, | 145:20, 146:2, | 186:19, 187:2, |
| above | 92:24, 94:2 | 147:12 | 187:10, 188:7, |
| 19:13, 155:23 | acts | affect | 190:3, 190:9, |
| above-entitled | 155:18 | 204:31 | 190:21, 192:12, |
| 5:8 | actual | affected | 200:8 |
| absolutely | 15:23, 24:23, | 169:6 | against |
| 199:19 | 39:2, 76:19, | affidavit | 28:20, 39:4, |
| abuse | 142:7 | 67:13 | 145:14, 145:16, |
| 101:21 | actually | aforesaid | 182:24, 183:5, |
| academy | 13:18, 30:24, | 204:10 | 184:1, 184:6, |
| 88:2 | 37:17, 40:10, | african-american | 185:5, 185:17, |
| acceptable | 51:6, 65:7, | 127:13, 132:19, | 186:5, 186:6, |
| 6:11 | 73:13, 74:1, | 132:22, 134:11, | 186:18, 187:9, |
| access | 83:16, 106:20, | 144:9, 150:3, | 188:4, 188:5, |
| 113:17 | 110:9, 114:7, | 192:4, 196:9 | 189:13, 190:22, |
| according | 115:4, 133:11, | african-americans | 192:3, 192:16, |
| 113:3, 131:18, | 137:2, 148:21, | 150:11 | 193:8, 193:13, |
| 152:2, 171:10 | 155:8 | after | 193:15, 193:22 |
| account | add | 5:9, 20:22, | age |
| 22:22, 23:7, | 140:20, 141:1 | 21:19, 26:15, | 177:11 |
| 34:4, 170:2, | addition | 29:6, 39:18, | ago |
| 196:13 | 22:14 | 40:21, 41:15, | 72:15, 74:1, |
| accurate | additional | 57:14, 74:8, | 122:16, 177:2, |
| 7:14, 116:20, | 7:20, 114:17, | 74:22, 78:6, | 178:1, 183:4, |
| 150:17, 169:24 | 163:22 | 98:2, 98:11, | 183:10, 183:13 |
| accused | address | 112:22, 114:20, | agree |
| 135:24 | 128:17, 128:18, | 115:13, 133:7 | 4:23, 47:18, |
| achieve | 169:22, 169:23, | again | 139:14, 196:12 |
| 160:19 | 170:12, 184:20 | 6:13, 24:15, | agreement |
| | addressed | 27:17, 27:22, | 49:24 |
| | 23:16, 67:21, | | |

Transcript of Samuel Page
Conducted on August 10, 2020

53

**ahead**
27:15, 43:8,
58:11, 59:3,
65:13, 65:22,
65:23, 74:4,
75:22, 84:11,
85:12, 116:4,
127:5, 145:10,
167:20, 168:13,
173:4, 179:8,
179:9, 196:3
**aide**
117:14
**aided**
8:9
**ain't**
77:17
**air-conditioning**
120:16
**al**
1:13
**alike**
180:10, 184:6
**all**
3:21, 3:23,
4:23, 4:24,
7:10, 10:22,
14:1, 16:4,
19:6, 26:2,
27:13, 30:19,
31:8, 32:20,
33:15, 35:17,
39:4, 39:19,
41:17, 46:20,
46:23, 47:2,
47:8, 48:16,
51:23, 52:2,
53:10, 55:2,
55:20, 55:21,
62:15, 63:7,
63:16, 64:20,
64:23, 66:1,
67:5, 67:20,
75:11, 87:16,
88:4, 89:14,
91:21, 92:7,
93:14, 93:19,
93:20, 95:8,

97:9, 97:11,
97:12, 97:15,
97:22, 98:17,
100:8, 101:6,
109:2, 111:11,
111:23, 118:9,
118:16, 119:12,
122:19, 124:19,
125:16, 126:16,
127:6, 130:24,
138:17, 140:4,
140:11, 145:1,
146:6, 147:5,
149:3, 149:5,
153:4, 155:22,
156:1, 157:5,
159:7, 161:6,
161:16, 161:17,
164:8, 165:14,
175:2, 175:18,
177:21, 180:10,
184:5, 190:13,
196:6, 196:20,
198:2, 199:23,
204:21
**allegation**
178:9
**allegations**
80:13, 177:17
**allege**
118:17, 119:15,
131:14, 140:18,
155:18, 156:24,
159:1, 160:7,
167:7, 192:7
**alleged**
130:18
**alleging**
145:13, 159:18
**allow**
6:7, 6:8,
160:23
**allowed**
25:16, 71:7,
76:15
**almost**
23:18, 60:17,
75:23, 76:3,

90:9, 115:5,
129:15, 136:14
**along**
158:4
**aloud**
87:9
**already**
43:3, 43:15,
100:12, 109:22,
110:8, 120:11,
120:12, 122:24,
134:22, 136:6,
140:19, 144:21,
183:23
**alright**
6:20, 7:13,
9:3, 12:6,
19:17, 27:8,
27:16, 27:21,
32:14, 41:9,
43:8, 56:1,
58:17, 90:17,
91:18, 95:13,
97:10, 108:2,
109:17, 116:11,
124:15, 125:4,
131:11, 135:6,
135:10, 143:13,
145:2, 151:14,
152:20, 153:24,
154:3, 155:12,
157:6, 157:7,
161:4, 162:4,
173:5, 175:12,
181:9, 186:11,
194:8
**also**
2:23, 21:24,
22:24, 26:21,
27:24, 30:12,
81:15, 86:11,
113:23, 124:4,
127:14, 132:21,
137:19, 145:3,
145:4, 147:15,
175:23, 196:16,
197:12
**always**
84:15, 84:24,

106:15, 121:1,
138:17, 138:24,
152:8, 196:13
**amount**
77:19, 109:21,
154:3, 162:21
**anguish**
112:16, 165:6
**ann**
1:29, 6:9,
14:9, 14:12,
87:6, 91:8,
124:3, 204:5,
204:36
**annunciate**
124:4
**another**
32:6, 32:12,
76:18, 85:20,
97:4, 97:19,
97:20, 102:8,
114:19, 118:22,
118:24, 134:7,
160:1, 160:17,
181:13, 190:1
**answer**
6:6, 6:8, 6:15,
6:17, 6:22, 7:9,
31:23, 50:6,
74:6, 77:18,
84:13, 86:21,
86:22, 87:10,
88:8, 93:15,
112:6, 121:5,
130:13, 135:16,
159:16, 162:15,
169:18, 174:10,
195:24, 196:2,
196:3, 196:17,
197:5, 197:14,
199:6
**answered**
102:3, 138:2,
138:4, 179:8,
193:16
**answering**
34:3, 87:13,
120:14, 144:4

Transcript of Samuel Page
Conducted on August 10, 2020
54

answers
3:16, 9:17,
11:21, 88:4,
109:7, 157:14,
158:14, 193:16
anthony
1:8, 188:22,
188:24
anticipate
4:3, 6:5, 6:6
anybody
10:23, 56:12,
172:6, 172:8,
172:14
anymore
113:7
anyone
7:22, 10:17,
11:4, 28:21,
57:13, 72:10,
117:9, 117:17,
151:14, 170:13,
170:19, 172:18,
186:8, 189:12,
191:1
anything
9:5, 9:23,
10:2, 12:4,
13:22, 18:4,
18:17, 18:21,
24:4, 29:5,
29:19, 31:17,
42:23, 43:24,
59:3, 68:11,
79:16, 80:1,
80:2, 104:22,
116:17, 135:10,
139:16, 140:19,
141:1, 143:14,
143:15, 143:19,
159:7, 164:17,
175:23, 185:2,
185:4, 194:5,
201:2, 202:12,
202:14, 202:15
anyway
98:17, 194:4
anywhere
82:18, 155:2,

155:6
apologize
4:13
appear
67:9
appearances
2:1
appeared
2:7, 2:14, 2:19
apply
56:2, 56:4,
57:6, 81:8,
103:4, 103:9,
106:10, 107:2,
107:11, 107:15,
107:22, 156:4
appointed
22:21
appreciate
143:23
appropriate
37:14
appropriately
138:2
approved
161:2
approximate
128:5
approximately
21:6, 21:20,
25:4, 39:11,
135:20
april
13:4, 60:16
arbitrarily
61:6
arbitration
61:14, 66:11,
66:15, 66:18,
66:20, 67:9,
67:11, 67:14,
67:16, 68:2,
68:3, 68:20,
68:22, 111:12,
111:20, 111:24
arbitrator
111:21, 112:6
area
12:23, 43:14,

47:12, 47:16,
58:2, 58:3,
58:7, 58:9,
82:6, 83:24,
84:21, 88:12,
89:17, 90:7,
90:8, 90:17,
90:19, 90:23,
91:18, 91:19,
91:24, 92:8,
93:13, 94:4,
94:18, 94:22,
95:17, 95:18,
98:24, 99:24,
100:18, 100:21,
102:8, 134:3,
154:24, 155:1,
155:3, 155:9
areas
32:21, 34:4,
46:14, 47:3,
47:5, 47:6,
47:8, 47:9,
81:7, 81:13,
82:16, 82:21,
83:3, 83:5,
83:19, 84:5,
84:16, 84:18,
86:5, 86:6,
89:3, 89:4,
89:11, 89:14,
89:15, 89:16,
89:19, 89:21,
90:1, 91:22,
92:19, 92:23,
93:4, 93:24,
94:7, 96:9,
96:21, 96:23,
96:24, 98:3,
98:9, 99:18,
99:23, 100:1,
100:8, 101:9,
101:14, 104:19,
140:24, 141:2,
147:8, 154:4,
196:22, 196:24,
197:1
areas"
104:15

argued
79:2
arguing
79:21, 80:1
argument
76:20, 78:10,
78:11, 79:5,
79:13, 79:18,
79:19, 80:5,
188:13
argumentative
86:19, 182:8
arguments
190:13
armitage
91:4, 91:5,
91:9, 91:11,
91:13, 91:16
around
12:16, 52:8,
53:12, 53:13,
60:21, 82:1,
82:2, 114:24,
115:6, 126:13,
128:6, 174:20,
177:4, 197:23
arrest
25:12
aside
194:9
asked
56:8, 56:10,
56:14, 81:20,
85:13, 109:24,
112:19, 116:15,
116:17, 118:15,
127:10, 135:21,
137:1, 140:17,
143:6, 144:22,
167:5, 169:21,
171:6, 172:3,
172:13, 178:18,
179:8, 186:20,
193:12, 201:18
asking
6:7, 35:11,
37:9, 88:5,
93:7, 116:23,

Transcript of Samuel Page
Conducted on August 10, 2020

55

119:14, 155:5,
163:21, 168:19,
171:2, 171:18,
184:21, 198:11,
201:15
**asks**
111:10, 114:13,
123:13, 130:16,
132:12, 134:20,
141:7, 145:20,
155:17
**assessed**
38:6
**assessments**
41:6
**assign**
27:4, 31:20
**assigned**
27:7, 32:9,
32:18, 51:10,
51:14, 52:10,
54:1, 54:10,
70:6, 71:13,
72:5, 72:13,
72:15, 73:18,
73:22, 74:10,
76:13, 82:6,
85:7, 96:8,
96:9, 96:11,
96:14, 96:21,
96:22, 96:23,
100:23, 101:3,
101:5, 102:19,
102:20, 104:13,
104:14, 105:3,
118:18, 123:14,
126:2, 126:7,
127:13, 127:14,
127:21, 127:24,
129:20, 129:21,
130:1, 130:5,
130:7, 131:16,
134:4, 152:4,
155:9, 196:22,
196:23, 197:1,
199:12, 199:21
**assigning**
106:2, 126:23,

196:14
**assignment**
22:23, 26:22,
31:15, 32:24,
33:2, 33:5,
41:20, 41:24,
44:8, 44:16,
44:22, 46:11,
47:19, 47:22,
48:9, 48:20,
49:9, 49:11,
50:4, 50:13,
50:14, 50:16,
51:4, 51:6,
52:1, 52:15,
52:16, 52:20,
53:4, 53:7,
53:22, 53:23,
71:4, 71:8,
72:7, 75:16,
77:14, 77:15,
77:18, 77:20,
78:4, 88:13,
88:15, 100:1,
102:22, 105:11,
105:19, 119:7,
119:8, 120:14,
122:4, 127:2,
127:7, 129:9,
147:4, 149:10,
190:19, 193:23,
193:24, 194:2
**assignments**
31:5, 31:7,
31:18, 32:3,
33:8, 33:13,
33:16, 33:18,
42:6, 44:19,
45:2, 45:3,
45:4, 45:13,
45:17, 48:23,
50:3, 51:7,
53:10, 69:8,
69:20, 82:8,
101:13, 101:17,
102:5, 102:24,
103:1, 104:14,
105:11, 117:1,

117:3, 118:16,
119:14, 119:18,
121:14, 127:11,
127:12, 140:18,
140:21, 142:9,
144:13, 144:19,
147:7, 147:8,
190:14, 190:17,
193:20, 196:12
**assistance**
8:8
**assistant**
56:17, 161:1,
161:7, 161:12,
161:18
**associated**
40:15, 145:22
**assume**
7:10, 94:8,
175:19
**assuming**
112:5
**attack**
148:8
**attend**
67:16
**attended**
62:8, 122:2
**attending**
4:2
**attention**
74:11, 74:16,
74:21, 75:1,
142:19, 179:18
**attentiveness**
155:24, 156:6
**attitude**
148:6, 153:5
**attorney**
10:4, 10:5,
10:17, 11:3,
11:17, 86:22,
122:10, 164:5,
164:19, 166:3,
166:9, 170:4,
170:10, 170:11,
170:21, 173:23,
174:12, 175:10,

178:16, 194:13,
195:2
**attorney's**
175:1
**attorneys**
5:15, 7:3,
164:1, 166:3,
170:11, 171:14,
171:18, 173:8,
204:29
**audio**
13:23, 35:6,
127:15, 127:21,
128:1, 128:9,
129:1, 129:20,
130:2, 130:8
**august**
1:20, 204:7
**authority**
13:10, 56:13,
165:14
**authorized**
204:13
**avenue**
46:23, 91:9
**aviation**
13:1
**aware**
4:3, 27:10,
28:9, 30:16,
31:5, 31:17,
33:8, 134:10,
197:9, 197:20
**away**
4:6, 49:16,
49:17, 49:18,
62:23, 63:7,
75:17, 135:9,
157:7
**awhile**
51:22, 55:9,
70:9, 72:23,
187:1

**B**

**b-a-n**
124:18
**baby**
149:20

Transcript of Samuel Page
Conducted on August 10, 2020

56

bachelor
12:21
bachelors
12:12
back
8:23, 24:2,
24:12, 25:5,
26:3, 31:12,
34:10, 42:10,
42:21, 48:11,
48:13, 50:9,
59:5, 61:18,
61:23, 70:17,
70:19, 79:7,
79:22, 82:24,
83:6, 83:11,
83:14, 87:7,
95:13, 97:5,
97:18, 108:10,
112:8, 119:24,
128:15, 129:4,
129:7, 129:9,
129:23, 133:16,
134:2, 142:13,
143:9, 144:1,
149:21, 152:16,
166:13, 166:14,
167:4, 170:7,
176:20, 182:14,
183:15, 183:17,
183:22, 187:12,
194:15, 194:23,
203:4
backs
74:24
backup
4:4
bad
27:17, 72:23
band
25:20, 42:15
bargaining
49:24
baroni
2:17
based
4:21, 50:5,
96:7, 105:3,

105:4, 106:3,
192:3, 202:8
basement
43:22, 44:3,
71:13, 71:14,
71:18, 72:14,
73:18, 73:22,
74:2, 104:14,
104:17, 116:18,
116:24, 117:11,
120:7, 123:14,
123:16, 123:18,
127:14
basic
31:24
basically
18:18, 19:1,
22:1, 28:15,
33:11, 42:4,
44:1, 46:18,
66:6, 74:19,
100:23, 117:2,
117:3, 131:1,
139:6, 142:9,
166:8, 177:2,
183:1, 190:8
basis
50:21, 65:5,
68:7, 105:7,
105:21, 110:19,
111:3, 129:18,
161:14, 165:11
bathroom
59:2
bear
196:20
became
49:4, 135:18,
136:4
become
160:23, 173:20,
192:23
been
5:9, 15:18,
29:24, 55:9,
56:22, 59:15,
65:10, 70:9,
75:3, 78:24,

79:7, 88:5,
88:7, 88:24,
89:15, 90:12,
91:21, 108:13,
113:15, 115:21,
115:23, 117:13,
117:15, 117:20,
117:22, 118:18,
122:24, 124:20,
126:17, 135:22,
154:7, 154:8,
154:9, 155:8,
155:15, 157:12,
160:15, 168:9,
169:12, 175:14,
175:17, 176:3,
176:6, 177:2,
178:13, 178:23,
180:2, 190:12,
190:14, 192:2,
193:6, 193:7,
193:13, 193:14,
193:21, 193:24,
194:2, 204:20,
204:22
before
1:29, 4:11,
5:21, 6:22,
21:5, 26:23,
35:9, 42:19,
66:7, 89:19,
91:16, 97:22,
108:5, 143:24,
149:16, 150:8,
157:4, 171:1,
182:21, 185:14,
200:6, 200:13
began
15:1, 60:15,
60:20
begin
15:15, 20:20
beginning
13:8, 84:20,
192:1
behalf
38:16, 38:18,
66:1, 66:14,

67:13
behavior
130:18, 131:14,
150:20, 150:24,
151:3
behaviors
150:17
being
26:22, 31:4,
38:17, 39:11,
43:2, 43:22,
44:13, 52:5,
63:20, 65:4,
71:12, 74:16,
74:24, 76:13,
84:16, 86:16,
87:16, 96:8,
96:9, 97:8,
101:21, 107:24,
110:5, 113:24,
114:15, 114:20,
115:5, 115:7,
126:7, 126:15,
127:14, 129:4,
129:7, 131:19,
133:18, 138:12,
139:16, 142:10,
143:17, 144:7,
150:8, 155:9,
155:19, 159:24,
161:17, 163:4,
165:12, 165:13,
182:24, 183:4,
183:5, 183:24,
184:2, 184:6,
185:17, 186:5,
186:6, 186:17,
187:8, 188:4,
193:8, 193:9,
197:9, 199:11,
201:10
belief
109:9, 158:16
believe
29:22, 37:12,
85:14, 87:15,
95:21, 125:11,
162:2, 192:2,

193:16, 198:3,
201:8, 201:19
**believed**
30:9, 37:13
**belittling**
138:3, 138:5
**below**
142:1
**bench**
31:12
**benefit**
114:20, 163:5
**benefits**
114:17, 114:18,
163:2, 163:4
**benefitting**
86:16
**besides**
135:10, 151:9,
185:2, 202:4
**best**
7:17, 7:18,
109:8, 124:5,
125:23, 158:15,
204:19
**better**
14:10, 14:14,
28:2, 44:14,
87:24, 200:18
**between**
16:9, 19:3,
19:15, 22:9,
41:23, 53:9,
73:1, 75:7,
106:17, 117:6,
133:12, 133:15,
133:22, 133:24,
136:12, 161:16,
162:23, 182:12,
183:16, 202:1
**bid**
47:22, 48:20,
48:22, 48:24,
49:4, 49:5,
49:8, 49:11,
50:4, 50:5,
50:16, 71:7
**bidding**
50:2, 71:4

**bieniek**
77:2, 77:3,
78:7, 78:14,
78:17, 79:11,
79:20, 80:4,
124:18, 139:24
**bit**
13:22, 25:9,
31:24, 41:11,
65:2, 72:24,
85:2, 112:16,
112:17, 120:1,
127:9, 136:7,
158:24, 166:23,
182:5, 192:11
**black**
55:23, 75:24,
76:1, 81:15,
96:8, 133:2,
136:19, 137:7,
137:9, 149:12,
152:11, 153:2,
196:21, 196:24,
197:20, 197:23,
199:2, 201:9,
201:18
**blacks**
51:22, 52:9,
53:18, 54:22,
74:12, 76:2,
81:12
**blood**
166:23, 167:13,
167:16, 167:23,
168:4, 168:8,
168:10, 169:5
**board**
38:12
**bond**
31:8
**book**
113:14, 113:15,
113:17, 148:2
**books**
114:21, 199:23
**bosses**
161:6
**both**
40:9, 43:5,

**bottom**
150:2, 158:5
191:12
**brass**
126:15
**break**
6:20, 6:23,
58:15, 83:7,
84:19, 194:11
**breaking**
13:21
**breaks**
120:17
**briefly**
30:18
**bring**
8:23, 25:14,
43:14, 74:16,
74:20, 84:17,
85:20
**bringing**
55:6
**broadcasting**
138:11
**broke**
135:13, 174:9,
192:11
**brook**
2:12
**brought**
61:13, 66:12,
74:11, 74:17,
75:1, 75:4,
75:8, 75:11,
77:11, 77:24,
138:8, 171:22,
177:24, 202:1
**bucket**
32:2
**building**
43:11, 43:12
**bulk**
171:16
**bullpen**
43:11
**bunch**
36:5, 43:10,
174:19

**bus**
13:12, 14:19

**C**

**c-a-b-a-l-o-r-y**
124:17
**cabarello**
124:13, 124:17
**cable**
14:2
**cadet**
15:6, 15:8
**call**
14:16, 17:8,
23:12, 27:23,
42:11, 43:13,
44:18, 44:21,
44:24, 48:13,
75:4, 76:11,
77:12, 77:24,
87:23, 101:8,
103:22, 104:2,
129:17, 133:6,
133:7, 134:2,
134:3, 136:21,
137:5, 137:6,
137:10, 137:14,
137:24, 138:1,
138:11, 140:13,
142:23, 171:3,
171:14, 172:1,
172:2, 174:2,
180:14, 180:23,
184:8, 184:15,
186:19, 190:2,
190:13, 190:22,
198:11, 200:5,
201:9, 201:11,
201:17, 201:21
**called**
17:10, 31:15,
63:17, 65:14,
102:17, 103:15,
171:22, 179:20,
180:2, 180:16,
181:4, 183:2,
183:3
**calling**
23:21, 73:11,

Transcript of Samuel Page
Conducted on August 10, 2020

58

73:12, 113:11
**calls**
62:8, 84:10,
168:12
**came**
26:24, 28:13,
34:2, 44:11,
52:6, 55:17,
62:7, 75:15,
75:18, 82:8,
83:1, 83:3,
115:13, 123:17,
125:18, 125:22,
126:2, 126:10,
129:4, 129:7,
133:5, 133:20,
136:21, 147:1,
157:3, 182:20,
183:22, 185:24
**camera**
116:2
**can't**
6:16, 7:14,
8:20, 11:12,
19:20, 20:1,
20:5, 20:11,
20:13, 20:15,
23:20, 29:7,
30:19, 33:22,
54:6, 60:2,
62:7, 62:8,
75:24, 91:6,
92:6, 92:7,
97:12, 113:19,
115:8, 116:7,
124:11, 124:13,
124:14, 125:12,
125:13, 125:14,
125:16, 128:4,
137:16, 139:16,
149:18, 151:24,
153:20, 157:3,
157:5, 178:22,
180:14
**cannot**
6:14
**car**
24:16, 27:4,

102:10, 102:11
**card**
42:6
**cards**
42:10
**care**
167:7, 167:10
**career**
49:8, 198:6,
198:21
**cars**
100:5, 102:21,
102:24, 103:1
**carter**
18:10
**case**
1:12, 8:17,
10:20, 11:1,
50:24, 59:22,
67:17, 105:8,
106:2, 159:2,
159:4, 159:12,
160:8, 160:11,
160:14, 162:18,
163:3, 164:4,
174:7, 174:14,
174:20, 177:21,
177:24, 178:7,
178:18, 178:24,
179:1, 179:5,
179:11, 179:17,
179:23, 180:3,
181:13, 181:17,
182:6
**catch**
36:7
**categorize**
196:5
**category**
24:7
**caucasian**
70:2, 74:10,
74:15, 77:6,
96:23, 129:24,
137:1, 140:2,
144:19, 193:9
**caucasians**
51:23, 81:14

**cause**
68:9, 168:10
**caused**
112:15, 148:2,
167:16, 167:18,
167:22, 167:24,
200:22
**causing**
168:4
**cecil**
1:8, 186:11
**cell**
35:7, 170:15,
170:16, 170:18,
172:22
**cellular**
169:22
**certain**
39:24, 41:3,
42:10, 47:15,
89:2, 89:11,
99:23, 100:1,
105:13, 113:12,
117:21, 196:8
**certainly**
197:23
**certificate**
122:3, 204:2
**certify**
204:5
**chain**
30:4, 30:9
**challenge**
37:15
**challenged**
77:16, 77:17
**chance**
60:11, 116:1
**change**
49:10, 49:13,
111:24, 152:1
**changed**
17:7, 17:12,
17:15, 83:6,
97:16, 98:7,
98:17, 113:15,
114:14, 130:20,
131:10, 184:8

**changes**
170:5
**charge**
3:17, 27:6,
42:13, 44:19,
44:20, 163:4,
164:14, 164:18,
164:24, 166:10,
188:15, 191:11
**charged**
204:20, 204:22
**charles**
56:11
**check**
25:21, 27:4,
42:15
**checked**
27:2, 27:3
**checking**
52:1
**chicago**
2:5, 2:18,
13:10, 47:3,
86:7, 88:3,
93:16, 93:23,
94:10, 94:11,
94:12, 98:16
**chief**
19:17, 19:18,
19:19, 19:21,
20:2, 20:7,
23:1, 36:15,
36:17, 41:7,
45:1, 50:17,
50:18, 51:5,
56:10, 56:11,
56:14, 56:20,
61:17, 62:12,
62:13, 62:16,
62:19, 62:20,
63:10, 63:18,
69:4, 69:16,
74:19, 74:20,
79:3, 110:3,
110:10, 112:22,
113:3, 114:4,
116:17, 116:23,
117:22, 130:19,

Transcript of Samuel Page
Conducted on August 10, 2020                                     59

130:21, 131:13,
131:21, 132:1,
132:7, 148:12,
148:13, 152:11,
160:16, 160:18,
160:20, 160:23,
161:2, 161:9,
161:12, 161:18,
161:21, 162:6,
162:10, 162:20,
162:23, 177:2
**chief's**
118:22
**chiefs**
45:6, 45:7,
45:9, 45:10,
63:18, 78:10,
79:2, 161:6
**child**
101:21, 175:21,
176:1
**choice**
49:9
**choose**
47:19, 100:12,
100:13
**chose**
80:16
**circle**
203:4
**circumstances**
177:4
**city**
83:1, 89:18,
92:20, 93:16,
93:19, 93:21,
94:1, 97:14,
100:5, 101:11
**civilian**
117:14, 129:14,
151:17
**claim**
178:12, 178:13,
192:7
**claiming**
165:4, 165:7,
166:1, 166:4,
168:16, 193:13

**clarification**
87:24
**clarify**
78:24, 85:20,
86:10, 91:8,
95:6, 95:8,
97:21, 119:1,
124:24, 134:15,
164:21, 164:23,
166:18, 195:16
**class**
122:3
**classes**
121:17, 122:2
**clear**
6:9, 37:9,
38:8, 40:2,
87:1, 163:21,
166:1
**cleared**
199:22, 199:24,
200:18
**client**
195:9
**close**
47:13, 91:14,
138:22, 139:4,
187:14
**closer**
14:3, 194:14
**co-plaintiffs**
153:18
**colleagues**
20:17, 153:17
**collective**
49:24
**college**
13:19
**collins**
19:24
**color**
28:14, 192:4
**com**
2:6, 2:7, 2:13,
2:19
**combined**
147:11
**come**
9:17, 18:7,

25:15, 34:2,
42:11, 58:9,
125:23, 129:9,
134:4, 137:2,
137:14, 144:1,
194:15
**comes**
99:7, 119:24,
138:8
**coming**
55:3, 75:13,
88:1, 88:2,
133:17, 151:18,
170:23
**command**
30:10, 165:14
**commander**
52:13
**comment**
135:6, 135:11
**commentary**
131:11
**comments**
103:17, 104:4,
138:13, 192:17,
192:20, 197:8,
197:9, 197:21
**communicated**
172:13
**communications**
170:11
**compensated**
121:1
**compensation**
114:14
**compensatory**
114:21, 165:5
**complain**
86:14, 131:3
**complained**
126:24, 139:3
**complaining**
74:9, 98:6,
126:6, 126:14,
147:13, 173:22,
193:8
**complaint**
3:14, 23:11,

29:13, 30:4,
30:10, 30:13,
31:3, 37:17,
37:18, 59:21,
66:11, 80:8,
96:17, 96:20,
112:21, 126:18,
130:17, 130:18,
131:14, 138:15,
142:8, 143:14,
143:17, 144:5,
159:17, 174:5
**complaints**
22:22, 23:7,
34:8, 126:13,
126:21, 127:15,
127:22, 128:1,
128:9, 129:1,
129:20, 130:2,
130:8, 130:19,
130:20, 130:24,
131:13, 131:20,
139:7, 141:9,
141:15, 141:17,
141:22, 142:7,
144:12, 155:24,
156:6, 156:9,
173:18, 198:17,
198:22, 200:12,
200:17, 200:21
**complete**
7:14, 7:16
**complimentary**
4:11
**computer**
4:6, 8:3,
102:16
**computers**
199:24
**concerning**
27:11, 28:10,
34:13, 40:7,
166:20, 182:12,
204:9
**concluded**
203:7
**conduct**
162:18, 167:8,

Transcript of Samuel Page
Conducted on August 10, 2020

60

167:16, 168:21,
169:1, 169:7
**conducted**
1:19, 134:2,
204:7
**confinement**
25:6, 94:6
**confirm**
36:10, 73:12,
73:13, 103:4,
191:12
**confrontations**
117:21
**confused**
54:9, 85:2,
88:9, 96:17,
100:11, 152:9,
152:15, 171:24,
184:11
**confusing**
83:21
**connect**
4:9, 71:5
**connected**
4:10, 14:2
**connection**
28:2
**consequence**
62:22
**consider**
92:18, 128:21,
138:6
**considered**
43:2, 64:1,
94:18, 138:7,
162:10, 185:4
**consistent**
29:16
**consistently**
17:1, 71:12,
72:13
**consult**
165:15
**contact**
42:7, 171:2,
172:8
**contacted**
171:23

**contacting**
171:11
**contend**
146:2, 147:2,
159:8
**continually**
130:19, 130:20
**continue**
192:15
**continued**
39:24, 41:3
**continues**
121:5, 121:8,
141:11, 167:12
**continuing**
192:1
**contract**
35:18, 48:4,
204:29
**control**
204:18
**controversy**
204:10
**conversation**
79:13, 135:23,
137:20, 139:9,
161:16, 171:5,
183:13
**conversations**
4:7, 141:20,
147:19, 170:13,
173:8, 173:10,
173:14
**cook**
1:13, 5:16,
13:3, 13:9,
25:16, 25:17,
58:5, 88:17,
88:20, 88:22,
89:6, 89:8,
89:22, 90:1,
92:10, 147:9,
157:14, 158:13
**coordinating**
25:2
**copies**
204:22, 204:23
**copy**
122:19

**corner**
191:13
**correct**
15:19, 18:14,
25:1, 30:24,
33:14, 34:21,
37:4, 39:17,
40:24, 41:4,
41:14, 47:20,
52:11, 54:2,
55:19, 57:24,
58:10, 60:18,
61:22, 65:15,
66:3, 71:3,
71:15, 77:8,
77:10, 77:22,
78:5, 78:9,
78:19, 84:1,
95:12, 97:2,
100:17, 101:18,
103:7, 104:21,
105:6, 107:15,
108:1, 109:11,
110:7, 110:20,
113:1, 118:4,
120:18, 123:23,
126:12, 141:16,
145:24, 146:22,
147:14, 155:7,
156:11, 158:18,
158:19, 160:21,
162:8, 163:1,
165:1, 166:11,
169:8, 169:13,
191:20, 191:22,
198:7, 198:8,
199:21, 200:8,
203:2, 204:17
**corrected**
127:9
**correctional**
15:7, 15:13,
18:6, 18:20
**corrections**
15:5, 15:13
**correctly**
92:11
**correspondence**
170:4

**correspondingly**
94:5
**cost**
204:20
**could**
5:17, 8:23,
8:24, 14:2,
14:3, 14:16,
23:16, 24:14,
25:9, 27:24,
30:9, 30:12,
32:17, 38:6,
38:7, 38:21,
46:19, 48:1,
48:8, 49:3,
49:5, 49:11,
50:19, 56:15,
59:10, 60:5,
60:9, 70:6,
78:24, 80:1,
80:9, 80:24,
82:12, 82:17,
83:2, 83:10,
87:6, 92:17,
103:13, 108:18,
109:1, 109:18,
111:6, 115:21,
115:23, 124:5,
124:15, 133:17,
138:9, 145:2,
152:3, 153:21,
154:23, 154:24,
155:1, 155:5,
167:4, 168:9,
192:11, 193:24,
194:1, 197:18,
200:9
**couldn't**
20:24, 27:13,
37:23, 46:4,
49:12, 50:6,
54:20, 75:6,
79:12, 93:11,
124:8, 129:12,
130:13, 133:18,
168:6, 173:24,
174:10, 176:22,
184:19, 200:4

counsel
4:16, 4:20,
4:23, 4:24,
116:11
count
199:21, 199:22,
200:4, 200:7
counties
92:10, 92:12
county
1:13, 5:16,
13:3, 13:9,
25:16, 25:17,
27:5, 46:13,
46:19, 47:8,
58:5, 82:6,
88:17, 88:20,
88:22, 89:7,
89:8, 89:22,
90:1, 92:10,
92:15, 97:8,
97:18, 97:24,
98:4, 98:18,
101:9, 101:10,
105:12, 105:16,
105:17, 147:9,
157:14, 158:13,
198:14, 204:2,
204:12
couple
7:20, 22:20,
27:8, 41:2,
47:1, 58:15,
75:4, 89:22,
119:3, 137:4,
137:7, 138:21,
142:2, 148:1,
151:12, 176:8,
194:12
course
31:9, 93:16,
163:8
court
1:1, 4:15,
4:16, 5:1, 6:8,
6:14, 6:16,
14:14, 24:18,
25:16, 31:11,

87:9, 91:6,
92:13, 92:16,
118:10, 119:5,
177:22, 178:1,
178:3, 178:6,
178:15, 179:14,
179:24, 203:1
covered
49:23
coworkers
174:19
cox
149:22, 149:23,
150:7
cpd
85:21
create
8:18
created
129:3, 129:5
creating
8:21, 148:14
credible
23:16
crime
96:9
crimes
27:2
criteria
71:8
crooks
103:16, 104:1
csr
1:29, 204:36
cst
1:21
cta
13:10, 13:11,
13:13, 14:20
cubicle
128:10
curious
94:10, 119:21,
125:8
current
164:1, 164:17
currently
15:20, 16:3

cut
154:17
cv
1:12

**D**

daffada
2:17
damages
159:1, 159:8,
165:4, 165:5,
165:11
dangerous
84:5
danny
97:6
dart
65:10, 65:11,
67:4
dart's
157:15, 158:14
date
15:23, 67:19,
81:22, 128:5,
170:20
dated
109:15, 158:22,
191:15
dates
53:23, 75:7,
128:4
daughter
7:23, 8:2,
173:10, 177:10
david
1:9, 187:19
day
1:20, 8:19,
50:15, 60:17,
72:8, 76:21,
152:2, 152:24,
175:1, 188:1,
204:7, 204:32
day's
53:7
day-by-day
31:20
days
34:2, 40:18,

52:22, 52:24,
53:1, 53:2,
53:3, 53:5,
53:6, 122:16,
140:7, 150:14,
185:11
dc
19:21, 56:13,
126:22, 141:23,
160:15
deal
84:16, 84:21
dealing
9:1, 22:1,
24:17, 121:16
deals
29:8
debate
190:10, 190:12
deceased
18:10, 97:6,
124:21
december
60:21
decide
46:10, 66:7
decided
25:11, 39:10,
57:9, 88:16,
89:8
decides
102:21
deciding
51:10
decision
36:13, 44:16,
49:21, 50:12,
50:14, 62:1,
62:5, 62:9,
62:14, 63:20,
64:14, 68:15,
76:17, 88:10,
88:11, 96:1,
110:9, 110:24,
111:3, 113:8,
113:10, 160:22,
161:9, 161:21,
162:7

Transcript of Samuel Page
Conducted on August 10, 2020

62

decisions
36:18, 44:22,
46:17, 50:16,
51:14, 52:12,
112:24, 113:2
declare
109:9, 158:16,
191:18
defendant
132:13, 157:14,
158:13, 183:2
defendants
1:14, 2:14,
2:20, 5:16,
106:1, 118:3,
134:21, 134:24,
145:15, 159:4,
159:9, 159:12,
159:18, 159:22,
160:14, 162:18,
163:3, 166:12,
167:8, 167:16,
168:3, 168:17,
168:20, 169:1,
169:7, 179:20,
180:3, 181:13,
181:16, 181:20,
182:2, 182:6,
185:18, 188:20,
189:10, 191:3
definitely
36:7, 90:24,
94:3, 95:23,
163:10, 202:10
degree
12:14
delete
23:15, 143:7,
143:9
deliveries
26:12, 26:13,
26:15, 46:3,
48:2, 48:17,
49:6, 49:7,
50:8, 81:19,
98:15, 188:15
delivery
25:21, 25:22,

26:7, 26:10,
26:18, 31:4,
42:22, 48:12,
50:8, 50:10,
154:16, 181:24
demoted
65:4, 68:8,
68:9, 165:12,
167:11, 169:10,
169:12, 193:6
demotion
65:14
dentist
24:19
denying
161:5
department
9:1, 48:16,
138:23, 176:16,
198:7
depending
21:15, 122:22,
152:24
depos
2:24
deposes
5:10
deposition
1:19, 4:12,
5:21, 6:3, 6:14,
10:3, 10:16,
10:20, 11:4,
11:11, 11:16,
59:12, 108:15,
157:8, 158:2,
158:6, 170:6,
170:20, 170:22,
171:4, 171:12,
171:15, 173:11,
176:23, 191:7,
203:6, 204:6,
204:21, 204:25
depressing
44:2
deputies
52:13
deputy
19:18, 19:19,

19:21, 20:2,
20:7, 23:1,
36:15, 36:17,
45:1, 45:7,
45:10, 50:18,
51:5, 56:10,
56:13, 56:20,
62:13, 62:20,
63:18, 117:22,
118:22, 131:21,
160:16, 160:18,
160:20, 160:23,
161:9, 161:21,
162:6, 162:10,
162:19, 162:20,
162:23, 177:1
deputy's
118:2
derogatory
103:17, 104:4,
134:24, 192:16,
192:20
describe
25:9
described
71:17, 198:10
describing
23:18, 24:21,
133:22, 165:17
description
3:12
designees
50:18
desirable
120:14
desk
69:10, 102:20,
136:12
detailed
11:8
details
101:19, 101:20,
131:12
detainee
40:10, 176:4,
176:6
detainees
23:19, 41:12,

43:2, 58:9,
93:3, 93:12,
94:2, 94:5,
94:6, 119:9
detective
142:18
determination
107:8
dial
27:18
dictate
85:7
died
65:9
difference
106:17, 162:22,
201:24
different
21:14, 25:13,
26:9, 31:20,
36:5, 46:11,
53:10, 87:14,
89:21, 93:4,
101:7, 120:13,
150:14, 166:9,
198:3
differently
64:8, 155:19,
156:13, 156:17,
157:1, 193:9,
199:3, 202:9
difficulty
6:1
diploma
12:17
direct
192:15
directed
197:8
direction
74:8, 97:20,
204:18
directly
14:8, 167:24
director
36:15, 36:17,
56:8, 56:9,
56:10, 56:17,

Transcript of Samuel Page
Conducted on August 10, 2020                                                63

61:16, 62:5,
80:14, 81:1,
81:5, 95:15,
103:14, 103:21,
104:11, 105:2,
105:24, 106:5,
106:23, 107:3,
132:1, 132:14,
132:21, 132:24,
133:16, 134:6,
161:1, 161:7,
161:11, 161:12,
161:18, 162:6,
162:20, 177:23
**director's**
22:22, 23:7,
34:4, 69:24,
118:23, 119:8,
119:20, 142:24
**disciplinary**
35:15, 37:5,
39:2, 107:6,
107:9, 107:12,
133:4
**discipline**
34:14, 34:19,
34:23, 35:11,
35:12, 36:13,
36:18, 36:21,
37:13, 37:14,
37:15, 38:5,
38:10, 38:19,
38:21, 38:24,
39:4, 39:8,
39:19, 40:5,
40:15, 40:23,
41:6, 68:13,
80:16, 80:17,
81:2, 106:7,
107:1, 107:21,
198:9, 200:10
**disciplined**
38:18, 81:2,
106:11, 146:5
**discriminate**
28:20, 192:16
**discriminated**
182:24, 183:5,

184:1, 184:6,
185:17, 186:5,
186:6, 186:18,
187:8, 188:4,
192:3, 193:8
**discrimination**
3:17, 27:11,
28:10, 29:1,
29:8, 29:20,
29:24, 30:9,
138:6, 183:8,
189:9, 189:24,
191:11, 192:8,
195:21
**discriminatory**
30:1, 118:17,
119:15, 127:10,
139:15, 140:18,
140:21, 146:3,
147:2, 185:4
**discuss**
10:16, 11:13,
174:16, 202:2
**discussed**
109:22
**discussing**
174:21
**discussion**
133:22, 182:12
**discussions**
4:5
**dismissed**
178:16, 179:2
**dispatch**
101:10, 101:17,
102:4, 102:7,
103:1, 105:12,
105:16, 105:17,
149:3
**dispatched**
101:10
**display**
137:18
**disproportional**
106:6
**disproportionally**
106:11
**distress**
165:6, 165:10

**district**
1:1, 1:2, 94:20
**divide**
45:20
**divided**
88:17, 89:7,
90:1
**division**
1:3, 15:3,
15:5, 15:7,
18:21, 42:21,
120:2, 183:22
**divisions**
25:13, 43:13
**divorce**
175:20, 175:21,
176:1
**doctor**
24:18, 166:22,
166:24
**document**
59:17, 59:19,
60:2, 108:19,
113:21, 157:13,
157:18, 157:21,
157:23, 195:5
**documents**
3:21, 8:12,
11:15, 11:19,
122:5, 123:9,
134:16, 158:1,
178:3, 195:4
**doing**
7:19, 15:9,
43:17, 87:16,
98:10
**done**
26:13, 37:6,
42:19, 55:17,
55:22, 63:20,
66:6, 68:12,
121:11, 123:9,
139:16, 147:3,
147:21, 198:23,
201:20, 202:3
**door**
136:13
**down**
6:9, 8:14, 9:2,

9:8, 9:11,
51:24, 63:1,
76:22, 90:3,
100:24, 108:3,
116:2, 116:6,
117:21, 124:4,
124:7, 125:5,
125:9, 128:3,
136:24, 143:8,
154:13, 154:15,
154:18, 159:14,
164:7, 175:1,
175:5
**downtown**
164:3, 174:12
**dr**
167:9
**dress**
136:24
**drop**
18:3
**drug**
58:4, 58:8,
92:23, 94:1
**dude**
77:14, 77:15,
78:4
**duly**
5:9, 204:8,
204:13
**dungeon**
71:18
**dupage**
92:14
**duration**
30:5
**during**
22:8, 22:16,
24:1, 38:20,
52:23, 53:18,
72:20, 76:8,
81:18, 81:19,
96:14, 105:9,
119:4, 133:6,
136:21, 154:16,
167:11, 167:23,
168:7, 169:4,
169:9, 174:2,

Transcript of Samuel Page
Conducted on August 10, 2020

64

180:23, 190:2,
195:17, 198:21
**duties**
21:21, 22:8,
22:15, 23:24,
31:2, 105:3,
106:2, 127:10,
142:12, 142:22,
190:14, 196:14,
200:13
**duty**
26:1, 32:3,
40:12, 200:14

**E**

**e-mail**
69:24, 169:22,
169:23, 170:2,
170:4, 170:12,
171:11
**e-mails**
9:23, 170:3,
170:9
**each**
4:10, 6:4,
76:1, 89:9,
93:3, 116:15,
130:17, 134:20,
177:8, 177:13,
177:15, 188:12
**earlier**
53:11, 60:18,
71:17, 73:11,
82:7, 85:14,
107:23, 112:1,
112:17, 114:1,
114:16, 125:19,
131:2, 156:22,
171:20, 180:9,
193:12, 193:17,
195:4
**early**
8:19, 85:6
**eased**
72:24
**east**
47:3
**eastern**
1:3

**education**
12:11
**eeoc**
164:14, 164:18,
164:23, 166:10,
174:4
**effect**
138:3, 138:5,
144:10
**eight**
93:22, 126:12
**eight-by-ten**
128:12
**eighth**
91:3, 94:19,
94:20
**eighties**
12:18
**either**
17:6, 21:4,
23:10, 30:21,
37:4, 38:12,
40:19, 41:2,
42:12, 48:2,
48:9, 50:17,
50:18, 63:23,
75:8, 77:24,
119:17, 131:23,
161:11, 183:16
**elaborate**
199:18
**electronic**
15:16, 16:11,
22:13, 43:3,
48:8, 56:2,
60:21, 61:2,
115:14, 128:22,
148:18, 148:22,
161:10, 202:24
**electronically**
3:23
**eligible**
48:15
**eliminate**
68:16
**elizabeth**
2:6
**else**
10:17, 12:4,

18:4, 18:17,
24:4, 29:5,
29:19, 31:17,
32:9, 34:1,
42:14, 42:16,
42:23, 43:24,
51:23, 85:1,
88:3, 104:22,
117:9, 117:13,
117:17, 135:10,
140:20, 141:1,
148:5, 151:14,
160:10, 170:13,
173:3, 174:15,
175:24, 177:22,
185:2, 194:5,
201:2
**em**
16:10, 16:14,
16:15, 16:18,
18:7, 18:8,
18:11, 18:13,
18:24, 19:5,
21:12, 21:22,
23:11, 23:19,
23:21, 26:7,
31:5, 31:18,
33:9, 33:12,
33:19, 34:13,
35:21, 36:13,
38:6, 38:20,
39:6, 42:5,
44:17, 45:13,
47:24, 49:3,
71:7, 80:15,
81:6, 88:23,
97:5, 103:15,
104:12, 105:3,
154:7, 154:8,
198:14, 198:15
**email**
2:6, 2:13, 2:18
**emery**
2:11
**emotional**
165:6, 165:10,
165:16
**employed**
16:3, 73:13

**employee**
77:6, 162:9
**employee's**
38:16
**employees**
38:6, 67:20,
76:8, 144:22,
145:3, 153:6,
153:9, 153:15,
153:18
**employer**
24:23
**employment**
16:7, 147:1
**enabled**
4:8
**encompass**
46:22
**end**
17:19, 25:19,
49:7, 73:20,
75:17, 92:21,
113:14, 121:4,
138:22, 171:5,
194:14, 195:7
**ended**
18:7, 73:2
**engaged**
141:8
**engines**
100:4
**enjoy**
43:17
**enough**
24:12
**entire**
16:15, 18:24,
127:15
**entirely**
122:23, 130:6
**entitled**
166:2, 166:4
**environment**
43:24, 147:16,
148:15
**equipment**
25:21, 42:15
**escape**
40:9

Transcript of Samuel Page
Conducted on August 10, 2020

65

escaped
40:10, 40:11
escapes
40:16, 146:16,
146:18, 146:20
especially
34:1
esq
2:3, 2:11, 2:16
essentially
15:11, 23:22,
41:12
establish
28:2
established
100:12, 141:14,
144:21
et
1:13
ethan
2:11, 202:15
ethernet
14:2
even
6:3, 8:20,
67:21, 71:17,
84:21, 88:3,
91:12, 124:6,
124:15, 136:4,
141:24, 142:2,
173:19, 173:24,
175:4, 177:19,
184:19
evening
17:9
events
190:23
eventually
131:8
ever
5:20, 20:8,
25:22, 38:19,
38:23, 39:3,
45:13, 56:2,
56:5, 57:6,
57:13, 66:9,
69:15, 78:20,
78:21, 96:11,

99:15, 104:3,
110:21, 130:20,
132:4, 142:1,
151:18, 153:5,
154:4, 154:9,
174:7, 174:13,
174:15, 175:14,
175:17, 176:3,
176:6, 176:9,
176:18, 176:24,
177:20, 178:2,
178:7, 179:19,
179:22, 180:1,
180:5, 181:11,
181:18, 181:22,
182:23, 183:24,
184:6, 185:3,
189:12, 191:1,
192:22, 198:10,
198:17, 200:12
every
26:18, 53:15,
97:14, 116:17,
122:2, 130:17,
134:21, 152:1
everybody
46:18, 51:23,
88:3, 101:6,
136:20, 136:24,
150:24, 151:4,
151:8, 201:21
everybody's
52:18
everyone
4:2
everything
8:24, 46:22,
70:10, 88:2,
98:17, 113:6,
171:16, 171:21,
179:2, 195:6
ewhite@emerylawl-
td
2:13
ex-wife
173:11, 175:19
exact
75:6, 76:24,

128:4, 152:1,
162:21, 171:6,
171:8
exactly
21:16, 23:23,
25:7, 29:14,
31:16, 45:11,
60:17, 68:14,
87:20, 93:1,
115:17, 127:23,
148:20, 154:2,
167:18, 173:24,
186:24, 190:20
exam
18:1, 18:2,
57:8
examination
3:3, 3:5, 3:6,
5:12, 195:13
example
28:21, 93:13,
95:18, 106:1,
179:21
exchange
133:11
exchanged
79:8
exclusively
98:10
excuse
21:23, 25:18,
48:14, 49:1,
149:17
exhibit
3:12, 3:14,
3:15, 3:16,
3:17, 59:11,
59:12, 59:16,
83:11, 108:3,
108:4, 108:14,
108:15, 148:8,
157:7, 157:8,
157:12, 158:4,
167:4, 191:5,
191:7, 191:10
exhibits
3:23
expect
87:19, 112:23

expected
113:3
expenses
163:12, 163:15,
163:18, 163:19,
166:2, 166:14
experience
47:11, 70:15,
84:4, 84:5,
84:6, 87:17,
105:4
experienced
42:1, 87:21,
88:6, 189:10,
189:23
explain
114:14
explained
143:12
exposed
148:17, 150:16
extra
64:8

F

face
116:7
faces
157:2
fact
4:23, 6:2,
69:15, 71:24,
78:7, 106:20,
158:1, 162:4
factors
51:9, 101:7
facts
60:9, 60:13,
80:21, 110:1,
111:11, 192:6
fail
81:1
failed
80:15
failure
40:13
fair
8:7, 15:11,

Transcript of Samuel Page
Conducted on August 10, 2020

66

17:8, 18:12,
19:11, 58:8,
84:7, 93:24,
102:5, 109:21,
133:23, 136:10,
153:24, 154:3,
169:10
**fall**
31:14, 154:15
**falsified**
178:17
**falsify**
113:21
**falsifying**
133:19, 134:16,
179:14, 179:15
**familiar**
47:4, 94:11,
98:24, 99:9,
99:12, 99:18,
99:23, 100:7
**famous**
77:13
**far**
22:17, 23:11,
35:13, 79:24,
98:16, 99:17,
99:24, 150:11,
165:10, 179:1,
190:17, 198:11
**fast**
66:6, 179:2
**favor**
111:21
**favorable**
161:13
**fax**
24:10, 24:13,
105:11
**february**
109:15, 121:12,
158:22
**feedback**
23:18, 23:20
**feel**
49:4, 63:2,
193:21, 193:23,
199:1, 200:22,

202:8
**feeling**
43:16
**feelings**
102:2
**fees**
166:3, 166:13
**fell**
113:6, 154:13
**ferguson**
1:7, 178:21,
181:15, 187:5,
187:8, 187:13
**few**
5:23, 8:14,
33:21, 34:10,
74:23, 87:2,
117:15, 121:20,
137:5, 137:23,
138:1, 174:1,
180:22, 195:15,
195:16
**fewer**
100:24, 101:2,
101:5
**field**
82:10, 86:1,
86:16
**file**
30:4, 30:10,
30:12, 37:17,
37:18, 38:5,
49:3, 64:17,
66:1, 138:15,
174:21
**filed**
64:23, 65:3,
65:13, 66:14,
107:1, 111:20,
166:10, 174:4
**files**
33:23
**filing**
141:9
**fill**
42:6, 45:2,
45:3
**finally**
117:8

**find**
8:20, 24:15,
48:15, 125:15
**findings**
36:23, 37:3,
37:21
**fine**
12:9, 12:19,
28:3, 36:9,
58:20, 59:2,
90:11, 123:4,
125:7, 125:11
**fingerprint**
42:18
**finish**
6:7, 6:8,
200:13
**finished**
119:1, 119:2,
147:24, 200:13
**finishing**
23:4
**fire**
100:4, 132:13,
132:15
**fired**
107:1, 179:15
**firm**
2:4, 2:11,
2:16, 164:19
**first**
5:9, 15:3,
20:19, 47:8,
48:1, 49:1,
57:10, 74:16,
76:3, 76:9,
77:5, 78:15,
78:18, 78:20,
80:22, 83:1,
87:17, 92:12,
97:5, 126:4,
126:9, 126:10,
129:9, 138:19,
142:15, 143:5,
143:6, 149:22,
157:15, 158:14,
174:10, 174:23,
175:1, 176:24,

185:24, 200:7,
204:8
**five**
15:5, 15:7,
18:21, 20:22,
21:4, 26:24,
42:21, 52:5,
52:6, 53:1,
53:2, 54:21,
55:15, 58:24,
89:11, 91:18,
91:19, 93:18,
114:13, 115:13,
120:2, 129:8,
157:4, 182:21,
194:11, 194:15
**five-minute**
194:11
**fleming@danherbe-
rtlaw**
2:6
**flexible**
99:24
**folder**
164:8
**folkers**
124:1, 124:8,
140:1
**folks**
126:1, 178:10
**follow**
39:24, 40:3,
47:10, 80:16,
81:2, 100:9,
100:10, 101:24,
134:8, 202:16
**followed**
41:3
**follows**
5:10
**force**
84:17
**forced**
120:17, 120:19
**foregoing**
109:10, 155:22,
158:17, 191:19,
204:16

Transcript of Samuel Page
Conducted on August 10, 2020

67

forest
97:9
forfeitures
31:8
forget
22:24
forgot
30:5
form
84:9, 84:10,
130:10, 149:6,
196:15, 197:11,
199:4, 201:12
formal
29:10, 29:12,
63:22, 174:4
formally
4:17, 29:11,
29:12
former
112:9
forms
37:20
forward
66:7, 68:5
found
111:21, 122:12
foundation
84:10, 86:18,
93:5, 130:9,
139:19, 145:9,
162:12, 195:23,
196:16, 197:12,
199:5, 201:13
four
20:22, 21:4,
26:24, 46:21,
52:5, 52:6,
54:21, 55:15,
70:2, 72:16,
72:19, 89:11,
89:13, 89:23,
91:1, 91:2,
93:13, 93:18,
95:18, 112:18,
151:19, 151:21,
151:23, 182:21
fourteen
20:23

frame
21:13, 39:5,
47:23, 85:11,
96:15
frequently
7:2, 135:17,
149:1
friday
10:4, 10:6,
10:13, 10:21,
10:22, 50:11
friends
10:24, 171:21,
177:6, 186:2,
187:14
front
37:22, 37:24,
38:2, 102:12,
134:3, 136:24,
139:23, 140:13,
153:23, 164:9,
201:20
fto
85:24
ftos
55:13, 85:23
full
7:14, 7:16
full-time
13:18
fullerton
91:15, 91:17
fully
87:13
function
142:17
further
110:18, 112:14,
120:14, 122:22,
192:14, 194:24,
202:12

G

gaines
19:22, 19:24
gainor
20:13, 20:14
gang
58:4, 58:8,

92:24, 94:1
garbage
122:6, 193:22,
193:24
gather
174:15
gathering
174:20, 174:23
gave
11:17, 11:21,
62:16, 69:11,
106:6, 111:2,
156:19, 156:22,
176:24
general
11:2, 28:13
generally
155:23
generate
199:24
generated
200:8
geographically
128:17
getting
17:19, 42:5,
51:24, 63:4,
63:6, 83:20,
139:4, 174:18,
193:21, 194:14,
196:22, 196:23,
196:24, 198:22,
200:19
ghee
56:11
gist
188:16
give
7:14, 11:8,
20:24, 21:13,
33:21, 37:4,
42:5, 42:6,
42:8, 63:19,
68:7, 75:6,
82:9, 82:11,
93:11, 124:23,
125:3, 128:4,
128:5, 130:23,

131:12, 147:20,
151:24, 164:3,
173:11, 174:2,
176:10, 176:23,
196:19, 199:8,
201:2
given
22:23, 50:15,
83:1, 98:23,
112:6, 120:11,
121:24, 144:19
giving
127:12, 176:18
goes
35:13, 37:10,
88:3, 111:7
going
7:10, 7:24,
9:22, 12:17,
13:19, 18:6,
24:16, 24:24,
25:3, 26:2,
26:9, 26:10,
35:4, 45:21,
45:22, 46:8,
46:10, 51:17,
57:17, 70:7,
73:14, 75:2,
75:13, 77:17,
82:24, 85:9,
87:19, 94:2,
94:5, 94:6,
99:19, 100:19,
100:20, 105:13,
108:3, 110:12,
113:21, 122:18,
124:3, 125:17,
131:5, 131:6,
131:15, 132:15,
134:2, 138:18,
139:5, 139:11,
147:5, 171:2,
171:3, 172:7,
178:8, 178:20,
179:1, 179:7,
202:22
gone
154:9, 183:21

Transcript of Samuel Page
Conducted on August 10, 2020

68

**good**
5:14, 6:13,
14:11, 29:2,
36:22, 138:24,
172:9, 195:8,
202:16, 202:18
**gps**
97:18
**granddaughter**
7:23, 8:10
**granted**
63:5, 161:1,
161:2
**grass**
100:3
**grievance**
38:5, 61:13,
64:18, 65:3,
65:7, 65:13,
66:1, 66:4,
66:12, 66:14,
66:22, 67:3,
67:14, 68:2,
68:20, 107:18,
107:20, 107:21,
107:23, 111:11,
111:20
**grievances**
107:1, 141:9
**ground**
5:23, 70:11,
70:13
**grounds**
134:16, 194:3
**group**
63:15, 65:13,
75:15, 75:18,
75:23
**grunt**
55:7
**guard**
15:11, 15:14,
36:8
**guardian**
25:20
**guess**
11:20, 17:9,
30:23, 32:3,

37:21, 90:14,
99:7, 119:23,
157:5, 160:3,
173:1, 174:3,
193:19
**guessing**
36:23, 37:2,
92:3
**guide**
87:23
**guidelines**
40:1, 41:3
**guy**
20:1, 30:3,
178:5, 178:22
**guys**
10:12, 58:18,
68:12, 77:11,
77:23, 110:11,
164:23, 174:15,
175:19, 177:8,
177:13, 177:16,
185:23, 186:2,
186:14, 187:22,
189:4, 189:19,
195:10, 201:2

**H**

**hairdo**
125:13
**half**
76:4, 120:22,
120:23, 120:24
**hand**
4:15, 204:32
**handed**
59:15, 108:13
**handing**
157:11
**handle**
103:1
**hang**
40:3, 70:21,
174:9
**happen**
55:7, 55:16,
69:6, 75:7,
81:24, 82:22,

82:23, 117:5,
133:8, 137:23,
180:15, 183:15,
183:16, 184:14,
200:2
**happened**
8:17, 8:24,
39:15, 49:15,
61:9, 66:4,
66:17, 67:18,
67:19, 74:7,
74:22, 75:9,
76:20, 79:5,
85:6, 97:3,
133:2, 137:23,
154:1, 154:12,
154:23, 154:24,
155:1, 155:5,
176:20, 176:21,
178:3, 182:12,
183:4
**happening**
180:5
**happy**
87:21
**harassed**
147:16, 184:2,
184:7, 185:17,
186:5, 186:18,
187:9, 188:4,
192:2
**harassing**
150:20, 150:24,
151:3, 185:4
**harassment**
189:9, 189:24,
192:7
**hard**
124:3, 151:18
**harmed**
159:18
**harsh**
190:3
**head**
6:16, 21:8,
183:2, 183:3
**health**
167:6

**hear**
14:9, 27:13,
37:7, 54:14,
68:6, 79:12,
91:6, 100:4,
116:3, 130:13,
133:8, 133:14,
133:17, 136:14,
136:17, 174:10,
189:12, 191:1,
197:17
**heard**
66:5, 66:9,
68:6, 85:22,
89:23, 105:24,
133:7, 133:10,
133:11, 134:15,
143:5, 180:13,
180:20, 180:21,
180:23, 187:11,
187:15, 188:6,
188:19
**hearing**
35:15, 38:12,
39:1
**hears**
172:24
**heat**
120:15
**held**
4:5, 16:7
**hello**
23:2
**help**
4:8, 5:24,
9:24, 97:19,
97:20, 200:5
**helped**
18:10
**helpful**
124:16
**helping**
8:1
**herbert**
2:3
**here**
8:6, 21:8,
26:9, 60:3,

60:8, 60:14,
61:4, 61:23,
66:11, 68:1,
69:3, 69:19,
69:22, 71:12,
71:22, 73:16,
73:20, 80:13,
81:5, 81:11,
81:17, 81:23,
83:15, 83:16,
85:17, 88:9,
95:14, 96:17,
104:6, 104:10,
104:17, 104:23,
105:14, 106:14,
108:10, 109:5,
109:23, 109:24,
110:3, 111:15,
111:17, 112:7,
112:19, 112:21,
113:23, 114:13,
114:23, 116:14,
118:13, 118:15,
118:17, 119:13,
120:7, 120:12,
121:4, 123:21,
125:6, 125:10,
127:8, 127:9,
127:11, 132:18,
132:21, 134:13,
134:20, 135:16,
140:16, 145:20,
147:15, 147:17,
155:17, 167:9,
168:18, 169:20,
178:24, 179:11,
179:17, 191:24,
193:7, 194:6,
195:2, 199:9
**here's**
50:6
**hereby**
5:1, 204:5
**hereto**
204:28
**hey**
110:22, 181:6
**high**
58:2, 89:16,

89:19, 96:8,
167:13, 167:16
**high-crime**
81:13
**high-incident**
58:3, 140:24,
141:2, 154:4,
154:24, 155:9,
196:22, 197:1
**high-risk**
84:16, 84:21
**higher**
81:7, 88:11,
92:19, 92:22,
96:21, 96:22,
100:19, 101:14,
104:15, 104:19
**higher-incident**
83:19, 83:24
**highest**
12:10, 90:2,
90:5, 93:16
**hills**
95:7
**himself**
112:15
**hire**
89:3
**hired**
17:19, 17:23,
17:24
**hiree**
70:12
**hispanic**
20:1, 137:7
**hispanics**
54:22
**hit**
87:17, 129:3,
129:7, 154:17
**holder**
42:12
**holiday**
72:5, 119:4
**holidays**
50:10
**holland**
1:29, 204:5,

204:36
**home**
23:10, 24:12,
25:6, 41:13,
47:13, 94:6
**honest**
67:17
**honestly**
168:6
**hooked**
8:3
**hopefully**
86:9
**hospital**
31:21, 154:19
**host**
2:24, 3:23,
4:1, 13:24,
27:24, 35:3,
116:1, 116:9
**hostile**
147:16, 148:8,
148:14, 200:23,
201:20
**hotline**
31:3
**hour**
17:18, 63:4,
64:8, 114:17,
146:24, 160:5,
162:21
**hourly**
159:23
**hours**
24:14, 114:20
**house**
25:12, 47:14,
154:17
**household**
42:13
**hr**
181:2, 181:6
**human**
141:17, 155:24,
156:6, 156:10
**hunched**
125:8
**hurry**
148:1

**hurt**
86:9, 154:20,
176:14, 183:19
**hypertension**
167:10, 168:21,
168:24

**I**

**ice**
154:17
**idea**
79:19, 80:6,
82:14, 85:24,
103:8, 110:24,
129:5, 130:1,
165:12, 189:1
**identification**
59:13, 108:16,
157:9, 191:8
**identified**
20:7, 168:18,
169:23
**identify**
4:8, 4:10,
110:1, 111:11,
112:20, 116:15,
118:16, 119:14,
123:13, 130:17,
132:12, 134:20,
140:17, 141:7,
145:20, 155:18,
156:20, 156:23,
169:21
**illinois**
1:2, 2:5, 2:12,
2:18
**immediate**
29:3
**impartiality**
204:31
**important**
6:3, 6:7, 71:8
**improper**
178:11, 178:12
**improve**
13:23
**inappropriate**
68:13

Transcript of Samuel Page
Conducted on August 10, 2020

70

inarticulate
7:3
incident
58:2, 81:7,
82:21, 88:11,
89:3, 89:4,
92:19, 92:22,
96:21, 96:23,
96:24, 98:9,
98:18, 98:20,
100:19, 100:21,
101:14, 104:15,
104:19, 141:10,
154:5, 180:9,
181:3, 181:12,
181:18, 184:5
incidents
98:17, 100:16,
100:24, 176:8,
176:11, 181:14,
181:19, 184:14
included
119:22
including
55:22, 141:8,
151:21, 151:22,
151:23
income
163:7
increase
169:5
increased
167:11, 168:22,
168:24
indicate
147:15
indicated
61:8, 107:23
indicating
116:8
individually
63:15
individuals
8:9, 133:23,
155:20, 156:13
information
9:7, 9:24,
109:9, 120:11,

120:12, 140:23,
158:16
informed
63:8, 110:5
initially
16:19, 44:11,
82:24, 96:14
initiated
173:24
injured
154:5, 154:10,
155:8
injuries
167:7, 168:17,
168:19, 168:20
injury
154:23
inmate
21:24, 22:3,
22:14, 22:22,
23:7, 24:6,
24:20, 31:2,
40:11, 73:8,
73:9, 73:10
inmates
15:10, 22:13,
23:9, 24:10,
25:13, 113:12,
176:14
inner
89:18, 92:20,
93:16, 93:19,
93:21, 94:1,
97:13, 100:5,
101:11
inserts
86:22
inside
23:21
instance
132:13, 134:21
instances
40:19
instead
4:18, 137:13,
138:10, 143:24,
171:17
instruct
144:1

instructed
87:16, 142:11,
142:16, 144:3
interactions
185:3
interest
204:30
interested
4:13, 170:9,
204:28
interject
124:2
internal
141:9, 141:21
interpreted
78:24
interrogatories
108:22, 109:7,
109:8, 157:15,
158:5, 158:14,
158:15
interrogatory
11:22, 109:19,
111:7, 111:10,
112:18, 119:10,
119:22, 120:5,
123:12, 132:12,
140:17, 145:19,
155:12, 155:14,
167:5, 169:17,
169:20, 193:15
interrupted
190:7
interruptions
4:14
interview
18:2, 18:3
investigation
121:5, 121:8,
121:11, 121:13,
123:8, 141:10,
167:12, 181:3
investigator
16:20, 16:24,
18:8, 19:10,
19:14, 21:11,
21:12, 21:22,
23:11, 27:4,

47:12, 64:2,
64:12, 110:22,
130:7, 131:10,
149:17, 162:23,
193:6, 198:20,
198:21, 201:18
investigators
46:2, 71:7,
75:19, 88:23,
105:3, 106:3,
123:17, 123:20,
125:18, 127:13,
127:21, 129:19,
132:19, 132:23,
133:3, 134:11,
136:11, 136:19,
136:21, 149:13,
152:17, 156:17,
156:24, 193:10,
196:21, 196:24,
197:21, 197:24,
199:2, 201:9,
201:10
involved
174:24, 175:4,
175:14, 175:17,
176:22, 177:21,
178:11
involves
24:21
isolation
72:4, 128:11
issuance
39:2
issue
27:22, 123:5
issued
31:13, 39:4
issues
18:19, 35:10,
71:16, 107:13,
198:9, 198:10
issuing
36:21
itself
23:19, 38:12,
42:19, 48:7,
87:20

## J

**jail**
17:16, 23:10,
23:21, 25:11,
25:12, 42:19,
44:12, 55:11,
187:12
**jail's**
17:15
**james**
19:23
**jefferson**
2:4
**job**
15:3, 21:11,
21:21, 23:24,
24:13, 31:2,
41:20, 43:17,
43:18, 82:12,
87:20, 117:1,
117:3, 119:7,
128:24, 131:6,
131:7, 142:9,
142:22, 143:10,
143:11, 143:12,
143:24, 144:8,
179:13, 187:11,
190:14, 196:14,
198:18, 198:23,
200:23
**jobs**
102:12, 102:17,
102:20, 113:11,
144:23, 145:3
**jog**
111:23
**jot**
8:14
**jotting**
9:11
**jr**
1:6, 185:20
**judge**
25:11, 92:16
**judgment**
36:24, 37:3
**jump**
164:11

**june**
191:15
**justin**
2:16, 5:15,
164:10, 202:11
**justin@ilesq**
2:19

## K

**keep**
14:7, 69:24,
75:2, 75:11,
75:16, 81:12
**kelly**
2:3, 2:7, 10:8,
122:18, 164:22,
171:3, 171:4,
175:5, 175:9,
195:7
**kept**
142:21, 149:19,
181:24
**kevin**
2:24, 13:22,
27:18, 35:3,
59:10, 60:5,
80:9, 83:10,
109:2, 109:19,
120:5, 132:10,
155:13, 158:8,
167:3
**keys**
113:17
**kind**
23:10, 23:18,
24:21, 25:24,
26:17, 26:22,
27:19, 31:6,
31:14, 31:23,
36:10, 38:11,
38:13, 40:2,
52:2, 54:13,
63:2, 63:22,
73:10, 79:8,
83:20, 133:3,
148:8, 148:14,
150:16, 150:19,
150:23, 151:3,

159:3, 166:20,
167:6, 175:16,
175:17, 175:18,
176:10, 176:11,
178:11, 181:2,
181:12, 184:16,
186:22, 188:13,
190:13, 201:18
**kinds**
141:21
**knew**
52:20, 174:24,
175:3, 183:9
**knowing**
105:17
**knowledge**
7:18, 50:22,
62:4, 93:8,
105:7, 105:9,
105:21, 109:9,
158:16, 161:15,
185:16, 186:4,
186:17, 187:8,
188:3, 189:8,
189:23
**known**
177:8, 187:13
**krauchun**
2:3, 3:6, 10:6,
58:20, 59:1,
59:6, 74:3,
84:9, 85:9,
86:18, 93:5,
123:4, 130:9,
139:19, 141:5,
145:9, 162:12,
164:10, 164:13,
164:16, 164:21,
165:1, 167:19,
168:12, 179:7,
182:7, 194:17,
194:20, 195:8,
195:14, 197:4,
197:15, 197:16,
201:1, 201:6,
201:14, 202:11,
202:22, 203:3
**krauchun@danherb-ertlaw**
2:7

## L

**lack**
155:23, 156:5
**lady's**
154:16
**lag**
155:15
**lake**
97:10
**lamont**
18:10
**language**
134:22, 134:24,
184:23, 187:2,
187:16, 188:20,
189:13, 190:22,
191:2, 191:3
**laptop**
14:1, 14:4,
14:8, 35:7,
116:2, 116:6
**large**
75:15, 75:18
**lasalle**
2:17
**last**
8:19, 20:10,
20:22, 26:23,
26:24, 36:6,
37:7, 52:4,
52:6, 54:21,
55:15, 57:8,
109:2, 109:3,
121:9, 135:20,
140:3, 149:15,
149:16, 149:23,
150:7, 151:2,
157:4, 158:9,
171:12, 171:13,
180:22
**lasted**
139:1
**later**
49:4, 157:3
**latino**
55:23, 75:24,
137:10

Transcript of Samuel Page
Conducted on August 10, 2020

72

latinos
51:23, 52:9,
53:18, 74:12,
74:24, 76:1,
76:3, 81:16
law
2:3, 2:11,
131:2
lawn
94:22, 95:7
lawsuit
159:17, 163:14,
163:16, 163:19,
164:17, 166:5,
170:3, 170:13,
170:19, 172:19,
173:9, 173:12,
173:15, 173:20,
174:21, 174:24,
176:9, 176:17,
177:1, 177:18,
182:4
lawyer
163:17, 163:22,
163:24
leading
164:18, 196:16
learn
46:19, 55:11,
70:10, 82:12,
83:2, 84:23,
84:24, 86:12,
97:7, 97:17,
97:18, 153:14
lease
42:12
least
97:19, 110:4,
143:4, 150:10,
193:16
leave
28:1, 42:19,
119:9, 137:6,
138:23
leaving
20:13
left
20:2, 20:5,

26:23, 66:7,
136:2, 154:16,
177:14
left-hand
191:13
legitimate
201:8, 202:6
legrain
1:5, 177:6
less
69:21, 73:17,
73:21, 93:23,
118:19, 152:4,
152:5
let's
11:2, 16:9,
18:23, 19:3,
19:7, 21:10,
21:19, 27:21,
27:23, 28:7,
31:1, 31:24,
34:10, 41:9,
45:4, 47:17,
60:6, 61:12,
61:23, 69:11,
80:7, 93:17,
97:4, 101:21,
104:6, 105:1,
106:23, 114:10,
115:24, 118:12,
120:4, 123:12,
130:16, 134:18,
136:6, 137:2,
140:16, 141:4,
145:19, 150:15,
155:12, 157:6,
157:7, 158:24,
169:20, 173:7,
175:14, 186:11,
191:5, 194:15
letter
18:9, 40:12,
40:14, 67:3
letterhead
24:14
letters
39:8, 40:5,
122:7

level
12:10, 71:9
levels
167:10, 168:22
lewis
12:12
lieu
4:17
lieutenant
19:24, 20:8
lights
154:17
likely
202:23
linda
117:14
line
116:19, 199:13
list
102:23, 102:24,
119:17
listed
119:10
listen
34:8, 79:16,
127:15, 127:21,
127:24, 128:24,
129:17, 129:20,
130:2, 130:7,
143:3, 143:18
listened
128:9
listening
22:21, 118:23,
119:8, 129:13,
129:15, 142:24
literally
83:8
litigation
163:12, 163:15,
163:19, 166:2,
174:16, 175:15,
175:16, 175:18
little
5:24, 13:22,
25:9, 31:24,
38:7, 41:11,
54:9, 65:2,

72:24, 73:24,
85:2, 112:16,
112:17, 117:16,
120:1, 127:9,
128:10, 158:24,
166:23, 182:5,
184:11, 192:11
live
42:10, 94:10,
94:12, 95:9
lived
98:23, 99:2,
99:5
llc
2:17
located
128:9, 128:16
location
25:15, 25:18,
176:21, 177:3
locations
32:17, 32:21,
33:7, 172:6
lock
31:12
lodge
29:10, 29:12
log
23:14, 143:18
logan
19:18, 141:24
logbook
143:4
loggins
19:22
logical
84:3
long
10:12, 26:12,
51:18, 51:20,
90:12, 91:21,
99:2, 138:18,
139:2, 139:5,
177:2, 177:8,
183:4, 183:10,
183:13, 198:6
longer
39:14, 39:18,

Transcript of Samuel Page
Conducted on August 10, 2020                                73

49:11, 50:15,
56:23, 57:12,
57:20, 57:22,
62:10, 62:17,
63:4, 63:17,
98:3, 101:8,
110:12, 113:19,
114:15, 183:21
**look**
9:22, 12:17,
53:24, 86:6,
104:6, 105:12,
108:18, 114:11,
115:16, 124:9,
125:15, 140:16,
169:16, 169:20,
172:10, 172:12,
180:10, 184:5
**looked**
125:7
**looking**
8:15, 21:13,
31:23, 121:14,
121:18, 123:9,
124:24
**looks**
60:20, 60:24,
120:10, 191:15
**lose**
40:18, 62:23,
159:22, 159:24,
160:10, 163:2
**losing**
62:22, 146:23,
179:13
**loss**
147:12
**lost**
55:5, 71:19,
71:21, 115:4,
145:21, 146:10,
159:3, 159:11,
160:8, 160:13
**lot**
9:1, 54:14,
58:4, 58:7,
58:9, 82:9,
122:12, 133:8,

136:15, 136:23,
139:6, 139:8,
183:5, 196:11,
198:1
**lougheren**
19:19, 124:20,
139:24
**low**
89:17
**low-incident**
155:1, 155:3
**low-risk**
83:5
**lower**
82:20, 89:4,
90:9, 92:21,
96:24, 98:9,
100:21
**lower-incident**
82:16
**lunch**
108:8, 113:5,
113:9, 120:17,
135:24
**lying**
153:19, 153:20

**M**

**m-e-s-s-i-n-a**
124:12
**made**
41:5, 44:15,
44:21, 50:14,
51:13, 52:12,
62:1, 62:5,
62:9, 63:2,
64:15, 68:16,
76:17, 88:10,
88:11, 88:13,
88:15, 96:1,
99:18, 110:9,
110:24, 113:10,
126:18, 126:21,
130:17, 130:19,
130:20, 130:24,
131:13, 131:20,
142:7, 144:12,
148:2, 156:1,

156:9, 160:22,
161:8, 161:22,
162:7, 192:16,
192:22, 197:10,
197:20, 197:21,
200:21
**madison**
90:9
**magnitude**
28:15
**main**
89:8
**majority**
54:21, 101:10,
101:12, 101:13,
101:22, 120:11,
120:12
**make**
36:18, 36:24,
37:3, 38:7,
45:13, 45:17,
46:17, 80:13,
87:1, 112:23,
113:3, 113:8,
141:15, 141:17,
141:21, 143:11,
168:23, 199:23,
200:7, 200:12
**makes**
7:4, 36:12,
163:8
**making**
24:22, 50:16,
54:18, 101:24,
102:4, 138:13,
141:8, 200:23
**man**
75:15, 148:7,
148:9, 150:4,
150:5
**man's**
62:7
**management**
13:1
**mandated**
131:19
**mandating**
181:24

**mandatory**
54:24
**manning**
1:8, 188:22,
188:24
**manpower**
152:2, 152:8,
152:16, 152:24
**many**
13:13, 19:7,
52:22, 52:24,
101:7, 114:20,
132:19, 132:22,
134:10
**map**
90:4, 91:21
**march**
42:20
**marie**
1:29, 6:9,
14:9, 14:12,
87:6, 91:8,
124:3, 204:5
**marked**
3:23, 59:12,
59:16, 108:14,
108:15, 157:8,
157:12, 191:7
**marquette**
94:20, 94:21,
94:22
**mass**
68:13
**materials**
9:14, 121:19,
122:9, 122:19,
122:23, 123:1
**math**
21:8, 115:8
**matter**
5:9, 99:19,
99:20, 99:21,
99:22, 204:10,
204:18
**maybe**
7:4, 10:14,
12:18, 14:3,
14:16, 26:17,

Transcript of Samuel Page
Conducted on August 10, 2020                                       74

27:24, 37:2,
54:7, 72:21,
74:13, 74:22,
75:18, 84:5,
85:17, 93:18,
96:5, 110:16,
125:24, 128:12,
131:8, 149:16,
172:15, 175:19,
182:20
**mccall**
180:17
**mcghee**
1:9, 180:17,
189:2, 189:10
**mchenry**
92:14
**mean**
10:24, 17:12,
22:18, 23:6,
26:21, 31:10,
32:12, 35:2,
35:14, 36:4,
37:19, 38:23,
39:22, 51:19,
55:3, 58:2,
68:3, 68:9,
69:14, 75:10,
75:12, 79:24,
83:23, 84:2,
86:13, 92:23,
99:5, 99:21,
100:11, 101:6,
102:2, 115:9,
115:12, 119:13,
126:10, 127:6,
129:6, 133:11,
133:21, 135:7,
139:12, 143:13,
144:3, 152:7,
156:14, 175:22,
182:4, 185:14,
197:13, 199:16
**meaning**
45:6, 45:9,
70:15, 72:9,
73:1, 174:15
**meaningful**
107:7

**means**
16:11, 24:10,
166:6, 195:20
**meant**
134:15
**mechanism**
37:14
**medical**
166:19, 167:6,
168:16, 168:19
**meet**
174:16
**meeting**
28:1, 110:11,
174:6, 174:11,
174:13
**member**
35:20
**memorandums**
141:9
**memory**
8:24, 9:9,
9:10, 111:23,
119:24
**mental**
112:15, 165:5,
166:20, 167:6
**mentioned**
30:7, 40:4,
127:16, 146:19,
180:9
**merit**
35:15, 56:14,
161:23, 162:2,
162:3
**message**
23:13, 172:1
**messages**
33:23, 143:7,
143:9, 170:16,
172:4, 172:18
**messina**
123:24, 124:12
**mic**
4:7
**michelle**
1:5, 182:16
**mid**
192:1

**middle**
113:13
**midwest**
2:12
**might**
6:15, 15:17,
31:20, 32:9,
36:4, 46:10,
47:13, 47:15,
65:10, 79:7,
89:14, 92:14,
93:17, 93:18,
93:21, 117:15,
117:20, 117:22,
120:24, 122:24,
130:5, 132:3,
132:6, 135:22,
136:3, 142:2,
155:14, 163:23,
176:15, 177:1,
185:14, 193:21,
194:12
**mind**
95:9, 180:11
**mine**
128:18, 136:13
**minnesota**
204:1, 204:12
**minorities**
126:14, 126:15,
196:10
**minority**
96:22
**minute**
12:16, 72:15,
83:8, 124:23,
172:23, 196:19,
199:8, 201:3
**minutes**
25:4, 58:15,
58:24, 59:1,
194:11, 194:15
**mischaracterizes**
74:4, 85:10,
167:20
**miss**
162:17
**misstates**
197:12

**mistake**
148:1
**mistaken**
85:17, 85:18
**misunderstood**
175:13
**monday**
11:11, 50:10
**money**
18:16, 77:20,
162:21, 163:6,
163:8, 163:23,
164:3, 166:9
**monitor**
23:1, 33:23,
102:12, 102:14,
102:18
**monitored**
101:21
**monitoring**
15:10, 15:16,
16:11, 21:23,
22:13, 23:6,
24:21, 32:11,
32:15, 33:4,
41:13, 43:3,
48:8, 53:15,
56:3, 60:21,
61:2, 69:7,
69:9, 72:10,
73:5, 73:6,
73:8, 79:6,
105:10, 113:16,
115:14, 118:22,
119:7, 128:22,
129:17, 129:22,
131:10, 134:4,
137:24, 138:10,
142:24, 148:18,
148:22, 149:3,
161:10, 199:21
**month**
171:12, 171:13
**months**
74:23, 76:9,
126:5, 126:9,
126:10
**moot**
122:24

Transcript of Samuel Page
Conducted on August 10, 2020

75

**more**
6:3, 18:16,
25:9, 27:17,
27:22, 31:24,
34:1, 34:16,
38:7, 38:22,
55:4, 57:16,
57:18, 57:22,
65:2, 73:2,
73:4, 76:14,
79:22, 82:15,
82:19, 82:20,
83:18, 83:23,
84:3, 84:4,
84:5, 87:21,
92:23, 94:1,
94:2, 94:6,
98:24, 100:20,
100:22, 110:16,
112:17, 113:19,
120:1, 131:12,
137:17, 138:21,
144:15, 152:3,
152:4, 152:18,
162:21, 163:6,
163:8, 163:9,
175:3, 187:14,
194:12, 197:18,
200:22, 200:23
**morning**
5:14
**most**
81:13, 93:19,
94:3, 94:4,
95:23, 98:14,
122:6, 163:9,
202:10
**mostly**
20:16, 82:11,
101:9, 132:7,
173:12
**motorcycle**
125:14
**move**
18:10, 18:13,
18:20, 47:1,
53:12, 56:13,
56:19, 57:2,

161:3, 161:5
**moved**
12:7, 53:12,
117:8
**movement**
21:24, 22:3,
22:14, 24:6,
24:17, 24:20,
31:3, 72:7,
73:8, 73:9,
73:10, 131:16
**moving**
18:8, 142:21
**much**
14:14, 44:14,
98:13, 100:6,
101:15, 116:10,
177:15, 179:18,
195:1
**multiple**
80:21
**mute**
4:6
**muted**
58:19, 132:8
**myself**
72:6, 119:5,
147:23

**N**

**name**
5:14, 5:17,
19:20, 20:2,
20:14, 20:16,
22:24, 29:7,
29:15, 33:22,
62:7, 62:9,
67:1, 67:2,
67:6, 76:24,
77:2, 113:11,
118:2, 118:8,
124:10, 125:12,
125:14, 140:2,
140:3, 149:18,
149:21, 149:22,
149:23, 164:6,
178:4, 178:14,
178:21, 178:22,

191:12
**named**
89:22, 117:14,
176:9, 176:15,
176:16, 176:17,
178:11
**names**
20:12, 123:22,
123:24, 124:4,
124:5, 124:7,
124:14, 125:16,
156:19, 156:22,
157:3, 157:5
**nappy**
183:2, 183:3
**nasty**
184:20
**nature**
87:20, 89:20,
100:18
**nd**
94:15, 94:16
**neal**
19:21, 62:13,
126:22, 131:23,
132:1, 132:2,
132:4, 141:23,
142:2, 142:18,
181:21, 182:1,
182:2, 182:12,
187:16
**need**
6:17, 6:21,
12:8, 14:16,
24:22, 42:12,
47:15, 83:7,
131:4, 168:15
**needed**
68:6, 97:19
**needless**
72:7
**needs**
37:5, 102:13
**negative**
69:13, 148:6,
184:16, 185:3,
186:20, 196:4
**neighborhood**
154:14, 155:4

**nervous**
87:18
**never**
37:22, 37:24,
38:1, 39:7,
61:11, 61:19,
61:20, 66:5,
68:24, 69:21,
73:18, 73:21,
74:14, 76:15,
105:24, 106:21,
107:3, 110:18,
112:8, 114:7,
123:17, 126:2,
126:7, 126:17,
127:20, 129:19,
131:20, 132:14,
134:23, 139:3,
139:10, 139:12,
139:22, 143:24,
144:3, 144:9,
144:16, 144:18,
146:8, 146:10,
146:13, 146:15,
153:21, 155:8,
156:9, 160:16,
160:19, 161:2,
171:1, 174:18,
176:9, 176:18,
176:24, 179:10,
181:4, 181:5,
181:6, 181:9,
183:21, 183:22,
185:6, 186:8,
187:15, 188:19
**new**
22:20, 42:4,
43:12, 52:6,
54:24, 55:2,
55:6, 55:17,
55:20, 55:22,
70:11, 74:22,
75:11, 75:13,
75:19, 84:15,
84:17, 85:21,
86:8, 88:1,
123:16, 125:18,
125:22, 126:16,

196:23
**newer**
82:11, 83:3
**newson**
1:6, 103:11,
185:20, 185:21,
186:5, 186:9
**next**
30:3, 61:4,
63:12, 76:21,
78:12, 104:7,
108:3, 112:7,
160:15, 167:9
**nick**
140:2
**nickle**
140:3
**night**
8:19
**nights**
180:22
**nineties**
85:7
**nobody**
55:9, 72:11,
74:10, 111:2,
129:23, 143:3,
143:11, 174:23
**nod**
6:16
**non-essential**
129:16
**non-merit**
20:11, 57:9,
66:8, 66:9
**non-minority**
69:20, 73:17,
73:21, 81:8,
82:4, 104:13,
106:7, 123:13,
123:20
**none**
54:23, 63:21,
74:16, 75:16,
128:3, 129:24
**nonverbal**
6:15
**normal**
166:24

**normally**
55:6, 128:24
**north**
46:21, 46:22,
46:23, 47:3,
81:14, 89:10,
89:13, 91:2,
91:4, 91:7,
91:12, 94:24,
96:4, 97:9,
100:6, 100:23,
101:3, 101:5
**northern**
1:2, 46:24,
100:2
**notary**
204:11, 204:37
**notes**
3:21, 8:12,
8:16, 8:18,
8:22, 9:8, 9:13,
195:3, 196:19,
204:17
**nothing**
8:8, 11:8,
63:21, 66:5,
66:6, 66:8,
68:8, 98:6,
119:19, 125:5,
125:9, 130:20,
160:10, 204:9
**noticed**
204:21
**nowhere**
139:10
**number**
42:8, 90:2,
93:3, 93:9,
93:11, 99:7,
124:10, 152:1,
164:8, 168:10,
169:22, 169:23
**numbers**
93:20, 143:8,
152:23, 173:19

---
**O**
---

**o'malley**
56:11, 61:17

**oak**
2:12, 95:7
**oath**
108:11, 204:14
**object**
4:20, 85:9,
162:12
**objection**
74:3, 84:9,
84:10, 86:18,
86:22, 93:5,
130:9, 139:19,
145:9, 167:19,
168:12, 179:7,
179:8, 182:7,
195:22, 196:15,
197:11, 199:4,
201:12
**objections**
3:15, 3:16,
87:2, 108:21,
157:13, 197:2
**observe**
183:24, 184:1
**observed**
150:19, 185:5
**obviously**
178:24
**occasion**
173:17
**occasionally**
24:2, 26:20,
27:5, 74:8,
150:13
**occasions**
26:16, 54:2,
152:10
**occurred**
49:10, 49:14,
98:18, 98:20
**offenders**
27:1
**offensive**
134:22
**offett**
2:24
**office**
5:16, 13:3,

13:9, 15:2,
15:4, 16:7,
17:20, 17:23,
17:24, 27:9,
27:11, 28:8,
28:10, 29:15,
30:17, 32:11,
32:15, 33:4,
33:22, 34:6,
34:11, 34:13,
45:22, 54:14,
56:18, 60:16,
68:16, 69:11,
70:1, 76:21,
79:7, 79:15,
90:4, 102:21,
104:13, 113:4,
118:22, 128:16,
128:22, 128:23,
132:6, 133:8,
133:17, 134:2,
134:3, 134:6,
135:23, 136:11,
136:16, 137:2,
137:15, 137:20,
138:9, 145:14,
147:19, 147:22,
148:19, 148:22,
149:4, 149:13,
150:9, 150:11,
150:20, 150:24,
151:4, 151:15,
151:16, 151:20,
152:4, 152:6,
152:7, 152:12,
152:21, 152:22,
152:23, 153:2,
175:2, 180:12,
183:6, 202:2
**officer**
15:5, 15:7,
15:13, 18:7,
18:20, 78:7,
78:18, 78:21,
83:1, 83:23,
84:4, 86:5,
86:8, 86:11,
86:12, 86:13,

Transcript of Samuel Page
Conducted on August 10, 2020

77

86:15, 86:17,
87:22, 88:6,
95:17, 96:1,
96:4, 97:19,
97:20, 102:8,
136:24, 137:1
**officers**
69:20, 70:2,
73:17, 73:21,
74:1, 74:15,
81:8, 81:15,
82:4, 82:10,
82:11, 82:15,
82:19, 82:20,
83:18, 84:15,
84:18, 85:21,
86:1, 87:14,
88:1, 89:2,
89:4, 96:8,
96:9, 96:21,
96:22, 96:23,
97:23, 98:3,
104:13, 106:8,
118:19, 123:14,
125:22, 137:5,
137:6, 137:7,
137:8, 137:9,
137:10, 137:11,
137:14, 139:22,
140:2, 140:5,
140:8, 144:19,
152:11, 156:20,
196:23, 197:10,
198:4, 202:1,
202:9
**offices**
128:15
**often**
73:3, 73:4,
100:20, 120:17
**oh**
12:16, 20:2,
20:21, 25:23,
27:12, 31:19,
35:24, 37:9,
37:11, 44:10,
52:4, 57:17,
62:7, 65:8,

71:19, 75:15,
81:22, 83:20,
92:20, 93:14,
94:3, 95:23,
99:5, 117:1,
117:7, 119:3,
121:13, 123:24,
125:3, 125:12,
132:24, 135:2,
149:15, 157:2,
164:7, 164:20,
165:10, 167:18,
171:4, 171:23,
175:12, 177:20,
177:21, 184:14,
187:10, 190:16,
202:10
**old**
8:11, 63:13,
178:18
**omissions**
155:18
**once**
18:1, 18:2,
22:23, 24:15,
26:18, 42:14,
88:13, 147:23,
149:20, 151:11,
153:12, 190:9
**one's**
20:15, 168:10
**one-offs**
26:17
**one-sided**
51:18, 51:20
**ones**
11:17, 26:19,
36:17, 65:9,
77:5, 84:23,
174:3
**only**
4:5, 6:21,
8:10, 49:6,
50:10, 51:21,
52:9, 53:11,
53:18, 74:12,
76:2, 88:23,
93:15, 98:9,

120:13, 127:13,
130:4, 136:19,
138:21, 141:23,
149:13, 151:16,
151:19, 152:6,
170:20, 173:17,
177:19, 178:2,
178:6, 179:16,
183:8, 187:13,
188:7, 196:24
**open**
44:11, 49:6,
145:1
**operator**
13:12, 14:19
**opinions**
174:2
**opportunities**
160:13
**opportunity**
107:7, 160:16,
161:3, 161:5
**opposed**
106:7, 201:10
**opposite**
174:11
**opr**
29:16, 30:12,
36:20, 37:16,
38:3, 38:12,
139:11, 139:15,
139:16, 141:15,
155:24, 156:6,
156:10, 181:2,
181:5
**oral**
130:20, 130:24
**order**
25:16, 28:14,
62:16, 69:12,
92:13, 92:16,
202:23, 203:1,
203:4
**ordered**
68:21, 199:16,
204:22
**orders**
147:20

**original**
204:20
**others**
110:14, 139:23,
140:13
**out**
14:17, 18:13,
18:21, 20:13,
22:13, 24:15,
25:5, 28:13,
28:14, 41:13,
42:5, 42:7,
42:17, 42:18,
42:20, 44:11,
44:12, 44:13,
45:2, 45:3,
51:3, 51:6,
70:9, 72:10,
75:21, 75:23,
76:2, 79:15,
81:14, 83:2,
86:6, 86:8,
86:9, 86:12,
88:1, 88:2,
88:13, 98:13,
105:18, 113:4,
125:15, 133:17,
133:20, 136:16,
137:24, 154:9,
162:17, 163:2,
172:7, 183:7,
183:18, 190:17,
199:24
**outcome**
204:28
**outlying**
89:15, 89:16,
92:9, 92:12
**outside**
25:17, 174:7,
174:14, 174:15
**over**
5:23, 6:3, 6:4,
18:8, 19:18,
24:10, 25:14,
43:14, 54:3,
54:16, 54:23,
55:1, 55:6,

55:18, 62:7,
63:5, 65:18,
70:1, 72:6,
72:18, 72:22,
74:10, 74:12,
74:15, 74:17,
75:1, 75:3,
75:8, 75:12,
75:18, 76:13,
77:4, 77:5,
78:8, 78:13,
78:16, 81:8,
82:4, 83:1,
83:4, 98:18,
105:11, 105:15,
111:7, 119:5,
125:8, 125:18,
126:2, 126:6,
126:8, 126:16,
126:17, 131:15,
131:16, 142:20,
177:12, 178:19,
179:13, 181:24,
182:20, 188:6,
188:14, 188:18,
195:3, 195:6,
195:7, 195:9,
196:20, 200:6
**overtime**
63:6, 114:22,
120:17, 120:19,
121:2, 131:17,
131:18, 148:2,
148:4, 159:24,
160:2, 160:3,
181:23, 182:13,
185:12, 185:13,
185:14, 190:15,
199:11, 199:16,
199:17, 200:1,
200:8
**own**
46:1, 47:19
**owner**
42:12

---
**P**
---

**p-a-g-e**
5:19

**page**
1:7, 1:19, 3:3,
3:4, 3:5, 3:6,
3:12, 3:14,
3:15, 3:16,
3:17, 4:23, 5:7,
5:14, 5:19,
5:20, 12:11,
14:1, 14:3,
14:7, 14:20,
35:9, 59:12,
59:15, 59:16,
60:6, 60:8,
60:10, 60:14,
61:5, 80:10,
80:12, 83:14,
84:13, 85:16,
87:11, 104:7,
104:10, 108:10,
108:14, 108:15,
109:2, 109:3,
109:5, 109:6,
109:21, 110:3,
110:17, 110:22,
112:14, 116:2,
116:3, 116:14,
122:22, 123:15,
123:18, 130:13,
155:17, 157:8,
157:11, 157:12,
158:9, 158:11,
158:12, 165:4,
167:9, 179:9,
191:7, 191:10,
194:14, 194:23,
195:4, 204:6
**page's**
157:13
**pages**
111:8
**paid**
64:7, 64:10,
163:11, 163:22,
166:3, 166:8
**pain**
165:16, 166:20
**paper**
164:7

**papers**
12:7, 122:12
**paperwork**
115:17, 121:16,
124:10
**paragraph**
60:6, 60:15,
61:4, 61:5,
66:11, 68:1,
69:3, 69:19,
71:12, 73:16,
73:20, 80:7,
80:14, 80:17,
80:22, 81:4,
81:5, 83:11,
83:14, 95:14,
103:3, 103:5,
103:13, 103:14,
103:19, 104:6,
104:11, 104:23,
105:1, 105:22,
106:5, 106:8,
106:10, 106:23,
107:6, 107:18,
111:17, 112:20,
191:24
**parent**
25:19
**park**
94:20, 94:21,
94:22, 97:11
**part**
8:19, 32:12,
90:9, 131:9,
143:22, 151:2,
173:20, 174:10,
183:8, 186:24
**part-time**
14:23
**participate**
66:20, 66:22,
181:2
**participated**
49:21
**participating**
8:1, 107:23
**participation**
195:2

**particular**
17:2, 44:8,
47:11, 48:9,
60:10, 60:14,
147:8, 179:11,
179:17
**parties**
172:7, 204:22,
204:27, 204:29
**party**
204:21
**pass**
57:10, 57:11
**passed**
18:1
**passing**
132:5, 133:7,
133:9, 133:10,
134:6, 134:16
**passis**
117:18, 117:20,
118:6
**past**
70:7, 70:14,
82:13, 82:14,
84:14, 85:6,
85:11, 86:11,
121:14
**patch**
154:17
**patrol**
26:8, 26:11,
44:10, 45:21,
45:24, 46:2,
46:6, 46:7,
46:11, 48:2,
48:10, 48:12,
48:17, 48:18,
49:6, 49:7,
50:7, 51:24,
52:10, 53:16,
55:8, 61:1,
61:6, 61:8,
61:21, 64:1,
64:15, 69:1,
70:3, 81:18,
88:18, 98:11,
98:12, 98:16,

Transcript of Samuel Page
Conducted on August 10, 2020                                79

99:15, 110:2,
111:12, 112:12,
114:15, 147:9,
154:5, 154:9,
154:10, 161:13,
161:19, 162:6
**pause**
135:8
**pay**
64:11, 77:20,
120:20, 120:21,
146:10, 163:15,
163:17, 163:18,
163:24, 179:18
**paying**
114:22, 166:13
**peaceful**
100:3
**pedophiles**
52:1
**penalties**
4:20, 5:3
**penalty**
109:10, 158:17,
191:19
**pending**
6:22, 182:9
**people**
27:1, 27:5,
42:4, 42:7,
42:9, 48:15,
50:7, 51:21,
52:6, 54:1,
54:10, 54:17,
54:24, 55:2,
55:4, 55:5,
55:6, 55:17,
55:20, 55:22,
55:23, 68:5,
74:22, 75:12,
75:13, 76:12,
76:13, 83:3,
84:17, 84:20,
86:8, 101:2,
101:5, 101:12,
101:20, 101:22,
104:5, 105:13,
126:16, 135:5,

135:6, 135:8,
135:23, 136:11,
151:9, 151:20,
152:3, 152:4,
152:5, 152:6,
152:7, 152:19,
153:1, 153:2,
174:1, 174:19,
174:24, 175:2,
176:22, 184:5,
187:11, 195:18,
195:19, 196:6,
196:7, 196:8,
196:9, 197:22
**percent**
76:1
**percentage**
76:2, 93:12
**perfect**
111:8
**perform**
32:23, 33:2,
33:4, 33:15,
142:12
**performance**
144:8, 198:18
**performing**
144:16
**period**
20:18, 22:8,
22:16, 24:1,
45:24, 50:3,
52:23, 53:19,
71:6, 72:18,
76:8, 88:20,
169:11
**periodically**
20:16
**perjury**
4:20, 5:3,
109:10, 158:17,
191:19
**permissions**
22:1
**person**
7:20, 8:3,
11:20, 27:6,
37:5, 42:13,

42:16, 65:24,
76:17, 102:21,
151:16, 161:13,
173:17, 188:9,
190:1
**personal**
43:16, 47:15,
87:17, 185:16,
186:4, 186:17,
187:8, 188:3,
189:8, 189:22
**personally**
62:24, 64:17,
64:21, 148:6,
180:20, 184:1,
184:2, 185:5
**persons**
204:29
**petitioned**
128:12
**phone**
2:5, 4:10,
9:23, 25:14,
25:19, 27:18,
33:23, 35:7,
42:8, 119:8,
119:20, 124:11,
125:8, 142:23,
142:24, 169:23,
170:15, 170:16,
170:18, 171:24,
172:2, 172:17,
172:22, 172:24,
173:19
**phones**
118:22
**phonetic**
19:19, 19:22,
19:23, 20:14,
46:23, 56:12,
97:6, 97:10,
117:15, 117:18,
117:20, 118:6,
124:1, 124:13,
124:18, 149:17,
149:22, 150:6,
151:12, 151:17,
178:4, 180:17

**phonetically**
124:6, 124:16
**physical**
43:23, 57:10,
57:11
**physically**
27:3, 128:8,
148:21
**physician**
167:10
**pick**
42:20, 43:4,
43:12
**picked**
42:22
**place**
73:13, 183:14,
196:20
**placed**
22:17, 22:19,
25:17, 81:6
**places**
89:20
**plaintiff**
61:5, 110:3,
110:17, 112:14,
123:15, 141:11,
157:13
**plaintiff's**
173:14
**plaintiffs**
1:11, 2:8,
10:20, 80:17,
80:22, 81:7,
103:16, 104:14,
106:7, 106:24,
107:8, 107:20,
155:19, 156:1,
173:13, 174:7,
174:14, 174:19
**planet**
2:24
**play**
82:5
**played**
70:6
**please**
4:3, 4:6, 4:7,

4:10, 4:16,
5:17, 7:2, 7:6,
34:16, 41:22,
59:11, 60:3,
87:10, 109:19,
116:12, 120:5,
164:12
**point**
8:7, 17:12,
32:24, 47:21,
57:14, 113:8,
130:8, 136:3
**pointed**
142:18
**police**
85:21, 86:4,
86:5, 88:21,
94:20, 100:5,
125:13
**policies**
27:9, 28:7,
34:10
**policy**
27:11, 28:10,
30:16, 30:21,
34:13
**portion**
87:8
**position**
16:17, 16:23,
21:11, 61:6,
61:8, 61:21,
62:2, 62:22,
62:23, 63:9,
64:12, 64:15,
64:19, 67:23,
68:17, 69:1,
107:24, 110:2,
110:4, 110:19,
110:23, 111:13,
115:18, 145:23,
146:21, 159:6,
160:18, 160:19,
162:10, 162:23,
162:24
**positions**
14:23, 22:20,
104:13, 142:10,

142:12
**possible**
6:1, 14:1,
14:3, 41:6,
122:23, 130:6,
130:11, 130:14,
130:15, 140:12,
140:15, 145:7,
145:11, 194:19
**possibly**
133:18
**post**
118:18, 118:19
**potentially**
122:21
**practice**
70:14, 82:14,
84:15, 85:6,
86:11, 97:7
**practices**
70:7, 82:13,
85:11
**preface**
170:8
**preferred**
44:9, 44:14
**pregnant**
149:19, 149:20
**preparation**
11:16
**prepare**
10:2, 10:12,
158:2, 158:6
**present**
2:23, 110:14,
117:9, 117:13,
117:22, 192:2
**presented**
63:22
**pressure**
166:23, 167:14,
167:16, 167:23,
168:4, 168:8,
168:10, 169:5
**prestige**
165:13
**presumably**
75:13, 89:3,

96:24
**pretty**
14:11, 48:12,
94:11, 99:9,
99:12, 101:15,
198:6
**prevent**
196:23
**previous**
55:10, 164:18
**primary**
167:10
**prior**
13:8, 14:19,
26:14, 41:16,
56:22, 57:4,
129:13, 166:3,
197:12, 198:12
**probably**
129:14
**problem**
34:17, 38:13,
201:4
**problems**
200:22
**procedure**
107:20, 107:22
**procedures**
107:7, 107:19
**proceed**
25:20
**proceeding**
4:2, 4:4, 4:21,
175:20
**process**
17:22, 17:23,
22:13, 49:16,
70:10, 81:18,
107:7
**processed**
41:13
**processes**
107:19
**processing**
25:8
**produce**
123:3
**produced**
122:20, 122:24

**professional**
29:16
**program**
23:12, 23:19
**progressive**
34:14, 34:19,
34:23, 35:10,
35:12, 38:24,
80:16, 81:2
**prohibited**
28:17, 28:20
**promote**
66:8, 161:9,
161:21
**promoted**
16:22, 20:10,
20:23, 56:16,
122:8, 193:1
**promotion**
56:5, 56:16,
57:14, 61:1,
63:1, 121:16,
160:24
**promotional**
57:8, 122:7
**promotions**
56:2, 57:6
**proper**
120:16, 184:21
**propose**
138:1
**proposed**
65:10
**protected**
141:7
**protocol**
102:17
**provide**
4:11, 9:17,
107:7, 107:19,
122:9
**provided**
110:18, 120:12,
120:16
**providers**
166:20
**provision**
156:5

Transcript of Samuel Page
Conducted on August 10, 2020                                                81

**psychiatrist**
165:16, 166:19
**psychological**
168:16
**public**
24:16, 137:18,
204:11, 204:37
**pull**
25:12, 25:13,
33:23, 48:14,
59:10, 83:10,
157:7, 167:4,
191:5
**pulled**
191:10
**punch**
49:3
**punish**
54:17
**punished**
40:8
**punishing**
54:4
**punishment**
54:16
**punk**
125:13
**purchase**
4:12
**purpose**
8:21, 201:8
**purposes**
4:4
**pursuant**
48:3
**put**
21:23, 22:24,
23:12, 24:2,
24:11, 25:12,
25:20, 27:1,
42:15, 43:22,
45:5, 46:14,
46:19, 46:20,
46:24, 55:8,
55:12, 69:10,
72:11, 74:13,
83:4, 84:22,
86:3, 96:15,

101:18, 102:17,
102:20, 116:2,
116:6, 128:10,
149:20, 157:6,
183:6, 187:11,
190:4
**puts**
85:21
**putting**
72:9, 126:6

---
**Q**
---

**qualified**
33:15, 33:19
**question**
6:5, 6:7, 6:22,
7:7, 7:9, 7:11,
11:3, 19:11,
29:2, 36:22,
50:23, 76:12,
82:17, 84:13,
85:13, 86:21,
86:23, 87:3,
87:7, 87:11,
87:14, 88:9,
89:6, 93:15,
102:3, 103:18,
103:21, 105:15,
105:16, 109:24,
111:15, 111:19,
114:13, 118:15,
119:13, 127:10,
136:23, 138:4,
144:5, 146:4,
155:21, 159:16,
161:8, 163:20,
168:18, 169:2,
169:21, 170:8,
171:6, 171:8,
174:13, 180:1,
182:8, 182:9,
184:15, 184:21,
186:20, 190:2,
197:14, 197:17,
201:18
**questioned**
69:8, 77:17
**questioning**
199:13

**questions**
6:18, 7:2,
7:21, 11:21,
27:9, 116:22,
117:10, 136:22,
138:1, 155:21,
194:13, 194:24,
195:15, 198:11,
199:10, 202:2,
202:6
**quick**
194:19
**quite**
83:6, 87:18,
136:7, 139:2,
166:6, 174:1
**quote**
100:19, 195:19

---
**R**
---

**race**
28:14, 28:21,
95:22, 97:23,
105:3, 106:3,
143:15, 143:19,
143:20, 144:14,
144:18, 147:3,
147:6, 192:3,
196:8, 201:7,
201:24, 202:4
**racial**
96:6, 144:20,
196:5
**racist**
103:17, 104:4,
134:22, 134:24,
138:6, 138:7,
138:13, 184:22,
185:1, 187:2,
187:16, 188:20,
189:13, 190:21,
191:2, 191:3,
197:8, 197:9,
197:21
**raise**
162:19
**raises**
162:17

**ran**
20:17, 87:22
**rank**
112:9, 112:12,
160:19
**ranzino**
19:18, 41:7,
62:12, 62:16,
63:10, 69:4,
69:16, 74:19,
77:11, 77:24,
110:4, 110:10,
112:23, 113:3,
114:4, 116:15,
116:17, 116:23,
126:22, 127:11,
130:19, 130:21,
131:13, 131:22,
132:7, 134:1,
135:17, 136:7,
138:12, 139:4,
139:23, 141:21,
148:12, 148:14,
152:11, 152:18,
152:20, 173:23,
180:9, 181:18,
181:20, 184:5,
184:15, 184:18,
186:20, 187:3,
187:15, 192:15,
198:2, 198:4,
198:12
**ranzino's**
74:21, 150:16,
150:19
**rate**
64:11, 120:20,
120:21, 204:23
**rather**
26:5, 100:2
**raymond**
167:9
**read**
87:7, 87:9,
103:5, 109:7,
119:12, 158:13
**reading**
30:18, 103:17,

Transcript of Samuel Page
Conducted on August 10, 2020                                          82

112:24, 193:10,
204:25
**ready**
25:21, 42:5,
42:20, 203:4
**real**
72:23, 194:3
**really**
6:6, 20:24,
22:24, 31:7,
37:22, 37:23,
37:24, 38:2,
44:7, 54:5,
54:6, 54:20,
62:3, 65:8,
65:11, 67:8,
68:21, 79:17,
92:6, 92:7,
93:14, 99:19,
105:14, 107:11,
107:12, 107:21,
107:22, 112:15,
115:8, 116:7,
117:7, 117:8,
125:14, 129:12,
130:4, 133:5,
136:16, 139:10,
139:11, 144:4,
144:14, 163:5,
176:22, 178:7,
179:17, 180:13,
185:15, 202:6
**reason**
7:13, 44:5,
50:8, 54:7,
63:19, 65:5,
72:2, 76:16,
76:19, 80:3,
95:16, 102:10,
102:11, 110:18,
111:2, 168:7,
202:3, 202:7
**reasons**
47:15, 168:10
**recall**
30:19, 42:24,
65:16, 122:21,
125:23, 132:4,

147:22, 157:5,
174:17, 174:18,
195:17
**receive**
33:20, 37:13,
38:19, 39:19,
40:22, 107:21,
172:18, 198:17,
198:22
**received**
40:4, 40:12,
61:1, 69:20,
69:21, 77:19,
105:10, 107:2,
118:16, 140:21,
146:10, 167:6,
170:10, 200:10
**receiving**
43:11, 146:19
**recess**
59:9, 108:8
**recognize**
59:16, 59:19,
157:18, 157:20,
157:23
**recollection**
9:2, 30:20,
110:21, 115:3,
182:11
**recommend**
13:22
**recommendations**
13:24
**record**
4:5, 5:5, 5:18,
6:10, 6:14,
6:17, 13:6,
13:20, 14:5,
28:5, 35:5,
58:13, 58:22,
59:8, 70:23,
83:9, 83:12,
87:9, 108:6,
108:7, 108:10,
117:24, 124:22,
161:24, 173:2,
194:21, 194:23,
195:10, 196:1,

201:5, 202:20
**recorded**
23:13
**recording**
4:4, 4:12
**records**
48:14
**rectified**
30:4
**reference**
18:9
**referenced**
112:20, 195:4
**references**
42:8
**referencing**
101:20, 125:19,
194:6
**referring**
19:9, 69:22,
71:14, 73:7,
123:21, 127:17,
135:4, 147:17,
192:19
**refresh**
115:3
**refused**
160:3
**regarding**
30:17, 31:2,
36:13, 36:18,
40:5, 44:16,
50:12, 64:18,
107:24, 110:1,
111:11, 111:12,
130:17, 130:24,
131:13, 144:13,
170:3, 170:13,
170:19, 172:19,
194:6
**regardless**
19:13, 39:15,
77:20, 81:7,
82:3, 97:23
**regards**
164:13
**regular**
31:9

**regularly**
103:15, 103:22,
104:12
**reinstated**
61:11, 61:20,
69:1
**rejoin**
28:1
**relate**
80:24
**related**
8:8, 8:17,
38:5, 80:4,
147:6, 163:14,
163:15, 163:19,
165:5, 165:16,
204:27
**relation**
177:17
**relative**
11:11, 80:21
**release**
43:2
**releases**
27:1
**relevant**
71:4, 102:2
**rely**
84:7
**remainder**
71:11
**remedy**
107:19
**remember**
4:6, 17:6,
19:20, 20:11,
30:18, 36:8,
62:9, 63:21,
65:19, 67:8,
67:18, 79:20,
89:14, 90:6,
90:7, 90:13,
90:15, 90:17,
92:2, 92:7,
92:10, 112:3,
115:8, 120:1,
124:19, 125:16,
127:14, 132:24,

Transcript of Samuel Page
Conducted on August 10, 2020                                    83

133:5, 142:6,
151:17, 154:22,
157:3, 169:17,
174:23, 176:8,
176:12, 176:14,
176:18, 177:3,
180:4, 180:5,
180:7, 180:8,
180:12, 180:14,
180:15, 180:23,
180:24, 181:11,
199:13, 201:21
**remembered**
121:15
**remotely**
2:7, 2:14,
2:19, 4:2, 204:6
**removal**
61:7, 63:8,
64:18, 110:1,
110:19, 111:12
**remove**
62:1, 64:15
**removed**
61:6, 107:24,
110:4, 110:6
**removing**
110:23
**rep**
188:14
**repeat**
34:16, 41:22,
73:19, 82:17,
87:3, 151:2,
197:18
**rephrase**
7:6, 34:15,
44:23, 146:4
**replacement**
66:10
**replenish**
55:5
**report**
29:3
**reported**
133:12, 204:6
**reporter**
4:8, 4:15,

4:16, 4:18, 5:1,
6:9, 6:14, 6:16,
14:14, 87:9,
91:6, 118:10,
203:1
**reporting**
19:15
**reports**
141:10
**represent**
164:23, 173:23
**representative**
38:11, 38:13,
38:14, 38:15
**representing**
2:8, 2:14, 2:19
**reprimand**
35:14, 40:15,
136:8, 136:20,
137:9, 137:15,
137:16, 137:21,
146:19
**reprimanded**
40:13, 139:22,
140:13
**reprimanding**
137:13
**request**
3:21, 48:2,
48:9, 48:24,
49:1, 49:4,
99:15, 123:2,
155:17, 195:5
**requested**
87:8
**required**
97:17, 114:18,
199:11, 199:15
**requirement**
82:15, 82:18
**reserve**
122:21
**reserves**
141:11
**residence**
42:10
**resources**
141:18, 155:24,

156:6, 156:10
**respect**
200:22
**respond**
117:11, 184:16
**responded**
145:21
**response**
30:24, 69:13,
78:3, 110:3,
111:19, 112:21,
114:24, 116:16,
119:17, 119:22,
120:2, 121:9,
121:12, 123:15,
127:1, 127:7,
134:13, 141:12,
155:22, 167:9,
168:18, 168:21,
186:21, 190:3,
200:16, 201:20
**responses**
3:15, 11:22,
108:21, 119:10,
155:23
**responsibilities**
21:12, 21:14,
21:22, 22:15,
24:1
**responsible**
127:12, 161:4,
166:13, 168:4
**responsive**
195:5
**rest**
24:17, 93:18
**result**
68:21, 114:14,
159:4, 159:9,
159:11, 159:22,
160:14, 162:18,
163:3, 166:5,
167:8, 168:17,
168:20, 169:1,
189:10
**resulted**
155:18
**retaliated**
145:14, 145:16,

186:18, 186:19,
187:9, 188:5,
193:7, 193:13,
193:15
**retaliation**
30:15, 30:17,
30:22, 189:9,
189:24, 194:6
**retaliatory**
193:22, 194:1
**retire**
15:22
**retired**
15:20, 16:4,
16:5, 16:6,
16:14, 16:23,
19:4, 19:20,
19:21, 20:6,
21:5, 149:16,
149:17, 150:9,
157:4, 182:21,
182:22, 183:23
**retirement**
15:23, 21:21,
41:16, 41:21,
41:23, 52:9,
139:4, 149:6,
163:7, 163:9
**returned**
68:24, 112:8
**review**
11:15, 29:16,
36:23, 37:2,
39:7, 60:9,
60:11, 103:13,
170:2
**reviewed**
158:2, 158:5
**reviewing**
31:3, 38:10,
60:12, 80:18,
103:8, 108:20,
191:14, 195:3,
199:9
**ride**
55:9, 85:22
**ride-along**
55:13

rights
122:21
rings
172:22
risk
89:17, 89:19
road
2:12
rockville
128:19
rockwell
128:19
rode
125:14
rohloff
20:2, 62:13,
62:19, 117:22,
118:2, 131:21,
152:20, 181:17,
181:21, 187:16
role
36:20, 38:9,
62:13, 70:6,
82:5, 102:4,
115:1, 115:4,
145:22, 146:24,
147:12
roll
44:18, 44:20,
44:24, 62:8,
75:4, 76:11,
77:12, 77:24,
133:6, 133:7,
134:2, 134:3,
136:21, 137:5,
137:6, 137:10,
137:14, 137:24,
138:1, 138:11,
140:13, 174:2,
180:14, 180:23,
184:8, 184:14,
186:19, 190:2,
190:13, 190:22,
198:11, 200:5,
201:9, 201:11,
201:17, 201:21
rookie
86:12, 86:13,

86:15
room
7:22, 128:13,
174:20
ropes
86:12
rotate
97:23, 98:5,
131:19
rotated
98:3
rotation
47:7
round
93:11
routine
101:9
rules
5:24
rumor
139:1
rumored
138:17
run
4:3, 69:10,
69:11, 129:22
runs
43:21

---
**S**
---
s
12:19
s-a-m-u-e-l
5:19
sam
59:2, 167:20,
195:15
same
64:11, 77:19,
86:7, 113:24,
135:24, 140:4,
140:7, 144:23,
150:23, 151:3,
158:11, 185:10,
185:23, 186:14,
186:22, 187:22,
189:6, 189:19,
190:9, 197:2,

204:23
samuel
1:7, 1:19, 3:4,
4:23, 5:7, 5:19,
60:10, 60:14,
61:5, 109:6,
150:6, 157:13,
158:12, 204:6
saw
127:20, 129:19,
186:8
saying
24:22, 25:3,
42:9, 50:2,
54:10, 54:18,
68:10, 73:3,
75:11, 77:7,
77:23, 78:20,
78:22, 82:21,
82:23, 83:16,
83:22, 84:14,
85:5, 85:21,
87:16, 89:2,
91:9, 92:16,
96:20, 96:22,
97:1, 97:3,
97:22, 98:2,
100:9, 100:10,
101:8, 113:21,
116:14, 126:1,
134:8, 134:9,
136:15, 147:7,
148:13, 151:19,
151:22, 151:24,
152:10, 152:13,
152:14, 156:12,
156:16, 159:19,
164:24, 165:23,
166:8, 166:12,
167:15, 167:22,
168:1, 168:3,
168:7, 168:24,
169:4, 171:11,
193:14, 193:18
says
5:10, 60:9,
60:15, 60:20,
60:24, 61:4,

61:11, 61:13,
66:12, 69:19,
73:20, 80:14,
80:21, 103:14,
104:10, 109:5,
109:6, 110:17,
112:7, 112:19,
114:24, 121:5,
121:8, 132:21,
156:5, 158:12,
169:9, 191:11,
191:18, 192:1,
195:19
scan
42:17
scared
87:18
schaumburg
93:17
schedule
24:11, 24:22
school
14:21, 21:24,
22:2, 22:4,
22:15, 24:9,
24:10, 24:12,
48:12, 48:15,
48:17, 73:12,
149:2
science
12:12, 12:21
screen
102:12, 102:14,
102:16, 102:18,
103:5, 116:6
screwed
60:1
scroll
158:9, 199:8,
201:3
seal
204:32
searching
180:11
second
12:8, 21:10,
40:3, 41:10,
47:18, 60:2,

Transcript of Samuel Page
Conducted on August 10, 2020

85

60:8, 61:23,
70:21, 81:4,
83:15, 91:8,
95:14, 108:6,
111:16, 124:2,
125:4, 138:17,
140:16, 167:4,
169:21, 170:7,
174:9, 191:24
**section**
60:9, 60:13,
89:9
**sections**
89:9
**sedgwick**
19:17, 141:24
**see**
16:9, 18:23,
23:14, 23:15,
26:2, 30:22,
31:1, 31:21,
52:16, 53:4,
53:7, 53:24,
60:6, 60:14,
61:12, 80:17,
90:4, 91:20,
96:16, 101:7,
102:12, 102:14,
103:19, 105:1,
105:5, 105:12,
106:8, 107:9,
109:5, 111:17,
111:21, 114:10,
114:23, 115:17,
116:7, 116:18,
116:19, 119:19,
120:13, 121:5,
123:1, 123:18,
124:9, 124:14,
129:24, 130:21,
141:12, 145:19,
150:15, 156:1,
157:2, 157:6,
157:16, 161:13,
163:5, 169:16,
170:3, 175:14,
177:13, 177:15,
184:6, 185:3,

186:11, 191:5,
193:10, 194:11,
195:3, 202:7
**seeking**
165:8
**seem**
84:2, 144:3
**seemed**
96:6, 190:10
**seems**
74:11, 115:19
**seen**
53:22, 53:23,
105:19, 129:23,
144:19, 175:2,
175:5
**selected**
95:17
**self-esteem**
62:24, 165:13
**send**
54:3, 54:16,
76:17, 81:13,
84:4, 86:7,
87:23, 88:11,
96:1, 102:10,
102:11, 105:15,
105:18, 116:23,
136:1, 172:17
**sending**
69:24, 74:12,
74:14, 76:18,
95:18, 96:3,
117:11, 135:24
**sends**
102:7
**senior**
73:17, 73:21,
82:19, 84:17,
86:4, 86:11,
118:19
**seniority**
50:5, 69:21,
70:5, 71:3,
71:9, 81:8,
82:4, 82:5,
82:16, 82:20,
83:18, 83:23,

84:3, 84:23,
84:24, 86:3,
105:4, 196:12,
196:13
**sense**
7:4, 25:3,
101:24
**sent**
22:10, 28:14,
33:21, 65:5,
69:23, 72:22,
74:24, 76:8,
77:4, 77:5,
77:9, 78:7,
78:16, 82:20,
83:4, 83:19,
83:24, 86:11,
89:3, 89:4,
93:3, 94:6,
116:18, 123:16,
123:17, 126:15,
149:10, 170:10,
187:12
**sentence**
112:7, 121:9
**separate**
26:1, 32:12,
33:12, 48:16,
64:5, 84:20
**separated**
46:2
**september**
15:24, 16:1,
16:14, 204:33
**sergeant**
20:11, 20:14,
66:9, 117:19
**sergeants**
20:9, 57:9,
66:8
**served**
20:19, 45:12
**service**
22:12, 23:13
**serving**
20:20, 21:20,
35:21, 40:21,
41:15, 57:5,

57:12, 57:20,
57:22, 63:24,
146:20
**set**
35:17, 157:15,
158:5, 158:14,
194:8
**sets**
95:1
**setting**
44:12
**settings**
120:16
**seven**
65:18, 89:12,
89:14, 89:15,
89:23, 90:1,
90:2, 90:5,
92:8, 92:9,
93:22, 118:15,
119:13
**several**
96:16, 136:10,
136:11
**severe**
112:15
**sex**
27:1
**shake**
6:16
**shakur**
178:4
**shape**
57:11
**shared**
147:18
**sharon**
149:21, 149:22,
150:7, 151:11
**shedor**
178:20, 178:21
**sheet**
51:4, 51:6,
53:7, 53:23,
88:14, 88:15
**sheets**
52:15, 52:16,
53:4, 53:22,

Transcript of Samuel Page
Conducted on August 10, 2020
86

75:16, 105:19
**shelly**
175:6, 175:8
**sheriff**
1:13, 34:18,
125:13, 157:14,
158:13
**sheriff's**
5:16, 9:1,
13:3, 13:9,
15:2, 15:4,
16:7, 17:20,
17:23, 17:24,
27:9, 27:11,
28:8, 28:10,
30:17, 34:11,
34:13, 60:15,
68:16, 138:23,
145:14, 176:16,
198:7
**shields**
56:10, 61:16,
62:5, 80:15,
81:1, 81:5,
95:15, 103:14,
103:22, 104:11,
105:2, 106:1,
106:5, 106:24,
107:3, 126:22,
131:23, 132:1,
132:5, 132:13,
132:14, 132:22,
132:24, 133:12,
133:16, 133:23,
133:24, 134:6,
134:10, 177:23,
177:24, 181:17,
181:20, 187:16,
188:7, 188:9,
188:13, 188:17,
192:15, 198:12,
199:1
**shift**
17:2, 17:4,
17:9, 17:10,
17:11, 18:24,
19:1, 19:5,
19:13, 19:15,

44:19, 49:5,
49:9, 127:15,
140:4, 143:6,
185:10, 185:23,
186:14, 187:22,
188:1, 189:6,
189:20
**shifts**
190:14
**shootings**
100:5
**short**
27:6, 59:9,
75:20, 138:17,
138:20
**should**
4:5, 61:3,
82:5, 82:21,
82:23, 83:18,
85:7, 88:5,
88:6, 118:18,
178:19
**shouldn't**
7:16, 83:23
**show**
31:11, 43:1,
55:14, 141:5,
143:3, 175:2
**showed**
86:5
**sick**
132:3
**side**
46:21, 47:3,
89:12, 89:13,
89:15, 89:20,
90:20, 90:22,
90:24, 92:21,
94:23, 94:24,
95:2, 95:3,
95:11, 96:3,
96:4, 97:9,
98:10, 98:16,
98:23, 99:1,
99:3, 99:6,
99:10, 99:11,
99:13, 99:14,
99:16, 100:6,

100:24, 101:3,
101:4, 101:6,
104:20, 128:11
**sign**
51:4, 51:6,
67:2, 113:17,
113:18, 113:19,
113:20, 129:22,
148:3, 148:5,
160:3
**sign-off**
131:4, 131:6
**signature**
109:13, 158:20,
160:2, 191:13,
191:20
**signature-maaqy**
204:34
**signed**
67:1, 67:6
**significant**
107:19
**significantly**
167:11
**signing**
131:2, 131:5,
204:25
**similarly**
155:20, 156:13,
156:24
**simple**
200:20
**since**
7:19, 10:21,
10:22, 16:6,
16:13, 19:3,
41:20, 44:17,
50:15, 52:8,
57:5, 57:12,
73:2, 88:24,
91:21, 93:4,
99:4, 107:20,
121:12, 154:7,
154:8, 154:9,
177:14
**sir**
6:12, 6:19,
7:12, 11:14,

18:22, 28:22,
49:12, 60:23,
64:16, 65:18,
66:16, 69:2,
74:6, 74:18,
75:7, 76:6,
77:22, 84:14,
99:1, 105:20,
106:19, 108:12,
116:5, 119:2,
120:9, 130:3,
131:4, 148:16,
152:13, 156:15,
162:15, 165:22,
166:7, 170:1,
170:14, 180:24
**sit**
14:3, 119:5,
128:13
**sitting**
174:20
**situated**
155:20, 156:13,
156:24
**situation**
114:1
**situations**
84:22, 117:16
**six**
76:9, 89:11,
89:14, 91:24,
92:1, 93:18,
126:4, 126:9,
126:10, 126:12,
152:7, 152:19,
157:4
**skathe**
149:17, 150:6,
151:12
**slaughter**
1:10, 173:22,
175:3, 189:15,
191:2
**slip**
160:3
**slowly**
74:13
**small**
89:9, 128:12

Transcript of Samuel Page
Conducted on August 10, 2020

87

**smoothly**
4:3
**some**
8:7, 17:11,
23:10, 23:21,
26:19, 29:24,
32:24, 35:9,
38:13, 47:21,
49:3, 50:7,
53:14, 53:15,
53:16, 54:10,
54:13, 62:8,
63:2, 69:8,
70:6, 74:1,
76:13, 79:8,
79:14, 80:12,
93:21, 117:21,
121:14, 121:15,
121:16, 122:4,
122:7, 124:9,
130:8, 133:2,
133:3, 133:17,
136:14, 149:6,
150:16, 150:19,
151:11, 151:12,
152:3, 152:10,
153:17, 154:13,
164:3, 166:9,
173:18, 174:24,
176:21, 177:3,
178:10, 178:11,
178:17, 182:1,
184:14, 187:10,
187:11, 188:13,
192:16, 194:13,
199:10
**somebody**
12:7, 25:12,
25:18, 27:6,
31:11, 31:21,
54:15, 55:13,
55:14, 56:17,
65:12, 70:9,
77:16, 84:24,
85:5, 86:14,
112:5, 133:12,
148:5, 171:11,
177:22, 184:20

**somebody's**
43:22, 44:3
**someone**
11:12, 47:5,
68:16, 73:12,
73:13, 88:11,
95:18, 161:9,
161:21, 184:15,
195:19
**something**
7:5, 22:12,
36:9, 39:24,
42:16, 54:5,
54:13, 54:15,
68:12, 72:22,
78:12, 79:7,
83:5, 87:22,
92:15, 122:5,
124:17, 124:18,
125:1, 132:5,
133:1, 133:19,
138:8, 139:9,
139:15, 144:10,
144:16, 149:22,
173:3, 177:1,
177:11, 178:17,
179:14, 180:12,
180:13, 181:6,
183:2, 183:4,
187:12
**sometime**
81:19, 131:17,
133:7
**sometimes**
6:15, 22:10,
26:16, 43:5,
43:9, 43:10,
43:13, 43:15,
45:1, 47:5,
54:10, 54:15,
113:17, 114:5,
117:12, 117:22,
136:8, 136:14,
142:20, 148:3,
148:19, 148:20,
152:5, 152:6,
152:17, 152:18,
152:19, 152:20,

152:23, 153:3,
184:9, 190:2,
190:10, 190:16,
199:20, 200:5
**somewhat**
7:3, 149:1,
165:13
**somewhere**
126:13, 174:15,
183:17
**sorano**
117:14
**sorry**
11:24, 23:3,
27:15, 35:3,
35:14, 37:7,
42:6, 43:7,
45:7, 54:9,
59:18, 61:12,
65:22, 70:18,
70:21, 70:24,
71:21, 72:11,
73:1, 75:22,
80:19, 81:5,
81:20, 83:7,
84:3, 84:11,
89:24, 111:15,
115:11, 125:3,
125:15, 126:20,
127:5, 131:24,
132:8, 132:20,
135:13, 150:1,
150:18, 156:20,
167:20, 167:21,
173:4, 175:12,
176:5, 179:8,
181:9, 183:12,
190:7, 192:11,
197:5, 197:18
**sort**
8:16, 13:11,
15:9, 29:24,
31:3, 32:2,
32:3, 33:12,
43:23, 113:2,
124:15, 136:7,
185:3
**sorts**
116:22

**sought**
18:12
**sound**
14:13, 191:16
**sounded**
64:22, 78:6,
90:2
**sounds**
21:9, 23:17,
68:15, 85:17,
94:11, 102:4,
133:21, 143:13,
148:24, 191:17,
195:8
**south**
2:4, 47:3,
81:14, 89:10,
89:15, 89:20,
90:19, 91:3,
91:19, 92:21,
94:23, 95:1,
95:3, 96:3,
97:10, 98:10,
98:16, 98:23,
99:2, 99:6,
99:10, 99:13,
99:14, 99:16,
101:4, 104:19,
128:18
**southeast**
90:20, 90:22,
95:2, 95:4
**southern**
47:2
**southwest**
92:3, 92:4,
95:2, 95:4,
95:10, 95:11
**span**
20:24
**spanish**
178:5, 178:22
**speak**
14:4, 14:8
**speaking**
4:8, 4:11,
155:23, 198:13
**special**
25:16, 26:16,

26:19, 26:24,
47:6, 51:24,
82:8, 101:19,
101:20
**specific**
12:23, 38:22,
47:12, 110:9,
155:22
**specifically**
65:17, 68:21,
119:14, 159:9,
196:9, 197:8,
198:15
**specifics**
130:23, 133:4
**specifies**
196:7
**speculate**
54:6
**speculating**
128:3, 129:14
**speculation**
54:19, 84:10,
86:19, 130:10,
168:13
**spell**
5:17, 118:8,
124:5, 124:14
**spelling**
118:11
**spent**
163:23
**spivey**
97:6
**spoke**
10:5, 69:5,
69:12, 135:2,
143:4
**spoken**
11:3, 166:18,
179:4, 179:6,
183:11
**stage**
160:15, 164:24
**stages**
35:13
**stairs**
154:13

**stand**
22:11, 127:9
**standing**
138:24
**start**
11:2, 13:2,
19:7, 24:9,
70:13, 126:14,
159:10, 164:3
**started**
16:10, 16:13,
26:3, 26:5,
26:11, 48:1,
49:1, 51:18,
51:19, 51:21,
55:5, 64:22,
70:15, 74:9,
74:13, 76:13,
80:4, 85:3,
92:13, 98:6,
115:9, 115:12,
119:24, 126:5,
126:6, 126:14,
129:13, 164:2,
173:21
**starting**
63:12
**starts**
36:14, 97:13
**state**
5:17, 85:21,
86:4, 90:9,
109:6, 118:17,
158:12, 167:9,
204:1, 204:12
**state's**
178:16
**stated**
89:19, 110:2,
131:1, 170:5
**statement**
80:18, 80:20,
129:19, 176:18
**statements**
128:2
**states**
1:1, 110:3,
110:18, 112:15,

**stating**
123:15
**stating**
24:14, 42:7
**stay**
84:18, 199:22,
200:18, 200:19
**stayed**
19:18, 26:12,
63:5, 132:3
**stenographic**
204:17
**stepped**
113:4
**steps**
154:18
**still**
10:24, 14:21,
23:3, 61:3,
64:1, 67:20,
67:23, 68:6,
69:9, 73:17,
85:2, 86:22,
108:11, 129:22,
143:6, 148:4,
163:21, 171:20,
178:7, 178:20,
182:14, 182:15
**stipulate**
4:17
**stipulation**
6:21
**stop**
21:3, 35:4,
39:12, 47:14,
74:13, 114:21
**stopped**
13:18, 21:19,
39:10, 39:13,
40:21, 41:15,
57:5, 98:8
**story**
180:21
**straight**
16:4, 16:5,
55:8, 70:3
**streamline**
109:22
**street**
2:4, 2:18,

18:16, 24:3,
26:21, 26:22,
31:4, 31:9,
31:15, 31:19,
31:22, 32:3,
32:10, 32:14,
32:23, 44:13,
51:24, 55:12,
55:15, 75:3,
76:14, 76:18,
83:2, 85:22,
87:14, 87:18,
91:16, 105:18,
149:21, 152:21,
183:7, 190:18
**streets**
47:9
**strenuous**
82:11
**strickland**
1:5, 182:16
**strike**
9:6, 21:2,
61:12, 156:21,
181:10, 193:22,
194:2
**stripped**
112:22, 115:1
**stuck**
113:13
**studying**
12:24
**stuff**
27:2, 28:14,
52:2, 63:6,
93:22, 101:22,
119:5, 119:6,
122:8, 143:9,
150:14, 172:6,
172:7, 174:4,
175:21, 183:7,
190:18, 195:9
**subjected**
29:24, 120:15
**submit**
67:13
**submitted**
67:6

Transcript of Samuel Page
Conducted on August 10, 2020                                    89

subordinate
80:15, 81:6,
95:16, 103:15,
103:22, 104:11,
105:2, 106:6
subsequently
172:5
substantial
204:30
suburb
97:13
suburbs
46:24, 47:2,
81:14, 91:20,
92:3, 92:4,
95:4, 96:10,
96:12, 97:9,
97:10, 97:12,
100:2, 101:23
successful
61:14, 68:2,
68:3, 68:4,
68:20
sued
176:3, 176:6
suffered
145:21, 146:2,
159:1, 159:8,
163:11, 167:8,
168:16, 168:19,
168:20
suffering
165:5, 165:17,
166:21
suggesting
83:18
suite
2:4, 2:12, 2:18
supervise
40:13
supervised
20:8
supervision
199:1
supervisor's
69:10
supervisors
19:4, 19:8,

45:4, 45:6,
45:9, 46:1,
49:2, 57:16,
57:18, 57:23,
62:10, 62:11,
63:16, 63:17,
63:18, 64:20,
64:23, 66:2,
66:14, 67:5,
80:15, 81:6,
95:16, 97:16,
99:18, 103:15,
103:22, 104:12,
105:2, 106:6,
110:11, 110:12,
110:15, 110:23,
112:20, 147:17,
159:14, 198:12,
198:18
supervisory
112:23, 113:2,
115:1, 115:4,
145:22, 145:23,
146:20, 146:24,
147:12
supplement
141:11
support
175:21, 176:2,
192:7
supposed
23:1, 28:24,
29:2, 29:7,
29:19, 29:23,
30:2, 30:3,
30:6, 30:21,
70:12, 131:18,
142:16, 171:12,
178:15, 188:11
supposedly
177:22
sure
24:22, 34:17,
38:23, 41:23,
48:13, 68:21,
69:12, 82:18,
90:10, 143:11,
168:23, 180:20,

199:23, 200:7
surely
153:16
surprise
153:14
surprising
182:5
surrounding
93:23
suspended
146:8
suspension
146:11
swearing
4:17
switched
35:6
sworn
5:10, 204:8
system
34:3
systematically
104:12

**T**

table
174:20
take
6:9, 6:20,
6:23, 18:3,
25:3, 58:15,
58:24, 60:8,
83:7, 108:2,
108:18, 155:13,
194:10
taken
1:20, 1:29,
5:21, 59:9,
62:23, 63:2,
63:7, 68:2,
108:8, 115:18,
183:14, 196:13
taking
6:2, 124:3,
144:1
talk
6:4, 10:4,
10:19, 10:23,

11:12, 21:10,
28:7, 41:9,
42:12, 71:12,
113:10, 113:23,
137:2, 137:17,
139:8, 142:2,
158:24, 161:12,
171:21, 173:7,
193:5, 196:11
talked
11:1, 11:20,
38:23, 41:11,
53:10, 61:7,
61:15, 71:16,
73:11, 73:24,
110:8, 112:16,
114:8, 132:6,
132:14, 134:23,
136:7, 140:19,
140:24, 142:2,
154:3, 177:16,
177:20, 178:2,
178:7, 179:10,
181:17, 192:8,
198:1, 201:17
talking
8:16, 31:2,
35:10, 38:1,
52:3, 52:4,
63:15, 70:14,
74:18, 76:23,
77:1, 81:11,
81:15, 81:17,
81:21, 81:23,
86:3, 88:19,
88:20, 88:23,
96:13, 104:22,
106:14, 114:1,
118:19, 120:7,
123:2, 134:1,
134:7, 137:6,
142:23, 147:4,
148:11, 154:6,
159:5, 159:7,
159:13, 159:14,
164:1, 164:6,
172:24, 173:16,
174:22, 179:22,

179:23, 184:13,
187:10, 197:23,
198:19
**targeted**
144:8
**tasks**
82:11
**taught**
84:15
**team**
46:19
**teamsters**
36:3, 36:4,
36:6
**tech**
129:14
**technical**
8:2, 8:8, 13:1,
22:12, 35:9
**technical-related**
4:14
**technically**
15:23
**telephone**
169:22
**tell**
37:23, 54:20,
65:2, 85:16,
87:23, 108:19,
129:12, 131:5,
131:7, 133:18,
139:7, 139:15,
143:3, 148:3,
153:20, 170:24,
174:1, 176:22,
179:19, 179:22,
180:2, 181:7,
181:18, 182:23,
184:20, 204:9
**telling**
74:14, 132:4,
181:11, 188:9
**tells**
102:18
**temporarily**
139:1, 149:23
**ten**
58:24, 59:1,

126:12
**tendency**
204:31
**tense**
200:23
**tenure**
75:12
**term**
58:1, 71:14,
98:9, 195:18
**terminate**
134:12
**terminated**
146:13
**termination**
107:4, 133:19,
134:17
**test**
56:14, 161:23,
162:2, 162:3,
162:5
**testified**
60:17, 85:11,
85:14, 193:17,
195:18, 196:21,
197:7
**testify**
67:11, 178:6,
178:15
**testifying**
11:13, 201:21
**testimony**
4:19, 5:2,
7:14, 8:9, 74:4,
85:10, 111:24,
116:18, 122:22,
125:21, 126:3,
126:4, 136:18,
137:11, 137:12,
167:20, 176:10,
195:17, 197:12,
201:19
**text**
170:16, 170:19,
172:1, 172:3,
172:5, 172:8,
172:17, 172:18
**texts**
9:23

**th**
1:20, 60:16,
109:15, 158:22,
171:13, 204:7,
204:32
**thank**
4:1, 59:7,
88:8, 95:13,
116:9, 195:1,
195:11
**thanks**
59:6, 104:8,
108:2, 123:6,
134:18, 155:14
**themselves**
20:17, 48:13,
86:9
**therapist**
165:16, 166:19
**thereof**
204:13
**thing**
37:7, 50:7,
57:10, 64:5,
67:5, 78:12,
84:19, 88:9,
97:4, 100:11,
120:13, 138:19,
177:19, 178:1,
178:2, 178:6,
179:12, 179:13,
179:16, 186:22,
187:13, 188:8,
190:9, 193:19,
194:1
**things**
7:3, 8:14,
8:17, 9:11,
11:1, 14:17,
24:19, 31:20,
41:3, 42:18,
54:14, 55:14,
82:9, 86:6,
86:7, 94:9,
97:16, 121:18,
133:8, 136:14,
147:5, 147:23,
190:17, 195:16,

198:10, 201:9
**thinking**
9:11, 69:17,
69:23, 90:5,
125:9, 140:1
**third**
17:10, 17:11,
18:24, 19:1,
19:5, 19:15,
48:10, 61:1,
188:8, 200:6
**thomas**
157:14, 158:13
**thought**
23:3, 49:16,
51:12, 56:12,
61:9, 119:19,
119:23, 127:16,
138:12, 139:4,
139:10, 144:20,
172:13, 190:1
**threat**
106:16, 106:18,
143:22, 144:2
**threaten**
69:14, 114:4,
132:15, 143:23
**threatened**
39:23, 41:2,
69:4, 106:24,
107:3, 113:24,
116:16, 132:13,
142:10, 142:13,
198:2
**threatening**
134:11, 142:19,
194:4
**threats**
41:5
**three**
13:15, 13:16,
32:20, 33:12,
70:1, 72:15,
72:19, 89:11,
89:12, 89:23,
90:23, 90:24,
93:13, 95:17,
111:17, 122:16,

130:3, 147:23,
150:8, 152:7,
161:16, 161:17,
177:24
**threw**
34:5, 75:17,
87:4, 122:6
**through**
5:24, 17:24,
23:14, 25:14,
27:19, 35:13,
35:17, 36:5,
41:19, 43:21,
46:23, 50:10,
97:24, 98:3,
122:12, 132:6,
134:5, 161:1,
161:2, 175:19,
192:1, 199:9,
201:3
**throughout**
27:5, 75:12
**time**
4:11, 6:20,
8:13, 11:4,
13:14, 16:15,
17:5, 17:16,
18:24, 20:19,
20:24, 21:13,
22:16, 24:1,
24:12, 25:5,
26:13, 27:22,
30:5, 34:16,
37:5, 38:20,
39:5, 39:6,
41:8, 46:20,
47:23, 47:24,
50:4, 51:18,
51:20, 57:8,
64:9, 69:4,
69:7, 69:9,
71:6, 72:18,
72:20, 74:9,
76:14, 77:16,
79:23, 85:11,
90:12, 91:21,
96:15, 105:10,
114:21, 116:15,

116:17, 120:22,
120:23, 120:24,
124:3, 127:6,
135:20, 135:24,
139:2, 142:15,
143:2, 143:5,
143:6, 144:1,
145:1, 147:22,
149:19, 151:20,
152:1, 153:4,
167:11, 167:23,
168:7, 169:5,
169:9, 174:23,
176:24, 178:12,
178:17, 179:14,
179:15, 185:12,
185:13, 188:10,
193:20, 195:1,
197:19, 198:2
**times**
6:4, 22:20,
40:9, 41:2,
63:5, 70:1,
70:2, 72:16,
72:19, 75:4,
82:9, 96:16,
98:15, 117:10,
117:15, 119:4,
136:15, 136:23,
137:4, 137:23,
138:1, 139:8,
142:3, 148:1,
151:13, 154:20,
183:6
**tims**
1:6, 103:11,
185:7, 185:8,
185:17, 186:9
**title**
60:13, 112:22,
157:12
**today**
5:24, 7:15,
7:22, 9:24,
10:3, 10:20,
11:16, 46:6,
46:8, 114:1,
120:13, 141:1,

156:19, 156:23,
173:11, 192:9,
195:1, 195:4
**together**
46:20, 64:20,
64:23, 83:4,
174:18, 189:4
**told**
61:18, 63:12,
63:14, 63:16,
110:10, 110:13,
110:22, 111:2,
132:5, 132:15,
141:24, 146:16,
170:22, 171:10,
171:19, 173:10
**tone**
184:17
**tonight**
51:7
**took**
14:24, 18:1,
47:17, 49:16,
49:17, 49:18,
112:4, 131:9
**top**
191:11
**total**
72:4, 128:11
**totally**
36:9, 64:4
**tour**
200:14
**towards**
90:9, 104:4,
148:7
**trained**
33:24, 34:3,
34:5, 100:8,
143:17, 144:9,
144:14, 144:16,
145:3
**training**
33:20, 86:1,
86:8, 86:17
**transcribed**
204:18
**transcript**
4:13, 4:21,

204:16, 204:17
**transferred**
183:18, 188:1
**transit**
13:10
**transition**
55:11
**transportation**
24:16, 183:19
**travel**
70:8
**treated**
155:19, 156:13,
156:17, 157:1,
193:9, 198:4,
199:2, 202:9
**treatment**
30:1, 167:7,
198:3
**tried**
8:14, 18:13,
79:15, 82:9,
139:12
**true**
4:19, 5:2,
103:2, 109:8,
109:10, 112:10,
112:13, 114:6,
135:19, 139:18,
158:15, 158:17,
169:19, 191:19,
204:16
**truth**
204:9
**try**
13:23, 14:7,
14:15, 27:17,
27:21, 28:1,
28:4, 85:20,
109:22, 124:5,
183:6
**trying**
17:5, 19:12,
21:8, 29:17,
36:7, 36:9,
42:17, 83:15,
86:10, 89:13,
90:14, 95:5,

95:8, 115:7,
118:11, 124:19,
125:2, 125:10,
133:3, 134:15,
147:23, 176:13,
178:14, 180:11,
180:22, 193:19
**tss**
22:10, 22:11,
22:15, 25:8,
25:10, 31:3,
32:7, 32:10,
32:15, 33:2,
41:9, 41:11,
41:17, 41:20,
41:24, 42:2,
43:1, 43:17,
45:22, 46:1,
46:5, 47:17,
48:2, 48:10,
48:13, 51:22,
52:10, 53:14,
53:15, 53:18,
54:1, 54:11,
54:16, 54:18,
69:24, 70:1,
71:14, 73:2,
75:3, 76:3,
76:8, 76:17,
77:9, 78:8,
78:18, 78:21,
80:4, 104:17,
118:21, 119:4,
120:8, 120:14,
121:3, 123:16,
123:18, 126:2,
127:14, 131:15,
147:5, 147:8,
149:9, 188:6,
199:12
**turn**
60:5, 108:3,
195:6, 195:7
**turned**
190:10, 195:9,
200:6
**turning**
195:3

**twelve**
8:10
**twice**
22:23
**two**
13:15, 13:16,
20:11, 26:6,
26:8, 34:4,
37:20, 39:8,
40:4, 46:2,
49:7, 54:3,
54:7, 54:8,
65:8, 74:13,
89:8, 90:17,
90:19, 95:1,
109:24, 110:16,
111:8, 122:16,
124:20, 129:8,
133:22, 135:23,
146:18, 146:20,
147:11, 149:16,
150:8, 150:10,
152:6, 152:11,
152:17, 152:19,
155:21, 177:10,
177:24, 183:20,
198:16
**type**
15:3, 39:3,
51:3, 51:6
**types**
23:24, 31:18,
33:8, 33:12,
33:18, 181:19,
190:22
**typical**
41:20, 41:24
**typically**
196:13
**typing**
172:9
**tyrone**
1:9, 189:2

---
**U**
---

**uh-huh**
11:23, 19:24,
22:5, 32:5,

46:16, 51:2,
53:13, 53:15,
77:16, 78:2,
94:17, 96:19,
103:20, 111:18,
115:2, 117:4,
127:19, 136:9,
156:3
**um**
30:3, 36:14,
69:7
**unable**
4:9
**unbiased**
107:8
**uncontrollable**
120:15
**under**
4:19, 5:2,
30:21, 31:14,
46:12, 80:22,
108:11, 109:9,
158:16, 191:18,
199:1, 204:18
**understand**
7:1, 7:5, 9:16,
9:20, 16:10,
17:21, 19:12,
31:22, 49:10,
49:13, 50:23,
75:10, 83:6,
83:15, 87:5,
90:14, 108:11,
166:6, 193:20,
201:15
**understanding**
28:12, 28:23,
30:1, 34:12,
34:24, 35:12,
36:12, 36:14,
36:16, 44:15,
44:21, 48:19,
50:13, 64:5,
65:12, 65:24,
66:13, 68:19,
70:5, 70:12,
78:17, 82:5,
93:2, 112:11,

162:5
**understood**
7:11, 28:15,
28:17, 29:4
**unedited**
4:12
**unfairly**
144:8
**unfortunately**
43:20
**uniform**
63:13, 114:19
**union**
35:17, 35:20,
35:23, 38:4,
38:9, 38:14,
38:15, 48:3,
49:20, 67:20,
67:21, 67:23,
131:18
**unions**
36:5
**unit**
23:16, 26:7,
26:8, 29:8,
34:20, 38:20,
42:22, 44:12,
46:11, 46:24,
48:7, 55:5,
60:21, 61:2,
70:8, 85:20,
123:17, 125:22,
126:11
**united**
1:1
**units**
26:6, 30:6,
40:8, 46:2,
88:21, 105:17,
181:24
**universe**
33:11
**university**
12:13, 97:11
**unjustified**
37:22
**unjustly**
165:12

Transcript of Samuel Page
Conducted on August 10, 2020

93

**unless**
101:18
**unquote**
100:19
**until**
16:14, 21:21,
41:21, 47:4,
52:8, 57:8,
98:6, 117:7,
126:5, 138:9,
149:6, 175:4,
199:22, 200:18
**urine**
18:3
**use**
9:5, 71:13,
104:3, 116:1,
134:24, 152:5,
170:12, 170:15,
170:18, 172:8,
184:22, 186:8,
187:16, 188:20,
189:12, 191:1,
191:3
**usually**
25:19, 42:21,
44:23, 44:24,
54:12, 55:12,
172:8

**V**

**vague**
31:6, 40:2
**van**
40:9, 40:10,
40:11, 43:14,
176:15
**varied**
152:8
**various**
98:3
**vary**
152:24
**ventilation**
43:20, 72:1
**verbal**
6:17, 34:8,
35:2, 35:14,

39:1, 56:15,
117:16, 137:5
**verbally**
39:20, 39:21,
40:23, 106:12,
106:13, 106:15,
136:8, 136:20,
139:22
**verbatim**
184:19
**verdict**
66:19
**verification**
109:6, 158:9,
158:11
**verified**
4:22, 42:9,
42:14
**verify**
25:14, 25:17,
25:18, 42:11
**vermin**
43:21, 72:2
**vernell**
1:6, 185:7
**versus**
76:17, 93:13,
95:18, 96:3,
102:8
**veteran**
82:10
**via**
4:10, 7:19
**victim**
29:23, 30:8,
30:22
**victor**
1:10, 189:15
**video**
2:24, 3:23,
4:1, 4:7, 4:9,
13:24, 27:24,
35:3, 60:2,
71:22, 116:1,
116:9
**villages**
93:23
**violent**
27:2

**virtual**
6:14
**virtually**
1:19, 204:7
**virtue**
204:13
**voice**
14:8
**voice-mail**
23:22, 118:23
**voice-mails**
119:9, 143:1,
143:18
**vs**
1:12

**W**

**wage**
146:24, 160:1
**wages**
145:22, 159:3,
159:10, 159:11,
159:22, 160:7,
160:11
**wait**
12:16, 171:24,
202:22
**waited**
138:9
**waiting**
86:24
**waived**
204:26
**walk**
41:19, 135:9,
136:16
**walked**
79:14
**walker**
1:9, 187:19,
187:20, 188:4,
188:15, 188:20
**walking**
132:6, 133:16
**walks**
27:19
**wall**
136:13

**want**
6:15, 12:15,
15:17, 15:24,
17:14, 20:22,
21:4, 23:15,
28:4, 33:21,
42:7, 47:14,
53:1, 58:24,
61:16, 67:4,
67:6, 72:21,
75:17, 76:3,
81:22, 90:8,
90:14, 91:2,
91:12, 91:19,
91:20, 92:1,
92:6, 99:22,
100:1, 103:4,
117:18, 120:23,
122:20, 128:6,
136:17, 149:15,
159:10, 159:21,
168:23, 177:12,
194:24, 195:2,
201:2, 202:16
**wanted**
49:5, 50:7,
50:8, 56:19,
57:2, 76:14,
78:23, 87:1,
138:23
**wants**
162:10
**warrant**
31:12
**washington**
204:2, 204:12
**washtenaw**
94:15, 94:16,
94:17
**watch**
20:17, 44:24,
45:19, 45:21,
50:17, 61:2,
75:17, 103:12,
113:14, 152:8,
152:17, 200:6,
200:7
**watches**
130:3, 130:5

Transcript of Samuel Page
Conducted on August 10, 2020

94

**way**
4:22, 8:1, 9:6, 10:24, 19:7, 26:2, 27:1, 29:3, 34:5, 37:10, 45:5, 46:23, 63:3, 79:1, 93:15, 93:23, 97:9, 97:11, 97:12, 109:2, 132:24, 138:3, 138:8, 149:5, 161:7, 170:8, 176:20, 182:14, 184:20, 190:4, 198:4, 202:4
**we'll**
112:17
**we're**
7:19, 110:23, 196:6, 197:23
**we've**
59:15, 192:8
**wear**
114:19
**week**
52:22, 52:24, 53:1, 53:2, 54:8, 63:4, 63:12, 64:8, 70:1, 70:2, 72:16, 72:19, 114:17, 146:24, 160:5
**weekends**
50:9
**weeks**
47:1
**weiss**
167:10
**went**
17:14, 24:18, 26:11, 36:5, 37:22, 37:24, 38:1, 39:7, 51:9, 54:5, 62:24, 65:13,

66:15, 68:5, 70:3, 70:9, 72:5, 74:23, 76:3, 92:11, 111:20, 113:8, 117:7, 117:21, 122:3, 122:12, 125:12, 129:23, 131:8, 135:23, 139:10, 154:18, 166:23, 167:23, 174:3, 175:1, 175:5, 175:19, 177:22, 181:5, 181:6, 181:9
**weren't**
41:3, 53:3, 57:17, 64:4, 72:9, 86:13, 140:14, 144:14, 154:1, 198:22
**west**
89:12, 89:19, 90:24, 94:22, 94:23, 98:10, 99:1, 99:11, 99:14, 99:16, 104:20
**western**
47:2, 97:11
**whatever**
37:5, 54:5, 56:16, 99:7, 137:21, 142:18, 173:12, 174:4
**whenever**
75:8, 75:11
**whereabouts**
94:14
**whereupon**
35:6, 59:9, 87:8, 108:8, 172:22, 203:6
**wherever**
25:15, 98:18, 98:20, 149:10
**whether**
19:14, 24:15,

27:10, 28:9, 30:16, 31:7, 34:12, 42:11, 62:4, 174:21, 176:23, 181:20
**white**
2:11, 52:13, 54:1, 54:10, 54:17, 55:20, 55:23, 74:1, 75:24, 76:2, 76:8, 78:7, 78:18, 78:21, 96:9, 123:16, 125:18, 125:22, 127:20, 129:19, 130:7, 137:10, 137:13, 139:21, 140:5, 144:22, 145:3, 153:1, 153:6, 153:8, 153:15, 153:18, 156:16, 156:20, 156:23, 178:5, 196:23, 198:4, 201:10, 202:1, 202:9, 202:18
**whites**
52:10
**whoever**
27:6, 38:17, 44:18, 44:20, 44:24, 45:20, 88:13, 88:15
**whole**
36:5, 87:20, 88:20, 97:8, 198:13
**wilford**
1:7, 187:5
**williams**
1:8, 186:11, 186:12, 186:16, 186:17, 187:3
**window**
24:11, 25:5
**windows**
43:20, 71:19,

72:1
**winston**
1:5, 10:24, 133:2, 133:12, 133:15, 133:23, 134:1, 170:22, 171:7, 171:17, 171:20, 172:14, 173:17, 173:22, 174:22, 177:6, 178:10, 178:21, 179:4, 179:19, 180:1, 181:11, 181:18, 182:12, 184:4, 185:5, 186:23, 187:14
**wisdom**
84:6
**within**
16:17, 25:16, 26:6, 26:11, 28:7, 30:5, 31:5, 31:18, 33:9, 33:19, 34:11, 36:13, 41:24, 44:16, 45:13, 48:7, 48:8, 56:2, 58:5, 88:22, 89:10, 89:21, 161:9
**without**
71:19, 87:16
**witness**
4:18, 4:22, 5:4, 5:8, 27:15, 27:20, 28:24, 29:20, 35:6, 58:11, 58:16, 58:19, 87:12, 116:4, 116:8, 130:11, 145:11, 153:10, 162:13, 164:20, 167:21, 173:3, 179:10, 197:3, 197:13, 204:8, 204:32
**woman**
150:4, 150:7,

Transcript of Samuel Page
Conducted on August 10, 2020

95

183:5
**women**
150:2
**wondering**
154:4
**word**
103:16, 103:23,
179:20, 180:2,
186:8, 197:22
**wording**
131:10
**words**
24:20, 71:6,
77:13, 79:8,
103:16, 133:17,
133:20, 135:2,
135:4, 147:2,
151:11, 151:12,
182:1, 184:8,
188:16
**wore**
63:13
**work**
13:8, 13:9,
13:11, 13:13,
14:17, 14:20,
15:9, 16:15,
17:1, 17:4,
21:24, 22:2,
22:4, 22:15,
24:9, 24:15,
24:23, 24:24,
26:18, 31:19,
32:9, 32:18,
32:20, 41:16,
46:21, 48:12,
48:15, 48:17,
49:2, 49:8,
52:17, 52:22,
53:6, 53:9,
53:11, 54:18,
54:23, 55:7,
69:20, 71:13,
72:6, 72:14,
72:15, 72:18,
73:14, 73:18,
73:22, 74:1,
78:18, 78:21,

82:10, 86:5,
98:13, 105:4,
118:10, 118:18,
120:17, 120:19,
129:8, 129:9,
130:4, 140:4,
140:7, 147:16,
148:15, 148:21,
149:2, 152:23,
160:2, 174:7,
174:14, 174:16,
181:24, 185:10,
185:23, 186:14,
187:22, 189:4,
189:19, 195:9,
199:11, 199:15,
199:16
**worked**
18:23, 19:1,
19:5, 21:24,
53:5, 53:18,
53:23, 67:19,
72:20, 97:8,
97:10, 97:11,
97:13, 97:14,
98:10, 105:10,
148:18, 149:2,
149:18, 149:23,
150:9, 150:11,
150:13, 152:21,
185:11, 185:12,
185:13, 185:14
**working**
13:2, 13:18,
14:19, 18:20,
21:3, 31:4,
31:9, 31:21,
39:6, 46:12,
46:20, 51:22,
51:24, 53:1,
54:22, 55:11,
55:12, 55:15,
60:15, 60:20,
69:9, 72:3,
73:2, 80:4,
98:8, 118:21,
121:1, 131:17,
149:13, 150:20,

151:20, 154:7,
154:8, 178:12,
178:13
**worried**
179:12
**worry**
142:21
**worse**
35:4
**wouldn't**
86:15, 107:11,
130:4, 148:3,
151:5, 182:5,
183:7, 190:24
**wow**
35:24, 93:14,
105:13
**wrap**
194:12
**write**
37:20, 69:4,
69:14, 114:4,
116:16, 128:3,
142:19, 143:4,
143:8, 177:1,
194:3, 198:2
**write-up**
41:2, 106:16,
106:18, 142:13,
144:2, 194:4
**writing**
63:22
**written**
9:2, 18:1,
18:2, 35:14,
35:15, 39:1,
39:23, 67:3,
69:15, 106:21,
113:24, 114:7,
142:10, 144:15,
146:15, 146:19,
162:3, 162:5,
164:7
**wrongful**
133:19
**wrote**
8:20, 9:8,
65:11, 67:5,

112:4

---
**X**
---

**x**
11:12

---
**Y**
---

**yahoo**
22:22, 23:7,
34:4, 170:12
**yeah**
11:11, 12:20,
21:9, 26:5,
36:5, 37:16,
38:17, 39:7,
40:11, 43:9,
44:3, 48:1,
53:2, 54:12,
61:10, 72:4,
72:11, 72:17,
77:4, 88:6,
91:11, 95:1,
99:8, 100:23,
116:4, 118:7,
120:23, 121:20,
124:20, 135:7,
137:22, 138:21,
139:6, 139:12,
145:5, 145:11,
164:2, 169:19,
171:23, 178:14,
178:22, 180:11,
180:22
**year**
20:10, 20:20,
21:15, 26:11,
57:9, 66:7,
75:9, 76:4,
81:21, 81:23,
121:12, 125:22,
128:5, 131:8,
158:22, 183:20
**years**
8:10, 13:13,
13:15, 13:16,
20:22, 20:23,
21:1, 21:5,
26:24, 52:5,

Transcript of Samuel Page
Conducted on August 10, 2020                                    96

54:21, 55:10,
55:16, 65:18,
99:6, 115:6,
115:7, 115:13,
124:20, 138:21,
149:16, 150:8,
157:4, 177:12,
177:24, 182:21,
198:14
**yell**
153:15, 153:18
**yelled**
145:4
**yelling**
79:14
**yourself**
4:10, 57:21

**Z**

**zoom**
6:3, 7:19

**0**

**00**
1:21, 17:6,
17:7, 17:13,
17:15
**0339**
2:13
**05726**
1:12

**1**

**10**
1:20, 1:21,
109:15, 127:8,
158:22, 204:7
**100**
2:4
**108**
3:15
**11**
17:7, 17:13,
17:15, 58:23,
59:5, 80:10,
130:16, 169:15
**12**
17:6, 17:13,

132:9, 194:16
**120**
2:17
**13**
82:1, 82:2,
83:4, 97:17,
117:7, 134:18,
134:19, 134:20,
135:17, 169:15,
183:16
**14**
21:1, 22:9,
72:21, 75:18,
93:19, 115:6,
128:6, 136:6,
183:16
**15**
72:21, 128:6,
140:17, 194:17,
194:18
**157**
3:16
**16**
60:16, 140:23,
183:17
**17**
141:4, 141:7,
194:18
**18**
1:12, 15:24
**19**
145:19
**191**
3:17
**195**
3:6
**1980**
12:19
**1986**
60:16
**1992**
15:18, 16:9,
16:13, 60:22,
70:17, 70:19,
88:24, 154:9
**1998**
60:24
**1st**
15:24, 16:1

**2**

**20**
15:24, 72:21,
75:18, 82:2,
99:6, 177:11,
177:12, 183:17
**200**
2:12
**2000**
2:18, 17:5,
91:11
**2009**
192:1
**2010**
19:3, 19:16,
41:20, 41:23,
44:17, 93:4
**2011**
114:24, 115:4,
115:5, 115:22,
169:11, 169:18
**2013**
21:6, 21:20,
22:9, 26:14,
26:15, 39:11,
39:15, 52:8,
53:9, 56:23,
57:13, 61:9,
82:2, 85:5,
85:7, 97:22,
98:11, 117:6,
125:24, 183:17
**2014**
21:7, 21:20,
39:11, 39:15,
52:8, 56:23,
57:13, 61:9,
75:18, 76:5,
77:24, 85:6,
85:8, 125:24,
128:7
**2015**
72:21, 73:1,
73:2, 75:18,
76:5, 78:1,
117:6, 128:7
**2016**
72:21, 73:2,

82:2, 183:17,
191:16
**2018**
15:24, 16:1,
16:14, 19:4,
19:16, 22:9,
41:24, 52:9,
53:9
**2020**
1:20, 109:15,
204:7, 204:33
**2021**
2:12, 115:15
**206**
2:4
**21**
155:12, 155:14,
155:17
**2323**
128:18, 128:19
**24**
91:15
**2400**
91:12
**25**
203:7
**27**
58:23
**28**
99:6, 99:7,
99:8, 204:32

**3**

**3**
17:6, 17:7,
17:13, 17:15,
194:16, 194:17,
194:18, 203:7
**30**
25:4, 76:1,
171:13
**312**
2:5
**37**
59:5

**4**

**4**
17:6, 17:13

Transcript of Samuel Page
Conducted on August 10, 2020                                    97

| 47 |
|---|
| 60:6, 60:15 |

| 5 |
|---|
| **5-0** |
| 61:5 |
| **50** |
| 61:5, 66:11, |
| 68:1, 75:23, |
| 75:24 |
| **51** |
| 112:20 |
| **52** |
| 69:3 |
| **53** |
| 69:19, 73:16, |
| 73:20 |
| **59** |
| 3:14 |

| 6 |
|---|
| **60523** |
| 2:13 |
| **60602** |
| 2:18 |
| **60661** |
| 2:5 |
| **630** |
| 2:13 |
| **655** |
| 2:5 |
| **6th** |
| 191:16 |

| 7 |
|---|
| **72** |
| 94:15, 94:16 |
| **7660** |
| 2:5 |
| **77** |
| 13:19, 80:7, |
| 80:14 |
| **78** |
| 81:5, 83:11, |
| 83:14, 95:14 |
| **79** |
| 103:3, 103:5, |
| 103:6 |

| 8 |
|---|
| **80** |
| 12:15, 103:13, |
| 103:19 |
| **81** |
| 104:6, 104:11 |
| **82** |
| 12:18, 12:20, |
| 105:1 |
| **83** |
| 106:5 |
| **84** |
| 106:23 |
| **85** |
| 12:15, 107:6 |
| **86** |
| 12:15, 13:4, |
| 15:2, 107:18 |

| 9 |
|---|
| **92** |
| 15:17, 85:3, |
| 99:4 |
| **97** |
| 115:10, 115:12, |
| 115:15 |
| **984** |
| 2:13 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEGRAIN WINSTON, et al.                    )
                                           ) Case No. 18-cv-05726
    Plaintiffs,                     )
                                           ) Hon. Matthew F. Kennelly
v.                                         )
                                           )
THOMAS J. DART, et al.                      )
                                           )
    Defendants.                     )

**PLAINTIFF SAMUEL PAGE'S OBJECTIONS AND ANSWERS TO DEFENDANT
GREGORY SHIELDS FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, Samuel Page, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1. These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2. Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3. Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.

Exhibit

Page 2

08*10*2020

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.    List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:**    **Samuel Page**
**7212 S. Washtenaw**
**Chicago, IL 60629**
**(773) 502-3385**

**Undersigned Counsel**

2.    Identify all facts regarding your removal from the Patrol Supervisor position as referenced in Paragraphs 49-51 of the Complaint, including when you were removed, who made the decision to remove you from the position, what you were informed was the reason for the removal, whether or not you agreed with the stated reason, how, if at all, you allege any Defendant was involved in the removal, and how you were damaged by this incident.

**Response:**    **Plaintiff Page states that Chief Ranzino removed him from the position; or, at least he was the supervisor to inform him he was being removed. Plaintiff Page states further that he was never provided a reason or basis for the removal of his supervisor position.**

3.    Identify all facts regarding the grievance and arbitration regarding your removal from the Patrol Supervisor position as alleged in Paragraphs 49-51 of the Complaint, and identify who was supposed to reinstate you to the Patrol Supervisor position, why and when they failed to do so, and how you were damaged by this incident.

**Response:**    **Plaintiff Page states that the grievance filed went to arbitration and the arbitrator found in his favor. However, the administration never returned him back to his**

2

former rank as a supervisor. **Plaintiff Page further states that this really caused him severe mental anguish because ultimately it meant that my employer could do whatever it wanted even with winning an arbitration, it still didn't follow the procedures. Essentially, the whole process was meaningless and the department could do anything to anybody.**

4.      Identify the supervisors referenced in Paragraph 51 of the Complaint, and explain each and every instance where they expected you to make decisions as a supervisor, including who had the expectation, what the expectation was, when and how they communicated this to you, what your response was, what you believe your duties actually were, and how you were damaged by this incident.

**Response:      Plaintiff Page states that after he was stripped of his supervisor title, Chief Ranzino would consistently ask and expect him to make supervisory decisions. There were many occasions where he was put in a position by Chief Ranzino where he had to make a decision outside the scope of his responsibilities, then when he did, he would be verbally reprimanded in front of others for doing so. If I spoke up, Chief Ranzino would threaten me with a write-up. Chief Ranzino would constantly remind me in front of other officers that I was no longer a supervisor but at the same time, he'd expect that I do supervisory duties.**

5.      Explain how and when your compensation changed as a result of being removed from the Patrol Supervisor position as alleged in Paragraphs 49-51 of the Complaint, and identify who was responsible for determining your compensation, what your compensation was prior to the removal, and after the removal, and what you believe your compensation should have been and why, and explain how you were damaged by this incident.

**Response:      Plaintiff Page states that as a supervisor you received extra pay every week for simply being a supervisor. In and around 2011, when he was stripped of his**

supervisory role, he stopped receiving the extra pay and the pay was never reinstated even though he won the grievance at arbitration. Plaintiff Page never learned who was responsible for the decision-making related to this situation.

6. Identify each and every time Defendant Ranzino threatened to write you up any time you spoke up as alleged in Paragraph 52 of the Complaint, including when you were threatened, what was specifically stated to you including the purported reason for the write up, what you response was, what you stated that led to the threat of being written up, where these threats were made, whether or not there were any witnesses, whether or not you were ever actually written up by Defendant Ranzino, whether or not any other Defendants were involved, and how you were damaged by this incident.

**Response:** Plaintiff Page states that every time he asked Chief Ranzino a question about anything, he was sent to the basement. This is was very troublesome because I had more seniority than most officers in the unit.

7. Identify all assignments you received that you allege were discriminatory as alleged in Paragraph 53 of the Complaint and forms the basis of your Complaint and explain when you were assigned there, who was involved in the assignment, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:** Plaintiff Page states that he had to work the post that should have been assigned to less-senior officers because Chief Ranzino was unwilling to discuss assignment details with me. Specifically, I would be sent to Division 5, in the basement. Anytime I would

4

ask Chief Ranzino about my work assignments, he would just say "what can I say, dude." Whereas, when white officers approached Chief Ranzino about their work assignments, he would actually have a conversation with them, hear them out, and even change their assignments.

8.      Explain specifically what you mean by "basement," as alleged in Paragraph 53 of the Complaint, what assignments you were qualified or available to serve in, and explain why the basement is a less desirable assignment than being assigned elsewhere.

**Response:**      **Plaintiff Page states that the basement refers to the area where "TSS" or Technical Services Section is located. It is in the basement of Division 5. TSS is not a desirable assignment because it is located in the basement, without proper ventilation or windows, and home to mice and cockroaches. Answering further, TSS is not a desirable assignment because you're subjected to uncontrollable heat and air conditioning settings, are not provided proper lunch breaks and are often forced to work overtime. Investigation continues.**

9.      Identify the other "non-minority officers" who were not assigned to the basement as alleged in Paragraph 53 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to what position the employee was assigned, what assignment the employee received instead, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:**      **Plaintiff Page states that he was sent to the basement or TSS when new, white investigators that came to the unit were never sent to the basement, or TSS.**

4815-3967-3012, v. 1

10.     If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**Response:     Chief Ranzino was responsible for giving the assignments and he assigned the African-American investigators only to the basement or TSS; I also remember being assigned to listen to audio complaints for my entire shift.  I never saw any white investigators get assigned to listen to audio complaints.  Investigation continues.**

11.     Identify each and every complaint you made regarding the behavior alleged in Paragraphs 50-53 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:     Continually made oral complaints to Chief Ranzino but nothing ever changed.**

12.     Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there

6

were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response:** **Director Shields never personally told Plaintiff Page that he was going to try to terminate him, but said this to many of the other African-American investigators. Investigation continues.**

13. If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:** **Chief Ranzino frequently asked me how I became a supervisor, implying that because I was African-American, I should not have been a supervisor.**

14. If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:** **Chief Ranzino constantly gave me verbal reprimands in front of other officers, but I never saw him do that to white officers.**

15.    If not already answered above, identify the assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, and explain how you were damaged by the assignment.

**Response:** **See response to Interrogatory No. 10. Investigation continues.**

16.    Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response:** **"High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative or unfavorable actions can take place.**

17.    If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

18. If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

19. Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:** **Plaintiff Page states that the loss of his supervisory role, the wages associated with the supervisor position, the hostile work environment and harassment by supervisors altering the conditions of his employment. Investigation continues and Plaintiff reserves the right to supplement this response.**

20. Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:** **Comradery and trust are exceptionally important in the law enforcement context. When being assigned to work in the high incident areas but not having**

faith that your supervisors or anyone within your unit will provide you with back-up should you require it, causes an enormous amount of additional stress on what is normally a stressful work environment just by the nature of the job.

21.    Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response:**    All of the foregoing for the specific responses above; and, generally speaking, the lack of attentiveness to any complaints to OPR, human resources made by any and all of the Plaintiffs; and, failure to correct any of the behavior complained of and committed by Director Shields, Chief Ranzino, and Chief Neal.

22.    Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response:**    Director Shields, Chief Ranzino and Chief Neal maintained an informal process and procedure of preventing African-American investigators in the Electronic Monitoring unit from advancing or being eligible for promotions by treating them differently in regards to job assignments and disciplinary measures taken against them.  Similarly situated white investigators did not receive discipline for same or similar actions that the plaintiffs did receive discipline for.  Also, see response to Interrogatory No. 14 in regards to E/M unit's promotional process.

Respectfully Submitted,

By:    /s/ Kelly A. Krauchun
KELLY A. KRAUCHUN
The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Kelly.krauchun@danherbertlaw.com

10

## **VERIFICATION**

I, Samuel Page, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2/10/2020

_____
Samuel Page

# Exhibit E



# Transcript of Victor Slaughter

**Date:** August 12, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
 1       IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION
    ------------------------------------------------
 3  LeGrain Winston, Michelle Strickland,
    Vernell Tims, I.V. Newson, Jr.,
 4  Samuel Page, Wilford Ferguson,
    Cecil Williams, Anthony Manning,
 5  David Walker, Tyrone McGhee and
    Victor Slaughter,
 6            Plaintiffs,
 7      vs.              Case No. 18-cv-05726
 8  Sheriff of Cook County, et al.,
 9            Defendants.
10  ------------------------------------------------
11
12        *     *     *     *     *
13
14  DEPOSITION OF VICTOR SLAUGHTER, CONDUCTED VIRTUALLY
15       Taken on the 12th Day of August, 2020
16            10:00 A.M. CST
17
18        *     *     *     *     *
19
20
21
22
23       Taken before Ann Marie Holland, CSR
24
```

**Page 2**

```
 1            APPEARANCES:
 2
 3       ELIZABETH FLEMING, ESQ., of THE HERBERT
    LAW FIRM, 206 South Jefferson Street, Suite 100,
 4  Chicago, Illinois  60661, phone: (312) 655-7660,
    email: elizabeth.fleming@danherbertlaw.com and
 5  kelly.krauchun@danherbertlaw.com, appeared remotely
    representing the Plaintiffs.
 6
 7
 8       ETHAN E. WHITE, ESQ., of the firm of EMERY LAW,
    LTD., 2021 Midwest Road, Suite 200, Oak Brook, Illinois
 9  60523, (630) 984-0339, email: ewhite@emerylawltd.com,
    appeared remoteley representing the Defendants.
10
11       JUSTIN L. LEINENWEBER, ESQ., of the firm of
    LEINENWEBER, BARONI & DAFFADA, LLC, 120 N. LaSalle
12  Street, Suite 2000, Chicago, Illinois  60602, email:
    justin@ilesq.com, appeared remotely representing the
13  Defendants.
14
15
16  Also Present:
17       Merinda Evans/Planet Depos Video Host
18
19
20
21
22
23
24
```

**Page 3**

```
 1            I N D E X
 2
 3  EXAMINATION                         PAGE
 4  of:  VICTOR SLAUGHTER
 5  Examination by Mr. White....................Page 5
 6
 7
 8            E X H I B I T S
 9  Exhibit No.      Description          Page
10
11  Exhibit 1   Complaint.....................Page 25
    Exhibit 2   Answer Re: Shields............Page 40
12  Exhibit 3   Disciplinary Action Form
                Re: Counseling................Page 67
13  Exhibit 4   Disciplinary Action Form
                Re: Dismissed.................Page 70
14  Exhibit 5   Answer Re: Dart...............Page 140
15
16
17
18
19   *All Exhibits Marked Electronically By Video Host
20
21
22
23
24
```

**Page 4**

```
 1       VIDEO HOST:  Thank you to everyone for
 2  attending this proceeding remotely, which weanticipate
 3  will run smoothly.  Please be aware that we are
 4  recording this proceeding for backup purposes only.
 5  Any off the record conversations should be held away
 6  from the computer.  Please remember to mute your mic
 7  for those conversations.  Please have your video enabled
 8  to help the reporter identify who is speaking.  If you
 9  are unable to connect with video and are connecting
10  via phone, please identify yourself each time before
11  speaking.  We will provide a complimentary unedited
12  recording of this deposition with the purchase of a
13  transcript, if you are interested.  I apologize in
14  advance for any technical related interruptions.
15       Thank you.  Ann, you may proceed.
16       COURT REPORTER:  Will counsel please
17  stipulate that in lieu of formally swearing in the
18  witness, the reporter will instead ask the witness to
19  acknowledge that their testimony will be true under the
20  penalties of perjury, that counsel will not object to
21  the admissibility of the transcript based on proceeding
22  in this way, and that the witness has verified that he
23  is in fact Victor Slaughter.  Do you all so agree?
24       ALL COUNSEL:  Agreed.
```

Transcript of Victor Slaughter
Conducted on August 12, 2020

2 (5 to 8)

**5**

1 COURT REPORTER: Mr. Slaughter,
2 do you hereby acknowledge that your testimony will be
3 true under the penalties of perjury?
4 THE WITNESS: I do.
5
6 VICTOR SLAUGHTER,
7 The Witness in the above-entitled
8 matter after having been first duly
9 sworn deposes and says as follows:
10
11 EXAMINATION
12 BY MR. WHITE:
13 Q. Good morning, Mr. Slaughter. My name is
14 Ethan White. I am one of the attorneys that represents
15 the Cook County Sheriff's Office, the Defendants in this
16 matter. I am here and I am going to ask you a bunch of
17 questions, but we will get through them as efficiently
18 as we can.
19 I suppose the first question is have you
20 ever given a deposition before?
21 **A. No.**
22 Q. Okay. Have you ever testified in any
23 lawsuit or proceeding before?
24 **A. Yes.**

**6**

1 Q. Okay. Where have you testified before?
2 **A. Actual place or just -- court for instances**
3 **for the job?**
4 Q. Okay. So, you testified in your job in
5 working for the Cook County Sheriff's Office?
6 **A. Yes.**
7 Q. Was this like where an inmate or a
8 detainee, you know, claimed something happened?
9 **A. Yes.**
10 Q. Okay. Were you a Defendant in any of those
11 cases?
12 **A. No.**
13 Q. So you were testifying as like a witness?
14 **A. Yes.**
15 Q. Okay. Alright. Well, let me give you,
16 because you haven't been deposed before, let me just
17 give you some ground rules so that we are both on the
18 same page here. This is kind of particularly important,
19 since we are doing this remotely and over Zoom.
20 The first is that you let me finish my
21 question and I will do my best to let you finish your
22 answer before either of us talks again. Okay?
23 **A. Okay.**
24 Q. That way the Court Reporter gets a clear

**7**

1 record of who is saying what. Alright?
2 **A. Okay.**
3 Q. The second is that I need you to answer out
4 loud, so that the Court Reporter can't take down things
5 like shrugging your shoulders or shaking your head,
6 anything like that. We need you to answer out loud.
7 Okay?
8 **A. Okay.**
9 Q. And because we are on video, you are doing
10 a great job so far, but it's going to be important to
11 kind of keep your voice up so that everybody can get a
12 clear record. Okay?
13 **A. Okay. Understood.**
14 Q. If you need to take a break at any time for
15 any reason, that's fine. I just ask that you answer my
16 question before we go on break. Okay?
17 **A. Okay.**
18 Q. If you don't understand any of my
19 questions, please let me know. If I use a word that you
20 don't know what I am asking, let me know, because if you
21 answer it, everybody is going to assume that you
22 understood what I was asking. Okay?
23 **A. Okay.**
24 Q. Is there any reason you can't give full,

**8**

1 accurate, complete and truthful testimony today?
2 **A. No.**
3 Q. Okay. Is there anyone in the room with
4 you?
5 **A. No.**
6 Q. Do you have any notes in front of you?
7 **A. No.**
8 Q. Do you have any kind of documents in front
9 of you at all?
10 **A. No.**
11 Q. Alright. And you understand that only you
12 can provide answers? You can't ask anybody else for the
13 answers?
14 **A. Yes.**
15 Q. And you agree with me that you will not
16 look at your phone or text messages or anything for any
17 answers, right?
18 **A. No.**
19 Q. And you are not going to have anybody in
20 the room with you at any point to give you the answers
21 for the deposition, correct?
22 **A. No.**
23 Q. Alright. Did you do anything to prepare
24 for your deposition?

Transcript of Victor Slaughter
Conducted on August 12, 2020

3 (9 to 12)

9

1    A.  Just simply tried to recollect some things
2  that I thought might be important, that's all.
3    Q.  Okay.  Did you look at any documents to
4  prepare?
5    A.  Yeah, a couple of documents.
6    Q.  Alright.  What did you look at to prepare?
7    A.  My interrogatories.
8    Q.  Okay.  What about the complaint?  Did you
9  look at the complaint at all?
10    A.  No, I couldn't find the complaint.  It's
11  been a long time.
12    Q.  Okay.  Alright.  I don't want to know what
13  you talked about, but did you talk to your attorney at
14  all prior to the deposition?
15    A.  Say again?
16    Q.  I said I don't want to know the content of
17  any conversation you had with your attorney, but I
18  simply want to know did you talk to your attorney to
19  prepare for the deposition?
20    A.  Yes.
21    Q.  Okay.  And when did that conversation
22  occur?
23    A.  Is today Wednesday?
24    Q.  Yes.

10

1    A.  Yesterday.  I'm sorry.
2    Q.  No problem.  Approximately how long did you
3  talk to your lawyer to prepare?
4    A.  Half an hour.
5    Q.  Did you talk to any other person to prepare
6  for your deposition?
7    A.  No.
8    Q.  What about the other Plaintiffs?  Did you
9  talk to any of them about your deposition?
10    A.  No.
11    Q.  Have you talked to any of the other
12  Plaintiffs about their depositions?
13    A.  No.
14    Q.  Okay.  When did you start working at the
15  Cook County Sheriff's Office?
16    A.  In April of 1997.
17    Q.  Did you start in electronic monitoring or
18  did you start in something else?
19    A.  No, I started in corrections, in the jail.
20    Q.  In the jail, so like as a correctional
21  officer?
22    A.  Right.
23    Q.  Approximately how long did you do that for?
24    A.  Before going to electronic monitoring?

11

1    Q.  Correct.
2    A.  I went to electronic monitoring in 2005.
3    Q.  So, that's about eight years after you
4  started?
5    A.  Correct.
6    Q.  Alright.  And if I -- if I use "EM," you
7  know that I am talking about electronic monitoring,
8  right?
9    A.  Yes.
10    Q.  Alright.  So you started in EM in 2005.
11  Did you start as an investigator?
12    A.  Yes.
13    Q.  Why did you want to move from the jail to
14  EM?
15    A.  Um, I saw it as a step up, one.  And also
16  a challenge.
17    Q.  In what ways was it a step up?
18  Financially?  How so?
19    A.  Well, yes.  At that time it was a
20  promotion.
21    Q.  Okay.  And you said you saw it as a
22  challenge.  What do you mean by that?
23    A.  Dealing with inmates inside the jail and
24  dealing with inmates on the EM program, away from the

12

1  jail and into their residences, it's totally different.
2    Q.  Is it harder?
3    A.  I'm sorry?
4    Q.  Is it harder in EM?
5    A.  Yeah.  Yeah.
6    Q.  And why would you say that dealing with the
7  inmates or I guess I should say participants in EM is
8  more difficult than dealing with inmates in the jail?
9    A.  The routine at the jail is -- it's regular.
10  It's set in stone.  Only every once in a while does
11  the routine change or get thrown off track.
12      In EM very rarely, very rarely is anything
13  the norm.  Because inside the jail the inmates have to
14  conform to the rules and regulations inside the jail,
15  which makes it routine.  When you go to someone's home,
16  there is no rules or regulations.  You don't know what
17  you're walking into.
18    Q.  Right.  Right.  Kind of anything goes out
19  on the street?
20    A.  Uh-huh.  Yeah.
21    Q.  Okay.  Alright.  And then when you were in
22  EM -- well, are you still in EM?
23    A.  Yes.
24    Q.  Okay.  And you are still an investigator?

Transcript of Victor Slaughter
Conducted on August 12, 2020

13

1    A.   Yes.
2    Q.   Have you held any other roles besides
3 investigator since you joined EM?
4    A.   No.
5    Q.   Let's talk about the shifts in EM.  How
6 many shifts are there?
7    A.   Three.
8    Q.   Okay.  I think it's -- is it first, second
9 and third?
10   A.   Correct.
11   Q.   Have you always been on the same shift?
12   A.   Yes.
13   Q.   What shift have you always been on?
14   A.   3:00 p.m. to 11:00 p.m.
15   Q.   And is that third watch?
16   A.   That's third watch.
17   Q.   Did you choose that shift or was it chosen
18 for you?
19   A.   It was chosen for me.
20   Q.   Is it based on seniority or anything like
21 that or it's just they decide what shift you are on?
22   A.   I don't know what it's based on.  Coming
23 in, initially, I was just placed on 3:00 to 11:00.
24   Q.   Okay.  Do you think it's governed by the

14

1 union contract or you just don't know?
2    A.   I do not know.
3    Q.   Alright.  And that's fair.  That's one
4 thing I should have told you at the beginning, too.
5 Nobody here wants you to guess, so if you don't know
6 something, that's fine.  Just tell me you don't know.
7 That's fine.  I'm not trying to trick you.
8    A.   I got you.
9    Q.   Alright.  EM policy, do you know if EM has
10 a policy regarding discrimination?
11   A.   I don't know for sure.  I've never read
12 one.
13   Q.   Okay.
14   A.   So I don't know.
15   Q.   Do you know if they have a policy on
16 retaliation?
17   A.   No, I do not.
18   Q.   Do you know what you are, you know,
19 supposed to do if you witness discrimination on the job?
20   A.   Yes.
21   Q.   What are you supposed to do?
22   A.   First, let it be known that you are aware.
23   Q.   What do you mean "let it be known"?  Let it
24 be known to who?

15

1    A.   If -- to your immediate supervisor.
2    Q.   What if it's your immediate supervisor who
3 is performing the discrimination?
4    A.   If I'm not mistaken, you are to address
5 him.  And if nothing comes of that, then you move up
6 the -- move up the chain.
7    Q.   Okay.  So, report up the chain of command
8 if you witness discrimination?
9    A.   Yes.
10   Q.   What about if you experience discrimination
11 yourself; the same procedure?
12   A.   If I'm not mistaken.
13   Q.   But you are not aware of any policy that
14 says that?  You are just kind of basing that on your
15 personal experience?
16   A.   Yes.
17   Q.   What about retaliation?  The same procedure
18 if you witness it, report up the chain of command?
19   A.   Retaliation?  I'm not sure about.
20   Q.   What about if you experience retaliation
21 yourself?  Do you know what you are supposed to do?
22   A.   Not exactly, no.
23   Q.   Does EM have a progressive discipline
24 policy?

16

1    A.   No.
2    Q.   Why do you say that?
3    A.   Because in discipline, progressive policy,
4 as I know it, does not exist because there is no
5 progression.  The progression was in an infraction,
6 verbal warning, written warning, after that, possible
7 suspension.  That doesn't exist any longer.
8    Q.   When did it stop existing?
9    A.   I can't say for sure, but many years ago.
10   Q.   More than ten years ago?
11   A.   If not more, about ten.
12   Q.   So, is it your testimony that for whatever
13 infraction, the EM does not follow progressive
14 discipline?
15   A.   No, they do not.
16   Q.   So, for any infraction, it just goes what?
17 Straight to days off?  Termination?
18   A.   Well, I can't say any infraction.  For me,
19 personally, and others that I have witnessed personally,
20 there was no progressive discipline.
21   Q.   In your mind what is "progressive
22 discipline"?
23   A.   Just as I stated, as it was written in
24 police before.  In an infraction, it was determined

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

17

1 how serious the infraction was.  And with that came
2 the progressive discipline.  A small infraction, as
3 I stated, you might receive a verbal warning first.
4 Well, not might, you would receive a verbal warning
5 first.  If the same infraction was done again, then
6 you would receive written counseling.  If the same
7 infraction was done again, then you would receive a
8 written warning.  And if the same infraction was done
9 again, then you would possibly be facing disciplinary
10 action, such as a suspension of a day or, you know,
11 whatever they determined.
12     Q.   You said as it was written.  Where are you
13 saying it was written?
14     A.   I'm referring back to policy when I first
15 arrived in EM, in 2005.
16     Q.   Do you believe that that policy no longer
17 exists?  That that written policy no longer exists?
18     A.   No, it doesn't because -- no, it doesn't.
19     Q.   Is it possible that that policy or that
20 progressive discipline existed in the union contract?
21     A.   I would say I don't believe so.  Because
22 the union contract does not govern Sheriff's policy.
23     Q.   What about your right to grieve discipline?
24 That comes from the union contract, right?

---

18

1     A.   Yes.
2     Q.   And the whole process by which you can
3 grieve, step one, step two, step three, that all comes
4 from the union contract, right?
5     A.   It's -- if I'm not mistaken, it's in the
6 union contract and it's also in Sheriff's policy, so I
7 don't know where it originated though.
8     Q.   Who in your mind decides the initial level
9 of discipline for an infraction?
10     A.   The director of EM.
11     Q.   So you believe the -- so, Director Shields
12 for example?
13     A.   Correct.
14     Q.   You believe Director Shields decides the
15 initial amount of discipline for any infraction?
16     A.   Correct.
17     Q.   What do you base that belief on?
18     A.   Prior -- prior write-ups that I have
19 received.
20     Q.   The write-ups that you received came from
21 Director Shields?
22     A.   Not initiated by Director Shields, but the
23 infraction cannot go through without his signature.
24     Q.   So, who would then initiate the discipline?

---

19

1     A.   That could be any supervisor.
2     Q.   Would it be the supervisor who, I guess,
3 witnessed the infraction or claims to have witnessed the
4 infraction?
5     A.   Not necessarily.
6     Q.   But you don't think that that supervisor
7 is the one determining the level of discipline?
8     A.   No.
9     Q.   Are you familiar with the grievance process
10 in EM?
11     A.   Yes.
12     Q.   And how does it work?
13     A.   If you wish to grieve a write-up that you
14 received, you simply have to fill out a grievance form
15 and submit it to the union representative.
16     Q.   Okay.  And what happens from there?
17     A.   You sit and you wait until they advise you
18 of a grievance hearing.
19     Q.   "They" being EM or "they" being your union
20 rep?
21     A.   Well, we would receive it via e-mail, so it
22 would come from the union, if I'm not mistaken.
23     Q.   You've grieved discipline before, correct?
24     A.   Yes.

---

20

1     Q.   Do you think that the process in place
2 works well?
3     A.   If followed the way it should be, yeah, it
4 can work well.
5     Q.   Would you agree that it has helped you
6 before?
7     A.   Well, I'm not going to say that the process
8 has helped me.  I have won some grievances, not because
9 of how the process is set up, simply because I was right
10 in my doing.
11     Q.   So, I mean it sounds like it does what it
12 is supposed to do, right?  It protects you from unfair
13 discipline?
14     A.   If done correctly.
15     Q.   Okay.  So, I guess the way it's designed,
16 it should protect employees from unfair or harsh
17 discipline?
18     A.   Again, if it's done correctly, it can.
19     Q.   Would you agree that initial discipline,
20 and let's just talk about you, we don't have to
21 speculate about other employees, but would you agree
22 that the initial discipline on you when you grieved
23 it was usually reduced?
24     A.   You say when done on me was it reduced?

---

Transcript of Victor Slaughter
Conducted on August 12, 2020

6 (21 to 24)

---

**21**

1    Q.   Yes.  You know, when there was initial
2  discipline levied against you, when you grieved it,
3  would you agree that that initial discipline was usually
4  reduced to something less than the initial discipline?
5        **A.   Not usually, but it has happened before.**
6        Q.   Who hears grievances?
7        **A.   There has been moments when a chief in the**
8  **unit has heard a grievance from me.  There has been**
9  **moments when the director has heard a grievance from me.**
10       Q.   Does that depend on the step of the
11 grievance?
12       **A.   No, because these -- I've had different**
13 **people hear the grievance at the very first step.**
14       Q.   Okay.  It's not necessarily, though, the
15 person who initiated the discipline, correct?
16       **A.   It shouldn't be, but it has been.**
17       Q.   What about discipline levied against you?
18 Has it ever been at the first step ever been heard by
19 the person who initiated the discipline against you?
20       **A.   Yes.**
21       Q.   Okay.  When did that happen?
22       **A.   I can't say exactly when.**
23       Q.   Was it more than ten years ago?
24       **A.   No, less than ten.**

---

**22**

1        Q.   Okay.  Who imposed or who initiated the
2  discipline that you are talking about?
3        **A.   I can't recall exactly who, but it was the**
4  **chief who initiated it.  And my first step in hearing it**
5  **was with the chief.**
6        Q.   And what was the result of that step one
7  hearing?
8        **A.   It was taken up to the second step.**
9        Q.   Who heard it at the second step?
10       **A.   The director.**
11       Q.   Was that Director Webb or was it somebody
12 else?
13       **A.   I believe so.**
14       Q.   Okay.  And what happened at step two?
15       **A.   I believe it was in my favor.**
16       Q.   So at step two the grievance was sustained?
17       **A.   Yes.**
18       Q.   Do you remember what the infraction or what
19 the alleged infraction was?
20       **A.   No, I don't.**
21       Q.   And as part of the grievance process, if
22 you go past step three, you can go to arbitration,
23 right?
24       **A.   Yes.**

---

**23**

1        Q.   And at the arbitration, the arbitrators are
2  not EM employees, correct?
3        **A.   If I'm not mistaken, no.  I've never been**
4  **to an arbitration hearing.**
5        Q.   So as far as you know, the arbitrators are
6  somebody outside of EM?
7        **A.   Yeah.**
8        Q.   Apart from that one instance that we just
9  talked about, where you believed that you received the
10 discipline and were heard at the first level by the same
11 supervisor, was there any other examples where the same
12 person who initiated discipline was the one who heard
13 the grievance?
14       **A.   I have been told by the supervisor who had**
15 **me to -- well, who presented me with a written reprimand**
16 **say to me that because, understanding that they weren't**
17 **there when the infraction took place, advised me that,**
18 **I was told by the supervisor above them to, "write you**
19 **up."  So, then being told by the supervisor that he was**
20 **instructed to write me up.  Then when you go to the**
21 **grievance hearing, you are at the grievance hearing with**
22 **the individual that instructed the supervisor to write**
23 **me up.**
24       Q.   Okay.  Let me see if I follow here.  Okay?

---

**24**

1  So why don't we use names.  Who are we talking about
2  here?
3        **A.   This was not long ago.  I was called into**
4  **the office by Lieutenant Collins, with a write-up.  I**
5  **can't remember the ones in the past.  But I started off**
6  **with Lieutenant Collins with a write-up.  Was informed**
7  **that she was instructed by the director to write me up.**
8        Q.   And who was the director?
9        **A.   At this time it was Director Roughin.**
10       Q.   Okay.  And then when that -- did you grieve
11 that discipline?
12       **A.   Yes.**
13       Q.   And at step one was it Director Roughin who
14 heard the grievance?
15       **A.   Yes.**
16       Q.   What was the outcome of step one?
17       **A.   I was given a -- I don't know.  I was given**
18 **a written warning.**
19       Q.   Was that a reduction from the initial
20 discipline?
21       **A.   If I recall the -- the initial discipline**
22 **did not have a suggested discipline on it, so.**
23       Q.   What was the alleged infraction for this
24 one?

---

Transcript of Victor Slaughter
Conducted on August 12, 2020

25

1    **A.  I believe being late for roll call, if I'm**
2 **not mistaken.**
3    Q.  How long ago was that?
4    **A.  A year and a half maybe.**
5    Q.  I looked through your comprehensive
6 discipline history.  It looks like most of the
7 discipline you've had was from being late to roll call.
8 Would you agree with that?
9    **A.  I'm not sure.  I can't recall all of my**
10 **write-ups.**
11   Q.  Alright.
12         MR. WHITE:  Merinda, if we could pull
13 up Exhibit 1 for the witness, please.
14         VIDEO HOST:  One moment, please.
15    MR. WHITE:  Thank you.  Sir, you are
16 going to see an exhibit pull up here on your screen in a
17 second here.
18         THE WITNESS:  Okay.
19 BY MR. WHITE:
20   Q.  So, sir, this is what has been marked as
21 Exhibit Slaughter 1.  This was the complaint that was
22 filed in this case by you and the other Plaintiffs.
23    **A.  Okay.**
24         (SLAUGHTER Deposition Exhibit 1 marked

26

1 for identification.)
2 BY MR. WHITE:
3    Q.  First of all, have you seen this document
4 before?
5    **A.  Yes.**
6    Q.  Okay.  Did you see it before it was filed?
7    **A.  I wouldn't know.**
8    Q.  Okay.  Let me ask it a different way.  Did
9 you review a draft of this document and, you know, make
10 suggestions or changes to it?
11   **A.  I -- I don't recall.  I don't know if that**
12 **happened or not.**
13   Q.  Alright.
14         MR. WHITE:  Merinda, if we could turn
15 to paragraph 75, which I think is on Page 11.  Okay.
16 BY MR. WHITE:
17   Q.  Sir, I will give you a second to read this,
18 but there is a section of the complaint entitled, "Facts
19 particular to Victor Slaughter," and it is paragraphs 73
20 to 76.
21   **A.  Alright.**
22   Q.  Why don't you read those paragraphs and let
23 me know when you are ready to talk about it.
24   **A.  (Reviewing.)  Okay.**

27

1    Q.  Alright.  In paragraph 75 of the complaint
2 you allege that you were consistently assigned to TSS or
3 the basement regardless of your seniority.  Non-minority
4 officers were very rarely, if ever, assigned to work in
5 the basement.  (Reading.)  Do you see that in paragraph
6 75?
7    **A.  Yes.**
8    Q.  Do you agree with that statement?
9    **A.  Yes.**
10   Q.  So, you believe that -- do you believe that
11 you were assigned -- sorry.  Let me back up.
12      What does "TSS" stand for?
13   **A.  Oh, it's changed a couple of times.  It was**
14 **Technical Support Services, now it's Technical Services**
15 **Section, if I'm not mistaken.**
16   Q.  Alright.  And I may use "TSS" or "the
17 basement" interchangeably, but you know what I am
18 talking about, right?
19   **A.  Yes.**
20   Q.  Alright.  So, you contend that you were
21 assigned to TSS on the basis of your race?
22   **A.  Yes.**
23   Q.  What shift -- well, I guess we have already
24 established this.  You always worked 3:00 to 11:00 when

28

1 you were assigned to TSS?
2    **A.  Yes.**
3    Q.  Did you ever work any other shift or was it
4 always 3:00 to 11:00?
5    **A.  Always 3:00 to 11:00.**
6    Q.  Does TSS operate during all three shifts?
7    **A.  No.  Right now, no.**
8    Q.  Okay.  Well, what about in, you know, the
9 last five years let's say?
10   **A.  No.**
11   Q.  Okay.  What shifts does TSS operate in the
12 last five years?
13   **A.  3:00 to 11:00.**
14   Q.  Only 3:00 to 11:00?
15   **A.  Only 3:00 to 11:00.**
16   Q.  Would you agree that you don't bid on
17 assignment, which is to say that you don't bid on patrol
18 versus TSS versus delivery?
19   **A.  No.**
20   Q.  In the past could you bid on assignments?
21   **A.  Yes, you could.**
22   Q.  Okay.  So, in the old union contract you
23 were able to bid on your assignment?
24   **A.  Yes.**

Transcript of Victor Slaughter
Conducted on August 12, 2020

29

1    Q.   Do you know why that changed?  Why did the
2  union make the change away from that?
3    A.   I have no idea.
4    Q.   Okay.  But that would have been a
5  negotiation between the union and the Sheriff's Office,
6  correct?
7    A.   Yes.
8    Q.   Do you claim or is it your belief that
9  seniority plays a role in who is assigned to TSS?
10    A.   No.
11    Q.   Alright.  So assignment to TSS doesn't have
12  anything to do with seniority?
13    A.   Well, that's a different question.
14       I believe it has something -- no.
15    Q.   Since 1997 I guess -- well, TSS didn't
16  exist when you joined EM, right?
17    A.   Yes, it did.
18    Q.   Oh, it did?  Okay.  So, since 1997 how
19  often have you been assigned to work at TSS?
20    A.   Oh, well, since 2005.
21    Q.   Okay.
22    A.   How often have I been assigned?  Well,
23  prior to -- prior to I want to say September maybe of
24  last year, I had been assigned to TSS every day, for

30

1  the prior four-and-a-half, five years.
2    Q.   Alright.  So, if I'm just trying to do the
3  math here, and I understand that this is approximate,
4  but approximately 2014 or so until 2019 you were
5  assigned to TSS every day?
6    A.   Correct.
7    Q.   Would you agree that you are good at it?
8    A.   I would agree that after four-and-a-half,
9  five straight years, I -- I was good at it then.
10    Q.   What about before, let's say before 2014,
11  how often were you assigned to TSS?
12    A.   Maybe once every six, seven months, one
13  day.
14    Q.   Okay.  What do you think changed in 2014?
15  Why do you think you started being assigned there every
16  day?
17    A.   Personally, I think what changed was the
18  way they began to use it, use that assignment as
19  discipline.
20    Q.   So you believe in 2014 TSS became a form of
21  discipline?
22    A.   Well, it's not a belief.  It was told to us
23  by the supervisors.
24    Q.   Okay.  Who told you that?

31

1    A.   It would be said in statements by -- by a
2  few of the chiefs.  Statements such as, "Keep doing
3  what you're doing, you are going to find yourself in
4  the basement." If you were to have an opinion about
5  something that wasn't seen as favorable, you would
6  be told, you know, "You obviously want to end up
7  downstairs." Statements such as that.
8    Q.   Okay.  So let's unpack it, because the
9  specifics are important.
10       The statement, "Keep doing what you are
11  doing and you will find yourself in the basement," who
12  said that?
13    A.   It was said by a few.  It was said by Chief
14  Neal, it was said by Chief Ranzino on many occasions.
15  It was said by Chief Rohloff.
16    Q.   Okay.  When did Neal say it?
17    A.   Oh, wow.  I can't remember it now.
18    Q.   Who was present when he said it?
19    A.   I -- I -- I can't remember who was standing
20  there.
21    Q.   Where did it take place?
22    A.   It was either in the roll call area or in
23  the office.
24    Q.   And what about Ranzino?  I'm sorry, just to

32

1  be clear, are you quoting them or are you just kind of,
2  you know, giving us the gist of what was said?
3    A.   No, I'm quoting.  It was what was said in
4  my presence.
5    Q.   So, these three people said the exact same
6  words?
7    A.   No, not the exact same words, it was
8  phrased differently, but the same meaning.
9    Q.   Okay.  I guess that's what I'm getting at,
10  sir.  You're not giving a quote, you're just giving the
11  meaning of what was understood?
12    A.   Uh-huh.
13    Q.   Is that a yes?
14    A.   I'm sorry, say again?
15    Q.   I'm trying to figure out are you giving us
16  a direct quote or are you just giving your belief of
17  what was said?
18    A.   No, these are direct quotes.
19    Q.   And that's what I'm getting at.  So, this
20  is a direct quote from three different people at three
21  different times?  "Keep doing what you're doing and you
22  will find yourself in the basement"?
23    A.   Yeah, that was said.  It was stated that
24  way once.

Transcript of Victor Slaughter
Conducted on August 12, 2020

9 (33 to 36)

33

1  Q. By who?
2  **A. That was stated by Chief Neal.**
3  Q. Okay.
4  **A. The way it was said by Chief Ranzino was,**
5  **"You must want to find yourself in the basement."**
6  Q. Alright.
7  **A. And Chief Rohloff, his statement was,**
8  **"Keep doing what you're doing and you will never get out**
9  **of the basement."**
10 Q. Okay. So let's talk about Ranzino.
11 When did he say, "You must want to find
12 yourself in the basement"?
13 **A. Prior to my being placed down there in**
14 **2014.**
15 Q. Who -- so, you know, a year before or
16 multiple years before?
17 **A. Oh, no, no. I want to say maybe two months**
18 **prior.**
19 Q. So, two months before you went down in the
20 basement in 2014 Ranzino said that?
21 **A. Yes.**
22 Q. Okay. Where did he say it?
23 **A. I believe we were in the roll call area.**
24 Q. Who else was present?

34

1  **A. Oh, boy. My partner at the time.**
2  Q. Which was?
3  **A. I'm sorry?**
4  Q. Who was that person? Who was your partner
5  at the time?
6  **A. Investigator Spivey.**
7  Q. Can you spell that for us, please?
8  **A. S-P-I-V-E-Y.**
9  Q. Okay. Anybody else present besides you and
10 Investigator Spivey?
11 **A. There were -- yeah. I can't recall.**
12 **Because roll call was over, so we weren't -- we weren't**
13 **at attention or anything. People were walking past, so.**
14 Q. Was that statement directed at you or was
15 it directed at somebody else?
16 **A. It was directed at me.**
17 Q. What about Rohloff? You said he said
18 something along the lines of, "Keep doing what you're
19 doing and you will never get out"? When did he make
20 that statement?
21 **A. Oh, I want to say maybe -- maybe after my**
22 **being assigned there for every day for about a year.**
23 Q. So is this like 2015 or so?
24 **A. Yeah.**

35

1  Q. Where did -- where did Rohloff make this
2  statement?
3  **A. I believe we might have been in the office**
4  **area.**
5  Q. Who else was present?
6  **A. I don't recall anybody else being present**
7  **on that one.**
8  Q. Did you say anything in response to him
9  when he said that?
10 **A. I believe I said something to the fact**
11 **that, "Well, I've been down there over a year, it**
12 **doesn't look like I'm going to get out of here anyway."**
13 **Something to that effect.**
14 Q. Where was TSS located before 2014?
15 **A. Before that it was in Division Six. In**
16 **the basement area of Division Six.**
17 Q. So, it was in a basement in a different
18 building; is that right?
19 **A. Yes.**
20 Q. When did it move to -- when you were in
21 TSS, was that Division Five?
22 **A. Yes.**
23 Q. Okay. When did it move to Division Five?
24 **A. I'm not sure. I want to say maybe -- maybe**

36

1  2012.
2  Q. So at least a few years before you went
3  down there?
4  **A. Yeah.**
5  Q. Were you ever assigned to TSS when it was
6  in Division Six?
7  **A. No.**
8  Q. Okay. So, when it was in Division Six,
9  would anyone from Division Five have been assigned to
10 TSS?
11 **A. At that particular time? Well, prior to**
12 **2012, we were bidding for shift and detail. So, those**
13 **that were assigned to TSS bidded for that position. So,**
14 **when it moved, when it -- when the division simply**
15 **moved, the same players went because that was their**
16 **bidded assignment.**
17 Q. Got it. So, there are investigators that
18 actually bid for TSS, right?
19 **A. Back in the day, when bidding for detail**
20 **was allowed.**
21 Q. Would it surprise you that you were
22 considered one of the most knowledgeable investigators
23 in EM regarding TSS?
24 **A. I think that would depend on who you talked**

Transcript of Victor Slaughter
Conducted on August 12, 2020

37

1  to.

2      Q.  Do you think you were one of the most
3  knowledgeable investigators regarding TSS?

4      A.  Again, after being there for almost five
5  years straight, every day, you can't help but become
6  knowledgeable.

7      Q.  Does it make sense to you that someone with
8  a high level of knowledge of TSS would be assigned to
9  TSS?

10     A.  Well, the knowledge would have to be
11 gained.  It would be, but then, you know, it goes
12 against -- it goes against policy.

13     Q.  What policy does it go against?

14     A.  Assignment rotation.

15     Q.  Is it your belief that there is a written
16 policy regarding assignment rotation?

17     A.  Yes.

18     Q.  Have you ever seen it?

19     A.  In the past, yes.

20     Q.  When was the last time you saw it?

21     A.  I can't recall.

22     Q.  Do you have a copy of it?

23     A.  No, I do not.

24     Q.  Have you seen it in the last ten years?

38

1      A.  Say again?

2      Q.  Have you seen that policy, you are saying
3  regarding assignment rotation, have you seen it in the
4  past ten years?

5      A.  No.

6      Q.  And what do you believe that policy
7  regarding assignment rotation says?

8      A.  It stated that assignment rotation would
9  take place every 90 days.

10     Q.  Where does that policy exist?

11     A.  Where does it exist?

12     Q.  Yes.  Like is it in a handbook?  Is it
13 online?  I've never seen it, so I'm trying to figure out
14 where it is.

15     A.  There is a -- a list of policies and
16 procedures pursuant to the Sheriff's Department.

17     Q.  So, if it exists, it would be in there?

18     A.  I would assume, yes.

19     Q.  And getting back to your performance, I'm
20 not trying to trick you, but I mean you would agree that
21 we want to put the people that are most skilled at a
22 particular position in that position, right?

23     A.  Again, every investigator should be skilled
24 in every facet of his or her job.  So, that's the -- one

39

1  of the purposes of the assignment rotation.

2          If you have an investigator who is assigned
3  to one particular area for, you know, half of his
4  career, and then something happens and they need him or
5  her to go out on the streets or do something totally
6  different in an emergency situation, then that
7  investigator is no good to you, because he has no idea
8  of what that particular assignment entails.  So --

9      Q.  Really -- sorry.  Please continue.

10     A.  Yeah.  So, you know, it's not -- you can't
11 say that you would put an investigator in an assignment
12 because he's skilled at it or he's very knowledgeable at
13 it, because he's supposed to be very knowledgeable about
14 all facets of his job.

15     Q.  But I mean really isn't it the supervisor's
16 job on any particular shift to look at what the
17 operational needs are and figure out, you know, who
18 needs to be where?

19     A.  Again, if -- if your entire unit is
20 knowledgeable about every facet, it doesn't matter where
21 you place that particular individual, because he's going
22 to do the job and do it well.

23     Q.  And I understand, sir, that that's your
24 view of how the office or how the unit should be run.

40

1  But I'm simply asking you isn't it the supervisor's
2  prerogative to try to figure out what investigator
3  should be in what spots based on operational needs?

4      A.  Well, never being a supervisor, I guess I
5  can't -- I guess I can't answer as to how it's supposed
6  to be done.

7      Q.  Weren't you in fact told that you were
8  being, I guess, continually assigned to TSS because you
9  had learned the new system for processing new inmates
10 for going home on house arrest?

11     A.  No.

12     Q.  Alright.

13         MR. WHITE:  Merinda, if we could pull
14 up what has been marked as Exhibit 2.

15         VIDEO HOST:  One moment, please.

16         (SLAUGHTER Deposition Exhibit 2 marked
17 for identification.)

18 BY MR. WHITE:

19     Q.  Okay.  Sir, what has been marked as Exhibit
20 Slaughter 2 is what we received from you.  It is
21 entitled "Plaintiff Victor Slaughter's Objections and
22 Answers to Defendant Gregory Shields First Set of
23 Interrogatories."

24         Have you seen this document before?

Transcript of Victor Slaughter
Conducted on August 12, 2020

41

1      A.  Yes.

2      Q.  And is this one of the documents you

3  mentioned that you looked at to prepare for your

4  deposition?

5      A.  Yes.

6          MR. WHITE:  If we could, Merinda, turn

7  to the very last page.

8  BY MR. WHITE:

9      Q.  And, sir, this is a verification where you

10  were swearing to the best of your knowledge, information

11  and belief under penalty of perjury that your answers

12  were true and correct.  Is that your signature, sir?

13      A.  Yes.

14      Q.  You signed this on February 10th, 2020?

15      A.  Yes.

16      Q.  Okay.

17          MR. WHITE:  Merinda, if we could turn

18  back to Page No. 2.

19  BY MR. WHITE:

20      Q.  We are going to focus on the bottom of that

21  page.  This was your response to an interrogatory asking

22  for all assignments you allege were discriminatory.  And

23  in response you wrote, "It was stated to Plaintiff that

24  he was assigned to TSS because he learned the new system

42

1  put in place for processing new inmates going home on

2  house arrest."  So which is it, sir?  You told me you

3  weren't told that, but you swore under perjury that you

4  were?

5      A.  I don't see where you are.

6      Q.  Okay.  Down at the bottom of Page 2, the

7  last sentence on that page.  It starts with --

8      A.  (Reviewing.)  Oh, okay.

9      Q.  So is that true or not?

10      A.  That is true.  I thought you meant early on

11  in my placement down there.

12      Q.  So, you testified that you were assigned to

13  TSS for every day for approximately four-and-a-half to

14  five years; is that right?

15      A.  Correct.

16      Q.  Is it true that you just got tired of

17  working in TSS, being down there for so long?

18      A.  What do you mean?

19      Q.  Well, did you want a change of pace?  Did

20  you want to get back out on patrol?

21      A.  I wanted to be rotated, like other

22  investigators were.

23      Q.  Okay.  So, you wanted to be on the streets

24  sometimes and you wanted to be in TSS sometimes?

43

1      A.  It wasn't a matter of wanting to be on the

2  street sometime or in TSS sometime, I just wanted to be

3  rotated, like other investigators were, and not be --

4  not be singled out by being placed in -- in an

5  assignment which was used for discipline.

6      Q.  In September of 2019 did you start being

7  rotated?

8      A.  No, we didn't start being rotated.  We had

9  a new group of investigators who were assigned to EM.

10      Q.  As punishment?

11      A.  No, no, no.  A new group that came in from

12  the jail.  As new investigators they were promoted to

13  that position.

14      Q.  Did they only work at TSS?

15      A.  When they were being trained in TSS, they

16  removed everyone that was working there in order to

17  train them.

18      Q.  That's not really my question though, sir.

19          That new group that came in, did they only

20  work in TSS?

21      A.  No.

22      Q.  Okay.  So they rotate as well?

23      A.  Yes.

24      Q.  And you continued to spend some of your

44

1  time in TSS?

2      A.  No, not -- not when they were hired and

3  they came over.

4      Q.  Since September of 2019 have you been

5  assigned to TSS?

6      A.  Yes.

7      Q.  How often?

8      A.  Since '20 -- since September, maybe three

9  times.

10      Q.  So, in the past -- what is that?  That's

11  about almost a year?  So, in the past year you've been

12  there approximately three times?

13      A.  Yeah, about -- yeah, about three times.

14      Q.  And when we say "times," that means shifts?

15      A.  Shifts.

16      Q.  Okay.  So that new group, I just want to

17  understand, that new group came over and they all

18  started in TSS; is that it?

19      A.  No.  No, no, no no, no.

20      Q.  I'm just trying to figure out what changed

21  basically.

22      A.  Well, I guess you -- well, I can't answer

23  that.  When they came over, they were being trained on

24  the different aspects, on the different assignments of

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

45

1   **EM.  When the time came where they were going to be**
2   **trained on the workings of TSS, then everyone that was**
3   **working there prior they removed from TSS, so they could**
4   **put them down there in order to train them.**
5       Q.   How many people were in this group, this
6   new group?
7       **A.   Wow.  20 to 25 maybe.**
8       Q.   And before that point was EM understaffed?
9       **A.   In comparison to the work, EM has always**
10  **been understaffed.**
11      Q.   I may have asked you this, and I apologize
12  if I did, but would you agree that some investigators
13  prefer working in TSS?
14      **A.   I wouldn't know.**
15      Q.   So you don't know?  So you wouldn't prefer
16  working in TSS?
17      **A.   No.**
18      Q.   Is TSS safer than being on the street?
19  I mean you mentioned before that being on the street
20  is dangerous.  You're knocking on doors, you don't know
21  what is behind the door.  Would you agree that TSS is a
22  more controlled environment?
23      **A.   It's a more controlled environment, but**
24  **you're still dealing with inmates.  So, the danger that**

---

46

1   **you might face going to the house and speaking to one**
2   **inmate and maybe have other family members there**
3   **present, as opposed to the danger of having 30, 40**
4   **inmates in your section, with maybe five investigators,**
5   it's a (indicating).
6       Q.   Where do you think the risk of somebody
7   having a weapon is higher, on the street or in TSS?
8       **A.   It would be higher on the street.  But**
9   **weapons inside that jail is not a strange occurrence**
10  **either.**
11      Q.   Were you ever attacked in TSS?
12      **A.   Yes.**
13      Q.   I'm sorry, did you say, "yes"?
14      **A.   Yes.**
15      Q.   When did that occur?
16      **A.   That has occurred on more than one**
17  **occasion.**
18      Q.   Approximately how many?
19      **A.   Maybe three.  I can recall three occasions.**
20      Q.   Did you suffer an injury in any of those
21  attacks?
22      **A.   Just -- not any major injury, no.**
23      Q.   You didn't go to the hospital or anything
24  like that?

---

47

1       **A.   No.**
2       Q.   Did you miss any work as a result of those
3   attacks?
4       **A.   I believe on maybe a couple I might have**
5   **called in the next day because of some, you know, maybe**
6   **some slight pain.**
7       Q.   What about patrol?  Have you ever been
8   injured on patrol?
9       **A.   No.  Not that I recall, no.**
10      Q.   You, again, I get the sense from your
11  testimony that you consider TSS a bad assignment.
12      **A.   I don't consider it a bad assignment.**
13  **It's -- it's -- well, yeah.  Yeah, it is a bad**
14  **assignment.**
15      Q.   And why?
16      **A.   No. 1, a safety issue.  The -- the area**
17  **itself, the amount of work that is asked of you is above**
18  **and beyond.  The conditions of the area.**
19      Q.   Anything else?
20      **A.   No, that's about it.**
21      Q.   Would you agree that you have more freedom
22  when you are on patrol?
23      **A.   Not necessarily.  Because there weren't**
24  **supervisors in the TSS area.**

---

48

1       Q.   Well, I guess what I'm getting at, I've
2   heard of, you know, investigators, when they are on
3   patrol, you can run home quick, if you need to, you can
4   run a quick errand?
5       **A.   No, you can't do that.**
6       Q.   That doesn't happen?
7       **A.   You can't do that, no.**
8       Q.   So, it's your testimony that when guys are
9   on patrol, they are never running errands or nothing
10  like that?
11      **A.   I have no idea if they are, but they're --**
12  **you know, that's not -- you know, you're on shift,**
13  **you know, so running to Wal-Mart to pick up some**
14  **personal items is not allowed.**
15      Q.   You've never done that?
16      **A.   Of course not.**
17      Q.   What about lunch breaks?  Do you get lunch
18  breaks when you are in TSS?  Lunch, dinner or what have
19  you?
20      **A.   We were assigned a lunchtime, but it was**
21  **modified.**
22      Q.   What do you mean by that?
23      **A.   We were assigned a lunchtime on the roster,**
24  **at the beginning of the shift.  But the way that it**

---

Transcript of Victor Slaughter
Conducted on August 12, 2020

**49**

1 worked, it was better for us, in order to get work done
2 that needed to be done, to grab a bite before going to
3 TSS. Because when our lunches were assigned, let's say
4 between 6:00 and 8:00 was the usual times, that was the
5 bulk of the work down there. So, had we taken lunches
6 at those times, we would have fallen further behind than
7 we normally do on any given day.
8      Q.   Okay. Was that, you know, kind of a
9 written policy or anything like that or was that just
10 operationally what you guys figured out what you needed
11 to do to get the work done?
12      A.   Yeah, it's operational because of the way
13 things were set up. Because in TSS we also depend on a
14 couple of departments and units inside the jail in order
15 for us to do our job. So, it kind of just worked that
16 way. We -- we kind of had no other choice. And, you
17 know, we ran it by our supervisors, and they agreed.
18      Q.   Okay. I'm going to shift gears a little
19 bit here.
20           MR. WHITE: Does anybody need, you
21 know, a five-minute break or anything like that?
22 BY MR. WHITE:
23      Q.   Mr. Slaughter, are you good to go?
24      A.   I'm good so far.

**50**

1      Q.   Just let me know. It is not meant to be an
2 endurance test. Just let me know. Alright?
3           So, we are still going to look at Exhibit
4 2. If we could go to the bottom of Page 3, please.
5           Alright. Sir, this is interrogatory No. 4,
6 which I'm not going to have you read the whole thing,
7 but we asked you to identify non-minority officers who
8 were rarely, if ever, assigned to the position,
9 basically assigned to TSS. Okay?
10      A.   Uh-huh.
11      Q.   And you identified for us several people
12 that I'm just going to go through.
13           The first is do you contend that
14 Investigator Nickle was rarely assigned to TSS?
15      A.   Yes.
16      Q.   What is Investigator Nickle's race?
17      A.   He's white.
18      Q.   Okay. Investigator Bieniek (phonetic)?
19      A.   Bieniek.
20      Q.   Bieniek was rarely assigned to TSS?
21      A.   Yes.
22      Q.   And what is that person's race?
23      A.   He's white also.
24      Q.   Okay. Shedor, rarely assigned to TSS?

**51**

1      A.   Yes.
2      Q.   White?
3      A.   Yes.
4      Q.   Okay. Turning to the next page, please.
5 Top of Page 4. Bosques, rarely assigned to TSS?
6      A.   Yes.
7      Q.   Race?
8      A.   White.
9      Q.   Pemonte, rarely assigned to TSS?
10      A.   Yes.
11      Q.   Race?
12      A.   White.
13      Q.   Messinas, rarely assigned to TSS?
14      A.   Yes.
15      Q.   Race?
16      A.   White.
17      Q.   Folkers, rarely assigned to TSS?
18      A.   Yes.
19      Q.   Race?
20      A.   White.
21      Q.   Vasques, rarely assigned to TSS?
22      A.   Yes.
23      Q.   Race?
24      A.   Latino.

**52**

1      Q.   Okay. So, is it your contention that
2 Latino is non-minority?
3      A.   My contention?
4      Q.   Well, we asked you for the non-minority
5 officers.
6      A.   Oh, alright.
7      Q.   And you listed one or more Latino officers?
8      A.   Yes.
9      Q.   Would you agree that Latinos are a
10 minority?
11      A.   Not on the scale of African-Americans.
12 That's what I was looking at.
13      Q.   What is the scale of minority?
14      A.   I don't know if that -- well, maybe I
15 shouldn't use the word "scale." Going by my personal
16 life, the only minority in this world that I see is
17 African-American people. And that's based on my -- on
18 my life experience.
19      Q.   So based on your life experience Latinos
20 are not a minority?
21      A.   Based on my life experience, as compared to
22 African-Americans.
23      Q.   And maybe I can short-circuit this here.
24 Lopez, Rico and Hurtado were all rarely assigned to TSS;

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

53

1   is that accurate?
2       A.  Yes.
3       Q.  They are all Latino?
4       A.  Yes.
5       Q.  And all of these people, I was just going
6   to count, one, two, three -- so you've identified 11
7   names.  Did they all work the 3:00 to 11:00 shift?
8       A.  Yes.
9       Q.  And how do you know that?
10      A.  How do I know they worked the 3:00 to 11:00
11  shift?
12      Q.  Correct.
13      A.  Because I worked the 3:00 to 11:00 shift
14  with them.
15      Q.  Were they there every day you worked?
16      A.  Unless they were off on their regular off
17  days, or days that they put in.
18      Q.  Okay.  But as far as --
19      A.  They were assigned to the 3:00 to 11:00
20  shift, as I believe.
21      Q.  So, in the past five years, as far as you
22  know, all of these people were on the 3:00 to 11:00
23  shift?
24      A.  Yes.

---

54

1       Q.  And I guess we probably need to go through
2   each of them.
3           How often was Investigator Nickle assigned
4   to TSS say in the past five years?
5       A.  My recollection, maybe ten or less.
6       Q.  Over the past five years?
7       A.  Yeah.
8       Q.  Okay.  What about Investigator Bieniek?
9       A.  I would say the same.  Ten or less.
10      Q.  Investigator Shedor?
11      A.  Maybe 10 to 15.
12      Q.  Investigator Bosques?
13      A.  Never.
14      Q.  As far as you know, investigator Bosques
15  has never worked in TSS?
16      A.  As far as I know, he has never worked in
17  TSS.
18      Q.  Investigator Pemonte?
19      A.  Maybe five.
20      Q.  Investigator Messinas?
21      A.  Maybe five again.
22      Q.  Investigator Folkers?
23      A.  I would say maybe five also.
24      Q.  Investigator Vasques?

---

55

1       A.  Vasques maybe -- he stayed in trouble a
2   lot.  Vasques probably was down there -- over the span
3   of five years?  I want to say maybe -- maybe 30 plus.
4       Q.  Investigator Lopez?
5       A.  Ten or less.
6       Q.  Investigator Rico?
7       A.  Maybe five.
8       Q.  And finally, Investigator Hurtado?  How
9   often do you think he or she was assigned to TSS in the
10  last five years?
11      A.  Maybe -- maybe about 20.
12      Q.  Sir, of those 10 or 11 people, would you
13  agree that you are better at the TSS job than every
14  single one of them?
15      A.  Yeah, I could be.
16      Q.  Would you agree that -- do you know
17  Investigator David Walker?
18      A.  Yes.
19      Q.  Would you agree that he's good at TSS?
20      A.  David Walker worked at TSS when it was in
21  Division Six and things have changed dramatically with
22  the way the TSS runs.  So, I would say that he's good
23  at it, yeah.
24      Q.  I mean --

---

56

1       A.  He --
2       Q.  I'm sorry.
3       A.  He might not know as far as the new system
4   and the other new things that were incorporated over the
5   last few years.
6       Q.  And I guess whether in Division Six or in
7   Division Five, would you agree that he is better at the
8   job than any one of these 10 or 11 people that we've
9   talked about?
10      A.  I can't say.  Because, again -- no, I can't
11  say.  Because 20 times -- I can't say.  So, I don't know
12  how he is with the new procedures.
13      Q.  What about Investigator Ferguson?  Have you
14  worked with him at TSS?
15      A.  Yes.
16      Q.  Would you agree that he is good at the TSS
17  job?
18      A.  Yes.
19      Q.  He has been there a long time?  He kind
20  of knows it in and out?
21      A.  Yes.
22      Q.  And you would agree that he can perform
23  that job better than any of these other 10 or 11 people
24  that we've identified?

---

57

1    A.  Again, it's -- it's -- it's hard to say.
2  Knowledgeable?  Because there is also different facets
3  of TSS that take place.  You know, TSS being an
4  assignment, there is also like mini assignments that
5  occur at TSS, not many, M-A-N-Y, but M-I-N-I,
6  assignments that take place at TSS.
7        So, you can have someone who does one
8  particular thing in TSS every day, but isn't as
9  knowledgeable on another aspect of TSS, because they
10  don't do that that often.
11    Q.  Uh-huh.  So, which of these 10 or 11 people
12  that we've identified in response to interrogatory No. 4
13  was better at TSS overall than Investigator Ferguson?
14    A.  I can't say that.
15    Q.  But you also can't say that he was better
16  in TSS than any of these people?
17    A.  He's worked down there more than they have.
18  Whether or not he's better at it?  I don't know.
19  Because I've never had the opportunity to sit and
20  critique any of them working when we are down there.
21    Q.  When you guys are down in TSS are you
22  working as a team?
23    A.  Yeah, we're working as a team, but doing
24  different things as the day goes along.

58

1    Q.  There is different -- I guess there is
2  different roles on the team, right?
3    A.  Different rules?
4    Q.  Roles?  Sorry.  R-O-L-E-S?
5    A.  Roles, yes.
6    Q.  Did you have any problems with Investigator
7  Ferguson's performance on the team?
8    A.  Did I have any problems with it?
9    Q.  Correct.
10    A.  No.
11    Q.  Would any of these other 10 or 11 folks
12  that were working down in TSS, did you have any problems
13  with their performance as a member of the team?
14    A.  Not a problem with their performance.
15  Simply they can only perform as best to their ability
16  from that, from hardly ever being down there.  So,
17  you know, I don't have a problem with it.  It's
18  understood.
19    Q.  So they just have less experience
20  basically?
21    A.  Yes.
22    Q.  Do you know Investigator Samuel Page?
23    A.  Yes.
24    Q.  Do you agree that Page was very good in

59

1  TSS?
2    A.  Investigator Page didn't work TSS that
3  often.  But when he did come down he was -- he worked,
4  you know, he would do as we asked.  As we would have
5  to do with some of these others, we would simply have
6  to ask them to do some things or tell them what to do
7  or how to do it.
8    Q.  Did he do a good job, though, when he was
9  down there?
10    A.  Yeah.
11    Q.  How often do you think he was down there,
12  let's say, in the past five years?
13    A.  I don't know.  Maybe -- from my
14  recollection, ten or more.
15    Q.  Do you think that Investigator Walker was
16  being punished when he worked in TSS?
17    A.  Investigator Walker would state instances
18  where he believed he was being punished by being
19  assigned there.
20    Q.  What would he say?
21    A.  I mean I don't know exactly what would be
22  said, but that was his belief.  We didn't, you know,
23  we didn't talk about, you know, the exactness of why
24  he was down there when he was.  But he would mention

60

1  that he believed it was punishment for something prior
2  or the day before that had taken place.
3    Q.  I guess that's what I'm getting at.  You
4  said you understand that that was his belief.  On what
5  are you basing that understanding?
6    A.  Just him stating that that was his belief.
7    Q.  How often in the past five years do you
8  think Mr. -- sorry, Investigator Walker was assigned
9  to TSS?
10    A.  Maybe 20 or so.
11    Q.  On each of those 20 occasions did he
12  express this belief that he thought it was punishment?
13    A.  On each occasion, not to me.  Not each
14  occasion, no.
15    Q.  What about Investigator Ferguson, do you
16  believe that he was being punished by his assignment
17  to TSS?
18    A.  I'm not aware of whether Investigator
19  Ferguson thought he was being punished.
20    Q.  What about Investigator Page?  Do you
21  believe he was being punished by his assignment to TSS?
22    A.  I do.
23    Q.  And what do you base that belief on?
24    A.  Investigator Page was assigned almost every

Transcript of Victor Slaughter
Conducted on August 12, 2020

61

1 day in the office. Almost every day in the office, so.
2     Q. Is the office within TSS?
3     A. No.
4     Q. Alright. Let's look at -- I think it's
5 already up there. Yes, it's No. 5, where we asked you
6 to identify all duties or assignments that you allege
7 were discriminatory. And you responded, "Since
8 Plaintiff joined the Electronic Monitoring Unit in 2005,
9 it always was the policy of the unit to train all new
10 investigators on every aspect of EMU work." And I'm
11 wondering, sir, is that policy written down?
12 Is that policy written down?
13     A. I don't know if it was a written policy,
14 but it was a policy that was told to us every -- since
15 my joining, that everyone that comes in needs to know
16 and needs to learn every aspect of EMU work.
17     Q. Did you say the policy was told to you more
18 than once?
19     A. Yeah. Well, going back to '05, yeah.
20     Q. Who told you about this policy in '05?
21     A. Well, I wasn't told about a written policy.
22 I was told it was the policy of the unit to make sure
23 that every investigator is fully trained on every aspect
24 of work that was done in the EM. And this was told

62

1 by -- by the chiefs at that time, once I joined the
2 unit.
3     Q. So, you were told by the chief at the time
4 when you joined the unit that it was the policy to train
5 all new investigators on every aspect of EMU work; is
6 that fair?
7     A. Yes.
8     Q. In the past five years has anyone told you
9 that that's the policy?
10     A. Yes.
11     Q. Okay. Who has told you that in the past
12 five years?
13     A. Chief Neal. Excuse me. Chief Ranzino.
14 Lieutenant Smith. Lieutenant Collins. It's been
15 said -- it's been said by just about every chief.
16     Q. When did Chief Neal tell you that this was
17 the policy?
18     A. I can't say exactly when.
19     Q. Where did the conversation take place?
20     A. It took place -- it took place at Rockwell.
21 I don't know exactly where. I'm sorry, Rockwell would
22 be the facility that we work out of.
23     Q. That's where Division Five is based,
24 correct?

63

1     A. No.
2     Q. No?
3     A. Division Five is inside the jail itself.
4 We work out of a different facility, which is actually
5 the -- it is actually the Sheriff's Department
6 warehouse.
7     Q. And Rockwell is one of the intersections
8 there?
9     A. Rockwell is the street, yes, that's on.
10     Q. But you don't remember when Chief Neal told
11 you about this policy?
12     A. I don't recall when, no.
13     Q. What about Ranzino? When did he tell you
14 that this was the policy?
15     A. I don't recall. And if I can -- in most
16 cases it was said either at roll call or at times when
17 myself would complain or ask, you know, "When am I going
18 to see some relief in the basement?" And it was told
19 to me, you know, "Don't worry, we're going to start
20 rotating, so that everyone can learn. We are going to
21 start rotating in the office, also, so that everyone
22 can learn," you know. So I can't --
23     Q. Is this --
24     A. Go ahead.

64

1     Q. Was this at the same time that they were
2 telling you that it was a punishment?
3     A. No, this was -- that they were telling me
4 it was a punishment? No, this was afterwards. This
5 was after being down there for a few years.
6     Q. Okay. So back in 2014, Neal and Ranzino
7 told you that TSS was a punishment. And then after that
8 they said, "Don't worry, we are going to rotate new
9 people through there, so that everybody learns the job"?
10     A. Yeah, but it never happened. It never
11 happened with me anyway.
12     Q. Is it your contention or your belief that
13 there are new EMU investigators that have never been
14 assigned to TSS?
15     A. Yes.
16     Q. Who?
17     A. I don't -- I don't know all of the names
18 of the new investigators. But, yeah, there are some
19 that have never worked in TSS.
20     Q. Alright. A lot?
21     A. There is -- there is quite a few.
22     Q. Do you know why they have never been
23 assigned to TSS?
24     A. I do not.

Transcript of Victor Slaughter
Conducted on August 12, 2020

65

1    Q.  Let's look down at the bottom of Page 4 and
2 then we are going to go on to Page 5.
3        Interrogatory No. 6 asked you to, in
4 summary, identify all of the discipline that you
5 received that you allege was discriminatory.  Okay?
6 And then we are going to go on to Page 5, where we can
7 see your response.
8        Let's see if we can get the whole thing on
9 your screen here.  I am going to give you a second to
10 read this through and then you let me know when you are
11 ready to talk about it.
12    A.  (Reviewing.)  Okay.
13    Q.  Okay.
14        MR. WHITE:  And I'm just realizing as
15 I'm looking at my section here, this section is going to
16 be a little while, so do we want to take like a
17 five-minute break before we dive in?  Does that make
18 sense to everybody?
19        MS. FLEMING:  Sure.
20        THE WITNESS:  Okay.
21        (Off the record.)
22 BY MR. WHITE:
23    Q.  Okay, Mr. Slaughter, we took a short break
24 there.  Thank you for accommodating me.

66

1        Is there anything that you want to change
2 or alter about your testimony so far?
3    A.  No.
4    Q.  Alright.  And we were talking about, sorry,
5 if you could pull up Exhibit No. 2 again.
6        So, in your sworn interrogatories we asked
7 you to identify the discipline that you received that
8 you allege was discriminatory.  Here you've identified
9 for us two incidents, correct?
10    A.  Uh-huh.
11    Q.  And you believe these two incidents were
12 motivated by your race; is that correct?
13    A.  Yes.
14    Q.  Okay.  And the first is a March 26th, 2015
15 incident -- well, I guess they both occurred on the same
16 day, right?
17    A.  Correct.
18    Q.  And they were both from Chief Ranzino?
19    A.  Correct.
20    Q.  And the first was for an incident that was
21 "inattention to duty," correct?
22    A.  Correct.
23    Q.  Okay.
24        MR. WHITE:  Let's pull up, Merinda,

67

1 please, what has been marked as Exhibit 3.
2        (SLAUGHTER Deposition Exhibit 3 marked
3 for identification.)
4 BY MR. WHITE:
5    Q.  Sir, this is what has been marked as
6 Exhibit 3.  It is a document entitled, "Cook County
7 Department of Corrections Disciplinary Action Form."
8 This was produced by your lawyer in this case.  It is
9 Bates stamped WINSTON CCSO011240.  Well, it is a
10 two-page document.  The second page is actually 11239,
11 but we tried to put them in chronological order here.
12        Looking at the first page here, sir, have
13 you seen this document before?
14    A.  Yes.
15    Q.  And is this the write-up that you referred
16 to in your interrogatory response?
17    A.  Yes.
18    Q.  And it looks like on March 15th -- sorry,
19 March 26th, 2015 Chief Ranzino wrote you up because he
20 believed you should have relieved Investigator Schife
21 (phonetic) sooner than you did I guess?
22    A.  Yes.
23    Q.  And if we could look at the second page.
24 Obviously, you didn't agree with his assessment, right?

68

1    A.  No.
2    Q.  And if we look at the second page, which is
3 marked 11239.  Was this the step one grievance that you
4 submitted regarding that discipline?
5    A.  Yes.
6    Q.  And we don't really need to get into the
7 content here, but you would agree that your grievance
8 was -- was it sustained?
9    A.  No.  According to the response, no.
10    Q.  It looks like your step one grievance was
11 heard by Investigator Webb; is that correct?
12    A.  Yeah, if that's what that says.  Yeah,
13 it looks like Webb.
14    Q.  Okay.  Alright.  And I realize it is a
15 little difficult to read there, but I believe that it
16 says, "RC."  Do you know what does "RC" stand for?
17    A.  It should be "reporting chief."
18    Q.  Okay.  Do you see where I'm looking down at
19 it and --
20    A.  Uh-huh.
21    Q.  -- it says, "step one"?  Okay.
22        And it says, "RC met with the grievant on
23 5/31/15.  Employee was offered a union rep and wished
24 to proceed without one.  Based on the information

69

1 presented, discipline will be reduced to a verbal
2 counseling by mutual agreement."
3      Is that your recollection, that this was
4 reduced to a verbal counseling by mutual agreement?
5      **A.  Yes.**
6      Q.  Okay.  If we could turn back to the first
7 page of this.  We see a handwritten note there under the
8 typed area that says, "Reduced to counseling by Chief
9 Webb 5/31/15"; is that correct?
10     **A.  Correct.**
11     Q.  And is this ultimately what you received as
12 a result of this incident; verbal counseling?
13     **A.  Yes.**
14     Q.  Alright.  And you would agree that Chief
15 Webb was not the management level staff that imposes
16 discipline, correct?
17     **A.  Correct.**
18     Q.  Is it your belief that Director Shields was
19 the one who implemented or attempted to implement this
20 discipline that we see on Page 1?
21     **A.  Is it my belief that he, Director Shields,**
22 **implemented it?**
23     Q.  Yes.  Or was it Ranzino?
24     **A.  No, it was Ranzino.**

70

1      Q.  Okay.  And then the second incident you
2 referred to that also occurred, the second incident you
3 alleged was motivated by your race also occurred on
4 March 26, 2015, correct?
5      **A.  Oh, yes.  Yes, yes.**
6      Q.  This was the one that had to do with the
7 shave card?
8      **A.  Correct.**
9      MR. WHITE:  Merinda, if we could pull
10 up Exhibit 4, please.
11     (SLAUGHTER Deposition Exhibit 4 marked
12 for identification.)
13 BY MR. WHITE:
14     Q.  Sir, this is, again, a document that's
15 marked as a Disciplinary Action Form.  Bates stamp is
16 11242 and 11241.
17     Have you seen this document before?
18     **A.  Yes.**
19     Q.  And is this the same discipline that you
20 referred to in your interrogatory, where Chief Ranzino
21 thought you were being disrespectful to a superior based
22 on his questions about a shave card?
23     **A.  Yes.**
24     Q.  Okay.  And Chief Ranzino recommended a

71

1 written reprimand as a result of this incident, correct?
2      **A.  Correct.**
3      Q.  If we could turn to the next page, please.
4 This is your step one grievance that you submitted in
5 response to that incident?
6      **A.  Yes.**
7      Q.  And, again, was this heard by Director
8 Webb?  That step one?
9      **A.  Yeah, it looks like Webb.**
10     Q.  Okay.  And you agree that as a result of
11 your grievance, there was no discipline imposed, as
12 a result of this incident, correct?
13     **A.  Correct.**
14     Q.  And if we look back at the first page,
15 there is a handwritten note after the typed area that
16 says, "Dismissed by Chief Webb 5/31/15," correct?
17     **A.  Correct.**
18     Q.  So, in this instance your grievance was
19 sustained, correct?
20     **A.  Correct.**
21     Q.  You received no discipline as a result of
22 this incident?
23     **A.  Correct.**
24     Q.  I'm sorry, I should have asked you this

72

1 when we were looking at the first incident.  So this is
2 the inattention to duty incident.
3      MR. WHITE:  Merinda, if we could pull
4 back up Exhibit 2, the interrogatory.
5      Sorry, I am getting close to the screen
6 here.
7 BY MR. WHITE:
8      Q.  Where you are talking about that incident,
9 you wrote that, about halfway through that first
10 paragraph you wrote, "Plaintiff was told to relieve
11 the other investigator sometime after roll call.  He
12 said at that time there were two white investigators
13 in the roll call area talking to each other and Chief
14 Ranzino walked directly past them when he approached
15 Plaintiff.  These two Caucasian investigators were not
16 instructed to remove themselves like Plaintiff."
17 (Reading.)
18     Is that the basis for which you are
19 claiming this discipline was racially motivated?
20     **A.  Yes.**
21     Q.  Okay.  So you were instructed to go to,
22 quote/unquote, remove yourself and they were not?
23     **A.  Right.  Remove myself from the roll call**
24 **area.**

Transcript of Victor Slaughter
Conducted on August 12, 2020

73

1    Q.   Was roll call over at that point?
2    **A.   Yes, it was.**
3    Q.   Who were the two Caucasian officers that
4    were in the roll call area talking to each other?
5    **A.   I cannot recall.**
6    Q.   What were their assignments on that day?
7    **A.   I don't know.**
8    Q.   What were they talking about when they were
9    standing there?
10   **A.   I do not know because I was talking to**
11   **someone else.**
12   Q.   Who were you talking to?
13   **A.   A monitoring technician.**
14   Q.   What is that person's name?
15   **A.   Linda.**
16   Q.   Okay.  Was Linda asked to remove herself?
17   **A.   No, she was not.**
18   Q.   Is Linda Caucasian?
19   **A.   Linda is Latino.  No, you know what?  I**
20   **don't know.**
21   Q.   Fair enough.  As far as you know she is not
22   African-American?
23   **A.   She is not African-American.**
24   Q.   Sorry.  I'm just reading the interrogatory

74

1    here.  Just give me a second.
2        In response to the second incident down in
3    the shave card area, you wrote Chief Ranzino had issues
4    with African-American investigators who questioned him.
5    Ranzino felt that the African-American investigators
6    should, as he stated once before, 'Just shut up and
7    follow orders.'"  Is that a direct quote from Chief
8    Ranzino?
9    **A.   Yes, it is.**
10   Q.   When did he say that?
11   **A.   This took place probably the same year,**
12   **earlier.**
13   Q.   So sometime in 2015 he said, quote, "Just
14   shut up and follow orders"?
15   **A.   Yeah.**
16   Q.   The Cook County Sheriff's Office, I guess
17   more specifically the EM unit, it's a paramilitary
18   organization, correct?
19   **A.   Correct.**
20   Q.   There is a chain of command?
21   **A.   Correct.**
22   Q.   And at the end of the day you have to
23   follow the orders of your superiors or risk discipline
24   or the consequences I should say?

75

1    **A.   Well, one of the general orders of the**
2    **Sheriff's Department says you have to follow your**
3    **orders unless they are immoral or illegal.**
4    Q.   Okay.  Do you believe that Chief Ranzino,
5    the two incidents we are talking about here, do you
6    believe that he was asking you to do something that
7    was immoral or illegal?
8    **A.   In a sense, I want to say illegal, with**
9    **the shave card.  He had seen the card that was signed by**
10   **Chief Webb, but yet he still wrote me up.  And that's --**
11   **that's why Chief Webb dismissed it, because I showed**
12   **him the card that he signed, so therefore, you know,**
13   **that write-up should have never taken place.  So, that**
14   **was illegal, to write me up, knowing that you had**
15   **already seen evidence of what it was that you were**
16   **asking for.**
17   Q.   Do you think there is a difference between
18   not following a rule and illegal?
19       Do you think him writing you up for a shave
20   card, I mean could he go to jail for that?
21   **A.   Could he go to jail for that?**
22   Q.   Yes.  Was it illegal?  Was it a criminal
23   violation?
24   **A.   It was illegal as far as EM rules and**

76

1    **regulations go.  It wasn't an illegal state statute that**
2    **he can go to jail for, but it was illegal, as far as**
3    **their rules and regulations are.**
4    Q.   It was a violation of the EM rules and
5    regulations?
6    **A.   Uh-huh.**
7    Q.   Is that a yes?
8    **A.   Yes.**
9    Q.   And that's your understanding that's why
10   Chief Webb dismissed it?
11   **A.   That's my understanding.**
12   Q.   Alright.  Do we still have it up here?
13   Okay.  The last sentence of your response to
14   interrogatory No. 6 you wrote, "Disciplinary actions
15   such as these stay in Plaintiff's work file and prevent
16   him from advancing or being placed in other units."
17       Do you believe having a finding of no
18   discipline for the shave card prevents you from
19   advancing?
20   **A.   It's not the finding that will prevent you**
21   **from advancing, it's the fact that the write-up exists**
22   **period.**
23   Q.   So the fact that your grievance was
24   sustained and the discipline was dismissed has no

Transcript of Victor Slaughter
Conducted on August 12, 2020

77

1  bearing?
2      A.  My understanding, with other officers
3  who have attempted to advance or move to other units,
4  it is frowned upon if you have been written up, not
5  necessarily what the outcome of what that write-up
6  has been, just the fact that you've been written up.
7  It's sort of looked at the same as you go to apply for
8  a job, nobody asks you what happened in court, it's
9  just the fact that you've been arrested 30 times.
10  Nobody breaks those arrests down and says, "Hey what
11  happened?" And you say, "Well, I was found not guilty
12  in every last one of them." That's not what they look
13  at. They look at the fact that you've been arrested
14  30 times. And that's the same the way it's done here.
15      Q.  What do you base that on?
16      A.  I base that on other officers stating
17  that that was the reason they were told they were not
18  promoted. I base that on in the past supervisors
19  expressing to me, "If you want to move up, you need to
20  stop getting written up" or "you need to not get written
21  up." I've been told in the past by a supervisor in the
22  jail to -- after me being there for a number of years,
23  and I didn't realize, to check your file. And you have
24  the ability to have things that are after a certain

78

1  amount of time removed from your file. Because
2  everything stays in your file for a minimum of three
3  years. And if you want to try to move up, they are
4  going to look at that file and they're going to see any
5  write-ups, if you have them in there, or any negative
6  paperwork in your file, and that will determine whether
7  or not you are allowed to advance.
8      Q.  Have you attempted to get the shave card
9  incident removed from your file, which was five years
10  ago?
11      A.  No. Because my understanding from speaking
12  to someone in HR, once the shave card policy had
13  changed, within the Sheriff's Department, that any
14  previous infractions were going to automatically be
15  removed.
16      Q.  Sir, have you attempted to get any
17  discipline in your file, going back 15 years, have you
18  tried to get any of it removed?
19      A.  Yes.
20      Q.  Okay. How did you go about doing that?
21      A.  You would have to go and speak to either
22  the chief or the superintendent of your particular unit,
23  and then they would, I guess set up -- not necessarily
24  that meeting, but set up a meeting with you with the

79

1  Human Resources Department. Because it's my
2  understanding that they've got files that are in your
3  particular unit or division and then there are files
4  in the human resources office, also.
5      Q.  And when did you set up that meeting?
6      A.  I set up that meeting before in the past.
7  I have not set up that meeting in EM as of late. Simply
8  because when attempting to talk to one of the chiefs
9  about removing something that shouldn't have been in
10  my file, he stated to me that he wasn't aware of the
11  procedure. He later asked another chief about a book
12  where certain things were kept and he said he didn't
13  know where it was.
14      Q.  Let's use names here. What chief are you
15  talking about?
16      A.  I asked Chief Ranzino -- I believe it was
17  at roll call one day, and I asked Chief Ranzino about
18  a sheet that we filled out. He said the sheet was kept.
19  They have it and that Chief Rohloff was in control of
20  that.
21          Chief Rohloff came into the roll call room,
22  just out of the blue, while we were in the middle of
23  roll call, and I asked him, I said, "Well, since he's
24  walking past, Chief, do you mind?" And I asked him

80

1  if he knew about it, and Chief Rohloff said, "I don't
2  have any idea where that is." And he said that in roll
3  call.
4      Q.  And what is the sheet?
5      A.  It was a sheet where we have personal
6  information. And what happened is we found a book in
7  TSS amongst some very old paperwork kept in the cabinet
8  and it had personal information from investigators in
9  it.
10      Q.  Like what? Addresses? What kind of
11  personal information?
12      A.  Yeah, it had addresses. It's a personal
13  sheet for filling out who to call in case you have an
14  accident, addresses, phone numbers. It's a personal
15  information sheet.
16      Q.  Well, let me circle back. Because what we
17  were talking about --
18      A.  Uh-huh.
19      Q.  -- you said that you had gone through this
20  process to remove old discipline from your file. Do you
21  remember saying that?
22      A.  Uh-huh.
23      Q.  Is that a "yes"?
24      A.  Yes. I'm sorry.

Transcript of Victor Slaughter
Conducted on August 12, 2020

81

1    Q.  Had you gone through that process in EM?
2    A.  This was the attempt.  The -- the sheet
3  that I'm speaking of --
4    Q.  Uh-huh.
5    A.  -- was the initial conversation to having
6  something removed from my file.  And these are the
7  answers that I got, that nobody knows where this stuff
8  is.
9        It started with the sheet, with that
10  personal information sheet, and lead up to, "Well, if
11  you don't know where that is, what about if I file for
12  other paperwork, grievances?"  "We would have to look
13  into that," was the answer.
14    Q.  Okay.  How did you follow up on that?  Who
15  did you follow up with?
16    A.  I believe I followed up with Webb.
17    Q.  When did you follow up with Webb?
18    A.  I can't recall.  Maybe a couple of days
19  after that incident.
20    Q.  Did you ever follow up with HR about this?
21    A.  No.
22    Q.  Did you ever submit anything in writing to
23  anybody in the world about removing discipline from your
24  file?

82

1    A.  In writing?
2    Q.  Yes.
3    A.  No, not in writing.
4    Q.  What advancements have you -- have you
5  attempted?  What advancements have you applied for?
6    A.  I have not.
7    Q.  And then you also said the discipline
8  prevents you from being placed in other units.  What
9  other units have you attempted to join?
10    A.  I have not.
11    Q.  Alright.  Let's go to Page 6, which is
12  interrogatory No. 8, please.  It is in the middle of the
13  page there, sir.  Interrogatory No. 8, we asked you to
14  identify each and everyone complaint or grievance you
15  made regarding the discipline alleged in paragraph 76
16  of the complaint.   And you responded that the
17  grievances pertaining to the incidents discussed, in
18  response to interrogatory No. 6, so this is the
19  disrespect and inattention to duty and shave card,
20  you said that they were denied at hearing.  That's
21  not true?  We know that now, correct?
22    A.  We know that one.
23    Q.  Right.  The shave card was sustained at
24  hearing, correct?

83

1    A.  I'm sorry, yes.
2    Q.  Okay.  And the other one, the inattention
3  to duty, was reduced per your agreement, correct?
4    A.  Yes.
5    Q.  Let's turn to Page 7, which is
6  interrogatory No. 11, please.  If we could scroll down
7  a little there, please.  Okay.
8        So, in this interrogatory we asked you to
9  identify each and every instance in which any of the
10  Defendants used offensive, derogatory or racist language
11  towards you.  Okay?  And we see part of your response,
12  it starts at the bottom on Page 7, you wrote, "Plaintiff
13  states in and around April 2015, Chief J. Ranzino," and
14  then if we can go on to the next page, please, "mistook
15  two African-American investigators for each other and
16  said words to the effect of, 'Oh, well, all you guys,'
17  wait, 'Oh, well, all you guys look alike.'  That was the
18  second time Chief Ranzino made a comment like that."
19  (Reading.)
20        Where did that comment take place?
21    A.  Roll call.
22    Q.  Okay.  Was this the roll call for the 3:00
23  to 11:00 shift?
24    A.  Yes.

84

1    Q.  And you found that statement, "Oh, well,
2  all you guys look alike," or something to that effect,
3  you found that to be racist?
4    A.  Yes.
5    Q.  And you actually gave a statement to HR
6  about that incident, correct?
7    A.  Yes.
8    Q.  Did you give a statement to OPR as well?
9    A.  No.
10    Q.  You never heard Ranzino use the N word,
11  correct?
12    A.  No.
13    Q.  You never heard Shields use the N word?
14    A.  No.
15    Q.  You never heard Rohloff use the N word?
16    A.  No.
17    Q.  You never heard Neal use the N word?
18    A.  No.
19    Q.  Looking back at your interrogatory
20  response, it moves on to an incident with Chief Rohloff
21  regarding a sniper shooting, six officers in Dallas,
22  Texas.  You wrote, "Chief Rohloff asked if the sniper
23  was part of that Black Lives Matter shit."
24        Do you recall Chief Rohloff using those

Transcript of Victor Slaughter
Conducted on August 12, 2020

85

1 words?
2    A. Yes.
3    Q. When did that happen?
4    A. I'm not sure, but I believe I was able
5 to come up with a date, but when answering these, I'm
6 not sure.
7    Q. You know what? You did. I'm sorry, sir.
8 You wrote April 4th, 2017. That's my mistake.
9         (Off the record.)
10 BY MR. WHITE:
11    Q. And where did that statement happen?
12    A. Roll call.
13    Q. It looks like it was in connection with a
14 verbal altercation with Investigator Martin; is that
15 correct?
16    A. No, that was a separate incident.
17    Q. A separate incident? So this says, "On
18 or about April 4th, 2017, Chief Rohloff had a verbal
19 altercation with Investigator Martin, who is
20 African-American, told him to leave the roll call area.
21 When Investigator Martin left the roll call area,
22 Chief Rohloff told the other"-- you are right, that's
23 my fault, sir. I've got too much handwriting on my
24 page here.

86

1         So, this statement about Black Lives
2 Matter, was that during roll call?
3    A. Yes.
4    Q. Was that a roll call for the 3:00 to 11:00
5 shift?
6    A. Yes.
7    Q. And did you believe that the statement
8 asking if that sniper was, "part of that Black Lives
9 Matter shit," did you believe that to be racist?
10    A. Yes, I did.
11    Q. Did you file a complaint with HR?
12    A. No, I did not.
13    Q. Did you file a complaint with OPR?
14    A. No, I did not.
15    Q. Did you report that statement to anyone in
16 management?
17    A. No, I did not.
18    Q. Did you report it to Director Shields?
19    A. No, I didn't.
20    Q. Did you report it to anyone? Anyone at EM
21 I should say?
22    A. No.
23    Q. Alright. Let's see if I can get back on
24 track with the order here. So, now we are at April 4,

87

1 2017, and this is regarding Investigator Martin, and it
2 says, "Chief Rohloff told the other on duty chief to
3 take Investigator Martin to his office and sit up down."
4    A. That's supposed to read, "sit him down."
5    Q. "Sit him down"? Not "sit up down," but
6 "sit him down"?
7    A. Yeah.
8    Q. Who was the other on-duty chief that you
9 were referring to?
10    A. I'm trying to think who came around the
11 corner. That was Chief Logan.
12    Q. Logan? L-O-G-A-N?
13    A. Yeah, if I'm not mistaken.
14    Q. Do you know what the verbal altercation
15 between Rohloff and Martin was about?
16    A. It's hard to remember because it started
17 off with something work related, which, you know, if I
18 recall, which he asked the question about and then tried
19 to get a better understanding or a more concise answer,
20 and it just escalated from there.
21    Q. Were you -- I mean did you hear the whole
22 conversation or this was just kind of going on in the
23 background?
24    A. No, it was in the middle of roll call.

88

1    Q. But you don't remember the specifics of
2 what they were arguing about?
3    A. I can't remember the specifics, no.
4    Q. But your recollection is that at some point
5 it got personal, I guess, for lack of a better term?
6    A. For lack of a better term.
7    Q. And do you believe that Chief Rohloff
8 telling Chief Logan to take Investigator Martin to his
9 office and sit him down was racist?
10    A. Yes, I do.
11    Q. What about the statement "sit him down," do
12 you believe to be racist?
13    A. As an African-American person, that
14 statement to me invokes a sense of -- I don't want to
15 say ownership, but you know, a lot of these statements,
16 including this one, that they have made, it -- it -- it
17 takes you back to slavery, when that's what you were
18 told to do; sit down, lay down, bow down, kneel down.
19 So, when he made a statement like that, "take him back
20 and sit him down somewhere," that's, you know, to me
21 that showed that he was some type of superiority over
22 this man, but he felt that he was in a position to make
23 him sit down somewhere. And to me that's -- that's a
24 racist statement. Because it has racial undertones.

Transcript of Victor Slaughter
Conducted on August 12, 2020

89

1 Even though the exact words, "sit him down," you know,
2 that statement can be used anywhere. You can -- you can
3 tell your niece, if she is holding a baby and he's
4 crying, she might say, "Well, sit him down and he might
5 stop crying," that's not a racist statement in and of
6 itself. But given the totality of the circumstances,
7 and the height at which the argument was going, then
8 yes, at that particular time, that particular statement
9 to me was racist.
10     Q.   Did you report your concerns about that
11 statement to HR?
12     A.   No.
13     Q.   Did you report it to OPR?
14     A.   No.
15     Q.   Did you report it to Director Shields?
16     A.   No.
17     Q.   Did you report it to anyone in EM?
18     A.   No.
19     Q.   The next statement says, "On May 11th, 2017
20 Chief Rohloff asked Investigator McCall," M-c-C-A-L-L,
21 "who is African-American, 'Where did he get his Rick,'
22 meaning Ames, 'glasses from?'"
23     A.   That's supposed to be a "J."
24     Q.   That makes a lot more sense. Okay. I'm

90

1 assuming that's referring to the musician, Rick James?
2     A.   Yes.
3     Q.   Okay. Did you believe that statement to be
4 racist?
5     A.   Yes.
6     Q.   And why did you believe that statement to
7 be racist?
8     A.   First and foremost, I don't recall Rick
9 James ever wearing glasses. Investigator McCall had
10 on a pair of prescription glasses. And for him to just
11 pull that out, it could have simply -- if he wanted to
12 know, you could have simply said, "Hey," if you felt,
13 "like those glasses are eccentric," or he could have
14 said something to that effect. But for you to go,
15 you know, "Where did you get those Rick James glasses
16 from?" You know, you were trying to denote that Rick
17 James is out there, and so are the glasses that he
18 wears. You know, I'm pretty sure there are a lot of
19 non African-American people who have worn eccentric
20 glasses or sunglasses at one time or another. So,
21 for you to pull Rick James out of the sky, that's --
22 that's -- no.
23     Q.   Did you report the Rick James comment to
24 HR?

91

1     A.   No.
2     Q.   Did you report it to OPR?
3     A.   No.
4     Q.   Did you report it to Director Shields?
5     A.   No.
6     Q.   Did you report it to anyone in electronic
7 monitoring?
8     A.   No.
9     Q.   The final statement you list here, it says,
10 "On another occasion Chief Ranzino, after having a
11 conversation with Plaintiff, began calling him Mr.
12 Slaughter. Plaintiff addressed him as 'Mr. Ranzino,'
13 at which time he was a chief and to address him as
14 'Chief Ranzino.' Plaintiff responded that he was
15 an investigator and to address him as 'Investigator
16 Slaughter.' Chief Ranzino became visibly upset and
17 walked away."
18     So, if I understand this here, Chief
19 Ranzino called you, "Mr. Slaughter," and your position
20 was, "I'm an investigator, you should be calling me
21 Investigator Slaughter"?
22     A.   When we began having our conversation,
23 it's always, you know, we don't even say the last name.
24 You know, if you want to talk to them, "Hey, Chief, can

92

1 I talk to you?" or "Look Sarge" and, "Hey, Lou." That's
2 how people are addressed. So, when the conversation
3 began and I'm talking like, "Well, Chief, we don't,"
4 and then, "Well, no, that's not correct, Mr. Slaughter."
5 "I understand, but Chief, if we," and "Well, explain to
6 me Mr. Slaughter how," you know. And then I began to
7 feel disrespected because I'm respecting your rank by
8 calling you, "Chief." So, when I said, "Well, Mr.
9 Ranzino," then he immediately said, "Excuse me, it's
10 Chief Ranzino."
11     So, he became visibly upset with my calling
12 him "Mr. Ranzino," but I guess assumed that I shouldn't
13 be feeling a certain type of way about him calling me
14 "Mr. Slaughter." So, when I advised him that, "Okay,
15 it's 'Chief Ranzino,' then it's 'Investigator
16 Slaughter.'"
17     Q.   And do you believe him calling you
18 "Mr. Slaughter" on this occasion was racially motivated?
19     A.   Yes.
20     Q.   And did you report Chief Ranzino calling
21 you "Mr. Slaughter" to HR?
22     A.   No.
23     Q.   Did you report it to OPR?
24     A.   No.

Transcript of Victor Slaughter
Conducted on August 12, 2020

93

1    Q.  Did you report it to Director Shields?
2    **A.  No.**
3    Q.  Did you report it to anyone in electronic
4 monitoring?
5    **A.  No.**
6    Q.  If we could turn to interrogatory No. 17,
7 which is on Page 10, please.
8        In 17 we asked you to identify all
9 Defendants' acts or omissions you allege resulted
10 in Plaintiffs being treated differently than other
11 similarly-situated individuals." And you responded,
12 "Plaintiff states that Chief Rohloff would grant certain
13 requests when asked by Caucasian investigators and
14 denied the same request made by African-American
15 investigators."
16        So, sir, I want to understand what were
17 these certain requests made by Caucasian investigators?
18    **A.  On one particular day, partners are paired**
19 **up and work together every day, for a couple of reasons.**
20 **On this particular day myself and my regular partner**
21 **were not -- were not paired together on the roster that**
22 **day.  We didn't question it.  We just went in the office**
23 **and prepared to get our equipment for the day.**
24    Q.  Sorry, I don't mean to interrupt, sir,

94

1 but who is the partner that you are referring to?
2    **A.  Spivey.  The one from before.**
3    Q.  Oh, S-P-I-V-E-Y?
4    **A.  Yes.**
5    Q.  Okay.  So, you were normally partnered with
6 Spivey on patrol, but on this particular day you were
7 partnered with someone else or were you by yourself?
8    **A.  Correct.  I was partnered with someone**
9 **else.**
10    Q.  Who were you partnered with on that
11 particular day?
12    **A.  Oh, I can't remember.  I can't remember.**
13    Q.  Did you remember if it was a white
14 investigator or a black investigator?
15    **A.  I don't.**
16    Q.  As an aside, I'm sorry, do you know what,
17 say, you know, in the last five years, approximately
18 what percentage of EM investigators were
19 African-American?  I realize it fluctuates, but just
20 an approximate guess?
21    **A.  Oh, I don't know.**
22    Q.  Would you agree that the majority of
23 investigators are African-American?
24    **A.  Yes.**

95

1    Q.  Alright.  I'm sorry, I interrupted you.
2 So, on this particular day, you would normally partner
3 with Spivey, but you were partnered with someone else?
4    **A.  Correct.**
5    Q.  Please continue.
6    **A.  So, as we were in the office, getting our**
7 **equipment, I believe it was Investigator Bieniek who**
8 **came in and he asked Chief Rohloff if he could be**
9 **partnered up with someone different.  As he -- I don't**
10 **know who his partner was that day, but he asked if he**
11 **could be partnered up with someone different.  And he**
12 **told him that the partner that he wanted to be partnered**
13 **with didn't have an issue with that, no problem.  So**
14 **Rohloff said, "Well, just let me know who it is that you**
15 **want to be with and I'll make the change."**
16        **And he was sitting at the desk adjacent to**
17 **where we were getting our equipment, so Investigator**
18 **Spivey and myself, we heard that.  So, as soon as**
19 **Investigator Bieniek walked away from the desk, we**
20 **walked over to him and said, well, you know, "You got us**
21 **split up today, Chief, do you think we can, you know,**
22 **do you think you can partner us back up today?"  And he**
23 **immediately looked at us and said, "No, I'm not changing**
24 **the roster."**

96

1    Q.  Were you ever partnered with Investigator
2 Spivey again after that point?
3    **A.  Yes.**
4    Q.  Do you know why on that particular day you
5 were not partnered with Investigator Spivey?
6    **A.  I do not.**
7    Q.  Were there occasions where you were not
8 partnered with Investigator Spivey?
9    **A.  Only on off days or if either he or I would**
10 **take a day off.**
11    Q.  Do you know who Investigator Spivey was
12 partnered with on this day that you are talking about?
13    **A.  I do not.**
14    Q.  Had you asked to change partners in the
15 past or was this the first time?
16    **A.  Not that I recall, no.  Because we were --**
17 **we were regular partners, so.**
18    Q.  Are you aware of other African-American
19 investigators asking to switch partners and it being
20 granted?
21    **A.  No, I'm not.**
22    Q.  Okay.  So, that's what you are talking
23 about here in No. 17 is Bieniek requesting a partner
24 change and it was allowed and you requesting a partner

97

1 change and it was not allowed?
2    A.   Yes.
3    Q.   Okay.  Let's go back to Exhibit 1, please,
4 which is the complaint.  Alright.  If we could scroll
5 down to the bottom of the page.
6         Sir, do you see there is a section
7 entitled, "Facts relevant to multiple Plaintiffs"?
8 Do you see that?
9    A.   Yes.
10    Q.   Is it your understanding that these are
11 facts that are intended to apply to you and all of your
12 other co-Plaintiffs?
13    A.   (Reviewing.)  Yeah.  Except for 80, I
14 can't.
15    Q.   Yes, 80, we've already established didn't
16 happen to you, right?
17    A.   Yeah.
18    Q.   And 79 I guess is about --
19    A.   Well, half of '80, let's just say that.
20    Q.   Okay.  Well, you never heard Shields or his
21 supervisors use the N word, correct?
22    A.   No.
23    Q.   And 79 applies to Tim Newson (phonetic) and
24 that doesn't apply to you, right?

98

1    A.   No.
2    Q.   Okay.  78 says, "Shields and his
3 subordinate supervisors placed the Plaintiffs,"
4 presumably including you, "in higher incident areas
5 regardless of their seniority over non-minority
6 officers."
7         Does that apply to you?  Do you contend
8 that you were put in higher incident areas based on your
9 race?
10    A.   Yes.
11    Q.   For 2014 to 2019 you were not on the street
12 you told us, correct?
13    A.   No.
14    Q.   Okay.  So, it was sometime after 2019 that
15 you were placed in higher incident areas?
16    A.   And before 2014.
17    Q.   Okay.  Are you saying that you wanted to be
18 on the streets, just not in certain areas?
19    A.   No.
20    Q.   Okay.  What are you -- what are you saying?
21    A.   The area that you are assigned to is not
22 up to you.  That goes along with the roster.  The
23 assignments that you are sent on is not up to you.
24 So, what we are stating is that all of the minority

99

1 investigators, South Side of Chicago, West Side of
2 Chicago, all the areas that are deemed by CPD's standard
3 to be extremely high-crime areas is where we would go.
4         I -- I can't remember the last time I was
5 sent on an assignment to an individual in Palatine or
6 in Wheaton.  But the non-minority investigators, that's
7 where they would be.
8    Q.   So you referred to seniority here.  Is it
9 your belief that the area you are assigned to is based
10 on your seniority or should be?
11    A.   No, I don't think it should be based on
12 your seniority.  I think it should be based on, again,
13 the same way as assignments to be rotated as -- as it
14 states they should be.
15    Q.   I'm sorry, I didn't understand the last
16 part.  As it what should be?
17    A.   As they should be.
18    Q.   Okay.  So, your belief is the area to which
19 you are assigned should be rotated amongst all
20 investigators?
21    A.   Uh-huh.  Yes.  I'm sorry.
22    Q.   Okay.  But you would agree that's not
23 written down anywhere, that you have ever seen?
24    A.   It's not written down anywhere that I've

100

1 seen, as pertaining to where you go in an assignment.
2    Q.   Look at paragraph 80.  We talked a little
3 bit about, have you heard Director Shields and his
4 subordinate supervisors call you a crook?
5    A.   No, I haven't heard that.
6    Q.   Okay.  And we've already covered in the
7 other interrogatories the remarks they've made.  Okay.
8         Paragraph 81.  Sorry, we need to go to the
9 next page, please.  It says, "Director Shields and his
10 subordinate supervisors regularly and systematically
11 assigned non-minority officers to office positions and
12 assigned the plaintiffs to assignments in the basement
13 for higher incident areas."
14         Samuel Page -- sorry, I was tongue-tied
15 there.  Samuel Page you said was regularly assigned to
16 an office position, correct?
17    A.   Yes.
18    Q.   There were other African-American employees
19 assigned to the office as well, correct?
20    A.   During that time frame --
21    Q.   What time frame are you talking about?
22    A.   Well, Page has since retired for a couple
23 of years, so --
24    Q.   Yes.

Transcript of Victor Slaughter
Conducted on August 12, 2020

101

1       A.   So, that's why I say during that time
2   frame, and after, the majority of the investigators in
3   the office were white.
4       Q.   In the office?  Okay.  But you would agree
5   that there were African-Americans regularly assigned to
6   the office?
7       A.   I'm not going to say "regularly."  They
8   would -- such as the same as in the basement.  Not so
9   much as -- as punishment, because I, you know, I didn't
10  work in the office, but the regular investigators
11  assigned to the office on a regular basis were white.
12  Page at that particular time was assigned to the office
13  because they had him doing supervisory duties because he
14  used to be a supervisor.
15      Q.   So, I had understood from your testimony,
16  when I asked you about Page being at TSS, you said he
17  was always in the office?
18      A.   Yeah.
19      Q.   Okay.  Alright.  Paragraph 84 says,
20  "Director Shields threatened the Plaintiffs that he
21  would have them fired if they filed grievances for the
22  discipline they received."
23          Director Shields never threatened to fire
24  you, correct?

102

1       A.   Correct.
2       Q.   85, "The Defendants' existent disciplinary
3   practices and procedures provide no meaningful
4   opportunity for the Plaintiffs to an unbiased
5   determination of disciplinary action."  (Reading.)
6           The two incidents that we talked about,
7   the inattention to duties and the shave card, do you
8   contend that you had no meaningful opportunity for
9   an unbiased determination?
10      A.   In that one particular instance, that's
11  not my contention.  That's just one.
12      Q.   So, the two that you've identified or that
13  you identified as being racially motivated, you would
14  agree that on one of them you had a meaningful
15  opportunity?
16      A.   Well, I say on that one because they both
17  were done on the same day, within minutes of each other,
18  so that's why I said that one.
19      Q.   Okay.  So, the shave card one, you felt
20  like you had an opportunity for an unbiased
21  determination, but on the other one, you don't?
22      A.   Going in I didn't feel like I had one, no.
23      Q.   But at the end of the day --
24      A.   It happened.  I didn't feel like I had it

103

1   though.
2       Q.   Well, I don't get it.  I mean Director Webb
3   said, "Yeah, that was a mistake," the discipline was
4   removed?
5       A.   Uh-huh.
6       Q.   Do you believe that was a biased
7   determination?
8       A.   You asked me did I feel as if I had an
9   opportunity to have unbiased, going into the grievance
10  hearing.  No, I didn't feel that way.
11      Q.   Okay.
12      A.   That's the way it turned out.  But I didn't
13  feel that I had that opportunity -- I didn't think the
14  opportunity was going to present itself for it to go the
15  way it went.
16      Q.   So putting aside your feeling -- I asked a
17  poor question.
18          In reality, did you get a meaningful
19  opportunity and unbiased determination?
20      A.   I received a determination in my favor.
21  I'm not -- I'm not going to answer whether Webb did
22  it unbiasedly or if he felt a certain way about it.
23  I received a determination in my favor.
24          As I stated before, if the process is done

104

1   right, then it works.  If it's done right.  It will
2   work, whether it's in your favor or not, if it's done
3   correctly.
4       Q.   Do you believe that for the inattention to
5   duty, that was reduced to a verbal counseling, do you
6   believe that the process was not done right in that
7   instance?
8       A.   No, I don't believe it was not.
9       Q.   Alright.
10          MR. WHITE:  We are going to change
11  gears a little bit.  Anybody need five minutes?
12          THE WITNESS:  I do.  I need to speak
13  to someone that just walked in my house.
14          MR. WHITE:  Okay.  Let's go off the
15  record, please.
16          VIDEO HOST:  Okay.  We are going off
17  the record.  The time is 1:54.
18          (Off the record.)
19          COURT REPORTER:  Ms. Flemming, will you
20  be ordering a copy of the transcript?
21          MS. FLEMING:  Hold on one second and
22  let me find out.
23          COURT REPORTER:  Okay.
24          (Off the record.)

Transcript of Victor Slaughter
Conducted on August 12, 2020

105

1      MS. FLEMING:  We are not going to be
2  ordering a copy of the transcript just yet, but
3  eventually we will.
4      COURT REPORTER:  Okay.
5      (Off the record.)
6      VIDEO HOST:  We are back on the record.
7  It is 1:06 p.m.
8  BY MR. WHITE:
9      Q.  Mr. Slaughter, we took a short break there.
10 Did you talk to anybody about the contents of your
11 testimony?
12     **A.  No.**
13     Q.  Is there anything that you want to change
14 or clarify about your testimony?
15     **A.  No.**
16     Q.  Alright.  Do you know LeGrain Winston?
17     **A.  Yes.**
18     Q.  Is he on the same shift as you?
19     **A.  Yes.**
20     Q.  So he's on the 3:00 to 11:00 shift?
21     **A.  Yes.**
22     Q.  Are you friends with him outside of work?
23     **A.  We are friendly, yes.**
24     Q.  Like do you guys go to social events

106

1  together or anything like that?
2      **A.  We have.**
3      Q.  How often do you talk to him?
4      **A.  Well, I talk to him every day at work.**
5      Q.  How often do you talk to him outside of
6  work do you think?
7      **A.  Not that often.  Not that often.**
8      Q.  Has Winston ever complained to you about
9  racial discrimination in the EM?
10     **A.  We have spoken about instances where we**
11 **both were present and --**
12     Q.  Is this the, "You all look alike," instance
13 with Ranzino?
14     **A.  Yeah, we spoke about that because we both**
15 **were present at roll call.**
16     Q.  Okay.  What percent, I mean this is back
17 when Chief Ranzino was still there in the EM, but what
18 percent of your roll calls do you think he conducted?
19     **A.  I'm going to say maybe seventy percent of**
20 **them.**
21     Q.  So a lot of them?
22     **A.  Yeah.**
23     Q.  And outside of talking to Mr. Winston about
24 the, "You all," and I'm not intending to make light of

107

1  it, I'm just giving it a title, the "You all look alike"
2  incident, did you talk to him about other forms of
3  racial discrimination at the EM or was that really the
4  main point?
5      **A.  Again, only ones that we both were like**
6  **maybe present when hearing or seeing something.**
7      Q.  Well, can you give me the other instances
8  where you were both present and you heard or saw
9  something?
10     **A.  Well, a couple of the other roll call**
11 **instances.  The -- the Investigator McCall incident I**
12 **believe Winston was present at roll call.  We were both**
13 **present at roll call when Shields made a particularly**
14 **interesting statement.  We talked about that.**
15     Q.  What is that statement that you are
16 referring to?
17     **A.  We were -- he joined roll call one**
18 **afternoon and we were speaking about some things that**
19 **were -- maybe a change or two in TSS.  And Investigator**
20 **Ferguson, I believe it was, asked him about our**
21 **receiving some of the sheets that the -- a couple of the**
22 **sheets that the inmates fill out, and then one sheet**
23 **where it gives the rules and regulations of house arrest**
24 **to them, he asked about getting those in Spanish.**

108

1  **Because of the -- some of the Latino inmates who come**
2  **down are not well versed in English.  And he stated**
3  **that, "Well, we will take a look at it," you know,**
4  **"and see if we can come up with that."  And he said,**
5  **you know, "We'll see."  Because as far as I'm concerned,**
6  **I don't know this prior chief or director, but he stated**
7  **his name, I can't remember, but he said he feels the**
8  **same way that he does.  He said, "If you can't speak**
9  **English, then you shouldn't go home on house arrest."**
10 **So we spoke about that.**
11     Q.  But you have already established that you
12 don't think Latinos are a minority, right?
13     **A.  I don't think they are -- I believe what I**
14 **said is I don't think they are a minority class, such as**
15 **African-Americans.**
16     Q.  Alright.  Do any of the Plaintiffs in this
17 lawsuit speak English as a second language, as far as
18 you know?
19     **A.  Do they who?**
20     Q.  Speak English as a second language?  Are
21 you there, sir?
22     **A.  Do any of the investigators in the unit you**
23 **said?**
24     Q.  No, the Plaintiffs in this lawsuit?

Transcript of Victor Slaughter
Conducted on August 12, 2020

109

1       A.   Can you repeat the question?  I didn't hear
2  it.
3       Q.   No problem.
4            To your knowledge do any of the Plaintiffs
5  in this lawsuit speak English as their second language?
6  Meaning they had to learn English?
7       A.   Not to my knowledge.
8       Q.   Okay.
9       A.   Not to my knowledge.
10      Q.   You speak English as your first language,
11 correct?
12      A.   Yes.
13      Q.   Do you speak Spanish?
14      A.   No.
15      Q.   Okay.  So, you talked about the incidents.
16 Back to Mr. Winston.  You talked to him about the
17 incidents with Ranzino, you talked to him about the
18 Shields' remark about people not speaking English.
19 Any other events, racially motivated events you talked
20 to Mr. Winston about?
21      A.   I can't recall right now.
22      Q.   Alright.  Let's talk about Chief Ranzino.
23 I think I already know the answer to this first
24 question, but what was your relationship with Chief

110

1  Ranzino like?
2       A.   It wasn't a good one.  I tried to just keep
3  it just professional.  Just stay professional.
4       Q.   Do you think he stayed professional or not?
5       A.   No.
6       Q.   So, do you think he was good at his job or
7  not very good at his job?
8       A.   Well, I mean I only saw him in certain
9  aspects of his job, which was, you know, so when we
10 would leave, I don't know what he did all day in the
11 office.
12      Q.   But your interaction, I mean your
13 interaction was primarily at roll call, right?
14      A.   Roll call, once down at TSS, we might have
15 to call or interact.  When on the street, he might call
16 or, you know, question about something going on.  Just
17 at different moments.
18      Q.   So, in an average day how often would you
19 interact with Chief Ranzino?  Apart from roll call I
20 should say?
21      A.   Apart from roll call?  Maybe once.
22      Q.   And was it usually just kind of a passing
23 thing?
24      A.   Yeah.  Well, like I say, if we're out in

111

1  the street and he's in the office, he might need to call
2  us for something, information or whatever.
3       Q.   Do you believe that Chief Ranzino was or is
4  racist?
5       A.   I --
6       Q.   I think I lost you there for a second.
7            VIDEO HOST:  Yes, your audio went out
8  for a minute.
9  BY MR. WHITE:
10      Q.   Just repeat your answer, please.
11      A.   I do.
12      Q.   Okay.  And is that based on the conduct
13 that we've already talked about?
14      A.   Yes.
15      Q.   Do you think he was sexist?  Meaning do
16 you think he was biassed in favor of men over women?
17      A.   That, I don't know.
18      Q.   Okay.
19      A.   I can't answer that.
20      Q.   Did you ever hear Chief Ranzino refer to an
21 African-American employee as "boy"?
22      A.   Yes.
23           (Off the record.)
24 BY MR. WHITE:

112

1       Q.   How often did you hear him refer to an
2  African-American employee as "boy"?
3       A.   Maybe twice.
4       Q.   Twice in the time you both worked there?
5       A.   Yes.
6       Q.   Did he ever use it referring to you?
7       A.   Not directly, but it was mentioned as the
8  collective, so I was part of the group.
9       Q.   Okay.  When did the first one occur?
10      A.   I can't say exactly when.
11      Q.   Can you give me an approximate?  Are we
12 talking 15 years ago?  Five years ago?
13      A.   Six years ago maybe.
14      Q.   Approximately?  Okay.  And tell me what
15 happened.
16      A.   We were again in the office.
17      Q.   Who is "we"?
18      A.   Well, just the group of investigators.
19 We were getting our equipment after roll call.  And I
20 can't remember who.  I can't remember names, but I do
21 recall at this particular time they were -- it was maybe
22 five of six, five or six of us African-Americans in the
23 office at the time, in the equipment area, getting our
24 equipment, and someone mentioned something about --

Transcript of Victor Slaughter
Conducted on August 12, 2020

113

1  I mean I think it was a joke they made about lunch,
2  by stating, "It will be nice if I can go and have
3  lunch" -- I can't remember the restaurant or anything
4  like that, but it was -- it was a restaurant that's
5  like in the north, northwest area of the city.  Not
6  the city, but in one of the -- in one of the
7  northwestern suburbs.  So, somebody had mentioned,
8  you know, "You know you ain't ever going out there.
9  You know you're going to be stuck on the westside,
10  like the rest of us," you know.  And Ranzino was
11  standing right there and he just shook his head.
12  And as he walked away, as he got ready to walk away,
13  you know, he said, "You boys are always complaining."
14      Q.  Okay.  What about the second time?  When
15  did the second time occur?
16      A.  The second time we -- in our roll call
17  area, because only a door separated the roll call area.
18  So, the roll call area was basically a doorway.  So,
19  just a door separated that from the office.  So we were
20  always in and out of the door.  And we went in, got
21  equipment, came back out to the roll call area.  Going
22  back and forth, if you forgot something.  And he was
23  in the roll call area.  He stepped into the office and
24  stepped back out again.  And I didn't really overhear

114

1  the conversation that someone was having in the roll
2  call area, because I had stepped back into the office,
3  and as I came back out of the office, back into that
4  roll call, back into the hallway, he passed me to go
5  back into the office.  And he stated -- what was it?
6  Not prima donnas.  Oh, he stated, "You guys are a bunch
7  of Keystone cops."  And he said that in passing, as I
8  came out and he walked in.
9          And as I walked out into the roll call
10  area, it was just four, five -- four or five black
11  investigators out there.  So, I don't know what the
12  conversation was because I was in the office at that
13  time, but.
14      Q.  And you are not saying that the "Keystone
15  cops" part of it was racist, it was the, "You boys,"
16  part of it?
17      A.  Yeah, "You boys are nothing but Keystone
18  cops," is what he said.
19      Q.  I apologize if you told me, but when did
20  that happen?
21      A.  I believe that might have been before the
22  second incident, if I recall now, because that happened
23  first.
24      Q.  Okay.  So, it was farther -- farther back

115

1  in time than the one in the office, correct?
2      A.  Yeah.
3      Q.  Okay.  So, let's call that the first one?
4      A.  Okay.
5      Q.  Did you report that first one to HR?
6      A.  No.
7      Q.  Did you report it to OPR?
8      A.  No.
9      Q.  Did you report it to any of the management
10  in EM?
11      A.  No.
12      Q.  And then that second one, where he said,
13  "You boys are always complaining," did you report that
14  to HR?
15      A.  No.
16      Q.  Did you report it to OPR?
17      A.  No.
18      Q.  And did you report it to anyone in
19  management in EM?
20      A.  No.
21      Q.  We've talked about the incident where he
22  said, "You all look alike."  You've told me about
23  these incidents where he referred to a group, groups
24  of African-American men as "boy."  Is there any other

116

1  racially offensive language that you contend Chief
2  Ranzino said while you were both employed there?
3      A.  Towards me or just anything?
4      Q.  Both.
5      A.  Okay.  Well, I recall -- well, that's a
6  negative statement.  I'm not going to, you know.
7      Q.  I'm not necessarily concerned with,
8  you know, Ranzino being a jerk, I'm concerned with
9  Ranzino making racist remarks or remarks you believe
10  to be racist?
11      A.  Yeah, I can't recall at this particular
12  time?
13      Q.  Okay.  Let's talk about Mr. Newson.  Do you
14  know I.V. Newson?
15      A.  Yes, I do.
16      Q.  Does he work the 3:00 to 11:00 shift?
17      A.  No, he worked the day shift.  He worked
18  7:00 to 3:00.
19      Q.  Okay.  So you generally don't work with
20  him, correct?
21      A.  No.
22      Q.  So how do you know him?
23      A.  Just over the years of being in the EM.
24  And I understand from talking to some of

Transcript of Victor Slaughter
Conducted on August 12, 2020

117

1  your other co-Plaintiffs, there might be times where he
2  might work the 3:00 to 11:00 and there might be times
3  where you worked during the day; is that accurate?
4      A.   That would be in overtime situations, if
5  he decided to -- if -- if -- if help was needed on the
6  3:00 to 11:00 shift and they asked for volunteers, he
7  might have volunteered once or twice.  I don't recall.
8  So that -- that would be in most cases the only time
9  someone would work a different shift, if they were
10 doing overtime.
11     Q.   So in an average day, would you -- I mean
12 just an average day, would you even see Mr. Newson?
13     A.   If I were to see him?  It would be in
14 passing, as the shifts were changing.
15     Q.   The changeover?
16     A.   Yes.
17     Q.   Okay.  On an average day how much time do
18 you spend talking to Mr. Newson?
19     A.   If I saw him?  A few minutes.
20     Q.   Just kind of pleasantries, "Hey, how are
21 you doing?"  That kind of stuff?
22     A.   Yeah.  Yeah.
23     Q.   Did Mr. Newson ever complain to you about
24 being discriminated against?

118

1      A.   Not to me.
2      Q.   Did he ever complain to you about a
3  Defendant using racist language?
4      A.   Not that I recall.
5      Q.   Do you know Vernell Tims?
6      A.   Yes, I do.
7      Q.   Does he work the 3:00 to 11:00?
8      A.   No.
9      Q.   So, is that kind of like Mr. Newson, you
10 see him, but it's just in passing?
11     A.   Correct.
12     Q.   Did he ever tell you that he heard Ranzino
13 use the N word?
14     A.   I don't recall that.
15     Q.   What about Shields?  Did he ever tell you
16 that he heard Shields use the N word?
17     A.   I don't recall that either.
18     Q.   Did he ever complain to you that he was
19 being discriminated against?
20     A.   He made mention of it.  Because Vernell
21 Tims was also a union steward.  And on one occasion the
22 union steward for our shift was off, so Tims sat in for
23 a meeting, not in a grievance, but I was issued -- I was
24 told to come in for a write-up.  Probably one of the

119

1      ones that we've already spoken about.  And so he just
2      simply came in the office with me, as I was doing a
3      write-up and requesting a grievance hearing.  And so as
4      we left the office, we talked about the grievance for a
5      minute.    And he might have stated -- I think he
6      stated that,   you know, that he was going through a
7      couple of things and stuff, about some derogatory things
8      that were said  on his shift or to him, but we didn't
9      get into detail.
10     Q.   So you don't know any specifics about that?
11     A.   I don't know any specifics.
12     Q.   Would you say the derogatory stuff he was
13 going through was racist or it was just derogatory
14 stuff?
15     A.   He just -- if "derogatory" was the word
16 that was mentioned, it was mentioned.  I don't believe
17 "racist" was mentioned.
18     Q.   Okay.  So, I guess to get back to my
19 question, you are not aware of him complaining to you
20 about racist discrimination?
21     A.   Not that I recall.
22     Q.   Let's talk about Director Shields.  What
23 was your relationship with Director Shields like when
24 he was working there?

120

1      A.   You know, by him being the director, we
2      didn't see him a lot of course.  Our run-ins would be,
3      like I mentioned earlier, if he came to roll call with
4      something to say or -- or in passing or, you know,
5      if he decided to pull you to the side to say something
6      to you, that was just the gist of our back and forth.
7      Q.   Do you know approximately how often he came
8  to roll call?
9      A.   I can't say.
10     Q.   I mean was it -- would you say it was a
11 rare occurrence or was it, you know, fairly frequent?
12     A.   It was rare.
13     Q.   And when you say he pulled you aside, was
14 that always a negative action, I'm sorry, a negative
15 interaction or was it sometimes, I guess, not negative?
16     A.   No, it was always negative.  Yeah.
17     Q.   Do you think he was good at his job?
18 Let me put it a different way, do you think he was
19 effective as a director?
20     A.   I cannot say because I don't -- I don't
21 know the duties of a director, so.
22     Q.   Okay.  Fair enough.  Do you think he was
23 racist?
24     A.   I think -- I think he has some racial

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

121

1 issues. I will put it like that.
2    Q. Is that different in your mind than being
3 racist? Is racial issues different than being racist?
4    **A. I would say racial issues lean more towards**
5 **opinion. So, I would say that could be slightly**
6 **different.**
7    Q. Okay. Do you think he made any decisions
8 based on race?
9    **A. A couple of the decisions that I know were**
10 **made by him, I would say yes. Because I can't -- I**
11 **can't speak on every decision in EM, whether it came**
12 from him on down (indicating). I don't know. But I
13 would say that -- you are going to ask me to recollect?
14    Q. Yes. You said there was a couple, you
15 know, decisions that you know he made that you believed
16 were racist? What are you referring to there?
17    **A. I can't recall specifics because it wasn't**
18 **said to me or to like to us in roll call, by him**
19 **personally, so --**
20    Q. Just in general what are you referring to?
21 We are kind of dancing around it here. What are you
22 thinking about?
23    **A. Well, the one -- I mean the one statement**
24 **that he made about, "If you can't speak English, you**

122

1 **shouldn't be able to go home on house arrest," that's**
2 **definitely a -- a racist statement to me. Excluding,**
3 **you know, any other race or person that doesn't speak**
4 **English.**
5    Q. Any other incidents that you are referring
6 to?
7    **A. I can't think of any other right now.**
8    Q. Have you ever heard Chief Shields, Director
9 Shields, sorry, wait -- yes, Director Shields, have you
10 ever heard him refer to an African-American employee as
11 a "boy"?
12    **A. No.**
13    Q. Alright. Samuel Page, do you know Mr.
14 Page?
15    **A. Yes.**
16    Q. Did he work 3:00 to 11:00?
17    **A. Yes.**
18    Q. On an average day how much interaction
19 would you have with Mr. Page?
20    **A. Again, by simply working the same shift,**
21 **you know. Of course our interaction would be longer**
22 **on the days when they assigned him to TSS or, you know,**
23 **but other than that, just your normal reaction -- I mean**
24 **interaction from just simply working with someone.**

123

1    Q. Did Mr. Page ever complain to you that he
2 thought Ranzino was racist?
3    **A. Not that he thought he was racist, but I**
4 **believe we might have had a conversation or two about**
5 **his racist statements.**
6    Q. The "You all look alike" comments?
7    **A. Yeah.**
8    Q. Did you ever hear Page complain about being
9 assigned to TSS too much, I guess I should say?
10    **A. No.**
11    Q. Did Mr. Page ever complain to you that he
12 was being discriminated against based on his race?
13    **A. No, I don't think we had a conversation**
14 **where he complained about it, no.**
15    Q. Did Mr. Page ever complain to you about
16 any of the Defendants using racist language?
17    **A. Not complaints, just a conversation, like**
18 **I said prior, just the conversations we had together**
19 **about statements that we heard at the same time.**
20    Q. And this is the Ranzino comment about "you
21 all look alike"?
22    **A. Yeah, that's one, yeah.**
23    Q. Well, is there more than that?
24    **A. Well, any statement on the day that he**

124

1 **would be at work and the statement was made, you know,**
2 **if it was made at roll call, and he would have heard it**
3 **also.**
4    Q. So, I guess that's kind of what we have
5 got to get to the bottom of, Mr. Slaughter. You know,
6 you're saying there are statements where we were both
7 there. I need to know specifically what was said. So,
8 we have established there was a couple of times where
9 Ranzino said, "You all look alike." Are there other --
10 and we've talked about the couple of times Ranzino
11 referred to a group of employees as "boy." Are there
12 other incidents that you and Mr. Page discussed that
13 we haven't already talked about?
14    **A. Oh, no.**
15    Q. Okay. Alright. Wilford Ferguson, do you
16 know Mr. Ferguson?
17    **A. Yes.**
18    Q. Was he on your shift?
19    **A. Yes.**
20    Q. Okay. So, how often, on an average day how
21 much interaction would you have with Mr. Ferguson?
22    **A. Again, you know, working with him, he**
23 **worked in TSS more than some of the other investigators**
24 **that we mentioned earlier, so we would have -- had a lot**

Transcript of Victor Slaughter
Conducted on August 12, 2020

125

1  of occasions.  Most of them when we worked in the
2  basement together.
3      Q.  Okay.  Was he assigned to TSS quite a bit?
4      A.  Yeah, he was assigned to TSS willingly.
5  That's where he wanted to be.
6      Q.  Oh, he wanted to be in TSS?
7      A.  He -- well, you know what, I will put it
8  like this, he mentioned that they don't -- he doesn't --
9  well, let's put it like this, like he said, I'm not
10  going to put it on them, he said that if he didn't go
11  on the street, it wouldn't be no big deal.  He didn't
12  need to be on the street.
13      Q.  Did he ever complain about race
14  discrimination to you?
15      A.  Again, nothing more than the same
16  conversations, the same statements that we both heard.
17      Q.  The Ranzino stuff that we've already talked
18  about?
19      A.  Yes.
20      Q.  Okay.  And apart from the Ranzino stuff
21  we've already talked about, did he tell you that any
22  other Defendant used racist language with him?
23      A.  Not that I recall now.
24      Q.  Okay.  Cecil Williams, do you know Mr.

126

1  Williams?
2      A.  Yes.
3      Q.  Is Mr. Williams on the 3:00 to 11:00 shift?
4      A.  Yes.
5      Q.  Okay.  On an average day how much do you
6  think you interacted with Mr. Williams?
7      A.  The same interaction, from simply just
8  being on the same shift.
9      Q.  Was Mr. Williams, in your experience, was
10  he often assigned to TSS?
11      A.  No.
12      Q.  He was mostly on patrol?
13      A.  Yeah.
14      Q.  Okay.
15      A.  He has been assigned to TSS.
16      Q.  Okay.  But he wasn't a, quote/unquote,
17  regular I guess?
18      A.  No.
19      Q.  Did Mr. Williams ever complain to you about
20  assignments?
21      A.  When assigned to TSS.
22      Q.  Okay.  So, when he was assigned to TSS he
23  would complain about being in TSS?
24      A.  Correct.

127

1      Q.  What would he say?
2      A.  I'm going back to there being an
3  understanding that he was being punished and that was
4  the reason for being down there.  Mentioning that, I
5  can't recall the specifics right now, of what might have
6  happened the day before and come to the conclusion that
7  that's why he was in TSS that particular day.
8      Q.  So, he would complain that he was being
9  assigned to TSS as a result of something that happened
10  the day before?
11      A.  Yeah.  As punishment, yeah.
12      Q.  Okay.  Did he complain -- did Mr. Williams
13  complain to you that he felt he was being racially
14  discriminated against?
15      A.  He just made mention, again, no specifics.
16  We have agreed on a couple of things, as far as patrol,
17  patrolling the high-crime areas.
18      Q.  What do you mean by you have agreed on a
19  couple of things?
20      A.  As far as the statements that I've made
21  and then about the African-American investigators being
22  assigned to patrol high-crime areas more often than
23  non African-American investigators.
24      Q.  Okay.  So, you talked to him about your

128

1  concerns that African-American investigators are
2  assigned more often to high-crime areas?
3      A.  Yeah.
4      Q.  Did he agree with that?
5      A.  Say that again?
6      Q.  I said did he agree with that?
7      A.  Yes, he did.
8      Q.  Did Mr. Williams ever complain to you
9  or tell you that he had heard Defendants use racist
10  language?
11      A.  Not that I recall.
12      Q.  Anthony Manning, do you know Mr. Manning?
13      A.  I do not know Mr. Manning.
14      Q.  You don't work with him?  You don't know
15  him?
16      A.  No.
17      Q.  Okay.  That makes it easy.
18          David Walker, do you know Mr. Walker?
19      A.  Yes.
20      Q.  Is Mr. Walker on your shift?
21      A.  Not any longer, but he was.
22      Q.  Okay.  At what point in time was he on your
23  shift?
24      A.  I believe -- I believe he went to days

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

129

1  maybe a couple of years ago.
2      Q.  So, you are thinking like 2018 he went to
3  days?
4      A.  Yeah.  2017, 2018 maybe.  I can't be sure.
5      Q.  Okay.  So, when he was on your shift how
6  often on an average day did you interact?
7      A.  About the same amount of time as, you know,
8  as the others.  Just yeah.
9      Q.  Do you recall Mr. Walker being assigned to
10 TSS?
11     A.  On different occasions, yeah.
12     Q.  How often was he down there?  I mean was
13 he a regular or was it more of a rarity?
14     A.  He was not a regular, no.
15     Q.  When he was in TSS did he complain to you
16 about being in TSS?
17     A.  Yeah.  Because he also felt he was being
18 punished the times he was down there.
19     Q.  So, he said the same kind of things as
20 Mr. Williams, "What, I'm only down here because I'm
21 being punished"?
22     A.  Yes.
23     Q.  How would you react when different
24 investigators would say that to you, that TSS was a

---

130

1  punishment they thought?
2      A.  I would agree.
3      Q.  Why do you think you were, you know,
4  in your mind punished for so long?  If these other guys
5  were only down there here and there, why were you down
6  there for four plus years?
7      A.  When the new system was implemented, and
8  the chief -- or the chief's stating that everyone needs
9  to learn it, I can't recall where I fell in place going
10 down, but we went down to learn the new system, and the
11 rotation after that never took place.  And I believe
12 that because of me on different occasions speaking up
13 and voicing my opinion about certain things, is the
14 reason why they just left me down there.  Okay?  "Just
15 leave him down there, we don't have to deal with him."
16 You know, I believe that was an issue that a lot of
17 chiefs had, with you simply speaking up and questioning
18 them.
19     Q.  Were you the only one who spoke up?
20     A.  I'm sorry?
21     Q.  Were you the only one who spoke up?
22     A.  Was I the only one who spoke up?
23     Q.  Yes.  You said you spoke up and then they
24 put you down there, so I was wondering who else spoke

---

131

1  up?
2      A.  I don't know.  I know I did.
3      Q.  Was anyone else put in TSS for four plus
4  years, that you know of?
5      A.  For that time frame, no.
6      Q.  Did Mr. Walker ever -- I'm sorry, I'm still
7  talking about David Walker, did Mr. Walker ever complain
8  to you about being discriminated against?
9      A.  No specific conversations about that, no.
10     Q.  Did he complain to you about hearing
11 Defendants use racist language?
12     A.  Not that I recall.
13     Q.  Michelle Strickland, do you know Ms.
14 Strickland?
15     A.  Yes.
16     Q.  And did Ms. Strickland work your shift?
17     A.  When she was there, yes, she did.
18     Q.  She was only in EM for a short period of
19 time, right?
20     A.  Yes.
21     Q.  Do you know about how long she was in EM?
22     A.  I don't know for sure.
23     Q.  Was she ever assigned to TSS while you were
24 down there?

---

132

1      A.  She had worked TSS a couple of times.  I
2  say a couple, but I'm not sure of the number.  But she
3  had worked down there before.
4      Q.  And the same question, like the other
5  folks, was it a regular thing for her to be down at TSS
6  or was it more of a rarity?
7      A.  No, it was a rarity.
8      Q.  It was a rarity, okay.  When she was down
9  at TSS did she complain to you about being down there?
10     A.  I don't recall her complaining about being
11 there so much as to why she believed she was there.
12     Q.  And what was her stated belief as to why
13 she was there?
14     A.  Ms. Strickland, like myself, and probably
15 even more so, stood up for herself.  Being a black
16 female, I can't relate to that.  I can only go with what
17 I see and hear from relatives, female friends, that she
18 needed to -- there were times where she was forced to
19 stand her ground very strongly because of the way she
20 was being treated or from what was said to her.  So, I
21 think that was more the reason behind it more so than
22 just being down there.
23     Q.  Did Ms. Strickland ever complain to you
24 about being discriminated against by the fact that she

Transcript of Victor Slaughter
Conducted on August 12, 2020

133

1  was female?
2      A.  On one occasion she did mention that she
3  was told that she didn't need to be on the street
4  because women just need to work in the office.
5      Q.  Was she assigned to the office?
6      A.  She was on occasions.
7      Q.  Okay.  But not regularly?
8      A.  Let's see.  Her tenure there wasn't that
9  long, so I'm going to say -- I guess for her, a
10  two-month span would be regular.
11     Q.  Because she wasn't on the job that long?
12     A.  Yeah.  Yeah.
13     Q.  Alright.  When did the conversation occur
14  when she told you, you know, she said she didn't need to
15  be on the street?
16     A.  I -- I can't recall.
17     Q.  Who did she tell you said that to her?
18     A.  I believe she said it was Ranzino.
19     Q.  But you didn't hear that statement, you
20  just heard that secondhand from her?
21     A.  From her, yeah.
22     Q.  Did she ever complain to you about being
23  discriminated against as an African-American?
24     A.  Yeah, she made mention that she overheard,

134

1  and I believe she stated that she also put that on
2  paper, that she overheard someone called her -- called
3  her "nappy head."  I don't know if they put a derogatory
4  term after that or not.  But she did mention that, that
5  she overheard someone in the office say that about her.
6      Q.  When did that happen?
7      A.  I can't recall when that happened either.
8      Q.  Who did she say she overheard saying "nappy
9  head"?
10     A.  I can't recall what chief she mentioned,
11  but -- I can't recall.
12     Q.  But it was a chief?
13     A.  Yeah.
14     Q.  And you said she put it on paper?
15     A.  I believe she wrote a grievance on it, if
16  I'm not mistaken.
17     Q.  Okay.  Have you seen that grievance?
18     A.  No, I have not.
19     Q.  Why do you believe it exists?  Did she
20  tell you that she grieved it or something?
21     A.  She stated that, you know, "Yeah, they're
22  not getting away with that.  I'm putting that on paper."
23  So, when she said, "Im putting that on paper," I took
24  that to be understanding that she was going to write a

135

1  grievance.
2      Q.  Okay.  So, to be clear, you don't actually
3  know that she did that, you just know that she said she
4  was going to?
5      A.  Yes.
6      Q.  Apart from the "nappy head" comment, did
7  Ms. Strickland complain to you about the Defendants
8  using any other racial language?
9      A.  Not that I recall, no.
10     Q.  Tyrone McGhee, do you know Mr. McGhee?
11     A.  Yes.
12     Q.  Does Mr. McGhee work on your shift?
13     A.  Yes.
14     Q.  Is Mr. McGhee your union steward?
15     A.  Yes.
16     Q.  So, is he the one who was supposed to be
17  out there that day and you said he was out?
18     A.  Oh, when -- when Tims --
19     Q.  When Tims was there?
20     A.  Yeah.  Yes.
21     Q.  Alright.  So Tims was standing in for
22  McGhee that day?
23     A.  Yeah.
24     Q.  Alright.  How much daily interaction did

136

1  you have with Mr. McGhee?
2      A.  The same as the other Defendants on the
3  shift.
4      Q.  And like the other Defendants, was it
5  regular for Mr. McGhee to be assigned to TSS or was it
6  rare?
7      A.  Towards the end of -- towards the end of my
8  time spent in TSS, he became a regular.
9      Q.  Okay.  So, if we're saying approximately
10  2014 you start spending a lot of time in TSS, was it
11  towards the end, like towards the fall of 2019?
12     A.  No, it was before that.  I'm going to
13  say -- I am going to say maybe 2018 and 2019.
14     Q.  2018 to 2019 McGhee became a regular at
15  TSS?
16     A.  Yeah.  I'm not -- you know, I'm not
17  actually sure, but he was, you know, it was longer than
18  just a handful at once.
19     Q.  Okay.  But for awhile you recall he was
20  down at TSS a lot?
21     A.  Yeah.
22     Q.  Did he complain about being down at TSS?
23     A.  Yeah, just like -- yeah.
24     Q.  What kind of stuff would he say about being

Transcript of Victor Slaughter
Conducted on August 12, 2020

35 (137 to 140)

---

137

1  assigned to TSS?
2      A.  The same that we had.  The same complaints
3  that I had.  The -- the -- the work, the area.  Forced
4  overtime.  Yeah.  Pretty much all of the same
5  complaints.
6      Q.  Okay.  Do you know why he became more
7  regular in TSS in 2018 and 2019?
8      A.  We talked once and I believe his
9  understanding was he was off for a little while with
10  an injury, and -- and in the midst of that injury I
11  believe we had a bid for days off.  And when he came
12  back, per our union contract, he should have been placed
13  back in the same days off he had when he left on injury.
14  But they moved him and he complained and filed a
15  grievance.  And I believe he believes that that had
16  something to do with it.
17      Q.  Okay.  So, if I understand correctly, you
18  believe that McGhee believes that he was assigned to TSS
19  because he grieved over his change in days off?
20      A.  Yeah.  That was -- that was what I got from
21  our conversation.
22      Q.  So, you are just basing that on from what
23  you heard from him; is that right?
24      A.  Yes.

---

138

1      Q.  Did Mr. McGhee complain to you about racial
2  discrimination?
3      A.  Yes.
4      Q.  What did he say to you about that subject?
5      A.  From hearing some of the same statements
6  that we've already discussed.
7      Q.  Anything that we haven't discussed?
8      A.  No.
9      Q.  Did he complain to you that he had heard
10  any Defendant use racial language?
11      A.  Not to me, no.
12      Q.  Rohloff?  What was your relationship with
13  Rohloff like?
14      A.  Strictly professional.  Job related.
15      Q.  Do you guys still work together?
16      A.  He is not there now.  I believe he is off
17  for an injury also.
18      Q.  Okay.  When he was there how often would
19  you interact with him on a daily basis?
20      A.  Roll call, if you need to speak to him
21  about anything work related.  That's about it.
22      Q.  I think you said, I'm not trying to put
23  words in your mouth, but I think you said Ranzino lead
24  your roll call 70 percent of the time approximately?

---

139

1      A.  Yeah.
2      Q.  So, then was like Rohloff the other 30
3  percent or was Rohloff and other chiefs for that other
4  part?
5      A.  It could have been any chief.  I'm not sure
6  how they decided who would conduct roll call, if there
7  are two or three of them there.  Then you would also
8  have to take into consideration the days, you know,
9  where either given one is off on his ROs or on his
10  regular days off, so.
11      Q.  Okay.  I mean you said your interactions
12  with him were professional.  I mean were you friendly
13  with him or was it just purely business?
14      A.  Just purely work.
15      Q.  Do you think he was effective at his job as
16  a chief?
17      A.  Again, I, you know, I don't know what each
18  of their job descriptions were, so I don't know.  I
19  don't know.
20      Q.  Do you think he was racist?
21      A.  I don't know if he was racist.  I believe
22  some of the statements that he made were.
23      Q.  And those are the statements that we have
24  already talked about?

---

140

1      A.  Yeah, I believe they had racial undertones,
2  yes.
3      Q.  Any other statements with racial
4  undertones, other than the ones we've already talked
5  about?
6      A.  Not that I can recall at this time.
7      Q.  Do you think he was sexist?  Meaning he,
8  you know, discriminated against females over males?
9      A.  I do not know.
10      Q.  You don't know?  Okay.  And I don't
11  think -- okay, we've already talked about that.
12      Just give me a few minutes.  I'm looking at
13  some of my notes here, trying to skip stuff we don't
14  need to talk about.
15      THE WITNESS:  I want to hit this light
16  right here, just to see if it brightens it up.
17      MR. WHITE:  Sure.
18      (Off the record.)
19      MR. WHITE:  Merinda, if we could pull
20  up Exhibit 5, please.
21      VIDEO HOST:  Please standby.
22      (SLAUGHTER Deposition Exhibit 5 marked
23  for identification.)
24  BY MR. WHITE:

---

Transcript of Victor Slaughter
Conducted on August 12, 2020

141
1    Q.   Then if we could go to the first page of
2  this, please.
3          Okay, sir, so this is an exhibit which has
4  been marked Slaughter 5. This is your Objections and
5  Answers to Defendant Sheriff of Cook County, Thomas J.
6  Dart's First Set of Interrogatories.
7          Have you seen this document before?
8    A.   Yes.
9    Q.   So, there was two sets of interrogatories
10 that we asked you to answer and this is the second set,
11 correct?
12   A.   Correct.
13   Q.   If we could go to the very last page,
14 please. And, again, like the other one, this is your
15 verification, under penalty of perjury, that everything
16 in here is true to the best of your knowledge. And
17 that's your signature, correct?
18   A.   (Reviewing.) Yeah, that says, "Greg
19 Shields" though.
20   Q.   You're right. It's the wrong -- so, we
21 have the wrong verification on here. But I will
22 represent to you that this is the verification that
23 was signed with this set of interrogatories.
24          As far as you know, everything in here

142
1  is true to the best of your knowledge, information and
2  belief, correct?
3    A.   As far as I know.
4    Q.   Okay. You reviewed these interrogatories,
5  and we'll go through your answers, but you reviewed
6  these prior to signing the verification, correct?
7    A.   Correct.
8    Q.   It will be back up in just a second because
9  we are going to talk about some damages and things like
10 that. But what do you want out of this lawsuit? At the
11 end of the day, what does success look to you like?
12   A.   Success to me would look like even though
13 I more than likely would not be there to see it, but so
14 success to me would be policy change. Policy change
15 and just simply the way things are done, the way the
16 investigators are treated. That's my major thing.
17 Because that -- that makes for a peaceful workplace
18 and, you know, that would be my major thing. Again,
19 I said I might not be there to see it, because I'm not
20 there much longer, but yeah, there needs to be some
21 change. A lot of times people don't realize that
22 supervisors also need extra training, as do
23 investigators and officers, and need to be brought
24 up to speed on interaction, with not just the public

143
1  or inmates, but also with their staff.
2    Q.   And what are -- are you referring to a
3  specific policy that you want changed or kind of more
4  of a systemic change? Help me understand that.
5    A.   A more systemic. If -- I mean I'm not
6  going over all of the policy of course. When I say
7  policy change, either written or just the way things
8  are done, you know. If -- if written policy needs to be
9  introduced in order to create a better work environment,
10 or you know, then so be it.
11   Q.   And even if you are saying that on a
12 systemic level, I mean what's -- what's wrong about the
13 way things are operating right now?
14   A.   Well, the one thing wrong is the way these
15 chiefs have said the things they've said, which should
16 not have been said, you know, I think we fix that
17 with -- with more training.
18   Q.   And are these all of the things we've
19 already talked about?
20   A.   Yes.
21   Q.   Okay. Okay, what is your understanding
22 of what happens if you lose the lawsuit?
23   A.   That things will stay the way they are and
24 I feel sorry for the investigators from that point on.

144
1    Q.   When you say you don't think you are going
2  to be there much longer, I hope that means you are
3  saying that you're going to retire?
4    A.   Yes.
5    Q.   Okay. It sounded kind of ominous, but
6  okay. Okay.
7          Do you guys understand and do the
8  Plaintiffs understand at all that if you are
9  unsuccessful, that you might have to pay the Sheriff's
10 cost for the lawsuit?
11   A.   It's been mentioned, if I'm not mistaken.
12   Q.   So, if we could go to, in the exhibit if we
13 could go to --
14          MR. WHITE: Sorry, give me one second.
15 Sorry. This is the problem working from home. My son
16 is asking me something.
17          (Off the record.)
18          MR. WHITE: Okay. I'm back.
19 BY MR. WHITE:
20   Q.   So, if we could go to Page 2, interrogatory
21 No. 3. Exhibit 5, I'm sorry. And then let's go to
22 Page 2.
23          And this is where we have -- I'm sorry, I
24 will wait until you get there. If we could go down to

Transcript of Victor Slaughter
Conducted on August 12, 2020

145

1  the bottom of the page and look at No. 3.
2       Alright. So, here we asked you basically
3  to provide a detailed computation of all of the damages
4  you are seeking in this lawsuit. And if you look at
5  your answer down at the very bottom of the page, one
6  of the things you said was you are seeking compensation
7  for your litigation expenses. And I'm wondering what
8  are your litigation expenses?
9       **A.  What are my litigation expenses?**
10      Q.  Yes. You said that one of the things
11 you want to get out of this lawsuit is your litigation
12 expenses, compensation for litigation expenses. So, I'm
13 wondering what those are?
14      Put it another way, have you had to pay any
15 money for this lawsuit?
16      **A.  Aside from our attorneys?**
17      Q.  Well, I think we've established with some
18 of the other witnesses that you are not paying your
19 current attorneys because they are working on a
20 contingent basis, so I'm wondering if you had to pay
21 any other attorney?
22      **A.  Any other attorney? No.**
23      Q.  Okay. So, how much money do you claim that
24 you have had to spend out of your own pocket for this

146

1  lawsuit?
2       **A.  That total has not been -- that total**
3  **hasn't been came up with yet.**
4       Q.  And I understand you are probably talking
5  about the contingent side of it. To date, as we sit
6  here today, how much money have you spent out of your
7  pocket for this lawsuit? And if the answer is zero,
8  that's fine. I just need to know.
9       **A.  I do not know. I haven't computed that.**
10      Q.  Is it more than a thousand dollars?
11      **A.  I cannot speculate.**
12      Q.  You have absolutely no idea how much money
13 you've spent on this lawsuit?
14      **A.  No.**
15      Q.  How would we figure that out?
16      **A.  If and when that time came for me to sit**
17 **and compute the monies spent, in relation to the suit,**
18 **then I think that's when it will happen.**
19      Q.  So, sir, the time -- the time was on
20 February 10th when we asked you to provide a computation
21 of your damages. And it's not enough to simply say you
22 are seeking computation for litigation expenses. We
23 need to know the dollar figure you are seeking.
24      **A.  As far as my understanding, that this was**

147

1  **ongoing, so a dollar figure at that particular time**
2  **wasn't going to be able to be produced.**
3       Q.  Yes, and that's why I am asking you as we
4  sit here today. I understand there could be damages
5  in the future or it could be a contingent recovery.
6  I am asking you as you sit here today, how much money
7  has come out of your bank account for this lawsuit?
8       **A.  I have not computed that. I do not know.**
9       Q.  What would you have to do to compute that?
10      **A.  Go back to look at -- take some time to**
11 **figure out over all of these years what was spent as**
12 **related to this case, figure out what was related.**
13 **So that -- that would take a little time.**
14      Q.  Yes, I guess my concern is, you know, these
15 are answered obviously under oath and it asks you to
16 compute it. And now you are telling me that you didn't
17 do it and it sounds like you're not, it's going to
18 take time to do it and, you know, this is certainly
19 information that we're entitled to know. I mean you
20 can't even tell me, is it more than a thousand dollars?
21 Is it more than $10,000?
22      **A.  Well, I'm -- in reading this questioning**
23 **here, I don't know if I'm reading it wrong, in three,**
24 **it states -- it states that it's asking for an**

148

1  **explanation of damages for the calculation. I provided**
2  **an explanation for damages.**
3       Q.  Sir, actually, it says, "Provide an
4  explanation of damages for the calculation of each
5  dollar amount for each category." And it's really
6  just a standard request. We have to understand what
7  is at issue in the lawsuit.
8       **A.  Okay. I don't have a calculation of each**
9  **dollar amount because I read that differently.**
10      Q.  Can you, once we are done here, perform
11 that calculation and provide it to your attorney?
12      **A.  I can get started on it and provide it to**
13 **her, once I have it, yeah.**
14      Q.  Okay. So, if we turn to the next page.
15 Up at the top. There we are. So, it also says you are
16 seeking damages for humiliation, mental and emotional
17 anguish and distress.
18      What are your symptoms here?
19      **A.  What are my symptoms?**
20      Q.  Yes. What are -- what is -- I mean we have
21 to be able to quantify it, right? So what -- how do we
22 quantify your humiliation?
23      **A.  How do I quantify it?**
24      Q.  How is -- how is your humiliation, mental

Transcript of Victor Slaughter
Conducted on August 12, 2020

149

1  and emotional anguish affecting you day-to-day?
2      A.  How is it affecting me?
3      Q.  Uh-huh.
4      A.  All of those together, that takes stress
5  to an extremely different level.
6      Q.  What do you mean?
7      A.  All of those together.
8      Q.  Uh-huh.  So, you're saying you are very
9  stressed out?
10      A.  I'm saying my job and my workplace causes
11 me stress.
12      Q.  Was your job stressful when you were in the
13 jail?
14      A.  Yes, it was stressful.
15      Q.  Is it more or less stressful than being in
16 EM?
17      A.  More.
18      Q.  Why is it more stressful?
19      A.  When I was in the jail my stress level was
20 mostly contingent on dealing with inmates.  Here in EM,
21 my stress level has risen because I'm not only dealing
22 with inmates, I'm also dealing with the racial attitudes
23 of my superiors.
24      Q.  Have you seen any mental health treater for

150

1  your increased stress?
2      A.  No, I haven't seen a mental -- not that
3  I've been -- I've had my stress tested.
4      Q.  Yes, and we will talk about -- we will talk
5  about other doctors, but I'm just trying to figure out,
6  have you seen a psychiatrist or a psychologist or
7  therapist?  Anything like that?
8      A.  No.
9      Q.  And I know that you've take a number of
10 medications, which we will talk about that, but do take
11 any medications related to any mental health diagnosis?
12 Whether that's, you know, anxiety -- excuse me, anxiety,
13 depression or anything like that?  Do you take any
14 medications for those?
15      A.  Not for anxiety or depression, no.
16      Q.  Any other mental health issue?
17      A.  No.
18      Q.  Alright.  Let's look at No. 4, which is in
19 front of you.  Let me find the right sentence here.
20      Okay.  So, I guess it's the very last
21 sentence.  So, let's go down to the bottom of the page.
22 And we asked you to detail the nature of any physical,
23 emotional or mental injuries that you claim you suffered
24 as a result of Defendants' conduct.  And one of the

151

1  things you said was that it aggravated your allergies.
2  And I'm wondering how did a claim of racial
3  discrimination aggravate your allegations?
4      A.  Because the racial discrimination is what
5  kept me in the basement for almost five years.  Where
6  there is no ventilation, no windows.  Complaints in the
7  winter about heat, complaints in the summer about air.
8  Inmates coming down there sick.  No way to -- to
9  ventilate any of this, so.
10      Q.  Have you ever had an allergy test?
11      A.  Yes, I have.
12      Q.  And did the doctor diagnose you as allergic
13 to any particular substances?
14      A.  Yeah, a few.
15      Q.  What have you been diagnosed of as being
16 allergic to?
17      A.  I can't remember every -- I can't -- I
18 can't -- I would have to -- I would have to get that
19 test result.
20      Q.  So, as you sit here today, you don't know
21 what you are allergic to?
22      A.  Out of the 20 pricks in my arm, at least
23 ten of them I showed an allergic reaction to.  Some of
24 them I don't even recall the names of them.  Because it

152

1  wasn't just ragweed and, you know, so that's what I'm
2  saying.  I can't give you everything that I saw an
3  allergic reaction to or everything that I had an
4  allergic reaction to.
5      Q.  What do you contend that you are allergic
6  to in TSS?
7      A.  The amount of dust and debris and, again,
8  inmates who are -- how can I say it?  Where hygiene
9  escapes them.  The humidity, the moisture when the
10 roof leaks, all of that exacerbates my sinus issues.
11      Q.  What else exacerbates your allergies?
12 I mean is it pollen?  Is it smoke?  Is it trees?
13      A.  Nothing like that, like grass and things
14 like that from the outside doesn't -- no, I don't know.
15 I -- I don't believe I had a high rate of pollen or
16 anything like that.
17      Q.  Okay.  You also claim that Defendants, that
18 their conduct as alleged in the complaint causes muscle
19 tightness, aches and pain and headaches.  When did --
20 when did those symptoms start?
21      A.  I can't give you a -- a date of when they
22 started.  The majority of them started when I realized
23 that my asking or attempting to -- to get some relief
24 from the basement was never going to happen, well, I

153

1  was told it wasn't going to happen, and the -- the
2  constant pressure put on from working down there.
3  It would be hard for me to describe to you what goes
4  on down there.
5      Q.  Did you ever consider transferring to
6  another unit?
7      A.  I thought about it.
8      Q.  And why have you not gone through with that
9  I guess?
10     A.  Assuming things were going to change,
11 relying on the word every once in a while of my
12 superiors.
13     Q.  Have you seen a doctor for your muscle
14 tightness, aches and pains and headaches?
15     A.  Yes, my -- yeah.
16     Q.  What doctor?
17     A.  My primary care physician.
18     Q.  Is that Dr. Reynolds?
19     A.  Yes.
20     Q.  And what did Dr. Reynolds diagnose you
21 with, if anything?
22     A.  He stated that it could be because of
23 stress.  And he was the one who initiated the testing
24 for my stress level.

154

1      Q.  Did he tell you it was related to your
2  working in TSS?
3      A.  No, he has no idea.  He can't tell me
4  it's related to working at the TSS because he doesn't
5  know what I do in TSS.
6      Q.  Okay.  Blood, you referred to some blood
7  pressure problems.  Is it your contention that it was
8  Defendants' discrimination that caused your blood
9  pressure problems?
10     A.  The Defendants' discrimination caused me
11 to be in one of the worst areas to work in every day,
12 for almost five years.  So in turn, yes, their
13 discrimination caused that problem.
14     Q.  Did you have any blood pressure problems
15 prior to joining EM?
16     A.  I had blood pressure sporadic issues that
17 were dealt with through my primary physician.
18     Q.  Have you been diagnosed with hypertension?
19     A.  Yes.
20     Q.  When were you diagnosed with hypertension?
21     A.  When -- well hypertension, the date -- I
22 don't know what date it was.  When I was seen by Dr.
23 Sullivan.
24     Q.  It looks like you listed Dr. Sullivan as

155

1  September 2018 and January 2019?
2      A.  Okay.
3      Q.  So, let me ask it a different way.  Have
4  you been diagnosed with hypertension in -- within the
5  past three years?
6      A.  Within the past three years?
7      Q.  Yes.  I'm just trying to figure out how
8  long ago you got the hypertension diagnosis?
9      A.  The diagnosis came from Dr. Sullivan.
10     Q.  Uh-huh.  So, when did Dr. Sullivan give you
11 that diagnosis?
12     A.  Whatever date it shows I seen him after --
13 after having the stress test.
14     Q.  Do you still take metoprolol?
15     A.  I'm sorry?
16     Q.  You still take your hypertension
17 medication?
18     A.  Yeah.
19     Q.  Okay.  Did you start taking that medication
20 prior to seeing Dr. Sullivan?
21     A.  No, he was the one that prescribed it.
22     Q.  And is it your contention that the high
23 blood pressure is caused by the discrimination you are
24 alleging or just working in EM generally?

156

1      A.  Again, and I think I need to clarify
2  hypertension.  I have not been per se diagnosed with
3  hypertension.  I've been diagnosed with an elevated
4  (indicating) --
5      Q.  Your blood pressure is higher than it
6  should be, according to the doctor?
7      A.  Yeah.  It's -- but my diagnosis is what
8  gets it there.
9      Q.  Well, I'm not sure I follow.  What do you
10 mean your diagnosis --
11     A.  The prescription that Dr. Sullivan
12 prescribed for me is to -- not simply because I've got
13 high blood pressure.  My blood pressure goes up, it's
14 prescribed to me to keep anxiety, for lack of a better
15 word, down so that in stressful situations, my blood
16 pressure would not go through the roof.
17     Q.  And the medication you take for that,
18 though, is metoprolol, correct?
19     A.  Yeah.  I believe it has since been changed,
20 since then.
21     Q.  Okay.  That's fine.  So, getting back to
22 my question, we can just call it a blood pressure
23 problem.  Okay?  We don't need to use a medical term for
24 it.  Do you think your blood pressure problem is caused

Transcript of Victor Slaughter
Conducted on August 12, 2020

157

1  by -- did we lose you?
2        VIDEO HOST:  Yes, it looks like his
3  Internet went out.  We are going to have to wait for him
4  to get back on.
5        MR. WHITE:  That's fine.
6        VIDEO HOST:  If you can call him,
7  Ms. Fleming?  It might be that his computer's power
8  is low or the Internet -- it is more than likely an
9  Internet connection.
10       (Off the record.)
11       MR. WHITE:  We can take five.  Why
12 don't we take five.  Come back at 2:30?
13       VIDEO HOST:  Okay.  We are off the
14 record.  Is that okay with everyone?  Okay.  We are off
15 the record.  The time is now 2:25.
16       (Off the record.)
17       VIDEO HOST:  Okay.  We are back on the
18 record.  The time is 2:33.
19 BY MR. WHITE:
20    Q.  Alright.  Mr. Slaughter, we are back on the
21 record.  Do you understand that you are still under
22 oath?
23    A.  Yes.
24    Q.  Okay.  Let me see.

158

1        Did any of your doctors tell you that your
2  high blood pressure was caused by working in EM?
3    A.  No.
4    Q.  And you were diagnosed, it sounds like,
5  with acid reflux?
6    A.  Yes.
7    Q.  Did any of your doctors tell you that the
8  acid reflux was caused by working in EM?
9    A.  No.
10    Q.  And it sounds like you have also been
11 diagnosed with high cholesterol?
12    A.  Yes.
13    Q.  And you are not claiming that Defendants'
14 conduct caused your high cholesterol, correct?
15    A.  I don't know.
16    Q.  Okay.  So you had a stress test?  Yes?
17    A.  Yes.
18    Q.  What was the outcome of that stress test?
19 What did the doctor say about the results of that stress
20 test?
21    A.  Again, that -- oh, a couple of things.
22 That my blood pressure during the stress test was
23 extremely high, way too high.  They had to stop midway
24 as a matter of fact.  And the preliminary follow up with

159

1  the doctor, after he got all of the results, then that's
2  when he saw was that -- as the stress goes up, my blood
3  pressure goes up, of course, as with anybody else, and
4  that it's enhanced in different situations, of course,
5  like, you know, like normal stress.  He then asked for
6  details of a day, of a normal day for me, workday, and
7  I explained that to him.
8    Q.  And when you described your normal workday
9  to him, did you describe a workday in TSS or patrol or
10 just in general?
11    A.  Well, at that time I only -- I only could
12 describe TSS because I hadn't been in patrol for a few
13 years.
14    Q.  Oh, I see.  Okay, yes.  Yes, I'm looking
15 at the dates.
16        And did you talk to your doctor at all
17 about racial discrimination or just describing to him
18 what you do at TSS?
19    A.  Yeah, I just described what I do at TSS.
20    Q.  Okay.  You mentioned some stomach pains in
21 November of 2019.  I think you said you had to go to the
22 ER maybe about it, right?
23    A.  Yeah.
24    Q.  Did you get a diagnosis out of that?  Did

160

1  they diagnose you with any particular medical condition?
2    A.  I went twice.  Because -- I believe the
3  first time is the one I mentioned to you all.
4    Q.  Yes.  I'm looking at it here and it says,
5  "Plaintiff was admitted to Advocate South Suburban
6  Hospital due to severe stomach pain 12 November 2019."
7  So that was the first time and you ended up going back
8  a second time?
9    A.  2019, no, that was the second time.
10    Q.  Okay.  On either of the times did they --
11 did the doctors tell you what was going on?
12    A.  Yeah.  The first diagnosis, the first
13 diagnosis was diverticulitis.  The second one was a
14 blockage of some sort.
15    Q.  Okay.  But you are not claiming that either
16 of those were caused by Defendants' conduct, right?
17    A.  I don't know if I put that down or not.
18 I did ask could it be stress related and the doctor
19 did mention it's possible.
20    Q.  Okay.
21    A.  So, I don't know if I put that down in
22 my -- in my answers or not.  I can't recall.
23    Q.  Okay.  So, for both times, though, both
24 incidents?

Transcript of Victor Slaughter
Conducted on August 12, 2020

161

1    A.  The second.
2    Q.  The second?
3    A.  Just the second.
4    Q.  Okay.  So the blockage, you said to the
5 doctor, "Could it be stress related?"  And he said,
6 "It's possible"?
7    A.  Yes.
8    Q.  And you had some treatment with Dr. Patel
9 for a prostate issue as well?
10    A.  Correct.
11    Q.  And are you claiming that that issue is
12 caused by Defendants' conduct?
13    A.  No.
14    Q.  Social media accounts.  You identified a
15 Facebook account, but you said you don't -- you have not
16 posted anything about the allegations in the complaint,
17 correct?
18    A.  Correct.
19    Q.  And it looks like you also have a Flickr
20 account?
21    A.  Flickr?  No.
22    Q.  You posted a lot of pictures of like a
23 cruise or something like that?  Does that sound familiar
24 at all?  You are in some of the pictures.

162

1    A.  Yeah, I posted pictures of cruises, but I
2 don't know if Flickr.  At that time -- maybe when --
3 because I'm not very computer savvy, so maybe at that
4 time when I posted them, maybe what they went through
5 was something called Flickr?  I don't know.
6    Q.  Fair enough.  But you used some kind of a
7 service to share photos with friends and family?
8    A.  Yeah.
9    Q.  But you have not posted anything, whether
10 there or anywhere else, about the allegations in the
11 complaint, correct?
12    A.  No.  No.
13    Q.  Any other social media ringing a bell?
14    A.  A cousin convinced me to go on a -- what's
15 the other one with the pictures?
16    Q.  Oh, Instagram?
17    A.  Instagram.
18    Q.  Okay.  So you have an Instagram account?
19    A.  That's as of a few months ago though.  Not
20 really this.
21    Q.  So, you haven't posted anything about this
22 case on Instagram?
23    A.  No, I haven't posted much on Instagram
24 period.

163

1    Q.  Okay.  That's actually a smart move.  Okay.
2 If we could actually look back at Exhibit 5, please.
3        VIDEO HOST:  Please stand by.
4 BY MR. WHITE:
5    Q.  And if we could go to the bottom of Page 7,
6 please.  And then I am going to read this and then we'll
7 go on to the next page.  But we asked you to identify
8 the basis of your contention that the Cook County
9 Sheriff failed to adequately discipline, supervise and
10 control its supervisory officers.  (Reading.) Okay?
11 So, if we could go to Page 8 then and look at your
12 response.  You are already there.
13        So, you referred to Chief Ranzino stating
14 words to the effect of, "Oh, well, all you guys look
15 alike," and that it was the second time that he had done
16 that.  And I guess he previously responded to the effect
17 of, "All you guys look alike," and giggled.  So, those
18 incidents you are putting forth as the Sheriff failed
19 to adequately discipline, supervise and control its
20 supervisory officers; is that correct?
21    A.  Yeah, that was the -- yeah, the initial,
22 yeah.
23    Q.  Okay.  And then you said, you continued,
24 "Since being placed in the Electronic Monitoring Unit

164

1 plaintiff has not witnessed or heard about a supervisor
2 being punished for their conduct despite the misconduct
3 being documented."  Do you agree with that statement?
4    A.  Yes.
5    Q.  Okay.  As we talked about, you participated
6 in the HR investigation of Ranzino, correct?
7    A.  Correct.
8    Q.  You got an interview with Joe Consolo
9 (phonetic)?
10    A.  Yes.
11    Q.  What did you hear happened to Ranzino as a
12 result of the, "All you guys look alike," incident?
13    A.  I didn't hear anything as a result of that
14 incident.
15    Q.  You've never heard anything about that?
16    A.  Not as far as any discipline, no.
17    Q.  You didn't hear that Ranzino got demoted?
18    A.  No.  We only heard that he was placed in
19 a different unit.
20    Q.  Okay.
21    A.  Well after that.  But we don't have no idea
22 the reason behind it or -- but demoted?  No, we didn't
23 hear anything about a demotion.
24    Q.  Okay.  What do you think should have

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

165

1 happened to Ranzino?
2   **A.   That the nature of the things he said or**
3 **what he said, I don't know what the list of discipline**
4 **is for supervisors, so I can only go with what I would**
5 **perceive to be the norm for investigators. And I'm**
6 **going to go with the fact that if something like this**
7 **was said, that an investigator complained and, you know,**
8 **looking at the norm, how things go now, he probably**
9 **would have gotten a day or two off, without pay. He**
10 **probably would have been suspended for a couple of days.**
11 **Again, I don't know how deep their disciplinary goes.**
12 **I don't know if, on their scale, would this constitute**
13 **a demotion or anything like that? I don't know.**
14   Q.   I guess what I'm saying, sir, is if he was
15 demoted and involuntarily transferred out of the unit
16 at the conclusion of the investigation, what more should
17 have been done or was that not sufficient?
18   **A.   Well, again, I don't know anything about**
19 **him being demoted if --**
20   Q.   So let's assume that he was demoted. Is
21 that sufficient?
22   **A.   Um, I don't know. If this was just that**
23 **one incident? Then maybe so.**
24   Q.   You said also that supervisors are not --

---

166

1 strike that.
2       Okay. You filed an EEOC charge prior to
3 this lawsuit, correct?
4   **A.   Yes.**
5   Q.   Whose idea was the EEOC charge? Was that
6 your idea or did you hear about that from somebody else?
7   **A.   I believe it was a collective -- yes, I**
8 **believe it was a collective idea.**
9   Q.   And who was in the collective?
10   **A.   I guess a couple of the Defendants.**
11   Q.   I think you probably mean Plaintiffs,
12 right? Not Defendants?
13   **A.   Yeah, I'm sorry. Yeah.**
14   Q.   Which of the Plaintiffs got together and
15 came up with the idea of the EEOC charges?
16   **A.   Maybe -- I'm trying to think. Maybe**
17 **myself, Investigator Winston, maybe Investigator**
18 **Williams, I believe. I can't recall exactly because**
19 **it's not like we just got together one day and decided,**
20 **you know, let's do this.**
21   Q.   So, how did it kind of come about? Did you
22 guys just kind of talk about it in passing? You know,
23 "Hey, maybe we should do this"?
24   **A.   Through our conversations about the things**

---

167

1 **that were happening, the statements being made that**
2 **we've already discussed.**
3   Q.   Was there ever a time when all of you,
4 meaning all of the Plaintiffs, all 10 or 11 of you,
5 got together and met as a group?
6   **A.   No.**
7   Q.   What about some subset of that? Was there
8 ever a time, you know, whatever it was, three or four
9 or five of you got together to discuss what was to be
10 done?
11   **A.   Yeah, that probably took place. Yeah.**
12   Q.   Do you have a specific recollection of that
13 taking place or are you just kind of guessing?
14   **A.   Just kind of guessing. Because we were**
15 **never all, you know, of course in the same space at**
16 **one time, so.**
17   Q.   Whose idea was it to file a lawsuit?
18   **A.   I don't think it was anyone's idea to file**
19 **a lawsuit. It was brought to us to possibly maybe we**
20 **need to go and speak to a lawyer.**
21   Q.   You are saying that it was brought to you
22 that maybe you should speak to a lawyer?
23   **A.   Yeah. I don't think anybody was like,**
24 **"Hey, let's start this lawsuit." No, it's like let's,**

---

168

1 **in the course of us trying to get something changed**
2 **or something done, someone might have mentioned, "Hey,**
3 **maybe we need to speak to a lawyer to see what,"**
4 **you know, "to see what it is that can be done,**
5 **if anything."**
6   Q.   Okay. Do you know how Anthony Manning
7 ended up in this thing?
8   **A.   I do not.**
9   Q.   Okay. Nobody seems to.
10       I should have asked you this before, but
11 whether you were in TSS or patrol you got paid the same,
12 right?
13   **A.   Right.**
14   Q.   And if we could go, in the same exhibit,
15 go to Page 12, please. And interrogatory No. 22.
16 We asked, "Please state, list and itemize each item
17 of expense, monetary loss or other damage claimed by
18 you in this action." And then it asked you for some
19 details about those. And you wrote, "No."
20       So, you are not seeking any expense,
21 monetary loss or other damage, correct?
22   **A.   Well, no. I mean this -- 22 -- wait a**
23 **minute. Oh, right, because it said, "investigation**
24 **continues." That's why -- that's why it was answered**

---

Transcript of Victor Slaughter
Conducted on August 12, 2020

---

169

1 that way.

2     Q. Well, what way?

3     A. I guess pretty much the same way we spoke

4 earlier.

5     Q. Okay. But you're not seeking any wages

6 or medical expenses or anything like that?

7     A. Oh, no. Wages? No, no.

8     Q. So, the sum total of what you are asking

9 for is in interrogatory No. 3? And maybe we can go back

10 to look at that. That's on Page 2.

11     If we can scroll down just a little bit,

12 please. So it says, it refers to the 26A-1 (phonetic)

13 disclosures, and then it says you seek compensation for

14 litigation expense, including attorney's fees and other

15 compensatory and punitive damages for humiliation,

16 embarrassment, mental and emotional anguish and

17 distress."

18     So, in terms of money, that's what you

19 are seeking in this lawsuit; is that correct?

20     A. Correct.

21     MR. WHITE: Why don't we take -- I may

22 be done. Can we just take like three minutes? I will

23 talk to my co-counsel and then we can turn it over to

24 your attorney to see if she has any questions.

---

170

1     VIDEO HOST: Okay. We are going off

2 the record. The time is 2:51.

3

4     (Off the record.)

5     VIDEO HOST: We are going back on the

6 record. The time is 2:56 p.m. You may proceed.

7

8 BY MR. WHITE:

9     Q. Mr. Slaughter, you understand that you are

10 back under oath?

11     A. Yes.

12     Q. One of the things I wanted to ask you

13 about, we were talking about TSS as a punishment, and

14 you said that Ranzino said something along the lines

15 of, "You must want to find yourself in the basement,"

16 or "You must not want to ever get out of the basement,"

17 something like that.

18     Do you recall that testimony?

19     A. Yes.

20     Q. Was he saying that in response to

21 something?

22     I guess what I am asking is what kind of

23 happened right before he made that comment?

24     A. I believe, in most cases with he and I,

---

171

1 it was simply a difference of opinion. We are often

2 asked, usually at the end of roll call, it's just --

3 it's just common, even inside the jail, you know, once

4 roll call is about to be over, "Does anyone have any

5 questions, comments or concerns?" But with Chief

6 Ranzino, if you had a question, comment or a concern,

7 it seemed in most cases he would either blow it off or

8 a, "Hey, it is what it is," type of thing, you know.

9 And if we wanted verification, we couldn't get it. So,

10 if you were to ask again, "Well, can I get verification

11 on it?" So, I believe it probably was along the lines

12 of something to that effect. I can't remember exactly.

13 But over the course he said, you know, "You must,"

14 you know, "You must not ever want to get out of the

15 basement," however he stated it. That stuck. Because

16 I don't believe the initial conversation with him was a

17 bad one or was personal or was anywhere near getting

18 into an argument, or anything of that effect. So, I

19 think that's why I probably don't remember the exact

20 reason for right before it, but I do remember him saying

21 that. Because at that point, TSS was definitely an

22 issue for me.

23     MR. WHITE: That's all I have for you.

24 I appreciate your time. I don't know if your counsel

---

172

1 has any questions for you.

2     MS. FLEMING: I don't have any

3 questions.

4     MR. WHITE: Okay. Well, Mr. Slaughter,

5 as I said, I appreciate your time being here and under

6 unusual circumstances. And that's that.

7     (Off the record.)

8     VIDEO HOST: We are going off the

9 record. The time is 2:59 p.m.

10

11     (Whereupon, the deposition was

12 concluded at 3:00 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

---

173

1             STATE OF MINNESOTA
2    COUNTY OF WASHINGTON       CERTIFICATE
3
4
5         I, Ann Marie Holland, hereby certify that I
    reported remotely the deposition of VICTOR SLAUGHTER,
    virtually conducted on the 12th day of August 2020,
6    and that the witness was by me first duly sworn to
    tell the truth and nothing but the truth concerning
7    the matter in controversy aforesaid;
8         That I was then and there a Notary Public in
    and for the County of Washington, State of Minnesota,
9    and that by virtue thereof, I was duly authorized to
    administer an oath;
10
         That the foregoing transcript is a true and
11   correct transcript of my stenographic notes in said
    matter, transcribed under my direction and control to
12   the best of my ability;
13       That the cost of the original has been charged
    to the party who noticed the deposition and that all
14   parties who ordered copies have been charged at the
    same rate for such copies;
15
         That the reading and signing of the deposition
16   was not waived;
17       That I am not related to any of the parties
    hereto, nor interested in the outcome of the action and
18   have no contract with any parties, attorneys or persons
    with an interest in the action that has a substantial
19   tendency to affect my impartiality;
20      WITNESS MY HAND AND SEAL this 5th day of
    October, 2020.
21
22
23        *Ann Holland*
24        Ann M. Holland, CSR
         Notary Public

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    45

| A |
| --- |

**a-1**
169:12
**ability**
58:15, 77:24,
173:19
**able**
28:23, 85:4,
122:1, 147:2,
148:21
**above**
23:18, 47:17
**above-entitled**
5:7
**absolutely**
146:12
**accident**
80:14
**accommodating**
65:24
**according**
68:9, 156:6
**account**
147:7, 161:15,
161:20, 162:18
**accounts**
161:14
**accurate**
8:1, 53:1,
117:3
**aches**
152:19, 153:14
**acid**
158:5, 158:8
**acknowledge**
4:19, 5:2
**action**
3:13, 3:15,
17:10, 67:7,
70:15, 102:5,
120:14, 168:18,
173:28, 173:30
**actions**
76:14
**acts**
93:9
**actual**
6:2

**actually**
36:18, 63:4,
63:5, 67:10,
84:5, 135:2,
136:17, 148:3,
163:1, 163:2
**address**
15:4, 91:13,
91:15
**addressed**
91:12, 92:2
**addresses**
80:10, 80:12,
80:14
**adequately**
163:9, 163:19
**adjacent**
95:16
**administer**
173:14
**admissibility**
4:21
**admitted**
160:5
**advance**
4:14, 77:3,
78:7
**advancements**
82:4, 82:5
**advancing**
76:16, 76:19,
76:21
**advise**
19:17
**advised**
23:17, 92:14
**advocate**
160:5
**affect**
173:31
**affecting**
149:1, 149:2
**aforesaid**
173:10
**african-american**
52:17, 73:22,
73:23, 74:4,
74:5, 83:15,

85:20, 88:13,
89:21, 90:19,
93:14, 94:19,
94:23, 96:18,
100:18, 111:21,
112:2, 115:24,
122:10, 127:21,
127:23, 128:1,
133:23
**african-americans**
52:11, 52:22,
101:5, 108:15,
112:22
**after**
5:8, 11:3,
16:6, 30:8,
34:21, 37:4,
64:5, 64:7,
71:15, 72:11,
77:22, 77:24,
81:19, 91:10,
96:2, 98:14,
101:2, 112:19,
130:11, 134:4,
155:12, 155:13,
159:1, 164:21
**afternoon**
107:18
**afterwards**
64:4
**again**
6:22, 9:15,
17:5, 17:7,
17:9, 20:18,
32:14, 37:4,
38:1, 38:23,
39:19, 47:10,
54:21, 56:10,
57:1, 66:5,
70:14, 71:7,
96:2, 99:12,
107:5, 112:16,
113:24, 122:20,
124:22, 125:15,
127:15, 128:5,
139:17, 141:14,
142:18, 152:7,
156:1, 158:21,

165:11, 165:18,
171:10
**against**
21:2, 21:17,
21:19, 37:12,
37:13, 117:24,
118:19, 123:12,
127:14, 131:8,
132:24, 133:23,
140:8
**aggravate**
151:3
**aggravated**
151:1
**ago**
16:9, 16:10,
21:23, 24:3,
25:3, 78:10,
112:12, 112:13,
129:1, 155:8,
162:19
**agree**
4:23, 8:15,
20:5, 20:19,
20:21, 21:3,
25:8, 27:8,
28:16, 30:7,
30:8, 38:20,
45:12, 45:21,
47:21, 52:9,
55:13, 55:16,
55:19, 56:7,
56:16, 56:22,
58:24, 67:24,
68:7, 69:14,
71:10, 94:22,
99:22, 101:4,
102:14, 128:4,
128:6, 130:2,
164:3
**agreed**
4:24, 49:17,
127:16, 127:18
**agreement**
69:2, 69:4,
83:3
**ahead**
63:24

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    46

| | | | |
|---|---|---|---|
| **ain't**<br>113:8<br>**air**<br>151:7<br>**al**<br>1:13<br>**alike**<br>83:17, 84:2,<br>106:12, 107:1,<br>115:22, 123:6,<br>123:21, 124:9,<br>163:15, 163:17,<br>164:12<br>**all**<br>3:22, 4:23,<br>4:24, 8:9, 9:2,<br>9:9, 9:14, 18:3,<br>25:9, 26:3,<br>28:6, 39:14,<br>41:22, 44:17,<br>52:24, 53:3,<br>53:5, 53:7,<br>53:22, 61:6,<br>61:9, 62:5,<br>64:17, 65:4,<br>83:16, 83:17,<br>84:2, 93:8,<br>97:11, 98:24,<br>99:2, 99:19,<br>106:12, 106:24,<br>107:1, 110:10,<br>115:22, 123:6,<br>123:21, 124:9,<br>137:4, 143:6,<br>143:18, 144:8,<br>145:3, 147:11,<br>149:4, 149:7,<br>152:10, 159:1,<br>159:16, 160:3,<br>161:24, 163:14,<br>163:17, 164:12,<br>167:3, 167:4,<br>167:15, 171:23,<br>173:21<br>**allegations**<br>151:3, 161:16,<br>162:10<br>**allege**<br>27:2, 41:22, | 61:6, 65:5,<br>66:8, 93:9<br>**alleged**<br>22:19, 24:23,<br>70:3, 82:15,<br>152:18<br>**alleging**<br>155:24<br>**allergic**<br>151:12, 151:16,<br>151:21, 151:23,<br>152:3, 152:4,<br>152:5<br>**allergies**<br>151:1, 152:11<br>**allergy**<br>151:10<br>**allowed**<br>36:20, 48:14,<br>78:7, 96:24,<br>97:1<br>**almost**<br>37:4, 44:11,<br>60:24, 61:1,<br>151:5, 154:12<br>**along**<br>34:18, 57:24,<br>98:22, 170:14,<br>171:11<br>**already**<br>27:23, 61:5,<br>75:15, 97:15,<br>100:6, 108:11,<br>109:23, 111:13,<br>119:1, 124:13,<br>125:17, 125:21,<br>138:6, 139:24,<br>140:4, 140:11,<br>143:19, 163:12,<br>167:2<br>**alright**<br>6:15, 7:1,<br>8:11, 8:23, 9:6,<br>9:12, 11:6,<br>11:10, 12:21,<br>14:3, 14:9,<br>25:11, 26:13,<br>26:21, 27:1, | 27:16, 27:20,<br>29:11, 30:2,<br>33:6, 40:12,<br>50:2, 50:5,<br>52:6, 61:4,<br>64:20, 66:4,<br>68:14, 69:14,<br>76:12, 82:11,<br>86:23, 95:1,<br>97:4, 101:19,<br>104:9, 105:16,<br>108:16, 109:22,<br>122:13, 124:15,<br>133:13, 135:21,<br>135:24, 145:2,<br>150:18, 157:20<br>**also**<br>2:23, 11:15,<br>18:6, 49:13,<br>50:23, 54:23,<br>57:2, 57:4,<br>57:15, 63:21,<br>70:2, 70:3,<br>79:4, 82:7,<br>118:21, 124:3,<br>129:17, 134:1,<br>138:17, 139:7,<br>142:22, 143:1,<br>148:15, 149:22,<br>152:17, 158:10,<br>161:19, 165:24<br>**alter**<br>66:2<br>**altercation**<br>85:14, 85:19,<br>87:14<br>**always**<br>13:11, 13:13,<br>27:24, 28:4,<br>28:5, 45:9,<br>61:9, 91:23,<br>101:17, 113:13,<br>113:20, 115:13,<br>120:14, 120:16<br>**ames**<br>89:22<br>**amongst**<br>80:7, 99:19 | **amount**<br>18:15, 47:17,<br>78:1, 129:7,<br>148:5, 148:9,<br>152:7<br>**anguish**<br>148:17, 149:1,<br>169:16<br>**ann**<br>1:28, 4:15,<br>173:5, 173:37<br>**another**<br>57:9, 79:11,<br>90:20, 91:10,<br>145:14, 153:6<br>**answer**<br>3:12, 3:17,<br>6:22, 7:3, 7:6,<br>7:15, 7:21,<br>40:5, 44:22,<br>81:13, 87:19,<br>103:21, 109:23,<br>111:10, 111:19,<br>141:10, 145:5,<br>146:7<br>**answered**<br>147:15, 168:24<br>**answering**<br>85:5<br>**answers**<br>8:12, 8:13,<br>8:17, 8:20,<br>40:22, 41:11,<br>81:7, 141:5,<br>142:5, 160:22<br>**anthony**<br>1:8, 128:12,<br>168:6<br>**anxiety**<br>150:12, 150:15,<br>156:14<br>**any**<br>4:5, 4:14,<br>5:22, 6:10,<br>7:14, 7:15,<br>7:18, 7:24, 8:6,<br>8:8, 8:16, 8:20,<br>9:3, 9:17, 10:5, |

10:9, 10:11,
13:2, 15:13,
16:7, 16:16,
16:18, 18:15,
19:1, 23:11,
28:3, 39:16,
46:20, 46:22,
47:2, 49:7,
56:8, 56:23,
57:16, 57:20,
58:6, 58:8,
58:11, 58:12,
78:4, 78:5,
78:13, 78:16,
78:18, 80:2,
83:9, 108:16,
108:22, 109:4,
109:19, 115:9,
115:24, 119:10,
119:11, 121:7,
122:3, 122:5,
122:7, 123:16,
123:24, 125:21,
128:21, 135:8,
138:10, 139:5,
140:3, 145:14,
145:21, 145:22,
149:24, 150:11,
150:13, 150:16,
150:22, 151:9,
151:13, 154:14,
158:1, 158:7,
160:1, 162:13,
164:16, 168:20,
169:5, 169:24,
171:4, 172:1,
172:2, 173:27,
173:29

**anybody**
8:12, 8:19,
34:9, 35:6,
49:20, 81:23,
104:11, 105:10,
159:3, 167:23

**anyone**
8:3, 36:9,
62:8, 86:15,
86:20, 89:17,

91:6, 93:3,
115:18, 131:3,
171:4

**anyone's**
167:18

**anything**
7:6, 8:16,
8:23, 12:12,
12:18, 13:20,
29:12, 34:13,
35:8, 46:23,
47:19, 49:9,
49:21, 66:1,
81:22, 105:13,
106:1, 113:3,
116:3, 138:7,
138:21, 150:7,
150:13, 152:16,
153:21, 161:16,
162:9, 162:21,
164:13, 164:15,
164:23, 165:13,
165:18, 168:5,
169:6, 171:18

**anyway**
35:12, 64:11

**anywhere**
89:2, 99:23,
99:24, 162:10,
171:17

**apart**
23:8, 110:19,
110:21, 125:20,
135:6

**apologize**
4:13, 45:11,
114:19

**appearances**
2:1

**appeared**
2:7, 2:14, 2:19

**applied**
82:5

**applies**
97:23

**apply**
77:7, 97:11,
97:24, 98:7

**appreciate**
171:24, 172:5

**approached**
72:14

**approximate**
30:3, 94:20,
112:11

**approximately**
10:2, 10:23,
30:4, 42:13,
44:12, 46:18,
94:17, 112:14,
120:7, 136:9,
138:24

**april**
10:16, 83:13,
85:8, 85:18,
86:24

**arbitration**
22:22, 23:1,
23:4

**arbitrators**
23:1, 23:5

**area**
31:22, 33:23,
35:4, 35:16,
39:3, 47:16,
47:18, 47:24,
69:8, 71:15,
72:13, 72:24,
73:4, 74:3,
85:20, 85:21,
98:21, 99:9,
99:18, 112:23,
113:5, 113:17,
113:18, 113:21,
113:23, 114:2,
114:10, 137:3

**areas**
98:4, 98:8,
98:15, 98:18,
99:2, 99:3,
100:13, 127:17,
127:22, 128:2,
154:11

**arguing**
88:2

**argument**
89:7, 171:18

**arm**
151:22

**around**
83:13, 87:10,
121:21

**arrest**
40:10, 42:2,
107:23, 108:9,
122:1

**arrested**
77:9, 77:13

**arrests**
77:10

**arrived**
17:15

**aside**
94:16, 103:16,
120:13, 145:16

**asked**
45:11, 47:17,
50:7, 52:4,
59:4, 61:5,
65:3, 66:6,
71:24, 73:16,
79:11, 79:16,
79:17, 79:23,
79:24, 82:13,
83:8, 84:22,
87:18, 89:20,
93:8, 93:13,
95:8, 95:10,
96:14, 101:16,
103:8, 103:16,
107:20, 107:24,
117:6, 141:10,
145:2, 146:20,
150:22, 159:5,
163:7, 168:10,
168:16, 168:18,
171:2

**asking**
7:20, 7:22,
40:1, 41:21,
75:6, 75:16,
86:8, 96:19,
144:16, 147:3,
147:6, 147:24,
152:23, 169:8,

Transcript of Victor Slaughter
Conducted on August 12, 2020                    48

170:22
**asks**
77:8, 147:15
**aspect**
57:9, 61:10,
61:16, 61:23,
62:5
**aspects**
44:24, 110:9
**assessment**
67:24
**assigned**
27:2, 27:4,
27:11, 27:21,
28:1, 29:9,
29:19, 29:22,
29:24, 30:5,
30:11, 30:15,
34:22, 36:5,
36:9, 36:13,
37:8, 39:2,
40:8, 41:24,
42:12, 43:9,
44:5, 48:20,
48:23, 49:3,
50:8, 50:9,
50:14, 50:20,
50:24, 51:5,
51:9, 51:13,
51:17, 51:21,
52:24, 53:19,
54:3, 55:9,
59:19, 60:8,
60:24, 64:14,
64:23, 98:21,
99:9, 99:19,
100:11, 100:12,
100:15, 100:19,
101:5, 101:11,
101:12, 122:22,
123:9, 125:3,
125:4, 126:10,
126:15, 126:21,
126:22, 127:9,
127:22, 128:2,
129:9, 131:23,
133:5, 136:5,
137:1, 137:18

**assignment**
28:17, 28:23,
29:11, 30:18,
36:16, 37:14,
37:16, 38:3,
38:7, 38:8,
39:1, 39:8,
39:11, 43:5,
47:11, 47:12,
47:14, 57:4,
60:16, 60:21,
99:5, 100:1
**assignments**
28:20, 41:22,
44:24, 57:4,
57:6, 61:6,
73:6, 98:23,
99:13, 100:12,
126:20
**assume**
7:21, 38:18,
165:20
**assumed**
92:12
**assuming**
90:1, 153:10
**attacked**
46:11
**attacks**
46:21, 47:3
**attempt**
81:2
**attempted**
69:19, 77:3,
78:8, 78:16,
82:5, 82:9
**attempting**
79:8, 152:23
**attending**
4:2
**attention**
34:13
**attitudes**
149:22
**attorney**
9:13, 9:17,
9:18, 145:21,
145:22, 148:11,

169:24
**attorney's**
169:14
**attorneys**
5:14, 145:16,
145:19, 173:29
**audio**
111:7
**august**
1:20, 173:7
**authorized**
173:13
**automatically**
78:14
**average**
110:18, 117:11,
117:12, 117:17,
122:18, 124:20,
126:5, 129:6
**aware**
4:3, 14:22,
15:13, 60:18,
79:10, 96:18,
119:19
**away**
4:5, 11:24,
29:2, 91:17,
95:19, 113:12,
134:22
**awhile**
136:19

**B**

**baby**
89:3
**back**
17:14, 27:11,
36:19, 38:19,
41:18, 42:20,
61:19, 64:6,
69:6, 71:14,
72:4, 78:17,
80:16, 84:19,
86:23, 88:17,
88:19, 95:22,
97:3, 105:6,
106:16, 109:16,
113:21, 113:22,

113:24, 114:2,
114:3, 114:4,
114:5, 114:24,
119:18, 120:6,
127:2, 137:12,
137:13, 142:8,
144:18, 147:10,
156:21, 157:4,
157:12, 157:17,
157:20, 160:7,
163:2, 169:9,
170:5, 170:10
**background**
87:23
**backup**
4:4
**bad**
47:11, 47:12,
47:13, 171:17
**bank**
147:7
**baroni**
2:17
**base**
18:17, 60:23,
77:15, 77:16,
77:18
**based**
4:21, 13:20,
13:22, 40:3,
52:17, 52:19,
52:21, 62:23,
68:24, 70:21,
98:8, 99:9,
99:11, 99:12,
111:12, 121:8,
123:12
**basement**
27:3, 27:5,
27:17, 31:4,
31:11, 32:22,
33:5, 33:9,
33:12, 33:20,
35:16, 35:17,
63:18, 100:12,
101:8, 125:2,
151:5, 152:24,
170:15, 170:16,

Transcript of Victor Slaughter
Conducted on August 12, 2020

49

171:15
**basically**
44:21, 50:9,
58:20, 113:18,
145:2
**basing**
15:14, 60:5,
137:22
**basis**
27:21, 72:18,
101:11, 138:19,
145:20, 163:8
**bates**
67:9, 70:15
**bearing**
77:1
**became**
30:20, 91:16,
92:11, 136:8,
136:14, 137:6
**because**
6:16, 7:9,
7:20, 12:13,
16:3, 16:4,
17:18, 17:21,
20:8, 20:9,
21:12, 23:16,
31:8, 34:12,
36:15, 39:7,
39:12, 39:13,
39:21, 40:8,
41:24, 47:5,
47:23, 49:3,
49:12, 49:13,
53:13, 56:10,
56:11, 57:2,
57:9, 57:19,
67:19, 73:10,
75:11, 78:1,
78:11, 79:1,
79:8, 80:16,
87:16, 88:24,
92:7, 96:16,
101:9, 101:13,
102:16, 106:14,
108:1, 108:5,
113:17, 114:2,
114:12, 114:22,

118:20, 120:20,
121:10, 121:17,
129:17, 129:20,
130:12, 132:19,
133:4, 133:11,
137:19, 142:8,
142:17, 142:19,
145:19, 148:9,
149:21, 151:4,
151:24, 153:22,
154:4, 156:12,
159:12, 160:2,
162:3, 166:18,
167:14, 168:23,
171:15, 171:21
**become**
37:5
**been**
5:8, 6:16,
9:11, 13:11,
13:13, 21:7,
21:8, 21:16,
21:18, 23:3,
23:14, 25:20,
29:4, 29:19,
29:22, 29:24,
35:3, 35:11,
36:9, 40:14,
40:19, 44:4,
44:11, 45:10,
47:7, 56:19,
62:14, 62:15,
64:13, 64:22,
67:1, 67:5,
77:4, 77:6,
77:9, 77:13,
77:21, 79:9,
114:21, 126:15,
137:12, 139:5,
141:4, 143:16,
144:11, 146:2,
146:3, 150:3,
151:15, 154:18,
155:4, 156:2,
156:3, 156:19,
158:10, 159:12,
165:10, 165:17,
173:20, 173:22

**before**
1:28, 4:10,
5:20, 5:23, 6:1,
6:16, 6:22,
7:16, 10:24,
16:24, 19:23,
20:6, 21:5,
26:4, 26:6,
30:10, 33:15,
33:16, 33:19,
35:14, 35:15,
36:2, 40:24,
45:8, 45:19,
49:2, 60:2,
65:17, 67:13,
70:17, 74:6,
79:6, 94:2,
98:16, 103:24,
114:21, 127:6,
127:10, 132:3,
136:12, 141:7,
168:10, 170:23,
171:20
**began**
30:18, 91:11,
91:22, 92:3,
92:6
**beginning**
14:4, 48:24
**behind**
45:21, 49:6,
132:21, 164:22
**being**
19:19, 23:19,
25:1, 25:7,
30:15, 33:13,
34:22, 35:6,
37:4, 40:4,
40:8, 42:17,
43:4, 43:6,
43:8, 43:15,
44:23, 45:18,
45:19, 57:3,
58:16, 59:16,
59:18, 60:16,
60:19, 60:21,
64:5, 70:21,
76:16, 77:22,

82:8, 93:10,
96:19, 101:16,
102:13, 116:8,
116:23, 117:24,
118:19, 120:1,
121:2, 121:3,
123:8, 123:12,
126:8, 126:23,
127:2, 127:3,
127:4, 127:8,
127:13, 127:21,
129:9, 129:16,
129:17, 129:21,
131:8, 132:9,
132:10, 132:15,
132:20, 132:22,
132:24, 133:22,
136:22, 136:24,
149:15, 151:15,
163:24, 164:2,
164:3, 165:19,
167:1, 172:5
**belief**
18:17, 29:8,
30:22, 32:16,
37:15, 41:11,
59:22, 60:4,
60:6, 60:12,
60:23, 64:12,
69:18, 69:21,
99:9, 99:18,
132:12, 142:2
**believe**
17:16, 17:21,
18:11, 18:14,
22:13, 22:15,
25:1, 27:10,
29:14, 30:20,
33:23, 35:3,
35:10, 38:6,
47:4, 53:20,
60:16, 60:21,
66:11, 68:15,
75:4, 75:6,
76:17, 79:16,
81:16, 85:4,
86:7, 86:9,
88:7, 88:12,

Transcript of Victor Slaughter
Conducted on August 12, 2020

50

90:3, 90:6,
92:17, 95:7,
103:6, 104:4,
104:6, 104:8,
107:12, 107:20,
108:13, 111:3,
114:21, 116:9,
119:16, 123:4,
128:24, 130:11,
130:16, 133:18,
134:1, 134:15,
134:19, 137:8,
137:11, 137:15,
137:18, 138:16,
139:21, 140:1,
152:15, 156:19,
160:2, 166:7,
166:8, 166:18,
170:24, 171:11,
171:16

**believed**
23:9, 59:18,
60:1, 67:20,
121:15, 132:11

**believes**
137:15, 137:18

**bell**
162:13

**besides**
13:2, 34:9

**best**
6:21, 41:10,
58:15, 141:16,
142:1, 173:19

**better**
49:1, 55:13,
56:7, 56:23,
57:13, 57:15,
57:18, 87:19,
88:5, 88:6,
143:9, 156:14

**between**
29:5, 49:4,
75:17, 87:15

**beyond**
47:18

**biased**
103:6

**biassed**
111:16

**bid**
28:16, 28:17,
28:20, 28:23,
36:18, 137:11

**bidded**
36:13, 36:16

**bidding**
36:12, 36:19

**bieniek**
50:18, 50:19,
50:20, 54:8,
95:7, 95:19,
96:23

**big**
125:11

**bit**
49:19, 100:3,
104:11, 125:3,
169:11

**bite**
49:2

**black**
84:23, 86:1,
86:8, 94:14,
114:10, 132:15

**blockage**
160:14, 161:4

**blood**
154:6, 154:8,
154:14, 154:16,
155:23, 156:5,
156:13, 156:15,
156:22, 156:24,
158:2, 158:22,
159:2

**blow**
171:7

**blue**
79:22

**book**
79:11, 80:6

**bosques**
51:5, 54:12,
54:14

**both**
6:17, 66:15,

66:18, 102:16,
106:11, 106:14,
107:5, 107:8,
107:12, 112:4,
116:2, 116:4,
124:6, 125:16,
160:23

**bottom**
41:20, 42:6,
50:4, 65:1,
83:12, 97:5,
124:5, 145:1,
145:5, 150:21,
163:5

**bow**
88:18

**boy**
34:1, 111:21,
112:2, 115:24,
122:11, 124:11

**boys**
113:13, 114:15,
114:17, 115:13

**break**
7:14, 7:16,
49:21, 65:17,
65:23, 105:9

**breaks**
48:17, 48:18,
77:10

**brightens**
140:16

**brook**
2:12

**brought**
142:23, 167:19,
167:21

**building**
35:18

**bulk**
49:5

**bunch**
5:16, 114:6

**business**
139:13

**C**

**cabinet**
80:7

**calculation**
148:1, 148:4,
148:8, 148:11

**call**
25:1, 25:7,
31:22, 33:23,
34:12, 63:16,
72:11, 72:13,
72:23, 73:1,
73:4, 79:17,
79:21, 79:23,
80:3, 80:13,
83:21, 83:22,
85:12, 85:20,
85:21, 86:2,
86:4, 87:24,
100:4, 106:15,
107:10, 107:12,
107:13, 107:17,
110:13, 110:14,
110:15, 110:19,
110:21, 111:1,
112:19, 113:16,
113:17, 113:18,
113:21, 113:23,
114:2, 114:4,
114:9, 115:3,
120:3, 120:8,
121:18, 124:2,
138:20, 138:24,
139:6, 156:22,
157:6, 171:2,
171:4

**called**
24:3, 47:5,
91:19, 134:2,
162:5

**calling**
91:11, 91:20,
92:8, 92:11,
92:13, 92:17,
92:20

**calls**
106:18

**came**
17:1, 18:20,
43:11, 43:19,
44:3, 44:17,

44:23, 45:1,
79:21, 87:10,
95:8, 113:21,
114:3, 114:8,
119:2, 120:3,
120:7, 121:11,
137:11, 146:3,
146:16, 155:9,
166:15
**can't**
7:4, 7:24,
8:12, 16:9,
16:18, 21:22,
22:3, 24:5,
25:9, 31:17,
31:19, 34:11,
37:5, 37:21,
39:10, 40:5,
44:22, 48:5,
48:7, 56:10,
56:11, 57:14,
57:15, 62:18,
63:22, 81:18,
88:3, 94:12,
97:14, 99:4,
108:7, 108:8,
109:21, 111:19,
112:10, 112:20,
113:3, 116:11,
120:9, 121:10,
121:11, 121:17,
121:24, 122:7,
127:5, 129:4,
130:9, 132:16,
133:16, 134:7,
134:10, 134:11,
147:20, 151:17,
151:18, 152:2,
152:21, 154:3,
160:22, 166:18,
171:12
**cannot**
18:23, 73:5,
120:20, 146:11
**card**
70:7, 70:22,
74:3, 75:9,
75:12, 75:20,

76:18, 78:8,
78:12, 82:19,
82:23, 102:7,
102:19
**care**
153:17
**career**
39:4
**case**
1:12, 25:22,
67:8, 80:13,
147:12, 162:22
**cases**
6:11, 63:16,
117:8, 170:24,
171:7
**category**
148:5
**caucasian**
72:15, 73:3,
73:18, 93:13,
93:17
**caused**
154:8, 154:10,
154:13, 155:23,
156:24, 158:2,
158:8, 158:14,
160:16, 161:12
**causes**
149:10, 152:18
**ccso**
67:9
**cecil**
1:8, 125:24
**certain**
77:24, 79:12,
92:13, 93:12,
93:17, 98:18,
103:22, 110:8,
130:13
**certainly**
147:18
**certificate**
173:2
**certify**
173:5
**chain**
15:6, 15:7,

15:18, 74:20
**challenge**
11:16, 11:22
**change**
12:11, 29:2,
42:19, 66:1,
95:15, 96:14,
96:24, 97:1,
104:10, 105:13,
107:19, 137:19,
142:14, 142:21,
143:4, 143:7,
153:10
**changed**
27:13, 29:1,
30:14, 30:17,
44:20, 55:21,
78:13, 143:3,
156:19, 168:1
**changeover**
117:15
**changes**
26:10
**changing**
95:23, 117:14
**charge**
166:2, 166:5
**charged**
173:20, 173:22
**charges**
166:15
**check**
77:23
**chicago**
2:5, 2:18,
99:1, 99:2
**chief**
21:7, 22:4,
22:5, 31:13,
31:14, 31:15,
33:2, 33:4,
33:7, 62:3,
62:13, 62:15,
62:16, 63:10,
66:18, 67:19,
68:17, 69:8,
69:14, 70:20,
70:24, 71:16,

72:13, 74:3,
74:7, 75:4,
75:10, 75:11,
76:10, 78:22,
79:11, 79:14,
79:16, 79:17,
79:19, 79:21,
79:24, 80:1,
83:13, 83:18,
84:20, 84:22,
84:24, 85:18,
85:22, 87:2,
87:8, 87:11,
88:7, 88:8,
89:20, 91:10,
91:13, 91:14,
91:16, 91:18,
91:24, 92:3,
92:5, 92:8,
92:10, 92:15,
92:20, 93:12,
95:8, 95:21,
106:17, 108:6,
109:22, 109:24,
110:19, 111:3,
111:20, 116:1,
122:8, 130:8,
134:10, 134:12,
139:5, 139:16,
163:13, 171:5
**chief's**
130:8
**chiefs**
31:2, 62:1,
79:8, 130:17,
139:3, 143:15
**choice**
49:16
**cholesterol**
158:11, 158:14
**choose**
13:17
**chosen**
13:17, 13:19
**chronological**
67:11
**circle**
80:16

Transcript of Victor Slaughter
Conducted on August 12, 2020

52

circumstances
89:6, 172:6
city
113:5, 113:6
claim
29:8, 145:23,
150:23, 151:2,
152:17
claimed
6:8, 168:17
claiming
72:19, 158:13,
160:15, 161:11
claims
19:3
clarify
105:14, 156:1
class
108:14
clear
6:24, 7:12,
32:1, 135:2
close
72:5
co-counsel
169:23
co-plaintiffs
97:12, 117:1
collective
112:8, 166:7,
166:8, 166:9
collins
24:4, 24:6,
62:14
com
2:6, 2:7, 2:13,
2:19
come
19:22, 59:3,
85:5, 108:1,
108:4, 118:24,
127:6, 147:7,
157:12, 166:21
comes
15:5, 17:24,
18:3, 61:15
coming
13:22, 151:8

command
15:7, 15:18,
74:20
comment
83:18, 83:20,
90:23, 123:20,
135:6, 170:23,
171:6
comments
123:6, 171:5
common
171:3
compared
52:21
comparison
45:9
compensation
145:6, 145:12,
169:13
compensatory
169:15
complain
63:17, 117:23,
118:2, 118:18,
123:1, 123:8,
123:11, 123:15,
125:13, 126:19,
126:23, 127:8,
127:12, 127:13,
128:8, 129:15,
131:7, 131:10,
132:9, 132:23,
133:22, 135:7,
136:22, 138:1,
138:9
complained
106:8, 123:14,
137:14, 165:7
complaining
113:13, 115:13,
119:19, 132:10
complaint
3:11, 9:8, 9:9,
9:10, 25:21,
26:18, 27:1,
82:14, 82:16,
86:11, 86:13,
97:4, 152:18,

161:16, 162:11
complaints
123:17, 137:2,
137:5, 151:6,
151:7
complete
8:1
complimentary
4:11
comprehensive
25:5
computation
145:3, 146:20,
146:22
compute
146:17, 147:9,
147:16
computed
146:9, 147:8
computer
4:6, 162:3
computer's
157:7
concern
147:14, 171:6
concerned
108:5, 116:7,
116:8
concerning
173:9
concerns
89:10, 128:1,
171:5
concise
87:19
concluded
172:12
conclusion
127:6, 165:16
condition
160:1
conditions
47:18
conduct
111:12, 139:6,
150:24, 152:18,
158:14, 160:16,
161:12, 164:2

conducted
1:19, 106:18,
173:7
conform
12:14
connect
4:9
connecting
4:9
connection
85:13, 157:9
consequences
74:24
consider
47:11, 47:12,
153:5
consideration
139:8
considered
36:22
consistently
27:2
consolo
164:8
constant
153:2
constitute
165:12
contend
27:20, 50:13,
98:7, 102:8,
116:1, 152:5
content
9:16, 68:7
contention
52:1, 52:3,
64:12, 102:11,
154:7, 155:22,
163:8
contents
105:10
contingent
145:20, 146:5,
147:5, 149:20
continually
40:8
continue
39:9, 95:5

Transcript of Victor Slaughter
Conducted on August 12, 2020

53

**continued**
43:24, 163:23
**continues**
168:24
**contract**
14:1, 17:20,
17:22, 17:24,
18:4, 18:6,
28:22, 137:12,
173:29
**control**
79:19, 163:10,
163:19, 173:18
**controlled**
45:22, 45:23
**controversy**
173:10
**conversation**
9:17, 9:21,
62:19, 81:5,
87:22, 91:11,
91:22, 92:2,
114:1, 114:12,
123:4, 123:13,
123:17, 133:13,
137:21, 171:16
**conversations**
4:5, 4:7,
123:18, 125:16,
131:9, 166:24
**convinced**
162:14
**cook**
1:13, 5:15,
6:5, 10:15,
67:6, 74:16,
141:5, 163:8
**copies**
173:22, 173:23
**cops**
114:7, 114:15,
114:18
**copy**
37:22, 104:20,
105:2
**corner**
87:11
**correct**
8:21, 11:1,

11:5, 13:10,
18:13, 18:16,
19:23, 21:15,
23:2, 29:6,
30:6, 41:12,
42:15, 53:12,
58:9, 62:24,
66:9, 66:12,
66:17, 66:19,
66:21, 66:22,
68:11, 69:9,
69:10, 69:16,
69:17, 70:4,
70:8, 71:1,
71:2, 71:12,
71:13, 71:16,
71:17, 71:19,
71:20, 71:23,
74:18, 74:19,
74:21, 82:21,
82:24, 83:3,
84:6, 84:11,
85:15, 92:4,
94:8, 95:4,
97:21, 98:12,
100:16, 100:19,
101:24, 102:1,
109:11, 115:1,
116:20, 118:11,
126:24, 141:11,
141:12, 141:17,
142:2, 142:6,
142:7, 156:18,
158:14, 161:10,
161:17, 161:18,
162:11, 163:20,
164:6, 164:7,
166:3, 168:21,
169:19, 169:20,
173:17
**correctional**
10:20
**corrections**
10:19, 67:7
**correctly**
20:14, 20:18,
104:3, 137:17
**cost**
144:10, 173:20

**could**
19:1, 25:12,
26:14, 28:20,
28:21, 40:13,
41:6, 41:17,
45:3, 50:4,
55:15, 66:5,
67:23, 69:6,
70:9, 71:3,
72:3, 75:20,
75:21, 83:6,
90:11, 90:12,
90:13, 93:6,
95:8, 95:11,
97:4, 121:5,
139:5, 140:19,
141:1, 141:13,
144:12, 144:13,
144:20, 144:24,
147:4, 147:5,
153:22, 159:11,
160:18, 161:5,
163:2, 163:5,
163:11, 168:14
**couldn't**
9:10, 171:9
**counsel**
4:16, 4:20,
4:24, 171:24
**counseling**
3:14, 17:6,
69:2, 69:4,
69:8, 69:12,
104:5
**count**
53:6
**county**
1:13, 5:15,
6:5, 10:15,
67:6, 74:16,
141:5, 163:8,
173:2, 173:12
**couple**
9:5, 27:13,
47:4, 49:14,
81:18, 93:19,
100:22, 107:10,
107:21, 119:7,

121:9, 121:14,
124:8, 124:10,
127:16, 127:19,
129:1, 132:1,
132:2, 158:21,
165:10, 166:10
**course**
48:16, 120:2,
122:21, 143:6,
159:3, 159:4,
167:15, 168:1,
171:13
**court**
1:1, 4:16, 5:1,
6:2, 6:24, 7:4,
77:8, 104:19,
104:23, 105:4
**cousin**
162:14
**covered**
100:6
**cpd's**
99:2
**create**
143:9
**criminal**
75:22
**critique**
57:20
**crook**
100:4
**cruise**
161:23
**cruises**
162:1
**crying**
89:4, 89:5
**csr**
1:28, 173:37
**cst**
1:21
**current**
145:19
**cv**
1:12

**D**

**daffada**
2:17

Transcript of Victor Slaughter
Conducted on August 12, 2020

54

| | | | |
|---|---|---|---|
| **daily** | 96:4, 96:10, | **deemed** | **deposition** |
| 135:24, 138:19 | 96:12, 102:17, | 99:2 | 1:19, 4:12, |
| **dallas** | 102:23, 106:4, | **deep** | 5:20, 8:21, |
| 84:21 | 110:10, 110:18, | 165:11 | 8:24, 9:14, |
| **damage** | 116:17, 117:3, | **defendant** | 9:19, 10:6, |
| 168:17, 168:21 | 117:11, 117:12, | 6:10, 40:22, | 10:9, 25:24, |
| **damages** | 117:17, 122:18, | 118:3, 125:22, | 40:16, 41:4, |
| 142:9, 145:3, | 123:24, 124:20, | 138:10, 141:5 | 67:2, 70:11, |
| 146:21, 147:4, | 126:5, 127:6, | **defendants** | 140:22, 172:11, |
| 148:1, 148:2, | 127:7, 127:10, | 1:14, 2:14, | 173:6, 173:21, |
| 148:4, 148:16, | 129:6, 135:17, | 2:20, 5:15, | 173:25 |
| 169:15 | 135:22, 142:11, | 83:10, 93:9, | **depositions** |
| **dancing** | 154:11, 159:6, | 102:2, 123:16, | 10:12 |
| 121:21 | 165:9, 166:19, | 128:9, 131:11, | **depression** |
| **danger** | 173:7, 173:32 | 135:7, 136:2, | 150:13, 150:15 |
| 45:24, 46:3 | **day-to-day** | 136:4, 150:24, | **derogatory** |
| **dangerous** | 149:1 | 152:17, 154:8, | 83:10, 119:7, |
| 45:20 | **days** | 154:10, 158:13, | 119:12, 119:13, |
| **dart** | 16:17, 38:9, | 160:16, 161:12, | 119:15, 134:3 |
| 3:17 | 53:17, 81:18, | 166:10, 166:12 | **describe** |
| **dart's** | 96:9, 122:22, | **definitely** | 153:3, 159:9, |
| 141:6 | 128:24, 129:3, | 122:2, 171:21 | 159:12 |
| **date** | 137:11, 137:13, | **delivery** | **described** |
| 85:5, 146:5, | 137:19, 139:8, | 28:18 | 159:8, 159:19 |
| 152:21, 154:21, | 139:10, 165:10 | **demoted** | **describing** |
| 154:22, 155:12 | **deal** | 164:17, 164:22, | 159:17 |
| **dates** | 125:11, 130:15 | 165:15, 165:19, | **description** |
| 159:15 | **dealing** | 165:20 | 3:9 |
| **david** | 11:23, 11:24, | **demotion** | **descriptions** |
| 1:9, 55:17, | 12:6, 12:8, | 164:23, 165:13 | 139:18 |
| 55:20, 128:18, | 45:24, 149:20, | **denied** | **designed** |
| 131:7 | 149:21, 149:22 | 82:20, 93:14 | 20:15 |
| **day** | **dealt** | **denote** | **desk** |
| 1:20, 17:10, | 154:17 | 90:16 | 95:16, 95:19 |
| 29:24, 30:5, | **debris** | **department** | **despite** |
| 30:13, 30:16, | 152:7 | 38:16, 63:5, | 164:2 |
| 34:22, 36:19, | **decide** | 67:7, 75:2, | **detail** |
| 37:5, 42:13, | 13:21 | 78:13, 79:1 | 36:12, 36:19, |
| 47:5, 49:7, | **decided** | **departments** | 119:9, 150:22 |
| 53:15, 57:8, | 117:5, 120:5, | 49:14 | **detailed** |
| 57:24, 60:2, | 139:6, 166:19 | **depend** | 145:3 |
| 61:1, 66:16, | **decides** | 21:10, 36:24, | **details** |
| 73:6, 74:22, | 18:8, 18:14 | 49:13 | 159:6, 168:19 |
| 79:17, 93:18, | **decision** | **depos** | **detainee** |
| 93:19, 93:20, | 121:11 | 2:24 | 6:8 |
| 93:22, 93:23, | **decisions** | **deposed** | **determination** |
| 94:6, 94:11, | 121:7, 121:9, | 6:16 | 102:5, 102:9, |
| 95:2, 95:10, | 121:15 | **deposes** | 102:21, 103:7, |
| | | 5:9 | |

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    55

103:19, 103:20,
103:23
**determine**
78:6
**determined**
16:24, 17:11
**determining**
19:7
**diagnose**
151:12, 153:20,
160:1
**diagnosed**
151:15, 154:18,
154:20, 155:4,
156:2, 156:3,
158:4, 158:11
**diagnosis**
150:11, 155:8,
155:9, 155:11,
156:7, 156:10,
159:24, 160:12,
160:13
**difference**
75:17, 171:1
**different**
12:1, 21:12,
26:8, 29:13,
32:20, 32:21,
35:17, 39:6,
44:24, 57:2,
57:24, 58:1,
58:2, 58:3,
63:4, 95:9,
95:11, 110:17,
117:9, 120:18,
121:2, 121:3,
121:6, 129:11,
129:23, 130:12,
149:5, 155:3,
159:4, 164:19
**differently**
32:8, 93:10,
148:9
**difficult**
12:8, 68:15
**dinner**
48:18
**direct**
32:16, 32:18,

32:20, 74:7
**directed**
34:14, 34:15,
34:16
**direction**
173:18
**directly**
72:14, 112:7
**director**
18:10, 18:11,
18:14, 18:21,
18:22, 21:9,
22:10, 22:11,
24:7, 24:8,
24:9, 24:13,
69:18, 69:21,
71:7, 86:18,
89:15, 91:4,
93:1, 100:3,
100:9, 101:20,
101:23, 103:2,
108:6, 119:22,
119:23, 120:1,
120:19, 120:21,
122:8, 122:9
**disciplinary**
3:13, 3:15,
17:9, 67:7,
70:15, 76:14,
102:2, 102:5,
165:11
**discipline**
15:23, 16:3,
16:14, 16:20,
16:22, 17:2,
17:20, 17:23,
18:9, 18:15,
18:24, 19:7,
19:23, 20:13,
20:17, 20:19,
20:22, 21:2,
21:3, 21:4,
21:15, 21:17,
21:19, 22:2,
23:10, 23:12,
24:11, 24:20,
24:21, 24:22,
25:6, 25:7,

30:19, 30:21,
43:5, 65:4,
66:7, 68:4,
69:1, 69:16,
69:20, 70:19,
71:11, 71:21,
72:19, 74:23,
76:18, 76:24,
78:17, 80:20,
81:23, 82:7,
82:15, 101:22,
103:3, 163:9,
163:19, 164:16,
165:3
**disclosures**
169:13
**discriminated**
117:24, 118:19,
123:12, 127:14,
131:8, 132:24,
133:23, 140:8
**discrimination**
14:10, 14:19,
15:3, 15:8,
15:10, 106:9,
107:3, 119:20,
125:14, 138:2,
151:3, 151:4,
154:8, 154:10,
154:13, 155:23,
159:17
**discriminatory**
41:22, 61:7,
65:5, 66:8
**discuss**
167:9
**discussed**
82:17, 124:12,
138:6, 138:7,
167:2
**dismissed**
3:16, 71:16,
75:11, 76:10,
76:24
**disrespect**
82:19
**disrespected**
92:7

**disrespectful**
70:21
**distress**
148:17, 169:17
**district**
1:1, 1:2
**dive**
65:17
**diverticulitis**
160:13
**division**
1:3, 35:15,
35:16, 35:21,
35:23, 36:6,
36:8, 36:9,
36:14, 55:21,
56:6, 56:7,
62:23, 63:3,
79:3
**doctor**
151:12, 153:13,
153:16, 156:6,
158:19, 159:1,
159:16, 160:18,
161:5
**doctors**
150:5, 158:1,
158:7, 160:11
**document**
26:3, 26:9,
40:24, 67:6,
67:10, 67:13,
70:14, 70:17,
141:7
**documented**
164:3
**documents**
8:8, 9:3, 9:5,
41:2
**doing**
6:19, 7:9,
20:10, 31:2,
31:3, 31:10,
31:11, 32:21,
33:8, 34:18,
34:19, 57:23,
78:20, 101:13,
117:10, 117:21,

119:2
**dollar**
146:23, 147:1,
148:5, 148:9
**dollars**
146:10, 147:20
**done**
17:5, 17:7,
17:8, 20:14,
20:18, 20:24,
40:6, 48:15,
49:1, 49:2,
49:11, 61:24,
77:14, 102:17,
103:24, 104:1,
104:2, 104:6,
142:15, 143:8,
148:10, 163:15,
165:17, 167:10,
168:2, 168:4,
169:22
**donnas**
114:6
**door**
45:21, 113:17,
113:19, 113:20
**doors**
45:20
**doorway**
113:18
**down**
7:4, 33:13,
33:19, 35:11,
36:3, 42:6,
42:11, 42:17,
45:4, 49:5,
55:2, 57:17,
57:20, 57:21,
58:12, 58:16,
59:3, 59:9,
59:11, 59:24,
61:11, 61:12,
64:5, 65:1,
68:18, 74:2,
77:10, 83:6,
87:3, 87:4,
87:5, 87:6,
88:9, 88:11,

88:18, 88:20,
88:23, 89:1,
89:4, 97:5,
99:23, 99:24,
108:2, 110:14,
121:12, 127:4,
129:12, 129:18,
129:20, 130:5,
130:10, 130:14,
130:15, 130:24,
131:24, 132:3,
132:5, 132:8,
132:9, 132:22,
136:20, 136:22,
144:24, 145:5,
150:21, 151:8,
153:2, 153:4,
156:15, 160:17,
160:21, 169:11
**downstairs**
31:7
**dr**
153:18, 153:20,
154:22, 154:24,
155:9, 155:10,
155:20, 156:11,
161:8
**draft**
26:9
**dramatically**
55:21
**due**
160:6
**duly**
5:8, 173:8,
173:13
**during**
28:6, 86:2,
100:20, 101:1,
117:3, 158:22
**dust**
152:7
**duties**
61:6, 101:13,
102:7, 120:21
**duty**
66:21, 72:2,
82:19, 83:3,

87:2, 104:5

## E

**e-mail**
19:21
**each**
4:10, 54:2,
60:11, 60:13,
72:13, 73:4,
82:14, 83:9,
83:15, 102:17,
139:17, 148:4,
148:5, 148:8,
168:16
**earlier**
74:12, 120:3,
124:24, 169:4
**early**
42:10
**eastern**
1:3
**easy**
128:17
**eccentric**
90:13, 90:19
**eeoc**
166:2, 166:5,
166:15
**effect**
35:13, 83:16,
84:2, 90:14,
163:14, 163:16,
171:12, 171:18
**effective**
120:19, 139:15
**efficiently**
5:17
**eight**
11:3
**either**
6:22, 31:22,
46:10, 63:16,
78:21, 96:9,
118:17, 134:7,
139:9, 143:7,
160:10, 160:15,
171:7
**electronic**
10:17, 10:24,

11:2, 11:7,
61:8, 91:6,
93:3, 163:24
**electronically**
3:22
**elevated**
156:3
**elizabeth**
2:3, 2:6
**else**
8:12, 10:18,
22:12, 33:24,
34:9, 34:15,
35:5, 35:6,
47:19, 73:11,
94:7, 94:9,
95:3, 130:24,
131:3, 152:11,
159:3, 162:10,
166:6
**em**
11:6, 11:10,
11:14, 11:24,
12:4, 12:7,
12:12, 12:22,
13:3, 13:5,
14:9, 15:23,
16:13, 17:15,
18:10, 19:10,
19:19, 23:2,
23:6, 29:16,
36:23, 43:9,
45:1, 45:8,
45:9, 61:24,
74:17, 75:24,
76:4, 79:7,
81:1, 86:20,
89:17, 94:18,
106:9, 106:17,
107:3, 115:10,
115:19, 116:23,
121:11, 131:18,
131:21, 149:16,
149:20, 154:15,
155:24, 158:2,
158:8
**email**
2:6, 2:13, 2:18

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    57

embarrassment
169:16
emergency
39:6
emery
2:11
emotional
148:16, 149:1,
150:23, 169:16
employed
116:2
employee
68:23, 111:21,
112:2, 122:10
employees
20:16, 20:21,
23:2, 100:18,
124:11
emu
61:10, 61:16,
62:5, 64:13
enabled
4:7
end
31:6, 74:22,
102:23, 136:7,
136:11, 142:11,
171:2
ended
160:7, 168:7
endurance
50:2
english
108:2, 108:9,
108:17, 108:20,
109:5, 109:6,
109:10, 109:18,
121:24, 122:4
enhanced
159:4
enough
73:21, 120:22,
146:21, 162:6
entails
39:8
entire
39:19
entitled
26:18, 40:21,

67:6, 97:7,
147:19
environment
45:22, 45:23,
143:9
equipment
93:23, 95:7,
95:17, 112:19,
112:23, 112:24,
113:21
er
159:22
errand
48:4
errands
48:9
escalated
87:20
escapes
152:9
esq
2:3, 2:11, 2:16
established
27:24, 97:15,
108:11, 124:8,
145:17
et
1:13
ethan
2:11, 5:14
evans
2:24
even
89:1, 91:23,
117:12, 132:15,
142:12, 143:11,
147:20, 151:24,
171:3
events
105:24, 109:19
eventually
105:3
ever
5:20, 5:22,
21:18, 27:4,
28:3, 36:5,
37:18, 46:11,
47:7, 50:8,

58:16, 81:20,
81:22, 90:9,
96:1, 99:23,
106:8, 111:20,
112:6, 113:8,
117:23, 118:2,
118:12, 118:15,
118:18, 122:8,
122:10, 123:1,
123:8, 123:11,
123:15, 125:13,
126:19, 128:8,
131:6, 131:7,
131:23, 132:23,
133:22, 151:10,
153:5, 167:3,
167:8, 170:16,
171:14
every
12:10, 29:24,
30:5, 30:12,
30:15, 34:22,
37:5, 38:9,
38:23, 38:24,
39:20, 42:13,
53:15, 55:13,
57:8, 60:24,
61:1, 61:10,
61:14, 61:16,
61:23, 62:5,
62:15, 77:12,
83:9, 93:19,
106:4, 121:11,
151:17, 153:11,
154:11
everybody
7:11, 7:21,
64:9, 65:18
everyone
4:1, 43:16,
45:2, 61:15,
63:20, 63:21,
82:14, 130:8,
157:14
everything
78:2, 141:15,
141:24, 152:2,
152:3

evidence
75:15
ewhite@emerylawl-
td
2:13
exacerbates
152:10, 152:11
exact
32:5, 32:7,
89:1, 171:19
exactly
15:22, 21:22,
22:3, 59:21,
62:18, 62:21,
112:10, 166:18,
171:12
exactness
59:23
examination
3:3, 3:5, 5:11
example
18:12
examples
23:11
except
97:13
excluding
122:2
excuse
62:13, 92:9,
150:12
exhibit
3:9, 3:11,
3:12, 3:13,
3:15, 3:17,
25:13, 25:16,
25:21, 25:24,
40:14, 40:16,
40:19, 50:3,
66:5, 67:1,
67:2, 67:6,
70:10, 70:11,
72:4, 97:3,
140:20, 140:22,
141:3, 144:12,
144:21, 163:2,
168:14
exhibits
3:22

Transcript of Victor Slaughter
Conducted on August 12, 2020

58

exist
16:4, 16:7,
29:16, 38:10,
38:11
existed
17:20
existent
102:2
existing
16:8
exists
17:17, 38:17,
76:21, 134:19
expense
168:17, 168:20,
169:14
expenses
145:7, 145:8,
145:9, 145:12,
146:22, 169:6
experience
15:10, 15:15,
15:20, 52:18,
52:19, 52:21,
58:19, 126:9
explain
92:5
explained
159:7
explanation
148:1, 148:2,
148:4
express
60:12
expressing
77:19
extra
142:22
extremely
99:3, 149:5,
158:23

F

face
46:1
facebook
161:15
facet
38:24, 39:20

facets
39:14, 57:2
facility
62:22, 63:4
facing
17:9
fact
4:23, 35:10,
40:7, 76:21,
76:23, 77:6,
77:9, 77:13,
132:24, 158:24,
165:6
facts
26:18, 97:7,
97:11
failed
163:9, 163:18
fair
14:3, 62:6,
73:21, 120:22,
162:6
fairly
120:11
fall
136:11
fallen
49:6
familiar
19:9, 161:23
family
46:2, 162:7
far
7:10, 23:5,
49:24, 53:18,
53:21, 54:14,
54:16, 56:3,
66:2, 73:21,
75:24, 76:2,
108:5, 108:17,
127:16, 127:20,
141:24, 142:3,
146:24, 164:16
farther
114:24
fault
85:23
favor
22:15, 103:20,

103:23, 104:2,
111:16
favorable
31:5
february
41:14, 146:20
feel
92:7, 102:22,
102:24, 103:8,
103:10, 103:13,
143:24
feeling
92:13, 103:16
feels
108:7
fees
169:14
fell
130:9
felt
74:5, 88:22,
90:12, 102:19,
103:22, 127:13,
129:17
female
132:16, 132:17,
133:1
females
140:8
ferguson
1:7, 56:13,
57:13, 60:15,
60:19, 107:20,
124:15, 124:16,
124:21
ferguson's
58:7
few
31:2, 31:13,
36:2, 56:5,
64:5, 64:21,
117:19, 140:12,
151:14, 159:12,
162:19
figure
32:15, 38:13,
39:17, 40:2,
44:20, 146:15,

146:23, 147:1,
147:11, 147:12,
150:5, 155:7
figured
49:10
file
76:15, 77:23,
78:1, 78:2,
78:4, 78:6,
78:9, 78:17,
79:10, 80:20,
81:6, 81:11,
81:24, 86:11,
86:13, 167:17,
167:18
filed
25:22, 26:6,
101:21, 137:14,
166:2
files
79:2, 79:3
fill
19:14, 107:22
filled
79:18
filling
80:13
final
91:9
finally
55:8
financially
11:18
find
9:10, 31:3,
31:11, 32:22,
33:5, 33:11,
104:22, 150:19,
170:15
finding
76:17, 76:20
fine
7:15, 14:6,
14:7, 146:8,
156:21, 157:5
finish
6:20, 6:21
fire
101:23

Transcript of Victor Slaughter
Conducted on August 12, 2020
59

**fired**
101:21
**firm**
2:4, 2:11, 2:16
**first**
5:8, 5:19,
6:20, 13:8,
14:22, 17:3,
17:5, 17:14,
21:13, 21:18,
22:4, 23:10,
26:3, 40:22,
50:13, 66:14,
66:20, 67:12,
69:6, 71:14,
72:1, 72:9,
90:8, 96:15,
109:10, 109:23,
112:9, 114:23,
115:3, 115:5,
141:1, 141:6,
160:3, 160:7,
160:12, 173:8
**five**
28:9, 28:12,
30:1, 30:9,
35:21, 35:23,
36:9, 37:4,
42:14, 46:4,
53:21, 54:4,
54:6, 54:19,
54:21, 54:23,
55:3, 55:7,
55:10, 56:7,
59:12, 60:7,
62:8, 62:12,
62:23, 63:3,
78:9, 94:17,
104:11, 112:12,
112:22, 114:10,
151:5, 154:12,
157:11, 157:12,
167:9
**five-minute**
49:21, 65:17
**fix**
143:16
**fleming**
2:3, 65:19,

104:21, 105:1,
157:7, 172:2
**fleming@danherbe-**
**rtlaw**
2:6
**flemming**
104:19
**flickr**
161:19, 161:21,
162:2, 162:5
**fluctuates**
94:19
**focus**
41:20
**folkers**
51:17, 54:22
**folks**
58:11, 132:5
**follow**
16:13, 23:24,
74:7, 74:14,
74:23, 75:2,
81:14, 81:15,
81:17, 81:20,
156:9, 158:24
**followed**
20:3, 81:16
**following**
75:18
**follows**
5:9
**forced**
132:18, 137:3
**foregoing**
173:16
**foremost**
90:8
**forgot**
113:22
**form**
3:13, 3:15,
19:14, 30:20,
67:7, 70:15
**formally**
4:17
**forms**
107:2
**forth**
113:22, 120:6,

163:18
**found**
77:11, 80:6,
84:1, 84:3
**four**
114:10, 130:6,
131:3, 167:8
**four-and-a-half**
30:1, 30:8,
42:13
**frame**
100:20, 100:21,
101:2, 131:5
**freedom**
47:21
**frequent**
120:11
**friendly**
105:23, 139:12
**friends**
105:22, 132:17,
162:7
**front**
8:6, 8:8,
150:19
**frowned**
77:4
**full**
7:24
**fully**
61:23
**further**
49:6
**future**
147:5

---

**G**

**gained**
37:11
**gave**
84:5
**gears**
49:18, 104:11
**general**
75:1, 121:20,
159:10
**generally**
116:19, 155:24

**getting**
32:9, 32:19,
38:19, 48:1,
60:3, 72:5,
77:20, 95:6,
95:17, 107:24,
112:19, 112:23,
134:22, 156:21,
171:17
**giggled**
163:17
**gist**
32:2, 120:6
**give**
6:15, 6:17,
7:24, 8:20,
26:17, 65:9,
74:1, 84:8,
107:7, 112:11,
140:12, 144:14,
152:2, 152:21,
155:10
**given**
5:20, 24:17,
49:7, 89:6,
139:9
**gives**
107:23
**giving**
32:2, 32:10,
32:15, 32:16,
107:1
**glasses**
89:22, 90:9,
90:10, 90:13,
90:15, 90:17,
90:20
**go**
7:16, 12:15,
18:23, 22:22,
23:20, 37:13,
39:5, 46:23,
49:23, 50:4,
50:12, 54:1,
63:24, 65:2,
65:6, 72:21,
75:20, 75:21,
76:1, 76:2,

77:7, 78:20,
78:21, 82:11,
83:14, 90:14,
97:3, 99:3,
100:1, 100:8,
103:14, 104:14,
105:24, 108:9,
113:2, 114:4,
122:1, 125:10,
132:16, 141:1,
141:13, 142:5,
144:12, 144:13,
144:20, 144:21,
144:24, 147:10,
150:21, 156:16,
159:21, 162:14,
163:5, 163:7,
163:11, 165:4,
165:6, 165:8,
167:20, 168:14,
168:15, 169:9
**goes**
12:18, 16:16,
37:11, 37:12,
57:24, 98:22,
153:3, 156:13,
159:2, 159:3,
165:11
**going**
5:16, 7:10,
7:21, 8:19,
10:24, 20:7,
25:16, 31:3,
35:12, 39:21,
40:10, 41:20,
42:1, 45:1,
46:1, 49:2,
49:18, 50:3,
50:6, 50:12,
52:15, 53:5,
61:19, 63:17,
63:19, 63:20,
64:8, 65:2,
65:6, 65:9,
65:15, 78:4,
78:14, 78:17,
87:22, 89:7,
101:7, 102:22,

103:9, 103:14,
103:21, 104:10,
104:16, 105:1,
106:19, 110:16,
113:8, 113:9,
113:21, 116:6,
119:6, 119:13,
121:13, 125:10,
127:2, 130:9,
133:9, 134:24,
135:4, 136:12,
136:13, 142:9,
143:6, 144:1,
144:3, 147:2,
147:17, 152:24,
153:1, 153:10,
157:3, 160:7,
160:11, 163:6,
165:6, 170:1,
170:5, 172:8
**gone**
80:19, 81:1,
153:8
**good**
5:13, 30:7,
30:9, 39:7,
49:23, 49:24,
55:19, 55:22,
56:16, 58:24,
59:8, 110:2,
110:6, 110:7,
120:17
**gotten**
165:9
**govern**
17:22
**governed**
13:24
**grab**
49:2
**grant**
93:12
**granted**
96:20
**grass**
152:13
**great**
7:10

**greg**
141:18
**gregory**
40:22
**grievance**
19:9, 19:14,
19:18, 21:8,
21:9, 21:11,
21:13, 22:16,
22:21, 23:13,
23:21, 24:14,
68:3, 68:7,
68:10, 71:4,
71:11, 71:18,
76:23, 82:14,
103:9, 118:23,
119:3, 119:4,
134:15, 134:17,
135:1, 137:15
**grievances**
20:8, 21:6,
81:12, 82:17,
101:21
**grievant**
68:22
**grieve**
17:23, 18:3,
19:13, 24:10
**grieved**
19:23, 20:22,
21:2, 134:20,
137:19
**ground**
6:17, 132:19
**group**
43:9, 43:11,
43:19, 44:16,
44:17, 45:5,
45:6, 112:8,
112:18, 115:23,
124:11, 167:5
**groups**
115:23
**guess**
12:7, 14:5,
19:2, 20:15,
27:23, 29:15,
32:9, 40:4,

40:5, 40:8,
44:22, 48:1,
54:1, 56:6,
58:1, 60:3,
66:15, 67:21,
74:16, 78:23,
88:5, 92:12,
94:20, 97:18,
119:18, 120:15,
123:9, 124:4,
126:17, 133:9,
147:14, 150:20,
153:9, 163:10,
165:14, 166:10,
169:3, 170:22
**guessing**
167:13, 167:14
**guilty**
77:11
**guys**
48:8, 49:10,
57:21, 83:16,
83:17, 84:2,
105:24, 114:6,
130:4, 138:15,
144:7, 163:14,
163:17, 164:12,
166:22

---

**H**

**half**
10:4, 25:4,
39:3, 97:19
**halfway**
72:9
**hallway**
114:4
**hand**
173:32
**handbook**
38:12
**handful**
136:18
**handwriting**
85:23
**handwritten**
69:7, 71:15
**happen**
21:21, 48:6,

Transcript of Victor Slaughter
Conducted on August 12, 2020

61

85:3, 85:11,
97:16, 114:20,
134:6, 146:18,
152:24, 153:1
**happened**
6:8, 21:5,
22:14, 26:12,
64:10, 64:11,
77:8, 77:11,
80:6, 102:24,
112:15, 114:22,
127:6, 127:9,
134:7, 164:11,
165:1, 170:23
**happening**
167:1
**happens**
19:16, 39:4,
143:22
**hard**
57:1, 87:16,
153:3
**harder**
12:2, 12:4
**hardly**
58:16
**harsh**
20:16
**head**
7:5, 113:11,
134:3, 134:9,
135:6
**headaches**
152:19, 153:14
**health**
149:24, 150:11,
150:16
**hear**
21:13, 87:21,
109:1, 111:20,
112:1, 123:8,
132:17, 133:19,
164:11, 164:13,
164:17, 164:23,
166:6
**heard**
21:8, 21:9,
21:18, 22:9,

23:10, 23:12,
24:14, 48:2,
68:11, 71:7,
84:10, 84:13,
84:15, 84:17,
95:18, 97:20,
100:3, 100:5,
107:8, 118:12,
118:16, 122:8,
122:10, 123:19,
124:2, 125:16,
128:9, 133:20,
137:23, 138:9,
164:1, 164:15,
164:18
**hearing**
19:18, 22:4,
22:7, 23:4,
23:21, 82:20,
82:24, 103:10,
107:6, 119:3,
131:10, 138:5
**hears**
21:6
**heat**
151:7
**height**
89:7
**held**
4:5, 13:2
**help**
4:8, 37:5,
117:5, 143:4
**helped**
20:5, 20:8
**herbert**
2:3
**here**
5:16, 6:18,
14:5, 23:24,
24:2, 25:16,
25:17, 30:3,
35:12, 49:19,
52:23, 65:9,
65:15, 66:8,
67:11, 67:12,
68:7, 72:6,
74:1, 75:5,

76:12, 77:14,
79:14, 85:24,
86:24, 91:9,
91:18, 96:23,
99:8, 121:21,
129:20, 130:5,
140:13, 140:16,
141:16, 141:21,
141:24, 145:2,
146:6, 147:4,
147:6, 147:23,
148:10, 148:18,
149:20, 150:19,
151:20, 160:4,
172:5
**hereby**
5:2, 173:5
**hereto**
173:28
**herself**
73:16, 132:15
**hey**
77:10, 90:12,
91:24, 92:1,
117:20, 166:23,
167:24, 168:2,
171:8
**high**
37:8, 152:15,
155:22, 156:13,
158:2, 158:11,
158:14, 158:23
**high-crime**
99:3, 127:17,
127:22, 128:2
**higher**
46:7, 46:8,
98:4, 98:8,
98:15, 100:13,
156:5
**hired**
44:2
**history**
25:6
**hit**
140:15
**hold**
104:21

**holding**
89:3
**holland**
1:28, 173:5,
173:37
**home**
12:15, 40:10,
42:1, 48:3,
108:9, 122:1,
144:15
**hope**
144:2
**hospital**
46:23, 160:6
**host**
2:24, 3:22,
4:1, 25:14,
40:15, 104:16,
105:6, 111:7,
140:21, 157:2,
157:6, 157:13,
157:17, 163:3,
170:1, 170:5,
172:8
**hour**
10:4
**house**
40:10, 42:2,
46:1, 104:13,
107:23, 108:9,
122:1
**however**
171:15
**hr**
78:12, 81:20,
84:5, 86:11,
89:11, 90:24,
92:21, 115:5,
115:14, 164:6
**human**
79:1, 79:4
**humidity**
152:9
**humiliation**
148:16, 148:22,
148:24, 169:15
**hurtado**
52:24, 55:8

Transcript of Victor Slaughter
Conducted on August 12, 2020                                       62

| | | | |
|---|---|---|---|
| **hygiene**<br>152:8<br>**hypertension**<br>154:18, 154:20,<br>154:21, 155:4,<br>155:8, 155:16,<br>156:2, 156:3<br><br>**I**<br><br>**idea**<br>29:3, 39:7,<br>48:11, 80:2,<br>146:12, 154:3,<br>164:21, 166:5,<br>166:6, 166:8,<br>166:15, 167:17,<br>167:18<br>**identification**<br>26:1, 40:17,<br>67:3, 70:12,<br>140:23<br>**identified**<br>50:11, 53:6,<br>56:24, 57:12,<br>66:8, 102:12,<br>102:13, 161:14<br>**identify**<br>4:8, 4:10,<br>50:7, 61:6,<br>65:4, 66:7,<br>82:14, 83:9,<br>93:8, 163:7<br>**illegal**<br>75:3, 75:7,<br>75:8, 75:14,<br>75:18, 75:22,<br>75:24, 76:1,<br>76:2<br>**illinois**<br>1:2, 2:5, 2:12,<br>2:18<br>**im**<br>134:23<br>**immediate**<br>15:1, 15:2<br>**immediately**<br>92:9, 95:23<br>**immoral**<br>75:3, 75:7 | **impartiality**<br>173:31<br>**implement**<br>69:19<br>**implemented**<br>69:19, 69:22,<br>130:7<br>**important**<br>6:18, 7:10,<br>9:2, 31:9<br>**imposed**<br>22:1, 71:11<br>**imposes**<br>69:15<br>**inattention**<br>66:21, 72:2,<br>82:19, 83:2,<br>102:7, 104:4<br>**incident**<br>66:15, 66:20,<br>69:12, 70:1,<br>70:2, 71:1,<br>71:5, 71:12,<br>71:22, 72:1,<br>72:2, 72:8,<br>74:2, 78:9,<br>81:19, 84:6,<br>84:20, 85:16,<br>85:17, 98:4,<br>98:8, 98:15,<br>100:13, 107:2,<br>107:11, 114:22,<br>115:21, 164:12,<br>164:14, 165:23<br>**incidents**<br>66:9, 66:11,<br>75:5, 82:17,<br>102:6, 109:15,<br>109:17, 115:23,<br>122:5, 124:12,<br>160:24, 163:18<br>**including**<br>88:16, 98:4,<br>169:14<br>**incorporated**<br>56:4<br>**increased**<br>150:1 | **indicating**<br>46:5, 121:12,<br>156:4<br>**individual**<br>23:22, 39:21,<br>99:5<br>**individuals**<br>93:11<br>**information**<br>41:10, 68:24,<br>80:6, 80:8,<br>80:11, 80:15,<br>81:10, 111:2,<br>142:1, 147:19<br>**informed**<br>24:6<br>**infraction**<br>16:5, 16:13,<br>16:16, 16:18,<br>16:24, 17:1,<br>17:2, 17:5,<br>17:7, 17:8,<br>18:9, 18:15,<br>18:23, 19:3,<br>19:4, 22:18,<br>22:19, 23:17,<br>24:23<br>**infractions**<br>78:14<br>**initial**<br>18:8, 18:15,<br>20:19, 20:22,<br>21:1, 21:3,<br>21:4, 24:19,<br>24:21, 81:5,<br>163:21, 171:16<br>**initially**<br>13:23<br>**initiate**<br>18:24<br>**initiated**<br>18:22, 21:15,<br>21:19, 22:1,<br>22:4, 23:12,<br>153:23<br>**injured**<br>47:8<br>**injuries**<br>150:23 | **injury**<br>46:20, 46:22,<br>137:10, 137:13,<br>138:17<br>**inmate**<br>6:7, 46:2<br>**inmates**<br>11:23, 11:24,<br>12:7, 12:8,<br>12:13, 40:9,<br>42:1, 45:24,<br>46:4, 107:22,<br>108:1, 143:1,<br>149:20, 149:22,<br>151:8, 152:8<br>**inside**<br>11:23, 12:13,<br>12:14, 46:9,<br>49:14, 63:3,<br>171:3<br>**instagram**<br>162:16, 162:17,<br>162:18, 162:22,<br>162:23<br>**instance**<br>23:8, 71:18,<br>83:9, 102:10,<br>104:7, 106:12<br>**instances**<br>6:2, 59:17,<br>106:10, 107:7,<br>107:11<br>**instead**<br>4:18<br>**instructed**<br>23:20, 23:22,<br>24:7, 72:16,<br>72:21<br>**intended**<br>97:11<br>**intending**<br>106:24<br>**interact**<br>110:15, 110:19,<br>129:6, 138:19<br>**interacted**<br>126:6<br>**interaction**<br>110:12, 110:13, |

Transcript of Victor Slaughter
Conducted on August 12, 2020                                      63

120:15, 122:18,
122:21, 122:24,
124:21, 126:7,
135:24, 142:24
**interactions**
139:11
**interchangeably**
27:17
**interest**
173:30
**interested**
4:13, 173:28
**interesting**
107:14
**internet**
157:3, 157:8,
157:9
**interrogatories**
9:7, 40:23,
66:6, 100:7,
141:6, 141:9,
141:23, 142:4
**interrogatory**
41:21, 50:5,
57:12, 65:3,
67:16, 70:20,
72:4, 73:24,
76:14, 82:12,
82:13, 82:18,
83:6, 83:8,
84:19, 93:6,
144:20, 168:15,
169:9
**interrupt**
93:24
**interrupted**
95:1
**interruptions**
4:14
**intersections**
63:7
**interview**
164:8
**introduced**
143:9
**investigation**
164:6, 165:16,
168:23

**investigator**
11:11, 12:24,
13:3, 34:6,
34:10, 38:23,
39:2, 39:7,
39:11, 40:2,
50:14, 50:16,
50:18, 54:3,
54:8, 54:10,
54:12, 54:14,
54:18, 54:20,
54:22, 54:24,
55:4, 55:6,
55:8, 55:17,
56:13, 57:13,
58:6, 58:22,
59:2, 59:15,
59:17, 60:8,
60:15, 60:18,
60:20, 60:24,
61:23, 67:20,
68:11, 72:11,
85:14, 85:19,
85:21, 87:1,
87:3, 88:8,
89:20, 90:9,
91:15, 91:20,
91:21, 92:15,
94:14, 95:7,
95:17, 95:19,
96:1, 96:5,
96:8, 96:11,
107:11, 107:19,
165:7, 166:17
**investigators**
36:17, 36:22,
37:3, 42:22,
43:3, 43:9,
43:12, 45:12,
46:4, 48:2,
61:10, 62:5,
64:13, 64:18,
72:12, 72:15,
74:4, 74:5,
80:8, 83:15,
93:13, 93:15,
93:17, 94:18,
94:23, 96:19,

99:1, 99:6,
99:20, 101:2,
101:10, 108:22,
112:18, 114:11,
124:23, 127:21,
127:23, 128:1,
129:24, 142:16,
142:23, 143:24,
165:5
**invokes**
88:14
**involuntarily**
165:15
**issue**
47:16, 95:13,
130:16, 148:7,
150:16, 161:9,
161:11, 171:22
**issued**
118:23
**issues**
74:3, 121:1,
121:3, 121:4,
152:10, 154:16
**item**
168:16
**itemize**
168:16
**items**
48:14
**itself**
47:17, 63:3,
89:6, 103:14

---

**J**

---

**j**
89:23
**jail**
10:19, 10:20,
11:13, 11:23,
12:1, 12:8,
12:9, 12:13,
12:14, 43:12,
46:9, 49:14,
63:3, 75:20,
75:21, 76:2,
77:22, 149:13,
149:19, 171:3

**james**
90:1, 90:9,
90:15, 90:17,
90:21, 90:23
**january**
155:1
**jefferson**
2:4
**jerk**
116:8
**job**
6:3, 6:4, 7:10,
14:19, 38:24,
39:14, 39:16,
39:22, 49:15,
55:13, 56:8,
56:17, 56:23,
59:8, 64:9,
77:8, 110:6,
110:7, 110:9,
120:17, 133:11,
138:14, 139:15,
139:18, 149:10,
149:12
**joe**
164:8
**join**
82:9
**joined**
13:3, 29:16,
61:8, 62:1,
62:4, 107:17
**joining**
61:15, 154:15
**joke**
113:1
**jr**
1:6
**justin**
2:16
**justin@ilesq**
2:19

---

**K**

---

**keep**
7:11, 31:2,
31:10, 32:21,
33:8, 34:18,

110:2, 156:14

**kelly**
2:7
**kept**
79:12, 79:18,
80:7, 151:5
**keystone**
114:7, 114:14,
114:17
**kind**
6:18, 7:11,
8:8, 12:18,
15:14, 32:1,
49:8, 49:15,
49:16, 56:19,
80:10, 87:22,
110:22, 117:20,
117:21, 118:9,
121:21, 124:4,
129:19, 136:24,
143:3, 144:5,
162:6, 166:21,
166:22, 167:13,
167:14, 170:22
**kneel**
88:18
**knew**
80:1
**knocking**
45:20
**knowing**
75:14
**knowledge**
37:8, 37:10,
41:10, 109:4,
109:7, 109:9,
141:16, 142:1
**knowledgeable**
36:22, 37:3,
37:6, 39:12,
39:13, 39:20,
57:2, 57:9
**known**
14:22, 14:23,
14:24
**knows**
56:20, 81:7
**krauchun@danherb-
ertlaw**
2:7

**L**

**l-o-g-a-n**
87:12
**lack**
88:5, 88:6,
156:14
**language**
83:10, 108:17,
108:20, 109:5,
109:10, 116:1,
118:3, 123:16,
125:22, 128:10,
131:11, 135:8,
138:10
**lasalle**
2:17
**last**
28:9, 28:12,
29:24, 37:20,
37:24, 41:7,
42:7, 55:10,
56:5, 76:13,
77:12, 91:23,
94:17, 99:4,
99:15, 141:13,
150:20
**late**
25:1, 25:7,
79:7
**later**
79:11
**latino**
51:24, 52:2,
52:7, 53:3,
73:19, 108:1
**latinos**
52:9, 52:19,
108:12
**law**
2:4, 2:11
**lawsuit**
5:23, 108:17,
108:24, 109:5,
142:10, 143:22,
144:10, 145:4,
145:11, 145:15,
146:1, 146:7,

146:13, 147:7,
148:7, 166:3,
167:17, 167:19,
167:24, 169:19
**lawyer**
10:3, 67:8,
167:20, 167:22,
168:3
**lay**
88:18
**lead**
81:10, 138:23
**leaks**
152:10
**lean**
121:4
**learn**
61:16, 63:20,
63:22, 109:6,
130:9, 130:10
**learned**
40:9, 41:24
**learns**
64:9
**least**
36:2, 151:22
**leave**
85:20, 110:10,
130:15
**left**
85:21, 119:4,
130:14, 137:13
**legrain**
1:5, 105:16
**leinenweber**
2:16, 2:17
**less**
21:4, 21:24,
54:5, 54:9,
55:5, 58:19,
149:15
**let's**
13:5, 20:20,
28:9, 30:10,
31:8, 33:10,
49:3, 59:12,
61:4, 65:1,
65:8, 66:24,

79:14, 82:11,
83:5, 86:23,
97:3, 97:19,
104:14, 109:22,
115:3, 116:13,
119:22, 125:9,
133:8, 144:21,
150:18, 150:21,
165:20, 166:20,
167:24
**level**
18:8, 19:7,
23:10, 37:8,
69:15, 143:12,
149:5, 149:19,
149:21, 153:24
**levied**
21:2, 21:17
**lieu**
4:17
**lieutenant**
24:4, 24:6,
62:14
**life**
52:16, 52:18,
52:19, 52:21
**light**
106:24, 140:15
**likely**
142:13, 157:8
**linda**
73:15, 73:16,
73:18, 73:19
**lines**
34:18, 170:14,
171:11
**list**
38:15, 91:9,
165:3, 168:16
**listed**
52:7, 154:24
**litigation**
145:7, 145:8,
145:9, 145:11,
145:12, 146:22,
169:14
**little**
49:18, 65:16,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    65

68:15, 83:7,
100:2, 104:11,
137:9, 147:13,
169:11
**lives**
84:23, 86:1,
86:8
**llc**
2:17
**located**
35:14
**logan**
87:11, 87:12,
88:8
**long**
9:11, 10:2,
10:23, 24:3,
25:3, 42:17,
56:19, 130:4,
131:21, 133:9,
133:11, 155:8
**longer**
16:7, 17:16,
17:17, 122:21,
128:21, 136:17,
142:20, 144:2
**look**
8:16, 9:3, 9:6,
9:9, 35:12,
39:16, 50:3,
61:4, 65:1,
67:23, 68:2,
71:14, 77:12,
77:13, 78:4,
81:12, 83:17,
84:2, 92:1,
100:2, 106:12,
107:1, 108:3,
115:22, 123:6,
123:21, 124:9,
142:11, 142:12,
145:1, 145:4,
147:10, 150:18,
163:2, 163:11,
163:14, 163:17,
164:12, 169:10
**looked**
25:5, 41:3,

77:7, 95:23
**looking**
52:12, 65:15,
67:12, 68:18,
72:1, 84:19,
140:12, 159:14,
160:4, 165:8
**looks**
25:6, 67:18,
68:10, 68:13,
71:9, 85:13,
154:24, 157:2,
161:19
**lopez**
52:24, 55:4
**lose**
143:22, 157:1
**loss**
168:17, 168:21
**lost**
111:6
**lot**
55:2, 64:20,
88:15, 89:24,
90:18, 106:21,
120:2, 124:24,
130:16, 136:10,
136:20, 142:21,
161:22
**lou**
92:1
**loud**
7:4, 7:6
**low**
157:8
**lunch**
48:17, 48:18,
113:1, 113:3
**lunches**
49:3, 49:5
**lunchtime**
48:20, 48:23

**M**

**m-a-n-y**
57:5
**m-c-c-a-l-l**
89:20

**m-i-n-i**
57:5
**made**
82:15, 83:18,
88:16, 88:19,
93:14, 93:17,
100:7, 107:13,
113:1, 118:20,
121:7, 121:10,
121:15, 121:24,
124:1, 124:2,
127:15, 127:20,
133:24, 139:22,
167:1, 170:23
**main**
107:4
**major**
46:22, 142:16,
142:18
**majority**
94:22, 101:2,
152:22
**make**
26:9, 29:2,
34:19, 35:1,
37:7, 61:22,
65:17, 88:22,
95:15, 106:24
**makes**
12:15, 89:24,
128:17, 142:17
**making**
116:9
**males**
140:8
**man**
88:22
**management**
69:15, 86:16,
115:9, 115:19
**manning**
1:8, 128:12,
128:13, 168:6
**many**
13:6, 16:9,
31:14, 45:5,
46:18, 57:5
**march**
66:14, 67:18,

67:19, 70:4
**marie**
1:28, 173:5
**marked**
3:22, 25:20,
25:24, 40:14,
40:16, 40:19,
67:1, 67:2,
67:5, 68:3,
70:11, 70:15,
140:22, 141:4
**martin**
85:14, 85:19,
85:21, 87:1,
87:3, 87:15,
88:8
**math**
30:3
**matter**
5:8, 5:16,
39:20, 43:1,
84:23, 86:2,
86:9, 158:24,
173:10, 173:18
**maybe**
25:4, 29:23,
30:12, 33:17,
34:21, 35:24,
44:8, 45:7,
46:2, 46:4,
46:19, 47:4,
47:5, 52:14,
52:23, 54:5,
54:11, 54:19,
54:21, 54:23,
55:1, 55:3,
55:7, 55:11,
59:13, 60:10,
81:18, 106:19,
107:6, 107:19,
110:21, 112:3,
112:13, 112:21,
129:1, 129:4,
136:13, 159:22,
162:2, 162:3,
162:4, 165:23,
166:16, 166:17,
166:23, 167:19,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    66

167:22, 168:3,
169:9
**mccall**
89:20, 90:9,
107:11
**mcghee**
1:9, 135:10,
135:12, 135:14,
135:22, 136:1,
136:5, 136:14,
137:18, 138:1
**mean**
11:22, 14:23,
20:11, 38:20,
39:15, 42:18,
45:19, 48:22,
55:24, 59:21,
75:20, 87:21,
93:24, 103:2,
106:16, 110:8,
110:12, 113:1,
117:11, 120:10,
121:23, 122:23,
127:18, 129:12,
139:11, 139:12,
143:5, 143:12,
147:19, 148:20,
149:6, 152:12,
156:10, 166:11,
168:22
**meaning**
32:8, 32:11,
89:22, 109:6,
111:15, 140:7,
167:4
**meaningful**
102:3, 102:8,
102:14, 103:18
**means**
44:14, 144:2
**meant**
42:10, 50:1
**media**
161:14, 162:13
**medical**
156:23, 160:1,
169:6
**medication**
155:17, 155:19,

156:17
**medications**
150:10, 150:11,
150:14
**meeting**
78:24, 79:5,
79:6, 79:7,
118:23
**member**
58:13
**members**
46:2
**men**
111:16, 115:24
**mental**
148:16, 148:24,
149:24, 150:2,
150:11, 150:16,
150:23, 169:16
**mention**
59:24, 118:20,
127:15, 133:2,
133:24, 134:4,
160:19
**mentioned**
41:3, 45:19,
112:7, 112:24,
113:7, 119:16,
119:17, 120:3,
124:24, 125:8,
134:10, 144:11,
159:20, 160:3,
168:2
**mentioning**
127:4
**merinda**
2:24, 25:12,
26:14, 40:13,
41:6, 41:17,
66:24, 70:9,
72:3, 140:19
**messages**
8:16
**messinas**
51:13, 54:20
**met**
68:22, 167:5
**metoprolol**
155:14, 156:18

**mic**
4:6
**michelle**
1:5, 131:13
**middle**
79:22, 82:12,
87:24
**midst**
137:10
**midway**
158:23
**midwest**
2:12
**might**
9:2, 17:3,
17:4, 35:3,
46:1, 47:4,
56:3, 89:4,
110:14, 110:15,
111:1, 114:21,
117:1, 117:2,
117:7, 119:5,
123:4, 127:5,
142:19, 144:9,
157:7, 168:2
**mind**
16:21, 18:8,
79:24, 121:2,
130:4
**mini**
57:4
**minimum**
78:2
**minnesota**
173:1, 173:12
**minority**
52:10, 52:13,
52:16, 52:20,
98:24, 108:12,
108:14
**minute**
111:8, 119:5,
168:23
**minutes**
102:17, 104:11,
117:19, 140:12,
169:22
**misconduct**
164:2

**miss**
47:2
**mistake**
85:8, 103:3
**mistaken**
15:4, 15:12,
18:5, 19:22,
23:3, 25:2,
27:15, 87:13,
134:16, 144:11
**mistook**
83:14
**modified**
48:21
**moisture**
152:9
**moment**
25:14, 40:15
**moments**
21:7, 21:9,
110:17
**monetary**
168:17, 168:21
**money**
145:15, 145:23,
146:6, 146:12,
147:6, 169:18
**monies**
146:17
**monitoring**
10:17, 10:24,
11:2, 11:7,
61:8, 73:13,
91:7, 93:4,
163:24
**months**
30:12, 33:17,
33:19, 162:19
**more**
12:8, 16:10,
16:11, 21:23,
45:22, 45:23,
46:16, 47:21,
52:7, 57:17,
59:14, 61:17,
74:17, 87:19,
89:24, 121:4,
123:23, 124:23,

125:15, 127:22,
128:2, 129:13,
132:6, 132:15,
132:21, 137:6,
142:13, 143:3,
143:5, 143:17,
146:10, 147:20,
147:21, 149:15,
149:17, 149:18,
157:8, 165:16
**morning**
5:13
**most**
25:6, 36:22,
37:2, 38:21,
63:15, 117:8,
125:1, 170:24,
171:7
**mostly**
126:12, 149:20
**motivated**
66:12, 70:3,
72:19, 92:18,
102:13, 109:19
**mouth**
138:23
**move**
11:13, 15:5,
15:6, 35:20,
35:23, 77:3,
77:19, 78:3,
163:1
**moved**
36:14, 36:15,
137:14
**moves**
84:20
**much**
85:23, 101:9,
117:17, 122:18,
123:9, 124:21,
126:5, 132:11,
135:24, 137:4,
142:20, 144:2,
145:23, 146:6,
146:12, 147:6,
162:23, 169:3
**multiple**
33:16, 97:7

**muscle**
152:18, 153:13
**musician**
90:1
**must**
33:5, 33:11,
170:15, 170:16,
171:13, 171:14
**mute**
4:6
**mutual**
69:2, 69:4
**myself**
63:17, 72:23,
93:20, 95:18,
132:14, 166:17

**N**

**name**
5:13, 73:14,
91:23, 108:7
**names**
24:1, 53:7,
64:17, 79:14,
112:20, 151:24
**nappy**
134:3, 134:8,
135:6
**nature**
150:22, 165:2
**neal**
31:14, 31:16,
33:2, 62:13,
62:16, 63:10,
64:6, 84:17
**near**
171:17
**necessarily**
19:5, 21:14,
47:23, 77:5,
78:23, 116:7
**need**
7:3, 7:6, 7:14,
39:4, 48:3,
49:20, 54:1,
68:6, 77:19,
77:20, 100:8,
104:11, 104:12,

111:1, 124:7,
125:12, 133:3,
133:4, 133:14,
138:20, 140:14,
142:22, 142:23,
146:8, 146:23,
156:1, 156:23,
167:20, 168:3
**needed**
49:2, 49:10,
117:5, 132:18
**needs**
39:17, 39:18,
40:3, 61:15,
61:16, 130:8,
142:20, 143:8
**negative**
78:5, 116:6,
120:14, 120:15,
120:16
**negotiation**
29:5
**never**
14:11, 23:3,
33:8, 34:19,
38:13, 40:4,
48:9, 48:15,
54:13, 54:15,
54:16, 57:19,
64:10, 64:13,
64:19, 64:22,
75:13, 84:10,
84:13, 84:15,
84:17, 97:20,
101:23, 130:11,
152:24, 164:15,
167:15
**new**
40:9, 41:24,
42:1, 43:9,
43:11, 43:12,
43:19, 44:16,
44:17, 45:6,
56:3, 56:4,
56:12, 61:9,
62:5, 64:8,
64:13, 64:18,
130:7, 130:10

**newson**
1:6, 97:23,
116:13, 116:14,
117:12, 117:18,
117:23, 118:9
**next**
47:5, 51:4,
71:3, 83:14,
89:19, 100:9,
148:14, 163:7
**nice**
113:2
**nickle**
50:14, 54:3
**nickle's**
50:16
**niece**
89:3
**nobody**
14:5, 77:8,
77:10, 81:7,
168:9
**non**
90:19, 127:23
**non-minority**
27:3, 50:7,
52:2, 52:4,
98:5, 99:6,
100:11
**norm**
12:13, 165:5,
165:8
**normal**
122:23, 159:5,
159:6, 159:8
**normally**
49:7, 94:5,
95:2
**north**
113:5
**northern**
1:2
**northwest**
113:5
**northwestern**
113:7
**notary**
173:11, 173:38

Transcript of Victor Slaughter
Conducted on August 12, 2020

68

note
69:7, 71:15
notes
8:6, 140:13,
173:17
nothing
15:5, 48:9,
114:17, 125:15,
152:13, 173:9
noticed
173:21
november
159:21, 160:6
number
77:22, 132:2,
150:9
numbers
80:14

O

oak
2:12
oath
147:15, 157:22,
170:10, 173:14
object
4:20
objections
40:21, 141:4
obviously
31:6, 67:24,
147:15
occasion
46:17, 60:13,
60:14, 91:10,
92:18, 118:21,
133:2
occasions
31:14, 46:19,
60:11, 96:7,
125:1, 129:11,
130:12, 133:6
occur
9:22, 46:15,
57:5, 112:9,
113:15, 133:13
occurred
46:16, 66:15,

70:2, 70:3
occurrence
46:9, 120:11
october
173:33
offensive
83:10, 116:1
offered
68:23
office
5:15, 6:5,
10:15, 24:4,
29:5, 31:23,
35:3, 39:24,
61:1, 61:2,
63:21, 74:16,
79:4, 87:3,
88:9, 93:22,
95:6, 100:11,
100:16, 100:19,
101:3, 101:4,
101:6, 101:10,
101:11, 101:12,
101:17, 110:11,
111:1, 112:16,
112:23, 113:19,
113:23, 114:2,
114:3, 114:5,
114:12, 115:1,
119:2, 119:4,
133:4, 133:5,
134:5
officer
10:21
officers
27:4, 50:7,
52:5, 52:7,
73:3, 77:2,
77:16, 84:21,
98:6, 100:11,
142:23, 163:10,
163:20
often
29:19, 29:22,
30:11, 44:7,
54:3, 55:9,
57:10, 59:3,
59:11, 60:7,

106:3, 106:5,
106:7, 110:18,
112:1, 120:7,
124:20, 126:10,
127:22, 128:2,
129:6, 129:12,
138:18, 171:1
oh
27:13, 29:18,
29:20, 31:17,
33:17, 34:1,
34:21, 42:8,
52:6, 70:5,
83:16, 83:17,
84:1, 94:3,
94:12, 94:21,
114:6, 124:14,
125:6, 135:18,
158:21, 159:14,
162:16, 163:14,
168:23, 169:7
old
28:22, 80:7,
80:20
ominous
144:5
omissions
93:9
on-duty
87:8
once
12:10, 30:12,
32:24, 61:18,
62:1, 74:6,
78:12, 110:14,
110:21, 117:7,
136:18, 137:8,
148:10, 148:13,
153:11, 171:3
one
5:14, 11:15,
14:3, 14:12,
18:3, 19:7,
22:6, 23:8,
23:12, 24:13,
24:16, 24:24,
25:14, 30:12,
35:7, 36:22,

37:2, 38:24,
39:3, 40:15,
41:2, 46:1,
46:16, 52:7,
53:6, 55:14,
56:8, 57:7,
63:7, 68:3,
68:10, 68:21,
68:24, 69:19,
70:6, 71:4,
71:8, 75:1,
77:12, 79:8,
79:17, 82:22,
83:2, 88:16,
90:20, 93:18,
94:2, 102:10,
102:11, 102:14,
102:16, 102:18,
102:19, 102:21,
102:22, 104:21,
107:17, 107:22,
110:2, 112:9,
113:6, 115:1,
115:3, 115:5,
115:12, 118:21,
118:24, 121:23,
123:22, 130:19,
130:21, 130:22,
133:2, 135:16,
139:9, 141:14,
143:14, 144:14,
145:5, 145:10,
150:24, 153:23,
154:11, 155:21,
160:3, 160:13,
162:15, 165:23,
166:19, 167:16,
170:12, 171:17
ones
24:5, 107:5,
119:1, 140:4
ongoing
147:1
online
38:13
only
4:4, 8:11,
12:10, 28:14,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    69

28:15, 43:14,
43:19, 52:16,
58:15, 96:9,
107:5, 110:8,
113:17, 117:8,
129:20, 130:5,
130:19, 130:21,
130:22, 131:18,
132:16, 149:21,
159:11, 164:18,
165:4
**operate**
28:6, 28:11
**operating**
143:13
**operational**
39:17, 40:3,
49:12
**operationally**
49:10
**opinion**
31:4, 121:5,
130:13, 171:1
**opportunity**
57:19, 102:4,
102:8, 102:15,
102:20, 103:9,
103:13, 103:14,
103:19
**opposed**
46:3
**opr**
84:8, 86:13,
89:13, 91:2,
92:23, 115:7,
115:16
**order**
43:16, 45:4,
49:1, 49:14,
67:11, 86:24,
143:9
**ordered**
173:22
**ordering**
104:20, 105:2
**orders**
74:7, 74:14,
74:23, 75:1,

75:3
**organization**
74:18
**original**
173:20
**originated**
18:7
**other**
10:5, 10:8,
10:11, 13:2,
20:21, 23:11,
25:22, 28:3,
42:21, 43:3,
46:2, 49:16,
56:4, 56:23,
58:11, 72:11,
72:13, 73:4,
76:16, 77:2,
77:3, 77:16,
81:12, 82:8,
82:9, 83:2,
83:15, 85:22,
87:2, 87:8,
93:10, 96:18,
97:12, 100:7,
100:18, 102:17,
102:21, 107:2,
107:7, 107:10,
109:19, 115:24,
117:1, 122:3,
122:5, 122:7,
122:23, 124:9,
124:12, 124:23,
125:22, 130:4,
132:4, 135:8,
136:2, 136:4,
139:2, 139:3,
140:3, 140:4,
141:14, 145:18,
145:21, 145:22,
150:5, 150:16,
162:13, 162:15,
168:17, 168:21,
169:14
**others**
16:19, 59:5,
129:8
**out**
7:3, 7:6,

12:18, 19:14,
32:15, 33:8,
34:19, 35:12,
38:13, 39:5,
39:17, 40:2,
42:20, 43:4,
44:20, 49:10,
56:20, 62:22,
63:4, 79:18,
79:22, 80:13,
90:11, 90:17,
90:21, 103:12,
104:22, 107:22,
110:24, 111:7,
113:8, 113:20,
113:21, 113:24,
114:3, 114:8,
114:9, 114:11,
135:17, 142:10,
145:11, 145:24,
146:6, 146:15,
147:7, 147:11,
147:12, 149:9,
150:5, 151:22,
155:7, 157:3,
159:24, 165:15,
170:16, 171:14
**outcome**
24:16, 77:5,
158:18, 173:28
**outside**
23:6, 105:22,
106:5, 106:23,
152:14
**over**
6:19, 34:12,
35:11, 44:3,
44:17, 44:23,
54:6, 55:2,
56:4, 73:1,
88:21, 95:20,
98:5, 111:16,
116:23, 137:19,
140:8, 143:6,
147:11, 169:23,
171:4, 171:13
**overall**
57:13

**overhear**
113:24
**overheard**
133:24, 134:2,
134:5, 134:8
**overtime**
117:4, 117:10,
137:4
**own**
145:24
**ownership**
88:15

P

**pace**
42:19
**page**
1:7, 3:3, 3:5,
3:9, 3:11, 3:12,
3:14, 3:16,
3:17, 6:18,
26:15, 41:7,
41:18, 41:21,
42:6, 42:7,
50:4, 51:4,
51:5, 58:22,
58:24, 59:2,
60:20, 60:24,
65:1, 65:2,
65:6, 67:10,
67:12, 67:23,
68:2, 69:7,
69:20, 71:3,
71:14, 82:11,
82:13, 83:5,
83:12, 83:14,
85:24, 93:7,
97:5, 100:9,
100:14, 100:15,
100:22, 101:12,
101:16, 122:13,
122:14, 122:19,
123:1, 123:8,
123:11, 123:15,
124:12, 141:1,
141:13, 144:20,
144:22, 145:1,
145:5, 148:14,

Transcript of Victor Slaughter
Conducted on August 12, 2020　　　　　　　　　　70

150:21, 163:5,
163:7, 163:11,
168:15, 169:10
**paid**
168:11
**pain**
47:6, 152:19,
160:6
**pains**
153:14, 159:20
**pair**
90:10
**paired**
93:18, 93:21
**palatine**
99:5
**paper**
134:2, 134:14,
134:22, 134:23
**paperwork**
78:6, 80:7,
81:12
**paragraph**
26:15, 27:1,
27:5, 72:10,
82:15, 100:2,
100:8, 101:19
**paragraphs**
26:19, 26:22
**paramilitary**
74:17
**part**
22:21, 83:11,
84:23, 86:8,
99:16, 112:8,
114:15, 114:16,
139:4
**participants**
12:7
**participated**
164:5
**particular**
26:19, 36:11,
38:22, 39:3,
39:8, 39:16,
39:21, 57:8,
78:22, 79:3,
89:8, 93:18,

93:20, 94:6,
94:11, 95:2,
96:4, 101:12,
102:10, 112:21,
116:11, 127:7,
147:1, 151:13,
160:1
**particularly**
6:18, 107:13
**parties**
173:22, 173:27,
173:29
**partner**
34:1, 34:4,
93:20, 94:1,
95:2, 95:10,
95:12, 95:22,
96:23, 96:24
**partnered**
94:5, 94:7,
94:8, 94:10,
95:3, 95:9,
95:11, 95:12,
96:1, 96:5,
96:8, 96:12
**partners**
93:18, 96:14,
96:17, 96:19
**party**
173:21
**passed**
114:4
**passing**
110:22, 114:7,
117:14, 118:10,
120:4, 166:22
**past**
22:22, 24:5,
28:20, 34:13,
37:19, 38:4,
44:10, 44:11,
53:21, 54:4,
54:6, 59:12,
60:7, 62:8,
62:11, 72:14,
77:18, 77:21,
79:6, 79:24,
96:15, 155:5,

155:6
**patel**
161:8
**patrol**
28:17, 42:20,
47:7, 47:8,
47:22, 48:3,
48:9, 94:6,
126:12, 127:16,
127:22, 159:9,
159:12, 168:11
**patrolling**
127:17
**pay**
144:9, 145:14,
145:20, 165:9
**paying**
145:18
**peaceful**
142:17
**pemonte**
51:9, 54:18
**penalties**
4:20, 5:3
**penalty**
41:11, 141:15
**people**
21:13, 32:5,
32:20, 34:13,
38:21, 45:5,
50:11, 52:17,
53:5, 53:22,
55:12, 56:8,
56:23, 57:11,
57:16, 64:9,
90:19, 92:2,
109:13, 142:21
**perceive**
165:5
**percent**
106:16, 106:18,
106:19, 138:24,
139:3
**percentage**
94:18
**perform**
56:22, 58:15,
148:10

**performance**
38:19, 58:7,
58:13, 58:14
**performing**
15:3
**period**
76:22, 131:18,
162:24
**perjury**
4:20, 5:3,
41:11, 42:3,
141:15
**person**
10:5, 21:15,
21:19, 23:12,
34:4, 88:13,
122:3
**person's**
50:22, 73:14
**personal**
15:15, 48:14,
52:15, 80:5,
80:8, 80:11,
80:12, 80:14,
81:10, 88:5,
171:17
**personally**
16:19, 30:17,
121:19
**persons**
173:29
**pertaining**
82:17, 100:1
**phone**
2:5, 4:10,
8:16, 80:14
**phonetic**
50:18, 67:21,
97:23, 164:9,
169:12
**photos**
162:7
**phrased**
32:8
**physical**
150:22
**physician**
153:17, 154:17

Transcript of Victor Slaughter
Conducted on August 12, 2020

71

pick
48:13
pictures
161:22, 161:24,
162:1, 162:15
place
6:2, 20:1,
23:17, 31:21,
38:9, 39:21,
42:1, 57:3,
57:6, 60:2,
62:19, 62:20,
74:11, 75:13,
83:20, 130:9,
130:11, 167:11,
167:13
placed
13:23, 33:13,
43:4, 76:16,
82:8, 98:3,
98:15, 137:12,
163:24, 164:18
placement
42:11
plaintiff
40:21, 41:23,
61:8, 72:10,
72:15, 72:16,
83:12, 91:11,
91:12, 91:14,
93:12, 160:5,
164:1
plaintiff's
76:15
plaintiffs
1:11, 2:8,
10:8, 10:12,
25:22, 93:10,
97:7, 98:3,
100:12, 101:20,
102:4, 108:16,
108:24, 109:4,
144:8, 166:11,
166:14, 167:4
planet
2:24
players
36:15

plays
29:9
pleasantries
117:20
please
4:3, 4:6, 4:7,
4:10, 4:16,
7:19, 25:13,
25:14, 34:7,
39:9, 40:15,
50:4, 51:4,
67:1, 70:10,
71:3, 82:12,
83:6, 83:7,
83:14, 93:7,
95:5, 97:3,
100:9, 104:15,
111:10, 140:20,
140:21, 141:2,
141:14, 163:2,
163:3, 163:6,
168:15, 168:16,
169:12
plus
55:3, 130:6,
131:3
pocket
145:24, 146:7
point
8:20, 45:8,
73:1, 88:4,
96:2, 107:4,
128:22, 143:24,
171:21
policies
38:15
policy
14:9, 14:10,
14:15, 15:13,
15:24, 16:3,
16:24, 17:14,
17:16, 17:17,
17:19, 17:22,
18:6, 37:12,
37:13, 37:16,
38:2, 38:6,
38:10, 49:9,
61:9, 61:11,

61:12, 61:13,
61:14, 61:17,
61:20, 61:21,
61:22, 62:4,
62:9, 62:17,
63:11, 63:14,
78:12, 142:14,
143:3, 143:6,
143:7, 143:8
pollen
152:12, 152:15
poor
103:17
position
36:13, 38:22,
43:13, 50:8,
88:22, 91:19,
100:16
positions
100:11
possible
16:6, 17:19,
160:19, 161:6
possibly
17:9, 167:19
posted
161:16, 161:22,
162:1, 162:4,
162:9, 162:21,
162:23
power
157:7
practices
102:3
prefer
45:13, 45:15
preliminary
158:24
prepare
8:23, 9:4, 9:6,
9:19, 10:3,
10:5, 41:3
prepared
93:23
prerogative
40:2
prescribed
155:21, 156:12,

156:14
prescription
90:10, 156:11
presence
32:4
present
2:23, 31:18,
33:24, 34:9,
35:5, 35:6,
46:3, 103:14,
106:11, 106:15,
107:6, 107:8,
107:12, 107:13
presented
23:15, 69:1
pressure
153:2, 154:7,
154:9, 154:14,
154:16, 155:23,
156:5, 156:13,
156:16, 156:22,
156:24, 158:2,
158:22, 159:3
presumably
98:4
pretty
90:18, 137:4,
169:3
prevent
76:15, 76:20
prevents
76:18, 82:8
previous
78:14
previously
163:16
pricks
151:22
prima
114:6
primarily
110:13
primary
153:17, 154:17
prior
9:14, 18:18,
29:23, 30:1,
33:13, 33:18,

Transcript of Victor Slaughter
Conducted on August 12, 2020

72

36:11, 45:3,
60:1, 108:6,
123:18, 142:6,
154:15, 155:20,
166:2
**probably**
54:1, 55:2,
74:11, 118:24,
132:14, 146:4,
165:8, 165:10,
166:11, 167:11,
171:11, 171:19
**problem**
10:2, 58:14,
58:17, 95:13,
109:3, 144:15,
154:13, 156:23,
156:24
**problems**
58:6, 58:8,
58:12, 154:7,
154:9, 154:14
**procedure**
15:11, 15:17,
79:11
**procedures**
38:16, 56:12,
102:3
**proceed**
4:15, 68:24,
170:6
**proceeding**
4:2, 4:4, 4:21,
5:23
**process**
18:2, 19:9,
20:1, 20:7,
20:9, 22:21,
80:20, 81:1,
103:24, 104:6
**processing**
40:9, 42:1
**produced**
67:8, 147:2
**professional**
110:3, 110:4,
138:14, 139:12
**program**
11:24

**progression**
16:5
**progressive**
15:23, 16:3,
16:13, 16:20,
16:21, 17:2,
17:20
**promoted**
43:12, 77:18
**promotion**
11:20
**prostate**
161:9
**protect**
20:16
**protects**
20:12
**provide**
4:11, 8:12,
102:3, 145:3,
146:20, 148:3,
148:11, 148:12
**provided**
148:1
**psychiatrist**
150:6
**psychologist**
150:6
**public**
142:24, 173:11,
173:38
**pull**
25:12, 25:16,
40:13, 66:5,
66:24, 70:9,
72:3, 90:11,
90:21, 120:5,
140:19
**pulled**
120:13
**punished**
59:16, 59:18,
60:16, 60:19,
60:21, 127:3,
129:18, 129:21,
130:4, 164:2
**punishment**
43:10, 60:1,

60:12, 64:2,
64:4, 64:7,
101:9, 127:11,
130:1, 170:13
**punitive**
169:15
**purchase**
4:12
**purely**
139:13, 139:14
**purposes**
4:4, 39:1
**pursuant**
38:16
**put**
38:21, 39:11,
42:1, 45:4,
53:17, 67:11,
98:8, 120:18,
121:1, 125:7,
125:9, 125:10,
130:24, 131:3,
134:1, 134:3,
134:14, 138:22,
145:14, 153:2,
160:17, 160:21
**putting**
103:16, 134:22,
134:23, 163:18

**Q**

**quantify**
148:21, 148:22,
148:23
**question**
5:19, 6:21,
7:16, 29:13,
43:18, 87:18,
93:22, 103:17,
109:1, 109:24,
110:16, 119:19,
132:4, 156:22,
171:6
**questioned**
74:4
**questioning**
130:17, 147:22
**questions**
5:17, 7:19,

70:22, 169:24,
171:5, 172:1,
172:3
**quick**
48:3, 48:4
**quite**
64:21, 125:3
**quote**
32:10, 32:16,
32:20, 72:22,
74:7, 74:13,
126:16
**quotes**
32:18
**quoting**
32:1, 32:3

**R**

r-o-l-e-s
58:4
**race**
27:21, 50:16,
50:22, 51:7,
51:11, 51:15,
51:19, 51:23,
66:12, 70:3,
98:9, 121:8,
122:3, 123:12,
125:13
**racial**
88:24, 106:9,
107:3, 120:24,
121:3, 121:4,
135:8, 138:1,
138:10, 140:1,
140:3, 149:22,
151:2, 151:4,
159:17
**racially**
72:19, 92:18,
102:13, 109:19,
116:1, 127:13
**racist**
83:10, 84:3,
86:9, 88:9,
88:12, 88:24,
89:5, 89:9,
90:4, 90:7,

Transcript of Victor Slaughter
Conducted on August 12, 2020

73

111:4, 114:15,
116:9, 116:10,
118:3, 119:13,
119:17, 119:20,
120:23, 121:3,
121:16, 122:2,
123:2, 123:3,
123:5, 123:16,
125:22, 128:9,
131:11, 139:20,
139:21
**ragweed**
152:1
**ran**
49:17
**rank**
92:7
**ranzino**
31:14, 31:24,
33:4, 33:10,
33:20, 62:13,
63:13, 64:6,
66:18, 67:19,
69:23, 69:24,
70:20, 70:24,
72:14, 74:3,
74:5, 74:8,
75:4, 79:16,
79:17, 83:13,
83:18, 84:10,
91:10, 91:12,
91:14, 91:16,
91:19, 92:9,
92:10, 92:12,
92:15, 92:20,
106:13, 106:17,
109:17, 109:22,
110:1, 110:19,
111:3, 111:20,
113:10, 116:2,
116:8, 116:9,
118:12, 123:2,
123:20, 124:9,
124:10, 125:17,
125:20, 133:18,
138:23, 163:13,
164:6, 164:11,
164:17, 165:1,

170:14, 171:6
**rare**
120:11, 120:12,
136:6
**rarely**
12:12, 27:4,
50:8, 50:14,
50:20, 50:24,
51:5, 51:9,
51:13, 51:17,
51:21, 52:24
**rarity**
129:13, 132:6,
132:7, 132:8
**rate**
152:15, 173:23
**rc**
68:16, 68:22
**react**
129:23
**reaction**
122:23, 151:23,
152:3, 152:4
**read**
14:11, 26:17,
26:22, 50:6,
65:10, 68:15,
87:4, 148:9,
163:6
**reading**
27:5, 72:17,
73:24, 83:19,
102:5, 147:22,
147:23, 163:10,
173:25
**ready**
26:23, 65:11,
113:12
**reality**
103:18
**realize**
68:14, 77:23,
94:19, 142:21
**realized**
152:22
**realizing**
65:14
**really**
39:9, 39:15,

43:18, 68:6,
107:3, 113:24,
148:5, 162:20
**reason**
7:15, 7:24,
77:17, 127:4,
130:14, 132:21,
164:22, 171:20
**reasons**
93:19
**recall**
22:3, 24:21,
25:9, 26:11,
34:11, 35:6,
37:21, 46:19,
47:9, 63:12,
63:15, 73:5,
81:18, 84:24,
87:18, 90:8,
96:16, 109:21,
112:21, 114:22,
116:5, 116:11,
117:7, 118:4,
118:14, 118:17,
119:21, 121:17,
125:23, 127:5,
128:11, 129:9,
130:9, 131:12,
132:10, 133:16,
134:7, 134:10,
134:11, 135:9,
136:19, 140:6,
151:24, 160:22,
166:18, 170:18
**receive**
17:3, 17:4,
17:6, 17:7,
19:21
**received**
18:19, 18:20,
19:14, 23:9,
40:20, 65:5,
66:7, 69:11,
71:21, 101:22,
103:20, 103:23
**receiving**
107:21
**recollect**
9:1, 121:13

**recollection**
54:5, 59:14,
69:3, 88:4,
167:12
**recommended**
70:24
**record**
4:5, 7:1, 7:12,
65:21, 85:9,
104:15, 104:17,
104:18, 104:24,
105:5, 105:6,
111:23, 140:18,
144:17, 157:10,
157:14, 157:15,
157:16, 157:18,
157:21, 170:2,
170:4, 170:6,
172:7, 172:9
**recording**
4:4, 4:12
**recovery**
147:5
**reduced**
20:23, 20:24,
21:4, 69:1,
69:4, 69:8,
83:3, 104:5
**reduction**
24:19
**refer**
111:20, 112:1,
122:10
**referred**
67:15, 70:2,
70:20, 99:8,
115:23, 124:11,
154:6, 163:13
**referring**
17:14, 87:9,
90:1, 94:1,
107:16, 112:6,
121:16, 121:20,
122:5, 143:2
**refers**
169:12
**reflux**
158:5, 158:8

Transcript of Victor Slaughter
Conducted on August 12, 2020
74

regarding
14:10, 36:23,
37:3, 37:16,
38:3, 38:7,
68:4, 82:15,
84:21, 87:1
regardless
27:3, 98:5
regular
12:9, 53:16,
93:20, 96:17,
101:10, 101:11,
126:17, 129:13,
129:14, 132:5,
133:10, 136:5,
136:8, 136:14,
137:7, 139:10
regularly
100:10, 100:15,
101:5, 101:7,
133:7
regulations
12:14, 12:16,
76:1, 76:3,
76:5, 107:23
relate
132:16
related
4:14, 87:17,
138:14, 138:21,
147:12, 150:11,
154:1, 154:4,
160:18, 161:5,
173:27
relation
146:17
relationship
109:24, 119:23,
138:12
relatives
132:17
relevant
97:7
relief
63:18, 152:23
relieve
72:10
relieved
67:20

relying
153:11
remark
109:18
remarks
100:7, 116:9
remember
4:6, 22:18,
24:5, 31:17,
31:19, 63:10,
80:21, 87:16,
88:1, 88:3,
94:12, 94:13,
99:4, 108:7,
112:20, 113:3,
151:17, 171:12,
171:19, 171:20
remoteley
2:14
remotely
2:7, 2:19, 4:2,
6:19, 173:6
remove
72:16, 72:22,
72:23, 73:16,
80:20
removed
43:16, 45:3,
78:1, 78:9,
78:15, 78:18,
81:6, 103:4
removing
79:9, 81:23
rep
19:20, 68:23
repeat
109:1, 111:10
report
15:7, 15:18,
86:15, 86:18,
86:20, 89:10,
89:13, 89:15,
89:17, 90:23,
91:2, 91:4,
91:6, 92:20,
92:23, 93:1,
93:3, 115:5,
115:7, 115:9,

115:13, 115:16,
115:18
reported
173:6
reporter
4:8, 4:16,
4:18, 5:1, 6:24,
7:4, 104:19,
104:23, 105:4
reporting
68:17
represent
141:22
representative
19:15
representing
2:8, 2:14, 2:19
represents
5:14
reprimand
23:15, 71:1
request
93:14, 148:6
requesting
96:23, 96:24,
119:3
requests
93:13, 93:17
residences
12:1
resources
79:1, 79:4
respecting
92:7
responded
61:7, 82:16,
91:14, 93:11,
163:16
response
35:8, 41:21,
41:23, 57:12,
65:7, 67:16,
68:9, 71:5,
74:2, 76:13,
82:18, 83:11,
84:20, 163:12,
170:20
rest
113:10

restaurant
113:3, 113:4
result
22:6, 47:2,
69:12, 71:1,
71:10, 71:12,
71:21, 127:9,
150:24, 151:19,
164:12, 164:13
resulted
93:9
results
158:19, 159:1
retaliation
14:16, 15:17,
15:19, 15:20
retire
144:3
retired
100:22
review
26:9
reviewed
142:4, 142:5
reviewing
26:24, 42:8,
65:12, 97:13,
141:18
reynolds
153:18, 153:20
rick
89:21, 90:1,
90:8, 90:15,
90:16, 90:21,
90:23
rico
52:24, 55:6
right
8:17, 10:22,
11:8, 12:18,
17:23, 17:24,
18:4, 20:9,
20:12, 22:23,
27:18, 28:7,
29:16, 35:18,
36:18, 38:22,
42:14, 58:2,
66:16, 67:24,

72:23, 82:23,
85:22, 97:16,
97:24, 104:1,
104:6, 108:12,
109:21, 110:13,
113:11, 122:7,
127:5, 131:19,
137:23, 140:16,
141:20, 143:13,
148:21, 150:19,
159:22, 160:16,
166:12, 168:12,
168:13, 168:23,
170:23, 171:20
**ringing**
162:13
**risen**
149:21
**risk**
46:6, 74:23
**road**
2:12
**rockwell**
62:20, 62:21,
63:7, 63:9
**rohloff**
31:15, 33:7,
34:17, 35:1,
79:19, 79:21,
80:1, 84:15,
84:20, 84:22,
84:24, 85:18,
85:22, 87:2,
87:15, 88:7,
89:20, 93:12,
95:8, 95:14,
138:12, 138:13,
139:2, 139:3
**role**
29:9
**roles**
13:2, 58:2,
58:4, 58:5
**roll**
25:1, 25:7,
31:22, 33:23,
34:12, 63:16,
72:11, 72:13,

72:23, 73:1,
73:4, 79:17,
79:21, 79:23,
80:2, 83:21,
83:22, 85:12,
85:20, 85:21,
86:2, 86:4,
87:24, 106:15,
106:18, 107:10,
107:12, 107:13,
107:17, 110:13,
110:14, 110:19,
110:21, 112:19,
113:16, 113:17,
113:18, 113:21,
113:23, 114:1,
114:4, 114:9,
120:3, 120:8,
121:18, 124:2,
138:20, 138:24,
139:6, 171:2,
171:4
**roof**
152:10, 156:16
**room**
8:3, 8:20,
79:21
**ros**
139:9
**roster**
48:23, 93:21,
95:24, 98:22
**rotate**
43:22, 64:8
**rotated**
42:21, 43:3,
43:7, 43:8,
99:13, 99:19
**rotating**
63:20, 63:21
**rotation**
37:14, 37:16,
38:3, 38:7,
38:8, 39:1,
130:11
**roughin**
24:9, 24:13
**routine**
12:9, 12:11,

12:15
**rule**
75:18
**rules**
6:17, 12:14,
12:16, 58:3,
75:24, 76:3,
76:4, 107:23
**run**
4:3, 39:24,
48:3, 48:4
**run-ins**
120:2
**running**
48:9, 48:13
**runs**
55:22

---
S
---

**s-p-i-v-e-y**
34:8, 94:3
**safer**
45:18
**safety**
47:16
**said**
9:16, 11:21,
17:12, 31:1,
31:12, 31:13,
31:14, 31:15,
31:18, 32:2,
32:3, 32:5,
32:17, 32:23,
33:4, 33:20,
34:17, 35:9,
35:10, 59:22,
60:4, 62:15,
63:16, 64:8,
72:12, 74:13,
79:12, 79:18,
79:23, 80:1,
80:2, 80:19,
82:7, 82:20,
83:16, 90:12,
90:14, 92:8,
92:9, 95:14,
95:20, 95:23,
100:15, 101:16,

102:18, 103:3,
108:4, 108:7,
108:8, 108:14,
108:23, 113:13,
114:7, 114:18,
115:12, 115:22,
116:2, 119:8,
121:14, 121:18,
123:18, 124:7,
124:9, 125:9,
125:10, 128:6,
129:19, 130:23,
132:20, 133:14,
133:17, 133:18,
134:14, 134:23,
135:3, 135:17,
138:22, 138:23,
139:11, 142:19,
143:15, 143:16,
145:6, 145:10,
151:1, 159:21,
161:4, 161:5,
161:15, 163:23,
165:2, 165:3,
165:7, 165:24,
168:23, 170:14,
171:13, 172:5,
173:17
**same**
6:18, 13:11,
15:11, 15:17,
17:5, 17:6,
17:8, 23:10,
23:11, 32:5,
32:7, 32:8,
36:15, 54:9,
64:1, 66:15,
70:19, 74:11,
77:7, 77:14,
93:14, 99:13,
101:8, 102:17,
105:18, 108:8,
122:20, 123:19,
125:15, 125:16,
126:7, 126:8,
129:7, 129:19,
132:4, 136:2,
137:2, 137:4,

Transcript of Victor Slaughter
Conducted on August 12, 2020

76

137:13, 138:5,
167:15, 168:11,
168:14, 169:3,
173:23
**samuel**
1:7, 58:22,
100:14, 100:15,
122:13
**sarge**
92:1
**sat**
118:22
**savvy**
162:3
**saw**
11:15, 11:21,
37:20, 107:8,
110:8, 117:19,
152:2, 159:2
**say**
9:15, 12:6,
12:7, 16:2,
16:9, 16:18,
17:21, 20:7,
20:24, 21:22,
23:16, 28:9,
28:17, 29:23,
30:10, 31:16,
32:14, 33:11,
33:17, 33:22,
34:21, 35:8,
35:24, 38:1,
39:11, 44:14,
46:13, 49:3,
54:4, 54:9,
54:23, 55:3,
55:22, 56:10,
56:11, 57:1,
57:14, 57:15,
59:12, 59:20,
61:17, 62:18,
74:10, 74:24,
75:8, 77:11,
86:21, 88:15,
89:4, 91:23,
94:17, 97:19,
101:1, 101:7,
102:16, 106:19,

110:20, 110:24,
112:10, 119:12,
120:4, 120:5,
120:9, 120:10,
120:13, 120:20,
121:4, 121:5,
121:10, 121:13,
123:9, 127:1,
128:5, 129:24,
132:2, 133:9,
134:5, 134:8,
136:13, 136:24,
138:4, 143:6,
144:1, 146:21,
152:8, 158:19
**saying**
7:1, 17:13,
38:2, 80:21,
98:17, 98:20,
114:14, 124:6,
134:8, 136:9,
143:11, 144:3,
149:8, 149:10,
152:2, 165:14,
167:21, 170:20,
171:20
**says**
5:9, 15:14,
38:7, 68:12,
68:16, 68:21,
68:22, 69:8,
71:16, 75:2,
77:10, 85:17,
87:2, 89:19,
91:9, 98:2,
100:9, 101:19,
141:18, 148:3,
148:15, 160:4,
169:12, 169:13
**scale**
52:11, 52:13,
52:15, 165:12
**schife**
67:20
**screen**
25:16, 65:9,
72:5
**scroll**
83:6, 97:4,

169:11
**se**
156:2
**seal**
173:32
**second**
7:3, 13:8,
22:8, 22:9,
25:17, 26:17,
65:9, 67:10,
67:23, 68:2,
70:1, 70:2,
74:1, 74:2,
83:18, 104:21,
108:17, 108:20,
109:5, 111:6,
113:14, 113:15,
113:16, 114:22,
115:12, 141:10,
142:8, 144:14,
160:8, 160:9,
160:13, 161:1,
161:2, 161:3,
163:15
**secondhand**
133:20
**section**
26:18, 27:15,
46:4, 65:15,
97:6
**see**
23:24, 25:16,
26:6, 27:5,
42:5, 52:16,
63:18, 65:7,
65:8, 68:18,
69:7, 69:20,
78:4, 83:11,
86:23, 97:6,
97:8, 108:4,
108:5, 117:12,
117:13, 118:10,
120:2, 132:17,
133:8, 140:16,
142:13, 142:19,
157:24, 159:14,
168:3, 168:4,
169:24

**seeing**
107:6, 155:20
**seek**
169:13
**seeking**
145:4, 145:6,
146:22, 146:23,
148:16, 168:20,
169:5, 169:19
**seemed**
171:7
**seems**
168:9
**seen**
26:3, 31:5,
37:18, 37:24,
38:2, 38:3,
38:13, 40:24,
67:13, 70:17,
75:9, 75:15,
99:23, 100:1,
134:17, 141:7,
149:24, 150:2,
150:6, 153:13,
154:22, 155:12
**seniority**
13:20, 27:3,
29:9, 29:12,
98:5, 99:8,
99:10, 99:12
**sense**
37:7, 47:10,
65:18, 75:8,
88:14, 89:24
**sent**
98:23, 99:5
**sentence**
42:7, 76:13,
150:19, 150:21
**separate**
85:16, 85:17
**separated**
113:17, 113:19
**september**
29:23, 43:6,
44:4, 44:8,
155:1
**serious**
17:1

Transcript of Victor Slaughter
Conducted on August 12, 2020

77

service
162:7
services
27:14
set
12:10, 20:9,
40:22, 49:13,
78:23, 78:24,
79:5, 79:6,
79:7, 141:6,
141:10, 141:23
sets
141:9
seven
30:12
seventy
106:19
several
50:11
severe
160:6
sexist
111:15, 140:7
shaking
7:5
share
162:7
shave
70:7, 70:22,
74:3, 75:9,
75:19, 76:18,
78:8, 78:12,
82:19, 82:23,
102:7, 102:19
shedor
50:24, 54:10
sheet
79:18, 80:4,
80:5, 80:13,
80:15, 81:2,
81:9, 81:10,
107:22
sheets
107:21, 107:22
sheriff
1:13, 141:5,
163:9, 163:18
sheriff's
5:15, 6:5,

10:15, 17:22,
18:6, 29:5,
38:16, 63:5,
74:16, 75:2,
78:13, 144:9
shields
3:12, 18:11,
18:14, 18:21,
18:22, 40:22,
69:18, 69:21,
84:13, 86:18,
89:15, 91:4,
93:1, 97:20,
98:2, 100:3,
100:9, 101:20,
101:23, 107:13,
109:18, 118:15,
118:16, 119:22,
119:23, 122:8,
122:9, 141:19
shift
13:11, 13:13,
13:17, 13:21,
27:23, 28:3,
36:12, 39:16,
48:12, 48:24,
49:18, 53:7,
53:11, 53:13,
53:20, 53:23,
83:23, 86:5,
105:18, 105:20,
116:16, 116:17,
117:6, 117:9,
118:22, 119:8,
122:20, 124:18,
126:3, 126:8,
128:20, 128:23,
129:5, 131:16,
135:12, 136:3
shifts
13:5, 13:6,
28:6, 28:11,
44:14, 44:15,
117:14
shit
84:23, 86:9
shook
113:11

shooting
84:21
short
65:23, 105:9,
131:18
short-circuit
52:23
should
4:5, 12:7,
14:4, 20:3,
20:16, 38:23,
39:24, 40:3,
67:20, 68:17,
71:24, 74:6,
74:24, 75:13,
86:21, 91:20,
99:10, 99:11,
99:12, 99:14,
99:16, 99:17,
99:19, 110:20,
123:9, 137:12,
143:15, 156:6,
164:24, 165:16,
166:23, 167:22,
168:10
shoulders
7:5
shouldn't
21:16, 52:15,
79:9, 92:12,
108:9, 122:1
showed
75:11, 88:21,
151:23
shows
155:12
shrugging
7:5
shut
74:6, 74:14
sick
151:8
side
99:1, 120:5,
146:5
signature
18:23, 41:12,
141:17

signature-6sqd7
173:35
signed
41:14, 75:9,
75:12, 141:23
signing
142:6, 173:25
similarly-situat-
ed
93:11
simply
9:1, 9:18,
19:14, 20:9,
36:14, 40:1,
58:15, 59:5,
79:7, 90:11,
90:12, 119:2,
122:20, 122:24,
126:7, 130:17,
142:15, 146:21,
156:12, 171:1
since
6:19, 13:3,
29:15, 29:18,
29:20, 44:4,
44:8, 61:7,
61:14, 79:23,
100:22, 156:19,
156:20, 163:24
single
55:14
singled
43:4
sinus
152:10
sir
25:15, 25:20,
26:17, 32:10,
39:23, 40:19,
41:9, 41:12,
42:2, 43:18,
50:5, 55:12,
61:11, 67:5,
67:12, 70:14,
78:16, 82:13,
85:7, 85:23,
93:16, 93:24,
97:6, 108:21,

141:3, 146:19,
148:3, 165:14
**sit**
19:17, 57:19,
87:3, 87:4,
87:5, 87:6,
88:9, 88:11,
88:18, 88:20,
88:23, 89:1,
89:4, 146:5,
146:16, 147:4,
147:6, 151:20
**sitting**
95:16
**situation**
39:6
**situations**
117:4, 156:15,
159:4
**six**
30:12, 35:15,
35:16, 36:6,
36:8, 55:21,
56:6, 84:21,
112:13, 112:22
**skilled**
38:21, 38:23,
39:12
**skip**
140:13
**sky**
90:21
**slaughter**
1:10, 1:19,
3:4, 4:23, 5:1,
5:6, 5:13,
25:21, 25:24,
26:19, 40:16,
40:20, 49:23,
65:23, 67:2,
70:11, 91:12,
91:16, 91:19,
91:21, 92:4,
92:6, 92:14,
92:16, 92:18,
92:21, 105:9,
124:5, 140:22,
141:4, 157:20,

170:9, 172:4,
173:6
**slaughter's**
40:21
**slavery**
88:17
**slight**
47:6
**slightly**
121:5
**small**
17:2
**smart**
163:1
**smith**
62:14
**smoke**
152:12
**smoothly**
4:3
**sniper**
84:21, 84:22,
86:8
**social**
105:24, 161:14,
162:13
**some**
6:17, 9:1,
20:8, 43:24,
45:12, 47:5,
47:6, 48:13,
59:5, 59:6,
63:18, 64:18,
80:7, 88:4,
88:21, 107:18,
107:21, 108:1,
116:24, 119:7,
120:24, 124:23,
138:5, 139:22,
140:13, 142:9,
142:20, 145:17,
147:10, 151:23,
152:23, 154:6,
159:20, 160:14,
161:8, 161:24,
162:6, 167:7,
168:18
**somebody**
22:11, 23:6,

34:15, 46:6,
113:7, 166:6
**someone**
37:7, 57:7,
73:11, 78:12,
94:7, 94:8,
95:3, 95:9,
95:11, 104:13,
112:24, 114:1,
117:9, 122:24,
134:2, 134:5,
168:2
**someone's**
12:15
**something**
6:8, 10:18,
14:6, 21:4,
29:14, 31:5,
34:18, 35:10,
35:13, 39:4,
39:5, 60:1,
75:6, 79:9,
81:6, 84:2,
87:17, 90:14,
107:6, 107:9,
110:16, 111:2,
112:24, 113:22,
120:4, 120:5,
127:9, 134:20,
137:16, 144:16,
161:23, 162:5,
165:6, 168:1,
168:2, 170:14,
170:17, 170:21,
171:12
**sometime**
43:2, 72:11,
74:13, 98:14
**sometimes**
42:24, 120:15
**somewhere**
88:20, 88:23
**son**
144:15
**soon**
95:18
**sooner**
67:21

**sorry**
10:1, 12:3,
27:11, 31:24,
32:14, 34:3,
39:9, 46:13,
56:2, 58:4,
60:8, 62:21,
66:4, 67:18,
71:24, 72:5,
73:24, 80:24,
83:1, 85:7,
93:24, 94:16,
95:1, 99:15,
99:21, 100:8,
100:14, 120:14,
122:9, 130:20,
131:6, 143:24,
144:14, 144:15,
144:21, 144:23,
155:15, 166:13
**sort**
77:7, 160:14
**sound**
161:23
**sounded**
144:5
**sounds**
20:11, 147:17,
158:4, 158:10
**south**
2:4, 99:1,
160:5
**space**
167:15
**span**
55:2, 133:10
**spanish**
107:24, 109:13
**speak**
78:21, 104:12,
108:8, 108:17,
108:20, 109:5,
109:10, 109:13,
121:11, 121:24,
122:3, 138:20,
167:20, 167:22,
168:3
**speaking**
4:8, 4:11,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                    79

46:1, 78:11,
81:3, 107:18,
109:18, 130:12,
130:17
**specific**
131:9, 143:3,
167:12
**specifically**
74:17, 124:7
**specifics**
31:9, 88:1,
88:3, 119:10,
119:11, 121:17,
127:5, 127:15
**speculate**
20:21, 146:11
**speed**
142:24
**spell**
34:7
**spend**
43:24, 117:18,
145:24
**spending**
136:10
**spent**
136:8, 146:6,
146:13, 146:17,
147:11
**spivey**
34:6, 34:10,
94:2, 94:6,
95:3, 95:18,
96:2, 96:5,
96:8, 96:11
**split**
95:21
**spoke**
106:14, 108:10,
130:19, 130:21,
130:22, 130:23,
130:24, 169:3
**spoken**
106:10, 119:1
**sporadic**
154:16
**spots**
40:3

**staff**
69:15, 143:1
**stamp**
70:15
**stamped**
67:9
**stand**
27:12, 68:16,
132:19, 163:3
**standard**
99:2, 148:6
**standby**
140:21
**standing**
31:19, 73:9,
113:11, 135:21
**start**
10:14, 10:17,
10:18, 11:11,
43:6, 43:8,
63:19, 63:21,
136:10, 152:20,
155:19, 167:24
**started**
10:19, 11:4,
11:10, 24:5,
30:15, 44:18,
81:9, 87:16,
148:12, 152:22
**starts**
42:7, 83:12
**state**
59:17, 76:1,
168:16, 173:1,
173:12
**stated**
16:23, 17:3,
32:23, 33:2,
38:8, 41:23,
74:6, 79:10,
103:24, 108:2,
108:6, 114:5,
114:6, 119:5,
119:6, 132:12,
134:1, 134:21,
153:22, 171:15
**statement**
27:8, 31:10,

33:7, 34:14,
34:20, 35:2,
84:1, 84:5,
84:8, 85:11,
86:1, 86:7,
86:15, 88:11,
88:14, 88:19,
88:24, 89:2,
89:5, 89:8,
89:11, 89:19,
90:3, 90:6,
91:9, 107:14,
107:15, 116:6,
121:23, 122:2,
123:24, 124:1,
133:19, 164:3
**statements**
31:1, 31:2,
31:7, 88:15,
123:5, 123:19,
124:6, 125:16,
127:20, 138:5,
139:22, 139:23,
140:3, 167:1
**states**
1:1, 83:13,
93:12, 99:14,
147:24
**stating**
60:6, 77:16,
98:24, 113:2,
130:8, 163:13
**statute**
76:1
**stay**
76:15, 110:3,
143:23
**stayed**
55:1, 110:4
**stays**
78:2
**stenographic**
173:17
**step**
11:15, 11:17,
18:3, 21:10,
21:13, 21:18,
22:4, 22:6,

22:8, 22:9,
22:14, 22:16,
22:22, 24:13,
24:16, 68:3,
68:10, 68:21,
71:4, 71:8
**stepped**
113:23, 113:24,
114:2
**steward**
118:21, 118:22,
135:14
**still**
12:22, 12:24,
45:24, 50:3,
75:10, 76:12,
106:17, 131:6,
138:15, 155:14,
155:16, 157:21
**stipulate**
4:17
**stomach**
159:20, 160:6
**stone**
12:10
**stood**
132:15
**stop**
16:8, 77:20,
89:5, 158:23
**straight**
16:17, 30:9,
37:5
**strange**
46:9
**street**
2:4, 2:18,
12:19, 43:2,
45:18, 45:19,
46:7, 46:8,
63:9, 98:11,
110:15, 111:1,
125:11, 125:12,
133:3, 133:15
**streets**
39:5, 42:23,
98:18
**stress**
149:4, 149:11,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                        80

149:19, 149:21,
150:1, 150:3,
153:23, 153:24,
155:13, 158:16,
158:18, 158:19,
158:22, 159:2,
159:5, 160:18,
161:5
**stressed**
149:9
**stressful**
149:12, 149:14,
149:15, 149:18,
156:15
**strickland**
1:5, 131:13,
131:14, 131:16,
132:14, 132:23,
135:7
**strictly**
138:14
**strike**
166:1
**strongly**
132:19
**stuck**
113:9, 171:15
**stuff**
81:7, 117:21,
119:7, 119:12,
119:14, 125:17,
125:20, 136:24,
140:13
**subject**
138:4
**submit**
19:15, 81:22
**submitted**
68:4, 71:4
**subordinate**
98:3, 100:4,
100:10
**subset**
167:7
**substances**
151:13
**substantial**
173:30

**suburban**
160:5
**suburbs**
113:7
**success**
142:11, 142:12,
142:14
**suffer**
46:20
**suffered**
150:23
**sufficient**
165:17, 165:21
**suggested**
24:22
**suggestions**
26:10
**suit**
146:17
**suite**
2:4, 2:12, 2:18
**sullivan**
154:23, 154:24,
155:9, 155:10,
155:20, 156:11
**sum**
169:8
**summary**
65:4
**summer**
151:7
**sunglasses**
90:20
**superintendent**
78:22
**superior**
70:21
**superiority**
88:21
**superiors**
74:23, 149:23,
153:12
**supervise**
163:9, 163:19
**supervisor**
15:1, 15:2,
19:1, 19:2,
19:6, 23:11,

23:14, 23:18,
23:19, 23:22,
40:4, 77:21,
101:14, 164:1
**supervisor's**
39:15, 40:1
**supervisors**
30:23, 47:24,
49:17, 77:18,
97:21, 98:3,
100:4, 100:10,
142:22, 165:4,
165:24
**supervisory**
101:13, 163:10,
163:20
**support**
27:14
**suppose**
5:19
**supposed**
14:19, 14:21,
15:21, 20:12,
39:13, 40:5,
87:4, 89:23,
135:16
**sure**
14:11, 15:19,
16:9, 25:9,
35:24, 61:22,
65:19, 85:4,
85:6, 90:18,
129:4, 131:22,
132:2, 136:17,
139:5, 140:17,
156:9
**surprise**
36:21
**suspended**
165:10
**suspension**
16:7, 17:10
**sustained**
22:16, 68:8,
71:19, 76:24,
82:23
**swearing**
4:17, 41:10

**switch**
96:19
**swore**
42:3
**sworn**
5:9, 66:6,
173:8
**symptoms**
148:18, 148:19,
152:20
**system**
40:9, 41:24,
56:3, 130:7,
130:10
**systematically**
100:10
**systemic**
143:4, 143:5,
143:12

---

T

**take**
7:4, 7:14,
31:21, 38:9,
57:3, 57:6,
62:19, 65:16,
83:20, 87:3,
88:8, 88:19,
96:10, 108:3,
139:8, 147:10,
147:13, 147:18,
150:9, 150:10,
150:13, 155:14,
155:16, 156:17,
157:11, 157:12,
169:21, 169:22
**taken**
1:20, 1:28,
22:8, 49:5,
60:2, 75:13
**takes**
88:17, 149:4
**taking**
155:19, 167:13
**talk**
9:13, 9:18,
10:3, 10:5,
10:9, 13:5,

20:20, 26:23,
33:10, 59:23,
65:11, 79:8,
91:24, 92:1,
105:10, 106:3,
106:4, 106:5,
107:2, 109:22,
116:13, 119:22,
140:14, 142:9,
150:4, 150:10,
159:16, 166:22,
169:23
**talked**
9:13, 10:11,
23:9, 36:24,
56:9, 100:2,
102:6, 107:14,
109:15, 109:16,
109:17, 109:19,
111:13, 115:21,
119:4, 124:10,
124:13, 125:17,
125:21, 127:24,
137:8, 139:24,
140:4, 140:11,
143:19, 164:5
**talking**
11:7, 22:2,
24:1, 27:18,
66:4, 72:8,
72:13, 73:4,
73:8, 73:10,
73:12, 75:5,
79:15, 80:17,
92:3, 96:12,
96:22, 100:21,
106:23, 112:12,
116:24, 117:18,
131:7, 146:4,
170:13
**talks**
6:22
**team**
57:22, 57:23,
58:2, 58:7,
58:13
**technical**
4:14, 27:14

**technician**
73:13
**tell**
14:6, 59:6,
62:16, 63:13,
89:3, 112:14,
118:12, 118:15,
125:21, 128:9,
133:17, 134:20,
147:20, 154:1,
154:3, 158:1,
158:7, 160:11,
173:9
**telling**
64:2, 64:3,
88:8, 147:16
**ten**
16:10, 16:11,
21:23, 21:24,
37:24, 38:4,
54:5, 54:9,
55:5, 59:14,
151:23
**tendency**
173:31
**tenure**
133:8
**term**
88:5, 88:6,
134:4, 156:23
**termination**
16:17
**terms**
169:18
**test**
50:2, 151:10,
151:19, 155:13,
158:16, 158:18,
158:20, 158:22
**tested**
150:3
**testified**
5:22, 6:1, 6:4,
42:12
**testifying**
6:13
**testimony**
4:19, 5:2, 8:1,

16:12, 47:11,
48:8, 66:2,
101:15, 105:11,
105:14, 170:18
**testing**
153:23
**texas**
84:22
**text**
8:16
**th**
1:20, 41:14,
66:14, 67:18,
67:19, 89:19,
146:20, 173:7
**thank**
4:1, 4:15,
25:15, 65:24
**themselves**
72:16
**therapist**
150:7
**therefore**
75:12
**thereof**
173:13
**thing**
14:4, 50:6,
57:8, 65:8,
110:23, 132:5,
142:16, 142:18,
143:14, 168:7,
171:8
**things**
7:4, 9:1,
49:13, 55:21,
56:4, 57:24,
59:6, 77:24,
79:12, 107:18,
119:7, 127:16,
127:19, 129:19,
130:13, 142:9,
142:15, 143:7,
143:13, 143:15,
143:18, 143:23,
145:6, 145:10,
151:1, 152:13,
153:10, 158:21,

165:2, 165:8,
166:24, 170:12
**think**
13:8, 13:24,
19:6, 20:1,
26:15, 30:14,
30:15, 30:17,
36:24, 37:2,
46:6, 55:9,
59:11, 59:15,
60:8, 61:4,
75:17, 75:19,
87:10, 95:21,
95:22, 99:11,
99:12, 103:13,
106:6, 106:18,
108:12, 108:13,
108:14, 109:23,
110:4, 110:6,
111:6, 111:15,
111:16, 113:1,
119:5, 120:17,
120:18, 120:22,
120:24, 121:7,
122:7, 123:13,
126:6, 130:3,
132:21, 138:22,
138:23, 139:15,
139:20, 140:7,
140:11, 143:16,
144:1, 145:17,
146:18, 156:1,
156:24, 159:21,
164:24, 166:11,
166:16, 167:18,
167:23, 171:19
**thinking**
121:22, 129:2
**third**
13:9, 13:15,
13:16
**thomas**
141:5
**thought**
9:2, 42:10,
60:12, 60:19,
70:21, 123:2,
123:3, 130:1,

Transcript of Victor Slaughter
Conducted on August 12, 2020

82

153:7
**thousand**
146:10, 147:20
**threatened**
101:20, 101:23
**three**
13:7, 18:3,
22:22, 28:6,
32:5, 32:20,
44:8, 44:12,
44:13, 46:19,
53:6, 78:2,
139:7, 147:23,
155:5, 155:6,
167:8, 169:22
**through**
5:17, 18:23,
25:5, 50:12,
54:1, 64:9,
65:10, 72:9,
80:19, 81:1,
119:6, 119:13,
142:5, 153:8,
154:17, 156:16,
162:4, 166:24
**thrown**
12:11
**tightness**
152:19, 153:14
**tim**
97:23
**time**
4:10, 7:14,
9:11, 11:19,
24:9, 34:1,
34:5, 36:11,
37:20, 44:1,
45:1, 56:19,
62:1, 62:3,
64:1, 72:12,
78:1, 83:18,
89:8, 90:20,
91:13, 96:15,
99:4, 100:20,
100:21, 101:1,
101:12, 104:17,
112:4, 112:21,
112:23, 113:14,

113:15, 113:16,
114:13, 115:1,
116:12, 117:8,
117:17, 123:19,
128:22, 129:7,
131:5, 131:19,
136:8, 136:10,
138:24, 140:6,
146:16, 146:19,
147:1, 147:10,
147:13, 147:18,
157:15, 157:18,
159:11, 160:3,
160:7, 160:8,
160:9, 162:2,
162:4, 163:15,
167:3, 167:8,
167:16, 170:2,
170:6, 171:24,
172:5, 172:9
**times**
27:13, 32:21,
44:9, 44:12,
44:13, 44:14,
49:4, 49:6,
56:11, 63:16,
77:9, 77:14,
117:1, 117:2,
124:8, 124:10,
129:18, 132:1,
132:18, 142:21,
160:10, 160:23
**tims**
1:6, 118:5,
118:21, 118:22,
135:18, 135:19,
135:21
**tired**
42:16
**title**
107:1
**today**
8:1, 9:23,
95:21, 95:22,
146:6, 147:4,
147:6, 151:20
**together**
93:19, 93:21,

106:1, 123:18,
125:2, 138:15,
149:4, 149:7,
166:14, 166:19,
167:5, 167:9
**told**
14:4, 23:14,
23:18, 23:19,
30:22, 30:24,
31:6, 40:7,
42:2, 42:3,
61:14, 61:17,
61:20, 61:21,
61:22, 61:24,
62:3, 62:8,
62:11, 63:10,
63:18, 64:7,
72:10, 77:17,
77:21, 85:20,
85:22, 87:2,
88:18, 95:12,
98:12, 114:19,
115:22, 118:24,
133:3, 133:14,
153:1
**tongue-tied**
100:14
**took**
23:17, 62:20,
65:23, 74:11,
105:9, 130:11,
134:23, 167:11
**top**
51:5, 148:15
**total**
146:2, 169:8
**totality**
89:6
**totally**
12:1, 39:5
**towards**
83:11, 116:3,
121:4, 136:7,
136:11
**track**
12:11, 86:24
**train**
43:17, 45:4,

61:9, 62:4
**trained**
43:15, 44:23,
45:2, 61:23
**training**
142:22, 143:17
**transcribed**
173:18
**transcript**
4:13, 4:21,
104:20, 105:2,
173:16, 173:17
**transferred**
165:15
**transferring**
153:5
**treated**
93:10, 132:20,
142:16
**treater**
149:24
**treatment**
161:8
**trees**
152:12
**trick**
14:7, 38:20
**tried**
9:1, 67:11,
78:18, 87:18,
110:2
**trouble**
55:1
**true**
4:19, 5:3,
41:12, 42:9,
42:10, 42:16,
82:21, 141:16,
142:1, 173:16
**truth**
173:9
**truthful**
8:1
**try**
40:2, 78:3
**trying**
14:7, 30:2,
32:15, 38:13,

38:20, 44:20,
87:10, 90:16,
138:22, 140:13,
150:5, 155:7,
166:16, 168:1
**turn**
26:14, 41:6,
41:17, 69:6,
71:3, 83:5,
93:6, 148:14,
154:12, 169:23
**turned**
103:12
**turning**
51:4
**twice**
112:3, 112:4,
117:7, 160:2
**two**
18:3, 22:14,
22:16, 33:17,
33:19, 53:6,
66:9, 66:11,
72:12, 72:15,
73:3, 75:5,
83:15, 102:6,
102:12, 107:19,
123:4, 139:7,
141:9, 165:9
**two-month**
133:10
**two-page**
67:10
**type**
88:21, 92:13,
171:8
**typed**
69:8, 71:15
**tyrone**
1:9, 135:10

**U**

**uh-huh**
12:20, 32:12,
50:10, 57:11,
66:10, 68:20,
76:6, 80:18,
80:22, 81:4,

99:21, 103:5,
149:3, 149:8,
155:10
**ultimately**
69:11
**um**
11:15, 165:22
**unable**
4:9
**unbiased**
102:4, 102:9,
102:20, 103:9,
103:19
**unbiasedly**
103:22
**under**
4:19, 5:3,
41:11, 42:3,
69:7, 141:15,
147:15, 157:21,
170:10, 172:5,
173:18
**understaffed**
45:8, 45:10
**understand**
7:18, 8:11,
30:3, 39:23,
44:17, 60:4,
91:18, 92:5,
93:16, 99:15,
116:24, 137:17,
143:4, 144:7,
144:8, 146:4,
147:4, 148:6,
157:21, 170:9
**understanding**
23:16, 60:5,
76:9, 76:11,
77:2, 78:11,
79:2, 87:19,
97:10, 127:3,
134:24, 137:9,
143:21, 146:24
**understood**
7:13, 7:22,
32:11, 58:18,
101:15
**undertones**
88:24, 140:1,

140:4
**unedited**
4:11
**unfair**
20:12, 20:16
**union**
14:1, 17:20,
17:22, 17:24,
18:4, 18:6,
19:15, 19:19,
19:22, 28:22,
29:2, 29:5,
68:23, 118:21,
118:22, 135:14,
137:12
**unit**
21:8, 39:19,
39:24, 61:8,
61:9, 61:22,
62:2, 62:4,
74:17, 78:22,
79:3, 108:22,
153:6, 163:24,
164:19, 165:15
**united**
1:1
**units**
49:14, 76:16,
77:3, 82:8, 82:9
**unless**
53:16, 75:3
**unpack**
31:8
**unquote**
72:22, 126:16
**unsuccessful**
144:9
**until**
19:17, 30:4,
144:24
**unusual**
172:6
**upset**
91:16, 92:11
**use**
7:19, 11:6,
24:1, 27:16,
30:18, 52:15,

79:14, 84:10,
84:13, 84:15,
84:17, 97:21,
112:6, 118:13,
118:16, 128:9,
131:11, 138:10,
156:23
**using**
84:24, 118:3,
123:16, 135:8
**usual**
49:4
**usually**
20:23, 21:3,
21:5, 110:22,
171:2

**V**

**vasques**
51:21, 54:24,
55:1, 55:2
**ventilate**
151:9
**ventilation**
151:6
**verbal**
16:6, 17:3,
17:4, 69:1,
69:4, 69:12,
85:14, 85:18,
87:14, 104:5
**verification**
41:9, 141:15,
141:21, 141:22,
142:6, 171:9,
171:10
**verified**
4:22
**vernell**
1:6, 118:5,
118:20
**versed**
108:2
**versus**
28:18
**via**
4:10, 19:21
**victor**
1:10, 1:19,

Transcript of Victor Slaughter
Conducted on August 12, 2020                                        84

3:4, 4:23, 5:6,
26:19, 40:21,
173:6
**video**
2:24, 3:22,
4:1, 4:7, 4:9,
7:9, 25:14,
40:15, 104:16,
105:6, 111:7,
140:21, 157:2,
157:6, 157:13,
157:17, 163:3,
170:1, 170:5,
172:8
**view**
39:24
**violation**
75:23, 76:4
**virtually**
1:19, 173:7
**virtue**
173:13
**visibly**
91:16, 92:11
**voice**
7:11
**voicing**
130:13
**volunteered**
117:7
**volunteers**
117:6
**vs**
1:12

---
                    W
---

**wages**
169:5, 169:7
**wait**
19:17, 83:17,
122:9, 144:24,
157:3, 168:22
**waived**
173:26
**wal-mart**
48:13
**walk**
113:12

**walked**
72:14, 91:17,
95:19, 95:20,
104:13, 113:12,
114:8, 114:9
**walker**
1:9, 55:17,
55:20, 59:15,
59:17, 60:8,
128:18, 128:20,
129:9, 131:6,
131:7
**walking**
12:17, 34:13,
79:24
**want**
9:12, 9:16,
9:18, 11:13,
29:23, 31:6,
33:5, 33:11,
33:17, 34:21,
35:24, 38:21,
42:19, 42:20,
44:16, 55:3,
65:16, 66:1,
75:8, 77:19,
78:3, 88:14,
91:24, 93:16,
95:15, 105:13,
140:15, 142:10,
143:3, 145:11,
170:15, 170:16,
171:14
**wanted**
42:21, 42:23,
42:24, 43:2,
90:11, 95:12,
98:17, 125:5,
125:6, 170:12,
171:9
**wanting**
43:1
**wants**
14:5
**warehouse**
63:6
**warning**
16:6, 17:3,

17:4, 17:8,
24:18
**washington**
173:2, 173:12
**watch**
13:15, 13:16
**way**
4:22, 6:24,
20:3, 20:15,
26:8, 30:18,
32:24, 33:4,
48:24, 49:12,
49:16, 55:22,
77:14, 92:13,
99:13, 103:10,
103:12, 103:15,
103:22, 108:8,
120:18, 132:19,
142:15, 143:7,
143:13, 143:14,
143:23, 145:14,
151:8, 155:3,
158:23, 169:1,
169:2, 169:3
**ways**
11:17
**we'll**
108:5, 142:5,
163:6
**we're**
57:23, 63:19,
110:24, 136:9,
147:19
**we've**
56:8, 56:24,
57:12, 97:15,
100:6, 111:13,
115:21, 119:1,
124:10, 125:17,
125:21, 138:6,
140:4, 140:11,
143:18, 145:17,
167:2
**weanticipate**
4:2
**weapon**
46:7
**weapons**
46:9

**wearing**
90:9
**wears**
90:18
**webb**
22:11, 68:11,
68:13, 69:9,
69:15, 71:8,
71:9, 71:16,
75:10, 75:11,
76:10, 81:16,
81:17, 103:2,
103:21
**wednesday**
9:23
**went**
11:2, 33:19,
36:2, 36:15,
93:22, 103:15,
111:7, 113:20,
128:24, 129:2,
130:10, 157:3,
160:2, 162:4
**weren't**
23:16, 34:12,
40:7, 42:3,
47:23
**west**
99:1
**westside**
113:9
**whatever**
16:12, 17:11,
111:2, 155:12,
167:8
**wheaton**
99:6
**whereupon**
172:11
**whether**
56:6, 57:18,
60:18, 78:6,
103:21, 104:2,
121:11, 150:12,
162:9, 168:11
**white**
2:11, 3:5,
5:12, 5:14,

25:12, 25:15,
25:19, 26:2,
26:14, 26:16,
40:13, 40:18,
41:6, 41:8,
41:17, 41:19,
49:20, 49:22,
50:17, 50:23,
51:2, 51:8,
51:12, 51:16,
51:20, 65:14,
65:22, 66:24,
67:4, 70:9,
70:13, 72:3,
72:7, 72:12,
85:10, 94:13,
101:3, 101:11,
104:10, 104:14,
105:8, 111:9,
111:24, 140:17,
140:19, 140:24,
144:14, 144:18,
144:19, 157:5,
157:11, 157:19,
163:4, 169:21,
170:8, 171:23,
172:4

**whole**
18:2, 50:6,
65:8, 87:21

**wilford**
1:7, 124:15

**williams**
1:8, 125:24,
126:1, 126:3,
126:6, 126:9,
126:19, 127:12,
128:8, 129:20,
166:18

**willingly**
125:4

**windows**
151:6

**winston**
1:5, 67:9,
105:16, 106:8,
106:23, 107:12,
109:16, 109:20,

166:17

**winter**
151:7

**wish**
19:13

**wished**
68:23

**within**
61:2, 78:13,
102:17, 155:4,
155:6

**without**
18:23, 68:24,
165:9

**witness**
4:18, 4:22,
5:4, 5:7, 6:13,
14:19, 15:8,
15:18, 25:13,
25:18, 65:20,
104:12, 140:15,
173:8, 173:32

**witnessed**
16:19, 19:3,
164:1

**witnesses**
145:18

**women**
111:16, 133:4

**won**
20:8

**wondering**
61:11, 130:24,
145:7, 145:13,
145:20, 151:2

**word**
7:19, 52:15,
84:10, 84:13,
84:15, 84:17,
97:21, 118:13,
118:16, 119:15,
153:11, 156:15

**words**
32:6, 32:7,
83:16, 85:1,
89:1, 138:23,
163:14

**work**
19:12, 20:4,

27:4, 28:3,
29:19, 43:14,
43:20, 45:9,
47:2, 47:17,
49:1, 49:5,
49:11, 53:7,
59:2, 61:10,
61:16, 61:24,
62:5, 62:22,
63:4, 76:15,
87:17, 93:19,
101:10, 104:2,
105:22, 106:4,
106:6, 116:16,
116:19, 117:2,
117:9, 118:7,
122:16, 124:1,
128:14, 131:16,
133:4, 135:12,
137:3, 138:15,
138:21, 139:14,
143:9, 154:11

**workday**
159:6, 159:8,
159:9

**worked**
27:24, 49:1,
49:15, 53:10,
53:13, 53:15,
54:15, 54:16,
55:20, 56:14,
57:17, 59:3,
59:16, 64:19,
112:4, 116:17,
117:3, 124:23,
125:1, 132:1,
132:3

**working**
6:5, 10:14,
42:17, 43:16,
45:3, 45:13,
45:16, 57:20,
57:22, 57:23,
58:12, 119:24,
122:20, 122:24,
124:22, 144:15,
145:19, 153:2,
154:2, 154:4,

155:24, 158:2,
158:8

**workings**
45:2

**workplace**
142:17, 149:10

**works**
20:2, 104:1

**world**
52:16, 81:23

**worn**
90:19

**worry**
63:19, 64:8

**worst**
154:11

**wouldn't**
26:7, 45:14,
45:15, 125:11

**wow**
31:17, 45:7

**write**
23:18, 23:20,
23:22, 24:7,
75:14, 134:24

**write-up**
19:13, 24:4,
24:6, 67:15,
75:13, 76:21,
77:5, 118:24,
119:3

**write-ups**
18:18, 18:20,
25:10, 78:5

**writing**
75:19, 81:22,
82:1, 82:3

**written**
16:6, 16:23,
17:6, 17:8,
17:12, 17:13,
17:17, 23:15,
24:18, 37:15,
49:9, 61:11,
61:12, 61:13,
61:21, 71:1,
77:4, 77:6,
77:20, 99:23,

99:24, 143:7,
143:8
**wrong**
141:20, 141:21,
143:12, 143:14,
147:23
**wrote**
41:23, 67:19,
72:9, 72:10,
74:3, 75:10,
76:14, 83:12,
84:22, 85:8,
134:15, 168:19

**Y**

**yeah**
9:5, 12:5,
12:20, 20:3,
23:7, 32:23,
34:11, 34:24,
36:4, 39:10,
44:13, 47:13,
49:12, 54:7,
55:15, 55:23,
57:23, 59:10,
61:19, 64:10,
64:18, 68:12,
71:9, 74:15,
80:12, 87:7,
87:13, 97:13,
97:17, 101:18,
103:3, 106:14,
106:22, 110:24,
114:17, 115:2,
116:11, 117:22,
120:16, 123:7,
123:22, 125:4,
126:13, 127:11,
128:3, 129:4,
129:8, 129:11,
129:17, 133:12,
133:21, 133:24,
134:13, 134:21,
135:20, 135:23,
136:16, 136:21,
136:23, 137:4,
137:20, 139:1,
140:1, 141:18,

142:20, 148:13,
151:14, 153:15,
155:18, 156:7,
156:19, 159:19,
159:23, 160:12,
162:1, 162:8,
163:21, 163:22,
166:13, 167:11,
167:23
**year**
25:4, 29:24,
33:15, 34:22,
35:11, 44:11,
74:11
**years**
11:3, 16:9,
16:10, 21:23,
28:9, 28:12,
30:1, 30:9,
33:16, 36:2,
37:5, 37:24,
38:4, 42:14,
53:21, 54:4,
54:6, 55:3,
55:10, 56:5,
59:12, 60:7,
62:8, 62:12,
64:5, 77:22,
78:3, 78:9,
78:17, 94:17,
100:23, 112:12,
112:13, 116:23,
129:1, 130:6,
131:4, 147:11,
151:5, 154:12,
155:5, 155:6,
159:13
**yesterday**
10:1
**yourself**
4:10, 15:11,
15:21, 31:3,
31:11, 32:22,
33:5, 33:12,
72:22, 94:7,
170:15

**Z**

**zero**
146:7

**zoom**
6:19

**$**

**$10,000**
147:21

**0**

**00**
1:21, 13:14,
13:23, 27:24,
28:4, 28:5,
28:13, 28:14,
28:15, 49:4,
53:7, 53:10,
53:13, 53:19,
53:22, 83:22,
83:23, 86:4,
105:20, 116:16,
116:18, 117:2,
117:6, 118:7,
122:16, 126:3,
172:12
**011240**
67:9
**0339**
2:13
**05**
61:19, 61:20
**05726**
1:12
**06**
105:7

**1**

**1**
104:17, 105:7
**10**
1:21, 41:14,
54:11, 55:12,
56:8, 56:23,
57:11, 58:11,
93:7, 146:20,
167:4
**100**
2:4
**11**
13:14, 13:23,

26:15, 27:24,
28:4, 28:5,
28:13, 28:14,
28:15, 53:6,
53:7, 53:10,
53:13, 53:19,
53:22, 55:12,
56:8, 56:23,
57:11, 58:11,
83:6, 83:23,
86:4, 89:19,
105:20, 116:16,
117:2, 117:6,
118:7, 122:16,
126:3, 167:4
**11239**
67:10, 68:3
**11241**
70:16
**11242**
70:16
**12**
1:20, 160:6,
168:15, 173:7
**120**
2:17
**140**
3:17
**15**
54:11, 67:18,
68:23, 69:9,
71:16, 78:17,
112:12
**17**
93:6, 93:8,
96:23
**18**
1:12
**1997**
10:16, 29:15,
29:18

**2**

**2**
157:12, 157:15,
157:18, 170:2,
170:6, 172:9
**20**
44:8, 45:7,

55:11, 56:11,
60:10, 60:11,
151:22
**200**
2:12
**2000**
2:18
**2005**
11:2, 11:10,
17:15, 29:20,
61:8
**2012**
36:1, 36:12
**2014**
30:4, 30:10,
30:14, 30:20,
33:14, 33:20,
35:14, 64:6,
98:11, 98:16,
136:10
**2015**
34:23, 66:14,
67:19, 70:4,
74:13, 83:13
**2017**
85:8, 85:18,
87:1, 89:19,
129:4
**2018**
129:2, 129:4,
136:13, 136:14,
137:7, 155:1
**2019**
30:4, 43:6,
44:4, 98:11,
98:14, 136:11,
136:13, 136:14,
137:7, 155:1,
159:21, 160:6,
160:9
**2020**
1:20, 41:14,
173:7, 173:33
**2021**
2:12
**206**
2:4
**22**
168:15, 168:22

**25**
3:11, 45:7,
157:15
**26**
66:14, 67:19,
70:4, 169:12

---
**3**

**3**
13:14, 13:23,
27:24, 28:4,
28:5, 28:13,
28:14, 28:15,
53:7, 53:10,
53:13, 53:19,
53:22, 83:22,
86:4, 105:20,
116:16, 116:18,
117:2, 117:6,
118:7, 122:16,
126:3, 172:12
**30**
46:3, 55:3,
77:9, 77:14,
139:2, 157:12
**31**
68:23, 69:9,
71:16
**312**
2:5
**33**
157:18

---
**4**

**40**
3:12, 46:3
**4th**
85:8, 85:18

---
**5**

**51**
170:2
**54**
104:17
**56**
170:6
**59**
172:9

**5th**
173:32

---
**6**

**6**
49:4
**60523**
2:13
**60602**
2:18
**60661**
2:5
**630**
2:13
**655**
2:5
**67**
3:14

---
**7**

**7**
116:18
**70**
3:16, 138:24
**73**
26:19
**75**
26:15, 27:1,
27:6
**76**
26:20, 82:15
**7660**
2:5
**78**
98:2
**79**
97:18, 97:23

---
**8**

**8**
49:4
**80**
97:13, 97:15,
97:19, 100:2
**81**
100:8
**84**
101:19

**85**
102:2

---
**9**

**90**
38:9
**984**
2:13



**Exhibit**

**Slaughter 2**

08/12/2020-ME

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEGRAIN WINSTON, et al.          )
                                 ) Case No. 18-cv-05726
      Plaintiffs,                )
                                 ) Hon. Matthew F. Kennelly
v.                               )
                                 )
THOMAS J. DART, et al.           )
                                 )
      Defendants.

**PLAINTIFF VICTOR SLAUGHTER'S OBJECTIONS AND ANSWERS TO
DEFENDANT GREGORY SHIELDS FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, Victor Slaughter, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1.  These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2.  Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3.  Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.

1

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

<div align="center">

**OBJECTIONS AND RESPONSES**

</div>

1.      List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**RESPONSE:**      Victor Slaughter, may be contacted through undersigned counsel.

2.      Identify all assignments that you allege were discriminatory as alleged in Paragraph 75 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**RESPONSE:**      Objection, this interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection, Plaintiff states that African-American investigators are assigned to patrol areas including but not limited to Englewood, Lawndale, the Southeast side of Chicago, Dolton, Harvey, Ford Heights while the Caucasian investigators, with less sonority, are assigned to areas located on the North side of Chicago including but not limited to Edgewater, River North, Oak Park and Elmwood Park. Answering further, Caucasian investigators are rarely split from their regular partners and are often given "soft" assignments. Additionally, African-American investigators are assigned to the basement while Caucasian investigators are assigned to the main office. Plaintiff was assigned to TSS by either Chief Ranzino, Ace, Rohloff or Neal depending on who prepared the daily roster. It was stated to Plaintiff that he was assigned to TSS because he learned the new system put in place for processing new inmates going home on house

<div align="center">

2

</div>

arrest. Chief Ranzino, Neal and Ace stated that every investigator would be assigned to TSS in order to learn how to use the new placement system, but that never happened. Plaintiff was singled out and assigned to TSS for approximately five and a half years. When this was brought to the attention of the Chiefs, supra, nothing changed. Plaintiff's work assignments should have been rotated like every other investigator in the unit. Investigation continues.

      3.     Explain specifically what you mean by "basement," and "TSS" as alleged in Paragraph 75 of the Complaint and explain why these were not desirable assignments.

**RESPONSE:**     "TSS" stands for Technical Services Section and it is a section of the Electronic Monitoring Unit where inmates are processed to be sent home on house arrest. "Basement" refers to the area where TSS is located, as it is in the basement of Division 5. TSS is not a desirable assignment because it is located in the basement, without proper ventilation or windows, and home to mice and cockroaches. Answering further, TSS is not a desirable assignment because your subjected to uncontrollable heat and air condition settings, are not provided proper lunch breaks and often are forced to work overtime. Investigation continues.

      4.     Identify the other "non-minority officers" who were "rarely, if ever," assigned to the positions you were assigned to as alleged in Paragraph 72 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to what position the employee was assigned, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**RESPONSE:**     Paragraph 72 of the Complaint is a factual allegation relevant to Plaintiff Tyrone McGhee. Notwithstanding, Plaintiff states that Investigators Nickle, Bieniek, Shedor,

<div align="center">3</div>

Bosques, Pemonte, Messinas, Folkers, Vasques, Lopez, Rico and Hurtado were rarely assigned to TSS. The on duty shift commander was responsible for the daily roster and assignments. The above named investigators were assigned to either the office or patrol in very low risk areas or assigned to patrol jobs with minimal work such as doing home checks on inmates. Plaintiff expressed his concerns and issues to Chief Neal, Ranzino and Rholoff but no changes occurred. Investigation continues.

5.     If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**RESPONSE:**     See Answer to Interrogatory No. 4. Answering further, since Plaintiff joining the Electronic Monitoring Unit in 2005, it always was the policy of the unit to train all new investigators on every aspect of EMU work. Permanent or regular work assignments were never given to new investigators as they would constantly move around either training or filling in areas where needed due to staff shortage or because of seniority.  That being said, 8 of the 11 investigators identified in response to Interrogatory No 4, excluding Bieniek, Lopez and Rico, had less seniority than Plaintiff, yet were very rarely assigned to TSS or high risk areas.  Investigation continues.

6.     Identify all discipline you received that you allege was discriminatory as alleged in Paragraph 76 of the Complaint and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what rule or regulation did you supposedly violate, what

the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**RESPONSE:**　　　　On or about March 26, 2015, Plaintiff received a two disciplinary write ups from Chief Ranzino. The first incident occurred for "inattention to duty" and the second for "minor acts of disrespect of a supervisor." The first reprimand stated that Plaintiff was ordered to relieve another investigator after roll call and failed to do so. Plaintiff did not agree with this because he was not instructed to relieve the investigator. Plaintiff was told to relieve the other investigator sometime after roll call. At that time, there were two white investigators in the roll call area talking to each other and Chief Ranzino walked directly past them when he approached Plaintiff. These two Caucasian investigators were not instructed to remove themselves like Plaintiff.

The second reprimand stated that Plaintiff turned and walked away without answering, when asked by the Chief, if he had a valid "shave card." It was further stated that the Chief asked Plaintiff a second time as he walked away and Plaintiff responded that he did not have a valid shave card. Plaintiff submitted grievances regarding both incidents. Chief Ranzino had issues with African American investigators who questioned him. Ranzino felt that the African American investigators should , as he stated once before, "just shut up and follow orders." Disciplinary actions such as these stay in Plaintiff's work file and prevent him from advancing or being placed in other units.  Investigation continues.

7.　　　If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the

issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**RESPONSE:** See Answer to Interrogatory No. 6. Investigation continues.

8. Identify each and every complaint or grievance you made regarding the discipline alleged in Paragraph 76 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**RESPONSE:** On April 29, 2015, Plaintiff submitted grievances pertaining to the incidents discussed in response to Interrogatory No. 6. The grievances were denied at the hearing. It is difficult to have a non-biased hearing when the hearing officer is another white Chief and/or Director of the unit who worked side by side with Director Shields. Because of these, they have like-minded attitudes and feelings about certain African American investigators. Investigation continues.

9. Identify the "non-minority officers" who did not receive discipline in the same proportion as you did as alleged in Paragraph 76 of the Complaint, including what employees were involved, who was responsible for supervising the employees, who was responsible for making the decision as to whether or not to discipline the employees, what the underlying incident was, when the underlying incident happened, what rule or regulation was purportedly violated, whether

or not any investigation was conducted, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response was to the incident or discipline was, whether or not anyone else was involved, and whether or not anyone else witnessed the underlying incident.

**RESPONSE:**        See Answer to Interrogatory No. 6. Investigation continues.

10.    Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**RESPONSE:**        None.

11.    If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**RESPONSE:**        Objection, this interrogatory calls for a narrative response. Subject to and without waiving the foregoing, Plaintiff states in or around April 2015, Chief J. Ranzino during

7

roll call, after mistaking two African American investigators for each other, stated words to the effect of "'oh well all you guys look alike." That was the second time Chief Ranzino made a comment like that. About a week and half earlier, Chief Ranzino asked for a specific investigator by name and was told the investigator was off that day. Chief Ranzino responded to the effect of "[a]ll you guys look alike" and giggled. Answering further, Director Shields stated that he felt if an inmate could not speak English he should not be allowed to go home on house arrest. On a separate occasion, an investigator brought up a situation that occurred in Dallas, Texas regarding a sniper shooting six officers. Chief Rohloff asked if the sniper "was part of that Black Live Matter shit?" On or around April 4, 2017, Chief Rohloff had a verbal altercation with Investigator Martin, who is African American, and told him to leave the roll call area. When Investigator Martin left the roll call area, Chief Rohloff told the other on duty Chief to take Investigator Martin to his office and "sit up down." On May 11, 2017, Chief Rohloff asked Investigator McCall, who is African American, where did he get his "Rick Hames" glasses from. On another occasion, Chief Ranzino , after having a conversation with Plaintiff, began calling him Mr. Slaughter. Plaintiff addressed him as Mr. Ranzino, at which time, he was a chief and to address him as Chief Ranzino. Plaintiff responded that he was an investigator and to address him as Investigator Slaughter. Chief Ranzino became visibly upset and walked away. Investigation continues.

12.     Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**RESPONSE:**        "High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative or unfavorable actions can take place. See also Answer to Interrogatory No. 2. Investigation continues.

13.    If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**RESPONSE:**        Objection, this Interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection: See answer to Interrogatory No. 6. Investigation continues.

14.    If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**RESPONSE:**        None.

15.    Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**RESPONSE:** Objection, this Interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection Plaintiff states see Answer to Interrogatory Nos 2, 4, 6, and 8. Investigation continues.

16. Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**RESPONSE:** Objection, this Interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection, see Answer to Interrogatory Nos 2 and 12. Investigation continues.

17. Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**RESPONSE:** Objection, this Interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection, Plaintiff states that Chief Rohloff would grant certain requests when asked by Caucasian investigators and deny the same request made by African American investigators. Answering further, see to Answers to Interrogatory Nos 2, 3, 4, 5, 6 and 11. Investigation continues.

18. Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**RESPONSE:** Objection, this Interrogatory calls for a narrative response. Subject to and without waiving the foregoing objection, Plaintiff states policies, practices and decisions pertaining to assignments and placement of investigators based on race; response given to certain

request asked of African American investigator compared to Caucasian investigator.

Investigation continues.

Respectfully Submitted,

By: /s/ Kelly A. Krauchun
KELLY KRAUCHUN
The Herbert Law Firm
206 S. Jefferson, Ste 100
Chicago, IL 60611
(312) 655-7660
Kelly.krauchun@danherbertlaw.com

11

**<u>VERIFICATION</u>**

I, Victor Slaughter, state that I have read Defendant Thomas J. Dart's First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated:

10 FEB 2020

_____
Victor Slaughter

# Exhibit F



# Transcript of Michelle Strickland

**Date:** August 21, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Page 1**

```
1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4    --------------------------x
5    LeGRAIN WINSTON, et al.,     :
6                  Plaintiffs,   :
7         v.                  :Case No. 18-cv-05726
8    SHERIFF OF COOK COUNTY      :
9    THOMAS J. DART, et al.,     :
10                 Defendants.  :
11   --------------------------x
12
13        Deposition of MICHELLE STRICKLAND
14              Conducted Virtually
15            Friday, August 21, 2020
16                10:00 a.m. CST
17
18
19
20
21
22   Job No.:  315903
23   Pages:  1 - 192
24   Reported by:  Paula M. Quetsch, CSR, RPR
```

**Page 2**

```
1        Deposition of MICHELLE STRICKLAND, held
2    virtually:
3
4
5
6
7
8        Pursuant to notice before Paula M. Quetsch, a
9    Certified Shorthand Reporter, Registered Professional
10   Reporter, and a Notary Public in and for the State
11   of Illinois.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3         KELLY A. KRAUCHUN, ESQUIRE
4         THE HERBERT LAW FIRM
5         206 South Jefferson Street
6         Suite 100
7         Chicago, Illinois 60661
8         (312) 655-7660
9
10   ON BEHALF OF THE DEFENDANTS:
11        ETHAN E. WHITE, ESQUIRE
12        EMERY LAW
13        2021 Midwest Road
14        Suite 200
15        Oak Brook, Illinois 60523
16        (630) 984-0339
17
18   ON BEHALF OF THE DEFENDANTS:
19        JUSTIN L. LEINENWEBER, ESQUIRE
20        LEINENWEBER, BARONI & DAFFADA, LLC
21        120 North LaSalle Street
22        Suite 2000
23        Chicago, Illinois 60602
24        (866) 786-3705
```

**Page 4**

```
1    ALSO PRESENT:
2         CHRISTOPHER BAUTISTA, A/V Technician
3
4              C O N T E N T S
5    EXAMINATION OF MICHELLE STRICKLAND        PAGE
6         By Mr. White                         6
7         By Ms. Krauchun                     172
8         By Mr. White                        186
9         By Ms. Krauchun                     190
10        By Mr. White                        191
11
12              E X H I B I T S
13            (Attached to transcript.)
14   STRICKLAND DEPOSITION EXHIBITS           PAGE
15   Exhibit 1  Case No. 1:02-cv-00074         11
16   Exhibit 2  WINSTON_CCS0011919, EEOC Charge 22
17   Exhibit 3  WINSTON_CCS011915 through 16   24
18   Exhibit 4  WINSTON_CCS0011917, Notice of  25
19              Right to Sue
20   Exhibit 5  Complaint                      26
21   Exhibit 6  WINSTON_CCS011955 through 11962 29
22   Exhibit 7  Objections and Answers to     114
23              Defendant Gregory Shields'
24              First Set of Interrogatories
```

---

**Page 5**

E X H I B I T S   C O N T I N U E D

Exhibit 8  WINSTON_CCSO11597 through 11599,    87
           Officer Disciplinary History
Exhibit 9  Disciplinary Actions                90
           Documentation
Exhibit 10 WINSTON_CCS018016 through 17,       136
           Email Chain
Exhibit 11 Objections and Answers to           148
           Defendant Sheriff of Cook
           County Thomas J. Dart's First
           Set of Interrogatories
Exhibit 12 Case No. 2019-cv-02621              159
Exhibit 13 Motion for Appointment of           61
           Counsel

---

**Page 6**

P R O C E E D I N G S

MICHELLE STRICKLAND,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MR. WHITE:

Q  Good morning, Ms. Strickland.  My name is Ethan White.  I am one of the attorneys that represents the Cook County Sheriff's Office in this litigation.

Have you ever given a deposition before?

A  Yes.

Q  How many times?

A  I think twice.

Q  Okay.  And what kind of cases were those?

A  One was at work for an inmate for an incident that happened.

Q  Okay.

A  And then one was related to -- also related to the job.

Q  Related to the job in what way?

A  I was deposed related to the job.

Q  Okay.  Well, these are probably -- this is probably going to be pretty similar --

MR. WHITE:  I'm so sorry; can you hold on

---

**Page 7**

for just one second?  My son is calling me.  Sorry.

(An off-the-record discussion was held.)

BY MR. WHITE:

Q  This will probably be very similar to what you've gone through before.  The first rule, as Chris already said, is to make sure that we let each other finish speaking.  So I will do my best to not interrupt you, and I'd ask that you let me try and get my question out before you answer it even if you think you know what I'm going to ask.  Okay?

A  Yes.

Q  I need you to answer everything verbally so the court reporter can get things down.  So that means no shrugging of the shoulders, no nodding, no shaking of the head because she can't take that down.  Okay?

A  Okay.

Q  If you need to take a break at any time, just let us know and we're happy to accommodate that.  We just ask that, you know, if I've asked a question you answer before we take a break.  Okay?

A  Okay.

Q  This is not supposed to be a guessing game.

---

**Page 8**

So if I ask you something that you just don't know, I just want you to tell me, "I don't know."  Okay?

A  Okay.

Q  And if you don't understand something I've said; if I use a word that doesn't make sense to you, I asked a weird question, just tell us.  Okay?  Because if you answer, everyone is going to assume you understood what I'm asking.  Okay?

A  Okay.

Q  Finally, is there any reason you can't give full and complete testimony today?

A  No.

Q  Since we're on Zoom we have these kind of added questions we have to ask, which is, where are you physically located right now?

A  At my home.

Q  And where is your home?

A  In Chicago.

Q  What's the address?

A  10723 South Cottage Grove Avenue, Chicago, Illinois 60628.

Q  Is anyone in the room with you?

A  No.

Q  Do you have any notes in front of you?

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

9

1    A  No.
2    Q  Do you have anything at all in front of you?
3    A  My tablet.
4    Q  Okay.  And are you -- you're not going to
5  look at your tablet to help you in your testimony
6  at all today, are you?
7    A  You can't have it open with Zoom on anyway.
8    Q  Makes sense.  All right.  And you understand
9  nobody can give you information during your
10  deposition to assist your testimony; right?
11    A  Yes, I understand.
12    Q  You're not going to look at your phone or
13  text messages for any information; correct?
14    A  No.
15    Q  Did you do anything to prepare for your
16  deposition?
17    A  I read over my complaint.
18    Q  Okay.  So you read the complaint.
19  Anything else?
20    A  No.
21    Q  I believe -- I don't want to know the
22  substance, but I believe you had a call with your
23  attorney; right?
24    A  Oh, I talked to my attorney, yes.

---

10

1    Q  Okay.  And, again, I don't want to know
2  what you guys talked about, but when did that
3  meeting -- or that telephone meeting take place?
4    A  Is today Friday?
5    Q  It is Friday.
6    A  Wednesday, I believe.
7    Q  All right.  And approximately how long did
8  you guys speak for?
9    A  45 minutes to an hour.  I'm unsure.
10    Q  Did you talk to anyone besides your
11  attorney about your deposition?
12    A  No.
13    Q  Did you talk to any of the other plaintiffs
14  in this case about your deposition?
15    A  No.
16    Q  And apart from the complaint, did you
17  review any other documents to prepare?
18    A  No.
19    Q  Okay.  Let's talk about some background.
20  Where did you grow up?
21    A  Chicago.
22    Q  Where did you go to high school?
23    A  Chicago Vocational High School.
24    Q  What is your highest level of education?

---

11

1    A  A master's of science in education.
2    Q  Where did you get that the degree from?
3    A  Chicago State University.
4    Q  Did you ever live in Calumet City?
5    A  Yes, I did.
6    Q  Did you ever live at 1495 Forest Avenue in
7  Calumet City?
8    A  Yes, I did.
9    Q  And who is LaDonna Strickland?  Do you
10  know that person?
11    A  My mom.
12    Q  The Federal government filed a complaint
13  against you and your mother in 2002; correct?
14    A  Not to my knowledge.
15    Q  You don't -- you don't remember the
16  Federal government suing you for student loan
17  fraud in 2002?
18    A  Never happened.  I've never been sued for
19  student loan fraud.
20    MR. WHITE:  Okay.  If we could pull up
21  Exhibit 1, please.
22    (Strickland Deposition Exhibit 1 marked
23  for identification and attached to the transcript.)
24    MS. KRAUCHUN:  And I'm just going to put

---

12

1  an objection on the record to relevance.  I'm not
2  sure how this relates to this litigation but just
3  want that noted.
4    MR. WHITE:  It's directly relevant under
5  Federal Rule of Evidence 608.
6    Q  Okay.  Ma'am, on the screen you should see
7  what's been marked as Exhibit 1.  This is a case
8  filed in the Northern District of Illinois, Case
9  No. 1:02-cv-00074.  Take a second to look at the
10  front page at least and let me know when you've
11  had a chance to review that.
12    A  Can you make it larger?
13    I'm looking at it.
14    Q  Okay.  If we could scroll down to the
15  bottom of the page under "parties."  It is says,
16  "Defendants LaDonna Strickland and Michelle
17  Strickland are domiciliaries of the state of
18  Illinois and reside at 1490 Forest Avenue, Calumet
19  City, Illinois 60409"?
20    A  Correct.
21    Q  And as far as you know, that's referring
22  to you and your mom living at that address; correct?
23    A  Correct.
24    Q  And your position is you've never, ever

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

4 (13 to 16)

---

**13**

1  seen this complaint before?
2  **A No. Can you scroll down some more?**
3  Q Yes. Let's go down to the second page so
4  you can see the factual background there. And
5  take whatever time you need to review that and let
6  us know when you're ready.
7  **A Okay.**
8  Q So this lawsuit -- have you ever -- have
9  you ever -- you never heard from your mom about
10  this lawsuit?
11  **A So now that I'm reading this, '94/'95 we**
12  **had someone that prepared financial documents for**
13  **us to go to school, and we did not know they did**
14  **something illegal. But I wasn't aware of this --**
15  **that this all existed right here, no.**
16  Q So it's still your position that you were
17  never -- you've never seen this lawsuit; you were
18  never served with this lawsuit?
19  **A No, I don't recall at all, but I do**
20  **remember the incident. We had someone prepare**
21  **financial documents for us when we were going to**
22  **school. It was a place that prepared documents.**
23  **My mom actually paid them to prepare our financial**
24  **documents for college, yes.**

**14**

1  Q Do you know how this lawsuit was resolved?
2  **A I don't.**
3  Q Okay. If we could go down to the third
4  page, and take whatever time you need to read that.
5  **A Okay.**
6  Q And so basically this is -- this is saying
7  that you and your mother knowingly presented or
8  caused others to present to an officer, employee,
9  or agent of the United States false or fraudulent
10  claims to get a student loan; correct?
11  **A I did get student loans, but we never**
12  **intentionally defrauded or did anything illegal,**
13  **no, we did not.**
14  Q Do you have any idea how this lawsuit was
15  resolved?
16  **A I -- no, I do not recall how it was**
17  **resolved, sir.**
18  Q And if you don't remember the lawsuit, I
19  assume you never disclosed it to the Cook County
20  Sheriff's Office.
21  **A I couldn't disclose it. No, I didn't.**
22  MR. WHITE: All right. We can put that
23  one aside.
24  Q Okay. When did you start working at the

**15**

1  Cook County Sheriff's Office?
2  **A June 2005.**
3  Q What was your role when you started -- let
4  me back up. What unit did you start in?
5  **A After the training academy, external**
6  **operations.**
7  Q And what did you do in external operations?
8  **A I was an officer.**
9  Q How long were you in external ops?
10  **A Roughly, I guess until about 2007. I'm**
11  **not sure. Or the end of 2006. I'm not sure.**
12  Q Where did you go after external ops?
13  **A Division 6.**
14  Q And what's Division 6 or what was Division 6?
15  **A A building where detainees were housed.**
16  Q What did you do in Division 6?
17  **A Correctional officer.**
18  Q How long were you a correctional officer?
19  **A I'm still a correctional officer.**
20  Q How long were you in Division 6?
21  **A Until I went to RCDC, and I went there in,**
22  **I believe 2007.**
23  Q What does RCDC stand for?
24  **A That's a good question. Receiving**

**16**

1  **something and -- it's where everybody comes in and**
2  **out, intake and exiting, but I can't remember what**
3  **the acronym stands for.**
4  Q What kind of stuff did you do in RCDC?
5  **A Process individuals in and out of the jail.**
6  Q How long were you there for?
7  **A To 2008.**
8  Q Where did you go in 2008?
9  **A Calumet City Police Department.**
10  Q I'm sorry? Calumet City Police Department?
11  **A Correct.**
12  Q What did you do at the Calumet City Police
13  Department?
14  **A I worked as a police officer.**
15  Q How long did you do that for?
16  **A 10 months.**
17  Q Where did you go after Calumet City Police
18  Department?
19  **A Back to Cook County Sheriff's Department.**
20  Q And what did you do when you came back?
21  **A 2008? Give me a second. I believe it**
22  **might have been Females 3 Annex, I believe it was**
23  **called at the time.**
24  Q I'm sorry; female what?

Transcript of Michelle Strickland
Conducted on August 21, 2020

5 (17 to 20)

17

1     A   3 Annex at the time. It was females
2 housed there.
3     Q   So were you again working as a correctional
4 officer?
5     A   Correct.
6     Q   How long did you do that for?
7     A   I might have gone back to receiving, which
8 might have been 2009, I believe, maybe '10. I'm
9 not sure. When we have bids -- we have bids
10 annually, so we change quite frequently. So I'm
11 not sure of the exact time frame.
12     Q   Okay. The first time that you worked in
13 electronic monitoring was in March of 2014; correct?
14     A   Yes.
15     Q   And what shift did you work in EM?
16     A   3:00 to 11:00.
17     Q   I'm sorry?
18     A   3:00 to 11:00.
19     Q   And you transferred out of EM to the
20 transportation in April of 2015?
21     A   Correct.
22     Q   So you worked in the EM for about 13 months?
23     A   Yes.
24     Q   Did you always work the 3:00-to-11:00 shift

18

1 when you were in EM?
2     A   Yes. I believe I did, yes. Sometimes we
3 would go initially for training to day shift, but
4 my bid issued was 3:00 to 11:00.
5     Q   Okay. What positions did you work when
6 you were in EM?
7     A   Investigator.
8     Q   And were you ever assigned to TSS?
9     A   Yes.
10     Q   Were you ever assigned to patrol -- or the
11 street, I guess I should say?
12     A   Yes.
13     Q   Were you ever assigned to the office?
14     A   Yes.
15     Q   You were injured on the job in April of
16 2015; is that correct?
17     A   Yes.
18     Q   That was -- that was shortly after you
19 transferred to transportation; right?
20     A   Correct.
21     Q   And then you were off duty as of January --
22 sorry -- June 29th, 2015?
23     A   Yes.
24     Q   When did you come back on duty,

19

1 approximately?
2     A   September, I think, 2017.
3     Q   So you would agree with me that none of
4 the defendants discriminated against you before
5 you joined EMU; correct?
6       MS. KRAUCHUN: Objection; foundation,
7 calls for speculation.
8     Q   Ma'am, does it require you to speculate if
9 Shields discriminated against you before you
10 worked with him?
11       MS. KRAUCHUN: Objection; calls for a
12 legal conclusion.
13     Q   Ma'am, are you claiming in this lawsuit
14 that Shields discriminated against you before you
15 worked with him?
16       MS. KRAUCHUN: Same objection.
17       MR. WHITE: You have to answer.
18     A   I want to make sure I understand your
19 question. Are you asking did he discriminate
20 against me before I was assigned to his unit?
21     Q   Correct.
22     A   No, he did not.
23     Q   Okay. Did Ranzino discriminate against
24 you before you joined his unit?

20

1     A   No, he did not.
2     Q   Did Rohloff discriminate against you before
3 you joined his unit?
4     A   No, he did not.
5     Q   And what about Thomas Neal? Did he
6 discriminate against you before you joined the
7 unit EM?
8     A   Before EM, no.
9     Q   And you would agree with me that none of
10 those defendants caused you to suffer from a
11 hostile work environment before you joined EM;
12 correct?
13     A   Before joining EM, no.
14     Q   And none of those defendants discriminated
15 against you after you left EM; correct?
16     A   I was still spoken of but no.
17     Q   And you would agree that none of those
18 defendants caused you to suffer from a hostile
19 work environment after you left EM; correct?
20       MS. KRAUCHUN: Objection. It calls for a
21 legal conclusion.
22       MR. WHITE: You can answer.
23     A   I still suffered from a hostile work
24 environment after leaving EM because you're

21

1  forever -- it's embedded in your memory everything
2  that you experience when you work in a hostile
3  work environment.
4      Q  Was -- day-to-day did you have any
5  interaction with any of the defendants after
6  leaving EM?
7      A  Yes.  I would see them in passing because
8  it was in the same building.
9      Q  And is it your contention in this lawsuit
10 that they continued to impose a hostile work
11 environment when you were not working with them?
12     A  Presented a hostile work environment for
13 me because I had to see them in the same parking
14 lot in the same building.  It brings up certain
15 memories.
16     Q  What's a hostile work environment to you?
17     A  A hostile work environment is being
18 discriminated against, being made to feel alienated,
19 outcasted, treated differently.  It induces stress
20 on your life; it provokes fear in your life.
21 There's a lot of other ways I can describe it, but
22 it's -- it's -- it's a feeling that you should not
23 be forced to deal with every day when you're going
24 into work.

22

1      MR. WHITE:  Let's pull up Exhibit 2, please.
2      (Strickland Deposition Exhibit 2 marked
3  for identification and attached to the transcript.)
4      Q  Okay.  Ma'am, take a second to review it
5  and let me know when you're ready to talk.
6      A  Can you make it larger, please?  Will you
7  please scroll up?
8      I'm done.
9      Q  Okay.  This is a document that's marked
10 Exhibit 2.  It's Bates-stamped WINSTON_CCS0011917.
11 This is an EEOC charge that you filed in July of
12 2016; correct?
13     A  Yes.
14     Q  And this charge claims that discrimination
15 occurred starting in mid-2006?
16     A  Yes.
17     Q  Okay.  And you'd agree with me that the
18 discrimination that you're described -- that you
19 described in this charge had nothing to do with
20 the defendants in this lawsuit; correct?
21     A  Not true.
22     Q  Okay.  In 2006 were you --
23     A  I'm sorry; can you scroll up to the top,
24 please.  Okay.  Can you scroll down just a little?

23

1      So no, to answer your question.
2      Q  I'm sorry; I didn't hear what you said.
3      A  I said no, to answer your question.
4      Q  Who is Lieutenant Olson?
5      A  I don't know who Lieutenant Olson is.
6      Q  Okay.  Sorry; I thought -- oh, no,
7  Lieutenant Queen?
8      A  Uh-huh.
9      Q  Who is Lieutenant Queen?
10     A  The supervisor I worked under in RCDC.
11     Q  You filed this on, it looks like July --
12 at least the EEOC received this on July 25th, 2016.
13     A  Uh-huh.
14     Q  Is that a yes?
15     A  Yes.  I apologize.
16     Q  No problem.
17     So you'd agree that was nearly 16 months
18 after you left EM, right?
19     A  Roughly.
20     Q  Roughly 16 months after your last day of
21 working with these defendants?
22     A  Let's see.  I left -- yes.
23     MR. WHITE:  If we could pull up Exhibit 3,
24 please.

24

1      (Strickland Deposition Exhibit 3 marked
2  for identification and attached to the transcript.)
3      Q  This is a two-page charge of discrimination.
4  It's Bates-stamped WINSTON_CCSO11915 through 16.
5  I'll give you a chance to scroll through here.
6  There's not much new on the first page, but the
7  second page has the narrative.
8      A  Yes, uh-huh.
9      Q  You've seen this document before?
10     A  I have.
11     Q  And it's -- as far as I can tell, it's
12 basically the same charge.  Correct?
13     A  It is.
14     Q  But it adds -- it looks like, by my reading
15 down at the bottom, quote, "Since my filing a
16 charge of discrimination on July 25th, 2016, I
17 have been suspended and harassed in clear
18 retaliation for engaging in protected activity."
19 Do you see that text?
20     A  I do.
21     Q  And that allegation has nothing to do with
22 the defendants in this lawsuit; correct?
23     A  No, that's not true.
24     Q  Well, in July 2016 you weren't working in

25

1  EM; isn't that right?
2     A  No, I wasn't working in EM.  I was not
3  working in EM at that time.
4     Q  And you were working in transportation;
5  right?
6     A  Correct.
7     Q  Actually, at the time you filed this, were
8  you -- you were actually off duty actually; right?
9     A  Correct.
10      MR. WHITE:  All right.  Let's look at
11 Exhibit 4.
12      (Strickland Deposition Exhibit 4 marked
13 for identification and attached to the transcript.)
14    Q  Okay.  This is a document Exhibit 4 Bates-
15 stamped?
16      WINSTON_CCSO11919 through 11922.  This is
17 for charge -- this is a notice of right to sue;
18 correct, ma'am?
19    A  Can you make it larger?  Yes.
20    Q  And this -- down at the bottom or towards
21 the bottom there's a section titled "Notice of
22 Suit Rights"?
23    A  Yes.
24    Q  The last sentence of the first paragraph

26

1  says, "Your lawsuit must be filed within 90 days
2  of your receipt of this notice."  Do you see that?
3     A  I see it.
4     Q  That was dated October 6, 2017; correct?
5     A  I see that.
6     Q  So 90 days from then is approximately
7  January 2018; would you agree with that?
8     A  I didn't count the months.  So if you did
9  the math correctly, I'd agree.
10    Q  Well, 90 days is about three months; right?
11      MS. KRAUCHUN:  Objection.  This is the
12 subject of a motion to dismiss that the Court
13 denied.  So object to relevance, foundation, form.
14      MR. WHITE:  Counsel, I'd ask you not to
15 make speaking objections.
16    Q  So three months from October 6 is
17 November 6, December 6, January 6; correct?
18    A  Are you talking to me?
19    Q  Yes.
20    A  Yes.
21      MR. WHITE:  Okay.  If we could pull up
22 Exhibit 5.
23      (Strickland Deposition Exhibit 5 marked
24 for identification and attached to the transcript.)

27

1     Q  All right.  Ma'am, Exhibit 6 [sic] is the
2  complaint that you and the other plaintiffs filed
3  in this action.  Have you seen this document before?
4     A  I have.
5     Q  Is this one of the documents you reviewed
6  to prepare for your deposition?
7     A  Yes.
8     Q  If you look up at the top of this
9  document, it's file stamped that it was filed
10 August 21st, 2018.  Do you see that?
11    A  I see it.
12    Q  It was about seven months after the
13 deadline to file the lawsuit for you based on that
14 notice of rights that we just looked at?
15    A  Say that again, sir.
16    Q  The last document we looked at -- and we
17 can go back to it if you need to -- we found out
18 that the timeline for you to file a lawsuit based
19 on that notice of right to sue was January 2018.
20 Correct?
21      MS. KRAUCHUN:  Objection.  Same objection;
22 foundation, form.
23      MR. WHITE:  You can answer.
24    A  Yes.

28

1     Q  And this was filed seven months later in
2  August of 2018; correct?
3     A  According to the form it was.
4     Q  Do you have any reason to dispute the
5  accuracy of the Court's stamp on the top of the
6  document?
7     A  I have no reason to dispute it.
8     Q  Why did you wait seven months after the
9  timeline to file your lawsuit?
10    A  Well, the reason I waited is because we
11 have several people that were in the unit with me,
12 and they were in Loudermill hearings pending
13 termination, and I was afraid to lose my job.
14    Q  Isn't it true, ma'am, that no discrimination
15 actually occurred or there was no discrimination
16 prior to December 2017?
17      MS. KRAUCHUN:  Objection --
18    A  I'm sorry --
19      MS. KRAUCHUN:  -- objection; calls for
20 speculation, asked and answered.
21    A  What's your question, sir?  I didn't
22 understand it.
23    Q  Yeah.  I asked you, isn't it true that you
24 suffered no discrimination prior to September 2017?

Transcript of Michelle Strickland
Conducted on August 21, 2020

29

1    MS. KRAUCHUN:  Objection.
2    **A From who?**
3    Q Anyone at the Cook County Sheriff's Office?
4    **A No, that's not true.**
5    Q Isn't it true you suffered no discrimination
6    from any of these defendants before December 2017?
7    MS. KRAUCHUN:  Objection; asked and
8    answered.
9    **A No, that's not true.**
10   MR. WHITE:  Let's pull up Exhibit 6.
11   (Strickland Deposition Exhibit 6 marked
12   for identification and attached to the transcript.)
13   Q Ma'am, Exhibit 6 is a document marked
14   WINSTON_CCSO11955 through 11962.  Have you seen
15   this document before?  And if you need to scroll
16   through it, please do.
17   **A Can you make it larger, please?**
18   **Yes, I've seen it.**
19   Q And this is a charge -- another charge you
20   filed with the EEOC in July of 2018; correct?
21   **A Yes.**
22   Q And if you see down there in the bottom
23   right-hand corner it says, "I declare under
24   penalty that the foregoing is true and correct.  I

30

1    swear or affirm that I've read the above charge
2    and that it's true to the best of my knowledge and
3    information and belief."  And is that your
4    signature, ma'am?
5    **A Yes.**
6    Q And you understood you were basically
7    swearing under penalty of perjury when you signed
8    this; correct?
9    **A Yes.**
10   Q You were again accusing the Sheriff's
11   Office of discrimination based on your race and
12   gender?
13   **A I am.**
14   MR. WHITE:  If we could go to the next page.
15   Q Ma'am, this is the -- the narrative that
16   describes the background of your charge; correct?
17   **A It is.**
18   Q If we look at paragraph 4, you wrote,
19   "Since on or about September 27th and continuing
20   thereafter, I have been subjected to a severe and
21   pervasive hostile work environment based on my
22   race;" correct?
23   **A Correct.**
24   Q You didn't say it happened before

31

1    September 2017; right?
2    **A I did not.**
3    Q You didn't say it happened back in 2006;
4    right?
5    MS. KRAUCHUN:  Objection; foundation.
6    What are we referring to?
7    MR. WHITE:  The document where your client
8    wrote under penalty of perjury that everything
9    began in September of 2017.
10   Q You didn't say it happened in 2006; correct?
11   **A On this document I did not because the**
12   **previous document you have shows that it started**
13   **then.  This one picks up with September of 2017.**
14   Q And this document doesn't say that anything
15   happened in electronic monitoring; correct?
16   **A It does not.**
17   Q Are you aware if the Cook County Sheriff's
18   Office has a policy on discrimination?
19   **A I am aware.**
20   Q Have you ever read that policy?
21   **A I've seen it, yes.**
22   Q When is the last time you looked at that
23   policy?
24   **A I can't say I know the last time I looked**

32

1    at the policy.
2    Q But you've seen it?
3    **A I've seen it.**
4    Q Okay.  What are you supposed to do pursuant
5    to that policy if you witness discrimination?
6    **A Report it.**
7    Q To who?
8    **A Superiors.**
9    Q Is there a procedure that you're supposed
10   to follow or just report it to a superior?
11   **A I can't say I can recall the procedure**
12   **offhand step by step, but I'm supposed to report**
13   **it to my superiors.**
14   Q Are you supposed to report it to HR?
15   **A I don't recall if it says that in there**
16   **or no.**
17   Q What are you supposed to do if you
18   experience discrimination yourself?
19   **A Report it.**
20   Q I'm sorry?
21   **A Report it.**
22   Q Report to who?
23   **A My superiors.**
24   Q What about to HR?

33

1   A  HR, that's an option, as well.
2   Q  What about retaliation?  Is there a policy
3 against workplace retaliation?
4   A  Yes, there is.
5   Q  And what does that policy say?
6   A  I do not know.
7   Q  Have you ever seen it before?
8   A  Yes, I probably have.
9   Q  Do you know what it prohibits?
10   A  That I shouldn't be retaliated against.
11 It's supposed to.
12   Q  I'm sorry, ma'am.  You've got to keep your
13 voice up.  I'm having a hard time hearing you.
14   A  That I'm not supposed to be retaliated
15 against.
16   Q  What -- per that policy, what are you
17 supposed to do if you're retaliated against?
18   A  Report it.
19   Q  Report it to who?
20   A  My superiors.
21   Q  Anybody else?  Anybody in HR?
22   A  I don't have the policy in front of me, so
23 I can't say yes or no.  I don't know.
24   Q  What about OPR?  Are you supposed to report

34

1 retaliation to OPR?
2   A  It is an option, yes.
3   Q  What about reporting discrimination to
4 OPR; is that an option?
5   A  I'm sure it is.
6   Q  Do you know LeGrain Winston?
7   A  I do.
8   Q  How long have you known Mr. Winston?
9   A  Since I started in EM.
10   Q  How often do you talk to him nowadays?
11   A  Not often at all.
12   Q  Are you guys friends outside of work?
13   A  Besides hi and bye in the workplace and
14 talk if something is going on, that's it.  Like
15 Walker's father died; he told me about that.
16   Q  When you were in EM, how often did you
17 work the same shift as Mr. Winston?
18   A  Probably my entire time at EM.
19   Q  He was 3:00 to 11:00 the whole time?
20   A  I believe, yes.
21   Q  So most days when you were working you
22 were in roll call with him?
23   A  Yes.  When we both were there, yes.
24   Q  Were you ever partnered with Mr. Winston?

35

1   A  No.
2   Q  When you were in EM, how often did Chief
3 Ranzino -- what percent of your roll call do you
4 think he conducted?
5   A  I can't give a percentage, but he did
6 conduct our roll calls.
7   Q  In April of 2015 did you hear Chief Ranzino
8 say in a roll call "You all look alike"?
9   A  "You all" was used in our roll call
10 frequently.
11   Q  I'm sorry, ma'am.  I can't hear you.
12 You're saying he was always in your roll call
13 frequently?
14   A  No.  I said terms like "You all, you
15 people, y'all" was used quite frequently around
16 electronic monitoring, sir.
17   Q  That's not my question.  Did you hear
18 Chief Ranzino in April 2015 in a roll call say
19 "You all look alike"?
20   A  I can't say I did.  I don't recall.  It
21 depended on the date if I was present or not.  I
22 had transitioned downstairs, so I don't know.
23   Q  That's fine, ma'am.  As I said at the
24 beginning, if you don't know something, you can

36

1 tell me you don't know.  I'm going to be asking
2 you about a lot of the allegations in the
3 complaint.  Some of them may have something to do
4 with you; some of them may have absolutely nothing
5 to do with you.  That's what we're trying to
6 figure out.  Okay?
7   A  Uh-huh, yes.
8   Q  What was your relationship like with
9 Ranzino when you worked in EM?
10   A  It wasn't the best relationship.  It
11 wasn't the best relationship.
12   Q  Do you think he was good at his job?
13   A  That's a projective.
14   Q  Well, that's why I'm asking you, do you
15 think he was good at his job?
16     MS. KRAUCHUN:  Objection; calls for
17 speculation.
18   A  He was okay at his job.
19   Q  Do you think he was racist?
20   A  I do.
21   Q  Okay.  Why?
22   A  The way he treated individuals, the way he
23 spoke down to individuals that were black versus
24 the way he spoke to individuals that were white,

Transcript of Michelle Strickland
Conducted on August 21, 2020

10 (37 to 40)

37

1 the way he treated individuals differently, the
2 fact that it was stated the N-word was used out of
3 his mouth all points to the direction of a racist
4 man to me.
5      MR. WHITE: And, sorry, Chris, we can take
6 this exhibit off the screen. I'm done with it
7 for now.
8      Q Okay. So let's unpack that a little bit.
9 First thing you said is the way he treated people.
10 What specifically about the way he treated people
11 makes you think he was racist?
12     A The way some assignments were assigned
13 were based on race in my opinion.
14     Q And what facts support that opinion?
15     A A lot of black investigators were forced
16 to work either on the south side of Chicago, they
17 were forced to work in TSS, and also in my case as
18 a secretary in the office.
19     Q What -- when you were in EM, what percent
20 of investigators were African-American?
21     A I do not know.
22     Q You'd agree that the majority of
23 investigators were African-American, though; right?
24     A No. I can't say.

38

1      Q You don't know one way or the other?
2      A I do not. I've never sat around and counted.
3      Q Okay. You said he also spoke down to
4 people, and you believe that was evidence of his
5 racism. What do you mean by "spoke down to people"?
6      A To start is using "you all" and "you
7 people," that's a racist statement. Using the
8 N-word is a racist word that should not be used.
9      Q How often did Chief Ranzino say "you all"?
10     A I do not have a number. I can't say.
11     Q How often did he refer to or use the words
12 "you people"?
13     A I do not have a number. I cannot say.
14     Q How often did he use the N-word?
15     A I wasn't present. I can't say.
16     Q So you've never heard him say the N-word?
17     A Never.
18     Q Do you think he was sexist?
19     A I do.
20     Q And why do you believe he was sexist?
21     A Because I was told that I should be doing
22 secretarial work.
23     Q Who said that?
24     A Ranzino.

39

1      Q When did he say it?
2      A I don't have the date.
3      Q Where did he say it?
4      A In -- in our unit, in the EM.
5      Q Where physically in EM? What room?
6      A Could have been in the office. We had
7 that conversation a couple of times.
8      Q Let's go through both of them. Where did
9 the first one take place?
10     A Again, it was in the EM area. Whether it was
11 in the roll call area or the actual office, it was
12 a conversation that should have never taken place.
13     Q I understand that, ma'am. But I need to
14 understand the specifics of that conversation. So
15 where did the first one take place?
16     A It may have been in the security office.
17 They both could have taken place in there.
18     Q But you don't know?
19     A They -- it took place in the security
20 office, sir.
21     Q Who was present?
22     A I don't recall. I know I was there; I
23 know Ranzino was there; I know other people were
24 present, but I couldn't rack my brain and go back

40

1 however many years ago, five years ago right now.
2      Q What did he say to you; what did you say
3 to him?
4      A That I earned my position to be in EM as
5 an investigator, and I wanted to do investigative
6 work, that I was not a secretary.
7      Q What did he say to you?
8      A That was my assignment.
9      Q Did you report that conversation to your
10 superiors?
11     A No.
12     Q Did you report it to HR?
13     A No.
14     Q Did you report it to OPR?
15     A No.
16     Q And what about hearing that Ranzino --
17 well, let's back up and get some foundation. You
18 said you heard that Ranzino had used the N-word;
19 correct?
20     A I did.
21     Q Who did you hear that from?
22     A Through conversation when we were standing
23 around venting about all the different racial
24 discriminations that we've encountered in that

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

**41**

1  workplace.
2      Q  Let me ask that again.  Who did you hear
3  it from?
4      A  I just stated, different investigators
5  were standing around and talking about it.  I can
6  recall that -- what is his name?  I can't even
7  think of his name right now.  Tims.  I can't -- I
8  can't recall everybody that was standing there but
9  it's been discussed.  I mean, everything that
10 typically goes on is -- I mean, we sit and vent
11 about it just like most people do in the workplace.
12     Q  When did you have this conversation with
13 Mr. Tims?
14     A  I don't know the date, sir.
15     Q  And when you learned of Ranzino using the
16 N-word, did you go to your superiors?
17     A  No, I didn't.
18     Q  Did you go to HR?
19     A  No, I didn't.
20     Q  Did you go to OPR?
21     A  No, I didn't.
22     Q  Did you ever hear Ranzino refer to a black
23 employee as "boy"?
24     A  I didn't.

---

**42**

1      Q  Do you know I.V. Newson?
2      A  I do.
3      Q  How do you know Mr. Newson?
4      A  From electronic monitoring.
5      Q  Are you friends with him outside of work?
6      A  No, he's just my coworker.
7      Q  How often did you talk -- do you still
8  talk to him?
9      A  I haven't talked to New -- what's his name?
10     Q  We can just call him Mr. Newson.
11     A  I haven't talked to him in a while.
12     Q  Okay.
13     A  I.V., yes.
14     Q  I.V., yes.  When you were in EM, how often
15 did you work with Mr. Newson?
16     A  I don't recall if I worked with him maybe
17 once.  I don't even recall.
18     Q  He was on the day shift; correct?
19     A  Yes.
20     Q  All right.
21     A  Yes.
22     Q  You may have worked with him, but it would
23 have been rare?
24     A  Very rare.  Maybe when we were training

---

**43**

1  because we were on day shift when we first started
2  for training.
3      Q  Did Mr. Newson ever complain to you about --
4  complain to you that he was being discriminated
5  against?
6      A  Everybody discriminated -- complained about
7  the discrimination there.  So yes.
8      Q  Okay.  When did he complain to you?
9      A  I don't have an exact date, sir.  We talk
10 in passing when we're walking, or someone has a
11 frown or are looking sad, you just check with each
12 other because that's what we do; we hold each
13 other up; we check on each other.  And so we may
14 have just vented, and I cannot give you a date
15 when it happened.
16     Q  Do you have any specifics about what he
17 said other than just venting?
18     A  Yeah.  He was looking forward to
19 retirement I'm sure.  Everybody always had their
20 date, and they were counting down because they
21 were just sick of the discrimination, being
22 treated differently.
23     Q  So it's your testimony that Mr. Newson
24 said he was looking forward to retirement because

---

**44**

1  he was sick of the discrimination?
2          MS. KRAUCHUN:  Objection; mischaracterizes
3  her statement.
4      Q  What I'm trying to figure out, ma'am, is
5  what Mr. Newson said to you.
6      A  I'm looking forward to retirement, sir,
7  because I'm tired of discrimination.  That doesn't
8  mean there's a date, there's a time I could just
9  walk away.  We just all look forward to this all
10 being over and not dealing with discrimination.
11     Q  So I'm asking you -- you have a specific
12 recollection of a conversation with Mr. Newson
13 about discrimination; is that true or false?
14     A  It's true.
15     Q  Okay.  What -- do you remember his exact
16 words in that conversation?
17     A  No, I do not remember his exact words.
18     Q  Okay.  Do you know who was present for
19 that conversation?
20     A  I do not.
21     Q  And you don't know where it occurred other
22 than in EM; right?
23     A  It could have been in the hall; it could
24 have been in passing.  We all walk past each other

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

12 (45 to 48)

---

45

1  on a daily basis.
2      Q  You don't recall when it happened; correct?
3      **A  I do not.**
4      Q  But your testimony is he said he was
5  looking forward to retirement because of the
6  discrimination?
7      **A  Yes.**
8      Q  Okay.  Did Mr. Newson ever complain to you
9  about his assignments?
10     **A  We all complain about assignments, sir.**
11     Q  Yeah, I don't -- that's not my question.
12  Did Mr. Newson complain to you about his
13  assignments?
14     **A  Yes.**
15     Q  What did he say?
16     **A  He was tired of being put on south which**
17  **was most of our complaints because it appeared to**
18  **be that most black people were put on the south**
19  **side of Chicago.**
20     Q  So he was complaining to you about the
21  area where he was assigned?
22     **A  Yes.**
23     Q  Where did that conversation occur?
24     **A  I do not know.**

---

46

1      Q  When?
2      **A  I don't know the exact date, sir.**
3      Q  Who was present for it?
4      **A  I don't know, sir.**
5      Q  Do you know Vernell Tims?
6      **A  I do.**
7      Q  How often do you talk to Mr. Tims?
8      **A  I don't.**
9      Q  Did you ever work the same shift as Mr. Tims?
10     **A  I believe when I was in training we did.**
11     Q  But he was days once you were out of
12  training?
13     **A  I think so, yes.**
14     Q  Do you -- did you ever partner with
15  Mr. Tims?
16     **A  Maybe in passing -- not in passing.  I**
17  **mean, maybe a day he worked overtime or something.**
18     Q  Did Mr. Tims ever tell you Director Shields
19  used the N-word?
20     **A  No.**
21     Q  Did Mr. Tims ever complain to you about
22  discrimination?
23     **A  Yes.**
24     Q  Okay.  Where did this conversation occur --

---

47

1  how many times?
2      **A  I don't have a number.**
3      Q  Okay.  Where did the conversations occur?
4      **A  In the roll call area, in passing.  Like I**
5  **said, we were walking and talking constantly up**
6  **and down the stairs.**
7      Q  When did the conversations occur?
8      **A  When I was assigned there in the 2015 year.**
9  **That's about all I can say.  2014, 2015 time frame.**
10     Q  And what did Mr. Tims complain to you
11  about regarding discrimination?
12     **A  It's just BS the way the assignments and**
13  **everything worked, and it's just not fair there.**
14     Q  What was his -- what was his complaint
15  about assignments?  Was it the same thing as
16  Mr. Newson?
17     **A  Everybody complained about constantly**
18  **being put on the south side, sir.**
19     Q  But I'd like to know about Mr. Tims.  What
20  was his complaint about assignments?  Not
21  everybody, Mr. Tims.
22     **A  I can't specify specifically each individual**
23  **complaint, but just talking in passing that was**
24  **the majority of our complaint, we all had the same**

---

48

1  **complaints, how things were not fair there.**
2      Q  I should have asked you this with
3  Mr. Newson.  But when Mr. Newson complained to you
4  about being discriminated against, did you take
5  that to your superiors?
6      **A  No.**
7      Q  Did you take it to HR or OPR?
8      **A  No and no.**
9      Q  And what about Mr. Tims?  When he
10  complained --
11     **A  No.**
12     Q  Ma'am, you need to wait for me to finish
13  my question.  When Mr. Tims complained to you
14  about discrimination, did you take it to your
15  superiors?
16     **A  No.**
17     Q  Did you take it to HR?
18     **A  No.**
19     Q  Did you take it to OPR?
20     **A  No.**
21     Q  What was your relationship with Director
22  Shields like?
23     **A  It was a work relationship, not a good one.**
24     Q  Well, let's hear about that.  What was --

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

49

1  what was bad about it?
2      A  Almost everything was bad about it.
3      Q  How so?
4      A  The condescending tone that he used when
5  he talked to me, how short he was, how he would
6  cut me off midsentence, how I was being written up
7  for a situation where white investigators had the
8  same kind of infraction and they were not written
9  up.  He threatened to have my car towed.  My
10 write-ups were not progressive at all; they were
11 always major cause and asking for suspension days.
12 The fact that he had a conversation with me, I
13 walked away, and he called me nappy head.  I mean,
14 I just -- I can go on and on.
15     Q  Well, we're going to go through each of
16 them.  I just wanted to get what the list was.
17        How often did you interact with him
18 day-to-day?
19     A  When he came to our roll calls.
20     Q  So is it fair to say you didn't interact
21 with him every day?
22     A  There wasn't an interaction every single
23 day, no.
24     Q  Was it most days?

50

1      A  I can't say most or some, but it was
2  enough days to make it not good.
3      Q  Do you think he was good at his job?
4      A  No.
5      Q  Why not?
6      A  Because of the way he treated us, because
7  of the way he specifically treated me.
8      Q  Do you think he was racist?
9      A  Yes.
10     Q  And is that because of the list of things
11 you've just given me?
12     A  Correct.
13     Q  Did you -- no, okay, I already asked
14 you that.
15        Did you ever hear -- ma'am, if you need to
16 take a break at any time, that's totally fine.
17 Okay?  This is not an endurance test.  Are you
18 okay to continue?
19     A  I'm fine.  Every time I talk about this,
20 this is what happens.
21        MR. WHITE:  Paula, are you able to hear
22 the witness okay?  I'm having a little trouble now
23 and again.
24     (An off-the-record discussion was held.)

51

1  BY MR. WHITE:
2      Q  Regarding Director Shields, ma'am, did you
3  ever hear him refer to black employees as "boy"?
4      A  I never heard him say "boy."
5      Q  All right.  Let's talk about one of the
6  incidents you just mentioned where you state he
7  called you "nappy head."  When did that conversation
8  occur -- first of all, was that a one-time thing,
9  or did it happen more than once?
10     A  Only one time I was made aware of it.  If
11 it happened more than that, I do not know.
12     Q  One time in your presence that you heard;
13 correct?
14     A  I did not hear it when we were standing
15 there having a conversation and I walked off and
16 he said "nappy head" as I was walking off.
17     Q  Sorry; I didn't hear the first part of your
18 answer, though.  You actually heard him say that?
19     A  I did not hear him say it.  I had walked
20 off; I was no longer in earshot, but the other
21 investigators that were standing there heard him
22 say it.
23     Q  And who were the other investigators that
24 were standing there?

52

1      A  I know Investigator Winston was standing
2  there.  I can't quote you everybody that was
3  standing there but it was heard.  And it was as
4  ongoing conversation, and it's still something
5  that is mocked and laughed about to this day.
6      Q  Besides Winston, you don't know anybody
7  else who was standing there?
8      A  No.  Maybe he can tell you who was
9  standing there.
10     Q  Where else did that -- sorry -- when did
11 that conversation occur?
12     A  In the hall in the electronic monitoring
13 area.
14     Q  What was the conversation you were having
15 with him -- I guess just before you walked off,
16 what was that conversation about?
17     A  I honestly do not remember.  I'm sure it
18 was questions about work-related to items.  It was
19 nothing -- I had no personal conversation with
20 this man.
21     Q  Okay.  Was it a heated conversation you
22 were having with him, or it was just all business?
23     A  I don't even recall having heated
24 conversations with him, so no.

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

53

1    Q  How did you learn about this comment?  Did
2  you learn about it from Winston?
3    **A  I learned about it from Winston and other**
4  **investigators talking about it.**
5    Q  What other investigators besides Winston?
6    **A  I can't name who else.  I mean, it's still**
7  **talked about today.  It still comes up.**
8    Q  What do you mean it still comes up today?
9  Who is bringing it up today?
10   **A  There was a new person hired there, and it**
11 **was stated that she wouldn't be called nappy head.**
12   Q  There was a new person hired in EM, and it
13 was stated that she would not --
14   **A  They would not call her nappy head.**
15   Q  I'm not following.  What do you mean?
16   **A  People were having conversations, and it**
17 **comes up about the topic of Shields calling me**
18 **nappy head because it's been rumored -- it's not a**
19 **rumor, it's a fact that it happened.  And there**
20 **are other women, other black women that was like,**
21 **"Well, he wouldn't call me nappy head" as if he**
22 **got away with something.**
23   Q  Are you talking about a conversation that
24 you've actually had with someone or is this --

---

54

1    **A  I'm talking about conversations that other**
2  **people are having.  Every time the topic comes up**
3  **someone is telling me, "Oh, they were talking**
4  **about the whole nappy head thing."**
5    Q  Who is telling you this?
6    **A  Different people in passing when we were**
7  **talking.**
8    Q  Okay.  So, ma'am, this is your lawsuit and
9  this is your deposition, so this is your chance to
10 provide me whatever information you have.  I can
11 keep asking you questions, and you can keep saying
12 "everyone, people," but if you don't have
13 specifics, just tell me you don't have specifics.
14 Otherwise, we're going to spend eight hours --
15   **A  Investigator Lopez has came to me about it**
16 **before bringing up the nappy head conversation.**
17 **Please forgive me if it's not the easiest topic**
18 **for me to discuss because it's very difficult.**
19 **It's very emotional for me every time I discuss**
20 **this.  To constantly even hear us saying "nappy**
21 **head," it's emotional for me.  Every time that I**
22 **have to relive this it's emotional.  It's a**
23 **difficult process for me, sir.**
24   Q  And I'm --

---

55

1    **A  So please forgive me.**
2    Q  You don't need to ask for my forgiveness,
3  and I'm not going to say I understand that because --
4  understand you because I haven't been through it,
5  but my job is --
6    **A  Yeah.  Imagine if you had to go through**
7  **it, though.**
8    Q  My job is to try and figure out what facts
9  you have that support the claims in this lawsuit.
10 Okay?  Just like your attorney will be asking
11 Shields, and Ranzino, and all of them very
12 difficult questions about these vents.  Okay?  So
13 I'm not here to punish you or anything like that.
14 I need to understand what facts there are, and if
15 there are facts you just don't have or you don't
16 remember --
17   **A  There are facts I have.  Investigator**
18 **Green, he didn't specifically talk to me about the**
19 **nappy head thing, but he came to me and said,**
20 **"Sister, I see how they're treating you.  I know**
21 **their treatment isn't right."  Investigator Lopez**
22 **has came to me and said something; Investigator**
23 **Winston has came to me and said something.  I'm**
24 **just sick of living with this.**

---

56

1    Q  So let's get back to -- this is still
2  ongoing?  You're still hearing about this --
3    **A  Yes.**
4    Q  Okay.  When is the most recent time you
5  heard about this?
6    **A  The most recent time was the last time when**
7  **a director told Investigator Winston that, "They're**
8  **not going to call me nappy head," Director Ruffin.**
9  **That comment was said when they first started the job.**
10   Q  And is Director Ruffin an African-American
11 woman?
12   **A  She is.**
13   Q  When did this conversation -- so Winston then
14 came to you and told you about this conversation
15 with Director --
16   **A  He did.**
17   Q  Ma'am, I'm going to need you to let me
18 finish my question.
19     Winston came to you about a conversation
20 he had with Director Ruffin?
21   **A  He did.**
22   Q  When did that occur?
23   **A  I don't know the exact month, sir.**
24   Q  What year?

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

57

1      A  If she started last year, it must have
2  been last year.  I'm not sure.
3      Q  Since you left EM, have you spoken to
4  Director Shields?
5      A  No.  I don't think I have.
6      Q  Since you left EM, have you spoken to
7  Ranzino?
8      A  Since I left?  I don't think so.
9      Q  Since you left EM, have you spoken to
10 Rohloff?
11     A  No, I don't think so.
12     Q  Since you left EM, have you talked to
13 Thomas Neal?
14     A  No.
15     Q  Apart from the "nappy head" comment that
16 Shields made, did he make any other -- use any
17 other racially offensive language you're aware of?
18     A  Roll call when he would say "you all" or
19 "you people."
20     Q  Okay.  So it's your testimony that Shields
21 also said "you people"?
22     A  Yes.
23     Q  Did you report any of Shields' -- Director
24 Shields' comments to HR?

---

58

1      A  No, I did not have.
2      Q  Did you report any of them to OPR?
3      A  No, I did not.
4      Q  Okay.  Do you need a --
5         MR. WHITE:  Does anybody need a break, or
6  should we keep going?
7         THE WITNESS:  Keep going.
8      Q  Okay.  Do you know Samuel Page?
9      A  I do.
10     Q  How long have you known Mr. Page?
11     A  Since I was in EM.
12     Q  Do you know him outside of work at all or
13 is it just professional?
14     A  Work, just work.
15     Q  How often do you talk to him now?
16     A  I don't.
17     Q  Have you talked to him since he left EM?
18     A  In passing, yeah.
19     Q  How often did you work the same shift as
20 Mr. Page?
21     A  I believe he was on my shift.
22     Q  Do you remember being in roll calls with him?
23     A  Sometimes.
24     Q  Did you ever partner with him?

---

59

1      A  That I don't think so.  I'm not sure.
2      Q  Did you ever -- do you ever recall hearing
3  Mr. Page complain about Ranzino?
4      A  Yes.  There were times when I would go to
5  him and complain.  Because I looked to him as a
6  senior investigator, and I'm just like, "Why do
7  they do the things they do?"  And he just told me,
8  he said just pretty much bide your time, it's --
9  "This is just the way they've been rolling for a
10 lot of years."  And he told me that we're the
11 change that's going to come to the unit, but I
12 didn't see it, I didn't understand it, and I
13 didn't stay around for the change.
14     Q  My question was, did Mr. Page ever complain
15 to you about Ranzino?
16     A  Yes.
17     Q  Okay.  When did that happen?
18     A  I don't know the day.  It was in the
19 security office.
20     Q  Who else was present?
21     A  I do not recall.
22     Q  What did you say to him; what did he say
23 to you?
24     A  I complained to him about working in the

---

60

1  office.  That was around the time that they were
2  constantly putting me in the office when I was
3  telling them I'm not a secretary.  He was
4  articulating to me some things that he went through
5  with them as far as not being fair in my
6  assignments and mistreatment, things he experienced
7  as being a supervisor previously, the way they
8  slotted him in a position but they used him and
9  then kind of put him back into the investigative
10 roll without, you know, giving them an official
11 title or anything like that.  So he had been
12 experiencing it much longer than me.
13     Q  Was it your understanding from that
14 conversation that when he was a supervisor he was
15 not an investigator?
16     A  That's not my understanding.  He was an
17 investigator supervisor I'm assuming.  I don't
18 know.  I wasn't present at that time.
19     Q  And what was his complaint -- what were
20 the specifics about his complaints about
21 assignments?
22     A  I can't say I can remember one thing in
23 detail or not about Sam's complaints.  I can't
24 other than just how they did not run things and do

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

61

1  things fairly.  And more so I remember Sam saying
2  that he was not happy with the way they treated
3  them when they were supervisors, they -- when they
4  were originally supervisors and then they kicked
5  them back down to investigators.  I just -- that
6  stands out as a complaint I know Sam had, we
7  talked about.
8       MR. WHITE: Chris, I uploaded another
9  exhibit that's marked as 13.  Could we pull that
10 up, please?
11      (Strickland Deposition Exhibit 13 marked
12 for identification and attached to the transcript.)
13      AV TECHNICIAN:  Sure.  Please stand by.
14 You would like me to mark this as Exhibit 13?
15      MR. WHITE:  Sure.  That's fine.  Let's
16 just keep the ordering.
17   Q  Okay.  Ma'am, this is a document marked
18 Exhibit 13.  It's titled "Motion for Appointment
19 of Counsel."  And this is that False Claims Act
20 lawsuit we talked about at the beginning.  Take
21 whatever time you need to read this.
22   A  Okay.
23   Q  And if we could scroll down to the bottom,
24 is that your signature?

62

1    A  That's my own signature.
2    Q  I'm sorry?
3    A  It looks like it, yes.
4    Q  Is it still your testimony that you did
5  not participate in this lawsuit at all?
6    A  Apparently I did.
7    Q  Apparently you did.  You filed a motion
8  for appointment of counsel; correct?
9    A  I did according to this.
10   Q  And you were deposed in this lawsuit, as
11 well; correct?
12   A  Honestly, I do not remember it.  I did not
13 remember this at all.
14   Q  So it's still your testimony you don't
15 know anything about this lawsuit?
16   A  I'm not saying I don't know anything about
17 it.  I'm looking at my penmanship on here.  I didn't
18 recall when you initially asked me about it.
19   Q  You don't recall --
20   A  I did not recall when you initially asked
21 me about it.
22   Q  So now I'm asking a different question.  Do
23 you recall giving sworn testimony in this lawsuit?
24   A  I do not recall giving sworn testimony,

63

1  but according to this, yes, I gave sworn testimony.
2       MR. WHITE:  Okay.  We can put that aside.
3    Q  Wilford Ferguson, do you know
4  Mr. Ferguson?
5    A  Yeah, I know Ferg, yes.
6    Q  Do you know him from working in EM?
7    A  Yes.
8    Q  Do you -- how often do you talk to
9  Mr. Ferguson?
10   A  I don't.
11   Q  I'm sorry?
12   A  I don't.
13   Q  Do you work the same shift as Ferguson?
14   A  Yes.
15   Q  The 3:00-to-11:00 shift?
16   A  Yes.
17   Q  Were you -- did you ever partner with
18 Mr. Ferguson?
19   A  We worked in TSS a lot together, I
20 believe, but that didn't make us partners on the
21 streets.  But we worked in -- we partnered -- in
22 TSS we worked together, to answer, yes.
23   Q  How often -- how often were you assigned
24 to TSS?

64

1    A  I don't have a specific number but a lot.
2  That was kind of the punishment spot.
3    Q  Was -- did Mr. Ferguson complain about
4  assignments to you?
5    A  I didn't talk a lot personally to Ferg,
6  but he did complain about being at TSS every day.
7    Q  What did he say?
8    A  I mean, he was pretty much exiled to TSS.
9    Q  Why do you say that?
10   A  Because he was there almost every day.  I
11 don't even know if Ferg had a vest because he was
12 in TSS so much.
13   Q  Do you know why he was assigned to TSS?
14   A  No, sir, I don't.
15   Q  Did he ever -- did Mr. Ferguson ever
16 complain about unfair discipline to you?
17   A  He talked about write-ups but not in
18 detail with me.
19   Q  Okay.  So you don't -- you don't know
20 anything other than he said he had write-ups?
21   A  I believe it was him and -- it was a
22 couple other guys that would periodically talk
23 about the whole Loudermill hearing thing where
24 they were pending their terminations.  And for

---

**65**

1  those reasons, those were some of the reasons I
2  was afraid to move forward and file anything.
3  Because you're looking at all these guys with all
4  this time and all this experience, and they filed
5  paperwork against the job, and now they're all
6  pending termination on their jobs.  So that topic
7  sometimes was discussed.  I know it was couple of
8  guys.  If I'm not mistaken, it might have been
9  Ferg, and Winston, and some more but I just can't
10  remember their names.  But was shocked to hear it
11  was that many of us that was in, you know,
12  Loudermill pending terminations.  That's pretty
13  scary to hear.
14      Q  Do you know why Ferguson and Winston were
15  in Loudermill hearings?
16      A  I just know it had to do with write-ups.
17  And I don't know the specifics, but I know it had
18  to do with write-ups and retaliations they were
19  receiving from Ranzino and Shields.
20      Q  So you didn't -- you didn't hear that it
21  was about them stealing time?
22      A  No, I didn't --
23          MS. KRAUCHUN:  Objection; foundation.
24      Q  Cecil Williams.  Do you know Mr. Williams?

**66**

1      A  I know Mr. Williams.
2      Q  How do you know Mr. Williams?
3      A  Investigator from EM.
4      Q  How often do you talk to Mr. Williams now?
5      A  I don't.
6      Q  Did you talk to -- how often did you talk
7  to him when you were in EM?
8      A  Hello in passing, you know, that circle
9  about venting about our job position and that's it.
10      Q  Did you -- did he work the same shift as
11  you when you were in EM?
12      A  Yes.
13      Q  Okay.  Did you ever partner with
14  Mr. Williams?
15      A  Maybe once.  I don't know.  Don't recall.
16      Q  Did he ever complain to you about his
17  assignments?
18      A  Same thing, south side assignments.
19      Q  Okay.  But nothing specific, just kind of
20  the general --
21      A  The same general complaint that, you know,
22  the vast majority of us had.  Some of us had
23  different complaints because some of us were in
24  TSS.  Some of us were on the south side more, you

**67**

1  know, than TSS.  But for the most part that's
2  where black people were.
3      Q  Black people were where?
4      A  TSS and on the south side of Chicago.
5      Q  Okay.  Did Mr. Williams ever complain to
6  you about unfair discipline?
7      A  It's funny, Little Will would vent quite
8  often about things.  So I can't -- I can't specify
9  one thing, if it was about -- I can't remember all
10  the details honestly.
11      Q  Anthony Manning.  Do you know Mr. Manning?
12      A  I do.
13      Q  How do you know Mr. Manning?
14      A  From -- where did I meet Manning initially?
15  In external operations.
16      Q  Okay.  So let's talk about Mr. Manning
17  because you're the first person who knows who he
18  is.  You worked with him in external operations?
19      A  I did.
20      Q  Okay.
21          MS. KRAUCHUN:  If I could just interject
22  for a second, he's the plaintiff that's voluntarily
23  dismissing this case.  So if you want to direct
24  your questioning about --

**68**

1          MR. WHITE:  Unfortunately -- I mean, if he
2  had been dismissed, it would, but he's still in
3  the case, so it is what it is.
4      Q  Okay.  Do you know Mr. Manning from
5  working in external operations?
6      A  Yes.
7      Q  I'm sorry; is that a yes?
8      A  Yes.
9      Q  How often do you talk to Mr. Manning now?
10      A  Periodically.  We're in the same unit now.
11      Q  Are you the one who told him about this
12  lawsuit?
13      A  Yes.
14      Q  Insofar as you know, Mr. Manning never
15  worked in EM; correct?
16      A  Correct.
17      Q  So he never -- as far as you know, never
18  interacted with Shields, or Ranzino, Rohloff, or
19  Neal?
20      A  I can't speak for him because he -- he
21  works in the same building.  I don't know what
22  another person's interactions were with other
23  people.
24      Q  Did he ever complain to you that any of

69

1 these defendants were discriminating against him?
2 **A He never spoke to me directly about it.**
3 Q Did he ever complain to you that any of
4 these defendants were unfairly disciplining him?
5 **A I can't say because I don't know what his**
6 **discipline was.**
7 Q I'm not asking that, ma'am. I'm just
8 asking, did he complain to you about it?
9 **A No.**
10 Q David Walker. Do you know Mr. Walker?
11 **A Yes.**
12 Q Okay. How do you know Mr. Walker?
13 **A EM.**
14 Q How often do you talk to Mr. Walker now?
15 **A I just spoke with him when his father passed.**
16 Q When was that?
17 **A I can't remember. Sometime last month maybe.**
18 Q And was that conversation about this
19 lawsuit, or it was just condolences for the
20 passing of his --
21 **A Condolences.**
22 Q When you worked with Mr. Walker -- first
23 of all, did you work on the same shift as
24 Mr. Walker in EM?

70

1 **A Yes. Yes.**
2 Q And when you worked in EM, about how much
3 did you talk to him?
4 **A In roll call when we went through that**
5 **same thing that I was just talking about. He**
6 **would talk about his experiences in his time that**
7 **he's been in EM and how unfair they were. He was**
8 **one of the ones that also spoke about how he**
9 **initially was a supervisor and how they kicked him**
10 **back down to investigator, how they used to give**
11 **him -- I guess they got some kind of time as**
12 **compensation and never had the rank. So those**
13 **were some of the details I spoke with Walker about.**
14 Q Were these just like general conversations
15 you were having in roll call, or are you thinking
16 about a specific conversation?
17 **A No, I'm talking about like if -- after**
18 **roll call. Not during roll call we weren't having**
19 **these conversations, but if and when things had**
20 **just happened, sometimes we would stand around and**
21 **chitchat about what just took place in roll call,**
22 **the unfairness, the assignments, and things like**
23 **that.**
24 Q So are these the general conversations

71

1 that we've kind of already been talking about,
2 people complaining about being at TSS, complaining
3 about being assigned to the south side?
4 **A Some of them. Specifically with Walker he**
5 **talked about different things that -- and he had**
6 **specific stories about things that Ranzino did,**
7 **that Shields had done, how he was, like I said, a**
8 **supervisor, and he never got the actual rank, how**
9 **they didn't do things fairly, they just created**
10 **this whole supervisor role and made things**
11 **convenient for themselves and how they used those**
12 **senior investigators instead of, you know, making**
13 **them official -- what is it? -- ranking**
14 **supervisors instead of just something that was in**
15 **place within EM.**
16 Q You said he would complain about specific
17 things Ranzino did. What do you -- what specific
18 things did he complain about?
19 **A Just how he mistreated people, how he**
20 **talked down to people, how he would speak to**
21 **people like they were children and we're all**
22 **adults.**
23 Q Okay. You said he told you about specific
24 things Shields did. What specific things did

72

1 he say?
2 **A Shields has just never been fair. He told**
3 **me how Shields didn't -- like we had to be tested**
4 **to come to electronic monitoring. He said, you**
5 **know, it was just a list, a group of them that**
6 **came over, and he specified that Shields never**
7 **really worked as an investigator; he worked in**
8 **equipment, and he was able to get promoted because**
9 **of the people that he knew through nepotism and**
10 **cronyism as opposed to working in the field like**
11 **they did. So he kind of rose through the ranks.**
12 **And I believe they came over at the same time,**
13 **Walker and maybe Shields and them.**
14 **So Walker told me like that's how Shields**
15 **got to be where he was. He wasn't ever, you know,**
16 **that investigator guy.**
17 Q Did Walker do -- did Walker ever complain
18 to you about discipline, unfair discipline he felt
19 like he was receiving?
20 **A I can't remember if he was one of the ones**
21 **that was in a Loudermill hearing, but I did hear**
22 **him talk and complain about different disciplines**
23 **and write-ups that he had.**
24 Q What did he say?

Transcript of Michelle Strickland
Conducted on August 21, 2020

73

1    A   That he had write-ups.
2    Q   But you don't know any specifics?
3    A   I don't know all the specifics of the
4  write-ups, no, I don't.
5    Q   Tyrone McGhee.  Do you know Mr. McGhee?
6    A   I know Mr. McGhee.
7    Q   How often did you talk with him when you
8  were working in EM?
9    A   Not very frequently.
10   Q   Was he on the same shift as you or different?
11   A   He wasn't present when I was there.  He
12 was off on injury.
13   Q   Oh, okay.  Did you work with him at all
14 when you were in EM?
15   A   Yes.
16   Q   What part of the time you were in EM did
17 you work with him?
18   A   As a matter of fact -- you know, what? --
19 no.  I can't even remember when Mr. McGhee came
20 back, but I want to say maybe right before I went
21 down to transportation but I can't recall.  He was
22 gone a very long time.
23   Q   Okay.  So -- and we can kind of cut to the
24 chase here.  Is it fair to say you didn't really

74

1  have much interaction with Mr. McGhee when you
2  were working in EM?
3    A   That is correct.
4    Q   Okay.  And is it fair to say he did not
5  complain to you about assignments when you were
6  in EM?
7    A   Correct.
8    Q   Victor Slaughter.  Do you know Mr. Slaughter?
9    A   I do.
10   Q   Did you work with him in EM?
11   A   I did.
12   Q   Was he on your shift?
13   A   He was.
14   Q   How often, if at all, did you partner with
15 Mr. Slaughter when you were in EM?
16   A   When we were exiled down to the basement
17 in TSS.
18   Q   Okay.  So you worked with him in TSS.
19   A   Yes.
20   Q   Was he down there pretty frequently?
21   A   Often.  Daily.
22   Q   And were you down there pretty frequently?
23   A   Not as often as him but we were the second
24 stream.  We were becoming -- him and his partner,

75

1  my partner Martin and I were the future in pig in
2  the slaughter.
3    Q   I'm sorry; the future what?
4    A   We were becoming that team.  We were
5  working down there not as often.  They had been
6  doing it for years, but it looked like we were
7  slated to fall into that same position to work
8  there all the time until we continued to complain
9  and talk to people and say, "This is not fair that
10 you're putting us down there."
11   Q   I thought you said you were scared to
12 complain because of Loudermill hearings.
13   A   There were some investigators -- not
14 investigators but supervisors.  I never said I put
15 anything in writing.  I was afraid to put things
16 in writing.  There's one thing to complain about
17 something, to say something versus putting something
18 in writing.  Those are two different things.
19   Q   Did you ever complain -- not put anything
20 in writing, did you ever complain to anybody in HR
21 about racism?
22   A   Never.
23   Q   Did you ever complain --
24   A   You're talking about this time frame in

76

1  EM; correct?
2    Q   Yeah, that's all this lawsuit is about and
3  that's all I care about.
4    A   No, I did not.
5    Q   Okay.  And did you ever complain but not
6  in writing to anybody in OPR about your time --
7    A   No, I did not.  I didn't have any friends
8  there.  I'm sorry.
9    Q   Is it your understanding that you need a
10 friend in OPR to make a complaint there?
11   A   Well, typically when you're venting,
12 you're talking to your friends, and you know that
13 your words probably can stay safe there without it
14 getting out at the County.
15   Q   I'm not sure that answers my question,
16 though.  Is it your understanding that whether
17 it's based on policy, practice, or procedure you
18 need a friend in OPR to make a complaint to OPR?
19   A   No, you don't need a friend to make a
20 complaint to OPR.
21   Q   Talking about Mr. Slaughter -- sorry --
22 you said -- and I realize I'm not using your exact
23 words -- that you and your partner were becoming
24 the team to replace "they" in TSS.  Who is "they"

---

Page 77

1 or "them" that was in TSS?
2    **A Slaughter and Spivy. Those were partners.**
3    Q Got it. Is Mr. Spivy African-American?
4    **A Yes.**
5    Q Does he still work in EM? Do you know?
6    **A I have no clue.**
7    Q Okay. Did Slaughter -- Mr. Slaughter ever
8 complain to you about unfair discipline he thought
9 he was receiving?
10    **A Mr. Slaughter complained a lot about**
11 **unfair discipline. He complained about unfair**
12 **assignments, as well.**
13    Q What did he say to you about discipline?
14    **A That he was getting write-ups, and I don't**
15 **know the frequency of his write-ups but he was**
16 **getting write-ups.**
17    Q Do you know anything about what the
18 write-ups were for?
19    **A Nope.**
20    Q Did he tell you who wrote him up?
21    **A I'm sure it varied but oftentimes the**
22 **write-ups in EM, the way they took place, Shields**
23 **would tell someone to write us up because he**
24 **couldn't write us up.**

Page 78

1    **So it was never fair the way the procedure**
2 **went because he was the one who initiated the**
3 **write-up, but he couldn't put his name on the**
4 **sheet, so he would instruct Ranzino, Neal, or some**
5 **other chief to write us up. And then once they**
6 **heard the write-up, they would tell you, "Sorry,**
7 **Strick, I can't throw it out" or "No, I can't give**
8 **you a written warning because Shields would get**
9 **upset with me." So they then would kick it up,**
10 **and it would go to the person that initiated the**
11 **write-up with you.**
12    **So we didn't have a chance to have fair**
13 **nor progressive discipline because the exact person**
14 **that we had to go up the ladder to was the one**
15 **that was down there telling the person below them**
16 **to write us up. So there was a no-win situation**
17 **for us, period, when we were written up in EM.**
18    Q My question was, did Mr. Slaughter tell
19 you who wrote him up?
20    **A He was written -- he was -- I don't know**
21 **any better way to say it. Shields initiated the**
22 **write-ups. He just didn't put his name on it. So**
23 **whoever he used as his person, that's who wrote**
24 **him up. I don't know who wrote him up on his**

Page 79

1 write-ups.
2    Q That's all I need, ma'am. We'll be here
3 all day. That's all I need is "I don't know who
4 wrote him up." Okay.
5    What was your relationship with Rohloff like?
6    **A Didn't have one.**
7    Q Okay. Did you interact with him at all?
8    **A Work-related.**
9    Q How often did you interact with him?
10    **A When I had to ask him something about an**
11 **assignment or if I was working in the office.**
12    Q All right. In an average week how much
13 would you interact with Mr. Rohloff?
14    **A I can't say. Every week was different. I**
15 **don't have a time frame or anything like that.**
16    Q The time frame you were working in EM, how
17 often did you interact with him?
18    **A I do not know, sir. It varied from week**
19 **to week. We just -- if I had to talk to him, I**
20 **talked to him. If I didn't, I didn't.**
21    Q Were you friendly with him?
22    **A No. It was a work relationship. That**
23 **was it.**
24    Q Do you think he was good at his job?

Page 80

1    **A I actually do.**
2    Q Do you think he's racist?
3    **A I can't say. I didn't have any of those**
4 **experiences with Rohloff.**
5    Q Okay. Do you think he is or was sexist?
6    **A He never was sexist to me.**
7    Q Did you ever hear Rohloff use the N-word?
8    **A No, I did not.**
9    Q Did you ever hear him refer to a black
10 employee as "boy"?
11    **A No, I did not.**
12    Q Did you ever hear him use discriminatory
13 language towards women?
14    **A Not towards me, no.**
15    Q And apart from the racial remarks I've
16 already stated, did you hear him use any racially
17 offensive language around you?
18    **A Not in front of me, no.**
19    Q Did you hear other people say he was
20 saying racially offensive things?
21    **A No, I didn't hear people talk about**
22 **Rohloff at all.**
23    MR. WHITE: Can we take a five-minute
24 break?

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

81

1        MS. KRAUCHUN:  That's fine, yeah.
2        MR. WHITE:  It's almost 11:30.  Let's come
3  back at like 11:35.
4        MS. KRAUCHUN:  Sounds good.
5        (Recess taken, 11:29 a.m. to 11:37 a.m.)
6  BY MR. WHITE:
7        Q  Ms. Strickland, we're back on the record.
8  You understand you're still under oath?
9        A  I do.
10       Q  Is there anything you want to change or
11 clarify about your prior testimony?
12       A  No.
13       Q  Okay.  You already talked a little bit
14 about it, about progressive discipline.  To your
15 knowledge, does EM have a progressive discipline
16 policy?
17       A  No.
18       Q  Do you have any understanding that there
19 is a progressive discipline policy in the union
20 contract?
21       A  Yes.
22       Q  Is it your belief that this does not apply
23 to EM?
24       A  It is my belief.

---

82

1        Q  If you -- and, again, we're talking about
2  when you were in EM.  Just to be clear, that's the
3  only time period I had care about.
4        When you were in EM, if you disagreed with
5  discipline, you had the ability to file a union
6  grievance; correct?
7        A  Yes.
8        Q  And who would hear the grievance?
9        A  At the first step the same person that
10 pretty much wrote you up -- not the same individual.
11 If one chief wrote you up, another chief heard it.
12       Q  Okay.  So it would not be the person who
13 wrote you up?
14       A  No.  But they were all in cahoots together.
15       Q  How do you know that?
16       A  Because they would say things in the
17 write-ups, in your hearings like -- because I
18 would ask, "Well, why can't I get a verbal or a
19 written reprimand?"
20       "Well, Strick, I can't because Shields
21 said to kick it up to him."
22       Q  Who said that?
23       A  I was told that before by Ranzino.  I was
24 told that -- another chief told me.  Well, Neal

---

83

1  was like, "I just can't do it.  I have to kick it
2  up.  They told me I have to kick it up."  So I
3  assumed he was talking about Shields, but Ranzino
4  specifically said it to me.
5        Q  Who was the second person you said?
6        A  Neal.
7        Q  Oh, Neal.  Okay.
8        A  And it might have happened, as well, with
9  AC now that I remember it because I was getting
10 written up kind of quite frequently.
11       Q  Okay.  So at Step 1 it would be heard by a
12 chief; is that correct?
13       A  Written by a chief, heard by a chief.
14       Q  Who would hear it at Step 2?
15       A  Shields.
16       Q  What about Step 3?
17       A  So oddly enough, I can't say because a lot
18 of mine never -- I probably still have discipline
19 from there lingering in Step 2 and 3 status.  I
20 can't answer.  I don't know.
21       Q  Well, we'll go through the discipline.
22 There's not very much of it.  But you don't know
23 who would hear at Step 3?
24       A  No.

---

84

1        Q  So you never took any yourself to Step 3;
2  is that correct?
3        A  I don't think I was allowed to go to that
4  step because everything stayed in-house with
5  Shields.  Even if it did go to Step 3, like I may
6  not be called in with the Step 3.  It was always a
7  chief and then it was Neal -- excuse me; I
8  apologize -- a chief and then there was Shields.
9        Q  You understood you always had the option
10 to take it to an arbitration; right?
11       A  No, I didn't at the time, did not
12 understand that.
13       Q  Okay.
14       A  Because they -- EM did everything different.
15 They did everything in-house like they were a
16 separate union -- not union but a separate unit
17 from our contract.  They didn't do things that was
18 done when you were in the jail like there were
19 written reprimands or there were verbal warnings.
20 There write-ups would come out major cause and
21 asking for days, and I would say, "Well, hey, I
22 didn't get a warning; I didn't get a verbal."  And
23 they would say no, this is what it is.
24       Q  You had a union steward when you were in

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

85

1  EM; right?
2  **A  Yes.**
3  Q  Who was that?
4  **A  He's retired.  His first name is Sam.  I**
5  **can't think of his name right now.**
6  Q  Was Mr. McGhee ever your union steward?
7  **A  No.**
8  Q  Sorry, Mr. Slaughter?
9  **A  No.  He's retired.  I can't think of his**
10 **last name.  I can't think of his name.  He was**
11 **pretty much -- we had a couple but he was one that**
12 **I used.  If you --**
13 Q  Did you ever --
14 **A  I was going to say, if you have one of my**
15 **write-ups there, I'm sure his name is on it.**
16 Q  So when you had a write-up, did you talk
17 to your union steward about it?
18 **A  I did.**
19 Q  And did you talk to them about how you
20 could grieve to Step 3 or arbitration hearing?
21 **A  No.**
22 Q  Why not?
23 **A  I just stated in EM it was like their own**
24 **rules.  They did things their way.  Because I would**

86

1  **talk to my union rep and say, "Well, why didn't**
2  **they give me a warning for this; why didn't they**
3  **give me a written reprimand; why are they asking**
4  **and making things major cause?"  And it was said,**
5  **you know, that's just the way they do things over**
6  **here.  It's kind of like the EM way; they dealt**
7  **with their own discipline in-house.**
8  Q  Is it your testimony that you were -- it
9  was not possible for you to take a grievance to an
10 arbitration hearing?
11 **A  I'm not saying that I couldn't take it,**
12 **but I'm just stating that the way my write-ups**
13 **went, it went through the process, through the --**
14 **through the chief, through the next step to**
15 **Shields, and then if you asked to kick it up, it**
16 **was kicked up, but I don't recall anything ever**
17 **happening with any of my write-ups after that.**
18 Q  Well, we'll go through them.  I mean, is
19 it your testimony that you ever tried to kick
20 something up to Step 3?
21 **A  I probably did but I'm just saying I don't**
22 **recall any resolution or anything coming out of**
23 **the write-ups because they were all just kind of**
24 **stuck lingering.**

87

1      MR. WHITE:  All right.  If we could pull
2  up Exhibit 8, please.
3      AV TECHNICIAN:  Please stand by.
4      (Strickland Deposition Exhibit 8 marked
5  for identification and attached to the transcript.)
6  Q  All right.  Exhibit 8 is a document Bates-
7  stamped WINSTON_CCSO11597 through 11599.  It's
8  titled "Cook County Sheriff's Office OPR Officer
9  Disciplinary History."  Have you seen this
10 document before, ma'am?
11 **A  I don't know.  Can you make it bigger?**
12 Q  Sure.  And you may not have.  I'm just
13 not sure.
14 **A  I don't think so.**
15 Q  Okay.  I will represent to you that
16 starting in part 2 is the record of discipline you
17 have, you know, starting with your employment --
18 **A  Uh-huh.**
19 Q  -- continuing through the present.  I
20 think we established that you worked in EM from
21 March 2014 to April 2015.  Correct?
22 **A  Uh-huh, yes.**
23 Q  Okay.  So if we could scroll down in this
24 document to get to the time frame at issue, I

88

1  think it's on -- towards the bottom of page 2.
2  Yep.  Okay.
3      So it looks like SPR2014-1584, Summary
4  Punishment is dated June 25th, 2014.  Do you see
5  that, ma'am?
6  **A  I do.**
7  Q  So the date before that is August 12th,
8  2013, so you would not have been in EM for the
9  previous one; correct?
10 **A  If you say I wasn't.  August -- that says**
11 **August 10th, 2015.  What date did you say I went**
12 **to EM?**
13 Q  We said March 2014.
14 **A  March 2014?  Then according to this**
15 **August 13th was when I was there.  Okay.**
16 Q  No, ma'am.  What I'm -- what I'm trying to
17 figure out is, this covers all your discipline
18 whatever unit you've been in.
19 **A  Right.  Okay.**
20 Q  What I'm trying to establish with you, is
21 SPR2014-1584 was your first discipline being in EM?
22 **A  Yes.**
23 Q  And we'll actually go through the detail
24 of these, but then we've got SPR2014-1950 was

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

89

1  August 13th, 2014, so you were still in EM for
2  that; correct?
3      A  Yes.
4      Q  And then there's OPR2014-1003, OPR
5  investigation, December 17th, 2015 -- that's out
6  of order.  Okay.  You were not in -- you were not
7  in EM for that, though?
8      A  No.  There's one below it that says 2014.
9      Q  Yeah.  That's -- I don't know.  It doesn't
10 make sense.  And then the bottom one is
11 SPR2014-2918 that's dated December 29th, 2014.  So
12 you were in EM for that; yes?
13     A  Yes.
14     Q  And then if we could go to the next page,
15 the next one is SPR2018-0573, which was April 17th,
16 2018, when you were definitely not in EM; correct?
17     A  Correct.
18     Q  All right.  So if we could scroll back up
19 to that bottom portion of page 2.  So it looks
20 like you had one, two, three pieces of discipline
21 when you were in EM.  Correct?
22     A  Four, five.
23     Q  How so?
24     A  June 25th, 2014; August 10th -- no, August

---

90

1  2015 I wouldn't have -- yeah, I would have still
2  been -- no, I wouldn't have been there.  Oh, they
3  are out of order.  Okay, yeah, one, two, three --
4      Q  I think what's going on here -- we'll go
5  through the detail, but taking a look at
6  SPR2014-1584, the June 25, '14, is the initial
7  discipline.
8      A  Okay.
9      Q  August 10, 2015, is what happened after
10 the grievance --
11     A  Oh, okay.
12     Q  -- was reduced, but we'll go through this.
13 So looking at these, though, there's one, two,
14 three separate pieces of discipline; correct?
15     A  It looks like it, yes.
16     MR. WHITE:  If we could pull up Exhibit 9,
17 and we'll go through those three.
18     AV TECHNICIAN:  Please stand by.
19     (Strickland Deposition Exhibit 9 marked
20 for identification and attached to the transcript.)
21     THE WITNESS:  Can you make it larger?
22     MR. WHITE:  Yeah.  And we'll probably have
23 to scroll through this, too, to see the whole thing.
24     Q  Exhibit 9 which we'll go through is -- the

---

91

1  Bates are kind of out of order because I had to
2  put them in chronological order just for the ease
3  of going through it.  So the first two pages we are
4  going to look at are WINSTON_CCSO11302 and 11303.
5      Ma'am, this first one -- well, let me ask
6  you this.  Have you seen this document before.
7      A  Yes, I have.
8      Q  Okay.  And this is a write-up you received
9  or at least the date of the incident is listed as
10 May 19th, 2014; correct?
11     A  Yes.
12     Q  And up at the top we see it's SPR14-1584;
13 correct?
14     A  Yes.
15     Q  And you can read for yourself, I'm just
16 summarizing, but the gist of it that Rohloff,
17 Deputy Chief Rohloff wrote you up because an
18 inmate -- they discovered a 3-inch knife concealed
19 in an inmate's pocket that I guess he's saying you
20 missed.  Is that right?
21     A  That's what's stated in the paper but
22 that's not what happened, yes.
23     Q  I understand that.  But that's what he
24 wrote you up for?

---

92

1      A  Yes.
2      Q  And then as listed on this document, his
3  initial discipline, recommended discipline was
4  five days off; correct?
5      A  Yes.
6      Q  And we see that down at the bottom.  And
7  he crossed -- he crossed out "without pay," and it
8  says instead --
9      MR. WHITE:  Chris, if we could scroll down
10 to the bottom of this page.
11     Q  It says -- it's crossed out looks like
12 "without pay," and he wrote in "with options."
13 What does that mean?
14     A  I've never been suspended but with options
15 I think they allow you to use your time.
16     Q  Okay.  But you've never actually been
17 suspended; correct?
18     A  I don't think I've ever been suspended.
19     MR. WHITE:  Okay.  If we could go to the
20 next page which is marked 11303, and maybe we can
21 scroll down a little bit so the witness can see
22 the whole thing.  Yeah, there we go.
23     Q  Tell me when you're ready to talk about this.
24     A  Actually, zoom back in.  I was reading.

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

93

1      Okay.
2      Q  All right.  So this is referring to the
3  May 19th, 2014, discipline we just talked about?
4      A  Uh-huh, yes.
5      Q  It was recommended that you receive a
6  five-day suspension; correct?
7      A  Yes.
8      Q  It was reduced to a written reprimand; right?
9      A  Yes.  Can you scroll down so I can see
10  what date this took place -- no, up; I'm sorry.
11  July 22nd, 2015.
12      April 2015 I was in transportation, so
13  this was still lingering, in my mind.  I don't
14  think I've ever seen this before.
15      Q  Is it your testimony this was not sent
16  to you?
17      A  I don't recall ever seeing this.  That's
18  why I asked the date.  I didn't even know it was a
19  written reprimand, no.
20      Q  Okay.  But you'd agree that your -- the
21  discipline, the five-day suspension was reduced to
22  a written reprimand; correct?
23      A  Yeah, I agree definitely based on what I see.
24      Q  Okay.  If we could scroll down on this

94

1  document, do you know whose signature that is?
2      A  I do not.
3      Q  All right.  Let's go to the next page
4  which is marked CCSO011300.
5      A  Can you zoom in?
6      Q  Yeah.  Tell me when you're done reading this.
7      A  Okay.
8      Q  So this -- who is Marlen Valdovinos?
9      A  I don't know.
10      Q  So this document is from Greg Shields,
11  Director of EMU, and it says that he had a hearing
12  with you on June 27th, 2014.  Do you recall that
13  hearing?
14      A  Definitely had the initial hearing on
15  it, yes.
16      Q  Okay.  Is Mark Robinson the union rep
17  you're thinking of?
18      A  No, it was Sam Scaife.  It's right there.
19      Q  Oh, oh, got it.  Who was Mark Robinson?
20      A  He was our chief union steward at that time.
21      Q  Chief -- I'm sorry.
22      A  The chief union steward at the time.
23      Q  So there was two union people there?
24      A  When I had my initial hearing, I -- yes.

95

1      Q  Okay.
2      A  I'm not sure.  I do not remember because
3  it was so long ago, but I know I definitely had a
4  first step.
5      Q  Okay.  And if we could scroll down a
6  little bit so we could see the signature.  Okay.
7  So this was signed by Greg Shields, Director of
8  Electronic Monitoring; correct?
9      A  That's what it says, yes.
10      Q  And the gist of this memo is that after a
11  lengthy explanation from you, Shields reduced the
12  discipline from five days to a written reprimand;
13  correct?
14      A  Ask your question again.
15      Q  Okay.  So the gist of this -- I'm trying
16  to avoid reading the entire thing in.  The gist of
17  this is that after a lengthy explanation from you,
18  Shields decided to reduce the discipline from a
19  five-day suspension to a written reprimand; correct?
20      A  Yeah.  But that wasn't done until it appears
21  to be a year later.  So I wasn't aware of this.
22      Q  It's just a yes-or-no question, ma'am.
23      A  Yes, according to your document.
24      Q  Okay.  Do you have any reason to doubt the

96

1  authenticity of this document?
2      A  I'm not doubting, no.
3      Q  Let's go to the next page in the exhibit,
4  and this was a page actually produced by plaintiffs
5  in this case.  Down in the right-hand corner it's
6  marked P000247, and I'll give you a chance to read
7  that.
8      A  I read it.
9      Q  Okay.  And this is relating to an August 2nd,
10  2014, incident where I guess you were accused of
11  having an unauthorized electronic device on you.
12      A  Correct.
13      Q  Do you remember that incident?
14      A  I do.
15      Q  Do you remember who wrote you up?
16      A  Chief Loggins wrote me up, but he told me
17  it was because Shields told him to.
18      Q  Oh, he said that?
19      A  Yes.
20      Q  Okay.  Let's go to the next page, which is
21  WINSTON_CCSO11301.  I'll give you a second to read
22  that.
23      A  It's ironic, the same thing, they reduce
24  in May of 2015 after I'm out of the unit.  So, again,

Transcript of Michelle Strickland
Conducted on August 21, 2020

97

1 as I stated, when I was there, my write-ups were
2 continuously lingering. This comes out May 21st,
3 2015, after I'm no longer there. When I left,
4 this stuff was still lingering.
5    Q You say, "it's ironic." Do you think there's
6 like a conspiracy to reduce your discipline?
7       MS. KRAUCHUN: Objection; misstates
8 testimony and calls for speculation.
9    A I'm not saying it's -- it's ironic to me
10 that the discipline was not handled until I was no
11 longer in the unit. It was pretty much left to
12 linger over our heads, and you're wondering if
13 you're ever going to get a five-day or not, and
14 you're producing documents. And they were reduced
15 and I wasn't aware of it. I wasn't even --
16 May 21st I wasn't present.
17    Q But you'd agree that, again, Shields
18 reduced your discipline?
19    A After the --
20       MS. KRAUCHUN: Objection; mischaracterizes.
21    A (Continuing.) After the fact. After I
22 left the unit. After the incident happened.
23    Q Ma'am, you would agree that Shields reduced
24 the discipline? Yes or no.

98

1       MS. KRAUCHUN: Objection.
2    A I'm assuming because you produced this
3 document. I wasn't present for it. I don't know.
4    Q Do you believe this is a fake document?
5    A I don't know where you got the document.
6       MS. KRAUCHUN: Objection; mischaracterizes
7 testimony.
8       MR. WHITE: There's no testimony to
9 mischaracterize, Counsel. I'm asking if she
10 thinks it's a fake document.
11    A Sir, I wasn't made aware that my discipline
12 was reduced down to what you're producing in front
13 of the screen today. I had no knowledge. To date
14 I thought these were still lingering out there. I
15 was no longer there in that unit on May 21st, 2015.
16    Q So you haven't seen this document in this
17 litigation?
18    A I'm seeing it right now, sir.
19    Q First time? It was produced months ago.
20 This is your first time seeing it?
21    A I don't recall ever seeing it. I'm
22 sitting here surprised that it was reduced. I
23 didn't know.
24    Q Okay. Let's go to the next one, please.

99

1    Q How long -- what's your understanding of how long
2 it takes to process discipline?
3    A I don't have an understanding, but it
4 doesn't seem like it should take a year. They
5 have a time frame to write us up and for us to
6 respond. But it takes a year?
7    Q But your answer is you have no idea what
8 the time frame is?
9    A I do not know what the time frame is.
10    Q So you don't know how long it typically
11 takes to go through the entire grievance process;
12 correct?
13    A I do not.
14    Q All right. This document which is Bates-
15 stamped CCSO11295 -- sorry. Have you had a chance
16 to read this?
17    A I have it. I'm reading it now.
18    Q Okay.
19    A I read it.
20    Q And this refers to a December 15th, 2014,
21 incident; correct?
22    A It does.
23    Q SPR14-2918?
24    A Yes.

100

1    Q And this refers to an incident where you
2 left your personal car in a parking lot and
3 ignored Supervisor Brown's request to move the
4 vehicle, correct?
5    A For the record, Supervisor Brown is not in
6 our ranking staff. She's a security guard.
7    Q Correct. That wasn't my question, though.
8 The incident was a write-up because Supervisor
9 Brown said you left your car in a parking lot, I
10 guess when you weren't supposed to?
11    A Yes, the security guard said I left my car
12 in the parking lot.
13    Q Okay. And you remember that event?
14    A I do.
15    Q All right. And if we can scroll down to the
16 bottom of this page, it looks like the initiating
17 supervisor's -- the person who wrote you up was
18 Director Webb. Is that -- or Chief Webb. Is that
19 right?
20    A Yes.
21    Q And his recommendation was two days off
22 with options?
23    A That's what it appears to be.
24    Q Okay. And then let's go down to the next

**101**

1 page. Let's see. So we've got CCSO11297. I'm
2 making sure I'm looking at the same one. Yeah, so
3 why don't you read this and then let me know when
4 you're ready to talk about it.
5    **A I'm done reading.**
6    Q Okay. And then if we can scroll down --
7 so this was a -- this was the Step 1 grievance you
8 filed?
9    **A Yes.**
10    Q Did you actually draft this, or like your
11 union rep drafts this?
12    **A My union rep drafted that.**
13    Q Okay. But if we look up at the top of the
14 screen where it says "Grievant's Signature," is
15 that your signature?
16    **A That is my signature.**
17    Q Okay. And it looks like at Step 1 the
18 disposition was "No contractual violation by
19 employer, grievance denied." Do you know who --
20 it says "Employer's Designee's Signature." Do you
21 know who signed that?
22    **A No, but if we can figure out whose number**
23 **it is, it would say. That just meant one chief**
24 **wrote it -- would have wrote it, another chief**

**102**

1 **heard it. But I don't know whose it is.**
2    Q Do you remember that Step 1 hearing?
3    **A I can't say if it was Ranzino or not. I**
4 **can't remember who it was, but I know this**
5 **particular one went straight to Shields, and they**
6 **definitely couldn't kick it out because he said to**
7 **send it up to him.**
8    Q Okay. And then it looks like at the
9 bottom at Step 2 the discipline was reduced to a
10 written.
11    **A It was on May 18, 2015, again, when I'm no**
12 **longer in the unit. It sounds like someone was**
13 **just cleaning up their old write-ups that were**
14 **lingering out there.**
15    Q Right. But you're just guessing on that;
16 right? You have no idea.
17    **A I think that's what happened.**
18    Q What do you base that on?
19    **A The fact that I wasn't even informed that**
20 **this was taking place.**
21    Q I mean, you -- your Step 1 was in late
22 January; Step 2 was in mid-February; the step --
23 sorry -- the Step 1 was in mid-February; the
24 Step 2 was in mid-March. You believe that then in

**103**

1 May, two months later, that's too long? Taking
2 two months to do this is too long?
3    **A I just realized --**
4       MS. KRAUCHUN: Objection.
5    **A -- the dates say May 17th and 18th. So it**
6 **sounds like somebody was just cleaning up their**
7 **files to me because they're all around the same**
8 **time frame.**
9    Q Would there be anything wrong with someone
10 trying to go through a backlog of discipline?
11       MS. KRAUCHUN: Objection; foundation.
12    **A I can't say if it's right or wrong. All I**
13 **can just say is it sounds like someone was just**
14 **covering some tracks because we had a lot of stuff**
15 **out there flapping in the wind.**
16    Q What do you mean covering their tracks? I
17 mean, in every instance your discipline gets
18 reduced. How is that covering anybody's tracks?
19    **A I didn't know it was reduced. I was not**
20 **informed.**
21    Q What tracks are being covered?
22    **A Why wasn't I informed is what I was asking.**
23 **I didn't know it was reduced. The fact that --**
24    Q That doesn't answer my question. You said

**104**

1 it looks like somebody is trying to cover their
2 tracks?
3    **A And I say that because Shields initiated**
4 **the discipline. He is the reason I got this**
5 **write-up. The -- what's her name -- Security**
6 **Officer Brown went to Shields directly, and he**
7 **wanted me written up, and I was written up by Webb**
8 **who knew nothing of the incident he was writing me**
9 **up for. She went to Shields.**
10    Q How do you know she --
11    **A If you pull up -- maybe you have it.**
12 **He'll tell you he wanted my car towed himself. He**
13 **told me that.**
14    Q But he didn't write you up. Webb wrote
15 you up; correct?
16    **A He didn't write me up, but he instructed**
17 **Webb to write me up.**
18    Q How do you know that?
19    **A Because that's the way that Shields did**
20 **things.**
21    Q So you weren't there for the conversation?
22    **A I was there for the conversation when he**
23 **said he wanted my car towed.**
24    Q Ma'am, were you there when Director Shields

Transcript of Michelle Strickland
Conducted on August 21, 2020

27 (105 to 108)

105

1  said, "Chief Webb, write her up"?
2      A  I was not there but in some of those
3  hearings they would tell you, "I can't kick it out
4  because I have to send it up to Shields; he will
5  not let me."
6      Q  And the point here was to kick it up to
7  Shields so that he could reduce the discipline?
8      A  Eventually, he reduced it.
9      Q  Okay.  Let's go down to the next page,
10 which is CCSO11296.  And this is, again, the same
11 disciplinary action form, but it was in your file.
12 There's a handwritten note there that says,
13 "Reduced to written rep by AED Miller, 5/18/15."
14 Do you know who AED Miller is?
15     A  I do.
16     Q  So it wasn't actually Shields who reduced
17 it, it was Miller, or you don't know?
18     A  That's what the paperwork says.  I didn't
19 know.
20     Q  Every one of the disciplines we've looked
21 at was reduced by Shields; correct?
22     A  No.  According to this one you said it was
23 by Miller.
24     Q  Okay.  So the first two were done by

106

1  Shields.  This one maybe Shields, maybe Miller?
2      A  According to you it's Miller on the sheet
3  of paper.
4      Q  It's not me, ma'am.  I'm just looking at
5  the document the same way you are.
6      A  And I'm answering it based on your
7  document you said Miller reduced this last one and
8  Shields did the other two.
9      Q  But we agree that every discipline you got
10 in EM was reduced?
11     A  Yes.
12     Q  Are you complaining --
13         MR. WHITE:  Sorry, Chris, we can put that
14 exhibit aside.  I'm done with it.
15     Q  Are you complaining in this lawsuit that
16 you were unfairly assigned to TSS?
17     A  Yes.
18     Q  Okay.  And are you saying that is on the
19 basis of your race or your gender?
20     A  Race.
21     Q  Nothing to do with your gender?
22     A  I don't even know how many women were --
23 no, I probably was the only woman down there now
24 that I think about it.

107

1      Q  Would you agree that some investigators
2  prefer TSS?
3      A  I can't say.  I don't know everyone's
4  preference.
5      Q  You didn't prefer it, though?
6      A  No.
7      Q  Did you ever hear of anyone saying they
8  preferred to be in TSS?
9      A  Again, I don't know everyone's preferences,
10 so I can't say.
11     Q  Yeah, it's just a yes-or-no question, ma'am.
12 Did anyone ever tell you they preferred being in TSS?
13     A  No.
14     Q  Would you agree that TSS is safer than
15 being on the street?
16     A  No.
17     Q  TSS isn't less dangerous than being on the
18 street?
19     A  Any part of TSS or on the street is
20 dangerous because we encounter very dangerous
21 individuals.  So it just depends on how an
22 individual decides to act up.  You can get beat up
23 on the streets; you can get beat up in TSS.
24     Q  They're both dangerous?

108

1      A  They're both dangerous.
2      Q  You consider -- well, have you -- you have
3  been assigned as a street investigator before;
4  correct?
5      A  Yes.
6      Q  I think one of the things that you --
7  complain about regarding TSS is that it has
8  vermin, mice, and cockroaches; correct?
9      A  Yes.
10     Q  Mice and cockroaches exist out on the
11 street, too; right?
12     A  They exist everywhere.
13     Q  Sure do.  All right.  You consider TSS a
14 bad assignment?
15     A  I never said it was a bad assignment.  It
16 was a punishment assignment.
17     Q  Okay.  What -- I guess I'm not understanding
18 the interaction there.  It was a good punishment?
19     A  I never said it was a good nor bad punishment
20 assignment.  I stated it was a punishment assignment.
21     Q  And what about it was punishment?
22     A  When someone would get upset with you,
23 Shields or Ranzino, you'd end up with your
24 assignment changed, and you would end up in TSS.

Transcript of Michelle Strickland
Conducted on August 21, 2020

109

1    Q  Did you get paid less in TSS than on the
2  street?
3    A  Say that again.
4    Q  Did you get paid less when assigned to TSS
5  as opposed to the street?
6    A  Not to my knowledge.
7    Q  You got paid the same; right?
8    A  Yes.
9    Q  Is it true people didn't like working in
10 TSS because you couldn't take breaks whenever you
11 wanted; you couldn't take lunch whenever you
12 wanted?
13   A  Everybody had their own reasons as to why
14 they disliked TSS, so I can't articulate everyone's
15 reason, but I could give you some of my reasons.
16 It was dark; it was damp.  You don't see the sun.
17 You're pretty much underground all day long.
18   Q  You would agree that you don't bid for
19 your assignment; right?
20   A  Not in EM, no, you do not.
21   Q  You bid for your shift, but you don't bid
22 for your assignment?
23   A  Correct.
24   Q  And the bid for shift is based on seniority;

110

1  is that right?
2    A  It is.
3    Q  You would agree that you have no right, no
4  contractual right to any particular assignment;
5  right?
6    A  I had no contractual right to a specific
7  assignment.
8    Q  Are you aware of anyone having a contractual
9  right to a specific assignment?
10   A  According to the contract, no.
11   Q  Okay.  You wouldn't have been there for
12 the former CBA.
13      Would you agree that assignments were made
14 based on operational needs?
15      MS. KRAUCHUN:  Objection to foundation.
16   A  I can't say that.  I don't know.  I wasn't
17 there when they discussed operational needs for
18 assignments.
19   Q  Are you complaining in this lawsuit that
20 you were unfairly assigned to high-incident areas?
21   A  Yes.
22   Q  And you would agree that assigned areas
23 are not based on seniority; correct?
24   A  Not to my knowledge, they were not.

111

1    Q  Aren't most of the areas that investigators
2  go to high-incident?
3    A  No, not at all.
4    Q  No?  The majority are in low-incident?
5    A  No.  I'm not saying the majority, I'm not
6  giving a percentage, but they're not all high-risk
7  areas.
8    Q  I wasn't saying all; I was saying most.
9    A  No, because there were some north side
10 suburbs you went to; there were downtown condos
11 that you went to.  So no, everything what not
12 high-incident.
13   Q  That's not my question, though, ma'am.
14 I'm saying, weren't the majority of areas
15 high-incident?  And if your answer is no, that's
16 fine.  But I understand there's other areas.
17   A  No.
18   Q  Watch commanders get assignments in
19 high-incident areas; correct?
20      MS. KRAUCHUN:  Objection; foundation.
21   A  What is a watch commander?  We had chiefs.
22 Are you talking about the chiefs?
23   Q  Did a chief do a shift in a high-incident
24 area, to your knowledge?

112

1    A  You're saying did they work in them?
2    Q  Correct.
3    A  I can't say.  I don't know.  You'd have
4  sometimes a chief would go out on patrol, but I can't
5  say what is areas he was in.  No, I don't know.
6    Q  Okay.  What about supervisors?  Did they
7  ever go to high-incident areas?
8    A  Those are the same people, chiefs.
9    Q  Would you agree that investigators were
10 assigned to areas they're familiar with?
11   A  No.
12   Q  Would you agree that investigators are
13 sometimes assigned to areas close to where they live?
14   A  No, that was never discussed with me.  And
15 if so, I would think that would be a terrible
16 situation to be put in.
17   Q  Did you ever hear of people wanting to be
18 assigned near their house?
19   A  Never.  It's no -- for what?  We drive to
20 work every day to Rockwell.  It's not like it's a
21 convenience or closer to home or anything like
22 that, so no.
23   Q  Well, I guess, you know, you'd be able to
24 go home whenever you want, you could run errands,

113

1  things like that.  You never heard of anybody
2  doing stuff like that?
3      **A  No, not at all.  We didn't have the right**
4  **or the privilege just to go home when we wanted**
5  **to.  I wouldn't even want to put a squad car in**
6  **front of my house and put my house at risk.  I**
7  **don't want everybody to know what I'm doing for a**
8  **living, and being assigned to the same area where**
9  **you work and live could be very dangerous for our**
10 **lives.  If that's their reason for putting us on**
11 **the south side all the time was, you're putting my**
12 **life at risk by putting me on the south side in an**
13 **area that's high-risk.**
14     Q  I'm not saying that's the reason, ma'am.
15 I'm saying, have you ever heard of anyone wanting
16 to be assigned close to their home?
17     **A  No.  I never was asked if I wanted to be.**
18        MR. WHITE:  Okay.  Let's pull up Exhibit 7,
19 please.
20        AV TECHNICIAN:  Please stand by.
21        We were on 9.  You said you wanted to go
22 back to 7?
23        MR. WHITE:  Let me make sure.  Maybe I
24 got -- yeah, please go back to 7.  I got things

114

1  out of order.
2         AV TECHNICIAN:  No problem.  Thank you.
3         (Strickland Deposition Exhibit 7 marked
4  for identification and attached to the transcript.)
5      Q  Ma'am, Exhibit 7 is your Objections and
6  Answers to Defendant Gregory Shields' First Set of
7  Interrogatories.  I assume you've seen this
8  document before.
9      **A  I have.**
10     Q  And if we could scroll to the very last
11 page, please.  Ma'am, after reviewing this
12 document, you declared under penalty of perjury
13 that the foregoing is true and correct.  That is
14 your signature?
15     **A  It is.**
16     Q  It looks like you signed that -- is that
17 February 10th, 2020?
18     **A  That's what it says.**
19     Q  Okay.  Let's go back up to Interrogatory
20 No. 2, please.  It is on page 2.
21        Okay.  So we asked you for every time
22 somebody said females do not belong in the
23 investigator position and that you should get a
24 secretarial position.  And I just want to confirm,

115

1  Ranzino is the only one who said that to you;
2  correct?
3      **A  Yes.**
4      Q  How many times did he say that to you?
5      **A  It was stated a couple different times.**
6      Q  But you never reported it to anybody?
7      **A  No.**
8      Q  Let's go to Interrogatory No. 3 -- well,
9  it starts on the bottom of this page where we ask
10 you to identify all the facts regarding the five-day
11 suspension you received in paragraph 38 of the
12 complaint, and then your answer is on the next
13 page, and you stated that you received a five-day
14 suspension.  First of all, we know that that was
15 reduced now; correct?
16     **A  We do know that.**
17     Q  Do you believe this -- that the suspension --
18 or at least the five-day suspension was based on
19 your race?
20     **A  I do believe it was based on my race.**
21     Q  And do you believe that the reduction to a
22 written reprimand was based on your race?
23     **A  I would say yes, because when this same**
24 **incident happened to another set of white**

116

1  **investigators, they did not get a write-up, they**
2  **were not threatened with a five-day suspension nor**
3  **did they end up with a written reprimand in their**
4  **file.  They were given a simple phone call, and**
5  **that was the end of it.**
6      Q  How do you know that?  You say here that
7  Messina told you that?
8      **A  Yes.  Officer Messina -- Investigator**
9  **Messina did tell me that.  Him and Investigator**
10 **Faulkner were partners.  They had the same incident**
11 **take place except for our incident was much more**
12 **different.  It wasn't found in a pocket; it was**
13 **found inside what is called a peg leg.  We can't**
14 **go inside of a human's body and take anything out.**
15 **It was concealed inside of his peg leg.**
16     Q  What was the incident with Messina?
17     **A  Messina had a pocket knife, which both of**
18 **us had pocket knives, but Messina had a pocket**
19 **knife in a pair of cargo pants, shorts, whatever**
20 **the case I don't know.  But he was taken -- the**
21 **same incident.  The guy was patted down, placed in**
22 **their vehicle, turned over to receiving; he was**
23 **put on a machine; they found a pocket knife.  They**
24 **called Messina and Faulkner on the phone, "Hey**

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

117

1  guys, they found this.  Be careful in the future."
2     Q  Who found the pocket knife?
3     A  Whoever worked in RCDC.
4     Q  Who called Messina?
5     A  He told me a director called him.  I don't
6  know which director called him.
7     Q  When did the director call him?
8     A  I'm assuming the same day the situation
9  took place.  He received a phone call from
10  receiving.  He said someone from receiving called
11  him and told him it happened, and then the director
12  called and told him, "Hey, be careful next time."
13     Q  When did Messina tell you this?
14     A  When he found out I received a five-day
15  suspension, myself and Investigator Keefe.
16     Q  When was that?
17     A  Whenever we were written up, whenever we
18  were informed about the write-up.  I don't know
19  the date; it's not in front of me.
20     Q  Why would Messina know about you getting
21  written up?
22     A  Because I talked to him about it.  I was
23  venting, just as I stated we tend to do when
24  you're getting discipline or being written up.

---

118

1  And I said -- Keefe and I were talking about that
2  we got wrote up and it's not even fair because the
3  dude had a peg leg; we wouldn't have been able to
4  go inside his leg.  And Messina asked, "Well, what
5  are you talking about?"
6     "We had a guy" -- explained the same
7  situation -- "we patted him down, put him in our
8  vehicle, took him into receiving; receiving put
9  him on a machine; they found a knife; Shields got
10  a phone call.  Instead of somebody calling and
11  saying, 'Hey, be careful in the future,' paperwork
12  came out and we were written up for five-day
13  suspension major cause."
14     I don't understand how two sets of
15  investigators, identical situations, they're
16  white, we're black -- I didn't even do the
17  pat-down, and Investigator Keefe specified that,
18  "Hey, Director Shields, Strickland did not pat the
19  guy down, I did.  So I'll take the hit, don't give
20  it to her."
21     He said, "No, she's your partner, she's
22  getting written up, too."
23     Q  What's a leg band?
24     A  Excuse me.

---

119

1     Q  What's a leg band?
2     A  That's a part of the equipment for the
3  house arrest program.
4     Q  Okay.  Sorry; something you said just made
5  me realize something.  If we could go back to
6  Exhibit 9, the first page, please.  If we could
7  zoom in, it says, "Upon bringing the inmate into
8  the Department of Corrections it was discovered
9  that the inmate had a 3-inch knife concealed in
10  his left pant pocket"?
11     A  Uh-huh.
12     Q  You're saying it was in a peg leg?
13     A  Yes.
14     Q  Okay.  Did you ever dispute this?
15     A  I just told you the conversation we had
16  when we were talking to Shields about it, yes.
17     Q  What I'm trying to understand, ma'am, is
18  you signed this document.  You didn't in any way
19  say it wasn't in his left pant pocket, it was in
20  his peg leg?
21     A  Do you have my response to this write-up?
22     Q  I have your signature at the bottom.
23     A  That's not what I asked.  I asked, do you
24  have my response to this write-up, my actual

---

120

1  grievance?
2     Q  I have no idea, ma'am.
3     A  Well, that's where it would be, in my
4  actual grievances.  I'm sure it's written in there.
5     Q  So if it's not there, it didn't happen?
6     A  That's not the case.  It happened and it's
7  written, sir.
8     Q  Okay.  Apart from Messina telling you
9  about his incident -- sorry -- if we could go back
10  to Exhibit 7.
11     Apart from Messina telling you about this
12  incident, do you have confirmation from anybody
13  else that Investigator Messina's recollection is
14  correct?
15     A  Yes.  Investigator Faulkner, his partner.
16     Q  Anybody else?
17     A  Those are the only two I needed.  They
18  were in the same situation I was in.  They told me
19  their experience and what happened with them
20  versus what happened with us, and it was not fair
21  at all.  They're two white men; we're a black
22  woman and a black man.
23     Q  You have no idea if they were telling the
24  truth?

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

121

1    A  They had no reason to lie to me that the
2  same incident happened a week before.
3    Q  You have no idea if he gave you an
4  accurate description?
5    A  I have no reason to believe that
6  Investigator Messina or Investigator Faulkner
7  would lie to me.
8    Q  You have no way of knowing whether what
9  they told you was 100 percent accurate; correct?
10   A  I have no reason to believe he would lie
11 to me.
12   Q  I can just keep asking the same question,
13 ma'am.  You have no reason -- no way of knowing
14 whether what they told you was accurate or not?
15   A  I believe what he told me was the truth.
16   Q  Did you confirm with anybody from -- what
17 was it, RCDC?
18   A  I confirmed with the two men who brought
19 it to my attention, Investigator Messina and
20 Investigator Faulkner that they had the same
21 incident happen.
22   Q  Those are the only two people?
23   A  Those are the only two people it happened to.
24   Q  It's your testimony that what, in the

122

1  history of EM they're the only two people who have
2  missed a pocket knife?
3      MS. KRAUCHUN:  Objection.
4    A  It's my testimony that the same incident
5  happened; I told them what happened to me; they
6  told me what happened to them; the outcomes were
7  completely different.  Two black investigators
8  versus two white investigators.  The discipline is
9  excessive.
10   Q  Did you talk to any other white investigators
11 if they had had an incident where they missed
12 contraband?
13   A  I only had those two to talk to because
14 they were the ones who willingly and openly gave
15 the information that the same thing had just
16 happened to them.
17   Q  Did you talk to any other white investigators
18 to find out if they had ever had an incident with
19 contraband?
20   A  It wasn't my job to go investigate anything
21 else that happened with other people.  They shared
22 their experience; I shared mine, just as I told
23 you we sit there and talk to each other, and this
24 was the outcome, sir.

123

1    Q  Did you talk to any other white
2  investigators about --
3    A  Just those two.
4    Q  It's very simple, ma'am.  The way this
5  goes --
6    A  It's just those two.
7    Q  -- is I can just keep asking the same
8  question over and over and you answer --
9    A  Those are the only two I talked to.  Those
10 are the only two I talked to.
11   Q  Great.  All right.  No. 7 is on page 5 of
12 Exhibit 7.  And we asked you to -- oh, sorry; I'll
13 wait until we get there.
14     We asked you to identify all abuse and
15 harassment you suffered as alleged in paragraph 40 of
16 the complaint, and you stated that you suffered
17 harassment by Shields, Ranzino, and Rohloff through
18 formal reprimand, work assignments, and verbal
19 derogatory comments.
20     First of all, we've established Rohloff
21 didn't make any verbal derogatory comments; correct?
22   A  He did not but he wrote me up.
23   Q  Okay.  Which write-up?  Of the ones we
24 went through, which of the three was from Rohloff?

124

1    A  I don't remember which one.
2    Q  Do you want to go back and look at them?
3    A  If you want me to answer that.  I just
4  know he wrote me up for one.
5    Q  Okay.  Yeah, I'd like to figure out which
6  one.  If we could pull up Exhibit 9 again, it may
7  have just been the first one.  Let's scroll down
8  to the bottom of that one.
9      So Rohloff wrote you up for this one?
10   A  He did.
11   Q  And then the next one it looks like is on
12 page 4.  And this one I think we said was by --
13 we've got to go back up to the narrative there.
14 This was by Loggins?
15   A  I'm assuming, yes.
16   Q  Okay.  And then the last one -- keep going.
17 Go down a little bit.  This one was from Webb;
18 correct?
19   A  Yes.
20   Q  I'm sorry; I couldn't hear you.
21   A  Yes.
22   Q  All right.  Let's go back to go Exhibit 7.
23     All right.  So it's that one write-up --
24 the first write-up from Rohloff you contend -- you

Transcript of Michelle Strickland
Conducted on August 21, 2020

125

1 contend that was based on your race and gender?
2    **A  It is.  Because two other investigators were**
3 **written up -- excuse me.  We, the two investigators**
4 **written up, were a black man and woman.  The white**
5 **investigators that went through the same exact**
6 **experience were not written up at all.**
7        **So yes, it's based on my race and my**
8 **gender because I didn't even search the man.**
9    Q  So I guess what I'm trying to figure out
10 is you said before you don't have any reason to
11 think that Rohloff was racist or sexist.
12    **A  That's because I did not remember that he**
13 **had wrote me up for that write-up.  So yes, I'll**
14 **stand corrected.**
15    Q  So now you do think Rohloff is racist and
16 sexist?
17    **A  Definitely because I was written up by him**
18 **for five days when he didn't write up anyone else**
19 **that had the same offense that was white, yes.**
20    Q  So your belief that he's racist and sexist
21 is based on that single write-up?
22    **A  It is.**
23    Q  Have you already -- so you refer to
24 harassment by Shields and Ranzino, as well.  Have

126

1 we already talked about all those incidents?
2    **A  Being called nappy head, being told to be**
3 **a secretary in the office, being written up**
4 **because I'm a black woman that didn't search a man**
5 **and maybe because I wasn't white and searched**
6 **somebody that had a knife, yeah, all sounds racist**
7 **and discriminatory to me and sexist, as well.**
8    Q  I don't disagree.  I'm just trying to
9 figure out if we've got the whole list.
10    **A  I believe we do.**
11    Q  All right.
12    **A  And him having -- Ranzino -- not Ranzino --**
13 **Shields threatening to have my car towed when in**
14 **past practice individuals leave cars in that**
15 **parking lot, they use it as their storage because**
16 **they have several cars, but he threatened to have**
17 **my car towed, and it's written in his response**
18 **that he was going to have my car towed, and that's**
19 **never a past practice that anyone has ever taken.**
20    Q  The parking lot was full --
21    **A  I'm sorry.  The parking lot was not full**
22 **when I parked my car.  I wouldn't have been able**
23 **to park it.**
24        **THE WITNESS:  Can you hold on one moment?**

127

1        MR. WHITE:  Yeah.  Let's go off the
2 record.
3        (An off-the-record discussion was held.)
4 BY MR. WHITE:
5    Q  Looking at the last sentence of your
6 response to 7 or at least the last part of it, it
7 says you did endure retaliation after filing your
8 EEOC charge.  That was after you were out of EM;
9 correct?
10    **A  What are you -- let me look at what you're**
11 **saying.**
12    Q  So the last sentence ends with -- I'll just
13 read the whole sentence.  "Plaintiff Strickland
14 states that she did not file a grievance against
15 the defendants due to her fear of being retaliated
16 against and did endure retaliation after filing
17 her EEOC charge."
18        And my question is simply, the retaliation
19 you're referring to happened long after you left
20 EM; correct?
21    **A  I'm trying to remember the date that I**
22 **filed my EEOC charge.**
23    Q  I'm not trying to make it a guessing game.
24 If you want us to pull those up again so you can

128

1 see them, that's fine, just tell me.
2    **A  Can you scroll up on this one so I can see**
3 **the next -- no, down, the other way; I'm sorry.**
4 **Scroll down again; I'm sorry.**
5    Q  If it's helpful, we can pull up the
6 exhibit which is your first EEOC charge.
7    **A  No, it's fine.  And I was threatened**
8 **because I was threatened to go back to the jail.**
9 **I had to read so I could remember the dates.  They**
10 **kept saying they were going to try to send me back**
11 **to the jail when I was in EM, so that took place**
12 **before I left the unit.**
13    Q  Okay.  So let's get back to my question.
14 You said you did endure retaliation after filing
15 the EEOC charge.  Okay?
16    **A  Okay.**
17    Q  Your EEOC charge, the first one was filed
18 in July 2016.  That is long after you were out of
19 EM; correct?
20    **A  Got you.  Yes.**
21    Q  Okay.  All right.  Let's go to Interrogatory
22 No. 14.  So we asked you to identify all protected
23 activities in which you engaged as alleged in the
24 complaint.  And you responded that, "Her disciplinary

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

129

1 process was biased and skewed due to Defendant
2 Shields not allowing her to make a case, and she
3 would ultimately have to make a case in front of
4 him even when he initiated the write-up."
5      You'd agree as we've looked at this that
6 Shields significantly reduced the discipline each
7 time; correct?
8    **A  He did significantly reduce the write-up,**
9 **but he initiated every last one of the write-ups**
10 **despite his name not appearing on there because**
11 **they did what Shields said.**
12    Q  And how is reducing discipline biased?
13    **A  Because he uses discipline to hang it over**
14 **your head.  As I stated, I feared I would end up**
15 **in Loudermill hearing if I went any further than**
16 **just grieving these write-ups that I had.  Hence,**
17 **past practices that go up there and guys are still**
18 **currently fighting for their jobs.**
19    Q  So having Shields reduce a five-day
20 suspension to a written reprimand you contend is
21 biased?
22    **A  If you recall, during the time that this**
23 **was written -- and even to date I didn't even know**
24 **it was reduced to a written reprimand.  I'm**

---

130

1 **learning of this now.  It wasn't like I was informed**
2 **of it.  It was still flapping in the wind to me.**
3 **So this is written before I even knew it was**
4 **reduced, sir.**
5    Q  So now that you know that all your
6 discipline was significantly reduced, you'd agree
7 that's not biased?
8    **A  I would agree.**
9      MS. KRAUCHUN:  Objection.
10    Q  How is it biased?
11    **A  Because there's no way an individual could**
12 **initiate your write-up, tell individuals that they**
13 **can't kick it up -- kick it out or throw it out,**
14 **excuse me, and they have to kick it up to the next**
15 **level.  So ultimately, you are doomed either way**
16 **because you can't get it done at his level.  He**
17 **has to be the one that throws everything out.**
18 **He's instructing his individuals below him not to**
19 **throw anything out.  So it's --**
20    Q  How do you know that?  I mean --
21    **A  Because it came out of their mouths.  They**
22 **would tell us, "Stick, I can't.  My hands are**
23 **tied.  I can't do anything about it.  You've got**
24 **to take it to Ranzino.  He told me I can't throw**

---

131

1 **it out."  They would say it; they weren't afraid**
2 **to say that.**
3    Q  But that has nothing to do with him
4 initiating it.
5    **A  It does if Director -- Supervisor Brown**
6 **goes to him and tells him I parked my car in a**
7 **spot in the lot and I wouldn't leave out if she**
8 **went directly to Shields and then Shields has**
9 **someone else write me up, and then there's a huge,**
10 **long, lengthy exchange of words between him and I**
11 **in documents about the write-up and how he wanted**
12 **to get my car towed.**
13    Q  Which eventually resulted in the biased
14 decision to reduce the discipline?
15    **A  If that's what you want to call it, yes.**
16    Q  That's what you're calling it, ma'am.
17    **A  It was biased from the start because there**
18 **are a lot of other individuals that park in our**
19 **parking lot.  They keep their cars there, and no**
20 **one's ever threatened, no one's ever been written**
21 **up to have their car towed.**
22    **And at the time that this took place my**
23 **grandmother died six months later.  She was sick.**
24 **I had to go out to see my grandmother for a visit**

---

132

1 **in Texas.  I told him that he didn't even have**
2 **empathy.  He said, "I don't care.  Your car wasn't**
3 **supposed to be there."**
4    Q  Is it possible that Shields just didn't
5 like you?
6    **A  Maybe he didn't.**
7      MS. KRAUCHUN:  Objection; foundation.
8    **A  (Continuing.)  I don't know.**
9    Q  I mean, every single grievance -- every
10 single discipline you had in EM, I mean, they gave
11 you what you wanted; right?  It was reduced every
12 time.
13    **A  They didn't give me what I wanted when the**
14 **initiating chief heard the write-up.  And you tell**
15 **me, if somebody called you nappy head, does it**
16 **sound like they liked you or disliked you?**
17 **Because it still sounds like it's biased and it's**
18 **discriminatory and racist for someone to talk to**
19 **you like that.  That's your call.**
20    Q  But my question was every time you asked
21 for something, they gave it to you, and it sounds
22 like what you're saying is they didn't give it to
23 you when you wanted?
24    **A  No.  They didn't --**

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

133

1      MS. KRAUCHUN: Objection, misstates --
2  mischaracterizes testimony.
3      A  (Continuing.)  That is not what I said.
4  They did not give it to me.  Nothing was heard on
5  the first level Step 1 was thrown out.  It had to
6  go up to Shields because Shields controlled that
7  unit, and he had it ran the way he wanted to.  The
8  chiefs' hands were tied, as they told us they
9  didn't have the discretion to use their own brain
10  and throw something out because that's not the way
11  that Shields wanted it.
12     Q  Shields was the executive director; correct?
13     A  I'm assuming that was his title, director.
14  We just called him Director Shields.
15     Q  Who was ultimately in charge of EM when
16  you were working there?
17     A  Director Shields.
18     Q  And the EM -- or the Cook County Sheriff's
19  Office, I should say, is a paramilitary organization;
20  correct?
21     A  Allegedly.
22     Q  And there's a chain of command?
23     A  Allegedly.  We didn't have a chain of
24  command over there, though.

134

1      Q  That's your opinion?
2      A  No, that's fact.  We went from investigator,
3  to a chief, to a director.
4      Q  Could you order Shields to do something?
5      A  No.
6      Q  So there was a chain of command?
7      A  If that's what you call it.  But it was
8  just -- it was -- if it's paramilitary and we're
9  talking Cook County Sheriff, the whole department,
10  everywhere I've ever worked we had sergeants,
11  lieutenants, commanders and/or chiefs, then
12  directors.  We didn't have any of the ranking
13  staff that I just spoke of.  No one was merit at
14  all.  There wasn't a sergeant; there wasn't a
15  lieutenant; these were just people assigned to
16  chief positions.  There was no testing to get
17  there; it was just appointments.
18     Q  So because there was not merit ranks, you
19  believe there was no chain of command?
20     A  I didn't say I didn't believe there wasn't
21  a chain of command.  If that -- as you said, it's
22  paramilitary.  So if it's paramilitary, everything
23  should be the same across the board.  And this
24  just shows that EM was their own world, and they

135

1  made their own rules as they went about because it
2  was not the same when you came from the jail into
3  EM.  There was a total difference.
4      Q  Well, that would make sense, though,
5  right, because they're completely different jobs?
6      A  No, it wouldn't make any sense.  There
7  still should have been -- to date they now have
8  sergeants, and they have lieutenants, and I'm
9  assuming they still have chiefs because Chief
10  Loggins is there.  So now they have the merit rank
11  in place, but they did not have that previously
12  when I was there.
13     Q  Who made the decision on which rank should
14  be in EM?
15     A  I don't know who made the decision at all.
16  We had Walker, Sam; they were fake supervisors.
17  They weren't sergeants but they were being
18  compensated with compensatory time for the services
19  that they did.  Again, they made their own rules
20  as they went along.
21     Q  When you were in EM, did you complain about
22  the way the progressive discipline policy was
23  being administered?
24     A  I did.  I stated that it wasn't progressive.

136

1      Q  And you actually complained about the way
2  hearing officers were assigned, too; right?
3      A  Hearing officers?  Are you referring to
4  the chiefs?
5      Q  Yes.
6      A  Yes, I did complain.  I talked about it to
7  the actual chief.  I was like, you know, "This
8  isn't fair."  And their response was just like,
9  "Yeah, that's just kind of the way it is in EM."
10     Q  Well, that's not true.  In fact, they gave
11  you exactly what you wanted; right?
12     A  No, they didn't give me exactly what I
13  wanted.  I just learned that my discipline was
14  kicked down today.
15     MR. WHITE:  So let's pull up Exhibit 10,
16  please.
17     AV TECHNICIAN:  Please stand by.
18     (Strickland Deposition Exhibit 10 marked
19  for identification and attached to the transcript.)
20     Q  This document marked Exhibit 10 which is
21  WINSTON_CCS018016 through 17.  If we could go down
22  to the bottom of this which is the first email in
23  the chain.
24     So on February 3rd, Webb wrote to you,

Transcript of Michelle Strickland
Conducted on August 21, 2020

35 (137 to 140)

---

137

1  "Please be advised that I've been assigned to
2  conduct your first step hearing in regards to the
3  above listed grievance."
4       And you wrote back then on February 5th,
5  "It is my position that I will not be judged
6  fairly by the individual that wrote this same
7  grievance to judge my first-level grievance. This
8  is a conflict of interest. That being said, I'd
9  like to have my grievance rescheduled also because
10 my union rep is scheduled to be off on Sunday."
11      So this was the incident where -- Webb
12 wrote you up February 5th, so this is the car
13 parking incident; correct?
14    A  Yes.
15    Q  Okay. And Webb wrote you up and then was
16 going to hear your Step 1; correct?
17    A  Right.
18    Q  You didn't want that? You thought it was
19 a conflict of interest; right?
20    A  It is a conflict of interest. How do you
21 write me up and hear my grievance? That just
22 shows you how unfair they do things there.
23    Q  And we see in the next email that he -- I
24 don't want to say agreed with you but accommodated

---

138

1  you; right?
2    A  And the reason he accommodated me was
3  because I put it in black and white. But how many
4  other investigators have been written and judge
5  and jury under the same chief? It happened all
6  the time. Some of them didn't have the wherewithal
7  or the sense to go ahead and fight for themselves,
8  and I happened to have won this fight, you're right.
9    Q  And that's what I'm kind of curious about
10 because you keep saying that, you know, you were
11 scared to complain, you said you were scared to
12 put anything in writing.
13    A  This is saying let me get a fair shake.
14 I'm not scared to say that but scared to go across
15 the street and put something on paper. This would
16 make my job pending, but they also said that they
17 wanted to send me back to the jail. I was difficult
18 because I did things like in when other
19 investigators, they accepted it.
20    Q  Let's scroll up to the next page -- well,
21 sorry -- let's go back down just so the record is
22 clear.
23      So Director Webb said, "Not sure if you
24 are aware, the supervisors in the department do

---

139

1  not recommend what the severity of the discipline
2  is anymore. We merely send the write-up up to the
3  employee discipline, and they recommend the
4  discipline severity. However, I understand your
5  concerns and am more than willing to accommodate
6  your request to reschedule with another member of
7  management."
8       So he granted you what you were asking
9  for; correct?
10    A  Yes.
11    Q  Let's go up now to your response. And you
12 said, "Thank you, Chief Webb. I appreciate your
13 response to my request. It's good" -- sorry; I
14 should read the whole thing. "I am scheduled off
15 on the calendar 12/15, so this date will not work
16 for me, either. It's good to know that the choice
17 of giving me a two-day suspension wasn't a choice
18 of my own. I'm sure at some point we will find
19 a day that accommodates our schedules. Have a
20 good day."
21    A  Uh-huh.
22    Q  And if we go up to the top, they, in fact,
23 rescheduled again with Chief Ranzino; correct?
24    A  Looks like it.

---

140

1    Q  Okay.
2    A  That doesn't mean it was rescheduled
3  because of me.
4    Q  Right. Let's go back to Exhibit 7, please.
5  All right. No. 15 which is on page 9 we asked you
6  to identify each and every instance of retaliation
7  that you allege defendants caused because of your
8  protected activity. And you state that
9  "Questioned Defendant Shields about training when
10 you first started at EM due to not feeling safe on
11 the job, and it was then that she started to
12 receive write-ups."
13      After looking at the three write-ups, do
14 you stand by that statement?
15    A  I do.
16    Q  Okay. What did you complain about training?
17    A  From not getting any training when we came
18 in, the training that we had was specific to the
19 equipment and how -- I'm trying to remember the
20 name of that. The protocol that they used for the
21 detainees when they were out on house arrest. We
22 went and visited -- the call center, that's what
23 it was. So our training was based on call center
24 and equipment, but it was not based on protocol,

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

141

1  safety on becoming a street unit.
2      We didn't initially have vests; we didn't
3  have Tasers; we didn't have any additional tools
4  on our tool belts to keep us safe.  And after
5  sitting inside of a jail for eight years, I felt
6  that there should have been more adequate and
7  appropriate training to kind of shift the mindset
8  from working inside to working outside on a street
9  unit.
10     Q  When did you complain to him?
11     A  I don't remember the date I asked him
12  about it.
13     Q  Who else was present?
14     A  I don't know.  I likely asked at roll call.
15     Q  Do you have a specific recollection or are
16  you just guessing?
17     A  No, I likely asked at roll call because I
18  asked that question a couple of times like, hey,
19  you know, raise your hand, you know, "When are we
20  going to get some training?"  That was a top
21  priority for me.  It's very important to keep
22  myself safe when I'm in the street and to have a
23  vest.
24     Q  What was Shields' response?

142

1      A  It wasn't like I can specifically state
2  what he said.  It was as if he constantly was just
3  stringing us along like, "You'll get training;
4  it's coming; it's coming."  But it didn't come.
5      Q  You never got training?
6      A  Not specifically to work on the streets,
7  no.  I ended up getting a vest; I ended up being
8  Taser trained, and that was sometime down the line.
9      Q  And finally, you said in this answer to
10  15, "Furthermore, after she filed her EEOC charge,
11  she suffered continued harassment and further
12  write-up resulting in suspension."
13      We've established that you did not file
14  your EEOC charge until a long time after you were
15  out of EM; correct?
16      A  Correct.
17      Q  So I guess what I'm -- it sounds like
18  you're saying you spoke up to Shields about
19  training, and then the write-ups started.
20      A  I asked at roll call about training and
21  the write-ups started.
22      Q  So it was like you're challenging his
23  authority?
24      A  I don't think I challenged his authority.

143

1  I asked because I care about my safety.  My life
2  is the most important one that I know right now,
3  and my job is to come home in one piece every day.
4  And based on my past training and experience, the
5  best way to do that is to be trained to be properly
6  prepared every single day, and I felt like we were
7  not adequately prepared to do our jobs in EM.
8      Q  Do you think the write-ups started because
9  you spoke up to Shields?
10     A  I think the write-ups started because I
11  asked a question and spoke up.
12     Q  All right.  No. 16 we asked you to
13  identify each and every allegedly adverse
14  employment action you suffered.  And you wrote
15  that, "Excessive write-ups by Defendant Shields
16  could have prevented her from advancing into other
17  units and prohibit movement from EMU."
18      My question is, did it?
19     A  Again, I didn't learn that those write-ups
20  were dealt with until today.  I had not advanced
21  into other units other than going to transportation,
22  which that was already in the works before I went
23  to EM; I tested and passed for that before I went
24  to EM.  So that was already in the works.  EM just

144

1  happened to call me before trans did.
2      Q  Did you -- have you tried to transfer to
3  anything?
4      A  I have and I've been denied.
5      Q  Where did you try to transfer to?
6      A  I don't know the acronym for the unit, but
7  one of those gang units.  I was interested in that
8  other unit that has a police station on the north
9  side. I can't remember the name of that.  That
10  was -- it is almost like a branch off of EM.  But
11  yeah, I've never been able to make any advancements.
12     Q  For the gang unit, did you submit something
13  in writing for that?
14     A  I did.  I have applications out there.  I
15  can't remember everything I applied to, but I have
16  not made any advancement since.
17     Q  Has anybody ever told you why?
18     A  I definitely received something in an
19  email saying my application wasn't complete for
20  something for one thing.  That was all I can recall.
21     Q  And did you fix it and resubmit it?
22     A  I didn't fix it or resubmit it.  I initially
23  was brought in the for an interview, and then
24  after the fact I received a letter that stated I

Transcript of Michelle Strickland
Conducted on August 21, 2020

145

1  did not get the job because my application was
2  incomplete.  I said, how could an incomplete
3  application allow me to get to the interview but
4  then get denied for it afterward?
5      Q  What job was that for?
6      A  One of those units I just spoke of.  I don't
7  know which one because they have a couple different
8  gang units with different little acronyms.
9      Q  Okay.  So we don't -- we don't know what
10  job that was for?
11     A  One of those gang units.  I just don't
12  know which acronym.
13     Q  Did you hear back on the other job
14  applications or the north side police station?
15     A  No.  I put in different applications, and
16  some you hear back from, some you don't.
17     Q  And you never know the reason why?
18     A  No, when you don't hear back, you never
19  know the reason why.
20     Q  You said in 16, "Furthermore, she states
21  that the reduction of her pay for a late arrival."
22  What is -- what is that talking about?
23     A  Shields had me docked.  I was standing in
24  the next room and did not want to walk out into

146

1  roll call while he was in the middle of talking
2  and I was actually docked.  I never had my pay
3  docked before, and he had my pay docked.
4         And that just shows and proves that he
5  constantly continued to harass and retaliate
6  against me.  Nobody has their pay docked, and now
7  all of a sudden I'm getting my pay docked.
8      Q  Then it says "multiple suspensions," but
9  we've established you've never been suspended;
10  correct?
11     A  No, that should have said write-ups.  It
12  shouldn't have said suspensions.  But, again, when
13  it's hanging over your head, you don't know if
14  you're going to be suspended or not.
15     Q  Is there ever -- did you ever try and get
16  anything removed from your personnel file?
17     A  We can do that?
18     Q  I'm just asking.  Have you ever tried to
19  get anything removed from your personnel file?
20     A  I don't recall, no.
21     Q  When you were in EM, you never applied for
22  any promotions; correct?
23     A  I don't know if I took the sergeant's test
24  or not when I was EM.  I may have because I took

147

1  it a couple of times.  But I can't say yes or no
2  I remember taking it when I was there.  And I
3  definitely took it, I just don't remember the
4  dates of when I took it.
5      Q  So apart from taking the sergeant's exam,
6  did you apply for any promotions when you were
7  in EM?
8      A  The sergeant's exam if I took it when I
9  was there and the other jobs that I just spoke of.
10  Those are the ones I applied to while I was in EM.
11     Q  You applied to these other jobs when you
12  were still in EM?
13     A  I applied -- I can't give you the exact
14  dates and time frames when I applied for jobs.
15  You know, the County things come up, you apply,
16  you get denied or you don't hear anything, and
17  that's pretty much the end of it.
18         MR. WHITE:  Okay.  I'm going to go to a
19  different document.  Does anybody need a break?
20  It's 1:00.
21         MS. KRAUCHUN:  Maybe we should just take
22  like a quick 10 minutes, 15 minutes.  Is that okay?
23         MR. WHITE:  That's fine with me.
24         MS. KRAUCHUN:  Michelle, are you okay with

148

1  that?  Say 15 minutes.  We'll come back at like 10
2  after 1:00?
3         THE WITNESS:  I'm okay with that.
4         (Recess taken, 12:57 p.m. to 1:16 p.m.)
5  BY MR. WHITE:
6      Q  Ms. Strickland, we took a short break there.
7  You understand you're still under oath?
8      A  Yes.
9      Q  During the break did you talk to anybody
10  about your testimony?
11     A  No.
12         MR. WHITE:  Let's pull up Exhibit 11, please.
13         AV TECHNICIAN:  Please stand by.
14         (Strickland Deposition Exhibit 11 marked
15  for identification and attached to the transcript.)
16     Q  All right.  Ma'am, Exhibit 11 is your
17  Objections and Answers to Defendant Sheriff of
18  Cook County Thomas J. Dart's First Set of
19  Interrogatories.  Have you seen this document
20  before?
21     A  Yes.
22     Q  And you probably know the drill at this
23  point, but if we can scroll to the very last page,
24  please.  And this is again your signature under

Transcript of Michelle Strickland
Conducted on August 21, 2020

38 (149 to 152)

149

1 penalty of perjury that the foregoing is true and
2 right?
3    **A   Correct.**
4    Q   And you signed this on February 10th of
5 this year; right?
6    **A   Yes.**
7    Q   First, just generally, what are you hoping
8 to get out of this lawsuit?
9    **A   Fair treatment, equal rights for blacks in**
10 **our workplace, stop the discriminatory practices**
11 **that are going on in our workplace, stop with the**
12 **racism, the sexism to hopefully prevent someone**
13 **who looks just like me from having to endure the**
14 **same thing in their future at the Sheriff's**
15 **Department.**
16    Q   Your understanding, though, is that this
17 is just aimed at electronic monitoring; correct?
18    **A   I do understand that.**
19    Q   I'm sorry?
20    **A   I do understand that.**
21    Q   You have another lawsuit against supervisors
22 or supervisors in transportation; is that right?
23    **A   A supervisor, yes.**
24    Q   And we're going to talk about that in a

150

1 minute but let's not get ahead.
2      All right.  So let's go to No. 3 in here
3 which starts on page 2, and then it goes onto
4 page 3.  Scroll down to the bottom of this page,
5 please.
6      So we asked you to identify and provide a
7 detailed computation of each and every category of
8 damages that you claimed to have suffered as a
9 result of defendants' alleged actions.
10      And your response at the top of page 3,
11 we're going to go through these different
12 categories.  So you said you seek compensation for
13 lost wages.  What wages did you lose?
14    **A   A chance to go to other units that could**
15 **have had a higher pay rate and the possibility of**
16 **promotion.  But, again, I don't remember.**
17    Q   But that's not lost wages; right?  Are you
18 contending you lost wages while working at EM?
19    **A   Oh, I didn't lose wages.  The possibility**
20 **of gaining those wages.**
21    Q   Got it.  All right.  Are you making more
22 or less in transportation?
23    **A   They took the dollar away, I believe when**
24 **I went from EM down to transportation, but I've**

151

1 **since gained more back now.**
2    Q   So are you saying when you went to
3 transportation, you were cut off your hourly
4 pay rate?
5    **A   Yes.**
6    Q   But now have you gained that dollar back?
7    **A   Through -- yes, I think I did, yes.**
8    Q   Did you gain more than a dollar back?
9    **A   That came from my -- I think my time in**
10 **service.**
11    Q   So you're making more -- I'm just trying
12 to cut to the chase.  You're making more now in
13 transportation than you were making in EM; is that
14 a fair statement?
15    **A   Right now I am.**
16    Q   Okay.  You list here that you -- you're
17 seeking compensation for opportunities.  Are these
18 the other jobs you told us you've applied for?
19    **A   Yes.**
20    Q   And did all of those pay more than you
21 were receiving in EM?
22    **A   I can't say they did or did not.  I don't**
23 **know.**
24    Q   Okay.  You went to transportation

152

1 voluntarily; right?  I mean, that was a position
2 you applied for?
3    **A   I did.**
4    Q   Promotions.  It says you seek compensation
5 for promotions.  What promotion are you seeking
6 compensation for?
7    **A   The possibility of being promoted.**
8    Q   And what about raises?  Is that the
9 possibility of raises?
10    **A   It is.**
11    Q   What about benefits?  What benefits did
12 you lose?
13    **A   I didn't get that additional training that**
14 **we were always promised to get.**
15    Q   Okay.  And what's that worth?
16    **A   I can't say a dollar amount.  I don't know.**
17    Q   You say you want to be compensated for
18 future retirement income.  Explain that to me.
19 What did you lose?
20    **A   Well, I lost my dollar going back down to**
21 **transportation and leaving there.  Had I retired**
22 **as an investigator, I would have retired making**
23 **more money than here.**
24    Q   When did you -- sorry -- that's a bad

153

1 question.
2        You lost the dollar when you went to
3 transportation.  At what point in time did you get
4 that the dollar back?
5     **A  Maybe last year.**
6     Q  Okay.  I'm trying to do math in my head.
7 So is that three years you were missing out on
8 that dollar?
9     **A  Yes.  '15 and this is '20, and I got it**
10 **back last year, so that could have been three to**
11 **four years depending on the month.**
12    Q  But we would be able to look at your
13 payroll records to figure that out; right?
14    **A  I'm sure, yes.**
15       AV TECHNICIAN:  I'm sorry to interrupt.
16 Ms. Strickland, would you mind placing the camera
17 so that we can see your face?
18       THE WITNESS:  I'm sorry.  I didn't know
19 you couldn't see me.
20    Q  It says you seek compensation for litigation
21 expenses.  What litigation expenses do you have?
22    **A  Any expenses that I would have incurred.**
23    Q  Have you incurred any?
24    **A  Not at this point.**

154

1     Q  And then compensatory and punitive damages
2 for humiliation, mental, and emotional anguish and
3 distress.  And we're going to talk about this in a
4 little bit more detail, but just generally describe
5 to me, you know, what are your symptoms for
6 humiliation, mental and emotional anguish, and
7 distress?
8     **A  I'm definitely known as the person that**
9 **Shields called nappy head.  When I wanted to be on**
10 **day shift, and I couldn't be on day shift, and he**
11 **allowed a white girl who has the exact same time**
12 **who was in my class be on day shift, that was**
13 **based on race.  I mean, we're both investigators;**
14 **we both have the same amount of time on the job.**
15 **It's just mentally it's like why am I not enough**
16 **no matter how much you may feel you are enough.**
17 **In addition to -- it's a lot of tears; it's a lot**
18 **of emotion involved because you have no control**
19 **over what's going on.  And it's like no one hears**
20 **your voice no matter how much you may speak or not.**
21    Q  And you are seeking treatment for mental
22 and emotional anguish?
23    **A  I am.**
24    Q  When did that treatment start?

155

1     **A  I started going to therapy back in 2015.**
2     Q  Okay.  And for the record, we asked for a
3 HIPAA release back in July.  We never received
4 that, and we asked for the treatment records, and
5 we only received them back to 2017.  Were you
6 seeing the same therapist in 2015 that you were
7 seeing in 2017?
8     **A  No.  I've had three different therapists.**
9     Q  Okay.  Is there any reason you wouldn't
10 return the HIPAA release to us?
11    **A  I don't have a reason why there wasn't a**
12 **HIPAA release given to you.**
13    Q  Okay.  Are you willing to sign that HIPAA
14 release so that we can get those records?
15    **A  Yes.  But I did get my records pulled, and**
16 **I don't know why 2015 isn't in there.  I'm not**
17 **sure -- well, I can articulate that.  My therapist**
18 **ended up being moved from her position, I took a**
19 **break in therapy because when you're telling**
20 **someone your business, it's an emotional thing;**
21 **it's difficult.  So I had to start with another**
22 **therapist.  Of course, initial questions are, "Are**
23 **you leaving or are you staying?"  She said she was**
24 **staying.  A few months later she ended up moving**

156

1 **to Germany.  So I then later started with a**
2 **third one.**
3     Q  So who were you seeing in 2015?
4     **A  Her last name is Smith.**
5     Q  Okay.
6     **A  I'm trying to think of her -- Patricia,**
7 **Patricia Smith.**
8     Q  Where did she work?  Where were you
9 seeing her?
10    **A  UIC.  All three of them were at the same**
11 **place.**
12    Q  And when did you stop seeing Patricia Smith?
13    **A  I can't -- it was sometime in 2015.  I**
14 **don't know the exact month or date.**
15    Q  Okay.  So you saw her for how many months --
16 how many sessions approximately in 2015?
17    **A  I don't know.  Three to five sessions**
18 **maybe.  I'm not real sure.**
19    Q  Okay.  And who did you see after Patricia
20 Smith?
21    **A  Colleen Reese.**
22    Q  How do you spell the last name?
23    **A  R-e-e-s-e.**
24    Q  Also at UIC?

Transcript of Michelle Strickland
Conducted on August 21, 2020

157

1    A  Yes.
2    Q  What period of time did you see Colleen
3  Reese?
4    A  I don't remember the months.  I may have
5  started back in 2016.
6    Q  Okay.  And then at some point you switched
7  to somebody else.  Who did you switch to?
8    A  Lindsay Swisher and she's currently who
9  I'm seeing.  I've been seeing her the longest, she
10  hasn't left, the same initial questions.
11    Q  Is she the one whose records go back to
12  2017?  That's who you've been seeing since then?
13    A  Likely.  That may cover some of Reese's
14  records in there, as well, in there.
15    Q  For the record, we need to get these
16  records.  So, you know, we need the HIPAA release,
17  and we need to subpoena these records.  Really we
18  need it today if we're going to --
19      MR. WHITE:  And, Kelly, I suppose this is
20  as much for you, you know, if you're going to
21  avoid motion practice on this, and we're going to
22  reserve the right to bring Ms. Strickland back
23  once we have the full records unless she's willing
24  to take the emotional damages prior to 2017 off

158

1  the table.
2      MS. KRAUCHUN:  That's fine.  We'll get you
3  the release.
4    Q  Have you ever been -- have you ever received
5  a diagnosis for any mental health issue?
6    A  I don't have anything in my pocket, but
7  it's in my records adjustment disorder, and
8  PTSD -- something about PTSD is in there.
9    Q  Are you taking any medications for any
10  mental health issues?
11    A  No.
12    Q  You filed -- as we just talked about, you
13  filed another lawsuit in 2019; correct?
14    A  I did.
15    Q  It's actually in front of the same judge.
16    A  It is.
17    Q  And in that lawsuit you claim gender and
18  race discrimination against the Cook County
19  Sheriff's Office; correct?
20    A  I did.
21      MR. WHITE:  Let's pull up Exhibit 12, if
22  we could.
23      AV TECHNICIAN:  Please stand by.
24  ///

159

1      (Strickland Deposition Exhibit 12 marked
2  for identification and attached to the transcript.)
3    Q  Okay.  Exhibit 12 is a lawsuit Case
4  No. 2019-cv-02621 captioned Michelle Strickland v.
5  Thomas J. Dart, Brad Sandifer, and County of Cook
6  as defendants.  Have you seen this lawsuit before,
7  ma'am?
8    A  Yes.
9    Q  And if we could scroll to page 2,
10  paragraph 3 -- sorry -- and I should be sure,
11  Defendant Sandifer, does he work in transportation?
12    A  Yes.
13    Q  I don't know anything about it.  Is he
14  your supervisor?  What's his role?
15    A  He's a sergeant.
16    Q  And, well, in paragraph 2 you state,
17  "Complaint stems from the individual defendant's
18  direct and personal discrimination against
19  Strickland based on her gender (female) and race
20  (African-American)."  And you'd agree that's the
21  same thing you're claiming in this lawsuit; correct?
22    A  Yes.
23    Q  And in paragraph 5 you state, "The hostile
24  work environment has been so egregious that

160

1  Strickland has suffered severe emotional damage,
2  including headaches, sleeplessness, and feelings
3  of intense anguish and dread at having to simply
4  go to work and do her job."  That's even worse
5  than what you're claiming in this lawsuit; right?
6    A  Yes.
7    Q  How do we distinguish between the mental
8  anguish you're suffering in that lawsuit compared
9  to the mental anguish you're suffering in our
10  lawsuit?
11    A  It's compounded.  I mean, you go from
12  one unit thinking you're hopping out of
13  one situation where you think the grass might be
14  greener on the other side, and you find out it's
15  as systematic as the same thing that's going on.
16    Q  I guess I'm saying for purposes of this
17  lawsuit, how do we distinguish by, you know, my
18  anxiety is caused by Lawsuit No. 1 versus Lawsuit
19  No. 2?  Don't they basically just blend together?
20    A  So the anxiety intensifies when you're
21  working in that particular environment.  You get
22  the term "out of sight out of mind."  It's never
23  out of your mind, but you're not in that same
24  environment as EM was.

161

1      And Shields -- I'm not seeing him
2  consistently anymore; I'm seeing this guy -- I was
3  seeing this guy consistently.  So it's all bad.
4  There isn't a level that's better or worse when
5  you're being discriminated against, when you're
6  being harassed, or you're being treated in such
7  a way.
8          THE WITNESS:  Oh, I have another delivery.
9          MR. WHITE:  Okay.  Let's go off the record.
10         (Recess taken, 1:33 p.m. to 1:34 p.m.)
11 BY MR. WHITE:
12   Q  So I guess what I'm trying to figure out --
13 and maybe there's no way to figure this out.  If
14 you have a sleepless night, can you say it was
15 caused by your time in EM, or it was caused by
16 your time in transportation, or is there really no
17 way to distinguish?
18   A  There's no way to distinguish.  It depends
19 on which stuff happens to come in your mind, which
20 thought you may end up dreaming about, which
21 thought -- I mean, because they randomly pop up.
22 It depends on if a situation happens at work
23 today, and you reflect like I just went through
24 this with Shields in EM, or this is the same thing

162

1  I've experienced in my past.
2      So it's just sad that it's ongoing.  This
3  is 2020 and I'm living like it's in the '60s and I
4  shouldn't have to.
5    Q  When did you start seeing a therapist
6  in 2015?
7    A  I don't know the exact month.  I can't
8  remember the exact month.
9    Q  Was it spring, summer, fall, winter?
10   A  It may have been fall.  I don't remember.
11   Q  Was it after you left EM?
12   A  I can't -- sorry, I don't remember.  I
13 know I left EM in April of 2015 but I do not
14 remember.
15   Q  How soon after you left EM did the issues
16 in transportation start?
17   A  They didn't start until two years later.
18   Q  Okay.  So everything was fine for two years?
19   A  Yes.
20   Q  All right.  If we can go back to Exhibit 11,
21 please.
22   A  That's not true.  One incident took place
23 the first week I was there -- no, that was in 2017.
24 So that is right, two years later.

163

1    Q  All right.  If we can go to Interrogatory
2  No. 10.  So we asked you for any social media.
3  You said you have a Facebook account and Instagram
4  but deny ever posting anything related to this
5  matter.  What's the name on the Facebook
6  account?
7    A  S-h-e-l-l-y, same as my last name
8  Strickland.
9    Q  And what about the Instagram account?
10   A  All one word, fitandsassy,
11 f-i-t-a-n-d-s-a-s-s-y, 2, as in the number 2, not
12 a hashtag, fitandsassy2.
13   Q  Do you have any other social media?
14   A  Wait.  Strictly Fitness and Nutrition.
15 There's nothing on that one at all, one post.
16   Q  Is that on a Facebook account?
17   A  No, it's on -- it's on Instagram.
18   Q  Was that like a side business you were
19 working on or something?
20   A  No.  I love fitness.
21   Q  Got it.  Okay.
22      No. 12 we asked you to identify the basis
23 of your contention that the Cook County Sheriff
24 fails to adequately discipline, supervise, and

164

1  control its supervisory officers.  And you said,
2  "Plaintiff states that due to Shields' excessive
3  use of discipline toward her, she never felt she
4  could utilize the grievance process properly, and
5  she felt she would never receive a fair procedure."
6      Having seen that Shields reduced the
7  discipline in each case, do you still believe that
8  it's excessive?
9    A  I do because this was written before I
10 learned that my discipline was reduced to a
11 written reprimand.
12   Q  Well, that's why I'm telling you I
13 understand that you didn't know about it, I guess
14 before today, but now that you know that, do you
15 still believe the discipline was excessive?
16   A  I do still believe it was excessive
17 because I shouldn't have gotten it.
18   Q  I mean, you said you felt you couldn't
19 use -- you could never receive a fair procedure.
20 When you asked for a different hearing officer,
21 they gave it to you; right?
22   A  They did.
23   Q  Let's go to No. 17 -- 17, please.  Thank
24 you.  In 17 we asked if you had any conversations

Transcript of Michelle Strickland
Conducted on August 21, 2020

165

1  basically related to anything at issue in the
2  complaint.  You said you spoke to Kevin Martin on
3  multiple occasions.  What did you talk to
4  Mr. Martin about?
5      A  How we were forced to go to TSS, how we
6  were forced to go to the south side, how it was
7  unfair.  That was my work partner.
8      Q  Is Mr. Martin African-American?
9      A  He is.
10     Q  Was he -- did he feel like it was
11  discriminatory being assigned to TSS?
12     A  He did think it was unfair, yes.
13     Q  Do you know why he's not a part of this
14  lawsuit?
15     A  I can't answer for someone else, no.
16     Q  You've not discussed that with him?
17     A  No.
18     Q  Whose idea was the lawsuit?
19     A  I think we all just kind of got tired of
20  complaining, and we decided to take action.
21     Q  Who reached out to a lawyer?
22     A  I believe it was Investigator Winston.
23     Q  Did you guys have any kind of like a group
24  meeting prior to the complaint being filed where

166

1  all the plaintiffs got together?
2      A  We did.
3      Q  Okay.  Where did that take place?
4      A  I want to say at -- at the office of the
5  attorney.
6      Q  Okay.  But that's not your current attorney;
7  right?  That was the previous attorney?
8      A  The initial one, yes.
9      Q  Were all the plaintiffs present for that
10  meeting?
11     A  I want to say no, I don't think so.  I'm
12  not sure, though.  I can't remember.
13     Q  But as far as you know, that was prior to
14  the lawsuit being filed?
15     A  Yes.
16     Q  Okay.  No. 20, if we could go to that,
17  please.  We asked you if you had ever been
18  involved in any civil actions excluding this case.
19  You said you're currently involved in a civil
20  action.  Is that the discrimination case we just
21  looked at?
22     A  Yes.
23     Q  And now we also know about the False Claim
24  Act case; right?

167

1      A  I'm sorry?  What's the False Claim Act?
2      Q  The case where the government sued you and
3  your mom.
4      A  Yes.
5      Q  Okay.  Any other lawsuits that you've been
6  a party?
7      A  Not that I can recall.
8      Q  What about litigation related to a beach
9  house condo association?  Do you know anything
10  about that?
11     A  So maybe I'm -- I did not understand.  I
12  didn't know like a foreclosure is considered
13  litigation.  Oh, well, if that's the case, yes,
14  I've been involved in a foreclosure before.
15     Q  Okay.  How many?
16     A  Two, I believe.
17     Q  Okay.  Any other -- when I say "lawsuit,"
18  think of it as anytime anybody has to go to court.
19  Okay?
20     A  Then if that's the case, I think I've been
21  involved in two other ones.
22     Q  Those being the two foreclosures?
23     A  Yes.
24     Q  All right.  So the foreclosures, this

168

1  case, the other discrimination case, and the False
2  Claim Act case, that's it?
3      A  Yes, that I can recall, yes.
4      Q  No. 21, it starts here and then we'll go
5  on the next page.  It says, "Are you asserting any
6  claim for lost wages or other lost income?"  And
7  you said your "paycheck was short as a result of
8  her being late, although similarly situated
9  individuals were not given the same treatment."
10        How much was your paycheck cut short?
11     A  However many minutes he alleged that I was
12  late, that's how my check was cut short.  I don't
13  remember the actual amount.
14     Q  I mean, so it was minutes.  So I mean, are
15  we talking --
16     A  It wasn't like a significant $100 amount
17  missing.  It was a small amount of money, but I
18  don't remember the amount of money.
19     Q  That's fine.  Is it fair to say that it
20  was between 10 and $50?
21     A  Yes, that's fair.
22     Q  All right.  No. 22.  We asked you to
23  itemize each item of expense, monetary loss, or
24  other damage claimed by you in this action, and

169

1  you say, "Investigation continues." And I'm just
2  wondering, what investigation are you still
3  working on?
4      **A  The reason that was put there is because I**
5  **didn't know if I was going to be suspended or not**
6  **because that five-day suspension was still**
7  **lingering out there.  So any day the County could**
8  **have came forward and said, "Hey, you're suspended."**
9      Q  But now that you're -- now that we've
10 resolved that question, you're not claiming any
11 other expenses or monetary losses?
12     **A  No.**
13     Q  In 23 we asked you if you are receiving or
14 received any reimbursement, medical insurance
15 coverage or disability benefits for any physical,
16 mental, or emotional illness.  And you said,
17 "Subject to and without waiving these objections:
18 Investigation continues and Plaintiff Ferguson
19 reserves the right to supplement this response."
20 I assume that's just a typo.  Right?
21     **A  I think so.**
22     Q  Are you claiming in this lawsuit any
23 medical expenses?
24     **A  I mean, every time I go to the doctor, I**

170

1  **definitely have to pay deductibles and things**
2  **like that.**
3      Q  What doctor?
4      **A  When I go for therapy.**
5      Q  Okay.  So you're talking about the therapist?
6      **A  Yes.**
7      Q  Well, what -- what amount would we
8  attribute to this lawsuit, and what amount would
9  we tribute to the other lawsuit?
10     **A  You're asking me how to put a dollar**
11 **amount on separating the continued discrimination**
12 **that has been ongoing over five years?  That's**
13 **what you're asking me to put a dollar amount on,**
14 **how to separate the two?**
15     Q  Correct.
16     **A  I don't know if I have an answer for that.**
17 **I'm not quite sure how to differentiate or separate**
18 **the two.  If I can have a moment to think about it.**
19     Q  Yeah, take as much time as you need.
20     **A  What was your question again?  Can you**
21 **repeat it?**
22     Q  Yeah.  What I'm trying to get at is, you
23 know, in any lawsuit a defendant has to try and
24 figure out kind of like what's on the table

171

1  monetarywise.  Okay?  And what I'm trying to
2  figure out is, you're saying at issue in this
3  lawsuit is the amount of money you have had to pay
4  to see a therapist, and I'm trying to figure out
5  what percent of that money has to be paid by these
6  defendants in EM and what percentage has to be
7  paid by the defendant in transportation.  Because
8  they both can't be on the hook for the same amount;
9  right?  That's what I'm trying to figure out.
10     **A  And you're trying to figure out the exact**
11 **dollar amount that I've spent in therapy?  Is that**
12 **what you're saying?**
13     Q  Yeah.  You said you have to pay every time
14 you go to see the doctor.
15     **A  So you're pretty much saying -- the**
16 **payments from therapy that I'm spending, what time**
17 **frame belongs to EM and what time frame belongs to**
18 **transportation, how to separate that, that's what**
19 **you're saying?**
20     Q  Correct.
21     **A  I mean, if I had to do it based on the**
22 **years that I have been in therapy and the time**
23 **that I started in transportation -- because the**
24 **harassment in the transportation didn't start**

172

1  **until 2017.**
2      Q  So is it the time period 2015 to 2017?
3      **A  I think that would be a way to separate**
4  **the two --**
5      Q  Okay.
6      **A  -- based on the years.**
7      MR. WHITE:  All right.  Can we just take --
8  I might be done.  Can we just take five minutes
9  and let me go over my notes?
10     MS. KRAUCHUN:  Sure.  That's fine.
11     MR. WHITE:  Okay.  Off the record, please.
12     (Recess taken, 1:49 p.m. to 1:57 p.m.)
13     MR. WHITE:  Ms. Strickland, I don't have
14 anymore questions at this time.  I assume your
15 attorney probably does, so I will turn it over to
16 her.
17     MS. KRAUCHUN:  Sure.  I just have a few
18 questions.
19     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
20 BY MS. KRAUCHUN:
21     Q  Before your time in the EM unit, Michelle,
22 did you have any issues with supervisors treating
23 you different because of your race?
24     MR. WHITE:  Objection to form.

Transcript of Michelle Strickland
Conducted on August 21, 2020

44 (173 to 176)

173

1    A  Yes, I did.  Yes, I did.
2    Q  And did you ever file complaints on -- in
3  regards to those supervisors?
4        MR. WHITE:  Objection to form and foundation.
5    Q  I'm sorry; did you answer that?  Did you
6  ever file complaints?
7    A  No.
8        MR. WHITE:  I'm sorry; I couldn't hear her.
9    A  (Continuing.) No.
10    Q  So there was a lot of discussion about the
11  discipline that you received while you were in the
12  EM unit.  Do you recall being shown documents --
13    A  Yes.
14    Q  And -- okay.  So I want to direct your
15  attention specifically to the write-up that you
16  received on June 27th, 2014.  Do you recall that
17  incident?
18    A  Can you refresh my memory about the topic,
19  please?
20    Q  I think the June 27th one, that was the
21  one in regards to the knife.  Correct?
22    A  Yes.
23    Q  You never saw that document dated May 21st,
24  2015, prior to today; correct?

174

1    A  No, ma'am.
2        MR. WHITE:  Counsel, for the record, that
3  was produced in this litigation many months ago.
4        MS. KRAUCHUN:  Outside of the litigation.
5  I guess let me clarify the question.
6    Q  Outside of this litigation, did you ever
7  receive a copy of the memorandum dated
8  May 21st, 2015?
9    A  No.
10    Q  When that memorandum was issued by
11  Director Shields, you were not in the EM unit any
12  longer; correct?
13    A  No, I wasn't.
14        MR. WHITE:  Objection to foundation.
15    Q  Okay.  But you were still employed with
16  the Cook County Sheriff's Department at that time,
17  weren't you?
18    A  Yes.
19    Q  So if you're in a different department but
20  there's an HR issue, a discipline outcome, doesn't
21  the Sheriff's Department have the ability to give
22  you notice of that?
23    A  Yes.
24        MR. WHITE:  Objection.

175

1    Q  And you never received a copy of that
2  memorandum?
3    A  No.
4    Q  And do you recall another memorandum that
5  was dated the same day, May 21st, 2015, that I
6  believe was in regards to a December 2014 discipline
7  write-up?
8    A  Yes.
9    Q  Outside of this litigation, had you ever
10  seen that memorandum before?
11    A  No.
12    Q  So when that memorandum was issued May 21st,
13  2015, you -- in the current unit you were in at
14  that time, you never received a copy of that?
15    A  No.
16    Q  But the Sheriff's Department had the
17  ability to get that to you; correct?
18        MR. WHITE:  Objection, foundation.
19    A  Yes.
20    Q  Typically when there's interoffice or
21  interdepartmental documents, as an employee how
22  would you receive notification of that?
23    A  In the past we would receive notification
24  on letter, and then they've now moved to emails,

176

1  as well.
2    Q  So they had the ability to serve you or
3  give you a copy of that memorandum; right?
4    A  Yes, to let me know there was a hearing
5  being conducted on my part, I should have received
6  something.
7    Q  Okay.  And you talked a lot about, you
8  know, these write-ups.  Why is this problematic
9  that these write-ups lingered for such a long
10  period of time?
11        MR. WHITE:  Objection; foundation.
12    A  It's problematic because you didn't know
13  the outcome of where you were going, and it also
14  affected me in knowing whether I could or could
15  not be eligible for other positions.  Because if
16  you have pending write-ups, you typically can't
17  move outside the unit or division that you're in.
18    Q  Do you recall the incident with a knife?
19  There was a lot of discussion about your knowledge
20  of two white investigators that were involved in a
21  similar incident.  You recall all that line of
22  questioning?
23    A  I do.
24    Q  Okay.  Again, what race were the

Transcript of Michelle Strickland
Conducted on August 21, 2020

---

177

1  two investigators that did not receive a write-up
2  for that?
3        MR. WHITE:  Objection.
4     A  They were white men.
5     Q  And were they forthcoming with the lack of
6  write-ups in regard to that incident with that
7  information?
8        MS. KRAUCHUN:  Objection --
9     A  Yes, they were.
10       MS. KRAUCHUN:  -- form and foundation.
11    Q  And, again, you talked about these
12  write-ups.  And if it's on your record in your
13  file, does that preclude you from getting
14  additional positions or bidding out?
15    A  Yes.
16    Q  There was some questioning about the
17  assignments when you're on patrol.  I'm talking
18  specifically patrol assignments here.  Okay?
19    A  Yes.
20    Q  Regardless of your assignment, at the
21  beginning of your tour of duty, where did you
22  begin?
23    A  Rockwell.
24    Q  So if you were assigned to TSS, you would

---

178

1  start your tour of duty at Rockwell; is that correct?
2     A  Yes.
3     Q  If you were assigned to the office, you
4  would start your tour of duty at Rockwell; is that
5  correct?
6     A  Yes.
7     Q  And if you were assigned to patrol, would
8  you start your tour of duty at Rockwell; is that
9  correct?
10    A  Yes.
11    Q  How did you get to the Rockwell?
12    A  I drove my personal vehicle to Rockwell.
13    Q  Okay.  So if you were assigned to patrol,
14  what did you do after roll call?
15    A  We grabbed our equipment; we had to write
16  up the vehicles, turn in the paperwork, and then
17  we may get our first assignment in the office if
18  there were things sitting in the queue that were
19  pressing matters.  Otherwise, we would be
20  dispatched to our next location or our future --
21  our first job for the day.
22    Q  Okay.  And then at the end of your tour of
23  duty -- and again, this is specifically on patrol --
24  what did you do?

---

179

1     A  We gathered up our paperwork; we logged
2  our mileage; we turned all that information in to
3  the office, our supervisors, turned in our
4  equipment, keys, cell phones, and things like that.
5     Q  And you left -- when you left Rockwell,
6  did you leave in a Sheriff's vehicle or your
7  personal vehicle?
8     A  My personal vehicle.
9     Q  So you always had to leave from Rockwell
10  and come back from Rockwell?
11    A  Correct.
12    Q  So where you were assigned and where you
13  lived didn't change anything, did it?
14    A  No.
15    Q  Because you still had to come in and out
16  of Rockwell?
17    A  Correct.
18    Q  And then we talked about progressive
19  discipline, verbal warnings, verbal reprimands,
20  and things of that nature.  But you received
21  discipline that was classified as a major
22  incident; correct?
23    A  Yes.
24    Q  Okay.  And on that specific incident,

---

180

1  which I believe was the knife one -- correct me if
2  I'm wrong.
3     A  It was major cause.
4     Q  Okay.  Had you ever been given a verbal
5  for a similar situation?
6     A  Never.
7     Q  Had you ever been given a written reprimand
8  for a similar situation?
9     A  No.
10    Q  But you were given a major instantly when
11  that incident happened before you could explain
12  the situation; is that correct?
13       MR. WHITE:  Objection --
14    A  Yes.
15       MR. WHITE:  -- foundation and leading.
16    Q  What effect, if anything, does having a
17  major discipline write-up on your record have with
18  your employment in general with the department?
19       MR. WHITE:  Objection; calls for
20  speculation, foundation.
21    A  For me it's bad.  I mean, coming from my
22  previous career I've never been written up.  All
23  of a sudden I become a bad employee when I come to
24  the Sheriff's Department.  And so then just

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

181

1 imagine you're losing a week's pay. I'm a single
2 individual. How do I pay my bills? I have looming
3 over my head I may lose five days. So it's a
4 scary situation.
5    Q To your knowledge, can other supervisors
6 within the department access your discipline
7 record and see that major discipline on there?
8    A I think they can.
9    Q Counsel asked you a lot about Shields
10 reducing those write-ups. Is there concern -- and
11 I'm not putting words in your mouth. Is the fact
12 that you got the write-up, you know, from the
13 get-go more of the issue as opposed to these
14 alleged reductions after the fact?
15    A It's definitely a huge issue that I was
16 written up specifically for that five-day period
17 because I know other officers that have done the
18 same kind of infraction, and they didn't even get
19 a slap on the wrist. It was, "Hey, guys, be
20 careful." Why didn't I get that? Why didn't I
21 deserve the, "Hey, lady, be careful," instead
22 major cause, five-days write-up.
23    Q Counsel asked you about the paramilitary
24 organization chain of command-type questions. Do

182

1 you have any knowledge when the ranked positions
2 came into the EM unit?
3       MR. WHITE: Objection to foundation.
4    A So the current ranked positions that they
5 have, is that what you're asking, do I know when
6 it happened, when it changed, like they have
7 sergeants --
8    Q Yes.
9    A -- and stuff?
10    Q Correct.
11    A It was after I left, but I don't know the
12 time frame exactly. It may have been 2016. I'm
13 not sure.
14    Q Okay. And then you talked about asking
15 questions, Shields questions during roll call
16 about training and things like that. Did white
17 investigators ever ask Shields questions either
18 about training or other questions about assignments
19 during roll call?
20       MR. WHITE: Objection to foundation --
21    A They did.
22       MS. KRAUCHUN: -- calls for speculation.
23    Q And did your --
24       MR. WHITE: Sorry; I didn't hear the

183

1 answer there. I was objecting.
2    A (Continuing.) They did.
3    Q And to your knowledge, did Shields ever
4 speak to them in a derogatory tone when they asked
5 questions?
6       MR. WHITE: Objection to foundation --
7    A No, not in my opinion he did not.
8       MR. WHITE: Ma'am, we -- unfortunately, I
9 have to object. So if you just give me a second.
10 Otherwise, we're just going to talk over each
11 other, and neither one of our answers are going to
12 be on there.
13       THE WITNESS: Okay.
14       MR. WHITE: So I object to foundation and
15 speculation. And your answer is?
16    A No, he didn't talk to them that way.
17    Q So in your opinion, in your experience
18 from being present in these roll calls, did
19 Shields speak differently to black investigators
20 than he did to white investigators?
21       MR. WHITE: Objection to foundation; calls
22 for speculation.
23    Q I'm asking for an opinion. In your opinion?
24    A Yes, he did.

184

1    Q To your knowledge, did Shields ever issue
2 discipline to any white investigators that asked
3 questions at roll call?
4       MR. WHITE: Objection to foundation; calls
5 for speculation.
6    A Not to my knowledge.
7    Q But you testified at length earlier that
8 all of you investigators talk to each other about
9 discipline; right? Do you remember testifying
10 to that?
11    A Yes.
12    Q And did that include black and white
13 investigators discussed discipline they received?
14    A We did talk about it.
15    Q Okay. So everybody kind of knew each
16 other's business when it came to write-ups and
17 things like that in the EM unit regardless of
18 their race; is that fair to say?
19       MR. WHITE: Objection; foundation, leading.
20    A Yes, it is.
21    Q So if someone -- if a fellow white
22 investigator received discipline as sort of
23 punishment for asking questions, you probably
24 would have known that; right?

Transcript of Michelle Strickland
Conducted on August 21, 2020

47 (185 to 188)

---

185

1      MR. WHITE:  Objection; leading, speculation,
2  lacks foundation.
3      **A  Yes.**
4      Q  And then there was all kinds of questions
5  about if you recall counsel showing you that email
6  where you requested for somebody else to hear your
7  grievance hearing.  Do you remember that
8  questioning and that email that was shown?
9      **A  Yes.**
10     Q  Okay.  If another chief -- if you
11  requested another chief to have your hearing, to
12  conduct your hearing on discipline, was that chief
13  still a chief that reported to Director Shields?
14     MR. WHITE:  Objection to foundation, form.
15     **A  Yes.**
16     Q  Okay.  So ultimately, you would get another
17  chief to hear it, but they still reported to Shields?
18     **A  Yes.**
19     Q  Okay.  And then just going back, at the
20  very beginning counsel asked you about that
21  lawsuit.  I think it was a False Claims Act
22  lawsuit or something like that.  In the
23  allegations it was in regards to something that
24  had taken place, I think it was 1994, 1995.

---

186

1  Michelle, how old were you in 1994 and 1995?
2      **A  18 or 19 years old -- 19 years probably**
3  **about, maybe 20.**
4      Q  Okay.  And that was when you were going to
5  college; correct?
6      **A  I was in undergraduate school, yes.**
7      MS. KRAUCHUN:  Okay.  I don't think I have
8  anything further, Counsel, if you have any follow-up.
9      MR. WHITE:  Yeah.
10     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
11  BY MR. WHITE:
12     Q  When you were sued by the Federal
13  government in 2002 for making false statements on
14  a loan application, how old were you?
15     **A  I was in --**
16     Q  2000?
17     **A  How old was I in 2000?  Give me a second**
18  **to do the math.  20-something.**
19     Q  You were an adult?
20     **A  Yeah.  I was probably 26 or 27 maybe.**
21     Q  Okay.  But you have no idea -- the lawsuit
22  that you were deposed in, you have no idea what
23  the outcome of that was?
24     **A  I honestly --**

---

187

1      MS. KRAUCHUN:  Objection.  I don't think
2  there was -- objection to foundation; misstates
3  her testimony.
4      MR. WHITE:  You can answer.
5      **A  I did not remember when you initially asked**
6  **me it was so many years ago.**
7      Q  How about now?  Do you remember how that
8  lawsuit ended?
9      **A  I still don't recall how it ended.**
10     Q  Okay.  Counsel was asking you about
11  everybody talks about discipline.  Is it your
12  testimony under oath you know all discipline that
13  every EM employee has received?
14     **A  I never said that had.**
15     MS. KRAUCHUN:  Objection; misstates --
16  mischaracterizes testimony.
17     Q  I'm asking you the question.  Is it your
18  position that you know all the discipline that's
19  been imposed for every EM employee?
20     **A  I never said that.  The answer is no.**
21     Q  Okay.  And you said that when you have
22  this discipline pending in your file, it precludes
23  you from bidding out; correct?
24     **A  Not bidding out because bids are done**

---

188

1  **in-house, but getting like promotions and moving up.**
2      Q  Oh, okay.  So you weren't prevented from
3  bidding out, or transferring out, or anything like
4  that; right?
5      **A  Well, Shields wanted me out; it wasn't a**
6  **secret.  So despite me having what I thought was**
7  **looming open cases, which proves to you they**
8  **weren't cleared up until May 2015, I was gone, I**
9  **was allowed to be released because he wanted me**
10  **gone anyway.**
11     Q  Sorry; that didn't answer my question.  You
12  were not prevented from, for example, transferring
13  to transportation while this discipline was in
14  your file; correct?
15     **A  I was not prevented.**
16     Q  Did you ever ask to see your personnel file?
17     **A  No.  I don't think so.**
18     Q  When you were assigned to the office, I think
19  you referred to it as like secretarial duties.  Is
20  that right?
21     **A  I didn't.  Ranzino and the other guys did.**
22  **Not me.**
23     Q  Got it.  What kind of stuff were you doing
24  in the office?

---

Transcript of Michelle Strickland
Conducted on August 21, 2020

189

1    A  Answering phones, taking messages.  What
2  else did you do in the office?  You might have
3  been typing memorandums.  I can't remember all the
4  details but secretarial work.
5    Q  Is it your position that no men were ever
6  assigned to answer phones, for example?
7    A  I can't say what happened that first
8  couple weeks when I first got there.  I didn't
9  know what went on there.  So I can't say when I
10 first started no men were working there.  I don't
11 know that.
12   Q  Did you ever see men answering phones in
13 the office?
14   A  I did.
15   Q  Did you ever see men taking messages in
16 the office?
17   A  I did.
18   Q  Did you ever see men typing memos in the
19 office?
20   A  I did.
21   Q  What about the men -- or just really the
22 people who were working in the office, did you
23 ever see a white person answering the phones?
24   A  Yes.

190

1    Q  Did you ever see a white person taking
2  messages in the office?
3    A  I -- yes.
4    Q  Did you ever see a white person typing
5  memos in the office?
6    A  Yes.
7    Q  And wouldn't you agree that there's some
8  people who actually wanted to work in the office?
9    A  I can't answer for other people.  I don't
10 know.
11   Q  You never heard anybody say they liked to
12 work in the office?
13   A  I did not.
14       MR. WHITE:  All right.  I think that's all
15 I have for you Ms. Strickland.
16       MS. KRAUCHUN:  I just have one quick
17 question.
18   EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
19 BY MS. KRAUCHUN:
20   Q  You bid to transportation to get out of
21 the EM unit; right?
22   A  Yes.
23   Q  Okay.  But essentially that was like a
24 demotion because your salary was decreased; correct?

191

1    A  It was.
2        MR. WHITE:  Objection; leading, foundation,
3  misstates testimony.
4    Q  You testified at length about it was a
5  dollar less an hour.  Do you remember that
6  testimony, Michelle?
7    A  Yes, I do.
8        MS. KRAUCHUN:  Okay.  I have nothing further.
9        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10 BY MR. WHITE:
11   Q  Ma'am, when you voluntarily transferred to
12 transportation, did you consider that a demotion?
13   A  It was a demotion but it was about my
14 quality of life and getting away from the stress.
15   Q  So it was a demotion?
16   A  It was a demotion.
17   Q  Why would you voluntarily sign up for a
18 demotion --
19       MR. WHITE:  You know what?  Scratch that.
20 I'm good.
21       All right.  Well, thanks for your time.
22 We appreciate you being here.
23       MS. KRAUCHUN:  Sounds good.  Thank you.
24       (Off the record at 2:18 p.m. CST.)

192

1  CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3      I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10 taken by me stenographically and thereafter reduced
11 to typewriting under my direction; that reading and
12 signing was not requested; and that I am neither
13 counsel for, related to, nor employed by any of
14 the parties to this case and have no interest,
15 financial or otherwise, in its outcome.
16     IN WITNESS WHEREOF, I have hereunto set my
17 hand and affixed my notarial seal this 6th day of
18 September, 2020.
19
20 My commission expires:  October 16, 2021
21
22 _Paula Quetsch_____
23 Notary Public in and for the
24 State of Illinois

Transcript of Michelle Strickland
Conducted on August 21, 2020

49

**A**

**ability**
82:5, 174:21,
175:17, 176:2
**able**
50:21, 72:8,
112:23, 118:3,
126:22, 144:11,
153:12
**above**
30:1, 137:3
**absolutely**
36:4
**abuse**
123:14
**ac**
83:9
**academy**
15:5
**accepted**
138:19
**access**
181:6
**accommodate**
7:20, 139:5
**accommodated**
137:24, 138:2
**accommodates**
139:19
**according**
28:3, 62:9,
63:1, 88:14,
95:23, 105:22,
106:2, 110:10
**account**
163:3, 163:6,
163:9, 163:16
**accuracy**
28:5
**accurate**
121:4, 121:9,
121:14
**accused**
96:10
**accusing**
30:10
**acronym**
16:3, 144:6,

145:12
**acronyms**
145:8
**across**
134:23, 138:14
**act**
61:19, 107:22,
166:24, 167:1,
168:2, 185:21
**action**
27:3, 105:11,
143:14, 165:20,
166:20, 168:24
**actions**
5:5, 150:9,
166:18
**activities**
128:23
**activity**
24:18, 140:8
**actual**
39:11, 71:8,
119:24, 120:4,
136:7, 168:13
**actually**
13:23, 25:7,
25:8, 28:15,
51:18, 53:24,
80:1, 88:23,
92:16, 92:24,
96:4, 101:10,
105:16, 136:1,
146:2, 158:15,
190:8
**added**
8:14
**addition**
154:17
**additional**
141:3, 152:13,
177:14
**address**
8:19, 12:22
**adds**
24:14
**adequate**
141:6
**adequately**
143:7, 163:24

**adjustment**
158:7
**administered**
135:23
**adult**
186:19
**adults**
71:22
**advanced**
143:20
**advancement**
144:16
**advancements**
144:11
**advancing**
143:16
**adverse**
143:13
**advised**
137:1
**aed**
105:13, 105:14
**affected**
176:14
**affirm**
30:1
**affixed**
192:17
**afraid**
28:13, 65:2,
75:15, 131:1
**african-american**
37:20, 37:23,
56:10, 77:3,
159:20, 165:8
**after**
15:5, 15:12,
16:17, 18:18,
20:15, 20:19,
20:24, 21:5,
23:18, 23:20,
27:12, 28:8,
70:17, 86:17,
90:9, 95:10,
95:17, 96:24,
97:3, 97:19,
97:21, 97:22,
114:11, 127:7,

127:8, 127:16,
127:19, 128:14,
128:18, 140:13,
141:4, 142:10,
142:14, 144:24,
148:2, 156:19,
162:11, 162:15,
178:14, 181:14,
182:11
**afterward**
145:4
**again**
10:1, 17:3,
27:15, 30:10,
39:10, 41:2,
50:23, 82:1,
95:14, 96:24,
97:17, 102:11,
105:10, 107:9,
109:3, 124:6,
127:24, 128:4,
135:19, 139:23,
143:19, 146:12,
148:24, 150:16,
170:20, 176:24,
177:11, 178:23
**against**
11:13, 19:4,
19:9, 19:14,
19:20, 19:23,
20:2, 20:6,
20:15, 21:18,
33:3, 33:10,
33:15, 33:17,
43:5, 48:4,
65:5, 69:1,
127:14, 127:16,
146:6, 149:21,
158:18, 159:18,
161:5
**agent**
14:9
**ago**
40:1, 95:3,
98:19, 174:3,
187:6
**agree**
19:3, 20:9,

20:17, 22:17,
23:17, 26:7,
26:9, 37:22,
93:20, 93:23,
97:17, 97:23,
106:9, 107:1,
107:14, 109:18,
110:3, 110:13,
110:22, 112:9,
112:12, 129:5,
130:6, 130:8,
159:20, 190:7
**agreed**
137:24
**ahead**
138:7, 150:1
**aimed**
149:17
**al**
1:5, 1:9
**alienated**
21:18
**alike**
35:8, 35:19
**allegation**
24:21
**allegations**
36:2, 185:23
**allege**
140:7
**alleged**
123:15, 128:23,
150:9, 168:11,
181:14
**allegedly**
133:21, 133:23,
143:13
**allow**
92:15, 145:3
**allowed**
84:3, 154:11,
188:9
**allowing**
129:2
**almost**
49:2, 64:10,
81:2, 144:10
**along**
135:20, 142:3

**already**
7:6, 50:13,
71:1, 80:16,
81:13, 125:23,
126:1, 143:22,
143:24
**also**
4:1, 6:18,
37:17, 38:3,
57:21, 70:8,
137:9, 138:16,
156:24, 166:23,
176:13
**although**
168:8
**always**
17:24, 35:12,
43:19, 49:11,
84:6, 84:9,
152:14, 179:9
**amount**
152:16, 154:14,
168:13, 168:16,
168:17, 168:18,
170:7, 170:8,
170:11, 170:13,
171:3, 171:8,
171:11
**anguish**
154:2, 154:6,
154:22, 160:3,
160:8, 160:9
**annex**
16:22, 17:1
**annually**
17:10
**another**
29:19, 61:8,
68:22, 82:11,
82:24, 101:24,
115:24, 139:6,
149:21, 155:21,
158:13, 161:8,
175:4, 185:10,
185:11, 185:16
**answer**
7:9, 7:13,
7:22, 8:7,

19:17, 20:22,
23:1, 23:3,
27:23, 51:18,
63:22, 83:20,
99:7, 103:24,
111:15, 115:12,
123:8, 124:3,
142:9, 165:15,
170:16, 173:5,
183:1, 183:15,
187:4, 187:20,
188:11, 189:6,
190:9
**answered**
28:20, 29:8
**answering**
106:6, 189:1,
189:12, 189:23
**answers**
4:22, 5:9,
76:15, 114:6,
148:17, 183:11
**anthony**
67:11
**anxiety**
160:18, 160:20
**any**
7:19, 8:10,
8:24, 9:13,
10:13, 10:17,
14:14, 21:4,
21:5, 28:4,
29:6, 43:16,
50:16, 57:16,
57:23, 58:2,
68:24, 69:3,
73:2, 76:7,
78:21, 80:3,
80:16, 81:18,
84:1, 86:17,
86:22, 95:24,
107:19, 110:4,
119:18, 122:10,
122:17, 123:1,
123:21, 125:10,
129:15, 134:12,
135:6, 140:17,
141:3, 144:11,

144:16, 146:22,
147:6, 153:22,
153:23, 155:9,
158:5, 158:9,
163:2, 163:13,
164:24, 165:23,
166:18, 167:5,
167:17, 168:5,
169:7, 169:10,
169:14, 169:15,
169:22, 170:23,
172:22, 174:11,
182:1, 184:2,
186:8, 192:13
**anybody**
33:21, 52:6,
58:5, 75:20,
76:6, 113:1,
115:6, 120:12,
120:16, 121:16,
144:17, 147:19,
148:9, 167:18,
190:11
**anybody's**
103:18
**anymore**
139:2, 161:2,
172:14
**anyone**
8:22, 10:10,
29:3, 107:7,
107:12, 110:8,
113:15, 125:18,
126:19
**anything**
9:2, 9:15,
9:19, 14:12,
31:14, 55:13,
60:11, 62:15,
62:16, 64:20,
65:2, 75:15,
75:19, 77:17,
79:15, 81:10,
86:16, 86:22,
103:9, 112:21,
116:14, 122:20,
130:19, 130:23,
138:12, 144:3,

Transcript of Michelle Strickland
Conducted on August 21, 2020

51

146:16, 146:19,
147:16, 158:6,
159:13, 163:4,
165:1, 167:9,
179:13, 180:16,
186:8, 188:3
**anytime**
167:18
**anyway**
9:7, 188:10
**apart**
10:16, 57:15,
80:15, 120:8,
120:11, 147:5
**apologize**
23:15, 84:8
**apparently**
62:6, 62:7
**appeared**
45:17
**appearing**
129:10
**appears**
95:20, 100:23
**application**
144:19, 145:1,
145:3, 186:14
**applications**
144:14, 145:14,
145:15
**applied**
144:15, 146:21,
147:10, 147:11,
147:13, 147:14,
151:18, 152:2
**apply**
81:22, 147:6,
147:15
**appointment**
5:14, 61:18,
62:8
**appointments**
134:17
**appreciate**
139:12, 191:22
**appropriate**
141:7
**approximately**
10:7, 19:1,

26:6, 156:16
**april**
17:20, 18:15,
35:7, 35:18,
87:21, 89:15,
93:12, 162:13
**arbitration**
84:10, 85:20,
86:10
**area**
39:10, 39:11,
45:21, 47:4,
52:13, 111:24,
113:8, 113:13
**areas**
110:20, 110:22,
111:1, 111:7,
111:14, 111:16,
111:19, 112:5,
112:7, 112:10,
112:13
**aren't**
111:1
**around**
35:15, 38:2,
40:23, 41:5,
59:13, 60:1,
70:20, 80:17,
103:7
**arrest**
119:3, 140:21
**arrival**
145:21
**articulate**
109:14, 155:17
**articulating**
60:4
**aside**
14:23, 63:2,
106:14
**asked**
7:21, 8:6,
28:20, 28:23,
29:7, 48:2,
50:13, 62:18,
62:20, 86:15,
93:18, 113:17,
114:21, 118:4,

119:23, 123:12,
123:14, 128:22,
132:20, 140:5,
141:11, 141:14,
141:17, 141:18,
142:20, 143:1,
143:11, 143:12,
150:6, 155:2,
155:4, 163:2,
163:22, 164:20,
164:24, 166:17,
168:22, 169:13,
181:9, 181:23,
183:4, 184:2,
185:20, 187:5
**asking**
8:8, 19:19,
36:1, 36:14,
44:11, 49:11,
54:11, 55:10,
62:22, 69:7,
69:8, 84:21,
86:3, 98:9,
103:22, 121:12,
123:7, 139:8,
146:18, 170:10,
170:13, 182:5,
182:14, 183:23,
184:23, 187:10,
187:17
**asserting**
168:5
**assigned**
18:8, 18:10,
18:13, 19:20,
37:12, 45:21,
47:8, 63:23,
64:13, 71:3,
106:16, 108:3,
109:4, 110:20,
110:22, 112:10,
112:13, 112:18,
113:8, 113:16,
134:15, 136:2,
137:1, 165:11,
177:24, 178:3,
178:7, 178:13,
179:12, 188:18,

189:6
**assignment**
40:8, 79:11,
108:14, 108:15,
108:16, 108:20,
108:24, 109:19,
109:22, 110:4,
110:7, 110:9,
177:20, 178:17
**assignments**
37:12, 45:9,
45:10, 45:13,
47:12, 47:15,
47:20, 60:6,
60:21, 64:4,
66:17, 66:18,
70:22, 74:5,
77:12, 110:13,
110:18, 111:18,
123:18, 177:17,
177:18, 182:18
**assist**
9:10
**association**
167:9
**assume**
8:8, 14:19,
114:7, 169:20,
172:14
**assumed**
83:3
**assuming**
60:17, 98:2,
117:8, 124:15,
133:13, 135:9
**attached**
4:13, 11:23,
22:3, 24:2,
25:13, 26:24,
29:12, 61:12,
87:5, 90:20,
114:4, 136:19,
148:15, 159:2
**attention**
121:19, 173:15
**attorney**
9:23, 9:24,
10:11, 55:10,

166:5, 166:6,
166:7, 172:15
**attorneys**
6:7
**attribute**
170:8
**august**
1:15, 27:10,
28:2, 88:7,
88:10, 88:11,
88:15, 89:1,
89:24, 90:9,
96:9
**authenticity**
96:1
**authority**
142:23, 142:24
**av**
61:13, 87:3,
90:18, 113:20,
114:2, 136:17,
148:13, 153:15,
158:23
**avenue**
8:20, 11:6,
12:18
**average**
79:12
**avoid**
95:16, 157:21
**aware**
13:14, 31:17,
31:19, 51:10,
57:17, 95:21,
97:15, 98:11,
110:8, 138:24
**away**
44:9, 49:13,
53:22, 150:23,
191:14

**B**

**back**
15:4, 16:19,
16:20, 17:7,
18:24, 27:17,
31:3, 39:24,
40:17, 56:1,

60:9, 61:5,
70:10, 73:20,
81:3, 81:7,
89:18, 92:24,
113:22, 113:24,
114:19, 119:5,
120:9, 124:2,
124:13, 124:22,
128:8, 128:10,
128:13, 137:4,
138:17, 138:21,
140:4, 145:13,
145:16, 145:18,
148:1, 151:1,
151:6, 151:8,
152:20, 153:4,
153:10, 155:1,
155:3, 155:5,
157:5, 157:11,
157:22, 162:20,
179:10, 185:19
**background**
10:19, 13:4,
30:16
**backlog**
103:10
**bad**
49:1, 49:2,
108:14, 108:15,
108:19, 152:24,
161:3, 180:21,
180:23
**band**
118:23, 119:1
**baroni**
3:20
**base**
102:18
**based**
27:13, 27:18,
30:11, 30:21,
37:13, 76:17,
93:23, 106:6,
109:24, 110:14,
110:23, 115:18,
115:20, 115:22,
125:1, 125:7,
125:21, 140:23,

140:24, 143:4,
154:13, 159:19,
171:21, 172:6
**basement**
74:16
**basically**
14:6, 24:12,
30:6, 160:19,
165:1
**basis**
45:1, 106:19,
163:22
**bates**
25:14, 87:6,
91:1, 99:14
**bates-stamped**
22:10, 24:4
**bautista**
4:2
**beach**
167:8
**beat**
107:22, 107:23
**become**
180:23
**becoming**
74:24, 75:4,
76:23, 141:1
**been**
6:3, 11:18,
12:7, 16:22,
17:8, 24:17,
30:20, 39:6,
39:16, 41:9,
42:23, 44:23,
44:24, 53:18,
55:4, 57:2,
59:9, 60:11,
65:8, 68:2,
70:7, 71:1,
72:2, 75:5,
88:8, 88:18,
90:2, 92:14,
92:16, 92:18,
108:3, 110:11,
118:3, 124:7,
126:22, 131:20,
135:7, 137:1,

138:4, 141:6,
144:4, 144:11,
146:9, 153:10,
157:9, 157:12,
158:4, 159:24,
162:10, 166:17,
167:5, 167:14,
167:20, 170:12,
171:22, 180:4,
180:7, 180:22,
182:12, 187:19,
189:3
**before**
2:8, 6:10, 7:5,
7:9, 7:22, 13:1,
19:4, 19:9,
19:14, 19:20,
19:24, 20:2,
20:6, 20:8,
20:11, 20:13,
24:9, 27:3,
29:6, 29:15,
30:24, 33:7,
52:15, 54:16,
73:20, 82:23,
87:10, 88:7,
91:6, 93:14,
108:3, 114:8,
121:2, 125:10,
128:12, 130:3,
143:22, 143:23,
144:1, 146:3,
148:20, 159:6,
164:9, 164:14,
167:14, 172:21,
175:10, 180:11,
192:6
**began**
31:9
**begin**
177:22
**beginning**
35:24, 61:20,
177:21, 185:20
**behalf**
3:2, 3:10, 3:18
**being**
21:17, 21:18,

Transcript of Michelle Strickland
Conducted on August 21, 2020

53

43:4, 43:21,
44:10, 45:16,
47:18, 48:4,
49:6, 58:22,
60:5, 60:7,
64:6, 71:2,
71:3, 88:21,
103:21, 107:12,
107:15, 107:17,
113:8, 117:24,
126:2, 126:3,
127:15, 135:17,
135:23, 137:8,
142:7, 152:7,
155:18, 161:5,
161:6, 165:11,
165:24, 166:14,
167:22, 168:8,
173:12, 176:5,
183:18, 191:22
**belief**
30:3, 81:22,
81:24, 125:20
**believe**
9:21, 9:22,
10:6, 15:22,
16:21, 16:22,
17:8, 18:2,
34:20, 38:4,
38:20, 46:10,
58:21, 63:20,
64:21, 72:12,
98:4, 102:24,
115:17, 115:20,
115:21, 121:5,
121:10, 121:15,
126:10, 134:19,
134:20, 150:23,
164:7, 164:15,
164:16, 165:22,
167:16, 175:6,
180:1
**belong**
114:22
**belongs**
171:17
**below**
78:15, 89:8,

130:18
**belts**
141:4
**benefits**
152:11, 169:15
**besides**
10:10, 34:13,
52:6, 53:5
**best**
7:7, 30:2,
36:10, 36:11,
143:5
**better**
78:21, 161:4
**between**
131:10, 160:7,
168:20
**biased**
129:1, 129:12,
129:21, 130:7,
130:10, 131:13,
131:17, 132:17
**bid**
18:4, 109:18,
109:21, 109:24,
190:20
**bidding**
177:14, 187:23,
187:24, 188:3
**bide**
59:8
**bids**
17:9, 187:24
**bigger**
87:11
**bills**
181:2
**bit**
37:8, 81:13,
92:21, 95:6,
124:17, 154:4
**black**
36:23, 37:15,
41:22, 45:18,
51:3, 53:20,
67:2, 67:3,
80:9, 118:16,
120:21, 120:22,

122:7, 125:4,
126:4, 138:3,
183:19, 184:12
**blacks**
149:9
**blend**
160:19
**board**
134:23
**body**
116:14
**both**
34:23, 39:8,
39:17, 107:24,
108:1, 116:17,
154:13, 154:14,
171:8
**bottom**
12:15, 24:15,
25:20, 25:21,
29:22, 61:23,
88:1, 89:10,
89:19, 92:6,
92:10, 100:16,
102:9, 115:9,
119:22, 124:8,
136:22, 150:4
**boy**
41:23, 51:3,
51:4, 80:10
**brad**
159:5
**brain**
39:24, 133:9
**branch**
144:10
**break**
7:19, 7:22,
50:16, 58:5,
80:24, 147:19,
148:6, 148:9,
155:19
**breaks**
109:10
**bring**
157:22
**bringing**
53:9, 54:16,

119:7
**brings**
21:14
**brook**
3:15
**brought**
121:18, 144:23
**brown**
100:5, 100:9,
104:6, 131:5
**brown's**
100:3
**bs**
47:12
**building**
15:15, 21:8,
21:14, 68:21
**business**
52:22, 155:20,
163:18, 184:16
**bye**
34:13

**C**

**cahoots**
82:14
**calendar**
139:15
**call**
9:22, 34:22,
35:3, 35:8,
35:9, 35:12,
35:18, 39:11,
42:10, 47:4,
53:14, 53:21,
56:8, 57:18,
70:4, 70:15,
70:18, 70:21,
116:4, 117:7,
117:9, 118:10,
131:15, 132:19,
134:7, 140:22,
140:23, 141:14,
141:17, 142:20,
144:1, 146:1,
178:14, 182:15,
182:19, 184:3
**called**
16:23, 49:13,

Transcript of Michelle Strickland
Conducted on August 21, 2020

54

51:7, 53:11,
84:6, 116:13,
116:24, 117:4,
117:5, 117:6,
117:10, 117:12,
126:2, 132:15,
133:14, 154:9
**calling**
7:1, 53:17,
118:10, 131:16
**calls**
19:7, 19:11,
20:20, 28:19,
35:6, 36:16,
49:19, 58:22,
97:8, 180:19,
182:22, 183:18,
183:21, 184:4
**calumet**
11:4, 11:7,
12:18, 16:9,
16:10, 16:12,
16:17
**came**
16:20, 49:19,
54:15, 55:19,
55:22, 55:23,
56:14, 56:19,
72:6, 72:12,
73:19, 118:12,
130:21, 135:2,
140:17, 151:9,
169:8, 182:2,
184:16
**camera**
153:16
**can't**
7:16, 8:10,
9:7, 16:2,
31:24, 32:11,
33:23, 35:5,
35:11, 35:20,
37:24, 38:10,
38:15, 41:6,
41:7, 41:8,
47:22, 50:1,
52:2, 53:6,
60:22, 60:23,

65:9, 67:8,
67:9, 68:20,
69:5, 69:17,
72:20, 73:19,
73:21, 78:7,
79:14, 80:3,
82:18, 82:20,
83:1, 83:17,
83:20, 85:5,
85:9, 85:10,
102:3, 102:4,
103:12, 105:3,
107:3, 107:10,
109:14, 110:16,
112:3, 112:4,
116:13, 130:13,
130:16, 130:22,
130:23, 130:24,
144:9, 144:15,
147:1, 147:13,
151:22, 152:16,
156:13, 162:7,
162:12, 165:15,
166:12, 171:8,
176:16, 189:3,
189:7, 189:9,
190:9
**cannot**
38:13, 43:14
**captioned**
159:4
**car**
49:9, 100:2,
100:9, 100:11,
104:12, 104:23,
113:5, 126:13,
126:17, 126:18,
126:22, 131:6,
131:12, 131:21,
132:2, 137:12
**care**
76:3, 82:3,
132:2, 143:1
**career**
180:22
**careful**
117:1, 117:12,
118:11, 181:20,

181:21
**cargo**
116:19
**cars**
126:14, 126:16,
131:19
**case**
1:7, 4:15,
5:13, 10:14,
12:7, 12:8,
37:17, 67:23,
68:3, 96:5,
116:20, 120:6,
129:2, 129:3,
159:3, 164:7,
166:18, 166:20,
166:24, 167:2,
167:13, 167:20,
168:1, 168:2,
192:14
**cases**
6:14, 188:7
**categories**
150:12
**category**
150:7
**cause**
49:11, 84:20,
86:4, 118:13,
180:3, 181:22
**caused**
14:8, 20:10,
20:18, 140:7,
160:18, 161:15
**cba**
110:12
**ccso**
94:4, 99:15,
101:1, 105:10
**cecil**
65:24
**cell**
179:4
**center**
140:22, 140:23
**certain**
21:14
**certificate**
192:1

**certified**
2:9, 192:3
**certify**
192:7
**chain**
5:8, 133:22,
133:23, 134:6,
134:19, 134:21,
136:23, 181:24
**challenged**
142:24
**challenging**
142:22
**chance**
12:11, 24:5,
54:9, 78:12,
96:6, 99:15,
150:14
**change**
17:10, 59:11,
59:13, 81:10,
179:13
**changed**
108:24, 182:6
**charge**
4:16, 22:11,
22:14, 22:19,
24:3, 24:12,
24:16, 25:17,
29:19, 30:1,
30:16, 127:8,
127:17, 127:22,
128:6, 128:15,
128:17, 133:15,
142:10, 142:14
**chase**
73:24, 151:12
**check**
43:11, 43:13,
168:12
**chicago**
3:7, 3:23,
8:18, 8:20,
10:21, 10:23,
11:3, 37:16,
45:19, 67:4
**chief**
35:2, 35:7,

Transcript of Michelle Strickland
Conducted on August 21, 2020                    55

35:18, 38:9,
78:5, 82:11,
82:24, 83:12,
83:13, 84:7,
84:8, 86:14,
91:17, 94:20,
94:21, 94:22,
96:16, 100:18,
101:23, 101:24,
105:1, 111:23,
112:4, 132:14,
134:3, 134:16,
135:9, 136:7,
138:5, 139:12,
139:23, 185:10,
185:11, 185:12,
185:13, 185:17
**chiefs**
111:21, 111:22,
112:8, 133:8,
134:11, 135:9,
136:4
**children**
71:21
**chitchat**
70:21
**choice**
139:16, 139:17
**chris**
7:6, 37:5,
61:8, 92:9,
106:13
**christopher**
4:2
**chronological**
91:2
**circle**
66:8
**city**
11:4, 11:7,
12:19, 16:9,
16:10, 16:12,
16:17
**civil**
166:18, 166:19
**claim**
158:17, 166:23,
167:1, 168:2,

168:6
**claimed**
150:8, 168:24
**claiming**
19:13, 159:21,
160:5, 169:10,
169:22
**claims**
14:10, 22:14,
55:9, 61:19,
185:21
**clarify**
81:11, 174:5
**class**
154:12
**classified**
179:21
**cleaning**
102:13, 103:6
**clear**
24:17, 82:2,
138:22
**cleared**
188:8
**client**
31:7
**close**
112:13, 113:16
**closer**
112:21
**clue**
77:6
**cockroaches**
108:8, 108:10
**colleen**
156:21, 157:2
**college**
13:24, 186:5
**come**
18:24, 59:11,
72:4, 81:2,
84:20, 142:4,
143:3, 147:15,
148:1, 161:19,
179:10, 179:15,
180:23
**comes**
16:1, 53:7,

53:8, 53:17,
54:2, 97:2
**coming**
86:22, 142:4,
180:21
**command**
133:22, 133:24,
134:6, 134:19,
134:21
**command-type**
181:24
**commander**
111:21
**commanders**
111:18, 134:11
**comment**
53:1, 56:9,
57:15
**comments**
57:24, 123:19,
123:21
**commission**
192:20
**compared**
160:8
**compensated**
135:18, 152:17
**compensation**
70:12, 150:12,
151:17, 152:4,
152:6, 153:20
**compensatory**
135:18, 154:1
**complain**
43:3, 43:4,
43:8, 45:8,
45:10, 45:12,
46:21, 47:10,
59:3, 59:5,
59:14, 64:3,
64:6, 64:16,
66:6, 67:5,
68:24, 69:3,
69:8, 71:16,
71:18, 72:17,
72:22, 74:5,
75:8, 75:12,
75:16, 75:19,

75:20, 75:23,
76:5, 77:8,
108:7, 135:21,
136:6, 138:11,
140:16, 141:10
**complained**
43:6, 47:17,
48:3, 48:10,
48:13, 59:24,
77:10, 77:11,
136:1
**complaining**
45:20, 71:2,
106:12, 106:15,
110:19, 165:20
**complaint**
4:20, 9:17,
9:18, 10:16,
11:12, 13:1,
27:2, 36:3,
47:14, 47:20,
47:23, 47:24,
60:19, 61:6,
66:21, 76:10,
76:18, 76:20,
115:12, 123:16,
128:24, 159:17,
165:2, 165:24
**complaints**
45:17, 48:1,
60:20, 60:23,
66:23, 173:2,
173:6
**complete**
8:11, 144:19
**completely**
122:7, 135:5
**compounded**
160:11
**computation**
150:7
**concealed**
91:18, 116:15,
119:9
**concern**
181:10
**concerns**
139:5

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    56

conclusion
19:12, 20:21
condescending
49:4
condo
167:9
condolences
69:19, 69:21
condos
111:10
conduct
35:6, 137:2,
185:12
conducted
1:14, 35:4,
176:5
confirm
114:24, 121:16
confirmation
120:12
confirmed
121:18
conflict
137:8, 137:19,
137:20
consider
108:2, 108:13,
191:12
considered
167:12
consistently
161:2, 161:3
conspiracy
97:6
constantly
47:5, 47:17,
54:20, 60:2,
142:2, 146:5
contend
124:24, 125:1,
129:20
contending
150:18
contention
21:9, 163:23
continue
50:18
continued
21:10, 75:8,

142:11, 146:5,
170:11
continues
169:1, 169:18
continuing
30:19, 87:19,
97:21, 132:8,
133:3, 173:9,
183:2
continuously
97:2
contraband
122:12, 122:19
contract
81:20, 84:17,
110:10
contractual
101:18, 110:4,
110:6, 110:8
control
154:18, 164:1
controlled
133:6
convenience
112:21
convenient
71:11
conversation
39:7, 39:12,
39:14, 40:9,
40:22, 41:12,
44:12, 44:16,
44:19, 45:23,
46:24, 49:12,
51:7, 51:15,
52:4, 52:11,
52:14, 52:16,
52:19, 52:21,
53:23, 54:16,
56:13, 56:14,
56:19, 60:14,
69:18, 70:16,
104:21, 104:22,
119:15
conversations
47:3, 47:7,
52:24, 53:16,
54:1, 70:14,

70:19, 70:24,
164:24
cook
1:8, 5:10, 6:8,
14:19, 15:1,
16:19, 29:3,
31:17, 87:8,
133:18, 134:9,
148:18, 158:18,
159:5, 163:23,
174:16
copy
174:7, 175:1,
175:14, 176:3
corner
29:23, 96:5
corrected
125:14
correctional
15:17, 15:18,
15:19, 17:3
corrections
119:8
correctly
26:9
cottage
8:20
could
11:20, 12:14,
14:3, 23:23,
26:21, 30:14,
39:6, 39:17,
44:8, 44:23,
61:9, 61:23,
67:21, 85:20,
87:1, 87:23,
89:14, 89:18,
90:16, 92:9,
92:19, 93:24,
95:5, 95:6,
105:7, 109:15,
112:24, 113:9,
114:10, 119:5,
119:6, 120:9,
124:6, 128:9,
130:11, 134:4,
136:21, 143:16,
145:2, 150:14,

153:10, 158:22,
159:9, 164:4,
164:19, 166:16,
169:7, 176:14,
180:11
couldn't
14:21, 39:24,
77:24, 78:3,
86:11, 102:6,
109:10, 109:11,
124:20, 153:19,
154:10, 164:18,
173:8
counsel
5:15, 6:4,
26:14, 61:19,
62:8, 98:9,
172:19, 174:2,
181:9, 181:23,
185:5, 185:20,
186:8, 186:10,
187:10, 190:18,
191:9, 192:13
count
26:8
counted
38:2
counting
43:20
county
1:8, 5:11, 6:8,
14:19, 15:1,
16:19, 29:3,
31:17, 76:14,
87:8, 133:18,
134:9, 147:15,
148:18, 158:18,
159:5, 163:23,
169:7, 174:16,
192:5
couple
39:7, 64:22,
65:7, 85:11,
115:5, 141:18,
145:7, 147:1,
189:8
course
155:22

Transcript of Michelle Strickland
Conducted on August 21, 2020                    57

court
1:1, 7:14,
26:12, 167:18,
192:1
court's
28:5
cover
104:1, 157:13
coverage
169:15
covered
103:21
covering
103:14, 103:16,
103:18
covers
88:17
coworker
42:6
created
71:9
cronyism
72:10
crossed
92:7, 92:11
csr
1:24, 192:4
cst
1:16, 191:24
curious
138:9
current
166:6, 175:13,
182:4
currently
129:18, 157:8,
166:19
cut
49:6, 73:23,
151:3, 151:12,
168:10, 168:12
cv
1:7, 5:13,
159:4

D

daffada
3:20

daily
45:1, 74:21
damage
160:1, 168:24
damages
150:8, 154:1,
157:24
damp
109:16
dangerous
107:17, 107:20,
107:24, 108:1,
113:9
dark
109:16
dart
1:9, 159:5
dart's
5:11, 148:18
date
35:21, 39:2,
41:14, 43:9,
43:14, 43:20,
44:8, 46:2,
88:7, 88:11,
91:9, 93:10,
93:18, 98:13,
117:19, 127:21,
129:23, 135:7,
139:15, 141:11,
156:14
dated
26:4, 88:4,
89:11, 173:23,
174:7, 175:5
dates
103:5, 128:9,
147:4, 147:14
david
69:10
day
18:3, 21:23,
23:20, 42:18,
43:1, 46:17,
49:21, 49:23,
52:5, 59:18,
64:6, 64:10,
79:3, 109:17,

112:20, 117:8,
139:19, 139:20,
143:3, 143:6,
154:10, 154:12,
169:7, 175:5,
178:21, 192:17
day-to-day
21:4, 49:18
days
26:1, 26:6,
26:10, 34:21,
46:11, 49:11,
49:24, 50:2,
84:21, 92:4,
95:12, 100:21,
125:18, 181:3
deadline
27:13
deal
21:23
dealing
44:10
dealt
86:6, 143:20
december
26:17, 28:16,
29:6, 89:5,
89:11, 99:20,
175:6
decided
95:18, 165:20
decides
107:22
decision
131:14, 135:13,
135:15
declare
29:23
declared
114:12
decreased
190:24
deductibles
170:1
defendant
4:23, 5:10,
114:6, 129:1,
140:9, 143:15,

148:17, 159:11,
170:23, 171:7
defendant's
159:17
defendants
1:10, 3:10,
3:18, 6:4,
12:16, 19:4,
20:10, 20:14,
20:18, 21:5,
22:20, 23:21,
24:22, 29:6,
69:1, 69:4,
127:15, 140:7,
150:9, 159:6,
171:6, 186:10,
191:9
definitely
89:16, 93:23,
94:14, 95:3,
102:6, 125:17,
144:18, 147:3,
154:8, 170:1,
181:15
defrauded
14:12
degree
11:2
delivery
161:8
demotion
190:24, 191:12,
191:13, 191:15,
191:16, 191:18
denied
26:13, 101:19,
144:4, 145:4,
147:16
deny
163:4
department
16:9, 16:10,
16:13, 16:18,
16:19, 119:8,
134:9, 138:24,
149:15, 174:16,
174:19, 174:21,
175:16, 180:18,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                          58

| | | | |
|---|---|---|---|
| 180:24, 181:6 | **details** | 57:4, 57:23, | 164:3, 164:7, |
| **depended** | 67:10, 70:13, | 94:11, 95:7, | 164:10, 164:15, |
| 35:21 | 189:4 | 100:18, 104:24, | 173:11, 174:20, |
| **depending** | **detainees** | 117:5, 117:6, | 175:6, 179:19, |
| 153:11 | 15:15, 140:21 | 117:7, 117:11, | 179:21, 180:17, |
| **depends** | **device** | 118:18, 131:5, | 181:6, 181:7, |
| 107:21, 161:18, | 96:11 | 133:12, 133:13, | 184:2, 184:9, |
| 161:22 | **diagnosis** | 133:14, 133:17, | 184:13, 184:22, |
| **deposed** | 158:5 | 134:3, 138:23, | 185:12, 187:11, |
| 6:21, 62:10, | **died** | 174:11, 185:13 | 187:12, 187:18, |
| 186:22 | 34:15, 131:23 | **directors** | 187:22, 188:13 |
| **deposition** | **difference** | 134:12 | **disciplines** |
| 1:13, 2:1, | 135:3 | **disability** | 72:22, 105:20 |
| 4:14, 6:10, | **different** | 169:15 | **disciplining** |
| 9:10, 9:16, | 40:23, 41:4, | **disagree** | 69:4 |
| 10:11, 10:14, | 54:6, 62:22, | 126:8 | **disclose** |
| 11:22, 22:2, | 66:23, 71:5, | **disagreed** | 14:21 |
| 24:1, 25:12, | 72:22, 73:10, | 82:4 | **disclosed** |
| 26:23, 27:6, | 75:18, 79:14, | **disciplinary** | 14:19 |
| 29:11, 54:9, | 84:14, 115:5, | 5:4, 5:5, 87:9, | **discovered** |
| 61:11, 87:4, | 116:12, 122:7, | 105:11, 128:24 | 91:18, 119:8 |
| 90:19, 114:3, | 135:5, 145:7, | **discipline** | **discretion** |
| 136:18, 148:14, | 145:8, 145:15, | 64:16, 67:6, | 133:9 |
| 159:1, 192:7 | 147:19, 150:11, | 69:6, 72:18, | **discriminate** |
| **deputy** | 155:8, 164:20, | 77:8, 77:11, | 19:19, 19:23, |
| 91:17 | 172:23, 174:19 | 77:13, 78:13, | 20:2, 20:6 |
| **derogatory** | **differentiate** | 81:14, 81:15, | **discriminated** |
| 123:19, 123:21, | 170:17 | 81:19, 82:5, | 19:4, 19:9, |
| 183:4 | **differently** | 83:18, 83:21, | 19:14, 20:14, |
| **describe** | 21:19, 37:1, | 86:7, 87:16, | 21:18, 43:4, |
| 21:21, 154:4 | 43:22, 183:19 | 88:17, 88:21, | 43:6, 48:4, |
| **described** | **difficult** | 89:20, 90:7, | 161:5 |
| 22:18, 22:19 | 54:18, 54:23, | 90:14, 92:3, | **discriminating** |
| **describes** | 55:12, 138:17, | 93:3, 93:21, | 69:1 |
| 30:16 | 155:21 | 95:12, 95:18, | **discrimination** |
| **description** | **direct** | 97:6, 97:10, | 22:14, 22:18, |
| 121:4 | 67:23, 159:18, | 97:18, 97:24, | 24:3, 24:16, |
| **deserve** | 173:14 | 98:11, 99:2, | 28:14, 28:15, |
| 181:21 | **direction** | 102:9, 103:10, | 28:24, 29:5, |
| **designee's** | 37:3, 192:11 | 103:17, 104:4, | 30:11, 31:18, |
| 101:20 | **directly** | 105:7, 106:9, | 32:5, 32:18, |
| **despite** | 12:4, 69:2, | 117:24, 122:8, | 34:3, 43:7, |
| 129:10, 188:6 | 104:6, 131:8 | 126:9, 129:12, | 43:21, 44:1, |
| **detail** | **director** | 129:13, 130:6, | 44:7, 44:10, |
| 60:23, 64:18, | 46:18, 48:21, | 131:14, 132:10, | 44:13, 45:6, |
| 88:23, 90:5, | 51:2, 56:7, | 135:22, 136:13, | 46:22, 47:11, |
| 154:4 | 56:8, 56:10, | 139:1, 139:3, | 48:14, 158:18, |
| **detailed** | 56:15, 56:20, | 139:4, 163:24, | 159:18, 166:20, |
| 150:7 | | | |

Transcript of Michelle Strickland
Conducted on August 21, 2020

59

168:1, 170:11
**discriminations**
40:24
**discriminatory**
80:12, 126:7,
132:18, 149:10,
165:11
**discuss**
54:18, 54:19
**discussed**
41:9, 65:7,
110:17, 112:14,
165:16, 184:13
**discussion**
7:2, 50:24,
127:3, 173:10,
176:19
**disliked**
109:14, 132:16
**dismiss**
26:12
**dismissed**
68:2
**dismissing**
67:23
**disorder**
158:7
**dispatched**
178:20
**disposition**
101:18
**dispute**
28:4, 28:7,
119:14
**distinguish**
160:7, 160:17,
161:17, 161:18
**distress**
154:3, 154:7
**district**
1:1, 1:2, 12:8
**division**
1:3, 15:13,
15:14, 15:16,
15:20, 176:17
**docked**
145:23, 146:2,
146:3, 146:6,

146:7
**doctor**
169:24, 170:3,
171:14
**document**
22:9, 24:9,
25:14, 27:3,
27:9, 27:16,
28:6, 29:13,
29:15, 31:7,
31:11, 31:12,
31:14, 61:17,
87:6, 87:10,
87:24, 91:6,
92:2, 94:1,
94:10, 95:23,
96:1, 98:3,
98:4, 98:5,
98:10, 98:16,
99:14, 106:5,
106:7, 114:8,
114:12, 119:18,
136:20, 147:19,
148:19, 173:23
**documentation**
5:6
**documents**
10:17, 13:12,
13:21, 13:22,
13:24, 27:5,
97:14, 131:11,
173:12, 175:21
**doing**
38:21, 75:6,
113:2, 113:7,
188:23
**dollar**
150:23, 151:6,
151:8, 152:16,
152:20, 153:2,
153:4, 153:8,
170:10, 170:13,
171:11, 191:5
**domiciliaries**
12:17
**done**
22:8, 37:6,
71:7, 84:18,

94:6, 95:20,
101:5, 105:24,
106:14, 130:16,
172:8, 181:17,
187:24
**doomed**
130:15
**doubt**
95:24
**doubting**
96:2
**down**
7:14, 7:17,
12:14, 13:2,
13:3, 14:3,
22:24, 24:15,
25:20, 29:22,
36:23, 38:3,
38:5, 43:20,
47:6, 61:5,
61:23, 70:10,
71:20, 73:21,
74:16, 74:20,
74:22, 75:5,
75:10, 78:15,
87:23, 92:6,
92:9, 92:21,
93:9, 93:24,
95:5, 96:5,
98:12, 100:15,
100:24, 101:6,
105:9, 106:23,
116:21, 118:7,
118:19, 124:7,
124:17, 128:3,
128:4, 136:14,
136:21, 138:21,
142:8, 150:4,
150:24, 152:20
**downstairs**
35:22
**downtown**
111:10
**draft**
101:10
**drafted**
101:12
**drafts**
101:11

**dread**
160:3
**dreaming**
161:20
**drill**
148:22
**drive**
112:19
**drove**
178:12
**dude**
118:3
**due**
127:15, 129:1,
140:10, 164:2
**duly**
6:3
**during**
9:9, 70:18,
129:22, 148:9,
182:15, 182:19
**duties**
188:19
**duty**
18:21, 18:24,
25:8, 177:21,
178:1, 178:4,
178:8, 178:23

**E**

**each**
7:7, 43:11,
43:12, 43:13,
44:24, 47:22,
49:15, 122:23,
129:6, 140:6,
143:13, 150:7,
164:7, 168:23,
183:10, 184:8,
184:15
**earlier**
184:7
**earned**
40:4
**earshot**
51:20
**ease**
91:2

Transcript of Michelle Strickland
Conducted on August 21, 2020

60

**easiest**
54:17
**eastern**
1:3
**education**
10:24, 11:1
**eeoc**
4:16, 22:11,
23:12, 29:20,
127:8, 127:17,
127:22, 128:6,
128:15, 128:17,
142:10, 142:14
**effect**
180:16
**egregious**
159:24
**eight**
54:14, 141:5
**either**
37:16, 130:15,
139:16, 182:17
**electronic**
17:13, 31:15,
35:16, 42:4,
52:12, 72:4,
95:8, 96:11,
149:17
**eligible**
176:15
**else**
9:19, 33:21,
52:7, 52:10,
53:6, 59:20,
120:13, 120:16,
122:21, 125:18,
131:9, 141:13,
157:7, 165:15,
185:6, 189:2
**email**
5:8, 136:22,
137:23, 144:19,
185:5, 185:8
**emails**
175:24
**embedded**
21:1
**emery**
3:12

**emotion**
154:18
**emotional**
54:19, 54:21,
54:22, 154:2,
154:6, 154:22,
155:20, 157:24,
160:1, 169:16
**empathy**
132:2
**employed**
174:15, 192:13
**employee**
14:8, 41:23,
80:10, 139:3,
175:21, 180:23,
187:13, 187:19
**employees**
51:3
**employer**
101:19
**employer's**
101:20
**employment**
87:17, 143:14,
180:18
**emu**
19:5, 94:11,
143:17
**encounter**
107:20
**encountered**
40:24
**end**
15:11, 108:23,
108:24, 116:3,
116:5, 129:14,
147:17, 161:20,
178:22
**ended**
142:7, 155:18,
155:24, 187:8,
187:9
**ends**
127:12
**endurance**
50:17
**endure**
127:7, 127:16,

**128:14, 149:13**
**engaged**
128:23
**engaging**
24:18
**enough**
50:2, 83:17,
154:15, 154:16
**entire**
34:18, 95:16,
99:11
**environment**
20:11, 20:19,
20:24, 21:3,
21:11, 21:12,
21:16, 21:17,
30:21, 159:24,
160:21, 160:24
**equal**
149:9
**equipment**
72:8, 119:2,
140:19, 140:24,
178:15, 179:4
**errands**
112:24
**esquire**
3:3, 3:11, 3:19
**essentially**
190:23
**establish**
88:20
**established**
87:20, 123:20,
142:13, 146:9
**et**
1:5, 1:9
**ethan**
3:11, 6:7
**even**
7:10, 41:6,
42:17, 52:23,
54:20, 64:11,
73:19, 84:5,
93:18, 97:15,
102:19, 106:22,
113:5, 118:2,
118:16, 125:8,

129:4, 129:23,
130:3, 132:1,
160:4, 181:18
**event**
100:13
**eventually**
105:8, 131:13
**ever**
6:10, 11:4,
11:6, 12:24,
13:8, 13:9,
18:8, 18:10,
18:13, 31:20,
33:7, 34:24,
41:22, 43:3,
45:8, 46:9,
46:14, 46:18,
46:21, 50:15,
51:3, 58:24,
59:2, 59:14,
63:17, 64:15,
66:13, 66:16,
67:5, 68:24,
69:3, 72:15,
72:17, 75:19,
75:20, 75:23,
76:5, 77:7,
80:7, 80:9,
80:12, 85:6,
85:13, 86:16,
86:19, 92:18,
93:14, 93:17,
97:13, 98:21,
107:7, 107:12,
112:7, 112:17,
113:15, 119:14,
122:18, 126:19,
131:20, 134:10,
144:17, 146:15,
146:18, 158:4,
163:4, 166:17,
173:2, 173:6,
174:6, 175:9,
180:4, 180:7,
182:17, 183:3,
184:1, 188:16,
189:5, 189:12,
189:15, 189:18,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                           61

189:23, 190:1,
190:4
**every**
21:23, 49:21,
49:22, 50:19,
54:2, 54:19,
54:21, 64:6,
64:10, 79:14,
103:17, 105:20,
106:9, 112:20,
114:21, 129:9,
132:9, 132:11,
132:20, 140:6,
143:3, 143:6,
143:13, 150:7,
169:24, 171:13,
187:13, 187:19
**everybody**
16:1, 41:8,
43:6, 43:19,
47:17, 47:21,
52:2, 109:13,
113:7, 184:15,
187:11
**everyone**
8:7, 54:12
**everyone's**
107:3, 107:9,
109:14
**everything**
7:13, 21:1,
31:8, 41:9,
47:13, 49:2,
84:4, 84:14,
84:15, 111:11,
130:17, 134:22,
144:15, 162:18
**everywhere**
108:12, 134:10
**evidence**
12:5, 38:4
**exact**
17:11, 43:9,
44:15, 44:17,
46:2, 56:23,
76:22, 78:13,
125:5, 147:13,
154:11, 156:14,

162:7, 162:8,
171:10
**exactly**
136:11, 136:12,
182:12
**exam**
147:5, 147:8
**examination**
4:5, 6:4,
172:19, 186:10,
190:18, 191:9
**example**
188:12, 189:6
**except**
116:11
**excessive**
122:9, 143:15,
164:2, 164:8,
164:15, 164:16
**exchange**
131:10
**excluding**
166:18
**excuse**
84:7, 118:24,
125:3, 130:14
**executive**
133:12
**exhibit**
4:15, 4:16,
4:17, 4:18,
4:20, 4:21,
4:22, 5:3, 5:5,
5:7, 5:9, 5:13,
5:14, 11:21,
11:22, 12:7,
22:1, 22:2,
22:10, 23:23,
24:1, 25:11,
25:12, 25:14,
26:22, 26:23,
27:1, 29:10,
29:11, 29:13,
37:6, 61:9,
61:11, 61:14,
61:18, 87:2,
87:4, 87:6,
90:16, 90:19,

90:24, 96:3,
106:14, 113:18,
114:3, 114:5,
119:6, 120:10,
123:12, 124:6,
124:22, 128:6,
136:15, 136:18,
136:20, 140:4,
148:12, 148:14,
148:16, 158:21,
159:1, 159:3,
162:20
**exhibits**
4:14
**exiled**
64:8, 74:16
**exist**
108:10, 108:12
**existed**
13:15
**exiting**
16:2
**expense**
168:23
**expenses**
153:21, 153:22,
169:11, 169:23
**experience**
21:2, 32:18,
65:4, 120:19,
122:22, 125:6,
143:4, 183:17
**experienced**
60:6, 162:1
**experiences**
70:6, 80:4
**experiencing**
60:12
**expires**
192:20
**explain**
152:18, 180:11
**explained**
118:6
**explanation**
95:11, 95:17
**external**
15:5, 15:7,

15:9, 15:12,
67:15, 67:18,
68:5

**F**

**f-i-t-a-n-d-s-a--
s-s-y**
163:11
**face**
153:17
**facebook**
163:3, 163:5,
163:16
**fact**
37:2, 49:12,
53:19, 73:18,
97:21, 102:19,
103:23, 134:2,
136:10, 139:22,
144:24, 181:11,
181:14
**facts**
37:14, 55:8,
55:14, 55:15,
55:17, 115:10
**factual**
13:4
**fails**
163:24
**fair**
47:13, 48:1,
49:20, 60:5,
72:2, 73:24,
74:4, 75:9,
78:1, 78:12,
118:2, 120:20,
136:8, 138:13,
149:9, 151:14,
164:5, 164:19,
168:19, 168:21,
184:18
**fairly**
61:1, 71:9,
137:6
**fake**
98:4, 98:10,
135:16
**fall**
75:7, 162:9,

Transcript of Michelle Strickland
Conducted on August 21, 2020     62

| | | | |
|---|---|---|---|
| 162:10 | 64:11, 65:9 | 127:16, 128:14 | **fitandsassy2** |
| **false** | **ferguson** | **finally** | 163:12 |
| 14:9, 44:13, | 63:3, 63:4, | 8:10, 142:9 | **fitness** |
| 61:19, 166:23, | 63:9, 63:13, | **financial** | 163:14, 163:20 |
| 167:1, 168:1, | 63:18, 64:3, | 13:12, 13:21, | **five** |
| 185:21, 186:13 | 64:15, 65:14, | 13:23, 192:15 | 40:1, 89:22, |
| **familiar** | 169:18 | **find** | 92:4, 95:12, |
| 112:10 | **few** | 122:18, 139:18, | 125:18, 156:17, |
| **far** | 155:24, 172:17 | 160:14 | 170:12, 172:8, |
| 12:21, 24:11, | **field** | **fine** | 181:3 |
| 60:5, 68:17, | 72:10 | 35:23, 50:16, | **five-day** |
| 166:13 | **fight** | 50:19, 61:15, | 93:6, 93:21, |
| **father** | 138:7, 138:8 | 81:1, 111:16, | 95:19, 97:13, |
| 34:15, 69:15 | **fighting** | 128:1, 128:7, | 115:10, 115:13, |
| **faulkner** | 129:18 | 147:23, 158:2, | 115:18, 116:2, |
| 116:10, 116:24, | **figure** | 162:18, 168:19, | 117:14, 118:12, |
| 120:15, 121:6, | 36:6, 44:4, | 172:10 | 129:19, 169:6, |
| 121:20 | 55:8, 88:17, | **finish** | 181:16 |
| **fear** | 101:22, 124:5, | 7:7, 48:12, | **five-days** |
| 21:20, 127:15 | 125:9, 126:9, | 56:18 | 181:22 |
| **feared** | 153:13, 161:12, | **firm** | **five-minute** |
| 129:14 | 161:13, 170:24, | 3:4 | 80:23 |
| **february** | 171:2, 171:4, | **first** | **fix** |
| 114:17, 136:24, | 171:9, 171:10 | 4:24, 5:11, | 144:21, 144:22 |
| 137:4, 137:12, | **file** | 7:5, 17:12, | **flapping** |
| 149:4 | 27:9, 27:13, | 24:6, 25:24, | 103:15, 130:2 |
| **federal** | 27:18, 28:9, | 37:9, 39:9, | **follow** |
| 11:12, 11:16, | 65:2, 82:5, | 39:15, 43:1, | 32:10 |
| 12:5, 186:12 | 105:11, 116:4, | 51:8, 51:17, | **follow-up** |
| **feel** | 127:14, 142:13, | 56:9, 67:17, | 186:8 |
| 21:18, 154:16, | 146:16, 146:19, | 69:22, 82:9, | **following** |
| 165:10 | 173:2, 173:6, | 85:4, 88:21, | 53:15 |
| **feeling** | 177:13, 187:22, | 91:3, 91:5, | **follows** |
| 21:22, 140:10 | 188:14, 188:16 | 95:4, 98:19, | 6:3 |
| **feelings** | **filed** | 98:20, 105:24, | **forced** |
| 160:2 | 11:12, 12:8, | 114:6, 115:14, | 21:23, 37:15, |
| **fellow** | 22:11, 23:11, | 119:6, 123:20, | 37:17, 165:5, |
| 184:21 | 25:7, 26:1, | 124:7, 124:24, | 165:6 |
| **felt** | 27:2, 27:9, | 128:6, 128:17, | **foreclosure** |
| 72:18, 141:5, | 28:1, 29:20, | 133:5, 136:22, | 167:12, 167:14 |
| 143:6, 164:3, | 62:7, 65:4, | 137:2, 140:10, | **foreclosures** |
| 164:5, 164:18 | 101:8, 127:22, | 148:18, 149:7, | 167:22, 167:24 |
| **female** | 128:17, 142:10, | 162:23, 178:17, | **foregoing** |
| 16:24, 159:19 | 158:12, 158:13, | 178:21, 189:7, | 29:24, 114:13, |
| **females** | 165:24, 166:14 | 189:8, 189:10 | 149:1, 192:6, |
| 16:22, 17:1, | **files** | **first-level** | 192:8 |
| 114:22 | 103:7 | 137:7 | **forest** |
| **ferg** | **filing** | **fitandsassy** | 11:6, 12:18 |
| 63:5, 64:5, | 24:15, 127:7, | 163:10 | |

Transcript of Michelle Strickland
Conducted on August 21, 2020

63

forever
21:1
forgive
54:17, 55:1
forgiveness
55:2
form
26:13, 27:22,
28:3, 105:11,
172:24, 173:4,
177:10, 185:14
formal
123:18
former
110:12
forthcoming
177:5
forward
43:18, 43:24,
44:6, 44:9,
45:5, 65:2,
169:8
found
27:17, 116:12,
116:13, 116:23,
117:1, 117:2,
117:14, 118:9
foundation
19:6, 26:13,
27:22, 31:5,
40:17, 65:23,
103:11, 110:15,
111:20, 132:7,
173:4, 174:14,
175:18, 176:11,
177:10, 180:15,
180:20, 182:3,
182:20, 183:6,
183:14, 183:21,
184:4, 184:19,
185:2, 185:14,
187:2, 191:2
four
89:22, 153:11
frame
17:11, 47:9,
75:24, 79:15,
79:16, 87:24,

99:5, 99:8,
99:9, 103:8,
171:17, 182:12
frames
147:14
fraud
11:17, 11:19
fraudulent
14:9
frequency
77:15
frequently
17:10, 35:10,
35:13, 35:15,
73:9, 74:20,
74:22, 83:10
friday
1:15, 10:4,
10:5
friend
76:10, 76:18,
76:19
friendly
79:21
friends
34:12, 42:5,
76:7, 76:12
front
8:24, 9:2,
12:10, 33:22,
80:18, 98:12,
113:6, 117:19,
129:3, 158:15
frown
43:11
full
8:11, 126:20,
126:21, 157:23
funny
67:7
further
129:15, 142:11,
186:8, 191:8
furthermore
142:10, 145:20
future
75:1, 75:3,
117:1, 118:11,

149:14, 152:18,
178:20

**G**

gain
151:8
gained
151:1, 151:6
gaining
150:20
game
7:24, 127:23
gang
144:7, 144:12,
145:8, 145:11
gathered
179:1
gave
63:1, 121:3,
122:14, 132:10,
132:21, 136:10,
164:21
gender
30:12, 106:19,
106:21, 125:1,
125:8, 158:17,
159:19
general
66:20, 66:21,
70:14, 70:24,
180:18
generally
149:7, 154:4
germany
156:1
get-go
181:13
getting
76:14, 77:14,
77:16, 83:9,
117:20, 117:24,
118:22, 140:17,
142:7, 146:7,
177:13, 188:1,
191:14
girl
154:11
gist
91:16, 95:10,

95:15, 95:16
give
8:11, 9:9,
16:21, 24:5,
35:5, 43:14,
70:10, 78:7,
86:2, 86:3,
96:6, 96:21,
109:15, 118:19,
132:13, 132:22,
133:4, 136:12,
147:13, 174:21,
176:3, 183:9,
186:17
given
6:10, 50:11,
116:4, 155:12,
168:9, 180:4,
180:7, 180:10,
192:9
giving
60:10, 62:23,
62:24, 111:6,
139:17
go
10:22, 13:3,
13:13, 14:3,
15:12, 16:8,
16:17, 18:3,
27:17, 30:14,
39:8, 39:24,
41:16, 41:18,
41:20, 49:14,
49:15, 55:6,
59:4, 78:10,
78:14, 83:21,
84:3, 84:5,
86:18, 88:23,
89:14, 90:4,
90:12, 90:17,
90:24, 92:19,
92:22, 94:3,
96:3, 96:20,
98:24, 99:11,
100:24, 103:10,
105:9, 111:2,
112:4, 112:7,
112:24, 113:4,

Transcript of Michelle Strickland
Conducted on August 21, 2020

64

113:21, 113:24,
114:19, 115:8,
116:14, 118:4,
119:5, 120:9,
122:20, 124:2,
124:13, 124:17,
124:22, 127:1,
128:8, 128:21,
129:17, 131:24,
133:6, 136:21,
138:7, 138:14,
138:21, 139:11,
139:22, 140:4,
147:18, 150:2,
150:11, 150:14,
157:11, 160:4,
160:11, 161:9,
162:20, 163:1,
164:23, 165:5,
165:6, 166:16,
167:18, 168:4,
169:24, 170:4,
171:14, 172:9

**goes**
41:10, 123:5,
131:6, 150:3

**going**
6:23, 7:10,
8:7, 9:4, 9:12,
11:24, 13:21,
21:23, 34:14,
36:1, 49:15,
54:14, 55:3,
56:8, 56:17,
58:6, 58:7,
59:11, 85:14,
90:4, 91:3,
91:4, 97:13,
124:16, 126:18,
128:10, 137:16,
141:20, 143:21,
146:14, 147:18,
149:11, 149:24,
150:11, 152:20,
154:3, 154:19,
155:1, 157:18,
157:20, 157:21,
160:15, 169:5,

176:13, 183:10,
183:11, 185:19,
186:4

**gone**
7:5, 17:7,
73:22, 188:8,
188:10

**good**
6:6, 15:24,
36:12, 36:15,
48:23, 50:2,
50:3, 79:24,
81:4, 108:18,
108:19, 139:13,
139:16, 139:20,
191:20, 191:23

**gotten**
164:17

**government**
11:12, 11:16,
167:2, 186:13

**grabbed**
178:15

**grandmother**
131:23, 131:24

**granted**
139:8

**grass**
160:13

**great**
123:11

**green**
55:18

**greener**
160:14

**greg**
94:10, 95:7

**gregory**
4:23, 114:6

**grievance**
82:6, 82:8,
86:9, 90:10,
99:11, 101:7,
101:19, 120:1,
127:14, 132:9,
137:3, 137:7,
137:9, 137:21,
164:4, 185:7

**grievances**
120:4

**grievant's**
101:14

**grieve**
85:20

**grieving**
129:16

**group**
72:5, 165:23

**grove**
8:20

**grow**
10:20

**guard**
100:6, 100:11

**guess**
15:10, 18:11,
52:15, 70:11,
91:19, 96:10,
100:10, 108:17,
112:23, 125:9,
142:17, 160:16,
161:12, 164:13,
174:5

**guessing**
7:24, 102:15,
127:23, 141:16

**guy**
72:16, 116:21,
118:6, 118:19,
161:2, 161:3

**guys**
10:2, 10:8,
34:12, 64:22,
65:3, 65:8,
117:1, 129:17,
165:23, 181:19,
188:21

**H**

**hall**
44:23, 52:12

**hand**
141:19, 192:17

**handled**
97:10

**hands**
130:22, 133:8

**grievances**
120:4

**handwritten**
105:12

**hang**
129:13

**hanging**
146:13

**happen**
51:9, 59:17,
120:5, 121:21

**happened**
6:16, 11:18,
30:24, 31:3,
31:10, 31:15,
43:15, 45:2,
51:11, 53:19,
70:20, 83:8,
90:9, 91:22,
97:22, 102:17,
115:24, 117:11,
120:6, 120:19,
120:20, 121:2,
121:23, 122:5,
122:6, 122:16,
122:21, 127:19,
138:5, 138:8,
144:1, 161:22,
180:11, 182:6,
189:7

**happening**
86:17

**happens**
50:20, 161:19

**happy**
7:20, 61:2

**harass**
146:5

**harassed**
24:17, 161:6

**harassment**
123:15, 123:17,
125:24, 142:11,
171:24

**hard**
33:13

**hashtag**
163:12

**he'll**
104:12

Transcript of Michelle Strickland
Conducted on August 21, 2020

65

**head**
7:16, 49:13,
51:7, 51:16,
53:11, 53:14,
53:18, 53:21,
54:4, 54:16,
54:21, 55:19,
56:8, 57:15,
126:2, 129:14,
132:15, 146:13,
153:6, 154:9,
181:3
**headaches**
160:2
**heads**
97:12
**health**
158:5, 158:10
**hear**
23:2, 35:7,
35:11, 35:17,
40:21, 41:2,
41:22, 48:24,
50:15, 50:21,
51:3, 51:14,
51:17, 51:19,
54:20, 65:10,
65:13, 65:20,
72:21, 80:7,
80:9, 80:12,
80:16, 80:19,
80:21, 82:8,
83:14, 83:23,
107:7, 112:17,
124:20, 137:16,
137:21, 145:13,
145:16, 145:18,
147:16, 173:8,
182:24, 185:6,
185:17
**heard**
13:9, 38:16,
40:18, 51:4,
51:12, 51:18,
51:21, 52:3,
56:5, 78:6,
82:11, 83:11,
83:13, 102:1,

113:1, 113:15,
132:14, 133:4,
190:11
**hearing**
33:13, 40:16,
56:2, 59:2,
64:23, 72:21,
85:20, 86:10,
94:11, 94:13,
94:14, 94:24,
102:2, 129:15,
136:2, 136:3,
137:2, 164:20,
176:4, 185:7,
185:11, 185:12
**hearings**
28:12, 65:15,
75:12, 82:17,
105:3
**hears**
154:19
**heated**
52:21, 52:23
**held**
2:1, 7:2,
50:24, 127:3
**hello**
66:8
**help**
9:5
**helpful**
128:5
**hence**
129:16
**herbert**
3:4
**here**
13:15, 24:5,
55:13, 62:17,
73:24, 79:2,
86:6, 90:4,
98:22, 105:6,
116:6, 150:2,
151:16, 152:23,
168:4, 177:18,
191:22
**hereby**
192:7

**hereunto**
192:16
**hey**
84:21, 116:24,
117:12, 118:11,
118:18, 141:18,
169:8, 181:19,
181:21
**hi**
34:13
**high**
10:22, 10:23
**high-incident**
110:20, 111:2,
111:12, 111:15,
111:19, 111:23,
112:7
**high-risk**
111:6, 113:13
**higher**
150:15
**highest**
10:24
**himself**
104:12
**hipaa**
155:3, 155:10,
155:12, 155:13,
157:16
**hired**
53:10, 53:12
**history**
5:4, 87:9,
122:1
**hit**
118:19
**hold**
6:24, 43:12,
126:24
**home**
8:16, 8:17,
112:21, 112:24,
113:4, 113:16,
143:3
**honestly**
52:17, 62:12,
67:10, 186:24
**hook**
171:8

**hopefully**
149:12
**hoping**
149:7
**hopping**
160:12
**hostile**
20:11, 20:18,
20:23, 21:2,
21:10, 21:12,
21:16, 21:17,
30:21, 159:23
**hour**
10:9, 191:5
**hourly**
151:3
**hours**
54:14
**house**
112:18, 113:6,
119:3, 140:21,
167:9
**housed**
15:15, 17:2
**however**
40:1, 139:4,
168:11
**hr**
32:14, 32:24,
33:1, 33:21,
40:12, 41:18,
48:7, 48:17,
57:24, 75:20,
174:20
**huge**
131:9, 181:15
**human's**
116:14
**humiliation**
154:2, 154:6

**I**

**idea**
14:14, 99:7,
102:16, 120:2,
120:23, 121:3,
165:18, 186:21,
186:22

identical
118:15
identification
11:23, 22:3,
24:2, 25:13,
26:24, 29:12,
61:12, 87:5,
90:20, 114:4,
136:19, 148:15,
159:2
identify
115:10, 123:14,
128:22, 140:6,
143:13, 150:6,
163:22
ignored
100:3
illegal
13:14, 14:12
illinois
1:2, 2:11, 3:7,
3:15, 3:23,
8:21, 12:8,
12:18, 12:19,
192:6, 192:24
illness
169:16
imagine
55:6, 181:1
important
141:21, 143:2
impose
21:10
imposed
187:19
in-house
84:4, 84:15,
86:7, 188:1
incident
6:16, 13:20,
91:9, 96:10,
96:13, 97:22,
99:21, 100:1,
100:8, 104:8,
115:24, 116:10,
116:11, 116:16,
116:21, 120:9,
120:12, 121:2,

121:21, 122:4,
122:11, 122:18,
137:11, 137:13,
162:22, 173:17,
176:18, 176:21,
177:6, 179:22,
179:24, 180:11
incidents
51:6, 126:1
include
184:12
including
160:2
income
152:18, 168:6
incomplete
145:2
incurred
153:22, 153:23
individual
47:22, 82:10,
107:22, 130:11,
137:6, 159:17,
181:2
individuals
16:5, 36:22,
36:23, 36:24,
37:1, 107:21,
126:14, 130:12,
130:18, 131:18,
168:9
induces
21:19
information
9:9, 9:13,
30:3, 54:10,
122:15, 177:7,
179:2
informed
102:19, 103:20,
103:22, 117:18,
130:1
infraction
49:8, 181:18
initial
90:6, 92:3,
94:14, 94:24,
155:22, 157:10,

166:8
initially
18:3, 62:18,
62:20, 67:14,
70:9, 141:2,
144:22, 187:5
initiate
130:12
initiated
78:2, 78:10,
78:21, 104:3,
129:4, 129:9
initiating
100:16, 131:4,
132:14
injured
18:15
injury
73:12
inmate
6:15, 91:18,
119:7, 119:9
inmate's
91:19
inside
116:13, 116:14,
116:15, 118:4,
141:5, 141:8
insofar
68:14
instagram
163:3, 163:9,
163:17
instance
103:17, 140:6
instantly
180:10
instead
71:12, 71:14,
92:8, 118:10,
181:21
instruct
78:4
instructed
104:16
instructing
130:18
insurance
169:14

intake
16:2
intense
160:3
intensifies
160:20
intentionally
14:12
interact
49:17, 49:20,
79:7, 79:9,
79:13, 79:17
interacted
68:18
interaction
21:5, 49:22,
74:1, 108:18
interactions
68:22
interdepartmental
175:21
interest
137:8, 137:19,
137:20, 192:14
interested
144:7
interject
67:21
interoffice
175:20
interrogatories
4:24, 5:12,
114:7, 148:19
interrogatory
114:19, 115:8,
128:21, 163:1
interrupt
7:8, 153:15
interview
144:23, 145:3
investigate
122:20
investigation
89:5, 169:1,
169:2, 169:18
investigative
40:5, 60:9
investigator
18:7, 40:5,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                      67

52:1, 54:15,
55:17, 55:21,
55:22, 56:7,
59:6, 60:15,
60:17, 66:3,
70:10, 72:7,
72:16, 108:3,
114:23, 116:8,
116:9, 117:15,
118:17, 120:13,
120:15, 121:6,
121:19, 121:20,
134:2, 152:22,
165:22, 184:22

**investigators**
37:15, 37:20,
37:23, 41:4,
49:7, 51:21,
51:23, 53:4,
53:5, 61:5,
71:12, 75:13,
75:14, 107:1,
111:1, 112:9,
112:12, 116:1,
118:15, 122:7,
122:8, 122:10,
122:17, 123:2,
125:2, 125:3,
125:5, 138:4,
138:19, 154:13,
176:20, 177:1,
182:17, 183:19,
183:20, 184:2,
184:8, 184:13

**involved**
154:18, 166:18,
166:19, 167:14,
167:21, 176:20

**ironic**
96:23, 97:5,
97:9

**issue**
87:24, 158:5,
165:1, 171:2,
174:20, 181:13,
181:15, 184:1

**issued**
18:4, 174:10,

175:12
**issues**
158:10, 162:15,
172:22
**item**
168:23
**itemize**
168:23
**items**
52:18

---
**J**

**jail**
16:5, 84:18,
128:8, 128:11,
135:2, 138:17,
141:5
**january**
18:21, 26:7,
26:17, 27:19,
102:22
**jefferson**
3:5
**job**
1:22, 6:19,
6:20, 6:21,
18:15, 28:13,
36:12, 36:15,
36:18, 50:3,
55:5, 55:8,
56:9, 65:5,
66:9, 79:24,
122:20, 138:16,
140:11, 143:3,
145:1, 145:5,
145:10, 145:13,
154:14, 160:4,
178:21
**jobs**
65:6, 129:18,
135:5, 143:7,
147:9, 147:11,
147:14, 151:18
**joined**
19:5, 19:24,
20:3, 20:6,
20:11
**joining**
20:13

**judge**
137:7, 138:4,
158:15
**judged**
137:5
**july**
22:11, 23:11,
23:12, 24:16,
24:24, 29:20,
93:11, 128:18,
155:3
**june**
15:2, 18:22,
88:4, 89:24,
90:6, 94:12,
173:16, 173:20
**jury**
138:5
**justin**
3:19

---
**K**

**kane**
192:5
**keefe**
117:15, 118:1,
118:17
**keep**
33:12, 54:11,
58:6, 58:7,
61:16, 121:12,
123:7, 124:16,
131:19, 138:10,
141:4, 141:21
**kelly**
3:3, 157:19
**kept**
128:10
**kevin**
165:2
**keys**
179:4
**kick**
78:9, 82:21,
83:1, 83:2,
86:15, 86:19,
102:6, 105:3,
105:6, 130:13,

130:14
**kicked**
61:4, 70:9,
86:16, 136:14
**kind**
6:14, 8:13,
16:4, 49:8,
60:9, 64:2,
66:19, 70:11,
71:1, 72:11,
73:23, 83:10,
86:6, 86:23,
91:1, 136:9,
138:9, 141:7,
165:19, 165:23,
170:24, 181:18,
184:15, 188:23
**kinds**
185:4
**knew**
72:9, 104:8,
130:3, 184:15
**knife**
91:18, 116:17,
116:19, 116:23,
117:2, 118:9,
119:9, 122:2,
126:6, 173:21,
176:18, 180:1
**knives**
116:18
**knowing**
121:8, 121:13,
176:14
**knowingly**
14:7
**knowledge**
11:14, 30:2,
81:15, 98:13,
109:6, 110:24,
111:24, 176:19,
181:5, 182:1,
183:3, 184:1,
184:6
**known**
34:8, 58:10,
154:8, 184:24
**knows**
67:17

Transcript of Michelle Strickland
Conducted on August 21, 2020
68

krauchun
3:3, 4:7, 4:9,
11:24, 19:6,
19:11, 19:16,
20:20, 26:11,
27:21, 28:17,
28:19, 29:1,
29:7, 31:5,
36:16, 44:2,
65:23, 67:21,
81:1, 81:4,
97:7, 97:20,
98:1, 98:6,
103:4, 103:11,
110:15, 111:20,
122:3, 130:9,
132:7, 133:1,
147:21, 147:24,
158:2, 172:10,
172:17, 172:20,
174:4, 177:8,
177:10, 182:22,
186:7, 187:1,
187:15, 190:16,
190:19, 191:8,
191:23

**L**

lack
177:5
lacks
185:2
ladder
78:14
ladonna
11:9, 12:16
lady
181:21
language
57:17, 80:13,
80:17
larger
12:12, 22:6,
25:19, 29:17,
90:21
lasalle
3:21
last
23:20, 25:24,

27:16, 31:22,
31:24, 56:6,
57:1, 57:2,
69:17, 85:10,
106:7, 114:10,
124:16, 127:5,
127:6, 127:12,
129:9, 148:23,
153:5, 153:10,
156:4, 156:22,
163:7
late
102:21, 145:21,
168:8, 168:12
later
28:1, 95:21,
103:1, 131:23,
155:24, 156:1,
162:17, 162:24
laughed
52:5
law
3:4, 3:12
lawsuit
13:8, 13:10,
13:17, 13:18,
14:1, 14:14,
14:18, 19:13,
21:9, 22:20,
24:22, 26:1,
27:13, 27:18,
28:9, 54:8,
55:9, 61:20,
62:5, 62:10,
62:15, 62:23,
68:12, 69:19,
76:2, 106:15,
110:19, 149:8,
149:21, 158:13,
158:17, 159:3,
159:6, 159:21,
160:5, 160:8,
160:10, 160:17,
160:18, 165:14,
165:18, 166:14,
167:17, 169:22,
170:8, 170:9,
170:23, 171:3,

185:21, 185:22,
186:21, 187:8
lawsuits
167:5
lawyer
165:21
leading
180:15, 184:19,
185:1, 191:2
learn
53:1, 53:2,
143:19
learned
41:15, 53:3,
136:13, 164:10
learning
130:1
least
12:10, 23:12,
91:9, 115:18,
127:6
leave
126:14, 131:7,
179:6, 179:9
leaving
20:24, 21:6,
152:21, 155:23
left
20:15, 20:19,
23:18, 23:22,
57:3, 57:6,
57:8, 57:9,
57:12, 58:17,
97:3, 97:11,
97:22, 100:2,
100:9, 100:11,
119:10, 119:19,
127:19, 128:12,
157:10, 162:11,
162:13, 162:15,
179:5, 182:11
leg
116:13, 116:15,
118:3, 118:4,
118:23, 119:1,
119:12, 119:20
legal
19:12, 20:21

legrain
1:5, 34:6
leinenweber
3:19, 3:20
length
184:7, 191:4
lengthy
95:11, 95:17,
131:10
less
107:17, 109:1,
109:4, 150:22,
191:5
let's
10:19, 13:3,
22:1, 23:22,
25:10, 29:10,
37:8, 39:8,
40:17, 48:24,
51:5, 56:1,
61:15, 67:16,
81:2, 94:3,
96:3, 96:20,
98:24, 100:24,
101:1, 105:9,
113:18, 114:19,
115:8, 124:7,
124:22, 127:1,
128:13, 128:21,
136:15, 138:20,
138:21, 139:11,
140:4, 148:23,
150:1, 150:2,
158:21, 161:9,
164:23
letter
144:24, 175:24
level
10:24, 130:15,
130:16, 133:5,
161:4
lie
121:1, 121:7,
121:10
lieutenant
23:4, 23:5,
23:7, 23:9,
134:15

Transcript of Michelle Strickland
Conducted on August 21, 2020                                      69

lieutenants
134:11, 135:8
life
21:20, 113:12,
143:1, 191:14
liked
132:16, 190:11
likely
141:14, 141:17,
157:13
lindsay
157:8
line
142:8, 176:21
linger
97:12
lingered
176:9
lingering
83:19, 86:24,
93:13, 97:2,
97:4, 98:14,
102:14, 169:7
list
49:16, 50:10,
72:5, 126:9,
151:16
listed
91:9, 92:2,
137:3
litigation
6:9, 12:2,
98:17, 153:20,
153:21, 167:8,
167:13, 174:3,
174:4, 174:6,
175:9
little
22:24, 37:8,
50:22, 67:7,
81:13, 92:21,
95:6, 124:17,
145:8, 154:4
live
11:4, 11:6,
112:13, 113:9
lived
179:13

lives
113:10
living
12:22, 55:24,
113:8, 162:3
llc
3:20
loan
11:16, 11:19,
14:10, 186:14
loans
14:11
located
8:15
location
178:20
logged
179:1
loggins
96:16, 124:14,
135:10
long
10:7, 15:9,
15:18, 15:20,
16:6, 16:15,
17:6, 34:8,
58:10, 73:22,
95:3, 99:1,
99:10, 103:1,
103:2, 109:17,
127:19, 128:18,
131:10, 142:14,
176:9
longer
51:20, 60:12,
97:3, 97:11,
98:15, 102:12,
174:12
longest
157:9
look
9:5, 9:12,
12:9, 25:10,
27:8, 30:18,
35:8, 35:19,
44:9, 90:5,
91:4, 101:13,
124:2, 127:10,

153:12
looked
27:14, 27:16,
31:22, 31:24,
59:5, 75:6,
105:20, 129:5,
166:21
looking
12:13, 43:11,
43:18, 43:24,
44:6, 45:5,
62:17, 65:3,
90:13, 101:2,
106:4, 127:5,
140:13
looks
23:11, 24:14,
62:3, 88:3,
89:19, 90:15,
92:11, 100:16,
101:17, 102:8,
104:1, 114:16,
124:11, 139:24,
149:13
looming
181:2, 188:7
lopez
54:15, 55:21
lose
28:13, 150:13,
150:19, 152:12,
152:19, 181:3
losing
181:1
loss
168:23
losses
169:11
lost
150:13, 150:17,
150:18, 152:20,
153:2, 168:6
lot
21:14, 21:21,
36:2, 37:15,
59:10, 63:19,
64:1, 64:5,
77:10, 83:17,

100:2, 100:9,
100:12, 103:14,
126:15, 126:20,
126:21, 131:7,
131:18, 131:19,
154:17, 173:10,
176:7, 176:19,
181:9
loudermill
28:12, 64:23,
65:12, 65:15,
72:21, 75:12,
129:15
love
163:20
low-incident
111:4
lunch
109:11

M

ma'am
12:6, 19:8,
19:13, 22:4,
25:18, 27:1,
28:14, 29:13,
30:4, 30:15,
33:12, 35:11,
35:23, 39:13,
44:4, 48:12,
50:15, 51:2,
54:8, 56:17,
61:17, 69:7,
79:2, 87:10,
88:5, 88:16,
91:5, 95:22,
97:23, 104:24,
106:4, 107:11,
111:13, 113:14,
114:5, 114:11,
119:17, 120:2,
121:13, 123:4,
131:16, 148:16,
159:7, 174:1,
183:8, 191:11
machine
116:23, 118:9
made
21:18, 51:10,

57:16, 71:10,
98:11, 110:13,
119:4, 135:1,
135:13, 135:15,
135:19, 144:16
**major**
49:11, 84:20,
86:4, 118:13,
179:21, 180:3,
180:10, 180:17,
181:7, 181:22
**majority**
37:22, 47:24,
66:22, 111:4,
111:5, 111:14
**make**
7:6, 8:5,
12:12, 19:18,
22:6, 25:19,
26:15, 29:17,
50:2, 57:16,
63:20, 76:10,
76:18, 76:19,
87:11, 89:10,
90:21, 113:23,
123:21, 127:23,
129:2, 129:3,
135:4, 135:6,
138:16, 144:11
**makes**
9:8, 37:11
**making**
71:12, 86:4,
101:2, 150:21,
151:11, 151:12,
151:13, 152:22,
186:13
**man**
37:4, 52:20,
120:22, 125:4,
125:8, 126:4
**management**
139:7
**manning**
67:11, 67:13,
67:14, 67:16,
68:4, 68:9,
68:14

**many**
6:12, 40:1,
47:1, 65:11,
106:22, 115:4,
138:3, 156:15,
156:16, 167:15,
168:11, 174:3,
187:6
**march**
17:13, 87:21,
88:13, 88:14
**mark**
61:14, 94:16,
94:19
**marked**
11:22, 12:7,
22:2, 22:9,
24:1, 25:12,
26:23, 29:11,
29:13, 61:9,
61:11, 61:17,
87:4, 90:19,
92:20, 94:4,
96:6, 114:3,
136:18, 136:20,
148:14, 159:1
**marlen**
94:8
**martin**
75:1, 165:2,
165:4, 165:8
**master's**
11:1
**math**
26:9, 153:6,
186:18
**matter**
73:18, 154:16,
154:20, 163:5
**matters**
178:19
**maybe**
17:8, 42:16,
42:24, 46:16,
46:17, 52:8,
66:15, 69:17,
72:13, 73:20,
92:20, 104:11,

106:1, 113:23,
126:5, 132:6,
147:21, 153:5,
156:18, 161:13,
167:11, 186:3,
186:20
**mcghee**
73:5, 73:6,
73:19, 74:1,
85:6
**mean**
38:5, 41:9,
41:10, 44:8,
46:17, 49:13,
53:6, 53:8,
53:15, 64:8,
68:1, 86:18,
92:13, 102:21,
103:16, 103:17,
130:20, 132:9,
132:10, 140:2,
152:1, 154:13,
160:11, 161:21,
164:18, 168:14,
169:24, 171:21,
180:21
**means**
7:15
**meant**
101:23
**media**
163:2, 163:13
**medical**
169:14, 169:23
**medications**
158:9
**meet**
67:14
**meeting**
10:3, 165:24,
166:10
**member**
139:6
**memo**
95:10
**memorandum**
174:7, 174:10,
175:2, 175:4,

175:10, 175:12,
176:3
**memorandums**
189:3
**memories**
21:15
**memory**
21:1, 173:18
**memos**
189:18, 190:5
**men**
120:21, 121:18,
177:4, 189:5,
189:10, 189:12,
189:15, 189:18,
189:21
**mental**
154:2, 154:6,
154:21, 158:5,
158:10, 160:7,
160:9, 169:16
**mentally**
154:15
**mentioned**
51:6
**merely**
139:2
**merit**
134:13, 134:18,
135:10
**messages**
9:13, 189:1,
189:15, 190:2
**messina**
116:7, 116:8,
116:9, 116:16,
116:17, 116:18,
116:24, 117:4,
117:13, 117:20,
118:4, 120:8,
120:11, 121:6,
121:19
**messina's**
120:13
**mice**
108:8, 108:10
**michelle**
1:13, 2:1, 4:5,

Transcript of Michelle Strickland
Conducted on August 21, 2020

71

6:2, 12:16,
147:24, 159:4,
172:21, 186:1,
191:6
**mid**
22:15
**mid-february**
102:22, 102:23
**mid-march**
102:24
**middle**
146:1
**midsentence**
49:6
**midwest**
3:13
**might**
16:22, 17:7,
17:8, 65:8,
83:8, 160:13,
172:8, 189:2
**mileage**
179:2
**miller**
105:13, 105:14,
105:17, 105:23,
106:1, 106:2,
106:7
**mind**
93:13, 153:16,
160:22, 160:23,
161:19
**mindset**
141:7
**mine**
83:18, 122:22
**minute**
150:1
**minutes**
10:9, 147:22,
148:1, 168:11,
168:14, 172:8
**mischaracterize**
98:9
**mischaracterizes**
44:2, 97:20,
98:6, 133:2,
187:16

**missed**
91:20, 122:2,
122:11
**missing**
153:7, 168:17
**misstates**
97:7, 133:1,
187:2, 187:15,
191:3
**mistaken**
65:8
**mistreated**
71:19
**mistreatment**
60:6
**mocked**
52:5
**mom**
11:11, 12:22,
13:9, 13:23,
167:3
**moment**
126:24, 170:18
**monetary**
168:23, 169:11
**monetarywise**
171:1
**money**
152:23, 168:17,
168:18, 171:3,
171:5
**monitoring**
17:13, 31:15,
35:16, 42:4,
52:12, 72:4,
95:8, 149:17
**month**
56:23, 69:17,
153:11, 156:14,
162:7, 162:8
**months**
16:16, 17:22,
23:17, 23:20,
26:8, 26:10,
26:16, 27:12,
28:1, 28:8,
98:19, 103:1,
103:2, 131:23,

155:24, 156:15,
157:4, 174:3
**more**
13:2, 51:9,
51:11, 61:1,
65:9, 66:24,
116:11, 139:5,
141:6, 150:21,
151:1, 151:8,
151:11, 151:12,
151:20, 152:23,
154:4, 181:13
**morning**
6:6
**most**
34:21, 41:11,
45:17, 45:18,
49:24, 50:1,
56:4, 56:6,
67:1, 111:1,
111:8, 143:2
**mother**
11:13, 14:7
**motion**
5:14, 26:12,
61:18, 62:7,
157:21
**mouth**
37:3, 181:11
**mouths**
130:21
**move**
65:2, 100:3,
176:17
**moved**
155:18, 175:24
**movement**
143:17
**moving**
155:24, 188:1
**much**
24:6, 59:8,
60:12, 64:8,
64:12, 70:2,
74:1, 79:12,
82:10, 83:22,
85:11, 97:11,
109:17, 116:11,

147:17, 154:16,
154:20, 157:20,
168:10, 170:19,
171:15
**multiple**
146:8, 165:3
**must**
26:1, 57:1
**myself**
117:15, 141:22

**N**

**n-word**
37:2, 38:8,
38:14, 38:16,
40:18, 41:16,
46:19, 80:7
**name**
6:6, 41:6,
41:7, 42:9,
53:6, 78:3,
78:22, 85:4,
85:5, 85:10,
85:15, 104:5,
129:10, 140:20,
144:9, 156:4,
156:22, 163:5,
163:7
**names**
65:10
**nappy**
49:13, 51:7,
51:16, 53:11,
53:14, 53:18,
53:21, 54:4,
54:16, 54:20,
55:19, 56:8,
57:15, 126:2,
132:15, 154:9
**narrative**
24:7, 30:15,
124:13
**nature**
179:20
**nd**
93:11
**neal**
20:5, 57:13,

68:19, 78:4,
82:24, 83:6,
83:7, 84:7
**near**
112:18
**nearly**
23:17
**need**
7:13, 7:19,
13:5, 14:4,
27:17, 29:15,
39:13, 48:12,
50:15, 55:2,
55:14, 56:17,
58:4, 58:5,
61:21, 76:9,
76:18, 76:19,
79:2, 79:3,
147:19, 157:15,
157:16, 157:17,
157:18, 170:19
**needed**
120:17
**needs**
110:14, 110:17
**neither**
183:11, 192:12
**nepotism**
72:9
**never**
11:18, 12:24,
13:9, 13:17,
13:18, 14:11,
14:19, 38:2,
38:16, 38:17,
39:12, 51:4,
68:14, 68:17,
69:2, 70:12,
71:8, 72:2,
72:6, 75:14,
75:22, 78:1,
80:6, 83:18,
84:1, 92:14,
92:16, 108:15,
108:19, 112:14,
112:19, 113:1,
113:17, 115:6,
126:19, 142:5,

144:11, 145:17,
145:18, 146:2,
146:9, 146:21,
155:3, 160:22,
164:3, 164:5,
164:19, 173:23,
175:1, 175:14,
180:6, 180:22,
187:14, 187:20,
190:11
**new**
24:6, 42:9,
53:10, 53:12
**newson**
42:1, 42:3,
42:10, 42:15,
43:3, 43:23,
44:5, 44:12,
45:8, 45:12,
47:16, 48:3
**next**
30:14, 86:14,
89:14, 89:15,
92:20, 94:3,
96:3, 96:20,
98:24, 100:24,
105:9, 115:12,
117:12, 124:11,
128:3, 130:14,
137:23, 138:20,
145:24, 168:5,
178:20
**night**
161:14
**no-win**
78:16
**nobody**
9:9, 146:6
**nodding**
7:16
**none**
19:3, 20:9,
20:14, 20:17
**nope**
77:19
**north**
3:21, 111:9,
144:8, 145:14

**northern**
1:2, 12:8
**notarial**
192:17
**notary**
2:10, 192:1,
192:4, 192:23
**note**
105:12
**noted**
12:3
**notes**
8:24, 172:9
**nothing**
22:19, 24:21,
36:4, 52:19,
66:19, 104:8,
106:21, 131:3,
133:4, 163:15,
191:8
**notice**
2:8, 4:18,
25:17, 25:21,
26:2, 27:14,
27:19, 174:22
**notification**
175:22, 175:23
**november**
26:17
**nowadays**
34:10
**number**
38:10, 38:13,
47:2, 64:1,
101:22, 163:11
**nutrition**
163:14

---
**O**
---

**oak**
3:15
**oath**
81:8, 148:7,
187:12
**object**
26:13, 183:9,
183:14
**objecting**
183:1

**objection**
12:1, 19:6,
19:11, 19:16,
20:20, 26:11,
27:21, 28:17,
28:19, 29:1,
29:7, 31:5,
36:16, 44:2,
65:23, 97:7,
97:20, 98:1,
98:6, 103:4,
103:11, 110:15,
111:20, 122:3,
130:9, 132:7,
133:1, 172:24,
173:4, 174:14,
174:24, 175:18,
176:11, 177:3,
177:8, 180:13,
180:19, 182:3,
182:20, 183:6,
183:21, 184:4,
184:19, 185:1,
185:14, 187:1,
187:2, 187:15,
191:2
**objections**
4:22, 5:9,
26:15, 114:5,
148:17, 169:17
**occasions**
165:3
**occur**
45:23, 46:24,
47:3, 47:7,
51:8, 52:11,
56:22
**occurred**
22:15, 28:15,
44:21
**october**
26:4, 26:16,
192:20
**oddly**
83:17
**off-the-record**
7:2, 50:24,
127:3

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    73

offense
125:19
offensive
57:17, 80:17,
80:20
offhand
32:12
office
6:8, 14:20,
15:1, 18:13,
29:3, 30:11,
31:18, 37:18,
39:6, 39:11,
39:16, 39:20,
59:19, 60:1,
60:2, 79:11,
87:8, 126:3,
133:19, 158:19,
166:4, 178:3,
178:17, 179:3,
188:18, 188:24,
189:2, 189:13,
189:16, 189:19,
189:22, 190:2,
190:5, 190:8,
190:12
officer
5:4, 14:8,
15:8, 15:17,
15:18, 15:19,
16:14, 17:4,
87:8, 104:6,
116:8, 164:20,
192:6
officers
136:2, 136:3,
164:1, 181:17
official
60:10, 71:13
often
34:10, 34:11,
34:16, 35:2,
38:9, 38:11,
38:14, 42:7,
42:14, 46:7,
49:17, 58:15,
58:19, 63:8,
63:23, 66:4,

66:6, 67:8,
68:9, 69:14,
73:7, 74:14,
74:21, 74:23,
75:5, 79:9,
79:17
oftentimes
77:21
oh
9:24, 23:6,
54:3, 73:13,
83:7, 90:2,
90:11, 94:19,
96:18, 123:12,
150:19, 161:8,
167:13, 188:2
old
102:13, 186:1,
186:2, 186:14,
186:17
olson
23:4, 23:5
once
42:17, 46:11,
51:9, 66:15,
78:5, 157:23
one
6:7, 6:15,
6:18, 7:1,
14:23, 27:5,
31:13, 38:1,
39:9, 39:15,
48:23, 51:5,
51:10, 51:12,
60:22, 67:9,
68:11, 70:8,
72:20, 75:16,
78:2, 78:14,
79:6, 82:11,
85:11, 85:14,
88:9, 89:8,
89:10, 89:15,
89:20, 90:3,
90:13, 91:5,
98:24, 101:2,
101:23, 102:5,
105:20, 105:22,
106:1, 106:7,

108:6, 115:1,
124:1, 124:4,
124:6, 124:7,
124:8, 124:9,
124:11, 124:12,
124:16, 124:17,
124:23, 126:24,
128:2, 128:17,
129:9, 130:17,
134:13, 143:2,
143:3, 144:7,
144:20, 145:6,
145:7, 145:11,
154:19, 156:2,
157:11, 160:12,
160:13, 162:22,
163:10, 163:15,
166:8, 173:20,
173:21, 180:1,
183:11, 190:16
one's
131:20
one-time
51:8
ones
70:8, 72:20,
122:14, 123:23,
147:10, 167:21
ongoing
52:4, 56:2,
162:2, 170:12
only
51:10, 82:3,
106:23, 115:1,
120:17, 121:22,
121:23, 122:1,
122:13, 123:9,
123:10, 155:5
open
9:7, 188:7
openly
122:14
operational
110:14, 110:17
operations
15:6, 15:7,
67:15, 67:18,
68:5

opinion
37:13, 37:14,
134:1, 183:7,
183:17, 183:23
opportunities
151:17
opposed
72:10, 109:5,
181:13
opr
33:24, 34:1,
34:4, 40:14,
41:20, 48:7,
48:19, 58:2,
76:6, 76:10,
76:18, 76:20,
87:8, 89:4
ops
15:9, 15:12
option
33:1, 34:2,
34:4, 84:9
options
92:12, 92:14,
100:22
order
89:6, 90:3,
91:1, 91:2,
114:1, 134:4
ordering
61:16
organization
133:19, 181:24
originally
61:4
other
7:7, 10:13,
10:17, 21:21,
27:2, 38:1,
39:23, 43:12,
43:13, 43:17,
44:21, 44:24,
51:20, 51:23,
53:3, 53:5,
53:20, 54:1,
57:16, 57:17,
60:24, 64:20,
64:22, 68:22,

78:5, 80:19,
106:8, 111:16,
122:10, 122:17,
122:21, 122:23,
123:1, 125:2,
128:3, 131:18,
138:4, 138:18,
143:16, 143:21,
144:8, 145:13,
147:9, 147:11,
150:14, 151:18,
160:14, 163:13,
167:5, 167:17,
167:21, 168:1,
168:6, 168:24,
169:11, 170:9,
176:15, 181:5,
181:17, 182:18,
183:11, 184:8,
188:21, 190:9
**other's**
184:16
**others**
14:8
**otherwise**
54:14, 178:19,
183:10, 192:15
**out**
7:9, 16:2,
16:5, 17:19,
27:17, 36:6,
37:2, 44:4,
46:11, 55:8,
61:6, 76:14,
78:7, 84:20,
86:22, 88:17,
89:5, 90:3,
91:1, 92:7,
92:11, 96:24,
97:2, 98:14,
101:22, 102:6,
102:14, 103:15,
105:3, 108:10,
112:4, 114:1,
116:14, 117:14,
118:12, 122:18,
124:5, 125:9,
126:9, 127:8,

128:18, 130:13,
130:17, 130:19,
130:21, 131:1,
131:7, 131:24,
133:5, 133:10,
140:21, 142:15,
144:14, 145:24,
149:8, 153:7,
153:13, 160:12,
160:14, 160:22,
160:23, 161:12,
161:13, 165:21,
169:7, 170:24,
171:2, 171:4,
171:9, 171:10,
177:14, 179:15,
187:23, 187:24,
188:3, 188:5,
190:20
**outcasted**
21:19
**outcome**
122:24, 174:20,
176:13, 186:23,
192:15
**outcomes**
122:6
**outside**
34:12, 42:5,
58:12, 141:8,
174:4, 174:6,
175:9, 176:17
**over**
9:17, 44:10,
72:6, 72:12,
86:5, 97:12,
116:22, 123:8,
129:13, 133:24,
146:13, 154:19,
170:12, 172:9,
172:15, 181:3,
183:10
**overtime**
46:17
**own**
62:1, 85:23,
86:7, 109:13,
133:9, 134:24,

135:1, 135:19,
139:18

**P**

**page**
4:5, 4:14,
12:10, 12:15,
13:3, 14:4,
24:6, 24:7,
30:14, 58:8,
58:10, 58:20,
59:3, 59:14,
88:1, 89:14,
89:19, 92:10,
92:20, 94:3,
96:3, 96:4,
96:20, 100:16,
101:1, 105:9,
114:11, 114:20,
115:9, 115:13,
119:6, 123:11,
124:12, 138:20,
140:5, 148:23,
150:3, 150:4,
150:10, 159:9,
168:5
**pages**
1:23, 91:3
**paid**
13:23, 109:1,
109:4, 109:7,
171:5, 171:7
**pair**
116:19
**pant**
119:10, 119:19
**pants**
116:19
**paper**
91:21, 106:3,
138:15
**paperwork**
65:5, 105:18,
118:11, 178:16,
179:1
**paragraph**
25:24, 30:18,
115:11, 123:15,

159:10, 159:16,
159:23
**paramilitary**
133:19, 134:8,
134:22, 181:23
**park**
126:23, 131:18
**parked**
126:22, 131:6
**parking**
21:13, 100:2,
100:9, 100:12,
126:15, 126:20,
126:21, 131:19,
137:13
**part**
51:17, 67:1,
73:16, 87:16,
107:19, 119:2,
127:6, 165:13,
176:5
**participate**
62:5
**particular**
102:5, 110:4,
160:21
**parties**
12:15, 192:14
**partner**
46:14, 58:24,
63:17, 66:13,
74:14, 74:24,
75:1, 76:23,
118:21, 120:15,
165:7
**partnered**
34:24, 63:21
**partners**
63:20, 77:2,
116:10
**party**
167:6
**passed**
69:15, 143:23
**passing**
21:7, 43:10,
44:24, 46:16,
47:4, 47:23,

Transcript of Michelle Strickland
Conducted on August 21, 2020

75

54:6, 58:18,
66:8, 69:20
**past**
44:24, 126:14,
126:19, 129:17,
143:4, 162:1,
175:23
**pat**
118:18
**pat-down**
118:17
**patricia**
156:6, 156:7,
156:12, 156:19
**patrol**
18:10, 112:4,
177:17, 177:18,
178:7, 178:13,
178:23
**patted**
116:21, 118:7
**paula**
1:24, 2:8,
50:21, 192:3
**pay**
92:7, 92:12,
145:21, 146:2,
146:3, 146:6,
146:7, 150:15,
151:4, 151:20,
170:1, 171:3,
171:13, 181:1,
181:2
**paycheck**
168:7, 168:10
**payments**
171:16
**payroll**
153:13
**peg**
116:13, 116:15,
118:3, 119:12,
119:20
**penalty**
29:24, 30:7,
31:8, 114:12,
149:1
**pending**
28:12, 64:24,

65:6, 65:12,
138:16, 176:16,
187:22
**penmanship**
62:17
**people**
28:11, 35:15,
37:9, 37:10,
38:4, 38:5,
38:7, 38:12,
39:23, 41:11,
45:18, 53:16,
54:2, 54:6,
54:12, 57:19,
57:21, 67:2,
67:3, 68:23,
71:2, 71:19,
71:20, 71:21,
72:9, 75:9,
80:19, 80:21,
94:23, 109:9,
112:8, 112:17,
121:22, 121:23,
122:1, 122:21,
134:15, 189:22,
190:8, 190:9
**percent**
35:3, 37:19,
121:9, 171:5
**percentage**
35:5, 111:6,
171:6
**period**
78:17, 82:3,
157:2, 172:2,
176:10, 181:16
**periodically**
64:22, 68:10
**perjury**
30:7, 31:8,
114:12, 149:1
**person**
11:10, 53:10,
53:12, 67:17,
78:10, 78:13,
78:15, 78:23,
82:9, 82:12,
83:5, 100:17,

154:8, 189:23,
190:1, 190:4
**person's**
68:22
**personal**
52:19, 100:2,
159:18, 178:12,
179:7, 179:8
**personally**
64:5
**personnel**
146:16, 146:19,
188:16
**pervasive**
30:21
**phone**
9:12, 116:4,
116:24, 117:9,
118:10
**phones**
179:4, 189:1,
189:6, 189:12,
189:23
**physical**
169:15
**physically**
8:15, 39:5
**picks**
31:13
**piece**
143:3
**pieces**
89:20, 90:14
**pig**
75:1
**place**
10:3, 13:22,
39:9, 39:12,
39:15, 39:17,
39:19, 70:21,
71:15, 77:22,
93:10, 102:20,
116:11, 117:9,
128:11, 131:22,
135:11, 156:11,
162:22, 166:3,
185:24
**placed**
116:21

**placing**
153:16
**plaintiff**
67:22, 127:13,
164:2, 169:18
**plaintiffs**
1:6, 3:2,
10:13, 27:2,
96:4, 166:1,
166:9, 172:19,
190:18
**please**
11:21, 22:1,
22:6, 22:7,
22:24, 23:24,
29:16, 29:17,
54:17, 55:1,
61:10, 61:13,
87:2, 87:3,
90:18, 98:24,
113:19, 113:20,
113:24, 114:11,
114:20, 119:6,
136:16, 136:17,
137:1, 140:4,
148:12, 148:13,
148:24, 150:5,
158:23, 162:21,
164:23, 166:17,
172:11, 173:19
**pocket**
91:19, 116:12,
116:17, 116:18,
116:23, 117:2,
119:10, 119:19,
122:2, 158:6
**point**
105:6, 139:18,
148:23, 153:3,
153:24, 157:6
**points**
37:3
**police**
16:9, 16:10,
16:12, 16:14,
16:17, 144:8,
145:14
**policy**
31:18, 31:20,

Transcript of Michelle Strickland
Conducted on August 21, 2020                    76

**pop**
31:23, 32:1,
32:5, 33:2,
33:5, 33:16,
33:22, 76:17,
81:16, 81:19,
135:22
**pop**
161:21
**portion**
89:19
**position**
12:24, 13:16,
40:4, 60:8,
66:9, 75:7,
114:23, 114:24,
137:5, 152:1,
155:18, 187:18,
189:5
**positions**
18:5, 134:16,
176:15, 177:14,
182:1, 182:4
**possibility**
150:15, 150:19,
152:7, 152:9
**possible**
86:9, 132:4
**post**
163:15
**posting**
163:4
**practice**
76:17, 126:14,
126:19, 157:21
**practices**
129:17, 149:10
**preclude**
177:13
**precludes**
187:22
**prefer**
107:2, 107:5
**preference**
107:4
**preferences**
107:9
**preferred**
107:8, 107:12

**prepare**
9:15, 10:17,
13:20, 13:23,
27:6
**prepared**
13:12, 13:22,
143:6, 143:7
**presence**
51:12
**present**
4:1, 14:8,
35:21, 38:15,
39:21, 39:24,
44:18, 46:3,
59:20, 60:18,
73:11, 87:19,
97:16, 98:3,
141:13, 166:9,
183:18
**presented**
14:7, 21:12
**pressing**
178:19
**pretty**
6:23, 59:8,
64:8, 65:12,
74:20, 74:22,
82:10, 85:11,
97:11, 109:17,
147:17, 171:15
**prevent**
149:12
**prevented**
143:16, 188:2,
188:12, 188:15
**previous**
31:12, 88:9,
166:7, 180:22
**previously**
60:7, 135:11
**prior**
28:16, 28:24,
81:11, 157:24,
165:24, 166:13,
173:24
**priority**
141:21
**privilege**
113:4

**probably**
6:22, 6:23,
7:4, 33:8,
34:18, 76:13,
83:18, 86:21,
90:22, 106:23,
148:22, 172:15,
184:23, 186:2,
186:20
**problem**
23:16, 114:2
**problematic**
176:8, 176:12
**procedure**
32:9, 32:11,
76:17, 78:1,
164:5, 164:19
**process**
16:5, 54:23,
86:13, 99:2,
99:11, 129:1,
164:4
**produced**
96:4, 98:2,
98:19, 174:3
**producing**
97:14, 98:12
**professional**
2:9, 58:13
**program**
119:3
**progressive**
49:10, 78:13,
81:14, 81:15,
81:19, 135:22,
135:24, 179:18
**prohibit**
143:17
**prohibits**
33:9
**projective**
36:13
**promised**
152:14
**promoted**
72:8, 152:7
**promotion**
150:16, 152:5

**promotions**
146:22, 147:6,
152:4, 152:5,
188:1
**properly**
143:5, 164:4
**protected**
24:18, 128:22,
140:8
**protocol**
140:20, 140:24
**proves**
146:4, 188:7
**provide**
54:10, 150:6
**provokes**
21:20
**ptsd**
158:8
**public**
2:10, 192:1,
192:5, 192:23
**pull**
11:20, 22:1,
23:23, 26:21,
29:10, 61:9,
87:1, 90:16,
104:11, 113:18,
124:6, 127:24,
128:5, 136:15,
148:12, 158:21
**pulled**
155:15
**punish**
55:13
**punishment**
64:2, 88:4,
108:16, 108:18,
108:19, 108:20,
108:21, 184:23
**punitive**
154:1
**purposes**
160:16
**pursuant**
2:8, 32:4
**put**
11:24, 14:22,

Transcript of Michelle Strickland
Conducted on August 21, 2020

77

45:16, 45:18,
47:18, 60:9,
63:2, 75:14,
75:15, 75:19,
78:3, 78:22,
91:2, 106:13,
112:16, 113:5,
113:6, 116:23,
118:7, 118:8,
138:3, 138:12,
138:15, 145:15,
169:4, 170:10,
170:13
**putting**
60:2, 75:10,
75:17, 113:10,
113:11, 113:12,
181:11

**Q**

**quality**
191:14
**queen**
23:7, 23:9
**question**
7:9, 7:22, 8:6,
15:24, 19:19,
23:1, 23:3,
28:21, 35:17,
45:11, 48:13,
56:18, 59:14,
62:22, 76:15,
78:18, 95:14,
95:22, 100:7,
103:24, 107:11,
111:13, 121:12,
123:8, 127:18,
128:13, 132:20,
141:18, 143:11,
143:18, 153:1,
169:10, 170:20,
174:5, 187:17,
188:11, 190:17
**questioned**
140:9
**questioning**
67:24, 176:22,
177:16, 185:8

**questions**
8:14, 52:18,
54:11, 55:12,
155:22, 157:10,
172:14, 172:18,
181:24, 182:15,
182:17, 182:18,
183:5, 184:3,
184:23, 185:4
**quetsch**
1:24, 2:8,
192:3
**queue**
178:18
**quick**
147:22, 190:16
**quite**
17:10, 35:15,
67:7, 83:10,
170:17
**quote**
24:15, 52:2

**R**

**r-e-e-s-e**
156:23
**race**
30:11, 30:22,
37:13, 106:19,
106:20, 115:19,
115:20, 115:22,
125:1, 125:7,
154:13, 158:18,
159:19, 172:23,
176:24, 184:18
**racial**
40:23, 80:15
**racially**
57:17, 80:16,
80:20
**racism**
38:5, 75:21,
149:12
**racist**
36:19, 37:3,
37:11, 38:7,
38:8, 50:8,
80:2, 125:11,

125:15, 125:20,
126:6, 132:18
**rack**
39:24
**raise**
141:19
**raises**
152:8, 152:9
**ran**
133:7
**randomly**
161:21
**rank**
70:12, 71:8,
135:10, 135:13
**ranked**
182:1, 182:4
**ranking**
71:13, 100:6,
134:12
**ranks**
72:11, 134:18
**ranzino**
19:23, 35:3,
35:7, 35:18,
36:9, 38:9,
38:24, 39:23,
40:16, 40:18,
41:15, 41:22,
55:11, 57:7,
59:3, 59:15,
65:19, 68:18,
71:6, 71:17,
78:4, 82:23,
83:3, 102:3,
108:23, 115:1,
123:17, 125:24,
126:12, 130:24,
139:23, 188:21
**rare**
42:23, 42:24
**rate**
150:15, 151:4
**rcdc**
15:21, 15:23,
16:4, 23:10,
117:3, 121:17
**reached**
165:21

**read**
9:17, 9:18,
14:4, 30:1,
31:20, 61:21,
91:15, 96:6,
96:8, 96:21,
99:16, 99:19,
101:3, 127:13,
128:9, 139:14
**reading**
13:11, 24:14,
92:24, 94:6,
95:16, 99:17,
101:5, 192:11
**ready**
13:6, 22:5,
92:23, 101:4
**real**
156:18
**realize**
76:22, 119:5
**realized**
103:3
**really**
72:7, 73:24,
157:17, 161:16,
189:21
**reason**
8:10, 28:4,
28:7, 28:10,
95:24, 104:4,
109:15, 113:10,
113:14, 121:1,
121:5, 121:10,
121:13, 125:10,
138:2, 145:17,
145:19, 155:9,
155:11, 169:4
**reasons**
65:1, 109:13,
109:15
**recall**
13:19, 14:16,
32:11, 32:15,
35:20, 39:22,
41:6, 41:8,
42:16, 42:17,
45:2, 52:23,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    78

59:2, 59:21,
62:18, 62:19,
62:20, 62:23,
62:24, 66:15,
73:21, 86:16,
86:22, 93:17,
94:12, 98:21,
129:22, 144:20,
146:20, 167:7,
168:3, 173:12,
173:16, 175:4,
176:18, 176:21,
185:5, 187:9
**receipt**
26:2
**receive**
93:5, 140:12,
164:5, 164:19,
174:7, 175:22,
175:23, 177:1
**received**
23:12, 91:8,
115:11, 115:13,
117:9, 117:14,
144:18, 144:24,
155:3, 155:5,
158:4, 169:14,
173:11, 173:16,
175:1, 175:14,
176:5, 179:20,
184:13, 184:22,
187:13
**receiving**
15:24, 17:7,
65:19, 72:19,
77:9, 116:22,
117:10, 118:8,
151:21, 169:13
**recent**
56:4, 56:6
**recess**
81:5, 148:4,
161:10, 172:12
**recollection**
44:12, 120:13,
141:15
**recommend**
139:1, 139:3

**recommendation**
100:21
**recommended**
92:3, 93:5
**record**
12:1, 81:7,
87:16, 100:5,
127:2, 138:21,
155:2, 157:15,
161:9, 172:11,
174:2, 177:12,
180:17, 181:7,
191:24, 192:8
**records**
153:13, 155:4,
155:14, 155:15,
157:11, 157:14,
157:16, 157:17,
157:23, 158:7
**reduce**
95:18, 96:23,
97:6, 105:7,
129:8, 129:19,
131:14
**reduced**
90:12, 93:8,
93:21, 95:11,
97:14, 97:18,
97:23, 98:12,
98:22, 102:9,
103:18, 103:19,
103:23, 105:8,
105:13, 105:16,
105:21, 106:7,
106:10, 115:15,
129:6, 129:24,
130:4, 130:6,
132:11, 164:6,
164:10, 192:10
**reducing**
129:12, 181:10
**reduction**
115:21, 145:21
**reductions**
181:14
**reese**
156:21, 157:3
**reese's**
157:13

**refer**
38:11, 41:22,
51:3, 80:9,
125:23
**referred**
188:19
**referring**
12:21, 31:6,
93:2, 127:19,
136:3
**refers**
99:20, 100:1
**reflect**
161:23
**refresh**
173:18
**regard**
177:6
**regarding**
47:11, 51:2,
108:7, 115:10
**regardless**
177:20, 184:17
**regards**
137:2, 173:3,
173:21, 175:6,
185:23
**registered**
2:9
**reimbursement**
169:14
**related**
6:18, 6:20,
6:21, 163:4,
165:1, 167:8,
192:13
**relates**
12:2
**relating**
96:9
**relationship**
36:8, 36:10,
36:11, 48:21,
48:23, 79:5,
79:22
**release**
155:3, 155:10,
155:12, 155:14,

157:16, 158:3
**released**
188:9
**relevance**
12:1, 26:13
**relevant**
12:4
**relive**
54:22
**remarks**
80:15
**remember**
11:15, 13:20,
14:18, 16:2,
44:15, 44:17,
52:17, 55:16,
58:22, 60:22,
61:1, 62:12,
62:13, 65:10,
67:9, 69:17,
72:20, 73:19,
83:9, 95:2,
96:13, 96:15,
100:13, 102:2,
102:4, 124:1,
125:12, 127:21,
128:9, 140:19,
141:11, 144:9,
144:15, 147:2,
147:3, 150:16,
157:4, 162:8,
162:10, 162:12,
162:14, 166:12,
168:13, 168:18,
184:9, 185:7,
187:5, 187:7,
189:3, 191:5
**removed**
146:16, 146:19
**rep**
86:1, 94:16,
101:11, 101:12,
105:13, 137:10
**repeat**
170:21
**replace**
76:24
**report**
32:6, 32:10,

Transcript of Michelle Strickland
Conducted on August 21, 2020                    79

32:12, 32:14,
32:19, 32:21,
32:22, 33:18,
33:19, 33:24,
40:9, 40:12,
40:14, 57:23,
58:2
**reported**
1:24, 115:6,
185:13, 185:17
**reporter**
2:9, 2:10,
7:14, 192:1,
192:4
**reporting**
34:3
**represent**
87:15
**represents**
6:8
**reprimand**
82:19, 86:3,
93:8, 93:19,
93:22, 95:12,
95:19, 115:22,
116:3, 123:18,
129:20, 129:24,
164:11, 180:7
**reprimands**
84:19, 179:19
**request**
100:3, 139:6,
139:13
**requested**
185:6, 185:11,
192:12
**require**
19:8
**reschedule**
139:6
**rescheduled**
137:9, 139:23,
140:2
**reserve**
157:22
**reserves**
169:19
**reside**
12:18

**resolution**
86:22
**resolved**
14:1, 14:15,
14:17, 169:10
**respond**
99:6
**responded**
128:24
**response**
119:21, 119:24,
126:17, 127:6,
136:8, 139:11,
139:13, 141:24,
150:10, 169:19
**resubmit**
144:21, 144:22
**result**
150:9, 168:7
**resulted**
131:13
**resulting**
142:12
**retaliate**
146:5
**retaliated**
33:10, 33:14,
33:17, 127:15
**retaliation**
24:18, 33:2,
33:3, 34:1,
127:7, 127:16,
127:18, 128:14,
140:6
**retaliations**
65:18
**retired**
85:4, 85:9,
152:21, 152:22
**retirement**
43:19, 43:24,
44:6, 45:5,
152:18
**return**
155:10
**review**
10:17, 12:11,
13:5, 22:4

**reviewed**
27:5
**reviewing**
114:11
**right-hand**
29:23, 96:5
**rights**
25:22, 27:14,
149:9
**risk**
113:6, 113:12
**road**
3:13
**robinson**
94:16, 94:19
**rockwell**
112:20, 177:23,
178:1, 178:4,
178:8, 178:11,
178:12, 179:5,
179:9, 179:10,
179:16
**rohloff**
20:2, 57:10,
68:18, 79:5,
79:13, 80:4,
80:7, 80:22,
91:16, 91:17,
123:17, 123:20,
123:24, 124:9,
124:24, 125:11,
125:15
**role**
15:3, 71:10,
159:14
**roll**
34:22, 35:3,
35:6, 35:8,
35:9, 35:12,
35:18, 39:11,
47:4, 49:19,
57:18, 58:22,
60:10, 70:4,
70:15, 70:18,
70:21, 141:14,
141:17, 142:20,
146:1, 178:14,
182:15, 182:19,

183:18, 184:3
**rolling**
59:9
**room**
8:22, 39:5,
145:24
**rose**
72:11
**roughly**
15:10, 23:19,
23:20
**rpr**
1:24, 192:4
**ruffin**
56:8, 56:10,
56:20
**rule**
7:5, 12:5
**rules**
85:24, 135:1,
135:19
**rumor**
53:19
**rumored**
53:18
**run**
60:24, 112:24

**S**

**s**
162:3
**s-h-e-l-l-y**
163:7
**sad**
43:11, 162:2
**safe**
76:13, 140:10,
141:4, 141:22
**safer**
107:14
**safety**
141:1, 143:1
**said**
7:6, 8:5, 23:2,
23:3, 35:14,
35:23, 37:9,
38:3, 38:23,
40:18, 43:17,

43:24, 44:5,
45:4, 47:5,
51:16, 55:19,
55:22, 55:23,
56:9, 57:21,
59:8, 64:20,
71:7, 71:16,
71:23, 72:4,
75:11, 75:14,
76:22, 82:21,
82:22, 83:4,
83:5, 86:4,
88:13, 96:18,
100:9, 100:11,
102:6, 103:24,
104:23, 105:1,
105:22, 106:7,
108:15, 108:19,
113:21, 114:22,
115:1, 117:10,
118:1, 118:21,
119:4, 124:12,
125:10, 128:14,
129:11, 132:2,
133:3, 134:21,
137:8, 138:11,
138:16, 138:23,
139:12, 142:2,
142:9, 145:2,
145:20, 146:11,
146:12, 150:12,
155:23, 163:3,
164:1, 164:18,
165:2, 166:19,
168:7, 169:8,
169:16, 171:13,
187:14, 187:20,
187:21, 192:9
**salary**
190:24
**sam**
61:1, 61:6,
85:4, 94:18,
135:16
**sam's**
60:23
**same**
19:16, 21:8,

21:13, 21:14,
24:12, 27:21,
34:17, 46:9,
47:15, 47:24,
49:8, 58:19,
63:13, 66:10,
66:18, 66:21,
68:10, 68:21,
69:23, 70:5,
72:12, 73:10,
75:7, 82:9,
82:10, 96:23,
101:2, 103:7,
105:10, 106:5,
109:7, 112:8,
113:8, 115:23,
116:10, 116:21,
117:8, 118:6,
120:18, 121:2,
121:12, 121:20,
122:4, 122:15,
123:7, 125:5,
125:19, 134:23,
135:2, 137:6,
138:5, 149:14,
154:11, 154:14,
155:6, 156:10,
157:10, 158:15,
159:21, 160:15,
160:23, 161:24,
163:7, 168:9,
171:8, 175:5,
181:18
**samuel**
58:8
**sandifer**
159:5, 159:11
**sat**
38:2
**saw**
156:15, 173:23
**say**
18:11, 27:15,
30:24, 31:3,
31:10, 31:14,
31:24, 32:11,
33:5, 33:23,
35:8, 35:18,

35:20, 37:24,
38:9, 38:10,
38:13, 38:15,
38:16, 39:1,
39:3, 40:2,
40:7, 45:15,
47:9, 49:20,
50:1, 51:4,
51:18, 51:19,
51:22, 55:3,
57:18, 59:22,
60:22, 64:7,
64:9, 69:5,
72:1, 72:24,
73:20, 73:24,
74:4, 75:9,
75:17, 77:13,
78:21, 79:14,
80:3, 80:19,
82:16, 83:17,
84:21, 84:23,
85:14, 86:1,
88:10, 88:11,
97:5, 101:23,
102:3, 103:5,
103:12, 103:13,
104:3, 107:3,
107:10, 109:3,
110:16, 112:3,
112:5, 115:4,
115:23, 116:6,
119:19, 131:1,
131:2, 133:19,
134:20, 137:24,
138:14, 147:1,
148:1, 151:22,
152:16, 152:17,
161:14, 166:4,
166:11, 167:17,
168:19, 169:1,
184:18, 189:7,
189:9, 190:11
**saying**
14:6, 35:12,
54:11, 54:20,
61:1, 62:16,
80:20, 86:11,
86:21, 91:19,

97:9, 106:18,
107:7, 111:5,
111:8, 111:14,
112:1, 113:14,
113:15, 118:11,
119:12, 127:11,
128:10, 132:22,
138:10, 138:13,
142:18, 144:19,
151:2, 160:16,
171:2, 171:12,
171:15, 171:19
**says**
12:15, 26:1,
29:23, 32:15,
88:10, 89:8,
92:8, 92:11,
94:11, 95:9,
101:14, 101:20,
105:12, 105:18,
114:18, 119:7,
127:7, 146:8,
152:4, 153:20,
168:5
**scaife**
94:18
**scared**
75:11, 138:11,
138:14
**scary**
65:13, 181:4
**scheduled**
137:10, 139:14
**schedules**
139:19
**school**
10:22, 10:23,
13:13, 13:22,
186:6
**science**
11:1
**scratch**
191:19
**screen**
12:6, 37:6,
98:13, 101:14
**scroll**
12:14, 13:2,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    81

22:7, 22:23,
22:24, 24:5,
29:15, 61:23,
87:23, 89:18,
90:23, 92:9,
92:21, 93:9,
93:24, 95:5,
100:15, 101:6,
114:10, 124:7,
128:2, 128:4,
138:20, 148:23,
150:4, 159:9
**seal**
192:17
**search**
125:8, 126:4
**searched**
126:5
**second**
7:1, 12:9,
13:3, 16:21,
22:4, 24:7,
67:22, 74:23,
83:5, 96:21,
183:9, 186:17
**secret**
188:6
**secretarial**
38:22, 114:24,
188:19, 189:4
**secretary**
37:18, 40:6,
60:3, 126:3
**section**
25:21
**security**
39:16, 39:19,
59:19, 100:6,
100:11, 104:5
**see**
12:6, 13:4,
21:7, 21:13,
23:22, 24:19,
26:2, 26:3,
26:5, 27:10,
27:11, 29:22,
55:20, 59:12,
88:4, 90:23,

91:12, 92:6,
92:21, 93:9,
93:23, 95:6,
101:1, 109:16,
128:1, 128:2,
131:24, 137:23,
153:17, 153:19,
156:19, 157:2,
171:4, 171:14,
181:7, 188:16,
189:12, 189:15,
189:18, 189:23,
190:1, 190:4
**seeing**
93:17, 98:18,
98:20, 98:21,
155:6, 155:7,
156:3, 156:9,
156:12, 157:9,
157:12, 161:1,
161:2, 161:3,
162:5
**seek**
150:12, 152:4,
153:20
**seeking**
151:17, 152:5,
154:21
**seem**
99:4
**seen**
13:1, 13:17,
24:9, 27:3,
29:14, 29:18,
31:21, 32:2,
32:3, 33:7,
87:9, 91:6,
93:14, 98:16,
114:7, 148:19,
159:6, 164:6,
175:10
**send**
102:7, 105:4,
128:10, 138:17,
139:2
**senior**
59:6, 71:12
**seniority**
109:24, 110:23

**sense**
8:5, 9:8,
89:10, 135:4,
135:6, 138:7
**sent**
93:15
**sentence**
25:24, 127:5,
127:12, 127:13
**separate**
84:16, 90:14,
170:14, 170:17,
171:18, 172:3
**separating**
170:11
**september**
19:2, 28:24,
30:19, 31:1,
31:9, 31:13,
192:18
**sergeant**
134:14, 159:15
**sergeant's**
146:23, 147:5,
147:8
**sergeants**
134:10, 135:8,
135:17, 182:7
**serve**
176:2
**served**
13:18
**service**
151:10
**services**
135:18
**sessions**
156:16, 156:17
**set**
4:24, 5:12,
114:6, 115:24,
148:18, 192:16
**sets**
118:14
**seven**
27:12, 28:1,
28:8
**several**
28:11, 126:16

**severe**
30:20, 160:1
**severity**
139:1, 139:4
**sexism**
149:12
**sexist**
38:18, 38:20,
80:5, 80:6,
125:11, 125:16,
125:20, 126:7
**shake**
138:13
**shaking**
7:16
**shared**
122:21, 122:22
**sheet**
78:4, 106:2
**sheriff**
1:8, 5:10,
134:9, 148:17,
163:23
**sheriff's**
6:8, 14:20,
15:1, 16:19,
29:3, 30:10,
31:17, 87:8,
133:18, 149:14,
158:19, 174:16,
174:21, 175:16,
179:6, 180:24
**shields**
4:23, 19:9,
19:14, 46:18,
48:22, 51:2,
53:17, 55:11,
57:4, 57:16,
57:20, 57:23,
57:24, 65:19,
68:18, 71:7,
71:24, 72:2,
72:3, 72:6,
72:13, 72:14,
77:22, 78:8,
78:21, 82:20,
83:3, 83:15,
84:5, 84:8,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    82

86:15, 94:10,
95:7, 95:11,
95:18, 96:17,
97:17, 97:23,
102:5, 104:3,
104:6, 104:9,
104:19, 104:24,
105:4, 105:7,
105:16, 105:21,
106:1, 106:8,
108:23, 114:6,
118:9, 118:18,
119:16, 123:17,
125:24, 126:13,
129:2, 129:6,
129:11, 129:19,
131:8, 132:4,
133:6, 133:11,
133:12, 133:14,
133:17, 134:4,
140:9, 141:24,
142:18, 143:9,
143:15, 145:23,
154:9, 161:1,
161:24, 164:2,
164:6, 174:11,
181:9, 182:15,
182:17, 183:3,
183:19, 184:1,
185:13, 185:17,
188:5
**shift**
17:15, 17:24,
18:3, 34:17,
42:18, 43:1,
46:9, 58:19,
58:21, 63:13,
63:15, 66:10,
69:23, 73:10,
74:12, 109:21,
109:24, 111:23,
141:7, 154:10,
154:12
**shocked**
65:10
**short**
49:5, 148:6,
168:7, 168:10,

168:12
**shorthand**
2:9, 192:3
**shortly**
18:18
**shorts**
116:19
**should**
12:6, 18:11,
21:22, 38:8,
38:21, 39:12,
48:2, 58:6,
99:4, 114:23,
133:19, 134:23,
135:7, 135:13,
139:14, 141:6,
146:11, 147:21,
159:10, 176:5
**shoulders**
7:15
**shouldn't**
33:10, 146:12,
162:4, 164:17
**showing**
185:5
**shown**
173:12, 185:8
**shows**
31:12, 134:24,
137:22, 146:4
**shrugging**
7:15
**sic**
27:1
**sick**
43:21, 44:1,
55:24, 131:23
**side**
37:16, 45:19,
47:18, 66:18,
66:24, 67:4,
71:3, 111:9,
113:11, 113:12,
144:9, 145:14,
160:14, 163:18,
165:6
**sight**
160:22

**sign**
155:13, 191:17
**signature**
30:4, 61:24,
62:1, 94:1,
95:6, 101:14,
101:15, 101:16,
101:20, 114:14,
119:22, 148:24
**signature-rhtdb**
192:21
**signed**
30:7, 95:7,
101:21, 114:16,
119:18, 149:4
**significant**
168:16
**significantly**
129:6, 129:8,
130:6
**signing**
192:12
**similar**
6:23, 7:4,
176:21, 180:5,
180:8
**similarly**
168:8
**simple**
116:4, 123:4
**simply**
127:18, 160:3
**since**
8:13, 24:15,
30:19, 34:9,
57:3, 57:6,
57:8, 57:9,
57:12, 58:11,
58:17, 144:16,
151:1, 157:12
**single**
49:22, 125:21,
132:9, 132:10,
143:6, 181:1
**sir**
14:17, 27:15,
28:21, 35:16,
39:20, 41:14,

43:9, 44:6,
45:10, 46:2,
46:4, 47:18,
54:23, 56:23,
64:14, 79:18,
98:11, 98:18,
120:7, 122:24,
130:4
**sister**
55:20
**sit**
41:10, 122:23
**sitting**
98:22, 141:5,
178:18
**situated**
168:8
**situation**
49:7, 78:16,
112:16, 117:8,
118:7, 120:18,
160:13, 161:22,
180:5, 180:8,
180:12, 181:4
**situations**
118:15
**six**
131:23
**skewed**
129:1
**slap**
181:19
**slated**
75:7
**slaughter**
74:8, 74:15,
75:2, 76:21,
77:2, 77:7,
77:10, 78:18,
85:8
**sleepless**
161:14
**sleeplessness**
160:2
**slotted**
60:8
**small**
168:17

Transcript of Michelle Strickland
Conducted on August 21, 2020                                        83

**smith**
156:4, 156:7,
156:12, 156:20
**social**
163:2, 163:13
**some**
10:19, 13:2,
36:3, 36:4,
37:12, 40:17,
50:1, 60:4,
65:1, 65:9,
66:22, 66:23,
66:24, 70:11,
70:13, 71:4,
75:13, 78:4,
103:14, 105:2,
107:1, 109:15,
111:9, 138:6,
139:18, 141:20,
145:16, 157:6,
157:13, 177:16,
190:7
**somebody**
103:6, 104:1,
114:22, 118:10,
126:6, 132:15,
157:7, 185:6
**someone**
13:12, 13:20,
43:10, 53:24,
54:3, 77:23,
102:12, 103:9,
103:13, 108:22,
117:10, 131:9,
132:18, 149:12,
155:20, 165:15,
184:21
**something**
8:1, 8:4,
13:14, 16:1,
34:14, 35:24,
36:3, 46:17,
52:4, 53:22,
55:22, 55:23,
71:14, 75:17,
79:10, 86:20,
119:4, 119:5,
132:21, 133:10,

134:4, 138:15,
144:12, 144:18,
144:20, 158:8,
163:19, 176:6,
185:22, 185:23,
186:18
**sometime**
69:17, 142:8,
156:13
**sometimes**
18:2, 58:23,
65:7, 70:20,
112:4, 112:13
**son**
7:1
**soon**
162:15
**sorry**
6:24, 7:1,
16:10, 16:24,
17:17, 18:22,
22:23, 23:2,
23:6, 28:18,
32:20, 33:12,
35:11, 37:5,
51:17, 52:10,
62:2, 63:11,
68:7, 75:3,
76:8, 76:21,
78:6, 85:8,
93:10, 94:21,
99:15, 102:23,
106:13, 119:4,
120:9, 123:12,
124:20, 126:21,
128:3, 128:4,
138:21, 139:13,
149:19, 152:24,
153:15, 153:18,
159:10, 162:12,
167:1, 173:5,
173:8, 182:24,
188:11
**sort**
184:22
**sound**
132:16
**sounds**
81:4, 102:12,

103:6, 103:13,
126:6, 132:17,
132:21, 142:17,
191:23
**south**
3:5, 8:20,
37:16, 45:16,
45:18, 47:18,
66:18, 66:24,
67:4, 71:3,
113:11, 113:12,
165:6
**speak**
10:8, 68:20,
71:20, 154:20,
183:4, 183:19
**speaking**
7:7, 26:15
**specific**
44:11, 64:1,
66:19, 70:16,
71:6, 71:16,
71:17, 71:23,
71:24, 110:6,
110:9, 140:18,
141:15, 179:24
**specifically**
37:10, 47:22,
50:7, 55:18,
71:4, 83:4,
142:1, 142:6,
173:15, 177:18,
178:23, 181:16
**specifics**
39:14, 43:16,
54:13, 60:20,
65:17, 73:2,
73:3
**specified**
72:6, 118:17
**specify**
47:22, 67:8
**speculate**
19:8
**speculation**
19:7, 28:20,
36:17, 97:8,
180:20, 182:22,

183:15, 183:22,
184:5, 185:1
**spell**
156:22
**spend**
54:14
**spending**
171:16
**spent**
171:11
**spivy**
77:2, 77:3
**spoke**
36:23, 36:24,
38:3, 38:5,
69:2, 69:15,
70:8, 70:13,
134:13, 142:18,
143:9, 143:11,
145:6, 147:9,
165:2
**spoken**
20:16, 57:3,
57:6, 57:9
**spot**
64:2, 131:7
**spr**
88:3, 88:21,
88:24, 89:11,
89:15, 90:6,
99:23
**spr-**
91:12
**spring**
162:9
**squad**
113:5
**st**
27:10, 97:2,
97:16, 98:15,
173:23, 174:8,
175:5, 175:12
**staff**
100:6, 134:13
**stairs**
47:6
**stamp**
28:5

Transcript of Michelle Strickland
Conducted on August 21, 2020

84

stamped
25:15, 27:9,
87:7, 99:15
stand
15:23, 61:13,
70:20, 87:3,
90:18, 113:20,
125:14, 136:17,
140:14, 148:13,
158:23
standing
40:22, 41:5,
41:8, 51:14,
51:21, 51:24,
52:1, 52:3,
52:7, 52:9,
145:23
stands
16:3, 61:6
start
14:24, 15:4,
38:6, 131:17,
154:24, 155:21,
162:5, 162:16,
162:17, 171:24,
178:1, 178:4,
178:8
started
15:3, 31:12,
34:9, 43:1,
56:9, 57:1,
140:10, 140:11,
142:19, 142:21,
143:8, 143:10,
155:1, 156:1,
157:5, 171:23,
189:10
starting
22:15, 87:16,
87:17
starts
115:9, 150:3,
168:4
state
2:10, 11:3,
12:17, 51:6,
140:8, 142:1,
159:16, 159:23,

192:5, 192:24
stated
37:2, 41:4,
53:11, 53:13,
80:16, 85:23,
91:21, 97:1,
108:20, 115:5,
115:13, 117:23,
123:16, 129:14,
135:24, 144:24
statement
38:7, 44:3,
140:14, 151:14
statements
186:13
states
1:1, 14:9,
127:14, 145:20,
164:2
stating
86:12
station
144:8, 145:14
status
83:19
stay
59:13, 76:13
stayed
84:4
staying
155:23, 155:24
stealing
65:21
stems
159:17
stenographically
192:10
step
32:12, 82:9,
83:11, 83:14,
83:16, 83:19,
83:23, 84:1,
84:4, 84:5,
84:6, 85:20,
86:14, 86:20,
95:4, 101:7,
101:17, 102:2,
102:9, 102:21,

102:22, 102:23,
102:24, 133:5,
137:2, 137:16
steward
84:24, 85:6,
85:17, 94:20,
94:22
stick
130:22
still
13:16, 15:19,
20:16, 20:23,
42:7, 52:4,
53:6, 53:7,
53:8, 56:1,
56:2, 62:4,
62:14, 68:2,
77:5, 81:8,
83:18, 89:1,
90:1, 93:13,
97:4, 98:14,
129:17, 130:2,
132:17, 135:7,
135:9, 147:12,
148:7, 164:7,
164:15, 164:16,
169:2, 169:6,
174:15, 179:15,
185:13, 185:17,
187:9
stop
149:10, 149:11,
156:12
storage
126:15
stories
71:6
straight
102:5
stream
74:24
street
3:5, 3:21,
18:11, 107:15,
107:18, 107:19,
108:3, 108:11,
109:2, 109:5,
138:15, 141:1,

141:8, 141:22
streets
63:21, 107:23,
142:6
stress
21:19, 191:14
strick
78:7, 82:20
strickland
1:13, 2:1, 4:5,
4:14, 6:2, 6:6,
11:9, 11:22,
12:16, 12:17,
22:2, 24:1,
25:12, 26:23,
29:11, 61:11,
81:7, 87:4,
90:19, 114:3,
118:18, 127:13,
136:18, 148:6,
148:14, 153:16,
157:22, 159:1,
159:4, 159:19,
160:1, 163:8,
172:13, 190:15
strictly
163:14
stringing
142:3
stuck
86:24
student
11:16, 11:19,
14:10, 14:11
stuff
16:4, 97:4,
103:14, 113:2,
161:19, 182:9,
188:23
subject
26:12, 169:17
subjected
30:20
submit
144:12
subpoena
157:17
substance
9:22

Transcript of Michelle Strickland
Conducted on August 21, 2020                                   85

suburbs
111:10
sudden
146:7, 180:23
sue
4:19, 25:17,
27:19
sued
11:18, 167:2,
186:12
suffer
20:10, 20:18
suffered
20:23, 28:24,
29:5, 123:15,
123:16, 142:11,
143:14, 150:8,
160:1
suffering
160:8, 160:9
suing
11:16
suit
25:22
suite
3:6, 3:14, 3:22
summarizing
91:16
summary
88:3
summer
162:9
sun
109:16
sunday
137:10
superior
32:10
superiors
32:8, 32:13,
32:23, 33:20,
40:10, 41:16,
48:5, 48:15
supervise
163:24
supervisor
23:10, 60:7,
60:14, 60:17,

70:9, 71:8,
71:10, 100:3,
100:5, 100:8,
131:5, 149:23,
159:14
supervisor's
100:17
supervisors
61:3, 61:4,
71:14, 75:14,
112:6, 135:16,
138:24, 149:21,
149:22, 172:22,
173:3, 179:3,
181:5
supervisory
164:1
supplement
169:19
support
37:14, 55:9
suppose
157:19
supposed
7:24, 32:4,
32:9, 32:12,
32:14, 32:17,
33:11, 33:14,
33:17, 33:24,
100:10, 132:3
sure
7:6, 12:2,
15:11, 17:9,
17:11, 19:18,
34:5, 43:19,
52:17, 57:2,
59:1, 61:13,
61:15, 76:15,
77:21, 85:15,
87:12, 87:13,
95:2, 101:2,
108:13, 113:23,
120:4, 138:23,
139:18, 153:14,
155:17, 156:18,
159:10, 166:12,
170:17, 172:10,
172:17, 182:13

surprised
98:22
suspended
24:17, 92:14,
92:17, 92:18,
146:9, 146:14,
169:5, 169:8
suspension
49:11, 93:6,
93:21, 95:19,
115:11, 115:14,
115:17, 115:18,
116:2, 117:15,
118:13, 129:20,
139:17, 142:12,
169:6
suspensions
146:8, 146:12
swear
30:1
swearing
30:7
swisher
157:8
switch
157:7
switched
157:6
sworn
6:3, 62:23,
62:24, 63:1
symptoms
154:5
systematic
160:15

T

table
158:1, 170:24
tablet
9:3, 9:5
take
7:17, 7:19,
7:22, 10:3,
12:9, 13:5,
14:4, 22:4,
37:5, 39:9,
39:15, 48:4,

48:7, 48:14,
48:17, 48:19,
50:16, 61:20,
80:23, 84:10,
86:9, 86:11,
99:4, 109:10,
109:11, 116:11,
116:14, 118:19,
130:24, 147:21,
157:24, 165:20,
166:3, 170:19,
172:7, 172:8
taken
39:12, 39:17,
81:5, 116:20,
126:19, 148:4,
161:10, 172:12,
185:24, 192:7,
192:10
takes
99:2, 99:6,
99:11
taking
90:5, 102:20,
103:1, 147:2,
147:5, 158:9,
189:1, 189:15,
190:1
talk
10:10, 10:13,
10:19, 22:5,
34:10, 34:14,
42:7, 42:8,
43:9, 46:7,
50:19, 51:5,
55:18, 58:15,
63:8, 64:5,
64:22, 66:4,
66:6, 67:16,
68:9, 69:14,
70:3, 70:6,
72:22, 73:7,
75:9, 79:19,
80:21, 85:16,
85:19, 86:1,
92:23, 101:4,
122:10, 122:13,
122:17, 122:23,

Transcript of Michelle Strickland
Conducted on August 21, 2020                    86

123:1, 132:18,
148:9, 149:24,
154:3, 165:3,
183:10, 183:16,
184:8, 184:14
**talked**
9:24, 10:2,
42:9, 42:11,
49:5, 53:7,
57:12, 58:17,
61:7, 61:20,
64:17, 71:5,
71:20, 79:20,
81:13, 93:3,
117:22, 123:9,
123:10, 126:1,
136:6, 158:12,
176:7, 177:11,
179:18, 182:14
**talking**
26:18, 41:5,
47:5, 47:23,
53:4, 53:23,
54:1, 54:3,
54:7, 70:5,
70:17, 71:1,
75:24, 76:12,
76:21, 82:1,
83:3, 111:22,
118:1, 118:5,
119:16, 134:9,
145:22, 146:1,
168:15, 170:5,
177:17
**talks**
187:11
**taser**
142:8
**tasers**
141:3
**team**
75:4, 76:24
**tears**
154:17
**technician**
4:2, 61:13,
87:3, 90:18,
113:20, 114:2,

136:17, 148:13,
153:15, 158:23
**telephone**
10:3
**tell**
8:2, 8:6,
24:11, 36:1,
46:18, 52:8,
54:13, 77:20,
77:23, 78:6,
78:18, 92:23,
94:6, 104:12,
105:3, 107:12,
116:9, 117:13,
128:1, 130:12,
130:22, 132:14
**telling**
54:3, 54:5,
60:3, 78:15,
120:8, 120:11,
120:23, 155:19,
164:12
**tells**
131:6
**tend**
117:23
**term**
160:22
**termination**
28:13, 65:6
**terminations**
64:24, 65:12
**terms**
35:14
**terrible**
112:15
**test**
50:17, 146:23
**tested**
72:3, 143:23
**testified**
6:3, 184:7,
191:4
**testifying**
184:9
**testimony**
8:11, 9:5,
9:10, 43:23,

45:4, 57:20,
62:4, 62:14,
62:23, 62:24,
63:1, 81:11,
86:8, 86:19,
93:15, 97:8,
98:7, 98:8,
121:24, 122:4,
133:2, 148:10,
187:3, 187:12,
187:16, 191:3,
191:6, 192:9
**testing**
134:16
**texas**
132:1
**text**
9:13, 24:19
**th**
18:22, 23:12,
24:16, 30:19,
88:4, 88:7,
88:11, 88:15,
89:1, 89:5,
89:11, 89:15,
89:24, 91:10,
93:3, 94:12,
99:20, 103:5,
114:17, 149:4,
173:16, 173:20
**thank**
114:2, 139:12,
164:23, 191:23
**thanks**
191:21
**themselves**
71:11, 138:7
**therapist**
155:6, 155:17,
155:22, 162:5,
170:5, 171:4
**therapists**
155:8
**therapy**
155:1, 155:19,
170:4, 171:11,
171:16, 171:22
**thereafter**
30:20, 192:10

**thing**
37:9, 47:15,
51:8, 54:4,
55:19, 60:22,
64:23, 66:18,
67:9, 70:5,
75:16, 90:23,
92:22, 95:16,
96:23, 122:15,
139:14, 144:20,
149:14, 155:20,
159:21, 160:15,
161:24
**things**
7:14, 48:1,
50:10, 59:7,
60:4, 60:6,
60:24, 61:1,
67:8, 70:19,
70:22, 71:5,
71:6, 71:9,
71:10, 71:17,
71:18, 71:24,
75:15, 75:18,
80:20, 82:16,
84:17, 85:24,
86:4, 86:5,
104:20, 108:6,
113:1, 113:24,
137:22, 138:18,
147:15, 170:1,
178:18, 179:4,
179:20, 182:16,
184:17
**think**
6:13, 7:10,
19:2, 35:4,
36:12, 36:15,
36:19, 37:11,
38:18, 41:7,
46:13, 50:3,
50:8, 57:5,
57:8, 57:11,
59:1, 79:24,
80:2, 80:5,
84:3, 85:5,
85:9, 85:10,
87:14, 87:20,

88:1, 90:4,
92:15, 92:18,
93:14, 97:5,
102:17, 106:24,
108:6, 112:15,
124:12, 125:11,
125:15, 142:24,
143:8, 143:10,
151:7, 151:9,
156:6, 160:13,
165:12, 165:19,
166:11, 167:18,
167:20, 169:21,
170:18, 172:3,
173:20, 181:8,
185:21, 185:24,
186:7, 187:1,
188:17, 188:18,
190:14
**thinking**
70:15, 94:17,
160:12
**thinks**
98:10
**third**
14:3, 156:2
**thomas**
1:9, 5:11,
20:5, 57:13,
148:18, 159:5
**thought**
23:6, 75:11,
77:8, 98:14,
137:18, 161:20,
161:21, 188:6
**threatened**
49:9, 116:2,
126:16, 128:7,
128:8, 131:20
**threatening**
126:13
**three**
26:10, 26:16,
89:20, 90:3,
90:14, 90:17,
123:24, 140:13,
153:7, 153:10,
155:8, 156:10,

156:17
**through**
4:17, 4:21,
5:3, 5:7, 7:5,
24:4, 24:5,
25:16, 29:14,
29:16, 39:8,
40:22, 49:15,
55:4, 55:6,
60:4, 70:4,
72:9, 72:11,
83:21, 86:13,
86:14, 86:18,
87:7, 87:19,
88:23, 90:5,
90:12, 90:17,
90:23, 90:24,
91:3, 99:11,
103:10, 123:17,
123:24, 125:5,
136:21, 150:11,
151:7, 161:23
**throw**
78:7, 130:13,
130:19, 130:24,
133:10
**thrown**
133:5
**throws**
130:17
**tied**
130:23, 133:8
**time**
7:19, 13:5,
14:4, 16:23,
17:1, 17:11,
17:12, 25:3,
25:7, 31:22,
31:24, 33:13,
34:18, 34:19,
44:8, 47:9,
50:16, 50:19,
51:10, 51:12,
54:2, 54:19,
54:21, 56:4,
56:6, 59:8,
60:1, 60:18,
61:21, 65:4,

65:21, 70:6,
70:11, 72:12,
73:16, 73:22,
75:8, 75:24,
76:6, 79:15,
79:16, 82:3,
84:11, 87:24,
92:15, 94:20,
94:22, 98:19,
98:20, 99:5,
99:8, 99:9,
103:8, 113:11,
114:21, 117:12,
129:7, 129:22,
131:22, 132:12,
132:20, 135:18,
138:6, 142:14,
147:14, 151:9,
153:3, 154:11,
154:14, 157:2,
161:15, 161:16,
169:24, 170:19,
171:13, 171:16,
171:17, 171:22,
172:2, 172:14,
172:21, 174:16,
175:14, 176:10,
182:12, 191:21
**timeline**
27:18, 28:9
**times**
6:12, 39:7,
47:1, 59:4,
115:4, 115:5,
141:18, 147:1
**tims**
41:7, 41:13,
46:5, 46:7,
46:9, 46:15,
46:18, 46:21,
47:10, 47:19,
47:21, 48:9,
48:13
**tired**
44:7, 45:16,
165:19
**title**
60:11, 133:13

**titled**
25:21, 61:18,
87:8
**today**
8:11, 9:6,
10:4, 53:7,
53:8, 53:9,
98:13, 136:14,
143:20, 157:18,
161:23, 164:14,
173:24
**together**
63:19, 63:22,
82:14, 160:19,
166:1
**told**
34:15, 38:21,
56:7, 56:14,
59:7, 59:10,
68:11, 71:23,
72:2, 72:14,
82:23, 82:24,
83:2, 96:16,
96:17, 104:13,
116:7, 117:5,
117:11, 117:12,
119:15, 120:18,
121:9, 121:14,
121:15, 122:5,
122:6, 122:22,
126:2, 130:24,
132:1, 133:8,
144:17, 151:18
**tone**
49:4, 183:4
**took**
39:19, 70:21,
77:22, 84:1,
93:10, 117:9,
118:8, 128:11,
131:22, 146:23,
146:24, 147:3,
147:4, 147:8,
148:6, 150:23,
155:18, 162:22
**tool**
141:4
**tools**
141:3

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    88

top
22:23, 27:8,
28:5, 91:12,
101:13, 139:22,
141:20, 150:10
topic
53:17, 54:2,
54:17, 65:6,
173:18
total
135:3
totally
50:16
tour
177:21, 178:1,
178:4, 178:8,
178:22
toward
164:3
towards
25:20, 80:13,
80:14, 88:1
towed
49:9, 104:12,
104:23, 126:13,
126:17, 126:18,
131:12, 131:21
tracks
103:14, 103:16,
103:18, 103:21,
104:2
trained
142:8, 143:5
training
15:5, 18:3,
42:24, 43:2,
46:10, 46:12,
140:9, 140:16,
140:17, 140:18,
140:23, 141:7,
141:20, 142:3,
142:5, 142:19,
142:20, 143:4,
152:13, 182:16,
182:18
trans
144:1
transcript
4:13, 11:23,

22:3, 24:2,
25:13, 26:24,
29:12, 61:12,
87:5, 90:20,
114:4, 136:19,
148:15, 159:2,
192:8
transfer
144:2, 144:5
transferred
17:19, 18:19,
191:11
transferring
188:3, 188:12
transitioned
35:22
transportation
17:20, 18:19,
25:4, 73:21,
93:12, 143:21,
149:22, 150:22,
150:24, 151:3,
151:13, 151:24,
152:21, 153:3,
159:11, 161:16,
162:16, 171:7,
171:18, 171:23,
171:24, 188:13,
190:20, 191:12
treated
21:19, 36:22,
37:1, 37:9,
37:10, 43:22,
50:6, 50:7,
61:2, 161:6
treating
55:20, 172:22
treatment
55:21, 149:9,
154:21, 154:24,
155:4, 168:9
tribute
170:9
tried
86:19, 144:2,
146:18
trouble
50:22

true
22:21, 24:23,
28:14, 28:23,
29:4, 29:5,
29:9, 29:24,
30:2, 44:13,
44:14, 109:9,
114:13, 136:10,
149:1, 162:22,
192:8
truth
120:24, 121:15
try
7:9, 55:8,
128:10, 144:5,
146:15, 170:23
trying
36:5, 44:4,
88:16, 88:20,
95:15, 103:10,
104:1, 119:17,
125:9, 126:8,
127:21, 127:23,
140:19, 151:11,
153:6, 156:6,
161:12, 170:22,
171:1, 171:4,
171:9, 171:10
tss
18:8, 37:17,
63:19, 63:22,
63:24, 64:6,
64:8, 64:12,
64:13, 66:24,
67:1, 67:4,
71:2, 74:17,
74:18, 76:24,
77:1, 106:16,
107:2, 107:8,
107:12, 107:14,
107:17, 107:19,
107:23, 108:7,
108:13, 108:24,
109:1, 109:4,
109:10, 109:14,
165:5, 165:11,
177:24
turn
172:15, 178:16

turned
116:22, 179:2,
179:3
twice
6:13
two
75:18, 89:20,
90:3, 90:13,
91:3, 94:23,
100:21, 103:1,
103:2, 105:24,
106:8, 118:14,
120:17, 120:21,
121:18, 121:22,
121:23, 122:1,
122:7, 122:8,
122:13, 123:3,
123:6, 123:9,
123:10, 125:2,
125:3, 162:17,
162:18, 162:24,
167:16, 167:21,
167:22, 170:14,
170:18, 172:4,
176:20, 177:1
two-day
139:17
two-page
24:3
typewriting
192:11
typically
41:10, 76:11,
99:10, 175:20,
176:16
typing
189:3, 189:18,
190:4
typo
169:20
tyrone
73:5

U

uh-huh
23:8, 23:13,
24:8, 36:7,
87:18, 87:22,

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    89

93:4, 119:11,
139:21
**uic**
156:10, 156:24
**ultimately**
129:3, 130:15,
133:15, 185:16
**unauthorized**
96:11
**under**
12:4, 12:15,
23:10, 29:23,
30:7, 31:8,
81:8, 114:12,
138:5, 148:7,
148:24, 187:12,
192:11
**undergraduate**
186:6
**underground**
109:17
**understand**
8:4, 9:8, 9:11,
19:18, 28:22,
39:13, 39:14,
55:3, 55:4,
55:14, 59:12,
81:8, 84:12,
91:23, 111:16,
118:14, 119:17,
139:4, 148:7,
149:18, 149:20,
164:13, 167:11
**understanding**
60:13, 60:16,
76:9, 76:16,
81:18, 99:1,
99:3, 108:17,
149:16
**understood**
8:8, 30:6, 84:9
**unfair**
64:16, 67:6,
70:7, 72:18,
77:8, 77:11,
137:22, 165:7,
165:12
**unfairly**
69:4, 106:16,

110:20
**unfairness**
70:22
**unfortunately**
68:1, 183:8
**union**
81:19, 82:5,
84:16, 84:24,
85:6, 85:17,
86:1, 94:16,
94:20, 94:22,
94:23, 101:11,
101:12, 137:10
**unit**
15:4, 19:20,
19:24, 20:3,
20:7, 28:11,
39:4, 59:11,
68:10, 84:16,
88:18, 96:24,
97:11, 97:22,
98:15, 102:12,
128:12, 133:7,
141:1, 141:9,
144:6, 144:8,
144:12, 160:12,
172:21, 173:12,
174:11, 175:13,
176:17, 182:2,
184:17, 190:21
**united**
1:1, 14:9
**units**
143:17, 143:21,
144:7, 145:6,
145:8, 145:11,
150:14
**university**
11:3
**unless**
157:23
**unpack**
37:8
**unsure**
10:9
**until**
15:10, 15:21,
75:8, 95:20,

97:10, 123:13,
142:14, 143:20,
162:17, 172:1,
188:8
**uploaded**
61:8
**upset**
78:9, 108:22
**use**
8:5, 38:11,
38:14, 57:16,
80:7, 80:12,
80:16, 92:15,
126:15, 133:9,
164:3, 164:19
**uses**
129:13
**using**
38:6, 38:7,
41:15, 76:22
**utilize**
164:4

---
**V**
---

**valdovinos**
94:8
**varied**
77:21, 79:18
**vast**
66:22
**vehicle**
100:4, 116:22,
118:8, 178:12,
179:6, 179:7,
179:8
**vehicles**
178:16
**vent**
41:10, 67:7
**vented**
43:14
**venting**
40:23, 43:17,
66:9, 76:11,
117:23
**vents**
55:12
**verbal**
82:18, 84:19,

84:22, 123:18,
123:21, 179:19,
180:4
**verbally**
7:13
**vermin**
108:8
**vernell**
46:5
**versus**
36:23, 75:17,
120:20, 122:8,
160:18
**vest**
64:11, 141:23,
142:7
**vests**
141:2
**victor**
74:8
**violation**
101:18
**virtually**
1:14, 2:2
**visit**
131:24
**visited**
140:22
**vocational**
10:23
**voice**
33:13, 154:20
**voluntarily**
67:22, 152:1,
191:11, 191:17

---
**W**
---

**wages**
150:13, 150:17,
150:18, 150:19,
150:20, 168:6
**wait**
28:8, 48:12,
123:13, 163:14
**waited**
28:10
**waiving**
169:17

Transcript of Michelle Strickland
Conducted on August 21, 2020                                    90

walk
44:9, 44:24,
145:24
walked
49:13, 51:15,
51:19, 52:15
walker
69:10, 69:12,
69:14, 69:22,
69:24, 70:13,
71:4, 72:13,
72:14, 72:17,
135:16
walker's
34:15
walking
43:10, 47:5,
51:16
want
8:2, 9:21,
10:1, 12:3,
19:18, 67:23,
73:20, 81:10,
112:24, 113:5,
113:7, 114:24,
124:2, 124:3,
127:24, 131:15,
137:18, 137:24,
145:24, 152:17,
166:4, 166:11,
173:14
wanted
40:5, 49:16,
104:7, 104:12,
104:23, 109:11,
109:12, 113:4,
113:17, 113:21,
131:11, 132:11,
132:13, 132:23,
133:7, 133:11,
136:11, 136:13,
138:17, 154:9,
188:5, 188:9,
190:8
wanting
112:17, 113:15
warning
78:8, 84:22,

86:2
warnings
84:19, 179:19
watch
111:18, 111:21
way
6:20, 36:22,
36:24, 37:1,
37:9, 37:10,
37:12, 38:1,
47:12, 50:6,
50:7, 59:9,
60:7, 61:2,
77:22, 78:1,
78:21, 85:24,
86:5, 86:6,
86:12, 104:19,
106:5, 119:18,
121:8, 121:13,
123:4, 128:3,
130:11, 130:15,
133:7, 133:10,
135:22, 136:1,
136:9, 143:5,
161:7, 161:13,
161:17, 161:18,
172:3, 183:16
ways
21:21
we'll
79:2, 83:21,
86:18, 88:23,
90:4, 90:12,
90:17, 90:22,
90:24, 148:1,
158:2, 168:4
we're
7:20, 8:13,
36:5, 43:10,
49:15, 54:14,
59:10, 68:10,
71:21, 81:7,
82:1, 118:16,
120:21, 134:8,
149:24, 150:11,
154:3, 154:13,
157:18, 157:21,
183:10

we've
40:24, 71:1,
88:24, 101:1,
105:20, 123:20,
124:13, 126:9,
129:5, 142:13,
146:9, 169:9
webb
100:18, 104:7,
104:14, 104:17,
105:1, 124:17,
136:24, 137:11,
137:15, 138:23,
139:12
wednesday
10:6
week
79:12, 79:14,
79:18, 79:19,
121:2, 162:23
week's
181:1
weeks
189:8
weird
8:6
went
15:21, 60:4,
70:4, 73:20,
78:2, 86:13,
88:11, 102:5,
104:6, 104:9,
111:10, 111:11,
123:24, 125:5,
129:15, 131:8,
134:2, 135:1,
135:20, 140:22,
143:22, 143:23,
150:24, 151:2,
151:24, 153:2,
161:23, 189:9
weren't
24:24, 70:18,
100:10, 104:21,
111:14, 131:1,
135:17, 174:17,
188:2, 188:8
whatever
13:5, 14:4,

54:10, 61:21,
88:18, 116:19
whenever
109:10, 109:11,
112:24, 117:17
whereof
192:16
wherewithal
138:6
whether
39:10, 76:16,
121:8, 121:14,
176:14
whoever
78:23, 117:3
whole
34:19, 54:4,
64:23, 71:10,
90:23, 92:22,
126:9, 127:13,
134:9, 139:14
wilford
63:3
williams
65:24, 66:1,
66:2, 66:4,
66:14, 67:5
willing
139:5, 155:13,
157:23
willingly
122:14
wind
103:15, 130:2
winston
1:5, 34:6,
34:8, 34:17,
34:24, 52:1,
52:6, 53:2,
53:3, 53:5,
55:23, 56:7,
56:13, 56:19,
65:9, 65:14,
165:22
winston_ccs
4:16, 4:18,
5:7, 22:10,
136:21

Transcript of Michelle Strickland
Conducted on August 21, 2020                                          91

**winston_ccso**
4:17, 4:21,
5:3, 24:4,
25:16, 29:14,
87:7, 91:4,
96:21
**winter**
162:9
**within**
26:1, 71:15,
181:6
**without**
60:10, 76:13,
92:7, 92:12,
169:17
**witness**
32:5, 50:22,
58:7, 90:21,
92:21, 126:24,
148:3, 153:18,
161:8, 183:13,
192:16
**woman**
56:11, 106:23,
120:22, 125:4,
126:4
**women**
53:20, 80:13,
106:22
**won**
138:8
**wondering**
97:12, 169:2
**word**
8:5, 38:8,
163:10
**words**
38:11, 44:16,
44:17, 76:13,
76:23, 131:10,
181:11
**work**
6:15, 17:15,
17:24, 18:5,
20:11, 20:19,
20:23, 21:2,
21:3, 21:10,
21:12, 21:16,

21:17, 21:24,
30:21, 34:12,
34:17, 37:16,
37:17, 38:22,
40:6, 42:5,
42:15, 46:9,
48:23, 58:12,
58:14, 58:19,
63:13, 66:10,
69:23, 73:13,
73:17, 74:10,
75:7, 77:5,
79:22, 112:1,
112:20, 113:9,
123:18, 139:15,
142:6, 156:8,
159:11, 159:24,
160:4, 161:22,
165:7, 189:4,
190:8, 190:12
**work-related**
52:18, 79:8
**worked**
16:14, 17:12,
17:22, 19:10,
19:15, 23:10,
36:9, 42:16,
42:22, 46:17,
47:13, 63:19,
63:21, 63:22,
67:18, 68:15,
69:22, 70:2,
72:7, 74:18,
87:20, 117:3,
134:10
**working**
14:24, 17:3,
21:11, 23:21,
24:24, 25:2,
25:3, 25:4,
34:21, 59:24,
63:6, 68:5,
72:10, 73:8,
74:2, 75:5,
79:11, 79:16,
109:9, 133:16,
141:8, 150:18,
160:21, 163:19,

169:3, 189:10,
189:22
**workplace**
33:3, 34:13,
41:1, 41:11,
149:10, 149:11
**works**
68:21, 143:22,
143:24
**world**
134:24
**worse**
160:4, 161:4
**worth**
152:15
**wouldn't**
53:11, 53:21,
90:1, 90:2,
110:11, 113:5,
118:3, 126:22,
131:7, 135:6,
155:9, 190:7
**wrist**
181:19
**write**
77:23, 77:24,
78:5, 78:16,
99:5, 104:14,
104:16, 104:17,
105:1, 125:18,
131:9, 137:21,
178:15
**write-up**
78:3, 78:6,
78:11, 85:16,
91:8, 100:8,
104:5, 116:1,
117:18, 119:21,
119:24, 123:23,
124:23, 124:24,
125:13, 125:21,
129:4, 129:8,
130:12, 131:11,
132:14, 139:2,
142:12, 173:15,
175:7, 177:1,
180:17, 181:12,
181:22

**write-ups**
49:10, 64:17,
64:20, 65:16,
65:18, 72:23,
73:1, 73:4,
77:14, 77:15,
77:16, 77:18,
77:22, 78:22,
79:1, 82:17,
84:20, 85:15,
86:12, 86:17,
86:23, 97:1,
102:13, 129:9,
129:16, 140:12,
140:13, 142:19,
142:21, 143:8,
143:10, 143:15,
143:19, 146:11,
176:8, 176:9,
176:16, 177:6,
177:12, 181:10,
184:16
**writing**
75:15, 75:16,
75:18, 75:20,
76:6, 104:8,
138:12, 144:13
**written**
49:6, 49:8,
78:8, 78:17,
78:20, 82:19,
83:10, 83:13,
84:19, 86:3,
93:8, 93:19,
93:22, 95:12,
95:19, 102:10,
104:7, 105:13,
115:22, 116:3,
117:17, 117:21,
117:24, 118:12,
118:22, 120:4,
120:7, 125:3,
125:4, 125:6,
125:17, 126:3,
126:17, 129:20,
129:23, 129:24,
130:3, 131:20,
138:4, 164:9,

Transcript of Michelle Strickland
Conducted on August 21, 2020                    92

164:11, 180:7,
180:22, 181:16
**wrong**
103:9, 103:12,
180:2
**wrote**
30:18, 31:8,
77:20, 78:19,
78:23, 78:24,
79:4, 82:10,
82:11, 82:13,
91:17, 91:24,
92:12, 96:15,
96:16, 100:17,
101:24, 104:14,
118:2, 123:22,
124:4, 124:9,
125:13, 136:24,
137:4, 137:6,
137:12, 137:15,
143:14

**Y**

**y'all**
35:15
**yeah**
28:23, 43:18,
45:11, 55:6,
58:18, 63:5,
76:2, 81:1,
89:9, 90:1,
90:3, 90:22,
92:22, 93:23,
94:6, 95:20,
101:2, 107:11,
113:24, 124:5,
126:6, 127:1,
136:9, 144:11,
170:19, 170:22,
171:13, 186:9,
186:20
**year**
47:8, 56:24,
57:1, 57:2,
95:21, 99:4,
99:6, 149:5,
153:5, 153:10
**years**
40:1, 59:10,

75:6, 141:5,
153:7, 153:11,
162:17, 162:18,
162:24, 170:12,
171:22, 172:6,
186:2, 187:6
**yep**
88:2
**yes-or-no**
95:22, 107:11
**yourself**
32:18, 84:1,
91:15

**Z**

**zoom**
8:13, 9:7,
92:24, 94:5,
119:7

**$**

**$100**
168:16
**$50**
168:20

**0**

**00**
1:16, 17:16,
17:18, 17:24,
18:4, 34:19,
63:15, 147:20,
148:2
**000247**
96:6
**00074**
4:15, 12:9
**0011917**
4:18, 22:10
**0011919**
4:16
**003733**
192:4
**011300**
94:4
**018016**
5:7, 136:21
**02**
4:15, 12:9

**02621**
5:13, 159:4
**0339**
3:16
**05726**
1:7
**0573**
89:15
**084**
192:4

**1**

**1**
137:16, 147:20,
148:2, 148:4,
161:10, 172:12
**10**
1:16, 5:7,
16:16, 17:8,
88:11, 89:24,
90:9, 114:17,
136:15, 136:18,
136:20, 147:22,
148:1, 149:4,
163:2, 168:20
**100**
3:6, 121:9
**1003**
89:4
**10723**
8:20
**11**
4:15, 5:9,
17:16, 17:18,
17:24, 18:4,
34:19, 63:15,
81:2, 81:3,
81:5, 148:12,
148:14, 148:16,
162:20
**11295**
99:15
**11296**
105:10
**11297**
101:1
**11301**
96:21

**11302**
91:4
**11303**
91:4, 92:20
**114**
4:22
**11597**
5:3, 87:7
**11599**
5:3, 87:7
**11915**
4:17, 24:4
**11919**
25:16
**11922**
25:16
**11955**
4:21, 29:14
**11962**
4:21, 29:14
**12**
5:13, 88:7,
139:15, 148:4,
158:21, 159:1,
159:3, 163:22
**120**
3:21
**13**
5:14, 17:22,
61:9, 61:11,
61:14, 61:18,
88:15, 89:1
**136**
5:7
**14**
90:6, 91:12,
99:23, 128:22
**148**
5:9
**1490**
12:18
**1495**
11:6
**15**
99:20, 105:13,
139:15, 140:5,
142:10, 147:22,
148:1, 153:9

Transcript of Michelle Strickland
Conducted on August 21, 2020

93

**1584**
88:3, 88:21,
90:6, 91:12
**159**
5:13
**16**
4:17, 23:17,
23:20, 24:4,
143:12, 145:20,
148:4, 192:20
**17**
5:7, 89:5,
89:15, 103:5,
136:21, 164:23,
164:24
**172**
4:7
**18**
1:7, 102:11,
103:5, 105:13,
186:2, 191:24
**186**
4:8
**19**
91:10, 93:3,
186:2
**190**
4:9
**191**
4:10
**192**
1:23
**1950**
88:24
**1994**
185:24, 186:1
**1995**
185:24, 186:1
**1:-cv**
4:15, 12:9

**2**

**2**
191:24
**20**
153:9, 166:16,
186:3, 186:18
**200**
3:14

**2000**
3:22, 186:16,
186:17
**2002**
11:13, 11:17,
186:13
**2005**
15:2
**2006**
15:11, 22:15,
22:22, 31:3,
31:10
**2007**
15:10, 15:22
**2008**
16:7, 16:8,
16:21
**2009**
17:8
**2013**
88:8
**2014**
17:13, 47:9,
87:21, 88:3,
88:4, 88:13,
88:14, 88:21,
88:24, 89:1,
89:4, 89:8,
89:11, 89:24,
90:6, 91:10,
93:3, 94:12,
96:10, 99:20,
173:16, 175:6
**2015**
17:20, 18:16,
18:22, 35:7,
35:18, 47:8,
47:9, 87:21,
88:11, 89:5,
90:1, 90:9,
93:11, 93:12,
96:24, 97:3,
98:15, 102:11,
155:1, 155:6,
155:16, 156:3,
156:13, 156:16,
162:6, 162:13,
172:2, 173:24,

174:8, 175:5,
175:13, 188:8
**2016**
22:12, 23:12,
24:16, 24:24,
128:18, 157:5,
182:12
**2017**
19:2, 26:4,
28:16, 28:24,
29:6, 31:1,
31:9, 31:13,
155:5, 155:7,
157:12, 157:24,
162:23, 172:1,
172:2
**2018**
26:7, 27:10,
27:19, 28:2,
29:20, 89:15,
89:16
**2019**
5:13, 158:13,
159:4
**2020**
1:15, 114:17,
162:3, 192:18
**2021**
3:13, 192:20
**206**
3:5
**21**
1:15, 27:10,
97:2, 97:16,
98:15, 168:4,
173:23, 174:8,
175:5, 175:12
**22**
4:16, 93:11,
168:22
**23**
169:13
**24**
4:17
**25**
4:18, 23:12,
24:16, 88:4,
89:24, 90:6

**26**
4:20, 186:20
**27**
30:19, 94:12,
173:16, 173:20,
186:20
**29**
4:21, 18:22,
81:5, 89:11
**2918**
89:11, 99:23
**2nd**
96:9

**3**

**3**
17:16, 17:18,
18:4, 34:19,
84:1
**3-inch**
91:18, 119:9
**30**
81:2
**312**
3:8
**315903**
1:22
**33**
161:10
**34**
161:10
**35**
81:3
**37**
81:5
**3705**
3:24
**38**
115:11
**3:-to**
17:24, 63:15
**3rd**
136:24

**4**

**40**
123:15
**45**
10:9

| | |
|---|---|
| **49** | 26:6, 26:10 |
| 172:12 | **94** |
| **5** | 13:11 |
| **57** | **95** |
| 148:4, 172:12 | 13:11 |
| **5th** | **984** |
| 137:4, 137:12 | 3:16 |
| **6** | |
| **6** | |
| 26:17 | |
| **60** | |
| 162:3 | |
| **60409** | |
| 12:19 | |
| **60523** | |
| 3:15 | |
| **60602** | |
| 3:23 | |
| **60628** | |
| 8:21 | |
| **60661** | |
| 3:7 | |
| **608** | |
| 12:5 | |
| **61** | |
| 5:14 | |
| **630** | |
| 3:16 | |
| **655** | |
| 3:8 | |
| **6th** | |
| 192:17 | |
| **7** | |
| **7660** | |
| 3:8 | |
| **786** | |
| 3:24 | |
| **8** | |
| **866** | |
| 3:24 | |
| **87** | |
| 5:3 | |
| **9** | |
| **90** | |
| 5:5, 26:1, | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEGRAIN WINSTON, et al. | ) | |
| | ) | Case No. 18-cv-05726 |
| Plaintiffs, | ) | |
| | ) | Hon. Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| THOMAS J. DART, et al. | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF MICHELLE STRICKLAND'S OBJECTIONS AND ANSWERS TO**
**DEFENDANT GREGORY SHIELDS FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, Michelle Strickland, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1. These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2. Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3. Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.

CB - 08/21/2020

Exhibit 7

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:**     **Michelle Strickland**
**10723 S. Cottage Grove**
**Chicago, IL 60628**
**(773) 593-1908**

**Undersigned Counsel**

2.     Identify each instance someone told you that "females did not belong in the investigator position" and that you "should get a secretarial position" as alleged in Paragraph 37 of the Complaint including what exactly you allege was said, who said it, what your response was, whether or not anyone else was involved, whether or not anyone else witnessed the exchange, where the comments were made, all facts or subjects discussed or stated during the conversation, and how you were damaged by this incident.

**Response: Plaintiff Strickland states that Defendant Ranzino began making those comments in the beginning of 2015 and stated them throughout her time at EMU. She responded that she had earned her right to be there and that she insisted to work on the streets. Legrain Winston was present when these comments were made.**

3.     Identify all facts regarding the five-day suspension you received as referenced in Paragraph 38 of the Complaint, including what the underlying incident was, when the incident occurred, when the discipline was imposed, whether an investigation was conducted into the incident, how, if at all, you allege any Defendant was involved, what was said to you about the

2

incident or discipline, what your response was, whether or not anyone else was involved, whether or not anyone else witnessed the incident, and how you were damaged by this incident.

**Response: Plaintiff Strickland and Investigator Keith patted down an individual to transfer him to the jail, during his processing at the jail, officers found a pocketknife on the individual. Plaintiff and Investigator Keith received a 5-day suspension. When they spoke about it, Investigator Messina stated that he and his partner had made the same mistake a couple weeks prior and had only received a phone call on the matter and to be more careful.**

4.     Identify the "non-minority investigators" who "had an analogous incident . . . yet received no discipline at all" as alleged in Paragraph 38 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to whether or not to discipline the employee, what the underlying incident was, whether or not any investigation was conducted, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response was to the incident or discipline was, whether or not anyone else was involved, and whether or not anyone else witnessed the incident.

**Response: Plaintiff Strickland states that Investigator Messina and his partner at the time were the investigators who were similarly situated but treated differently.**

5.     Identify each and every grievance you filed against Defendant Shields regarding his alleged treatment of you as alleged in Paragraph 39 of your Complaint, including when the grievances were made, to whom, what form or format the grievances took (e.g., verbal, phone call, written, email, or letter), the content of the grievances, the status or outcome of the grievances, whether or not you agreed with the outcome of the grievances, what the response to

3

the grievances were, whether or not you contend you suffered any retaliation for these grievances, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response: Plaintiff Strickland states that she did not file grievances against Defendant Shields out of fear of retaliation, but she would state that Shields was acting discriminatorily in her responses to his excessive write-ups. Furthermore, Plaintiff claims to have suffered retaliation in regard to her filing of 2016 EEOC charge. See P000047.**

6. Identify what harassment you suffered before or after filing the grievances as alleged in Paragraph 39 of your Complaint, including who the harasser was, what form the harassment took (e.g. verbal or physical, in person, over the phone, over the internet, etc.), whether or not you asked that the harassment stop, who you asked to stop the harassment, whether or not you filed a grievance or complaint regarding the harassment, and, if so, the status or outcome of the grievance or complaint, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response: Plaintiff Strickland states that she was harassed by Defendant Shields as he was the individual initiating all of the write ups. Plaintiff Strickland questioned Defendant Shields write ups and his request for higher punishments, such as multi-day suspensions. Furthermore, she was verbally harassed by Defendant Ranzino when he spoke about how a woman should only be completing secretarial work and not out on the streets. Plaintiff Strickland states that she responded to Ranzino and told him that she earned her position at EMU and insisted being put on the streets.**

4

7.      If not already answered above, identify all "abuse and harassment" you suffered as alleged in Paragraph 40 of your Complaint, including which supervisors or other employees are alleged to have abused or harassed you, what form the abuse or harassment took (e.g. verbal or physical, in person, over the phone, over the internet, etc.), whether or not you asked that the abuse or harassment stop, who you asked to stop, whether or not you filed a grievance or complaint regarding the abuse or harassment, and, if so, the status or outcome of the grievance or complaint, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the abuse, harassment or alleged retaliation.

**Response: Plaintiff Strickland states that harassment by Shields, Ranzino, and Rohloff through formal reprimand, work assignments, and verbal derogatory comments. Plaintiff Strickland states that she did not file a grievance against the defendants due to her fear of being retaliated against and did endure retaliation after filing her EEOC charge.**

8.      If not already answered above, identify all facts related to your bidding out of the Electronic Monitoring Unit as alleged in Paragraph 40 of your Complaint including when you first began considering requesting or moving or bidding out of the EMU, each and every instance where you bid, requested, applied or otherwise attempted to move out of the EMU, how you identified possible locations you wanted to move to, which position(s) you were offered, and which position(s) you ultimately accepted.

**Response: Plaintiff Strickland states that she tested for transportation prior to EMU, she went on EMU because there was a position open to accept. Plaintiff states that she wanted to enter the EMU, but once a position opened on transportation, she took it to get away from the harassment and abuse.**

5

9.      Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response: Plaintiff Strickland states that Defendant Shields did not threaten to fire her but did verbally threaten to have her sent back to her prior position at the jail. Plaintiff states that Chief Loggins was present for these comments.**

10.     If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response: Plaintiff Strickland states that Defendant Shields called her "nappy head" in front of Investigators Legrain Winston, David Walker, and Victor Slaughterhouse. Plaintiff states that Mary Harvey, the office clerk, was present during many incidents when Defendant Shields made the derogatory comments about her working in the office because she was a woman.**

6

11.    If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline.   Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response: Plaintiff Strickland states that on or around August 2014 she was placed in the basement, Chief Loggins was watching her in the basement and she was caught listening to music with a speaker. See P000044. Strickland states that this was common practice however she received a written reprimand. During December 2014, Plaintiff Strickland parked her personal vehicle in an employee parking lot and it remained there for over 48 hours, this act of parking a personal vehicle in the employee parking lot and leaving it there was common practice. See P000045. Plaintiff Strickland states that Defendant Shields threatened to have her car towed and received a 2-day suspension. Plaintiff Strickland never received a verbal warning, she was always given a written reprimand or suspension, even for her first offense.**

12.    If not already answered above, identify the duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

7

**Response: Plaintiff Strickland states that she was placed in the basement, in the office, and when she worked on the streets she was placed on the South Side. Plaintiff states that she was placed in these areas due to her race and sex. Furthermore, she states that another non-minority female was placed on day shift, but when Plaintiff Strickland requested to be placed on it, she was automatically rejected.**

13.     Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response: Plaintiff Strickland states that "high incident area" means the South Side area, which has a higher crime rate and more likelihood for injury. She states that African American investigators were more likely to be placed in this dangerous area than non-minority investigators.**

14.     If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response: Plaintiff Strickland states that her disciplinary process was bias and skewed due to Defendant Shields not allowing her to make a case and she would ultimately**

8

**have to make a case in front of him, even when he initiated the write up. Furthermore, Plaintiff Strickland states that she feared making an internal complaint or grievance due to the disparaging treatment she already received for asking questions and trying to better understand the unit.**

15.    If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response: Plaintiff Strickland states that she questioned Defendant Shields about training when she first started at EMU due to not feeling safe on the job, it was then that she started to receive write ups. Furthermore, after she filed her EEOC charge, she suffered continued harassment and further write up resulting in suspensions.**

16.    Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response: Plaintiff Strickland states that the excessive write ups by Defendant Shields could have prevented her from advancing into other units and prohibit movement from EMU. Furthermore, she states that the reduction of her pay for a late arrival and multiple suspensions hurt her employee record and could get her fired if too many disciplinary notices are filed against her.**

9

17.    Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response: Plaintiff Strickland states then when she began working in EMU, they received no vests, tasers, and formal training was put in place. When Plaintiff Strickland brought this up during Defendant Shields' roll call, he began taking issue with her and the write ups started.**

18.    Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response: Previously identified.**

19.    Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response: Plaintiff Strickland states that Defendant Shields did not utilize the proper grievance process that would allow for a fair procedure. Due to Defendant Shields' excessive write ups, Plaintiff Strickland did not want them placed in her file as a written reprimand, and by fighting this, Defendant Shields ultimately decided what punishment Plaintiff Strickland received.**

Respectfully Submitted,

By:    /s/ Kelly A. Krauchun
      KELLY A. KRAUCHUN
      The Herbert Law Firm
      206 S. Jefferson, Suite 100

10

Chicago, IL 60661
(312) 655-7660
Kelly.krauchun@danherbertlaw.com

11

4814-5578-6932, v. 1

## <u>VERIFICATION</u>

I, Michelle Strickland, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 2-10-2020

Michelle Strickland

# Exhibit G



# Transcript of Tyrone McGhee

**Date:** August 24, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Tyrone McGhee

1 (1 to 4)

Conducted on August 24, 2020

---

**1**

```
1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4    ----------------------------x
5    LeGRAIN WINSTON, et al.,   :
6             Plaintiffs,       :
7       v.            :Case No. 18-cv-05726
8    SHERIFF OF COOK COUNTY      :
9    THOMAS J. DART, et al.,     :
10            Defendants.   :
11   ----------------------------x
12
13        Deposition of TYRONE McGHEE
14            Conducted Virtually
15        Monday, August 24, 2020
16             11:40 a.m. CST
17
18
19
20
21
22   Job No.:  316652
23   Pages:  1 - 128
24   Reported by:  Paula M. Quetsch, CSR, RPR
```

**2**

```
1        Deposition of TYRONE McGHEE, held virtually:
2
3
4
5
6
7        Pursuant to notice before Paula M. Quetsch, a
8    Certified Shorthand Reporter, Registered Professional
9    Reporter, and a Notary Public in and for the State
10   of Illinois.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1             A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3        KELLY A. KRAUCHUN, ESQUIRE
4        THE HERBERT LAW FIRM
5        206 South Jefferson Street
6        Suite 100
7        Chicago, Illinois 60661
8        (312) 655-7660
9
10   ON BEHALF OF THE DEFENDANTS:
11       ETHAN E. WHITE, ESQUIRE
12       EMERY LAW
13       2021 Midwest Road
14       Suite 200
15       Oak Brook, Illinois 60523
16       (630) 984-0339
17
18   ON BEHALF OF THE DEFENDANTS:
19       JUSTIN L. LEINENWEBER, ESQUIRE
20       LEINENWEBER, BARONI & DAFFADA, LLC
21       120 North LaSalle Street
22       Suite 2000
23       Chicago, Illinois 60602
24       (866) 786-3705
```

**4**

```
1    ALSO PRESENT:
2        DANNY TERRY, AV Technician
3        IAN ROWE, AV Technician
4             C O N T E N T S
5    EXAMINATION OF TYRONE McGHEE        PAGE
6        By Mr. White                  5
7        By Ms. Krauchun              112
8        By Mr. White                 120
9        By Ms. Krauchun              125
10       By Mr. White                 127
11
12            E X H I B I T S
13           (Attached to transcript.)
14   MCGHEE DEPOSITION EXHIBITS         PAGE
15   Exhibit 1  Complaint               23
16   Exhibit 2  Plaintiff Tyrone McGhee's   32
17           Objections and Answers to
18           Defendant Gregory Shields'
19           First Set of Interrogatories
20   Exhibit 4  Plaintiff Tyrone McGhee's   89
21           Objections and Answers to
22           Defendant Sheriff of Cook
23           County Thomas J. Dart's First
24           Set of Interrogatories
```

Transcript of Tyrone McGhee
2 (5 to 8)
Conducted on August 24, 2020

---

**Page 5**

1           P R O C E E D I N G S
2      (Witness sworn.)
3           TYRONE McGHEE,
4  having been duly sworn, testified as follows:
5      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6  BY MR. WHITE:
7      Q  Good morning, sir.  My name is Ethan White.
8  I'm one of the attorneys representing the Cook
9  County Sheriff's Office in this litigation.
10      I'm going to be asking you a number of
11  questions, the first of which is, have you ever
12  been deposed before?
13      A  Been who?
14      Q  Deposed before?
15      A  Have I had a deposition, yes.
16      Q  Okay.  How many times?
17      A  Once.
18      Q  Okay.  What kind of case was that?
19      A  That was probably back in 20- -- no, not
20  20-, 1980- -- maybe '90, somewhere around there.
21  I was a supervisor and one of my employees got
22  injured.
23      Q  So you were like a witness in an injury case?
24      A  No, I wasn't a witness.  I wasn't even on

**Page 6**

1  the scene when it happened, but I had to testify
2  as to the policies and procedures.
3      Q  Fair enough.  Well, this is probably going
4  to go pretty similar to how that went, but before
5  we begin let me just give you some ground rules so
6  we're both on the same page.  Okay?
7      A  Okay.
8      Q  So I'm going to -- and it's a little awkward
9  because we're doing it by video and phone, but
10  we're going to do our best where -- you know, let
11  me finish my question before you start answering,
12  and I will do my best to let you finish answering
13  before I ask another question.  Okay?
14      A  Okay.
15      Q  And I need you to, as you've been doing,
16  answer every question out loud.  The court
17  reporter can't pick up things like nodding the
18  head, or shrugging your shoulders, or anything
19  like that.  Okay?
20      A  Okay.
21      Q  Hopefully we won't go too long today, but
22  if you need to take a break at any time, just let
23  me know, and as long as there's no question pending,
24  we can go on a break.  Okay?

**Page 7**

1      A  Yes.
2      Q  If you don't understand something that
3  I've asked you, whether it's a question or a word
4  I'm using, I need to you let me know.  Because if
5  you answer the question, we're all going to assume
6  that you knew what I was asking.  Okay?
7      A  Okay.
8      Q  Is there any reason you can't give full,
9  accurate, complete, truthful testimony here today?
10      A  No.
11      Q  I have to ask some additional questions
12  because we're doing everything remotely.
13      So is anybody in the room with you?
14      A  No.
15      Q  Do you have any notes or other documents
16  in front of you?
17      A  No.
18      Q  And you understand that only you can provide
19  testimony?  Nobody can help you with that; right?
20      A  Yes.
21      Q  You agree that you won't look at your
22  phone or any text messages or anything like that
23  for help during your deposition; right?
24      A  Okay.  Correct.

**Page 8**

1      Q  Okay.  Did you do anything to prepare for
2  your deposition?
3      A  No.
4      Q  Did you -- and I don't want to know about
5  the substance, but did you have a call with your
6  attorney to prepare for this deposition?
7      A  Yes.
8      Q  Okay.  When did that call occur?
9      A  Saturday.
10      Q  And about how long did that call last?
11      A  20 minutes.
12      Q  Okay.  Did you look at any documents to
13  prepare for your deposition?
14      A  No.
15      Q  Besides your attorney, did you talk to
16  anyone else about your deposition?
17      A  No.
18      Q  When did you start working at the Cook
19  County Sheriff's Office?
20      A  10/31/1994.
21      Q  Did you start in EM or you started
22  somewhere else?
23      A  Somewhere else.
24      Q  Sorry; I should be clear for the record,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

9

1 sir. When I say "EM," I'm referring to electronic
2 monitoring. We can use that interchangeably; right?
3   **A Yes. No problem.**
4   Q So what -- when you first started in 1994,
5 what were you doing for the Sheriff's Office?
6   **A I was a correctional officer working in**
7 **Division 8.**
8   Q And how long did you work in -- as a
9 correctional officer in Division 8?
10   **A Probably about a year, year and a half.**
11 **Then I went to Division 10, maximum security.**
12   Q Were you still acting a correctional
13 officer in Division 10?
14   **A Pardon me?**
15   Q Were you still acting as a correctional
16 officer in Division 10?
17   **A What do you mean by was I still acting?**
18 **I'm sorry.**
19   Q No, no problem. What was your job when
20 you moved over to Division 10?
21   **A Correctional officer.**
22   Q Okay. And how long were you a correctional
23 officer in Division 10?
24   **A Approximately seven years.**

10

1   Q All right. And then where did you go
2 after Division 10?
3   **A To EM.**
4   Q All right. So if my math is right, you
5 came over to EM in like -- what? -- 2002, 2003,
6 something like that?
7   **A Yes, sir, that's correct.**
8   Q And when you joined EM, did you join as an
9 investigator?
10   **A Yes.**
11   Q Why did you want to join EM in the first
12 place?
13   **A EM was considered a promotion.**
14   Q Did you earn more money in EM?
15   **A Yes.**
16   Q Okay. And you're still working in EM; is
17 that correct?
18   **A Correct.**
19   Q Okay. What -- have you always had the
20 same shift in EM or has it changed?
21   **A Only through training and then I worked**
22 **the night shift for probably about a year before I**
23 **went to the shift that I'm on now.**
24   Q So when you say "night shift," is that the

11

1 3:00-to-11:00 shift?
2   **A No, no, night shift was -- it was 12:00 at**
3 **night to 8:00 in the morning.**
4   Q Got it. And then what shift are you on --
5 so you did that 12:00-to-8:00 shift for about a
6 year you think?
7   **A Yes.**
8   Q And then what shift did you switch to?
9   **A 3:00 to 11:00.**
10   Q And that's what you've been doing since then?
11   **A Yes.**
12   Q Is -- do you bid for shift?
13   **A Yes.**
14   Q So that's the shift that you -- the shift
15 that you bid on, is that all handled through the CBA?
16   **A Yes.**
17   Q Okay. And are you a union steward, sir?
18   **A Yes.**
19   Q Okay. So we'll talk about that a little
20 bit more later.
21     Are you aware of the Cook County Sheriff's
22 Office having a policy regarding discrimination?
23   **A Yes.**
24   Q Have you seen that policy?

12

1   **A Yes.**
2   Q When do you think is the last time you saw
3 that policy?
4   **A I'm not sure. Maybe a year ago.**
5   Q And I should have said this at the
6 beginning, sir. This isn't meant to be -- I don't
7 know -- a quiz show. If you don't remember
8 something, just tell me you don't remember
9 something. Okay? Because nobody wants you to
10 guess at anything. Okay?
11   **A Okay.**
12   Q So you think you saw it about a year ago?
13   **A Yes.**
14   Q In what context would you have seen it a
15 year ago?
16   **A I think that they mentioned it when I was**
17 **doing my in-service training.**
18   Q All right. Have you ever actually sat
19 down and read the policy on discrimination?
20   **A Yes.**
21   Q What are you supposed to do if you witness
22 discrimination occurring pursuant to that policy?
23   **A I can't tell you the exact steps right now**
24 **because I don't remember, you know, the last time**

Transcript of Tyrone McGhee
Conducted on August 24, 2020

13

1  I read it.
2     Q  Okay.  Do you know if -- are you supposed
3  to report the discrimination to somebody if you
4  witness it?
5     **A  Yes.**
6     Q  Who are you supposed to report it to?
7     **A  Immediate supervisor.**
8     Q  What if the discrimination is coming from
9  your -- if you witness discrimination from your
10 immediate supervisor?  Is there a backup plan?
11    **A  The supervisor for that guy or whoever is**
12 **next in line.**
13    Q  So you go up the chain of command?
14    **A  Yes, chain of command.**
15    Q  And what are you supposed to do if you
16 yourself are discriminated against?
17    **A  That should actually be the same process.**
18    Q  Okay.  So report it to a supervisor?
19    **A  Yes.**
20    Q  And report it up the chain?
21    **A  Yes.**
22    Q  What about retaliation?  Does the Cook
23 County Sheriff's Office have an anti-retaliation
24 policy?

14

1     **A  Yes.**
2     Q  Have you reviewed that policy in the past?
3     **A  I don't remember when.**
4     Q  Okay.  But you think you've seen it before?
5     **A  Yes.**
6     Q  And do you know what that policy says if
7  you yourself experience retaliation, what are you
8  supposed to do?
9     **A  Well, there's supposed to be no retaliation.**
10    Q  Okay.  So let's say -- understood there's
11 not supposed to be any.  Let's say, though, it
12 actually happens to you.  What are you supposed
13 to do?
14    **A  Well, that depends on who is the next in**
15 **chain of command.  If you tell the next in chain**
16 **of command, you know, depends on how far up it goes.**
17    Q  Uh-huh.  Well, what if the retaliation was
18 coming from the very top of the chain of command?
19 What are you supposed to do?
20    **A  I'm not sure.  I can't answer that question.**
21    Q  Does EM have a progressive discipline policy
22 that you're aware of?
23    **A  Yes, we do.**
24    Q  What is that policy?  What does it say?

15

1     **A  As far as what, sir?**
2     Q  Just how is progressive discipline supposed
3  to work in EM?
4     **A  Well, that depends on what the infraction is.**
5     Q  Okay.  Let's say the infraction is being
6  late for roll call.
7     **A  Well, anytime there's tardiness the**
8  **process would be verbal, then written warning,**
9  **then written reprimand, and from there they'll**
10 **probably start asking for some days off.**
11    Q  Okay.  What about if it's a major infraction?
12 What does the progressive discipline policy say is
13 supposed to happen?
14       MS. KRAUCHUN:  Objection; foundation,
15 calls for speculation.
16       MR. WHITE:  You can answer, sir.
17    **A  If there's a major infraction?**
18    Q  Correct.
19    **A  Depending on the infraction, they can go**
20 **straight for days off up to and including**
21 **termination.**
22    Q  And is that progressive discipline
23 determined by the union contract?
24       MS. KRAUCHUN:  Objection; foundation.

16

1       MR. WHITE:  You can answer, sir.
2     **A  Okay.  There is supposed to be a process.**
3  **However, management decides at what point they**
4  **want to implement the process.  If they feel it's**
5  **a major cause, they won't give you a verbal**
6  **warning; they'll go straight to the days off.**
7     Q  So who decides the initial amount of
8  discipline?
9     **A  Are you looking for a name or just**
10 **management?**
11    Q  A name would be great.
12    **A  I don't have one, sir.**
13    Q  Okay.  You tricked me on that one.  Okay.
14 So is it really just -- well, what is it, the
15 supervisor who witnesses the infraction?
16    **A  Whatever form of infraction they decide is**
17 **not with the rules and regulations, and then you**
18 **would get the written disciplinary action**
19 **according to that.**
20    Q  Okay.  And I asked you before, you are a
21 union steward; correct?
22    **A  Yes, sir.**
23    Q  What does that entail?  What do you do as
24 a union steward?

17

1    A   Most of the time I represent my coworkers
2  in matters with management as far as disciplinary
3  action goes.
4    Q   Do you get paid for it?
5    A   No.  I mean, I don't pay union dues, but I
6  don't get paid for it, no.
7    Q   Okay.  So in -- so in -- by virtue of you
8  being a union steward, you don't have to pay your
9  union dues?
10   A   Yes.
11   Q   Are you familiar with -- well, let me back
12 up.  Does the Cook County Sheriff's Office have
13 a -- the EM unit have a grievance process?
14   A   Yes.
15   Q   This is a process by which an employee who
16 has been dinged with some discipline can kind of
17 challenge that discipline?
18   A   Yes.
19   Q   Are you familiar with that grievance process?
20   A   Yes.
21   Q   Is that part of your role as a union steward
22 is to kind of help employees navigate through that
23 grievance process?
24   A   Yes, sir.

18

1    Q   Do you think the grievance process in
2  EM works well?
3      MS. KRAUCHUN:  Objection; calls for
4  speculation, foundation, form.
5      MR. WHITE:  You can answer.
6    A   Could you ask the question again?
7    Q   Yeah.  Do you think the grievance process
8  in EM works well?
9    A   That is not a yes-or-no answer, so I'm
10 kind of up in the air on that.
11   Q   What do you mean by that?
12   A   I can't tell you it works well, and I
13 can't tell you exactly if it's bad.  You know,
14 it's a process.
15   Q   I mean, is it -- I'm just trying to
16 understand what you're saying.  Sometimes it works
17 and sometimes it doesn't?
18   A   Right.  I can't tell you that it's a great
19 process, and I can't tell you that it's a bad
20 process.  So I can't speculate as far as whether I
21 think it's good or bad.  It's just a process.
22   Q   Do you think the process is designed to
23 make sure discipline is fair?
24     MS. KRAUCHUN:  Objection; foundation.

19

1    A   No.
2    Q   Would you agree that the initial discipline
3  imposed is often reduced through the grievance
4  process?
5      MS. KRAUCHUN:  Objection; foundation,
6  calls for speculation, form.
7      MR. WHITE:  You can answer.
8    A   No.
9    Q   Who hears grievances?
10   A   The -- it can be anybody from the lieutenant
11 to the director.
12   Q   Do you know how it gets decided who is
13 going to hear a particular grievance?
14   A   I do not.
15   Q   And then there's different steps in the
16 grievance process, right, like Step 1, Step 2,
17 Step 3?
18   A   Yes, sir.
19   Q   Does a different hearing officer hear it
20 at each level?
21     MS. KRAUCHUN:  Objection; asked and
22 answered.
23     MR. WHITE:  So two things, Mr. McGhee.
24 First, I think you're kind of getting off the

20

1  screen here; we only have about half of you.
2      THE WITNESS:  Okay.
3      MR. WHITE:  There we go.  Thank you.
4      And the second thing is your counsel is
5  going to make objections throughout the deposition.
6  Unless she specifically tells you not to answer,
7  you're going to have to answer the question.  Okay?
8      THE WITNESS:  That's not a problem.
9  BY MR. WHITE:
10   Q   So my question was, does a different
11 hearing officer hear the grievance at each step in
12 the process?
13   A   Yes.
14   Q   And ultimately, could any grievance go to
15 arbitration?
16   A   Yes.
17   Q   And the arbitration would be heard by --
18 the hearing officer would be somebody who doesn't
19 even work in EM; correct?
20   A   Yes.
21   Q   Do you contend in this lawsuit that
22 EM supervisors are not following progressive
23 discipline?
24   A   Yes.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

21

1    Q  When has that occurred?
2    **A  I can't give you specific dates and times.**
3    Q  Okay.  Who is not following progressive
4  discipline?
5    **A  That would be management, sir, all of them.**
6    Q  All of management?  Okay.  And how are
7  they not following progressive discipline?
8    **A  Well, first of all, if there's an infraction,**
9  **and you're supposed to give a person a verbal or**
10 **some type of reason that you're having a problem**
11 **with their performance, then that should take**
12 **place before you give them a written disciplinary**
13 **action.**
14   Q  Okay.  What policy says that?
15   **A  Well, that's according to the CBA.  It**
16 **says that you should -- that you should give a**
17 **person a verbal, precursory written, and that's**
18 **just what should happen.**
19   Q  No matter what the infraction?
20     MS. KRAUCHUN:  Objection; foundation.
21     Go ahead, Tyrone.
22   **A  Well, we already stated that, you know,**
23 **they can start at any point they decide they want**
24 **to start at.  So if it's a minor infraction and**

22

1  **they decide they want days, they can quote it as a**
2  **minor infraction and ask for days.**
3    Q  Pursuant to the policy?
4    **A  Yes, sir.**
5    Q  Okay.  And it's your contention that that
6  policy is in the CBA or is it somewhere else?
7    **A  It's in the CBA.**
8    Q  So they're following the CBA then?
9      MS. KRAUCHUN:  Objection.
10   **A  No, that's not what I said.**
11   Q  Well, that's what I'm trying to understand.
12 So you're saying the CBA says they can give a
13 verbal, and I'm trying to figure out what type of
14 infractions get a verbal.
15     MS. KRAUCHUN:  Objection.
16   **A  I didn't say that.**
17     MS. KRAUCHUN:  I just want to put my
18 objection on.  Foundation, form.  There's no
19 specificity as to what we're talking about here
20 and what level of discipline.
21     But, go on, Tyrone, and try and answer.
22   **A  (Continuing.)  Okay.  What I was saying is**
23 **that if they decided that you were tardy and then**
24 **they wanted to ask for days off, they can do that**

23

1  **instead of giving you a verbal warning.  And then**
2  **I would have to implement the grievance process to**
3  **say you should start here instead of there.**
4    Q  Okay.  So the grievance process would
5  address that issue that you're talking about?
6    **A  Yes.**
7      MR. WHITE:  All right.  Danny, if we can
8  pull up Exhibit 1, please.
9      AV TECHNICIAN:  Yes, sir.  Stand by, please.
10     (McGhee Deposition Exhibit 1 marked for
11 identification and attached to the transcript.)
12   Q  Okay.  Mr. McGhee, you should see on the
13 screen in front of you there a document we've
14 marked Exhibit 1, and it is the complaint in this
15 lawsuit.
16     And we're going to talk about some specific
17 paragraphs here, but let me ask, have you seen
18 this document before?
19   **A  Yes.**
20   Q  Did you see this document prior to it
21 being filed as a lawsuit?
22   **A  I'm not exactly sure.**
23   Q  So you've seen it but you just don't know
24 when in the process you saw it the first time?

24

1    **A  Right.  I can't tell you exactly when in**
2  **the process I seen it, yes.**
3      MR. WHITE:  Danny, if we could scroll down
4  to paragraph 72, please, I believe it is on the
5  top of page 11.  Actually -- yeah, maybe we can
6  zoom out so we can see the bottom of page 10 and
7  then the top of page 11.  There we go.
8    Q  All right, sir, so this is a section in
9  the complaint titled "Facts Particular to Tyrone
10 McGhee."  Do you see that?
11   **A  Uh-huh, yes.**
12   Q  Okay.  And then paragraph 70 talks about
13 when you began your employment, 71 talks about you
14 transferring to EM, and 72 says you have been
15 consistently assigned to work in the basement when
16 other nonminority officers with less seniority are
17 assigned to work in the office or less dangerous
18 positions.
19     Do you contend that your assignment to
20 the, quote, "basement," is because of your race?
21   **A  Because of my race?**
22   Q  Correct.
23   **A  Well, I'm contending that other people**
24 **didn't have the same opportunity to work down**

Transcript of Tyrone McGhee
Conducted on August 24, 2020

7 (25 to 28)

25

1 there as I did.
2    Q  And do you believe that that is because of
3 your race?
4    A  Yes, sir.
5    Q  Okay.  What shift were you working when
6 you were assigned -- well, let me short-circuit
7 that.  Were you always working the 3:00-to-11:00
8 shift when you were assigned to TSS?
9    A  Yes.
10    Q  Would you agree that you don't bid on
11 assignment?  You don't bid on patrol, versus TSS,
12 versus delivery?
13    A  As of the last bid, yes.
14    Q  Right and that's a good point.  So that
15 used to be in the union contract that you could
16 bid on assignment; right?
17    A  No.  It was a matter that you would bid
18 for starting times, and each starting time was
19 assigned to where you wanted to work.  So if you
20 wanted to work a 4:00, you knew you was going to
21 be patrol.  If you wanted to work 3:00 to 12:00,
22 you knew you was going to be at TSS.
23    Q  So if I understand, you weren't bidding
24 for position, but the starting time that you were

26

1 bidding on would basically decide your assignment?
2    A  Yes.  That's the way it used to be, yes.
3    Q  When did -- approximately when did that
4 change?
5    A  I'm not exactly sure.
6    Q  I'm just trying to understand, was it
7 5 years ago, 10 years ago, longer than that?
8    A  Not exactly sure.  I don't remember the
9 bidding process.  I can't tell you that offhand.
10    Q  And it looks like in paragraph 72 you're
11 claiming that employees with less seniority are
12 not assigned to TSS.  Is that correct?
13    A  Yes.
14    Q  What -- is there a policy that says
15 seniority governs assignment?
16    A  A policy?  No.
17    Q  Is there anything in the CBA that says
18 seniority determines assignment?
19    A  No.
20    Q  Are you aware of any document in the world
21 that says seniority determines assignment?
22       MS. KRAUCHUN:  Objection; asked and
23 answered.
24    A  No.

27

1    Q  Since 1994, how often -- not '94 --
2 whenever you joined EM.  Since you joined EM, how
3 often are you assigned to work in TSS?
4    A  Since I joined EM?
5    Q  Correct.
6    A  In 2003?
7    Q  Yes, sir.
8    A  I was basically consistently put in
9 EM probably 2015.
10    Q  And I think you may have misspoke there.
11 You said --
12    A  I mean put in TSS 2015.
13    Q  Okay.  So since 2015 you believe you've
14 been consistently placed in TSS?
15    A  Yes.
16    Q  Would you agree that you're good at it?
17       MS. KRAUCHUN:  Objection; foundation,
18 form, calls for speculation.
19    Q  Sir, do you believe that you have to
20 speculate whether you're good at your job?
21    A  No.  You asked a question, she objected,
22 and so I waited until you guys finished so I can
23 answer.
24    Q  Sure.  Do you think you're good at your job?

28

1    A  Yes.
2    Q  Do you think you're good at working in TSS?
3    A  Yes.
4    Q  And you've been doing it a long time.  Do
5 you think that you're one of the -- in your
6 opinion one of the most knowledgeable investigators
7 in TSS?
8    A  Yes.
9    Q  Do you in your opinion think supervisors
10 think you're good in TSS?
11    A  Yes.
12    Q  Does it make sense to you that a
13 high-level performer in TSS would be consistently
14 assigned to TSS?
15       MS. KRAUCHUN:  Objection; foundation,
16 speculation.
17       MR. WHITE:  Go ahead, sir.
18    A  No.  No.
19    Q  No, EM should not be put in high-level TSS
20 performers in TSS?
21    A  Well, if -- if that was the case, then
22 when they decided to move you because you
23 disagreed with them on something, they wouldn't do
24 it so freely if you were such a high performer.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

---

29

1    Q  Have you been moved out of TSS a lot
2  because you disagreed with someone?
3    A  No.
4    Q  Would you agree that officers are placed
5  in TSS based on -- sorry -- strike that.
6        Would you agree that investigators are put
7  in their assignments based on operational needs?
8        MS. KRAUCHUN: Objection; foundation.
9    Q  Sorry; I didn't get your answer, sir.
10   A  No.
11   Q  Why do you say that?
12   A  Because I feel like managers are moving
13 people around as they want, not as they need.
14   Q  What do you base that on?
15   A  I'm basing that on experiencing people
16 being moved because of disagreements.
17   Q  But not you?
18   A  No.
19   Q  Would you agree that some investigators
20 actually prefer to be assigned to TSS?
21       MS. KRAUCHUN: Objection; foundation.
22   A  That's not a conversation that I have with
23 my coworkers about where they prefer to work.
24   Q  And that's fine, sir. So if I understand

---

30

1  you, you're saying you don't know whether people
2  prefer to work in TSS?
3    A  Correct.
4    Q  Do you prefer to work in TSS versus patrol?
5    A  No.
6    Q  You would rather be on patrol?
7    A  Yes.
8    Q  Is TSS more or less dangerous than working
9  on patrol?
10   A  What do you mean by "dangerous," sir?
11   Q  I'm not sure I can really elaborate on
12 that. You know, I don't work in EM, but, you know,
13 I understand it's a dangerous job regardless, and
14 I'm trying to figure out if being in TSS or being
15 out on the street is more or less dangerous for
16 your personal safety.
17   A  I'd say both being equal, seeing that TSS
18 is -- the conditions in TSS could be just as
19 dangerous when you have inmates not being
20 contained in a particular area or the amount of
21 inmates as compared to the amount of people that's
22 working down there.
23   Q  Do you consider TSS a bad assignment?
24   A  A bad assignment?

---

31

1    Q  Yeah.
2    A  What do you mean by "bad," sir? Because I
3  mean, the questions you're asking me -- do I think
4  it's bad? As compared to being on the street is
5  it bad? What am I comparing it to?
6    Q  We can start with that. That's fine. Do
7  you think it's bad compared to being on the street?
8    A  I think it's about the same. I think the
9  health conditions are a little bit worse in TSS
10 than being on the street, yes.
11   Q  Did you say, "the health conditions"?
12   A  Yes.
13   Q  What do you mean by that?
14   A  I mean TSS is dirty. You know, the
15 ventilation system is poor, bathrooms are
16 despicable. There's a bunch of things that goes
17 on in working with TSS.
18   Q  What else?
19   A  Well, just a bunch of things. I can't
20 say -- pick up every little thing. I'm sure that
21 we've talked about it before.
22   Q  When you're working patrol, do you
23 sometimes have to go into participants' homes?
24   A  Yes.

---

32

1    Q  And are all those homes clean, and well
2  lit, and safe?
3    A  No.
4        MR. WHITE: Danny, if we could look at
5  Exhibit 2, please.
6        AV TECHNICIAN: Stand by.
7        (McGhee Deposition Exhibit 2 marked for
8  identification and attached to the transcript.)
9    Q  All right. Sir, you're now seeing on your
10 screen McGhee Exhibit 2, which is "Plaintiff
11 Tyrone McGhee's Objections and Answers to
12 Defendant Gregory Shields' First Set of
13 Interrogatories." Have you seen this before?
14   A  Yes.
15       MR. WHITE: And, Danny, if we could scroll
16 all the way to the last page, please.
17   Q  Sir, this is a verification where it says,
18 "I declare under penalty of perjury that the
19 foregoing is true and correct." Is that your
20 signature?
21   A  Yes.
22   Q  It looks like you signed this on
23 March 13th, 2020.
24   A  Yes.

---

Transcript of Tyrone McGhee
Conducted on August 24, 2020

33

1       MR. WHITE: Okay. Danny, if we could go
2   to Interrogatory No. 1, which is on page 3.
3       Q And then I think he is going to make that
4   a little bigger for you. Give that a read through
5   and let me know when you're ready to talk about it.
6       **A Okay.**
7       Q Okay. So this interrogatory asks you to
8   identify the other, quote, "nonminority officers"
9   who were not assigned to the positions you were
10  assigned to as alleged in paragraph 72 of the
11  complaint. And if you recall, paragraph 72 referred
12  to you being assigned to TSS; correct?
13      **A Correct.**
14      Q Okay. So as other nonminority officers, you
15  identified a list of 11 people. Do you see that?
16      **A Yes.**
17      Q And is it your contention that all of
18  these 11 nonminority officers were rarely assigned
19  to TSS?
20      **A Yes.**
21      Q Not all of these people, though, are
22  nonminority investigators; correct?
23      **A Correct.**
24      Q So Lopez, Rico, Hurtado, they're Latino;

34

1   correct?
2       **A Correct.**
3       Q Why did you include them as nonminority
4   officers?
5       **A They're not black, sir. They're not**
6   **African-American.**
7       Q Okay. So when you think of nonminority,
8   that only means African-American people?
9       **A According to this situation, yes.**
10      Q Did all of these 11 people work the same
11  shift?
12      **A Yes.**
13      Q What shift is that?
14      **A 3:00 to 11:00.**
15      Q And how do you know the shift for each of
16  these people?
17      **A I can look at them and tell you my coworkers.**
18      Q So are you saying because you see them at
19  work in the 3:00-to-11:00 you know they work the
20  3:00-to-11:00?
21      **A Yes, sir.**
22      Q How often is Investigator Nickle assigned
23  to TSS?
24      **A How often?**

35

1       Q Yes.
2       **A I don't know. Not often.**
3       Q What about Bieniek? How much is Bieniek
4   assigned?
5       **A Not often.**
6       Q Shedor?
7       **A Shedor? Again, not often.**
8       Q How often is Bosques assigned to TSS?
9       **A Almost never.**
10      Q Pemonte, how often is Pemonte assigned
11  to TSS?
12      **A Not often, sir.**
13      Q Folkers?
14      **A Not often.**
15      Q How often is Bosques assigned to TSS?
16      **A Not often.**
17      Q We're almost done. How often is Lopez
18  assigned to TSS?
19      **A Almost never.**
20      Q Okay. How often is Rico assigned to TSS?
21      **A Not often.**
22      Q And how often is Messina assigned to TSS?
23      **A Almost never.**
24      Q And what about Investigator Hurtado?

36

1       **A Hurtado, not often.**
2       Q Would you agree with me that you are
3   better than every one of those 11 people in TSS?
4       MS. KRAUCHUN: Objection; foundation.
5       **A No.**
6       Q Who is better than you amongst that list
7   at performing in TSS?
8       MS. KRAUCHUN: Same objection.
9       **A That matter -- that's a matter of opinion.**
10  **I mean, I don't know. I mean, I don't know what**
11  **their skill set is, what their computer**
12  **capabilities are or anything like that.**
13      Q So you just don't have an opinion one way
14  or the other about whether you're better than
15  these people at TSS?
16      **A No.**
17      Q They could be better than you; you could
18  be better than them?
19      **A They can replace me at any time that they**
20  **want to put them in there.**
21      Q Yeah, I understand management can do that,
22  sir. But what I'm trying to understand is if you
23  have an opinion on whether or not you are better
24  than this list of 11 people at performing in TSS.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

---

**37**

1    A  I understand what you want to know, and I
2  can't answer that because I can't tell you what
3  their skill set is.
4    Q  Do you know -- have you worked with David
5  Walker in TSS?
6    A  I'm sure I have.  I can't tell you when or
7  what year.
8    Q  Do you have any opinion on Mr. Walker's
9  performance, job performance in TSS?
10    A  No, sir, I do not.
11    Q  What about Victor Slaughter?  Have you
12  worked with Mr. Slaughter in TSS?
13    A  Yes.
14    Q  How often do you work with Mr. Slaughter
15  in TSS?
16    A  I worked with -- I worked with Victor
17  Slaughter quite a bit.
18    Q  Would you agree that Mr. Slaughter is a
19  very strong performer in TSS?
20    A  Yes, sir.
21    Q  He's been there a long time, kind of knows
22  the ins and outs?
23    A  Yes, sir.
24    Q  Would you agree that Mr. Slaughter is a

---

**38**

1  better performer in TSS than any of these 11 people
2  in Interrogatory No. 4?
3    MS. KRAUCHUN:  Objection; foundation.
4    A  No, sir; I do not.
5    Q  Sorry; you have no opinion on that?
6    A  No, sir, I do not know.
7    Q  Did you ever complain to anyone about
8  being assigned to TSS too much?
9    A  Yes.
10    MR. WHITE:  Okay.  Let's go to -- scroll
11  down to Interrogatory No. 6, please.
12    Q  I'll let you read that, sir, and we can
13  talk about it when you're ready.
14    A  Okay.  I'm ready.
15    Q  All right.  So in this interrogatory we
16  asked you to identify each and every complaint you
17  made regarding the behavior alleged in paragraph 72,
18  which is again being assigned to TSS.  You
19  responded, "investigation continues."  Did you
20  review this interrogatory before you signed it?
21    A  Yes.
22    Q  You understood you were signing it under
23  penalty of perjury?
24    A  Yes.

---

**39**

1    Q  You decided not to include any complaints?
2    A  Well, the thing about it is I don't
3  remember exact dates and times.  I do remember
4  people that I talked to, and I do know that there
5  was a lot of retaliations.  There was a lot of
6  things that went unsaid.
7    Q  That wasn't my question.  Why didn't you
8  include any of that information there?
9    A  Because I said at that date and time there
10  was a lot of retaliation going on, and I can't
11  remember -- what I can't remember is just that I'm
12  not exactly sure the dates and times of who I
13  talked to or what I said.
14    Q  But this asks you to identify each and
15  every complaint.  You didn't include a single one.
16    MS. KRAUCHUN:  Objection; asked and
17  answered.
18    But go ahead.
19    A  At that particular time I couldn't tell
20  you exactly who I talked to or what the dates and
21  times were, sir.
22    Q  Okay.  Can you tell us anything about
23  those complaints?  You don't know who you talked
24  to; you don't know when it happened?

---

**40**

1    A  I know that -- when you made a complaint,
2  I know what the retaliation was.
3    Q  What complaint did you make?
4    A  I complained about being downstairs and
5  being in the conditions of being downstairs at TSS.
6    Q  Who did you make the complaint to?
7    A  I made it to my management, my supervisors.
8    Q  Which one?
9    A  Who was ever there at that particular
10  time, that set of individuals, whether it would
11  have been Chief Neal, or Rohloff, or Ranzino, any
12  of those guys.
13    Q  Okay.  But you don't know which one or
14  when you made the complaint; correct?
15    A  No.  I can't tell you who I made the
16  complaint to when or what time, no.
17    Q  If we can scroll down to No. 7.  If you want
18  to read that, sir, and let me know when you're
19  ready to talk about it.
20    A  Okay.  I'm ready.
21    Q  Okay.  In this interrogatory we asked you
22  to identify each and every instance in which any
23  of the defendants used offensive, derogatory, or
24  racist language toward you as alleged in the

41
1  complaint.  And you responded with an incident
2  where you say deputy Chief Rohloff --
3      A  Ranzino.
4      Q  Sorry, sorry -- Ranzino came into roll
5  call and said, "You people all look alike."  Correct?
6      A  Correct.
7      Q  First of all, when did this occur?
8      A  I'm not exactly sure the date or the time.
9  I think it was 2016.
10     Q  Okay.  Where did it occur?
11     A  Roll call.
12     Q  And so was everybody from the 3:00-to-11:00
13 shift present in that roll call or should have
14 been present?
15     A  What do you mean by "everybody," sir?
16     Q  Was everybody who was working the
17 3:00-to-11:00 shift that day in the roll call?
18     A  I mean, are you talking management?  Are
19 you talking --
20     Q  I'm talking --
21     A  Pardon me.
22     Q  I'm talking investigators.
23     A  Investigators, yes.
24     Q  Who from management was there that day?

42
1      A  I'm not exactly sure other than Ranzino.
2  Sometimes, you know, you only had only one member
3  of management to hold roll call.
4      Q  And that comment, "You people all look
5  alike," did you find that to be a racist comment?
6      A  Yes.
7      Q  Did you file an OPR in response?
8      A  No.
9      Q  Did you report that to management?
10     A  He was management.
11     Q  Did you report it to anyone else in
12 management?
13     A  No.
14     Q  Did you report it to Director Shields?
15     A  No.
16     Q  Did you report it to anyone in the Cook
17 County Sheriff's Office?
18     A  No.
19     Q  Have you ever heard Ranzino use the N-word?
20     A  No.
21     Q  Have you ever heard Shields use the N-word?
22     A  No.
23     Q  Have you ever heard Rohloff use the N-word?
24     A  No.

43
1      Q  Have you ever heard Thomas Neal use the
2  N-word?
3      A  I'm not exactly sure about Thomas Neal.
4      Q  If you did hear Mr. Neal use the N-word,
5  did you find it to be a racist comment?
6      A  Yes.
7      Q  Okay.  When -- you said you're not exactly
8  sure.  Do you have a specific recollection of
9  hearing Mr. Neal use the N-word?
10     A  No, I do not but I didn't have a whole lot
11 of conversations with Mr. Neal.
12     Q  Okay.  But the answer to my question is
13 you don't specifically remember him using the
14 N-word?
15     A  Yes, you're right, I do not specifically
16 remember him using the N-word.
17     Q  Let's go to Interrogatory No. 8, please.
18 Let me know when you're ready to talk about
19 that one.
20     A  Okay.  I'm ready.
21     Q  All right.  So we asked you to identify
22 all discipline you received that you allege was
23 discriminatory and that formed the basis of your
24 complaint, and you responded with an incident in

44
1  2015 where you and Mr. Winston received a write-up
2  for logging their assignments at a later time
3  instead of at the time of the assignment; correct?
4      A  Correct.
5      Q  Wasn't the real issue with that discipline
6  that you said you were at a location that you
7  were not?
8      A  Correct.
9      Q  So you told -- you said over the radio
10 we're at one location, and, in fact, you were not
11 at that location; correct?
12     A  We had already been to that location.
13     Q  Understood, sir.  But you said over the
14 radio that you were still at that location, and,
15 in fact, you were back at Rockwell; correct?
16        MS. KRAUCHUN:  Objection; foundation.
17     A  Correct.
18        MS. KRAUCHUN:  Go ahead.
19     Q  And you grieved that -- and so Director --
20 not Director but what was Webb's position at that
21 time in 2015?  Do you remember, was he a deputy
22 chief?
23     A  I think he might have -- yeah, I think he
24 was chief.  I'm not sure.  I think he was chief

Transcript of Tyrone McGhee
Conducted on August 24, 2020

12 (45 to 48)

45

1  but I'm not sure.
2     Q  But for that incident we'll say Chief Webb
3  recommended 10 days of discipline -- sorry -- 10 days
4  off as discipline; right?
5     A  Yes, sir.
6     Q  Did you grieve that discipline?
7     A  Yes, sir.
8     Q  What was the outcome of your grievance?
9     A  I received 10 days off.
10    Q  So you grieved it at Step 1; is that right?
11    A  Yes.
12    Q  Did you grieve it beyond Step 1?
13    A  It went into default.
14    Q  What does that mean?
15    A  That means that it was not responded to in
16 a timely fashion.
17    Q  Not responded to by you; correct?
18    A  Yes.  Or my union steward at the time, yes.
19    Q  Who -- I'm looking back at No. 8 here.
20 You said, "Shortly thereafter Plaintiff worked
21 with other nonminority investigators who did the
22 same thing and received no write-up or discipline."
23 Who -- what other nonminority investigators said
24 they were at one location when, in fact, they were

46

1  at a different location?
2     A  What, do you want names?
3     Q  Yes, sir.
4     A  I work with a guy by the name of
5  Peter Tam.
6     Q  Peter and how do you spell the last name,
7  please?
8     A  T-a-m, Tam.
9     Q  Okay.  What is, if you know, Mr. Tam's
10 ethnicity?
11    A  I don't know, Oriental, Asian.  I'm not
12 exactly sure.
13    Q  Nonwhite?
14    A  Nonblack.
15    Q  Nonblack, okay.  So Mr. Tam was -- said
16 over the radio, "I'm in Calumet City," and then,
17 in fact, he was on Rockwell?
18    A  No, he didn't say those exact words, no.
19    Q  Okay.  Why don't you tell me what happened
20 with Mr. Tam.
21    A  He was at another location other than a
22 location that he went up and down on and nothing
23 happened.
24    Q  What location was that?

47

1     A  I can't tell you the exact location at
2  that particular time.  I do know it wasn't at the
3  location that he was supposed to be at.
4     Q  How do you know?
5     A  Because I was with him.
6     Q  So you were with him doing the same thing
7  you got in trouble for, but the next time you
8  didn't get in trouble?
9     A  He did the exact same thing, correct.  And
10 no, I did not get in trouble.
11    Q  Okay.  How do you know management even
12 knew about that?
13    A  How do I know management knew about it?
14    Q  Yeah.
15    A  I can't answer that.  I mean, that I can't
16 answer.
17    Q  Presumably they can't punish you for
18 something they don't know about; right?
19       MS. KRAUCHUN:  Objection; calls for
20 speculation.
21    Q  Sorry; I didn't hear your answer.
22    A  You said for someone they can't what?
23    Q  What I said was, I'm assuming management
24 cannot punish you for something they don't know

48

1  about.
2     A  I'm not exactly sure how to answer that
3  because I feel like they punish you when they're
4  incorrect anyway.
5     Q  All right.  Shields never threatened to
6  fire you; is that right?
7     A  No.
8       MR. WHITE:  If we could scroll, Danny, to
9  No. 12, please.
10    Q  And, sir, before you read that, I'm just
11 going to give you a preview of where I'm going
12 with this.
13       There were a number of interrogatories
14 here where we asked you to identify certain
15 things, and for each of them you just pointed to
16 the complaint.  So what I want to do just make
17 sure as we go through and verify each of those is
18 you aren't contending anything that isn't in the
19 complaint in response to these.  Okay?
20    A  Say that again, sir.
21    Q  Okay.  So let's do the first one.  That
22 will probably make it easier.
23       So in No. 12 -- well, let me give you a
24 chance to read that and then let me know.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

13 (49 to 52)

---

49

1  A  Okay.  Go ahead.
2    Q  Okay.  So we asked you here, sir, to identify
3  all protected activities in which you engaged as
4  alleged in the complaint.  And in response you
5  said, "Subject to and without waiving this
6  objection:  See complaint."  So what I just need
7  to confirm for my purposes is, you're not contending
8  there were some other protected activities that
9  are not included in the complaint; correct?
10   A  Not that I can remember at this time.
11   Q  All right.  Let's go to No. 13.  And here
12 we asked you to identify each and every instance
13 of retaliation that you allege defendants caused.
14 And, again, you said "See complaint," so I want to
15 confirm all instances of retaliation you have
16 included in the complaint.
17   A  Yes, sir, that I can remember at this time.
18   Q  All right.  No. 14, please.  We asked you
19 to identify each and every allegedly adverse
20 employment action you suffered and some detail
21 about those, and you pointed to the complaint.
22 So I want to make sure all the adverse
23 employment actions you are alleging are in the
24 complaint.

---

50

1  A  Yes, sir.  I can't think of anything else.
2    Q  No. 15 we asked you -- this one kind of
3  goes onto two pages.  We asked you to identify
4  what you consider to be unsafe about your working
5  environment as alleged in the complaint, and you
6  said, "See complaint."  So I want to make sure
7  everything you contend was unsafe about your
8  working environment is included in the complaint.
9    A  Yes, sir.  I can't think of anything else
10 at this time.
11   Q  All right.  No. 16 we ask you to identify
12 all defendants' acts or omissions you allege
13 resulted in plaintiffs being treated differently
14 than other similarly situated individuals, and you
15 again pointed to the complaint.  So I want to make
16 sure all examples of different treatment that
17 you're contending are in the complaint; right?
18   A  Yes, sir.  I can't think of anything else
19 at this particular time.
20   Q  Okay.  No. 17 is the last one.  We asked
21 you to identify all policies, practices, and
22 decisions that you allege had a disparate impact
23 on plaintiffs based upon their race as alleged in
24 the complaint.  And you claim that the response --

---

51

1  well, you responded that the response given to
2  certain requests of African-American investigators
3  compared to white investigators was, I guess a
4  policy, practice, or decision that had a disparate
5  impact.  So I want to understand, what request are
6  you talking about there?
7    A  I mean, the requests as far as assignment,
8  let me just start there.  As far as working TSS or
9  even if you work on the street, depends on working
10 in Englewood or the 15th District and up north.
11   Q  So did you request to not work in TSS?
12   A  Yes.
13   Q  And I think we talked about this.  You
14 just don't remember who or when you made that
15 request to.
16   A  Yes.
17   Q  And did other -- did you personally
18 witness other nonminority investigators requesting
19 to not work in TSS?
20   A  Did I witness them making that request, no.
21   Q  That you have firsthand knowledge of.
22   A  No, I never witnessed them making it.
23 They just weren't there.
24   Q  So you never witnessed them ask to avoid

---

52

1  TSS or not?
2    A  Correct.
3    Q  And what about patrol assignments?  Did
4  you make a request to not work in, I think you
5  said Englewood, I'm not sure what else you said.
6    A  Englewood, or the 10th District or the
7  15th District, something like that.  What we call
8  initiative areas, is that what you're asking?
9    Q  That is what I'm asking.  Did you -- did
10 you request to not work in the 10th District,
11 15th District, Englewood?
12   A  Yes.
13   Q  Okay.  Who did you make that request to?
14   A  That would be to my immediate supervisor.
15   Q  Which one?
16   A  Well, I mean, depends on who was there at
17 that particular time.  You know, you might ask for
18 a break from that particular area if you're working
19 that area every day.
20   Q  What I'm trying to understand, sir, do you
21 have a specific memory of making a request to not
22 work in those areas?
23   A  I mean, it's just making a request to
24 management.  You know, I can't tell you what

---

Transcript of Tyrone McGhee
Conducted on August 24, 2020

14 (53 to 56)

53

1  management is going to do at what specific date
2  and time.
3     Q  So you believe you made the request, but
4  you don't remember to who or when you made the
5  request?
6     A  I know I made the request.  I just can't
7  tell you exactly who, date, and time.
8     Q  What -- do you have personal knowledge of
9  nonminority officers requesting to not work in
10 those areas?
11    A  Do I want to ask you -- no, I just
12 know they were not working that area.
13    Q  How do you know they were not working that
14 area?
15    A  Because they wasn't.  They couldn't work
16 if I was there.
17    Q  But, sir, I guess -- I mean, you said
18 since 2005 you've been pretty consistently assigned
19 to TSS; correct?
20    A  2005?  That's not what I said.
21    Q  2015, 2015.
22    A  Yes.
23    Q  So when you're working in TSS, do you know
24 who is working in the 10th District?

54

1     A  Yes.
2     Q  Do you know who was working every day in
3  the 15th District?
4     A  According to the lineup or the -- the
5  lineup for the day, you know, the roster, that can
6  tell you who is working there along with who is
7  working down in TSS.
8     Q  But on a day when you're working in TSS,
9  do you know that a nonminority officer has
10 requested not to work in those areas, or are you
11 just assuming that?
12    A  No, I do not know that they request it
13 or not.
14    MR. WHITE:  All right.  Let's go back to --
15 does anybody need like a five-minute break?  Or
16 are we okay?
17    MS. KRAUCHUN:  We can keep going.  That's
18 fine.
19    MR. WHITE:  Well, you know what?  That's
20 fine.  Let's take a five-minute break, Kelly,
21 because I'm going to go back to the complaint.
22    MS. KRAUCHUN:  Let's take five minutes.
23    (Recess taken, 11:20 a.m. to 11:27 a.m.)
24    MR. WHITE:  Back on the record.

55

1     BY MR. WHITE:
2     Q  Mr. McGhee, you understand you're still
3  under oath?
4     A  I do.
5     MR. WHITE:  Danny, if we could go back to
6  Exhibit 1, please, and we're going to go to
7  paragraph 80 of the complaint.
8     AV TECHNICIAN:  Yes, sir.  Stand by, please.
9     MR. WHITE:  Thanks.
10    Q  Okay.  Take a look at paragraph 80 there,
11 sir, and then I want to ask you -- well, read it
12 and let me know when you're ready.
13    A  Okay.
14    Q  Did Director Shields -- well, did any of
15 the defendants call you a crook?
16    A  No.
17    MR. WHITE:  All right.  Danny, we can put
18 that exhibit aside for the moment.
19    Q  Mr. McGhee, have you ever filed a charge
20 with the EEOC?
21    A  No.
22    Q  Do you know LeGrain Winston?
23    A  Yes.
24    Q  How long have you known Mr. Winston?

56

1     A  Since 2003.
2     Q  How often do you talk to Mr. Winston?
3     A  I mean, we speak every day at work.
4     Q  You guys are on the same shift?
5     A  Yes.
6     Q  How often do you partner with Mr. Winston?
7     A  Not often at all.
8     Q  Does Mr. Winston work down in TSS very much?
9     A  No.
10    Q  Has Mr. Winston complained to you about
11 discrimination based on his race?
12    A  Yes.
13    Q  Okay.  When has he complained to you?
14    A  What do you want?  Dates and times?
15    Q  Yes, please.
16    A  I can't give you that because I don't have
17 exact dates and times of when Mr. Winston complains.
18 If he complains to me, I tell him to make
19 notification or write it up, so to speak, keep a
20 journal of it.
21    Q  To your knowledge, has he kept a journal
22 of the discrimination?
23    A  I don't know, sir.
24    Q  Have you ever seen it?

Transcript of Tyrone McGhee
Conducted on August 24, 2020

15 (57 to 60)

---

57

1    A  I mean, no.
2    Q  Have you told Mr. Winston that he should
3  report discrimination to -- up the chain, so to
4  speak?
5       MS. KRAUCHUN:  Objection; asked and
6  answered.
7    A  Yes.
8    Q  Have you told him that he should report it
9  outside of EM?
10    A  Yes.
11    Q  Has Mr. Winston complained to you about
12  his assignment being unfair?
13    A  Yes.
14    Q  And, again, do you have any specific dates
15  or times when he made those complaints?
16    A  No.
17    Q  What was the -- what was -- his complaint
18  about his assignments?
19    A  Pretty much being put in areas that was
20  high-profile as compared to other people or being
21  put in TSS when he had a disagreement with
22  management.
23    Q  You said in high-profile as compared to
24  other people.  What other people?

---

58

1    A  Other minorities or nonminorities, however
2  you want to put it.
3    Q  Did Mr. Winston ever complain to you about
4  unfair or what he thought was unfair discipline?
5    A  Yes.
6    Q  Do you have any dates of when those
7  complaints occurred?
8    A  No.
9    Q  What was he complaining about regarding
10  discipline?
11    A  I mean, there are several instances in
12  which he complained about it.  I can't simulate
13  any particular one or any particular date in time.
14  If he was written up about something, then there
15  should be a disciplinary action for him in the files.
16    Q  So you believe he complained to you about
17  discipline; you just don't remember any of the
18  specifics; is that fair?
19    A  Right.  Correct.
20    Q  What was your relationship with Ranzino like?
21    A  As an employee and as a supervisor, that's
22  it.  That's it; that's all.
23    Q  Professional relationship?
24    A  That was it, just a professional

---

59

1  relationship.
2    Q  Did you think he was good at his job?
3    A  That's hard to say.  Personalitywise or
4  professionalwise?
5    Q  I suppose those two kind of bleed together.
6  I'm just kind of trying to figure out, you worked
7  with him a lot, you know, so do you think he was
8  effective as a leader?
9    A  Well, you know, that would just be my
10  personal opinion.
11    Q  That's what I'm looking for.
12    A  Is that what you're looking for, or are
13  you looking for a professional -- see, that's the
14  thing.  If you want me to comment on Chief Ranzino
15  as my supervisor and his assignment or how he's
16  passed out assignments or how he reacted to
17  somebody giving him some opposition about what he
18  was assigning, that's one thing.  But if you ask
19  me how he was as a person, that's something else.
20    Q  Well, let's start with number one.
21    A  Which is?
22    Q  The first thing you said, how he was about
23  giving out assignments and dealing with people,
24  et cetera.

---

60

1    A  I mean, as far as giving out assignments,
2  he assigned people to where he wanted them to be
3  according to if they were friends or not.
4    Q  You're saying he assigned -- he gave
5  people -- he assigned people based on his
6  friendship with that person?
7    A  Yeah.  If you were good with him, you got
8  an easy assignment.  If you were not, you got the
9  rougher stuff.
10    Q  Okay.  And we talked about the "You all
11  look alike" incident.  Do you remember that?
12    A  Yes.
13    Q  Were there other incidents you are aware
14  of where you believe he made a racist remark?
15    A  Say that again.
16    Q  Apart from that one instance we've already
17  talked about, are there any other incidents that
18  you believe -- sorry -- strike that.
19       Apart from the "You all look alike"
20  comment, are there any other racist comments you
21  believe Ranzino made?
22    A  Yes.  But I can't give you exactly dates
23  and times.
24    Q  Okay.  So without a date or time, what

---

Transcript of Tyrone McGhee
Conducted on August 24, 2020

16 (61 to 64)

**61**

1  else did Ranzino say that you believe is racist?
2  **A  I've heard him say something like, "You**
3  **boys go to work."**
4  Q  Okay.  What else?
5  **A  I mean, I can't, you know, articulate**
6  **every little thing that he said, but I mean,**
7  **that's just another instance.**
8  Q  Well, I mean, it's important for the
9  lawsuit, sir.  Are there other incidents where he
10  used what you believed to be racist language?
11  **A  I can't think of any right now.**
12  Q  Do you think he was sexist?  And what I
13  mean there is have a bias against women in the
14  workplace.
15  **A  I don't know.**
16  Q  That's fine.  All right.  Do you know
17  I.V. Newson?
18  **A  Yes.**
19  Q  Do you guys work on the same shift?
20  **A  No.**
21  Q  Okay.  How do you know Mr. Newson?
22  **A  I mean, we were -- we worked in the same**
23  **department.  Probably back in 2003 we worked on**
24  **midnights together for a short, brief period of**

**62**

1  **time.  And that's pretty much it.  In past, me**
2  **being a union steward, he has asked me about**
3  **several things.**
4  Q  How often would you say you talked to him
5  in an average day?
6  **A  An average day?**
7  Q  Yeah.  Maybe average week is better, I
8  should say.
9  **A  I don't know.  Maybe two times a week.**
10  **Two to three times a week in passing.**
11  Q  Those conversations are usually just kind
12  of brief?
13  **A  Yes.**
14  Q  So you would not regularly be in roll call
15  with Mr. Newson; correct?
16  **A  No.**
17  Q  You would not regularly be partnered with
18  him; correct?
19  **A  Correct.**
20  Q  Did Mr. Newson ever complain to you that
21  he felt he was being discriminated against?
22  **A  Yes.**
23  Q  Okay.  When did that occur?
24  **A  I'm not exactly sure what year, date,**

**63**

1  and time.
2  Q  Okay.  Who was present for the conversation?
3  **A  Pardon me?**
4  Q  Who was present for the conversation when
5  he complained to you?
6  **A  I'm pretty sure it was just me and him.**
7  Q  Where did the conversation take place?
8  **A  Probably in the hallway somewhere.**
9  Q  What did he say to you; what did you say
10  to him?
11  **A  Usually, when somebody brings this type of**
12  **information to me, I tell them to document it and**
13  **to make some type of notification if they feel**
14  **like it's warranted if they want to pursue it.**
15  Q  Do you recall specifically what Mr. Newson
16  was complaining about regarding discrimination?
17  **A  I'm pretty sure it was about assignment.**
18  Q  Okay.  So he was complaining that he felt
19  like he was receiving a particular assignment
20  because of his race?
21  **A  Yes.**
22  Q  And what assignment was he complaining about?
23  **A  I can't tell you exactly what the**
24  **assignment was.**

**64**

1  Q  Did Mr. Newson ever complain to you about
2  what he felt was unfair discipline?
3  **A  Yes.**
4  Q  All right.  When did that occur?
5  **A  I don't remember the exact date and time.**
6  **It was probably more than one incident.**
7  Q  Do you recall any of the specifics of what
8  he was complaining to you about discipline?
9  **A  Not at this particular time.  I don't want**
10  **to guess or anything.**
11  Q  No, and I don't want you to guess.  If you
12  don't remember --
13  **A  Right.  Those things are vague.  I just don't**
14  **remember exactly what, when, and where right now.**
15  Q  All right.  Vernell Tims, do you know
16  Mr. Tims?
17  **A  Yes, I do.**
18  Q  Does he work on your shift?
19  **A  No, sir.**
20  Q  So, again, in an average week how often do
21  you think you talk to Mr. Tims?
22  **A  About the same.  Maybe two or three times**
23  **a week.**
24  Q  And is it usually, again, in passing, a

65

1 brief conversation?

2 **A Yes.**

3 Q Did Tims ever tell you Ranzino used the

4 N-word?

5 **A No.**

6 Q Did he ever tell you Shields used the

7 N-word?

8 **A No.**

9 Q Did he ever complain to you about his

10 assignments?

11 **A Mr. Tims was also a union steward. He**

12 **would have no reason to complain to me. We had**

13 **the same type of knowledge of process of**

14 **discipline.**

15 Q What you're saying is it wouldn't have

16 made any sense for him to complain to you?

17 **A Correct.**

18 Q He didn't complain to you that he was

19 being discriminated against; correct?

20 **A He would have no reason to, no.**

21 Q All right. Director Shields or former

22 Director Shields. What was your relationship with

23 Shields like when he was working in the EM?

24 **A Okay.**

66

1 Q Professional?

2 **A Yes.**

3 Q Day-to-day how often did you interact with

4 the Director Shields?

5 **A That's hard to say. Sometimes maybe once**

6 **or twice a week, sometimes not at all in a week.**

7 Q And when you would interact with him,

8 would these be like detailed conversations or just

9 kind of in passing?

10 **A Sometimes both.**

11 Q What would -- what would you likely be

12 having detailed conversations with have about?

13 **A We had some detailed conversations about**

14 **me having my off days changed, which I was**

15 **entitled to. We had some detailed conversations**

16 **about as far as the work process goes in EM as a**

17 **union steward as related to being in management.**

18 Q You said you had a detailed conversation

19 with him about changing your off days. Were your

20 off days eventually changed?

21 **A Eventually, yes.**

22 Q And then you said you had some detailed

23 conversations, it sounds like in your capacity as

24 a union steward about the work process. What do

67

1 you mean by that?

2 **A Things that he wanted to implement and,**

3 **you know, was telling me about what he was**

4 **planning on implementing and asking my opinion to**

5 **see if we would have some type of opposition to**

6 **implementing certain things in EM.**

7 Q Did you guys have a friendly relationship

8 or just purely professional?

9 **A Professional.**

10 Q Do you think that Shields is or was racist?

11 **A I can't speculate to that. I mean, you**

12 **know, how he treated me could not be the way he**

13 **treated everybody else. I don't know.**

14 Q Do you believe he acted in a racist manner

15 toward you?

16 **A No. He was always professional.**

17 Q Did you ever hear Shields refer to a black

18 employee as, quote, "boy"?

19 **A Not that I can remember.**

20 Q Samuel Page. Do you know Mr. Page?

21 **A Yes, sir.**

22 Q Does he work on your shift?

23 **A Yes, sir. He used to.**

24 Q Is Mr. -- now, I can't remember. Is he

68

1 retired or is he still working?

2 **A He's retired now.**

3 Q So when he was working, he was working on

4 the same shift with you, though?

5 **A Correct.**

6 Q How often in an average week would you

7 talk to Mr. Page?

8 **A Pretty much every day.**

9 Q And you were probably usually in roll call

10 with him?

11 **A Yes.**

12 Q How often did you partner with him out on

13 the street?

14 **A Not often.**

15 Q And I apologize if we already talked about

16 this, but was he down in TSS with you a lot?

17 **A No.**

18 Q Did you ever hear Mr. Page complain about

19 Ranzino?

20 **A Yes.**

21 Q And do you remember when those complaints

22 occurred?

23 **A No.**

24 Q What did he say to you about Ranzino?

**A I can't give you specifics. I just know he complained to me about Ranzino.**
Q Was he complaining about racial stuff or just the fact that Ranzino is a jerk?
**A Sir, I really can't tell you exactly what he said about Chief Ranzino. You have to remember I got a lot of complaints, and I just don't remember who said what, and I don't want to be at a risk of getting it all mixed up.**
Q Okay. In your job as a union steward, I mean, you're kind of -- are you kind of a sounding board for employees?
**A Pretty much, yeah.**
Q So, I mean, is part of your job to kind of, you know, they come complain to you, and you've got to listen and try and get them to where they should go next?
**A Correct.**
Q People probably come to you with all sorts of complaints, not just racial complaints. Right?
**A Correct.**
Q Did a nonminority employee ever come to you with a complaint about an assignment?
**A Not that I can recall, no.**

Q You can't remember any nonminority investigator coming to you with a complaint about an assignment?
**A Not that I can remember.**
Q Can you remember nonminority investigators coming to you with any complaints?
**A Yes.**
Q Okay. What kinds of things were the nonminority investigators complaining to you about?
**A Promotional opportunities, shift bid opportunities, vacation day opportunities, days off calendar opportunities, things of this sort.**
Q Okay. All right. Do you recall Mr. Page complaining to you about his assignments?
**A Yes.**
Q When? Do you remember when that occurred?
**A That was probably an ongoing occurrence between 2015 and the time that he retired.**
Q What was he complaining to you about his assignments?
**A Always being in the office.**
Q Did he complain to you that that assignment to the office was based on his race?
**A No, just always being in the office.**

Q Did Mr. Page ever complain to you that he was being discriminated against?
**A I'm not exactly sure. We've had several conversations. I can't remember the content of all the conversations, so at the risk of saying the wrong thing, I'm not exactly sure.**
Q Wilford Ferguson. Do you know Mr. Ferguson?
**A Yes.**
Q How long have you known Mr. Ferguson?
**A Probably since 2003.**
Q Does he work the 3:00-to-11:00 shift with you?
**A Yes, he does.**
Q And how often do you think you talked to Mr. Ferguson?
**A That would have been kind of often.**
Q You thought you talked to Mr. Page every day. Do you think you talked to Mr. Ferguson about that amount?
**A Yeah, pretty much. Because Mr. Ferguson was in TSS, so pretty much every day.**
Q So when you were working in TSS, Mr. Ferguson was often there, as well?
**A Yes, sir.**

Q Did Mr. Ferguson ever complain to you about his assignments?
**A Yes, sir.**
Q Was he complaining to you that he was assigned to TSS too much?
**A Yes, sir.**
Q Did he -- and when did the complaints happen?
**A I'm going to say, you know, several complaints between 2015 and present.**
Q Did Mr. Ferguson complain to you that he thought his assignment to TSS was based on his race?
**A No, I'm not going to say it was racial.**
Q Did he Mr. Ferguson complain to you about what he thought was unfair discipline?
**A Yes.**
Q All right. And, again, do you remember when those complaints occurred?
**A No, sir.**
Q All right. What -- did he complain to you that he believed the unfair discipline was based on his race?
**A No, he just complained to me it was unfair discipline.**

Transcript of Tyrone McGhee
Conducted on August 24, 2020

---

73

1    Q  Do you remember the specifics of what he
2  thought was unfair discipline?
3    **A  I'm not exactly sure what all Mr. Ferguson's**
4  **disciplinary actions were at this particular time,**
5  **so it was hard for me to say exactly when and**
6  **where -- what he was accused of not doing or doing.**
7    Q  Okay.  Cecil Williams.  Do you know
8  Mr. Williams?
9    **A  Yes, sir.**
10   Q  How long have you known Mr. Williams?
11   **A  I think probably since 2005 or 2006,**
12 **somewhere around there.**
13   Q  Does he work the 3:00-to-11:00 shift
14 with you?
15   **A  Yes, sir.**
16   Q  How often in a normal day are you talking
17 to Mr. Williams?
18   **A  In passing, probably almost every day.**
19   Q  Is this more just kind of walking by saying,
20 "Hey, how are you today," that kind of a deal?
21   **A  Yeah, that type of detail.  We went to**
22 **roll call together.  We didn't really work**
23 **together or anything like that.**
24   Q  So you weren't really partnered with

---

74

1  Mr. Williams?
2    **A  No.**
3    Q  Did Mr. Williams ever complain to you
4  about his assignments?
5    **A  Yes.**
6    Q  Did he complain to you that he thought his
7  assignment was based on his race?
8    **A  Yes.**
9    Q  Okay.  So let's talk about that.  When did
10 the complaint occur?
11   **A  There were several complaints between**
12 **2015 and present.  Mr. Williams and Mr. Winston**
13 **were partners.**
14   Q  And what did Mr. Williams say to you about
15 his assignments being based on his race?
16   **A  Basically, that he was always in the**
17 **high-profile area, high-priority area.**
18   Q  And he believed that was based on his race?
19   **A  Yes, sir.**
20   Q  What about him being assigned to a
21 high-profile area did he tell you was motivated by
22 his race?
23   **A  The areas we spoke about as far as**
24 **Englewood, District 10, District 15, high-profile**

---

75

1    areas where there's a lot of activity, he
2    **complained about being in those areas as compared**
3    **to some of my other coworkers.**
4      Q  So how did he tie his assignment to his race?
5      **A  Because there were no others in that area.**
6    **It was pretty much always black.**
7      Q  Pretty much always or always, if you know?
8      **A  I'm going to say always, but I mean, I**
9    **can't say specifically because I don't know the**
10   **operation every day for the last five, six years.**
11     Q  Did Mr. Williams ever complain to you
12   about what he believed was unfair discipline?
13     **A  Yes.**
14     Q  Did he tell you that he believed the
15   unfair discipline was based on his race?
16     **A  Yes.**
17     Q  And when did that occur?
18     **A  There was -- there was probably a couple**
19   **instances between 2015 and present.**
20     Q  Do you remember the specific instances?
21     **A  No, I do not.**
22     Q  Do you remember what about them was
23   related to his race?
24     **A  The only incident that I remember**

---

76

1    **specifically about Mr. Williams was the one between**
2    **him and Ranzino where -- something about Ranzino**
3    **said he threatened him or something of this sort.**
4    **That's the only thing I can think of offhand, and**
5    **I can't even give you specifics for that.**
6      Q  So you remember him complaining something
7    about Ranzino threatened him, but do you remember
8    him saying it had anything to do with his race or
9    just that Ranzino threatened him?
10     **A  It had something to do with race, but I**
11   **can't tell you all the specifics of it, no.**
12     Q  All right.  Anthony Manning.  Do you know
13   Anthony Manning?
14     **A  Yes, sir, I do.**
15     Q  How do you know Anthony Manning?
16     **A  Mr. Manning and myself was in the academy**
17   **together.**
18     Q  Did you ever work -- outside of the
19   academy, did you ever work with Mr. Manning?
20     **A  Yes, sir.**
21     Q  Where did you work with him?
22     **A  I worked with him in Division 10, maximum**
23   **security as a correctional officer.**
24     Q  Is it fair to say you haven't worked with

---

Transcript of Tyrone McGhee
Conducted on August 24, 2020

---

**Page 77**

1  him since about 2003?
2     A  Yes, sir.
3     Q  And in an average week how often do you
4  talk to Mr. Manning?
5     A  Talk?  No conversation.  Do we speak in
6  passing?  Yes.
7     Q  To your knowledge, has Mr. Manning ever
8  worked in EM?
9     A  Not to my knowledge.  I don't know.
10    Q  Has Mr. Manning ever complained to you
11 about discipline received?
12    A  No.
13    Q  Has he ever complained to you that he
14 believed he was being discriminated against?
15    A  No.
16    Q  Has he ever complained to you about
17 assignments he was receiving?
18    A  No.  We don't -- we don't work the same
19 department.
20    Q  I understand; I understand.  It's just
21 that's the way it's in the complaint.
22       All right.  Do you know David Walker?
23    A  Yeah.  You asked me that earlier.  Or is
24 that another David Walker?

---

**Page 78**

1     Q  I don't know.  Did we already do Walker?
2  Are we doing him twice?  Let me look in my notes.
3       No, we didn't do Walker yet.
4     A  You asked me did I work with David Walker
5  in TSS.
6     Q  Oh, yeah, yeah.  You're right, you're
7  right, I did back when we were talking about TSS.
8  Okay.  Well, we'll talk about him a little bit more.
9     A  Okay.
10    Q  He worked the 3:00-to-11:00 shift with you?
11    A  He used to work the 3:00-to-11:00 shift
12 with me.
13    Q  Do you know when he stopped working
14 with you?
15    A  Gosh, probably about at least three years
16 ago, I want to say.
17    Q  Okay.  Do you know where -- what he's --
18 where he's working now?
19    A  He works the day shift.
20    Q  Okay.  Still in EM, though?
21    A  Yeah, the 7:00-to-3:00 shift.
22    Q  Did Mr. Walker -- well, I guess then in an
23 average week now how often do you talk to
24 Mr. Walker?

---

**Page 79**

1     A  Once or twice.
2     Q  When he was still on your 3:00-to-11:00
3  shift, would you talk to him every day?
4     A  At least three times a week.
5     Q  Did he ever complain to assignments about
6  you -- to you -- sorry?
7     A  Yes.
8     Q  And did he complain to you that he believed
9  his assignments were motivated by his race?
10    A  I'm not exactly sure.  I just remember him
11 complaining about his assignments.
12    Q  What was he complaining to you about the
13 assignments?
14    A  Basically, the fact that if he disagreed
15 with management, then his assignment was moved
16 from what he would normally work or where he
17 thought he should work to where he was working
18 that particular day or time.
19    Q  Did Mr. Walker complain to you about
20 discipline he received?
21    A  I don't recall any discipline at this
22 particular time.
23    Q  And do you recall Mr. Walker ever
24 complaining to you that he believed he was being

---

**Page 80**

1  discriminated against based on his race?
2     A  Not at this particular time, no.
3     Q  Do you know Michelle Strickland?
4     A  Yes.
5     Q  How do you know Ms. Strickland?
6     A  Ms. Strickland was in EM for a short
7  period of time.
8     Q  And is that how you know her, just through
9  her period of time in EM?
10    A  Yes.
11    Q  How often do you talk to Ms. Strickland now?
12    A  I haven't talked to Ms. Strickland in, I
13 probably want to say years.  I'm not exactly sure.
14    Q  That's fair.
15    A  I haven't seen her.
16    Q  When she was -- I know she was only in
17 EM for like a year or so, but when she was working
18 there, how often did you talk to her?
19    A  Periodically.  We didn't have a whole a
20 lot of interaction, though.
21    Q  When she was working in EM, was she on
22 your 3:00-to-11:00 shift?
23    A  Yes.
24    Q  Did you ever partner with Ms. Strickland

Transcript of Tyrone McGhee
Conducted on August 24, 2020

21 (81 to 84)

81
1  out on the street?
2      A  No, not that I can remember.
3      Q  Do you remember working with her in TSS?
4      A  Maybe once or twice.
5      Q  Do you recall Ms. Strickland complaining
6  to you about her assignments?
7      A  No.
8      Q  Do you recall Ms. Strickland complaining
9  to you about gender discrimination?
10     A  No.
11     Q  Do you recall Ms. Strickland complaining
12 to you that she believed she was being
13 discriminated against on the basis of her race?
14     A  I don't remember the contents of the brief
15 conversation we had.  I do know that she was
16 having some type of issues with management.
17     Q  Were the -- were the issues racially
18 motivated?
19     A  I don't remember the content of the
20 conversation, and I'm not exactly sure if her
21 issue was with Shields or Ranzino because that was
22 quite some time ago.
23     Q  Understood.  All right.  Victor Slaughter.
24 Do you know Mr. Slaughter?

82
1      A  Yes, sir.
2      Q  How long have you known Mr. Slaughter?
3      A  Since 2005, 2006.
4      Q  Does he work the 3:00-to-11:00 shift
5  with you?
6      A  Yes, sir.
7      Q  And in an average day how often -- let me
8  say average week how often do you talk to him?
9      A  Quite often.
10     Q  Do you ever partner with Mr. Slaughter on
11 the street?
12     A  Maybe a couple times, yeah.  A few times.
13     Q  And how often would you say Mr. Slaughter
14 is working down in TSS with you?
15     A  95 percent of the time, if not more.
16     Q  Has Mr. Slaughter complained about his
17 assignments to you?
18     A  As a union steward, yes.
19     Q  What about just as a coworker?
20     A  We didn't necessarily have those type of
21 conversations.
22     Q  Okay.  But he did complain to you, you
23 think, in your role as a union steward about his
24 assignments?

83
1      A  Yes.
2      Q  Was he complaining that he thought his
3  assignments were based on his race?
4      A  Yes.
5      Q  Okay.  When did the complaint happen?
6      A  Between 2015 and present.
7      Q  What was he saying to you about his
8  assignments being motivated by his race?
9      A  Basically, because he was in TSS 99 percent
10 of the time with no relief.
11     Q  I mean, just being assigned to TSS is not
12 in itself racist; right?  What was he saying about
13 being assigned to TSS was because of his race?
14     A  Because of the conditions in TSS, and who
15 was assigned to TSS, and how the other minorities --
16 nonminorities was not assigned to TSS.
17     Q  Do you know what percent of EM is
18 African-American?
19     MS. KRAUCHUN:  Objection; foundation.
20     A  I do not.
21     Q  Would you say African-Americans are the --
22 make up the majority of investigators?
23     MS. KRAUCHUN:  Objection; foundation,
24 speculation.

84
1      MR. WHITE:  You can answer.
2      A  I do not.
3      Q  Did Mr. Slaughter ever complain to you
4  about what he believed to be unfair discipline?
5      A  I don't recall anything at this particular
6  time.
7      Q  And apart from his assignment, did
8  Mr. Slaughter ever complain to you that he felt he
9  was otherwise being discriminated against because
10 of his race?
11     A  I can't think of anything at this
12 particular time.
13     Q  All right.  Rohloff.  What was -- what
14 was, is your relationship with Rohloff like?
15     A  Was, is.  Chief Rohloff was my supervisor.
16 It was a professional relationship.
17     Q  How often -- because I want to make sure
18 we're talking about the right time period.  I
19 mean, I guess this is like, you know, 2017-ish.
20 How often did you interact with Rohloff day-to-day?
21     A  I'm not exactly sure because he was gone
22 quite a bit, and I don't remember when he left, or
23 when he came back, or when he left, when he came
24 back.  He did off and on several times.

---

85

1    Q  So he just wasn't around a lot?  I mean,
2  is that a fair statement?
3    **A  No, he did -- he had -- I want to say it**
4  **was a medical issue or something like that, and he**
5  **just -- you know, he was off and on.  He was in**
6  **and out.  I don't remember the exact dates and**
7  **times of how long he was gone, but it was quite**
8  **a bit.**
9    Q  Do you think that Rohloff is racist?
10   **A  He's never said anything racist to me.**
11   Q  Do you have any evidence that he's racist?
12   **A  But he's never said anything racist to me.**
13   Q  Okay.  So your answer is no, you don't
14  have any reason to say he's racist?
15   **A  No.  He's never said anything racist to**
16  **me, no, sir.**
17   Q  Do you think he's sexist against women?
18   **A  Pardon me?**
19   Q  Do you believe he discriminates against
20  women based on their gender?
21   **A  I've never witnessed him being sexist.**
22   Q  Have you ever heard him refer to a black
23  employee as "boy"?
24   **A  That -- that conversation of "boy" as**

86

1  a word?
2    Q  I thought that was Ranzino.
3    **A  I can't say who all said that, but, you**
4  **know, he wasn't the only one to use it.  And I**
5  **can't say specifically that I heard Chief Rohloff**
6  **use that particular slang.  So no.**
7    Q  Okay.  All right.  Are you claiming in
8  this lawsuit that you were assigned to higher-
9  incident areas on patrol because of your race?
10   **A  Am I claiming in this lawsuit that I was**
11  **assigned to higher-patrol areas?**
12   Q  Because of your race, correct.
13   **A  I'm claiming -- I'm claiming that I was in**
14  **TSS, that I was there due to -- I mean, I was**
15  **there in an unsafe environment.**
16   Q  So you're not -- you're not -- the
17  problems with the high-incident area doesn't apply
18  to you; correct?
19   **A  It does.  But I mean, you know, that's**
20  **something that has recently been happening.**
21   Q  How recent?
22   **A  I don't think -- I think we were moved out**
23  **of TSS probably almost a year ago.**
24   Q  So you're not in TSS anymore?

87

1    **A  No, I don't think it's been quite a year.**
2    Q  Do you contend now as we sit here today
3  that you are being assigned to higher-incident
4  areas because of your race?
5    **A  Yeah.**
6    Q  Your assigned area is not based on
7  seniority; correct?
8    **A  Correct.**
9    Q  Would you agree that most incidents --
10  sorry -- most areas that EM is dealing with are
11  high-incident?
12   **A  Pardon me?**
13   Q  Would you agree that the majority of areas
14  EM investigators are going to are high-incident?
15   **A  The majority of areas?**
16   Q  Yes.
17   **A  No.**
18   Q  Okay.  Supervisors did assignments in
19  high-incident areas; correct?
20   **A  Correct.**
21   Q  Would you agree that investigators are
22  assigned to areas they're familiar with?
23      MS. KRAUCHUN:  Objection; foundation.
24      MR. WHITE:  You can answer.

88

1    **A  No.**
2    Q  Who determines assignments -- assigned
3  areas -- sorry?
4    **A  Management.**
5    Q  Do you know what they're basing their
6  decisions on?
7      MS. KRAUCHUN:  Objection; foundation,
8  calls for speculation.
9      Go ahead.
10   **A  No.**
11   Q  What's the process for promotions in EM?
12   **A  Basically, you only get promoted if -- I'm**
13  **not going to say if you're a favorite of someone.**
14  **There's no merit what you're doing.  There's a**
15  **nonmerit process of being promoted.**
16   Q  Have you applied for any promotions since
17  say 2015?
18   **A  No.**
19      MR. WHITE:  Danny, if we could pull up
20  Exhibit 4, please.
21      AV TECHNICIAN:  Stand by.  I'm sorry,
22  Counsel, did you mean Exhibit 3?
23      MR. WHITE:  No, we're going to skip that.
24  We're just going to go to Exhibit 4, please.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

89

1      AV TECHNICIAN: Yes, sir.
2      (McGhee Deposition Exhibit 4 marked for
3  identification and attached to the transcript.)
4      Q  All right.  Mr. McGhee, you should see on
5  your screen there what's been marked as McGhee
6  Exhibit 4.  This is "Plaintiff Tyrone McGhee's
7  Objections and Answers to Defendant Sheriff of
8  Cook County Thomas J. Dart's First Set of
9  Interrogatories."
10      Have you seen this document before,
11  Mr. McGhee?
12      A  Yes, sir.
13      MR. WHITE:  And, Danny, if we could go to
14  the very last page, please.
15      Q  And, again, Mr. McGhee, you sign -- you
16  declared under penalty of perjury that the
17  document is the true and correct and that is your
18  signature, sir?
19      A  Yes, sir.
20      Q  It looks like you signed this on March 13th,
21  2020.  Correct?
22      A  Correct.
23      Q  Let me back up one second.  What -- what
24  do you want out of this lawsuit?

90

1      A  What do I want?
2      Q  Yeah.
3      A  Actually, I would like for the system to
4  be changed and everybody to be treated fairly.
5  That's the first thing.  You know, I'd like
6  everyone to have equal opportunity and as far as
7  being promoted and work opportunities.  That's the
8  second, as far as promotional opportunities, I
9  want everybody to have equal promotional
10  opportunities and not have to be a basic -- I
11  don't want to say pay to play but a basic
12  situation whereas if you're a good employee and
13  you're knowledgeable of the situation, then you
14  should be easily promoted as compared to somebody
15  else instead of bringing somebody from the outside
16  or things of this sort.
17      You know, those are the very, very best
18  things that I want.  Everything else is negotiated.
19  I do not wish to be promoted.
20      Q  You do not want to be promoted?
21      A  Not at this particular point, no.
22      Q  All right.  Let's go look at Interrogatory
23  No. 3 which begins on page 2 and continues over
24  into page 3, please.  I'll give you a second to

91

1  read that, Mr. McGhee.
2      A  Okay.
3      Q  All right.  So in this interrogatory we
4  asked you to identify and provide a detailed
5  computation of each and every category of damages
6  that you claim you have suffered.  And on the
7  bottom of page 2 you said that you seek a number
8  of things that go over onto page 3, so I want to
9  go through each of these.
10      A  Uh-huh.
11      Q  You say you seek compensation for lost
12  wages.  What wages did you lose?
13      A  Between 2015 for about six, seven months
14  when I did not receive the off days that I should
15  have, I spent a lot of time taking off on weekends
16  and for other events that I shouldn't have had to.
17  I should have been off those particular days.
18      Q  And you believe not having the right off
19  days was because your race?
20      A  Yes.  Because according to the CBA, it
21  says that I would have had any days that I could
22  have bid for, and it was in writing and I
23  presented those in writing, and I was not given
24  those days for six, seven months.

92

1      Q  Did you grieve that through the Union?
2      A  I did.
3      Q  And what was the outcome of that?
4      A  It had to go through arbitration, which
5  was about seven months.
6      Q  And did you say in that arbitration that
7  it was motivated by your race?
8      A  I did not.  I said I was entitled to
9  whatever days I should have been given off.  It
10  shouldn't have been a race thing at all.  It
11  should have been what I was entitled to.
12      Q  I don't disagree, sir, but I just want to
13  make sure, you didn't complain to anyone in the
14  Cook County Sheriff's Office that you weren't
15  getting those off days because of your race; right?
16      A  No, I didn't say race.  I said I should
17  have been given those off days.
18      Q  Apart from having to take those days for
19  that six to seven months, are you claiming any
20  other lost wages in this lawsuit?
21      A  No.
22      Q  And how many days are we talking about
23  here that are at issue?
24      A  I don't know offhand.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

93

1    Q  More than 10, more than 20?
2    **A  Yes.**
3    Q  More than 30?
4    **A  However many weekends it goes for seven**
5    **months.**
6    Q  So your contention is every single weekend
7    you had to use --
8    **A  I mean, I was entitled to weekends for**
9    **seven months.**
10   Q  I'm just trying to understand.  So every
11   weekend for seven months you're contending you
12   should have had off but you didn't?
13   **A  Yes.**
14   Q  Okay.  The second thing you said you're
15   seeking is opportunities.  What does that mean?
16   **A  Well, like I said, you know, I would like**
17   **for it to be fair.  You know, me being in EM for**
18   **an extended period of time, being knowledgeable of**
19   **the EM process, I think that we should have had --**
20   **and I'm not just speaking for myself; I'm speaking**
21   **for EM, period -- should have had promotional**
22   **opportunities that was consistent with the**
23   **department.**
24   Q  Okay.  Do you -- is there a specific

94

1    opportunity you're claiming you missed out on in
2    this lawsuit?
3    **A  Well, yeah, I mean, let's say -- let's say**
4    **I wanted to be promoted to a sergeant.  It should**
5    **have been competitive between me and other**
6    **coworkers within the EM department and not with**
7    **somebody outside of the EM department that had no**
8    **knowledge of EM process.**
9    Q  Are you using promotions and opportunities
10   interchangeably?  Do they mean the same thing?
11   **A  Same thing, yes.**
12   Q  All right.  But you didn't apply for any
13   promotions; correct?
14   **A  I did not.**
15   Q  And you don't want to be promoted now;
16   right?
17   **A  No.  Not now, no.**
18   Q  All right.  You said also here you're
19   seeking compensation for raises.  What raises did
20   you lose out on?
21   **A  Basically, between 2014 to '15 to present**
22   **there were step promotions that I should have**
23   **gotten that I didn't get.**
24   Q  Why didn't you get them?

95

1    **A  I'm going to say probably during a pay**
2    **freeze, but I don't see that happening with other**
3    **ranks as far as sergeant, lieutenant, things of**
4    **this sort.**
5    Q  Do they have sergeants and lieutenants
6    in EM?
7    **A  They do now.**
8    Q  When did that start?
9    **A  Probably about two years ago.  Two to**
10   **three years ago.**
11   Q  Have you ever asked anybody about this pay
12   freeze?
13   **A  I mean, as far as asking who, sir?**
14   Q  Well, you said -- it sounds like you think
15   you're being not paid what you should be paid.  So
16   I'm wondering, did you talk to anybody about that?
17   **A  I mean, as far as management?**
18   Q  Anybody.
19   **A  I'm not exactly sure right now.**
20   Q  So you're saying as part of this lawsuit,
21   as part of your damages you are seeking money for
22   raises, and I'm trying to figure out what raises
23   you think you missed out on because of your race.
24   **A  Well, basically, if I would have had the**

96

1    **opportunity to be promoted, that would have been**
2    **another raise itself.  And actually, as an**
3    **investigator and not being a correctional officer,**
4    **I should have had my raises as compared to any**
5    **sergeant or lieutenant.  That's pretty much it.  I**
6    **shouldn't have been subjected to other things.**
7    Q  Again, did you complain to anybody in the
8    Cook County Sheriff's Office, in EM, outside of
9    EM that you believed you were not receiving the
10   compensation you were entitled to?
11   **A  No, I did not write any grievances.**
12   Q  Well, I don't even -- grievances aside,
13   did you send an email to anybody --
14   **A  No.**
15   Q  -- did you have conversation with anybody?
16   Okay.  All right.
17       You also said you're seeking compensation
18   for benefits.  What benefits did you lose out on
19   based on your race?
20   **A  I felt like, you know -- I'd have to go**
21   **back to my promotional benefits, that even though**
22   **I didn't apply at the particular time, I could**
23   **have applied, and I didn't apply because of what**
24   **was going on.  At that particular time I did not**

97

1  want to be -- you know, or no longer wanted to be
2  promoted because of the things that was going on.
3  At some particular point I did feel like I was
4  promotable and I would have been an asset to
5  management.
6      Q  When we were talking about, you know, your
7  days off and having to take off every weekend for
8  six or seven months, what year was that?
9      A  2015.  2015 I think it was.
10     Q  Okay.  All right.  Another thing you wrote
11 here that you're seeking compensation for is
12 future retirement income.  What future retirement
13 income have you missed out on based on your race?
14 Is that, again, the promotional opportunities?
15     A  Yes, sir.  Yes, sir.
16     Q  Anything else?
17     A  No, sir.
18     Q  You're seeking compensation for litigation
19 expenses.  What litigation expenses have you
20 incurred to date?
21     A  Whatever expenses it cost me to endure
22 this process that we're going through right now.
23     Q  So what money have you paid out of your
24 pocket for this litigation so far?

98

1      A  You're talking about how much money
2  amountwise?  I have given my attorney money, yes,
3  I have.
4      Q  Okay.  How much?
5      A  I'm not exactly sure how much I've given
6  at this particular point.
7      Q  Okay.  How would we figure that out?
8      A  Ask my attorney.
9      Q  You're the one who has to answer the
10 questions here, sir.  So I need to know how much
11 money you've paid your attorney.
12     A  I don't know because I don't have it in
13 front of me, and I don't have a balance in front
14 of me, either.
15     Q  Is it more than $1,000?
16     A  Probably, yes.
17     Q  More than --
18     A  I don't know.  I don't -- I don't remember
19 and I don't have the balance in front of me.
20     Q  Well, the problem, sir, is I mean we've
21 asked you --
22     A  I can -- I can -- I can confer with my
23 attorney and see if I can come up with that
24 information for you.

99

1      Q  Yeah.  I mean, it's -- you put it at issue
2  in this lawsuit, and you've sworn under penalty of
3  perjury that you were providing a detailed
4  computation of every and every category of
5  damages.  So if it's at issue in this lawsuit,
6  we're entitled to know it.
7      A  Well, I'm not trying to hide it from you.
8  I'm just telling you I don't know at this
9  particular time.
10     MS. KRAUCHUN:  And I'm just going to
11 object and just assert that the plaintiffs can
12 withdraw -- witness can withdraw that as a damage.
13 As previously discussed, we -- that was previous
14 attorney representation, not current.
15     MR. WHITE:  Okay.
16     MS. KRAUCHUN:  So if that clarifies it, I
17 think we discussed it numerous times.
18     MR. WHITE:  So, Kelly, you'll stipulate on
19 the record that the plaintiffs are not seeking
20 litigation expenses?
21     MS. KRAUCHUN:  In regards to their
22 previous representation, yes.
23     MR. WHITE:  Okay.  That's great.
24     MS. KRAUCHUN:  Previous representation,

100

1  not anything directly related to this lawsuit.
2      MR. WHITE:  Great.  Thank you for the
3  explanation.
4      Q  You also are seeking damages for
5  humiliation, mental and emotional anguish and
6  distress.  Explain those to me.  What are -- what
7  are your symptoms?
8      A  So as far as being told that we all look
9  alike, that is humiliating.  And, you know, at a
10 point of not wanting to report stuff because of
11 retaliation that we knew is very present and very
12 blatant, that's pretty much a lot of mental and
13 emotional things going on there.  Because you feel
14 like if you do say something, then now your
15 situation has went from bad to worse.  You know,
16 being told every day, you know, "Let's go to work
17 boy," or whatever it is, yeah, that would be a
18 problem.
19     Q  And for your mental anguish, are you
20 seeking any treatment?
21     A  No.
22     Q  Have you received any kind of a diagnosis
23 from a medical professional?
24     A  No.

Transcript of Tyrone McGhee
Conducted on August 24, 2020

101

1    Q  Are you taking any medication for your
2  mental anguish?
3    A  No.
4    Q  If we could go to Interrogatory No. 5,
5  please.  All right.  We asked you if you received
6  any kind of medical or mental healthcare or
7  treatment which you allege you suffered as a
8  result of defendants' conduct, and you just wrote,
9  "Investigation continues."  So I want to confirm,
10 you're not seeking any medical treatment related
11 to this lawsuit; correct?
12   A  No.
13   Q  Okay.  In No. 6 -- oh, I'm sorry.  If we
14 could go to No. 6, please.
15      Okay.  We asked you during the five years
16 prior to the first day you alleged to have
17 suffered any harassment or abuse attributable to
18 defendants, and then we asked you for any doctors'
19 information.  You said you were diagnosed with
20 high blood pressure in and around 2013.  Are you
21 contending that your blood pressure was caused by
22 racism at the Cook County Sheriff's Office?
23   A  It was caused by stress as far as Cook
24 County EM, yes.

102

1    Q  You'd agree that working in EM is
2  generally a high-stress environment; correct?
3    A  Yes.
4    Q  So how do we separate the high blood
5  pressure that's caused by race discrimination from
6  just being in a stressful work retirement?
7       MS. KRAUCHUN:  Objection; foundation.
8       MR. WHITE:  You can answer.
9    A  Because I feel like it was undue stress
10 about being assigned to certain areas that other
11 people were not assigned to.
12   Q  And is it your testimony that you would
13 not have high blood pressure if it wasn't for race
14 discrimination at EM?
15      MS. KRAUCHUN:  Objection; mischaracterizes
16 testimony.
17      Sorry, Tyrone.  Go ahead.
18   A  Yes.  I think it was undue stress.
19   Q  That's not what I asked, though, sir.  Are
20 you saying your high blood pressure was caused by
21 racism in EM?
22      MS. KRAUCHUN:  Objection; asked and
23 answered.
24      Go ahead.

103

1    A  My answer is because of undue stress at
2  EM, being assigned to specific areas, yes, I do
3  believe it caused me to have high blood pressure.
4    Q  Have you told Dr. Kelsey that you believe
5  you're suffering racial discrimination at EM?
6    A  No.
7    Q  And has Dr. Kelsey ever said your high
8  blood pressure is caused by racism in the
9  workplace?
10   A  No.  Why would he say that?
11   Q  I'm -- I'm just trying to figure it out
12 because you're claiming that's what caused it, so
13 I'm wondering if any medical professional has ever
14 given you an opinion as to that claim.
15   A  (Indicating.)
16   Q  All right.  Let's go to No. 10.  We asked
17 you for any social media, and you said you don't
18 have any social media.  So I just want to confirm,
19 you don't have any social media accounts; correct?
20   A  Absolutely none.
21   Q  All right.  If we could go to No. 12 --
22 I'm sorry -- No. -- let me look at my notes.
23 No. 12, please.  I'll give you a second to read
24 that, Mr. McGhee.

104

1    A  Okay.
2    Q  All right.  So we asked you to identify
3  the basis of your contention that the Cook County
4  Sheriff fails to adequately discipline, supervise,
5  and control its supervisory officers.  And you
6  responded that, "Supervisors in the EM unit
7  arbitrarily issue discipline to the African-American
8  investigator and were never held accountable for
9  issuing erroneous discipline after EM investigators
10 filed numerous grievances and complaints putting
11 the department on notice of the illegal practice."
12      I just simply -- I need to know the
13 details, which is what we asked for.  Who issued
14 discipline; when was it issued; who was the
15 discipline issued to; what was the outcome; can
16 you provide any of those details, sir?
17   A  I cannot.  There were several incidents
18 where I told people they should actually go to OPR
19 or make notification of how they felt about being
20 disciplined, and I do know for a fact that I was
21 representing more African-Americans than anybody
22 else.
23   Q  Uh-huh.  Who did you tell to go to OPR?
24   A  Whoever -- whatever employee had problems

Transcript of Tyrone McGhee
Conducted on August 24, 2020

27 (105 to 108)

105

1  with management as far as feeling like they were
2  being discriminated against. Now, some of them
3  did and some of them probably didn't do it because
4  they didn't want to be subject to retaliation.
5      Q  Uh-huh. And do you know in any of those
6  instances if OPR initiated an investigation?
7      A  I do not.
8      Q  Do you know the outcome of any OPR's
9  investigations?
10     A  They would not be given to me, sir. I do
11 not know.
12     Q  Do you know why Ranzino left EM?
13     A  I do not know.
14         MS. KRAUCHUN: Objection; foundation.
15     Q  Sorry. Sir, I thought we were all on the
16 same page. Is Ranzino still in EM?
17     A  No, he's not.
18     Q  But you don't know why he left?
19     A  No, it was not -- we were not given an
20 explanation.
21     Q  All right. We're going to go through
22 several of these much like we did with the other
23 ones where you just pointed us to the complaint,
24 and I just need to make sure that everything you

106

1  know is in the complaint. Okay?
2      A  Okay.
3      Q  So why don't we look at No. 13, please.
4  Let me know once you've had a chance to read that.
5      A  Okay. Go ahead.
6      Q  All right. So we asked you here to
7  identify all misconduct by supervisory officers
8  you allege was not properly and fully investigated
9  by the sheriff and you said, "See complaint." So
10 I want to make sure we've talked about all the
11 misconduct that you believe occurred.
12     A  To my knowledge, I think we have.
13     Q  Okay. No. 14, please.
14     A  Okay. Go ahead.
15     Q  So we asked you for all the facts
16 supporting your contention that the defendants
17 were unfit for supervisory positions, and you
18 referred us to the complaint. So have we now
19 talked about all the facts supporting your
20 contention that they were unfit?
21     A  Yeah. I can't think of anything else at
22 this particular time, no.
23     Q  No. 15, if you want to read that, please.
24     A  Okay. Go ahead.

107

1      Q  So we asked you to identify all the facts
2  supporting your -- wait. What did I ask you
3  about? 15? Yes. Identify all facts supporting
4  your contention that the disciplinary process and
5  procedures do not provide, quote, "meaningful
6  opportunity for an unbiased determination of
7  disciplinary actions," and you referred to the
8  complaint. So I want to make sure, have we
9  talked about all the facts supporting that
10 contention?
11     A  Yes. I can't think of anything else at
12 this particular time.
13     Q  Okay. No. 17, can you read that and let
14 me know we you're ready, please.
15     A  Okay. I'm ready.
16     Q  So we asked you if you or anyone on your
17 behalf has had any conversations or do you know of
18 any statements regarding the matters in the
19 complaint within and you said no. So is that -- I
20 mean, is that accurate; you've never talked to
21 anybody about the allegations in the complaint?
22     A  Correct.
23     Q  No. 20, please.
24     A  Okay.

108

1      Q  And, Mr. McGhee, it looks like we lost
2  your face there.
3      A  Yeah, I stood up, sorry. I'll sit down.
4      Q  Do you want to take like a five-minute
5  break?
6      A  No, no. I just needed to stretch my legs.
7  That's all.
8      Q  You're sitting down already.
9      A  Can you see me?
10     Q  Yes. So this Interrogatory No. 20 asks
11 you if you had been involved in any civil actions,
12 and you mention here a workers' comp case in 2013.
13     A  Yes.
14     Q  Was that related to your work in EM?
15     A  Yes.
16     Q  And how were you injured?
17     A  I had a torn right triceps.
18     Q  Did that injury occur in TSS or in patrol?
19     A  In patrol.
20     Q  Okay. Have you ever been injured in TSS?
21     A  No.
22     Q  Was that your only injury on patrol?
23     A  Yes.
24     Q  And then I also -- we tend to look through

Transcript of Tyrone McGhee
Conducted on August 24, 2020

28 (109 to 112)

---

**109**

1  court records, and I thought I saw a personal
2  injury lawsuit that you were involved with in
3  2006.  Does that sound familiar to you?
4      **A  A vehicle personal injury?**
5      Q  Could be.
6      **A  I think -- yeah, I think I was in a car**
7  **accident.  Was it 2006?**
8      Q  Somewhere around there.
9      **A  I think I was in a car accident in 2006 if**
10 **I'm correct.**
11     Q  So you had a car accident.  Did you sue
12 somebody or they sued you?
13     **A  Basically -- I'm not exactly sure.  I**
14 **think I sued for -- to get my car fixed, if I'm**
15 **correct.**
16     Q  Did you have car insurance?  Maybe they
17 handled it.
18     **A  Yes, I did.**
19     Q  Okay.
20     **A  Yes, I did.  Whether it was an uninsured**
21 **woman that hit me -- I think it was.**
22     Q  Did you give a deposition in that lawsuit?
23     **A  Yes, I did.**
24     Q  All right.  And did that case go to trial?

---

**110**

1      **A  No, it didn't.**
2      Q  So sometime after your deposition it
3  settled?
4      **A  Yes.**
5      Q  Okay.  Any other lawsuits that you have
6  been a party to?
7      **A  Not that I can think of, no.  I actually**
8  **forgot about that.**
9      Q  No problem.
10     **A  No.**
11     Q  Have you ever filed for bankruptcy?
12     **A  No.**
13     Q  And this is going to sound like a weird
14 question, but there's a lot of Tyrone McGhees out
15 there in the world, so I'm trying to figure out
16 which ones are you.  Have you ever lived in
17 Alabama?
18     **A  No.**
19     Q  And have you ever sued the United States
20 Postal Service?
21     **A  No.**
22     Q  All right.  If we could go to Interrogatory
23 No. 22, please.  And let me know when you're ready.
24     **A  Okay.  Go ahead.**

---

**111**

1      Q  All right.  So we asked you to state,
2  list, and itemize each item of expense, monetary
3  loss, or other damage claim by you other than the
4  lost income or wages described above.  And you
5  just said, "Investigation continues."  So is it
6  fair to say outside of that list we talked about,
7  you don't have any other monetary loss?
8      **A  No, I can't think of anything at this**
9  **particular time, no.**
10         MR. WHITE:  All right.  I probably don't
11 have a lot left, Kelly.
12         MS. KRAUCHUN:  Sure.
13         MR. WHITE:  Do you want to take like
14 10 minutes, and that will give me enough time to
15 talk to my cocounsel and everybody to stretch
16 their legs.
17         MS. KRAUCHUN:  That's great and I'm going
18 to have to plug in my phone, guys, because it's
19 going dead.  Can we just say 15 minutes and come
20 back at 1:00?
21         MR. WHITE:  That's perfect.
22         MS. KRAUCHUN:  All right.  Thanks.
23         (Recess taken, 12:43 p.m. to 1:00 p.m.)
24         MR. WHITE:  All right.  Mr. McGhee, we are

---

**112**

1  back on the record.  You understand you're still
2  under oath?
3          THE WITNESS:  Yes, I do.
4          MR. WHITE:  I don't have any more
5  questions for you at the moment, sir.  I'm going
6  to turn it over to your attorney, and then I may
7  have some follow-up after that.
8          THE WITNESS:  Okay.
9          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
10 BY MS. KRAUCHUN:
11     Q  Hi, Tyrone.  I'm just going to direct your
12 attention -- we were discussing your role as a
13 union steward.  How long have you been a union
14 steward?
15     **A  I think since about 2016 or '17, somewhere**
16 **around there.**
17     Q  And there was a lot of discussion about
18 discipline.  Do you recall we talked about
19 progressive discipline?
20     **A  Yes.**
21     Q  Is there a specific handbook, or does the
22 collective bargaining agreement itemize each
23 offense and what the appropriate discipline is for
24 those offenses?

Transcript of Tyrone McGhee
Conducted on August 24, 2020

113

1      MR. WHITE:  Object to form.
2      **A  Not necessarily.  I mean, there is an**
3  **agreement about the disciplinary steps.  However,**
4  **it's not directed toward any specific offense.**
5      Q  So there -- like is there a policy or
6  something in the CBA that says if you're late,
7  this is the appropriate discipline?
8      MR. WHITE:  Object to form.
9      **A  Yes, there is.  But it is optional in that**
10 **particular incident.**
11     Q  So who would make the determination of
12 what discipline would be assigned to an
13 investigator that is tardy for their tour of duty?
14     **A  Management.**
15     Q  And based on your experience as a union
16 rep, would it be unusual and irregular for a
17 supervisor to issue a written reprimand for an
18 investigator's first offense of tardiness?
19     MR. WHITE:  Objection to form and
20 foundation.
21     **A  Could you repeat the question, please?**
22     Q  So just based on your experience as a
23 union steward, would it be normal practice for a
24 supervisor to write up an investigator for the

114

1  first time they were tardy to a tour of duty?
2      MR. WHITE:  Same objections.
3      **A  Yes.  They can do it.**
4      Q  They can do it but is it normal that
5  that's done that way?
6      MR. WHITE:  Object to form.
7      **A  It's hard to say because sometimes it's**
8  **applicable and sometimes it's not.  It depends on**
9  **the supervision.**
10     Q  Just generally speaking, based on your
11 experience as a union steward, roughly how many
12 grievances have you dealt with?  Could you give us
13 an estimate?
14     **A  Quite a few over the years.  I don't know,**
15 **maybe 100, maybe less.  I don't know.  It's hard**
16 **to say.**
17     Q  But it's fair to say probably in and
18 around 100 or more; is that correct?
19     **A  Yes.**
20     Q  And based on your experience as a union
21 steward and having part in filing these
22 grievances, is there -- is it fair to say that
23 there are more black investigators that had to
24 file grievances?

115

1      MR. WHITE:  Objection to foundation.
2      **A  Yes.**
3      Q  And based -- what is your contention that --
4  or what would support that contention that more
5  black investigators have to file grievances?
6      MR. WHITE:  Objection to form and
7  foundation.
8      **A  Basically, because they get more**
9  **disciplinary actions.**
10     Q  So in your experience, would a black
11 investigator get written up for being tardy to
12 roll call more often than a white investigator?
13     MR. WHITE:  Objection to foundation.
14     **A  You'd have to use another instance instead**
15 **of tardy because, you know, we have clocks and,**
16 **you know, that.  This is not something that I can --**
17 **you know, can be judged upon.  They do whatever**
18 **they feel like they want to do according to the**
19 **clock.**
20     **I mean, can they do it?  Yes.  Do they do**
21 **it?  Sometimes there's a different pattern.  It's**
22 **kind of hard to say.**
23     Q  Based on your experience as a union
24 steward, did you feel that black investigators

116

1  were written up for discipline more frequently
2  than white investigators that had the same
3  discipline violations or alleged discipline
4  violations?
5      MR. WHITE:  Objection to foundation.
6      **A  Yes.**
7      Q  And then counsel asked you quite a bit
8  about, you know, requesting different assignments.
9  Did you on multiple occasions request a different
10 assignment?
11     MR. WHITE:  Objection; asked and answered.
12     **A  Yes.**
13     Q  And when would those conversations have
14 taken place?
15     **A  Somewhere between 2015 and present.**
16     Q  And during your workday, when would those
17 conversations take place?
18     **A  Basically, somewhere at the beginning of**
19 **the shift.**
20     Q  And did you ever hear other -- did you
21 ever hear white investigators question or request
22 different assignments?
23     MR. WHITE:  Objection; asked and answered.
24     **A  No.**

Transcript of Tyrone McGhee
Conducted on August 24, 2020

117

1   Q  Did you ever witness any of your fellow
2  black investigators ask questions of the
3  supervisors during roll call?
4      MR. WHITE:  Objection; foundation.
5     **A  Could you repeat the question, please?**
6   Q  So during roll call, did you ever see or
7  witness other black investigators question
8  supervisors about anything in regards to
9  assignments or anything during roll call?
10      MR. WHITE:  Object to form.
11   **A  Yes.**
12   Q  I'm sorry.  What was your answer?
13   **A  Yes.**
14   Q  And can you describe the tone the
15  supervisor would speak to those black
16  investigators that asked questions?  What was
17  their tone towards the investigator?
18      MR. WHITE:  Objection to form; foundation.
19   **A  It was negative, you know, more of an**
20  **aggressive tone.**
21   Q  If a white investigator asked a question
22  at roll call, was the tone towards that white
23  investigator the same?
24      MR. WHITE:  Objection to form and

118

1  foundation.
2     **A  I don't recall any white investigator**
3  **having any confrontation at roll call.**
4   Q  And counsel asked you about being moved
5  out of TSS, and I think your testimony was that
6  roughly, give or take, less than a year ago you
7  were moved out of TSS; is that correct?
8     **A  Yes.**
9   Q  And were you moved out of TSS after this
10  lawsuit was filed?
11   **A  Yes.**
12   Q  And there was a lot of testimony about
13  promotions and things like that.  And you
14  mentioned -- I believe your testimony was that you
15  didn't apply for promotions.  Why didn't you?
16   **A  At one point I thought I would be an**
17  **asset, but at another point I didn't like what I**
18  **was seeing as far as management goes.  So that**
19  **was -- at that particular point there was really**
20  **nothing I wanted to be a part of.**
21   Q  And you recall some testimony about, I
22  believe it was in 2015 that you were not given the
23  days off that you should have been based on your
24  seniority; correct?

119

1     **A  Correct.**
2   Q  And you testified that you filed a
3  grievance in that regard; correct?
4     **A  Correct.**
5   Q  And you also testified that you felt that
6  that was because of your race; is that correct?
7     **A  Yes.**
8   Q  Do you know of any nonminority investigators
9  that had to actually take a grievance to arbitration
10  to get their days off in accordance with their
11  seniority?
12      MR. WHITE:  Objection; foundation.
13   **A  No.**
14   Q  If that's the case, do you think that's
15  something you would have knowledge of?
16      MR. WHITE:  Objection; calls for
17  speculation.
18   **A  Yeah, they probably --**
19   Q  Sorry.  Go ahead.
20   **A  Yeah, they probably would have come to me**
21  **as far as implementing the grievance process.**
22   Q  So based on that, it's fair to say it
23  likely did not happen that a white investigator
24  had to take a grievance to arbitration to bid for

120

1  his days off in accordance with his seniority?
2      MR. WHITE:  Objection; form, foundation,
3  calls for speculation, leading.
4      MS. KRAUCHUN:  You can answer.
5     **A  Yes.**
6      MS. KRAUCHUN:  I don't think I have
7  anything else right now, Counsel, if you have any
8  follow-up to that.
9      EXAMINATION BY COUNSEL FOR THE DEFENDANTS
10  BY MR. WHITE:
11   Q  How many union stewards are in EM?
12   **A  Right now, one.**
13   Q  Okay.  How many were there in 2015?
14   **A  Two.**
15   Q  Who were the two?
16   **A  Wait, wait.  I think right now it's two,**
17  **and I think in 2015 it might have been three.**
18   Q  Who were the three in 2015?
19   **A  In 2015 I think it was Scaife, and I think**
20  **it was Ludnowski on midnights.  Those are the only**
21  **two I can think of.  Scaife and Ludnowski, those**
22  **were the only two.**
23   Q  And you?
24   **A  Pardon me?**

121

1    Q  And you?
2    A  No, I was not a union steward at that
3  particular time.
4    Q  Okay.  What about in 2016, who were the
5  union stewards?
6    A  I want to say -- I think I came in -- it
7  was either 2016 or 2017 when I came in, and I want
8  to say it was myself, and I think Investigator
9  Berg was on midnights, and I don't think
10  Investigator Tims came on in days until sometime
11  later maybe six, seven months later.
12    Q  Okay.  What about in 2018, who were the
13  union stewards?
14    A  2018, that would have been myself,
15  Investigator Tims and Investigator Berg.
16    Q  Is it Byrd or Berg?
17    A  Berg.  B-e-r-g, Berg.
18    Q  So, of course, if an employee wanted a
19  union steward to help them file a grievance on the
20  midnight shift, you wouldn't have anything to do
21  with that; right?
22    A  They have their choice to ask
23  representation from any union steward that is, of
24  course, present when they're assigned to that

122

1  department.
2    Q  So in 2015 you were not a union steward,
3  so you would not have been involved in the
4  grievance process; correct?
5    A  Not as a union steward, no.
6    Q  And in 2016 if somebody went to Berg to
7  deal with a grievance, you would have nothing to
8  do with that; right?
9    A  Correct.
10    Q  And in 2017 if somebody went to Tims or
11  Berg for a grievance, you would not be involved in
12  that; right?
13    A  Correct.
14    Q  In 2018 if somebody went to Tims or Berg,
15  you would not be involved in that -- in terms of
16  filing a grievance, you would not be involved in
17  that; correct?
18    A  Correct.
19    Q  One thing I want to understand about your
20  move out from TSS -- okay? -- are you claiming
21  that you were moved out of TSS because this
22  lawsuit was filed?
23    MS. KRAUCHUN:  Objection; misstates
24  testimony.

123

1    MR. WHITE:  You can answer.
2    A  I think so.
3    Q  Okay.  Well, give me what -- that's new.
4  So give me what facts support the claim that you
5  were moved out of TSS because of this lawsuit.
6    A  Because it was -- it was a -- there was a
7  kind of quick move.  It wasn't like, you know, you
8  take the people down there, then you rotate them
9  out and rotate other people in.  It was pretty
10  much they took one out and another one in all at
11  one time.
12    Q  You wanted to get out of TSS; right?
13    A  Yes, I did.
14    Q  Are you claiming that moving you out of
15  TSS was retaliation for filing this lawsuit?
16    MS. KRAUCHUN:  Objection; misstates --
17  mischaracterizes testimony.
18    A  I didn't say retaliation.  I'm just
19  speaking to how they moved us.
20    Q  Uh-huh.  So --
21    A  I don't think -- I couldn't say it was
22  retaliatory, you know.  Because we wanted to get
23  out of TSS, so it wasn't retaliatory, but they
24  moved us all of a sudden.  They didn't rotate us

124

1  out.  It was like, you know, if you're going to do
2  something, bring a new person in, rotate one out,
3  you know, there's a process.  There's a training
4  process, not just take one crew and move another
5  crew.  If we were so expendable, then you wouldn't
6  have moved the whole crew at the same time is my
7  opinion.
8    Q  So the speed at which you were transferred
9  out makes you think it was motivated by the lawsuit?
10    A  Yes.
11    Q  Have you ever helped nonminority
12  investigators file a grievance regarding discipline?
13    A  Yes.
14    Q  When you say the crew was transferred out
15  of TSS, who was in the crew?
16    A  I mean, everybody that was assigned there
17  on a daily basis, myself, Slaughter, Ferguson,
18  Spivey.  Who else?  That's pretty much who was
19  down there on a daily basis, but we pretty much
20  worked there every day.
21    MR. WHITE:  Okay.  Just a second here.  I
22  think that's all I have.
23    MS. KRAUCHUN:  I just have a couple more.
24  ///

Transcript of Tyrone McGhee
Conducted on August 24, 2020

125

1    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
2  BY MS. KRAUCHUN:
3    Q  So, obviously, you're familiar with the
4  grievance process.
5    **A  Right.**
6    Q  So should an employee receive notifications
7  of end resolution of a grievance they file?
8    MR. WHITE:  Objection --
9    **A  They should.**
10    MR. WHITE:  -- speculation.
11    Q  And if an employee had discipline reduced,
12  shouldn't they receive notification of that, as well?
13    MR. WHITE:  Objection --
14    **A  Yes, they should.**
15    MR. WHITE:  -- calls for speculation.
16    Q  And is there any reason why an employee
17  wouldn't receive notification of a resolution of a
18  grievance?
19    MR. WHITE:  Objection; foundation, calls
20  for speculation.
21    **A  No, I don't have any -- no, not that I**
22  **know of.**
23    Q  And if an employee moves from one department
24  to another within the Sheriff's Department, does

126

1  the Department still have an ability to provide
2  them with the outcome of a grievance?
3    MR. WHITE:  Objection; foundation --
4    **A  Yes.**
5    MR. WHITE:  -- calls for speculation.
6    Q  How does an employee receive what their
7  grievance outcome is?
8    MR. WHITE:  Objection; foundation, calls
9  for speculation.
10    **A  Either through a grievance hearing or email.**
11    Q  And is that department-issued email?
12    **A  Yes, through department email.**
13    Q  So if it's sent through email, it wouldn't
14  matter what department you're in; you have the
15  same email address at the County; is that correct?
16    **A  Yes, ma'am.**
17    MR. WHITE:  Objection; calls for speculation.
18    Q  So if you move tomorrow to transportation,
19  your email address would be the same; correct?
20    MR. WHITE:  Objection; calls for
21  speculation.
22    **A  Correct.**
23    MS. KRAUCHUN:  I have nothing further.
24    MR. WHITE:  I have a few more for you.

127

1    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
2  BY MR. WHITE:
3    Q  Is it your understanding that an employee
4  can ask to look at their personnel file at any time?
5    **A  No, they cannot.**
6    Q  They cannot see --
7    **A  They have been -- no.  No, they cannot.**
8    Q  How does somebody go about seeing their
9  personnel file?
10    **A  They have to fill out a request form in**
11  **order to look at their personnel file.**
12    Q  And once they fill out that request form,
13  they're allowed to see their personnel file?
14    **A  Yeah, once it's approved, I guess.**
15    MR. WHITE:  That's all I have.  Thanks for
16  your time.  I appreciate your being here.
17    MS. KRAUCHUN:  Thanks, Tyrone.  We're all
18  set for today.
19    THE WITNESS:  Thank you.
20    MR. WHITE:  Paula, we'll order for
21  electronic regular delivery, please.
22    MS. KRAUCHUN:  And we're going to order
23  just not at this time, Paula.
24    (Off the record at 1:20 p.m. CST.)

128

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3    I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10  taken by me stenographically and thereafter reduced
11  to typewriting under my direction; that reading and
12  signing was not requested; and that I am neither
13  counsel for, related to, nor employed by any of
14  the parties to this case and have no interest,
15  financial or otherwise, in its outcome.
16    IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my notarial seal this 6th day of
18  September, 2020.
19
20  My commission expires:  October 16, 2021
21
22  _Paula Quetsch_____
23  Notary Public in and for the
24  State of Illinois

Transcript of Tyrone McGhee
Conducted on August 24, 2020

33

**A**

**ability**
126:1
**above**
111:4
**absolutely**
103:20
**abuse**
101:17
**academy**
76:16, 76:19
**accident**
109:7, 109:9,
109:11
**accordance**
119:10, 120:1
**according**
16:19, 21:15,
34:9, 54:4,
60:3, 91:20,
115:18
**accountable**
104:8
**accounts**
103:19
**accurate**
7:9, 107:20
**accused**
73:6
**acted**
67:14
**acting**
9:12, 9:15,
9:17
**action**
16:18, 17:3,
21:13, 49:20,
58:15
**actions**
49:23, 73:4,
107:7, 108:11,
115:9
**activities**
49:3, 49:8
**activity**
75:1
**acts**
50:12

**actually**
12:18, 13:17,
14:12, 24:5,
29:20, 90:3,
96:2, 104:18,
110:7, 119:9
**additional**
7:11
**address**
23:5, 126:15,
126:19
**adequately**
104:4
**adverse**
49:19, 49:22
**affixed**
128:17
**african-american**
34:6, 34:8,
51:2, 83:18,
104:7
**african-americans**
83:21, 104:21
**after**
10:2, 104:9,
110:2, 112:7,
118:9
**again**
18:6, 35:7,
38:18, 48:20,
49:14, 50:15,
57:14, 60:15,
64:20, 64:24,
72:17, 89:15,
96:7, 97:14
**against**
13:16, 61:13,
62:21, 65:19,
71:2, 77:14,
80:1, 81:13,
84:9, 85:17,
85:19, 105:2
**aggressive**
117:20
**ago**
12:4, 12:12,
12:15, 26:7,
78:16, 81:22,

**86:23, 95:9,**
95:10, 118:6
**agree**
7:21, 19:2,
25:10, 27:16,
29:4, 29:6,
29:19, 36:2,
37:18, 37:24,
87:9, 87:13,
87:21, 102:1
**agreement**
112:22, 113:3
**ahead**
21:21, 28:17,
39:18, 44:18,
49:1, 88:9,
102:17, 102:24,
106:5, 106:14,
106:24, 110:24,
119:19
**air**
18:10
**al**
1:5, 1:9
**alabama**
110:17
**alike**
41:5, 42:5,
60:11, 60:19,
100:9
**all**
7:5, 10:1,
10:4, 11:15,
12:18, 21:5,
21:6, 21:8,
23:7, 24:8,
32:1, 32:9,
32:16, 33:17,
33:21, 34:10,
38:15, 41:5,
41:7, 42:4,
43:21, 43:22,
48:5, 49:3,
49:11, 49:15,
49:18, 49:22,
50:11, 50:12,
50:16, 50:21,
54:14, 55:17,

**56:7, 58:22,**
60:10, 60:19,
61:16, 64:4,
64:15, 65:21,
66:6, 69:9,
69:19, 70:13,
71:5, 72:17,
72:20, 73:3,
76:11, 76:12,
77:22, 81:23,
84:13, 86:3,
86:7, 89:4,
90:22, 91:3,
92:10, 94:12,
94:18, 96:16,
97:10, 100:8,
101:5, 103:16,
103:21, 104:2,
105:15, 105:21,
106:6, 106:7,
106:10, 106:15,
106:19, 107:1,
107:3, 107:9,
108:7, 109:24,
110:22, 111:1,
111:10, 111:22,
111:24, 123:10,
123:24, 124:22,
127:15, 127:17
**allegations**
107:21
**allege**
43:22, 49:13,
50:12, 50:22,
101:7, 106:8
**alleged**
33:10, 38:17,
40:24, 49:4,
50:5, 50:23,
101:16, 116:3
**allegedly**
49:19
**alleging**
49:23
**allowed**
127:13
**almost**
35:9, 35:17,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

34

35:19, 35:23,
73:18, 86:23
**along**
54:6
**already**
21:22, 44:12,
60:16, 68:15,
78:1, 108:8
**also**
4:1, 65:11,
94:18, 96:17,
100:4, 108:24,
119:5
**always**
10:19, 25:7,
67:16, 70:21,
70:24, 74:16,
75:6, 75:7, 75:8
**amongst**
36:6
**amount**
16:7, 30:20,
30:21, 71:19
**amountwise**
98:2
**anguish**
100:5, 100:19,
101:2
**another**
6:13, 46:21,
61:7, 77:24,
96:2, 97:10,
115:14, 118:17,
123:10, 124:4,
125:24
**answer**
6:16, 7:5,
14:20, 15:16,
16:1, 18:5,
18:9, 19:7,
20:6, 20:7,
22:21, 27:23,
29:9, 37:2,
43:12, 47:15,
47:16, 47:21,
48:2, 84:1,
85:13, 87:24,
98:9, 102:8,

103:1, 117:12,
120:4, 123:1
**answered**
19:22, 26:23,
39:17, 57:6,
102:23, 116:11,
116:23
**answering**
6:11, 6:12
**answers**
4:17, 4:21,
32:11, 89:7
**anthony**
76:12, 76:13,
76:15
**anti-retaliation**
13:23
**any**
6:22, 7:8,
7:15, 7:22,
8:12, 14:11,
20:14, 21:23,
26:20, 36:19,
37:8, 38:1,
39:1, 39:8,
40:11, 40:22,
55:14, 57:14,
58:6, 58:13,
58:17, 60:17,
60:20, 61:11,
64:7, 65:16,
70:1, 70:6,
79:21, 85:11,
85:14, 88:16,
91:21, 92:19,
94:12, 96:4,
96:11, 100:20,
100:22, 101:1,
101:6, 101:10,
101:17, 101:18,
103:13, 103:17,
103:18, 103:19,
104:16, 105:5,
105:8, 107:17,
107:18, 108:11,
110:5, 111:7,
112:4, 113:4,
117:1, 118:2,

118:3, 119:8,
120:7, 121:23,
125:16, 125:21,
127:4, 128:13
**anybody**
7:13, 19:10,
54:15, 95:11,
95:16, 95:18,
96:7, 96:13,
96:15, 104:21,
107:21
**anymore**
86:24
**anyone**
8:16, 38:7,
42:11, 42:16,
92:13, 107:16
**anything**
6:18, 7:22,
8:1, 12:10,
26:17, 36:12,
39:22, 48:18,
50:1, 50:9,
50:18, 64:10,
73:23, 76:8,
84:5, 84:11,
85:10, 85:12,
85:15, 97:16,
100:1, 106:21,
107:11, 111:8,
117:8, 117:9,
120:7, 121:20
**anytime**
15:7
**anyway**
48:4
**apart**
60:16, 60:19,
84:7, 92:18
**apologize**
68:15
**applicable**
114:8
**applied**
88:16, 96:23
**apply**
86:17, 94:12,
96:22, 96:23,

118:15
**appreciate**
127:16
**appropriate**
112:23, 113:7
**approved**
127:14
**approximately**
9:24, 26:3
**arbitrarily**
104:7
**arbitration**
20:15, 20:17,
92:4, 92:6,
119:9, 119:24
**area**
30:20, 52:18,
52:19, 53:12,
53:14, 74:17,
74:21, 75:5,
86:17, 87:6
**areas**
52:8, 52:22,
53:10, 54:10,
57:19, 74:23,
75:1, 75:2,
86:9, 86:11,
87:4, 87:10,
87:13, 87:15,
87:19, 87:22,
88:3, 102:10,
103:2
**aren't**
48:18
**around**
5:20, 29:13,
73:12, 85:1,
101:20, 109:8,
112:16, 114:18
**articulate**
61:5
**asian**
46:11
**aside**
55:18, 96:12
**asked**
7:3, 16:20,
19:21, 26:22,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                    35

27:21, 38:16,
39:16, 40:21,
43:21, 48:14,
49:2, 49:12,
49:18, 50:2,
50:3, 50:20,
57:5, 62:2,
77:23, 78:4,
91:4, 95:11,
98:21, 101:5,
101:15, 101:18,
102:19, 102:22,
103:16, 104:2,
104:13, 106:6,
106:15, 107:1,
107:16, 111:1,
116:7, 116:11,
116:23, 117:16,
117:21, 118:4
**asking**
5:10, 7:6,
15:10, 31:3,
52:8, 52:9,
67:4, 95:13
**asks**
33:7, 39:14,
108:10
**assert**
99:11
**asset**
97:4, 118:17
**assigned**
24:15, 24:17,
25:6, 25:8,
25:19, 26:12,
27:3, 28:14,
29:20, 33:9,
33:10, 33:12,
33:18, 34:22,
35:4, 35:8,
35:10, 35:15,
35:18, 35:20,
35:22, 38:8,
38:18, 53:18,
60:2, 60:4,
60:5, 72:5,
74:20, 83:11,
83:13, 83:15,

83:16, 86:8,
86:11, 87:3,
87:6, 87:22,
88:2, 102:10,
102:11, 103:2,
113:12, 121:24,
124:16
**assigning**
59:18
**assignment**
24:19, 25:11,
25:16, 26:1,
26:15, 26:18,
26:21, 30:23,
30:24, 44:3,
51:7, 57:12,
59:15, 60:8,
63:17, 63:19,
63:22, 63:24,
69:23, 70:3,
70:22, 72:12,
74:7, 75:4,
79:15, 84:7,
116:10
**assignments**
29:7, 44:2,
52:3, 57:18,
59:16, 59:23,
60:1, 65:10,
70:14, 70:20,
72:2, 74:4,
74:15, 77:17,
79:5, 79:9,
79:11, 79:13,
81:6, 82:17,
82:24, 83:3,
83:8, 87:18,
88:2, 116:8,
116:22, 117:9
**assume**
7:5
**assuming**
47:23, 54:11
**attached**
4:13, 23:11,
32:8, 89:3
**attention**
112:12

**attorney**
8:6, 8:15,
98:2, 98:8,
98:11, 98:23,
99:14, 112:6
**attorneys**
5:8
**attributable**
101:17
**august**
1:15
**av**
4:2, 4:3, 23:9,
32:6, 55:8,
88:21, 89:1
**average**
62:5, 62:6,
62:7, 64:20,
68:6, 77:3,
78:23, 82:7,
82:8
**avoid**
51:24
**aware**
11:21, 14:22,
26:20, 60:13
**awkward**
6:8

_____
**B**
_____
**b-e-r-g**
121:17
**back**
5:19, 17:11,
44:15, 45:19,
54:14, 54:21,
54:24, 55:5,
61:23, 78:7,
84:23, 84:24,
89:23, 96:21,
111:20, 112:1
**backup**
13:10
**bad**
18:13, 18:19,
18:21, 30:23,
30:24, 31:2,
31:4, 31:5,

31:7, 100:15
**balance**
98:13, 98:19
**bankruptcy**
110:11
**bargaining**
112:22
**baroni**
3:20
**base**
29:14
**based**
29:5, 29:7,
50:23, 56:11,
60:5, 70:23,
72:12, 72:21,
74:7, 74:15,
74:18, 75:15,
80:1, 83:3,
85:20, 87:6,
96:19, 97:13,
113:15, 113:22,
114:10, 114:20,
115:3, 115:23,
118:23, 119:22
**basement**
24:15, 24:20
**basic**
90:10, 90:11
**basically**
26:1, 27:8,
74:16, 79:14,
83:9, 88:12,
94:21, 95:24,
109:13, 115:8,
116:18
**basing**
29:15, 88:5
**basis**
43:23, 81:13,
104:3, 124:17,
124:19
**bathrooms**
31:15
**because**
6:9, 7:4, 7:12,
12:9, 12:24,
24:20, 24:21,

25:2, 28:22,
29:2, 29:12,
29:16, 31:2,
34:18, 37:2,
39:9, 47:5,
48:3, 53:15,
54:21, 56:16,
63:20, 71:20,
75:5, 75:9,
81:21, 83:9,
83:13, 83:14,
84:9, 84:17,
84:21, 86:9,
86:12, 87:4,
91:19, 91:20,
92:15, 95:23,
96:23, 97:2,
98:12, 100:10,
100:13, 102:9,
103:1, 103:12,
105:3, 111:18,
114:7, 115:8,
115:15, 119:6,
122:21, 123:5,
123:6, 123:22
**been**
5:4, 5:12,
5:13, 6:15,
11:10, 17:16,
24:14, 27:14,
28:4, 29:1,
37:21, 40:11,
41:14, 44:12,
53:18, 71:16,
86:20, 87:1,
89:5, 91:17,
92:9, 92:10,
92:11, 92:17,
94:5, 96:1,
96:6, 97:4,
108:11, 108:20,
110:6, 112:13,
118:23, 120:17,
121:14, 122:3,
127:7
**before**
2:7, 5:12,
5:14, 6:4, 6:11,

6:13, 10:22,
14:4, 16:20,
21:12, 23:18,
31:21, 32:13,
38:20, 48:10,
89:10, 128:6
**began**
24:13
**begin**
6:5
**beginning**
12:6, 116:18
**begins**
90:23
**behalf**
3:2, 3:10,
3:18, 107:17
**behavior**
38:17
**being**
15:5, 17:8,
23:21, 29:16,
30:14, 30:17,
30:19, 31:4,
31:7, 31:10,
33:12, 38:8,
38:18, 40:4,
40:5, 50:13,
57:12, 57:19,
57:20, 62:2,
62:21, 65:19,
66:17, 70:21,
70:24, 71:2,
74:15, 74:20,
75:2, 77:14,
79:24, 81:12,
83:8, 83:11,
83:13, 84:9,
85:21, 87:3,
88:15, 90:7,
93:17, 93:18,
95:15, 96:3,
100:8, 100:16,
102:6, 102:10,
103:2, 104:19,
105:2, 115:11,
118:4, 127:16
**believe**
24:4, 25:2,

27:13, 27:19,
53:3, 58:16,
60:14, 60:18,
60:21, 61:1,
67:14, 85:19,
91:18, 103:3,
103:4, 106:11,
118:14, 118:22
**believed**
61:10, 72:21,
74:18, 75:12,
75:14, 77:14,
79:8, 79:24,
81:12, 84:4,
96:9
**benefits**
96:18, 96:21
**berg**
121:9, 121:15,
121:16, 121:17,
122:6, 122:11,
122:14
**besides**
8:15
**best**
6:10, 6:12,
90:17
**better**
36:3, 36:6,
36:14, 36:17,
36:18, 36:23,
38:1, 62:7
**between**
70:18, 72:10,
74:11, 75:19,
76:1, 83:6,
91:13, 94:5,
94:21, 116:15
**beyond**
45:12
**bias**
61:13
**bid**
11:12, 11:15,
25:10, 25:11,
25:13, 25:16,
25:17, 70:10,
91:22, 119:24

**bidding**
25:23, 26:1,
26:9
**bieniek**
35:3
**bigger**
33:4
**bit**
11:20, 31:9,
37:17, 78:8,
84:22, 85:8,
116:7
**black**
34:5, 67:17,
75:6, 85:22,
114:23, 115:5,
115:10, 115:24,
117:2, 117:7,
117:15
**blatant**
100:12
**bleed**
59:5
**blood**
101:20, 101:21,
102:4, 102:13,
102:20, 103:3,
103:8
**board**
69:12
**bosques**
35:8, 35:15
**both**
6:6, 30:17,
66:10
**bottom**
24:6, 91:7
**boy**
67:18, 85:23,
85:24, 100:17
**boys**
61:3
**break**
6:22, 6:24,
52:18, 54:15,
54:20, 108:5
**brief**
61:24, 62:12,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

37

65:1, 81:14
**bring**
124:2
**bringing**
90:15
**brings**
63:11
**brook**
3:15
**bunch**
31:16, 31:19
**byrd**
121:16

**C**

**calendar**
70:12
**call**
8:5, 8:8, 8:10,
15:6, 41:5,
41:11, 41:13,
41:17, 42:3,
52:7, 55:15,
62:14, 68:9,
73:22, 115:12,
117:3, 117:6,
117:9, 117:22,
118:3
**calls**
15:15, 18:3,
19:6, 27:18,
47:19, 88:8,
119:16, 120:3,
125:15, 125:19,
126:5, 126:8,
126:17, 126:20
**calumet**
46:16
**came**
10:5, 41:4,
84:23, 121:6,
121:7, 121:10
**can't**
6:17, 7:8,
12:23, 14:20,
18:12, 18:13,
18:18, 18:19,
18:20, 21:2,

24:1, 26:9,
31:19, 37:2,
37:6, 39:10,
39:11, 40:15,
47:1, 47:15,
47:17, 47:22,
50:1, 50:9,
50:18, 52:24,
53:6, 56:16,
58:12, 60:22,
61:5, 61:11,
63:23, 67:11,
67:24, 69:1,
69:5, 70:1,
71:4, 75:9,
76:5, 76:11,
84:11, 86:3,
86:5, 106:21,
107:11, 111:8
**cannot**
47:24, 104:17,
127:5, 127:6,
127:7
**capabilities**
36:12
**capacity**
66:23
**car**
109:6, 109:9,
109:11, 109:14,
109:16
**case**
1:7, 5:18,
5:23, 28:21,
108:12, 109:24,
119:14, 128:14
**category**
91:5, 99:4
**cause**
16:5
**caused**
49:13, 101:21,
101:23, 102:5,
102:20, 103:3,
103:8, 103:12
**cba**
11:15, 21:15,
22:6, 22:7,

22:8, 22:12,
26:17, 91:20,
113:6
**cecil**
73:7
**certain**
48:14, 51:2,
67:6, 102:10
**certificate**
128:1
**certified**
2:8, 128:3
**certify**
128:7
**cetera**
59:24
**chain**
13:13, 13:14,
13:20, 14:15,
14:18, 57:3
**challenge**
17:17
**chance**
48:24, 106:4
**change**
26:4
**changed**
10:20, 66:14,
66:20, 90:4
**changing**
66:19
**charge**
55:19
**chicago**
3:7, 3:23
**chief**
40:11, 41:2,
44:22, 44:24,
45:2, 59:14,
69:6, 84:15,
86:5
**choice**
121:22
**city**
46:16
**civil**
108:11
**claim**
50:24, 91:6,

103:14, 111:3,
123:4
**claiming**
26:11, 86:7,
86:10, 86:13,
92:19, 94:1,
103:12, 122:20,
123:14
**clarifies**
99:16
**clean**
32:1
**clear**
8:24
**clock**
115:19
**clocks**
115:15
**cocounsel**
111:15
**collective**
112:22
**come**
69:15, 69:19,
69:22, 98:23,
111:19, 119:20
**coming**
13:8, 14:18,
70:2, 70:6
**command**
13:13, 13:14,
14:15, 14:16,
14:18
**comment**
42:4, 42:5,
43:5, 59:14,
60:20
**comments**
60:20
**commission**
128:20
**comp**
108:12
**compared**
30:21, 31:4,
31:7, 51:3,
57:20, 57:23,
75:2, 90:14,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                    38

96:4
**comparing**
31:5
**compensation**
91:11, 94:19,
96:10, 96:17,
97:11, 97:18
**competitive**
94:5
**complain**
38:7, 58:3,
62:20, 64:1,
65:9, 65:12,
65:16, 65:18,
68:18, 69:15,
70:22, 71:1,
72:1, 72:11,
72:14, 72:20,
74:3, 74:6,
75:11, 79:5,
79:8, 79:19,
82:22, 84:3,
84:8, 92:13,
96:7
**complained**
40:4, 56:10,
56:13, 57:11,
58:12, 58:16,
63:5, 69:2,
72:23, 75:2,
77:10, 77:13,
77:16, 82:16
**complaining**
58:9, 63:16,
63:18, 63:22,
64:8, 69:3,
70:9, 70:14,
70:19, 72:4,
76:6, 79:11,
79:12, 79:24,
81:5, 81:8,
81:11, 83:2
**complains**
56:17, 56:18
**complaint**
4:15, 23:14,
24:9, 33:11,
38:16, 39:15,

40:1, 40:3,
40:6, 40:14,
40:16, 41:1,
43:24, 48:16,
48:19, 49:4,
49:6, 49:9,
49:14, 49:16,
49:21, 49:24,
50:5, 50:6,
50:8, 50:15,
50:17, 50:24,
54:21, 55:7,
57:17, 69:23,
70:2, 74:10,
77:21, 83:5,
105:23, 106:1,
106:9, 106:18,
107:8, 107:19,
107:21
**complaints**
39:1, 39:23,
57:15, 58:7,
68:21, 69:7,
69:20, 70:6,
72:7, 72:10,
72:18, 74:11,
104:10
**complete**
7:9
**computation**
91:5, 99:4
**computer**
36:11
**conditions**
30:18, 31:9,
31:11, 40:5,
83:14
**conduct**
101:8
**conducted**
1:14
**confer**
98:22
**confirm**
49:7, 49:15,
101:9, 103:18
**confrontation**
118:3

**consider**
30:23, 50:4
**considered**
10:13
**consistent**
93:22
**consistently**
24:15, 27:8,
27:14, 28:13,
53:18
**contained**
30:20
**contend**
20:21, 24:19,
50:7, 87:2
**contending**
24:23, 48:18,
49:7, 50:17,
93:11, 101:21
**content**
71:4, 81:19
**contention**
22:5, 33:17,
93:6, 104:3,
106:16, 106:20,
107:4, 107:10,
115:3, 115:4
**contents**
81:14
**context**
12:14
**continues**
38:19, 90:23,
101:9, 111:5
**continuing**
22:22
**contract**
15:23, 25:15
**control**
104:5
**conversation**
29:22, 63:2,
63:4, 63:7,
65:1, 66:18,
77:5, 81:15,
81:20, 85:24,
96:15
**conversations**
43:11, 62:11,

66:8, 66:12,
66:13, 66:15,
66:23, 71:4,
71:5, 82:21,
107:17, 116:13,
116:17
**cook**
1:8, 4:22, 5:8,
8:18, 11:21,
13:22, 17:12,
42:16, 89:8,
92:14, 96:8,
101:22, 101:23,
104:3
**correct**
7:24, 10:7,
10:17, 10:18,
15:18, 16:21,
20:19, 24:22,
26:12, 27:5,
30:3, 32:19,
33:12, 33:13,
33:22, 33:23,
34:1, 34:2,
40:14, 41:5,
41:6, 44:3,
44:4, 44:8,
44:11, 44:15,
44:17, 45:17,
47:9, 49:9,
52:2, 53:19,
58:19, 62:15,
62:18, 62:19,
65:17, 65:19,
68:5, 69:18,
69:21, 86:12,
86:18, 87:7,
87:8, 87:19,
87:20, 89:17,
89:21, 89:22,
94:13, 101:11,
102:2, 103:19,
107:22, 109:10,
109:15, 114:18,
118:7, 118:24,
119:1, 119:3,
119:4, 119:6,
122:4, 122:9,

122:13, 122:17,
122:18, 126:15,
126:19, 126:22,
128:8
**correctional**
9:6, 9:9, 9:12,
9:15, 9:21,
9:22, 76:23,
96:3
**cost**
97:21
**could**
18:6, 20:14,
24:3, 25:15,
30:18, 32:4,
32:15, 33:1,
36:17, 48:8,
55:5, 67:12,
88:19, 89:13,
91:21, 96:22,
101:14, 101:14,
103:21, 109:5,
110:22, 113:21,
114:12, 117:5
**couldn't**
39:19, 53:15,
123:21
**counsel**
5:5, 20:4,
88:22, 112:9,
116:7, 118:4,
120:7, 120:9,
125:1, 127:1,
128:13
**county**
1:8, 4:23, 5:9,
8:19, 11:21,
13:23, 17:12,
42:17, 89:8,
92:14, 96:8,
101:22, 101:24,
104:3, 126:15,
128:5
**couple**
75:18, 82:12,
124:23
**course**
121:18, 121:24

**court**
1:1, 6:16,
109:1, 128:1
**coworker**
82:19
**coworkers**
17:1, 29:23,
34:17, 75:3,
94:6
**crew**
124:4, 124:5,
124:6, 124:14,
124:15
**crook**
55:15
**csr**
1:24, 128:4
**cst**
1:16, 127:24
**current**
99:14
**cv**
1:7

**D**

**daffada**
3:20
**daily**
124:17, 124:19
**damage**
99:12, 111:3
**damages**
91:5, 95:21,
99:5, 100:4
**dangerous**
24:17, 30:8,
30:10, 30:13,
30:15, 30:19
**danny**
4:2, 23:7,
24:3, 32:4,
32:15, 33:1,
48:8, 55:5,
55:17, 88:19,
89:13
**dart**
1:9
**dart's**
4:23, 89:8

**date**
39:9, 41:8,
53:1, 53:7,
58:13, 60:24,
62:24, 64:5,
97:20
**dates**
21:2, 39:3,
39:12, 39:20,
56:14, 56:17,
57:14, 58:6,
60:22, 85:6
**david**
37:4, 77:22,
77:24, 78:4
**day**
41:17, 41:24,
52:19, 54:2,
54:5, 54:8,
56:3, 62:5,
62:6, 68:8,
70:11, 71:18,
71:21, 73:16,
73:18, 75:10,
78:19, 79:3,
79:18, 82:7,
100:16, 101:16,
124:20, 128:17
**day-to-day**
66:3, 84:20
**days**
15:10, 15:20,
16:6, 22:1,
22:2, 22:24,
45:3, 45:9,
66:14, 66:19,
66:20, 70:11,
91:14, 91:17,
91:19, 91:21,
91:24, 92:9,
92:15, 92:17,
92:18, 92:22,
97:7, 118:23,
119:10, 120:1,
121:10
**dead**
111:19
**deal**
73:20, 122:7

**dealing**
59:23, 87:10
**dealt**
114:12
**decide**
16:16, 21:23,
22:1, 26:1
**decided**
19:12, 22:23,
28:22, 39:1
**decides**
16:3, 16:7
**decision**
51:4
**decisions**
50:22, 88:6
**declare**
32:18
**declared**
89:16
**default**
45:13
**defendant**
4:18, 4:22,
32:12, 89:7
**defendants**
1:10, 3:10,
3:18, 5:5,
40:23, 49:13,
50:12, 55:15,
101:8, 101:18,
106:16, 120:9,
127:1
**delivery**
25:12, 127:21
**department**
61:23, 77:19,
93:23, 94:6,
94:7, 104:11,
122:1, 125:23,
125:24, 126:1,
126:12, 126:14
**department-issued**
126:11
**depending**
15:19
**depends**
14:14, 14:16,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                    40

15:4, 51:9,
52:16, 114:8
**deposed**
5:12, 5:14
**deposition**
1:13, 2:1,
4:14, 5:15,
7:23, 8:2, 8:6,
8:13, 8:16,
20:5, 23:10,
32:7, 89:2,
109:22, 110:2,
128:7
**deputy**
41:2, 44:21
**derogatory**
40:23
**describe**
117:14
**described**
111:4
**designed**
18:22
**despicable**
31:16
**detail**
49:20, 73:21
**detailed**
66:8, 66:12,
66:13, 66:15,
66:18, 66:22,
91:4, 99:3
**details**
104:13, 104:16
**determination**
107:6, 113:11
**determined**
15:23
**determines**
26:18, 26:21,
88:2
**diagnosed**
101:19
**diagnosis**
100:22
**different**
19:15, 19:19,
20:10, 46:1,

50:16, 115:21,
116:8, 116:9,
116:22
**differently**
50:13
**dinged**
17:16
**direct**
112:11
**directed**
113:4
**direction**
128:11
**directly**
100:1
**director**
19:11, 42:14,
44:19, 44:20,
55:14, 65:21,
65:22, 66:4
**dirty**
31:14
**disagree**
92:12
**disagreed**
28:23, 29:2,
79:14
**disagreement**
57:21
**disagreements**
29:16
**disciplinary**
16:18, 17:2,
21:12, 58:15,
73:4, 107:4,
107:7, 113:3,
115:9
**discipline**
14:21, 15:2,
15:12, 15:22,
16:8, 17:16,
17:17, 18:23,
19:2, 20:23,
21:4, 21:7,
22:20, 43:22,
44:5, 45:3,
45:4, 45:6,
45:22, 58:4,

58:10, 58:17,
64:2, 64:8,
65:14, 72:15,
72:21, 72:24,
73:2, 75:12,
75:15, 77:11,
79:20, 79:21,
84:4, 104:4,
104:7, 104:9,
104:14, 104:15,
112:18, 112:19,
112:23, 113:7,
113:12, 116:1,
116:3, 124:12,
125:11
**disciplined**
104:20
**discriminated**
13:16, 62:21,
65:19, 71:2,
77:14, 80:1,
81:13, 84:9,
105:2
**discriminates**
85:19
**discrimination**
11:22, 12:19,
12:22, 13:3,
13:8, 13:9,
56:11, 56:22,
57:3, 63:16,
81:9, 102:5,
102:14, 103:5
**discriminatory**
43:23
**discussed**
99:13, 99:17
**discussing**
112:12
**discussion**
112:17
**disparate**
50:22, 51:4
**distress**
100:6
**district**
1:1, 1:2,
51:10, 52:6,

52:7, 52:10,
52:11, 53:24,
54:3, 74:24
**division**
1:3, 9:7, 9:9,
9:11, 9:13,
9:16, 9:20,
9:23, 10:2,
76:22
**doctors**
101:18
**document**
23:13, 23:18,
23:20, 26:20,
63:12, 89:10,
89:17
**documents**
7:15, 8:12
**doing**
6:9, 6:15,
7:12, 9:5,
11:10, 12:17,
28:4, 47:6,
73:6, 78:2,
88:14
**done**
35:17, 114:5
**down**
12:19, 24:3,
24:24, 30:22,
38:11, 40:17,
46:22, 54:7,
56:8, 68:16,
82:14, 108:3,
108:8, 123:8,
124:19
**downstairs**
40:4, 40:5
**dr**
103:4, 103:7
**due**
86:14
**dues**
17:5, 17:9
**duly**
5:4
**during**
7:23, 95:1,

Transcript of Tyrone McGhee
Conducted on August 24, 2020
41

101:15, 116:16,
117:3, 117:6,
117:9
**duty**
113:13, 114:1

**E**

**each**
19:20, 20:11,
25:18, 34:15,
38:16, 39:14,
40:22, 48:15,
48:17, 49:12,
49:19, 91:5,
91:9, 111:2,
112:22
**earlier**
77:23
**earn**
10:14
**easier**
48:22
**easily**
90:14
**eastern**
1:3
**easy**
60:8
**eeoc**
55:20
**effective**
59:8
**either**
98:14, 121:7,
126:10
**elaborate**
30:11
**electronic**
9:1, 127:21
**else**
8:16, 8:22,
8:23, 22:6,
31:18, 42:11,
50:1, 50:9,
50:18, 52:5,
59:19, 61:1,
61:4, 67:13,
90:15, 90:18,

97:16, 104:22,
106:21, 107:11,
120:7, 124:18
**em**
8:21, 9:1,
10:3, 10:5,
10:8, 10:11,
10:13, 10:14,
10:16, 10:20,
14:21, 15:3,
17:13, 18:2,
18:8, 20:19,
20:22, 24:14,
27:2, 27:4,
27:9, 28:19,
30:12, 57:9,
65:23, 66:16,
67:6, 77:8,
78:20, 80:6,
80:9, 80:17,
80:21, 83:17,
87:10, 87:14,
88:11, 93:17,
93:19, 93:21,
94:6, 94:7,
94:8, 95:6,
96:8, 96:9,
101:24, 102:1,
102:14, 102:21,
103:2, 103:5,
104:6, 104:9,
105:12, 105:16,
108:14, 120:11
**email**
96:13, 126:10,
126:11, 126:12,
126:13, 126:15,
126:19
**emery**
3:12
**emotional**
100:5, 100:13
**employed**
128:13
**employee**
17:15, 58:21,
67:18, 69:22,
85:23, 90:12,

104:24, 121:18,
125:6, 125:11,
125:16, 125:23,
126:6, 127:3
**employees**
5:21, 17:22,
26:11, 69:12
**employment**
24:13, 49:20,
49:23
**end**
125:7
**endure**
97:21
**engaged**
49:3
**englewood**
51:10, 52:5,
52:6, 52:11,
74:24
**enough**
6:3, 111:14
**entail**
16:23
**entitled**
66:15, 92:8,
92:11, 93:8,
96:10, 99:6
**environment**
50:5, 50:8,
86:15, 102:2
**equal**
30:17, 90:6,
90:9
**erroneous**
104:9
**esquire**
3:3, 3:11, 3:19
**estimate**
114:13
**et**
1:5, 1:9, 59:24
**ethan**
3:11, 5:7
**ethnicity**
46:10
**even**
5:24, 20:19,

47:11, 51:9,
76:5, 96:12,
96:21
**events**
91:16
**eventually**
66:20, 66:21
**ever**
5:11, 12:18,
38:7, 40:9,
42:19, 42:21,
42:23, 43:1,
55:19, 56:24,
58:3, 62:20,
64:1, 65:3,
65:6, 65:9,
67:17, 68:18,
69:22, 71:1,
72:1, 74:3,
75:11, 76:18,
76:19, 77:7,
77:10, 77:13,
77:16, 79:5,
79:23, 80:24,
82:10, 84:3,
84:8, 85:22,
95:11, 103:7,
103:13, 108:20,
110:11, 110:16,
110:19, 116:20,
116:21, 117:1,
117:6, 124:11
**every**
6:16, 31:20,
36:3, 38:16,
39:15, 40:22,
49:12, 49:19,
52:19, 54:2,
56:3, 61:6,
68:8, 71:17,
71:21, 73:18,
75:10, 79:3,
91:5, 93:6,
93:10, 97:7,
99:4, 100:16,
124:20
**everybody**
41:12, 41:15,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

42

41:16, 67:13,
90:4, 90:9,
111:15, 124:16
**everyone**
90:6
**everything**
7:12, 50:7,
90:18, 105:24
**evidence**
85:11
**exact**
12:23, 39:3,
46:18, 47:1,
47:9, 56:17,
64:5, 85:6
**exactly**
18:13, 23:22,
24:1, 26:5,
26:8, 39:12,
39:20, 41:8,
42:1, 43:3,
43:7, 46:12,
48:2, 53:7,
60:22, 62:24,
63:23, 64:14,
69:5, 71:3,
71:6, 73:3,
73:5, 79:10,
80:13, 81:20,
84:21, 95:19,
98:5, 109:13
**examination**
4:5, 5:5,
112:9, 120:9,
125:1, 127:1
**examples**
50:16
**exhibit**
4:15, 4:16,
4:20, 23:8,
23:10, 23:14,
32:5, 32:7,
32:10, 55:6,
55:18, 88:20,
88:22, 88:24,
89:2, 89:6
**exhibits**
4:14

**expendable**
124:5
**expense**
111:2
**expenses**
97:19, 97:21,
99:20
**experience**
14:7, 113:15,
113:22, 114:11,
114:20, 115:10,
115:23
**experiencing**
29:15
**expires**
128:20
**explain**
100:6
**explanation**
100:3, 105:20
**extended**
93:18

--------

**F**

**face**
108:2
**fact**
44:10, 44:15,
45:24, 46:17,
69:4, 79:14,
104:20
**facts**
24:9, 106:15,
106:19, 107:1,
107:3, 107:9,
123:4
**fails**
104:4
**fair**
6:3, 18:23,
58:18, 76:24,
80:14, 85:2,
93:17, 111:6,
114:17, 114:22,
119:22
**fairly**
90:4
**familiar**
17:11, 17:19,

87:22, 109:3,
125:3
**far**
14:16, 15:1,
17:2, 18:20,
51:7, 51:8,
60:1, 66:16,
74:23, 90:6,
90:8, 95:3,
95:13, 95:17,
97:24, 100:8,
101:23, 105:1,
118:18, 119:21
**fashion**
45:16
**favorite**
88:13
**feel**
16:4, 29:12,
48:3, 63:13,
97:3, 100:13,
102:9, 115:18,
115:24
**feeling**
105:1
**fellow**
117:1
**felt**
62:21, 63:18,
64:2, 84:8,
96:20, 104:19,
119:5
**ferguson**
71:7, 71:9,
71:15, 71:18,
71:20, 71:22,
72:1, 72:11,
72:14, 124:17
**ferguson's**
73:3
**few**
82:12, 114:14,
126:24
**figure**
22:13, 30:14,
59:6, 95:22,
98:7, 103:11,
110:15

**file**
42:7, 114:24,
115:5, 121:19,
124:12, 125:7,
127:4, 127:9,
127:11, 127:13
**filed**
23:21, 55:19,
104:10, 110:11,
118:10, 119:2,
122:22
**files**
58:15
**filing**
114:21, 122:16,
123:15
**fill**
127:10, 127:12
**financial**
128:15
**find**
42:5, 43:5
**fine**
29:24, 31:6,
54:18, 54:20,
61:16
**finish**
6:11, 6:12
**finished**
27:22
**fire**
48:6
**firm**
3:4
**first**
4:19, 4:23,
5:11, 9:4,
10:11, 19:24,
21:8, 23:24,
32:12, 41:7,
48:21, 59:22,
89:8, 90:5,
101:16, 113:18,
114:1
**firsthand**
51:21
**five**
54:22, 75:10,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                    43

101:15
**five-minute**
54:15, 54:20,
108:4
**fixed**
109:14
**folkers**
35:13
**follow-up**
112:7, 120:8
**following**
20:22, 21:3,
21:7, 22:8
**follows**
5:4
**foregoing**
32:19, 128:6,
128:8
**forgot**
110:8
**form**
16:16, 18:4,
19:6, 22:18,
27:18, 113:1,
113:8, 113:19,
114:6, 115:6,
117:10, 117:18,
117:24, 120:2,
127:10, 127:12
**formed**
43:23
**former**
65:21
**foundation**
15:14, 15:24,
18:4, 18:24,
19:5, 21:20,
22:18, 27:17,
28:15, 29:8,
29:21, 36:4,
38:3, 44:16,
83:19, 83:23,
87:23, 88:7,
102:7, 105:14,
113:20, 115:1,
115:7, 115:13,
116:5, 117:4,
117:18, 118:1,

119:12, 120:2,
125:19, 126:3,
126:8
**freely**
28:24
**freeze**
95:2, 95:12
**frequently**
116:1
**friendly**
67:7
**friends**
60:3
**friendship**
60:6
**front**
7:16, 23:13,
98:13, 98:19
**full**
7:8
**fully**
106:8
**further**
126:23
**future**
97:12

--------- G ---------

**gave**
60:4
**gender**
81:9, 85:20
**generally**
102:2, 114:10
**getting**
19:24, 69:9,
92:15
**give**
6:5, 7:8, 16:5,
21:2, 21:9,
21:12, 21:16,
22:12, 33:4,
48:11, 48:23,
56:16, 60:22,
69:1, 76:5,
90:24, 103:23,
109:22, 111:14,
114:12, 118:6,

123:3, 123:4
**given**
51:1, 91:23,
92:9, 92:17,
98:2, 98:5,
103:14, 105:10,
105:19, 118:22,
128:9
**giving**
23:1, 59:17,
59:23, 60:1
**go**
6:4, 6:21,
6:24, 10:1,
13:13, 15:19,
16:6, 20:3,
20:14, 21:21,
22:21, 24:7,
28:17, 31:23,
33:1, 38:10,
39:18, 43:17,
44:18, 48:17,
49:1, 49:11,
54:14, 54:21,
55:5, 55:6,
61:3, 69:17,
88:9, 88:24,
89:13, 90:22,
91:8, 91:9,
92:4, 96:20,
100:16, 101:4,
101:14, 102:17,
102:24, 103:16,
103:21, 104:18,
104:23, 105:21,
106:5, 106:14,
106:24, 109:24,
110:22, 110:24,
119:19, 127:8
**goes**
14:16, 17:3,
31:16, 50:3,
66:16, 93:4,
118:18
**going**
5:10, 6:3, 6:8,
6:10, 7:5,
19:13, 20:5,

20:7, 23:16,
25:20, 25:22,
33:3, 39:10,
48:11, 53:1,
54:17, 54:21,
55:6, 72:9,
72:13, 75:8,
87:14, 88:13,
88:23, 88:24,
95:1, 96:24,
97:2, 97:22,
99:10, 100:13,
105:21, 110:13,
111:17, 111:19,
112:5, 112:11,
124:1, 127:22
**gone**
84:21, 85:7
**good**
5:7, 18:21,
25:14, 27:16,
27:20, 27:24,
28:2, 28:10,
59:2, 60:7,
90:12
**gosh**
78:15
**gotten**
94:23
**governs**
26:15
**great**
16:11, 18:18,
99:23, 100:2,
111:17
**gregory**
4:18, 32:12
**grievance**
17:13, 17:19,
17:23, 18:1,
18:7, 19:3,
19:13, 19:16,
20:11, 20:14,
23:2, 23:4,
45:8, 119:3,
119:9, 119:21,
119:24, 121:19,
122:4, 122:7,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

44

122:11, 122:16,
124:12, 125:4,
125:7, 125:18,
126:2, 126:7,
126:10
**grievances**
19:9, 96:11,
96:12, 104:10,
114:12, 114:22,
114:24, 115:5
**grieve**
45:6, 45:12,
92:1
**grieved**
44:19, 45:10
**ground**
6:5
**guess**
12:10, 51:3,
53:17, 64:10,
64:11, 78:22,
84:19, 127:14
**guy**
13:11, 46:4
**guys**
27:22, 40:12,
56:4, 61:19,
67:7, 111:18

---
**H**
---

**half**
9:10, 20:1
**hallway**
63:8
**hand**
128:17
**handbook**
112:21
**handled**
11:15, 109:17
**happen**
15:13, 21:18,
72:8, 83:5,
119:23
**happened**
6:1, 39:24,
46:19, 46:23
**happening**
86:20, 95:2

**happens**
14:12
**harassment**
101:17
**hard**
59:3, 66:5,
73:5, 114:7,
114:15, 115:22
**head**
6:18
**health**
31:9, 31:11
**healthcare**
101:6
**hear**
19:13, 19:19,
20:11, 43:4,
47:21, 67:17,
68:18, 116:20,
116:21
**heard**
20:17, 42:19,
42:21, 42:23,
43:1, 61:2,
85:22, 86:5
**hearing**
19:19, 20:11,
20:18, 43:9,
126:10
**hears**
19:9
**held**
2:1, 104:8
**help**
7:19, 7:23,
17:22, 121:19
**helped**
124:11
**herbert**
3:4
**here**
7:9, 20:1,
22:19, 23:3,
23:17, 45:19,
48:14, 49:2,
49:11, 87:2,
92:23, 94:18,
97:11, 98:10,

106:6, 108:12,
124:21, 127:16
**hereby**
128:7
**hereunto**
128:16
**hey**
73:20
**hi**
112:11
**hide**
99:7
**high**
28:24, 101:20,
102:4, 102:13,
102:20, 103:3,
103:7
**high-incident**
86:17, 87:11,
87:14, 87:19
**high-level**
28:13, 28:19
**high-priority**
74:17
**high-profile**
57:20, 57:23,
74:17, 74:21,
74:24
**high-stress**
102:2
**higher**
86:8
**higher-incident**
87:3
**higher-patrol**
86:11
**hit**
109:21
**hold**
42:3
**homes**
31:23, 32:1
**hopefully**
6:21
**however**
16:3, 58:1,
93:4, 113:3
**humiliating**
100:9

**humiliation**
100:5
**hurtado**
33:24, 35:24,
36:1

---
**I**
---

**ian**
4:3
**identification**
23:11, 32:8,
89:3
**identified**
33:15
**identify**
33:8, 38:16,
39:14, 40:22,
43:21, 48:14,
49:2, 49:12,
49:19, 50:3,
50:11, 50:21,
91:4, 104:2,
106:7, 107:1,
107:3
**illegal**
104:11
**illinois**
1:2, 2:10, 3:7,
3:15, 3:23,
128:6, 128:24
**immediate**
13:7, 13:10,
52:14
**impact**
50:22, 51:5
**implement**
16:4, 23:2,
67:2
**implementing**
67:4, 67:6,
119:21
**important**
61:8
**imposed**
19:3
**in-service**
12:17
**incident**
41:1, 43:24,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                      45

45:2, 60:11,
64:6, 75:24,
86:9, 113:10
**incidents**
60:13, 60:17,
61:9, 87:9,
104:17
**include**
34:3, 39:1,
39:8, 39:15
**included**
49:9, 49:16,
50:8
**including**
15:20
**income**
97:12, 97:13,
111:4
**incorrect**
48:4
**incurred**
97:20
**indicating**
103:15
**individuals**
40:10, 50:14
**information**
39:8, 63:12,
98:24, 101:19
**infraction**
15:4, 15:5,
15:11, 15:17,
15:19, 16:15,
16:16, 21:8,
21:19, 21:24,
22:2
**infractions**
22:14
**initial**
16:7, 19:2
**initiated**
105:6
**initiative**
52:8
**injured**
5:22, 108:16,
108:20
**injury**
5:23, 108:18,

108:22, 109:2,
109:4
**inmates**
30:19, 30:21
**ins**
37:22
**instance**
40:22, 49:12,
60:16, 61:7,
115:14
**instances**
49:15, 58:11,
75:19, 75:20,
105:6
**instead**
23:1, 23:3,
44:3, 90:15,
115:14
**insurance**
109:16
**interact**
66:3, 66:7,
84:20
**interaction**
80:20
**interchangeably**
9:2, 94:10
**interest**
128:14
**interrogatories**
4:19, 4:24,
32:13, 48:13,
89:9
**interrogatory**
33:2, 33:7,
38:2, 38:11,
38:15, 38:20,
40:21, 43:17,
90:22, 91:3,
101:4, 108:10,
110:22
**investigated**
106:8
**investigation**
38:19, 101:9,
105:6, 111:5
**investigations**
105:9

**investigator**
10:9, 34:22,
35:24, 70:2,
96:3, 104:8,
113:13, 113:24,
115:11, 115:12,
117:17, 117:21,
117:23, 118:2,
119:23, 121:8,
121:10, 121:15
**investigator's**
113:18
**investigators**
28:6, 29:6,
29:19, 33:22,
41:22, 41:23,
45:21, 45:23,
51:2, 51:3,
51:18, 70:5,
70:9, 83:22,
87:14, 87:21,
104:9, 114:23,
115:5, 115:24,
116:2, 116:21,
117:2, 117:7,
117:16, 119:8,
124:12
**involved**
108:11, 109:2,
122:3, 122:11,
122:15, 122:16
**irregular**
113:16
**ish**
84:19
**issue**
23:5, 44:5,
81:21, 85:4,
92:23, 99:1,
99:5, 104:7,
113:17
**issued**
104:13, 104:14,
104:15
**issues**
81:16, 81:17
**issuing**
104:9

**item**
111:2
**itemize**
111:2, 112:22
**itself**
83:12, 96:2

**J**

**jefferson**
3:5
**jerk**
69:4
**job**
1:22, 9:19,
27:20, 27:24,
30:13, 37:9,
59:2, 69:10,
69:14
**join**
10:8, 10:11
**joined**
10:8, 27:2,
27:4
**journal**
56:20, 56:21
**judged**
115:17
**justin**
3:19

**K**

**kane**
128:5
**keep**
54:17, 56:19
**kelly**
3:3, 54:20,
99:18, 111:11
**kelsey**
103:4, 103:7
**kept**
56:21
**kind**
5:18, 17:16,
17:22, 18:10,
19:24, 37:21,
50:2, 59:5,
59:6, 62:11,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

46

66:9, 69:11,
69:14, 71:16,
73:19, 73:20,
100:22, 101:6,
115:22, 123:7
**kinds**
70:8
**knew**
7:6, 25:20,
25:22, 47:12,
47:13, 100:11
**knowledge**
51:21, 53:8,
53:11, 56:21,
65:13, 77:7,
77:9, 94:8,
106:12, 119:15
**knowledgeable**
28:6, 90:13,
93:18
**known**
55:24, 71:9,
73:10, 82:2
**knows**
37:21
**krauchun**
3:3, 4:7, 4:9,
15:14, 15:24,
18:3, 18:24,
19:5, 19:21,
21:20, 22:9,
22:15, 22:17,
26:22, 27:17,
28:15, 29:8,
29:21, 36:4,
36:8, 38:3,
39:16, 44:16,
44:18, 47:19,
54:17, 54:22,
57:5, 83:19,
83:23, 87:23,
88:7, 99:10,
99:16, 99:21,
99:24, 102:7,
102:15, 102:22,
105:14, 111:12,
111:17, 111:22,
112:10, 120:4,

120:6, 122:23,
123:16, 124:23,
125:2, 126:23,
127:17, 127:22

---
L
---

**language**
40:24, 61:10
**lasalle**
3:21
**last**
8:10, 12:2,
12:24, 25:13,
32:16, 46:6,
50:20, 75:10,
89:14
**late**
15:6, 113:6
**later**
11:20, 44:2,
121:11
**latino**
33:24
**law**
3:4, 3:12
**lawsuit**
20:21, 23:15,
23:21, 61:9,
86:8, 86:10,
89:24, 92:20,
94:2, 95:20,
99:2, 99:5,
100:1, 101:11,
109:2, 109:22,
118:10, 122:22,
123:5, 123:15,
124:9
**lawsuits**
110:5
**leader**
59:8
**leading**
120:3
**least**
78:15, 79:4
**left**
84:22, 84:23,
105:12, 105:18,

111:11
**legrain**
1:5, 55:22
**legs**
108:6, 111:16
**leinenweber**
3:19, 3:20
**less**
24:16, 24:17,
26:11, 30:8,
30:15, 114:15,
118:6
**let's**
14:10, 14:11,
15:5, 38:10,
43:17, 48:21,
49:11, 54:14,
54:20, 54:22,
59:20, 74:9,
90:22, 94:3,
100:16, 103:16
**level**
19:20, 22:20
**lieutenant**
19:10, 95:3,
96:5
**lieutenants**
95:5
**likely**
66:11, 119:23
**line**
13:12
**lineup**
54:4, 54:5
**list**
33:15, 36:6,
36:24, 111:2,
111:6
**listen**
69:16
**lit**
32:2
**litigation**
5:9, 97:18,
97:19, 97:24,
99:20
**little**
6:8, 11:19,

31:9, 31:20,
33:4, 61:6, 78:8
**lived**
110:16
**llc**
3:20
**location**
44:6, 44:10,
44:11, 44:12,
44:14, 45:24,
46:1, 46:21,
46:22, 46:24,
47:1, 47:3
**logging**
44:2
**long**
6:21, 6:23,
8:10, 9:8, 9:22,
28:4, 37:21,
55:24, 71:9,
73:10, 82:2,
85:7, 112:13
**longer**
26:7, 97:1
**look**
7:21, 8:12,
32:4, 34:17,
41:5, 42:4,
55:10, 60:11,
60:19, 78:2,
90:22, 100:8,
103:22, 106:3,
108:24, 127:4,
127:11
**looking**
16:9, 45:19,
59:11, 59:12,
59:13
**looks**
26:10, 32:22,
89:20, 108:1
**lopez**
33:24, 35:17
**lose**
91:12, 94:20,
96:18
**loss**
111:3, 111:7

**lost**
91:11, 92:20,
108:1, 111:4
**lot**
29:1, 39:5,
39:10, 43:10,
59:7, 68:16,
69:7, 75:1,
80:20, 85:1,
91:15, 100:12,
110:14, 111:11,
112:17, 118:12
**loud**
6:16
**ludnowski**
120:20, 120:21

**M**

**ma'am**
126:16
**made**
38:17, 40:1,
40:7, 40:14,
40:15, 51:14,
53:3, 53:4,
53:6, 57:15,
60:14, 60:21,
65:16
**major**
15:11, 15:17,
16:5
**majority**
83:22, 87:13,
87:15
**make**
18:23, 20:5,
28:12, 33:3,
40:3, 40:6,
48:16, 48:22,
49:22, 50:6,
50:15, 52:4,
52:13, 56:18,
63:13, 83:22,
84:17, 92:13,
104:19, 105:24,
106:10, 107:8,
113:11
**makes**
124:9

**making**
51:20, 51:22,
52:21, 52:23
**management**
16:3, 16:10,
17:2, 21:5,
21:6, 36:21,
40:7, 41:18,
41:24, 42:3,
42:9, 42:10,
42:12, 47:11,
47:13, 47:23,
52:24, 53:1,
57:22, 66:17,
79:15, 81:16,
88:4, 95:17,
97:5, 105:1,
113:14, 118:18
**managers**
29:12
**manner**
67:14
**manning**
76:12, 76:13,
76:15, 76:16,
76:19, 77:4,
77:7, 77:10
**many**
5:16, 92:22,
93:4, 114:11,
120:11, 120:13
**march**
32:23, 89:20
**marked**
23:10, 23:14,
32:7, 89:2, 89:5
**math**
10:4
**matter**
21:19, 25:17,
36:9, 126:14
**matters**
17:2, 107:18
**maximum**
9:11, 76:22
**maybe**
5:20, 12:4,
24:5, 62:7,

62:9, 64:22,
66:5, 81:4,
82:12, 109:16,
114:15, 121:11
**mcghee**
1:13, 2:1, 4:5,
4:14, 5:3,
19:23, 23:10,
23:12, 24:10,
32:7, 32:10,
55:2, 55:19,
89:2, 89:4,
89:5, 89:11,
89:15, 91:1,
103:24, 108:1,
111:24
**mcghee's**
4:16, 4:20,
32:11, 89:6
**mcghees**
110:14
**mean**
9:17, 17:5,
18:11, 18:15,
27:12, 30:10,
31:2, 31:3,
31:13, 31:14,
36:10, 41:15,
41:18, 45:14,
47:15, 51:7,
52:16, 52:23,
53:17, 56:3,
57:1, 58:11,
60:1, 61:5,
61:6, 61:8,
61:13, 61:22,
67:1, 67:11,
69:11, 69:14,
75:8, 83:11,
84:19, 85:1,
86:14, 86:19,
88:22, 93:8,
93:15, 94:3,
94:10, 95:13,
95:17, 98:20,
99:1, 107:20,
113:2, 115:20,
124:16

**meaningful**
107:5
**means**
34:8, 45:15
**meant**
12:6
**media**
103:17, 103:18,
103:19
**medical**
85:4, 100:23,
101:6, 101:10,
103:13
**medication**
101:1
**member**
42:2
**memory**
52:21
**mental**
100:5, 100:12,
100:19, 101:2,
101:6
**mention**
108:12
**mentioned**
12:16, 118:14
**merit**
88:14
**messages**
7:22
**messina**
35:22
**michelle**
80:3
**midnight**
121:20
**midnights**
61:24, 120:20,
121:9
**midwest**
3:13
**might**
44:23, 52:17,
120:17
**minor**
21:24, 22:2
**minorities**
58:1, 83:15

Transcript of Tyrone McGhee
Conducted on August 24, 2020 48

minutes
8:11, 54:22,
111:14, 111:19
mischaracterizes
102:15, 123:17
misconduct
106:7, 106:11
missed
94:1, 95:23,
97:13
misspoke
27:10
misstates
122:23, 123:16
mixed
69:9
moment
55:18, 112:5
monday
1:15
monetary
111:2, 111:7
money
10:14, 95:21,
97:23, 98:1,
98:2, 98:11
monitoring
9:2
months
91:13, 91:24,
92:5, 92:19,
93:5, 93:9,
93:11, 97:8,
121:11
more
10:14, 11:20,
30:8, 30:15,
64:6, 73:19,
78:8, 82:15,
93:1, 93:3,
98:15, 98:17,
104:21, 112:4,
114:18, 114:23,
115:4, 115:8,
115:12, 116:1,
117:19, 124:23,
126:24
morning
5:7, 11:3

most
17:1, 28:6,
87:9, 87:10
motivated
74:21, 79:9,
81:18, 83:8,
92:7, 124:9
move
28:22, 122:20,
123:7, 124:4,
126:18
moved
9:20, 29:1,
29:16, 79:15,
86:22, 118:4,
118:7, 118:9,
122:21, 123:5,
123:19, 123:24,
124:6
moves
125:23
moving
29:12, 123:14
much
35:3, 38:8,
56:8, 57:19,
62:1, 68:8,
69:13, 71:20,
71:21, 72:5,
75:6, 75:7,
96:5, 98:1,
98:4, 98:5,
98:10, 100:12,
105:22, 123:10,
124:18, 124:19
multiple
116:9
myself
76:16, 93:20,
121:8, 121:14,
124:17

N

n-word
42:19, 42:21,
42:23, 43:2,
43:4, 43:9,
43:14, 43:16,

65:4, 65:7
name
5:7, 16:9,
16:11, 46:4,
46:6
names
46:2
navigate
17:22
neal
40:11, 43:1,
43:3, 43:4,
43:9, 43:11
necessarily
82:20, 113:2
need
6:15, 6:22,
7:4, 29:13,
49:6, 54:15,
98:10, 104:12,
105:24
needed
108:6
needs
29:7
negative
117:19
negotiated
90:18
neither
128:12
never
35:9, 35:19,
35:23, 48:5,
51:22, 51:24,
85:10, 85:12,
85:15, 85:21,
104:8, 107:20
new
123:3, 124:2
newson
61:17, 61:21,
62:15, 62:20,
63:15, 64:1
next
13:12, 14:14,
14:15, 47:7,
69:17

nickle
34:22
night
10:22, 10:24,
11:2, 11:3
nobody
7:19, 12:9
nodding
6:17
nonblack
46:14, 46:15
none
103:20
nonmerit
88:15
nonminorities
58:1, 83:16
nonminority
24:16, 33:8,
33:14, 33:18,
33:22, 34:3,
34:7, 45:21,
45:23, 51:18,
53:9, 54:9,
69:22, 70:1,
70:5, 70:9,
119:8, 124:11
nonwhite
46:13
normal
73:16, 113:23,
114:4
normally
79:16
north
3:21, 51:10
northern
1:2
notarial
128:17
notary
2:9, 128:1,
128:4, 128:23
notes
7:15, 78:2,
103:22
nothing
46:22, 118:20,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

49

122:7, 126:23
**notice**
2:7, 104:11
**notification**
56:19, 63:13,
104:19, 125:12,
125:17
**notifications**
125:6
**number**
5:10, 48:13,
59:20, 91:7
**numerous**
99:17, 104:10

O

**oak**
3:15
**oath**
55:3, 112:2
**object**
99:11, 113:1,
113:8, 114:6,
117:10
**objected**
27:21
**objection**
15:14, 15:24,
18:3, 18:24,
19:5, 19:21,
21:20, 22:9,
22:15, 22:18,
26:22, 27:17,
28:15, 29:8,
29:21, 36:4,
36:8, 38:3,
39:16, 44:16,
47:19, 49:6,
57:5, 83:19,
83:23, 87:23,
88:7, 102:7,
102:15, 102:22,
105:14, 113:19,
115:1, 115:6,
115:13, 116:5,
116:11, 116:23,
117:4, 117:18,
117:24, 119:12,

119:16, 120:2,
122:23, 123:16,
125:8, 125:13,
125:19, 126:3,
126:8, 126:17,
126:20
**objections**
4:17, 4:21,
20:5, 32:11,
89:7, 114:2
**obviously**
125:3
**occasions**
116:9
**occur**
8:8, 41:7,
41:10, 62:23,
64:4, 74:10,
75:17, 108:18
**occurred**
21:1, 58:7,
68:22, 70:16,
72:18, 106:11
**occurrence**
70:17
**occurring**
12:22
**october**
128:20
**offense**
112:23, 113:4,
113:18
**offenses**
112:24
**offensive**
40:23
**offhand**
26:9, 76:4,
92:24
**office**
5:9, 8:19, 9:5,
11:22, 13:23,
17:12, 24:17,
42:17, 70:21,
70:23, 70:24,
92:14, 96:8,
101:22
**officer**
9:6, 9:9, 9:13,

9:16, 9:21,
9:23, 19:19,
20:11, 20:18,
54:9, 76:23,
96:3, 128:6
**officers**
24:16, 29:4,
33:8, 33:14,
33:18, 34:4,
53:9, 104:5,
106:7
**often**
19:3, 27:1,
27:3, 34:22,
34:24, 35:2,
35:5, 35:7,
35:8, 35:10,
35:12, 35:14,
35:15, 35:16,
35:17, 35:20,
35:21, 35:22,
36:1, 37:14,
56:2, 56:6,
56:7, 62:4,
64:20, 66:3,
68:6, 68:12,
68:14, 71:14,
71:16, 71:23,
73:16, 77:3,
78:23, 80:11,
80:18, 82:7,
82:8, 82:9,
82:13, 84:17,
84:20, 115:12
**oh**
78:6, 101:13
**omissions**
50:12
**once**
5:17, 66:5,
79:1, 81:4,
106:4, 127:12,
127:14
**one**
5:8, 5:21,
16:12, 16:13,
28:5, 28:6,
36:3, 36:13,

39:15, 40:8,
40:13, 42:2,
43:19, 44:10,
45:24, 48:21,
50:2, 50:20,
52:15, 58:13,
59:18, 59:20,
60:16, 64:6,
76:1, 86:4,
89:23, 98:9,
118:16, 120:12,
122:19, 123:10,
123:11, 124:2,
124:4, 125:23
**ones**
105:23, 110:16
**ongoing**
70:17
**only**
7:18, 10:21,
20:1, 34:8,
42:2, 75:24,
76:4, 80:16,
86:4, 88:12,
108:22, 120:20,
120:22
**operation**
75:10
**operational**
29:7
**opinion**
28:6, 28:9,
36:9, 36:13,
36:23, 37:8,
38:5, 59:10,
67:4, 103:14,
124:7
**opportunities**
70:10, 70:11,
70:12, 90:7,
90:8, 90:10,
93:15, 93:22,
94:9, 97:14
**opportunity**
24:24, 90:6,
94:1, 96:1,
107:6
**opposition**
59:17, 67:5

Transcript of Tyrone McGhee
Conducted on August 24, 2020                          50

opr
42:7, 104:18,
104:23, 105:6
opr's
105:8
optional
113:9
order
127:11, 127:20,
127:22
oriental
46:11
other
7:15, 24:16,
24:23, 33:8,
33:14, 36:14,
42:1, 45:21,
45:23, 46:21,
49:8, 50:14,
51:17, 51:18,
57:20, 57:24,
58:1, 60:13,
60:17, 60:20,
61:9, 75:3,
83:15, 91:16,
92:20, 94:5,
95:2, 96:6,
102:10, 105:22,
110:5, 111:3,
111:7, 116:20,
117:7, 123:9
others
75:5
otherwise
84:9, 128:15
out
6:16, 22:13,
24:6, 29:1,
30:14, 30:15,
59:6, 59:16,
59:23, 60:1,
68:12, 81:1,
85:6, 86:22,
89:24, 94:1,
94:20, 95:22,
95:23, 96:18,
97:13, 97:23,
98:7, 103:11,

110:14, 110:15,
118:5, 118:7,
118:9, 122:20,
122:21, 123:5,
123:9, 123:10,
123:12, 123:14,
123:23, 124:1,
124:2, 124:9,
124:14, 127:10,
127:12
outcome
45:8, 92:3,
104:15, 105:8,
126:2, 126:7,
128:15
outs
37:22
outside
57:9, 76:18,
90:15, 94:7,
96:8, 111:6
over
9:20, 10:5,
44:9, 44:13,
46:16, 90:23,
91:8, 112:6,
114:14

**P**

page
4:5, 4:14, 6:6,
24:5, 24:6,
24:7, 32:16,
33:2, 67:20,
68:7, 68:18,
70:13, 71:1,
71:17, 89:14,
90:23, 90:24,
91:7, 91:8,
105:16
pages
1:23, 50:3
paid
17:4, 17:6,
95:15, 97:23,
98:11
paragraph
24:4, 24:12,

26:10, 33:10,
33:11, 38:17,
55:7, 55:10
paragraphs
23:17
pardon
9:14, 41:21,
63:3, 85:18,
87:12, 120:24
part
17:21, 69:14,
95:20, 95:21,
114:21, 118:20
participants
31:23
particular
19:13, 24:9,
30:20, 39:19,
40:9, 47:2,
50:19, 52:17,
52:18, 58:13,
63:19, 64:9,
73:4, 79:18,
79:22, 80:2,
84:5, 84:12,
86:6, 90:21,
91:17, 96:22,
96:24, 97:3,
98:6, 99:9,
106:22, 107:12,
111:9, 113:10,
118:19, 121:3
parties
128:14
partner
56:6, 68:12,
80:24, 82:10
partnered
62:17, 73:24
partners
74:13
party
110:6
passed
59:16
passing
62:10, 64:24,
66:9, 73:18,

77:6
past
14:2, 62:1
patrol
25:11, 25:21,
30:4, 30:6,
30:9, 31:22,
52:3, 86:9,
108:18, 108:19,
108:22
pattern
115:21
paula
1:24, 2:7,
127:20, 127:23,
128:3
pay
17:5, 17:8,
90:11, 95:1,
95:11
pemonte
35:10
penalty
32:18, 38:23,
89:16, 99:2
pending
6:23
people
24:23, 29:13,
29:15, 30:1,
30:21, 33:15,
33:21, 34:8,
34:10, 34:16,
36:3, 36:15,
36:24, 38:1,
39:4, 41:5,
42:4, 57:20,
57:24, 59:23,
60:2, 60:5,
69:19, 102:11,
104:18, 123:8,
123:9
percent
82:15, 83:9,
83:17
perfect
111:21
performance
21:11, 37:9

Transcript of Tyrone McGhee
Conducted on August 24, 2020

51

performer
28:13, 28:24,
37:19, 38:1
performers
28:20
performing
36:7, 36:24
period
61:24, 80:7,
80:9, 84:18,
93:18, 93:21
periodically
80:19
perjury
32:18, 38:23,
89:16, 99:3
person
21:9, 21:17,
59:19, 60:6,
124:2
personal
30:16, 53:8,
53:11, 59:10,
109:1, 109:4
personalitywise
59:3
personally
51:17
personnel
127:4, 127:9,
127:11, 127:13
peter
46:5, 46:6
phone
6:9, 7:22,
111:18
pick
6:17, 31:20
place
10:12, 21:12,
63:7, 116:14,
116:17
placed
27:14, 29:4
plaintiff
4:16, 4:20,
32:10, 45:20,
89:6

plaintiffs
1:6, 3:2,
50:13, 50:23,
99:11, 99:19,
112:9, 125:1
plan
13:10
planning
67:4
play
90:11
please
23:8, 23:9,
24:4, 32:5,
32:16, 38:11,
43:17, 46:7,
48:9, 49:18,
55:6, 55:8,
56:15, 88:20,
88:24, 89:14,
90:24, 101:5,
101:14, 103:23,
106:3, 106:13,
106:23, 107:14,
107:23, 110:23,
113:21, 117:5,
127:21
plug
111:18
pocket
97:24
point
16:3, 21:23,
25:14, 90:21,
97:3, 98:6,
100:10, 118:16,
118:17, 118:19
pointed
48:15, 49:21,
50:15, 105:23
policies
6:2, 50:21
policy
11:22, 11:24,
12:3, 12:19,
12:22, 13:24,
14:2, 14:6,
14:21, 14:24,

15:12, 21:14,
22:3, 22:6,
26:14, 26:16,
51:4, 113:5
poor
31:15
position
25:24, 44:20
positions
24:18, 33:9,
106:17
postal
110:20
practice
51:4, 104:11,
113:23
practices
50:21
precursory
21:17
prefer
29:20, 29:23,
30:2, 30:4
prepare
8:1, 8:6, 8:13
present
4:1, 41:13,
41:14, 63:2,
63:4, 72:10,
74:12, 75:19,
83:6, 94:21,
100:11, 116:15,
121:24
presented
91:23
pressure
101:20, 101:21,
102:5, 102:13,
102:20, 103:3,
103:8
presumably
47:17
pretty
6:4, 53:18,
57:19, 62:1,
63:6, 63:17,
68:8, 69:13,
71:20, 71:21,

75:6, 75:7,
96:5, 100:12,
123:9, 124:18,
124:19
preview
48:11
previous
99:13, 99:22,
99:24
previously
99:13
prior
23:20, 101:16
probably
5:19, 6:3,
9:10, 10:22,
15:10, 27:9,
48:22, 61:23,
63:8, 64:6,
68:9, 69:19,
70:17, 71:10,
73:11, 73:18,
75:18, 78:15,
80:13, 86:23,
95:1, 95:9,
98:16, 105:3,
111:10, 114:17,
119:18, 119:20
problem
9:3, 9:19,
20:8, 21:10,
98:20, 100:18,
110:9
problems
86:17, 104:24
procedures
6:2, 107:5
process
13:17, 15:8,
16:2, 16:4,
17:13, 17:15,
17:19, 17:23,
18:1, 18:7,
18:14, 18:19,
18:20, 18:21,
18:22, 19:4,
19:16, 20:12,
23:2, 23:4,

23:24, 24:2,
26:9, 65:13,
66:16, 66:24,
88:11, 88:15,
93:19, 94:8,
97:22, 107:4,
119:21, 122:4,
124:3, 124:4,
125:4
**professional**
2:8, 58:23,
58:24, 59:13,
66:1, 67:8,
67:9, 67:16,
84:16, 100:23,
103:13
**professionalwise**
59:4
**progressive**
14:21, 15:2,
15:12, 15:22,
20:22, 21:3,
21:7, 112:19
**promotable**
97:4
**promoted**
88:12, 88:15,
90:7, 90:14,
90:19, 90:20,
94:4, 94:15,
96:1, 97:2
**promotion**
10:13
**promotional**
70:10, 90:8,
90:9, 93:21,
96:21, 97:14
**promotions**
88:11, 88:16,
94:9, 94:13,
94:22, 118:13,
118:15
**properly**
106:8
**protected**
49:3, 49:8
**provide**
7:18, 91:4,

104:16, 107:5,
126:1
**providing**
99:3
**public**
2:9, 128:1,
128:5, 128:23
**pull**
23:8, 88:19
**punish**
47:17, 47:24,
48:3
**purely**
67:8
**purposes**
49:7
**pursuant**
2:7, 12:22,
22:3
**pursue**
63:14
**put**
22:17, 27:8,
27:12, 28:19,
29:6, 36:20,
55:17, 57:19,
57:21, 58:2,
99:1
**putting**
104:10

**Q**

**question**
6:11, 6:13,
6:16, 6:23, 7:3,
7:5, 14:20,
18:6, 20:7,
20:10, 27:21,
39:7, 43:12,
110:14, 113:21,
116:21, 117:5,
117:7, 117:21
**questions**
5:11, 7:11,
31:3, 98:10,
112:5, 117:2,
117:16
**quetsch**
1:24, 2:7,

128:3
**quick**
123:7
**quite**
37:17, 81:22,
82:9, 84:22,
85:7, 87:1,
114:14, 116:7
**quiz**
12:7
**quote**
22:1, 24:20,
33:8, 67:18,
107:5

**R**

**race**
24:20, 24:21,
25:3, 50:23,
56:11, 63:20,
70:23, 72:12,
72:22, 74:7,
74:15, 74:18,
74:22, 75:4,
75:15, 75:23,
76:8, 76:10,
79:9, 80:1,
81:13, 83:3,
83:8, 83:13,
84:10, 86:9,
86:12, 87:4,
91:19, 92:7,
92:10, 92:15,
92:16, 95:23,
96:19, 97:13,
102:5, 102:13,
119:6
**racial**
69:3, 69:20,
72:13, 103:5
**racially**
81:17
**racism**
101:22, 102:21,
103:8
**racist**
40:24, 42:5,
43:5, 60:14,

60:20, 61:1,
61:10, 67:10,
67:14, 83:12,
85:9, 85:10,
85:11, 85:12,
85:14, 85:15
**radio**
44:9, 44:14,
46:16
**raise**
96:2
**raises**
94:19, 95:22,
96:4
**ranks**
95:3
**ranzino**
40:11, 41:3,
41:4, 42:1,
42:19, 58:20,
59:14, 60:21,
61:1, 65:3,
68:19, 68:24,
69:2, 69:4,
69:6, 76:2,
76:7, 76:9,
81:21, 86:2,
105:12, 105:16
**rarely**
33:18
**rather**
30:6
**reacted**
59:16
**read**
12:19, 13:1,
33:4, 38:12,
40:18, 48:10,
48:24, 55:11,
91:1, 103:23,
106:4, 106:23,
107:13
**reading**
128:11
**ready**
33:5, 38:13,
38:14, 40:19,
40:20, 43:18,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                    53

43:20, 55:12,
107:14, 107:15,
110:23
**real**
44:5
**really**
16:14, 30:11,
69:5, 73:22,
73:24, 118:19
**reason**
7:8, 21:10,
65:12, 65:20,
85:14, 125:16
**recall**
33:11, 63:15,
64:7, 69:24,
70:13, 79:21,
79:23, 81:5,
81:8, 81:11,
84:5, 112:18,
118:2, 118:21
**receive**
91:14, 125:6,
125:12, 125:17,
126:6
**received**
43:22, 44:1,
45:9, 45:22,
77:11, 79:20,
100:22, 101:5
**receiving**
63:19, 77:17,
96:9
**recent**
86:21
**recently**
86:20
**recess**
54:23, 111:23
**recollection**
43:8
**recommended**
45:3
**record**
8:24, 54:24,
99:19, 112:1,
127:24, 128:8
**records**
109:1

**reduced**
19:3, 125:11,
128:10
**refer**
67:17, 85:22
**referred**
33:11, 106:18,
107:7
**referring**
9:1
**regard**
119:3
**regarding**
11:22, 38:17,
58:9, 63:16,
107:18, 124:12
**regardless**
30:13
**regards**
99:21, 117:8
**registered**
2:8
**regular**
127:21
**regularly**
62:14, 62:17
**regulations**
16:17
**related**
66:17, 75:23,
100:1, 101:10,
108:14, 128:13
**relationship**
58:20, 58:23,
59:1, 65:22,
67:7, 84:14,
84:16
**relief**
83:10
**remark**
60:14
**remember**
12:7, 12:8,
12:24, 14:3,
26:8, 39:3,
39:11, 43:13,
43:16, 44:21,
49:10, 49:17,

51:14, 53:4,
58:17, 60:11,
64:5, 64:12,
64:14, 67:19,
67:24, 68:21,
69:6, 69:8,
70:1, 70:4,
70:5, 70:16,
71:4, 72:17,
73:1, 75:20,
75:22, 75:24,
76:6, 76:7,
79:10, 81:2,
81:3, 81:14,
81:19, 84:22,
85:6, 98:18
**remotely**
7:12
**rep**
113:16
**repeat**
113:21, 117:5
**replace**
36:19
**report**
13:3, 13:6,
13:18, 13:20,
42:9, 42:11,
42:14, 42:16,
57:3, 57:8,
100:10
**reported**
1:24
**reporter**
2:8, 2:9, 6:17,
128:1, 128:4
**represent**
17:1
**representation**
99:14, 99:22,
99:24, 121:23
**representing**
5:8, 104:21
**reprimand**
15:9, 113:17
**request**
51:5, 51:11,
51:15, 51:20,

52:4, 52:10,
52:13, 52:21,
52:23, 53:3,
53:5, 53:6,
54:12, 116:9,
116:21, 127:10,
127:12
**requested**
54:10, 128:12
**requesting**
51:18, 53:9,
116:8
**requests**
51:2, 51:7
**resolution**
125:7, 125:17
**responded**
38:19, 41:1,
43:24, 45:15,
45:17, 51:1,
104:6
**response**
42:7, 48:19,
49:4, 50:24,
51:1
**result**
101:8
**resulted**
50:13
**retaliation**
13:22, 14:7,
14:9, 14:17,
39:10, 40:2,
49:13, 49:15,
100:11, 105:4,
123:15, 123:18
**retaliations**
39:5
**retaliatory**
123:22, 123:23
**retired**
68:1, 68:2,
70:18
**retirement**
97:12, 102:6
**review**
38:20
**reviewed**
14:2

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                    54

**rico**
33:24, 35:20
**right**
7:19, 7:23,
9:2, 10:1, 10:4,
12:18, 12:23,
18:18, 19:16,
23:7, 24:1,
24:8, 25:14,
25:16, 32:9,
38:15, 43:15,
43:21, 45:4,
45:10, 47:18,
48:5, 48:6,
49:11, 49:18,
50:11, 50:17,
54:14, 55:17,
58:19, 61:11,
61:16, 64:4,
64:13, 64:14,
64:15, 65:21,
69:20, 70:13,
72:17, 72:20,
76:12, 77:22,
78:6, 78:7,
81:23, 83:12,
84:13, 84:18,
86:7, 89:4,
90:22, 91:3,
91:18, 92:15,
94:12, 94:16,
94:18, 95:19,
96:16, 97:10,
97:22, 101:5,
103:16, 103:21,
104:2, 105:21,
106:6, 108:17,
109:24, 110:22,
111:1, 111:10,
111:22, 111:24,
120:7, 120:12,
120:16, 121:21,
122:8, 122:12,
123:12, 125:5
**risk**
69:9, 71:5
**road**
3:13

**rockwell**
44:15, 46:17
**rohloff**
40:11, 41:2,
42:23, 84:13,
84:14, 84:15,
84:20, 85:9,
86:5
**role**
17:21, 82:23,
112:12
**roll**
15:6, 41:4,
41:11, 41:13,
41:17, 42:3,
62:14, 68:9,
73:22, 115:12,
117:3, 117:6,
117:9, 117:22,
118:3
**room**
7:13
**roster**
54:5
**rotate**
123:8, 123:9,
123:24, 124:2
**rougher**
60:9
**roughly**
114:11, 118:6
**rowe**
4:3
**rpr**
1:24, 128:4
**rules**
6:5, 16:17

---

**S**

**safe**
32:2
**safety**
30:16
**said**
12:5, 22:10,
27:11, 39:9,
39:13, 41:5,
43:7, 44:6,

44:9, 44:13,
45:20, 45:23,
46:15, 47:22,
47:23, 49:5,
49:14, 50:6,
52:5, 53:17,
53:20, 57:23,
59:22, 61:6,
66:18, 66:22,
69:6, 69:8,
76:3, 85:10,
85:12, 85:15,
86:3, 91:7,
92:8, 92:16,
93:14, 93:16,
94:18, 95:14,
96:17, 101:19,
103:7, 103:17,
106:9, 107:19,
111:5, 128:9
**same**
6:6, 10:20,
13:17, 24:24,
31:8, 34:10,
36:8, 45:22,
47:6, 47:9,
56:4, 61:19,
61:22, 64:22,
65:13, 68:4,
77:18, 94:10,
94:11, 105:16,
114:2, 116:2,
117:23, 124:6,
126:15, 126:19
**samuel**
67:20
**sat**
12:18
**saturday**
8:9
**saw**
12:2, 12:12,
23:24, 109:1
**say**
9:1, 10:24,
14:10, 14:11,
14:24, 15:5,
15:12, 22:16,

23:3, 29:11,
30:17, 31:11,
31:20, 41:2,
45:2, 46:18,
48:20, 59:3,
60:15, 61:1,
61:2, 62:4,
62:8, 63:9,
66:5, 68:24,
72:9, 72:13,
73:5, 74:14,
75:8, 75:9,
76:24, 78:16,
80:13, 82:8,
82:13, 83:21,
85:3, 85:14,
86:3, 86:5,
88:13, 88:17,
90:11, 91:11,
92:6, 92:16,
94:3, 95:1,
100:14, 103:10,
111:6, 111:19,
114:7, 114:16,
114:17, 114:22,
115:22, 119:22,
121:6, 121:8,
123:18, 123:21,
124:14
**saying**
18:16, 22:12,
22:22, 30:1,
34:18, 60:4,
65:15, 71:5,
73:19, 76:8,
83:7, 83:12,
95:20, 102:20
**says**
14:6, 21:14,
21:16, 22:12,
24:14, 26:14,
26:17, 26:21,
32:17, 91:21,
113:6
**scaife**
120:19, 120:21
**scene**
6:1

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                                   55

| | | | |
|---|---|---|---|
| **screen** 20:1, 23:13, 32:10, 89:5 | **seniority** 24:16, 26:11, 26:15, 26:18, 26:21, 87:7, 118:24, 119:11, 120:1 | 106:9 **sheriff's** 5:9, 8:19, 9:5, 11:21, 13:23, 17:12, 42:17, 92:14, 96:8, 101:22, 125:24 | 57:2, 57:8, 58:15, 62:8, 69:17, 79:17, 89:4, 90:14, 91:14, 91:17, 92:9, 92:11, 92:16, 93:12, 93:19, 93:21, 94:4, 94:22, 95:15, 96:4, 104:18, 118:23, 125:6, 125:9, 125:14 |
| **scroll** 24:3, 32:15, 38:10, 40:17, 48:8 | **sense** 28:12, 65:16 | | |
| **seal** 128:17 | **sent** 126:13 | **shields** 4:18, 32:12, 42:14, 42:21, 48:5, 55:14, 65:6, 65:21, 65:22, 65:23, 66:4, 67:10, 67:17, 81:21 | |
| **second** 20:4, 89:23, 90:8, 90:24, 93:14, 103:23, 124:21 | **separate** 102:4 | | |
| **section** 24:8 | **september** 128:18 | | |
| **security** 9:11, 76:23 | **sergeant** 94:4, 95:3, 96:5 | **shift** 10:20, 10:22, 10:23, 10:24, 11:1, 11:2, 11:4, 11:5, 11:8, 11:12, 11:14, 25:5, 25:8, 34:11, 34:13, 34:15, 41:13, 41:17, 56:4, 61:19, 64:18, 67:22, 68:4, 70:10, 71:11, 73:13, 78:10, 78:11, 78:19, 78:21, 79:3, 80:22, 82:4, 116:19, 121:20 | **shoulders** 6:18 |
| **see** 23:12, 23:20, 24:6, 24:10, 33:15, 34:18, 49:6, 49:14, 50:6, 59:13, 67:5, 89:4, 95:2, 98:23, 106:9, 108:9, 117:6, 127:6, 127:13 | **sergeants** 95:5 | | **shouldn't** 91:16, 92:10, 96:6, 125:12 |
| | **service** 110:20 | | **show** 12:7 |
| | **set** 4:19, 4:24, 32:12, 36:11, 37:3, 40:10, 89:8, 127:18, 128:16 | | **shrugging** 6:18 |
| | | | **sign** 89:15 |
| | | | **signature** 32:20, 89:18 |
| **seeing** 30:17, 32:9, 118:18, 127:8 | **settled** 110:3 | | **signature-k1pdc** 128:21 |
| **seek** 91:7, 91:11 | **seven** 9:24, 91:13, 91:24, 92:5, 92:19, 93:4, 93:9, 93:11, 97:8, 121:11 | **short** 61:24, 80:6 | **signed** 32:22, 38:20, 89:20 |
| **seeking** 93:15, 94:19, 95:21, 96:17, 97:11, 97:18, 99:19, 100:4, 100:20, 101:10 | | **short-circuit** 25:6 | **signing** 38:22, 128:12 |
| | | **shorthand** 2:8, 128:3 | **similar** 6:4 |
| | **several** 58:11, 62:3, 71:3, 72:9, 74:11, 84:24, 104:17, 105:22 | **shortly** 45:20 | **similarly** 50:14 |
| **seen** 11:24, 12:14, 14:4, 23:17, 23:23, 24:2, 32:13, 56:24, 80:15, 89:10 | **sexist** 61:12, 85:17, 85:21 | **should** 8:24, 12:5, 13:17, 21:11, 21:16, 21:18, 23:3, 23:12, 28:19, 41:13, | **simply** 104:12 |
| | | | **simulate** 58:12 |
| | **shedor** 35:6, 35:7 | | **since** 11:10, 27:1, 27:2, 27:4, 27:13, 53:18, 56:1, 71:10, 73:11, 77:1, 82:3, 88:16, |
| **send** 96:13 | **sheriff** 1:8, 4:22, 89:7, 104:4, | | |

112:15

**single**
39:15, 93:6

**sir**
5:7, 9:1, 10:7,
11:17, 12:6,
15:1, 15:16,
16:1, 16:12,
16:22, 17:24,
19:18, 21:5,
22:4, 23:9,
24:8, 25:4,
27:7, 27:19,
28:17, 29:9,
29:24, 30:10,
31:2, 32:9,
32:17, 34:5,
34:21, 35:12,
36:22, 37:10,
37:20, 37:23,
38:4, 38:6,
38:12, 39:21,
40:18, 41:15,
44:13, 45:5,
45:7, 46:3,
48:10, 48:20,
49:2, 49:17,
50:1, 50:9,
50:18, 52:20,
53:17, 55:8,
55:11, 56:23,
61:9, 64:19,
67:21, 67:23,
69:5, 71:24,
72:3, 72:6,
72:19, 73:9,
73:15, 74:19,
76:14, 76:20,
77:2, 82:1,
82:6, 85:16,
89:1, 89:12,
89:18, 89:19,
92:12, 95:13,
97:15, 97:17,
98:10, 98:20,
102:19, 104:16,
105:10, 105:15,
112:5

**sit**
87:2, 108:3

**sitting**
108:8

**situated**
50:14

**situation**
34:9, 90:12,
90:13, 100:15

**six**
75:10, 91:13,
91:24, 92:19,
97:8, 121:11

**skill**
36:11, 37:3

**skip**
88:23

**slang**
86:6

**slaughter**
37:11, 37:12,
37:14, 37:17,
37:18, 37:24,
81:23, 81:24,
82:2, 82:10,
82:13, 82:16,
84:3, 84:8,
124:17

**social**
103:17, 103:18,
103:19

**some**
6:5, 7:11,
15:10, 17:16,
21:10, 23:16,
29:19, 49:8,
49:20, 59:17,
63:13, 66:13,
66:15, 66:22,
67:5, 75:3,
81:16, 81:22,
97:3, 105:2,
105:3, 112:7,
118:21

**somebody**
13:3, 20:18,
59:17, 63:11,
90:14, 90:15,

94:7, 109:12,
122:6, 122:10,
122:14, 127:8

**someone**
29:2, 47:22,
88:13

**something**
7:2, 10:6,
12:8, 12:9,
28:23, 47:18,
47:24, 52:7,
58:14, 59:19,
61:2, 76:2,
76:3, 76:6,
76:10, 85:4,
86:20, 100:14,
113:6, 115:16,
119:15, 124:2

**sometime**
110:2, 121:10

**sometimes**
18:16, 18:17,
31:23, 42:2,
66:5, 66:6,
66:10, 114:7,
114:8, 115:21

**somewhere**
5:20, 8:22,
8:23, 22:6,
63:8, 73:12,
109:8, 112:15,
116:15, 116:18

**sorry**
8:24, 9:18,
29:5, 29:9,
38:5, 41:4,
45:3, 47:21,
60:18, 79:6,
87:10, 88:3,
88:21, 101:13,
102:17, 103:22,
105:15, 108:3,
117:12, 119:19

**sort**
70:12, 76:3,
90:16, 95:4

**sorts**
69:19

**sound**
109:3, 110:13

**sounding**
69:11

**sounds**
66:23, 95:14

**south**
3:5

**speak**
56:3, 56:19,
57:4, 77:5,
117:15

**speaking**
93:20, 114:10,
123:19

**specific**
21:2, 23:16,
43:8, 52:21,
53:1, 57:14,
75:20, 93:24,
103:2, 112:21,
113:4

**specifically**
20:6, 43:13,
43:15, 63:15,
75:9, 76:1, 86:5

**specificity**
22:19

**specifics**
58:18, 64:7,
69:1, 73:1,
76:5, 76:11

**speculate**
18:20, 27:20,
67:11

**speculation**
15:15, 18:4,
19:6, 27:18,
28:16, 47:20,
83:24, 88:8,
119:17, 120:3,
125:10, 125:15,
125:20, 126:5,
126:9, 126:17,
126:21

**speed**
124:8

**spell**
46:6

Transcript of Tyrone McGhee
Conducted on August 24, 2020

57

spent
91:15
spivey
124:18
spoke
74:23
stand
23:9, 32:6,
55:8, 88:21
start
6:11, 8:18,
8:21, 15:10,
21:23, 21:24,
23:3, 31:6,
51:8, 59:20,
95:8
started
8:21, 9:4
starting
25:18, 25:24
state
2:9, 111:1,
128:5, 128:24
stated
21:22
statement
85:2
statements
107:18
states
1:1, 110:19
stenographically
128:10
step
19:16, 19:17,
20:11, 45:10,
45:12, 94:22
steps
12:23, 19:15,
113:3
steward
11:17, 16:21,
16:24, 17:8,
17:21, 45:18,
62:2, 65:11,
66:17, 66:24,
69:10, 82:18,
82:23, 112:13,

112:14, 113:23,
114:11, 114:21,
115:24, 121:2,
121:19, 121:23,
122:2, 122:5
stewards
120:11, 121:5,
121:13
still
9:12, 9:15,
9:17, 10:16,
44:14, 55:2,
68:1, 78:20,
79:2, 105:16,
112:1, 126:1
stipulate
99:18
stood
108:3
stopped
78:13
straight
15:20, 16:6
street
3:5, 3:21,
30:15, 31:4,
31:7, 31:10,
51:9, 68:13,
81:1, 82:11
stress
101:23, 102:9,
102:18, 103:1
stressful
102:6
stretch
108:6, 111:15
strickland
80:3, 80:5,
80:6, 80:11,
80:12, 80:24,
81:5, 81:8,
81:11
strike
29:5, 60:18
strong
37:19
stuff
60:9, 69:3,

100:10
subject
49:5, 105:4
subjected
96:6
substance
8:5
sudden
123:24
sue
109:11
sued
109:12, 109:14,
110:19
suffered
49:20, 91:6,
101:7, 101:17
suffering
103:5
suite
3:6, 3:14, 3:22
supervise
104:4
supervision
114:9
supervisor
5:21, 13:7,
13:10, 13:11,
13:18, 16:15,
52:14, 58:21,
59:15, 84:15,
113:17, 113:24,
117:15
supervisors
20:22, 28:9,
40:7, 87:18,
104:6, 117:3,
117:8
supervisory
104:5, 106:7,
106:17
support
115:4, 123:4
supporting
106:16, 106:19,
107:2, 107:3,
107:9
suppose
59:5

supposed
12:21, 13:2,
13:6, 13:15,
14:8, 14:9,
14:11, 14:12,
14:19, 15:2,
15:13, 16:2,
21:9, 47:3
sure
12:4, 14:20,
18:23, 23:22,
26:5, 26:8,
27:24, 30:11,
31:20, 37:6,
39:12, 41:8,
42:1, 43:3,
43:8, 44:24,
45:1, 46:12,
48:2, 48:17,
49:22, 50:6,
50:16, 52:5,
62:24, 63:6,
63:17, 71:3,
71:6, 73:3,
79:10, 80:13,
81:20, 84:17,
84:21, 92:13,
95:19, 98:5,
105:24, 106:10,
107:8, 109:13,
111:12
switch
11:8
sworn
5:2, 5:4, 99:2
symptoms
100:7
system
31:15, 90:3

**T**

t-a-m
46:8
take
6:22, 21:11,
54:20, 54:22,
55:10, 63:7,
92:18, 97:7,

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                      58

108:4, 111:13,
116:17, 118:6,
119:9, 119:24,
123:8, 124:4
**taken**
54:23, 111:23,
116:14, 128:7,
128:10
**taking**
91:15, 101:1
**talk**
8:15, 11:19,
23:16, 33:5,
38:13, 40:19,
43:18, 56:2,
64:21, 68:7,
74:9, 77:4,
77:5, 78:8,
78:23, 79:3,
80:11, 80:18,
82:8, 95:16,
111:15
**talked**
31:21, 39:4,
39:13, 39:20,
39:23, 51:13,
60:10, 60:17,
62:4, 68:15,
71:14, 71:17,
71:18, 80:12,
106:10, 106:19,
107:9, 107:20,
111:6, 112:18
**talking**
22:19, 23:5,
41:18, 41:19,
41:20, 41:22,
51:6, 73:16,
78:7, 84:18,
92:22, 97:6,
98:1
**talks**
24:12, 24:13
**tam**
46:5, 46:8,
46:15, 46:20
**tam's**
46:9

**tardiness**
15:7, 113:18
**tardy**
22:23, 113:13,
114:1, 115:11,
115:15
**technician**
4:2, 4:3, 23:9,
32:6, 55:8,
88:21, 89:1
**tell**
12:8, 12:23,
14:15, 18:12,
18:13, 18:18,
18:19, 24:1,
26:9, 34:17,
37:2, 37:6,
39:19, 39:22,
40:15, 46:19,
47:1, 52:24,
53:7, 54:6,
56:18, 63:12,
63:23, 65:3,
65:6, 69:5,
74:21, 75:14,
76:11, 104:23
**telling**
67:3, 99:8
**tells**
20:6
**tend**
108:24
**termination**
15:21
**terms**
122:15
**terry**
4:2
**testified**
5:4, 119:2,
119:5
**testify**
6:1
**testimony**
7:9, 7:19,
102:12, 102:16,
118:5, 118:12,
118:14, 118:21,

122:24, 123:17,
128:9
**text**
7:22
**th**
32:23, 51:10,
52:6, 52:7,
52:10, 52:11,
53:24, 54:3,
89:20
**thank**
20:3, 100:2,
127:19
**thanks**
55:9, 111:22,
127:15, 127:17
**thereafter**
45:20, 128:10
**thing**
20:4, 31:20,
39:2, 45:22,
47:6, 47:9,
59:14, 59:18,
59:22, 61:6,
71:6, 76:4,
90:5, 92:10,
93:14, 94:10,
94:11, 97:10,
122:19
**things**
6:17, 19:23,
31:16, 31:19,
39:6, 48:15,
62:3, 64:13,
67:2, 67:6,
70:8, 70:12,
90:16, 90:18,
91:8, 95:3,
96:6, 97:2,
100:13, 118:13
**think**
11:6, 12:2,
12:12, 12:16,
14:4, 18:1,
18:7, 18:21,
18:22, 19:24,
27:10, 27:24,
28:2, 28:5,

28:9, 28:10,
31:3, 31:7,
31:8, 33:3,
34:7, 41:9,
44:23, 44:24,
50:1, 50:9,
50:18, 51:13,
52:4, 59:2,
59:7, 61:11,
61:12, 64:21,
67:10, 71:14,
71:18, 73:11,
76:4, 82:23,
84:11, 85:9,
85:17, 86:22,
87:1, 93:19,
95:14, 95:23,
97:9, 99:17,
102:18, 106:12,
106:21, 107:11,
109:6, 109:9,
109:14, 109:21,
110:7, 111:8,
112:15, 118:5,
119:14, 120:6,
120:16, 120:17,
120:19, 120:21,
121:6, 121:8,
121:9, 123:2,
123:21, 124:9,
124:22
**thomas**
1:9, 4:23,
43:1, 43:3, 89:8
**thought**
58:4, 71:17,
72:12, 72:15,
73:2, 74:6,
79:17, 83:2,
86:2, 105:15,
109:1, 118:16
**threatened**
48:5, 76:3,
76:7, 76:9
**three**
62:10, 64:22,
78:15, 79:4,
95:10, 120:17,

120:18
**through**
10:21, 11:15,
17:22, 19:3,
33:4, 48:17,
80:8, 91:9,
92:1, 92:4,
97:22, 105:21,
108:24, 126:10,
126:12, 126:13
**throughout**
20:5
**tie**
75:4
**time**
6:22, 12:2,
12:24, 17:1,
23:24, 25:18,
25:24, 28:4,
36:19, 37:21,
39:9, 39:19,
40:10, 40:16,
41:8, 44:2,
44:3, 44:21,
45:18, 47:2,
47:7, 49:10,
49:17, 50:10,
50:19, 52:17,
53:2, 53:7,
58:13, 60:24,
62:1, 63:1,
64:5, 64:9,
70:18, 73:4,
79:18, 79:22,
80:2, 80:7,
80:9, 81:22,
82:15, 83:10,
84:6, 84:12,
84:18, 91:15,
93:18, 96:22,
96:24, 99:9,
106:22, 107:12,
111:9, 111:14,
114:1, 121:3,
123:11, 124:6,
127:4, 127:16,
127:23
**timely**
45:16

**times**
5:16, 21:2,
25:18, 39:3,
39:12, 39:21,
56:14, 56:17,
57:15, 60:23,
62:9, 62:10,
64:22, 79:4,
82:12, 84:24,
85:7, 99:17
**tims**
64:15, 64:16,
64:21, 65:3,
65:11, 121:10,
121:15, 122:10,
122:14
**titled**
24:9
**to-8**
11:5
**today**
6:21, 7:9,
73:20, 87:2,
127:18
**together**
59:5, 61:24,
73:22, 73:23,
76:17
**told**
44:9, 57:2,
57:8, 100:8,
100:16, 103:4,
104:18
**tomorrow**
126:18
**tone**
117:14, 117:17,
117:20, 117:22
**took**
123:10
**top**
14:18, 24:5,
24:7
**torn**
108:17
**tour**
113:13, 114:1
**toward**
40:24, 67:15,

113:4
**towards**
117:17, 117:22
**training**
10:21, 12:17,
124:3
**transcript**
4:13, 23:11,
32:8, 89:3,
128:8
**transferred**
124:8, 124:14
**transferring**
24:14
**transportation**
126:18
**treated**
50:13, 67:12,
67:13, 90:4
**treatment**
50:16, 100:20,
101:7, 101:10
**trial**
109:24
**triceps**
108:17
**tricked**
16:13
**trouble**
47:7, 47:8,
47:10
**true**
32:19, 89:17,
128:8
**truthful**
7:9
**try**
22:21, 69:16
**trying**
18:15, 22:11,
22:13, 26:6,
30:14, 36:22,
52:20, 59:6,
93:10, 95:22,
99:7, 103:11,
110:15
**tss**
25:8, 25:11,

25:22, 26:12,
27:3, 27:12,
27:14, 28:2,
28:7, 28:10,
28:13, 28:14,
28:19, 28:20,
29:1, 29:5,
29:20, 30:2,
30:4, 30:8,
30:14, 30:17,
30:18, 30:23,
31:9, 31:14,
31:17, 33:12,
33:19, 34:23,
35:8, 35:11,
35:15, 35:18,
35:20, 35:22,
36:3, 36:7,
36:15, 36:24,
37:5, 37:9,
37:12, 37:15,
37:19, 38:1,
38:8, 38:18,
40:5, 51:8,
51:11, 51:19,
52:1, 53:19,
53:23, 54:7,
54:8, 56:8,
57:21, 68:16,
71:21, 71:22,
72:5, 72:12,
78:5, 78:7,
81:3, 82:14,
83:9, 83:11,
83:13, 83:14,
83:15, 83:16,
86:14, 86:23,
86:24, 108:18,
108:20, 118:5,
118:7, 118:9,
122:20, 122:21,
123:5, 123:12,
123:15, 123:23,
124:15
**turn**
112:6
**twice**
66:6, 78:2,

Transcript of Tyrone McGhee
Conducted on August 24, 2020

60

79:1, 81:4
**two**
19:23, 50:3,
59:5, 62:9,
62:10, 64:22,
95:9, 120:14,
120:15, 120:16,
120:21, 120:22
**type**
21:10, 22:13,
63:11, 63:13,
65:13, 67:5,
73:21, 81:16,
82:20
**typewriting**
128:11
**tyrone**
1:13, 2:1, 4:5,
4:16, 4:20, 5:3,
21:21, 22:21,
24:9, 32:11,
89:6, 102:17,
110:14, 112:11,
127:17

**U**

**uh-huh**
14:17, 24:11,
91:10, 104:23,
105:5, 123:20
**ultimately**
20:14
**unbiased**
107:6
**under**
32:18, 38:22,
55:3, 89:16,
99:2, 112:2,
128:11
**understand**
7:2, 7:18,
18:16, 22:11,
25:23, 26:6,
29:24, 30:13,
36:21, 36:22,
37:1, 51:5,
52:20, 55:2,
77:20, 93:10,

112:1, 122:19
**understanding**
127:3
**understood**
14:10, 38:22,
44:13, 81:23
**undue**
102:9, 102:18,
103:1
**unfair**
57:12, 58:4,
64:2, 72:15,
72:21, 72:23,
73:2, 75:12,
75:15, 84:4
**unfit**
106:17, 106:20
**uninsured**
109:20
**union**
11:17, 15:23,
16:21, 16:24,
17:5, 17:8,
17:9, 17:21,
25:15, 45:18,
62:2, 65:11,
66:17, 66:24,
69:10, 82:18,
82:23, 92:1,
112:13, 113:15,
113:23, 114:11,
114:20, 115:23,
120:11, 121:2,
121:5, 121:13,
121:19, 121:23,
122:2, 122:5
**unit**
17:13, 104:6
**united**
1:1, 110:19
**unless**
20:6
**unsafe**
50:4, 50:7,
86:15
**unsaid**
39:6
**until**
27:22, 121:10

**unusual**
113:16
**use**
9:2, 42:19,
42:21, 42:23,
43:1, 43:4,
43:9, 86:4,
86:6, 93:7,
115:14
**using**
7:4, 43:13,
43:16, 94:9
**usually**
62:11, 63:11,
64:24, 68:9

**V**

**vacation**
70:11
**vague**
64:13
**vehicle**
109:4
**ventilation**
31:15
**verbal**
15:8, 21:9,
21:17, 22:13,
22:14, 23:1
**verification**
32:17
**verify**
48:17
**vernell**
64:15
**versus**
25:11, 25:12,
30:4
**victor**
37:11, 37:16,
81:23
**video**
6:9
**violations**
116:3, 116:4
**virtually**
1:14, 2:1
**virtue**
17:7

**W**

**wages**
91:12, 92:20,
111:4
**wait**
107:2, 120:16
**waited**
27:22
**waiving**
49:5
**walker**
37:5, 77:22,
77:24, 78:1,
78:3, 78:4,
78:22, 78:24,
79:19, 79:23
**walker's**
37:8
**walking**
73:19
**want**
8:4, 10:11,
16:4, 21:23,
22:1, 22:17,
29:13, 36:20,
37:1, 40:17,
46:2, 48:16,
49:14, 49:22,
50:6, 50:15,
51:5, 55:11,
56:14, 58:2,
59:14, 63:14,
64:9, 64:11,
69:8, 78:16,
80:13, 84:17,
85:3, 89:24,
90:1, 90:9,
90:11, 90:18,
90:20, 91:8,
92:12, 94:15,
97:1, 101:9,
103:18, 105:4,
106:10, 106:23,
107:8, 108:4,
111:13, 115:18,
121:6, 121:7,
122:19

Transcript of Tyrone McGhee
Conducted on August 24, 2020                                    61

**wanted**
22:24, 25:19, 25:20, 25:21, 60:2, 67:2, 94:4, 97:1, 118:20, 121:18, 123:12, 123:22
**wanting**
100:10
**wants**
12:9
**warning**
15:8, 16:6, 23:1
**warranted**
63:14
**way**
26:2, 32:16, 36:13, 67:12, 77:21, 114:5
**we'll**
11:19, 45:2, 78:8, 127:20
**we're**
6:6, 6:9, 6:10, 7:5, 7:12, 22:19, 23:16, 35:17, 44:10, 55:6, 84:18, 88:23, 88:24, 97:22, 99:6, 105:21, 127:17, 127:22
**we've**
23:13, 31:21, 60:16, 71:3, 98:20, 106:10
**webb**
45:2
**webb's**
44:20
**week**
62:7, 62:9, 62:10, 64:20, 64:23, 66:6, 68:6, 77:3, 78:23, 79:4, 82:8

**weekend**
93:6, 93:11, 97:7
**weekends**
91:15, 93:4, 93:8
**weird**
110:13
**went**
6:4, 9:11, 10:23, 39:6, 45:13, 46:22, 73:21, 100:15, 122:6, 122:10, 122:14
**weren't**
25:23, 51:23, 73:24, 92:14
**whatever**
16:16, 92:9, 97:21, 100:17, 104:24, 115:17
**whenever**
27:2
**whereas**
90:12
**whereof**
128:16
**whether**
7:3, 18:20, 27:20, 30:1, 36:14, 36:23, 40:10, 109:20
**white**
3:11, 4:6, 4:8, 4:10, 5:6, 5:7, 15:16, 16:1, 18:5, 19:7, 19:23, 20:3, 20:9, 23:7, 24:3, 28:17, 32:4, 32:15, 33:1, 38:10, 48:8, 51:3, 54:14, 54:19, 54:24, 55:1, 55:5, 55:9, 55:17, 84:1,

87:24, 88:19, 88:23, 89:13, 99:15, 99:18, 99:23, 100:2, 102:8, 111:10, 111:13, 111:21, 111:24, 112:4, 113:1, 113:8, 113:19, 114:2, 114:6, 115:1, 115:6, 115:12, 115:13, 116:2, 116:5, 116:11, 116:21, 116:23, 117:4, 117:10, 117:18, 117:21, 117:22, 117:24, 118:2, 119:12, 119:16, 119:23, 120:2, 120:10, 123:1, 124:21, 125:8, 125:10, 125:13, 125:15, 125:19, 126:3, 126:5, 126:8, 126:17, 126:20, 126:24, 127:2, 127:15, 127:20
**whoever**
13:11, 104:24
**whole**
43:10, 80:19, 124:6
**wilford**
71:7
**williams**
73:7, 73:8, 73:10, 73:17, 74:1, 74:3, 74:12, 74:14, 75:11, 76:1
**winston**
1:5, 44:1, 55:22, 55:24, 56:2, 56:6, 56:8, 56:10, 56:17, 57:2, 57:11, 58:3,

74:12
**wish**
90:19
**withdraw**
99:12
**within**
94:6, 107:19, 125:24
**without**
49:5, 60:24
**witness**
5:2, 5:23, 5:24, 12:21, 13:4, 13:9, 20:2, 20:8, 51:18, 51:20, 99:12, 112:3, 112:8, 117:1, 117:7, 127:19, 128:16
**witnessed**
51:22, 51:24, 85:21
**witnesses**
16:15
**woman**
109:21
**women**
61:13, 85:17, 85:20
**wondering**
95:16, 103:13
**word**
7:3, 86:1
**words**
46:18
**work**
9:8, 15:3, 20:19, 24:15, 24:17, 24:24, 25:19, 25:20, 25:21, 27:3, 29:23, 30:2, 30:4, 30:12, 34:10, 34:19, 37:14, 46:4, 51:9, 51:11, 51:19, 52:4,

52:10, 52:22,
53:9, 53:15,
54:10, 56:3,
56:8, 61:3,
61:19, 64:18,
66:16, 66:24,
67:22, 71:11,
73:13, 73:22,
76:18, 76:19,
76:21, 77:18,
78:4, 78:11,
79:16, 79:17,
82:4, 90:7,
100:16, 102:6,
108:14
**workday**
116:16
**worked**
10:21, 37:4,
37:12, 37:16,
45:20, 59:6,
61:22, 61:23,
76:22, 76:24,
77:8, 78:10,
124:20
**workers**
108:12
**working**
8:18, 9:6,
10:16, 25:5,
25:7, 28:2,
30:8, 30:22,
31:17, 31:22,
41:16, 50:4,
50:8, 51:8,
51:9, 52:18,
53:12, 53:13,
53:23, 53:24,
54:2, 54:6,
54:7, 54:8,
65:23, 68:1,
68:3, 71:22,
78:13, 78:18,
79:17, 80:17,
80:21, 81:3,
82:14, 102:1
**workplace**
61:14, 103:9

**works**
18:2, 18:8,
18:12, 18:16,
78:19
**world**
26:20, 110:15
**worse**
31:9, 100:15
**wouldn't**
28:23, 65:15,
121:20, 124:5,
125:17, 126:13
**write**
56:19, 96:11,
113:24
**write-up**
44:1, 45:22
**writing**
91:22, 91:23
**written**
15:8, 15:9,
16:5, 16:18,
21:12, 21:17,
58:14, 113:17,
115:11, 116:1
**wrong**
71:6
**wrote**
97:10, 101:8

**Y**

**yeah**
18:7, 24:5,
31:1, 36:21,
44:23, 47:14,
60:7, 62:7,
69:13, 71:20,
73:21, 77:23,
78:6, 78:21,
82:12, 87:5,
90:2, 94:3,
99:1, 100:17,
106:21, 108:3,
109:6, 119:18,
119:20, 127:14
**year**
9:10, 10:22,
11:6, 12:4,

12:12, 12:15,
37:7, 62:24,
80:17, 86:23,
87:1, 97:8,
118:6
**years**
9:24, 26:7,
75:10, 78:15,
80:13, 95:9,
95:10, 101:15,
114:14
**yes-or-no**
18:9
**yourself**
13:16, 14:7

**Z**

**zoom**
24:6

**$**

**$1,000**
98:15

**0**

**00**
11:1, 11:2,
11:3, 11:5,
11:9, 25:7,
25:20, 25:21,
34:14, 34:19,
34:20, 41:12,
41:17, 71:11,
73:13, 78:10,
78:11, 78:21,
79:2, 80:22,
82:4, 111:20,
111:23
**003733**
128:4
**0339**
3:16
**05726**
1:7
**084**
128:4

**1**

**1**
45:10, 111:20,

111:23, 127:24
**10**
8:20, 9:11,
9:13, 9:16,
9:20, 9:23,
10:2, 24:6,
26:7, 45:3,
45:9, 52:6,
52:10, 53:24,
74:24, 76:22,
93:1, 103:16,
111:14
**100**
3:6, 114:15,
114:18
**11**
1:16, 11:1,
11:9, 24:5,
24:7, 25:7,
33:15, 33:18,
34:10, 34:14,
34:19, 34:20,
36:3, 36:24,
38:1, 41:12,
41:17, 54:23,
71:11, 73:13,
78:10, 78:11,
79:2, 80:22,
82:4
**112**
4:7
**12**
11:2, 11:5,
25:21, 48:9,
48:23, 103:21,
103:23, 111:23
**120**
3:21, 4:8
**125**
4:9
**127**
4:10
**128**
1:23
**13**
32:23, 49:11,
89:20, 106:3
**14**
49:18, 106:13

**15**
50:2, 51:10,
52:7, 52:11,
54:3, 74:24,
94:21, 106:23,
107:3, 111:19
**16**
50:11, 128:20
**17**
50:20, 107:13,
112:15
**18**
1:7
**1980**
5:20
**1994**
8:20, 9:4, 27:1

---

**2**

**20**
5:19, 5:20,
8:11, 54:23,
93:1, 107:23,
108:10, 127:24
**200**
3:14
**2000**
3:22
**2002**
10:5
**2003**
10:5, 27:6,
56:1, 61:23,
71:10, 77:1
**2005**
53:18, 53:20,
73:11, 82:3
**2006**
73:11, 82:3,
109:3, 109:7,
109:9
**2013**
101:20, 108:12
**2014**
94:21
**2015**
27:9, 27:12,
27:13, 44:1,

44:21, 53:21,
70:18, 72:10,
74:12, 75:19,
83:6, 88:17,
91:13, 97:9,
116:15, 118:22,
120:13, 120:17,
120:18, 120:19,
122:2
**2016**
41:9, 112:15,
121:4, 121:7,
122:6
**2017**
84:19, 121:7,
122:10
**2018**
121:12, 121:14,
122:14
**2020**
1:15, 32:23,
89:21, 128:18
**2021**
3:13, 128:20
**206**
3:5
**22**
110:23
**23**
4:15
**24**
1:15
**27**
54:23

---

**3**

**3**
11:9, 25:21,
34:14
**30**
93:3
**31**
8:20
**312**
3:8
**316652**
1:22
**32**
4:16

**3705**
3:24
**3:-to**
11:1, 25:7,
34:19, 34:20,
41:12, 41:17,
71:11, 73:13,
78:10, 78:11,
79:2, 80:22,
82:4

---

**4**

**4**
25:20
**40**
1:16
**43**
111:23

---

**6**

**60523**
3:15
**60602**
3:23
**60661**
3:7
**630**
3:16
**655**
3:8
**6th**
128:17

---

**7**

**70**
24:12
**71**
24:13
**72**
24:4, 24:14,
26:10, 33:10,
33:11, 38:17
**7660**
3:8
**786**
3:24
**7:-to-3**
78:21

---

**8**

**8**
11:3
**80**
55:7, 55:10
**866**
3:24
**89**
4:20

---

**9**

**90**
5:20
**94**
27:1
**95**
82:15
**984**
3:16
**99**
83:9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEGRAIN WINSTON, et al. )
                             ) Case No. 18-cv-05726
       Plaintiffs, )
                             ) Hon. Matthew F. Kennelly
v. )
                             )
THOMAS J. DART, et al. )
                             )
       Defendants.

**PLAINTIFF TYRONE MCGHEE'S OBJECTIONS AND ANSWERS TO DEFENDANT
GREGORY SHIELDS' FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, Tyrone McGhee, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1. These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2. Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3. Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.



Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

## OBJECTIONS AND RESPONSES

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:**     **Tyrone McGhee**
**8237 S. Maplewood**
**Chicago, IL 60652**
**(773) 677-9943**

**Undersigned Counsel**

2.     Identify all positions you were assigned to that you allege were discriminatory as alleged in Paragraph 72 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment of that position, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:     Plaintiff states that he was consistently assigned to work TSS; Investigation continues and Plaintiff reserves the right to supplement this response.**

3.     Explain specifically what you mean by "basement," "office," and "less dangerous positions" as alleged in Paragraph 72 of the Complaint and explain what was dangerous about your assignment.

**Response:     Plaintiff states that TSS is in the basement of Division 5.  There is no ventilation, rodents, leaking ceilings, asbestos, unsanitary toilets, mold in the heating/cooling**

2

vents and other dangerous conditions. **Investigation continues and Plaintiff reserves the right to supplement this response.**

4. Identify the other "non-minority officers" who were not assigned to the positions you were assigned to as alleged in Paragraph 72 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to what position the employee was assigned, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:** **See response to interrogatory No. 2; Plaintiff further states that Investigators Nickle, Bieniek, Shedor, Bosques, Pemonte, Folkers, Vasques, Lopez, Rico, Messina and Hurtado were rarely assigned to TSS. The above-named investigators were assigned to either the office or patrol of very low risk areas or assigned to patrol jobs with minimal work such as doing home checks on inmates. Investigation continues and Plaintiff reserves the right to supplement this response.**

5. If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

3

**Response:** See response to interrogatory No. 4; Answering further, Plaintiff that Ranzino, Neal and Rohloff were responsible for assignments. Investigation continues and Plaintiff reserves the right to supplement this response.

6. Identify each and every complaint you made regarding the behavior alleged in Paragraph 72 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:** Investigation continues; Plaintiff reserves the right to supplement this response.

7. If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:** Plaintiff states that Deputy Chief Ranzino came to roll call one day and spoke to investigator McGhee about an assignment that was for Investigator McCall. When McGhee corrected DC Ranzino, he told McGhee (out loud and in front of everyone at roll all) that "you people all look alike." Investigation continues and Plaintiff reserves the right to supplement this response.

4

8.      Identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:     Plaintiff states that in and around 2015, Plaintiff Winston and he received a write-up for logging their assignments at a later time instead of at the time of the assignment. This was a normal practice in the E/M unit. Shortly thereafter, Plaintiff worked with other, non-minority investigators, who did the same thing and received no write-ups or discipline. Investigation continues and Plaintiff reserves the right to supplement this response.**

9.      Identify the assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, and explain how you were damaged by the assignment.

**Response:     See response to interrogatory No. 5; Investigation continues and Plaintiff reserves the right to supplement this response.**

10.      If not already answered above, explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were

assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response:** **"High incident area" refers to areas in Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative or unfavorable actions can take place. Investigation continues and Plaintiff reserves the right to supplement this response.**

11. Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response:** **Investigation continues and Plaintiff reserves the right to supplement this response.**

12. If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they

4816-5711-3524, v. 1

were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

13.     If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

14.     Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

15.     If not already answered above, identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether

4816-5711-3524, v. 1

or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

16. Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

17. Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection, Plaintiff states policies, practices and decisions pertaining to assignments and placement of investigators based on race; response given to certain requests asked of African-American investigators compared to white investigators. Investigation continues and Plaintiff reserves the right to supplement this response.**

Respectfully Submitted,

By: /s/ Kelly A. Krauchun
KELLY A. KRAUCHUN
The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Kelly.krauchun@danherbertlaw.com

8

4816-5711-3524, v. 1

## **VERIFICATION**

I, Tyronne McGhee, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/13/2020

Tyronne McGhee

# Exhibit H

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 780 of 1503 PageID #:1171
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION


 3
     LEGRAIN WINSTON,                )
 4   MICHELLE STRICKLAND,            )
     VERNELL TIMS, I.V.              )
 5   NEWSON, JR., SAMUEL             )
     PAGE, WILFORD FERGUSON,         )
 6   CECIL WILLIAMS, ANTHONY         )
     MANNING, DAVID WALKER,          )
 7   TYRONE MCGHEE and VICTOR        )
     SLAUGHTER,                      )
 8                                   )
            Plaintiffs,              )
 9                                   )
            vs.                      ) No. 18-cv-05726
10                                   )
     SHERIFF OF COOK COUNTY          )
11   THOMAS J. DART, in his          )
     Official Capacity,             )
12   JOSEPH RANZINO,                 )
     Individually and in his        )
13   Official Capacity,             )
     GREGORY SHIELDS,                )
14   Individually and in his        )
     Official Capacity,             )
15   THOMAS NEAL,                    )
     Individually and in his        )
16   Official Capacity,             )
     CHRISTOPHER ROHLOFF,            )
17   Individually and in his        )
     Official Capacity, and         )
18   COUNTY OF COOK,                 )
     ILLINOIS,                      )
19                                   )
            Defendants.              )
20

21          The remote deposition of GREGORY SHIELDS,

22   taken in the above-entitled cause, before

23   Brenda S. Hall, Certified Shorthand Reporter of the

24   State of Illinois, CSR License No. 084-003359, on
```

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 781 of 1503 PageID #:1172

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1    Thursday, August 27, 2020, at 10:00 a.m. via Zoom,

 2    pursuant to notice.

 3

 4    REMOTE APPEARANCES:

 5              HERBERT LAW FIRM, INC.
              BY:  MR. DANIEL Q. HERBERT
 6                 MS. KELLY A. KRAUCHUN
              206 South Jefferson Street
 7            Suite 100
              Chicago, Illinois  60661
 8            (312) 655-7660
              dan.herbert@danherbertlaw.com
 9            kelly.krauchun@danherbertlaw.com

10                 Appeared remotely on behalf of
                   Plaintiffs;
11

12            EMERY LAW LIMITED
              BY:  MR. ETHAN E. WHITE
13            2201 Midwest Road
              Suite 200
14            Oak Brook, Illinois  60523
              (630) 984-0339
15            ewhite@emertlawltd.com

16                 Appeared remotely on behalf of
                   Defendants;
17

18            LEINENWEBER BARONI & DAFFADA, LLC
              BY:  MR. JUSTIN L. LEINENWEBER
19            120 North LaSalle Street
              Suite 2000
20            Chicago, Illinois  60602
              (866) 786-3705
21            justin@ilesq.com

22                 Appeared remotely on behalf of
                   Defendants.
23

24                      *    *    *
```



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 782 of 1503 PageID #:1173
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1                    I N D E X
     WITNESS                        EXAMINATION
 2
     GREGORY SHIELDS
 3
         By Mr. Herbert                        5
 4

 5

 6

 7

 8

 9
                    E X H I B I T S
10   NUMBER                       MARKED FOR ID

11   Shields Deposition Exhibit

12     A                                    162

13     B                                    253

14     D                                    281

15

16

17

18

19

20

21

22

23

24
```

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 783 of 1503 PageID #:1174

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    (Whereupon, the witness was

2    duly sworn.)

3    MR. HERBERT:  Good morning, Mr. Shields.

4    MR. LEINENWEBER:  Sorry, Dan.  Dan, can I

5  just check one thing?  I just want to make sure.

6    Greg, is that loud enough for you?

7  Can you hear when we're discussing?

8    THE WITNESS:  I'm good.

9    MR. LEINENWEBER:  Okay.

10    MR. HERBERT:  Good morning, Mr. Shields.  How

11  are you?  Can you hear us, Mr. Shields?

12    THE WITNESS:  Yeah.  Two people just left.

13  Yeah, I've got you now.

14    MR. HERBERT:  Okay.  Do you see me, Dan

15  Herbert?

16    THE WITNESS:  Yes.

17    MR. HERBERT:  Okay.  How are you?

18    THE WITNESS:  I'm doing well.

19    Okay.  So now I can't hear you.

20    MR. WHITE:  Yeah, Dan, I can't hear you

21  either.

22

23

24

---

1    GREG SHIELDS,

2  called as a witness herein, was examined and

3  testified via Zoom as follows:

4    DIRECT EXAMINATION

5  BY MR. HERBERT:

6    Q.  Okay.  Would you please introduce

7  yourself and spell your first and last name?

8    **A.  Oh, yeah.  I'm Greg Shields.  Are you**

9  **ready?  I'm Greg Shields.  G-r-e-g S-h-i-e-l-d-s.**

10    Q.  Thank you.  Mr. Shields, have you given a

11  deposition before?  We're off to a good start.

12    **A.  I didn't hear you.**

13    Q.  Did you hear me?

14    **A.  What did you say?  Now I can, yeah.**

15    Q.  Okay.  Have you given a deposition

16  before?

17    **A.  Yes.**

18    Q.  How many times?

19    **A.  Just once.**

20    Q.  Okay.  I'm going to ask that if you need

21  to take a break, please ask to do so, and I would

22  just ask that a break not be taken while a question

23  is pending.  Is that okay?

24    **A.  Yeah, sure.**

---

1    Q.  Okay.  And obviously we need verbal

2  answers here.

3    **A.  Yes, sir.**

4    Q.  So, you know, head nods, shaking of your

5  head yes, no are not going to be satisfactory.  We

6  need to have some verbal responses to all questions.

7    **A.  Yes, sir.**

8    Q.  Okay.  And if you don't understand a

9  question, which I will assure you during this

10  deposition there will be one or two that you don't,

11  feel free to ask me to -- tell me that you don't

12  understand it and ask me to rephrase it, okay?

13    **A.  Yes, sir.  Yes, sir.**

14    Q.  Okay.  Very good.

15    MR. HERBERT:  This deposition is being taken

16  pursuant to the Civil Rules of Federal Procedure in

17  the case 18-cv-5726, and we have a defendant party

18  member, Mr. Gregory Shields.

19  BY MR. HERBERT:

20    Q.  Mr. Shields, did you prepare for this

21  deposition in any way?

22    **A.  Did I prepare for it?**

23    Q.  Yes.  You spoke with your attorneys I'm

24  assuming, correct?

---

1    **A.  Yes.**

2    Q.  Okay.  And obviously I don't want to know

3  the contents of that.  Did you review any documents?

4    **A.  Yes.**

5    Q.  Okay.  And do you know when you were

6  first made aware of this lawsuit?  Would it have been

7  shortly after it was filed, do you know?

8    **A.  I don't know when it was filed.**

9    Q.  Okay.  It was filed in April of 2019 --

10  or I'm sorry.

11    **A.  Oh, okay.**

12    Q.  '18.  Does that sound about the time that

13  you became aware of this lawsuit?

14    **A.  Yeah, reasonably.  I mean, I'm -- I can't**

15  **pinpoint the month, but I'll agree to it, yes.**

16    Q.  Okay.  And have you reviewed the

17  Complaint?

18    **A.  Yes.**

19    Q.  And have you reviewed any other documents

20  in preparation for your deposition?

21    **A.  I mean, I read, you know, the Complaint.**

22    Q.  Mr. Shields, if I can ask you to speak up

23  a little because I am also having a little trouble

24  hearing you.

---

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 784 of 1503 PageID #:1175
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 8

1  A.  Okay.  You're going back and forth.
2  Q.  Okay.  Can you hear me now?
3  A.  Yeah, definitely.
4  Q.  Okay.  I would just ask you as best as
5  you can, if you can keep your voice up -- you know,
6  this is obviously unusual but the norm now, so that
7  everyone can hear you.  If you want to take your mask
8  off, it's totally up to you, but if you can keep your
9  voice up.  Is that okay?
10  A.  Yes, sir.
11  Q.  Okay.  Did you review the documents that
12  were sent to your attorneys earlier this morning
13  concerning this lawsuit?
14  A.  My apologies, Mr. Herbert, but your
15  question didn't come through.  Can you hear me?
16  Q.  I can hear you, yes.  I'll ask it again.
17  A.  I didn't hear your question.
18  Q.  Okay.  I'll ask it again.  Can you hear
19  me?
20  A.  Yes, sir.
21  Q.  Okay.  Did you review a set of documents
22  that we produced to your attorneys earlier this
23  morning?
24  A.  Yes, sir.

Page 9

1  Q.  Okay.  And that included the Answers to
2  the Complaint, correct?
3  A.  Yes, sir.
4  Q.  Your Answers to the Interrogatories?
5  A.  Yes, sir.
6  Q.  A portion of the Collective Bargaining
7  Agreement?
8  A.  Yes.  Hello?
9  MR. LEINENWEBER:  Hey, Dan, can I interrupt
10  for one second?
11  MR. HERBERT:  Yes.
12  MR. LEINENWEBER:  Since the audio is so bad,
13  I'm just going to go check a couple settings on his
14  laptop.
15  MR. HERBERT:  Yes.  Okay.  We'll go off the
16  record for a little bit.
17  MR. LEINENWEBER:  That will be great.  Thank
18  you.  Give me two seconds.
19  (Whereupon, a short break
20  was taken.)
21  MR. HERBERT:  We can go back on the record.
22  MR. WHITE:  Yeah, and, Dan -- back on the
23  record.  I think we should probably go through those
24  questions again because to be clear, we did not share

Page 10

1  those exhibits with him, so I don't know if he wasn't
2  hearing your questions or what.
3  MR. HERBERT:  Very good.
4 BY MR. HERBERT:
5  Q.  Okay.  We talked about documents that you
6  reviewed for this deposition, and the questions I
7  asked were, you reviewed the Answers to the
8  Complaint.  Is that correct?
9  A.  Yes.
10  Q.  And your Answers to Interrogatories,
11  correct?
12  A.  I reviewed the Complaint.  The
13  interrogatories are what?
14  Q.  Those were questions that we sent to your
15  attorneys and you answered and signed a verification
16  form.
17  A.  Oh, yeah.  Yes.
18  Q.  Okay.  You reviewed those, correct?
19  A.  Yes.
20  Q.  And you reviewed portions of the
21  Collective Bargaining Agreement?
22  A.  No.
23  Q.  Okay.  Have you reviewed the harassment
24  training documents that were produced concerning

Page 11

1  sheriff's policy on harassment?
2  A.  My apologies if you can hear me, but I
3  didn't get the full question.  It went back and forth
4  again.
5  Q.  We'll strike that question.
6  Mr. Shields, how old are you?
7  A.  59.
8  Q.  And what's your date of birth?
9  A.  2/17/1961.
10  Q.  And where do you currently reside?
11  A.  In Chicago, Illinois.
12  Q.  And what's your address?
13  A.  420 West 38th Street.
14  Q.  And is that the Bridgeport neighborhood?
15  A.  Yes, sir.
16  Q.  Were you born and raised in the
17  Bridgeport neighborhood?
18  A.  No.
19  Q.  Where were you born and raised?
20  A.  Inglewood.
21  Q.  Okay.  And where did you attend high
22  school?
23  A.  De La Salle.
24  Q.  And when did you get out of De La Salle?

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 785 of 1503 PageID #:1176
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 12

1    A.  De La Salle.  Hello?
2    Q.  Yes.  My last question was when did you
3  -- did you graduate from De La Salle?
4    **A.  Oh, yeah.  1980.**
5    Q.  Okay.  And is that the alma mater of
6  Mayor Daley and the second Mayor Daley?
7    **A.  The alma mater of the second Mayor Daley**
8  **and who, sir?**
9    Q.  And his father.
10   **A.  I know Mr. Richard Daley, I mean the**
11 **former State's Attorney went there.**
12   Q.  Okay.  And are you friends with Richard
13 Daley, the former State's Attorney?
14   **A.  No.**
15   Q.  Have you ever worked any of his political
16 organizations?
17   MR. WHITE:  Objection to foundation.
18       You can answer.
19   THE WITNESS:  Can you repeat the question?
20 BY MR. HERBERT:
21   Q.  Sure.  Have you ever worked in any
22 political organizations on behalf of Mayor Richard
23 Daley?
24   MR. WHITE:  Objection to foundation.

Page 13

1  BY MR. HERBERT:
2    Q.  You can answer.
3    **A.  Okay.  No.**
4    Q.  Okay.  Have you ever donated money to
5  Mayor Richard Daley?
6    **A.  No.**
7    Q.  Okay.  And after graduating from
8  De La Salle High School, did you continue your
9  education in any way?
10   **A.  Somewhat.  Yes, I believe I did, but**
11 **it...**
12   Q.  If you can just describe what your
13 further education was.
14   **A.  Hello?**
15   Q.  Yes.  Did you hear my last question,
16 Mr. Shields?
17   **A.  No, sir.**
18   Q.  Okay.  Would you please describe your
19 further education after high school?
20   **A.  There is none.**
21   Q.  Okay.  What did you do after high school?
22 Did you begin working?
23   **A.  Not right after high school, no.**
24   Q.  When did you begin working after high

Page 14

1  school?  Mr. Shields?
2    **A.  Like can you be more specific?**
3    Q.  Sure.  Did you obtain employment after
4  high school?
5    **A.  I mean, I -- I did work.  I remember**
6  **working some type of construction.  I remember**
7  **working at a drive-in.  I remember working as a**
8  **bartender.  I remember working as -- I worked at**
9  **Burger King, different restaurants, so I tried to**
10 **work as much as I could.**
11   Q.  You began working for the Cook County
12 Sheriff's Department at some point, correct?
13   **A.  Yes, sir.**
14   Q.  When did you begin working for the Cook
15 County Sheriff's Department?
16   **A.  1989.  1989.**
17   Q.  Okay.  And in what position did you begin
18 your work with the Cook County Sheriff's Department?
19   **A.  What position?  I was a deputy sheriff.**
20   Q.  And what were your duties as a deputy
21 sheriff?
22   **A.  I was a court security officer for the**
23 **Cook County Sheriff's Department.**
24   Q.  Okay.  And did you -- were you a sworn

Page 15

1  officer at this point?
2    **A.  Yes, I was.**
3    Q.  And so you went through the training
4  academy.  Is that correct?
5    **A.  Yes.**
6    Q.  And your first assignment out of the
7  training academy was the court security system?
8    **A.  You asked me for my first assignment?**
9    Q.  Yes, your first assignment out of the
10 academy.  Were you assigned to the court security?
11   **A.  Yeah, 26th and California.**
12   Q.  Okay.  And where did you work
13 specifically in court security?
14   **A.  2600 South California.  I think that's**
15 **the address.**
16   Q.  Okay.  2650 South California sounds
17 correct?
18   **A.  Yes.**
19   Q.  Okay.  And did you work in a particular
20 courtroom?
21   **A.  I don't remember.**
22   Q.  Do you remember what your duties were?
23   **A.  Yes.  I was on the, you know, the lanes**
24 **if you will.  I don't know how I would describe lanes**

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 786 of 1503 PageID #:1177
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 16**

1 and search for contraband. Downstairs in receiving
2 when prisoners came in, we would make sure we have,
3 you know, the -- how do I say this, like the right
4 prisoner, if you will.
5     I worked with the security officers
6 throughout the floors, like the first floor, the
7 second floor checking entrances and exits and
8 relieving deputies in the courtrooms for whenever
9 they may have to bring a prisoner or jury or, you
10 know, stuff like that.
11    Q. And how long did you stay in that
12 position?
13    A. I don't recall.
14    Q. Did your position change at some point?
15    A. No.
16    Q. So how long did you remain working in the
17 court security section for the Cook County Sheriff's
18 Department?
19    A. Three years.
20    Q. And then after three years, your
21 assignment was changed?
22    A. Yes.
23    Q. Okay. That's what I was asking you. So
24 what was it changed to?

**Page 17**

1    A. You froze.
2    Q. I'll ask the question again.
3    A. Okay.
4    Q. Did you hear my question?
5    A. No, sir.
6    Q. Okay. After three years, so would this
7 be approximately 1992?
8    A. Yes.
9    Q. Your position changed you testified?
10    MR. WHITE: Objection. Misstates testimony.
11 BY MR. HERBERT:
12    Q. Did your position change at some point?
13    A. Yes.
14    Q. Okay. Tell me about that.
15    A. The -- how do you... The position
16 changed to a unit. So, in other words, I -- it was
17 changed to the electronic monitoring unit.
18    Q. Okay.
19    A. So I worked in the electronic monitoring
20 unit.
21    Q. Okay. So you were transferred into the
22 electronic monitoring?
23    A. (Simultaneous cross talk between witness
24 and counsel.)

**Page 18**

1    Q. Just so -- I know it's difficult here,
2 but we've got to just make sure when one person is
3 talking, the other one isn't, and I'm going to do my
4 best not to speak over you, okay?
5    A. Yes, sir. If I'm doing it, then I
6 apologize. I'm just anticipating that you can hear
7 my question (sic), but my apologies.
8    Q. Yeah, no problem. You're doing fine.
9 And that's another point I should have brought up.
10 I'm going to ask a lot of questions that you're going
11 to be able to anticipate what the question is before
12 I finish. I just ask that you allow me to finish it
13 before giving the answer, okay?
14    A. Yes, sir. I apologize. It's totally my
15 fault. I apologize.
16    Q. No problem. So you were transferred to
17 the electronic monitoring unit. Is that correct?
18    A. Yes, sir.
19    Q. Okay. And that was in 1992?
20    A. Yes.
21    Q. And did you bid into that unit? Strike
22 that.
23       How is it that you were assigned to
24 that unit?

**Page 19**

1    A. I don't have that answer. I mean, I -- I
2 don't know how I was transferred there.
3    Q. Was it a place that you wanted to go?
4    A. I didn't know anything about it, and it
5 was part of, you know, my work. It was part of, hey,
6 you're going to go here or, you know, we're going to
7 move you over here. I was like, all right.
8    Q. Okay. So you didn't apply to go to that
9 unit. You were transferred there by management,
10 correct?
11    A. Yes.
12    Q. Okay. And in 1992 was that the inception
13 of the electronic monitoring unit with the Cook
14 County Sheriff's Department?
15    A. No.
16    Q. It had been in existence prior to that?
17    A. Yes.
18    Q. And who was your supervisor -- or strike
19 that.
20       Who was in charge of the electronic
21 monitoring unit when you went there in 1992? Would
22 it have been Jack Byrne?
23    A. He was there, but there was another
24 gentleman. Jack Byrne.

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 787 of 1503 PageID #:1178
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Q.   Okay. And was your father employed by
2 the Cook County Sheriff's Department?
3    **A.   No.**
4    Q.   How is it that you became a sheriff? Is
5 it something that you applied for?
6    **A.   Yes, sir.**
7    Q.   Did you have any friends in the sheriff's
8 office at that point?
9    **A.   No.**
10    Q.   Okay. And when you went to the
11 electronic monitoring unit, what were your duties
12 then?
13    **A.   I was a call taker. I was considered --**
14 **you know, checking files, in other words. A piece of**
15 **paper would come over the desk, I'd put it in the**
16 **file. I was -- I did a lot of answering the phones**
17 **and trying to assist with the general questions from**
18 **the public.**
19    Q.   How long did you work in the electronic
20 monitoring unit?
21    **A.   27 years.**
22    Q.   And when you started there in 1992, were
23 there different divisions within the electronic
24 monitoring unit?

Page 20

1    **A.   No. What do you mean different**
2 **divisions, like Division 1, 2, 3?**
3    Q.   No. I'm sorry. A bad question.
4      Were there different job functions
5 within the electronic monitoring unit when you
6 started there in 1992?
7    **A.   Yes.**
8    Q.   Okay. What were those?
9    **A.   There was -- like there was field units**
10 **that would go out and do home checks. There was a**
11 **processing unit where they would process the**
12 **detainees to be removed. There was a delivery unit**
13 **where we delivered the individuals. (Inaudible**
14 **caused by video conference audio technical**
15 **difficulties).**
16    Q.   I'm sorry. You broke up there. A
17 delivery unit?
18    **A.   Yeah, there was a delivery unit. When**
19 **they processed the detainee, they would drive them**
20 **home.**
21    Q.   Okay.
22    **A.   And then I believe there was a records**
23 **unit where we kept records on detainees.**
24    Q.   And did you work in the records unit at

Page 21

1 any point?
2    **A.   No.**
3    Q.   Did you work in the delivery unit at any
4 point?
5    **A.   Yes.**
6    Q.   When?
7    **A.   I don't recall the dates.**
8    Q.   Well, was it multiple years that you
9 worked in the delivery unit?
10    **A.   My response would be I definitely worked**
11 **in the delivery unit driving the detainees home, but**
12 **I just can't put my thumb on how long.**
13    Q.   Would it have been more than a year?
14    **A.   Yes.**
15    Q.   Would it have been more than two years?
16    **A.   I mean, my apologies, but I'm -- for**
17 **memory and -- I know for a fact that I worked in that**
18 **unit delivering bodies and I went to -- I mean, it**
19 **was part of -- it was definitely part of me working**
20 **there, but I can't put my thumb on the years of me**
21 **delivering people, you know.**
22    Q.   But I'm asking you how many years if that
23 better helps you. Do you know how many years you
24 would have worked in that unit?

Page 22

1    **A.   I don't know, sir.**
2    Q.   Okay. But you know it was more than a
3 year, correct?
4    **A.   Yes. Yes.**
5    Q.   Okay. But other than that, you can't be
6 any more specific about it, correct?
7    **A.   I mean, I would have to -- I would have**
8 **to -- I mean, I can agree to whatever assignments or**
9 **HR has sent me, but I definitely am telling you I**
10 **worked in that unit and I'm definitely telling you**
11 **that it was probably more than a year. You know,**
12 **I've got nothing to hide. My record is my record.**
13 **That's where I'm at, you know.**
14    Q.   Yeah. And again, I'm not trying to trick
15 you up here. I'm not trying to hold you to anything
16 specific. I'm just trying to get an idea of your
17 memory and your recollection of your work history
18 with the sheriff's.
19    **A.   Okay.**
20    Q.   Okay. So that being said, is over a year
21 the best that you can give me right now as far as
22 your memory on how long you worked in the delivery
23 unit?
24    **A.   Yes, sir.**

Page 23



Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 788 of 1503 PageID #:1179

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 24**

1   Q.   Okay.  And how about the processing unit?
2   Did you work in that unit at all?
3   **A.  Yes, I did.**
4   Q.   And do you know how long you worked in
5   that unit?
6   **A.  More than a year.**
7   Q.   Do you know if you worked in that unit
8   before you worked in the delivery unit?
9   **A.  I probably did both, you know, at the**
10  **same time.  I processed -- you know, if they were**
11  **ready to go, if I was asked to get on a delivery van,**
12  **I would do it.**
13  Q.   Okay.  And how about the field unit?  Did
14  you work in that unit?
15  **A.  The home checks?**
16  Q.   Well, you described, I think you said a
17  field unit.  I'm not sure if that's what you meant.
18  Is that the same as --
19  **A.  I worked in the field.  Yes, sir.**
20  Q.   And how long did you work in the field?
21  **A.  I was in the field up until I retired.**
22  Q.   Okay.  And I'm sorry.  What year did you
23  retire?
24  **A.  Oh, I never told you.  Sorry.  This**

**Page 25**

1   **year -- not this year.**
2   Q.   2019?
3   **A.  2019, December 31st, yeah.**
4   Q.   Okay.  And when you worked in these
5   various units that we just spoke of, how is it that
6   you were assigned to these units?  Did you request
7   them, or were you assigned by management?
8   **A.  I was -- yeah, I was assigned by**
9   **management.**
10  Q.   Were you able to request to work in
11  certain areas?
12  MR. WHITE:  Object to form.
13  You can answer.
14  THE WITNESS:  Okay.
15  BY MR. HERBERT:
16  Q.   Do you understand the question?
17  **A.  (Inaudible caused by video conference**
18  **audio technical difficulties).  Was that the**
19  **question, sir?**
20  Q.   I'll just repeat the question.  Were you
21  able to request to work in certain units when you
22  were in the electronic monitoring unit?
23  **A.  No.**
24  Q.   Do you know of anyone while you were

**Page 26**

1   there that had requested to work in certain units
2   within the electronic monitoring unit?
3   **A.  There was a procedure through the union**
4   **that you were allowed to bid for your shift, your**
5   **detail and your assignment.**
6   Q.   Okay.  And the assignment, that would be
7   the field unit, the processing unit, the delivery
8   unit, and the records unit as we spoke of earlier?
9   **A.  So you were allowed to pick your bid -- I**
10  **mean, not pick your bid.  You were allowed to pick**
11  **your shift which is obviously days, nights, or**
12  **afternoons, your detail, your Group 7, you know,**
13  **through 1, and then you were allowed to pick your**
14  **assignment.**
15  Q.   Okay.  And did you utilize the bidding
16  process to pick a particular assignment within the
17  electronic monitoring unit at any point?
18  **A.  Yeah, that was part of the Collective**
19  **Bargaining Act.  Yes.**
20  Q.   What units did you choose through the
21  Collective Bargaining Agreement?
22  **A.  Dating from memory, I probably picked the**
23  **patrol unit.  I probably -- or the processing unit.**
24  **I think that's the only thing I can remember right**

**Page 27**

1   **now.**
2   Q.   Okay.  And did you pick those because
3   those were more desirable units within the electronic
4   monitoring unit?
5   **A.  No.**
6   Q.   Why did you choose those positions?
7   **A.  It probably had to do with your day off**
8   **group or your shift and detail.**
9   Q.   Did you find those positions more
10  desirable than the other positions?
11  **A.  No.**
12  Q.   So the only reason you chose those units
13  is because of your day off group.  Is that your
14  testimony?
15  MR. WHITE:  Objection.  It misstates
16  testimony.
17  BY MR. HERBERT:
18  Q.   You can answer.
19  **A.  I probably -- the bidding process,**
20  **knowing I was going to get a good shift and a good**
21  **day off group, I basically could care less what I**
22  **did.  I just wanted -- you know, if you're in a day**
23  **off group and you've got Tuesday, Wednesday.  A lot**
24  **of people would like to have Saturday, Sunday.  If**



Gregory Shields   -   8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 789 of 1503 PageID #:1180
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  you're, you know, working in one department, a slow
2  district, you might want to bid to a slow district or
3  bid to a busy district.  I probably bid for different
4  details and didn't care where I worked.
5      Q.  Okay.  So is it your testimony that you
6  had to be in a specific day off group to work within
7  one of the specific units within the electronic
8  monitoring unit?
9      A.  No.
10     Q.  So anyone that worked in any day off
11 group, they could bid for any of the units within the
12 electronic monitoring unit, correct?
13     MR. WHITE:  Object to form.
14         You can answer.
15     THE WITNESS:  Mr. Herbert, I didn't hear that
16 question all the way through.
17 BY MR. HERBERT:
18     Q.  I'll repeat it.
19         So it's fair to say that regardless
20 of what day off group a sheriff was in, they could
21 work in any of the units within the electronic
22 monitoring unit, correct?
23     A.  I mean, pending your seniority.  I mean,
24 it was -- I'm assuming -- well, no.  I mean, we had

Page 28

1  bids.  You have day off groups and shifts, and that's
2  the time you could pick your position, you know.
3      Q.  But while you worked there, you had
4  certainly spoken with your coworkers, correct?
5      MR. WHITE:  Objection to form and foundation.
6          You can answer.
7      THE WITNESS:  Yes.
8  BY MR. HERBERT:
9      Q.  And you were aware of the fact that your
10 coworkers found one unit more desirable over another
11 unit, fair to say?
12     MR. WHITE:  Object to form and foundation.
13         You can answer.
14     THE WITNESS:  I said, yes, I did talk with my
15 coworkers.  And your other question was did they like
16 the units they worked in?
17 BY MR. HERBERT:
18     Q.  No.  You became aware through your
19 conversations with your coworkers that many of them
20 had specific units that they desired to work in over
21 other units in electronic monitoring, fair to say?
22     MR. WHITE:  Objection to form and foundation.
23         You can answer.
24     THE WITNESS:  Everyone bid for their shift

Page 29

1  and detail, I mean.
2  BY MR. WHITE:
3      Q.  I understand that.  My question is a
4  little more specific.
5          Were you aware of the fact that your
6  coworkers wanted to work in one unit more than a
7  different unit?
8      MR. WHITE:  Objection to form and foundation.
9          You can answer.
10     THE WITNESS:  Am I aware that they wanted to
11 work in different units?  I mean, we were all one
12 unit.  We were electronic monitoring.  We were all --
13 seniority played a role.  We bid for shift detail and
14 assignment.
15         When your seniority came up, you
16 were called in and you wrote on your bid slip like
17 your vacation, this is what I want and so...
18 BY MR. HERBERT:
19     Q.  I get that.  Were you aware that
20 different assignments were sought after by your
21 coworkers more than other assignments?
22     MR. WHITE:  Objection to form and foundation.
23         You can answer.
24     THE WITNESS:  Everybody reasonably wanted to

Page 30

1  work (Inaudible caused by video conference audio
2  technical difficulties).  That prime real estate over
3  there.
4      MS. REPORTER:  I have to have that repeated.
5      MR. HERBERT:  Yeah, I didn't hear it either.
6      THE WITNESS:  Everybody -- not everybody, but
7  the majority of the group always wants Monday through
8  Friday, Saturday and Sunday off, and those were
9  desirable -- not positions.  Those were desirable
10 days off and -- days off and weekends.
11 BY MR. HERBERT:
12     Q.  I'm talking about assignments though, not
13 day off groups, okay?  Do you understand what I'm
14 talking about?
15     A.  Yes.
16     Q.  Okay.  So my question is:  With regard to
17 assignments, were you aware your coworkers wanted to
18 work one assignment more so than another assignment?
19     MR. WHITE:  Objection to form and foundation.
20         You can answer.
21     THE WITNESS:  Yes.
22 BY MR. HERBERT:
23     Q.  Tell me about that.
24     A.  There were assignments that you bid for,

Page 31



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 790 of 1503 PageID #:1181

Gregory Shields - 8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that participants in the electronic monitoring unit
2 bid for and was awarded it.
3      Q.  Do you know out of the four assignments
4 that you spoke of, do you know if one was more sought
5 after by your coworkers than the others?
6      MR. WHITE:  Objection to form.
7      You can answer.
8      THE WITNESS:  No, I don't.
9 BY MR. HERBERT:
10      Q.  So as far as you're aware, your coworkers
11 didn't have any preference as to what assignment they
12 were given.  They were all satisfied with getting
13 whatever assignment they wanted or they were
14 assigned?
15      MR. WHITE:  Objection.  Form, foundation,
16 misstates testimony.
17      You can answer.
18      THE WITNESS:  At one particular time in the
19 unit contract you bidded for your assignment, so I'm
20 not sure whether the individual would be happy or
21 mad.
22 BY MR. HERBERT:
23      Q.  Were you ever aware of any of your
24 coworkers that were unhappy working within a

Page 32

1 unit.
2      Q.  Okay.  So your testimony is that you
3 never heard anyone say, "Boy, I'd rather work the
4 field unit versus working in the records unit"?
5      MR. WHITE:  Objection to form and foundation.
6      You can answer.
7      THE WITNESS:  What I did say is there was
8 plenty of conversation that people wanted to work
9 days with weekends off.
10 BY MR. HERBERT:
11      Q.  I understand that, but how about the
12 assignments?  The same conversations, or no?
13      MR. WHITE:  Objection to form.
14      THE WITNESS:  Mr. Herbert, I think maybe it's
15 me, but I can't delineate from any other answer other
16 than saying (inaudible caused by video conference
17 audio technical difficulties) your assignment is the
18 patrol watch.  That's when they -- years ago, that's
19 when they bidded for it.  They bid for their
20 assignment, so I don't know whether -- I mean, I'm
21 doing my best to help you understand what I know.
22 BY MR. HERBERT:
23      Q.  Okay.  Maybe I can ask another question.

Page 34

1 particular assignment and wanted to work a different
2 assignment?
3      A.  What I can tell you is I remember people
4 that bidded the midnight and there would be talk
5 amongst -- hey, how many years do you think I need to
6 get days?  I don't know, you know.
7      Q.  Okay.  And I get that.  We're talking
8 about shifts.  I'm talking about assignments.  Do you
9 understand the difference?
10      A.  No, because if you're assigned to the
11 second watch patrol unit in the field, that's your
12 job.  That's what you do.  I mean, you can't walk in
13 one day and say, I'm not happy today.  Put me on the
14 midnight watch, you know.
15      Q.  Okay.  Tell me if I'm correct.  It's your
16 testimony that you're not aware of any of your
17 coworkers that preferred working in one unit versus a
18 different unit, assignment?
19      MR. WHITE:  Objection to form.
20      You can answer.
21      THE WITNESS:  They would have to go through
22 the union to change their assignment.  I mean, their
23 assignment is -- and I'll give you an example.  The
24 second watch, detail off three, you're in a patrol

Page 33

1      Do you know if one of those
2 assignments was bid for more often than other
3 assignments?
4      MR. WHITE:  Objection to form.
5      You can answer.
6      THE WITNESS:  They had -- like you
7 couldn't -- if there was three bids per shift detail
8 and your assignment, the top three people with
9 seniority would fill it, so.
10 BY MR. HERBERT:
11      Q.  I understand that.
12      A.  (Inaudible caused by video conference
13 audio technical difficulties).  I'm sorry.  Did I
14 talk over you?
15      Q.  No, but you cut out.  I don't know if the
16 court reporter got it.  Do you want to repeat what
17 you said, Mr. Shields?
18      A.  I don't even -- something about
19 assignments for the...
20      Q.  We'll move on.  Are you aware of the TSS
21 assignment in the electronic monitoring unit?
22      A.  Yes, sir.
23      Q.  Okay.  What is the TSS assignment?
24 Strike that.

Page 35

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 791 of 1503 PageID #:1182

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1      What does TSS stand for?

2      **A.  Oh, wow.  Technical Section.  Technical**

3  **Service Section.**

4      Q.  Okay.

5      **A.  Technical Service Section.**

6      Q.  Okay.  And what are the duties for those

7  working in the Technical Service Section?

8      **A.  Processing the detainees that came**

9  **through bond court.**

10      Q.  And -- I'm sorry.  Go ahead.

11      **A.  As well as fitting them with the**

12  **electronic monitoring bracelet, as well as delivering**

13  **the participants, coordinating with records, checking**

14  **with, you know, the bond people to see if the client**

15  **bonded out and making sure you're releasing the right**

16  **individual.**

17      Q.  When you worked in the electronic

18  monitoring unit beginning in 1992, was TSS an

19  assignment within the electronic monitoring unit?

20      **A.  It was effectively up and running, but**

21  **I'm not sure if in '92 it was an assignment.**

22      Q.  Okay.  You talked about four assignments,

23  field, processing, delivery, and records, and you

24  didn't mention TSS, correct?

Page 36

1      **A.  Correct.**

2      Q.  So is it fair to say that TSS was not an

3  assignment when you began working there in 1992?

4      **A.  I referred to it as processing, TSS**

5  **because everybody asked me the same question, what**

6  **does TSS mean?  I referred to it as a processing**

7  **unit.  The entire operation and the entire unit ran**

8  **out of one room, so it would be a matter of going**

9  **from one desk to another until we occupied more**

10  **space.**

11      Q.  Okay.  And at some point did these

12  various units run out of different rooms?

13      **A.  Yes.**

14      Q.  When did that take place?

15      **A.  '95, '96 maybe.**

16      Q.  Okay.  And was the TSS unit, was that run

17  out of a basement office in 1995?

18      **A.  It was run out of Division 5 receiving**

19  **and we might have had -- we had a records component**

20  **in Division 5 on the first floor.  The -- wait.  I'm**

21  **going back.  When did we...  It was always run out of**

22  **the receiving prisoners, and then we might have**

23  **had a subsection of records keeping upstairs.**

24      Q.  So when you say it was always run out of

Page 37

1  the receiving of prisoners, is that in the basement?

2      **A.  I've never referred to it as the**

3  **basement.  Division 5 receiving has been there for**

4  **before I even started, and that's where the receiving**

5  **room is.**

6      Q.  And it's the lowest level, correct?

7      **A.  They cut through one building and went to**

8  **another, but it is the lower level of Division 5,**

9  **yes.  Through the tunnel, you connect through the**

10  **tunnel, and then you go around to the main office**

11  **where you had to, you know, bring the prisoners.  You**

12  **had to walk them.**

13      Q.  Right.  So when you went into the

14  elevator, you had to hit the B button for basement to

15  get there, right?

16      **A.  No.**

17      MR. WHITE:  Objection to foundation.

18          You can answer.

19      THE WITNESS:  There was no B button in the

20  elevator for basement.  Everybody pulled in the back

21  of receiving, drove their cars, opened up a door and

22  they were in the receiving room.

23  BY MR. HERBERT:

24      Q.  Did you ever work in the TSS assignment

Page 38

1  when you were in electronic monitoring?

2      **A.  Yes.**

3      Q.  And when did you work there?

4      **A.  I worked in there probably from 1994**

5  **processing detainees and going upstairs to records**

6  **and doing -- identifying bonds.**

7      Q.  From '94 until when?

8      **A.  I've done it up until I retired.**

9      Q.  Okay.  And let's talk about that.  You

10  retired in 2019.  Is that correct?

11      **A.  Yes, sir.**

12      Q.  And other than your time period in the

13  court security section, the entirety of your career

14  was in the electronic monitoring unit, correct?

15      **A.  Yes, sir.**

16      Q.  And at some point did your title change

17  from deputy sheriff?

18      **A.  Yes, it did.**

19      Q.  Tell me about that, please.

20      **A.  It changed to investigator.**

21      Q.  And when was it changed to investigator?

22      **A.  I don't recall.  Maybe '93.**

23      Q.  Okay.  So roughly a year after you began

24  working in the electronic monitoring unit, you were

Page 39

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 792 of 1503 PageID #:1183

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  reassigned as an investigator, correct?

2  **A.  Yes.**

3  MR. WHITE:  Objection.  Misstates testimony.

4  BY MR. HERBERT:

5  Q.  That's correct?

6  **A.  Yes.**

7  Q.  And investigator, was that a promotion?

8  **A.  Yes.**

9  Q.  And how is it that you obtained this

10  promotion?

11  **A.  I was asked.**

12  Q.  By whom?

13  **A.  I don't remember his name.**

14  Q.  Do you remember his title?

15  **A.  Yeah, I believe he was the deputy**

16  **director.  I'm guessing it was Richard Whitney.**

17  Q.  And did you know Richard Whitney at the

18  time?

19  **A.  No, I didn't know who he was.**

20  Q.  Had you worked for Richard Whitney at the

21  time?

22  **A.  Negative.  No.**

23  Q.  Have you ever worked for him?

24  **A.  No.**

1  Q.  And what do you remember him telling you

2  about being promoted?

3  **A.  I remember him saying that the unit is**

4  **going to expand.  The unit is going to expand, and**

5  **you were transferred over here, and it seems like --**

6  **I think it had a lot to do with budget, if they were**

7  **going to fund the positions, and you were transferred**

8  **over here and they were going to ask us if we wanted**

9  **to stay in the unit.**

10  Q.  Okay.  So you were given a pay increase,

11  correct?

12  **A.  I'm not sure if I was given a pay**

13  **increase, but I know we had (Inaudible caused by**

14  **video conference audio technical difficulties).**

15  Q.  That didn't come through.

16  MS. REPORTER:  Yeah, I need that back.

17  THE WITNESS:  We resigned from our -- say it

18  again.

19  BY MR. HERBERT:

20  Q.  You have to repeat what you said earlier

21  just a moment ago.  I'll ask another question.

22  The assignment to investigator was a

23  promotion you testified to, correct?

24  **A.  Yeah, that's my testimony.  Yeah.**

1  Q.  Okay.  And you didn't apply for this

2  promotion, correct?

3  **A.  I was transferred as a deputy sheriff.**

4  Q.  My question is:  You didn't apply to be

5  promoted to the investigator position, correct?

6  MR. WHITE:  Object to form.

7  You can answer.

8  THE WITNESS:  No.

9  BY MR. HERBERT:

10  Q.  Okay.  And you didn't take a test to be

11  promoted to this position, correct?

12  Did you hear me, Mr. Shields?

13  **A.  No, sir.**

14  Q.  Okay.  You didn't take a test to be

15  promoted to the position of investigator, correct?

16  **A.  Yeah, we took a test.**

17  Q.  So you did apply to become an

18  investigator.  Is that correct?

19  MR. WHITE:  Objection.  It misstates the

20  testimony.

21  You can answer.

22  THE WITNESS:  We went through training and I

23  vaguely remember I think we took the State certified

24  test as an investigator.

1  BY MR. HERBERT:

2  Q.  And that was after you were already

3  promoted, correct?

4  **A.  I'm not sure whether it was after.  We**

5  **were required to take the State test as an**

6  **investigator.**

7  Q.  Were you sent to the academy for training

8  as an investigator?

9  **A.  I don't remember.**

10  Q.  At the time that you were promoted to

11  investigator, who was the Cook County Sheriff at that

12  point?

13  **A.  I want to say it was (Inaudible caused by**

14  **video conference audio technical difficulties).**

15  Q.  You broke up.

16  **A.  I'm almost positive it was O'Grady, but**

17  **there comes a fine line of when Sheriff Sheahan came**

18  **in.  I said I want to say it was Sheriff O'Grady.**

19  Q.  O'Grady?  So it was Sheriff O'Grady the

20  first sheriff that you worked under?

21  **A.  Yes, sir.**

22  Q.  Did you know Sheriff O'Grady prior to you

23  beginning work there?

24  **A.  No.**

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 793 of 1503 PageID #:1184

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

| | |
|---|---|
| 1     Q. Had you ever met him before prior to<br>2 beginning work there?<br>3     **A. No.**<br>4     Q. At some point Sheriff Sheahan took over.<br>5 Is that correct?<br>6     **A. Yes, sir.**<br>7     Q. Do you know Sheriff Sheahan?<br>8     **A. No.**<br>9     Q. You certainly know him now, correct?<br>10     **A. Yeah. Yeah, I know him.**<br>11     Q. Okay. When he took over, you did not<br>12 know Sheriff Sheahan?<br>13     **A. No, sir.**<br>14     Q. Had you ever met Sheriff Sheahan?<br>15     **A. Through the years, yes.**<br>16     Q. Okay. Had you ever met him prior to you<br>17 being employed by the Cook County Sheriff?<br>18     **A. No.**<br>19     Q. Had you any friends in common with Chief<br>20 Sheahan?<br>21     MR. WHITE: Objection. It calls for<br>22 speculation.<br>23     You can answer.<br>24     THE WITNESS: I'm sorry, Mr. Herbert. The<br>*Page 44* | 1     MR. WHITE: Okay. Why don't we just take<br>2 five minutes and we'll try and see if we can improve<br>3 things.<br>4     MR. HERBERT: Very good. Thank you.<br>5     MR. LEINENWEBER: Back in five.<br>6     (Whereupon, a short break<br>7     was taken.)<br>8     MR. HERBERT: Back on the record.<br>9 BY MR. HERBERT:<br>10     Q. So, Mr. Shields, I was asking you about<br>11 working on Sheriff Sheahan's campaigns. Do you<br>12 remember that?<br>13     **A. Yes.**<br>14     Q. And I asked you what campaigns you worked<br>15 on. I believe I asked you that. If not, I'm asking<br>16 you now.<br>17     **A. The only -- I remember hearing him**<br>18 **running for maybe the second term of sheriff when he**<br>19 **ran for sheriff. Getting people to register to vote**<br>20 **and getting him to get re-elected.**<br>21     Q. Okay. Other than that, did you do any<br>22 work on that second campaign?<br>23     **A. I'm sure I did in reference to getting**<br>24 **the vote out and registering voters. I was most**<br>*Page 46* |
| 1 question broke up.<br>2 BY MR. HERBERT:<br>3     Q. That's okay. Did you have mutual friends<br>4 between yourself and Sheriff Sheahan?<br>5     MR. WHITE: Objection. It calls for<br>6 speculation.<br>7     You can answer.<br>8     THE WITNESS: No. I mean -- I mean, I do<br>9 now. I know people who know him.<br>10 BY MR. HERBERT:<br>11     Q. I get it now. I'm talking about back<br>12 then though.<br>13     **A. No.**<br>14     Q. Okay. During the years did you ever work<br>15 on any of Sheriff Sheahan's campaigns?<br>16     **A. I could have.**<br>17     MR. WHITE: Hey, Dan?<br>18     MR. HERBERT: Yes.<br>19     MR. WHITE: Maybe it makes sense to take a<br>20 quick break and have Justin -- I know sometimes if we<br>21 log out and log back in again, that can make the<br>22 connection better just to try and fix some of this<br>23 lag that's going on.<br>24     MR. HERBERT: That's great.<br>*Page 45* | 1 likely there trying to, you know, encourage people to<br>2 vote, encourage people to get the vote out.<br>3     Q. To get the vote out for Sheriff Sheahan,<br>4 correct?<br>5     **A. Well, it all depends. I mean, for**<br>6 **everybody.**<br>7     Q. And by everybody, you mean political<br>8 candidates?<br>9     **A. (Inaudible caused by video conference**<br>10 **audio technical difficulties).**<br>11     MS. REPORTER: That is not coming through.<br>12     MR. LEINENWEBER: Dan, is it all right if we<br>13 go off for two minutes and I'll call in?<br>14     (Whereupon, the record was<br>15     read as requested.)<br>16 BY MR. HERBERT:<br>17     Q. Do you remember that question? I asked<br>18 you about working to get the vote out for Sheriff<br>19 Sheahan and your testimony was, well, for everybody.<br>20 So I guess my question then is, by everybody you mean<br>21 other political candidates, correct?<br>22     **A. I worked on Sheriff Sheahan's campaign,**<br>23 **and I also encouraged people to vote, you should**<br>24 **register and you should vote.**<br>*Page 47* |



Gregory Shields  -  8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Q.   Did you encourage them to vote for any
2 particular candidates?
3      **A.   Yes.   I supported Sheriff Sheahan.**
4    Q.   Okay.   And by supported, you encouraged
5 voters to vote for Sheriff Sheahan?
6      **A.   Yes.**
7    Q.   Okay.   Do you know what year that
8 campaign was that you worked on?
9      **A.   20 years ago maybe.**
10    Q.   Did you work on any campaigns for Sheriff
11 Sheahan other than that campaign?
12      **A.   Did I work on any other campaigns other**
13 **than Sheriff Sheahan?**
14    Q.   No.   Did you work on any other campaigns
15 for Sheriff Sheahan other than his second re-election
16 campaign?
17      **A.   I didn't work -- he was in office twice.**
18 **I worked on probably both of them.**
19    Q.   Okay.   And would your role have been the
20 same, encouraging voters to vote for Sheriff Sheahan?
21      **A.   Yes, sir.**
22    Q.   Okay.   And did you donate money to
23 Sheriff Sheahan's campaign?
24    MR. WHITE:   Object to form.

Page 48

1    You can answer.
2    THE WITNESS:   I didn't donate money to
3 Sheriff Sheahan's campaign.
4 BY MR. HERBERT:
5    Q.   Did you donate money to the Democratic
6 Party campaign?
7    MR. WHITE:   Objection to form, foundation.
8    THE WITNESS:   No.   No, I didn't donate money
9 to the Democratic Party.
10 BY MR. HERBERT:
11    Q.   Did you donate money for political
12 purposes at all?
13    MR. WHITE:   Objection to form.
14    You can answer.
15    THE WITNESS:   Well, I went to his
16 fundraisers.
17 BY MR. HERBERT:
18    Q.   Sheriff Sheahan's?
19      **A.   Yes, sir.**
20    Q.   You paid money to go to those, correct?
21      **A.   Yes, I did.**
22    Q.   Any other instances that you donated
23 money to Sheriff Sheahan other than when you went to
24 his fundraisers?

Page 49

1      **A.   No.**
2    Q.   Okay.   And after you were promoted to
3 investigator, was anyone else from the electronic
4 monitoring unit promoted to investigator in 1993?
5      **A.   I don't remember.**
6    Q.   Okay.   And how long did you serve as an
7 investigator?
8      **A.   Ten years.**
9    Q.   Okay.   And do you know now why you were
10 chosen to be promoted to investigator?
11      **A.   No.**
12    Q.   But you accepted the position.   Is that
13 correct?
14      **A.   Yes.**
15    Q.   And you were -- it was a desirable
16 position, correct?
17      **A.   Yes.**
18    Q.   Okay.   And what was your next position
19 after investigator?
20      **A.   I believe it was deputy chief.**
21    Q.   In what year were you promoted to deputy
22 chief?
23    MR. WHITE:   Objection.   Foundation.
24    You can answer.

Page 50

1    THE WITNESS:   I'm going from memory, and with
2 all due respect, if you have the date there, I'll
3 agree to it.   I want to say, you know, it's --
4 without my personnel roster, maybe like '99.   I'm
5 guessing 2000.   I don't remember the dates.   I
6 apologize.
7 BY MR. HERBERT:
8    Q.   No, that's okay.   And I get it's an
9 approximation, but I'm not trying to trick you.   I
10 don't have your career in front of me, so I'm just
11 asking from your memory.
12      **A.   Yes.**
13    Q.   When you were promoted to deputy chief,
14 what were your duty assignments?
15      **A.   My duty assignments was -- I was a deputy**
16 **chief in electronic monitoring and staffing,**
17 **vehicles, assignments, the bond courts, you know, how**
18 **many we had to process, where are they going to go.**
19    Q.   The deputy chief position, was that an
20 exempt position?   And you know what I mean by that?
21      **A.   Was it union, in other words?**
22    Q.   Well, what's your understanding of an
23 exempt position versus a career service position?
24      **A.   Career service meaning you're supported**

Page 51

Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 795 of 1503 PageID #:1186

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 52**

1  by the local union and you pay membership dues.  An
2  exempt position is you are a nonunion employee.  Is
3  that good enough?
4      Q.  Yeah.  And deputy chief, that was an
5  appointed position, correct?
6      A.  Yes, it was.  Yes.
7      Q.  And it was an exempt position, correct?
8      A.  Yes.
9      Q.  Okay.  And at the time you were promoted
10  to deputy chief, how many deputy chiefs were there in
11  the Cook County Sheriff's Department?
12      MR. WHITE:  Objection.  It calls for
13  speculation.
14      THE WITNESS:  I don't recall that.
15  BY MR. HERBERT:
16      Q.  Would it be more than 20?
17      MR. WHITE:  Objection.  It calls for
18  speculation.
19      THE WITNESS:  I don't recall.
20  BY MR. HERBERT:
21      Q.  Do you have any idea, as you sit here
22  today, how many deputy chiefs there were when you
23  were promoted in 2000?
24      A.  No.

**Page 53**

1      Q.  It's fair to say that this was the upper
2  echelon of the sheriff's department, correct?
3      MR. WHITE:  Object to form.
4          You can answer.
5      THE WITNESS:  I don't agree with that
6  definition.
7  BY MR. HERBERT:
8      Q.  Okay.  If there were 20 deputy chiefs at
9  that point, you would agree with me that the 20
10  deputy chiefs would be the 20 highest ranking
11  officers within the sheriff's department, correct?
12      A.  No.
13      Q.  Other than the sheriff?
14      A.  No.
15      Q.  It was a high level management position,
16  correct?
17      A.  No.
18      Q.  At the time in which you retired, do you
19  know how many deputy chiefs there were?
20      A.  No.
21      Q.  At any point during your career, did you
22  know how many deputy chiefs there were?
23      A.  I mean, I remember that there was rosters
24  and that at any given time I could pull it up and

**Page 54**

1  find out how many deputy chiefs were there.
2      Q.  My question is:  Do you remember the
3  number of deputy chiefs at any point during your
4  career?
5      A.  I mean, in all due respect, I would have
6  to count them or write them down or...
7      Q.  I'm asking for an approximation, if you
8  know?
9      A.  What was the time frame?
10      Q.  At any point in your career.
11      A.  There could have been nine when I
12  retired, when I retired, but there probably was more
13  when staffing allowed it.
14      Q.  Okay.  And do you think that that was
15  probably consistent in 2000 when you were promoted to
16  deputy chief that there was nine deputy chiefs?
17      A.  I don't remember.
18      Q.  Would that sound about right though?
19      A.  I mean, I can't verify that right now.  I
20  know things were different 20 some years ago, but I
21  don't remember if that's consistent or we had nine.
22  I don't remember.
23      Q.  Okay.  And if there were nine, they would
24  be high ranking members within the sheriff's

**Page 55**

1  department, correct?
2      A.  No.
3      MR. WHITE:  Objection to foundation.
4      THE WITNESS:  No.
5  BY MR. HERBERT:
6      Q.  Why not?
7      A.  The definition of deputy -- my apologies.
8      Q.  Go ahead.
9      A.  I'm trying to use the words you used.  A
10  high ranking position?  Is that what you're asking?
11      Q.  I'll ask a different question.  How's
12  that?
13      A.  All right, sir.
14      Q.  You're aware of the structure of the
15  sheriff's department with respect to the hierarchy of
16  different positions, correct?
17      A.  Yes, sir.
18      Q.  And the chief certainly would be -- or
19  the sheriff would certainly be on the top of that
20  chain of hierarchy, correct?
21      A.  Yes, sir.
22      Q.  And at the bottom would be deputy
23  sheriffs, correct?
24      A.  Under the sheriff?



Gregory Shields - 8/27/2020

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 56**

1    Q.  Yes.
2    **A.  I mean -- no.  That's not true.**
3    Q.  Is it your testimony that deputy sheriffs
4  would be ranked higher than the sheriff?
5    **A.  No, sir.**
6    Q.  Okay.  So they would be under the
7  sheriff, correct?
8    **A.  No.  I mean, there's a lot -- they are --**
9  **I don't know how to answer you.  You have a -- you**
10 **have the sheriff at its highest level.  He's the**
11 **boss.  And then you have the chief of staff, and then**
12 **you have legal, and so there's no deputy sheriffs**
13 **under the sheriff unless they changed things.**
14   Q.  The deputy sheriffs certainly report to
15 the sheriff though, correct?
16   **A.  The sheriff?  The deputy sheriff would**
17 **report to Sheriff Dart?**
18   Q.  Yes.
19   **A.  No.**
20   Q.  Sheriff Dart certainly has control over
21 the positions and the discipline and the work
22 conditions of the deputy sheriffs, correct?
23   MR. WHITE:  Object to form.
24       You can answer.

**Page 57**

1    THE WITNESS:  I can't speak for Sheriff Dart,
2  sir.  He's Sheriff Dart.  I apologize but, you know.
3  BY MR. HERBERT:
4    Q.  Okay.  Do deputy sheriffs, is there a --
5  on the hierarchy chain, is there a position that is
6  above the deputy sheriff position?
7    **A.  Yes.**
8    Q.  And who would that be?
9    **A.  A sergeant.**
10   Q.  Okay.  And would there be any position
11 that is below a deputy sheriff, not including
12 civilians?  I'm talking sworn personnel.
13   **A.  No.  Not that I'm aware of, no.**
14   Q.  Okay.  So that's what I'm asking you.  So
15 the deputy sheriffs would be at the bottom?
16   **A.  You know, I mean...**
17   Q.  Just let me finish.
18   **A.  I don't know -- I'm sorry.**
19   Q.  That's all right.  The deputy sheriffs
20 would be at the bottom of the hierarchical chain that
21 I was speaking of, correct?
22   **A.  Yes, sir.**
23   Q.  Okay.  And then you said sergeants would
24 be above them, correct?

**Page 58**

1    **A.  Well, wherever you want to fit in a**
2  **correctional officer.  I don't know, but I think a**
3  **correctional officer, deputy sheriff, so yeah.**
4    Q.  And a sergeant would be above them?
5    **A.  Yes, sir.**
6    Q.  And the lieutenant would be above the
7  sergeant, correct?
8    **A.  Yes.  Yes, sir.**
9    Q.  And a captain would be above lieutenant,
10 correct?
11   **A.  Yes.**
12   Q.  And above captain would be the exempt
13 rank members, correct?
14   **A.  Yes.**
15   Q.  Okay.  And above captains would be the
16 deputy chiefs, correct?
17   **A.  No.**
18   Q.  Who would that be then that would be
19 above captains, what position?
20   **A.  Who would be above a captain?**
21   Q.  Yes.  You said it was not deputy chiefs,
22 so my question is:  Who was it then that's above a
23 captain?
24   **A.  We didn't have captains.**

**Page 59**

1    Q.  So there is no position of captain?
2    **A.  No, sir.**
3    Q.  Okay.  Who was above lieutenants then?
4    **A.  At the time we didn't have lieutenants.**
5    Q.  At any point did you have lieutenants?
6    **A.  Yes, sir.**
7    Q.  At what point did lieutenants become part
8  of the hierarchical chain?
9    MR. WHITE:  Objection to form.
10       You can answer.
11   THE WITNESS:  Reasonably four years ago.
12 BY MR. HERBERT:
13   Q.  In 2000 when you were promoted to deputy
14 chief, there were no lieutenants.  Is that your
15 testimony?
16   **A.  Yes, sir.**
17   Q.  Were there sergeants?
18   **A.  No, sir.**
19   Q.  So the deputy sheriffs would report to
20 the deputy chiefs in 2000.  Is that correct?
21   **A.  We didn't have deputy sheriffs.**
22   Q.  You testified that you became a deputy
23 sheriff in 1989, correct?
24   **A.  Yes, sir.**

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 797 of 1503 PageID #:1188
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Q. So I'm confused by your answer then. Is it your testimony that there was no deputy sheriffs in 2000 when you were promoted to deputy chief?

A. Yes.

Q. Okay. When did they, deputy sheriffs, become eliminated from a job assignment?

MR. WHITE: Object to form and foundation.

You can answer.

THE WITNESS: I'm not aware of any deputy sheriff being eliminated.

BY MR. HERBERT:

Q. Well, you testified that you were a deputy sheriff in 1989 but that there were no deputy sheriffs in 2000. Is that correct?

A. Yes, sir.

Q. And is that because the name changed, or did they eliminate every single deputy sheriff that was working there?

MR. WHITE: Object to form.

You can answer.

THE WITNESS: I'm not aware of anybody being eliminated.

BY MR. HERBERT:

Q. Well, there was thousands of deputy

Page 60

sheriffs in 1989, correct?

MR. WHITE: Object to form.

You can answer.

THE WITNESS: I'll agree to that, yes.

BY MR. HERBERT:

Q. Okay. And in 2000 there was thousands of sheriffs, correct?

A. Yes, sir.

Q. What were they called if they were not called deputy sheriffs?

A. They were called deputy sheriffs.

Q. Okay. Well, that's what I'm asking you then. So in 2000 there were deputy sheriffs, correct?

A. Yes, sir. 2000 there were deputy sheriffs, yes.

Q. Okay. And those deputy sheriffs reported to sergeants in 2000, correct?

MR. WHITE: Objection. Misstates prior testimony.

THE WITNESS: No. No.

BY MR. HERBERT:

Q. Is it your testimony there was no sergeants in 2000? Is that correct?

Page 61

MR. WHITE: Object to form.

THE WITNESS: Correct.

BY MR. HERBERT:

Q. Do you know at what point sergeants became a position within the sheriff's department?

A. Yes.

Q. When?

A. 2015.

Q. Okay. In 2000 who were the supervisors of the deputy sheriffs?

MR. WHITE: Objection to form.

You can answer.

THE WITNESS: As far as I understand, we didn't have deputy sheriffs working in the EM unit.

BY MR. HERBERT:

Q. In 2000 though who were the supervisors of deputy sheriffs in the sheriff's department?

MR. WHITE: Objection to form.

THE WITNESS: Well, the deputy sheriffs in the sheriff's department would have been sergeants.

BY MR. HERBERT:

Q. Okay. So there were sergeants in 2000 then?

MR. WHITE: Object to form.

Page 62

You can answer.

THE WITNESS: Yes.

BY MR. HERBERT:

Q. Okay. And there were lieutenants then, correct?

MR. WHITE: Object to form.

THE WITNESS: Yes.

BY MR. HERBERT:

Q. And above deputy sheriff would be the position of investigator, correct?

A. Yes, sir.

Q. Okay. And above the lieutenants in 2000, who were their supervisors?

A. We didn't have lieutenants.

Q. Okay. Well, you just testified that you did, I guess, so maybe I'm getting confused.

MR. WHITE: It misstates prior testimony.

BY MR. HERBERT:

Q. Did you have lieutenants in 2000?

MR. WHITE: Object to form.

THE WITNESS: Can I take a break?

BY MR. HERBERT:

Q. Can you answer that question, please?

A. Can you repeat the question?

Page 63



**Gregory Shields - 8/27/2020**
Case: 1:18-cv-05726 Document #: 105-5 Filed: 12/21/20 Page 798 of 1503 PageID #:1189
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 64

1  Q. Did you have lieutenants in 2000 when you
2 were promoted to deputy chief?
3  MR. WHITE: Object to form.
4  THE WITNESS: That answer is no.
5 BY MR. HERBERT:
6  Q. Okay. Did you have sergeants?
7  MR. WHITE: Object to form, asked and
8 answered.
9  MR. HERBERT: I've been given two different
10 answers. That's why I'm asking. I understand your
11 objection.
12  MR. WHITE: Well, you clearly want
13 clarification. You're not differentiating between
14 multiple organizations, so he's going to keep giving
15 you the same answer, but fine. Go ahead.
16 BY MR. HERBERT:
17  Q. All right. You understand I'm talking
18 about the sheriff's department, not the electronic
19 monitoring unit specifically in 2000?
20  **A. Yes, sir.**
21  Q. Okay. And were there sergeants in 2000
22 within the sheriff's department?
23  **A. Yes, there was.**
24  Q. And was there lieutenants within the

Page 65

1 sheriff's department in 2000?
2  **A. Yes, sir.**
3  Q. Okay. And then who did the sheriffs --
4 or I'm sorry, the lieutenants report to in 2000?
5 Would it be the next highest rank?
6  **A. Yeah. I mean, yes, a lieutenant would**
7 **report to the next highest rank.**
8  Q. And what was the next highest rank in
9 2000?
10  MR. WHITE: Object to form.
11  THE WITNESS: Watch commander.
12 BY MR. HERBERT:
13  Q. Okay. And did the watch commander report
14 to any supervisor?
15  MR. WHITE: Object to form.
16 BY MR. HERBERT:
17  Q. In 2000?
18  **A. I don't know. I don't know.**
19  Q. In 2000 was there any rank that was
20 higher than watch commander that you're aware of?
21  MR. WHITE: Object to form.
22  THE WITNESS: I don't know.
23 BY MR. HERBERT:
24  Q. At some point were you ever aware when

Page 66

1 you worked in the sheriff's department whether there
2 was a rank higher than watch commander?
3  MR. WHITE: Object to form.
4  THE WITNESS: No.
5 BY MR. HERBERT:
6  Q. Do you agree with me that the sheriff
7 would be a higher rank than watch commander?
8  **A. Yes.**
9  Q. Okay. So other than the sheriff, are you
10 aware of any rank that would be higher than watch
11 commander ever while you worked in the sheriff's
12 department?
13  MR. WHITE: Object to form.
14  THE WITNESS: Yes.
15 BY MR. HERBERT:
16  Q. Tell me about that.
17  **A. The chief of staff.**
18  Q. Okay. Anyone else?
19  **A. The chief of police if there was one. I**
20 **don't know if there was one.**
21  Q. Okay. Anyone else?
22  **A. No.**
23  Q. How about the deputy chiefs, where do
24 they rank in 2000 in that hierarchical chain?

Page 67

1  MR. WHITE: Object to form.
2  THE WITNESS: In 2000, I'm not sure. I
3 mean...
4 BY MR. HERBERT:
5  Q. Well, when you were deputy chief, did a
6 watch commander report to you?
7  **A. No.**
8  Q. Do you know that -- do you know whether
9 or not as deputy chief you were a higher rank than a
10 watch commander in the year 2000?
11  **A. No.**
12  Q. No, you don't know or, no, watch
13 commander was not -- did not report to deputy chiefs
14 in 2000?
15  **A. No.**
16  Q. No, they did not. Is that correct?
17  **A. No, they did not.**
18  Q. Who reported to deputy chiefs in 2000?
19  MR. WHITE: Object to form.
20 BY MR. HERBERT:
21  Q. In the sheriff's department?
22  MR. WHITE: The same objection.
23  THE WITNESS: I would -- I don't know who
24 would report to a deputy chief in 2000.



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 799 of 1503 PageID #:1190

Gregory Shields  -  8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q.  Okay.  Well, we talked about the hierarchical chain being deputy sheriffs, investigators, sergeants, lieutenants, sheriff, chief of staff.  That's what you testified to, correct?

MR. WHITE:  Objection.  Mischaracterizes testimony.

THE WITNESS:  Correct.

BY MR. HERBERT:

Q.  Where do the deputy chiefs fit into that chain?

**A.  In 2000?**

Q.  Yes.

**A.  I don't know.**

Q.  How about at any point in the sheriff's department?  Were you aware of -- were deputy chiefs ranked in that chain of command?

MR. WHITE:  Objection to form.

THE WITNESS:  I don't know.

BY MR. HERBERT:

Q.  Were deputy sheriffs a higher rank than sheriffs at any point in the sheriff's department, deputy sheriffs?

**A.  Can you rephrase that?**

*Page 68*

Q.  Were deputy chiefs a higher rank than deputy sheriffs at any point while you worked for the sheriff's department?

**A.  Yes.**

Q.  Were deputy chiefs a higher rank than sergeants at any point that you worked in the sheriff's department?

**A.  Yes.**

Q.  Were deputy chiefs a higher rank than lieutenants at any point that you worked in the sheriff's office?

**A.  Yes.**

Q.  Were deputy chiefs a higher rank than watch commanders at any point that you worked in the sheriff's office?

**A.  Yes.**

Q.  Were deputy chiefs ever a lower rank while you worked in the sheriff's office to any of those groups?

**A.  Yes.**

Q.  When was that?

**A.  I don't think it's ever changed.**

Q.  So they have never been a lower rank in the sheriff's department as far as you're aware of,

*Page 69*

correct?

**A.  A deputy chief?**

Q.  Yes.

**A.  What was the question?**

Q.  A deputy chief has never been a lower rank than watch commander, lieutenant, sergeant, investigator, or deputy sheriff the entire time that you've been in the sheriff's department, correct?

MR. WHITE:  Object to form.

THE WITNESS:  No, that's not correct.

BY MR. HERBERT:

Q.  It's not correct?

**A.  Yes, sir.**

Q.  Tell me what's not correct about that.

**A.  The ranking structure of a deputy chief in 2000.**

Q.  I don't understand that answer.  Can you expand on it, please?

**A.  We're talking about the ranking structure of a deputy chief?**

Q.  Yes.

**A.  And the question was, was it ever lower or higher?  I'm not sure I understand it.**

Q.  I'll ask it again.  Was it ever lower

*Page 70*

than a watch commander at any point that you've been in the sheriff's department?

MR. WHITE:  Object to form.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  When?

**A.  When?  Through the years I've worked at the sheriff's department, it's been a lower rank, but to put a date on it I don't -- I can't do that for you.**

Q.  So is it your testimony that at the time you left the sheriff's department, a deputy chief was a lower rank than a watch commander?

MR. WHITE:  Objection.  It mischaracterizes his testimony.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  Was it a lower rank than lieutenant at any point when you worked in the sheriff's department?

MR. WHITE:  Objection to form.

THE WITNESS:  Yes.

BY MR. HERBERT:

Q.  When you left the sheriff's department,

*Page 71*

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 800 of 1503 PageID #:1191

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 was it a lower rank than a lieutenant?

2    MR. WHITE:  Objection to form.

3    THE WITNESS:  Yes.

4 BY MR. HERBERT:

5    Q.   So it's your testimony that in all the

6 years that you've worked in the sheriff's department

7 that a lieutenant never reported to a deputy chief?

8    MR. WHITE:  Objection to form.

9    THE WITNESS:  No.

10 BY MR. HERBERT:

11    Q.   That's not your testimony?

12    **A.   No.**

13    Q.   So a lieutenant did report to deputy

14 chiefs while you worked in the sheriff's department,

15 correct?

16    **A.   Yes.**

17    Q.   And in those situations, a deputy chief

18 would have been higher on the hierarchical chain than

19 lieutenants, correct?

20    **A.   Yes.**

21    Q.   Are you aware of any situations in which

22 a deputy chief reported to a lieutenant while you

23 were on the sheriff's department?

24    MR. WHITE:  Object to form.

Page 72

1    Q.   And was it in place in 2000 when you were

2 promoted to deputy chief?

3    **A.   Yes.**

4    Q.   So lieutenants reported to deputy chiefs

5 in 2000, correct?

6    MR. WHITE:  Object to form.

7    THE WITNESS:  No.

8 BY MR. HERBERT:

9    Q.   Who did you report to when you were

10 deputy chief in 2000?

11    **A.   The chief.**

12    Q.   Did you report to a lieutenant?

13    **A.   No.**

14    Q.   Were there any lieutenants below your

15 rank?

16    **A.   No.**

17    Q.   None?

18    **A.   I might have answered that question fast.**

19 **Were there any lieutenants below my rank?**

20    Yes.

21    MR. WHITE:  Object to form.

22    THE WITNESS:  No.  No.

23 BY MR. HERBERT:

24    Q.   And just so I'm clear, there was no

Page 74

1    THE WITNESS:  Yes.

2 BY MR. HERBERT:

3    Q.   When?

4    **A.   Through my career, it was common for that**

5 **reporting process.**

6    Q.   And I get the reporting process, but I'm

7 talking about the hierarchical chain though.  Is it

8 your testimony that deputy chiefs were below

9 lieutenants at any point in the sheriff's department?

10    MR. WHITE:  Object to form.

11    THE WITNESS:  Yes.  Yes, that's my testimony.

12 BY MR. HERBERT:

13    Q.   All right.  And you're also aware of

14 points in the sheriff's department where deputy

15 chiefs were on a higher hierarchical chain than

16 lieutenants, correct?

17    MR. WHITE:  Object to form.

18    THE WITNESS:  Yes.

19 BY MR. HERBERT:

20    Q.   And when did that change take place?

21    **A.   I don't know.**

22    Q.   Do you know if it was in place at the

23 time in which you retired?

24    **A.   Yes.**

Page 73

1 lieutenants below your rank in the entire sheriff's

2 department in 2000.  Is that your testimony?

3    **A.   So I'm just trying to process this**

4 **answer, and you're asking me if there was lieutenants**

5 **that were below my rank?**

6    Q.   Yes.

7    **A.   No.**

8    Q.   Okay.  And so on the other side, every

9 lieutenant in the sheriff's department was above your

10 rank as deputy chief in 2000, correct?

11    **A.   Yes.**

12    Q.   Okay.  And you said you reported to the

13 chief, correct?

14    **A.   Yes.**

15    Q.   Well, wouldn't you have reported to the

16 lieutenants prior to reporting to the chief?

17    **A.   No.**

18    Q.   You would agree that you would have to

19 report to the next highest level on the hierarchical

20 chain after deputy chief, correct?

21    **A.   Yes.**

22    Q.   Okay.  And were there any lieutenants

23 that were higher ranking on the hierarchical chain

24 than chief in 2000?

Page 75

Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 801 of 1503 PageID #:1192
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  No.
2    Q.  Okay.  So no lieutenants were below you
3  during that time frame, correct?
4    A.  Correct.
5    Q.  But you reported to the deputy chief --
6  or I'm sorry.
7        You reported to the chief, correct?
8    A.  Correct.
9    Q.  Why is it that you wouldn't have had to
10  report to a lieutenant -- or strike that.
11        A chief is certainly a higher
12  ranking position than a lieutenant, correct?
13    A.  I don't know.
14    Q.  Well, it's higher ranking than deputy
15  chief, correct?
16    A.  I don't know.
17    Q.  You reported to the chief, correct?
18    A.  Yes.
19    Q.  Wouldn't that make you think that that
20  was a higher rank then?
21    A.  Oh, yes.  I would agree with that, yes.
22    Q.  Okay.  And that's all I'm asking.  So I'm
23  not sure if I'm making myself clear, but a deputy
24  chief is below a chief on the hierarchical chain,

Page 76

1  correct?
2    A.  Correct.
3    Q.  Okay.  And then just so we're clear,
4  lieutenants did not directly report to deputy chiefs
5  on the hierarchical chain, correct?
6    A.  Correct.
7    Q.  Okay.  They reported to the watch
8  commanders, correct?
9    MR. WHITE:  Object to form.
10  BY MR. HERBERT:
11    Q.  Do you remember the question?
12    A.  No.  You're asking me who reported to
13  who, the lieutenants?
14    Q.  Lieutenants reported to the watch
15  commanders, correct?
16    MR. WHITE:  Object to form.
17    THE WITNESS:  Yes.
18  BY MR. HERBERT:
19    Q.  Because a watch commander was a higher
20  rank than a lieutenant, correct?
21    A.  Yes.
22    Q.  And deputy chief is a higher rank than
23  watch commander, correct?
24    A.  No.

Page 77

1    Q.  Did deputy chiefs report to watch
2  commanders?
3    A.  No.  They didn't report to watch
4  commanders, no.
5    Q.  At any point when you were deputy chief,
6  did you report to a watch commander?
7    A.  No.
8    Q.  At any point that you were deputy chief,
9  did a watch commander ever report to you?
10    A.  Yes.
11    Q.  And I'm really confused about your
12  understanding about the hierarchical system because
13  if they reported to you, wouldn't you agree that you
14  were a higher rank on the hierarchical system than a
15  watch commander would be?
16    A.  No.
17    Q.  Who did the chief report to in 2000 when
18  you were deputy chief?
19    A.  The deputy director.
20    Q.  Okay.  And at the time do you know how
21  many deputy directors there were in 2000?
22    MR. WHITE:  Object to form.
23    THE WITNESS:  No, I don't, sir.  No, I don't.
24  I don't recall.

Page 78

1  BY MR. HERBERT:
2    Q.  At the time in 2000 do you remember how
3  many chiefs there were?
4    MR. WHITE:  Object to form.
5    THE WITNESS:  No, I don't recall.
6  BY MR. HERBERT:
7    Q.  Okay.  The deputy directors, to whom did
8  they report?
9    A.  To the director.
10    Q.  And the director -- and that would be a
11  director of the various units within the Cook County
12  Sheriff's Department, correct?
13    A.  Yes.
14    Q.  And how many units were there in the
15  sheriff's department in 2000?
16    A.  I don't know, sir.
17    Q.  Would it have been more than ten?
18    A.  I don't know.  I don't know.
19    Q.  You have no idea how many positions -- or
20  how many units there were in the Cook County
21  Sheriff's Department in 2000?
22    A.  That's correct.
23    Q.  How about when you retired?  Do you have
24  any idea how many units there were in the sheriff's

Page 79




Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 802 of 1503 PageID #:1193
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 80**

1  department in 2019?
2    **A.  No, I don't.  No, sir, I don't.**
3    Q.  At any point during your career in the
4  sheriff's department, were you aware of how many
5  units there were?
6    **A.  No, I don't.**
7    Q.  Do you know whether or not it was more
8  than ten at any point in your career?
9    **A.  No, I don't.**
10    Q.  Do you know at any point in your career
11  if it was less than ten?
12    **A.  No, I don't.**
13    Q.  So as you sit here today, you have no
14  idea at any point in your career how many units there
15  were within the sheriff's department.  Is that your
16  testimony?
17    **A.  I could guess.**
18    Q.  Would it be an educated guess based upon
19  your 20 some years in the sheriff's department?
20    **A.  Yes.**
21    Q.  Okay.  What would that be then?
22    MR. WHITE:  Objection.  It calls for
23  speculation.
24    THE WITNESS:  More than ten.

**Page 81**

1  BY MR. HERBERT:
2    Q.  And that's your best guess, it would be
3  more than ten, yes?
4    **A.  Yes.**
5    Q.  Would it be more than 20?
6    MR. WHITE:  Objection.  It calls for
7  speculation.
8    THE WITNESS:  I don't know, sir.
9  BY MR. HERBERT:
10    Q.  And is it your testimony that every
11  single unit had a director?
12    **A.  I don't know.**
13    Q.  To whom did the director report?
14    MR. WHITE:  Object to form.
15  BY MR. HERBERT:
16    Q.  In 2000?
17    MR. WHITE:  Object to form.
18    THE WITNESS:  The deputy executive director.
19  BY MR. HERBERT:
20    Q.  And do you know how many deputy executive
21  directors there were in 2000?
22    **A.  No, sir.**
23    Q.  Do you know if there was more than one
24  deputy executive in 2000?

**Page 82**

1    **A.  No, I don't know.**
2    Q.  Do you know who your deputy executive was
3  in 2000?
4    **A.  No, I don't.**
5    Q.  Do you know who the deputy executive
6  reported to in 2000?
7    MR. WHITE:  Object to form.
8    THE WITNESS:  The executive director.
9  BY MR. HERBERT:
10    Q.  Do you know how many executive directors
11  there were in 2000?
12    **A.  No, I don't.**
13    Q.  Do you know if there was more than one
14  executive director in 2000?
15    **A.  No, I don't.**
16    Q.  You don't know if there was more than
17  one?
18    **A.  I don't know, sir.**
19    Q.  Okay.  Is it possible that there was one
20  executive director?
21    MR. WHITE:  Objection.  It calls for
22  speculation.
23    THE WITNESS:  My apologies.  Am I answering?
24

**Page 83**

1  BY MR. HERBERT:
2    Q.  Yes.
3    **A.  What am I answering?**
4    Q.  Is it possible there was only one
5  executive director in 2000?
6    **A.  I don't know, sir.**
7    Q.  And who did the executive director
8  respond to or report to in 2000?
9    **A.  I don't know.**
10    Q.  Do you know -- I'm not asking the
11  person's name just so you're clear.  I'm asking what
12  position did they report to?
13    **A.  No, I don't know, sir.**
14    Q.  Would there be any position higher
15  ranking than the executive director on the
16  hierarchical chain in 2000?
17    **A.  Yes.**
18    Q.  What positions were those?
19    **A.  I think chief of staff could have been**
20  **one of them.**
21    Q.  Any other position other than chief of
22  staff?
23    **A.  I don't know.**
24    Q.  None that you can think of?

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 803 of 1503 PageID #:1194
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  None that I can think of, yes.

2    Q.  Okay.  And chief of staff would report to

3 the sheriff, correct?

4    A.  I don't know who they would report to.

5 I'm not sure whether it's him or... I don't know who

6 they reported to.

7    Q.  Okay.  Tell me about how long you served

8 as deputy chief.

9    A.  A couple years.

10   Q.  Okay.  So you were promoted in 2000,

11 correct?

12   A.  Yes.

13   Q.  Okay.  And how is it you were promoted to

14 deputy chief, what was the process?

15   A.  I don't remember the process.

16   Q.  Well, did you ever express an interest to

17 become a deputy chief at any point prior to being a

18 deputy chief?

19   A.  No.

20   Q.  So when you became deputy chief, you had

21 not been a watch commander at any point, correct?

22   A.  No.

23   Q.  You had not been a lieutenant, correct?

24   A.  Correct.

Page 84

1 investigator -- or strike that.

2    You were the only one that you know

3 that was promoted to deputy chief after having not

4 been a sergeant, correct?

5    A.  I can speak for me, myself, Greg Shields.

6 I'm not sure about anyone else, but I can speak for

7 myself.  I was not a sergeant.

8    Q.  And you don't know anyone else that was

9 promoted to deputy chief ever in your career on the

10 sheriff's department without at least holding the

11 rank of sergeant prior to that, correct?

12   A.  I can only speak for myself.  I mean, the

13 answer is I was never a sergeant.

14   Q.  That's not my question though.

15   A.  I apologize.

16   Q.  I understand you weren't a sergeant.

17    My question is:  You're not aware of

18 anyone other than yourself that was promoted to the

19 position of deputy chief without having at least

20 served a rank of sergeant prior to that, correct?

21   A.  So I understand your question, you're

22 asking me something about were other people sergeants

23 and promoted to deputy chiefs?

24   Q.  Any other deputy chiefs that were

Page 86

1    Q.  You had not been a sergeant, correct?

2    A.  Correct.

3    Q.  So you would agree with me that it was

4 pretty rare back in 2000 that somebody would be

5 appointed deputy chief after not having served in

6 those other career service positions, correct?

7    MR. WHITE:  Object to form, foundation, also

8 speculation.

9    Go ahead, Greg.

10   THE WITNESS:  No, I wouldn't agree with you.

11 BY MR. HERBERT:

12   Q.  Okay.  How many other people in your

13 career on the sheriff's department are you aware of

14 that was promoted to deputy chief prior to being a

15 sergeant?

16   A.  I'm not aware of any.

17   Q.  Okay.  So as far as you know, you were

18 the only one to have ever been promoted to deputy

19 chief during your career from having never served in

20 the position of sergeant prior to that, correct?

21   A.  Correct.  I was never a sergeant.

22   Q.  My question was more specific though.

23    You were the only one, as far as you

24 know, that was ever promoted from sergeant -- or from

Page 85

1 promoted that never served the rank of sergeant other

2 than you?

3    A.  Yes.  Yes.  That answer is yes.

4    Q.  Who?

5    A.  When were you talking?  I mean...

6    Q.  Ever in your career on the sheriff's

7 department.

8    A.  I don't believe no one was a sergeant.

9    Q.  Okay.  So you worked what, 30 years,

10 31 years in the sheriff's department?

11   A.  I'm still processing your first question.

12   Q.  Let's focus on this one.

13   A.  Well, I would like to give you a true and

14 accurate answer, and I believe, if my memory serves

15 me, there was an individual who was a sergeant.

16 There was an individual who was a sergeant.  I'm not

17 clear.  I apologize.  I don't believe anyone was a

18 sergeant that was promoted to deputy chief.

19   Q.  And you're not aware of anyone that was

20 promoted from investigator to deputy chief either,

21 correct?

22   A.  Yes, I am.

23   Q.  Yes, you are?  I'm sorry.

24   A.  What was the question?

Page 87



Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Q. You're not aware of anyone that was
2 promoted from investigator directly to deputy chief
3 during your career in the sheriff's department,
4 correct?
5    **A. No, that's not correct.**
6    Q. Who was promoted from investigator to
7 deputy chief other than you?
8    **A. The majority of the deputy chiefs that**
9 **were in that position were promoted from investigator**
10 **to deputy chief.**
11    Q. Okay. And you know what I'm saying when
12 I'm saying promoted from, meaning they went from the
13 rank of investigator having never served as sergeant,
14 lieutenant directly to deputy chief? You understand
15 that's the preface of my question?
16    **A. I understand the preface, yes, but there**
17 **was a title of supervisor in there, so most did**
18 **supervise.**
19    Q. What was the title of supervisor that
20 you're speaking of?
21    **A. Supervisor.**
22    Q. Where did that fall in the hierarchical
23 chain that we talked about quite some time, moments
24 ago?

Page 88

1    **A. I would say after the investigator's**
2 **position.**
3    Q. There's a position called supervisor
4 after the investigator position, correct?
5    **A. Yes, sir.**
6    Q. And that would be a lower rank than a
7 sergeant, correct?
8    **A. Yes, sir.**
9    MR. WHITE: Objection to foundation.
10 BY MR. HERBERT:
11    Q. I'm sorry. Did you say yes?
12    **A. Yes.**
13    Q. Okay. And are you aware of any
14 individuals that went directly from the position of
15 investigator -- or I'm sorry. What was the one after
16 investigator? Supervisor, anyone that went from the
17 position of supervisor directly to the position of
18 deputy chief prior to being -- or without being a
19 sergeant?
20    **A. Yes.**
21    Q. Who?
22    **A. I'd have to look at a roster. I don't...**
23    Q. Take your time.
24    **A. I don't have anything to look at. You**

Page 89

1 know, I'm trying to remember verbatim. I remember
2 their names.
3    Q. How many people were promoted from the
4 rank of supervisor directly to deputy chief during
5 your career?
6    MR. WHITE: Object to form.
7    THE WITNESS: I don't know. I don't know.
8 BY MR. HERBERT:
9    Q. Do you know if it ever happened?
10    **A. Can you ask me the question?**
11    Q. Do you know if it ever happened where
12 somebody was promoted from supervisor directly to
13 deputy chief?
14    **A. I'm sure it's happened.**
15    Q. Can you think of one example?
16    **A. It's just I don't have a name. You know,**
17 **I'm sure it's happened.**
18    Q. Is it fair to say as you sit here today
19 you can't name one person that was promoted from the
20 rank of supervisor to deputy chief during your career
21 on the sheriff's department?
22    MR. WHITE: Object to form.
23    THE WITNESS: I don't remember.
24

Page 90

1 BY MR. HERBERT:
2    Q. And you certainly don't remember the name
3 of anyone who went from investigator directly to the
4 rank of deputy chief other than yourself, correct?
5    MR. WHITE: Objection. Misstates testimony.
6    THE WITNESS: Well, sir, I would like to add
7 something to that. I was a supervisor.
8 BY MR. HERBERT:
9    Q. When were you promoted to supervisor?
10    **A. I don't remember.**
11    Q. Well, you were promoted to investigator
12 in 1993. Do you know how long you served as an
13 investigator before you were promoted to supervisor?
14    **A. No.**
15    Q. Do you know how long you were in the
16 supervisor rank prior to being promoted to deputy
17 chief?
18    MR. WHITE: Objection to foundation.
19    THE WITNESS: No.
20 BY MR. HERBERT:
21    Q. How is it that you were appointed to
22 supervisor?
23    **A. I don't remember.**
24    Q. How is it that you were appointed to

Page 91



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 805 of 1503 PageID #:1196
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 deputy chief in 2000?

2    A.  What comes to mind is I think I was

3 asked.

4    Q.  By whom?

5    A.  I believe by the chief of the unit.

6    Q.  Who was that?

7    A.  I apologize.  I'm drawing blanks to these

8 names.  It was...

9    Q.  Would it have been after you had worked

10 on Sheriff Sheahan's campaigns?

11    A.  I don't remember.

12    Q.  And is there anything about today that

13 would prevent you from remembering these instances,

14 any medications that you're on or anything?

15    A.  I mean, how do I answer that?  I mean...

16    Q.  Well, I'm asking questions that, you

17 know -- we've spent two and a half hours trying to

18 get through your background and, you know, with all

19 due respect, I don't think these are very difficult

20 questions I'm asking.

21    MR. WHITE:  I would object that that's

22 argumentative.  You're asking about stuff 30 years

23 ago.

24

BY MR. HERBERT:

2    Q.  Is there anything affecting your memory

3 today as you sit here?  Mr. Shields?

4    A.  Yeah.  I'm just trying to process the

5 answer.  I don't -- I don't have a response.  It's my

6 personal opinion that nothing is hindering my

7 responses, so I apologize in advance if I'm not as

8 punctual or...  I would like to get through it and as

9 best as I can.

10    Q.  And so would I.  And, you know, I would

11 like to get through it, but we want to make sure we

12 get the proper testimony, and that's why we just

13 wanted to make sure that you feel you are capable of

14 providing testimony, there's nothing that is --

15 concerns your state of mind today that would prevent

16 us from getting the proper testimony.

17    A.  I'd like to move on.  I mean, I'm here to

18 help.  I'm here.  I'm part of the solution.

19    Q.  Okay.  How long did you serve as deputy

20 chief?

21    A.  Four, five years.

22    Q.  And then at what -- what was your change

23 in assignment after deputy chief?

24    A.  I didn't have a change in assignment,

1 sir.

2    Q.  Well, tell me what happened after you

3 were deputy chief.

4    A.  I still -- I still worked in the

5 electronic monitoring unit.

6    Q.  Did you have a title that was different

7 four or five years after you were promoted to deputy

8 chief?

9    A.  Yes.

10    Q.  That's what I'm asking you.

11    A.  That answer is yes.

12    Q.  What was the title?

13    A.  Chief.

14    Q.  Okay.  So you were promoted to chief,

15 correct?

16    A.  Yes.

17    Q.  And that would have been some time in

18 2004 or 2005?

19    A.  Yes.

20    Q.  And how is it that you were promoted to

21 chief during that time?

22    A.  I believe again I was asked.

23    Q.  By whom?

24    A.  It could have been the -- it could have

1 been the deputy director of the unit or the director.

2    Q.  And did the deputy chief report to you

3 then when you were a chief?

4    A.  Yes.

5    Q.  Okay.  And how long did you serve as

6 chief?

7    A.  Let's see.  Six -- when did you say I was

8 chief, or how long did I say it was, five years?

9    Q.  That's what I'm asking you.  You said

10 deputy chief four or five years.

11    A.  And then chief four or five years?

12    Q.  No, I'm asking you.  I don't know how

13 long you were a chief.

14    A.  Oh.  Five years.

15    Q.  So would that take us to approximately

16 2009, 2010?

17    A.  2006.  Four years.

18    Q.  Do you know what years you were a chief?

19    A.  No, I don't.

20    Q.  Do you know what year you became a chief?

21    A.  No, I don't.

22    Q.  Do you know how long you were a chief?

23    A.  I'd say it was about maybe three or

24 four years.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 806 of 1503 PageID #:1197

Gregory Shields - 8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 96**

1  Q.  What happened after -- at some point did
2  your title from chief change?
3  **A.  Yes, it did.**
4  Q.  And to what did it change to?
5  **A.  It changed to director.**
6  Q.  And do you know what year it was that you
7  became a director?
8  **A.  September 2006.**
9  Q.  So you would have been a chief for one or
10 two years prior to being a director.  Does that sound
11 fair?
12 **A.  Yes.**
13 Q.  And when you were the director, the chief
14 reported to you, correct?
15 **A.  No.**
16 Q.  Did you report to a chief at any point
17 when you were a director?
18 **A.  No.**
19 Q.  Was your position not filled when you
20 went from chief to director?
21 **A.  I don't know.**
22 Q.  At any point was there a chief that
23 reported to you when you were a director?
24 **A.  Yes.**

**Page 97**

1  Q.  How long did you serve as director?
2  **A.  Nine years.**
3  Q.  And did your position change from
4  director?
5  **A.  Yes.**
6  Q.  To what?
7  **A.  Executive director.**
8  Q.  And do you remember what year you became
9  executive director?
10 **A.  I'm going to say three years, so '16.**
11 **March of '16, '17, '18, '19.**
12 Q.  2016?
13 **A.  Yes, sir.**  Okay.  And did your position ever change
14 Q.  Okay.  And did your position ever change
15 from executive director?
16 **A.  No.**
17 Q.  Did you retire as executive director?
18 **A.  Yes, sir.**
19 Q.  Okay.  And when you were promoted to
20 director -- how is it that you were promoted to
21 director, what happened?
22 **A.  I was called down by HR to interview for**
23 **the position.**
24 Q.  Okay.  And did you in fact interview?

**Page 98**

1  **A.  Yes, I did.**
2  Q.  Any other steps other than an interview
3  before you were promoted to director?
4  **A.  No.**
5  Q.  And with whom did you interview?
6  **A.  I don't recall.  It was -- I don't**
7  **recall.  It was down in the seventh floor of the**
8  **Daley Center where HR was at the time.**
9  Q.  Well, did you interview with the sheriff?
10 **A.  No.**
11 Q.  Did you interview with anyone from his
12 executive staff?
13 **A.  You know, I did -- I did meet with**
14 **Sheriff Sheahan.  I did meet with him.**
15 Q.  Prior to being promoted?
16 **A.  Yes.**
17 Q.  Okay.  And this was after you had donated
18 time to his campaigns, correct?
19 **A.  Donated -- yes.**
20 Q.  Okay.  And did anyone else interview for
21 that position that you're aware of?
22 **A.  I'm told that there was some, and that's**
23 **all I know about it.**
24 Q.  Do you know anyone that applied that

**Page 99**

1  was -- that met with the sheriff such as you did?
2  **A.  I don't remember.**
3  Q.  Okay.  And when you became executive
4  director, how did that promotion occur?
5  **A.  I was asked.**
6  Q.  By who?
7  **A.  Brad Curry.**
8  Q.  And who is he?  What was his rank?
9  **A.  He's the chief of staff for Sheriff Dart.**
10 Q.  Okay.  And was anyone else asked to be
11 executive director other than you?
12    MR. WHITE:  Objection.  It calls for
13 speculation.
14    THE WITNESS:  I don't know.
15 BY MR. HERBERT:
16 Q.  Are you aware of anyone that was promoted
17 other than you?
18 **A.  I don't know.**
19 Q.  You don't know if anyone else was, or you
20 don't -- as you sit here today, you can't think of
21 anyone?
22    MR. WHITE:  Object to form.
23    THE WITNESS:  I don't know who was promoted.
24 Is that the answer (sic)?

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 807 of 1503 PageID #:1198

Legrann Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 100**

BY MR. HERBERT:

Q. You don't know anyone else that was promoted to executive director at the time you were other than yourself, correct?

A. Correct.

Q. Okay. And you don't know anyone else that applied to be executive director other than you being promoted to that, correct?

A. I don't know.

Q. Okay. And then how long did you serve as executive director?

A. '16, March of, I think, 2016.

Q. That's when you started, correct?

A. Yes.

Q. When did you finish, I guess, is my question?

A. I retired.

Q. When did you retire?

A. December 31, 2020 -- I'm sorry, '19, 2019.

Q. Okay. And when you were the executive director, the director reported to you, correct?

A. Yes.

Q. Okay. And did your position change at

**Page 101**

any point from when you were appointed executive director to when you retired?

A. Did my position change?

Q. Yes.

A. I mean, I was the executive director in 2016, and I retired as the executive director in 2019.

Q. Okay. So during that time period, you were made executive director, correct?

A. For those three years, yes.

Q. Okay. And your job assignments were the same during those three years, correct?

MR. WHITE: Objection to form.

THE WITNESS: No. No, they were not.

BY MR. HERBERT:

Q. What was the change? When was the change as well?

A. What was the change? The change was more work.

Q. Okay. But you were the executive director of the electronic monitoring unit, correct?

A. I was the executive director of community corrections.

Q. Okay. And did community corrections, did

**Page 102**

that encompass the electronic monitoring unit?

A. Yes, sir.

Q. Okay. And the director of the electronic monitoring unit reported to you, correct?

A. Yes.

Q. Okay. All right. The TSS unit within the electronic monitoring unit, we spoke about that earlier. Do you remember?

A. Yes.

Q. All right. When you were the executive director, was the TSS unit, was that part of the electronic monitoring unit?

A. Yes.

Q. And was it the same when you were the director?

A. No. Wait.

Q. You were the director of the electronic monitoring unit, correct?

A. Yes, sir.

Q. So you were the highest ranking member in the electronic monitoring unit as a director, correct?

A. No.

Q. Who was a higher ranking member in the

**Page 103**

electronic monitoring unit than the director?

A. The deputy executive director was.

Q. Okay. And you were never a deputy executive director, correct?

A. Correct.

Q. You went directly from director to executive director, correct?

A. Yes.

Q. Okay. Who was -- was there a higher ranking member than the deputy executive -- deputy executive director of the electronic monitoring unit?

A. You had then the executive director.

Q. It was my understanding that the executive director has other units other than the electronic monitoring unit, correct?

A. The deputy executive director has other units?

Q. Yes, responsible for other units other than just the electronic monitoring unit.

A. I don't know what the deputy director of electronic monitoring was responsible for.

Q. Okay. When you were the director of the electronic monitoring unit, did you report to the deputy executive director?



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 808 of 1503 PageID #:1199

Gregory Shields  -  8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 104**

1  A.  Yes, sir.

2  Q.  And who was that?

3  A.  I remember one.  There was maybe a few,

4  but I believe his name was Thomas Tansey.

5  Q.  Okay.  And did the -- the deputy

6  executive director while you were the director, do

7  you know if they were responsible for any other units

8  other than the electronic monitoring unit?

9  A.  Yes.

10  Q.  Okay.  So would it be fair to say that

11  while you were in the electronic monitoring unit, the

12  director was the highest ranking member of that unit

13  whose responsibilities were solely the electronic

14  monitoring unit?

15  MR. WHITE:  Object to form.

16  THE WITNESS:  The highest member in the

17  electronic monitoring unit was the executive

18  director.

19  BY MR. HERBERT:

20  Q.  All right.  When you were the director,

21  how was the electronic monitoring unit broken up

22  regarding assignments like we talked about when you

23  became a deputy chief in the electronic monitoring

24  unit?

**Page 105**

1  A.  How were they broken up?

2  Q.  Was there a TSS unit?

3  A.  Yes, there was.

4  Q.  Was there an office unit?

5  A.  Yes.

6  Q.  Was there a patrol unit?

7  A.  Yes.

8  Q.  Okay.  Any other units?

9  A.  A delivery unit.

10  Q.  Anything else?

11  A.  And there was a field unit, like a --

12  they call them home checks and then -- home checks

13  and then a field unit.

14  Q.  And when you served as a director, and I

15  imagine the number changed, fluctuated throughout the

16  years, but how many people, how many deputy sheriffs,

17  sergeants, lieutenants, watch commanders, how many

18  people were there in that unit during your time

19  period?

20  MR. WHITE:  Object to form and foundation.

21  THE WITNESS:  Hundreds.  There was -- no,

22  strike that.  There was more than a hundred.

23  BY MR. HERBERT:

24  Q.  Okay.  And were you allowed to choose any

**Page 106**

1  individuals to come into your unit?

2  A.  No, I wasn't.  No.

3  Q.  Did you ever make requests for people to

4  come into your unit?

5  A.  No.

6  Q.  Were there any management positions

7  within the electronic monitoring unit when you were a

8  director?  And you know what I mean by that,

9  management where people can be assigned there without

10  going through the bid process?

11  A.  That's -- yes, I'm aware of that.

12  Q.  And were there any management position

13  employees when you were director for those ten years?

14  A.  Yes, there was management positions.

15  Yes.

16  Q.  And those management positions were

17  people that could be assigned to that unit without

18  going through the bidding process, correct?

19  A.  Yes.

20  Q.  And those were people that were chosen by

21  management to forego that bidding process and be

22  assigned there directly, correct?

23  MR. WHITE:  Objection to foundation.

24  THE WITNESS:  I don't know what the process

**Page 107**

1  was.

2  BY MR. HERBERT:

3  Q.  Well, somebody that was -- an individual

4  that was going to be part of a management assignment,

5  would that have to be approved by you as a director?

6  A.  I don't understand your question.

7  Q.  Well, you said you had management

8  personnel that worked while you were the director,

9  correct?

10  A.  Yes.

11  Q.  Did you have to -- were you given a list

12  of names of people for the management positions?

13  MR. WHITE:  Objection.

14  THE WITNESS:  No.

15  BY MR. HERBERT:

16  Q.  How is it that these individuals were

17  selected to the management while you were director?

18  A.  I don't have that information.

19  Q.  Did you have any involvement in who was

20  going to be given a management position in any way

21  when you were director?

22  A.  No.

23  Q.  Who made that decision when you were

24  director?



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 809 of 1503 PageID #:1200
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 **A. I don't know.**

2 Q. Would it have been somebody of a higher

3 rank than you?

4 **A. I can speak for myself. I don't know.**

5 Q. Okay. Do you know if it was somebody of

6 a lower rank than you that made the decision who was

7 selected to the management positions?

8 **A. I don't know that.**

9 Q. Did you have to sign off on a list of

10 names of people that were selected to the management

11 positions? Mr. Shields: Oh, I'm sorry.

12 **A. Yeah. I'm just trying to -- I mean,**

13 **there was a list of eligibility for sergeants that I**

14 **looked at.**

15 Q. Okay.

16 **A. I don't recall anything -- or any events**

17 **in reference to your question.**

18 Q. All right. But that list of eligibility

19 sergeants, you said you looked at that, correct?

20 **A. Yes.**

21 Q. And then you had the ability to choose

22 certain individuals off of that eligibility list,

23 correct?

24 MR. WHITE: Objection. Foundation.

Page 108

1 THE WITNESS: I didn't choose no one.

2 BY MR. HERBERT:

3 Q. How did those people go from the

4 eligibility list to being actually on the list?

5 MR. WHITE: Objection to form and foundation.

6 THE WITNESS: You probably -- personnel could

7 probably give you the process.

8 BY MR. HERBERT:

9 Q. Did you ever have any role in somebody

10 becoming a management employee in the electronic

11 monitoring unit at all during the time that you were

12 a director?

13 **A. I don't remember.**

14 Q. Take your time.

15 **A. Thank you. I don't remember.**

16 Q. Okay. Do you remember ever recommending

17 a black deputy sheriff to be placed on a management

18 list while you were the director?

19 MR. WHITE: Objection to foundation.

20 THE WITNESS: No, I don't remember.

21 BY MR. HERBERT:

22 Q. And you don't remember, is that because

23 you never made that request for a black deputy

24 sheriff to be a part of the management list?

Page 109

1 MR. WHITE: Objection. It mischaracterizes

2 testimony.

3 THE WITNESS: I'm not aware of any list. I

4 don't remember.

5 BY MR. HERBERT:

6 Q. Well, the people that were on management.

7 Certainly you became aware of who was a management --

8 who was there based on management as opposed to who

9 was there based on bid. You were certainly made

10 aware of that, correct?

11 MR. WHITE: Objection to foundation.

12 THE WITNESS: What is the question?

13 BY MR. HERBERT:

14 Q. As a director, you certainly were aware

15 of your employees' status in the electronic

16 monitoring unit, whether they were there on bid or

17 whether they were there on management, correct?

18 MR. WHITE: Object to form.

19 THE WITNESS: Yes.

20 BY MR. HERBERT:

21 Q. And you had to approve the management

22 list, correct?

23 **A. No.**

24 Q. You saw the management list prior to it

Page 110

1 being signed off on, fair to say?

2 MR. WHITE: Objection to foundation.

3 THE WITNESS: I don't remember. I don't know

4 your line of question. I don't remember.

5 BY MR. HERBERT:

6 Q. Okay. But you said that you knew which

7 employees were there based upon the management list,

8 correct?

9 MR. WHITE: Objection. It mischaracterizes

10 testimony.

11 BY MR. HERBERT:

12 Q. You can answer.

13 **A. There was no career path and everybody**

14 **that was placed in the electronic monitoring was on**

15 **an exempt position. It was just recently where we**

16 **established a career path.**

17 Q. Okay. While you were the director, you

18 certainly had a roster of all of your employees

19 assigned to that unit, correct?

20 **A. Yes.**

21 Q. And that roster would indicate whether or

22 not that employee was there based upon bid or based

23 upon management, correct?

24 MR. WHITE: Objection to foundation.

Page 111



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 810 of 1503 PageID #:1201

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    THE WITNESS: That roster didn't tell me any
2 of that.
3 BY MR. HERBERT:
4    Q. The roster told you what race the
5 employees were, correct?
6    MR. WHITE: Objection to foundation.
7    THE WITNESS: Yes.
8 BY MR. HERBERT:
9    Q. And you knew what race the employees were
10 when you looked at the management list, correct?
11    MR. WHITE: Objection to foundation.
12    THE WITNESS: Can we go back to your question
13 because I --
14 BY MR. HERBERT:
15    Q. Well, let's stick to this one first and
16 then we can go back to it.
17    A. I would like to clarify the word. I
18 thought you said rank on the roster. Are you saying
19 race?
20    Q. Race, yes.
21    A. I had no knowledge of race.
22    Q. You have no knowledge of the race of the
23 personnel that were assigned to you when you were a
24 director?

Page 112

1    MR. WHITE: Objection. Mischaracterizes --
2    THE WITNESS: No, sir.
3 BY MR. HERBERT:
4    Q. Well, as a director, were you concerned
5 about having a unit that represented the sheriff's
6 department properly?
7    MR. WHITE: Objection to form.
8 BY MR. HERBERT:
9    Q. Do you understand the question?
10    A. No.
11    Q. Well, did you -- was it your goal to have
12 a diverse workforce within the electronic monitoring
13 unit, and by diverse I'm talking about racially
14 diverse?
15    A. It wasn't a goal. It was something the
16 electronic monitoring unit stood for. I mean, we
17 didn't do any other unethical -- you know, look at
18 the daily lineup and say, "Oh, this guy's black." I
19 mean, that's never existed. That's so far from the
20 integrity of the unit.
21    Q. The integrity of the unit certainly
22 wanted to have a diverse workforce within the
23 electronic monitoring unit, correct?
24    MR. WHITE: Objection to form.

Page 113

1    THE WITNESS: That's the sheriff's -- that is
2 the sheriff's mission and yes.
3 BY MR. HERBERT:
4    Q. Okay. And you followed the sheriff's
5 mission, correct?
6    A. I'm a part of the sheriff's office and I
7 support that.
8    Q. Okay. So you were concerned about having
9 a racially diverse employee list within the
10 electronic monitoring unit when you were the
11 director?
12    A. I never used the word concerned. We had
13 a -- one of the top electronic monitoring units in
14 the country, and I was proud to be a part of it.
15    Q. Well, what was the mission that you said
16 the sheriff's office had with regard to diversity
17 within the workplace? What was that mission?
18    A. Our mission was under the federal decree
19 to alleviate the jail population, and once we got
20 that under control, we worked hard to build the unit
21 to where it's at right now.
22    Q. But when you talk about the mission in
23 the sheriff's department, are you saying that that's
24 the only mission the sheriff's department had, that

Page 114

1 you were aware of, was to clear the prison
2 population?
3    A. No, I didn't say that. I said we were
4 under the federal decree, and part of the sheriff's
5 mission, all three of them -- all two of them,
6 Sheahan and Dart, was to alleviate the jail
7 population, and bond reform to release detainees on
8 electronic monitoring. Outside of doing that, we ran
9 an electronic monitoring unit to the best in the U.S.
10    Q. Other than the bail reforms and clearing
11 out the jail, was there any mission regarding a
12 diversity in the workplace, that being a desired
13 position?
14    MR. WHITE: Object to form.
15    THE WITNESS: I'm not aware of any. I'm not
16 aware of any.
17 BY MR. HERBERT:
18    Q. Okay. Well, while you were director, do
19 you know what the racial breakdown was of the
20 electronic monitoring unit during the time period
21 that you were there?
22    A. No.
23    Q. Did you ever look to see what the racial
24 breakdown was?

Page 115



**Gregory Shields - 8/27/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 811 of 1503 PageID #:1202
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  A. No.
2  Q. Did you ever look to see what the racial
3  breakdown was of supervisors?
4  A. No.
5  Q. The different assignments within the
6  electronic monitoring unit while you were the
7  director, were those -- how were those jobs
8  identified, meaning was it through word of mouth or
9  were they written down somewhere in a policy or
10 Collective Bargaining Agreement?
11 A. The assignments were through the CBA, the
12 Collective Bargaining Agreement. You'd bid for your
13 assignment and...
14 Q. And then those that were on management,
15 they would be placed on various assignments by their
16 supervisors, correct?
17 A. Well, they had -- they had a shift and
18 detail and assignment, and they -- they had a shift
19 and detail and assignment also.
20 Q. Right. And they were given an assignment
21 by management, correct?
22 A. I believe that seniority played a role.
23 Either you're working days, afternoons, or midnights.
24 Q. And seniority played a role in the
Page 116

1  various assignments as well, correct?
2  MR. WHITE: Objection to foundation.
3  THE WITNESS: Their assignment is their
4  assignment. I mean, if you're working on the patrol
5  unit, that's where you're working. If you're working
6  in the delivery unit, that's where you're working.
7  If you're working in the TSS unit, that's where
8  you're working.
9  BY MR. HERBERT:
10 Q. And I get that but -- somebody that bids
11 into certain units, that's how they get to their job.
12 What I'm talking about is management. Management
13 assigns them to those particular units, correct?
14 MR. WHITE: Objection. It misstates
15 testimony, and form.
16 THE WITNESS: Well, they are management and
17 they come to work and they -- you know, I mean, it's
18 not like every day they come in and we say, hey,
19 you're working days, now you're working nights, now
20 you're working afternoons. You know, they have to
21 run a watch. They have to run the second or third or
22 midnight watch.
23 BY MR. HERBERT:
24 Q. Right. And I don't mean to cut you off,
Page 117

1  but I just want to make sure we're clear. I'm not
2  talking about various shifts. I'm talking about
3  assignments within those shifts.
4  So based upon that, management
5  assigns those management employees to the assignments
6  they have, correct?
7  A. Correct.
8  Q. Okay. And they assign them to the watch,
9  correct?
10 A. No. They bid for their watch. I mean,
11 you can't come in and work days and then decide to
12 come in and work afternoons.
13 Q. But the management people do not bid into
14 their spot, correct?
15 A. Yeah, I just said that if you have -- you
16 know, the -- if you have the management and, hey, I
17 want to work days, you're not working days because we
18 have a -- that position filled is days. They
19 don't -- so it's kind of like, you know. I don't
20 know how to tell you.
21 You don't go into different watches
22 and different shifts and different details. You're
23 already assigned to the afternoon watch and that's
24 where you're working and that's where you're going to
Page 118

1  get your roster ready and move on.
2  Q. And the assignment within that afternoon
3  watch, that would be based upon management's
4  directive, right?
5  A. Yes.
6  Q. Okay. And that's what I'm getting at.
7  That's what I'm just trying to get from you.
8  And you talked about how seniority
9  is a factor that plays into assignments?
10 MR. WHITE: Objection. It misstates
11 testimony. He never said that.
12 You can answer.
13 THE WITNESS: Seniority doesn't play into
14 assignments. I'll repeat what I said earlier, that
15 the investigators at one particular time in their
16 Collective Bargaining Act had an opportunity to bid
17 for their shift, bid for their detail, and bid for
18 their assignment.
19 BY MR. HERBERT:
20 Q. Okay. But again, I'm not talking about
21 the bidding officers here. I'm talking about the
22 management officers. You said that seniority plays a
23 factor in assignments and watches, correct?
24 MR. WHITE: Objection. It mischaracterizes
Page 119



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 812 of 1503 PageID #:1203
Legrant Winston, et al. v. Sheriff of Cook County Thomas J. Dart, et al.

1 testimony. Again, Dan, you can't say something he
2 didn't say and keep saying he said it, okay? He
3 didn't say that.
4 BY MR. HERBERT:
5    Q. Okay. Well, then let me ask you. What
6 did you say when you were talking about seniority
7 plays a factor in choosing assignments and shifts?
8    MR. WHITE: Again, he never said it. It
9 mischaracterizes testimony.
10 BY MR. HERBERT:
11    Q. What did you say about seniority then?
12    **A. In the Collective Bargaining Act the**
13 **investigators had an opportunity to bid for their**
14 **shift, detail, and their assignment.**
15    Q. Okay. And you're saying with the
16 management officers, they did not bid for those
17 assignments, details, and watches, correct?
18    **A. There was a point where the deputy chiefs**
19 **had bid to their shift and detail. So if an**
20 **individual had 25 years of seniority and he had been**
21 **working days, it's highly unlikely that an individual**
22 **came in with five years' seniority and said, I'm**
23 **working days. Very highly unlikely.**
24    Q. But again you're talking about the bid

*Page 120*

1 process, I'm talking about the management process,
2 strictly that. Does your answer change with the
3 management process?
4    MR. WHITE: Object to form.
5    THE WITNESS: Well, maybe I should understand
6 the definition of management. What is the definition
7 of management?
8 BY MR. HERBERT:
9    Q. Management versus bid positions.
10    **A. Management versus bid positions? Pardon**
11 **me?**
12    Q. You don't understand the difference
13 between those two. Is that your testimony?
14    MR. WHITE: Objection.
15    THE WITNESS: No, I'm asking you.
16 BY MR. HERBERT:
17    Q. What are you asking? Here, no offense,
18 but I don't have to answer questions here. I can
19 clear something up.
20    **A. No, I'm sorry. I totally apologize. I'm**
21 **sorry.**
22    Q. You know what I'm talking about when I
23 say management versus bid position, yes or no?
24    **A. No.**

*Page 121*

1    Q. Okay.
2    **A. And I'm sorry I asked you the question.**
3    Q. That's okay.
4    MR. HERBERT: You know what, this might be a
5 really good time to take a break.
6    MR. WHITE: Yeah, it sounds good. Come back
7 at like 20 after?
8       (Whereupon, a short break
9         was taken.)
10 BY MR. HERBERT:
11    Q. Mr. Shields, we were talking about the
12 management and the bid positions.
13       It's my understanding that at some
14 point there was a change in the Collective Bargaining
15 Agreement with respect to people coming into the
16 electronic monitoring unit versus bids. Is that fair
17 to say? Mr. Shields, can you hear me?
18    **A. Yeah, you asked me if there was a change**
19 **in the bidding positions?**
20    Q. Yes, as far as how individuals came into
21 the unit. Did it change at some point in 2015, 2016?
22    **A. Not that I'm aware of.**
23    Q. Okay. So your understanding, the entire
24 time that you were director and executive director

*Page 122*

1 that the electronic monitoring unit was manned with
2 bid as well as management positions?
3    MR. WHITE: Object to form.
4    THE WITNESS: You needed to bid into the unit
5 through the department of personnel if that answers
6 your question.
7 BY MR. HERBERT:
8    Q. Okay. And that was like that all the way
9 through 2019?
10    **A. Yeah. You had to put -- you had to bid**
11 **into the unit. Yes, you're correct.**
12    Q. Okay. And then those that didn't bid
13 in -- there were people that did not bid in that were
14 in that unit as well, correct?
15    **A. I don't understand your question.**
16    Q. Mr. Shields, am I coming through as a
17 delay?
18    **A. Not that I'm aware of.**
19    Q. Are we using the phone line again,
20 remember because we had the issue with the computer.
21    **A. Yeah, I'm actually sitting in front of**
22 **the phone line right now so you can hear me better.**
23    Q. Got you. Okay. I just want to make sure
24 you can hear me properly.

*Page 123*



Case: 1:18-cv-05726 Document #: 1095-1 Filed: 12/21/20 Page 813 of 1503 PageID #:1204

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

A.  Yeah.  I want to be extremely as helpful as I can and detailed in my answers, and I think my last answer was, yes, you needed to bid into the electronic monitoring unit.

Q.  Okay.  And there was also people in the electronic monitoring unit that were there not through the bid process as well, correct?

A.  You have to be specific.

Q.  Well, what part of that question do you not understand?

A.  Who didn't bid to get in the unit?

Q.  That's what I'm asking you.  Were there any individuals that were in your unit that were not there pursuant to a bid?

A.  Yes.

Q.  And those were people that were there pursuant to management, correct?

MR. WHITE:  Object to form.

THE WITNESS:  Pursuant to management?  I don't know that answer.

BY MR. HERBERT:

Q.  Well, you would agree with me that it was the sheriff's policy while you were employed by the sheriff, that the sheriff wanted to have a happy and

productive workforce?

MR. WHITE:  Object to form and foundation.

BY MR. HERBERT:

Q.  You can answer.

A.  Yeah, I just don't know how to answer when you use the word happy.

Q.  Well, you want your employees to be -- not to be disgruntled as workers preferably, correct?

MR. WHITE:  Objection to foundation.

THE WITNESS:  I mean, yes.  That would be correct, yes.

BY MR. HERBERT:

Q.  Okay.  And included in that is a desire to accommodate individuals as best as possible with respect to shifts that they work, correct?

MR. WHITE:  Objection to foundation.

THE WITNESS:  They had to bid for their shift and detail.

BY MR. HERBERT:

Q.  Okay.  It's not unusual for individuals to request to work a certain bid -- or a certain watch over another watch?

MR. WHITE:  Objection.  Form.

THE WITNESS:  Yeah, that's unusual.  Yes.

BY MR. HERBERT:

Q.  It's unusual that somebody would prefer working one watch over a different watch?

A.  Oh, no.  Now I understand your question.  No, that's -- I think I'm confusing myself.  It's not unusual for somebody to request working a different watch?

Q.  Yeah.  Working a specific watch based on family needs or anything else, correct?

A.  There's a procedure that you should have followed and there are wants and needs of families and medical issues, and we try to accommodate and then get the job done.

Q.  You try to accommodate the employees as best as you can, right?

MR. WHITE:  Object to form.

THE WITNESS:  Yeah, I don't.

BY MR. HERBERT:

Q.  You don't try to accommodate your employees as best as you can?

MR. WHITE:  Object to form and foundation.

THE WITNESS:  There's a lot of resources that the employees can use and we suggest that they use them to the fullest because the department is there

for their wants and needs, and for the most part I'm going to say the department steps up and helps the member if they're in a situation of, let's say, family care.

BY MR. HERBERT:

Q.  Okay.  But as far as when you were a director and executive director, did you ever talk to your supervisors and tell them that they should try and accommodate those that work below them as best as they could?

MR. WHITE:  Object to form and foundation.

THE WITNESS:  I don't understand the word accommodate.  They show up to work, and they're working.

BY MR. HERBERT:

Q.  Okay.  Well, what if somebody preferred to work one assignment over another?  If it was able to be done, certainly you would try to accommodate that worker with respect to the job that they work, correct?

MR. WHITE:  Objection to form and foundation.

THE WITNESS:  No.

BY MR. HERBERT:

Q.  During the time that you were a director



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 814 of 1503 PageID #:1205
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 or an executive director, was any request ever made
2 to you regarding somebody's desire to work a certain
3 job assignment?
4    A.  I don't remember.
5    Q.  How about when you were like deputy
6 chief, do you remember anyone making any request to
7 you to work a specific job assignment over a
8 different one?
9    A.  No, at that particular time you bid for
10 your assignment.
11    Q.  Okay.  I thought you bid for your
12 assignments in 2016, as well as 2006?
13    MR. WHITE:  Objection.  Mischaracterizes
14 testimony.
15    THE WITNESS:  No.
16 BY MR. HERBERT:
17    Q.  Is it your testimony that from 2006 until
18 you retired in 2019 that people did not bid to get
19 into the unit for the electronic monitoring?
20    A.  No.
21    Q.  No, they did not?
22    A.  I answered no to the question, but if you
23 could repeat the question.
24    Q.  All right.  I'm just trying to clear this

Page 128

1 up because when I just started this, I said, isn't it
2 true at some point it changed where people were
3 assigned to the electronic monitoring unit not via
4 bid but through a management procedure, and your
5 testimony was, no, that never changed.  Is that
6 correct?
7    A.  My apologies, but I'm confused.
8    Q.  Let me help clear up the confusion.  What
9 are you confused about?
10    A.  The line of questioning, I'd like you to,
11 in all due respect, if you could just like...
12    Q.  You know, I'm sorry.  I don't know how to
13 make it more clear.  If you can tell me what you're
14 confused about, I would be more than happy to do my
15 best to clear it up.
16    A.  Could you reask me the question?  Would
17 that be too much, in all due respect?
18    Q.  From 2006 until you retired, did
19 members bid into that position in the electronic
20 monitoring unit?
21    A.  Yes.  Yes, they did.
22    Q.  Okay.  Were there any members during that
23 time period that came to the electronic monitoring
24 unit through any other process other than bid?

Page 129

1    A.  From 2006 until I retired, did any
2 members come into the unit prior to bid?
3    Q.  No.  No, without bidding.
4    A.  Through the union?
5    Q.  Through anyone.  Was anyone there not
6 because they bid there?
7    A.  Yes.
8    Q.  Okay.  And those are the management
9 people, correct?
10    A.  Yes.
11    Q.  Okay.  But see, I've asked that question
12 several times and I'm getting different answers to
13 it, so I want to make sure that we're clear on this
14 because it's really prolonging the deposition.
15    MR. WHITE:  I'm going to object.
16    THE WITNESS:  Mr. Herbert, definitely I'm not
17 here to prolong anything.  Anything I can help you
18 with, I am an open book.  Whatever you need.  I will
19 stay, I'll come to your office, whatever you need.
20    MR. WHITE:  Counsel, you're clearly --
21    THE WITNESS:  I'm the last one to confuse
22 anybody.
23    MR. WHITE:  Greg, just hold on.
24    Counsel, you're not asking the same

Page 130

1 thing.  You're talking about who bid in, and you're
2 talking about bidding assignments.  Those aren't the
3 same thing.  You're asking multiple different
4 questions here, and that's why you're getting
5 different answers.
6    MR. HERBERT:  Okay.
7 BY MR. HERBERT:
8    Q.  From 2006 until 2019, how were people
9 assigned a particular watch?
10    A.  They bidded for it.
11    Q.  Okay.  Were there any people -- go ahead.
12    A.  Do you know what the watch is, second --
13 days, afternoons, or midnights.
14    Q.  Yes.  My question is:  Was every person
15 that worked in electronic monitoring from 2006 to
16 2019, were they there pursuant to a bid?
17    A.  Every member?
18    Q.  Yes.
19    A.  No.
20    Q.  And those were people -- the people that
21 weren't there via bid were there via management,
22 correct?
23    A.  Yes, sir.
24    Q.  Okay.  That's all I'm trying to get out

Page 131



Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 815 of 1503 PageID #:1206
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 here.

2         And the people that were there via

3 management, they were placed into shifts by

4 management, correct?

5     MR. WHITE:  Object to form.

6     THE WITNESS:  I think that's the same

7 question, but I believe you asked me the people that

8 were in management were placed there by management?

9 BY MR. HERBERT:

10    Q.  Yes.

11    **A.  I honestly don't understand that.**

12    Q.  Okay.  The different job assignments, is

13 it your testimony that everyone was able to bid for

14 the job assignment that they wanted during the time

15 period from 2006 until you retired?

16    MR. WHITE:  Objection.  It mischaracterizes

17 testimony.

18    THE WITNESS:  No.

19 BY MR. HERBERT:

20    Q.  All right.  Explain that then.  How were

21 the -- strike that.

22         How were the assignments given to

23 the employees of the electronic monitoring unit?

24    **A.  In the Collective Bargaining Act they had**

1 **a clause in their Collective Bargaining Act that**

2 **would allow them to bid for shift detail and**

3 **assignment.**

4    Q.  Okay.  So if somebody bid for a

5 particular assignment, then they can't be moved off

6 the assignment, correct?

7    **A.  They can be moved.**

8    Q.  Okay.  Who can move them?

9    **A.  As the workload dictates and we needed to**

10 **get -- get it done, the -- you call them managers.  I**

11 **call them, you know, the staff members.  How do I**

12 **explain this?**

13         **If they released 300 people from the**

14 **jail, it would take everybody in the unit to process**

15 **them and get them out.  We knew specifically if we**

16 **had a good day or a bad day depending on the judge**

17 **that was in bond court.  So, you know, we had people**

18 **that wanted to work overtime and people that, you**

19 **know, just did an outstanding job.**

20    Q.  Okay.  So people that wanted to work

21 overtime, they would be given the overtime if it was

22 there?

23    **A.  Seniority based.  Every day there would**

24 **be a seniority list, and if you worked yesterday,**

1 they would have to ask me.

2    Q.  And if somebody didn't want the overtime,

3 obviously the staff members would have to go and find

4 out everyone that wanted to work overtime, correct?

5    MR. WHITE:  Object to form and foundation.

6    THE WITNESS:  Yes.  You have to ask.

7 BY MR. HERBERT:

8    Q.  Yeah.  You wouldn't force somebody to

9 work overtime if you can meet all your operational

10 needs by people that wanted to work overtime,

11 correct?

12    **A.  Correct.  If we had staff, we wouldn't**

13 **have to force no one.**

14    Q.  And aside from that unusual situation

15 where 300 people were bonded out in one particular

16 day, other than that, the staff members were directed

17 to -- to allow people to work the assignments that

18 they want, correct?

19    MR. WHITE:  Objection to foundation and form.

20    THE WITNESS:  No, that's not correct.

21 BY MR. HERBERT:

22    Q.  Okay.  What was the process then for

23 determining what particular sheriffs were assigned to

24 what particular duties?

1    **A.  When are you talking about?**

2    Q.  Well, we'll keep this whole time frame

3 from 2006 until 2019 unless I change it.  How's that?

4    **A.  Okay.**

5    Q.  Okay?

6    **A.  Yes, sir.**

7    Q.  Can you answer that question?

8    **A.  It was about assignments and how people**

9 **were given assignments?**

10    Q.  Yes.

11    **A.  The watch, the first, second, or third**

12 **watch, days, nights, or midnights, would show up.  We**

13 **would have a roster, and we would put people in**

14 **positions to fulfill the wants and needs of the**

15 **department.**

16    Q.  And who made the decision to put which

17 personnel in which department?

18    MR. WHITE:  Object to form.

19    THE WITNESS:  Can I answer?

20    MR. WHITE:  Yeah, if you understand.

21    THE WITNESS:  Yeah.  The deputy chiefs and

22 the chiefs.  They had a -- you know, they put it

23 together that -- we had work, a lot of work.

24

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 816 of 1503 PageID #:1207

Gregory Shields  -  8/27/2020

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q. Okay. And the deputy chiefs and the chiefs, they worked for you when you were the director, correct?

A. I was the director, yes.

Q. Okay. And did you give them any advice on how they were to make the assignments, the daily assignments?

A. No.

Q. Did you ever have any discussion with them about what their thought process was into making the daily assignments?

A. Yes.

Q. Tell me about that.

A. We would look at the arrests prior to -- the day before, knowing how many people were in bond court, knowing how many people were on the judge -- not the judge, knowing how many people were given I-bonds and electronic I-bonds and we would -- we would, you know -- I would get -- I would get the daily totals of who came in of the surrounding districts, if somebody was newsworthy, and then we would kind of plan how much staff we need, how many vehicles we needed, who was going to prepare the

Page 136

information, and who was going to deal with the general population on electronic monitoring, and it was -- I can remember that we were short-staffed, and I believe we gave it a college effort to try to get the job done.

Q. And just so I'm clear, what about that scenario that you just spoke of, what about that scenario, how does that affect the job assignments?

A. I don't know how it affects the job assignments. I mean...

Q. Well, you just testified that that would be an example of how it would -- one of the things that were talked about with your supervisors about making assignments. So, I guess, my question is: What about that scenario was talked about with respect to making assignments?

A. Well, we would talk about, hey, the 26th and California judge whoever was on the bench only released three individuals today for electronic monitoring, so give it some thought on how many staff you're going to put down there, or, you know, the gun offenders are increasing. Let's see if we can increase the home checks on the gun offenders and see if we can put staff there.

Page 137

There's somebody in custody right now in the hospital. See if we can get a car over to the hospital to sit on him, you know. So that's probably what we did on a daily basis to try to allocate staff as best we could.

Q. All right. And were you aware at any time that you were director and executive director about any employees desiring to work -- or strike that, requesting to work one assignment over another?

A. No.

Q. Did you ever ask your supervisors whether or not certain employees wanted to work one assignment versus another?

A. No, I didn't ask them. No, I mean it's...

Q. Was there ever any consideration discussed between you and your supervisors about allowing people to work the assignments that they wanted to work if it was feasible?

A. What does feasible mean?

Q. Well, if it was not one of those emergency situations that you spoke of about the number of people coming out of bond court.

A. Well, I apologize if it was misleading,

Page 138

but there is really no emergency. We just had an opportunity to place these people on electronic monitoring and, you know, I can say we did a pretty good job. When we gave somebody an assignment, it wasn't a request. You know, it has to get done, I mean.

Q. Okay. And so your instruction was you put people wherever you want to put them regardless of what the employees are preferring as far as a position?

MR. WHITE: Objection. It misstates testimony.

You can answer.

THE WITNESS: Yeah, I never even said that.

BY MR. HERBERT:

Q. All right. Well, then let me ask you a question. Did you take into consideration employees' preferences for certain assignments when your supervisors would make out the daily assignments?

A. No.

MR. WHITE: Objection. Asked and answered.

BY MR. HERBERT:

Q. Okay. And why is the answer no, because you did not -- you didn't care to, or what's the

Page 139



Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 817 of 1503 PageID #:1208
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 reason?

2 **A. I don't have a reason. I didn't**

3 **specifically say to my supervisors do this, this,**

4 **this, this. It was daily operations.**

5 Q. Was it your -- I'm sorry if you're still

6 going.

7 **A. No, I'm finished.**

8 Q. Okay. Was it your understanding that all

9 the employees in the electronic monitoring unit

10 worked an equal amount in each of the assignments

11 within that unit?

12 **A. What's equal assignments? We didn't --**

13 **we gave one assignment out, and when they finished**

14 **that one, we gave them another one. There was no**

15 **equal.**

16 Q. Okay. I'm talking about the different

17 assignments within the electronic monitoring unit

18 that we talked about like the TSS.

19 **A. Yes, sir. I'm clear with it.**

20 Q. Okay. My question is -- I forget what my

21 question was. But was there any consideration given

22 to individuals that wanted to work one assignment

23 versus the other? Strike that.

24 I know what my original question

*Page 140*

1 was. It was: Was it your policy and expressed to

2 your supervisors that all the employees in the

3 electronic monitoring unit were to work in all the

4 different assignments that we just spoke about

5 equally, or what was the policy?

6 MR. WHITE: Objection to foundation and form.

7 THE WITNESS: The policy through the union

8 negotiations removed the assignment. The policy was

9 stated you now can only bid for your shift and your

10 detail, so the Collective Bargaining Act was changed.

11 BY MR. HERBERT:

12 Q. Okay. And when did that occur?

13 **A. I don't recall.**

14 Q. So prior to that change, everyone was

15 allowed to work the positions that they wanted to

16 pursuant to the bid process, correct?

17 MR. WHITE: Objection. It misstates

18 testimony.

19 THE WITNESS: No, that's not correct.

20 BY MR. HERBERT:

21 Q. What's not correct about that?

22 **A. If I remember your question, you said to**

23 **me prior to that everyone got to work where they**

24 **wanted?**

*Page 141*

1 Q. The assignments within the electronic

2 monitoring unit.

3 **A. And that's prior to 2006?**

4 Q. No, prior to you said this change in the

5 Collective Bargaining Agreement that occurred

6 regarding assignments.

7 **A. Yeah, the union, their union negotiated**

8 **with legal over in our department and the chief union**

9 **steward said you no longer can bid for your**

10 **assignment.**

11 Q. Again if I can, my question -- I'm not

12 really concerned with, you know, the negotiations and

13 how it came about.

14 My question is: Prior to this

15 change in the Collective Bargaining Agreement, the

16 employees of the electronic monitoring unit worked

17 the assignments that they wanted, that they bid to,

18 correct?

19 **A. Negative. I'm not aware of that.**

20 Q. Okay. Did they work the assignments that

21 they bid to?

22 **A. When they bid to their assignment, they**

23 **were sent to that assignment.**

24 Q. Okay. And then they worked in that

*Page 142*

1 assignment, correct?

2 **A. Correct.**

3 Q. Okay. And then after this change in the

4 Collective Bargaining Agreement, then -- is it your

5 testimony that then people would be subject to

6 assignments based upon management's decision?

7 **A. They lost the ability to bid for the**

8 **assignment.**

9 Q. I get that. So then how were they

10 assigned after they lost that ability?

11 **A. We went back to the union and said,**

12 **there's a tremendous amount of investigators here**

13 **that are comfortable and happy with their assignment.**

14 **Could we have a subsection in there where they could**

15 **bid for their assignment?**

16 Q. Okay. Did that happen?

17 **A. No. "I don't want any specialty**

18 **positions in the electronic monitoring. An officer**

19 **is an officer is an officer, nothing special," which**

20 **kind of affected the streamline of the unit and we**

21 **tried to ask for it back because it worked.**

22 Q. When you said I don't want any specialty,

23 was that something --

24 **A. I didn't say that.**

*Page 143*



Gregory Shields   -   8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 818 of 1503 PageID #:1209
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Q.  Hold on, sir.

2    A.  I'm sorry.

3    Q.  That's all right.  Who were you saying
4  made that statement?  Was that you or somebody else?

5    A.  The union, the chief union steward.

6    Q.  Okay.  And you wanted, that was -- you
7  wanted to have people that had specialties and were
8  assigned to particular units, right?

9    A.  I never called it specialties.  I called
10  it a bid assignment, and if you bid to your
11  assignment, that's where you worked, and there was
12  guys that got set in their own ways, and the union
13  said no.

14    Q.  Okay.  So that's what I'm trying to get
15  at here.  So after the union said no and people were
16  working in the assignments that they became accustom
17  to, how were they given assignments after that
18  change?

19    A.  At roll call.  If you were on the first
20  or second or third watch understanding that days,
21  afternoons, or midnights depending on the workload.

22    Q.  I'm not saying the specifics of how it
23  happens, but who makes -- how is that decision made
24  as to which deputies were assigned to which

Page 144

1  assignments?

2    A.  It was in accordance to the workload.  I
3  mean, there was -- I only can refer back to like bond
4  court.  If there was a -- if the judges let the
5  heavens out, everybody would be trying to get them
6  out.

7    Q.  And what would that do to the
8  assignments?  People would be needed to be assigned
9  to a particular task on that day?

10    A.  Yes.

11    Q.  Where would that be?

12    A.  You would be in receiving.  You would
13  be -- on a heavy day where we needed to get everybody
14  out, your assignment would be to receiving.

15    Q.  Okay.  Would that be like an off --
16  considered an office assignment?

17    A.  It would be both because we required you
18  to, you know, escort your prisoners, and there would
19  be a couple of guys that have to do that and bring
20  the prisoners back over to receiving, and it would be
21  like a domino effect.  People would be upstairs in
22  records clarifying bonds and other agencies would be
23  trying to -- you know, say they have warrants and you
24  work with the warrant clerk, and then you say -- you

Page 145

1  know.  Then you would get people who couldn't make it
2  out and we had a team to bring them back to jail.
3  Then we would have a team processing them, calling
4  their loved ones, and that would be guys downstairs,
5  and making phone calls, and then we would have
6  delivery vans and delivery teams, and then we would
7  have follow-up cars to follow these guys, so it
8  was...  That was one heavy day.

9    Q.  Okay.  Aside from there being a heavy day
10  in bond court, what other factors would require an
11  assignment more heavily to one area than the other?

12    A.  More heavily to one area than another?
13  So I'm going to tell you that when there's people
14  that need to be released on electronic monitoring,
15  I'm going to say that they would route the vans, they
16  would route them north, south, east, west or suburbs,
17  and we would have maybe two and a half vans going
18  south, we would have one van going north, and then we
19  had a central van delivering to all the suburbs.

20       So there would be the detainees in a
21  delivery van going to the south side often versus the
22  north side.  It's just the lay of the land.

23    Q.  Okay.

24    A.  And then there would be, you know, the

Page 146

1  compassionate discharges that they would release and
2  we would have to run the whole city and split up and
3  deliver detainees.

4    Q.  Okay.  So if I get it, there's a scenario
5  where there's a high number of individuals that were
6  bonded out which would require the shifting of
7  assignments, and then there's also the scenario where
8  there's a high number of individuals that are going
9  to be taken off EM which would require a change in
10  assignments.  Is that fair?

11    A.  I don't know nothing about taking people
12  off of EM, but I can tell that -- I think to respond
13  to your question, was there more in one area than
14  another, that answer is yes or...

15    Q.  I don't understand that.  More in one
16  area than the other, what does that mean?

17    A.  Didn't you just ask me about is there
18  more assignments in one area than another?

19    Q.  Yes.

20    A.  And I answered yes, and I was trying to
21  give you an example of how there could be more
22  assignments.

23    Q.  I get it.  Okay.  I understand you.

24       Now, the TSS assignment, what was

Page 147



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 819 of 1503 PageID #:1210
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that assignment when you were there as a director and
2 an executive director?
3     A. It probably hasn't changed. I mean, it's
4 still the same.
5     Q. Why don't you tell me what it is?
6     A. It's receiving.
7     Q. Receiving prisoners?
8     A. Yeah. It's where all the prisoners get
9 routed from bond court and then the process starts.
10 I believe they -- in the morning they get interviewed
11 by pretrial services, the State's attorneys and then
12 the public defenders, and then they get a
13 recommendation, they go to bond court. In bond court
14 they get an assessment from the judge, whoever gets
15 electronic monitoring and then we get that master
16 list, and our guys go to receiving and, you know,
17 they have a -- they have a responsibility to go down
18 to get those prisoners, bring those prisoners back to
19 receiving and start the process of getting them out
20 on electronic monitoring.
21     Q. How many people were generally assigned
22 in one particular 24-hour period to the TSS
23 assignment?
24     MR. WHITE: Object to foundation.

Page 148

1     You can answer.
2     THE WITNESS: Six.
3 BY MR. HERBERT:
4     Q. So would it be two on each watch?
5     A. No.
6     Q. Explain it to me then.
7     A. Six individuals would be assigned to the
8 TSS unit to process the prisoners that come out of
9 bond court and then -- there may be another lane
10 in there where they -- there's a new receiving room
11 across the hall, but for the purposes of identifying,
12 they would have to go down to Division 6 and get the
13 detainees that were processed that evening.
14     Q. So those six individuals, do they all
15 work the second watch?
16     A. No.
17     Q. There's three watches that the TSS
18 assignment encompasses, correct?
19     A. Yes, sir. No, what did you ask me? I
20 answered too first.
21     Q. The TSS assignment, is that for
22 midnights, afternoons, and days?
23     A. No.
24     Q. All right. When is the TSS assignment,

Page 149

1 for what watches?
2     A. I'm going to say the afternoon watch.
3 Yeah, for the afternoon watch. Periodically, you
4 know, if there's a computer down or something, it may
5 run into the midnight watch.
6     Q. Okay. But absent some type of emergency,
7 only individuals on the afternoon shift worked TSS,
8 correct?
9     A. Absent an emergency. I don't know if you
10 would call that an emergency.
11     Q. However you want to characterize it.
12     A. I mean, we would send people down there
13 during the day watch because, you know, they were --
14 they needed to be placed on electronic monitoring.
15 They had a bond and they paid the cash. I don't know
16 if it was an emergency, but there were people that
17 were sent down there on the second watch and the
18 third watch which is afternoons.
19     And, you know, to give you a
20 reasonable response is there was people that we
21 worked all day and night to get out.
22     Q. Right. But you assigned people to TSS
23 from the afternoon shift because that's typically the
24 shift that would be required to complete the

Page 150

1 assignments of the TSS, correct, the afternoon shift?
2     A. That's correct for all three watches.
3     Q. Okay. But the TSS shift, it was -- or
4 strike that.
5     But you told me that there weren't
6 people assigned from the midnight and the day shift,
7 that it was people from the afternoon shift that
8 manned the TSS assignments. Is that correct?
9     A. Yes, sir. The majority of the processing
10 and delivering these guys was done on the third
11 watch. I think it was 3:00 to 11:00.
12     Q. Okay.
13     A. I could be wrong. I could be wrong.
14 Maybe 4:00 to 12:00.
15     Q. Okay. And absent some situation that you
16 weren't prepared for, such as a heavy amount of
17 people, you know, either bonding out or coming out of
18 EM, the second and third watch would not assign
19 individuals to the TSS assignment, correct?
20     A. I mean, I don't know how to answer that.
21 We would come in and there would be people that need
22 to be processed and they would say, I need you to go
23 down to TSS and process someone. You never know when
24 these individuals are going to pay a bond or the

Page 151



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 820 of 1503 PageID #:1211
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 lawyer comes to court and gets a court order and
2 release him now.
3          Yes, it was commonly that we worked
4 on the third watch, but it's not uncommon to process
5 these guys on the second watch and the midnight
6 watch.
7      Q.  Okay.  Are you aware of any employees for
8 the electronic monitoring unit that never worked in
9 the TSS unit?
10     A.  No.  I would be guessing.  No, I'm not
11 aware of that.
12     Q.  Would it surprise you if there were
13 individuals that never worked in that unit?
14     MR. WHITE:  Objection.  It assumes facts not
15 in evidence.
16          You can answer.
17     THE WITNESS:  I don't easily -- should I
18 answer?
19     MR. WHITE:  Yeah, you can answer.
20     THE WITNESS:  I don't get easily surprised.
21 It wouldn't -- I wouldn't, you know, say, oh, wow,
22 you know.  I don't get easily surprised.  I mean,
23 it's not laughable.  I don't have a response.
24
                                              Page 152

1 BY MR. HERBERT:
2      Q.  Well, how would that happen then if
3 somebody were to have worked there for five years and
4 they were never assigned to the TSS unit, how would
5 that occur?
6      MR. WHITE:  Object to form.
7      THE WITNESS:  I don't have that answer.  I
8 don't know.
9 BY MR. HERBERT:
10     Q.  So you think it would be -- there would
11 be no -- there would be no reason that you can think
12 of that something like that would happen, correct?
13     MR. WHITE:  Objection.  It misstates
14 testimony, assumes facts not in evidence, form.
15          You can answer.
16     THE WITNESS:  I don't -- I don't have any
17 knowledge of somebody not working down there for
18 five years.
19 BY MR. HERBERT:
20     Q.  Did you ever --
21     A.  I was glad the job got done.
22     Q.  Were you ever aware of any individuals
23 that expressed a desire not to work in TSS?
24     A.  No.
                                              Page 153

1      Q.  Well, you know my clients, correct?
2      A.  Who are they?
3      Q.  Where is the TSS located at the jail?
4      A.  In receiving, in Division 5.
5      Q.  Okay.  And you indicated -- is that in
6 the basement area?
7      MR. WHITE:  Objection.  Asked and answered.
8      THE WITNESS:  Yes.
9 BY MR. HERBERT:
10     Q.  Okay.  The basement, right?
11     MR. WHITE:  Objection.  Asked and answered.
12     THE WITNESS:  I don't refer to it as a
13 basement, so I'll refer to it as the receiving room,
14 Division 5.  It's been there for about 45 years.
15 BY MR. HERBERT:
16     Q.  The bottom floor, correct?
17     A.  Like I said, just to be respectful, if
18 you -- you know, if you were to tell somebody at 26th
19 Street, hey, I need to bond out, my buddy is in
20 receiving, the sheriff's office employee may know
21 that.  If you were to suggest to a sheriff's office
22 employee, hey, I've got to bond myself out from the
23 basement, it's a matter of --
24     Q.  Got it.  No floors below it, correct?
                                              Page 154

1      MR. WHITE:  Objection.  Asked and answered.
2 BY MR. HERBERT:
3      Q.  Go ahead.
4      A.  I'm going to say no.  No.  No.
5      Q.  All right.  And there's no windows down
6 there, correct?
7      A.  No, no.  No windows.
8      Q.  And it's filled with prisoners pretty
9 much 24 hours a day, correct?
10     A.  No.
11     Q.  It's filled with prisoners though,
12 correct?
13     A.  No.
14     Q.  That's where the prisoners go, correct?
15     A.  No.
16     Q.  It smells down there poorly, correct?
17     A.  No.  I mean, they've got a sanitation
18 crew down there that gives it a good effort.
19     Q.  Is your office -- was it ever down there?
20     A.  Yes.
21     Q.  When was your office down there?
22     A.  Years ago.
23     Q.  How many years ago?
24     A.  Oh, boy.  15 years ago I was in the
                                              Page 155



Case: 1:18-cv-05726 Document #: 1095-1 Filed: 12/21/20 Page 821 of 1503 PageID #:1212

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 **Division 5, in the processing unit.**
2 Q. Okay. While you were a director, was
3 your office ever down there?
4 **A. No.**
5 Q. While you were an executive director, was
6 your office ever down there?
7 **A. No.**
8 Q. Does your office have windows?
9 **A. My office, yes.**
10 Q. Okay. And what floor is your office on?
11 **A. It was on six.**
12 Q. Okay. And the units -- or the
13 assignments other than TSS, where were those
14 assignments? What floors did they report out of?
15 MR. WHITE: Objection to form and foundation.
16 THE WITNESS: I don't understand.
17 BY MR. HERBERT:
18 Q. You don't understand my question?
19 **A. Yes.**
20 Q. Other than the TSS assignment, were any
21 other assignments in that bottom floor area that I'll
22 refer to as a basement?
23 **A. Everyone came to roll call.**
24 Q. That's not my question though.

Page 156

1 **A. Okay. I'll be specific. I apologize.**
2 Q. Do you need me to reask it?
3 **A. Please.**
4 Q. Were any other assignments in what I'll
5 characterize as the basement other than TSS?
6 **A. Yes.**
7 Q. What else?
8 **A. Records.**
9 Q. How many people were assigned on a
10 particular watch to the records division or records
11 assignment?
12 **A. At the time I'm going to -- oh, boy.**
13 **Three, four.**
14 Q. And what was the number of individuals
15 assigned to the respective watches? And I understand
16 it may change from night to night and year to year,
17 but generally speaking, what was the percentage of
18 people employed?
19 **A. Over a hundred.**
20 Q. But, I mean, typically on a first watch,
21 how many people were on the first watch working that
22 day, not individuals on day off?
23 **A. Give or take, 25.**
24 Q. Okay. And how about the second watch?

Page 157

1 **A. That's each watch. I mean, I can't be**
2 **specific. I'm going to say maybe 25 to 30 each**
3 **watch.**
4 Q. Okay. And there would be -- in the
5 second -- or the afternoon which would be third
6 watch, correct?
7 **A. Yes, sir.**
8 Q. There would be six people assigned to the
9 TSS assignment generally out of that 30 -- what did
10 you say, 30 or 25 members work in each watch?
11 **A. I thought you asked me not to be**
12 **specific, so with time off, compensation time,**
13 **medical, vacation, duty injuries, there could be a**
14 **minimum of 20, or when we had people healthy, there**
15 **could be a maximum of 25.**
16 Q. Okay. So out of those 20 to 25 people on
17 third watch, six of them their assignment would be
18 TSS, correct?
19 **A. It would specifically be determined on**
20 **the workload.**
21 Q. Okay. Assuming a normal workload, six
22 individuals?
23 **A. Yeah, that's fair to say. Yes.**
24 Q. Okay. And then the remaining people, any

Page 158

1 of those people -- or strike that.
2 How many of those people would be
3 assigned to the records department in the basement on
4 the third watch?
5 **A. Well, it was like a combined -- you know,**
6 **I mean, if you're processing an individual and you**
7 **find some irregularities and he's got a bond, you**
8 **need to get some clarification, so you would have to**
9 **go up to records, and I believe we had two, maybe**
10 **three individuals in records that would say, okay,**
11 **thank you. He would head back down to TSS and the**
12 **people up in records would clarify it and bring it**
13 **down.**
14 Q. So there would be two or three people up
15 in records on the third watch. Is that your
16 testimony?
17 **A. That would be fair to say, yeah.**
18 Q. Okay. You said they would have to go up
19 to records, so they would have to go up to a
20 different floor?
21 **A. Yeah, they would have to go up to a**
22 **different floor.**
23 Q. You testified earlier that records was in
24 that bottom floor the same as TSS. That wasn't

Page 159



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 822 of 1503 PageID #:1213
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 right, was it?

2   A.  No, that was correct.

3   Q.  Then I don't understand how can -- if it

4 was on the same floor as TSS, why would they be

5 required to walk up a floor to speak to individuals

6 in records?

7   A.  Because if they had a -- if an individual

8 had to surrender his passport, we probably wouldn't

9 have that information.

10   Q.  Again I'm not worried about the details

11 of the reason why they have to go to records.  My

12 question is much more specific.

13       If records were on the basement

14 level the same as the TSS, why would the individuals

15 from TSS have to walk up a floor to go to records?

16   A.  Without explaining it to you, I don't

17 know what type of response I could give you.

18   Q.  Why would they walk up a floor to go to

19 records if records was on the same floor as them in

20 the basement?

21   A.  Records -- when we had EM records, we had

22 the ability just to go get the information we wanted.

23 The EM records was combined with all the DOC records.

24   Q.  I'm not concerned about that.  I'm not

Page 160

1 I have John Doe's file, or can you look through it

2 for me?

3 BY MR. HERBERT:

4   Q.  Okay.  And the people in the records

5 department, they were part of the 20 to 25

6 individuals that would be working on a particular

7 watch?

8   A.  Yes.

9   Q.  Out of that 20 to 25 individuals that

10 were assigned to records, how many of them worked in

11 the basement?

12   A.  I'm sure the majority of them worked in

13 the basement.

14   Q.  The majority.  How many people worked in

15 records on a given shift?

16   A.  At the time when we had records, ten.

17   Q.  Okay.  And how many would work upstairs

18 in the office that you spoke about?

19   A.  That's what I'm speaking about.  Records

20 was centrally located in our office in the beginning.

21 They now merged to records above the basement, so you

22 either had to walk or go up a flight of stairs to get

23 certain information you needed.

24   Q.  Okay.  I would like to go to Exhibit A

Page 162

1 concerned about the reason they go up and speak to

2 them.  I'm not concerned about what's contained up

3 there.

4       You testified that the records

5 department was in the basement -- or I'm sorry, the

6 bottom floor, the same as the TSS, and now you're

7 testifying that the TSS individuals would have to go

8 upstairs to go to the records department.  I'm asking

9 you to explain that discrepancy, not the reason why

10 somebody would go up to records.  I don't care about

11 that right now.

12   MR. WHITE:  Counsel, that's what he's trying

13 to do, but you keep cutting him off.  So maybe if you

14 let him finish his explanation, you'll understand.

15   MR. HERBERT:  Okay.

16   MR. WHITE:  Go ahead, Greg.

17   THE WITNESS:  At one particular time we had

18 records at our office, in the TSS and the different

19 units that we moved to.  We had the availability to

20 go up and pull the file.  We lost that availability

21 because they wanted all the records in one stop

22 shopping upstairs.

23       So, yes, the investigator would have

24 to go upstairs to the records department and say, can

Page 161

1 which is the complaint in this case.  Mr. Shields, do

2 you have that in front of you?

3   MR. WHITE:  No, he doesn't have any exhibits

4 in front of him.

5   THE WITNESS:  No, I don't.

6   MS. KRAUCHUN:  Can the tech have -- is there

7 a tech on the line?

8 BY MR. HERBERT:

9   Q.  Okay.  Mr. Shields, do you see what we

10 have there marked as Exhibit A?

11   A.  Yeah.

12   Q.  Okay.  And I misspoke.  This is the

13 answer and amended affirmative defenses to the

14 complaint, not the actual complaint, but for all

15 purposes, it has the same content as the complaint

16 does without the answers.

17       So you see up in the top there where

18 it's got the list of plaintiffs' names?

19   A.  Yes.

20   Q.  Okay.  Do you know Legrain Winston?

21   A.  Yes.

22   Q.  And do you know Michelle Strickland?

23   A.  Yes.

24   Q.  Do you know Vernell Tims?

Page 163



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 823 of 1503 PageID #:1214
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  A. Yes.
2  Q. Do you know I.V. Newson?
3  A. Yes.
4  Q. Do you know Samuel Page?
5  A. Yes.
6  Q. Do you know Wilford Ferguson?
7  A. Yes.
8  Q. Cecil Williams?
9  A. Yes.
10  Q. Anthony Manning we're not going to talk
11 about today. He's been dismissed, I believe.
12      Do you know David Walker?
13  A. Yes.
14  Q. Do you know Tyrone McGhee?
15  A. Yes.
16  Q. And do you know Victor Slaughter?
17  A. Yes.
18  Q. And how is it that you know these
19 individuals?
20  A. They all work for the Cook County
21 Sheriff's Department.
22  Q. Okay. And do you know them personally?
23  A. No.
24  Q. Have you had interaction with any of

Page 164

1 them?
2  MR. WHITE: Objection to form.
3  THE WITNESS: No.
4 BY MR. HERBERT:
5  Q. Have you ever spoken with any of them?
6  A. Yes.
7  Q. Who?
8  A. Through my career all of them.
9  Q. Okay. And you supervised them, correct?
10  A. Yes. Yes.
11  Q. And they've worked under your direction,
12 correct?
13  A. Yes.
14  Q. Okay. And did you ever evaluate any of
15 these individuals as far as their work performance?
16  A. No.
17  Q. Were you ever -- did you ever sign off on
18 any evaluations concerning their work performance?
19  A. No.
20  Q. Were you aware of what type of work these
21 individuals did, as far as the quality of work while
22 they worked under your command?
23  MR. WHITE: Objection to form.
24  THE WITNESS: I know they were assigned to

Page 165

1 the electronic monitoring unit, and I'm aware that
2 they worked in that unit. No, I didn't know what
3 type of quality work that they did.
4 BY MR. HERBERT:
5  Q. Okay. You're not aware of any poor work
6 that they did that you can think of, correct?
7  MR. WHITE: Objection to form.
8  THE WITNESS: Yeah, I'm aware of poor work
9 that they've done.
10 BY MR. HERBERT:
11  Q. Okay. But you're not aware of any --
12 well, I asked you about the quality of work, so I
13 guess my question is, you are aware of some poor
14 quality of work done by some or all of the
15 plaintiffs?
16  MR. WHITE: Objection to form.
17  THE WITNESS: Yes.
18 BY MR. HERBERT:
19  Q. Okay. Are you aware of any quality work
20 that has been done by any one or all of the
21 plaintiffs?
22  MR. WHITE: Objection to form.
23  THE WITNESS: Yes.
24

Page 166

1 BY MR. HERBERT:
2  Q. And how were you made aware of the good
3 quality of work done by the plaintiffs?
4  MR. WHITE: Objection to form.
5  THE WITNESS: In talking with the other staff
6 members and discussing it with the deputy chiefs and
7 chiefs that these guys did a great job last night
8 and, you know, they really stepped up.
9 BY MR. HERBERT:
10  Q. Okay. And you had those conversations
11 about all of the plaintiffs in this case?
12  A. I don't recall all of them.
13  Q. Which ones do you not remember hearing
14 positive assessments of their work?
15  A. I don't recall.
16  Q. Which ones do you remember hearing a
17 positive assessment of their work?
18  A. Well, I know Tyrone McGhee, I mean, he's
19 just an outstanding individual. He's a, you know,
20 union rep. I don't know if he was the chief union
21 rep, but he really put forth in trying to get a, you
22 know, contract signed and agreed upon, and he did the
23 right thing for the members.
24  Q. Anyone other than Tyrone McGhee?

Page 167



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 824 of 1503 PageID #:1215
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

A.   Samuel Page was just -- I can't -- I
mean, he was just an outstanding individual, a great
person, a great worker.

Q.   And that information was given to you by
your supervisors?

A.   No, I actually seen Sam through the years
and just realized that he's a good man.

Q.   How about Legrain Winston?  What do you
know about his --

A.   Legrain, he's got some bad energy.

Q.   What do you mean by bad energy?

A.   He's put people in positions where he's
been less than truthful.

Q.   He's put other people in positions where
he has been less than truthful?

A.   Yes, sir.

Q.   And can you tell me what those situations
were?

A.   He had -- we had asked him -- let me
think.  He had falsified his time sheets at one
particular time.  He had falsified his whereabouts
when he was on the street, and he just lost a lot of
credibility with me when he made the responses he
did.

Page 168

Q.   So he made responses to you?

A.   No.

Q.   Because you didn't have any interaction
with him, correct?

MR. WHITE:  Objection.  It mischaracterizes
testimony.

THE WITNESS:  No, I would like to revert back
to your original question, and if my memory serves
me, you asked me to explain the bad energy that he
produced.

BY MR. HERBERT:

Q.   I did, but I asked you earlier about
interactions you had with Legrain, so I guess I'll
ask it again.  Did you have personal interaction with
Legrain?

A.   I had -- I had one personal interaction
with him and it kind of, you know, how do I say this?
It's kind of like pulling -- how do you say it, the
strings on your heart.  It kind of made me feel real
bad.

He had come into my office and asked
if he could talk to me, and I said absolutely, and he
said, my wife's got severe cancer.  And I know a
bunch of people who had it and I was like, oh, it's

Page 169

terrible.  And he goes, so I'm trying to nurse her
back to health.  Anything you can do or, you know, I
appreciate it if you can, you know, just keep her in
your prayers and I'm going through a lot.  And I was
like, I understand what you're going through and I
feel bad for you, and I hope your wife feels good and
there's, you know, always different services that you
can reach out to the department for.

And it was kind of like a heart to
heart, a serious, wow, this guy is going through a
lot.  He's a young man and his wife and...

Q.   When did that take place?

A.   That's a while ago.

Q.   What position were you in at the time?

A.   A while ago.  I was the director.

Q.   Okay.  And any other interactions that
you had with him?

A.   Not that I recall, no.

Q.   Did anything about that interaction make
you think that he was not a good employee in any way?

A.   No.  I mean, you know, his wife's got
cancer.  I mean, you can't look at a -- I mean, I've
got a heart.  I mean, he comes in and tells me his
wife's got cancer.  It's terrible.

Page 170

Q.   Okay.  How about Michelle Strickland, did
you ever have any contact with her?

A.   I did, but I don't really know her.  She
parachuted in the unit.

Q.   What does that mean, parachuted in the
unit?

A.   I apologize for that phrase.

Q.   That's okay.

A.   She came into the unit, and I didn't have
any interaction, and then I found out she had bidded
out.

Q.   When you say parachuted though, what does
that mean, parachuted?

A.   She came into the unit and -- she came
into the unit.  She obviously bidded over to the
unit.  She came into the unit not for long and then
she bidded out of the unit.

Q.   Okay.  How about I.V. Newson, did you
have any interaction with him?

A.   No.

Q.   Okay.  Any other of the plaintiffs that
you had interaction with?

A.   I mean, I did have interactions with
I.V. Newson work related, but I just can't remember

Page 171



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095-1 Filed: 12/21/20 Page 825 of 1503 PageID #:1216

Legrant Winston, et al. v. Sheriff of Cook County Thomas J. Dart, et al.

1 them. You know, I don't want to go on the record
2 saying, well, you said you don't ever talk to this
3 guy. I did have him.
4     Q. Okay. Do you know what assignments these
5 individuals had throughout their tenure in the
6 electronic monitoring unit?
7     A. Well, I could go -- I know Legrain
8 Winston worked the third watch and...
9     Q. And again, I'm not asking about watches
10 necessarily. I'm talking more about assignments.
11     A. Yeah, I believe he was -- I believe he
12 was on deliveries. I'm almost positive he was on
13 deliveries.
14     Q. Okay. And do you know about the
15 assignments of the other plaintiffs?
16     A. Michelle Strickland, I mean, the
17 assignments could vary every day.
18     Q. Did you ever become aware of the fact
19 that any of these individuals requested to work one
20 assignment over another assignment?
21     A. Going from memory, I believe Wilford
22 Ferguson used to ask could he work in the basement.
23     Q. Okay. And who made you aware of that?
24     A. Either -- one of the command staff

1 members. I can't be specific.
2     Q. And did he work in the basement then?
3     A. Yes.
4     Q. And did you tell your supervisors to
5 assign him to the basement?
6     A. No. I wouldn't. It wouldn't go that
7 far, no.
8     Q. Did you tell your supervisors, hey,
9 William -- Wilford wants to work in the basement.
10 Try and put him there when you can?
11     A. No.
12     Q. Did you give them any direction in any
13 way, shape, or form about where to assign Wilford
14 Ferguson?
15     A. No.
16     Q. You became aware of the fact that he
17 wanted to work in the basement and you didn't take
18 any action to see that he was assigned to the
19 basement?
20     A. No.
21     Q. Anyone else that you became aware wanted
22 to work a particular assignment other than Wilford
23 Ferguson?
24     A. Just for clarification purposes, I've

1 never had a conversation with Wilford about working
2 the basement. It's third party through my command
3 staff.
4     Q. I understand that.
5     A. Okay. So, no. The answer is no to the
6 rest of the individuals.
7     Q. Okay. How about anyone else aside from
8 the plaintiffs in your working as a director and
9 executive director? Were you ever made aware of
10 anyone else desiring to work one assignment versus
11 another?
12     A. I'm not aware of that, no.
13     Q. Okay. And so this was the only time that
14 you became aware of an employee in the 14 years or
15 13 years that you were a director, an executive
16 director about an employee expressing a desire to
17 work a particular assignment?
18     A. That's a long time span for me to
19 remember. And just for clarification, Wilford
20 Ferguson never said a word to me.
21     Q. Yeah, we're clear on that. I understand
22 that point.
23     A. Go ahead.
24     Q. You became aware that he wanted to work

1 in the basement. So my question is: Any other
2 employee during those 13 years, did you get
3 information that any other employee wanted to work a
4 particular assignment?
5     A. I mean, the time span is excessive, and
6 my response would be I don't have any more
7 information.
8     Q. So you can't think of one single person
9 as we sit here today?
10     A. That's a -- so you're asking me if
11 anybody came up to me to work a certain --
12     Q. No.
13     A. -- job or assignment?
14     Q. I'm asking you if there was any situation
15 similar to Wilford Ferguson where you became aware of
16 an employee that expressed a desire to work one
17 particular assignment versus another?
18     A. Yeah, I don't remember any of those
19 events. I mean, I -- 13 years is a pretty big time
20 span, and I apologize for...
21     Q. That's okay. I just want to clarify.
22 When you say you don't remember any of those events,
23 are you saying that you don't remember any event
24 occurring such as that other than Wilford Ferguson?



Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-5 Filed: 12/21/20 Page 826 of 1503 PageID #:1217

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

A. Well, I can't remember. I cannot remember.

Q. Do you remember any event where some unknown person, an employee that you just don't remember who that person is now, do you remember any situation in which you became aware that this person requested a particular assignment versus another?

A. I don't -- you know, I don't know what you mean by any unknown person.

Q. Other than the scenario of Wilford Ferguson, are you aware of any situation in which any employee ever expressed the desire to work a particular assignment versus another?

A. Yeah, I don't remember.

Q. Okay. So as far as you know, Wilford Ferguson is the only person that you remember having knowledge of making such a request?

A. My response is I had spoke with management and they suggested that, hey, Wilford Ferguson would like to work down at TSS. The bid -- he bid into that unit. He bidded on his own. The union took it away from him. He had suggested that, hey, I like it down there. He never told me, and just for clarification, he had brought it up to the

Page 176

staff members to say, I'll go down there.

Q. What did you tell the staff members in response to them informing you of that?

A. I don't remember my statement.

Q. Do you remember anything about your statement, the substance of it, not the specifics?

A. I might have said -- I think that's -- no, I don't remember what I told them.

Q. Do you remember if you in any way indicated that, well, then put Ferguson in the basement if that's where he wants to go?

A. No, I don't remember if that was my response.

Q. Do you remember if you took a position and gave any advice or command to your supervisors regarding that request?

A. My position that I took was, let's see what the workload entails. Let's find out who we need and plug them in. I can tell you that Wilford Ferguson worked a lot of different assignments through the years which is not uncommon.

Q. Okay. But you understood that the supervisors were bringing to you a request by Wilford Ferguson, correct?

Page 177

A. No, that's not true.

Q. You understand that your supervisors were bringing this to you to inform you that Wilford Ferguson was asking to be assigned to the basement?

A. That's not true. I never said that, never said that.

Q. I'm not talking about what you said. You're not listening to my question.

A. I apologize.

Q. You understood that your supervisors, when they came to you to tell you this information, they were informing you to -- so that you knew that one of your employees wanted to work a particular assignment, correct?

MR. WHITE: Objection to form.

THE WITNESS: Negative. That's not correct.

BY MR. HERBERT:

Q. So they just were mentioning that out of passing, not trying to get a response from you one way or the other? That's the way you took it?

A. In passing. That answer is, yes, in passing, hey, you know, Fergy likes to work down in TSS. I said, oh, wow. Really. I said, well, okay. Let's figure out what we've got to do today, you

Page 178

know, and there could be a tremendous amount of different assignments.

Q. Okay. But in no way did you indicate one way or the other whether the supervisors should put him there when they could?

A. That answer is no.

Q. Okay.

A. I wouldn't get that involved. You know, I've got...

Q. You were responsible for the conduct of your supervisors, correct?

A. Yes.

Q. And you were responsible to observe them in the workplace to see how they were performing their roles as supervisor, correct?

A. Yes.

Q. And you were responsible for the general working environment of the electronic monitoring unit, correct?

A. Yes.

Q. It was your duty to make sure that there was a safe working environment for all your employees, correct?

A. Yes.

Page 179



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 827 of 1503 PageID #:1218
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  Q.  And you were responsible to make sure
2  that your employees would be allowed to come to work
3  and do their job without being harassed, correct?
4  **A.  Yes.**
5  Q.  Without being intimidated, correct?
6  **A.  I'm not aware of anybody being**
7  **intimidated.**
8  Q.  Without being treated differently than a
9  different employee?
10  MR. WHITE:  Object to form.
11  THE WITNESS:  Nobody was treated differently.
12  I don't...
13  BY MR. HERBERT:
14  Q.  That's because that was your directive,
15  to make sure that all employees were treated equally,
16  correct?
17  **A.  I don't remember writing a directive.**
18  Q.  That was your policy.  That's what you
19  told your supervisors, right?  Hey, treat them fair,
20  treat them equally, correct?
21  MR. WHITE:  Objection to foundation.
22  THE WITNESS:  I've never had that
23  conversation with any supervisor, never.
24
Page 180

1  BY MR. HERBERT:
2  Q.  Did you ever have -- was it your
3  understanding that your employees were treated fairly
4  by your supervisors?
5  MR. WHITE:  Objection to foundation.
6  THE WITNESS:  I understood that they were
7  being treated fairly.  I don't have any examples to
8  say that they were not treated fairly.
9  BY MR. HERBERT:
10  Q.  And it was your policy to treat them
11  fairly as well too, right?
12  MR. WHITE:  Objection to foundation.
13  THE WITNESS:  I don't write policy.
14  BY MR. HERBERT:
15  Q.  Okay.  It was certainly part of your
16  duties as a supervisor to treat your employees fair,
17  correct?
18  **A.  The policy, I can't recite it verbatim,**
19  **but I'm sure the policy has that language that you**
20  **suggested.**
21  Q.  Treat employees fairly, correct?
22  **A.  I don't know what the policy says.**
23  MR. WHITE:  Objection.
24  BY MR. HERBERT:
Page 181

1  Q.  I'm talking your management style though.
2  Wasn't that part of your management style, to make
3  sure that everyone was being treated fairly in your
4  unit?
5  **A.  I was never really graded on my**
6  **management style.**
7  Q.  Okay.  So that wasn't part of your -- you
8  weren't concerned about employees being treated
9  fairly.  Is that fair?
10  MR. WHITE:  Objection.  It mischaracterizes
11  the testimony.
12  THE WITNESS:  No, that's not fair to accuse
13  me of that.
14  BY MR. HERBERT:
15  Q.  Okay.  So you were concerned about that?
16  **A.  There is a policy and a procedure that**
17  **all sheriff's office employees should have filed.  If**
18  **there was something that was disturbing or upsetting,**
19  **there was an avenue that they could approach.**
20  Q.  And you followed the policies, correct?
21  **A.  The policies in the Cook County Sheriff's**
22  **office are on...**
23  Q.  I don't care where they're at.  I'm
24  saying you're required to follow them, correct?
Page 182

1  **A.  I'm part of the sheriff's office and,**
2  **yes.**
3  Q.  Okay.  And part of those policies were
4  that all employees had to be treated fairly, correct?
5  MR. WHITE:  Objection.  Foundation.
6  THE WITNESS:  I'm not sure right now what
7  policies are out there.  I'm definitely not going to
8  say that -- you know, when you use the term all
9  employees treat fairly, I'm not sure if that language
10  is in one of those policies.
11  BY MR. HERBERT:
12  Q.  Well, in fact, the employees in your
13  electronic monitoring unit, they were treated
14  differently, correct?
15  **A.  I have no knowledge of that.**
16  Q.  Well, you have knowledge of all the
17  assignments that different individuals had on any
18  given day, correct?
19  MR. WHITE:  Objection.  Foundation.
20  BY MR. HERBERT:
21  Q.  You can answer.
22  **A.  I didn't have direct knowledge of**
23  **assignments.**
24  Q.  Is it your testimony that your
Page 183



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 828 of 1503 PageID #:1219

Gregory Shields - 8/27/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 supervisors made the assignments, and you were not
2 aware of the assignments they made?
3    MR. WHITE: Objection. It mischaracterizes
4 testimony.
5 BY MR. HERBERT:
6    Q. You can answer.
7    **A. So you're saying the assignments,**
8 **somebody made assignments and I wasn't aware of it?**
9    Q. That's what you're saying. Is that
10 correct?
11    **A. I'm not saying that, sir.**
12    Q. Okay. So you were aware of the
13 assignments that your supervisors were making on a
14 daily basis, correct?
15    **A. No, it would be next to impossible to**
16 **know every assignment seven days a week 24 hours a**
17 **day. No. How does somebody reasonably figure that**
18 **out?**
19    Q. Well, you were responsible for the
20 actions of your supervisors, correct?
21    MR. WHITE: Objection. Asked and answered.
22 BY MR. HERBERT:
23    Q. You can answer.
24    **A. What actions are we talking about?**

Page 184

1    Q. Supervisory actions within the scope of
2 their employment. You're responsible for your
3 supervisors, are you not, as the director and the
4 executive director?
5    **A. That answer is yes.**
6    Q. Okay. Part of those duties would be the
7 making of assignments by your supervisors, correct?
8    **A. Correct.**
9    Q. So you were responsible for particular
10 employees being assigned to various assignments
11 within the electronic monitoring unit, correct?
12    **A. I wasn't involved with particular**
13 **employees.**
14    Q. You were responsible. You were
15 responsible for the assignments made by your
16 supervisors, correct?
17    **A. I mean, can you be more specific, dates,**
18 **times?**
19    Q. You've answered that question. That's
20 all right. I'll move on.
21       Are you aware of the fact that all
22 of our plaintiffs are African-American?
23    **A. No, I'm not.**
24    Q. Okay. Is this the first time that you --

Page 185

1 well, I'll represent to you that all of our
2 plaintiffs are African-American. Is this the first
3 time that you've been made aware of the fact that the
4 plaintiffs here are African-American?
5    MR. WHITE: Objection to form.
6    THE WITNESS: I don't want to speak
7 derogatory. I want to speak positive. I'm not
8 really sure about Michelle Strickland, and I never
9 asked. I don't know this kid Anthony Manning, and
10 that's where I'm at.
11 BY MR. HERBERT:
12    Q. Okay. Michelle Strickland you were not
13 sure of, and that's after you met her you weren't
14 sure based upon her skin color what race she was?
15    MR. WHITE: Objection. That's argumentative.
16 BY MR. HERBERT:
17    Q. You can answer.
18    **A. Yes. Your answer is yes. I was unsure.**
19    Q. But what was that unsurety based upon,
20 because you had met her and you weren't able to tell
21 what race she was?
22    **A. I was just unsure whether she was --**
23 **yeah, I was unsure. I didn't question it. I didn't**
24 **ask. There's no need for me to ask.**

Page 186

1    Q. Okay. But Legrain Winston, you were sure
2 that he was African-American?
3    **A. Yes.**
4    Q. Okay. Vernell Tims, were you sure he was
5 African-American?
6    **A. Yes.**
7    Q. And how about all the other plaintiffs
8 except for Anthony Manning? You were sure they were
9 African-American, right?
10    **A. Yes.**
11    Q. And that's because they looked
12 African-American, correct?
13    **A. Yes.**
14    Q. They were dark?
15    **A. Say it again.**
16    Q. They were dark?
17    MR. WHITE: Objection to foundation.
18    THE WITNESS: Yeah, I don't have a response
19 to that.
20 BY MR. HERBERT:
21    Q. Well, how did you know they were black?
22    **A. I had visualing, worked with them through**
23 **the years, you know. They were African-American.**
24    Q. But you had visualing of Michelle

Page 187



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 829 of 1503 PageID #:1220

Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 Strickland, so my question is: How did you not know
2 that she was black?
3     MR. WHITE: Objection. Argumentative.
4     THE WITNESS: I thought she was -- you know,
5 I don't remember. I only -- our passings were short,
6 but I thought she was Jamaican. I thought maybe she
7 was -- I don't know. I mean, I just -- that's my
8 thought process. That's what I thought.
9 BY MR. HERBERT:
10    Q. Well, you certainly knew she was a
11 minority, right?
12    **A. I don't know what you're trying to ask**
13 **me. You asked me what I thought, you asked me how I**
14 **knew, and I had seen her and I thought she was...**
15    Q. Is it your understanding that
16 African-Americans are a minority?
17    **A. No, that's not my understanding.**
18    Q. Well, it's your understanding that
19 employees can't be -- they can't be discriminated
20 against based upon their race, correct?
21    **A. Correct. Yes, sir.**
22    Q. Okay. You knew that during the time that
23 you supervised all these African-Americans, correct?
24    **A. I didn't have any direct -- yes.**

Page 188

1    Q. And you knew that there was
2 non-minorities that were assigned to your unit,
3 correct?
4    **A. So non-minorities meaning Caucasian?**
5    Q. Yes.
6    **A. Yes.**
7    Q. Okay. And your supervisors, you had
8 white supervisors, correct?
9    **A. Yes.**
10    Q. And how many supervisors did you
11 generally have during your 13 years there?
12    MR. WHITE: Objection to form and foundation.
13    THE WITNESS: I don't recall.
14 BY MR. HERBERT:
15    Q. Approximately?
16    **A. I don't recall. We had -- we had --**
17 **had supervisors on each watch. We had three on each**
18 **watch, four on each watch.**
19    Q. Okay. And what was the percentage of
20 black supervisors during your 13 years as the
21 director or executive director?
22    MR. WHITE: Objection to form.
23    THE WITNESS: I'd have to look at a roster.
24

Page 189

1 BY MR. HERBERT:
2    Q. I'm asking you what you remember right
3 now.
4    MR. WHITE: Object to form.
5    THE WITNESS: Can you give me a second to
6 count them?
7 BY MR. HERBERT:
8    Q. Sure.
9    **A. More than ten African-American**
10 **supervisors, management.**
11    Q. Ten African-American supervisors over the
12 span of 13 years?
13    **A. No, I just counted like when I left how**
14 **many there were there then.**
15    Q. Okay.
16    **A. I don't remember what we had 13 years**
17 **ago.**
18    Q. Okay. So when you left in 2019, there
19 was ten African-American supervisors?
20    **A. There could have been more than ten.**
21    Q. Okay. Was there ever less than ten
22 during your 13 years prior to leaving?
23    MR. WHITE: Objection to form.
24    THE WITNESS: There could have been, yes.

Page 190

1 BY MR. HERBERT:
2    Q. Okay. Would it be fair to say that there
3 was always in your 13 years more white supervisors
4 than there were black supervisors?
5    MR. WHITE: Objection to form.
6    THE WITNESS: I don't know.
7 BY MR. HERBERT:
8    Q. Take your time.
9    **A. That's my answer.**
10    Q. In any of the 13 years that you worked,
11 did you ever have more black supervisors than white
12 supervisors?
13    **A. I don't recall. I don't remember.**
14    Q. You know Chief Ranzino, do you not?
15    **A. Yes.**
16    Q. And Chief Ranzino, what color is he?
17    MR. WHITE: Sorry, Counsel. What color?
18 BY MR. HERBERT:
19    Q. I'm sorry. What race? Excuse me.
20    **A. He's Italian.**
21    Q. Okay. White?
22    **A. Yes.**
23    Q. Okay. And how long -- what was his rank
24 while he worked under your command? Well, I already

Page 191



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 830 of 1503 PageID #:1221

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  said --
2      A.  He was a chief.
3      Q.  He was a chief, correct?
4      A.  Yeah.  He was a chief, yeah.
5      Q.  Okay.  And how long was he a chief under
6  your command in the electronic monitoring unit?
7      A.  Oh, seven years.
8      Q.  Okay.  What years were those?
9      A.  Probably when I -- 2006.
10     Q.  So the seven years after that?
11     A.  Yeah, maybe 2006 moving forward to 2013,
12  '12.
13     Q.  Okay.  And he was -- he reported directly
14  to you, correct?
15     A.  No.  How did that work?  He was on
16  afternoons.
17     Q.  I'm saying more hierarchical in the
18  chain, you were the director.  As a chief, he
19  reported to you directly?
20     A.  No.
21     Q.  Who did Chief Ranzino report to when you
22  were the director?
23     A.  I want to say -- I want to say John Webb.
24     Q.  You were his boss, correct?

Page 192

1      A.  Whose boss?
2      Q.  Chief Ranzino's.
3      A.  Yes.
4      Q.  And he was the highest ranking member
5  under your command, correct, as a chief?
6      A.  Well, we had -- we had John Webb in the
7  organizational chart because there was no deputy
8  director, and I believe they reported to John Webb.
9  I really didn't have a whole lot of conversations
10  with the guys on afternoons.  I would -- I would be
11  working days.
12     Q.  And all the deputy sheriffs in the
13  electronic monitoring unit reported to Chief Ranzino,
14  correct?
15     MR. WHITE:  Objection.  It mischaracterizes
16  evidence.
17     THE WITNESS:  We didn't have no deputy
18  sheriffs that reported to Ranzino.
19  BY MR. HERBERT:
20     Q.  The investigators, they reported to Chief
21  Ranzino, correct?
22     A.  Not all of them.
23     Q.  Who did not?
24     A.  I believe he worked the third watch, and

Page 193

1  the second watch and the first watch did not report
2  to Ranzino.
3      Q.  Chief Ranzino was still the boss of
4  individuals that worked a different watch though,
5  correct?
6      A.  He was the chief in the department.  I
7  mean, he...
8      Q.  That's what I'm getting.
9      A.  He worked the third watch.
10     Q.  If he worked the second watch, he would
11  be a boss, right?
12     A.  If he worked the second watch, yes, he
13  would be the second watch chief.
14     Q.  If he worked the first watch, he would be
15  a boss, right?
16     A.  He would be the chief of the -- did you
17  say first watch?  Yes.
18     Q.  Okay.  And you gave Chief Ranzino his job
19  duties, correct?
20     MR. WHITE:  Objection to form and foundation.
21     THE WITNESS:  I don't know what that means.
22  BY MR. HERBERT:
23     Q.  You don't know what it means to -- what a
24  job duty means?

Page 194

1      A.  Yes.  I didn't give Joe Ranzino job
2  duties.
3      Q.  Okay.  Did anyone else that you know of
4  give Joe Ranzino job duties?
5      MR. WHITE:  Objection to foundation.
6      THE WITNESS:  Yeah, I don't understand that
7  question.
8  BY MR. HERBERT:
9      Q.  Okay.  You were responsible for the job
10  that Chief Ranzino did pursuant to his duties as a
11  chief under your command, correct?
12     A.  Yes.
13     Q.  Okay.  And part of those duties would be
14  he would conduct roll calls, right?
15     A.  Yes.
16     Q.  And you were aware of the fact that he
17  conducted roll calls, correct?
18     A.  Yes.
19     Q.  You instructed him to conduct roll calls,
20  correct?
21     A.  It's part of the job description.  If I
22  had to instruct somebody to hold the roll call every
23  day, that would be time consuming.
24     Q.  Okay.  And Chief Ranzino was responsible

Page 195

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 831 of 1503 PageID #:1222

Gregory Shields - 8/27/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 196**

1 for conducting a professional roll call, correct?

2     **A. What's the definition of professional?**

3 **It's a roll call.**

4     Q. All right. Well, you became aware of the

5 fact --

6     **A. I apologize I asked you. I didn't mean**

7 **that. But, I mean, everybody is supposed to act at**

8 **the workplace in a professional manner.**

9     Q. Exactly.

10     **A. You know, not only that, pay attention,**

11 **you know.**

12     Q. Not singling out one employee versus

13 another employee so to embarrass that person,

14 correct?

15     **A. I'm not aware of any of that, and that's**

16 **unprofessional.**

17     Q. Yeah, I agree. But you became aware of

18 the fact that Chief Ranzino referred to Legrain

19 Winston as boy, correct?

20     MR. WHITE: Objection to foundation.

21     THE WITNESS: No. I never heard that.

22 BY MR. HERBERT:

23     Q. You were not aware of the fact that Chief

24 Ranzino referred to Legrain Winston as boy?

**Page 197**

1     MR. WHITE: Objection to foundation.

2     THE WITNESS: No.

3 BY MR. HERBERT:

4     Q. Is this the first time you're hearing of

5 that allegation, that Chief Ranzino referred to

6 Winston as boy?

7     **A. I read the Complaint, and if it was in**

8 **the Complaint, I read it. Nobody's volunteered it to**

9 **me.**

10     Q. Well, Legrain Winston was black, correct?

11     **A. Yes.**

12     Q. And you would agree that if one of your

13 black employees was called boy by a supervisor,

14 especially a white one, you would agree that would be

15 improper, wouldn't it?

16     MR. WHITE: Objection to form.

17     THE WITNESS: There's a lot of things that I

18 would agree with and I wouldn't agree with, and it's

19 all one's interpretation.

20 BY MR. HERBERT:

21     Q. Tell me one scenario where a white

22 supervisor refers to a black employee as boy that you

23 would consider that to be acceptable?

24     **A. I don't have one.**

**Page 198**

1     Q. Well, you just said that there's certain

2 situations that may make that comment not rise to the

3 level of being improper?

4     **A. Yes.**

5     Q. Can you tell me?

6     MR. WHITE: It mischaracterizes testimony.

7 BY MR. HERBERT:

8     Q. You can answer.

9     **A. I've heard through the years in my**

10 **service where an individual referred to his partner**

11 **as boy. Hey, I met up with your boy Friday. Man,**

12 **what a great guy. I didn't pay no attention to it,**

13 **and that would be the scenario of whether it would be**

14 **acceptable or not. Hey, did you talk to your boy**

15 **because I'm supposed to meet him at the Bears game?**

16 **No, I didn't talk to him.**

17     Q. So that would be an acceptable

18 characterization of somebody as a boy, correct?

19     **A. No, that's my interpretation of this --**

20 **he's talking about his buddy. He's talking about his**

21 **friend. You know, it's like the Irish referring to**

22 **lads. Hey, lad. Let's go boys. I believe that**

23 **would be acceptable.**

24     Q. Is it your understanding that Chief

**Page 199**

1 Ranzino was referring to Legrain as a boy as like a

2 friendship term?

3     MR. WHITE: Objection. Assumes facts not in

4 evidence, mischaracterizes testimony, foundation.

5 BY MR. HERBERT:

6     Q. You can answer.

7     **A. I've never heard Chief Ranzino use that**

8 **phrase.**

9     Q. And had you become aware of the fact that

10 Chief Ranzino used that phrase to a black employee in

11 front of other people, you would have taken action,

12 wouldn't you have?

13     MR. WHITE: Objection. Assumes facts not in

14 evidence, lacks foundation, calls for speculation.

15 BY MR. HERBERT:

16     Q. You can answer.

17     **A. I would definitely look into the**

18 **complaint.**

19     Q. Because you had a duty to look into that

20 complaint, correct?

21     MR. WHITE: Objection. Foundation.

22     THE WITNESS: I would look into the

23 complaint.

24



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 832 of 1503 PageID #:1223

Gregory Shields  -  8/27/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 BY MR. HERBERT:

2 Q. Didn't you look into it because you're

3 responsible for your supervisors, correct?

4 **A. Yes.**

5 Q. And you're responsible for how your

6 supervisors are treating your employees in the

7 workplace, correct?

8 **A. Yes.**

9 Q. And you're responsible to make sure that

10 none of your employees are treated differently

11 because of their race, correct?

12 **A. Yes.**

13 Q. And you're responsible to make sure that

14 none of your employees are subjected to racial terms

15 being directed at them, correct?

16 **A. Yes.**

17 Q. Okay. And also using other threats

18 against individuals. You're responsible to make sure

19 that there's no threats against your employees while

20 they're working in your command, correct?

21 MR. WHITE: Object to form.

22 BY MR. HERBERT:

23 Q. You can answer.

24 **A. I'm not aware of a threat.**

Page 200

1 Q. But you're responsible for threats,

2 correct?

3 MR. WHITE: Object to form.

4 BY MR. HERBERT:

5 Q. You can answer.

6 **A. I'm stuck on I'm responsible for a**

7 **threat.**

8 Q. Okay. We'll move on. You became aware

9 of the fact that Chief Ranzino threatened to have

10 Winston fired?

11 MR. WHITE: Objection. Foundation, assumes

12 facts not in evidence.

13 THE WITNESS: No.

14 BY MR. HERBERT:

15 Q. No, you're not aware of that?

16 **A. No.**

17 Q. Well, on or around July 30, 2015, Legrain

18 Winston had a conversation with you, correct?

19 MR. WHITE: Objection. Foundation.

20 BY MR. HERBERT:

21 Q. You can answer.

22 **A. I had one conversation with Legrain**

23 **Winston and he was telling me about his mother -- I'm**

24 **sorry, his wife having cancer.**

Page 201

1 Q. That's the only conversation you had,

2 huh, with Mr. Winston?

3 **A. What is it? Can...**

4 Q. I'll ask it again. The only conversation

5 you ever had with Mr. Winston was strictly related to

6 him telling you about his wife's cancer. Is that

7 correct?

8 MR. WHITE: Objection. It mischaracterizes

9 testimony.

10 THE WITNESS: No, that's not correct. No.

11 BY MR. HERBERT:

12 Q. Okay. Well, then tell me about the other

13 conversations you had with Mr. Winston.

14 MR. WHITE: And, Dan, after he answers this

15 question, let's take a break. We've been going quite

16 a while.

17 MR. HERBERT: And I'm just going to be -- you

18 know, I have a lot to get through, and I don't know

19 what your position is going to be about when we get

20 to that time limit, but I would ask that we can be

21 given some time to go through it.

22 If you obviously -- we can talk

23 about it, but if you don't want to give me more than

24 seven hours, I'm going to petition the Court. I

Page 202

1 don't know if I'm going to need much more, but I've

2 got a lot to go through here.

3 MR. WHITE: Yeah, and I can't really help you

4 with that. I mean, we spent a lot of time on stuff

5 that --

6 MR. HERBERT: Your client can help with it.

7 MR. WHITE: The questions matter too. We

8 spent an hour on chain of command. So, you know,

9 I've got a hard stop at 5:30. That's seven hours.

10 You know, if you think you've got 15 minutes before

11 then or something, we can squeeze it in on a

12 different day, but I don't know what to tell you.

13 MR. HERBERT: Depending on how long this

14 break is, we'll see about the hard stop at 5:30.

15 MR. WHITE: No, we're done at 5:30

16 regardless.

17 MR. HERBERT: That might not be seven hours

18 then.

19 MR. WHITE: Okay. Well, we can pick it up

20 then at 6:30. That's fine. That's no problem. I'll

21 pick it up and we can go into the night.

22 MR. HERBERT: I'm not trying to be difficult

23 or, you know, mess with anyone's time here but, you

24 know, I think we would all agree that I've had to ask

Page 203



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 833 of 1503 PageID #:1224
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 several questions several times that shouldn't have
2 had to have been asked that many times.
3     MR. WHITE: I would completely disagree with
4 that, and I would also say that we've spent time on
5 things that have come up in the other depositions
6 that you were not there for, so a lot of this you're
7 hearing for the first time and we're being forced to
8 spend a lot more time on it than we should.  But why
9 don't we take a five-minute break and we'll see how
10 far you can get until 5:30, okay?
11     MR. HERBERT: Okay.
12         (Whereupon, a short break
13         was taken.)
14     MR. HERBERT: Okay.  If we could maybe go to
15 page 8 of Exhibit A, please.
16 BY MR. HERBERT:
17     Q.  Mr. Shields, you're there, correct?
18     A.  Yes, sir.
19     Q.  Okay.  Can you take a look at what we
20 have up here which is specifically paragraph 23 of
21 page 8?  Do you see that there?
22     A.  Yes, sir.
23     Q.  And it talks about how the defendant was,
24 "Ranzino was at all times relevant herein the chief

Page 204

1 of patrol on the third watch in the electronic
2 monitoring unit of the Cook County Sheriff's
3 Department.  Ranzino was responsible for conducting
4 roll call, assigning duty assignments, granting
5 compensatory time on and administering discipline to
6 subordinate officers."  Do you see that?
7     A.  Yes, sir.
8     Q.  I'm sorry?
9     A.  Yes.
10     Q.  You agree with everything in that
11 paragraph, correct?
12     A.  He wasn't the chief of patrol.  He was a
13 chief of the third watch but, yes.
14     Q.  Okay.  And he was responsible for
15 conducting the roll calls, correct?
16     A.  He was one of many that conducted the
17 third watch roll calls, yes.
18     Q.  Did you give him any instruction about
19 the assignment of duty assignments?
20     A.  No.
21     Q.  Was there any policy about assigning duty
22 assignments?
23     A.  No.
24     Q.  What about granting compensatory time on

Page 205

1 or off?  Did you give Ranzino any instructions about
2 how to do that?
3     A.  No.
4     Q.  Was there any policy regarding the
5 granting or denial of compensatory time?
6     A.  There's a policy out there for
7 compensatory time.
8     Q.  Okay.  And you were required to follow
9 that, correct?
10     A.  Yes.
11     Q.  And do you know if Ranzino was required
12 to follow that?
13     A.  He's a sheriff's office employee.  Yes,
14 he's required to follow it.
15     Q.  You were responsible to make sure that
16 Ranzino followed it, correct, as his supervisor?
17     A.  Yes.
18     Q.  And as far as administering discipline to
19 subordinate officers, that would be the
20 investigators, correct?
21     MR. WHITE: Objection to foundation.
22     THE WITNESS: Disciplining the suburban and
23 -- I'm sorry.  What?
24 BY MR. HERBERT:

Page 206

1     Q.  Subordinate officers, that would be the
2 investigators that worked under Mr. Ranzino, correct?
3     A.  If there was an infraction he could
4 definitely issue the infraction according to the
5 policy.  He wouldn't issue discipline.  He would
6 write up the infraction.  It could be a deputy chief.
7 It could be anybody.
8     Q.  Okay.  And did you give him any
9 instruction, him being Ranzino, about how he was to
10 administer discipline?
11     A.  Ranzino didn't administer discipline.
12     Q.  Okay.  So you obviously did not give him
13 any instruction about -- well, let's -- you would
14 agree that Ranzino can write people up for
15 discipline, correct?
16     A.  Ranzino was a chief in the department and
17 followed policy, and if there was a violation of the
18 Collective Bargaining Act and a member was involved,
19 he has the responsibility of producing that write-up.
20     Q.  Okay.  And you would agree that making an
21 individual uncomfortable regarding their race, that
22 would be a violation of the Collective Bargaining
23 Agreement, correct?
24     MR. WHITE: Objection to foundation, form.

Page 207



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 834 of 1503 PageID #:1225
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    THE WITNESS: Making somebody -- I didn't
2 hear you. What?
3 BY MR. HERBERT:
4    Q. Well, you know, referring to somebody as
5 boy and that individual is black, that certainly
6 would be a violation of the Collective Bargaining
7 Agreement, correct?
8    MR. WHITE: Objection. Form, it calls for
9 speculation.
10    THE WITNESS: I would have to read the
11 Collective Bargaining Act if those terms are in
12 there.
13 BY MR. HERBERT:
14    Q. You don't know, as you sit here today,
15 whether that would be a violation of the Collective
16 Bargaining Agreement?
17    **A. Yes, I don't know specifically if that**
18 **language is in there.**
19    Q. Okay. So you don't know if that conduct,
20 if in fact it occurred, would violate the Collective
21 Bargaining Agreement?
22    MR. WHITE: Objection. Asked and answered.
23 BY MR. HERBERT:
24    Q. Correct?

Page 208

1    **A. I don't know if that language -- yeah, I**
2 **don't know if that language is specifically in the**
3 **CBA. I think without -- referring to memory -- yeah,**
4 **I'm going to say there's no conversation in when**
5 **somebody refers to somebody as a boy.**
6 BY MR. HERBERT:
7    Q. Okay. Moving on to the next one. The
8 second sentence of paragraph 24 there, do you see
9 where it says, "Shields was responsible for the
10 oversight and supervision of all subordinate officers
11 and the administration of discipline for all members
12 of the electronic monitoring unit"? Do you see that?
13    **A. Yes, sir.**
14    Q. Can you agree with me on that?
15    **A. No, I don't agree with you.**
16    Q. What do you disagree on?
17    **A. I didn't issue discipline.**
18    Q. Did you have the -- did you have the
19 authority to discipline anyone under your command?
20    **A. I had the authority to write up the**
21 **violation.**
22    Q. Well, you had authority to place people
23 in various work assignments, correct?
24    **A. No, I mean --**

Page 209

1    MR. WHITE: Objection.
2    THE WITNESS: Yes, as the workload dictated
3 to it, I guess the answer is yes.
4 BY MR. HERBERT:
5    Q. Okay. If we can move to page 10, please,
6 of that document. Okay. Let's look at paragraph No.
7 32. Do you see that there?
8    **A. Yes, sir.**
9    Q. July 30th, 2015, we spoke of that
10 earlier. "Legrain Winston discussed work-related
11 matters with Director Shields and Shields became
12 hostile and screamed in Winston's face in a
13 threatening manner." Do you see that?
14    **A. Yes, sir.**
15    Q. I see that the answer is that the
16 allegations were denied.
17        Did you have a conversation with
18 Legrain Winston on July 30th, 2015?
19    **A. I can't be specific to the date. I mean,**
20 **that was five or six years ago.**
21    Q. Okay. Did you ever scream in Winston's
22 face in a threatening manner?
23    **A. The dates and the times, they sound**
24 **familiar. It could have been...**

Page 210

1    Q. Well, you were disciplined for this,
2 weren't you?
3    **A. What question do you want me to answer?**
4    Q. The one I just asked.
5    **A. Was I disciplined, or did I have a**
6 **conversation?**
7    Q. You were disciplined for your behavior
8 during the conversation with Legrain Winston as
9 referenced in paragraph 32, correct?
10    **A. I never received anything.**
11    Q. Okay. You know that Mr. Winston filed a
12 complaint against you, correct?
13    **A. Yes, sir.**
14    Q. And you know that that complaint was
15 investigated by the Office of Professional
16 Regulation, correct?
17    MR. WHITE: Objection to foundation.
18    THE WITNESS: Yes, sir.
19 BY MR. HERBERT:
20    Q. And you had to give statements to the OPR
21 during that investigation, correct?
22    **A. Yes, sir.**
23    Q. And it's your testimony that you're not
24 aware of the fact that OPR sustained the allegations?

Page 211



Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 835 of 1503 PageID #:1226
Gregory Shields - 8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    **A. I never received any discipline.**
2    Q. I'm asking you, are you aware of the fact
3 that OPR sustained the investigation regarding the
4 allegation that you became hostile and screamed in
5 Winston's face in a threatening manner?
6    **A. Sustained meaning it... I'm not being**
7 **sarcastic. I usually get sustained and unsustained**
8 **flip-flopped, but sustained meaning that it happened,**
9 **it didn't happen?**
10    Q. Your understanding --
11    **A. I'm sorry I asked you. I'm sorry I asked**
12 **you. Yes. That answer is, yes, I'm aware of it.**
13    Q. That the investigation determined that it
14 was sustained regarding you becoming hostile and
15 screaming in Winston's face in a threatening manner?
16    MR. WHITE: Object to foundation.
17    THE WITNESS: Yes.
18 BY MR. HERBERT:
19    Q. Okay. When did you become aware of that?
20    **A. I don't remember when I became aware of**
21 **it. I believe the --**
22    Q. Nonetheless, you were never disciplined
23 for that, correct?
24    **A. I never lost a day's pay ever, no.**
                                        Page 212

1    Q. And you didn't suffer any discipline as a
2 result of that sustained finding, correct?
3    **A. I don't remember. I honestly don't**
4 **remember.**
5    Q. Well, wouldn't you remember if you were
6 disciplined in any way? Wouldn't that be reasonable
7 to remember that?
8    MR. WHITE: Object to form.
9    THE WITNESS: If I lost money out of my
10 paycheck, yes, I would remember that.
11 BY MR. HERBERT:
12    Q. Okay. And then the next paragraph talks
13 about on August 19, 2015, you told plaintiff Winston
14 that you're going to try your best to get him fired.
15 Do you see that?
16    **A. Yes, sir.**
17    Q. In fact, you said that you were going to
18 try and get him fired, correct?
19    **A. No, negative.**
20    Q. But you did try to get him fired,
21 correct?
22    MR. WHITE: Objection to foundation.
23    THE WITNESS: No, I didn't.
24
                                        Page 213

1 BY MR. HERBERT:
2    Q. Well, you placed charges against Officer
3 Winston, did you not?
4    **A. No, I didn't.**
5    Q. Well, you gathered -- you didn't make any
6 allegations about improper actions against Officer
7 Winston at any point?
8    MR. WHITE: Objection to form.
9    THE WITNESS: I remember -- I remember, this
10 was July, Legrain discussing this with me, but it was
11 the day after -- I believe he came in either the day
12 after or the day of he was questioned and asked about
13 theft of overtime -- theft of -- timecard fraud, if
14 you will.
15 BY MR. HERBERT:
16    Q. You made the allegation that Winston did
17 that, correct?
18    **A. No.**
19    Q. Who made the allegation that Winston did
20 that?
21    **A. I don't remember. It was brought to my**
22 **attention when -- I think it was Tommy Neal, Thomas**
23 **Neal.**
24    Q. And then you took actions to investigate
                                        Page 214

1 whether in fact he committed theft, correct, Winston?
2    MR. WHITE: Objection. Foundation.
3    THE WITNESS: It was brought to my attention
4 because there wasn't enough staff to work and they
5 came in my office and requested for approval for
6 overtime, and I said, well, where's everybody at, and
7 at that particular time they started calling and they
8 found out that they had went home. So nobody
9 authorized them to go home. Where are they at? They
10 went home. And I said, well, look into it. We can't
11 hire overtime because guys want to go home. Find
12 out. Did everybody get the day off?
13 BY MR. HERBERT:
14    Q. This would have been a couple weeks after
15 you were alleged to have -- or it was sustained that
16 you became hostile and screamed in Winston's face in
17 a threatening manner, correct?
18    MR. WHITE: Objection. Foundation, misstates
19 testimony.
20    THE WITNESS: That's not correct.
21 BY MR. HERBERT:
22    Q. Well, the date on that was July 30, 2015,
23 when you were alleged to have done that, correct?
24    **A. Yes.**
                                        Page 215



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 836 of 1503 PageID #:1227

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Q.  Okay.  And then August 19th is when you
2  were alleged to have said that you were going to get
3  Winston fired, correct?
4    A.  No, that's not true.  That's an ambiguous
5  date.  I have no recollection of that date.
6    Q.  Okay.  Well, on September 2nd, 2015, you
7  provided OPR with supporting documents to verify --
8  in an attempt to verify that Winston committed theft,
9  correct?
10    MR. WHITE:  Objection to foundation.
11    THE WITNESS:  I don't have those documents in
12  front of me, so I'm not sure what I would be
13  answering to.  I know for a fact that I did ask for
14  an inquiry and find out the facts, and that's what
15  was provided.
16  BY MR. HERBERT:
17    Q.  In fact, you conducted the inquiry,
18  correct?
19    MR. WHITE:  Objection to foundation.
20    THE WITNESS:  I didn't conduct the inquiry,
21  no.
22  BY MR. HERBERT:
23    Q.  Did you play any role in the
24  investigation?

Page 216

1    MR. WHITE:  Objection to foundation.
2    THE WITNESS:  No, I had Tommy Neal do the
3  inquiry and write-ups and just asked for updates.
4  BY MR. HERBERT:
5    Q.  You reached out to the State's attorneys,
6  didn't you?
7    MR. WHITE:  Objection.  Foundation.
8    THE WITNESS:  Yes, I reached out to the
9  State's attorney to actually see.  There's a memo on
10  file from the State's attorney.
11  BY MR. HERBERT:
12    Q.  But my question is:  You reached out to
13  the State's attorneys to determine what time Officer
14  Winston left court that day, correct?
15    MR. WHITE:  Objection to form and foundation.
16  BY MR. HERBERT:
17    Q.  You can answer.
18    A.  Yes, I did place a call to the State's
19  attorney.  I was shocked that all these guys left,
20  and I was hoping I didn't get the response from the
21  State's attorney that, yeah, they left, they had me
22  sign blank overtime forms and they left, and I was
23  shocked.
24    Q.  You reached out to two different State's

Page 217

1  attorneys, correct?
2    A.  I just remember one.
3    Q.  Robert Mack and Denise Tomasek?
4    A.  I don't remember their names.  I know I
5  did ask them to send me an e-mail.
6    Q.  And then you attempted to get video
7  surveillance from the courtroom, correct?
8    MR. WHITE:  Objection to foundation.
9    THE WITNESS:  Yeah, we did go to our -- we
10  did go to our video guys, what is it called, video
11  room, and they provided videotape that -- I don't
12  think they ever appeared in court and that they left
13  the building.
14  BY MR. HERBERT:
15    Q.  Okay.  And you did this to -- you did
16  this as part of the investigation to determine
17  whether or not Officer Winston was in fact in court,
18  correct?
19    A.  Yeah.  I don't think I secured the
20  videotape.  I don't think I asked for the videotape.
21  I just let the guys who were looking at it obtain it.
22    Q.  And you did this while OPR was in charge
23  of the investigation, correct?
24    MR. WHITE:  Objection to foundation.

Page 218

1    THE WITNESS:  No.  No.  No.  We had to put
2  the violation of this occurrence together and then
3  forward it to OPR.
4  BY MR. HERBERT:
5    Q.  Okay.
6    A.  We put it all together because we wanted
7  to -- you know, if he did leave at 4:00 o'clock in
8  the afternoon, then it's over with.  If he did --
9  never showed up in court and said he did, well, let's
10  look into it.
11    Q.  Well, let me ask you this.  In the years
12  that you worked as director and executive director,
13  had you ever been aware of a situation where an
14  investigator in your unit went to court and then --
15  pursuant to a subpoena and utilized that as a tour of
16  duty?
17    MR. WHITE:  Objection to form.
18    THE WITNESS:  It wouldn't -- it would not --
19  no, I'm not aware of it.
20  BY MR. HERBERT:
21    Q.  You're not aware of a single situation
22  where an individual that went to court pursuant to a
23  subpoena requested a tour of duty and did not appear
24  that day for duty because they went to court?

Page 219



Case: 1:18-cv-05726 Document #: 1095-1 Filed: 12/21/20 Page 837 of 1503 PageID #:1228

Gregory Shields - 8/27/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1   MR. WHITE: Objection to form, asked and
2   answered.
3       THE WITNESS: I don't have a -- no. I mean,
4   I don't have names. If an individual went to court
5   and he was there for his tour of duty, he would
6   contact his supervisor and say, hey, listen, I've
7   been here for eight hours. Can you consider this my
8   tour of duty, and it would be up to the supervisor to
9   say yes or, no, I need you, and I'm certain that went
10  on, but I don't have a name to provide to you. What
11  we're talking about is individuals that just
12  blatantly left and put in for eight hours' overtime.
13  BY MR. HERBERT:
14      Q. Did you ever bring to the attention of
15  OPR any situations where white investigators went to
16  court and requested a tour of duty?
17      MR. WHITE: Objection to form and foundation.
18      THE WITNESS: I didn't put any information in
19  the investigation about a white investigator. I was
20  never asked about it.
21  BY MR. HERBERT:
22      Q. My question is: Did you ever take part
23  in an investigation into somebody stealing time
24  regarding going to court and asking that it be

Page 220

1   considered a tour of duty with a white officer?
2       MR. WHITE: Objection to form and foundation.
3       THE WITNESS: Did I ever take part in an
4   investigation involving a white officer and his tour
5   of duty?
6   BY MR. HERBERT:
7       Q. Yes.
8       A. No.
9       Q. Okay. Moving on, the next paragraph,
10  "Legrain Winston made numerous complaints regarding
11  the above mentioned incidents, yet the conduct
12  continued."
13          You became aware of the fact that
14  Winston was complaining about threats that you made
15  to him, correct?
16      A. That's not correct.
17      Q. You never became aware of the fact that
18  Winston made complaints about you becoming hostile
19  and threatening to have him fired?
20      A. No. This whole -- probably one of the
21  main reasons I'm here is because of this individual's
22  actions of the theft of overtime and he certainly
23  made it known that he wanted to rally around, as he
24  puts it, and I quote, "I would like to see everybody

Page 221

1   else in federal court with Shields."
2       Q. Well, you tell me. When Winston alleged
3   that you became hostile and screamed at him in a
4   threatening manner, you denied that you did that,
5   correct?
6       A. Yes.
7       Q. And you were upset that he made that
8   allegation against you, correct?
9       A. No, I think the word upset is
10  exaggerated. I just -- I just -- he's pretty
11  intimidating. You know, he's a big man, and so when
12  this all materialized, he demanded -- I mean, I'm --
13  I'm speaking softly. He demanded that I read the
14  overtime policy to him in the middle of about 25
15  people and it was between doorways, and he kept
16  pointing the finger at me saying, hey, Shields, you M
17  F'er, you put your hands on me, we're going to the
18  police station.
19      Q. Were you threatened by those statements?
20      A. I ran to my office. I was like, you know
21  what, get out of my face. I'm through with it. I'm
22  not going to read an overtime policy to you. I've
23  had it. I'm done, and I walked in my office.
24      Q. Did you report that you felt you needed

Page 222

1   to run to your office because of the actions by
2   Winston? Did you report that to anyone?
3       A. No.
4       Q. Did you consider that violence in the
5   workplace towards you?
6       A. Interesting. I mean, everyone had guns,
7   you know, and I thought it best to defuse the
8   situation. I basically -- I stepped into my office
9   and tried to defuse it, you know. I did -- I'm
10  sorry. What?
11      Q. Were you afraid? Is that part of the
12  reason why you stepped into your office?
13      A. It wasn't welcome at the workplace with
14  the staff members and civilians that were in an ear's
15  drop away or looking or leaving. I know it was shift
16  change. So it was for best interest for me to defuse
17  it and go to my office, and that's exactly what it
18  was.
19      Q. Okay. If we can move to the next page,
20  page 11, and if we can look at paragraph No. 38. Do
21  you see that? "Plaintiff Michelle Strickland
22  received a five-day suspension for a specific
23  incident with an inmate; nonminority investigators
24  had an analogous incident occur yet received no

Page 223



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 838 of 1503 PageID #:1229
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 discipline at all."

2 **A. Yes, sir.**

3 Q. And you remember Michelle Strickland

4 received a five-day suspension for that incident?

5 **A. Yes.**

6 MR. WHITE: Objection. It assumes facts not

7 in evidence.

8 BY MR. HERBERT:

9 Q. And you signed off on that discipline,

10 correct?

11 MR. WHITE: Objection. Assumes facts not in

12 evidence, foundation.

13 BY MR. HERBERT:

14 Q. You can answer.

15 **A. Yeah, I don't know who signed off on it.**

16 Q. You certainly approved of it, correct?

17 MR. WHITE: Objection. Assumes facts not

18 in evidence.

19 THE WITNESS: No. I just want to make it --

20 BY MR. HERBERT:

21 Q. Were you made aware of the fact that she

22 received a five-day suspension?

23 MR. WHITE: Objection. It assumes facts not

24 in evidence, foundation.

Page 224

1 BY MR. HERBERT:

2 Q. You can answer.

3 **A. I just want to make it very clear that we**

4 **don't issue discipline. We don't issue days off.**

5 Q. Do you become aware of when your

6 employees are given discipline?

7 **A. Yes and no. I mean, that's a terrible**

8 **answer but, yes, I do hear of discipline where the**

9 **director of the unit has to serve them with**

10 **termination or getting fired, and, no, I don't hear**

11 **of the grievances that are heard and the discipline**

12 **is reduced.**

13 Q. Okay. But you certainly know about when

14 somebody is given a suspension, correct?

15 **A. Yes, I definitely heard about Michelle**

16 **Strickland's five-day suspension.**

17 Q. Okay. And what do you recall about the

18 nature of the incident with the inmate?

19 **A. I recall that an inmate brought in**

20 **contraband that she was transporting with her partner**

21 **into the receiving room, and in the receiving room**

22 **they said that the individual brought in a weapon and**

23 **in fact it was some type of knife, some type of**

24 **knife.**

Page 225

1 Q. Okay.

2 **A. And I said -- go ahead.**

3 MR. WHITE: Finish your answer.

4 BY MR. HERBERT:

5 Q. Are you done, Mr. Shields?

6 **A. No. I mean, so I don't think the -- the**

7 **occurrence or the violation of the policy stemmed**

8 **from our unit. It could have been somebody in**

9 **receiving. It could have been somebody who actually**

10 **viewed it. It could have been, hey, these are the**

11 **facts. And I know for a fact that when somehow the**

12 **grievance was on its last leg, and the chief union**

13 **steward said, hey, is there anybody that can hear**

14 **this grievance for Michelle Strickland and I don't**

15 **remember her partner, and I was the only one in the**

16 **office, and I said, Mark, I'll hear it, no problem.**

17 **So I heard it and I read it, and**

18 **then from what I'm told, the guy had a fake leg, a**

19 **prosthesis, and he had the knife tucked up under**

20 **the -- tucked under whatever they hook them onto, and**

21 **so I felt that was, you know, not in conjunction with**

22 **the five-day suspension she received, and I talked**

23 **with her about it and I reduced it to nothing.**

24 **I said, okay, it sounds like we're**

Page 226

1 **going to have to look for knives in fake legs, and I**

2 **reduced both her and her partner's five-day**

3 **suspension to nothing, to zero. I said, what do they**

4 **call it, a verbal, or, hey, try not to let it happen**

5 **again, and Mark Robinson thanked me and I said, okay,**

6 **fine.**

7 Q. In your years in the electronic

8 monitoring, certainly this is not the first time that

9 a prisoner was brought in where it was discovered

10 that they had a weapon concealed on them, correct?

11 **A. I don't know what they do over there. I**

12 **mean...**

13 Q. I'm not asking what they do. I'm asking

14 you, you're certainly aware of situations in which

15 prisoners have been brought in and they're found to

16 have some type of weapon or narcotics, correct?

17 MR. WHITE: Objection to form.

18 THE WITNESS: Narcotics I would agree to.

19 BY MR. HERBERT:

20 Q. Okay. And is it your testimony that this

21 is the first time you've ever heard of an inmate

22 being brought in that is found to have a weapon?

23 **A. With a fake leg?**

24 Q. Not with a fake leg. Just listen to my

Page 227



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 839 of 1503 PageID #:1230
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 question. I'm just saying an inmate brought in with
2 a weapon, not unusual?
3 **A. Yeah, I've heard of different stories.**
4 Q. Okay. Are you aware of any
5 nonAfrican-American investigators within your unit
6 that received a five-day suspension for missing a
7 weapon in a search?
8 MR. WHITE: Objection to foundation and
9 misstates prior testimony.
10 THE WITNESS: A nonAfrican-American missing a
11 weapon on a search?
12 BY MR. HERBERT:
13 Q. Yes, and receiving discipline.
14 **A. Not that I -- and receiving discipline.**
15 BY MR. HERBERT:
16 Q. I'm sorry. Are you finished?
17 **A. No, I don't have an example. I mean, I**
18 **don't remember. I don't have any thoughts on that, a**
19 **nonAfrican-American bringing in a weapon who didn't**
20 **receive discipline. No, I don't have any examples.**
21 **No.**
22 Q. Okay. And paragraph 40, do you see that
23 there? "Ms. Strickland eventually bid out of the
24 electronic monitoring unit because she could not deal

Page 228

1 with the constant abuse and harassment from her
2 supervisors." Do you see that?
3 **A. Yes.**
4 Q. You became aware that Michelle Strickland
5 was complaining about harassment from her
6 supervisors, correct?
7 MR. WHITE: Objection. It assumes facts not
8 in evidence, foundation.
9 THE WITNESS: No, I have no information about
10 that. I never even heard about it.
11 BY MR. HERBERT:
12 Q. Well, how did you hear about the five-day
13 suspension then and you didn't hear about these other
14 complaints?
15 MR. WHITE: Objection. Asked and answered
16 and foundation.
17 BY MR. HERBERT:
18 Q. You can answer.
19 **A. How did I hear about that? I was asked**
20 **by the chief union steward if I could hear this**
21 **grievance on her five-day suspension and I said yes.**
22 Q. So it's your testimony that you never
23 heard any complaints about Michelle Strickland
24 complaining about her supervisors harassing her?

Page 229

1 MR. WHITE: Objection to form.
2 THE WITNESS: Yeah. I mean, there's an
3 avenue for her to file a complaint.
4 BY MR. HERBERT:
5 Q. I understand that, but I'm asking you
6 about what you know. Were you ever made aware of the
7 fact that Michelle Strickland was complaining about
8 harassment from her supervisors?
9 MR. WHITE: Objection to foundation.
10 THE WITNESS: No. I never seen her.
11 BY MR. HERBERT:
12 Q. And if Michelle Strickland was
13 complaining about --
14 **A. And that answer is no.**
15 Q. Well, let me finish first. And if
16 Michelle Strickland was complaining about harassment
17 by her supervisors, certainly you would have a duty
18 to look into that, correct?
19 **A. Yes.**
20 Q. Okay. And you would have a duty to
21 correct that behavior, correct?
22 **A. Yes.**
23 Q. And you didn't look into any of these
24 situations, correct?

Page 230

1 MR. WHITE: Objection to foundation, facts
2 not in evidence.
3 BY MR. HERBERT:
4 Q. Go ahead.
5 **A. If you could be specific. I'm not aware**
6 **of any situations. What I -- I am aware of a**
7 **situation where she may not have even worked for us.**
8 **She might have worked on the first floor for the**
9 **Department of Transportation.**
10 **She came into work, left her car in**
11 **the parking lot and left and caught a flight, and**
12 **they were curious as an abandoned car, whose it was,**
13 **and they found out it was hers and they were going to**
14 **tow it, and somebody said, no, just leave it there**
15 **and when she comes back we'll remind her that she has**
16 **to check with the security to leave an abandoned car**
17 **in the lot. I don't think that's harassment. I**
18 **mean, that's probably one of the only scenarios I**
19 **know of Michelle Strickland.**
20 Q. Okay. You're aware of the fact that
21 Michelle Strickland was disciplined for that
22 incident, correct, that you just spoke of?
23 MR. WHITE: Objection. Assumes facts not in
24 evidence, foundation.

Page 231

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 840 of 1503 PageID #:1231

Gregory Shields - 8/27/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 232

1  THE WITNESS: You know what, my apologies.
2  I'm not aware that she was disciplined on that.
3  BY MR. HERBERT:
4  Q. Well, do you think she should have been
5  disciplined from what you heard?
6  MR. WHITE: Objection. It calls for
7  speculation, improper opinion testimony.
8  BY MR. HERBERT:
9  Q. You can answer.
10  A. Given the fact that she left the car with
11  no one knowing who she was and the security guards
12  were asking whose car this is, we're going to have it
13  towed, she probably should have been subject to
14  saying, hey, you can't do that anymore. Maybe -- you
15  know, something other than nothing.
16  Q. Okay. If we go to the next page,
17  page 12, and if we can look at paragraph No. 43.
18  "In and around 2012, Chief Ranzino
19  said on a recorded call to the Director Shields that
20  Tims was the, quote, dumb ass Johnnie Cochran nigger
21  while Tims was on the line." Do you see that there?
22  A. Yes, sir.
23  Q. Do you remember that incident?
24  A. No, I don't.

Page 233

1  Q. Do you ever remember Ranzino referring to
2  Tims in the phrase that is there in quotes?
3  A. No.
4  Q. Do you ever remember him referring to him
5  in a derogatory term in any way?
6  A. No, never.
7  Q. Certainly, if Ranzino referred to Tims
8  that way, that would certainly be improper, correct?
9  A. Yes, that would be improper.
10  Q. Okay. If I can move on to the next page,
11  please, page 13. Paragraph 46 there, "I.V. Newson,
12  Jr., filed numerous complaints regarding the
13  consistent assignments he received in high incident
14  areas as opposed to the non-minority officers not
15  receiving the same assignments even though they had
16  less seniority and the assignments were to be
17  rotated." Do you see that there?
18  A. Yes, sir.
19  Q. Did you ever become aware of the fact
20  that I.V. Newson was complaining about the
21  assignments he was given?
22  MR. WHITE: Objection to foundation, it
23  assumes facts not in evidence.
24

Page 234

1  BY MR. HERBERT:
2  Q. You can answer.
3  A. No.
4  Q. You're not aware of one single complaint
5  that I.V. Newson made regarding work assignments?
6  A. No.
7  Q. Okay. Were these assignments, were they
8  supposed to be rotated amongst the different workers?
9  MR. WHITE: Objection to form.
10  THE WITNESS: An assignment that's to be
11  given to the investigators, it's not a request, and
12  the assignments that are given to the investigators,
13  no matter what you do, where you're at, at any given
14  time should be considered dangerous.
15  BY MR. HERBERT:
16  Q. You would agree with me -- go ahead.
17  A. The investigators had information
18  provided to them when they went on these assignments.
19  The investigators also had mobile laptops to look up
20  their background, to call for backup, could call for
21  help, and they had gainful knowledge that every
22  single person on the electronic monitoring unit is a
23  felon presumably indicted considering aggravated DUI
24  to murder.

Page 235

1  Q. Okay. But you would agree with me that
2  there's certain assignments within the electronic
3  monitoring unit where people didn't have to worry
4  about going, picking up these fugitives, correct?
5  A. I'm not aware of any of that. If they
6  were given an assignment to pick up a fugitive --
7  Q. That's not my question though. There's
8  assignments within the electronic monitoring unit
9  that don't require officers to go out and pick up
10  dangerous fugitives, correct?
11  A. Everyone is considered dangerous. I'm
12  not...
13  Q. Well, if you're assigned to work in an
14  office, you're not required to go out and pick up
15  people on a fugitive list, correct?
16  A. Yes. I mean, if there's an assignment
17  that the fugitive team needs a cage car and/or needs
18  help, that was dispatched to them to assist. Every
19  assignment is dangerous. I mean, I just -- you know.
20  I mean, I went to a house and, hey, how are you, and
21  there was four automatic weapons on the couch.
22  Q. You would agree with me that there are
23  some assignments that are more inherently dangerous
24  than other assignments within the electronic



Case: 1:18-cv-05726 Document #: 1095-1 Filed: 12/21/20 Page 841 of 1503 PageID #:1232

Gregory Shields  -  8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 monitoring unit, correct?
2  **A. I'll never agree with you on that, never.**
3 **In so many years of depicting a criminal's mind, I'll**
4 **never agree with that. You tell me which one's**
5 **dangerous and which one isn't. You can get killed on**
6 **a traffic stop.**
7  Q. Okay.
8  **A. I'm not trying to throw fluff on there.**
9 **I'm just telling you.**
10  Q. So your testimony is that being assigned
11 to work in an office and do paperwork is no less
12 dangerous than being assigned to go out and arrest
13 fugitives. Is that your testimony?
14  **A. No, that's not my testimony.**
15  Q. Okay. If we can move on to the next
16 page, please.
17  **A. Can we clarify that question?**
18  Q. You can do it with your attorney if you
19 want. I'm trying to get through my questions.
20  **A. If you had them, but working in an**
21 **office --**
22  Q. Sir.
23  MR. WHITE: Greg, just wait for a question or
24 we'll be here all night.
Page 236

BY MR. HERBERT:
2  Q. Paragraph No. 53.
3  **A. Yes, sir.**
4  Q. "Samuel Page received work assignments
5 that nonminority officers with less seniority never
6 received, specifically he was consistently assigned
7 to work in the basement even though he had the most
8 seniority, and less senior, nonminority officers were
9 never assigned to work in the basement."
10      Are you aware of the fact that
11 nonminority officers were never assigned to work in
12 the basement in the electronic monitoring unit?
13  MR. WHITE: Objection. Assumes facts not in
14 evidence, foundation.
15  THE WITNESS: Nonminority officers never
16 worked in the basement, no, I'm not aware of that.
17 BY MR. HERBERT:
18  Q. Would that surprise you?
19  MR. WHITE: Objection. It assumes facts not
20 in evidence.
21  THE WITNESS: What's the question?
22 BY MR. HERBERT:
23  Q. Would that surprise you if that occurred,
24 a non-minority officer that worked in electronic
Page 237

1 monitoring that was never assigned to work in the
2 basement?
3  **A. There's nothing surprising to me.**
4  Q. Okay. So it may have occurred?
5  **A. It's not like, ha, ha, I've got you.**
6 **It's -- I'm not going to agree. It may have**
7 **occurred, but you're asking me do non-Caucasian**
8 **members not work in the basement?**
9  Q. I'll move on to another question. You
10 would agree with me that seniority is a factor that
11 is taken into consideration regarding employees and
12 their work conditions?
13  **A. It's part of the Collective Bargaining**
14 **Act, yes.**
15  Q. Okay. And part of that is that employees
16 with more seniority are given more of a -- they're
17 given more consideration concerning their work
18 assignments as opposed to somebody with less
19 seniority, correct?
20  MR. WHITE: Objection to form, foundation.
21  THE WITNESS: No. I'm not aware of that.
22 BY MR. HERBERT:
23  Q. If there were two spots available and the
24 person with more seniority said I would rather work
Page 238

1 in this unit, and then somebody with less seniority
2 says, boy, I want to work in that unit, would the
3 seniority be considered in you assigning these
4 officers to that particular spot?
5  MR. WHITE: Objection to form and foundation.
6  THE WITNESS: No.
7 BY MR. HERBERT:
8  Q. You wouldn't consider seniority at all?
9  MR. WHITE: Objection. Asked and answered.
10  THE WITNESS: They have to bid according to
11 the Collective Bargaining Act. If there's spots
12 open, they've got to bid.
13 BY MR. HERBERT:
14  Q. Yeah, but you told me that after 2016
15 there was no bidding for particular spots. Isn't
16 that correct?
17  MR. WHITE: Objection. Misstates --
18  THE WITNESS: That's not correct, no.
19 BY MR. HERBERT:
20  Q. How about bidding for assignments?
21 You're saying the only way somebody can get an
22 assignment is through a bid process?
23  MR. WHITE: Objection. It misstates
24 testimony.
Page 239

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 842 of 1503 PageID #:1233
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 THE WITNESS: What's the question?
2 BY MR. HERBERT:
3 Q. You assigned investigators to work in the
4 employment -- in the different tasks of employment
5 that you chose, correct?
6 MR. WHITE: Objection to form.
7 BY MR. HERBERT:
8 Q. Do you understand the question?
9 **A. No, I don't.**
10 Q. The assignments given to the
11 investigators, those were done through your
12 supervisors, correct?
13 **A. The assignments given to my investigators**
14 **are given out to the investigators, yes.**
15 Q. By the supervisors, correct?
16 **A. The supervisors meaning management?**
17 Q. Yes. I'm not sure how else to
18 characterize them.
19 **A. When they do their lineups and their**
20 **rosters, that's when they are sent in the field, in**
21 **the street, in the basement.**
22 Q. They can put any employee in any position
23 that they're -- or any assignment that they want for
24 that particular day, correct?

Page 240

1 **A. Well, as the workload dictates to it,**
2 **yes.**
3 Q. Okay. And that means if they want to
4 stick somebody in the basement for one month
5 straight, they can do that, correct?
6 **A. Yes.**
7 Q. Okay. And in fact, that's what happened
8 to Samuel Page, correct? He was stuck in the
9 basement, and he didn't want to be there, correct?
10 MR. WHITE: Objection. It assumes facts not
11 in evidence, foundation, form.
12 THE WITNESS: Samuel Page worked the third
13 watch in the office. I've seen him periodically
14 through my career. There was a time where he would
15 have to go over to the basement and then come back
16 and work in the office.
17 BY MR. HERBERT:
18 Q. When you say had to, you're aware of the
19 fact that he didn't want to be in the basement,
20 correct?
21 **A. No, I'm not aware of that.**
22 Q. All right. Let's move on to Wilson
23 Ferguson -- Wilford Ferguson.
24 **A. Yeah.**

Page 241

1 Q. You know him, correct?
2 **A. Yes.**
3 Q. You're aware of the fact that he was
4 assigned to positions that nonminority officers also
5 were never assigned to despite him having more
6 seniority than them, correct?
7 MR. WHITE: Objection. Assumes facts not in
8 evidence, foundation.
9 THE WITNESS: I'm not aware of that, no.
10 BY MR. HERBERT:
11 Q. Okay. You're aware of the fact that
12 Cecil Williams received discipline in situations
13 where nonminority officers didn't receive discipline?
14 MR. WHITE: Objection. Assumes facts not in
15 evidence, foundation, form.
16 THE WITNESS: I'm not aware of him receiving
17 discipline and other individuals haven't received it.
18 BY MR. HERBERT:
19 Q. How about David Walker, are you aware of
20 him receiving discipline when nonminority officers
21 did not receive discipline for the similar conduct?
22 **A. No.**
23 Q. Did you ever look into those -- did you
24 become made aware of those complaints that they were

Page 242

1 being treated differently than other nonminority
2 officers?
3 MR. WHITE: Objection. It assumes facts not
4 in evidence, foundation.
5 THE WITNESS: No, I was never made aware of
6 it.
7 BY MR. HERBERT:
8 Q. Okay. Had you become aware of it, would
9 you have investigated that?
10 MR. WHITE: Objection. It calls for
11 speculation.
12 THE WITNESS: Sure. I mean, if they violated
13 the contractual agreement in part of their contract,
14 yes, I would have to look into it or their immediate
15 supervisor.
16 BY MR. HERBERT:
17 Q. And part of that is not taking seniority
18 into account when assigning people, correct?
19 **A. You didn't take seniority into account**
20 **when you assigned them. They could bid for their**
21 **shift and detail.**
22 Q. Okay. Tyrone McGhee, you're aware of the
23 fact that he worked in the basement and complained
24 about working there when less senior officers were

Page 243



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 843 of 1503 PageID #:1234

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 not assigned to work there?

2     MR. WHITE:  Objection.  Assumes facts not in

3 evidence, foundation.

4     THE WITNESS:  No, I'm not aware of it.

5 BY MR. HERBERT:

6     Q.  How about Victor Slaughter, are you aware

7 of the fact that he complained about the fact that he

8 complained about being assigned to the TSS basement

9 while --

10     MR. WHITE:  Objection.  Assumes facts not in

11 evidence, foundation.  (Simultaneous cross talk

12 between counsels).

13     MS. REPORTER:  That was overlap.  I couldn't

14 get the question.

15     MR. HERBERT:  Sorry.  I'll start again.

16 BY MR. HERBERT:

17     Q.  You're aware of the fact that Victor

18 Slaughter complained about being assigned to the

19 basement in the TSS unit, and he specifically alleged

20 that less senior nonminority officers were rarely if

21 ever assigned to work in the basement?

22     MR. WHITE:  Objection.  Assumes facts not in

23 evidence, foundation.

24

Page 244

1 BY MR. HERBERT:

2     Q.  You can answer.

3     **A.  Victor Slaughter was promoted to a field**

4 **training officer who had to --**

5     Q.  That's not my question though.

6         You're aware of the fact that he

7 complained about being assigned to the basement in

8 the TSS and he complained that less senior

9 nonminority officers were not assigned there and if

10 they were there it was rare?

11     MR. WHITE:  Objection.  Assumes facts not in

12 evidence, lacks foundation.

13     THE WITNESS:  No, sir.  I'm not aware of it.

14 BY MR. HERBERT:

15     Q.  Okay.  Did you ever look to see what the

16 percentage of black employees assigned to the

17 basement in TSS were compared to white employees?

18     **A.  No, sir.**

19     Q.  Okay.  The sheriff's office has a

20 progressive discipline policy, correct?

21     **A.  Yes, sir.**

22     Q.  And what's your understanding of

23 progressive discipline?

24     **A.  My understanding is it's progressive.**

Page 245

1     **It's -- how do you say it?  A written reprimand,**

2     **verbal, first time occurrence, second time, you know,**

3     **major, major infraction, minor infraction.**

4     Q.  Okay.  You remember a situation where

5 plaintiff Tims and Newson, they entered roll call and

6 they were about to begin their assignment and their

7 assignment was changed by you where you assigned them

8 to a location where a family had scabies instead of

9 sending nonminority officers to that particular

10 assignment?

11     MR. WHITE:  Objection.  Assumes facts not in

12 evidence, foundation, form.

13 BY MR. HERBERT:

14     Q.  You can answer.

15     **A.  I mean, I remember the scenario.  Yes, I**

16 **remember.**

17     Q.  Why did you send Tims and Newson instead

18 of less senior, nonminority officers to that job?

19     **A.  I never used seniority when I asked for**

20 **maybe an available unit, an available body.  As I**

21 **said before, it wasn't a request.**

22     Q.  Right.  It was your assignment?

23     **A.  I went to, I believe, as I past**

24 **practiced, I would probably ask one of the chiefs,**

Page 246

1     **hey, send the first available car.  I've got these**

2     **guys.  All right, send them.**

3     Q.  In this case you actually sent Tims and

4 Newson on that job assignment, correct?

5     **A.  I'd have to look at the lineup and I'd**

6 **have to see who was there.**

7     Q.  And you would agree that sending somebody

8 to a family that had scabies, that certainly would

9 not be a desirable assignment for anyone, correct?

10     **A.  I don't believe it would be desirable to**

11 **anyone.**

12     Q.  And you sent the black guys there, right?

13     **A.  I don't look at race when I assign an**

14 **assignment, sir.**

15     Q.  Well, it turned out you sent the black

16 guys though, right?

17     MR. WHITE:  Counsel, let him finish his

18 answer, please.

19     THE WITNESS:  When I assigned a unit, I don't

20 look at color.  I look at availability and what we're

21 doing and where we're at.  There's not enough thought

22 that goes into, hey, let's send the two black guys.

23 That's terrible for somebody to even suggest that.

24

Page 247



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 844 of 1503 PageID #:1235
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 248**

1 BY MR. HERBERT:

2     Q. I get that, but that's what happened in

3 this case, right? You sent the two black guys over

4 there to the family that had scabies, correct?

5     MR. WHITE: Objection. Asked and answered.

6     THE WITNESS: I would have to look at the

7 entire case. I'd have to look at the rosters, the

8 lineups, you know. I mean, I myself was sent on

9 different assignments that --

10 BY MR. HERBERT:

11     Q. Again I'm not asking what you were sent

12 on. I'm just trying to get through this.

13     A. All right. My fault.

14     Q. I'm sorry. Did you ever hear the word

15 nigger or crooks being used referring to any of the

16 black employees in the electronic monitoring unit?

17     A. No. Can I go back to the other question?

18     Q. No. You can do it with your counsel if

19 you'd like.

20     Certainly if you became aware of the

21 fact that employees were being referred to as nigger

22 or crooks, those certainly would be a violation of

23 the department policy, correct?

24     A. Yes.

**Page 249**

1     MR. WHITE: Objection.

2 BY MR. HERBERT:

3     Q. It certainly would result in a racial

4 discrimination, correct?

5     A. I'm not sure what it would result in, but

6 I can tell you that it would be a violation of

7 department policy and in accordance to what's written

8 out and all the other information that's out there I

9 would agree with you.

10     Q. And other than you sitting on the

11 grievance panel for Michelle Strickland, were you

12 ever in a position to assess a disciplinary penalty

13 of any of the plaintiffs?

14     A. All discipline came from the OPR unit.

15     Q. I understand that.

16     A. I can reasonably say to you that when the

17 discipline was issued from the OPR unit, they had an

18 opportunity to assess it, grieve it, and I'm going to

19 say in a large number of cases it was reduced by

20 management.

21     Q. And in any cases was it not reduced by

22 management?

23     MR. WHITE: Objection to foundation.

24     THE WITNESS: I'd have to look. I mean, if

**Page 250**

1 it's a major policy and they get 29 -- go ahead.

2 BY MR. HERBERT:

3     Q. If it was a situation where it was not

4 reduced, that would have been your decision, correct?

5     A. No, not correct.

6     Q. Okay. You became aware of the fact that

7 the plaintiffs here filed EEOC charges, correct?

8     MR. WHITE: Objection. Foundation, assumes

9 facts not in evidence.

10     THE WITNESS: Yes.

11 BY MR. HERBERT:

12     Q. And you became aware of the fact that

13 they made complaints specifically about you as their

14 supervisor, correct?

15     MR. WHITE: Objection. Foundation, assumes

16 facts not in evidence.

17     THE WITNESS: I'm not sure who made

18 complaints about me, but I believe that's what I'm

19 here for now, right?

20 BY MR. HERBERT:

21     Q. And you would agree with me that the

22 discipline against our plaintiffs certainly increased

23 after they made complaints about you and the working

24 conditions to the EEOC, correct?

**Page 251**

1     MR. WHITE: Objection to foundation.

2     THE WITNESS: We don't issue discipline. I

3 don't know how else to spell it. I apologize for

4 getting, you know.

5 BY MR. HERBERT:

6     Q. I understand. I'm not asking --

7     A. We don't issue discipline.

8     Q. I understand that point. I'm not asking

9 who issued it. I'm just saying that it certainly

10 became -- you became aware of the fact that the

11 disciplinary incidents in which they were being

12 accused of certainly increased after they made

13 complaints to the EEOC?

14     MR. WHITE: Objection. Foundation, assumes

15 facts not in evidence.

16     THE WITNESS: I'm not aware of it. I mean,

17 I'm not -- I mean, if they were -- how do you say

18 this like? If they were written up and a violation

19 of occurrence happened, they had the opportunity to

20 discuss it with the supervisor, grieve it, or accept

21 it. On the bottom they should have said, yes, I

22 accept whatever, and it won't happen again.

23 BY MR. HERBERT:

24     Q. And certainly somebody that makes an EEOC



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 845 of 1503 PageID #:1236

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 complaint, you want to make sure that those
2 individuals are not discriminated against as a result
3 of making those EEOC complaints, correct?
4    **A. Everything has to be whole. So if**
5 **somebody is going to make an EEOC complaint, my**
6 **position is, let's take a look at it. How can we**
7 **correct it? Let's get out the policy. Let's figure**
8 **out what we can do right. Let's figure out what we**
9 **can do wrong.**
10    **I'm part of the solution to try to**
11 **resolve this with you and everyone else. I'm here to**
12 **tell you that in fairness that I took an aggressive**
13 **approach to look at the allegations, reduce**
14 **discipline, and at the end of the day we all go home**
15 **safe.**
16    Q. And was part of that aggressive approach
17 increasing the discipline against the complainants in
18 this case?
19    **A. Absolutely not.**
20    MR. WHITE: Objection. Foundation, facts not
21 in evidence.
22 BY MR. HERBERT:
23    Q. That's what happened.
24    MR. WHITE: It didn't happen.

Page 252

1    THE WITNESS: Yeah, I'm not aware of it
2 happening.
3    MR. HERBERT: And if we can move on to
4 Exhibit B, please. If we can go to page 4 of that --
5 I'm sorry. Page 3. And if we can go to the bottom
6 which is question No. 4 of the interrogatories.
7 BY MR. HERBERT:
8    Q. Do you see there the question No. 4,
9 Mr. Shields?
10    **A. Yes, sir.**
11    Q. It's asking, "Have you or anyone acting
12 on your behalf had any conversations or do you know
13 of any statements with or by any person at any time
14 with regard to the incidents which forms the basis of
15 Plaintiffs' Complaint in this matter? If so, state
16 the following." Do you see that sentence there?
17    **A. Yes.**
18    Q. Okay. And if we can go on to the next
19 page, page 4.
20    **A. Yes.**
21    Q. Okay. And the last sentence of your
22 response where it says, "Defendant Shields spoke with
23 OPR concerning plaintiff Winston's complaint that he
24 had yelled at him, and he may have also spoken with

Page 253

1 John Webb concerning these allegations but does not
2 recall any specifics of the conversation at this
3 time." Do you see that?
4    **A. Yes, sir.**
5    Q. Do you remember speaking to John Webb
6 about this, the complaint made?
7    **A. Yes, sir.**
8    Q. And tell me about the conversation you
9 had.
10    **A. John Webb was involved in this complaint.**
11 **We were interviewed by OPR and the attorneys**
12 **together, and I was just puzzled after I talked with**
13 **OPR and asked, you know, how come you're not in it?**
14 **Maybe they forgot me. I did discuss with John the**
15 **complaint.**
16    Q. And was John, was he an accused member of
17 that complaint?
18    **A. I'm going to say yes. I remember seeing**
19 **his name. We were interviewed. We were called by**
20 **the county sheriff's lawyers and interviewed**
21 **together.**
22    Q. Okay. And then you had a conversation
23 with him after that?
24    **A. Yes.**

Page 254

1    Q. Okay. Were you instructed that you
2 weren't supposed to speak with anyone other than your
3 attorney or union representative if you had one about
4 the ongoing investigation?
5    **A. I don't recall, but it was the lawyers**
6 **and me and John, and that's who I confided with.**
7    Q. Okay. And part of your confiding was to
8 get your story straight with John, correct?
9    MR. WHITE: Objection.
10    THE WITNESS: No, we had to answer the
11 questions from the lawyers.
12 BY MR. HERBERT:
13    Q. And you guys wanted to make sure your
14 answers were the same, correct?
15    **A. That was never our motive.**
16    Q. But that's in fact what happened, isn't
17 it? After you guys spoke, your answers were the
18 same, correct?
19    **A. Not that I'm aware of.**
20    Q. Well, you talked about the incident,
21 correct?
22    **A. No, the attorneys asked us questions**
23 **about the incident, and we gave a response.**
24    Q. And that response was what you believe

Page 255



Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-5 Filed: 12/21/20 Page 846 of 1503 PageID #:1237

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 your actions were concerning that incident, correct?

2 **A.  The response -- we gave the response to**

3 **the two lawyers.**

4     Q.  Okay.  If we can move on to page 6,

5 please.  And I'm going to ask about paragraph 8 right

6 at the top there.

7        Have you ever been involved in any

8 civil action either as a defendant, respondent, or

9 plaintiff in a court or before an administrative

10 agency?  Do you see that question there?

11 **A.  Yes, sir.**

12     Q.  Okay.  And in your answer -- and you

13 reviewed these answers, correct?

14 **A.  Yes, sir.**

15     Q.  And you reviewed them for their accuracy

16 to being truthful, correct?

17 **A.  Yes, sir.**

18     Q.  And you signed a verification attesting

19 that all the answers were truthful and accurate to

20 the best of your knowledge?

21 **A.  Yes, sir.**

22     Q.  Okay.  And about midway down -- I'm

23 sorry.  It's the second sentence, you talk about you

24 were named as a defendant by David Walker in the

1 District Court for the Northern District of Illinois.

2 Do you see that?

3 **A.  Yes, sir.**

4     Q.  You were sued by David Walker?

5 **A.  Yes, sir.**

6     Q.  And who was David Walker?

7 **A.  He's an investigator in the electronic**

8 **monitoring unit.**

9     Q.  Okay.  And he's one of the plaintiffs in

10 this case, correct?

11 **A.  Yes, sir.**

12     Q.  And he's black, correct?

13 **A.  Yes, sir.**

14     Q.  And what did David Walker allege that you

15 did?

16 **A.  You know what, I don't know.  I like**

17 **David Walker.  I don't know.**

18     Q.  Okay.  Investigator Raymond Villa, he

19 filed a charge against you at the EEOC?

20 **A.  Yes.**

21     Q.  Okay.  And Raymond Villa, is he Hispanic?

22     MR. WHITE:  Objection.  It calls for

23 speculation.

24     THE WITNESS:  He could be.

1 BY MR. HERBERT:

2     Q.  Well, have you met him?

3 **A.  Yes.  I'm going to say maybe Italian.**

4     Q.  Okay.  The same as Chief Ranzino?

5 **A.  Ray Villa is Italian.**

6     Q.  Okay.  And what did Ray Villa allege that

7 you had done to him?

8 **A.  I don't know.**

9     Q.  Okay.  Dorian Swain, you're certainly

10 familiar with Mr. Swain, correct?

11 **A.  Yes.**

12     Q.  And he's black, correct?

13 **A.  Yes.**

14     Q.  And he filed a complaint against you,

15 correct?

16 **A.  Yes.**

17     Q.  And what did he allege about you?

18 **A.  He alleged that I -- he alleged that I**

19 **sexually harassed him and mistreated him and that I**

20 **was looking at his -- are there women on the phone?**

21     Q.  There are, but there's nothing sacred

22 here when we're conducting a dep.

23 **A.  He alleged that I was looking at his**

24 **private parts below his waist and that I was sexually**

1 harassing him and...

2     Q.  Did he make any racial complaints?

3 **A.  Racial complaints?**

4     Q.  Yes.

5 **A.  After that complaint he brought -- he did**

6 **something with the State of Illinois with me and a**

7 **female black supervisor, that we were harassing him,**

8 **and we had to go to a hearing at the State of**

9 **Illinois building.**

10     Q.  Harassing him based on race, right?

11 **A.  Yes.  Race and sexuality.**

12     Q.  Okay.  If I can move on to page 7, and

13 I'm going to look at No. 10 where we're asking you,

14 "Describe any complaints made against you in the last

15 five years regardless of the complaint's current

16 status or outcome.  If this interrogatory is answered

17 by reference to a complaint history sheet, please

18 state in general the allegations made against you for

19 each complaint.  Please also state under oath whether

20 your complaint history sheet includes all complaints

21 responsive to this interrogatory.  For all complaints

22 described in response to this interrogatory, please

23 provide a file number and other identifying

24 information."  You see that, correct?

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 847 of 1503 PageID #:1238

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  Yes, sir.

2    Q.  And in there you put the complaint that

3  was made by Winston against you on August 6, 2015,

4  correct?

5    A.  Yes.

6    Q.  Okay.  And that's the one that was

7  sustained, correct?

8    A.  Yes.

9    Q.  Okay.  And then Steven Andrews --

10   MR. WHITE:  Counsel, I want to be clear for

11  the record.  This says that part of it was sustained,

12  not the whole thing.

13   MR. HERBERT:  Okay.

14  BY MR. HERBERT:

15   Q.  Steven Andrews filed a complaint register

16  against you to OPR, correct?

17   A.  I'm not -- I mean, I know he filed

18  something.  I don't know how many people were on it,

19  but I'm almost sure I was on it.

20   Q.  That's in the answer that you responded

21  to, that you swore to.  Investigator Steven Andrew

22  submitted a complaint register to OPR alleging that

23  he felt he received a disciplinary complaint and felt

24  he was being harassed.

Page 260

1  know.  His underwear and his private parts were

2  hanging out.

3    Q.  And what did you say to him regarding

4  that?

5    A.  I said, you can't go to work like that.

6  Do you have another pair of pants in your locker, and

7  he spun the whole thing and said are you -- you know,

8  are you gay?  Why are you checking out my privates?

9  I've got to go home.  Why are you looking at me in a

10  perverted way?

11   Q.  And you were the executive director at

12  that point?

13   A.  No, I think I was the director.

14   Q.  Well, if it happened in 2018, wouldn't

15  that have been -- wouldn't you have been the

16  executive director?

17   A.  Maybe.  Yeah.  Yeah.  I didn't pick up on

18  the date.

19   Q.  Okay.  And as an executive director, did

20  you complain to any nonminority officers about the

21  condition of their uniforms?

22   A.  Yes.

23   Q.  Who and when?

24   A.  Lieutenant, what was his name?  I'm

Page 262

1    You agree that that's what your

2  answer was?

3    A.  Yes.

4    Q.  Okay.  And what did Steven Andrews allege

5  regarding being harassed?

6    A.  I don't know what he alleged.  I never --

7  I mean, I don't know anything.

8    Q.  Steven Andrews is black, correct?

9    A.  Yes.

10   Q.  And then you talk about the March 8, 2018

11  complaint that Dorian Swain made about you

12  questioning about a hole in his uniform pants.  Do

13  you see that?

14   A.  Yes.

15   Q.  And did you question him about a hole in

16  his uniform pants?

17   A.  Yes.

18   Q.  Okay.  And is that the situation that

19  Dorian Swain complained that you sexually harassed

20  him?

21   A.  Yes, that was when I was -- yes, like

22  checking out his private parts.

23   Q.  Okay.  Where was that rip in his pants?

24   A.  Below his waist, between his pants, you

Page 261

1  drawing a blank right now, but I had the

2  lieutenant -- he said I was sexually harassing you

3  (sic), so I had the lieutenant go over and inspect

4  his uniform.

5    Q.  Are you talking about Mr. Swain?

6    A.  Yes.  You asked me did I talk about --

7    Q.  I'm asking you something different

8  though.  I'm asking you, as an executive director,

9  had you instructed any other nonminority officer that

10  they needed to change their uniform?

11   A.  The guy had his pants hanging out.  I

12  mean, he had his junk hanging out.

13   Q.  I know, but you have to answer my

14  question.  Do you remember the question?

15   A.  Did I ask any nonminority people to

16  change their pants or to change their uniform?

17   Q.  Other than Officer Swain, as the

18  executive -- just let me finish the question, okay?

19      Other than Officer Swain, in your

20  role as executive director of the electronic

21  monitoring unit, did you instruct any other officers

22  that they needed to change their uniform pants?

23   A.  No.

24   MR. WHITE:  Greg, are you there?

Page 263



Case: 1:18-cv-05726 Document #: 1093 Filed: 12/21/20 Page 848 of 1503 PageID #:1239

Gregory Shields  -  8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

THE WITNESS:  Yeah, I'm here, but I lost you on the screen.  I didn't mean to interrupt you.  Can you guys still hear you?

MR. WHITE:  Yeah, we can hear you.  We just can't see you.

THE WITNESS:  Yeah.  I don't have anything on my screen now.

BY MR. HERBERT:

Q.  That's okay.  Can you answer the question though, please?

**A.  No, I didn't.  That's the answer.**

Q.  Okay.  And if we can move on to the next page please, page 8.

**A.  Yeah, I don't have it up.**

MR. WHITE:  Yeah, he can't see it.

MR. LEINENWEBER:  Hang on.  Something must have happened to the computer.  I'm going to go in right now.  Hang on a second.  We have something weird happening on the computer.  We got kicked out of Zoom maybe.

MR. WHITE:  While they're figuring it out, so unfortunately because we are in, you know, COVID times, I don't have a choice about 5:30.  I have to get my kids and there's nobody else that can do it.

So I am -- you know, if you're not done at 5:30 which is like in 45 minutes, I'm perfectly willing to be reasonable and if you say to me, you know, Ethan, I need another 15 or 30 minutes, you know, I'm not going to make you go to the court for that.  I think we're just going to figure out a way -- we can do it, you know, this weekend over the telephone or something like that.

If instead you think I'm going to need an hour, I'm going to need two hours, I don't know how much longer that I'm going to need, then, you know, I do think our position will be you're going to have to go ask Judge Kennelly for that.

MR. HERBERT:  Yeah, and I appreciate that.  I doubt I'm going to have to ask for more than a half hour.  We'll see how long this break is.

MR. WHITE:  Yeah.  Unfortunately, Justin has the same child care problem, so we both have to have a hard stop at least for today at 5:30.

MR. HERBERT:  We have no issues with that.

MR. WHITE:  Okay.

MR. HERBERT:  So I'm probably going to need a little bit of time, and if I think it's going to be excessive, then I'll let you know and you can tell me

what your position is.

MR. WHITE:  Okay.  And we were even talking, you know, if all it's going to be is putting an exhibit in front of him and talking through that, we can probably do that over the phone and make it even easier where he doesn't have to coordinate coming into Justin's office and all that.

MR. HERBERT:  Yeah, that's a good solution.

MR. LEINENWEBER:  Just stand by, Guys.  I had to restart the computer.  For some reason Zoom was just spinning.  It wasn't letting me back in.

MR. WHITE:  Okay.

BY MR. HERBERT:

Q.  Okay.  Can you hear, Mr. Shields?

**A.  Yes.**

MR. WHITE:  Do you have the exhibit, Greg?

THE WITNESS:  Page 8.  That's what I'm on.

BY MR. HERBERT:

Q.  Yes.  Okay.  Great.  I want to look at really the response to paragraph No. 12, but the question is, "Identify each and every individual who witnessed or claims to have witnessed the occurrences alleged in the complaint and as to each person identified state the details and substance of what

they witnessed."

And I'm going to go to the last sentence of your answer where you state, "Defendant believes that any EMU employee could have witnessed the conduct related to plaintiff's complaint and believes Winston, John Webb and Mike Brady may have witnessed some of the allegations of the plaintiff's complaint."  Do you see that?

**A.  Yes, sir.**

Q.  What portions of the complaint do you believe were witnessed by John Webb?

**A.  I'm almost positive the diffusing of Winston and myself just abruptly leaving -- abruptly leaving the whatever room going into my office.**

Q.  Okay.  The one that we spoke of earlier?

**A.  Yes, sir.**

Q.  Okay.  Anything else that John Webb may have witnessed other than that incident?

**A.  He was there.  I remember him being there, so.**

Q.  Right.  I'm talking anything different than that?

**A.  I'm not sure whether he heard anything else, but he was there.  He was there.**



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 849 of 1503 PageID #:1240
Legraul Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Q.  Nothing other than that incident is what I'm talking about?  None of the other incidents complained about in the complaint?

A.  I'm not sure what he witnessed.  I mean, I can't be specific, but I can be specific that when I had left to go into my office, I know he was with me.

Q.  Okay.  How about Mike Brady, what allegations in the complaint do you believe that he may have witnessed?

A.  You know, he was there and -- he showed up.  He just showed up.  I don't know where his position was.  I don't know what door he came through, but I believe he came back into my office asking me if I was okay.  Are you okay?  Are you good?

Q.  Okay.  So that's the same incident that you believe Webb may have witnessed, the incident with Winston that we spoke of earlier, correct?

A.  Yeah.  Winston was demanding I read the overtime policy out loud.

Q.  Right.  I get that.

A.  That was where I said, you know, I'm done with it.  I'm through with it.  Get it out of my

*Page 268*

face.

Q.  Okay.  I just wanted to know of that incident.  Thank you.

A.  Yes.

Q.  Okay.  All right.  If we can move on to page 9.

A.  All right.

Q.  And I'm going to look at interrogatory No. 17 where we asked you to state whether or not any other Cook County Sheriff officer or employee to your knowledge acted inconsistently with any of the policies and practices of the Cook County Sheriff's Office, formal or informal, written or unwritten, at any time during the incidents described in plaintiffs' complaint.

And then if we can move to your answer.  So your answer is that -- the last sentence, you're not aware of any information responsive to this interrogatory.  Do you see?

A.  Yes.

Q.  Okay.  So it's fair to say that you're not aware of any Cook County Sheriff's officer or employee that violated any department policies with respect to the allegations contained within this

*Page 269*

complaint made by the plaintiffs?

MR. WHITE:  Objection.  That ignores all of the objections that have come before that which made very clearly what he was answering, so that's not a fair question unless you read the entire response.

BY MR. HERBERT:

Q.  I'm going to move on.  If I can move on to the next -- or I'm sorry.

Okay.  Question 20 at the bottom there, "Please state whether the defendant has ever received a complaint of racial discrimination," and then the next page goes on to your answer, and the second sentence there, "Defendant Shields will provide information related to race discrimination complaints made against him in the electronic monitoring unit from 2015 to the present.  Defendant Shields reports that other than the plaintiffs in this case, and the complaints outlined in response to interrogatory No. 10, he has not received any other complaints of race discrimination."  Do you see that?

A.  Yes.

Q.  Okay.  Is it your understanding that that is still a true statement today, that you're not aware of any racial complaints other than the ones

*Page 270*

made by the plaintiffs in this case and the individuals that you identified earlier that we talked about, Steven Andrews?  Is that correct?

A.  To the best of my knowledge, yes.

Q.  All right.  How about prior to 2015?  Had you ever been accused of any or had there been any race discrimination complaints made against you prior to 2015?

A.  Prior to 2015.  I've never been made aware of any.

Q.  Okay.  Are you aware of any racial complaints made against you other than the ones that we just talked about, the plaintiffs and Mr. Andrews?

A.  I've never been made aware of any.

Q.  Okay.  So you're not aware of any complaints that have been made against you?

MR. WHITE:  Objection.  Asked and answered.

MR. HERBERT:  Well, it's a little bit different.  He said he wasn't made aware of any.

BY MR. HERBERT:

Q.  You're not aware of any complaints ever made against you of racial discrimination other than the ones -- and the plaintiffs and Mr. Andrews, correct?

*Page 271*



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 850 of 1503 PageID #:1241
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 272**

1    A.  I mean, I want to answer your question,

2 but wasn't Swain involved in that too?

3    Q.  Yeah, but he's a complainant here, so.

4    MR. WHITE:  No, he's not in this case.

5 BY MR. HERBERT:

6    Q.  Oh, he's not.  Well, Swain, would that be

7 one?

8    A.  Yes.  He brought us down to something,

9 and he filed something with the State of Illinois

10 building.

11    Q.  Anyone else?

12    A.  Did anybody else what, file a complaint

13 against me?

14    Q.  Yes.

15    A.  I'm not aware of any of them.

16    Q.  Okay.

17    A.  They file a complaint, and then they

18 don't run and tell you.

19    Q.  Okay.  If I can move on to --

20    A.  To the best of my knowledge.  All right.

21 Go ahead.

22    Q.  If I can move on to page 12 then.

23    A.  Yeah.

24    Q.  And I'm looking at question No. 22.

**Page 273**

1 "Does the defendant or any of the defendant's

2 supervisory personnel have knowledge or indication of

3 racial statements, stereotypical comments, ridicule

4 or joking in the workplace?"  Do you see that there?

5    A.  Yes, sir.

6    Q.  And the last part of your answer is that

7 the interrogatory is unduly burdensome and you will

8 only provide answers concerning claims by EMU

9 employees regarding harassment or a hostile work

10 environment based on race since 2015, correct?

11    A.  Correct.

12    Q.  Are you aware as we sit here of any --

13 any complaints about racial statements, stereotypical

14 comments, ridicule or joking in the workplace other

15 than the allegations contained within this complaint?

16    MR. WHITE:  Objection to form.

17    THE WITNESS:  Should I answer?  No, I'm not

18 aware of any.

19 BY MR. HERBERT:

20    Q.  You're not aware of any.  How about prior

21 to 2015?

22    MR. WHITE:  Objection to form.

23    THE WITNESS:  I'm not.  I'm not aware of any.

24

**Page 274**

1 BY MR. HERBERT:

2    Q.  Okay.  And then as far as question No.

3 23, were any reports made by any persons concerning

4 the complaints alleged in plaintiffs' complaint?

5    Are you aware of any reports that

6 were made regarding these complaints?

7    MR. WHITE:  Objection to form.

8 BY MR. HERBERT:

9    Q.  Do you understand?

10    A.  No, I don't.

11    Q.  Well, are you aware of any documents

12 regarding allegations of complaints about the nature

13 of the workplace made by any employees?

14    MR. WHITE:  Objection to foundation and form.

15    THE WITNESS:  They did complain about, you

16 know, like the roll call room, they needed better

17 chairs and lighting, and we did what we could.  They

18 did complain about Motorola radios, and we got

19 everybody radios.  They did complain about less than

20 lethal Tasers, and then we get Tasers.  I don't know

21 if that's the answer you want, but.

22 BY MR. HERBERT:

23    Q.  No, I'm asking about -- well, they made

24 complaints about all of the allegations that they

**Page 275**

1 made in this complaint.  They made complaints

2 regarding those written complaints.  You agree with

3 me on that?

4    MR. WHITE:  Objection.  Assumes fact not in

5 evidence, foundation.

6    THE WITNESS:  No.

7 BY MR. HERBERT:

8    Q.  They filed grievances, did they not?

9    MR. WHITE:  Objection.  Assumes facts not in

10 evidence, form, foundation.

11    THE WITNESS:  Anybody can file a grievance.

12 Well, let me take that back.  I'm sorry.

13 BY MR. HERBERT:

14    Q.  I'm asking about these plaintiffs filed

15 grievances complaining about the work -- or I'm

16 sorry, the conduct that was addressed in this

17 complaint?

18    MR. WHITE:  Objection.  It assumes facts not

19 in evidence, foundation, form.

20    THE WITNESS:  Well, just to respond to that,

21 they filed a grievance.  It should have been heard

22 and resolved.

23 BY MR. HERBERT:

24    Q.  But you were made aware --



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 851 of 1503 PageID #:1242
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 276**

1    **A.  No, I was not made aware of it.**

2    Q.  Well, you signed several of the

3  complaints regarding moving on to step two or step

4  three.  Do you remember doing that?

5    MR. WHITE:  Objection to foundation.

6    THE WITNESS:  I mean, if you have something

7  with my signature, I'll agree to that, but I can't go

8  by memory.

9  BY MR. HERBERT:

10    Q.  Do you remember signing any complaints

11  concerning any of the allegations that were made

12  within this complaint?

13    MR. WHITE:  Objection.  Assumes facts not in

14  evidence, foundation.

15    THE WITNESS:  I don't remember signing any

16  grievances made in this complaint.

17  BY MR. HERBERT:

18    Q.  Okay.  And then I asked you about your

19  interactions with the plaintiffs earlier today.  Do

20  you remember that?

21    A.  Yes, sir.

22    Q.  Okay.  And you talked about your

23  interaction with Officer Winston certainly, correct?

24    A.  Yes, sir.

**Page 277**

1    Q.  Any other interaction with any of the

2  other plaintiffs that you can remember?

3    MR. WHITE:  Objection to form.

4    THE WITNESS:  Just a work related -- work,

5  you know, work atmosphere.

6  BY MR. HERBERT:

7    Q.  During your time as director and

8  executive director, did you ever become aware of any

9  harassment that was taking place within the

10  workplace?

11    **A.  I don't remember any harassment in the**

12  **workplace.**

13    Q.  Did you ever become aware of any racial

14  discrimination occurring within the workplace?

15    **A.  No, I don't remember any racial**

16  **discrimination.**

17    Q.  Did you ever do -- take any steps to

18  ensure that there was no harassment done within the

19  workplace?

20    **A.  I mean, when -- that answer was yes.**

21    Q.  Can you please name all the steps you

22  took to make sure that there was no harassment in the

23  workplace?

24    **A.  I was accused of sexually harassing, I**

**Page 278**

1  **forget his name, Swain, and he said he wanted to file**

2  **a complaint.  And if my memory serves me, I believe**

3  **that you have to send him a copy of the general order**

4  **and a copy of the complaint form, and you have to**

5  **assign a supervisor to help fill it out.**

6    Q.  All right.  I'm asking a different

7  question.  I'll try and be more specific.

8    Did you take any --

9    **A.  I did that.**

10    Q.  Okay.  But I'm just talking about your

11  duties and role as a director and executive director.

12  Did you take any steps to prevent harassment in the

13  workplace?

14    **A.  Outside of myself I wasn't aware of any**

15  **harassment at the workplace.**

16    Q.  I'm asking you did you do anything to --

17  did you do any -- did you take any steps to ensure

18  that harassment was not taking place in the

19  workplace?

20    **A.  Well, in accordance to the sheriff's**

21  **policy, they were to -- each and every individual**

22  **were to complete their LMS training online, and I'm**

23  **sure some of those policies and procedures were in**

24  **there about this subject, and it was the**

**Page 279**

1  **responsibility of myself to make sure they all took**

2  **this training.**

3    **And we had a percentage of, like say**

4  **if there was a hundred guys, you know, we're at**

5  **98 percent, who didn't do it?  And then I would call**

6  **the boss and say, hey, get these two guys to finish**

7  **this.**

8    Q.  Is that the harassment training?

9    **A.  It was multiple learning management**

10  **training, use of force, harassment, sexual harassment**

11  **racial discrimination.  Each and every investigator**

12  **had a fiduciary right to take that training, and the**

13  **supervisors had a right to allow them time to**

14  **complete it.**

15    Q.  Did the supervisors, were they required

16  to take that training?

17    **A.  Yes.**

18    Q.  Did you ensure that all of your

19  supervisors took that training?

20    **A.  Yes.**

21    Q.  Okay.  Are you aware of any supervisors

22  that did not complete that training?

23    **A.  I'd like to say the degree of accuracy**

24  **was a hundred percent, and my answer would be, yes, I**



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 852 of 1503 PageID #:1243

Gregory Shields - 8/27/2020
Legrant Winston, et al. v. Sheriff of Cook County Thomas J. Dart, et al.

1 assured that the supervisors also took the field
2 training under learning management on policies.
3    Q.  Go ahead.
4    A.  On policies.
5    Q.  Okay.  Did you take training concerning
6 discrimination and harassment in the workplace?
7    A.  Yes.
8    Q.  When did you do that?
9    A.  Through my -- I can't be specific.  I'm
10 going to say within -- whenever the learning
11 management came out.
12    Q.  Was it during your time as a director?
13    A.  It could be.  Yeah, it could have been,
14 yeah.
15    Q.  Well, how many different training courses
16 did you take concerning discrimination and harassment
17 in the workplace?
18    A.  I think the sheriff's office has one
19 policy specific to discrimination, sexual harassment.
20    Q.  I'm not talking about the policy.  I'm
21 talking about the training.
22    A.  I'm not sure whether it was once a year
23 or I'm not sure whether it was like every three years
24 but -- I don't recall like duplicating policy after

Page 280

1 policy after policy.  I'm almost positive that the
2 policies that were -- the learning management system
3 that was sent to me I completed.
4    Q.  Do you know if you took any classes
5 regarding retaliation, discrimination in the
6 workplace?
7    A.  I don't take classes for -- no, I didn't.
8    Q.  Okay.  Well, you're aware of the fact
9 that the sheriff's department has a training program
10 that deals with discrimination, harassment, and
11 retaliation in the workplace?
12    MR. WHITE:  Objection to foundation.
13 BY MR. HERBERT:
14    Q.  Are you aware of that?
15    A.  No, I'm not aware of.  No, it's the first
16 time I'm hearing that they have classes for this.
17    Q.  Okay.  If I can go to Exhibit D, please,
18 and I'm going to go to the last page on Exhibit D.
19       Do you see that page there?
20    A.  Yes, sir.
21    Q.  And the first title there is
22 Discrimination, Harassment, and Retaliation Annual
23 Training.  Do you see that?
24    A.  Yes, sir.

Page 281

1    Q.  And this is your -- this is a report for
2 the training that's specific to you.  Do you see
3 that, your name above?
4    A.  Yes, sir.
5    Q.  Okay.  And do you recognize this
6 document?
7    A.  No, I've never seen it.
8    Q.  Okay.  And that class, it indicates that
9 you registered for it on June 10, 2019.  Do you see
10 that?
11    A.  Yes, sir.
12    Q.  Okay.  When did you retire?
13    A.  This year, December 31st.
14    Q.  2019, correct?
15    A.  Yes, sir.
16    Q.  Okay.  Do you know whether or not you
17 ever completed this course?
18    A.  There was a -- there was a like, I don't
19 know, a tab that will show you if you completed it or
20 not.
21    Q.  Yeah.  If I can show you maybe the
22 previous page.
23    MR. HERBERT:  And I don't know if we can put
24 those two pages up simultaneously.  If not...  Is

Page 282

1 that possible or no?  Well, I'm just going to ask
2 questions.
3 BY MR. HERBERT:
4    Q.  But it's my understanding that this page
5 correlates to the previous page that we had on the --
6 that we had on the screen and it matches with all the
7 courses.  But my question is, do you see that, where
8 we have the circle there 8/9/2019, registered
9 completion status n/a.  Do you see that?
10    A.  Yes.
11    Q.  Okay.  And is it your understanding that
12 that means that it was never completed by you?
13    MR. WHITE:  Objection.  It calls for
14 speculation.
15    THE WITNESS:  That's -- is this in reference
16 to the -- what was the course name?
17 BY MR. HERBERT:
18    Q.  Discrimination, harassment, and
19 retaliation.
20    A.  That I registered and do by -- I don't --
21 at face value that's what it appears to be, but I
22 don't trust this document.
23    Q.  Do you remember completing this training
24 program?

Page 283



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 853 of 1503 PageID #:1244
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.   I'm going to say yes.
2    Q.   And when did you complete it?
3    A.   I don't know.  I mean, if you -- I just
4  don't trust the information on here.
5    Q.   Okay.  So you're saying that this
6  document is -- does not accurately reflect -- it's
7  not an accurate document concerning you completing
8  it?
9    A.   I'm not sure what's accurate and what
10  isn't accurate, and I'm not here to like figure it
11  out, but did you get it from the training academy?
12  Where did you get it from?  I've never seen it.
13    Q.   Your lawyers can answer that better than
14  I can.  You don't remember completing that class
15  though, correct?
16    MR. WHITE:  Objection.  It misstates
17  testimony.
18    THE WITNESS:  I remember taking the LMS
19  training.  I remember taking...
20  BY MR. HERBERT:
21    Q.   But I'm talking about this class?
22    A.   I can't remember.
23    Q.   Okay.  Fair enough.
24    A.   You know, I don't -- discrimination and
                                                    Page 284

1    Q.   Since you were the director in 2016
2  through the time that you retired, did you ever have
3  -- did you provide any training to any of your
4  supervisors regarding discrimination, harassment,
5  retaliation in the workplace?
6    A.   I had nothing to do with training.  We
7  had a training board.  We had a curriculum.  We had a
8  training academy.
9    Q.   I'm asking about you though.  So you
10  didn't provide any training to your supervisors or
11  employees about discrimination, harassment -- hold
12  on.
13    You didn't provide any training
14  regarding discrimination, harassment, or retaliation
15  in the workplace with your supervisors or any of your
16  employees, correct?
17    A.   I was instructed to make sure that staff
18  members that worked under me completed the training
19  that was sent to the investigators under LMS.
20    Q.   I get that.
21    A.   That was my -- me overseeing the
22  department, I made sure that the staff members had
23  allowed investigators time to complete their
24  training, so I was -- I was part of the management
                                                    Page 286

1  harassment prevention or discrimination and
2  harassment prevention, I could have taken it.  I
3  don't know how often they offered it, but if -- I did
4  take it and go through it.
5    Q.   So if I can, other than taking these
6  classes and ensuring that your supervisors and
7  employees took them, did you take any other steps to
8  ensure that harassment did not occur within your
9  workplace as a director and executive director?
10    A.   I wasn't aware of any harassment.
11    Q.   I understand that, but I'm asking you
12  about did you take any steps to ensure that there was
13  no harassment?
14    MR. WHITE:  Objection.  Asked and answered.
15    THE WITNESS:  As far as the -- I followed the
16  policy and procedures with the management
17  understanding, the learning management system and --
18  you know, you can even discuss it amongst roll calls,
19  policies and procedures and conduct.  Other than
20  continually talking with staff, I don't have a -- I
21  didn't have a syllabus and I didn't write down
22  specifics, but knowing in my heart that we didn't
23  discriminate or harass or retaliate against anyone.
24  BY MR. HERBERT:
                                                    Page 285

1  and part of the responsibility of making sure that
2  these individuals completed it as far as...
3    Q.   Okay.  Did you ever have any discussions
4  with your supervisors about the proper steps to make
5  sure that no harassment in the workplace was
6  occurring?
7    A.   Yeah, you had to -- they needed to
8  complete the LMS training that was provided.
9    Q.   I get that.  I'm asking something
10  different.  I'm asking, did you have any discussions,
11  you personally, discussions with your supervisors
12  about ways to prevent harassment in the workplace at
13  any point since 2006 until the time you retired in
14  2019?
15    A.   Again my response is I made sure that the
16  members of the department -- I mean the management of
17  the department, I made sure that they finished the
18  LMS training and their due dates on it.  I believe
19  people were pulled into the office to say, get on the
20  computer and finish this, this is important.
21    Q.   And it's your belief having people that
22  work below you taking these classes was all that was
23  needed for you to do to prevent harassment in the
24  workplace?
                                                    Page 287



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 854 of 1503 PageID #:1245

Gregory Shields  -  8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 MR. WHITE: Objection. It misstates the
2 testimony.
3 BY MR. HERBERT:
4 Q. You can answer.
5 **A. Yeah, there was -- those were the tools**
6 **that were provided to us.**
7 Q. And did you believe that was sufficient
8 to adequately prevent harassment in the workplace,
9 that limited tool that you testified about?
10 **A. There's a lot of --**
11 MR. WHITE: Objection. Mischaracterization.
12 THE WITNESS: There's a lot of thought that
13 goes in these learning managements. It's a great
14 tool. There's some smart people that put it
15 together, and I agree with it.
16 BY MR. HERBERT:
17 Q. Okay. One moment, please.
18 MR. WHITE: Dan, I've got to go.
19 MR. HERBERT: Do you want to stop here?
20 MR. WHITE: Well, it's up to you. I don't
21 want to abruptly cut you off if we're right in the
22 middle of something but, or end this thing and
23 everybody just quick log off. We have about ten
24 minutes.

Page 288

1 MR. HERBERT: Here, if you want, and I think
2 that if we do this, if we get another date, I can
3 give you -- it won't be any different exhibits. It
4 will be less than all the ones I've given you, but I
5 might be able to just direct you exactly to the page
6 and we can do it a lot quicker than we can do it
7 right now if that's acceptable.
8 MR. WHITE: That's fine. Yeah, I mean, from
9 my perspective we're creeping up on seven hours. I
10 don't know the exact numbers, but we're probably
11 within 10 or 15 minutes of it.
12 MR. HERBERT: How about an extra 45 minutes?
13 We'll cap it at that.
14 MR. WHITE: An extra 45 minutes?
15 MR. HERBERT: Well, considering we're about
16 50 minutes shy today, an extra half hour.
17 MR. WHITE: Yeah, I guess. I mean -- I
18 guess, yeah, but it's going to be like a hard stop,
19 so if you're in the middle of a question and we hit
20 the 45, we're done, okay?
21 MR. HERBERT: I'll speak fast.
22 Good. Thank you for that. I
23 appreciate it. And we'll just shoot e-mails,
24 whatever works for you, and I'm fine if Mr. Shields

Page 289

1 wants to do it just on telephone.
2 MR. LEINENWEBER: Yeah, that will massively
3 improve our scheduling options, I believe.
4 MR. HERBERT: Yeah. Yeah, that's great.
5 MR. LEINENWEBER: And I'm happy to help
6 facilitate getting him paper copies of what we'll
7 want to talk about.
8 MR. HERBERT: Okay. We can send that off to
9 you by the end of the week probably.
10 MR. LEINENWEBER: That's tomorrow.
11 MR. HERBERT: Oh, geez, today's Thursday.
12 MR. LEINENWEBER: Yeah, it crept up on me
13 too.
14 MR. HERBERT: Whatever works for Mr. Shields
15 and we'll within, you know, at least a couple days
16 beforehand, we'll highlight the points that we're
17 going to hit with him.
18 MR. WHITE: Okay. So how do we leave -- I
19 haven't done this in a while, like leaving one open.
20 Do we keep the same record or do we -- I don't know.
21 MR. HERBERT: I don't know either.
22 MR. WHITE: We're moving by agreement of the
23 parties with the agreement that Mr. Herbert will have
24 an additional 45 minutes with the witness sometime in

Page 290

1 the near future.
2 (Whereupon, the deposition
3 concluded at 5:24 and to be
4 continued.)

Page 291

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 855 of 1503 PageID #:1246
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Brenda S. Hall, CSR No. 084-003359,

 4   Certified Shorthand Reporter of said state, do hereby

 5   certify:

 6          That previous to the commencement of the

 7   examination of the witness, the witness was duly

 8   sworn to testify the whole truth concerning the

 9   matters herein;

10          That the foregoing deposition transcript was

11   reported stenographically by me, was thereafter

12   reduced to typewriting under my personal direction

13   and constitutes a true record of the testimony given

14   and the proceedings had;

15          That the said deposition was taken before me

16   at the time and place specified;

17          That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24
```



Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 856 of 1503 PageID #:1247
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 7th day of October, 2020.

3

4

5                    _____

6                    Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



Gregory Shields   -   8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 857 of 1503 PageID #:1248
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

### WORD INDEX

**< 0 >**
**084-003359**  1:*24*
292:*3*

**< 1 >**
**1**  21:*2*  26:*13*
**10**  210:*5*  259:*13*
270:*19*  282:*9*
289:*11*
**10:00**  2:*13*
**100**  2:*7*
**11**  223:*20*
**11:00**  151:*11*
**12**  192:*12*  232:*17*
266:*20*  272:*22*
**12:00**  151:*14*
**120**  2:*19*
**13**  174:*15*  175:2,
*19*  189:*11, 20*
190:*12, 16, 22*
191:*3, 10*  233:*11*
**14**  174:*14*
**15**  155:*24*  203:*10*
265:*4*  289:*11*
**16**  97:*10, 11*  100:*12*
**162**  3:*12*
**17**  97:*11*  269:*9*
**18**  7:*12*  97:*11*
**18-cv-05726**  1:*9*
**18-cv-5726**  6:*17*
**19**  97:*11*  100:*19*
213:*13*
**1980**  12:*4*
**1989**  14:*16*  59:*23*
60:*13*  61:*1*
**1992**  17:*7*  18:*19*
19:*12, 21*  20:*22*
21:*6*  36:*18*  37:*3*
**1993**  50:*4*  91:*12*
**1994**  39:*4*
**1995**  37:*17*
**19th**  216:*1*

**< 2 >**
**2**  21:*2*
**2/17/1961**  11:*9*
**20**  48:*9*  52:*16*
53:*8, 9, 10*  54:*20*
80:*19*  81:*5*  122:*7*

158:*14, 16*  162:5, 9
270:*9*
**200**  2:*13*
**2000**  2:*19*  51:*5*
52:23  54:*15*  59:*13,
20*  60:*3, 14*  61:6,
*13, 15, 18, 24*  62:9,
*16, 22*  63:*12, 19*
64:*1, 19, 21*  65:1, 4,
*9, 17, 19*  66:*24*
67:2, *10, 14, 18, 24*
68:*12*  70:*16*  74:*1,
5, 10*  75:2, *10, 24*
78:*17, 21*  79:2, *15,
21*  81:*16, 21, 24*
82:*3, 6, 11, 14*  83:5,
*8, 16*  84:*10*  85:4
92:*1*
**2004**  94:*18*
**2005**  94:*18*
**2006**  95:*17*  96:*8*
128:*12, 17*  129:*18*
130:*1*  131:*8, 15*
132:*15*  135:*3*
142:*3*  192:*9, 11*
287:*13*
**2009**  95:*16*
**2010**  95:*16*
**2012**  232:*18*
**2013**  192:*11*
**2015**  62:*8*  122:*21*
201:*17*  210:*9, 18*
213:*13*  215:*22*
216:6  260:*3*
270:*16*  271:5, *8, 9*
273:*10, 21*
**2016**  97:*12*  100:*12*
101:6  122:*21*
128:*12*  239:*14*
286:*1*
**2018**  261:*10*  262:*14*
**2019**  7:*9*  25:*2, 3*
39:*10*  80:*1*  100:*20*
101:*7*  123:*9*
128:*18*  131:*8, 16*
135:*3*  190:*18*
282:*9, 14*  287:*14*
**2020**  2:*1*  100:*19*
293:*2*
**206**  2:*6*

**22**  272:*24*
**2201**  2:*13*
**23**  204:*20*  274:*3*
**24**  155:*9*  184:*16*
209:*8*
**24-hour**  148:*22*
**25**  120:*20*  157:*23*
158:2, *10, 15, 16*
162:5, 9  222:*14*
**253**  3:*13*
**2600**  15:*14*
**2650**  15:*16*
**26th**  15:*11*  137:*17*
154:*18*
**27**  2:*1*  20:*21*
**281**  3:*14*
**29**  250:*1*
**2nd**  216:6

**< 3 >**
**3**  21:*2*  253:*5*
**3:00**  151:*11*
**30**  87:*9*  92:*22*
158:2, *9, 10*  201:*17*
215:22  265:*4*
**300**  133:*13*  134:*15*
**30th**  210:*9, 18*
**31**  87:*10*  100:*19*
**312**  2:*8*
**31st**  25:*3*  282:*13*
**32**  210:*7*  211:*9*
**38**  223:*20*
**38th**  11:*13*

**< 4 >**
**4**  253:*4, 6, 8, 19*
**4:00**  151:*14*  219:*7*
**40**  228:*22*
**420**  11:*13*
**43**  232:*17*
**45**  154:*14*  265:*2*
289:*12, 14, 20*
290:*24*
**46**  233:*11*

**< 5 >**
**5**  3:*1*  37:*18, 20*
38:*3, 8*  154:*4, 14*
156:*1*
**5:24**  291:*3*

**22**  272:*24*

**5:30**  203:*9, 14, 15*
204:*10*  264:*23*
265:2, *19*
**50**  289:*16*
**53**  237:*2*
**59**  11:*7*

**< 6 >**
**6**  149:*12*  256:*4*
260:*3*
**6:30**  203:*20*
**60523**  2:*14*
**60602**  2:*20*
**60661**  2:*7*
**630**  2:*14*
**655-7660**  2:*8*

**< 7 >**
**7**  26:*12*  259:*12*
**786-3705**  2:*20*
**7th**  293:*2*

**< 8 >**
**8**  204:*15, 21*  256:*5*
261:*10*  264:*13*
266:*17*
**8/9/2019**  283:*8*
**866**  2:*20*

**< 9 >**
**9**  269:*6*
**92**  36:*21*
**93**  39:*22*
**94**  39:*7*
**95**  37:*15*
**96**  37:*15*
**98**  279:*5*
**984-0339**  2:*14*
**99**  51:*4*

**< A >**
**a.m**  2:*1*
**abandoned**  231:*12,
16*
**ability**  108:*21*
143:*7, 10*  160:*22*
**able**  18:*11*  25:*10,
21*  127:*17*  132:*13*
186:*20*  289:*5*
**above-entitled**  1:*22*

Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 858 of 1503 PageID #:1249
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**abruptly** 267:*13*
288:*21*
**absent** 150:*6, 9*
151:*15*
**absolutely** 169:*22*
252:*19*
**abuse** 229:*1*
**academy** 15:*4, 7, 10*
43:*7* 284:*11* 286:*8*
**accept** 251:*20, 22*
**acceptable** 197:*23*
198:*14, 17, 23* 289:*7*
**accepted** 50:*12*
**accommodate**
125:*14* 126:*12, 14,
19* 127:*9, 13, 18*
**account** 243:*18, 19*
**accuracy** 256:*15*
279:*23*
**accurate** 87:*14*
256:*19* 284:*7, 9, 10*
**accurately** 284:*6*
**accuse** 182:*12*
**accused** 251:*12*
254:*16* 271:*6*
277:*24*
**accustom** 144:*16*
**Act** 26:*19* 119:*16*
120:*12* 132:*24*
133:*1* 141:*10*
196:*7* 207:*18*
208:*11* 238:*14*
239:*11*
**acted** 269:*11*
**acting** 253:*11*
**action** 173:*18*
199:*11* 256:*8*
292:*21*
**actions** 184:*20, 24*
185:*1* 214:*6, 24*
221:*22* 223:*1* 256:*1*
**actual** 163:*14*
**add** 91:*6*
**additional** 290:*24*
**address** 11:*12*
15:*15*
**addressed** 275:*16*
**adequately** 288:*8*
**administer** 207:*10,
11*

**administering**
205:*5* 206:*18*
**administration**
209:*11*
**administrative**
256:*9*
**advance** 93:*7*
**advice** 136:*6*
177:*15*
**affect** 137:*8*
**affirmative** 163:*13*
**afraid** 223:*11*
**African-American**
185:*22* 186:*2, 4*
187:*2, 5, 9, 12, 23*
190:*9, 11, 19*
**African-Americans**
188:*16, 23*
**afternoon** 118:*23*
119:*2* 150:*2, 3, 7,
23* 151:*1, 7* 158:*5*
219:*8*
**afternoons** 26:*12*
116:*23* 117:*20*
118:*12* 131:*13*
144:*21* 149:*22*
150:*18* 192:*16*
193:*10*
**agencies** 145:*22*
**agency** 256:*10*
**aggravated** 234:*23*
**aggressive** 252:*12,
16*
**ago** 34:*19* 41:*21*
48:*9* 54:*20* 59:*11*
88:*24* 92:*23*
155:*22, 23, 24*
170:*13, 15* 190:*17*
210:*20*
**agree** 7:*15* 23:*8*
51:*3* 53:*5, 9* 61:*4*
66:*6* 75:*18* 76:*21*
78:*13* 85:*3, 10*
124:*22* 196:*17*
197:*12, 14, 18*
203:*24* 205:*10*
207:*14, 20* 209:*14,
15* 227:*18* 234:*16*
235:*1, 22* 236:*2, 4*
238:*6, 10* 247:*7*
249:*9* 250:*21*

261:*1* 275:*2* 276:*7*
288:*15*
**agreed** 167:*22*
**Agreement** 9:*7*
10:*21* 26:*21*
116:*10, 12* 122:*15*
142:*5, 15* 143:*4*
207:*23* 208:*7, 16,
21* 243:*13* 290:*22,
23*
**ahead** 36:*10* 55:*8*
64:*15* 85:*9* 131:*11*
155:*3* 161:*16*
174:*23* 226:*2*
231:*4* 234:*16*
250:*1* 272:*21* 280:*3*
**allegation** 197:*5*
212:*4* 214:*16, 19*
222:*8*
**allegations** 210:*16*
211:*24* 214:*6*
252:*13* 254:*1*
259:*18* 267:*7*
268:*9* 269:*24*
273:*15* 274:*12, 24*
276:*11*
**allege** 257:*14*
258:*6, 17* 261:*4*
**alleged** 215:*15, 23*
216:*2* 222:*2*
244:*19* 258:*18, 23*
261:*6* 266:*23* 274:*4*
**alleging** 260:*22*
**alleviate** 114:*19*
115:*6*
**allocate** 138:*5*
**allow** 18:*12* 133:*2*
134:*17* 279:*13*
**allowed** 26:*4, 9, 10,
13* 54:*13* 105:*24*
141:*15* 180:*2*
286:*23*
**allowing** 138:*18*
**alma** 12:*5, 7*
**ambiguous** 216:*4*
**amended** 163:*13*
**amount** 140:*10*
143:*12* 151:*16*
179:*1*
**analogous** 223:*24*

**and/or** 235:*17*
**Andrew** 260:*21*
**Andrews** 260:*9, 15*
261:*4, 8* 271:*3, 13,
23*
**Annual** 281:*22*
**answer** 12:*18* 13:*2*
18:*13* 19:*1* 25:*13*
27:*18* 28:*14* 29:*6,
13, 23* 30:*9, 23*
31:*20* 32:*7, 17*
33:*20* 34:*7, 16*
35:*5* 38:*18* 42:*7,
21* 44:*23* 45:*7*
49:*1, 14* 50:*24*
53:*4* 56:*9, 24*
59:*10* 60:*1, 8, 20*
61:*3* 62:*12* 63:*1,
23* 64:*4, 15* 70:*17*
75:*4* 86:*13* 87:*3,
14* 92:*15* 93:*5*
94:*11* 99:*24*
111:*12* 119:*12*
121:*2, 18* 124:*3, 20*
125:*4, 5* 135:*7, 19*
139:*13, 23* 147:*14*
149:*1* 151:*20*
152:*16, 18, 19*
153:*7, 15* 163:*13*
174:*5* 178:*21*
179:*6* 183:*21*
184:*6, 23* 185:*5*
186:*17, 18* 191:*9*
198:*8* 199:*6, 16*
200:*23* 201:*5, 21*
210:*3, 15* 211:*3*
212:*12* 217:*17*
224:*14* 225:*2, 8*
226:*3* 229:*18*
230:*14* 232:*9*
234:*2* 245:*2*
246:*14* 247:*18*
255:*10* 256:*12*
260:*20* 261:*2*
263:*13* 264:*9, 11*
267:*3* 269:*17*
270:*12* 272:*1*
273:*6, 17* 274:*21*
277:*20* 279:*24*
284:*13* 288:*4*

Gregory Shields   -   8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 859 of 1503 PageID #:1250

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**answered** 10:15
64:8 74:18 128:22
139:21 147:20
149:20 154:7, 11
155:1 184:21
185:19 208:22
220:2 229:15
239:9 248:5
259:16 271:17
285:14

**answering** 20:16
82:23 83:3 216:13
270:4

**answers** 6:2 9:1, 4
10:7, 10 64:10
123:5 124:2
130:12 131:5
163:16 202:14
255:14, 17 256:13,
19 273:8

**ANTHONY** 1:6
164:10 186:9 187:8

**anticipate** 18:11

**anticipating** 18:6

**anybody** 60:21
130:22 175:11
180:6 207:7
226:13 272:12
275:11

**anymore** 232:14

**anyone's** 203:23

**apologies** 8:14
11:2 18:7 22:16
55:7 82:23 129:7
232:1

**apologize** 18:6, 14,
15 51:6 57:2
86:15 87:17 92:7
93:7 121:20
138:24 157:1
171:7 175:20
178:9 196:6 251:3

**appear** 219:23

**APPEARANCES**
2:4

**Appeared** 2:10, 16,
22 218:12

**appears** 283:21

**applied** 20:5 98:24
100:7

**apply** 19:8 42:1, 4,
17

**appointed** 52:5
85:5 91:21, 24
101:1

**appreciate** 170:3
265:14 289:23

**approach** 182:19
252:13, 16

**approval** 215:5

**approve** 110:21

**approved** 107:5
224:16

**approximately** 17:7
95:15 189:15

**approximation** 51:9
54:7

**April** 7:9

**area** 146:11, 12
147:13, 16, 18
154:6 156:21

**areas** 25:11 233:14

**argumentative**
92:22 186:15 188:3

**arrest** 236:12

**arrests** 136:15

**aside** 134:14 146:9
174:7

**asked** 10:7 15:8
24:11 37:5 40:11
46:14, 15 47:17
64:7 92:3 94:22
99:5, 10 122:2, 18
130:11 132:7
139:21 154:7, 11
155:1 158:11
166:12 168:19
169:9, 12, 21
184:21 186:9
188:13 196:6
204:2 208:22
211:4 212:11
214:12 217:3
218:20 220:1, 20
229:15, 19 239:9
246:19 248:5
254:13 255:22
263:6 269:9
271:17 276:18
285:14

**asking** 16:23 22:22
46:10, 15 51:11
54:7 55:10 57:14
61:12 64:10 75:4
76:22 77:12 83:10,
11 86:22 92:16, 20,
22 94:10 95:9, 12
121:15, 17 124:12
130:24 131:3
161:8 172:9
175:10, 14 178:4
190:2 212:2
220:24 227:13
230:5 232:12
238:7 248:11
251:6, 8 253:11
259:13 263:7, 8
268:15 274:23
275:14 278:6, 16
285:11 286:9
287:9, 10

**ass** 232:20

**assess** 249:12, 18

**assessment** 148:14
167:17

**assessments** 167:14

**assign** 118:8
151:18 173:5, 13
247:13 278:5

**assigned** 15:10
18:23 25:6, 7, 8
32:14 33:10 106:9,
17, 22 111:19
112:23 118:23
129:3 131:9
134:23 143:10
144:8, 24 145:8
148:21 149:7
150:22 151:6
153:4 157:9, 15
158:8 159:3
162:10 165:24
173:18 178:4
185:10 189:2
235:13 236:10, 12
237:6, 9, 11 238:1
240:3 242:4, 5
243:20 244:1, 8, 18,
21 245:7, 9, 16
246:7 247:19

**assigning** 205:4, 21
239:3 243:18

**assignment** 15:6, 8,
9 16:21 26:5, 6, 14,
16 30:14 31:18
32:11, 13, 19 33:1,
2, 18, 22, 23 34:18,
21 35:8, 21, 23
36:19, 21 37:3
38:24 41:22 60:6
93:23, 24 107:4
116:13, 18, 19, 20
117:3, 4 119:2, 18
120:14 127:17
128:3, 7, 10 132:14
133:3, 5, 6 138:9,
13 139:4 140:13,
22 141:8 142:10,
22, 23 143:1, 8, 13,
15 144:10, 11
145:14, 16 146:11
147:24 148:1, 23
149:18, 21, 24
151:19 156:20
157:11 158:9, 17
172:20 173:22
174:10, 17 175:4,
13, 17 176:7, 13
178:14 184:16
205:19 234:10
235:6, 16, 19
239:22 240:23
246:6, 7, 10, 22
247:4, 9, 14

**assignments** 23:8
30:20, 21 31:12, 17,
24 32:3 33:8
34:13 35:2, 3, 19
36:22 51:14, 15, 17
101:11 104:22
116:5, 11, 15 117:1
118:3, 5 119:9, 14,
23 120:7, 17
128:12 131:2
132:12, 22 134:17
135:8, 9 136:7, 8,
12 137:8, 10, 14, 16
138:18 139:18, 19
140:10, 12, 17
141:4 142:1, 6, 17,
20 143:6 144:16,

Gregory Shields - 8/27/2020
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 1053 Filed: 12/21/20 Page 860 of 1503 PageID #:1251

*17* 145:*1, 8* 147:*7, 10, 18, 22* 151:*1, 8 156:13, 14, 21* 157:*4* 172:*4, 10, 15, 17* 177:20 179:2 183:*17, 23* 184:*1, 2, 7, 8, 13* 185:*7, 10, 15* 205:*4, 19, 22* 209:*23* 233:*13, 15, 16, 21* 234:*5, 7, 12, 18* 235:*2, 8, 23, 24* 237:*4* 238:*18* 239:*20* 240:*10, 13* 248:*9*

**assigns** 117:*13* 118:*5*

**assist** 20:*17* 235:*18*

**assumes** 152:*14* 153:*14* 199:*3, 13* 201:*11* 224:6, *11, 17, 23* 229:*7* 231:*23* 233:*23* 237:*13, 19* 241:*10* 242:*7, 14* 243:*3* 244:*2, 10, 22* 245:*11* 246:*11* 250:*8, 15* 251:*14* 275:*4, 9, 18* 276:*13*

**assuming** 6:*24* 28:*24* 158:*21*

**assure** 6:*9*

**assured** 280:*1*

**atmosphere** 277:*5*

**attempt** 216:*8*

**attempted** 218:*6*

**attend** 11:*21*

**attention** 196:*10* 198:*12* 214:*22* 215:*3* 220:*14*

**attesting** 256:*18*

**Attorney** 12:*11, 13* 217:*9, 10, 19, 21* 236:*18* 255:*3* 292:*18, 19*

**attorneys** 6:*23* 8:*12, 22* 10:*15* 148:*11* 217:*5, 13* 218:*1* 254:*11* 255:*22*

**audio** 9:*12* 21:*14* 25:*18* 31:*1* 34:*18*

35:*13* 41:*14* 43:*14* 47:*10*

**August** 2:*1* 213:*13* 216:*1* 260:*3*

**authority** 209:*19, 20, 22*

**authorized** 215:*9*

**automatic** 235:*21*

**availability** 161:*19, 20* 247:*20*

**available** 238:*23* 246:*20* 247:*1*

**avenue** 182:*19* 230:*3*

**awarded** 32:*2*

**aware** 7:*6, 13* 29:*9, 18* 30:*5, 10, 19* 31:*17* 32:*10, 23* 33:*16* 35:*20* 55:*14* 57:*13* 60:*9, 21* 65:*20, 24* 66:*10* 68:*16* 69:*24* 72:*21* 73:*13* 80:*4* 85:*13, 16* 86:*17* 87:*19* 88:*1* 89:*13* 98:*21* 99:*16* 106:*11* 110:*3, 7, 10, 14* 115:*1, 15, 16* 122:*22* 123:*18* 138:*6* 142:*19* 152:*7, 11* 153:*22* 165:*20* 166:*1, 5, 8, 11, 13, 19* 167:*2* 172:*18, 23* 173:*16, 21* 174:*9, 12, 14, 24* 175:*15* 176:*6, 11* 180:*6* 184:*2, 8, 12* 185:*21* 186:*3* 195:*16* 196:*4, 15, 17, 23* 199:*9* 200:*24* 201:*8, 15* 211:*24* 212:*2, 12, 19, 20* 219:*13, 19, 21* 221:*13, 17* 224:*21* 225:*5* 227:*14* 228:*4* 229:*4* 230:*6* 231:*5, 6, 20* 232:*2* 233:*19* 234:*4* 235:*5* 237:*10, 16* 238:*21* 241:*18, 21* 242:*3, 9,*

*11, 16, 19, 24* 243:*5, 8, 22* 244:*4, 6, 17* 245:*6, 13* 248:*20* 250:*6, 12* 251:*10, 16* 253:*1* 255:*19* 269:*18, 22* 270:*24* 271:*10, 11, 14, 15, 19, 21* 272:*15* 273:*12, 18, 20, 23* 274:*5, 11* 275:*24* 276:*1* 277:*8, 13* 278:*14* 279:*21* 281:*8, 14, 15* 285:*10*

**< B >**

**back** 8:*1* 9:*21, 22* 11:*3* 37:*21* 38:*20* 41:*16* 45:*11, 21* 46:*5, 8* 85:*4* 112:*12, 16* 122:*6* 143:*11, 21* 145:*3, 20* 146:*2* 148:*18* 159:*11* 169:*7* 170:*2* 231:*15* 241:*15* 248:*17* 266:*11* 268:*14* 275:*12*

**background** 92:*18* 234:*20*

**backup** 234:*20*

**bad** 9:*12* 21:*3* 133:*16* 168:*10, 11* 169:*9, 20* 170:*6*

**bail** 115:*10*

**Bargaining** 9:*6* 10:*21* 26:*19, 21* 116:*10, 12* 119:*16* 120:*12* 122:*14* 132:*24* 133:*1* 141:*10* 142:*5, 15* 143:*4* 207:*18, 22* 208:*6, 11, 16, 21* 238:*13* 239:*11*

**BARONI** 2:*18*

**bartender** 14:*8*

**based** 80:*18* 110:*8, 9* 111:*7, 22* 118:*4* 119:*3* 126:*8* 133:*23* 143:*6* 186:*14, 19* 188:*20* 259:*10* 273:*10*

**basement** 37:*17* 38:*1, 3, 14, 20* 154:*6, 10, 13, 23* 156:*22* 157:*5* 159:*3* 160:*13, 20* 161:*5* 162:*11, 13, 21* 172:*22* 173:*2, 5, 9, 17, 19* 174:*2* 175:*1* 177:*11* 178:*4* 237:*7, 9, 12, 16* 238:*2, 8* 240:*21* 241:*4, 9, 15, 19* 243:*23* 244:*8, 19, 21* 245:*7, 17*

**basically** 27:*21* 223:*8*

**basis** 138:*4* 184:*14* 253:*14*

**Bears** 198:*15*

**becoming** 109:*10* 212:*14* 221:*18*

**began** 14:*11* 37:*3* 39:*23*

**beginning** 36:*18* 43:*23* 44:*2* 162:*20*

**behalf** 2:*10, 16, 22* 12:*22* 253:*12*

**behavior** 211:*7* 230:*21*

**belief** 287:*21*

**believe** 13:*10* 21:*22* 40:*15* 46:*15* 50:*20* 87:*8, 14, 17* 92:*5* 94:*22* 104:*4* 116:*22* 132:*7* 137:*4* 148:*10* 159:*9* 164:*11* 172:*11, 21* 193:*8, 24* 198:*22* 212:*21* 214:*11* 246:*23* 247:*10* 250:*18* 255:*24* 267:*11* 268:*9, 14, 18* 278:*2* 287:*18* 288:*7* 290:*3*

**believes** 267:*4, 6*

**bench** 137:*18*

**best** 8:*4* 18:*4* 23:*21* 34:*22* 81:*2* 93:*9* 115:*9* 125:*14* 126:*15, 20* 127:*9* 129:*15* 138:*5*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 861 of 1503 PageID #:1252
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

213:*14* 223:7, *16*
256:*20* 271:*4*
272:*20*

**better** 22:*23* 45:*22*
123:*22* 274:*16*
284:*13*

**bid** 18:*21* 26:*4, 9,*
*10* 28:*2, 3, 11*
29:*24* 30:*13, 16*
31:*24* 32:*2* 34:*20*
35:*2* 106:*10* 110:*9,*
*16* 111:*22* 116:*12*
118:*10, 13* 119:*16,*
*17* 120:*13, 16, 19,*
*24* 121:*9, 10, 23*
122:*12* 123:*2, 4, 10,*
*12, 13* 124:*3, 7, 11,*
*14* 125:*17, 21*
128:*9, 11, 18* 129:*4,*
*19, 24* 130:*2, 6*
131:*1, 16, 21*
132:*13* 133:*2, 4*
141:*9, 16* 142:*9, 17,*
*21, 22* 143:*7, 15*
144:*10* 176:*20, 21*
228:*23* 239:*10, 12,*
*22* 243:*20*

**bidded** 32:*19* 33:*4*
34:*20* 131:*10*
171:*10, 15, 17*
176:*21*

**bidding** 26:*15*
27:*19* 106:*18, 21*
119:*21* 122:*19*
130:*3* 131:*2*
239:*15, 20*

**bids** 29:*1* 35:*7*
117:*10* 122:*16*

**big** 175:*19* 222:*11*

**birth** 11:*8*

**bit** 9:*16* 265:*23*
271:*18*

**black** 109:*17, 23*
113:*18* 187:*21*
188:*2* 189:*20*
191:*4, 11* 197:*10,*
*13, 22* 199:*10*
208:*5* 245:*16*
247:*12, 15, 22*
248:*3, 16* 257:*12*

258:*12* 259:7 261:*8*

**blank** 217:*22* 263:*1*

**blanks** 92:7

**blatantly** 220:*12*

**board** 286:7

**bodies** 22:*18*

**body** 246:*20*

**bond** 36:*9, 14*
51:*17* 115:7
133:*17* 136:*16*
138:*23* 145:*3*
146:*10* 148:*9, 13*
149:*9* 150:*15*
151:*24* 154:*19, 22*
159:7

**bonded** 36:*15*
134:*15* 147:*6*

**bonding** 151:*17*

**bonds** 39:*6* 145:*22*

**book** 130:*18*

**born** 11:*16, 19*

**boss** 56:*11* 192:*24*
193:*1* 194:*3, 11, 15*
279:*6*

**bottom** 55:*22*
57:*15, 20* 154:*16*
156:*21* 159:*24*
161:*6* 251:*21*
253:*5* 270:*9*

**Boy** 34:*4* 155:*24*
157:*12* 196:*19, 24*
197:*6, 13, 22*
198:*11, 14, 18*
199:*1* 208:*5* 209:*5*
239:*2*

**boys** 198:*22*

**bracelet** 36:*12*

**Brad** 99:7

**Brady** 267:*6* 268:*8*

**break** 5:*21, 22*
9:*19* 45:*20* 46:*6*
63:*21* 122:*5, 8*
202:*15* 203:*14*
204:*9, 12* 265:*16*

**breakdown** 115:*19,*
*24* 116:*3*

**Brenda** 1:*23* 292:*3*

**Bridgeport** 11:*14,*
*17*

**bring** 16:*9* 38:*11*
145:*19* 146:*2*

148:*18* 159:*12*
220:*14*

**bringing** 177:*23*
178:*3* 228:*19*

**broke** 21:*16* 43:*15*
45:*1*

**broken** 104:*21*
105:*1*

**Brook** 2:*14*

**brought** 18:*9*
176:*24* 214:*21*
215:*3* 225:*19, 22*
227:*9, 15, 22* 228:*1*
259:*5* 272:*8*

**buddy** 154:*19*
198:*20*

**budget** 41:*6*

**build** 114:*20*

**building** 38:7
218:*13* 259:*9*
272:*10*

**bunch** 169:*24*

**burdensome** 273:7

**Burger** 14:*9*

**busy** 28:*3*

**button** 38:*14, 19*

**Byrne** 19:*22, 24*

**< C >**

**cage** 235:*17*

**California** 15:*11,*
*14, 16* 137:*18*

**call** 20:*13* 47:*13*
105:*12* 133:*10, 11*
144:*19* 150:*10*
156:*23* 195:*22*
196:*1, 3* 205:*4*
217:*18* 227:*4*
232:*19* 234:*20*
246:*5* 274:*16* 279:*5*

**called** 5:*2* 30:*16*
61:*9, 10, 11* 89:*3*
97:*22* 144:*9*
197:*13* 218:*10*
254:*19*

**calling** 146:*3* 215:7

**calls** 44:*21* 45:*5*
52:*12, 17* 80:*22*
81:*6* 82:*21* 99:*12*
146:*5* 195:*14, 17,*
*19* 199:*14* 205:*15,*

*17* 208:*8* 232:*6*
243:*10* 257:*22*
283:*13* 285:*18*

**campaign** 46:*22*
47:*22* 48:*8, 11, 16,*
*23* 49:*3, 6*

**campaigns** 45:*15*
46:*11, 14* 48:*10, 12,*
*14* 92:*10* 98:*18*

**cancer** 169:*23*
170:*22, 24* 201:*24*
202:*6*

**candidates** 47:*8, 21*
48:*2*

**cap** 289:*13*

**capable** 93:*13*

**Capacity** 1:*11, 13,*
*14, 16, 17*

**captain** 58:*9, 12, 20,*
*23* 59:*1*

**captains** 58:*15, 19,*
*24*

**car** 138:*2* 231:*10,*
*12, 16* 232:*10, 12*
235:*17* 247:*1*

**care** 27:*21* 28:*4*
127:*4* 139:*24*
161:*10* 182:*23*
265:*18*

**career** 39:*13* 51:*10,*
*23, 24* 53:*21* 54:*4,*
*10* 73:*4* 80:*3, 8, 10,*
*14* 85:*6, 13, 19*
86:*9* 87:*6* 88:*3*
90:*5, 20* 111:*13, 16*
165:*8* 241:*14*

**cars** 38:*21* 146:7

**case** 6:*17* 163:*1*
167:*11* 247:*3*
248:*3, 7* 252:*18*
257:*10* 270:*18*
271:*1* 272:*4*

**cases** 249:*19, 21*

**cash** 150:*15*

**Caucasian** 189:*4*

**caught** 231:*11*

**cause** 1:*22*

**caused** 21:*14*
25:*17* 31:*1* 34:*17*
35:*12* 41:*13* 43:*13*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 862 of 1503 PageID #:1253
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

47:9
**CBA** 116:*11* 209:*3*
**CECIL** 1:*6* 164:*8*
242:*12*
**Center** 98:*8*
**central** 146:*19*
**centrally** 162:*20*
**certain** 25:*11*, *21*
26:*1* 108:22
117:*11* 125:*21*
128:2 138:*12*
139:*18* 162:*23*
175:*11* 198:*1*
220:9 235:2
**certainly** 29:*4* 44:*9*
55:*18*, *19* 56:*14*, *20*
76:*11* 91:2 110:7,
*9*, *14* 111:*18*
113:*21* 127:*18*
181:*15* 188:*10*
208:5 221:*22*
224:*16* 225:*13*
227:8, *14* 230:*17*
233:7, 8 247:8
248:*20*, *22* 249:*3*
250:22 251:9, *12*,
*24* 258:9 276:*23*
**CERTIFICATE**
292:*1*
**Certified** 1:*23*
42:*23* 292:*4* 293:6
**certify** 292:*5*
**chain** 55:*20* 57:*5*,
*20* 59:*8* 66:*24*
68:*3*, *11*, *17* 72:*18*
73:*7*, *15* 75:*20*, *23*
76:*24* 77:*5* 83:*16*
88:*23* 192:*18* 203:*8*
**chairs** 274:*17*
**change** 16:*14*
17:*12* 33:22 39:*16*
73:*20* 93:22, *24*
96:*2*, *4* 97:*3*, *14*
100:*24* 101:*3*, *16*,
*18* 121:2 122:*14*,
*18*, *21* 135:*3*
141:*14* 142:*4*, *15*
143:*3* 144:*18*
147:9 157:*16*
223:*16* 263:*10*, *16*,
*22*

**changed** 16:*21*, *24*
17:*9*, *16*, *17* 39:*20*,
*21* 56:*13* 60:*16*
69:*22* 96:*5* 105:*15*
129:*2*, *5* 141:*10*
148:*3* 246:*7*
**characterization**
198:*18*
**characterize** 150:*11*
157:*5* 240:*18*
**charge** 19:*20*
218:22 257:*19*
**charges** 214:*2*
250:*7*
**chart** 193:*7*
**check** 4:*5* 9:*13*
231:*16*
**checking** 16:*7*
20:*14* 36:*13*
261:22 262:*8*
**checks** 21:*10* 24:*15*
105:*12* 137:*23*
**Chicago** 2:*7*, *20*
11:*11* 293:2
**Chief** 44:*19* 50:*20*,
*22* 51:*13*, *16*, *19*
52:*4*, *10* 54:*16*
55:*18* 56:*11* 59:*14*
60:*3* 64:*2* 66:*17*,
*19* 67:*5*, *9*, *24* 68:*4*
70:*2*, *5*, *15*, *20*
71:*12* 72:*7*, *17*, *22*
74:*2*, *10*, *11* 75:*10*,
*13*, *16*, *20*, *24* 76:*5*,
*7*, *11*, *15*, *17*, *24*
77:22 78:*5*, *8*, *17*,
*18* 83:*19*, *21* 84:*2*,
*8*, *14*, *17*, *18*, *20*
85:*5*, *14*, *19* 86:*3*, *9*,
*19* 87:*18*, *20* 88:*2*,
*7*, *10*, *14* 89:*18*
90:*4*, *13*, *20* 91:*4*,
*17* 92:*1*, *5* 93:*20*,
*23* 94:*3*, *8*, *13*, *14*,
*21* 95:*2*, *3*, *6*, *8*, *10*,
*11*, *13*, *18*, *20*, *22*
96:*2*, *9*, *13*, *16*, *20*,
*22* 99:*9* 104:*23*
128:*6* 142:*8* 144:*5*
167:*20* 191:*14*, *16*
192:*2*, *3*, *4*, *5*, *18*, *21*

193:*2*, *5*, *13*, *20*
194:*3*, *6*, *13*, *16*, *18*
195:*10*, *11*, *24*
196:*18*, *23* 197:*5*
198:*24* 199:*7*, *10*
201:*9* 204:*24*
205:*12*, *13* 207:*6*,
*16* 226:*12* 229:*20*
232:*18* 258:*4*
**chiefs** 52:*10*, *22*
53:*8*, *10*, *19*, *22*
54:*1*, *3*, *16* 58:*16*,
*21* 59:*20* 66:*23*
67:*13*, *18* 68:*10*, *16*
69:*1*, *5*, *9*, *13*, *17*
72:*14* 73:*8*, *15*
74:*4* 77:*4* 78:*1*
79:*3* 86:*23*, *24*
88:*8* 120:*18*
135:*21*, *22* 136:*2*, *3*
167:*6*, *7* 246:*24*
**child** 265:*18*
**choice** 264:*23*
**choose** 26:*20* 27:*6*
105:*24* 108:*21*
109:*1*
**choosing** 120:*7*
**chose** 27:*12* 240:*5*
**chosen** 50:*10*
106:*20*
**CHRISTOPHER**
1:*16*
**circle** 283:*8*
**city** 147:*2*
**Civil** 6:*16* 256:*8*
**civilians** 57:*12*
223:*14*
**claims** 266:22
273:*8*
**clarification** 64:*13*
159:*8* 173:*24*
174:*19* 176:*24*
**clarify** 112:*17*
159:*12* 175:*21*
236:*17*
**clarifying** 145:*22*
**class** 282:*8* 284:*14*,
*21*
**classes** 281:*4*, *7*, *16*
285:*6* 287:22
**clause** 133:*1*

**clear** 9:*24* 74:*24*
76:*23* 77:*3* 83:*11*
87:*17* 115:*1* 118:*1*
121:*19* 128:*24*
129:*8*, *13*, *15*
130:*13* 137:*6*
140:*19* 174:*21*
225:*3* 260:*10*
**clearing** 115:*10*
**clearly** 64:*12*
130:*20* 270:*4*
**clerk** 145:*24*
**client** 36:*14* 203:*6*
**clients** 154:*1*
**Cochran** 232:*20*
**Collective** 9:*6*
10:*21* 26:*18*, *21*
116:*10*, *12* 119:*16*
120:*12* 122:*14*
132:*24* 133:*1*
141:*10* 142:*5*, *15*
143:*4* 207:*18*, *22*
208:*6*, *11*, *15*, *20*
238:*13* 239:*11*
**college** 137:*4*
**color** 186:*14*
191:*16*, *17* 247:*20*
**combined** 159:*5*
160:*23*
**come** 8:*15* 20:*15*
41:*15* 106:*1*, *4*
117:*17*, *18* 118:*11*,
*12* 122:*6* 130:*2*, *19*
149:*8* 151:*21*
169:*21* 180:*2*
204:*5* 241:*15*
254:*13* 270:*3*
**comes** 43:*17* 92:*2*
152:*1* 170:*23*
231:*15*
**comfortable** 143:*13*
**coming** 47:*11*
122:*15* 123:*16*
138:*23* 151:*17*
266:*6*
**command** 68:*17*
165:22 172:*24*
174:*2* 177:*15*
191:*24* 192:*6*
193:*5* 195:*11*

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 863 of 1503 PageID #:1254

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

200:*20* 203:*8*
209:*19*
**commander** 65:*11,*
*13, 20* 66:*2, 7, 11*
67:*6, 10, 13* 70:*6*
71:*1, 13* 77:*19, 23*
78:*6, 9, 15* 84:*21*
**commanders** 69:*14*
77:*8, 15* 78:*2, 4*
105:*17*
**commencement**
292:*6*
**comment** 198:*2*
**comments** 273:*3, 14*
**committed** 215:*1*
216:*8*
**common** 44:*19*
73:*4*
**commonly** 152:*3*
**community** 101:*22,*
*24*
**compared** 245:*17*
**compassionate**
147:*1*
**compensation**
158:*12*
**compensatory**
205:*5, 24* 206:*5, 7*
**complain** 262:*20*
274:*15, 18, 19*
**complainant** 272:*3*
**complainants**
252:*17*
**complained** 243:*23*
244:*7, 8, 18* 245:*7,*
*8* 261:*19* 268:*3*
**complaining** 221:*14*
229:*5, 24* 230:*7, 13,*
*16* 233:*20* 275:*15*
**Complaint** 7:*17, 21*
9:*2* 10:*8, 12* 163:*1,*
*14, 15* 197:*7, 8*
199:*18, 20, 23*
211:*12, 14* 230:*3*
234:*4* 252:*1, 5*
253:*15, 23* 254:*6,*
*10, 15, 17* 258:*14*
259:*5, 17, 19, 20*
260:*2, 15, 22, 23*
261:*11* 266:*23*
267:*5, 8, 10* 268:*3,*

*9* 269:*15* 270:*1, 11*
272:*12, 17* 273:*15*
274:*4* 275:*1, 17*
276:*12, 16* 278:*2, 4*
**complaints** 221:*10,*
*18* 229:*14, 23*
233:*12* 242:*24*
250:*13, 18, 23*
251:*13* 252:*3*
259:*2, 3, 14, 20, 21*
270:*15, 18, 20, 24*
271:*7, 12, 16, 21*
273:*13* 274:*4, 6, 12,*
*24* 275:*1, 2* 276:*3,*
*10*
**complaint's** 259:*15*
**complete** 150:*24*
278:*22* 279:*14, 22*
284:*2* 286:*23* 287:*8*
**completed** 281:*3*
282:*17, 19* 283:*12*
286:*18* 287:*2*
**completely** 204:*3*
**completing** 283:*23*
284:*7, 14*
**completion** 283:*9*
**component** 37:*19*
**computer** 123:*20*
150:*4* 264:*17, 19*
266:*10* 287:*20*
**concealed** 227:*10*
**concerned** 113:*4*
114:*8, 12* 142:*12*
160:*24* 161:*1, 2*
182:*8, 15*
**concerning** 8:*13*
10:*24* 165:*18*
238:*17* 253:*23*
254:*1* 256:*1* 273:*8*
274:*3* 276:*11*
280:*5, 16* 284:*7*
292:*8*
**concerns** 93:*15*
**concluded** 291:*3*
**condition** 262:*21*
**conditions** 56:*22*
238:*12* 250:*24*
**conduct** 179:*10*
195:*14, 19* 208:*19*
216:*20* 221:*11*

242:*21* 267:*5*
275:*16* 285:*19*
**conducted** 195:*17*
205:*16* 216:*17*
**conducting** 196:*1*
205:*3, 15* 258:*22*
**conference** 21:*14*
25:*17* 31:*1* 34:*17*
35:*12* 41:*14* 43:*14*
47:*9*
**confided** 255:*6*
**confiding** 255:*7*
**confuse** 130:*21*
**confused** 60:*1*
63:*16* 78:*11* 129:*7,*
*9, 14*
**confusing** 126:*5*
**confusion** 129:*8*
**conjunction** 226:*21*
**connect** 38:*9*
**connection** 45:*22*
**consider** 197:*23*
220:*7* 223:*4* 239:*8*
**consideration**
138:*16* 139:*17*
140:*21* 238:*11, 17*
**considered** 20:*13*
145:*16* 221:*1*
234:*14* 235:*11*
239:*3*
**considering** 234:*23*
289:*15*
**consistent** 54:*15, 21*
233:*13*
**consistently** 237:*6*
**constant** 229:*1*
**constitutes** 292:*13*
**construction** 14:*6*
**consuming** 195:*23*
**contact** 171:*2* 220:*6*
**contained** 161:*2*
269:*24* 273:*15*
**content** 163:*15*
**contents** 7:*3*
**continually** 285:*20*
**continue** 13:*8*
**continued** 221:*12*
291:*4*
**contraband** 16:*1*
225:*20*

**contract** 32:*19*
167:*22* 243:*13*
**contractual** 243:*13*
**control** 56:*20*
114:*20*
**conversation** 34:*9*
174:*1* 180:*23*
201:*18, 22* 202:*1, 4*
209:*4* 210:*17*
211:*6, 8* 254:*2, 8, 22*
**conversations** 29:*19*
34:*13* 167:*10*
193:*9* 202:*13*
253:*12*
**COOK** 1:*10, 18*
14:*11, 14, 18, 23*
16:*17* 19:*13* 20:*2*
43:*11* 44:*17* 52:*11*
79:*11, 20* 164:*20*
182:*21* 205:*2*
269:*10, 12, 22*
**coordinate** 266:*6*
**coordinating** 36:*13*
**copies** 290:*6*
**copy** 278:*3, 4*
**correct** 6:*24* 9:*2*
10:*8, 11, 18* 14:*12*
15:*4, 17* 18:*17*
19:*10* 23:*3, 6*
28:*12, 22* 29:*4*
33:*15* 36:*24* 37:*1*
38:*6* 39:*10, 14*
40:*1, 5* 41:*11, 23*
42:*2, 5, 11, 15, 18*
43:*3* 44:*5, 9* 47:*4,*
*21* 49:*20* 50:*13, 16*
52:*5, 7* 53:*2, 11, 16*
55:*1, 16, 20, 23*
56:*7, 15, 22* 57:*21,*
*24* 58:*7, 10, 13, 16*
59:*20, 23* 60:*14*
61:*1, 7, 14, 18, 24*
62:*2* 63:*5, 10*
67:*16* 68:*5, 8* 70:*1,*
*8, 10, 12, 14* 72:*15,*
*19* 73:*16* 74:*5*
75:*10, 13, 20* 76:*3,*
*4, 7, 8, 12, 15, 17*
77:*1, 2, 5, 6, 8, 15,*
*20, 23* 79:*12, 22*
84:*3, 11, 21, 23, 24*

Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 864 of 1503 PageID #:1255

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

85:*1*, 2, 6, 20, 21
86:*4*, *11*, 20  87:*21*
88:*4*, 5  89:*4*, 7
91:*4*  94:*15*  96:*14*
98:*18*  100:*4*, 5, 8,
*13*, 22  101:*9*, *12*, 21
102:*4*, *18*, 22  103:*4*,
5, 7, 15  106:*18*, 22
107:*9*  108:*19*, 23
110:*10*, *17*, 22
111:*8*, *19*, 23  112:*5*,
10  113:*23*  114:*5*
116:*16*, 21  117:*1*,
13  118:*6*, 7, 9, 14
119:*23*  120:*17*
123:*11*, 14  124:*7*,
17  125:*8*, *11*, 15
126:*9*  127:*20*
129:*6*  130:*9*
131:*22*  132:*4*
133:*6*  134:*4*, *11*, *12*,
*18*, 20  136:*4*
141:*16*, *19*, 21
142:*18*  143:*1*, 2
149:*18*  150:*8*
151:*1*, 2, 8, 19
153:*12*  154:*1*, *16*,
24  155:*6*, 9, *12*, 14,
16  158:*6*, *18*  160:*2*
165:*9*, *12*  166:*6*
169:*4*  177:*24*
178:*14*, 16  179:*11*,
*15*, *19*, 23  180:*3*, 5,
16, 20  181:*17*, 21
182:*20*, 24  183:*4*,
14, 18  184:*10*, *14*,
20  185:*7*, 8, *11*, 16
187:*12*  188:*20*, *21*,
23  189:*3*, 8  192:*3*,
14, 24  193:*5*, 14, 21
194:*5*, 19  195:*11*,
*17*, 20  196:*1*, 14, 19
197:*10*  198:*18*
199:*20*  200:*3*, 7, *11*,
*15*, 20  201:*2*, 18
202:*7*, 10  204:*17*
205:*11*, 15  206:*9*,
*16*, 20  207:*2*, 15, 23
208:*7*, 24  209:*23*
211:*9*, *12*, *16*, 21
212:*23*  213:*2*, *18*,

21  214:*17*  215:*1*,
*17*, *20*, 23  216:*3*, 9,
18  217:*14*  218:*1*, 7,
*18*, 23  221:*15*, 16
222:*5*, 8  224:*10*, 16
225:*14*  227:*10*, 16
229:*6*  230:*18*, *21*,
24  231:*22*  233:*8*
235:*4*, *10*, 15  236:*1*
238:*19*  239:*16*, 18
240:*5*, *12*, 15, 24
241:*5*, 8, 9, 20
242:*1*, 6  243:*18*
245:*20*  247:*4*, 9
248:*4*, 23  249:*4*
250:*4*, 5, 7, 14, 24
252:*3*, 7  255:*8*, *14*,
*18*, 21  256:*1*, *13*, 16
257:*10*, *12*  258:*10*,
*12*, 15  259:*24*
260:*4*, 7, 16  261:*8*
268:*19*  271:*3*, 24
273:*10*, *11*  276:*23*
282:*14*  284:*15*
286:*16*
**correctional**  58:*2*, 3
**corrections**  101:*23*,
24
**correlates**  283:*5*
**couch**  235:*21*
**counsel**  17:*24*
130:*20*, 24  161:*12*
191:*17*  247:*17*
248:*18*  260:*10*
292:*18*, 19
**counsels**  244:*12*
**count**  54:*6*  190:*6*
**counted**  190:*13*
**country**  114:*14*
**COUNTY**  1:*10*, 18
14:*11*, 15, 18, 23
16:*17*  19:*14*  20:*2*
43:*11*  44:*17*  52:*11*
79:*11*, 20  164:*20*
182:*21*  205:*2*
254:*20*  269:*10*, *12*,
22
**couple**  9:*13*  84:*9*
145:*19*  215:*14*
290:*15*

**course**  282:*17*
283:*16*
**courses**  280:*15*
283:*7*
**COURT**  1:*1*  14:*22*
15:*7*, *10*, *13*  16:*17*
35:*16*  36:*9*  39:*13*
133:*17*  136:*17*
138:*23*  145:*4*
146:*10*  148:*9*, *13*
149:*9*  152:*1*
202:*24*  217:*14*
218:*12*, 17  219:*9*,
14, 22, 24  220:*4*, 16,
24  222:*1*  256:*9*
257:*1*  265:*5*
**courtroom**  15:*20*
218:*7*
**courtrooms**  16:*8*
**courts**  51:*17*
**COVID**  264:*22*
**coworkers**  29:*4*, *10*,
15, 19  30:*6*, 21
31:*17*  32:*5*, *10*, 24
33:*17*
**credibility**  168:*23*
**creeping**  289:*9*
**crept**  290:*12*
**crew**  155:*18*
**criminal's**  236:*3*
**crooks**  248:*15*, 22
**cross**  17:*23*  244:*11*
**CSR**  1:*24*  292:*3*
**curious**  231:*12*
**current**  259:*15*
**currently**  11:*10*
**curriculum**  286:*7*
**Curry**  99:*7*
**custody**  138:*1*
**cut**  35:*15*  38:*7*
117:*24*  288:*21*
**cutting**  161:*13*

**< D >**
**DAFFADA**  2:*18*
**daily**  113:*18*  136:*7*,
*12*, 21  138:*4*
139:*19*  140:*4*
184:*14*
**Daley**  12:*6*, 7, *10*,
*13*, 23  13:*5*  98:*8*

**Dan**  4:*4*, *14*, 20  9:*9*,
22  45:*17*  47:*12*
120:*1*  202:*14*
288:*18*
**dan.herbert@danher**
**bertlaw.com**  2:*8*
**dangerous**  234:*14*
235:*10*, *11*, 19, 23
236:*5*, 12
**DANIEL**  2:*5*
**dark**  187:*14*, 16
**DART**  1:*11*  56:*17*,
20  57:*1*, 2  99:*9*
115:*6*
**date**  11:*8*  51:*2*
71:*9*  210:*19*
215:*22*  216:*5*
262:*18*  289:*2*
**dates**  22:*7*  51:*5*
185:*17*  210:*23*
287:*18*
**Dating**  26:*22*
**DAVID**  1:*6*  164:*12*
242:*19*  256:*24*
257:*4*, 6, 14, 17
**day**  27:*7*, *13*, *21*, 22
28:*6*, *10*, 20  29:*1*
31:*13*  33:*13*
117:*18*  133:*16*, 23
134:*16*  136:*16*
145:*9*, 13  146:*8*, 9
150:*13*, 21  151:*6*
155:*9*  157:*22*
172:*17*  183:*18*
184:*17*  195:*23*
203:*12*  214:*11*, 12
215:*12*  217:*14*
219:*24*  240:*24*
252:*14*  293:*2*
**days**  26:*11*  31:*10*
33:*6*  34:*10*  116:*23*
117:*19*  118:*11*, *17*,
18  120:*21*, 23
131:*13*  135:*12*
144:*20*  149:*22*
184:*16*  193:*11*
225:*4*  290:*15*
**day's**  212:*24*
**De**  11:*23*, 24  12:*1*,
3  13:*8*

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 865 of 1503 PageID #:1256

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**deal** 137:*1* 228:*24*

**deals** 281:*10*

**December** 25:*3*
100:*19* 282:*13*

**decide** 118:*11*

**decision** 107:*23*
108:*6* 135:*16*
143:*6* 144:*23* 250:*4*

**decree** 114:*18*
115:*4*

**defendant** 6:*17*
204:*23* 253:*22*
256:*8*, *24* 267:*3*
270:*10*, *13*, *16* 273:*1*

**Defendants** 1:*19*
2:*16*, *22*

**defendant's** 273:*1*

**defenders** 148:*12*

**defenses** 163:*13*

**definitely** 8:*3*
22:*10*, *19* 23:*9*, *10*
130:*16* 183:*7*
199:*17* 207:*4*
225:*15*

**definition** 53:*6*
55:*7* 121:*6* 196:*2*

**defuse** 223:*7*, *9*, *16*

**degree** 279:*23*

**delay** 123:*17*

**delineate** 34:*16*

**deliver** 147:*3*

**delivered** 21:*13*

**deliveries** 172:*12*, *13*

**delivering** 22:*18*, *21*
36:*12* 146:*19*
151:*10*

**delivery** 21:*12*, *17*,
*18* 22:*3*, *9*, *11*
23:*22* 24:*8*, *11*
26:*7* 36:*23* 105:*9*
117:*6* 146:*6*, *21*

**demanded** 222:*12*,
*13*

**demanding** 268:*20*

**Democratic** 49:*5*, *9*

**denial** 206:*5*

**denied** 210:*16*
222:*4*

**Denise** 218:*3*

**dep** 258:*22*

**Department** 14:*12*,
*15*, *18*, *23* 16:*18*
19:*14* 20:*2* 28:*1*
52:*11* 53:*2*, *11*
55:*1*, *15* 62:*5*, *17*,
*20* 64:*18*, *22* 65:*1*
66:*1*, *12* 67:*21*
68:*16*, *22* 69:*3*, *7*,
*24* 70:*8* 71:*2*, *8*, *12*,
*20*, *24* 72:*6*, *14*, *23*
73:*9*, *14* 75:*2*, *9*
79:*12*, *15*, *21* 80:*1*,
*4*, *15*, *19* 85:*13*
86:*10* 87:*7*, *10*
88:*3* 90:*21* 113:*6*
114:*23*, *24* 123:*5*
126:*24* 127:*2*
135:*15*, *17* 142:*8*
159:*3* 161:*5*, *8*, *24*
162:*5* 164:*21*
170:*8* 194:*6* 205:*3*
207:*16* 231:*9*
248:*23* 249:*7*
269:*23* 281:*9*
286:*22* 287:*16*, *17*

**depending** 133:*16*
144:*21* 203:*13*

**depends** 47:*5*

**depicting** 236:*3*

**deposition** 1:*21*
3:*11* 5:*11*, *15* 6:*10*,
*15*, *21* 7:*20* 10:*6*
130:*14* 291:*2*
292:*10*, *15*

**depositions** 204:*5*

**deputies** 16:*8*
144:*24*

**deputy** 14:*19*, *20*
39:*17* 40:*15* 42:*3*
50:*20*, *21* 51:*13*, *15*,
*19* 52:*4*, *10*, *22*
53:*8*, *10*, *19*, *22*
54:*1*, *3*, *16* 55:*7*, *22*
56:*3*, *12*, *14*, *16*, *22*
57:*4*, *6*, *11*, *15*, *19*
58:*3*, *16*, *21* 59:*13*,
*19*, *20*, *21*, *22* 60:*2*,
*3*, *5*, *9*, *13*, *17*, *24*
61:*10*, *11*, *13*, *15*, *17*
62:*10*, *14*, *17*, *19*
63:*9* 64:*2* 66:*23*

67:*5*, *9*, *13*, *18*, *24*
68:*3*, *10*, *16*, *21*, *23*
69:*1*, *2*, *5*, *9*, *13*, *17*
70:*2*, *5*, *7*, *15*, *20*
71:*12* 72:*7*, *13*, *17*,
*22* 73:*8*, *14* 74:*2*, *4*,
*10* 75:*10*, *20* 76:*5*,
*14*, *23* 77:*4*, *22*
78:*1*, *5*, *8*, *18*, *19*, *21*
79:*7* 81:*18*, *20*, *24*
82:*2*, *5* 84:*8*, *14*, *17*,
*18*, *20* 85:*5*, *14*, *18*
86:*3*, *9*, *19*, *23*, *24*
87:*18*, *20* 88:*2*, *7*, *8*,
*10*, *14* 89:*18* 90:*4*,
*13*, *20* 91:*4*, *16*
92:*1* 93:*19*, *23*
94:*3*, *7* 95:*1*, *2*, *10*
103:*2*, *3*, *10*, *16*, *20*,
*24* 104:*5*, *23*
105:*16* 109:*17*, *23*
120:*18* 128:*5*
135:*21* 136:*2*
167:*6* 193:*7*, *12*, *17*
207:*6*

**derogatory** 186:*7*
233:*5*

**describe** 13:*12*, *18*
15:*24* 259:*14*

**described** 24:*16*
259:*22* 269:*14*

**description** 195:*21*

**desirable** 27:*3*, *10*
29:*10* 31:*9* 50:*15*
247:*9*, *10*

**desire** 125:*13*
128:*2* 153:*23*
174:*16* 175:*16*
176:*12*

**desired** 29:*20*
115:*12*

**desiring** 138:*8*
174:*10*

**desk** 20:*15* 37:*9*

**despite** 242:*5*

**detail** 26:*5*, *12*
27:*8* 30:*1*, *13*
33:*24* 35:*7* 116:*18*,
*19* 119:*17* 120:*14*,
*19* 125:*18* 133:*2*

141:*10* 243:*21*

**detailed** 124:*2*

**details** 28:*4* 118:*22*
120:*17* 160:*10*
266:*24*

**detainee** 21:*19*

**detainees** 21:*12*, *23*
22:*11* 36:*8* 39:*5*
115:*7* 146:*20*
147:*3* 149:*13*

**determine** 217:*13*
218:*16*

**determined** 158:*19*
212:*13*

**determining** 134:*23*

**dictated** 210:*2*

**dictates** 133:*9*
241:*1*

**difference** 33:*9*
121:*12*

**different** 14:*9*
20:*23* 21:*1*, *4* 28:*3*
30:*7*, *11*, *20* 33:*1*,
*18* 37:*12* 54:*20*
55:*11*, *16* 64:*9*
94:*6* 116:*5* 118:*21*,
*22* 126:*3*, *6* 128:*8*
130:*12* 131:*3*, *5*
132:*12* 140:*16*
141:*4* 159:*20*, *22*
161:*18* 170:*7*
177:*20* 179:*2*
180:*9* 183:*17*
194:*4* 203:*12*
217:*24* 228:*3*
234:*8* 240:*4* 248:*9*
263:*7* 267:*21*
271:*19* 278:*6*
280:*15* 287:*10*
289:*3*

**differentiating**
64:*13*

**differently** 180:*8*,
*11* 183:*14* 200:*10*
243:*1*

**difficult** 18:*1*
92:*19* 203:*22*

**difficulties** 21:*15*
25:*18* 31:*2* 34:*18*
35:*13* 41:*14* 43:*14*

Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 866 of 1503 PageID #:1257

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

47:*10*

**diffusing** 267:*12*

**DIRECT** 5:*4*
183:*22* 188:*24*
289:*5*

**directed** 134:*16*
200:*15*

**direction** 165:*11*
173:*12* 292:*12*

**directive** 119:*4*
180:*14*, *17*

**directly** 77:*4* 88:*2*,
*14* 89:*14*, *17* 90:*4*,
*12* 91:*3* 103:*6*
106:*22* 192:*13*, *19*
292:*20*

**director** 40:*16*
78:*19* 79:*9*, *10*, *11*
81:*11*, *13*, *18* 82:*8*,
*14*, *20* 83:*5*, *7*, *15*
95:*1* 96:*5*, *7*, *10*, *13*,
*17*, *20*, *23* 97:*1*, *4*, *7*,
*9*, *15*, *17*, *20*, *21*
98:*3* 99:*4*, *11*
100:*3*, *7*, *11*, *22*
101:*2*, *5*, *6*, *9*, *21*, *22*
102:*3*, *11*, *15*, *17*, *21*
103:*1*, *2*, *4*, *6*, *7*, *11*,
*12*, *14*, *16*, *20*, *22*, *24*
104:*6*, *12*, *18*, *20*
105:*14* 106:*8*, *13*
107:*5*, *8*, *17*, *21*, *24*
109:*12*, *18* 110:*14*
111:*17* 112:*24*
113:*4* 114:*11*
115:*18* 116:*7*
122:*24* 127:*7*, *24*
128:*1* 136:*4*, *5*
138:*7* 148:*1*, *2*
156:*2*, *5* 170:*15*
174:*8*, *9*, *15*, *16*
185:*3*, *4* 189:*21*
192:*18*, *22* 193:*8*
210:*11* 219:*12*
225:*9* 232:*19*
262:*11*, *13*, *16*, *19*
263:*8*, *20* 277:*7*, *8*
278:*11* 280:*12*
285:*9* 286:*1*

**directors** 78:*21*
79:*7* 81:*21* 82:*10*

**disagree** 204:*3*
209:*16*

**discharges** 147:*1*

**disciplinary** 249:*12*
251:*11* 260:*23*

**discipline** 56:*21*
205:*5* 206:*18*
207:*5*, *10*, *11*, *15*
209:*11*, *17*, *19*
212:*1* 213:*1* 224:*1*,
*9* 225:*4*, *6*, *8*, *11*
228:*13*, *14*, *20*
242:*12*, *13*, *17*, *20*,
*21* 245:*20*, *23*
249:*14*, *17* 250:*22*
251:*2*, *7* 252:*14*, *17*

**disciplined** 211:*1*, *5*,
*7* 212:*22* 213:*6*
231:*21* 232:*2*, *5*

**Disciplining** 206:*22*

**discovered** 227:*9*

**discrepancy** 161:*9*

**discriminate** 285:*23*

**discriminated**
188:*19* 252:*2*

**discrimination**
249:*4* 270:*11*, *14*,
*20* 271:*7*, *22*
277:*14*, *16* 279:*11*
280:*6*, *16*, *19* 281:*5*,
*10*, *22* 283:*18*
284:*24* 285:*1*
286:*4*, *11*, *14*

**discuss** 251:*20*
254:*14* 285:*18*

**discussed** 138:*17*
210:*10*

**discussing** 4:*7*
167:*6* 214:*10*

**discussion** 136:*10*

**discussions** 287:*3*,
*10*, *11*

**disgruntled** 125:*8*

**dismissed** 164:*11*

**dispatched** 235:*18*

**DISTRICT** 1:*1*
28:*2*, *3* 257:*1*

**districts** 136:*22*

**disturbing** 182:*18*

**diverse** 113:*12*, *13*,
*14*, *22* 114:*9*

**diversity** 114:*16*
115:*12*

**DIVISION** 1:*2*
21:*2* 37:*18*, *20*
38:*3*, *8* 149:*12*
154:*4*, *14* 156:*1*
157:*10*

**divisions** 20:*23*
21:*2*

**DOC** 160:*23*

**document** 210:*6*
282:*6* 283:*22*
284:*6*, *7*

**documents** 7:*3*, *19*
8:*11*, *21* 10:*5*, *24*
216:*7*, *11* 274:*11*

**Doe's** 162:*1*

**doing** 4:*18* 18:*5*, *8*
34:*22* 39:*6* 115:*8*
247:*21* 276:*4*

**domino** 145:*21*

**donate** 48:*22* 49:*2*,
*5*, *8*, *11*

**donated** 13:*4*
49:*22* 98:*17*, *19*

**door** 38:*21* 268:*13*

**doorways** 222:*15*

**Dorian** 258:*9*
261:*11*, *19*

**doubt** 265:*15*

**Downstairs** 16:*1*
146:*4*

**drawing** 92:*7* 263:*1*

**drive** 21:*19*

**drive-in** 14:*7*

**driving** 22:*11*

**drop** 223:*15*

**drove** 38:*21*

**due** 51:*2* 54:*5*
92:*19* 129:*11*, *17*
287:*18*

**dues** 52:*1*

**DUI** 234:*23*

**duly** 4:*2* 292:*7*

**dumb** 232:*20*

**duplicating** 280:*24*

**duties** 14:*20* 15:*22*
20:*11* 36:*6* 134:*24*
181:*16* 185:*6*
194:*19* 195:*2*, *4*, *10*,
*13* 278:*11*

**duty** 51:*14*, *15*
158:*13* 179:*21*
194:*24* 199:*19*
205:*4*, *19*, *21*
219:*16*, *23*, *24*
220:*5*, *8*, *16* 221:*1*,
*5* 230:*17*, *20*

**< E >**

**earlier** 8:*12*, *22*
26:*8* 41:*20* 102:*8*
119:*14* 159:*23*
169:*12* 210:*10*
267:*15* 268:*19*
271:*2* 276:*19*

**ear's** 223:*14*

**easier** 266:*6*

**easily** 152:*17*, *20*, *22*

**east** 146:*16*

**EASTERN** 1:*2*

**echelon** 53:*2*

**educated** 80:*18*

**education** 13:*9*, *13*,
*19*

**EEOC** 250:*7*, *24*
251:*13*, *24* 252:*3*, *5*
257:*19*

**effect** 145:*21*

**effectively** 36:*20*

**effort** 137:*4* 155:*18*

**eight** 220:*7*, *12*

**either** 4:*21* 31:*5*
87:*20* 116:*23*
151:*17* 162:*22*
172:*24* 214:*11*
256:*8* 290:*21*

**electronic** 17:*17*, *19*,
*22* 18:*17* 19:*13*, *20*
20:*11*, *19*, *23* 21:*5*
25:*22* 26:*2*, *17*
27:*3* 28:*7*, *12*, *21*
29:*21* 30:*12* 32:*1*
35:*21* 36:*12*, *17*, *19*
39:*1*, *14*, *24* 50:*3*
51:*16* 64:*18* 94:*5*
101:*21* 102:*1*, *3*, *7*,
*12*, *17*, *21* 103:*1*, *11*,
*15*, *19*, *21*, *23* 104:*8*,
*11*, *13*, *17*, *21*, *23*
106:*7* 109:*10*
110:*15* 111:*14*



Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 867 of 1503 PageID #:1258
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

113:*12, 16, 23*
114:*10, 13*  115:*8, 9, 20*  116:6  122:16
123:*1*  124:*4, 6*
128:*19*  129:*3, 19, 23*  131:15  132:23
136:19  137:2, *19*
139:*2*  140:9, *17*
141:*3*  142:*1, 16*
143:18  146:14
148:*15, 20*  150:14
152:8  166:*1*  172:6
179:18  183:13
185:11  192:6
193:13  205:*1*
209:12  227:7
228:24  234:22
235:2, *8, 24*  237:*12, 24*  248:16  257:7
263:20  270:15
**elevator**  38:*14, 20*
**eligibility**  108:*13, 18, 22*  109:*4*
**eliminate**  60:17
**eliminated**  60:6, *10, 22*
**EM**  62:*14*  147:9, *12*  151:18  160:*21, 23*
**e-mail**  218:5
**e-mails**  289:23
**embarrass**  196:13
**emergency**  138:22
139:*1*  150:6, 9, *10, 16*
**EMERY**  2:*12*
**employed**  20:*1*
44:*17*  124:*23*
157:18
**employee**  52:2
109:*10*  111:22
114:9  154:*20, 22*
170:20  174:*14, 16*
175:2, *3, 16*  176:*4, 12*  180:9  196:*12, 13*  197:22  199:10
206:13  240:22
267:4  269:*10, 23*
292:*17, 18*
**employees**  106:*13*
110:15  111:7, *18*

112:5, *9*  118:5
125:7  126:*14, 20, 23*  132:23  138:*8, 12*  139:9, *17*  140:9
141:2  142:16
152:7  178:13
179:23  180:2, *15*
181:*3, 16, 21*  182:8, *17*  183:*4, 9, 12*
185:*10, 13*  188:*19*
197:13  200:6, *10, 14, 19*  225:6
238:*11, 15*  245:*16, 17*  248:*16, 21*
273:9  274:*13*
285:7  286:*11, 16*
**employment**  14:*3*
185:2  240:*4*
**EMU**  267:*4*  273:8
**encompass**  102:*1*
**encompasses**  149:*18*
**encourage**  47:*1, 2*
48:*1*
**encouraged**  47:23
48:*4*
**encouraging**  48:20
**energy**  168:*10, 11*
169:9
**ensure**  277:*18*
278:*17*  279:*18*
285:8, *12*
**ensuring**  285:6
**entails**  177:*18*
**entered**  246:5
**entire**  37:7  70:7
75:*1*  122:23  248:7
270:5
**entirety**  39:*13*
**entrances**  16:7
**environment**
179:*18, 22*  273:10
**equal**  140:*10, 12, 15*
**equally**  141:5
180:*15, 20*
**escort**  145:18
**especially**  197:*14*
**established**  111:*16*
**estate**  31:2
**ETHAN**  2:*12*  265:*4*
**evaluate**  165:*14*

**evaluations**  165:18
**evening**  149:13
**event**  175:23  176:*3*
**events**  108:*16*
175:*19, 22*
**eventually**  228:*23*
**Everybody**  30:*24*
31:6  37:5  38:20
47:6, *7, 19, 20*
111:*13*  133:*14*
145:5, *13*  196:7
215:6, *12*  221:*24*
274:*19*  288:*23*
**evidence**  152:15
153:14  193:16
199:*4, 14*  201:*12*
224:7, *12, 18, 24*
229:8  231:2, *24*
233:*23*  237:*14, 20*
241:*11*  242:8, *15*
243:*4*  244:*3, 11, 23*
245:12  246:12
250:9, *16*  251:15
252:21  275:5, *10, 19*  276:*14*
**ewhite@emertlawltd.
com**  2:*15*
**exact**  289:*10*
**Exactly**  196:*9*
223:*17*  289:5
**exaggerated**  222:*10*
**EXAMINATION**
3:*1*  5:*4*  292:7
**examined**  5:2
**example**  33:*23*
90:*15*  137:*12*
147:*21*  228:*17*
**examples**  181:7
228:*20*
**excessive**  175:5
265:*24*
**Excuse**  191:*19*
**executive**  81:*18, 20, 24*  82:*2, 5, 8, 10, 14, 20*  83:*5, 7, 15*  97:*7, 9, 15, 17*  98:*12*
99:*3, 11*  100:*3, 7, 11, 21*  101:*1, 5, 6, 9, 20, 22*  102:*10*
103:*2, 4, 7, 10, 11, 12, 14, 16, 24*  104:*6,*

*17*  122:24  127:7
128:*1*  138:7  148:2
156:5  174:9, *15*
185:*4*  189:*21*
219:12  262:*11, 16, 19*  263:8, *18, 20*
277:8  278:*11*  285:9
**exempt**  51:*20, 23*
52:2, *7*  58:12
111:*15*
**Exhibit**  3:*11*
162:24  163:*10*
204:15  253:*4*
266:*4, 16*  281:*17, 18*
**exhibits**  10:*1*  163:*3*
289:*3*
**existed**  113:*19*
**existence**  19:*16*
**exits**  16:7
**expand**  41:*4*  70:18
**Explain**  132:*20*
133:*12*  149:6
161:9  169:9
**explaining**  160:*16*
**explanation**  161:*14*
**express**  84:*16*
**expressed**  141:*1*
153:*23*  175:16
176:*12*
**expressing**  174:*16*
**extra**  289:*12, 14, 16*
**extremely**  124:*1*

**< F >**
**face**  210:*12, 22*
212:5, *15*  215:16
222:*21*  269:*1*
283:*21*
**facilitate**  290:6
**fact**  22:*17*  29:9
30:5  97:*24*  172:18
173:*16*  183:*12*
185:21  186:*3*
195:16  196:5, *18, 23*  199:9  201:9
208:20  211:*24*
212:2  213:*17*
215:*1*  216:*13, 17*
218:*17*  221:*13, 17*
224:21  225:*23*
226:*11*  230:7



Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 868 of 1503 PageID #:1259
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

231:20  232:10
233:19  237:10
241:7, 19  242:3, 11
243:23  244:7, 17
245:6  248:21
250:6, 12  251:10
255:16  275:4  281:8
**factor**  119:9, 23
120:7  238:10
**factors**  146:10
**facts**  152:14
153:14  199:3, 13
201:12  216:14
224:6, 11, 17, 23
226:11  229:7
231:1, 23  233:23
237:13, 19  241:10
242:7, 14  243:3
244:2, 10, 22
245:11  246:11
250:9, 16  251:15
252:20  275:9, 18
276:13
**fair**  28:19  29:11,
21  37:2  53:1
90:18  96:11
104:10  111:1
122:16  147:10
158:23  159:17
180:19  181:16
182:9, 12  191:2
269:21  270:5
284:23
**fairly**  181:3, 7, 8, 11,
21  182:3, 9  183:4, 9
**fairness**  252:12
**fake**  226:18  227:1,
23, 24
**fall**  88:22
**falsified**  168:20, 21
**familiar**  210:24
258:10
**families**  126:11
**family**  126:9  127:4
246:8  247:8  248:4
**far**  23:21  32:10
62:13  69:24  85:17,
23  113:19  122:20
127:6  139:9
165:15, 21  173:7
176:15  204:10

206:18  274:2
285:15  287:2
**fast**  74:18  289:21
**father**  12:9  20:1
**fault**  18:15  248:13
**feasible**  138:19, 20
**Federal**  6:16
114:18  115:4  222:1
**feel**  6:11  93:13
169:19  170:6
**feels**  170:6
**felon**  234:23
**felt**  222:24  226:21
260:23
**female**  259:7
**F'er**  222:17
**FERGUSON**  1:5
164:6  172:22
173:14, 23  174:20
175:15, 24  176:11,
16, 20  177:10, 20,
24  178:4  241:23
**Fergy**  178:22
**fiduciary**  279:12
**field**  21:9  24:13,
17, 19, 20, 21  26:7
33:11  34:5  36:23
105:11, 13  240:20
245:3  280:1
**figure**  178:24
184:17  252:7, 8
265:6  284:10
**figuring**  264:21
**file**  20:16  161:20
162:1  217:10
230:3  259:23
272:12, 17  275:11
278:1
**filed**  7:7, 8, 9
182:17  211:11
233:12  250:7
257:19  258:14
260:15, 17  272:9
275:8, 14, 21
**files**  20:14
**fill**  35:9  278:5
**filled**  96:19  118:18
155:8, 11
**find**  27:9  54:1
134:3  159:7

177:18  215:11
216:14
**finding**  213:2
**fine**  18:8  43:17
64:15  203:20
227:6  289:8, 24
**finger**  222:16
**finish**  18:12  57:17
100:15  161:14
226:3  230:15
247:17  263:18
279:6  287:20
**finished**  140:7, 13
228:16  287:17
**fired**  201:10
213:14, 18, 20
216:3  221:19
225:10
**FIRM**  2:5
**first**  5:7  7:6  15:6,
8, 9  16:6  37:20
43:20  87:11
112:15  135:11
144:19  149:20
151:18  157:20, 21
185:24  186:2
194:1, 14, 17  197:4
204:7  227:8, 21
230:15  231:8
246:2  247:1
281:15, 21
**fit**  58:1  68:10
**fitting**  36:11
**five**  46:2, 5  93:21
94:7  95:8, 10, 11,
14  120:22  153:3,
18  210:20  259:15
**five-day**  223:22
224:4, 22  225:16
226:22  227:2
228:6  229:12, 21
**five-minute**  204:9
**fix**  45:22
**flight**  162:22
231:11
**flip-flopped**  212:8
**floor**  16:6, 7  37:20
98:7  154:16
156:10, 21  159:20,
22, 24  160:4, 5, 15,
18, 19  161:6  231:8

**floors**  16:6  154:24
156:14
**fluctuated**  105:15
**fluff**  236:8
**focus**  87:12
**follow**  146:7
182:24  206:8, 12, 14
**followed**  114:4
126:11  182:20
206:16  207:17
285:15
**following**  253:16
**follows**  5:3
**follow-up**  146:7
**force**  134:8, 13
279:10
**forced**  204:7
**forego**  106:21
**foregoing**  292:10
**forget**  140:20  278:1
**forgot**  254:14
**form**  10:16  25:12
28:13  29:5, 12, 22
30:8, 22  31:19
32:6, 15  33:19
34:6, 14  35:4  42:6
48:24  49:7, 13
53:3  56:23  59:9
60:7, 19  61:2  62:1,
11, 18, 24  63:6, 20
64:3, 7  65:10, 15,
21  66:3, 13  67:1,
19  68:18  70:9
71:3, 21  72:2, 8, 24
73:10, 17  74:6, 21
77:9, 16  78:22
79:4  81:14, 17
82:7  85:7  90:6, 22
99:22  101:13
104:15  105:20
109:5  110:18
113:7, 24  115:14
117:15  121:4
123:3  124:18
125:2, 23  126:16,
21  127:11, 21
132:5  134:5, 19
135:18  141:6
153:6, 14  156:15
165:2, 23  166:7, 16,
22  167:4  173:13

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 869 of 1503 PageID #:1260

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

178:*15* 180:*10* 186:*5* 189:*12, 22* 190:*4, 23* 191:*5* 194:*20* 197:*16* 200:*21* 201:*3* 207:*24* 208:*8* 213:*8* 214:*8* 217:*15* 219:*17* 220:*1, 17* 221:*2* 227:*17* 230:*1* 234:*9* 238:*20* 239:*5* 240:*6* 241:*11* 242:*15* 246:*12* 273:*16, 22* 274:*7, 14* 275:*10, 19* 277:*3* 278:*4*
**formal** 269:*13*
**former** 12:*11, 13*
**forms** 217:*22* 253:*14*
**forth** 8:*1* 11:*3* 167:*21*
**forward** 192:*11* 219:*3*
**found** 29:*10* 171:*10* 215:*8* 227:*15, 22* 231:*13*
**foundation** 12:*17, 24* 29:*5, 12, 22* 30:*8, 22* 31:*19* 32:*15* 34:*6* 38:*17* 49:*7* 50:*23* 55:*3* 60:*7* 85:*7* 89:*9* 91:*18* 105:*20* 106:*23* 108:*24* 109:*5, 19* 110:*11* 111:*2, 24* 112:*6, 11* 117:*2* 125:*2, 9, 16* 126:*21* 127:*11, 21* 134:*5, 19* 141:*6* 148:*24* 156:*15* 180:*21* 181:*5, 12* 183:*5, 19* 187:*17* 189:*12* 194:*20* 195:*5* 196:*20* 197:*1* 199:*4, 14, 21* 201:*11, 19* 206:*21* 207:*24* 211:*17* 212:*16* 213:*22* 215:*2, 18* 216:*10, 19* 217:*1, 7, 15*

218:*8, 24* 220:*17* 221:*2* 224:*12, 24* 228:*8* 229:*8, 16* 230:*9* 231:*1, 24* 233:*22* 237:*14* 238:*20* 239:*5* 241:*11* 242:*8, 15* 243:*4* 244:*3, 11, 23* 245:*12* 246:*12* 249:*23* 250:*8, 15* 251:*1, 14* 252:*20* 274:*14* 275:*5, 10, 19* 276:*5, 14* 281:*12*
**four** 32:*3* 36:*22* 59:*11* 93:*21* 94:*7* 95:*10, 11, 17, 24* 157:*13* 189:*18* 235:*21*
**frame** 54:*9* 76:*3* 135:*2*
**fraud** 214:*13*
**free** 6:*11*
**Friday** 31:*8* 198:*11*
**friend** 198:*21*
**friends** 12:*12* 20:*7* 44:*19* 45:*3*
**friendship** 199:*2*
**front** 51:*10* 123:*21* 163:*2, 4* 199:*11* 216:*12* 266:*4*
**froze** 17:*1*
**fugitive** 235:*6, 15, 17*
**fugitives** 235:*4, 10* 236:*13*
**fulfill** 135:*14*
**full** 11:*3*
**fullest** 126:*24*
**functions** 21:*4*
**fund** 41:*7*
**fundraisers** 49:*16, 24*
**further** 13:*13, 19*
**future** 291:*1*

**< G >**
**gainful** 234:*21*
**game** 198:*15*
**gathered** 214:*5*
**gay** 262:*8*
**geez** 290:*11*

**general** 20:*17* 137:*2* 179:*17* 259:*18* 278:*3*
**generally** 148:*21* 157:*17* 158:*9* 189:*11*
**gentleman** 19:*24*
**getting** 32:*12* 46:*19, 20, 23* 63:*16* 93:*16* 119:*6* 130:*12* 131:*4* 148:*19* 194:*8* 225:*10* 251:*4* 290:*6*
**Give** 9:*18* 23:*21* 33:*23* 87:*13* 109:*7* 136:*6* 137:*20* 147:*21* 150:*19* 157:*23* 160:*17* 173:*12* 190:*5* 195:*1, 4* 202:*23* 205:*18* 206:*1* 207:*8, 12* 211:*20* 289:*3*
**given** 5:*10, 15* 32:*12* 41:*10, 12* 53:*24* 64:*9* 107:*11, 20* 116:*20* 132:*22* 133:*21* 135:*9* 136:*18* 140:*21* 144:*17* 162:*15* 168:*4* 183:*18* 202:*21* 225:*6, 14* 232:*10* 233:*21* 234:*11, 12, 13* 235:*6* 238:*16, 17* 240:*10, 13, 14* 289:*4* 292:*13*
**gives** 155:*18*
**giving** 18:*13* 64:*14*
**glad** 153:*21*
**go** 9:*13, 15, 21, 23* 19:*3, 6, 8* 21:*10* 24:*11* 33:*21* 36:*10* 38:*10* 47:*13* 49:*20* 51:*18* 55:*8* 64:*15* 85:*9* 109:*3* 112:*12, 16* 118:*21* 131:*11* 134:*3* 148:*13, 16, 17* 149:*12* 151:*22* 155:*3, 14* 159:*9, 18, 19, 21* 160:*11, 15,*

18, 22 161:*1, 7, 8, 10, 16, 20, 24* 162:*22, 24* 172:*1, 7* 173:*6* 174:*23* 177:*1, 11* 198:*22* 202:*21* 203:*2, 21* 204:*14* 215:*9, 11* 218:*9, 10* 223:*17* 226:*2* 231:*4* 232:*16* 234:*16* 235:*9, 14* 236:*12* 241:*15* 248:*17* 250:*1* 252:*14* 253:*4, 5, 18* 259:*8* 262:*5, 9* 263:*3* 264:*17* 265:*5, 13* 267:*2* 268:*6* 272:*21* 276:*7* 280:*3* 281:*17, 18* 285:*4* 288:*18*
**goal** 113:*11, 15*
**goes** 170:*1* 247:*22* 270:*12* 288:*13*
**going** 5:*20* 6:*5* 8:*1* 9:*13* 18:*3, 10* 19:*6* 27:*20* 37:*8, 21* 39:*5* 41:*4, 7, 8* 45:*23* 51:*1, 18* 64:*14* 97:*10* 106:*10, 18* 107:*4, 20* 118:*24* 127:*2* 130:*15* 136:*24* 137:*1, 21* 140:*6* 146:*13, 15, 17, 18, 21* 147:*8* 150:*2* 151:*24* 155:*4* 157:*12* 158:*2* 164:*10* 170:*4, 5, 10* 172:*21* 183:*7* 202:*15, 17, 19, 24* 203:*1* 209:*4* 213:*14, 17* 216:*2* 220:*24* 222:*17, 21* 227:*1* 231:*13* 232:*12* 235:*4* 238:*6* 249:*18* 252:*5* 254:*18* 256:*5* 258:*3* 259:*13* 264:*17* 265:*5, 6, 9, 10, 11, 13, 15, 22, 23* 266:*3*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 870 of 1503 PageID #:1261
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

267:2, *14* 269:8
270:7 280:*10*
281:*18* 283:*1*
284:*1* 289:*18*
290:*17*
**Good** 4:*3, 8, 10*
5:*11* 6:*14* 10:*3*
27:20 46:*4* 52:*3*
122:*5, 6* 133:*16*
139:*4* 155:*18*
167:2 168:7 170:*6,*
*20* 266:8 268:*16*
289:22
**graded** 182:*5*
**graduate** 12:*3*
**graduating** 13:*7*
**granting** 205:*4, 24*
206:*5*
**great** 9:*17* 45:24
167:7 168:2, *3*
198:*12* 266:*19*
288:*13* 290:*4*
**Greg** 4:*6* 5:*1, 8, 9*
85:*9* 86:*5* 130:*23*
161:*16* 236:*23*
263:*24* 266:*16*
**G-r-e-g** 5:*9*
**GREGORY** 1:*13,*
*21* 3:*1* 6:*18*
**grievance** 226:*12,*
*14* 229:*21* 249:*11*
275:*11, 21*
**grievances** 225:*11*
275:*8, 15* 276:*16*
**grieve** 249:*18*
251:*20*
**Group** 26:*12* 27:*8,*
*13, 21, 23* 28:6, *11,*
*20* 31:*7*
**groups** 29:*1* 31:*13*
69:*19*
**guards** 232:*11*
**guess** 47:20 63:*16*
80:*17, 18* 81:*2*
100:*15* 137:*14*
166:*13* 169:*13*
210:*3* 289:*17, 18*
**guessing** 40:*16*
51:*5* 152:*10*
**gun** 137:*21, 23*
**guns** 223:*6*

**guy** 170:*10* 172:*3*
198:*12* 226:*18*
263:*11*
**guys** 144:*12*
145:*19* 146:*4, 7*
148:*16* 151:*10*
152:*5* 167:*7*
193:*10* 215:*11*
217:*19* 218:*10, 21*
247:2, *12, 16, 22*
248:*3* 255:*13, 17*
264:*3* 266:*9* 279:*4,*
*6*
**guy's** 113:*18*


**< H >**
**ha** 238:*5*
**half** 92:*17* 146:*17*
265:*15* 289:*16*
**Hall** 1:*23* 149:*11*
292:*3*
**hand** 293:*1*
**hands** 222:*17*
**Hang** 264:*16, 18*
**hanging** 262:2
263:*11, 12*
**happen** 143:*16*
153:2, *12* 212:9
227:*4* 251:22
252:*24*
**happened** 90:*9, 11,*
*14, 17* 94:2 96:*1*
97:*21* 212:8 241:7
248:2 251:*19*
252:*23* 255:*16*
262:*14* 264:*17*
**happening** 253:2
264:*19*
**happens** 144:*23*
**happy** 32:20 33:*13*
124:*24* 125:*6*
129:*14* 143:*13*
290:*5*
**harass** 285:*23*
**harassed** 180:*3*
258:*19* 260:24
261:*5, 19*
**harassing** 229:*24*
259:*1, 7, 10* 263:2
277:*24*

**harassment** 10:*23*
11:*1* 229:*1, 5*
230:*8, 16* 231:*17*
273:*9* 277:*9, 11, 18,*
*22* 278:*12, 15, 18*
279:*8, 10* 280:*6, 16,*
*19* 281:*10, 22*
283:*18* 285:*1, 2, 8,*
*10, 13* 286:*4, 11, 14*
287:*5, 12, 23* 288:8
**hard** 114:*20* 203:*9,*
*14* 265:*19* 289:*18*
**head** 6:*4, 5* 159:*11*
**health** 170:*2*
**healthy** 158:*14*
**hear** 4:*7, 11, 19, 20*
5:*12, 13* 8:*2, 7, 15,*
*16, 17, 18* 11:2
13:*15* 17:*4* 18:*6*
28:*15* 31:*5* 42:*12*
122:*17* 123:22, *24*
208:2 225:*8, 10*
226:*13, 16* 229:*12,*
*13, 19, 20* 248:*14*
264:*3, 4* 266:*14*
**heard** 34:*4* 196:*21*
198:9 199:7
225:*11, 15* 226:*17*
227:*21* 228:*3*
229:*10, 23* 232:*5*
267:*23* 275:*21*
**hearing** 7:*24* 10:*2*
46:*17* 167:*13, 16*
197:*4* 204:7 259:*8*
281:*16*
**heart** 169:*19* 170:*9,*
*10, 23* 285:22
**heavens** 145:*5*
**heavily** 146:*11, 12*
**heavy** 145:*13*
146:*8, 9* 151:*16*
**Hello** 9:*8* 12:*1*
13:*14*
**help** 34:22 93:*18*
129:*8* 130:*17*
203:*3, 6* 234:*21*
235:*18* 278:*5* 290:*5*
**helpful** 124:*1*
**helps** 22:*23* 127:*2*
**HERBERT** 2:*5*
3:*1* 4:*3, 10, 14, 15,*

*17* 5:*5* 6:*15, 19*
8:*14* 9:*11, 15, 21*
10:*3, 4* 12:20 13:*1*
17:*11* 25:*15* 27:*17*
28:*15, 17* 29:*8, 17*
30:2, *18* 31:*5, 11,*
*22* 32:*9, 22* 34:2,
*11, 15, 23* 35:*10*
38:*23* 40:*4* 41:*19*
42:*9* 43:*1* 44:*24*
45:2, *10, 18, 24*
46:*4, 8, 9* 47:*16*
49:*4, 10, 17* 51:*7*
52:*15, 20* 53:*7*
55:*5* 57:*3* 59:*12*
60:*11, 23* 61:*5, 22*
62:*3, 15, 21* 63:*3, 8,*
*18, 22* 64:*5, 9, 16*
65:*12, 16, 23* 66:*5,*
*15* 67:*4, 20* 68:*1, 9,*
*20* 70:*11* 71:*5, 17,*
*23* 72:*4, 10* 73:*2,*
*12, 19* 74:*8, 23*
77:*10, 18* 79:*1, 6*
81:*1, 9, 15, 19* 82:*9*
83:*1* 85:*11* 89:*10*
90:*8* 91:*1, 8, 20*
93:*1* 99:*15* 100:*1*
101:*15* 104:*19*
105:*23* 107:2, *15*
109:*2, 8, 21* 110:*5,*
*13, 20* 111:*5, 11*
112:*3, 8, 14* 113:*3,*
*8* 114:*3* 115:*17*
117:*9, 23* 119:*19*
120:*4, 10* 121:*8, 16*
122:*4, 10* 123:*7*
124:*21* 125:*3, 12,*
*19* 126:*1, 18* 127:*5,*
*15, 23* 128:*16*
130:*16* 131:*6, 7*
132:*9, 19* 134:*7, 21*
136:*1* 139:*15, 22*
141:*11, 20* 149:*3*
153:*1, 9, 19* 154:*9,*
*15* 155:2 156:*17*
161:*15* 162:*3*
163:*8* 165:*4* 166:*4,*
*10, 18* 167:*1, 9*
169:*11* 178:*17*
180:*13* 181:*1, 9, 14,*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 871 of 1503 PageID #:1262
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

24 182:14 183:11,
20 184:5, 22
186:11, 16 187:20
188:9 189:14
190:1, 7 191:1, 7,
18 193:19 194:22
195:8 196:22
197:3, 20 198:7
199:5, 15 200:1, 22
201:4, 14, 20
202:11, 17 203:6,
13, 17, 22 204:11,
14, 16 206:24
208:3, 13, 23 209:6
210:4 211:19
212:18 213:11
214:1, 15 215:13,
21 216:16, 22
217:4, 11, 16
218:14 219:4, 20
220:13, 21 221:6
224:8, 13, 20 225:1
226:4 227:19
228:12, 15 229:11,
17 230:4, 11 231:3
232:3, 8 234:1, 15
237:1, 17, 22
238:22 239:7, 13,
19 240:2, 7 241:17
242:10, 18 243:7,
16 244:5, 15, 16
245:1, 14 246:13
248:1, 10 249:2
250:2, 11, 20 251:5,
23 252:22 253:3, 7
255:12 258:1
260:13, 14 264:8
265:14, 20, 22
266:8, 13, 18 270:6
271:18, 20 272:5
273:19 274:1, 8, 22
275:7, 13, 23 276:9,
17 277:6 281:13
282:23 283:3, 17
284:20 285:24
288:3, 16, 19 289:1,
12, 15, 21 290:4, 8,
11, 14, 21, 23
**hereto** 292:20
**hereunto** 293:1

**Hey** 9:9 19:5 33:5
45:17 117:18
118:16 137:17
154:19, 22 173:8
176:19, 23 178:22
180:19 198:11, 14,
22 220:6 222:16
226:10, 13 227:4
232:14 235:20
247:1, 22 279:6
**hide** 23:12
**hierarchical** 57:20
59:8 66:24 68:3
72:18 73:7, 15
75:19, 23 76:24
77:5 78:12, 14
83:16 88:22 192:17
**hierarchy** 55:15, 20
57:5
**high** 11:21 13:8,
19, 21, 23, 24 14:4
53:15 54:24 55:10
147:5, 8 233:13
**higher** 56:4 65:20
66:2, 7, 10 67:9
68:21 69:1, 5, 9, 13
70:23 72:18 73:15
75:23 76:11, 14, 20
77:19, 22 78:14
83:14 102:24
103:9 108:2
**highest** 53:10
56:10 65:5, 7, 8
75:19 102:20
104:12, 16 193:4
**highlight** 290:16
**highly** 120:21, 23
**hindering** 93:6
**hire** 215:11
**Hispanic** 257:21
**history** 23:17
259:17, 20
**hit** 38:14 289:19
290:17
**hold** 23:15 130:23
144:1 195:22
286:11
**holding** 86:10
**hole** 261:12, 15
**home** 21:10, 20
22:11 24:15

105:12 137:23
215:8, 9, 10, 11
252:14 262:9
**honestly** 132:11
213:3
**hook** 226:20
**hope** 170:6
**hoping** 217:20
**hospital** 138:2, 3
**hostile** 210:12
212:4, 14 215:16
221:18 222:3 273:9
**hour** 203:8 265:10,
16 289:16
**hours** 92:17 155:9
184:16 202:24
203:9, 17 220:7, 12
265:10 289:9
**house** 235:20
**How's** 55:11 135:3
**HR** 23:9 97:22
98:8
**huh** 202:2
**hundred** 105:22
157:19 279:4, 24
**Hundreds** 105:21

**< I >**
**I.V** 1:4 164:2
171:18, 24 233:11,
20 234:5
**I-bonds** 136:19
**ID** 3:10
**idea** 23:16 52:21
79:19, 24 80:14
**identified** 116:8
266:24 271:2
**Identify** 266:21
**identifying** 39:6
149:11 259:23
**ignores** 270:2
**ILLINOIS** 1:1, 18,
24 2:7, 14, 20
11:11 257:1 259:6,
9 272:9 293:2
**imagine** 105:15
**immediate** 243:14
**important** 287:20
**impossible** 184:15

**improper** 197:15
198:3 214:6 232:7
233:8, 9
**improve** 46:2 290:3
**Inaudible** 21:13
25:17 31:1 34:17
35:12 41:13 43:13
47:9
**inception** 19:12
**incident** 223:23, 24
224:4 225:18
231:22 232:23
233:13 255:20, 23
256:1 267:18
268:1, 17, 18 269:3
**incidents** 221:11
251:11 253:14
268:2 269:14
**included** 9:1
125:13
**includes** 259:20
**including** 57:11
**inconsistently**
269:11
**increase** 41:10, 13
137:23
**increased** 250:22
251:12
**increasing** 137:22
252:17
**indicate** 111:21
179:3
**indicated** 154:5
177:10
**indicates** 282:8
**indication** 273:2
**indicted** 234:23
**indirectly** 292:20
**individual** 32:20
36:16 87:15, 16
107:3 120:20, 21
159:6 160:7
167:19 168:2
198:10 207:21
208:5 219:22
220:4 225:22
266:21 278:21
**Individually** 1:12,
14, 15, 17
**individuals** 21:13
89:14 106:1

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 872 of 1503 PageID #:1263
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

107:*16*  108:*22*
122:*20*  124:*13*
125:*14, 20*  137:*19*
140:*22*  147:*5, 8*
149:*7, 14*  150:*7*
151:*19, 24*  152:*13*
153:*22*  157:*14, 22*
158:*22*  159:*10*
160:*5, 14*  161:*7*
162:*6, 9*  164:*19*
165:*15, 21*  172:*5,
19*  174:*6*  183:*17*
194:*4*  200:*18*
220:*11*  242:*17*
252:*2*  271:*2*  287:*2*
**individual's** 221:*21*
**inform** 178:*3*
**informal** 269:*13*
**information** 107:*18*
137:*1*  160:*9, 22*
162:*23*  168:*4*
175:*3, 7*  178:*11*
220:*18*  229:*9*
234:*17*  249:*8*
259:*24*  269:*18*
270:*14*  284:*4*
**informing** 177:*3*
178:*12*
**infraction** 207:*3, 4,
6*  246:*3*
**Inglewood** 11:*20*
**inherently** 235:*23*
**injuries** 158:*13*
**inmate** 223:*23*
225:*18, 19*  227:*21*
228:*1*
**inquiry** 216:*14, 17,
20*  217:*3*
**inspect** 263:*3*
**instances** 49:*22*
92:*13*
**instruct** 195:*22*
263:*21*
**instructed** 195:*19*
255:*1*  263:*9*  286:*17*
**instruction** 139:*7*
205:*18*  207:*9, 13*
**instructions** 206:*1*
**integrity** 113:*20, 21*
**interaction** 164:*24*
169:*3, 14, 16*

170:*19*  171:*10, 19,
22*  276:*23*  277:*1*
**interactions** 169:*13*
170:*16*  171:*23*
276:*19*
**interest** 84:*16*
223:*16*
**interested** 292:*20*
**Interesting** 223:*6*
**interpretation**
197:*19*  198:*19*
**Interrogatories** 9:*4*
10:*10, 13*  253:*6*
**interrogatory**
259:*16, 21, 22*
269:*8, 19*  270:*19*
273:*7*
**interrupt** 9:*9*  264:*2*
**interview** 97:*22, 24*
98:*2, 5, 9, 11, 20*
**interviewed** 148:*10*
254:*11, 19, 20*
**intimidated** 180:*5, 7*
**intimidating** 222:*11*
**introduce** 5:*6*
**investigate** 214:*24*
**investigated** 211:*15*
243:*9*
**investigation**
211:*21*  212:*3, 13*
216:*24*  218:*16, 23*
220:*19, 23*  221:*4*
255:*4*
**investigator** 39:*20,
21*  40:*1, 7*  41:*22*
42:*5, 15, 18, 24*
43:*6, 8, 11*  50:*3, 4,
7, 10, 19*  63:*10*
70:*7*  86:*1*  87:*20*
88:*2, 6, 9, 13*  89:*4,
15, 16*  91:*3, 11, 13*
161:*23*  219:*14*
220:*19*  257:*7, 18*
260:*21*  279:*11*
**investigators** 68:*4*
119:*15*  120:*13*
143:*12*  193:*20*
206:*20*  207:*2*
220:*15*  223:*23*
228:*5*  234:*11, 12,

17, 19*  240:*3, 11, 13,
14*  286:*19, 23*
**investigator's** 89:*1*
**involved** 179:*8*
185:*12*  207:*18*
254:*10*  256:*7*  272:*2*
**involvement** 107:*19*
**involving** 221:*4*
**Irish** 198:*21*
**irregularities** 159:*7*
**issue** 123:*20*  207:*4,
5*  209:*17*  225:*4*
251:*2, 7*
**issued** 249:*17*
251:*9*
**issues** 126:*12*
265:*20*
**Italian** 191:*20*
258:*3, 5*
**its** 56:*10*  226:*12*

**< J >**
**Jack** 19:*22, 24*
**jail** 114:*19*  115:*6,
11*  133:*14*  146:*2*
154:*3*
**Jamaican** 188:*6*
**Jefferson** 2:*6*
**job** 21:*4*  33:*12*
60:*6*  101:*11*
117:*11*  126:*13*
127:*19*  128:*3, 7*
132:*12, 14*  133:*19*
137:*5, 8, 9*  139:*4*
153:*21*  167:*7*
175:*13*  180:*3*
194:*18, 24*  195:*1, 4,
9, 21*  246:*18*  247:*4*
**jobs** 116:*7*
**Joe** 195:*1, 4*
**John** 162:*1*  192:*23*
193:*6, 8*  254:*1, 5,
10, 14, 16*  255:*6, 8*
267:*6, 11, 17*
**Johnnie** 232:*20*
**joking** 273:*4, 14*
**JOSEPH** 1:*12*
**JR** 1:*5*  233:*12*
**judge** 133:*16*
136:*17, 18*  137:*18*

148:*14*  265:*13*
**judges** 145:*4*
**July** 201:*17*  210:*9,
18*  214:*10*  215:*22*
**June** 282:*9*
**junk** 263:*12*
**jury** 16:*9*
**JUSTIN** 2:*18*
45:*20*  265:*17*
justin@ilesq.com
2:*21*
**Justin's** 266:*7*

**< K >**
**keep** 8:*5, 8*  64:*14*
120:*2*  135:*2*
161:*13*  170:*3*
290:*20*
**keeping** 37:*23*
**KELLY** 2:*6*
kelly.krauchun@dan
herbertlaw.com 2:*9*
**Kennelly** 265:*13*
**kept** 21:*23*  222:*15*
**kicked** 264:*19*
**kid** 186:*9*
**kids** 264:*24*
**killed** 236:*5*
**kind** 118:*19*
136:*23*  143:*20*
169:*17, 18, 19*  170:*9*
**King** 14:*9*
**knew** 111:*6*  112:*9*
133:*15*  178:*12*
188:*10, 14, 22*  189:*1*
**knife** 225:*23, 24*
226:*19*
**knives** 227:*1*
**know** 6:*4*  7:*2, 5, 7,
8, 21*  8:*5*  10:*1*
12:*10*  15:*23, 24*
16:*3, 10*  18:*1*  19:*2,
4, 5, 6*  20:*14*  22:*17,
21, 23*  23:*1, 2, 11,
13*  24:*4, 7, 9, 10*
25:*24*  26:*12*  27:*22*
28:*1*  29:*2*  32:*3, 4*
33:*6, 14*  34:*21, 22*
35:*1, 15*  36:*14*
38:*11*  40:*17, 19*
41:*13*  43:*22*  44:*7,

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page: 873 of 1503 PageID #:1264

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

9, 10, 12  45:9, 20
47:1  48:7  50:9
51:3, 17, 20  53:19,
22  54:8, 20  56:9
57:2, 16, 18  58:2
62:4  65:18, 22
66:20  67:8, 12, 23
68:14, 19  73:21, 22
76:13, 16  78:20
79:16, 18  80:7, 10
81:8, 12, 20, 23
82:1, 2, 5, 10, 13, 16,
18  83:6, 9, 10, 13,
23  84:4, 5  85:17,
24  86:2, 8  88:11
90:1, 7, 9, 11, 16
91:12, 15  92:17, 18
93:10  95:12, 18, 20,
22  96:6, 21  98:13,
23, 24  99:14, 18, 19,
23  100:2, 6, 9
103:20  104:7
106:8, 24  108:1, 4,
5, 8  111:3  113:17
115:19  117:17, 20
118:16, 19, 20
121:22  122:4
124:20  125:5
129:12  131:12
133:11, 17, 19
135:22  136:20
137:9, 21  138:3
139:3, 5  140:24
142:12  145:18, 23
146:1, 24  147:11
148:16  150:4, 9, 13,
15, 19  151:17, 20,
23  152:21, 22
153:8  154:1, 18, 20
159:5  160:17
163:20, 22, 24
164:2, 4, 6, 12, 14,
16, 18, 22  165:24
166:2  167:8, 18, 19,
20, 22  168:9
169:17, 23  170:2, 3,
7, 21  171:3  172:1,
4, 7, 14  176:8, 15
178:22  179:1, 8
181:22  183:8
184:16  186:9

187:21, 23  188:1, 4,
7, 12  191:6, 14
194:21, 23  195:3
196:10, 11  198:21
202:18  203:1, 8, 10,
12, 23, 24  206:11
208:4, 14, 17, 19
209:1, 2  211:11, 14
216:13  218:4
219:7  222:11, 20
223:7, 9, 15  224:15
225:13  226:11, 21
227:11  230:6
231:19  232:1, 15
235:19  242:1
246:2  248:8  251:3,
4  253:12  254:13
257:16, 17  258:8
260:17, 18  261:6, 7
262:1, 7  263:13
264:22  265:1, 4, 5,
7, 11, 12, 24  266:3
268:6, 11, 12, 13, 23
269:2  274:16, 20
277:5  279:4  281:4
282:16, 19, 23
284:3, 24  285:3, 18
289:10  290:15, 20,
21
**knowing**  27:20
136:16, 17, 18
232:11  285:22
**knowledge**  112:21,
22  153:17  176:17
183:15, 16, 22
234:21  256:20
269:11  271:4
272:20  273:2
**known**  221:23
**KRAUCHUN**  2:6
163:6

**< L >**
**La**  11:23, 24  12:1,
3  13:8
**lacks**  199:14
245:12
**lad**  198:22
**lads**  198:22
**lag**  45:23

**land**  146:22
**lane**  149:9
**lanes**  15:23, 24
**language**  181:19
183:9  208:18
209:1, 2
**laptop**  9:14
**laptops**  234:19
**large**  249:19
**LaSalle**  2:19
**laughable**  152:23
**LAW**  2:5, 12
**lawsuit**  7:6, 13  8:13
**lawyer**  152:1
**lawyers**  254:20
255:5, 11  256:3
284:13
**lay**  146:22
**learning**  279:9
280:2, 10  281:2
285:17  288:13
**leave**  219:7  231:14,
16  290:18
**leaving**  190:22
223:15  267:13, 14
290:19
**left**  4:12  71:12, 24
190:13, 18  217:14,
19, 21, 22  218:12
220:12  231:10, 11
232:10  268:6
**leg**  226:12, 18
227:23, 24
**legal**  56:12  142:8
**LEGRAIN**  1:2
163:20  168:8, 10
169:13, 15  172:7
187:1  196:18, 24
197:10  199:1
201:17, 22  210:10,
18  211:8  214:10
221:10
**legs**  227:1
**LEINENWEBER**
2:18  4:4, 9  9:9, 12,
17  46:5  47:12
264:16  266:9
290:2, 5, 10, 12
**lethal**  274:20
**letting**  266:11

**level**  38:6, 8  53:15
56:10  75:19
160:14  198:3
**License**  1:24
**lieutenant**  58:6, 9
65:6  70:6  71:18
72:1, 7, 13, 22
74:12  75:9  76:10,
12  77:20  84:23
88:14  262:24
263:2, 3
**lieutenants**  59:3, 4,
5, 7, 14  63:4, 12, 14,
19  64:1, 24  65:4
68:4  69:10  72:19
73:9, 16  74:4, 14,
19  75:1, 4, 16, 22
76:2  77:4, 13, 14
105:17
**lighting**  274:17
**likes**  178:22
**limit**  202:20
**LIMITED**  2:12
288:9
**line**  43:17  111:4
123:19, 22  129:10
163:7  232:21
**lineup**  113:18
247:5
**lineups**  240:19
248:8
**list**  107:11  108:9,
13, 18, 22  109:4, 18,
24  110:3, 22, 24
111:7  112:10
114:9  133:24
148:16  163:18
235:15
**listen**  220:6  227:24
**listening**  178:8
**little**  7:23  9:16
30:4  265:23  271:18
**LLC**  2:18
**LMS**  278:22
284:18  286:19
287:8, 18
**local**  52:1
**located**  154:3
162:20
**location**  246:8

Gregory Shields - 8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 874 of 1503 PageID #:1265

Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**locker** 262:6
**log** 45:21 288:23
**long** 16:11, 16
20:19 22:12 23:22
24:4, 20 50:6 84:7
91:12, 15 93:19
95:5, 8, 13, 22 97:1
100:10 171:16
174:18 191:23
192:5 203:13
265:16
**longer** 142:9
265:11
**look** 89:22, 24
113:17 115:23
116:2 136:15
162:1 170:22
189:23 199:17, 19,
22 200:2 204:19
210:6 215:10
219:10 223:20
227:1 230:18, 23
232:17 234:19
242:23 243:14
245:15 247:5, 13,
20 248:6, 7 249:24
252:6, 13 259:13
266:19 269:8
**looked** 108:14, 19
112:10 187:11
**looking** 218:21
223:15 258:20, 23
262:9 272:24
**lost** 143:7, 10
161:20 168:22
212:24 213:9 264:1
**lot** 18:10 20:16
27:23 41:6 56:8
126:22 135:23
168:22 170:4, 11
177:20 193:9
197:17 202:18
203:2, 4 204:6, 8
231:11, 17 288:10,
12 289:6
**loud** 4:6 268:21
**loved** 146:4
**lower** 38:8 69:17,
23 70:5, 22, 24
71:8, 13, 18 72:1

89:6 108:6
**lowest** 38:6

**< M >**
**Mack** 218:3
**mad** 32:21
**main** 38:10 221:21
**major** 246:3 250:1
**majority** 31:7 88:8
151:9 162:12, 14
**making** 36:15
76:23 128:6
136:11 137:14, 16
146:5 176:17
184:13 185:7
207:20 208:1
252:3 287:1
**man** 168:7 170:11
198:11 222:11
**management** 19:9
25:7, 9 53:15
106:6, 9, 12, 14, 16,
21 107:4, 7, 12, 17,
20 108:7, 10
109:10, 17, 24
110:6, 7, 8, 17, 21,
24 111:7, 23
112:10 116:14, 21
117:12, 16 118:4, 5,
13, 16 119:22
120:16 121:1, 3, 6,
7, 9, 10, 23 122:12
123:2 124:17, 19
129:4 130:8
131:21 132:3, 4, 8
176:19 182:1, 2, 6
190:10 240:16
249:20, 22 279:9
280:2, 11 281:2
285:16, 17 286:24
287:16
**managements**
288:13
**management's**
119:3 143:6
**managers** 133:10
**manned** 123:1
151:8
**manner** 196:8
210:13, 22 212:5,
15 215:17 222:4

**MANNING** 1:6
164:10 186:9 187:8
**March** 97:11
100:12 261:10
**Mark** 226:16 227:5
**MARKED** 3:10
163:10
**mask** 8:7
**massively** 290:2
**master** 148:15
**matches** 283:6
**mater** 12:5, 7
**materialized** 222:12
**matter** 37:8
154:23 203:7
234:13 253:15
**matters** 210:11
292:9
**maximum** 158:15
**Mayor** 12:6, 7, 22
13:5
**MCGHEE** 1:7
164:14 167:18, 24
243:22
**mean** 7:14, 21
12:10 14:5 19:1
21:1 22:16, 18
23:7, 8 26:10
28:23, 24 30:1, 11
33:12, 22 34:21
37:6 45:8 47:5, 7,
20 51:20 53:23
54:5, 19 56:2, 8
57:16 65:6 67:3
86:12 87:5 92:15
93:17 101:5 106:8
108:12 113:16, 19
117:4, 17, 24
118:10 125:10
137:10 138:14, 20
139:6 145:3
147:16 148:3
150:12 151:20
152:22 155:17
157:20 158:1
159:6 167:18
168:2, 11 170:21,
22, 23 171:5, 13, 23
172:16 175:5, 19
176:9 185:17
188:7 194:7 196:6,

7 203:4 209:24
210:19 220:3
222:12 223:6
225:7 226:6
227:12 228:17
230:2 231:18
235:16, 19, 20
243:12 246:15
248:8 249:24
251:16, 17 260:17
261:7 263:12
264:2 268:4 272:1
276:6 277:20
284:3 287:16
289:8, 17
**meaning** 51:24
88:12 116:8 189:4
212:6, 8 240:16
**means** 194:21, 23,
24 241:3 283:12
**meant** 24:17
**medical** 126:12
158:13
**medications** 92:14
**meet** 98:13, 14
134:9 198:15
**member** 6:18
102:20, 24 103:10
104:12, 16 127:3
131:17 193:4
207:18 254:16
**members** 54:24
58:13 129:19, 22
130:2 133:11
134:3, 16 158:10
167:6, 23 173:1
177:1, 2 209:11
223:14 238:8
286:18, 22 287:16
**membership** 52:1
**memo** 217:9
**memory** 22:17
23:17, 22 26:22
51:1, 11 87:14
93:2 169:8 172:21
209:3 276:8 278:2
**mention** 36:24
**mentioned** 221:11
**mentioning** 178:18
**merged** 162:21
**mess** 203:23

Gregory Shields - 8/27/2020

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 1095 Filed: 12/21/20 Page 875 of 1503 PageID #:1266

met 44:*1, 14, 16*
*99:1 186:13, 20*
*198:11 258:*2
**MICHELLE** 1:*4*
*163:22 171:1*
*172:16 186:8, 12*
*187:24 223:21*
*224:3 225:15*
*226:14 229:4, 23*
*230:7, 12, 16*
*231:19, 21 249:11*
**middle** 222:*14*
*288:22 289:19*
**midnight** 33:*4, 14*
*117:22 150:5*
*151:6 152:5*
**midnights** 116:*23*
*131:13 135:12*
*144:21 149:22*
**midway** 256:*22*
**Midwest** 2:*13*
**Mike** 267:*6 268:8*
**mind** 92:*2 93:15*
*236:3*
**minimum** 158:*14*
**minor** 246:*3*
**minority** 188:*11, 16*
**minutes** 46:*2*
*47:13 203:10*
*265:2, 4 288:24*
*289:11, 12, 14, 16*
*290:24*
**Mischaracterization**
*288:11*
**Mischaracterizes**
*68:6 71:14 110:1*
*111:9 113:1*
*119:24 120:9*
*128:13 132:16*
*169:5 182:10*
*184:3 193:15*
*198:6 199:4 202:8*
**misleading** 138:*24*
**missing** 228:*6, 10*
**mission** 114:*2, 5, 15,*
*17, 18, 22, 24 115:5,*
*11*
**misspoke** 163:*12*
**Misstates** 17:*10*
*27:15 32:16 40:3*
*42:19 61:19 63:17*

91:*5 117:14*
*119:10 139:11*
*141:17 153:13*
*215:18 228:9*
*239:17, 23 284:16*
*288:1*
**mistreated** 258:*19*
**mobile** 234:*19*
**moment** 41:*21*
*288:17*
**moments** 88:*23*
**Monday** 31:*7*
**money** 13:*4 48:22*
*49:2, 5, 8, 11, 20, 23*
*213:9*
**monitoring** 17:*17,*
*19, 22 18:17 19:13,*
*21 20:11, 20, 24*
*21:5 25:22 26:2,*
*17 27:4 28:8, 12,*
*22 29:21 30:12*
*32:1 35:21 36:12,*
*18, 19 39:1, 14, 24*
*50:4 51:16 64:19*
*94:5 101:21 102:1,*
*4, 7, 12, 18, 21*
*103:1, 11, 15, 19, 21,*
*23 104:8, 11, 14, 17,*
*21, 23 106:7*
*109:11 110:16*
*111:14 113:12, 16,*
*23 114:10, 13*
*115:8, 9, 20 116:6*
*122:16 123:1*
*124:4, 6 128:19*
*129:3, 20, 23*
*131:15 132:23*
*137:2, 20 139:3*
*140:9, 17 141:3*
*142:2, 16 143:18*
*146:14 148:15, 20*
*150:14 152:8*
*166:1 172:6*
*179:18 183:13*
*185:11 192:6*
*193:13 205:2*
*209:12 227:8*
*228:24 234:22*
*235:3, 8 236:1*
*237:12 238:1*

248:*16 257:8*
*263:21 270:16*
**month** 7:*15 241:4*
**morning** 4:*3, 10*
*8:12, 23 148:10*
**mother** 201:*23*
**motive** 255:*15*
**Motorola** 274:*18*
**mouth** 116:*8*
**move** 19:*7 35:20*
*93:17 119:1 133:8*
*185:20 201:8*
*210:5 223:19*
*233:10 236:15*
*238:9 241:22*
*253:3 256:4*
*259:12 264:12*
*269:5, 16 270:7*
*272:19, 22*
**moved** 133:*5, 7*
*161:19*
**moving** 192:*11*
*209:7 221:9 276:3*
*290:22*
**multiple** 22:*8*
*64:14 131:3 279:9*
**murder** 234:*24*
**mutual** 45:*3*

< N >
**n/a** 283:*9*
**name** 5:*7 40:13*
*60:16 83:11 90:16,*
*19 91:2 104:4*
*220:10 254:19*
*262:24 277:21*
*278:1 282:3 283:16*
**named** 256:*24*
**names** 90:*2 92:8*
*107:12 108:10*
*163:18 218:4 220:4*
**narcotics** 227:*16, 18*
**nature** 225:*18*
*274:12*
**NEAL** 1:*15 214:22,*
*23 217:2*
**near** 291:*1*
**necessarily** 172:*10*
**need** 5:*20 6:1, 6*
*33:5 41:16 130:18,*
*19 136:23 146:14*

151:*21, 22 154:19*
*157:2 159:8*
*177:19 186:24*
*203:1 220:9 265:4,*
*10, 11, 22*
**needed** 123:*4*
*124:3 133:9*
*136:24 145:8, 13*
*150:14 162:23*
*222:24 263:10, 22*
*274:16 287:7, 23*
**needs** 126:*9, 11*
*127:1 134:10*
*135:14 235:17*
**Negative** 40:*22*
*142:19 178:16*
*213:19*
**negotiated** 142:*7*
**negotiations** 141:*8*
*142:12*
**neighborhood**
*11:14, 17*
**never** 24:*24 34:4*
*38:2 69:23 70:5*
*72:7 85:19, 21*
*86:13 87:1 88:13*
*103:3 109:23*
*113:19 114:12*
*119:11 120:8*
*129:5 139:14*
*144:9 151:23*
*152:8, 13 153:4*
*174:1, 20 176:23*
*178:5, 6 180:22, 23*
*182:5 186:8*
*196:21 199:7*
*211:10 212:1, 22,*
*24 219:9 220:20*
*221:17 229:10, 22*
*230:10 233:6*
*236:2, 4 237:5, 9,*
*11, 15 238:1 242:5*
*243:5 246:19*
*255:15 261:6*
*271:9, 14 282:7*
*283:12 284:12*
**new** 149:*10*
**NEWSON** 1:*5*
*164:2 171:18, 24*
*233:11, 20 234:5*

Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 876 of 1503 PageID #:1267
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

246:*5, 17* 247:*4*
**newsworthy** 136:*22*
**nigger** 232:*20*
248:*15, 21*
**night** 150:*21*
157:*16* 167:*7*
203:*21* 236:*24*
**nights** 26:*11*
117:*19* 135:*12*
**nine** 54:*11, 16, 21,*
*23* 97:*2*
**Nobody's** 197:*8*
**nods** 6:*4*
**nonAfrican-**
**American** 228:*5, 10,*
*19*
**non-Caucasian**
238:*7*
**non-minorities**
189:*2, 4*
**nonminority** 223:*23*
237:*5, 8, 11, 15*
242:*4, 13, 20* 243:*1*
244:*20* 245:*9*
246:*9, 18* 262:*20*
263:*9, 15*
**non-minority**
233:*14* 237:*24*
**nonunion** 52:*2*
**norm** 8:*6*
**normal** 158:*21*
**North** 2:*19* 146:*16,*
*18, 22*
**NORTHERN** 1:*1*
257:*1*
**notice** 2:*2*
**NUMBER** 3:*10*
54:*3* 105:*15*
138:*23* 147:*5, 8*
157:*14* 249:*19*
259:*23*
**numbers** 289:*10*
**numerous** 221:*10*
233:*12*
**nurse** 170:*1*

**< O >**
**Oak** 2:*14*
**oath** 259:*19*
**Object** 25:*12*
28:*13* 29:*12* 42:*6*

48:*24* 53:*3* 56:*23*
60:*7, 19* 61:*2* 62:*1,*
*24* 63:*6, 20* 64:*3, 7*
65:*10, 15, 21* 66:*3,*
*13* 67:*1, 19* 70:*9*
71:*3* 72:*24* 73:*10,*
*17* 74:*6, 21* 77:*9,*
*16* 78:*22* 79:*4*
81:*14, 17* 82:*7*
85:*7* 90:*6, 22*
92:*21* 99:*22*
104:*15* 105:*20*
110:*18* 115:*14*
121:*4* 123:*3*
124:*18* 125:*2*
126:*16, 21* 127:*11*
130:*15* 132:*5*
134:*5* 135:*18*
148:*24* 153:*6*
180:*10* 190:*4*
200:*21* 201:*3*
212:*16* 213:*8*
**Objection** 12:*17, 24*
17:*10* 27:*15* 29:*5,*
*22* 30:*8, 22* 31:*19*
32:*6, 15* 33:*19*
34:*6, 14* 35:*4*
38:*17* 40:*3* 42:*19*
44:*21* 45:*5* 49:*7,*
*13* 50:*23* 52:*12, 17*
55:*3* 59:*9* 61:*19*
62:*11, 18* 64:*11*
67:*22* 68:*6, 18*
71:*14, 21* 72:*2, 8*
80:*22* 81:*6* 82:*21*
89:*9* 91:*5, 18*
99:*12* 101:*13*
106:*23* 107:*13*
108:*24* 109:*5, 19*
110:*1, 11* 111:*2, 9,*
*24* 112:*6, 11* 113:*1,*
*7, 24* 117:*2, 14*
119:*10, 24* 121:*14*
125:*9, 16, 23*
127:*21* 128:*13*
132:*16* 134:*19*
139:*11, 21* 141:*6,*
*17* 152:*14* 153:*13*
154:*7, 11* 155:*1*
156:*15* 165:*2, 23*
166:*7, 16, 22* 167:*4*

169:*5* 178:*15*
180:*21* 181:*5, 12,*
*23* 182:*10* 183:*5,*
*19* 184:*3, 21* 186:*5,*
*15* 187:*17* 188:*3*
189:*12, 22* 190:*23*
191:*5* 193:*15*
194:*20* 195:*5*
196:*20* 197:*1, 16*
199:*3, 13, 21*
201:*11, 19* 202:*8*
206:*21* 207:*24*
208:*8, 22* 210:*1*
211:*17* 213:*22*
214:*8* 215:*2, 18*
216:*10, 19* 217:*1, 7,*
*15* 218:*8, 24*
219:*17* 220:*1, 17*
221:*2* 224:*6, 11, 17,*
*23* 227:*17* 228:*8*
229:*7, 15* 230:*1, 9*
231:*1, 23* 232:*6*
233:*22* 234:*9*
237:*13, 19* 238:*20*
239:*5, 9, 17, 23*
240:*6* 241:*10*
242:*7, 14* 243:*3, 10*
244:*2, 10, 22*
245:*11* 246:*11*
248:*5* 249:*1, 23*
250:*8, 15* 251:*1, 14*
252:*20* 255:*9*
257:*22* 270:*2*
271:*17* 273:*16, 22*
274:*7, 14* 275:*4, 9,*
*18* 276:*5, 13* 277:*3*
281:*12* 283:*13*
284:*16* 285:*14*
288:*1, 11*
**objections** 270:*3*
**observe** 179:*13*
**obtain** 14:*3* 218:*21*
**obtained** 40:*9*
**obviously** 6:*1* 7:*2*
8:*6* 26:*11* 134:*3*
171:*15* 202:*22*
207:*12*
**occupied** 37:*9*
**occur** 99:*4* 141:*12*
153:*5* 223:*24* 285:*8*

**occurred** 142:*5*
208:*20* 237:*23*
238:*4, 7*
**occurrence** 219:*2*
226:*7* 246:*2* 251:*19*
**occurrences** 266:*22*
**occurring** 175:*24*
277:*14* 287:*6*
**o'clock** 219:*7*
**October** 293:*2*
**offenders** 137:*22, 23*
**offense** 121:*17*
**offered** 285:*3*
**office** 20:*8* 37:*17*
38:*10* 48:*17* 69:*11,*
*15, 18* 105:*4* 114:*6,*
*16* 130:*19* 145:*16*
154:*20, 21* 155:*19,*
*21* 156:*3, 6, 8, 9, 10*
161:*18* 162:*18, 20*
169:*21* 182:*17, 22*
183:*1* 206:*13*
211:*15* 215:*5*
222:*20, 23* 223:*1, 8,*
*12, 17* 226:*16*
235:*14* 236:*11, 21*
241:*13, 16* 245:*19*
266:*7* 267:*14*
268:*6, 14* 269:*13*
280:*18* 287:*19*
**officer** 14:*22* 15:*1*
58:*2, 3* 143:*18, 19*
214:*2, 6* 217:*13*
218:*17* 221:*1, 4*
237:*24* 245:*4*
263:*9, 17, 19*
269:*10, 22* 276:*23*
**officers** 16:*5* 53:*11*
119:*21, 22* 120:*16*
205:*6* 206:*19*
207:*1* 209:*10*
233:*14* 235:*9*
237:*5, 8, 11, 15*
239:*4* 242:*4, 13, 20*
243:*2, 24* 244:*20*
245:*9* 246:*9, 18*
262:*20* 263:*21*
**Official** 1:*11, 13, 14,*
*16, 17*
**O'Grady** 43:*16, 18,*
*19, 22*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 877 of 1503 PageID #:1268
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Oh** 5:8 7:11
10:17 12:4 24:24
36:2 76:21 95:14
108:11 113:18
126:4 152:21
155:24 157:12
169:24 178:23
192:7 272:6 290:11
**Okay** 4:9, 14, 17, 19
5:6, 15, 20, 23 6:1,
8, 12, 14 7:2, 5, 9,
11, 16 8:1, 2, 4, 9,
11, 18, 21 9:1, 15
10:5, 18, 23 11:21
12:5, 12 13:3, 4, 7,
18, 21 14:17, 24
15:12, 16, 19 16:23
17:3, 6, 14, 18, 21
18:4, 13, 19 19:8,
12 20:1, 10 21:8,
21 23:2, 5, 19, 20
24:1, 13, 22 25:4,
14 26:6, 15 27:2
28:5 31:13, 16
33:7, 15 34:3, 24
35:23 36:4, 6, 22
37:11, 16 39:9, 23
41:10 42:1, 10, 14
44:11, 16 45:3, 14
46:1, 21 48:4, 7, 19,
22 50:2, 6, 9, 18
51:8 52:9 53:8
54:14, 23 56:6
57:4, 10, 14, 23
58:15 59:3 60:5
61:6, 12, 17 62:9,
22 63:4, 12, 15
64:6, 21 65:3, 13
66:9, 18, 21 68:2
75:8, 12, 22 76:2,
22 77:3, 7 78:20
79:7 80:21 82:19
84:2, 7, 10, 13
85:12, 17 87:9
88:11 89:13 93:19
94:14 95:5 97:14,
19, 24 98:17, 20
99:3, 10 100:6, 10,
21, 24 101:8, 11, 20,
24 102:3, 6 103:3,
9, 22 104:5, 10

105:8, 24 108:5, 15
109:16 111:6, 17
114:4, 8 115:18
118:8 119:6, 20
120:2, 5, 15 122:1,
3, 23 123:8, 12, 23
124:5 125:13, 20
127:6, 16 128:11
129:22 130:8, 11
131:6, 11, 24
132:12 133:4, 8, 20
134:22 135:4, 5
136:2, 6 139:7, 23
140:8, 16, 20
141:12 142:20, 24
143:3, 16 144:6, 14
145:15 146:9, 23
147:4, 23 150:6
151:3, 12, 15 152:7
154:5, 10 156:2, 10,
12 157:1, 24 158:4,
16, 21, 24 159:10,
18 161:15 162:4,
17, 24 163:9, 12, 20
164:22 165:9, 14
166:5, 11, 19
167:10 170:16
171:1, 8, 18, 21
172:4, 14, 23 174:5,
7, 13 175:21
176:15 177:22
178:23 179:3, 7
181:15 182:7, 15
183:3 184:12
185:6, 24 186:12
187:1, 4 188:22
189:7, 19 190:15,
18, 21 191:2, 21, 23
192:5, 8, 13 194:18
195:3, 9, 13, 24
200:17 201:8
202:12 203:19
204:10, 11, 14, 19
205:14 206:8
207:8, 12, 20
208:19 209:7
210:5, 6, 21 211:11
212:19 213:12
216:1, 6 218:15
219:5 221:9
223:19 225:13, 17

226:1, 24 227:5, 20
228:4, 22 230:20
231:20 232:16
233:10 234:7
235:1 236:7, 15
238:4, 15 241:3, 7
242:11 243:8, 22
245:15, 19 246:4
250:6 253:18, 21
254:22 255:1, 7
256:4, 12, 22 257:9,
18, 21 258:4, 6, 9
259:12 260:6, 9, 13
261:4, 18, 23
262:19 263:18
264:9, 12 265:21
266:2, 12, 14, 19
267:15, 17 268:8,
15, 17 269:2, 5, 21
270:9, 22 271:11,
15 272:16, 19
274:2 276:18, 22
278:10 279:21
280:5 281:8, 17
282:5, 8, 12, 16
283:11 284:5, 23
287:3 288:17
289:20 290:8, 18
**old** 11:6
**once** 5:19 114:19
280:22
**ones** 146:4 167:13,
16 270:24 271:12,
23 289:4
**one's** 197:19 236:4
**ongoing** 255:4
**online** 278:22
**open** 130:18
239:12 290:19
**opened** 38:21
**operation** 37:7
**operational** 134:9
**operations** 140:4
**opinion** 93:6 232:7
**opportunity** 119:16
120:13 139:2
249:18 251:19
**opposed** 110:8
233:14 238:18
**OPR** 211:20, 24
212:3 216:7

218:22 219:3
220:15 249:14, 17
253:23 254:11, 13
260:16, 22
**options** 290:3
**order** 152:1 278:3
**organizational**
193:7
**organizations** 12:16,
22 64:14
**original** 140:24
169:8
**outcome** 259:16
292:21
**outlined** 270:18
**Outside** 115:8
278:14
**outstanding** 133:19
167:19 168:2
**overlap** 244:13
**overseeing** 286:21
**oversight** 209:10
**overtime** 133:18, 21
134:2, 4, 9, 10
214:13 215:6, 11
217:22 220:12
221:22 222:14, 22
268:21

**< P >**
**PAGE** 1:5 164:4
168:1 204:15, 21
210:5 223:19, 20
232:16, 17 233:10,
11 236:16 237:4
241:8, 12 253:4, 5,
19 256:4 259:12
264:13 266:17
269:6 270:12
272:22 281:18, 19
282:22 283:4, 5
289:5
**pages** 282:24
**paid** 49:20 150:15
**pair** 262:6
**panel** 249:11
**pants** 261:12, 16, 23,
24 262:6 263:11,
16, 22
**paper** 20:15 290:6
**paperwork** 236:11

Gregory Shields   -   8/27/2020
Case: 1:18-cv-05726 Document #: 105-5 Filed: 12/21/20 Page 878 of 1503 PageID #:1269
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**parachuted** 171:*4, 5, 12, 13*
**paragraph** 204:*20* 205:*11* 209:*8* 210:*6* 211:*9* 213:*12* 221:*9* 223:*20* 228:*22* 232:*17* 233:*11* 237:*2* 256:*5* 266:*20*
**Pardon** 121:*10*
**parking** 231:*11*
**part** 19:*5* 22:*19* 26:*18* 59:*7* 93:*18* 102:*11* 107:*4* 109:*24* 114:*6, 14* 115:*4* 124:*9* 127:*1* 162:*5* 181:*15* 182:*2, 7* 183:*1, 3* 185:*6* 195:*13, 21* 218:*16* 220:*22* 221:*3* 223:*11* 238:*13, 15* 243:*13, 17* 252:*10, 16* 255:*7* 260:*11* 273:*6* 286:*24* 287:*1*
**participants** 32:*1* 36:*13*
**particular** 15:*19* 26:*16* 32:*18* 33:*1* 48:*2* 117:*13* 119:*15* 128:*9* 131:*9* 133:*5* 134:*15, 23, 24* 144:*8* 145:*9* 148:*22* 157:*10* 161:*17* 162:*6* 168:*21* 173:*22* 174:*17* 175:*4, 17* 176:*7, 13* 178:*13* 185:*9, 12* 215:*7* 239:*4, 15* 240:*24* 246:*9*
**parties** 290:*23* 292:*19*
**partner** 198:*10* 225:*20* 226:*15*
**partner's** 227:*2*
**parts** 258:*24* 261:*22* 262:*1*
**party** 6:*17* 49:*6, 9* 174:*2*

**passing** 178:*19, 21, 22*
**passings** 188:*5*
**passport** 160:*8*
**path** 111:*13, 16*
**patrol** 26:*23* 33:*11, 24* 34:*19* 105:*6* 117:*4* 205:*1, 12*
**pay** 41:*10, 12* 52:*1* 151:*24* 196:*10* 198:*12* 212:*24*
**paycheck** 213:*10*
**penalty** 249:*12*
**pending** 5:*23* 28:*23*
**people** 4:*12* 22:*21* 27:*24* 33:*3* 34:*9* 35:*8* 36:*14* 45:*9* 46:*19* 47:*1, 2, 23* 85:*12* 86:*22* 90:*3* 105:*16, 18* 106:*3, 9, 17, 20* 107:*12* 108:*10* 109:*3* 110:*6* 118:*13* 122:*15* 123:*13* 124:*5, 16* 128:*18* 129:*2* 130:*9* 131:*8, 11, 20* 132:*2, 7* 133:*13, 17, 18, 20* 134:*10, 15, 17* 135:*8, 13* 136:*16, 17, 18* 138:*18, 23* 139:*2, 8* 143:*5* 144:*7, 15* 145:*8, 21* 146:*1, 13* 147:*11* 148:*21* 150:*12, 16, 20, 22* 151:*6, 7, 17, 21* 157:*9, 18, 21* 158:*8, 14, 16, 24* 159:*1, 2, 12, 14* 162:*4, 14* 168:*12, 14* 169:*24* 199:*11* 207:*14* 209:*22* 222:*15* 235:*3, 15* 243:*18* 260:*18* 263:*15* 287:*19, 21* 288:*14*
**percent** 279:*5, 24*
**percentage** 157:*17* 189:*19* 245:*16* 279:*3*
**perfectly** 265:*3*

**performance** 165:*15, 18*
**performing** 179:*14*
**period** 39:*12* 101:*8* 105:*19* 115:*20* 129:*23* 132:*15* 148:*22*
**Periodically** 150:*3* 241:*13*
**person** 18:*2* 90:*19* 131:*14* 168:*3* 175:*8* 176:*4, 5, 6, 9, 16* 196:*13* 234:*22* 238:*24* 253:*13* 266:*23*
**personal** 93:*6* 169:*14, 16* 292:*12*
**personally** 164:*22* 287:*11*
**personnel** 51:*4* 57:*12* 107:*8* 109:*6* 112:*23* 123:*5* 135:*17* 273:*2*
**persons** 274:*3*
**person's** 83:*11*
**perspective** 289:*9*
**perverted** 262:*10*
**petition** 202:*24*
**phone** 123:*19, 22* 146:*5* 258:*20* 266:*5*
**phones** 20:*16*
**phrase** 171:*7* 199:*8, 10* 233:*2*
**pick** 26:*9, 10, 13, 16* 27:*2* 29:*2* 203:*19, 21* 235:*6, 9, 14* 262:*17*
**picked** 26:*22*
**picking** 235:*4*
**piece** 20:*14*
**pinpoint** 7:*15*
**place** 19:*3* 37:*14* 73:*20, 22* 74:*1* 139:*2* 170:*12* 209:*22* 217:*18* 277:*9* 278:*18* 292:*16*
**placed** 109:*17* 111:*14* 116:*15* 132:*3, 8* 150:*14* 214:*2*

**plaintiff** 213:*13* 223:*21* 246:*5* 253:*23* 256:*9*
**Plaintiffs** 1:*8* 2:*10* 163:*18* 166:*15, 21* 167:*3, 11* 171:*21* 172:*15* 174:*8* 185:*22* 186:*2, 4* 187:*7* 249:*13* 250:*7, 22* 253:*15* 257:*9* 269:*15* 270:*1, 17* 271:*1, 13, 23* 274:*4* 275:*14* 276:*19* 277:*2*
**plaintiff's** 267:*5, 7*
**plan** 136:*23*
**play** 119:*13* 216:*23*
**played** 30:*13* 116:*22, 24*
**plays** 119:*9, 22* 120:*7*
**please** 5:*6, 21* 13:*18* 39:*19* 63:*23* 70:*18* 157:*3* 204:*15* 210:*5* 233:*11* 236:*16* 247:*18* 253:*4* 256:*5* 259:*17, 19, 22* 264:*10, 13* 270:*10* 277:*21* 281:*17* 288:*17*
**plenty** 34:*9*
**plug** 177:*19*
**point** 14:*12* 15:*1* 16:*14* 17:*12* 18:*9* 20:*8* 22:*1, 4* 26:*17* 37:*11* 39:*16* 43:*12* 44:*4* 53:*9, 21* 54:*3, 10* 59:*5, 7* 62:*4* 65:*24* 68:*15, 22* 69:*2, 6, 10, 14* 71:*1, 19* 73:*9* 78:*5, 8* 80:*3, 8, 10, 14* 84:*17, 21* 96:*1, 16, 22* 101:*1* 120:*18* 122:*14, 21* 129:*2* 174:*22* 214:*7* 251:*8* 262:*12* 287:*13*
**pointing** 222:*16*

Gregory Shields  -  8/27/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 879 of 1503 PageID #:1270

Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**points** 73:*14*
290:*16*
**police** 66:*19* 222:*18*
**policies** 182:*20, 21*
183:*3, 7, 10* 269:*12,
23* 278:*23* 280:*2, 4*
281:*2* 285:*19*
**policy** 11:*1* 116:*9*
124:*23* 141:*1, 5, 7,
8* 180:*18* 181:*10,
13, 18, 19, 22*
182:*16* 205:*21*
206:*4, 6* 207:*5, 17*
222:*14, 22* 226:*7*
245:*20* 248:*23*
249:*7* 250:*1* 252:*7*
268:*21* 278:*21*
280:*19, 20, 24*
281:*1* 285:*16*
**political** 12:*15, 22*
47:*7, 21* 49:*11*
**poor** 166:*5, 8, 13*
**poorly** 155:*16*
**population** 114:*19*
115:*2, 7* 137:*2*
**portion** 9:*6*
**portions** 10:*20*
267:*10*
**position** 14:*17, 19*
16:*12, 14* 17:*9, 12,
15* 29:*2* 42:*5, 11,
15* 50:*12, 16, 18*
51:*19, 20, 23* 52:*2,
5, 7* 53:*15* 55:*10*
57:*5, 6, 10* 58:*19*
59:*1* 62:*5* 63:*10*
76:*12* 83:*12, 14, 21*
85:*20* 86:*19* 88:*9*
89:*2, 3, 4, 14, 17*
96:*19* 97:*3, 14, 23*
98:*21* 100:*24*
101:*3* 106:*12*
107:*20* 111:*15*
115:*13* 118:*18*
121:*23* 129:*19*
139:*10* 170:*14*
177:*14, 17* 202:*19*
240:*22* 249:*12*
252:*6* 265:*12*
266:*1* 268:*13*

**positions** 27:*6, 9, 10*
31:*9* 41:*7* 55:*16*
56:*21* 79:*19* 83:*18*
85:*6* 106:*6, 14, 16*
107:*12* 108:*7, 11*
121:*9, 10* 122:*12,
19* 123:*2* 135:*14*
141:*15* 143:*18*
168:*12, 14* 242:*4*
**positive** 43:*16*
167:*14, 17* 172:*12*
186:*7* 267:*12* 281:*1*
**possible** 82:*19*
83:*4* 125:*14* 283:*1*
**practiced** 246:*24*
**practices** 269:*12*
**prayers** 170:*4*
**preface** 88:*15, 16*
**prefer** 126:*2*
**preferably** 125:*8*
**preference** 32:*11*
**preferences** 139:*18*
**preferred** 33:*17*
127:*16*
**preferring** 139:*9*
**preparation** 7:*20*
**prepare** 6:*20, 22*
136:*24*
**prepared** 151:*16*
**present** 270:*16*
**presumably** 234:*23*
**pretrial** 148:*11*
**pretty** 85:*4* 139:*3*
155:*8* 175:*19*
222:*10*
**prevent** 92:*13*
93:*15* 278:*12*
287:*12, 23* 288:*8*
**prevention** 285:*1, 2*
**previous** 282:*22*
283:*5* 292:*6*
**prime** 31:*2*
**prior** 19:*16* 43:*22*
44:*1, 16* 61:*19*
63:*17* 75:*16* 84:*17*
85:*14, 20* 86:*11, 20*
89:*18* 91:*16* 96:*10*
98:*15* 110:*24*
130:*2* 136:*15*
141:*14, 23* 142:*3, 4,

14* 190:*22* 228:*9*
271:*5, 7, 9* 273:*20*
**prison** 115:*1*
**prisoner** 16:*4, 9*
227:*9*
**prisoners** 16:*2*
37:*22* 38:*1, 11*
145:*18, 20* 148:*7, 8,
18* 149:*8* 155:*8, 11,
14* 227:*15*
**private** 258:*24*
261:*22* 262:*1*
**privates** 262:*8*
**probably** 9:*23*
23:*11* 24:*9* 26:*22,
23* 27:*7, 19* 28:*3*
39:*4* 48:*18* 54:*12,
15* 109:*6, 7* 138:*4*
148:*3* 160:*8* 192:*9*
221:*20* 231:*18*
232:*13* 246:*24*
265:*22* 266:*5*
289:*10* 290:*9*
**problem** 18:*8, 16*
203:*20* 226:*16*
265:*18*
**Procedure** 6:*16*
26:*3* 126:*10* 129:*4*
182:*16*
**procedures** 278:*23*
285:*16, 19*
**proceedings** 292:*14*
**process** 21:*11*
26:*16* 27:*19* 51:*18*
73:*5, 6* 75:*3* 84:*14,
15* 93:*4* 106:*10, 18,
21, 24* 109:*7* 121:*1,
3* 124:*7* 129:*24*
133:*14* 134:*22*
136:*11* 141:*16*
148:*9, 19* 149:*8*
151:*23* 152:*4*
188:*8* 239:*22*
**processed** 21:*19*
24:*10* 149:*13*
151:*22*
**processing** 21:*11*
24:*1* 26:*7, 23* 36:*8,
23* 37:*4, 6* 39:*5*
87:*11* 146:*3* 151:*9*
156:*1* 159:*6*

**produced** 8:*22*
10:*24* 169:*10*
**producing** 207:*19*
**productive** 125:*1*
**professional** 196:*1,
2, 8* 211:*15*
**program** 281:*9*
283:*24*
**progressive** 245:*20,
23, 24*
**prolong** 130:*17*
**prolonging** 130:*14*
**promoted** 41:*2*
42:*5, 11, 15* 43:*3,
10* 50:*2, 4, 10, 21*
51:*13* 52:*9, 23*
54:*15* 59:*13* 60:*3*
64:*2* 74:*2* 84:*10,
13* 85:*14, 18, 24*
86:*3, 9, 18, 23* 87:*1,
18, 20* 88:*2, 6, 9, 12*
90:*3, 12, 19* 91:*9,
11, 13, 16* 94:*7, 14,
20* 97:*19, 20* 98:*3,
15* 99:*16, 23* 100:*3,
8* 245:*3*
**promotion** 40:*7, 10*
41:*23* 42:*2* 99:*4*
**proper** 93:*12, 16*
287:*4*
**properly** 113:*6*
123:*24*
**prosthesis** 226:*19*
**proud** 114:*14*
**provide** 220:*10*
259:*23* 270:*14*
273:*8* 286:*3, 10, 13*
**provided** 216:*7, 15*
218:*11* 234:*18*
287:*8* 288:*6*
**providing** 93:*14*
**public** 20:*18*
148:*12*
**pull** 53:*24* 161:*20*
**pulled** 38:*20*
287:*19*
**pulling** 169:*18*
**punctual** 93:*8*
**purposes** 49:*12*
149:*11* 163:*15*
173:*24*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 880 of 1503 PageID #:1271
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

pursuant 2:2 6:16 124:14, 17, 19 131:16 141:16 195:10 219:15, 22
put 20:15 22:12, 20 33:13 71:9 123:10 135:13, 16, 22 137:21, 24 139:8 167:21 168:12, 14 173:10 177:10 179:4 219:1, 6 220:12, 18 222:17 240:22 260:2 282:23 288:14
puts 221:24
putting 266:3
puzzled 254:12

< Q >
quality 165:21 166:3, 12, 14, 19 167:3
question 5:22 6:9 8:15, 17 11:3, 5 12:2, 19 13:15 17:2, 4 18:7, 11 21:3 25:16, 19, 20 28:16 29:15 30:3 31:16 34:24 37:5 41:21 42:4 45:1 47:17, 20 54:2 55:11 58:22 63:23, 24 70:4, 22 74:18 77:11 85:22 86:14, 17, 21 87:11, 24 88:15 90:10 100:16 107:6 108:17 110:12 111:4 112:12 113:9 122:2 123:6, 15 124:9 126:4 128:22, 23 129:16 130:11 131:14 132:7 135:7 137:14 139:17 140:20, 21, 24 141:22 142:11, 14 147:13 156:18, 24 160:12 166:13 169:8 175:1 178:8

185:19 186:23 188:1 195:7 202:15 211:3 217:12 220:22 228:1 235:7 236:17, 23 237:21 238:9 240:1, 8 244:14 245:5 248:17 253:6, 8 256:10 261:15 263:14, 18 264:9 266:21 270:5, 9 272:1, 24 274:2 278:7 283:7 289:19
questioned 214:12
questioning 129:10 261:12
questions 6:6 9:24 10:2, 6, 14 18:10 20:17 92:16, 20 121:18 131:4 203:7 204:1 236:19 255:11, 22 283:2
quick 45:20 288:23
quicker 289:6
quite 88:23 202:15
quote 221:24 232:20
quotes 233:2

< R >
race 112:4, 9, 19, 20, 21, 22 186:14, 21 188:20 191:19 200:11 207:21 247:13 259:10, 11 270:14, 20 271:7 273:10
racial 115:19, 23 116:2 200:14 249:3 259:2, 3 270:11, 24 271:11, 22 273:3, 13 277:13, 15 279:11
racially 113:13 114:9
radios 274:18, 19
raised 11:16, 19
rally 221:23

ran 37:7 46:19 115:8 222:20
rank 58:13 65:5, 7, 8, 19 66:2, 7, 10, 24 67:9 68:21 69:1, 5, 9, 13, 17, 23 70:6 71:8, 13, 18 72:1 74:15, 19 75:1, 5, 10 76:20 77:20, 22 78:14 86:11, 20 87:1 88:13 89:6 90:4, 20 91:4, 16 99:8 108:3, 6 112:18 191:23
ranked 56:4 68:17
ranking 53:10 54:24 55:10 70:15, 19 75:23 76:12, 14 83:15 102:20, 24 103:10 104:12 193:4
RANZINO 1:12 191:14, 16 192:21 193:13, 18, 21 194:2, 3, 18 195:1, 4, 10, 24 196:18, 24 197:5 199:1, 7, 10 201:9 204:24 205:3 206:1, 11, 16 207:2, 9, 11, 14, 16 232:18 233:1, 7 258:4
Ranzino's 193:2
rare 85:4 245:10
rarely 244:20
Ray 258:5, 6
Raymond 257:18, 21
reach 170:8
reached 217:5, 8, 12, 24
read 7:21 47:15 197:7, 8 208:10 222:13, 22 226:17 268:20 270:5
ready 5:9 24:11 119:1
real 31:2 169:19
realized 168:7
really 78:11 122:5 130:14 139:1

142:12 167:8, 21 171:3 178:23 182:5 186:8 193:9 203:3 266:20
reask 129:16 157:2
reason 27:12 140:1, 2 153:11 160:11 161:1, 9 223:12 266:10
reasonable 150:20 213:6 265:3
reasonably 7:14 30:24 59:11 184:17 249:16
reasons 221:21
reassigned 40:1
recall 16:13 22:7 39:22 52:14, 19 78:24 79:5 98:6, 7 108:16 141:13 167:12, 15 170:18 189:13, 16 191:13 225:17, 19 254:2 255:5 280:24
receive 228:20 242:13, 21
received 211:10 212:1 223:22, 24 224:4, 22 226:22 228:6 233:13 237:4, 6 242:12, 17 260:23 270:11, 19
receiving 16:1 37:18, 22 38:1, 3, 4, 21, 22 145:12, 14, 20 148:6, 7, 16, 19 149:10 154:4, 13, 20 225:21 226:9 228:13, 14 233:15 242:16, 20
recite 181:18
recognize 282:5
recollection 23:17 216:5
recommendation 148:13
recommending 109:16
record 9:16, 21, 23 23:12 46:8 47:14

Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 106-1 Filed: 12/21/20 Page 881 of 1503 PageID #:1272
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

172:*1* 260:*11*
290:*20* 292:*13*
**recorded** 232:*19*
**records** 21:*22, 23,
24* 26:*8* 34:*5*
36:*13, 23* 37:*19, 23*
39:*5* 145:22 157:*8,
10* 159:*3, 9, 10, 12,
15, 19, 23* 160:*6, 11,
13, 15, 19, 21, 23*
161:*4, 8, 10, 18, 21,
24* 162:*4, 10, 15, 16,
19, 21*
**reduce** 252:*13*
**reduced** 225:*12*
226:*23* 227:*2*
249:*19, 21* 250:*4*
292:*12*
**re-elected** 46:*20*
**re-election** 48:*15*
**refer** 145:*3* 154:*12,
13* 156:22
**reference** 46:*23*
108:*17* 259:*17*
283:*15*
**referenced** 211:*9*
**referred** 37:*4, 6*
38:2 196:*18, 24*
197:5 198:*10*
233:7 248:*21*
**referring** 198:*21*
199:*1* 208:*4* 209:*3*
233:*1, 4* 248:*15*
**refers** 197:22 209:*5*
**reflect** 284:*6*
**reform** 115:*7*
**reforms** 115:*10*
**regard** 31:*16*
114:*16* 253:*14*
**regarding** 104:*22*
115:*11* 128:2
142:*6* 177:*16*
206:*4* 207:*21*
212:3, *14* 220:*24*
221:*10* 233:*12*
234:*5* 238:*11*
261:*5* 262:*3* 273:*9*
274:*6, 12* 275:*2*
276:*3* 281:*5* 286:*4,
14*

**regardless** 28:*19*
139:*8* 203:*16*
259:*15*
**register** 46:*19*
47:*24* 260:*15, 22*
**registered** 282:*9*
283:*8, 20*
**registering** 46:*24*
**Regulation** 211:*16*
**related** 171:*24*
202:*5* 267:*5*
270:*14* 277:*4*
**relative** 292:*17, 18*
**release** 115:*7*
147:*1* 152:*2*
**released** 133:*13*
137:*19* 146:*14*
**releasing** 36:*15*
**relevant** 204:*24*
**relieving** 16:*8*
**remain** 16:*16*
**remaining** 158:*24*
**remember** 14:*5, 6,
7, 8* 15:*21, 22*
26:*24* 33:*3* 40:*13,
14* 41:*1, 3* 42:*23*
43:*9* 46:*12, 17*
47:*17* 50:*5* 51:*5*
53:*23* 54:*2, 17, 21,
22* 77:*11* 79:*2*
84:*15* 90:*1, 23*
91:2, *10, 23* 92:*11*
97:*8* 99:*2* 102:*8*
104:*3* 109:*13, 15,
16, 20, 22* 110:*4*
111:3, *4* 123:*20*
128:*4, 6* 137:*3*
141:*22* 167:*13, 16*
171:*24* 174:*19*
175:*18, 22, 23*
176:*1, 2, 3, 5, 14, 16*
177:*4, 5, 8, 9, 12, 14*
180:*17* 188:*5*
190:2, *16* 191:*13*
212:*20* 213:*3, 4, 5,
7, 10* 214:*9, 21*
218:2, *4* 224:*3*
226:*15* 228:*18*
232:*23* 233:*1, 4*
246:*4, 15, 16* 254:*5,
18* 263:*14* 267:*19*

276:*4, 10, 15, 20*
277:*2, 11, 15*
283:*23* 284:*14, 18,
19, 22*
**remembering** 92:*13*
**remind** 231:*15*
**remote** 1:*21* 2:4
**remotely** 2:*10, 16,
22*
**removed** 21:*12*
141:*8*
**rep** 167:*20, 21*
**repeat** 12:*19* 25:*20*
28:*18* 35:*16* 41:*20*
63:*24* 119:*14*
128:*23*
**repeated** 31:*4*
**rephrase** 6:*12*
68:*24*
**report** 56:*14, 17*
59:*19* 65:*4, 7, 13*
67:*6, 13, 24* 72:*13*
74:*9, 12* 75:*19*
76:*10* 77:*4* 78:*1, 3,
6, 9, 17* 79:*8* 81:*13*
83:*8, 12* 84:*2, 4*
95:*2* 96:*16* 103:*23*
156:*14* 192:*21*
194:*1* 222:*24*
223:*2* 282:*1*
**reported** 61:*17*
67:*18* 72:*7, 22*
74:*4* 75:*12, 15*
76:*5, 7, 17* 77:*7, 12,
14* 78:*13* 82:*6*
84:*6* 96:*14, 23*
100:*22* 102:*4*
192:*13, 19* 193:*8,
13, 18, 20* 292:*11*
**Reporter** 1:*23*
31:*4* 35:*16* 41:*16*
47:*11* 244:*13*
292:*4* 293:*6*
**REPORTER'S**
292:*1*
**reporting** 73:*5, 6*
75:*16*
**reports** 270:*17*
274:*3, 5*
**represent** 186:*1*

**representative** 255:*3*
**represented** 113:*5*
**reprimand** 246:*1*
**request** 25:*6, 10, 21*
109:*23* 125:*21*
126:*6* 128:*1, 6*
139:*5* 176:*17*
177:*16, 23* 234:*11*
246:*21*
**requested** 26:*1*
47:*15* 172:*19*
176:7 215:*5*
219:*23* 220:*16*
**requesting** 138:*9*
**requests** 106:*3*
**require** 146:*10*
147:*6, 9* 235:*9*
**required** 43:*5*
145:*17* 150:*24*
160:5 182:*24*
206:*8, 11, 14*
235:*14* 279:*15*
**reside** 11:*10*
**resigned** 41:*17*
**resolve** 252:*11*
**resolved** 275:22
**resources** 126:*22*
**respect** 51:2 54:*5*
55:*15* 92:*19*
122:*15* 125:*15*
127:*19* 129:*11, 17*
137:*16* 269:*24*
**respectful** 154:*17*
**respective** 157:*15*
**respond** 83:*8*
147:*12* 275:*20*
**responded** 260:*20*
**respondent** 256:*8*
**response** 22:*10*
93:*5* 150:*20*
152:*23* 160:*17*
175:*6* 176:*18*
177:*3, 13* 178:*19*
187:*18* 217:*20*
253:*22* 255:*23, 24*
256:*2* 259:22
266:*20* 270:*5, 18*
287:*15*
**responses** 6:*6* 93:*7*
168:*23* 169:*1*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 882 of 1503 PageID #:1273
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

responsibilities 104:13

responsibility 148:17 207:19 279:1 287:1

responsible 103:18, 21 104:7 179:10, 13, 17 180:1 184:19 185:2, 9, 14, 15 195:9, 24 200:3, 5, 9, 13, 18 201:1, 6 205:3, 14 206:15 209:9

responsive 259:21 269:18

rest 174:6

restart 266:10

restaurants 14:9

result 213:2 249:3, 5 252:2

retaliate 285:23

retaliation 281:5, 11, 22 283:19 286:5, 14

retire 24:23 97:17 100:18 282:12

retired 24:21 39:8, 10 53:18 54:12 73:23 79:23 100:17 101:2, 6 128:18 129:18 130:1 132:15 286:2 287:13

revert 169:7

review 7:3 8:11, 21

reviewed 7:16, 19 10:6, 7, 12, 18, 20, 23 256:13, 15

Richard 12:10, 12, 22 13:5 40:16, 17, 20

ridicule 273:3, 14

right 13:23 16:3 19:7 23:21 26:24 36:15 38:13, 15 47:12 54:18, 19 55:13 57:19 64:17 73:13 102:6, 10 104:20 108:18 114:21 116:20 117:24 119:4

123:22 126:15 128:24 132:20 138:1, 6 139:16 144:3, 8 149:24 150:22 154:10 155:5 160:1 161:11 167:23 180:19 181:11 183:6 185:20 187:9 188:11 190:2 194:11, 15 195:14 196:4 241:22 246:22 247:2, 12, 16 248:3, 13 250:19 252:8 256:5 259:10 263:1 264:18 267:21 268:22 269:5, 7 271:5 272:20 278:6 279:12, 13 288:21 289:7

rip 261:23

rise 198:2

Road 2:13

Robert 218:3

Robinson 227:5

ROHLOFF 1:16

role 30:13 48:19 109:9 116:22, 24 216:23 263:20 278:11

roles 179:15

roll 144:19 156:23 195:14, 17, 19, 22 196:1, 3 205:4, 15, 17 246:5 274:16 285:18

room 37:8 38:5, 22 149:10 154:13 218:11 225:21 267:14 274:16

rooms 37:12

roster 51:4 89:22 111:18, 21 112:1, 4, 18 119:1 135:13 189:23

rosters 53:23 240:20 248:7

rotated 233:17

234:8

roughly 39:23

route 146:15, 16

routed 148:9

Rules 6:16

run 37:12, 16, 18, 21, 24 117:21 147:2 150:5 223:1 272:18

running 36:20 46:18

< S >

sacred 258:21

safe 179:22 252:15

Salle 11:23, 24 12:1, 3 13:8

Sam 168:6

SAMUEL 1:5 164:4 168:1 237:4 241:8, 12

sanitation 155:17

sarcastic 212:7

satisfactory 6:5

satisfied 32:12

Saturday 27:24 31:8

saw 110:24

saying 34:17 41:3 88:11, 12 112:18 114:23 120:2, 15 144:3, 22 172:2 175:23 182:24 184:7, 9, 11 192:17 222:16 228:1 232:14 239:21 251:9 284:5

says 181:22 209:9 239:2 253:22 260:11

scabies 246:8 247:8 248:4

scenario 137:7, 8, 15 147:4, 7 176:10 197:21 198:13 246:15

scenarios 231:18

scheduling 290:3

school 11:22 13:8, 19, 21, 23 14:1, 4

scope 185:1

scream 210:21

screamed 210:12 212:4 215:16 222:3

screaming 212:15

screen 264:2, 7 283:6

search 16:1 228:7, 11

second 9:10 12:6, 7 16:7 33:11, 24 46:18, 22 48:15 117:21 131:12 135:11 144:20 149:15 150:17 151:18 152:5 157:24 158:5 190:5 194:1, 10, 12, 13 209:8 246:2 256:23 264:18 270:13

seconds 9:18

section 16:17 36:2, 3, 5, 7 39:13

secured 218:19

security 14:22 15:7, 10, 13 16:5, 17 39:13 231:16 232:11

see 4:14 36:14 46:2 95:7 115:23 116:2 130:11 137:22, 23 138:2 163:9, 17 173:18 177:17 179:14 203:14 204:9, 21 205:6 209:8, 12 210:7, 13, 15 213:15 217:9 221:24 223:21 228:22 229:2 232:21 233:17 245:15 247:6 253:8, 16 254:3 256:10 257:2 259:24 261:13 264:5, 15 265:16 267:8 269:19 270:20 273:4 281:19, 23 282:2, 9

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 883 of 1503 PageID #:1274
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

283:*7, 9*
**seeing** 254:*18*
**seen** 168:*6* 188:*14*
230:*10* 241:*13*
282:*7* 284:*12*
**selected** 107:*17*
108:*7, 10*
**send** 150:*12* 218:*5*
246:*17* 247:*1, 2, 22*
278:*3* 290:*8*
**sending** 246:*9*
247:*7*
**senior** 237:*8*
243:*24* 244:*20*
245:*8* 246:*18*
**seniority** 28:*23*
30:*13, 15* 35:*9*
116:*22, 24* 119:*8,*
*13, 22* 120:*6, 11, 20,*
*22* 133:*23, 24*
233:*16* 237:*5, 8*
238:*10, 16, 19, 24*
239:*1, 3, 8* 242:*6*
243:*17, 19* 246:*19*
**sense** 45:*19*
**sent** 8:*12* 10:*14*
23:*9* 43:*7* 142:*23*
150:*17* 240:*20*
247:*3, 12, 15* 248:*3,*
*8, 11* 281:*3* 286:*19*
**sentence** 209:*8*
253:*16, 21* 256:*23*
267:*3* 269:*17*
270:*13*
**September** 96:*8*
216:*6*
**sergeant** 57:*9* 58:*4,*
*7* 70:*6* 85:*1, 15, 20,*
*21, 24* 86:*4, 7, 11,*
*13, 16, 20* 87:*1, 8,*
*15, 16, 18* 88:*13*
89:*7, 19*
**sergeants** 57:*23*
59:*17* 61:*18, 24*
62:*4, 20, 22* 64:*6,*
*21* 68:*4* 69:*6*
86:*22* 105:*17*
108:*13, 19*
**serious** 170:*10*

**serve** 50:*6* 93:*19*
95:*5* 97:*1* 100:*10*
225:*9*
**served** 84:*7* 85:*5,*
*19* 86:*20* 87:*1*
88:*13* 91:*12* 105:*14*
**serves** 87:*14* 169:*8*
278:*2*
**Service** 36:*3, 5, 7*
51:*23, 24* 85:*6*
198:*10*
**services** 148:*11*
170:*7*
**set** 8:*21* 144:*12*
293:*1*
**settings** 9:*13*
**seven** 184:*16* 192:*7,*
*10* 202:*24* 203:*9,*
*17* 289:*9*
**seventh** 98:*7*
**severe** 169:*23*
**sexual** 279:*10*
280:*19*
**sexuality** 259:*11*
**sexually** 258:*19, 24*
261:*19* 263:*2*
277:*24*
**shaking** 6:*4*
**shape** 173:*13*
**share** 9:*24*
**Sheahan** 43:*17*
44:*4, 7, 12, 14, 20*
45:*4* 47:*3, 19* 48:*3,*
*5, 11, 13, 15, 20*
49:*23* 98:*14* 115:*6*
**Sheahan's** 45:*15*
46:*11* 47:*22* 48:*23*
49:*3, 18* 92:*10*
**sheet** 259:*17, 20*
**sheets** 168:*20*
**SHERIFF** 1:*10*
14:*19, 21* 20:*4*
28:*20* 39:*17* 42:*3*
43:*11, 17, 18, 19, 20,*
*22* 44:*4, 7, 12, 14,*
*17* 45:*4, 15* 46:*11,*
*18, 19* 47:*3, 18, 22*
48:*3, 5, 10, 13, 15,*
*20, 23* 49:*3, 18, 23*
53:*13* 55:*19, 24*
56:*4, 7, 10, 13, 15,*

*16, 17, 20* 57:*1, 2, 6,*
*11* 58:*3* 59:*23*
60:*10, 13, 17* 63:*9*
66:*6, 9* 68:*4* 70:*7*
84:*3* 92:*10* 98:*9,*
*14* 99:*1, 9* 109:*17,*
*24* 124:*24* 269:*10*
**sheriffs** 55:*23* 56:*3,*
*12, 14, 22* 57:*4, 15,*
*19* 59:*19, 21* 60:*2,*
*5, 14* 61:*1, 7, 10, 11,*
*13, 16, 17* 62:*10, 14,*
*17, 19* 65:*3* 68:*3,*
*21, 22, 23* 69:*2*
105:*16* 134:*23*
193:*12, 18*
**sheriff's** 11:*1*
14:*12, 15, 18, 23*
16:*17* 19:*14* 20:*2,*
*7* 23:*18* 52:*11*
53:*2, 11* 54:*24*
55:*15* 62:*5, 17, 20*
64:*18, 22* 65:*1*
66:*1, 11* 67:*21*
68:*15, 22* 69:*3, 7,*
*11, 15, 18, 24* 70:*8*
71:*2, 8, 12, 19, 24*
72:*6, 14, 23* 73:*9,*
*14* 75:*1, 9* 79:*12,*
*15, 21, 24* 80:*4, 15,*
*19* 85:*13* 86:*10*
87:*6, 10* 88:*3*
90:*21* 113:*5* 114:*1,*
*2, 4, 6, 16, 23, 24*
115:*4* 124:*23*
154:*20, 21* 164:*21*
182:*17, 21* 183:*1*
205:*2* 206:*13*
245:*19* 254:*20*
269:*12, 22* 278:*20*
280:*18* 281:*9*
**SHIELDS** 1:*13, 21*
3:*1, 11* 4:*3, 10, 11*
5:*1, 8, 9, 10* 6:*18,*
*20* 7:*22* 11:*6*
13:*16* 14:*1* 35:*17*
42:*12* 46:*10* 86:*5*
93:*3* 108:*11*
122:*11, 17* 123:*16*
163:*1, 9* 204:*17*
209:*9* 210:*11*

222:*1, 16* 226:*5*
232:*19* 253:*9, 22*
266:*14* 270:*13, 17*
289:*24* 290:*14*
**S-h-i-e-l-d-s** 5:*9*
**shift** 26:*4, 11* 27:*8,*
*20* 29:*24* 30:*13*
35:*7* 116:*17, 18*
119:*17* 120:*14, 19*
125:*17* 133:*2*
141:*9* 150:*7, 23, 24*
151:*1, 3, 6, 7*
162:*15* 223:*15*
243:*21*
**shifting** 147:*6*
**shifts** 29:*1* 33:*8*
118:*2, 3, 22* 120:*7*
125:*15* 132:*3*
**shocked** 217:*19, 23*
**shoot** 289:*23*
**shopping** 161:*22*
**short** 9:*19* 46:*6*
122:*8* 188:*5* 204:*12*
**Shorthand** 1:*23*
292:*4* 293:*6*
**shortly** 7:*7*
**short-staffed** 137:*3*
**show** 127:*13*
135:*12* 282:*19, 21*
**showed** 219:*9*
268:*11, 12*
**shy** 289:*16*
**sic** 18:*7* 99:*24*
263:*3*
**side** 75:*8* 146:*21,*
*22*
**sign** 108:*9* 165:*17*
217:*22*
**signature** 276:*7*
**signed** 10:*15* 111:*1*
167:*22* 224:*9, 15*
256:*18* 276:*2*
**signing** 276:*10, 15*
**similar** 175:*15*
242:*21*
**Simultaneous** 17:*23*
244:*11*
**simultaneously**
282:*24*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 884 of 1503 PageID #:1275
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**single** 60:*17* 81:*11* 175:*8* 219:*21* 234:*4, 22*

**singling** 196:*12*

**sir** 6:*3, 7, 13* 8:*10, 20, 24* 9:*3, 5* 11:*15* 12:*8* 13:*17* 14:*13* 17:*5* 18:*5, 14, 18* 20:*6* 23:*1, 24* 24:*19* 25:*19* 35:*22* 39:*11, 15* 42:*13* 43:*21* 44:*6, 13* 48:*21* 49:*19* 55:*13, 17, 21* 56:*5* 57:*2, 22* 58:*5, 8* 59:*2, 6, 16, 18, 24* 60:*15* 61:*8, 15* 63:*11* 64:*20* 65:*2* 70:*13* 78:*23* 79:*16* 80:*2* 81:*8, 22* 82:*18* 83:*6, 13* 89:*5, 8* 91:*6* 94:*1* 97:*13, 18* 102:*2, 19* 104:*1* 113:*2* 131:*23* 135:*6* 140:*19* 144:*1* 149:*19* 151:*9* 158:*7* 168:*16* 184:*11* 188:*21* 204:*18, 22* 205:*7* 209:*13* 210:*8, 14* 211:*13, 18, 22* 213:*16* 224:*2* 232:*22* 233:*18* 236:*22* 237:*3* 245:*13, 18, 21* 247:*14* 253:*10* 254:*4, 7* 256:*11, 14, 17, 21* 257:*3, 5, 11, 13* 260:*1* 267:*9, 16* 273:*5* 276:*21, 24* 281:*20, 24* 282:*4, 11, 15*

**sit** 52:*21* 80:*13* 90:*18* 93:*3* 99:*20* 138:*3* 175:*9* 208:*14* 273:*12*

**sitting** 123:*21* 249:*10*

**situation** 127:*3* 134:*14* 151:*15* 175:*14* 176:*6, 11*

**singling** 196:*12*

**situations** 72:*17, 21* 138:*22* 168:*17* 198:*2* 220:*15* 227:*14* 230:*24* 231:*6* 242:*12*

**Six** 95:*7* 149:*2, 7, 14* 156:*11* 158:*8, 17, 21* 210:*20*

**skin** 186:*14*

**SLAUGHTER** 1:*7* 164:*16* 244:*6, 18* 245:*3*

**slip** 30:*16*

**slow** 28:*1, 2*

**smart** 288:*14*

**smells** 155:*16*

**softly** 222:*13*

**solely** 104:*13*

**solution** 93:*18* 252:*10* 266:*8*

**somebody** 85:*4* 90:*12* 107:*3* 108:*2, 5* 109:*9* 117:*10* 126:*2, 6* 127:*16* 133:*4* 134:*2, 8* 136:*22* 138:*1* 139:*4* 144:*4* 153:*3, 17* 154:*18* 161:*10* 184:*8, 17* 195:*22* 198:*18* 208:*1, 4* 209:*5* 220:*23* 225:*14* 226:*8, 9* 231:*14* 238:*18* 239:*1, 21* 241:*4* 247:*7, 23* 251:*24* 252:*5*

**somebody's** 128:*2*

**Somewhat** 13:*10*

**Sorry** 4:*4* 7:*10* 21:*3, 16* 24:*22, 24* 35:*13* 36:*10* 44:*24* 57:*18* 65:*4* 76:*6* 87:*23* 89:*11, 15* 100:*19* 108:*11* 121:*20, 21* 122:*2* 129:*12* 140:*5* 144:*2* 161:*5* 191:*17, 19* 201:*24*

205:*8* 206:*23* 212:*11* 223:*10* 228:*16* 244:*15* 248:*14* 253:*5* 256:*23* 270:*8* 275:*12, 16*

**sought** 30:*20* 32:*4*

**sound** 7:*12* 54:*18* 96:*10* 210:*23*

**sounds** 15:*16* 122:*6* 226:*24*

**South** 2:*6* 15:*14, 16* 146:*16, 18, 21*

**space** 37:*10*

**span** 174:*18* 175:*5, 20* 190:*12*

**speak** 7:*22* 18:*4* 57:*1* 86:*5, 6, 12* 108:*4* 160:*5* 161:*1* 186:*6, 7* 255:*2* 289:*21*

**speaking** 57:*21* 88:*20* 157:*17* 162:*19* 222:*13* 254:*5*

**special** 143:*19*

**specialties** 144:*7, 9*

**specialty** 143:*17, 22*

**specific** 14:*2* 23:*6, 16* 28:*6, 7* 29:*20* 30:*4* 85:*22* 124:*8* 126:*8* 128:*7* 157:*1* 158:*2, 12* 160:*12* 173:*1* 185:*17* 210:*19* 223:*22* 231:*5* 268:*5* 278:*7* 280:*9, 19* 282:*2*

**specifically** 15:*13* 64:*19* 133:*15* 140:*3* 158:*19* 204:*20* 208:*17* 209:*2* 237:*6* 244:*19* 250:*13*

**specifics** 144:*22* 177:*6* 254:*2* 285:*22*

**specified** 292:*16*

**speculation** 44:*22* 45:*6* 52:*13, 18* 80:*23* 81:*7* 82:*22* 85:*8* 99:*13* 199:*14* 208:*9* 232:*7*

243:*11* 257:*23* 283:*14*

**spell** 5:*7* 251:*3*

**spend** 204:*8*

**spent** 92:*17* 203:*4, 8* 204:*4*

**spinning** 266:*11*

**split** 147:*2*

**spoke** 6:*23* 25:*5* 26:*8* 32:*4* 102:*7* 137:*7* 138:*22* 141:*4* 162:*18* 176:*18* 210:*9* 231:*22* 253:*22* 255:*17* 267:*15* 268:*19*

**spoken** 29:*4* 165:*5* 253:*24*

**spot** 118:*14* 239:*4*

**spots** 238:*23* 239:*11, 15*

**spun** 262:*7*

**squeeze** 203:*11*

**staff** 56:*11* 66:*17* 68:*5* 83:*19, 22* 84:*2* 98:*12* 99:*9* 133:*11* 134:*3, 12, 16* 136:*23* 137:*20, 24* 138:*5* 167:*5* 172:*24* 174:*3* 177:*1, 2* 215:*4* 223:*14* 285:*20* 286:*17, 22*

**staffing** 51:*16* 54:*13*

**stairs** 162:*22*

**stand** 36:*1* 266:*9*

**start** 5:*11* 148:*19* 244:*15*

**started** 20:*22* 21:*6* 38:*4* 100:*13* 129:*1* 215:*7*

**starts** 148:*9*

**State** 1:*24* 42:*23* 43:*5* 93:*15* 253:*15* 259:*6, 8, 18, 19* 266:*24* 267:*3* 269:*9* 270:*10* 272:*9* 292:*4*

**stated** 141:*9*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 105-1 Filed: 12/21/20 Page 885 of 1503 PageID #:1276
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**statement** 144:*4*
177:*4, 6* 270:23
**statements** 211:*20*
222:*19* 253:*13*
273:*3, 13*
**STATES** 1:*1*
**State's** 12:*11, 13*
148:*11* 217:5, *9, 10,*
*13, 18, 21, 24*
**station** 222:*18*
**status** 110:*15*
259:*16* 283:*9*
**stay** 16:*11* 41:*9*
130:*19*
**stealing** 220:23
**stemmed** 226:7
**stenographically**
292:*11*
**step** 276:3
**stepped** 167:*8*
223:*8, 12*
**steps** 98:2 127:2
277:*17, 21* 278:*12,*
*17* 285:7, *12* 287:*4*
**stereotypical** 273:*3,*
*13*
**Steven** 260:*9, 15, 21*
261:*4, 8* 271:*3*
**steward** 142:*9*
144:*5* 226:*13*
229:*20*
**stick** 112:*15* 241:*4*
**stood** 113:*16*
**stop** 161:*21* 203:*9,*
*14* 236:6 265:*19*
288:*19* 289:*18*
**stories** 228:*3*
**story** 255:*8*
**straight** 241:*5*
255:*8*
**streamline** 143:*20*
**Street** 2:6, *19*
11:*13* 154:*19*
168:22 240:2*1*
**STRICKLAND** 1:*4*
163:22 171:*1*
172:16 186:8, *12*
188:*1* 223:2*1*
224:*3* 226:*14*
228:23 229:*4, 23*

230:*7, 12, 16*
231:*19, 21* 249:*11*
**Strickland's** 225:*16*
**strictly** 121:2 202:*5*
**strike** 11:*5* 18:2*1*
19:*18* 35:24 76:*10*
86:*1* 105:22
132:2*1* 138:*8*
140:23 151:*4* 159:*1*
**strings** 169:*19*
**structure** 55:*14*
70:*15, 19*
**stuck** 201:6 241:*8*
**stuff** 16:*10* 92:22
203:*4*
**style** 182:*1, 2, 6*
**subject** 143:*5*
232:*13* 278:24
**subjected** 200:*14*
**submitted** 260:22
**subordinate** 205:*6*
206:*19* 207:*1*
209:*10*
**subpoena** 219:*15, 23*
**subsection** 37:*23*
143:*14*
**substance** 177:*6*
266:24
**suburban** 206:22
**suburbs** 146:*16, 19*
**sued** 257:*4*
**suffer** 213:*1*
**sufficient** 288:*7*
**suggest** 126:23
154:2*1* 247:23
**suggested** 176:*19,*
*22* 181:*20*
**Suite** 2:*7, 13, 19*
**Sunday** 27:24 31:*8*
**supervise** 88:*18*
**supervised** 165:*9*
188:23
**supervision** 209:*10*
**supervisor** 19:*18*
65:*14* 88:*17, 19, 21*
89:*3, 16, 17* 90:*4,*
*12, 20* 91:*7, 9, 13,*
*16, 22* 179:*15*
180:23 181:*16*
197:*13, 22* 206:*16*
220:6, *8* 243:*15*

250:*14* 251:*20*
259:7 278:*5*
**supervisors** 62:*9,*
*16* 63:*13* 116:*3, 16*
127:*8* 137:*13*
138:*11, 17* 139:*19*
140:*3* 141:2 168:*5*
173:*4, 8* 177:*15, 23*
178:2, *10* 179:*4, 11*
180:*19* 181:*4*
184:*1, 13, 20* 185:*3,*
*7, 16* 189:7, *8, 10,*
*17, 20* 190:*10, 11,*
*19* 191:*3, 4, 11, 12*
200:*3, 6* 229:2, *6,*
*24* 230:*8, 17*
240:*12, 15, 16*
279:*13, 15, 19, 21*
280:*1* 285:6 286:*4,*
*10, 15* 287:*4, 11*
**Supervisory** 185:*1*
273:2
**support** 114:7
**supported** 48:*3, 4*
51:*24*
**supporting** 216:7
**supposed** 196:7
198:*15* 234:8 255:2
**sure** 4:*5* 5:24
12:2*1* 14:*3* 16:2
18:2 24:*17* 32:*20*
36:*15, 21* 41:*12*
43:*4* 46:23 67:2
70:*23* 76:23 84:*5*
86:6 90:*14, 17*
93:*11, 13* 118:*1*
123:23 130:*13*
162:*12* 179:2*1*
180:*1, 15* 181:*19*
182:*3* 183:6, *9*
186:8, *13, 14* 187:*1,*
*4, 8* 190:*8* 200:*9,*
*13, 18* 206:*15*
216:*12* 240:*17*
243:*12* 249:*5*
250:*17* 252:*1*
255:*13* 260:*19*
267:23 268:*4*
277:22 278:23
279:*1* 280:22, *23*

284:*9* 286:*17, 22*
287:*1, 5, 15, 17*
**surprise** 152:*12*
237:*18, 23*
**surprised** 152:*20, 22*
**surprising** 238:*3*
**surrender** 160:*8*
**surrounding** 136:2*1*
**surveillance** 218:7
**suspension** 223:22
224:*4, 22* 225:*14,*
*16* 226:22 227:*3*
228:6 229:*13, 21*
**sustained** 211:*24*
212:*3, 6, 7, 8, 14*
213:2 215:*15*
260:7, *11*
**Swain** 258:*9, 10*
261:*11, 19* 263:*5,*
*17, 19* 272:2, *6*
278:*1*
**swore** 260:2*1*
**sworn** 4:2 14:24
57:*12* 292:*8*
**syllabus** 285:2*1*
**system** 15:7 78:*12,*
*14* 281:2 285:*17*

**< T >**
**tab** 282:*19*
**take** 5:2*1* 8:7
37:*14* 42:*10, 14*
43:*5* 45:*19* 46:*1*
63:2*1* 73:*20* 89:23
95:*15* 109:*14*
122:*5* 133:*14*
139:*17* 157:23
170:*12* 173:*17*
191:*8* 202:*15*
204:*9, 19* 220:22
221:*3* 243:*19*
252:6 275:*12*
277:*17* 278:*8, 12,*
*17* 279:*12, 16*
280:*5, 16* 281:7
285:*4, 7, 12*
**taken** 1:22 5:22
6:*15* 9:*20* 46:7
122:*9* 147:*9*
199:*11* 204:*13*

Gregory Shields   -   8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 886 of 1503 PageID #:1277
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

238:*11*  285:2
292:*15*

**taker**  20:*13*

**talk**  17:*23*  29:*14*
33:*4*  35:*14*  39:9
114:22  127:7
137:*17*  164:*10*
169:22  172:2
198:*14, 16*  202:22
244:*11*  256:*23*
261:*10*  263:6  290:7

**talked**  10:*5*  36:22
68:2  88:*23*  104:22
119:*8*  137:*13, 15*
140:*18*  226:22
254:*12*  255:*20*
271:*3, 13*  276:22

**talking**  18:*3*  31:*12,
14*  33:7, *8*  45:*11*
57:*12*  64:*17*  70:*19*
73:*7*  87:5  113:*13*
117:*12*  118:2
119:*20, 21*  120:*6,
24*  121:*1, 22*
122:*11*  131:*1, 2*
135:*1*  140:*16*
167:5  172:*10*
178:7  182:*1*
184:*24*  198:*20*
220:*11*  263:5
266:2, *4*  267:*21*
268:2  278:*10*
280:*20, 21*  284:*21*
285:*20*

**talks**  204:*23*  213:*12*

**Tansey**  104:*4*

**Tasers**  274:*20*

**task**  145:9

**tasks**  240:*4*

**team**  146:2, *3*
235:*17*

**teams**  146:*6*

**tech**  163:6, 7

**technical**  21:*14*
25:*18*  31:2  34:*18*
35:*13*  36:2, 5, 7
41:*14*  43:*14*  47:*10*

**telephone**  265:*8*
290:*1*

**tell**  6:*11*  17:*14*
31:*23*  33:*3, 15*

39:*19*  66:*16*  70:*14*
84:7  94:2  112:*1*
118:*20*  127:*8*
129:*13*  136:*14*
146:*13*  147:*12*
148:5  154:*18*
168:*17*  173:*4, 8*
177:*2, 19*  178:*11*
186:*20*  197:*21*
198:5  202:*12*
203:*12*  222:2
236:*4*  249:*6*
252:*12*  254:*8*
265:*24*  272:*18*

**telling**  23:9, *10*
41:*1*  201:*23*  202:6
236:9

**tells**  170:*23*

**Ten**  50:*8*  79:*17*
80:*8, 11, 24*  81:*3*
106:*13*  162:*16*
190:*9, 11, 19, 20, 21*
288:*23*

**tenure**  172:5

**term**  46:*18*  183:*8*
199:2  233:5

**termination**  225:*10*

**terms**  200:*14*
208:*11*

**terrible**  170:*1, 24*
225:7  247:*23*

**test**  42:*10, 14, 16,
24*  43:5

**testified**  5:*3*  17:9
41:*23*  59:22  60:*12*
63:*15*  68:5  137:*11*
159:*23*  161:*4*  288:9

**testify**  292:*8*

**testifying**  161:7

**testimony**  17:*10*
27:*14, 16*  28:5
32:*16*  33:*16*  34:*3*
40:*3*  41:*24*  42:*20*
47:*19*  56:*3*  59:*15*
60:2  61:*20, 23*
63:*17*  68:7  71:*11,
15*  72:5, *11*  73:*8,
11*  75:2  80:*16*
81:*10*  91:5  93:*12,
14, 16*  110:2
111:*10*  117:*15*

119:*11*  120:*1, 9*
121:*13*  128:*14, 17*
129:5  132:*13, 17*
139:*12*  141:*18*
143:5  153:*14*
159:*16*  169:6
182:*11*  183:*24*
184:*4*  198:6  199:*4*
202:9  211:*23*
215:*19*  227:*20*
228:9  229:22
232:7  236:*10, 13,
14*  239:*24*  284:*17*
288:2  292:*13*

**Thank**  5:*10*  9:*17*
46:*4*  109:*15*
159:*11*  269:*3*
289:22

**thanked**  227:5

**theft**  214:*13*  215:*1*
216:*8*  221:22

**thing**  9:23  15:*14*
24:*16*  26:24  33:5
34:*15*  41:6  42:*23*
54:*14*  58:2  69:22
76:*19*  83:*19, 24*
84:*1*  90:*15*  92:2,
*19*  99:20  100:*12*
124:2  126:5  132:6
147:*12*  151:*11*
153:*10, 11*  166:6
168:*20*  170:*20*
175:8  177:7
203:*10, 24*  209:*3*
214:22  218:*12, 19,
20*  222:9  226:6
231:*17*  232:4
262:*13*  265:6, *9, 12,
23*  280:*18*  289:*1*

**third**  117:*21*
135:*11*  144:*20*
150:*18*  151:*10*
152:*4*  158:5, *17*
159:*4, 15*  172:8

174:2  193:*24*
194:9  205:*1, 13, 17*
241:*12*

**THOMAS**  1:*11, 15*
104:*4*  214:22

**thought**  112:*18*
128:*11*  136:*11*
137:*20*  158:*11*
188:*4, 6, 8, 13, 14*
223:7  247:*21*
288:*12*

**thoughts**  228:*18*

**thousands**  60:*24*
61:*6*

**threat**  200:*24*  201:7

**threatened**  201:9
222:*19*

**threatening**  210:*13,
22*  212:5, *15*
215:*17*  221:*19*
222:*4*

**threats**  200:*17, 19*
201:*1*  221:*14*

**Three**  16:*19, 20*
17:6  33:24  35:7, *8*
95:23  97:*10*
101:*10, 12*  115:5
137:*19*  149:*17*
151:2  157:*13*
159:*10, 14*  189:*17*
276:*4*  280:*23*

**throw**  236:*8*

**thumb**  22:*12, 20*

**Thursday**  2:*1*
290:*11*

**time**  7:*12*  24:*10*
29:2  32:*18*  39:*12*
40:*18, 21*  43:*10*
52:9  53:*18, 24*
54:9  59:*4*  70:7
71:*11*  73:23  76:*3*
78:20  79:2  88:*23*
89:23  94:*17, 21*
98:8, *18*  100:*3*
101:8  105:*18*
109:*11, 14*  115:*20*
119:*15*  122:5, *24*
127:*24*  128:*9*
129:*23*  132:*14*
135:2  138:7
157:*12*  158:*12*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 887 of 1503 PageID #:1278
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

161:*17* 162:*16*
168:*20*, *21* 170:*14*
174:*13*, *18* 175:*5*,
*19* 185:*24* 186:*3*
188:*22* 191:*8*
195:*23* 197:*4*
202:*20*, *21* 203:*4*,
*23* 204:*4*, *7*, *8*
205:*5*, *24* 206:*5*, *7*
215:*7* 217:*13*
220:*23* 227:*8*, *21*
234:*14* 241:*14*
246:*2* 253:*13*
254:*3* 265:*23*
269:*14* 277:*7*
279:*13* 280:*12*
281:*16* 286:*2*, *23*
287:*13* 292:*16*

**timecard** 214:*13*

**times** 5:*18* 130:*12*
185:*18* 204:*1*, *2*, *24*
210:*23* 264:*23*

**TIMS** 1:*4* 163:*24*
187:*4* 232:*20*, *21*
233:*2*, *7* 246:*5*, *17*
247:*3*

**title** 39:*16* 40:*14*
88:*17*, *19* 94:*6*, *12*
96:*2* 281:*21*

**today** 33:*13* 52:*22*
80:*13* 90:*18* 92:*12*
93:*3*, *15* 99:*20*
137:*19* 164:*11*
175:*9* 178:*24*
208:*14* 265:*19*
270:*23* 276:*19*
289:*16*

**today's** 290:*11*

**told** 24:*24* 98:*22*
112:*4* 151:*5*
176:*23* 177:*8*
180:*19* 213:*13*
226:*18* 239:*14*

**Tomasek** 218:*3*

**Tommy** 214:*22*
217:*2*

**tomorrow** 290:*10*

**tool** 288:*9*, *14*

**tools** 288:*5*

**top** 35:*8* 55:*19*
114:*13* 163:*17*
256:*6*

**totally** 8:*8* 18:*14*
121:*20*

**totals** 136:*21*

**tour** 219:*15*, *23*
220:*5*, *8*, *16* 221:*1*, *4*

**tow** 231:*14*

**towed** 232:*13*

**traffic** 236:*6*

**training** 10:*24*
15:*3*, *7* 42:*22* 43:*7*
245:*4* 278:*22*
279:*2*, *8*, *10*, *12*, *16*,
*19*, *22* 280:*2*, *5*, *15*,
*21* 281:*9*, *23* 282:*2*
283:*23* 284:*11*, *19*
286:*3*, *6*, *7*, *8*, *10*, *13*,
*18*, *24* 287:*8*, *18*

**transcript** 292:*10*

**transferred** 17:*21*
18:*16* 19:*2*, *9* 41:*5*,
*7* 42:*3*

**Transportation**
231:*9*

**transporting** 225:*20*

**treat** 180:*19*, *20*
181:*10*, *16*, *21* 183:*9*

**treated** 180:*8*, *11*,
*15* 181:*3*, *7*, *8*
182:*3*, *8* 183:*4*, *13*
200:*10* 243:*1*

**treating** 200:*6*

**tremendous** 143:*12*
179:*1*

**trick** 23:*14* 51:*9*

**tried** 14:*9* 143:*21*
223:*9*

**trouble** 7:*23*

**true** 56:*2* 87:*13*
129:*2* 178:*1*, *5*
216:*4* 270:*23*
292:*13*

**trust** 283:*22* 284:*4*

**truth** 292:*8*

**truthful** 168:*13*, *15*
256:*16*, *19*

**try** 45:*22* 46:*2*
126:*12*, *14*, *19*
127:*8*, *18* 137:*4*

138:*4* 173:*10*
213:*14*, *18*, *20*
227:*4* 252:*10* 278:*7*

**trying** 20:*17* 23:*14*,
*15*, *16* 47:*1* 51:*9*
55:*9* 75:*3* 90:*1*
92:*17* 93:*4* 108:*12*
119:*7* 128:*24*
131:*24* 144:*14*
145:*5*, *23* 147:*20*
161:*12* 167:*21*
170:*1* 178:*19*
188:*12* 203:*22*
236:*8*, *19* 248:*12*

**TSS** 35:*20*, *23* 36:*1*,
*18*, *24* 37:*2*, *4*, *6*, *16*
38:*24* 102:*6*, *11*
105:*2* 117:*7*
140:*18* 147:*24*
148:*22* 149:*8*, *17*,
*21*, *24* 150:*7*, *22*
151:*1*, *3*, *8*, *19*, *23*
152:*9* 153:*4*, *23*
154:*3* 156:*13*, *20*
157:*5* 158:*9*, *18*
159:*11*, *24* 160:*4*,
*14*, *15* 161:*6*, *7*, *18*
176:*20* 178:*23*
244:*8*, *19* 245:*8*, *17*

**tucked** 226:*19*, *20*

**Tuesday** 27:*23*

**tunnel** 38:*9*, *10*

**turned** 247:*15*

**twice** 48:*17*

**Two** 4:*12* 6:*10*
9:*18* 22:*15* 47:*13*
64:*9* 92:*17* 96:*10*
115:*5* 121:*13*
146:*17* 149:*4*
159:*9*, *14* 217:*24*
238:*23* 247:*22*
248:*3* 256:*3*
265:*10* 276:*3*
279:*6* 282:*24*

**type** 14:*6* 150:*6*
160:*17* 165:*20*
166:*3* 225:*23*
227:*16*

**typewriting** 292:*12*

**typically** 150:*23*
157:*20*

**TYRONE** 1:*7*
164:*14* 167:*18*, *24*
243:*22*

**< U >**

**U.S** 115:*9*

**uncomfortable**
207:*21*

**uncommon** 152:*4*
177:*21*

**understand** 6:*8*, *12*
25:*16* 30:*3* 31:*13*
33:*9* 34:*12*, *22*
35:*11* 62:*13* 64:*10*,
*17* 70:*17*, *23* 86:*16*,
*21* 88:*14*, *16* 107:*6*
113:*9* 121:*5*, *12*
123:*15* 124:*10*
126:*4* 127:*12*
132:*11* 135:*20*
147:*15*, *23* 156:*16*,
*18* 157:*15* 160:*3*
161:*14* 170:*5*
174:*4*, *21* 178:*2*
195:*6* 230:*5* 240:*8*
249:*15* 251:*6*, *8*
274:*9* 285:*11*

**understanding**
51:*22* 78:*12*
103:*13* 122:*13*, *23*
140:*8* 144:*20*
181:*3* 188:*15*, *17*,
*18* 198:*24* 212:*10*
245:*22*, *24* 270:*22*
283:*4*, *11* 285:*17*

**understood** 177:*22*
178:*10* 181:*6*

**underwear** 262:*1*

**unduly** 273:*7*

**unethical** 113:*17*

**unfortunately**
264:*22* 265:*17*

**unhappy** 32:*24*

**uniform** 261:*12*, *16*
263:*4*, *10*, *16*, *22*

**uniforms** 262:*21*

**union** 26:*3* 33:*22*
51:*21* 52:*1* 130:*4*
141:*7* 142:*7*, *8*
143:*11* 144:*5*, *12*,
*15* 167:*20* 176:*22*

Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 888 of 1503 PageID #:1279
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

226:*12*  229:*20*
255:*3*

**unit**  17:*16, 17, 20*
18:*17, 21, 24*  19:*9,*
*13, 21*  20:*11, 20, 24*
21:*5, 11, 12, 17, 18,*
*23, 24*  22:*3, 9, 11,*
*18, 24*  23:*10, 23*
24:*1, 2, 5, 7, 8, 13,*
*14, 17*  25:22  26:*2,*
*7, 8, 17, 23*  27:*4*
28:*8, 12, 22*  29:*10,*
*11*  30:*6, 7, 12*  32:*1,*
*19*  33:*11, 17, 18*
34:*1, 5*  35:*21*
36:*18, 19*  37:*7, 16*
39:*14, 24*  41:*3, 4, 9*
50:*4*  62:*14*  64:*19*
81:*11*  92:*5*  94:*5*
95:*1*  101:*21*  102:*1,*
*4, 6, 7, 11, 12, 18, 21*
103:*1, 11, 15, 19, 23*
104:*8, 11, 12, 14, 17,*
*21, 24*  105:*2, 4, 6, 9,*
*11, 13, 18*  106:*1, 4,*
*7, 17*  109:*11*
110:*16*  111:*19*
113:*5, 13, 16, 20, 21,*
*23*  114:*10, 20*
115:*9, 20*  116:*6*
117:*5, 6, 7*  122:*16,*
*21*  123:*1, 4, 11, 14*
124:*4, 6, 11, 13*
128:*19*  129:*3, 20,*
*24*  130:*2*  132:*23*
133:*14*  140:*9, 11,*
*17*  141:*3*  142:*2, 16*
143:*20*  149:*8*
152:*8, 9, 13*  153:*4*
156:*1*  166:*1, 2*
171:*4, 6, 9, 14, 15,*
*16, 17*  172:*6*
176:*21*  179:*19*
182:*4*  183:*13*
185:*11*  189:*2*
192:*6*  193:*13*
205:*2*  209:*12*
219:*14*  225:*9*
226:*8*  228:*5, 24*
234:22  235:*3, 8*
236:*1*  237:*12*

239:*1, 2*  244:*19*
246:*20*  247:*19*
248:*16*  249:*14, 17*
257:*8*  263:*21*
270:*16*

**UNITED**  1:*1*
**units**  21:*9*  25:*5, 6,*
*21*  26:*1, 20*  27:*3,*
*12*  28:*7, 11, 21*
29:*16, 20, 21*  30:*11*
37:*12*  79:*11, 14, 20,*
*24*  80:*5, 14*  103:*14,*
*17, 18*  104:*7*  105:*8*
114:*13*  117:*11, 13*
144:*8*  156:*12*
161:*19*
**unknown**  176:*4, 9*
**unprofessional**
196:*16*
**unsure**  186:*18, 22,*
*23*
**unsurety**  186:*19*
**unsustained**  212:7
**unusual**  8:*6*
125:*20, 24*  126:*2, 6*
134:*14*  228:*2*
**unwritten**  269:*13*
**updates**  217:*3*
**upper**  53:*1*
**upset**  222:*7, 9*
**upsetting**  182:*18*
**upstairs**  37:*23*
39:*5*  145:*21*  161:*8,*
*22, 24*  162:*17*
**use**  55:*9*  125:*6*
126:*23*  183:*8*
199:*7*  279:*10*
**usually**  212:*7*
**utilize**  26:*15*
**utilized**  219:*15*

**< V >**
**vacation**  30:*17*
158:*13*
**vaguely**  42:*23*
**value**  283:*21*
**van**  24:*11*  146:*18,*
*19, 21*
**vans**  146:*6, 15, 17*
**various**  25:*5*  37:*12*
*79:11*  116:*15*

117:*1*  118:*2*
185:*10*  209:*23*
**vary**  172:*17*
**vehicles**  51:*17*
136:*24*
**verbal**  6:*1, 6*  227:*4*
246:*2*
**verbatim**  90:*1*
181:*18*
**verification**  10:*15*
256:*18*
**verify**  54:*19*  216:*7,*
*8*
**VERNELL**  1:*4*
163:*24*  187:*4*
**versus**  33:*17*  34:*5*
51:*23*  121:*9, 10, 23*
122:*16*  138:*13*
140:*23*  146:*21*
174:*10*  175:*17*
176:*7, 13*  196:*12*
**VICTOR**  1:*7*
164:*16*  244:*6, 17*
245:*3*
**video**  21:*14*  25:*17*
31:*1*  34:*17*  35:*12*
41:*14*  43:*14*  47:*9*
218:*6, 10*
**videotape**  218:*11, 20*
**viewed**  226:*10*
**Villa**  257:*18, 21*
258:*5, 6*
**violate**  208:*20*
**violated**  243:*12*
269:*23*
**violation**  207:*17, 22*
208:*6, 15*  209:*21*
219:*2*  226:*7*
248:22  249:*6*
251:*18*
**violence**  223:*4*
**visualing**  187:*22, 24*
**voice**  8:*5, 9*
**volunteered**  197:*8*
**vote**  46:*19, 24*  47:*2,*
*3, 18, 23, 24*  48:*1, 5,*
*20*
**voters**  46:*24*  48:*5,*
*20*
**vs**  1:*9*

**< W >**
**waist**  258:*24*
261:*24*
**wait**  37:*20*  102:*16*
236:*23*
**walk**  33:*12*  38:*12*
160:*5, 15, 18*  162:22
**walked**  222:*23*
**WALKER**  1:*6*
164:*12*  242:*19*
256:*24*  257:*4, 6, 14,*
*17*
**want**  4:*5*  7:*2*  8:*7*
28:*2*  30:*17*  35:*16*
43:*13, 18*  51:*3*
58:*1*  64:*12*  93:*11*
118:*1, 17*  123:*23*
124:*1*  125:*7*
130:*13*  134:*2, 18*
139:*8*  143:*17, 22*
150:*11*  172:*1*
175:*21*  186:*6, 7*
192:*23*  202:*23*
211:*3*  215:*11*
224:*19*  225:*3*
236:*19*  239:*2*
240:*23*  241:*3, 9, 19*
252:*1*  260:*10*
266:*19*  272:*1*
274:*21*  288:*19, 21*
289:*1*  290:*7*
**wanted**  19:*3*  27:22
30:*6, 10, 24*  31:*17*
32:*13*  33:*1*  34:*9*
41:*8*  93:*13*  113:22
124:24  132:*14*
133:*18, 20*  134:*4,*
*10*  138:*12, 19*
140:22  141:*15, 24*
142:*17*  144:*6, 7*
160:22  161:*21*
173:*17, 21*  174:24
175:*3*  178:*13*
219:*6*  221:*23*
255:*13*  269:*2*  278:*1*
**wants**  31:*7*  126:*11*
127:*1*  135:*14*
173:*9*  177:*11*  290:*1*
**warrant**  145:*24*
**warrants**  145:*23*

Gregory Shields  -  8/27/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 1055 Filed: 12/21/20 Page 889 of 1503 PageID #:1280

watch 33:*11*, *14*, *24*
34:*19* 65:*11*, *13*, *20*
66:*2*, *7*, *10* 67:*6*, *10*,
*12* 69:*14* 70:6
71:*1*, *13* 77:7, *14*,
*19*, *23* 78:*1*, *3*, *6*, *9*,
*15* 84:*21* 105:*17*
117:*21*, *22* 118:*8*,
*10*, *23* 119:*3*
125:*22* 126:*3*, *7*, *8*
131:9, *12* 135:*11*,
*12* 144:*20* 149:*4*,
*15* 150:*2*, *3*, *5*, *13*,
*17*, *18* 151:*11*, *18*
152:*4*, *5*, *6* 157:*10*,
*20*, *21*, *24* 158:*1*, *3*,
*6*, *10*, *17* 159:*4*, *15*
162:*7* 172:*8*
189:*17*, *18* 193:*24*
194:*1*, *4*, *9*, *10*, *12*,
*13*, *14*, *17* 205:*1*, *13*,
*17* 241:*13*
watches 118:*21*
119:*23* 120:*17*
149:*17* 150:*1*
151:*2* 157:*15* 172:*9*
way 6:*21* 13:*9*
28:*16* 107:*20*
123:*8* 170:*20*
173:*13* 177:*9*
178:*20* 179:*3*, *4*
213:*6* 233:*5*, *8*
239:*21* 262:*10*
265:*7*
ways 144:*12*
287:*12*
weapon 225:*22*
227:*10*, *16*, *22*
228:*2*, *7*, *11*, *19*
weapons 235:*21*
Webb 192:*23*
193:*6*, *8* 254:*1*, *5*,
*10* 267:*6*, *11*, *17*
268:*18*
Wednesday 27:*23*
week 184:*16* 290:*9*
weekend 265:*7*
weekends 31:*10*
34:*10*
weeks 215:*14*

weird 264:*19*
welcome 223:*13*
well 4:*18* 22:*8*
24:*16* 28:*24* 36:*11*,
*12* 47:*5*, *19* 49:*15*
51:*22* 58:*1* 60:*12*,
*24* 61:*12* 62:*19*
63:*15* 64:*12* 67:*5*
68:*2* 75:*15* 76:*14*
84:*16* 87:*13* 91:*6*,
*11* 92:*16* 94:*2*
98:*9* 101:*17* 107:*3*,
*7* 110:*6* 112:*15*
113:*4*, *11* 114:*15*
115:*18* 116:*17*
117:*1*, *16* 120:*5*
121:*5* 123:*2*, *14*
124:*7*, *9*, *22* 125:*7*
127:*16* 128:*12*
135:*2* 137:*11*, *17*
138:*21*, *24* 139:*16*
153:*2* 154:*1* 159:*5*
166:*12* 167:*18*
172:*2*, *7* 176:*1*
177:*10* 178:*23*
181:*11* 183:*12*, *16*
184:*19* 186:*1*
187:*21* 188:*10*, *18*
191:*24* 193:*6*
196:*4* 197:*10*
198:*1* 201:*17*
202:*12* 203:*19*
207:*13* 208:*4*
209:*22* 211:*1*
213:*5* 214:*2*, *5*
215:*6*, *10*, *22* 216:*6*
219:*9*, *11* 222:*2*
229:*12* 230:*15*
232:*4* 235:*13*
241:*1* 247:*15*
255:*20* 258:*2*
262:*14* 271:*18*
272:*6* 274:*11*, *23*
275:*12*, *20* 276:*2*
278:*20* 280:*15*
281:*8* 283:*1*
288:*20* 289:*15*
went 11:*3* 12:*11*
15:*3* 19:*21* 20:*10*
22:*18* 38:*7*, *13*
42:*22* 49:*15*, *23*

88:*12* 89:*14*, *16*
91:*3* 96:*20* 103:*6*
143:*11* 215:*8*, *10*
219:*14*, *22*, *24*
220:*4*, *9*, *15* 234:*18*
235:*20* 246:*23*
we're 4:*7* 5:*11*
19:*6* 33:*7* 70:*19*
77:*3* 118:*1* 130:*13*
164:*10* 174:*21*
203:*15* 204:*7*
220:*11* 222:*17*
226:*24* 232:*12*
247:*20*, *21* 258:*22*
259:*13* 265:*6*
279:*4* 288:*21*
289:*9*, *10*, *15*, *20*
290:*16*, *22*
West 11:*13* 146:*16*
we've 18:*2* 92:*17*
178:*24* 202:*15*
204:*4*
whereabouts 168:*21*
WHEREOF 293:*1*
WHITE 2:*12* 4:*20*
9:*22* 12:*17*, *24*
17:*10* 25:*12* 27:*15*
28:*13* 29:*5*, *12*, *22*
30:*8*, *22* 31:*19*
32:*6*, *15* 33:*19*
34:*6*, *14* 35:*4*
38:*17* 40:*3* 42:*6*,
*19* 44:*21* 45:*5*, *17*,
*19* 46:*1* 48:*24*
49:*7*, *13* 50:*23*
52:*12*, *17* 53:*3*
55:*3* 56:*23* 59:*9*
60:*7*, *19* 61:*2*, *19*
62:*1*, *11*, *18*, *24*
63:*6*, *17*, *20* 64:*3*, *7*,
*12* 65:*10*, *15*, *21*
66:*3*, *13* 67:*1*, *19*,
*22* 68:*6*, *18* 70:*9*
71:*3*, *14*, *21* 72:*2*, *8*,
*24* 73:*10*, *17* 74:*6*,
*21* 77:*9*, *16* 78:*22*
79:*4* 80:*22* 81:*6*,
*14*, *17* 82:*7*, *21*
85:*7* 89:*9* 90:*6*, *22*
91:*5*, *18* 92:*21*
99:*12*, *22* 101:*13*

104:*15* 105:*20*
106:*23* 107:*13*
108:*24* 109:*5*, *19*
110:*1*, *11*, *18* 111:*2*,
*9*, *24* 112:*6*, *11*
113:*1*, *7*, *24* 115:*14*
117:*2*, *14* 119:*10*,
*24* 120:*8* 121:*4*, *14*
122:*6* 123:*3*
124:*18* 125:*2*, *9*, *16*,
*23* 126:*16*, *21*
127:*11*, *21* 128:*13*
130:*15*, *20*, *23*
132:*5*, *16* 134:*5*, *19*
135:*18*, *20* 139:*11*,
*21* 141:*6*, *17*
148:*24* 152:*14*, *19*
153:*6*, *13* 154:*7*, *11*
155:*1* 156:*15*
161:*12*, *16* 163:*3*
165:*2*, *23* 166:*7*, *16*,
*22* 167:*4* 169:*5*
178:*15* 180:*10*, *21*
181:*5*, *12*, *23*
182:*10* 183:*5*, *19*
184:*3*, *21* 186:*5*, *15*
187:*17* 188:*3*
189:*8*, *12*, *22* 190:*4*,
*23* 191:*3*, *5*, *11*, *17*,
*21* 193:*15* 194:*20*
195:*5* 196:*20*
197:*1*, *14*, *16*, *21*
198:*6* 199:*3*, *13*, *21*
200:*21* 201:*3*, *11*,
*19* 202:*8*, *14* 203:*3*,
*7*, *15*, *19* 204:*3*
206:*21* 207:*24*
208:*8*, *22* 210:*1*
211:*17* 212:*16*
213:*8*, *22* 214:*8*
215:*2*, *18* 216:*10*,
*19* 217:*1*, *7*, *15*
218:*8*, *24* 219:*17*
220:*1*, *15*, *17*, *19*
221:*1*, *2*, *4* 224:*6*,
*11*, *17*, *23* 226:*3*
227:*17* 228:*8*
229:*7*, *15* 230:*1*, *9*
231:*1*, *23* 232:*6*
233:*22* 234:*9*
236:*23* 237:*13*, *19*

Gregory Shields - 8/27/2020
Case: 1:18-cv-05726 Document # 109-5 Filed: 12/21/20 Page 890 of 1503 PageID #:1281
Legrant Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

238:20 239:5, 9, 17, 23 240:6 241:10 242:7, 14 243:3, 10 244:2, 10, 22 245:11, 17 246:11 247:17 248:5 249:1, 23 250:8, 15 251:1, 14 252:20, 24 255:9 257:22 260:10 263:24 264:4, 15, 21 265:17, 21 266:2, 12, 16 270:2 271:17 272:4 273:16, 22 274:7, 14 275:4, 9, 18 276:5, 13 277:3 281:12 283:13 284:16 285:14 288:1, 11, 18, 20 289:8, 14, 17 290:18, 22

**Whitney** 40:16, 17, 20

**wife** 170:6, 11 201:24

**wife's** 169:23 170:21, 24 202:6

**WILFORD** 1:5 164:6 172:21 173:9, 13, 22 174:1, 19 175:15, 24 176:10, 15, 19 177:19, 23 178:3 241:23

**William** 173:9

**WILLIAMS** 1:6 164:8 242:12

**willing** 265:3

**Wilson** 241:22

**windows** 155:5, 7 156:8

**WINSTON** 1:2 163:20 168:8 172:8 187:1 196:19, 24 197:6, 10 201:10, 18, 23 202:2, 5, 13 210:10, 18 211:8, 11 213:13 214:3, 7, 16, 19 215:1 216:3, 8

217:14 218:17 221:10, 14, 18 222:2 223:2 260:3 267:6, 13 268:19, 20 276:23

**Winston's** 210:12, 21 212:5, 15 215:16 253:23

**WITNESS** 3:1 4:1, 8, 12, 16, 18 5:2 12:19 17:23 25:14 28:15 29:7, 14, 24 30:10, 24 31:6, 21 32:8, 18 33:21 34:8, 15 35:6 38:19 41:17 42:8, 22 44:24 45:8 49:2, 8, 15 51:1 52:14, 19 53:5 55:4 57:1 59:11 60:9, 21 61:4, 21 62:2, 13, 19 63:2, 7, 21 64:4 65:11, 22 66:4, 14 67:2, 23 68:8, 19 70:10 71:4, 16, 22 72:3, 9 73:1, 11, 18 74:7, 22 77:17 78:23 79:5 80:24 81:8, 18 82:8, 23 85:10 90:7, 23 91:6, 19 99:14, 23 101:14 104:16 105:21 106:24 107:14 109:1, 6, 20 110:3, 12, 19 111:3 112:1, 7, 12 113:2 114:1 115:15 117:3, 16 119:13 121:5, 15 123:4 124:19 125:10, 17, 24 126:17, 22 127:12, 22 128:15 130:16, 21 132:6, 18 134:6, 20 135:19, 21 139:14 141:7, 19 149:2 152:17, 20 153:7, 16 154:8, 12 156:16 161:17 163:5 165:3, 24 166:8, 17, 23 167:5

169:7 178:16 180:11, 22 181:6, 13 182:12 183:6 186:6 187:18 188:4 189:13, 23 190:5, 24 191:6 193:17 194:21 195:6 196:21 197:2, 17 199:22 201:13 202:10 206:22 208:1, 10 210:2 211:18 212:17 213:9, 23 214:9 215:3, 20 216:11, 20 217:2, 8 218:9 219:1, 18 220:3, 18 221:3 224:19 227:18 228:10 229:9 230:2, 10 232:1 234:10 237:15, 21 238:21 239:6, 10, 18 240:1 241:12 242:9, 16 243:5, 12 244:4 245:13 247:19 248:6 249:24 250:10, 17 251:2, 16 253:1 255:10 257:24 264:1, 6 266:17 273:17, 23 274:15 275:6, 11, 20 276:6, 15 277:4 283:15 284:18 285:15 288:12 290:24 292:7 293:1

**witnessed** 266:22 267:1, 4, 7, 11, 18 268:4, 10, 18

**women** 258:20

**word** 112:17 114:12 116:8 125:6 127:12 174:20 222:9 248:14

**words** 17:16 20:14 51:21 55:9

**work** 14:5, 10, 18 15:12, 19 19:5 20:19 21:24 22:3 23:17 24:2, 14, 20

25:10, 21 26:1 28:6, 21 29:20 30:6, 11 31:1, 18 33:1 34:4, 9 38:24 39:3 43:23 44:2 45:14 46:22 48:10, 12, 14, 17 56:21 101:19 117:17 118:11, 12, 17 125:15, 21 127:9, 13, 17, 19 128:2, 7 133:18, 20 134:4, 9, 10, 17 135:23 138:8, 9, 12, 18, 19 140:22 141:3, 15, 23 142:20 145:24 149:15 153:23 158:10 162:17 164:20 165:15, 18, 20, 21 166:3, 5, 8, 12, 14, 19 167:3, 14, 17 171:24 172:19, 22 173:2, 9, 17, 22 174:10, 17, 24 175:3, 11, 16 176:12, 20 178:13, 22 180:2 192:15 209:23 215:4 231:10 234:5 235:13 236:11 237:4, 7, 9, 11 238:1, 8, 12, 17, 24 239:2 240:3 241:16 244:1, 21 262:5 273:9 275:15 277:4, 5 287:22

**worked** 12:15, 21 14:8 16:5 17:19 22:9, 10, 17, 24 23:10, 22 24:4, 7, 8, 19 25:4 28:4, 10 29:3, 16 36:17 39:4 40:20, 23 43:20 46:14 47:22 48:8, 18 66:1, 11 69:2, 6, 10, 14, 18 71:7, 19 72:6, 14 87:9 92:9 94:4 107:8 114:20 131:15 133:24

Gregory Shields  -  8/27/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 891 of 1503 PageID #:1282
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

136:*3*  140:*10*
142:*16, 24*  143:*21*
144:*11*  150:*7, 21*
152:*3, 8, 13*  153:*3*
162:*10, 12, 14*
165:*11, 22*  166:2
172:8  177:*20*
187:*22*  191:*10, 24*
193:*24*  194:*4, 9, 10,
12, 14*  207:2
219:*12*  231:*7, 8*
237:*16, 24*  241:*12*
243:*23*  286:*18*
**worker**  127:*19*
168:*3*
**workers**  125:8
234:8
**workforce**  113:*12,
22*  125:*1*
**working**  13:22, *24*
14:*6, 7, 8, 11, 14*
16:*16*  22:*19*  28:*1*
32:*24*  33:*17*  34:5
36:7  37:*3*  39:*24*
46:*11*  47:*18*  60:*18*
62:*14*  116:*23*
117:*4, 5, 6, 7, 8, 19,
20*  118:*17, 24*
120:*21, 23*  126:*3, 6,
8*  127:*14*  144:*16*
153:*17*  157:*21*
162:6  174:*1, 8*
179:*18, 22*  193:*11*
200:*20*  236:*20*
243:*24*  250:*23*
**workload**  133:*9*
144:*21*  145:2
158:*20, 21*  177:*18*
210:2  241:*1*
**workplace**  114:*17*
115:*12*  179:*14*
196:8  200:7  223:*5,
13*  273:*4, 14*
274:*13*  277:*10, 12,
14, 19, 23*  278:*13,
15, 19*  280:*6, 17*
281:*6, 11*  285:9
286:*5, 15*  287:*5, 12,
24*  288:8
**work-related**  210:*10*

**works**  289:*24*
290:*14*
**worried**  160:*10*
**worry**  235:*3*
**wow**  36:2  152:*21*
170:*10*  178:*23*
**write**  54:6  181:*13*
207:6, *14*  209:*20*
285:*21*
**write-up**  207:*19*
**write-ups**  217:*3*
**writing**  180:*17*
**written**  116:*9*
246:*1*  249:*7*
251:*18*  269:*13*
275:2
**wrong**  151:*13*
252:*9*
**wrote**  30:*16*

**< Y >**
**Yeah**  4:*12, 13, 20*
5:*8, 14, 24*  7:*14*
8:*3*  9:22  10:*17*
12:*4*  15:*11*  18:8
21:*18*  23:*14*  25:*3,
8*  26:*18*  31:5
40:*15*  41:*16, 24*
42:*16*  44:*10*  52:*4*
58:*3*  65:6  93:*4*
108:*12*  118:*15*
122:6, *18*  123:*10,
21*  124:*1*  125:5, *24*
126:8, *17*  134:8
135:*20, 21*  139:*14*
142:7  148:8  150:*3*
152:*19*  158:*23*
159:*17, 21*  163:*11*
166:8  172:*11*
174:*21*  175:*18*
176:*14*  186:*23*
187:*18*  192:*4, 11*
195:6  196:*17*
203:*3*  209:*1, 3*
217:*21*  218:*9, 19*
224:*15*  228:*3*
230:2  239:*14*
241:*24*  253:*1*
262:*17*  264:*1, 4, 6,
14, 15*  265:*14, 17*
266:8  268:*20*

272:*3, 23*  280:*13,
14*  282:*21*  287:7
288:5  289:*8, 17, 18*
290:2, *4, 12*
**year**  22:*13*  23:*3,
11, 20*  24:6, *22*
25:*1*  39:*23*  48:7
50:*21*  67:*10*  95:*20*
96:6  97:8  157:*16*
280:*22*  282:*13*
**years**  16:*19, 20*
17:6  20:*21*  22:*8,
15, 20, 22, 23*  33:5
34:*19*  44:*15*  45:*14*
48:*9*  50:8  54:*20*
59:*11*  71:7  72:6
80:*19*  84:9  87:*9,
10*  92:22  93:*21*
94:7  95:*8, 10, 11,
14, 17, 18, 24*  96:*10*
97:*2, 10*  101:*10, 12*
105:*16*  106:*13*
120:*20, 22*  153:*3,
18*  154:*14*  155:*22,
23, 24*  168:6
174:*14, 15*  175:2,
19*  177:*21*  187:*23*
189:*11, 20*  190:*12,
16, 22*  191:*3, 10*
192:*7, 8, 10*  198:9
210:*20*  219:*11*
227:7  236:*3*
259:*15*  280:*23*
**yelled**  253:*24*
**yesterday**  133:*24*
**young**  170:*11*

**< Z >**
**zero**  227:*3*
**Zoom**  2:*1*  5:*3*
264:*20*  266:*10*

# Exhibit I



# Transcript of LeGrain Winston

**Date:** August 28, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of LeGrain Winston

1 (1 to 4)

Conducted on August 28, 2020

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2        NORTHERN DISTRICT OF ILLINOIS
3             EASTERN DIVISION
4    ---------------------------x
5    LeGRAIN WINSTON, et al.,    :
6             Plaintiffs,       :
7         v.             :Case No. 18-cv-05726
8    SHERIFF OF COOK COUNTY      :
9    THOMAS J. DART, et al.,     :
10            Defendants.   :
11   ---------------------------x
12
13       Deposition of LeGRAIN WINSTON
14           Conducted Virtually
15        Friday, August 28, 2020
16            10:07 a.m. CST
17
18
19
20
21
22   Job No.:  315905
23   Pages:  1 - 294
24   Reported by:  Paula M. Quetsch, CSR, RPR
```

**Page 2**

```
1        Deposition of LeGRAIN WINSTON, held virtually:
2
3
4
5
6
7        Pursuant to notice before Paula M. Quetsch, a
8    Certified Shorthand Reporter, Registered Professional
9    Reporter, and a Notary Public in and for the State
10   of Illinois.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
1            A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFFS:
3        KELLY A. KRAUCHUN, ESQUIRE
4        THE HERBERT LAW FIRM
5        206 South Jefferson Street
6        Suite 100
7        Chicago, Illinois 60661
8        (312) 655-7660
9
10   ON BEHALF OF THE DEFENDANTS:
11       ETHAN E. WHITE, ESQUIRE
12       EMERY LAW
13       2021 Midwest Road
14       Suite 200
15       Oak Brook, Illinois 60523
16       (630) 984-0339
17
18   ON BEHALF OF THE DEFENDANTS:
19       JUSTIN L. LEINENWEBER, ESQUIRE
20       LEINENWEBER, BARONI & DAFFADA, LLC
21       120 North LaSalle Street
22       Suite 2000
23       Chicago, Illinois 60602
24       (866) 786-3705
```

**Page 4**

```
1    ALSO PRESENT:
2        GABRIEL ELI, A/V Technician
3            C O N T E N T S
4    EXAMINATION OF LeGRAIN WINSTON          PAGE
5        By Mr. Leinenweber                   6
6        By Ms. Krauchun                    265
7        By Mr. Leinenweber                 283
8
9            E X H I B I T S
10           (Attached to transcript.)
11
12   WINSTON DEPOSITION EXHIBITS            PAGE
13
14   Exhibit 1  Complaint                   87
15   Exhibit 2  Plaintiff LeGrain Winston's  115
16           Objections and Answers to
17           Defendant Gregory Shields'
18           First Set of Interrogatories
19   Exhibit 3  August 3, 2015, Memo, P000001  119
20   Exhibit 4  August 19, 2015, Memo, P000002  120
21   Exhibit 5  EEOC Charge of Discrimination  122
22   Exhibit 6  P000004                    191
23
24
```

Transcript of LeGrain Winston
Conducted on August 28, 2020

2 (5 to 8)

---

**5**

1     E X H I B I T S   C O N T I N U E D

2

3  Exhibit 7  Plaintiff LeGrain Winston's        210

4            Objections and Answers to

5            Defendant Sheriff of Cook

6            County Thomas J. Dart's First

7            Set of Interrogatories

8  Exhibit 8  P000012, 9/21/2015 Email           193

9  Exhibit 9  P000014                            194

10 Exhibit 10 P000015 through 21                 195

11 Exhibit 11 P000022 through 29                 206

12 Exhibit 12 WINSTON_CCS0011522 and 523         196

13 Exhibit 13 WINSTON_CCS0011524                 197

14 Exhibit 14 WINSTON_CCS0011525                 198

15 Exhibit 15 WINSTON_CCS0011529 through 30      198

16 Exhibit 16 WINSTON_CCS0011535                 200

17 Exhibit 17 WINSTON_CCS0011646 through 47      201

18 Exhibit 18 WINSTON_CCS0017464 through 66      202

19 Exhibit 19 WINSTON_CCS0017569 through 71      204

20

21

22

23

24

---

**6**

1           P R O C E E D I N G S

2      (Witness sworn.)

3           LeGRAIN WINSTON,

4  having been duly sworn, testified as follows:

5      EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6  BY MR. LEINENWEBER:

7      Q  Good morning, Mr. Winston.  My name is

8  Justin Leinenweber.  I'm an attorney for the

9  defendants in this case along with my cocounsel

10 Ethan white.  We hope -- as Gabriel just said,

11 hope this goes smoothly today.  We have had some

12 technical issues in the past, but I think we're

13 getting this down to a science a little bit, so

14 hopefully everything will run smoothly today and

15 we'll get you in and out of here.  All right?

16     A  All right.

17     Q  So I want to start with some basic ground

18 rules for the deposition.  Have you ever had your

19 deposition taken before?

20     A  Yes, I have.

21     Q  You have.  Okay.  When was that?

22     A  Just work-related.  I don't have a

23 specific date.

24     Q  Was it within the last five years?

---

**7**

1      A  Possibly so.

2      Q  Okay.

3      A  Possibly so, yes.

4      Q  And when you say it was work-related, do

5  you mean it was like a detainee lawsuit or

6  something like that?

7      A  Yes.  A statement of detainee or

8  work-related issues.

9      Q  Okay.  Work-related issues in the sense of

10 an employee suing the Sheriff's Office?

11     A  Correct.

12     Q  Or a detainee?

13     A  Correct, correct.

14     Q  Okay.  Who was that employee?

15     A  It's not an employee.  It was a detainee --

16     Q  Okay.

17     A  -- suing the Sheriff's Department.

18     Q  Okay.  Well, this will be sort of the

19 pandemic version of that.

20     A  Okay.

21     Q  So right now we're doing these via Zoom,

22 and there's a few ground rules that still apply.

23 First and foremost is when I'm asking a question,

24 even though you may anticipate where I'm going

---

**8**

1  with it, please let me finish my question before

2  you answer it.  Okay?

3      A  Okay.

4      Q  That ensures that Paula can take down a

5  good and clean record of what I'm saying, and what

6  you're saying, and what your attorney is saying.

7      A  All right.

8      Q  There will be times where your attorney

9  inserts an objection to a question I ask.  When

10 she does that, unless she instructs you not to

11 answer the question, you should answer the

12 question.  Okay?

13     A  Okay.

14     Q  We can only accept oral answers.  So you

15 have to verbally respond.  You can't shake your

16 head or nod your head or anything like that; okay?

17     A  I understand.

18     Q  We are happy to take a break.  We'll take

19 several breaks throughout the day today.  The only

20 thing that I ask that is if there's a question

21 pending you answer the question before we take a

22 break.  Okay?

23     A  Okay.  Fine.

24     Q  If you do not understand a question I ask,

---

**Page 9**

1  which I'm sure will happen today, please just
2  indicate that and ask me to clarify it. I'm happy
3  to do so. If you do answer a question, we're all
4  going to assume that you understood the question.
5  Okay?
6     A  Got you.
7     Q  Is there any reason you can't give full,
8  complete, and accurate testimony today?
9     A  No.
10    Q  Is there anyone with you in the room there
11 today?
12    A  No -- well, my wife was initially to help
13 me set it up.
14    Q  Okay. But she's no longer in the room?
15    A  She's in the other room.
16    Q  Okay. And do you have any notes in front
17 of you today or any documents in front of you?
18    A  No. Just a -- just a note pad. Just a
19 regular note pad.
20    Q  Like a blank note pad?
21    A  A blank note pad, yeah.
22    Q  Got it. And you understand that no one
23 can provide you with answers today; right?
24    A  Okay. You broke up. That last little

---

**Page 10**

1  part, it was a little -- I didn't hear you.
2     Q  Sure. Sorry; I'll say it again. You
3  understand that no one can provide you with
4  answers today; right?
5     A  Yes.
6     Q  Okay. Let's see. And you're not going to
7  look at your phone or text messages or anything
8  like that to provide you with information for the
9  dep today; right?
10    A  No.
11    Q  Did you do anything to prepare for your
12 deposition today?
13    A  Just went over my interrogatories.
14    Q  Okay.
15    A  Yeah.
16    Q  Anything else?
17    A  No. Got a good night's sleep.
18    Q  Okay. Did you meet with your attorney
19 at all?
20    A  I spoke to my attorney.
21    Q  Okay. For about how long did you speak
22 with your attorney?
23    A  Roughly probably about a half hour.
24    Q  Okay. And when was that?

---

**Page 11**

1     A  Some yesterday.
2     Q  Okay.
3     A  Yes.
4     Q  Did you talk with anyone else besides your
5  attorney about your deposition today?
6     A  No.
7     Q  Okay.
8     A  No.
9     Q  Presumably your wife knows that's what is
10 going on.
11    A  Yes, yes, for technical support.
12    Q  Sure.
13    A  Yes.
14    Q  Okay. And have you spoken with any of the
15 other plaintiffs about your deposition today?
16    A  No details, just that I had one.
17    Q  Okay. Who was that that you spoke with?
18    A  Just in passing I spoke to my partner
19 Cecil Williams.
20    Q  Okay. Anyone else?
21    A  No, no.
22    Q  When was that conversation?
23    A  It was just in the locker room changing
24 clothes.

---

**Page 12**

1     Q  When was that, I said.
2     A  Probably Tuesday.
3     Q  Tuesday?
4     A  Tuesday or Wednesday.
5     Q  Okay. What did Mr. Williams say to you?
6     A  He was taking off work.
7     Q  Sorry; what did he say to you about your
8  deposition?
9     A  He didn't ask me about my deposition.
10    Q  What did you say to him about the dep?
11    A  That I had a deposition Friday.
12    Q  Okay. All right. Anything else?
13    A  That was it.
14    Q  Okay.
15    A  Yep.
16    Q  And the only documents you reviewed are
17 your interrogatory responses?
18    A  Correct.
19    Q  Where do you live, Mr. Winston?
20    A  12003 South Princeton and that's Chicago
21 60628.
22    Q  Okay. And what's your highest level of
23 education?
24    A  I went up to my sophomore year in school,

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

13

1  Ball State University.
2      Q   Okay.  So you have a high school degree?
3      A   Yes, I do.
4      Q   Okay.  And then you have some college?
5      A   I have some college, correct.
6      Q   Okay.  And I know you said you're married,
7  you have a wife.  Do you have any kids?
8      A   I have three children.
9      Q   Okay.
10     A   Well, three adults.
11     Q   Three adults?
12     A   Now.
13     Q   And you work for the Cook County Sheriff's
14 Office; right?
15     A   Correct.
16     Q   And when did you start working in the Cook
17 County Sheriff's Office?
18     A   In 1991.
19     Q   Okay.
20     A   January 25th, 1991.
21     Q   And that's all the way up through the
22 present you've worked at the Sheriff's Office?
23     A   Correct, correct.
24     Q   What year did you graduate from high school?

---

14

1      A   1988.
2      Q   And between 1988 and 1991, where did you
3  work, if anywhere?
4      A   Well, I went to school after that.  I went
5  to Ball State.
6      Q   Okay.  So you did Ball State, and then did
7  you work anywhere else before starting at the
8  Sheriff's Office?
9      A   Part-time jobs.  UPS, I worked at UPS a
10 little bit.  Pretty much that's -- Munchie's Pizza
11 Factory at Ball State University, if you want to
12 call that working.  I worked that such a short
13 period of time.  I've pretty much only worked at
14 the Sheriff's Department my adult life.
15     Q   Why did you not complete your degree at
16 Ball State?
17     A   Why did I not complete my degree?
18     Q   Right.
19     A   Basically financial reasons.
20     Q   Let's see.  So where do you currently work
21 within the Sheriff's Office?
22     A   In EM.
23     Q   You're in EM.  Okay?
24     A   Yep.

---

15

1      Q   And how long have you -- when did you
2  start in EM?
3      A   I started in EM in 1994.
4      Q   Okay.  And so between 1991 when you joined
5  the Sheriff's Office and 1994 when you joined the
6  EM unit, where did you work?
7      A   I worked Division 9 corrections from '93 to
8  '94 I was on a body guard detail.  I was assigned
9  on a body guard detail to the budget chairman for
10 the City of Chicago, but I was still working with
11 the Sheriff's Department.
12     Q   Sure.  So from '91 to '93 you were in
13 Division 9?
14     A   Correct.
15     Q   And were you a correctional officer?
16     A   Absolutely, yes.
17     Q   And 1993 to 1994 you were a body guard for
18 who was it again?
19     A   Lemuel Austin.  I was a body guard.  He
20 was the budget chairman for the City of Chicago.
21     Q   Got it.  Okay.  So then in 1994 you come
22 to EM; right?
23     A   Yes.
24     Q   How -- how did it come about that you

---

16

1  moved into the EM unit after serving in this body
2  guard position?
3      A   When I left -- when I left the body guard
4  detail, they asked me where did I want to be
5  placed, where did I want to go back to.  I said --
6  I gave out three to four answers that I possibly
7  could go to, and I applied and I went to EM, was
8  accepted, yes.
9      Q   And what were the three to four places
10 that you wanted to go?
11     A   Well, original place where I was -- where
12 I left was -- which was Division 9.  I was so
13 young it really didn't matter.  I was just happy
14 to have a job.  And Division 9 where I came from,
15 and, of course, I thought about going to the
16 sheriff's police.
17     Q   So Division 9, sheriff's police, EM?
18     A   And EM and that was it.
19     Q   And that was it?
20     A   Yep.
21     Q   Got it.  And do you know who decided to
22 put you in EM in 1994?
23     A   No.  I'm not sure.
24     Q   Okay.

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

5 (17 to 20)

17

1    A  When I turned my badge -- when I changed
2  my credentials, I was assigned over there when I
3  went back.
4    Q  Okay.  And what was your position within
5  EM in 1994?
6    A  Investigator.
7    Q  And what is your position today in EM?
8    A  Investigator.
9    Q  Okay.  And did it change at any time
10 between 1994 and present?
11   A  No.
12   Q  Okay.  What are the duties of an
13 investigator in EM, generally speaking?
14   A  Several.  We patrol.  The main purpose is
15 patrol detainees that are being placed on
16 electronic monitoring, the bracelet in various
17 areas in Cook County.
18   Q  Okay.  Anything else?
19   A  Basically, we'll go and if say, for
20 instance, they are not in compliance, their bands
21 are off or they've broken off of EM, we'll go to
22 the residence to find out what happened.
23   Q  And you might reincarcerate them if that
24 happens?

18

1    A  If they don't have a valid reason for
2  being, you know, away from the home for a certain
3  period of time, yes, it's possible.  Or if there's
4  a technical problem, we'll fix it.
5    Q  Okay.  What -- we kind of touched on this
6  a little bit, and you mentioned patrol, but
7  generally speaking, what are the different
8  assignments within EM that an investigator may be
9  tasked with performing?
10   A  Well, it's changed over the years because
11 the unit has divided and changed to different
12 areas, but your basic tasks, like I just
13 previously said, is to patrol the areas.  You
14 know, you're in different parts of Cook County,
15 north, south.  It's broken down into zones, and
16 they assign you a zone.  That's the zone that
17 you'll be working that day or whatever.
18   Q  Okay.  In addition to patrol, what other
19 assignments are there within EM?
20   A  Basically, back then it was deliveries.
21 You had TSS; you had -- you had work/school
22 program.  You had a lot of different departments.
23   Q  Okay.  And you said "back then."  What are
24 you referring to -- when you are referring to?

19

1    A  You used to bid for those positions.
2    Q  Okay.
3    A  They used to be biddable positions.
4    Q  Okay.  So you used to bid for positions.
5  Some of the positions were patrol, TSS, work/school?
6    A  Yes, that's one, yes.
7    Q  And I think you said another one.  Did I
8  miss one?
9    A  They would have investigators assigned to
10 the office.
11   Q  In the office?
12   A  That's correct.
13   Q  Any other assignments within EM that --
14 let's talk about when you were able to bid for a
15 second.  Were there any other assignments within
16 EM that you were able -- that investigators were
17 able to bid for?
18   A  When it was a biddable position, those
19 were it.
20   Q  Okay.
21   A  The ones I mentioned, yes.
22   Q  Okay.  So we had four.  We had patrol,
23 TSS, work/school, and office?
24   A  Yes.

20

1    Q  When -- were you able to bid for assignments
2  when you joined EM in 1994?
3    A  1994?  I would say yes.  Yes, I would
4  say yes.
5    Q  Okay.  And at some point that changed --
6  right? -- you were no longer able to bid for
7  assignments?
8    A  Yes, it did.
9    Q  When did that change?
10   A  I'm not quite sure when it actually
11 changed.
12   Q  Okay.  Do you have an approximate year
13 when it changed?
14   A  It probably changed before the --
15 before 2000.
16   Q  Okay.
17   A  I'm not quite sure.  I always was in patrol.
18   Q  So at some point, possibly the year 2000,
19 it changed and you were no longer able to bid for
20 these assignments within EM?
21   A  Yes, it did.
22   Q  Okay.  And after you were no longer able
23 to bid for assignments, how was it determined
24 which assignment you would have?

Transcript of LeGrain Winston
Conducted on August 28, 2020

6 (21 to 24)

21

1    A  It was determined by the supervisors.
2    Q  Okay.  And how do you know that?
3    A  Well, they would do the rosters.
4    Q  Okay.  So yeah, let me sort of ask it in a
5  different way then.  When -- how would you find
6  out on a given day what your assignment would be?
7    A  It would be -- it would be on what we call
8  our hump sheet.  It would be on the lineup they
9  would give you at the beginning of -- beginning of
10  the shift.
11    Q  So you called it a hump sheet or lineup --
12    A  Yes.
13    Q  -- or roster.  Those are all the same
14  things?
15    A  Yeah, they're all the same things.
16    Q  I just want to remind you just so we don't
17  make Paula's day miserable to be careful not to
18  talk over me even though you're anticipating where
19  I'm going with this.
20    A  Okay.
21    Q  Thanks.
22      So your understanding is that supervisors
23  would create a lineup, and that would indicate
24  where investigators would be assigned for that day?

22

1    A  Yes, correct.
2    Q  Was that done on a daily basis, a weekly
3  basis, a monthly basis?
4    A  I'm assuming a daily.  I don't know how
5  they prepare for their -- their day, but I'm
6  pretty sure they did this daily.
7    Q  What I was getting at is, when you
8  physically come to this lineup, when you come to
9  work and look at the lineup it may be like the
10  pizza place where you have your schedule for the
11  next two weeks, or was it you come in Tuesday and
12  this is your assignment on Tuesday?
13    A  It's essentially if I go on a Monday, it's
14  where they place me on a Monday.
15    Q  Got it.  That answers my question.  Thanks.
16      And I think you indicated that you -- you
17  work in patrol.  You've only worked in patrol; is
18  that correct?
19    A  Pretty much, yes.
20    Q  Okay.  How does it come -- strike that.
21      Have you ever worked in TSS?
22    A  Yes.
23    Q  Okay.  Have you ever worked in what you
24  called work/school?

23

1    A  A few times, yes.
2    Q  Okay.  And then what about the office?
3  Have you ever worked in the office?
4    A  A few times, yes.
5    Q  Okay.  So predominantly you've worked
6  patrol, but you have done a little bit of TSS,
7  work/school, and office it sounds like.
8    A  So few, yeah.  I've done quite -- well, a
9  few days here and there, yes.
10    Q  So it's fair to say, though, that your
11  predominant assignment within EM since 1994 has
12  been to patrol?
13    A  That's correct.
14    Q  And back between 1994 and 2000 when you
15  were able to bid, did you bid -- did you, in fact,
16  bid for the patrol position -- sorry; strike that.
17      Back between 1994 and 2000 when you were
18  able to bid, did you, in fact, bid for the patrol
19  assignment?
20    A  I bid for patrol.
21    Q  Okay.  Did you ever bid for TSS?
22    A  No.
23    Q  Did you ever bid for work/school?
24    A  No.

24

1    Q  Did you ever bid for office?
2    A  No.
3    Q  Is it fair to say that you liked patrol
4  the best of the four different types of
5  assignments within EM?
6    A  I was good at it.
7    Q  You were good at patrol.  Did you enjoy
8  it?  Do you enjoy it?
9    A  Yes, I did.
10    Q  Okay.  And the limited work you had in
11  TSS, did you think you were good at that?
12    A  Well, I think I'm good at anything I do at
13  work, yes.  I'm a professional.
14    Q  TSS, work/school, office, those are
15  pretty -- well, strike that.
16      What do you think it is that makes you
17  good at patrol?
18    A  I'm good at -- I'm good at communicating
19  with the detainees; I'm good at dealing with the
20  people in the residences.  I'm very, very good at
21  my directions on how to get around Cook County.
22    Q  All right.  Anything else?
23    A  No.  That's it.
24    Q  Okay.  And you said in your limited

Transcript of LeGrain Winston
Conducted on August 28, 2020

25
1  experience in TSS you do think you were good at
2  that position?
3      A  Yes.
4      Q  Okay.  What about work/school?  Did you
5  think you were good at that one, as well?
6      A  Yes.
7      Q  What about the office?  Did you think you
8  were good at that, as well?
9      A  Yes.
10     Q  And if you were good at those other
11 positions, is there any reason why you didn't bid
12 for any of them when you were able to bid?
13     A  Because I wanted to be on patrol.
14     Q  Because you wanted to be on patrol?
15     A  Correct.
16     Q  Why did you want to be on patrol?
17     A  Well, the hours fit the time as far as my
18 family life.
19     Q  Okay.  It might help then to -- let's talk
20 about the hours for a second.  My understanding is
21 there's a first watch, a second watch, and a third
22 watch.  Is that right?
23     A  Yeah.  As of now, yes, correct.
24     Q  Okay.  And typically have you been

26
1  assigned to the same watch the entire time or no?
2      A  Yes, I have.
3      Q  Okay.  And which watch is that?
4      A  Third watch.
5      Q  And third watch is approximately 4:00 p.m.
6  in the afternoon to 11:00, or 3:00 to 11:00,
7  something like that?
8      A  It was originally 4:00 to 12:00.  It's now
9  3:00 to 11:00.
10     Q  So 3:00 p.m. to 11:00 p.m.; it used to be
11 4:00 p.m. to 12:00 a.m.?
12     A  Yes.  At one point it was 6:00 to 2:00 for
13 a short period of time.
14     Q  Got it.  So those late afternoon, early
15 evening hours worked best for you and your family?
16     A  Correct.
17     Q  And would you have been able to work those
18 hours in TSS?
19     A  Would I have been -- yes, yes.
20     Q  Okay.  And what about work/school?
21     A  Yes.
22     Q  And what about the office?
23     A  Yes.
24     Q  Okay.  So other than patrol fitting your

27
1  hours, is there any reason why you didn't bid for
2  TSS, work/school, or office?
3      A  Other than it fitting my schedule?
4      Q  Correct.
5      A  They were not desirable -- certain positions
6  weren't desirable for me.
7      Q  Okay.  And what do you mean by "were not
8  desirable" for you?
9      A  They weren't the -- they weren't what I
10 went to EM for.  I went to EM to be on patrol.
11     Q  Okay.  So you saw your role as being on
12 patrol; that was your best role that you felt you
13 could serve within the Sheriff's Office?
14     A  Correct.
15     Q  Are you aware of whether or not the
16 Sheriff's Office has any kind of a policy on
17 discrimination, harassment, or retaliation?
18     A  Yes, they do.
19     Q  Okay.  And what's your understanding of
20 that policy?
21     A  My understanding, you shouldn't have any
22 harassment or discrimination within the workplace.
23     Q  Or retaliation; right?
24     A  Or retaliation in the workplace, correct.

28
1      Q  And where is that policy set forth?
2      A  Excuse me?
3      Q  Where is that policy set forth or laid out?
4      A  Right now it's in our Lexipol app on our
5  computer, the Lexipol policies.
6      Q  Okay.  So that's a computer program that
7  has policies which you can access and review?
8      A  As of now, correct.  Before, general orders.
9      Q  Okay.  And general orders were generally
10 acceptable -- sorry -- strike that.
11        General orders were accessible via computer
12 or hard copy?
13     A  Correct.
14     Q  What is your understanding of what you're
15 supposed to do if you witness discrimination,
16 harassment, or retaliation?
17     A  You're supposed to contact your supervisor.
18     Q  Okay.  And what else?
19     A  Your supervisor is supposed to take it
20 from there.
21     Q  So you contact your supervisor and tell
22 them, "I've seen X" or "I've witnessed X," and
23 then your supervisor takes it from there?
24     A  Correct.

29

1     Q  What if your supervisor is the person that
2  you saw committing the discrimination, harassment,
3  or retaliation?  Is there anything different that
4  you're supposed to do?
5     **A  Well, we're a military-based unit, so then**
6  **you're supposed to go to the next person in the**
7  **chain of command.**
8     Q  Okay.  And so you go to the next up in the
9  chain of command, and you report that, "I saw X
10  happen"?
11     **A  Correct.**
12     Q  And that's just done?  You're out at that
13  point because you reported it, or are there any
14  other continuing obligations?
15     **A  If your -- if they are able to investigate**
16  **that issue, then you allow them to investigate it.**
17     Q  "You allow them to investigate"?  What do
18  you mean by that?
19     **A  Well, they -- they -- I'm not a supervisor,**
20  **but as a supervisor they're supposed to take that**
21  **and file the proper paperwork as far as with that**
22  **and take that to the next level.**
23     Q  And who are the supervisors supposed to
24  file the paperwork with?

30

1     **A  Either -- the next person up in the chain**
2  **of command.**
3     Q  Anyone else?
4     **A  It depends on the -- the complaint itself,**
5  **you know.  If that next person in the chain of**
6  **command can't answer it, it's supposed to go to OPR.**
7     Q  OPR, and that's -- what does OPR stand for?
8     **A  Office of Professional Review.**
9     Q  Okay.  And did you have the ability as an
10  investigator if you witness discrimination,
11  harassment, or retaliation to go to OPR and
12  complain to them?
13     **A  Could you repeat that again?  You kind of**
14  **froze on screen a little bit.**
15     Q  Okay.  Yeah, no problem.  And that will
16  happen periodically, I'm sure.
17     **A  Okay.  That's okay.**
18     Q  Did you have -- as an investigator who
19  would possibly witness discrimination, harassment,
20  or retaliation, did you have the ability to go to
21  OPR to make a complaint that you had witnessed
22  discrimination, harassment, or retaliation?
23     **A  Yes.**
24     Q  Could you go to human resources to make

31

1  that kind of complaint, as well?
2     **A  No.**
3     Q  You couldn't?
4     **A  No.**
5     Q  And what's your understanding of why you
6  were not able to go to HR to make that kind of
7  complaint?
8     **A  Well, generally, that's not our chain of**
9  **command generally.  HR generally comes to you, I**
10  **guess, if the complaint is in OPR, and they try to**
11  **deal with the complaint.**
12     Q  Okay.  So is it fair to say then that part
13  of your responsibilities under the Sheriff's
14  Department -- I'm sorry -- the Sheriff's Office's
15  discrimination, retaliation, harassment policies
16  is to respond to or participate in OPR or
17  HR interviews or investigations?
18     **A  I'm not sure what you mean by "participate."**
19     Q  Well, if OPR comes to you and says that,
20  "We have received a complaint alleging
21  discrimination, harassment, retaliation," and you
22  are listed as a witness, and they want to
23  interview you, is that an optional thing for you?
24  Are you supposed to sit with them and give an

32

1  interview with them?
2     **A  Your last part froze up.**
3     Q  Okay.  So if OPR is investigating a
4  complaint --
5     **A  Okay.**
6     Q  -- and you are listed as a witness and
7  they want to interview you, is that optional for
8  you to participate in that interview, or are you
9  required to participate in that interview?
10     **A  I'm not quite sure if it's you have to or**
11  **not.  Generally, if OPR can't reach some type of**
12  **understanding, they'll contact HR and go from**
13  **there and try to mediate the issue.**
14     Q  Okay.  Is it your understanding that HR or
15  OPR may seek to interview witnesses to incidents
16  of discrimination, harassment, or retaliation?
17     **A  Yes.**
18     Q  Is there any difference -- strike that.
19        If instead of witnessing the discrimination,
20  retaliation, or harassment you are actually the
21  victim of it, are there any other things that
22  you're supposed to do?
23     **A  Well, I'm supposed to report the**
24  **discrimination against myself.**

Transcript of LeGrain Winston
Conducted on August 28, 2020

33

1    Q   Okay.  And to whom would you report that?
2    **A   Well, under normal circumstances it would**
3    **be my first line supervisor.**
4    Q   So chain of command essentially?
5    **A   That's correct.  It's paramilitary unit.**
6    Q   Okay.  So next up in your chain of command,
7    and if that person is the harasser or
8    discriminator or retaliator, you can go to the
9    next level of chain of command?
10   **A   Correct.  You're allowed to.**
11   Q   Okay.  And you're also allowed to go to
12   OPR; right?
13       (No response.)
14       MR. LEINENWEBER:  Sorry; I didn't get -- I
15   didn't hear the answer to that.
16       THE WITNESS:  You froze up on the screen.
17   Q   If the -- you're also allowed to go to
18   OPR, right, in that circumstance?
19   **A   Correct.**
20   Q   Okay.  Could you explain currently what is
21   the chain of command above investigator within EM?
22   **A   Today?**
23   Q   Correct.
24   **A   It would be the EM sergeant.  You want**

34

1    the --
2    Q   Yeah, let's do the whole thing.  Let's do
3    the whole thing.
4    **A   Okay.  It would be the EM sergeant.  We**
5    **don't have an EM lieutenant, so it would be a**
6    **deputy director.  The chain of command changes**
7    **quite frequently, so it's kind of hard to give a**
8    **correct answer on that all the time.**
9    Q   That's okay.  We're just trying to get --
10   **A   Right now it should be EM sergeant,**
11   **EM lieutenant, and deputy director.**
12   Q   Okay.  And then what happened after deputy
13   director?
14   **A   They add directors as they see fit, so I**
15   **don't know all the directors.**
16   Q   Is it fair to say, though, that director
17   of EM is in your chain of command?
18   **A   Excuse me, could you repeat that?**
19   Q   Sure, I'll repeat it.
20       Is it fair to say that director of EM is
21   within your chain of command?
22   **A   Correct.**
23   Q   And who would be above director?
24   **A   Director?  It depends.  We have multiple**

35

1    **directors.  So I -- it's hard to know the chain of**
2    **command due to the fact that they add or subtract.**
3    Q   Do you have an understanding of whether or
4    not anyone within EM is ranked above director?
5    **A   I would say executive director.**
6    Q   Okay.  And is anyone within -- do you have
7    an understanding of whether or not anyone else
8    within EM is above executive director?
9    **A   Not -- not to my knowledge, no.**
10   Q   So the next level over executive director
11   would be outside of EM within the Sheriff's Office?
12   **A   Yes.**
13   Q   Okay.  And you said that this chain of
14   command changed and changes frequently.  What --
15   is this generally the way the chain of command has
16   been your entire time there?
17   **A   The names of the positions have changed.**
18   Q   Okay.  So prior to this formulation that
19   we just talked about with sergeant, lieutenant,
20   et cetera, what was the prior iteration of the
21   chain of command within EM?
22   **A   You had supervisor, you had deputy chief,**
23   **you had chief, and then you went on to the**
24   **director or executive director.**

36

1    Q   And then any other sort of version of the
2    chain of command as far as you understand, or are
3    those two sort of the basic contours of the chain
4    of command of EM while you worked there?
5    **A   Correct.**
6    Q   Do you know who determines what discipline
7    an employee within EM should receive for a given
8    infraction?
9    **A   The supervision.  They -- you mean as far**
10   **as a grievance or a write-up?**
11   Q   Let's talk about a write-up.  So we'll
12   talk about the grievance process a little bit
13   later, but I just want to know if, you know,
14   Joe Smith does something wrong and is issued
15   discipline for it, generally speaking who -- what
16   is your understanding of who makes the decision
17   for what that discipline should be?
18   **A   The supervision.**
19   Q   And when you say "supervision," are you
20   talking about that chain of command we just
21   discussed?
22   **A   Correct.**
23   Q   And so it's your understanding that when
24   you -- the decision of what discipline an employee

Transcript of LeGrain Winston
Conducted on August 28, 2020

10 (37 to 40)

**37**

1 within EM receives could be made by currently a
2 sergeant, a lieutenant, a deputy director, the
3 director, or the executive director?
4 **A They write the complaint up, and they --**
5 **from my understanding, they send it across to OPR**
6 **to get a disciplinary SPAR number, and that's when**
7 **they can get I guess the amount of days for that**
8 **incident.**
9 Q So I'm a little confused then, I guess.
10 So any one of these people in the chain of command
11 can do the write-up, but then they send it to OPR?
12 **A They -- they initiate the write-up.**
13 Q Okay.
14 **A Depending on which supervisor initiates**
15 **the discipline, they write it up, and they send**
16 **it, I guess wherever for the amount of days that**
17 **they can receive for it.**
18 Q And when you say "wherever," though, you're
19 talking about OPR; right? They send it to OPR?
20 **A Correct, yes.**
21 Q And then is it your understanding that
22 OPR makes the determination regarding the number
23 of days?
24 **A That's my understanding, correct.**

**38**

1 Q Okay. And does EM have a progressive
2 discipline policy?
3 **A As far as -- what do you mean as**
4 **"progressive"? As far as --**
5 Q Let me ask it differently. Okay?
6 **A Okay.**
7 Q Do you know what progressive discipline is?
8 **A Yes.**
9 Q In your understanding tell me what
10 progressive discipline is.
11 **A It varies. Say if, for instance, you**
12 **didn't activate your body cam. That's a warning.**
13 **The next time you do it it's maybe possibly a**
14 **written reprimand. Next time you do it again,**
15 **it's possibly a day. And so on and so on.**
16 Q Okay. So the types of discipline that you
17 could receive would include a verbal warning, a
18 written reprimand, and then when you said get a
19 day, I assume you're referring to a suspension.
20 **A Correct.**
21 Q Okay. And so when you use the term
22 progressive discipline, your understanding is
23 that, you know, if it's the first time you did it,
24 it's the verbal warning; if it's the second time,

**39**

1 it might be the written reprimand; if it's the
2 third time, it's, okay, you're getting a
3 suspension now?
4 **A Correct.**
5 Q Okay. And presumably some things can also
6 result in termination?
7 **A Correct.**
8 Q Okay. And where is -- okay. So then we've
9 sort of established what progressive discipline is
10 in your understanding. Does EM or the Sheriff's
11 Office, do they have a policy regarding progressive
12 discipline?
13 **A Yes, they do.**
14 Q Okay. And what's your understanding of
15 what that policy is?
16 **A What I just explained to you.**
17 Q Meaning that there's this progression and
18 it should be followed?
19 **A Correct.**
20 Q Okay. And where -- what's your understanding
21 of where that policy is located? Is that in the
22 general orders? Is it in the collective bargaining
23 agreement?
24 **A It should be in both. It should be in the**

**40**

1 **general orders. It should be in both of those;**
2 **correct.**
3 Q Okay. And then you -- you sort of touched
4 on extremely briefly something called a grievance.
5 So let's talk a little bit about that.
6 **A Okay.**
7 Q So do you -- what is the purpose, in your
8 understanding, of filing a grievance?
9 **A To seek a remedy to the issue that you're**
10 **filing a grievance for.**
11 Q And what types of issues would that include,
12 do you think?
13 **A It's varied issues. It's -- it could be**
14 **for many things, that you filed a grievance**
15 **because your siren didn't work in your car. It**
16 **could be -- it's a lot of varied reasons. It's**
17 **not just one.**
18 Q Is it fair to say that the grievance --
19 filing a grievance is used to either express the
20 employee's disagreement with the sort of charge of
21 what they've done wrong?
22 **A Yes.**
23 Q Okay.
24 **A Yes.**

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

41

1    Q  And is the purpose of that grievance process
2  to, I guess give you an opportunity to sort of
3  make your case as, like I said, if there's an
4  explanation, well, "Hey, I didn't use the siren
5  because the siren wasn't working," gives you an
6  option to communicate that information?
7    **A  Correct.**
8    Q  And presumably since you are -- well, are
9  you in a union?
10   **A  Yes, I am.**
11   Q  Okay.  Which union is that?
12   **A  You froze up.  I don't know if you asked**
13 **something or not.**
14   Q  Which union are you in?
15   **A  Teamsters 700.**
16   Q  Okay.  Have you been in a union the entire
17 time you've been an investigator in EM?
18   **A  Yes.**
19   Q  Okay.  And the Union has a collective
20 bargaining agreement with the Office; right?
21   **A  Correct.**
22   Q  And the Sheriff's grievance process could
23 also be used to allege that the terms of the
24 collective bargaining agreement were not being

---

42

1  followed when the discipline was written up or
2  issued; right?
3    **A  Okay.  I lost you for a second.**
4    Q  That's okay.  That's okay.  If -- sorry;
5  strike that.
6        The grievance process could also be used
7  to allege or contend that the collective
8  bargaining agreement was not being followed; right?
9    **A  When you say "alleged," I'm trying to**
10 **understand what you're saying.**
11   Q  Sure.  All I'm saying is that it could be
12 used for the employee to argue that the collective
13 bargaining process is not being followed properly --
14 sorry -- strike that.
15       The grievance process, an employee could
16 also use the grievance process to contend or argue
17 that the collective bargaining agreement was not
18 being followed when they were issued a written --
19 a write-up?
20   **A  Correct.**
21   Q  And if you -- if an employee like yourself
22 thought that progressive discipline was not being
23 followed, you could also file a grievance
24 regarding that; correct?

---

43

1    **A  Correct.**
2    Q  Okay.  What -- let's go over then, could you
3  just explain, what's your understanding of what that
4  grievance process is?  We've talked a little bit
5  now about kind of what it can be used for, where
6  the policy is.  Could you explain your understanding
7  of what the grievance process itself is?
8    **A  That's kind of a broad stroke but I'll**
9  **try.  Basically, if you -- you have an issue like**
10 **you just said that didn't meet the CBA agreement,**
11 **you would write a grievance.**
12   Q  What do you -- so the grievance is sort of
13 a physical form, right, that you would write out
14 these details in?
15   **A  Correct.**
16   Q  Okay.  And then what do you do with that
17 form?
18   **A  You would note -- you would note the**
19 **violation within a grievance.**
20   Q  I think we crossed paths there.  What --
21 what would you actually do then once you've
22 completed your grievance form?  Where does it go?
23   **A  It would be submitted to the Union.**
24   Q  Okay.  And then what happens after that?

---

44

1    **A  The Union will -- I guess they will**
2  **investigate the grievance.**
3    Q  Okay.  And then what happens?
4    **A  That's normally a lengthy process.  It**
5  **depends on the grievance; it depends on the**
6  **violation that was done.  It can go all the way up**
7  **to arbitration.**
8    Q  My understanding is that there's various
9  steps kind of along the way, a Step 1, a Step 2, a
10 Step 3, a Step 4.  Is that your understanding,
11 as well?
12   **A  Yes, that's what I'm saying, all the way**
13 **up to arbitration, yes.**
14   Q  So what's -- what's your understanding of
15 what a -- what is done with a grievance at Step 1?
16   **A  Step 1 the grievance is presented to -- I**
17 **believe the Union presents that to whoever**
18 **violated the CBA.**
19   Q  So would that be member of the chain of
20 command who issued the -- the write-up?
21   **A  Yes.**
22   Q  Okay.
23   **A  Yes.**
24   Q  What can happen at Step 1 to the grievance

---

45

1 and the write-up?  What can happen there?
2 **A If they reach a mutual agreement, it can**
3 **be thrown out.**
4 Q Okay.  So the grievance could be thrown
5 out is one option.  Presumably the grievance could
6 be denied is a second option; is that fair to say?
7 **A Yeah, it can be denied and sent to the**
8 **next step, which would be the second step.**
9 Q Or presumably the employee would have the
10 right to withdraw the grievance, as well?
11 **A Yes.**
12 Q So if it is not resolved at Step 1, we go
13 to Step 2.  What's Step 2 like?
14 **A It just goes up to the next level of**
15 **supervision.**
16 Q Okay.  And then same potential outcomes
17 there, you know, reject the grievance, accept the
18 grievance, or potentially withdraw the grievance?
19 **A Yes.**
20 Q And if the grievance is rejected at Step 2,
21 you move to Step 3?
22 **A Correct.**
23 Q And that's just the next level of command?
24 **A Command, supervision, yes.**

46

1 Q And presumably, again, we have our same
2 three potential outcomes, and if it's rejected --
3 if the grievance is rejected at Step 3, you move
4 to step 4?
5 **A That's correct.**
6 Q What happens at Step 4?
7 **A It just depends.  It could be heard by the**
8 **executive member in our unit, or it could be kicked**
9 **across the street to the disciplinary board.**
10 Q And what's the disciplinary board?
11 **A It's -- the disciplinary board, they're**
12 **the people that will hear it somewhat like a**
13 **hearing.**
14 Q And are those -- who makes up the -- not
15 actual names, but are these Sheriff's Office
16 employees?  Are they totally third parties?
17 **A These are appointed members by the**
18 **Sheriff's Office.**
19 Q Okay.  And then if the grievance is
20 rejected at the fourth level, do you have any
21 additional options?
22 **A Generally, you would -- you probably would**
23 **take the discipline that was given to you and then**
24 **arbitrate -- try to recoup your loss in arbitration.**

47

1 Q Okay.  So is it fair to say that when you
2 get to a grievance that's been rejected at Step 4,
3 you are going to receive the discipline, but you
4 can also file an arbitration and try and sort of
5 retroactively get that cleared up?
6 **A Yes.**
7 Q Where does the -- I think there's something
8 called the Sheriff's Office Merit Board.  Where --
9 where do they fit into this process, or is that
10 something totally separate?
11 **A In that step, that's on a major.  That's**
12 **when you would be probably seeking 29 days pending,**
13 **possible termination.**
14 Q Okay.  So the Merit Board would be
15 reserved for the more serious infractions which --
16 **A Yes.**
17 Q Okay.  And the discipline might be a
18 lengthy suspension or a termination?
19 **A Correct.**
20 Q So, in other words, you're not going to
21 take a written reprimand to the Merit Board?
22 **A No.**
23 Q Roughly -- I think you said it was just a
24 handful of times, but approximately how many times

48

1 would you say you worked in TSS?
2 **A Including to date, up to date?**
3 Q Sure.
4 **A I couldn't tell you.  I don't have an an**
5 **exact number.**
6 Q Is it more than 100 or less than 100?
7 **A It would probably be slightly more, yes.**
8 Q Okay.  So just over 100 --
9 **A Yes.**
10 Q -- times you think you've worked in TSS?
11 **A Yes.**
12 Q And that's since 1994?
13 **A Correct.**
14 Q Okay.  So is it fair to say it might be a
15 couple of times a year?
16 **A More than that.**
17 Q Is it spread out across your career, or
18 was anytime -- were there any years where you had
19 more TSS than another year?
20 **A I'm not understanding what you mean by that.**
21 Q That's all right.  I'll strike that
22 question.
23 **A No problem.**
24 Q And TSS, my understanding is that employees

Transcript of LeGrain Winston
Conducted on August 28, 2020

49

1  sometimes refer to that as the basement, as well.
2  **A  That's correct.**
3  Q  Okay.  And you -- you previously indicated
4  that you primarily see yourself as a patrol officer.
5  Is that fair to say?
6  **A  Correct.**
7  Q  And the times -- but at the same time you
8  said that you were pretty good at the TSS job you
9  think?
10  **A  No, I said I'm good at any job I do.**
11  Q  Including TSS; right?
12  **A  That's correct.**
13  Q  Yeah, yeah.  I didn't mean to say that
14  you're only good at --
15  **A  No, that's okay.**
16  Q  -- the TSS job.
17  **A  That's okay.**
18  Q  Tell me a little bit about what your
19  duties -- well, strike that.
20      When was the last time you worked at TSS?
21  **A  My last day at work.**
22  Q  Pretty recently?
23  **A  Yes.**
24  Q  Okay.  So yeah, when approximately was that?

50

1  **A  That would be Wednesday.**
2  Q  Wednesday.  Okay.
3  **A  Yes.**
4  Q  Okay.  So given that you have worked there
5  at least 100 times including as recently as
6  Wednesday, what are your duties -- actually,
7  strike that.
8      How many investigators work in TSS,
9  generally speaking, on a given day?
10  **A  Generally, anywhere from four to six.**
11  Q  Okay.  Do you have any understanding of
12  why some days it might be four, other days it
13  might be six?
14  **A  I have an understanding of why it could be**
15  **four to six, yes, I do.**
16  Q  And why is that?
17  **A  It depends on how you did on patrol, possibly**
18  **the numbers might increase down in the basement.**
19  Q  What does that mean?  I'm sorry; I'm just
20  not understanding.
21  **A  Essentially, if they're not satisfied with**
22  **your production, you could possibly end up in the**
23  **basement.**
24  Q  If they're not satisfied with your

51

1  production?
2  **A  On patrol.**
3  Q  What is production in patrol?  What does
4  that mean?
5  **A  The amount of assignments.  The amount of**
6  **assignments that were completed.**
7  Q  Okay.  So your understanding is that if
8  you do not complete enough assignments on patrol,
9  then you get assigned to the basement?
10  **A  Possibly, yes.**
11  Q  What do you mean "possibly, yes"?
12  **A  It depends on the person.  Possibly, yes.**
13  Q  What does that mean?
14  **A  Depends on if the supervision -- if you're**
15  **in the favor of the supervision.**
16  Q  Okay.  Who makes the decision about the
17  number of employees assigned to TSS?
18  **A  Supervisors.**
19  Q  Okay.  And so that's back to your chain of
20  command; right?
21  **A  Correct.**
22  Q  And so who in the chain of command makes
23  the decision?  Is it the sergeant, the lieutenant,
24  the deputy director, the director, or the

52

1  executive director?
2  **A  It could be either one of those people.**
3  Q  Can be any one of those people?
4  **A  It can be either one of those people.**
5  Q  When you say "either one," though --
6  **A  It could be the director; it could be the**
7  **supervisor.  It could be either one.  I'm not in**
8  **the room when they actually do it, but it could be**
9  **either one.**
10  Q  Okay.  And it could be a sergeant?
11  **A  It could be a sergeant.**
12  Q  Okay.  And it could be a lieutenant --
13  **A  Correct.**
14  Q  -- if you guys have one?
15  **A  Yes, if we have one.**
16  Q  It could be the deputy director?
17  **A  It could be.**
18  Q  And then under the old chain of command it
19  could be a supervisor?
20  **A  It could be the supervisor, yes.**
21  Q  It could be a deputy chief?
22  **A  Correct.**
23  Q  Could be the chief?
24  **A  Yes.**

Transcript of LeGrain Winston
Conducted on August 28, 2020

53

1    Q  The director or the executive director?
2    **A  Absolutely.**
3    Q  Okay.  So any of those individuals in the
4  chain of command could -- could decide who has
5  gone to TSS on any given day?
6    **A  Correct.**
7    Q  And between four and six employees will be
8  assigned there on any given day?
9    **A  Correct.**
10    Q  Okay.  And your understanding is that the
11  determination of who is going to get assigned is
12  based on the number of assignments an investigator
13  completes on patrol?
14    **A  It could be based on a lot of things, not**
15  **just that.  It's quite a few areas that that could**
16  **end up with you in the basement.**
17    Q  Okay.  And one of those is the number of
18  assignments you complete?
19    **A  Well, that's the reason that's sometimes**
20  **given by the supervision, yes.**
21    Q  And what are the other reasons why an
22  individual could be assigned to TSS?
23    **A  Well, per supervision, they'll say**
24  **punishment.**

54

1    Q  Okay.  So you could be -- well, is that
2  the same thing as not being productive on your
3  assignments?
4    **A  Productivity is a -- is a long -- it's a**
5  **big range as far as when you talk about -- we have**
6  **no quota.  So productivity, that can be**
7  **misunderstood by supervision, but it's -- yeah.**
8    Q  How many assignments do you need to complete
9  to ensure that you don't get assigned to TSS?
10    **A  There isn't a quota.**
11    Q  Okay.  So where does it come -- where does
12  your understanding that not completing a certain
13  number of assignments can land you in a
14  TSS assignment?
15    **A  My understanding comes from supervisors.**
16    Q  Okay.  Which ones?
17    **A  All of them.**
18    Q  Okay.  And this is something that they
19  specifically told you?
20    **A  Absolutely.**
21    Q  Okay.  And every supervisor has told
22  you this?
23    **A  Every supervisor is aware of this.**
24    Q  That's not my question, though.  I want to

55

1  know where your understanding comes from.  So what
2  we need to understand here is who is telling you
3  that if you don't complete enough assignments you
4  are going to get assigned to TSS?
5    **A  Supervision from today or supervision from**
6  **prior to today?**
7    Q  We'll talk about all of them.  But who is
8  the most recent supervisor to tell you that if you
9  don't complete enough assignments that you're
10  going to be assigned to TSS?
11    **A  Well, like I said, once again, you have to**
12  **kind of tell me exactly what supervisors that**
13  **you're speaking to.  We don't have a quota.  We**
14  **don't have a quota.**
15    Q  I understand that.  I understand that.
16  But let's just do it a different way then.
17    **A  Okay.**
18    Q  So tell me the name of one supervisor who
19  told you about this assignment requirement in
20  order to avoid being at TSS.
21    **A  Assignment requirement?  Okay.  Can I --**
22  **more than one or do you need just one?**
23    Q  Let's start with one.  Who is the first
24  person that comes to mind that told you this?

56

1    **A  Chief Rohloff.**
2    Q  Okay.  And when did Chief Rohloff tell
3  you that?
4    **A  Multiple times.**
5    Q  When did he most recently tell you that?
6    **A  He's not there now.  He's on duty injury.**
7    Q  Sure.  But when did he most recently tell
8  you that?
9    **A  I can't give you an exact date.**
10    Q  I'm not asking for an exact date.  What's
11  an approximate date?
12    **A  I can't give you an approximate date.**
13  **It's been a while.  He's been on and off at work**
14  **and he's on duty injury.**
15    Q  But it's fair to say sometime between
16  1994 and today you're saying Chief Rohloff told
17  you about this completing assignment requirement?
18    **A  Yes.  I've had Chief Rohloff,**
19  **Lieutenant Collins.**
20    Q  Hang on one second.  We're talking about
21  Chief Rohloff right now.
22    **A  Okay.  Go ahead.**
23    Q  So at some point between 1994 and today,
24  Chief Rohloff told you about this requirement;

Transcript of LeGrain Winston
Conducted on August 28, 2020

57

1  right?
2     A  Yes.
3     Q  Okay.  And where did that conversation
4  take place?
5     A  In the office.
6     Q  Okay.  Which office?  Let's be specific here.
7     A  Supervisor's office.
8     Q  So is that his office or -- I don't
9  understand the geography there, so --
10    A  Okay.  It would be his office.
11    Q  Okay.  And who was present for the
12 conversation?
13    A  Himself.
14    Q  Just the two of you?
15    A  Yes.
16    Q  Okay.  And what did he say to you?
17    A  As far as what?  Why I'm assigned to the
18 basement?
19    Q  Well, you said that he told you that
20 there's a requirement that you complete a certain
21 number of assignments or you will end up being
22 assigned to TSS.  So what did he say to you
23 about that?
24    A  They'll tell you that your work was

58

1  unsatisfactory --
2     Q  And let's just stop for one second because
3  we're talking about a specific conversation with
4  you and Rohloff, so not they, not --
5     A  Okay.
6     Q  What did Mr. Rohloff tell you?
7     A  Chief Rohloff would say to me that the
8  reason I'm being placed in the basement is that my
9  productivity wasn't good on a previous night.
10    Q  Okay.  Did he say anything else?
11    A  That's it.
12    Q  And what did you say to him?
13    A  I would ask him, "Do we have a quota?"
14    Q  Okay.  And what did he say?
15    A  There was no answer.
16    Q  Okay.  Did you say anything else?
17    A  No.
18    Q  Did he say anything else?
19    A  No.
20    Q  Did you file any kind of a -- well, first
21 of all, is it prohibited to assign you to TSS as a
22 result of not having sort of good productivity in
23 the eyes of your supervisor?
24    MS. KRAUCHUN:  Objection; foundation.

59

1     Go ahead, LeGrain.
2     Q  I'm just asking if you know.
3     A  You broke up.  You broke up.  I didn't
4  hear you.
5     Q  That's all right.  I'll ask you the
6  question again, and your attorney may have an
7  objection.
8     Is it prohibited anywhere for you to be
9  assigned to TSS in part because of your lack of
10 productivity on patrol?
11    MS. KRAUCHUN:  Objection; foundation.
12    Go ahead.
13    MR. LEINENWEBER:  You can answer that
14 question.
15    A  Okay.  You say is it prohibited?
16    Q  Yeah.
17    A  No.
18    Q  It's not?
19    A  No.
20    Q  Okay.  So you said that Rohloff -- you had
21 this conversation with Rohloff, and then I think
22 you started to say Lieutenant Collins.  Is that
23 right?
24    A  It was one of the list of supervisors.

60

1     Q  Is there anything else that Rohloff told
2  you about this or is that --
3     A  No.
4     Q  Okay.  So who is the other supervisor --
5  who is another supervisor who has told you this?
6     A  You're breaking up.  You broke up; I'm
7  sorry.
8     Q  No, that's all right.  It's the new world
9  we live in, frozen screens and horrible feedback
10 sometimes.
11    Who is another supervisor that told you
12 about this requirement of, you know, completing a
13 certain amount of productivity?
14    A  I would say Director Shields.
15    Q  Okay.  And am I wrong or did you also
16 mention Lieutenant Collins?
17    A  I had started to but you told me to stay
18 on Rohloff.
19    Q  Okay.
20    A  I was going -- I was going by chain of
21 command.  I thought you wanted it in paramilitary
22 order.
23    Q  That's fair and that shows the way your
24 brain works as a paramilitary officer.

61

1      Let's talk about Lieutenant Collins then.
2  When did Lieutenant Collins tell you that this was
3  the reason for being assigned to the basement?
4      A  Oh, I've been told quite frequently.  This
5  was -- you'll find yourself in the basement.
6      Q  We're specifically talking about
7  Lieutenant Collins, though.
8      A  That's the one I'm speaking on.
9      Q  And when did the most recent conversation
10 with her about this take place?
11     A  Probably a couple weeks prior to an OPR
12 complaint.
13     Q  Can you give me a date?
14     A  I don't have a specific date, no, I don't.
15     Q  What about a year?
16     A  About two weeks ago.  About two, three
17 weeks ago.
18     Q  Two weeks ago?
19     A  Yeah.
20     Q  Where did that conversation take place?
21     A  Computer room.
22     Q  Who was present for the conversation?
23     A  My union steward.
24     Q  Okay.  Who is that?

62

1      A  Tyrone McGhee.
2      Q  So you, and Mr. McGhee, and Lieutenant
3  Collins?
4      A  Correct.
5      Q  Okay.  What was the purpose of the meeting?
6      A  The purpose was to ask why was she
7  harassing me.
8      Q  How did the meeting come about?  Was this
9  something that you and your union steward just
10 went in and said, "Hey, we want to talk to
11 Lieutenant Collins for a second," or was it
12 through the grievance process?  How did the
13 meeting come about?
14     A  No, it was in the computer room, and she
15 began to speak to me, and I asked for my union rep.
16     Q  And she told you about the -- why you were
17 going to the basement?
18     A  Yes.
19     Q  Okay.  So other than Rohloff, Collins, and
20 I think you said probably Director Shields, as
21 well, anybody else tell you about that -- that
22 policy of productivity and getting sent to the TSS?
23     A  No, I didn't say probably Director Shields.
24 I said Director Shields.

63

1      Q  Okay.  When did the conversation with
2  Director Shields take place?
3      A  Several times.  It would take -- while I
4  was sitting there tagging videos, he would tell
5  me, "Don't worry about going out; you're going to
6  be in the basement."
7      Q  And can you give us a sense of when this
8  conversation occurred?
9      A  It's been several times.  It's actually so
10 many that I can't give you an exact date.
11     Q  Okay.  And you mentioned that -- would you
12 have been tagging videos?
13     A  I would have been doing computer work as
14 far as LMS training, checking email.  We're
15 required to do those things on a daily basis.
16     Q  Sure, sure.  I assume you were in the
17 computer room then.  I said I'm assuming you were
18 in the computer room then.
19     A  No, I was in the work/school area.
20     Q  Okay.
21     A  Which is the office, the work/school office.
22     Q  And then what did Director Shields say
23 to you?
24     A  Well, like I said, it's been a varied

64

1  amount of times.  He would say things such as,
2  "Don't worry about getting your vest on; you'll be
3  in the basement."  He would let me know that I'm
4  downstairs, I'm on punishment until further notice.
5  So it became a norm.
6      Q  What else did he say?
7      A  Like I said, there's so many different
8  times.  It all depended.
9      Q  You kind of broke up there for me.
10     A  I said it was a various amount of types.
11 The end result would be me being in the basement.
12     Q  And he would tell you, "Don't worry about
13 getting your vest on because you're in the
14 basement"?
15     A  Yes.
16     Q  And he said it was punishment?
17     A  Yeah.  It's always been mentioned that
18 it's punishment.  It's -- the word punishment has
19 been used by him, yes.
20     Q  And what were you being punished for?
21     A  I don't know what's in his head, but
22 whatever he decided I needed to be punished for.
23     Q  Okay.  And you don't know -- you can't
24 give any specific date that this was related to?

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

65

1    A  This is various dates.  Like I said, I've
2  been there -- I've been with the Sheriff's
3  Department 30 years.  It's various dates.
4    Q  Okay.
5    A  Yeah.
6    Q  Okay.  So -- and you can't identify a
7  specific date any better than that it sounds like.
8  What was your response to Director Shields?  What
9  did you say to him, in other words?
10   A  You kind of broke up a little bit.  Can
11 you -- I would ask for an explanation.
12   Q  Let's just start over since I think it
13 might have been a little bit muddy there.
14     So Shields would tell you you're being
15 punished by being sent to TSS, and you would ask
16 for an explanation?
17   A  Yes.
18   Q  And what do you recall him giving as that
19 explanation?
20   A  Well, it depends on the time.  Like I
21 said, it became a norm in that unit, not just with
22 me but with other investigators that were being
23 punished.
24   Q  Let's stick with you, though.

---

66

1    A  Okay.  If we're sticking with me --
2    Q  Let me just clarify, though.  I want to
3  know as best as you recall, what did Shields
4  tell you?
5    A  One time he told me that it was
6  productivity.  Another time he told me because of
7  a complaint that I filed.
8    Q  Okay.  And when was -- do you have any
9  sense of when that was?
10   A  No.
11   Q  Okay.  And what was the complaint that you
12 filed?
13   A  It's been -- it's been several depending
14 on the complaint.
15   Q  What is the one that he was talking about?
16   A  It's been several.
17   Q  But what is the one that Shields was
18 talking about as far as you understand?
19   A  You're freezing up again.
20     MR. LEINENWEBER:  Am I freezing up for
21 anyone else, or is it possibly for just the
22 witness?
23     THE COURT REPORTER:  You're fine with me.
24     MR. WHITE:  You're fine with me, as well.

---

67

1      MR. LEINENWEBER:  I'm wondering, do you
2  think we should have Mr. Winston call in.
3      THE WITNESS:  It's just your first part.
4      MR. LEINENWEBER:  Let's try for just a
5  little bit more, and if we're still having an
6  issue, we can take a quick break and maybe have
7  you dial in for audio.  Okay?
8      THE WITNESS:  Okay.
9      MR. LEINENWEBER:  So, Paula, can you read
10 back what my last question was?  I totally lost my
11 train of thought.
12     (The Reporter read the question as
13 follows:  "But what is the one that Shields was
14 talking about as far as you understand?")
15 BY MR. LEINENWEBER:
16   Q  Which complaint that you filed was he
17 talking about?
18   A  Well, it could be the complaint in which
19 I -- it could be several.  Like I said, it's
20 several complaints.  I went to OPR with -- he gave
21 me a grievance hearing when he was on the
22 OPR complaint.  That was one of the times that I
23 ended up in the basement.  They told me I couldn't
24 go to OPR to make a complaint; I ended up in the

---

68

1  basement.
2    Q  So any other specific complaint that you
3  believe it was tied to?
4    A  Any other complaint as far as -- as far as --
5    Q  Well, you said that -- that Shields told
6  you essentially "Because you filed a complaint
7  against me, you're going to be assigned to TSS"?
8    A  Right.
9    Q  Okay.  And what I want to know is, as best
10 as you can recall, since you don't remember when
11 this conversation -- this specific conversation
12 took place, what was that complaint about that you
13 filed?
14   A  One of the complaints was when I contacted
15 Miriam Rentas, OPR -- director of OPR and stated --
16 and asked her why was he -- why was he hearing my
17 grievance hearing when he was under an OPR
18 investigation.
19   Q  And you're saying one of the times.  So is
20 it -- is it fair to say that you don't have a
21 specific recollection of this specific conversation
22 with Shields?
23   A  I have many recollections of conversations
24 with him.  It's been -- it's -- like I told you

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

69

1 once before, it was the norm in our unit.
2    Q  Sure.  I'm just trying to understand because
3 it seems like you had a specific recollection of
4 him, you know, telling you that you're being
5 assigned to OPR because of this complaint, and I'm
6 just trying to focus down on which complaint this
7 was that you think he was referring to.
8    A  Well, like I said, it's been quite a few
9 times I've been placed in the basement.  So to
10 have a specific one for that, no, I don't.
11 There's been multiple -- multiple, multiple times
12 being placed in the basement.
13    Q  Sure.  Yeah, I understand.  You said that
14 it was --
15    A  So to have a specific one --
16    Q  -- just over 100 -- hang on; we're talking
17 over each other.
18        You indicated it was just over 100 times
19 or so that you had worked in the basement; right?
20    A  Yes.
21    Q  Okay.  Do you have -- anyone else besides
22 Rohloff, Director Shields, or Lieutenant Collins
23 that you recall telling you were going to the
24 basement for -- because of productivity or as

70

1 punishment?
2    A  Yeah -- yes.
3    Q  Okay.  Who else?
4    A  Chief Ranzino.
5    Q  Okay.  And when did that happen?
6    A  Once again, that was multiple times.  It
7 was multiple times.
8    Q  Okay.  When is the most recent time?
9    A  Well, he's not there now.  So it's been
10 quite a while.
11    Q  Okay.
12    A  Yep.
13    Q  And what do you remember him saying to you?
14    A  As far as the last time being placed in
15 the basement?
16    Q  Uh-huh, yes.
17    A  He told me, "You're going in the basement.
18 I don't like the work you did; you're going in the
19 basement."
20    Q  Any other conversations with Ranzino that
21 you recall like that?
22    A  In reference to going in the basement?
23    Q  Yeah.
24    A  Yeah, well, it was quite a few.  Like I

71

1    said, it's quite a few.
2    Q  Okay.  Anyone else that you recall telling
3 you you're going into the basement because of
4 your, you know, productivity or as punishment?
5    A  Well, I've already mentioned Lieutenant
6 Collins.
7    Q  Yeah.
8    A  Yeah, so yeah, those are the main ones.
9 Chief Neal.
10    Q  When did Chief Neal most recently tell
11 you that?
12    A  It's been -- it's been quite a while.
13 He's not there, either.  He retired.
14    Q  Okay.  And what do you remember Chief Neal
15 telling you?
16    A  I'm going in the basement for punishment.
17    Q  Okay.  Punishment for what?
18    A  For whatever they decide they need to
19 punish me for.
20    Q  Okay.  So you don't have a specific
21 understanding of what you were being punished for?
22    A  Well, I shouldn't be punished in the first
23 place.
24    Q  Oh, I'm not -- I'm not taking issue

72

1 with that.
2    A  Okay.
3    Q  I'm just asking if you have a specific
4 understanding.
5    A  Well, once again, like I said, I shouldn't
6 be punished.  I'm a professional.  So if you felt
7 like you needed to punish me, you should go
8 through the proper protocol to write me up.  We
9 don't have a set punishment placement.  So when
10 you say, "I'm punishing you," it pretty much
11 speaks for itself.
12    Q  Did you file any grievances related to any
13 of these punishment assignments to the basement?
14    A  Yes.
15    Q  Okay.  What was the -- when was that?
16    A  I've done quite a few grievances and
17 memorandums, so you would have to be more specific.
18    Q  Okay.  Well, that's a good point.  But
19 let's -- so let's limit it to grievances -- okay? --
20 and not like memorandums right now.  But when do
21 you recall filing grievances related to being
22 assigned to the basement for punishment?
23    A  I don't recall.
24    Q  Do you recall what the outcome of any of

Transcript of LeGrain Winston
Conducted on August 28, 2020

73

1  those grievances was?
2  **A  Nothing.**
3  Q  Nothing was the outcome or --
4  **A  Nothing was -- nothing was done.**
5  Q  Well, is it -- I mean, we talked about
6  there were three options for grievances; right?
7  It can either be --
8  **A  Correct.**
9  Q  -- accepted, rejected, or withdrawn; right?
10  **A  That's correct.**
11  Q  Okay.  So do you recall which of those
12  three events occurred related to the grievances
13  that you're talking about?
14  **A  No.  Like I said, there was -- the**
15  **grievances were -- there was no remedy for the**
16  **grievances.**
17  Q  I understand.  So that's your -- you know,
18  from your perspective personally it wasn't a
19  remedy as you see it.  So does that indicate that
20  they were probably -- those grievances were
21  rejected?  Is that fair to say?
22  **A  I don't know if they were rejected or not.**
23  **They were never returned back to me.  There's a**
24  **process.  They're supposed to be returned back to**

74

1  **you.  A notification is supposed to be made.**
2  Q  Okay.  And you're just saying that didn't
3  happen?
4  **A  It didn't happen, no.**
5  Q  Okay.  So you filed these grievances, and
6  then as far as you know, nothing happened with
7  them, and nothing was done with them?
8  **A  Absolutely.**
9  Q  Okay.  And do you have copies of those
10  grievances?
11  **A  My attorney should have them.**
12  Q  Okay.  So you gave those to your attorney?
13  **A  Correct.**
14  MR. LEINENWEBER:  And, Kelly, I'd just
15  like to confirm on the record that those are the
16  grievances that were produced in your production
17  to us.
18  MS. KRAUCHUN:  Correct.  They were all
19  tendered.
20  MR. LEINENWEBER:  Mr. Winston, is the
21  audio working a little bit better for you?  Am I
22  coming through clearly?
23  THE WITNESS:  Yeah, I hear you.
24  MR. LEINENWEBER:  Can we just take a

75

1  five-minute break?  We've been going about an hour
2  and a half, it looks like, and maybe just take
3  until 1:37 -- I'm sorry -- 11:37.  I can't believe
4  it's Friday, to be honest, like Dan said yesterday.
5  MS. KRAUCHUN:  I know.  Perfect.  Yeah,
6  that's fine.  Five minutes is good.
7  (Recess taken, 11:31 a.m. to 11:39 a.m.)
8  BY MR. LEINENWEBER:
9  Q  Mr. Winston, we're back on the record.
10  You understand you're still under oath here today?
11  **A  Yes.**
12  Q  Okay.  I want to ask you -- you started to
13  mention earlier today, this morning about the
14  different zones that Cook County is divided up
15  into.  Could you explain that to me?
16  **A  You said the areas that Cook County is**
17  **divided up into?**
18  Q  I think you referred to it as different
19  zones.
20  **A  Yeah.**
21  Q  How is it divided up?
22  **A  Into areas.**
23  Q  Do you recall the areas?
24  **A  Yeah, areas.  Areas 1 through 8, 9, 10, yeah.**

76

1  Q  Okay.  And what's your understanding of
2  what each of those numbers corresponds to?
3  **A  Just an area of the city.  It could be**
4  **south side; it could be Berwyn, east side of**
5  **Chicago.  It just refers to different areas.**
6  Q  Okay.  And have you -- well, so as a
7  patrol officer then, or a patrol investigator, you
8  could be assigned to do patrol in any of these
9  given areas?
10  **A  Yes.**
11  Q  Okay.  And who makes the decision regarding
12  which area an investigator is assigned to on a
13  given day?
14  **A  The supervisors.**
15  Q  Okay.  And when we're talking about
16  supervisors, we're again talking about that chain
17  of command we discussed earlier that currently
18  includes sergeant, lieutenant, deputy director,
19  director, and executive director?
20  **A  Yeah.  Well, you're missing two -- yeah,**
21  **if you're talking about present or past, yes,**
22  **there's two different --**
23  Q  That's present?
24  **A  Present, yes.**

Transcript of LeGrain Winston
Conducted on August 28, 2020

77

1    Q  And prior to that it would have been
2  supervisor, deputy chief, chief, director, and
3  executive director?
4    A  Correct.
5    Q  And is it your understanding that the
6  decision to assign an investigator to a given area
7  is made by -- sorry -- strike that.
8      Is it your understanding that any of those
9  supervisors I just mentioned or any of that chain
10 of command I just mentioned can make the decision
11 as to which area a given investigator is going to?
12   A  Correct.
13   Q  And how is the assignment your area for a
14 given day communicated to you?
15   A  How is it communicated?
16   Q  Yeah.  How do you find out what your given
17 area is for a given day?
18   A  Well, generally, previously it would be
19 north/south.  They would have it on the top of the
20 roster.  It would be on your roster initially.  It
21 would say south, it would say north, and so on and
22 so on.
23   Q  And you're saying "previously."  Is that
24 because previously they didn't have this numbered

78

1  system, they used names or north, south, et cetera?
2    A  Yes.  It would have it on the sheet.
3    Q  Okay.  And so it would be on the sheet.
4  And your understanding is that it could have been
5  put on that sheet by any of those members of the
6  chain of command that we discussed a second ago?
7    A  Correct.
8    Q  Okay.  And do you specifically know --
9  sorry -- strike that.
10     Other than sort of generally stating that
11 any member of the chain of command could do that,
12 do you have any sort of specific understanding as
13 to who actually did it?
14   A  It could be either one of the supervisors.
15 It's not -- they don't have a signature on the
16 statement that they did it.
17   Q  Do you know what goes into the decision to
18 assign an investigator to a given area?
19     MS. KRAUCHUN:  Objection; foundation.
20     Go ahead.  You can answer.
21   A  Basically, no, no.  As far as -- you're
22 saying as far as what do they base their decision on?
23   Q  Yeah.  Yeah, exactly.
24   A  No.

79

1    Q  What -- what's your understanding -- well,
2  okay.  Other than -- other than the positions
3  within the chain of command and the investigator
4  position -- and just to be clear, I'm talking
5  about both sort of the new chain of command and
6  the old one.
7    A  Uh-huh.
8    Q  Other than those positions and the
9  investigator position, are there any other sworn
10 positions within EM?
11   A  Other than investigators and the chain of
12 command?
13   Q  Correct.
14   A  No.
15   Q  Okay.  So if you wanted to -- or sorry --
16 strike that.
17     If an investigator was going to be
18 promoted, then the position that they would be
19 promoted into would be among those chains of
20 command?
21   A  Correct.
22   Q  Okay.  And do you have an understanding of
23 what the process is for being promoted from the
24 investigator position into one of those positions

80

1  within the chain of command?
2    A  Previously or now?
3    Q  When you say "previously or now," are you
4  talking about the chain of command?
5    A  Yes.
6    Q  Okay.  So basically, I'm saying either, if
7  that makes sense.
8    A  Well, it really -- it's like two different
9  spectrums.  Previously you had to be appointed to
10 a supervision or a deputy chief position by your
11 supervisor -- your director or assistant director.
12 Today you would take -- it's a nonmerited
13 EM sergeant's test, but you would still be
14 promoted by the director.  So there are some
15 differences.
16   Q  Okay.  So currently, since you've had the
17 new chain of command with sergeants and
18 lieutenants, there's a test you can take to be
19 eligible to be promoted into the sergeant position?
20   A  Not so much a test as -- they generated a
21 test.  It's a nonmerited sergeant's position.
22 It's not merited throughout Cook County.
23   Q  Right.
24   A  It's a nonmerited position.  You can take

81

1 that test, but you still have to be appointed by
2 the directors.
3    Q  And you can't be appointed without taking
4 the test, right, under the current system?
5    A  Under the current system -- you know what?
6 I don't know.
7    Q  Okay.  That's fair.  And you said that
8 under the old system you would be appointed to one
9 of these -- sorry -- you'd be promoted to one of
10 these positions within the chain of command by the
11 deputy director or the director?
12    A  You would be promoted by the director.
13    Q  You'd be promoted by the director?
14    A  That's correct.
15    Q  Okay.  And what's your understanding --
16 sorry -- strike that.
17       What's the basis of that understanding?
18 Like how do you know that that's a decision that
19 the director makes?
20    A  Because of the people that's been promoted
21 generally would have an interview with the
22 director, and then they would be promoted.
23    Q  Okay.  My question is a little bit more
24 specific than that, though, I guess.  How do you

82

1 know it was the director making the decision to --
2 to do the appointment?
3    A  How do I know?
4    Q  Yeah.  Yeah.
5    A  Well, basically that's my understanding is
6 the executive director or director would make the
7 decision.  They would have an interview, and they
8 would appoint who they would want to appoint.
9    Q  And is it -- did someone tell you that
10 that's the process?  Did you read that that's the
11 process?  Is there anything else that leads you to
12 have that understanding?
13    A  That's my understanding of the process.
14    Q  Okay.  That's fair.  And then today your
15 understanding is that that's essentially sort of
16 still the process except there's also this
17 nonmerited test of position of sergeant?
18    A  Correct.
19    Q  But your belief is still that then it
20 would be the director who makes the decision to
21 appoint someone to a sergeant position?
22    A  Yes.
23    Q  Okay.  And the basis of that understanding
24 is the same as what you just said a minute ago

83

1 regarding the old chain of command?
2    A  Yes.
3    Q  Okay.  When did they introduce this tested
4 sergeant position?
5    A  I think it's been at least about two or
6 three years ago.
7    Q  Okay.
8    A  Or maybe a little bit more.
9    Q  Have you ever taken the test?
10    A  No.
11    Q  And did you ever -- under the old chain of
12 command did you ever have an interview for one of
13 those promotions that we talked about?
14    A  No.
15    Q  Did you ever ask to be considered for one
16 of those positions?
17    A  Yes.
18    Q  You did?
19    A  Yes.
20    Q  Okay.  Which position were you asking to
21 be considered for?
22    A  I wanted to be either a deputy chief or
23 chief.
24    Q  Deputy chief or chief?

84

1    A  That's correct.
2    Q  Okay.  And when are we talking about that
3 you asked to be considered for -- actually, strike
4 that for a second.
5       Do you have to be a deputy chief before
6 you become a chief?
7    A  Deputy chief.  It's generally deputy chief
8 then chief.
9    Q  Okay.
10    A  The rank is not -- is no longer in
11 existence now.
12    Q  Sure, sure.  Yeah, I understand that.  So
13 then I guess that helps us with the timing --
14 right? -- because this would have been under the
15 old system.
16    A  Right.
17    Q  And you had indicated that you wanted to
18 be considered for a deputy chief or a chief
19 position?
20    A  Or higher, yes.
21    Q  Okay.  And to whom did you indicate that?
22    A  I've indicated that to Chief Neal; I've
23 indicated that to -- when I could speak to him,
24 Director Shields.

85

1    Q  Okay.  And do you have a recollection --
2  well, strike that.
3        Was this in writing or was this a verbal
4  statement?
5    A  Verbal, verbal.
6    Q  In person or over the phone?
7    A  In person.
8    Q  Okay.  And do you have a specific
9  recollection of the date that this occurred?
10   A  Not the date, no.
11   Q  Okay.  But we can assume again that it was
12 before this new system was implemented?
13   A  Correct.
14   Q  Okay.  And where -- let's talk about Chief
15 Neal first.  What did you say to him, and what did
16 he say to you?
17   A  I just expressed interest that I wouldn't
18 mind being a chief.
19   Q  Okay.  And what did he say?
20   A  He's the chief.
21   Q  Okay.  Anything else?
22   A  That's it.
23   Q  Okay.  What about with Director Shields?
24 What did you say to him, and what did he say to you?

86

1    A  I've had -- I've told him that I wouldn't
2  mind being a chief or maybe a higher position.
3    Q  Okay.  And do you remember what he said?
4    A  "That's not going to happen."
5    Q  He said it's not going to happen?
6    A  It's not going to happen.
7    Q  Okay.  And where was this conversation?
8    A  Probably in the work/school area which is
9  right outside his office.
10   Q  Okay.  Was anybody else there?
11   A  Not that I recall.
12   Q  Anything else you remember saying to him
13 or him saying to you?
14   A  No.
15   Q  Let's talk about --
16       MR. LEINENWEBER:  Gabriel, can you bring
17 up Exhibit 1?
18       AV TECHNICIAN:  One moment.  Would you like
19 me to mark that as Exhibit 1 on my end, as well?
20       MR. LEINENWEBER:  Yes, please.
21       And, Mr. Winston, in just a second we're
22 going to pull up Exhibit 1 here and have you take
23 a look at it, and so it will pop up on your screen.
24       THE WITNESS:  Okay.

87

1        (Winston Deposition Exhibit 1 marked for
2  identification and attached to the transcript.)
3    Q  So, Mr. Winston, we are handing you
4  virtually what's been marked as Exhibit 1.
5    A  Uh-huh.
6    Q  You see this document that says
7  "Complaint" there in the middle of the page?
8    A  Yes.
9    Q  And it is your understanding this is the
10 complaint you filed in this lawsuit; right?
11   A  Yes.
12       MR. LEINENWEBER:  And let's turn, if we
13 could, Gabriel, to page 5, the bottom of page 5.
14   Q  Okay.  Can you see that well enough,
15 Mr. Winston?
16   A  Yes.
17   Q  Okay.  So you see here at the bottom of
18 the page it says "Facts particular to LeGrain
19 Winston"?
20   A  Yes.
21   Q  And paragraph 28 just mentions when you
22 started your employment.
23       MR. LEINENWEBER:  Can we continue to the
24 next page?

88

1    Q  Paragraph 29 talks about when you joined
2  EM, which is 1994 as we talked about, and then
3  paragraph 30 here, let's talk about this for a
4  second here.
5    A  Okay.
6    Q  This says that on or -- excuse me.  Wait a
7  minute.  I lost my page -- okay.  "On or about
8  April 9th, 2013, Chief Ranzino conducted roll call
9  during which he told Plaintiff LeGrain Winston
10 that, 'All of you look alike,' referring to the
11 African-American investigators"; right?
12   A  Okay.
13   Q  Do you see that?
14   A  Yeah, I see it.
15   Q  And you did -- okay.  So you considered
16 this to be an inappropriate statement; right?
17   A  Absolutely.
18   Q  Okay.  And what did you do about that fact
19 that it was an inappropriate statement?
20   A  Well, I expressed it to him that it was
21 inappropriate.
22   Q  Okay.  Anything else?
23   A  And I believe I wrote a -- wrote something
24 in regards to it.

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

89

1    Q  Do you remember who you wrote to?
2    **A  You know what?  Not offhand no, I don't.**
3    Q  Okay.  Do you have a recollection of
4  whether or not you filed a discrimination complaint?
5    **A  I believe I wrote an OPR complaint.**
6    Q  Okay.  And do you have a recollection of
7  whether or not you filed like a grievance about this?
8    **A  A complaint form, a complaint registration**
9  **form, I believe.**
10    Q  Did -- after you filed that complaint,
11 did -- was anything done with that complaint?
12    **A  Not that -- not to my knowledge, no.**
13    Q  So you filed a complaint, and it just went
14 off into the ether kind of like that other
15 grievance you were talking about?
16    **A  I'm assuming so, yes.**
17    Q  So you filed the complaint, and then as
18 far as you recall, nothing else happened?
19    **A  No, nothing else happened that I know of, no.**
20    Q  Did Chief Ranzino conduct roll call within
21 EM again after that?
22    **A  You know what?  I -- I couldn't really say**
23 **for sure, no.**
24    Q  Is it possible that he didn't?

---

90

1    MS. KRAUCHUN:  Objection; calls for
2  speculation.
3    Go ahead.
4    **A  I wouldn't be able to tell you that**
5  **correctly.**
6    Q  Do you have a recollection of him
7  conducting roll call again after you filed this
8  complaint about this comment?
9    **A  Possibly so, yes.**
10    Q  Okay.  And let's see, paragraph 31 here it
11 says on numerous occasions Chief Ranzino referred
12 to you as "boy"?
13    **A  Uh-huh.**
14    Q  And threatened to have you fired?
15    **A  Yes.**
16    Q  And are you able to tell us when Chief
17 Ranzino referred to you as "boy"?
18    **A  Just in talking -- talking to us.  It**
19 **possibly be a roll call.  It wasn't just him; it**
20 **was Rohloff, as well, would say the word "boy" or**
21 **"boys."**
22    Q  Okay.  And let's just stick with Ranzino
23 here because that's what your complaint says --
24    **A  Okay.**

---

91

1    Q  -- is that Ranzino said it.  So let's
2  stick with him for a second.
3    **A  Uh-huh.**
4    Q  Is it your understanding he was specifically
5  referring to you, or was it to a group of you and
6  other investigators?
7    **A  Well, to me if he was talking in my**
8  **direction.**
9    Q  Okay.  But do you get what I'm saying?
10 Like I'm just trying to understand, was it like
11 I'm talking to you and I'm using the word "boy,"
12 or was it I'm talking to a room full of people and
13 I'm using the word "boy" generally?
14    **A  It was used at different times.  So it was**
15 **times when he talked to me and called me a boy; it**
16 **was times when he was speaking to my other black**
17 **investigators and called us boys.**
18    Q  Okay.
19    **A  So if it was singular, it was "boy."  If**
20 **it was more, it was "boys."**
21    Q  Okay.  And do you have a recollection of
22 when Chief Ranzino referred to you as "boy" or
23 "boys"?
24    **A  That was numerous times and numerous times**

---

92

1  we told him to stop.
2    Q  And this was while he was still in EM; right?
3    **A  Correct.**
4    Q  And -- and you said that -- well, what
5  specifically did he say to you?
6    **A  Well, for instance -- you want a for**
7  **instance?**
8    Q  Well, let's talk about, what do you
9  remember him saying to you?
10    **A  Well, the last time I remember him calling**
11 **me a boy it stuck out in my mind because my sister**
12 **was dying in Arizona, and I was by my locker**
13 **crying, a little emotional because I was speaking**
14 **to her, and I was in roll call.  But I was in the**
15 **back of roll call, and he passed me, and I didn't**
16 **hear him at first, and he said, "Boy, I said go to**
17 **the roll call."  And I remember that because of my**
18 **sister -- a conversation I was having with my**
19 **sister, and she stated to me to just relax because**
20 **she heard it.**
21    Q  Did your sister end up passing?
22    **A  She passed away, yes.**
23    Q  And is that -- my condolences for your
24 loss.  It sounds like some time has certainly

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

93

1 passed since then, but that's certainly not an
2 easy thing to go through. Do you -- do you
3 remember, when your sister did pass?
4    A  Do I remember when?
5    Q  Yeah, do you remember what year?
6    A  She passed in 2018.
7    Q  Okay.
8    A  But she was diagnosed with terminal cancer.
9 That was the conversation that we were having.
10    Q  So it was kind of a lengthy illness it
11 sounds like.
12    A  Correct.
13    Q  All right.  And do you have any -- sorry.
14 Did I hear you were in the locker room and he was --
15    A  No, I was at my locker room.  There's a
16 locker that's in the common area.
17    Q  Okay.  And he was saying get to roll call
18 essentially?
19    A  Yeah.
20    Q  Okay.  And any other instances of him
21 calling you "boy" that you have a specific
22 recollection of?
23    A  No.  No.  There's been quite a few.
24    Q  Okay.  And did you file any complaint

---

94

1 registers or grievances regarding Chief Ranzino
2 calling you boy?
3    A  Yes.
4    Q  And do you have a specific recollection of
5 when you would have filed any of those grievances
6 or complaints?
7    A  No, I don't have the specific dates, no.
8    Q  Okay.  Do you have copies of those
9 materials that you filed?
10    A  I believe so, yes.
11    Q  Okay.  And those, like the others we
12 talked about, would have been ones you turned over
13 to your attorney and were produced in this
14 litigation?
15    A  Correct.
16    Q  All right.  And do you have any
17 understanding of what -- sorry -- strike that.
18      Let's move on to paragraph 32 here.  It
19 says, "On or about July 30th, 2015, Plaintiff
20 LeGrain Winston discussed work-related matters
21 with Director Shields when Shields became hostile
22 and screamed in Winston's face in a threatening
23 manner."  Do you see that paragraph?
24    A  Yes, sir.

---

95

1    Q  And here we have a specific date, July 30th,
2 2015.  Let's talk about this instance.  Where did
3 this incident occur?
4    A  It occurred at Rockwell.  It was in the
5 back of the office where the chiefs' desks were
6 right outside Director Shields' office.
7    Q  And it says here you were discussing
8 work-related matters?  Did you bring up the
9 work-related matters?  Did Director Shields bring
10 them up?  Who initiated the conversation here?
11    A  I did.
12    Q  So you went to Director Shields to raise
13 some work-related -- strike that.
14      You went to Director Shields to discuss
15 some work-related issues?
16    A  Correct.
17    Q  Do you remember what the work-related
18 issues were?
19    A  About the change in how we went to court.
20    Q  And what about that does -- what does that
21 mean, "the change in how we went to court"?
22    A  Previously we would go to court, and it
23 would be our tour of duty for that day.  It didn't
24 matter the hours; they would tell us that was our

---

96

1 tour for the day.  And on that particular day I
2 asked him what had changed.
3    Q  Excuse my ignorance here.  What do you
4 mean by your "tour of duty for the day"?  What
5 would that mean?
6    A  Tour of duty, my 3:00-to-11:00 shift.
7    Q  So are you saying then that -- obviously,
8 court is, you know, oftentimes first thing in the
9 morning.  So if you went to court on, you know,
10 Monday morning, then that time you spent there
11 would be used to cover your 3:00-to-11:00 shift
12 for the day?
13    A  Yes.  Previously it was a standing
14 operating procedure that when you went to court,
15 that was your tour of duty for the day.  Even
16 though some of us would want to come in and get
17 overtime, they would tell us, "No, that's your
18 tour of duty."
19    Q  And when you say "they," who are you
20 referring to?
21    A  Our supervisors would tell us, you know,
22 "That's your tour of duty."  They would give us a
23 subpoena for court and say that's -- I'll use your
24 example.  On Monday, you have court on Monday,

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

25 (97 to 100)

**97**

1  that would be your tour of duty for the day.
2     Q  Okay.  And so in that case -- well,
3  strike that.
4        Do you -- did it matter how much time you
5  spent at court?
6     **A  It generally didn't, no.**
7     Q  Okay.  So if you went to court, and you're
8  in and out of there in an hour because the
9  defendant doesn't show up or something, it's kind
10 of lucky you because you get now the tour of duty
11 for the day covered?
12    **A  Correct.**
13    Q  Okay.  Other times presumably you might be
14 stuck in court all day and be there the whole day?
15    **A  That's correct.**
16    Q  Okay.  Was it -- okay.  All right.  So
17 that's what you went there to discuss that day,
18 and you say that Shields became hostile and
19 screamed in your face in a threatening manner?
20    **A  Correct.**
21    Q  Okay.  What did -- what did Director
22 Shields say to you on that occasion?
23    **A  Basically, I asked what had changed**
24 **because I reported to work, and I don't know where**

**98**

1  it came from, but he lunged at me and pointed his
2  finger in my face and yelled.  Maybe he was having
3  a hard day, I don't know.
4     Q  But do you remember what he said?
5     **A  He told me get out of his face, and I had**
6  **to step back because I thought he was trying to**
7  **strike me.**
8     Q  Okay.  Did he say anything else that you
9  recall?
10    **A  Not that I recall, no.**
11    Q  Okay.  Did you say anything else to him?
12    **A  Yes.**
13    Q  Okay.  What did you say to him?
14    **A  I told him just because he's the director**
15 **doesn't give him the right to put his hand in my**
16 **face.**
17    Q  Did he say anything in response?
18    **A  Director Brady grabbed his arm, the arm**
19 **that he had in my face.**
20    Q  And then what happened next?
21    **A  He walked him into the office, and I**
22 **walked into the other office.**
23    Q  Okay.  What happened after that?
24    **A  I went to OPR.**

**99**

1     Q  And what did do you there?
2     **A  I filed a complaint.**
3     Q  Okay.  So you filed a complaint against
4  Director Shields related to this incident?
5     **A  Correct.**
6     Q  Okay.  And do you know what happened to
7  that -- with that complaint after you filed it?
8     **A  No.**
9     Q  So, again, you just -- you just don't know
10 what happened to it?  There could have been
11 something done with it but you don't know?
12    **A  I don't know.**
13    Q  Anything else related to that incident
14 that you haven't told me about?
15    **A  No.  Not that I know of, no.**
16    Q  Okay.  And then paragraph 33 here it says
17 on or about August 19th, 2015, Director Shields
18 told you, quote, "I'm going to try my best to get
19 you fired"?
20    **A  Correct.**
21    Q  Okay.  And, again, here we have a specific
22 date, and it's just a few weeks later.  Where did
23 this conversation take place?
24    **A  In the office.**

**100**

1     Q  Okay.  Where in the office?
2     **A  I believe it was in the -- by the chief's**
3  **office.**
4     Q  Okay.  Was this another circumstance where
5  you were coming to ask him about something, or
6  what -- how did this conversation come about?
7     **A  I didn't have a conversation with him.**
8  **He -- he said that to me.  It was directed to**
9  **just me.**
10    Q  Okay.
11    **A  I was through talking to him.**
12    Q  Okay.  Did you say anything in response
13 to that?
14    **A  I shook my head.**
15    Q  Okay.  Anything else?  Did he say anything
16 else or that was it?
17    **A  That was it.**
18    Q  Okay.  And was anybody else present for
19 that conversation?
20    **A  Not that I know of, no.**
21    Q  Okay.  Did you file a complaint regarding
22 that interaction?
23    **A  I -- I wrote a memorandum per Director**
24 **Rentas.  She said to attach my OPR complaint**

Transcript of LeGrain Winston
Conducted on August 28, 2020

101

1 number from my previous one to that one. And I
2 attached that memorandum to that previous
3 OPR complaint.
4     Q  Okay. And do you know what happened
5 within that complaint?
6     A  No.
7     Q  All right. And then paragraph 34 here it
8 says, "Plaintiff LeGrain Winston named numerous
9 complaints regarding the above-mentioned instances,
10 yet the conduct continued." Do you see that
11 language there?
12    A  Yes, I see it.
13    Q  When you say you made numerous complaints,
14 are these the ones we've been talking about, like
15 the memorandum you just mentioned, the complaints
16 to OPR, the grievances?
17    A  Yes.
18    Q  Are there any other complaints other than
19 those written ones that you made regarding the
20 above-mentioned incidents?
21    A  Not that I believe, no.
22       MR. LEINENWEBER: Gabriel, if we could
23 move to page 11.
24    Q  I believe that's readable there for you,

102

1 Mr. Winston. If it's not, just let us know.
2       Halfway down it says "Facts relevant to
3 multiple plaintiffs." Do you see that language?
4     A  Yes, yes.
5     Q  Okay. All right. So let's go to
6 paragraph 79 about this scabies incident. That
7 doesn't apply to you; right?
8     A  No, it doesn't.
9     Q  Okay. You weren't involved in that, I
10 didn't think.
11    A  No.
12    Q  Let's talk about paragraph 80 here.
13 Paragraph 80 says, "Director Shields and his
14 subordinate supervisors in the EM regularly called
15 Plaintiffs words such as the N-word, crooks, and
16 other derogatory and racist comments." Do you see
17 that language there, sir?
18    A  Yes.
19    Q  When did -- when did Shields -- sorry --
20 strike that.
21       Did Shields call you the N-word?
22    A  No, he didn't.
23    Q  Did any of the other defendants call you
24 the N-word?

103

1     A  Yes.
2     Q  Okay. Who?
3     A  Chief Ranzino.
4     Q  Okay. Let's talk about that. When did --
5 sorry. Any of the other defendants, as well, or
6 just Ranzino?
7     A  Just Ranzino.
8     Q  Okay. And when did -- when did this happen?
9     A  It happened after he attempted to give me
10 a write-up for some days off, a write-up from --
11 that he didn't write; it was from Chief Neal.
12    Q  Okay.
13    A  I don't know if you want me to elaborate
14 on it.
15    Q  Well, let's provide some sort of context
16 here as much as we can. When, as best as you can
17 recall, did this occur?
18    A  Okay. You said when?
19    Q  Yeah. When, as best as you can recall,
20 did this occur?
21    A  It occurred -- it would be simultaneously
22 to the write-up, I guess that I received when they
23 wanted me to lift the wheelchair-bound inmate into
24 the van, delivery van, and they wrote me up for

104

1 not lifting a wheelchair-bound inmate into the van.
2     Q  And I think you said Neal wrote you up for
3 that incident, but Ranzino was giving you the
4 write-up?
5     A  He was giving -- I don't know. I think
6 Neal was out and he was giving me the write-up.
7     Q  Okay. And where did this take place?
8     A  The conversation?
9     Q  Correct.
10    A  It was in the break room at 2323 South
11 Rockwell on the 6th floor.
12    Q  Okay. And who was present other than you
13 and Mr. Ranzino?
14    A  It was me -- it was me -- it was Williams,
15 me, and Williams.
16    Q  And what specifically did Mr. Ranzino say
17 to you?
18    A  Well, he was essentially telling us we
19 needed to take the days offered for the write-up.
20 Well, he actually lied and said Investigator Larry
21 already took the three days offered for the
22 write-up.
23    Q  Okay.
24    A  And I refused. I said, "I'm grieving this

Transcript of LeGrain Winston
Conducted on August 28, 2020

105

1  and I'm not taking it."
2      Q  Okay.  And then what happened?
3      A  He said, "Well, this meeting is over."  So
4  he proceeded to leave out, walk down the hallway,
5  and he called me a dumb ass nigger.  And I asked
6  him what did he say.  I said, "What did you say?"
7  He said, "Nothing."  He said, "I didn't say
8  nothing."
9      Q  Okay.
10     A  But I clearly heard him say "dumb ass
11 nigger."
12     Q  Okay.  And did -- you said you were in the
13 break room?
14     A  We were initially -- the meeting for the
15 grievance took place in the break room.
16     Q  Okay.  So you guys were there for a
17 meeting for the grievance?
18     A  He asked could he speak to us, and he went
19 in the break room and we followed him.
20     Q  Okay.  And did you guys sit down in the
21 break room?
22     A  I don't believe I did, no.
23     Q  Okay.  And then he -- you guys talked
24 about, "Take the discipline; I'm grieving it," and

106

1  then he left the break room, started to walk down
2  the hallway, and you heard him use that language?
3      A  Correct.
4      Q  And you said -- what did you say and he
5  said "Nothing"?
6      A  Well, I asked him -- I was appalled that
7  he said that.  I said, "What did you say?"
8      Q  Yeah.  And his response was "Nothing.  I
9  didn't say anything"?
10     A  Yeah.
11     Q  Not he didn't have a response, his
12 response was, quote, "Nothing"?
13     A  Nothing.
14     Q  Meaning that "I didn't say anything"?
15     A  Correct.
16     Q  Okay.  And did -- did he say anything else,
17 or did you say anything else to him at that time?
18     A  I didn't say anything else to him at that
19 time, no.
20     Q  Okay.  Did you and Mr. Williams talk
21 about it?
22     A  I asked him, "I can't believe he said that."
23     Q  And what did Mr. Williams say?
24     A  He said the same.  He shook his head.

107

1      Q  Okay.  Anything else?  Did you guys continue
2  to talk about it?
3      A  No, that's all I recall.
4      Q  What did you do next regarding this incident?
5      A  I believe I wrote a complaint up.  I think
6  I wrote the Teamsters.  I think I wrote Director
7  Miller on that one, as well, I believe.
8      Q  Sorry, you said "Director Miller."  Who is
9  Director Miller?
10     A  He's the director over at the jail.
11     Q  Okay.
12     A  Over the whole -- well, at that time he was.
13     Q  So he's further up in the chain of command,
14 in other words?
15     A  Correct.
16     Q  Okay.  So you wrote a complaint, a
17 grievance, and a memo to Director Miller?
18     A  Correct.
19     Q  And what happened as a result of those
20 things you wrote?
21     A  Nothing.
22     Q  Okay.  And do you know -- well, how do you
23 know that nothing else happened?
24     A  Well, he stayed there and continued to work.

108

1      Q  Was this before or after the "all of you
2  look alike" comment?
3      A  I believe this -- that had to be possibly
4  before.  I'm not sure the order.
5      Q  And then back to paragraph 80 there of the
6  complaint, you see it also says that, "Director
7  Shields and his subordinate supervisors regularly
8  used the word 'crooks.'"  What -- what are you
9  referring to there?
10     A  Oh, a conversation I had with Chief Neal.
11     Q  Okay.  So the word "crooks" was used by
12 Chief Neal?
13     A  Correct.
14     Q  So not Shields, not Rohloff, not Ranzino?
15     A  No, it was used by Neal.
16     Q  Okay.  And when did that happen?
17     A  It happened in -- it was at the gas
18 station, and I was discussing with him about the
19 mandation ago, illegal mandation of overtime.  I
20 was working multiple days overtime.  And he got
21 infuriated that I kept asking him why it was being
22 mandated every day, and he reached over and called
23 me a crook, called me a crook.
24     Q  Okay.

Transcript of LeGrain Winston
Conducted on August 28, 2020

28 (109 to 112)

109

1    A  And "I found me some crooks."
2    Q  Okay.  Sorry to interrupt there.  Did he
3  say anything else?
4    A  No.
5    Q  Okay.
6    A  Not at that time that I can remember.
7    Q  Then it says here also in paragraph 8 that
8  there were other derogatory and racist comments.
9  What other derogatory or racist comments were made
10  to you by Director Shields or the subordinate
11  supervisors?
12    A  Just certain things like addressing roll
13  call saying if you can't speak English, you don't
14  deserve to go on house arrest.  There's a lot of
15  people that don't speak English.  You've got a lot
16  of Hispanic -- in other words, if you can't speak
17  English, you don't deserve to go on house arrest.
18    Q  So that would be regarding detainees?
19    A  I found that to be insulting.
20    Q  Sorry; I think we ended up talking over
21  each other.
22    A  Yeah.
23    Q  Sorry; were you finished with your answer?
24    A  No, I wasn't.  You cut me off.

110

1    Q  Go ahead.  Sorry.
2    A  No, I just was saying that multiple --
3  there's been multiple complaints like that as far
4  as statements like that, saying "If you can't
5  speak English.  You need to be American."  And a
6  lot of our participants are Spanish speaking, or
7  they might be even Polish speaking, or
8  Czechoslovakian, or whatever, but that was a
9  comment that was inappropriate, as well.
10    Q  And that was a comment regarding detainees?
11    A  Correct.
12    Q  So that wasn't regarding EM investigators
13  or employees; right?
14    A  No.
15    Q  Any other derogatory or racist comments?
16    A  Besides the "boys" and all that, no.
17    Q  Sure.  And that's a good -- that's a good
18  point.  So we talked about "boys" and then
19  Ranzino's comment "All of you look alike."  So
20  other than the incident with Ranzino using the
21  N-word, Neal using the word "crooks," Ranzino
22  saying "All of you look alike," and I think you
23  said Ranzino and Rohloff referring to you guys as
24  "boys," any other racist or derogatory comments

111

1  that we haven't covered?
2    A  No.
3    Q  That comment where -- where Shields
4  threatened to have you fired, was that the only
5  time he threatened to have you fired, or were
6  there other incidents where he threatened to have
7  you fired?
8    A  He stated to me that I'll be out of here
9  real soon.
10    Q  Okay.  And do you recall when that was?
11    A  I noted it when he said it on my -- I took
12  a note of it when he said it.  I don't have that
13  in front of me now, so I can't tell you.
14    Q  Is that something you -- sorry; is that
15  something you did periodically, though, you would
16  note down something that was said that you found
17  either offensive or inappropriate?
18    A  I would write it down, yes.
19    Q  Okay.  And what would you write it down on?
20    A  Sometimes I would write it down on my note
21  pad, or I would write notes on my phone.
22    Q  Okay.  Notes on your phone?  How would you
23  write a note on your phone?
24    A  Like Inkbox.

112

1    Q  Inkbox?
2    A  Yeah.
3    Q  And then do you still have either those
4  notebooks or that note box app that you're talking
5  about?
6    A  Yes.
7    Q  You do?
8    A  Yes.
9    Q  And did you review either those notebooks
10  or the phone note app to see if you had any
11  responsive materials related to this litigation?
12    A  Did I review it?
13    Q  Yes.
14    A  No, I didn't.
15    Q  You didn't?
16    A  No, I didn't.
17    Q  Okay.  So do you still have that phone?
18    A  Yes, I do.
19    Q  Okay.  Do you still have those -- that
20  notebook?
21    A  I believe I have it saved, yes.
22    Q  When you say "notebook," are you talking
23  about a physical notebook that you had, as well,
24  like paper?

Transcript of LeGrain Winston
Conducted on August 28, 2020

29 (113 to 116)

113

1    A  No, I'm talking about my Inkbox.  It's
2  called a notebook.
3    Q  Okay.  So you would take out your phone
4  and type down a note, not take out a physical
5  notebook and write it down?
6    A  No, I would -- I would save it on my
7  phone.  New technology.
8    Q  Yeah, replace the old pen and stuff.
9    A  Yep.
10    Q  And you did not review that related to
11  this litigation, though, to see if you have any of
12  those materials?
13    A  The specific one you have I didn't -- I
14  didn't -- I didn't go over it.  No, I don't -- I
15  didn't.
16    Q  Is there any reason you didn't do that?
17    A  Well, whatever I have sent to my attorney,
18  she has it.  I went over my interrogatories.
19    Q  Okay.  Did you send that -- what is it
20  called, InkPad?
21    A  I believe it's InkPad.
22    Q  So I'm going to refer to it as the phone
23  app just because that's going to be easier for me.
24    A  Okay.

114

1    Q  Did you provide that to your attorney?
2    A  I believe so, yes.
3    Q  Okay.  And is there any reason why you
4  wouldn't be able to turn over those materials on
5  the phone app?
6    A  The materials related to that, yes.
7  There's no problem, no.
8    MR. LEINENWEBER:  And I'll just say for
9  the record, Kelly, I don't think we've received
10  any of those materials and would ask that either
11  you confirm that they've been reviewed and there's
12  nothing responsive, or if they were produced,
13  perhaps we're missing them, you know, like just
14  not noticing that they're in the production.  If
15  you could point us to those things, that would be
16  much appreciated.
17    MS. KRAUCHUN:  Sure.  I'll look into it,
18  Justin, and let you guys know.
19    MR. LEINENWEBER:  Thanks.  I think those
20  would be responsive to some of our requests, so I
21  appreciate that.
22    Is everyone doing okay?  We're approaching
23  12:30.  Paula or Gabriel, do you guys need a break
24  at all?

115

1    THE COURT REPORTER:  I'm okay.
2    MR. LEINENWEBER:  Mr. Winston, are you
3  doing okay?
4    THE WITNESS:  Yeah.
5    MS. KRAUCHUN:  Why don't we just shoot for
6  1:00 as long as you're not in the middle of
7  something.
8    MR. LEINENWEBER:  Let's try and push
9  through to 1:00 and then take a little bit longer
10  break then and then just keep moving.
11    MS. KRAUCHUN:  Okay.
12    MR. LEINENWEBER:  Okay.  Gabriel, can you
13  take down Exhibit 1 and then bring up Exhibit 2?
14    (Winston Deposition Exhibit 2 marked for
15  identification and attached to the transcript.)
16    Q  So, Mr. Winston, we're handing you what's
17  been marked as Winston Exhibit 2.  The title of it
18  is "Plaintiff LeGrain Winston's Objections and
19  Answers to Defendant Gregory Shields' First Set of
20  Interrogatories."  Do you see that?
21    A  Okay.
22    MR. LEINENWEBER:  And then, Gabriel, if we
23  could go to the last page of that document.
24    Q  Do you see this page here, Mr. Winston?

116

1  It's a verification it says.
2    A  Yes, I see it.
3    Q  Okay.  And it says in the last sentence
4  there, "I declare under penalty of perjury that
5  the foregoing is true and correct"?
6    A  Yes.
7    Q  And then that's your signature?
8    A  Yes.
9    MR. LEINENWEBER:  Let's go to page 2, please.
10  And can you scroll down a little bit just so the
11  question and answer for No. 2 is visible.
12    Q  Okay.  Mr. Winston, here we asked you to
13  describe what you recalled about the April 9th,
14  2015, interaction with Mr. Ranzino where he said
15  that "You all look alike."
16    A  Uh-huh.
17    Q  Excuse me; I've got something in my
18  throat.
19    And we've talked in detail about that this
20  morning.  Is there anything either that you didn't
21  cover in your testimony or didn't cover in this
22  response that occurred regarding this incident?
23    A  Not that I know of, no.
24    MR. LEINENWEBER:  Okay.  Well, take a

Transcript of LeGrain Winston
Conducted on August 28, 2020

117

1  second and just review your response here and just
2  confirm for me that there's nothing else that is a
3  relevant fact for that incident.
4       And, Gabriel, just to make it clear,
5  you're going to have to scroll a little bit to the
6  top of page 3, as well, because the answer
7  trickles onto that one.
8    Q  Anything else, Mr. Winston, you'd like to
9  add to that testimony or this answer regarding
10 that incident?
11   A  No.
12   Q  Okay.
13      MR. LEINENWEBER:  And then if we could
14 scroll down to Question 3 and the response thereto.
15   Q  And here, Mr. Winston, here we're talking
16 about the incident where Chief Ranzino and Deputy
17 Chief Rohloff made references to you African-American
18 investigators as boys --
19   A  Uh-huh.
20   Q  -- do you see that?  Anything -- and we've
21 talked about that this morning, as well; right?
22   A  Yes.
23   Q  Anything that you would add --
24   A  I'm sorry; what?

118

1    Q  We've talked about this morning, as
2  well; right?
3    A  Okay.
4    Q  And then anything else that you would add
5  to that testimony today or to this response that
6  is relevant to this incident -- these incidents?
7    A  No.
8       MR. LEINENWEBER:  And then, Gabriel, if we
9  could go to 4.  The question is at the bottom of
10 3 here and then the response.  Oh, you've got the
11 whole thing there.
12   Q  So this question, Mr. Winston, is talking
13 about Director Shields -- the yelling incident,
14 I'll call it, on July 30th, 2015; right?
15   A  Okay.
16   Q  And then we talked about that incident, as
17 well; right?
18   A  That's correct.
19   Q  Okay.  And then this one, your answer, it
20 mentions an August 3rd, 2015, memo, and we'll look
21 at that in a second.  But other than that, any
22 additional facts related to that incident that
23 you'd like to add to your testimony today or to
24 this response?

119

1    A  Not at this moment, no.
2       MR. LEINENWEBER:  And let's go ahead and --
3  Gabriel, we can take this one down for a second,
4  and then can you pull up Exhibit 3.
5       (Winston Deposition Exhibit 3 marked for
6  identification and attached to the transcript.)
7    Q  Mr. Winston, we've handed you what's been
8  marked as Winston Exhibit 3.  It's as August 3rd,
9  2015, memo that appears to be drafted by you, and
10 it was produced to us by your attorneys under the
11 Bates No. P000001.  Is this the -- this is the
12 memo you're referring to that you filed regarding
13 this incident with Director Shields?
14   A  Correct.
15   Q  Okay.  And it looks like here in the
16 second paragraph you have a couple things that you
17 say Shields said to you, including "Who ordered
18 you to take off," and a little bit further down
19 then, "I'm ordering you to give me a name," stepping
20 forward and placing his hand in your face as if to
21 strike?
22   A  Yes.
23      MR. LEINENWEBER:  Okay.  We can set that
24 one aside.  And then can you pull Exhibit 2 back

120

1  up, please.  And then can we scroll down to
2  Question 5 and the answer to that.
3    Q  Okay.  Mr. Winston, this -- this is your
4  interrogatory responses again, and this question
5  asked about the interaction with Defendant Shields
6  on August 19th, 2015 --
7    A  Uh-huh.
8    Q  -- from paragraph 33 of the complaint
9  which is where he said, quote, "I'm going to try
10 my best to get you fired"?
11   A  Yes.
12   Q  You reference, it looks like a separate
13 memo dated August 19th, 2015.  Anything else that
14 you -- we'll look at that in a second, but
15 anything else about that interaction or that
16 incident that you'd like to add to your testimony
17 that's relevant to it or to this response?
18   A  No, not that I recall, no.
19      MR. LEINENWEBER:  Gabriel, can we pull up
20 Exhibit 4?
21      (Winston Deposition Exhibit 4 marked for
22 identification and attached to the transcript.)
23   Q  Mr. Winston, we've handed you what's been
24 marked as Winston Exhibit 4.  This is a memo that

Transcript of LeGrain Winston
Conducted on August 28, 2020

121

1  appears to be drafted by you and dated August 19th,
2  2015.  It was produced by your attorneys in this
3  litigation Bates-labeled P000002.  Do you see that
4  document?
5      **A  Yes.**
6      Q  Okay.  And then here it looks like you
7  reference in the second paragraph that Director
8  Shields approached you and stated, quote, "I'm
9  going to try my best to get you fired."
10     **A  Yes.**
11     Q  And then it says you shook your head and
12 walked away; right?
13     **A  Yes.**
14     Q  And then it says you went to report the
15 incident to OPR?
16     **A  That's correct.**
17     MR. LEINENWEBER:  Okay.  We can set that
18 one aside, Gabriel.  And then if we could pull
19 Exhibit 2 back up.
20     Okay.  Can we look at Question 6 and the
21 response to that one?  Perfect, thank you.
22     Q  So this asks you to identify complaints
23 and grievances you made regarding your allegations
24 in paragraphs 30 through 34 of the complaint, and

122

1  here you've identified some of the documents we
2  just looked at, including your August 3rd, 2015,
3  memo dated -- sorry, Bates-stamped P000001 and
4  then the August 19th memo dated P000002, and then
5  also a charge of discrimination that you filed on
6  July 25th, 2016; right?
7      **A  Correct.**
8      Q  Any other complaints or grievances you made
9  regarding the allegations from paragraph 30 to
10 34 there?
11     **A  Any other -- not that I recall, no.**
12     MR. LEINENWEBER:  Okay.  And Gabriel, can
13 we pull up Exhibit 5 now?
14     (Winston Deposition Exhibit 5 marked for
15 identification and attached to the transcript.)
16     Q  Mr. Winston, we've handed you what's been
17 marked as Winston Exhibit 5.  This is the charge
18 of discrimination filed with the EEOC, and it
19 looks like your signature is at the bottom.  Could
20 you confirm that's your signature there at the
21 bottom?
22     **A  Yes, it is.**
23     Q  Okay.  And that's dated June 23rd, 2016?
24     **A  Correct.**

123

1      Q  Okay.  One question I had here, you
2  indicated -- in the "Cause of discrimination based
3  on," you indicated disability.  You're not
4  bringing a disability claim in this lawsuit,
5  though; right?
6      **A  Excuse me?  A disability claim?**
7      Q  You don't have a disability claim in this
8  lawsuit; right?
9      **A  No, I -- no.**
10     Q  And it says here in this second paragraph
11 of the sort of narrative there, there's a
12 reference to -- it says -- let's see -- "Some have
13 made derogatory comments to me such as 'boy, dumb
14 ass N-word, and crooks, and you all look alike'";
15 right?
16     **A  Uh-huh.**
17     Q  We've already talked about all those
18 incidents; right?
19     **A  That's correct.**
20     Q  And you don't have anything to add in
21 terms of the sort of particular facts related to
22 those incidents; right?
23     **A  No.**
24     MR. LEINENWEBER:  All right.  We can set

124

1  that one aside for a minute.  And then if we could
2  go back to Exhibit 2, please, and we'll move on to
3  Question 7 and the response to that.
4      Q  Okay.  So Question 7 asks you about
5  Defendant Shields threatening to fire you, and
6  here is where I think you mention that sort of
7  second -- I think it was the second incident.
8  Well, let's see.  Your response -- in the second
9  sentence your response it says, "Director Shields
10 threatened to fire me on August 19th, 2015, when
11 he stated, 'I'm going to try my best to get you
12 fired'"; right?
13     **A  Right.**
14     Q  And then -- oh, yeah, this is what I was
15 talking about.  It also says, "Further, on
16 September 12th, 2015, Director Shields stated,
17 'You'll be gone real soon'"; right?  Do you see
18 that language there?
19     **A  Yes.**
20     Q  Okay.  So any -- and we have already
21 talked about both of those comments that were made
22 to you, as well; right?
23     **A  Correct.**
24     Q  Okay.  And do you have any other facts to

125

1   add to the particulars of either of those incidents?
2       A  No.
3       Q  Okay.  What do you think Director Shields
4   was referring to when he said, "You'll be gone
5   real soon"?
6       A  You said what do I think?
7       Q  Yeah, exactly.  Did you have an understanding
8   of what he meant by that, why you would be gone
9   real soon?
10      A  I believe he meant I'd be fired.
11      Q  And why would you possibly be fired do you
12  think?
13      A  Well, one, he stated it.
14      Q  Okay.  But do you have any other
15  understanding of what you think he meant by
16  "You'll be gone really soon" or why he thought
17  you'd be gone real soon?
18      A  Well, because he previously stated that
19  I'd be fired.
20      Q  Okay.
21      A  That's my understanding.
22      Q  Okay.  And do you have any understanding
23  of why he felt that you would be gone or should be
24  fired?

126

1       A  Not at that present time I didn't, no.
2       Q  All right.  And then you say here in the
3   next sentence, "Director Shields falsely filed an
4   OPR complaint against me and my coplaintiff
5   Investigator Ferguson stating we falsified
6   one court appearance.  This is an erroneous
7   complaint."  Do you see that language?
8       A  Yes.
9       Q  What's this referring to?
10      A  We were subpoenaed to go to court.
11      Q  Okay.  And what happened?
12      A  You want me to explain what happened in
13  court?
14      Q  Yeah.  What happened with this incident
15  that you're referring to here?
16      A  We were subpoenaed to go to court to testify.
17  Turned out we were the wrong people subpoenaed.
18  The State's Attorney informed us -- she called our
19  names out; we were the wrong four people she
20  called out.  She said, "This is a cluster F."  She
21  said, "Give me your three-part forms; I'll sign
22  them.  Give me your numbers.  You guys go to
23  lunch.  If I need you, I'll call you.  If not,
24  have a good day."

127

1       Q  And did she end up calling you?
2       A  She never called us.  I never -- I never
3   left -- I left the building to go to lunch.  I
4   waited around an ample amount of time and I
5   reported to work.
6       Q  What building are you talking about?
7   Where were you guys?
8       A  We were at CCB, Cook County building.
9       Q  Help me out here, where is that?  What's
10  the address?
11      A  26th and California.
12      Q  26th and California?
13      A  Correct.
14      Q  And you said that the four of us.  Who are
15  you referring to?
16      A  It's me, Investigator Ferguson,
17  Investigator Rico, and Investigator Shedor.
18      Q  And those are all four EM investigators?
19      A  Correct.
20      Q  Okay.  And you say -- okay.  See you say
21  here that Shields falsely filed an OPR complaint
22  against you?
23      A  Yes.
24      Q  Okay.  Explain that to me.  How did he

128

1   falsely file a complaint against you?
2       A  Well, one, he had a complaint filed against
3   him, and my understanding is if you have a
4   complaint as a supervisor filed against you from
5   an officer or an investigator, you're unable to
6   file a complaint against the person that has a
7   complaint against you.  That's number one.
8       Two, the accounts of that day, I never got
9   paid for that day, and I went to work on that day.
10  So it was a false complaint.  And I was not the
11  right person subpoenaed for that date.  None of
12  those were my -- was my fault.  That's an
13  administrative issue.
14      Q  Anything else about Shields' complaint
15  about this incident that was false?
16      A  Well, the dates on the complaint were
17  false, and the incident itself was.  Like I said,
18  we didn't get paid for that day, and we were the
19  wrong people subpoenaed.
20      Q  And you said that Shields had a complaint
21  filed against him already at the time?
22      A  Well, I -- yes.
23      Q  Okay.  And what was that?
24      A  Well, in your previous question it was

129

1 August 19th I had a complaint that was registered
2 with OPR with the complaint number.
3    Q So that's the August 19th comment, "I'm
4 going to try and get you fired"?
5    A That comment was attached to a previous
6 complaint prior to that one.
7    Q Oh, the August 3rd, 2015, complaint to OPR
8 about the yelling incident?
9    A Correct.
10    Q Okay.
11    A Correct. The memorandum was told to me to
12 be attached to that. I believe it was 2015 0286.
13    Q Okay.
14    A I can't never forget that.
15    Q So your contention is essentially that you
16 and your three colleagues presumably did nothing
17 wrong; you guys went to court; it turned out you
18 were the wrong officers subpoenaed; you did your
19 time and then that's it?
20    A Yes. Under our policy we are under the
21 directive of the State's Attorney until she
22 releases us.
23    Q Okay.
24    A Under the Lexipol policy we're under her

130

1 jurisdiction until she releases us. She never
2 released us until it was time for me to go to work.
3    Q Got it. So you said you came there, and
4 she said, "This is a cluster F; you guys are the
5 wrong guys; go ahead have lunch; I'll call you if
6 I need you"?
7    A Correct.
8    Q What did you do next?
9    A I went to lunch.
10    Q Okay. And then what about after lunch?
11    A I waited around for her to call me.
12    Q And then when she didn't call you, what
13 did you do?
14    A I went to work.
15    Q Where did you go to work that day? Was it
16 at EM?
17    A EM, correct.
18    Q Okay. So you went straight from court, to
19 lunch, to court, to work?
20    A I went from court to lunch. I stood by
21 waiting for her to call me on compound. She
22 didn't call me and I went to work when it was time
23 to go to work.
24    Q Okay. And then so, I guess I'm confused

131

1 here and maybe you are, too. What's the
2 allegation of -- you know, what were you supposed
3 to have done wrong?
4    A You said you're confused?
5    Q Yeah. And I said I suppose, you know --
6    A I'm not confused. I mean, if you're
7 confused, explain it to me. Maybe I can help
8 you out.
9    Q What about this was wrong? What was
10 inappropriate about what you did?
11    A Well, basically what was inappropriate was
12 the actual complaint itself. We had previously,
13 like I told you before, used court as a tour of
14 duty for that day. I did not use it as a tour of
15 duty for that day. I came into work. I was the
16 wrong person subpoenaed, so I shouldn't have even
17 been at court that day. I think they should have
18 been a little bit better at what they were doing.
19 And I haven't been paid for that day as of today,
20 so I haven't received funds for going to court on
21 that day.
22    Q Okay. And you said you didn't use it for
23 tour of duty for the day, but what was the
24 allegation? What are you alleged to have done

132

1 wrong, I guess is the better way to ask it.
2    A What was alleged?
3    Q Yeah.
4    A What was alleged was that we stole two or
5 three hours of time, I guess.
6    Q Okay.
7    A That we essentially took two or three hours
8 of time. So how do you take time that you've
9 never been paid for?
10    Q Okay. And Shields filed this complaint
11 against you?
12    A Shields and Neal. Their name is on the
13 complaint.
14    Q Okay. Shields and Neal filed this
15 complaint against you?
16    A Correct.
17    Q Why did Shields and Neal believe, if you
18 know -- strike that.
19    Do you know what led Shields and Neal to
20 believe that you had done something wrong related
21 to this incident?
22    A That's not a question for me to ask what
23 they thought, what Shields and Neal did. I
24 believe what I believe.

Transcript of LeGrain Winston
Conducted on August 28, 2020

34 (133 to 136)

133

1    Q  I understand that.  I'm just trying to
2  understand, do you have any understanding of why
3  they believed that you had done something wrong?
4  You may not.  I don't know.
5       MS. KRAUCHUN:  I'm just going to object
6  that it calls for speculation.
7       But go ahead.
8       THE WITNESS:  Hello?
9       MR. LEINENWEBER:  You can answer.
10   A  No.
11   Q  So you have no understanding of why they
12 would have done that -- why they would have
13 believed that -- sorry?
14   A  No.
15   Q  And you said -- well, what's the status --
16 well -- sorry -- strike that.
17      Let me ask you, who was the ASA you spoke
18 to that morning, the Assistant State's Attorney
19 you spoke to?
20   A  We actually spoke to two Assistant State's
21 Attorneys.
22   Q  Okay.
23   A  I'm not quite sure.  I actually don't
24 recall their names.

134

1    Q  Did you receive discipline related to that
2  incident?
3    A  I'm going through discipline right now.
4    Q  What was the discipline that you were
5  given?
6    A  I've been in the Merit Board for the last
7  5 1/2 years pending termination for that incident.
8    Q  When did you get the initial sort of word
9  that the discipline for this incident would be
10 termination?
11   A  I want to say roughly almost -- almost a
12 year later.
13   Q  Okay.  So this would have been in 2016 then,
14 summer of 2016?
15   A  It's around -- it was 2016, yes.
16   Q  And who made the decision that you should
17 be terminated for this offense?
18      MS. KRAUCHUN:  Objection; foundation.
19      MR. LEINENWEBER:  All right.  I'll strike
20 that question.
21   Q  Do you know who made the decision that you
22 should be terminated for this offense?
23   A  No, no.  I know Chief Neal and Director --
24 Chief Neal and Director Shields' name were on the

135

1  complaint.  I know that.
2    Q  But you do not know who made the
3  determination that you should be terminated for
4  this offense?
5    A  No.  I know who started the process.
6    Q  Do you know what was the discipline for
7  the other three investigators involved determined
8  to be?
9    A  The same.
10   Q  Termination?
11   A  Correct.
12   Q  And what's the -- sorry -- strike that.
13 Let's go to Question 8 and the answer there.
14      Okay.  This Question 8 asks you, "If not
15 already answered above, identify each and every
16 instance in which the defendants used offensive,
17 derogatory, or racist language."  And then here --
18 let's see.  In response -- well, take a second to
19 familiarize yourself with 8A and B, and then we
20 can continue down all the way through 8H.
21      MR. LEINENWEBER:  And, Gabriel, if you
22 could help him scroll down.  So, Mr. Winston, just
23 tell Gabriel to move down when you've reached to
24 the bottom of the page and she'll keep scrolling.

136

1       THE WITNESS:  Okay.  Scroll.
2       MR. LEINENWEBER:  And then, Gabriel, if
3  you could just scroll back up to letter A.
4    Q  So 8A here you put some info about the
5  detainees not speaking English; right?
6    A  Correct.
7    Q  Okay.  And we talked about that.  Letter
8  B, as in "boy" it references the "dumb ass N-word"
9  incident with Chief Ranzino?
10   A  Uh-huh.
11   Q  And it says here that was in and around
12 summer of 2012.  Does that refresh your
13 recollection that this was in or around summer of
14 2012 when this incident occurred?
15   A  Yes.
16   Q  Okay.  Can we go to Exhibit C?
17   A  I have to plug my computer in; the battery
18 is running low.
19   Q  We're going to take a break here in just
20 two minutes.
21   A  That's fine, that's fine.
22   Q  And then this is where you were talking
23 about running into Neal at the gas pumps, and he
24 used the word "crooks"; right?

Transcript of LeGrain Winston
Conducted on August 28, 2020

137

1     A  Yes.
2     Q  And then D, as in "dog," I don't think we
3  talked about this one, but it looks like he
4  referenced "stupid mother F'er"; right?
5     A  Yes.
6     Q  Anything else to add about that incident
7  where Chief Neal called you "stupid mother F'er"?
8     A  No, he didn't call me a stupid --
9     Q  Oh, I'm sorry.  Who was he talking about?
10    A  He called Neal a stupid mother fucker.
11    Q  Oh, Chief Ranzino did.  I'm sorry; I was
12 confused.  I was stuck on the crooks incident.
13    Okay.  Then E, as in "Edward," looks like
14 Chief Neal said to you he can't stand your dumb
15 ass; right?  And this one -- I don't think we
16 talked about this one.  Anything else to add here?
17    A  For E?
18    Q  Yeah.  E, as in "Edward."
19    A  No.
20    Q  I think you -- did you file a grievance
21 regarding this one?
22    A  I did.
23    Q  Oh, yeah.  "I wrote a grievance letter."
24 Okay.  And it just says no corrective actions were

138

1  taken?
2     A  No.
3     Q  And do you have an understanding of
4  whether or not that was -- whether that was --
5  sorry; I totally lost my train of thought.
6     F, it says Chief Neal told you you were
7  in trouble.  Any other facts related to this
8  August 25th, 2015, phone call?
9     THE WITNESS:  Can you scroll up a little
10 bit?  Because it's just a second line.
11    MR. LEINENWEBER:  Scroll down, Gabriel.
12 There you go.
13    THE WITNESS:  All right.  Thank you.
14    A  No.
15    Q  And then next page, G, and this is -- it
16 references an August 20th, 2015, write-up.  Do you
17 see that one here --
18    A  Yes.
19    Q  -- for a 10-day suspension?  What was
20 this -- and, again, it says, "This write-up was
21 erroneous."  What was this write-up regarding?
22    A  Basically, I worked overtime that day, and
23 we were down in Dalton, Illinois, on an assignment.
24 Cook County told us to hold traffic until they --

139

1  you know, when you say hold the traffic, that
2  means all radio traffic.  So -- and you can't
3  really speak on a radio until they come back up
4  and let you.
5     And I had drove from Dalton to Rockwell,
6  parked the car, and my partner went to get the
7  CR number that's the number that goes with that
8  assignment.  And as soon as he got the number, he
9  stated he was completing the assignment.  We saw
10 Chief Webb and he wrote us up for saying that we
11 said we were out in Dalton, but we were actually
12 down on 23rd Street, which was a total
13 misunderstanding on his part.
14    Q  Did you file a grievance about that one?
15    A  When he wrote me up, I filed a grievance
16 in regards to it, yes.
17    Q  What happened with that grievance?
18    A  Nothing.  It went -- I had a 10-day
19 suspension.  It went to arbitration and I haven't
20 heard anything from arbitration.
21    Q  So it went through the first step, second
22 step, third step, and fourth step?
23    A  Yes, yes.
24    Q  And the grievance was rejected at each

140

1  one of those steps?
2     A  It was pushed up, yes, correct.
3     Q  Meaning that they did not choose to accept
4  that the grievance was proper?
5     A  Correct.
6     Q  And you said it went to arbitration?
7     A  Yes, it did.
8     Q  All right.  Let's see.  And then H here,
9  this is a -- let's see.  What's this one?  What is
10 this one regarding?
11    A  H?
12    Q  Yeah.
13    A  It was --
14    Q  What was the event?
15    A  I was in a grievance hearing as a -- a
16 second-step grievance hearing with Director Shields.
17    Q  Is this regarding the discipline that we
18 just talked about where they claimed you were
19 somewhere -- you know, claimed you said you were
20 somewhere that you weren't?
21    A  I believe that's the grievance.  I'm not
22 quite sure.
23    Q  Let's see if it says.  Well, we'll see if
24 we can figure it out.

Transcript of LeGrain Winston
Conducted on August 28, 2020

141

1     One thing I wanted to ask you, and then we
2 can take a break. You said that Shields had
3 falsely filed a complaint against you related to
4 that court subpoena; right?
5   **A Correct.**
6   Q What was -- what was -- do you have a
7 belief as to what Shields' motivation was there?
8     THE WITNESS: I don't know if my attorney
9 is speaking.
10    MS. KRAUCHUN: Sorry. Objection, calls
11 for speculation, foundation.
12    MR. LEINENWEBER: You can answer.
13    THE WITNESS: Hello?
14    MR. LEINENWEBER: Mr. Winston, you can
15 answer the question.
16   **A What is my belief? My belief is that he**
17 **intended to get me fired.**
18   Q And why?
19   **A You said why would he get me fired?**
20   Q Yeah.
21   **A That's -- he would have to answer that**
22 **for you.**
23   Q You just don't know one way or the other?
24   **A Well, I would believe it's for me filing**

142

1 **complaints against him. I would believe it's for**
2 **those reasons, yes.**
3    MR. LEINENWEBER: Okay. Why don't we take
4 our 1:00 break.
5    (Recess taken, 1:06 p.m. to 1:32 p.m.)
6    MR. LEINENWEBER: Back on the record.
7 BY MR. LEINENWEBER:
8   Q Mr. Winston, you understand you're still
9 under oath?
10   **A Yes.**
11    MR. LEINENWEBER: Gabriel, if we could
12 pull up Exhibit 2, the bottom of page 8 and the
13 top of page 9.
14   Q This is your interrogatories again,
15 Exhibit 2, and asks you to identify all discipline
16 you received that you contend was discriminatory
17 and forms the basis of your complaint in this
18 lawsuit. Do you see that question here?
19   **A Yes.**
20   Q Okay. And then the response on the next
21 page there, 9, and you have a couple subparts, it
22 looks like subpart A and subpart B. So let's look
23 at -- well, do me a favor and review that response
24 both A and B, and then we're going to talk about it.

143

1    MR. LEINENWEBER: Gabriel, can you scroll
2 down a little bit so he can see the second --
3 yeah. Perfect.
4   **A Okay.**
5    MR. LEINENWEBER: And then B it looks like
6 it just goes onto top of page 10. So, Gabriel, if
7 you could just scroll down just a little bit.
8   Q Do you see it?
9   **A Yeah, I see it.**
10   Q And then let's go back to paragraph A, as
11 in "apple." So we asked you to identify the
12 discipline that you contend was discriminatory and
13 is the basis of your complaint, and in Part A here
14 you say that on or about September 24th, 2015,
15 Director Shields and Chief Webb alleged that
16 Investigator McGhee and you violated rules of
17 conduct for improper radio transmission?
18   **A Yes.**
19   Q Is this the -- what is this incident about?
20   **A The one that I explained to you previously.**
21   Q Okay.
22   **A Yeah.**
23   Q So this is the -- where I think you said
24 you were down in Dalton or something like that?

144

1   **A Yes.**
2   Q And Chief Webb saw you guys across the
3 street?
4   **A Correct.**
5   Q And then what -- what was the discipline
6 that you received related to this incident?
7   **A 10-day suspension.**
8   Q 10-day --
9   **A 10-day suspension, yes.**
10   Q And you filed a grievance about that?
11   **A Yes.**
12   Q Remind me what happened with your
13 grievance in this.
14   **A This one is in arbitration.**
15   Q All right.
16   **A Still in arbitration, yeah.**
17   Q So this is the one that it was rejected at
18 the first, second, third, and fourth level, you
19 got the 10-day suspension, and you're submitting
20 it for arbitration?
21   **A Correct.**
22   Q Have you actually served this suspension --
23   **A All the levels are them. I'm not quite sure**
24 **if you understand, all the levels of first, second,**

Transcript of LeGrain Winston
Conducted on August 28, 2020

145

1 those are them, Ranzino, Rohloff, Shields, Webb,
2 all of those are the steps. So they go pretty quick.
3    Q  Okay. And I think you had said that
4 Step 4, though, was across the street. It's not
5 within EM; right?
6    A  Step 4, yes, yes.
7    Q  Right. What was it called, like a
8 discipline committee or something like that?
9    A  I don't know the exact name. They change
10 the name all the time. So I know it goes across
11 the street.
12    Q  Discipline board, I think is what you
13 called it, disciplinary board.
14       Okay. So have you actually served that --
15 have you actually served that 10-day suspension?
16    A  Yes, I have.
17    Q  Do you remember when you served that?
18    A  It's been a couple years ago.
19    Q  Okay.
20    A  Two years ago.
21    Q  Did you actually take days off, or did you
22 use like accrued time to cover the suspension?
23    A  I took days off.
24    Q  Okay. And what about this incident do you

146

1 contend was discriminatory?
2    A  Well, I believe it was more retaliation.
3 Because during that space in time you had Director
4 Shields -- one, he had a case against him. He
5 shouldn't have even been signed off on it in the
6 first place. That violates our policy right
7 there.
8       And they were asking for 10 days, and that
9 was a little bit over what they should have been
10 giving.
11    Q  What should have been given?
12    A  Shouldn't have been given anything.
13    Q  Well, you said 10 days was a little bit
14 over what should have been given. What did you
15 mean by that?
16    A  10 days is -- yes, it's over that. It
17 shouldn't have been anything actually.
18    Q  Okay. So, again, in this incident you say
19 essentially that you did nothing -- you and McGhee
20 did nothing wrong; right?
21    A  No, we did nothing wrong, no.
22    Q  What discipline did McGhee get?
23    A  He got 10 days, as well.
24    Q  Okay. And is his in arbitration, as well?

147

1    A  I believe so. I couldn't say for sure.
2    Q  Okay. Fair enough.
3       All right. And you said there's a policy
4 against Shields being involved in the grievance
5 process because he had an OPR complaint against him?
6    A  Not a policy but if someone writes a
7 complaint against you, you're not supposed to be
8 able to write them up. That's retaliation. So by
9 him writing me up or even being part of any
10 discipline of me, that was a form of retaliation.
11 He's not supposed to be able to now write me up.
12    Q  So it's your understanding that Director
13 Shields wrote you up for this incident?
14    A  Director Shields had to sign off on it.
15 He signed it.
16    Q  What do you mean he had to sign off on it?
17    A  He's the executive. He has to sign off --
18 he has to sign off on all the write-ups.
19    Q  Okay.
20    A  There's like three or four spots for
21 signatures. His has to be on it, as well.
22    Q  So your position is that because of the
23 fact that you filed an OPR charge related to him
24 yelling at you that he -- he should not have

148

1 signed off on this discipline?
2    A  Yeah. He has an OPR complaint against
3 him; he shouldn't be able to give discipline to a
4 person that has a complaint against him.
5    Q  Okay. And that's your personal belief;
6 right?
7    A  No, it's my belief -- yeah, it's what I --
8 what is told to me. If you're in a supervisory
9 position, you're not allowed -- if someone -- say,
10 for instance, one of the supervisors sexually
11 assaults one of the investigators, he should not
12 be able to then turn around and write a complaint
13 against the person he sexually assaulted.
14    Q  Well, you're kind of mixing metaphors
15 here. Because for starters we've established that
16 Shields didn't write the complaint; right?
17    A  No.
18    Q  Shields didn't write the complaint?
19    A  Shields signed off on it. He shouldn't be
20 allowed to sign off on it.
21    Q  That's my question. So my question is,
22 where is that written? Where is that policy?
23    A  It should be in our Lexipol policy. Other
24 retaliation and harassment, that's what it would

Transcript of LeGrain Winston
Conducted on August 28, 2020

38 (149 to 152)

149

1 probably fall underneath.

2    Q  So you're saying that because of the fact

3 that you filed an OPR complaint related to this

4 yelling incident with Shields that it's your

5 belief that he can have no role whatsoever in any

6 discipline related to you ever?

7    A  Well --

8       MS. KRAUCHUN:  Object; misstates testimony.

9    Go ahead.

10    A  -- on September 24th -- okay; I'm sorry.

11    Q  Go ahead.  You can answer.

12    A  Actually, on that September 24th date,

13 that's actually after he threatened to fire me at

14 that point I believe twice, and it was wrote up

15 twice along with the OPR case.  So yeah.

16    Q  Okay.  But, again, your belief is that

17 he can't be involved in this -- in any discipline

18 for you?

19    A  He's supposed to recuse himself.

20    Q  And where is that written down?

21    A  It should be in the Lexipol policy.

22    Q  Okay.  And do you know -- I mean, have you

23 seen this policy?

24    A  I've seen the policy portion where it says

150

1 retaliation, correct.

2    Q  And it prohibits retaliation; right?

3    A  Correct.

4    Q  Is it your understanding that anything you

5 would be written up for even if you did it would

6 be retaliation because you had filed a complaint?

7       MS. KRAUCHUN:  Objection; foundation,

8 misstates testimony.

9    A  Sorry, if I had --

10       MR. LEINENWEBER:  I'm asking what his

11 understanding is, so it's -- whatever his

12 knowledge is is what it is.  Let's strike the

13 question and I'll try again.

14       THE WITNESS:  Okay.

15    Q  So your belief is that any discipline --

16 I'm just having a hard time understanding here

17 what you're saying.  Because it seems like you're

18 saying because of the fact that you filed an

19 OPR charge against him that he then can never be

20 involved in discipline with you again because it

21 would be retaliation.

22       MS. KRAUCHUN:  Objection; again, misstates

23 his testimony.

24       MR. LEINENWEBER:  It doesn't.  I'm saying

151

1 that's my understanding and asking him to confirm.

2       So, Paula, could read that back, and,

3 Mr. Winston, I'd like you to answer that question.

4       (The Reporter read the question from

5 page 150, lines 15 through 21.)

6       THE WITNESS:  Okay.  Do you want me to

7 answer?

8       MR. LEINENWEBER:  Please.

9       MS. KRAUCHUN:  Yes.

10    A  Okay.  I have two OPR complaints that had

11 the OPR complaints against him for threatening to

12 get me fired.  Until those OPR complaints reach a

13 conclusion, he shouldn't be issuing me new

14 discipline, or he shouldn't be sitting for

15 discipline over me until that's reached a conclusion.

16    Q  And, again, your belief of where this policy

17 is written is that it is the anti-retaliation

18 provision in the Sheriff's Office?

19    A  It falls under the policy of retaliation

20 and harassment.

21    Q  All right.  We'll move on.

22       And then Section B here it says that on or

23 about June 2nd, 2012, Chief Neal wrote you for

24 insubordination and failure to obey a lawful

152

1 order; right?

2    A  Failure -- he gave an unlawful order.  You

3 said lawful.

4    Q  Well, it says lawful, failure to obey a

5 lawful order.

6    A  Oh, okay.  All right.  I was reading

7 further down.  Excuse me.

8    Q  Okay.  And it says Chief Neal forced you

9 to work overtime, and then he gave you an unlawful

10 order -- there it is -- to, I assume that's lift a

11 wheelchair-bound detainee and place him in a

12 regular van.  What is the discipline that you

13 received related to this incident?

14    A  I didn't receive any discipline.  I was

15 offered three days.

16    Q  Okay.  So you didn't receive any discipline

17 related to this?

18    A  Yes.  I wrote a grievance up on that and

19 went to the disciplinary board over that.  It was

20 an unlawful order.

21    Q  Okay.  So your grievance was sustained in

22 that instance, and you didn't receive any discipline?

23    A  No.

24    Q  No, that's incorrect, or that is what

Transcript of LeGrain Winston
Conducted on August 28, 2020

153

1 happened?
2    **A  No, I didn't receive any discipline.**
3    Q  Okay.  Because your grievance was sustained?
4    **A  Correct.**
5    Q  Okay.  And what was discriminatory about
6 this?
7    **A  Excuse me?**
8    Q  What was discriminatory about this?
9    **A  Well, basically, he knew -- he's the**
10 **chief; he's the chief of patrol; he knew it was an**
11 **unlawful order.  He had violated me working**
12 **overtime.  He ordered me to lift a wheelchair-**
13 **bound subject which was a no-no because of the**
14 **simple fact we're not properly trained to deal**
15 **with handicapped individuals.  So I was -- possibly**
16 **could have injured this wheelchair-bound detainee,**
17 **and I wasn't going to do it, so I refused that**
18 **order.**
19    Q  Okay.  Anything else?
20    **A  No, that's it.**
21    Q  All right.
22    **A  And, also, let me state that that was the**
23 **wrong vehicle.  It should have been a handicap**
24 **accessible vehicle.  Okay?**

154

1    Q  All right.  Let's go to the next page,
2 Interrogatory 10.
3       Okay.  This asks you to identify the duties
4 or assignments you allege were discriminatory as
5 alleged in the complaint, and you essentially
6 answer here that African-American investigators
7 are patrolling different areas than white
8 investigators with less seniority.  Is that
9 correct?
10    **A  Correct.**
11    Q  And what -- what's the basis of your belief
12 that this is discriminatory?
13    **A  Well, basically, I'm in the high-crime**
14 **area every day.  It's misstated that that's where**
15 **I should be staying at, and that's what I base**
16 **that on.**
17    Q  You broke up a little bit.  I think you
18 stated, "It's been stated that that's where I
19 should be staying in."
20    **A  Yes, it had been stated that I should stay**
21 **in those areas.**
22    Q  Okay.  And who stated that to you?
23    **A  Shields had stated it.  I've heard him**
24 **state that to Lieutenant Collins, and those are**

155

1 the areas that I stayed in.
2    Q  Okay.  And when did Shields state this
3 to you?
4    **A  I believe I sent in -- I believe I stated --**
5 **I sent it in when I overheard it.  I think it was**
6 **July.  Yeah, it's right there, July 13th, 2017.**
7    Q  Okay.  Okay.  So that's when you overheard
8 it.  And what about when Shields told you this
9 directly?  Or did he tell you this directly?
10    **A  No, he didn't tell me that he directly.  I**
11 **just stayed in those areas.**
12    Q  So you never had a direct conversation
13 with Defendant Shields where he stated that you
14 were going to stay in these areas?
15    **A  I heard him say that we should stay in**
16 **the hood.**
17    Q  Okay.  And on July 13th, 2017, you heard
18 Shields state to Collins that you should stay in
19 those areas?
20    **A  Correct.**
21    Q  Where was that conversation?
22    **A  In the hallway.**
23    Q  Where?
24    **A  2323 South Rockwell, 6th floor, outside of**

156

1 work/school.
2    Q  Okay.  And who was there?
3    **A  Lieutenant Collins and himself.**
4    Q  Okay.  And where were you?
5    **A  I was on the computer right by the door**
6 **where they were standing.**
7    Q  Okay.  And what did Shields say to
8 Lieutenant Collins, and what did she say to him?
9    **A  What is stated there, that you keep them**
10 **in the hood.**
11    Q  Okay.  What were you doing in the computer
12 room?
13    **A  LMS training, checking emails, work/school,**
14 **you know, all those different things.  We're**
15 **required to check our emails daily.**
16    Q  What is LMS school?
17    **A  LMS training is training that they'll give**
18 **you for different things like drug awareness --**
19    Q  Okay.
20    **A  -- CPR, just different things like that.**
21 **It is almost like an online class.**
22    Q  It's an online class?
23    **A  Yeah.**
24    Q  Like live with instruction or how does

Transcript of LeGrain Winston
Conducted on August 28, 2020

157

1 that work, audio, video?
2     **A Sometimes they're video; sometimes they're**
3 **not. Most of the times they're not. Just a**
4 **different page will come up, you'll study it and**
5 **click off into another page.**
6     Q Okay. And let's see. What specifically
7 did you hear Director Shields say?
8     **A "You've got to keep him in the hood."**
9     Q "Keep him in the hood"?
10     **A Yeah. "You've got to keep him in the**
11 **hood. That's the only way to get him out of here."**
12     Q And what did Lieutenant Collins say?
13     **A She just nodded with him and that was it.**
14     Q So you could see them and hear them; is
15 that right?
16     **A Yes.**
17     Q Is that yes?
18     **A Yes.**
19     Q And could they see you?
20     **A No. I don't think they could. I don't**
21 **know what vantage point they had.**
22     Q How would you be able to see them and they
23 not be able to see you?
24     **A I wasn't in their line of sight. I don't**

158

1 **know if they looked over to me. I'm not -- I'm**
2 **not within their eyes, so I don't know if they**
3 **looked over to me or if they were even saying that**
4 **for my benefit. I saw them clearly. I'm pretty**
5 **sure they saw me. You would have to ask him if he**
6 **saw me but I saw him.**
7     Q And, again, the only thing you heard
8 Director Shields state was -- what were his words
9 again?
10     **A "You have to keep him in the hood. That's**
11 **the only way to get him out of here."**
12     Q Okay. And you didn't hear Lieutenant Collins
13 say anything; you just saw that she shook her head?
14     **A She shook her head like in agreement.**
15     Q So she nodded? She nodded in agreement?
16     **A She nodded in agreement.**
17     Q Okay. All right. And then other than
18 that, anything else to add to this answer asking
19 you to identify the assignments that you thought
20 were discriminatory? And I think I had asked you
21 why you think they were discriminatory?
22     **A Are you asking is there anything else?**
23     Q Yeah. Is there anything else that caused
24 you to believe that this assignment was

159

1 discriminatory?
2     **A No, no, that's it.**
3     Q But just, you know, to revisit something
4 you said earlier, though, you were -- you were
5 good at this patrol; right?
6     **A I didn't hear your question.**
7     Q You were good at this patrol; right? You
8 were good at patrolling these areas?
9     **A I said I was good at anything I did.**
10     Q But you would agree you were good at
11 patrolling these areas?
12     **A I was good at patrol or anything that I**
13 **do, yes.**
14     Q Including patrolling these areas?
15     **A Correct.**
16     Q All right. Let's go to -- when you're out
17 on patrol, is it just you and a partner?
18     **A Yes, me and my partner.**
19     Q Have you ever been like injured on patrol
20 or hurt on patrol or anything?
21     **A Excuse me?**
22     Q Have you ever been hurt on patrol or
23 injured on patrol?
24     **A Have I ever been what on patrol?**

160

1     Q Injured.
2     **A Yes.**
3     Q What happened?
4     **A I was chasing down a subject once, that**
5 **was the latest thing, and I -- and I -- I pulled --**
6 **not pulled like a pulled muscles, but I tore a**
7 **muscle in my calf.**
8     Q Okay.
9     **A After a suspect.**
10     Q Anything else?
11     **A No. That's it. That's it.**
12     Q All right. And we talked about earlier
13 this morning that your understanding is that the
14 way you're assigned to a given area is anybody in
15 the chain of command can make that decision; right?
16     **A Correct.**
17     Q Okay. And do you -- and I think I asked
18 you already, but do you have any understanding as
19 to what factors go into the chain of command's
20 decision about where to allocate investigators?
21     MS. KRAUCHUN: Objection; foundation.
22     MR. LEINENWEBER: I'm sorry. We couldn't
23 hear your answer.
24     THE WITNESS: Go ahead and answer?

161

1       MR. LEINENWEBER:  We couldn't hear your
2   answer.  I think you said no but --
3       A I said no.
4       Q Have you ever asked to work in a specific
5   area?
6       A Yes.
7       Q You have?  Okay.  And was that -- when
8   was that?
9       A Probably some time.  I knew better than to
10  ask.  After getting shut down so many times, you
11  know, you stop asking.  So yeah.
12      Q You said you had periodically asked to
13  work in a particular area?
14      A Yeah.  Different areas, yeah.
15      Q Where did you want to work?
16      A Just somewhere different, the north side
17  or, you know, one of the suburban areas or something
18  like that.
19      Q Have you ever worked on the north side?
20      A Yes.
21      Q Have you ever worked in any of the suburbs?
22      A Yes.
23      Q And do you give -- do you have a right to
24  request working in a particular area?

162

1       A You said do I have a right?
2       Q To request working in a particular area.
3       A I have seniority.  So the more seniority
4   you have, yeah.
5       Q So explain that to me.  So you believe
6   that seniority -- well, first of all, regardless
7   of the level of seniority, do investigators have
8   the right to request which area they would like to
9   be assigned to for patrol?
10      A Do they have the right?  No, they don't
11  have the right, no.
12      Q So it is not written in a policy?  It is not
13  written in the collective bargaining agreement --
14      A No.
15      Q -- that investigators are allowed to choose
16  the area that they get to go to?
17      A No.
18      Q In fact, that's a decision that is reserved
19  exclusively for management?
20      A Correct.
21      Q All right.  Let's see.  And you mentioned
22  in one of your interrogatory answers about not
23  having -- not being provided with backup?
24      A What did you say about not backup?

163

1       Q Not being provided with backup.
2       A Yes.
3       Q Okay.  Well, when did that occur?
4       A When?
5       Q Correct.
6       A Every day.
7       Q So you request backup every day and it's
8   not provided?
9       A You request backup -- I lock up someone
10  every day.  It's not something I'm supposed to
11  request.  It's supposed to happen.  If you're in a
12  position of supervision, you're supposed to know
13  that.  Every day if me and my partner have to lock
14  up someone in a high-crime area yeah, we need
15  backup.
16      Q Just as a matter of course?
17      A Excuse me?
18      Q Just as a matter of course?
19      A Yes.
20      Q So you believe there are areas of the city
21  that you can only go into with backup?
22      A I believe there's areas in the city that
23  you require more backup.
24      Q Okay.  And where are those areas?

164

1       A The areas where you require backup?
2       Q Yeah.
3       A I would say what I've listed there,
4   Englewood, I would say the west side, Harvey, Ford
5   Heights, Chicago Heights, you know, the east side,
6   Lawndale, those areas are higher crime areas
7   statistically.
8       Q What is the Sheriff's Office or the EM unit's
9   policy regarding providing backup to investigators
10  on patrol?
11      A I don't know the exact policy.
12      Q Well, you may not know the exact policy,
13  but generally speaking, what's your understanding
14  of the policy?
15      A My understanding of the policy is that in
16  incidents -- in certain assignments that we have
17  you are required to have a backup.  If it's a
18  reincarceration or if it's a warrant, a high-risk
19  warrant, you're required to have a backup.
20      Q And where is that -- where does that
21  understanding come from?
22      A Where does it come from?
23      Q Yeah.  Your understanding, where does that
24  come from?

165

1    A  My understanding of that is that that is
2  what is supposed to occur.  You're supposed to
3  have a backup and that's --
4    Q  And you --
5    A  I'm explaining.  You're cutting me off.
6    Q  I apologize.
7    A  Okay.  That comes from my supervisors, how
8  we originally were told that when I originally
9  came to the unit in 1994 that when you have a
10  high-risk warrant or you have a high-risk
11  reincarceration, you are to have a backup.  That
12  policy has changed from the initial time I started
13  in EM to that period of time that we're referring to.
14    Q  You've mentioned a little bit earlier
15  about -- sorry -- strike that.
16      Okay.  So other than -- so you had a
17  10-day suspension we established; right?
18    A  Yes.
19    Q  And that was related to the incident where
20  Webb saw you across the street, and you had been
21  down in Dalton?
22    A  Correct.
23    Q  Okay.  Other than that, what other
24  suspensions or discipline have you received, other

166

1  than that and -- sorry -- we also talked about the
2  attendance in court issue that's ongoing.  So
3  other than those two, what other discipline have
4  you received?
5    A  You said what other discipline?
6    Q  Correct.
7    A  I've had some discipline in regards to
8  camera training with my body worn camera.  Are we
9  talking about recently, or are we talking about in
10  the past?
11    Q  Well, let's -- let's -- we can talk about
12  all of it if you want, but what's the -- let's start
13  with this body camera discipline.  What was the
14  discipline you received related to the body camera?
15    A  Just that we didn't cut it in on time.
16  That was all.
17    Q  And what was the discipline you received?
18    A  I believe we had a warning for that.
19    Q  A verbal warning?
20    A  No.  No, a written warning.
21    Q  Written warning.  Okay.  So you didn't
22  receive any days off or anything?
23    A  No, not for that.
24    Q  Was there anything discriminatory about

167

1  that discipline?
2    A  No, no.
3    Q  What -- okay.  So there was the body camera.
4  What other discipline do you recall receiving?
5    A  Excuse me?
6    Q  What other discipline have you received?
7    A  I can't recall.  I don't recall any of the
8  other discipline.
9    Q  You don't recall any other discipline?
10    A  That I can recall, no, not at this time.
11    Q  So have you been suspended ever before?
12    A  Yes.
13    Q  You have.  Other than the 10-day?
14    A  Yes.
15    Q  Okay.  What was that for?
16    A  I can't recall.  I can't recall off the
17  top of my head.  I have to look in my file.
18    Q  How many days' suspension?
19    A  I would have to look at my file.  I can't
20  recall.
21    Q  Okay.  Do you recall if it was more than
22  10 or less than 10?
23    A  I don't think it's more than 10, but I
24  have to look in my files.

168

1    Q  And did you actually serve that discipline?
2    A  Yes.
3    Q  But you don't remember what the incident was?
4    A  No.
5    Q  Do you know how long ago it was?
6    A  No.
7    Q  Okay.  Other than that, any other discipline
8  that you recall?
9    A  No.
10    Q  Is there any other discipline that you're
11  contending was discriminatory and part of this
12  lawsuit?
13    A  Yes.
14    Q  Okay.  What is that?
15    A  The merit board -- being put into the
16  merit board system, the write-up for the 10-day
17  suspension, the -- putting me in the -- lifting
18  the wheelchair-bound detainee.  All of those things.
19    Q  What was the discipline for the wheelchair-
20  bound detainee?
21    A  They were seeking three-day suspension.
22  It was initially 10 days --
23    Q  Right.
24    A  Excuse me.  Excuse me; initially it was

Transcript of LeGrain Winston
Conducted on August 28, 2020

169

1  10 days, and then they broke it down to 3 days,
2  and then we -- we beat it out.
3     Q  So you got no discipline for that?
4     A  No.
5     Q  Okay.  And then you also mentioned the
6  10-day, and then also the merit board I think you
7  said.
8     A  The merit -- go ahead, I'm sorry.
9     Q  No, that's okay.
10    A  Go ahead.  I'm sorry.
11    Q  The merit board one was the -- which one
12 is that?  That's the court subpoena?
13    A  Correct.
14    Q  Okay.  And then the 10-day was again the --
15 we already talked about that one.  That was the
16 different side of town when you were just across
17 the street?
18    A  Yes.
19    Q  And we already talked about how you didn't
20 think Director Shields should have been involved
21 in that because he had a pending OPR complaint
22 against him from you?
23    A  Yes.
24    Q  What was -- sorry -- strike that.

170

1        What's the -- what's the retaliation you
2  allege to have suffered in this lawsuit?
3     A  The retaliation?
4     Q  Correct.
5     A  Well, basically, it's the -- it's the
6  merit board situation for seeking remedy with OPR.
7  I have the merit board just still pending.  I
8  can't be promoted; I can't do anything.  It's like
9  I'm in a perpetual -- perpetual discipline right
10 now.  Everything is held up.  I have 30 years.  I
11 can't even receive a promotion.  If I plan to
12 retire, I have to hold it for four years in order
13 to receive the pay.  So I feel like I'm being
14 punished every day.
15    Q  What was that retaliation for?
16    A  For my writing OPR complaints against
17 Shields for threatening to strike me and also for
18 threatening to fire me.
19    Q  Anything else that you alleged was illegal
20 or discriminatory about that discipline?
21    A  About the merit board?
22    Q  Yeah.
23    A  Well, I did my job.  I did exactly what I
24 was instructed to do by the State's Attorney, and

171

1  yet I'm --
2     Q  Yeah.  I get that.  I'm not talking about
3  the underlying, you know, whether or not you're
4  right or --
5     A  -- merit board.
6     Q  But I mean, why -- what was -- how do I
7  phrase this?  Strike that.  I'll try to figure out
8  a better way to ask that question.  I'm not
9  communicating correctly.
10       Okay.  And have you received -- so you
11 haven't received any discipline yet for the case
12 before the merit board; right?
13    A  No, I haven't.
14    Q  And you weren't the only one brought up on
15 those charges related to the merit board; right?
16    A  No.
17    Q  Who was with you?
18    A  Investigator Ferguson, Investigator Shedor,
19 Investigator Rico.
20    Q  Were -- those other investigators, were they
21 also being retaliated against or discriminated
22 against related to that charge, if you know?
23    A  I don't know.
24    Q  You don't know.  I think I asked this

172

1  earlier, but just to be sure, who made the
2  decision that you should be terminated for that
3  offense?
4        MS. KRAUCHUN:  Objection; asked and
5  answered.
6        You can answer, LeGrain.
7     A  Okay.  You said who made the determination?
8     Q  Who decided that you should be terminated
9  for that offense?
10    A  I'm not quite sure but they initiated the
11 discipline.
12    Q  Is it your understanding that OPR actually
13 decided it should be a termination?
14    A  I know that Chief Neal and Director Shields
15 initiated the discipline.
16    Q  Yeah, that's not my question, though.
17    A  I wouldn't know who -- I couldn't tell you.
18    Q  Well, we talked about this morning that
19 OPR is actually responsible for --
20    A  It gets over the, the SPAR number.
21    Q  And they actually make the determination
22 about what the level of discipline is; right?
23 That was your testimony this morning.
24       MS. KRAUCHUN:  Objection; misstates

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

173

1  testimony.
2      MR. LEINENWEBER:  You can answer.
3      MS. KRAUCHUN:  You can answer.
4  **A  Okay.  Could you repeat the question?**
5      Q  Yeah.  You testified earlier today that
6  OPR made the determination about what the
7  discipline is, that a supervisor in your chain of
8  command could actually do the write-up, but then
9  the level of discipline is determined by OPR; right?
10  **A  Correct.**
11      Q  One of the interrogatories asks you -- you
12  stated -- or one of the interrogatories asks you
13  to identify what defendants' acts and omissions
14  resulted in you being treated differently than
15  other similarly situated individuals.  Do you
16  remember that?
17  **A  No.  I'd probably have to see that.**
18      MR. LEINENWEBER:  Gabriel, can we scroll
19  down to the bottom of page 13?  There you go.
20      Q  16, "Identify all defendants' acts and
21  omissions resulted in you being treated
22  differently than other similarly situated
23  individuals."
24      And one of the things you said here is,

---

174

1  "All of the foregoing for the specific responses
2  above and generally speaking the lack of
3  attentiveness to any complaints to OPR/human
4  resources made by any and all of the plaintiffs."
5      Are you talking -- is this answer -- is
6  this regarding you specifically, or are you
7  talking about all the plaintiffs?
8  **A  I'm reading here; I'm sorry.**
9      Q  Sure.
10  **A  Well, I would have to address me.  This is
11  pertaining to me.**
12      Q  Okay.  Yeah, I just was confused because
13  it says "made by any and all of the plaintiffs."
14  So you are just talking about you here; right?
15  **A  Could you repeat?  I couldn't hear you.**
16      Q  I'm sorry.  That's okay.  You're just
17  referring to yourself in this answer; right?
18  **A  Correct.**
19      Q  And it says "Failure to correct any
20  behavior complained of," and we talked a little
21  bit about that earlier, but as far as you know,
22  you have no understanding or belief that any of
23  your complaints to OPR resulted in any kind of
24  discipline for anyone; right?  Any of your

---

175

1  supervisors that is.
2  **A  Correct.**
3      Q  Although, you are aware, are you not, that
4  Defendant Ranzino was removed from EM?
5  **A  I'm aware.**
6      Q  And do you have an understanding as to why
7  he was removed at all?
8  **A  No, I don't.**
9      Q  Are you aware that he was demoted?
10  **A  No.**
11      Q  Do you have an understanding as to why he
12  was demoted?
13  **A  No.**
14      Q  Do you think it could have had anything to
15  do with the complaint that you made against him
16  for the "All of you look alike" comment?
17      MS. KRAUCHUN:  Objection; calls for
18  speculation.
19      Go ahead.
20      MR. LEINENWEBER:  You can answer.
21  **A  Well, he called me a nigger, too.  So if I
22  would have called him something like that, I
23  probably would have been fired.  So I know --**
24      Q  That's not my question.

---

176

1  **A  I know he was --**
2      Q  You're not answering my question.  I'm
3  just going to stop you for a second --
4  **A  Okay.  Go ahead.**
5      Q  -- because you're not answering my question.
6  **A  Go ahead.  Go ahead.**
7      MR. LEINENWEBER:  Paula, can you read back
8  my question?
9      (The Reporter read the question from
10  page 175, lines 14 through 16.)
11  **A  I don't know.**
12      Q  You don't know one way or the other; right?
13  **A  No.**
14      Q  Do you have any understanding of whether
15  Director Shields was found to have violated any
16  kind of rules for the incident in which he was
17  pointing his finger in your face that you
18  referenced earlier?
19      MS. KRAUCHUN:  Objection; foundation.
20  **A  I don't know.**
21      Q  I'm just asking if you have any understanding
22  as to whether or not that happened.
23  **A  I don't know.**
24      Q  Okay.  If he did receive discipline, and

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

45 (177 to 180)

---

177

1 if Ranzino did receive a demotion and transfer
2 out, wouldn't it be fair to say that the Sheriff's
3 Office had taken steps to correct behavior that
4 you complained about?
5     MS. KRAUCHUN: Objection; calls for
6 speculation.
7     You can answer.
8     MR. LEINENWEBER: You can answer the question.
9     A He was promoted to executive director, so
10 I don't know.
11    Q So let's talk about Ranzino for a second.
12 If he was removed and if he was demoted, would it
13 be fair to say that the Sheriff's Office had taken
14 actions to correct the behavior about which you
15 complained?
16     MS. KRAUCHUN: Objection; calls for
17 speculation.
18    A I don't know.
19    Q It's possible, though; right?
20    A Did you hear me?
21    Q I didn't hear you. What was your answer?
22    A Oh, I said I don't know.
23    Q And then I said it's possible, though;
24 right?

---

178

1     A I don't know.
2     Q Did you ever contact OPR to follow up on
3 your complaint about Ranzino or Shields?
4     A Yes.
5     Q Okay. And when did you do that?
6     A Several times.
7     Q When?
8     A I don't know exactly when. I don't have a
9 specific date.
10    Q What was the manner in which you checked
11 in with OPR on those investigations?
12    A I either emailed or spoke directly and
13 asked what was the disposition.
14    Q Okay. And what were you told?
15    A Nothing.
16    Q There was just silence on the other end?
17    A There was no response. The investigation
18 was ongoing.
19    Q Okay. So at that point the investigation
20 was ongoing. And when was the last time you
21 checked in on either of those investigations?
22    A It's been a while. I haven't -- they're
23 not there anymore so --
24    Q Did anybody ever tell you that Ranzino got

---

179

1 moved out of the unit?
2     A No.
3     Q How did you find out he got moved out of
4 the unit?
5     A I didn't see him.
6     Q What did you and the guys talk about?
7       (No response.)
8     Q Did you hear my question?
9     A No, I didn't.
10    Q Oh, I'm sorry. When you came in and you
11 realized that, hey, Ranzino is not there, did you
12 talk to any of the other investigators about it?
13    A No.
14    Q Really? Not at all?
15    A Really, really.
16    Q That seems a little odd to me.
17    A Really? Well, you know.
18    Q Don't you think that's kind of odd?
19    A Are you asking my opinion?
20    Q Well, it seems a little odd, I guess --
21 all right. All right. That's fair. Let me
22 strike that and I'll ask the question this way.
23       It's your testimony that you came in, and
24 you saw that Ranzino was gone; right?

---

180

1     A Correct.
2     Q And it's also your testimony that you never
3 discussed that with any of the other investigators?
4     MS. KRAUCHUN: Objection; misstates
5 testimony.
6     A No.
7     Q When did you discuss that with the other
8 investigators?
9     A I didn't.
10    Q Okay. So is it your testimony that you
11 did not discuss the fact that Ranzino was removed
12 from the unit with other investigators?
13    A I believe -- the first part of your
14 question, I heard "other investigators." Can you
15 repeat that first part?
16    Q Sure. I'm just trying to confirm it's
17 your testimony that you did not speak to the other
18 investigators about the fact that Ranzino was gone.
19    A That I wouldn't know. I mean, I couldn't --
20 he wasn't there. I thought he maybe was promoted.
21    Q Didn't you think it was a big deal?
22    A As far as what?
23    Q That he was gone.
24    A No.

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

181

1    Q  You didn't think it was a big deal that he
2  was no longer there?
3    A  No.
4    Q  And you guys didn't talk about it at all?
5    A  No.
6    Q  Next roll call, Ranzino's not there and --
7    A  Supervisor --
8    Q  Hang on.  I'm trying my best not to talk
9  over you.
10   A  Can I speak on it?
11   Q  I'm trying my best not to talk over you,
12 and if you'll do the same --
13   A  Well, your screen is freezing.
14   Q  That's fair.  It's not intentional, I
15 don't think, on either part.
16   A  No, okay.
17   Q  My question is that, you know, you come
18 in, Ranzino is gone, and you and the other
19 investigators don't talk about it.  And so the
20 next roll call you didn't think to ask, "Hey,
21 where's Ranzino?  Why isn't he doing a roll call?"
22   A  No.
23   Q  Okay.  Just another day at work?
24   A  Another day at work.

---

182

1    Q  "Give me the assignment and I'll go do it"?
2    A  Question?  Yes.
3    Q  "Give me the assignment and I'll go do
4  it"; right?
5       (No response.)
6       MR. LEINENWEBER:  Interrogatory 17,
7  Gabriel, if you could scroll down to the top of
8  page 14, and Mr. Winston, if you can just take a
9  second to review that.
10      THE WITNESS:  Okay.
11   Q  So this asks you to identify policies and
12 practices and decisions that you allege had
13 disparate impacts on plaintiffs based on their
14 race as alleged in the complaint.  It looks like
15 the process and procedure you identified is a --
16 Shields', Ranzino, and Neal's informal process and
17 procedure of preventing African-American
18 investigators from advancing or being eligible for
19 promotions; right?
20   A  Yes.
21   Q  And what is the basis of your belief that
22 Shields, Ranzino, and Neal had an informal process
23 and procedure of preventing African-American
24 investigators from advancing or being eligible for

---

183

1  promotions?
2    A  Based upon the fact that they promoted who
3  they wanted to promote.  I asked to be promoted
4  and was told that I was not going to be promoted.
5    Q  Right.  Okay.  Anything else go into forming
6  your belief that there was this informal process
7  and procedure preventing African-Americans from
8  being promoted?
9    A  Well, based on the fact that Chief Ranzino
10 and Neal, they were his mob.  So if you weren't in
11 his mob, you weren't getting promoted.  That was
12 stated by Chief Ranzino.
13   Q  Okay.  And we talked about this earlier
14 but who makes the decision as to who is promoted
15 within EM?
16   A  Director Shields.
17   Q  And the basis of your knowledge that Director
18 Shields makes the promotions within EM is what?
19   A  The fact that he said he's the one to do
20 promotions.
21   Q  When did he tell you that?
22   A  When I asked him about being promoted.
23   Q  That's not what you testified to earlier.
24   A  I've asked him about being promoted.  You

---

184

1  asked me a question --
2    Q  But that's a different --
3    A  I'll let you finish asking.  Go ahead.
4    Q  You're saying something different now.
5  That's not what you testified to earlier.
6    A  Okay.
7    Q  You testified earlier that you said to
8  him, "I would like to be considered for
9  promotion," and he said "That's not going to
10 happen."
11   A  That's correct.
12   Q  Where in that statement does he say that
13 "I'm the one that makes the decision"?
14   A  He's the one that does the promotions.
15   Q  Right.  And what's the basis of your
16 belief of that fact?
17   A  The fact that he said I won't be promoted.
18   Q  Okay.  So it's your understanding because
19 he said you're not going to be promoted that he is
20 the one who makes the decision?
21   A  Correct.
22   Q  Okay.  Anything else?
23   A  No.
24   Q  Okay.  What role did Ranzino, and Neal, and

---

Transcript of LeGrain Winston
Conducted on August 28, 2020

47 (185 to 188)

185
1  Rohloff have in making decisions about promotions?
2     A  I heard "role."  Can you repeat that?
3     Q  What role did Ranzino, Neal, or Rohloff have
4  in making decisions about promotions within EM?
5     A  Well, they were part of his mob according
6  to Ranzino and Neal, stated by them.
7     Q  Okay.  That doesn't really answer my
8  question.
9     A  So they made the decisions.  This was
10  their operation.
11    Q  And at what point -- sorry -- strike that.
12       Let's just expand on this a little bit
13  more.  What role did Ranzino, Neal, and Rohloff
14  have in the decision-making process regarding
15  promotions?
16    A  They were part of the interview process.
17    Q  Okay.  Part of the interview process.
18  What else?
19    A  As far as I know, that's it.
20    Q  Is says here, "Similarly situated white
21  investigators did not receive discipline for the
22  same or similar actions that the plaintiffs did
23  receive discipline for."  Do you see that language
24  there?

186
1     A  Yes.
2     Q  Which white investigators did not receive
3  discipline for the same or similar actions that
4  you did receive discipline for?
5     A  Which ones?
6     Q  Correct.
7     A  I couldn't tell you all the ones, the names.
8     Q  Can you tell me any names?
9     A  I could tell you one name, Brian Shedor.
10    Q  Okay.  What incident did -- sorry -- what --
11  yeah, what conduct, what similar actions did
12  Mr. Shedor undergo as you for which he did not
13  receive discipline but you did?
14    A  For court, for instance, the same thing --
15  the standard procedures for going to court.
16    Q  Okay.  Go ahead.
17    A  A previous court date, yes.
18    Q  Okay.  So what -- what are we talking
19  about here?  What --
20    A  I don't know all the particulars.  I'm
21  just telling you that that's basically it.
22    Q  Okay.  Because that's confusing to me
23  because you indicated that he's a part of that
24  same merit board case where they're seeking his

187
1  termination.
2     A  Yes.  But this was another time.
3     Q  Okay.  And --
4     A  Not for the -- not for this incident.  I
5  was involved in the incident, this incident.
6  That's what made it different.
7     Q  So you're guessing that he had a prior
8  incident for which he did not receive discipline?
9     A  Several investigators had prior court
10  dates that they didn't get disciplined for this.
11    Q  Yeah.  But I mean, having a court date
12  isn't the same thing as what is -- that's not
13  really a fair representation of what is alleged to
14  have happened; right?
15    A  Yes, it is.
16    Q  Okay.  It's just a court date.  Okay.
17  What -- okay.  So when -- tell me everything you
18  know about the incident for which Brian Shedor did
19  not receive any discipline.
20    A  You just told me to name one instance.
21  Going to court, being told the same thing in court
22  and no discipline was issued.
23    Q  Okay.  And you don't know when this
24  occurred?

188
1     A  No, I don't.
2     Q  Okay.  And how do you know that this did
3  occur?
4     A  Well, I know this when they go to court,
5  when they went to court.
6     Q  Investigators go to court periodically;
7  right?
8     A  That's correct.
9     Q  Investigators are subpoenaed to testify in
10  court periodically; right?
11    A  Correct.
12    Q  You do not keep track of every time an
13  investigator goes to court; right?
14    A  Correct.
15    Q  And there's nothing inherently wrong, or
16  suspicious, or inappropriate about an investigator
17  going to court; right?
18    A  Correct.
19    Q  Okay.  What did Brian Shedor do wrong or
20  incorrectly for which he should have been
21  disciplined?
22    A  He didn't do anything wrong.
23    Q  So then why would he be disciplined?
24    A  I never said he should be disciplined.  I

Transcript of LeGrain Winston
Conducted on August 28, 2020

189

1   said I shouldn't be disciplined for going to court.
2       Q   Okay.
3       A   I mean, I think you're losing it in
4   translation.
5       Q   I guess maybe.
6       A   I shouldn't have been disciplined for
7   going to court.
8       Q   Okay.  And Brian shouldn't have been
9   either; right?
10      A   Correct.
11      Q   But he was?
12      A   When he went to court with me.
13      Q   Yep.  He was disciplined; right?  Isn't
14  that correct?
15      A   We're in the merit board.
16      Q   So he was given discipline; right?
17      MS. KRAUCHUN:  Objection; asked and
18  answered.
19      MR. LEINENWEBER:  He's not answering.
20  He's evading.
21      A   I'm not evading.  We were in the merit
22  board together.
23      Q   Yeah.  But -- okay.  So the point is,
24  though, that he received the same discipline that

190

1   you received for that same incident; isn't that
2   correct?
3       A   We're both in the merit board.  He's in
4   the merit board due to the fact that I'm in the
5   merit board.
6       Q   So I don't understand why you're having a
7   hard time answering this question because it's a
8   very, very simple yes-or-no question.
9       A   Absolutely not.
10      Q   Did Brian Shedor receive the same
11  discipline related to the attendance at court
12  issue for which you did?
13      A   We haven't received the discipline yet.
14      Q   But you told me that you did receive
15  discipline and that you were -- they were seeking
16  your termination.
17      MS. KRAUCHUN:  Objection; misstates
18  testimony.
19      Q   You haven't been terminated yet, but
20  you've received the notification of intent to
21  terminate; right?
22      A   Correct.
23      Q   And Brian received one, as well --
24      A   Correct.

191

1       Q   -- related to that same incident?
2       A   Correct.
3       Q   Can you identify an incident which Brian
4   Shedor violated some rule or policy related to
5   going to court for which he did not receive
6   discipline?
7       A   I wasn't with him any other time he went
8   to court.
9       MR. LEINENWEBER:  Okay.  You can put that
10  one aside.
11      Q   Oh -- I'm sorry -- Mr. Winston, are there
12  any other similarly situated white investigators
13  who did not receive discipline for the same
14  conduct for which you did receive discipline?
15      A   I don't know.
16      Q   Okay.  So you can't name any others?
17      A   No.
18      MR. LEINENWEBER:  Gabriel, can you pull up
19  Exhibit 6?
20      (Winston Deposition Exhibit 6 marked for
21  identification and attached to the transcript.)
22      MR. LEINENWEBER:  And I'm just going to
23  run through a handful of exhibits here just to get
24  them on the record and establish what they are,

192

1   especially if there's a danger that Gabriel is going
2   to lose power.  So I'm not going to talk about all
3   of these, but I'm going to run through them.
4       MS. KRAUCHUN:  That's fine.
5       Q   Mr. Winston, I've handed you what's been
6   marked Winston Exhibit 6, and you'll see at the
7   bottom-hand corner it's a document Bates-labeled
8   P000004, and it goes all the way through page 11.
9   Let's see.  This is a document produced by you.
10  Do you recognize this?
11      A   Excuse me?
12      Q   Do you recognize this document?
13      A   Yes.
14      Q   Okay.  Let's see.  If we go to --
15      THE WITNESS:  I'm just making sure.  Is my
16  attorney still on the line?
17      MS. KRAUCHUN:  I'm here.  I think my video
18  went out for a minute but I'm here.
19      THE WITNESS:  Okay.  Good.
20      MR. LEINENWEBER:  Sorry; I'm just looking
21  for my questions and struggling to find them here.
22      Q   So there on page 1 this is the incident at
23  the criminal courts building, and it says Efran Rico,
24  you, Ferguson, and Shedor; right?

Transcript of LeGrain Winston
Conducted on August 28, 2020

49 (193 to 196)

193

1    A  Correct.
2        MR. LEINENWEBER:  All right.  We can set
3  that one aside.
4        Did I mark -- sorry -- strike that.  Let's
5  just go through a couple others here.
6        Gabriel, can you pull up Exhibit 8,
7  please.
8        (Winston Deposition Exhibit 8 marked for
9  identification and attached to the transcript.)
10   Q  Mr. Winston, we've handed you what's been
11 marked Winston Exhibit 8.  It's a document with
12 Bates No. P000012, and this appears to be a
13 September 21st, 2015, email from you to Miriam
14 Rentas that you told us about earlier; right?
15   A  Yes.
16   Q  And this is where you said you think
17 Shields has a conflict of interest due to his
18 pending OPR case; right?
19   A  Correct.
20   Q  Unless you want to look at that for
21 longer, we can set it aside and move to the next.
22   A  Uh-huh.
23       MR. LEINENWEBER:  Gabriel, can you pull up
24 Exhibit 9 and we'll mark it as Exhibit 9.

194

1        (Winston Deposition Exhibit 9 marked for
2  identification and attached to the transcript.)
3    Q  Okay.  Mr. Winston, we've handed you a
4  document which has been marked as Winston
5  Exhibit 9.  In the bottom right-hand corner it's
6  Bates-labeled P000014.  Do you recognize this
7  document?
8    A  Can you blow it up a little bit?
9    Q  Yeah.  This one is kind of hard to read.
10 Go ahead and do whatever you've got to do to be
11 able to read it here.
12   A  Okay.
13   Q  I think this is a grievance that you filed
14 in 2012 -- right? -- regarding the overtime issue,
15 I think.
16   A  The overtime and the -- I think the van
17 issue.
18   Q  Okay.  And that's your signature there in
19 the middle of the page?
20   A  Correct.
21       MR. LEINENWEBER:  All right.  We can set
22 that one aside.
23       And then, Gabriel, if you could pull up
24 Exhibit 10, and we'll mark it as Exhibit 10.

195

1        (Winston Deposition Exhibit 10 marked for
2  identification and attached to the transcript.)
3    Q  Mr. Winston, we're handing you what's been
4  marked as Winston Exhibit 10.  This is a series of
5  pages Bates-labeled P000015 through 21.  I'll give
6  you a second to just have Gabriel sort of scroll
7  through it so you can see it, and then I'll just
8  have a couple questions for you.  There's about
9  seven pages or so.
10   A  Okay.
11   Q  I assume these are looking familiar to
12 you.  Right?
13   A  Yeah.
14   Q  Just keep looking through and tell me when
15 you're ready.
16   A  Okay.  All right.
17   Q  So you drafted -- you wrote all these; right?
18   A  Correct.
19   Q  These are all complaints you made or
20 submitted, it looks like back in 2012 related to
21 that incident -- right?  -- with Neal, and the
22 wheelchair, and the overtime.
23   A  Yes.
24       MR. LEINENWEBER:  All right.  We can set

196

1  that aside.
2        Kelly, I'm trying to figure out if there's
3  a faster way I can do this.  Maybe we'll set them
4  aside and see if there's something we can figure out.
5        Gabriel, can you pull up Exhibit 12?
6        (Winston Deposition Exhibit 12 marked for
7  identification and attached to the transcript.)
8    Q  All right.  Mr. Winston, we're handing you
9  what's been marked as Winston Exhibit 12.  It's a
10 document Bates-labeled WINSTON_CCSO011522 and 523.
11 This is -- it looks like the complaint register --
12 right? -- that you filed related to the Ranzino
13 "All of you look alike" comment.
14   A  Yes.
15   Q  And if you look at the second page, that's
16 your signature; right?
17   A  Yes.
18   Q  Okay.  And I think it says -- yeah, "I
19 solemnly swear that the facts and allegations
20 contained within are true and correct to the best
21 of my knowledge"; right?
22   A  Correct.
23       MR. LEINENWEBER:  Set that one aside.
24 Gabriel, can we pull up 13?

Transcript of LeGrain Winston
Conducted on August 28, 2020

50 (197 to 200)

197

1    (Winston Deposition Exhibit 13 marked for
2  identification and attached to the transcript.)
3    Q  Mr. Winston, we're handing you what's been
4  marked as Winston Exhibit 13.  It's a document
5  with a Bates No. WINSTON_CCSO011524, and this is
6  the Cook County Sheriff's Office discrimination,
7  harassment, sexual harassment complaint form that
8  you completed regarding the Ranzino "All of you
9  look alike comment"; right?
10   A  Right.
11   Q  It says here --
12     MR. LEINENWEBER:  If you scroll down,
13  Gabriel, to the second block of text there.
14   Q  Is that your handwriting and your signature?
15   A  Yes.
16   Q  Okay.  And it looks like it says -- what
17  does R/I stand for?
18   A  Reporting investigator.
19   Q  Okay.  "Reporting investigator is
20  requesting Chief Ranzino to be removed from
21  electronic monitoring unit permanently"; right?
22   A  Yep.
23     MR. LEINENWEBER:  We can set that one
24  aside.  And then can we pull up Winston Exhibit 14?

198

1    (Winston Deposition Exhibit 14 marked for
2  identification and attached to the transcript.)
3    Q  Mr. Winston, we've handed you what's been
4  marked Winston Exhibit 14.  It's a document
5  labeled WINSTON_CCSO011525, and this appears to be
6  the grievance form that you filed related to the
7  Ranzino "All of you look alike" incident; right?
8    A  Correct.
9    Q  And that's your grievance; right?
10   A  Yes.
11   Q  And that's your signature in the middle of
12  the page --
13     MR. LEINENWEBER:  Oh, sorry.  Can we
14  scroll down?
15   A  Yes.
16     MR. LEINENWEBER:  Okay.  Set that one
17  aside. Can we pull up Winston Exhibit 15?
18     (Winston Deposition Exhibit 15 marked for
19  identification and attached to the transcript.)
20   Q  Mr. Winston we've handed you what's been
21  marked as Winston Exhibit 15.  It's a document
22  Bates numbered WINSTON_CCSO011529 through 30.  It
23  is a two-page document related to your interview,
24  I believe with human resources related to Ranzino

199

1  "You all look alike comment."
2    A  Uh-huh, yes.
3      MR. LEINENWEBER:  Gabriel, if you can
4  scroll to the second page.
5    Q  I think you can see.  Mr. Winston, can you
6  confirm that that's your signature?
7    A  Yes.
8    Q  It says, "My signature below indicates my
9  approval of the contents of the statement as a
10  fair and accurate summary of what I said"; right?
11   A  Yes.
12     MR. LEINENWEBER:  Okay.  You can set that
13  one aside.
14   Q  Do you recall giving a statement to OPR
15  regarding that Ranzino incident?
16   A  Yes -- you know what?  I'm not sure.  No,
17  I'm not sure.
18   Q  Okay.  Do you remember sitting for an
19  interview with an OPR investigator Carl James
20  Singletary, Sr.?
21   A  Yes, I do.
22   Q  You do.  Okay?
23   A  Yes, I do.
24   Q  All right.  And do you recall what you

200

1  told those investigators?
2    A  No.  I would have to go over my notes
3  exactly.
4    Q  Okay.  When you say "my notes," like what
5  are you referring to?
6    A  I guess whatever notes my attorney would
7  have.  I can't recall the exact conversation.
8      MR. LEINENWEBER:  All right.  Can we pull
9  up Winston Exhibit 16?
10     (Winston Deposition Exhibit 16 marked for
11  identification and attached to the transcript.)
12   Q  Mr. Winston, we've handed you what has
13  been marked as Winston Exhibit 16.  It has Bates
14  No. Winston_CCSO011535.  And this document would
15  indicate that you sat for an interview with the
16  Office of Professional Review on or about
17  February 2nd, 2016.  Does that sound about right?
18   A  Yes.
19   Q  Okay.  And it says, "Carl James Singletary,
20  Sr., as the primary investigator, and that's the
21  individual who you recall?
22   A  Yes.
23     MR. LEINENWEBER:  Okay.  We can set that
24  one aside.  And then can we pull up Winston

Transcript of LeGrain Winston
Conducted on August 28, 2020

---

201

1  Exhibit 17.
2      (Winston Deposition Exhibit 17 marked for
3  identification and attached to the transcript.)
4      Q  All right.  Mr. Winston, we've handed you
5  what's been marked as Winston Exhibit 17.  It's a
6  two-page document Bates-labeled WINSTON_CCSO011646
7  through 47.  Is that your handwriting?
8      **A  Yes.**
9      Q  Okay.  And this is -- it indicates it's a
10 timekeeping attendance form.  I'm presuming this
11 form looks familiar to you.  Right?  You know what
12 these are?
13     **A  Yes.**
14     Q  Okay.  If you scroll to the second page,
15 you'll see there's two -- there's another page of
16 it.  And these appear to be related to -- if you
17 look there in the middle, it looks like it says
18 date, July 29th, 2015, and then it says "Reporting
19 investigator appeared in CCB."  What's CCB?
20     **A  Cook County court building.**
21     Q  Okay.  And so that -- this would be
22 related to that testimony where you guys were the
23 wrong officers; right?
24     **A  Correct.**

---

202

1      MR. LEINENWEBER:  Okay.  Let's set that
2  one aside.  Okay.  If we could pull up Winston
3  Exhibit 18.
4      (Winston Deposition Exhibit 18 marked for
5  identification and attached to the transcript.)
6      Q  Mr. Winston, take a second and look
7  through what we've just handed you.  This is
8  Winston Exhibit 18.  It's a three-page document
9  labeled WINSTON_CCSO17464 through 66.
10     **A  Uh-huh, yeah, I see it.**
11     Q  Okay.  And it appears to be a grievance
12 form you completed; right?
13     **A  Yes.**
14     Q  And I think this is related -- oh, sorry --
15 go ahead if you were going to say something.
16     **A  It looks like a page is missing.  Doesn't**
17 **it look like the second page, I believe.**
18     Q  Which one looks like the second page?
19     **A  It looks like a continuation.  I'm not sure.**
20     Q  All right.  Let's see.  Well, this is your
21 handwriting; right?  And in the middle of the
22 page, that's your signature?
23     **A  Yes.**
24     Q  Let's see.  It looks like it's dated -- is

---

203

1  it August 26, 2015?  Does that look right, that
2  date to you?
3      **A  Yes.**
4      Q  Okay.  And then it looks like there's a
5  Step 1 grievance, and if we go a little bit
6  further down, there's Step 2.  Do you know who did
7  this at Step 2, whose signature that is -- I'm
8  sorry -- I meant Step 1; I apologize.
9      MR. LEINENWEBER:  Scroll back a little
10 bit.  Right there.  Stop, stop.
11     Q  Okay.  It says Step 1.
12     **A  Chief Neal.**
13     Q  That's Chief Neal?
14     **A  Yes.**
15     Q  And I think it says here -- it says, "I
16 reduced the discipline to three days"; right?
17     **A  Yes.**
18     Q  Okay.  So the discipline is actually being
19 reduced?
20     **A  It was reduced.  He said he would reduced**
21 **it but that was 10 days.**
22     Q  Okay.  And then if we go to the last page
23 here, I'm curious as to if this is your
24 handwriting.  It may not be.  It says "Refused to

---

204

1  sign" in the line of your name.  Is that your
2  handwriting?
3      **A  No.**
4      Q  That's not.  Okay.  So you -- do you have
5  any reason to believe you weren't presented with
6  this and didn't refuse to sign it?
7      **A  I'd have to see the body of it.  You**
8  **scrolled right down to the bottom.**
9      Q  I'm sorry.  Go ahead and look through it.
10     **A  Yeah.  I'm sorry.**
11     **Okay.  I know what it is.  All right.**
12     Q  Do you have any reason to believe that
13 didn't happen?  You did refuse to sign this;
14 correct?
15     **A  I did refuse to sign it, correct.**
16     MR. LEINENWEBER:  Okay.  Can we pull up
17 Winston Exhibit 19?
18     (Winston Deposition Exhibit 19 marked for
19 identification and attached to the transcript.)
20     MR. LEINENWEBER:  Getting to the end of
21 the exhibits so -- I think this is the last one,
22 actually.
23     Q  Mr. Winston we're handing you what's been
24 marked as Winston Exhibit 19.  It is a three-page

Transcript of LeGrain Winston
Conducted on August 28, 2020

52 (205 to 208)

205

1 document Bates-labeled WINSTON_CCSO017569 through 71.
2      Do you recognize this document?  And take
3 a second to look through it because there's a few
4 different pages here.
5      A  Okay.
6      Q  All right.  Mr. Winston, do you recognize
7 these documents?
8      A  Yes.
9      Q  These appear to be materials related to
10 the 10-day suspension related to the incident
11 where you guys had been in Dalton but then Chief
12 Webb saw you across the street; right?
13      A  Yeah.
14      Q  And then it looks like this third page
15 here, this is the fourth step grievance answer;
16 right?
17      A  The one that's above or the one that's —
18      Q  If you scroll up just to the beginning of
19 this page here, this is the fourth step grievance
20 answer?
21      A  Yes.  Yes.
22      Q  And it looks like Cynthia Perkins,
23 Assistant General Counsel, made this report and
24 determination?

206

1      A  Correct.
2      Q  Okay.  And this one -- refresh my
3 recollection.  I think you said this is the one
4 that is in arbitration.  This is the discipline
5 that's in arbitration, I think.  Right?
6      A  Yes.
7      Q  Did you already have the arbitration?
8      A  We had the arbitration.  We still haven't
9 heard anything.
10      MR. LEINENWEBER:  Okay.  You can set that
11 one aside.
12      Q  Do you recall when you had the arbitration?
13      A  It's been years ago.  It's been some years
14 ago.  I don't -- I don't recall the exact date.
15      MR. LEINENWEBER:  I did realize I forgot to
16 do one exhibit.  So, Gabriel, can we pull up Winston
17 Exhibit 11?  I think I skipped over that one.
18      (Winston Deposition Exhibit 11 marked for
19 identification and attached to the transcript.)
20      Q  We'll give you an opportunity to scroll
21 through this.  This hopefully looks familiar.  We've
22 handed you what has been marked as Winston
23 Exhibit 11.  It is Bates-labeled P000022 through 29.
24 It appears to be a series of emails that you sent,

207

1      I think, and gave to your attorney and produced to
2 us.  If you could just take a look and let me know
3 when you've reviewed it.
4      A  Okay.  All right.
5      Q  Mr. Winston, do you recognize these emails?
6      A  Yes.
7      Q  And they're emails you wrote; right?
8      A  Yes.
9      Q  Okay.  And that you gave to your attorney
10 who produced them in this litigation; right?
11      A  Yes.
12      MR. LEINENWEBER:  Okay.  We can set that
13 one aside.
14      I was going to turn to a different topic,
15 if anyone would like to take a break.  We can also
16 keep going if people want to keep going.  I'm
17 getting to the end, so I don't have a ton more.
18      MS. KRAUCHUN:  I'm okay to keep going as
19 long as Paula and LeGrain are.
20      THE WITNESS:  Yeah, I'm fine.
21      MR. LEINENWEBER:  Paula, Gabriel?
22      THE COURT REPORTER:  I'm fine.  Thank you.
23      A/V TECHNICIAN:  That's fine with me.
24 ///

208

1 BY MR. LEINENWEBER:
2      Q  I want to turn, Mr. Winston, to what
3 damages you're claiming in this lawsuit.  Could
4 you give me an overview of the damages that you
5 are seeking in this lawsuit?
6      A  Well, I believe they're wrote down already,
7 but I'm in severe stress.  I have severe stress
8 from what's happening being in the merit board the
9 last five years.  I mean, my attorney fees being
10 taken care of.  There's quite a few.  I have them
11 wrote down if you can go to that.
12      Q  You're referring to your interrogatory
13 responses?
14      A  Yes.
15      Q  We'll go to that in a second.  I just kind
16 of wanted to get a general understanding of, you
17 know, what you are hoping to -- what you're hoping
18 to have happen as a result of this lawsuit.
19      A  Well, the first thing I'm hoping for is
20 everything to -- harassment and retaliation and
21 all that to end.  I want to be made whole for the
22 time I haven't been able to be promoted.  And like
23 I said, I've had some medical issues in regards to
24 this.  Like I said, my attorney fees, I have to

Transcript of LeGrain Winston
Conducted on August 28, 2020

209

1  have those covered, things of that nature.
2      Q  And you said you want the harassment and
3  retaliation to end?
4      A  Correct.
5      Q  Which of the defendants are still
6  retaliating or harassing you?
7      A  I'm still going -- I'm still going
8  underneath -- I'm still going underneath -- that's
9  another issue, I don't know if that's okay to
10  discuss because you didn't bring it up.  I'm still
11  having issues with Lieutenant Collins that's
12  underneath Shields' regime, the one that we
13  discussed earlier.
14      And I -- you know, basically, that's it.
15      Q  Okay.  So Lieutenant Collins is retaliating
16  and harassing you?
17      A  Well, she's Deputy Director Collins now.
18      Q  Okay.  She's deputy director.  But in
19  other words, though, Defendants Shields, Neal,
20  Rohloff, Ranzino, they're not continuing to
21  discriminate or harass you?
22      A  No, no.
23      Q  None of them are working there anymore;
24  right?

210

1      A  I believe all of them except Rohloff might
2  still be there, but he's on, I believe some type
3  of medical leave.  I'm not sure.
4      Q  And Ranzino has been gone since right
5  around the time of that "All you people look
6  alike" incident; right?
7      A  I guess sometime after that.  It was after
8  that, sometime after that comment.
9      Q  Right around there, maybe not that same
10  day but --
11      A  No, not that same day definitely.
12      Q  And Neal has been gone for a little
13  while now?
14      A  Correct.
15      Q  And Shields has been gone for a little
16  while now?
17      A  Correct.
18      MR. LEINENWEBER:  All right.  Let's go
19  ahead and pull up Winston Exhibit 7.
20      (Winston Deposition Exhibit 7 marked for
21  identification and attached to the transcript.)
22      Q  All right.  Mr. Winston, we've handed you
23  what's been marked as Winston Exhibit 7.  The
24  title there is "Plaintiff LeGrain Winston's

211

1  Objections and Answers to Defendant Sheriff of
2  Cook County Thomas J. Dart's First Set of
3  Interrogatories"; right?
4      A  Yes.
5      MR. LEINENWEBER:  And, Gabriel, if we
6  could scroll to the last page.
7      Q  And that's your signature on this
8  verification page; right?
9      A  Correct.
10      Q  And you testified -- sorry -- you verified
11  that, "I declare under penalty of perjury that the
12  foregoing is true and correct"; right.
13      A  Correct.
14      MR. LEINENWEBER:  Okay.  So let's go --
15  let's go to page 4 of that document, Gabriel, and
16  Request No. 3.
17      Q  Okay.  So this -- just like we were talking
18  about a second ago, this asks you to identify the
19  damages you're seeking that you claim to have
20  suffered as a result of the defendants' actions,
21  and as you indicated, you wrote out some of this
22  here.  So let's talk through these a little bit.
23      It looks like you're seeking loss of
24  promotions, loss of future wages, and then if you

212

1  go to the top of the next page it says
2  "nonfinancial damages."
3      Okay.  So let's talk about loss of
4  promotions first.
5      MR. LEINENWEBER:  So, Gabriel, I
6  apologize, I need you to scroll back up.
7      Q  Okay.  So you had indicated loss of
8  promotions as a category of damages here.  What
9  damages have you suffered as a result of loss of
10  promotions?
11      A  I haven't been able to be promoted.  I
12  would have made more money.
13      Q  Okay.  And what position are you talking
14  about that you have not been able to be promoted
15  into?
16      A  Well, I wanted to go all the way up to the
17  top.  I wanted to be -- I know this is going to
18  sound crazy, but I thought myself as actually
19  being the sheriff of Cook County at one time.  So
20  that was my ambition.
21      Q  Okay.
22      A  So I saw myself as the director of EM.  I
23  thought I was qualified.  I thought I -- you know,
24  when I was younger, that would happen for me.

Transcript of LeGrain Winston
Conducted on August 28, 2020

54 (213 to 216)

213

1    Q  So what promotions -- and I don't think
2  it's crazy certainly, especially when you're
3  younger, right, to have kind of wild and crazy
4  dreams.  I think most of us have some that we
5  think at the time are wild and crazy.
6        What, though, what promotions are you
7  talking about in this lawsuit here?  Like which
8  promotions did you lose that led you to miss out
9  on gaining money?
10   **A  Going up the -- at that point when they**
11 **were involved, I wanted to be chief.  I wanted to**
12 **become a chief of EM or deputy chief of EM at that**
13 **time.  Like I said, that position is no longer in**
14 **existence.**
15   Q  Right.
16   **A  So I had ambitions about being a chief,**
17 **and I had ambitions to be the director.  That was**
18 **my -- that was my personal ambition.**
19   Q  Sure.  And I understand that was your
20 personal ambition, and what I'd like to focus on
21 is, which have those positions, if any or if all,
22 were you prevented from receiving as a result of
23 defendants' conduct as alleged in this lawsuit?
24   **A  All of them.  All the positions I just**

214

1  **mentioned.**
2    Q  Okay.  And other than the two conversations
3  you had that we discussed earlier, one with
4  Defendant Neal and one with Defendant Shields
5  where you expressed a desire to be promoted, were
6  there any other steps you took to be promoted into
7  any of these positions?
8    **A  I didn't know any steps to take.  The only**
9  **steps I knew to take was through them.**
10   Q  Are you --
11   **A  If I might add, mind you, while this was**
12 **going on he was promoted to executive director.**
13   Q  Who prevented you from being promoted into
14 these positions?
15   **A  From Director Shields' mouth, him.**
16   Q  Okay.  So you contend that Director
17 Shields prevented you from being promoted to --
18   **A  Absolutely.**
19   Q  -- chief, deputy chief, and director?
20   **A  Absolutely.**
21   Q  What did he do to prevent you from being
22 promoted to any of those positions?
23   **A  He told me I wasn't going to be promoted.**
24 **He told me there's no sense in me seeking**

215

1  **promotion; he wasn't going to promote me.**
2    Q  Okay.  And in addition to just whatever he
3  told you, what, if anything, did he do to prevent
4  you from being promoted?
5        THE WITNESS:  I'm sorry; that first part, it
6  just broke up.  I'm sorry.
7        MR. LEINENWEBER:  That's okay.
8        Paula, were you able to get my question?
9        THE COURT REPORTER:  Yes.
10       MR. LEINENWEBER:  Can you read that back,
11 please?
12       (Pending question read.)
13   **A  That was all.  There was no other chain to**
14 **go up.**
15   Q  But as far as you know, other than that
16 conversation you had with Shields, he did not take
17 any other steps to prevent you from being promoted
18 into one of these three positions?
19   **A  Well, he is the decision maker, so I don't**
20 **know -- I personally didn't know any other steps**
21 **to get promoted that didn't go through his office.**
22   Q  Okay.  But all I'm trying to clarify is
23 that other than that conversation, you're not
24 aware of him, you know, doing something else to

216

1  prevent you from being promoted into these
2  positions?
3    **A  Not that I know of, no.**
4    Q  Okay.  And then did any of the other
5  defendants have a role in preventing you from
6  being promoted into any of those three positions?
7    **A  Excuse me?  I didn't hear that last part.**
8    Q  Did any of the other defendants have a
9  role in preventing you from being promoted into
10 any of those positions?
11   **A  Not that I know of, no.**
12   Q  Okay.  When should you have been promoted
13 into one of those positions?
14   **A  When?  When I requested it.  I had plenty**
15 **of time on the job and experience.**
16   Q  Okay.  And I think you did --
17   **A  There's -- okay.  I'm sorry.  Go ahead.**
18   Q  That's all right.  Go ahead.
19   **A  No, I think we just got crossed.**
20   Q  I think so.  Okay.
21   **A  Yeah, okay.**
22       MR. LEINENWEBER:  Now I lost my -- Paula,
23 I'm sorry to ask you again, but what was my
24 question?

Transcript of LeGrain Winston
Conducted on August 28, 2020

55 (217 to 220)

217

1    (The Reporter read the question as
2 follows: "When should you have been promoted into
3 one of those positions"?)
4    Q  And you said I think when you asked to be
5 promoted.  Right?
6    A  Yes.
7    Q  Okay.  And I'm trying to remember from
8 this morning, but do you remember when that
9 conversation with Shields or with Neal was
10 regarding promotion?
11    A  I don't recall, no.
12    Q  Okay.  Do you know whether or not there
13 were any open positions for chiefs, deputy chiefs,
14 or directors at the time you expressed that interest
15 in being promoted?
16    A  I believe it was.  So our unit always
17 worked on -- we're always short-staffed from the
18 investigators all the way up to supervision.  Just
19 like we don't have a lieutenant slot right now, we
20 need one, we need several, but it just works like
21 that.
22    Q  Okay.  And do you know whether or not
23 there was funding available for those positions
24 even if they were open?

218

1    A  No, I do not.
2    Q  Okay.  And did you specifically mention
3 any of these three positions in that conversation
4 with Shields or with Neal, or did you just say
5 generally, "I'd like to be promoted"?
6    A  I said generally I'd like to be promoted.
7    Q  Okay.  How do you calculate the amount of
8 money that you believe you're entitled to for a
9 loss of these promotions?
10    A  Well, whatever the position pays, you have
11 to look at it -- you have to be in that position
12 for four years in order to earn pension credit, so
13 that's how I calculate it.  So the closer I am to
14 being able to retire, I won't be able to get the
15 four years' pension credit.
16    Q  And do you know what the difference in pay
17 was between your position and the deputy chief,
18 the chief, or the director position?
19    A  For the director position I don't know the
20 exact pay.  I don't know.  The scale has changed
21 some over the years.  I don't know the exact pay
22 scale now.
23    Q  Do you have a ballpark figure for the
24 difference in any of these positions in pay?

219

1    A  I do have a ballpark figure.  I believe --
2 at the time I think I was at 70-something thousand
3 .  I think there was a difference of $30,000,
4 20- to $30,000.
5    Q  And which position was that?
6    A  That's director's pay.
7    Q  So a 20- to $30,000 differential for the
8 director pay?
9    A  That's correct.  That's correct, yes.
10    Q  And then I'm assuming the chief position
11 would be less than that --
12    A  Correct.
13    Q  -- and the deputy position would be less
14 than that.
15    A  Right.  Correct.
16    Q  So somewhere between zero and $30,000 is
17 the --
18    A  Correct.
19    Q  -- range?
20    A  Yes.
21    Q  You're not really sure, though, of what
22 year you asked to be promoted into these positions?
23    A  No, I'm not.
24    Q  The second category here is loss of future

220

1 wages, and this is where you're talking about you
2 have to be in it for four years in order to get
3 the retirement credits.  Right?
4    A  Correct.
5    Q  And you're saying that you would make
6 $4,000 more per year once you retire?
7    A  That's an estimate, yeah, but roughly
8 so, yes.
9    Q  And what position is that based on being
10 promoted into?
11    A  I believe that position was the deputy
12 chief, chief position.
13    Q  Okay.
14    A  Yep.  Because as your years increase, your
15 pay scale changes.
16    Q  Okay.  When are you planning on retiring?
17    A  I have my 30th -- I want to retire with
18 honor.  So I want to retire when this is seen
19 through, and I want to be retired with some honor.
20 That means a lot to me.  I don't know if -- being
21 a civilian, you know, if you know what I mean, but
22 it means a lot to the me, you know.  I don't want
23 to retire under this cloud.
24    Q  But you're currently eligible for

Transcript of LeGrain Winston
Conducted on August 28, 2020

56 (221 to 224)

221

1  retirement, is that what you're saying?
2     **A  Yes, I am.**
3     Q  Okay.  And you don't have any date in mind
4  right now at which you're going to be retiring?
5     **A  I kind of do have a date in mind.**
6     Q  What are you thinking?
7     **A  Well, my start date is January 25th of the**
8  **following year.  That's my -- that's my out date**
9  **technically.  I mean, I don't necessarily have to**
10 **leave on that date but that is my out date.**
11    Q  Of 2021?
12    **A  Yes, sir.**
13    Q  Okay.  And then we can talk about -- we'll
14 come back to that one in a second.  Let me ask you
15 a couple other questions here.
16       You had indicated when I asked specifically
17 about --
18       MR. LEINENWEBER:  If you'd go to page 12,
19 Gabriel, and this is Interrogatory 21 at the
20 bottom of the page there.
21    Q  So this asks you to identify the lost
22 wages that you're claiming, which we just talked
23 about.  I think if you go to the top of the next
24 page it asks you for a number of things, including

222

1  your annual income from 2015 to the present, and
2  then it just says "Investigation continues" and
3  that you reserve the right to supplement this.  Do
4  you see that?
5     **A  Yes.**
6     Q  Are you able to provide answers to those
7  questions like, for example, your annual income
8  from 2015 to the present?
9     **A  You say am I able -- well, not at this**
10 **time.  I would have to have that in front of me,**
11 **my salary.**
12    Q  Yeah, and I understand that you would need
13 maybe like your W-2 or something like that.
14    **A  Yes.**
15    Q  I'm just curious if -- is there anything
16 preventing you from providing that information
17 to us?
18    **A  No.**
19    Q  Okay.  Is there anything you still need to
20 do investigationwise to provide that information
21 to us?
22    **A  That would be between me and my attorney.**
23 **I'm not quite sure.**
24    Q  Okay.

223

1     **A  I would have to confer with her.**
2     Q  Have you done any investigation since you
3  signed these interrogatories on February 10th of
4  2020?
5     **A  Like I said, I'd probably have to talk to**
6  **my attorney on that just to make sure.**
7     Q  Okay.  And then Interrogatory 22 there
8  just below that asks for expenses, and here this
9  one just says "Investigation continues."  What
10 expenses have you incurred as a result of this
11 lawsuit?
12    **A  Like I said, I would have to talk to my**
13 **attorney on this one to make sure I'm correct with**
14 **that.  I don't want to give any -- I don't want to**
15 **give any false information.**
16    Q  Sure.  And nobody wants you to give false
17 information, and we don't want you to guess, but
18 let me ask you this way --
19    **A  I don't want to guesstimate.**
20    Q  No, we don't want you to guess, but are
21 you aware of having paid out any money related to
22 this lawsuit?
23    **A  Like I said, I'm going to have to talk to**
24 **my attorney on that and get back to you.**

224

1     Q  Well, I mean, you still have to answer my
2  question.  I mean, I understand regarding a
3  specific figure you might need to, you know, talk
4  to your attorney, but do you recall paying out any
5  money related to this lawsuit?
6     **A  No.**
7     Q  Okay.  Have you paid any --
8     **A  Not that I recall.**
9     Q  Have you paid any money to attorneys
10 related to this lawsuit?
11    **A  No.**
12    Q  Okay.  Then are there any expenses that
13 you can identify for me that you are claiming that
14 you're entitled to be reimbursed for right now?
15    **A  Okay.  Once again, I'd probably have to**
16 **get back to you when I talk to my attorney.**
17    Q  Let's talk about Interrogatory 23 a little
18 bit below there.  This asked if you're currently
19 receiving or have you received any other
20 reimbursements or money from any other sources.
21 Have you during the time you've worked for the
22 Sheriff's Office, say since 2010, have you
23 received income from any other sources other than
24 Cook County Sheriff's Office?

Transcript of LeGrain Winston
Conducted on August 28, 2020

57 (225 to 228)

225

1    A  You mean like other jobs?
2    Q  Yeah.
3    A  Yeah, I worked a few part-time jobs here
4  and there.  I don't recall -- nothing -- nothing
5  any lengthy period of time.
6    Q  What sorts of part-time jobs?
7    A  Just probably security.
8    Q  Okay.
9    A  Yeah.
10    Q  Okay.  And what was the name of those
11 companies that you worked for?
12    A  I don't recall.  I haven't worked any in a
13 while, so I don't recall.
14    Q  When is the last time that you think you
15 worked for another -- sorry -- strike that.
16       When is the last time you think you
17 received income from another employer aside from
18 Cook County Sheriff's Office?
19    A  I'm not sure.  I'm not sure.  I would have
20 to check my W-2s --
21    Q  Okay.
22    A  -- and get back to you.
23    Q  Okay.  Did you file tax returns every year
24 since 2015?

226

1    A  Excuse me?  I didn't hear you.
2    Q  Sorry; we were garbled.  Did you file tax
3  returns since 2015?
4    A  Yes.
5    Q  Okay.
6    A  Yes.
7    Q  And is that something that you'd be able
8  to provide your attorney that would indicate the
9  sources of income?
10    A  Yes.
11    Q  Let's talk about nonfinancial damages that
12 you've suffered.
13       MR. LEINENWEBER:  And if we could go back
14 to page 5, Gabriel.
15    Q  And take a second to just -- I guess you've
16 already looked at this, but if you need more time
17 to look at this paragraph here, feel free to.
18 This one you've identified a Dr. Buchanan that
19 you've been seeing for over 10 years; right?
20    A  Yes.
21    Q  And he's your primary care physician?
22    A  Correct.
23    Q  And you identify a handful of health
24 issues here, including stress, anxiety, sleep

227

1  apnea, high blood pressure.  It looks like that's
2  it.  Is that accurate?
3    A  Yes.
4    Q  Okay.  And has Dr. Buchanan or any medical
5  professional told you that any of your health
6  issues are related to defendants' conduct?
7    A  "To defendants' conduct"?
8    Q  Yeah.  So, in other words, you're claiming
9  that Shields, Rohloff, Ranzino, Neal did
10 inappropriate things to you; right?  And what I'd
11 like to know is if Dr. Buchanan was able to
12 connect their actions to any of these health
13 conditions.
14    A  During that period of time, he noticed that
15 my blood pressure was higher than it should be.  I
16 went from one medication to three medications.  I
17 had to have -- I had to have anxiety medication
18 prescribed to me just so I could function, and I
19 had very bad stomach problems, a nerves stomach,
20 so I took medication for that.  And I couldn't
21 sleep.  My sleep was getting very bad.
22       So he's aware of a change.  He asked me
23 what was my change.
24    Q  At what time period are we talking

228

1  about here?
2    A  Like I said, it's been over probably --
3  it's been over 10 years roughly -- roughly --
4  roughly it's got -- my health has deteriorated a
5  little bit probably over the last five, six years
6  to where -- Dr. Buchanan has been my doctor for
7  probably about 10 years.
8    Q  Okay.  But it's the last five to six years
9  that you've developed these health issues?
10    A  Well, they've gotten worse.  I've had --
11 I've had blood pressure issues prior to but it's
12 gotten worse.  I only was on one medication; I'm
13 on three now.  And I wasn't on anxiety medication;
14 I'm on anxiety medication now.
15    Q  Okay.
16    A  And I didn't have stomach issues; I have
17 stomach issues now.  And I don't sleep.
18    Q  And you had said that Dr. Buchanan asked
19 kind of what's changed.  What did change and when?
20    A  I told him I had more stress at work.  He
21 asked me -- you know, that my blood pressure was
22 getting dangerously high; my anxiety level, you
23 know, to the point where my hands would be shaking
24 just sitting still, and he asked me what was

Transcript of LeGrain Winston
Conducted on August 28, 2020

58 (229 to 232)

229

1 happening, and I said I'm under severe stress.
2    Q  Okay.
3    A  So he prescribed medication for me for the
4 anxiety, and he gave me two additional blood
5 pressure medications because he said it could kill
6 me if I don't get it under control.
7    Q  When did you start that anxiety
8 prescription?
9    A  I don't know the exact date but it's been --
10 it's been probably maybe two or three years.
11    Q  Okay.  Do you -- would you be able to find
12 out when that was prescribed for you?
13    A  Yes.
14    Q  Okay.  And would you be able to get
15 medical records from Dr. Buchanan regarding these
16 health conditions?
17    A  Yes.
18    Q  And you're contending that these health
19 conditions were caused at least in part by
20 defendants' actions; right?
21    A  Oh, absolutely.  The additional stress,
22 work-related stress, absolutely.
23    Q  Did any other factors go into causing
24 these health conditions?

231

1    Q  And when was that?
2    A  This was a couple years -- probably when I
3 had the anxiety medication prescribed.  I'd have
4 to ask my doctor.
5    Q  Would you be willing to sign a HIPAA release
6 form so that your doctor could release medical
7 records related to these issues to us for review?
8    A  Yeah, that's fine.
9    Q  Let's see.  Okay.  Any other -- oh, so in
10 here you also talk about it's affected your
11 relationship with your family and your wife; right?
12    A  Yes.
13    Q  Okay.  And you have a lack of interest in
14 doing things you used to do?
15    A  Yes.
16    Q  And you have a CPAP machine?
17    A  Yes.
18    Q  Okay.  Are all of those things caused by
19 defendants' actions in this lawsuit?
20    A  Yes.
21    Q  Okay.  And how is it that you attribute
22 those actions to -- sorry -- strike that.
23       How is that you attribute those issues to
24 defendants' actions?

230

1    A  Not that I know of, no.
2    Q  What about have you had any other -- I
3 mean, is work the only stressful thing in your
4 life?  Have you had other stressful things going
5 on in the last five to six years?
6    A  Well, my sister passed away, so that was
7 very stressful.  That happened after this was
8 going on.
9    Q  Okay.  So that at least in part contributed
10 to your stress?
11    A  My sister passing?
12    Q  Yeah.
13    A  It's a different kind of stress, a
14 different kind of stress.  I would pull up to work
15 and be bent over because I just was terrified to
16 go to work.
17    Q  And did you see any therapists, or
18 counselors, or psychiatrists, or psychologists?
19    A  I was supposed to see a counselor or
20 therapist, but my insurance was having issues
21 trying to set it up.  We set one up and then they
22 said they couldn't pay for it, and then we went
23 through something else, and we just couldn't
24 afford to do that at the time.

232

1    A  I mean, do you want me to take them as you
2 listed them?
3    Q  That's fine.  How is it that defendants'
4 actions affected your relationship with your
5 family and your wife?  How do you attribute that
6 to those?
7    A  Well, I've only ever -- I've only been a
8 Cook County sheriff since the age of 21.  I'm a
9 51-year-old man now, and I have three children,
10 and if I don't have a job, I can't provide for my
11 family.  So it scares me; I'm terrified that
12 someone can fire me at their whim.  So, therefore,
13 when I see my family, I -- I get depressed because
14 I feel like I'll be in a position where I can't
15 take care of them.
16    Q  Have you ever been diagnosed with depression?
17    A  No.
18    Q  And I know you said it this way, but you
19 said "I can just be fired at someone's whim," and
20 that's not really what's going on, though; right?
21    A  That's what I believe is going on.
22    Q  But I mean, it's been over five years now --
23 right? -- and you've still been working that
24 entire time; right?

Transcript of LeGrain Winston
Conducted on August 28, 2020

59 (233 to 236)

233

1    A  Can I answer?  You want me to answer?
2    Q  Oh, yeah, yeah, please.
3    A  Like I said, I've been here 30 years, and
4 going in the merit board I felt like I was
5 brand-new.  Like this was brand-new ground for me.
6 I've never been in the merit board, never been in
7 a Loudermill, and from my understanding, they can
8 walk you out anytime they wanted to.
9        So for the last five years it felt like
10 being on death row not knowing when you're going
11 to be executed and if today was your day.  So it
12 hasn't been like I should feel thankful for work;
13 it feels like I've been -- day-to-day is this
14 going to be my day that I get walked off.
15   Q  How is it that you can be terminated for
16 misconduct without going through the merit board
17 hearing?
18   A  Well, first of all, you can -- first of
19 all, you can be walked off pending the
20 determination of the merit board.  So therefore,
21 you'll be without a job.  So the whole thing is to
22 be without a job.  You know, I can't be without a
23 job and support my family.  This is all I've been
24 trained to do.  The merit board doesn't -- you go

234

1 to the merit board hearing, but you can still be
2 led -- you go to the Loudermill hearing; the
3 Loudermill hearing can say, okay, "We're going to
4 walk you off."
5        I never got a disposition from the
6 Loudermill hearing, so every day felt like I was
7 going to be terminated because I never knew.
8    Q  But there was a determination that you be
9 allowed to work pending the outcome of this; right?
10   A  No.  I never received a determination
11 whether I could work or not.  I was told at the
12 Loudermill hearing that they would get back to me
13 in two weeks.
14   Q  And when was the Loudermill hearing?
15   A  Roughly -- it's a few years ago, a couple
16 years ago.
17   Q  And did you ask what that determination
18 was at any point since then?
19   A  I don't -- no, I haven't.  I haven't.  I
20 didn't want to ask the executioner when they were
21 going to execute me.
22   Q  So yeah, I mean, you're going to want to
23 check with your attorney then because there was a
24 determination made that you were able to work

235

1 pending the outcome of the merit board, as far as
2 I'm aware.
3    A  I never received it.  I never received
4 confirmation emails, anything.
5    Q  You might want to ask about that.
6    A  Okay.
7    Q  Because you can't be -- I mean, you have a
8 hearing coming up, right, for the merit board?
9    A  I had one that was for August 11th and the
10 12th.  It was reassigned to February, I believe.
11   Q  Yeah, yeah.
12   A  Yes.
13   Q  And you've been working that whole time,
14 this whole time?
15   A  Correct.
16   Q  And the -- you still have your retirement
17 income; right?
18   A  Not if I get fired, no.
19   Q  You don't get your retirement income if you
20 end up being terminated from the Sheriff's Office?
21   A  If I'm terminated, I don't -- I don't
22 receive a pension.
23   Q  Okay.  And what's the basis of your belief
24 of that fact?

236

1    A  That's been my understanding.  That's been
2 me talking to other officers and investigators.
3    Q  Okay.
4    A  That you -- unless the policy has changed,
5 that's been my understanding of it.
6    Q  And who -- you pay into the pension fund;
7 right?
8    A  Correct.
9    Q  What's your pension fund?
10   A  It's a County pension fund.
11   Q  Okay.
12   A  County pension fund.
13   Q  And have you ever asked anyone at the
14 County pension fund for an opinion as to whether
15 or not you're going to be continuing to receive a
16 pension?
17   A  I didn't want to ask if I get fired will I
18 still get a pension.  That's not questions that I
19 generally would ask, you know, will I get a
20 pension if I'm fired.  I just became qualified to
21 retire.  You have to be a certain age to retire
22 first of all.  If you don't, your pension is
23 vastly different.
24   Q  The reality is, though, that you have been

Transcript of LeGrain Winston
Conducted on August 28, 2020

60 (237 to 240)

237

1  paid for the last five years the entire time while
2  this was pending?
3      A  Correct.
4      Q  All right.  So it just seems odd, I guess,
5  to me that you're saying that this is so stressful,
6  and I'm sure it is, but I mean, why wouldn't you
7  ask your union representative about these issues,
8  about a Loudermill determination or about whether
9  or not your retirement is going to be taken away?
10     MS. KRAUCHUN:  Objection; foundation,
11 form, calls for speculation, argumentative.
12     MR. LEINENWEBER:  You can answer.
13     Q  The question is, why haven't you spoken to
14 your union about this?
15     A  Fear, just straight fear.  I didn't want
16 to talk to anybody about it.  I didn't want
17 anybody to bring it up for them to expedite me
18 possibly being fired.  I was scared.
19     Q  You're afraid of talking --
20     A  My family depends on me to pay the bills.
21 I'm afraid of being fired.  I'm afraid of being
22 fired.  I've never been in this place before ever
23 in my life.  So, you know, I didn't -- I didn't
24 want to bring up something that, "Hey, we forgot

238

1  to fire him."  So yeah, yeah.
2      Q  Thought maybe they forgot about you?
3      A  Well, possibly.
4      Q  But why would you be afraid about asking
5  your union rep who you pay dues for and who
6  represents you at things like a Loudermill hearing,
7  why would you be afraid of asking them something
8  related to this?
9      A  Well, I know the basic dynamics of how the
10 retirement works.  You have to get -- to get to
11 72 percent you have to be 50 years of age and
12 30 years of service to get 72, and the highest he
13 can get is 80 percent.
14     Now, if you're 49 with 29 years, your
15 pension will look like 20 percent.  It doesn't
16 jump until you hit the age of 50 and 30 years of
17 service.
18     So if they fire me -- even if we go by
19 your calculations, if they fire me, I would only
20 get 27 percent of my salary.  That wouldn't
21 support my family.  So I wasn't fully vested in
22 being able to retire until age 50, and I just
23 turned 50 in April.
24     Q  But there is nothing preventing you from

239

1  reaching out to your union reps who represent your
2  interests to ask them about these issues; right?
3      MS. KRAUCHUN:  Objection.
4      Go ahead.
5      Q  Your answer is no?
6      A  No, my attorney said something.
7      MR. LEINENWEBER:  She was going to object
8  I think but then didn't.
9      MS. KRAUCHUN:  I'm sorry.
10     A  Could you ask it again?  I believe I
11 said no.
12     Q  There was nothing -- other than this fear,
13 there was nothing preventing you from asking the
14 union, your union rep about these issues related
15 to retirement or whether or not you're going to be
16 allowed to work pending the outcome of the merit
17 board hearing?
18     A  As far as the being allowed to work, they
19 generally give you notification of Loudermill.  I
20 never received any notification.  That's as far as
21 the Loudermill.
22     As far as retirement, I know my retirement
23 scale, and I know there's no way I would get full
24 retirement until I reached age 50 and 30 years of

240

1  service.  So I already know that the best case
2  scenario if you say I'm fired I would get like
3  20 percent of my salary.  So I already know that.
4  There's no need to speak to anyone on that.  I
5  know that; there's no denying that.  You have to
6  have 50 years and 30 years of service.
7      And besides that, I enjoyed my job prior
8  to these years, and I hadn't planned on retiring
9  until age 55, 60 years old.
10     Q  Your job as an investigator on payroll,
11 that's a pretty stressful job; right?
12     A  Yeah.  It can be.  It can be at times, yes.
13     Q  And how do you separate the sort of stress
14 related to the fact that you are an investigator
15 on patrol in these dangerous neighborhoods from
16 the stress related to, you know, having dealt with
17 Shields, and Ranzino, and Rohloff, and Neal?
18     A  Well, basically, the stress that I deal
19 with from them, I see it all the time.  It's kind
20 of like one of my mantras.  I don't have any
21 problems on the street as far as the stress level
22 too much with that because I expect what I expect
23 from there.  I grew up in the projects; I understand
24 the dynamic.

Transcript of LeGrain Winston
Conducted on August 28, 2020

241

1    The stress that I receive the most is from
2  my administration. I don't expect them to do the
3  things they do to me; I expect the criminals to do
4  what they do. So it's a difference; it's a
5  difference. My wife can tell you I never come
6  home and talk about what some subject did; I come
7  home and be stressed out about what somebody on my
8  team has done.
9    Q  When did -- let's go to Interrogatory 6.
10 And this asks you to identify for the five years
11 prior to when you allege to have suffered
12 harassment or abuse attributed to the defendants
13 if you had any medical issues, and you just
14 answered that there was an objection and then that
15 "Investigation continues."
16    Are you able to tell us whether or not
17 during the five years prior to the abuse and
18 harassment that you contend in this lawsuit
19 whether or not you were having any health issues?
20    A  You know, like I said, let me speak to my
21 attorney on that in regards to that and get back
22 to you. I told you I had -- I did have blood
23 pressure but it wasn't as bad.
24    Q  Is there any reason you can't answer that

242

1  question?
2    A  Well, I'd like to consult with my attorney.
3    Q  I understand that but I'm just saying, is
4  there any reason you can't answer that?
5    MS. KRAUCHUN: I think he just did.
6  Didn't you?
7    A  I have to consult with my attorney on that
8  for you, sir.
9    Q  The problem is this is your lawsuit,
10 Mr. Winston --
11    A  I understand.
12    Q  -- and you're here to testify, not your
13 attorney. So you don't really get to ask your
14 attorney how to answer certain questions. So it's
15 just a little bit difficult for us, I think to
16 conduct a full and fair deposition if there's
17 questions you're refusing to answer.
18    A  No, I'm not refusing to answer it. I
19 basically answered it when you asked me about my
20 health. I said I had an issue with blood
21 pressure, but it wasn't as bad as it is now.
22    Q  Okay.
23    A  And other than that I haven't had any
24 health issues.

243

1    Q  Thank you. That is helpful.
2    So you've not had any other health issues
3  other than the blood pressure?
4    A  Just normal things, go see the foot doctor
5  because you're on your feet all the time, things
6  of that nature, but other than that, no.
7    Q  Have you had any medical conditions that
8  are -- sorry, strike that.
9    Have you had any medical conditions --
10 since you began suffering the abuse and harassment
11 at the hands of the defendants that you allege in
12 this lawsuit, have you had any other medical
13 conditions attributable to something else?
14    A  To something else?
15    Q  Correct, other than defendants' conduct.
16    A  No. Not that I can think of, no.
17    Q  What about your leg? When did you hurt
18 your leg?
19    A  That was a few years ago, a couple years
20 ago. Other than that, I was -- yeah, a couple
21 years ago, maybe a few years ago.
22    Q  Did you have surgery related to that?
23    A  No, I didn't.
24    Q  Did Dr. Buchanan treat you for that?

244

1    A  I had therapy, yes.
2    Q  Sorry; that wasn't my question. I think
3  we were talking past each other. Did Dr. Buchanan
4  treat you for that?
5    A  Yes.
6    Q  And then if we scroll down to
7  Interrogatory 8, this asks for the medications
8  you're taking.
9    A  Okay.
10    Q  And first of all, is this list accurate?
11    A  Yes.
12    Q  Which of these medications, if any, were
13 prescribed -- well, sorry -- strike that.
14    Let's see. So you say the Escitalopram
15 was prescribed for anxiety, and you've been on
16 that for a couple years?
17    A  Yes.
18    Q  And then hydrochlorothiazide and
19 amlodipine are your blood pressure medications?
20    A  Yes, I was only on one of those.
21    Q  Prior to a few years ago?
22    A  Yes.
23    Q  And then nervous stomach you are taking
24 omeprazole?

Transcript of LeGrain Winston
Conducted on August 28, 2020

245

1    A   Omeprazole, yes.
2    Q   And for sleep apnea you have a sleep apnea
3  machine?
4    A   That's correct.
5    Q   Are you alleging that the sleep apnea was
6  caused by defendants' conduct?
7    A   You say what now?
8    Q   Are you alleging that the sleep apnea was
9  caused by defendants' conduct?
10   A   It's gotten worse.  I have nightmares.  I
11 can't sleep.  So yeah, it's gotten severely
12 worse, yes.
13   Q   Okay.  And has any medical professional
14 told you that your sleep apnea has gotten worse as
15 a result of the conduct the defendants are alleged
16 to have done?
17   A   Well, they didn't say alleged due to the
18 conduct of the defendants.  They said it's gotten
19 worse, the sleep apnea.
20   Q   All right.  And it says "Investigation
21 continues" here.  What do you mean by that?
22   A   You said what do I mean by that?
23   Q   Yeah.
24   A   Well, I still have things that -- it's

246

1  still ongoing.
2    Q   Okay.
3    A   Yeah, still ongoing.
4    Q   But as of today this list is accurate,
5  complete, and there's no other medications that
6  you contend are at issue because of this case;
7  right?
8    A   I heard you say accurate.  What was the
9  rest of it?
10   Q   So this list here, though, as of today is
11 accurate and complete and is the sum and total of
12 the medications that you contend are at issue
13 because of defendants' conduct?
14   A   Correct.
15   Q   And you're not suffering from any other
16 health issues that you allege as a result of
17 defendants' conduct; right?
18   A   Not that I know of, no.
19   Q   Can you turn to Interrogatory 9?  Just go
20 to the top of page 8.  This asks you to identify
21 your email address, and you identified your Cook
22 CountyIL.gov email.  Do you have a personal email
23 address?
24   A   Yes, I do.

247

1    Q   What is that?
2    A   It's LeGrain221@gmail.com.
3    Q   Is there any reason you didn't identify
4  that here in response to Interrogatory 9?
5    A   When they said the email, I just went with
6  the County email.  There's no specific reason.
7    Q   Okay.  But it asks you to provide each and
8  every electronic mail address; right?
9    A   Excuse me?
10   Q   It asks you to identify all your email
11 addresses.
12   A   Oh, okay.  That was my mistake.  It's
13 legrain221@gmail.com.
14   Q   Is that the only personal email address
15 you have?
16   A   That's it.
17   Q   Did you look in that email -- well,
18 strike that.
19       Did you review that email account for any
20 materials responsive to our document request for
21 this lawsuit?
22   A   No.
23   Q   Why not?
24   A   You said did I look into my email in

248

1  regards to what we're talking about right now?
2    Q   Yeah.  So we provided you and your attorney
3  with document requests asking you for materials
4  that you had, and you produced some, for example,
5  the email screen shots that were labeled with a
6  P in the bottom right-hand corner that we
7  discussed earlier.  So my question is, did you
8  look in a Gmail inbox for materials related to
9  this lawsuit?
10   A   There's no materials related to this
11 lawsuit in my Gmail.
12   Q   Okay.  So you haven't had any correspondence
13 with anyone regarding this lawsuit in that Gmail
14 account?
15   A   No, just my --
16   Q   Other than your attorneys?
17   A   Other than my attorney, that's it.
18   Q   So you haven't emailed with any of the
19 other plaintiffs regarding this lawsuit in that
20 email inbox?
21   A   No.
22   Q   And you haven't emailed with any of --
23 Dr. Buchanan or anyone in his office or any
24 medical providers?

Transcript of LeGrain Winston
Conducted on August 28, 2020

63 (249 to 252)

249

1    A   No.
2    Q   And that's your cell phone?
3    A   That's my cell phone.
4    Q   Okay.  Do you use your cell phone to text?
5    A   Sometimes, yes.
6    Q   Have you ever sent anyone any text messages
7  related to this lawsuit other than your attorney?
8    A   Not that I know of, no.
9    Q   Did you look?
10   A   Did I -- what do you mean did I look?
11   Q   Did you look on your phone to see if you
12  had any text messages, for example, about this
13  lawsuit?
14   A   No.  No, there's no text messages about
15  the lawsuit.
16   Q   Just those notes that we discussed
17  earlier, right, the Omni app on your phone; right?
18   A   Excuse me?
19   Q   I said just those notes on your phone,
20  right, on the app that we discussed earlier?
21   A   Correct.
22   Q   And you have no social media accounts?
23   A   None.
24   Q   Okay.

250

1    A   Not a one.
2    Q   Okay.  Let's look at Interrogatory 12, and
3  this asks you to identify the basis of your
4  contention that the Cook County Sheriff's failed
5  to adequately discipline, supervise, control its
6  supervisory officers, and you responded by
7  pointing to a few of the materials we've discussed
8  here in this deposition.  And then you said, "I've
9  never been provided with a meaningful opportunity
10  for my concerns and complaints to be heard," and
11  then you also point to some emails and a grievance.
12       Other than these materials here, are there
13  any other complaints, or emails, or filings that
14  you made regarding the conduct at issue in your
15  lawsuit?
16   A   Not that I know of, no.
17   Q   And do you have any other facts or evidence
18  to support your contention that the Cook County
19  Sheriff doesn't properly discipline, supervise, or
20  control its supervisory officers other than what
21  you listed here?
22   A   Not at this time, no.
23   Q   13, we already talked I think a little bit
24  about this.  This asks you to identify misconduct

251

1  by supervisory officers you allege wasn't properly
2  and fully investigated, and you just said, "See
3  complaint," and then you cite to your other
4  interrogatory responses which we discussed
5  already.
6       Other than that information, do you have
7  any evidence in support of your contention that
8  the misconduct by supervisory officers wasn't
9  properly and fully investigated?
10   A   Other than that, not at this time, no.
11   Q   Okay.  Do you know whether or not any
12  investigations were conducted -- well, presumably
13  you do know that an investigation was conducted
14  into Ranzino's comment "All of you look alike";
15  right?
16   A   Yes.
17   Q   Okay.  What was done improperly about that
18  investigation?
19   A   What was done improperly?
20   Q   Yeah.
21       MS. KRAUCHUN:  Objection; foundation.
22       MR. LEINENWEBER:  Let me strike it and
23  I'll ask a different question.
24   Q   Do you know if anything was done improperly

252

1  related to that investigation?
2    A   Not that I know of.  I don't know.
3    Q   Do you know whether or not that
4  investigation or that -- sorry -- strike that.
5       Do you know whether or not that incident
6  was, quote/unquote, fully investigated as you use
7  that term?
8    A   No, I do not know.
9    Q   Is there anything else that you contend
10  should have been done regarding the investigation
11  into Ranzino's "All of you look alike" comment?
12   A   Do I contend anything else should have
13  been done?
14   Q   Correct.
15   A   Possible termination.
16   Q   Okay.  So the issue is not so much the
17  investigation that was conducted; it's potentially
18  the discipline that was determined?
19   A   I don't know what discipline was determined.
20   Q   Okay.  And that's because, as you said,
21  you don't know the results of the investigation;
22  right?
23   A   Correct.
24   Q   Okay.  And if the result of the investigation

Transcript of LeGrain Winston
Conducted on August 28, 2020

64 (253 to 256)

253

1  was that he was demoted and transferred, would that
2  have been sufficient in your mind?
3     **A  No.**
4     Q  Okay.  And why not?
5     **A  Because of the comments that were made.**
6     Q  "All of you look alike," because of that
7  comment "All of you look alike"?
8     **A  That and the N-word kind of, yeah.**
9     Q  Yeah, but that was -- that was back in
10  2012; right?
11    **A  Yep.**
12    Q  Right.  And refresh my recollection, did
13  you file a complaint about that back in 2012?
14    **A  I believe you would have to pull that up**
15  **again.  I believe I did.  I'm not sure.**
16    Q  Who did you -- who do you recall telling
17  that to?
18    **A  I don't recall.  I would have to look at**
19  **the documentation again.  I don't want to make a**
20  **mistake.**
21    Q  I mean, I'll represent to you that I'm not
22  aware of any complaint you made to anyone about
23  that allegation.
24    **A  I believe it was in the memo.  It was in**

254

1  **the statement when he called me a dumb ass nigger.**
2     Q  In what memo?
3     **A  I would have to go over the documentation**
4  **again.  I believe I did write that -- something on**
5  **that.**
6     Q  So the only place I see it is in the EEOC
7  charge.
8     **A  Okay.**
9     Q  Is that what you might be referring to?
10    **A  I might be referring to that.  I would**
11  **have to review that.**
12    MR. LEINENWEBER:  Gabriel, can you pull up --
13  sorry -- I lost it.  It was here -- 5, Exhibit 5,
14  please.
15    Q  Okay.  You'll see here --
16    MR. LEINENWEBER:  Can we make that second
17  paragraph of text a little bigger?
18    Q  You see a reference here to the quote
19  "Dumb ass N-word"?
20    **A  Yeah.**
21    Q  Other than that in this EEOC charge of
22  discrimination July 2016 on, I guess -- there must
23  have been one other one because we established
24  there was 2012.  Other than that, though, this

255

1  EEOC charge, are you aware of having made a
2  complaint about this to anyone else?
3     **A  That statement I'm not -- I'm not sure.  I**
4  **would have to review my documentation.**
5     MS. KRAUCHUN:  Justin, if I can, I think
6  it might have been either Exhibit 9 or 10.
7     MR. LEINENWEBER:  Please, yeah.  I'm
8  missing --
9     MS. KRAUCHUN:  I'm not sure that those are
10  relevant to 2012 so --
11    MR. LEINENWEBER:  Yeah.  But 9 is the --
12  it's not 9.  I don't see it in any of those.
13  That's fine.
14    Q  So do you have any -- sorry -- strike that.
15    All right.  Let's go on to Interrogatory 14,
16  if we could pull Exhibit 7 back up.  And then can
17  you take a look at response to Interrogatory 14,
18  please, Mr. Winston?
19    **A  14?**
20    Q  Yeah, please.
21    **A  I only have 13 up here.**
22    MR. LEINENWEBER:  Oh, Gabriel, can you
23  scroll down a little bit?
24    THE WITNESS:  Thank you.

256

1     Q  Okay.  So this question asks you to
2  identify the basis of your contention that
3  Ranzino, Shields, Neal, and Rohloff were unfit for
4  being supervisors, and you answered, "See
5  complaint" and then cited your responses to
6  Interrogatories 12 and 13.
7     Other than the complaint and your
8  responses to 12 and 13, do you have any other
9  evidence that supports your contention that those
10  individuals are unfit for supervisory positions or
11  created a danger of harm to third persons?
12    **A  Not at this time, no.**
13    Q  Oh, let's go to Interrogatory 17, please,
14  which is on page 11.
15    So Interrogatory 17 here asks you to
16  identify if you've had any conversations or know
17  of any statements with any person at any time
18  regarding the matters referenced in your complaint.
19  You did not answer this question.  Is there any
20  reason why you didn't answer this question?
21    **A  Okay.  I'm reading the question.**
22    Q  Sure.
23    **A  Yeah, I'm going to have to talk to my**
24  **attorney on that question if you can explain it to**

Transcript of LeGrain Winston
Conducted on August 28, 2020

65 (257 to 260)

257

1  me a little better.
2      Q  Let me ask it this way.  Have you had any
3  conversations with anyone regarding the matters
4  referenced in your complaint other than your
5  attorneys?
6      A  Excuse me?
7      Q  Have you had any conversations with anyone
8  other than your attorneys regarding the matters
9  referenced in your complaint?
10     A  No.
11     Q  You haven't?
12     A  No.
13     Q  You've never spoken to any of the other
14  plaintiffs about the matters alleged in the
15  complaint?
16     A  No.  Not in detail, no.
17     Q  Not in detail, no.  Have you talked to
18  them --
19     A  They know we have a lawsuit, but no.  No
20  details, no.
21     Q  Have you talked to them about the lawsuit?
22     A  No.
23     Q  Have you had any meetings to discuss the
24  lawsuit?

258

1      A  With my attorney present, yes.
2      Q  Have you had any meetings with the other
3  plaintiffs without attorneys to discuss the
4  allegations of the lawsuit?
5      A  No.
6      Q  Why would several other plaintiffs have
7  told us that there was a meeting in which everyone
8  discussed the lawsuit and decided to move forward
9  with it?
10         MS. KRAUCHUN:  Objection.  That misstates
11  prior testimony and not supported by evidence in
12  the record.
13         But you can answer, LeGrain.
14     A  Okay.  Go ahead and ask it again.
15     Q  So several other plaintiffs have told us
16  that there was a meeting held at which the plaintiffs
17  got together and discussed filing this lawsuit.
18     A  I don't recall that.
19     Q  You don't recall that meeting?
20     A  I don't recall that, no.
21     Q  Okay.  So it may have happened or may not
22  have happened, you just don't recall?
23     A  I don't recall.  I don't recall.
24     Q  Okay.  So you're not saying it didn't

259

1  happen; you're just saying you don't recall?
2      A  I think I answered.  I said I don't recall.
3      Q  So you're not -- I just want to clarify.
4  You're not saying it didn't happen; you're just
5  saying you don't remember if it happened?
6      A  I don't recall.  I don't recall.  I work
7  with a lot of people at the same time.  We have
8  roll call together; we have meetings that don't
9  pertain to this.  So I don't recall that, no, I
10  don't.
11     Q  So you haven't discussed any of the
12  allegations underlying this complaint with any of
13  the other -- anyone else other than your
14  attorneys?
15     A  My attorney only.
16     Q  And when Ranzino called you the N-word
17  back in 2012, you only discussed that with, I
18  think it was Cecil Williams?
19     A  I thought he heard it because he said it
20  loud enough.  We were in the same hallway.
21     Q  You thought Cecil Williams heard it?
22     A  Yeah.
23     Q  But you didn't discuss that with anyone else?
24     A  OPR.

260

1      Q  So you have an independent recollection of
2  discussing that with OPR?
3      A  I remember telling OPR some of the
4  statements that he made, yeah.
5      Q  And when was that?
6      A  Because that's -- that's kind of a
7  horrific statement.
8      Q  And when was that?
9      A  I can't recall.  I have to -- I would have
10  to look over my documents.
11     Q  So was that -- was that related to the
12  investigation into "All of you look alike" comment
13  made by Chief Ranzino?
14     A  Possibly.
15     Q  Okay.
16     A  Possibly.
17     Q  I mean, but I'm having --
18     A  I was interviewed by HR, as well, so --
19     Q  Okay.
20     A  Yeah.
21     Q  Then what about -- do you have any -- are
22  you -- strike that.
23         Did you file a grievance with the Union
24  regarding Ranzino using the N-word?

Transcript of LeGrain Winston
Conducted on August 28, 2020

66 (261 to 264)

261

1     MS. KRAUCHUN:  Objection; asked and
2 answered.
3     Q  Back in -- strike that.  Back in 2012 when
4 Ranzino used the N-word with you, did you file a
5 grievance regarding that?
6     MS. KRAUCHUN:  Objection; asked and
7 answered.  We just talked about this.
8     **A  I'd have to review my -- I'd have to**
9 **review my documentation.**
10    Q  Without reviewing your documentation, are
11 you able to recall whether or not when Ranzino
12 used the N-word with you back in 2012 filed a
13 grievance through the Union?
14    **A  I would have -- like I said, I would have**
15 **to check my documentation so I could be thorough.**
16    Q  So my question is, do you have a
17 recollection of doing that?
18    **A  And I heard your question, and I would**
19 **have to consult my documentation.**
20    Q  You don't have to consult your documentation
21 to answer my question.  In fact, consulting your
22 documentation --
23    **A  Then it's all speculation.**
24    Q  Consulting your documentation --

262

1     **A  Because I have multiple -- I have**
2 **multiple -- I have multiple paperwork --**
3     Q  You need to stop.  You need to stop
4 talking and let me ask the questions.  Okay?
5     **A  Okay.  Go ahead.**
6     Q  The question is, as you sit here today, do
7 you have an independent recollection --
8     **A  No.**
9     Q  -- of --
10    **A  No.**
11    Q  You've got to let me finish my question,
12 Mr. Winston, or we're going to be here all night
13 and into Saturday.  Okay?
14    **A  Okay.  Go ahead.**
15    Q  It's not fair to the court reporter to
16 talk over me.
17       So my question is, as you sit here today,
18 do you have an independent recollection of filing
19 a grievance with the Union regarding Chief Ranzino
20 using the N-word with you in 2012?
21    **A  No.**
22    Q  Do you have an independent recollection as
23 you sit here today of filing any kind of
24 discrimination form complaint with OPR regarding

263

1 Chief Ranzino using the N-word with you in 2012?
2     **A  No.**
3     Q  And do you have an independent recollection
4 as you sit here today of having filed any kind of
5 complaint related to that comment by Chief Ranzino
6 in 2012?
7     **A  You've got to repeat that last one because**
8 **you broke up on that one.**
9     Q  That's fine.  So do you have an independent
10 recollection as you sit here today of having filed
11 any kind of complaint regarding Chief Ranzino
12 using the N-word back in 2012?
13    **A  I think based on my EEOC that you just**
14 **showed me, yes.**
15    Q  Okay.  So in 2016 when you filed your
16 EEOC complaint, you recall doing that?
17    **A  Yeah.**
18    Q  And that would be about three years after
19 the conversation occurred; right?
20    **A  The complaint -- you have the complaint in**
21 **front of you.  So if you say so, yes.**
22    Q  Well, you filed the EEOC charge in 2016 --
23 actually, four years -- and the comment allegedly
24 occurred in 2012.

264

1     **A  Uh-huh.**
2     Q  So that's about four years; right?
3     **A  Yes.**
4     Q  What supervisor -- as you sit here today,
5 do you have an independent recollection or are you
6 aware of having told any supervisors at the Cook
7 County Sheriff's Office that Ranzino had used the
8 N-word with you in 2012?
9       THE WITNESS:  Could you repeat that?
10      MR. LEINENWEBER:  Yeah, Paula, can you
11 read that question back, please?
12      (Pending question read.)
13    **A  No.**
14    Q  Okay.  Any other conversations -- have you
15 had any other conversations -- I just want to make
16 sure that your memory is exhausted here.  Have you
17 had any conversations with any other individuals
18 other than your attorneys about the allegations in
19 the complaint?
20    **A  No.**
21    Q  And you have not been a party to any kind
22 of civil actions, right, any kind of lawsuits?
23    **A  Not that I know of, no.**
24      MR. LEINENWEBER:  Why don't we -- can we

Transcript of LeGrain Winston
Conducted on August 28, 2020

67 (265 to 268)

265

1 take a quick break? And I should be able to wrap
2 up pretty quickly, I think.
3     MS. KRAUCHUN: Do you want to take five
4 minutes?
5     MR. LEINENWEBER: Be back at 4:22?
6     MS. KRAUCHUN: Perfect.
7     (Recess taken, 4:17 p.m. to 4:27 p.m.)
8     MR. LEINENWEBER: All right. Mr. Winston,
9 we have just returned from a break. I don't have
10 any more questions for you at this time. I just
11 want to say thank you for your time, and I think
12 your attorney may have some questions for you.
13     THE WITNESS: You're welcome.
14     MS. KRAUCHUN: If you guys give me
15 one second, I'm just scribbling down a couple
16 thoughts.
17     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
18 BY MS. KRAUCHUN:
19     Q  LeGrain, thanks for your patience; I know
20 it's been a long day. A couple questions; I don't
21 have a lot.
22     Specifically, do you know who Michelle
23 Strickland is?
24     A  Yes.

266

1     Q  And --
2     A  Yes, I do.
3     Q  And she only worked in the EM unit for a
4 short time; correct?
5     A  Correct.
6     Q  And do you recall while she -- while
7 Ms. Strickland worked in EM any incidents where
8 any supervisors spoke about her in a racist or
9 derogatory manner?
10     A  Yes.
11     Q  And can you describe what that incident was?
12     A  We were in roll call. It was extremely
13 hot in our area; there's no air-conditioning. And
14 Strickland had went inside the inner office which
15 has air-conditioners. Shields came out to address
16 roll call, and he said where was Strickland at.
17 We stated she went inside because she was hot.
18 And she was joking saying this heat is going to
19 mess her hair up, and he called her a nappy head.
20 He said, "I don't know why, she got a nappy head
21 anyway."
22     Blacks know what that means. It's been a
23 derogatory statement for hundreds of years. So we
24 were kind of struck that he said that.

267

1     Q  And who was present in the room when that
2 was said?
3     A  All the roll call. I had -- I believe
4 Investigator Slaughter was in the room. Quite a
5 few of us was in the room. Director Shields was --
6 he was the one that stated it. He was in the
7 room, as well.
8     Q  And Director Shields -- at the time was he
9 the director or executive director? Do you recall?
10     A  What did you say? Could you repeat that?
11     Q  Sorry. At the time this happened, if you
12 recall, was Shields -- was he the director at the
13 time, or was he the executive director?
14     A  He was the director at the time.
15     Q  Okay. But he was the supervisor over
16 supervisors; right?
17     MR. LEINENWEBER: Object to form and
18 foundation.
19     MS. KRAUCHUN: You can answer it, LeGrain.
20     A  Correct. Could you hear me?
21     Q  Yeah. We could hear you.
22     MS. KRAUCHUN: I don't know, am I delaying,
23 guys? Is my video delayed?
24     THE COURT REPORTER: No.

268

1     MR. LEINENWEBER: You're good.
2     Q  We talked a lot -- there was a lot of
3 questions about grievances and stuff, but I think
4 we have to start by going to write-ups.
5     So who actually issues write-ups for
6 discipline?
7     MR. LEINENWEBER: Object to form and
8 foundation.
9     A  Go ahead and answer?
10     Q  Yeah. Go ahead. He's going to make his
11 objections, LeGrain, and then you can answer.
12     A  Oh, okay. Who issues discipline is the
13 supervisors, Shields, Neal, Ranzino. They're the
14 ones that would generally issue the discipline.
15     Q  And would you agree that supervisors use
16 discretion to determine, you know, what
17 investigators they write up?
18     MR. LEINENWEBER: Objection to form;
19 foundation, also leading, also argumentative.
20     A  Yes.
21     Q  Can you explain that to me? What do you
22 mean by that?
23     MR. LEINENWEBER: Same objections.
24     A  Okay. Because you faded out, can you

Transcript of LeGrain Winston
Conducted on August 28, 2020

68 (269 to 272)

269

1  repeat that question again?
2      Q  Just can you explain why you think
3  supervisors use discretion when they decide who to
4  write up and what to write up?
5      MR. LEINENWEBER:  Same objections.
6      A  Well, like I said, that's -- like I said,
7  that's basically they'll -- they'll choose who --
8  they'll choose the ones that are giving them the
9  most problems as far as was complaint forms, and
10 sometimes you can be asking too many questions and
11 they'll -- and they'll have issue with you and say
12 you're insubordinate or whatever.  So yeah, that's
13 basically how it is.
14     Q  And when you ask questions, where would
15 you be when you ask questions?
16     A  Roll call.
17     MR. LEINENWEBER:  Objection to form;
18 foundation.
19     Q  So had you asked questions in roll call
20 before?
21     A  Yes.
22     Q  And can you describe the tone in which your
23 question was answered by any of the supervisors?
24     MR. LEINENWEBER:  Objection; form,

270

1  foundation.
2      MS. KRAUCHUN:  Sorry; go ahead.
3      A  You said my tone?
4      Q  No, the tone in which a supervisor would
5  respond to your question.
6      MR. LEINENWEBER:  Same objections.
7      A  Well, the tone would be argumentative,
8  possibly yelling.  Yeah, that's how it would be.
9      Q  And you had that experience personally;
10 correct?
11     A  Correct.
12     Q  And did you ever witness any other
13 investigators have that same experience when they
14 asked a question in roll call?
15     MR. LEINENWEBER:  Same objections.
16     A  Yes, especially the black investigators.
17     Q  And what do you mean by that?  So if a
18 white investigator asked a question, they weren't
19 spoken to the same way; is that what you're saying?
20     MR. LEINENWEBER:  Same objections.  Also,
21 leading.
22     A  Okay.  Well, basically, it was basically --
23 what's the saying when you say when you say
24 something is written all over someone's face.

271

1  Basically, if one person asks one question, and
2  another asks another, it would be answered in
3  two different ways.  It would be argumentative if
4  African-American investigators would ask a question
5  as opposed to some of the white investigators.
6      Q  And so kind of digressing back to the
7  write-ups, so before OPR could make any discipline
8  recommendations the direct supervisor has to
9  complete the write-up first; is that correct?
10     MR. LEINENWEBER:  Objection to form;
11 foundation.  Also, leading.
12     A  Correct.
13     Q  And so the supervisor actually fills out
14 what's called a disciplinary action form; is that
15 right?
16     MR. LEINENWEBER:  Same objections.
17     A  That's correct.
18     Q  Okay.  And so the narrative that goes into
19 that disciplinary action form comes from whom?
20     A  The supervisors.
21     Q  Okay.  So and then to your knowledge, just
22 based on your knowledge, OPR makes the
23 recommendation based on that narrative that's
24 written in that disciplinary action form; is that

272

1  your understanding?
2      MR. LEINENWEBER:  Same objections.
3      A  Yes.
4      Q  So hypothetically, if a write-up isn't
5  accurately written or it relies on erroneous
6  facts, then it would affect OPR's recommendations.
7  Do you think that's a fair statement?
8      MR. LEINENWEBER:  Same objections, also
9  incomplete hypothetical.
10     A  Yes.  Absolutely.
11     Q  And write-ups, they prevent promotional
12 opportunities; is that fair to say?
13     MR. LEINENWEBER:  Objection to form;
14 foundation.  Also, leading.
15     A  Can you ask that question again?
16     Q  I am asking you if write-ups -- you know,
17 the amount of write-ups or write-ups in your file,
18 personnel file, would that prevent you from
19 getting a promotion?
20     MR. LEINENWEBER:  Same objections.
21     A  Yes.  Absolutely.
22     Q  And counsel had asked you questions about
23 informal process and procedures that you believed
24 prevented promotions.  Do you remember that line

Transcript of LeGrain Winston
Conducted on August 28, 2020

273

1 of questioning?
2     A  Yes, I do.
3     Q  So the supervisors issuing write-ups, do
4 you believe that that was a process or procedure
5 that prevented promotions for African-Americans?
6         MR. LEINENWEBER:  Objection to form;
7 foundation, leading, and also, asked and answered.
8     A  Absolutely.
9     Q  And Ranzino, Neal, and Rohloff, they had
10 the authority to issue write-ups; correct?
11        MR. LEINENWEBER:  Objection to form and
12 foundation.
13    A  Correct.
14    Q  They were supervisors; correct?
15        MR. LEINENWEBER:  Same objections.
16    A  I didn't hear the question.
17    Q  Ranzino, Neal, and Rohloff were all
18 supervisors in the EM unit; right?
19        MR. LEINENWEBER:  Same objections.
20    A  Yes.
21    Q  And is it your belief that the disciplinary
22 write-ups were more frequently issued to
23 African-American investigators?
24        MR. LEINENWEBER:  Objection to form;

274

1 foundation; also leading.
2     A  Yes, I believe that to be the case.
3     Q  And then do you remember counsel asked you
4 quite a few questions about you not knowing that
5 Ranzino was transferred out of the EM unit.  Do
6 you recall that questioning?
7     A  Yes.
8     Q  Did Ranzino -- did Ranzino always conduct
9 roll call on your watch -- which is the third
10 watch; right?
11    A  Yes.
12    Q  Was Ranzino always the supervisor to do
13 roll call on your shift?
14    A  No.  Not always.
15    Q  So there were different supervisors that
16 held roll call; is that correct?
17    A  I didn't hear you.  What now?
18    Q  I said so there were different supervisors
19 that held roll call?
20    A  Yes.
21    Q  So we talked a little bit about being on
22 patrol and being in, you know, more dangerous areas
23 in the city.  Do you remember that questioning?
24    A  Yes.

275

1     Q  And we talked about, you know, when you're
2 in certain neighborhoods or you're reincarcerating
3 someone or picking up somebody on a high-risk
4 warrant that backup was always required.  Do you
5 remember testifying to that?
6         MR. LEINENWEBER:  Objection to form.
7 Objection; foundation, leading, misstates prior
8 testimony.
9     A  Yes.
10    Q  Okay.  So why was it so problematic to you
11 that you didn't have backup in those circumstances?
12    A  Well, basically, it was dangerous and
13 those supervisors didn't want to come on the street
14 in the areas that we were in.
15    Q  And when you say "those supervisors," what
16 supervisors are you referring to specifically?
17    A  Chief Neal, Ranzino.  And Shields was not
18 a street supervisor, so I can't name him.
19    Q  And because you didn't have backup, what --
20 what did that make you feel or think about what
21 your -- how your supervisors valued you?
22        MR. LEINENWEBER:  Objection to form,
23 foundation, also leading.
24    A  Well, it made us feel that they didn't even

276

1 really care about our safety.  They weren't
2 concerned what happened to us on these incidents.
3     Q  And then just kind of moving on -- I'm all
4 over the place because my notes are all over the
5 place, but let me just ask you, for all the years
6 you've worked at the Sheriff's Department up until
7 this time around 2014 when all of this stuff
8 started, did you enjoy doing your job?
9     A  I loved doing my job.
10    Q  Did you have integrity in your job and
11 your job duties?
12        MR. LEINENWEBER:  Objection to form,
13 foundation, also leading.
14    A  Absolutely.
15    Q  And you talked about how you currently
16 have charges pending before the merit board.  Are
17 you embarrassed that you have these charges pending?
18    A  Extremely embarrassed.  I'm supposed to be
19 a senior investigator, and I'm sitting in a merit
20 board for the last five years.  It's very
21 demeaning, very demeaning.  People I don't even
22 know say -- they see my name on my vest, and they
23 say, "Oh, you're the guy that's in the merit board
24 on the schedule."  So it's very demeaning.

Transcript of LeGrain Winston
Conducted on August 28, 2020

70 (277 to 280)

277

1    Q  And how has that affected your ability to
2  do your job?
3    A  Well, it takes away my confidence if
4  someone feels like they've had me pretried, and it
5  makes my job a little bit more stressful.  It's --
6  like I said, it's very demeaning.  I pride myself
7  on being a professional, and it feels like someone
8  is trying to take my professionalism away from me.
9  And I have built up a long-standing reputation at
10 the Sheriff's Department.  People know me as
11 someone you can rely on, and now I'm on the merit
12 board.
13   Q  Since the time Shields has been director
14 of EM, do you know how many African-American
15 investigators were promoted to supervisor positions?
16       MR. LEINENWEBER:  Objection; form and
17 foundation.
18   A  I would say if it was, not many at all.
19   Q  Would you care to give a guesstimate like
20 a percentage or anything like that, 20 percent,
21 30 percent, more or less than that?
22       MR. LEINENWEBER:  Objection; form,
23 foundation, also leading.
24   A  If I would give a percentage, I would say

278

1  it's 25 percent out of 100.  So I would say that
2  who they would promote would be the unpaid
3  supervisors.
4    Q  And what do you mean by "unpaid"?
5    A  Well, they didn't get paid for their
6  supervision.  They got paid for time.  They'd give
7  them an hour a day for supervision.  So it didn't
8  reflect on -- towards pension retirement benefits.
9    Q  And counsel asked you about meeting with
10 the other plaintiffs to discuss the allegations of
11 the complaint.  Did you -- were there meetings --
12 did you have meetings with the other plaintiffs?
13   A  No, we didn't have meetings.  Like I said,
14 we might pass each other in the hallway or whatever,
15 and that pretty much would be it, you know, but a
16 sit-down meeting, no.
17   Q  But you did have a meeting with attorneys
18 present, right, and all the plaintiffs?
19   A  Correct.  Correct.
20   Q  And did the other EM investigators know of
21 the racist language that Ranzino used towards you?
22       MR. LEINENWEBER:  Objection to form;
23 foundation, also leading.
24       MS. KRAUCHUN:  Strike that.

279

1        Let me reask it a different way.
2        THE WITNESS:  Repeat it.
3    Q  Did you come to learn that the other
4  EM investigators knew about the racist language
5  that Ranzino used towards you?
6        MR. LEINENWEBER:  Objection to form;
7  foundation, also leading.
8    A  Yes.  Absolutely it would -- it would go
9  throughout the unit.  I mean, initially one person
10 heard that this conversation and this language was
11 being used.  We are a big department but a small
12 unit.
13   Q  And do you recall saying anything to anybody
14 about that?
15       MR. LEINENWEBER:  Same objections.
16   A  No.  Like I said, it would be something in
17 passing.  We would be talking in passing or
18 whatever and then -- but nothing explicit, you
19 know, nothing specific.
20   Q  So just like typical workplace gossip, is
21 that what you would say?
22   A  Absolutely.  It would be something that
23 possibly would be said, someone overheard, "Did
24 you hear this was called to Strickland or you

280

1  heard they called Strickland this, or they called
2  Winston this," and then it was spread throughout
3  the unit.
4    Q  But you never had like specific conversations
5  with people saying, "Hey, did you hear Ranzino
6  called me the N-word"?
7        (Video disruption.)
8        MS. KRAUCHUN:  I don't even remember what
9  I said.  Paula, can you read that back?
10       (Pending question read.)
11   A  Yeah.  Well, people would bring that to me
12 that they heard that.  They were like, "I heard
13 Ranzino called you the N-word," and I was like,
14 "Yeah, yeah."  But it was almost like it was
15 typical behavior, you know, like it became the norm.
16       MS. KRAUCHUN:  Just give me one second.
17 Let me just scroll through here real quick.  I
18 don't think I have anything more but -- oh, a
19 couple things about grievances.
20   Q  So we talked about write-ups; right?  You
21 get a write-up, and then you want to grieve it?
22   A  Yes.
23   Q  And do you remember giving testimony that
24 Steps 1, 2, 3, and 4 all occur within your

Transcript of LeGrain Winston
Conducted on August 28, 2020

281

1  department.  Is that correct?
2      **A  Yes.  Yes.**
3      Q  So after Step 4, the next step would be to
4  go to arbitration; is that what you testified to?
5      **A  I didn't hear that last part.**
6      Q  So after Step 4, if the grievance is
7  still -- if it was unsuccessful at being resolved,
8  the next step would be to go to arbitration; is
9  that right?
10     **A  It would be to go to arbitration, but**
11 **generally you would do the discipline -- the time,**
12 **whatever they offered you or told you you were**
13 **going to do, you would do it, and you would go to**
14 **arbitration in order to regain your time or**
15 **whatever you had lost.**
16     Q  So in the interim between Step 4, you
17 would take your discipline, is that what you're
18 saying?
19     **A  You said what now?**
20     Q  So after Step 4, let's say they tell you
21 you still are going to get a 10-day suspension.
22 You actually have to take that discipline; correct?
23     MR. LEINENWEBER:  Objection; form,
24 foundation.

282

1      **A  Yeah, you actually would take the discipline,**
2  **and you would try to regain your money and your**
3  **days in arbitration.**
4      Q  And typically how long does it take to get
5  to arbitration?
6      MR. LEINENWEBER:  Objection to form;
7  foundation.
8      **A  The way things are now, it could take --**
9  **it could take literally years.**
10     Q  So in the interim, that discipline is
11 sitting in your record; correct?
12     **A  Correct.**
13     Q  So even if you go to arbitration, and it's
14 found out that you weren't actually guilty of that
15 offense, it's been on your record pending for
16 however long that process takes; correct?
17     MR. LEINENWEBER:  Objection to form;
18 foundation.
19     **A  Correct.**
20     MR. LEINENWEBER:  Also leading.
21     Q  And so if you wanted to bid out of your
22 unit --
23     **A  Correct.**
24     Q  -- would that discipline -- sorry.  If you

283

1  wanted to bid out of your unit, would that
2  discipline potentially affect that process?
3      MR. LEINENWEBER:  Objection to form;
4  foundation, also leading.
5      **A  Yes.**
6      Q  If you wanted to apply for a promotion,
7  would that, you know, discipline sitting there,
8  would it impede your ability to be promoted?
9      MR. LEINENWEBER:  Same objections.
10     **A  Yes.**
11     THE WITNESS:  Did you hear my response?
12     MS. KRAUCHUN:  I did.  Thank you.  Sorry;
13 I'm thinking.
14     THE WITNESS:  Oh, that's okay.
15     MS. KRAUCHUN:  I don't think I have
16 anything further right now.  Justin, if you have
17 any follow-up to that.
18     MR. LEINENWEBER:  Just a couple quick
19 follow-ups.
20     EXAMINATION BY COUNSEL FOR THE DEFENDANTS
21 BY MR. LEINENWEBER:
22     Q  When did -- when did Shields make the
23 comment about Michelle Strickland's hair?
24     **A  That was in roll call.  It was in roll call.**

284

1      Q  I'm sorry.  I'm having a hard time hearing
2  you.  I don't know if something happened.
3      **A  Can you hear me?**
4      Q  It's a lot quieter for some reason.
5      **A  Can you hear me?**
6      MR. LEINENWEBER:  Yeah.
7      MS. KRAUCHUN:  That's a little bit better,
8  yeah.
9      **A  (Continuing.)  It was during roll call.**
10     Q  Okay.  When was that?
11     **A  I don't have a specific date.  I don't**
12 **have the specific date in front of me right now.**
13     MR. LEINENWEBER:  Let me just make sure.
14 Paula, are you able to hear him?
15     THE COURT REPORTER:  Yes.
16     Q  Okay.  So you don't have a specific date.
17 How did you respond to that comment?
18     **A  I asked him what did he say.  I said,**
19 **"What did you say?"**
20     Q  Okay.  And then he said what?
21     **A  He didn't say anything else.  There's lots**
22 **of people that were, I guess kind of shocked by**
23 **what he said.**
24     Q  And what else did you do in response?

285

1    A  I don't recall after that.
2    Q  Did you file a grievance regarding that?
3    A  No, I didn't.
4    Q  Did you file an OPR complaint regarding that?
5    A  No.
6    Q  So you didn't feel it rose to the level to
7  which you should go and file a complaint with OPR?
8    A  I had already --
9      MS. KRAUCHUN:  Objection.
10      THE WITNESS:  Go ahead.
11      MS. KRAUCHUN:  Objection; form, foundation.
12      MR. LEINENWEBER:  You can answer.
13    A  Yeah, I had already filed complaints that
14  were similar to that.
15    Q  But not about this?
16    A  No.
17    Q  How many complaints to OPR did you make
18  regarding the tone of responses to your questions
19  or African-American investigators' questions
20  during roll call?
21    A  The tones of my question?
22    Q  No -- sorry -- strike that.  Let me strike
23  that and ask the question again.
24      How many complaints did you make to

286

1  OPR regarding the tone that the individuals
2  conducting roll call used to answer your questions?
3    A  I'm not quite sure the number, but if you
4  mean tone as far as like when you say "Boy" or
5  something like that, I believe that was the
6  one that you showed me earlier.
7    Q  So I'm asking you a different question
8  because when your attorney was asking you questions,
9  she asked you if questions were answered in a
10  different manner for African-Americans versus
11  white investigators, and you said yes that --
12    A  Yes.
13    Q  -- the person conducting roll call would
14  yell at you and other African-Americans but not
15  white investigators?
16    A  It was like being exasperated.  The way
17  you asked it I wasn't clear.  So now I understand
18  what you're saying.
19      As far as the tones, it was almost like
20  you were exasperated to answer our questions, but
21  you took more detail to answer someone else's
22  questions.
23    Q  Yeah, that's not my question.  My question
24  is, how many complaints did you make about that

287

1  to OPR?
2    A  I just told you -- okay.  You were talking
3  over my answer.
4    Q  Sorry.  It must be a reconcile thing.  The
5  question is simply whether or not -- did you make
6  any complaints to OPR regarding the tone that the
7  supervisors -- sorry; strike that -- the employees
8  conducting roll call used to answer your questions?
9    A  The volume, the tone, I didn't make any
10  OPR about tones.
11    Q  Okay.  What about -- which write-ups that
12  you received prevented you from receiving a
13  promotion?
14    A  All the write-ups that are still pending.
15  I'm still in arbitration with the one for the
16  radio transmission.  I'm still in the merit board.
17  You definitely can't get promoted while you're in
18  a merit board case.  So that's still -- that's 5
19  1/2 years in the merit board.
20    Q  Which promotions did they prevent you from
21  obtaining?
22    A  Any.
23    Q  But you never applied for any; right?
24    A  You won't be promoted.  I'm in the merit

288

1  board.
2    Q  Okay.  But you didn't apply for any; right?
3    A  No, I asked to be, as I stated earlier.
4    Q  As we talked about, but you never completed
5  any applications or took any tests to be promoted?
6    A  There was no application and there was no
7  test for promotion.
8    Q  Okay.  There were tests for promotion,
9  though; right?
10    A  They just established -- no, they just
11  established a test for promotion.
12    Q  Sure.  But --
13    A  Those were exempt -- those were exempt
14  positions.
15    Q  Okay.  But you never took a test for one of
16  those sergeant or lieutenant positions; right?
17    A  I can't take a test.  I'm in the merit board.
18    Q  Okay.  So did you -- you never took a test;
19  right?  You never took a test for one of those
20  positions?
21      MS. KRAUCHUN:  Objection; asked and answered.
22      MR. LEINENWEBER:  He didn't answer.
23    Q  Yes or no, did you take test to become a
24  sergeant ever?

Transcript of LeGrain Winston
Conducted on August 28, 2020

73 (289 to 292)

289

1    A  No.
2    Q  Did you take the test to become a
3  lieutenant ever?
4    A  No.
5    Q  What discipline prevented you from bidding
6  out of the unit?
7    A  Well, one, if I wanted to bid out of the
8  unit, the merit board would prevent that.
9    Q  I'm confused.  Did you try and bid out of
10 the unit at all?
11   A  Why would I bid out of the unit?
12   Q  I don't know.  I'm not here to answer the
13 questions.  Your attorney asked you about
14 discipline preventing you from bidding out of the
15 unit, and so I'm asking you -- following up on that.
16   A  I love the unit I'm in, and unless I
17 wanted to bid into another unit, I would not be
18 able to go to a better unit because I'm in the
19 merit board.
20   Q  How many African-American investigators
21 within EM applied for promotions -- sorry --
22 strike that.
23      How many African-American investigators
24 applied for promotions while Defendant Shields was

290

1  the director or executive director?
2    A  I couldn't tell that you.  I don't know.
3    Q  You don't know?
4    A  No.
5    Q  Do you know if any did?
6    A  I don't know.  There was not an application
7  process back then.
8    Q  Do you know if any African-American
9  investigator -- sorry -- strike that.
10      How many African-American investigators
11 attempted to get promotions while Defendant Shields
12 was the director or executive director of EM?
13   A  I don't know.
14   MS. KRAUCHUN:  Objection; foundation.
15   Q  Do you know if any African-American
16 investigators sought promotion within EM while
17 Defendant Shields was the director or executive
18 director?
19   A  I don't know.
20   Q  And then how many grievances did you file
21 regarding the lack of backup being provided to you
22 while you were on patrol?
23   A  How many grievances did I file?
24   Q  Correct.

291

1    A  I don't recall any, no.
2    Q  Okay.  And how many complaints to OPR did you
3  make about not being assigned backup while on patrol?
4    A  I can't hear you.
5    Q  How many complaints to OPR did you make
6  about not being assigned backup while on patrol?
7    A  None.
8    Q  Who came up to you and said they heard
9  Ranzino call you the N-word?
10   A  Who came up to me?
11   Q  Yeah.
12   A  I heard him call me the N-word.
13   Q  No, I know that.  But you were discussing
14 with your attorney, and you said that people were
15 coming up to you and saying, "Hey, I heard Ranzino
16 called you the N-word," and I want to know who did
17 that.  Who said that to you?
18   A  I don't know specifically.  I couldn't
19 tell you that.  I'm just saying that's just people
20 in general in a crowd or whatever or a group or
21 whatever.  I couldn't give you a specific name.  I
22 heard him call me the N-word --
23   Q  Okay.
24   A  -- out of his mouth.

292

1    Q  When did those individuals come up to you
2  and say, "Hey, I heard that Ranzino called you the
3  N-word"?
4    A  Over a period of time.
5    Q  When was that period of time?
6    A  I guess shortly after he called me the
7  N-word.
8    Q  One thing I want to clarify, I think your
9  attorney was asking you about steps of the grievance
10 process being handled within the department.  Step
11 4 is handled outside of the department; right?
12   A  It depends.  If -- when the director is
13 promoted to executive director, I believe he can
14 handle the Step 4.
15   Q  I'm confused.  Because, for example, the
16 grievance that we looked at which was Exhibit 19 --
17 and we can pull it up if you need to look at it,
18 but if you remember, that one was handled by
19 Cynthia Perkins, Assistant General Counsel.
20   A  Yes.
21   Q  Do you remember that?
22   A  Yes.
23   Q  Now, Cynthia Perkins, Assistant General
24 Counsel, she's not a member of EM; right?

293

1     A  Excuse me?  You said she's not a member
2  of EM?
3     Q  Correct.
4     A  No, she's not a member of EM, no.
5     Q  So at least in your case that grievance
6  was handled at Step 4 outside of the unit; right?
7     A  By the Sheriff's attorney.
8     Q  By Cynthia Perkins, Assistant General
9  Counsel of -- not of EM?
10     A  No, not of EM.  That was for that
11  particular grievance.
12     Q  Right.
13     A  It could change per grievance.
14        MR. LEINENWEBER:  Okay.  I don't have any
15  other questions.
16        MS. KRAUCHUN:  I don't have anything,
17  either.  So I think we're done.
18        MR. LEINENWEBER:  Thank you very much,
19  Mr. Winston.
20        And, Gabriel and Paula, thank you again
21  for the help today.
22        (Off the record at 5:02 p.m. CST.)
23
24

294

1     CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3        I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10  taken by me stenographically and thereafter reduced
11  to typewriting under my direction; that reading and
12  signing was not requested; and that I am neither
13  counsel for, related to, nor employed by any of
14  the parties to this case and have no interest,
15  financial or otherwise, in its outcome.
16        IN WITNESS WHEREOF, I have hereunto set my
17  hand and affixed my notarial seal this 9th day of
18  September, 2020.
19
20  My commission expires:  October 16, 2021
21
22  _____
23  Notary Public in and for the
24  State of Illinois

Transcript of LeGrain Winston
Conducted on August 28, 2020

75

| A | | | |
|---|---|---|---|

**ability**
30:9, 30:20,
277:1, 283:8
**able**
19:14, 19:16,
19:17, 20:1,
20:6, 20:19,
20:22, 23:15,
23:18, 25:12,
26:17, 29:15,
31:6, 90:4,
90:16, 114:4,
147:8, 147:11,
148:3, 148:12,
157:22, 157:23,
194:11, 208:22,
212:11, 212:14,
215:8, 218:14,
222:6, 222:9,
226:7, 227:11,
229:11, 229:14,
234:24, 238:22,
241:16, 261:11,
265:1, 284:14,
289:18
**above**
33:21, 34:23,
35:4, 35:8,
135:15, 174:2,
205:17
**above-mentioned**
101:9, 101:20
**absolutely**
15:16, 53:2,
54:20, 74:8,
88:17, 190:9,
214:18, 214:20,
229:21, 229:22,
272:10, 272:21,
273:8, 276:14,
279:8, 279:22
**abuse**
241:12, 241:17,
243:10
**accept**
8:14, 45:17,

140:3
**acceptable**
28:10
**accepted**
16:8, 73:9
**access**
28:7
**accessible**
28:11, 153:24
**according**
185:5
**account**
247:19, 248:14
**accounts**
128:8, 249:22
**accrued**
145:22
**accurate**
9:8, 199:10,
227:2, 244:10,
246:4, 246:8,
246:11
**accurately**
272:5
**across**
37:5, 46:9,
48:17, 144:2,
145:4, 145:10,
165:20, 169:16,
205:12
**action**
271:14, 271:19,
271:24
**actions**
137:24, 177:14,
185:22, 186:3,
186:11, 211:20,
227:12, 229:20,
231:19, 231:22,
231:24, 232:4,
264:22
**activate**
38:12
**acts**
173:13, 173:20
**actual**
46:15, 131:12
**actually**
20:10, 32:20,

43:21, 50:6,
52:8, 63:9,
78:13, 84:3,
104:20, 133:20,
133:23, 139:11,
144:22, 145:14,
145:15, 145:21,
146:17, 149:12,
149:13, 168:1,
172:12, 172:19,
172:21, 173:8,
203:18, 204:22,
212:18, 263:23,
268:5, 271:13,
281:22, 282:1,
282:14
**add**
34:14, 35:2,
117:9, 117:23,
118:4, 118:23,
120:16, 123:20,
125:1, 137:6,
137:16, 158:18,
214:11
**addition**
18:18, 215:2
**additional**
46:21, 118:22,
229:4, 229:21
**address**
127:10, 174:10,
246:21, 246:23,
247:8, 247:14,
266:15
**addresses**
247:11
**addressing**
109:12
**adequately**
250:5
**administration**
241:2
**administrative**
128:13
**adult**
14:14
**adults**
13:10, 13:11

**advancing**
182:18, 182:24
**affect**
272:6, 283:2
**affected**
231:10, 232:4,
277:1
**affixed**
294:17
**afford**
230:24
**afraid**
237:19, 237:21,
238:4, 238:7
**african-american**
88:11, 117:17,
154:6, 182:17,
182:23, 271:4,
273:23, 277:14,
285:19, 289:20,
289:23, 290:8,
290:10, 290:15
**african-americans**
183:7, 273:5,
286:10, 286:14
**after**
14:4, 16:1,
20:22, 34:12,
43:24, 89:10,
89:21, 90:7,
98:23, 99:7,
103:9, 108:1,
130:10, 149:13,
160:9, 161:10,
210:7, 210:8,
230:7, 263:18,
281:3, 281:6,
281:20, 285:1,
292:6
**afternoon**
26:6, 26:14
**again**
10:2, 15:18,
30:13, 38:14,
46:1, 55:11,
59:6, 66:19,
70:6, 72:5,
76:16, 85:11,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                           76

89:21, 90:7,
99:9, 99:21,
120:4, 138:20,
142:14, 146:18,
149:16, 150:13,
150:20, 150:22,
151:16, 158:7,
158:9, 169:14,
216:23, 224:15,
239:10, 253:15,
253:19, 254:4,
258:14, 269:1,
272:15, 285:23,
293:20
**against**
32:24, 68:7,
99:3, 126:4,
127:22, 128:1,
128:2, 128:4,
128:6, 128:7,
128:21, 132:11,
132:15, 141:3,
142:1, 146:4,
147:4, 147:5,
147:7, 148:2,
148:4, 148:13,
150:19, 151:11,
169:22, 170:16,
171:21, 171:22,
175:15
**age**
232:8, 236:21,
238:11, 238:16,
238:22, 239:24,
240:9
**ago**
61:16, 61:17,
61:18, 78:6,
82:24, 83:6,
108:19, 145:18,
145:20, 168:5,
206:13, 206:14,
211:18, 234:15,
234:16, 243:19,
243:20, 243:21,
244:21
**agree**
159:10, 268:15

**agreement**
39:23, 41:20,
41:24, 42:8,
42:17, 43:10,
45:2, 158:14,
158:15, 158:16,
162:13
**ahead**
56:22, 59:1,
59:12, 78:20,
90:3, 110:1,
119:2, 130:5,
133:7, 149:9,
149:11, 160:24,
169:8, 169:10,
175:19, 176:4,
176:6, 184:3,
186:16, 194:10,
202:15, 204:9,
210:19, 216:17,
216:18, 239:4,
258:14, 262:5,
262:14, 268:9,
268:10, 270:2,
285:10
**air-conditioners**
266:15
**air-conditioning**
266:13
**al**
1:5, 1:9
**alike**
88:10, 108:2,
110:19, 110:22,
116:15, 175:16,
196:13, 197:9,
198:7, 199:1,
210:6, 252:11,
253:6, 253:7,
260:12
**alike"**
251:14
**alike'"**
123:14
**allegation**
131:2, 131:24,
253:23
**allegations**
121:23, 122:9,

196:19, 258:4,
259:12, 264:18,
278:10
**allege**
41:23, 42:7,
154:4, 170:2,
182:12, 243:11,
246:16, 251:1
**alleged**
42:9, 131:24,
132:2, 132:4,
143:15, 154:5,
170:19, 182:14,
187:13, 213:23,
241:11, 245:15,
245:17, 257:14
**allegedly**
263:23
**alleging**
31:20, 245:5,
245:8
**allocate**
160:20
**allow**
29:16, 29:17
**allowed**
33:10, 33:11,
33:17, 148:9,
148:20, 162:15,
234:9, 239:16,
239:18
**almost**
134:11, 156:21,
280:14, 286:19
**along**
6:9, 44:9,
149:15
**already**
71:5, 104:21,
123:17, 124:20,
128:21, 135:15,
160:18, 169:15,
169:19, 206:7,
208:6, 226:16,
240:1, 240:3,
250:23, 251:5,
285:8, 285:13
**also**
4:1, 33:11,

33:17, 39:5,
41:23, 42:6,
42:16, 42:23,
47:4, 60:15,
82:16, 108:6,
109:7, 122:5,
124:15, 153:22,
166:1, 169:5,
169:6, 170:17,
171:21, 180:2,
207:15, 231:10,
250:11, 268:19,
270:20, 271:11,
272:8, 272:14,
273:7, 274:1,
275:23, 276:13,
277:23, 278:23,
279:7, 282:20,
283:4
**although**
175:3
**always**
20:17, 64:17,
217:16, 217:17,
274:8, 274:12,
274:14, 275:4
**ambition**
212:20, 213:18,
213:20
**ambitions**
213:16, 213:17
**american**
110:5
**amlodipine**
244:19
**among**
79:19
**amount**
37:7, 37:16,
51:5, 60:13,
64:1, 64:10,
127:4, 218:7,
272:17
**ample**
127:4
**annual**
222:1, 222:7
**another**
19:7, 48:19,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    77

60:5, 60:11,
66:6, 100:4,
157:5, 181:23,
181:24, 187:2,
201:15, 209:9,
225:15, 225:17,
271:2, 289:17
**answer**
8:2, 8:11,
8:21, 9:3, 30:6,
33:15, 34:8,
58:15, 59:13,
78:20, 109:23,
116:11, 117:6,
117:9, 118:19,
120:2, 133:9,
135:13, 141:12,
141:15, 141:21,
149:11, 151:3,
151:7, 154:6,
158:18, 160:23,
160:24, 161:2,
172:6, 173:2,
173:3, 174:5,
174:17, 175:20,
177:7, 177:8,
177:21, 185:7,
205:15, 205:20,
224:1, 233:1,
237:12, 239:5,
241:24, 242:4,
242:14, 242:17,
242:18, 256:19,
256:20, 258:13,
261:21, 267:19,
268:9, 268:11,
285:12, 286:2,
286:20, 286:21,
287:3, 287:8,
288:22, 289:12
**answered**
135:15, 172:5,
189:18, 241:14,
242:19, 256:4,
259:2, 261:2,
261:7, 269:23,
271:2, 273:7,
286:9, 288:21

**answering**
176:2, 176:5,
189:19, 190:7
**answers**
4:16, 5:4,
8:14, 9:23,
10:4, 16:6,
22:15, 115:19,
162:22, 211:1,
222:6
**anti-retaliation**
151:17
**anticipate**
7:24
**anticipating**
21:18
**anxiety**
226:24, 227:17,
228:13, 228:14,
228:22, 229:4,
229:7, 231:3,
244:15
**anybody**
62:21, 86:10,
100:18, 160:14,
178:24, 237:16,
237:17, 279:13
**anymore**
178:23, 209:23
**anyone**
9:10, 11:4,
11:20, 30:3,
35:4, 35:6,
35:7, 66:21,
69:21, 71:2,
174:24, 207:15,
236:13, 240:4,
248:13, 248:23,
249:6, 253:22,
255:2, 257:3,
257:7, 259:13,
259:23
**anything**
8:16, 10:7,
10:11, 10:16,
12:12, 17:18,
24:12, 24:22,
29:3, 58:10,

58:16, 58:18,
60:1, 82:11,
85:21, 86:12,
88:22, 89:11,
98:8, 98:11,
98:17, 99:13,
100:12, 100:15,
106:9, 106:14,
106:16, 106:17,
106:18, 107:1,
109:3, 116:20,
117:8, 117:20,
117:23, 118:4,
120:13, 120:15,
123:20, 128:14,
137:6, 137:16,
139:20, 146:12,
146:17, 150:4,
153:19, 158:13,
158:18, 158:22,
158:23, 159:9,
159:12, 159:20,
160:10, 166:22,
166:24, 170:8,
170:19, 175:14,
183:5, 184:22,
188:22, 206:9,
215:3, 222:15,
222:19, 235:4,
251:24, 252:9,
252:12, 277:20,
279:13, 280:18,
283:16, 284:21,
293:16
**anytime**
48:18, 233:8
**anyway**
266:21
**anywhere**
14:3, 14:7,
50:10, 59:8
**apnea**
227:1, 245:2,
245:5, 245:8,
245:14, 245:19
**apologize**
165:6, 203:8,
212:6

**app**
28:4, 112:4,
112:10, 113:23,
114:5, 249:17,
249:20
**appalled**
106:6
**appear**
201:16, 205:9
**appearance**
126:6
**appeared**
201:19
**appears**
119:9, 121:1,
193:12, 198:5,
202:11, 206:24
**apple**
143:11
**application**
288:6, 290:6
**applications**
288:5
**applied**
16:7, 287:23,
289:21, 289:24
**apply**
7:22, 102:7,
283:6, 288:2
**appoint**
82:8, 82:21
**appointed**
46:17, 80:9,
81:1, 81:3, 81:8
**appointment**
82:2
**appreciate**
114:21
**appreciated**
114:16
**approached**
121:8
**approaching**
114:22
**approval**
199:9
**approximate**
20:12, 56:11,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    78

56:12
**approximately**
26:5, 47:24,
49:24
**april**
88:8, 116:13,
238:23
**arbitrate**
46:24
**arbitration**
44:7, 44:13,
46:24, 47:4,
139:19, 139:20,
140:6, 144:14,
144:16, 144:20,
146:24, 206:4,
206:5, 206:7,
206:8, 206:12,
281:4, 281:8,
281:10, 281:14,
282:3, 282:5,
282:13, 287:15
**area**
63:19, 76:3,
76:12, 77:6,
77:11, 77:13,
77:17, 78:18,
86:8, 93:16,
154:14, 160:14,
161:5, 161:13,
161:24, 162:2,
162:8, 162:16,
163:14, 266:13
**areas**
17:17, 18:12,
18:13, 53:15,
75:16, 75:22,
75:23, 75:24,
76:5, 76:9,
154:7, 154:21,
155:1, 155:11,
155:14, 155:19,
159:8, 159:11,
159:14, 161:14,
161:17, 163:20,
163:22, 163:24,
164:1, 164:6,
274:22, 275:14

**argue**
42:12, 42:16
**argumentative**
237:11, 268:19,
270:7, 271:3
**arizona**
92:12
**arm**
98:18
**around**
24:21, 127:4,
130:11, 134:15,
136:11, 136:13,
148:12, 210:5,
210:9, 276:7
**arrest**
109:14, 109:17
**asa**
133:17
**aside**
119:24, 121:18,
124:1, 191:10,
193:3, 193:21,
194:22, 196:1,
196:4, 196:23,
197:24, 198:17,
199:13, 200:24,
202:2, 206:11,
207:13, 225:17
**asked**
16:4, 41:12,
62:15, 68:16,
84:3, 96:2,
97:23, 105:5,
105:18, 106:6,
106:22, 116:12,
120:5, 143:11,
158:20, 160:17,
161:4, 161:12,
171:24, 172:4,
178:13, 183:3,
183:22, 183:24,
184:1, 189:17,
217:4, 219:22,
221:16, 224:18,
227:22, 228:18,
228:21, 228:24,
236:13, 242:19,

261:1, 261:6,
269:19, 270:14,
270:18, 272:22,
273:7, 274:3,
278:9, 284:18,
286:9, 286:17,
288:3, 288:21,
289:13
**asking**
7:23, 56:10,
59:2, 72:3,
83:20, 108:21,
146:8, 150:10,
151:1, 158:18,
158:22, 161:11,
176:21, 179:19,
184:3, 238:4,
238:7, 239:13,
248:3, 269:10,
272:16, 286:7,
286:8, 289:15,
292:9
**asks**
121:22, 124:4,
135:14, 142:15,
154:3, 173:11,
173:12, 182:11,
211:18, 221:21,
221:24, 223:8,
241:10, 244:7,
246:20, 247:7,
247:10, 250:3,
250:24, 256:1,
256:15, 271:1,
271:2
**ass**
105:5, 105:10,
123:14, 136:8,
137:15, 254:1,
254:19
**assaulted**
148:13
**assaults**
148:11
**assign**
18:16, 58:21,
77:6, 78:18
**assigned**
15:8, 17:2,

19:9, 21:24,
26:1, 51:9,
51:17, 53:8,
53:11, 53:22,
54:9, 55:4,
55:10, 57:17,
57:22, 59:9,
61:3, 68:7,
69:5, 72:22,
76:8, 76:12,
160:14, 162:9,
291:3, 291:6
**assignment**
20:24, 21:6,
22:12, 23:11,
23:19, 54:14,
55:19, 55:21,
56:17, 77:13,
138:23, 139:8,
139:9, 158:24,
182:1, 182:3
**assignments**
18:8, 18:19,
19:13, 19:15,
20:1, 20:7,
20:20, 20:23,
24:5, 51:5,
51:6, 51:8,
53:12, 53:18,
54:3, 54:8,
54:13, 55:3,
55:9, 57:21,
72:13, 154:4,
158:19, 164:16
**assistant**
80:11, 133:18,
133:20, 205:23,
292:19, 292:23,
293:8
**assume**
9:4, 38:19,
63:16, 85:11,
152:10, 195:11
**assuming**
22:4, 63:17,
89:16, 219:10
**attach**
100:24

Transcript of LeGrain Winston
Conducted on August 28, 2020                    79

attached
4:10, 87:2,
101:2, 115:15,
119:6, 120:22,
122:15, 129:5,
129:12, 191:21,
193:9, 194:2,
195:2, 196:7,
197:2, 198:2,
198:19, 200:11,
201:3, 202:5,
204:19, 206:19,
210:21
attempted
103:9, 290:11
attendance
166:2, 190:11,
201:10
attentiveness
174:3
attorney
6:8, 8:6, 8:8,
10:18, 10:20,
10:22, 11:5,
59:6, 74:11,
74:12, 94:13,
113:17, 114:1,
126:18, 129:21,
133:18, 141:8,
170:24, 192:16,
200:6, 207:1,
207:9, 208:9,
208:24, 222:22,
223:6, 223:13,
223:24, 224:4,
224:16, 226:8,
234:23, 239:6,
241:21, 242:2,
242:7, 242:13,
242:14, 248:2,
248:17, 249:7,
256:24, 258:1,
259:15, 265:12,
286:8, 289:13,
291:14, 292:9,
293:7
attorneys
119:10, 121:2,

133:21, 224:9,
248:16, 257:5,
257:8, 258:3,
259:14, 264:18,
278:17
attributable
243:13
attribute
231:21, 231:23,
232:5
attributed
241:12
audio
67:7, 74:21,
157:1
august
1:15, 4:19,
4:20, 99:17,
118:20, 119:8,
120:6, 120:13,
121:1, 122:2,
122:4, 124:10,
129:1, 129:3,
129:7, 138:8,
138:16, 203:1,
235:9
austin
15:19
authority
273:10
av
86:18
available
217:23
avoid
55:20
aware
27:15, 54:23,
175:3, 175:5,
175:9, 215:24,
223:21, 227:22,
235:2, 253:22,
255:1, 264:6
awareness
156:18
away
18:2, 92:22,
121:12, 230:6,

237:9, 277:3,
277:8

**B**

back
16:5, 17:3,
18:20, 18:23,
23:14, 23:17,
51:19, 67:10,
73:23, 73:24,
75:9, 92:15,
95:5, 98:6,
108:5, 119:24,
121:19, 124:2,
136:3, 139:3,
142:6, 143:10,
151:2, 176:7,
195:20, 203:9,
212:6, 215:10,
221:14, 223:24,
224:16, 225:22,
226:13, 234:12,
241:21, 253:9,
253:13, 255:16,
259:17, 261:3,
261:12, 263:12,
264:11, 265:5,
271:6, 280:9,
290:7
backup
162:23, 162:24,
163:1, 163:7,
163:9, 163:15,
163:21, 163:23,
164:1, 164:9,
164:17, 164:19,
165:3, 165:11,
275:4, 275:11,
275:19, 290:21,
291:3, 291:6
bad
227:19, 227:21,
241:23, 242:21
badge
17:1
ball
13:1, 14:5,
14:6, 14:11,

14:16
ballpark
218:23, 219:1
bands
17:20
bargaining
39:22, 41:20,
41:24, 42:8,
42:13, 42:17,
162:13
baroni
3:20
base
78:22, 154:15
based
53:12, 53:14,
123:2, 182:13,
183:2, 183:9,
220:9, 263:13,
271:22, 271:23
basement
49:1, 50:18,
50:23, 51:9,
53:16, 57:18,
58:8, 61:3,
61:5, 62:17,
63:6, 64:3,
64:11, 64:14,
67:23, 68:1,
69:9, 69:12,
69:19, 69:24,
70:15, 70:17,
70:19, 70:22,
71:3, 71:16,
72:13, 72:22
basic
6:17, 18:12,
36:3, 238:9
basically
14:19, 17:19,
18:20, 43:9,
78:21, 80:6,
82:5, 97:23,
131:11, 138:22,
153:9, 154:13,
170:5, 186:21,
209:14, 240:18,
242:19, 269:7,

269:13, 270:22,
271:1, 275:12
**basis**
22:2, 22:3,
63:15, 81:17,
82:23, 142:17,
143:13, 154:11,
182:21, 183:17,
184:15, 235:23,
250:3, 256:2
**bates**
119:11, 193:12,
197:5, 198:22,
200:13
**bates-labeled**
121:3, 192:7,
194:6, 195:5,
196:10, 201:6,
205:1, 206:23
**bates-stamped**
122:3
**battery**
136:17
**beat**
169:2
**became**
64:5, 65:21,
94:21, 97:18,
236:20, 280:15
**because**
18:10, 25:13,
25:14, 29:13,
40:15, 41:5,
58:2, 59:9,
64:13, 66:6,
68:6, 69:2,
69:5, 69:24,
71:3, 77:24,
81:20, 84:14,
90:23, 92:11,
92:13, 92:17,
92:19, 97:8,
97:10, 97:24,
98:6, 98:14,
113:23, 117:6,
125:18, 138:10,
146:3, 147:5,
147:22, 148:15,

149:2, 150:6,
150:17, 150:18,
150:20, 153:3,
153:13, 169:21,
174:12, 176:5,
184:18, 186:22,
186:23, 190:7,
205:3, 209:10,
220:14, 229:5,
230:15, 232:13,
234:7, 234:23,
235:7, 240:22,
243:5, 246:6,
246:13, 252:20,
253:5, 253:6,
254:23, 259:19,
260:6, 262:1,
263:7, 266:17,
268:24, 275:19,
276:4, 286:8,
289:18, 292:15
**become**
84:6, 213:12,
288:23, 289:2
**before**
2:7, 6:19, 8:1,
8:21, 14:7,
20:14, 20:15,
28:8, 69:1,
84:5, 85:12,
108:1, 108:4,
131:13, 167:11,
171:12, 237:22,
269:20, 271:7,
276:16, 294:6
**began**
62:15, 241:18,
243:10
**beginning**
21:9, 205:18
**behalf**
3:2, 3:10, 3:18
**behavior**
174:20, 177:3,
177:14, 280:15
**being**
17:15, 18:2,
27:11, 41:24,

42:8, 42:13,
42:18, 42:22,
54:2, 55:20,
57:21, 58:8,
61:3, 64:11,
64:20, 65:14,
65:15, 65:22,
69:4, 69:12,
70:14, 71:21,
72:21, 79:23,
85:18, 86:2,
108:21, 147:4,
147:9, 162:23,
163:1, 168:15,
170:13, 171:21,
173:14, 173:21,
182:18, 182:24,
183:8, 183:22,
183:24, 187:21,
203:18, 208:8,
208:9, 212:19,
213:16, 214:13,
214:17, 214:21,
215:4, 215:17,
216:1, 216:6,
216:9, 217:15,
218:14, 220:9,
220:20, 233:10,
235:20, 237:18,
237:21, 238:22,
239:18, 256:4,
274:21, 274:22,
277:7, 279:11,
281:7, 286:16,
290:21, 291:3,
291:6, 292:10
**belief**
82:19, 141:7,
141:16, 148:5,
148:7, 149:5,
149:16, 150:15,
151:16, 154:11,
174:22, 182:21,
183:6, 184:16,
235:23, 273:21
**believe**
44:17, 68:3,
75:3, 88:23,

89:5, 89:9,
94:10, 100:2,
101:21, 101:24,
105:22, 106:22,
107:5, 107:7,
108:3, 112:21,
113:21, 114:2,
125:10, 129:12,
132:17, 132:20,
132:24, 140:21,
141:24, 142:1,
146:2, 147:1,
149:14, 155:4,
158:24, 162:5,
163:20, 163:22,
166:18, 180:13,
198:24, 202:17,
204:5, 204:12,
208:6, 210:1,
210:2, 217:16,
218:8, 219:1,
220:11, 232:21,
235:10, 239:10,
253:14, 253:15,
253:24, 254:4,
267:3, 273:4,
274:2, 286:5,
292:13
**believed**
133:3, 133:13,
272:23
**below**
199:8, 223:8,
224:18
**benefit**
158:4
**benefits**
278:8
**bent**
230:15
**berwyn**
76:4
**besides**
11:4, 69:21,
110:16, 240:7
**best**
24:4, 26:15,
27:12, 66:3,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    81

68:9, 99:18,
103:16, 103:19,
120:10, 121:9,
124:11, 181:8,
181:11, 196:20,
240:1
**better**
65:7, 74:21,
131:18, 132:1,
161:9, 171:8,
257:1, 284:7,
289:18
**between**
14:2, 15:4,
17:10, 23:14,
23:17, 53:7,
56:15, 56:23,
218:17, 219:16,
222:22, 281:16
**bid**
19:1, 19:4,
19:14, 19:17,
20:1, 20:6,
20:19, 20:23,
23:15, 23:16,
23:18, 23:20,
23:21, 23:23,
24:1, 25:11,
25:12, 27:1,
282:21, 283:1,
289:7, 289:9,
289:11, 289:17
**biddable**
19:3, 19:18
**bidding**
289:5, 289:14
**big**
54:5, 180:21,
181:1, 279:11
**bigger**
254:17
**bills**
237:20
**bit**
6:13, 14:10,
18:6, 23:6,
30:14, 36:12,
40:5, 43:4,

49:18, 65:10,
65:13, 67:5,
74:21, 81:23,
83:8, 115:9,
116:10, 117:5,
119:18, 131:18,
138:10, 143:2,
143:7, 146:9,
146:13, 154:17,
165:14, 174:21,
185:12, 194:8,
203:5, 203:10,
211:22, 224:18,
228:5, 242:15,
250:23, 255:23,
274:21, 277:5,
284:7
**black**
91:16, 270:16
**blacks**
266:22
**blank**
9:20, 9:21
**block**
197:13
**blood**
227:1, 227:15,
228:11, 228:21,
229:4, 241:22,
242:20, 243:3,
244:19
**blow**
194:8
**board**
46:9, 46:10,
46:11, 47:8,
47:14, 47:21,
134:6, 145:12,
145:13, 152:19,
168:15, 168:16,
169:6, 169:11,
170:6, 170:7,
170:21, 171:5,
171:12, 171:15,
186:24, 189:15,
189:22, 190:3,
190:4, 190:5,
208:8, 233:4,

233:6, 233:16,
233:20, 233:24,
234:1, 235:1,
235:8, 239:17,
276:16, 276:20,
276:23, 277:12,
287:16, 287:18,
287:19, 288:1,
288:17, 289:8,
289:19
**body**
15:8, 15:9,
15:17, 15:19,
16:1, 16:3,
38:12, 166:8,
166:13, 166:14,
167:3, 204:7
**both**
39:24, 40:1,
79:5, 124:21,
142:24, 190:3
**bottom**
87:13, 87:17,
118:9, 122:19,
122:21, 135:24,
142:12, 173:19,
194:5, 204:8,
221:20, 248:6
**bottom-hand**
192:7
**bound**
153:13, 168:20
**box**
112:4
**boy**
90:12, 90:17,
90:20, 91:11,
91:13, 91:15,
91:19, 91:22,
92:11, 92:16,
93:21, 94:2,
123:13, 136:8,
286:4
**boys**
90:21, 91:17,
91:20, 91:23,
110:16, 110:18,
110:24, 117:18

**bracelet**
17:16
**brady**
98:18
**brain**
60:24
**brand-new**
233:5
**break**
8:18, 8:22,
67:6, 75:1,
104:10, 105:13,
105:15, 105:19,
105:21, 106:1,
114:23, 115:10,
136:19, 141:2,
142:4, 207:15,
265:1, 265:9
**breaking**
60:6
**breaks**
8:19
**brian**
186:9, 187:18,
188:19, 189:8,
190:10, 190:23,
191:3
**briefly**
40:4
**bring**
86:16, 95:8,
95:9, 115:13,
209:10, 237:17,
237:24, 280:11
**bringing**
123:4
**broad**
43:8
**broke**
9:24, 59:3,
60:6, 64:9,
65:10, 154:17,
169:1, 215:6,
263:8
**broken**
17:21, 18:15
**brook**
3:15

Transcript of LeGrain Winston
Conducted on August 28, 2020

82

brought
171:14
buchanan
226:18, 227:4,
227:11, 228:6,
228:18, 229:15,
243:24, 244:3,
248:23
budget
15:9, 15:20
building
127:3, 127:6,
127:8, 192:23,
201:20
built
277:9

**C**

calculate
218:7, 218:13
calculations
238:19
calf
160:7
california
127:11, 127:12
call
14:12, 21:7,
67:2, 88:8,
89:20, 90:7,
90:19, 92:14,
92:15, 92:17,
93:17, 102:21,
102:23, 109:13,
118:14, 126:23,
130:5, 130:11,
130:12, 130:21,
130:22, 137:8,
138:8, 181:6,
181:20, 181:21,
259:8, 266:12,
266:16, 267:3,
269:16, 269:19,
270:14, 274:9,
274:13, 274:16,
274:19, 283:24,
284:9, 285:20,
286:2, 286:13,

287:8, 291:9,
291:12, 291:22
called
21:11, 22:24,
40:4, 47:8,
91:15, 91:17,
102:14, 105:5,
108:22, 108:23,
113:2, 113:20,
126:18, 126:20,
127:2, 137:7,
137:10, 145:7,
145:13, 175:21,
175:22, 254:1,
259:16, 266:19,
271:14, 279:24,
280:1, 280:6,
280:13, 291:16,
292:2, 292:6
calling
92:10, 93:21,
94:2, 127:1
calls
90:1, 133:6,
141:10, 175:17,
177:5, 177:16,
237:11
cam
38:12
came
16:14, 98:1,
130:3, 131:15,
165:9, 179:10,
179:23, 266:15,
291:8, 291:10
camera
166:8, 166:13,
166:14, 167:3
can't
8:15, 9:7,
30:6, 32:11,
56:9, 56:12,
63:10, 64:23,
65:6, 75:3,
81:3, 106:22,
109:13, 109:16,
110:4, 111:13,
129:14, 137:14,

139:2, 149:17,
167:7, 167:16,
167:19, 170:8,
170:11, 191:16,
200:7, 232:10,
232:14, 233:22,
235:7, 241:24,
242:4, 245:11,
260:9, 275:18,
287:17, 288:17,
291:4
cancer
93:8
car
40:15, 139:6
care
208:10, 226:21,
232:15, 276:1,
277:19
career
48:17
careful
21:17
carl
199:19, 200:19
case
1:7, 6:9, 41:3,
97:2, 146:4,
149:15, 171:11,
186:24, 193:18,
240:1, 246:6,
274:2, 287:18,
293:5, 294:14
category
212:8, 219:24
cause
123:2
caused
158:23, 229:19,
231:18, 245:6,
245:9
causing
229:23
cba
43:10, 44:18
ccb
127:8, 201:19
cecil
11:19, 259:18,

259:21
cell
249:2, 249:3,
249:4
certain
18:2, 27:5,
54:12, 57:20,
60:13, 109:12,
164:16, 236:21,
242:14, 275:2
certainly
92:24, 93:1,
213:2
certificate
294:1
certified
2:8, 294:3
certify
294:7
cetera
35:20, 78:1
chain
29:7, 29:9,
30:1, 30:5,
31:8, 33:4,
33:6, 33:9,
33:21, 34:6,
34:17, 34:21,
35:1, 35:13,
35:15, 35:21,
36:2, 36:3,
36:20, 37:10,
44:19, 51:19,
51:22, 52:18,
53:4, 60:20,
76:16, 77:9,
78:6, 78:11,
79:3, 79:5,
79:11, 80:1,
80:4, 80:17,
81:10, 83:1,
83:11, 107:13,
160:15, 160:19,
173:7, 215:13
chains
79:19
chairman
15:9, 15:20

Transcript of LeGrain Winston
Conducted on August 28, 2020　　　　83

**change**
17:9, 20:9,
95:19, 95:21,
145:9, 227:22,
227:23, 228:19,
293:13
**changed**
17:1, 18:10,
18:11, 20:5,
20:11, 20:13,
20:14, 20:19,
35:14, 35:17,
96:2, 97:23,
165:12, 218:20,
228:19, 236:4
**changes**
34:6, 35:14,
220:15
**changing**
11:23
**charge**
4:21, 40:20,
122:5, 122:17,
147:23, 150:19,
171:22, 254:7,
254:21, 255:1,
263:22
**charges**
171:15, 276:16,
276:17
**chasing**
160:4
**check**
156:15, 225:20,
234:23, 261:15
**checked**
178:10, 178:21
**checking**
63:14, 156:13
**chicago**
3:7, 3:23,
12:20, 15:10,
15:20, 76:5,
164:5
**chief**
35:22, 35:23,
52:21, 52:23,
56:1, 56:2,

56:16, 56:18,
56:21, 56:24,
58:7, 70:4,
71:9, 71:10,
71:14, 77:2,
80:10, 83:22,
83:23, 83:24,
84:5, 84:6,
84:7, 84:8,
84:18, 84:22,
85:14, 85:18,
85:20, 86:2,
88:8, 89:20,
90:11, 90:16,
91:22, 94:1,
103:3, 103:11,
108:10, 108:12,
117:16, 117:17,
134:23, 134:24,
136:9, 137:7,
137:11, 137:14,
138:6, 139:10,
143:15, 144:2,
151:23, 152:8,
153:10, 172:14,
183:9, 183:12,
197:20, 203:12,
203:13, 205:11,
213:11, 213:12,
213:16, 214:19,
218:17, 218:18,
219:10, 220:12,
260:13, 262:19,
263:1, 263:5,
263:11, 275:17
**chief's**
100:2
**chiefs**
95:5, 217:13
**children**
13:8, 232:9
**choose**
140:3, 162:15,
269:7, 269:8
**circumstance**
33:18, 100:4
**circumstances**
33:2, 275:11

**cite**
251:3
**cited**
256:5
**city**
15:10, 15:20,
76:3, 163:20,
163:22, 274:23
**civil**
264:22
**civilian**
220:21
**claim**
123:4, 123:6,
123:7, 211:19
**claimed**
140:18, 140:19
**claiming**
208:3, 221:22,
224:13, 227:8
**clarify**
9:2, 66:2,
215:22, 259:3,
292:8
**class**
156:21, 156:22
**clean**
8:5
**clear**
79:4, 117:4,
286:17
**cleared**
47:5
**clearly**
74:22, 105:10,
158:4
**click**
157:5
**closer**
218:13
**clothes**
11:24
**cloud**
220:23
**cluster**
126:20, 130:4
**cocounsel**
6:9

**colleagues**
129:16
**collective**
39:22, 41:19,
41:24, 42:7,
42:12, 42:17,
162:13
**college**
13:4, 13:5
**collins**
56:19, 59:22,
60:16, 61:1,
61:2, 61:7,
62:3, 62:11,
62:19, 69:22,
71:6, 154:24,
155:18, 156:3,
156:8, 157:12,
158:12, 209:11,
209:15, 209:17
**com**
247:2, 247:13
**come**
15:21, 15:24,
22:8, 22:11,
22:20, 54:11,
62:8, 62:13,
96:16, 100:6,
139:3, 157:4,
164:21, 164:22,
164:24, 181:17,
221:14, 241:5,
241:6, 275:13,
279:3, 292:1
**comes**
31:9, 31:19,
54:15, 55:1,
55:24, 165:7,
271:19
**coming**
74:22, 100:5,
235:8, 291:15
**command**
29:7, 29:9,
30:2, 30:6,
31:9, 33:4,
33:6, 33:9,
33:21, 34:6,

34:17, 34:21,
35:2, 35:14,
35:15, 35:21,
36:2, 36:4,
36:20, 37:10,
44:20, 45:23,
45:24, 51:20,
51:22, 52:18,
53:4, 60:21,
76:17, 77:10,
78:6, 78:11,
79:3, 79:5,
79:12, 79:20,
80:1, 80:4,
80:17, 81:10,
83:1, 83:12,
107:13, 160:15,
173:8
**command's**
160:19
**comment**
90:8, 108:2,
110:9, 110:10,
110:19, 111:3,
129:3, 129:5,
175:16, 196:13,
199:1, 210:8,
251:14, 252:11,
253:7, 260:12,
263:5, 263:23,
283:23, 284:17
**comment"**
197:9
**comments**
102:16, 109:8,
109:9, 110:15,
110:24, 123:13,
124:21, 253:5
**commission**
294:20
**committee**
145:8
**committing**
29:2
**common**
93:16
**communicate**
41:6

**communicated**
77:14, 77:15
**communicating**
24:18, 171:9
**companies**
225:11
**complain**
30:12
**complained**
174:20, 177:4,
177:15
**complaints**
67:20, 68:14,
94:6, 101:9,
101:13, 101:15,
101:18, 110:3,
121:22, 122:8,
142:1, 151:10,
151:11, 151:12,
170:16, 174:3,
174:23, 195:19,
250:10, 250:13,
285:13, 285:17,
285:24, 286:24,
287:6, 291:2,
291:5
**complete**
9:8, 14:15,
14:17, 51:8,
53:18, 54:8,
55:3, 55:9,
57:20, 246:5,
246:11, 271:9
**completed**
43:22, 51:6,
197:8, 202:12,
288:4
**completes**
53:13
**completing**
54:12, 56:17,
60:12, 139:9
**compliance**
17:20
**compound**
130:21
**computer**
28:5, 28:6,

28:11, 61:21,
62:14, 63:13,
63:17, 63:18,
136:17, 156:5,
156:11
**concerned**
276:2
**concerns**
250:10
**conclusion**
151:13, 151:15
**conditions**
227:13, 229:16,
229:19, 229:24,
243:7, 243:9,
243:13
**condolences**
92:23
**conduct**
89:20, 101:10,
143:17, 186:11,
191:14, 213:23,
227:6, 227:7,
242:16, 243:15,
245:6, 245:9,
245:15, 245:18,
246:13, 246:17,
250:14, 274:8
**conducted**
1:14, 88:8,
251:12, 251:13,
252:17
**conducting**
90:7, 286:2,
286:13, 287:8
**confer**
223:1
**confidence**
277:3
**confirm**
74:15, 114:11,
117:2, 122:20,
151:1, 180:16,
199:6
**confirmation**
235:4
**conflict**
193:17

**confused**
37:9, 130:24,
131:4, 131:6,
131:7, 137:12,
174:12, 289:9,
292:15
**confusing**
186:22
**connect**
227:12
**considered**
83:15, 83:21,
84:3, 84:18,
88:15, 184:8
**consult**
242:2, 242:7,
261:19, 261:20
**consulting**
261:21, 261:24
**contact**
28:17, 28:21,
32:12, 178:2
**contacted**
68:14
**contained**
196:20
**contend**
42:7, 42:16,
142:16, 143:12,
146:1, 214:16,
241:18, 246:6,
246:12, 252:9,
252:12
**contending**
168:11, 229:18
**contention**
129:15, 250:4,
250:18, 251:7,
256:2, 256:9
**contents**
199:9
**context**
103:15
**continuation**
202:19
**continue**
87:23, 107:1,
135:20

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    85

continued
101:10, 107:24
continues
222:2, 223:9,
241:15, 245:21
continuing
29:14, 209:20,
236:15, 284:9
contours
36:3
contributed
230:9
control
229:6, 250:5,
250:20
conversation
11:22, 57:3,
57:12, 58:3,
59:21, 61:9,
61:20, 61:22,
63:1, 63:8,
68:11, 68:21,
86:7, 92:18,
93:9, 95:10,
99:23, 100:6,
100:7, 100:19,
104:8, 108:10,
155:12, 155:21,
200:7, 215:16,
215:23, 217:9,
218:3, 263:19,
279:10
conversations
68:23, 70:20,
214:2, 256:16,
257:3, 257:7,
264:14, 264:15,
264:17, 280:4
cook
1:8, 5:5,
13:13, 13:16,
17:17, 18:14,
24:21, 75:14,
75:16, 80:22,
127:8, 138:24,
197:6, 201:20,
211:2, 212:19,
224:24, 225:18,

232:8, 246:21,
250:4, 250:18,
264:6
copies
74:9, 94:8
coplaintiff
126:4
copy
28:12
corner
192:7, 194:5,
248:6
correct"
211:12
correctional
15:15
corrections
15:7
corrective
137:24
correctly
90:5, 171:9
correspondence
248:12
corresponds
76:2
could
16:7, 27:13,
30:13, 30:24,
33:20, 34:18,
37:1, 38:17,
40:13, 40:16,
41:22, 42:6,
42:11, 42:15,
42:23, 43:2,
43:6, 45:4,
45:5, 46:7,
46:8, 50:14,
50:22, 52:2,
52:6, 52:7,
52:8, 52:10,
52:11, 52:12,
52:16, 52:17,
52:19, 52:20,
52:21, 52:23,
53:4, 53:14,
53:15, 53:22,
54:1, 67:18,

67:19, 75:15,
76:3, 76:4,
76:8, 78:4,
78:11, 78:14,
84:23, 87:13,
99:10, 101:22,
105:18, 114:15,
115:23, 117:13,
118:9, 121:18,
122:19, 124:1,
135:22, 136:3,
142:11, 143:7,
151:2, 153:16,
157:14, 157:19,
157:20, 173:4,
173:8, 174:15,
175:14, 182:7,
186:9, 194:23,
202:2, 207:2,
208:3, 211:6,
226:13, 227:18,
229:5, 231:6,
234:11, 239:10,
255:16, 261:15,
264:9, 267:10,
267:20, 267:21,
271:7, 282:8,
282:9, 293:13
couldn't
31:3, 48:4,
67:23, 89:22,
147:1, 160:22,
161:1, 172:17,
174:15, 180:19,
186:7, 227:20,
230:22, 230:23,
290:2, 291:18,
291:21
counsel
6:5, 205:23,
265:17, 272:22,
274:3, 278:9,
283:20, 292:19,
292:24, 293:9,
294:13
counselor
230:19
counselors
230:18

county
1:8, 5:6,
13:13, 13:17,
17:17, 18:14,
24:21, 75:14,
75:16, 80:22,
127:8, 138:24,
197:6, 201:20,
211:2, 212:19,
224:24, 225:18,
232:8, 236:10,
236:12, 236:14,
247:6, 250:4,
250:18, 264:7,
294:5
countyil
246:22
couple
48:15, 61:11,
119:16, 142:21,
145:18, 193:5,
195:8, 221:15,
231:2, 234:15,
243:19, 243:20,
244:16, 265:15,
265:20, 280:19,
283:18
course
16:15, 163:16,
163:18
court
1:1, 66:23,
95:19, 95:21,
95:22, 96:8,
96:9, 96:14,
96:23, 96:24,
97:5, 97:7,
97:14, 115:1,
126:6, 126:10,
126:13, 126:16,
129:17, 130:18,
130:19, 130:20,
131:13, 131:17,
131:20, 141:4,
166:2, 169:12,
186:14, 186:15,
186:17, 187:9,
187:11, 187:16,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                          86

187:21, 188:4,
188:5, 188:6,
188:10, 188:13,
188:17, 189:1,
189:7, 189:12,
190:11, 191:5,
191:8, 201:20,
207:22, 215:9,
262:15, 267:24,
284:15, 294:1
**courts**
192:23
**cover**
96:11, 116:21,
145:22
**covered**
97:11, 111:1,
209:1
**cpap**
231:16
**cpr**
156:20
**cr**
139:7
**crazy**
212:18, 213:2,
213:3, 213:5
**create**
21:23
**created**
256:11
**credentials**
17:2
**credit**
218:12, 218:15
**credits**
220:3
**crime**
164:6
**criminal**
192:23
**criminals**
241:3
**crook**
108:23
**crooks**
102:15, 108:8,
108:11, 109:1,

110:21, 123:14,
137:12
**crooks"**
136:24
**crossed**
43:20, 216:19
**crowd**
291:20
**crying**
92:13
**csr**
1:24, 294:4
**cst**
1:16, 293:22
**curious**
203:23, 222:15
**current**
81:4, 81:5
**currently**
14:20, 33:20,
37:1, 76:17,
80:16, 220:24,
224:18, 276:15
**cut**
109:24, 166:15
**cutting**
165:5
**cv**
1:7
**cynthia**
205:22, 292:19,
292:23, 293:8
**czechoslovakian**
110:8

**D**

**daffada**
3:20
**daily**
22:2, 22:4,
22:6, 63:15,
156:15
**dalton**
138:23, 139:5,
139:11, 143:24,
165:21, 205:11
**damages**
208:3, 208:4,

211:19, 212:2,
212:8, 212:9,
226:11
**dan**
75:4
**danger**
192:1, 256:11
**dangerous**
240:15, 274:22,
275:12
**dangerously**
228:22
**dart**
1:9
**dart's**
5:6, 211:2
**date**
6:23, 48:2,
56:9, 56:10,
56:11, 56:12,
61:13, 61:14,
63:10, 64:24,
65:7, 85:9,
85:10, 95:1,
99:22, 128:11,
149:12, 178:9,
186:17, 187:11,
187:16, 201:18,
203:2, 206:14,
221:3, 221:5,
221:7, 221:8,
221:10, 229:9,
284:11, 284:12,
284:16
**dated**
120:13, 121:1,
122:3, 122:4,
122:23, 202:24
**dates**
65:1, 65:3,
94:7, 128:16,
187:10
**day**
8:19, 18:17,
21:6, 21:17,
21:24, 22:5,
38:15, 38:19,
49:21, 50:9,

53:5, 53:8,
76:13, 77:14,
77:17, 95:23,
96:1, 96:4,
96:12, 96:15,
97:1, 97:11,
97:14, 97:17,
98:3, 108:22,
126:24, 128:8,
128:9, 128:18,
130:15, 131:14,
131:15, 131:17,
131:19, 131:21,
131:23, 138:19,
138:22, 139:18,
144:7, 144:8,
144:9, 144:19,
145:15, 154:14,
163:6, 163:7,
163:10, 163:13,
165:17, 167:13,
168:16, 169:6,
169:14, 170:14,
181:23, 181:24,
205:10, 210:10,
210:11, 233:11,
233:14, 234:6,
265:20, 278:7,
281:21, 294:17
**day-to-day**
233:13
**days**
23:9, 37:7,
37:16, 37:23,
47:12, 50:12,
103:10, 104:19,
104:21, 108:20,
145:21, 145:23,
146:8, 146:13,
146:16, 146:23,
152:15, 166:22,
167:18, 168:22,
169:1, 203:21,
282:3
**days"**
203:16
**deal**
31:11, 153:14,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    87

180:21, 181:1,
240:18
**dealing**
24:19
**dealt**
240:16
**death**
233:10
**decide**
53:4, 71:18,
269:3
**decided**
16:21, 64:22,
172:8, 172:13,
258:8
**decision**
36:16, 36:24,
51:16, 51:23,
76:11, 77:6,
77:10, 78:17,
78:22, 81:18,
82:1, 82:7,
82:20, 134:16,
134:21, 160:15,
160:20, 162:18,
172:2, 183:14,
184:13, 184:20,
215:19
**decision-making**
185:14
**decisions**
182:12, 185:1,
185:4, 185:9
**declare**
116:4, 211:11
**defendant**
4:17, 5:5,
97:9, 115:19,
120:5, 124:5,
155:13, 175:4,
211:1, 214:4,
289:24, 290:11,
290:17
**defendants**
1:10, 3:10,
3:18, 6:5, 6:9,
102:23, 103:5,
135:16, 173:13,

173:20, 209:5,
209:19, 211:20,
213:23, 216:5,
216:8, 227:6,
227:7, 229:20,
231:19, 231:24,
232:3, 241:12,
243:11, 243:15,
245:6, 245:9,
245:15, 245:18,
246:13, 246:17,
283:20
**definitely**
210:11, 287:17
**degree**
13:2, 14:15,
14:17
**delayed**
267:23
**delaying**
267:22
**deliveries**
18:20
**delivery**
103:24
**demeaning**
276:21, 276:24,
277:6
**demoted**
175:9, 175:12,
177:12, 253:1
**demotion**
177:1
**denied**
45:6, 45:7
**denying**
240:5
**dep**
10:9, 12:10
**department**
7:17, 14:14,
15:11, 31:14,
65:3, 276:6,
277:10, 279:11,
281:1, 292:10,
292:11
**departments**
18:22

**depended**
64:8
**depending**
37:14, 66:13
**depends**
30:4, 34:24,
44:5, 46:7,
50:17, 51:12,
51:14, 65:20,
237:20, 292:12
**deposition**
1:13, 2:1,
4:12, 6:18,
6:19, 10:12,
11:5, 11:15,
12:8, 12:9,
12:11, 87:1,
115:14, 119:5,
120:21, 122:14,
191:20, 193:8,
194:1, 195:1,
196:6, 197:1,
198:1, 198:18,
200:10, 201:2,
202:4, 204:18,
206:18, 210:20,
242:16, 250:8,
294:7
**depressed**
232:13
**depression**
232:16
**deputy**
34:6, 34:11,
34:12, 35:22,
37:2, 51:24,
52:16, 52:21,
76:18, 77:2,
80:10, 81:11,
83:22, 83:24,
84:5, 84:7,
84:18, 117:16,
209:17, 209:18,
213:12, 214:19,
217:13, 218:17,
219:13, 220:11
**derogatory**
102:16, 109:8,

109:9, 110:15,
110:24, 123:13,
135:17, 266:9,
266:23
**describe**
116:13, 266:11,
269:22
**deserve**
109:14, 109:17
**desirable**
27:5, 27:6,
27:8
**desire**
214:5
**desks**
95:5
**detail**
15:8, 15:9,
16:4, 116:19,
257:16, 257:17,
286:21
**details**
11:16, 43:14,
257:20
**detainee**
7:5, 7:7, 7:12,
7:15, 152:11,
153:16, 168:18,
168:20
**detainees**
17:15, 24:19,
109:18, 110:10,
136:5
**deteriorated**
228:4
**determination**
37:22, 53:11,
135:3, 172:7,
172:21, 173:6,
205:24, 233:20,
234:8, 234:10,
234:17, 234:24,
237:8
**determine**
268:16
**determined**
20:23, 21:1,
135:7, 173:9,

Transcript of LeGrain Winston
Conducted on August 28, 2020                              88

252:18, 252:19
**determines**
36:6
**developed**
228:9
**diagnosed**
93:8, 232:16
**dial**
67:7
**difference**
32:18, 218:16,
218:24, 219:3,
241:4, 241:5
**differences**
80:15
**different**
18:7, 18:11,
18:14, 18:22,
21:5, 24:4,
29:3, 55:16,
64:7, 75:14,
75:18, 76:5,
76:22, 80:8,
91:14, 154:7,
156:14, 156:18,
156:20, 157:4,
161:14, 161:16,
169:16, 184:2,
184:4, 187:6,
205:4, 207:14,
230:13, 230:14,
236:23, 251:23,
271:3, 274:15,
274:18, 279:1,
286:7, 286:10
**differential**
219:7
**differently**
38:5, 173:14,
173:22
**difficult**
242:15
**digressing**
271:6
**direct**
155:12, 271:8
**directed**
100:8

**direction**
91:8, 294:11
**directions**
24:21
**directive**
129:21
**directly**
155:9, 155:10,
178:12
**director's**
219:6
**directors**
34:14, 34:15,
35:1, 81:2,
217:14
**disability**
123:3, 123:4,
123:6, 123:7
**disagreement**
40:20
**disciplinary**
37:6, 46:9,
46:10, 46:11,
145:13, 152:19,
271:14, 271:19,
271:24, 273:21
**disciplined**
187:10, 188:21,
188:23, 188:24,
189:1, 189:6,
189:13
**discretion**
268:16, 269:3
**discriminate**
209:21
**discriminated**
171:21
**discrimination**
4:21, 27:17,
27:22, 28:15,
29:2, 30:10,
30:19, 30:22,
31:15, 31:21,
32:16, 32:19,
32:24, 89:4,
122:5, 122:18,
123:2, 197:6,
254:22, 262:24

**discriminator**
33:8
**discriminatory**
142:16, 143:12,
146:1, 153:5,
153:8, 154:4,
154:12, 158:20,
158:21, 159:1,
166:24, 168:11,
170:20
**discuss**
95:14, 97:17,
180:7, 180:11,
209:10, 257:23,
258:3, 259:23,
278:10
**discussed**
36:21, 76:17,
78:6, 94:20,
180:3, 209:13,
214:3, 248:7,
249:16, 249:20,
250:7, 251:4,
258:8, 258:17,
259:11, 259:17
**discussing**
95:7, 108:18,
260:2, 291:13
**disparate**
182:13
**disposition**
178:13, 234:5
**disruption**
280:7
**district**
1:1, 1:2
**divided**
18:11, 75:14,
75:17, 75:21
**division**
1:3, 15:7,
15:13, 16:12,
16:14, 16:17
**doctor**
228:6, 231:4,
231:6, 243:4
**document**
87:6, 115:23,

121:4, 192:7,
192:9, 192:12,
193:11, 194:4,
194:7, 196:10,
197:4, 198:4,
198:21, 198:23,
200:14, 201:6,
202:8, 205:1,
205:2, 211:15,
247:20, 248:3
**documentation**
253:19, 254:3,
255:4, 261:9,
261:10, 261:15,
261:19, 261:20,
261:22, 261:24
**documents**
9:17, 12:16,
122:1, 205:7,
260:10
**dog**
137:2
**doing**
7:21, 63:13,
114:22, 115:3,
131:18, 156:11,
181:21, 215:24,
231:14, 261:17,
263:16, 276:8,
276:9
**done**
22:2, 23:6,
23:8, 29:12,
40:21, 44:6,
44:15, 72:16,
73:4, 74:7,
89:11, 99:11,
131:3, 131:24,
132:20, 133:3,
133:12, 223:2,
241:8, 245:16,
251:17, 251:19,
251:24, 252:10,
252:13, 293:17
**door**
156:5
**down**
6:13, 8:4,

18:15, 50:18,
69:6, 102:2,
105:4, 105:20,
106:1, 111:16,
111:18, 111:19,
111:20, 113:4,
113:5, 115:13,
116:10, 117:14,
119:3, 119:18,
120:1, 135:20,
135:22, 135:23,
138:11, 138:23,
139:12, 143:2,
143:7, 143:24,
149:20, 152:7,
160:4, 161:10,
165:21, 169:1,
173:19, 182:7,
197:12, 198:14,
203:6, 204:8,
208:6, 208:11,
244:6, 255:23,
265:15
**downstairs**
64:4
**dr**
226:18, 227:4,
227:11, 228:6,
228:18, 229:15,
243:24, 244:3,
248:23
**drafted**
119:9, 121:1,
195:17
**dreams**
213:4
**drove**
139:5
**drug**
156:18
**due**
35:2, 190:4,
193:17, 245:17
**dues**
238:5
**duly**
6:4
**dumb**
105:5, 105:10,

123:13, 136:8,
137:14, 254:1,
254:19
**during**
88:9, 146:3,
224:21, 227:14,
241:17, 284:9,
285:20
**duties**
17:12, 49:19,
50:6, 154:3,
276:11
**duty**
56:6, 56:14,
95:23, 96:4,
96:6, 96:15,
96:18, 96:22,
97:1, 97:10,
131:14, 131:15,
131:23
**dying**
92:12
**dynamic**
240:24
**dynamics**
238:9

---
**E**
---

**each**
69:17, 76:2,
109:21, 135:15,
139:24, 244:3,
247:7, 278:14
**earlier**
75:13, 76:17,
159:4, 160:12,
165:14, 172:1,
173:5, 174:21,
176:18, 183:13,
183:23, 184:5,
184:7, 193:14,
209:13, 214:3,
248:7, 249:17,
249:20, 286:6,
288:3
**early**
26:14
**earn**
218:12

**easier**
113:23
**east**
76:4, 164:5
**eastern**
1:3
**easy**
93:2
**education**
12:23
**edward**
137:13, 137:18
**eeoc**
4:21, 122:18,
254:6, 254:21,
255:1, 263:13,
263:16, 263:22
**efran**
192:23
**either**
30:1, 40:19,
52:2, 52:4,
52:5, 52:7,
52:9, 71:13,
73:7, 78:14,
80:6, 83:22,
111:17, 112:3,
112:9, 114:10,
116:20, 125:1,
178:12, 178:21,
181:15, 189:9,
255:6, 293:17
**elaborate**
103:13
**electronic**
17:16, 197:21,
247:8
**eli**
4:2
**eligible**
80:19, 182:18,
182:24, 220:24
**else**
10:16, 11:4,
11:20, 12:12,
14:7, 17:18,
24:22, 28:18,
30:3, 35:7,

58:10, 58:16,
58:18, 60:1,
62:21, 64:6,
66:21, 69:21,
70:3, 71:2,
82:11, 85:21,
86:10, 86:12,
88:22, 89:18,
89:19, 98:8,
98:11, 99:13,
100:15, 100:16,
100:18, 106:16,
106:17, 106:18,
107:1, 107:23,
109:3, 117:2,
117:8, 118:4,
120:13, 120:15,
128:14, 137:6,
137:16, 153:19,
158:18, 158:22,
158:23, 160:10,
170:19, 183:5,
184:22, 185:18,
215:24, 230:23,
243:13, 243:14,
252:9, 252:12,
255:2, 259:13,
259:23, 284:21,
284:24
**else's**
286:21
**em**
14:22, 14:23,
15:2, 15:3,
15:6, 15:22,
16:1, 16:7,
16:17, 16:18,
16:22, 17:5,
17:7, 17:13,
17:21, 18:8,
18:19, 19:13,
19:16, 20:2,
20:20, 23:11,
24:5, 27:10,
33:21, 33:24,
34:4, 34:5,
34:10, 34:11,
34:17, 34:20,

Transcript of LeGrain Winston
Conducted on August 28, 2020

90

35:4, 35:8,
35:11, 35:21,
36:4, 36:7,
37:1, 38:1,
39:10, 41:17,
79:10, 80:13,
88:2, 89:21,
92:2, 102:14,
110:12, 127:18,
130:16, 130:17,
145:5, 164:8,
165:13, 175:4,
183:15, 183:18,
185:4, 212:22,
213:12, 266:3,
266:7, 273:18,
274:5, 277:14,
278:20, 279:4,
289:21, 290:12,
290:16, 292:24,
293:2, 293:4,
293:9, 293:10
**email**
5:8, 63:14,
193:13, 246:21,
246:22, 247:5,
247:6, 247:10,
247:14, 247:17,
247:19, 247:24,
248:5, 248:20
**emailed**
178:12, 248:18,
248:22
**emails**
156:13, 156:15,
206:24, 207:5,
207:7, 235:4,
250:11, 250:13
**embarrassed**
276:17, 276:18
**emery**
3:12
**emotional**
92:13
**employed**
294:13
**employee**
7:10, 7:14,

7:15, 36:7,
36:24, 42:12,
42:15, 42:21,
45:9
**employee's**
40:20
**employees**
46:16, 48:24,
51:17, 53:7,
110:13, 287:7
**employer**
225:17
**employment**
87:22
**end**
50:22, 53:16,
57:21, 64:11,
86:19, 92:21,
127:1, 178:16,
204:20, 207:17,
208:21, 209:3,
235:20
**ended**
67:23, 67:24,
109:20
**englewood**
164:4
**english**
109:13, 109:15,
109:17, 110:5,
136:5
**enjoy**
24:7, 24:8,
276:8
**enjoyed**
240:7
**enough**
51:8, 55:3,
55:9, 87:14,
147:2, 259:20
**ensure**
54:9
**ensures**
8:4
**entire**
26:1, 35:16,
41:16, 232:24,
237:1

**entitled**
218:8, 224:14
**erroneous**
126:6, 138:21,
272:5
**escitalopram**
244:14
**especially**
192:1, 213:2,
270:16
**esquire**
3:3, 3:11, 3:19
**essentially**
22:13, 33:4,
50:21, 68:6,
82:15, 93:18,
104:18, 129:15,
132:7, 146:19,
154:5
**establish**
191:24
**established**
39:9, 148:15,
165:17, 254:23,
288:10, 288:11
**estimate**
220:7
**et**
1:5, 1:9,
35:20, 78:1
**ethan**
3:11, 6:10
**ether**
89:14
**evading**
189:20, 189:21
**even**
7:24, 21:18,
96:15, 110:7,
131:16, 146:5,
147:9, 150:5,
158:3, 170:11,
217:24, 238:18,
275:24, 276:21,
280:8, 282:13
**evening**
26:15
**event**
140:14

**events**
73:12
**ever**
6:18, 22:21,
22:23, 23:3,
23:21, 23:23,
24:1, 83:9,
83:11, 83:12,
83:15, 149:6,
159:19, 159:22,
159:24, 161:4,
161:19, 161:21,
167:11, 178:2,
178:24, 232:7,
232:16, 236:13,
237:22, 249:6,
270:12, 288:24,
289:3
**every**
54:21, 54:23,
108:22, 135:15,
154:14, 163:6,
163:7, 163:10,
163:13, 170:14,
188:12, 225:23,
234:6, 247:8
**everyone**
114:22, 258:7
**everything**
6:14, 170:10,
187:17, 208:20
**evidence**
250:17, 251:7,
256:9, 258:11
**exact**
48:5, 56:9,
56:10, 63:10,
145:9, 164:11,
164:12, 200:7,
206:14, 218:20,
218:21, 229:9
**exactly**
55:12, 78:23,
125:7, 170:23,
178:8, 200:3
**examination**
4:4, 6:5,
265:17, 283:20

Transcript of LeGrain Winston
Conducted on August 28, 2020

91

**example**
96:24, 222:7,
248:4, 249:12,
292:15
**exasperated**
286:16, 286:20
**except**
82:16, 210:1
**exclusively**
162:19
**excuse**
28:2, 34:18,
88:6, 96:3,
116:17, 123:6,
152:7, 153:7,
159:21, 163:17,
167:5, 168:24,
192:11, 216:7,
226:1, 247:9,
249:18, 257:6,
293:1
**execute**
234:21
**executed**
233:11
**executioner**
234:20
**executive**
35:5, 35:8,
35:10, 35:24,
37:3, 46:8,
52:1, 53:1,
76:19, 77:3,
82:6, 147:17,
177:9, 214:12,
267:9, 267:13,
290:1, 290:12,
290:17, 292:13
**exempt**
288:13
**exhausted**
264:16
**exhibit**
4:14, 4:15,
4:19, 4:20,
4:21, 4:22, 5:3,
5:8, 5:9, 5:10,
5:11, 5:12,

5:13, 5:14,
5:15, 5:16,
5:17, 5:18,
5:19, 86:17,
86:19, 86:22,
87:1, 87:4,
115:13, 115:14,
115:17, 119:4,
119:5, 119:8,
119:24, 120:20,
120:21, 120:24,
121:19, 122:13,
122:14, 122:17,
124:2, 136:16,
142:12, 142:15,
191:19, 191:20,
192:6, 193:6,
193:8, 193:11,
193:24, 194:1,
194:5, 194:24,
195:1, 195:4,
196:5, 196:6,
196:9, 197:1,
197:4, 197:24,
198:1, 198:4,
198:17, 198:18,
198:21, 200:9,
200:10, 200:13,
201:1, 201:2,
201:5, 202:3,
202:4, 202:8,
204:17, 204:18,
204:24, 206:16,
206:17, 206:18,
206:23, 210:19,
210:20, 210:23,
254:13, 255:6,
255:16, 292:16
**exhibits**
4:12, 191:23,
204:21
**existence**
84:11, 213:14
**expand**
185:12
**expect**
240:22, 241:2,
241:3

**expedite**
237:17
**expenses**
223:8, 223:10,
224:12
**experience**
25:1, 216:15,
270:9, 270:13
**expires**
294:20
**explain**
33:20, 43:3,
43:6, 75:15,
126:12, 127:24,
131:7, 162:5,
256:24, 268:21,
269:2
**explained**
39:16, 143:20
**explaining**
165:5
**explanation**
41:4, 65:11,
65:16, 65:19
**explicit**
279:18
**express**
40:19
**expressed**
85:17, 88:20,
214:5, 217:14
**extremely**
40:4, 266:12,
276:18
**eyes**
58:23, 158:2

## F

**f**
130:4
**f'er**
137:7
**f'er"**
137:4
**face**
94:22, 97:19,
98:2, 98:5,
98:16, 98:19,

119:20, 176:17,
270:24
**fact**
23:15, 23:18,
35:2, 88:18,
117:3, 147:23,
149:2, 150:18,
153:14, 162:18,
180:11, 180:18,
183:2, 183:9,
183:19, 184:16,
184:17, 190:4,
235:24, 240:14,
261:21
**factors**
160:19, 229:23
**factory**
14:11
**facts**
87:18, 102:2,
118:22, 123:21,
124:24, 138:7,
196:19, 250:17,
272:6
**faded**
268:24
**failed**
250:4
**failure**
151:24, 152:2,
152:4, 174:19
**fair**
23:10, 24:3,
31:12, 34:16,
34:20, 40:18,
45:6, 47:1,
48:14, 49:5,
56:15, 60:23,
68:20, 73:21,
81:7, 82:14,
147:2, 177:2,
177:13, 179:21,
181:14, 187:13,
199:10, 242:16,
262:15, 272:7,
272:12
**fall**
149:1

Transcript of LeGrain Winston
Conducted on August 28, 2020

92

falls
151:19
false
128:10, 128:15,
128:17, 223:15,
223:16
falsely
126:3, 127:21,
128:1, 141:3
falsified
126:5
familiar
195:11, 201:11,
206:21
familiarize
135:19
family
25:18, 26:15,
231:11, 232:5,
232:11, 232:13,
233:23, 237:20,
238:21
far
25:17, 29:21,
36:2, 36:9,
38:3, 38:4,
54:5, 57:17,
63:14, 66:18,
67:14, 68:4,
70:14, 74:6,
78:21, 78:22,
89:18, 110:3,
174:21, 180:22,
185:19, 215:15,
235:1, 239:18,
239:20, 239:22,
240:21, 269:9,
286:4, 286:19
faster
196:3
fault
128:12
favor
51:15, 142:23
fear
237:15, 239:12
february
200:17, 223:3,

235:10
feedback
60:9
feel
170:13, 226:17,
232:14, 233:12,
275:20, 275:24,
285:6
feels
233:13, 277:4,
277:7
fees
208:9, 208:24
feet
243:5
felt
27:12, 72:6,
125:23, 233:4,
233:9, 234:6
ferguson
126:5, 127:16,
171:18, 192:24
few
7:22, 23:1,
23:4, 23:8,
23:9, 53:15,
69:8, 70:24,
71:1, 72:16,
93:23, 99:22,
205:3, 208:10,
225:3, 234:15,
243:19, 243:21,
244:21, 250:7,
267:5, 274:4
figure
140:24, 171:7,
196:2, 196:4,
218:23, 219:1,
224:3
file
29:21, 29:24,
42:23, 47:4,
58:20, 72:12,
93:24, 100:21,
128:1, 128:6,
137:20, 139:14,
167:17, 167:19,
225:23, 226:2,

253:13, 260:23,
261:4, 272:17,
272:18, 285:2,
285:4, 285:7,
290:20, 290:23
filed
40:14, 66:7,
66:12, 67:16,
68:6, 68:13,
74:5, 87:10,
89:4, 89:7,
89:10, 89:13,
89:17, 90:7,
94:5, 94:9,
99:2, 99:3,
99:7, 119:12,
122:5, 122:18,
126:3, 127:21,
128:2, 128:4,
128:21, 132:10,
132:14, 139:15,
141:3, 144:10,
147:23, 149:3,
150:6, 150:18,
194:13, 196:12,
198:6, 261:12,
263:4, 263:10,
263:15, 263:22,
285:13
files
167:24
filing
40:8, 40:10,
40:19, 72:21,
141:24, 258:17,
262:18, 262:23
filings
250:13
fills
271:13
financial
14:19, 294:15
find
17:22, 21:5,
61:5, 77:16,
179:3, 192:21,
229:11
fine
8:23, 66:23,

66:24, 75:6,
136:21, 192:4,
207:20, 207:22,
207:23, 231:8,
232:3, 255:13,
263:9
finger
98:2, 176:17
finish
8:1, 184:3,
262:11
finished
109:23
fire
124:5, 124:10,
149:13, 170:18,
232:12, 238:1,
238:18, 238:19
fired
90:14, 99:19,
111:4, 111:5,
111:7, 120:10,
121:9, 125:10,
125:11, 125:19,
125:24, 129:4,
141:17, 141:19,
151:12, 175:23,
232:19, 235:18,
236:17, 236:20,
237:18, 237:21,
237:22, 240:2
fired'"
124:12
firm
3:4
first
4:18, 5:6,
7:23, 25:21,
33:3, 38:23,
55:23, 58:20,
67:3, 71:22,
85:15, 92:16,
96:8, 115:19,
139:21, 144:18,
144:24, 146:6,
162:6, 180:13,
180:15, 208:19,
211:2, 212:4,

Transcript of LeGrain Winston
Conducted on August 28, 2020          93

215:5, 233:18,
236:22, 244:10,
271:9
**fit**
25:17, 34:14,
47:9
**fitting**
26:24, 27:3
**five**
6:24, 75:6,
208:9, 228:5,
228:8, 230:5,
232:22, 233:9,
237:1, 241:10,
241:17, 265:3,
276:20
**five-minute**
75:1
**fix**
18:4
**floor**
104:11, 155:24
**focus**
69:6, 213:20
**follow**
178:2
**follow-up**
283:17
**follow-ups**
283:19
**followed**
39:18, 42:1,
42:8, 42:13,
42:18, 42:23,
105:19
**following**
221:8, 289:15
**follows**
6:4, 67:13,
217:2
**foot**
243:4
**forced**
152:8
**ford**
164:4
**foregoing**
116:5, 174:1,

211:12, 294:6,
294:8
**foremost**
7:23
**forget**
129:14
**forgot**
206:15, 237:24,
238:2
**form**
43:13, 43:17,
43:22, 89:8,
89:9, 147:10,
197:7, 198:6,
201:10, 201:11,
202:12, 231:6,
237:11, 262:24,
267:17, 268:7,
268:18, 269:17,
269:24, 271:10,
271:14, 271:19,
271:24, 272:13,
273:6, 273:11,
273:24, 275:6,
275:22, 276:12,
277:16, 277:22,
278:22, 279:6,
281:23, 282:6,
282:17, 283:3,
285:11
**forming**
183:5
**forms**
126:21, 142:17,
269:9
**formulation**
35:18
**forth**
28:1, 28:3
**forward**
119:20, 258:8
**found**
109:1, 109:19,
111:16, 176:15,
282:14
**foundation**
58:24, 59:11,
78:19, 134:18,

141:11, 150:7,
160:21, 176:19,
237:10, 251:21,
267:18, 268:8,
268:19, 269:18,
270:1, 271:11,
272:14, 273:7,
273:12, 274:1,
275:7, 275:23,
276:13, 277:17,
277:23, 278:23,
279:7, 281:24,
282:7, 282:18,
283:4, 285:11,
290:14
**four**
16:6, 16:9,
19:22, 24:4,
50:10, 50:12,
50:15, 53:7,
126:19, 127:14,
127:18, 147:20,
170:12, 218:12,
218:15, 220:2,
263:23, 264:2
**fourth**
46:20, 139:22,
144:18, 205:15,
205:19
**free**
226:17
**freezing**
66:19, 66:20,
181:13
**frequently**
34:7, 35:14,
61:4, 273:22
**friday**
1:15, 12:11,
75:4
**front**
9:16, 9:17,
111:13, 222:10,
263:21, 284:12
**froze**
30:14, 32:2,
33:16, 41:12
**frozen**
60:9

**fucker**
137:10
**full**
9:7, 91:12,
239:23, 242:16
**fully**
238:21, 251:2,
251:9, 252:6
**function**
227:18
**fund**
236:6, 236:9,
236:10, 236:12,
236:14
**funding**
217:23
**funds**
131:20
**further**
64:4, 107:13,
119:18, 124:15,
152:7, 203:6,
283:16
**future**
211:24, 219:24
─────────G─────────
**gabriel**
4:2, 6:10,
86:16, 87:13,
101:22, 114:23,
115:12, 115:22,
117:4, 118:8,
119:3, 120:19,
121:18, 122:12,
135:21, 135:23,
136:2, 138:11,
142:11, 143:1,
143:6, 173:18,
182:7, 191:18,
192:1, 193:6,
193:23, 194:23,
195:6, 196:5,
196:24, 197:13,
199:3, 206:16,
207:21, 211:5,
211:15, 212:5,
221:19, 226:14,

254:12, 255:22,
293:20
**gaining**
213:9
**garbled**
226:2
**gas**
108:17, 136:23
**gave**
16:6, 67:20,
74:12, 152:2,
152:9, 207:1,
207:9, 229:4
**general**
28:8, 28:9,
28:11, 39:22,
40:1, 205:23,
208:16, 291:20,
292:19, 292:23,
293:8
**generally**
17:13, 18:7,
28:9, 31:8,
31:9, 32:11,
35:15, 36:15,
46:22, 50:9,
50:10, 77:18,
78:10, 81:21,
84:7, 91:13,
97:6, 164:13,
174:2, 218:5,
218:6, 236:19,
239:19, 268:14,
281:11
**generated**
80:20
**geography**
57:9
**getting**
6:13, 22:7,
39:2, 62:22,
64:2, 64:13,
161:10, 183:11,
204:20, 207:17,
227:21, 228:22,
272:19
**give**
9:7, 21:9,

31:24, 34:7,
41:2, 56:9,
56:12, 61:13,
63:7, 63:10,
64:24, 96:22,
98:15, 103:9,
119:19, 126:21,
126:22, 148:3,
156:17, 161:23,
182:1, 182:3,
195:5, 206:20,
208:4, 223:14,
223:15, 223:16,
239:19, 265:14,
277:19, 277:24,
278:6, 280:16,
291:21
**given**
21:6, 36:7,
46:23, 50:4,
50:9, 53:5,
53:8, 53:20,
76:9, 76:13,
77:6, 77:11,
77:14, 77:16,
77:17, 78:18,
134:5, 146:11,
146:12, 146:14,
160:14, 189:16,
294:9
**gives**
41:5
**giving**
65:18, 104:3,
104:5, 104:6,
146:10, 199:14,
269:8, 280:23
**gmail**
248:8, 248:11,
248:13
**goes**
6:11, 45:14,
78:17, 139:7,
143:6, 145:10,
188:13, 192:8,
271:18
**going**
7:24, 9:4,

10:6, 11:10,
16:15, 21:19,
47:3, 47:20,
53:11, 55:4,
55:10, 60:20,
62:17, 63:5,
68:7, 69:23,
70:17, 70:18,
70:22, 71:3,
71:16, 75:1,
77:11, 79:17,
86:4, 86:5,
86:6, 86:22,
99:18, 113:22,
113:23, 117:5,
120:9, 121:9,
124:11, 129:4,
131:20, 133:5,
134:3, 136:19,
142:24, 153:17,
155:14, 176:3,
183:4, 184:9,
184:19, 186:15,
187:21, 188:17,
189:1, 189:7,
191:5, 191:22,
192:1, 192:2,
192:3, 202:15,
207:14, 207:16,
207:18, 209:7,
209:8, 212:17,
213:10, 214:12,
214:23, 215:1,
221:4, 223:23,
230:4, 230:8,
232:20, 232:21,
233:4, 233:10,
233:14, 233:16,
234:3, 234:7,
234:21, 234:22,
236:15, 237:9,
239:7, 239:15,
256:23, 262:12,
266:18, 268:4,
268:10, 281:13,
281:21
**gone**
53:5, 124:17,

125:4, 125:8,
125:16, 125:17,
125:23, 179:24,
180:18, 180:23,
181:18, 210:4,
210:12, 210:15
**good**
6:7, 8:5,
10:17, 24:6,
24:7, 24:11,
24:12, 24:17,
24:18, 24:19,
24:20, 25:1,
25:5, 25:8,
25:10, 49:8,
49:10, 49:14,
58:9, 58:22,
72:18, 75:6,
110:17, 126:24,
159:5, 159:7,
159:8, 159:9,
159:10, 159:12,
192:19, 268:1
**gossip**
279:20
**gotten**
228:10, 228:12,
245:10, 245:11,
245:14, 245:18
**gov**
246:22
**grabbed**
98:18
**graduate**
13:24
**gregory**
4:17, 115:19
**grew**
240:23
**grievance**
36:10, 36:12,
40:4, 40:8,
40:10, 40:14,
40:18, 40:19,
41:1, 41:22,
42:6, 42:15,
42:16, 42:23,
43:4, 43:7,

43:11, 43:12,
43:19, 43:22,
44:2, 44:5,
44:15, 44:16,
44:24, 45:4,
45:5, 45:10,
45:17, 45:18,
45:20, 46:3,
46:19, 47:2,
62:12, 67:21,
68:17, 89:7,
89:15, 105:15,
105:17, 107:17,
137:20, 137:23,
139:14, 139:15,
139:17, 139:24,
140:4, 140:15,
140:16, 140:21,
144:10, 144:13,
147:4, 152:18,
152:21, 153:3,
194:13, 198:6,
198:9, 202:11,
203:5, 205:15,
205:19, 250:11,
260:23, 261:5,
261:13, 262:19,
281:6, 285:2,
292:9, 292:16,
293:5, 293:11,
293:13
**grievances**
72:12, 72:16,
72:19, 72:21,
73:1, 73:6,
73:12, 73:15,
73:16, 73:20,
74:5, 74:10,
74:16, 94:1,
94:5, 101:16,
121:23, 122:8,
268:3, 280:19,
290:20, 290:23
**grieve**
280:21
**grieving**
104:24, 105:24
**ground**
6:17, 7:22,

233:5
**group**
91:5, 291:20
**guard**
15:8, 15:9,
15:17, 15:19,
16:2, 16:3
**guess**
31:10, 37:7,
37:9, 37:16,
41:2, 44:1,
81:24, 84:13,
103:22, 130:24,
132:1, 132:5,
179:20, 189:5,
200:6, 210:7,
223:17, 223:20,
226:15, 237:4,
254:22, 284:22,
292:6
**guessing**
187:7
**guesstimate**
223:19, 277:19
**guilty**
282:14
**guy**
276:23
**guys**
52:14, 105:16,
105:20, 105:23,
107:1, 110:23,
114:18, 114:23,
126:22, 127:7,
129:17, 130:4,
130:5, 144:2,
179:6, 181:4,
201:22, 205:11,
265:14, 267:23

**H**

**hair**
266:19, 283:23
**half**
10:23, 75:2
**halfway**
102:2
**hallway**
105:4, 106:2,

155:22, 259:20,
278:14
**hand**
98:15, 119:20,
294:17
**handed**
119:7, 120:23,
122:16, 192:5,
193:10, 194:3,
198:3, 198:20,
200:12, 201:4,
202:7, 206:22,
210:22
**handful**
47:24, 191:23,
226:23
**handicap**
153:23
**handicapped**
153:15
**handing**
87:3, 115:16,
195:3, 196:8,
197:3, 204:23
**handle**
292:14
**handled**
292:10, 292:11,
292:18, 293:6
**hands**
228:23, 243:11
**handwriting**
197:14, 201:7,
202:21, 203:24,
204:2
**hang**
56:20, 69:16,
181:8
**happen**
9:1, 29:10,
30:16, 44:24,
45:1, 70:5,
74:3, 74:4,
86:4, 86:5,
86:6, 103:8,
108:16, 163:11,
184:10, 204:13,
208:18, 212:24,

259:1, 259:4
**happened**
17:22, 34:12,
74:6, 89:18,
89:19, 98:20,
98:23, 99:6,
99:10, 101:4,
103:9, 105:2,
107:19, 107:23,
108:17, 126:11,
126:12, 126:14,
139:17, 144:12,
153:1, 160:3,
176:22, 187:14,
230:7, 258:21,
258:22, 259:5,
267:11, 276:2,
284:2
**happening**
208:8, 229:1
**happens**
17:24, 43:24,
44:3, 46:6
**happy**
8:18, 9:2,
16:13
**harass**
209:21
**harasser**
33:7
**harassing**
62:7, 209:6,
209:16
**harassment**
27:17, 27:22,
28:16, 29:2,
30:11, 30:19,
30:22, 31:15,
31:21, 32:16,
32:20, 148:24,
151:20, 197:7,
208:20, 209:2,
241:12, 241:18,
243:10
**hard**
28:12, 34:7,
35:1, 98:3,
150:16, 190:7,

Transcript of LeGrain Winston
Conducted on August 28, 2020

96

194:9, 284:1
**harm**
256:11
**harvey**
164:4
**head**
8:16, 64:21,
100:14, 106:24,
121:11, 158:13,
158:14, 167:17,
266:19, 266:20
**health**
226:23, 227:5,
227:12, 228:4,
228:9, 229:16,
229:18, 229:24,
241:19, 242:20,
242:24, 243:2,
246:16
**hear**
10:1, 33:15,
46:12, 59:4,
74:23, 92:16,
93:14, 157:7,
157:14, 158:12,
159:6, 160:23,
161:1, 174:15,
177:20, 177:21,
179:8, 216:7,
226:1, 267:20,
267:21, 273:16,
274:17, 279:24,
280:5, 281:5,
283:11, 284:3,
284:5, 284:14,
291:4
**heard**
46:7, 92:20,
105:10, 106:2,
139:20, 154:23,
155:15, 155:17,
158:7, 180:14,
185:2, 206:9,
246:8, 250:10,
259:19, 259:21,
261:18, 279:10,
280:1, 280:12,
291:8, 291:12,

291:15, 291:22,
292:2
**hearing**
46:13, 67:21,
68:16, 68:17,
140:15, 140:16,
233:17, 234:1,
234:2, 234:3,
234:6, 234:12,
234:14, 235:8,
238:6, 239:17,
284:1
**heat**
266:18
**heights**
164:5
**held**
2:1, 170:10,
258:16, 274:16,
274:19
**hello**
133:8, 141:13
**help**
9:12, 25:19,
127:9, 131:7,
135:22, 293:21
**helpful**
243:1
**helps**
84:13
**herbert**
3:4
**hereby**
294:7
**hereunto**
294:16
**hey**
41:4, 62:10,
179:11, 181:20,
237:24, 280:5,
291:15, 292:2
**high**
13:2, 13:24,
227:1, 228:22
**high-crime**
154:13, 163:14
**high-risk**
164:18, 165:10,

275:3
**higher**
84:20, 86:2,
164:6, 227:15
**highest**
12:22, 238:12
**himself**
57:13, 149:19,
156:3
**hipaa**
231:5
**hispanic**
109:16
**hit**
238:16
**hold**
138:24, 139:1,
170:12
**home**
18:2, 241:6,
241:7
**honest**
75:4
**honor**
220:18, 220:19
**hood**
155:16, 156:10,
157:8, 157:9,
157:11, 158:10
**hope**
6:10, 6:11
**hopefully**
6:14, 206:21
**hoping**
208:17, 208:19
**horrible**
60:9
**horrific**
260:7
**hostile**
94:21, 97:18
**hot**
266:13, 266:17
**hour**
10:23, 75:1,
97:8, 278:7
**hours**
25:17, 25:20,

26:15, 26:18,
27:1, 95:24,
132:5, 132:7
**house**
109:14, 109:17
**however**
282:16
**hr**
31:6, 31:9,
31:17, 32:12,
32:14, 260:18
**human**
30:24, 174:3,
198:24
**hump**
21:8, 21:11
**hundreds**
266:23
**hurt**
159:20, 159:22,
243:17
**hydrochlorothiaz-**
**ide**
244:18
**hypothetical**
272:9
**hypothetically**
272:4

**I**

**identification**
87:2, 115:15,
119:6, 120:22,
122:15, 191:21,
193:9, 194:2,
195:2, 196:7,
197:2, 198:2,
198:19, 200:11,
201:3, 202:5,
204:19, 206:19,
210:21
**identified**
122:1, 182:15,
226:18, 246:21
**identify**
65:6, 121:22,
135:15, 142:15,
143:11, 154:3,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                         97

158:19, 173:13,
173:20, 182:11,
191:3, 211:18,
221:21, 224:13,
226:23, 241:10,
246:20, 247:3,
247:10, 250:3,
250:24, 256:2,
256:16
**ignorance**
96:3
**illegal**
108:19, 170:19
**illinois**
1:2, 2:10, 3:7,
3:15, 3:23,
138:23, 294:6,
294:24
**illness**
93:10
**impacts**
182:13
**impede**
283:8
**implemented**
85:12
**improper**
143:17
**improperly**
251:17, 251:19,
251:24
**inappropriate**
88:16, 88:19,
88:21, 110:9,
111:17, 131:10,
131:11, 188:16,
227:10
**inbox**
248:8, 248:20
**incident**
37:8, 95:3,
99:4, 99:13,
102:6, 104:3,
107:4, 110:20,
116:22, 117:3,
117:10, 117:16,
118:6, 118:13,
118:16, 118:22,

119:13, 120:16,
121:15, 124:7,
126:14, 128:15,
128:17, 129:8,
132:21, 134:2,
134:7, 134:9,
136:9, 136:14,
137:6, 137:12,
143:19, 144:6,
145:24, 146:18,
147:13, 149:4,
152:13, 165:19,
168:3, 176:16,
186:10, 187:4,
187:5, 187:8,
187:18, 190:1,
191:1, 191:3,
192:22, 195:21,
198:7, 199:15,
205:10, 210:6,
252:5, 266:11
**incidents**
32:15, 101:20,
111:6, 118:6,
123:18, 123:22,
125:1, 164:16,
266:7, 276:2
**include**
38:17, 40:11
**includes**
76:18
**including**
48:2, 49:11,
50:5, 119:17,
122:2, 159:14,
221:24, 226:24
**income**
222:1, 222:7,
224:23, 225:17,
226:9, 235:17,
235:19
**incomplete**
272:9
**incorrect**
152:24
**incorrectly**
188:20
**increase**
50:18, 220:14

**incurred**
223:10
**independent**
260:1, 262:7,
262:18, 262:22,
263:3, 263:9,
264:5
**indicate**
9:2, 21:23,
73:19, 84:21,
200:15, 226:8
**indicated**
22:16, 49:3,
69:18, 84:17,
84:22, 84:23,
123:2, 123:3,
186:23, 211:21,
212:7, 221:16
**indicates**
199:8, 201:9
**individual**
53:22, 200:21
**individuals**
53:3, 153:15,
173:15, 173:23,
256:10, 264:17,
286:1, 292:1
**info**
136:4
**informal**
182:16, 182:22,
183:6, 272:23
**information**
10:8, 41:6,
222:16, 222:20,
223:15, 223:17,
251:6
**informed**
126:18
**infraction**
36:8
**infractions**
47:15
**infuriated**
108:21
**inherently**
188:15
**initial**
134:8, 165:12

**initially**
9:12, 77:20,
105:14, 168:22,
168:24, 279:9
**initiate**
37:12
**initiated**
95:10, 172:10,
172:15
**initiates**
37:14
**injured**
153:16, 159:19,
159:23, 160:1
**injury**
56:6, 56:14
**inkbox**
111:24, 112:1,
113:1
**inkpad**
113:20, 113:21
**inmate**
103:23, 104:1
**inner**
266:14
**inserts**
8:9
**inside**
266:14, 266:17
**instance**
17:20, 38:11,
92:6, 92:7,
95:2, 135:16,
148:10, 152:22,
186:14, 187:20
**instances**
93:20, 101:9
**instead**
32:19
**instructed**
170:24
**instruction**
156:24
**instructs**
8:10
**insubordinate**
269:12
**insubordination**
151:24

Transcript of LeGrain Winston
Conducted on August 28, 2020                                              98

| | | | |
|---|---|---|---|
| insulting | 81:21, 82:7, | 197:18, 197:19, | 242:20, 246:6, |
| 109:19 | 83:12, 185:16, | 199:19, 200:20, | 246:12, 250:14, |
| insurance | 185:17, 198:23, | 201:19, 240:10, | 252:16, 268:14, |
| 230:20 | 199:19, 200:15 | 240:14, 267:4, | 269:11, 273:10 |
| integrity | interviewed | 270:18, 276:19, | issued |
| 276:10 | 260:18 | 290:9 | 36:14, 42:2, |
| intended | interviews | investigators | 42:18, 44:20, |
| 141:17 | 31:17 | 19:9, 19:16, | 187:22, 273:22 |
| intent | introduce | 21:24, 50:8, | issues |
| 190:20 | 83:3 | 65:22, 79:11, | 6:12, 7:8, 7:9, |
| intentional | investigate | 91:6, 91:17, | 40:11, 40:13, |
| 181:14 | 29:15, 29:16, | 110:12, 117:18, | 95:15, 95:18, |
| interaction | 29:17, 44:2 | 127:18, 135:7, | 208:23, 209:11, |
| 100:22, 116:14, | investigated | 148:11, 154:6, | 226:24, 227:6, |
| 120:5, 120:15 | 251:2, 251:9, | 154:8, 160:20, | 228:9, 228:11, |
| interest | 252:6 | 162:7, 162:15, | 228:16, 228:17, |
| 85:17, 193:17, | investigating | 164:9, 171:20, | 230:20, 231:7, |
| 217:14, 231:13, | 32:3 | 179:12, 180:3, | 231:23, 237:7, |
| 294:14 | investigation | 180:8, 180:12, | 239:2, 239:14, |
| interests | 68:18, 178:17, | 180:14, 180:18, | 241:13, 241:19, |
| 239:2 | 178:19, 222:2, | 181:19, 182:18, | 242:24, 243:2, |
| interim | 223:2, 223:9, | 182:24, 185:21, | 246:16, 268:5, |
| 281:16, 282:10 | 241:15, 245:20, | 186:2, 187:9, | 268:12 |
| interrogatories | 251:13, 251:18, | 188:6, 188:9, | issuing |
| 4:18, 5:7, | 252:1, 252:4, | 191:12, 200:1, | 151:13, 273:3 |
| 10:13, 113:18, | 252:10, 252:17, | 217:18, 236:2, | it" |
| 115:20, 142:14, | 252:21, 252:24, | 268:17, 270:13, | 182:4 |
| 173:11, 173:12, | 260:12 | 270:16, 271:4, | iteration |
| 223:3, 256:6 | investigations | 271:5, 273:23, | 35:20 |
| interrogatories" | 31:17, 178:11, | 277:15, 278:20, | itself |
| 211:3 | 178:21, 251:12 | 279:4, 285:19, | 30:4, 43:7, |
| interrogatory | investigationwise | 286:11, 286:15, | 72:11, 128:17, |
| 12:17, 120:4, | 222:20 | 289:20, 289:23, | 131:12 |
| 154:2, 162:22, | investigator | 290:10, 290:16 | |
| 182:6, 208:12, | 17:6, 17:8, | investigators" | —————— |
| 221:19, 223:7, | 17:13, 18:8, | 88:11 | J |
| 224:17, 241:9, | 30:10, 30:18, | involved | —————— |
| 244:7, 246:19, | 33:21, 41:17, | 102:9, 135:7, | jail |
| 247:4, 250:2, | 53:12, 76:7, | 147:4, 149:17, | 107:10 |
| 251:4, 255:15, | 76:12, 77:6, | 150:20, 169:20, | james |
| 256:15 | 77:11, 78:18, | 187:5, 213:11 | 199:19, 200:19 |
| 256:13, | 79:3, 79:9, | issue | january |
| interrupt | 79:17, 79:24, | 29:16, 32:13, | 13:20, 221:7 |
| 109:2 | 104:20, 126:5, | 40:9, 43:9, | jefferson |
| interview | 127:16, 127:17, | 67:6, 71:24, | 3:5 |
| 31:23, 32:1, | 128:5, 143:16, | 128:13, 166:2, | job |
| 32:7, 32:8, | 171:18, 171:19, | 190:12, 194:14, | 1:22, 16:14, |
| 32:9, 32:15, | 188:13, 188:16, | 194:17, 209:9, | 49:8, 49:10, |
| | | | 49:16, 170:23, |
| | | | 216:15, 232:10, |

Transcript of LeGrain Winston
Conducted on August 28, 2020

99

233:21, 233:22, 233:23, 240:7, 240:10, 240:11, 276:8, 276:9, 276:10, 276:11, 277:2, 277:5

**jobs**
14:9, 225:1, 225:3, 225:6

**joe**
36:14

**joined**
15:4, 15:5, 20:2, 88:1

**joking**
266:18

**july**
94:19, 95:1, 118:14, 122:6, 155:6, 155:17, 201:18, 254:22

**jump**
238:16

**june**
122:23, 151:23

**jurisdiction**
130:1

**justin**
3:19, 6:8, 114:18, 255:5, 283:16

**K**

**kane**
294:5

**keep**
115:10, 135:24, 156:9, 157:8, 157:9, 157:10, 158:10, 188:12, 195:14, 207:16, 207:18

**kelly**
3:3, 74:14, 114:9, 196:2

**kept**
108:21

**kicked**
46:8

**kids**
13:7

**kill**
229:5

**kind**
18:5, 27:16, 30:13, 31:1, 31:6, 34:7, 43:5, 43:8, 44:9, 55:12, 58:20, 64:9, 65:10, 89:14, 93:10, 97:9, 148:14, 174:23, 176:16, 179:18, 194:9, 208:15, 213:3, 221:5, 228:19, 230:13, 230:14, 240:19, 253:8, 260:6, 262:23, 263:4, 263:11, 264:21, 264:22, 266:24, 271:6, 276:3, 284:22

**knew**
153:9, 153:10, 161:9, 214:9, 234:7, 279:4

**knowing**
233:10, 274:4

**knowledge**
35:9, 89:12, 150:12, 183:17, 271:21, 271:22

**knowledge"**
196:21

**knows**
11:9

**krauchun**
3:3, 4:6, 58:24, 59:11, 74:18, 75:5, 78:19, 90:1, 114:17, 115:5, 115:11, 133:5, 134:18, 141:10, 149:8, 150:7,

150:22, 151:9, 160:21, 172:4, 172:24, 173:3, 175:17, 176:19, 177:5, 177:16, 180:4, 189:17, 190:17, 192:4, 192:17, 207:18, 237:10, 239:3, 239:9, 242:5, 251:21, 255:5, 255:9, 258:10, 261:1, 261:6, 265:3, 265:6, 265:14, 265:18, 267:19, 267:22, 270:2, 278:24, 280:8, 280:16, 283:12, 283:15, 284:7, 285:9, 285:11, 288:21, 290:14, 293:16

**L**

**labeled**
198:5, 202:9, 248:5

**lack**
59:9, 174:2, 231:13, 290:21

**laid**
28:3

**land**
54:13

**language**
101:11, 102:3, 102:17, 106:2, 124:18, 126:7, 135:17, 185:23, 278:21, 279:4, 279:10

**larry**
104:20

**lasalle**
3:21

**last**
6:24, 9:24, 32:2, 49:20,

49:21, 67:10, 70:14, 92:10, 115:23, 116:3, 134:6, 178:20, 203:22, 204:21, 208:9, 211:6, 216:7, 225:14, 225:16, 228:5, 228:8, 230:5, 233:9, 237:1, 263:7, 276:20, 281:5

**late**
26:14

**later**
36:13, 99:22, 134:12

**latest**
160:5

**law**
3:4, 3:12

**lawful**
151:24, 152:3, 152:4, 152:5

**lawndale**
164:6

**lawsuit**
7:5, 87:10, 123:4, 123:8, 142:18, 168:12, 170:2, 208:3, 208:5, 208:18, 213:7, 213:23, 223:11, 223:22, 224:5, 224:10, 231:19, 241:18, 242:9, 243:12, 247:21, 248:9, 248:11, 248:13, 248:19, 249:7, 249:13, 249:15, 250:15, 257:19, 257:21, 257:24, 258:4, 258:8, 258:17

**lawsuits**
264:22

**leading**
268:19, 270:21,

Transcript of LeGrain Winston
Conducted on August 28, 2020

100

271:11, 272:14,
273:7, 274:1,
275:7, 275:23,
276:13, 277:23,
278:23, 279:7,
282:20, 283:4
**leads**
82:11
**learn**
279:3
**least**
50:5, 83:5,
229:19, 230:9,
293:5
**leave**
105:4, 210:3,
221:10
**led**
132:19, 213:8,
234:2
**left**
16:3, 16:12,
106:1, 127:3
**leg**
243:17, 243:18
**legrain**
1:5, 1:13, 2:1,
4:4, 4:15, 5:3,
6:3, 59:1,
87:18, 88:9,
94:20, 101:8,
115:18, 172:6,
207:19, 210:24,
258:13, 265:19,
267:19, 268:11
**legrain@gmail**
247:2, 247:13
**lemuel**
15:19
**lengthy**
44:4, 47:18,
93:10, 225:5
**less**
48:6, 154:8,
167:22, 219:11,
219:13, 277:21
**let's**
10:6, 14:20,

19:14, 25:19,
34:2, 36:11,
40:5, 43:2,
55:16, 55:23,
57:6, 58:2,
61:1, 65:12,
65:24, 67:4,
72:19, 85:14,
86:15, 87:12,
88:3, 90:10,
90:22, 91:1,
92:8, 94:18,
95:2, 102:5,
102:12, 103:4,
103:15, 115:8,
116:9, 119:2,
123:12, 124:8,
135:13, 135:18,
140:8, 140:9,
140:23, 142:22,
143:10, 150:12,
154:1, 157:6,
159:16, 162:21,
166:11, 166:12,
177:11, 185:12,
192:9, 192:14,
193:4, 202:1,
202:20, 202:24,
210:18, 211:14,
211:15, 211:22,
212:3, 224:17,
226:11, 231:9,
241:9, 244:14,
250:2, 255:15,
256:13, 281:20
**letter**
136:3, 136:7,
137:23
**level**
12:22, 29:22,
33:9, 35:10,
45:14, 45:23,
46:20, 144:18,
162:7, 172:22,
173:9, 228:22,
240:21, 285:6
**levels**
144:23, 144:24

**lexipol**
28:4, 28:5,
129:24, 148:23,
149:21
**lied**
104:20
**lieutenant**
34:5, 34:11,
35:19, 37:2,
51:23, 52:12,
56:19, 59:22,
60:16, 61:1,
61:2, 61:7,
62:2, 62:11,
69:22, 71:5,
76:18, 154:24,
156:3, 156:8,
157:12, 158:12,
209:11, 209:15,
217:19, 288:16,
289:3
**lieutenants**
80:18
**life**
14:14, 25:18,
230:4, 237:23
**lift**
103:23, 152:10,
153:12
**lifting**
104:1, 168:17
**liked**
24:3
**limit**
72:19
**limited**
24:10, 24:24
**line**
33:3, 138:10,
157:24, 192:16,
204:1, 272:24
**lines**
151:5, 176:10
**lineup**
21:8, 21:11,
21:23, 22:8,
22:9
**list**
59:24, 244:10,

246:4, 246:10
**listed**
31:12, 32:6,
164:3, 232:2,
250:21
**literally**
282:9
**litigation**
94:14, 112:11,
113:11, 121:3,
207:10
**little**
6:13, 9:24,
10:1, 14:10,
18:6, 23:6,
30:14, 36:12,
37:9, 40:5,
43:4, 49:18,
65:10, 65:13,
67:5, 74:21,
81:23, 83:8,
92:13, 115:9,
116:10, 117:5,
119:18, 131:18,
138:9, 143:2,
143:7, 146:9,
146:13, 154:17,
165:14, 174:20,
179:16, 179:20,
185:12, 194:8,
203:5, 203:9,
210:12, 210:15,
211:22, 224:17,
228:5, 242:15,
250:23, 254:17,
255:23, 257:1,
274:21, 277:5,
284:7
**live**
12:19, 60:9,
156:24
**llc**
3:20
**lms**
63:14, 156:13,
156:16, 156:17
**located**
39:21

Transcript of LeGrain Winston
Conducted on August 28, 2020

101

**lock**
163:9, 163:13
**locker**
11:23, 92:12,
93:14, 93:15,
93:16
**long**
10:21, 15:1,
54:4, 115:6,
168:5, 207:19,
265:20, 282:4,
282:16
**long-standing**
277:9
**longer**
9:14, 20:6,
20:19, 20:22,
84:10, 115:9,
181:2, 193:21,
213:13
**look**
10:7, 22:9,
86:23, 88:10,
108:2, 110:19,
110:22, 114:17,
116:15, 118:20,
120:14, 121:20,
123:14, 142:22,
167:17, 167:19,
167:24, 175:16,
193:20, 196:13,
196:15, 197:9,
198:7, 199:1,
201:17, 202:6,
202:17, 203:1,
204:9, 205:3,
207:2, 210:5,
218:11, 226:17,
238:15, 247:17,
247:24, 248:8,
249:9, 249:10,
249:11, 250:2,
251:14, 252:11,
253:6, 253:7,
253:18, 255:17,
260:10, 260:12,
292:17
**looked**
122:2, 158:1,

158:3, 226:16,
292:16
**looking**
192:20, 195:11,
195:14
**looks**
75:2, 119:15,
120:12, 121:6,
122:19, 137:3,
137:13, 142:22,
143:5, 182:14,
195:20, 196:11,
197:16, 201:11,
201:17, 202:16,
202:18, 202:19,
202:24, 203:4,
205:14, 205:22,
206:21, 211:23,
227:1
**lose**
192:2, 213:8
**losing**
189:3
**loss**
46:24, 92:24,
211:23, 211:24,
212:3, 212:7,
212:9, 218:9,
219:24
**lost**
42:3, 67:10,
88:7, 138:5,
216:22, 221:21,
254:13, 281:15
**lot**
18:22, 40:16,
53:14, 109:14,
109:15, 110:6,
220:20, 220:22,
259:7, 265:21,
268:2, 284:4
**lots**
284:21
**loud**
259:20
**loudermill**
233:7, 234:2,
234:3, 234:6,

234:12, 234:14,
237:8, 238:6,
239:19, 239:21
**love**
289:16
**loved**
276:9
**low**
136:18
**lucky**
97:10
**lunch**
126:23, 127:3,
130:5, 130:9,
130:10, 130:19,
130:20
**lunged**
98:1

---
**M**
---
**machine**
231:16, 245:3
**made**
37:1, 74:1,
77:7, 101:13,
101:19, 109:9,
117:17, 121:23,
122:8, 123:13,
124:21, 134:16,
134:21, 135:2,
172:1, 172:7,
173:6, 174:4,
174:13, 175:15,
185:9, 187:6,
195:19, 205:23,
208:21, 212:12,
234:24, 250:14,
253:5, 253:22,
255:1, 260:4,
260:13, 275:24
**mail**
247:8
**main**
17:14, 71:8
**major**
47:11
**make**
21:17, 30:21,

30:24, 31:6,
41:3, 67:24,
77:10, 82:6,
117:4, 160:15,
172:21, 220:5,
223:6, 223:13,
253:19, 254:16,
264:15, 268:10,
271:7, 275:20,
283:22, 284:13,
285:17, 285:24,
286:24, 287:5,
287:9, 291:3,
291:5
**maker**
215:19
**makes**
24:16, 36:16,
37:22, 46:14,
51:16, 51:22,
76:11, 80:7,
81:19, 82:20,
183:14, 183:18,
184:13, 184:20,
271:22, 277:5
**making**
82:1, 185:1,
185:4, 192:15
**man**
232:9
**management**
162:19
**mandated**
108:22
**mandation**
108:19
**manner**
94:23, 97:19,
178:10, 266:9,
286:10
**mantras**
240:20
**many**
40:14, 47:24,
50:8, 54:8,
63:10, 64:7,
68:23, 161:10,
167:18, 269:10,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                                    102

277:14, 277:18,
285:17, 285:24,
286:24, 289:20,
289:23, 290:10,
290:20, 290:23,
291:2, 291:5
**mark**
86:19, 193:4,
193:24, 194:24
**marked**
87:1, 87:4,
115:14, 115:17,
119:5, 119:8,
120:21, 120:24,
122:14, 122:17,
191:20, 192:6,
193:8, 193:11,
194:1, 194:4,
195:1, 195:4,
196:6, 196:9,
197:1, 197:4,
198:1, 198:4,
198:18, 198:21,
200:10, 200:13,
201:2, 201:5,
202:4, 204:18,
204:24, 206:18,
206:22, 210:20,
210:23
**married**
13:6
**materials**
94:9, 112:11,
113:12, 114:4,
114:6, 114:10,
205:9, 247:20,
248:3, 248:8,
248:10, 250:7,
250:12
**matter**
16:13, 95:24,
97:4, 163:16,
163:18
**matters**
94:20, 95:8,
95:9, 256:18,
257:3, 257:8,
257:14

**maybe**
38:13, 67:6,
75:2, 83:8,
86:2, 98:2,
131:1, 131:7,
180:20, 189:5,
196:3, 210:9,
222:13, 229:10,
238:2, 243:21
**mcghee**
62:1, 62:2,
143:16, 146:19,
146:22
**mean**
7:5, 27:7,
29:18, 31:18,
36:9, 38:3,
48:20, 49:13,
50:19, 51:4,
51:11, 51:13,
73:5, 95:21,
96:4, 96:5,
131:6, 146:15,
147:16, 149:22,
171:6, 180:19,
187:11, 189:3,
208:9, 220:21,
221:9, 224:1,
224:2, 225:1,
230:3, 232:1,
232:22, 234:22,
235:7, 237:6,
245:21, 245:22,
249:10, 253:21,
260:17, 268:22,
270:17, 278:4,
279:9, 286:4
**meaning**
39:17, 106:14,
140:3
**meaningful**
250:9
**means**
139:2, 220:20,
220:22, 266:22
**meant**
125:8, 125:10,
125:15, 203:8

**media**
249:22
**mediate**
32:13
**medical**
208:23, 210:3,
227:4, 229:15,
231:6, 241:13,
243:7, 243:9,
243:12, 245:13,
248:24
**medication**
227:16, 227:17,
227:20, 228:12,
228:13, 228:14,
229:3, 231:3
**medications**
227:16, 229:5,
244:7, 244:12,
244:19, 246:5,
246:12
**meet**
10:18, 43:10
**meeting**
62:5, 62:8,
62:13, 105:3,
105:14, 105:17,
258:7, 258:16,
258:19, 278:9,
278:16, 278:17
**meetings**
257:23, 258:2,
259:8, 278:11,
278:12, 278:13
**member**
44:19, 46:8,
78:11, 292:24,
293:1, 293:4
**members**
46:17, 78:5
**memo**
4:19, 4:20,
107:17, 118:20,
119:9, 119:12,
120:13, 120:24,
122:3, 122:4,
253:24, 254:2
**memorandum**
100:23, 101:2,

101:15, 129:11
**memorandums**
72:17, 72:20
**memory**
264:16
**mention**
60:16, 75:13,
124:6, 218:2
**mentioned**
18:6, 19:21,
63:11, 64:17,
71:5, 77:9,
77:10, 101:15,
162:21, 165:14,
169:5, 214:1
**mentions**
87:21, 118:20
**merit**
47:8, 47:14,
47:21, 134:6,
168:15, 168:16,
169:6, 169:8,
169:11, 170:6,
170:7, 170:21,
171:5, 171:12,
171:15, 186:24,
189:15, 189:21,
190:3, 190:4,
190:5, 208:8,
233:4, 233:6,
233:16, 233:20,
233:24, 234:1,
235:1, 235:8,
239:16, 276:16,
276:19, 276:23,
277:11, 287:16,
287:18, 287:19,
287:24, 288:17,
289:8, 289:19
**merited**
80:22
**mess**
266:19
**messages**
10:7, 249:6,
249:12, 249:14
**metaphors**
148:14

**michelle**
265:22, 283:23
**middle**
87:7, 115:6,
194:19, 198:11,
201:17, 202:21
**midwest**
3:13
**might**
17:23, 25:19,
39:1, 47:17,
48:14, 50:12,
50:13, 50:18,
65:13, 97:13,
110:7, 210:1,
214:11, 224:3,
235:5, 254:9,
254:10, 255:6,
278:14
**military-based**
29:5
**miller**
107:7, 107:8,
107:9, 107:17
**mind**
55:24, 85:18,
86:2, 92:11,
214:11, 221:3,
221:5, 253:2
**minute**
82:24, 88:7,
124:1, 192:18
**minutes**
75:6, 136:20,
265:4
**miriam**
68:15, 193:13
**misconduct**
233:16, 250:24,
251:8
**miserable**
21:17
**miss**
19:8, 213:8
**missing**
76:20, 114:13,
202:16, 255:8
**misstated**
154:14

**misstates**
149:8, 150:8,
150:22, 172:24,
180:4, 190:17,
258:10, 275:7
**mistake**
247:12, 253:20
**misunderstanding**
139:13
**misunderstood**
54:7
**mixing**
148:14
**mob**
183:10, 183:11,
185:5
**moment**
86:18, 119:1
**monday**
22:13, 22:14,
96:10, 96:24
**money**
212:12, 213:9,
218:8, 223:21,
224:5, 224:9,
224:20, 282:2
**monitoring**
17:16, 197:21
**monthly**
22:3
**more**
47:15, 48:6,
48:7, 48:16,
48:19, 55:22,
67:5, 72:17,
81:23, 83:8,
91:20, 146:2,
162:3, 163:23,
167:21, 167:23,
185:13, 207:17,
212:12, 220:6,
226:16, 228:20,
265:10, 273:22,
274:22, 277:5,
277:21, 280:18,
286:21
**morning**
6:7, 75:13,

96:9, 96:10,
116:20, 117:21,
118:1, 133:18,
160:13, 172:18,
172:23, 217:8
**most**
55:8, 56:5,
56:7, 61:9,
70:8, 71:10,
157:3, 213:4,
241:1, 269:9
**mother**
137:4, 137:7,
137:10
**motivation**
141:7
**mouth**
214:15, 291:24
**move**
45:21, 46:3,
94:18, 101:23,
124:2, 135:23,
151:21, 193:21,
258:8
**moved**
16:1, 179:1,
179:3
**moving**
115:10, 276:3
**much**
14:10, 14:13,
22:19, 72:10,
80:20, 97:4,
103:16, 114:16,
240:22, 252:16,
278:15, 293:18
**muddy**
65:13
**multiple**
34:24, 56:4,
69:11, 70:6,
70:7, 102:3,
108:20, 110:2,
110:3, 262:1,
262:2
**munchie's**
14:10
**muscle**
160:7

**muscles**
160:6
**must**
254:22, 287:4
**mutual**
45:2
**myself**
32:24, 212:18,
212:22, 277:6

---
### N
---

**n-word**
102:15, 102:21,
102:24, 110:21,
123:14, 136:8,
253:8, 254:19,
259:16, 260:24,
261:4, 261:12,
262:20, 263:1,
263:12, 264:8,
280:6, 280:13,
291:9, 291:12,
291:16, 291:22,
292:3, 292:7
**name**
6:7, 55:18,
119:19, 132:12,
134:24, 145:9,
145:10, 186:9,
187:20, 191:16,
204:1, 225:10,
275:18, 276:22,
291:21
**named**
101:8
**names**
35:17, 46:15,
78:1, 126:19,
133:24, 186:7,
186:8
**nappy**
266:19, 266:20
**narrative**
123:11, 271:18,
271:23
**nature**
209:1, 243:6
**neal**
71:9, 71:10,

71:14, 84:22,
85:15, 103:11,
104:2, 104:6,
108:10, 108:12,
108:15, 110:21,
132:12, 132:14,
132:17, 132:19,
132:23, 134:23,
134:24, 136:23,
137:7, 137:10,
137:14, 138:6,
151:23, 152:8,
172:14, 182:22,
183:10, 184:24,
185:3, 185:6,
185:13, 195:21,
203:12, 203:13,
209:19, 210:12,
214:4, 217:9,
218:4, 227:9,
240:17, 256:3,
268:13, 273:9,
273:17, 275:17
**neal's**
182:16
**necessarily**
221:9
**need**
54:8, 55:2,
55:22, 71:18,
110:5, 114:23,
126:23, 130:6,
163:14, 212:6,
217:20, 222:12,
222:19, 224:3,
226:16, 240:4,
262:3, 292:17
**needed**
64:22, 72:7,
104:19
**neighborhoods**
240:15, 275:2
**neither**
294:12
**nerves**
227:19
**nervous**
244:23

**never**
73:23, 127:2,
128:8, 129:14,
130:1, 132:9,
150:19, 155:12,
180:2, 188:24,
233:6, 234:5,
234:7, 234:10,
235:3, 237:22,
239:20, 241:5,
250:9, 257:13,
280:4, 287:23,
288:4, 288:15,
288:18, 288:19
**new**
60:8, 79:5,
80:17, 85:12,
113:7, 151:13
**next**
22:11, 29:6,
29:8, 29:22,
30:1, 30:5,
33:6, 33:9,
35:10, 38:13,
38:14, 45:8,
45:14, 45:23,
87:24, 98:20,
107:4, 126:3,
130:8, 138:15,
142:20, 154:1,
181:6, 181:20,
193:21, 212:1,
221:23, 281:3,
281:8
**nigger**
105:5, 105:11,
175:21, 254:1
**night**
58:9, 262:12
**night's**
10:17
**nightmares**
245:10
**no-no**
153:13
**nobody**
223:16
**nod**
8:16

**nodded**
157:13, 158:15,
158:16
**none**
128:11, 209:23,
249:23, 291:7
**nonfinancial**
212:2, 226:11
**nonmerited**
80:12, 80:21,
80:24, 82:17
**norm**
64:5, 65:21,
69:1, 280:15
**normal**
33:2, 243:4
**normally**
44:4
**north**
3:21, 18:15,
77:19, 77:21,
78:1, 161:16,
161:19
**northern**
1:2
**notarial**
294:17
**notary**
2:9, 294:1,
294:4, 294:23
**note**
9:18, 9:19,
9:20, 9:21,
43:18, 111:12,
111:16, 111:20,
111:23, 112:4,
112:10, 113:4
**notebook**
112:20, 112:22,
112:23, 113:2,
113:5
**notebooks**
112:4, 112:9
**noted**
111:11
**notes**
9:16, 111:21,
111:22, 200:2,

200:4, 200:6,
249:16, 249:19,
276:4
**nothing**
73:2, 73:3,
73:4, 74:6,
74:7, 89:18,
89:19, 105:7,
105:8, 106:5,
106:8, 106:12,
106:13, 107:21,
107:23, 114:12,
117:2, 129:16,
139:18, 146:19,
146:20, 146:21,
178:15, 188:15,
225:4, 238:24,
239:12, 239:13,
279:18, 279:19
**notice**
2:7, 64:4
**noticed**
227:14
**noticing**
114:14
**notification**
74:1, 190:20,
239:19, 239:20
**number**
37:6, 37:22,
48:5, 51:17,
53:12, 53:17,
54:13, 57:21,
101:1, 128:7,
129:2, 139:7,
139:8, 172:20,
221:24, 286:3
**numbered**
77:24, 198:22
**numbers**
50:18, 76:2,
126:22
**numerous**
90:11, 91:24,
101:8, 101:13

---
O
---
**oak**
3:15

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    105

**oath**
75:10, 142:9
**obey**
151:24, 152:4
**object**
133:5, 149:8,
239:7, 267:17,
268:7
**objection**
8:9, 58:24,
59:7, 59:11,
78:19, 90:1,
134:18, 141:10,
150:7, 150:22,
160:21, 172:4,
172:24, 175:17,
176:19, 177:5,
177:16, 180:4,
189:17, 190:17,
237:10, 239:3,
241:14, 251:21,
258:10, 261:1,
261:6, 268:18,
269:17, 269:24,
271:10, 272:13,
273:6, 273:11,
273:24, 275:6,
275:7, 275:22,
276:12, 277:16,
277:22, 278:22,
279:6, 281:23,
282:6, 282:17,
283:3, 285:9,
285:11, 288:21,
290:14
**objections**
4:16, 5:4,
115:18, 211:1,
268:11, 268:23,
269:5, 270:6,
270:15, 270:20,
271:16, 272:2,
272:8, 272:20,
273:15, 273:19,
279:15, 283:9
**obligations**
29:14
**obtaining**
287:21

**obviously**
96:7
**occasion**
97:22
**occasions**
90:11
**occur**
95:3, 103:17,
103:20, 163:3,
165:2, 188:3,
280:24
**occurred**
63:8, 73:12,
85:9, 95:4,
103:21, 116:22,
136:14, 187:24,
263:19, 263:24
**october**
294:20
**odd**
179:16, 179:18,
179:20, 237:4
**offense**
134:17, 134:22,
135:4, 172:3,
172:9, 282:15
**offensive**
111:17, 135:16
**offered**
104:19, 104:21,
152:15, 281:12
**offhand**
89:2
**office**
7:10, 13:14,
13:17, 13:22,
14:8, 14:21,
15:5, 19:10,
19:11, 19:23,
23:2, 23:3,
23:7, 24:1,
24:14, 25:7,
26:22, 27:2,
27:13, 27:16,
30:8, 35:11,
39:11, 41:20,
46:15, 46:18,
47:8, 57:5,

57:6, 57:7,
57:8, 57:10,
63:21, 86:9,
95:5, 95:6,
98:21, 98:22,
99:24, 100:1,
100:3, 151:18,
164:8, 177:3,
177:13, 197:6,
200:16, 215:21,
224:22, 224:24,
225:18, 235:20,
248:23, 264:7,
266:14
**office's**
31:14
**officer**
15:15, 49:4,
60:24, 76:7,
128:5, 294:6
**officers**
129:18, 201:23,
236:2, 250:6,
250:20, 251:1,
251:8
**oftentimes**
96:8
**oh**
61:4, 71:24,
108:10, 118:10,
124:14, 129:7,
137:9, 137:11,
137:23, 152:6,
177:22, 179:10,
191:11, 198:13,
202:14, 229:21,
231:9, 233:2,
247:12, 255:22,
256:13, 268:12,
276:23, 280:18,
283:14
**old**
52:18, 79:6,
81:8, 83:1,
83:11, 84:15,
113:8, 240:9
**omeprazole**
244:24, 245:1

**omissions**
173:13, 173:21
**omni**
249:17
**once**
43:21, 55:11,
69:1, 70:6,
72:5, 160:4,
220:6, 224:15
**ones**
19:21, 54:16,
71:8, 94:12,
101:14, 101:19,
186:5, 186:7,
268:14, 269:8
**ongoing**
166:2, 178:18,
178:20, 246:1,
246:3
**online**
156:21, 156:22
**only**
8:14, 8:19,
12:16, 14:13,
22:17, 49:14,
111:4, 157:11,
158:7, 158:11,
163:21, 171:14,
214:8, 228:12,
230:3, 232:7,
238:19, 244:20,
247:14, 254:6,
255:21, 259:15,
259:17, 266:3
**open**
217:13, 217:24
**operating**
96:14
**operation**
185:10
**opinion**
179:19, 236:14
**opportunities**
272:12
**opportunity**
41:2, 206:20,
250:9
**opposed**
271:5

Transcript of LeGrain Winston
Conducted on August 28, 2020

106

**opr**
30:6, 30:7,
30:11, 30:21,
31:10, 31:16,
31:19, 32:3,
32:11, 32:15,
33:12, 33:18,
37:5, 37:11,
37:19, 37:22,
61:11, 67:20,
67:22, 67:24,
68:15, 68:17,
69:5, 89:5,
98:24, 100:24,
101:3, 101:16,
121:15, 126:4,
127:21, 129:2,
129:7, 147:5,
147:23, 148:2,
149:3, 149:15,
150:19, 151:10,
151:11, 151:12,
169:21, 170:6,
170:16, 172:12,
172:19, 173:6,
173:9, 174:3,
174:23, 178:2,
178:11, 193:18,
199:14, 199:19,
259:24, 260:2,
260:3, 262:24,
271:7, 271:22,
285:4, 285:7,
285:17, 286:1,
287:1, 287:6,
287:10, 291:2,
291:5
**opr's**
272:6
**option**
41:6, 45:5,
45:6
**optional**
31:23, 32:7
**options**
46:21, 73:6
**oral**
8:14

**order**
55:20, 60:22,
108:4, 152:1,
152:2, 152:5,
152:10, 152:20,
153:11, 153:18,
170:12, 218:12,
220:2, 281:14
**ordered**
119:17, 153:12
**ordering**
119:19
**orders**
28:8, 28:9,
28:11, 39:22,
40:1
**original**
16:11
**originally**
26:8, 165:8
**others**
94:11, 191:16,
193:5
**otherwise**
294:15
**out**
6:15, 16:6,
17:22, 21:6,
28:3, 29:12,
43:13, 45:3,
45:5, 48:17,
63:5, 77:16,
92:11, 97:8,
98:5, 104:6,
105:4, 111:8,
113:3, 113:4,
126:17, 126:19,
126:20, 127:9,
129:17, 131:8,
139:11, 140:24,
157:11, 158:11,
159:16, 169:2,
171:7, 177:2,
179:1, 179:3,
192:18, 196:2,
196:4, 211:21,
213:8, 221:8,
221:10, 223:21,

224:4, 229:12,
233:8, 239:1,
241:7, 266:15,
268:24, 271:13,
274:5, 278:1,
282:14, 282:21,
283:1, 289:6,
289:7, 289:9,
289:11, 289:14,
291:24
**outcome**
72:24, 73:3,
234:9, 235:1,
239:16, 294:15
**outcomes**
45:16, 46:2
**outside**
35:11, 86:9,
95:6, 155:24,
292:11, 293:6
**over**
10:13, 17:2,
18:10, 21:18,
35:10, 43:2,
48:8, 65:12,
69:16, 69:17,
69:18, 85:6,
94:12, 105:3,
107:10, 107:12,
108:22, 109:20,
113:14, 113:18,
114:4, 146:9,
146:14, 146:16,
151:15, 152:19,
158:1, 158:3,
172:20, 181:9,
181:11, 200:2,
206:17, 218:21,
226:19, 228:2,
228:3, 228:5,
230:15, 232:22,
254:3, 260:10,
262:16, 267:15,
270:24, 276:4,
287:3, 292:4
**overheard**
155:5, 155:7,
279:23

**overtime**
96:17, 108:19,
108:20, 138:22,
152:9, 153:12,
194:14, 194:16,
195:22
**overview**
208:4

**P**

**pad**
9:18, 9:19,
9:20, 9:21,
111:21
**page**
4:4, 4:12,
87:7, 87:13,
87:18, 87:24,
88:7, 101:23,
115:23, 115:24,
116:9, 117:6,
135:24, 138:15,
142:12, 142:13,
142:21, 143:6,
151:5, 154:1,
157:4, 157:5,
173:19, 176:10,
182:8, 192:8,
192:22, 194:19,
196:15, 198:12,
199:4, 201:14,
201:15, 202:16,
202:17, 202:18,
202:22, 203:22,
205:14, 205:19,
211:6, 211:8,
211:15, 212:1,
221:18, 221:20,
221:24, 226:14,
246:20, 256:14
**pages**
1:23, 195:5,
195:9, 205:4
**paid**
128:9, 128:18,
131:19, 132:9,
223:21, 224:7,
224:9, 237:1,

278:5, 278:6
**pandemic**
7:19
**paper**
112:24
**paperwork**
29:21, 29:24,
262:2
**paragraph**
87:21, 88:1,
88:3, 90:10,
94:18, 94:23,
99:16, 101:7,
102:6, 102:12,
102:13, 108:5,
109:7, 119:16,
120:8, 121:7,
122:9, 123:10,
143:10, 226:17,
254:17
**paragraphs**
121:24
**paramilitary**
33:5, 60:21,
60:24
**parked**
139:6
**part**
10:1, 31:12,
32:2, 59:9,
67:3, 139:13,
143:13, 147:9,
168:11, 180:13,
180:15, 181:15,
185:5, 185:16,
185:17, 186:23,
215:5, 216:7,
229:19, 230:9,
281:5
**part-time**
14:9, 225:3,
225:6
**participants**
110:6
**participate**
31:16, 31:18,
32:8, 32:9
**particular**
87:18, 96:1,

123:21, 161:13,
161:24, 162:2,
293:11
**particulars**
125:1, 186:20
**parties**
46:16, 294:14
**partner**
11:18, 139:6,
159:17, 159:18,
163:13
**parts**
18:14
**party**
264:21
**pass**
93:3, 278:14
**passed**
92:15, 92:22,
93:1, 93:6,
230:6
**passing**
11:18, 92:21,
230:11, 279:17
**past**
6:12, 76:21,
166:10, 244:3
**paths**
43:20
**patience**
265:19
**patrol**
17:14, 17:15,
18:6, 18:13,
18:18, 19:5,
19:22, 20:17,
22:17, 23:6,
23:12, 23:16,
23:18, 23:20,
24:3, 24:7,
24:17, 25:13,
25:14, 25:16,
26:24, 27:10,
27:12, 49:4,
50:17, 51:2,
51:3, 51:8,
53:13, 59:10,
76:7, 76:8,

153:10, 159:5,
159:7, 159:12,
159:17, 159:19,
159:20, 159:22,
159:23, 159:24,
162:9, 164:10,
240:15, 274:22,
290:22, 291:3,
291:6
**patrolling**
154:7, 159:8,
159:11, 159:14
**paula**
1:24, 2:7, 8:4,
67:9, 114:23,
151:2, 176:7,
207:19, 207:21,
215:8, 216:22,
264:10, 280:9,
284:14, 293:20,
294:3
**paula's**
21:17
**pay**
170:13, 218:16,
218:20, 218:21,
218:24, 219:6,
219:8, 220:15,
230:22, 236:6,
237:20, 238:5
**paying**
224:4
**payroll**
240:10
**pays**
218:10
**pen**
113:8
**penalty**
116:4, 211:11
**pending**
8:21, 47:12,
134:7, 169:21,
170:7, 193:18,
215:12, 233:19,
234:9, 235:1,
237:2, 239:16,
264:12, 276:16,

276:17, 280:10,
282:15, 287:14
**pension**
218:12, 218:15,
235:22, 236:6,
236:9, 236:10,
236:12, 236:14,
236:16, 236:18,
236:20, 236:22,
238:15, 278:8
**people**
24:20, 37:10,
46:12, 52:2,
52:3, 52:4,
81:20, 91:12,
109:15, 126:17,
126:19, 128:19,
207:16, 210:5,
259:7, 276:21,
277:10, 280:5,
280:11, 284:22,
291:14, 291:19
**percent**
238:11, 238:13,
238:15, 238:20,
240:3, 277:20,
277:21, 278:1
**percentage**
277:20, 277:24
**perfect**
75:5, 121:21,
143:3, 265:6
**performing**
18:9
**perhaps**
114:13
**period**
14:13, 18:3,
26:13, 165:13,
225:5, 227:14,
227:24, 292:4,
292:5
**periodically**
30:16, 111:15,
161:12, 188:6,
188:10
**perjury**
116:4, 211:11

Transcript of LeGrain Winston
Conducted on August 28, 2020

108

| | | | |
|---|---|---|---|
| **perkins** 205:22, 292:19, 292:23, 293:8 | **planning** 220:16 | 164:14, 164:15, 165:12, 191:4, 236:4 |
| **permanently"** 197:21 | **physically** 22:8 | **please** 8:1, 9:1, 86:20, 116:9, 120:1, 124:2, 151:8, 193:7, 215:11, 233:2, 254:14, 255:7, 255:18, 255:20, 256:13, 264:11 | **polish** 110:7 |

perkins
205:22, 292:19,
292:23, 293:8
permanently"
197:21
perpetual
170:9
person
29:1, 29:6,
30:1, 30:5,
33:7, 51:12,
55:24, 85:6,
85:7, 128:6,
128:11, 131:16,
148:4, 148:13,
256:17, 271:1,
279:9, 286:13
personal
148:5, 213:18,
213:20, 246:22,
247:14
personally
73:18, 215:20,
270:9
personnel
272:18
persons
256:11
perspective
73:18
pertain
259:9
pertaining
174:11
phone
10:7, 85:6,
111:21, 111:22,
111:23, 112:10,
112:17, 113:3,
113:7, 113:22,
114:5, 138:8,
249:2, 249:3,
249:4, 249:11,
249:17, 249:19
phrase
171:7
physical
43:13, 112:23,

113:4
physically
22:8
physician
226:21
picking
275:3
pizza
14:10, 22:10
place
16:11, 22:10,
22:14, 57:4,
61:10, 61:20,
63:2, 68:12,
71:23, 99:23,
104:7, 105:15,
146:6, 152:11,
237:22, 254:6,
276:4, 276:5
placed
16:5, 17:15,
58:8, 69:9,
69:12, 70:14
placement
72:9
places
16:9
placing
119:20
plaintiff
4:15, 5:3,
88:9, 94:19,
101:8, 115:18,
210:24
plaintiffs
1:6, 3:2,
11:15, 102:3,
102:15, 174:4,
174:7, 174:13,
182:13, 185:22,
248:19, 257:14,
258:3, 258:6,
258:15, 258:16,
265:17, 278:10,
278:12, 278:18
plan
170:11
planned
240:8

planning
220:16
please
8:1, 9:1,
86:20, 116:9,
120:1, 124:2,
151:8, 193:7,
215:11, 233:2,
254:14, 255:7,
255:18, 255:20,
256:13, 264:11
plenty
216:14
plug
136:17
point
20:5, 20:18,
26:12, 29:13,
56:23, 72:18,
110:18, 114:15,
149:14, 157:21,
178:19, 185:11,
189:23, 213:10,
228:23, 234:18,
250:11
pointed
98:1
pointing
176:17, 250:7
police
16:16, 16:17
policies
28:5, 28:7,
31:15, 182:11
policy
27:16, 27:20,
28:1, 28:3,
38:2, 39:11,
39:15, 39:21,
43:6, 62:22,
129:20, 129:24,
146:6, 147:3,
147:6, 148:22,
148:23, 149:21,
149:23, 149:24,
151:16, 151:19,
162:12, 164:9,
164:11, 164:12,

164:14, 164:15,
165:12, 191:4,
236:4
polish
110:7
pop
86:23
portion
149:24
position
16:2, 17:4,
17:7, 19:18,
23:16, 25:2,
79:4, 79:9,
79:18, 79:24,
80:10, 80:19,
80:21, 80:24,
82:17, 82:21,
83:4, 83:20,
84:19, 86:2,
147:22, 148:9,
163:12, 212:13,
213:13, 218:10,
218:11, 218:17,
218:18, 218:19,
219:5, 219:10,
219:13, 220:9,
220:11, 220:12,
232:14
positions
19:1, 19:3,
19:4, 19:5,
25:11, 27:5,
35:17, 79:2,
79:8, 79:10,
79:24, 81:10,
83:16, 213:21,
213:24, 214:7,
214:14, 214:22,
215:18, 216:2,
216:6, 216:10,
216:13, 217:3,
217:13, 217:23,
218:3, 218:24,
219:22, 256:10,
277:15, 288:14,
288:16, 288:20
possible
18:3, 47:13,

Transcript of LeGrain Winston
Conducted on August 28, 2020                          109

89:24, 177:19,
177:23, 252:15
**possibly**
7:1, 7:3, 16:6,
20:18, 30:19,
38:13, 38:15,
50:17, 50:22,
51:10, 51:11,
51:12, 66:21,
90:9, 90:19,
108:3, 125:11,
153:15, 237:18,
238:3, 260:14,
260:16, 270:8,
279:23
**potential**
45:16, 46:2
**potentially**
45:18, 252:17,
283:2
**power**
192:2
**practices**
182:12
**predominant**
23:11
**predominantly**
23:5
**prepare**
10:11, 22:5
**prescribed**
227:18, 229:3,
229:12, 231:3,
244:13, 244:15
**prescription**
229:8
**present**
4:1, 13:22,
17:10, 57:11,
61:22, 76:21,
76:23, 76:24,
100:18, 104:12,
126:1, 222:1,
222:8, 258:1,
267:1, 278:18
**presented**
44:16, 204:5
**presents**
44:17

**pressure**
227:1, 227:15,
228:11, 228:21,
229:5, 241:23,
242:21, 243:3,
244:19
**presumably**
11:9, 39:5,
41:8, 45:5,
45:9, 46:1,
97:13, 129:16,
251:12
**presuming**
201:10
**pretried**
277:4
**pretty**
14:10, 14:13,
22:6, 22:19,
24:15, 49:8,
49:22, 72:10,
145:2, 158:4,
240:11, 265:2,
278:15
**prevent**
214:21, 215:3,
215:17, 216:1,
272:11, 272:18,
287:20, 289:8
**prevented**
213:22, 214:13,
214:17, 272:24,
273:5, 287:12,
289:5
**preventing**
182:17, 182:23,
183:7, 216:5,
216:9, 222:16,
238:24, 239:13,
289:14
**previous**
58:9, 101:1,
101:2, 128:24,
129:5, 186:17
**previously**
18:13, 49:3,
77:18, 77:23,
77:24, 80:2,

80:3, 80:9,
95:22, 96:13,
125:18, 131:12,
143:20
**pride**
277:6
**primarily**
49:4
**primary**
200:20, 226:21
**princeton**
12:20
**prior**
35:18, 35:20,
55:6, 61:11,
77:1, 129:6,
187:7, 187:9,
228:11, 240:7,
241:11, 241:17,
244:21, 258:11,
275:7
**probably**
10:23, 12:2,
20:14, 46:22,
47:12, 48:7,
61:11, 62:20,
62:23, 73:20,
86:8, 149:1,
161:9, 173:17,
175:23, 223:5,
224:15, 225:7,
228:2, 228:5,
228:7, 229:10,
231:2
**problem**
18:4, 30:15,
48:23, 114:7,
242:9
**problematic**
275:10
**problems**
227:19, 240:21,
269:9
**procedure**
96:14, 182:15,
182:17, 182:23,
183:7, 273:4
**procedures**
186:15, 272:23

**proceeded**
105:4
**process**
36:12, 41:1,
41:22, 42:6,
42:13, 42:15,
42:16, 43:4,
43:7, 44:4,
47:9, 62:12,
73:24, 79:23,
82:10, 82:11,
82:13, 82:16,
135:5, 147:5,
182:15, 182:16,
182:22, 183:6,
185:14, 185:16,
185:17, 272:23,
273:4, 282:16,
283:2, 290:7,
292:10
**produced**
74:16, 94:13,
114:12, 119:10,
121:2, 192:9,
207:1, 207:10,
248:4
**production**
50:22, 51:1,
51:3, 74:16,
114:14
**productive**
54:2
**productivity**
54:4, 54:6,
58:9, 58:22,
59:10, 60:13,
62:22, 66:6,
69:24, 71:4
**professional**
2:8, 24:13,
30:8, 72:6,
200:16, 227:5,
245:13, 277:7
**professionalism**
277:8
**program**
18:22, 28:6
**progression**
39:17

Transcript of LeGrain Winston
Conducted on August 28, 2020

110

progressive
38:1, 38:4,
38:7, 38:10,
38:22, 39:9,
39:11, 42:22
prohibited
58:21, 59:8,
59:15
prohibits
150:2
projects
240:23
promote
183:3, 215:1,
278:2
promoted
79:18, 79:19,
79:23, 80:14,
80:19, 81:9,
81:12, 81:13,
81:20, 81:22,
170:8, 177:9,
180:20, 183:2,
183:3, 183:4,
183:8, 183:11,
183:14, 183:22,
183:24, 184:17,
184:19, 208:22,
212:11, 212:14,
214:5, 214:6,
214:12, 214:13,
214:17, 214:22,
214:23, 215:4,
215:17, 215:21,
216:1, 216:6,
216:9, 216:12,
217:2, 217:5,
217:15, 218:5,
218:6, 219:22,
220:10, 277:15,
283:8, 287:17,
287:24, 288:5,
292:13
promotion
170:11, 184:9,
215:1, 217:10,
272:19, 283:6,
287:13, 288:7,

288:8, 288:11,
290:16
promotional
272:11
promotions
83:13, 182:19,
183:1, 183:18,
183:20, 184:14,
185:1, 185:4,
185:15, 211:24,
212:4, 212:8,
212:10, 213:1,
213:6, 213:8,
218:9, 272:24,
273:5, 287:20,
289:21, 289:24,
290:11
proper
29:21, 72:8,
140:4
properly
42:13, 153:14,
250:19, 251:1,
251:9
protocol
72:8
provide
9:23, 10:3,
10:8, 103:15,
114:1, 222:6,
222:20, 226:8,
232:10, 247:7
provided
162:23, 163:1,
163:8, 248:2,
250:9, 290:21
providers
248:24
providing
164:9, 222:16
provision
151:18
psychiatrists
230:18
psychologists
230:18
public
2:9, 294:1,

294:5, 294:23
pull
86:22, 119:4,
119:24, 120:19,
121:18, 122:13,
142:12, 191:18,
193:6, 193:23,
194:23, 196:5,
196:24, 197:24,
198:17, 200:8,
200:24, 202:2,
204:16, 206:16,
210:19, 230:14,
253:14, 254:12,
255:16, 292:17
pulled
160:5, 160:6
pumps
136:23
punish
71:19, 72:7
punished
64:20, 64:22,
65:15, 65:23,
71:21, 71:22,
72:6, 170:14
punishing
72:10
punishment
53:24, 64:4,
64:16, 64:18,
70:1, 71:4,
71:16, 71:17,
72:9, 72:13,
72:22
purpose
17:14, 40:7,
41:1, 62:5, 62:6
pursuant
2:7
push
115:8
pushed
140:2
put
16:22, 78:5,
98:15, 136:4,
168:15, 191:9

putting
168:17

Q

qualified
212:23, 236:20
question
7:23, 8:1, 8:9,
8:11, 8:12,
8:20, 8:21,
8:24, 9:3, 9:4,
22:15, 48:22,
54:24, 59:6,
59:14, 67:10,
67:12, 81:23,
116:11, 117:14,
118:9, 118:12,
120:2, 120:4,
121:20, 123:1,
124:3, 124:4,
128:24, 132:22,
134:20, 135:13,
135:14, 141:15,
142:18, 148:21,
150:13, 151:3,
151:4, 159:6,
171:8, 172:16,
173:4, 175:24,
176:2, 176:5,
176:8, 176:9,
177:8, 179:8,
179:22, 180:14,
181:17, 182:2,
184:1, 185:8,
190:7, 190:8,
215:8, 215:12,
216:24, 217:1,
224:2, 237:13,
242:1, 244:2,
248:7, 251:23,
256:1, 256:19,
256:20, 256:21,
256:24, 261:16,
261:18, 261:21,
262:6, 262:11,
262:17, 264:11,
264:12, 269:1,
269:23, 270:5,

Transcript of LeGrain Winston
Conducted on August 28, 2020                      111

270:14, 270:18,
271:1, 271:4,
272:15, 273:16,
280:10, 285:21,
285:23, 286:7,
286:23, 287:5
**questioning**
273:1, 274:6,
274:23
**questions**
192:21, 195:8,
221:15, 222:7,
236:18, 242:14,
242:17, 262:4,
265:10, 265:12,
265:20, 268:3,
269:10, 269:14,
269:15, 269:19,
272:22, 274:4,
285:18, 285:19,
286:2, 286:8,
286:9, 286:20,
286:22, 287:8,
289:13, 293:15
**quetsch**
1:24, 2:7,
294:3
**quick**
67:6, 145:2,
265:1, 280:17,
283:18
**quickly**
265:2
**quieter**
284:4
**quite**
20:10, 20:17,
23:8, 32:10,
34:7, 53:15,
61:4, 69:8,
70:10, 70:24,
71:1, 71:12,
72:16, 93:23,
133:23, 140:22,
144:23, 172:10,
208:10, 222:23,
267:4, 274:4,
286:3

**quota**
54:6, 54:10,
55:13, 55:14,
58:13
**quote**
99:18, 106:12,
120:9, 121:8,
252:6, 254:18

---

R

**race**
182:14
**racist**
102:16, 109:8,
109:9, 110:15,
110:24, 135:17,
266:8, 278:21,
279:4
**radio**
139:2, 139:3,
143:17, 287:16
**raise**
95:12
**range**
54:5, 219:19
**rank**
84:10
**ranked**
35:4
**ranzino**
70:4, 70:20,
88:8, 89:20,
90:11, 90:17,
90:22, 91:1,
91:22, 94:1,
103:3, 103:6,
103:7, 104:3,
104:13, 104:16,
108:14, 110:20,
110:21, 110:23,
116:14, 117:16,
136:9, 137:11,
145:1, 175:4,
177:1, 177:11,
178:3, 178:24,
179:11, 179:24,
180:11, 180:18,
181:18, 181:21,

182:16, 182:22,
183:9, 183:12,
184:24, 185:3,
185:6, 185:13,
196:12, 197:8,
197:20, 198:7,
198:24, 199:15,
209:20, 210:4,
227:9, 240:17,
256:3, 259:16,
260:13, 260:24,
261:4, 261:11,
262:19, 263:1,
263:5, 263:11,
264:7, 268:13,
273:9, 273:17,
274:5, 274:8,
274:12, 275:17,
278:21, 279:5,
280:5, 280:13,
291:9, 291:15,
292:2
**ranzino's**
110:19, 181:6,
251:14, 252:11
**rd**
122:23, 139:12
**reach**
32:11, 45:2,
151:12
**reached**
108:22, 135:23,
151:15, 239:24
**reaching**
239:1
**read**
67:9, 67:12,
82:10, 151:2,
151:4, 176:7,
176:9, 194:9,
194:11, 215:10,
215:12, 217:1,
264:11, 264:12,
280:9, 280:10
**readable**
101:24
**reading**
152:6, 174:8,

256:21, 294:11
**ready**
195:15
**real**
111:9, 124:17,
125:5, 125:9,
125:17, 280:17
**reality**
236:24
**realize**
206:15
**realized**
179:11
**really**
16:13, 80:8,
89:22, 125:16,
139:3, 179:14,
179:15, 179:17,
185:7, 187:13,
219:21, 232:20,
242:13, 276:1
**reask**
279:1
**reason**
9:7, 18:1,
25:11, 27:1,
53:19, 58:8,
61:3, 113:16,
114:3, 204:5,
204:12, 241:24,
242:4, 247:3,
247:6, 256:20,
284:4
**reasons**
14:19, 40:16,
53:21, 142:2
**reassigned**
235:10
**recall**
65:18, 66:3,
68:10, 69:23,
70:21, 71:2,
72:21, 72:23,
72:24, 73:11,
75:23, 86:11,
89:18, 98:9,
98:10, 103:17,
103:19, 107:3,

111:10, 120:18,
122:11, 133:24,
167:4, 167:7,
167:9, 167:10,
167:16, 167:20,
167:21, 168:8,
199:14, 199:24,
200:7, 200:21,
206:12, 206:14,
217:11, 224:4,
224:8, 225:4,
225:12, 225:13,
253:16, 253:18,
258:18, 258:19,
258:20, 258:22,
258:23, 259:1,
259:2, 259:6,
259:9, 260:9,
261:11, 263:16,
266:6, 267:9,
267:12, 274:6,
279:13, 285:1,
291:1
**recalled**
116:13
**receive**
36:7, 37:17,
38:17, 47:3,
134:1, 152:14,
152:16, 152:22,
153:2, 166:22,
170:11, 170:13,
176:24, 177:1,
185:21, 185:23,
186:2, 186:4,
186:13, 187:8,
187:19, 190:10,
190:14, 191:5,
191:13, 191:14,
235:22, 236:15,
241:1
**received**
31:20, 103:22,
114:9, 131:20,
142:16, 144:6,
152:13, 165:24,
166:4, 166:14,
166:17, 167:6,

171:10, 171:11,
189:24, 190:1,
190:13, 190:20,
190:23, 224:19,
224:23, 225:17,
234:10, 235:3,
239:20, 287:12
**receives**
37:1
**receiving**
167:4, 213:22,
224:19, 287:12
**recent**
55:8, 61:9,
70:8
**recently**
49:22, 50:5,
56:5, 56:7,
71:10, 166:9
**recess**
75:7, 142:5,
265:7
**recognize**
192:10, 192:12,
194:6, 205:2,
205:6, 207:5
**recollection**
68:21, 69:3,
85:1, 85:9,
89:3, 89:6,
90:6, 91:21,
93:22, 94:4,
136:13, 206:3,
253:12, 260:1,
261:17, 262:7,
262:18, 262:22,
263:3, 263:10,
264:5
**recollections**
68:23
**recommendation**
271:23
**recommendations**
271:8, 272:6
**reconcile**
287:4
**record**
8:5, 74:15,

75:9, 114:9,
142:6, 191:24,
258:12, 282:11,
282:15, 293:22,
294:8
**records**
229:15, 231:7
**recoup**
46:24
**recuse**
149:19
**reduced**
203:16, 203:19,
203:20, 294:10
**refer**
49:1, 113:22
**reference**
70:22, 120:12,
121:7, 123:12,
254:18
**referenced**
137:4, 176:18,
256:18, 257:4,
257:9
**references**
117:17, 136:8,
138:16
**referred**
75:18, 90:11,
90:17, 91:22
**referring**
18:24, 38:19,
69:7, 88:10,
91:5, 96:20,
108:9, 110:23,
119:12, 125:4,
126:9, 126:15,
127:15, 165:13,
174:17, 200:5,
208:12, 254:9,
254:10, 275:16
**refers**
76:5
**reflect**
278:8
**refresh**
136:12, 206:2,
253:12

**refuse**
204:6, 204:13,
204:15
**refused**
104:24, 153:17,
203:24
**refusing**
242:17, 242:18
**regain**
281:14, 282:2
**regarding**
37:22, 39:11,
42:24, 76:11,
83:1, 94:1,
100:21, 101:9,
101:19, 107:4,
109:18, 110:10,
110:12, 116:22,
117:9, 119:12,
121:23, 122:9,
137:21, 138:21,
140:10, 140:17,
164:9, 174:6,
185:14, 194:14,
197:8, 199:15,
217:10, 224:2,
229:15, 248:13,
248:19, 250:14,
252:10, 256:18,
257:3, 257:8,
260:24, 261:5,
262:19, 262:24,
263:11, 285:2,
285:4, 285:18,
286:1, 287:6,
290:21
**regardless**
162:6
**regards**
88:24, 139:16,
166:7, 208:23,
241:21, 248:1
**regime**
209:12
**register**
196:11
**registered**
2:8, 129:1

**registers**
94:1
**registration**
89:8
**regular**
9:19, 152:12
**regularly**
102:14, 108:7
**reimbursed**
224:14
**reimbursements**
224:20
**reincarcerate**
17:23
**reincarcerating**
275:2
**reincarceration**
164:18, 165:11
**reject**
45:17
**rejected**
45:20, 46:2,
46:3, 46:20,
47:2, 73:9,
73:21, 73:22,
139:24, 144:17
**related**
64:24, 72:12,
72:21, 73:12,
99:4, 99:13,
112:11, 113:10,
114:6, 118:22,
123:21, 132:20,
134:1, 138:7,
141:3, 144:6,
147:23, 149:3,
149:6, 152:13,
152:17, 165:19,
166:14, 171:15,
171:22, 190:11,
191:1, 191:4,
195:20, 196:12,
198:6, 198:23,
198:24, 201:16,
201:22, 202:14,
205:9, 205:10,
223:21, 224:5,
224:10, 227:6,

231:7, 238:8,
239:14, 240:14,
240:16, 243:22,
248:8, 248:10,
249:7, 252:1,
260:11, 263:5,
294:13
**relationship**
231:11, 232:4
**relax**
92:19
**release**
231:5, 231:6
**released**
130:2
**releases**
129:22, 130:1
**relevant**
102:2, 117:3,
118:6, 120:17,
255:10
**relies**
272:5
**rely**
277:11
**remedy**
40:9, 73:15,
73:19, 170:6
**remember**
68:10, 70:13,
71:14, 86:3,
86:12, 89:1,
92:9, 92:10,
92:17, 93:3,
93:4, 93:5,
95:17, 98:4,
109:6, 145:17,
168:3, 173:16,
199:18, 217:7,
217:8, 259:5,
260:3, 272:24,
274:3, 274:23,
275:5, 280:8,
280:23, 292:18,
292:21
**remind**
21:16, 144:12
**removed**
175:4, 175:7,

177:12, 180:11,
197:20
**rentas**
68:15, 100:24,
193:14
**rep**
62:15, 238:5,
239:14
**repeat**
30:13, 34:18,
34:19, 173:4,
174:15, 180:15,
185:2, 263:7,
264:9, 267:10,
269:1, 279:2
**replace**
113:8
**report**
29:9, 32:23,
33:1, 121:14,
205:23
**reported**
1:24, 29:13,
97:24, 127:5
**reporter**
2:8, 2:9,
66:23, 67:12,
115:1, 151:4,
176:9, 207:22,
215:9, 217:1,
262:15, 267:24,
284:15, 294:1,
294:4
**reporting**
197:18, 197:19,
201:18
**represent**
239:1, 253:21
**representation**
187:13
**representative**
237:7
**represents**
238:6
**reprimand**
38:14, 38:18,
39:1, 47:21
**reps**
239:1

**reputation**
277:9
**request**
161:24, 162:2,
162:8, 163:7,
163:9, 163:11,
211:16, 247:20
**requested**
216:14, 294:12
**requesting**
197:20
**requests**
114:20, 248:3
**require**
163:23, 164:1
**required**
32:9, 63:15,
156:15, 164:17,
164:19, 275:4
**requirement**
55:19, 55:21,
56:17, 56:24,
57:20, 60:12
**reserve**
222:3
**reserved**
47:15, 162:18
**residence**
17:22
**residences**
24:20
**resolved**
45:12, 281:7
**resources**
30:24, 174:4,
198:24
**respond**
8:15, 31:16,
270:5, 284:17
**responded**
250:6
**response**
33:13, 65:8,
98:17, 100:12,
106:8, 106:11,
106:12, 116:22,
117:1, 117:14,
118:5, 118:10,

118:24, 120:17,
121:21, 124:3,
124:8, 124:9,
135:18, 142:20,
142:23, 178:17,
179:7, 182:5,
247:4, 255:17,
283:11, 284:24
**responses**
12:17, 120:4,
174:1, 208:13,
251:4, 256:5,
256:8, 285:18
**responsibilities**
31:13
**responsible**
172:19
**responsive**
112:11, 114:12,
114:20, 247:20
**rest**
246:9
**result**
39:6, 58:22,
64:11, 107:19,
208:18, 211:20,
212:9, 213:22,
223:10, 245:15,
246:16, 252:24
**resulted**
173:14, 173:21,
174:23
**results**
252:21
**retaliated**
171:21
**retaliating**
209:6, 209:15
**retaliation**
27:17, 27:23,
27:24, 28:16,
29:3, 30:11,
30:20, 30:22,
31:15, 31:21,
32:16, 32:20,
146:2, 147:8,
147:10, 148:24,
150:1, 150:2,

150:6, 150:21,
151:19, 170:1,
170:3, 170:15,
208:20, 209:3
**retaliator**
33:8
**retire**
170:12, 218:14,
220:6, 220:17,
220:18, 220:23,
236:21, 238:22
**retired**
71:13, 220:19
**retirement**
220:3, 221:1,
235:16, 235:19,
237:9, 238:10,
239:15, 239:22,
239:24, 278:8
**retiring**
220:16, 221:4,
240:8
**retroactively**
47:5
**returned**
73:23, 73:24,
265:9
**returns**
225:23, 226:3
**review**
28:7, 30:8,
112:9, 112:12,
113:10, 117:1,
142:23, 182:9,
200:16, 231:7,
247:19, 254:11,
255:4, 261:8,
261:9
**reviewed**
12:16, 114:11,
207:3
**reviewing**
261:10
**revisit**
159:3
**rico**
127:17, 171:19,
192:23

**right-hand**
194:5, 248:6
**road**
3:13
**rockwell**
95:4, 104:11,
139:5, 155:24
**rohloff**
56:1, 56:2,
56:16, 56:18,
56:21, 56:24,
58:4, 58:6,
58:7, 59:20,
59:21, 60:1,
60:18, 62:19,
69:22, 90:20,
108:14, 110:23,
117:17, 145:1,
185:1, 185:3,
185:13, 209:20,
210:1, 227:9,
240:17, 256:3,
273:9, 273:17
**role**
27:11, 27:12,
149:5, 184:24,
185:2, 185:3,
185:13, 216:5,
216:9
**roll**
88:8, 89:20,
90:7, 90:19,
92:14, 92:15,
92:17, 93:17,
109:12, 181:6,
181:20, 181:21,
259:8, 266:12,
266:16, 267:3,
269:16, 269:19,
270:14, 274:9,
274:13, 274:16,
274:19, 283:24,
284:9, 285:20,
286:2, 286:13,
287:8
**room**
9:10, 9:14,
9:15, 11:23,

52:8, 61:21,
62:14, 63:17,
63:18, 91:12,
93:14, 93:15,
104:10, 105:13,
105:15, 105:19,
105:21, 106:1,
156:12, 267:1,
267:4, 267:5,
267:7
**rose**
285:6
**roster**
21:13, 77:20
**rosters**
21:3
**roughly**
10:23, 47:23,
134:11, 220:7,
228:3, 228:4,
234:15
**row**
233:10
**rpr**
1:24, 294:4
**rule**
191:4
**rules**
6:18, 7:22,
143:16, 176:16
**run**
6:14, 191:23,
192:3
**running**
136:18, 136:23

**S**

**safety**
276:1
**said"**
199:10
**salary**
222:11, 238:20,
240:3
**same**
21:13, 21:15,
26:1, 45:16,
46:1, 49:7,

54:2, 82:24,
106:24, 135:9,
181:12, 185:22,
186:3, 186:14,
186:24, 187:12,
187:21, 189:24,
190:1, 190:10,
191:1, 191:13,
210:9, 210:11,
259:7, 259:20,
268:23, 269:5,
270:6, 270:13,
270:15, 270:19,
270:20, 271:16,
272:2, 272:8,
272:20, 273:15,
273:19, 279:15,
283:9
**sat**
200:15
**satisfied**
50:21, 50:24
**saturday**
262:13
**save**
113:6
**saved**
112:21
**saw**
27:11, 29:2,
29:9, 139:9,
144:2, 158:4,
158:5, 158:6,
158:13, 165:20,
179:24, 205:12,
212:22
**saying**
8:5, 8:6,
42:10, 42:11,
44:12, 56:16,
68:19, 70:13,
74:2, 77:23,
78:22, 80:6,
86:12, 86:13,
91:9, 92:9,
93:17, 96:7,
109:13, 110:2,
110:4, 110:22,

139:10, 149:2,
150:17, 150:18,
150:24, 158:3,
184:4, 220:5,
221:1, 237:5,
242:3, 258:24,
259:1, 259:4,
259:5, 266:18,
270:19, 270:23,
279:13, 280:5,
281:18, 286:18,
291:15, 291:19
**says**
31:19, 87:6,
87:18, 88:6,
90:11, 90:23,
94:19, 95:7,
99:16, 101:8,
102:2, 102:13,
108:6, 109:7,
116:1, 116:3,
121:11, 121:14,
123:10, 123:12,
124:9, 124:15,
136:11, 137:24,
138:6, 138:20,
140:23, 149:24,
151:22, 152:4,
152:8, 174:13,
174:19, 185:20,
192:23, 196:18,
197:11, 197:16,
199:8, 200:19,
201:17, 201:18,
203:11, 203:15,
203:24, 212:1,
222:2, 223:9,
245:20
**scabies**
102:6
**scale**
218:20, 218:22,
220:15, 239:23
**scared**
237:18
**scares**
232:11
**scenario**
240:2

**schedule**
22:10, 27:3,
276:24
**school**
12:24, 13:2,
13:24, 14:4,
18:21, 19:5,
19:23, 22:24,
23:7, 23:23,
24:14, 25:4,
26:20, 27:2,
63:19, 63:21,
86:8, 156:1,
156:13, 156:16
**science**
6:13
**screamed**
94:22, 97:19
**screen**
30:14, 33:16,
86:23, 181:13,
248:5
**screens**
60:9
**scribbling**
265:15
**scroll**
116:10, 117:5,
117:14, 120:1,
135:22, 136:1,
136:3, 138:9,
138:11, 143:1,
143:7, 173:18,
182:7, 195:6,
197:12, 198:14,
199:4, 201:14,
203:9, 205:18,
206:20, 211:6,
212:6, 244:6,
255:23, 280:17
**scrolled**
204:8
**scrolling**
135:24
**seal**
294:17
**second**
19:15, 25:20,

25:21, 38:24,
42:3, 45:6,
45:8, 56:20,
58:2, 62:11,
78:6, 84:4,
86:21, 88:4,
91:2, 117:1,
118:21, 119:3,
119:16, 120:14,
121:7, 123:10,
124:7, 124:8,
135:18, 138:10,
139:21, 143:2,
144:18, 144:24,
176:3, 177:11,
182:9, 195:6,
196:15, 197:13,
199:4, 201:14,
202:6, 202:17,
202:18, 205:3,
208:15, 211:18,
219:24, 221:14,
226:15, 254:16,
265:15, 280:16
**second-step**
140:16
**section**
151:22
**security**
225:7
**see**
10:6, 14:20,
34:14, 49:4,
73:19, 87:6,
87:14, 87:17,
88:13, 88:14,
90:10, 94:23,
101:10, 101:12,
102:3, 102:16,
108:6, 112:10,
113:11, 115:20,
115:24, 116:2,
117:20, 121:3,
123:12, 124:8,
124:17, 126:7,
127:20, 135:18,
138:17, 140:8,
140:9, 140:23,

142:18, 143:2,
143:8, 143:9,
157:6, 157:14,
157:19, 157:22,
157:23, 162:21,
173:17, 179:5,
185:23, 192:6,
192:9, 192:14,
195:7, 196:4,
199:5, 201:15,
202:10, 202:20,
202:24, 204:7,
222:4, 230:17,
230:19, 231:9,
232:13, 240:19,
243:4, 244:14,
249:11, 251:2,
254:6, 254:15,
254:18, 255:12,
256:4, 276:22
**seeing**
226:19
**seek**
32:15, 40:9
**seeking**
47:12, 168:21,
170:6, 186:24,
190:15, 208:5,
211:19, 211:23,
214:24
**seems**
69:3, 150:17,
179:16, 179:20,
237:4
**seen**
28:22, 149:23,
149:24, 220:18
**send**
37:5, 37:11,
37:15, 37:19,
113:19
**senior**
276:19
**seniority**
154:8, 162:3,
162:6, 162:7
**sense**
7:9, 63:7,

66:9, 80:7,
214:24
**sent**
45:7, 62:22,
65:15, 113:17,
155:4, 155:5,
172:20, 206:24,
249:6
**sentence**
116:3, 124:9,
126:3
**separate**
47:10, 120:12,
240:13
**september**
124:16, 143:14,
149:10, 149:12,
193:13, 294:18
**sergeant**
33:24, 34:4,
34:10, 35:19,
37:2, 51:23,
52:10, 52:11,
76:18, 80:19,
82:17, 82:21,
83:4, 288:16,
288:24
**sergeant's**
80:13, 80:21
**sergeants**
80:17
**series**
195:4, 206:24
**serious**
47:15
**serve**
27:13, 168:1
**served**
144:22, 145:14,
145:15, 145:17
**service**
238:12, 238:17,
240:1, 240:6
**serving**
16:1
**set**
4:18, 5:7,
9:13, 28:1,

28:3, 72:9,
115:19, 119:23,
121:17, 123:24,
193:2, 193:21,
194:21, 195:24,
196:3, 196:23,
197:23, 198:16,
199:12, 200:23,
202:1, 206:10,
207:12, 211:2,
230:21, 294:16
**seven**
195:9
**several**
8:19, 17:14,
63:3, 63:9,
66:13, 66:16,
67:19, 67:20,
178:6, 187:9,
217:20, 258:6,
258:15
**severe**
208:7, 229:1
**severely**
245:11
**sexual**
197:7
**sexually**
148:10, 148:13
**shake**
8:15
**shaking**
228:23
**she'll**
135:24
**shedor**
127:17, 171:18,
186:9, 186:12,
187:18, 188:19,
190:10, 191:4,
192:24
**sheet**
21:8, 21:11,
78:2, 78:3, 78:5
**sheriff**
1:8, 5:5,
211:1, 212:19,
232:8, 250:19

**sheriff's**
7:10, 7:17,
13:13, 13:17,
13:22, 14:8,
14:14, 14:21,
15:5, 15:11,
16:16, 16:17,
27:13, 27:16,
31:13, 31:14,
35:11, 39:10,
41:22, 46:15,
46:18, 47:8,
65:2, 151:18,
164:8, 177:2,
177:13, 197:6,
224:22, 224:24,
225:18, 235:20,
250:4, 264:7,
276:6, 277:10,
293:7
**shift**
21:10, 96:6,
96:11, 274:13
**shocked**
284:22
**shook**
100:14, 106:24,
121:11, 158:13,
158:14
**shoot**
115:5
**short**
14:12, 26:13,
266:4
**short-staffed**
217:17
**shorthand**
2:8, 294:3
**shortly**
292:6
**shots**
248:5
**should**
8:11, 34:10,
36:7, 36:17,
39:18, 39:24,
40:1, 67:2,
72:7, 74:11,

125:23, 131:17,
134:16, 134:22,
135:3, 146:9,
146:11, 146:14,
147:24, 148:11,
148:23, 149:21,
153:23, 154:15,
154:19, 154:20,
155:15, 155:18,
169:20, 172:2,
172:8, 172:13,
188:20, 188:24,
216:12, 217:2,
227:15, 233:12,
252:10, 252:12,
265:1, 285:7

**shouldn't**
27:21, 71:22,
72:5, 131:16,
146:5, 146:12,
146:17, 148:3,
148:19, 151:13,
151:14, 189:1,
189:6, 189:8

**show**
97:9

**showed**
263:14, 286:6

**shows**
60:23

**shut**
161:10

**side**
76:4, 161:16,
161:19, 164:4,
164:5, 169:16

**sight**
157:24

**sign**
126:21, 147:14,
147:16, 147:17,
147:18, 148:20,
204:1, 204:6,
204:13, 204:15,
231:5

**signature**
78:15, 116:7,
122:19, 122:20,

194:18, 196:16,
197:14, 198:11,
199:6, 199:8,
202:22, 203:7,
211:7

**signature-6sqd7**
294:21

**signatures**
147:21

**signed**
146:5, 147:15,
148:1, 148:19,
223:3

**signing**
294:12

**silence**
178:16

**similar**
185:22, 186:3,
186:11, 285:14

**similarly**
173:15, 173:22,
185:20, 191:12

**simple**
153:14, 190:8

**simply**
287:5

**simultaneously**
103:21

**since**
23:11, 41:8,
48:12, 65:12,
68:10, 80:16,
93:1, 210:4,
223:2, 224:22,
225:24, 226:3,
232:8, 234:18,
243:10, 277:13

**singletary**
199:20, 200:19

**singular**
91:19

**sir**
94:24, 102:17,
221:12, 242:8

**siren**
40:15, 41:4,
41:5

**sister**
92:11, 92:18,
92:19, 92:21,
93:3, 230:6,
230:11

**sit**
31:24, 105:20,
262:6, 262:17,
262:23, 263:4,
263:10, 264:4

**sit-down**
278:16

**sitting**
63:4, 151:14,
199:18, 228:24,
276:19, 282:11,
283:7

**situated**
173:15, 173:22,
185:20, 191:12

**situation**
170:6

**six**
50:10, 50:13,
50:15, 53:7,
228:5, 228:8,
230:5

**skipped**
206:17

**slaughter**
267:4

**sleep**
10:17, 226:24,
227:21, 228:17,
245:2, 245:5,
245:8, 245:11,
245:14, 245:19

**slightly**
48:7

**slot**
217:19

**small**
279:11

**smith**
36:14

**smoothly**
6:11, 6:14

**social**
249:22

**solemnly**
196:19

**some**
6:11, 6:17,
11:1, 13:4,
13:5, 19:5,
20:5, 20:18,
32:11, 39:5,
50:12, 56:23,
80:14, 92:24,
95:13, 95:15,
96:16, 103:10,
103:15, 109:1,
114:20, 122:1,
123:12, 136:4,
161:9, 166:7,
191:4, 206:13,
208:23, 210:2,
211:21, 213:4,
218:21, 220:19,
241:6, 248:4,
250:11, 260:3,
265:12, 271:5,
284:4

**somebody**
241:7, 275:3

**someone**
82:9, 82:21,
147:6, 148:9,
163:9, 163:14,
232:12, 275:3,
277:4, 277:7,
277:11, 279:23,
286:21

**someone's**
232:19, 270:24

**something**
7:6, 26:7,
36:14, 40:4,
41:13, 47:7,
47:10, 54:18,
62:9, 88:23,
97:9, 99:11,
100:5, 111:14,
111:15, 111:16,
115:7, 116:17,
132:20, 133:3,
143:24, 145:8,

Transcript of LeGrain Winston
Conducted on August 28, 2020

118

159:3, 161:17,
163:10, 175:22,
184:4, 196:4,
202:15, 215:24,
219:2, 222:13,
226:7, 230:23,
237:24, 238:7,
239:6, 243:13,
243:14, 254:4,
270:24, 279:16,
279:22, 284:2,
286:5
**sometime**
56:15, 210:7,
210:8
**sometimes**
49:1, 53:19,
60:10, 111:20,
157:2, 249:5,
269:10
**somewhat**
46:12
**somewhere**
140:19, 140:20,
161:16, 219:16
**soon**
111:9, 125:5,
125:9, 125:16,
125:17, 139:8
**soon'"**
124:17
**sophomore**
12:24
**sorry**
10:2, 12:7,
23:16, 28:10,
31:14, 33:14,
42:4, 42:14,
50:19, 60:7,
75:3, 77:7,
78:9, 79:15,
81:9, 81:16,
93:13, 94:17,
102:19, 103:5,
107:8, 109:2,
109:20, 109:23,
110:1, 111:14,
117:24, 122:3,

133:13, 133:16,
135:12, 137:9,
137:11, 138:5,
141:10, 149:10,
150:9, 160:22,
165:15, 166:1,
169:8, 169:10,
169:24, 174:8,
174:16, 179:10,
185:11, 186:10,
191:11, 192:20,
193:4, 198:13,
202:14, 203:8,
204:9, 204:10,
211:10, 215:5,
215:6, 216:17,
216:23, 225:15,
226:2, 231:22,
239:9, 243:8,
244:2, 244:13,
252:4, 254:13,
255:14, 267:11,
270:2, 282:24,
283:12, 284:1,
285:22, 287:4,
287:7, 289:21,
290:9
**sort**
7:18, 21:4,
36:1, 36:3,
39:9, 40:3,
40:20, 41:2,
43:12, 47:4,
58:22, 78:10,
78:12, 79:5,
82:15, 103:15,
123:11, 123:21,
124:6, 134:8,
195:6, 240:13
**sorts**
225:6
**sought**
290:16
**sound**
200:17, 212:18
**sounds**
23:7, 65:7,
92:24, 93:11

**sources**
224:20, 224:23,
226:9
**south**
3:5, 12:20,
18:15, 76:4,
77:19, 77:21,
78:1, 104:10,
155:24
**space**
146:3
**spanish**
110:6
**spar**
37:6, 172:20
**speak**
10:21, 62:15,
84:23, 105:18,
109:13, 109:15,
109:16, 110:5,
139:3, 180:17,
181:10, 240:4,
241:20
**speaking**
17:13, 18:7,
36:15, 50:9,
55:13, 61:8,
91:16, 92:13,
110:6, 110:7,
136:5, 141:9,
164:13, 174:2
**speaks**
72:11
**specific**
6:23, 57:6,
58:3, 61:14,
64:24, 65:7,
68:2, 68:11,
68:21, 69:3,
69:10, 69:15,
71:20, 72:3,
72:17, 78:12,
81:24, 85:8,
93:21, 94:4,
94:7, 95:1,
99:21, 113:13,
161:4, 174:1,
178:9, 224:3,

**sources**
247:6, 279:19,
280:4, 284:11,
284:12, 284:16,
291:21
**specifically**
54:19, 61:6,
78:8, 91:4,
92:5, 104:16,
157:6, 174:6,
218:2, 221:16,
265:22, 275:16,
291:18
**spectrums**
80:9
**speculation**
90:2, 133:6,
141:11, 175:18,
177:6, 177:17,
237:11, 261:23
**spent**
96:10, 97:5
**spoke**
10:20, 11:17,
11:18, 133:17,
133:19, 133:20,
178:12, 266:8
**spoken**
11:14, 237:13,
257:13, 270:19
**spots**
147:20
**spread**
48:17, 280:2
**sr**
199:20, 200:20
**st**
193:13
**stand**
30:7, 137:14,
197:17
**standard**
186:15
**standing**
96:13, 156:6
**start**
6:17, 13:16,
15:2, 55:23,
65:12, 166:12,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                        119

221:7, 229:7,
268:4
**started**
15:3, 59:22,
60:17, 75:12,
87:22, 106:1,
135:5, 165:12,
276:8
**starters**
148:15
**starting**
14:7
**state**
2:9, 13:1,
14:5, 14:6,
14:11, 14:16,
153:22, 154:24,
155:2, 155:18,
158:8, 294:5,
294:24
**state's**
126:18, 129:21,
133:18, 133:20,
170:24
**stated**
68:15, 92:19,
111:8, 121:8,
124:11, 124:16,
125:13, 125:18,
139:9, 154:18,
154:20, 154:22,
154:23, 155:4,
155:13, 156:9,
173:12, 183:12,
185:6, 266:17,
267:6, 288:3
**statement**
7:7, 78:16,
85:4, 88:16,
88:19, 184:12,
199:9, 199:14,
254:1, 255:3,
260:7, 266:23,
272:7
**statements**
110:4, 256:17,
260:4
**states**
1:1

**stating**
78:10, 126:5
**station**
108:18
**statistically**
164:7
**status**
133:15
**stay**
60:17, 154:20,
155:14, 155:15,
155:18
**stayed**
107:24, 155:1,
155:11
**staying**
154:15, 154:19
**stenographically**
294:10
**step**
44:9, 44:10,
44:15, 44:16,
44:24, 45:8,
45:12, 45:13,
45:20, 45:21,
46:3, 46:4,
46:6, 47:2,
47:11, 98:6,
139:21, 139:22,
145:4, 145:6,
203:5, 203:6,
203:7, 203:8,
203:11, 205:15,
205:19, 281:3,
281:6, 281:8,
281:16, 281:20,
292:10, 292:14,
293:6
**stepping**
119:19
**steps**
44:9, 140:1,
145:2, 177:3,
214:6, 214:8,
214:9, 215:17,
215:20, 280:24,
292:9
**steward**
61:23, 62:9

**stick**
65:24, 90:22,
91:2
**sticking**
66:1
**still**
7:22, 15:10,
67:5, 75:10,
80:13, 81:1,
82:16, 82:19,
92:2, 112:3,
112:17, 112:19,
142:8, 144:16,
170:7, 192:16,
206:8, 209:5,
209:7, 209:8,
209:10, 210:2,
222:19, 224:1,
228:24, 232:23,
234:1, 235:16,
236:18, 245:24,
246:1, 246:3,
281:7, 281:21,
287:14, 287:15,
287:16, 287:18
**stole**
132:4
**stomach**
227:19, 228:16,
228:17, 244:23
**stood**
130:20
**stop**
58:2, 92:1,
161:11, 176:3,
203:10, 262:3
**straight**
130:18, 237:15
**street**
3:5, 3:21,
46:9, 139:12,
144:3, 145:4,
145:11, 165:20,
169:17, 205:12,
240:21, 275:13,
275:18
**stress**
208:7, 226:24,

228:20, 229:1,
229:21, 229:22,
230:10, 230:13,
230:14, 240:13,
240:16, 240:18,
240:21, 241:1
**stressed**
241:7
**stressful**
230:3, 230:4,
230:7, 237:5,
240:11, 277:5
**strickland**
265:23, 266:7,
266:14, 266:16,
279:24, 280:1
**strickland's**
283:23
**strike**
22:20, 23:16,
24:15, 28:10,
32:18, 42:5,
42:14, 48:21,
49:19, 50:7,
77:7, 78:9,
79:16, 81:16,
84:3, 85:2,
94:17, 95:13,
97:3, 98:7,
102:20, 119:21,
132:18, 133:16,
134:19, 135:12,
150:12, 165:15,
169:24, 170:17,
171:7, 179:22,
185:11, 193:4,
225:15, 231:22,
243:8, 244:13,
247:18, 251:22,
252:4, 255:14,
260:22, 261:3,
278:24, 285:22,
287:7, 289:22,
290:9
**stroke**
43:8
**struck**
266:24

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    120

struggling
192:21
stuck
92:11, 97:14,
137:12
study
157:4
stuff
113:8, 268:3,
276:7
stupid
137:4, 137:7,
137:8, 137:10
subject
153:13, 160:4,
241:6
submitted
43:23, 195:20
submitting
144:19
subordinate
102:14, 108:7,
109:10
subpart
142:22
subparts
142:21
subpoena
96:23, 141:4,
169:12
subpoenaed
126:10, 126:16,
126:17, 128:11,
128:19, 129:18,
131:16, 188:9
subtract
35:2
suburban
161:17
suburbs
161:21
suffered
170:2, 211:20,
212:9, 226:12,
241:11
suffering
243:10, 246:15
sufficient
253:2

suing
7:10, 7:17
suite
3:6, 3:14, 3:22
sum
246:11
summary
199:10
summer
134:14, 136:12,
136:13
supervise
250:5, 250:19
supervision
36:9, 36:18,
36:19, 45:15,
45:24, 51:14,
51:15, 53:20,
53:23, 54:7,
55:5, 80:10,
163:12, 217:18,
278:6, 278:7
supervisor
28:17, 28:19,
28:21, 28:23,
29:1, 29:19,
29:20, 33:3,
35:22, 37:14,
52:7, 52:19,
52:20, 54:21,
54:23, 55:8,
55:18, 58:23,
60:4, 60:5,
60:11, 77:2,
80:11, 128:4,
173:7, 181:7,
264:4, 267:15,
270:4, 271:8,
271:13, 274:12,
275:18, 277:15
supervisor's
57:7
supervisors
21:1, 21:22,
29:23, 51:18,
54:15, 55:12,
59:24, 76:14,
76:16, 77:9,

78:14, 96:21,
102:14, 108:7,
109:11, 148:10,
165:7, 175:1,
256:4, 264:6,
266:8, 267:16,
268:13, 268:15,
269:3, 269:23,
271:20, 273:3,
273:14, 273:18,
274:15, 274:18,
275:13, 275:15,
275:16, 275:21,
278:3, 287:7
supervisory
148:8, 250:6,
250:20, 251:1,
251:8, 256:10
supplement
222:3
support
11:11, 233:23,
238:21, 250:18,
251:7
supported
258:11
supports
256:9
suppose
131:5
supposed
28:15, 28:17,
28:19, 29:4,
29:6, 29:20,
29:23, 30:6,
31:24, 32:22,
32:23, 73:24,
74:1, 131:2,
147:7, 147:11,
149:19, 163:10,
163:11, 163:12,
165:2, 230:19,
276:18
sure
9:1, 10:2,
11:12, 15:12,
16:23, 20:10,
20:17, 22:6,

30:16, 31:18,
32:10, 34:19,
42:11, 48:3,
56:7, 63:16,
69:2, 69:13,
84:12, 89:23,
108:4, 110:17,
114:17, 133:23,
140:22, 144:23,
147:1, 158:5,
172:1, 172:10,
174:9, 180:16,
192:15, 199:16,
199:17, 202:19,
210:3, 213:19,
219:21, 222:23,
223:6, 223:13,
223:16, 225:19,
237:6, 253:15,
255:3, 255:9,
256:22, 264:16,
284:13, 286:3,
288:12
surgery
243:22
suspect
160:9
suspended
167:11
suspension
38:19, 39:3,
47:18, 138:19,
139:19, 144:7,
144:9, 144:19,
144:22, 145:15,
145:22, 165:17,
167:18, 168:17,
168:21, 205:10,
281:21
suspensions
165:24
suspicious
188:16
sustained
152:21, 153:3
swear
196:19
sworn
6:2, 6:4, 79:9

system
78:1, 81:4,
81:5, 81:8,
84:15, 85:12,
168:16

**T**

tagging
63:4, 63:12
take
8:4, 8:18,
8:21, 28:19,
29:20, 29:22,
46:23, 47:21,
57:4, 61:10,
61:20, 63:2,
63:3, 67:6,
74:24, 75:2,
80:12, 80:18,
80:24, 86:22,
99:23, 104:7,
104:19, 105:24,
113:3, 113:4,
115:9, 115:13,
116:24, 119:3,
119:18, 132:8,
135:18, 136:19,
141:2, 142:3,
145:21, 182:8,
202:6, 205:2,
207:2, 207:15,
214:8, 214:9,
215:16, 226:15,
232:1, 232:15,
255:17, 265:1,
265:3, 277:8,
281:17, 281:22,
282:1, 282:4,
282:8, 282:9,
288:17, 288:23,
289:2
taken
6:19, 75:7,
83:9, 138:1,
142:5, 177:3,
177:13, 208:10,
237:9, 265:7,
294:7, 294:10

takes
28:23, 277:3,
282:16
taking
12:6, 71:24,
81:3, 105:1,
244:8, 244:23
talk
11:4, 19:14,
21:18, 25:19,
36:11, 36:12,
40:5, 54:5,
55:7, 61:1,
62:10, 85:14,
86:15, 88:3,
92:8, 95:2,
102:12, 103:4,
106:20, 107:2,
142:24, 166:11,
177:11, 179:6,
179:12, 181:4,
181:8, 181:11,
181:19, 192:2,
211:22, 212:3,
221:13, 223:5,
223:12, 223:23,
224:3, 224:16,
224:17, 226:11,
231:10, 237:16,
241:6, 256:23,
262:16
talked
35:19, 43:4,
73:5, 83:13,
88:2, 91:15,
94:12, 105:23,
110:18, 116:19,
117:21, 118:1,
118:16, 123:17,
124:21, 136:7,
137:3, 137:16,
140:18, 160:12,
166:1, 169:15,
169:19, 172:18,
174:20, 183:13,
221:22, 250:23,
257:17, 257:21,
261:7, 268:2,

274:21, 275:1,
276:15, 280:20,
288:4
talking
36:20, 37:19,
56:20, 58:3,
61:6, 66:15,
66:18, 67:14,
67:17, 69:16,
73:13, 76:15,
76:16, 76:21,
79:4, 80:4,
84:2, 89:15,
90:18, 91:7,
91:11, 91:12,
100:11, 101:14,
109:20, 112:4,
112:22, 113:1,
117:15, 118:12,
124:15, 127:6,
136:22, 137:9,
166:9, 171:2,
174:5, 174:7,
174:14, 186:18,
211:17, 212:13,
213:7, 220:1,
227:24, 236:2,
237:19, 244:3,
248:1, 262:4,
279:17, 287:2
talks
88:1
tasked
18:9
tasks
18:12
tax
225:23, 226:2
team
241:8
teamsters
41:15, 107:6
technical
6:12, 11:11,
18:4
technically
221:9
technician
4:2, 86:18,

207:23
technology
113:7
tell
28:21, 38:9,
48:4, 49:18,
55:8, 55:12,
55:18, 56:2,
56:5, 56:7,
57:24, 58:6,
61:2, 62:21,
63:4, 64:12,
65:14, 66:4,
71:10, 82:9,
90:4, 90:16,
95:24, 96:17,
96:21, 111:13,
135:23, 155:9,
155:10, 172:17,
178:24, 183:21,
186:7, 186:8,
186:9, 187:17,
195:14, 241:5,
241:16, 281:20,
290:2, 291:19
telling
55:2, 69:4,
69:23, 71:2,
71:15, 104:18,
186:21, 253:16,
260:3
tendered
74:19
term
38:21, 252:7
terminal
93:8
terminate
190:21
terminated
134:17, 134:22,
135:3, 172:2,
172:8, 190:19,
233:15, 234:7,
235:20, 235:21
termination
39:6, 47:13,
47:18, 134:7,

134:10, 135:10,
172:13, 187:1,
190:16, 252:15
**terms**
41:23, 123:21
**terrified**
230:15, 232:11
**test**
80:13, 80:18,
80:20, 80:21,
81:1, 81:4,
82:17, 83:9,
288:7, 288:11,
288:15, 288:17,
288:18, 288:19,
288:23, 289:2
**tested**
83:3
**testified**
6:4, 173:5,
183:23, 184:5,
184:7, 211:10,
281:4
**testify**
126:16, 188:9,
242:12
**testifying**
275:5
**testimony**
9:8, 116:21,
117:9, 118:5,
118:23, 120:16,
149:8, 150:8,
150:23, 172:23,
173:1, 179:23,
180:2, 180:5,
180:10, 180:17,
190:18, 201:22,
258:11, 275:8,
280:23, 294:9
**tests**
288:5, 288:8
**text**
10:7, 197:13,
249:4, 249:6,
249:12, 249:14,
254:17
**th**
13:20, 94:19,

95:1, 99:17,
118:14, 120:6,
120:13, 121:1,
122:4, 122:6,
124:10, 124:16,
127:11, 127:12,
129:1, 129:3,
138:8, 138:16,
143:14, 149:10,
149:12, 155:6,
155:17, 201:18,
220:17, 221:7,
223:3, 235:9,
235:10
**thank**
121:21, 138:13,
207:22, 243:1,
255:24, 265:11,
283:12, 293:18,
293:20
**thankful**
233:12
**thanks**
21:21, 22:15,
114:19, 265:19
**therapist**
230:20
**therapists**
230:17
**therapy**
244:1
**thereafter**
294:10
**therefore**
232:12, 233:20
**thereto**
117:14
**they'd**
278:6
**thing**
8:20, 31:23,
34:2, 34:3,
54:2, 93:2,
96:8, 118:11,
141:1, 158:7,
160:5, 186:14,
187:12, 187:21,
208:19, 230:3,

233:21, 287:4,
292:8
**things**
21:14, 21:15,
32:21, 39:5,
40:14, 53:14,
63:15, 64:1,
107:20, 109:12,
114:15, 119:16,
156:14, 156:18,
156:20, 168:18,
173:24, 209:1,
221:24, 227:10,
230:4, 231:14,
231:18, 238:6,
241:3, 243:4,
243:5, 245:24,
280:19, 282:8
**thinking**
221:6, 283:13
**third**
25:21, 26:4,
26:5, 39:2,
46:16, 139:22,
144:18, 205:14,
256:11, 274:9
**thomas**
1:9, 5:6, 211:2
**thorough**
261:15
**thought**
16:15, 42:22,
60:21, 67:11,
98:6, 125:16,
132:23, 138:5,
158:19, 180:20,
212:18, 212:23,
238:2, 259:19,
259:21
**thoughts**
265:16
**thousand**
219:2
**threatened**
90:14, 111:4,
111:5, 111:6,
124:10, 149:13
**threatening**
94:22, 97:19,

124:5, 151:11,
170:17, 170:18
**three**
13:8, 13:10,
13:11, 16:6,
16:9, 46:2,
61:16, 73:6,
73:12, 83:6,
104:21, 129:16,
132:5, 132:7,
135:7, 147:20,
152:15, 203:16,
215:18, 216:6,
218:3, 227:16,
228:13, 229:10,
232:9, 263:18
**three-day**
168:21
**three-page**
202:8, 204:24
**three-part**
126:21
**throat**
116:18
**through**
5:10, 5:11,
5:15, 5:17,
5:18, 5:19,
13:21, 62:12,
72:8, 74:22,
75:24, 93:2,
100:11, 115:9,
121:24, 134:3,
135:20, 139:21,
151:5, 176:10,
191:23, 192:3,
192:8, 193:5,
195:5, 195:7,
195:14, 198:22,
201:7, 202:7,
202:9, 204:9,
205:1, 205:3,
206:21, 206:23,
211:22, 214:9,
215:21, 220:19,
230:23, 233:16,
261:13, 280:17
**throughout**
8:19, 80:22,

279:9, 280:2
**thrown**
45:3, 45:4
**tied**
68:3
**time**
14:13, 17:9,
18:3, 25:17,
26:1, 26:13,
34:8, 35:16,
38:13, 38:14,
38:23, 38:24,
39:2, 41:17,
49:7, 49:20,
65:20, 66:5,
66:6, 70:8,
70:14, 92:10,
92:24, 96:10,
97:4, 106:17,
106:19, 107:12,
109:6, 111:5,
126:1, 127:4,
128:21, 129:19,
130:2, 130:22,
132:5, 132:8,
145:10, 145:22,
146:3, 150:16,
161:9, 165:12,
165:13, 166:15,
167:10, 178:20,
187:2, 188:12,
190:7, 191:7,
208:22, 210:5,
212:19, 213:5,
213:13, 216:15,
217:14, 219:2,
222:10, 224:21,
225:5, 225:14,
225:16, 226:16,
227:14, 227:24,
230:24, 232:24,
235:13, 235:14,
237:1, 240:19,
243:5, 250:22,
251:10, 256:12,
256:17, 259:7,
265:10, 265:11,
266:4, 267:8,

267:11, 267:13,
267:14, 276:7,
277:13, 278:6,
281:11, 281:14,
284:1, 292:4,
292:5
**timekeeping**
201:10
**times**
8:8, 23:1,
23:4, 47:24,
48:10, 48:15,
49:7, 50:5,
56:4, 63:3,
63:9, 64:1,
64:8, 67:22,
68:19, 69:9,
69:11, 69:18,
70:6, 70:7,
91:14, 91:15,
91:16, 91:24,
97:13, 157:3,
161:10, 178:6,
240:12
**timing**
84:13
**title**
115:17, 210:24
**today**
6:11, 6:14,
8:19, 9:1, 9:8,
9:11, 9:17,
9:23, 10:4,
10:9, 10:12,
11:5, 11:15,
17:7, 33:22,
55:5, 55:6,
56:16, 56:23,
75:10, 75:13,
80:12, 82:14,
118:5, 118:23,
131:19, 173:5,
233:11, 246:4,
246:10, 262:6,
262:17, 262:23,
263:4, 263:10,
264:4, 293:21
**together**
189:22, 258:17,

259:8
**told**
54:19, 54:21,
55:19, 55:24,
56:16, 56:24,
57:19, 60:1,
60:5, 60:11,
60:17, 61:4,
62:16, 66:5,
66:6, 67:23,
68:5, 68:24,
70:17, 86:1,
88:9, 92:1,
98:5, 98:14,
99:14, 99:18,
129:11, 131:13,
138:6, 138:24,
148:8, 155:8,
165:8, 178:14,
183:4, 187:20,
187:21, 190:14,
193:14, 200:1,
214:23, 214:24,
215:3, 227:5,
228:20, 234:11,
241:22, 245:14,
258:7, 258:15,
264:6, 281:12,
287:2
**ton**
207:17
**tone**
269:22, 270:3,
270:4, 270:7,
285:18, 286:1,
286:4, 287:6,
287:9
**tones**
285:21, 286:19,
287:10
**took**
68:12, 104:21,
105:15, 111:11,
132:7, 145:23,
214:6, 227:20,
286:21, 288:5,
288:15, 288:18,
288:19

**top**
77:19, 117:6,
142:13, 143:6,
167:17, 182:7,
212:1, 212:17,
221:23, 246:20
**topic**
207:14
**tore**
160:6
**total**
139:12, 246:11
**totally**
46:16, 47:10,
67:10, 138:5
**touched**
18:5, 40:3
**tour**
95:23, 96:1,
96:4, 96:6,
96:15, 96:18,
96:22, 97:1,
97:10, 131:13,
131:14, 131:23
**towards**
278:8, 278:21,
279:5
**town**
169:16
**track**
188:12
**traffic**
138:24, 139:1,
139:2
**train**
67:11, 138:5
**trained**
153:14, 233:24
**training**
63:14, 156:13,
156:17, 166:8
**transcript**
4:10, 87:2,
115:15, 119:6,
120:22, 122:15,
191:21, 193:9,
194:2, 195:2,
196:7, 197:2,

198:2, 198:19,
200:11, 201:3,
202:5, 204:19,
206:19, 210:21,
294:8
**transfer**
177:1
**transferred**
253:1, 274:5
**translation**
189:4
**transmission**
143:17, 287:16
**treat**
243:24, 244:4
**treated**
173:14, 173:21
**trickles**
117:7
**trouble**
138:7
**true**
116:5, 196:20,
211:12, 294:8
**try**
31:10, 32:13,
43:9, 46:24,
47:4, 67:4,
99:18, 115:8,
120:9, 121:9,
124:11, 129:4,
150:13, 171:7,
282:2, 289:9
**trying**
34:9, 42:9,
69:2, 69:6,
91:10, 98:6,
133:1, 180:16,
181:8, 181:11,
196:2, 215:22,
217:7, 230:21,
277:8
**tss**
18:21, 19:5,
19:23, 22:21,
23:6, 23:21,
24:11, 24:14,
25:1, 26:18,

27:2, 48:1,
48:10, 48:19,
48:24, 49:8,
49:11, 49:16,
49:20, 50:8,
51:17, 53:5,
53:22, 54:9,
54:14, 55:4,
55:10, 55:20,
57:22, 58:21,
59:9, 62:22,
65:15, 68:7
**tuesday**
12:2, 12:3,
12:4, 22:11,
22:12
**turn**
87:12, 114:4,
148:12, 207:14,
208:2, 246:19
**turned**
17:1, 94:12,
126:17, 129:17,
238:23
**twice**
149:14, 149:15
**two**
22:11, 36:3,
57:14, 61:16,
61:18, 76:20,
76:22, 80:8,
83:5, 128:8,
132:4, 132:7,
133:20, 136:20,
145:20, 151:10,
166:3, 201:15,
214:2, 229:4,
229:10, 234:13,
271:3
**two-page**
198:23, 201:6
**type**
32:11, 113:4,
210:2
**types**
24:4, 38:16,
40:11, 64:10
**typewriting**
294:11

**typical**
279:20, 280:15
**typically**
25:24, 282:4
**tyrone**
62:1

---
**U**
---

**uh-huh**
70:16, 79:7,
87:5, 90:13,
91:3, 116:16,
117:19, 120:7,
123:16, 136:10,
193:22, 199:2,
202:10, 264:1
**unable**
128:5
**under**
31:13, 33:2,
52:18, 68:17,
75:10, 81:4,
81:5, 81:8,
83:11, 84:14,
116:4, 119:10,
129:20, 129:24,
142:9, 151:19,
211:11, 220:23,
229:1, 229:6,
294:11
**undergo**
186:12
**underlying**
171:3, 259:12
**underneath**
149:1, 209:8,
209:12
**understand**
8:17, 8:24,
9:22, 10:3,
36:2, 42:10,
55:2, 55:15,
57:9, 66:18,
67:14, 69:2,
69:13, 73:17,
75:10, 84:12,
91:10, 133:1,
133:2, 142:8,

144:24, 190:6,
213:19, 222:12,
224:2, 240:23,
242:3, 242:11,
286:17
**understanding**
21:22, 25:20,
27:19, 27:21,
28:14, 31:5,
32:12, 32:14,
35:3, 35:7,
36:16, 36:23,
37:5, 37:21,
37:24, 38:9,
38:22, 39:10,
39:14, 39:20,
40:8, 43:3,
43:6, 44:8,
44:10, 44:14,
48:20, 48:24,
50:11, 50:14,
50:20, 51:7,
53:10, 54:12,
54:15, 55:1,
71:21, 72:4,
76:1, 77:5,
77:8, 78:4,
78:12, 79:1,
79:22, 81:15,
81:17, 82:5,
82:12, 82:13,
82:15, 82:23,
87:9, 91:4,
94:17, 125:7,
125:15, 125:21,
125:22, 128:3,
133:2, 133:11,
138:3, 147:12,
150:4, 150:11,
150:16, 151:1,
160:13, 160:18,
164:13, 164:15,
164:21, 164:23,
165:1, 172:12,
174:22, 175:6,
175:11, 176:14,
176:21, 184:18,
208:16, 233:7,

236:1, 236:5,
272:1
**understood**
9:4
**unfit**
256:3, 256:10
**union**
41:9, 41:11,
41:14, 41:16,
41:19, 43:23,
44:1, 44:17,
61:23, 62:9,
62:15, 237:7,
237:14, 238:5,
239:1, 239:14,
260:23, 261:13,
262:19
**unit**
15:6, 16:1,
18:11, 29:5,
33:5, 46:8,
65:21, 69:1,
165:9, 179:1,
179:4, 180:12,
197:21, 217:16,
266:3, 273:18,
274:5, 279:9,
279:12, 280:3,
282:22, 283:1,
289:6, 289:8,
289:10, 289:11,
289:15, 289:16,
289:17, 289:18,
293:6
**unit's**
164:8
**united**
1:1
**university**
13:1, 14:11
**unlawful**
152:2, 152:9,
152:20, 153:11
**unless**
8:10, 193:20,
236:4, 289:16
**unpaid**
278:2, 278:4

**unquote**
252:6
**unsatisfactory**
58:1
**unsuccessful**
281:7
**until**
64:4, 75:3,
129:21, 130:1,
130:2, 138:24,
139:3, 151:12,
151:15, 238:16,
238:22, 239:24,
240:9, 276:6
**ups**
14:9
**use**
38:21, 41:4,
42:16, 96:23,
106:2, 131:14,
131:22, 145:22,
249:4, 252:6,
268:15, 269:3
**using**
91:11, 91:13,
110:20, 110:21,
260:24, 262:20,
263:1, 263:12

---
**V**
---

**valid**
18:1
**valued**
275:21
**van**
103:24, 104:1,
152:12, 194:16
**vantage**
157:21
**varied**
40:13, 40:16,
63:24
**varies**
38:11
**various**
17:16, 44:8,
64:10, 65:1,
65:3

**vastly**
236:23
**vehicle**
153:23, 153:24
**verbal**
38:17, 38:24,
85:3, 85:5,
166:19
**verbally**
8:15
**verification**
116:1, 211:8
**verified**
211:10
**version**
7:19, 36:1
**versus**
286:10
**vest**
64:2, 64:13,
276:22
**vested**
238:21
**via**
7:21, 28:11
**victim**
32:21
**video**
157:1, 157:2,
192:17, 267:23,
280:7
**videos**
63:4, 63:12
**violated**
44:18, 143:16,
153:11, 176:15,
191:4
**violates**
146:6
**violation**
43:19, 44:6
**virtually**
1:14, 2:1, 87:4
**visible**
116:11
**volume**
287:9

---
**W**
---

**w-2**
222:13

**w-2s**
225:20
**wages**
211:24, 220:1,
221:22
**wait**
88:6
**waited**
127:4, 130:11
**waiting**
130:21
**walk**
105:4, 106:1,
233:8, 234:4
**walked**
98:21, 98:22,
121:12, 233:14,
233:19
**want**
6:17, 14:11,
16:4, 16:5,
21:16, 25:16,
31:22, 32:7,
33:24, 36:13,
54:24, 62:10,
66:2, 68:9,
75:12, 82:8,
92:6, 96:16,
103:13, 126:12,
134:11, 151:6,
161:15, 166:12,
193:20, 207:16,
208:2, 208:21,
209:2, 220:17,
220:18, 220:19,
220:22, 223:14,
223:17, 223:19,
223:20, 232:1,
233:1, 234:20,
234:22, 235:5,
236:17, 237:15,
237:16, 237:24,
253:19, 259:3,
264:15, 265:3,
265:11, 275:13,
280:21, 291:16,
292:8
**wanted**
16:10, 25:13,

Transcript of LeGrain Winston
Conducted on August 28, 2020                                    126

25:14, 60:21,
79:15, 83:22,
84:17, 103:23,
141:1, 183:3,
208:16, 212:16,
212:17, 213:11,
233:8, 282:21,
283:1, 283:6,
289:7, 289:17
**wants**
223:16
**warning**
38:12, 38:17,
38:24, 166:18,
166:19, 166:20,
166:21
**warrant**
164:18, 164:19,
165:10, 275:4
**watch**
25:21, 25:22,
26:1, 26:3,
26:4, 26:5,
274:9, 274:10
**way**
13:21, 21:5,
35:15, 44:6,
44:9, 44:12,
55:16, 60:23,
132:1, 135:20,
141:23, 157:11,
158:11, 160:14,
171:8, 176:12,
179:22, 192:8,
196:3, 212:16,
217:18, 223:18,
232:18, 239:23,
257:2, 270:19,
279:1, 282:8,
286:16
**ways**
271:3
**we'll**
6:15, 8:18,
17:19, 17:21,
18:4, 36:11,
55:7, 118:20,
120:14, 124:2,

140:23, 151:21,
193:24, 194:24,
196:3, 206:20,
208:15, 221:13
**we're**
6:12, 7:21,
9:3, 29:5, 34:9,
56:20, 58:3,
61:6, 63:14,
66:1, 67:5,
69:16, 75:9,
76:15, 76:16,
86:21, 114:13,
114:22, 115:16,
117:15, 129:24,
136:19, 142:24,
153:14, 156:14,
165:13, 189:15,
190:3, 195:3,
196:8, 197:3,
204:23, 217:17,
234:3, 248:1,
262:12, 293:17
**we've**
39:8, 43:4,
75:1, 101:14,
114:9, 116:19,
117:20, 118:1,
119:7, 120:23,
122:16, 123:17,
148:15, 193:10,
194:3, 198:3,
198:20, 200:12,
201:4, 202:7,
206:21, 210:22,
250:7
**webb**
139:10, 143:15,
144:2, 145:1,
165:20, 205:12
**wednesday**
12:4, 50:1,
50:2, 50:6
**weekly**
22:2
**weeks**
22:11, 61:11,
61:16, 61:17,

61:18, 99:22,
234:13
**welcome**
265:13
**went**
10:13, 12:24,
14:4, 16:7,
17:3, 27:10,
35:23, 62:10,
67:20, 89:13,
95:12, 95:14,
95:19, 95:21,
96:9, 96:14,
97:7, 97:17,
98:24, 105:18,
113:18, 121:14,
128:9, 129:17,
130:9, 130:14,
130:18, 130:20,
130:22, 139:6,
139:18, 139:19,
139:21, 140:6,
152:19, 188:5,
189:12, 191:7,
192:18, 227:16,
230:22, 247:5,
266:14, 266:17
**weren't**
27:6, 27:9,
102:9, 140:20,
171:14, 183:10,
183:11, 204:5,
270:18, 276:1,
282:14
**west**
164:4
**whatever**
18:17, 64:22,
71:18, 110:8,
113:17, 150:11,
194:10, 200:6,
215:2, 218:10,
269:12, 278:14,
279:18, 281:12,
281:15, 291:20,
291:21
**whatsoever**
149:5

**wheelchair**
153:12, 168:19,
195:22
**wheelchair-bound**
103:23, 104:1,
152:11, 153:16,
168:18
**whereof**
294:16
**wherever**
37:16, 37:18
**whether**
27:15, 35:3,
35:7, 89:4,
89:7, 138:4,
171:3, 176:14,
176:22, 217:12,
217:22, 234:11,
236:14, 237:8,
239:15, 241:16,
241:19, 251:11,
252:3, 252:5,
261:11, 287:5
**whim**
232:12, 232:19
**white**
3:11, 6:10,
66:24, 154:7,
185:20, 186:2,
191:12, 270:18,
271:5, 286:11,
286:15
**whoever**
44:17
**whole**
34:2, 34:3,
97:14, 107:12,
118:11, 208:21,
233:21, 235:13,
235:14
**wife**
9:12, 11:9,
13:7, 231:11,
232:5, 241:5
**wild**
213:3, 213:5
**williams**
11:19, 12:5,

104:14, 104:15,
106:20, 106:23,
259:18, 259:21
**willing**
231:5
**winston's**
4:15, 5:3,
94:22, 115:18,
210:24
**winston_ccso**
5:12, 5:13,
5:14, 5:16,
5:17, 5:18,
5:19, 196:10,
197:5, 198:5,
198:22, 200:14,
201:6, 202:9,
205:1
**winston_ccso0129**
5:15
**withdraw**
45:10, 45:18
**withdrawn**
73:9
**within**
6:24, 14:21,
17:4, 18:8,
18:19, 19:13,
19:15, 20:20,
23:11, 24:5,
27:13, 27:22,
33:21, 34:21,
35:4, 35:6,
35:8, 35:11,
35:21, 36:7,
37:1, 43:19,
79:3, 79:10,
80:1, 81:10,
89:20, 101:5,
145:5, 158:2,
183:15, 183:18,
185:4, 196:20,
280:24, 289:21,
290:16, 292:10
**without**
81:3, 233:16,
233:21, 233:22,
258:3, 261:10

**witness**
6:2, 28:15,
30:10, 30:19,
31:22, 32:6,
33:16, 66:22,
67:3, 67:8,
74:23, 86:24,
115:4, 133:8,
136:1, 138:9,
138:13, 141:8,
141:13, 150:14,
151:6, 160:24,
182:10, 192:15,
192:19, 207:20,
215:5, 255:24,
264:9, 265:13,
270:12, 279:2,
283:11, 283:14,
285:10, 294:16
**witnessed**
28:22, 30:21
**witnesses**
32:15
**witnessing**
32:19
**wondering**
67:1
**word**
64:18, 90:20,
91:11, 91:13,
108:8, 108:11,
110:21, 134:8,
136:24
**words**
47:20, 65:9,
102:15, 107:14,
109:16, 158:8,
209:19, 227:8
**work**
12:6, 13:13,
14:3, 14:7,
14:20, 15:6,
18:21, 19:5,
19:23, 22:9,
22:17, 22:24,
23:7, 23:23,
24:10, 24:13,
24:14, 25:4,

26:17, 26:20,
27:2, 40:15,
49:21, 50:8,
56:13, 57:24,
63:13, 63:19,
63:21, 70:18,
86:8, 97:24,
107:24, 127:5,
128:9, 130:2,
130:14, 130:15,
130:19, 130:22,
130:23, 131:15,
152:9, 156:1,
156:13, 157:1,
161:4, 161:13,
161:15, 181:23,
181:24, 228:20,
230:3, 230:14,
230:16, 233:12,
234:9, 234:11,
234:24, 239:16,
239:18, 259:6
**work-related**
6:22, 7:4, 7:8,
7:9, 94:20,
95:8, 95:9,
95:13, 95:15,
95:17, 229:22
**worked**
13:22, 14:9,
14:12, 14:13,
15:7, 22:17,
22:21, 22:23,
23:3, 23:5,
26:15, 36:4,
48:1, 48:10,
49:20, 50:4,
69:19, 138:22,
161:19, 161:21,
217:17, 224:21,
225:3, 225:11,
225:12, 225:15,
266:3, 266:7,
276:6
**working**
13:16, 14:12,
15:10, 18:17,
41:5, 74:21,

108:20, 153:11,
161:24, 162:2,
209:23, 232:23,
235:13
**workplace**
27:22, 27:24,
279:20
**works**
60:24, 217:20,
238:10
**world**
60:8
**worn**
166:8
**worry**
63:5, 64:2,
64:12
**worse**
228:10, 228:12,
245:10, 245:12,
245:14, 245:19
**wouldn't**
85:17, 86:1,
90:4, 114:4,
172:17, 177:2,
180:19, 237:6,
238:20
**wrap**
265:1
**write**
37:4, 37:15,
43:11, 43:13,
72:8, 103:11,
111:18, 111:19,
111:20, 111:21,
111:23, 113:5,
147:8, 147:11,
148:12, 148:16,
148:18, 254:4,
268:17, 269:4
**write-up**
36:10, 36:11,
37:11, 37:12,
42:19, 44:20,
45:1, 103:10,
103:22, 104:4,
104:6, 104:19,
104:22, 138:16,

138:20, 138:21,
168:16, 173:8,
271:9, 272:4,
280:21
**write-ups**
147:18, 268:4,
268:5, 271:7,
272:11, 272:16,
272:17, 273:3,
273:10, 273:22,
280:20, 287:11,
287:14
**writes**
147:6
**writing**
85:3, 147:9,
170:16
**written**
38:14, 38:18,
39:1, 42:1,
42:18, 47:21,
101:19, 148:22,
149:20, 150:5,
151:17, 162:12,
162:13, 166:20,
166:21, 270:24,
271:24, 272:5
**wrong**
36:14, 40:21,
60:15, 126:17,
126:19, 128:19,
129:17, 129:18,
130:5, 131:3,
131:9, 131:16,
132:1, 132:20,
133:3, 146:20,
146:21, 153:23,
188:15, 188:19,
188:22, 201:23
**wrote**
88:23, 89:1,
89:5, 100:23,
103:24, 104:2,
107:5, 107:6,
107:16, 107:20,
137:23, 139:10,
139:15, 147:13,
149:14, 151:23,

152:18, 195:17,
207:7, 208:6,
208:11, 211:21

**X**

**x**
28:22

**Y**

**year**
12:24, 13:24,
20:12, 20:18,
48:15, 48:19,
61:15, 93:5,
134:12, 219:22,
220:6, 221:8,
225:23
**year-old**
232:9
**years**
6:24, 18:10,
48:18, 65:3,
83:6, 134:7,
145:18, 145:20,
170:10, 170:12,
206:13, 208:9,
218:12, 218:15,
218:21, 220:2,
220:14, 226:19,
228:3, 228:5,
228:7, 228:8,
229:10, 230:5,
231:2, 232:22,
233:3, 233:9,
234:15, 234:16,
237:1, 238:11,
238:12, 238:14,
238:16, 239:24,
240:6, 240:8,
240:9, 241:10,
241:17, 243:19,
243:21, 244:16,
244:21, 263:18,
263:23, 264:2,
266:23, 276:5,
276:20, 282:9,
287:19
**yell**
286:14

**yelled**
98:2
**yelling**
118:13, 129:8,
147:24, 149:4,
270:8
**yep**
12:15, 14:24,
16:20, 70:12,
113:9, 189:13,
197:22, 220:14,
253:11
**yes-or-no**
190:8
**yesterday**
11:1, 75:4
**young**
16:13
**younger**
212:24, 213:3
**yourself**
42:21, 49:4,
61:5, 135:19,
174:17

**Z**

**zero**
219:16
**zone**
18:16
**zones**
18:15, 75:14,
75:19
**zoom**
7:21

**$**

**$30,000**
219:3, 219:4,
219:7, 219:16
**$4,000**
220:6

**0**

**00**
26:5, 26:6,
26:8, 26:9,
26:10, 26:11,

26:12, 96:6,
96:11, 115:6,
115:9, 142:4
**000001**
4:19, 119:11,
122:3
**000002**
4:20, 121:3,
122:4
**000004**
4:22, 192:8
**000012**
5:8, 193:12
**000014**
5:9, 194:6
**000015**
5:10, 195:5
**000022**
5:11, 206:23
**003733**
294:4
**011522**
5:12, 196:10
**011524**
5:13, 197:5
**011525**
5:14, 198:5
**011529**
5:15, 198:22
**011535**
5:16, 200:14
**011646**
5:17, 201:6
**017569**
5:19, 205:1
**02**
293:22
**0286**
129:12
**0339**
3:16
**05726**
1:7
**06**
142:5
**07**
1:16
**084**
294:4

Transcript of LeGrain Winston
Conducted on August 28, 2020                    129

---

**1**

**1**
75:3, 115:6,
115:9, 142:4,
142:5, 203:8
**10**
1:16, 5:10,
75:24, 138:19,
139:18, 143:6,
144:7, 144:8,
144:9, 144:19,
145:15, 146:8,
146:13, 146:16,
146:23, 154:2,
165:17, 167:13,
167:22, 167:23,
168:16, 168:22,
169:1, 169:6,
169:14, 194:24,
195:1, 195:4,
203:21, 205:10,
223:3, 226:19,
228:3, 228:7,
255:6, 281:21
**100**
3:6, 48:6,
48:8, 50:5,
69:16, 69:18,
278:1
**11**
5:11, 26:6,
26:9, 26:10,
75:3, 75:7,
96:6, 96:11,
101:23, 192:8,
206:17, 206:18,
206:23, 235:9,
256:14
**115**
4:15
**119**
4:19
**12**
5:12, 26:8,
26:11, 114:23,
124:16, 196:5,
196:6, 196:9,

221:18, 235:10,
250:2, 256:6,
256:8
**120**
3:21, 4:20
**12003**
12:20
**122**
4:21
**13**
5:13, 155:6,
155:17, 173:19,
196:24, 197:1,
197:4, 250:23,
255:21, 256:6,
256:8
**14**
5:14, 176:10,
182:8, 197:24,
198:1, 198:4,
255:15, 255:17,
255:19
**15**
5:15, 138:16,
151:5, 198:17,
198:18, 198:21
**150**
151:5
**16**
5:16, 173:20,
176:10, 200:9,
200:10, 200:13,
294:20
**17**
5:17, 182:6,
201:1, 201:2,
201:5, 256:13,
256:15, 265:7
**17464**
5:18, 202:9
**175**
176:10
**18**
1:7, 5:18,
202:3, 202:4,
202:8
**19**
4:20, 5:19,

99:17, 120:6,
120:13, 121:1,
122:4, 124:10,
129:1, 129:3,
204:17, 204:18,
204:24, 292:16
**191**
4:22
**193**
5:8
**194**
5:9
**195**
5:10
**196**
5:12
**197**
5:13
**198**
5:14, 5:15
**1988**
14:1, 14:2
**1991**
13:18, 13:20,
14:2, 15:4
**1993**
15:17
**1994**
15:3, 15:5,
15:17, 15:21,
16:22, 17:5,
17:10, 20:2,
20:3, 23:11,
23:14, 23:17,
48:12, 56:16,
56:23, 88:2,
165:9

---

**2**

**2**
26:12
**20**
138:16, 219:4,
219:7, 238:15,
240:3, 277:20
**200**
3:14, 5:16
**2000**
3:22, 20:15,

20:18, 23:14,
23:17
**201**
5:17
**2010**
224:22
**2012**
136:12, 136:14,
151:23, 194:14,
195:20, 253:10,
253:13, 254:24,
255:10, 259:17,
261:3, 261:12,
262:20, 263:1,
263:6, 263:12,
263:24, 264:8
**2013**
88:8
**2014**
276:7
**2015**
4:19, 4:20,
5:8, 94:19,
95:2, 99:17,
116:14, 118:14,
118:20, 119:9,
120:6, 120:13,
121:2, 122:2,
124:10, 124:16,
129:7, 129:12,
138:8, 138:16,
143:14, 193:13,
201:18, 203:1,
222:1, 222:8,
225:24, 226:3
**2016**
122:6, 122:23,
134:13, 134:14,
134:15, 200:17,
254:22, 263:15,
263:22
**2017**
155:6, 155:17
**2018**
93:6
**202**
5:18
**2020**
1:15, 223:4,

Transcript of LeGrain Winston
Conducted on August 28, 2020

130

**294:18**
**2021**
3:13, 221:11,
294:20
**204**
5:19
**206**
3:5, 5:11
**21**
5:8, 5:10,
151:5, 193:13,
195:5, 221:19,
232:8
**210**
5:3
**22**
223:7, 265:5
**221**
247:2, 247:13
**23**
122:23, 139:12,
224:17
**2323**
104:10, 155:24
**24**
143:14, 149:10,
149:12
**25**
13:20, 122:6,
138:8, 221:7,
278:1
**26**
127:11, 127:12,
203:1
**265**
4:6
**27**
238:20, 265:7
**28**
1:15, 87:21
**283**
4:7
**29**
5:11, 47:12,
88:1, 201:18,
206:23, 238:14
**294**
1:23

**2nd**
151:23, 200:17

**3**

**3**
26:6, 26:9,
26:10
**30**
5:15, 65:3,
88:3, 94:19,
95:1, 114:23,
118:14, 121:24,
122:9, 170:10,
198:22, 220:17,
233:3, 238:12,
238:16, 239:24,
240:6, 277:21
**31**
75:7, 90:10
**312**
3:8
**315905**
1:22
**32**
94:18, 142:5
**33**
99:16, 120:8
**34**
101:7, 121:24,
122:10
**37**
75:3
**3705**
3:24
**39**
75:7
**3:-to**
96:6, 96:11
**3rd**
118:20, 119:8,
122:2, 129:7

**4**

**4**
26:5, 26:8,
26:11, 265:5,
265:7
**47**
5:17, 201:7

**49**
238:14

**5**

**5**
293:22
**50**
238:11, 238:16,
238:22, 238:23,
239:24, 240:6
**51**
232:9
**523**
5:12, 196:10
**55**
240:9

**6**

**6**
26:12
**60**
240:9
**60523**
3:15
**60602**
3:23
**60628**
12:21
**60661**
3:7
**630**
3:16
**655**
3:8
**66**
5:18, 202:9
**6th**
104:11, 155:24

**7**

**70**
219:2
**700**
41:15
**71**
5:19, 205:1
**72**
238:11, 238:12

**7660**
3:8
**786**
3:24
**79**
102:6

**8**

**80**
102:12, 102:13,
108:5, 238:13
**866**
3:24
**87**
4:14
**8a**
135:19, 136:4
**8h**
135:20

**9**

**91**
15:12
**93**
15:7, 15:12
**94**
15:8
**984**
3:16
**9th**
88:8, 116:13,
294:17



**SHERIFF'S OFFICE OF COOK COUNTY**
**OFFICE OF PROFESSIONAL REVIEW**
**COMPLAINT REGISTER**

**Complainant Information**

| NAME (Last, First, M.I.): Winshill LeGran | AGE: 45 | DATE OF BIRTH: 4/15/1970 | HOME #: (773) 660-1936 |
|---|---|---|---|
| HOME ADDRESS: 1203 S Perimeter | CITY: Chicago | | WORK/OTHER #: (708) 785-3692 |
| STATE: IL | ZIP CODE: 60628 | STATE I.D./D.S.#: WS23-5397-6108 | STATE OF ISSUANCE: IL |

I HAVE BEEN NOTIFIED THAT, PURSUANT TO 50 ILCS 725/3.8(b), ANYONE FILING A COMPLAINT AGAINST A SWORN PEACE OFFICER MUST HAVE THE COMPLAINT SUPPORTED BY A SWORN AFFIDAVIT.

**Complainant Information**

| DATE OF INCIDENT: 9 April 2015 | TIME OF INCIDENT: Roll Call Approximately 1530hrs |
|---|---|

LOCATION OF INCIDENT: 2323 S Rockwell 6th Floor (Roll Call)

PROVIDE NAMES, BADGE NUMBERS, SQUAD NUMBER or LICENSE PLATE, and/or PHYSICAL DESCRIPTION OF THE OFFICER AGAINST WHOM YOU WISH TO FILE A COMPLAINT:

Chief Joseph Ranzino Electronic Monitoring Unit

**Witness**

ARE THERE ANY WITNESSES YOU WISH TO BE CONTACTED DURING THE INVESTIGATION? ☑ YES ☐ NO
IF YES, PROVIDE CONTACT INFORMATION.

| NAME | ADDRESS/CITY/STATE/ZIP | HOME PHONE # |
|---|---|---|
| Inv Victor Slaughter | N/A | (708) 845-2085 |
| Inv David Walker | N/A | (773) 502-9656 |

**Narrative**

PROVIDE A FULL DETAILED ACCOUNT OF YOUR COMPLAINT AND THE NATURE OF THE INCIDENT.

On Thursday, 9 April 2015 while attending Roll Call conducted by Chief Ranzino, R/I overheard as well as several other Investigators; Chief Ranzino asked if Investigator McGhee was on duty. R/I Winston responded by saying, "he (McGhee) was off today". Chief Ranzino responded by saying, he meant Investigator McCall, and then stated **"all of you look alike".** There is only one way to interpret that comment, and that is racially driven. This is not the first incident with Chief Ranzino where he has used racially insensitive and prejudice statements; check previous Grievances and OPR Complaints, without any resolution from the Administration or the Union. I write this grievance with much trepidation, due to fear of retaliation. If the Administration does not address the egregious and negative behavior in the workplace, it would leave me with no other alternative but to take this matter to the next level. Thank you in advance for your attention to this issue.

FOR OFFICE USE ONLY
DATE COMPLAINT RECEIVED: _____ RECEIVED BY: _____
READING #: _____

08/28/2020 - GE
WINSTON 12

Complaint Narrative (Continued)

PLEASE BE AWARE THAT IF YOU ALLEGE INJURIES AS A RESULT OF THIS INCIDENT, DUE TO FEDERAL PRIVACY LAWS ON THE RELEASE OF MEDICAL RECORDS, YOU MUST PROVIDE COPIES OF YOUR RELEVANT MEDICAL RECORDS REGARDING ANY EXAMINATION OR TREATMENT TO THE SHERIFF'S OFFICE INVESTIGATING UNIT TO BE MADE PART OF THE INVESTIGATION.

I have read this statement that I have voluntarily made, consisting of ___ pages, and I solemnly swear that the facts and allegations contained within are true and correct to the best of my knowledge. _LeBron W Winston II_

(Print Name)

Complainant's Signature: _____ Date: 20 April 2015

State of Illinois )
County of Cook )

Signed and sworn to before me on 20 April 15 by _LeBron W Winston II_
(date) (name of person making statement)

OFFICIAL SEAL
BEVERLY ADAMS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/14/16

_Beverly Adams_
(signature of notary public)

A person commits PERJURY when, under oath or affirmation, in a proceeding or in any matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. PERJURY IS A CLASS 3 FELONY.

Please mail your completed, signed and notarized, complaint form to:

**Cook County Sheriff's Office of Professional Review**
3026 S. California
Chicago, IL. 60608

# Exhibit J



# Transcript of Wilford Ferguson

**Date:** August 31, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Wilford Ferguson
Conducted on August 31, 2020

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF ILLINOIS

 3               EASTERN DIVISION

 4  LEGRAIN WINSTON, MICHELLE      )

 5  STRICKLAND, VERNELL TIMS,      )
    I.V. NEWSON, JR., SAMUEL       )
 6  PAGE, WILFORD FERGUSON,        )

 7  CECIL WILLIAMS, ANTHONY        ) No. 18 cv-05726
    MANNING, DAVID WALKER,         )
 8  TYRONE MCGHEE and VICTOR       )
    SLAUGHTER,                     )
 9                                 )

10        Plaintiffs,              )

11                                 )

12        -vs-                     )

13  SHERIFF OF COOK COUNTY         )

14  THOMAS J. DART, in his         )
    Official Capacity, JOSEPH      )
15  RANZINO, Individually and      )

16  in his Official Capacity,      )
    GREGORY SHIELDS,               )
17  Individually and in his        )

18  Official Capacity, THOMAS      )
    NEAL, Individually and in      )
19  his Official Capacity,         )
    CHRISTOPHER ROHLOFF,           )
20  Individually and in his        )
    Official Capacity, and         )
21  COUNTY OF COOK, ILLINOIS,      )

22                                 )

23        Defendants.              )

24
```

---

**Page 2**

```
 1        The virtual deposition of WILFORD

 2  FERGUSON, called by the defendants for

 3  examination, pursuant to notice and pursuant to

 4  Federal Rules of Civil Procedure for the United

 5  States District Courts pertaining to the taking of

 6  depositions, taken before DIANA DEBRA SABO,

 7  Certified Shorthand Reporter within and for the

 8  State of Illinois, on the 31 day of August, 2020.
```

---

**Page 3**

```
 1  A P P E A R A N C E S :

 2        HERBERT LAW FIRM, INC., by
          MS. KELLY A. KRAUCHUN,
 3        206 South Jefferson Street
          Suite 100
 4        Chicago, Illinois   60661
          (312) 655-7660
 5
 6            Appeared virtually on behalf of the
              Plaintiff, Wilford Ferguson;
 7
          LEINENWEBER, BARONI & DAFFADA, LLC, by
 8        MR. JUSTIN L. LEINENWEBER,
          120 North LaSalle Street
 9        Suite 2000
          Chicago, Illinois   60602
10        (312) 380-6635

11            Appeared virtually on behalf of the
              Defendants.
12
13        EMERY LAW, LTD., by
          MR. ETHAN E. WHITE,
14        2021 Midwest Road
          Suite 200
15        Oak Brook, Illinois   60523
          (312) 380-6635
16
              Appeared virtually on behalf of the
17            Defendants.
18
19  Also Present:
20  Mr. Lucien Newell, Planet Depos IT
21
22
23
24
```

---

**Page 4**

```
 1  INDEX
 2  WITNESS:                                    Page
 3  WILFORD FERGUSON
 4  Direct Examination by Mr. Leinenweber       9-61
 5
 6  *   *   *   *   *   *   *   *   *   *   *
 7  EXHIBITS:
 8        (No exhibits marked.)
 9
10
11  *   *   *   *   *   *   *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Transcript of Wilford Ferguson
Conducted on August 31, 2020

5

1  MR. NEWELL: All right. Thank you to
2 everyone for attending this proceeding remotely
3 which we anticipate will run smoothly.
4  Please be aware that we are recording this
5 proceeding for backup purposes. Any
6 off-the-record discussion should be had away from
7 the computer. Please remember to mute your mike
8 for these conversations.
9  Please have your video enabled to help the
10 reporter identify who is speaking. If you are
11 unable to connect with the video and are
12 connecting via phone, please identify yourself
13 each time before speaking.
14  We will provide a complimentary, unedited
15 recording of this deposition with the purchase of
16 a transcript if you are interested.
17  I apologize in advance for any
18 technical-related interruptions. Thank you.
19 (Witness virtually sworn pursuant to Executive
20 Order 2020-14.)
21  MR. LEINENWEBER: All right. Good
22 morning, Mr. Ferguson. My name is Justin
23 Leinenweber. I'm one of the attorneys for the
24 defendants in this lawsuit, along with my

6

1 co-counsel, Ethan White, who is here as well.
2  Could you please state and spell your name
3 for the record.
4  THE WITNESS: Wilford Ferguson,
5 W-I-L-F-O-R-D; Ferguson, F-E-R-G-U-S-O-N.
6  MR. LEINENWEBER: And Mr. Ferguson, have
7 you ever had your deposition taken before?
8  THE WITNESS: No.
9  MR. LEINENWEBER: Okay. I'm going to give
10 you a couple of ground rules for today that the
11 main goal of is to make sure that we do our best
12 to make Diana, the court reporter's job a little
13 bit easier today.
14  So the first -- the first ground rule here
15 is that when I'm asking a question, please let me
16 finish before you answer it. There may be
17 occasions where you anticipate what I'm asking and
18 want to interject which is perfectly normal and at
19 regular conversation, but during a deposition when
20 the court reporter is typing everything, it
21 doesn't work so well. So if you let me finish my
22 question and then I will do my best to let you
23 finish your answer before talking. Is that -- is
24 that okay?

7

1  THE WITNESS: Yes.
2  MR. LEINENWEBER: Okay. Great.
3  And because this is a deposition, the
4 court reporter can only take down verbal answers.
5 So we can't accept a nod of the head or a shake of
6 the head or "Uh-huh" or an "Unh-unh." So please
7 do your best to answer "Yes" or "No" or, you know,
8 as the question requires. Is that okay?
9  THE WITNESS: Yes.
10  MR. LEINENWEBER: Okay. We're going to be
11 at this for a little while today, but this isn't a
12 marathon. So if you would like a take a break,
13 we're happy to accommodate that. The only thing
14 is is that we request if I've asked a question,
15 you answer that before we take a break. Okay?
16  THE WITNESS: Okay.
17  MR. LEINENWEBER: And I'm going to be
18 asking a number of questions today, some of which
19 you may not understand. If you don't understand
20 what I am asking, please just ask me to clarify
21 and I'll do my best to explain a little bit better
22 what I'm asking. Is that okay?
23  THE WITNESS: Yes.
24  MR. LEINENWEBER: Okay. If you do answer

8

1 one of my questions, we're all going to assume
2 that you understood the question. Okay?
3  THE WITNESS: Okay.
4  MR. LEINENWEBER: Is there any reason you
5 can't give full, complete, and accurate testimony
6 today?
7  THE WITNESS: No.
8  MR. LEINENWEBER: Okay. Usually for a
9 deposition we'd be sitting in the same room, but
10 because of the pandemic, we're doing this over
11 Zoom. So there's a few additional questions I
12 want to ask you.
13  Is there anyone with you there today?
14  THE WITNESS: Not in this room.
15  MR. LEINENWEBER: Okay.
16  THE WITNESS: At home, yes.
17  MR. LEINENWEBER: And you understand that
18 no one can provide you with answers to the
19 questions today; right?
20  THE WITNESS: Right.
21  MR. LEINENWEBER: Okay. Do you have any
22 notes in front of you?
23  THE WITNESS: No.
24  MR. LEINENWEBER: Do you have any

Transcript of Wilford Ferguson
Conducted on August 31, 2020

---

9

1 documents of any kind?
2    THE WITNESS:  No.
3    MR. LEINENWEBER:  Okay.  Do you have
4 anything at all with you to aid you in the
5 deposition today?
6    THE WITNESS:  Nope.
7    MR. LEINENWEBER:  Okay.  And you agree you
8 won't look at your phone or text messages or
9 anything like that for information to help you
10 with your testimony today; right?
11    THE WITNESS:  I agree.
12    MR. LEINENWEBER:  Okay.
13 WHEREUPON:
14         WILFORD FERGUSON
15 called as a witness herein, after having been first
16 virtually duly sworn, was examined upon oral
17 interrogatories and testified as follows:
18    D I R E C T   E X A M I N A T I O N
19         BY MR. LEINENWEBER
20
21    Q  Did you do anything to prepare for your
22 deposition today?
23    **A  Just looked over paperwork, old paperwork.**
24    Q  Okay.  What sort of paperwork?

---

10

1    **A  Just documentation from the attorneys and**
2 **stuff like that.**
3    Q  Okay.  Do you know the titles of any of
4 the documents that you looked at?
5    **A  Not offhand.  I don't have them in front**
6 **of me.**
7    Q  Okay.  Are those all documents that were
8 produced in this lawsuit?
9    **A  Yes.**
10    Q  Okay.  When did you meet with any --
11 Sorry.  Strike that.
12       Other than looking at this paperwork you
13 just mentioned, did you do anything else to
14 prepare for your deposition today?
15    **A  No.**
16    Q  Did you meet with your attorney at all?
17    **A  Not meet but talk.**
18    Q  Okay.  When was that?
19    **A  Yesterday.**
20    Q  Okay.  About how long did you guys talk?
21    **A  I don't know.  Probably 30 minutes.**
22    Q  Okay.
23    **A  Maybe 25.  I don't know offhand.**
24    Q  Other than speaking with your attorney,

---

11

1 have you spoken with anyone else about your
2 deposition?
3    **A  No.**
4    Q  Okay.  Have you spoken with any of the
5 other plaintiffs regarding your deposition?
6    **A  No.**
7    Q  Have you spoken with any of the other
8 plaintiffs regarding their depositions?
9    **A  No.**
10    Q  Okay.  Could you tell us where do you live
11 currently.
12    **A  South Holland, Illinois.**
13    Q  What's your address?
14    **A  16729 Kimbark Court, South Holland,**
15 **Illinois, 60473.**
16    Q  And what is your highest level of
17 education?
18    **A  Some college.**
19    Q  Okay.  So you graduated from high school?
20    **A  Yes.**
21    Q  What year did you graduate from high
22 school?
23    **A  1984.**
24    Q  All right.  And then you said some

---

12

1 college.  Where did you --
2    **A  Yeah.**
3    Q  -- attend college?
4    **A  It was Loop College but Harold Washington**
5 **now.**
6    Q  Harold Washington?  Okay.
7    **A  Junior college downtown.**
8    Q  And how many years did you attend Loop
9 College or Harold Washington?
10    **A  One.**
11    Q  One year?
12    **A  Yes.**
13    Q  Okay.  And you did not obtain a degree?
14    **A  No.**
15    Q  Why didn't you obtain a degree from that
16 school?
17    **A  I started working, helped my mother and**
18 **father out.**
19    Q  Okay.  And are you married, sir?
20    **A  Yes.**
21    Q  Okay.  And do you have any kids?
22    **A  Yes.**
23    Q  Okay.  Let's see.  So you graduated from
24 high school in 1984.  Where did you go to high

---

Transcript of Wilford Ferguson
Conducted on August 31, 2020

4 (13 to 16)

13

1  school?
2      A  Chicago Vocational, CVS.
3      Q  Okay.  All right.  And between the --
4  let's see.  What year did you start at the Cook
5  County Sheriff's office?
6      A  '91, 4-16-1991.
7      Q  Okay.  So between 1984 and 1991 what did
8  you do?
9      A  I was working -- well, I was -- I went to
10 Harold Washington College for a year, then I was
11 working at the post office for about four years
12 and something like that, and I went to -- I moved
13 to Dubuque, Iowa.
14     Q  Okay.
15     A  And -- and I -- once I got certified with
16 the County, I moved back here.  I worked at White
17 Hen Pantry, and I got certified and got called for
18 the County and everything else is history --
19     Q  Okay.
20     A  -- you know --
21     Q  When you worked at the post office, what
22 sort of work did you do?  Were you a letter
23 carrier?
24     A  No, I was a -- I worked on -- I was a jam

14

1  breaker.  I worked in the main post office
2  downtown.
3      Q  So, like, running the sorting machinery,
4  things like that?
5      A  Sorting, yeah, yeah.  Weighing the mail,
6  stuff like that.
7      Q  What took you to Dubuque, Iowa?
8      A  I just went.  Just a change of scenery.  I
9  just -- I wasn't doing anything else; so I just
10 went down with some cousins.
11     Q  Okay.
12     A  Because I had a cousin down there going to
13 the University of Dubuque.  So I went down there
14 to visit and then I liked it; so I stayed.
15     Q  Okay.  And what sort of work did you do
16 while you were there?
17     A  Worked as auto mechanic, Sears.
18     Q  Okay.  And let's see.  So --
19     A  I DJ'd for all the colleges down there,
20 too, because I DJ'd.
21     Q  Okay.  Cool.  Do you still DJ today?
22     A  No.  I do a little -- little bit of
23 something, but nothing like I did.
24     Q  Okay.  So you began working for the Cook

15

1  County Sheriff's office in 1991.
2      Do you currently still work at the
3  sheriff's office?
4      A  Yes, sir.
5      Q  So '91 to the present.
6      At any time between '91 and the present
7  did you stop working at the sheriff's office?
8      A  No, sir.
9      Q  And any time between '91 and the present
10 did you work anywhere else in addition to the
11 sheriff's office?
12     A  I worked at the -- as far as a part-time
13 job you mean?
14     Q  Sure.  Part or full, additional, yeah.
15     A  Chicago Park District.
16     Q  Okay.  Anything else?
17     A  A little security, odd-end jobs.  It
18 wasn't --
19     Q  Okay.
20     A  Like, one-day jobs.
21     Q  Were either of those Chicago Park District
22 or security jobs in the last --
23     A  Oh.
24     Q  -- say, five years?

16

1      A  I worked at -- I worked for the Board of
2  Education too.  I was security --
3      Q  Okay.
4      A  -- officer for the Dunbar High School.
5      Q  Okay.  And then was any of those
6  additional positions -- Sorry.  Strike that.
7      Were any of those additional positions
8  within the last, say, five years?
9      A  Let me see.  No, no.
10     Q  Okay.  In the last -- since 2015 have you
11 had any other additional employment other than the
12 sheriff's office?
13     A  No.
14     Q  Okay.  And when did you start -- Well,
15 sorry.  Strike that.
16     In 1991 when you joined the sheriff's
17 office, what position -- what was your position?
18     A  Correctional officer.
19     Q  Okay.  And where were you assigned?
20     A  Division 6 at the jail.
21     Q  Okay.  And then when did you begin in
22 electronic monitoring?
23     A  December 27, 1992.
24     Q  And between your start at the sheriff's

Transcript of Wilford Ferguson
Conducted on August 31, 2020

5 (17 to 20)

---

17

1  office in '91 and when you went to EM on December
2  27, 1992, did you have any other positions or
3  assignments with the sheriff's office?
4      A  No.
5      Q  Okay.  You so you were a correctional
6  officer Division 6 up until you joined EM.
7      A  Right.
8      Q  Okay.  And when you joined EM, what was
9  your position?  Investigator, I assume?
10     A  Right.
11     Q  Okay.  And have you -- have you worked
12 approximately the same watch the entire time
13 you've been in EM or have you bounced around?
14     A  When I started, I was working midnights,
15 12:00 to -- 12:00 to 8:00.
16     Q  Okay.
17     A  And then I went to working the evening
18 shift in TSS -- no, patrol working 4:00 to 12:00.
19 And then I went to TSS and that was 12:00 to 8:00,
20 12:00 in the afternoon to 8:00 in the evening, and
21 then back to, I think it was, 3:00 to 11:00 and --
22     Q  And --
23     A  -- 11:00 ever since.
24     Q  3:00 to 11:00.

---

18

1         And then after you were doing the 12:00 to
2  8:00 shift in TSS, you said you moved back to the
3  3:00 to 11:00.  What was that position?
4      A  Patrol.
5      Q  That was patrol.  Okay.
6         So okay.  Let me see if I understand this
7  then.  So when you started, you were working 12:00
8  A.M. to 8:00 A.M., the overnight shift.
9      A  In patrol.
10     Q  In patrol.
11     A  Yeah.
12     Q  And then at some point there you switched
13 to the evening shift.  So that was 4:00 P.M. to
14 12:00 A.M.?
15     A  Right.  That was patrol also.
16     Q  That was patrol also.  Okay.
17        And then you went to TSS and you were
18 working 12:00 P.M. to 8:00 P.M.?
19     A  Right.
20     Q  Okay.  And then you went back to patrol
21 and you were working 3:00 to 11:00 P.M.?
22     A  Right.
23     Q  Okay.  And is that where you're working
24 currently, patrol 3:00 to 11:00?

---

19

1      A  Yes.  Well, right now I'm in Division 5
2  because of Article U that I got over there in EM
3  from Director Shields.  So I'm in EM, but I'm
4  placed in Division 5 right now.
5      Q  What is Division 5?
6      A  Correctional facility.
7      Q  Yeah, what --
8      A  Part of the jail.
9      Q  It's part of the jail?
10     A  Yes.
11     Q  Is there any further way you can
12 elaborate?  Like, what's the difference between
13 Division 5 and Division 6, for example?
14     A  Well, Division 5 is where civilians come
15 pay inmates' bonds or they can come pick up
16 property.  They commissary is ran from there.  And
17 also Division 5 is a holding area.  When the
18 inmates first get to the jail, they hold them
19 there for, like, a few days before they place them
20 in their general population.
21     Q  Okay.  And you said you're currently --
22 that's what you're currently doing is Division 5.
23     A  I'm in Division 5; right.
24     Q  Okay.  And you're still an investigator

---

20

1  though?
2      A  Right.
3      Q  Okay.  And when did you begin in Division
4  5?
5      A  I think that was March.
6      Q  March of this year?
7      A  This year; right.
8      Q  Yeah.
9      A  2020.
10     Q  So March 2020 you moved to Division 5.
11     A  Yes.
12     Q  So from December 27, 1992, until
13 March 2020 you were always working within EM?
14     A  Right.
15     Q  Okay.  And you said -- okay.  So
16 immediately prior to moving to Division 5 you were
17 working patrol?
18     A  Yes.
19     Q  Okay.  And before you were working patrol,
20 you were working in TSS.
21        When did you move from TSS to patrol?
22     A  Okay.  When I was working in TSS, after I
23 left patrol from that 4:00 to 12:00 shift and went
24 to evenings from 12:00 to 8:00, you used to bid

---

Transcript of Wilford Ferguson
Conducted on August 31, 2020

6 (21 to 24)

---

21

1  and at the position you wanted to work.  If you
2  wanted patrol, you bid to patrol.  If you wanted
3  to work in TSS, you bid at the TSS.  Okay?  If you
4  wanted to work in deliveries, you bid into that --
5  that spot in EM.
6        But then they took all of that, the
7  bidding, away and they just put everybody in
8  patrol.  And then once you have roll call, you
9  knew what assignment you had before you went on
10 the street.
11       So that's how I ended up back on 3:00 to
12 11:00 -- the 3:00 to 11:00 shift from that 12:00
13 to 8:00 evening shift.  They stopped that bidding
14 and just put everybody in patrol.
15    Q  Okay.
16    A  And once roll call was over, you knew
17 where you were working that day.
18    Q  Did you know when they --
19       And sorry.  Could you adjust your camera
20 just a little bit so we can see your face a little
21 bit better.
22    A  Okay.
23    Q  Okay.  Thank you.
24

---

22

1        When -- you said that at some point they
2  took away bidding.  When was that done?
3     A  I can't recall that time.
4     Q  Okay.
5     A  I don't know offhand.
6     Q  Okay.
7     A  Some years ago.
8     Q  Okay.
9     A  Some years ago.
10    Q  Years ago.  Okay.
11       And who took away the ability to bid on
12 assignments?
13    A  I don't know if -- I don't know what
14 director that was at the time.  I can't recall.
15 Yeah, so many directors I don't know which one --
16    Q  Okay.
17    A  -- took that away.
18    Q  Is it your belief, though, that a director
19 was responsible for removing your ability to bid
20 on assignments?
21    A  Oh, yeah.
22    Q  Okay.
23    A  Yes.
24    Q  Where did the -- Sorry.  Strike that.

---

23

1        Where was the practice of being able to
2  bid on assignments written down?
3     A  I don't know if we had a -- I don't know
4  if it was in our general orders that we had at the
5  time.  I don't -- I don't know.
6     Q  Okay.
7     A  I can't recall.
8     Q  Are you familiar with -- go ahead.
9     A  EM used to have their own general orders
10 before --
11    Q  Okay.
12    A  -- they combined everybody to the jail.
13    Q  Did you -- Sorry.  Strike that.
14       Since 1992 when you joined EM, have you
15 been in a union?
16    A  Yes.
17    Q  And what union is that?
18    A  Teamsters.
19    Q  Okay.  And the Teamsters have a Collective
20 Bargaining Agreement with the sheriff's office?
21    A  Yes.
22    Q  Okay.  And do you have any understanding
23 of whether or not the bidding process was outlined
24 in the Collective Bargaining Agreement?

---

24

1     A  I don't -- I don't know.  I don't think
2  so.
3     Q  You don't think so?
4     A  I don't -- I don't think it was.
5     Q  Okay.  Is it possible that it was included
6  in there?
7     A  Probably not.
8     Q  Okay.  And why do you say that?
9     A  Probably not.  Because EM was -- they
10 stood off from the jail, you know -- we was in a
11 union, but we was -- we was like a small group,
12 you know --
13    Q  Uh-hum.
14    A  So it wasn't -- we didn't have a big -- a
15 big -- how can I say? -- a big population as far
16 as people, you know -- we was a little old piece
17 of the union I can say.  We was involved in it,
18 but we really didn't have no steward or nobody to
19 stand up for us or whatever.  We was really off on
20 our own.  We didn't have, like, 3,000 or 1800
21 officers like the jail did.  We only had, like,
22 maybe 178 officers in our unit at that time.
23    Q  What's the basis of your understanding
24 that the director of EM took away the ability to

---

Transcript of Wilford Ferguson
Conducted on August 31, 2020

25

1 bid on assignments?
2 **A Well, the director was the only person**
3 **that could do that, as far as I understand. I**
4 **understood. You know, I didn't -- you know, I**
5 **guess he gave the directive to stop the bidding**
6 **process and put everybody in the patrol unit and**
7 **separate them after roll -- you know, roll call to**
8 **where they were going to work that day.**
9 Q Do you have an understanding as to whether
10 or not the Collective Bargaining Agreement could
11 have had the bidding process outlined in it?
12 **A I don't know.**
13 Q You don't know. Okay. Okay.
14 Let's see. Okay. You said March 2020 is
15 when you moved to Division 5. You moved from TSS
16 to patrol around the time that this bidding
17 process was eliminated; is that right?
18 **A Yes.**
19 Q Okay. So when you were working in TSS
20 then, you had actually bid for that position; is
21 that correct?
22 **A Then, yes.**
23 Q Okay. When -- and you don't recall when
24 that was?

26

1 **A I don't know if it was 1994 or '95. I**
2 **don't know. I can't recall that far back.**
3 Q Let's see. Okay. So other than patrol,
4 TSS, and now working in Division 5, are there any
5 other assignments that you worked while employed
6 in the EM unit?
7 **A No.**
8 Q Okay. So you were always -- when you were
9 within EM, you were always patrol or TSS.
10 **A Right.**
11 Q Okay.
12 **A Well, no, I take -- I was in a delivery.**
13 **I was doing deliveries also.**
14 Q Okay. Let's do it this way: Let me ask
15 you a different question and then I think this
16 will help clarify things.
17 What types of assignments are there within
18 EM?
19 **A They had the delivery unit, patrol unit,**
20 **TSS, and we did have a fugitive unit.**
21 Q Anything else?
22 **A That's it.**
23 Q Okay.
24 **A Oh, hold on. You had working school.**

27

1 **What else? You had monitoring and you got the**
2 **front desk. I think that's -- that's about it.**
3 Q Okay. And delivery, that's presumably
4 taking detainees and driving them to where they're
5 going to stay, the house that they're going to
6 stay in?
7 **A Right.**
8 Q Okay. Fugitive, is that just -- that's
9 investigators who are out looking for people who
10 have cut their bracelet or something like that and
11 kind of gone on --
12 **A Right. Went AWOL.**
13 Q Okay. What's work school?
14 **A Well, the people want to -- if they work,**
15 **if the inmates work or they go to school on the**
16 **program, you know, they can -- if they've got the**
17 **proper paperwork that states that they work or go**
18 **to school, they have to email us that paperwork**
19 **and everything, then they verify, you know, to see**
20 **if they really work or go to school and they let**
21 **them go.**
22 Q Okay. So your role as an investigator
23 working on work school would be doing that kind of
24 investigation to confirm that the employment or

28

1 school information the detainee's providing is
2 accurate?
3 **A Right.**
4 Q Okay. What's monitoring?
5 **A Where you've got some -- some officers**
6 **are -- they're in the office checking on the**
7 **inmates. Maybe they're out of range or maybe they**
8 **cut their bracelet off or maybe they need a**
9 **bracelet change or something like that, and they**
10 **can see all that on the computer.**
11 Q Okay.
12 **A You know, maybe --**
13 Q What about -- sorry.
14 **A Maybe they need permission to go to a**
15 **doctor or get groceries or go see a specialist or**
16 **something like that or cash a check. You know,**
17 **they give them permission to do all that stuff.**
18 Q And what about front desk? What is that?
19 **A That's the guy that sends out the jobs,**
20 **you know, to investigators on the street.**
21 Q And what does that mean?
22 **A You know, if a guy -- if you've got -- if**
23 **a guy didn't go to court and the judge put a**
24 **warrant out for him, they will send a squad car to**

Transcript of Wilford Ferguson
Conducted on August 31, 2020

---

**29**

1  his house to see what happened, why didn't he go
2  to court, and then bring him back to the jail so
3  he can go to court and then they put him back on
4  the program.
5      Or he will send a job out.  Guy got a low
6  battery or might need changes in equipment or
7  something like that.  Probably been on the program
8  for a year and they never changed his equipment
9  and battery is low or getting a low signal and
10 they change equipment out.  He just gives out
11 jobs, you know, and, you know, information like
12 that.
13     Q  Okay.  All right.  And then you would be
14 eligible for serving in all of these different
15 positions as an investigator within EM?
16     A  Yes.
17     Q  Okay.  And you have worked -- have you
18 worked all of these?  I'm a little unclear on
19 that.
20     A  Except fugitive.
21     Q  Except fugitive?  Okay.
22     A  Right.
23     Q  And you said fugitive they used to have
24 but they don't really have it anymore; is that

---

**30**

1  correct?
2      A  Right.  They -- I think that's a separate
3  unit now from EM.
4      Q  Okay.  And do you know when that
5  separation occurred?
6      A  I think last year.
7      Q  Okay.
8      A  2019.
9      Q  And -- all right.  Do you think -- let's
10 see.
11     A  Oh, no, I think it was, like, maybe --
12 maybe a few -- two or three.  About three years
13 ago.  Maybe three or four years ago, something
14 like that.
15     Q  Okay.  Let's see.
16     A  You was promoted -- you was promoted to
17 that spot.  They never had a test.  They just
18 started testing.
19     Q  Okay.  And let's see here.  What is
20 your -- Strike that.
21        So under the bid process you used to be
22 able to bid for one of these different
23 assignments; correct?
24     A  Yes.

---

**31**

1      Q  Okay.  And you used to bid for a TSS?
2      A  Yes.
3      Q  Approximately how long were you working in
4  TSS under that bid process?
5      A  Probably maybe four or five years.
6      Q  Okay.  All right.  And then after that you
7  started to work in patrol?
8      A  Yes.
9      Q  And then did you ever work in TSS again at
10 that point or no?
11     A  Yes.
12     Q  Can you adjust your camera again.  We lost
13 you.
14     A  I'm trying to.  It's this cord.  I got a
15 cord that my cat had chewed almost up and I'm
16 hoping that this battery don't -- it keep a
17 charge, cord keeps a charge.  That's why I keep
18 moving it around.
19     Q  Okay.
20     A  I don't want it cutting me off.
21     Q  Got you.
22     A  So --
23     Q  Well, if it becomes an issue, just let us
24 know and we'll take a break so you can figure it

---

**32**

1  out.  Okay?
2      A  Okay.
3      Q  All right.  So you said after you lost the
4  ability to bid, you did continue at least
5  sometimes to work in TSS?
6      A  Right.
7      Q  Okay.  But you also worked in patrol?
8      A  Well, patrol -- everything was patrol.
9  After they -- after they shut that bidding process
10 down, everybody was in patrol.  Just at roll call
11 you knew what -- they would tell you your
12 assignment.  You was either working deliveries or
13 they send you down to TSS or you was working the
14 street, you was working patrol.  But everything
15 was all patrol after they stopped the bidding
16 process.
17     Q  Okay.  So it's your understanding that
18 after they stopped the bidding process,
19 everyone -- all the investigators were included in
20 the sort of patrol bucket?
21     A  Right.
22     Q  And then those individuals would be
23 divided up into different assignments during roll
24 call?

---

Transcript of Wilford Ferguson
Conducted on August 31, 2020

33

1    A  Right.
2    Q  Okay.  And what is your understanding of
3  who made the decision to send investigators to any
4  of those different positions at roll call?
5    A  Oh, that would be up to the supervisors.
6    Q  Okay.
7    A  The chiefs or the deputy chiefs or
8  lieutenant or the sergeants.
9    Q  Let's -- let's talk about chain of command
10 for a second.
11   A  Okay.
12   Q  What is the -- currently -- or sorry.  As
13 of March when you were still in EM, what was the
14 chain of command there from investigator up?
15   A  Investigator, sergeant, lieutenant, and
16 you got your directors.
17   Q  Okay.  Anything else?
18   A  Well, the chiefs that they had that still
19 there that was chiefs back before they changed and
20 brought the sergeants and lieutenants in, they let
21 them keep their position as a deputy chief and
22 chief.  But other than that, everything is
23 sergeant and lieutenant now and, I guess, director
24 and executive director, whatever, and that was --

34

1  that's it.
2    Q  That's it?
3    A  Yes.
4    Q  And you kind of made reference to at some
5  point there used to be chiefs and deputy chiefs
6  but then it changed and there became sergeants and
7  lieutenants.
8    A  Right.
9    Q  So walk me through the old chain of
10 command when there were deputy chiefs and chiefs
11 from investigator up.
12   A  It was investigator.
13   Q  Uh-hum.
14   A  Investigator, then you had supervisors.
15   Q  Okay.
16   A  Then you had deputy chiefs, then you had
17 chiefs, then you had assistant directors, and then
18 you had directors, and then you got executive
19 director.
20   Q  Okay.  So then back to the sort of roll
21 call when the assignments are given out, who makes
22 the decision for regarding who gets which
23 assignment?
24   A  Well, now the lieutenant -- the lieutenant

35

1  does.  I guess if the lieutenant is there, I guess
2  that's who makes the assignment or the sergeant if
3  that person is there, you know -- but then it was,
4  like, the supervisors would make the assignment.
5    Q  Tell me about the supervisor position.  So
6  that's below deputy chief?
7    A  Yes.
8    Q  And what's your understanding of that
9  position?  Were these just investigators?  Were
10 they a wholly different position than
11 investigator?
12   A  With the supervisors?
13   Q  Yes.
14   A  Supervisors was just investigator.  They
15 just gave them a supervisory position.  No pay.
16 They would get, like, an hour time due a day.
17 Like, an hour of comp time a day.  That was their
18 perk for them.
19   Q  And it's your understanding that those
20 supervisors were the ones who made the decision
21 concerning assignments?
22   A  Right.
23   Q  Okay.  And now it is -- well, after
24 lieutenants and sergeants came on board, it became

36

1  the lieutenant --
2    A  Right.
3    Q  -- who made the decision regarding
4  assignments --
5    A  Right.
6    Q  -- or the sergeant if the lieutenant is
7  not there.
8    A  Right.
9    Q  And so you had four to five years of
10 experience under your belt in TSS when they had
11 the bid process.  After the bid process ended, you
12 continued to be assigned to TSS sometimes; is that
13 correct?
14   A  Yes.
15   Q  How often were you in TSS after that bid
16 process went away?
17   A  Well, after I was put back on the street
18 and then it's, like, they put you on the street
19 for so, you know, you get used to being back on
20 the street.
21      And I guess if you -- they -- they started
22 to punish you if you did something that they
23 didn't like or you did something or missed --
24 missed something in your paperwork or whatever

Transcript of Wilford Ferguson
Conducted on August 31, 2020

37

1  they -- whatever little thing that you did if they
2  didn't like it, they punish you by putting you in
3  TSS. They punished you. That was your
4  punishment, you know, because they know you don't
5  want to be down on TSS. So they put you down in
6  TSS rather than put you back with your partner on
7  the street. So they'll separate you and your
8  partner or they'll put you with another partner,
9  but it was a punishment now. That's what TSS now
10 is a punishment for blacks. No whites.
11 Punishment for blacks. That's what TSS is now.
12    Q  Okay. There's kind of a lot to unpack
13 there. So let's take this a step at a time here.
14       So I can't remember exactly what my
15 original question was, but let's go about it this
16 way: After you lost the ability to bid to TSS,
17 did you ever request to go back to TSS?
18    A  No.
19    Q  You never asked that of any of the
20 supervisors or anyone?
21    A  No. They put you wherever they wanted
22 you. I mean, they knew you -- they knew --
23    Q  Sorry. You've answered my question and
24 we're going to be here all day if you --

38

1     A  Okay.
2     Q  -- don't just answer my questions as I ask
3  it.
4        Okay. So my understanding is you never
5  asked to go back to TSS; right?
6     A  Right.
7     Q  Okay. And so are you saying that the only
8  times you were assigned to TSS after losing the
9  ability to bid for it were times where you were
10 being punished?
11    A  Right.
12    Q  Okay. And what's the basis of your
13 understanding that you were being punished by
14 being sent to TSS?
15    A  I was being -- I was -- I mean, they'll
16 put me on the street maybe, like, for a day or
17 two. And then I go back to being down in TSS, I
18 guess, like, the rest of the week.
19       You know, it was, like -- how could I put
20 it? If a certain person -- a certain person on
21 the supervisory position as far as lieutenant or
22 chief or director or whatever, if that person
23 didn't -- didn't like you and they will -- if they
24 were off that day or two, you go on the street.

39

1  But if they were back at work and they see you was
2  at work, they'll have a supervisor put you in the
3  basement of TSS.
4     Q  Okay. So that doesn't really answer my
5  question. Let me ask it again.
6        How do you know that you were being
7  punished by being sent to TSS?
8     A  From a certain -- if a certain person,
9  certain supervisor would be on duty or the
10 supervisor meaning I'm talking about chief or
11 whatever or lieutenant, sergeant or whatever,
12 director -- if that person was on duty and they
13 didn't like a certain investigators or whatever,
14 didn't get along with them, they would put them in
15 TSS.
16    Q  Okay. I'm not talking about other
17 investigators. I'm only talking about you right
18 now. Okay?
19       You indicated -- hang on. Let me finish
20 my question. You've indicated that you were
21 punished by being sent to TSS. Okay? You bid for
22 TSS for, like, four to five years and worked in
23 TSS, then you guys lost the ability to bid for
24 position. Okay? I'm right so far?

40

1     A  Right.
2     Q  Okay. So then after that, the only times
3  you were sent to TSS were times where you felt you
4  were being punished; right?
5     A  Right.
6     Q  Okay. How do you know that you were being
7  punished? That's the question.
8     A  As I said, because they put you on the
9  street, and if a person -- like I said, if you did
10 something, paperwork, paperwork wasn't good or
11 just, I guess, the supervisor didn't like you or
12 whatever, you know, they put you down in TSS. But
13 you be -- you be working the street, like,
14 deliveries or just patrol and all of a sudden you
15 being put down to TSS.
16    Q  Okay. I understand that that's what
17 happened.
18       But what I am trying to get at is and
19 maybe it's I'm just not asking it correctly. But
20 who -- did someone tell you, hey, you're being
21 punished because you screwed this paperwork so I'm
22 sending you to TSS?
23    A  Nobody tell you that. They not going to
24 tell you. You can see it. I mean, you just know.

Transcript of Wilford Ferguson
Conducted on August 31, 2020

11 (41 to 44)

41

1    Q  Did anyone ever tell you, any supervisor
2  Sorry.  Strike that.
3       Did anyone in the chain of command above
4  you ever tell you that they were punishing you by
5  putting you in TSS?
6    **A  You never was -- you wasn't told.  It's**
7  **just you can see that that's what it was.**
8    Q  Okay.
9    **A  Because you been there so long -- you**
10 **know, you been there so long you see -- you see**
11 **it.**
12   Q  Okay.  And you indicated that one of the
13 reasons you might end up in TSS would be because
14 you made some mistakes or I think you said
15 paperwork is not good?
16   **A  Right.**
17   Q  Okay.  What other sorts of -- sort of
18 violations -- or maybe that's not the right
19 word -- but mix-ups or screw-ups could lead you to
20 be in TSS?
21   **A  Let's see.  I don't know.  I can't recall**
22 **at this time right now.**
23   Q  Okay.  And you also mentioned you said or
24 a supervisor didn't like you.

42

1    **A  If a supervisor didn't like you or, you**
2  **know, I don't --**
3    Q  So let's -- let's be a little bit more
4  specific here then.  Okay?
5       Which members of the chain of command were
6  responsible for assigning you to TSS as
7  punishment?
8    **A  I mean, like I said, they never was**
9  **saying -- they never was saying that they will**
10 **assign you there for punishment but, you know --**
11 **you knew it was like that, you know --**
12   Q  Can you tell me a single person's name who
13 was responsible for assigning you to TSS as
14 punishment.
15   **A  I couldn't tell -- I couldn't tell you**
16 **that.  It was whatever supervisors was on at that**
17 **time.  I don't -- I can't -- I couldn't tell you,**
18 **you know --**
19   Q  Okay.  And it's your testimony that only
20 blacks were sent to TSS?
21   **A  Yes.**
22   Q  Okay.  So is it also your testimony that
23 white employees -- Sorry.  Strike that.
24

43

1       Is it also your testimony that white
2  investigators never worked in TSS, as far as
3  you're aware?
4    **A  Never.**
5    Q  Okay.  So you have never worked in TSS
6  with a white investigator?
7    **A  Not like -- not like -- not like it was**
8  **with us down -- with blacks down there, no.**
9       **You might get a white investigator down**
10 **there maybe -- maybe once every three months,**
11 **something like that.  But no, it was black**
12 **investigators down there every day, every day.**
13   Q  Now, you can't really say that, though,
14 right, because you weren't in TSS every day;
15 right?
16   **A  I see the roster every day.**
17   Q  Yeah, but you don't see the roster every
18 day because you're not at work every day; right?
19   **A  I see a copy of the roster when I come**
20 **back to work.  I see a copy of the roster who was**
21 **working down there Saturday and Sunday.**
22   Q  Okay.  So you make it a --
23   **A  Saturdays or Sundays and I see the roster.**
24 **Don't -- the roster be laying around.  You know,**

44

1  **you see who was working down TSS.**
2    Q  Okay.  And in your assessment of that,
3  you're saying that maybe one white person works in
4  TSS every three months.
5       MS. KRAUCHUN:  Objection.  Misstates
6  testimony.
7  BY MR. LEINENWEBER:
8    Q  You can answer.
9       MS. KRAUCHUN:  Go ahead.
10      THE WITNESS:  Three or four months,
11 something like that.
12 BY MR. LEINENWEBER:
13   Q  Okay.  Who are the -- can you tell me the
14 names of any white investigators who engaged in
15 the same kind of conduct that led to you being
16 punished but did not get assigned to TSS as a
17 result.
18   **A  Bieniek, Investigator Bieniek;**
19 **Investigator Messina; Investigator Folkers;**
20 **Investigator Nickles.**
21      **Who else?  Who else?  I'm trying to think.**
22 **There's a couple more.  Can't think of their names**
23 **right now.**
24   Q  Okay.  And what sort of misconduct did

Transcript of Wilford Ferguson
Conducted on August 31, 2020

12 (45 to 48)

---

**45**

1 they engage in?
2    **A The same -- the same thing. I mean, just,**
3 **like, paperwork or talking -- talking to the host**
4 **in the house with -- just disrespecting the host**
5 **of the house or -- and -- and the host**
6 **report -- called back to the office and report**
7 **this investigator. But nothing would happen, I**
8 **mean --**
9    Q All right. And you identified --
10 **A Hello?**
11    Q You identified Nickle, Bieniek, and
12 Folkers?
13 **A Yes. Messina.**
14    Q Okay. And Messina?
15 **A Yes.**
16    Q Okay. And when did these investigators --
17 these white investigators engage in the misconduct
18 you just described?
19 **A I can't recall.**
20    Q How do you know that they engaged in the
21 misconduct you just described?
22 **A Because you hear about it. I mean, you**
23 **hear about it.**

**46**

1    Q Do you have any firsthand knowledge that
2 they actually engaged in this kind of misconduct?
3 **A Yeah.**
4    Q Well, let me ask it this way: Did you see
5 Investigator Nickle ever be disrespectful to the
6 host at a house?
7 **A I never seen Nickles be disrespectful to a**
8 **host.**
9    Q Yeah, what about Bieniek?
10 **A Oh, shoot.**
11    Q What about Bieniek? Mr. Ferguson?
12    MR. LEINENWEBER: I think we lost him.
13    MS. KRAUCHUN: Ferguson, can you hear us?
14    MR. NEWELL: I think his Internet cut out.
15    MS. KRAUCHUN: Justin, you want to take,
16 like a two-minute break and see if I can call him
17 and see what happened.
18    MR. LEINENWEBER: Yes, I'm hoping his --
19    MS. KRAUCHUN: Let me see if I can call
20 him and if it's dead, then I'll know, then I'll
21 jump back on then.
22    MR. LEINENWEBER: Okay.
23    (There was a short interruption.)
24    MR. LEINENWEBER: Diana, are you able to

**47**

1 read back my last question, and actually, could
2 you read the question before that with Nickle I
3 think it was.
4    (The record was read as requested.)
5 BY MR. LEINENWEBER:
6    Q So Mr. Ferguson, my question then was --
7 and I believe your answer to that was no, you had
8 never seen Investigator Nickle be disrespectful to
9 a host.
10    What about investigator Bieniek?
11 **A No.**
12    Q And what about Folkers?
13 **A I never seen Folkers, no.**
14    Q Okay. And Messina?
15 **A And Laughran.**
16    Q Sorry. And Messina?
17 **A No.**
18    Q Okay. And --
19 **A Let me take -- Bieniek, Bieniek I have.**
20 **Bieniek I have.**
21    Q Bieniek you have seen be disrespectful to
22 the host?
23 **A Yeah.**
24    Q Okay. You were with him?

**48**

1    **A Yes.**
2    Q And you said no for Folkers and no for
3 Messina?
4    **A Right.**
5    Q Okay.
6    **A And Laughran was another investigator.**
7 **Laughran was another person.**
8    Q Is that John Laughran?
9    **A Yes.**
10    Q L-A-U-G-H-R-A-N? Does that sound right?
11 **A I think something like that. Close.**
12    Q Okay. Okay. All right. So we'll come
13 back to that in a minute.
14    Are you aware of whether or not the Cook
15 County Sheriff's office has a policy on
16 discrimination?
17 **A Yes, I am.**
18    Q Okay. And what about retaliation and
19 harassment?
20 **A Yes.**
21    Q Okay. So you're aware that the sheriff's
22 office has a policy concerning discrimination,
23 harassment, and retaliation; right?
24 **A Right.**

Transcript of Wilford Ferguson

13 (49 to 52)

Conducted on August 31, 2020

---

**49**

1  Q  Okay.  And what are you supposed to do as
2  an investigator if you're a witness to
3  discrimination, harassment or retaliation?
4  **A  Then I -- then I didn't know.  You know, I**
5  **didn't know back then that they had that, but now**
6  **I do.**
7  Q  Okay.  So you -- at some point you did not
8  know and then at some point you became aware.
9  **A  Right; right.**
10  Q  When did you become aware of the sheriff's
11  office did discrimination, harassment,
12  retaliation?
13  **A  I can't recall.**
14  Q  Okay.  Was it more than five years ago?
15  **A  Can't recall.**
16  Q  You said then you didn't know.  Were
17  you --
18  **A  Oh.**
19  Q  -- having a specific date you're referring
20  to?  A specific year?
21  **A  Specific -- I don't know what year.  I**
22  **don't know what year it was.**
23  Q  Okay.
24  **A  I can't recall right now.**

---

**50**

1  Q  What is your understanding of what you're
2  supposed to do if you witness discrimination,
3  harassment or retaliation?
4  **A  Supposed to report it.**
5  Q  Okay.  To whom?
6  **A  I guess to your supervisor.  But how can**
7  **you report something -- I guess to your**
8  **supervisor.**
9  Q  Okay.  And who would your supervisor be in
10  the chain of command?
11  THE WITNESS:  Oh, God.  This stupid thing.
12  I don't know.
13  MR. LEINENWEBER:  I don't think that was
14  an answer to the question.  I think we lost him
15  again though.
16  MS. KRAUCHUN:  I guess we have to wait now
17  for him to log back in.
18  MR. LEINENWEBER:  What's going -- is his
19  phone just dying or something or what is going on?
20  MS. KRAUCHUN:  I guess, yes.  I don't
21  know.  I guess that's why he had it plugged in
22  but --
23  MR. LEINENWEBER:  Diana, we can be off the
24  record.

---

**51**

1  (A discussion was had that was off the
2  record.)
3  (A short recess was taken.)
4  MR. LEINENWEBER:  All right, Mr. Ferguson.
5  We're back on the record.  I understand you had
6  some phone problems that have potentially and
7  hopefully been resolved now.  If they haven't
8  been, just let us know and we'll do what we have
9  to do.  Okay?
10  THE WITNESS:  I'm working on it.
11  BY MR. LEINENWEBER:
12  Q  Okay.  So when we left off, we were
13  talking about the sheriff's office policy about
14  discrimination, harassment, retaliation.  Do you
15  remember that testimony earlier?
16  **A  Yes.**
17  Q  Okay.  My question I think I was trying to
18  ask and I don't think we got an answer to it was
19  what are you supposed to do if you witness
20  discrimination, harassment or retaliation?
21  **A  Report it.  Report it to your supervisor.**
22  Q  Okay.  And who within the chain of command
23  are you talking about that you would report it to?
24  **A  Then it would be the supervisor that was**

---

**52**

1  **on duty.**
2  Q  And then what about after there were no
3  more supervisors, then there were sergeants and
4  lieutenants?
5  **A  The sergeant.**
6  Q  Okay.  And what -- anything else that
7  you're supposed to do?
8  **A  That was the only thing I knew, report it**
9  **to your supervisor.  He supposed to write it up**
10  **and send it up the chain of command.**
11  Q  Okay.
12  **A  You know, to the lieutenant or and it go**
13  **up from there.**
14  Q  Okay.
15  **A  OPR, you know --**
16  Q  What's OPR?
17  **A  That's internal affairs.**
18  Q  Okay.  The Office of Professional
19  Regulation?
20  **A  Professional Regulation, yeah.**
21  Q  Okay.  And if you are a witness to
22  discrimination, harassment or retaliation after
23  you've reported it, do you have any other
24  obligations or role in the sheriff's office

---

53

1 process?
2    **A Yeah. Offhand, I don't -- offhand, I**
3 **don't -- I don't know the policy right now**
4 **offhand, but obviously you do.**
5    Q Okay. One thing you might be asked to do,
6 for example, would be to give -- sit for an
7 interview with an investigator from OPR or HR
8 possibly; right?
9    **A Yes.**
10    Q Okay. And what if the supervisor that you
11 would typically report to is the person that you
12 observed discriminating or harassing or
13 retaliating? What are you supposed do on that
14 occasion?
15    **A I guess you can write it up and send it**
16 **to -- go to OPR yourself.**
17    Q So you have that option?
18    **A Yes.**
19    Q Okay. What about if the discrimination or
20 harassment or retaliation is actually happening to
21 you?
22    In other words, you're not a witness.
23 You're the victim. What's your -- what are you
24 supposed to do under the policy then?

54

1    **A Go to a supervisor and report it.**
2    Q Okay. So it's fair to say essentially the
3 same process --
4    **A Yes.**
5    Q -- whether or not --
6    **A Yes.**
7    Q -- you're a victim or a witness?
8    **A Yes.**
9    Q Okay. All right. All right. Let's talk
10 about discipline for a minute.
11    What is your understanding of the meaning
12 of the words progressive discipline? What does
13 that mean to you?
14    **A Progressive discipline?**
15    Q Correct.
16    **A What do you mean? Explain it.**
17    Q Are you familiar with the term progressive
18 discipline?
19    **A Not -- no.**
20    Q Okay. Do you know whether or not the
21 sheriff's office or the electronic monitoring unit
22 has a progressive discipline policy?
23    **A I don't know.**
24    Q Okay.

55

1    **A I never heard -- I never heard it.**
2    Q Let's talk for a minute about discipline
3 that you've received. Okay?
4    What is the discipline that you have
5 received which you allege this lawsuit is --
6 Sorry. Strike that.
7    What is the discipline that you have
8 received that you allege was discriminatory or
9 retaliatory or harassing as alleged in this
10 Complaint?
11    **A The situation with me and Legrain Winston**
12 and Rico and Shador (phonetic) when we went to
13 court -- when we went to court in 2015 of July, we
14 were the wrong people that they had subpoenaed to
15 come to court. And the right person that's
16 supposed to have been there was off that day.
17    And just because -- the state's attorney
18 said just because we were in EM, we knew about the
19 policies and everything of EM. So they wanted us
20 to stay around and hang around. And they took our
21 phone numbers and names, and they said if we need
22 you, we will call you. Okay?
23    So we hung around till, like, 2:00
24 o'clock, 2:00 or 3:00 o'clock, 2:30, 2:00 o'clock,

56

1 something like that. They never called.
2    So me and Winston was going to use that
3 tour of duty that the hours that we got for that
4 day in court as our tour of duty. But
5 Chief O'Malley told us that we couldn't do that
6 and for us to come to work. Okay?
7    Now, we never got time or pay for the time
8 that we went to court. But Shador, he got pay for
9 that day.
10    And we was questioning one day -- well, I
11 say, like, a couple of -- maybe a month or two
12 later when we saw Director Shields in the office,
13 Investigator Winston asked him, Director, we want
14 to know whatever happened to past practices when
15 we went to court, we could use as our tour of
16 duty?
17    He -- he said that we never did that, and
18 we always did that. Okay?
19    So the conversation got heated. So we
20 were told to go back in the back to
21 Director Winston -- well, he was chief then I
22 think, whatever -- his office and finish the
23 conversation back there.
24

Transcript of Wilford Ferguson
Conducted on August 31, 2020

15 (57 to 60)

57

1    So the conversation got so heated back in
2  the back where me, Chief Laughran's,
3  Director Brady, Winston, and Director Shields were
4  at.
5        And Director Shields put his hand -- I
6  thought he almost about to slap Winston and put
7  his hand in Winston's face because I had stepped
8  back because I didn't want him to hit me.
9        And Director Brady told Director Shields
10 that he couldn't do that.  And he pulled him by
11 his elbow and pulled Shields in his own office,
12 told him, Greg, you can't do that.  You can't do
13 that.
14       So after that Winston wrote
15 Director Shields up.  Okay?
16       Now, before that, before all of that, me
17 and Winston and Rico were asking for our
18 three-part forms, why we never got them returned.
19 Those were the hours that we were at court.  Why
20 didn't we ever get the hours on the books that we
21 earned when we went to court?  Why didn't we get
22 paid?
23       And every time we asked Chief Neill that
24 question, he said, well, I'm going to check with

58

1  Director Shields to see what happened to you all's
2  forms.
3        Every time he asked Shields, Shields say,
4  I misplaced them.  Have them fill out some more.
5        He asked him that three -- three or four
6  times.  Okay?  So nothing ever happened.
7        We asked Shields' secretary Erica about
8  our three-part forms.
9        She say, I'm going to ask Director Shields
10 whatever happened to your forms.  She asked him.
11 Same thing.
12       I misplaced them.  Have them fill out some
13 more.  Have them fill them out again.
14       MS. KRAUCHUN:  Investigator Ferguson, this
15 gets too confusing.  If you can just wait and let
16 counsel ask you follow-up questions because we
17 need to break that down a little bit; so --
18       THE WITNESS:  Okay.
19       MS. KRAUCHUN:  Sorry about that.
20       So Justin, if you want to --
21       MR. LEINENWEBER:  Yeah, that's all right.
22 BY MR. LEINENWEBER:
23    Q  Other -- Okay.  So what is the discipline
24 that you received for what I'll refer to as the

59

1  court subpoena issue?
2    A  The very -- we had to go a Loudermill
3  hearing and -- for the merit board.
4    Q  So what is the discipline that you
5  received?  I understand you may have gone to a
6  Loudermill hearing and may be before the merit
7  board, but what is the discipline?
8    A  We haven't received the discipline yet
9  because we still in the status of, you know, been,
10 like, going on six years now.  We still involved
11 in -- involved in this situation.
12    Q  Okay.
13    A  We haven't received anything yet from the
14 merit board.
15    Q  Okay.
16    A  And -- oh, okay.  Go ahead.
17    Q  That's all right.  If you weren't
18 finished, go ahead.
19    A  And now I'm in another situation.
20    Q  All right.  And we'll talk about another
21 situation --
22       MS. KRAUCHUN:  Yes.
23 BY MR. LEINENWEBER:
24    Q  -- in a minute.  Let's -- let's confine

60

1  right now we're talking about the subpoena, the
2  court subpoena discipline.
3        Okay.  So you haven't received the
4  discipline yet.  But do you have an understanding
5  that they are -- that the sheriff's office is
6  seeking your termination through the merit board
7  proceeding?
8    A  Yes.
9    Q  And when did you receive notice of that,
10 that they were seeking your termination?
11    A  I don't know if it was --
12    Q  That's all right.  If you don't recall,
13 you don't recall.  I don't want you to guess here.
14    A  I can't recall right now.
15    Q  Okay.  And you said the names of a few
16 other investigators who were involved in this
17 discipline as well.
18       Who were those other investigators?
19    A  Rico, Shador, and Winston.
20    Q  Okay.  And all four of you had to go to
21 Loudermill hearings?
22    A  Yes.
23    Q  And all four of you are currently in the
24 merit board process?

Transcript of Wilford Ferguson
Conducted on August 31, 2020

16 (61 to 64)

---

**61**

1    **A  Three now. One retired, Rico.**

2    Q  Okay. Rico retired?

3      And the -- before his retirement he was in

4 the merit board process; right?

5    **A  Yes.**

6    Q  And the sheriff's office was seeking

7 termination of all four of those investigators?

8    **A  Yes.**

9    Q  Okay. All right. Other than the court

10 subpoena discipline seeking your termination, what

11 other discipline do you contend is at issue in

12 this case? Do you understand my question, sir?

13 Oh, no.

14    MS. KRAUCHUN: Ferguson, can you hear us?

15 I don't think so.

16    MR. LEINENWEBER: It looks like we've lost

17 him again.

18    MS. KRAUCHUN: We'll just wait for a

19 minute and see if he gets back on.

20    MR. LEINENWEBER: Diana, we can go off the

21 record.

22    (A discussion was had that was off the

23    record.)

24    MR. LEINENWEBER: So then, Diana, why

**62**

1 don't we just go back on the record and just put

2 that on the record.

3    Is that good with you, Kelly?

4    MS. KRAUCHUN: Yeah. Perfect.

5    MR. LEINENWEBER: Ethan, that's all good

6 with you; right? Ethan? Did you hear me?

7    MR. WHITE: Yeah, yeah.

8    MR. LEINENWEBER: Diana, can we go back on

9 the record.

10    Okay. We're back on the record.

11 Mr. Ferguson is with us. He's been dropped a

12 number of times due to some issues he's having

13 with his phone not holding a charge. In fact, he

14 had to go to his car to try and get a charge and

15 that was unsuccessful.

16    So we have -- the parties have agreed to

17 terminate the deposition for today and reconvene

18 it -- reconvene it either at a time in which

19 Mr. Ferguson's phone is for sure working and has

20 been tested as working over Zoom or possibly just

21 come to his attorney, Miss Krauchun -- Mrs. I

22 don't know if it's Miss or Ms. Sorry.

23    MS. KRAUCHUN: Miss is fine.

24    MR. LEINENWEBER: Kelly, Kelly's office.

**63**

1 And we'll be convening at that point, and we'll

2 just explain this to Judge Kennelly tomorrow

3 morning.

4    MS. KRAUCHUN: Okay. Perfect.

5    MR. LEINENWEBER: Do you have anything

6 else you want to put on the record or are you just

7 good with that?

8    MS. KRAUCHUN: I'm fine with that, Justin.

9    MR. LEINENWEBER: Fine.

10    Okay. And then, Diana, I don't know if

11 you need to do anything to do us -- you know, sort

12 of play us out of the dep for today. I guess, we

13 just sort of it leave it open, and Diana, maybe we

14 can get you to reconvene it next time.

15    THE REPORTER: Okay. Do you need to have

16 this portion transcribed now or do you want to

17 wait until the end?

18    MR. LEINENWEBER: Yeah, let's wait until

19 we have a whole complete dep with the -- with it

20 done.

21    MS. KRAUCHUN: Thanks, Diana.

22    MR. LEINENWEBER: Lucien, anything else we

23 need to do on your end?

24    MR. NEWELL: I was just going to ask about

**64**

1 the pre-marked exhibits. Per your order just kind

2 of hold them?

3    MR. LEINENWEBER: Just kind of hold them

4 or you can delete them and I can re-upload them.

5 I'm sure I'm not going to be changing them, but if

6 they just sort of stay out there on the server or

7 whatever, that's totally fine, but I don't think

8 you need to provide them to her as of yet since we

9 didn't mark anything else.

10    MR. NEWELL: Okay. Sounds good.

11    MS. KRAUCHUN: Thank you, guys.

12    MR. LEINENWEBER: Okay. All right,

13 Mr. Ferguson, sorry about this. Thanks for you

14 patience today and for trying, and we will --

15 we'll get it done soon.

16    THE WITNESS: Okay. Okay. Thank you.

17    MS. KRAUCHUN: Thanks a lot you guys.

18    (The deposition was adjourned to be

19    reconvened sine die at 11:58 o'clock

20    A.M.)

21

22

23

24

65

1        IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION
  LEGRAIN WINSTON, et al,   )
                   )
     Plaintiffs,    )
                   )
    vs.        ) Case No. 18 cv-05726
                   )
  SHERIFF OF COOK COUNTY   )
  THOMAS J. DART, in his    )
  Official Capacity, et al,  )
                 )
     Defendants.   )
3
4      I, WILFORD FERGUSON, being first duly
5  swom, on oath say that I am the deponent in the
6  aforesaid deposition, that I have read the
7  foregoing transcript of my deposition, consisting
8  of page 9 through 61 inclusive, taken at the
9  aforesaid time and place and that the foregoing is
10  a true and correct transcript of my testimony so
11  given.
12  _____
      WILFORD FERGUSON, Deponent
13
14  SUBSCRIBED AND SWORN TO
  before me this _____
15  of _____, A.D.20__.
16
17  _____
    Notary Public
18
19
20
21
22
23
24

66

1  UNITED STATES OF AMERICA   )
  NORTHERN DISTRICT OF ILLINOIS )SS.
2  EASTERN DIVISION         )
  STATE OF ILLINOIS        )
3  COUNTY OF WILL       )
4     I, DIANA DEBRA SABO, Certified Shorthand
5  Reporter for the State of Illinois, do hereby
6  certify that WILFORD FERGUSON, was first virtually
7  duly sworn by me to testify the whole truth and
8  that the above deposition was reported
9  stenographically and was reduced to typewriting
10  under my direction.
11     I further certify that the said deposition
12  was taken at the time specified and that the
13  taking of said deposition commenced on the 31 of
14  August, A.D. 2020, at 10:20 o'clock A.M.
15     I further certify that I am not a
16  relative, employee, attorney, or counsel of any of
17  the parties, nor a relative or employee of such
  attorney or counsel or financially interested
18  directly or indirectly in this action.
19     In witness whereof, I have hereunto set my
  hand at Tinley Park, Illinois, this 1 day of
20  October, A.D. 2020.
21
22  _____
23    DIANA DEBRA SABO, CSR
24  License No. 084-002667

OFFICIAL SEAL
DIANA DEBRA SABO
Notary Public - State of Illinois
My Commission Expires 6/07/2021

Transcript of Wilford Ferguson
Conducted on August 31, 2020

18

**A**

**ability**
22:11, 22:19,
24:24, 32:4,
37:16, 38:9,
39:23
**able**
23:1, 30:22,
46:24
**about**
10:20, 11:1,
13:11, 27:2,
28:13, 28:18,
30:12, 33:9,
35:5, 37:15,
39:10, 39:16,
39:17, 45:23,
45:24, 46:9,
46:11, 47:10,
47:12, 48:18,
51:13, 51:23,
52:2, 53:19,
54:10, 55:2,
55:18, 57:6,
58:7, 58:19,
59:20, 60:1,
63:24, 64:13
**above**
41:3, 66:10
**accept**
7:5
**accommodate**
7:13
**accurate**
8:5, 28:2
**action**
66:21
**actually**
25:20, 46:2,
47:1, 53:20
**addition**
15:10
**additional**
8:11, 15:14,
16:6, 16:7,
16:11
**address**
11:13

**adjourned**
64:18
**adjust**
21:19, 31:12
**advance**
5:17
**affairs**
52:17
**aforesaid**
65:18, 65:21
**after**
9:15, 18:1,
20:22, 25:7,
31:6, 32:3,
32:9, 32:15,
32:18, 35:23,
36:11, 36:15,
36:17, 37:16,
38:8, 40:2,
52:2, 52:22,
57:14
**afternoon**
17:20
**again**
31:9, 31:12,
39:5, 50:15,
58:13, 61:17
**ago**
22:7, 22:9,
22:10, 30:13,
49:14
**agree**
9:7, 9:11
**agreed**
62:16
**agreement**
23:20, 23:24,
25:10
**ahead**
23:8, 44:9,
59:16, 59:18
**aid**
9:4
**al**
65:4, 65:12
**all**
5:1, 5:21, 8:1,
9:4, 10:7,

10:16, 11:24,
13:3, 14:19,
21:6, 28:10,
28:17, 29:13,
29:14, 29:18,
30:9, 31:6,
32:3, 32:15,
32:19, 37:24,
40:14, 45:10,
48:12, 51:4,
54:9, 57:16,
58:21, 59:17,
59:20, 60:12,
60:20, 60:23,
61:7, 61:9,
62:5, 64:12
**all's**
58:1
**allege**
55:5, 55:8
**alleged**
55:9
**almost**
31:15, 57:6
**along**
5:24, 39:14
**also**
3:31, 18:15,
18:16, 19:17,
26:13, 32:7,
41:23, 42:22,
43:1
**always**
20:13, 26:8,
26:9, 56:18
**america**
66:1
**another**
37:8, 48:6,
48:7, 59:19,
59:20
**answer**
6:16, 6:23,
7:7, 7:15, 7:24,
38:2, 39:4,
44:8, 47:7,
50:14, 51:18
**answered**
37:23

**answers**
7:4, 8:18
**anthony**
1:8
**anticipate**
5:3, 6:17
**any**
5:5, 5:17, 8:4,
8:21, 8:24, 9:1,
10:3, 10:10,
11:4, 11:7,
12:21, 15:6,
15:9, 16:5,
16:7, 16:11,
17:2, 19:11,
23:22, 26:4,
33:3, 37:19,
41:1, 44:14,
45:3, 46:1,
52:23, 66:18
**anymore**
29:24
**anyone**
8:13, 11:1,
37:20, 41:1,
41:3
**anything**
9:4, 9:9, 9:21,
10:13, 14:9,
15:16, 26:21,
33:17, 52:6,
59:13, 63:5,
63:11, 63:22,
64:9
**anywhere**
15:10
**apologize**
5:17
**appeared**
3:9, 3:18, 3:28
**approximately**
17:12, 31:3
**area**
19:17
**around**
17:13, 25:16,
31:18, 43:24,
55:20, 55:23

Transcript of Wilford Ferguson
Conducted on August 31, 2020                    19

**article**
19:2
**asked**
7:14, 37:19,
38:5, 53:5,
56:13, 57:23,
58:3, 58:5,
58:7, 58:10
**asking**
6:15, 6:17,
7:18, 7:20,
7:22, 40:19,
57:17
**assessment**
44:2
**assign**
42:10
**assigned**
16:19, 36:12,
38:8, 44:16
**assigning**
42:6, 42:13
**assignment**
21:9, 32:12,
34:23, 35:2,
35:4
**assignments**
17:3, 22:12,
22:20, 23:2,
25:1, 26:5,
26:17, 30:23,
32:23, 34:21,
35:21, 36:4
**assistant**
34:17
**assume**
8:1, 17:9
**attend**
12:3, 12:8
**attending**
5:2
**attorney**
10:16, 10:24,
55:17, 62:21,
66:18, 66:20
**attorneys**
5:23, 10:1
**august**
2:8, 66:16

**auto**
14:17
**aware**
5:4, 43:3,
48:14, 48:21,
49:8, 49:10
**away**
5:6, 21:7,
22:2, 22:11,
22:17, 24:24,
36:16
**awol**
27:12

**B**

**back**
13:16, 17:21,
18:2, 18:20,
21:11, 26:2,
29:2, 29:3,
33:19, 34:20,
36:17, 36:19,
37:6, 37:17,
38:5, 38:17,
39:1, 43:20,
45:7, 46:21,
47:1, 48:13,
49:5, 50:17,
51:5, 56:20,
56:23, 57:1,
57:2, 57:8,
61:19, 62:1,
62:8, 62:10
**backup**
5:5
**bargaining**
23:20, 23:24,
25:10
**baroni**
3:12
**basement**
39:3
**basis**
24:23, 38:12
**battery**
29:6, 29:9,
31:16
**became**
34:6, 35:24,

49:8
**because**
7:3, 8:10,
14:12, 14:20,
19:2, 24:9,
37:4, 40:8,
40:21, 41:9,
41:13, 43:14,
43:18, 45:23,
55:17, 55:18,
57:7, 57:8,
58:16, 59:9
**become**
49:10
**becomes**
31:23
**been**
9:15, 17:13,
23:15, 29:7,
41:9, 41:10,
51:7, 51:8,
55:16, 59:9,
62:11, 62:20
**before**
2:6, 5:13, 6:7,
6:16, 6:23,
7:15, 19:19,
20:19, 21:9,
23:10, 33:19,
47:2, 57:16,
59:6, 61:3,
65:28
**began**
14:24
**begin**
16:21, 20:3
**behalf**
3:9, 3:18, 3:28
**being**
23:1, 36:19,
38:10, 38:13,
38:14, 38:15,
38:17, 39:6,
39:7, 39:21,
40:4, 40:6,
40:15, 40:20,
44:15, 65:16
**belief**
22:18

**believe**
47:7
**below**
35:6
**belt**
36:10
**best**
6:11, 6:22,
7:7, 7:21
**better**
7:21, 21:21
**between**
13:3, 13:7,
15:6, 15:9,
16:24, 19:12
**bid**
20:24, 21:2,
21:3, 21:4,
22:11, 22:19,
23:2, 25:1,
25:20, 30:21,
30:22, 31:1,
31:4, 32:4,
36:11, 36:15,
37:16, 38:9,
39:21, 39:23
**bidding**
21:7, 21:13,
22:2, 23:23,
25:5, 25:11,
25:16, 32:9,
32:15, 32:18
**bieniek**
44:18, 45:12,
46:9, 46:11,
47:10, 47:19,
47:20, 47:21
**big**
24:14, 24:15
**bit**
6:13, 7:21,
14:22, 21:20,
21:21, 42:3,
58:17
**black**
43:11
**blacks**
37:10, 37:11,

42:20, 43:8
**board**
16:1, 35:24,
59:3, 59:7,
59:14, 60:6,
60:24, 61:4
**bonds**
19:15
**books**
57:20
**bounced**
17:13
**bracelet**
27:10, 28:8,
28:9
**brady**
57:3, 57:9
**break**
7:12, 7:15,
31:24, 46:16,
58:17
**breaker**
14:1
**bring**
29:2
**brook**
3:25
**brought**
33:20
**bucket**
32:20

---
**C**
---

**call**
21:8, 21:16,
25:7, 32:10,
32:24, 33:4,
34:21, 46:16,
46:19, 55:22
**called**
2:2, 9:15,
13:17, 45:7,
56:1
**came**
35:24
**camera**
21:19, 31:12
**can't**
7:5, 8:5, 22:3,

22:14, 23:7,
26:2, 37:14,
41:21, 42:17,
43:13, 44:22,
45:20, 49:13,
49:15, 49:24,
57:12, 60:14
**capacity**
1:19, 1:21,
1:24, 1:26,
1:29, 65:12
**car**
28:24, 62:14
**carrier**
13:23
**case**
61:12, 65:8
**cash**
28:16
**cat**
31:15
**cecil**
1:8
**certain**
38:20, 39:8,
39:9, 39:13
**certified**
2:7, 13:15,
13:17, 66:6
**certify**
66:8, 66:13,
66:17
**chain**
33:9, 33:14,
34:9, 41:3,
42:5, 50:10,
51:22, 52:10
**change**
14:8, 28:9,
29:10
**changed**
29:8, 33:19,
34:6
**changes**
29:6
**changing**
64:5
**charge**
31:17, 62:13,

62:14
**check**
28:16, 57:24
**checking**
28:6
**chewed**
31:15
**chicago**
3:6, 3:16,
13:2, 15:15,
15:21
**chief**
33:21, 33:22,
35:6, 38:22,
39:10, 56:5,
56:21, 57:2,
57:23
**chiefs**
33:7, 33:18,
33:19, 34:5,
34:10, 34:16,
34:17
**christopher**
1:27
**civil**
2:4
**civilians**
19:14
**clarify**
7:20, 26:16
**close**
48:11
**co-counsel**
6:1
**collective**
23:19, 23:24,
25:10
**college**
11:18, 12:1,
12:3, 12:4,
12:7, 12:9,
13:10
**colleges**
14:19
**combined**
23:12
**come**
19:14, 19:15,

43:19, 48:12,
55:15, 56:6,
62:21
**command**
33:9, 33:14,
34:10, 41:3,
42:5, 50:10,
51:22, 52:10
**commenced**
66:15
**commissary**
19:16
**comp**
35:17
**complaint**
55:10
**complete**
8:5, 63:19
**complimentary**
5:14
**computer**
5:7, 28:10
**concerning**
35:21, 48:22
**conduct**
44:15
**confine**
59:24
**confirm**
27:24
**confusing**
58:15
**connect**
5:11
**connecting**
5:12
**consisting**
65:19
**contend**
61:11
**continue**
32:4
**continued**
36:12
**convening**
63:1
**conversation**
6:19, 56:19,

56:23, 57:1
**conversations**
5:8
**cook**
1:17, 1:30,
13:4, 14:24,
48:14, 65:10
**cool**
14:21
**copy**
43:19, 43:20
**cord**
31:14, 31:15,
31:17
**correct**
25:21, 30:1,
30:23, 36:13,
54:15, 65:22
**correctional**
16:18, 17:5,
19:6
**correctly**
40:19
**could**
6:2, 11:10,
21:19, 25:3,
25:10, 38:19,
41:19, 47:1,
56:15
**couldn't**
42:15, 42:17,
56:5, 57:10
**counsel**
58:16, 66:18,
66:20
**county**
1:17, 1:30,
13:5, 13:16,
13:18, 15:1,
48:15, 65:10,
66:5
**couple**
6:10, 44:22,
56:11
**court**
1:1, 6:12,
6:20, 7:4,
11:14, 28:23,

29:2, 29:3,
55:13, 55:15,
56:4, 56:8,
56:15, 57:19,
57:21, 59:1,
60:2, 61:9, 65:1
**courts**
2:5
**cousin**
14:12
**cousins**
14:10
**csr**
66:27
**currently**
11:11, 15:2,
18:24, 19:21,
19:22, 33:12,
60:23
**cut**
27:10, 28:8,
46:14
**cutting**
31:20
**cv**
1:8, 65:8
**cvs**
13:2

---
**D**
---

**d_**
65:29
**daffada**
3:12
**dart**
1:18, 65:11
**date**
49:19
**david**
1:9
**day**
2:8, 21:17,
25:8, 35:16,
35:17, 37:24,
38:16, 38:24,
43:12, 43:14,
43:16, 43:18,
55:16, 56:4,

56:9, 56:10,
66:23
**days**
19:19
**dead**
46:20
**debra**
2:6, 66:6,
66:27
**december**
16:23, 17:1,
20:12
**decision**
33:3, 34:22,
35:20, 36:3
**defendants**
1:32, 2:2,
3:19, 3:29,
5:24, 65:14
**degree**
12:13, 12:15
**delete**
64:4
**deliveries**
21:4, 26:13,
32:12, 40:14
**delivery**
26:12, 26:19,
27:3
**dep**
63:12, 63:19
**deponent**
65:17, 65:25
**depos**
3:32
**deposition**
2:1, 5:15, 6:7,
6:19, 7:3, 8:9,
9:5, 9:22,
10:14, 11:2,
11:5, 62:17,
64:18, 65:18,
65:19, 66:10,
66:13, 66:15
**depositions**
2:6, 11:8
**deputy**
33:7, 33:21,

34:5, 34:10,
34:16, 35:6
**described**
45:19, 45:22
**desk**
27:2, 28:18
**detainee's**
28:1
**detainees**
27:4
**diana**
2:6, 6:12,
46:24, 50:23,
61:20, 61:24,
62:8, 63:10,
63:13, 63:21,
66:6, 66:27
**die**
64:19
**difference**
19:12
**different**
26:15, 29:14,
30:22, 32:23,
33:4, 35:10
**direct**
4:4
**direction**
66:12
**directive**
25:5
**directly**
66:21
**director**
19:3, 22:14,
22:18, 24:24,
25:2, 33:23,
33:24, 34:19,
38:22, 39:12,
56:12, 56:13,
56:21, 57:3,
57:5, 57:9,
57:15, 58:1,
58:9
**directors**
22:15, 33:16,
34:17, 34:18
**discipline**
54:10, 54:12,

Transcript of Wilford Ferguson
Conducted on August 31, 2020                                    22

54:14, 54:18,
54:22, 55:2,
55:4, 55:7,
58:23, 59:4,
59:7, 59:8,
60:2, 60:4,
60:17, 61:10,
61:11
**discriminating**
53:12
**discrimination**
48:16, 48:22,
49:3, 49:11,
50:2, 51:14,
51:20, 52:22,
53:19
**discriminatory**
55:8
**discussion**
5:6, 51:1,
61:22
**disrespectful**
46:5, 46:7,
47:8, 47:21
**disrespecting**
45:5
**district**
1:1, 1:2, 2:5,
15:15, 15:21,
65:1, 65:2, 66:2
**divided**
32:23
**division**
1:3, 16:20,
17:6, 19:1,
19:4, 19:5,
19:13, 19:14,
19:17, 19:22,
19:23, 20:3,
20:10, 20:16,
25:15, 26:4,
65:3, 66:3
**dj**
14:21
**dj'd**
14:19, 14:20
**doctor**
28:15

**documentation**
10:1
**documents**
9:1, 10:4, 10:7
**doing**
8:10, 14:9,
18:1, 19:22,
26:13, 27:23
**done**
22:2, 63:20,
64:15
**down**
7:4, 14:10,
14:12, 14:13,
14:19, 23:2,
32:10, 32:13,
37:5, 38:17,
40:12, 40:15,
43:8, 43:9,
43:12, 43:21,
44:1, 58:17
**downtown**
12:7, 14:2
**driving**
27:4
**dropped**
62:11
**dubuque**
13:13, 14:7,
14:13
**due**
35:16, 62:12
**duly**
9:16, 65:16,
66:9
**dunbar**
16:4
**during**
6:19, 32:23
**duty**
39:9, 39:12,
52:1, 56:3,
56:4, 56:16
**dying**
50:19

---
                  **E**

**each**
5:13

**earlier**
51:15
**earned**
57:21
**easier**
6:13
**eastern**
1:3, 65:3, 66:3
**education**
11:17, 16:2
**either**
15:21, 32:12,
62:18
**elaborate**
19:12
**elbow**
57:11
**electronic**
16:22, 54:21
**eligible**
29:14
**eliminated**
25:17
**else**
10:13, 11:1,
13:18, 14:9,
15:10, 15:16,
26:21, 27:1,
33:17, 44:21,
52:6, 63:6,
63:22, 64:9
**em**
17:1, 17:6,
17:8, 17:13,
19:2, 19:3,
20:13, 21:5,
23:9, 23:14,
24:9, 24:24,
26:6, 26:9,
26:18, 29:15,
30:3, 33:13,
55:18, 55:19
**email**
27:18
**emery**
3:21
**employed**
26:5

**employee**
66:18, 66:19
**employees**
42:23
**employment**
16:11, 27:24
**enabled**
5:9
**end**
41:13, 63:17,
63:23
**ended**
21:11, 36:11
**engage**
45:1, 45:18
**engaged**
44:14, 45:21,
46:2
**entire**
17:12
**equipment**
29:6, 29:8,
29:10
**erica**
58:7
**essentially**
54:2
**et**
65:4, 65:12
**ethan**
3:22, 6:1,
62:5, 62:6
**evening**
17:17, 17:20,
18:13, 21:13
**evenings**
20:24
**ever**
6:7, 17:23,
31:9, 37:17,
41:1, 41:4,
46:5, 57:20,
58:6
**every**
43:10, 43:12,
43:14, 43:16,
43:17, 43:18,
44:4, 57:23,

Transcript of Wilford Ferguson
Conducted on August 31, 2020                                          23

58:3
**everybody**
21:7, 21:14,
23:12, 25:6,
32:10
**everyone**
5:2, 32:19
**everything**
6:20, 13:18,
27:19, 32:8,
32:14, 33:22,
55:19
**exactly**
37:14
**examination**
2:3, 4:4
**examined**
9:16
**example**
19:13, 53:6
**except**
29:20, 29:21
**executive**
5:19, 33:24,
34:18
**exhibits**
4:7, 4:8, 64:1
**experience**
36:10
**explain**
7:21, 54:16,
63:2

**F**
**f-e-r-g-u-s-o-n**
6:5
**face**
21:20, 57:7
**facility**
19:6
**fact**
62:13
**fair**
54:2
**familiar**
23:8, 54:17
**far**
15:12, 24:15,

25:3, 26:2,
38:21, 39:24,
43:2
**father**
12:18
**federal**
2:4
**felt**
40:3
**ferguson**
1:7, 2:2, 3:10,
4:3, 5:22, 6:4,
6:5, 6:6, 9:14,
46:11, 46:13,
47:6, 51:4,
58:14, 61:14,
62:11, 64:13,
65:16, 65:25,
66:8
**ferguson's**
62:19
**few**
8:11, 19:19,
30:12, 60:15
**figure**
31:24
**fill**
58:4, 58:12,
58:13
**financially**
66:20
**fine**
62:23, 63:8,
63:9, 64:7
**finish**
6:16, 6:21,
6:23, 39:19,
56:22
**finished**
59:18
**firm**
3:2
**first**
6:14, 9:15,
19:18, 65:16,
66:8
**firsthand**
46:1

**five**
15:24, 16:8,
31:5, 36:9,
39:22, 49:14
**folkers**
44:19, 45:13,
47:12, 47:13,
48:2
**follow-up**
58:16
**follows**
9:17
**foregoing**
65:19, 65:21
**forms**
57:18, 58:2,
58:8, 58:10
**four**
13:11, 30:13,
31:5, 36:9,
39:22, 44:10,
58:5, 60:20,
60:23, 61:7
**front**
8:22, 10:5,
27:2, 28:18
**fugitive**
26:20, 27:8,
29:20, 29:21,
29:23
**full**
8:5, 15:14
**further**
19:11, 66:13,
66:17

**G**
**gave**
25:5, 35:15
**general**
19:20, 23:4,
23:9
**getting**
29:9
**give**
6:9, 8:5,
28:17, 53:6
**given**
34:21, 65:23

**gives**
29:10
**go**
12:24, 23:8,
27:15, 27:17,
27:20, 27:21,
28:14, 28:15,
28:23, 29:1,
29:3, 37:15,
37:17, 38:5,
38:17, 38:24,
44:9, 52:12,
53:16, 54:1,
56:20, 59:2,
59:16, 59:18,
60:20, 61:20,
62:1, 62:8,
62:14
**goal**
6:11
**god**
50:11
**going**
6:9, 7:10,
7:17, 8:1,
14:12, 25:8,
27:5, 37:24,
40:23, 50:18,
50:19, 56:2,
57:24, 58:9,
59:10, 63:24,
64:5
**gone**
27:11, 59:5
**good**
5:21, 40:10,
41:15, 62:3,
62:5, 63:7,
64:10
**graduate**
11:21
**graduated**
11:19, 12:23
**great**
7:2
**greg**
57:12
**gregory**
1:22

Transcript of Wilford Ferguson
Conducted on August 31, 2020

24

**groceries**
28:15
**ground**
6:10, 6:14
**group**
24:11
**guess**
25:5, 33:23,
35:1, 36:21,
38:18, 40:11,
50:6, 50:7,
50:16, 50:20,
50:21, 53:15,
60:13, 63:12
**guy**
28:19, 28:22,
28:23, 29:5
**guys**
10:20, 39:23,
64:11, 64:17

**H**

**hand**
57:5, 57:7,
66:23
**hang**
39:19, 55:20
**happen**
45:8
**happened**
29:1, 40:17,
46:17, 56:14,
58:1, 58:6,
58:10
**happening**
53:20
**happy**
7:13
**harassing**
53:12, 55:9
**harassment**
48:19, 48:23,
49:3, 49:11,
50:3, 51:14,
51:20, 52:22,
53:20
**harold**
12:4, 12:6,

12:9, 13:10
**head**
7:5, 7:6
**hear**
45:23, 45:24,
46:13, 61:14,
62:6
**heard**
55:1
**hearing**
59:3, 59:6
**hearings**
60:21
**heated**
56:19, 57:1
**hello**
45:11
**help**
5:9, 9:9, 26:16
**helped**
12:17
**hen**
13:17
**herbert**
3:2
**here**
6:1, 6:14,
13:16, 30:19,
37:13, 37:24,
42:4, 60:13
**hereby**
66:7
**herein**
9:15
**hereunto**
66:22
**hey**
40:20
**high**
11:19, 11:21,
12:24, 16:4
**highest**
11:16
**history**
13:18
**hit**
57:8
**hold**
19:18, 26:24,

64:2, 64:3
**holding**
19:17, 62:13
**holland**
11:12, 11:14
**home**
8:16
**hopefully**
51:7
**hoping**
31:16, 46:18
**host**
45:4, 45:5,
45:6, 46:6,
46:8, 47:9,
47:22
**hour**
35:16, 35:17
**hours**
56:3, 57:19,
57:20
**house**
27:5, 29:1,
45:5, 45:6, 46:6
**hr**
53:7
**hung**
55:23

**I**

**identified**
45:10, 45:12
**identify**
5:10, 5:12
**illinois**
1:2, 1:30, 2:8,
3:6, 3:16, 3:25,
11:12, 11:15,
65:2, 66:2,
66:4, 66:7,
66:23
**immediately**
20:16
**inc**
3:2
**included**
24:5, 32:19
**inclusive**
65:20

**index**
4:1
**indicated**
39:19, 39:20,
41:12
**indirectly**
66:21
**individually**
1:20, 1:23,
1:25, 1:28
**individuals**
32:22
**information**
9:9, 28:1,
29:11
**inmates**
19:15, 19:18,
27:15, 28:7
**interested**
5:16, 66:20
**interject**
6:18
**internal**
52:17
**internet**
46:14
**interrogatories**
9:17
**interruption**
46:23
**interruptions**
5:18
**interview**
53:7
**investigation**
27:24
**investigator**
17:9, 19:24,
27:22, 29:15,
33:14, 33:15,
34:11, 34:12,
34:14, 35:11,
35:14, 43:6,
43:9, 44:18,
44:19, 44:20,
45:8, 46:5,
47:8, 47:10,
48:6, 49:2,

53:7, 56:13,
58:14
**investigators**
27:9, 28:20,
32:19, 33:3,
35:9, 39:13,
39:17, 43:2,
43:12, 44:14,
45:17, 45:18,
60:16, 60:18,
61:7
**involved**
24:17, 59:10,
59:11, 60:16
**iowa**
13:13, 14:7
**issue**
31:23, 59:1,
61:11
**issues**
62:12

---
**J**
---
**jail**
16:20, 19:8,
19:9, 19:18,
23:12, 24:10,
24:21, 29:2
**jam**
13:24
**jefferson**
3:4
**job**
6:12, 15:13,
29:5
**jobs**
15:17, 15:20,
15:22, 28:19,
29:11
**john**
48:8
**joined**
16:16, 17:6,
17:8, 23:14
**joseph**
1:19
**jr**
1:6

**judge**
28:23, 63:2
**july**
55:13
**jump**
46:21
**junior**
12:7
**justin**
3:13, 5:22,
46:15, 58:20,
63:8

---
**K**
---
**keep**
31:16, 31:17,
33:21
**keeps**
31:17
**kelly**
3:3, 62:3,
62:24
**kelly's**
62:24
**kennelly**
63:2
**kids**
12:21
**kimbark**
11:14
**kind**
9:1, 27:11,
27:23, 34:4,
37:12, 44:15,
46:2, 64:1, 64:3
**knew**
21:9, 21:16,
32:11, 37:22,
42:11, 52:8,
55:18
**know**
7:7, 10:3,
10:21, 10:23,
13:20, 21:18,
22:5, 22:13,
22:15, 23:3,
23:5, 24:1,
24:10, 24:12,

24:16, 25:4,
25:7, 25:12,
25:13, 26:1,
26:2, 27:16,
27:19, 28:12,
28:16, 28:20,
28:22, 29:11,
30:4, 31:24,
35:3, 36:19,
37:4, 38:19,
39:6, 40:6,
40:12, 40:24,
41:10, 41:21,
42:2, 42:10,
42:11, 42:18,
43:24, 45:21,
46:20, 49:4,
49:5, 49:8,
49:16, 49:21,
49:22, 50:12,
50:21, 51:8,
52:12, 52:15,
53:3, 54:20,
54:23, 56:14,
59:9, 60:11,
62:22, 63:10,
63:11
**knowledge**
46:1
**krauchun**
3:3, 44:5,
44:9, 46:13,
46:15, 46:19,
50:16, 50:20,
58:14, 58:19,
59:22, 61:14,
61:18, 62:4,
62:21, 62:23,
63:4, 63:8,
63:21, 64:11,
64:17

---
**L**
---
**l-a-u-g-h-r-a-n**
48:10
**lasalle**
3:14
**last**
15:22, 16:8,

16:10, 30:6,
47:1
**later**
56:12
**laughran**
47:15, 48:6,
48:7, 48:8
**laughran's**
57:2
**law**
3:2, 3:21
**lawsuit**
5:24, 10:8,
55:5
**laying**
43:24
**lead**
41:19
**least**
32:4
**leave**
63:13
**led**
44:15
**left**
20:23, 51:12
**legrain**
1:4, 55:11,
65:4
**leinenweber**
3:12, 3:13,
4:4, 5:21, 5:23,
6:6, 6:9, 7:2,
7:10, 7:17,
7:24, 8:4, 8:8,
8:15, 8:17,
8:21, 8:24, 9:3,
9:7, 9:12, 9:19,
44:7, 44:12,
46:12, 46:18,
46:22, 46:24,
47:5, 50:13,
50:18, 50:23,
51:4, 51:11,
58:21, 58:22,
59:23, 61:16,
61:20, 61:24,
62:5, 62:8,

62:24, 63:5,
63:9, 63:18,
63:22, 64:3,
64:12
**let's**
12:23, 13:4,
14:18, 25:14,
26:3, 26:14,
30:9, 30:15,
30:19, 33:9,
37:13, 37:15,
41:21, 42:3,
54:9, 55:2,
59:24, 63:18
**letter**
13:22
**level**
11:16
**license**
66:28
**lieutenant**
33:8, 33:15,
33:23, 34:24,
35:1, 36:1,
36:6, 38:21,
39:11, 52:12
**lieutenants**
33:20, 34:7,
35:24, 52:4
**liked**
14:14
**little**
6:12, 7:11,
7:21, 14:22,
15:17, 21:20,
24:16, 29:18,
37:1, 42:3,
45:3, 58:17
**live**
11:10
**llc**
3:12
**log**
50:17
**long**
10:20, 31:3,
41:9, 41:10
**look**
9:8

**looked**
9:23, 10:4
**looking**
10:12, 27:9
**looks**
61:16
**loop**
12:4, 12:8
**losing**
38:8
**lost**
31:11, 32:3,
37:16, 39:23,
46:12, 50:14,
61:16
**lot**
37:12, 64:17
**loudermill**
59:2, 59:6,
60:21
**low**
29:5, 29:9
**lucien**
3:32, 63:22

**M**

**machinery**
14:3
**made**
33:3, 34:4,
35:20, 36:3,
41:14
**mail**
14:5
**main**
6:11, 14:1
**make**
6:11, 6:12,
35:4, 43:22
**makes**
34:21, 35:2
**manning**
1:9
**many**
12:8, 22:15
**marathon**
7:12
**march**
20:5, 20:6,

20:10, 20:13,
25:14, 33:13
**mark**
64:9
**marked**
4:8
**married**
12:19
**maybe**
10:23, 24:22,
28:7, 28:8,
28:12, 28:14,
30:11, 30:12,
30:13, 31:5,
38:16, 40:19,
41:18, 43:10,
44:3, 56:11,
63:13
**mcghee**
1:10
**mean**
15:13, 28:21,
37:22, 38:15,
40:24, 42:8,
45:2, 45:3,
45:9, 45:23,
54:13, 54:16
**meaning**
39:10, 54:11
**mechanic**
14:17
**meet**
10:10, 10:16,
10:17
**members**
42:5
**mentioned**
10:13, 41:23
**merit**
59:3, 59:6,
59:14, 60:6,
60:24, 61:4
**messages**
9:8
**messina**
44:19, 45:14,
45:15, 47:14,
47:16, 48:3

**michelle**
1:4
**midnights**
17:14
**midwest**
3:23
**might**
29:6, 41:13,
43:9, 53:5
**mike**
5:7
**minute**
48:13, 54:10,
55:2, 59:24,
61:19
**minutes**
10:21
**misconduct**
44:24, 45:18,
45:22, 46:2
**misplaced**
58:4, 58:12
**miss**
62:21, 62:22,
62:23
**missed**
36:23, 36:24
**misstates**
44:5
**mistakes**
41:14
**mix-ups**
41:19
**monitoring**
16:22, 27:1,
28:4, 54:21
**month**
56:11
**months**
43:10, 44:4,
44:10
**more**
42:3, 44:22,
49:14, 52:3,
58:4, 58:13
**morning**
5:22, 63:3
**mother**
12:17

move
20:21
moved
13:12, 13:16,
18:2, 20:10,
25:15
moving
20:16, 31:18
mute
5:7

**N**

name
5:22, 6:2,
42:12
names
44:14, 44:22,
55:21, 60:15
neal
1:25
need
28:8, 28:14,
29:6, 55:21,
58:17, 63:11,
63:15, 63:23,
64:8
neill
57:23
never
29:8, 30:17,
37:19, 38:4,
41:6, 42:8,
42:9, 43:2,
43:4, 43:5,
46:7, 47:8,
47:13, 55:1,
56:1, 56:7,
56:17, 57:18
newell
3:32, 5:1,
46:14, 63:24,
64:10
newson
1:6
next
63:14
nickle
45:12, 46:5,

47:2, 47:8
nickles
44:20, 46:7
nobody
24:18, 40:23
nod
7:5
nope
9:6
normal
6:18
north
3:14
northern
1:2, 65:2, 66:2
notary
65:32
notes
8:22
nothing
14:23, 45:8,
58:6
notice
2:3, 60:9
number
7:18, 62:12
numbers
55:21

**O**

o'clock
55:24, 64:19,
66:16
o'malley
56:5
oak
3:25
oath
65:17
objection
44:5
obligations
52:24
observed
53:12
obtain
12:13, 12:15
obviously
53:4

occasion
53:14
occasions
6:17
occurred
30:5
october
66:24
odd-end
15:17
off-the-record
5:6
offhand
10:5, 10:23,
22:5, 53:2, 53:4
office
13:5, 13:11,
13:21, 14:1,
15:1, 15:3,
15:7, 15:11,
16:12, 16:17,
17:1, 17:3,
23:20, 28:6,
45:7, 48:15,
48:22, 49:11,
51:13, 52:18,
52:24, 54:21,
56:12, 56:22,
57:11, 60:5,
61:6, 62:24
officer
16:4, 16:18,
17:6
officers
24:21, 24:22,
28:5
official
1:19, 1:21,
1:24, 1:26,
1:29, 65:12
often
36:15
oh
15:23, 22:21,
26:24, 30:11,
33:5, 46:10,
49:18, 50:11,
59:16, 61:13

old
9:23, 24:16,
34:9
once
13:15, 21:8,
21:16, 43:10
one
5:23, 8:1,
8:18, 12:10,
12:11, 22:15,
30:22, 41:12,
44:3, 53:5,
56:10, 61:1
one-day
15:20
ones
35:20
only
7:4, 7:13,
24:21, 25:2,
38:7, 39:17,
40:2, 42:19,
52:8
open
63:13
opr
52:15, 52:16,
53:7, 53:16
option
53:17
oral
9:16
order
5:20, 64:1
orders
23:4, 23:9
original
37:15
other
10:12, 10:24,
11:5, 11:7,
16:11, 17:2,
26:3, 26:5,
33:22, 39:16,
41:17, 52:23,
53:22, 58:23,
60:16, 60:18,
61:9, 61:11

Transcript of Wilford Ferguson
Conducted on August 31, 2020                                    28

out
12:18, 27:9,
28:7, 28:19,
28:24, 29:5,
29:10, 32:1,
34:21, 46:14,
58:4, 58:12,
58:13, 63:12,
64:6
outlined
23:23, 25:11
over
8:10, 9:23,
19:2, 21:16,
62:20
overnight
18:8
own
23:9, 24:20,
57:11

**P**

page
1:7, 4:2, 65:20
paid
57:22
pandemic
8:10
pantry
13:17
paperwork
9:23, 9:24,
10:12, 27:17,
27:18, 36:24,
40:10, 40:21,
41:15, 45:3,
45:4
park
15:15, 15:21,
66:23
part
15:14, 19:8,
19:9
part-time
15:12
parties
62:16, 66:19
partner
37:6, 37:8

past
56:14
patience
64:14
patrol
17:18, 18:4,
18:5, 18:9,
18:10, 18:15,
18:16, 18:20,
18:24, 20:17,
20:19, 20:21,
20:23, 21:2,
21:8, 21:14,
25:6, 25:16,
26:3, 26:9,
26:19, 31:7,
32:7, 32:8,
32:10, 32:14,
32:15, 32:20,
40:14
pay
19:15, 35:15,
56:7, 56:8
people
24:16, 27:9,
27:14, 55:14
perfect
62:4, 63:4
perfectly
6:18
perk
35:18
permission
28:14, 28:17
person
25:2, 35:3,
38:20, 38:22,
39:8, 39:12,
40:9, 44:3,
48:7, 53:11,
55:15
person's
42:12
pertaining
2:5
phone
5:12, 9:8,
50:19, 51:6,

55:21, 62:13,
62:19
phonetic
55:12
pick
19:15
piece
24:16
place
19:19, 65:21
placed
19:4
plaintiff
3:10
plaintiffs
1:13, 11:5,
11:8, 65:6
planet
3:32
play
63:12
please
5:4, 5:7, 5:9,
5:12, 6:2, 6:15,
7:6, 7:20
plugged
50:21
point
18:12, 22:1,
31:10, 34:5,
49:7, 49:8, 63:1
policies
55:19
policy
48:15, 48:22,
51:13, 53:3,
53:24, 54:22
population
19:20, 24:15
portion
63:16
position
16:17, 17:9,
18:3, 21:1,
25:20, 33:21,
35:5, 35:9,
35:10, 35:15,
38:21, 39:24

positions
16:6, 16:7,
17:2, 29:15,
33:4
possible
24:5
possibly
53:8, 62:20
post
13:11, 13:21,
14:1
potentially
51:6
practice
23:1
practices
56:14
pre-marked
64:1
prepare
9:21, 10:14
present
3:31, 15:5,
15:6, 15:9
presumably
27:3
prior
20:16
probably
10:21, 24:7,
24:9, 29:7, 31:5
problems
51:6
procedure
2:4
proceeding
5:2, 5:5, 60:7
process
23:23, 25:6,
25:11, 25:17,
30:21, 31:4,
32:9, 32:16,
32:18, 36:11,
36:16, 53:1,
54:3, 60:24,
61:4
produced
10:8

**professional**
52:18, 52:20
**program**
27:16, 29:4,
29:7
**progressive**
54:12, 54:14,
54:17, 54:22
**promoted**
30:16
**proper**
27:17
**property**
19:16
**provide**
5:14, 8:18,
64:8
**providing**
28:1
**public**
65:32
**pulled**
57:10, 57:11
**punish**
36:22, 37:2
**punished**
37:3, 38:10,
38:13, 39:7,
39:21, 40:4,
40:7, 40:21,
44:16
**punishing**
41:4
**punishment**
37:4, 37:9,
37:10, 37:11,
42:7, 42:10,
42:14
**purchase**
5:15
**purposes**
5:5
**pursuant**
2:3, 5:19
**put**
21:7, 21:14,
25:6, 28:23,
29:3, 36:17,

36:18, 37:5,
37:6, 37:8,
37:21, 38:16,
38:19, 39:2,
39:14, 40:8,
40:12, 40:15,
57:5, 57:6,
62:1, 63:6
**putting**
37:2, 41:5

---

**Q**

**question**
6:15, 6:22,
7:8, 7:14, 8:2,
26:15, 37:15,
37:23, 39:5,
39:20, 40:7,
47:1, 47:2,
47:6, 50:14,
51:17, 57:24,
61:12
**questioning**
56:10
**questions**
7:18, 8:1,
8:11, 8:19,
38:2, 58:16

---

**R**

**ran**
19:16
**range**
28:7
**ranzino**
1:20
**rather**
37:6
**re-upload**
64:4
**read**
47:1, 47:2,
47:4, 65:18
**really**
24:18, 24:19,
27:20, 29:24,
39:4, 43:13
**reason**
8:4

**reasons**
41:13
**recall**
22:3, 22:14,
23:7, 25:23,
26:2, 41:21,
45:20, 49:13,
49:15, 49:24,
60:12, 60:13,
60:14
**receive**
60:9
**received**
55:3, 55:5,
55:8, 58:24,
59:5, 59:8,
59:13, 60:3
**recess**
51:3
**reconvene**
62:17, 62:18,
63:14
**reconvened**
64:19
**record**
6:3, 47:4,
50:24, 51:2,
51:5, 61:21,
61:23, 62:1,
62:2, 62:9,
62:10, 63:6
**recording**
5:4, 5:15
**reduced**
66:11
**refer**
58:24
**reference**
34:4
**referring**
49:19
**regarding**
11:5, 11:8,
34:22, 36:3
**regular**
6:19
**regulation**
52:19, 52:20

**relative**
66:18, 66:19
**remember**
5:7, 37:14,
51:15
**remotely**
5:2
**removing**
22:19
**report**
45:7, 50:4,
50:7, 51:21,
51:23, 52:8,
53:11, 54:1
**reported**
52:23, 66:10
**reporter**
2:7, 5:10,
6:20, 7:4,
63:15, 66:7
**reporter's**
6:12
**request**
7:14, 37:17
**requested**
47:4
**requires**
7:8
**resolved**
51:7
**responsible**
22:19, 42:6,
42:13
**rest**
38:18
**result**
44:17
**retaliating**
53:13
**retaliation**
48:18, 48:23,
49:3, 49:12,
50:3, 51:14,
51:20, 52:22,
53:20
**retaliatory**
55:9
**retired**
61:1, 61:2

Transcript of Wilford Ferguson
Conducted on August 31, 2020                    30

retirement
61:3
returned
57:18
rico
55:12, 57:17,
60:19, 61:1,
61:2
right
5:1, 5:21,
8:19, 8:20,
9:10, 11:24,
13:3, 17:7,
17:10, 18:15,
18:19, 18:22,
19:1, 19:4,
19:23, 20:2,
20:7, 20:14,
25:17, 26:10,
27:7, 27:12,
28:3, 29:13,
29:22, 30:2,
30:9, 31:6,
32:3, 32:6,
32:21, 33:1,
34:8, 35:22,
36:2, 36:5,
36:8, 38:5,
38:6, 38:11,
39:17, 39:24,
40:1, 40:4,
40:5, 41:16,
41:18, 41:22,
43:14, 43:15,
43:18, 44:23,
45:10, 48:4,
48:10, 48:12,
48:23, 48:24,
49:9, 49:24,
51:4, 53:3,
53:8, 54:9,
55:15, 58:21,
59:17, 59:20,
60:1, 60:12,
60:14, 61:4,
61:9, 62:6,
64:12
road
3:23

rohloff
1:27
role
27:22, 52:24
roll
21:8, 21:16,
25:7, 32:10,
32:23, 33:4,
34:20
room
8:9, 8:14
roster
43:16, 43:17,
43:19, 43:20,
43:23, 43:24
rule
6:14
rules
2:4, 6:10
run
5:3
running
14:3

─────────── S ───────────

s
3:1
sabo
2:6, 66:6,
66:27
said
11:24, 18:2,
19:21, 20:15,
22:1, 25:14,
29:23, 32:3,
40:8, 40:9,
41:14, 41:23,
42:8, 48:2,
49:16, 55:18,
55:21, 56:17,
57:24, 60:15,
66:13, 66:15
same
8:9, 17:12,
44:15, 45:2,
54:3, 58:11
samuel
1:6

saturday
43:21
saturdays
43:23
saw
56:12
say
15:24, 16:8,
24:8, 24:15,
24:17, 43:13,
54:2, 56:11,
58:3, 58:9,
65:17
saying
38:7, 42:9,
44:3
scenery
14:8
school
11:19, 11:22,
12:16, 12:24,
13:1, 16:4,
26:24, 27:13,
27:15, 27:18,
27:20, 27:23,
28:1
screw-ups
41:19
screwed
40:21
sears
14:17
second
33:10
secretary
58:7
security
15:17, 15:22,
16:2
see
12:23, 13:4,
14:18, 16:9,
18:6, 21:20,
25:14, 26:3,
27:19, 28:10,
28:15, 29:1,
30:10, 30:15,
30:19, 39:1,

40:24, 41:7,
41:10, 41:21,
43:16, 43:17,
43:19, 43:20,
43:23, 44:1,
46:4, 46:16,
46:17, 46:19,
58:1, 61:19
seeking
60:6, 60:10,
61:6, 61:10
seen
46:7, 47:8,
47:13, 47:21
send
28:24, 29:5,
32:13, 33:3,
52:10, 53:15
sending
40:22
sends
28:19
sent
38:14, 39:7,
39:21, 40:3,
42:20
separate
25:7, 30:2,
37:7
separation
30:5
sergeant
33:15, 33:23,
35:2, 36:6,
39:11, 52:5
sergeants
33:8, 33:20,
34:6, 35:24,
52:3
server
64:6
serving
29:14
set
66:22
shador
55:12, 56:8,
60:19

Transcript of Wilford Ferguson
Conducted on August 31, 2020                    31

| | | | |
|---|---|---|---|
| **shake** | 15:8, 61:12 | 28:13, 33:12, | **started** |
| 7:5 | **sit** | 37:23, 41:2, | 12:17, 17:14, |
| **sheriff** | 53:6 | 42:23, 47:16, | 18:7, 30:18, |
| 1:17, 65:10 | **sitting** | 55:6, 58:19, | 31:7, 36:21 |
| **sheriff's** | 8:9 | 62:22, 64:13 | **state** |
| 13:5, 15:1, | **situation** | **sort** | 2:8, 6:2, 66:4, |
| 15:3, 15:7, | 55:11, 59:11, | 9:24, 13:22, | 66:7 |
| 15:11, 16:12, | 59:19, 59:21 | 14:15, 32:20, | **state's** |
| 16:16, 16:24, | **six** | 34:20, 41:17, | 55:17 |
| 17:3, 23:20, | 59:10 | 44:24, 63:11, | **states** |
| 48:15, 48:21, | **slap** | 63:13, 64:6 | 1:1, 2:5, |
| 49:10, 51:13, | 57:6 | **sorting** | 27:17, 65:1, |
| 52:24, 54:21, | **slaughter** | 14:3, 14:5 | 66:1 |
| 60:5, 61:6 | 1:11 | **sorts** | **status** |
| **shields** | **small** | 41:17 | 59:9 |
| 1:22, 19:3, | 24:11 | **sound** | **stay** |
| 56:12, 57:3, | **smoothly** | 48:10 | 27:5, 27:6, |
| 57:5, 57:9, | 5:3 | **sounds** | 55:20, 64:6 |
| 57:11, 57:15, | **some** | 64:10 | **stayed** |
| 58:1, 58:3, | 7:18, 11:18, | **south** | 14:14 |
| 58:7, 58:9 | 11:24, 14:10, | 3:4, 11:12, | **stenographically** |
| **shift** | 18:12, 22:1, | 11:14 | 66:11 |
| 17:18, 18:2, | 22:7, 22:9, | **speaking** | **step** |
| 18:8, 18:13, | 28:5, 34:4, | 5:10, 5:13, | 37:13 |
| 20:23, 21:12, | 41:14, 49:7, | 10:24 | **stepped** |
| 21:13 | 49:8, 51:6, | **specialist** | 57:7 |
| **shoot** | 58:4, 58:12, | 28:15 | **steward** |
| 46:10 | 62:12 | **specific** | 24:18 |
| **short** | **someone** | 42:4, 49:19, | **still** |
| 46:23, 51:3 | 40:20 | 49:20, 49:21 | 14:21, 15:2, |
| **shorthand** | **something** | **specified** | 19:24, 33:13, |
| 2:7, 66:6 | 13:12, 14:23, | 66:14 | 33:18, 59:9, |
| **should** | 27:10, 28:9, | **spell** | 59:10 |
| 5:6 | 28:16, 29:7, | 6:2 | **stood** |
| **shut** | 30:13, 36:22, | **spoken** | 24:10 |
| 32:9 | 36:23, 36:24, | 11:1, 11:4, | **stop** |
| **signal** | 40:10, 43:11, | 11:7 | 15:7, 25:5 |
| 29:9 | 44:11, 48:11, | **spot** | **stopped** |
| **signature-7cx0z** | 50:7, 50:19, | 21:5, 30:17 | 21:13, 32:15, |
| 66:25 | 56:1 | **squad** | 32:18 |
| **since** | **sometimes** | 28:24 | **street** |
| 16:10, 17:23, | 32:5, 36:12 | **ss** | 3:4, 3:14, |
| 23:14, 64:8 | **soon** | 66:2 | 21:10, 28:20, |
| **sine** | 64:15 | **stand** | 32:14, 36:17, |
| 64:19 | **sorry** | 24:19 | 36:18, 36:20, |
| **single** | 10:11, 16:6, | **start** | 37:7, 38:16, |
| 42:12 | 16:15, 21:19, | 13:4, 16:14, | 38:24, 40:9, |
| **sir** | 22:24, 23:13, | 16:24 | 40:13 |
| 12:19, 15:4, | | | |

Transcript of Wilford Ferguson
Conducted on August 31, 2020
32

strickland
1:5
strike
10:11, 16:6,
16:15, 22:24,
23:13, 30:20,
41:2, 42:23,
55:6
stuff
10:2, 14:6,
28:17
stupid
50:11
subpoena
59:1, 60:1,
60:2, 61:10
subpoenaed
55:14
subscribed
65:27
sudden
40:14
suite
3:5, 3:15, 3:24
sunday
43:21
sundays
43:23
supervisor
35:5, 39:2,
39:9, 39:10,
40:11, 41:1,
41:24, 42:1,
50:6, 50:8,
50:9, 51:21,
51:24, 52:9,
53:10, 54:1
supervisors
33:5, 34:14,
35:4, 35:12,
35:14, 35:20,
37:20, 42:16,
52:3
supervisory
35:15, 38:21
supposed
49:1, 50:2,
50:4, 51:19,

52:7, 52:9,
53:13, 53:24,
55:16
sure
6:11, 15:14,
62:19, 64:5
switched
18:12
sworn
5:19, 9:16,
65:17, 65:27,
66:9

**T**

take
7:4, 7:12,
7:15, 26:12,
31:24, 37:13,
46:15, 47:19
taken
2:6, 6:7, 51:3,
65:20, 66:14
taking
2:5, 27:4,
66:15
talk
10:17, 10:20,
33:9, 54:9,
55:2, 59:20
talking
6:23, 39:10,
39:16, 39:17,
45:4, 51:13,
51:23, 60:1
teamsters
23:18, 23:19
technical-related
5:18
tell
11:10, 32:11,
35:5, 40:20,
40:23, 40:24,
41:1, 41:4,
42:12, 42:15,
42:17, 44:13
term
54:17
terminate
62:17

termination
60:6, 60:10,
61:7, 61:10
test
30:17
tested
62:20
testified
9:17
testify
66:9
testimony
8:5, 9:10,
42:19, 42:22,
43:1, 44:6,
51:15, 65:22
testing
30:18
text
9:8
thank
5:1, 5:18,
21:23, 64:11,
64:16
thanks
63:21, 64:13,
64:17
thing
7:13, 37:1,
45:2, 45:3,
50:11, 52:8,
53:5, 58:11
things
14:4, 26:16
think
17:21, 20:5,
24:1, 24:3,
24:4, 26:15,
27:2, 30:2,
30:6, 30:9,
30:11, 41:14,
44:21, 44:22,
46:12, 46:14,
47:3, 48:11,
50:13, 50:14,
51:17, 51:18,
56:22, 61:15,
64:7

thomas
1:18, 1:24,
65:11
thought
57:6
three
30:12, 30:13,
43:10, 44:4,
44:10, 58:5,
61:1
three-part
57:18, 58:8
through
34:9, 60:6,
65:20
till
55:23
time
5:13, 15:6,
15:9, 17:12,
22:3, 22:14,
23:5, 24:22,
25:16, 35:16,
35:17, 37:13,
41:22, 42:17,
56:7, 57:23,
58:3, 62:18,
63:14, 65:21,
66:14
times
38:8, 38:9,
40:2, 40:3,
58:6, 62:12
tims
1:5
tinley
66:23
titles
10:3
today
6:10, 6:13,
7:11, 7:18, 8:6,
8:13, 8:19, 9:5,
9:10, 9:22,
10:14, 14:21,
62:17, 63:12,
64:14
told
41:6, 56:5,

Transcript of Wilford Ferguson
Conducted on August 31, 2020                                33

56:20, 57:9,
57:12
**tomorrow**
63:2
**took**
14:7, 21:6,
22:2, 22:11,
22:17, 24:24,
55:20
**totally**
64:7
**tour**
56:3, 56:4,
56:15
**transcribed**
63:16
**transcript**
5:16, 65:19,
65:22
**true**
65:22
**truth**
66:9
**try**
62:14
**trying**
31:14, 40:18,
44:21, 51:17,
64:14
**tss**
17:18, 17:19,
18:2, 18:17,
20:20, 20:21,
20:22, 21:3,
25:15, 25:19,
26:4, 26:9,
26:20, 31:1,
31:4, 31:9,
32:5, 32:13,
36:10, 36:12,
36:15, 37:3,
37:5, 37:6,
37:9, 37:11,
37:16, 37:17,
38:5, 38:8,
38:14, 38:17,
39:3, 39:7,
39:15, 39:21,

39:22, 39:23,
40:3, 40:12,
40:15, 40:22,
41:5, 41:13,
41:20, 42:6,
42:13, 42:20,
43:2, 43:5,
43:14, 44:1,
44:4, 44:16
**two**
30:12, 38:17,
38:24, 56:11
**two-minute**
46:16
**types**
26:17
**typewriting**
66:11
**typically**
53:11
**typing**
6:20
**tyrone**
1:10

---
U
---
**uh-huh**
7:6
**uh-hum**
24:13, 34:13
**unable**
5:11
**unclear**
29:18
**under**
30:21, 31:4,
36:10, 53:24,
66:12
**understand**
7:19, 8:17,
18:6, 25:3,
40:16, 51:5,
59:5, 61:12
**understanding**
23:22, 24:23,
25:9, 32:17,
33:2, 35:8,
35:19, 38:4,

38:13, 50:1,
54:11, 60:4
**understood**
8:2, 25:4
**unedited**
5:14
**unh-unh**
7:6
**union**
23:15, 23:17,
24:11, 24:17
**unit**
24:22, 25:6,
26:6, 26:19,
26:20, 30:3,
54:21
**united**
1:1, 2:4, 65:1,
66:1
**university**
14:13
**unpack**
37:12
**unsuccessful**
62:15
**until**
17:6, 20:12,
63:17, 63:18
**use**
56:2, 56:15
**usually**
8:8

---
V
---
**verbal**
7:4
**verify**
27:19
**vernell**
1:5
**via**
5:12
**victim**
53:23, 54:7
**victor**
1:10
**video**
5:9, 5:11

**violations**
41:18
**virtual**
2:1
**virtually**
3:9, 3:18,
3:28, 5:19,
9:16, 66:8
**visit**
14:14
**vocational**
13:2
**vs**
1:15, 65:8

---
W
---
**w-i-l-f-o-r-d**
6:5
**wait**
50:16, 58:15,
61:18, 63:17,
63:18
**walk**
34:9
**walker**
1:9
**want**
6:18, 8:12,
27:14, 31:20,
37:5, 46:15,
56:13, 57:8,
58:20, 60:13,
63:6, 63:16
**wanted**
21:1, 21:2,
21:4, 37:21,
55:19
**warrant**
28:24
**washington**
12:4, 12:6,
12:9, 13:10
**watch**
17:12
**way**
19:11, 26:14,
37:16, 46:4
**we'll**
31:24, 48:12,

51:8, 59:20,
61:18, 63:1,
64:15
**we're**
7:10, 7:13,
8:1, 8:10,
37:24, 51:5,
60:1, 62:10
**we've**
61:16
**week**
38:18
**weighing**
14:5
**went**
13:9, 13:12,
14:8, 14:10,
14:13, 17:1,
17:17, 17:19,
18:17, 18:20,
20:23, 21:9,
27:12, 36:16,
55:12, 55:13,
56:8, 56:15,
57:21
**weren't**
43:14, 59:17
**whatever**
24:19, 33:24,
36:24, 37:1,
38:22, 39:11,
39:13, 40:12,
42:16, 56:14,
56:22, 58:10,
64:7
**whereof**
66:22
**whereupon**
9:13
**wherever**
37:21
**whether**
23:23, 25:9,
48:14, 54:5,
54:20
**white**
3:22, 6:1,
13:16, 42:23,

43:1, 43:6,
43:9, 44:3,
44:14, 45:18,
62:7
**whites**
37:10
**whole**
63:19, 66:9
**wholly**
35:10
**wilford**
1:7, 2:1, 3:10,
4:3, 6:4, 9:14,
65:16, 65:25,
66:8
**williams**
1:8
**winston**
1:4, 55:11,
56:2, 56:13,
56:21, 57:3,
57:6, 57:14,
57:17, 60:19,
65:4
**winston's**
57:7
**within**
2:7, 16:8,
20:13, 26:9,
26:17, 29:15,
51:22
**witness**
4:2, 5:19, 6:4,
6:8, 7:1, 7:9,
7:16, 7:23, 8:3,
8:7, 8:14, 8:16,
8:20, 8:23, 9:2,
9:6, 9:11, 9:15,
44:10, 49:2,
50:2, 50:11,
51:10, 51:19,
52:21, 53:22,
54:7, 58:18,
64:16, 66:22
**word**
41:19
**words**
53:22, 54:12

**work**
6:21, 13:22,
14:15, 15:2,
15:10, 21:1,
21:3, 21:4,
25:8, 27:13,
27:14, 27:15,
27:17, 27:20,
27:23, 31:7,
31:9, 32:5,
39:1, 39:2,
43:18, 43:20,
56:6
**worked**
13:16, 13:21,
13:24, 14:1,
14:17, 15:12,
16:1, 17:11,
26:5, 29:17,
29:18, 32:7,
39:22, 43:2,
43:5
**working**
12:17, 13:9,
13:11, 14:24,
15:7, 17:14,
17:17, 17:18,
18:7, 18:18,
18:21, 18:23,
20:13, 20:17,
20:19, 20:20,
20:22, 21:17,
25:19, 26:4,
26:24, 27:23,
31:3, 32:12,
32:13, 32:14,
40:13, 43:21,
44:1, 51:10,
62:19, 62:20
**works**
44:3
**write**
52:9, 53:15
**written**
23:2
**wrong**
55:14
**wrote**
57:14

|     Y     |
|-----------|
**yeah**
12:2, 14:5,
15:14, 18:11,
19:7, 20:8,
22:15, 22:21,
43:17, 46:3,
46:9, 47:23,
52:20, 53:2,
58:21, 62:4,
62:7, 63:18
**year**
11:21, 12:11,
13:4, 13:10,
20:6, 20:7,
29:8, 30:6,
49:20, 49:21,
49:22
**years**
12:8, 13:11,
15:24, 16:8,
22:7, 22:9,
22:10, 30:12,
30:13, 31:5,
36:9, 39:22,
49:14, 59:10
**yesterday**
10:19
**yourself**
5:12, 53:16

|     Z     |
|-----------|
**zoom**
8:11, 62:20

|     .     |
|-----------|
**.20**
65:29

|     0     |
|-----------|
**00**
17:15, 17:18,
17:19, 17:20,
17:21, 17:23,
17:24, 18:1,
18:2, 18:3,
18:7, 18:8,

18:13, 18:14,
18:18, 18:21,
18:24, 20:23,
20:24, 21:11,
21:12, 21:13,
55:24, 55:24
**002667**
66:28
**05726**
1:8, 65:8
**084**
66:28

---
**1**

**10**
66:16
**100**
3:5
**11**
17:21, 17:23,
17:24, 18:3,
18:21, 18:24,
21:12, 64:19
**12**
17:15, 17:18,
17:19, 17:20,
18:1, 18:7,
18:14, 18:18,
20:23, 20:24,
21:12
**120**
3:14
**14**
5:20
**16**
13:6
**16729**
11:14
**178**
24:22
**18**
1:8, 65:8
**1800**
24:20
**1984**
11:23, 12:24,
13:7
**1991**
13:6, 13:7,

15:1, 16:16
**1992**
16:23, 17:2,
20:12, 23:14
**1994**
26:1

---
**2**

**2**
55:23, 55:24
**20**
66:16
**200**
3:24
**2000**
3:15
**2015**
16:10, 55:13
**2019**
30:8
**2020**
2:8, 5:20,
20:9, 20:10,
20:13, 25:14,
66:16, 66:24
**2021**
3:23
**206**
3:4
**25**
10:23
**27**
16:23, 17:2,
20:12

---
**3**

**3**
17:21, 17:24,
18:3, 18:21,
18:24, 21:11,
21:12, 55:24
**3,000**
24:20
**30**
10:21, 55:24
**31**
2:8, 66:15
**312**
3:7, 3:17, 3:26

**380**
3:17, 3:26

---
**4**

**4**
17:18, 18:13,
20:23
**4--19**
13:6

---
**5**

**5**
19:23
**58**
64:19

---
**6**

**60473**
11:15
**60523**
3:25
**60602**
3:16
**60661**
3:6
**61**
4:4, 65:20
**655**
3:7
**6635**
3:17, 3:26

---
**7**

**7660**
3:7

---
**8**

**8**
17:15, 17:19,
17:20, 18:2,
18:8, 18:18,
20:24, 21:13

---
**9**

**9**
4:4
**91**
13:6, 15:5,

15:6, 15:9, 17:1
**95**
26:1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEGRAIN WINSTON, et al. | ) | |
| | ) | Case No. 18-cv-05726 |
| Plaintiffs, | ) | |
| | ) | Hon. Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| THOMAS J. DART, et al. | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF WILFORD FERGUSON'S OBJECTIONS AND ANSWERS TO
DEFENDANT GREGORY SHIELDS FIRST SET OF INTERROGATORIES**

NOW COMES, Plaintiff, Wilford Ferguson, and provides the following objections and responses to Defendant Gregory Shields First Set of Interrogatories.

**GENERAL OBJECTIONS**

1.   These General Objections are hereby incorporated by reference into the responses made with respect to each separate interrogatory. The inclusion of any specific objection in response to an interrogatory shall not be deemed as a waiver of any general objection made herein or any additional objection that may be asserted at another date. Plaintiff reserves all objections or other questions regarding the relevance, materiality, or admissibility of the information sought in each interrogatory as evidence in this suit or any other proceeding, action or trial.

2.   Plaintiff will respond to each interrogatory based on the best of his present knowledge, information and belief, Plaintiff notes the pending action is in its early stages, and his investigation is ongoing. Plaintiff reserves the right to supplement and amend his responses herein as discovery proceeds and further information is received.

3.   Plaintiff objects to the Defendant's Definitions and to each interrogatory to the extent they seek to impose obligations beyond those required under the Federal Rules.

Subject to the foregoing General Objections, and without waiver of these objections, Plaintiff responds as follows:

<div align="center">

**OBJECTIONS AND RESPONSES**

</div>

1.     List the name, address, and telephone number of each person who answered or assisted in answering these interrogatories.

**Response:**     **Wilford Ferguson**
**16729 Kimbark Court**
**South Holland, IL 60473**
**(708) 955-7397**

**Undersigned Counsel**

2.     Identify all discipline you received that you allege was discriminatory as alleged in Paragraph 56 of the Complaint and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline. Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:**     **Plaintiff states that in and around July 2015, he was not allowed to use court subpoena as a tour of duty; whereas, Plaintiff has knowledge that other white investigators have been allowed to do so. Answering further, Plaintiff states that he was written up for not showing up to his tour of duty when he was in court on a subpoena. The Sheriff brought charges against Plaintiff which are currently pending before the Cook County Sheriff's Merit Board. Investigation continues and Plaintiff reserves the right to supplement this response.**

3.      If not already answered above, identify all discipline you received that you allege was discriminatory and forms the basis of your Complaint and explain who was involved in the issuance of the discipline, what the stated reason for the discipline was, whether or not you agreed with that reason, and, if you disagreed, why you disagree with the discipline, what specifically was discriminatory and disproportionate about the discipline, and explain how you were damaged by the discipline.  Explain what (if any) progressive discipline you contend should have applied and the basis for that contention.

**Response:      See response to interrogatory No. 2; Investigation continues and Plaintiff reserves the right to supplement this response.**

4.      Identify each and every complaint or grievance you made regarding the discipline alleged in Paragraph 56 of your Complaint, including when the complaint was made, to whom, what form or format the complaint took (e.g., verbal, phone call, written, email, or letter), what the response to the complaint was, whether or not you contend you suffered any retaliation for these complaints, and, if so, what retaliation you suffered, when you suffered it, and who was responsible for retaliating against you, and how you were damaged by the alleged retaliation.

**Response:      See response to interrogatory No. 2; Plaintiff further states that he filed a grievance related to the July 2015 pending discipline; however, it remains pending and undetermined.  Investigation continues and Plaintiff reserves the right to supplement this response.**

5.      Identify the similarly situated "non-minority officers" who did not receive discipline as alleged in Paragraph 56 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was responsible for making the decision as to whether or not to discipline the employee, what the underlying incident was, when the

underlying incident happened, what rule or regulation was purportedly violated, whether or not any investigation was conducted, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response was to the incident or discipline was, whether or not anyone else was involved, and whether or not anyone else witnessed the incident.

**Response:** **See response to interrogatory No. 2; Plaintiff further states that Investigators Nickle, Bieniek, Shedor, Bosques, Pemonte, Folkers, Vasques, Lopez, Rico and Hurtado were rarely assigned to TSS. The above-named investigators were assigned to either the office or patrol of very low risk areas or assigned to patrol jobs with minimal work such as doing home checks on inmates. Investigation continues and Plaintiff reserves the right to supplement this response.**

6.     Identify all positions you were assigned to that you allege were discriminatory as alleged in Paragraph 57 of the Complaint and forms the basis of your Complaint and explain who was involved in the assignment of that position, what the stated reason for assignment was, whether or not you agreed with that reason, and, if you disagreed, why you disagreed with the assignment, what assignment you contend you should have received instead, what specifically was discriminatory and disproportionate about the assignment, and explain how you were damaged by the assignment.

**Response:** **Plaintiff states that he was consistently assigned to TSS; whereas, other white investigators with less seniority were not. Investigation continues and Plaintiff reserves the right to supplement this response.**

7.     Identify the similarly situated "non-minority officers" who were not assigned to the positions you were assigned to as alleged in Paragraph 57 of the Complaint, including what employees were involved, who was responsible for supervising the employee, who was

4

responsible for making the decision as to what position the employee was assigned, what assignment the employee received, when the assignment was made, whether or not any grievance was filed, and if so the status or outcome of the grievance, what the employee's response to the assignment was, and whether or not anyone else was involved.

**Response:     See response to interrogatory No. 5; Investigation continues and Plaintiff reserves the right to supplement this response.**

8.     If not answered above, identify all duties or assignments you allege were discriminatory as alleged in the Complaint, and explain who was responsible for giving you the assignment, what was discriminatory about the assignment, what assignment you contend you should have received instead, identify the basis of your contention that the assignments were based on race, identify the basis of your contention that the assignments should have been based on seniority or work experience, and explain how you were damaged by the assignment.

**Response:     See response to interrogatory No. 5; Answering further, Plaintiff states that Ranzino, Neal and Rohloff were responsible for assignments.  Investigation continues and Plaintiff reserves the right to supplement this response.**

9.     If not already answered above, identify each and every instance in which any of the Defendants used offensive, derogatory, or racist language towards you as alleged in the Complaint, including the term(s) used, name(s) of person(s) involved, date the language was used, location of the conversation, all facts or subjects discussed or stated in the conversation, identify any witnesses to the conversation, identify what your response to the language was, including whether or not you reported to anyone that you considered the language to be offensive or racist, and explain how you were damaged by the language.

**Response:** **Investigation continues; Plaintiff reserves the right to supplement this response.**

10. Explain what you mean by "high incident area" as that term is used in your Complaint, and identify and explain the basis of your contention that you were disproportionately or discriminatorily assigned to those areas, including what area you were assigned to, when you were assigned, who assigned you, what was discriminatory about the assignment, where you contend you should have been assigned, and how you were damaged by the assignment.

**Response:** **"High incident area" refers to areas throughout Cook County that have been listed per the Chicago Police Department, Cook County Sheriff's Office and other law enforcement agencies, statistically, as areas where the most crime is committed or areas where the potential for bad, negative and unfavorable actions can take place. Investigation continues and Plaintiff reserves the right to supplement this response.**

11. If not already answered above, identify all protected activities in which you engaged as alleged in the Complaint including each and every internal complaint, grievance, memorandum, and incident report, and identify the date on which you engaged in each protected activity, explain whether or not each Defendant was aware of the protected activity and, if they were aware of the protected activity, the basis of your contention that they were aware of the protected activity.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

12. Identify each and every instance in which Defendant Shields threatened to fire you as alleged in Paragraph 84 of the Complaint, including when the threat was made, what the

6

underlying incident was that led to the discipline, what rule or regulation you are alleged to have violated, whether or not you actually received any discipline regarding this incident, what form the threat took (e.g. verbal, in person or over the phone, written, email, etc.), whether or not there were any witnesses to the underlying incident or to Defendant Shield's threat, whether or not any other Defendant was involved, whether or not you filed a grievance or complaint related to the underlying discipline or the threat, and how you were damaged by the retaliation.

**Response:** **Investigation continues; Plaintiff reserves the right to supplement this response.**

13. If not already answered above, identify each and every instance of retaliation that you allege Defendants caused because of your protected activity, identify the date of the retaliation, who caused or participated in the retaliation, and how you were damaged by the retaliation.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

14. Identify each and every allegedly adverse employment action you suffered, the date(s) on which it occurred, who was responsible for causing or implementing the action, how the action affected the terms and conditions of your employment, what your response to the action was including whether or not you filed an appeal, grievance, or other means of challenging the action, and explain how you were damaged by the action.

**Response:** **Objection, this interrogatory calls for a narrative response. Subject to and without waiving this objection: See Complaint. Investigation continues and Plaintiff reserves the right to supplement this response.**

15.     Identify what, if anything, you considered to be unsafe about your working environment as alleged in the complaint, including the date of any alleged incidents, who was involved in or caused the incidents, whether or not you reported the conditions to anyone, what response (if any) was made to your report of those conditions, whether or not you agreed or disagreed with the response, and how you were damaged by the working environment conditions.

**Response:     Plaintiff states that in TSS there is no ventilation, rodents, leaking ceilings, asbestos, unsanitary toilets, mold in the heating/cooling vents and other dangerous conditions.  Investigation continues and Plaintiff reserves the right to supplement this response.**

16.     Identify all Defendants' acts or omissions you allege resulted in Plaintiffs being treated differently than other similarly situated individuals.

**Response:     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection: See Complaint.  Answering further, Plaintiff states that Chief would grant certain requests when asked by white investigators and deny the same request made by African-American investigators.  Investigation continues and Plaintiff reserves the right to supplement this response.**

17.     Identify all policies, practices, and decisions that you allege had a disparate impact upon Plaintiffs based upon their race as alleged in the Complaint.

**Response:     Objection, this interrogatory calls for a narrative response.  Subject to and without waiving this objection, Plaintiff states policies, practices and decisions pertaining to assignments and placement of investigators based on race; response given to certain requests asked of African-American investigators compared to white investigators. Investigation continues and Plaintiff reserves the right to supplement this response.**

4816-9066-7956, v. 1

Respectfully Submitted,

By:    /s/ Kelly A. Krauchun
KELLY A. KRAUCHUN
The Herbert Law Firm
206 S. Jefferson, Suite 100
Chicago, IL 60661
(312) 655-7660
Kelly.krauchun@danherbertlaw.com

4816-9066-7956, v. 1

## **VERIFICATION**

I, Wilford Ferguson, state that I have read Defendant Gregory Shields' First Set of Interrogatories and my answers to those interrogatories, which are true to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3/13/2020

Wilford Ferguson

# Exhibit K

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1074 of 1503 PageID #:1465

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   LEGRAIN WINSTON,            )
     MICHELLE STRICKLAND,        )
 4   VERNELL TIMS, I.V.          )
     NEWSON, JR., SAMUEL         )
 5   PAGE, WILFORD FERGUSON,     )
     CECIL WILLIAMS, ANTHONY     )
 6   MANNING, DAVID WALKER,      )
     TYRONE MCGHEE, and          )
 7   VICTOR SLAUGHTER,           )
                                 )
 8        Plaintiffs,            )
                                 )
 9        vs.                    ) No. 18-cv-05726
                                 )
10   SHERIFF OF COOK COUNTY      )
     THOMAS J. DART, in his      )
11   Official Capacity,         )
     JOSEPH RANZINO,             )
12   Individually and in his     )
     Official Capacity,          )
13   GREGORY SHIELDS,            )
     Individually and in his     )
14   Official Capacity,          )
     THOMAS NEAL,                )
15   Individually and in his     )
     Official Capacity,          )
16   CHRISTOPHER ROHLOFF,        )
     Individually and in his     )
17   Official Capacity, and      )
     COUNTY OF COOK,             )
18   ILLINOIS,                   )
                                 )
19        Defendants.            )

20

21            The discovery deposition of JOSEPH

22   RANZINO, taken in the above-entitled cause, before

23   Brenda S. Hall, Certified Shorthand Reporter of the

24   State of Illinois, CSR License No. 084-003359, on
```

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1075 of 1503 PageID #:1466

1    Tuesday, September 8, 2020, at 11:02 a.m., via Zoom,

2    pursuant to notice.

3

4    PRESENT:

5              HERBERT LAW FIRM, INC.
               BY:  MR. DANIEL Q. HERBERT
6                   MS. KELLY A. KRAUCHUN
               206 South Jefferson Street
7              Suite 100
               Chicago, Illinois  60661
8              (312) 655-7660
               dan.herbert@danherbertlaw.com
9              kelly.krauchun@danherbertlaw.com

10                  Appeared remotely on behalf of
                    Plaintiffs;
11

12             LEINENWEBER BARONI & DAFFADA, LLC
               BY:  MR. JUSTIN L. LEINENWEBER
13             120 North LaSalle Street
               Suite 2000
14             Chicago, Illinois  60602
               (866) 786-3705
15             justin@ilesq.com

16                  Appeared remotely on behalf of
                    Defendants;
17

18             EMERY LAW LIMITED
               BY:  MR. ETHAN E. WHITE
19             2201 Midwest Road
               Suite 200
20             Oak Brook, Illinois  60523
               (630) 984-0339
21             ewhite@emerylawltd.com

22                  Appeared remotely on behalf of
                    Defendants.
23

24                        *    *    *



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1076 of 1503 PageID #:1467

```
 1                    I N D E X
     WITNESS                            EXAMINATION
 2
     JOSEPH RANZINO
 3
        By Mr. Herbert                        6
 4
        By Mr. Leinenweber                  188
 5

 6

 7

 8

 9

10               E X H I B I T S
     NUMBER                          MARKED FOR ID
11
     Ranzino Deposition Exhibit
12
      A                                  62
13
      C                                  99
14
      L                                 101
15
      K                                 144
16

17

18

19

20

21

22

23

24
```

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1077 of 1503 PageID #:1468

1    (Whereupon, the witness was
2  duly sworn.)
3    MR. HERBERT:  Good morning, Mr. Ranzino.  How
4  are you?
5    THE WITNESS:  Good morning, sir.  How are
6  you?
7    MR. HERBERT:  Good.  My name is Dan Herbert
8  and I am one of the attorneys for the plaintiffs in
9  this case, okay?
10    THE WITNESS:  Yes, sir.  Yes, sir.
11    MR. HERBERT:  This is the discovery
12  deposition of the defendant Joseph Ranzino.
13    Did I pronounce that correct?
14    THE WITNESS:  Yes, sir.  R-a-n-z-i-n-o.
15    MR. HERBERT:  In the case of 18-cv-5726.
16    Mr. Ranzino, have you ever given a
17  deposition before?
18    THE WITNESS:  Yes.  Yes, I did.  I have.
19    MR. HERBERT:  Okay.  How many times --
20    THE WITNESS:  Did you hear my response?
21    MR. HERBERT:  I did.  Thank you.  And this
22  is -- you know, it's going to be difficult.
23    THE WITNESS:  I'm sorry.
24    MR. HERBERT:  No, no.  It's going to be

Page 4

1  difficult, and we just want to make sure that the
2  court reporter can take down everything that we're
3  saying.
4    So you might anticipate what my
5  question is before I finish asking the question.  I
6  just ask that you pause and wait until I'm done
7  talking and then provide the answer, okay?
8    THE WITNESS:  Yes, sir.
9    MR. HERBERT:  Thank you.  And also, you know,
10  I need verbal responses, so the typical shake of the
11  head yes or no, that doesn't suffice.  We need to
12  have a verbal response, okay?
13    THE WITNESS:  Yes, sir.
14    MR. HERBERT:  Okay.  And if I ask you a
15  question that you don't understand, feel free to tell
16  me to repeat the question if you need to, okay?
17    THE WITNESS:  Yes, sir.
18    MR. HERBERT:  And if you'd like to take a
19  break, you certainly can take a break.  I just ask
20  that if a question is pending, that the question is
21  answered prior to you taking a break, okay?
22    THE WITNESS:  Yes, sir.
23
24

Page 5

1    JOSEPH RANZINO,
2  called as a witness herein, was examined and
3  testified via Zoom as follows:
4    EXAMINATION
5  BY MR. HERBERT:
6    Q.  Okay.  And I notice you had some
7  documents in front of you.  My question is:  Did you
8  prepare for this deposition by reviewing any
9  documents?
10    A.  Of course.
11    Q.  Okay.  And tell me what you've reviewed.
12    A.  Yes, sir.  Of course.
13    The Complaint that we're going to
14  talk about this morning.
15    Q.  Okay.  Anything else?
16    A.  Did you hear me, sir?
17    Q.  Yes.  I heard you say the Complaint.
18    A.  No, that's it this morning.
19    Q.  Okay.  Anything else other than the
20  Complaint?
21    A.  Yes.  Yes, the Complaint.  That's what I
22  have reviewed this morning.
23    Q.  Okay.  No other documents other than
24  that?

Page 6

1    A.  Not this morning, sir, no.
2    Q.  I'm sorry.  I'm going to have to ask you
3  to repeat that.  It broke up.
4    A.  No.  No, sir.  I have a pad of paper here
5  just for me, but it's empty.
6    MR. LEINENWEBER:  I think he froze, right?
7    MR. HERBERT:  Yeah.
8    THE WITNESS:  Oh, I'm sorry, sir.
9  BY MR. HERBERT:
10    Q.  That's okay.
11    A.  I have a blank pad of paper here for me.
12  That's all I have.
13    Q.  Okay.
14    A.  I can't hear.  Excuse me?  Can you hear
15  me?
16    Q.  Yeah, we can.
17    A.  I'm sorry.  I have a blank pad of paper.
18  It's blank.
19    Q.  Thank you.  Are you ready to move on?
20    A.  I just want to be able to follow along
21  with the Complaint.
22    Q.  I've got you.  And we're going to refer
23  to the Complaint at some point, okay?
24    A.  Yeah.  I didn't hear what you said.  I

Page 7

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1078 of 1503 PageID #:1469
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 just heard the thank you but, yes. Whatever you
2 would like to do. Okay, sir.
3      Q.   Are you currently employed?
4      A.   No, sir. I'm retired.
5      Q.   Okay. And how long have you been
6 retired?
7      A.   Oh, for -- when I actually decided to
8 stop working was just over a year now, a year and a
9 half. Somewhere in there. I left the sheriff's
10 department -- I'm sorry, sir.
11      MR. HERBERT: Go ahead. Go ahead, Justin.
12      MR. LEINENWEBER: Sorry. I was muted. Can
13 we try and have him call in on his cell phone? I
14 think that might make it easier because I'm getting
15 -- like I'm hearing your question and then his answer
16 almost at the exact same time.
17      MR. HERBERT: That's fine.
18      MR. LEINENWEBER: Okay.
19      THE WITNESS: I'm waiting.
20      MR. LEINENWEBER: Yeah, it's not you. It's
21 the internet. Can we have you dial in with your
22 phone if we give you a phone number?
23      THE WITNESS: Sure. Whatever you want.
24                                    Page 8

1                (Whereupon, a discussion
2                was had off the record.)
3      MR. HERBERT: Back on the record.
4 BY MR. HERBERT:
5      Q.   Mr. Ranzino, what neighborhood did you
6 grow up in?
7      A.   Neighborhood that I -- well, actually, I
8 grew up in the northwest suburbs, but I worked in the
9 City a lot.
10      Q.   Okay. Where did you go to high school?
11      A.   I started at Deerfield and then went to
12 Barrington.
13      Q.   And did you graduate from Barrington High
14 School?
15      A.   No, sir. I did not. I quit school my
16 senior year to go to work.
17      Q.   And tell me about where you worked after
18 school.
19      A.   Construction jobs.
20      Q.   Okay. How long did you work construction
21 jobs for?
22      A.   My whole life. I would continue to do
23 them now if I was in good enough shape.
24      Q.   Okay. You were employed by the Cook
                                    Page 9

1 County Sheriff at some point, correct?
2      A.   Later on in my adult life. 34, 35 years
3 old I took that job.
4      Q.   Do you remember what year you started?
5      A.   '95 I believe I went to the academy,
6 early '95.
7      Q.   And prior to that, your work was strictly
8 in construction. Is that correct?
9      A.   For the most part, but I held some
10 different supervisory positions throughout my young
11 life. I started working at a very early age, and by
12 the time I was in my 20s, I was into like
13 superintendent jobs and what have you, running small
14 jobs, concrete jobs, you know, pouring concrete,
15 whatever.
16      Q.   And did you work for private companies?
17      A.   Yeah, privately held. Yeah. Small
18 companies. I never worked for a big company.
19      Q.   Okay. So your first government job then
20 was with the Cook County Sheriff's Department?
21      A.   Yes, sir, and only.
22      Q.   And how is it that you applied to become
23 a sheriff?
24      A.   Well, actually, I didn't originally apply
                                    Page 10

1 for a sheriff, but I was taking civil exams for like
2 State jobs, County jobs, whatever, trying to get into
3 something else and maybe be able to go back to school
4 and what have you.
5           I had gotten a GED in like, I want
6 to say about 1989 through the College of Lake County.
7 It never was a problem with education. It was a
8 problem with life, trying to get by, family, money,
9 you know.
10      Q.   Okay. At the time you applied to be a
11 Cook County sheriff, did you have friends in the
12 sheriff's office?
13      A.   My father actually worked at the
14 sheriff's office.
15      Q.   Okay. How long did your father work at
16 the sheriff's office?
17      A.   Oh, I don't know. He worked there 20
18 some years. He retired a long time ago. He's passed
19 a long time now.
20      Q.   Okay. Sorry to hear that.
21      A.   It is what it is.
22      Q.   What positions did your dad hold with the
23 sheriff's department?
24      A.   I think all the way from investigator. I
                                    Page 11



Joseph Ranzino  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1079 of 1503 PageID #:1470
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 think at the end when he left, he was like a grade 18
2 deputy chief maybe.
3     Q.  Okay.  What does that mean, a grade 18
4 deputy chief?
5     A.  Well, it's just -- a deputy chief there's
6 -- they have titles and then they have pay grades.
7 They don't always necessarily match up.
8     Q.  What year did your father retire?
9     A.  Oh, God.  2011, 2012 maybe, and he died a
10 year or so later.  He was in bad shape.
11     Q.  Okay.  And when you were in the academy,
12 you eventually graduated from the training academy.
13 Is that correct?
14     A.  Yeah, out at Triton College.
15     Q.  Where did you go after graduating the
16 training academy?
17     A.  I was assigned to the court services.
18 Actually, I wanted to get into corrections because
19 there was a big money difference at that time, but
20 there was no openings.  So, you know, you've got to
21 take the job where the job is.  My big thing is I
22 wanted to get insurance.  You know, I had a young
23 family.
24     Q.  Okay.  And just speaking of your family,

Page 12

1 can you describe your family situation now?
2     A.  I don't see why it's pertinent, but I
3 will.  I've been married 38, almost -- yeah, 38 years
4 plus, the same woman.  I've raised three children,
5 put them all through college.  They're all adults.
6 And I have a couple grandchildren now, and now it's
7 just about the grandchildren.  I try to be here for
8 them.
9     Q.  Very good.  Congratulations.
10     A.  Thank you, sir.
11     Q.  Where do you currently live, Mr. Ranzino?
12     A.  At 23106 West Grant Highway, Marengo,
13 Illinois.  It's where I've lived for 20 something
14 years, 30 years almost.
15     Q.  Okay.  Is Marengo, is that in Cook
16 County?
17     A.  No, sir.  It's McHenry County.
18     Q.  Was there a residency -- go ahead.
19     A.  No, there is no residency requirement,
20 and that's why I was either trying -- I had taken a
21 lot of exams for State jobs and -- you know, the
22 County, you have to take these -- they're like, you
23 know, civil service exams.  And that's what I was
24 doing after I got my GED because you would have to

Page 13

1 have at least a high school diploma to, you know,
2 apply for these things.
3         So I started taking civil service
4 promotions both for the State and for County.
5     Q.  Okay.
6     A.  I couldn't go with the City because I
7 couldn't do residency and I didn't want to have to
8 raise my children -- my thing went out.
9     Q.  That's okay.  I can hear you.
10     A.  Can you still see me?
11     MR. LEINENWEBER:  Yeah, we see you.
12     THE WITNESS:  I'm sorry.  All of a sudden it
13 went out.  It's just going back and forth.  I can't
14 see anybody, but if you can hear me and you can see
15 me, I don't think you're worried about that, right?
16 BY MR. HERBERT:
17     Q.  Well, I would like to see you.
18     A.  Can you see me, because I can see me, but
19 I can't see anybody else anymore.
20     MR. LEINENWEBER:  Yeah, it looks like you
21 just got bounced out.
22             (Whereupon, a discussion
23             was had off the record.)
24

Page 14

1 BY MR. HERBERT:
2     Q.  Okay.  So anyway you began working the
3 court services after graduating from the training
4 academy, correct?
5     A.  That's correct, sir.  That's where I was
6 assigned.
7     Q.  And was Michael Sheahan the sheriff at
8 the time at which you were hired?
9     A.  That's correct, sir.
10     Q.  And did you have any type of -- did you
11 know Michael Sheahan prior to you being hired?
12     A.  I had met the man, yes.  I wouldn't say I
13 was at his house or anything, but I had met the man.
14     Q.  Okay.  Did your dad know Mr. Sheahan at
15 the point at which you were hired?
16     A.  I think every employee at the Cook County
17 Sheriff's Office knew Mr. Sheahan.
18     Q.  And had you done any work on any of
19 Mr. Sheahan's campaigns at any point prior to joining
20 the sheriff's department?
21     A.  No, sir.
22     Q.  Okay.  At any point after joining the
23 sheriff's department, did you work on any campaigns
24 for Sheriff Sheahan?

Page 15

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1080 of 1503 PageID #:1471
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.   For Sheriff Sheahan directly, no.
2    Q.   Did you work on any campaigns for Sheriff
3 Sheahan indirectly?
4    A.   Well, the Democratic Party.  I mean, if
5 he's on the ticket, he's on the ticket.
6    Q.   And what type of work did you provide for
7 the Democratic Party?
8    A.   Well, I used to do sometimes handing out
9 literature, you know, like cards and stuff or...
10    Q.   At the poll?
11    A.   Yeah, the polling places.  I would be a
12 poll watcher sometimes, but then -- that was very
13 early, early, early in my career.  I really quit
14 doing that I want to say in the late '90s because
15 then I used to work -- I would hire on to the
16 Election Board.  You know, they would hire off duty
17 people in law enforcement, I'm pretty sure you know
18 that, to do checking -- not judging.  What do they
19 call it?  It's like that next
20 thing up.
21    Q.   I've got it.  And Sheriff Dart, he became
22 the sheriff at some point, correct?
23    A.   Yeah.  When was that election, '08, '09,
24 '10?

1    Q.   It sounds about right.  Did you know
2 Sheriff Dart prior to him becoming the sheriff?
3    A.   Again, I had met him briefly.  You know,
4 hey, how are you, you know, that type of thing, but I
5 didn't have any type of personal relationship or
6 really know the man.
7    Q.   How about later in your career, did you
8 have a friend relationship with Tom Dart at any
9 point?
10    A.   I don't believe so.  I never met him or
11 went to dinner.  I was never invited to anything or,
12 you know.  Early on I may have went to one or two
13 fundraisers for the individual, but that was pretty
14 standard practice.  There was a lot of employees
15 there from all over the County.
16    Q.   Okay.  It was standard practice for the
17 Cook County sheriffs to go to the fundraisers for the
18 sheriff?
19    A.   No, it was standard practice --
20    MR. LEINENWEBER:  Objection to form and
21 foundation.
22    THE WITNESS:  Excuse me?
23    MR. LEINENWEBER:  I interjected an objection,
24 Joe.  So you can answer the question once you stop

1 hearing my objections.
2    THE WITNESS:  I'm sorry, sir.  It was broke
3 up.
4 BY MR. HERBERT:
5    Q.   That's okay.  You can go ahead and
6 answer.  We were asking about your comment about it
7 being standard.
8    A.   What did I do?  About what I did?
9    Q.   Well, here.  Let me ask another question.
10    A.   Yes, sir.
11    Q.   Okay.  When you said it was standard
12 practice --
13    A.   Well, standard for me?
14    Q.   Standard practice for employees to go to
15 fundraisers, was that your testimony?
16    A.   No.  Standard practice for me.  To show
17 respect, you go.  That's just me.  I don't know.
18    Q.   I've got it.
19    A.   Who's the boss?  He's the boss.  You go.
20 It could have been anybody, whoever was the boss.
21    Q.   Okay.  Tell me about how long you worked
22 in court services.
23    A.   I was in court services until '97, April,
24 May, June.  Sometime in the early summer of '97 when

1 I was able to get transferred to the electronic
2 monitoring unit.
3    Q.   Okay.  And did you apply to the
4 electronic monitoring unit?
5    A.   I don't really remember how the whole
6 thing went back then.  You're talking pretty long
7 ago.  I made some inquiries, and I don't remember the
8 rest of the process.  I really don't.
9         I believe I had to fill out some
10 type of paper expressing interest or whatever the
11 heck it was.  But it was different back then, how
12 they picked and chose and it wasn't -- I don't know
13 if there was really a bid process for it.  I don't
14 know how all that worked.  I don't remember.
15    Q.   Okay.  So basically it was the
16 supervisors could pick what employees come to what
17 units.  Is that fair to say?
18    MR. LEINENWEBER:  Objection to form and
19 foundation.
20    THE WITNESS:  Yeah, I don't know that that
21 would be a fact.  No, I don't think so.
22 BY MR. HERBERT:
23    Q.   Well, who was the director in 1997 of the
24 electronic monitoring unit when you went there?

Joseph Ranzino  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1081 of 1503 PageID #:1472
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

A.  Oh, my goodness.  The director back then.
He was a very old man, a nice guy.  I know he was an
ex-Chicago policeman.  Oh, his name was Jack Byrne.
I couldn't remember his name.
Q.  I knew Jack Byrne.  A wonderful man.
A.  Oh, he was one of the best guys I ever
worked for, seriously.
Q.  And what about Director Shields, do you
know him?
A.  Yes, I know Director Shields.  I worked
with Director Shields in -- not like partners or
anything, but we were there a long time together, you
know what I mean, in different areas.
Q.  And when you say a long time, you mean a
long time together in the electronic monitoring unit?
A.  Yes.  Yes.  That's what I meant.  I'm
sorry.  Because I basically spent most of my career
in the electronic monitoring unit, although I was --
you know, the sheriff, they move people around to
where they need them, especially when you're in
administration, so.
Q.  Okay.  Tell me about your career in the
electronic monitoring unit.  When you went there, did
you go there as an investigator?

A.  Yeah.  I started at the bottom of the
ladder just like everybody else and worked my way up.
In the meantime, I --  well, the bottom of the
ladder, I wasn't a civilian.  So the bottom of the
ladder there would be you start off as an
investigator, you know, for sworn personnel.
Q.  Right.  And when you talk about the
ladder, you're talking about the chain of command,
correct?
A.  Yeah.  Yeah.  I'm sorry.  I should have
been more specific.
Q.  That's okay.
MR. HERBERT:  And we lost his picture.
MR. LEINENWEBER:  Yeah.  We lost the video.
What do you want to do, Dan?  Do you want me to try
and get him in again?
MR. HERBERT:  Yeah, I would say if we can try
and get him in.
THE WITNESS:  Yes.  I'm sorry, Guys.  I'll
try this again.  I don't know why I keep getting
kicked out.  The weather is terrible out here and my
internet again is over the -- you know, it's a Dish.
It's not a hard line, so sorry.
MR. LEINENWEBER:  Yeah.  He has a Dish and

they're having storms in the area.
MR. HERBERT:  Let's try it one more time.  If
it doesn't work, we'll just do audio.
(Whereupon, a discussion
was had off the record.)
BY MR. HERBERT:
Q.  When you went to the electronic
monitoring unit in 1997, tell me about that chain of
command.  When you were an investigator, who was
above you in the chain of command?
A.  When I first went there, I was put on
midnights in records because that's where the
position -- you know, everybody wants to go to EM, they
want to go out on the street, but that's not how it
works.  You know, you've got to go where you've got
to go.
So I had to go midnight on records,
and I spent my first few years there in records on
midnights or the first year and a half or so.  I
think eventually I got to third watch.  Midnights and
third watch were really rough for me because of my
young family, but, you know, you do what you have to
do.
Q.  Yeah.  Who was your direct supervisor?

I'm not necessarily asking for a name, a sergeant?
A.  It would have been -- I think at that
time my direct supervisor was a grade 16 supervisor.
Oh, my God.  I can't think of his name, but he
reported -- and our deputy chief was Norvid.  He was
the deputy chief of records, jail records, but it was
really DCSI.  It's kind of a convoluted thing.
Q.  Okay.  And you talk about, you know,
when --
A.  Norvid -- I'm sorry, sir.  His name was
Norvid Servani (phonetic).  It took me forever to
remember his name.  I'm sorry.
Q.  That's okay.  And what rank was he?  I'm
sorry?
A.  I believe -- he was either a chief or a
deputy chief, but I know his grade was a grade 18 and
there was always whatever.
Q.  Okay.  Would there have been a lieutenant
that was a closer rank to you as an investigator?
A.  They didn't have -- nothing over at EM
was merit rank.  Everything there is appointed.  Just
now maybe they're starting to move stuff in there.  I
don't know.
Q.  Okay.  And when you say merit rank,



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1082 of 1503 PageID #:1473

1 you're talking about like career service positions?

2    **A.** **Yeah, where you have to take promotional**

3 **exams, you know.**

4    Q. I've got it.

5    **A.** **And you follow the exam. There has to be**

6 **something there, sir. You know how it is.**

7    Q. And so EM was more of an appointment

8 position, the supervisors were appointed, correct?

9    MR. LEINENWEBER: Objection to foundation.

10    THE WITNESS: Everybody was appointed.

11 BY MR. HERBERT:

12    Q. Okay. And you talked about how, you

13 know, when you went to EM, everyone wanted to get out

14 in the street, right?

15    **A.** **That's the reason people went to EM.**

16 **That's what they -- they all expected that. But as I**

17 **soon found out early in my career is that 50 percent**

18 **of the jobs are really clerical, inside computer**

19 **work, paperwork, that type of thing.**

20    Q. And those are less desirable jobs

21 obviously?

22    MR. LEINENWEBER: Objection to form and

23 foundation.

24    THE WITNESS: Not less desirable.

Page 24

1 BY MR. HERBERT:

2    Q. You would agree most people that went to

3 the EM unit, they didn't want to work inside in the

4 office. They wanted to be out in the street though,

5 right?

6    MR. LEINENWEBER: The same objection.

7    THE WITNESS: I can't speak for everyone,

8 sir.

9 BY MR. HERBERT:

10    Q. Okay. But you certainly did, right?

11    **A.** **That's what I thought, but I soon**

12 **realized that that wasn't the case.**

13    Q. Okay. Were you promoted at some point in

14 the electronic monitoring unit?

15    **A.** **I was given a supervisory position**

16 **because they wanted me to work on a program -- not a**

17 **program, some project that was -- they had me do a**

18 **lot of auditing throughout my whole career of**

19 **different systems and...**

20       **You know, like when the Y2K thing**

21 **was going on, I worked on that because, you know,**

22 **it's electronic monitoring and it's a big problem if**

23 **things go out on computers and all that.**

24    Q. What year --

Page 25

1    **A.** **I worked on that project for over a year.**

2 **Probably in '99 because -- in '98, '99 because we**

3 **were getting ready for the -- you know, the big**

4 **turnover with the computers. Oh, they're going to go**

5 **to the year 2000, everything is going to get lost.**

6 **That never happened.**

7    Q. I've got you.

8    **A.** **That was a big concern for us. It was a**

9 **big concern.**

10    Q. I've got you. What year were you given

11 this supervisory position?

12    **A.** **Probably around '99, '98, '99. It was**

13 **just a quasi, okay, you're a supervisor. You can**

14 **wear plainclothes. That was the big perk.**

15    Q. And was that a position that you sought,

16 that you applied for?

17    **A.** **I don't think anybody applied for those**

18 **positions. There was expressed interest, but I don't**

19 **know that there was any formal -- but you're talking**

20 **way back. That's before all the Shakman stuff. They**

21 **changed a lot of things under -- as things**

22 **progressed. And I've got to tell you the truth, from**

23 **day one at the sheriff's department there was**

24 **constant change. They were always trying to do**

Page 26

1 **things better and they should.**

2    Q. Okay. What was your title when you were

3 given that supervisor position?

4    **A.** **Well, I was still an investigator.**

5    Q. Okay. Did you receive a pay raise?

6    **A.** **No.**

7    Q. Okay. How long did you work in that

8 supervisory position?

9    **A.** **Until I ended up being deputy chief in**

10 **monitoring, and it was an acting position for, I**

11 **don't know. I was -- again, you take the position.**

12 **If it works out, you know, that's how they did. I**

13 **can't speak to anyone else. That's how it worked for**

14 **me.**

15    Q. What year did you become deputy chief in

16 the monitoring unit?

17    **A.** **When did I actually become? I think**

18 **around 2002, 2001. That's when they actually gave me**

19 **the money and everything.**

20    Q. I've got it. So prior to that, you were

21 an acting deputy chief?

22    **A.** **Yes, sir.**

23    Q. And what year were you an acting deputy

24 chief?

Page 27

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1083 of 1503 PageID #:1474
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1      A.   Sometime I think late 2000. Sometime in
2 2000.
3      Q.   Okay. And how is it that you were given
4 that promotion?
5      A.   You know, I don't remember. I know that
6 somebody who had that was getting sick or leaving or
7 retiring, something was going on, and I know that
8 they were interviewing different people. I don't
9 know how that went. I was just probably in the right
10 place at the right time doing good things, and I was
11 approached if I would be interested.
12      Q.   Okay. So you --
13      A.   And I said, yes, I would be interested,
14 and I guess that was part of the application process.
15 I don't know. I don't make it up. I just do what
16 I'm told. I'm a worker.
17      Q.   Okay. But you didn't apply for it at any
18 point, correct?
19      A.   You know, there might have been some
20 paperwork at one time that I had to fill out after
21 they asked me if I was interested, but I can't really
22 remember that, Mr. Herbert, one way or the other.
23      Q.   And you didn't take a test for it,
24 correct?

Page 28

1      A.   No, sir. There was no testing for any of
2 those positions from -- I don't believe from -- even
3 from investigators. After -- I mean, they started
4 changing things though and then there started to
5 be -- you know, because all that Shakman stuff and
6 everything was going on. I understand that. Change
7 is good. Change is better.
8      Q.   Good. And when you were a supervisor
9 prior to becoming an acting deputy chief, did you
10 supervise any investigators in the EM unit?
11      A.   Did I supervise, no, but I supervised
12 mostly -- yeah, there was a couple that I was over.
13 I don't want to misspeak. Because in the monitoring
14 room was mostly civilians.
15      Q.   Okay.
16      A.   So we had civilians, and then we had a
17 couple investigators in there but -- and a
18 dispatcher. Always a dispatcher and sometimes two.
19      Q.   Okay. And when you became a deputy
20 chief, did you supervise any subordinates?
21      A.   Yes.
22      Q.   And who would be the subordinates when
23 you were the deputy chief? They'd be the
24 investigators, correct?

Page 29

1      A.   Yeah, it would be investigators under me
2 and civilians under me.
3      Q.   Okay. Nobody else? No lieutenant, no
4 sergeant at the time you were a deputy chief?
5      A.   There were none. There weren't any in
6 that unit.
7      Q.   Okay. And then tell me, about how long
8 did you remain the deputy chief in the monitoring
9 unit?
10      A.   Until they promoted me to acting chief in
11 records which was still DCSI records before they had
12 the big breakup, and then we went under the jail
13 auspices.
14      Q.   I believe you said DCSI?
15      A.   Yeah. You know, they changed -- we were
16 under -- it's all budgetary, I guess. I really don't
17 know. It is really above my pay grade to tell you
18 the truth.
19      Q.   What does that stand for?
20      A.   Department of Community Supervision and
21 Intervention. That's what it was called. It's
22 budgeting stuff and how everything's laid out, but
23 again, way above my pay grade.
24      Q.   Got it. What year did you become the

Page 30

1 acting chief?
2      A.   2004 April, 2005. 2004, I believe. But
3 that was just of DCSI records.
4      Q.   And was the process the same for you
5 being promoted there as it was when you were promoted
6 to the deputy chief position?
7      A.   We knew that -- well, I mean, you start
8 inquiring because you'd find out when people are
9 going to be retiring, and everybody knew that Odell
10 Anderson who was the former chief was getting ready
11 to retire, so people made inquiries. I know there
12 was a few people that made inquiries, and I had to
13 put together a resumé, and I believe I sent the
14 resumé and a letter of intent up to the top floor in
15 DCSI.
16      Q.   Okay.
17      A.   You know, people who would be above like
18 for the position Shields is now. There was a couple
19 of directors and stuff above him in that unit, and
20 then it went to the sheriff. That was my
21 understanding anyway of the chain of command.
22      Q.   Okay. Great. And then how long did you
23 serve in that position?
24      A.   Until they actually were like revamping

Page 31



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1084 of 1503 PageID #:1475
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 everything, and at first they -- you know, it was all
2 about budgetary, cost-cutting, duplication of
3 services, manpower.  You know, you know how it is.
4 It's always about the budget.  I mean, it goes on to
5 this day.
6          So they combined -- they had me --
7 well, I was in charge over there, but they had me
8 combine the TSS function and TSS was, and I'm going
9 to use terms that aren't -- that are probably very
10 old.  I doubt they call any of this any of it
11 anymore.  TSS is where we used to process individuals
12 who had gone through the records classification and
13 screening process to be delivered, so they were
14 actually -- and originally everything kind of ran as
15 separate entities but under the same EM kind of
16 working together, okay?
17      Q.  Yeah.
18      A.  And then we started merging things
19 because the records actually went completely to the
20 Department of Corrections and, you know, because --
21 well, I don't want to get into all that.  That's
22 where it went.  I don't have to get into processes
23 for you.  That's where that went.  Things were
24 getting moved and combined and changed and budgets.

Page 32

1 Yeah, it was a lot, and it continued through the
2 whole time I was there.  You know, we were under a
3 new sheriff.
4      Q.  Got it.
5      A.  A younger, different thinking, a
6 different thinking pattern.  You know, we went from a
7 bunch of ex-Chicago policemen running the sheriff's
8 department to all lawyers running the sheriff's
9 department.  It's a complete different mindset.
10      Q.  Okay.  And what year do you believe it
11 was that you were promoted -- or I'm sorry.  We've
12 talked about that.
13          About how long did you serve as the
14 acting chief?
15      A.  I think it was about nine months.
16      Q.  Okay.
17      A.  And then they made the final decision.
18 And I don't remember who it was between, but there
19 was a few people in there that were, you know, and
20 that's where I ended up.
21      Q.  When was that?
22      A.  Late 2004, early 2005.  I think it was
23 late 2004, like November or something.
24      Q.  And then you became the chief, correct?

Page 33

1      A.  Well, that's when they -- yeah, that's
2 when they sent me the notification.  One of the few
3 notifications I ever got.  I don't know.  It came
4 from personnel, I guess.
5      Q.  And aside from -- well, strike that.
6          Investigators worked under your
7 command when you were the chief, correct?
8      A.  Oh, yeah, investigators and civilians.
9      Q.  Okay.  And the deputy chief worked under
10 your command as well?
11      A.  Yes.
12      Q.  And how long did you serve as a chief?
13      A.  Until I retired.
14      Q.  Okay.  What year did you --
15      A.  I mean, that was -- I was called chief.
16 I was a lieutenant.  They called us a lot of
17 different changes throughout the changes.  I don't
18 care what you call me, don't touch my pay and let me
19 do my job.
20      Q.  What year did you retire?
21      A.  I actually retired from the County in
22 March of 2018.  I went and signed paperwork.  My
23 health is terrible.  It was bad then.  And, you know,
24 they had laid us -- I had gotten laid off.  I'm sure

Page 34

1 you're going to ask the question.  So I had gotten
2 laid off.  Remember the pop tax in 2017, and then
3 that didn't go through.  I mean, it was a huge County
4 thing and I was in an administrative position, and
5 quite honestly, I was in terrible health and I was on
6 FMLA.  You know, I was one of the guys that got laid
7 off.  I wasn't the only one.  There was a lot of
8 people in the same position as me who got laid off
9 pretty much in, you know, a couple of days.
10      Q.  Okay.  So you weren't laid off for
11 disciplinary reasons, correct?
12      A.  No, not at all.  They told me it was
13 budgetary, this, that, you know.  I did have a --
14      Q.  Got it.
15      A.  It is what it is.  There wasn't much of
16 an explanation.
17      Q.  I've got it.  And you retired.  Your rank
18 was chief when you retired?
19      A.  Actually, I was -- yes, I retired as a
20 chief.  Yes.
21      Q.  Okay.  So you were never given a lower
22 position after you were promoted to chief, fair to
23 say?
24      A.  Fair to say.  I do understand that there

Page 35



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1085 of 1503 PageID #:1476
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 was -- well, we'll get into that. Go ahead.

2 Q. But, I mean, you still received the pay
3 that went with being a chief until --

4 A. A chief or a lieutenant. Actually, we
5 were in the budget. We were lieutenants, so. It was
6 like lieutenants' pay, I guess.

7 Q. Okay.

8 A. That's the way I understand it.

9 Q. Okay. And you know Director Shields,
10 correct?

11 A. Yeah. I said I worked most of my career
12 and he worked in the same unit. He was there a lot
13 longer than me. He was there before I got in that
14 unit.

15 Q. Okay. How did you characterize the work
16 that he did when you worked with him?

17 MR. LEINENWEBER: Objection to form and
18 foundation.

19 THE WITNESS: Not for me.

20 BY MR. HERBERT:

21 Q. I'm sorry?

22 A. That would be above my pay grade. I
23 mean, I did my job. I was told what to do and
24 direction came down the hill, and we just did what we

Page 36

1 were supposed to do as best as I could every day.
2 I'm not perfect like anybody else, come on.

3 Q. I've got you. When you were the chief --

4 A. But I wasn't the only chief. There was
5 multiple chiefs. You have to keep that in mind.
6 Everybody had to -- go ahead, sir. I'm sorry.

7 Q. Who were the other chiefs while you were
8 there?

9 A. All the chiefs. Let's see, who were all
10 the chiefs? The one who had been there longest would
11 probably be Chief O'Malley, then you had Chief Duran,
12 then you had Chief, let's see. The people kind of
13 got different positions throughout the years.

14 Then you had Chief Acey, you had
15 Chief Neal, you had me on third watch, you had Chief
16 -- who was the chief on the midnights? Well, I
17 think -- yeah, Duran. I know there was some deputy
18 chiefs. They had Mr. Logan.

19 Q. That's good.

20 A. Okay.

21 Q. You said you were the chief on the third
22 watch?

23 A. I was one of the chiefs assigned to the
24 third watch, yes.

Page 37

1 Q. How many years did you work on the third
2 watch?

3 A. I was moved to the -- when they were
4 changing everything and after we combined that, they
5 went into -- we centralized roll calls and there was
6 a big thing that was bided and all that, and then --
7 so they weren't like separate units anymore. I want
8 to say that was late 2011, early 2012.

9 Q. When you say they weren't separate units,
10 what do you mean they weren't separate units?

11 A. Well, they weren't separate assignments.
12 The whole unit was undergoing a -- well, a -- well, a
13 metamorphosis. We were progressing, evolving.

14 It used to be the investigators
15 would bid for like a specific assignment. They
16 changed all that, and that was all bargained through
17 their union and everything. I had nothing to do with
18 it. I'm doing my job, you know. It caused a lot of
19 issues for the men. No one likes change. I don't
20 know what to tell you. I know from early in my
21 career you have to change and adapt if you want to
22 thrive, or you could be a dinosaur. I don't know
23 what to tell you.

24 Q. So somewhere around 2011 the changes were

Page 38

1 that people were no longer allowed to bid for their
2 assignments?

3 A. Yeah, there was no assignment bidding.
4 It was merely watch, day off group -- you know, watch
5 and day off group, and then everything was centrally
6 done and everything was just an assignment for that
7 day then and, you know, you do the best you can.

8 There was a lot of cross-training
9 going on. There was a lot of resistance from the
10 guys. You know, guys that had been there -- there
11 was a lot of guys there. If you look at that unit,
12 they'd been there a long time. Like I spent my whole
13 career there. I think Mr. Shields spent most of his
14 career. There was a lot of people there who spent
15 most of their career in that unit.

16 Q. Okay. And you said that the guys were
17 upset that they could no longer bid the particular
18 assignments, right?

19 A. Yeah, but they had -- you know, that was
20 all bargained through their unit, through their
21 bargaining --

22 Q. I'm going to get into the bargaining
23 process.

24 A. I'm sorry. I'm just saying though, no

Page 39



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1086 of 1503 PageID #:1477

Joseph Ranzino - 9/8/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 40**

1  one -- okay.  Go ahead.

2      Q.  So what were the assignments, the various

3  assignments prior to them being changed via bids?

4      A.  They were exactly the same as they were

5  after the bids, just that you could go to any area,

6  and they were all trained, and part of their training

7  was in all the areas.  Just because you -- listen,

8  just because I was assigned to records --

9      Q.  I'm asking about the positions though.

10 What were the assignments?

11     MR. LEINENWEBER:  Objection.  Form.

12     THE WITNESS:  At what time, sir?  They were

13 always the same from the beginning to the end of my

14 career.

15 BY MR. HERBERT:

16     Q.  Describe them for me.

17     A.  Describe the assignments.  You mean a

18 processing assignment, which I would say would be

19 TSS.  You would process individuals for release on

20 EM.

21     Q.  And that was an office assignment,

22 correct?

23     A.  Clerical, yes.  Yes, yes, yes.  Mostly

24 clerical, yes.

**Page 41**

1      Q.  What were the other assignments?

2      A.  There could be assignments on patrol,

3  there could be assignments on dispatch, there could

4  be assignments on TSS, there could be assignments in

5  monitoring.

6      Q.  What were the assignments that were not

7  office assignments?

8      MR. LEINENWEBER:  Objection to form.

9      THE WITNESS:  Oh, go ahead.

10     MR. LEINENWEBER:  No, you can answer.  I just

11 inserted an objection.

12     THE WITNESS:  Well, I mean, please give me

13 the question again because now I've lost my train of

14 thought.

15 BY MR. HERBERT:

16     Q.  Yeah.  So patrol, that would be a

17 non-office assignment, correct?

18     A.  Well, before the change or after the

19 change?  Because there was always clerical stuff

20 within patrol going on when it was just patrol, so

21 they had investigators that were assigned inside too.

22         But once the changes took place, you

23 know, it wasn't just patrol.  It was like -- it was

24 just the third watch.  We did monitoring.  We did

**Page 42**

1  processing.  We did everything on the third watch,

2  and things changed for all the watches because the

3  timelines changed.  We became under the auspices of

4  the Department of Corrections, and they said, well,

5  how come you guys are only doing this during here?

6  We're a 24/7 operation and this should happen this

7  way.  Okay.  You guys are the bosses, and we followed

8  what they told us to do.

9      Q.  So the patrol assignment after the

10 change, that was a non-office position, correct?

11     A.  For the most part, yes.  I would say

12 that, yes.

13     Q.  Okay.  And were there any other

14 assignments that were also non-office other than the

15 patrol assignment?

16     A.  Well, I considered any out -- anybody in

17 a car, I considered a patrol.  There were deliveries

18 going on.  There were actual jobs for, you know,

19 things that we would check on, things that needed a

20 car to show up at the house.

21         We also had these people who were

22 categorized as high priorities, you know, if it was

23 certain charges or what have you.  I don't think I

24 need to get into that, but if I do let me know.

**Page 43**

1      Q.  No, that's all right.  And were any jobs

2  more sought after by employees than other jobs while

3  you were there as a director?

4      MR. LEINENWEBER:  Objection to form and

5  foundation.

6  BY MR. HERBERT:

7      Q.  You can answer.

8      A.  You know, I don't know who was thinking

9  what.  I really don't.  Some people wanted to be

10 inside and some people didn't want to be inside, and

11 that could change on a daily basis every day.

12 BY MR. HERBERT:

13     Q.  I've got it.  And as a director, did you

14 make the assignments?

15     A.  I was never a director.

16     Q.  Oh, I'm sorry.  As a chief, did you make

17 the assignments?

18     A.  Was I -- I was one of the people

19 responsible.  I wasn't the only person responsible.

20     Q.  And tell me about what the policy was for

21 making the assignments.

22     MR. LEINENWEBER:  Objection to form.

23         You can answer, Joe.

24     THE WITNESS:  Oh, okay.  Go ahead and give me



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1087 of 1503 PageID #:1478
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 the question again then.
2 BY MR. HERBERT:
3     Q.  What was the policy for making
4 assignments in the EM unit?
5     A.  Get the job done.  I don't understand the
6 question.
7     Q.  All right.  I'll ask it a different way.
8 You would assign various people to work on different
9 assignments, correct?
10     A.  Yes.
11     Q.  And that would change on a daily basis,
12 correct?
13     A.  Sometimes by the minute.
14     Q.  Okay.
15     A.  I mean, you know, it's not like a box
16 factory, Mr. Herbert, where you go in, you know
17 you're going to make your six boxes and then you're
18 going to go home for the day.  It's a completely
19 different ball game.
20     Q.  I get it.
21     A.  Okay.  I mean, things change by the
22 minute.
23     Q.  I've got it.  Okay.  What was the policy
24 though as far as assigning different individuals to

1 different assignments on a daily basis?
2     A.  What was the policy?
3     Q.  Yes, sir.
4     A.  We tried to be fair and to help everybody
5 as best as you can.  You try to put people where you
6 want them to me or where it makes them happy.  You
7 want happy employees, but there's only so much -- you
8 can't make everyone happy.  It's part of being a
9 boss.  It's terrible, I feel bad, but you've got to
10 do your job.  It's part of the job.  It's part of the
11 investigator's description.
12     Q.  I get it.  And as far as like trying to
13 keep your employees happy, would you take seniority
14 into account when assigning people to different
15 assignments?
16     MR. LEINENWEBER:  Objection to form and
17 foundation.
18     Go ahead, you can answer.
19     THE WITNESS:  I don't think that once the bid
20 was done that that was looked at for anything besides
21 contractually what it was looked at for, for bidding
22 for their vacations and all that, they took their
23 time into account, but I don't think it had anything
24 to do with assignments.  I don't think anybody.  It

1 wasn't just on the third watch.  You're talking about
2 the whole unit.  It wasn't just on our watch.
3 BY MR. HERBERT:
4     Q.  And you talked about how you tried to
5 keep people happy and put them where they wanted to
6 work -- hold on.  You have to let me finish.
7     A.  Yes, sir.  I'm sorry.
8     Q.  That's all right.  How is it that you
9 knew where these people wanted to work?
10     MR. LEINENWEBER:  Objection to form and
11 foundation.
12 BY MR. HERBERT:
13     Q.  You can answer.
14     MR. LEINENWEBER:  Yeah, you can answer.
15 Unless I tell you do not answer, you can go ahead and
16 answer.
17     THE WITNESS:  Okay.  Okay.  I'm also trying
18 to give it time because I realize we're cutting in
19 and out.  Just a minute.  Okay.  Let's go again.
20 BY MR. HERBERT:
21     Q.  Okay.  How is it that you --
22     A.  I'm sorry, Mr. Herbert.  It's a
23 frustrating deal because I just went to work and did
24 my job.

1     Q.  No, I understand.  I just ask -- I'm
2 trying to get answers.
3     A.  I know.
4     Q.  And I don't want to go off on a tangent.
5 I just want to try and keep you --
6     A.  I'm sorry.  And neither do I.  I'm sorry.
7     Q.  You're doing fine.
8         So my question is:  How is it that
9 you became aware of where people wanted to work?
10     A.  Many times they would request.  Like I
11 know -- I mean, I can remember one instance for sure
12 a young man, Mr. Spivy, and he was partners with a
13 man named -- well, his preferred working partner was
14 a guy by the name of Victor Slaughter, and there were
15 a lot of times they -- well, Spivy would request to
16 be inside because he had a medical condition, and I
17 can't get into that.  You know, he confided in me.
18 That's none of my business.  So if he would request
19 if I could, if I would find an inside job, I would.
20 You know, things like that.
21     Q.  And you tried to accommodate him?
22     A.  I tried to do that for everybody though
23 throughout my whole career every time I was a boss.
24 I mean, you want happy people.  You want unity.  You



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1088 of 1503 PageID #:1479

Joseph Ranzino  -  9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 **don't want them all -- you know, you don't want all**
2 **that consternation. My thing is to get the job done.**
3 **When people -- you can't get the job done.**
4     Q.  Okay.  And you tried to keep people with
5 the partners that they preferred to work with,
6 correct?
7     MR. LEINENWEBER: Objection to form,
8 foundation.
9     THE WITNESS:  As best as you can.
10 BY MR. HERBERT:
11     Q.  Okay.  And when you were there as a
12 chief, what percentage of employees would work on
13 patrol, in other words, in a non-office position?
14     MR. LEINENWEBER: Objection to form and
15 foundation.
16     THE WITNESS:  Go ahead and give him...
17     MR. LEINENWEBER:  Yeah.
18     THE WITNESS:  Okay.  You know, I don't know
19 the exact number, Mr. Herbert, but I'm trying to
20 think back.  I would say that on our roster about
21 50 percent of the positions on every shift were
22 indoor and I would think that -- I don't know how
23 much was happening of that on days because they were
24 also -- they were actually doing processing and stuff
Page 48

1 on days too which they had never done before, you
2 know what I mean?  So there was a lot of changes
3 going on everywhere.
4 BY MR. HERBERT:
5     Q.  So just generally speaking, 50 percent
6 in-house, 50 percent out of house?
7     MR. LEINENWEBER: Objection to form and
8 foundation.
9     THE WITNESS:  Approximately, yes, sir.
10 BY MR. HERBERT:
11     Q.  Okay.  And did you try to assign people
12 equally to inside positions and outside positions?
13     MR. LEINENWEBER: Objection to form and
14 foundation.
15     THE WITNESS:  Absolutely.
16     MR. LEINENWEBER:  Go ahead.
17     THE WITNESS:  You would try and accommodate
18 everybody.  However, you have to get the job done and
19 people have different tendencies.  Some people, even
20 though they were supposed to know how to do certain
21 things, they were reluctant to do those jobs.  So if
22 you're real short-handed and you put somebody in
23 those jobs where they may be reluctant to really do
24 the job, it could actually put people in jeopardy.
Page 49

1     So you would have to put people that
2 you were confident that had the proper knowledge in
3 certain positions to do those because even though
4 they were all trained the same, they all had the same
5 training, some people are -- everyone has skills.
6 You're good at this, you're not so good.  Me too.
7 You know, some things I'm really good at, some things
8 I'm not.  Human condition.
9 BY MR. HERBERT:
10     Q.  I've got it.  You talked about Spivy, he
11 wanted to work with his normal partner, Slaughter,
12 correct?
13     MR. LEINENWEBER: Objection to form and
14 foundation.
15 BY MR. HERBERT:
16     Q.  Go ahead.
17     **A.  They preferred to work together.**
18     Q.  Okay.
19     **A.  That's all I can say.**
20     Q.  And you assigned them to positions where
21 they didn't work together, correct?
22     MR. LEINENWEBER:  The same objections.
23     THE WITNESS:  I can't remember yes, no.  You
24 put people where you need them.  You know, you're
Page 50

1 filling positions that they're all supposed to be
2 able to do depending on situations, night, whatever.
3 You know, you've got to do what you've got to do.
4 BY MR. HERBERT:
5     Q.  Was it common for people to complain
6 about their assignments while you were there as a
7 chief?
8     MR. LEINENWEBER:  Objection to form and
9 foundation.
10     Go ahead.
11     THE WITNESS:  Every day.
12 BY MR. HERBERT:
13     Q.  Okay.  And you know the plaintiffs in
14 this case?
15     MR. LEINENWEBER:  Objection.  Form,
16 foundation.
17     THE WITNESS:  Pardon me?
18 BY MR. HERBERT:
19     Q.  You know Legrain Winston?
20     **A.  Oh, I'm familiar with the names here**
21 **except for that one, that Anthony Manning.  I don't**
22 **know.  I don't know who that is.**
23     Q.  Okay.  But aside from Mr. Manning, you're
24 familiar with all the other plaintiffs, correct?
Page 51



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1089 of 1503 PageID #:1480
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 52**

1     **A.  I know their names, yes.**

2     Q.  Okay.  And do you know them personally?

3     **A.  Yeah.  We worked together, but only on a**

4 **work level.**

5     Q.  Okay.  You were their supervisor,

6 correct?

7     MR. LEINENWEBER:  Objection to form and

8 foundation.

9     THE WITNESS:  I was in a supervisory

10 position, yes.

11 BY MR. HERBERT:

12     Q.  Okay.  And you made assignments for the

13 plaintiffs, correct?

14     MR. LEINENWEBER:  The same objections.

15     THE WITNESS:  At times, yes.

16 BY MR. HERBERT:

17     Q.  Okay.  And the complainants, they

18 complained to you about their assignments, correct?

19     MR. LEINENWEBER:  The same objections.

20     THE WITNESS:  They complained to everybody

21 about their assignments.

22 BY MR. HERBERT:

23     Q.  Well, everybody being you as one of them,

24 correct?

**Page 53**

1     **A.  Okay.  Yes, absolutely.**

2     Q.  You said they complained to everyone.

3 They complained to other supervisors other than you

4 about their assignments, correct?

5     MR. LEINENWEBER:  The same objections.

6     THE WITNESS:  That's true, to my knowledge.

7     MR. HERBERT:  I'm not sure if you got that,

8 Brenda.

9         (Whereupon, the record was

10         read as requested.)

11     THE WITNESS:  Yeah.

12     MR. LEINENWEBER:  Joe, just try as best you

13 can not to anticipate and start talking because then

14 we end up, the three of us end up talking at the same

15 time, okay?

16     THE WITNESS:  I have to give it more time.

17 I'm sorry.  This connection is slow.

18 BY MR. HERBERT:

19     Q.  That's okay.  And the plaintiffs in this

20 case, they were complaining about the assignments

21 that they were being assigned to, correct?

22     MR. LEINENWEBER:  The same objections.

23     THE WITNESS:  I think it's common knowledge.

24

**Page 54**

1 BY MR. HERBERT:

2     Q.  So that's a yes?

3     **A.  It's common knowledge, yes.**

4     Q.  Okay.  And were there any white employees

5 that were complaining about their assignments?

6     MR. LEINENWEBER:  The same objections.

7     THE WITNESS:  All investigators were salty.

8 I don't -- even guys who typically would go with the

9 changes and everything, they were getting salty.  The

10 reason they were getting salty was because other

11 people were being resistant to all this change that

12 was going on.  I didn't create the change.  I'm just

13 a face of change.  I was the new guy who got assigned

14 to third watch.  Come on, Mr. Herbert.

15 BY MR. HERBERT:

16     Q.  Okay.  What white employees made

17 complaints about their assignments while you were the

18 chief?

19     MR. LEINENWEBER:  The same objections.

20     THE WITNESS:  I mean, do you want me to

21 answer or not?

22     MR. LEINENWEBER:  Yeah.  Yeah.  Unless I tell

23 you do not answer, you answer.

24     THE WITNESS:  Okay.  I'm sorry.  It was broke

**Page 55**

1 up.  I'm not trying...

2     MR. LEINENWEBER:  That's okay.

3     THE WITNESS:  Let's see, Mr. -- yeah, I can't

4 remember names but, you know, I had people tell me,

5 well, you know, when it used to be TSS, I had to go

6 there all the time.  I don't want to go there.  Well,

7 look, they've got to go there.  It's the assignment.

8 Well, if I go there, I'm not going to do anything.

9 Now what am I going to do?  Am I supposed to nail

10 this guy and write him up?  You can't be like that.

11 There's a time to write paper and a time not to.

12 That's all I can tell you.

13     Q.  Okay.

14     **A.  But it happened.  And it didn't just**

15 **happen to me, it happened to other supervisors.**

16     Q.  So it was common for people to complain

17 about being in the TSS unit?

18     MR. LEINENWEBER:  The same objections.

19     THE WITNESS:  I got in fights sometimes when

20 somebody was put on patrol if they were set to go do

21 jobs that night, "but I didn't want to be there."

22 "I understand, but that's what the job is tonight."

23 Now, if we can accommodate and make the change, we

24 would try to, but there were a lot of times we

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1090 of 1503 PageID #:1481

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 56**

1 couldn't based on who was there getting the job done,

2 the operation.

3 BY MR. HERBERT:

4　Q. When the plaintiffs in this case, when

5 they complained about their work assignments, did you

6 do anything to try and accommodate them?

7　MR. LEINENWEBER: The same objections.

8　　Go ahead.

9　THE WITNESS: I believe so. I believe that I

10 have accommodated everybody on that list on numerous

11 occasions in different ways, whether it was a call,

12 hey, I'm going to be a little bit late, they don't

13 want to get written up for being --

14 BY MR. HERBERT:

15　Q. But I'm talking about the assignments.

16　**A. The assignments?**

17　Q. Yes. Hold on a second.

18　**A. Throughout the time if you could make an**

19 **adjustment, you would. If you couldn't, you**

20 **wouldn't. It's just that simple, boss.**

21　Q. Did you make any accommodations for them

22 when they complained about their assignments, the

23 plaintiffs?

24　MR. LEINENWEBER: The same objections.

**Page 57**

1　　Go ahead.

2　THE WITNESS: Well, I would say, yeah, that

3 you would try to move people. We tried to rotate --

4 you would try to rotate everybody, but by the time

5 you get done with the call-ins, the medicals, we were

6 short-staffed constantly. You know, come on. We had

7 people coming in on overtime from the other shifts.

8 It was a daily occurrence, you know.

9 BY MR. HERBERT:

10　Q. When you said you tried to rotate them,

11 you tried to rotate the employees to the different

12 assignments within the electronic monitoring unit?

13　**A. Except for ones that were so critical**

14 **that I would be concerned with maybe they didn't have**

15 **the proper skill set, not that they weren't trained**

16 **but maybe that they weren't on top of their game in**

17 **that area like dispatch or in the monitoring center.**

18 **You really had to be a detail-oriented individual to**

19 **handle those positions. And again, we all have -- go**

20 **ahead, sir.**

21　Q. The plaintiffs in this case, did they

22 have any deficiencies that prevented you from

23 assigning them to various assignments?

24　MR. LEINENWEBER: Objection to form and

**Page 58**

1 foundation.

2　THE WITNESS: Only their own unwillingness to

3 learn.

4 BY MR. HERBERT:

5　Q. It's your belief that the plaintiffs had

6 an unwillingness to learn. Is that what you stated?

7　**A. A resistance to attain.**

8　Q. Tell me why you had that belief?

9　**A. Why did I have that belief? Because**

10 **they'd tell you, well, you can send me there, I'm not**

11 **going to perform. I mean, when a guy tells you, what**

12 **are you going to do? Are you going to write that guy**

13 **up? You don't want -- I don't know how to answer**

14 **this. I really don't.**

15　Q. When the plaintiffs in this case said

16 they didn't want to work a particular assignment, did

17 you try to accommodate them to give them the

18 assignment that they preferred working in?

19　MR. LEINENWEBER: Objection. Asked and

20 answered, also form and foundation.

21　　Go ahead.

22　THE WITNESS: As I've already answered that,

23 we would try -- you would prefer to have a happier

24 staff.

**Page 59**

1 BY MR. HERBERT:

2　Q. I'm talking about specific though. I get

3 it.

4　**A. But I don't have -- I understand,**

5 **Mr. Herbert, but we're talking five, six years ago.**

6 **You know, I'm answering the best I can, Mr. Herbert.**

7 **I really am.**

8　MR. LEINENWEBER: Joe, just listen to his

9 question and try your best to answer that question,

10 okay, because otherwise we're going to be here like

11 all night, okay?

12　THE WITNESS: I'm sorry. I hear you.

13　MR. LEINENWEBER: No, that's all right. Just

14 listen to the question and answer it as best you can.

15　　Sorry, Dan. I don't like to

16 interrupt, but I'm just trying to move us along.

17　MR. HERBERT: That's fine.

18 BY MR. HERBERT:

19　Q. I'm not looking for generally. If I am,

20 I'll say generally speaking. But like in this case I

21 was saying, did you provide or did you try to

22 accommodate the plaintiffs when they complained to

23 you about the assignments that they were being given?

24　MR. LEINENWEBER: The same objections.



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1091 of 1503 PageID #:1482
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Go ahead.

2    THE WITNESS: I really can't recall any

3  specifics on it. I really can't. You know, a couple

4  which I've mentioned already, like with Mr. Spivy

5  his partner Mr. Slaughter. You know, the same thing.

6  And Slaughter even asked a couple times, hey, Spivy

7  is not feeling good. Okay, whatever you need.

8  That's a medical thing. I don't want anybody being

9  hurt or losing their job because of that, you know.

10  BY MR. HERBERT:

11    Q.  I get it. Did any of the plaintiffs --

12  were there any assignments that you believe they were

13  not qualified to handle?

14    **A.  No.**

15    MR. LEINENWEBER: Objection.

16    THE WITNESS: They should have been qualified

17  for all of it. All of those positions were held by

18  investigators. All of those positions were done by

19  investigators. Nothing changed. Just the only thing

20  that changed was the way they bid for their

21  assignments and...

22  BY MR. HERBERT:

23    Q.  So they should have been assigned to

24  other assignments the same as anyone else that worked

1  in the unit that didn't have any deficiencies that

2  prevented them from being assigned to one particular

3  spot, correct?

4    MR. LEINENWEBER: Objection to form and

5  foundation.

6    Go ahead.

7    THE WITNESS: That would only make sense to

8  me. Yes, I guess.

9  BY MR. HERBERT:

10    Q.  Okay. Well, when the plaintiffs

11  complained to you about working in one assignment

12  more than other assignments, did you ever take any

13  steps to see whether or not they were being

14  disproportionately assigned to positions that they

15  didn't want to work at?

16    MR. LEINENWEBER: Objection to form and

17  foundation. Also assumes facts not in evidence.

18    Go ahead.

19    THE WITNESS: Right. You know, I wasn't

20  there every day and I was sick, so you're asking me

21  questions of things. Now, when I was there, I did

22  the best I could to accommodate everybody and get the

23  job done every day.

24

1  BY MR. HERBERT:

2    Q.  Okay.

3    **A.  I don't know what else to tell you.**

4    Q.  All right.

5    **A.  Again, when there's another boss -- a lot**

6  **of times there was only one boss there on duty for**

7  **all of it.**

8    Q.  Okay. I've got you. We're going to move

9  on to the Complaint here.

10    MR. HERBERT: If we can mark as Ranzino

11  Exhibit A which should be the Answer and Amended

12  Affirmative Defenses to the Complaint.

13    If we can go to page 8 of that

14  document.

15    THE WITNESS: Okay.

16  BY MR. HERBERT:

17    Q.  And this document, this is the Answer to

18  the Complaint. My question is: You have seen the

19  Complaint in this case, correct?

20    **A.  Yes, I have.**

21    Q.  And that's the document -- you also have

22  a document in front of you that we spoke of, and that

23  was the Complaint, right?

24    **A.  Yes, it's the whole Complaint that's**

1  **sitting here. Yes.**

2    Q.  Okay. And if you can see paragraph 23

3  there.

4    **A.  Is it okay if I look at the paper copy?**

5  **It's just bigger print. I have terrible eyesight.**

6    Q.  That's fine with me if it's all right

7  with your lawyer.

8    MR. LEINENWEBER: Well, the only thing I

9  would say is I think he said it's a different

10  document. I think he said it's the Complaint. This

11  is the Answer here, so.

12    THE WITNESS: I'm going to do my best.

13    MR. LEINENWEBER: Maybe the tech can make it

14  a little bit bigger since we're talking about a

15  specific paragraph.

16    THE WITNESS: That's much better, sir. Much

17  better. Thank you.

18  BY MR. HERBERT:

19    Q.  So in there it talks about how you were

20  responsible for conducting roll call, assigning duty

21  assignments, granting compensatory time on, and

22  administering discipline to subordinate officers.

23    Do you see that?

24    **A.  Yes.**



Joseph Ranzino  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1092 of 1503 PageID #:1483
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  Q.  And you would agree with me that as a
2  chief, you did conduct roll calls?
3  **A.  As a chief, those were my**
4  **responsibilities, yes.**
5  Q.  And we've already talked that you did
6  assign duty assignments?
7  **A.  Absolutely.**
8  Q.  And granted compensatory time?
9  **A.  Yes.**
10  Q.  And you administered discipline to
11  subordinate officers, correct?
12  **A.  Yes.**
13  Q.  Okay.  We can go to paragraph -- I'm
14  sorry, page 10.
15  MR. LEINENWEBER:  They'll move it for you,
16  Joe.
17  THE WITNESS:  Yeah.  You see me trying to do
18  that?  I've got you.
19  BY MR. HERBERT:
20  Q.  I've got it.  And we're talking about
21  paragraph 31.  You know that Legrain Winston has
22  alleged that you referred to him as boy and
23  threatened to have him fired.  You're aware of that
24  allegation, correct?

Page 64

1  **A.  It never happened.**
2  Q.  Okay.  Did you ever refer to him as boy?
3  **A.  I never use that kind of language**
4  **anywhere.  I was always courteous.  When I passed**
5  **somebody, I would say good morning, good afternoon,**
6  **how are you?  I always tried to be pleasant with all**
7  **the employees there.**
8  Q.  Would you consider the term boy to be a
9  discriminatory term if used against Mr. Winston?
10  MR. LEINENWEBER:  Objection to form and
11  foundation.
12  You can go ahead and answer.
13  THE WITNESS:  It would have to be the context
14  of it.  I mean, I don't know.
15  BY MR. HERBERT:
16  Q.  Well, Mr. Winston is black, correct?
17  **A.  Yes, he is African-American.  That's**
18  **true.**
19  Q.  And all the plaintiffs are
20  African-American, correct?
21  **A.  I believe so.**
22  Q.  And you would agree that calling an
23  African-American boy, that certainly would be
24  inappropriate, correct?

Page 65

1  **A.  Yeah.**
2  MR. LEINENWEBER:  Objection to form and
3  foundation.
4  THE WITNESS:  On the context of it, unless
5  someone was to make a -- well, small talk, but none
6  of my business really.  You don't hear nothing like
7  that.  Through all my years at the sheriff's -- oh,
8  go ahead.  I'm sorry.  I'm rambling.
9  BY MR. HERBERT:
10  Q.  Did you ever threatened Winston that you
11  would have him fired?
12  **A.  Never.  I never threatened anyone I'd**
13  **have them fired.  I couldn't have anybody fired.  I**
14  **don't have -- that's way above my pay grade.**
15  Q.  Do you remember talking to Director
16  Shields about Investigator Tims at any point?
17  MR. LEINENWEBER:  Objection to form and
18  foundation.
19  THE WITNESS:  I have no recollection of that
20  at all.
21  BY MR. HERBERT:
22  Q.  Do you ever remember -- well, you know
23  that Tims alleged that you spoke to Director Shields
24  on the telephone and referred to Tims as dumb ass

Page 66

1  Johnnie Cochran, the N word, n-i-g-g-e-r.  You know
2  that he alleged that?
3  **A.  It never happened.  Come on.  It would be**
4  **completely unprofessional.  I might be a little rough**
5  **around the edges, but I'm not unprofessional, and I'm**
6  **sorry for that.**
7  Q.  How would you be rough around the edges?
8  Describe what you mean by that.
9  **A.  More -- you know, I grew up with more**
10  **street smarts and then did my education as an adult.**
11  Q.  Why is it that you're rough around the
12  edges?  Describe what you mean by that.
13  **A.  I'm a man's man.  I tell it like I see**
14  **it.  It is what it is.**
15  Q.  Okay.
16  **A.  Yeah, I try to be nice and sugar coat it**
17  **but, you know, you can't make these people happy.**
18  **And I'll give you an analogy, and I know you don't**
19  **want one, but I'm going to give you one anyways,**
20  **okay?**
21  Q.  I don't need an analogy.
22  **A.  No analogies.**
23  MR. LEINENWEBER:  Joe, just listen to the
24  question and answer the question.

Page 67



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1093 of 1503 PageID #:1484

BY MR. HERBERT:

Q. You're talking about the plaintiffs in this case, you couldn't make them happy, right?

MR. LEINENWEBER: Objection to form, foundation.

Go ahead.

THE WITNESS: Everybody, again everybody from top to bottom, not just on the third watch, they were all salty about those changes. I don't know how else to describe it.

BY MR. HERBERT:

Q. You became aware of the fact that I.V. Newson complained about where he was being assigned when he was on patrol, correct?

MR. LEINENWEBER: Objection to form and foundation.

THE WITNESS: Again, I don't have any knowledge of that really. It's above my pay grade. It wasn't on my watch. I never dealt with it really.

BY MR. HERBERT:

Q. Okay. Did you -- the assignments that people were given on patrol, those various assignments would be given out by a dispatcher. Is that correct?

Page 68

A. Yeah.

MR. LEINENWEBER: Objection. Foundation.

THE WITNESS: As far as I know. Wait a minute. Whoa, whoa, whoa, whoa. We're talking about a -- you mean like an assignment to go do a job?

BY MR. HERBERT:

Q. Yes.

A. A street job, yes, it would go through dispatch.

Q. Okay. And did you have any influence over dispatch as to who would be assigned which jobs?

A. Not really unless it was --

MR. LEINENWEBER: Objection. Foundation.

Go ahead. Sorry.

THE WITNESS: Yeah, I mean, for the most part people would be -- you know, whatever your assignment was. We had limited cars, so you couldn't just send everybody everywhere. So you'd have a guy, somebody assigned north, south, middle. Depending on who you had and how many people you had and what the workload was that night and how many jobs were at the desk and how many you had to process. There was a lot factors going into it.

Page 69

BY MR. HERBERT:

Q. I get it. I'm asking more about the actual assignments that they were given, the jobs that came from the dispatcher. Did you have --

A. Well, that would --

Q. Hold on. Just let me finish. You wouldn't make those job assignments, would you, through the dispatcher?

A. No, sir.

Q. Did you ever talk to any dispatchers and give advice or an order as to who to give certain job assignments to on any particular day?

MR. LEINENWEBER: Objection to form, foundation. Also a compound question.

Go ahead.

THE WITNESS: It is a compound question, but the way that dispatch works is quite honestly the program, depending on violations and what have you, it like prioritizes. So whatever comes up in that area that needs to be handled, whatever is the most urgent is -- what I would do as a dispatcher, I can't speak for the dispatcher sitting there, but I would think they would do the same thing. I would have --

Page 70

BY MR. HERBERT:

Q. I get that. But did you ever advise a dispatcher who they should give a particular job assignment to?

MR. LEINENWEBER: The same objections.

THE WITNESS: I don't believe so. You know, they should all be able to do the same job. Unless it was something that was like -- needed to be handled with kid gloves, like the guy was whatever, and if something came down, hey, we want a special, send this team out, but it usually wouldn't even be from the guys who were on duty that night. Different things come up.

BY MR. HERBERT:

Q. You know Jessie Lopez, the dispatcher?

A. He was at one time. Yes, I do know who Jessie is.

Q. Did you ever tell Jessie Lopez at any point to put the plaintiffs and to give them certain job assignments over others?

MR. LEINENWEBER: The same objections.

THE WITNESS: I don't believe so. I have no knowledge.

Page 71

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1094 of 1503 PageID #:1485

Joseph Ranzino - 9/8/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q. Is it possible that you did tell him to put the plaintiffs, give them different job assignments?

Mr. LEINENWEBER: The same objections.

THE WITNESS: Whatever was on dispatch that needed to be handled is what was being handled. That is a program.

BY MR. HERBERT:

Q. I get it, but my question is more specific. Did you ever talk to Jessie Lopez about how he should assign jobs out in dispatch?

A. No. I don't think that ever happened. I have no recollection of ever having any of those conversations like that.

Q. Do you remember ever telling Jessie Lopez that, put all those people in the area that they belong? Do you remember saying anything like that?

A. What?

MR. LEINENWEBER: The same objection.

THE WITNESS: Absolutely not saying that. Absolutely not. I would never say that.

BY MR. HERBERT:

Q. You know Investigator Shador, Shadur?

Page 72

A. Who is it? What watch was he on? He must have been a new guy.

Q. Well, he came off midnights and then he went to the third watch.

A. When was that because I don't really remember him. It must have been shortly before I left.

Q. Yeah, it was. I think it was around 2015 or so.

A. I got transferred in 2015. I don't know. It could have been due to this investigation. I don't know.

Q. Do you remember ever having a conversation when he was new to the third watch with him?

A. No, not really.

Q. Okay.

A. I didn't really have personal conversations with people I don't know.

Q. Did you ever -- well, let me ask this question. Did you ever tell Investigator Shador that he shouldn't act like all these other guys? Do you remember making a statement to him along those lines?

MR. LEINENWEBER: Objection to form,

Page 73

foundation.

THE WITNESS: No, I do not. I have no recollection of that.

BY MR. HERBERT:

Q. As you said those guys, you were pointing to your arm as if to indicate the color of somebody's skin. Do you remember that?

MR. LEINENWEBER: The same objections.

THE WITNESS: It never happened.

BY MR. HERBERT:

Q. Did you have issues with black investigators that worked under your command when you were --

MR. LEINENWEBER: Objection to form.

THE WITNESS: Absolutely not. I treated everybody the same, exactly the same. It was just business.

BY MR. HERBERT:

Q. You would agree that the black employees were complaining more than the white employees, correct?

MR. LEINENWEBER: Objection to form and foundation. It also calls for speculation.

THE WITNESS: I think everyone was upset the

Page 74

same. They were all salty from top to bottom on all the watches. Nobody was being picked on. Everyone was just being asked to come to work and do their job.

BY MR. HERBERT:

Q. Okay. You know the plaintiff Tyrone Mcghee?

A. Yes.

Q. Okay. And Mr. Mcghee, he complained about being assigned to work in the basement area to you, correct?

MR. LEINENWEBER: Objection to form and foundation.

THE WITNESS: Yeah.

BY MR. HERBERT:

Q. And the basement area, that was -- would you agree that the majority of people did not want to work in the basement area?

A. That was the processing area.

MR. LEINENWEBER: Objection to form and foundation and calls for foundation.

BY MR. HERBERT:

Q. I'm sorry. Can you repeat your answer?

A. I said that would have been the

Page 75



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1095 of 1503 PageID #:1486

Joseph Ranzino - 9/8/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 processing area in Division 5.
2    Q.  Okay.  People didn't want to work there
3 generally?
4    MR. LEINENWEBER:  The same objections.
5      Go ahead.
6    THE WITNESS:  Not all people.
7 BY MR. HERBERT:
8    Q.  The majority of people didn't want to
9 work there in the unit, right?
10    MR. LEINENWEBER:  The same objections.
11    THE WITNESS:  They didn't want -- I guess,
12 yeah.  That's what it seemed like, my interpretation.
13 I don't know.
14 BY MR. HERBERT:
15    Q.  Did you ever look to see if Tyrone Mcghee
16 was assigned to the basement more than other
17 employees?
18    A.  Nope.
19    Q.  Would it surprise you if he was assigned
20 to the basement disproportionately more so than white
21 employees?
22    MR. LEINENWEBER:  Objection to form and
23 foundation.  Also calls for speculation.
24    THE WITNESS:  Perhaps it was a training

Page 76

1 issue.  I don't know.
2 BY MR. HERBERT:
3    Q.  I'm asking --
4    A.  I don't know.  I don't know.  I don't
5 have those numbers.  I don't have any numbers.  I
6 really don't know.  I don't know the answer.  I can't
7 give you an answer if I don't know it.
8    Q.  You said it might have been a training
9 issue.  Do you know, as you sit here today, that it
10 was a training issue for Tyrone Mcghee to be assigned
11 in the basement?
12    MR. LEINENWEBER:  Objection to form,
13 foundation.  It calls for speculation.
14    THE WITNESS:  I don't know.  I really don't
15 know.
16    MR. LEINENWEBER:  Dan, when you come to a
17 good point, can we take a quick break for the
18 restroom?
19    MR. HERBERT:  Yeah.  Let's do it now.
20 Five minutes?
21    MR. LEINENWEBER:  Yeah, that's fine.  So
22 that's 12:40?
23    MR. HERBERT:  It sounds right, yeah.
24

Page 77

1        (Whereupon, a short break
2        was taken.)
3 BY MR. HERBERT:
4    Q.  Okay.  Mr. Ranzino, you know Wilson
5 Ferguson, correct?
6    A.  Wilford Ferguson, right?
7    Q.  Yes, I'm sorry.  And you supervised him,
8 correct?
9    A.  Yes.
10    Q.  And you made duty assignments for him,
11 correct?
12    A.  Yes.
13    Q.  And you're aware of the fact that
14 Mr. Ferguson complained to you about his various
15 assignments in the unit, correct?
16    MR. LEINENWEBER:  Objection to form and
17 foundation.
18      Go ahead.
19    THE WITNESS:  I don't recall him being
20 verbal.
21 BY MR. HERBERT:
22    Q.  Okay.  You recall him making complaints
23 though about his work assignments, correct?
24    MR. LEINENWEBER:  The same objection.  Also

Page 78

1 asked and answered.
2      Go ahead.
3    THE WITNESS:  No, I don't recollect that at
4 all.
5 BY MR. HERBERT:
6    Q.  Okay.  How about Cecil Williams?  You're
7 aware that he complained that he was getting
8 disciplined more than his coworkers were, correct?
9    MR. LEINENWEBER:  The same objections.
10      Go ahead.
11    THE WITNESS:  I don't know that that was his
12 complaint.  It was above me.
13 BY MR. HERBERT:
14    Q.  Well, you disciplined Cecil Williams,
15 correct?
16    A.  I may have through the years.
17    Q.  And Cecil Williams, he also complained
18 about his work assignments, correct?
19    MR. LEINENWEBER:  The same objections.
20      Go ahead.
21    THE WITNESS:  I would say he might have been
22 verbal, yeah.
23 BY MR. HERBERT:
24    Q.  Okay.  And he was complaining about being

Page 79



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1096 of 1503 PageID #:1487

1 assigned to positions that nonwhite people were not
2 being assigned at at the same rate, fair to say?
3    MR. LEINENWEBER: The same objections.
4       You can go ahead.
5    THE WITNESS: That would call for -- I don't
6 know those answers.
7 BY MR. HERBERT:
8    Q. Okay. Did you ever do anything to
9 investigate whether or not Cecil Williams was being
10 assigned to positions more so than his coworkers?
11    A. No. I never looked into that.
12    Q. And Tyrone Mcghee, you know him as well,
13 correct?
14    A. Yes.
15    Q. And he complained about being assigned to
16 the basement, correct?
17    A. I don't remember him ever being verbal
18 with me.
19    Q. Okay. But you were aware of complaints
20 that Tyrone Mcghee made about his assignments to the
21 basement, correct?
22    MR. LEINENWEBER: Objection to form,
23 foundation.
24       Go ahead.

Page 80

1    THE WITNESS: Again, never anything verbal to
2 me directly.
3 BY MR. HERBERT:
4    Q. So were you made aware of it indirectly
5 somehow then?
6    A. Just that the whole unit was salty.
7    Q. Well, if somebody filed a grievance about
8 the working conditions, you would become aware of the
9 grievances, correct?
10    MR. LEINENWEBER: Objection to form,
11 foundation, an incomplete hypothetical.
12    THE WITNESS: Some of that would be way over
13 my pay grade unless it was a complaint made directly
14 to me. I don't know, you know, hearsay what...
15 BY MR. HERBERT:
16    Q. Well, if somebody was complaining about
17 their assignments, you would agree with me that you
18 were the one that was involved in making the
19 assignments, correct?
20    MR. LEINENWEBER: Objection to form,
21 foundation.
22       Go ahead.
23    THE WITNESS: It would have been one of my
24 responsibilities when I was on duty to make those --

Page 81

1 delineate or whatever, to make sure the assignments
2 and the jobs were going to work together and
3 everything was going to get done. I don't know how
4 else to answer that.
5 BY MR. HERBERT:
6    Q. But you were eventually told or put on
7 notice that the plaintiffs here were complaining
8 about the assignments that they were being given and
9 complaining about the assignments that you were
10 giving them, correct?
11    MR. LEINENWEBER: Objection to form and
12 foundation.
13       Go ahead.
14    THE WITNESS: I've answered that as best as I
15 can. I don't know how else to answer that.
16 BY MR. HERBERT:
17    Q. So is that a yes, you were made aware of
18 the fact that they were complaining about their work
19 assignments?
20    MR. LEINENWEBER: The same objections.
21       Go ahead.
22    THE WITNESS: I don't have particulars. I
23 don't remember any particulars. The whole place was
24 salty. The whole place was salty. That was the

Page 82

1 mentality, even guys who were never salty or maybe
2 reluctant or -- they were all in it. You know, the
3 Blue Lives, they stick -- it just is.
4 BY MR. HERBERT:
5    Q. Well, would you characterize the EM unit
6 as a hostile unit when you were there?
7    MR. LEINENWEBER: Objection to form,
8 foundation.
9       Go ahead.
10    THE WITNESS: You know, change is tough for a
11 lot of people and they just don't handle it well.
12 There was a lot of change going on, and we were
13 trying to just get the job done.
14 BY MR. HERBERT:
15    Q. Well, you were interviewed by OPR in
16 2015. Do you remember being interviewed by somebody
17 from OPR in 2015?
18    A. I remember I went there. I can't
19 remember particulars.
20    Q. Well, in that interview you said that the
21 EM unit was a hostile work unit. Do you remember
22 saying that?
23    MR. LEINENWEBER: Objection to form,
24 foundation.

Page 83



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1097 of 1503 PageID #:1488
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    Go ahead.
2    THE WITNESS:  Well, if I did, I did.  But
3 what I was talking about was people not wanting to
4 cooperate and do their job.
5 BY MR. HERBERT:
6    Q.  Okay.  Victor Slaughter, you know Victor
7 Slaughter?
8    **A.  Yeah.  I thought he was a pretty**
9 **detailed-oriented guy.**
10    Q.  But he was assigned to the TSS by you
11 more than his coworkers, correct?
12    MR. LEINENWEBER:  Objection to form and
13 foundation, and it also calls for speculation.
14    Go ahead.
15    THE WITNESS:  I don't know if he was or
16 wasn't.  I do know that many times the guy who he
17 preferred to work with was Mr. Spivy, and he
18 preferred to be inside most of the time.
19 BY MR. HERBERT:
20    Q.  Who did, Mr. Spivy or Mr. Slaughter?
21    **A.  Mr. Spivy, the guy who he usually**
22 **partnered up with.**
23    Q.  Okay.  But --
24    **A.  Who also was a pretty detail-oriented**

Page 84

1 guy.
2    Q.  Okay.  But Mr. Slaughter did not enjoy
3 being assigned to TSS.  You became aware of that,
4 correct?
5    MR. LEINENWEBER:  Objection.  Form,
6 foundation, it calls for speculation.  Also a
7 compound question.
8    Go ahead.
9    THE WITNESS:  No one was happy about working
10 in TSS.
11 BY MR. HERBERT:
12    Q.  Okay.  And did you ever look to see if
13 Slaughter or any of the other plaintiffs were being
14 assigned to TSS more than their coworkers?
15    MR. LEINENWEBER:  The same objections.  Also
16 asked and answered.
17    THE WITNESS:  An assignment is an assignment,
18 Mr. Herbert.
19 BY MR. HERBERT:
20    Q.  But you talked about earlier how you
21 wanted to keep your employees happy, and if people
22 didn't want to work in the TSS unit, wouldn't you try
23 to make that an assignment that everyone gets the
24 same amount of time?

Page 85

1    **A.  We tried to do that with all the**
2 **assignments, Mr. Herbert.**
3    Q.  Okay.  Did you ever look to see if any of
4 the plaintiffs were assigned in that TSS unit more
5 than white employees?
6    MR. LEINENWEBER:  The same objections.  Also
7 asked and answered.
8    THE WITNESS:  I believe I've answered that.
9 BY MR. HERBERT:
10    Q.  Do you remember ever looking to see
11 whether or not the plaintiffs were assigned to the
12 TSS unit more than white employees?
13    **A.  I would have to say no.  I don't look at**
14 **things like that.  It's not -- an investigator is an**
15 **investigator is an investigator.**
16    MR. LEINENWEBER:  Joe, just answer the
17 question.  When you answer the question, you can be
18 done, otherwise we're going to be here forever, okay?
19    THE WITNESS:  I'm sorry.
20 BY MR. HERBERT:
21    Q.  Victor Slaughter, you disciplined Victor
22 Slaughter on occasion, correct?
23    MR. LEINENWEBER:  Objection to form and
24 foundation.

Page 86

1    THE WITNESS:  Yes, I believe so.
2 BY MR. HERBERT:
3    Q.  Are you aware of the term progressive
4 discipline?
5    **A.  Yeah.**
6    Q.  And would you describe what -- was there
7 a department policy concerning progressive discipline
8 while you were the director in the EM unit?
9    **A.  Yeah.  There was some policies about that**
10 **and I would say that -- well, yeah, they have a**
11 **policy in place, and I followed it.**
12    Q.  What is your understanding of the
13 progressive discipline policy?
14    **A.  Well, it would depend on the infraction**
15 **as to where the progressive discipline would start.**
16    Q.  Okay.  Just explain the process to me.
17 What does that mean, progressive discipline?  What's
18 your understanding of it?
19    **A.  Well, first there would have to be an**
20 **infraction.  Then you would deal with that**
21 **infraction, you would write that up in whatever way**
22 **you would.  You would get ahold of OPR, if that's**
23 **what they still call it.  I don't know.**
24    Q.  Okay.

Page 87



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1098 of 1503 PageID #:1489

**A.** You get direction from there.

Q. And so it's fair to say that progressive discipline would be the more infractions that somebody is accused of committing, the discipline would go higher, correct?

MR. LEINENWEBER: Objection to form and foundation.

Go ahead.

THE WITNESS: Not necessarily my understanding. Depending on the infraction, is it a minor infraction, is it a major cause -- you have to be more specific for me to answer that.

BY MR. HERBERT:

Q. Let's assume it's -- well, is there a policy -- was there a policy with the sheriff about characterizing an infraction as a major versus a minor?

**A.** There was actually a list of things which would be considered minor and which -- and I don't remember exactly what they all were.

Q. Okay. What if there was an infraction that wasn't listed, who would determine whether or not it was a major or a minor infraction?

MR. LEINENWEBER: Objection to form and

foundation.

THE WITNESS: Yeah, I don't know where you would have the basis for that. What do you mean?

BY MR. HERBERT:

Q. Well, when you file a complaint against an individual, you would characterize it, as the complainant, as a major or a minor infraction, correct?

MR. LEINENWEBER: The same objections.

THE WITNESS: Yeah, well, whatever was in the GOs. That's what I followed.

BY MR. HERBERT:

Q. Did you ever have a situation where there was an infraction that wasn't in the GO and you had to make an independent determination of whether it was major or minor?

**A.** You're calling for speculation. I have no recollection of doing that. I mean, whatever is in the book, that's what you do. Follow the rules.

Q. So if something wasn't listed as an infraction in the general order, then it wouldn't be an infraction, fair to say?

MR. LEINENWEBER: Objection to form and foundation.

Go ahead.

THE WITNESS: You'd have to give me a specific for me to answer this. I can't answer that. You're asking for -- you're trying to get specific but you're generalizing. You're going back and forth there.

BY MR. HERBERT:

Q. All right. I'll try and ask it a different way.

For something to be an infraction, there would have to be -- it would have to be listed in the general order for you to determine that it was an infraction?

MR. LEINENWEBER: Objection to form and foundation.

You can go ahead.

THE WITNESS: I guess that was part of my responsibilities.

BY MR. HERBERT:

Q. Okay. And somebody couldn't be -- somebody couldn't be written up for an infraction that was not -- somebody couldn't be written up for an infraction that wasn't listed in the general order, correct?

**A.** Well, what kind of infraction would that be then?

Q. I guess that's my point. It's not an infraction unless it's listed as an infraction?

**A.** Well, something like insubordination, stuff like that, they fall under a completely different...

Q. Got it.

**A.** I mean, it's there. I'm having trouble understanding exactly what you're asking.

Q. I'll move on.

**A.** I'm sorry.

Q. That's okay. The patrol unit, when people were assigned to different positions within the patrol unit, they were broken up into, was it a north, central, and a south area?

MR. LEINENWEBER: Objection to, form, foundation.

You can go ahead.

THE WITNESS: That would probably be the norm. However, I think there were exceptions at different times depending if something happened to you.

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1099 of 1503 PageID #:1490
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q. Right. At one point it was essentially broken up, there was a patrol north, central, and south, correct?

MR. LEINENWEBER: The same objection.

THE WITNESS: That -- yes, that did happen at times. I would say it was probably a norm.

BY MR. HERBERT:

Q. Okay. And you would agree with me that the north assignment -- or strike that.

The south and the central assignments were certainly higher incident areas as opposed to the north, correct?

MR. LEINENWEBER: Objection to form and foundation.

You can go ahead and answer.

THE WITNESS: It would depend on the demographics of -- you know, we cover all of Cook County which I'm sure you're aware of, so it would depend on demographics and where our participants are living, where are they located.

BY MR. HERBERT:

Q. I understand. While you were there, you certainly would agree that the north assignments were

certainly less higher risk incident areas as opposed to the central and the south assignments, correct?

MR. LEINENWEBER: Objection to form and foundation.

THE WITNESS: Not necessarily, my friend. Anything can happen anywhere at any time.

BY MR. HERBERT:

Q. You would agree with me that there would be more calls for service in the south and central areas as opposed to in the north area, correct?

MR. LEINENWEBER: The same objections.

Go ahead.

THE WITNESS: Again, that would be dispatch, and I would say that wherever our population was living was where there would be more assignments. It would only make sense.

BY MR. HERBERT:

Q. Did you ever hear the word n-i-g-g-e-r used at any point in the workplace while you were working --

A. No, sir.

Q. Or I'm sorry. As a --

A. No, sir.

Q. Okay. How about, did you ever refer to

any black employees as crooks?

A. What? No, never.

Q. If those words were used towards any of the plaintiffs, that certainly would create a hostile work environment. You would agree with me on that?

MR. LEINENWEBER: Objection to form and foundation. It also calls for a legal conclusion.

You can go ahead.

THE WITNESS: I'm not a lawyer. I don't know.

BY MR. HERBERT:

Q. Well, you've had training in harassment, correct?

A. Yes, sir.

Q. Okay. And you were responsible as a chief to make sure that the environment in which individuals worked were not subjected to harassment?

MR. LEINENWEBER: Objection to form and foundation.

BY MR. HERBERT:

Q. That's a bad question.

As a supervisor, you would agree that it was your responsibility to make sure that it was a nonhostile working environment, correct?

MR. LEINENWEBER: The same objections.

Go ahead.

THE WITNESS: I can't control people's feelings. I would not create and I would not allow that.

BY MR. HERBERT:

Q. And if you became aware of that, being a hostile work environment, you would be responsible to take steps to remedy that to make sure that the hostile work environment ended, correct?

MR. LEINENWEBER: The same objections.

You can go ahead.

THE WITNESS: You would have to really tell me what you're -- I don't understand hostile work environment. Because things are changing, it doesn't mean it's hostile. It's change.

BY MR. HERBERT:

Q. Well, people complaining about their work assignments, that would be a form of a hostile work environment, correct?

MR. LEINENWEBER: Objection to form, foundation. It also calls for a legal conclusion.

You can go ahead.

THE WITNESS: Again, I'm not a lawyer. I

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1100 of 1503 PageID #:1491

Joseph Ranzino  -  9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 don't know legal...
2 BY MR. HERBERT:
3     Q.  What is your understanding of what a
4 hostile work environment is then?
5     MR. LEINENWEBER:  Objection to form.  It
6 calls for a legal conclusion.
7     Go ahead.
8     THE WITNESS:  Again, I'm not a lawyer.
9 Certainly racial slurs, that type of thing that
10 you're speaking of, yes, but it didn't happen.
11 BY MR. HERBERT:
12     Q.  Did you conduct any investigation into
13 the allegations about racial slurs being made in the
14 workplace?
15     MR. LEINENWEBER:  Objection to form and
16 foundation.
17     You can go ahead.
18     THE WITNESS:  If anybody was to come with
19 anything with me, I would have immediately contacted
20 OPR and made a report.  It's just that simple.
21 BY MR. HERBERT:
22     Q.  Did you do that in this case?
23     MR. LEINENWEBER:  The same objections.
24     Go ahead.

Page 96

1     THE WITNESS:  This case was already being
2 done whatever.  When I got called in, then I told
3 them what I told them.
4 BY MR. HERBERT:
5     Q.  And when you talk about getting called
6 in, it was called in regarding the complaints that
7 were made --
8     **A.  OPR investigation.  That's correct.**
9     Q.  Okay.  You were called in to address the
10 complaints made by the plaintiffs in this case,
11 right?
12     MR. LEINENWEBER:  Objection.  Form and
13 foundation.
14     Go ahead.
15 BY MR. HERBERT:
16     Q.  You can answer.
17     **A.  I was called in on an OPR of Winston.**
18     Q.  Okay.  While you were called into OPR
19 concerning complaints that the plaintiffs were saying
20 they were referred to as derogatory racial slurs,
21 correct?
22     MR. LEINENWEBER:  Objection to form and
23 foundation.
24     You can go ahead.

Page 97

1     THE WITNESS:  It was for harassment or...
2 BY MR. HERBERT:
3     Q.  Okay.  And who did you interview with
4 regarding that OPR investigation?
5     **A.  Oh, God.  I don't recall.  OPR**
6 **investigators.  I don't know the name.  I don't have**
7 **a clue.**
8     Q.  Okay.  Did you interview with an
9 attorney?
10     **A.  At the OPR investigation?**
11     Q.  Yeah.  Because there was an OPR
12 investigation concerning the EEOC complaint that was
13 filed by the plaintiffs in this case in 2016,
14 correct?
15     **A.  You know, I'm not privy to a lot of that,**
16 **and I didn't get a lot of -- I don't get**
17 **notifications on all that.  It's above my pay grade.**
18 **I was made aware when I got called in on the**
19 **allegation or when they wanted to move me to an**
20 **investigation.  I'm sorry.  I misspoke.**
21     Q.  That's okay.  So you talked about the
22 investigation was concerning the allegations of a
23 hostile work environment, right?
24     **A.  No, it was an allegation of a racial**

Page 98

1 **slur.**
2     Q.  Okay.  And did you interview with an
3 attorney about that allegation?
4     **A.  I don't know who they were.  They were**
5 **the people at OPR.  I don't know who they are.**
6     Q.  Okay.
7     **A.  They were investigators, I'm assuming,**
8 **from OPR.  That's what their credentials say.**
9     MR. HERBERT:  Okay.  I would like to move on
10 and mark Ranzino Exhibit B, and that would be the
11 Answers to Interrogatories.  Oh, I think we premarked
12 this as C.
13     MR. LEINENWEBER:  C, okay.  I was going to
14 say my B is something different but let me see.
15     MR. HERBERT:  Well, we'll put it as Exhibit C
16 then.
17     MR. LEINENWEBER:  No, my C is something
18 different as well.
19     MR. HERBERT:  Is your C the objections to --
20     MR. LEINENWEBER:  C, the first page of it
21 says OPR final disposition form.  I'm looking to see
22 which one.
23     MR. HERBERT:  Could we put Exhibit C up on
24 the screen?

Page 99

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1101 of 1503 PageID #:1492

1 MR. LEINENWEBER: It looks like I don't have

2 that one, but if it is the -- whatever they have, if

3 it's the right one, just go ahead and use it and I'll

4 pull it up in my files.

5 MR. HERBERT: Did I ask, do we have a -- it

6 should say -- it's got the caption and should say

7 Defendant Joseph Ranzino's Objections and Responses

8 to Plaintiffs' First Set of Interrogatories. If you

9 don't have that document, we'll send it over.

10 MR. LEINENWEBER: For what it's worth, I do

11 not see it in the A through M premarked stuff.

12 MR. HERBERT: All right. We'll send it over

13 now.

14 BY MR. HERBERT:

15 Q. And let me ask you, Mr. Ranzino, while

16 we're waiting for that, you indicated that you were

17 laid off by the sheriff in 2017 I believe you said?

18 A. Yeah, November.

19 Q. Tell me, why is it that you were laid

20 off?

21 MR. LEINENWEBER: Objection to form and

22 foundation.

23 Go ahead.

24 THE WITNESS: I believe I was told it was

Page 100

1 budgetary cuts and...

2 BY MR. HERBERT:

3 Q. Okay. Give me one second, please.

4 MR. HERBERT: Well, maybe if we can just

5 start off, we'll go to Exhibit L.

6 MR. LEINENWEBER: Is that the officer

7 history?

8 MR. HERBERT: Yes.

9 MR. LEINENWEBER: Okay. I'm with you.

10 BY MR. HERBERT:

11 Q. Okay. If you can look right at that

12 first bolded point where it talks about OPR 2009-

13 0425. Do you see that?

14 A. Sure.

15 Q. Okay. And you were an accused in this

16 OPR investigation, correct?

17 A. Yeah, that's what it says. I really

18 don't remember it.

19 Q. If we can scroll down to the bottom of

20 that page, and you see there that Lisa Allen was

21 alleging union and management problems with Chief

22 Ranzino causing a hostile work environment. Do you

23 see that?

24 A. Yes.

Page 101

1 Q. And do you remember what her allegations

2 were about you creating a hostile work environment?

3 A. No.

4 Q. Did she make any allegations to you about

5 a hostile work environment?

6 A. No.

7 Q. Were you ever made aware that she had

8 complained about a hostile work environment and you

9 specifically creating one?

10 A. I remember that something about -- again,

11 it was about assignments.

12 Q. Okay. About assignments, about her being

13 assigned to positions that were -- she didn't want to

14 be assigned to more so than other people, correct?

15 MR. LEINENWEBER: Objection to form and

16 foundation.

17 Go ahead.

18 THE WITNESS: She said that I put her in an

19 unsafe work environment. That's the way I understood

20 that, but all I did was give her a regular assignment

21 that investigators in that unit had done

22 traditionally forever.

23 BY MR. HERBERT:

24 Q. What was the assignment that you gave her

Page 102

1 that she believed put her in an unsafe environment?

2 A. To go pick up TSS equipment.

3 Q. Okay. And do you remember what it was

4 that she alleged was unsafe about that?

5 A. No, just that she was being assigned to

6 the street.

7 Q. Okay. She didn't want to be assigned to

8 the street. Is that fair to say?

9 A. Obviously.

10 Q. Okay.

11 A. She made this complaint.

12 Q. Did you speak with OPR about her

13 complaint?

14 A. Yeah, I'm pretty sure I did. I can't

15 remember, but I would assume if you have all this

16 complaint stuff, I must have talked to them.

17 Q. Okay. And after that complaint was made,

18 was Lisa Allen assigned to inside spots?

19 A. I really don't remember. She would have

20 been assigned like anybody else as far as I know, but

21 if she had concerns, we may have done something and

22 decided we don't want to cause an issue, is there

23 something else we can do. We may have done that. I

24 don't know.

Page 103



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1102 of 1503 PageID #:1493

1  Q. Well, and that would be assigning her to
2  a position that she felt comfortable being in,
3  correct?
4      A. Which would have been --
5      MR. LEINENWEBER: Objection. Form and
6  foundation. Hang on. Hang on. You have to let me
7  make my objection so that Brenda can hear it.
8          Objection to form and foundation.
9          Go ahead.
10     THE WITNESS: I believe I answered it.
11     MR. HERBERT: Did we get that answer?
12     THE REPORTER: No. I didn't get that answer,
13 Joe.
14     THE WITNESS: Please give me the question
15 again.
16     MR. HERBERT: Would you mind reading it
17 again?
18         (Whereupon, the record was
19          read as requested.)
20     THE WITNESS: It may or may not have
21 happened. I don't know.
22     MR. HERBERT: Okay. We can move on to --
23     THE WITNESS: I mean, you're talking 11 years
24 ago.

Page 104

1      MR. LEINENWEBER: There's no question
2  pending. There's no question.
3      MR. HERBERT: Move on to page 3 of that
4  document which is Bates stamped 38. Okay. Thank you
5  very much.
6  BY MR. HERBERT:
7      Q. This is a complaint COR2013-245, and it
8  was made on December 17, 2013. You were made -- or
9  you were an accused in this CR complaint, correct?
10     A. I don't really know what it is, but it
11 looks like it, yes.
12     Q. We can scroll down to the summary there
13 and, you know, the summary is that you were arrested
14 by CPD for battery on 12/3, 2010?
15     A. Misdemeanor battery, correct.
16     MR. LEINENWEBER: I think there's a
17 disconnect here because that's not what's on the
18 screen.
19     MR. HERBERT: I'm sorry. Scrolling down to
20 the Bates stamped number. It should be the two pages
21 prior to that. Thank you very much.
22 BY MR. HERBERT:
23     Q. So this is OPR2010-1093, and the summary
24 talked about how you were arrested by CPD for battery

Page 105

1  in December 2010. Do you see that?
2      A. Yes, I see it.
3      Q. Do you remember that incident?
4      A. Sure.
5      Q. Tell me what happened with that.
6      A. What happened with it? It was nolle
7  prossed. They did not follow through with any of it.
8      Q. Who was the victim of the battery?
9      A. Some female that they said. I don't
10 know. That's what the allegation is. I don't really
11 remember any of it, the names in particular. I
12 really don't.
13     Q. Did you know the female?
14     A. Absolutely not.
15     Q. Where did this battery alleged to have
16 been committed?
17     A. It was a melee at a bar.
18     Q. What bar?
19     A. Just off duty.
20     Q. That's the name of the bar?
21     A. No, the name of the bar was Cha Cha's. I
22 don't even know if it's still there. It was close to
23 the jail area.
24     Q. Is that in Cicero, or was that in

Page 106

1  Chicago?
2      A. No, it's in Chicago. It was in Chicago
3  like at Pershing and Western, I believe. Somewhere
4  right around there.
5      Q. Okay. Were you involved in this melee?
6      A. Actually, I was assaulted. I was hit.
7      Q. By whom were you hit?
8      A. I don't know.
9      Q. Did you strike anyone in this melee?
10     A. Absolutely not.
11     Q. Okay. When did this melee happen in
12 comparison to when you were arrested? Was it the
13 same day?
14     A. Yeah.
15     Q. Was anyone else arrested?
16     A. I don't know.
17     Q. And were you disciplined for --
18     A. Yes.
19     Q. -- being arrested for this?
20         Do you remember what the discipline
21 was that you were given?
22     A. Well, first of all, you know, after the
23 incident they -- they followed everything I should
24 have. I reported it within the time frame, like the

Page 107

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1103 of 1503 PageID #:1494

Joseph Ranzino  -  9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

next morning, and they started an investigation. I
was de-deputized. I ended up with some type of a
suspension and conduct unbecoming as far as I
remember.

Q. Okay. Were you charged with a felony or
a misdemeanor?

A. A misdemeanor.

Q. And did you appear at court at 26th and
California?

A. Misdemeanor court is at -- was it like
51st Street over there off the highway? Isn't that
where it's at?

Q. And OPR investigated the allegation that
you committed a battery. Is that fair to say?

A. That's fair to say.

Q. And they found that you did commit the
battery?

A. No. I was never -- it was nolle prossed
and the case was dropped by the State.

Q. You said that you were disciplined by the
sheriff for this incident. What is your
understanding of why you were disciplined?

A. For putting myself in an injudicious
situation, being somewhere I shouldn't have been

Page 108

according to them, but I'm a private citizen. I was
off duty. I was at a tavern.

Q. Did you agree with the discipline that
you received?

A. No. I grieved it. It's not a grievance
process but, you know, administrative grievance
process.

Q. What was the result of that?

A. I ended up taking a -- well, they weren't
going to settle it. They weren't just going to let
me off. They wanted their pound of flesh, so I
agreed to take two days on -- I think it fell under
conduct unbecoming. That's like a catch-all.

Q. Was that a major infraction?

A. Yeah. Yeah, I was right at OPR and I
think they wanted to originally give me like ten days
and I'm like, but I didn't do anything. I'm sorry,
but that's the max.

MR. HERBERT: Okay. If we can move on to the
next page, please, and it's going to be about midway
down the page. I'm sorry. The page after this one.
It's Bates stamped 39 at the bottom. Great. And
that's perfect right there.

Page 109

BY MR. HERBERT:

Q. Do you see that there was an IA No.
OPR2013-1086? Do you see that?

A. Okay.

Q. Okay. And again you were an accused in
that OPR investigation, correct?

A. I can't read the whole thing, but it
looks like it.

Q. And I want to make sure. This may
be the...

A. I don't know what this is.

MR. HERBERT: Okay. And we can go on to the
next page, please.

BY MR. HERBERT:

Q. And you see in the summary there Thomas
Schulz alleged that he was being harassed by you, and
working for you created a hostile work environment.
Do you see that?

A. Yes.

Q. And you became aware of the fact that
Schulz was complaining about being harassed by you
and subjected to working in a hostile work
environment, correct?

A. All I did was ask him to do his job.

Page 110

Q. Okay. But he alleged that it was more
than that, correct?

MR. LEINENWEBER: Objection to form,
foundation.

Go ahead.

THE WITNESS: I believe so, otherwise there
wouldn't be a complaint here.

BY MR. HERBERT:

Q. Well, what were the allegations against
you in that complaint because you were investigated
for this, correct?

A. I don't -- I don't really know. I gave
the man direction to do something, you know.

Q. Tell us about the direction.

A. What? Do your job. That was the
direction.

Q. Where was this? Was this at a roll call?
Where did this take place?

A. You know, he was in monitoring, so I
imagine it happened by monitoring.

Q. And do you remember the circumstances
about what you said to him?

A. No.

Q. You testified earlier you said something,

Page 111



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1104 of 1503 PageID #:1495

Joseph Ranzino  -  9/8/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that you told him to do his job?

2     **A. Yeah, it was something about -- something**

3 **that I had asked him, to send something somewhere or**

4 **fax something. It was something like that.**

5     Q. Okay.

6     **A. That's the best I can remember. And**

7 **again, he was pretty salty.**

8     MR. HERBERT: Okay. And if we can move on to

9 the next page, Bates Stamp 41.

10 BY MR. HERBERT:

11     Q. And this is Internal Affairs

12 COR2013-0245, and this complaint was received on

13 December 17, 2013. Do you see that?

14     **A. Uh-huh. Yes.**

15     Q. Okay. So during this time period, this

16 is the third complaint made against you within a

17 two-week period in December 2013, right?

18     **A. Like I said, they were all salty, nobody**

19 **wanted to learn, nobody wanted to change. Nobody**

20 **wanted to -- they didn't like the changes.**

21     Q. Okay.

22     **A. I wasn't the only one giving out**

23 **assignments, so.**

24     Q. The allegation against you is that

Page 112

---

1 Investigator Randall Davis alleged that you "Yells

2 and screams at him daily and will not rotate his

3 assignments as he does for other investigators." Do

4 you see that?

5     **A. I did not yell and scream at anybody**

6 **daily. I don't do that.**

7     Q. Randall Davis, you know him, correct?

8     **A. Yeah. I thought he was a pretty decent**

9 **guy.**

10     Q. And he's black, correct?

11     **A. He is African-American. That is correct.**

12     Q. And he was making the same complaints as

13 the plaintiffs in this case, that he was not being

14 rotated like other nonblack employees, correct?

15     MR. LEINENWEBER: Objection to form and

16 foundation.

17     You can go ahead.

18     THE WITNESS: Wait a minute. What was the

19 determination on this? I mean, doesn't that say at

20 all?

21 BY MR. HERBERT:

22     Q. That's not my question though.

23     **A. Yeah, I know, but I'm trying to -- you're**

24 **confusing me, sir.**

Page 113

---

1     Q. Well, let me try to clear it up then.

2 Randall Davis was alleging that you yelled and

3 screamed at him on a daily basis, correct?

4     **A. That's what it says. That's correct.**

5     Q. And he alleged that you would not rotate

6 his assignments regularly. You wouldn't rotate his

7 assignments. You stuck him in one particular

8 assignment, right? That's what his allegation is?

9     MR. LEINENWEBER: Objection to form,

10 foundation, also a compound question.

11     You can go ahead.

12     THE WITNESS: I'm also not the only guy

13 making those decisions. I don't know what to tell

14 you. I don't -- I didn't do anything against anybody

15 personally. It was a job. It's an assignment. I

16 don't know what else to tell you. I didn't yell and

17 holler and scream at everybody. I didn't do that. I

18 don't do that.

19 BY MR. HERBERT:

20     Q. His complaint about not being rotated is

21 the same complaint that was made by the plaintiffs in

22 this case, correct?

23     MR. LEINENWEBER: Objection to form,

24 foundation. Also assumes facts not in evidence.

Page 114

---

1     You can go ahead.

2     THE WITNESS: Yeah, I don't have all that

3 evidence or what you're talking about, any -- go

4 ahead.

5 BY MR. HERBERT:

6     Q. You know that that's the nature of the

7 complaint that's made by the plaintiffs, one of

8 them -- you have to let me finish.

9     MR. LEINENWEBER: Yeah.

10 BY MR. HERBERT:

11     Q. One of their complaints is that you

12 didn't rotate their assignments, correct?

13     **A. That is one of the complaints, yes.**

14     MR. LEINENWEBER: The same objections.

15     Go ahead.

16     THE WITNESS: Again, that is one of their

17 beef, their big beef.

18 BY MR. HERBERT:

19     Q. And this is your comprehensive

20 disciplinary report that we're looking at?

21     **A. Yes. May I get up for one moment just to**

22 **grab a glass of water?**

23     Q. Sure.

24     **A. Thank you.**

Page 115

---



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1105 of 1503 PageID #:1496

1    MR. HERBERT: Off the record.
2         (Whereupon, a conversation
3         was had off the record.)
4    BY MR. HERBERT:
5    Q.  Okay.  So this is your comprehensive
6    officer history form, correct?
7    **A.  Okay.**
8    Q.  And it contains all the complaints made
9    against you, correct?
10   **A.  Okay.**
11   MR. LEINENWEBER:  Objection to form and
12   foundation.
13        You can go ahead and answer.
14   BY MR. HERBERT:
15   Q.  And you would agree with me there were no
16   complaints made against you about assigning -- or not
17   rotating assignments made by any white employees,
18   correct?
19   MR. LEINENWEBER:  Objection to form and
20   foundation.
21        You can go ahead.
22   THE WITNESS:  I don't know that.  They may
23   have been made.  I don't know.  It could have
24   happened.
                                        Page 116

1    BY MR. HERBERT:
2    Q.  Well, had they been made, there would
3    have been an investigation assigned into that
4    allegation, correct?
5    MR. LEINENWEBER:  Objection to form and
6    foundation.
7    THE WITNESS:  If somebody made a complaint,
8    then they would follow up on it.
9    BY MR. HERBERT:
10   Q.  Okay.  And as you sit here today, can you
11   think of any white employee that complained about
12   your assignments for them and not being rotated?
13   MR. LEINENWEBER:  Objection to form,
14   foundation, also asked and answered.
15        You can go ahead.
16   THE WITNESS:  I think I've answered it as
17   best I can.
18   BY MR. HERBERT:
19   Q.  Try again, please.
20   **A.  Excuse me?**
21   Q.  I'm not trying to trick you here.
22        Are you aware of any white employees
23   that complained about you assigning them to positions
24   and assignments in an unfair way?
                                        Page 117

1    MR. LEINENWEBER:  The same objections.
2    Go ahead.
3    THE WITNESS:  If they were making anything
4    like that, I wasn't made aware of it.
5    BY MR. HERBERT:
6    Q.  Okay.
7    **A.  Because it would be something on -- it**
8    **would be a complaint.**
9    MR. HERBERT:  Okay.  If we can move on to the
10   next page of that document which is Bates stamped No.
11   42.
12   BY MR. HERBERT:
13   Q.  Okay.  About halfway down we have IA No.
14   OPR2014-0821.  Do you see that?
15   **A.  Yes, sir.**
16   Q.  And that was a complaint made again in
17   December of 2013, correct?
18   **A.  Yes.**
19   MR. HERBERT:  Okay.  And if we can move to
20   the next page, please, 43.
21   BY MR. HERBERT:
22   Q.  And the summary, Investigator -- I'm not
23   sure how to pronounce that, Bieniek B-i-e-n-i-e-k
24   alleged that you made an inappropriate statement at
                                        Page 118

1    roll call which he perceived to be sexual harassment.
2    Do you see that there?
3    **A.  Pardon me?**
4    Q.  You became aware of the fact that this
5    investigator --
6    **A.  Yes.**
7    Q.  That he accused you of sexual harassment,
8    correct?
9    **A.  Yes.  It never happened.  No sexual**
10   **harassment.**
11   Q.  What was your understanding of his
12   allegation?
13   **A.  You know, I don't really remember it,**
14   **but.**
15   Q.  Tell me anything you remember about it.
16   **A.  I didn't sexually harass the guy.**
17   Q.  Tell me anything you remember about it.
18   **A.  Let's see here.  I really don't recall**
19   **the whole thing.  I was taken aback, but okay.**
20   Q.  Do you remember making a statement to him
21   at roll call that he found to be sexual harassing?
22   **A.  It was after roll call I said -- I told**
23   **him, don't forget your condoms.  In other words, be**
24   **safe out there.  I knew the guy for a long time.  He**
                                        Page 119



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1106 of 1503 PageID #:1497
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 rides bikes. I thought I had a different
2 relationship with him. I'm sorry.
3    Q. And who was around when you made that
4 statement? And the statement was, don't forget your
5 condoms?
6    A. I think that's what I said.
7    Q. Okay. Who else was around when you made
8 that statement?
9    A. I couldn't tell you who was or wasn't.
10 It was at the end of a roll call. People were going
11 all over the place. They were moving all over. They
12 were getting radios. Whoever was at roll call
13 probably.
14    Q. How many people are normally in a roll
15 call?
16    A. Our average staffing was like 20 people,
17 25, somewhere in there.
18    Q. And would it be uncommon for there to be
19 women in a typical roll call?
20    A. We had men, women. We had all
21 ethnicities. You know, it's a multi-cultural sheriff
22 department as is the world.
23    Q. Do you know if any women heard you make
24 this comment about the condoms?

Page 120

1    A. I don't know.
2    MR. LEINENWEBER: Objection to form and
3 foundation.
4 BY MR. HERBERT:
5    Q. And what did you mean by that statement,
6 don't forget your condoms?
7    A. I told you that. I said be safe out
8 there.
9    Q. Was it your understanding that your
10 employees were engaging in sexual activity during
11 their tour of duty?
12    A. No.
13    Q. I'm trying to figure out what the
14 significance of wearing a condom or having a condom
15 has to do with being safe out there?
16    A. Well, to be safe, you wear a condom.
17 It's just an expression.
18    Q. Okay. In fact, you were -- they
19 sustained this grievance, correct?
20    A. I'm not sure what the outcome was.
21    Q. Well, you were disciplined for it, right?
22    A. Okay.
23    Q. Do you remember that, or no?
24    A. I'm trying to read what's in front of me.

Page 121

1    Q. I'm just asking if you remember if you
2 were disciplined for this?
3    A. Oh, I know I had to go down to OPR. I
4 think I took a day for conduct unbecoming.
5    Q. Okay. So was this a minor infraction
6 that you know of?
7    A. I think it was treated as a major until
8 they realized it wasn't -- it's not sexual
9 harassment. There's a lot more to sexual harassment,
10 my friend.
11    Q. Tell me what more there is to sexual
12 harassment then.
13    A. You're the lawyer.
14    Q. You just made the statement that your
15 comment is not sexual harassment.
16    My question is: What do you believe
17 is sexual harassment?
18    A. Well, what I think is, if you continue to
19 bother somebody, trying to do this, trying to do
20 that, trying to get -- making jokes that are sexual,
21 unwanted. People would have to -- it would have to
22 be ongoing. This was just getting the job done.
23    Q. So it's your understanding that one
24 offensive sexual statement alone would not constitute

Page 122

1 sexual harassment?
2    MR. LEINENWEBER: Objection to form,
3 foundation. It also calls for a legal conclusion.
4    You can go ahead.
5    THE WITNESS: Yeah, I'm not a lawyer. I
6 don't know that.
7 BY MR. HERBERT:
8    Q. I'm asking your opinion.
9    A. I don't have one.
10    Q. But you received training on sexual
11 harassment, didn't you?
12    A. I didn't think it was. Obviously, I was
13 mistaken, but I never was -- I didn't get disciplined
14 for sexual harassment. What I got disciplined for
15 was conduct unbecoming.
16    Q. And you received a one-day suspension?
17    A. I believe that's what it was.
18    Q. And you were sent back to the same
19 position that you had, correct?
20    A. That's correct.
21    MR. LEINENWEBER: Objection to form,
22 foundation.
23    You can go ahead.
24    THE WITNESS: That is correct.

Page 123



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1107 of 1503 PageID #:1498

BY MR. HERBERT:

Q. You continued to conduct roll calls, correct?

MR. LEINENWEBER: The same objections.

THE WITNESS: I don't know. I may have, may have not. I don't know. There's other bosses. I don't know. This, I don't know when this was actually -- when was it adjudicated? Well, you would know all those.

MR. HERBERT: Let's move on to the next page, please, Bates stamp 44.

BY MR. HERBERT:

Q. Okay. And we'll look at that second bolded point there, entered by Annette, IA NO. OPR2014-0875. Do you see that?

A. Yes.

Q. It was another complaint made against you, correct?

A. This was not the same, so I mean, I don't...

Q. Well, the investigator --

A. I don't understand what it...

Q. The Investigator Jaime Hurtado alleged that you created a hostile work environment in the EM

Page 124

office. You see that complaint, right?

A. Yes, it's because I asked him to help with assigning radios which we asked other investigators. They did it.

Q. Jaime Hurtado is Hispanic, correct?

A. Pardon me?

Q. Just please try and pause before you answer.

A. I'm sorry.

Q. That's all right. Jaime Hurtado is Hispanic, correct?

A. Yeah, I believe he is.

Q. And you were investigated for the allegations about creating a hostile work environment, correct?

A. That's what the complaint is.

Q. Okay. Were there complaints made to other supervisors about creating a hostile work environment during this 2013, 2014 period?

MR. LEINENWEBER: Objection to form and foundation.

You can go ahead and answer.

THE WITNESS: I do not know. All I can tell you is I was the face of change, and I was taking all

Page 125

the heat.

BY MR. HERBERT:

Q. And what do you mean by you were the face of change?

A. I had gotten moved to the third watch. There was all this reorganization going on. There was new people coming in. We had been down to nothing. We were rebuilding the unit, and there was people who were being reluctant.

This young man, who I actually thought was a pretty nice young man, but he came over from female photo which did very much what EM did. I don't know what else to tell you about the young man. I did not create a hostile work environment. I merely asked him to do a position. I asked him to do something. I gave him an assignment.

Q. Did you yell at him?

A. Absolutely not.

Q. Why would he make an allegation that you created a hostile work environment if you simply asked him to do a job?

MR. LEINENWEBER: Objection to form, foundation. It calls for speculation.

You can go ahead.

Page 126

THE WITNESS: That's a good question, but you have to ask him.

MR. HERBERT: Okay. If we can move two pages further, page 12 Bates stamped No. 47 at the bottom of the page.

BY MR. HERBERT:

Q. A year later another -- well, not even a year, another complaint made against you, OPR2015-0166.

MR. HERBERT: And if we can move on to the next page Bates stamped 48 towards the bottom.

BY MR. HERBERT:

Q. In this case Investigator Williams got his complaint register alleging that you created a hostile work environment by threatening him at the EM department. Do you see that?

A. I never threatened, no. Yes, I see it. I never threatened anybody. I don't threaten people.

Q. Investigator Williams, he's African-American, correct?

A. Yes, he is African-American.

Q. What happened? What was the nature of this allegation you made towards him?

A. Excuse me?

Page 127



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1108 of 1503 PageID #:1499
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1   Q.  What was the nature of this allegation?

2   A.  I have no clue.  I really don't.

3   Q.  Well, were you ever investigated?  You

4   were named as --

5   A.  I believe they called me in.  I don't

6   know.  They probably would have investigated it.

7   Q.  Okay.  But you don't remember anything

8   about the allegations that were made against you?

9   A.  Well, it's right here.  It says that I

10  was, what, hollering or...  What did I do here?  I

11  threatened him?

12  Q.  I see what the paper says.  Do you

13  remember having --

14  A.  No, I really don't.  I have to go by

15  what's here.

16      MR. LEINENWEBER:  Dan, let me just -- Joe,

17  you cannot talk while Dan is talking, okay?

18      THE WITNESS:  I'm sorry.

19      MR. LEINENWEBER:  I know.  I know, and it's

20  hard to do, but you have to try as hard as you can

21  not to talk while Dan is talking because we will have

22  a horrible transcript to deal with if that's the

23  case.

24      No offense, Brenda, who is --

Page 128

1       THE WITNESS:  I'm sorry.

2       MR. LEINENWEBER:  She's working hard at this.

3   You can help all of us by waiting for the question.

4   Even if you're anticipating it, wait for the question

5   and then answer it.

6       Sorry, Dan.

7       MR. HERBERT:  No, no.  Thanks for that.

8   BY MR. HERBERT:

9   Q.  So what happened between you and Williams

10  on April 16, 2015?

11  A.  I really don't recall.

12      MR. HERBERT:  Okay.  If we can move, I

13  believe four pages further.  The Bates stamp is 51 at

14  the bottom, and it's about midway through there.

15  BY MR. HERBERT:

16  Q.  Another complaint made against you, IA

17  No. OPR2015-0167.  Do you see that?

18  A.  Yes, I see that number.

19  Q.  Okay.  And this was --

20      MR. HERBERT:  The next page, if we can go.

21  BY MR. HERBERT:

22  Q.  And this was Investigator Winston

23  submitted a complaint, alleged that on April 9, 2015,

24  you used racially driven remarks toward him at the

Page 129

1   electronic monitoring unit.  Do you see that there?

2   A.  Yes.

3   Q.  And what do you remember about that

4   incident?

5   A.  We were at a roll call.  It was toward

6   the end of the roll call.  I was passing stuff out.

7   I think I inadvertently called him by somebody else's

8   name.  He said, I'm Winston.  I said, well, come on,

9   man.  All you investigators look alike.

10      It wasn't racially motivated.  It's

11  set up that way.  It's a paramilitary organization.

12  Everyone is in the same uniform.  That was really all

13  I meant by anything.

14      I then walked away from the

15  situation because it looked like it was going to get

16  explosive, and I believe I -- hey, I'm sorry.  I

17  wasn't trying to offend anybody, but it is what it

18  is.  A complaint was made.  I did say it.  I admitted

19  I said that, but that was not what I was saying.

20  That was not what I was trying to mean.  It just came

21  out that way and it was probably, looking back, a

22  poor choice of words.

23  Q.  Okay.  And this was in front of the

24  entire roll call room, correct?

Page 130

1       MR. LEINENWEBER:  Objection.  Form,

2   foundation.

3       You have to pause so I can object.

4   So objection to form, foundation.

5       You can go ahead.

6       THE WITNESS:  There would have been whoever.

7   It was the end of the roll call again.  I was handing

8   out assignments.  There could have been -- whoever

9   was at roll call could have been around.

10  BY MR. HERBERT:

11  Q.  And you said that people were upset by

12  this comment?

13  A.  I just -- I heard a couple, you know,

14  whoo, whoo, whoo, and I just -- hey, I'm sorry.

15  That's not -- and I just walked away because I was

16  the only boss there by myself.

17      So they can say whatever they want

18  to say.  No one is going to back you up.  They're all

19  going to stick together.  End of the story.  Just my

20  opinion.

21  Q.  And in this case Winston made the

22  complaints about what you said to him, right?

23  A.  Yes.

24  Q.  And then the other -- some of the other

Page 131



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1109 of 1503 PageID #:1500
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 plaintiffs corroborated what Winston claimed you said
2 to them, correct?
3 MR. LEINENWEBER: Objection to form and
4 foundation.
5 THE WITNESS: I don't know that. I don't
6 know.
7 BY MR. HERBERT:
8 Q. Well, you're aware that other individuals
9 were interviewed and they backed up Winston's story,
10 they said, yeah, that's what Ranzino said?
11 MR. LEINENWEBER: Objection to form,
12 foundation.
13 You can go ahead.
14 THE WITNESS: I believe I already answered
15 that for you. I believe I told you what I said. I
16 didn't mean it -- that's not what I meant.
17 BY MR. HERBERT:
18 Q. Right. But other people backed up what
19 Winston said, correct?
20 MR. LEINENWEBER: The same objections.
21 Go ahead.
22 THE WITNESS: I don't know that. I was not
23 part of the investigation. I don't know what people
24 said or didn't say.

Page 132

1 BY MR. HERBERT:
2 Q. Okay. Well, are you aware that other
3 black investigators said that they heard you say,
4 hey, you all look alike?
5 MR. LEINENWEBER: The same objections. Also
6 asked and answered, also misstates his prior
7 testimony.
8 Go ahead.
9 THE WITNESS: The same answer.
10 BY MR. HERBERT:
11 Q. Which is what?
12 **A. I thought I answered that question.**
13 Q. I'll move on.
14 **A. You're confusing me again. You're**
15 **talking in circles, Boss. Just give it to me**
16 **straight.**
17 MR. LEINENWEBER: Dan, when you have a
18 second, if we could take a break, I'd appreciate it.
19 Whenever is convenient.
20 MR. HERBERT: Yeah. Let me get through this
21 point.
22 MR. LEINENWEBER: Sure.
23 BY MR. HERBERT:
24 Q. You were alleged to have said you all

Page 133

1 look alike to Winston, correct?
2 **A. That is correct, but that was not my**
3 **words.**
4 Q. Okay. And you're aware that Investigator
5 Williams -- or strike that.
6 You're aware that other black
7 members at the roll call said that they heard you
8 say, you all look alike, correct?
9 MR. LEINENWEBER: Objection to form,
10 foundation, and also asked and answered. Thank you.
11 Go ahead.
12 THE WITNESS: Again it's the same question.
13 It's the same answer.
14 MR. LEINENWEBER: You still have to answer
15 it.
16 THE WITNESS: Okay, but I'm trying to --
17 there were oohs and aahs. I didn't hear anything
18 else.
19 BY MR. HERBERT:
20 Q. The oohs and aahs were by the black
21 people in the roll call, correct?
22 MR. LEINENWEBER: Objection. Form and
23 foundation.
24 Go ahead.

Page 134

1 THE WITNESS: I can't give you specific names
2 or anything else. It could have been anybody.
3 BY MR. HERBERT:
4 Q. I didn't ask for specific names. That
5 was the black individuals in the roll call that were
6 oohing and aahing after you made that comment, right?
7 MR. LEINENWEBER: Objection to form and
8 foundation.
9 You can go ahead and answer.
10 THE WITNESS: Again I don't know exactly who
11 oohed and aahed.
12 BY MR. HERBERT:
13 Q. The oohs and aahs were because they were
14 shocked that you made a statement that you all look
15 alike?
16 MR. LEINENWEBER: Objection to form,
17 foundation. It calls for speculation.
18 You can go ahead.
19 THE WITNESS: If that's what you say, yes.
20 BY MR. HERBERT:
21 Q. I'm not testifying here. I'm talking
22 about your interpretation.
23 **A. My interpretation was that there was**
24 **going to be a problem, and I probably used a poor**

Page 135



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1110 of 1503 PageID #:1501
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 choice of words. I mean, it's pretty evident here.
2   Q. As you sit here today, is it possible
3 that you said, you all look alike?
4   A. No.
5   Q. Is it possible that you meant you all, as
6 in all of you blacks, look alike?
7   MR. LEINENWEBER: Objection to form and
8 foundation.
9      You can go ahead.
10   THE WITNESS: Absolutely not.
11 BY MR. HERBERT:
12   Q. Well, that's what was investigated in
13 this case, correct?
14   MR. LEINENWEBER: Objection to form,
15 foundation.
16      You can go ahead.
17   THE WITNESS: You would have to ask OPR.
18 BY MR. HERBERT:
19   Q. Well, the investigation was that you made
20 an inappropriate comment indicating or implying that
21 all blacks look alike, correct?
22   MR. LEINENWEBER: The same objection.
23      Go ahead.
24   THE WITNESS: I wasn't implying that all

Page 136

1 blacks look alike.
2 BY MR. HERBERT:
3   Q. I understand that, but the investigation
4 centered around you allegedly making a statement that
5 all blacks look alike?
6   A. That is correct. The investigation --
7   MR. LEINENWEBER: Hang on. Hang on. Hang
8 on. Hang on. Stop. I'm making my objection.
9      Objection to form. Objection to
10 foundation. Also assumes facts not in evidence and
11 misstates prior testimony.
12      You can go ahead and answer.
13 BY MR. HERBERT:
14   Q. Do you remember the question?
15   A. No, I don't, Mr. Herbert. I'm sorry.
16   MR. HERBERT: I'm sorry. Brenda, would you
17 mind reading that question back?
18      (Whereupon, the record was
19        read as requested.)
20   MR. LEINENWEBER: The same objections.
21      Go ahead and answer.
22   THE WITNESS: Yes, that is what I believe the
23 allegation was.
24

Page 137

1 BY MR. HERBERT:
2   Q. Okay. And the investigation was
3 sustained into that, correct?
4   MR. LEINENWEBER: Objection to form and
5 foundation.
6   THE WITNESS: That's correct. That's
7 correct.
8 BY MR. HERBERT:
9   Q. And you were disciplined for that,
10 correct?
11   A. Yep.
12   Q. And you were disciplined -- or I'm sorry.
13 It was sustained because OPR determined that you
14 didn't say all investigators look alike, you said all
15 blacks look alike. That's what they determined?
16   MR. LEINENWEBER: Objection to form and
17 foundation. And this is completely misleading
18 because that's not anywhere what the allegation was.
19 The allegation was not all you blacks look alike.
20   THE WITNESS: No, and the fact --
21   MR. LEINENWEBER: Hang on. Hang on. There's
22 no question pending, Joe. You do not talk unless
23 there's a question asked.
24   THE WITNESS: Yep.

Page 138

1 BY MR. HERBERT:
2   Q. You were interviewed during this
3 investigation, correct?
4   A. Yes.
5   Q. And you would agree with me that the
6 central or a big part of the investigation was
7 whether you were indicating when you said all look
8 alike, the center of that investigation was were you
9 referring to all blacks looking alike, correct?
10   A. No, I was talking about --
11   MR. LEINENWEBER: Objection to form. Stop
12 stop, stop, stop. Stop. You have to let me make my
13 record. Objection to form and foundation.
14      You can go ahead and answer the
15 question, Joe.
16   THE WITNESS: As I said, I was referring to
17 all investigators.
18 BY MR. HERBERT:
19   Q. Okay. You would agree with me that if
20 you made a statement all investigators look alike,
21 there would be nothing inappropriate about that,
22 correct?
23   MR. LEINENWEBER: Objection to form and
24 foundation.

Page 139



**Joseph Ranzino  -  9/8/2020**
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1111 of 1503 PageID #:1502
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          Go ahead.
2      THE WITNESS:  I don't believe so.
3  BY MR. HERBERT:
4      Q.  No.  That wouldn't be offensive at all,
5  correct?
6      **A.  I don't believe so.**
7      MR. LEINENWEBER:  The same objection.
8      THE WITNESS:  But I can't speculate what's
9  going on in somebody else's mind.
10  BY MR. HERBERT:
11      Q.  So it's fair to say that you were
12  disciplined for making a statement at a roll call
13  indicating that all black people look alike, correct?
14      **A.  That's not true.**
15      MR. LEINENWEBER:  I just want to interject
16  objection to form, foundation, assumes facts not in
17  evidence.
18          You can answer the question.
19      THE WITNESS:  The way I understand it, it was
20  conduct unbecoming.
21  BY MR. HERBERT:
22      Q.  Right.  And that conduct unbecoming was
23  you making an inappropriate statement at roll call?
24      MR. LEINENWEBER:  Objection to form and

Page 140

1  foundation.
2          Go ahead.
3      THE WITNESS:  That's what this complaint
4  says, yes.
5  BY MR. HERBERT:
6      Q.  Okay.  And we've already established that
7  had you compared all investigators as looking alike,
8  that there would be nothing inappropriate about that,
9  correct?
10      MR. LEINENWEBER:  Objection.  Asked and
11  answered.
12      THE WITNESS:  I answered it the best as I can
13  already.
14  BY MR. HERBERT:
15      Q.  You've already answered it.  That's fine.
16          So you would agree with me that it
17  was sustained because the inappropriate comment that
18  you made was that all black people look alike?
19      MR. LEINENWEBER:  Objection to form --
20      THE WITNESS:  That is not true.
21      MR. LEINENWEBER:  Stop.  Let me make my
22  record.
23          Objection to form and foundation.
24  Also assumes facts not in evidence.  Also argue --

Page 141

1  well, strike that.
2          Go ahead.  Go ahead, Joe.  You can
3  answer.
4      THE WITNESS:  I thought I did.
5      MR. HERBERT:  We'll take a break now if you
6  want.
7      MR. LEINENWEBER:  That's fine.
8          (Whereupon, a short break
9              was taken.)
10  BY MR. HERBERT:
11      Q.  Okay.  So we were talking about the roll
12  call incident where you alleged to have made a
13  statement that you all look alike, and it's your
14  position that you said all you investigators look
15  alike?
16      **A.  That's correct.**
17      Q.  Okay.  And you were interviewed as a
18  result of the investigation that was conducted by the
19  human resources department, correct?
20      **A.  OPR, I believe.**
21      Q.  Okay.  And were you made aware of the
22  sustained findings?
23      **A.  Just the other day.**
24      Q.  But nobody ever told you that this

Page 142

1  investigation was sustained against you?
2      **A.  No, sir.**
3      Q.  Okay.
4      **A.  I was never given...**
5      Q.  So you were never disciplined as a result
6  of this incident, correct?
7      MR. LEINENWEBER:  Objection to form,
8  foundation.
9          Go ahead.
10      THE WITNESS:  I was retired by then.
11  BY MR. HERBERT:
12      Q.  One of the recommendations was that you
13  receive supervisory and sensitivity training.
14          My question is:  Did you ever
15  receive supervisory or sensitivity training as a
16  result of the sustained findings in this case?
17      **A.  I would say that I had that throughout my
18  career.  I don't know exactly when or -- there should
19  be records of it though.**
20      Q.  Okay.  You gave a statement in this case,
21  correct?
22      MR. LEINENWEBER:  Objection to form and
23  foundation.
24          Go ahead.

Page 143

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1112 of 1503 PageID #:1503

Joseph Ranzino  -  9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q.  You were interviewed?

A.  **On the Winston complaint?**

Q.  Yes.

A.  **Yes.**

Q.  Okay.  And isn't it true that you admitted that you did say, you know you all look alike?

A.  **That's not what I said.**

Q.  Did you see the -- you said that you became aware that it was sustained a couple days ago, I believe you said?

A.  **Yeah.**

MR. HERBERT:  Okay.  If we can go to Exhibit K, please.  And if we could go to eight pages in on Exhibit K.

BY MR. HERBERT:

Q.  We're going to go right in the findings part, the second paragraph.  Is this what you reviewed when you became aware that it was sustained against you?

A.  **I was never given this document.  I've never seen this document before right now.**

Q.  Okay.  Well, I'll represent to you that

Page 144

this is what was tendered by counsel, your lawyers with respect to the OPR investigation into the allegations made about you saying, you all look alike.

And if you can see there, it says "There's sufficient evidence to support the allegation of conduct unbecoming when Ranzino stated to his subordinates 'you all look alike' during roll call."  Do you see that?

A.  **Yeah, I see what it says.  That's not what I said.**

Q.  All right.  Well, we'll get into that.  The last sentence, "There is clear evidence from several complaints that Ranzino is ignorant with his employees."  Do you see that?

A.  **Okay.**

Q.  Do you know what the OPR's findings are referring to other than the comment you made at the roll call subject to the Winston complaint?

A.  **I have no idea.**

Q.  Do you believe that you were ignorant with your employees on certain occasions?

A.  **No.**

Q.  Do you have any idea why it was concluded

Page 145

that you were ignorant with your employees?

A.  **No.**

Q.  Were you asked about other instances in which employees complained about you during the investigation into the Winston complaint?

MR. LEINENWEBER:  Objection to form and foundation.

Go ahead.

THE WITNESS:  I really can't recall.  I can't recall that.

MR. HERBERT:  Okay.  And if we can turn to the next page right at the top.

BY MR. HERBERT:

Q.  And right there it says, "Ranzino stated he did say, 'you know you all look alike,' but it was in reference to him asking about another investigator."  Do you see what I just read there?

A.  **That's not my words.  That's not what I said.**

Q.  Okay.  If we can move along to -- or strike that.  Strike that.

Did your job change after this complaint was made against you?

A.  **I believe that I was -- I believe, yes.**

Page 146

Q.  Describe that.  What happened?

A.  **I was moved to a different position within the sheriff's department.**

Q.  When were you moved to a different position?

A.  **April or May.  Late April, early May.  When was my heart attack?  Early May.**

Q.  Early May 2015?

A.  **Yeah, late April, early May.  I would say it was in conjunction with this, probably due to the investigation.**

Q.  Okay.  So you never -- you already testified that you didn't receive any suspension days or anything, correct?

MR. LEINENWEBER:  Objection to form, foundation, misstates prior testimony.

You can go ahead.

THE WITNESS:  It looks like it was filled out here.  I mean, that's what the document says, right?

BY MR. HERBERT:

Q.  I'm asking what -- you never received -- you never served a suspension day as a result of this OPR investigation?

A.  **Not on this.  I wasn't at work, no.**

Page 147



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1113 of 1503 PageID #:1504

Joseph Ranzino  -  9/8/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Q.  Okay.  Were you off work -- or strike that.

The incident was alleged to have taken place on April 9, 2015, okay?

A.  **Okay.**

Q.  You testified that you would have gone to the other unit, I believe you said late April or May of that same year, correct?

A.  **It was in the spring so -- I think, yeah. It was before my heart attack which was -- that's the only reason I remember the timing, I want to say like a month, and my heart attack was right around Mother's Day.**

Q.  Okay.  So you would have been --

A.  **Of that year.**

Q.  You would have been working your regular job duties prior to the heart attack, correct?

A.  **No, I had already been moved.**

Q.  Okay.  But prior to being moved, you were working your regular duties, correct?

A.  **Yeah, and I did after my heart attack once I got done with it.**

Q.  Okay.  So prior to being moved, you worked as the director in the electronic monitoring

Page 148

unit, correct?

MR. LEINENWEBER:  Objection to form, foundation.

Go ahead.

THE WITNESS:  I was one of the chiefs there, not director.

BY MR. HERBERT:

Q.  I'm sorry.

A.  **That's okay.**

Q.  Your duties were the same as far as making assignments and conducting roll calls, correct?

A.  **Yeah, up until I was transferred.**

Q.  Tell me about it.  How is it that you were transferred?

A.  **How was I actually transferred?  I believe they gave me something and said you're going to be transferred due to an investigation.**

Q.  Okay.

A.  **I believe.**

Q.  What did they give you?

A.  **I don't think they really -- I don't remember them giving me anything.  I know I got called down to personnel and they said I was getting**

Page 149

moved.  I don't remember who I talked to there.  It was pretty generic, and that was that.

Q.  Did they tell you where you were being moved to?

A.  **They hadn't figured that out just yet.**

Q.  Okay.  When did they figure out where to move you to?

A.  **I'm sorry.  I had been going to -- I was scheduled to go to some in-service training or some type of training, and so they figured it out while I was in training and then I got some type of notification.  I don't remember.  I don't remember anything in writing that I was given, but there may have been something but that I was going to be moved over to a court liaison position because I had the knowledge to fill a void that they were having at the courts with court orders and EM and a lot of things.**

Q.  Well, didn't you put in for the transfer to the court liaison area?

A.  **I had been asking about it.  I didn't really put in for it.  It was an administrative position that I had been asking about, but I was trying to get promoted the whole time.  I mean, I worked through my whole career trying to be promoted**

Page 150

and do different things.  You know, I took the tests. I took the exams.  I studied.  I went to work.

Q.  You tried to be promoted to what position?

A.  **Through the merit board positions or move up within the -- whatever their administration positions were.**

Q.  And were you ever promoted to any of those positions?

A.  **No.**

Q.  Do you know why you weren't promoted to those positions?

A.  **No.**

Q.  Did you ever ask why you weren't promoted?

A.  **No.**

Q.  Do you know if it was because of the harassment allegations against you that you were not promoted?

A.  **I have no clue.**

Q.  Okay.  Well, you in fact put in the transfer to the court liaison section, correct?

A.  **I had been asking about it.**

Q.  Okay.  And you told human resources that

Page 151



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1114 of 1503 PageID #:1505

1 you wanted to transfer to the court liaison section?

2     **A. Actually, I wanted to go back to the**

3 **courts where merit meant something.**

4     Q. Okay. But you were essentially assigned

5 to the position that you wanted to go to?

6     MR. LEINENWEBER: Objection to form and

7 foundation.

8         You can go ahead.

9     THE WITNESS: It wouldn't be my first pick,

10 but it was a job I could do.

11 BY MR. HERBERT:

12     Q. But more than a job that you can do.

13 It's a job that you requested to go to?

14     **A. Well, I didn't object to it when they**

15 **asked me if I would go there.**

16     Q. Well, in fact, when you gave your

17 statement to the human resource investigator as well

18 as --

19     **A. Okay.**

20     Q. -- as well as the OPR investigator, you

21 indicated that you requested to go to the court

22 liaison officer position. Do you remember saying

23 that?

24     **A. I really don't recall it.**

                      Page 152

1     Q. Okay. When you went to the court liaison

2 section, what were your duties there?

3     **A. We would follow up court cases and, you**

4 **know, different -- whatever was going on, security**

5 **issues, courthouse. A lot of EM court orders and**

6 **stuff that I helped so that the verbiage and stuff**

7 **was correct, to put people out and make sure they had**

8 **a place to stay and all that.**

9     Q. What was your title when you were there?

10     **A. I think they were calling us EM**

11 **lieutenants at that time.**

12     Q. Okay. What was your rate of pay compared

13 to what it was when you were a chief in the EM unit?

14     **A. Actually, it was the same because the**

15 **lieutenant -- it was the lieutenant pay. That's how**

16 **the budgets were. It was lieutenant pay.**

17     Q. Okay. So you weren't demoted in any way?

18     MR. LEINENWEBER: Objection to form and

19 foundation.

20         You can answer.

21     THE WITNESS: I don't think so, no.

22 BY MR. HERBERT:

23     Q. And you supervised individuals when you

24 were at the court liaison section?

                      Page 153

1     **A. No.**

2     Q. And how long did you work there?

3     **A. Until they laid me off due to budget**

4 **cuts, 2017.**

5     Q. And it's your testimony that the entire

6 time that you worked in the court liaison section,

7 you were never made aware of a sustained finding

8 against you concerning you making the statement you

9 all look alike at roll call?

10     **A. Never. And if I did, I don't recall it.**

11     Q. In what month -- I'm sorry if you've

12 answered this already, but what month did you say

13 would have retired in?

14     **A. I believe I retired late -- I went down**

15 **to the pension board after I was laid off. You know,**

16 **I had to get some stuff together, da, da, da, and**

17 **then we went through the numbers and I decided, you**

18 **know what, my health is not good, I'm going to**

19 **retire. And I think I went down there in early**

20 **March, late February, early March of 2018.**

21     Q. But that was after you were already laid

22 off, you said?

23     **A. Yeah. Yeah.**

24     Q. But when were you laid off?

                      Page 154

1     **A. November of 2017.**

2     Q. Okay. November 2017?

3     **A. Yes, sir.**

4     Q. Okay. So you would have come down then

5 the following spring to the pension board?

6     **A. Yeah, like four months away, whatever.**

7 **Three, four months.**

8     Q. 2018, correct?

9     **A. Yeah, it was early 2018 is when I went**

10 **down there. I think my official date was like -- it**

11 **was the end of March, early April was the official**

12 **date.**

13     Q. And when you retired, were you given your

14 credentials, your police star?

15     **A. Yes, I was given -- well, not right away.**

16 **You have to ask for them and all that.**

17     Q. Okay. What other benefits did you get

18 upon retirement?

19     **A. Just my pension.**

20     Q. Okay. And as far as you know, you

21 retired in good standing, correct?

22     **A. That's the way I understood. I don't**

23 **know. That's what I understood.**

24     Q. But there was nothing that you didn't

                      Page 155



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1115 of 1503 PageID #:1506
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 receive on -- upon retirement that you believed you
2 were entitled to receive, correct?
3     A.  I don't understand what you mean.
4     Q.  Well, you received your retirement star,
5 correct?
6     A.  Yeah.  I didn't expect more than my
7 retirement credentials for my service that I had put
8 in and my pension.  I mean, that's what I'm entitled
9 to.
10     MR. HERBERT:  All right.  If we can look at
11 Exhibit C which is the interrogatories that we just
12 sent over.
13 BY MR. HERBERT:
14     Q.  Okay.  Mr. Ranzino, do you see the
15 document there on the screen?
16     A.  Yeah.  The first page.  Yes, sir.
17     MR. HERBERT:  If we can scroll down a little
18 bit, please.
19 BY MR. HERBERT:
20     Q.  And here it says, "The Defendant Joseph
21 Ranzino's Objections and Responses to Plaintiffs'
22 First Set of Interrogatories."  Do you see that?
23     A.  Yes, sir.
24     Q.  And you reviewed these with your

1 information protected by the attorney-client
2 privilege.  Do you see that?
3     A.  Okay.
4     Q.  Do you know what documents or subject
5 information is covered by the attorney-client
6 privilege?
7     MR. LEINENWEBER:  Objection to form and
8 foundation.  It also calls for a legal conclusion.
9     THE WITNESS:  I really don't know what that
10 means.
11 BY MR. HERBERT:
12     Q.  Okay.  Did you speak with an attorney
13 about any of the complaints that are addressed in the
14 lawsuit that was filed?
15     A.  Just Mr. Leinenweber.  Oh, there was --
16     MR. LEINENWEBER:  Hang on.  Objection to form
17 and foundation.  Also asked and answered.
18     Go ahead.
19     THE WITNESS:  Yeah.
20 BY MR. HERBERT:
21     Q.  Who did you speak with?
22     A.  Mr. Leinenweber and Mr. --
23     Ethan, I'm sorry.  I don't remember
24 your last name.

1 attorney, I'm assuming?
2     A.  We've gone over them before, yeah.  It's
3 been a while.
4     Q.  Okay.  And in fact, you provided answers
5 for these interrogatories, correct?
6     A.  Yes.  I was interviewed.
7     Q.  Okay.  And then you signed a verification
8 form indicating that all these statements were true
9 under -- subject to the penalty of perjury, correct?
10     A.  Yeah, to the best of my recollection.
11     MR. HERBERT:  Okay.  And if we can turn to
12 page 4 of that document.  I'm sorry.  Maybe we can go
13 to the previous page.
14 BY MR. HERBERT:
15     Q.  Okay.  And then this question is you or
16 anyone acting on your behalf had any conversations or
17 do you know of any statements with or by any person
18 at any time with regard to the incidents forming the
19 basis for plaintiffs' complaint in this matter.  You
20 see that there, correct?
21     A.  I can see No. 4, yeah.
22     Q.  Okay.  And then if we can turn to the
23 next page, and the second line there, the last part
24 of it, because it calls for the production of

1 BY MR. HERBERT:
2     Q.  Okay.  And those are your lawyers in this
3 case, correct?
4     A.  Yes, sir.
5     Q.  You didn't speak to any lawyers from the
6 sheriff's department concerning any of the
7 allegations made in the Complaint here, correct?
8     MR. LEINENWEBER:  Objection to form and
9 foundation.
10     You can go ahead.
11     THE WITNESS:  I don't recall that, but I may
12 have -- who's in personnel?  I don't know.  I don't
13 know what their titles are or anything else, so I
14 can't answer that.
15 BY MR. HERBERT:
16     Q.  Okay.
17     A.  I don't believe so.  Not to my knowledge.
18     MR. HERBERT:  Okay.  And if we can turn to
19 the next page, paragraph 5.  And we will do the --
20 that second response.  Okay.  Great.  Actually, I'm
21 sorry.  Could we -- I think that's the wrong page.
22 Yeah, the next page.  And if we can go down to that
23 second response, and I want to address the second
24 sentence in that response beginning with -- I'm



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1116 of 1503 PageID #:1507
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 sorry. The second full sentence, so the third line
2 answering further.
3 BY MR. HERBERT:
4  Q. "If Defendant Ranzino became aware of any
5 allegation of discrimination or harassment, he would
6 follow the Cook County Sheriff's Office policy, call
7 the Office of Professional Review and follow the
8 process outlined by them." Do you see that there?
9  A. Yes.
10  Q. Were you ever made aware of any
11 allegations of discrimination or harassment in the
12 workplace while you were serving as a chief?
13  MR. LEINENWEBER: Objection to form, asked
14 and answered.
15  Go ahead.
16  THE WITNESS: You have all these documents
17 that were complaints, yes.
18 BY MR. HERBERT:
19  Q. Okay. And what is the sheriff's office
20 policy concerning when you became aware of
21 allegations of discrimination or harassment?
22  A. What -- rephrase that for me, please.
23  Q. Well, your sentence there says that if
24 you became aware of allegations of discrimination or

Page 160

1 harassment, you would follow the Cook County
2 Sheriff's policy. My question is --
3  A. Oh, so if somebody came to me with it or
4 if I saw something?
5  Q. Yes.
6  A. Okay. I'm sorry. I wasn't sure.
7  Q. Go ahead. What is -- you've just go to
8 let me finish, okay?
9  A. Sorry.
10  Q. That's all right. What was the Cook
11 County Sheriff's Office policy concerning allegations
12 of discrimination or harassment?
13  A. What were the actual -- okay. What I
14 would do if something was reported to me? Is that
15 the question, if something was reported to me or if I
16 knew of something?
17  Q. Yes. What were you required to do?
18  A. What would I do? Okay.
19  Q. Hold on. Hold on. What did you believe
20 you were required to do per the Cook County Sheriff's
21 policy if you were made aware of such allegations?
22  A. To document it and contact OPR and follow
23 their guidance, whatever they wanted us to do.
24  Q. Okay. And how would you document the

Page 161

1 allegation?
2  A. I would probably start off in a to/from
3 narrative and a phone call, here's what we've got.
4 It changed over time. It might have just been a form
5 at the end that you filled out and sent in.
6  Q. That would be proper notification,
7 correct?
8  A. Yeah. That's what I'm trying to say if I
9 didn't come across that way.
10  Q. Did you ever document any allegations of
11 discrimination or harassment during the time period
12 that you were a director in the EM unit?
13  MR. LEINENWEBER: Objection to form and
14 foundation.
15  THE WITNESS: Yeah. Yeah, and I'm sorry. I
16 don't mean to correct anybody. Yeah, in my career I
17 had to do these types of things, of course.
18 BY MR. HERBERT:
19  Q. Okay. How many did you document? How
20 many allegations of discrimination or harassment did
21 you document?
22  A. I don't have an exact number, but I have
23 had to do that throughout my career as a deputy chief
24 or a chief on multiple occasions.

Page 162

1  Q. Do you know if you had done that from the
2 time period of, say, 2010 until you left your
3 employment?
4  A. I can't -- I can't recall either way. I
5 don't know the timeline.
6  Q. Do you know if you ever documented
7 allegations of discrimination or harassment alleging
8 to have occurred in the electronic monitoring unit?
9  A. Yes.
10  Q. Tell me about that.
11  A. An African-American gentleman who was a
12 civilian in the monitoring room was obviously using
13 some inappropriate language which was overheard by
14 somebody else who brought it to me and we immediately
15 took action.
16  Q. When was this?
17  A. That's one instance. I was in
18 monitoring, the deputy chief. Early '90s -- or late
19 '90s, early 2000s.
20  Q. Okay. Any other instances that you can
21 think of?
22  A. There might have been something in the
23 later 2000s, but I was still over by records or
24 monitoring, where there was a female thought that

Page 163



Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1117 of 1503 PageID #:1508

1 there was something inappropriate. She brought it to
2 me and we wrote it up and got it over to OPR and did
3 all that. It was a sexual harassment, but I don't
4 know what happened with it.
5     Q.  Do you remember who the female was?
6     A.  No, I don't remember, but I do remember
7 that -- who was the guy? The guy's passed away,
8 unfortunately. He had bad diabetes and stuff too,
9 so. I'm not making excuses for him but...
10    Q.  Do you remember what the allegation was?
11    A.  It was something about some reading
12 material that -- maybe some type of magazine that had
13 inappropriate content. It was no naked pictures or
14 anything. I think it was lingerie or something.
15    Q.  Okay. And she made this complaint to
16 you?
17    A.  Actually, she went to I think Ray Villa
18 who was like a quasi-supervisor, and then Ray brought
19 it to me and we made the phone call and started
20 filling out paperwork. I mean, you have to start the
21 process right away.
22    Q.  Okay. And did you take part in the
23 investigation at all?
24    A.  No. That goes to OPR.
                                                    Page 164

1     Q.  Did you take any action to determine
2 whether or not the allegation was true?
3     A.  What did we do? I think he got like
4 moved or reassigned to a different watch or
5 something. You know, you don't want any -- you're
6 trying to keep the peace. You don't want any
7 problems.
8     Q.  Were you working on the day that this
9 apparent lingerie magazine was made known to this
10 female employee?
11    A.  I don't know. I don't know if it
12 happened the same day or if it was something from the
13 weekend and then on a Monday or Tuesday. I don't
14 remember.
15    Q.  Did you ever investigate or did you ever
16 see the magazine that was alleged to have been
17 sexually harassing?
18    A.  Yes, I believe there was a copy of it
19 that we did see.
20    Q.  Okay. And how is it that you obtained
21 that copy? Do you know?
22    A.  I believe she brought it into whoever it
23 was. I believe it was Ray Villa first.
24    Q.  Okay. And where was this document
                                                    Page 165

1 supposed to have been -- where was it located when
2 this female employee saw it?
3     A.  Yeah, I don't -- maybe on the guy's desk
4 or something. He was looking at it like in the
5 corner. I don't think he was being blatant, but I
6 don't really know. I didn't see it. I don't know.
7 It came to me after the fact. I acted on it as soon
8 as I knew.
9     Q.  Okay. Did you take any steps to prevent
10 people reading inappropriate magazines and people
11 becoming aware of it and being offended?
12    MR. LEINENWEBER:  Objection to form,
13 foundation. Also a compound question.
14        Go ahead.
15    THE WITNESS:  You know, there was general
16 orders. They weren't supposed to have any reading
17 material at all, but they let -- you know, people
18 would bring in books and stuff that they would read
19 on their break. That's the only way I can answer
20 that question.
21 BY MR. HERBERT:
22    Q.  Okay.
23    A.  Not lingerie magazines. You know, books
24 and stuff, you know, appropriate, I guess.
                                                    Page 166

1     Q.  Okay. Do you know an individual by the
2 name of David Walker?
3     A.  Yes, I do.
4     Q.  And he filed a lawsuit against you. Is
5 that correct?
6     A.  Against the sheriff's department. I was
7 named as a plaintiff.
8     Q.  As a defendant, right?
9     A.  Yes, that's what I meant. As a
10 defendant. I'm sorry.
11    Q.  What did David Walker allege that you
12 did?
13    A.  I don't think David Walker alleged that I
14 did anything. I don't really remember. I was
15 dismissed from that suit pretty quick.
16    Q.  Do you know anything about the
17 allegations in that lawsuit?
18    A.  Not really.
19    Q.  Okay. You say not really. Tell me --
20    A.  I don't remember. I'm sure I was made
21 aware of it at the time.
22    Q.  Right. I'm just asking. I'm trying to
23 find out what was the nature of the allegations?
24    A.  Again, I don't know exactly, but it was
                                                    Page 167



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1118 of 1503 PageID #:1509

Joseph Ranzino - 9/8/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 obviously some type of labor dispute or whatever.
2    Q.  What do you mean it was a labor -- just
3 tell me anything you remember about it.
4    A.  I wasn't really involved in it.  What was
5 it all about?  I really don't recall the whole -- I
6 really don't.
7    Q.  Was it a racial case, a racial harassment
8 case?
9    A.  It may have been.  I do not know.  I do
10 not know all of it.
11    Q.  Is David Walker African-American?
12    A.  Yes, David Walker is African-American.  I
13 worked with him many nights.  He was a good guy, I
14 thought.
15    Q.  Do you know an investigator by the name
16 of Michael Moore?
17    A.  Michael Moore.  I don't think so.  I
18 don't recall him.
19    Q.  Well, on June 5, 2017 Michael Moore filed
20 a complaint register alleging that you ordered the
21 courthouse staff to conduct a full search.  Do you
22 remember that?
23    A.  I don't believe I've ever met the guy.
24    Q.  Okay.  But do you remember -- this is the

Page 168

1 answer to your interrogatory, so maybe we can turn to
2 page 7.
3    A.  Okay.
4    Q.  Right at the top there, the third
5 sentence down.  "Finally on or about June 5, 2017,
6 Correctional Officer Michael Moore filed a complaint
7 register alleging Defendant Ranzino ordered
8 courthouse staff to conduct a full search."  Do you
9 see that?
10    A.  I don't believe it's me.  I don't know
11 this.
12    Q.  Well, this is your answer though,
13 correct?
14    A.  I don't remember this ever happening.  I
15 don't even know this guy, I don't think.
16    Q.  Okay.
17    A.  I don't know how else to answer that.
18    Q.  Yeah, and I have not seen any documents
19 on this, if there is any -- hold on.  If there's any
20 documents about this complaint, but obviously this
21 came from somewhere, so I would ask that --
22    A.  I'm with you.  Never heard of it.
23    Q.  Okay.
24    A.  I don't have a clue.

Page 169

1    Q.  If we can go down to the bottom of
2 paragraph 11 there, the last sentence in your
3 response where it says, "Defendant Ranzino has spoken
4 with OPR concerning the underlying allegations of
5 Plaintiffs' Complaint."  Do you see that there?
6    A.  Yes.
7    Q.  Those were all the complaints that were
8 made by the plaintiffs that are contained within the
9 lawsuit, right?
10    MR. LEINENWEBER:  Objection to form and
11 foundation.
12    Go ahead.
13    THE WITNESS:  Okay.
14 BY MR. HERBERT:
15    Q.  Is that right?  When you said that you
16 spoke with OPR about the underlying allegations of
17 the Complaint, you're talking about the complaints
18 that are contained within the lawsuit by the
19 plaintiffs, right?
20    MR. LEINENWEBER:  Objection to form and
21 foundation.
22    Go ahead.
23    THE WITNESS:  Yeah.  I'm sorry.  Yes.
24

Page 170

1 BY MR. HERBERT:
2    Q.  And do you know if that was on one
3 occasion or multiple occasions that you spoke with
4 OPR about that?
5    A.  About which one?
6    Q.  Well, there was an EEOC charge filed by
7 the plaintiffs in July of 2016, so my question is --
8    A.  Okay.
9    Q.  You spoke with OPR about those
10 allegations filed with the EEOC, correct?
11    A.  I don't know that I was ever called in on
12 that.  I didn't know anything about an EEOC
13 complaint.  I was never notified.  I was never given
14 anything, I don't believe.
15    Q.  What were you referring to there when you
16 said "Defendant Ranzino has spoken with OPR
17 concerning the underlying allegations of plaintiffs'
18 Complaint"?
19    A.  Oh, well, they had -- I think I know what
20 this is now.  This is going back to this guy Moore.
21 They contacted me to come down for an interview, and
22 I'm like, I don't know this guy.  I was somewhere --
23 I was at a different location.  Wherever this
24 happened, I don't know where it happened, and I don't

Page 171



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1119 of 1503 PageID #:1510

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 know how the guy got my name because I don't think it
2 was me. I don't know this guy.
3    Q. What did he allege happened?
4    A. Well, it says it right -- what does it
5 say there? You were reading it off.
6    Q. Yeah. The previous questions that I was
7 asking you?
8    A. Yes.
9    Q. Alleging --
10    A. This one right here.
11    Q. Right.
12    A. I was talking about this Michael Moore.
13    Q. Okay. So then tell me, what is the
14 allegation or what was the allegation?
15    A. I don't know.
16    Q. Okay.
17    A. It says it right here, alleged that I had
18 him -- but I don't know this guy. I don't know this.
19    Q. Okay. But you were asked questions about
20 this by OPR, correct?
21    A. They were going to call me down and
22 interview for this. They were going to put -- and I
23 told them, I don't know this guy, and here's where I
24 was on this day, here's where I was assigned all day.
Page 172

1    Q. Okay.
2    A. And then I never heard anything back from
3 anybody. I don't know the guy.
4    Q. Okay. If we can go down to paragraph 12
5 at the bottom of that page and then it says -- the
6 question is, "Identify each and every individual who
7 witnessed or claims to have witnessed occurrences
8 alleged in the Complaint, and as to each person
9 identified state the details and substance of what
10 they witnessed." Do you see that question?
11    A. Yes, I do.
12    Q. Do you know anyone that may have
13 witnessed or claims to have witnessed any of the
14 occurrences in the Complaint as you sit here today?
15    MR. LEINENWEBER: Objection to form,
16 foundation.
17    You can answer.
18    THE WITNESS: I don't know who could have
19 heard what or claims they heard what or did hear
20 what. I don't know that. I just don't know that.
21 BY MR. HERBERT:
22    Q. All right.
23    A. There's a lot of people everywhere. It's
24 a big unit.
Page 173

1    Q. All right.
2    MR. HERBERT: All right. And then if we can
3 go to page 9, interrogatory No. 17.
4 BY MR. HERBERT:
5    Q. See that there? "Please state whether
6 you or any other Cook County Sheriff officer or
7 employee to your knowledge acted inconsistently with
8 any of the policies and practices of the Cook County
9 Sheriff's Office, formal or informal, written or
10 unwritten, at any time during the incident described
11 in plaintiffs' Complaint."
12    As you sit here today, are you aware
13 of any Cook County Sheriff officer or employee that
14 acted inconsistent with any policies during the time
15 periods addressed in this Complaint?
16    MR. LEINENWEBER: Objection to form and
17 foundation.
18    Go ahead.
19    THE WITNESS: Well, apparently in the
20 Complaint, the people in the Complaint obviously have
21 a grievance, but we didn't do anything outside of
22 policy and procedure. I don't know what else you're
23 asking for.
24
Page 174

1 BY MR. HERBERT:
2    Q. That's fine. We talked earlier when we
3 went through your personnel file with the
4 disciplinary --
5    A. Yes, sir.
6    Q. -- allegations and findings and, you
7 know, a number of those concerned people making
8 complaints about you, some of them were race related.
9 Do you remember talking about those allegations and
10 complaints?
11    A. To who?
12    MR. LEINENWEBER: Objection to form and
13 foundation.
14    You can answer.
15    THE WITNESS: To who? To OPR, yes. That
16 would be it, and my lawyers now with whatever is
17 going on here.
18 BY MR. HERBERT:
19    Q. Okay. Is there any other complaints
20 about race discrimination made against you other than
21 the ones that we have spoken of today?
22    MR. LEINENWEBER: Objection. Form and
23 foundation.
24    THE WITNESS: Not to my knowledge. And
Page 175



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1120 of 1503 PageID #:1511
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 again, I'm sorry. Not to my knowledge. I don't
2 know.
3 BY MR. HERBERT:
4   Q.  Okay. Do you have any knowledge of,
5 other than the allegations about the statements you
6 made concerning, you all look alike, do you have any
7 knowledge of any racial statements or stereotypical
8 comments, ridicule or joking in the workplace in any
9 way, shape, or form during the time that you were the
10 chief at EM?
11   **A.  No. No, sir.**
12   MR. LEINENWEBER: Objection to form and
13 foundation.
14 BY MR. HERBERT:
15   Q.  Okay. Are you aware of any allegations
16 of discrimination in any other units of the sheriff's
17 department aside from the EM unit?
18   MR. LEINENWEBER: Objection to form and
19 foundation.
20       You can answer.
21   THE WITNESS: It really would be above my pay
22 grade.
23   MR. HERBERT: Okay. Guys, I'm going to take
24 just a few minutes. Maybe we'll take ten minutes and

Page 176

1 then I'm probably going to have, because Kelly is
2 writing furiously here, I'll probably have another --
3   MR. LEINENWEBER: She's throwing things at
4 you?
5   THE WITNESS: Probably throwing them at me,
6 and I apologize. I'm sorry. I'm trying.
7   MR. HERBERT: We'll come back in 15 minutes?
8   MR. LEINENWEBER: Yeah, that's fine. 3:30.
9   MR. HERBERT: Yeah. Thank you.
10       (Whereupon, a short break
11           was taken.)
12 BY MR. HERBERT:
13   Q.  Okay. I was flipping through some of the
14 reports in Exhibit K which was the investigative
15 findings from the allegations about you saying you
16 all look alike, and my question to you is: Were you
17 ever asked by somebody from human resources to speak
18 with them about allegations made by the plaintiffs in
19 this case?
20   MR. LEINENWEBER: Objection to form and
21 foundation.
22       You can go ahead.
23   THE WITNESS: I don't think so. I don't
24 remember.

Page 177

1 BY MR. HERBERT:
2   Q.  And the reason I --
3   **A.  Only when I was getting moved.**
4   Q.  Okay. The reason I ask you because
5 there's a sentence in here. I can tell you where it
6 is. I don't know if we need to go to it, but it's --
7 543 is the Bates stamp number in there, but it says,
8 "Chief Ranzino said he declined to speak with the
9 Bureau of Human Resources."
10   **A.  When was this?**
11   Q.  It was --
12   MR. HERBERT: Maybe we can go to that page,
13 and I apologize, but it's going to be 543. Great.
14 Thank you.
15 BY MR. HERBERT:
16   Q.  Do you see that last sentence there,
17 "Ranzino said he declined to speak with the Bureau of
18 Human Resources"?
19   **A.  I don't remember that, but -- I don't
20 remember saying that. Why wouldn't I?**
21   Q.  Okay. And that's kind of what I'm asking
22 you. Do you remember if in fact you declined to
23 speak to somebody from human resources?
24   **A.  The only time I remember that I spoke**

Page 178

1 **with them was when I was getting moved and -- I don't
2 know if they gave me a piece of paper or they just
3 said you're getting moved, here's the order, but I
4 think some type of order came down. I don't know if
5 I had to sign for it or not. I don't remember.**
6   Q.  Right. But it's my understanding human
7 resources conducted an investigation into the
8 allegations, complaints made to the EEOC. So my
9 question is: You never spoke with anyone from the
10 Bureau of Human Resources regarding the EEOC
11 complaint filed by the plaintiffs?
12   **A.  I don't remember that.**
13   Q.  Okay.
14   **A.  I don't remember that ever happening, no.**
15   Q.  Okay. And that's fine.
16   **A.  If they would have called me in, I mean,
17 administratively I have to speak to them.**
18   Q.  Okay. And the date on here is before we
19 get off is March --
20   **A.  What is that date?**
21   Q.  Pardon me? The date that they're
22 alleging the interview took place was on March 1,
23 2016, so that would have been -- that would have been
24 after you had transferred, correct, or right around

Page 179



Joseph Ranzino    -    9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1121 of 1503 PageID #:1512
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 there?  No, it would have been well after, right?
2    A.  It would have been after that, I believe,
3 yes.
4    Q.  Okay.  Very good.
5    A.  I believe.
6    MR. HERBERT:  All right.  That's all I need
7 with that document.
8 BY MR. HERBERT:
9    Q.  Okay.  And wrapping up here, Mr. Ranzini.
10    A.  Ranzino.  That's okay, Mr. Herbert.
11    Q.  I'm not trying to --
12    A.  Mr. Herbert, come on.  Take it easy.
13    Q.  Okay.  I'm going to go through some of
14 the specific allegations that have been made by --
15    A.  I've been called worse.  I know I blurted
16 that out.  I shouldn't have.
17    Q.  That's all right.  Mr. Page in this case
18 talked about how you would routinely threaten to
19 write him up for discipline.  Do you remember --
20    A.  Absolutely not.
21    MR. LEINENWEBER:  Hey, hey, hey, hey.  Hang
22 on.  We're getting off on the wrong foot here.  We
23 need to do it in the question, objection, answer,
24 okay?

Page 180

1    Sorry.  Go ahead, Dan.  Sorry.
2    MR. HERBERT:  That's all right.
3 BY MR. HERBERT:
4    Q.  Do you remember ever threatening to write
5 up Mr. Page?
6    A.  No.
7    Q.  But you did write him up for certain
8 disciplinary infractions, correct?
9    MR. LEINENWEBER:  Objection to form,
10 foundation.
11    Go ahead.
12    THE WITNESS:  I don't recall.
13 BY MR. HERBERT:
14    Q.  Okay.  Investigator Newson -- well,
15 Investigator Tims, we'll start with him, claims that
16 you used the N word in front of him.  Do you remember
17 ever using the N word in front of Investigator Tims?
18    A.  No, sir.  I don't use it.
19    Q.  Okay.  Have you ever used it in the
20 workplace?
21    A.  No, sir.
22    Q.  Because David Walker also alleged that
23 you used the N word numerous times in front of him.
24    A.  It never happened.

Page 181

1    Q.  Okay.  And Walker said that he would tell
2 you constantly that you shouldn't talk like that.  Do
3 you remember him ever saying that to you?
4    A.  Never had that conversation.
5    Q.  Okay.  Cecil Williams also states that he
6 heard you use the N word multiple times and say, you
7 all people look alike?
8    A.  It never happened.
9    Q.  Tyrone Mcghee also says that he heard you
10 using the N word?
11    A.  It never happened.
12    Q.  Do you have any reason to know why
13 multiple individuals would allege that you used the N
14 word?
15    MR. LEINENWEBER:  Objection to form and
16 foundation.  It calls for speculation.
17    You can answer.
18    THE WITNESS:  I do not have a clue.
19 BY MR. HERBERT:
20    Q.  The plaintiffs in this case, did you ever
21 have any reason to believe that they were not
22 truthful in any way?
23    A.  Yeah.
24    Q.  How so?

Page 182

1    A.  By making untrue statements.
2    Q.  How about anything unrelated to this
3 complaint though?  Did you have any reason to believe
4 that the plaintiffs in this case that worked for you
5 were in some way dishonest?
6    A.  They worked for me under me.  Why would I
7 think they're dishonest?  I don't have anything to
8 know.
9    Q.  But certainly if you had an employee that
10 you believed was dishonest, you would certainly
11 address that situation, right?
12    MR. LEINENWEBER:  Objection to form and
13 foundation.
14    Go ahead.
15    THE WITNESS:  Yeah, I don't know what
16 you're -- but you have to give me what you -- you
17 know, give me a specific.
18 BY MR. HERBERT:
19    Q.  You had no reason to believe that they
20 were not credible people at any time during their
21 employment obviously outside of the allegations that
22 you deny in this Complaint?  Do you understand the
23 question?
24    MR. LEINENWEBER:  Objection to form and

Page 183

Joseph Ranzino  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1122 of 1503 PageID #:1513
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 foundation.
2     THE WITNESS: It's kind of convoluted.
3 BY MR. HERBERT:
4     Q.  Let me reask it.  Part of your duties as
5 a supervisor, you have to judge your employees' work
6 abilities, correct?
7     **A.  Yes, and accountability.**
8     Q.  And you assess their credibility.  That's
9 an important --
10     **A.  Yes.**
11     Q.  Okay.  And so my question along that
12 preface is:  Did you ever have any reason to question
13 the credibility of any of the plaintiffs at any point
14 in which they worked for you?
15     **A.  Well, part of my job would be to question**
16 **things that they did or answers.  I can't give you**
17 **specifics.**
18     Q.  Can you think of any situation in which
19 you ever questioned the credibility of these
20 plaintiffs?
21     **A.  That's pretty broad.  Credibility in what**
22 **kind of way?**
23     MR. LEINENWEBER:  Yeah.  Objection to form,
24 foundation.  Sorry.
                                        Page 184

1     THE WITNESS:  Some people are better at
2 things than others.
3 BY MR. HERBERT:
4     Q.  I'm talking about the credibility though.
5 Did you ever have any reason to believe that the
6 plaintiffs were not credible in any situations that
7 they worked under you?
8     MR. LEINENWEBER:  The same objections.
9         Go ahead.
10     THE WITNESS:  I'm having trouble putting this
11 into perspective.  How can you help me?  Credible in
12 what way, and be specific, Dude.
13 BY MR. HERBERT:
14     Q.  Well, I'm talking about being incredible.
15 Did you ever have reason to believe that the
16 plaintiffs' credibility was at issue during the time
17 that they worked for you?
18     **A.  You know, perhaps if somebody stated they**
19 **were somewhere or their paperwork didn't match up**
20 **with dispatch said where they were supposed to be.**
21 **There were questions like that all the time but not**
22 **just on my watch.  I mean, it was everywhere.  Or**
23 **they were always on guys following dispatch**
24 **procedures because we need to know where you're at.**
                                        Page 185

1 **It's a safety thing.  No one's trying to keep you**
2 **under surveillance, but you have to use the radio.**
3 **You have to go up, you have to go down.**
4     Q.  Were there any situations with these
5 plaintiffs where you found their credibility was --
6 they were incredible about any of their work
7 performance that you just spoke of, going down on the
8 radio, things like that.
9     MR. LEINENWEBER:  The same objections.
10     THE WITNESS:  I really don't recall
11 particulars.  I really don't.  It's a long time ago.
12 There would be some type of discipline or something
13 or something generated if something was to come into
14 question that we thought we'd need something like
15 that.
16 BY MR. HERBERT:
17     Q.  Okay.  And in fact --
18     **A.  It may just be --**
19     Q.  And in fact, during your time as the
20 chief, there was discipline issued concerning
21 employees and their credibility, correct?  Is that
22 fair to say?
23     MR. LEINENWEBER:  Objection to form and
24 foundation.
                                        Page 186

1     THE WITNESS:  I don't think it was anything
2 with -- I don't know.  I would say that if there was
3 an infraction of some sort that needed some type of
4 action, whether that be talking to someone,
5 counseling someone, it's all part of that, you know,
6 supervision.
7 BY MR. HERBERT:
8     Q.  Okay.
9     MR. LEINENWEBER:  I'm sorry.  My dog is
10 barking.  Do you guys mind if I just run and grab him
11 real quick?  It will be two seconds.
12     MR. HERBERT:  Not at all.  I think I'm done
13 with questions but.
14     THE WITNESS:  Take care of the dog.
15     MR. LEINENWEBER:  You're done?
16     MR. HERBERT:  I'm done.
17     MR. LEINENWEBER:  Okay.  Then why don't you
18 do that on the record and give me five minutes and I
19 may have one or two quick follow-ups.
20     MR. HERBERT:  Okay.  We'll take a few minutes
21 then.
22         (Whereupon, a short break
23             was taken.)
24     MR. HERBERT:  Nothing further.
                                        Page 187



Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1123 of 1503 PageID #:1514

Joseph Ranzino   -   9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    MR. WHITE:  Joe, I just have a couple quick

2  follow-up questions for you.

3    THE WITNESS:  Yes, sir.

4         EXAMINATION

5  BY MR. LEINENWEBER:

6    Q.  Okay.  So, Mr. Ranzino, earlier today

7  Mr. Herbert had asked you a couple questions

8  regarding some OPR matters, complaints that were

9  filed against you.  Do you recall that?

10    **A.  Yes.**

11    Q.  And one of those complainants was someone

12  named Thomas Schulz?

13    **A.  Yes.**

14    Q.  Do you know what race Mr. Schulz is?

15    **A.  I don't know his complete ethnicity, but**

16  **he's Caucasian.**

17    Q.  Okay.  And then another employee who had

18  filed an OPR against you that Mr. Herbert was asking

19  about was an Investigator Bieniek which I think was

20  B-i-e-n-i-e-k.  Do you remember that?

21    **A.  Yes.**

22    Q.  What is Investigator Bieniek's race if

23  you know?

24    **A.  He's also a Caucasian.**

1    MR. LEINENWEBER:  Okay.  I have nothing else.

2  Thank you.

3    MR. HERBERT:  Great.  Nothing for me.

4    MR. LEINENWEBER:  Okay.  And, Brenda, we can

5  waive signature.

6    THE WITNESS:  Thank you, Gentlemen.  Have a

7  nice day.

8    MR. HERBERT:  Thank you.  You too.

9      (FURTHER DEPONENT SAITH NOT.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1124 of 1503 PageID #:1515

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
1                    REPORTER'S CERTIFICATE

2

3           I, Brenda S. Hall, CSR No. 084-003359,

4   Certified Shorthand Reporter of said state, do hereby

5   certify:

6           That previous to the commencement of the

7   examination of the witness, the witness was duly

8   sworn to testify the whole truth concerning the

9   matters herein;

10          That the foregoing remote deposition

11  transcript was reported stenographically by me, was

12  thereafter reduced to typewriting under my personal

13  direction and constitutes a true record of the

14  testimony given and the proceedings had;

15          That the said remote deposition was taken

16  before me at the time specified;

17          That I am not a relative or employee or

18  attorney or counsel, nor a relative or employee of

19  such attorney or counsel for any of the parties

20  hereto, nor interested directly or indirectly in the

21  outcome of this action.

22

23

24
```



Joseph Ranzino - 9/8/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1125 of 1503 PageID #:1516

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 16th day of October, 2020.

3

4

5     _____

6              Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1126 of 1503 PageID #:1517
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

## WORD INDEX

**< 0 >**
**0425** 101:*13*
**08** 16:*23*
**084-003359** 1:*24*
190:*3*
**09** 16:*23*

**< 1 >**
**1** 179:22
**10** 16:*24* 64:*14*
**100** 2:7
**101** 3:*10*
**11** 104:*23* 170:2
**11:02** 2:*1*
**12** 127:*4* 173:*4*
**12/3** 105:*14*
**12:40** 77:22
**120** 2:*13*
**144** 3:*10*
**15** 177:7
**16** 23:*3* 129:*10*
**16th** 191:2
**17** 105:*8* 112:*13*
174:*3*
**18** 12:*1, 3* 23:*16*
**188** 3:*1*
**18-cv-05726** 1:*9*
**18-cv-5726** 4:*15*
**1989** 11:6
**1997** 19:*23* 22:8

**< 2 >**
**20** 11:*17* 13:*13*
120:*16*
**200** 2:*19*
**2000** 2:*13* 26:5
28:*1, 2*
**2000s** 163:*19, 23*
**2001** 27:*18*
**2002** 27:*18*
**2004** 31:2 33:*22, 23*
**2005** 31:2 33:22
**2009** 101:*12*
**2010** 105:*14* 106:*1*
163:2
**2011** 12:9 38:*8, 24*
**2012** 12:9 38:8
**2013** 105:*8* 112:*13,*

**17** 118:*17* 125:*19*
**2014** 125:*19*
**2015** 73:8, *10*
83:*16, 17* 129:*10,*
*23* 147:8 148:*4*
**2016** 98:*13* 171:7
179:*23*
**2017** 35:2 100:*17*
154:*4* 155:*1, 2*
168:*19* 169:5
**2018** 34:22 154:*20*
155:8, *9*
**2020** 2:*1* 191:2
**206** 2:6
**20s** 10:*12*
**2201** 2:*19*
**23** 63:2
**23106** 13:*12*
**24/7** 42:6
**25** 120:*17*
**26th** 108:8

**< 3 >**
**3** 105:*3*
**3:30** 177:8
**30** 13:*14*
**31** 64:*21*
**312** 2:8
**34** 10:2
**35** 10:2
**38** 13:*3* 105:*4*
**39** 109:22

**< 4 >**
**4** 157:*12, 21*
**41** 112:9
**42** 118:*11*
**43** 118:*20*
**44** 124:*11*
**47** 127:*4*
**48** 127:*11*

**< 5 >**
**5** 76:*1* 159:*19*
168:*19* 169:5
**50** 24:*17* 48:*21*
49:*5, 6*
**51** 129:*13*
**51st** 108:*11*
**543** 178:7, *13*

**< 6 >**
**6** 3:*1*
**60523** 2:*20*
**60602** 2:*14*
**60661** 2:7
**62** 3:*10*
**630** 2:*20*
**655-7660** 2:8

**< 7 >**
**7** 169:2
**786-3705** 2:*14*

**< 8 >**
**8** 2:*1* 62:*13*
**866** 2:*14*

**< 9 >**
**9** 129:*23* 148:*4*
174:*3*
**90s** 16:*14* 163:*18,*
*19*
**95** 10:5, *6*
**97** 18:*23, 24*
**98** 26:2, *12*
**984-0339** 2:*20*
**99** 3:*10* 26:2, *12*

**< A >**
**a.m** 2:*1*
**aahed** 135:*11*
**aahing** 135:6
**aahs** 134:*17, 20*
135:*13*
**aback** 119:*19*
**abilities** 184:6
**able** 7:*20* 11:*3*
19:*1* 51:2 71:7
**above-entitled** 1:22
**Absolutely** 49:*15*
53:*1* 64:7 72:*21,*
*22* 74:*15* 106:*14*
107:*10* 126:*18*
136:*10* 180:*20*
**academy** 10:5
12:*11, 12, 16* 15:4
**accommodate** 47:*21*
49:*17* 55:*23* 56:6
58:*17* 59:22 61:22

**accommodated**
56:*10*
**accommodations**
56:*21*
**account** 45:*14, 23*
**accountability** 184:7
**accused** 88:*4*
101:*15* 105:9
110:5 119:7
**Acey** 37:*14*
**act** 73:22
**acted** 166:7 174:7,
*14*
**acting** 27:*10, 21, 23*
29:9 30:*10* 31:*1*
33:*14* 157:*16*
**action** 163:*15*
165:*1* 187:*4* 190:*21*
**activity** 121:*10*
**actual** 42:*18* 70:*3*
161:*13*
**adapt** 38:*21*
**address** 97:9
159:*23* 183:*11*
**addressed** 158:*13*
174:*15*
**adjudicated** 124:8
**adjustment** 56:*19*
**administered** 64:*10*
**administering** 63:22
**administration**
20:*21* 151:6
**administrative** 35:*4*
109:6 150:*21*
**administratively**
179:*17*
**admitted** 130:*18*
144:7
**adult** 10:2 67:*10*
**adults** 13:5
**advice** 70:*11*
**advise** 71:2
**Affairs** 112:*11*
**Affirmative** 62:*12*
**African-American**
65:*17, 20, 23*
113:*11* 127:*20, 21*
163:*11* 168:*11, 12*
**afternoon** 65:5
**age** 10:*11*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1127 of 1503 PageID #:1518
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

ago 11:*18* 19:7
59:5 104:*24*
144:*11* 186:*11*
agree 25:2 64:*1*
65:22 74:*19* 75:17
81:*17* 92:9, *24*
93:8 94:5, 22
109:*3* 116:*15*
139:*5, 19* 141:*16*
agreed 109:*12*
ahead 8:*11* 13:*18*
18:5 36:*1* 37:6
40:*1* 41:9 43:*24*
45:*18* 46:*15* 48:*16*
49:*16* 50:*16* 51:*10*
56:8 57:*1, 20*
58:*21* 60:*1* 61:*6,
18* 65:12 66:8
68:6 69:*14* 70:*15*
76:5 78:*18* 79:*2,
10, 20* 80:*4, 24*
81:22 82:*13, 21*
83:9 84:*1, 14* 85:8
88:8 90:*1, 16*
91:*19* 92:*16* 93:*12*
94:8 95:2, *12, 23*
96:7, *17, 24* 97:*14,
24* 100:*3, 23*
102:*17* 104:9
111:5 113:*17*
114:*11* 115:*1, 4, 15*
116:*13, 21* 117:*15*
118:2 123:*4, 23*
125:22 126:*24*
131:5 132:*13, 21*
133:8 134:*11, 24*
135:9, *18* 136:9, *16,
23* 137:*12, 21*
139:*14* 140:*1*
141:2 142:2 143:*9,
24* 146:8 147:*17*
149:*4* 152:8
158:*18* 159:*10*
160:*15* 161:7
166:*14* 170:*12, 22*
174:*18* 177:22
181:*1, 11* 183:*14*
185:9
ahold 87:22
alike 130:9 133:*4*
134:*1, 8* 135:*15*

136:*3, 6, 21* 137:*1,
5* 138:*14, 15, 19*
139:*8, 9, 20* 140:*13*
141:7, *18* 142:*13,
15* 144:8 145:*4, 8*
146:*15* 154:9
176:6 177:*16* 182:7
allegation 64:*24*
98:*19, 24* 99:*3*
106:*10* 108:*13*
112:24 114:8
117:*4* 119:*12*
126:*19* 127:*23*
128:*1* 137:*23*
138:*18, 19* 145:7
160:5 162:*1*
164:*10* 165:2
172:*14*
allegations 96:*13*
98:22 102:*1, 4*
111:9 125:*14*
128:8 145:*3*
151:*18* 159:7
160:*11, 21, 24*
161:*11, 21* 162:*10,
20* 163:7 167:*17,
23* 170:*4, 16*
171:*10, 17* 175:6, 9
176:5, *15* 177:*15,
18* 179:8 180:*14*
183:*21*
allege 167:*11*
172:*3* 182:*13*
alleged 64:22
66:23 67:2 103:*4*
106:*15* 110:*16*
111:*1* 113:*1* 114:5
118:24 124:23
129:23 133:24
142:*12* 148:*3*
165:*16* 167:*13*
172:*17* 173:8
181:22
allegedly 137:*4*
alleging 101:*21*
114:2 127:*14*
163:7 168:20
169:7 172:9 179:22
Allen 101:*20*
103:*18*

allow 95:*4*
allowed 39:*1*
Amended 62:*11*
amount 85:*24*
analogies 67:22
analogy 67:*18, 21*
Anderson 31:*10*
Annette 124:*14*
answer 5:7 8:*15*
17:24 18:6 41:*10*
43:7, *23* 45:*18*
46:*13, 14, 15, 16*
54:*21, 23* 58:*13*
59:9, *14* 62:*11, 17*
63:*11* 65:*12* 67:*24*
75:*23* 77:6, 7 82:*4,
15* 86:*16, 17* 88:*12*
90:*3* 92:*16* 97:*16*
104:*11, 12* 116:*13*
125:8, 22 129:5
133:9 134:*13, 14*
135:9 137:*12, 21*
139:*14* 140:*18*
142:*3* 153:*20*
159:*14* 166:*19*
169:*1, 12, 17*
173:*17* 175:*14*
176:*20* 180:*23*
182:*17*
answered 5:*21*
58:20, 22 79:*1*
82:*14* 85:*16* 86:7,
8* 104:*10* 117:*14,
16* 132:*14* 133:*6,
12* 134:*10* 141:*11,
12, 15* 154:*12*
158:*17* 160:*14*
answering 59:6
160:2
answers 47:2 80:6
99:*11* 157:*4* 184:*16*
ANTHONY 1:*5*
51:*21*
anticipate 5:*4*
53:*13*
anticipating 129:*4*
anybody 14:*14, 19*
18:20 26:*17* 37:2
42:*16* 45:*24* 60:8
66:*13* 96:*18*
103:*20* 113:*5*

114:*14* 127:*18*
130:*17* 135:2
162:*16* 173:*3*
anymore 14:*19*
32:*11* 38:7
anyway 15:2 31:*21*
anyways 67:*19*
apologize 177:6
178:*13*
apparent 165:9
apparently 174:*19*
appear 108:8
Appeared 2:*10, 16,
22*
application 28:*14*
applied 10:22
11:*10* 26:*16, 17*
apply 10:*24* 14:2
19:*3* 28:*17*
appointed 23:*21*
24:8, *10*
appointment 24:7
appreciate 133:*18*
approached 28:*11*
appropriate 166:*24*
Approximately 49:9
April 18:*23* 31:2
129:*10, 23* 147:6, 9
148:*4, 7* 155:*11*
area 22:*1* 40:5
57:*17* 70:20 72:*17*
75:*10, 16, 18, 19*
76:*1* 91:*16* 93:*10*
106:*23* 150:*19*
areas 20:*13* 40:7
92:*12* 93:*1, 10*
argue 141:*24*
arm 74:6
arrested 105:*13, 24*
107:*12, 15, 19*
aside 34:5 51:*23*
176:*17*
asked 28:*21* 58:*19*
60:6 75:*3* 79:*1*
85:*16* 86:7 112:*3*
117:*14* 125:*2, 3*
126:*15, 21* 133:6
134:*10* 138:*23*
141:*10* 146:*3*
152:*15* 158:*17*

160:*13* 172:*19*
177:*17* 188:*7*

**asking** 5:*5* 18:*6*
23:*1* 40:*9* 61:*20*
70:*2* 77:*3* 90:*4*
91:*10* 122:*1* 123:*8*
146:*16* 147:*21*
150:*20, 22* 151:*23*
167:*22* 172:*7*
174:*23* 178:*21*
188:*18*

**ass** 66:*24*

**assaulted** 107:*6*

**assess** 184:*8*

**assign** 44:*8* 49:*11*
64:*6* 72:*12*

**assigned** 12:*17*
15:*6* 37:*23* 40:*8*
41:*21* 50:*20* 53:*21*
54:*13* 60:*23* 61:*2,
14* 68:*13* 69:*11, 19*
75:*10* 76:*16, 19*
77:*10* 80:*1, 2, 10,
15* 84:*10* 85:*3, 14*
86:*4, 11* 91:*14*
102:*13, 14* 103:*5, 7,
18, 20* 117:*3* 152:*4*
172:*24*

**assigning** 44:*24*
45:*14* 57:*23* 63:*20*
104:*1* 116:*16*
117:*23* 125:*3*

**assignment** 38:*15*
39:*3, 6* 40:*18, 21*
41:*17* 42:*9, 15*
55:*7* 58:*16, 18*
61:*11* 69:*5, 16*
71:*4* 85:*17, 23*
92:*10* 102:*20, 24*
114:*8, 15* 126:*16*

**assignments** 38:*11*
39:*2, 18* 40:*2, 3, 10,
17* 41:*1, 2, 3, 4, 6, 7*
42:*14* 43:*14, 17, 21*
44:*4, 9* 45:*1, 15, 24*
51:*6* 52:*12, 18, 21*
53:*4, 20* 54:*5, 17*
56:*5, 15, 16, 22*
57:*12, 23* 59:*23*
60:*12, 21, 24* 61:*12*
63:*21* 64:*6* 68:*21,*

23* 70:*3, 7, 12*
71:*20* 72:*4* 78:*10,
15, 23* 79:*18* 80:*20*
81:*17, 19* 82:*1, 8, 9,
19* 86:*2* 92:*12, 24*
93:*2, 15* 95:*19*
102:*11, 12* 112:*23*
113:*3* 114:*6, 7*
115:*12* 116:*17*
117:*12, 24* 131:*8*
149:*11*

**assume** 88:*14*
103:*15*

**assumes** 61:*17*
114:*24* 137:*10*
140:*16* 141:*24*

**assuming** 99:*7*
157:*1*

**attack** 147:*7*
148:*10, 12, 17, 21*

**attain** 58:*7*

**attorney** 98:*9* 99:*3*
157:*1* 158:*12*
190:*18, 19*

**attorney-client**
158:*1, 5*

**attorneys** 4:*8*

**audio** 22:*3*

**auditing** 25:*18*

**auspices** 30:*13* 42:*3*

**average** 120:*16*

**aware** 47:*9* 64:*23*
68:*12* 78:*13* 79:*7*
80:*19* 81:*4, 8*
82:*17* 85:*3* 87:*3*
92:*19* 95:*7* 98:*18*
102:*7* 110:*20*
117:*22* 118:*4*
119:*4* 132:*8* 133:*2*
134:*4, 6* 142:*21*
144:*11, 20* 154:*7*
160:*4, 10, 20, 24*
161:*21* 166:*11*
167:*21* 174:*12*
176:*15*

**< B >**

**Back** 9:*3* 11:*3*
14:*13* 19:*6, 11*
20:*1* 26:*20* 48:*20*
90:*5* 123:*18*

130:*21* 131:*18*
137:*17* 152:*2*
171:*20* 173:*2* 177:*7*

**backed** 132:*9, 18*

**bad** 12:*10* 34:*23*
45:*9* 94:*21* 164:*8*

**ball** 44:*19*

**bar** 106:*17, 18, 20,
21*

**bargained** 38:*16*
39:*20*

**bargaining** 39:*21,
22*

**barking** 187:*10*

**BARONI** 2:*12*

**Barrington** 9:*12, 13*

**based** 56:*1*

**basement** 75:*10, 16,
18* 76:*16, 20* 77:*11*
80:*16, 21*

**basically** 19:*15*
20:*17*

**basis** 43:*11* 44:*11*
45:*1* 89:*3* 114:*3*
157:*19*

**Bates** 105:*4, 20*
109:*22* 112:*9*
118:*10* 124:*11*
127:*4, 11* 129:*13*
178:*7*

**battery** 105:*14, 15,
24* 106:*8, 15*
108:*14, 17*

**becoming** 17:*2*
29:*9* 166:*11*

**beef** 115:*17*

**began** 15:*2*

**beginning** 40:*13*
159:*24*

**behalf** 2:*10, 16, 22*
157:*16*

**belief** 58:*5, 8, 9*

**believe** 10:*5* 17:*10*
19:*9* 23:*15* 29:*2*
30:*14* 31:*2, 13*
33:*10* 56:*9* 60:*12*
65:*21* 71:*6, 22*
86:*8* 87:*1* 100:*17,
24* 104:*10* 107:*3*
111:*6* 122:*16*
123:*17* 125:*12*

128:*5* 129:*13*
130:*16* 132:*14, 15*
137:*22* 140:*2, 6*
142:*20* 144:*12*
145:*21* 146:*24*
148:*7* 149:*17, 20*
154:*14* 159:*17*
161:*19* 165:*18, 22,
23* 168:*23* 169:*10*
171:*14* 180:*2, 5*
182:*21* 183:*3, 19*
185:*5, 15*

**believed** 103:*1*
156:*1* 183:*10*

**belong** 72:*18*

**benefits** 155:*17*

**best** 20:*6* 37:*1*
39:*7* 45:*5* 48:*9*
53:*12* 59:*6, 9, 14*
61:*22* 63:*12* 82:*14*
112:*6* 117:*17*
141:*12* 157:*10*

**better** 27:*1* 29:*7*
63:*16, 17* 185:*1*

**bid** 19:*13* 38:*15*
39:*1, 17* 45:*19*
60:*20*

**bidding** 39:*3* 45:*21*

**bided** 38:*6*

**bids** 40:*3, 5*

**Bieniek** 118:*23*
188:*19*

**B-i-e-n-i-e-k** 118:*23*
188:*20*

**Bieniek's** 188:*22*

**big** 10:*18* 12:*19, 21*
25:*22* 26:*3, 8, 9, 14*
30:*12* 38:*6* 115:*17*
139:*6* 173:*24*

**bigger** 63:*5, 14*

**bikes** 120:*1*

**bit** 56:*12* 63:*14*
156:*18*

**black** 65:*16* 74:*11,
19* 94:*1* 113:*10*
133:*3* 134:*6, 20*
135:*5* 140:*13*
141:*18*

**blacks** 136:*6, 21*
137:*1, 5* 138:*15, 19*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1129 of 1503 PageID #:1520
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

139:*9*

**blank** 7:*11*, *17*, *18*
**blatant** 166:*5*
**Blue** 83:*3*
**blurted** 180:*15*
**Board** 16:*16* 151:*5*
154:*15* 155:*5*
**bolded** 101:*12*
124:*14*
**book** 89:*19*
**books** 166:*18*, *23*
**boss** 18:*19*, *20* 45:*9*
47:*23* 56:*20* 62:*5*,
*6* 131:*16* 133:*15*
**bosses** 42:7 124:*6*
**bother** 122:*19*
**bottom** 21:*1*, *3*, *4*
68:*8* 75:*1* 101:*19*
109:*22* 127:*4*, *11*
129:*14* 170:*1* 173:5
**bounced** 14:2*1*
**box** 44:*15*
**boxes** 44:*17*
**boy** 64:*22* 65:*2*, *8*,
*23*
**break** 5:*19*, *21*
77:*17* 78:*1* 133:*18*
142:*5*, *8* 166:*19*
177:*10* 187:*22*
**breakup** 30:*12*
**Brenda** 1:*23* 53:*8*
104:*7* 128:*24*
137:*16* 189:*4* 190:*3*
**briefly** 17:*3*
**bring** 166:*18*
**broad** 184:*21*
**broke** 7:*3* 18:*2*
54:*24*
**broken** 91:*15* 92:*3*
**Brook** 2:*20*
**brought** 163:*14*
164:*1*, *18* 165:*22*
**budget** 32:*4* 36:*5*
154:*3*
**budgetary** 30:*16*
32:*2* 35:*13* 101:*1*
**budgeting** 30:*22*
**budgets** 32:*24*
153:*16*
**bunch** 33:*7*

**Bureau** 178:*9*, *17*
179:*10*
**business** 47:*18*
66:*6* 74:*17*
**Byrne** 20:*3*, *5*

**< C >**

**California** 108:*9*
**call** 8:*13* 16:*19*
32:*10* 34:*18* 56:*11*
63:*20* 80:*5* 87:*23*
111:*17* 119:*1*, *21*,
*22* 120:*10*, *12*, *15*,
*19* 130:*5*, *6*, *24*
131:*7*, *9* 134:*7*, *21*
135:*5* 140:*12*, *23*
142:*12* 145:*9*, *19*
154:*9* 160:*6* 162:*3*
164:*19* 172:*21*
**called** 6:*2* 30:*21*
34:*15*, *16* 97:*2*, *5*, *6*,
*9*, *17*, *18* 98:*18*
128:*5* 130:*7*
149:*24* 171:*11*
179:*16* 180:*15*
**calling** 65:*22* 89:*17*
153:*10*
**call-ins** 57:*5*
**calls** 38:*5* 64:*2*
74:*23* 75:*21* 76:*23*
77:*13* 84:*13* 85:*6*
93:*9* 94:*7* 95:*22*
96:*6* 123:*3* 124:*2*
126:*23* 135:*17*
149:*11* 157:*24*
158:*8* 182:*16*
**campaigns** 15:*19*,
*23* 16:2
**Capacity** 1:*11*, *12*,
*14*, *15*, *17*
**caption** 100:*6*
**car** 42:*17*, *20*
**cards** 16:9
**care** 34:*18* 187:*14*
**career** 16:*13* 17:*7*
20:*17*, *22* 24:*1*, *17*
25:*18* 36:*11* 38:*21*
39:*13*, *14*, *15* 40:*14*
47:*23* 143:*18*
150:*24* 162:*16*, *23*
**cars** 69:*17*

**case** 4:*9*, *15* 25:*12*
51:*14* 53:*20* 56:*4*
57:*21* 58:*15* 59:*20*
62:*19* 68:*3* 96:*22*
97:*1*, *10* 98:*13*
108:*19* 113:*13*
114:*22* 127:*13*
128:*23* 131:*21*
136:*13* 143:*16*, *20*
159:*3* 168:*7*, *8*
177:*19* 180:*17*
182:*20* 183:*4*
**cases** 153:*3*
**catch-all** 109:*13*
**categorized** 42:*22*
**Caucasian** 188:*16*,
*24*
**cause** 1:*22* 88:*11*
103:*22*
**caused** 38:*18*
**causing** 101:*22*
**CECIL** 1:*5* 79:*6*,
*14*, *17* 80:*9* 182:*5*
**cell** 8:*13*
**center** 57:*17* 139:*8*
**centered** 137:*4*
**central** 91:*16* 92:*3*,
*11* 93:*2*, *9* 139:*6*
**centralized** 38:*5*
**centrally** 39:*5*
**certain** 42:*23*
49:*20* 50:*3* 70:*11*
71:*19* 145:*22* 181:*7*
**certainly** 5:*19*
25:*10* 65:*23* 92:*12*,
*24* 93:*1* 94:*4* 96:*9*
183:*9*, *10*
**CERTIFICATE**
190:*1*
**Certified** 1:*23*
190:*4* 191:*6*
**certify** 190:*5*
**Cha** 106:*21*
**chain** 21:*8* 22:*8*, *10*
31:*21*
**change** 26:*24* 29:*6*,
*7* 38:*19*, *21* 41:*18*,
*19* 42:*10* 43:*11*
44:*11*, *21* 54:*11*, *12*,
*13* 55:*23* 83:*10*, *12*
95:*16* 112:*19*

125:*24* 126:*4*
146:*22*
**changed** 26:*21*
30:*15* 32:*24* 38:*16*
40:*3* 42:*2*, *3* 60:*19*,
*20* 162:*4*
**changes** 34:*17*
38:*24* 41:*22* 49:*2*
54:*9* 68:*9* 112:*20*
**changing** 29:*4*
38:*4* 95:*15*
**characterize** 36:*15*
83:*5* 89:*6*
**characterizing**
88:*16*
**charge** 32:*7* 171:*6*
**charged** 108:*5*
**charges** 42:*23*
**Cha's** 106:*21*
**check** 42:*19*
**checking** 16:*18*
**Chicago** 2:*7*, *14*
107:*1*, *2* 191:*2*
**chief** 12:*2*, *4*, *5*
23:*5*, *6*, *15*, *16* 27:*9*,
*15*, *21*, *24* 29:*9*, *20*,
*23* 30:*4*, *8*, *10* 31:*1*,
*6*, *10* 33:*14*, *24*
34:*7*, *9*, *12*, *15*
35:*18*, *20*, *22* 36:*3*,
*4* 37:*3*, *4*, *11*, *12*, *14*,
*15*, *16*, *21* 43:*16*
48:*12* 51:*7* 54:*18*
64:*2*, *3* 94:*16*
101:*21* 153:*13*
160:*12* 162:*23*, *24*
163:*18* 176:*10*
178:*8* 186:*20*
**chiefs** 37:*5*, *7*, *9*, *10*,
*18*, *23* 149:*5*
**children** 13:*4* 14:*8*
**choice** 130:*22*
136:*1*
**chose** 19:*12*
**CHRISTOPHER**
1:*16*
**Cicero** 106:*24*
**circles** 133:*15*
**circumstances**
111:*21*

Joseph Ranzino   -   9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1130 of 1503 PageID #:1521
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

citizen 109:*1*
City 9:*9* 14:*6*
civil 11:*1* 13:*23* 14:*3*
civilian 21:*4* 163:*12*
civilians 29:*14*, *16* 30:*2* 34:*8*
claimed 132:*1*
claims 173:*7*, *13*, *19* 181:*15*
classification 32:*12*
clear 114:*1* 145:*13*
clerical 24:*18* 40:*23*, *24* 41:*19*
close 106:*22*
closer 23:*19*
clue 98:*7* 128:*2* 151:*20* 169:*24* 182:*18*
coat 67:*16*
Cochran 67:*1*
College 11:*6* 12:*14* 13:*5*
color 74:*6*
combine 32:*8*
combined 32:*6*, *24* 38:*4*
come 19:*16* 37:*2* 42:*5* 54:*14* 57:*6* 67:*3* 71:*13* 75:*3* 77:*16* 96:*18* 130:*8* 155:*4* 162:*9* 171:*21* 177:*7* 180:*12* 186:*13*
comes 70:*19*
comfortable 104:*2*
coming 57:*7* 126:*7*
command 21:*8* 22:*9*, *10* 31:*21* 34:*7*, *10* 74:*12*
commencement 190:*6*
comment 18:*6* 120:*24* 122:*15* 131:*12* 135:*6* 136:*20* 141:*17* 145:*18*
comments 176:*8*
commit 108:*16*

committed 106:*16* 108:*14*
committing 88:*4*
common 51:*5* 53:*23* 54:*3* 55:*16*
Community 30:*20*
companies 10:*16*, *18*
company 10:*18*
compared 141:*7* 153:*12*
comparison 107:*12*
compensatory 63:*21* 64:*8*
complain 51:*5* 55:*16*
complainant 89:*7*
complainants 52:*17* 188:*11*
complained 52:*18*, *20* 53:*2*, *3* 56:*5*, *22* 59:*22* 61:*11* 68:*13* 75:*9* 78:*14* 79:*7*, *17* 80:*15* 102:*8* 117:*11*, *23* 146:*4*
complaining 53:*20* 54:*5* 74:*20* 79:*24* 81:*16* 82:*7*, *9*, *18* 95:*18* 110:*21*
Complaint 6:*13*, *17*, *20*, *21* 7:*21*, *23* 62:*9*, *12*, *18*, *19*, *23*, *24* 63:*10* 79:*12* 81:*13* 89:*5* 98:*12* 103:*11*, *13*, *16*, *17* 105:*7*, *9* 111:*7*, *10* 112:*12*, *16* 114:*20*, *21* 115:*7* 117:*7* 118:*8*, *16* 124:*17* 125:*1*, *16* 127:*8*, *14* 129:*16*, *23* 130:*18* 141:*3* 144:*3* 145:*19* 146:*5*, *23* 157:*19* 159:*7* 164:*15* 168:*20* 169:*6*, *20* 170:*5*, *17* 171:*13*, *18* 173:*8*, *14* 174:*11*, *15*, *20* 179:*11* 183:*3*, *22*
complaints 54:*17* 78:*22* 80:*19* 97:*6*, *10*, *19* 113:*12*

115:*11*, *13* 116:*8*, *16* 125:*17* 131:*22* 145:*14* 158:*13* 160:*17* 170:*7*, *17* 175:*8*, *10*, *19* 179:*8* 188:*8*
complete 33:*9* 188:*15*
completely 32:*19* 44:*18* 67:*4* 91:*6* 138:*17*
compound 70:*14*, *16* 85:*7* 114:*10* 166:*13*
comprehensive 115:*19* 116:*5*
computer 24:*18*
computers 25:*23* 26:*4*
concern 26:*8*, *9*
concerned 57:*14* 175:*7*
concerning 87:*7* 97:*19* 98:*12*, *22* 154:*8* 159:*6* 160:*20* 161:*11* 170:*4* 171:*17* 176:*6* 186:*20* 190:*8*
concerns 103:*21*
concluded 145:*24*
conclusion 94:*7* 95:*22* 96:*6* 123:*3* 158:*8*
concrete 10:*14*
condition 47:*16* 50:*8*
conditions 81:*8*
condom 121:*14*, *16*
condoms 119:*23* 120:*5*, *24* 121:*6*
conduct 64:*2* 96:*12* 108:*3* 109:*13* 122:*4* 123:*15* 124:*2* 140:*20*, *22* 145:*7* 168:*21* 169:*8*
conducted 142:*18* 179:*7*
conducting 63:*20* 149:*11*

confided 47:*17*
confident 50:*2*
confusing 113:*24* 133:*14*
Congratulations 13:*9*
conjunction 147:*10*
connection 53:*17*
consider 65:*8*
considered 42:*16*, *17* 88:*19*
constant 26:*24*
constantly 57:*6* 182:*2*
consternation 48:*2*
constitute 122:*24*
constitutes 190:*13*
Construction 9:*19*, *20* 10:*8*
contact 161:*22*
contacted 96:*19* 171:*21*
contained 170:*8*, *18*
contains 116:*8*
content 164:*13*
context 65:*13* 66:*4*
continue 9:*22* 122:*18*
continued 33:*1* 124:*2*
contractually 45:*21*
control 95:*3*
convenient 133:*19*
conversation 73:*14* 116:*2* 182:*4*
conversations 72:*15* 73:*19* 157:*16*
convoluted 23:*7* 184:*2*
COOK 1:*10*, *17* 9:*24* 10:*20* 11:*11* 13:*15* 15:*16* 17:*17* 92:*18* 160:*6* 161:*1*, *10*, *20* 174:*6*, *8*, *13*
cooperate 84:*4*
copy 63:*4* 165:*18*, *21*
COR2013-0245 112:*12*
COR2013-245 105:*7*
corner 166:*5*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1131 of 1503 PageID #:1522
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

correct 4:*13* 10:*1,
8* 12:*13* 15:*4, 5, 9*
16:22 21:*9* 24:8
28:*18, 24* 29:24
33:24 34:7 35:*11*
36:*10* 40:22 41:*17*
42:*10* 44:*9, 12*
48:6 50:*12, 21*
51:24 52:6, *13, 18,
24* 53:*4, 21* 61:*3*
62:*19* 64:*11, 24*
65:*16, 20, 24* 68:*14,
24* 74:*21* 75:*11*
78:*5, 8, 11, 15, 23*
79:*8, 15, 18* 80:*13,
16, 21* 81:*9, 19*
82:*10* 84:*11* 85:*4*
86:22 88:5 89:8
90:24 92:*4, 13*
93:*2, 10* 94:*13, 24*
95:*10, 20* 97:*8, 21*
98:*14* 101:*16*
102:*14* 104:*3*
105:*9, 15* 110:*6, 23*
111:*2, 11* 113:*7, 10,
11, 14* 114:*3, 4, 22*
115:*12* 116:*6, 9, 18*
117:*4* 118:*17*
119:*8* 121:*19*
123:*19, 20, 24*
124:*3, 18* 125:*5, 11,
15* 127:*20* 130:24
132:*2, 19* 134:*1, 2,
8, 21* 136:*13, 21*
137:*6* 138:*3, 6, 7,
10* 139:*3, 9, 22*
140:*5, 13* 141:*9*
142:*16, 19* 143:*6,
21* 147:*14* 148:*8,
17, 20* 149:*1, 12*
151:22 153:7
155:*8, 21* 156:*2, 5*
157:*5, 9, 20* 159:*3,
7* 162:*7, 16* 167:*5*
169:*13* 171:*10*
172:*20* 179:*24*
181:*8* 184:6 186:*21*
**Correctional** 169:*6*
**corrections** 12:*18*
32:*20* 42:*4*

**corroborated** 132:*1*
**cost-cutting** 32:*2*
**counsel** 145:*1*
190:*18, 19*
**counseling** 187:*5*
**COUNTY** 1:*10, 17*
10:*1, 20* 11:*2, 6, 11*
13:*16, 17, 22* 14:*4*
15:*16* 17:*15, 17*
34:*21* 35:*3* 92:*19*
160:*6* 161:*1, 11, 20*
174:*6, 8, 13*
**couple** 13:*6* 29:*12,
17* 31:*18* 35:*9*
60:*3, 6* 131:*13*
144:*11* 188:*1, 7*
**course** 6:*10, 12*
162:*17*
**COURT** 1:*1* 5:*2*
12:*17* 15:*3* 18:*22,
23* 108:*8, 10*
150:*15, 17, 19*
151:22 152:*1, 21*
153:*1, 3, 5, 24* 154:*6*
**courteous** 65:*4*
**courthouse** 153:*5*
168:*21* 169:*8*
**courts** 150:*17*
152:*3*
**cover** 92:*18*
**covered** 158:*5*
**coworkers** 79:*8*
80:*10* 84:*11* 85:*14*
**CPD** 105:*14, 24*
**CR** 105:*9*
**create** 54:*12* 94:*4*
95:*4* 126:*14*
**created** 110:*17*
124:*24* 126:*20*
127:*14*
**creating** 102:*2, 9*
125:*14, 18*
**credentials** 99:*8*
155:*14* 156:*7*
**credibility** 184:*8,
13, 19, 21* 185:*4, 16*
186:*5, 21*
**credible** 183:*20*
185:*6, 11*
**critical** 57:*13*

**crooks** 94:*1*
**cross-training** 39:*8*
**CSR** 1:*24* 190:*3*
**currently** 8:*3* 13:*11*
**cuts** 101:*1* 154:*4*
**cutting** 46:*18*

**< D >**
**da** 154:*16*
**dad** 11:22 15:*14*
**DAFFADA** 2:*12*
**daily** 43:*11* 44:*11*
45:*1* 57:*8* 113:*2, 6*
114:*3*
**Dan** 4:7 21:*15*
59:*15* 77:*16*
128:*16, 17, 21*
129:*6* 133:*17* 181:*1*
**dan.herbert@danher
bertlaw.com** 2:*8*
**DANIEL** 2:*5*
**DART** 1:*10* 16:*21*
17:*2, 8*
**date** 155:*10, 12*
179:*18, 20, 21*
**DAVID** 1:*6* 167:*2,
11, 13* 168:*11, 12*
181:22
**Davis** 113:*1, 7*
114:*2*
**day** 26:*23* 32:*5*
37:*1* 39:*4, 5, 7*
43:*11* 44:*18* 51:*11*
61:*20, 23* 70:*12*
107:*13* 122:*4*
142:*23* 147:22
148:*13* 165:*8, 12*
172:24 189:*7* 191:*2*
**days** 35:*9* 48:*23*
49:*1* 109:*12, 16*
144:*11* 147:*13*
**DCSI** 23:7 30:*11,
14* 31:*3, 15*
**deal** 46:*23* 87:*20*
128:22
**dealt** 68:*19*
**December** 105:*8*
106:*1* 112:*13, 17*
118:*17*
**decent** 113:*8*

**decided** 8:7 103:22
154:*17*
**decision** 33:*17*
**decisions** 114:*13*
**declined** 178:*8, 17,
22*
**de-deputized** 108:*2*
**Deerfield** 9:*11*
**defendant** 4:*12*
100:7 156:*20*
160:*4* 167:*8, 10*
169:*7* 170:*3* 171:*16*
**Defendants** 1:*19*
2:*16, 22*
**Defenses** 62:*12*
**deficiencies** 57:22
61:*1*
**delineate** 82:*1*
**delivered** 32:*13*
**deliveries** 42:*17*
**Democratic** 16:*4, 7*
**demographics**
92:*18, 20*
**demoted** 153:*17*
**deny** 183:22
**department** 8:*10*
10:20 11:*23* 15:*20,
23* 26:*23* 30:20
32:20 33:*8, 9* 42:*4*
87:7 120:22
127:*16* 142:*19*
147:*3* 159:*6* 167:*6*
176:*17*
**depend** 87:*14*
92:*17, 20*
**depending** 51:*2*
69:*19* 70:*18* 88:*10*
91:22
**DEPONENT** 189:*9*
**deposition** 1:*21*
3:*10* 4:*12, 17* 6:*8*
190:*10, 15*
**deputy** 12:*2, 4, 5*
23:*5, 6, 16* 27:*9, 15,
21, 23* 29:*9, 19, 23*
30:*4, 8* 31:6 34:*9*
37:*17* 162:*23*
163:*18*
**derogatory** 97:*20*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1132 of 1503 PageID #:1523
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**describe** 13:*1*
40:*16*, *17* 67:*8*, *12*
68:*10* 87:6 147:*1*
**described** 174:*10*
**description** 45:*11*
**desirable** 24:*20*, *24*
**desk** 69:*21* 166:*3*
**detailed-oriented**
84:*9*
**detail-oriented**
57:*18* 84:*24*
**details** 173:*9*
**determination**
89:*15* 113:*19*
**determine** 88:*22*
90:*12* 165:*1*
**determined** 138:*13*,
*15*
**diabetes** 164:*8*
**dial** 8:*21*
**died** 12:*9*
**difference** 12:*19*
**different** 10:*10*
19:*11* 20:*13* 25:*19*
28:*8* 33:5, *6*, *9*
34:*17* 37:*13* 44:*7*,
*8*, *19*, *24* 45:*1*, *14*
49:*19* 56:*11* 57:*11*
63:*9* 71:*12* 72:*3*
90:*9* 91:*7*, *14*, *22*
99:*14*, *18* 120:*1*
147:2, *4* 151:*1*
153:*4* 165:*4* 171:*23*
**difficult** 4:*22* 5:*1*
**dinner** 17:*11*
**dinosaur** 38:*22*
**diploma** 14:*1*
**direct** 22:*24* 23:*3*
**direction** 36:*24*
88:*1* 111:*13*, *14*, *16*
190:*13*
**directly** 16:*1* 81:2,
*13* 190:*20*
**director** 19:*23*
20:*1*, *8*, *10*, *11* 36:*9*
43:*3*, *13*, *15* 66:*15*,
*23* 87:8 148:*24*
149:6 162:*12*
**directors** 31:*19*
**disciplinary** 35:*11*
115:*20* 175:*4* 181:*8*

**discipline** 63:*22*
64:*10* 87:*4*, *7*, *13*,
*15*, *17* 88:*3*, *4*
107:*20* 109:*3*
180:*19* 186:*12*, *20*
**disciplined** 79:*8*, *14*
86:*21* 107:*17*
108:*20*, *22* 121:*21*
122:*2* 123:*13*, *14*
138:*9*, *12* 140:*12*
143:*5*
**disconnect** 105:*17*
**discovery** 1:*21* 4:*11*
**discrimination**
160:*5*, *11*, *21*, *24*
161:*12* 162:*11*, *20*
163:*7* 175:*20*
176:*16*
**discriminatory** 65:*9*
**discussion** 9:*1*
14:*22* 22:*4*
**Dish** 21:*22*, *24*
**dishonest** 183:*5*, *7*,
*10*
**dismissed** 167:*15*
**dispatch** 41:*3*
57:*17* 69:*9*, *11*
70:*17* 72:6, *12*
93:*13* 185:*20*, *23*
**dispatcher** 29:*18*
68:*23* 70:*4*, *8*, *21*,
*22* 71:*3*, *15*
**dispatchers** 70:*10*
**disposition** 99:*21*
**disproportionately**
61:*14* 76:*20*
**dispute** 168:*1*
**DISTRICT** 1:*1*
**DIVISION** 1:*2*
76:*1*
**document** 62:*14*, *17*,
*21*, *22* 63:*10* 100:*9*
105:*4* 118:*10*
144:*22*, *23* 147:*19*
156:*15* 157:*12*
161:*22*, *24* 162:*10*,
*19*, *21* 165:*24* 180:*7*
**documented** 163:*6*
**documents** 6:*7*, *9*,
*23* 158:*4* 160:*16*

169:*18*, *20*
**dog** 187:*9*, *14*
**doing** 13:*24* 16:*14*
28:*10* 38:*18* 42:*5*
47:*7* 48:*24* 89:*18*
**doubt** 32:*10*
**driven** 129:*24*
**dropped** 108:*19*
**Dude** 185:*12*
**due** 73:*11* 147:*10*
149:*18* 154:*3*
**duly** 4:2 190:*7*
**dumb** 66:*24*
**duplication** 32:2
**Duran** 37:*11*, *17*
**duties** 148:*17*, *20*
149:*10* 153:2 184:*4*
**duty** 16:*16* 62:6
63:*20* 64:6 71:*12*
78:*10* 81:*24*
106:*19* 109:2
121:*11*

**< E >**
**earlier** 85:*20*
111:*24* 175:2 188:6
**early** 10:6, *11*
16:*13* 17:*12* 18:*24*
24:*17* 33:22 38:8,
*20* 147:6, 7, 8, *9*
154:*19*, *20* 155:*9*,
*11* 163:*18*, *19*
**easier** 8:*14*
**EASTERN** 1:2
**easy** 180:*12*
**edges** 67:5, *7*, *12*
**education** 11:7
67:*10*
**EEOC** 98:*12* 171:6,
*10*, *12* 179:*8*, *10*
**eight** 144:*15*
**either** 13:*20* 23:*15*
163:*4*
**Election** 16:*16*, *23*
**electronic** 19:*1*, *4*,
*24* 20:*15*, *18*, *23*
22:7 25:*14*, *22*
57:*12* 130:*1*
148:*24* 163:*8*
**else's** 130:*7* 140:*9*

**EM** 22:*13* 23:*20*
24:*7*, *13*, *15* 25:*3*
29:*10* 32:*15* 40:*20*
44:*4* 83:*5*, *21* 87:*8*
124:*24* 126:*12*
127:*15* 150:*17*
153:*5*, *10*, *13*
162:*12* 176:*10*, *17*
**EMERY** 2:*18*
**employed** 8:*3* 9:*24*
**employee** 15:*16*
117:*11* 165:*10*
166:2 174:*7*, *13*
183:*9* 188:*17*
190:*17*, *18*
**employees** 17:*14*
18:*14* 19:*16* 43:2
45:*7*, *13* 48:*12*
54:*4*, *16* 57:*11*
65:7 74:*19*, *20*
76:*17*, *21* 85:*21*
86:*5*, *12* 94:*1*
113:*14* 116:*17*
117:*22* 121:*10*
145:*15*, *22* 146:*1*, *4*
184:*5* 186:*21*
**employment** 163:*3*
183:*21*
**empty** 7:*5*
**ended** 27:*9* 33:*20*
95:*10* 108:2 109:*9*
**enforcement** 16:*17*
**engaging** 121:*10*
**enjoy** 85:2
**entered** 124:*14*
**entire** 130:*24* 154:*5*
**entities** 32:*15*
**entitled** 156:2, *8*
**environment** 94:*5*,
*16*, *24* 95:*8*, *10*, *15*,
*20* 96:*4* 98:*23*
101:*22* 102:2, *5*, *8*,
*19* 103:*1* 110:*17*,
*23* 124:*24* 125:*15*,
*19* 126:*14*, *20*
127:*15*
**equally** 49:*12*
**equipment** 103:2
**especially** 20:*20*
**essentially** 92:2

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1133 of 1503 PageID #:1524
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

152:*4*
**established** 141:*6*
**ETHAN** 2:*18*
158:*23*
**ethnicities** 120:*21*
**ethnicity** 188:*15*
**eventually** 12:*12*
22:*20* 82:*6*
**everybody** 21:*2*
22:*13* 24:*10* 31:*9*
37:*6* 45:*4* 47:*22*
49:*18* 52:*20, 23*
56:*10* 57:*4* 61:*22*
68:*7* 69:*18* 74:*16*
114:*17*
**everything's** 30:*22*
**evidence** 61:*17*
114:*24* 115:*3*
137:*10* 140:*17*
141:*24* 145:*6, 13*
**evident** 136:*1*
**evolving** 38:*13*
**ewhite@emerylawltd**
**.com** 2:*21*
**exact** 8:*16* 48:*19*
162:*22*
**exactly** 40:*4* 74:*16*
88:*20* 91:*10*
135:*10* 143:*18*
167:*24*
**exam** 24:*5*
**EXAMINATION**
3:*1* 6:*4* 188:*4*
190:*7*
**examined** 6:*2*
**exams** 11:*1* 13:*21,*
*23* 24:*3* 151:*2*
**exceptions** 91:*21*
**ex-Chicago** 20:*3*
33:*7*
**Excuse** 7:*14* 17:*22*
117:*20* 127:*24*
**excuses** 164:*9*
**Exhibit** 3:*10* 62:*11*
99:*10, 15, 23* 101:*5*
144:*14, 16* 156:*11*
177:*14*
**expect** 156:*6*
**expected** 24:*16*
**explain** 87:*16*

**explanation** 35:*16*
**explosive** 130:*16*
**expressed** 26:*18*
**expressing** 19:*10*
**expression** 121:*17*
**eyesight** 63:*5*

**< F >**
**face** 54:*13* 125:*24*
126:*3*
**fact** 19:*21* 68:*12*
78:*13* 82:*18*
110:*20* 119:*4*
121:*18* 138:*20*
151:*21* 152:*16*
157:*4* 166:*7*
178:*22* 186:*17, 19*
**factors** 69:*22*
**factory** 44:*16*
**facts** 61:*17* 114:*24*
137:*10* 140:*16*
141:*24*
**fair** 19:*17* 35:*22,*
*24* 45:*4* 80:*2* 88:*2*
89:*22* 103:*8*
108:*14, 15* 140:*11*
186:*22*
**fall** 91:*6*
**familiar** 51:*20, 24*
**family** 11:*8* 12:*23,*
*24* 13:*1* 22:*22*
**far** 44:*24* 45:*12*
69:*3* 103:*20* 108:*3*
149:*10* 155:*20*
**father** 11:*13, 15*
12:*8*
**fax** 112:*4*
**February** 154:*20*
**feel** 5:*15* 45:*9*
**feeling** 60:*7*
**feelings** 95:*4*
**fell** 109:*12*
**felony** 108:*5*
**felt** 104:*2*
**female** 106:*9, 13*
126:*12* 163:*24*
164:*5* 165:*10* 166:*2*
**FERGUSON** 1:*5*
78:*5, 6, 14*
**fights** 55:*19*

**figure** 121:*13* 150:*6*
**figured** 150:*5, 10*
**file** 89:*5* 175:*3*
**filed** 81:*7* 98:*13*
158:*14* 167:*4*
168:*19* 169:*6*
171:*6, 10* 179:*11*
188:*9, 18*
**files** 100:*4*
**fill** 19:*9* 28:*20*
150:*16*
**filled** 147:*18* 162:*5*
**filling** 51:*1* 164:*20*
**final** 33:*17* 99:*21*
**Finally** 169:*5*
**find** 31:*8* 47:*19*
167:*23*
**finding** 154:*7*
**findings** 142:*22*
143:*16* 144:*18*
145:*17* 175:*6*
177:*15*
**fine** 8:*17* 47:*7*
59:*17* 63:*6* 77:*21*
141:*15* 142:*7*
175:*2* 177:*8* 179:*15*
**finish** 5:*5* 46:*6*
70:*6* 115:*8* 161:*8*
**fired** 64:*23* 66:*11,*
*13*
**FIRM** 2:*5*
**first** 10:*19* 22:*11,*
*18, 19* 32:*1* 87:*19*
99:*20* 100:*8*
101:*12* 107:*22*
152:*9* 156:*16, 22*
165:*23*
**five** 59:*5* 77:*20*
187:*18*
**flesh** 109:*11*
**flipping** 177:*13*
**floor** 31:*14*
**FMLA** 35:*6*
**follow** 7:*20* 24:*5*
89:*19* 106:*7* 117:*8*
153:*3* 160:*6, 7*
161:*1, 22*
**followed** 42:*7*
87:*11* 89:*11* 107:*23*
**following** 155:*5*

185:*23*
**follows** 6:*3*
**follow-up** 188:*2*
**follow-ups** 187:*19*
**foot** 180:*22*
**foregoing** 190:*10*
**forever** 23:*11*
86:*18* 102:*22*
**forget** 119:*23*
120:*4* 121:*6*
**form** 17:*20* 19:*18*
24:*22* 36:*17* 40:*11*
41:*8* 43:*4, 22*
45:*16* 46:*10* 48:*7,*
*14* 49:*7, 13* 50:*13*
51:*8, 15* 52:*7*
57:*24* 58:*20* 61:*4,*
*16* 65:*10* 66:*2, 17*
68:*4, 15* 70:*13*
73:*24* 74:*14, 22*
75:*12, 20* 76:*22*
77:*12* 78:*16* 80:*22*
81:*10, 20* 82:*11*
83:*7, 23* 84:*12*
85:*5* 86:*23* 88:*6,*
*24* 89:*23* 90:*14*
91:*17* 92:*14* 93:*3*
94:*6, 18* 95:*19, 21*
96:*5, 15* 97:*12, 22*
99:*21* 100:*21*
102:*15* 104:*5, 8*
111:*3* 113:*15*
114:*9, 23* 116:*6, 11,*
*19* 117:*5, 13* 121:*2*
123:*2, 21* 125:*20*
126:*22* 131:*1, 4*
132:*3, 11* 134:*9, 22*
135:*7, 16* 136:*7, 14*
137:*9* 138:*4, 16*
139:*11, 13, 23*
140:*16, 24* 141:*19,*
*23* 143:*7, 22* 146:*6*
147:*15* 149:*2*
152:*6* 153:*18*
157:*8* 158:*7, 16*
159:*8* 160:*13*
162:*4, 13* 166:*12*
170:*10, 20* 173:*15*
174:*16* 175:*12, 22*
176:*9, 12, 18*
177:*20* 181:*9*

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1134 of 1503 PageID #:1525

182:*15* 183:*12, 24*
184:*23* 186:*23*
**formal** 26:*19* 174:*9*
**former** 31:*10*
**forming** 157:*18*
**forth** 14:*13* 90:*5*
**found** 24:*17*
108:*16* 119:*21*
186:*5*
**foundation** 17:*21*
19:*19* 24:*9, 23*
36:*18* 43:*5* 45:*17*
46:*11* 48:*8, 15*
49:*8, 14* 50:*14*
51:*9, 16* 52:*8* 58:*1,*
*20* 61:*5, 17* 65:*11*
66:*3, 18* 68:*5, 16*
69:*2, 13* 70:*14*
74:*1, 23* 75:*13, 21*
76:*23* 77:*13* 78:*17*
80:*23* 81:*11, 21*
82:*12* 83:*8, 24*
84:*13* 85:*6* 86:*24*
88:*7* 89:*1, 24*
90:*15* 91:*18* 92:*15*
93:*4* 94:*7, 19*
95:*22* 96:*16* 97:*13,*
*23* 100:*22* 102:*16*
104:*6, 8* 111:*4*
113:*16* 114:*10, 24*
116:*12, 20* 117:*6,*
*14* 121:*3* 123:*3, 22*
125:*21* 126:*23*
131:*2, 4* 132:*4, 12*
134:*10, 23* 135:*8,*
*17* 136:*8, 15*
137:*10* 138:*5, 17*
139:*13, 24* 140:*16*
141:*1, 23* 143:*8, 23*
146:*7* 147:*16*
149:*3* 152:*7*
153:*19* 158:*8, 17*
159:*9* 162:*14*
166:*13* 170:*11, 21*
173:*16* 174:*17*
175:*13, 23* 176:*13,*
*19* 177:*21* 181:*10*
182:*16* 183:*13*
184:*1, 24* 186:*24*
**four** 129:*13* 155:*6,*

*7*
**frame** 107:*24*
**free** 5:*15*
**friend** 17:*8* 93:*5*
122:*10*
**friends** 11:*11*
**front** 6:*7* 62:*22*
121:*24* 130:*23*
181:*16, 17, 23*
**froze** 7:*6*
**frustrating** 46:*23*
**full** 160:*1* 168:*21*
169:*8*
**function** 32:*8*
**fundraisers** 17:*13,*
*17* 18:*15*
**furiously** 177:*2*
**further** 127:*4*
129:*13* 160:*2*
187:*24* 189:*9*

**< G >**
**game** 44:*19* 57:*16*
**GED** 11:*5* 13:*24*
**general** 89:*21*
90:*12, 23* 166:*15*
**generalizing** 90:*5*
**generally** 49:*5*
59:*19, 20* 76:*3*
**generated** 186:*13*
**generic** 150:*2*
**gentleman** 163:*11*
**Gentlemen** 189:*6*
**getting** 8:*14* 21:*20*
26:*3* 28:*6* 31:*10*
32:*24* 54:*9, 10*
56:*1* 79:*7* 97:*5*
120:*12* 122:*22*
149:*24* 178:*3*
179:*1, 3* 180:*22*
**give** 8:*22* 41:*12*
43:*24* 46:*18* 48:*16*
53:*16* 58:*17* 67:*18,*
*19* 70:*11* 71:*3, 19*
72:*3* 77:*7* 90:*2*
101:*3* 102:*20*
104:*14* 109:*16*
133:*15* 135:*1*
149:*21* 183:*16, 17*
184:*16* 187:*18*

**given** 4:*16* 25:*15*
26:*10* 27:*3* 28:*3*
35:*21* 59:*23* 68:*22,*
*23* 70:*3* 82:*8*
107:*21* 143:*4*
144:*22* 150:*13*
155:*13, 15* 171:*13*
190:*14*
**giving** 82:*10*
112:*22* 149:*23*
**glass** 115:*22*
**gloves** 71:*9*
**Go** 8:*11* 9:*10, 16*
11:*3* 12:*15* 13:*18*
14:*6* 17:*17* 18:*5,*
*14, 17, 19* 20:*24*
22:*14, 15, 16, 17*
25:*23* 26:*4* 35:*3*
36:*1* 37:*6* 40:*1, 5*
41:*9* 43:*24* 44:*16,*
*18* 45:*18* 46:*15, 19*
47:*4* 48:*16* 49:*16*
50:*16* 51:*10* 54:*8*
55:*5, 6, 7, 8, 20*
56:*8* 57:*1, 19*
58:*21* 60:*1* 61:*6,*
*18* 62:*13* 64:*13*
65:*12* 66:*8* 68:*6*
69:*5, 8, 14* 70:*15*
76:*5* 78:*18* 79:*2,*
*10, 20* 80:*4, 24*
81:*22* 82:*13, 21*
83:*9* 84:*1, 14* 85:*8*
88:*5, 8* 89:*14* 90:*1,*
*16* 91:*19* 92:*16*
93:*12* 94:*8* 95:*2,*
*12, 23* 96:*7, 17, 24*
97:*14, 24* 100:*3, 23*
101:*5* 102:*17*
103:*2* 104:*9*
110:*12* 111:*5*
113:*17* 114:*11*
115:*1, 3, 15* 116:*13,*
*21* 117:*15* 118:*2*
122:*3* 123:*4, 23*
125:*22* 126:*24*
128:*14* 129:*20*
131:*5* 132:*13, 21*
133:*8* 134:*11, 24*
135:*9, 18* 136:*9, 16,*
*23* 137:*12, 21*

139:*14* 140:*1*
141:*2* 142:*2* 143:*9,*
*24* 144:*14, 15, 18*
146:*8* 147:*17*
149:*4* 150:*9* 152:*2,*
*5, 8, 13, 15, 21*
157:*12* 158:*18*
159:*10, 22* 160:*15*
161:*7* 166:*14*
170:*1, 12, 22* 173:*4*
174:*3, 18* 177:*22*
178:*6, 12* 180:*13*
181:*1, 11* 183:*14*
185:*9* 186:*3*
**God** 12:*9* 23:*4*
98:*5*
**goes** 22:*13* 32:*4*
164:*24*
**going** 4:*22, 24* 6:*13*
7:*2, 22* 14:*13*
25:*21* 26:*4, 5* 28:*7*
29:*6* 31:*9* 32:*8*
35:*1* 39:*9, 22*
41:*20* 42:*18* 44:*17,*
*18* 49:*3* 54:*12*
55:*8, 9* 56:*12*
58:*11, 12* 59:*10*
62:*8* 63:*12* 67:*19*
69:*23* 82:*2, 3*
83:*12* 86:*18* 90:*5*
99:*13* 109:*10, 20*
120:*10* 126:*6*
130:*15* 131:*18, 19*
135:*24* 140:*9*
144:*18* 149:*17*
150:*8, 14* 153:*4*
154:*18* 171:*20*
172:*21, 22* 175:*17*
176:*23* 177:*1*
178:*13* 180:*13*
186:*7*
**Good** 4:*3, 5, 7* 9:*23*
13:*9* 28:*10* 29:*7, 8*
37:*19* 50:*6, 7* 60:*7*
65:*5* 77:*17* 127:*1*
154:*18* 155:*21*
168:*13* 180:*4*
**goodness** 20:*1*
**GOs** 89:*11*
**gotten** 11:*5* 34:*24*

Joseph Ranzino    -    9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1135 of 1503 PageID #:1526
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

35:1  126:5

**government**  10:*19*
**grab**  115:22  187:*10*
**grade**  12:*1, 3*  23:*3,
16*  30:*17, 23*  36:22
66:*14*  68:*18*  81:*13*
98:17  176:22
**grades**  12:6
**graduate**  9:*13*
**graduated**  12:*12*
**graduating**  12:*15*
15:*3*
**grandchildren**  13:*6,
7*
**Grant**  13:*12*
**granted**  64:*8*
**granting**  63:*21*
**Great**  31:22
109:22  159:*20*
178:*13*  189:*3*
**GREGORY**  1:*13*
**grew**  9:*8*  67:*9*
**grievance**  81:*7*
109:*5, 6*  121:*19*
174:*21*
**grievances**  81:*9*
**grieved**  109:*5*
**group**  39:*4, 5*
**grow**  9:*6*
**guess**  28:*14*  30:*16*
34:*4*  36:*6*  61:*8*
76:*11*  90:*17*  91:*3*
166:*24*
**guidance**  161:*23*
**guy**  20:*2*  47:*14*
54:*13*  55:*10*  58:*11,
12*  69:*18*  71:*9*
73:*2*  84:*9, 16, 21*
85:*1*  113:*9*  114:*12*
119:*16, 24*  164:*7*
168:*13, 23*  169:*15*
171:*20, 22*  172:*1, 2,
18, 23*  173:*3*
**guys**  20:*6*  21:*19*
35:*6*  39:*10, 11, 16*
42:*5, 7*  54:*8*  71:*12*
73:*22*  74:*5*  83:*1*
176:*23*  185:*23*
187:*10*
**guy's**  164:*7*  166:*3*

**< H >**
**half**  8:*9*  22:*19*
**halfway**  118:*13*
**Hall**  1:*23*  190:*3*
**hand**  191:*1*
**handing**  16:*8*  131:7
**handle**  57:*19*
60:*13*  83:*11*
**handled**  70:*20*
71:*9*  72:7
**Hang**  104:*6*  137:*7,
8*  138:*21*  158:*16*
180:*21*
**happen**  42:*6*  55:*15*
92:*6*  93:*6*  96:*10*
107:*11*
**happened**  26:*6*
55:*14, 15*  65:*1*
67:*3*  72:*13*  74:*9*
91:22  104:*21*
106:*5, 6*  111:*20*
116:*24*  119:*9*
127:22  129:*9*
147:*1*  164:*4*
165:*12*  171:*24*
172:*3*  181:*24*
182:8, *11*
**happening**  48:*23*
169:*14*  179:*14*
**happier**  58:*23*
**happy**  45:*6, 7, 8, 13*
46:*5*  47:*24*  67:*17*
68:*3*  85:*9, 21*
**harass**  119:*16*
**harassed**  110:*16, 21*
**harassing**  119:*21*
165:*17*
**harassment**  94:*12,
17*  98:*1*  119:*1, 7,
10*  122:*9, 12, 15, 17*
123:*1, 11, 14*
151:*18*  160:*5, 11,
21*  161:*1, 12*
162:*11, 20*  163:*7*
164:*3*  168:*7*
**hard**  21:*23*  128:*20*
129:*2*
**head**  5:*11*
**health**  34:*23*  35:*5*
154:*18*

**hear**  4:*20*  6:*16*
7:*14, 24*  11:*20*
14:*9, 14*  59:*12*
66:*6*  93:*18*  104:*7*
134:*17*  173:*19*
**heard**  6:*17*  8:*1*
120:*23*  131:*13*
133:*3*  134:*7*
169:22  173:2, *19*
182:6, *9*
**hearing**  8:*15*  18:*1*
**hearsay**  81:*14*
**heart**  147:*7*  148:*10,
12, 17, 21*
**heat**  126:*1*
**heck**  19:*11*
**held**  10:*9, 17*  60:*17*
**help**  45:*4*  125:*2*
129:*3*  185:*11*
**helped**  153:*6*
**HERBERT**  2:*5*
3:*1*  4:*3, 7, 11, 15,
19, 21, 24*  5:*9, 14,
18*  6:*5*  7:*7, 9*  8:*11,
17*  9:*3, 4*  14:*16*
15:*1*  18:*4*  19:22
21:*13, 17*  22:*2, 6*
24:*11*  25:*1, 9*
28:22  36:20  40:*15*
41:*15*  43:*6, 12*
44:*2, 16*  46:*3, 12,
20, 22*  48:*10, 19*
49:*4, 10*  50:*9, 15*
51:*4, 12, 18*  52:*11,
16, 22*  53:*7, 18*
54:*1, 14, 15*  56:*3,
14*  57:*9*  58:*4*  59:*1,
5, 6, 17, 18*  60:*10,
22*  61:*9*  62:*1, 10,
16*  63:*18*  64:*19*
65:*15*  66:*9, 21*
68:*1, 11, 20*  69:*6*
70:*1*  71:*1, 14*  72:*1,
9, 23*  74:*4, 10, 18*
75:*5, 15, 22*  76:*7,
14*  77:*2, 19, 23*
78:*3, 21*  79:*5, 13,
23*  80:*7*  81:*3, 15*
82:*5, 16*  83:*4, 14*
84:*5, 19*  85:*11, 18,
19*  86:*2, 9, 20*  87:*2*

88:*13*  89:*4, 12*
90:*7, 19*  92:*1, 8, 22*
93:*7, 17*  94:*11, 20*
95:*6, 17*  96:*2, 11,
21*  97:*4, 15*  98:*2*
99:*9, 15, 19, 23*
100:*5, 12, 14*  101:*2,
4, 8, 10*  102:*23*
104:*11, 16, 22*
105:*3, 6, 19, 22*
109:*19*  110:*1, 12,
14*  111:*8*  112:*8, 10*
113:*21*  114:*19*
115:*5, 10, 18*  116:*1,
4, 14*  117:*1, 9, 18*
118:*5, 9, 12, 19, 21*
121:*4*  123:*7*  124:*1,
10, 12*  126:*2*  127:*3,
6, 10, 12*  129:*7, 8,
12, 15, 20, 21*
131:*10*  132:*7, 17*
133:*1, 10, 20, 23*
134:*19*  135:*3, 12,
20*  136:*11, 18*
137:*2, 13, 15, 16*
138:*1, 8*  139:*1, 18*
140:*3, 10, 21*  141:*5,
14*  142:*5, 10*
143:*11*  144:*1, 14,
17*  146:*11, 13*
147:*20*  149:*7*
152:*11*  153:22
156:*10, 13, 17, 19*
157:*11, 14*  158:*11,
20*  159:*1, 15, 18*
160:*3, 18*  162:*18*
166:*21*  170:*14*
171:*1*  173:*21*
174:*2, 4*  175:*1, 18*
176:*3, 14, 23*  177:*7,
9, 12*  178:*1, 12, 15*
180:*6, 8, 10, 12*
181:*2, 3, 13*  182:*19*
183:*18*  184:*3*
185:*3, 13*  186:*16*
187:*7, 12, 16, 20, 24*
188:*7, 18*  189:*3, 8*
**hereto**  190:*20*
**hereunto**  191:*1*
**hey**  17:*4*  56:*12*
60:*6*  71:*10*  130:*16*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1136 of 1503 PageID #:1527
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

131:*14* 133:*4*
180:*21*
**high** 9:*10, 13* 14:*1*
42:*22*
**higher** 88:*5* 92:*12*
93:*1*
**Highway** 13:*12*
108:*11*
**hill** 36:*24*
**hire** 16:*15, 16*
**hired** 15:*8, 11, 15*
**Hispanic** 125:*5, 11*
**history** 101:*7* 116:*6*
**hit** 107:*6, 7*
**hold** 11:*22* 46:*6*
56:*17* 70:*6* 161:*19*
169:*19*
**holler** 114:*17*
**hollering** 128:*10*
**home** 44:*18*
**honestly** 35:*5* 70:*17*
**horrible** 128:*22*
**hostile** 83:*6, 21*
94:*4* 95:*8, 10, 14,*
*16, 19* 96:*4* 98:*23*
101:*22* 102:*2, 5, 8*
110:*17, 22* 124:*24*
125:*14, 18* 126:*14,*
*20* 127:*15*
**house** 15:*13* 42:*20*
49:*6*
**huge** 35:*3*
**Human** 50:*8*
142:*19* 151:*24*
152:*17* 177:*17*
178:*9, 18, 23* 179:*6,*
*10*
**hurt** 60:*9*
**Hurtado** 124:*23*
125:*5, 10*
**hypothetical** 81:*11*

**< I >**
**I.V** 1:*4* 68:*12*
**IA** 110:*2* 118:*13*
124:*14* 129:*16*
**ID** 3:*10*
**idea** 145:*20, 24*
**identified** 173:*9*
**Identify** 173:*6*

**ignorant** 145:*14, 21*
146:*1*
**ILLINOIS** 1:*1, 18,*
*24* 2:*7, 14, 20*
13:*13* 191:*2*
**imagine** 111:*20*
**immediately** 96:*19*
163:*14*
**implying** 136:*20, 24*
**important** 184:*9*
**inadvertently** 130:*7*
**inappropriate**
65:*24* 118:*24*
136:*20* 139:*21*
140:*23* 141:*8, 17*
163:*13* 164:*1, 13*
166:*10*
**incident** 92:*12*
93:*1* 106:*3* 107:*23*
108:*21* 130:*4*
142:*12* 143:*6*
148:*3* 174:*10*
**incidents** 157:*18*
**incomplete** 81:*11*
**inconsistent** 174:*14*
**inconsistently** 174:*7*
**incredible** 185:*14*
186:*6*
**independent** 89:*15*
**indicate** 74:*6*
**indicated** 100:*16*
152:*21*
**indicating** 136:*20*
139:*7* 140:*13* 157:*8*
**indirectly** 16:*3*
81:*4* 190:*20*
**individual** 17:*13*
57:*18* 89:*6* 167:*1*
173:*6*
**Individually** 1:*12,*
*13, 15, 16*
**individuals** 32:*11*
40:*19* 44:*24* 94:*17*
132:*8* 135:*5*
153:*23* 182:*13*
**indoor** 48:*22*
**influence** 69:*10*
**informal** 174:*9*
**information** 158:*1, 5*
**infraction** 87:*14, 20,*
*21* 88:*10, 11, 16, 21,*

*23* 89:*7, 14, 21, 22*
90:*10, 13, 21, 23*
91:*1, 4* 109:*14*
122:*5* 187:*3*
**infractions** 88:*3*
181:*8*
**in-house** 49:*6*
**injudicious** 108:*23*
**inquiries** 19:*7*
31:*11, 12*
**inquiring** 31:*8*
**inserted** 41:*11*
**in-service** 150:*9*
**inside** 24:*18* 25:*3*
41:*21* 43:*10* 47:*16,*
*19* 49:*12* 84:*18*
103:*18*
**instance** 47:*11*
163:*17*
**instances** 146:*3*
163:*20*
**insubordination**
91:*5*
**insurance** 12:*22*
**intent** 31:*14*
**interest** 19:*14*
26:*18*
**interested** 28:*11, 13,*
*21* 190:*20*
**interject** 140:*15*
**interjected** 17:*23*
**Internal** 112:*11*
**internet** 8:*21* 21:*22*
**interpretation**
76:*12* 135:*22, 23*
**Interrogatories**
99:*11* 100:*8*
156:*11, 22* 157:*5*
**interrogatory** 169:*1*
174:*3*
**interrupt** 59:*16*
**Intervention** 30:*21*
**interview** 83:*20*
98:*3, 8* 99:*2*
171:*21* 172:*22*
179:*22*
**interviewed** 83:*15,*
*16* 132:*9* 139:*2*
142:*17* 144:*2* 157:*6*
**interviewing** 28:*8*

**investigate** 80:*9*
165:*15*
**investigated** 108:*13*
111:*10* 125:*13*
128:*3, 6* 136:*12*
**investigation** 73:*11*
96:*12* 97:*8* 98:*4,*
*10, 12, 20, 22*
101:*16* 108:*1*
110:*6* 117:*3*
132:*23* 136:*19*
137:*3, 6* 138:*2*
139:*3, 6, 8* 142:*18*
143:*1* 145:*2* 146:*5*
147:*11, 23* 149:*18*
164:*23* 179:*7*
**investigative** 177:*14*
**investigator** 11:*24*
20:*24* 21:*6* 22:*9*
23:*19* 27:*4* 66:*16*
72:*24* 73:*21* 86:*14,*
*15* 113:*1* 118:*22*
119:*5* 124:*21, 23*
127:*13, 19* 129:*22*
134:*4* 146:*17*
152:*17, 20* 168:*15*
181:*14, 15, 17*
188:*19, 22*
**investigators** 29:*3,*
*10, 17, 24* 30:*1*
34:*6, 8* 38:*14*
41:*21* 54:*7* 60:*18,*
*19* 74:*12* 98:*6*
99:*7* 102:*21* 113:*3*
125:*4* 130:*9* 133:*3*
138:*14* 139:*17, 20*
141:*7* 142:*14*
**investigator's** 45:*11*
**invited** 17:*11*
**involved** 81:*18*
107:*5* 168:*4*
**issue** 77:*1, 9, 10*
103:*22* 185:*16*
**issued** 186:*20*
**issues** 38:*19* 74:*11*
153:*5*

**< J >**
**Jack** 20:*3, 5*
**jail** 23:*6* 30:*12*
106:*23*

Joseph Ranzino   -   9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1137 of 1503 PageID #:1528

**Jaime** 124:23
125:5, 10
**Jefferson** 2:6
**jeopardy** 49:24
**Jessie** 71:15, 17, 18
72:11, 16
**job** 10:3, 19 12:21
34:19 36:23 38:18
44:5 45:10 46:24
47:19 48:2, 3
49:18, 24 55:22
56:1 60:9 61:23
69:5, 8 70:7, 11
71:3, 7, 20 72:3
75:4 83:13 84:4
110:24 111:15
112:1 114:15
122:22 126:21
146:22 148:17
152:10, 12, 13
184:15
**jobs** 9:19, 21 10:13,
14 11:2 13:21
24:18, 20 42:18
43:1, 2 49:21, 23
55:21 69:11, 21
70:3 72:12 82:2
**Joe** 17:24 43:23
53:12 59:8 64:16
67:23 86:16
104:13 128:16
138:22 139:15
142:2 188:1
**Johnnie** 67:1
**joining** 15:19, 22
**jokes** 122:20
**joking** 176:8
**JOSEPH** 1:11, 21
3:1 4:12 6:1
100:7 156:20
**JR** 1:4
**judge** 184:5
**judging** 16:18
**July** 171:7
**June** 18:24 168:19
169:5
**JUSTIN** 2:12 8:11
justin@ilesq.com
2:15

< K >

**keep** 21:20 37:5
45:13 46:5 47:5
48:4 85:21 165:6
186:1
**KELLY** 2:6 177:1
kelly.krauchun@dan
herbertlaw.com 2:9
**kicked** 21:21
**kid** 71:9
**kind** 23:7 32:14,
15 37:12 65:3
91:1 178:21 184:2,
22
**knew** 15:17 20:5
31:7, 9 46:9
119:24 161:16
166:8
**know** 4:22 5:9
10:14 11:9, 17
12:20, 22 13:21, 23
14:1 15:11, 14
16:9, 16, 17 17:1, 3,
4, 6, 12 18:17
19:12, 14, 20 20:2,
9, 10, 13, 19 21:6,
20, 22 22:13, 15, 22
23:8, 16, 23 24:3, 6,
13 25:20, 21 26:3,
19 27:11, 12 28:5,
7, 9, 15, 19 29:5
30:15, 17 31:11, 17
32:1, 3, 20 33:2, 6,
19 34:3, 23 35:6, 9,
13 36:9 37:17
38:18, 20, 22 39:4,
7, 10, 19 41:23
42:18, 22, 24 43:8
44:15, 16 47:3, 11,
17, 20 48:1, 18, 22
49:2, 20 50:7, 24
51:3, 13, 19, 22
52:1, 2 55:4, 5
57:6, 8 58:13 59:6
60:3, 5, 9 61:19
62:3 64:21 65:14
66:22 67:1, 9, 17,
18 68:9 69:3, 16
71:6, 15, 16 72:24
73:10, 12, 19 75:6
76:13 77:1, 4, 6, 7,
9, 14, 15 78:4

79:11 80:6, 12
81:14 82:3, 15
83:2, 10 84:6, 15,
16 87:23 89:2
92:18 94:10 96:1
98:6, 15 99:4, 5
103:20, 24 104:21
105:10, 13 106:10,
13, 22 107:8, 16, 22
109:6 110:11
111:12, 13, 19
113:7, 23 114:13,
16 115:6 116:22,
23 119:13 120:21,
23 121:1 122:3, 6
123:6 124:5, 6, 7, 9
125:23 126:13
128:6, 19 131:13
132:5, 6, 22, 23
135:10 143:18
144:7 145:17
146:15 149:23
151:1, 11, 17 153:4
154:15, 18 155:20,
23 157:17 158:4, 9
159:12, 13 163:1, 5,
6 164:4 165:5, 11,
21 166:6, 15, 17, 23,
24 167:1, 16, 24
168:9, 10, 15
169:10, 15, 17
171:2, 11, 12, 19, 22,
24 172:1, 2, 15, 18,
23 173:3, 12, 18, 20
174:22 175:7
176:2 178:6 179:2,
4 180:15 182:12
183:8, 15, 17
185:18, 24 187:2, 5
188:14, 15, 23
**knowledge** 50:2
53:6, 23 54:3
68:18 71:23
150:16 159:17
174:7 175:24
176:1, 4, 7
**known** 165:9
**KRAUCHUN** 2:6

< L >

**labor** 168:1, 2
**ladder** 21:2, 4, 5, 8
**laid** 30:22 34:24
35:2, 6, 8, 10
100:17, 19 154:3,
15, 21, 24
**Lake** 11:6
**language** 65:3
163:13
**LaSalle** 2:13
**late** 16:14 28:1
33:22, 23 38:8
56:12 147:6, 9
148:7 154:14, 20
163:18
**LAW** 2:5, 18 16:17
**lawsuit** 158:14
167:4, 17 170:9, 18
**lawyer** 63:7 94:9
95:24 96:8 122:13
123:5
**lawyers** 33:8 145:1
159:2, 5 175:16
**learn** 58:3, 6
112:19
**leaving** 28:6
**left** 8:9 12:1 73:7
163:2
**legal** 94:7 95:22
96:1, 6 123:3 158:8
**LEGRAIN** 1:3
51:19 64:21
**LEINENWEBER**
2:12 3:1 7:6 8:12,
18, 20 14:11, 20
17:20, 23 19:18
21:14, 24 24:9, 22
25:6 36:17 40:11
41:8, 10 43:4, 22
45:16 46:10, 14
48:7, 14, 17 49:7,
13, 16 50:13, 22
51:8, 15 52:7, 14,
19 53:5, 12, 22
54:6, 19, 22 55:2,
18 56:7, 24 57:24
58:19 59:8, 13, 24
60:15 61:4, 16
63:8, 13 64:15
65:10 66:2, 17
67:23 68:4, 15

Joseph Ranzino - 9/8/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1138 of 1503 PageID #:1529

69:2, *13*  70:*13*
71:5, *21*  72:5, *20*
73:24  74:8, *14, 22*
75:*12, 20*  76:4, *10,*
*22*  77:*12, 16, 21*
78:*16, 24*  79:9, *19*
80:3, *22*  81:*10, 20*
82:*11, 20*  83:7, *23*
84:*12*  85:5, *15*
86:6, *16, 23*  88:6,
*24*  89:9, *23*  90:*14*
91:*17*  92:5, *14*
93:3, *11*  94:6, *18*
95:*1, 11, 21*  96:5,
*15, 23*  97:*12, 22*
99:*13, 17, 20*  100:*1,*
*10, 21*  101:6, *9*
102:*15*  104:5
105:*1, 16*  111:*3*
113:*15*  114:9, *23*
115:9, *14*  116:*11,*
*19*  117:5, *13*  118:*1*
121:2  123:2, *21*
124:*4*  125:*20*
126:*22*  128:*16, 19*
129:2  131:*1*  132:*3,*
*11, 20*  133:5, *17, 22*
134:9, *14, 22*  135:7,
*16*  136:7, *14, 22*
137:7, *20*  138:*4, 16,*
*21*  139:*11, 23*
140:7, *15, 24*
141:*10, 19, 21*
142:7  143:7, *22*
146:6  147:*15*
149:2  152:6
153:*18*  158:7, *15,*
*16, 22*  159:*8*
160:*13*  162:*13*
166:*12*  170:*10, 20*
173:*15*  174:*16*
175:*12, 22*  176:*12,*
*18*  177:*3, 8, 20*
180:*21*  181:9
182:*15*  183:*12, 24*
184:*23*  185:*8*
186:9, *23*  187:9, *15,*
*17*  188:5  189:*1, 4*
**letter**  31:*14*
**level**  52:*4*

**liaison**  150:*15, 19*
151:22  152:*1, 22*
153:*1, 24*  154:6
**License**  1:*24*
**lieutenant**  23:*18*
30:*3*  34:*16*  36:4
153:*15, 16*
**lieutenants**  36:5, *6*
153:*11*
**life**  9:*22*  10:2, *11*
11:*8*
**likes**  38:*19*
**LIMITED**  2:*18*
69:*17*
**line**  21:*23*  157:*23*
160:*1*
**lines**  73:*23*
**lingerie**  164:*14*
165:9  166:*23*
**Lisa**  101:*20*  103:*18*
**list**  56:*10*  88:*18*
**listed**  88:22  89:*20*
90:*11, 23*  91:*4*
**listen**  40:7  59:*8, 14*
67:*23*
**literature**  16:*9*
**little**  56:*12*  63:*14*
67:*4*  156:*17*
**live**  13:*11*
**lived**  13:*13*
**Lives**  83:*3*
**living**  92:*21*  93:*15*
**LLC**  2:*12*
**located**  92:*21*  166:*1*
**location**  171:*23*
**Logan**  37:*18*
**long**  8:5  9:*20*
11:*15, 18, 19*  18:*21*
19:*6*  20:*12, 14, 15*
27:*7*  30:*7*  31:22
33:*13*  34:*12*  39:*12*
119:*24*  154:2
186:*11*
**longer**  36:*13*  39:*1,*
*17*
**longest**  37:*10*
**look**  39:*11*  55:7
63:*4*  76:*15*  85:*12*
86:*3, 13*  101:*11*
124:*13*  130:*9*
133:*4*  134:*1, 8*

135:*14*  136:*3, 6, 21*
137:*1, 5*  138:*14, 15,*
*19*  139:7, *20*
140:*13*  141:*18*
142:*13, 14*  144:7
145:3, *8*  146:*15*
154:9  156:*10*
176:6  177:*16*  182:7
**looked**  45:20, *21*
80:*11*  130:*15*
**looking**  59:*19*
86:*10*  99:*21*
115:*20*  130:*21*
139:9  141:7  166:*4*
**looks**  14:*20*  100:*1*
105:*11*  110:*8*
147:*18*
**Lopez**  71:*15, 18*
72:*11, 16*
**losing**  60:*9*
**lost**  21:*13, 14*  26:5
41:*13*
**lot**  9:9  13:*21*
17:*14*  25:*18*  26:*21*
33:*1*  34:*16*  35:7
36:*12*  38:*18*  39:*8,*
*9, 11, 14*  47:*15*
49:2  55:*24*  62:5
69:*22*  83:*11, 12*
98:*15, 16*  122:9
150:*17*  153:5
173:*23*
**lower**  35:*21*

**< M >**
**magazine**  164:*12*
165:9, *16*
**magazines**  166:*10,*
*23*
**major**  88:*11, 16, 23*
89:7, *16*  109:*14*
122:*7*
**majority**  75:*17*
76:*8*
**making**  43:*21*  44:*3*
73:*23*  78:22  81:*18*
113:*12*  114:*13*
118:*3*  119:*20*
122:*20*  137:*4, 8*
140:*12, 23*  149:*11*

154:*8*  164:*9*  175:*7*
183:*1*
**man**  15:*12, 13*
17:*6*  20:2, *5*  47:*12,*
*13*  67:*13*  111:*13*
126:*10, 11, 13*  130:9
**management**  101:*21*
**MANNING**  1:*6*
51:*21, 23*
**manpower**  32:*3*
**man's**  67:*13*
**March**  34:22
154:*20*  155:*11*
179:*19, 22*
**Marengo**  13:*12, 15*
**mark**  62:*10*  99:*10*
**MARKED**  3:*10*
**married**  13:*3*
**match**  12:7  185:*19*
**material**  164:*12*
166:*17*
**matter**  157:*19*
**matters**  188:*8*
190:9
**MCGHEE**  1:*6*
75:7, *9*  76:*15*
77:*10*  80:*12, 20*
182:9
**McHenry**  13:*17*
**mean**  12:*3*  16:*4*
20:*13, 14*  29:*3*
31:7  32:*4*  34:*15*
35:*3*  36:2, *23*
38:*10*  40:*17*  41:*12*
44:*15, 21*  47:*11, 24*
49:2  54:*20*  58:*11*
65:*14*  67:8, *12*
69:*5, 15*  87:*17*
89:3, *18*  91:9
95:*16*  104:*23*
113:*19*  121:5
124:*19*  126:*3*
130:*20*  132:*16*
136:*1*  147:*19*
150:*23*  156:*3, 8*
162:*16*  164:*20*
168:2  179:*16*
185:22
**means**  158:*10*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1139 of 1503 PageID #:1530
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**meant** 20:*16*
130:*13* 132:*16*
136:*5* 152:*3* 167:*9*
**medical** 47:*16* 60:*8*
**medicals** 57:*5*
**melee** 106:*17*
107:*5, 9, 11*
**members** 134:*7*
**men** 38:*19* 120:*20*
**mentality** 83:*1*
**mentioned** 60:*4*
**merely** 39:*4* 126:*15*
**merging** 32:*18*
**merit** 23:*21, 24*
151:*5* 152:*3*
**met** 15:*12, 13* 17:*3,
10* 168:*23*
**metamorphosis**
38:*13*
**Michael** 15:*7, 11*
168:*16, 17, 19*
169:*6* 172:*12*
**MICHELLE** 1:*3*
**middle** 69:*19*
**midnight** 22:*17*
**midnights** 22:*12, 19,
20* 37:*16* 73:*3*
**midway** 109:*20*
129:*14*
**Midwest** 2:*19*
**mind** 37:*5* 104:*16*
137:*17* 140:*9*
187:*10*
**mindset** 33:*9*
**minor** 88:*11, 17, 19,
23* 89:*7, 16* 122:*5*
**minute** 44:*13, 22*
46:*19* 69:*4* 113:*18*
**minutes** 77:*20*
176:*24* 177:*7*
187:*18, 20*
**Misdemeanor**
105:*15* 108:*6, 7, 10*
**misleading** 138:*17*
**misspeak** 29:*13*
**misspoke** 98:*20*
**misstates** 133:*6*
137:*11* 147:*16*
**mistaken** 123:*13*
**moment** 115:*21*
**Monday** 165:*13*

**money** 11:*8* 12:*19*
27:*19*
**monitoring** 19:*2, 4,
24* 20:*15, 18, 23*
22:*8* 25:*14, 22*
27:*10, 16* 29:*13*
30:*8* 41:*5, 24*
57:*12, 17* 111:*19,
20* 130:*1* 148:*24*
163:*8, 12, 18, 24*
**month** 148:*12*
154:*11, 12*
**months** 33:*15*
155:*6, 7*
**Moore** 168:*16, 17,
19* 169:*6* 171:*20*
172:*12*
**morning** 4:*3, 5*
6:*14, 18, 22* 7:*1*
65:*5* 108:*1*
**Mother's** 148:*13*
**motivated** 130:*10*
**move** 7:*19* 20:*19*
23:*22* 57:*3* 59:*16*
62:*8* 64:*15* 91:*11*
98:*19* 99:*9* 104:*22*
105:*3* 109:*19*
112:*8* 118:*9, 19*
124:*10* 127:*3, 10*
129:*12* 133:*13*
146:*20* 150:*7* 151:*5*
**moved** 32:*24* 38:*3*
126:*5* 147:*2, 4*
148:*18, 19, 23*
150:*1, 4, 14* 165:*4*
178:*3* 179:*1, 3*
**moving** 120:*11*
**multi-cultural**
120:*21*
**multiple** 37:*5*
162:*24* 171:*3*
182:*6, 13*
**muted** 8:*12*

**< N >**
**nail** 55:*9*
**naked** 164:*13*
**name** 4:*7* 20:*3, 4*
23:*1, 4, 10, 12*
47:*14* 98:*6* 106:*20,

*21* 130:*8* 158:*24*
167:*2* 168:*15* 172:*1*
**named** 47:*13*
128:*4* 167:*7* 188:*12*
**names** 51:*20* 52:*1*
55:*4* 106:*11* 135:*1,
4*
**narrative** 162:*3*
**nature** 115:*6*
127:*22* 128:*1*
167:*23*
**NEAL** 1:*14* 37:*15*
**necessarily** 12:*7*
23:*1* 88:*9* 93:*5*
**need** 5:*10, 11, 16*
20:*20* 42:*24* 50:*24*
60:*7* 67:*21* 178:*6*
180:*6, 23* 185:*24*
186:*14*
**needed** 42:*19* 71:*8*
72:*7* 187:*3*
**needs** 70:*20*
**neighborhood** 9:*5, 7*
**neither** 47:*6*
**never** 10:*18* 11:*7*
17:*10, 11* 26:*6*
35:*21* 43:*15* 49:*1*
65:*1, 3* 66:*12* 67:*3*
68:*19* 72:*22* 74:*9*
80:*11* 81:*1* 83:*1*
94:*2* 108:*18* 119:*9*
123:*13* 127:*17, 18*
143:*4, 5* 144:*22, 23*
147:*12, 21, 22*
154:*7, 10* 169:*22*
171:*13* 173:*2*
179:*9* 181:*24*
182:*4, 8, 11*
**new** 33:*3* 54:*13*
73:*2, 14* 126:*7*
**NEWSON** 1:*4*
68:*13* 181:*14*
**nice** 20:*2* 67:*16*
126:*11* 189:*7*
**n-i-g-g-e-r** 67:*1*
93:*18*
**night** 51:*2* 55:*21*
59:*11* 69:*21* 71:*12*
**nights** 168:*13*
**nine** 33:*15*

**nolle** 106:*6* 108:*18*
**nonblack** 113:*14*
**nonhostile** 94:*24*
**non-office** 41:*17*
42:*10, 14* 48:*13*
**nonwhite** 80:*1*
**Nope** 76:*18*
**norm** 91:*21* 92:*7*
**normal** 50:*11*
**normally** 120:*14*
**North** 2:*13* 69:*19*
91:*16* 92:*3, 10, 13,
24* 93:*10*
**NORTHERN** 1:*1*
**northwest** 9:*8*
**Norvid** 23:*5, 10, 11*
**notice** 2:*2* 6:*6* 82:*7*
**notification** 34:*2*
150:*12* 162:*6*
**notifications** 34:*3*
98:*17*
**notified** 171:*13*
**November** 33:*23*
100:*18* 155:*1, 2*
**NUMBER** 3:*10*
8:*22* 48:*19* 105:*20*
129:*18* 162:*22*
175:*7* 178:*7*
**numbers** 77:*5*
154:*17*
**numerous** 56:*10*
181:*23*

**< O >**
**Oak** 2:*20*
**object** 131:*3* 152:*14*
**Objection** 17:*20, 23*
19:*18* 24:*9, 22*
25:*6* 36:*17* 40:*11*
41:*8, 11* 43:*4, 22*
45:*16* 46:*10* 48:*7,
14* 49:*7, 13* 50:*13*
51:*8, 15* 52:*7*
57:*24* 58:*19* 60:*15*
61:*4, 16* 65:*10*
66:*2, 17* 68:*4, 15*
69:*2, 13* 70:*13*
72:*20* 73:*24* 74:*14,
22* 75:*12, 20* 76:*22*
77:*12* 78:*16, 24*
80:*22* 81:*10, 20*



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1140 of 1503 PageID #:1531
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

82:11 83:7, 23
84:12 85:5 86:23
88:6, 24 89:23
90:14 91:17 92:5,
14 93:3 94:6, 18
95:21 96:5, 15
97:12, 22 100:21
102:15 104:5, 7, 8
111:3 113:15
114:9, 23 116:11,
19 117:5, 13 121:2
123:2, 21 125:20
126:22 131:1, 4
132:3, 11 134:9, 22
135:7, 16 136:7, 14,
22 137:8, 9 138:4,
16 139:11, 13, 23
140:7, 16, 24
141:10, 19, 23
143:7, 22 146:6
147:15 149:2
152:6 153:18
158:7, 16 159:8
160:13 162:13
166:12 170:10, 20
173:15 174:16
175:12, 22 176:12,
18 177:20 180:23
181:9 182:15
183:12, 24 184:23
186:23

**objections** 18:1
50:22 52:14, 19
53:5, 22 54:6, 19
55:18 56:7, 24
59:24 71:5, 21
72:5 74:8 76:4, 10
79:9, 19 80:3
82:20 85:15 86:6
89:9 93:11 95:1,
11 96:23 99:19
100:7 115:14
118:1 124:4
132:20 133:5
137:20 156:21
185:8 186:9

**obtained** 165:20

**obviously** 24:21
103:9 123:12
163:12 168:1

169:20 174:20
183:21

**occasion** 86:22
171:3

**occasions** 56:11
145:22 162:24
171:3

**occurred** 163:8

**occurrence** 57:8

**occurrences** 173:7,
14

**October** 191:2

**Odell** 31:9

**offend** 130:17

**offended** 166:11

**offense** 128:24

**offensive** 122:24
140:4

**office** 11:12, 14, 16
15:17 25:4 40:21
41:7 125:1 160:6,
7, 19 161:11 174:9

**officer** 101:6 116:6
152:22 169:6
174:6, 13

**officers** 63:22
64:11

**Official** 1:11, 12, 14,
15, 17 155:10, 11

**Oh** 7:8 8:7 11:17
12:9 20:1, 3, 6
23:4 26:4 34:8
41:9 43:16, 24
51:20 66:7 98:5
99:11 122:3
158:15 161:3
171:19

**okay** 4:9, 19 5:7,
12, 14, 16, 21 6:6,
11, 15, 19, 23 7:10,
13, 23 8:2, 5, 18
9:10, 20, 24 10:19
11:10, 15, 20 12:3,
11, 24 13:15 14:5,
9 15:2, 14, 22
17:16 18:5, 11, 21
19:3, 15 20:22
21:12 23:8, 13, 18,
24 24:12 25:10, 13
26:13 27:2, 5, 7
28:3, 12, 17 29:15,

19 30:3, 7 31:16,
22 32:16 33:10, 16
34:9, 14 35:10, 21
36:7, 9, 15 37:20
39:16 40:1 42:7,
13 43:24 44:14, 21,
23 46:17, 19, 21
48:4, 11, 18 49:11
50:18 51:13, 23
52:2, 5, 12, 17 53:1,
15, 19 54:4, 16, 24
55:2, 13 59:10, 11
60:7 61:10 62:2, 8,
15 63:2, 4 64:13
65:2 67:15, 20
68:21 69:10 73:17
75:6, 9 76:2 78:4,
22 79:6, 24 80:8,
19 84:6, 23 85:2,
12 86:3, 18 87:16,
24 88:21 90:20
91:13 92:9 93:24
94:15 97:9, 18
98:3, 8, 21 99:2, 6,
9, 13 101:3, 9, 11,
15 102:12 103:3, 7,
10, 17 104:22
105:4 107:5, 11
108:5 109:19
110:4, 5, 12 111:1
112:5, 8, 15, 21
116:5, 7, 10 117:10
118:6, 9, 13, 19
119:19 120:7
121:18, 22 122:5
124:13 125:17
127:3 128:7, 17
129:12, 19 130:23
133:2 134:4, 16
138:2 139:19
141:6 142:11, 17,
21 143:3, 20 144:6,
14, 24 145:16
146:11, 20 147:12
148:1, 4, 5, 14, 19,
23 149:9, 19 150:6
151:21, 24 152:4,
19 153:1, 12, 17
155:2, 4, 17, 20
156:14 157:4, 7, 11,
15, 22 158:3, 12

159:2, 16, 18, 20
160:19 161:6, 8, 13,
18, 24 162:19
163:20 164:15, 22
165:20, 24 166:9,
22 167:1, 19
168:24 169:3, 16,
23 170:13 171:8
172:13, 16, 19
173:1, 4 175:19
176:4, 15, 23
177:13 178:4, 21
179:13, 15, 18
180:4, 9, 10, 13, 24
181:14, 19 182:1, 5
184:11 186:17
187:8, 17, 20 188:6,
17 189:1, 4

**old** 10:3 20:2
32:10

**O'Malley** 37:11

**once** 17:24 41:22
45:19 148:22

**one-day** 123:16

**ones** 57:13 175:21

**one's** 186:1

**ongoing** 122:22

**oohed** 135:11

**oohing** 135:6

**oohs** 134:17, 20
135:13

**openings** 12:20

**operation** 42:6
56:2

**opinion** 123:8
131:20

**opposed** 92:13
93:1, 10

**OPR** 83:15, 17
87:22 96:20 97:8,
17, 18 98:4, 5, 10,
11 99:5, 8, 21
101:12, 16 103:12
108:13 109:15
110:6 122:3
136:17 138:13
142:20 145:2
147:23 152:20
161:22 164:2, 24
170:4, 16 171:4, 9,

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1141 of 1503 PageID #:1532
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

*16* 172:*20* 175:*15*
188:*8, 18*
**OPR2010-1093**
105:*23*
**OPR2013-1086**
110:*3*
**OPR2014-0821**
118:*14*
**OPR2014-0875**
124:*15*
**OPR2015-0166**
127:*9*
**OPR2015-0167**
129:*17*
**OPR's** 145:*17*
**order** 70:*11* 89:*21*
90:*12, 24* 179:*3, 4*
**ordered** 168:*20*
169:*7*
**orders** 150:*17*
153:*5* 166:*16*
**organization** 130:*11*
**originally** 10:*24*
32:*14* 109:*16*
**outcome** 121:*20*
190:*21*
**outlined** 160:*8*
**outside** 49:*12*
174:*21* 183:*21*
**overheard** 163:*13*
**overtime** 57:*7*

**< P >**
**pad** 7:*4, 11, 17*
**PAGE** 1:*5* 62:*13*
64:*14* 99:*20*
101:*20* 105:*3*
109:*20, 21* 110:*13*
112:*9* 118:*10, 20*
124:*10* 127:*4, 5, 11*
129:*20* 146:*12*
156:*16* 157:*12, 13,*
*23* 159:*19, 21, 22*
169:*2* 173:*5* 174:*3*
178:*12* 180:*17*
181:*5*
**pages** 105:*20*
127:*3* 129:*13*
144:*15*

**paper** 7:*4, 11, 17*
19:*10* 55:*11* 63:*4*
128:*12* 179:*2*
**paperwork** 24:*19*
28:*20* 34:*22*
164:*20* 185:*19*
**paragraph** 63:*2, 15*
64:*13, 21* 144:*19*
159:*19* 170:*2* 173:*4*
**paramilitary** 130:*11*
**Pardon** 51:*17*
119:*3* 125:*6* 179:*21*
**part** 10:*9* 28:*14*
40:*6* 42:*11* 45:*8,*
*10* 69:*15* 90:*17*
132:*23* 139:*6*
144:*19* 157:*23*
164:*22* 184:*4, 15*
187:*5*
**participants** 92:*20*
**particular** 39:*17*
58:*16* 61:*2* 70:*12*
71:*3* 106:*11* 114:*7*
**particulars** 82:*22,*
*23* 83:*19* 186:*11*
**parties** 190:*19*
**partner** 47:*13*
50:*11* 60:*5*
**partnered** 84:*22*
**partners** 20:*11*
47:*12* 48:*5*
**Party** 16:*4, 7*
**passed** 11:*18* 65:*4*
164:*7*
**passing** 130:*6*
**patrol** 41:*2, 16, 20,*
*23* 42:*9, 15, 17*
48:*13* 55:*20* 68:*14,*
*22* 91:*13, 15* 92:*3*
**pattern** 33:*6*
**pause** 5:*6* 125:*7*
131:*3*
**pay** 12:*6* 27:*5*
30:*17, 23* 34:*18*
36:*2, 6, 22* 66:*14*
68:*18* 81:*13* 98:*17*
153:*12, 15, 16*
176:*21*
**peace** 165:*6*
**penalty** 157:*9*

**pending** 5:*20*
105:*2* 138:*22*
**pension** 154:*15*
155:*5, 19* 156:*8*
**people** 16:*17* 20:*19*
24:*15* 25:*2* 28:*8*
31:*8, 11, 12, 17*
33:*19* 35:*8* 37:*12*
39:*1, 14* 42:*21*
43:*9, 10, 18* 44:*8*
45:*5, 14* 46:*5, 9*
47:*9, 24* 48:*3, 4*
49:*11, 19, 24* 50:*1,*
*5, 24* 51:*5* 54:*11*
55:*4, 16* 57:*3, 7*
67:*17* 68:*22* 69:*16,*
*20* 72:*17* 73:*19*
75:*17* 76:*2, 6, 8*
80:*1* 83:*11* 84:*3*
85:*21* 91:*14* 95:*18*
99:*5* 102:*14*
120:*10, 14, 16*
122:*21* 126:*7, 9*
127:*18* 131:*11*
132:*18, 23* 134:*21*
140:*13* 141:*18*
153:*7* 166:*10, 17*
173:*23* 174:*20*
175:*7* 182:*7*
183:*20* 185:*1*
**people's** 95:*3*
**perceived** 119:*1*
**percent** 24:*17*
48:*21* 49:*5, 6*
**percentage** 48:*12*
**perfect** 37:*2* 109:*23*
**perform** 58:*11*
**performance** 186:*7*
**period** 112:*15, 17*
125:*19* 162:*11*
163:*2*
**periods** 174:*15*
**perjury** 157:*9*
**perk** 26:*14*
**Pershing** 107:*3*
**person** 43:*19*
157:*17* 173:*8*
**personal** 17:*5*
73:*18* 190:*12*
**personally** 52:*2*
114:*15*

**personnel** 21:*6*
34:*4* 149:*24*
159:*12* 175:*3*
**perspective** 185:*11*
**pertinent** 13:*2*
**phone** 8:*13, 22*
162:*3* 164:*19*
**phonetic** 23:*11*
**photo** 126:*12*
**pick** 19:*16* 103:*2*
152:*9*
**picked** 19:*12* 75:*2*
**picture** 21:*13*
**pictures** 164:*13*
**piece** 179:*2*
**place** 28:*10* 41:*22*
82:*23, 24* 87:*11*
111:*18* 120:*11*
148:*4* 153:*8* 179:*22*
**places** 16:*11*
**plainclothes** 26:*14*
**plaintiff** 75:*6* 167:*7*
**Plaintiffs** 1:*8* 2:*10*
4:*8* 51:*13, 24*
52:*13* 53:*19* 56:*4,*
*23* 57:*21* 58:*5, 15*
59:*22* 60:*11* 61:*10*
65:*19* 68:*2* 71:*19*
72:*3* 82:*7* 85:*13*
86:*4, 11* 94:*4*
97:*10, 19* 98:*13*
100:*8* 113:*13*
114:*21* 115:*7*
132:*1* 156:*21*
157:*19* 170:*5, 8, 19*
171:*7, 17* 174:*11*
177:*18* 179:*11*
182:*20* 183:*4*
184:*13, 20* 185:*6,*
*16* 186:*5*
**pleasant** 65:*6*
**please** 41:*12* 101:*3*
104:*14* 109:*20*
110:*13* 117:*19*
118:*20* 124:*11*
125:*7* 144:*15*
156:*18* 160:*22*
174:*5*
**plus** 13:*4*
**point** 7:*23* 10:*1*
15:*15, 19, 22* 16:*22*

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1142 of 1503 PageID #:1533
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

17:9  25:13  28:18
66:16  71:19  77:17
91:3  92:2  93:19
101:12  124:14
133:21  184:13
**pointing**  74:5
**police**  155:14
**policeman**  20:3
**policemen**  33:7
**policies**  87:9  174:8,
14
**policy**  43:20  44:3,
23  45:2  87:7, 11,
13  88:15  160:6, 20
161:2, 11, 21  174:22
**poll**  16:10, 12, 19
**polling**  16:11
**poor**  130:22  135:24
**pop**  35:2
**population**  93:14
**position**  22:13
24:8  25:15  26:11,
15  27:3, 8, 10, 11
31:6, 18, 23  35:4, 8,
22  42:10  48:13
52:10  104:2
123:19  126:15
142:14  147:2, 5
150:15, 22  151:4
152:5, 22
**positions**  10:10
11:22  24:1  26:18
29:2  37:13  40:9
48:21  49:12  50:3,
20  51:1  57:19
60:17, 18  61:14
80:1, 10  91:14
102:13  117:23
151:5, 7, 9, 12
**possible**  72:2
136:2, 5
**pound**  109:11
**pouring**  10:14
**practice**  17:14, 16,
19  18:12, 14, 16
**practices**  174:8
**preface**  184:12
**prefer**  58:23
**preferred**  47:13
48:5  50:17  58:18
84:17, 18

**premarked**  99:11
100:11
**prepare**  6:8
**PRESENT**  2:4
**pretty**  16:17  17:13
19:6  35:9  84:8, 24
103:14  112:7
113:8  126:11
136:1  150:2
167:15  184:21
**prevent**  166:9
**prevented**  57:22
61:2
**previous**  157:13
172:6  190:6
**print**  63:5
**prior**  5:21  10:7
15:11, 19  17:2
27:20  29:9  40:3
105:21  133:6
137:11  147:16
148:17, 19, 23
**priorities**  42:22
**prioritizes**  70:19
**private**  10:16  109:1
**privately**  10:17
**privilege**  158:2, 6
**privy**  98:15
**Probably**  26:2, 12
28:9  32:9  37:11
91:20  92:7  120:13
128:6  130:21
135:24  147:10
162:2  177:1, 2, 5
**problem**  11:7, 8
25:22  135:24
**problems**  101:21
165:7
**procedure**  174:22
**procedures**  185:24
**proceedings**  190:14
**process**  19:8, 13
28:14  31:4  32:11,
13  39:23  40:19
69:22  87:16  109:6,
7  160:8  164:21
**processes**  32:22
**processing**  40:18
42:1  48:24  75:19
76:1

**production**  157:24
**Professional**  160:7
**program**  25:16, 17
70:18  72:8
**progressed**  26:22
**progressing**  38:13
**progressive**  87:3, 7,
13, 15, 17  88:2
**project**  25:17  26:1
**promoted**  25:13
30:10  31:5  33:11
35:22  150:23, 24
151:3, 8, 11, 15, 19
**promotion**  28:4
**promotional**  24:2
**promotions**  14:4
**pronounce**  4:13
118:23
**proper**  50:2  57:15
162:6
**prossed**  106:7
108:18
**protected**  158:1
**provide**  5:7  16:6
59:21
**provided**  157:4
**pull**  100:4
**pursuant**  2:2
**put**  13:5  22:11
31:13  45:5  46:5
49:22, 24  50:1, 24
55:20  71:19  72:3,
17  82:6  99:15, 23
102:18  103:1
150:18, 21  151:21
153:7  156:7  172:22
**putting**  108:23
185:10

**< Q >**
**qualified**  60:13, 16
**quasi**  26:13
**quasi-supervisor**
164:18
**question**  5:5, 15, 16,
20  6:7  8:15  17:24
18:9  35:1  41:13
44:1, 6  47:8  59:9,
14  62:18  67:24
70:14, 16  72:10
73:21  85:7  86:17

94:21  104:14
105:1, 2  113:22
114:10  122:16
127:1  129:3, 4
133:12  134:12
137:14, 17  138:22,
23  139:15  140:18
143:14  157:15
161:2, 15  166:13,
20  171:7  173:6, 10
177:16  179:9
180:23  183:23
184:11, 12, 15
186:14
**questioned**  184:19
**questions**  61:21
172:6, 19  185:21
187:13  188:2, 7
**quick**  77:17
167:15  187:11, 19
188:1
**quit**  9:15  16:13
**quite**  35:5  70:17

**< R >**
**race**  175:8, 20
188:14, 22
**racial**  96:9, 13
97:20  98:24  168:7
176:7
**racially**  129:24
130:10
**radio**  186:2, 8
**radios**  120:12
125:3
**raise**  14:8  27:5
**raised**  13:4
**rambling**  66:8
**ran**  32:14
**Randall**  113:1, 7
114:2
**rank**  23:13, 19, 21,
24  35:17
**Ranzini**  180:9
**RANZINO**  1:11, 22
3:1, 10  4:3, 12, 16
6:1  9:5  13:11
62:10  78:4  99:10
100:15  101:22
132:10  145:7, 14
146:14  156:14



Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1143 of 1503 PageID #:1534
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

160:*4* 169:*7* 170:*3*
171:*16* 178:*8, 17*
180:*10* 188:*6*
**R-a-n-z-i-n-o** 4:*14*
**Ranzino's** 100:*7*
156:*21*
**rate** 80:2 153:*12*
**Ray** 164:*17, 18*
165:*23*
**read** 53:*10* 104:*19*
110:*7* 121:*24*
137:*19* 146:*17*
166:*18*
**reading** 104:*16*
137:*17* 164:*11*
166:*10, 16* 172:5
**ready** 7:*19* 26:*3*
31:*10*
**real** 49:*22* 187:*11*
**realize** 46:*18*
**realized** 25:*12*
122:*8*
**really** 16:*13* 17:6
19:*5, 8, 13* 22:*21*
23:*7* 24:*18* 28:*21*
30:*16, 17* 43:9
49:*23* 50:7 57:*18*
58:*14* 59:7 60:2, *3*
66:*6* 68:*18, 19*
69:*12* 73:5, *16, 18*
77:*6, 14* 95:*13*
101:*17* 103:*19*
105:*10* 106:*10, 12*
111:*12* 119:*13, 18*
128:2, *14* 129:*11*
130:*12* 146:9
149:22 150:*21*
152:*24* 158:9
166:*6* 167:*14, 18,*
*19* 168:*4, 5, 6*
176:*21* 186:*10, 11*
**reask** 184:*4*
**reason** 24:*15* 54:*10*
148:*11* 178:2, *4*
182:*12, 21* 183:*3,*
*19* 184:*12* 185:5, *15*
**reasons** 35:*11*
**reassigned** 165:*4*
**rebuilding** 126:*8*
**recall** 60:2 78:*19,*
*22* 98:5 119:*18*

129:*11* 146:9, *10*
152:24 154:*10*
159:*11* 163:*4*
168:5, *18* 181:*12*
186:*10* 188:9
**receive** 27:5
143:*13, 15* 147:*13*
156:*1, 2*
**received** 36:2
109:*4* 112:*12*
123:*10, 16* 147:*21*
156:*4*
**recollect** 79:*3*
**recollection** 66:*19*
72:*14* 74:*3* 89:*18*
157:*10*
**recommendations**
143:*12*
**record** 9:2, *3* 14:*23*
22:5 53:9 104:*18*
116:*1, 3* 137:*18*
139:*13* 141:22
187:*18* 190:*13*
**records** 22:*12, 17,*
*18* 23:6 30:*11*
31:*3* 32:*12, 19*
40:8 143:*19* 163:*23*
**reduced** 190:*12*
**refer** 7:22 65:2
93:*24*
**reference** 146:*16*
**referred** 64:*22*
66:*24* 97:20
**referring** 139:9, *16*
145:*18* 171:*15*
**regard** 157:*18*
**regarding** 97:*6*
98:*4* 179:*10* 188:*8*
**register** 127:*14*
168:*20* 169:*7*
**regular** 102:*20*
148:*16, 20*
**regularly** 114:*6*
**related** 175:*8*
**relationship** 17:5, *8*
120:*2*
**relative** 190:*17, 18*
**release** 40:*19*
**reluctant** 49:*21, 23*
83:2 126:9

**remain** 30:*8*
**remarks** 129:*24*
**remedy** 95:9
**remember** 10:*4*
19:*5, 7, 14* 20:*4*
23:*12* 28:5, *22*
33:*18* 35:2 47:*11*
50:*23* 55:*4* 66:*15,*
*22* 72:*16, 18* 73:*6,*
*13, 23* 74:7 80:*17*
82:*23* 83:*16, 18, 19,*
*21* 86:*10* 88:*20*
101:*18* 102:*1, 10*
103:*3, 15, 19* 106:*3,*
*11* 107:*20* 108:*4*
111:*21* 112:*6*
119:*13, 15, 17, 20*
121:*23* 122:*1*
128:*7, 13* 130:*3*
137:*14* 148:*11*
149:*23* 150:*1, 12*
152:*22* 158:*23*
164:5, *6, 10* 165:*14*
167:*14, 20* 168:*3,*
*22, 24* 169:*14*
175:9 177:*24*
178:*19, 20, 22, 24*
179:*5, 12, 14*
180:*19* 181:*4, 16*
182:*3* 188:*20*
**remote** 190:*10, 15*
**remotely** 2:*10, 16,*
*22*
**reorganization**
126:*6*
**repeat** 5:*16* 7:*3*
75:*23*
**rephrase** 160:*22*
**report** 96:*20*
115:*20*
**reported** 23:5
107:*24* 161:*14, 15*
190:*11*
**Reporter** 1:*23* 5:2
104:*12* 190:*4* 191:*6*
**REPORTER'S**
190:*1*
**reports** 177:*14*
**represent** 144:*24*
**request** 47:*10, 15,*
*18*

**requested** 53:*10*
104:*19* 137:*19*
152:*13, 21*
**required** 161:*17, 20*
**requirement** 13:*19*
**residency** 13:*18, 19*
14:7
**resistance** 39:9
58:7
**resistant** 54:*11*
**resource** 152:*17*
**resources** 142:*19*
151:*24* 177:*17*
178:*9, 18, 23* 179:7,
*10*
**respect** 18:*17* 145:2
**response** 4:*20* 5:*12*
159:*20, 23, 24* 170:*3*
**responses** 5:*10*
100:*7* 156:*21*
**responsibilities**
64:*4* 81:*24* 90:*18*
**responsibility** 94:*23*
63:*20* 94:*15* 95:*8*
**responsible** 43:*19*
**rest** 19:*8*
**restroom** 77:*18*
**result** 109:*8*
142:*18* 143:5, *16*
147:22
**resumé** 31:*13, 14*
**retire** 12:*8* 31:*11*
34:*20* 154:*19*
**retired** 8:*4, 6*
11:*18* 34:*13, 21*
35:*17, 18, 19*
143:*10* 154:*13, 14*
155:*13, 21*
**retirement** 155:*18*
156:*1, 4, 7*
**retiring** 28:7 31:9
**revamping** 31:*24*
**Review** 160:*7*
**reviewed** 6:*11, 22*
144:*20* 156:*24*
**reviewing** 6:*8*
**rides** 120:*1*
**ridicule** 176:*8*
**right** 7:*6* 14:*15*
17:*1* 21:7 24:*14*
25:*5, 10* 28:9, *10*

Joseph Ranzino  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1144 of 1503 PageID #:1535
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

39:*18*  43:*1*  44:*7*
46:*8*  59:*13*  61:*19*
62:*4, 23*  63:6  68:*3*
76:*9*  77:*23*  78:6
90:*8*  92:2  97:*11*
98:*23*  100:*3, 12*
101:*11*  107:*4*
109:*15, 23*  112:*17*
114:*8*  121:*21*
125:*1, 10*  128:*9*
131:22  132:*18*
135:6  140:22
144:*18, 23*  145:*12*
146:*12, 14*  147:*19*
148:*12*  155:*15*
156:*10*  161:*10*
164:*21*  167:*8, 22*
169:*4*  170:*9, 15, 19*
172:*4, 10, 11, 17*
173:22  174:*1, 2*
179:*6, 24*  180:*1, 6,*
*17*  181:2  183:*11*
**risk**  93:*1*
**Road**  2:*19*
**ROHLOFF**  1:*16*
**roll**  38:*5*  63:*20*
64:2  111:*17*  119:*1,*
*21, 22*  120:*10, 12,*
*14, 19*  124:2  130:*5,*
*6, 24*  131:*7, 9*
134:*7, 21*  135:5
140:*12, 23*  142:*11*
145:*8, 19*  149:*11*
154:*9*
**room**  29:*14*  130:*24*
163:*12*
**roster**  48:*20*
**rotate**  57:*3, 4, 10,*
*11*  113:2  114:*5, 6*
115:*12*
**rotated**  113:*14*
114:*20*  117:*12*
**rotating**  116:*17*
**rough**  22:*21*  67:*4,*
*7, 11*
**routinely**  180:*18*
**rules**  89:*19*
**run**  187:*10*
**running**  10:*13*
33:*7, 8*

**< S >**
**safe**  119:*24*  121:*7,*
*15, 16*
**safety**  186:*1*
**SAITH**  189:*9*
**salty**  54:*7, 9, 10*
68:*9*  75:*1*  81:6
82:*24*  83:*1*  112:*7,*
*18*
**SAMUEL**  1:*4*
**saw**  161:*4*  166:2
**saying**  5:*3*  39:*24*
59:*21*  72:*18, 21*
83:22  97:*19*
130:*19*  145:*3*
152:22  177:*15*
178:*20*  182:*3*
**says**  99:*21*  101:*17*
114:*4*  128:*9, 12*
141:*4*  145:*5, 10*
146:*14*  147:*19*
156:*20*  160:*23*
170:*3*  172:*4, 17*
173:*5*  178:*7*  182:*9*
**scheduled**  150:*9*
**school**  9:*10, 14, 15,*
*18*  11:*3*  14:*1*
**Schulz**  110:*16, 21*
188:*12, 14*
**scream**  113:*5*
114:*17*
**screamed**  114:*3*
**screams**  113:2
**screen**  99:*24*
105:*18*  156:*15*
**screening**  32:*13*
**scroll**  101:*19*
105:*12*  156:*17*
**Scrolling**  105:*19*
**search**  168:*21*
169:*8*
**second**  56:*17*
101:*3*  124:*13*
133:*18*  144:*19*
157:*23*  159:*20, 23*
160:*1*
**seconds**  187:*11*
**section**  151:22
152:*1*  153:2, *24*

154:6
**security**  153:*4*
**see**  13:2  14:*10, 11,*
*14, 17, 18, 19*  37:*9,*
*12*  55:*3*  61:*13*
63:2, *23*  64:*17*
67:*13*  76:*15*  85:*12*
86:*3, 10*  99:*14, 21*
100:*11*  101:*13, 20,*
*23*  106:*1, 2*  110:*2,*
*3, 15, 18*  112:*13*
113:*4*  118:*14*
119:2, *18*  124:*15*
125:*1*  127:*16, 17*
128:*12*  129:*17, 18*
130:*1*  144:*10*
145:*5, 9, 10, 15*
146:*17*  156:*14, 22*
157:*20, 21*  158:2
160:*8*  165:*16, 19*
166:6  169:*9*  170:*5*
173:*10*  174:*5*
178:*16*
**seen**  62:*18*  144:*23*
169:*18*
**send**  58:*10*  69:*17*
71:*11*  100:*9, 12*
112:*3*
**senior**  9:*16*
**seniority**  45:*13*
**sense**  61:*7*  93:*16*
**sensitivity**  143:*13,*
*15*
**sent**  31:*13*  34:2
123:*18*  156:*12*
162:*5*
**sentence**  145:*13*
159:*24*  160:*1, 23*
169:*5*  170:2  178:*5,*
*16*
**separate**  32:*15*
38:*7, 9, 10, 11*
**September**  2:*1*
**sergeant**  23:*1*  30:*4*
**seriously**  20:*7*
**Servani**  23:*11*
**serve**  31:*23*  33:*13*
34:*12*
**served**  147:22
**service**  13:*23*  14:*3*
24:*1*  93:*9*  156:*7*

**services**  12:*17*  15:*3*
18:22, *23*  32:*3*
**serving**  160:*12*
**set**  55:*20*  57:*15*
100:*8*  130:*11*
156:22  191:*1*
**settle**  109:*10*
**sexual**  119:*1, 7, 9,*
*21*  121:*10*  122:*8, 9,*
*11, 15, 17, 20, 24*
123:*1, 10, 14*  164:*3*
**sexually**  119:*16*
165:*17*
**Shador**  72:*24*
73:*21*
**Shadur**  72:*24*
**shake**  5:*10*
**Shakman**  26:*20*
29:*5*
**shape**  9:*23*  12:*10*
176:*9*
**Sheahan**  15:*7, 11,*
*14, 17, 24*  16:*1, 3*
**Sheahan's**  15:*19*
**SHERIFF**  1:*10*
10:*1, 23*  11:*1, 11*
15:*7, 24*  16:*1, 2, 21,*
*22*  17:2, *18*  20:*19*
31:*20*  33:*3*  88:*15*
100:*17*  108:*21*
120:*21*  174:*6, 13*
**sheriffs**  17:*17*
**sheriff's**  8:*9*  10:*20*
11:*12, 14, 16, 23*
15:*17, 20, 23*  26:*23*
33:*7, 8*  66:*7*  147:*3*
159:6  160:*6, 19*
161:2, *11, 20*  167:6
174:*9*  176:*16*
**SHIELDS**  1:*13*
20:*8, 10, 11*  31:*18*
36:*9*  39:*13*  66:*16,*
*23*
**shift**  48:*21*
**shifts**  57:*7*
**shocked**  135:*14*
**short**  78:*1*  142:*8*
177:*10*  187:22
**Shorthand**  1:*23*
190:*4*  191:6

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1145 of 1503 PageID #:1536
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**short-handed** 49:22
**shortly** 73:6
**short-staffed** 57:6
**show** 18:16 42:20
**sick** 28:6 61:20
**sign** 179:5
**signature** 189:5
**signed** 34:22 157:7
**significance** 121:14
**simple** 56:20 96:20
**simply** 126:20
**sir** 4:5, 10, 14 5:8,
13, 17, 22 6:12, 16
7:1, 4, 8 8:2, 4, 10
9:15 10:21 13:10,
17 15:5, 9, 21 18:2,
10 23:10 24:6
25:8 27:22 29:1
37:6 40:12 45:3
46:7 49:9 57:20
63:16 70:9 93:21,
23 94:14 113:24
118:15 143:2
155:3 156:16, 23
159:4 175:5
176:11 181:18, 21
188:3
**sit** 77:9 117:10
136:2 173:14
174:12
**sitting** 63:1 70:22
**situation** 13:1
89:13 108:24
130:15 183:11
184:18
**situations** 51:2
185:6 186:4
**six** 44:17 59:5
**skill** 57:15
**skills** 50:5
**skin** 74:7
**SLAUGHTER** 1:7
47:14 50:11 60:5,
6 84:6, 7, 20 85:2,
13 86:21, 22
**slow** 53:17
**slur** 99:1
**slurs** 96:9, 13 97:20
**small** 10:13, 17
66:5
**smarts** 67:10

**somebody** 28:6
49:22 55:20 65:5
69:18 81:7, 16
83:16 88:4 90:20,
21, 22 117:7
122:19 130:7
140:9 161:3
163:14 177:17
178:23 185:18
**somebody's** 74:6
**soon** 24:17 25:11
166:7
**sorry** 4:23 7:2, 8,
17 8:10, 12 11:20
14:12 18:2 20:17
21:10, 19, 23 23:10,
12, 14 33:11 36:21
37:6 39:24 43:16
46:7, 22 47:6
53:17 54:24 59:12,
15 64:14 66:8
67:6 69:14 75:23
78:7 86:19 91:12
93:22 98:20
105:19 109:17, 21
120:2 125:9
128:18 129:1, 6
130:16 131:14
137:15, 16 138:12
149:8 150:8
154:11 157:12
158:23 159:21
160:1 161:6, 9
162:15 167:10
170:23 176:1
177:6 181:1
184:24 187:9
**sort** 187:3
**sought** 26:15 43:2
**sounds** 17:1 77:23
**South** 2:6 69:19
91:16 92:4, 11
93:2, 9
**speak** 25:7 27:13
70:22 103:12
158:12, 21 159:5
177:17 178:8, 17,
23 179:17
**speaking** 12:24
49:5 59:20 96:10
**special** 71:10

**specific** 21:11
38:15 59:2 63:15
72:11 88:12 90:3,
4 135:1, 4 180:14
183:17 185:12
**specifically** 102:9
**specifics** 60:3
184:17
**specified** 190:16
**speculate** 140:8
**speculation** 74:23
76:23 77:13 84:13
85:6 89:17 126:23
135:17 182:16
**spent** 20:17 22:18
39:12, 13, 14
**Spivy** 47:12, 15
50:10 60:4, 6
84:17, 20, 21
**spoke** 62:22 66:23
170:16 171:3, 9
178:24 179:9 186:7
**spoken** 170:3
171:16 175:21
**spot** 61:3
**spots** 103:18
**spring** 148:9 155:5
**staff** 58:24 168:21
169:8
**staffing** 120:16
**Stamp** 112:9
124:11 129:13
178:7
**stamped** 105:4, 20
109:22 118:10
127:4, 11
**stand** 30:19
**standard** 17:14, 16,
19 18:7, 11, 13, 14,
16
**standing** 155:21
**star** 154:14 156:4
**start** 21:5 31:7
53:13 87:15 101:5
162:2 164:20
181:15
**started** 9:11 10:4,
11 14:3 21:1 29:3,
4 32:18 108:1
164:19
**starting** 23:22

**State** 1:24 11:2
13:21 14:4 108:19
173:9 174:5 190:4
**stated** 58:6 145:7
146:14 185:18
**statement** 73:23
118:24 119:20
120:4, 8 121:5
122:14, 24 135:14
137:4 139:20
140:12, 23 142:13
143:20 152:17
154:8
**statements** 157:8,
17 176:5, 7 183:1
**STATES** 1:1 182:5
**stay** 153:8
**stenographically**
190:11
**steps** 61:13 95:9
166:9
**stereotypical** 176:7
**stick** 83:3 131:19
**stop** 8:8 17:24
137:8 139:11, 12
141:21
**storms** 22:1
**story** 131:19 132:9
**straight** 133:16
**Street** 2:6, 13
22:14 24:14 25:4
67:10 69:8 103:6,
8 108:11
**STRICKLAND** 1:3
**strictly** 10:7
**strike** 34:5 92:10
107:9 134:5 142:1
146:21 148:1
**stuck** 114:7
**studied** 151:2
**stuff** 16:9 23:22
26:20 29:5 30:22
31:19 41:19 48:24
91:6 100:11
103:16 130:6
153:6 154:16
164:8 166:18, 24
**subject** 145:19
157:9 158:4
**subjected** 94:17

Joseph Ranzino - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1146 of 1503 PageID #:1537
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

110:22
submitted 129:23
subordinate 63:22
  64:11
subordinates 29:20,
  22 145:8
substance 173:9
suburbs 9:8
sudden 14:12
suffice 5:11
sufficient 145:6
sugar 67:16
suit 167:15
Suite 2:7, 13, 19
summary 105:12,
  13, 23 110:15
  118:22
summer 18:24
superintendent
  10:13
supervise 29:10, 11,
  20
supervised 29:11
  78:7 153:23
Supervision 30:20
  187:6
supervisor 22:24
  23:3 26:13 27:3
  29:8 52:5 94:22
  184:5
supervisors 19:16
  24:8 53:3 55:15
  125:18
supervisory 10:10
  25:15 26:11 27:8
  52:9 143:13, 15
support 145:6
supposed 37:1
  49:20 51:1 55:9
  166:1, 16 185:20
sure 5:1 8:23
  16:17 34:24 47:11
  53:7 82:1 92:19
  94:16, 23 95:9
  101:14 103:14
  106:4 110:9
  115:23 118:23
  121:20 133:22
  153:7 161:6 167:20
surprise 76:19
surveillance 186:2

suspension 108:3
  123:16 147:13, 22
sustained 121:19
  138:3, 13 141:17
  142:22 143:1, 16
  144:11, 20 154:7
sworn 4:2 21:6
  190:8
systems 25:19

< T >

take 5:2, 18, 19
  12:21 13:22 24:2
  27:11 28:23 45:13
  61:12 77:17 95:9
  109:12 111:18
  133:18 142:5
  164:22 165:1
  166:9 176:23, 24
  180:12 187:14, 20
taken 1:22 13:20
  78:2 119:19 142:9
  148:4 177:11
  187:23 190:15
talk 6:14 21:7
  23:8 66:5 70:10
  72:11 97:5 128:17,
  21 138:22 182:2
talked 24:12 33:12
  46:4 50:10 64:5
  85:20 98:21
  103:16 105:24
  150:1 175:2 180:18
talking 5:7 19:6
  21:8 24:1 26:19
  46:1 53:13, 14
  56:15 59:2, 5
  63:14 64:20 66:15
  68:2 69:4 84:3
  104:23 115:3
  128:17, 21 133:15
  135:21 139:10
  142:11 170:17
  172:12 175:9
  185:4, 14 187:4
talks 63:19 101:12
tangent 47:4
tavern 109:2
tax 35:2
team 71:11

tech 63:13
telephone 66:24
tell 5:15 6:11
  9:17 18:21 20:22
  22:8 26:22 30:7,
  17 38:20, 23 43:20
  46:15 54:22 55:4,
  12 58:8, 10 62:3
  67:13 71:18 72:2
  73:21 95:13
  100:19 106:5
  111:14 114:13, 16
  119:15, 17 120:9
  122:11 125:23
  126:13 149:14
  150:3 163:10
  167:19 168:3
  172:13 178:5 182:1
telling 72:16
tells 58:11
ten 109:16 176:24
tendencies 49:19
tendered 145:1
term 65:8, 9 87:3
terms 32:9
terrible 21:21
  34:23 35:5 45:9
  63:5
test 28:23
testified 6:3
  111:24 147:13
  148:6
testify 190:8
testifying 135:21
testimony 18:15
  133:7 137:11
  147:16 154:5
  190:14
testing 29:1
tests 151:1
Thank 4:21 5:9
  7:19 8:1 13:10
  63:17 105:4, 21
  115:24 134:10
  177:9 178:14
  189:2, 6, 8
Thanks 129:7
thing 12:21 14:8
  16:20 17:4 19:6
  23:7 24:19 25:20
  35:4 38:6 48:2

60:5, 8, 19 63:8
  70:23 96:9 110:7
  119:19 186:1
things 14:2 25:23
  26:21 27:1 28:10
  29:4 32:18, 23
  42:2, 19 44:21
  47:20 49:21 50:7
  61:21 71:13 86:14
  88:18 95:15
  150:17 151:1
  162:17 177:3
  184:16 185:2 186:8
think 7:6 8:14
  11:24 12:1 14:15
  15:16 19:21 22:20
  23:2, 4 26:17
  27:17 28:1 33:15,
  22 37:17 39:13
  42:23 45:19, 23, 24
  48:20, 22 53:23
  63:9, 10 70:23
  72:13 73:8 74:24
  91:21 99:11
  105:16 109:12, 16
  117:11, 16 120:6
  122:4, 7, 18 123:12
  130:7 148:9
  149:22 153:10, 21
  154:19 155:10
  159:21 163:21
  164:14, 17 165:3
  166:5 167:13
  168:17 169:15
  171:19 172:1
  177:23 179:4
  183:7 184:18
  187:1, 12 188:19
thinking 33:5, 6
  43:8
third 22:20, 21
  37:15, 21, 24 38:1
  41:24 42:1 46:1
  54:14 68:8 73:4,
  14 112:16 126:5
  160:1 169:4
THOMAS 1:10, 14
  110:15 188:12
thought 25:11
  41:14 84:8 113:8
  120:1 126:11

Joseph Ranzino - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1147 of 1503 PageID #:1538

133:*12* 142:*4*
163:*24* 168:*14*
186:*14*
**threaten** 127:*18*
180:*18*
**threatened** 64:*23*
66:*10, 12* 127:*17,*
*18* 128:*11*
**threatening** 127:*15*
181:*4*
**three** 13:*4* 53:*14*
155:*7*
**thrive** 38:*22*
**throwing** 177:*3, 5*
**ticket** 16:*5*
**time** 8:*16* 10:*12*
11:*10, 18, 19* 12:*19*
15:*8* 20:*12, 14, 15*
22:*2* 23:*3* 28:*10,*
*20* 30:*4* 33:*2*
39:*12* 40:*12* 45:*23*
46:*18* 47:*23* 53:*15,*
*16* 55:*6, 11* 56:*18*
57:*4* 63:*21* 64:*8*
71:*16* 84:*18* 85:*24*
93:*6* 107:*24*
112:*15* 119:*24*
150:*23* 153:*11*
154:*6* 157:*18*
162:*4, 11* 163:*2*
167:*21* 174:*10, 14*
176:*9* 178:*24*
183:*20* 185:*16, 21*
186:*11, 19* 190:*16*
**timeline** 163:*5*
**timelines** 42:*3*
**times** 4:*19* 47:*10,*
*15* 52:*15* 55:*24*
60:*6* 62:*6* 84:*16*
91:*22* 92:*7* 181:*23*
182:*6*
**timing** 148:*11*
**TIMS** 1:*4* 66:*16,*
*23, 24* 181:*15, 17*
**title** 27:*2* 153:*9*
**titles** 12:*6* 159:*13*
**to/from** 162:*2*
**today** 77:*9* 117:*10*
136:*2* 173:*14*
174:*12* 175:*21*
188:*6*

**told** 28:*16* 35:*12*
36:*23* 42:*8* 82:*6*
97:*2, 3* 100:*24*
112:*1* 119:*22*
121:*7* 132:*15*
142:*24* 151:*24*
172:*23*
**Tom** 17:*8*
**tonight** 55:*22*
**top** 31:*14* 57:*16*
68:*8* 75:*1* 146:*12*
169:*4*
**touch** 34:*18*
**tough** 83:*10*
**tour** 121:*11*
**traditionally** 102:*22*
**train** 41:*13*
**trained** 40:*6* 50:*4*
57:*15*
**training** 12:*12, 16*
15:*3* 40:*6* 50:*5*
76:*24* 77:*8, 10*
94:*12* 123:*10*
143:*13, 15* 150:*9,*
*10, 11*
**transcript** 128:*22*
190:*11*
**transfer** 150:*18*
151:*22* 152:*1*
**transferred** 19:*1*
73:*10* 149:*13, 15,*
*16, 18* 179:*24*
**treated** 74:*15* 122:*7*
**trick** 117:*21*
**tried** 45:*4* 46:*4*
47:*21, 22* 48:*4*
57:*3, 10, 11* 65:*6*
86:*1* 151:*3*
**Triton** 12:*14*
**trouble** 91:*9*
185:*10*
**true** 53:*6* 65:*18*
140:*14* 141:*20*
144:*6* 157:*8* 165:*2*
190:*13*
**truth** 26:*22* 30:*18*
109:*18* 190:*8*
**truthful** 182:*22*
**try** 8:*13* 13:*7*
21:*15, 17, 20* 22:*2*
45:*5* 47:*5* 49:*11,*

*17* 53:*12* 55:*24*
56:*6* 57:*3, 4* 58:*17,*
*23* 59:*9, 21* 67:*16*
85:*22* 90:*8* 114:*1*
117:*19* 125:*7*
128:*20*
**trying** 11:*2, 8*
13:*20* 26:*24* 45:*12*
46:*17* 47:*2* 48:*19*
55:*1* 59:*16* 64:*17*
83:*13* 90:*4* 113:*23*
117:*21* 121:*13, 24*
122:*19, 20* 130:*17,*
*20* 134:*16* 150:*23,*
*24* 162:*8* 165:*6*
167:*22* 177:*6*
180:*11* 186:*1*
**TSS** 32:*8, 11* 40:*19*
41:*4* 55:*5, 17*
84:*10* 85:*3, 10, 14,*
*22* 86:*4, 12* 103:*2*
**Tuesday** 2:*1*
165:*13*
**turn** 146:*11*
157:*11, 22* 159:*18*
169:*1*
**turnover** 26:*4*
**two** 17:*12* 29:*18*
105:*20* 109:*12*
127:*3* 187:*11, 19*
**two-week** 112:*17*
**type** 15:*10* 16:*6*
17:*4, 5* 19:*10*
24:*19* 96:*9* 108:*2*
150:*10, 11* 164:*12*
168:*1* 179:*4*
186:*12* 187:*3*
**types** 162:*17*
**typewriting** 190:*12*
**typical** 5:*10* 120:*19*
**typically** 54:*8*
**TYRONE** 1:*6* 75:*6*
76:*15* 77:*10* 80:*12,*
*20* 182:*9*

< U >
**Uh-huh** 112:*14*
**unbecoming** 108:*3*
109:*13* 122:*4*
123:*15* 140:*20, 22*

145:*7*
**uncommon** 120:*18*
**undergoing** 38:*12*
**underlying** 170:*4,*
*16* 171:*17*
**understand** 5:*15*
29:*6* 35:*24* 36:*8*
44:*5* 47:*1* 55:*22*
59:*4* 92:*23* 95:*14*
124:*22* 137:*3*
140:*19* 156:*3*
183:*22*
**understanding**
31:*21* 87:*12, 18*
88:*10* 91:*10* 96:*3*
108:*22* 119:*11*
121:*9* 122:*23* 179:*6*
**understood** 102:*19*
155:*22, 23*
**unfair** 117:*24*
**unfortunately** 164:*8*
**uniform** 130:*12*
**union** 38:*17* 101:*21*
**unit** 19:*2, 4, 24*
20:*15, 18, 23* 22:*8*
25:*3, 14* 27:*16*
29:*10* 30:*6, 9*
31:*19* 36:*12, 14*
38:*12* 39:*11, 15, 20*
44:*4* 46:*2* 55:*17*
57:*12* 61:*1* 76:*9*
78:*15* 81:*6* 83:*5, 6,*
*21* 85:*22* 86:*4, 12*
87:*8* 91:*13, 15*
102:*21* 126:*8*
130:*1* 148:*7* 149:*1*
153:*13* 162:*12*
163:*8* 173:*24*
176:*17*
**UNITED** 1:*1*
**units** 19:*17* 38:*7, 9,*
*10* 176:*16*
**unity** 47:*24*
**unprofessional** 67:*4,*
*5*
**unrelated** 183:*2*
**unsafe** 102:*19*
103:*1, 4*
**untrue** 183:*1*
**unwanted** 122:*21*

Joseph Ranzino — 9/8/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1148 of 1503 PageID #:1539

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

unwillingness 58:2, 6
unwritten 174:10
upset 39:17 74:24 131:11
urgent 70:21
use 32:9 65:3 100:3 181:18 182:6 186:2
usually 71:11 84:21

< V >
vacations 45:22
various 40:2 44:8 57:23 68:22 78:14
verbal 5:10, 12 78:20 79:22 80:17 81:1
verbiage 153:6
verification 157:7
VERNELL 1:4
versus 88:16
victim 106:8
VICTOR 1:7 47:14 84:6 86:21
video 21:14
Villa 164:17 165:23
violations 70:18
void 150:16
vs 1:9

< W >
wait 5:6 69:3 113:18 129:4
waiting 8:19 100:16 129:3
waive 189:5
walked 130:14 131:15
WALKER 1:6 167:2, 11, 13 168:11, 12 181:22 182:1
want 5:1 7:20 8:23 11:5 14:7 16:14 21:15 22:14 25:3 29:13 32:21 38:7, 21 43:10 45:6, 7 47:4, 5, 24 48:1 54:20 55:6, 21 56:13 58:13, 16

60:8 61:15 67:19 71:10 75:17 76:2, 8, 11 85:22 102:13 103:7, 22 110:9 131:17 140:15 142:6 148:11 159:23 165:5, 6
wanted 12:18, 22 24:13 25:4, 16 43:9 46:5, 9 47:9 50:11 85:21 98:19 109:11, 16 112:19, 20 152:1, 2, 5 161:23
wanting 84:3
watch 22:20, 21 37:15, 22, 24 38:2 39:4 41:24 42:1 46:1, 2 54:14 68:8, 19 73:1, 4, 14 126:5 165:4 185:22
watcher 16:12, 19
watches 42:2 75:2
water 115:22
way 11:24 21:2 26:20 28:22 30:23 36:8 42:7 44:7 60:20 66:14 70:17 81:12 87:21 90:9 102:19 117:24 130:11, 21 140:19 153:17 155:22 162:9 163:4 166:19 176:9 182:22 183:5 184:22 185:12
ways 56:11
wear 26:14 121:16
wearing 121:14
weather 21:21
weekend 165:13
well 9:7 10:24 12:5 14:17 16:4, 8 18:9, 13 19:23 21:3 27:4 31:7 32:7, 21 34:1, 5, 10 36:1 37:16 38:11, 12 41:12, 18 42:4, 16 47:13, 15 52:23 55:5, 6, 8 57:2 58:10 61:10 63:8

65:16 66:5, 22 70:5 73:3, 20 79:14 80:12 81:7, 16 83:5, 11, 15, 20 84:2 87:10, 14, 19 88:14 89:5, 10 91:1, 5 94:12 95:18 99:15, 18 101:4 104:1 107:22 109:9 111:9 114:1 117:2 121:16, 21 122:18 124:8, 21 127:7 128:3, 9 130:8 132:8 133:2 136:12, 19 142:1 144:24 145:12 150:18 151:21 152:14, 16, 17, 20 155:15 156:4 160:23 168:19 169:12 171:6, 19 172:4 174:19 180:1 181:14 184:15 185:14
went 9:11 10:5 14:8, 13 17:11, 12 19:6, 24 20:23 22:7, 11 24:13, 15 25:2 28:9 30:12 31:20 32:19, 22, 23 33:6 34:22 36:3 38:5 46:23 73:4 83:18 151:2 153:1 154:14, 17, 19 155:9 164:17 175:3
we're 5:2 6:13 7:22 42:6 46:18 59:5, 10 62:8 63:14 64:20 69:4 86:18 100:16 115:20 144:18 180:22
West 13:12
Western 107:3
We've 33:11 64:5 141:6 157:2 162:3
WHEREOF 191:1
WHITE 2:18 54:4, 16 74:20 76:20

86:5, 12 116:17 117:11, 22 188:1
Whoa 69:4
whoo 131:14
WILFORD 1:5 78:6
WILLIAMS 1:5 79:6, 14, 17 80:9 127:13, 19 129:9 134:5 182:5
Wilson 78:4
WINSTON 1:3 51:19 64:21 65:9, 16 66:10 97:17 129:22 130:8 131:21 132:1, 19 134:1 144:3 145:19 146:5
Winston's 132:9
WITNESS 3:1 4:1, 5, 10, 14, 18, 20, 23 5:8, 13, 17, 22 6:2 7:8 8:19, 23 14:12 17:22 18:2 19:20 21:19 24:10, 24 25:7 36:19 40:12 41:9, 12 43:24 45:19 46:17 48:9, 16, 18 49:9, 15, 17 50:23 51:11, 17 52:9, 15, 20 53:6, 11, 16, 23 54:7, 20, 24 55:3, 19 56:9 57:2 58:2, 22 59:12 60:2, 16 61:7, 19 62:15 63:12, 16 64:17 65:13 66:4, 19 68:7, 17 69:3, 15 70:16 71:6, 22 72:6, 21 74:2, 9, 15, 24 75:14 76:6, 11, 24 77:14 78:19 79:3, 11, 21 80:5 81:1, 12, 23 82:14, 22 83:10 84:2, 15 85:9, 17 86:8, 19 87:1 88:9 89:2, 10 90:2, 17 91:20 92:6, 17 93:5, 13 94:9 95:3, 13, 24

Joseph Ranzino - 9/8/2020

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1149 of 1503 PageID #:1540

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

96:8, *18* 97:*1* 98:*1* 100:*24* 102:*18* 104:*10, 14, 20, 23* 111:*6* 113:*18* 114:*12* 115:2, *16* 116:*22* 117:7, *16* 118:*3* 123:5, *24* 124:5 125:*23* 127:*1* 128:*18* 129:*1* 131:*6* 132:5, *14, 22* 133:9 134:*12, 16* 135:*1, 10, 19* 136:*10, 17, 24* 137:*22* 138:*6, 20, 24* 139:*16* 140:2, *8, 19* 141:*3, 12, 20* 142:*4* 143:*10* 146:9 147:*18* 149:5 152:9 153:*21* 158:9, *19* 159:*11* 160:*16* 162:*15* 166:*15* 170:*13, 23* 173:*18* 174:*19* 175:*15, 24* 176:*21* 177:5, *23* 181:*12* 182:*18* 183:*15* 184:2 185:*1, 10* 186:*10* 187:*1, 14* 188:*3* 189:6 190:7 191:*1*

**witnessed** 173:7, *10, 13*

**woman** 13:*4*

**women** 120:*19, 20, 23*

**wonderful** 20:5

**word** 67:*1* 93:*18* 181:*16, 17, 23* 182:6, *10, 14*

**words** 48:*13* 94:*3* 119:*23* 130:22 134:*3* 136:*1* 146:*18*

**work** 9:*16, 20* 10:7, *16* 11:*15* 15:*18, 23* 16:2, *6, 15* 22:*3* 24:*19* 25:*3, 16* 27:7 36:*15* 38:*1* 44:8 46:6, *9, 23* 47:9 48:5, *12* 50:*11, 17, 21* 52:4

56:5 58:*16* 61:*15* 75:*3, 10, 18* 76:2, *9* 78:*23* 79:*18* 82:2, *18* 83:*21* 84:*17* 85:22 94:5 95:*8, 10, 14, 18, 19* 96:4 98:*23* 101:22 102:2, *5, 8, 19* 110:*17, 22* 124:*24* 125:*14, 18* 126:*14, 20* 127:*15* 147:*24* 148:*1* 151:2 154:2 184:5 186:6

**worked** 9:8, *17* 10:*18* 11:*13, 17* 18:*21* 19:*14* 20:7, *10* 21:2 25:*21* 26:*1* 27:*13* 34:6, *9* 36:*11, 12, 16* 52:*3* 60:*24* 74:*12* 94:*17* 148:*24* 150:*24* 154:6 168:*13* 183:*4, 6* 184:*14* 185:*7, 17*

**worker** 28:*16*

**working** 8:8 10:*11* 15:2 32:*16* 47:*13* 58:*18* 61:*11* 81:8 85:9 93:*20* 94:*24* 110:*17, 22* 129:2 148:*16, 20* 165:8

**workload** 69:*20*

**workplace** 93:*19* 96:*14* 160:*12* 176:8 181:*20*

**works** 22:*15* 27:*12* 70:*17*

**world** 120:*22*

**worried** 14:*15*

**worse** 180:*15*

**worth** 100:*10*

**wrapping** 180:9

**write** 55:*10, 11* 58:*12* 87:*21* 180:*19* 181:*4, 7*

**writing** 150:*13* 177:2

**written** 56:*13* 90:*21, 22* 174:9

**wrong** 159:*21*

180:22

**wrote** 164:2

**< Y >**

**Y2K** 25:*20*

**Yeah** 7:7, *16, 24* 8:*20* 10:*17* 12:*14* 13:*3* 14:*11, 20* 16:*11, 23* 19:*20* 21:*1, 10, 14, 17, 24* 22:*24* 24:2 29:*12* 30:*1, 15* 32:*17* 33:*1* 34:*1, 8* 36:*11* 37:*17* 39:*3, 19* 41:*16* 46:*14* 48:*17* 52:*3* 53:*11* 54:22 55:*3* 57:2 64:*17* 66:*1* 67:*16* 69:*1, 15* 73:8 75:*14* 76:*12* 77:*19, 21, 23* 79:22 84:8 87:5, *9, 10* 89:2, *10* 98:*11* 100:*18* 101:*17* 103:*14* 107:*14* 109:*15* 112:2 113:8, *23* 115:2, *9* 123:5 125:*12* 132:*10* 133:20 144:*13* 145:*10* 147:9 148:9, *21* 149:*13* 154:*23* 155:6, *9* 156:6, *16* 157:2, *10, 21* 158:*19* 159:22 162:8, *15, 16* 166:*3* 169:*18* 170:*23* 172:6 177:8, *9* 182:*23* 183:*15* 184:*23*

**year** 8:8 9:*16* 10:*4* 12:8, *10* 22:*19* 25:*24* 26:*1, 5, 10* 27:*15, 23* 30:*24* 33:*10* 34:*14, 20* 127:7, *8* 148:*8, 15*

**years** 10:2 11:*18* 13:*3, 14* 22:*18* 37:*13* 38:*1* 59:5 66:7 79:*16* 104:*23*

**yell** 113:5 114:*16* 126:*17*

**yelled** 114:2

**Yells** 113:*1*

**Yep** 138:*11, 24*

**young** 10:*10* 12:22 22:22 47:*12* 126:*10, 11, 13*

**younger** 33:5

**< Z >**

**Zoom** 2:*1* 6:*3*



# Exhibit L

Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1151 of 1503 PageID #:1542
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
     LEGRAIN WINSTON,               )
 4   MICHELLE STRICKLAND,           )
     VERNELL TIMS, I.V.             )
 5   NEWSON, JR., SAMUEL            )
     PAGE, WILFORD FERGUSON,        )
 6   CECIL WILLIAMS, ANTHONY        )
     MANNING, DAVID WALKER,         )
 7   TYRONE MCGHEE and VICTOR       )
     SLAUGHTER,                     )
 8                                  )
          Plaintiffs,               )
 9                                  )
          vs.                       ) No. 18-cv-05726
10                                  )
     SHERIFF OF COOK COUNTY         )
11   THOMAS J. DART, in his         )
     Official Capacity,            )
12   JOSEPH RANZINO,                )
     Individually and in his        )
13   Official Capacity,            )
     GREGORY SHIELDS,               )
14   Individually and in his        )
     Official Capacity,            )
15   THOMAS NEAL,                   )
     Individually and in his        )
16   Official Capacity,            )
     CHRISTOPHER ROHLOFF,           )
17   Individually and in his        )
     Official Capacity, and         )
18   COUNTY OF COOK,                )
     ILLINOIS,                      )
19                                  )
          Defendants.               )
20

21                       VOLUME II

22           The continued deposition of GREGORY

23   SHIELDS, taken in the above-entitled cause, before

24   Brenda S. Hall, Certified Shorthand Reporter of the
```

Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1152 of 1503 PageID #:1543
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1    State of Illinois, CSR License No. 084-003359, on

 2    Tuesday, September 8, 2020, at 10:00 a.m., via Zoom,

 3    pursuant to notice.

 4

 5    REMOTE APPEARANCES:

 6                HERBERT LAW FIRM, LLC
                BY:  MR. DANIEL Q. HERBERT
 7                   MS. KELLY A. KRAUCHUN
                206 South Jefferson
 8                Suite 100
                Chicago, Illinois  60661
 9                (312) 655-7660
                dan.herbert@danherbertlaw.com
10                kelly.krauchun@danherbertlaw.com

11                    Appeared on behalf of Plaintiffs;

12
                EMERY LAW LIMITED
13                BY:  MR. ETHAN E. WHITE
                201 Midwest Road
14                Suite 200
                Oak Brook, Illinois  60523
15                (630) 984-0339
                ewhite@emerylawltd.com
16
                    Appeared on behalf of Defendants;
17

18                LEINENWEBER BARONI & DAFFADA, LLC
                BY:  MR. JUSTIN L. LEINENWEBER
19                120 North LaSalle Street
                Suite 2000
20                Chicago, Illinois  60602
                (866) 786-3705
21                justin@ilesq.com

22                    Appeared on behalf of Defendants.

23

24                     *    *    *
```

Gregory Shields Volume II - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1153 of 1503 PageID #:1544

1                    I N D E X

   WITNESS                        EXAMINATION
2
   GREGORY SHIELDS
3
      By Mr. Herbert                        5
4

5

6

7

8

9             E X H I B I T S

   NUMBER                     MARKED FOR ID
10
   Shields Deposition Exhibit
11
                (NO EXHIBITS MARKED.)
12

13

14

15

16

17

18

19

20

21

22

23

24

Gregory Shields Volume II - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1154 of 1503 PageID #:1545

**Page 4**

1    (Whereupon, the witness was
2        duly sworn.)
3    MR. HERBERT:  This is the continued
4 deposition of defendant, one of the defendants
5 Gregory Shields.  It is being taken by Zoom, however,
6 Mr. Shields is on the telephone.
7    Counsel, if I could just ask you
8 that if you can just instruct your client.  You know,
9 at our last deposition, your client, you know, you
10 may disagree, but he gave some very long answers that
11 were really not responsive to the question.  So I
12 would just ask you, since we are limited by time
13 here, that you can instruct your client to just
14 answer the questions and don't provide long
15 narratives.
16    MR. WHITE:  Yeah, I do disagree.  So I think
17 he'll answer the questions that are asked to the best
18 of his ability.
19    MR. HERBERT:  Okay.  Great.
20
21
22
23
24

**Page 5**

1        GREGORY SHIELDS,
2 called as a witness herein, was examined and
3 testified via Zoom conference call as follows:
4        DIRECT EXAMINATION
5        (Continued)
6 BY MR. HERBERT:
7    Q.  Mr. Shields, good morning.
8    **A.  Good morning.**
9    Q.  What is your relationship with the
10 Sheriff, Tom Dart?
11    MR. WHITE:  Objection to form.
12    THE WITNESS:  I don't -- like friendly?
13 BY MR. HERBERT:
14    Q.  Yes.
15    **A.  A friendly relationship?  Yeah, a friend.**
16 **A friendly relationship.  I know specifically who he**
17 **is and I've had some conversations with him.**
18    Q.  Well, your wife is friends with his wife,
19 correct?
20    **A.  Yes.**
21    Q.  Okay.  In fact, they're close friends,
22 correct?
23    **A.  You would have to ask her.  I don't think**
24 **so, but you'd have to ask her, I mean.**

**Page 6**

1    Q.  Well, Tom Dart became the chief of staff
2 for the sheriff in approximately 2003.  Does that
3 sound about correct?
4    **A.  I don't know.**
5    Q.  You don't know when he became the chief
6 of staff?
7    **A.  No, I don't.**
8    Q.  Well, your career certainly blossomed
9 after 2003, didn't it?
10    MR. WHITE:  Objection to form.
11    THE WITNESS:  I don't understand blossom.
12 What do you mean?
13 BY MR. HERBERT:
14    Q.  Your career, you rose through the ranks
15 rather quickly from 2003 on.  You would agree with me
16 on that, correct?
17    MR. WHITE:  Objection to form.
18    THE WITNESS:  No, I disagree.
19 BY MR. HERBERT:
20    Q.  At the last dep you talked a little bit
21 about the training that you received, and I remember
22 looking at your training history sheet that we
23 provided to you.  And you have all those documents
24 that we provided in the last deposition?

**Page 7**

1    MR. WHITE:  No.  Counsel, for the record, we
2 ask that anything you want him to look at here -- you
3 know, you said you were going to highlight or
4 something.  He doesn't have anything.
5 BY MR. HERBERT:
6    Q.  But you reviewed the documents that we
7 submitted to your attorneys for the deposition?
8    **A.  I reviewed documents, yes.**
9    Q.  Okay.  And one of the training documents
10 for your training history talks about how there was a
11 discrimination, harassment, and retaliation class.
12 Do you remember taking that class?
13    MR. WHITE:  Objection to foundation.
14    THE WITNESS:  I remember taking classes, and
15 specifically which ones I don't recall.
16 BY MR. HERBERT:
17    Q.  Do you recall taking any classes about
18 discrimination, harassment, and retaliation?
19    **A.  I must have taken them.  You know, the**
20 **LMS training was given out, you know, for the**
21 **purposes of training, so I'm thinking I'm -- I think**
22 **I had taken them through the years.**
23    Q.  Okay.  When one of your -- or when an
24 investigator files a grievance regarding workplace

Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1155 of 1503 PageID #:1546
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 conditions, you become aware of that grievance.
2 Isn't that correct?
3     MR. WHITE:  Object to form and foundation.
4     THE WITNESS:  No.  I mean, they don't -- the
5 investigators don't tell me first, I'm going to file
6 a grievance.  I don't become aware of it.
7 BY MR. HERBERT:
8     Q.  At some point you become aware of a
9 grievance being filed, correct?
10     **A.  Not necessarily, no.  Not -- not**
11 **necessarily, no.  I wouldn't become aware of.**
12     Q.  What about complaints that are made to
13 the EEOC regarding workplace conditions?
14 Specifically in this case, you're aware of the fact
15 that my clients had made complaints to the EEOC
16 regarding harassment in the workplace, correct?
17     **A.  No, I was not made aware of it until**
18 **somebody brought it to my attention.**
19     Q.  I'm sorry.  I didn't catch that.  Not
20 made aware of it until when?
21     **A.  I'm not made aware of the complaints the**
22 **investigators put in.  They don't advertise that,**
23 **hey, I'm putting in a complaint against you and then**
24 **file it, so they don't tell me that the EEOC**

1 **complaint is going through.**
2     Q.  You became aware of the complaints that
3 were made in this case, correct?
4     MR. WHITE:  Objection to form.
5     THE WITNESS:  You know, I'm not quite sure
6 when this was even filed.
7 BY MR. HERBERT:
8     Q.  Well, it was filed in July 2016, the EEOC
9 complaints by the plaintiffs in this case.  You
10 became aware of those complaints, correct?
11     **A.  I'm not sure when I became aware of it.**
12 **I did not --**
13     Q.  I'm not asking you when.  I said you
14 became aware of them, correct?
15     **A.  Yes.**
16     Q.  And in fact, you were interviewed as part
17 of the complaints made in the EEOC investigation,
18 correct?
19     MR. WHITE:  Objection to foundation.
20     THE WITNESS:  Yeah, the call broke up.  I
21 mean the sentence, the question broke up.  I'm sorry.
22 BY MR. HERBERT:
23     Q.  That's all right.  You were interviewed
24 in regards to the complaints made to the EEOC by the

1 plaintiffs in this case, correct?
2     MR. WHITE:  Object to foundation.
3     THE WITNESS:  No, I wasn't.
4 BY MR. HERBERT:
5     Q.  No, you were never interviewed by anyone
6 from the sheriff's department in any capacity
7 regarding these EEOC complaints?
8     **A.  Yes, I was.**
9     Q.  I'm sorry.  Can you say that again?
10     **A.  Yes, I was.**
11     Q.  Okay.  Well, that's what I asked you
12 previously.  That's why I'm confused.
13         You were interviewed about that,
14 correct?
15     **A.  Can you repeat your first question for**
16 **me?**
17     Q.  No.  We're going to move on.
18     MR. HERBERT:  And, Counsel, we don't have any
19 records from any of those interviews with Mr. Shields
20 concerning the EEOC investigation, so I don't know,
21 you know.  We have documentation that he was
22 interviewed, but we don't have any of those records,
23 and we would request those.
24     MR. WHITE:  Well, you -- it's kind of late in

1 the game, but I would say that to the extent there
2 were interviews, they were probably with counsel, but
3 I'm not aware of anything beyond that.
4 BY MR. HERBERT:
5     Q.  Well, were you interviewed by an
6 attorney, Mr. Shields?
7     **A.  Yes.**
8     Q.  And who was the attorney?
9     **A.  It was a lady by the name of Ochoa, and**
10 **then there was a gentleman by the name of -- an Irish**
11 **guy.  What's his name?  Attorney Nelligan.**
12     Q.  And how many times were you interviewed
13 by those attorneys?
14     **A.  I can -- let's see.  Once.**
15     Q.  Okay.  And were the attorneys together
16 when they interviewed you?
17     **A.  Yes.**
18     Q.  And who were you with?  Who else was part
19 of that interview?
20     **A.  John Webb.**
21     Q.  Okay.  And were these attorneys, were
22 they your attorneys?
23     MR. WHITE:  Objection.  It calls for a legal
24 conclusion.



Gregory Shields Volume II  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1156 of 1503 PageID #:1547
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q.  You can answer.

**A.  They work for the sheriff office.  They**
**work for the sheriff's office.**

Q.  So you didn't hire them, correct?

MR. WHITE:  Objection.  It calls for a legal
conclusion.

THE WITNESS:  Should I answer?

BY MR. HERBERT:

Q.  You can answer.

MR. WHITE:  Yeah, you can answer.

THE WITNESS:  Yeah, no.  No, I didn't hire
them.

MR. HERBERT:  Okay.  I don't know how that's
privileged, but we can address it at a later issue.

BY MR. HERBERT:

Q.  Mr. Shields, you became aware of the
complaints regarding a hostile work environment that
were made by the plaintiffs in this case, correct?

MR. WHITE:  Objection to foundation.

THE WITNESS:  A hostile work environment.
I was interviewed.  I'm not quite
sure if it was a hostile work environment complaint.

Page 12

BY MR. HERBERT:

Q.  Well, it was complaints about that our
plaintiffs in this case were complaining that they
were receiving assignments disproportionate to other
nonblack employees at the EM unit, correct?

MR. WHITE:  And, Counsel, it sounds like
you're asking him questions about his interview with
counsel which is absolutely privileged.  So to the
extent you're trying to get out what he talked to
Ochoa and Nelligan against, I'm going to instruct him
not to answer.

MR. HERBERT:  I'm not asking him any of the
details of the conversation.  First of all, I don't
know how it's privileged, but second of all, I can
certainly ask him the subject matters that were
talked about.  That's not asking --

MR. WHITE:  Yeah.  If you want to ask him the
general subject matter, that's fine.  Anything beyond
that is privileged.

MR. HERBERT:  That's what I'm asking him.

BY MR. HERBERT:

Q.  So you were made aware that the
plaintiffs were complaining about receiving
assignments that were in -- that were undesirable

Page 13

more so than nonblack employees, correct?

MR. WHITE:  Object to form and foundation.

THE WITNESS:  I don't remember specifically
the total conversation, but I was interviewed by
those two.

BY MR. HERBERT:

Q.  And part of it was they were complaining
about the work assignments, correct?

MR. WHITE:  Object to form and foundation.

THE WITNESS:  I'm not aware of these guys
complaining about their work assignment.  Where I'm
getting lost here is...

BY MR. HERBERT:

Q.  What was the subject of your interviews
then?  Without telling me the contents of it right
now, but what were the subjects of your interviews?
Did they address or relate to the complaints that are
made in this lawsuit?

**A.  I'm not sure if they address or relates**
**to this lawsuit.  What I do know is that they talked**
**to me and John Webb about --**

MR. WHITE:  Greg, no.  Greg, Greg.  Stop, no.
You're not going to talk about what you talked to the
attorneys about, okay?  He's just asking the general

Page 14

subject matter.

THE WITNESS:  My apologies.  Sorry about
that.

BY MR. HERBERT:

Q.  And the general subject matter was the
complaints made in this lawsuit, correct?

**A.  That I can't confirm.**

Q.  Then what was the topics of conversation
at that meeting?

**A.  They had to review a complaint that was**
**set forth by a couple of individuals that worked in**
**the EM unit.**

Q.  And that complaint was about
disproportionate discipline concerning those
individuals, a hostile work environment, and
receiving assignments that were undesirable more so
than nonblack employees, correct?

MR. WHITE:  Objection to form, asked and
answered.

BY MR. HERBERT:

Q.  You can answer.

**A.  No, I don't remember all of that in the**
**complaint.**

Q.  Okay.  When you retired, what year did

Page 15



**Gregory Shields Volume II - 9/8/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1157 of 1503 PageID #:1548
**Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.**

1  you retire?

2  **A.   2019.**

3  Q.   Were you asked by anyone to retire?

4  **A.   Yes.**

5  Q.   And who asked you to retire?

6  **A.   My wife, my family.  I talked about it**

7  **with my father.**

8  Q.   Did anyone from the sheriff's department

9  ask you to retire?

10  **A.   No.**

11  Q.   Were you under any investigation by the

12  sheriff's department when you retired?

13  MR. WHITE:  Objection.  It calls for

14  speculation.

15  THE WITNESS:  No.

16  BY MR. HERBERT:

17  Q.   Do you know an individual by the name of

18  Lopez who worked dispatch?

19  MR. WHITE:  Objection to form and foundation.

20  THE WITNESS:  Yes.

21  BY MR. HERBERT:

22  Q.   And do you remember having a conversation

23  with him in 2015 in which you talked about how no

24  Mexicans were going to be allowed to lead the jail?

---

1  MR. WHITE:  Objection to foundation.

2  THE WITNESS:  No.

3  BY MR. HERBERT:

4  Q.   Did you ever instruct Lopez who to assign

5  to various neighborhoods out in the field?

6  MR. WHITE:  Objection to form.

7  THE WITNESS:  What's getting lost here is I

8  wouldn't instruct investigators.  They had -- they

9  had a black supervisor, a female black supervisor

10  that would make the lineups and disseminate the work.

11  If Lopez was on dispatch, most likely they would talk

12  to them to get the job done.

13  BY MR. HERBERT:

14  Q.   But did you ever talk to Lopez about who

15  should be assigned different jobs in various

16  neighborhoods?

17  **A.   No.**

18  Q.   Do you ever remember talking to Lopez and

19  saying anything along the lines of, if it wasn't for

20  these fucking N word, n-i-g-g-e-r-s, the unit would

21  run better?

22  MR. WHITE:  Objection to form, foundation.

23  THE WITNESS:  No, never.

24  BY MR. HERBERT:

---

1  Q.   Did you ever use the N word in front of

2  Lopez?

3  **A.   No.**

4  Q.   Did you ever use the N word in the

5  workplace?

6  **A.   No.**

7  Q.   Do you remember telling Lopez, fuck

8  Winston and fuck all those other N words in 2016?

9  **A.   No.**

10  MR. WHITE:  Object to foundation.

11  BY MR. HERBERT:

12  Q.   Well, do you remember in 2016 the EM unit

13  was moving to a different office space?  Correct?

14  **A.   Yes, we did move.  I don't know if it was**

15  **2016.**

16  Q.   Okay.  At your last deposition, you

17  talked about -- basically about how you didn't have

18  any role in the disciplinary process.  Do you

19  remember talking about that?

20  MR. WHITE:  Objection.  It misstates prior

21  testimony.

22  THE WITNESS:  Yes.

23  BY MR. HERBERT:

24  Q.   Okay.  And in fact, you did have a role

---

1  in the disciplinary process, correct?

2  **A.   I don't understand.  You just asked me if**

3  **I did or I didn't.  I don't understand your question,**

4  **sir.**

5  Q.   What part do you not understand?  You had

6  a role in the disciplinary process, correct?

7  **A.   Yes.**

8  Q.   And during your time at the sheriff's

9  department from 2010, from that time period, do you

10  have any knowledge about any complaints about racial

11  statements or stereotypical comments that were being

12  made in the workplace?

13  MR. WHITE:  Object to form and foundation.

14  THE WITNESS:  I don't remember.

15  BY MR. HERBERT:

16  Q.   Well, that would be a serious complaint,

17  correct, if somebody were complaining about

18  harassment in the workplace?

19  MR. WHITE:  Object to form.

20  THE WITNESS:  Yes, it would be.

21  BY MR. HERBERT:

22  Q.   Okay.  And as you sit here today, you

23  don't remember any complaints?

24  MR. WHITE:  Object to form.

Gregory Shields Volume II  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1158 of 1503 PageID #:1549
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 THE WITNESS: I can't put my thumb on the
2 complaints you're talking about, but I will agree
3 that there were some complaints.
4 BY MR. HERBERT:
5 Q. That's what I'm asking you about. What
6 kind of complaints were they? Strike that.
7 They were complaints about
8 harassment in the workplace, correct?
9 MR. WHITE: Objection to foundation.
10 THE WITNESS: I don't recall harassment in
11 the workplace.
12 BY MR. HERBERT:
13 Q. Well, there was complaints about some
14 racial comments being made in the workplace, correct?
15 MR. WHITE: Objection to foundation.
16 THE WITNESS: You know, I don't recall it
17 right now at this moment. I don't recall racial
18 complaints that I was made aware of.
19 BY MR. HERBERT:
20 Q. Well, part of your duties as a director
21 was you wanted to make sure that there was no racial
22 discrimination occurring in the workplace, correct?
23 **A. Yes.**
24 Q. And what steps did you take to ensure

1 that there was no racial harassment in the workplace
2 while you were the director?
3 **A. If in fact it was brought to my**
4 **attention, I would have it investigated to find the**
5 **source of it.**
6 Q. Okay. And certainly Director Webb would
7 have been made aware of any of those complaints made
8 within the workplace, correct?
9 MR. WHITE: Objection to foundation, calls
10 for speculation.
11 THE WITNESS: Each and every supervisor on
12 all three watches, whatever watch it happened on,
13 first, second, or third, the frontline supervisor
14 should have been made aware of it and taken action.
15 BY MR. HERBERT:
16 Q. Do you remember at the last deposition we
17 talked about the investigation into Investigator
18 Winston concerning leaving court and his belief that
19 it constituted a tour of duty? Do you remember that
20 investigation?
21 **A. I didn't do the investigation.**
22 Q. You remember that investigation, correct?
23 **A. Yes.**
24 Q. Okay. And at our last deposition, I

1 believe you said that you were not the complainant in
2 that case?
3 **A. I don't believe I was, no.**
4 Q. Okay. Well, would it surprise you that
5 you are listed as the complainant in that case on the
6 summary report from the sheriff's department?
7 MR. WHITE: Objection to foundation.
8 THE WITNESS: On the summary report, is that
9 the actual --
10 BY MR. HERBERT:
11 Q. On any report -- hold on. On any report
12 concerning that investigation, would it surprise you
13 that you're listed as a complainant in that case?
14 MR. WHITE: Objection to foundation.
15 THE WITNESS: I'm thinking back at the actual
16 alleged act and --
17 BY MR. HERBERT:
18 Q. I'll move on.
19 **A. Say it again.**
20 Q. I'll move on. Withdraw that question.
21 You would agree with me that prior
22 to disciplining Winston for this action with regard
23 to replacing court time in lieu of a tour of duty
24 that it was a past practice in the sheriff's

1 department that people would be allowed to use their
2 court time in lieu of a tour of duty, correct?
3 MR. WHITE: Objection to form.
4 THE WITNESS: I believe that was answered in
5 my last deposition.
6 BY MR. HERBERT:
7 Q. Answer it again.
8 **A. I don't issue discipline. Discipline**
9 **comes from OPR.**
10 BY MR. HERBERT:
11 Q. Okay. Not my question. My question is
12 specific. There was a past practice prior to Winston
13 where sheriffs were allowed to use their court time
14 in lieu of their tour of duty, correct?
15 MR. WHITE: Objection to form.
16 THE WITNESS: I'm not aware of the past
17 practice. It's not in the CBA, the Collective
18 Bargaining Act.
19 BY MR. HERBERT:
20 Q. Do you know of any nonblack investigators
21 that were disciplined for using court time in lieu of
22 their tour of duty?
23 **A. Yes.**
24 Q. Who?

Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1159 of 1503 PageID #:1550
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 24

1    **A.  The name's drawing a blank. It was the**
2 **four individuals with Winston. I think Rico, a male**
3 **Hispanic. There was a white guy in there. I'm**
4 **drawing a blank on him.**
5    Q.  Yeah. The white guy was part of this
6 case, correct?
7    **A.  Yeah. He received discipline.**
8    Q.  Any cases after that or prior to that
9 where any nonblack employees -- or strike that.
10      Other than those four individuals,
11 at any time when you were the director, was anyone
12 else disciplined for using court time in lieu of a
13 tour of duty?
14    MR. WHITE: Objection to foundation.
15    THE WITNESS: Was any nonwhite asked for
16 discipline? What? Were nonblack people disciplined?
17 I don't -- can you repeat it real fast?
18 BY MR. HERBERT:
19    Q.  I'll try. Other than those four
20 individuals that were disciplined for using court
21 time in lieu of a tour of duty, was anyone else
22 disciplined in the same subject matter as those four?
23    **A.  Yeah, that I don't know.**
24    Q.  You're aware of the fact that there were

Page 25

1 complaints made regarding you and -- or taking part
2 in the OPR investigations where complaints were being
3 made against you, correct? That's a horrible
4 question. Let me ask it a better way.
5      You're aware that investigators
6 complained about you being part of the OPR
7 investigations in certain cases, correct?
8    MR. WHITE: Objection to form and foundation.
9    THE WITNESS: No, sir. No.
10 BY MR. HERBERT:
11    Q.  Investigator Winston complained about you
12 being part of an OPR investigation and sitting on the
13 nonconcurrence panel because he believed there was a
14 conflict of interest because he's got a complaint
15 against you?
16    MR. WHITE: Object to form and foundation.
17    THE WITNESS: I don't understand your
18 question. I wasn't part of OPR.
19 BY MR. HERBERT:
20    Q.  Pardon me?
21    **A.  I was not part of OPR.**
22    Q.  I'm not talking about that. I'm talking
23 about there was complaints made about you being part
24 of the disciplinary process in an OPR investigation

Page 26

1 by Investigator Winston, by Investigator Michelle
2 Strickland. Do you remember those?
3    MR. WHITE: Object to form and foundation.
4    THE WITNESS: No, I don't. I mean, I made it
5 a point to resolve the grievance or reduce the
6 discipline.
7 BY MR. HERBERT:
8    Q.  Do you remember we talked about the
9 incident where you and Investigator Winston had an
10 argument out in front of your office? Do you
11 remember talking about that at the last deposition?
12    **A.  Yes, I do.**
13    Q.  Okay. And you talked about how you
14 turned around and went back into the office of your
15 own accord. Do you remember talking about that?
16    **A.  Yes.**
17    Q.  While in fact, there was a -- Director
18 Brady was present, correct?
19    **A.  Yes.**
20    Q.  In fact, Director Brady grabbed you by
21 the arm and escorted you into the office, correct?
22    **A.  No, that's not correct.**
23    Q.  And with respect to that incident, that
24 was a sustained finding against you, correct?

Page 27

1    MR. WHITE: Objection to form and foundation.
2    THE WITNESS: What was sustained?
3 BY MR. HERBERT:
4    Q.  The allegations against you concerning
5 the threats made to Investigator Winston. That OPR
6 investigation resulted in a sustained finding against
7 you, correct?
8    MR. WHITE: Objection. Foundation.
9    THE WITNESS: It was my understanding the
10 allegation of me hollering at him was sustained.
11 BY MR. HERBERT:
12    Q.  And that was -- August 3, 2015 is when
13 Investigator Winston made that complaint about you,
14 correct?
15    **A.  I don't remember that date, sir.**
16    Q.  That's not right? You can answer.
17    **A.  I didn't hear the question. What's that?**
18    Q.  Does that date sound accurate?
19    **A.  I'm sure it's accurate if you're reading**
20 **from something, but I can't -- I don't know what**
21 **happened six years ago.**
22    Q.  Okay. And then about two weeks after
23 Investigator Winston made a complaint against you for
24 what we just discussed, two weeks after that Winston



Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1160 of 1503 PageID #:1551
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  was given a disciplinary action form for an incident
2  that occurred on July 14, 2015. Do you remember
3  that?
4      MR. WHITE: Objection to foundation.
5      THE WITNESS: Can you refer to the incident?
6  I don't remember the dates.
7  BY MR. HERBERT:
8      Q. Yeah, the July 14, 2015 incident where --
9  you made a complaint against Winston for that
10 incident, for an incident in July of 2015, correct?
11     **A. I don't remember the incident, sir.**
12     Q. Okay.
13     **A. Can you tell me?**
14     Q. (Shaking head.) Part of your
15 investigation -- or I'm sorry, part of the
16 investigation into your actions with respect to
17 Winston where there was a sustained finding against
18 you, one of the findings indicated that you were not
19 supposed to be sitting on the second step of the
20 grievance process with respect to Winston because
21 there was a conflict of interest. Do you remember
22 that?
23     MR. WHITE: Object to form and foundation.
24     THE WITNESS: You know, the Collective

Page 28

1  Bargaining Act has changed several times, whether I
2  did sit on it or they eliminated the director or they
3  put him back on, so I can't be specific but...
4  BY MR. HERBERT:
5      Q. Well, you were interviewed as part of
6  that investigation, correct?
7      MR. WHITE: Objection to form.
8      THE WITNESS: Which investigation?
9  BY MR. HERBERT:
10     Q. The investigation into you that was
11 sustained with respect to the incident with Winston.
12     MR. WHITE: Object to form.
13     THE WITNESS: The investigation which I was
14 interviewed for?
15 BY MR. HERBERT:
16     Q. The sustained finding against you, that
17 investigation you were interviewed, correct?
18     **A. Yes, sir.**
19     Q. Okay. And you were interviewed twice,
20 and the first time you said that you would not be
21 associated with the second step grievance process
22 with respect to Winston, correct?
23     MR. WHITE: Object to foundation.
24     THE WITNESS: I don't recall from memory, but

Page 29

1  I do recall that either I was asked to sit on
2  disciplinary hearings and the Collective Bargaining
3  Act did remove the director out of disciplinary
4  hearing and then at one point put him back in and
5  hear it when the union would ask me on emergency,
6  hey, can you sit and hear this, this is the last day,
7  yes, I will. There was an investigation coming
8  through on I.V. Newson. I felt it necessary to say,
9  listen, he's involved in a lawsuit. I'll send it
10 back. You probably want to give it to somebody else
11 so it's fair and impartial.
12 BY MR. HERBERT:
13     Q. Well, in your later interview, you
14 admitted that you should not have sat on the second
15 step of the grievance process for --
16     MR. WHITE: Objection. Foundation.
17     THE WITNESS: In my second interview with
18 you, sir?
19 BY MR. HERBERT:
20     Q. We're still talking about the interviews
21 with OPR, okay, with the sustained finding into your
22 CR complaint that was made against you.
23         During that second interview with
24 OPR, you admitted that it was a mistake for you to

Page 30

1  sit on the second step of the grievance process?
2      MR. WHITE: Objection. Foundation.
3      THE WITNESS: I'd probably have to hear the
4  way the question was posed to me. I mean...
5  BY MR. HERBERT:
6      Q. Why? I'm asking you, do you remember
7  saying that?
8      **A. No, I don't remember saying that. No, I
9  don't remember saying it, sir.**
10     Q. Okay.
11     **A. And that's -- no, never mind.**
12     Q. You know Lieutenant Ranzino, correct?
13     **A. Yes.**
14     Q. And he worked under your command,
15 correct?
16     **A. Yes.**
17     Q. And you're aware of numerous complaints
18 made by investigators about Lieutenant Ranzino
19 creating a hostile work environment, correct?
20     MR. WHITE: Objection to foundation.
21     THE WITNESS: I was made aware of them, yes.
22 BY MR. HERBERT:
23     Q. Okay. And what steps did you take to
24 ensure that there was no harassment in the workplace

Page 31



Gregory Shields Volume II  -  9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1 of 1503 PageID #:1552
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 after receiving these complaints about Lieutenant
2 Ranzino?
3      **A.  I know he was subsequently transferred**
4 **out of the unit, and I'm not sure.  I wasn't privy to**
5 **the suspension time that he received.**
6      Q.  Did you have him transferred out of the
7 unit?
8      **A.  Did I, no.**
9      Q.  I'm asking you what steps you took to
10 ensure that no harassment took place within the
11 workplace upon receiving the complaints, the numerous
12 complaints about Ranzino being harassing in the
13 workplace?
14      MR. WHITE:  Objection.  Form, foundation,
15 assumes facts not in evidence.
16      THE WITNESS:  I'm not quite sure right now
17 what steps I took, but I could tell you that for his
18 alleged actions, he was transferred out of the unit
19 and sent I think over...
20 BY MR. HERBERT:
21      Q.  Again, I'm not asking what OPR did.
22          So is it fair to say, as you sit
23 here today, that you are not aware of any single step
24 you took to prevent harassment in the workplace

Page 32

1 during the time that you were director of the EM
2 unit?
3      MR. WHITE:  Objection.  It misstates
4 testimony, foundation.
5      THE WITNESS:  No, that's not fair to say.
6 BY MR. HERBERT:
7      Q.  Well, then answer my question.  What
8 steps did you take?
9      **A.  I can't remember.**
10      MR. WHITE:  Two different questions.  Object
11 to form.
12 BY MR. HERBERT:
13      Q.  You can't remember a single step that you
14 took to prevent harassment in the workplace after
15 receiving numerous complaints about harassment in the
16 workplace, correct?
17      MR. WHITE:  Objection.  It assumes facts not
18 in evidence, form, foundation.
19      THE WITNESS:  I'd have to review maybe the
20 personnel file or review notes.
21 BY MR. HERBERT:
22      Q.  Because you can't think of an incident in
23 fact, correct?
24      **A.  I never said that.**

Page 33

1      Q.  Okay.  A complaint was made against you
2 by Investigator Raymond Villa, correct?
3      **A.  Yes.**
4      Q.  And that was in approximately June
5 of 2015?
6      **A.  Approximately, yes.**
7      Q.  Okay.  And what was the nature of that
8 complaint?
9      **A.  I'd have to read it.  I don't remember.**
10      Q.  Do you remember anything about the nature
11 of the complaint?
12      **A.  No, I...**
13      Q.  No, you don't remember anything about the
14 complaint made?
15      **A.  I know he filed a complaint.  I know he**
16 **demanded that I bring him straight to the sheriff's**
17 **office.**
18      Q.  Again, I'm not talking about the process.
19 Do you remember what the nature of the allegations
20 were?
21      **A.  A hostile work environment or workplace**
22 **harassment or something.**
23      Q.  Okay.  And in fact, you were named as an
24 accused for creating a hostile work environment in

Page 34

1 2011, correct?
2      MR. WHITE:  Objection to foundation.
3      THE WITNESS:  Is that the Villa complaint?
4 BY MR. HERBERT:
5      Q.  Who else made complaints about you making
6 harassment, being harassing in the workplace other
7 than Investigator Villa?
8      MR. WHITE:  Objection to foundation.
9      THE WITNESS:  I don't think anyone.
10 BY MR. HERBERT:
11      Q.  Well, Investigator Rizzo did, correct?
12      MR. WHITE:  Objection.  Foundation.
13      THE WITNESS:  I'm not aware of that.
14 BY MR. HERBERT:
15      Q.  In 2011 Investigator Rizzo made a
16 complaint that you harassed him by chastising him in
17 front of other employees and restricted him from
18 going into the supervisor's office.  Do you remember
19 that?
20      MR. WHITE:  Objection to foundation.
21      THE WITNESS:  No, I don't.
22 BY MR. HERBERT:
23      Q.  Okay.  Well, you remember that
24 Investigator Villa alleged that from March 2012 to

Page 35



**Gregory Shields Volume II - 9/8/2020**
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1162 of 1503 PageID #:1553

1 February 2013, you created a hostile work environment
2 for him. Does that refresh your memory as to what
3 the complaint was by Mr. Villa?
4     MR. WHITE: Objection. Foundation.
5     THE WITNESS: Yes.
6 BY MR. HERBERT:
7     Q. Okay. And what was the nature of the
8 complaint that Villa made regarding you creating a
9 harassing work environment?
10    **A. I believe they -- I believe he was**
11 **disappointed and they removed the title of supervisor**
12 **and that he accused me of removing the title**
13 **supervisor.**
14    Q. Well, and he accused you of creating a
15 harassing work environment, correct?
16    MR. WHITE: Objection to foundation.
17    THE WITNESS: He could have. Not that I
18 recall. I believe he was more upset that he
19 removed the title of supervisor and that we were --
20 we were, you know, trying to resolve it, and he felt
21 he was being harassed. Hello?
22 BY MR. HERBERT:
23    Q. In 2014 you were accused and there was an
24 OPR investigation that you retaliated against Fred

Page 36

1 Davis, Jr. Do you remember that?
2     MR. WHITE: Objection to foundation.
3     THE WITNESS: No, I really don't.
4 BY MR. HERBERT:
5     Q. Well, in fact, there was a lawsuit in
6 that case, correct?
7     MR. WHITE: Objection to foundation.
8     THE WITNESS: Not that I'm aware of.
9 BY MR. HERBERT:
10    Q. And Fred Davis is black, correct?
11    **A. Yes.**
12    Q. And you were also accused for creating a
13 hostile work environment in 2013. Do you remember
14 that?
15    MR. WHITE: Objection to foundation.
16    THE WITNESS: No, I don't.
17    MR. WHITE: Counsel, we've got about a minute
18 30 left.
19    MR. HERBERT: Well, I'm going to need a
20 little more time based upon these answers.
21    MR. WHITE: Nothing I can help you with
22 there.
23    MR. HERBERT: Well, I'm going to request a
24 few more minutes.

Page 37

1     MR. WHITE: Counsel, he's been giving you one
2 word answers, so I don't know what more you want.
3 BY MR. HERBERT:
4     Q. You were accused by a detainee of
5 refusing to give him an appointment with a
6 neurologist in 2015. Do you remember that?
7     MR. WHITE: Objection to foundation.
8     THE WITNESS: No, I don't, sir.
9 BY MR. HERBERT:
10    Q. You were accused of creating a hostile
11 work environment in -- December 16, 2016?
12    MR. WHITE: Objection to foundation.
13    THE WITNESS: No, I don't, sir.
14 BY MR. HERBERT:
15    Q. You were accused by Steven Andrews. Do
16 you know Steven Andrews?
17    **A. Yes.**
18    Q. And you were accused by him of creating a
19 hostile work environment in 2018, correct?
20    MR. WHITE: Objection to foundation.
21    THE WITNESS: I'm not aware of that.
22    MR. WHITE: Final question.
23    MR. HERBERT: Well, it's not going to be
24 final, but I'm getting close.

Page 38

1 BY MR. HERBERT:
2     Q. In 2016 he made a CR saying that he
3 believed he was being harassed by you in the
4 electronic monitoring unit. Do you remember that?
5     MR. WHITE: Objection to foundation.
6     THE WITNESS: No, I don't remember that.
7     MR. WHITE: Okay. That's it.
8     MR. HERBERT: Well, I have a couple more
9 questions.
10    MR. WHITE: No. We were very, very clear on
11 the record last time that you only had 30 minutes
12 left and I said --
13    MR. HERBERT: 45. 45.
14    MR. WHITE: -- if you agree that you will
15 stop a hard stop at 45, we will give you 45. You
16 said on the record, I agree. You've now had more
17 than 45 minutes. He's done. If you want more time,
18 you can ask the Court.
19        All right, Greg. Thanks for being
20 here.
21    THE WITNESS: Okay. Thanks, everyone.
22    MR. WHITE: We'll waive signature.
23        (FURTHER DEPONENT SAITH NOT.)
24

Page 39



Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1163 of 1503 PageID #:1554
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1              REPORTER'S CERTIFICATE

2

3         I, Brenda S. Hall, CSR No. 084-003359,

4    Certified Shorthand Reporter of said state, do hereby

5    certify:

6         That previous to the commencement of the

7    examination of the witness, the witness was duly

8    sworn to testify the whole truth concerning the

9    matters herein;

10        That the foregoing remote deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15        That the said remote deposition was taken

16   before me at the time specified;

17        That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24



Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1164 of 1503 PageID #:1555
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1       IN WITNESS WHEREOF, I do hereunto set my hand

2  at Chicago, Illinois, this 8th day of October, 2020.

3

4

5          _____

6         Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



**Gregory Shields Volume II - 9/8/2020**
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1165 of 1503 PageID #:1556

## WORD INDEX

**< 0 >**
**084-003359** 2:*1*
40:*3*

**< 1 >**
**10:00** 2:*2*
**100** 2:*8*
**120** 2:*19*
**14** 28:2, *8*
**16** 38:*11*
**18-cv-05726** 1:*9*

**< 2 >**
**200** 2:*14*
**2000** 2:*19*
**2003** 6:2, *9*, *15*
**201** 2:*13*
**2010** 19:*9*
**2011** 35:*1*, *15*
**2012** 35:*24*
**2013** 36:*1* 37:*13*
**2014** 36:*23*
**2015** 16:*23* 27:*12*
28:2, *8*, *10* 34:*5*
38:*6*
**2016** 9:*8* 18:*8*, *12*,
*15* 38:*11* 39:*2*
**2018** 38:*19*
**2019** 16:*2*
**2020** 2:*2* 41:*2*
**206** 2:*7*

**< 3 >**
**3** 27:*12*
**30** 37:*18* 39:*11*
**312** 2:*9*

**< 4 >**
**45** 39:*13*, *15*, *17*

**< 5 >**
**5** 3:*1*

**< 6 >**
**60523** 2:*14*
**60602** 2:*20*
**60661** 2:*8*
**630** 2:*15*

**655-7660** 2:*9*

**< 7 >**
**786-3705** 2:*20*

**< 8 >**
**8** 2:*2*
**866** 2:*20*
**8th** 41:*2*

**< 9 >**
**984-0339** 2:*15*

**< A >**
**a.m** 2:*2*
**ability** 4:*18*
**above-entitled** 1:*23*
**absolutely** 13:*8*
**accord** 26:*15*
**accurate** 27:*18*, *19*
**accused** 34:*24*
36:*12*, *14*, *23* 37:*12*
38:*4*, *10*, *15*, *18*
**act** 22:*16* 23:*18*
29:*1* 30:*3*
**action** 21:*14* 22:*22*
28:*1* 40:*21*
**actions** 28:*16* 32:*18*
**actual** 22:*9*, *15*
**address** 12:*15*
14:*17*, *19*
**admitted** 30:*14*, *24*
**advertise** 8:*22*
**ago** 27:*21*
**agree** 6:*15* 20:*2*
22:*21* 39:*14*, *16*
**allegation** 27:*10*
**allegations** 27:*4*
34:*19*
**alleged** 22:*16*
32:*18* 35:*24*
**allowed** 16:*24* 23:*1*,
*13*
**Andrews** 38:*15*, *16*
**answer** 4:*14*, *17*
12:2, *8*, *10*, *11*
13:*11* 15:*21* 23:*7*
27:*16* 33:*7*
**answered** 15:*19*
23:*4*

**answers** 4:*10*
37:*20* 38:*2*
**ANTHONY** 1:*6*
**apologies** 15:*2*
**APPEARANCES**
2:*5*
**Appeared** 2:*11*, *15*,
*22*
**appointment** 38:*5*
**approximately** 6:*2*
34:*4*, *6*
**argument** 26:*10*
**arm** 26:*21*
**asked** 4:*17* 10:*11*
15:*18* 16:*3*, *5* 19:*2*
24:*15* 30:*1*
**asking** 9:*13* 13:*7*,
*12*, *16*, *20* 14:*24*
20:*5* 31:*6* 32:*9*, *21*
**assign** 17:*4*
**assigned** 17:*15*
**assignment** 14:*11*
**assignments** 13:*4*,
*24* 14:*8* 15:*16*
**associated** 29:*21*
**assumes** 32:*15*
33:*17*
**attention** 8:*18* 21:*4*
**attorney** 11:*6*, *8*, *11*
40:*18*, *19*
**attorneys** 7:*7*
11:*13*, *15*, *21*, *22*
14:*24*
**August** 27:*12*
**aware** 8:*1*, *6*, *8*, *11*,
*14*, *17*, *20*, *21* 9:*2*,
*10*, *11*, *14* 11:*3*
12:*17* 13:*22* 14:*10*
20:*18* 21:*7*, *14*
23:*16* 24:*24* 25:*5*
31:*17*, *21* 32:*23*
35:*13* 37:*8* 38:*21*

**< B >**
**back** 22:*15* 26:*14*
29:*3* 30:*4*, *10*
**Bargaining** 23:*18*
29:*1* 30:*2*
**BARONI** 2:*18*
**based** 37:*20*

**basically** 18:*17*
**behalf** 2:*11*, *15*, *22*
**belief** 21:*18*
**believe** 22:*1*, *3*
23:*4* 36:*10*, *18*
**believed** 25:*13* 39:*3*
**best** 4:*17*
**better** 17:*21* 25:*4*
**beyond** 11:*3* 13:*18*
**bit** 6:*20*
**black** 17:*9* 37:*10*
**blank** 24:*1*, *4*
**blossom** 6:*11*
**blossomed** 6:*8*
**Brady** 26:*18*, *20*
**Brenda** 1:*24* 40:*3*
**bring** 34:*16*
**broke** 9:*20*, *21*
**Brook** 2:*14*
**brought** 8:*18* 21:*3*

**< C >**
**call** 5:*3* 9:*20*
**called** 5:*2*
**calls** 11:*23* 12:*6*
16:*13* 21:*9*
**Capacity** 1:*11*, *13*,
*14*, *16*, *17* 10:*6*
**career** 6:*8*, *14*
**case** 8:*14* 9:*3*, *9*
10:*1* 12:*19* 13:*3*
22:*2*, *5*, *13* 24:*6*
37:*6*
**cases** 24:*8* 25:*7*
**catch** 8:*19*
**cause** 1:*23*
**CBA** 23:*17*
**CECIL** 1:*6*
**certain** 25:*7*
**certainly** 6:*8* 13:*15*
21:*6*
**CERTIFICATE**
40:*1*
**Certified** 1:*24* 40:*4*
41:*6*
**certify** 40:*5*
**changed** 29:*1*
**chastising** 35:*16*
**Chicago** 2:*8*, *20*
41:*2*
**chief** 6:*1*, *5*

Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1166 of 1503 PageID #:1557
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**CHRISTOPHER**
 1:*16*

**class** 7:*11*, *12*

**classes** 7:*14*, *17*

**clear** 39:*10*

**client** 4:*8, 9, 13*

**clients** 8:*15*

**close** 5:*21* 38:*24*

**Collective** 23:*17*
 28:*24* 30:*2*

**comes** 23:*9*

**coming** 30:*7*

**command** 31:*14*

**commencement**
 40:*6*

**comments** 19:*11*
 20:*14*

**complainant** 22:*1, 5,*
*13*

**complained** 25:*6, 11*

**complaining** 13:*3,*
*23* 14:*7, 11* 19:*17*

**complaint** 8:*23* 9:*1*
 12:*23* 15:*10, 13, 23*
 19:*16* 25:*14* 27:*13,*
*23* 28:*9* 30:*22*
 34:*1, 8, 11, 14, 15*
 35:*3, 16* 36:*3, 8*

**complaints** 8:*12, 15,*
*21* 9:*2, 9, 10, 17, 24*
 10:*7* 12:*18* 13:*2*
 14:*17* 15:*6* 19:*10,*
*23* 20:*2, 3, 6, 7, 13,*
*18* 21:*7* 25:*1, 2, 23*
 31:*17* 32:*1, 11, 12*
 33:*15* 35:*5*

**concerning** 10:*20*
 15:*14* 21:*18* 22:*12*
 27:*4* 40:*8*

**conclusion** 11:*24*
 12:*7*

**conditions** 8:*1, 13*

**conference** 5:*3*

**confirm** 15:*7*

**conflict** 25:*14*
 28:*21*

**confused** 10:*12*

**constituted** 21:*19*

**constitutes** 40:*13*

**contents** 14:*15*

**continued** 1:*22* 4:*3*
 5:*5*

**conversation** 13:*13*
 14:*4* 15:*8* 16:*22*

**conversations** 5:*17*

**COOK** 1:*10, 18*

**correct** 5:*19, 22*
 6:*3, 16* 8:*2, 9, 16*
 9:*3, 10, 14, 18* 10:*1,*
*14* 12:*5, 19* 13:*5*
 14:*1, 8* 15:*6, 17*
 18:*13* 19:*1, 6, 17*
 20:*8, 14, 22* 21:*8,*
*22* 23:*2, 14* 24:*6*
 25:*3, 7* 26:*18, 21,*
*22, 24* 27:*7, 14*
 28:*10* 29:*6, 17, 22*
 31:*12, 15, 19* 33:*16,*
*23* 34:*2* 35:*1, 11*
 36:*15* 37:*6, 10*
 38:*19*

**Counsel** 4:*7* 7:*1*
 10:*18* 11:*2* 13:*6, 8*
 37:*17* 38:*1* 40:*18,*
*19*

**COUNTY** 1:*10, 18*

**couple** 15:*11* 39:*8*

**COURT** 1:*1* 21:*18*
 22:*23* 23:*2, 13, 21*
 24:*12, 20* 39:*18*

**CR** 30:*22* 39:*2*

**created** 36:*1*

**creating** 31:*19*
 34:*24* 36:*8, 14*
 37:*12* 38:*10, 18*

**CSR** 2:*1* 40:*3*

**< D >**

**DAFFADA** 2:*18*

**dan.herbert@danher
bertlaw.com** 2:*9*

**DANIEL** 2:*6*

**DART** 1:*11* 5:*10*
 6:*1*

**date** 27:*15, 18*

**dates** 28:*6*

**DAVID** 1:*6*

**Davis** 37:*1, 10*

**day** 30:*6* 41:*2*

**December** 38:*11*

**defendant** 4:*4*

**Defendants** 1:*19*
 2:*15, 22* 4:*4*

**demanded** 34:*16*

**dep** 6:*20*

**department** 10:*6*
 16:*8, 12* 19:*9* 22:*6*
 23:*1*

**DEPONENT** 39:*23*

**deposition** 1:*22*
 3:*9* 4:*4, 9* 6:*24*
 7:*7* 18:*16* 21:*16,*
*24* 23:*5* 26:*11*
 40:*10, 15*

**details** 13:*13*

**detainee** 38:*4*

**different** 17:*15*
 18:*13* 33:*10*

**DIRECT** 5:*4*

**direction** 40:*13*

**directly** 40:*20*

**director** 20:*20*
 21:*2, 6* 24:*11*
 26:*17, 20* 29:*2*
 30:*3* 33:*1*

**disagree** 4:*10, 16*
 6:*18*

**disappointed** 36:*11*

**disciplinary** 18:*18*
 19:*1, 6* 25:*24* 28:*1*
 30:*2, 3*

**discipline** 15:*14*
 23:*8* 24:*7, 16* 26:*6*

**disciplined** 23:*21*
 24:*12, 16, 20, 22*

**disciplining** 22:*22*

**discrimination** 7:*11,*
*18* 20:*22*

**discussed** 27:*24*

**dispatch** 16:*18*
 17:*11*

**disproportionate**
 13:*4* 15:*14*

**disseminate** 17:*10*

**DISTRICT** 1:*1*

**DIVISION** 1:*2*

**documentation**
 10:*21*

**documents** 6:*23*
 7:*6, 8, 9*

**drawing** 24:*1, 4*

**duly** 4:*2* 40:*7*

**duties** 20:*20*

**duty** 21:*19* 22:*23*
 23:*2, 14, 22* 24:*13,*
*21*

**< E >**

**EASTERN** 1:*2*

**EEOC** 8:*13, 15, 24*
 9:*8, 17, 24* 10:*7, 20*

**either** 30:*1*

**electronic** 39:*4*

**eliminated** 29:*2*

**EM** 13:*5* 15:*12*
 18:*12* 33:*1*

**emergency** 30:*5*

**EMERY** 2:*11*

**employee** 40:*17, 18*

**employees** 13:*5*
 14:*1* 15:*17* 24:*9*
 35:*17*

**ensure** 20:*24* 31:*24*
 32:*10*

**environment** 12:*18,*
*21, 23* 15:*15* 31:*19*
 34:*21, 24* 36:*1, 9,*
*15* 37:*13* 38:*11, 19*

**escorted** 26:*21*

**ETHAN** 2:*13*

**evidence** 32:*15*
 33:*18*

**ewhite@emerylawltd
.com** 2:*15*

**EXAMINATION**
 3:*1* 5:*4* 40:*7*

**examined** 5:*2*

**Exhibit** 3:*9*

**EXHIBITS** 3:*9*

**extent** 11:*1* 13:*9*

**< F >**

**fact** 5:*21* 8:*14*
 9:*16* 18:*24* 21:*3*
 24:*24* 26:*17, 20*
 33:*23* 34:*23* 37:*5*

**facts** 32:*15* 33:*17*

**fair** 30:*11* 32:*22*
 33:*5*

**family** 16:*6*

**fast** 24:*17*

Gregory Shields Volume II - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1167 of 1503 PageID #:1558

father 16:7
February 36:1
felt 30:8 36:20
female 17:9
FERGUSON 1:5
field 17:5
file 8:5, 24 33:20
filed 8:9 9:6, 8
 34:15
files 7:24
Final 38:22, 24
find 21:4
finding 26:24 27:6
 28:17 29:16 30:21
findings 28:18
fine 13:18
FIRM 2:6
first 8:5 10:15
 13:13 21:13 29:20
follows 5:3
foregoing 40:10
form 5:11 6:10, 17
 8:3 9:4 14:2, 9
 15:18 16:19 17:6,
 22 19:13, 19, 24
 23:3, 15 25:8, 16
 26:3 27:1 28:1, 23
 29:7, 12 32:14
 33:11, 18
forth 15:11
foundation 7:13
 8:3 9:19 10:2
 12:20 14:2, 9
 16:19 17:1, 22
 18:10 19:13 20:9,
 15 21:9 22:7, 14
 24:14 25:8, 16
 26:3 27:1, 8 28:4,
 23 29:23 30:16
 31:2, 20 32:14
 33:4, 18 35:2, 8, 12,
 20 36:4, 16 37:2, 7,
 15 38:7, 12, 20 39:5
four 24:2, 10, 19, 22
Fred 36:24 37:10
friend 5:15
friendly 5:12, 15, 16
friends 5:18, 21
front 18:1 26:10
 35:17

frontline 21:13
fuck 18:7, 8
fucking 17:20
FURTHER 39:23

< G >
game 11:1
general 13:18
 14:24 15:5
gentleman 11:10
getting 14:12 17:7
 38:24
give 30:10 38:5
 39:15
given 7:20 28:1
 40:14
giving 38:1
going 7:3 8:5 9:1
 10:17 13:10 14:23
 16:24 35:18 37:19,
 23 38:23
good 5:7, 8
grabbed 26:20
Great 4:19
Greg 14:22 39:19
GREGORY 1:13,
 22 3:1 4:5 5:1
grievance 7:24 8:1,
 6, 9 26:5 28:20
 29:21 30:15 31:1
guy 11:11 24:3, 5
guys 14:10

< H >
Hall 1:24 40:3
hand 41:1
happened 21:12
 27:21
harassed 35:16
 36:21 39:3
harassing 32:12
 35:6 36:9, 15
harassment 7:11,
 18 8:16 19:18
 20:8, 10 21:1
 31:24 32:10, 24
 33:14, 15 34:22
 35:6
hard 39:15
head 28:14

hear 27:17 30:5, 6
 31:3
hearing 30:4
hearings 30:2
he'll 4:17
Hello 36:21
help 37:21
HERBERT 2:6
 3:1 4:3, 19 5:6, 13
 6:13, 19 7:5, 16
 8:7 9:7, 22 10:4,
 18 11:4 12:1, 9, 14,
 16 13:1, 12, 20, 21
 14:6, 13 15:4, 20
 16:16, 21 17:3, 13,
 24 18:11, 23 19:15,
 21 20:4, 12, 19
 21:15 22:10, 17
 23:6, 10, 19 24:18
 25:10, 19 26:7
 27:3, 11 28:7 29:4,
 9, 15 30:12, 19
 31:5, 22 32:20
 33:6, 12, 21 35:4,
 10, 14, 22 36:6, 22
 37:4, 9, 19, 23 38:3,
 9, 14, 23 39:1, 8, 13
hereto 40:20
hereunto 41:1
hey 8:23 30:6
highlight 7:3
hire 12:5, 12
Hispanic 24:3
history 6:22 7:10
hold 22:11
hollering 27:10
horrible 25:3
hostile 12:18, 21, 23
 15:15 31:19 34:21,
 24 36:1 37:13
 38:10, 19

< I >
I.V 1:4 30:8
ID 3:9
II 1:21
ILLINOIS 1:1, 18
 2:1, 8, 14, 20 41:2
impartial 30:11

incident 26:9, 23
 28:1, 5, 8, 10, 11
 29:11 33:22
indicated 28:18
indirectly 40:20
individual 16:17
Individually 1:12,
 14, 15, 17
individuals 15:11,
 15 24:2, 10, 20
instruct 4:8, 13
 13:10 17:4, 8
interest 25:14
 28:21
interested 40:20
interview 11:19
 13:7 30:13, 17, 23
interviewed 9:16,
 23 10:5, 13, 22
 11:5, 12, 16 12:22
 14:4 29:5, 14, 17, 19
interviews 10:19
 11:2 14:14, 16
 30:20
investigated 21:4
investigation 9:17
 10:20 16:11 21:17,
 20, 21, 22 22:12
 25:12, 24 27:6
 28:15, 16 29:6, 8,
 10, 13, 17 30:7
 36:24
investigations 25:2,
 7
investigator 7:24
 21:17 25:11 26:1,
 9 27:5, 13, 23 34:2
 35:7, 11, 15, 24
investigators 8:5,
 22 17:8 23:20
 25:5 31:18
involved 30:9
Irish 11:10
issue 12:15 23:8

investigations
< J >
jail 16:24
Jefferson 2:7
job 17:12
jobs 17:15

Gregory Shields Volume II - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1168 of 1503 PageID #:1559

John  11:20  14:21
JOSEPH  1:12
JR  1:5  37:1
July  9:8  28:2, 8, 10
June  34:4
JUSTIN  2:18
justin@ilesq.com
 2:21

**< K >**
KELLY  2:7
kelly.krauchun@dan
herbertlaw.com
 2:10
kind  10:24  20:6
know  4:8, 9  5:16
 6:4, 5  7:3, 19, 20
 9:5  10:20, 21
 12:14  13:14  14:20
 16:17  18:14  20:16
 23:20  24:23  27:20
 28:24  31:12  32:3
 34:15  36:20  38:2,
 16
knowledge  19:10
KRAUCHUN  2:7

**< L >**
lady  11:9
LaSalle  2:19
late  10:24
LAW  2:6, 11
lawsuit  14:18, 20
 15:6  30:9  37:5
lead  16:24
leaving  21:18
left  37:18  39:12
legal  11:23  12:6
LEGRAIN  1:2
LEINENWEBER
 2:18
License  2:1
lieu  22:23  23:2, 14,
 21  24:12, 21
Lieutenant  31:12,
 18  32:1
LIMITED  2:11
 4:12
lines  17:19
lineups  17:10

listed  22:5, 13
listen  30:9
little  6:20  37:20
LLC  2:6, 18
LMS  7:20
long  4:10, 14
look  7:2
looking  6:22
Lopez  16:18  17:4,
 11, 14, 18  18:2, 7
lost  14:12  17:7

**< M >**
making  35:5
male  24:2
MANNING  1:6
March  35:24
MARKED  3:9
matter  13:18  15:1,
 5  24:22
matters  13:15  40:9
MCGHEE  1:7
mean  5:24  6:12
 8:4  9:21  26:4  31:4
meeting  15:9
memory  29:24  36:2
Mexicans  16:24
MICHELLE  1:4
 26:1
Midwest  2:13
mind  31:11
minute  37:17
minutes  37:24
 39:11, 17
misstates  18:20
 33:3
mistake  30:24
moment  20:17
monitoring  39:4
morning  5:7, 8
move  10:17  18:14
 22:18, 20
moving  18:13

**< N >**
name  11:9, 10, 11
 16:17
named  34:23
name's  24:1
narratives  4:15

nature  34:7, 10, 19
 36:7
NEAL  1:15
necessarily  8:10, 11
necessary  30:8
need  37:19
neighborhoods  17:5,
 16
Nelligan  11:11
 13:10
neurologist  38:6
never  10:5  17:23
 31:11  33:24
NEWSON  1:5  30:8
n-i-g-g-e-r-s  17:20
nonblack  13:5
 14:1  15:17  23:20
 24:9, 16
nonconcurrence
 25:13
nonwhite  24:15
North  2:19
NORTHERN  1:1
notes  33:20
notice  2:3
NUMBER  3:9
numerous  31:17
 32:11  33:15

**< O >**
Oak  2:14
Object  8:3  10:2
 14:2, 9  18:10
 19:13, 19, 24  25:16
 26:3  28:23  29:12,
 23  33:10
Objection  5:11
 6:10, 17  7:13  9:4,
 19  11:23  12:6, 20
 15:18  16:13, 19
 17:1, 6, 22  18:20
 20:9, 15  21:9  22:7,
 14  23:3, 15  24:14
 25:8  27:1, 8  28:4
 29:7  30:16  31:2,
 20  32:14  33:3, 17
 35:2, 8, 12, 20  36:4,
 16  37:2, 7, 15  38:7,
 12, 20  39:5
occurred  28:2

occurring  20:22
Ochoa  11:9  13:10
October  41:2
office  12:3, 4  18:13
 26:10, 14, 21  34:17
 35:18
Official  1:11, 13, 14,
 16, 17
Okay  4:19  5:21
 7:9, 23  10:11
 11:15, 21  12:14
 14:24  15:24  18:16,
 24  19:22  21:6, 24
 22:4  23:11  26:13
 27:22  28:12  29:19
 30:21  31:10, 23
 34:1, 7, 23  35:23
 36:7  39:7, 21
Once  11:14
ones  7:15
OPR  23:9  25:2, 6,
 12, 18, 21, 24  27:5
 30:21, 24  32:21
 36:24
outcome  40:21

**< P >**
PAGE  1:5
panel  25:13
Pardon  25:20
part  9:16  11:18
 14:7  19:5  20:20
 24:5  25:1, 6, 12, 18,
 21, 23  28:14, 15
 29:5
parties  40:19
people  23:1  24:16
period  19:9
personal  40:12
personnel  33:20
place  32:10
Plaintiffs  1:8  2:11
 9:9  10:1  12:19
 13:3, 23
point  8:8  26:5
 30:4
posed  31:4
practice  22:24
 23:12, 17
present  26:18



Gregory Shields Volume II - 9/8/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1169 of 1503 PageID #:1560
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

prevent 32:24
33:14
previous 40:6
previously 10:12
prior 18:20 22:21
23:12 24:8
privileged 12:15
13:8, 14, 19
privy 32:4
probably 11:2
30:10 31:3
proceedings 40:14
process 18:18 19:1,
6 25:24 28:20
29:21 30:15 31:1
34:18
provide 4:14
provided 6:23, 24
purposes 7:21
pursuant 2:3
put 8:22 20:1
29:3 30:4
putting 8:23

< Q >
question 4:11 9:21
10:15 19:3 22:20
23:11 25:4, 18
27:17 31:4 33:7
38:22
questions 4:14, 17
13:7 33:10 39:9
quickly 6:15
quite 9:5 12:22
32:16

< R >
racial 19:10 20:14,
17, 21 21:1
ranks 6:14
RANZINO 1:12
31:12, 18 32:2, 12
Raymond 34:2
read 34:9
reading 27:19
real 24:17
really 4:11 37:3
recall 7:15, 17
20:10, 16, 17 29:24
30:1 36:18

received 6:21 24:7
32:5
receiving 13:4, 23
15:16 32:1, 11
33:15
record 7:1 39:11,
16 40:13
records 10:19, 22
reduce 26:5
reduced 40:12
refer 28:5
refresh 36:2
refusing 38:5
regard 22:22
regarding 7:24
8:13, 16 10:7
12:18 25:1 36:8
regards 9:24
relate 14:17
relates 14:19
relationship 5:9, 15,
16
relative 40:17, 18
remember 6:21
7:12, 14 14:3
15:22 16:22 17:18
18:7, 12, 19 19:14,
23 21:16, 19, 22
26:2, 8, 11, 15
27:15 28:2, 6, 11,
21 31:6, 8, 9 33:9,
13 34:9, 10, 13, 19
35:18, 23 37:1, 13
38:6 39:4, 6
REMOTE 2:5
40:10, 15
remove 30:3
removed 36:11, 19
removing 36:12
repeat 10:15 24:17
replacing 22:23
report 22:6, 8, 11
reported 40:11
Reporter 1:24
40:4 41:6
REPORTER'S 40:1
request 10:23
37:23
resolve 26:5 36:20
respect 26:23

28:16, 20 29:11, 22
responsive 4:11
restricted 35:17
resulted 27:6
retaliated 36:24
retaliation 7:11, 18
retire 16:1, 3, 5, 9
retired 15:24 16:12
review 15:10 33:19,
20
reviewed 7:6, 8
Rico 24:2
right 9:23 14:15
20:17 27:16 32:16
39:19
Rizzo 35:11, 15
Road 2:13
ROHLOFF 1:16
role 18:18, 24 19:6
rose 6:14
run 17:21

< S >
SAITH 39:23
SAMUEL 1:5
sat 30:14
saying 17:19 31:7,
8, 9 39:2
second 13:14
21:13 28:19 29:21
30:14, 17, 23 31:1
see 11:14
send 30:9
sent 32:19
sentence 9:21
September 2:2
serious 19:16
set 15:11 41:1
Shaking 28:14
sheet 6:22
SHERIFF 1:10
5:10 6:2 12:3
sheriffs 23:13
sheriff's 10:6 12:4
16:8, 12 19:8 22:6,
24 34:16
SHIELDS 1:13, 23
3:1, 9 4:5, 6 5:1, 7
10:19 11:6 12:17
Shorthand 1:24

40:4 41:6
signature 39:22
single 32:23 33:13
sir 19:4 25:9
27:15 28:11 29:18
30:18 31:9 38:8, 13
sit 19:22 29:2
30:1, 6 31:1 32:22
sitting 25:12 28:19
six 27:21
SLAUGHTER 1:7
somebody 8:18
19:17 30:10
sorry 8:19 9:21
10:9 15:2 28:15
sound 6:3 27:18
sounds 13:6
source 21:5
South 2:7
space 18:13
specific 23:12 29:3
specifically 5:16
7:15 8:14 14:3
specified 40:16
speculation 16:14
21:10
staff 6:1, 6
State 2:1 40:4
statements 19:11
STATES 1:1
stenographically
40:11
step 28:19 29:21
30:15 31:1 32:23
33:13
steps 20:24 31:23
32:9, 17 33:8
stereotypical 19:11
Steven 38:15, 16
Stop 14:22 39:15
straight 34:16
Street 2:19
STRICKLAND 1:4
26:2
Strike 20:6 24:9
subject 13:15, 18
14:14 15:1, 5 24:22
subjects 14:16
submitted 7:7
subsequently 32:3

Gregory Shields Volume II - 9/8/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1170 of 1503 PageID #:1561

**Suite** 2:*8*, *14*, *19*
**summary** 22:6, *8*
**supervisor** 17:*9*
21:*11*, *13* 36:*11*, *13*, *19*
**supervisor's** 35:*18*
**supposed** 28:*19*
**sure** 9:*5*, *11* 12:*23*
14:*19* 20:*21* 27:*19*
32:*4*, *16*
**surprise** 22:*4*, *12*
**suspension** 32:*5*
**sustained** 26:*24*
27:*2*, *6*, *10* 28:*17*
29:*11*, *16* 30:*21*
**sworn** 4:*2* 40:*8*

**< T >**
**take** 20:*24* 31:*23*
33:*8*
**taken** 1:*23* 4:*5*
7:*19*, *22* 21:*14*
40:*15*
**talk** 14:*23* 17:*11*,
*14*
**talked** 6:*20* 13:*9*,
*16* 14:*20*, *23* 16:*6*,
*23* 18:*17* 21:*17*
26:*8*, *13*
**talking** 17:*18*
18:*19* 20:*2* 25:*22*
26:*11*, *15* 30:*20*
34:*18*
**talks** 7:*10*
**telephone** 4:*6*
**tell** 8:*5*, *24* 28:*13*
32:*17*
**telling** 14:*15* 18:*7*
**testified** 5:*3*
**testify** 40:*8*
**testimony** 18:*21*
33:*4* 40:*14*
**Thanks** 39:*19*, *21*
**think** 4:*16* 5:*23*
7:*21* 24:*2* 32:*19*
33:*22* 35:*9*
**thinking** 7:*21*
22:*15*
**third** 21:*13*
**THOMAS** 1:*11*, *15*

**threats** 27:*5*
**three** 21:*12*
**thumb** 20:*1*
**time** 4:*12* 19:*8*, *9*
22:*23* 23:*2*, *13*, *21*
24:*11*, *12*, *21* 29:*20*
32:*5* 33:*1* 37:*20*
39:*11*, *17* 40:*16*
**times** 11:*12* 29:*1*
**TIMS** 1:*4*
**title** 36:*11*, *12*, *19*
**today** 19:*22* 32:*23*
**Tom** 5:*10* 6:*1*
**topics** 15:*8*
**total** 14:*4*
**tour** 21:*19* 22:*23*
23:*2*, *14*, *22* 24:*13*,
*21*
**training** 6:*21*, *22*
7:*9*, *10*, *20*, *21*
**transcript** 40:*11*
**transferred** 32:*3*, *6*,
*18*
**true** 40:*13*
**truth** 40:*8*
**try** 24:*19*
**trying** 13:*9* 36:*20*
**Tuesday** 2:*2*
**turned** 26:*14*
**twice** 29:*19*
**two** 14:*5* 27:*22*, *24*
33:*10*
**typewriting** 40:*12*
**TYRONE** 1:*7*

**< U >**
**understand** 6:*11*
19:*2*, *3*, *5* 25:*17*
**understanding** 27:*9*
**undesirable** 13:*24*
15:*16*
**union** 30:*5*
**unit** 13:*5* 15:*12*
17:*20* 18:*12* 32:*4*,
*7*, *18* 33:*2* 39:*4*
**UNITED** 1:*1*
**upset** 36:*18*
**use** 18:*1*, *4* 23:*1*, *13*

**< V >**

**various** 17:*5*, *15*
**VERNELL** 1:*4*
**VICTOR** 1:*7*
**Villa** 34:*2* 35:*3*, *7*,
*24* 36:*3*, *8*
**VOLUME** 1:*21*
**vs** 1:*9*

**< W >**
**waive** 39:*22*
**WALKER** 1:*6*
**want** 7:*2* 13:*17*
30:*10* 38:*2* 39:*17*
**wanted** 20:*21*
**watch** 21:*12*
**watches** 21:*12*
**way** 25:*4* 31:*4*
**Webb** 11:*20* 14:*21*
21:*6*
**weeks** 27:*22*, *24*
**Well** 5:*18* 6:*1*, *8*
9:*8* 10:*11*, *24* 11:*5*
13:*2* 18:*12* 19:*16*
20:*13*, *20* 22:*4*
29:*5* 30:*13* 33:*7*
35:*11*, *23* 36:*14*
37:*5*, *19*, *23* 38:*23*
39:*8*
**went** 26:*14*
**We're** 10:*17* 30:*20*
**we've** 37:*17*
**WHEREOF** 41:*1*
**WHITE** 2:*13* 4:*16*
5:*11* 6:*10*, *17* 7:*1*,
*13* 8:*3* 9:*4*, *19*
10:*2*, *24* 11:*23*
12:*6*, *11*, *20* 13:*6*,
*17* 14:*2*, *9*, *22*
15:*18* 16:*13*, *19*
17:*1*, *6*, *22* 18:*10*,
*20* 19:*13*, *19*, *24*
20:*9*, *15* 21:*9* 22:*7*,
*14* 23:*3*, *15* 24:*3*, *5*,
*14* 25:*8*, *16* 26:*3*
27:*1*, *8* 28:*4*, *23*
29:*7*, *12*, *23* 30:*16*
31:*2*, *20* 32:*14*
33:*3*, *10*, *17* 35:*2*, *8*,
*12*, *20* 36:*4*, *16*
37:*2*, *7*, *15*, *17*, *21*

38:*1*, *7*, *12*, *20*, *22*
39:*5*, *7*, *10*, *14*, *22*
**wife** 5:*18* 16:*6*
**WILFORD** 1:*5*
**WILLIAMS** 1:*6*
**WINSTON** 1:*2*
18:*8* 21:*18* 22:*22*
23:*12* 24:*2* 25:*11*
26:*1*, *9* 27:*5*, *13*, *23*,
*24* 28:*9*, *17*, *20*
29:*11*, *22*
**Withdraw** 22:*20*
**WITNESS** 3:*1* 4:*1*
5:*2*, *12* 6:*11*, *18*
7:*14* 8:*4* 9:*5*, *20*
10:*3* 12:*8*, *12*, *21*
14:*3*, *10* 15:*2*
16:*15*, *20* 17:*2*, *7*,
*23* 18:*22* 19:*14*, *20*
20:*1*, *10*, *16* 21:*11*
22:*8*, *15* 23:*4*, *16*
24:*15* 25:*9*, *17*
26:*4* 27:*2*, *9* 28:*5*,
*24* 29:*8*, *13*, *24*
30:*17* 31:*3*, *21*
32:*16* 33:*5*, *19*
35:*3*, *9*, *13*, *21* 36:*5*,
*17* 37:*3*, *8*, *16* 38:*8*,
*13*, *21* 39:*6*, *21*
40:*7* 41:*1*
**word** 17:*20* 18:*1*, *4*
38:*2*
**words** 18:*8*
**work** 12:*3*, *4*, *18*, *21*,
*23* 14:*8*, *11* 15:*15*
17:*10* 31:*19* 34:*21*,
*24* 36:*1*, *9*, *15*
37:*13* 38:*11*, *19*
**worked** 15:*11*
16:*18* 31:*14*
**workplace** 7:*24*
8:*13*, *16* 18:*5*
19:*12*, *18* 20:*8*, *11*,
*14*, *22* 21:*1*, *8*
31:*24* 32:*11*, *13*, *24*
33:*14*, *16* 34:*21*
35:*6*

**< Y >**
**Yeah** 4:*16* 5:*15*
9:*20* 12:*11*, *12*



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1171 of 1503 PageID #:1562

13:*17*   24:*5, 7, 23*
28:*8*
**year**   15:*24*
**years**   7:22   27:2*1*

**< Z >**
**Zoom**   2:2   4:*5*   5:*3*

# Exhibit M



# Transcript of Wilford Ferguson, Volume 2

**Date:** September 11, 2020
**Case:** Slaughter, et al. -v- County of Cook, IL, et al.

Planet Depos
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

**67**

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE NORTHERN DISTRICT OF ILLINOIS

3          EASTERN DIVISION

4  - - - - - - - - - - - - x

5 LEGRAIN WINSTON, et al,   :

6                 :

7      Plaintiffs,    :

8               : Case No.

9    v.         : 18 cv-05726

10             : Hon. Matthew F.

11 SHERIFF OF COOK COUNTY  : Kennelly

12 THOMAS J. DART, ET AL.,  :

13              :

14     Defendants.    :

15  - - - - - - - - - - - - x

16          Volume 2

17     Deposition of WILFORD FERGUSON

18       Conducted Virtually

19     Friday, September 11, 2020

20       10:08 a.m. CST

21

22  Job No.: 320939

23  Pages: 1 - 179

24  Reported By: Renee E. Brass, CSR, RPR

**68**

1    Deposition of WILFORD FERGUSON, conducted

2 virtually,

3

4

5

6

7    Pursuant to notice, before Renee E. Brass, CSR,

8 RPR, Notary Public in and for the State of

9 Illinois.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**69**

1       A P P E A R A N C E S

2 ON BEHALF OF THE PLAINTIFFS:

3    ELIZABETH FLEMING, ESQUIRE

4    THE HERBERT LAW FIRM

5    206 S. Jefferson, Suite 100

6    Chicago, IL 60661

7    312.655.7660

8

9 ON BEHALF OF THE DEFENDANTS:

10    JUSTIN LEINENWEBER, ESQUIRE

11    LEINENWEBER BARONI & DAFFADA LLC

12    203 North LaSalle Street, Suite 2000

13    Chicago, IL 60601

14    312.380.6635

15

16 ON BEHALF OF THE DEFENDANTS:

17    ETHAN WHITE, ESQUIRE

18    EMERY LAW

19    2021 Midwest Road, Suite 200

20    Oak Brook, IL 60523

21    630.984.0339

22

23 ALSO PRESENT:

24    Juliet Hooper, AV Technician

**70**

1        I N D E X

2

3  EXAMINATIONS         PAGE

4

5  MR. LEINENWEBER       71

6

7        E X H I B I T S

8  NO.      DESCRIPTION     PAGE

9

10 Exhibit 1    complaint      123

11 Exhibit 2    Answers to Interrogatories  166

12 Exhibit 3    Objections and Answers  210

13 Exhibit 4    Disclosures     220

14

15

16

17

18

19

20

21

22

23

24

**71**

1        P R O C E E D I N G S
2        (Witness duly sworn.)
3        WILFORD FERGUSON,
4   having been first duly sworn, was examined and
5   testified as follows:
6        EXAMINATION BY COUNSEL FOR THE DEFENDANTS
7   BY MR. LEINENWEBER:
8        Q   Good morning, Mr. Ferguson.  My name,
9   again, as you may recall is Justin Leinenweber.
10   I'm one of the attorneys representing the
11   defendants in this matter.
12        This is the continued deposition, your
13   continued deposition.  We began, I believe it was
14   a week ago Monday, and you had some technical
15   difficulties with your phone, so we at that time
16   agreed to break and reconvene at a later time when
17   you had been able to resolve those issues.
18        Do you think that you've resolved those
19   issues?  Do you anticipate any problems with your
20   device today?
21        A   No, I don't.
22        Q   Okay.  Great.
23        And there were -- we went over, I know,
24   last time a number of rules for the deposition,

**72**

1   and I'm just going to quickly go through those
2   again so we are on the same page as far as today.
3        So the first rule is that when I'm
4   speaking, please let me finish asking my question
5   before you answer it.  If you anticipate where I'm
6   going with my question, there may be an urge to
7   interrupt me and kind of get to the chase, but in
8   order for Renee to have a clear transcript and to
9   make her job a little bit easier today, we just
10   need to make sure we don't speak over each other.
11   Is that okay with you?
12        A   Yes.
13        Q   Because of the fact that this is being
14   transcribed, the court reporter can only take down
15   verbal answers, so that means you can't respond
16   with an uh-uh or a nod or shake of the head.
17   Okay?
18        A   Right.
19        Q   Again, we can take a break any time you
20   need one today so long as there's no question
21   pending.  If there's a question pending, I just
22   ask that you answer it before we take a break.
23   Okay?
24        A   Okay.

**73**

1        Q   And if you do not understand one of my
2   questions, that's perfectly fine.  Just let me
3   know, and I'll do my best to rephrase it so that
4   you do understand.  But if you do answer one of my
5   questions, we're all going to assume that you
6   understood the question.  Okay?
7        A   Okay.
8        Q   And is there any reason why you can't give
9   full, complete and accurate testimony today?
10        A   No.
11        Q   Do you have any materials with you today
12   to aid you in your testimony?
13        A   No.
14        Q   Do you have any documents with you of any
15   kind at all?
16        A   No.
17        Q   You understand that no one can assist you
18   with your testimony today, right?
19        A   Yes.
20        Q   Did you do anything between when we first
21   started your deposition and today, did you do
22   anything in addition to prepare for your
23   deposition today?
24        A   No.

**74**

1        Q   Did you review any documents related to
2   this case between us breaking your last deposition
3   and then starting today?
4        A   No.
5        Q   Have you spoken to anyone regarding your
6   testimony today?
7        A   No.
8        Q   When we broke last time, we were talking
9   about some of the different assignments within the
10   electronic monitoring unit.  Do you remember that?
11        A   Yes.
12        Q   Just to kind of refresh our recollection
13   here, my understanding is that you started at the
14   sheriff's office in 1991, right?
15        A   Yes.
16        Q   And you began in electronic monitoring on
17   or about December 27, 1992?
18        A   1992.
19        Q   Is that correct?
20        A   Yes.
21        Q   You don't work in electronic monitoring
22   anymore now, right?
23        A   No.
24        Q   And when did you move from electronic

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

3 (75 to 78)

75

1  monitoring?
2      A  January of this year.
3      Q  January 2020?
4      A  Yes.
5      Q  Where do you work now?
6      A  Division 5.
7      Q  I think last time you maybe said that you
8  moved in March of 2020?
9      A  I moved -- they moved me downtown to Daley
10 Center in January, and then I grieved it, and they
11 moved me to Division 5 in March.
12     Q  Got it.  So between December 27, 1992, and
13 approximately January of 2020, you worked in
14 electronic monitoring that entire time, right?
15     A  Yes.
16     Q  Can you tell me one of the positions --
17 strike that.
18        One of the assignments that we talked
19 about in electronic monitoring last time was the
20 patrol assignment?
21     A  Yes.
22     Q  Do you remember that?
23     A  Yes.
24     Q  Since, say, 2010, until you left the

76

1  electronic monitoring unit, can you tell me what
2  is your understanding of the duties of an
3  investigator when they have the patrol assignment?
4      A  The duties of an investigator when you
5  have a patrol assignment is you are assigned to
6  different type of assignments, like, say, check to
7  see if the person is at home, do a body check, and
8  if it's equipment, if you need new equipment, if
9  it shows up on the computer, you have to go out
10 and change his equipment.  If he misses court, you
11 have to go out and pick the subject up and bring
12 them back to the jail so he can go to court.  If
13 he cuts his band off and it picks that up on a
14 computer, go out and check to see what's wrong
15 with the band, if he still is at home.  If he is
16 not, maybe he left the band at home, get the band
17 and bring it back to the job and send everything
18 to the fugitive unit or -- that's mainly it.  Do
19 home checks, and that's mainly it.
20     Q  It sounds like there's sort of three main
21 areas.  One would be home checks.  One would be
22 dealing with technical issues, and then the other
23 would be essentially doing pickups; is that fair
24 to say?

77

1      A  Yeah.
2      Q  And so the term patrol for this
3  assignment, it's not really patrol in sort of the
4  conventional sense of you're in your car just
5  patrolling the streets, right?
6      A  Right.
7      Q  You're in patrol, but you get a specific
8  type of assignment when you are in patrol?
9      A  Right.
10     Q  What -- when you do this patrol
11 assignment, is it just you alone or are you in a
12 squad car?  Tell me a little bit more about that.
13     A  If you are in a squad car, you usually
14 have a partner.  And, yeah, you usually have a
15 partner.
16     Q  Partner in a squad car.  And do you have
17 like a bunch of equipment with you or --
18     A  Yes.
19     Q  What kind of equipment do you have with
20 you?
21     A  You have an HMRU base and HMT band, and
22 then you usually have your tools that they issue
23 out to you so that you can change the band on his
24 leg.

78

1      Q  Anything else?
2      A  That's mainly it.
3      Q  Okay.  What about in terms of sort of
4  protective equipment?  Are you issued protective
5  equipment to wear when you are on patrol?
6      A  What do you mean protective equipment,
7  like bulletproof vests and stuff like that?
8      Q  Sure.
9      A  Yeah, issued bulletproof vests, different
10 little things on your duty rig.  That's mainly it.
11     Q  You used the term duty rag?
12     A  Duty rig.
13     Q  You mentioned the term duty rig, so for
14 someone like myself who is not involved in law
15 enforcement at all, could you just explain what
16 do you mean?  What's included in a duty rig?
17     A  On your duty rig, you usually have your
18 gun holster, handcuff holster, flashlight holster,
19 holster to carry your radio, magazine holster,
20 key, your key ring, and your ASP, baton holder,
21 those sort of things.  It's like a belt.
22     Q  You have a sidearm as well?
23     A  Yes.
24     Q  When you go on patrol, you're armed?

---

**79**

1   A  Oh, yes.
2   Q  Do you have a body camera on when you go
3 out on patrol?
4   A  Yes.  Now you do.
5   Q  When did that start?
6   A  Maybe about I want to say 2018 or maybe
7 '19.  Around 2018, I think.  '18 or '17, one of
8 them.
9   Q  And then we -- before we could get to some
10 of the other assignments that there are within
11 electronic monitoring, we had to end the
12 deposition last time, but I remember we talked
13 about some of the different types of assignments
14 other than patrol were delivery, TSS.  I believe
15 you said a fugitive unit, work pool, monitoring,
16 and the front desk.
17   A  Right.
18   Q  Anything else besides those?
19   A  That's it.
20   Q  I have heard that there's also records?
21   A  Used to be.
22   Q  Used to be records?
23   A  Yeah.
24   Q  And TSS, tell me a little bit about that

---

**80**

1 assignment.  What is TSS?
2   A  TSS stands for technical service section,
3 and what TSS is the start of EM where you process
4 the inmate to go out on a program.  Okay.
5      You call him down from his tier, and he
6 comes down.  You explain the program to him.
7 Explain what he has to fill out as far as the
8 application.  They fill out the application.  We
9 let them make their phone call of where they're
10 trying to go stay with the host, whatever host
11 they are trying to go stay with, and after that
12 they find a place to go.
13      We put everything in the computer, issue
14 the equipment, put the band on.  They sign the
15 contract stating that they understand the rules
16 and regulations of the program and get ready to go
17 out.
18   Q  Then how do they physically get out to
19 where they're going?
20   A  The delivery unit takes them home.
21   Q  So delivery is a sort of separate part of
22 TSS; is that fair to say?
23   A  Yeah.
24   Q  You referred to TSS as the start of

---

**81**

1 electronic monitoring, meaning this is like the
2 very first step of getting to electronic
3 monitoring -- getting out on electronic
4 monitoring?
5   A  Right.
6   Q  And I have heard this referred to as the
7 basement by a number of -- I think in your
8 complaint and things like that it says it's the
9 basement.  Tell me what you mean by basement.
10   A  It's the basement.  It used to be the
11 basement part of Division 6 when our office was in
12 Division 6.  Now it's in the basement of
13 Division 5 which used to be old receiving, the old
14 receiving room for the jail.
15   Q  Okay.
16   A  So that's where they are located at now,
17 in the basement of Division 5.
18   Q  Got it.  Okay.  And did you think -- were
19 you pretty good at the TSS assignment?
20   A  Yes.
21   Q  Why do you say that?
22   A  I was trained to do this job, and I did
23 everything I was supposed to do, as far as put the
24 band on, explain the program, help the guys fill

---

**82**

1 out the information sheet, verify the information
2 sheet with the host, that's mainly it.
3   Q  Anything else?
4   A  That was mainly it.
5   Q  Okay.  My understanding is that the amount
6 of detainees who are going to be processed through
7 TSS, that kind of varies from day-to-day, right?
8   A  Yes.
9   Q  What determines whether it's going to be a
10 busy night or if it's going to be a slow night?
11   A  Well, then it -- it all depends on how
12 many inmates were locked, got arrested that
13 weekend or when we come back on Monday or it
14 determines on how many the judge let out on
15 electronic monitoring, like that.
16   Q  So the volume of -- go ahead.  Sorry.
17   A  Oh.  And back then it was when we did have
18 records, it all depends on who qualify for the
19 program also.
20   Q  So the volume of detainees in TSS on a
21 given night would be driven by in part the number
22 of people that are arrested?
23   A  Right.
24   Q  The number of people that the judge orders

**83**

1  to be released on electronic monitoring or
2  eligible to be released on electronic monitoring?
3      **A  Right.**
4      Q  And also the number of people who sort of
5  records approves them to be placed on electronic
6  monitoring?
7      **A  Right.**
8      Q  And what determines the number of patrol
9  assignments on a given day, if you know?
10     **A  It all depends on how long you was at the**
11 **first assignment.  You don't know.  Because one**
12 **assignment could last a couple hours or two, three**
13 **hours.  You never know.**
14         **You may have to lock a guy up.  You might**
15 **have problems with the subject, tough to find the**
16 **subject.  He's not at home, so that shortens your**
17 **time.  You still have to write the report, so you**
18 **never know.**
19     Q  What did you mean by you might have
20 problems with the subject?  What sort of problems?
21     **A  Subject might get out of hand, refusing to**
22 **go back to jail if he have to go back.  You might**
23 **have to get into a confrontation with him or**
24 **whatever, put handcuffs and everything, talk to**

**84**

1  **him, calm him down, stuff like that.**
2      Q  Did that happen in your experience from
3  time to time?
4      **A  Yes, it did.**
5      Q  Were you ever injured as a result of any
6  of those interactions?
7      **A  Have I ever got injured?**
8      Q  Well, more specifically you were
9  describing sort of detainees or EM participants
10 sometimes causing problems if they don't want to
11 go back, so I'm wondering if you had any
12 interactions with people on EM who got physical
13 and you were injured as a result?
14     **A  No, I didn't.  I never got injured.**
15     Q  When you were able to bid for
16 assignments -- so, again, just to kind of refresh
17 our recollection, my understanding is that for a
18 period of time you were able to actually bid for
19 your assignment, right?
20     **A  Right.**
21     Q  Meaning that under the collective
22 bargaining agreement you guys had, there was a
23 process by which investigators could put in or bid
24 for their particular assignment on a given day,

**85**

1  right?
2      **A  Yes.**
3      Q  I assume that seniority played some role
4  in who would actually be awarded the bid on
5  various assignments?
6      **A  Say that again.  I don't understand.**
7      Q  Sorry.  That was a bad question.
8          If two people are applying for the same
9  assignment on a given day and there's only one
10 position available or one assignment available, I
11 would assume it goes to the investigator with the
12 most seniority.  Is that your understanding as
13 well?
14     **A  Right.**
15     Q  So under the old bidding process for
16 assignment, seniority drove who would prevail in
17 their bid for the assignment?
18     **A  The person with the most seniority.**
19     Q  Okay.  And we talked a little bit about --
20 well, did you ever bid for patrol when you were
21 able to bid?
22     **A  I bidded -- no, I didn't, no.**
23     Q  I think you actually bid for TSS, right?
24     **A  I bid for deliveries.**

**86**

1      Q  Are you saying you didn't bid for TSS?
2      **A  Not -- I bid for TSS before.  I mean, the**
3  **first time I bid for deliveries, and then I bid**
4  **for TSS, and then I bidded back to delivery.  It**
5  **was like that.**
6      Q  Okay.
7      **A  It all depended on the work hours, because**
8  **TSS had different hours than deliveries.**
9      Q  So you might bid for whichever one had the
10 more favorable hours in your opinion?
11     **A  Yeah, that you can work.**
12     Q  Who made the -- strike that.
13         So once the bid process was eliminated,
14 the bid process for assignments was eliminated,
15 who made the decision as to which assignment you
16 as an investigator would receive?
17     **A  Supervisors.**
18     Q  Can you be a little bit more specific
19 about that?
20     **A  What do you want?  I guess the chief made**
21 **up the roster, and then the supervisor will come**
22 **out to rollcall it, issue out the different**
23 **assignments that you will be at that day.**
24     Q  And what do you mean by supervisor?

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

6 (87 to 90)

87

1    A  We had investigators that were promoted to
2  supervisors within the unit, and then after that
3  it was like deputy chiefs and then chief.
4    Q  So your understanding is that the chiefs
5  would make the roster and then the supervisors
6  would essentially present the roster at rollcall?
7    A  Right.
8    Q  Did you work the same -- strike that.
9      There's a word I'm missing.  I can't
10 remember it, but essentially there is like three
11 different shifts, right?
12   A  Yes.
13   Q  What's the term for them?  I can't
14 remember.
15   A  It goes first watch, second watch, and
16 third watch.
17   Q  First watch, second watch, third watch.
18 Okay.  And I think you typically worked third
19 watch, right?
20   A  Yes.  When I worked deliveries, it was
21 third watch.  TSS was just -- I don't know what
22 that was, but when I worked deliveries, it was
23 just third watch.
24   Q  When you worked TSS, what were your

88

1  typical hours?
2    A  12 in the afternoon to 8 in the evening.
3    Q  And what time frame are we talking about?
4  When did that -- when were those your hours?
5    A  That was in I'd say -- I don't know how
6  long -- I don't know how long that had lasted, but
7  then they changed TSS to 3 to 11.
8    Q  So that would be third watch?
9    A  Yes.
10   Q  So you did work TSS on third watch?
11   A  Yes.
12   Q  And who typically -- when you worked TSS
13 on third watch, who was the chief who prepared the
14 assignments?
15   A  It was Chief Ranzino, Chief Neal, Deputy
16 Chief Rohloff, that was mainly it.
17   Q  Okay.
18   A  Chief Acey.
19   Q  And Chief Acey.
20     What factors went into a chief's sort of
21 division of labor on the roster?
22   A  What do you mean?
23   Q  Well, how -- what factors did the chiefs
24 consider to decide who would go to which various

89

1  assignments?
2    A  I don't know.  I don't know.
3    Q  Okay.  That's fine.
4      What role, if any, did the director or
5  executive director have in creating the roster of
6  assignments?
7    A  I don't know if they had anything to do
8  with the roster.
9    Q  Back to patrol for a second.  We talked a
10 little bit about various types of jobs you might
11 get for the day in patrol, and we talked a little
12 bit about it's you and a partner.  You are in a
13 squad car.  You got a vest on.  You have got a
14 sidearm, and you're going out to do these jobs.
15 Right?
16   A  Yes.
17   Q  Okay.  How do you get -- how are you
18 informed what your job is for the day or what your
19 first job is in the patrol position?
20   A  Over the radio.
21   Q  And what do you mean by that?  Walk me
22 through what actually happens.
23   A  Okay.  Before you leave to go out on the
24 street that day, you are given an assignment,

90

1  okay, from the dispatch desk.  Then once you get
2  on the street, the dispatcher will call you to
3  give you the assignment over the radio also, and
4  then the next job after that, the next job after
5  that would be over the radio.  Dispatcher will
6  call you and give it to you.
7    Q  It sounds like on a given day that you are
8  assigned to patrol.  You find that out at
9  rollcall, right?
10   A  Yes.
11   Q  And you find that out from the roster
12 sheet, right?
13   A  Yes.
14   Q  And then the dispatch desk will say,
15 Investigator Ferguson, here is the first job for
16 today.  Right?
17   A  Right.
18   Q  And then they'll contact you on the radio
19 once you are in your car, your vehicle, and
20 they'll say, Investigator Ferguson, here's the
21 first job again for today?
22   A  Right.
23   Q  First of all, who works the dispatch desk?
24 Is it an investigator?  Is it a civilian?  Who

**91**

1  does that?
2  **A An investigator.**
3  Q  Where do the -- the investigators who work
4  the dispatch desk, where do they get the jobs that
5  then they assign out to investigators on patrol?
6  **A I guess they would get it from the**
7  **supervisors or the chiefs. I guess they would get**
8  **it from the supervisor or the chiefs.**
9  Q  You say I guess. So is that something you
10 know from personal experience or --
11 **A I have seen that a few times, but mainly**
12 **sometimes it's like -- let's say they have jobs on**
13 **the board, and I don't know if they're talking**
14 **about the board or the computer or bulletin board**
15 **or what, but the chief would give them the job to**
16 **hand out to the investigators on the street.**
17 Q  And did you ever work the dispatch desk?
18 **A Yes, I have, but not a lot, but I did.**
19 Q  When is the last time you did it you
20 think?
21 **A The last time I helped out on the desk was**
22 **maybe in either November or December last year,**
23 **2019.**
24 Q  You said that you helped out. Does that

**92**

1  mean there's more than one investigator working at
2  the dispatch desk?
3  **A Sometimes.**
4  Q  And it was not your primary responsibility
5  to work the dispatch desk, right?
6  **A Right.**
7  Q  And the chiefs who give the various jobs
8  to the dispatch desk to be spread out to the
9  patrol investigators, is that something they just
10 hand it to them in paper form, or how do they
11 actually communicate that?
12 **A They hand it to you in paper form before**
13 **you left the office to go on the street and then**
14 **the next job will be over the air. You just write**
15 **it down on a piece of paper.**
16 Q  I'm sorry. I think you maybe
17 misunderstand my question. I understand that's
18 the way dispatch gives the patrol investigator the
19 job, but how does the chief physically get the
20 assignment to the dispatch desk to be then
21 delivered?
22 **A I'm not sure.**
23 Q  Do the chiefs when they give the dispatch
24 desk -- sorry. Strike that.

**93**

1      What determines where within Cook County
2  your job -- that first job in patrol may be?
3  **A What determines --**
4  Q  Yeah.
5  **A It all depends on that day what area you**
6  **was assigned to.**
7  Q  So tell me about that. How are you --
8  because I think we didn't discuss that. How are
9  you assigned to an area?
10 **A Well, south side would be area 1, which**
11 **would be the southeast side. Area 2 would be the**
12 **southwest side. Area 3 will be the west side of**
13 **Chicago. Area 4 will be the north side of**
14 **Chicago. Area 5 will be the north suburb, and**
15 **area 6 -- area 5 would be, like, the east suburbs**
16 **of the north side. Area 6 will be south suburbs**
17 **of the south side, and area 7 will be the far**
18 **north suburbs, like Schaumburg, Hoffman Estates,**
19 **all that.**
20 Q  And when you go out on patrol, you're
21 assigned to a specific area for the day?
22 **A Yes.**
23 Q  When do you find that out?
24 **A At rollcall.**

**94**

1  Q  And who determines which area you are
2  going to be going to on patrol?
3  **A The chiefs.**
4  Q  And how do you know that?
5  **A Chiefs and deputy chiefs assign you, put**
6  **your name in the area where they want you to work**
7  **that day, or on the roster.**
8  Q  Okay.
9  **A You just -- you just know, I mean, because**
10 **I think their name was either at the top of the**
11 **roster or signed at the bottom, something like**
12 **that.**
13 Q  So your understanding is that the chiefs
14 and the deputy chiefs will, in addition to
15 deciding who is going to which various assignments
16 for the day, would also decide which area the
17 investigator is assigned to patrol would be in?
18 **A The chiefs and deputy chiefs will give**
19 **you -- assign you that area. Okay. And they give**
20 **that to the supervisor to give to you.**
21 Q  Okay.
22 **A So whatever job come up in that area that**
23 **day, that's your job.**
24 Q  Got it. What factors do the chiefs or the

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

95

1  deputy chiefs consider when determining which
2  patrol -- sorry, which investigator assigned to
3  patrol is going to be in which area?
4  **A  Well, the main -- black guys was always**
5  **assigned to the south side, Englewood, southeast**
6  **side or southwest side.  They never was assigned**
7  **to the south suburbs or the north suburbs.  It was**
8  **either Englewood, southeast side or southwest side**
9  **or the west side.**
10  Q  I understand that that's what you are
11  alleging in this complaint here, but that was not
12  my question.  Okay.
13  My question is what factors do the chiefs
14  and deputy chiefs who make the decision, according
15  to you, about which area the person is going to be
16  patrolling, what factors do they consider to make
17  that decision?
18  **A  I'm not understanding what you're saying**
19  **when you say factors.  You mean what make them**
20  **give that decision to have that person work that**
21  **area that day?**
22  Q  Sure.
23  **A  It all depends on -- usually like if you**
24  **were friends or if you got in good or you was**

96

1  **friends with a certain supervisor or certain chief**
2  **or deputy chief, they will put you in that**
3  **position, but if you wasn't, they will put you in**
4  **a position that you didn't -- that it was a**
5  **problem area, you know.**
6  Q  Let's try this one more time.  Okay.
7  So what I want to know is do you know what
8  factors a chief or deputy chief considers when
9  they make a decision regarding who goes to the
10  various areas on patrol?
11  **A  That's the only thing I know.**
12  Q  The only thing you know about is if you
13  are kind of friendly or sort of in good with
14  someone, you might get a more -- what you perceive
15  is a more favorable area?
16  **A  Yes.**
17  Q  The division of -- sorry.  Strike that.
18  How many investigators are assigned to
19  each area for patrol on a given day?
20  **A  I really can't answer that because it all**
21  **depends on how many investigators you got coming**
22  **to work that day, you know, because you still need**
23  **to have TSS and you still need to have TSS also.**
24  Q  As an investigator since, say, 2010, so in

97

1  EM since 2010, what positions, if you know, are
2  investigators able to be promoted into?
3  **A  Within EM?**
4  Q  Sorry.  That's a good clarification.  I
5  should have -- let's focus exclusively on EM, not
6  transferring out of that division.
7  **A  Supervisor, chief or deputy chief, I**
8  **never -- I mean, I only seen deputy chief, but**
9  **supervisor I have saw that happen.  I never seen**
10  **anyone promoted to chief.**
11  Q  And deputy chief is below chief, right?
12  **A  Yes.**
13  Q  The supervisor position, you are still an
14  investigator as a supervisor, right?
15  **A  Yes.**
16  Q  And at some point they got rid of the
17  supervisor positions, right?
18  **A  Yes.**
19  Q  When did that happen?
20  **A  I can't recall the date.  I can't recall**
21  **that date.**
22  Q  But you are aware that it was eliminated
23  at some point?
24  **A  It was eliminated, yes.**

98

1  Q  And do you know who made the decision to
2  eliminate the supervisor position?
3  **A  I have no idea.**
4  Q  And since you don't know who made the
5  decision, I'm assuming, but do you know -- I'm
6  assuming the answer is no, but do you know what
7  factors went into deciding to eliminate the
8  supervisor position?
9  **A  No.**
10  Q  What did an investigator -- sorry.
11  What was the process to be promoted to a
12  deputy chief or a supervisor or a chief actually?
13  Sorry.  Strike that.  Let me ask that question
14  again.
15  What is the process for being promoted
16  from the investigator position to either the
17  supervisor, chief or deputy chief positions?
18  **A  I don't know.**
19  Q  And do you know who made decisions to
20  promote investigators within EM since, say, 2010?
21  **A  Do I know who promoted investigators?**
22  Q  Let me ask it again just so we're clear.
23  Since 2010 who made the decision to promote an
24  investigator to one of those three positions?

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

---

**99**

1  A  I don't know.
2   Q  Did you apply for any promotions at any
3  time while you worked in EM?
4   **A  I never applied for a promotion, no.  I**
5  **never applied for a promotion.**
6   Q  Okay.  Let's talk a little bit about
7  discipline.  What discipline have you received
8  while working in EM?
9   **A  Attendance.**
10   Q  Anything else?
11   **A  Discipline on as far as being at the merit**
12  **board right now.**
13   Q  Oh, the court subpoena issue?
14   **A  Yes.**
15   Q  Anything else?
16   **A  Discipline for being in Division 5**
17  **under -- me not coming to an aid.  They say I**
18  **didn't come to the aid of a civilian in an**
19  **attempted child abduction.**
20   Q  Anything else?
21   **A  That's it.**
22   Q  Attendance, I'm assuming -- or explain to
23  me what you mean by attendance.  Like what sort of
24  disciplinary issues have you had with attendance?

---

**100**

1   **A  If you call in medical, but with no**
2  **medical time, if you was sick or something like**
3  **that and you ran out of time or you wasn't able to**
4  **call in or something like that because of your**
5  **health, then there'll be maybe a suspension day or**
6  **take a vacation day from you or something like**
7  **that.**
8   Q  Anything else besides those three types
9  of -- or sorry, those three pieces of discipline
10  that you received?
11   **A  That's it.**
12   Q  You said for attendance, you might receive
13  a suspension of days or hours or something I think
14  you said?
15   **A  Days, a day or you might get a verbal**
16  **warning or a write up or suspension, three days or**
17  **a day, something like that.**
18   Q  Then for the court subpoena issue, what is
19  the discipline that you received for that?
20   **A  We haven't.  Well, we had --**
21   Q  Go ahead.
22   **A  We were sent to the Loudermill hearing**
23  **board and just waiting the outcome to go to trial**
24  **for the merit board, to the merit board right now.**

---

**101**

1   Q  And they're seeking termination for that,
2  right?
3   **A  Yes.**
4   Q  You have been allowed to continue working
5  pending outcome of that merit board hearing,
6  right?
7   **A  Yes.**
8   Q  How did you find out that you were allowed
9  to keep working pending the outcome of the merit
10  board hearing?
11   **A  Loudermill.**
12   Q  The Loudermill hearing?
13   **A  Yes.**
14   Q  What were you told?
15   **A  Just to keep working.**
16   Q  How was that communicated to you?
17   **A  By mouth.**
18   Q  Who would have told you that?
19   **A  The person that conducted the Loudermill**
20  **hearing.  I don't know his name.**
21   Q  At the Loudermill hearing, at the end of
22  it, you were told that you were allowed to
23  continue working pending the outcome of the merit
24  board hearing?

---

**102**

1   **A  Yes.**
2   Q  The Loudermill hearing, was that -- were
3  you the only individual in the Loudermill hearing,
4  or were the other investigators who are charged
5  with the same incident, were they there as well?
6   **A  Yes, they were.**
7   Q  So all of you guys were together?
8   **A  Yes.**
9   Q  Remind me again, who are the individuals
10  that were in that Loudermill hearing?
11   **A  LeGrain Winston, Shedor, and Rico.**
12   Q  LeGrain Winston, he's another one of the
13  plaintiffs.  He's African-American, right?
14   **A  Yes.**
15   Q  And Investigator Shedor, what is his race?
16   **A  White.**
17   Q  And then was it Rico, is that the last
18  one?
19   **A  Yes.**
20   Q  What is Investigator Rico's race?
21   **A  Mexican, Hispanic.**
22   Q  Hispanic.  Okay.  All right.  Let's see.
23  So that's the only discipline -- or sorry.
24   And then you mentioned this incident about

---

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

103

1 not coming to the rescue of a child or something.
2 I think you said it was in Division 5. So was
3 that while you were working in EM? Was that
4 something completely separate?
5     A  Right. I was working in EM. It was in
6 2018.
7     Q  What happened?
8     A  I was doing my vehicle inspection, 2018,
9 on Halloween, October 31. I was doing my vehicle
10 inspection with my body cam, and there was kids
11 walking down the street playing, hollering and
12 everything because it was Halloween, and there was
13 a guy on the bike that I saw and two ladies
14 standing on the south side of a corner and the
15 north side of a corner.
16     And one of the investigators, as I was
17 doing my vehicle inspection asked me, hey,
18 Ferguson, do you see my car down there by you? I
19 said -- I looked around. I said no, and that was
20 it.
21     I got done with my vehicle inspection and
22 turned my body cam off, got into the vehicle.
23     The guy on the bike came up to me and
24 said, man, those kids are crazy, aren't they? I

104

1 said, well, it's Halloween. They just having fun,
2 and I left.
3     Next thing I know, I go home that day,
4 fast forward. Go home that night and turn on the
5 TV. I'm watching television, sports or whatever,
6 me and my wife. The news come on after that, and
7 they showed 24th and Rockwell by the job saying
8 that an attempted child abduction had happened
9 over there by the job where I was doing my vehicle
10 inspection.
11     I said, wow. I said, I didn't know that.
12 I said, so what am I going to do? I'm going to
13 call Investigator Jackson in the morning, which is
14 the person that was in charge of body cams, so
15 that he can pull my body cam to check on my
16 camera, take it to the director, check my body cam
17 to see if I picked up anything on my body cam that
18 might help Chicago out with their case, with that
19 case, because I didn't know that that had
20 happened, and maybe I got something. I don't
21 know.
22     So when I got to work, Lieutenant Collins
23 said, Investigator Ferguson. I said, yes. He
24 said, Chicago police want to interview you in the

105

1 security office here inside the building of the
2 job. I said, okay.
3     So I told Chicago, the detectives, the
4 same thing I just told you, and they said, well,
5 if you see the guy on the bike again, would you
6 recognize him? Okay. Yes, then I would have,
7 yes. And they gave me the card.
8     Now, I go back to work. Nobody ever asked
9 me, Investigator Ferguson, what happened, or what
10 did Chicago want or what's going on? Nobody asked
11 me. No supervisor, no director, no chief, nobody
12 ever asked me what happened.
13     2019, October, I get an email from OPR
14 stating that I'm a witness in an attempted child
15 abduction. Now they say I am a witness. They
16 never said for what.
17     I'm like, wait, what am I a witness to?
18 What am I a witness to?
19     So I called OPR, the investigator that was
20 doing the investigating. She wasn't there that
21 day, so I called the next day, and she told me,
22 oh, you are a witness to an attempted child
23 abduction that happened outside of Rockwell.
24     I said, attempted child abduction? Then

106

1 she said, she said, oh, no. You have been
2 accused.
3     I said, been accused? I said, I never
4 could have been either one because I never knew it
5 happened. Only reason I know it happened because
6 I saw it on the news and I'm the one that gave my
7 camera to the supervisor, to the director and
8 everything at the job to see if I had something on
9 my camera, pickup Chicago. Why would I wait a day
10 after something like that had happened to give
11 them my camera?
12     Okay. So then they -- I never heard. I
13 didn't hear anything else from it.
14     I come in January in rollcall, they told
15 me, Ferguson, you've been de-deputized. Had to
16 give them my taser, give them my radio, and they
17 transferred me down to the Daley Center.
18     I didn't bid to the Daley Center, so I put
19 in a grievance because I bid the 3 to 11 shift.
20 They put me on at the Daley Center at 9 to 5 in
21 the evening. And my grievance went through. I
22 won it. That's why I'm in Division 5 right now.
23 That's that.
24     Q  So what was the discipline you were

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

107

1 actually issued for that incident?
2    A  Can I say something real quick?
3    Q  Yes, please.
4    A  It was also six other investigators out
5 there at the time that that happened, that the
6 incident happened.
7    Q  Okay.
8    A  Sheriff police told me, Investigator
9 Ferguson, you know there's no such thing as
10 attempted child abduction.  Either the baby was
11 abducted or it wasn't.
12    Q  Okay.
13    A  Some investigators that were out there
14 asked me, are they punishing you for what happened
15 at that -- outside Rockwell?  I said, yeah.  They
16 said, we heard a lady screaming help, help, but we
17 never knew what direction it came from.  We never
18 seen anything like that.
19       Nobody was in emergency situation or
20 nothing.  Nobody asked, sheriff, help, help this
21 lady, help this lady.  I never seen anything like
22 that.  I never even seen a little kid, a baby or
23 nothing.
24    Q  And what was the actual discipline that

108

1 you received for that incident, if any?
2    A  I had to go to the Loudermill hearing.
3 They sent the letter over to the Division 5 on the
4 outcome of the Loudermill hearing.  They told me
5 to keep working, so just waiting, going through
6 different status hearings, just waiting, just
7 doing the investigation still.
8    Q  So they're still doing an investigation?
9    A  Yeah.
10    Q  You haven't -- other than being
11 transferred, which you grieved and then was
12 overturned, you haven't been issued any discipline
13 for that incident yet?
14    A  Right.  Well, other -- right, right.
15    Q  And you mentioned that there were six
16 other investigators outside at the time?
17    A  Yes.
18    Q  Do you know the names of who those
19 individuals were?
20    A  Investigator Keith, Investigator Folkers,
21 Investigator Messina, and there was three more
22 that I don't know, but I think they looked at the
23 camera, the surveillance camera that's around the
24 perimeter and saw other investigators out there

109

1    also.
2    Q  Do you know whether or not any of those
3 other individuals were questioned regarding the
4 incident?
5    A  Nobody was questioned.
6    Q  And how do you know that none of those
7 individuals were questioned?
8    A  Because I would have -- the ones that --
9 the people that told me about it, they told me
10 they've never been -- nobody asked them about
11 anything.  And they're white investigators too.
12    Q  So your understanding is that these other
13 individuals were not questioned by CPD?
14    A  They wasn't questioned by anyone.
15    Q  They were not questioned by any
16 supervisors?
17    A  Right.  I was the only one singled out.  I
18 wasn't even questioned by a supervisor.  Only
19 person that questioned me was Chicago police.
20    Q  How did it get to OPR, if you know?
21    A  Director Shields told Pat, Lieutenant
22 Collins, to write me up and send it over to OPR.
23 I had been singled out.
24    Q  How do you know that Director Shields told

110

1 Lieutenant Collins to write you up and send it to
2 OPR?
3    A  Because his name was at the head of the
4 paperwork along with her name.
5    Q  I understand that, but how do you know
6 that he told her to write you up?
7    A  He's the only one that could have done
8 that, and plus I was on a post in Division 5, I
9 say maybe -- I think it was June, maybe June of
10 this year, and -- no.  I think it was either June
11 or July of this year, and Director Webb came down.
12       He was on his way to Division 6 in the
13 basement from Division 5 going through the tunnel,
14 and he looked up and saw me at that post, and he
15 stopped, and he came and talked to me.
16       He said, Ferg, what are you going down
17 here?  And I told him.  He said, Oh, Shields put
18 that paperwork in on you.  I said, what?  He said,
19 Shields did this to you.  He told me -- Director
20 Webb told me that Shields did this.
21    Q  It's kind of a lot to unpack there, so
22 let's take this a step at a time.
23       Okay.  The basis of the belief that
24 Shields told Lieutenant Collins to write you up is

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

111

1  that his name appears on the top of the form?
2      A  His name and her name up at the top and
3  down at the bottom.
4      Q  Okay.  Other than that, any other reason
5  you believe that he told her to write you up?
6      A  Because of what Director Webb told me.
7      Q  But Webb didn't tell you that Shields told
8  Lieutenant Collins to write you up, right?
9      A  Webb told me that Shields wrote me,
10  Shields did this.
11      Q  So -- and when was this conversation with
12  Webb?
13      A  I'm trying to -- I'm trying to see.  Was
14  it -- it was during this COVID thing.  I don't
15  know if it was the end of June or July.  I can't
16  recall.  I can't recall, because he was walking
17  through the hallway with two young ladies and
18  then, I guess, he told the two young ladies to go
19  ahead because he saw me, and he came back to the
20  post that I was at and talked to me.
21      Q  Okay.  And --
22      A  This was probably about -- I'm sorry.
23      Q  Where was this?
24      A  This was probably about 5:00.  The post is

112

1  called post OE in Division 5 in the basement, and
2  I think it happened right around probably about
3  4:00, between 4 and 5:00 in the evening.
4      Q  You were -- were you still working in EM
5  at the time?
6      A  No.  I was over in Division 5.
7      Q  So Division 5 is separate from EM?
8      A  Oh, yeah.
9      Q  So you're working in Division 5 in the
10  basement, so you are not working as an
11  investigator in EM?
12      A  Right.  That's part of that punishment.
13      Q  Okay.  But you requested to be transferred
14  to Division 5 as part of that grievance?
15      A  Well, I requested to go back to the 3 to
16  11 shift.  They put me in Division 5.
17      Q  Who is they?
18      A  I guess Director Ruffin and a couple more
19  directors or whatever.  I can't recall their name
20  at this time.
21          If I had that paper, I could, but I can't
22  recall their name.
23      Q  Tell me exactly what you and Webb said to
24  each other.

113

1      A  He asked me what -- he said, Ferg, what
2  are you doing down here?  I said, what are you
3  doing here?
4          I told him that this is where they put me
5  at after my grievance from downtown to Daley
6  Center.
7      Q  Okay.
8      A  I said, this is from that attempted child
9  abduction that Shields said that I didn't come to
10  the aid of the civilian.
11          He said, oh, you know, Shields put this
12  case on you.  He did this to you.  He has
13  written up.  He put this case on you.  That's what
14  he said.
15      Q  Did he say anything else?
16      A  He said -- he said a few curse words about
17  the man and everything and said he wasn't nothing
18  and he did people wrong.  He said, I don't know
19  why he's doing people like this.
20      Q  Can you be a little more specific?  What
21  did he actually say?
22      A  He said that the man wasn't hit and don't
23  know why he's fucking with people like that.  And
24  he's a -- he don't know why.  He just don't know

114

1  why, you know.  He said, he's doing people real
2  dirty.  That's what he said.
3      Q  Did he say anything else?
4      A  No, because he had to catch up with those
5  two young ladies that he was -- I guess they
6  were -- he was taking them somewhere or whatever.
7  I don't know, but that was it.
8      Q  What did you say to him?
9      A  I just -- I was like, you know, I knew I
10  was singled out, you know, and for him to tell me
11  that, I'm like, man, I figured that I was singled
12  out, you know, and it's retaliation due to all
13  this other stuff that's going on with Shields, you
14  know.  And that was it.
15      Q  I'm confused.  You said that to him?
16      A  No.  I told -- I'm saying that to myself.
17  I didn't say it to him.
18      Q  That's what I want to know.  What did you
19  say to Webb?
20      A  I said, oh, yeah.  I said, you know, I
21  said, I never knew.  He did put this on me?  He
22  said, yeah, yeah.  He did that.
23          I said, because I never even seen nobody
24  in an emergency situation.  Nobody even called for

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

13 (115 to 118)

115

1  help or nothing like that.  I never even seen a
2  little baby.  I said, I don't even know how I got
3  into this.
4        I told him, I'm the one that told Jackson
5  to give you my body cam to see if I pulled
6  something up or got something on my body cam that
7  I didn't know I even got to help them out.
8     Q  You said this all to Webb?
9     A  To Webb, yeah, yeah.
10    Q  Okay.
11    A  I done told the same story 100 times.
12    Q  Did you say anything else to him at that
13 time?
14    A  No.
15    Q  Okay.  One thing that confuses me is how
16 could your response be, oh, yeah, I didn't know,
17 or yeah, he did put this on this because I didn't
18 know, when just a minute ago you testified that
19 you knew that he put it on you because -- or
20 directed Lieutenant Collins to file this because
21 his name was on the paperwork.
22    A  No.  I'm talking about I didn't know that
23 he had -- at that time -- at that time I didn't
24 know that he had did that, you know, singled me

116

1  out like that at the time I told him to pull my
2  body cam and all that stuff.
3     Q  But you said that --
4     A  After I seen -- after I seen the paperwork
5  and all that, that's what I knew.
6     Q  Yeah.  So you saw the paperwork well
7  before the interaction with Webb this summer?
8     A  Yeah.  Oh, yeah.
9     Q  So why would you say to Webb, oh, yeah.
10 He did put this on me, because I never knew, if
11 you had already seen that paperwork and knew that
12 Shields directed the filing of this complaint to
13 OPR?
14    A  No.  I was talking about the past then,
15 back then, you know, before I had seen the
16 paperwork.
17    Q  No.  I don't understand.
18    A  Before I --
19    Q  You are saying -- hang on.
20       You are saying in June or July of 2020
21 during the pandemic, as you said, you told Webb,
22 oh, yeah, he did put this on me because I never
23 knew.  Okay.
24       But you told me right before that that you

117

1  knew that he directed the filing of this at OPR
2  because his name was on the top and bottom of the
3  paperwork.  How do you explain that?
4     A  I'm talking about before all this
5  happened.  Before I even went to OPR, I didn't
6  know that he had put this stuff on me until I seen
7  the paperwork.  That's what I was talking about.
8        Maybe I said it wrong.  I don't know.
9  Maybe I said it wrong.
10    Q  I think you said it.  You said it pretty
11 clearly.  You said that when you reviewed the
12 paperwork, you knew that Shields was involved.
13 Okay.  And then now you are telling us that you
14 learned about Shields being involved from this
15 June or July 2020 conversation, so I'm a little
16 confused here because that's a total discrepancy.
17    A  No.  I'm saying when I told Webb -- when I
18 told Webb that, I'm talking about all the way in
19 the beginning that I didn't know he had did this
20 to me, he had put this on me until I seen the
21 paperwork and everything from OPR and all that.
22    Q  So you didn't say that to him?
23    A  That's what I am talking about.  Well, I
24 probably -- you know, I don't know, but that's

118

1  what I thought, you know.  That's what I meant.
2  When I was talking to him, that's what I meant.
3     Q  Do you understand why I'm confused about
4  this discrepancy here?
5     A  Yeah.  That's what I meant when I talked
6  to Webb about in the beginning of all this stuff.
7        I didn't know that it was him that did
8  this, but after I seen the paperwork -- because I
9  didn't even know I was in any of that stuff.  I
10 didn't know that.
11    Q  Okay.
12    A  I didn't know I was in anything because
13 nobody ever said nothing to me about anything for
14 a year almost, so I'm thinking I helped Chicago
15 out in that situation.  I thought I did good, you
16 know.  I don't know.
17    Q  Why did Shields report you to OPR?
18    A  I guess I'm being singled out.  I don't
19 know if it's because of what's going on now or I
20 don't know.  What's going on now?
21    Q  What do you mean what's going on now?
22    A  With the things that we're involved in
23 with him now as far as me and Winston and Shedor,
24 you know, when he had almost hit Winston in the

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

14 (119 to 122)

119

1  face, and I was there to be a witness.
2       I don't know if he is trying to get me on
3  that or what.  I don't know.
4       Q  Okay.
5       A  That's why I'm being singled out.
6       Q  Did you watch your body cam footage?
7       A  Yes.
8       Q  When did you watch that?
9       A  It was in -- it was last October.  I don't
10 know if it was on a Wednesday.  I don't know what
11 date.  I don't know if it was the 19th of October.
12 I don't know the exact date.  I know it was in
13 October when I watched it.
14      Q  Where did you watch it?
15      A  In building 2 of south campus in OPR's
16 office.
17      Q  So you watched it at OPR?
18      A  Yes.
19      Q  And did they give you a copy of it?
20      A  A copy of it in my email.
21      Q  Did you give that to your attorneys?
22      A  Yes.
23      Q  You did?
24      A  I gave it to the union attorney.  I gave a

120

1  copy of that.
2       Q  I'm talking about your current attorneys.
3       A  No, I didn't.  I don't recall that I did.
4       Q  When you say your email, are you talking
5  about your personal email or your work email?
6       A  Work email.
7       Q  When is the last time you watched the
8  video?
9       A  That was the only time I watched it, when
10 I was there with them.
11      Q  And so you -- I asked you the question why
12 did Shields send this over to OPR, and you gave
13 sort of your personal thoughts on that.  I don't
14 know if it's related to this or that, so I want to
15 ask you again.  I want to ask that question again.
16      I want to know first or foremost, do you
17 know, okay, do you have personal knowledge why
18 Shields sent this to OPR?
19      A  From my knowledge, I think because I'm
20 being -- because of the lawsuits and everything
21 that's going on between me and Winston and the
22 situation that him and Winston got into that I was
23 a witness of in that room that day when he almost
24 hit Winston in the face.

121

1       Q  Anything else?
2       A  That's the only thing that I know.
3       Q  You said I think.  You don't know this for
4  a fact, right?
5       A  Well, you know what, that's -- that's the
6  only thing it could be.  That's the only thing it
7  could be, you know.
8       Q  It's not possible that they thought you
9  were in a position to help this woman out and
10 didn't do so?
11      A  Never even knew anything like that was
12 happening.
13      Q  I'm not saying you did or didn't, but
14 isn't it possible that they think that you were in
15 a position to help, but didn't do so?
16      A  They could have never thought that I was
17 in that position if there was six other
18 investigators out there other than me.
19      They should have thought those other
20 five -- or those other six investigators the same
21 thing.  How did I get singled out?
22      Q  Well, the other six investigators, they
23 weren't physically standing right next to you,
24 right?

122

1       A  They was scattered out, I guess.
2       Q  Did you see them, like you knew that I can
3  see this is where one, two, three, four, five, six
4  are?
5       A  Three was -- one was standing out on the
6  left side of me, and two were on the right side of
7  me down the street, but, like I say, I was doing
8  my vehicle inspection, so I wasn't even paying
9  attention to what they were doing.
10      Q  Okay.  Yeah, that's fair.
11      The only discipline you have received is a
12 transfer?
13      A  Yes.
14      Q  Okay.  Did you ever put in a request to be
15 transferred out of EM?
16      A  No.
17      Q  Are you being paid the same amount of
18 money as when you were in EM?
19      A  Yes.  I'm still --
20      Q  You are working the same hours as when you
21 were in EM?
22      A  Yes.
23      Q  Okay.  I think -- were you just trying to
24 say you're still in EM?

123

1    A  I'm still in EM.  Just it's pending
2  investigation.  They got me over in Division 5.
3    Q  What's the status of the investigation
4  right now?
5    A  It's still under status hearing.
6    Q  Okay.  Did any of those other
7  investigators have body cams on?
8    A  Everybody had body cams on, but I don't
9  know if they were recording at the time because
10  they wasn't doing an inspection.  One was looking
11  for his car.  The other two was at their car.
12    Q  So -- all right.
13    MR. LEINENWEBER:  Can we take a break, a
14  five-minute break?
15    THE WITNESS:  Okay.
16    MR. LEINENWEBER:  Just come back at 11:35.
17    MS. FLEMING:  Sounds good.
18    MR. LEINENWEBER:  Okay.
19    (A recess was had.)
20    MR. LEINENWEBER:  Juliet, could we pull up
21  Exhibit 1, please.
22    (Exhibit 1 marked for
23    identification.)
24  BY MR. LEINENWEBER:

124

1    Q  Mr. Ferguson, we are handing you what's
2  been marked as Ferguson Exhibit 1.  Do you
3  recognize this document?
4    A  I can't even --
5    Q  It should be your complaint that you filed
6  in this case, right?
7    A  Okay.
8    Q  Does that seem right?
9    A  I just see my name and stuff, yeah.
10    Q  Do you have any reason to believe this
11  isn't the complaint that you filed in this case?
12    A  It is.
13    Q  And then --
14    MR. LEINENWEBER:  Juliet, can we scroll to
15  paragraphs 54 through 57.
16    Q  Mr. Ferguson, when we get there, can you
17  review this section here that says:  Facts
18  particular to Wilford Ferguson.  Let me know when
19  you are finished reviewing that.
20    A  Okay.
21    Q  Back to -- real quick, back to the
22  incident with -- sorry.  Strike that.
23    You allege here in paragraph 67 that you
24  received discipline when similarly-situated

125

1  nonminority officers did not, right?
2    A  Yes.
3    Q  What are you referring to there?
4    A  Paragraph -- I can't see that.
5    Q  Paragraph 56.
6    A  57.
7    Q  56.  56.  My question is what discipline
8  are you referring to here?
9    A  Like when we had to go to court.  We got
10  subpoenaed to court, me and --
11    Q  For the subpoena?
12    A  Right.
13    Q  You are not referring to the attendance
14  issues that we talked about earlier, right?
15    A  No.
16    Q  You are not talking about the
17  Halloween-cry-for-help incident, right?
18    A  I'm talking about that too.
19    Q  How could you be talking about that --
20    A  Let me --
21    Q  Hang on a second.
22    A  Okay.
23    Q  How could you be talking about that when
24  this complaint was filed before that incident?

126

1    A  I thought you asked me --
2    MR. LEINENWEBER:  Juliet, can you scroll
3  up just a little bit so we can see that top line,
4  right there.
5    Q  So you see here how it says filed
6  August 21, 2018, right?
7    A  Okay.
8    Q  That was several months prior to the
9  Halloween 2018 incident, right?
10    A  I thought you were talking about now.  I'm
11  sorry.
12    Q  Well --
13    A  I thought you were talking about now.
14    Q  It's your complaint, so I don't --
15    A  I thought you were talking about now.
16    Q  Hang on.  We have to make sure that we are
17  not talking over each other.
18    Back to paragraph 56 here then, so the
19  discipline that you are referring to in
20  paragraph 56 is the discipline that you received
21  from the court subpoena incident in the summer of
22  2015, right?
23    A  Right.
24    Q  Who are the similarly-situated nonminority

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

16 (127 to 130)

127

1 officers who were not disciplined for that
2 incident or that same type of incident, the court
3 subpoena issue?
4    **A  Investigator Anson, Investigator Pemonte,**
5 **Investigator Messina, Investigator Folkers.**
6    Q  Anyone else?
7    **A  Not that I can recall.**
8    Q  Let's start with Investigator Anson, which
9 I believe is A-N-S-O-N; is that right?
10   **A  I think so, yeah.**
11   Q  And when did Investigator Anson have to go
12 to court for a subpoena?
13   **A  I think that was -- I don't know if that**
14 **was November or what, if that was in November or**
15 **what it was.**
16   **Offhand I can't remember when it was, but**
17 **I know we had -- I don't know what exact date that**
18 **was.**
19   Q  What year was it?
20   **A  I'm trying to see what year that was that**
21 **we went to -- that me and Winston, all of us had**
22 **to go to that OPR interview for that case we went**
23 **to court on.  It was the same day.  I think it was**
24 **the same day or day after that they went out.**

128

1    **I can't recall that date, but they were**
2 **coming back from court that day and getting ready**
3 **to leave.  They said that they could use that as**
4 **their tour of duty.  I know it was in November,**
5 **but I don't know the exact date.**
6    Q  I'm real confused, because you have said
7 that same day and it was in November.  I'm real
8 confused here, so let's try and clarify.
9    **A  It was the same day.**
10   Q  Okay.  So are you saying that on the same
11 day that you went to court, which -- let me get
12 the date so that we're all on the same page.
13   **A  Not the same day we went to court.**
14   Q  Hang on a second.  The day you guys went
15 to court was July 29, 2015.  Does that sound
16 right?
17   **A  Oh, yeah.  I know about that.**
18   Q  So you guys went to court that day and
19 that's where your guys were accused of stealing
20 time.  Okay.  So what did Investigator Anson do in
21 November for which he was not disciplined?
22   **A  They had court in November also, and they**
23 **were -- when I was coming in to come to work to go**
24 **upstairs, him and I think that was Pemonte or -- I**

129

1    **think it was Pemonte, him and Pemonte was leaving,**
2 **and they said that they can use that as their tour**
3 **of duty because they had court that day.**
4    **I said, wow.  They said they don't do that**
5 **no more.**
6    Q  Who told you that you are not allowed to
7 use court time as tour of duty anymore?
8    **A  Chief O'Malley.**
9    Q  When did Chief O'Malley say this?
10   **A  That day of July -- that day we had that**
11 **court.  Was that year July 29?**
12   Q  Yeah, July 29, 2015.
13   **A  That day.  That's why we worked.**
14   Q  What were Chief O'Malley's exact words as
15 best you can recall?
16   **A  We gave our forms to Investigator Rico to**
17 **turn in for us.  He turned them in to Chief**
18 **O'Malley.**
19   **Chief O'Malley called me.  He said Ferg,**
20 **you and Winston, you all can't use this as your**
21 **tour of duty.  They don't do it like that anymore.**
22 **It's up to the discretion of the supervisor now.**
23   Q  So it's not that it was eliminated.  It's
24 just that it's up to the discretion of the

130

1 supervisor?
2    **A  Yeah, but they never told us that.  They**
3 **never said it was up to the discretion.  It's up**
4 **to the state's attorney.**
5    Q  The state's attorney gets to decide if you
6 get to use tour of duty in the sheriff's office?
7    **A  Right.  They always told us after they**
8 **sign our form to have a nice day, enjoy the rest**
9 **of your day.**
10   Q  I just don't understand how a state's
11 attorney who doesn't work for the sheriff's office
12 could say you don't have to go in to work for your
13 assigned shift.
14   **A  They said that was our tour of duty of**
15 **that day.**
16   Q  Where is it written down or where is the
17 policy or where is it -- where has anyone ever
18 told you that a state's attorney can tell you
19 do not have to go to work that day for your shift?
20   **A  I never got anything in writing, but every**
21 **time we went to court, that was our tour of duty,**
22 **that I was told by our supervisors, and I mean our**
23 **chiefs and everything, that that is considered**
24 **your tour of duty.**

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

17 (131 to 134)

131

1    I never saw any writing.  Okay.  But I was
2 told by my chiefs and state's attorneys that that
3 is considered your tour of duty, and ever since
4 I've been in EM when I was going to court, it was
5 always considered my tour of duty.
6    Q  Even if you only go for one hour?
7    A  If you go from 9 to 10:00 and the case was
8 continued, that was considered your tour of duty
9 for that day.
10    Q  So then you got the bonus of getting paid
11 for eight hours that day even though you only
12 worked one hour?
13    A  Yes, sir.
14    Q  That seems a little unfair, right?
15    A  I didn't know how it worked.  That's what
16 I was told, that it was my tour of duty for that
17 day if you had to go to court.
18    Q  You said that Anson and Pemonte, you
19 understood that they were able to use tour of
20 duty, right?
21    A  Yes.
22    Q  Sometime in November?
23    A  I think it was November.
24    Q  Did they request that they be allowed to

132

1 use their time as tour of duty?
2    A  No.  They was just told that they -- I
3 guess they were told that because they were on
4 their way home.
5    Q  Okay.
6    A  I don't know if they requested or
7 whatever.  I wasn't there, but they just told me
8 that they was told that they could use that as
9 their tour of duty.
10    Q  So you don't know --
11    A  I don't know.
12    Q  -- if they received approval, right?
13    A  They had to receive approval if they left.
14 They wouldn't just leave on their own.
15    Q  Right.  Okay.  Because if you did that,
16 you might get in trouble, right?
17    A  Yes.  That's why we had to come in and
18 work.
19    Q  Am I to understand then that you and
20 Winston, you did not leave the courthouse that day
21 and go straight to work, right?
22    A  They told us to hang around.
23    Q  I understand that.  But when you left the
24 courthouse, when you were finished at the

133

1 courthouse, where did you go?
2    A  We went outside, gave our slips to Rico to
3 turn in to Chief O'Malley.
4    Q  Okay.
5    A  And then I was in the parking lot and got
6 a call from Chief O'Malley, said that we couldn't
7 use that as our tour of duty.  They don't do it
8 like that anymore.  It's up to the discretion of
9 the supervisor, and you all come back to work.  I
10 said, okay, and we came to work.
11    Q  All right.
12    A  But we came to work.
13    Q  What hours were you at the courthouse that
14 day?
15    A  From 9 to -- was it -- we stayed in the
16 hallway from 9 to probably about -- shoot.  I
17 don't recall right now because we sat in the
18 hallway because the jury office was full of police
19 officers at the time, so they brought us chairs
20 out in the hallway just to sit out there.
21    State's attorney came out two or three
22 times and told us that they will be with us, just
23 hold tight, and when they --
24    Q  You don't recall what time you left?

134

1    A  I don't recall what time.
2    Q  You also mentioned Messina and Folkers.
3 And Folkers, I think, is F-O-L-K-E-R-S, right?
4    A  Yes.
5    Q  And tell me about when they used tour of
6 duty -- used court time as tour of duty.  When was
7 that?
8    A  I don't recall when they did, but they
9 always told us that they had to go to court that
10 day, so they were leaving, using it as their tour
11 of duty.  They always told us that.  I don't
12 know --
13    Q  Like when?  I mean, presumably they didn't
14 always tell you this every time you saw them, so
15 when were you informed of this fact?
16    A  I can't recall the exact dates or the
17 month or whatever, but it was like an unexpected
18 thing.
19    Q  Why was it unexpected?
20    A  Because when I saw them, I was thinking
21 that they was coming in to work, but they was like
22 they had already been here, and they was using it
23 as tour of duty because they went to court, and
24 that was it.

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

18 (135 to 138)

135

1    Q  But why was it unexpected?  It sounds like
2 this is a fairly regular occurrence that
3 investigators go to court and occasionally use
4 their court time as tour of duty, right?
5    **A  I'm talking about like I'm just -- like me**
6 **just coming to work, and when I see them, I'm**
7 **thinking that they coming into work too because --**
8    Q  Because they are on your same shift?
9    **A  Yes.**
10   Q  So they are on your same shift.  You are
11 thinking you guys are showing up too.  It's work
12 time or whatever and then they leave?
13   **A  Right.**
14   Q  So your understanding is that they get to
15 use tour of duty that day?
16   **A  Right.**
17   Q  And what else did they say to you?
18   **A  That was it.  I mean, that was it.**
19   Q  Do you know whether or not they requested
20 approval for using their court time as tour of
21 duty that day?
22   **A  I don't know that.**
23   Q  And you don't know that they didn't
24 request it, right?

136

1    **A  I don't know.**
2    Q  You don't know that they --
3    **A  They did or not.**
4    Q  Who made the decision to allow Messina,
5 Folkers, Anson or Pemonte that they were able to
6 use tour of duty?
7    **A  I would think Director Webb would make**
8 **that decision.**
9    Q  Okay.  And you think that.  Do you know
10 that?
11   **A  He would be the only person that could**
12 **make that decision.**
13   Q  Any other nonminority officers who didn't
14 receive discipline for this same sort of stealing
15 of time allegation?
16   **A  I can't recall.**
17   Q  Did Anson, Pemonte, Messina and Folkers,
18 did they complete attendance forms that day for
19 their tour of duty?
20   **A  I don't know.**
21   Q  You don't know then how much time was put
22 in for, right?
23   **A  I don't know.**
24   Q  You don't know how long they were at court

137

1 that day, right?
2    **A  No.**
3    Q  And, again, any other nonminority officers
4 that you are aware of related to this issue?
5    **A  Not that I can recall offhand.**
6    Q  Let's look at paragraph 57.  Can you read
7 that paragraph.
8    **A  Okay.**
9    Q  Who are the supervisors you were referring
10 to in this paragraph?
11   **A  Like Rohloff, Lieutenant Smith, Chief**
12 **Ranzino, Chief Neal.**
13   Q  Anyone else?
14   **A  That's all.  That's the only people that I**
15 **can recall.**
16   Q  Okay.  What positions are you referring to
17 here?
18   **A  TSS.**
19   Q  Anything else?
20   **A  No, just TSS.**
21   Q  Who are the nonminority officers you are
22 referring to here?
23   **A  Like Bieniek, Nickle.  What was it?**
24 **Messina, Folkers, Anson, Pemonte, Laughran, that's**

138

1 about it that I know.
2    Q  You are saying here that your supervisor,
3 so Rohloff, Lieutenant Smith, Ranzino and Neal,
4 assigned you to TSS, and they didn't assign these
5 other nonminority officers to TSS, right?
6    **A  Right.**
7    Q  And then you say here, regardless of
8 seniority or work experience, right?
9    **A  Right.**
10   Q  So it's your position that seniority and
11 work experience should play some role in who gets
12 assigned to TSS?
13   **A  Well, everybody had to learn TSS, but**
14 **that's what Ranzino would tell us.  Everybody had**
15 **to learn TSS, but he never put those guys down in**
16 **TSS, you know.**
17   Q  But my question was that it was you
18 believe seniority and work experience should have
19 played a role in the decision to assign officers
20 to TSS?
21   **A  No, it shouldn't have played no role.**
22   Q  I'm confused here.  Why not?
23   **A  Because they said everybody should know**
24 **TSS, you know, regardless of your seniority or**

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

---

139

1  your work experience.
2     Q  And it's your belief that these
3  nonminority officers you mentioned here were not
4  assigned to TSS?
5     **A  They were not.**
6     Q  They were never assigned to TSS?
7     **A  They was assigned to TSS after we**
8  **complained and complained and complained, you**
9  **know.  Then they might send one person down to TSS**
10 **to make it look good, but it will be, like, eight**
11 **or nine months before you see another white guy**
12 **down there.**
13    Q  Did all these individuals you mentioned,
14 did they all work on your watch?
15    **A  Yes.**
16    Q  So Bieniek, Nickle, Messina, Folkers,
17 Anson, Pemonte and Laughran, they all worked third
18 watch?
19    **A  Yes.**
20    Q  And you never saw them work TSS?
21    **A  Not to -- I never seen Bieniek and Nickle**
22 **until we started complaining, none of them really,**
23 **until we started complaining, like I say, until we**
24 **started complaining.**

---

140

1     Q  When did you start complaining?
2     **A  I guess we started seeing those guys once**
3  **the supervisors, as far as the chiefs or whatever,**
4  **found out that they were in a lawsuit, and then**
5  **that's when you start seeing some of those guys**
6  **come down to TSS, but before the lawsuit, before**
7  **they found out they was in a lawsuit, you never**
8  **saw those guys down in TSS.**
9     Q  You are saying that none of these guys
10 worked in TSS prior to August 21, 2018, when you
11 guys filed your complaint?
12    **A  No.**
13    Q  No, you are not saying that, or no, you
14 never saw them there?
15    **A  I never saw them down there.**
16    Q  Your testimony is they never worked in TSS
17 prior to August 21, 2018?
18       MS. FLEMING:  I'm going to object.  That
19 mischaracterizes his testimony.
20    Q  You can answer.  Sir, is that correct?
21    **A  I don't recall.**
22    Q  Did you have the same days off as all
23 these individuals?
24    **A  No.**

---

141

1     Q  You didn't?
2     **A  No.**
3     Q  So even though these guys all worked third
4  watch, on any given day they may not have been at
5  work or you may not have been at work, right?
6     **A  It could have been like that.**
7     Q  And so you -- okay.  All right.  Why were
8  these individuals not assigned to TSS?
9     **A  I have no idea, sir.**
10    Q  And who made the decision not to assign
11 them to TSS?
12    **A  It had to be a chief or a deputy chief.**
13    Q  Why did the chief or the deputy chief make
14 the decision not to assign them to TSS?
15    **A  I have no idea.**
16    Q  Okay.  Let's go to paragraph 77.
17       MR. LEINENWEBER:  Juliet, if you could go
18 down to that page.  Thanks.
19    Q  And this section, Mr. Ferguson, is a
20 section, it says:  Facts relevant to multiple
21 plaintiffs, here.  Okay.
22       So the first one, paragraph 77 alleges
23 here that:  Director Shields and his subordinate
24 supervisors in EM failed to follow progressive

---

142

1  discipline when they chose to discipline the
2  plaintiffs.
3        Okay.  Do you see that?
4     **A  Yes, I see it.**
5     Q  So what is the progressive discipline that
6  you should have -- you contend you should have
7  received?
8     **A  I'm not understanding it.  Trying to see.**
9  **I'm trying to see discipline, what you're talking**
10 **about.**
11    Q  It's not me that's talking.  It's your
12 complaint.
13    **A  I'm trying to see, I mean.**
14    Q  We have established that the discipline
15 that you received that you contend is at issue is
16 related to the court subpoena, time stealing
17 issue, right?
18    **A  Right.**
19    Q  So presumably then if this applies to you,
20 are you alleging you should have received some
21 sort of progressive discipline related to that
22 issue?
23    **A  I'm getting caught on the progressive**
24 **part.  What do you mean progressive discipline?**

---

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

143

1  Q  It's not my complaint, so, unfortunately,
2  I can't explain that to you.
3      A  I'm not understanding this.
4      Q  Are you aware of any progressive
5  discipline that you should have received?
6      A  Not that I -- I don't understand that.
7      Q  Okay.  Let's move on.  Paragraph 78 here,
8  it says that:  Director Shields and his
9  subordinate supervisors in the EM placed the
10 plaintiffs in higher incident areas regardless of
11 their seniority over nonminority officers.
12     A  Yes.
13     Q  And what are the -- where are the higher
14 incident areas you are referring to here?
15     A  Engelwood, southwest side of Chicago, west
16 side of Chicago, southeast of Chicago.
17     Q  Anywhere else?
18     A  Some parts of the north side, but mainly
19 it was southeast, southwest, and west side of
20 Chicago.
21     Q  And you are saying here that you were
22 placed in these higher incident areas, right?
23     A  Yes.
24     Q  So you are saying that you went out on

144

1  patrol and patrolled these, quote unquote, higher
2  incident areas?
3      A  Yes.
4      Q  What's the consequence of being in a
5  higher incident area?
6      A  You can get shot at.  I had cans of food
7  thrown at me.  Garbage tops thrown at me.  I had
8  to break up a shootout between a boyfriend and
9  girlfriend and just anything versus you being in
10 Hoffman Estates or Evanston or Wheeling, Winnetka,
11 something like that.
12     Q  So it sounds like -- I mean, are you
13 saying that the only place you could be injured --
14 well, first of all, you were never injured, right?
15     A  I was never injured.
16     Q  So these are just hypotheticals, right?
17     A  Those things actually happened.  Those
18 things actually happened --
19     Q  Sure.  Okay.
20     A  -- that I am talking about.
21     Q  Those things could happen to you anywhere,
22 right?
23     A  I didn't get injured in the midst of that
24 happening.  I didn't get hit by the stuff, but it

145

1  did hit the squad car, you know.
2      Q  Okay.
3      A  I could have got shot because the person
4  shot at their boyfriend right there when I was
5  standing there.  I took the gun away from the
6  person, but those things that happened in those
7  certain areas versus you going to Frankfort or
8  Winnetka, something like that, Hoffman Estates,
9  Schaumburg, things like that, nice areas, but you
10 always ended up in Engelwood.
11     Q  Do you have a lot of detainees on house
12 arrest in, quote unquote, nice areas?
13     A  Well, I wouldn't say a lot.
14     Q  Do you have more detainees under house
15 arrest in the, quote unquote, higher incident
16 areas of the city than you do in the nicer areas
17 of the city?
18     A  Yes, sir.
19     Q  Again, here is the appearance of this
20 language about seniority, and seniority has no
21 role in determining where an investigator goes on
22 patrol in Cook County, though, right, as far as
23 you know?
24     A  It used to, but that was a while back.  I

146

1  don't know.
2      Q  Back when you could bid for assignments,
3  right?
4      A  Right, yes.
5      Q  Then paragraph 79 here, this paragraph
6  appears to be regarding Tims and Newson having to
7  go to a house with scabies.  This doesn't have
8  anything to do with you, right?
9      A  No.
10     Q  Paragraph 80 here, it says:  Director
11 Shields and his subordinate supervisors in the EM
12 regularly called plaintiffs words such as the
13 N word, crooks and other derogatory racist
14 comments.
15     A  Yes.
16     Q  When did you hear Shields use the N word?
17     A  He would be talking to -- like, he would
18 come up to you or to some of the guys and be like,
19 what's up, my nigger?  You know, like that was
20 good.  Like, hey, how are you all doing?
21     Q  When did Shields do this?
22     A  He did it all the time.  I don't recall.
23 I can't recall times he done it or how many times
24 he done it, but he done it like it was a good

147

1  thing.
2      Q  Can you tell me one date that he did it?
3      A  I can't give you no date.
4      Q  Did you ever file any kind of complaint
5  alerting anyone that Shields had used the N word
6  with you?
7      A  I guess this would be the complaint.
8      Q  So other than the complaint you filed in
9  Federal Court on August 21, 2018, did you ever
10 file any kind of complaints or grievances or tell
11 any supervisors or anyone at the sheriff's office
12 in a supervisory position that Shields had used
13 the N word with you?
14     A  Trying to see who did I tell?  I can't
15 recall offhand who did I tell that to, but I had
16 never filled out a grievance, but I openly told a
17 couple of people, a couple of supervisors, I can't
18 believe he go around saying something like that,
19 you know.
20     Q  What supervisors?
21     A  That's what I was trying to --
22     Q  You don't recall?
23     A  Right, I can't recall.
24     Q  Did you go to OPR about it?

148

1      A  No, I did not.
2      Q  Did you think it was appropriate to use
3  the N word with you?
4      A  No, I did not.
5      Q  Why didn't you report it?
6      A  Actually, it was like, say, for instance,
7  we were talking in a group or whatever.  He would
8  walk past and say that, you know.
9      Q  That wasn't my question.  My question is
10 why didn't you go report it?
11     A  I don't -- I don't know if it would be
12 retaliation or scared that -- you know, because
13 the position he was in and the position I was in,
14 he retaliate on me, you know.  I don't know.
15     Q  But you knew there was a process you could
16 follow to report something like this, right?
17     A  Yes, I knew that.
18     Q  And you knew that retaliating against you
19 for reporting something like this is prohibited,
20 right?
21     A  Yes.
22     Q  And when is the first time -- what year
23 are we talking about here?  When is the first time
24 that this happened?

149

1      A  I can't recall, sir.
2      Q  You can't pin it down with any kind of
3  time frame whatsoever?
4      A  No.  Because, like I say, it happened so
5  much.
6      Q  When did Shields use the word -- did --
7  sorry.  Strike that.
8         Did Shields ever call you a crook?
9      A  He never called me no crook.
10     Q  Did Shields ever use any other derogatory
11 or racist terms with you?
12     A  I don't recall right now.
13     Q  Let's talk about Ranzino.  Okay.  Did you
14 ever hear -- did Ranzino ever use the N word with
15 you?
16     A  He never -- I never heard him use the N
17 word.
18     Q  What about crook?  Did Ranzino ever call
19 you a crook?
20     A  No.
21     Q  What about any other derogatory or racist
22 comments?
23     A  No.
24     Q  Did Neal ever call you the N word?

150

1      A  No.
2      Q  Did he ever call you a crook?
3      A  No.
4      Q  And did he ever use any other derogatory
5  or racist comments with you?
6      A  No.
7      Q  What about Rohloff, did Rohloff ever use
8  the N word with you?
9      A  No.
10     Q  Did he ever call you a crook?
11     A  No.
12     Q  Did he ever use any other derogatory or
13 racist comments with you?
14     A  No, not that I know of.  I don't recall.
15     Q  Let's go to paragraph 81, and this
16 paragraph here says that:  Director Shields and
17 his subordinate supervisors in the EM regularly
18 and systemically assigned nonminority officers to
19 office positions and assigned the plaintiffs to
20 assignments in the basement or the higher incident
21 areas.
22     A  Yes.
23     Q  So who -- we already talked about this
24 one, right, when we talked about paragraph 57

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

22 (151 to 154)

151

1 where you talked about being assigned to TSS and
2 the nonminority officers who were not assigned to
3 TSS?
4    A Yes.
5    Q You said that the supervisors at issue
6 were Rohloff, Lieutenant Smith, Ranzino and Neal,
7 right?
8    A Yes.
9    Q So for this paragraph then are you -- is
10 there anything else to add to this or is it the
11 same thing as we talked about earlier regarding
12 TSS?
13    A The same way.
14    Q Paragraph 82, it says that: Director
15 Shields and his subordinate supervisors assigned
16 duties to EM investigators based on their race and
17 not based on their seniority or work experience
18 here.
19       What does it mean to assign duties? Is
20 that -- how are duties different than assignments
21 or positions? Are those all the same thing?
22    A Right, they are all the same.
23    Q And do you have anything else? Are you
24 talking about anything else in this paragraph 82

152

1 that is different than paragraph 57 where we
2 talked about being assigned to TSS and the white
3 officers who were not assigned to TSS?
4    A Mainly the same thing.
5    Q Is there anything else at all?
6    A Not that I can think of right offhand.
7    Q And then paragraph 83, it says: Director
8 Shields and his subordinate supervisors gave
9 disproportionate discipline to the plaintiffs as
10 opposed to nonminority officers.
11       And is this the same as your section of
12 the complaint where it says in paragraph 56 that
13 you received discipline when similarly situated
14 nonminority officers did not?
15    A As far as the court and all that.
16    Q Okay. And paragraph 84, it says:
17 Director Shields threatened plaintiffs that he
18 would have them fired if they filed grievances for
19 the discipline they received.
20       Do you see that paragraph?
21    A Yes.
22    Q Did Shields ever threaten to have you
23 fired?
24    A He never threatened to have me fired, but

153

1    I never filed a grievance either even though I
2    heard him say the N word and all that.
3       I can't recall if he said -- I don't
4    remember him saying or threatening somebody to get
5    them fired if they put any grievance against him.
6    I don't know if that's why I didn't. I just I
7    can't remember, because it's been a long time.
8    Q Well, let me ask you this: You did file a
9 grievance related to the court subpoena issue,
10 right?
11    A Yes.
12    Q Director Shields did not threaten to have
13 you fired as a result of filing that grievance,
14 right?
15    A Right.
16    Q You did file a grievance regarding the
17 Halloween incident where you are alleged to have
18 not helped this woman whose child was -- that
19 someone was trying to abduct, right?
20    A Right.
21    Q And Director Shields did not threaten to
22 have you fired as a result of filing that
23 grievance, right?
24    A I filed a grievance, yeah, right.

154

1    Q Okay. And then let's go to paragraph 85.
2 It says that: Defendants' disciplinary process
3 provides no meaningful opportunity for the
4 plaintiffs to have an unbiased determination of
5 disciplinary actions.
6       Do you see that paragraph?
7    A I see that.
8    Q Does this apply to you, this paragraph?
9    Are you alleging that you didn't have a meaningful
10 opportunity to get unbiased determination about
11 the discipline you have received?
12    A Yes, we all did. I think we all did that.
13    Q What do you mean?
14    A You said we had an opportunity to file an
15 unbiased determination?
16    Q Yeah.
17    A On disciplinary action?
18    Q Yeah.
19    A That's that grievance and everything,
20 right?
21    Q Sure, yeah. I think you said that you
22 filed a grievance. Are you alleging that you have
23 not had an unbiased determination of the
24 discipline that you have received?

155

1    A  No, I'm not.
2    Q  Paragraph 86:  The grievance process and
3  procedures provided no significant remedy for
4  plaintiffs as their concerns and complaints are
5  heard by the wrongdoers.
6       Do you see that paragraph?
7    A  Yes.
8    Q  So are you saying that you have not had a
9  remedy related to grievances you filed?
10   A  I haven't.
11   Q  You haven't?
12   A  No.
13   Q  It sounded like when you filed a grievance
14 related to being transferred to the Daley Center
15 after the Halloween incident, that that was
16 granted, right?  Your grievance was allowed?
17   A  Oh, you are talking about -- yes.  I'm
18 sorry.
19   Q  Okay.  And then the grievance regarding
20 the court subpoena issue, are you alleging that
21 that was not -- that the complainant -- sorry.
22 Strike that.  That's a terrible question.
23      It says here that the complaints are heard
24 by wrongdoers.

156

1       Who in that circumstance is the wrongdoer
2  related to the court subpoena?
3    A  The complaints were heard by the
4  wrongdoers?
5    Q  That's what it says, yes.  Who are the
6  wrongdoers?
7    A  Unless it's like Neal.  The only person
8  that I can think of is Neal and Shields.
9    Q  Did you read this complaint before it was
10 filed?
11   A  Not this one.
12   Q  Not this one?
13   A  I don't remember.  I don't remember.  I
14 read all this a while back ago.
15   Q  Do you know whether you read this before
16 it was filed?
17   A  I'm sure I read it.  I read it all before
18 it was filed.
19   Q  You are saying that Neal and Shields are
20 the, quote unquote, wrongdoers referred to in
21 paragraph 86?
22   A  Not Neal and Shields.  I don't know if
23 it's -- oh, I don't understand this.  I don't
24 understand this here.  I don't understand it.  I

157

1  don't know --
2    Q  Okay.  We'll move on.
3    A  -- wrongdoers.
4    Q  Let's see.
5       MR. LEINENWEBER:  Can we go to
6  paragraph 88.
7    Q  Before we do that, well, Mr. Ferguson, you
8  allege in your -- do you allege -- you allege in
9  your complaint that you have been subjected to a
10 hostile work environment?
11   A  Yes.
12   Q  How have you been subjected to a hostile
13 work environment, in what ways?
14   A  As far as working in TSS and everything.
15   Q  I just want to know what you consider to
16 be the facts that you allege have created a
17 hostile work environment for you.  It's your
18 complaint.
19   A  Well, I mean, working in all this unclean
20 areas and the air that is circulating, blowing out
21 different vents and everything.  The vents being
22 matted with dust, and then you have the toilets
23 and everything that get stopped up and have
24 different feces just sitting in the toilets.  You

158

1  have to smell all of this stuff for the whole time
2  that you are downstairs in TSS, and then all of
3  the -- you got -- when it rains or snow, you got
4  water dripping everywhere where you have put to 10
5  to 12 garbage cans downstairs to catch the water
6  so it won't drip on yourself, you know, things
7  like that, and working around gnats and bugs and
8  all that.
9    Q  Anything else that you consider to be
10 causing a hostile work environment?
11   A  That's about it.
12   Q  What about intimidation?  Have you been
13 intimidated in any way while you have been working
14 in EM?
15   A  By a supervisor or chief, anything like
16 that --
17   Q  Anyone at all.
18   A  -- are you talking about?
19   Q  Has anyone been intimidating you?
20   A  Well, Ranzino told us that -- told me that
21 he was going to put me back down in TSS if -- what
22 he said, he would put me back down in TSS if I
23 wouldn't work faster as far as deliveries or get
24 more jobs done on the street or I would be down in

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

24 (159 to 162)

159

1  TSS.
2      Q  Anything else?
3      A  That's mainly it.
4      Q  Let's see.  We can -- let me ask you, so
5  you allege in your complaint that you have -- that
6  the sheriff's office -- well, strike that.
7          Do you consider your job working for the
8  sheriff's office to be unsafe in any way?
9      A  I guess it all depends what job you are
10 doing.
11     Q  What do you mean by that?
12     A  It all depends on what job.  I don't know
13 what job -- you could be -- whatever job you might
14 be assigned to, you know, it would be unsafe, as
15 far as like putting you in a position like
16 Englewood, different areas out there or down in
17 TSS, any of those two jobs could be unsafe.
18     Q  So being on patrol in Englewood and
19 working in TSS are unsafe positions?
20     A  Yes, especially Englewood and the South
21 Shore area and the west side, yes.
22     Q  Okay.  Where are the safe positions?
23     A  The safe positions that you -- 95 percent
24 of the time you will have no problem would be

160

1  north suburb, northwest suburb, northeast suburb
2  or parts of the south suburbs.
3      Q  You are talking about patrol?
4      A  Patrol.
5      Q  So there's a safe patrol job and there's
6  an unsafe patrol job in your view?
7      A  Yes.
8      Q  TSS is unsafe?
9      A  It's unsafe because you never know.  You
10 might get into a fight with a subject that know he
11 doesn't have a place to go home and now he has
12 turned violent because he's mad or he get into it
13 with another inmate or something like that.
14     Q  Okay.  And --
15     A  And things like with pencils.  They write
16 with pencils down there.  You give them pencils to
17 write with knowing from a long time ago we used to
18 fill out the application for the inmate, but now
19 they let the inmate fill out his application.
20         They have a pencil, so if the host tell
21 him you can't come to my house after he's begged a
22 thousand times, but he get mad and you tell him to
23 get off the phone because he's talking real bad to
24 his mother or grandmother or something like that.

161

1  He get mad and he might come at you with that
2  pencil.  You never know.
3      Q  Have you ever been attacked by a pencil?
4      A  I haven't been attacked by a pencil, but
5  another inmate have been.
6      Q  Okay.
7      A  That I had to take the pencil away from
8  the inmate.
9      Q  Let me ask you this:  If you have a
10 detainee arrested of a -- charged with a violent
11 crime who you have to take back to court, you, I
12 believe, had said that that could be kind of a
13 dangerous interaction, right?
14     A  Yes.
15     Q  Because they -- I think you said, well,
16 they might not want to go back to jail, right?
17     A  Yes.
18     Q  That could happen anywhere in the city,
19 right?
20     A  Mainly in those violent crime areas
21 because the guys never know whether they're going
22 to the penitentiary.  So...
23     Q  That wasn't -- well, okay.
24         So is it your testimony that that could

162

1  not happen in what you consider to be safer parts
2  of the city?
3      A  It wouldn't happen more in those areas
4  that stayed -- that -- the violent crime areas.
5      Q  I'm sorry.  I don't understand.  Can you
6  repeat your answer?
7      A  I said it wouldn't happen -- it wouldn't
8  happen as much as it would in those violent crime
9  areas.
10     Q  Why not?
11     A  It just wouldn't.
12     Q  Why not?
13     A  I don't know.  It just wouldn't.
14     Q  Okay.  So your testimony is that it
15 would -- it just wouldn't happen that somebody in
16 a nice area of the city would be capable of having
17 a sort of more violent interaction when you have
18 to take him back to jail?
19     A  You have cooperative subject and
20 uncooperative subject.  I mean, it's like in a
21 nonviolent area, the subject mostly will cooperate
22 with you and come on back and go back to court,
23 see what the judge got to say.
24         With a person in a more violent area that

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

---

163

1  know he did wrong, I mean, he's probably going to
2  get some time or -- and that's the reason he
3  didn't go to court, because he wanted more time
4  out there on the street.
5      He's going to, you know, give you a little
6  trouble.  He's not going to go with you
7  voluntarily or on his own, you know.
8      Q  So it's your testimony, though, that can
9  only happen at certain areas of the city, those
10 are the more violent areas?
11     A  Right.
12     Q  You are just basing this on your personal
13 belief?
14     A  Right.  My personal experience.
15     Q  But you don't go to the safer areas,
16 right, the nicer areas of the city?
17     A  No.
18     Q  The north side, the suburbs, you don't go
19 to any of those, right?
20     A  Well, I did a long time ago.  That's why I
21 know, a long time ago when I first came to EM.
22     Q  Okay.  So you have been assigned to patrol
23 areas of Cook County that you consider to be the
24 nicer areas?

---

164

1      A  Long time ago.  That's how you know they
2  are nice.
3      When I first got there, it was different
4  supervisory.  When I first got to EM, there was
5  different supervisory personnel there when I first
6  got there.
7      Q  You are talking about in 1992?
8      A  '92, '93.
9      Q  Almost 30 years ago?
10     A  Yeah.
11     Q  So you haven't been assigned to any of the
12 areas of the city that you consider to be nicer
13 since what, 25, 30 years?
14     A  I mean, you might get assigned once or
15 twice.  You are not going to get assigned like
16 those white guys that they assign there, no.  No,
17 you are not.
18     Q  Okay.
19     A  No.
20     Q  So I'm still confused by your testimony
21 because I thought it said that you have never been
22 assigned there, and then it seems like now you are
23 saying you do occasionally get assigned to what
24 you consider to be the nicer areas of the city?

---

165

1      A  Then.  I'm talking about then.  You might
2  get assigned one time, if one time.  You might get
3  assigned one time or you might get assigned twice.
4  I'm talking about like --
5      Q  What period of time, though, in a month?
6      A  Yeah, a month or --
7      Q  Okay.
8      A  -- two months or something like that.  You
9  might.  You might.
10     Q  Okay.  So every couple of months you
11 probably or possibly get assigned to what you
12 consider to be the nicer areas of Cook County?
13     A  You might.
14     Q  Okay.
15     A  You might.
16     Q  So that's a yes?
17     A  I said you might.
18     Q  Yeah.  But I mean you do, right?  Like you
19 have been.  You are saying you have been assigned
20 to these nicer areas of Cook County on occasion?
21     A  Yeah, that's how you know.  You're not
22 going to know if you don't get assigned there.
23     Q  That's how you know what?
24     A  Huh?

---

166

1      Q  That's how you know that?
2      A  That that area is a nice area.
3      Q  Okay.
4      A  Or those suburbs are nice areas, but
5  you're not going to get assigned there like you
6  get assigned to Englewood or something like that,
7  no, uh-uh.
8      Q  Okay.  And that is because of why?
9      A  Because of what I told you earlier.
10     Q  Which is?
11     A  The clique thing and the friend thing and
12 whatever, it's your boy or whatever, you know,
13 like that, or that person that is usually assigned
14 to it is off that day.
15     And they don't have -- they short.  They
16 might need you to go, but you are not going to be
17 regularly, like, assigned to there, nothing like
18 that, no.
19     Q  Okay.  Let's see.  How have you -- sorry.
20 Trying to think here.
21     MR. LEINENWEBER:  Can we pull up Exhibit 2
22 please, Juliet.
23     (Exhibit 2 marked for
24 identification.)

---

167

1    Q  Mr. Ferguson, we have handed you what's
2  been marked as Ferguson Exhibit 2.  Do you
3  recognize this document?
4        MR. LEINENWEBER:  Actually, before we
5  start on this document, do you guys mind if we
6  take a break, five-minute break?
7        MS. FLEMING:  That's fine.
8        MR. LEINENWEBER:  Okay.  Let's just take
9  five minutes.  I will be right back.
10       MS. FLEMING:  Okay.
11         (A recess was had.)
12       MR. LEINENWEBER:  Juliet, if you could
13  pull up Exhibit 2, please.
14  BY MR. LEINENWEBER:
15   Q  Mr. Ferguson, we have handed you what's
16  been marked as Ferguson Exhibit Number 2.  Can you
17  please take a moment to review that document and
18  then let me know when you're done.  At least the
19  first page of it here just to identify it.
20       Do you recognize this as your answers to
21  defendants' interrogatories?
22   A  Still trying to look at it.
23   Q  Okay.  Do you recognize this as your
24  response to defendants' interrogatories?

168

1    A  Yes.
2        MR. LEINENWEBER:  And then, Juliet, if we
3  could scroll over to the last page or the second
4  to the last page, the verification page.
5    Q  And this is your signature here, right,
6  Mr. Ferguson, on the verification page?
7    A  Yes.
8    Q  You declared under penalty of perjury that
9  the foregoing is true and correct in this
10  verification, right?
11   A  Yes.
12   Q  It was signed March 13, 2020?
13   A  Yes.
14       MR. LEINENWEBER:  Juliet, if we could
15  scroll back up to Interrogatory Number 2, please.
16   Q  And then we ask you here to identify
17  discipline you received that you allege was
18  discriminatory as alleged in your complaint.
19       And here in your response it states that
20  in or around July 2015 you were not allowed to use
21  your court subpoena as tour of duty, right?
22   A  Right.
23   Q  And you were written up related to this
24  and they brought charges pending before the merit

169

1  board, right?
2    A  Right.
3    Q  So we talked about that issue earlier
4  today, right?
5    A  Yes.
6        MR. LEINENWEBER:  And then if you could go
7  to Interrogatory 3, please.
8    Q  This asks you to identify any other
9  discipline you received that you allege was
10  discriminatory and forms the basis of your
11  complaint.
12       You put in here:  See response to
13  Interrogatory Number 2.  Right, do you see that?
14   A  Yes.
15   Q  Then it says investigation continues?
16   A  Yes.
17   Q  Okay.  What investigation have you done
18  since March of 2020 related to this issue of the
19  discipline that you allege is discriminatory?
20   A  Talking about the child neglect -- I mean,
21  child abduction?
22   Q  So what I am asking is here in March of
23  2020 you indicated that the discipline at issue in
24  your lawsuit is the court subpoena from July 2015.

170

1  Okay.  And you also say here, though, that
2  investigation continues.  Okay.
3        So my question is what investigation did
4  you do, if any, related to the discipline that you
5  allege is discriminatory?
6    A  I don't understand the question.  You are
7  saying -- I don't understand what you are saying.
8    Q  Have you done any kind of an investigation
9  at all related to your answers to the
10  interrogatories?
11   A  Have I done any investigation?
12   Q  Yeah.  Have you done any kind of an
13  investigation, any kind of effort to obtain
14  additional information to provide in your
15  interrogatory responses?
16   A  No.
17   Q  And the child abduction issue as you
18  referred to it, are you alleging that that was
19  done to you because of your race?
20   A  Yes.
21   Q  So why did you not include that in the
22  response to Interrogatory 2 or 3?
23   A  I said -- no, not due to my race.  That
24  was me being singled out due to the lawsuits and

171

1 everything that we are in against Shields. That's
2 what I said.
3         They do have a little bit to do with race,
4 I guess, a little bit, but the majority is me
5 being singled out due to the lawsuit situation.
6     Q  What does the child abduction issue
7 discipline -- what is the basis of your belief
8 that it has something to do with your race?
9     A  Because of the two white guys that was out
10 there that said they heard the lady, and I never
11 heard anything, and they said they heard this
12 lady.
13    Q  Who did they say that to?
14        You know what, stop.  Strike that for a
15 second.  Let's be specific.
16        Okay.  Who are the two people you are
17 talking about?
18    A  Messina and Folkers.
19    Q  Messina and Folkers.  And who did they
20 tell that they heard, quote unquote, heard the
21 lady as you said?
22    A  They told me.
23    Q  Did you file an OPR complaint against
24 them?

172

1     A  I told my attorneys.
2     Q  That wasn't my question.  Can you just --
3     A  No, I did not.
4     Q  Can you adjust your camera a little bit so
5 we can see.
6     A  This cord is in my way.  I got my charger
7 hooked up.
8     Q  If you could do it that way --
9     A  It's sliding down.
10    Q  That's perfect if you could do it that
11 way.
12    A  Yeah.
13    Q  You did not report them to OPR, right?
14    A  I did not, no.
15    Q  Did you report them to Director Shields?
16    A  No, because he -- when I found out, they
17 had removed him from the office.  He was no longer
18 director no more.
19    Q  When did he leave EM?
20    A  I think maybe either the beginning of the
21 year or the end of the year.  I'm not sure.
22    Q  So did you tell any supervisors that
23 Messina and Folkers claimed to have heard this
24 woman and did not do anything about it?

173

1     A  No.
2     Q  Did Messina and Folkers tell Shields or
3 any of the supervisors or the defendants in this
4 case, Ranzino, Neal, Rohloff, that they had heard
5 this woman, but did nothing?
6     A  Ranzino and Neal wasn't there.
7     Q  Was Rohloff there?
8     A  Rohloff was -- I don't know if he was
9 there, because he has been in and out of the
10 hospital.
11    Q  So do you know -- so then as far as you
12 know, Messina and Folkers did not tell -- or
13 sorry.  Strike that.
14        As far as you know, none of the defendants
15 were aware that Messina and Folkers claims to have
16 heard this woman and done nothing about it, right?
17    A  Right.
18    Q  Are there any other investigators that you
19 are aware of who heard this woman and did nothing?
20    A  No.
21    Q  And -- okay.  So other than what you have
22 just stated, is there any other evidence you have
23 that causes you to believe that this was related
24 to your race?

174

1     A  No.
2     Q  And you said that you think it's due to
3 the -- I think you said, quote, lawsuit and
4 everything that's going on or something to that
5 effect, right?
6     A  Right.
7     Q  So the lawsuit presumably is this lawsuit;
8 is that right?
9     A  Yes.
10    Q  And when you say "and everything," what do
11 you mean by that?
12    A  As far as Shields getting ready to -- as
13 far as the court, the court situation with me and
14 Winston and Rico and Shedor.
15    Q  So when you're saying the "court
16 situation," are you referring to the merit board?
17    A  Yes, I'm referring to the merit board,
18 yeah.
19    Q  So you are saying you think that -- and
20 you know, I'm not trying to put words in your
21 mouth.  I'm trying to understand what you are
22 saying.
23        Are you saying that you think you were
24 singled out for discipline related to the child

**175**

1 abduction issue because you had the case pending
2 before the merit board related to the court
3 subpoena issue?
4 **A Yes.**
5 Q Anything else?
6 **A Me witnessing Shields get ready to hit**
7 **Winston in the face.**
8 Q Okay. And Shields did not hit Winston in
9 the face, right?
10 **A Right. He was close to it, yeah.**
11 Q He did not hit him in the face, though,
12 right?
13 **A He didn't because Director Brady pulled**
14 **him.**
15 Q Okay.
16 **A Pulled his elbow into his office, but no.**
17 **He did not hit him.**
18 Q So you are saying that the fact that you
19 witnessed that, you believe led to you receiving
20 discipline in which it's alleged that you heard
21 this woman crying for help related to her child
22 being abducted and didn't do anything, right?
23 **A Yes.**
24 Q So other than those three things that

**176**

1 we've just discussed, are there any other facts
2 that lead you to believe that you were, quote
3 unquote, singled out related to the child
4 abduction issue, that you were singled out for
5 discipline?
6 **A No.**
7 Q We have discussed everything that you
8 allege is discriminatory or retaliatory about that
9 incident, right, that discipline?
10 **A Yes.**
11 Q And I think you said OPR is still
12 investigating that case?
13 **A Yes.**
14 Q So discipline is not final in that case?
15 **A Right.**
16 Q So you have not received any discipline
17 related to the child abduction issue?
18 **A Just being transferred to Division 5 out**
19 **of my unit.**
20 Q Who was responsible for making the
21 decision to transfer you out of EM?
22 **A Director Carmen Ruffin.**
23 Q Is that a man or a woman?
24 **A Woman.**

**177**

1 Q And why did Director Carmen Ruffin elect
2 to transfer you out of the unit, if you know?
3 **A I don't know.**
4 MR. LEINENWEBER: If we can go to
5 interrogatory 4 here.
6 Q So we asked you to identify the complaints
7 or grievances you made regarding the discipline
8 that you alleged, and you indicated that you filed
9 a grievance and it remains pending, right?
10 **A Right.**
11 Q Is there -- are there any other complaints
12 or grievances that you made regarding the
13 discipline that you allege was discriminatory in
14 your lawsuit?
15 **A No.**
16 Q I'm sorry. What was your answer?
17 **A You said 2015?**
18 Q So let me just strike that, and I'll ask
19 it again so we make sure we get a clear answer.
20 Are there any other complaints or
21 grievances that you made to anybody regarding
22 discipline that you allege was discriminatory in
23 this lawsuit?
24 **A No.**

**178**

1 MR. LEINENWEBER: Let's go to
2 Interrogatory Number 5 here. This one stretches
3 over these two pages, so we're going to -- let's
4 take it in two parts here.
5 That's pretty good actually.
6 Q So for 5, we asked you to identify the
7 similarly-situated nonminority officers who did
8 not receive discipline as you allege you received
9 in the complaint. Okay.
10 And then here in the answer, you said, see
11 response to Interrogatory Number 2. Okay.
12 MR. LEINENWEBER: Can we scroll up to the
13 response to Number 2 for a second.
14 Q If we look at this response here, there's
15 no individuals identified in this response, right?
16 **A Right.**
17 Q It says here that you have knowledge that
18 other white investigators have been allowed to do
19 so. And that would be the folks that we talked
20 about earlier, right? That was Anson, Pemonte,
21 Messina and Folkers, right?
22 **A Right.**
23 Q So anybody else that you allege was a
24 similarly-situated nonminority officer who did not

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

29 (179 to 182)

179

1  receive discipline for the using of tour of duty
2  time?
3     A  Not that I can recall.  I don't
4  know -- no.
5       MR. LEINENWEBER:  If we can scroll back
6  down to 5.  Thank you, Juliet.
7     Q  And then the second part of this response
8  here, you said:  Plaintiff further states that
9  Investigators Nickle, Bieniek, Shedor, Bosques,
10 Pemonte, Folkers, Vasquez, Lopez, Rico and
11 Hurtado --
12       MR. LEINENWEBER:  Off the record.
13       (Discussion off the record.)
14    Q  You indicate that these individuals were
15 rarely assigned to TSS, right?
16    A  Oh, yeah.
17    Q  But that doesn't have anything to do with
18 the discipline, right?
19    A  Well, I will say the discipline, Shedor
20 was assigned down there more when he was put into
21 that situation with me and Winston and Rico.  They
22 started putting him down there, because of -- what
23 do you call it?  Trying to -- what do you call
24 that?  What's the word I'm looking for?  Because

180

1  of the situation he was with us on as far as that
2  court thing.
3     Q  You are talking about the --
4     A  Trying to punish him, but then they took
5  him out of there, so -- but other than that, the
6  main people that you hardly never -- that never
7  came down was those people, especially Bosques.
8  Bosques never been down there.  He never been
9  down.
10    Q  Is Bosques white?
11    A  Yes.
12    Q  He's Caucasian?
13    A  Yes.
14    Q  Is he Latino?
15    A  Huh?
16    Q  Isn't he Latino?
17    A  Bosques?
18    Q  Yeah.
19    A  Looks to me like he's white.
20    Q  Okay.  And then getting back to this
21 response paragraph 5 here, again, you are
22 responding regarding the assignment issue, not
23 discipline, right, here in this response?
24    A  Right.

181

1     Q  Any other similarly-situated nonminority
2  officers that you can identify for us today who
3  did not receive discipline for conduct for which
4  you did receive discipline?
5     A  Just the ones I named.
6       MR. LEINENWEBER:  Let's go to
7  Interrogatory 6.
8     Q  We asked you to identify positions you
9  were assigned to that you allege was
10 discriminatory.  And here you responded by saying
11 you were consistently assigned to TSS, whereas
12 other white investigators with less seniority were
13 not.  Right?
14    A  Right.
15    Q  And we talked about that fairly
16 extensively earlier today?
17    A  Yes.
18    Q  Is there anything additional that supports
19 your contention that this assignment to TSS was
20 based on race?
21    A  It was based on race.
22    Q  Sorry?
23    A  I said it was based on race.
24    Q  That wasn't my question, though.  My

182

1  question is:  Are there any other facts or
2  evidence that you can offer to us today in support
3  of your contention that the assignment you
4  received to TSS was based on your race?
5     A  No.
6       MR. LEINENWEBER:  Let's go to
7  Interrogatory 7.
8     Q  And this one here asks you to identify the
9  similarly-situated nonminority officers who were
10 not assigned to the positions you were assigned
11 to.
12       And you responded:  See response to
13 Interrogatory Number 5, and investigation
14 continues.
15       So first, I want to ask you:  Have you
16 done any investigation or do you need to do any
17 investigation to answer this question?
18    A  No.
19       MR. LEINENWEBER:  Let's go to 5 because
20 that lists the individuals here related to the
21 assignment.  Okay.  We just need the response, if
22 you could make that a little -- perfect.
23    Q  Okay.  So here the individuals you have
24 identified who you say were rarely assigned to TSS

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

183

1 are the officers that you list here.  Okay.  So
2 you listed Nickle.  Is Nickle white?
3     A  Yes.
4     Q  And was Nickle ever assigned to TSS?
5     A  No, him or his partner.
6     Q  Let's just talk about Nickle for a second.
7 Okay.  You are saying Nickle never was assigned to
8 TSS, right?
9     A  Right.
10    Q  Did Nickle work the same watch as you?
11    A  Yes.
12    Q  Did he have the same off days as you?
13    A  No.
14    Q  How do you know that Nickle did not work
15 TSS on days in which you weren't there?
16    A  I don't know that.  I can only speak for
17 the days I was there.
18    Q  Why on the days that you were there --
19 sorry.  Strike that.
20       Who made the decision not to assign Nickle
21 to TSS?
22    A  I guess whatever chief or whatever chief
23 had the -- did the roster.
24    Q  Why was Nickle not assigned to TSS?

184

1     A  Because he was white.
2     Q  How do you know that?
3     A  Because it was always blacks down there.
4     Q  That's not my question, though.  Okay.  My
5 question is more specific than that.  Why was
6 Nickle not assigned to TSS?
7     A  Because of the racist situation going on.
8 I don't know.  I guess there was a racist
9 situation going on between patrolling and TSS and
10 people assigned down there.
11    Q  Do you know if Nickle was good at doing
12 the TSS job?
13    A  I don't know.
14    Q  Do you know if he was bad at doing the TSS
15 job?
16    A  I don't know.
17    Q  Is it possible that Nickle was just really
18 bad at working at TSS?
19    A  I don't know.
20    Q  And so you believe, though, that he was
21 not assigned to TSS because he's white?
22    A  Yes.
23    Q  And what evidence other than his having
24 not worked there on days that you worked there do

185

1 you have to support that allegation?
2     A  Because every time I worked and he worked,
3 they always assigned him to the north suburbs or
4 the northeast suburb, and then if he was
5 assigned -- if they assigned him to the south
6 side, he would take lunch on the north side, which
7 was unheard of, and we couldn't do that.
8     Q  Do you have any evidence to support your
9 allegation that Nickle was not assigned to TSS
10 because he was white other than the facts that you
11 never saw him work there?
12    A  No.
13    Q  What about Bieniek, same question?
14    A  No.
15    Q  Did you ever see Bieniek work in TSS?
16    A  No.
17    Q  Do you know who made the decision not to
18 assign him to TSS?
19    A  A chief, I guess.
20    Q  Do you know why Bieniek was not assigned
21 to TSS?
22    A  I guess same reason.  I don't know.
23    Q  Shedor, was Shedor ever assigned to TSS?
24    A  Yes.

186

1     Q  He was.  In fact, I think you said that he
2 worked there kind of frequently after the court
3 issue, right?
4     A  Yes, as a punishment.
5     Q  And so -- okay.  And do you know -- sorry.
6 Strike that.
7       Who made the decision to assign Shedor to
8 TSS?
9     A  Lieutenant Collins, I think.
10    Q  Why did Lieutenant Collins decide to
11 assign Shedor to TSS?
12    A  I don't know.
13    Q  What about Bosques, did Bosques ever work
14 in TSS?
15    A  No.
16    Q  And who made the decision not to assign
17 Bosques to TSS?
18    A  Chief or supervisor or lieutenants and
19 sergeants.
20    Q  Why did they decide not to assign Bosques
21 to TSS?
22    A  I don't know.
23    Q  Was Pemonte ever assigned to TSS?
24    A  Maybe once or twice.

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

187

1    Q  So a few times Pemonte was assigned to
2  TSS?
3    **A  Yes.**
4    Q  You were working at those times?
5    **A  Yes.**
6    Q  And who assigned him to TSS?
7    **A  Supervisors or lieutenants or whoever.**
8    Q  So I mean you don't know, right, like
9  specifically who made these decisions to assign
10 any of these individuals to TSS, right?
11   **A  I don't know.**
12   Q  You don't really know what the actual
13 reason was that they assigned these individuals to
14 TSS or to a different assignment?
15   **A  Right.**
16   Q  Pemonte, you said he worked there a few
17 times in TSS, right?
18   **A  Yes.**
19   Q  And on days when he wasn't working there,
20 do you know why he was not assigned to TSS?
21   **A  Because he said he didn't want to learn**
22 **how to do anything down there and he wasn't doing**
23 **anything down there.  He wasn't helpful, so they**
24 **put him back on the street.**

188

1    Q  What about Folkers, did Folkers ever work
2  in TSS?
3    **A  Couple times.  Maybe a couple of times,**
4  **maybe once or twice a year.**
5    Q  And on those occasions where he did work
6  in TSS, why was he assigned there, if you know?
7    **A  I don't know.**
8    Q  Do you know who made the decision to
9  assign him TSS?
10   **A  It had to be somebody in a supervisory**
11 **position or chief position or something.**
12   Q  On the days when Folkers was not working
13 in TSS, do you know why he was not assigned to
14 TSS?
15   **A  I don't know.**
16   Q  And then Vasquez, what's Vasquez's race?
17   **A  Mexican.**
18   Q  And was Vasquez ever assigned to TSS?
19   **A  Yes.**
20   Q  And why was Vasquez assigned to TSS?
21   **A  As a punishment.**
22   Q  Punishment for what?
23   **A  I guess something him and his partner**
24 **probably did on the street or they didn't do**

189

1  **enough jobs that satisfied the supervisors, so**
2  **they would put them down in TSS, but they wouldn't**
3  **be, like there like we were, probably once**
4  **or twice or if it was two months or whatever,**
5  **three months, whatever.**
6    Q  And when Vasquez was not assigned to TSS,
7  do you know why it was decided that he would not
8  be assigned to TSS and he would do something else?
9    **A  I don't know.**
10   Q  What about Lopez?  First of all, what's
11 Lopez's race?
12   **A  Mexican.**
13   Q  And was Lopez ever assigned to TSS?
14   **A  No.**
15   Q  Why was Lopez not assigned to TSS?
16   **A  I think Lopez was -- I think he was**
17 **de-deputized at one time, but before that, he**
18 **never went down to TSS.  He was always on the**
19 **street, and then after he was done with the**
20 **investigation, he was on the street or in the**
21 **office.  He never was down in TSS.**
22   Q  Who made the decision not to assign him to
23 TSS?
24   **A  Supervisors or chiefs or whatever.**

190

1    Q  Why did they make that decision?
2    **A  I don't know.**
3    Q  Rico I think is the next one.  Rico,
4  what's Rico's race?
5    **A  Mexican.**
6    Q  And was Rico ever assigned to TSS?
7    **A  Sometimes.**
8    Q  And do you know why he was assigned to
9  TSS?
10   **A  I don't know why he was assigned to TSS.**
11 **I don't think they got along with Rico, but I**
12 **don't know the reason they put him down in TSS or**
13 **on the street or what they did.**
14     **Rico, he was on the street more than he**
15 **was downstairs, I know that.**
16   Q  You don't know why it was decided that he
17 would be on the street instead of TSS?
18   **A  I actually think because he was in the**
19 **same situation as Shedor, me and Winston, they put**
20 **him downstairs, but then they took him from**
21 **downstairs and put him back on the street.**
22   Q  Do you know why he was put on the street?
23   **A  I don't know.**
24   Q  What about Hurtado?  What's Hurtado's

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

191

1  race?
2  **A I think he's Mexican.**
3  Q Was Hurtado ever assigned to TSS?
4  **A Couple times, maybe a couple times.**
5  Q Do you know why Hurtado was assigned to
6  TSS?
7  **A The same, I think the same way they**
8  **treated Vasquez. They were partners, so if there**
9  **was something they didn't like that they done,**
10 **they would put them down in TSS, but, then again,**
11 **they wouldn't be down there but for maybe a day or**
12 **two or something like that.**
13 Q And when they were not assigned -- when
14 Hurtado was not assigned to TSS, where was Hurtado
15 assigned?
16 **A Patrol.**
17 Q Do you know who made the decision to
18 assign him to patrol on those occasions?
19 **A Supervisors.**
20 Q But you don't know which supervisor?
21 **A I don't know which supervisor.**
22 **Supervisor, chiefs. It was either supervisor,**
23 **chief, deputy chief, lieutenant, sergeants.**
24 Q And you don't know why they chose to

192

1  assign Hurtado to the street, right?
2  **A No.**
3  Q What about Messina, did Messina ever work
4  TSS?
5  **A Him and Folkers was partners, so if**
6  **Folkers was down there, he came down, but, like I**
7  **said, they was only down there for a day or two.**
8  **They always was on the street.**
9  Q Okay. Do you know who made the decision
10 to typically have them on the street?
11 **A Somebody in a supervisor's position.**
12 Q Do you know why it was decided to
13 typically have Messina on the street?
14 **A I don't know, but they were only -- they**
15 **were on the street like -- I mean down in TSS**
16 **maybe for a half day. It wasn't a whole day, you**
17 **know. If they came down, it was only half a**
18 **day --**
19 Q Why was that?
20 **A -- and then back on the street. I don't**
21 **know.**
22 Q And you don't know why they would be --
23 when Messina would be assigned to the street
24 instead of TSS?

193

1  **A I don't know.**
2  Q What about -- is it Laughran, which I
3  think is spelled -- boy, I don't know how to spell
4  it. Do you know how to spell that?
5  **A No.**
6  Q Is it John Laughran?
7  **A John Laughran.**
8  Q So that's L-A-U-G-H-R-A-N.
9  And was Laughran ever assigned to TSS?
10 **A Couple times.**
11 Q Do you know why on those occasions that
12 Laughran was assigned to TSS?
13 **A I don't know why.**
14 Q And when Laughran was not assigned to TSS,
15 do you know why he was being assigned somewhere
16 else?
17 **A I don't know.**
18 Q You wrote investigation continues here as
19 well. Is there any -- have you done any further
20 investigation or need to do any further
21 investigation into that?
22 **A No.**
23 MR. LEINENWEBER: Let's go to Number 8,
24 please.

194

1  Q And this one asks you to identify all
2  duties and assignments that you allege were
3  discriminatory. And you referenced Interrogatory
4  Number 5, which we already talked about. And then
5  said Ranzino, Neal, and Rohloff were responsible
6  for assignments, right?
7  **A Uh-huh, yes.**
8  Q Other than what you wrote in response to
9  Interrogatory 5 and what we've discussed here
10 today about being assigned to different
11 assignments like TSS or patrol, are there any
12 other facts which support your contention that you
13 were assigned to TSS because of your race?
14 **A No.**
15 MR. LEINENWEBER: And then go to
16 Interrogatory 9.
17 Q This asks you to identify the offensive
18 derogatory language that you allege was used. I'm
19 just curious here. You wrote investigation
20 continues, right?
21 **A There was no need for investigation**
22 **continues.**
23 Q Right. You didn't really answer this
24 question, right?

195

1    A  What's that question again?
2    Q  The question is Number 9:  If not answered
3  above, identify each and every instance in which
4  any of the defendants used offensive, derogatory,
5  or racist language towards you as alleged in the
6  complaint, right?  Do you see that language?
7    A  Yes.
8    Q  So why didn't you answer this question?
9    A  You are talking about when Shields used
10 the N word?
11   Q  No, sir.  I have a very straightforward
12 question for you.  Okay.  Question 9 asks you to
13 identify each and every instance in which one of
14 the defendants used racist language with you, and
15 you did not answer that question.  I would like to
16 know why you did not answer it.
17   A  I don't know.
18   Q  Is there some reason you couldn't have
19 answered it?
20   A  I probably missed it.  I don't know.  I
21 don't know.  I really don't know.
22   Q  It just strikes me as odd to hear in your
23 deposition today that Shields was using the N word
24 with you on a regular basis and you did not see

196

1  fit to put that in your response to
2  Interrogatory 9 here.
3      MS. FLEMING:  I'm going to object.  Is
4  that a question?
5    A  I don't know.  I don't know.  I don't
6  know.  I just said I don't know.
7      Hello?
8    Q  Yeah.  I'm here.
9      MR. LEINENWEBER:  Let's go on to
10 Interrogatory 10.
11   Q  This asks you to describe what you mean by
12 high incident areas.  We've discussed that, that
13 you think some areas are nicer, some areas are not
14 so nice.
15     Are there any other facts that you have
16 which support your contention that you were
17 assigned to high incident areas on the basis of
18 your race?
19   A  No.
20     MR. LEINENWEBER:  Let's go to 11.
21   Q  This one asks you to identify the
22 protected activities you engaged in.  I think we
23 already discussed this in terms of internal
24 complaints or grievances or things that you may

197

1  have filed or reported to anyone.
2      You identified for me earlier the
3  grievance you filed related to the July 2015 court
4  subpoena and then the grievance you filed related
5  to the October 2018 child abduction, right?
6    A  Yes.
7    Q  Are there any other types of complaints
8  you made or grievances you filed or memorandums or
9  anything that you created related to your
10 contention that you were either disciplined
11 because of your race or assigned somewhere because
12 of your race?
13   A  No.
14     MR. LEINENWEBER:  And can we go to
15 Interrogatory 12.
16   Q  This one asks you to identify each
17 instance that Director Shields -- sorry.  Strike
18 that -- each instance that Defendant Shields
19 threatened to fire you.
20     We talked about that already.  It turned
21 out that doesn't really apply to you, right,
22 because Director Shields didn't threaten to fire
23 you?
24   A  No.

198

1      MR. LEINENWEBER:  And then
2  Interrogatory 13, if we could go to that.
3    Q  We asked you here to identify all of the
4  retaliation that you allege you suffered as a
5  result of your protected activities, and you just
6  wrote, see complaint, investigation continues.
7      Is there any retaliation you allege you
8  suffered as a result of your protected activities
9  in this case?
10   A  Other than the 2018 incident and the July
11 '15, no.
12   Q  So help me with -- so the July 2015, what
13 was that retaliation for?  Strike that.  Let me
14 start over again.
15   A  Court.
16   Q  Strike that for a second.
17     July 29, 2015, is when you guys tried to
18 use tour of duty slip time for your shift and you
19 were told by O'Malley that you can't do that, you
20 have to come in to work, right?
21   A  Right.
22   Q  You are saying that that was retaliation?
23   A  Yes.
24   Q  What was that retaliation for?

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

34 (199 to 202)

199

1    A  For when Shields couldn't -- didn't -- he
2  couldn't find our three-part forms.  He kept
3  giving excuses to Chief Neal and to his secretary,
4  Erica.
5        When we was inquiring about our three-part
6  forms that we never got paid or time for being in
7  court that day, he always said he misplaced them,
8  four times.  He always told them to tell them I
9  misplaced them.
10        So once Winston saw Shields in the hallway
11  and then in the office when he started inquiring
12  about asking him about the past practices of using
13  court as our tour of duty, whatever happened to
14  that, and after that situation got so out of hand
15  and everything, and Shields put his hand in
16  Winston's face or almost hit him or whatever.
17        I'm standing there and witnessing this,
18  and Chief Laughran and Director Brady, and when he
19  pulled Shields in his office, told him, LeGrain,
20  you can't do this, you can't put your hand in this
21  man's face like that.
22        And when Winston wrote him up because he
23  did that and sent it to OPR, all of a sudden the
24  three-part forms that we have been asking about

200

1  for about a month or two reappeared and ended up
2  in OPR saying we stole time, but how can we steal
3  the time when something that we never even got.
4        We never got paid from that day.  We never
5  got no time from that day, but they said we stole
6  time and we never did.
7        And when we went to the Loudermill
8  hearing, Erica, which is Shields' secretary, gave
9  us our attendance sheets, told us to present this
10  to the guy that's leading the Loudermill hearing.
11        And when we did, he said, what is this?
12  Is this you all's attendance sheets?  Yes, sir.
13  He said, you mean to tell me you all worked that
14  day?  I said, yes, sir.  He said, you mean to tell
15  me you all worked from 3 to 11 that day?  Said,
16  yes, sir.
17        Shields never knew that we had worked.  He
18  thought we just still took off and just
19  disregarded what was told to us that we couldn't
20  do it, which he thought we steal work.
21        He never knew that we worked.  He didn't
22  know we did.  He thought we didn't work, but we
23  did, and that's why the guy told us to go back to
24  work, and it's been five years since then that we

201

1  still been working.  So...
2    Q  And so what's the retaliation aspect of
3  that?
4    A  The three-part forms that we had turned
5  in, he kept telling us --
6    Q  But what did you do initially?  You are
7  saying basically that he purposely lost the
8  three-part form that you turned in, right?
9    A  He purposely lied and said that --
10    Q  And lied about it, okay.  So what was that
11  in retaliation for?  What had you guys done prior
12  to that?
13    A  After he put his hand in Winston's face
14  and me standing there witnessing that he did that
15  and Winston wrote him up and sent that over to
16  OPR, now all of a sudden he retaliated on Winston
17  and me for Winston taking that report to OPR and
18  reporting him that he had did that to him.
19    Q  Okay.
20    A  Putting those three-parts in saying that
21  we stole time.
22    Q  Your allegation is that the reason you
23  were written up for the stealing time incident is
24  because you were a witness and participated, I

202

1  guess, in the OPR investigation into Winston and
2  Shields having an argument in which, as you say
3  it, Shields tried to hit Winston?
4    A  Yes.
5    Q  Anything else?
6    A  That's it.
7    Q  Is there any other retaliation you allege
8  you suffered?  I think you said that the -- what
9  was the October of 2018, what was that in
10  retaliation for?
11    A  From I am being singled out.
12    Q  I understand you were singled out.
13    A  There was other guys out there --
14    Q  Why --
15    A  -- other than me due to the fact that what
16  happened with Winston and due to the fact of this
17  lawsuit right here that's going on that he's
18  involved in, and I just happened to be in all of
19  this and happened to be out there when he says
20  that this is going on with that child abduction, I
21  mean.
22    Q  So let me just stop you for a second
23  because I think we're -- this is going to take
24  longer if we don't kind of focus here.

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

203

1    So you getting written up for the child
2 abduction incident, okay, you contend that Shields
3 did that, right?
4    **A   Yes.**
5    Q   And Shields retaliated against you for
6 something, right?
7    **A   For that, yeah.**
8    Q   And are you saying that Shields retaliated
9 against you for that because of the time you
10 witnessed him and Winston get into it and you
11 participated in the OPR investigation?
12    **A   Yes.**
13    Q   Was that write up -- when Shields wrote
14 you up for the child abduction issue, was that
15 retaliation for anything else?
16    **A   No, just that and this lawsuit that's**
17 **going on now too.**
18    Q   You allege that Shields was upset that you
19 filed this lawsuit against him, and so he filed
20 a -- he wrote you up for that issue?
21    **A   Yes, sir.**
22    MR. LEINENWEBER:  Sorry.  Just need one
23 second here.
24    Q   One of the things that you allege in your

204

1 interrogatory responses is that the defendants
2 would -- how did you put it?  Give me one second
3 here.
4    MR. LEINENWEBER:  Actually, can you just
5 put back up Exhibit 2.  Thanks.  And then go to
6 16.
7    Q   You say in here:  Plaintiff states that
8 Chief would grant certain requests when asked by
9 white investigators and deny the same requests
10 made by African-American investigators.  Do you
11 see that?
12    **A   Which one are we looking at here?**
13    Q   16, the response to 16.
14    **A   Yes.**
15    Q   Who is the chief?
16    **A   Probably be Chief Rohloff or Chief**
17 **Ranzino.**
18    Q   And what are the requests that you are
19 referring to?
20    **A   Time off, like vacation day or personal**
21 **day or a couple of days off or something like**
22 **that.**
23    Q   And chief was either Ranzino or Rohloff?
24    **A   Yes.**

205

1    Q   So you are saying that you would ask
2 Ranzino or Rohloff for time off and they would
3 deny that request?
4    **A   Yes.**
5    Q   When did you request time off from Rohloff
6 or Ranzino and have it denied?
7    **A   Maybe around my birthday, maybe around**
8 **Christmas or Thanksgiving or maybe sometime in the**
9 **summertime, something like that, or my wife's**
10 **birthday or just to be off for a couple of days to**
11 **get my mind right.**
12    Q   Why did they deny your request?
13    **A   Because they said the calendar is full.**
14    Q   What does that mean, that the calendar is
15 full?
16    **A   They already had -- there's only supposed**
17 **to be three people off.  It was three people**
18 **already on the calendar be off, but I don't know**
19 **about, you know, Rohloff, but Ranzino, he would**
20 **open it up for certain people, certain guys,**
21 **certain white guys.**
22    Q   What does that mean?
23    **A   If he -- they might give him $50 to let**
24 **them have that day off.**

206

1    Q   You are going to have to explain this to
2 me because you are kind of -- this is not clear.
3    So you are saying that certain individuals
4 would pay Rohloff $50 to get a day off?
5    **A   Ranzino.**
6    Q   Okay.  So certain individuals would pay
7 Ranzino $50 to get a day off?
8    **A   Right.  He wouldn't tell -- it was between**
9 **him and the white guys.  They'd give him when they**
10 **get paid $50 for letting them take off that day.**
11    Q   Okay.
12    **A   But he wouldn't put it on the board.  It's**
13 **just that day that they take off, he give them on**
14 **that day he put it in the book.  He wouldn't put**
15 **it on the board, but he would put it in the book.**
16    Q   Did you ever pay Ranzino for a day off?
17    **A   No, I never knew -- I never knew nothing**
18 **like that was going on until I was told if you**
19 **want a day off, that's what you have to do.  I**
20 **said no.**
21    Q   Who told you that?
22    **A   One of them was Laughran, Cook.  Who else?**
23 **It was a couple more other guys.  I don't think**
24 **they're there no more.**

207

1    Q  But you're -- what you are saying is that
2  if you wanted a day off and the calendar was full,
3  you would have had to pay $50 to Ranzino to get
4  that day off?
5    A  Yes.
6    Q  Did you ever report that to OPR?
7    A  No.
8    Q  Why not?
9    A  Because, I mean, I think Ranzino by that
10  time he was gone.  I think they had pushed him out
11  or something or transferred him or something like
12  that happened.
13    Q  Is there any other reason why you didn't
14  report it to OPR?
15    A  That's the only reason.  I mean, he wasn't
16  there anymore, and that's all.  That's the only
17  thing I knew.
18    Q  Did you think it was appropriate?
19    A  No.
20    Q  Then why wouldn't you report that?  You
21  are saying because he was gone from EM?
22    A  Right.  I thought the man had got fired or
23  something like that, and come to find out later
24  on, maybe half a year or a year later, say, he was

208

1  working over in the court building, but I didn't
2  know.
3      I thought he had got fired.  That's the
4  word that was going around, that he got fired, but
5  I didn't know.
6    Q  Okay.
7    A  I never saw him again.
8    Q  Were you there the day that Ranzino had
9  the incident with Winston in rollcall?
10    A  I don't know.
11    Q  You don't know.  Do you remember Ranzino
12  and Winston having any kind of an issue in
13  rollcall?
14    A  There was -- I can't recall that incident.
15    Q  Let me ask you this:  Why did you think
16  that Ranzino got fired?
17    A  It was a couple -- it was a couple of
18  things that happened in rollcall with Ranzino,
19  with the investigators, and he said a couple of
20  investigators, one of them was late coming in.
21  Maybe he stopped to get some condoms for his
22  partner to have sex with him.
23      Then he said something about another
24  investigator's family, mother or something, Davis,

209

1  I forgot, something like that.
2      Winston's situation, I don't know.  I
3  can't remember.
4    Q  Okay.  Any other types of requests that
5  you allege that Rohloff or Ranzino would grant for
6  white investigators but not for black
7  investigators other than this day off time?
8    A  No.
9    Q  Number 17 here, we asked you to identify
10  the policy, practices or decisions that you allege
11  have a disparate impact on plaintiffs based on
12  their race.  Give you a second to read this.
13      You identified here in response, you said:
14  Policy, practices, decisions related to
15  assignments, placements of investigators,
16  responses to certain kinds of requests.  I'm
17  assuming the assignments we are talking about are
18  assignments to TSS or assignments to sort of more
19  high incident areas of Cook County, right?
20    A  Yes.
21    Q  Any other types of assignments that you
22  are alleging here?
23    A  No.
24    Q  What about the requests, responses given

210

1  to certain kind of requests?  We just talked about
2  those, right, it's just the days off that you had
3  to pay 50 bucks to get?
4    A  Right.
5      MR. LEINENWEBER:  You can put that one
6  aside, and then can we just go right into
7  Exhibit 3, unless anybody needs a break.
8      THE WITNESS:  How much longer?
9    Q  Let's pull up Exhibit 3.
10      (Exhibit 3 marked for
11      identification.)
12    Q  And Mr. Ferguson, do you see this document
13  here that we've marked Ferguson 3 in front of you,
14  titled Plaintiff Ferguson's Objections and Answers
15  to Defendant Sheriff of Cook County's First Set of
16  Interrogatories?
17    A  Okay.
18    Q  Do you recognize this document?
19    A  Yeah.
20    Q  These are your interrogatory responses,
21  right?
22    A  Yes.
23      MR. LEINENWEBER:  And, Juliet, if we could
24  go to the verification page, which should be the

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

37 (211 to 214)

211

1  last page, I believe.
2      Q  And that's your signature again, right,
3  Mr. Ferguson?
4      A  Yes.
5      Q  You signed it on 3-13-2020?
6      A  Yes.
7      Q  And you said, declare under penalty of
8  perjury that the foregoing is true and correct,
9  right?
10     A  Yes.
11        MR. LEINENWEBER:  If we could go to
12  Number 12.
13     Q  So here this is in reference to your
14  allegation that the Cook County sheriff doesn't
15  adequately discipline, supervise or control its
16  supervisory officers.  You responded that:
17  Supervisors in the EM unit arbitrarily issued
18  discipline to African-American investigators and
19  were never held accountable for issuing erroneous
20  discipline after EM investigators filed numerous
21  grievances and complaints.
22     A  Yes.
23     Q  So, first of all, who are the supervisors
24  you are referencing here?

212

1      A  Like Rohloff, Ranzino.
2      Q  Anyone else?
3      A  Chief Neal.
4      Q  Anybody else?
5      A  No.
6      Q  What discipline did Rohloff arbitrarily
7  issue as far as you know?
8      A  I can't recall any of them right now.  I
9  can't remember.  I can't remember.
10     Q  What about Ranzino, what erroneous
11  discipline did he issue or arbitrary discipline
12  did he issue?
13     A  I can't remember him either.  I can't
14  remember all that stuff he did either.
15     Q  What about Neal, same question?
16     A  Same thing.
17     Q  It's fair to say, though, that none of
18  these three guys issued any erroneous or arbitrary
19  discipline to you, right?
20     A  No.
21     Q  No, that's not fair or no, they didn't?
22     A  No, they didn't.
23        MR. LEINENWEBER:  And we can go to 13
24  then.

213

1      Q  This question asks you to identify
2  misconduct by supervisory officers that you allege
3  was not fully investigated.
4        Your response at the top of page 7 is:
5  See complaint, investigation continues.
6        Can you identify for me any misconduct by
7  supervisory officers that you allege was not fully
8  investigated?
9      A  Director Shields was asked a question in
10  rollcall about I had -- I asked him in rollcall, I
11  go, Director, is it any way that we can get
12  information sheets about rules and the regulations
13  of electronic monitoring for Hispanic people that
14  can't speak English?
15        He said, well, as far as I'm concerned,
16  past practices from my past director, if you can't
17  speak English, you can't go out on the program.  I
18  don't care if you was Hispanic or what.  If you
19  can't speak English, you can't go on our program.
20        That never happened, because all the rules
21  and regulations we had was in English, and those
22  guys didn't speak English, they mess up on our
23  program and get sent back to jail because they
24  didn't know what their contract said.  You just

214

1  having them to sign something.
2        And I told him that, and a whole bunch of
3  Hispanics put in grievances, wrote a report on
4  Shields, sent it to OPR, but nothing never
5  happened.
6      Q  Was it -- did OPR investigate it?
7      A  Not that I know of.  I haven't heard
8  nothing about that until this day.
9      Q  So you don't know one way or the other,
10  right?
11     A  No.
12     Q  Other than that incident -- and by the
13  way, when did that happen?
14     A  Maybe, I think, maybe 2016, probably or
15  something like that.
16     Q  Can you identify any other misconduct by
17  supervisors that you allege wasn't properly or
18  fully investigated?
19     A  I don't even think that a situation
20  with -- that happened to Winston and Shields was
21  properly investigated.
22     Q  Okay.  What incident are you talking
23  about?
24     A  When he put his hand in his face.  I don't

215

1  think my situation --
2      Q  Let's stick with that one for a second.
3  Was that reported to anyone at the sheriff's
4  office?
5      A  When he put his hand in Winston's face?
6      Q  Yes.  Let's talk about that.
7      A  Yes.
8      Q  That was reported?
9      A  Yes.
10     Q  Who was it reported to?
11     A  OPR.
12     Q  What did OPR do, if anything?
13     A  I don't think they found anything.
14     Q  That wasn't my question.  Okay.  Listen
15  carefully to my question.
16         What, if anything, did OPR do in response
17  to that complaint?
18     A  In response to Winston putting a complaint
19  in on Shields?
20     Q  Yes.
21     A  I don't think nothing came about that.  I
22  don't think.
23     Q  I'm not asking what the result is.  I'm
24  just asking --

216

1      A  I don't know.
2      Q  -- whether or not did they do anything in
3  response to that?
4      A  They haven't did nothing as far as I know.
5      Q  Do you know if they did an investigation?
6      A  I don't know.
7      Q  Did you give any kind of statement to OPR?
8      A  I didn't.
9      Q  Did Winston give a statement to OPR?
10     A  Yes.
11     Q  It's probably fair to assume that some
12  kind of an investigation did take place then,
13  right?
14     A  I guess.  I'm not sure.
15     Q  And do you know whether or not OPR reached
16  any kind of conclusion related to that
17  investigation?
18     A  I don't know.
19     Q  Do you know whether or not they took any
20  kind of discipline steps against Director Shields
21  related to that investigation?
22     A  I don't know.
23     Q  What other supervisory misconduct do you
24  allege was not investigated?

217

1      A  Investigated or investigated right?
2      Q  Well, let's start with -- let's see.  You
3  say, properly fully investigated, so you are
4  right.  Not properly and fully investigated.  So
5  let's use the right language here.
6         Any other misconduct by supervisory
7  officers that you allege was not properly or fully
8  investigated by the sheriff's office?
9      A  Yes, that attempted child abduction.
10     Q  So you are saying that was not properly
11  and fully investigated?
12     A  No, it wasn't.
13     Q  Who -- all right.  In what way was that
14  not properly and fully investigated?
15     A  Because after I called and told
16  Investigator Jackson to pull my body cam and give
17  it to Director Webb and go online to see if I
18  pulled up anything, if I got anything on my body
19  cam that can help Chicago out with the case, and
20  after I talked to Chicago, they interviewed me,
21  nobody from my unit ever interviewed me.
22         They never even asked me a question.  They
23  never asked me what happened.  They never said
24  anything, nothing.  Nobody from my unit, no

218

1  supervisor, no lieutenant, no sergeant, no chief,
2  no director, nobody.
3      Q  Okay.  And so --
4      A  The next thing I know, a year passed and I
5  get an email stating that I am a witness.  I
6  couldn't even have been no witness.
7         Then they told me you're not a witness.
8  You have been accused.
9      Q  Right.  That was from whom?
10     A  That was from OPR.
11     Q  From OPR.  Okay.  So do you have some
12  reason to believe that your supervisors should be
13  the ones investigating this?
14     A  They should.  If they had talked to me and
15  asked me questions and everything, they would have
16  known that I shouldn't even have been wrote up.  I
17  didn't know anything had happened like that.
18     Q  That investigation you said is still
19  ongoing, right?
20     A  Yes, sir.
21     Q  So isn't it maybe premature to say that
22  the investigation wasn't proper or full if it has
23  not been completed yet?
24     A  Yes, because it should never have been

**219**

1  this way in the beginning.
2      Q  I understand that.  That's not the issue
3  we are talking about here.
4          You are saying that the investigation
5  wasn't proper and full.  Okay.  And the question
6  is isn't it premature --
7      **A  I guess not.  You are right.**
8      Q  Okay.  It's premature to say that that
9  wasn't a full and complete investigation, right?
10     **A  Right, yeah.**
11     Q  So then other than the three we've now
12 spoken about, is there any other supervisor
13 misconduct that you allege was not properly or
14 fully investigated?
15     **A  No.**
16     Q  And let's see.
17     **A  Can I cut this and use the restroom or**
18 **something?**
19     Q  Yeah, of course.  You want to take five
20 minutes?
21     **A  Yes.**
22     Q  Okay.  Yes.  That's fine.  It's 2:18.
23 Just come back in five minutes.
24     **A  Okay.  All right.**

**220**

1          (A recess was had.)
2  BY MR. LEINENWEBER:
3      Q  Mr. Ferguson, back on the record here.
4  Let's talk about -- actually, let's pull up
5  Exhibit 3 and go to response 3.  And Number 3
6  here, this one asks you to identify, provide a
7  detailed computation of the damages that you
8  allege you have suffered and each category of
9  damages here.
10         You said:  Please see plaintiff's initial
11 Rule 26 (a)(1) disclosures, and then plaintiff
12 seeks compensation for lost wages, opportunities,
13 promotions, raises, benefits, future retirement
14 income, litigation expenses, including attorneys'
15 fees and other compensatory or punitive damages
16 for humiliation, mental and emotional anguish and
17 distress.
18         Do you see that language there?
19     **A  Yes.**
20     MR. LEINENWEBER:  Let's go ahead and mark
21 Exhibit 4.  Let's just switch to that one for just
22 a second.
23         (Exhibit 4 marked for
24          identification.)

**221**

1      Q  Mr. Ferguson, we've handed you what's been
2  marked as Ferguson Exhibit 4, and this is the
3  Plaintiff's Rule 26 (a)(1) initial disclosures.
4  Do you see that?
5      **A  Yes.**
6      Q  And then if we go to page -- they're not
7  numbered, but I think it's page 4, bottom of 4, it
8  says -- this one asks for a computation of
9  damages, and it says, computation of damages is
10 ongoing.  Plaintiffs will seasonably supplement as
11 required.  Right?
12     **A  Yes.**
13     Q  Do you recognize this document, the 26
14 (a)(1) disclosure?  I'll strike that question.
15 That's all right.
16         Let's just go back to Exhibit 3,
17 Interrogatory 3.  Let's talk about the categories
18 here, so what are the lost wages that you claim
19 you are entitled to in this lawsuit?
20     **A  Wages as far as like promotions and things**
21 **like that?**
22     Q  Well, again.  It's your lawsuit, so I
23 can't really explain what you mean by this lost
24 wage.

**222**

1      **A  Lost wages like --**
2      Q  Yeah, you tell me what you mean by lost
3  wages.  What wages have you lost as a result of
4  the defendants' conduct in this lawsuit?
5      **A  Okay.  Me not taking any test for**
6  **sergeants or lieutenant or going to the fugitive**
7  **unit, taking a test for the fugitive unit, things**
8  **of that nature.  Raises and benefits I still got,**
9  **but just promotions, I can't get and those lost**
10 **wages I was talking about.**
11     Q  Did you say you did get raises?
12     **A  I mean, you still get your little bonus or**
13 **whatever raise or whatever you get every so many**
14 **years or your -- what do you call it, your --**
15     Q  Cost of living?
16     **A  Yeah, stuff like that.**
17     Q  So you said the lost wages then, if I'm
18 understanding you correctly, that you are claiming
19 in this lawsuit are related to promotions that you
20 did not receive?
21     **A  Right, promotions and that I got passed up**
22 **because I couldn't take the test due to me being**
23 **in this merit situation, due to these**
24 **investigations and everything and, you know.**

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

40 (223 to 226)

223

1    Q  So you're saying that you couldn't take
2  the test for promotion to sergeant and lieutenant
3  within the EM unit because of the discipline
4  pending before the merit board?
5    A  Right.  You can't do any of that.
6    Q  So it's your understanding you can't take
7  a test for promotion --
8    A  No.
9    Q  -- while you have discipline pending
10  before the merit board?
11    A  Right, sheriff, police, none of that.
12    Q  You also mentioned the fugitive unit?
13    A  Yes.
14    Q  And tell me about that.  You would want to
15  transfer to the fugitive unit; is that right?
16    A  Yes.
17    Q  Because that's an entirely separate unit,
18  right?
19    A  Yes.
20    Q  And is that a promotion or is that a
21  transfer?
22    A  Actually, it's kind of both without a
23  raise because you get to be in plain clothes.
24  Then you get to have your own squad car, so you

224

1  are not using your car, wear and tear, gas and all
2  of that stuff, so actually it is, you know.
3    Q  And then the test to take for sergeant or
4  lieutenant, tell me about that.  What kind of test
5  is that?
6    A  Well, it's not -- within EM, it's not a
7  merit, sergeant, lieutenant.  It's just a sergeant
8  or lieutenant within EM, but you do get a raise.
9  You do get raises.  I mean, you do get a higher
10  salary, a salary, yeah.
11    Q  But my question is about the test.  What
12  kind of test do you have to take?
13    A  I guess --
14    Q  If you know.
15    A  I never even got the chance to even study
16  or look at the proper paperwork for that, so I
17  really don't know.
18    Q  So you don't have an understanding of what
19  kind of test there is?
20    A  No, because really sergeants and
21  lieutenants are new to electronic monitoring.
22    Q  How new?
23    A  Maybe a good three or four years, if that.
24    Q  Is it a written test?

225

1    A  Yes.
2    Q  Is there also a physical test?
3    A  Yes.
4    Q  Do you have any limitations that would
5  preclude you from passing the physical test?
6    A  Not that I know of.
7    Q  For example, are you able to complete like
8  a run in a certain amount of time if needed and
9  all those things?
10    A  Yes.
11    Q  So the promotions that you are contending
12  are -- sorry, strike that.
13    The lost wages that you are contending are
14  at issue here, you are claiming as damages are the
15  promotions to sergeant or lieutenant in EM?
16    A  Right.
17    Q  And do you have to be a sergeant before
18  you become a lieutenant or can you go straight to
19  lieutenant?
20    A  You can go straight to lieutenant.
21    Q  Do you know what the difference in pay is
22  between you and the sergeant position?
23    A  I don't know.
24    Q  Same question for the lieutenant position,

226

1  do you know?
2    A  I don't know.
3    Q  When you say here that in this response
4  that you are also looking for lost opportunities
5  and lost raises, are you referring to this same
6  idea of being promoted into the sergeant or
7  lieutenant position?
8    A  Right.
9    Q  Any other opportunities or raises that you
10  contend you missed out on because of defendants'
11  conduct?
12    A  I don't want you to get confused on
13  sergeant and lieutenant in the EM unit and
14  sergeant and lieutenant in the jail, because those
15  are merit lieutenants and sergeants in the jail.
16  Lieutenant, sergeant in EM, it's non-merit.
17    Q  Yep.  Okay.
18    A  Okay.  So I didn't get a chance to even
19  take those tests either for the jail.
20    Q  Is that something you were trying to do at
21  some point?
22    A  I was trying to decide if that's what I
23  wanted to do.
24    Q  Because those would have been available

227
1 for years and years and years, right?
2    A  Oh, yeah.
3    Q  So I mean, at any point really since 1992
4 prior to your court subpoena, time stealing issue,
5 you could have applied and taken the sergeant's
6 test, for example, right?  The merit sergeant's
7 test.
8    A  Actually, then I wanted to go to the
9 fugitive unit, so I didn't want to go back to the
10 jail, because you got to go back to the jail for
11 one year and then reapply to come back over to EM.
12   Q  Okay.
13   A  But EM didn't have sergeants and
14 lieutenants then.  They just had chiefs and all
15 that, so now that they have sergeants and
16 everything, you know, that was something I was
17 looking at.
18   Q  You contend that you were precluded from
19 getting these opportunities because of the
20 discipline write ups relating to the court
21 subpoena issue?
22   A  Yes, sir.
23   Q  Any other raises or opportunities that you
24 are referring to other than these?

228
1    A  That's it.
2    Q  You also mention benefits here.  What
3 benefits do you claim you are entitled to as
4 damages?
5    A  No benefits.  I mean, I didn't have a
6 problem with benefits.  I don't know if that was
7 just in there or what.  I don't know.
8    Q  What about future retirement income, what
9 future retirement income are you contending you
10 have lost as a result of defendants' conduct in
11 this lawsuit?
12   A  I haven't lost anything like that.
13   Q  What about litigation expenses, what
14 litigation expenses have you had?
15   A  I didn't.  I haven't had none of that.
16   Q  What about attorneys' fees, what
17 attorneys' fees have you had?
18   A  Just attorneys' fees with -- it's down
19 here.  Attorneys' fees with Kelly in the law firm
20 that I have got now, just whatever come up, but
21 nothing right now.
22   Q  So just to clarify here:  Are there any
23 attorneys' fees that you have paid to Kelly and
24 Liz's law firm?

229
1    A  Not yet.
2    Q  Then you put compensatory damages here,
3 humiliation, mental and emotional anguish and
4 distress?
5    A  Yes.
6    Q  And how do you quantify those damages?
7 What are you entitled to as a result of
8 defendants' conduct in this lawsuit?
9    A  I mean, you can't even -- I can't
10 even -- I don't even know at this time, you know.
11 I don't even know at this time.
12   Q  All right.  Let's go to Interrogatory 4.
13 Maybe this will tease that issue out a little bit.
14      I guess not.  You are asked here:  State
15 in detail the nature of any physical, emotional,
16 or mental injuries that you claim in this lawsuit.
17      And you said:  See Interrogatory Number 3,
18 and then investigation continues.
19      So is there any other facts supporting
20 your contention that you have suffered physical,
21 emotional, mental injuries that you can tell us
22 about right now?
23   A  Like high blood pressure and just stress
24 and everything, not knowing if you're going to be

230
1 working tomorrow or, you know, having this held
2 over your head and knowing that you haven't did
3 anything, you know.
4    Q  What do you mean you don't know if you are
5 going to be working tomorrow?
6    A  You know, just stress, pressure, things
7 you just think about.
8    Q  I understand the other part of what you
9 said, but you said not knowing if you are going to
10 be working tomorrow.  Why wouldn't you be working
11 tomorrow, I mean, maybe other than it may be your
12 day off?
13   A  I'm just saying going through these
14 situations here, that's all I'm saying.
15   Q  Well, I --
16   A  Just things that go through your head,
17 okay, at any given time.  Just think about a lot
18 of stuff, that's all.
19   Q  But you would agree that other than it may
20 be your day off, you know that you are going to be
21 working tomorrow, right?
22   A  I pray that I do, you know --
23   Q  Why wouldn't you?
24   A  -- and everything.  Because of stuff like

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

42 (231 to 234)

231

1 this, I mean.
2    Q  Stuff like you filing this lawsuit, is
3 that what you mean?
4    A  I'm talking about things you go through
5 with people lying on you and everything and how
6 you get into a certain situation without being
7 interviewed by your supervisors and everything and
8 just take things up to a higher level, things that
9 they can just do like that, I mean.
10    Q  So other than sort of speculating about
11 what could possibly happen in the future, okay, do
12 you have any reason to believe that you won't be
13 working at the sheriff's office tomorrow?
14    A  No.
15    Q  You mentioned high blood pressure and
16 stress, and then in interrogatory 5 here, you
17 mentioned high blood pressure as well.  When were
18 you diagnosed with high blood pressure?
19    A  Maybe a couple years ago, three, something
20 like that.
21    Q  You said three years ago you were
22 diagnosed?
23    A  Two or three years, something like that.
24    Q  Who diagnosed you?

232

1    A  My doctor.
2    Q  Who is that?
3    A  Dr. William, Dr. Williams.
4    Q  Dr. Williams?
5    A  Dr. Evans and Dr. Tan.  I'm sorry.  I said
6 his first name, William.  Dr. Evans, my first
7 doctor, and then Dr. Tan.
8    Q  Who is Dr. Evans?  Because I don't see him
9 disclosed in this.
10    A  Dr. Evans is my first doctor before
11 Dr. Tan.
12    Q  Let's do it this way, when did you first
13 start seeing Dr. Tan?
14    A  Maybe two years ago, I think.  Maybe two
15 years ago.
16    Q  And you saw Dr. Evans before that?
17    A  Yeah.
18    Q  Is Dr. Evans with the same practice as
19 Dr. Tan?
20    A  He was, but they stopped taking that
21 insurance.
22    Q  So you went to the same address in Olympia
23 Fields to see Dr. Evans?
24    A  No.  Evans was in Matteson at first, and

233

1 Dr. Tan is in Olympia Fields now.
2    Q  So I'm just trying to figure out, did
3 these guys work together?  Did this man or
4 woman --
5    A  It was two men.
6    Q  Did they work together?
7    A  No.  They was separate.
8    Q  They were at separate facilities?
9    A  Right.
10    Q  Separate practices?
11    A  Right.
12    Q  What's the practice that Dr. Evans was at?
13    A  What do you mean?
14    Q  So what's the contact information for
15 Dr. Evans?
16    A  I don't know.  I don't have any of his
17 contact information right with me.
18    Q  Because this interrogatory asked you to
19 identify, you know, medical providers, and you
20 only identified Dr. Tan here.
21    A  I thought you had asked me about when my
22 blood pressure was first --
23    Q  That's fair.  So you are saying that you
24 never had high blood pressure with Dr. Evans?

234

1    A  That's when it started, about three years
2 ago, something like that, when it started coming
3 around.
4    Q  With Dr. Evans?
5    A  Yeah.
6       MR. LEINENWEBER:  So we are going to
7 need -- Liz, I just want to say on the record, if
8 you could, we would request that you get us
9 Dr. Evans's contact information because I don't
10 believe we have received any information about
11 that doctor at all.
12       I don't think we received any kind of
13 medical records to document this medical condition
14 as a result of conduct, defendants' conduct.
15       MS. FLEMING:  Okay.  I'll --
16       MR. LEINENWEBER:  Maybe check with Kelly
17 and --
18       MS. FLEMING:  I'll let Kelly know and see
19 what she says.  We'll get that information over to
20 you guys.
21       MR. LEINENWEBER:  Thanks.
22    Q  Did Dr. Tan, did he tell you why you have
23 high blood pressure he thinks?
24    A  What did he say?  It could be from

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

43 (235 to 238)

235

1 worrying, stress, few things.
2    Q  What about lifestyle choices, for
3 instance, weight and diet?  Did he say anything
4 about those?
5    A  Weight, a little bit, and I have been
6 eating right.  So...
7    Q  Does he consider -- has he told you that
8 you are overweight?
9    A  My weight was fluctuating.  It wasn't --
10 he never really said I was overweight, you know.
11 I was doing diets myself.  So...
12    Q  Are you a smoker?
13    A  I might smoke a cigar, but I don't smoke
14 no cigarettes or nothing, nothing like that.
15    Q  Have you ever been a cigarette smoker?
16    A  No.
17    Q  But you smoke cigars occasionally?
18    A  Sometimes.
19    Q  What about alcohol, do you drink alcohol?
20    A  Sometimes.
21    Q  Did Dr. Tan tell you that -- sorry.
22       Has anybody said that your blood pressure
23 is related to things that you allege happened in
24 this lawsuit?

236

1    A  I can't recall.  He did say work, you
2 know.  Work and -- you know.
3    Q  Did Dr. Evans ever tell you that you might
4 be a candidate for having high blood pressure?
5    A  No.
6    Q  Any other medical issues or physical
7 issues that you allege are the result of
8 defendants' conduct in this lawsuit?
9    A  No.
10    Q  And let's see.  I think you said you have
11 rheumatoid arthritis now?
12    A  Yes.
13    Q  What caused that?
14    A  I don't know.  I don't know where it come
15 from.  Me playing -- because I play drums.  I'm a
16 percussionist, and I don't know, from the weather
17 here or just getting up in age or whatever.  I
18 don't know what caused that or not.
19    Q  Do you take any medication for your high
20 blood pressure?
21    A  Yes.
22    Q  What do you take?
23    A  I can't pronounce the name of it.  It's
24 all in the report, in the documentation Kelly put

237

1 in there.
2    Q  Is it in here?  I'm sorry.  Maybe I missed
3 it.  Let's see.
4    A  I got it in my phone, pictures in my
5 phone.
6    Q  We asked you on 8 if you are taking any
7 medications and you said:  See response 5 to 7.
8       5 doesn't identify any medicine.  And then
9 7 says you take a Humira injection every two weeks
10 for the rheumatoid arthritis.
11       But as far as you know, you are taking
12 medication for blood pressure?
13    A  Yes, because I sent it to Kelly.
14    Q  That's fine.  Just send it again.
15    MR. LEINENWEBER:  And Liz, I'll ask you to
16 just follow up with him to get us the dosages or
17 names and types of medication.
18    MS. FLEMING:  All right.
19    MR. LEINENWEBER:  If we can go to
20 Interrogatory 9.
21    Q  This one asks you to identify your
22 personal email address, and that's your personal
23 email address right there?
24    A  Yes, sir.

238

1    Q  Do you have any other personal email
2 addresses?
3    A  No, sir.
4    Q  Have you checked that -- sorry.  Strike
5 that.
6       Have you had any correspondence, any
7 emails with this email account with anyone other
8 than your attorneys about this lawsuit?
9    A  No, sir.
10    Q  Have you -- that's your cell phone number?
11    A  Yes.
12    Q  Do you send text messages with that cell
13 phone?
14    A  Sometimes.
15    Q  And have you sent any text messages to
16 anyone other than your attorneys regarding this
17 lawsuit?
18    A  No.
19    Q  I think you said you don't have any social
20 media; is that right?
21    A  I don't have any of that.
22    Q  And have you had any conversations with
23 anyone other than your attorneys about any of the
24 allegations in this lawsuit?

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

239

1    A  No.
2    Q  So you have never talked to LeGrain
3  Winston about this lawsuit?
4    A  No.
5    Q  Never talked to any of the other
6  plaintiffs about this lawsuit?
7    A  No.
8    Q  Sorry.  I think I interrupted you.  I
9  think you were starting to say something.
10   A  No, nobody.
11   Q  Have you been involved in any kind of
12  other lawsuits?
13   A  No.
14   Q  No other lawsuits of any kind?
15   A  No.
16   Q  What about any other kinds of court
17  proceedings that you have been involved in at all?
18   A  No.
19   Q  Have you ever filed bankruptcy?
20   A  Yes.
21   Q  Do you understand that a bankruptcy is a
22  court proceeding?
23   A  I didn't think you was talking -- I think
24  you were talking about the county.  Yeah.  Okay.

240

1    Q  So when was the last time you filed
2  bankruptcy?  It's okay if you don't have an exact
3  date.  An approximation is fine.
4    A  Maybe five, six years ago, seven years
5  ago, I guess.  I don't know.
6    Q  Just take a look through my notes here.  I
7  may be finished.
8       Sir, what are you hoping to get out of
9  this lawsuit?
10   A  My peace of mind back, my health, better
11  health condition, to retire, justice, you know.
12   Q  Is there some reason you can't retire?
13  Like why would you need something from this
14  lawsuit in order to retire?
15   A  Just retire with a peace of mind.
16   Q  It seems like -- are you referring to the
17  merit board action, though, right?
18   A  Yes.
19   Q  But that's a separate thing from this
20  lawsuit, right?
21   A  Okay.
22   Q  I mean --
23   A  Yes.
24   Q  -- is it --

241

1    A  Yes.
2    Q  -- in your mind?
3    A  Yes.
4    Q  Do you think that somehow if you prevail
5  in this lawsuit, it's going to eliminate the merit
6  board action?
7    A  I hope so.  I hope, you know.
8    Q  Why would you think --
9    A  I just want to get all this over with,
10  that's all.
11   Q  I understand that.  Lawsuits are not fun
12  for anybody.  But my question is what makes you
13  think that you're going to prevail in the merit
14  board action if you prevail in this lawsuit?
15   A  I'm just hoping.  I mean, like I say,
16  everything comes to mind.  You think about a whole
17  bunch of stuff, you know.  I don't know, you know.
18  Just thinking out loud.  Just --
19   Q  Did you hope that by filing this lawsuit
20  it would somehow influence the outcome of the
21  merit board action?
22   A  I don't know.
23   Q  Do you think that filing this lawsuit has
24  led to the delay of that merit board action?

242

1    A  Probably.  I don't know.
2    Q  Are you eligible for retirement right now?
3    A  Yes.  Well, no, no, no.  In March.
4    Q  In March?
5    A  Yeah.
6    Q  When do you intend to retire?
7    A  Hopefully March 31.
8    Q  Of 2021?
9    A  Yes.
10   Q  So as soon as you are eligible for
11  retirement, you are going to take it?
12   A  Yes.  I would love to take it, yeah.
13   Q  Got it.  Let's check one last thing here.
14      MR. LEINENWEBER:  I don't have any further
15  questions.
16      MS. FLEMING:  Can you give me just five
17  minutes.  I just want to make sure.  I think
18  everything I needed to ask about has been covered,
19  but just five minutes would be great.
20      MR. LEINENWEBER:  Yeah.  Sure.  I'll just
21  hang here.
22      MS. FLEMING:  Thank you.
23      (A recess was had.)
24      MS. FLEMING:  I don't have any questions.

243

1      MR. LEINENWEBER:  Waive signature?

2      MS. FLEMING:  We will waive signature.

3      MR. LEINENWEBER:  Okay.  All right.  I

4  think that's it then.

5      MR. WHITE:  Renee, can we order, just for

6  electronic regular delivery, please.

7      THE STENOGRAPHER:  Sure.

8      Ms. Fleming, do you need a copy?

9      MS. FLEMING:  Plaintiffs would like a copy

10  as well.

11     THE STENOGRAPHER:  Okay.  Perfect.

12     MR. LEINENWEBER:  We marked four exhibits,

13  right?

14     MS. HOOPER:  Yes.

15     MR. LEINENWEBER:  The court reporter has

16  all those?

17     MS. HOPPER:  I will send them to her after

18  the deposition.

19     MR. LEINENWEBER:  Awesome.  Thanks,

20  everyone.  Have a very good weekend.

21     Mr. Ferguson, thank you very much for your

22  time today and for taking care of the technical

23  issues.  Sorry we had to do this kind of in two

24  parts, but it went pretty well today, so...

244

1      THE WITNESS:  Thank you.

2      (Off the record at 3:04 p.m. CST.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

245

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2      I, Renee E. Brass, CSR, RPR, the officer

3  before whom the foregoing deposition was taken, do

4  hereby certify that the foregoing transcript is a

5  true and correct record of the testimony given;

6  that said testimony was taken by me

7  stenographically and thereafter reduced to

8  typewriting under my direction; that reading and

9  signing was not requested; and that I am neither

10  counsel for, related to, nor employed by any of

11  the parties to this case and have no interest,

12  financial or otherwise, in its outcome.

13

14  IN WITNESS WHEREOF, I have hereunto set my hand

15  this 22nd day of September 2020.

16

17

18  _____

19

20  Renee E. Brass, CSR, RPR

21

22  CSR No. 084-004119 - Expiration Date: May 31, 2021

23

24

| A |
|---|

**a) (1**
220:11, 221:3,
221:14

**a-n-s-o-n**
127:9

**abduct**
153:19

**abducted**
107:11, 175:22

**abduction**
99:19, 104:8,
105:15, 105:23,
105:24, 107:10,
113:9, 169:21,
170:17, 171:6,
175:1, 176:4,
176:17, 197:5,
202:20, 203:2,
203:14, 217:9

**able**
71:17, 84:15,
84:18, 85:21,
97:2, 100:3,
131:19, 136:5,
225:7

**above**
195:3

**according**
95:14

**account**
238:7

**accountable**
211:19

**accurate**
73:9

**accused**
106:2, 106:3,
128:19, 218:8

**acey**
88:18, 88:19

**action**
154:17, 240:17,
241:6, 241:14,
241:21, 241:24

**actions**
154:5

**activities**
196:22, 198:5,
198:8

**actual**
107:24, 187:12

**actually**
84:18, 85:4,
85:23, 89:22,
92:11, 98:12,
107:1, 113:21,
144:17, 144:18,
148:6, 167:4,
178:5, 190:18,
204:4, 220:4,
223:22, 224:2,
227:8

**add**
151:10

**addition**
73:22, 94:14

**additional**
170:14, 181:18

**address**
232:22, 237:22,
237:23

**addresses**
238:2

**adequately**
211:15

**adjust**
172:4

**african-american**
102:13, 204:10,
211:18

**after**
80:11, 87:2,
90:4, 104:6,
106:10, 113:5,
116:4, 118:8,
127:24, 130:7,
139:7, 155:15,
160:21, 186:2,
189:19, 199:14,
201:13, 211:20,
217:15, 217:20,
243:17

**afternoon**
88:2

**again**
71:9, 72:2,
72:19, 84:16,
85:6, 90:21,
98:14, 98:22,
102:9, 105:5,
120:15, 137:3,
145:19, 177:19,
180:21, 191:10,
195:1, 198:14,
208:7, 211:2,
221:22, 237:14

**against**
148:18, 153:5,
171:1, 171:23,
203:5, 203:9,
203:19, 216:20

**age**
236:17

**ago**
71:14, 115:18,
156:14, 160:17,
163:20, 163:21,
164:1, 164:9,
231:19, 231:21,
232:14, 232:15,
234:2, 240:4,
240:5

**agree**
230:19

**agreed**
71:16

**agreement**
84:22

**ahead**
82:16, 100:21,
111:19, 220:20

**aid**
73:12, 99:17,
99:18, 113:10

**air**
92:14, 157:20

**al**
67:5, 67:12

**alcohol**
235:19

**alerting**
147:5

**all**
73:5, 73:15,
78:15, 82:11,
82:18, 83:10,
86:7, 90:23,
93:5, 93:19,
95:23, 96:20,
102:7, 102:22,
114:12, 115:8,
116:2, 116:5,
117:4, 117:18,
117:21, 118:6,
123:12, 127:21,
128:12, 129:20,
133:9, 133:11,
137:14, 139:13,
139:14, 139:17,
140:22, 141:3,
141:7, 144:14,
146:20, 146:22,
151:21, 151:22,
152:5, 152:15,
153:2, 154:12,
156:14, 156:17,
157:19, 158:1,
158:2, 158:8,
158:17, 159:9,
159:12, 170:9,
189:10, 194:1,
198:3, 199:23,
200:13, 200:15,
201:16, 202:18,
207:16, 211:23,
212:14, 213:20,
217:13, 219:24,
221:15, 224:1,
225:9, 227:14,
229:12, 230:14,
230:18, 234:11,
236:24, 237:18,
239:17, 241:9,
241:10, 243:3,
243:16

**all's**
200:12

**allegation**
136:15, 185:1,
185:9, 201:22,

211:14
**allegations**
238:24
**allege**
124:23, 157:8,
157:16, 159:5,
168:17, 169:9,
169:19, 170:5,
176:8, 177:13,
177:22, 178:8,
178:23, 181:9,
194:2, 194:18,
198:4, 198:7,
202:7, 203:18,
203:24, 209:5,
209:10, 213:2,
213:7, 214:17,
216:24, 217:7,
219:13, 220:8,
235:23, 236:7
**alleged**
153:17, 168:18,
175:20, 177:8,
195:5
**alleges**
141:22
**alleging**
95:11, 142:20,
154:9, 154:22,
155:20, 170:18,
209:22
**allow**
136:4
**allowed**
101:4, 101:8,
101:22, 129:6,
131:24, 155:16,
168:20, 178:18
**almost**
118:14, 118:24,
120:23, 164:9,
199:16
**alone**
77:11
**along**
110:4, 190:11
**already**
116:11, 134:22,

150:23, 194:4,
196:23, 197:20,
205:16, 205:18
**also**
69:23, 79:20,
82:19, 83:4,
90:3, 94:16,
96:23, 107:4,
109:1, 128:22,
134:2, 170:1,
223:12, 225:2,
226:4, 228:2
**always**
95:4, 130:7,
131:5, 134:9,
134:11, 134:14,
145:10, 184:3,
185:3, 189:18,
192:8, 199:7,
199:8
**amount**
82:5, 122:17,
225:8
**anguish**
220:16, 229:3
**another**
102:12, 139:11,
160:13, 161:5,
208:23
**anson**
127:4, 127:8,
127:11, 128:20,
131:18, 136:5,
136:17, 137:24,
139:17, 178:20
**answer**
72:5, 72:22,
73:4, 96:20,
98:6, 140:20,
162:6, 177:16,
177:19, 178:10,
182:17, 194:23,
195:8, 195:15,
195:16
**answered**
195:2, 195:19
**answers**
70:11, 70:12,

72:15, 167:20,
170:9, 210:14
**anticipate**
71:19, 72:5
**anybody**
177:21, 178:23,
210:7, 212:4,
235:22, 241:12
**anymore**
74:22, 129:7,
129:21, 133:8,
207:16
**anyone**
74:5, 97:10,
109:14, 127:6,
130:17, 137:13,
147:5, 147:11,
158:17, 158:19,
197:1, 212:2,
215:3, 238:7,
238:16, 238:23
**anything**
73:20, 73:22,
78:1, 79:18,
82:3, 89:7,
99:10, 99:15,
99:20, 100:8,
104:17, 106:13,
107:18, 107:21,
109:11, 113:15,
114:3, 115:12,
118:12, 118:13,
121:1, 121:11,
130:20, 137:19,
144:9, 146:8,
151:10, 151:23,
151:24, 152:5,
158:9, 158:15,
159:2, 171:11,
172:24, 175:5,
175:22, 179:17,
181:18, 187:22,
187:23, 197:9,
202:5, 203:15,
215:12, 215:13,
215:16, 216:2,
217:18, 217:24,
218:17, 228:12,

230:3, 235:3
**anywhere**
143:17, 144:21,
161:18
**appearance**
145:19
**appears**
111:1, 146:6
**application**
80:8, 160:18,
160:19
**applied**
99:4, 99:5,
227:5
**applies**
142:19
**apply**
99:2, 154:8,
197:21
**applying**
85:8
**appropriate**
148:2, 207:18
**approval**
132:12, 132:13,
135:20
**approves**
83:5
**approximately**
75:13
**approximation**
240:3
**arbitrarily**
211:17, 212:6
**arbitrary**
212:11, 212:18
**area**
93:5, 93:9,
93:10, 93:11,
93:12, 93:13,
93:14, 93:15,
93:16, 93:17,
93:21, 94:1,
94:6, 94:16,
94:19, 94:22,
95:3, 95:15,
95:21, 96:5,
96:15, 96:19,

144:5, 159:21,
162:16, 162:21,
162:24, 166:2
**areas**
76:21, 96:10,
143:10, 143:14,
143:22, 144:2,
145:7, 145:9,
145:12, 145:16,
150:21, 157:20,
159:16, 161:20,
162:3, 162:4,
162:9, 163:9,
163:10, 163:15,
163:16, 163:23,
163:24, 164:12,
164:24, 165:12,
165:20, 166:4,
196:12, 196:13,
196:17, 209:19
**aren't**
103:24
**argument**
202:2
**armed**
78:24
**around**
79:7, 103:19,
108:23, 112:2,
132:22, 147:18,
158:7, 168:20,
205:7, 208:4,
234:3
**arrest**
145:12, 145:15
**arrested**
82:12, 82:22,
161:10
**arthritis**
236:11, 237:10
**aside**
210:6
**asked**
103:17, 105:8,
105:10, 105:12,
107:14, 107:20,
109:10, 113:1,
120:11, 126:1,

177:6, 178:6,
181:8, 198:3,
204:8, 209:9,
213:9, 213:10,
217:22, 217:23,
218:15, 229:14,
233:18, 233:21,
237:6
**asking**
72:4, 169:22,
199:12, 199:24,
215:23, 215:24
**asks**
169:8, 182:8,
194:1, 194:17,
195:12, 196:11,
196:21, 197:16,
213:1, 220:6,
221:8, 237:21
**asp**
78:20
**aspect**
201:2
**assign**
91:5, 94:5,
94:19, 138:4,
138:19, 141:10,
141:14, 151:19,
164:16, 183:20,
185:18, 186:7,
186:11, 186:16,
186:20, 187:9,
188:9, 189:22,
191:18, 192:1
**assigned**
76:5, 90:8,
93:6, 93:9,
93:21, 94:17,
95:2, 95:5,
95:6, 96:18,
130:13, 138:4,
138:12, 139:4,
139:6, 139:7,
141:8, 150:18,
150:19, 151:1,
151:2, 151:15,
152:2, 152:3,
159:14, 163:22,

164:11, 164:14,
164:15, 164:22,
164:23, 165:2,
165:3, 165:11,
165:19, 165:22,
166:5, 166:6,
166:13, 166:17,
179:15, 179:20,
181:9, 181:11,
182:10, 182:24,
183:4, 183:7,
183:24, 184:6,
184:10, 184:21,
185:3, 185:5,
185:9, 185:20,
185:23, 186:23,
187:1, 187:6,
187:13, 187:20,
188:6, 188:13,
188:18, 188:20,
189:6, 189:8,
189:13, 189:15,
190:6, 190:8,
190:10, 191:3,
191:5, 191:13,
191:14, 191:15,
192:23, 193:9,
193:12, 193:14,
193:15, 194:10,
194:13, 196:17,
197:11
**assignment**
75:20, 76:3,
76:5, 77:3,
77:8, 77:11,
80:1, 81:19,
83:11, 83:12,
84:19, 84:24,
85:9, 85:10,
85:16, 85:17,
86:15, 89:24,
90:3, 92:20,
180:22, 181:19,
182:3, 182:21,
187:14
**assignments**
74:9, 75:18,
76:6, 79:10,

79:13, 83:9,
84:16, 85:5,
86:14, 86:23,
88:14, 89:1,
89:6, 94:15,
146:2, 150:20,
151:20, 194:2,
194:6, 194:11,
209:15, 209:17,
209:18, 209:21
**assist**
73:17
**assume**
73:5, 85:3,
85:11, 216:11
**assuming**
98:5, 98:6,
99:22, 209:17
**attacked**
161:3, 161:4
**attempted**
99:19, 104:8,
105:14, 105:22,
105:24, 107:10,
113:8, 217:9
**attendance**
99:9, 99:22,
99:23, 99:24,
100:12, 125:13,
136:18, 200:9,
200:12
**attention**
122:9
**attorney**
119:24, 130:4,
130:5, 130:11,
130:18, 133:21
**attorneys**
71:10, 119:21,
120:2, 131:2,
172:1, 220:14,
228:16, 228:17,
228:18, 228:19,
228:23, 238:8,
238:16, 238:23
**august**
126:6, 140:10,
140:17, 147:9

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

49

**av**
69:24
**available**
85:10, 226:24
**awarded**
85:4
**aware**
97:22, 137:4,
143:4, 173:15,
173:19
**away**
145:5, 161:7
**awesome**
243:19

**B**

**baby**
107:10, 107:22,
115:2
**back**
76:12, 76:17,
82:13, 82:17,
83:22, 84:11,
86:4, 89:9,
105:8, 111:19,
112:15, 116:15,
123:16, 124:21,
126:18, 128:2,
133:9, 145:24,
146:2, 156:14,
158:21, 158:22,
161:11, 161:16,
162:18, 162:22,
167:9, 168:15,
179:5, 180:20,
187:24, 190:21,
192:20, 200:23,
204:5, 213:23,
219:23, 220:3,
221:16, 227:9,
227:10, 227:11,
240:10
**bad**
85:7, 160:23,
184:14, 184:18
**band**
76:13, 76:15,
76:16, 77:21,

77:23, 80:14,
81:24
**bankruptcy**
239:19, 239:21,
240:2
**bargaining**
84:22
**baroni**
69:11
**base**
77:21
**based**
151:16, 151:17,
181:20, 181:21,
181:23, 182:4,
209:11
**basement**
81:7, 81:9,
81:10, 81:11,
81:12, 81:17,
110:13, 112:1,
112:10, 150:20
**basically**
201:7
**basing**
163:12
**basis**
110:23, 169:10,
171:7, 195:24,
196:17
**baton**
78:20
**become**
225:18
**been**
71:4, 71:17,
101:4, 106:1,
106:3, 106:4,
106:15, 108:12,
109:10, 109:23,
124:2, 131:4,
134:22, 141:4,
141:5, 141:6,
153:7, 157:9,
157:12, 158:12,
158:13, 158:19,
161:3, 161:4,
161:5, 163:22,

164:11, 164:21,
165:19, 167:2,
167:16, 173:9,
178:18, 180:8,
199:24, 200:24,
201:1, 218:6,
218:8, 218:16,
218:23, 218:24,
221:1, 226:24,
235:5, 235:15,
239:11, 239:17,
242:18
**before**
68:7, 72:5,
72:22, 79:9,
86:2, 89:23,
92:12, 116:7,
116:15, 116:18,
116:24, 117:4,
117:5, 125:24,
139:11, 140:6,
156:9, 156:15,
156:17, 157:7,
167:4, 168:24,
175:2, 189:17,
223:4, 223:10,
225:17, 232:10,
232:16, 245:3
**began**
71:13, 74:16
**begged**
160:21
**beginning**
117:19, 118:6,
172:20, 219:1
**behalf**
69:2, 69:9,
69:16
**being**
72:13, 98:15,
99:11, 99:16,
108:10, 117:14,
118:18, 119:5,
120:20, 122:17,
144:4, 144:9,
151:1, 152:2,
155:14, 157:21,
159:18, 170:24,

171:5, 175:22,
176:18, 193:15,
194:10, 199:6,
202:11, 222:22,
226:6, 231:6
**belief**
110:23, 139:2,
163:13, 171:7
**believe**
71:13, 79:14,
111:5, 124:10,
127:9, 138:18,
147:18, 161:12,
173:23, 175:19,
176:2, 184:20,
211:1, 218:12,
231:12, 234:10
**below**
97:11
**belt**
78:21
**benefits**
220:13, 222:8,
228:2, 228:3,
228:5, 228:6
**besides**
79:18, 100:8
**best**
73:3, 129:15
**better**
240:10
**between**
73:20, 74:2,
75:12, 112:3,
120:21, 144:8,
184:9, 206:8,
225:22
**bid**
84:15, 84:18,
84:23, 85:4,
85:17, 85:20,
85:21, 85:23,
85:24, 86:1,
86:2, 86:3,
86:9, 86:13,
86:14, 106:18,
106:19, 146:2
**bidded**
85:22, 86:4

bidding
85:15
bieniek
137:23, 139:16,
139:21, 179:9,
185:13, 185:15,
185:20
bike
103:13, 103:23,
105:5
birthday
205:7, 205:10
bit
72:9, 77:12,
79:24, 85:19,
86:18, 89:10,
89:12, 99:6,
126:3, 171:3,
171:4, 172:4,
229:13, 235:5
black
95:4, 209:6
blacks
184:3
blood
229:23, 231:15,
231:17, 231:18,
233:22, 233:24,
234:23, 235:22,
236:4, 236:20,
237:12
blowing
157:20
board
91:13, 91:14,
99:12, 100:23,
100:24, 101:5,
101:10, 101:24,
169:1, 174:16,
174:17, 175:2,
206:12, 206:15,
223:4, 223:10,
240:17, 241:6,
241:14, 241:21,
241:24
body
76:7, 79:2,
103:10, 103:22,

104:14, 104:15,
104:16, 104:17,
115:5, 115:6,
116:2, 119:6,
123:7, 123:8,
217:16, 217:18
bonus
131:10, 222:12
book
206:14, 206:15
bosques
179:9, 180:7,
180:8, 180:10,
180:17, 186:13,
186:17, 186:20
both
223:22
bottom
94:11, 111:3,
117:2, 221:7
boy
166:12, 193:3
boyfriend
144:8, 145:4
brady
175:13, 199:18
brass
67:24, 68:7,
245:2, 245:20
break
71:16, 72:19,
72:22, 123:13,
123:14, 144:8,
167:6, 210:7
breaking
74:2
bring
76:11, 76:17
broke
74:8
brook
69:20
brought
133:19, 168:24
bucks
210:3
bugs
158:7

building
105:1, 119:15,
208:1
bulletin
91:14
bulletproof
78:7, 78:9
bunch
77:17, 214:2,
241:17
busy
82:10

---
C
---

calendar
205:13, 205:14,
205:18, 207:2
call
80:5, 80:9,
90:2, 90:6,
100:1, 100:4,
104:13, 133:6,
149:8, 149:18,
149:24, 150:2,
150:10, 179:23,
222:14
called
105:19, 105:21,
112:1, 114:24,
129:19, 146:12,
149:9, 217:15
calm
84:1
cam
103:10, 103:22,
104:15, 104:16,
104:17, 115:5,
115:6, 116:2,
119:6, 217:16,
217:19
came
103:23, 107:17,
110:11, 110:15,
111:19, 133:10,
133:12, 133:21,
163:21, 180:7,
192:6, 192:17,
215:21

camera
79:2, 104:16,
106:7, 106:9,
106:11, 108:23,
172:4
campus
119:15
cams
104:14, 123:7,
123:8
can't
72:15, 73:8,
87:9, 87:13,
96:20, 97:20,
111:15, 111:16,
112:19, 112:21,
124:4, 125:4,
127:16, 128:1,
129:20, 134:16,
136:16, 143:2,
146:23, 147:3,
147:14, 147:17,
147:23, 149:1,
149:2, 153:3,
153:7, 160:21,
198:19, 199:20,
208:14, 209:3,
212:8, 212:9,
212:13, 213:14,
213:16, 213:17,
213:19, 221:23,
222:9, 223:5,
223:6, 229:9,
236:1, 236:23,
240:12
candidate
236:4
cans
144:6, 158:5
capable
162:16
car
77:4, 77:12,
77:13, 77:16,
89:13, 90:19,
103:18, 123:11,
145:1, 223:24,
224:1

**card**
105:7
**care**
213:18, 243:22
**carefully**
215:15
**carmen**
176:22, 177:1
**carry**
78:19
**case**
67:8, 74:2,
104:18, 104:19,
113:12, 113:13,
124:6, 124:11,
127:22, 131:7,
173:4, 175:1,
176:12, 176:14,
198:9, 217:19,
245:11
**catch**
114:4, 158:5
**categories**
221:17
**category**
220:8
**caucasian**
180:12
**caught**
142:23
**caused**
236:13, 236:18
**causes**
173:23
**causing**
84:10, 158:10
**cell**
238:10, 238:12
**center**
75:10, 106:17,
106:18, 106:20,
113:6, 155:14
**certain**
96:1, 145:7,
163:9, 204:8,
205:20, 205:21,
206:3, 206:6,
209:16, 210:1,

225:8, 231:6
**certificate**
245:1
**certify**
245:4
**chairs**
133:19
**chance**
224:15, 226:18
**change**
76:10, 77:23
**changed**
88:7
**charge**
104:14
**charged**
102:4, 161:10
**charger**
172:6
**charges**
168:24
**chase**
72:7
**check**
76:6, 76:7,
76:14, 104:15,
104:16, 234:16,
242:13
**checked**
238:4
**checks**
76:19, 76:21
**chicago**
69:6, 69:13,
93:13, 93:14,
104:18, 104:24,
105:3, 105:10,
106:9, 109:19,
118:14, 143:15,
143:16, 143:20,
217:19, 217:20
**chief**
86:20, 87:3,
88:13, 88:15,
88:16, 88:18,
88:19, 91:15,
92:19, 96:1,
96:2, 96:8,

97:7, 97:8,
97:10, 97:11,
98:12, 98:17,
105:11, 129:8,
129:9, 129:14,
129:17, 129:19,
133:3, 133:6,
137:11, 137:12,
141:12, 141:13,
158:15, 183:22,
185:19, 186:18,
188:11, 191:23,
199:3, 199:18,
204:8, 204:15,
204:16, 204:23,
212:3, 218:1
**chief's**
88:20
**chiefs**
87:3, 87:4,
88:23, 91:7,
91:8, 92:7,
92:23, 94:3,
94:5, 94:13,
94:14, 94:18,
94:24, 95:1,
95:13, 95:14,
130:23, 131:2,
140:3, 189:24,
191:22, 227:14
**child**
99:19, 103:1,
104:8, 105:14,
105:22, 105:24,
107:10, 113:8,
153:18, 169:20,
169:21, 170:17,
171:6, 174:24,
175:21, 176:3,
176:17, 197:5,
202:20, 203:1,
203:14, 217:9
**choices**
235:2
**chose**
142:1, 191:24
**christmas**
205:8

**cigar**
235:13
**cigarette**
235:15
**cigarettes**
235:14
**cigars**
235:17
**circulating**
157:20
**circumstance**
156:1
**city**
145:16, 145:17,
161:18, 162:2,
162:16, 163:9,
163:16, 164:12,
164:24
**civilian**
90:24, 99:18,
113:10
**claim**
221:18, 228:3,
229:16
**claimed**
172:23
**claiming**
222:18, 225:14
**claims**
173:15
**clarification**
97:4
**clarify**
128:8, 228:22
**clear**
72:8, 98:22,
177:19, 206:2
**clearly**
117:11
**clique**
166:11
**close**
175:10
**clothes**
223:23
**collective**
84:21
**collins**
104:22, 109:22,

110:1, 110:24,
111:8, 115:20,
186:9, 186:10
**come**
82:13, 86:21,
94:22, 99:18,
104:6, 106:14,
113:9, 123:16,
128:23, 132:17,
133:9, 140:6,
146:18, 160:21,
161:1, 162:22,
198:20, 207:23,
219:23, 227:11,
228:20, 236:14
**comes**
80:6, 241:16
**coming**
96:21, 99:17,
103:1, 128:2,
128:23, 134:21,
135:6, 135:7,
208:20, 234:2
**comments**
146:14, 149:22,
150:5, 150:13
**communicate**
92:11
**communicated**
101:16
**compensation**
220:12
**compensatory**
220:15, 229:2
**complainant**
155:21
**complained**
139:8
**complaining**
139:22, 139:23,
139:24, 140:1
**complaint**
70:10, 81:8,
95:11, 116:12,
124:5, 124:11,
125:24, 126:14,
140:11, 142:12,
143:1, 147:4,

147:7, 147:8,
152:12, 156:9,
157:9, 157:18,
159:5, 168:18,
169:11, 171:23,
178:9, 195:6,
198:6, 213:5,
215:17, 215:18
**complaints**
147:10, 155:4,
155:23, 156:3,
177:6, 177:11,
177:20, 196:24,
197:7, 211:21
**complete**
73:9, 136:18,
219:9, 225:7
**completed**
218:23
**completely**
103:4
**computation**
220:7, 221:8,
221:9
**computer**
76:9, 76:14,
80:13, 91:14
**concerned**
213:15
**concerns**
155:4
**conclusion**
216:16
**condition**
234:13, 240:11
**condoms**
208:21
**conduct**
181:3, 222:4,
226:11, 228:10,
229:8, 234:14,
236:8
**conducted**
67:18, 68:1,
101:19
**confrontation**
83:23
**confused**
114:15, 117:16,

118:3, 128:6,
128:8, 138:22,
164:20, 226:12
**confuses**
115:15
**consequence**
144:4
**consider**
88:24, 95:1,
95:16, 157:15,
158:9, 159:7,
162:1, 163:23,
164:12, 164:24,
165:12, 235:7
**considered**
130:23, 131:3,
131:5, 131:8
**considers**
96:8
**consistently**
181:11
**contact**
90:18, 233:14,
233:17, 234:9
**contend**
142:6, 142:15,
203:2, 226:10,
227:18
**contending**
225:11, 225:13,
228:9
**contention**
181:19, 182:3,
194:12, 196:16,
197:10, 229:20
**continue**
101:4, 101:23
**continued**
71:12, 71:13,
131:8
**continues**
169:15, 170:2,
182:14, 193:18,
194:20, 194:22,
198:6, 213:5,
229:18
**contract**
80:15, 213:24

**control**
211:15
**conventional**
77:4
**conversation**
111:11, 117:15
**conversations**
238:22
**cook**
67:11, 93:1,
145:22, 163:23,
165:12, 165:20,
206:22, 209:19,
210:15, 211:14
**cooperate**
162:21
**cooperative**
162:19
**copy**
119:19, 119:20,
120:1, 243:8,
243:9
**cord**
172:6
**corner**
103:14, 103:15
**correct**
74:19, 140:20,
168:9, 211:8,
245:5
**correctly**
222:18
**correspondence**
238:6
**cost**
222:15
**could**
78:15, 79:9,
83:12, 84:23,
106:4, 110:7,
112:21, 115:16,
121:6, 121:7,
121:16, 123:20,
125:19, 125:23,
128:3, 130:12,
132:8, 136:11,
141:6, 141:17,
144:13, 144:21,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020          53

145:3, 146:2,
148:15, 159:13,
159:17, 161:12,
161:18, 161:24,
167:12, 168:3,
168:14, 169:6,
172:8, 172:10,
182:22, 198:2,
210:23, 211:11,
227:5, 231:11,
234:8, 234:24
**couldn't**
133:6, 185:7,
195:18, 199:1,
199:2, 200:19,
218:6, 222:22,
223:1
**counsel**
71:6, 245:10
**county**
67:11, 93:1,
145:22, 163:23,
165:12, 165:20,
209:19, 211:14,
239:24
**county's**
210:15
**couple**
83:12, 112:18,
147:17, 165:10,
188:3, 191:4,
193:10, 204:21,
205:10, 206:23,
208:17, 208:19,
231:19
**course**
219:19
**court**
67:1, 72:14,
76:10, 76:12,
99:13, 100:18,
125:9, 125:10,
126:21, 127:2,
127:12, 127:23,
128:2, 128:11,
128:13, 128:15,
128:18, 128:22,
129:3, 129:7,

129:11, 130:21,
131:4, 131:17,
134:6, 134:9,
134:23, 135:3,
135:4, 135:20,
136:24, 142:16,
147:9, 152:15,
153:9, 155:20,
156:2, 161:11,
162:22, 163:3,
168:21, 169:24,
174:13, 174:15,
175:2, 180:2,
186:2, 197:3,
198:15, 199:7,
199:13, 208:1,
227:4, 227:20,
239:16, 239:22,
243:15
**courthouse**
132:20, 132:24,
133:1, 133:13
**covered**
242:18
**covid**
111:14
**cpd**
109:13
**crazy**
103:24
**created**
157:16, 197:9
**creating**
89:5
**crime**
161:11, 161:20,
162:4, 162:8
**crook**
149:8, 149:9,
149:18, 149:19,
150:2, 150:10
**crooks**
146:13
**crying**
175:21
**csr**
67:24, 68:7,
245:2, 245:20,

245:22
**cst**
67:20, 244:2
**curious**
194:19
**current**
120:2
**curse**
113:16
**cut**
219:17
**cuts**
76:13
**cv**
67:9

**D**

**daffada**
69:11
**daley**
75:9, 106:17,
106:18, 106:20,
113:5, 155:14
**damages**
220:7, 220:9,
220:15, 221:9,
225:14, 228:4,
229:2, 229:6
**dangerous**
161:13
**dart**
67:12
**date**
97:20, 97:21,
119:11, 119:12,
127:17, 128:1,
128:5, 128:12,
147:2, 147:3,
240:3, 245:22
**dates**
134:16
**davis**
208:24
**day**
83:9, 84:24,
85:9, 86:23,
89:11, 89:18,
89:24, 90:7,

93:5, 93:21,
94:7, 94:16,
94:23, 95:21,
96:19, 96:22,
100:5, 100:6,
100:15, 100:17,
104:3, 105:21,
106:9, 120:23,
127:23, 127:24,
128:2, 128:7,
128:9, 128:11,
128:13, 128:14,
128:18, 129:3,
129:10, 129:13,
130:8, 130:9,
130:15, 130:19,
131:9, 131:11,
131:17, 132:20,
133:14, 134:10,
135:15, 135:21,
136:18, 137:1,
141:4, 166:14,
191:11, 192:7,
192:16, 192:18,
199:7, 200:4,
200:5, 200:14,
200:15, 204:20,
204:21, 205:24,
206:4, 206:7,
206:10, 206:13,
206:14, 206:16,
206:19, 207:2,
207:4, 208:8,
209:7, 214:8,
230:12, 230:20,
245:15
**day-to-day**
82:7
**days**
100:13, 100:15,
100:16, 140:22,
183:12, 183:15,
183:17, 183:18,
184:24, 187:19,
188:12, 204:21,
205:10, 210:2
**de-deputized**
106:15, 189:17

dealing
76:22
december
74:17, 75:12,
91:22
decide
88:24, 94:16,
130:5, 186:10,
186:20, 226:22
decided
189:7, 190:16,
192:12
deciding
94:15, 98:7
decision
86:15, 95:14,
95:17, 95:20,
96:9, 98:1,
98:5, 98:23,
136:4, 136:8,
136:12, 138:19,
141:10, 141:14,
176:21, 183:20,
185:17, 186:7,
186:16, 188:8,
189:22, 190:1,
191:17, 192:9
decisions
98:19, 187:9,
209:10, 209:14
declare
211:7
declared
168:8
defendant
197:18, 210:15
defendants
67:14, 69:9,
69:16, 71:6,
71:11, 154:2,
167:21, 167:24,
173:3, 173:14,
195:4, 195:14,
204:1, 222:4,
226:10, 228:10,
229:8, 234:14,
236:8
delay
241:24

delivered
92:21
deliveries
85:24, 86:3,
86:8, 87:20,
87:22, 158:23
delivery
79:14, 80:20,
80:21, 86:4,
243:6
denied
205:6
deny
204:9, 205:3,
205:12
depended
86:7
depends
82:11, 82:18,
83:10, 93:5,
95:23, 96:21,
159:9, 159:12
deposition
67:17, 68:1,
71:12, 71:13,
71:24, 73:21,
73:23, 74:2,
79:12, 195:23,
243:18, 245:3
deputy
87:3, 88:15,
94:5, 94:14,
94:18, 95:1,
95:14, 96:2,
96:8, 97:7,
97:8, 97:11,
98:12, 98:17,
141:12, 141:13,
191:23
derogatory
146:13, 149:10,
149:21, 150:4,
150:12, 194:18,
195:4
describe
196:11
describing
84:9

description
70:8
desk
79:16, 90:1,
90:14, 90:23,
91:4, 91:17,
91:21, 92:2,
92:5, 92:8,
92:20, 92:24
detail
229:15
detailed
220:7
detainee
161:10
detainees
82:6, 82:20,
84:9, 145:11,
145:14
detectives
105:3
determination
154:4, 154:10,
154:15, 154:23
determines
82:9, 82:14,
83:8, 93:1,
93:3, 94:1
determining
95:1, 145:21
device
71:20
diagnosed
231:18, 231:22,
231:24
diet
235:3
diets
235:11
difference
225:21
different
74:9, 76:6,
78:9, 79:13,
86:8, 86:22,
87:11, 108:6,
151:20, 152:1,
157:21, 157:24,

159:16, 164:3,
164:5, 187:14,
194:10
difficulties
71:15
directed
115:20, 116:12,
117:1
direction
107:17, 245:8
director
89:4, 89:5,
104:16, 105:11,
106:7, 109:21,
109:24, 110:11,
110:19, 111:6,
112:18, 136:7,
141:23, 143:8,
146:10, 150:16,
151:14, 152:7,
152:17, 153:12,
153:21, 172:15,
172:18, 175:13,
176:22, 177:1,
197:17, 197:22,
199:18, 213:9,
213:11, 213:16,
216:20, 217:17,
218:2
directors
112:19
dirty
114:2
disciplinary
99:24, 154:2,
154:5, 154:17
discipline
99:7, 99:11,
99:16, 100:9,
100:19, 102:23,
106:24, 107:24,
108:12, 122:11,
124:24, 125:7,
126:19, 126:20,
136:14, 142:1,
142:5, 142:9,
142:14, 142:21,
142:24, 143:5,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                                    55

152:9, 152:13,
152:19, 154:11,
154:24, 168:17,
169:9, 169:19,
169:23, 170:4,
171:7, 174:24,
175:20, 176:5,
176:9, 176:14,
176:16, 177:7,
177:13, 177:22,
178:8, 179:1,
179:18, 179:19,
180:23, 181:3,
181:4, 211:15,
211:18, 211:20,
212:6, 212:11,
212:19, 216:20,
223:3, 223:9,
227:20
**disciplined**
127:1, 128:21,
197:10
**disclosed**
232:9
**disclosure**
221:14
**disclosures**
70:13, 220:11,
221:3
**discrepancy**
117:16, 118:4
**discretion**
129:22, 129:24,
130:3, 133:8
**discriminatory**
168:18, 169:10,
169:19, 170:5,
176:8, 177:13,
177:22, 181:10,
194:3
**discuss**
93:8
**discussed**
176:1, 176:7,
194:9, 196:12,
196:23
**discussion**
179:13

**disparate**
209:11
**dispatch**
90:1, 90:14,
90:23, 91:4,
91:17, 92:2,
92:5, 92:8,
92:18, 92:20,
92:23
**dispatcher**
90:2, 90:5
**disproportionate**
152:9
**disregarded**
200:19
**distress**
220:17, 229:4
**district**
67:1, 67:2
**division**
67:3, 75:6,
75:11, 81:11,
81:12, 81:13,
81:17, 88:21,
96:17, 97:6,
99:16, 103:2,
106:22, 108:3,
110:8, 110:12,
110:13, 112:1,
112:6, 112:7,
112:9, 112:14,
112:16, 123:2,
176:18
**doctor**
232:1, 232:7,
232:10, 234:11
**document**
124:3, 167:3,
167:5, 167:17,
210:12, 210:18,
221:13, 234:13
**documentation**
236:24
**documents**
73:14, 74:1
**doing**
76:23, 103:8,
103:9, 103:17,

104:9, 105:20,
108:7, 108:8,
113:2, 113:3,
113:19, 114:1,
122:7, 122:9,
123:10, 146:20,
159:10, 184:11,
184:14, 187:22,
235:11
**done**
103:21, 110:7,
115:11, 146:23,
146:24, 158:24,
167:18, 169:17,
170:8, 170:11,
170:12, 170:19,
173:16, 182:16,
189:19, 191:9,
193:19, 201:11
**dosages**
237:16
**down**
72:14, 80:5,
80:6, 84:1,
92:15, 103:11,
103:18, 106:17,
110:11, 110:16,
111:3, 113:2,
122:7, 130:16,
138:15, 139:9,
139:12, 140:6,
140:8, 140:15,
141:18, 149:2,
158:21, 158:22,
158:24, 159:16,
160:16, 172:9,
179:6, 179:20,
179:22, 180:7,
180:8, 180:9,
184:3, 184:10,
187:22, 187:23,
189:2, 189:3,
189:18, 189:21,
190:12, 191:10,
191:11, 192:6,
192:7, 192:15,
192:17, 228:18
**downstairs**
158:2, 158:5,

190:15, 190:20,
190:21
**downtown**
75:9, 113:5
**dr**
232:3, 232:4,
232:5, 232:6,
232:7, 232:8,
232:10, 232:11,
232:13, 232:16,
232:18, 232:19,
232:23, 233:1,
233:12, 233:15,
233:20, 233:24,
234:4, 234:9,
234:22, 235:21,
236:3
**drink**
235:19
**drip**
158:6
**dripping**
158:4
**driven**
82:21
**drove**
85:16
**drums**
236:15
**due**
114:12, 170:23,
170:24, 171:5,
174:2, 202:15,
202:16, 222:22,
222:23
**duly**
71:2, 71:4
**during**
111:14, 116:21
**dust**
157:22
**duties**
76:2, 76:4,
151:16, 151:19,
151:20, 194:2
**duty**
78:10, 78:11,
78:12, 78:13,

78:16, 78:17,
128:4, 129:3,
129:7, 129:21,
130:6, 130:14,
130:21, 130:24,
131:3, 131:5,
131:8, 131:16,
131:20, 132:1,
132:9, 133:7,
134:6, 134:11,
134:23, 135:4,
135:15, 135:21,
136:6, 136:19,
168:21, 179:1,
198:18, 199:13

**E**

**each**
72:10, 96:19,
112:24, 126:17,
195:3, 195:13,
197:16, 197:18,
220:8
**earlier**
125:14, 151:11,
166:9, 169:3,
178:20, 181:16,
197:2
**easier**
72:9
**east**
93:15
**eastern**
67:3
**eating**
235:6
**effect**
174:5
**effort**
170:13
**eight**
131:11, 139:10
**either**
91:22, 94:10,
95:8, 98:16,
106:4, 107:10,
110:10, 153:1,
172:20, 191:22,

197:10, 204:23,
212:13, 212:14,
226:19
**elbow**
175:16
**elect**
177:1
**electronic**
74:10, 74:16,
74:21, 74:24,
75:14, 75:19,
76:1, 79:11,
81:1, 81:2,
81:3, 82:15,
83:1, 83:2,
83:5, 213:13,
224:21, 243:6
**eligible**
83:2, 242:2,
242:10
**eliminate**
98:2, 98:7,
241:5
**eliminated**
86:13, 86:14,
97:22, 97:24,
129:23
**elizabeth**
69:3
**else**
78:1, 79:18,
82:3, 99:10,
99:15, 99:20,
100:8, 106:13,
113:15, 114:3,
115:12, 121:1,
127:6, 135:17,
137:13, 137:19,
143:17, 151:10,
151:23, 151:24,
152:5, 158:9,
159:2, 175:5,
178:23, 189:8,
193:16, 202:5,
203:15, 206:22,
212:2, 212:4
**em**
80:3, 84:9,

84:12, 97:1,
97:3, 97:5,
98:20, 99:3,
99:8, 103:3,
103:5, 112:4,
112:7, 112:11,
122:15, 122:18,
122:21, 122:24,
123:1, 131:4,
141:24, 143:9,
146:11, 150:17,
151:16, 158:14,
163:21, 164:4,
172:19, 176:21,
207:21, 211:17,
211:20, 223:3,
224:6, 224:8,
225:15, 226:13,
226:16, 227:11,
227:13
**email**
105:13, 119:20,
120:4, 120:5,
120:6, 218:5,
237:22, 237:23,
238:1, 238:7
**emails**
238:7
**emergency**
107:19, 114:24
**emery**
69:18
**emotional**
220:16, 229:3,
229:15, 229:21
**employed**
245:10
**end**
79:11, 101:21,
111:15, 172:21
**ended**
145:10, 200:1
**enforcement**
78:15
**engaged**
196:22
**engelwood**
143:15, 145:10

**englewood**
95:5, 95:8,
159:16, 159:18,
159:20, 166:6
**english**
213:14, 213:17,
213:19, 213:21,
213:22
**enjoy**
130:8
**enough**
189:1
**entire**
75:14
**entirely**
223:17
**entitled**
221:19, 228:3,
229:7
**environment**
157:10, 157:13,
157:17, 158:10
**equipment**
76:8, 76:10,
77:17, 77:19,
78:4, 78:5,
78:6, 80:14
**erica**
199:4, 200:8
**erroneous**
211:19, 212:10,
212:18
**especially**
159:20, 180:7
**esquire**
69:3, 69:10,
69:17
**essentially**
76:23, 87:6,
87:10
**established**
142:14
**estates**
93:18, 144:10,
145:8
**et**
67:5, 67:12
**ethan**
69:17

**evans**
232:5, 232:6,
232:8, 232:10,
232:16, 232:18,
232:23, 232:24,
233:12, 233:15,
233:24, 234:4,
236:3
**evans's**
234:9
**evanston**
144:10
**even**
107:22, 109:18,
114:23, 114:24,
115:1, 115:2,
115:7, 117:5,
118:9, 121:11,
122:8, 124:4,
131:6, 131:11,
141:3, 153:1,
200:3, 214:19,
217:22, 218:6,
218:16, 224:15,
226:18, 229:9,
229:10, 229:11
**evening**
88:2, 106:21,
112:3
**ever**
84:5, 84:7,
85:20, 91:17,
105:8, 105:12,
118:13, 122:14,
130:17, 131:3,
147:4, 147:9,
149:8, 149:10,
149:14, 149:18,
149:24, 150:2,
150:4, 150:7,
150:10, 150:12,
152:22, 161:3,
183:4, 185:15,
185:23, 186:13,
186:23, 188:1,
188:18, 189:13,
190:6, 191:3,
192:3, 193:9,

206:16, 207:6,
217:21, 235:15,
236:3, 239:19
**every**
130:20, 134:14,
165:10, 185:2,
195:3, 195:13,
222:13, 237:9
**everybody**
123:8, 138:13,
138:14, 138:23
**everyone**
243:20
**everything**
76:17, 80:13,
81:23, 83:24,
103:12, 106:8,
113:17, 117:21,
120:20, 130:23,
154:19, 157:14,
157:21, 157:23,
171:1, 174:4,
174:10, 176:7,
199:15, 218:15,
222:24, 227:16,
229:24, 230:24,
231:5, 231:7,
241:16, 242:18
**everywhere**
158:4
**evidence**
173:22, 182:2,
184:23, 185:8
**exact**
119:12, 127:17,
128:5, 129:14,
134:16, 240:2
**exactly**
112:23
**examination**
71:6
**examinations**
70:3
**examined**
71:4
**example**
225:7, 227:6
**exclusively**
97:5

**excuses**
199:3
**executive**
89:5
**exhibit**
70:10, 70:11,
70:12, 70:13,
123:21, 123:22,
124:2, 166:21,
166:23, 167:2,
167:13, 167:16,
204:5, 210:7,
210:9, 210:10,
220:5, 220:21,
220:23, 221:2,
221:16
**exhibits**
243:12
**expenses**
220:14, 228:13,
228:14
**experience**
84:2, 91:10,
138:8, 138:11,
138:18, 139:1,
151:17, 163:14
**expiration**
245:22
**explain**
78:15, 80:6,
80:7, 81:24,
99:22, 117:3,
143:2, 206:1,
221:23
**extensively**
181:16

**F**

**f-o-l-k-e-r-s**
134:3
**face**
119:1, 120:24,
175:7, 175:9,
175:11, 199:16,
199:21, 201:13,
214:24, 215:5
**facilities**
233:8

**fact**
72:13, 121:4,
134:15, 175:18,
186:1, 202:15,
202:16
**factors**
88:20, 88:23,
94:24, 95:13,
95:16, 95:19,
96:8, 98:7
**facts**
124:17, 141:20,
157:16, 176:1,
182:1, 185:10,
194:12, 196:15,
229:19
**failed**
141:24
**fair**
76:23, 80:22,
122:10, 212:17,
212:21, 216:11,
233:23
**fairly**
135:2, 181:15
**family**
208:24
**far**
72:2, 80:7,
81:23, 93:17,
99:11, 118:23,
140:3, 145:22,
152:15, 157:14,
158:23, 159:15,
173:11, 173:14,
174:12, 174:13,
180:1, 212:7,
213:15, 216:4,
221:20, 237:11
**fast**
104:4
**faster**
158:23
**favorable**
86:10, 96:15
**feces**
157:24
**federal**
147:9

**fees**
220:15, 228:16,
228:17, 228:18,
228:19, 228:23
**ferg**
110:16, 113:1,
129:19
**ferguson**
67:17, 68:1,
71:3, 71:8,
90:15, 90:20,
103:18, 104:23,
105:9, 106:15,
107:9, 124:1,
124:2, 124:16,
124:18, 141:19,
157:7, 167:1,
167:2, 167:15,
167:16, 168:6,
210:12, 210:13,
211:3, 220:3,
221:1, 221:2,
243:21
**ferguson's**
210:14
**few**
91:11, 113:16,
187:1, 187:16,
235:1
**fields**
232:23, 233:1
**fight**
160:10
**figure**
233:2
**figured**
114:11
**file**
115:20, 147:4,
147:10, 153:8,
153:16, 154:14,
171:23
**filed**
124:5, 124:11,
125:24, 126:5,
140:11, 147:8,
152:18, 153:1,
153:24, 154:22,

**fees** (col 2)
155:9, 155:13,
156:10, 156:16,
156:18, 177:8,
197:1, 197:3,
197:4, 197:8,
203:19, 211:20,
239:19, 240:1
**filing**
116:12, 117:1,
153:13, 153:22,
231:2, 241:19,
241:23
**fill**
80:7, 80:8,
81:24, 160:18,
160:19
**filled**
147:16
**final**
176:14
**financial**
245:12
**find**
80:12, 83:15,
90:8, 90:11,
93:23, 101:8,
199:2, 207:23
**fine**
73:2, 89:3,
167:7, 219:22,
237:14, 240:3
**finish**
72:4
**finished**
124:19, 132:24,
240:7
**fire**
197:19, 197:22
**fired**
152:18, 152:23,
152:24, 153:5,
153:13, 153:22,
207:22, 208:3,
208:4, 208:16
**firm**
69:4, 228:19,
228:24
**first**
71:4, 72:3,

73:20, 81:2,
83:11, 86:3,
87:15, 87:17,
89:19, 90:15,
90:21, 90:23,
93:2, 120:16,
141:22, 144:14,
148:22, 148:23,
163:21, 164:3,
164:4, 164:5,
167:19, 182:15,
189:10, 210:15,
211:23, 232:6,
232:10, 232:12,
232:24, 233:22
**fit**
196:1
**five**
121:20, 122:3,
167:9, 200:24,
219:19, 219:23,
240:4, 242:16,
242:19
**five-minute**
123:14, 167:6
**flashlight**
78:18
**fleming**
69:3, 123:17,
140:18, 167:7,
167:10, 196:3,
234:15, 234:18,
237:18, 242:16,
242:22, 242:24,
243:2, 243:8,
243:9
**fluctuating**
235:9
**focus**
97:5, 202:24
**folkers**
108:20, 127:5,
134:2, 134:3,
136:5, 136:17,
137:24, 139:16,
171:18, 171:19,
172:23, 173:2,
173:12, 173:15,

178:21, 179:10,
188:1, 188:12,
192:5, 192:6
**folks**
178:19
**follow**
141:24, 148:16,
237:16
**follows**
71:5
**food**
144:6
**footage**
119:6
**foregoing**
168:9, 211:8,
245:3, 245:4
**foremost**
120:16
**forgot**
209:1
**form**
92:10, 92:12,
111:1, 130:8,
201:8
**forms**
129:16, 136:18,
169:10, 199:2,
199:6, 199:24,
201:4
**forward**
104:4
**found**
140:4, 140:7,
172:16, 215:13
**four**
122:3, 199:8,
224:23, 243:12
**frame**
88:3, 149:3
**frankfort**
145:7
**frequently**
186:2
**friday**
67:19
**friend**
166:11

friendly
96:13
friends
95:24, 96:1
front
79:16, 210:13
fucking
113:23
fugitive
76:18, 79:15,
222:6, 222:7,
223:12, 223:15,
227:9
full
73:9, 133:18,
205:13, 205:15,
207:2, 218:22,
219:5, 219:9
fully
213:3, 213:7,
214:18, 217:3,
217:4, 217:7,
217:11, 217:14,
219:14
fun
104:1, 241:11
further
179:8, 193:19,
193:20, 242:14
future
220:13, 228:8,
228:9, 231:11

**G**

garbage
144:7, 158:5
gas
224:1
gave
105:7, 106:6,
119:24, 120:12,
129:16, 133:2,
152:8, 200:8
getting
81:2, 81:3,
128:2, 131:10,
142:23, 174:12,
180:20, 203:1,

227:19, 236:17
girlfriend
144:9
give
73:8, 90:3,
90:6, 91:15,
92:7, 92:23,
94:18, 94:19,
94:20, 95:20,
106:10, 106:16,
115:5, 119:19,
119:21, 147:3,
160:16, 163:5,
204:2, 205:23,
206:9, 206:13,
209:12, 216:7,
216:9, 217:16,
242:16
given
82:21, 83:9,
84:24, 85:9,
89:24, 90:7,
96:19, 141:4,
209:24, 230:17,
245:5
gives
92:18
giving
199:3
gnats
158:7
go
72:1, 76:9,
76:11, 76:12,
76:14, 78:24,
79:2, 80:4,
80:10, 80:11,
80:12, 80:16,
82:16, 83:22,
84:11, 88:24,
89:23, 92:13,
93:20, 100:21,
100:23, 104:3,
104:4, 105:8,
108:2, 111:18,
112:15, 125:9,
127:11, 127:22,
128:23, 130:12,

130:19, 131:6,
131:7, 131:17,
132:21, 133:1,
134:9, 135:3,
141:16, 141:17,
146:7, 147:18,
147:24, 148:10,
150:15, 154:1,
157:5, 160:11,
161:16, 162:22,
163:3, 163:6,
163:15, 163:18,
166:16, 169:6,
177:4, 178:1,
181:6, 182:6,
182:19, 193:23,
194:15, 196:9,
196:20, 197:14,
198:2, 200:23,
204:5, 210:6,
210:24, 211:11,
212:23, 213:11,
213:17, 213:19,
217:17, 220:5,
220:20, 221:6,
221:16, 225:18,
225:20, 227:8,
227:9, 227:10,
229:12, 230:16,
231:4, 237:19
goes
85:11, 87:15,
96:9, 145:21
going
72:1, 72:6,
73:5, 80:19,
82:6, 82:9,
82:10, 89:14,
94:2, 94:15,
95:3, 95:15,
104:12, 105:10,
108:5, 110:13,
110:16, 114:13,
118:19, 118:21,
120:21, 131:4,
140:18, 145:7,
158:21, 161:21,
163:1, 163:5,

163:6, 164:15,
165:22, 166:5,
166:16, 174:4,
178:3, 184:7,
184:9, 196:3,
202:17, 202:20,
202:23, 203:17,
206:1, 206:18,
208:4, 222:6,
229:24, 230:5,
230:9, 230:13,
230:20, 234:6,
241:5, 241:13,
242:11
gone
207:10, 207:21
good
71:8, 81:19,
95:24, 96:13,
97:4, 118:15,
123:17, 139:10,
146:20, 146:24,
178:5, 184:11,
224:23, 243:20
grandmother
160:24
grant
204:8, 209:5
granted
155:16
great
71:22, 242:19
grievance
106:19, 106:21,
112:14, 113:5,
147:16, 153:1,
153:5, 153:9,
153:13, 153:16,
153:23, 153:24,
154:19, 154:22,
155:2, 155:13,
155:16, 155:19,
177:9, 197:3,
197:4
grievances
147:10, 152:18,
155:9, 177:7,
177:12, 177:21,

196:24, 197:8,
211:21, 214:3
**grieved**
75:10, 108:11
**group**
148:7
**guess**
86:20, 91:6,
91:7, 91:9,
111:18, 112:18,
114:5, 118:18,
122:1, 132:3,
140:2, 147:7,
159:9, 171:4,
183:22, 184:8,
185:19, 185:22,
188:23, 202:1,
216:14, 219:7,
224:13, 229:14,
240:5
**gun**
78:18, 145:5
**guy**
83:14, 103:13,
103:23, 105:5,
139:11, 200:10,
200:23
**guys**
81:24, 84:22,
95:4, 102:7,
128:14, 128:18,
128:19, 135:11,
138:15, 140:2,
140:5, 140:8,
140:9, 140:11,
141:3, 146:18,
161:21, 164:16,
167:5, 171:9,
198:17, 201:11,
202:13, 205:20,
205:21, 206:9,
206:23, 212:18,
213:22, 233:3,
234:20

**H**

**half**
192:16, 192:17,

207:24
**halloween**
103:9, 103:12,
104:1, 126:9,
153:17, 155:15
**halloween-cry-fo-
r-help**
125:17
**hallway**
111:17, 133:16,
133:18, 133:20,
199:10
**hand**
83:21, 91:16,
92:10, 92:12,
199:14, 199:15,
199:20, 201:13,
214:24, 215:5,
245:14
**handcuff**
78:18
**handcuffs**
83:24
**handed**
167:1, 167:15,
221:1
**handing**
124:1
**hang**
116:19, 125:21,
126:16, 128:14,
132:22, 242:21
**happen**
84:2, 97:9,
97:19, 144:21,
161:18, 162:1,
162:3, 162:7,
162:8, 162:15,
163:9, 214:13,
231:11
**happened**
103:7, 104:8,
104:20, 105:9,
105:12, 105:23,
106:5, 106:10,
107:5, 107:6,
107:14, 112:2,
117:5, 144:17,

144:18, 145:6,
148:24, 149:4,
199:13, 202:16,
202:18, 202:19,
207:12, 208:18,
213:20, 214:5,
214:20, 217:23,
218:17, 235:23
**happening**
121:12, 144:24
**happens**
89:22
**hardly**
180:6
**head**
72:16, 110:3,
230:2, 230:16
**health**
100:5, 240:10,
240:11
**hear**
106:13, 146:16,
149:14, 195:22
**heard**
79:20, 81:6,
106:12, 107:16,
149:16, 153:2,
155:5, 155:23,
156:3, 171:10,
171:11, 171:20,
172:23, 173:4,
173:16, 173:19,
175:20, 214:7
**hearing**
100:22, 101:5,
101:10, 101:12,
101:20, 101:21,
101:24, 102:2,
102:3, 102:10,
108:2, 108:4,
123:5, 200:8,
200:10
**hearings**
108:6
**held**
211:19, 230:1
**hello**
196:7

**help**
81:24, 104:18,
107:16, 107:20,
107:21, 115:1,
115:7, 121:9,
121:15, 175:21,
198:12, 217:19
**helped**
91:21, 91:24,
118:14, 153:18
**helpful**
187:23
**herbert**
69:4
**here**
74:13, 90:15,
95:11, 105:1,
110:17, 113:2,
113:3, 117:16,
118:4, 124:17,
124:23, 125:8,
126:5, 126:18,
128:8, 134:22,
137:17, 137:22,
138:2, 138:7,
138:22, 139:3,
141:21, 141:23,
143:7, 143:14,
143:21, 145:19,
146:5, 146:10,
148:23, 150:16,
151:18, 155:23,
156:24, 166:20,
167:19, 168:5,
168:16, 168:19,
169:12, 169:22,
170:1, 177:5,
178:2, 178:4,
178:10, 178:14,
178:17, 179:8,
180:21, 180:23,
181:10, 182:8,
182:20, 182:23,
183:1, 193:18,
194:9, 194:19,
196:2, 196:8,
198:3, 202:17,
202:24, 203:23,

204:3, 204:7,
204:12, 209:9,
209:13, 209:22,
210:13, 211:13,
211:24, 217:5,
219:3, 220:3,
220:6, 220:9,
221:18, 225:14,
226:3, 228:2,
228:19, 228:22,
229:2, 229:14,
230:14, 231:16,
233:20, 236:17,
237:2, 240:6,
242:13, 242:21
**here's**
90:20
**hereby**
245:4
**hereunto**
245:14
**hey**
103:17, 146:20
**high**
196:12, 196:17,
209:19, 229:23,
231:15, 231:17,
231:18, 233:24,
234:23, 236:4,
236:19
**higher**
143:10, 143:13,
143:22, 144:1,
144:5, 145:15,
150:20, 224:9,
231:8
**hispanic**
102:21, 102:22,
213:13, 213:18
**hispanics**
214:3
**hit**
113:22, 118:24,
120:24, 144:24,
145:1, 175:6,
175:8, 175:11,
175:17, 199:16,
202:3

**hmru**
77:21
**hmt**
77:21
**hoffman**
93:18, 144:10,
145:8
**hold**
133:23
**holder**
78:20
**hollering**
103:11
**holster**
78:18, 78:19
**home**
76:7, 76:15,
76:16, 76:19,
76:21, 80:20,
83:16, 104:3,
104:4, 132:4,
160:11
**hon**
67:10
**hooked**
172:7
**hooper**
69:24, 243:14
**hope**
241:7, 241:19
**hopefully**
242:7
**hoping**
240:8, 241:15
**hopper**
243:17
**hospital**
173:10
**host**
80:10, 82:2,
160:20
**hostile**
157:10, 157:12,
157:17, 158:10
**hour**
131:6, 131:12
**hours**
83:12, 83:13,

86:7, 86:8,
86:10, 88:1,
88:4, 100:13,
122:20, 131:11,
133:13
**house**
145:11, 145:14,
146:7, 160:21
**huh**
165:24, 180:15
**humiliation**
220:16, 229:3
**humira**
237:9
**hurtado**
179:11, 190:24,
191:3, 191:5,
191:14, 192:1
**hurtado's**
190:24
**hypotheticals**
144:16

**I**

**idea**
98:3, 141:9,
141:15, 226:6
**identification**
123:23, 166:24,
210:11, 220:24
**identified**
178:15, 182:24,
197:2, 209:13,
233:20
**identify**
167:19, 168:16,
169:8, 177:6,
178:6, 181:2,
181:8, 182:8,
194:1, 194:17,
195:3, 195:13,
196:21, 197:16,
198:3, 209:9,
213:1, 213:6,
214:16, 220:6,
233:19, 237:8,
237:21
**il**
69:6, 69:13,

**69:20**
**illinois**
67:2, 68:9
**impact**
209:11
**incident**
102:5, 102:24,
107:1, 107:6,
108:1, 108:13,
109:4, 124:22,
125:17, 125:24,
126:9, 126:21,
127:2, 143:10,
143:14, 143:22,
144:2, 144:5,
145:15, 150:20,
153:17, 155:15,
176:9, 196:12,
196:17, 198:10,
201:23, 203:2,
208:9, 208:14,
209:19, 214:12,
214:22
**include**
170:21
**included**
78:16
**including**
220:14
**income**
220:14, 228:8,
228:9
**indicate**
179:14
**indicated**
169:23, 177:8
**individual**
102:3
**individuals**
102:9, 108:19,
109:3, 109:7,
109:13, 139:13,
140:23, 141:8,
178:15, 179:14,
182:20, 182:23,
187:10, 187:13,
206:3, 206:6
**influence**
241:20

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

62

information
82:1, 170:14,
213:12, 233:14,
233:17, 234:9,
234:10, 234:19
informed
89:18, 134:15
initial
220:10, 221:3
initially
201:6
injection
237:9
injured
84:5, 84:7,
84:13, 84:14,
144:13, 144:14,
144:15, 144:23
injuries
229:16, 229:21
inmate
80:4, 160:13,
160:18, 160:19,
161:5, 161:8
inmates
82:12
inquiring
199:5, 199:11
inside
105:1
inspection
103:8, 103:10,
103:17, 103:21,
104:10, 122:8,
123:10
instance
148:6, 195:3,
195:13, 197:17,
197:18, 235:3
instead
190:17, 192:24
insurance
232:21
intend
242:6
interaction
116:7, 161:13,
162:17

interactions
84:6, 84:12
interest
245:11
internal
196:23
interrogatories
70:11, 167:21,
167:24, 170:10,
210:16
interrogatory
168:15, 169:7,
169:13, 170:15,
170:22, 177:5,
178:2, 178:11,
181:7, 182:7,
182:13, 194:3,
194:9, 194:16,
196:2, 196:10,
197:15, 198:2,
204:1, 210:20,
221:17, 229:12,
229:17, 231:16,
233:18, 237:20
interrupt
72:7
interrupted
239:8
interview
104:24, 127:22
interviewed
217:20, 217:21,
231:7
intimidated
158:13
intimidating
158:19
intimidation
158:12
investigate
214:6
investigated
213:3, 213:8,
214:18, 214:21,
216:24, 217:1,
217:3, 217:4,
217:8, 217:11,
217:14, 219:14

investigating
105:20, 176:12,
218:13
investigation
108:7, 108:8,
123:2, 123:3,
169:15, 169:17,
170:2, 170:3,
170:8, 170:11,
170:13, 182:13,
182:16, 182:17,
189:20, 193:18,
193:20, 193:21,
194:19, 194:21,
198:6, 202:1,
203:11, 213:5,
216:5, 216:12,
216:17, 216:21,
218:18, 218:22,
219:4, 219:9,
229:18
investigations
222:24
investigator
76:3, 76:4,
85:11, 86:16,
90:15, 90:20,
90:24, 91:2,
92:1, 92:18,
94:17, 95:2,
96:24, 97:14,
98:10, 98:16,
98:24, 102:15,
102:20, 104:13,
104:23, 105:9,
105:19, 107:8,
108:20, 108:21,
112:11, 127:4,
127:5, 127:8,
127:11, 128:20,
129:16, 145:21,
217:16
investigator's
208:24
investigators
84:23, 87:1,
91:3, 91:5,
91:16, 92:9,

96:18, 96:21,
97:2, 98:20,
98:21, 102:4,
103:16, 107:4,
107:13, 108:16,
108:24, 109:11,
121:18, 121:20,
121:22, 123:7,
135:3, 151:16,
173:18, 178:18,
179:9, 181:12,
204:9, 204:10,
208:19, 208:20,
209:6, 209:7,
209:15, 211:18,
211:20
involved
78:14, 117:12,
117:14, 118:22,
202:18, 239:11,
239:17
issue
77:22, 80:13,
86:22, 99:13,
100:18, 127:3,
137:4, 142:15,
142:17, 142:22,
151:5, 153:9,
155:20, 169:3,
169:18, 169:23,
170:17, 171:6,
175:1, 175:3,
176:4, 176:17,
180:22, 186:3,
203:14, 203:20,
208:12, 212:7,
212:11, 212:12,
219:2, 225:14,
227:4, 227:21,
229:13
issued
78:4, 78:9,
107:1, 108:12,
211:17, 212:18
issues
71:17, 71:19,
76:22, 99:24,
125:14, 236:6,

236:7, 243:23
**issuing**
211:19

---
**J**
---

**jackson**
104:13, 115:4,
217:16
**jail**
76:12, 81:14,
83:22, 161:16,
162:18, 213:23,
226:14, 226:15,
226:19, 227:10
**january**
75:2, 75:3,
75:10, 75:13,
106:14
**jefferson**
69:5
**job**
67:22, 72:9,
76:17, 81:22,
89:18, 89:19,
90:4, 90:15,
90:21, 91:15,
92:14, 92:19,
93:2, 94:22,
94:23, 104:7,
104:9, 105:2,
106:8, 159:7,
159:9, 159:12,
159:13, 160:5,
160:6, 184:12,
184:15
**jobs**
89:10, 89:14,
91:4, 91:12,
92:7, 158:24,
159:17, 189:1
**john**
193:6, 193:7
**judge**
82:14, 82:24,
162:23
**juliet**
69:24, 123:20,
124:14, 126:2,

141:17, 166:22,
167:12, 168:2,
168:14, 179:6,
210:23
**july**
110:11, 111:15,
116:20, 117:15,
128:15, 129:10,
129:11, 129:12,
168:20, 169:24,
197:3, 198:10,
198:12, 198:17
**june**
110:9, 110:10,
111:15, 116:20,
117:15
**jury**
133:18
**justice**
240:11
**justin**
69:10, 71:9

---
**K**
---

**keep**
101:9, 101:15,
108:5
**keith**
108:20
**kelly**
228:19, 228:23,
234:16, 234:18,
236:24, 237:13
**kennelly**
67:11
**kept**
199:2, 201:5
**key**
78:20
**kid**
107:22
**kids**
103:10, 103:24
**kind**
72:7, 73:15,
74:12, 77:19,
82:7, 84:16,
96:13, 110:21,

147:4, 147:10,
149:2, 161:12,
170:8, 170:12,
170:13, 186:2,
202:24, 206:2,
208:12, 210:1,
216:7, 216:12,
216:16, 216:20,
223:22, 224:4,
224:12, 224:19,
234:12, 239:11,
239:14, 243:23
**kinds**
209:16, 239:16
**knew**
106:4, 107:17,
114:9, 114:21,
115:19, 116:5,
116:10, 116:11,
116:23, 117:1,
117:12, 121:11,
122:2, 148:15,
148:17, 148:18,
200:17, 200:21,
206:17, 207:17
**knowing**
160:17, 229:24,
230:2, 230:9
**knowledge**
120:17, 120:19,
178:17
**known**
218:16

---
**L**
---

**l-a-u-g-h-r-a-n**
193:8
**labor**
88:21
**ladies**
103:13, 111:17,
111:18, 114:5
**lady**
107:16, 107:21,
171:10, 171:12,
171:21
**language**
145:20, 194:18,

195:5, 195:6,
195:14, 217:5,
220:18
**lasalle**
69:12
**last**
71:24, 74:2,
74:8, 75:7,
75:19, 79:12,
83:12, 91:19,
91:21, 91:22,
102:17, 119:9,
120:7, 168:3,
168:4, 211:1,
240:1, 242:13
**lasted**
88:6
**late**
208:20
**later**
71:16, 207:23,
207:24
**latino**
180:14, 180:16
**laughran**
137:24, 139:17,
193:2, 193:6,
193:7, 193:9,
193:12, 193:14,
199:18, 206:22
**law**
69:4, 69:18,
78:14, 228:19,
228:24
**lawsuit**
140:4, 140:6,
140:7, 169:24,
171:5, 174:3,
174:7, 177:14,
177:23, 202:17,
203:16, 203:19,
221:19, 221:22,
222:4, 222:19,
228:11, 229:8,
229:16, 231:2,
235:24, 236:8,
238:8, 238:17,
238:24, 239:3,

239:6, 240:9,
240:14, 240:20,
241:5, 241:14,
241:19, 241:23
**lawsuits**
120:20, 170:24,
239:12, 239:14,
241:11
**lead**
176:2
**leading**
200:10
**learn**
138:13, 138:15,
187:21
**learned**
117:14
**least**
167:18
**leave**
89:23, 128:3,
132:14, 132:20,
135:12, 172:19
**leaving**
129:1, 134:10
**led**
175:19, 241:24
**left**
75:24, 76:16,
92:13, 104:2,
122:6, 132:13,
132:23, 133:24
**leg**
77:24
**legrain**
67:5, 102:11,
102:12, 199:19,
239:2
**leinenweber**
69:10, 69:11,
70:5, 71:7,
71:9, 123:13,
123:16, 123:18,
123:20, 123:24,
124:14, 126:2,
141:17, 157:5,
166:21, 167:4,
167:8, 167:12,

167:14, 168:2,
168:14, 169:6,
177:4, 178:1,
178:12, 179:5,
179:12, 181:6,
182:6, 182:19,
193:23, 194:15,
196:9, 196:20,
197:14, 198:1,
203:22, 204:4,
210:5, 210:23,
211:11, 212:23,
220:2, 220:20,
234:6, 234:16,
234:21, 237:15,
237:19, 242:14,
242:20, 243:1,
243:3, 243:12,
243:15, 243:19
**less**
181:12
**let's**
91:12, 96:6,
97:5, 99:6,
102:22, 110:22,
127:8, 128:8,
137:6, 141:16,
143:7, 149:13,
150:15, 154:1,
157:4, 159:4,
166:19, 167:8,
171:15, 178:1,
178:3, 181:6,
182:6, 182:19,
183:6, 193:23,
196:9, 196:20,
210:9, 215:2,
215:6, 217:2,
217:5, 219:16,
220:4, 220:20,
220:21, 221:16,
221:17, 229:12,
232:12, 236:10,
237:3, 242:13
**letter**
108:3
**letting**
206:10

**level**
231:8
**lied**
201:9, 201:10
**lieutenant**
104:22, 109:21,
110:1, 110:24,
111:8, 115:20,
137:11, 138:3,
151:6, 186:9,
186:10, 191:23,
218:1, 222:6,
223:2, 224:4,
224:7, 224:8,
225:15, 225:18,
225:19, 225:20,
225:24, 226:7,
226:13, 226:14,
226:16
**lieutenants**
186:18, 187:7,
224:21, 226:15,
227:14
**lifestyle**
235:2
**limitations**
225:4
**line**
126:3
**list**
183:1
**listed**
183:2
**listen**
215:14
**lists**
182:20
**litigation**
220:14, 228:13,
228:14
**little**
72:9, 77:12,
78:10, 79:24,
85:19, 86:18,
89:10, 89:11,
99:6, 107:22,
113:20, 115:2,
117:15, 126:3,

131:14, 163:5,
171:3, 171:4,
172:4, 182:22,
222:12, 229:13,
235:5
**living**
222:15
**liz**
234:7, 237:15
**liz's**
228:24
**llc**
69:11
**located**
81:16
**lock**
83:14
**locked**
82:12
**long**
72:20, 83:10,
88:6, 136:24,
153:7, 160:17,
163:20, 163:21,
164:1
**longer**
172:17, 202:24,
210:8
**look**
137:6, 139:10,
167:22, 178:14,
224:16, 240:6
**looked**
103:19, 108:22,
110:14
**looking**
123:10, 179:24,
204:12, 226:4,
227:17
**looks**
180:19
**lopez**
179:10, 189:10,
189:13, 189:15,
189:16
**lopez's**
189:11
**lost**
201:7, 220:12,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                    65

221:18, 221:23,
222:1, 222:2,
222:3, 222:9,
222:17, 225:13,
226:4, 226:5,
228:10, 228:12
**lot**
91:18, 110:21,
133:5, 145:11,
145:13, 230:17
**loud**
241:18
**loudermill**
100:22, 101:11,
101:12, 101:19,
101:21, 102:2,
102:3, 102:10,
108:2, 108:4,
200:7, 200:10
**love**
242:12
**lunch**
185:6
**lying**
231:5

M

**mad**
160:12, 160:22,
161:1
**made**
86:12, 86:15,
86:20, 98:1,
98:4, 98:19,
98:23, 136:4,
141:10, 177:7,
177:12, 177:21,
183:20, 185:17,
186:7, 186:16,
187:9, 188:8,
189:22, 191:17,
192:9, 197:8,
204:10
**magazine**
78:19
**main**
76:20, 95:4,
180:6

**mainly**
76:18, 76:19,
78:2, 78:10,
82:2, 82:4,
88:16, 91:11,
143:18, 152:4,
159:3, 161:20
**majority**
171:4
**make**
72:9, 72:10,
80:9, 87:5,
95:14, 95:16,
95:19, 96:9,
126:16, 136:7,
136:12, 139:10,
141:13, 177:19,
182:22, 190:1,
242:17
**makes**
241:12
**making**
176:20
**man**
103:24, 113:17,
113:22, 114:11,
176:23, 207:22,
233:3
**man's**
199:21
**many**
82:12, 82:14,
96:18, 96:21,
146:23, 222:13
**march**
75:8, 75:11,
168:12, 169:18,
169:22, 242:3,
242:4, 242:7
**mark**
220:20
**marked**
123:22, 124:2,
166:23, 167:2,
167:16, 210:10,
210:13, 220:23,
221:2, 243:12
**materials**
73:11

**matted**
157:22
**matter**
71:11
**matteson**
232:24
**matthew**
67:10
**maybe**
75:7, 76:16,
79:6, 91:22,
92:16, 100:5,
104:20, 110:9,
117:8, 117:9,
172:20, 186:24,
188:3, 188:4,
191:4, 191:11,
192:16, 205:7,
205:8, 207:24,
208:21, 214:14,
218:21, 224:23,
229:13, 230:11,
231:19, 232:14,
234:16, 237:2,
240:4
**mean**
78:6, 78:16,
81:9, 83:19,
86:2, 86:24,
88:22, 89:21,
92:1, 94:9,
95:19, 97:8,
99:23, 118:21,
130:22, 134:13,
135:18, 142:13,
142:24, 144:12,
151:19, 154:13,
157:19, 159:11,
162:20, 163:1,
164:14, 165:18,
169:20, 174:11,
187:8, 192:15,
196:11, 200:13,
200:14, 202:21,
205:14, 205:22,
207:9, 207:15,
221:23, 222:2,
222:12, 224:9,

**matted**
227:3, 228:5,
229:9, 230:4,
230:11, 231:1,
231:3, 231:9,
233:13, 240:22,
241:15
**meaning**
81:1, 84:21
**meaningful**
154:3, 154:9
**means**
72:15
**meant**
118:1, 118:2,
118:5
**media**
238:20
**medical**
100:1, 100:2,
233:19, 234:13,
236:6
**medication**
236:19, 237:12,
237:17
**medications**
237:7
**medicine**
237:8
**memorandums**
197:8
**men**
233:5
**mental**
220:16, 229:3,
229:16, 229:21
**mention**
228:2
**mentioned**
78:13, 102:24,
108:15, 134:2,
139:3, 139:13,
223:12, 231:15,
231:17
**merit**
99:11, 100:24,
101:5, 101:9,
101:23, 168:24,
174:16, 174:17,

**175:2,** 222:23,
223:4, 223:10,
224:7, 226:15,
227:6, 240:17,
241:5, 241:13,
241:21, 241:24
**mess**
213:22
**messages**
238:12, 238:15
**messina**
108:21, 127:5,
134:2, 136:4,
136:17, 137:24,
139:16, 171:18,
171:19, 172:23,
173:2, 173:12,
173:15, 178:21,
192:3, 192:13,
192:23
**mexican**
102:21, 188:17,
189:12, 190:5,
191:2
**midst**
144:23
**midwest**
69:19
**might**
83:14, 83:19,
83:21, 83:22,
86:9, 89:10,
96:14, 100:12,
100:15, 104:18,
132:16, 139:9,
159:13, 160:10,
161:1, 161:16,
164:14, 165:1,
165:2, 165:3,
165:9, 165:13,
165:15, 165:17,
166:16, 205:23,
235:13, 236:3
**mind**
167:5, 205:11,
240:10, 240:15,
241:2, 241:16
**minute**
115:18

**minutes**
167:9, 219:20,
219:23, 242:17,
242:19
**mischaracterizes**
140:19
**misconduct**
213:2, 213:6,
214:16, 216:23,
217:6, 219:13
**misplaced**
199:7, 199:9
**missed**
195:20, 226:10,
237:2
**misses**
76:10
**missing**
87:9
**misunderstand**
92:17
**moment**
167:17
**monday**
71:14, 82:13
**money**
122:18
**monitoring**
74:10, 74:16,
74:21, 75:1,
75:14, 75:19,
76:1, 79:11,
79:15, 81:1,
81:3, 81:4,
82:15, 83:1,
83:2, 83:6,
213:13, 224:21
**month**
134:17, 165:5,
165:6, 200:1
**months**
126:8, 139:11,
165:8, 165:10,
189:4, 189:5
**more**
77:12, 84:8,
86:10, 86:18,
92:1, 96:6,

96:14, 96:15,
108:21, 112:18,
113:20, 129:5,
145:14, 158:24,
162:3, 162:17,
162:24, 163:3,
163:10, 172:18,
179:20, 184:5,
190:14, 206:23,
206:24, 209:18
**morning**
71:8, 104:13
**most**
85:12, 85:18
**mostly**
162:21
**mother**
160:24, 208:24
**mouth**
101:17, 174:21
**move**
74:24, 143:7,
157:2
**moved**
75:8, 75:9,
75:11
**much**
136:21, 149:5,
162:8, 210:8,
243:21
**multiple**
141:20
**myself**
78:14, 114:16,
235:11

---
**N**
---

**name**
71:8, 94:6,
94:10, 101:20,
110:3, 110:4,
111:1, 111:2,
112:19, 112:22,
115:21, 117:2,
124:9, 232:6,
236:23
**named**
181:5

**names**
108:18, 237:17
**nature**
222:8, 229:15
**nd**
245:15
**neal**
88:15, 137:12,
138:3, 149:24,
151:6, 156:7,
156:8, 156:19,
156:22, 173:4,
173:6, 194:5,
199:3, 212:3,
212:15
**need**
72:10, 72:20,
76:8, 96:22,
96:23, 166:16,
182:16, 182:21,
193:20, 194:21,
203:22, 234:7,
240:13, 243:8
**needed**
225:8, 242:18
**needs**
210:7
**neglect**
169:20
**neither**
245:9
**never**
83:13, 83:18,
84:14, 95:6,
97:8, 97:9,
99:4, 99:5,
105:16, 106:3,
106:4, 106:12,
107:17, 107:21,
107:22, 109:10,
114:21, 114:23,
115:1, 116:10,
116:22, 121:11,
121:16, 130:2,
130:3, 130:20,
131:1, 138:15,
139:6, 139:20,
139:21, 140:7,

140:14, 140:15,
140:16, 144:14,
144:15, 147:16,
149:9, 149:16,
152:24, 153:1,
160:9, 161:2,
161:21, 164:21,
171:10, 180:6,
180:8, 183:7,
185:11, 189:18,
189:21, 199:6,
200:3, 200:4,
200:6, 200:17,
200:21, 206:17,
208:7, 211:19,
213:20, 214:4,
217:22, 217:23,
218:24, 224:15,
233:24, 235:10,
239:2, 239:5
**new**
76:8, 224:21,
224:22
**news**
104:6, 106:6
**newson**
146:6
**next**
90:4, 92:14,
104:3, 105:21,
121:23, 190:3,
218:4
**nice**
130:8, 145:9,
145:12, 162:16,
164:2, 166:2,
166:4, 196:14
**nicer**
145:16, 163:16,
163:24, 164:12,
164:24, 165:12,
165:20, 196:13
**nickle**
137:23, 139:16,
139:21, 179:9,
183:2, 183:4,
183:6, 183:7,
183:10, 183:14,

183:20, 183:24,
184:6, 184:11,
184:17, 185:9
**nigger**
146:19
**night**
82:10, 82:21,
104:4
**nine**
139:11
**nobody**
105:8, 105:10,
105:11, 107:19,
107:20, 109:5,
109:10, 114:23,
114:24, 118:13,
217:21, 217:24,
218:2, 239:10
**nod**
72:16
**non-merit**
226:16
**none**
109:6, 139:22,
140:9, 173:14,
212:17, 223:11,
228:15
**nonminority**
125:1, 126:24,
136:13, 137:3,
137:21, 138:5,
139:3, 143:11,
150:18, 151:2,
152:10, 152:14,
178:7, 178:24,
181:1, 182:9
**nonviolent**
162:21
**north**
69:12, 93:13,
93:14, 93:16,
93:18, 95:7,
103:15, 143:18,
160:1, 163:18,
185:3, 185:6
**northeast**
160:1, 185:4
**northern**
67:2

**northwest**
160:1
**notary**
68:8
**notes**
240:6
**nothing**
107:20, 107:23,
113:17, 115:1,
118:13, 166:17,
173:5, 173:16,
173:19, 206:17,
214:4, 214:8,
215:21, 216:4,
217:24, 228:21,
235:14
**notice**
68:7
**november**
91:22, 127:14,
128:4, 128:7,
128:21, 128:22,
131:22, 131:23
**number**
71:24, 81:7,
82:21, 82:24,
83:4, 83:8,
167:16, 168:15,
169:13, 178:2,
178:11, 178:13,
182:13, 193:23,
194:4, 195:2,
209:9, 211:12,
220:5, 229:17,
238:10
**numbered**
221:7
**numerous**
211:20

**O**

**o'malley**
129:8, 129:9,
129:18, 129:19,
133:3, 133:6,
198:19
**o'malley's**
129:14

**oak**
69:20
**object**
140:18, 196:3
**objections**
70:12, 210:14
**obtain**
170:13
**occasion**
165:20
**occasionally**
135:3, 164:23,
235:17
**occasions**
188:5, 191:18,
193:11
**occurrence**
135:2
**october**
103:9, 105:13,
119:9, 119:11,
119:13, 197:5,
202:9
**odd**
195:22
**oe**
112:1
**offensive**
194:17, 195:4
**offer**
182:2
**offhand**
127:16, 137:5,
147:15, 152:6
**office**
74:14, 81:11,
92:13, 105:1,
119:16, 130:6,
130:11, 133:18,
147:11, 150:19,
159:6, 159:8,
172:17, 175:16,
189:21, 199:11,
199:19, 215:4,
217:8, 231:13
**officer**
178:24, 245:2
**officers**
125:1, 127:1,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

68

133:19, 136:13,
137:3, 137:21,
138:5, 138:19,
139:3, 143:11,
150:18, 151:2,
152:3, 152:10,
152:14, 178:7,
181:2, 182:9,
183:1, 211:16,
213:2, 213:7,
217:7

**oh**
79:1, 82:17,
99:13, 105:22,
106:1, 110:17,
112:8, 113:11,
114:20, 115:16,
116:8, 116:9,
116:22, 128:17,
155:17, 156:23,
179:16, 227:2

**old**
81:13, 85:15

**olympia**
232:22, 233:1

**once**
86:13, 90:1,
90:19, 140:2,
164:14, 186:24,
188:4, 189:3,
199:10

**one**
71:10, 72:20,
73:1, 73:4,
73:17, 75:16,
75:18, 76:21,
79:7, 83:11,
85:9, 85:10,
86:9, 92:1,
96:6, 98:24,
102:12, 102:18,
103:16, 106:4,
106:6, 109:17,
110:7, 115:4,
115:15, 122:3,
122:5, 123:10,
131:6, 131:12,
139:9, 141:22,

147:2, 150:24,
156:11, 156:12,
165:2, 165:3,
178:2, 182:8,
189:17, 190:3,
194:1, 195:13,
196:21, 197:16,
203:22, 203:24,
204:2, 204:12,
206:22, 208:20,
210:5, 214:9,
215:2, 220:6,
220:21, 221:8,
227:11, 237:21,
242:13

**ones**
109:8, 181:5,
218:13

**ongoing**
218:19, 221:10

**online**
217:17

**only**
72:14, 85:9,
96:11, 96:12,
97:8, 102:3,
102:23, 106:5,
109:17, 109:18,
110:7, 120:9,
121:2, 121:6,
122:11, 131:6,
131:11, 136:11,
137:14, 144:13,
156:7, 163:9,
183:16, 192:7,
192:14, 192:17,
205:16, 207:15,
207:16, 233:20

**open**
205:20

**openly**
147:16

**opinion**
86:10

**opportunities**
220:12, 226:4,
226:9, 227:19,
227:23

**opportunity**
154:3, 154:10,
154:14

**opposed**
152:10

**opr**
105:13, 105:19,
109:20, 109:22,
110:2, 116:13,
117:1, 117:5,
117:21, 118:17,
119:17, 120:12,
120:18, 127:22,
147:24, 171:23,
172:13, 176:11,
199:23, 200:2,
201:16, 201:17,
202:1, 203:11,
207:6, 207:14,
214:4, 214:6,
215:11, 215:12,
215:16, 216:7,
216:9, 216:15,
218:10, 218:11

**opr's**
119:15

**order**
72:8, 240:14,
243:5

**orders**
82:24

**other**
72:10, 76:22,
79:10, 79:14,
102:4, 107:4,
108:10, 108:14,
108:16, 108:24,
109:3, 109:12,
111:4, 112:24,
114:13, 121:17,
121:18, 121:19,
121:20, 121:22,
123:6, 123:11,
126:17, 136:13,
137:3, 138:5,
146:13, 147:8,
149:10, 149:21,
150:4, 150:12,

169:8, 173:18,
173:21, 173:22,
175:24, 176:1,
177:11, 177:20,
178:18, 180:5,
181:1, 181:12,
182:1, 184:23,
185:10, 194:8,
194:12, 196:15,
197:7, 198:10,
202:7, 202:13,
202:15, 206:23,
207:13, 209:4,
209:7, 209:21,
214:9, 214:12,
214:16, 216:23,
217:6, 219:11,
219:12, 220:15,
226:9, 227:23,
227:24, 229:19,
230:8, 230:11,
230:19, 231:10,
236:6, 238:1,
238:7, 238:16,
238:23, 239:5,
239:12, 239:14,
239:16

**otherwise**
245:12

**out**
76:9, 76:11,
76:14, 77:23,
79:3, 80:4,
80:7, 80:8,
80:17, 80:18,
81:3, 82:1,
82:14, 83:21,
86:22, 89:14,
89:23, 90:8,
90:11, 91:5,
91:16, 91:21,
91:24, 92:8,
93:20, 93:23,
97:6, 100:3,
101:8, 104:18,
107:4, 107:13,
108:24, 109:17,
109:23, 114:10,

114:12, 115:7,
116:1, 118:15,
118:18, 119:5,
121:9, 121:18,
121:21, 122:1,
122:5, 122:15,
127:24, 133:20,
133:21, 140:4,
140:7, 143:24,
147:16, 157:20,
159:16, 160:18,
160:19, 163:4,
170:24, 171:5,
171:9, 172:16,
173:9, 174:24,
176:3, 176:4,
176:18, 176:21,
177:2, 180:5,
197:21, 199:14,
202:11, 202:12,
202:13, 202:19,
207:10, 207:23,
213:17, 217:19,
226:10, 229:13,
233:2, 240:8,
241:18
**outcome**
100:23, 101:5,
101:9, 101:23,
108:4, 241:20,
245:12
**outside**
105:23, 107:15,
108:16, 133:2
**over**
71:23, 72:10,
89:20, 90:3,
90:5, 92:14,
104:9, 108:3,
109:22, 112:6,
120:12, 123:2,
126:17, 143:11,
168:3, 178:3,
198:14, 201:15,
208:1, 227:11,
230:2, 234:19,
241:9
**overturned**
108:12

**overweight**
235:8, 235:10
**own**
132:14, 163:7,
223:24

---

**P**

---

**page**
70:3, 70:8,
72:2, 128:12,
141:18, 167:19,
168:3, 168:4,
168:6, 210:24,
211:1, 213:4,
221:6, 221:7
**pages**
67:23, 178:3
**paid**
122:17, 131:10,
199:6, 200:4,
206:10, 228:23
**pandemic**
116:21
**paper**
92:10, 92:12,
92:15, 112:21
**paperwork**
110:4, 110:18,
115:21, 116:4,
116:6, 116:11,
116:16, 117:3,
117:7, 117:12,
117:21, 118:8,
224:16
**paragraph**
124:23, 125:4,
125:5, 126:18,
126:20, 137:6,
137:7, 137:10,
141:16, 141:22,
143:7, 146:5,
146:10, 150:15,
150:16, 150:24,
151:9, 151:14,
151:24, 152:1,
152:7, 152:12,
152:16, 152:20,
154:1, 154:6,

154:8, 155:2,
155:6, 156:21,
157:6, 180:21
**paragraphs**
124:15
**parking**
133:5
**part**
80:21, 81:11,
82:21, 112:12,
112:14, 142:24,
179:7, 230:8
**participants**
84:9
**participated**
201:24, 203:11
**particular**
84:24, 124:18
**parties**
245:11
**partner**
77:14, 77:15,
77:16, 89:12,
183:5, 188:23,
208:22
**partners**
191:8, 192:5
**parts**
143:18, 160:2,
162:1, 178:4,
243:24
**passed**
218:4, 222:21
**passing**
225:5
**past**
116:14, 148:8,
199:12, 213:16
**pat**
109:21
**patrol**
75:20, 76:3,
76:5, 77:2,
77:3, 77:7,
77:8, 77:10,
78:5, 78:24,
79:3, 79:14,
83:8, 85:20,

89:9, 89:11,
89:19, 90:8,
91:5, 92:9,
92:18, 93:2,
93:20, 94:2,
94:17, 95:2,
95:3, 96:10,
96:19, 144:1,
145:22, 159:18,
160:3, 160:4,
160:5, 160:6,
163:22, 191:16,
191:18, 194:11
**patrolled**
144:1
**patrolling**
77:5, 95:16,
184:9
**pay**
206:4, 206:6,
206:16, 207:3,
210:3, 225:21
**paying**
122:8
**peace**
240:10, 240:15
**pemonte**
127:4, 128:24,
129:1, 131:18,
136:5, 136:17,
137:24, 139:17,
178:20, 179:10,
186:23, 187:1,
187:16
**penalty**
168:8, 211:7
**pencil**
160:20, 161:2,
161:3, 161:4,
161:7
**pencils**
160:15, 160:16
**pending**
72:21, 101:5,
101:9, 101:23,
123:1, 168:24,
175:1, 177:9,
223:4, 223:9

penitentiary
161:22
people
82:22, 82:24,
83:4, 84:12,
85:8, 109:9,
113:18, 113:19,
113:23, 114:1,
137:14, 147:17,
171:16, 180:6,
180:7, 184:10,
205:17, 205:20,
213:13, 231:5
perceive
96:14
percent
159:23
percussionist
236:16
perfect
172:10, 182:22,
243:11
perfectly
73:2
perimeter
108:24
period
84:18, 165:5
perjury
168:8, 211:8
person
76:7, 85:18,
95:15, 95:20,
101:19, 104:14,
109:19, 136:11,
139:9, 145:3,
145:6, 156:7,
162:24, 166:13
personal
91:10, 120:5,
120:13, 120:17,
163:12, 163:14,
204:20, 237:22,
238:1
personnel
164:5
phone
71:15, 80:9,

160:23, 237:4,
237:5, 238:10,
238:13
physical
84:12, 225:2,
225:5, 229:15,
229:20, 236:6
physically
80:18, 92:19,
121:23
pick
76:11
picked
104:17
picks
76:13
pickup
106:9
pickups
76:23
pictures
237:4
piece
92:15
pieces
100:9
pin
149:2
place
80:12, 144:13,
160:11, 216:12
placed
83:5, 143:9,
143:22
placements
209:15
plain
223:23
plaintiff
179:8, 204:7,
210:14, 220:11
plaintiff's
220:10, 221:3
plaintiffs
67:7, 69:2,
102:13, 141:21,
142:2, 143:10,
146:12, 150:19,

152:9, 152:17,
154:4, 155:4,
209:11, 221:10,
239:6, 243:9
play
138:11, 236:15
played
85:3, 138:19,
138:21
playing
103:11, 236:15
please
72:4, 107:3,
123:21, 166:22,
167:13, 167:17,
168:15, 169:7,
193:24, 220:10,
243:6
plus
110:8
point
97:16, 97:23,
226:21, 227:3
police
104:24, 107:8,
109:19, 133:18,
223:11
policy
130:17, 209:10,
209:14
pool
79:15
position
85:10, 89:19,
96:3, 96:4,
97:13, 98:2,
98:8, 98:16,
121:9, 121:15,
121:17, 138:10,
147:12, 148:13,
159:15, 188:11,
192:11, 225:22,
225:24, 226:7
positions
75:16, 97:1,
97:17, 98:17,
98:24, 137:16,
150:19, 151:21,

159:19, 159:22,
159:23, 181:8,
182:10
possible
121:8, 121:14,
184:17
possibly
165:11, 231:11
post
110:8, 110:14,
111:20, 111:24,
112:1
practice
232:18, 233:12
practices
199:12, 209:10,
209:14, 213:16,
233:10
pray
230:22
preclude
225:5
precluded
227:18
premature
218:21, 219:6,
219:8
prepare
73:22
prepared
88:13
present
69:23, 87:6,
200:9
pressure
229:23, 230:6,
231:15, 231:17,
231:18, 233:22,
233:24, 234:23,
235:22, 236:4,
236:20, 237:12
presumably
134:13, 142:19,
174:7
pretty
81:19, 117:10,
178:5, 243:24
prevail
85:16, 241:4,

241:13, 241:14
**primary**
92:4
**prior**
126:8, 140:10,
140:17, 201:11,
227:4
**probably**
111:22, 111:24,
112:2, 117:24,
133:16, 163:1,
165:11, 188:24,
189:3, 195:20,
204:16, 214:14,
216:11, 242:1
**problem**
96:5, 159:24,
228:6
**problems**
71:19, 83:15,
83:20, 84:10
**procedures**
155:3
**proceeding**
239:22
**proceedings**
239:17
**process**
80:3, 84:23,
85:15, 86:13,
86:14, 98:11,
98:15, 148:15,
154:2, 155:2
**processed**
82:6
**program**
80:4, 80:6,
80:16, 81:24,
82:19, 213:17,
213:19, 213:23
**progressive**
141:24, 142:5,
142:21, 142:23,
142:24, 143:4
**prohibited**
148:19
**promote**
98:20, 98:23

**promoted**
87:1, 97:2,
97:10, 98:11,
98:15, 98:21,
226:6
**promotion**
99:4, 99:5,
223:2, 223:7,
223:20
**promotions**
99:2, 220:13,
221:20, 222:9,
222:19, 222:21,
225:11, 225:15
**pronounce**
236:23
**proper**
218:22, 219:5,
224:16
**properly**
214:17, 214:21,
217:3, 217:4,
217:7, 217:10,
217:14, 219:13
**protected**
196:22, 198:5,
198:8
**protective**
78:4, 78:6
**provide**
170:14, 220:6
**provided**
155:3
**providers**
233:19
**provides**
154:3
**public**
68:8, 245:1
**pull**
104:15, 116:1,
123:20, 166:21,
167:13, 210:9,
217:16, 220:4
**pulled**
115:5, 175:13,
175:16, 199:19,
217:18

**punish**
180:4
**punishing**
107:14
**punishment**
112:12, 186:4,
188:21, 188:22
**punitive**
220:15
**purposely**
201:7, 201:9
**pursuant**
68:7
**pushed**
207:10
**put**
80:13, 80:14,
81:23, 83:24,
84:23, 94:5,
96:2, 96:3,
106:18, 106:20,
110:17, 112:16,
113:4, 113:11,
113:13, 114:21,
115:17, 115:19,
116:10, 116:22,
117:6, 117:20,
122:14, 136:21,
138:15, 153:5,
158:4, 158:21,
158:22, 169:12,
174:20, 179:20,
187:24, 189:2,
190:12, 190:19,
190:21, 190:22,
191:10, 196:1,
199:15, 199:20,
201:13, 204:2,
204:5, 206:12,
206:14, 206:15,
210:5, 214:3,
214:24, 215:5,
229:2, 236:24
**putting**
159:15, 179:22,
201:20, 215:18

---
**Q**
---
**qualify**
82:18

**quantify**
229:6
**question**
72:4, 72:6,
72:20, 72:21,
73:6, 85:7,
92:17, 95:12,
95:13, 98:13,
120:11, 120:15,
125:7, 138:17,
148:9, 155:22,
170:3, 170:6,
172:2, 181:24,
182:1, 182:17,
184:4, 184:5,
185:13, 194:24,
195:1, 195:2,
195:8, 195:12,
195:15, 196:4,
212:15, 213:1,
213:9, 215:14,
215:15, 217:22,
219:5, 221:14,
224:11, 225:24,
241:12
**questioned**
109:3, 109:5,
109:7, 109:13,
109:14, 109:15,
109:18, 109:19
**questions**
73:2, 73:5,
218:15, 242:15,
242:24
**quick**
107:2, 124:21
**quickly**
72:1
**quote**
144:1, 145:12,
145:15, 156:20,
171:20, 174:3,
176:2

---
**R**
---
**race**
102:15, 102:20,
151:16, 170:19,

170:23, 171:3,
171:8, 173:24,
181:20, 181:21,
181:23, 182:4,
188:16, 189:11,
190:4, 191:1,
194:13, 196:18,
197:11, 197:12,
209:12
**racist**
146:13, 149:11,
149:21, 150:5,
150:13, 184:7,
184:8, 195:5,
195:14
**radio**
78:19, 89:20,
90:3, 90:5,
90:18, 106:16
**rag**
78:11
**rains**
158:3
**raise**
222:13, 223:23,
224:8
**raises**
220:13, 222:8,
222:11, 224:9,
226:5, 226:9,
227:23
**ran**
100:3
**ranzino**
88:15, 137:12,
138:3, 138:14,
149:13, 149:14,
149:18, 151:6,
158:20, 173:4,
173:6, 194:5,
204:17, 204:23,
205:2, 205:6,
205:19, 206:5,
206:7, 206:16,
207:3, 207:9,
208:8, 208:11,
208:16, 208:18,
209:5, 212:1,

212:10
**rarely**
179:15, 182:24
**reached**
216:15
**read**
137:6, 156:9,
156:14, 156:15,
156:17, 209:12
**reading**
245:8
**ready**
80:16, 128:2,
174:12, 175:6
**real**
107:2, 114:1,
124:21, 128:6,
128:7, 160:23
**really**
77:3, 96:20,
139:22, 184:17,
187:12, 194:23,
195:21, 197:21,
221:23, 224:17,
224:20, 227:3,
235:10
**reappeared**
200:1
**reapply**
227:11
**reason**
73:8, 106:5,
111:4, 124:10,
163:2, 185:22,
187:13, 190:12,
195:18, 201:22,
207:13, 207:15,
218:12, 231:12,
240:12
**recall**
71:9, 97:20,
111:16, 112:19,
112:22, 120:3,
127:7, 128:1,
129:15, 133:17,
133:24, 134:1,
134:8, 134:16,
136:16, 137:5,

137:15, 140:21,
146:22, 146:23,
147:15, 147:22,
147:23, 149:1,
149:12, 150:14,
153:3, 179:3,
208:14, 212:8,
236:1
**receive**
86:16, 100:12,
132:13, 136:14,
178:8, 179:1,
181:3, 181:4,
222:20
**received**
99:7, 100:10,
100:19, 108:1,
122:11, 124:24,
126:20, 132:12,
142:7, 142:15,
142:20, 143:5,
152:13, 152:19,
154:11, 154:24,
168:17, 169:9,
176:16, 178:8,
182:4, 234:10,
234:12
**receiving**
81:13, 81:14,
175:19
**recess**
123:19, 167:11,
220:1, 242:23
**recognize**
105:6, 124:3,
167:3, 167:20,
167:23, 210:18,
221:13
**recollection**
74:12, 84:17
**reconvene**
71:16
**record**
179:12, 179:13,
220:3, 234:7,
244:2, 245:5
**recording**
123:9

**records**
79:20, 79:22,
82:18, 83:5,
234:13
**reduced**
245:7
**reference**
211:13
**referenced**
194:3
**referencing**
211:24
**referred**
80:24, 81:6,
156:20, 170:18
**referring**
125:3, 125:8,
125:13, 126:19,
137:9, 137:16,
137:22, 143:14,
174:16, 174:17,
204:19, 226:5,
227:24, 240:16
**refresh**
74:12, 84:16
**refusing**
83:21
**regarding**
74:5, 96:9,
109:3, 146:6,
151:11, 153:16,
155:19, 177:7,
177:12, 177:21,
180:22, 238:16
**regardless**
138:7, 138:24,
143:10
**regular**
135:2, 195:24,
243:6
**regularly**
146:12, 150:17,
166:17
**regulations**
80:16, 213:12,
213:21
**related**
74:1, 120:14,

137:4, 142:16,
142:21, 153:9,
155:9, 155:14,
156:2, 168:23,
169:18, 170:4,
170:9, 173:23,
174:24, 175:2,
175:21, 176:3,
176:17, 182:20,
197:3, 197:4,
197:9, 209:14,
216:16, 216:21,
222:19, 235:23,
245:10
**relating**
227:20
**released**
83:1, 83:2
**relevant**
141:20
**remains**
177:9
**remedy**
155:3, 155:9
**remember**
74:10, 75:22,
79:12, 87:10,
87:14, 127:16,
153:4, 153:7,
156:13, 208:11,
209:3, 212:9,
212:13, 212:14
**remind**
102:9
**removed**
172:17
**renee**
67:24, 68:7,
72:8, 243:5,
245:2, 245:20
**repeat**
162:6
**rephrase**
73:3
**report**
83:17, 118:17,
148:5, 148:10,
148:16, 172:13,

172:15, 201:17,
207:6, 207:14,
207:20, 214:3,
236:24
**reported**
67:24, 197:1,
215:3, 215:8,
215:10
**reporter**
72:14, 243:15
**reporter-notary**
245:1
**reporting**
148:19, 201:18
**representing**
71:10
**request**
122:14, 131:24,
135:24, 205:3,
205:5, 205:12,
234:8
**requested**
112:13, 112:15,
132:6, 135:19,
245:9
**requests**
204:8, 204:9,
204:18, 209:4,
209:16, 209:24,
210:1
**required**
221:11
**rescue**
103:1
**resolve**
71:17
**resolved**
71:18
**respond**
72:15
**responded**
181:10, 182:12,
211:16
**responding**
180:22
**response**
115:16, 167:24,
168:19, 169:12,

170:22, 178:11,
178:13, 178:14,
178:15, 179:7,
180:21, 180:23,
182:12, 182:21,
194:8, 196:1,
204:13, 209:13,
213:4, 215:16,
215:18, 216:3,
220:5, 226:3,
237:7
**responses**
170:15, 204:1,
209:16, 209:24,
210:20
**responsibility**
92:4
**responsible**
176:20, 194:5
**rest**
130:8
**restroom**
219:17
**result**
84:5, 84:13,
153:13, 153:22,
198:5, 198:8,
215:23, 222:3,
228:10, 229:7,
234:14, 236:7
**retaliate**
148:14
**retaliated**
201:16, 203:5,
203:8
**retaliating**
148:18
**retaliation**
114:12, 148:12,
198:4, 198:7,
198:13, 198:22,
198:24, 201:2,
201:11, 202:7,
202:10, 203:15
**retaliatory**
176:8
**retire**
240:11, 240:12,

240:14, 240:15,
242:6
**retirement**
220:13, 228:8,
228:9, 242:2,
242:11
**review**
74:1, 124:17,
167:17
**reviewed**
117:11
**reviewing**
124:19
**rheumatoid**
236:11, 237:10
**rico**
102:11, 102:17,
129:16, 133:2,
174:14, 179:10,
179:21, 190:3,
190:6, 190:11,
190:14
**rico's**
102:20, 190:4
**rid**
97:16
**rig**
78:10, 78:12,
78:13, 78:16,
78:17
**ring**
78:20
**road**
69:19
**rockwell**
104:7, 105:23,
107:15
**rohloff**
88:16, 137:11,
138:3, 150:7,
151:6, 173:4,
173:7, 173:8,
194:5, 204:16,
204:23, 205:2,
205:5, 205:19,
206:4, 209:5,
212:1, 212:6
**role**
85:3, 89:4,

138:11, 138:19,
138:21, 145:21
**rollcall**
86:22, 87:6,
90:9, 93:24,
106:14, 208:9,
208:13, 208:18,
213:10
**room**
81:14, 120:23
**roster**
86:21, 87:5,
87:6, 88:21,
89:5, 89:8,
90:11, 94:7,
94:11, 183:23
**rpr**
67:24, 68:8,
245:2, 245:20
**ruffin**
112:16, 176:22,
177:1
**rule**
72:3, 220:11,
221:3
**rules**
71:24, 80:15,
213:12, 213:20
**run**
225:8

**S**

**safe**
159:22, 159:23,
160:5
**safer**
162:1, 163:15
**salary**
224:10
**same**
72:2, 85:8,
87:8, 102:5,
105:4, 115:11,
121:20, 122:17,
122:20, 127:2,
127:23, 127:24,
128:7, 128:9,
128:10, 128:12,

128:13, 135:8,
135:10, 136:14,
140:22, 151:11,
151:13, 151:21,
151:22, 152:4,
152:11, 183:10,
183:12, 185:13,
185:22, 190:19,
191:7, 204:9,
212:15, 212:16,
225:24, 226:5,
232:18, 232:22
**sat**
133:17
**satisfied**
189:1
**saw**
97:9, 103:13,
106:6, 108:24,
110:14, 111:19,
116:6, 131:1,
134:14, 134:20,
139:20, 140:8,
140:14, 140:15,
185:11, 199:10,
208:7, 232:16
**say**
75:24, 76:6,
76:24, 79:6,
80:22, 81:21,
85:6, 88:5,
90:14, 90:20,
91:9, 91:12,
95:19, 96:24,
98:20, 99:17,
105:15, 107:2,
110:9, 113:15,
113:21, 114:3,
114:8, 114:17,
114:19, 115:12,
116:9, 117:22,
120:4, 122:7,
122:24, 129:9,
130:12, 135:17,
138:7, 139:23,
145:13, 148:6,
153:2, 162:23,

170:1, 171:13,
174:10, 179:19,
182:24, 202:2,
204:7, 207:24,
212:17, 217:3,
218:21, 219:8,
222:11, 226:3,
234:7, 234:24,
235:3, 236:1,
239:9, 241:15
**saying**
86:1, 95:18,
104:7, 114:16,
116:19, 116:20,
117:17, 121:13,
128:10, 138:2,
140:9, 140:13,
143:21, 143:24,
144:13, 147:18,
153:4, 155:8,
156:19, 164:23,
165:19, 170:7,
174:15, 174:19,
174:22, 174:23,
175:18, 181:10,
183:7, 198:22,
200:2, 201:7,
201:20, 203:8,
205:1, 206:3,
207:1, 207:21,
217:10, 219:4,
223:1, 230:13,
230:14, 233:23
**says**
81:8, 124:17,
126:5, 141:20,
143:8, 146:10,
150:16, 151:14,
152:7, 152:12,
152:16, 154:2,
155:23, 156:5,
169:15, 178:17,
202:19, 221:8,
221:9, 234:19,
237:9
**scabies**
146:7
**scared**
148:12

**scattered**
122:1
**schaumburg**
93:18, 145:9
**screaming**
107:16
**scroll**
124:14, 126:2,
168:3, 168:15,
178:12, 179:5
**seasonably**
221:10
**second**
87:15, 87:17,
89:9, 125:21,
128:14, 168:3,
171:15, 178:13,
179:7, 183:6,
198:16, 202:22,
203:23, 204:2,
209:12, 215:2,
220:22
**secretary**
199:3, 200:8
**section**
80:2, 124:17,
141:19, 141:20,
152:11
**security**
105:1
**see**
76:7, 76:14,
102:22, 103:18,
104:17, 105:5,
106:8, 111:13,
115:5, 122:2,
122:3, 124:9,
125:4, 126:3,
126:5, 127:20,
135:6, 139:11,
142:3, 142:4,
142:8, 142:9,
142:13, 147:14,
152:20, 154:6,
154:7, 155:6,
157:4, 159:4,
162:23, 166:19,
169:12, 169:13,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

75

172:5, 178:10,
182:12, 185:15,
195:6, 195:24,
198:6, 204:11,
210:12, 213:5,
217:2, 217:17,
219:16, 220:10,
220:18, 221:4,
229:17, 232:8,
232:23, 234:18,
236:10, 237:3,
237:7
**seeing**
140:2, 140:5,
232:13
**seeking**
101:1
**seeks**
220:12
**seem**
124:8
**seems**
131:14, 164:22,
240:16
**seen**
91:11, 97:8,
97:9, 107:18,
107:21, 107:22,
114:23, 115:1,
116:4, 116:11,
116:15, 117:6,
117:20, 118:8,
139:21
**send**
76:17, 109:22,
110:1, 120:12,
139:9, 237:14,
238:12, 243:17
**seniority**
85:3, 85:12,
85:16, 85:18,
138:8, 138:10,
138:18, 138:24,
143:11, 145:20,
151:17, 181:12
**sense**
77:4
**sent**
100:22, 108:3,

120:18, 199:23,
201:15, 213:23,
214:4, 237:13,
238:15
**separate**
80:21, 103:4,
112:7, 223:17,
233:7, 233:8,
233:10, 240:19
**september**
67:19, 245:15
**sergeant**
218:1, 223:2,
224:3, 224:7,
225:15, 225:17,
225:22, 226:6,
226:13, 226:14,
226:16
**sergeant's**
227:5, 227:6
**sergeants**
186:19, 191:23,
222:6, 224:20,
226:15, 227:13,
227:15
**service**
80:2
**set**
210:15, 245:14
**seven**
240:4
**several**
126:8
**sex**
208:22
**shake**
72:16
**shedor**
102:11, 102:15,
118:23, 174:14,
179:9, 179:19,
185:23, 186:7,
186:11, 190:19
**sheet**
82:1, 82:2,
90:12
**sheets**
200:9, 200:12,

213:12
**sheriff**
67:11, 107:8,
107:20, 210:15,
211:14, 223:11
**sheriff's**
74:14, 130:6,
130:11, 147:11,
159:6, 159:8,
215:3, 217:8,
231:13
**shields**
109:21, 109:24,
110:17, 110:19,
110:20, 110:24,
111:7, 111:9,
111:10, 113:9,
113:11, 114:13,
116:12, 117:12,
117:14, 118:17,
120:12, 120:18,
141:23, 143:8,
146:11, 146:16,
146:21, 147:5,
147:12, 149:6,
149:8, 149:10,
150:16, 151:15,
152:8, 152:17,
152:22, 153:12,
153:21, 156:8,
156:19, 156:22,
171:1, 172:15,
173:2, 174:12,
175:6, 175:8,
195:9, 195:23,
197:17, 197:18,
197:22, 199:1,
199:10, 199:15,
199:19, 200:8,
200:17, 202:2,
202:3, 203:2,
203:5, 203:8,
203:13, 203:18,
213:9, 214:4,
214:20, 215:19,
216:20
**shift**
106:19, 112:16,

130:13, 130:19,
135:8, 135:10,
198:18
**shifts**
87:11
**shoot**
133:16
**shootout**
144:8
**shore**
159:21
**short**
166:15
**shortens**
83:16
**shorthand**
245:1
**shot**
144:6, 145:3,
145:4
**should**
97:5, 121:19,
124:5, 138:11,
138:18, 138:23,
142:6, 142:20,
143:5, 210:24,
218:12, 218:14,
218:24
**shouldn't**
138:21, 218:16
**showed**
104:7
**showing**
135:11
**shows**
76:9
**sick**
100:2
**side**
93:10, 93:11,
93:12, 93:13,
93:16, 93:17,
95:5, 95:6,
95:8, 95:9,
103:14, 103:15,
122:6, 143:15,
143:16, 143:18,
143:19, 159:21,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                    76

sidearm
163:18, 185:6
sidearm
78:22, 89:14
sign
80:14, 130:8,
214:1
signature
168:5, 211:2,
243:1, 243:2
signature-mig2k
245:17
signed
94:11, 168:12,
211:5
significant
155:3
signing
245:9
similarly
152:13
similarly-situat-
ed
124:24, 126:24,
178:7, 178:24,
181:1, 182:9
since
75:24, 96:24,
97:1, 98:4,
98:20, 98:23,
131:3, 164:13,
169:18, 200:24,
227:3
singled
109:17, 109:23,
114:10, 114:11,
115:24, 118:18,
119:5, 121:21,
170:24, 171:5,
174:24, 176:3,
176:4, 202:11,
202:12
sir
131:13, 140:20,
141:9, 145:18,
149:1, 195:11,
200:12, 200:14,
200:16, 203:21,
218:20, 227:22,

237:24, 238:3,
238:9, 240:8
sit
133:20
sitting
157:24
situated
152:13
situation
107:19, 114:24,
118:15, 120:22,
171:5, 174:13,
174:16, 179:21,
180:1, 184:7,
184:9, 190:19,
199:14, 209:2,
214:19, 215:1,
222:23, 231:6
situations
230:14
six
107:4, 108:15,
121:17, 121:20,
121:22, 122:3,
240:4
sliding
172:9
slip
198:18
slips
133:2
slow
82:10
smell
158:1
smith
137:11, 138:3,
151:6
smoke
235:13, 235:17
smoker
235:12, 235:15
snow
158:3
social
238:19
some
71:14, 74:9,

79:9, 79:13,
85:3, 97:16,
97:23, 107:13,
138:11, 140:5,
142:20, 143:18,
146:18, 163:2,
195:18, 196:13,
208:21, 216:11,
218:11, 226:21,
240:12
somebody
153:4, 162:15,
188:10, 192:11
somehow
241:4, 241:20
someone
78:14, 96:14,
153:19
something
91:9, 92:9,
94:11, 100:2,
100:4, 100:6,
100:13, 100:17,
103:1, 103:4,
104:20, 106:8,
106:10, 107:2,
115:6, 144:11,
145:8, 147:18,
148:16, 148:19,
160:13, 160:24,
165:8, 166:6,
171:8, 174:4,
188:11, 188:23,
189:8, 191:9,
191:12, 200:3,
203:6, 204:21,
205:9, 207:11,
207:23, 208:23,
208:24, 209:1,
214:1, 214:15,
219:18, 226:20,
227:16, 231:19,
231:23, 234:2,
239:9, 240:13
sometime
131:22, 205:8
sometimes
84:10, 91:12,

92:3, 190:7,
235:18, 235:20,
238:14
somewhere
114:6, 193:15,
197:11
soon
242:10
sorry
82:16, 85:7,
92:16, 92:24,
95:2, 96:17,
97:4, 98:10,
98:13, 100:9,
102:23, 111:22,
124:22, 126:11,
149:7, 155:18,
155:21, 162:5,
166:19, 173:13,
177:16, 181:22,
183:19, 186:5,
197:17, 203:22,
225:12, 232:5,
235:21, 237:2,
238:4, 239:8,
243:23
sort
76:20, 77:3,
78:3, 78:21,
80:21, 83:4,
83:20, 84:9,
88:20, 96:13,
99:23, 120:13,
136:14, 142:21,
162:17, 209:18,
231:10
sound
128:15
sounded
155:13
sounds
76:20, 90:7,
123:17, 135:1,
144:12
south
93:10, 93:16,
93:17, 95:5,
95:7, 103:14,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

77

119:15, 159:20,
160:2, 185:5
**southeast**
93:11, 95:5,
95:8, 143:16,
143:19
**southwest**
93:12, 95:6,
95:8, 143:15,
143:19
**speak**
72:10, 183:16,
213:14, 213:17,
213:19, 213:22
**speaking**
72:4
**specific**
77:7, 86:18,
93:21, 113:20,
171:15, 184:5
**specifically**
84:8, 187:9
**speculating**
231:10
**spell**
193:3, 193:4
**spelled**
193:3
**spoken**
74:5, 219:12
**sports**
104:5
**spread**
92:8
**squad**
77:12, 77:13,
77:16, 89:13,
145:1, 223:24
**standing**
103:14, 121:23,
122:5, 145:5,
199:17, 201:14
**stands**
80:2
**start**
79:5, 80:3,
80:24, 127:8,
140:1, 140:5,

167:5, 198:14,
217:2, 232:13
**started**
73:21, 74:13,
139:22, 139:23,
139:24, 140:2,
179:22, 199:11,
234:1, 234:2
**starting**
74:3, 239:9
**state**
68:8, 229:14
**state's**
130:4, 130:5,
130:10, 130:18,
131:2, 133:21
**stated**
173:22
**statement**
216:7, 216:9
**states**
67:1, 168:19,
179:8, 204:7
**stating**
80:15, 105:14,
218:5
**status**
108:6, 123:3,
123:5
**stay**
80:10, 80:11
**stayed**
133:15, 162:4
**steal**
200:2, 200:20
**stealing**
128:19, 136:14,
142:16, 201:23,
227:4
**stenographer**
243:7, 243:11
**stenographically**
245:7
**step**
81:2, 110:22
**steps**
216:20
**stick**
215:2

**still**
76:15, 83:17,
96:22, 96:23,
97:13, 108:7,
108:8, 112:4,
122:19, 122:24,
123:1, 123:5,
164:20, 167:22,
176:11, 200:18,
201:1, 218:18,
222:8, 222:12
**stole**
200:2, 200:5,
201:21
**stop**
171:14, 202:22
**stopped**
110:15, 157:23,
208:21, 232:20
**story**
115:11
**straight**
132:21, 225:18,
225:20
**straightforward**
195:11
**street**
69:12, 89:24,
90:2, 91:16,
92:13, 103:11,
122:7, 158:24,
163:4, 187:24,
188:24, 189:19,
189:20, 190:13,
190:14, 190:17,
190:21, 190:22,
192:1, 192:8,
192:10, 192:13,
192:15, 192:20,
192:23
**streets**
77:5
**stress**
229:23, 230:6,
231:16, 235:1
**stretches**
178:2
**strike**
75:17, 86:12,

87:8, 92:24,
96:17, 98:13,
124:22, 149:7,
155:22, 159:6,
171:14, 173:13,
177:18, 183:19,
186:6, 197:17,
198:13, 198:16,
221:14, 225:12,
238:4
**strikes**
195:22
**study**
224:15
**stuff**
78:7, 84:1,
114:13, 116:2,
117:6, 118:6,
118:9, 124:9,
144:24, 158:1,
212:14, 222:16,
224:2, 230:18,
230:24, 231:2,
241:17
**subject**
76:11, 83:15,
83:16, 83:20,
83:21, 160:10,
162:19, 162:20,
162:21
**subjected**
157:9, 157:12
**subordinate**
141:23, 143:9,
146:11, 150:17,
151:15, 152:8
**subpoena**
99:13, 100:18,
125:11, 126:21,
127:3, 127:12,
142:16, 153:9,
155:20, 156:2,
168:21, 169:24,
175:3, 197:4,
227:4, 227:21
**subpoenaed**
125:10
**suburb**
93:14, 160:1,

185:4
**suburbs**
93:15, 93:16,
93:18, 95:7,
160:2, 163:18,
166:4, 185:3
**sudden**
199:23, 201:16
**suffered**
198:4, 198:8,
202:8, 220:8,
229:20
**suite**
69:5, 69:12,
69:19
**summer**
116:7, 126:21
**summertime**
205:9
**supervise**
211:15
**supervisor**
86:21, 86:24,
91:8, 94:20,
96:1, 97:7,
97:9, 97:13,
97:14, 97:17,
98:2, 98:8,
98:12, 98:17,
105:11, 106:7,
109:18, 129:22,
130:1, 133:9,
138:2, 158:15,
186:18, 191:20,
191:21, 191:22,
218:1, 219:12
**supervisor's**
192:11
**supervisors**
86:17, 87:2,
87:5, 91:7,
109:16, 130:22,
137:9, 140:3,
141:24, 143:9,
146:11, 147:11,
147:17, 147:20,
150:17, 151:5,
151:15, 152:8,

172:22, 173:3,
187:7, 189:1,
189:24, 191:19,
211:17, 211:23,
214:17, 218:12,
231:7
**supervisory**
147:12, 164:4,
164:5, 188:10,
211:16, 213:2,
213:7, 216:23,
217:6
**supplement**
221:10
**support**
182:2, 185:1,
185:8, 194:12,
196:16
**supporting**
229:19
**supports**
181:18
**supposed**
81:23, 205:16
**sure**
72:10, 78:8,
92:22, 95:22,
126:16, 144:19,
154:21, 156:17,
172:21, 177:19,
216:14, 242:17,
242:20, 243:7
**surveillance**
108:23
**suspension**
100:5, 100:13,
100:16
**switch**
220:21
**sworn**
71:2, 71:4
**systemically**
150:18

---
**T**
---

**take**
72:14, 72:19,
72:22, 100:6,

104:16, 110:22,
123:13, 161:7,
161:11, 162:18,
167:6, 167:8,
167:17, 178:4,
185:6, 202:23,
206:10, 206:13,
216:12, 219:19,
222:22, 223:1,
223:6, 224:3,
224:12, 226:19,
231:8, 236:19,
236:22, 237:9,
240:6, 242:11,
242:12
**taken**
227:5, 245:3,
245:6
**takes**
80:20
**taking**
114:6, 201:17,
222:5, 222:7,
232:20, 237:6,
237:11, 243:22
**talk**
83:24, 99:6,
149:13, 183:6,
215:6, 220:4,
221:17
**talked**
75:18, 79:12,
85:19, 89:9,
89:11, 110:15,
111:20, 118:5,
125:14, 150:23,
150:24, 151:1,
151:11, 152:2,
169:3, 178:19,
181:15, 194:4,
197:20, 210:1,
217:20, 218:14,
239:2, 239:5
**talking**
74:8, 88:3,
91:13, 115:22,
116:14, 117:4,
117:7, 117:18,

117:23, 118:2,
120:2, 120:4,
125:16, 125:18,
125:19, 125:23,
126:10, 126:13,
126:15, 126:17,
135:5, 142:9,
142:11, 144:20,
146:17, 148:7,
148:23, 151:24,
155:17, 158:18,
160:3, 160:23,
164:7, 165:1,
165:4, 169:20,
171:17, 180:3,
195:9, 209:17,
214:22, 219:3,
222:10, 231:4,
239:23, 239:24
**tan**
232:5, 232:7,
232:11, 232:13,
232:19, 233:1,
233:20, 234:22,
235:21
**taser**
106:16
**tear**
224:1
**tease**
229:13
**technical**
71:14, 76:22,
80:2, 243:22
**technician**
69:24
**television**
104:5
**tell**
75:16, 76:1,
77:12, 79:24,
81:9, 93:7,
111:7, 112:23,
114:10, 130:18,
134:5, 134:14,
138:14, 147:2,
147:10, 147:14,
147:15, 160:20,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                    79

160:22, 171:20,
172:22, 173:2,
173:12, 199:8,
200:13, 200:14,
206:8, 222:2,
223:14, 224:4,
229:21, 234:22,
235:21, 236:3
**telling**
117:13, 201:5
**term**
77:2, 78:11,
78:13, 87:13
**termination**
101:1
**terms**
78:3, 149:11,
196:23
**terrible**
155:22
**test**
222:5, 222:7,
222:22, 223:2,
223:7, 224:3,
224:4, 224:11,
224:12, 224:19,
224:24, 225:2,
225:5, 227:6,
227:7
**testified**
71:5, 115:18
**testimony**
73:9, 73:12,
73:18, 74:6,
140:16, 140:19,
161:24, 162:14,
163:8, 164:20,
245:5, 245:6
**tests**
226:19
**text**
238:12, 238:15
**th**
104:7, 119:11
**thank**
179:6, 242:22,
243:21, 244:1
**thanks**
141:18, 204:5,

234:21, 243:19
**thanksgiving**
205:8
**thereafter**
245:7
**they'd**
206:9
**thing**
96:11, 96:12,
104:3, 105:4,
107:9, 111:14,
115:15, 121:2,
121:6, 121:21,
134:18, 147:1,
151:11, 151:21,
152:4, 166:11,
180:2, 207:17,
212:16, 218:4,
240:19, 242:13
**things**
78:10, 78:21,
81:8, 118:22,
144:17, 144:18,
144:21, 145:6,
145:9, 158:6,
160:15, 175:24,
196:24, 203:24,
208:18, 221:20,
222:7, 225:9,
230:6, 230:16,
231:4, 231:8,
235:1, 235:23
**think**
71:18, 75:7,
79:7, 81:7,
81:18, 85:23,
87:18, 91:20,
92:16, 93:8,
94:10, 100:13,
103:2, 108:22,
110:9, 110:10,
112:2, 117:10,
120:19, 121:3,
121:14, 122:23,
127:10, 127:13,
127:23, 128:24,
129:1, 131:23,
134:3, 136:7,

136:9, 148:2,
152:6, 154:12,
154:21, 156:8,
161:15, 166:20,
172:20, 174:2,
174:3, 174:19,
174:23, 176:11,
186:1, 186:9,
189:16, 190:3,
190:11, 190:18,
191:2, 191:7,
193:3, 196:13,
196:22, 202:8,
202:23, 206:23,
207:9, 207:10,
207:18, 208:15,
214:14, 214:19,
215:1, 215:13,
215:21, 215:22,
221:7, 230:7,
230:17, 232:14,
234:12, 236:10,
238:19, 239:8,
239:9, 239:23,
241:4, 241:8,
241:13, 241:16,
241:23, 242:17,
243:4
**thinking**
118:14, 134:20,
135:7, 135:11,
241:18
**thinks**
234:23
**third**
87:16, 87:17,
87:18, 87:21,
87:23, 88:8,
88:10, 88:13,
139:17, 141:3
**thomas**
67:12
**thought**
118:1, 118:15,
121:8, 121:16,
121:19, 126:1,
126:10, 126:13,
126:15, 164:21,

200:18, 200:20,
200:22, 207:22,
208:3, 233:21
**thoughts**
120:13
**thousand**
160:22
**threaten**
152:22, 153:12,
153:21, 197:22
**threatened**
152:17, 152:24,
197:19
**threatening**
153:4
**three**
76:20, 83:12,
87:10, 98:24,
100:8, 100:9,
100:16, 108:21,
122:3, 122:5,
133:21, 175:24,
189:5, 205:17,
212:18, 219:11,
224:23, 231:19,
231:21, 231:23,
234:1
**three-part**
199:2, 199:5,
199:24, 201:4,
201:8
**three-parts**
201:20
**through**
72:1, 82:6,
89:22, 106:21,
108:5, 110:13,
111:17, 124:15,
230:13, 230:16,
231:4, 240:6
**thrown**
144:7
**tier**
80:5
**tight**
133:23
**time**
71:15, 71:16,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                    80

71:24, 72:19,
74:8, 75:7,
75:14, 75:19,
79:12, 83:17,
84:3, 84:18,
86:3, 88:3,
91:19, 91:21,
96:6, 99:3,
100:2, 100:3,
107:5, 108:16,
110:22, 112:5,
112:20, 115:13,
115:23, 116:1,
120:7, 120:9,
123:9, 128:20,
129:7, 130:21,
132:1, 133:19,
133:24, 134:1,
134:6, 134:14,
135:4, 135:12,
135:20, 136:15,
136:21, 142:16,
146:22, 148:22,
148:23, 149:3,
153:7, 158:1,
159:24, 160:17,
163:2, 163:3,
163:20, 163:21,
164:1, 165:2,
165:3, 165:5,
179:2, 185:2,
189:17, 198:18,
199:6, 200:2,
200:3, 200:5,
200:6, 201:21,
201:23, 203:9,
204:20, 205:2,
205:5, 207:10,
209:7, 225:8,
227:4, 229:10,
229:11, 230:17,
240:1, 243:22
**times**
91:11, 115:11,
133:22, 146:23,
160:22, 187:1,
187:4, 187:17,
188:3, 191:4,

193:10, 199:8
**tims**
146:6
**titled**
210:14
**today**
71:20, 72:2,
72:9, 72:20,
73:9, 73:11,
73:18, 73:21,
73:23, 74:3,
74:6, 90:16,
90:21, 169:4,
181:2, 181:16,
182:2, 194:10,
195:23, 243:22,
243:24
**together**
102:7, 233:3,
233:6
**toilets**
157:22, 157:24
**told**
101:14, 101:18,
101:22, 105:3,
105:4, 105:21,
106:14, 107:8,
108:4, 109:9,
109:21, 109:24,
110:6, 110:17,
110:19, 110:20,
110:24, 111:5,
111:6, 111:7,
111:9, 111:18,
113:4, 114:16,
115:4, 115:11,
116:1, 116:21,
116:24, 117:17,
117:18, 129:6,
130:2, 130:7,
130:18, 130:22,
131:2, 131:16,
132:2, 132:3,
132:7, 132:8,
132:22, 133:22,
134:9, 134:11,
147:16, 158:20,
166:9, 171:22,

172:1, 198:19,
199:8, 199:19,
200:9, 200:19,
200:23, 206:18,
206:21, 214:2,
217:15, 218:7,
235:7
**tomorrow**
230:1, 230:5,
230:10, 230:11,
230:21, 231:13
**took**
145:5, 180:4,
190:20, 200:18,
216:19
**tools**
77:22
**top**
94:10, 111:1,
111:2, 117:2,
126:3, 213:4
**tops**
144:7
**total**
117:16
**tough**
83:15
**tour**
128:4, 129:2,
129:7, 129:21,
130:6, 130:14,
130:21, 130:24,
131:3, 131:5,
131:8, 131:16,
131:19, 132:1,
132:9, 133:7,
134:5, 134:6,
134:10, 134:23,
135:4, 135:15,
135:20, 136:6,
136:19, 168:21,
179:1, 198:18,
199:13
**towards**
195:5
**trained**
81:22
**transcribed**
72:14

**transcript**
72:8, 245:4
**transfer**
122:12, 176:21,
177:2, 223:15,
223:21
**transferred**
106:17, 108:11,
112:13, 122:15,
155:14, 176:18,
207:11
**transferring**
97:6
**treated**
191:8
**trial**
100:23
**tried**
198:17, 202:3
**trouble**
132:16, 163:6
**true**
168:9, 211:8,
245:5
**try**
96:6, 128:8
**trying**
80:10, 80:11,
111:13, 119:2,
122:23, 127:20,
142:8, 142:9,
142:13, 147:14,
147:21, 153:19,
166:20, 167:22,
174:20, 174:21,
179:23, 180:4,
226:20, 226:22,
233:2
**tunnel**
110:13
**turn**
104:4, 129:17,
133:3
**turned**
103:22, 129:17,
160:12, 197:20,
201:4, 201:8
**tv**
104:5

twice
164:15, 165:3,
186:24, 188:4,
189:4
two
83:12, 85:8,
103:13, 111:17,
111:18, 114:5,
122:3, 122:6,
123:11, 133:21,
159:17, 165:8,
171:9, 171:16,
178:3, 178:4,
189:4, 191:12,
192:7, 200:1,
231:23, 232:14,
233:5, 237:9,
243:23
type
76:6, 77:8,
127:2
types
79:13, 89:10,
100:8, 197:7,
209:4, 209:21,
237:17
typewriting
245:8
typical
88:1
typically
87:18, 88:12,
192:10, 192:13

**U**

uh-huh
194:7
uh-uh
72:16, 166:7
unbiased
154:4, 154:10,
154:15, 154:23
unclean
157:19
uncooperative
162:20
under
84:21, 85:15,

99:17, 123:5,
145:14, 168:8,
211:7, 245:8
understand
73:1, 73:4,
73:17, 80:15,
85:6, 92:17,
95:10, 110:5,
116:11, 118:3,
130:10, 132:19,
132:23, 143:6,
156:23, 156:24,
162:5, 170:6,
170:7, 174:21,
202:12, 219:2,
230:8, 239:21,
241:11
understanding
74:13, 76:2,
82:5, 84:17,
85:12, 87:4,
94:13, 95:18,
109:12, 135:14,
142:8, 143:3,
222:18, 223:6,
224:18
understood
73:6, 131:19
unexpected
134:17, 134:19,
135:1
unfair
131:14
unfortunately
143:1
unheard
185:7
union
119:24
unit
74:10, 76:1,
76:18, 79:15,
80:20, 87:2,
176:19, 177:2,
211:17, 217:21,
217:24, 222:7,
223:3, 223:12,
223:15, 223:17,

226:13, 227:9
united
67:1
unless
156:7, 210:7
unpack
110:21
unquote
144:1, 145:12,
145:15, 156:20,
171:20, 176:3
unsafe
159:8, 159:14,
159:17, 159:19,
160:6, 160:8,
160:9
until
75:24, 117:6,
117:20, 139:22,
139:23, 206:18,
214:8
ups
227:20
upset
203:18
upstairs
128:24
urge
72:6
use
128:3, 129:2,
129:7, 129:20,
130:6, 131:19,
132:1, 132:8,
133:7, 135:3,
135:15, 136:6,
146:16, 148:2,
149:6, 149:10,
149:14, 149:16,
150:4, 150:7,
150:12, 168:20,
198:18, 217:5,
219:17
using
134:10, 134:22,
135:20, 179:1,
195:23, 199:12,
224:1

usually
77:13, 77:14,
77:22, 78:17,
95:23, 166:13

**V**

vacation
100:6, 204:20
varies
82:7
various
85:5, 88:24,
89:10, 92:7,
94:15, 96:10
vasquez
179:10, 188:16,
188:18, 188:20,
189:6, 191:8
vasquez's
188:16
vehicle
90:19, 103:8,
103:9, 103:17,
103:21, 103:22,
104:9, 122:8
vents
157:21
verbal
72:15, 100:15
verification
168:4, 168:6,
168:10, 210:24
verify
82:1
versus
144:9, 145:7
vest
89:13
vests
78:7, 78:9
video
120:8
view
160:6
violent
160:12, 161:10,
161:20, 162:4,
162:8, 162:17,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                                82

| | | | |
|---|---|---|---|
| 162:24, 163:10 | 87:17, 87:19, | 117:18, 118:6, | **whereof** |
| **virtually** | 87:21, 87:23, | 136:7, 217:17 | 245:14 |
| 67:18, 68:2 | 88:8, 88:10, | **wednesday** | **whether** |
| **volume** | 88:13, 119:6, | 119:10 | 82:9, 109:2, |
| 67:16, 82:16, | 119:8, 119:14, | **week** | 135:19, 156:15, |
| 82:20 | 139:14, 139:18, | 71:14 | 161:21, 216:2, |
| **voluntarily** | 141:4, 183:10 | **weekend** | 216:15, 216:19 |
| 163:7 | **watched** | 82:13, 243:20 | **whichever** |
| **W** | 119:13, 119:17, | **weeks** | 86:9 |
| **wage** | 120:7, 120:9 | 237:9 | **white** |
| 221:24 | **watching** | **weight** | 69:17, 102:16, |
| **wages** | 104:5 | 235:3, 235:5, | 109:11, 139:11, |
| 220:12, 221:18, | **water** | 235:9 | 152:2, 164:16, |
| 221:20, 222:1, | 158:4, 158:5 | **went** | 171:9, 178:18, |
| 222:3, 222:10, | **way** | 71:23, 88:20, | 180:10, 180:19, |
| 222:17, 225:13 | 92:18, 110:12, | 98:7, 106:21, | 181:12, 183:2, |
| **wait** | 117:18, 132:4, | 117:5, 127:21, | 184:1, 184:21, |
| 105:17, 106:9 | 151:13, 158:13, | 127:22, 127:24, | 185:10, 204:9, |
| **waiting** | 159:8, 172:6, | 128:11, 128:13, | 205:21, 206:9, |
| 100:23, 108:5, | 172:8, 172:11, | 128:14, 128:18, | 209:6, 243:5 |
| 108:6 | 191:7, 213:11, | 130:21, 133:2, | **whoever** |
| **waive** | 214:9, 214:13, | 134:23, 143:24, | 187:7 |
| 243:1, 243:2 | 217:13, 219:1, | 189:18, 200:7, | **whole** |
| **walk** | 232:12 | 232:22, 243:24 | 158:1, 192:16, |
| 89:21, 148:8 | **ways** | **weren't** | 214:2, 241:16 |
| **walking** | 157:13 | 121:23, 183:15 | **wife** |
| 103:11, 111:16 | **we'll** | **west** | 104:6 |
| **want** | 157:2, 234:19 | 93:12, 95:9, | **wife's** |
| 79:6, 84:10, | **we're** | 143:15, 143:19, | 205:9 |
| 86:20, 94:6, | 73:5, 98:22, | 159:21 | **wilford** |
| 96:7, 104:24, | 118:22, 128:12, | **whatever** | 67:17, 68:1, |
| 105:10, 114:18, | 178:3, 202:23 | 80:10, 83:24, | 71:3, 124:18 |
| 120:14, 120:15, | **we've** | 94:22, 104:5, | **william** |
| 120:16, 157:15, | 176:1, 194:9, | 112:19, 114:6, | 232:3, 232:6 |
| 161:16, 182:15, | 196:12, 210:13, | 132:7, 134:17, | **williams** |
| 187:21, 206:19, | 219:11, 221:1 | 135:12, 140:3, | 232:3, 232:4 |
| 219:19, 223:14, | **wear** | 148:7, 159:13, | **winnetka** |
| 226:12, 227:9, | 78:5, 224:1 | 166:12, 183:22, | 144:10, 145:8 |
| 234:7, 241:9, | **weather** | 189:4, 189:5, | **winston** |
| 242:17 | 236:16 | 189:24, 199:13, | 67:5, 102:11, |
| **wanted** | **webb** | 199:16, 222:13, | 102:12, 118:23, |
| 163:3, 207:2, | 110:11, 110:20, | 228:20, 236:17 | 118:24, 120:21, |
| 226:23, 227:8 | 111:6, 111:7, | **whatsoever** | 120:22, 120:24, |
| **warning** | 111:9, 111:12, | 149:3 | 127:21, 129:20, |
| 100:16 | 112:23, 114:19, | **wheeling** | 132:20, 174:14, |
| **watch** | 115:8, 115:9, | 144:10 | 175:7, 175:8, |
| 87:15, 87:16, | 116:7, 116:9, | **whereas** | 179:21, 190:19, |
| | 116:21, 117:17, | 181:11 | 199:10, 199:22, |

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020                                          83

201:15, 201:16,
201:17, 202:1,
202:3, 202:16,
203:10, 208:9,
208:12, 214:20,
215:18, 216:9,
239:3
**winston's**
199:16, 201:13,
209:2, 215:5
**within**
74:9, 79:10,
87:2, 93:1,
97:3, 98:20,
223:3, 224:6,
224:8
**without**
223:22, 231:6
**witness**
71:2, 105:14,
105:15, 105:17,
105:18, 105:22,
119:1, 120:23,
123:15, 201:24,
210:8, 218:5,
218:6, 218:7,
244:1, 245:14
**witnessed**
175:19, 203:10
**witnessing**
175:6, 199:17,
201:14
**woman**
121:9, 153:18,
172:24, 173:5,
173:16, 173:19,
175:21, 176:23,
176:24, 233:4
**won**
106:22
**wondering**
84:11
**word**
87:9, 146:13,
146:16, 147:5,
147:13, 148:3,
149:6, 149:14,
149:17, 149:24,

150:8, 153:2,
179:24, 195:10,
195:23, 208:4
**words**
113:16, 129:14,
146:12, 174:20
**work**
74:21, 75:5,
79:15, 86:7,
86:11, 87:8,
88:10, 91:3,
91:17, 92:5,
94:6, 95:20,
96:22, 104:22,
105:8, 120:5,
120:6, 128:23,
130:11, 130:12,
130:19, 132:18,
132:21, 133:9,
133:10, 133:12,
134:21, 135:6,
135:7, 135:11,
138:8, 138:11,
138:18, 139:1,
139:14, 139:20,
141:5, 151:17,
157:10, 157:13,
157:17, 158:10,
158:23, 183:10,
183:14, 185:11,
185:15, 186:13,
188:1, 188:5,
192:3, 198:20,
200:20, 200:22,
200:24, 233:3,
233:6, 236:1,
236:2
**worked**
75:13, 87:18,
87:20, 87:22,
87:24, 88:12,
99:3, 129:13,
131:12, 131:15,
139:17, 140:10,
140:16, 141:3,
184:24, 185:2,
186:2, 187:16,
200:13, 200:15,

200:17, 200:21
**working**
92:1, 99:8,
101:4, 101:9,
101:15, 101:23,
103:3, 103:5,
108:5, 112:4,
112:9, 112:10,
122:20, 157:14,
157:19, 158:7,
158:13, 159:7,
159:19, 184:18,
187:4, 187:19,
188:12, 201:1,
208:1, 230:1,
230:5, 230:10,
230:21, 231:13
**works**
90:23
**worrying**
235:1
**wouldn't**
132:14, 145:13,
158:23, 162:3,
162:7, 162:11,
162:13, 162:15,
189:2, 191:11,
206:8, 206:12,
206:14, 207:20,
230:10, 230:23
**wow**
104:11, 129:4
**write**
83:17, 92:14,
100:16, 109:22,
110:1, 110:6,
110:24, 111:5,
111:8, 160:15,
160:17, 203:13,
227:20
**writing**
130:20, 131:1
**written**
113:13, 130:16,
168:23, 201:23,
203:1, 224:24
**wrong**
76:14, 113:18,

117:8, 117:9,
163:1
**wrongdoer**
156:1
**wrongdoers**
155:5, 155:24,
156:4, 156:6,
156:20, 157:3
**wrote**
111:9, 193:18,
194:8, 194:19,
198:6, 199:22,
201:15, 203:13,
203:20, 214:3,
218:16

--- **Y** ---

**yeah**
77:1, 77:14,
78:9, 79:23,
80:23, 86:11,
93:4, 107:15,
108:9, 112:8,
114:20, 114:22,
115:9, 115:16,
115:17, 116:6,
116:8, 116:9,
116:22, 118:5,
122:10, 124:9,
127:10, 128:17,
129:12, 130:2,
153:24, 154:16,
154:18, 154:21,
164:10, 165:6,
165:18, 165:21,
170:12, 172:12,
174:18, 175:10,
179:16, 180:18,
196:8, 203:7,
210:19, 219:10,
219:19, 222:2,
222:16, 224:10,
227:2, 232:17,
234:5, 239:24,
242:5, 242:12,
242:20
**year**
75:2, 91:22,

Transcript of Wilford Ferguson, Volume 2
Conducted on September 11, 2020

84

110:10, 110:11,
118:14, 127:19,
127:20, 148:22,
172:21, 188:4,
207:24, 218:4,
227:11
**years**
164:9, 164:13,
200:24, 222:14,
224:23, 227:1,
231:19, 231:21,
231:23, 232:14,
232:15, 234:1,
240:4
**yep**
226:17
**young**
111:17, 111:18,
114:5
**yourself**
158:6

**$**

**$50**
205:23, 206:4,
206:7, 206:10,
207:3

**.**

**.0339**
69:21
**.6635**
69:14
**.7660**
69:7

**0**

**00**
111:24, 112:3,
131:7
**004119**
245:22
**04**
244:2
**05726**
67:9
**08**
67:20

**084**
245:22

**1**

**10**
67:20, 131:7,
158:4, 196:10
**100**
69:5, 115:11
**11**
67:19, 88:7,
106:19, 112:16,
123:16, 196:20,
200:15
**12**
88:2, 158:5,
197:15, 211:12
**123**
70:10
**13**
168:12, 198:2,
211:5, 212:23
**15**
198:11
**16**
204:6, 204:13
**166**
70:11
**17**
79:7, 209:9
**179**
67:23
**18**
67:9, 79:7,
219:22
**19**
79:7, 119:11
**1991**
74:14
**1992**
74:17, 74:18,
75:12, 164:7,
227:3

**2**

**2**
219:22
**200**
69:19

**2000**
69:12
**2010**
75:24, 96:24,
97:1, 98:20,
98:23
**2015**
126:22, 128:15,
129:12, 168:20,
169:24, 177:17,
197:3, 198:12,
198:17
**2016**
214:14
**2018**
79:6, 79:7,
103:6, 103:8,
126:6, 126:9,
140:10, 140:17,
147:9, 197:5,
198:10, 202:9
**2019**
91:23, 105:13
**2020**
67:19, 75:3,
75:8, 75:13,
116:20, 117:15,
168:12, 169:18,
169:23, 211:5,
245:15
**2021**
69:19, 242:8,
245:22
**203**
69:12
**206**
69:5
**21**
126:6, 140:10,
140:17, 147:9
**210**
70:12
**22**
245:15
**220**
70:13
**24**
104:7

**25**
164:13
**26**
220:11, 221:3,
221:13
**27**
74:17, 75:12
**29**
128:15, 129:11,
129:12, 198:17

**3**

**3**
244:2
**3-**
211:5
**30**
164:9, 164:13
**31**
103:9, 242:7,
245:22
**312.380**
69:14
**312.655**
69:7
**320939**
67:22
**35**
123:16

**4**

**4**
112:3

**5**

**5**
111:24, 112:3
**50**
210:3
**54**
124:15
**56**
125:5, 125:7,
126:18, 126:20,
152:12
**57**
124:15, 125:6,
137:6, 150:24,

152:1

**6**

**60523**
69:20
**60601**
69:13
**60661**
69:6
**630.984**
69:21
**67**
124:23

**7**

**71**
70:5
**77**
141:16, 141:22
**78**
143:7
**79**
146:5

**8**

**80**
146:10
**81**
150:15
**82**
151:14, 151:24
**83**
152:7
**84**
152:16
**85**
154:1
**86**
155:2, 156:21
**88**
157:6

**9**

**9**
195:2
**92**
164:8
**93**
164:8

**95**
159:23

# Exhibit N

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1260 of 1503 PageID #:1651

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
      LEGRAIN WINSTON,              )
 4    MICHELLE STRICKLAND,          )
      VERNELL TIMS, I.V.            )
 5    NEWSON, JR., SAMUEL           )
      PAGE, WILFORD FERGUSON,       )
 6    CECIL WILLIAMS, ANTHONY       )
      MANNING, DAVID WALKER,        )
 7    TYRONE MCGHEE and VICTOR      )
      SLAUGHTER,                    )
 8                                  )
           Plaintiffs,             )
 9                                  )
           vs.                      ) No. 18 CV-05726
10                                  )
      SHERIFF OF COOK COUNTY        )
11    THOMAS J. DART, in his        )
      Official Capacity,            )
12    JOSEPH RANZINO,               )
      Individually and in his       )
13    Official Capacity,            )
      GREGORY SHIELDS,              )
14    Individually and in his       )
      Official Capacity,            )
15    THOMAS NEAL,                  )
      Individually and in his       )
16    Official Capacity,            )
      CHRISTOPHER ROHLOFF,          )
17    Individually and in his       )
      Official Capacity, and        )
18    COUNTY OF COOK,               )
      ILLINOIS,                     )
19                                  )
           Defendants.             )
20

21          The deposition of CHRISTOPHER ROHLOFF,

22    taken in the above-entitled cause, before

23    Brenda S. Hall, Certified Shorthand Reporter of the

24    State of Illinois, CSR License No. 084-003359, on
```

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1261 of 1503 PageID #:1652
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1    Tuesday, September 15, 2020, at 10:00 a.m., via Zoom,

 2    pursuant to notice.

 3

 4    REMOTE APPEARANCES:

 5              HERBERT LAW FIRM, INC.
                BY:  MS. KELLY A. KRAUCHUN
 6              206 South Jefferson Street
                Suite 100
 7              Chicago, Illinois  60661
                (312) 655-7660
 8              kelly.krauchun@danherbertlaw.com

 9                  Appeared remotely on behalf of
                    Plaintiffs;
10

11              EMERY LAW LIMITED
                BY:  MR. ETHAN E. WHITE
12              2201 Midwest Road
                Suite 200
13              Oak Brook, Illinois  60523
                (630) 984-0339
14              ewhite@emerylawltd.com

15                  Appeared remotely on behalf of
                    Defendants;
16

17              LEINENWEBER BARONI & DAFFADA, LLC
                BY:  MR. JUSTIN L. LEINENWEBER
18              120 North LaSalle Street
                Suite 2000
19              Chicago, Illinois  60602
                (866) 786-3705
20              justin@ilesq.com

21                  Appeared remotely on behalf of
                    Defendants.
22

23
                       *    *    *
24
```



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1262 of 1503 PageID #:1653

```
 1                    I N D E X
    WITNESS                        EXAMINATION
 2
    CHRISTOPHER ROHLOFF
 3
        By Ms. Krauchun                        4
 4

 5

 6

 7

 8

 9

10                 E X H I B I T S
    NUMBER                        MARKED FOR ID
11
    Rohloff Deposition Exhibit
12
     A                                38
13
     C                               100
14
     D                               102
15
     E                               106
16
     F                               111
17
     G                               122
18
     H                                72
19

20

21

22

23

24
```

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1263 of 1503 PageID #:1654
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1         (Whereupon, the witness was
2         duly sworn.)
3     MS. KRAUCHUN: So this is going to be the
4 discovery deposition of defendant Christopher Rohloff
5 in Winston v. Sheriff of Cook County, that's
6 18 CV 5726. And this deposition is being taken
7 pursuant to the Federal Rules of Civil Procedure.
8       CHRISTOPHER ROHLOFF,
9 called as a witness herein, was examined and
10 testified as follows:
11       EXAMINATION
12 BY MS. KRAUCHUN:
13   Q. Mr. Rohloff, how are you doing today?
14   **A. I'm well.**
15   Q. Can you state your name for the record?
16   **A. Christopher Richard Rohloff,**
17 **R-o-h-l-o-f-f.**
18   Q. And, Mr. Rohloff, have you ever given a
19 deposition before?
20   **A. I have.**
21   Q. And how many times have you given a
22 deposition?
23   **A. I honestly don't know the exact number.**
24 **It's been numerous times.**

1   **A. Sure.**
2   Q. Okay. So just some ground rules.
3 Obviously, the dynamics of giving depositions these
4 days is a little different with it being through the
5 video. I just ask, you know, even if you're going to
6 anticipate the answer to one of my questions, if you
7 just wait until I finish the question before you
8 respond just to make sure our court reporter, Brenda,
9 can take down a clean record.
10     And also if you need to take a break
11 at any time, just let us know, but if there is a
12 question pending, you have to answer that question
13 first before you take your break.
14     And if your counsel is making
15 objections, just make sure that you wait until your
16 counsel is finished making objections again so our
17 court reporter can make a clear record of your
18 testimony here today. Do you understand all those
19 rules or guidelines?
20   **A. Yes, ma'am.**
21   Q. Okay. So, Chris, why don't you tell me,
22 where do you currently live?
23   **A. 9009 Corcoran C-o-r-c-o-r-a-n Road in**
24 **Hometown, Illinois.**

1   Q. And can you tell me what type of
2 litigation you were involved with that you had to
3 give a deposition?
4   **A. It was in regards to employment,**
5 **typically search and seizure, related to work.**
6   Q. So were you a named defendant in an
7 action against Cook County?
8   **A. I have been, yeah.**
9   Q. Okay. And do you know how many times
10 you've been a named defendant?
11   **A. No, ma'am, I don't.**
12   Q. Would you say more than five?
13   **A. No.**
14   Q. Okay. And how long ago was your most
15 recent deposition?
16   **A. Four, five years ago.**
17   Q. Okay. And can you tell me the nature of
18 that case? What exactly was that in regards to?
19   **A. That was a -- I believe it was in Cicero,**
20 **and it was an inmate that felt he was wrongfully**
21 **incarcerated. I don't remember the exact nature of**
22 **the suit.**
23   Q. So it's fair to say you're familiar with
24 this process of giving a deposition then, correct?

1   Q. And do you mind if I call you Chris? I'm
2 sorry. I just called you Chris.
3   **A. That's fine.**
4   Q. Perfect. Where are you currently
5 employed?
6   **A. I am currently on total duty disability.**
7   Q. So are you -- is that permanent
8 disability with the sheriff's department?
9   **A. It's temporary duty disability right now.**
10   Q. Okay.
11   **A. Temporary total duty disability.**
12   Q. Okay. And how long have you been on this
13 duty disability?
14   **A. Since February 2, 2020.**
15   Q. Okay. And this disability is due to what
16 injuries, or is it on the job related?
17   **A. Yeah, on the job related injuries.**
18   Q. Perfect. So, Chris, tell me, where did
19 you grow up?
20   **A. I grew up in Chicago.**
21   Q. Okay. And where did you go to high
22 school?
23   **A. Marist.**
24   Q. And what year did you graduate from



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1264 of 1503 PageID #:1655

1 Marist?

2     **A.  1992.**

3     Q.  And after you graduated from high school,

4 did you go to college?

5     **A.  I didn't complete college but, yes, I did**

6 **go to college.**

7     Q.  And where did you go to college at?

8     **A.  Moraine Valley and Triton.**

9     Q.  Okay.  And did you complete an

10 associate's degree or anything?

11     **A.  No.**

12     Q.  And when did you begin working at the

13 sheriff's department?

14     **A.  1992.**

15     Q.  So between 1992 and 1996, did you have

16 any other employment?

17     **A.  I worked at a dental office in Burbank,**

18 **Illinois, I believe, and I worked at a pet store.**

19     Q.  Okay.  And how did you come about getting

20 hired with the sheriff's department?  Can you explain

21 that process for me?

22     **A.  I applied and -- (Inaudible caused by**

23 **video conference audio technical difficulties).**

24         **The last question, Counsel?**

Page 8

1     MS. KRAUCHUN:  I don't even remember what I

2 asked you.

3         Brenda, could you read it back?

4         (Whereupon, the record was

5         read as requested.)

6     THE WITNESS:  I applied, I tested, and I was

7 hired.

8 BY MS. KRAUCHUN:

9     Q.  And you had to go through an academy with

10 the sheriff's department, correct?

11     **A.  Yes.**

12     Q.  Okay.  So once you graduated from the

13 academy, what was the first position you held with

14 the sheriff's department?

15     **A.  I was a court services deputy assigned to**

16 **the 1st District.**

17     Q.  And court services deputy, can you

18 explain what your duties were as a court services

19 deputy?

20     **A.  Courtroom -- or court facility security**

21 **essentially.**

22     Q.  Okay.  And how long were you in that

23 role?

24     **A.  Until, I believe, 1999.**

Page 9

1     Q.  And in 1999, what role did you move to?

2     **A.  An investigator in the electronic**

3 **monitoring unit.**

4     Q.  Okay.  And did you have to -- how did you

5 make that move?  Did you have to bid for that, or how

6 did you come to learn of that opportunity in EM?

7     MR. WHITE:  Object to form.

8         You can answer.

9     THE WITNESS:  I honestly don't recall.

10 BY MS. KRAUCHUN:

11     Q.  So you don't recall from courtroom

12 services deputy to becoming an investigator, how you

13 ended up taking that position.  Is that fair to say?

14     **A.  You asked if I recall how I heard about**

15 **it.  I don't remember how I heard about it.  I was**

16 **appointed to that position.**

17     Q.  And who appointed you to that position?

18     **A.  Sheriff Michael Sheahan.**

19     Q.  And how did you become aware of that

20 appointment?

21     **A.  I don't know.**

22     Q.  Did you have to fill out an application?

23     **A.  I went through an interview process.**

24     Q.  Do you know who interviewed you?

Page 10

1     **A.  Jack Byrne.**

2     Q.  And what was Jack Byrne's title?

3     **A.  I believe he was the director of**

4 **electronic monitoring at the time.**

5     Q.  So as a court services deputy, you're

6 part of a union.  Is that correct?

7     **A.  I was, yes.**

8     Q.  And what union is that?

9     **A.  Oh, I -- back then, I mean, they changed.**

10 **The correctional officers and the court services**

11 **deputies have changed unions so many times I can't --**

12 **I don't remember.**

13     Q.  Okay.  And when you moved over to the EM

14 unit as an investigator, were you still a part of a

15 union?

16     **A.  Yes, I was.**

17     Q.  And is that the same union as the court

18 services deputy?

19     **A.  I honestly don't know.**

20     Q.  Okay.  And so when you began in the --

21 can you describe your duties as an investigator?

22     **A.  I worked on midnights in -- at the time**

23 **it was deemed patrol which was we went out and**

24 **checked on the inmates on the electronic monitoring**

Page 11

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1265 of 1503 PageID #:1656

**Page 12**

1  program, if they had violated or at that time there
2  was what was called random hits. We were given a
3  list of addresses of the inmates that are on the
4  program and we just go and check the equipment and
5  make sure they're doing what they're supposed to be
6  doing or not doing what they're not supposed to be
7  doing.
8      Q.  Okay. And so how long were you on
9  midnights once you got to EM?
10     A.  Two, three -- I don't remember exact
11 times. It was a couple years.
12     Q.  And during that time, were you always on
13 patrol?
14     A.  No.
15     Q.  So could you give me an estimate of --
16 roughly how often would you say you did the job of
17 patrol for those two or three years?
18     A.  I don't remember.
19     Q.  Was it the majority of the time?
20     A.  No. I would say it was 50/50. It was
21 between patrol and -- it was between patrol,
22 dispatch, and monitoring.
23     Q.  Patrol, dispatch, and what else did you
24 say?

**Page 13**

1      A.  Monitoring, the monitoring center.
2      Q.  Okay. And so can you describe what your
3  duties were when you were on dispatch?
4      A.  I would be going through violations and
5  assigning them to vehicles.
6      Q.  Okay. And when you were on monitoring,
7  what exactly was your duties?
8      A.  It would be going through -- it would be
9  going through messages that were generated by the
10 house monitoring equipment for inmates and
11 determining whether there were violations, whether
12 there was needed further action, along those lines.
13 Pretty much taking raw data and pushing it in one
14 direction or another.
15     Q.  And logistically speaking, when you began
16 your tour of duty when you were on patrol, where did
17 you begin that tour of duty at?
18     A.  At that time it was 31st and California
19 in the basement of the building. I think it was
20 building one, and it was done at roll call.
21     Q.  So you had to report there to roll call
22 before your tour of duty, correct?
23     A.  Correct.
24     Q.  And describe for me what would happen at

**Page 14**

1  roll call.
2      A.  We would sit down and -- at the time it
3  was two supervisors and a deputy chief, and it would
4  be -- yeah, they'd go through what's going on,
5  officer safety alerts, things like that. They'd hand
6  out assignments, tell you who your partners are if
7  you were new. Yeah, and then that was about it.
8  Roll call typically back then lasted 10, 15 minutes.
9      Q.  And you said that there were supervisors.
10 Explain to me because just for the hierarchy or the
11 chain of command, supervisors would be the next step
12 above an investigator. Is that correct?
13     A.  Supervising investigator, yes.
14     Q.  Okay. And then the next -- going up the
15 chain of command, who would be the next in line above
16 a supervisor?
17     A.  The watch commander.
18     Q.  Okay. And then going up the chain of
19 command, who would be above a watch commander?
20     A.  The deputy chief.
21     Q.  And above a deputy chief?
22     A.  A chief.
23     Q.  And above a chief?
24     A.  Deputy director.

**Page 15**

1      Q.  And above that deputy director?
2      A.  Director.
3      Q.  And then above the director?
4      A.  Deputy executive director.
5      Q.  And then who would be above that deputy
6  executive director?
7      A.  Executive director.
8      Q.  And then who would be above the executive
9  director?
10     A.  I haven't got a clue.
11     Q.  Okay. So you testified that the
12 supervisors held roll call. Is that correct?
13     A.  Correct. You're considering 1999.
14 Things have changed significantly since that time.
15     Q.  Right. I'm talking specifically when you
16 were on patrol, so thank you for clarifying that.
17         So at that time the supervisors held
18 roll call. You said that they gave out assignments.
19 Can you describe to me what that looked like?
20     A.  They would tell you what squad car you
21 would take, what radios you would take, who your
22 partner was, whether you were incidents or hits,
23 incidents being the ones that actually went to the
24 houses to answer alarms, hits being just go and check

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1266 of 1503 PageID #:1657
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 on them. They would tell you your -- back then it
2 was done by -- oh, boy. I think it was zone or area.
3 I can't remember the terminology. Zone 7 was
4 everything out of the County per se, and then the
5 other, the rest of the County was broken up by
6 numbers.
7     Q. Okay. So you said you would be assigned
8 to a squad car, right?
9     A. Correct.
10     Q. Okay. And you would be assigned radios,
11 right?
12     A. Uh-huh.
13     Q. Okay. And then you said partner. Was it
14 common to have a regular partner when you were on
15 patrol?
16     A. For investigators that had been there for
17 a period of time and established relationships, yes,
18 it was common.
19     Q. And in the law enforcement context, is it
20 important to have a regular partner?
21     A. I believe it is.
22     Q. And why would you say that?
23     A. As I indicated earlier or as I said
24 earlier, I think that you develop a relationship with

Page 16

1 that person and you anticipate, you know, how they're
2 going to act or so on and so forth. I mean, how
3 they're going to react, how they're going to act.
4 Can you spend eight to ten hours in a car with a
5 person? I think that's important that you can
6 tolerate each other.
7     Q. So is it fair to say it's kind of a
8 relationship that is built on trust? Is that
9 accurate?
10     A. That is accurate.
11     Q. And so you would agree with me that
12 having a regular partner that you trust is a really
13 important dynamic in law enforcement, correct?
14     MR. WHITE: Object to form.
15 BY MS. KRAUCHUN:
16     Q. You can answer.
17     A. I do believe that, yes.
18     Q. Okay. And during your time in patrol,
19 did you have a regular partner?
20     A. Yes.
21     Q. And who was that partner?
22     A. I had two regular partners, and one was
23 Dan Fort Bennett (phonetic), and the other was Frank
24 Vernagus.

Page 17

1     Q. And when you were given assignments, I
2 think you just talked about zone and area. Were you
3 assigned to a specific zone or area or whatever the
4 terminology is to identify a certain area of the
5 County?
6     A. I was, yes. Every day, yeah.
7     Q. And can you describe what area you were
8 usually assigned to?
9     A. It varied.
10     Q. Was it -- was there any -- strike that.
11     Do you have any knowledge of any
12 factors that supervisors relied on to assign you to
13 certain areas?
14     MR. WHITE: Objection to form, foundation.
15 BY MS. KRAUCHUN:
16     Q. You can answer that, Chris.
17     A. Repeat the question. I'm sorry.
18     Q. Do you have any knowledge of what factors
19 were considered in assigning certain officers to
20 specific areas?
21     MR. WHITE: The same objection.
22     You can answer.
23     THE WITNESS: I remember that there was -- me
24 particular, I mean, we're going back to map book

Page 18

1 days, but if you were familiar with, say, the north
2 side of the County, they would typically assign you
3 to the north side. If you were familiar with the
4 south side of the County, they would assign you to
5 the south side.
6 BY MS. KRAUCHUN:
7     Q. And so you're a south sider then,
8 correct?
9     A. That is correct.
10     Q. So were you typically assigned to the
11 south side?
12     A. No.
13     Q. So the area that you were from or lived
14 really wasn't indicative of where your assignment was
15 going to be. That's fair to say?
16     A. I can only --
17     MR. WHITE: Objection to foundation -- Chris,
18 hold on. I have to get my objection in. Objection
19 to foundation.
20     You can answer.
21     THE WITNESS: I apologize. I mean, I can
22 only speak for myself, and I know that -- you know, I
23 personally wasn't familiar with the south side. I
24 was familiar with the south side of Chicago, but not

Page 19



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1267 of 1503 PageID #:1658

1 the south side of Cook County. So, I mean, to say
2 that I was being assigned to the south side because I
3 lived there is really not valid, you know. I was
4 assigned to Schaumburg. I was assigned to, you know,
5 northern suburbs, northern city, east, west, north,
6 south. It was a fairly new experience for me.
7 BY MS. KRAUCHUN:
8    Q.   Was there a specific area that you were
9 assigned to more than others?
10    A.   No.
11    Q.   So would you say you were evenly assigned
12 across the County?
13    A.   I honestly don't remember. You're asking
14 me to remember 20 some odd years ago. I mean, I just
15 remember the one area that I particularly didn't care
16 for which doesn't even exist any longer and hasn't
17 for years and years was Area 7 because it was out of
18 Cook County and I would always get lost. That's
19 pretty much what I remember about areas and zones.
20    Q.   Okay. You said Area 7, where would that
21 be if it's outside of Cook County?
22    A.   It was wherever, in some of the judicial
23 placements back in the '90s, judges did not regard
24 the statutes regarding electronic monitoring. They

Page 20

1 placed people in, you know, Will County, Kendall
2 County, things like that.
3    Q.   Fair enough. So when you were working on
4 dispatch, logistically where was that located?
5    A.   31st and California.
6    Q.   And was that in an office?
7    A.   I wouldn't call it an office. It was the
8 old contagious disease building from the City of
9 Chicago.
10    Q.   That's interesting.
11    A.   I don't remember.
12    Q.   On each watch how many investigators
13 would be assigned to dispatch?
14    A.   With -- taking into mind days off, day
15 off groups, vacations, I would say there was a
16 rotation of -- again, you're asking me from, you
17 know, '90s, early 2000s. I would say a rotation of
18 four to six people.
19    Q.   Okay. And with monitoring, again
20 logistically speaking, where was monitoring located?
21    A.   That was also at 31st and California on
22 the second story.
23    Q.   And how many investigators would be
24 assigned to monitoring per watch?

Page 21

1    A.   Typically again with rotation taken into
2 consideration, days off group, four to six.
3    Q.   Okay. So I believe you testified that
4 you were on patrol for roughly two to three years,
5 correct?
6    A.   If I remember correctly.
7    Q.   After that two to three years, so that's
8 roughly 2002. Would you agree with that?
9    A.   I think two thousand and -- it might have
10 been -- I'm trying to remember. I don't remember
11 when I was made a -- my next step was a supervisor.
12 I don't remember the year. My daughter was born in
13 2000. It might have been 2001.
14    Q.   So 2001, what role did you then take on
15 within the EM unit?
16    A.   Supervisor, supervising investigator.
17    Q.   And how was it that you assumed that
18 role?
19    MR. WHITE:  Object to form.
20 BY MS. KRAUCHUN:
21    Q.   You can answer that.
22    A.   I was asked by then the deputy director
23 of electronic monitoring if I would be interested in
24 the position.

Page 22

1    Q.   And who was that deputy director?
2    A.   Michael Rickey.
3    Q.   And can you explain how that conversation
4 happened?
5    A.   I don't remember the exact conversation.
6 I remember him saying to me that I did good work and
7 that I work with paper, and he asked me if I would be
8 interested in taking that position. That's about it.
9 I don't remember the specifics of the conversation.
10    Q.   So did you have to formally apply for
11 that position?
12    A.   I believe I had to write a letter or a
13 memorandum of interest or intent. I don't recall.
14 I'm fairly positive that I did have to write some
15 sort of document.
16    Q.   But there was no process, like you fill
17 out an application, you submit it to your supervisor
18 and things like -- of that nature.
19        It was you were approached and you
20 were told to write a memorandum of intent. Is that
21 what I understand you just testified to?
22    MR. WHITE:  Object to form.
23        Go ahead, Chris.
24    THE WITNESS:  I believe so. I honestly don't

Page 23



Christopher Rohloff  -  9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1268 of 1503 PageID #:1659
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 recall the semantics of how it worked.  I remember
2 that there was a position open.  I think someone
3 retired if I'm not mistaken, I don't recall, and I
4 remember voicing interest amongst my peers.  I'm
5 fairly positive I remember writing a memorandum.  Who
6 indicated that I should do that, I don't -- I don't
7 recall.  That's about it.
8 BY MS. KRAUCHUN:
9     Q.  And so when you became a supervising
10 investigator, what -- did your compensation change?
11 Did your salary change?
12     **A.  No, it did not.**
13     Q.  So what was the incentive to become a
14 supervising investigator?
15     **A.  I would just assume forward progression**
16 **in your career.**
17     Q.  So is it your understanding there was no
18 increase in pay or any -- did you receive any
19 additional benefits?
20     **A.  I know my hours altered by an hour, if**
21 **I'm not mistaken, whereas instead of working 4:00 to**
22 **12:00, it was 3:00 to 11:00 -- or I'm sorry.  That**
23 **was midnights.  So instead of midnight to 8:00, it**
24 **was 11:00 to 7:00 in the morning.  Oh, we were out of**

Page 24

1 **uniform.  That was definitely a benefit.**
2     **Now in retrospect, I don't believe**
3 **it was a benefit because I spent more on casual**
4 **business clothes than I did on uniforms.  I really --**
5 **yeah, I don't -- I was a young kid that wanted to,**
6 **you know, move forward with my career.**
7     Q.  So there was no -- there was no benefit,
8 I suppose quantifiable benefit that you received from
9 taking that position?
10     MR. WHITE:  Objection.  It misstates the
11 testimony.
12     You can answer.
13     THE WITNESS:  I don't -- no, I don't
14 remember.  I honestly don't know.
15 BY MS. KRAUCHUN:
16     Q.  Okay.  And how long did you serve in this
17 role as a supervising investigator?
18     **A.  Oh, boy.  I'm trying to think.  Maybe six**
19 **or seven years.  Five, six, seven years.  I don't**
20 **recall.**
21     Q.  Okay.  So then your position changed
22 somewhere between 2006 and '07?
23     **A.  Probably '06 and '07, yes.**
24     Q.  Okay.  And what did your position change

Page 25

1 to at that time?
2     **A.  I was an acting deputy chief.**
3     Q.  Okay.  And can you explain to me what an
4 acting deputy chief is as opposed to a deputy chief?
5     **A.  I was given responsibilities and the**
6 **credentials of a deputy chief without the salary.**
7     Q.  And how did that work out?  No, strike
8 that.  I'm joking.
9     So how did that role, how did you
10 come to be appointed to act in that role?
11     MR. WHITE:  Objection to foundation.
12     You can answer.
13     THE WITNESS:  That -- let's see here.  I'm
14 trying to remember who retired.
15     The deputy chief of monitoring
16 retired.  I want to say he retired.  The position was
17 vacated.  I had been a supervisor for some time and
18 along the lines of, you know, the move to supervising
19 investigator I was asked, you know, you're a young
20 guy, you're a go-getter, you're, you know, your paper
21 is good, you know your way around the unit.
22     I spent a couple years writing
23 general orders for the department and it was asked,
24 you know, would you be interested in that position

Page 26

1 and of course I said yes.
2 BY MS. KRAUCHUN:
3     Q.  And do you recall who asked you?
4     **A.  I can't remember.  I mean, it was talk**
5 **amongst all of the command members with the unit.**
6 **We've had so many bosses over the years.  At that**
7 **time I want to say the executive director was a**
8 **fellow named Joe Logue (phonetic).  I want to say**
9 **the -- I can't remember who the deputy executive**
10 **director was.**
11     **But if I'm not mistaken, through the**
12 **course of talking with chiefs and the deputy director**
13 **and the director, I believe it was actually made --**
14 **you know, solidified and done by the executive**
15 **director of DCSI at the time.**
16     MS. KRAUCHUN:  I think this is probably a
17 good time for us to take a break, Guys, so I can jump
18 on that court status.  So I will -- I'm hoping it's
19 not too long.  It is traffic court, Guys, so I don't
20 know how that's going to work out, but I'll shoot for
21 being back on at 10:45, and I'll shoot you a text
22 maybe or something if I'm going to be later.  Is that
23 cool?
24     MR. WHITE:  Yeah, that's fine.

Page 27



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1269 of 1503 PageID #:1660
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  MS. KRAUCHUN:  Thanks a lot, Guys.

2       (Whereupon, a short break

3        was taken.)

4  MS. KRAUCHUN:  So we're back on the record.

5  BY MS. KRAUCHUN:

6  Q.  So I think where we left off was you were

7  talking about your role as the acting deputy chief.

8  Is that about right?

9  A.  Yes, ma'am.

10  Q.  Okay.  So you said that you were acting

11  deputy chief because you weren't getting -- you

12  didn't get a pay raise.  Is that correct?

13  A.  Yes, it was.

14  Q.  Okay.  And how long did you serve as this

15  acting deputy chief?

16  A.  Again, I don't remember.  I'm not good

17  with time frames.  I apologize.  Two and a half,

18  three years possibly.

19  Q.  Okay.  And during that entire time, were

20  you assuming the role of deputy chief and not getting

21  paid for it?

22  A.  Yes, I was.

23  Q.  Okay.  And can you describe to me what

24  your duties were as the deputy chief?

Page 28

1  A.  At that time I was the deputy chief of

2  monitoring.  I oversaw monitoring operations.

3  Q.  So were you overseeing the supervisors

4  then at that time?

5  A.  The monitoring supervisors.

6  Q.  Okay.  And what did that -- describe what

7  that role entailed.

8  A.  The monitoring -- at that time the

9  monitoring section center, whatever you want to --

10  however you want to deem it consisted of dispatch

11  which was, you know, the investigators assigned to

12  dispatch, consisted of monitoring supervisors, it

13  consisted of the watch commanders monitoring, and I

14  want to say at our highest point, I believe I had

15  about 50 civilians that I was responsible for, and

16  they were responsible for -- well, dispatch was

17  responsible for, as I said earlier, dispatching our

18  units, our field units to assignments, answering the

19  telephones.

20       The monitoring civilian staff was

21  responsible for interpreting raw data from the home

22  monitoring devices and pushing it in one direction or

23  the other for action, and obviously the supervisors

24  and watch commanders were in charge of those

Page 29

1  civilians.

2  Q.  So did you give out assignments to any of

3  the investigators or employees underneath you?

4  A.  No, I did not.

5  MR. WHITE:  Objection to form.

6       You can answer.

7  BY MS. KRAUCHUN:

8  Q.  Sorry.  You said you -- I'm sorry.  What

9  was your answer to that?

10  A.  No, ma'am, I didn't.

11  Q.  Okay.  So who was responsible for giving

12  those assignments to the people that you supervised?

13  A.  The supervisor.

14  Q.  The supervisor.  So the -- on the chain

15  of command, that would be the person below you.  Is

16  that correct?

17  A.  On the chain of command the watch

18  commander for each shift -- the watch commander and

19  the supervisor -- at that juncture the watch

20  commander and supervisor position was

21  interchangeable.  There really was no difference in

22  function, so the watch commander may do -- there

23  really was no difference so, yes.

24       The supervisor would -- on paper

Page 30

1  next below me would have been the watch commander and

2  then the supervisor, but the supervisor was

3  responsible for assignments on that particular day.

4  Q.  Okay.  And so your role was to oversee

5  the supervisors then, correct?

6  A.  That's correct.

7  Q.  Okay.  And after this acting deputy chief

8  role, what was the next role that you assumed with

9  the sheriff's department?

10  A.  Deputy chief.

11  Q.  I'm sorry.  You broke up there for a

12  second.

13  A.  It was pay deputy chief.

14  Q.  What was the first word before deputy

15  chief?

16  A.  Pay, salaried deputy chief.

17  Q.  Oh, okay.  Got you.  So you weren't just

18  an acting deputy chief.  You were a deputy chief?

19  A.  Yes, ma'am.

20  Q.  Okay.  And what year approximately was

21  that?

22  A.  Maybe 2008, 2009.

23  Q.  Okay.  And what was your roles and duties

24  at that time once you became that paid deputy chief?

Page 31



Christopher Rohloff  -  9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1270 of 1503 PageID #:1661

Page 32

1    A.  At that time nothing had changed from my
2  position as acting deputy chief.  I was the deputy
3  chief of monitoring, and my role and responsibilities
4  did not alter from the supervision of the civilian
5  staff, dispatch of the monitoring supervisors.
6    Q.  Okay.  So you were only assigned as the
7  deputy chief of monitoring.  So you were not the
8  deputy chief of patrol, correct?
9    A.  Things changed, you know, right around
10  that time where sections were no longer the -- well,
11  for starters, the investigators' Collective
12  Bargaining Unit, I don't know if it was Teamsters,
13  MAP, whoever it was at that time, bargained away
14  their ability to bid to a section.  So rather than
15  bidding to patrol, technical services, records,
16  monitoring dispatch, they simply bid for their shift
17  and their day off group.
18    And then shortly thereafter that
19  happened, they -- the Department of Community
20  Supervision and Intervention which is DCSI was
21  dissolved.  Sheriff Dart got rid of the department,
22  broke the units up into different payrolls, and it
23  was -- I don't remember what year at that juncture,
24  and also the position as supervisor was eliminated

Page 33

1  because of the union issues.
2    There was a lot that -- I'm trying
3  to remember when.  And again, you indicated
4  supervisor or deputy chief of patrol.  There was --
5  as this transitioned, the positions -- you were no
6  longer the deputy chief of monitoring or the deputy
7  chief of patrol or the deputy chief of records or the
8  deputy chief of TSS and the deputy chief of fugitive.
9  You became a shift deputy chief.
10    Q.  Okay.  So let me break that down a little
11  bit.  So prior to the time that you became the paid
12  deputy chief, I guess we'll refer to it as that way,
13  prior to that time, there was a deputy chief of each
14  different section within EM.  Is that fair to say?
15    A.  There was -- yes, that's correct.  Some
16  of the sections had multiple deputy chiefs.
17    Q.  Okay.  So there would have been a deputy
18  chief of patrol?
19    A.  I believe there were three or four
20  deputies.
21    Q.  Okay.  And then a deputy chief of TSS?
22    A.  I believe there was three or four of
23  them.
24    Q.  Okay.  And you were a deputy chief of

Page 34

1  monitoring?
2    A.  There was one deputy chief of monitoring.
3  That's correct.
4    Q.  And was there a deputy chief of dispatch?
5    A.  No, monitoring -- dispatch was included
6  in monitoring.
7    Q.  Okay.  And then was there any other
8  sections within EM besides the ones we just talked
9  about?
10    A.  There was a second section.  I believe
11  there was two deputy chiefs there and two chiefs.
12  There was a technical services section, and again I
13  believe there was two maybe -- I can't recall how
14  many, but I believe they had one chief and maybe two
15  deputy chiefs.  There was the fugitive section which
16  had let's say four deputy chiefs at the time.
17    Q.  Okay.  And then once you became the
18  deputy chief, I believe what you just said was that
19  those roles were not separated out by sections any
20  longer.  Is that correct?
21    A.  I can't give you a time frame, but it was
22  within six months to a year the roles were no longer
23  separated with the exception of fugitive and it was
24  simply you were a deputy chief on a shift.

Page 35

1    Q.  Okay.  So you would have been a deputy
2  chief on a specific watch, right?
3    A.  Correct.  That's correct.
4    Q.  What watch were you the deputy chief of?
5    A.  At that time I was on -- I was one of
6  three or four deputy chiefs that were on days.  Days
7  was -- I believe I worked 7:00 to 3:00 at the time.
8    Q.  Okay.  And who were the other deputy
9  chiefs with you at that time on days?
10    A.  I believe Jessie Walker.  You had Fred
11  Hudson.  I honestly can't recall if John Webb was a
12  chief or a deputy chief at that time.  That's all I
13  can remember off the top of my head.
14    Q.  And so as the deputy chief of the -- is
15  that the first watch?
16    A.  Second watch.
17    Q.  Second watch.  Sorry.  So as the deputy
18  chief of the second watch, what were your roles or
19  duties?
20    A.  My duties never changed because I had a
21  background in monitoring dispatch.  That's what I
22  continued to do.
23    Q.  So essentially you were doing the same
24  thing, it's just that the title changed slightly.  Is



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1271 of 1503 PageID #:1662
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that fair to say?

2     **A. That's fair.**

3     Q. Okay. And how long did you work on the

4 second watch as the deputy chief?

5     **A. Maybe a year or two years. I don't**

6 **recall.**

7     Q. Okay. And after that time that you were

8 the deputy chief of -- on the second watch, what was

9 the next title or role that you assumed with the

10 sheriff's department?

11     **A. I simply transferred to third shift,**

12 **third watch.**

13     MR. WHITE: If we keep getting weird

14 feedback, sometimes it helps if you just completely

15 log out and log back in again, but let's just see if

16 it continues.

17 BY MS. KRAUCHUN:

18     Q. Yeah, Chris, just let us know. If it's

19 really weird, you can try and log back out as Ethan

20 said.

21     **A. Okay.**

22     Q. So you went to the third watch then as a

23 deputy chief, correct?

24     **A. Yes, ma'am.**

1     Q. And were your roles the same as they were

2 in the monitoring dispatch position?

3     **A. Pretty much, yes.**

4     Q. Okay. And why were you transferred to

5 the third watch?

6     **A. I requested it.**

7     Q. Okay. And how does -- how did you have

8 to go about requesting that change in shift?

9     **A. I believe I -- in the interim of this,**

10 **the deputy chiefs went to the labor board and**

11 **unionized and we were -- the labor board ruled we**

12 **could. I believe I did it through the union. I**

13 **asked for the transfer through the union.**

14     Q. So you guys became union members, the

15 deputy chiefs?

16     **A. That's the only -- I became a paid deputy**

17 **chief.**

18     Q. Got you. So roughly that happened in

19 like 2008, 2009, the deputy chiefs became part of the

20 -- is it the same union as the investigators?

21     **A. No, we're in MAP.**

22     Q. You're in MAP. Okay. And it was once

23 you became a union member that you then -- did you

24 have to do a bid process to get onto the third watch?

1     **A. No. The contractual agreement was that**

2 **everybody would stay where they're at unless, you**

3 **know, as positions opened, they would be bid and --**

4 **yeah, I remember -- I can't remember who left. I**

5 **don't remember if someone left. Yeah, I'm sorry.**

6 **Cedric Logan wanted to come -- he was on afternoons**

7 **and I was on days, and Cedric wanted -- he was having**

8 **vision problems at night driving, and he approached**

9 **me and said, would you be interested in going**

10 **afternoons and switching with me because he knew I**

11 **was having child care issues, and we wrote a -- we**

12 **did it -- now I remember. We did it through the**

13 **union with a letter of agreement.**

14     Q. Perfect. Okay. So once you became the

15 third watch deputy chief, how long were you in that

16 role for?

17     **A. Until I was injured.**

18     Q. Okay. So that was the last position that

19 you held when you were actively working?

20     **A. Yes.**

21     MS. KRAUCHUN: Okay. If I can, can I have

22 Exhibit A?

23     And, Ethan, I'm sorry. Did I send

24 those to you?

1     MR. WHITE: No.

2     MS. KRAUCHUN: Is it helpful if I e-mail them

3 to you now or does it not matter?

4     MR. WHITE: It is helpful just so I can look

5 through them, you know, instead of being dependent on

6 the screen.

7     MS. KRAUCHUN: Yeah, I apologize. I'll send

8 them to you right now.

9     And if the tech can bring up Exhibit

10 A, that would be great.

11     That was really an oversight, Ethan.

12     MR. WHITE: No worries. Honestly, I forgot

13 too.

14     MS. KRAUCHUN: And then if we can scroll

15 down.

16     THE WITNESS: Am I to scroll down?

17     MS. KRAUCHUN: No, the tech is. Sorry.

18     So scroll down to page 2, please,

19 and paragraph 2. So if you can just pull that up a

20 little bit so we can see. Actually, paragraph 2 and

21 the answer to that.

22 BY MS. KRAUCHUN:

23     Q. So, Chris, I'm going to ask you some

24 questions. This is the answer, defendant's answer

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1272 of 1503 PageID #:1663

1 and affirmative defenses that were filed.

2     **A. I've got to go get my glasses.**

3     Q. Sure. Go ahead.

4     **A. I apologize again. Okay.**

5     Q. So do you see paragraph No. 2 our tech

6 highlighted for us?

7     **A. Yes, I do.**

8     Q. Okay. So this is your defendants' answer

9 to the plaintiffs' complaint. Do you recognize this

10 document?

11     **A. Yes, I do.**

12     Q. And you reviewed this document before it

13 was -- before it was filed, correct?

14     **A. Yes, ma'am.**

15     Q. Okay. So specifically No. 2, if you can

16 read what it says there.

17     **A. Okay.**

18     Q. It says defendants deny the allegations.

19 Can you explain to me the basis of denying that

20 paragraph?

21     MR. WHITE: I object to the extent it calls

22 for a legal conclusion.

23 BY MS. KRAUCHUN:

24     Q. You can answer, Chris.

1     **A. I don't personally believe that race of**

2 **any type had any impact on anything.**

3     Q. And when you say anything, what

4 specifically do you mean by that?

5     **A. Any employment action.**

6     Q. You said employment issue?

7     **A. Action.**

8     Q. Okay. And what is your basis for having

9 that opinion?

10     **A. I believe that I always -- I never looked**

11 **at race or creed or gender or anything like that, I**

12 **mean, when doing anything, honestly, whether it be**

13 **socializing with my peers and my coworkers, with**

14 **anything that I did.**

15     Q. And kind of digressing for a minute,

16 you've obviously seen the complaint filed in this

17 case, correct?

18     **A. Yes, ma'am.**

19     Q. And do you know the plaintiffs that

20 are -- that filed this complaint?

21     **A. I do.**

22     Q. Okay. So actually, I'm going to kind of

23 go one by one. So Legrain Winston, do you know

24 Legrain?

1     **A. I do.**

2     Q. And have you worked with Legrain?

3     **A. For many, many years, yes.**

4     Q. So roughly how many years would you say

5 that you've worked with Legrain?

6     **A. 20.**

7     Q. 20 years?

8     **A. Yes, ma'am.**

9     Q. And what was your relationship like with

10 Legrain?

11     **A. It was a professional relationship. I**

12 **would say we had a good professional relationship.**

13     Q. Did you ever work as Legrain's partner?

14     **A. No, ma'am.**

15     Q. Were you and Legrain assigned to the same

16 watch?

17     **A. Yes.**

18     Q. And what watch was that?

19     **A. Third watch.**

20     Q. Okay. So your time as a deputy chief on

21 the third watch was when you worked with Legrain. Is

22 that correct?

23     **A. Yeah. Legrain was on third watch when I**

24 **was on midnights as a patrol investigator or as an**

1 investigator per se.

2     Q. So how much interaction would you have

3 with Legrain through the course of the years?

4     MR. WHITE: Objection to foundation.

5         You can answer.

6     THE WITNESS: Recently my interaction has

7 been I would say -- I would speak with him on the

8 phone. I'm trying to remember when -- I would close

9 the shift out prior to getting -- just dealing with

10 him on the radio, on the telephone, and as of late at

11 roll calls.

12         When I got transferred to the

13 afternoon shift, my hours were not -- the chiefs all

14 worked 3:00 to 11:00, all the investigators worked

15 3:00 to 11:00, I worked 4:00 to 12:00, so my

16 interaction in that time frame was -- typically, they

17 were already on the street working or wherever they

18 were working, so my interaction was typically on the

19 phone or the radio, and then I would see Legrain at

20 the end of the shift.

21 BY MS. KRAUCHUN:

22     Q. And can you describe the interactions

23 that you had with Legrain?

24     **A. Typically they'd call and, how do you**

Christopher Rohloff   -   9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1273 of 1503 PageID #:1664

1 want this handled, you know.  How do you want certain
2 things handled, or what do you think I should do
3 here, you know, that type of thing.  And at the end
4 of the shift it was, just turn your paperwork in,
5 give me your numbers, and have a good night.
6        Q.  And you would agree with me that Legrain
7 was a good employee, correct?
8        A.  Yeah, he was a good employee.  Yes.
9        Q.  And did Legrain have a regular partner
10 that he worked with?
11        A.  Legrain -- through the years Legrain, his
12 partner was -- I want to say Legrain was partnered
13 with a fellow named Carl Merchanson for many years
14 and after that it was Cecil Williams was his partner.
15        Q.  And you know Cecil Williams is also one
16 of the plaintiffs in this action, correct?
17        A.  Yes, ma'am.
18        Q.  Okay.  And do you know roughly how long
19 Legrain and Williams were partners for?
20        A.  That I don't know.
21        Q.  Okay.  And do you know Cecil Williams
22 well?
23        A.  Do I know him -- again, ma'am.
24        Q.  Do you know him well?
Page 44

1        A.  Yes, I do.
2        Q.  How do you know Cecil Williams well?
3        A.  Through work.
4        Q.  And how long have you known him?
5        A.  My interaction with Cecil started when I
6 transferred to the third watch.
7        Q.  Okay.  And so roughly how many -- that's
8 what, the most recent ten years.  Is that fair to
9 say?
10        A.  I don't think it's been ten years.  I
11 think it's probably, I don't know, five, six years
12 maybe.  Yeah, it might be going on ten maybe.  Again,
13 I'm not good with time frames.
14        Q.  And so at the point that you met
15 Williams, you were a deputy chief at that time.  Is
16 that correct?
17        A.  Yes, ma'am.
18        Q.  Okay.  And what was the nature of your
19 relationship with Cecil Williams?
20        A.  Strictly professional.
21        Q.  Okay.  And so you never were -- you never
22 partnered with him at any time, did you?
23        A.  No.
24        Q.  And you said that was on the third watch,
Page 45

1 correct?
2        A.  Yes, ma'am.
3        Q.  And describe the interactions that you
4 had with Cecil Williams.
5        A.  The same as with Legrain.  Typically they
6 were already at their assignments in the field or at
7 the jail, one of those functions, and they would
8 correspond with me by radio, telephone, the same
9 nature, you know, what do you want us to do, so on,
10 so forth, how do you want to handle this, and then at
11 the end of the shift.
12        Q.  Were you ever responsible for giving
13 either Legrain or Cecil Williams their assignments?
14        A.  On very few occasions.
15        Q.  And on those very few occasions, describe
16 how you would be the one giving assignments out?
17        A.  If the chiefs -- there were three chiefs
18 on the shift, Ranzino, Acey, and Tom Neal.  If they
19 did not -- you know, if they weren't able to --
20 whether they were on vacation, days off, whatever the
21 case may be, in the event that they weren't going to
22 be there, I would come in one hour early to conduct
23 roll call, and that's when I would hand out
24 assignments.
Page 46

1        Q.  So based on your knowledge, how were
2 those assignments out at roll call?
3        MR. WHITE:  Objection to foundation, form.
4        You can answer.
5        THE WITNESS:  I don't understand the
6 question.  How -- it's fairly vague.
7 BY MS. KRAUCHUN:
8        Q.  So you just testified that you filled in
9 essentially at roll call, correct?
10        A.  On occasion.
11        Q.  Okay.  So on those occasions when you
12 filled in at roll call, how did you give out the
13 assignments?
14        A.  There was a roster and you would sit down
15 at the roster and I would sit down with the
16 attendance book, see who would be on duty that day,
17 and I would plug in assignments typically with the
18 attendance book.  It was alphabetical.  I would just
19 go down the book and go, okay, A, B, like Barron
20 Alston was the first one, so he would go into slot
21 one, and then I would look for Barron's partner who
22 was Terel Nichols, and I'd put him into slot two.
23 Then I believe it was after Alston, I can't recall.
24        But essentially alphabetically.  I
Page 47



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1274 of 1503 PageID #:1665
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  would take the first alphabetically, place it into
2  slot one which was, I believe 3418 was the car.  By
3  that time the unit numbers or the beat numbers
4  already had assigned equipment, and then I would go
5  find their partner in the roster and plug him in and
6  then go down the line alphabetically and then find
7  the next fellow.  I'm not saying this is who it was,
8  but let's say alphabetically it was Legrain.  I would
9  plug him into, now that 3418 is filled, I would plug
10  Legrain into 3417, and then I would find Cecil and
11  plug him into spot number two for 17 and so forth.
12      Q.  Okay.  And that required you to assign in
13  different areas, so like we talked about earlier,
14  patrol, TSS, monitoring, dispatch, and I think was
15  there a fugitive in there too?  Correct?
16      A.  It was separated.
17      Q.  Okay.  But with the absence of fugitive,
18  but that required you to assign people to those
19  different areas, right?
20      A.  Yes.  Correct.
21      Q.  Okay.  And was there certain people that
22  you put in certain areas as a matter of course?
23      MR. WHITE:  Object to form.
24          You can answer if you understand.
                                              Page 48

1      THE WITNESS:  When you say areas, you mean --
2  you're going to have to elaborate on areas.
3  Assignment, particular?
4  BY MS. KRAUCHUN:
5      Q.  Yeah, so that was kind of a confusing
6  question.  What I mean is when you were doing these
7  roster sheets, right, you had to assign different
8  investigators to patrol, correct?
9      A.  Correct.
10      Q.  You had to assign different investigators
11  to TSS, correct?
12      A.  Yes, ma'am.
13      Q.  Okay.  So that's what I mean by
14  assignment.  So when you were doing the roster
15  sheets, that was your job as the deputy chief, to
16  make out those assignments before roll call, correct?
17      A.  On occasion.
18      Q.  When you were filling in?
19      A.  Correct.
20      Q.  Okay.  So let me go back.  So we were
21  talking about Cecil Williams.  Do you know who
22  Michelle Strickland is?
23      A.  I remember the name very vaguely.
24      Q.  Okay.  And did you ever work with
                                              Page 49

1  Michelle Strickland?
2      A.  She -- I believe she came to the third
3  watch or came to the unit.  I don't know if she
4  transferred from another shift or if she came to the
5  unit.  Right around the time I came to the shift, she
6  was there briefly, maybe a month, maybe two months.
7  I can't recall the time frames, but she was gone as
8  quick as she came.  She left the unit.  I understood
9  she bid out.
10      Q.  Okay.  And what's the basis of your
11  knowledge that she bid out?
12      A.  Just, you know, the guys saying she bid
13  out.
14      Q.  Oh, okay.  How would you describe the EM
15  unit?  Would you describe it as like a small
16  tight-knit unit, or would it be kind of a larger,
17  impersonal unit?
18      MR. WHITE:  Object to form.
19          You can answer.
20      THE WITNESS:  I'm not even going to offer my
21  opinion on that.  I don't know how to answer that.
22  I've been there so many years.  If you'd asked me
23  that question 20 years ago, yeah, it was a small,
24  tight-knit unit and people, you know, shared holidays
                                              Page 50

1  together and things like that.  That's changed over
2  the course of time much like most of the social
3  interaction has over the course of time.
4  BY MS. KRAUCHUN:
5      Q.  So would it be normal to kind of hear
6  gossip in the workplace?
7      MR. WHITE:  Object to form and foundation.
8          You can answer.
9      THE WITNESS:  On occasion.
10  BY MS. KRAUCHUN:
11      Q.  So you mentioned that you heard that
12  Strickland bid out.  Is that the kind of stuff that
13  you would hear through the workplace?
14      A.  Yes.
15      MR. WHITE:  Object to form.
16  BY MS. KRAUCHUN:
17      Q.  Okay.  And did you have any personal
18  interaction with Strickland?
19      A.  I don't remember any, no.
20      Q.  Okay.  So you couldn't speak to her
21  quality of work or anything?
22      A.  I -- like I said, I really don't remember
23  much about her at all.
24      Q.  What about Vernell Tims?  Do you know
                                              Page 51



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1275 of 1503 PageID #:1666

**Page 52**

1  Vernell Tims?

2      **A.   I do.**

3      Q.   And how long have you known Vernell?

4      **A.   Vernell came into the unit probably 10,**

5  **15 years ago.**

6      Q.   And were you ever partnered with him?

7      **A.   No, I was not.**

8      Q.   Okay.  And can you describe your

9  relationship with him?

10      **A.   It was a good, professional working**

11  **relationship, and as of late he became a union**

12  **steward, and I think we've actually got a very good**

13  **professional relationship.  I know when he became**

14  **ill, his wife called me and then he ended up calling**

15  **me.**

16      Q.   So it's fair to say all your interactions

17  with him were good interactions?

18      **A.   Yes, ma'am.**

19      Q.   And could you -- were you ever in a

20  position to comment on like the quality of his

21  performance on the job?

22      MR. WHITE:  Objection to form.

23  BY MS. KRAUCHUN:

24      Q.   I'm sorry, Chris?

**Page 53**

1      **A.   I believe he's a very good employee.**

2      Q.   Okay.  And what about I.V. Newson?  Do

3  you know I.V.?

4      **A.   I.V., yeah, I know who he is.  I do know**

5  **who he is, yes.**

6      Q.   Have you had any personal interactions

7  with I.V.?

8      **A.   I don't recall if I.V. was ever on**

9  **afternoons.  When I was on days, my interaction with**

10  **the investigators was very, very limited.  I don't --**

11  **I.V. I think -- if I'm not mistaken, I.V. was always**

12  **on days.**

13      Q.   And when you say when you were on days

14  that your interaction with the investigators was very

15  limited, what do you mean by that?

16      **A.   Again my role was still pretty**

17  **predominately dealing with just the monitoring**

18  **function of the electronic monitoring unit.**

19  **Accordingly, I was typically only dealing with**

20  **dispatch and the civilians that were assigned to the**

21  **unit.**

22      Q.   And so based on what you just said, could

23  you comment on I.V. Newson's work performance?

24      **A.   I really never directly supervised him.**

**Page 54**

1      No, I wouldn't feel comfortable.

2      Q.   And then what about Samuel Page?  Do you

3  know Sam Page?

4      **A.   I do.**

5      Q.   And how long have you known him?

6      **A.   20 years.**

7      Q.   And can you describe your relationship

8  with him?

9      **A.   I consider Sam a friend, a friend and,**

10  **you know, professionally and personally.**

11      Q.   And when you say personally, describe

12  what you mean by that.

13      **A.   We would have lunch together.  We've had**

14  **drinks together.  You know, I would share some things**

15  **that were going on in my personal life with him.  You**

16  **know, a friendship.**

17      Q.   So did you ever meet Sam outside of work?

18      **A.   Yes.**

19      Q.   And you said you guys would meet up and

20  have a drink or something like that?

21      **A.   We had drinks, yes.**

22      Q.   Okay.  And describe your interactions

23  with Sam at work.

24      **A.   Sam and I were supervisors together on**

**Page 55**

1  the same shift back in the early 2000s, so at some

2  extent we were partners.  We weren't in a squad car,

3  but we were performing essentially the same function,

4  supervision.

5          As later years passed, Sam -- after

6  the title of supervisor was taken away based on the

7  union nonsense, Sam again continued as in a role of

8  performing a monitoring supervisor's assignment.

9  Essentially his job never changed, so I worked with

10  him in the office environment on a daily basis.

11      Q.   You guys were supervisors together,

12  right?  Is that what you just said?

13      A.   That's correct.

14      Q.   Okay.  So you were supervisors, and once

15  that supervisor role was essentially eliminated, you

16  became an acting deputy chief, correct?

17      MR. WHITE:  Objection to form, foundation.

18          You can answer.

19      THE WITNESS:  I was an acting deputy chief

20  prior to the supervisor's position being eliminated.

21  BY MS. KRAUCHUN:

22      Q.   Okay.  And then when that supervisor's

23  position was eliminated, I believe you just said Sam

24  Page still kind of acted in that role, correct?



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1276 of 1503 PageID #:1667

1 A. Yes, ma'am.
2 Q. Okay. And did you ever have discussions
3 with Sam about maybe ever assuming like a deputy
4 chief role or anything above a supervisor?
5 MR. WHITE: Objection to form.
6 You can answer.
7 THE WITNESS: No, I hadn't.
8 BY MS. KRAUCHUN:
9 Q. So you never -- Sam never communicated to
10 you that he was looking to get a deputy chief role
11 ever?
12 MR. WHITE: Objection to foundation.
13 You can answer.
14 BY MS. KRAUCHUN:
15 Q. Sorry, Chris?
16 A. Not that I recall, no.
17 Q. Okay. Okay. And you agree that Sam Page
18 was good at his job then, right?
19 A. Sam was great at his job, yes.
20 Q. Okay. And then moving along, Wilford
21 Ferguson, do you know Ferguson?
22 A. I do.
23 Q. And how long have you known him?
24 A. 20 years.

Page 56

1 Q. And what was your relationship like with
2 Ferguson?
3 A. Again on a -- very similar to Sam Page,
4 on a professional and a personal level. I've had
5 drinks with big Ferg and, yeah, I had just a good
6 working relationship as well.
7 Q. And describe your interactions with
8 Ferguson at work.
9 A. It was similar to all the others. While
10 I was on afternoons, Ferg would typically be at his
11 assignment prior or by the time I got there, and I
12 would interact with him by telephone, radio, and at
13 the end of the shift have a good night, thank you.
14 Q. And were you ever partnered with
15 Ferguson?
16 A. No, ma'am.
17 Q. And would you agree that he was good at
18 his job?
19 A. Ferg was good at his job, yes.
20 Q. And then Cecil Williams -- well, we've
21 already talked about Cecil, right? Yeah. Sorry.
22 David Walker, do you know who David
23 Walker is?
24 A. I sure do.

Page 57

1 Q. And how long have you known David Walker?
2 A. 20 years.
3 Q. And what was your relationship like with
4 David Walker?
5 A. I personally think we had a great
6 professional relationship and again a personal
7 relationship too where I could confide in him things
8 that were going on in my personal life, talk with him
9 about that. I had drinks with the fellow, things
10 like that.
11 Q. Did you ever partner with David Walker?
12 A. No, ma'am.
13 Q. And what about your interactions with him
14 at work?
15 A. Again drinks, radio or and telephone
16 prior to me -- or, you know, before me going to the
17 3:00 to 11:00 rather than -- or I'm sorry, the 4:00
18 to 12:00 -- you know what I mean. The 3:00 to 11:00
19 rather than 4:00 to 12:00. So I would see him at the
20 end of the shift. Yeah, pretty much, okay, thanks.
21 How did it go? Have a good night.
22 Q. And would you agree with me that David
23 Walker was a good employee and good at his job?
24 A. I would, yeah.

Page 58

1 Q. What about Tyrone Mcghee? Do you know
2 Tyrone?
3 A. I sure do.
4 Q. And how long have you known him?
5 A. Tyrone wasn't there at the beginning.
6 I'll bet maybe, yeah, 17, 18 years.
7 Q. And what's your relationship like with
8 Tyrone?
9 A. Very similar to the last fellows you
10 asked me about. I think we have a great professional
11 relationship. Tyrone is now the union rep. Prior to
12 me getting hurt, he and I resolved quite a few issues
13 related to the union and things like that. Again, a
14 fellow that I've had cocktails with and -- you know,
15 and able to talk to him about personal things, things
16 like that. A friendship.
17 Q. When you said that you and Tyrone Mcghee
18 worked together to resolve some union issues, what
19 specifically? What types of union issues are you
20 talking about?
21 A. I don't know specifically. Probably very
22 minuscule meaning, you know -- I'm trying to
23 remember.
24 Q. Would it be like grievances or things of

Page 59



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1277 of 1503 PageID #:1668
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that nature?

2     A.  Yeah.  As a matter of fact, yeah,

3 mentioning that, yeah, there was a grievance filed by

4 someone that's not a plaintiff, and I think we were

5 able to resolve that.  I don't remember the specifics

6 of it.  There's been a few issues that, you know, in

7 error that have been able to be resolved.

8     Q.  So you would agree then Mcghee is a good

9 employee and worker?

10     A.  An excellent.

11     Q.  And then what about Victor Slaughter?  Do

12 you know Victor Slaughter?

13     A.  I do.

14     Q.  And how long have you known Victor for?

15     A.  Victor, probably -- I don't remember when

16 he came to the unit.  That one I don't recall to be

17 honest with you.

18     Q.  And what is the nature of your

19 relationship with Victor?

20     A.  Strictly professional.

21     Q.  And were you ever partnered with him or

22 anything?

23     A.  No, ma'am.

24     Q.  And describe your interactions with him

Page 60

1 at work.

2     A.  It was radio transaction, telephone

3 transaction, the end of the shift until my hours were

4 changed to 3:00 to 11:00.  And, yeah, that was about

5 it.

6     Q.  And what about your codefendants, so

7 Joseph Ranzino.  You know Joseph Ranzino, right?

8     A.  Yes, ma'am.

9     Q.  And how long did you know Ranzino for?

10     A.  I can't remember.  I believe he came to

11 the unit after me, so probably 18, 19 years.

12     Q.  And describe your working relationship

13 with him.  Did you and Ranzino ever work together?

14     A.  Yeah, at one juncture back in the early

15 2000s, the chief of monitoring.  I was the deputy

16 chief of monitor.

17     Q.  So during your time as the deputy chief

18 of monitoring, so that was when you were acting

19 deputy chief, correct?

20     A.  Yeah, acting deputy -- yes, correct.  I'm

21 sorry.  Acting chief -- or, no, I take that back.  I

22 stand corrected.  I was not acting deputy chief at

23 that time when he was chief of monitoring.  I was a

24 supervisor.

Page 61

1     Q.  Okay.  And what was your interaction with

2 Ranzino like at that time when you were a supervisor

3 and he was the chief of monitoring?

4     A.  It was fairly professional.  It was a

5 fairly good professional relationship.

6     Q.  And did you have a personal relationship

7 with Ranzino?

8     A.  We were friends, yes.

9     Q.  Would you go out after work with him?

10     A.  I have been out with him, yes.

11     Q.  And describe your interactions with him

12 at work.

13     A.  At that time they were fairly limited.

14 If there was a problem or something like that,

15 that's when he would -- you know, I would get called

16 into the office and he would ask a question or

17 whatnot.  And then when I -- you have to give me time

18 frames here because the early 2000s when he was chief

19 of monitoring, I was a supervisor.  It was different

20 than my interaction with him when we were on the same

21 shift together, on third watch.

22     Q.  So I'm specifically asking when he was

23 chief of monitoring and you were the supervisor, at

24 that time?

Page 62

1     A.  My interaction with him was fairly

2 limited.

3     Q.  And did you ever have any like negative

4 interactions with him when you were reporting to him?

5     A.  Not at that time, no.

6     Q.  And then after that point, so at one

7 point -- strike that.

8       Was Ranzino then moved from the

9 chief of monitoring position?

10     A.  Correct.  Yes, ma'am.

11     Q.  Do you know roughly when that happened?

12     A.  No.

13     Q.  And when he was moved from -- Ranzino was

14 moved from chief of monitoring, do you know where he

15 went to?

16     A.  I believe he went to records.

17     Q.  To records?

18     A.  I believe so.

19     Q.  Okay.  And was that on the same watch as

20 you or a different watch?

21     A.  I was still on days, so it would have

22 been the same shift.

23     Q.  Okay.  So that was on the second watch?

24     A.  Correct.

Page 63

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1278 of 1503 PageID #:1669
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 64

1    Q.  Okay.  And then you said you then worked
2 again with Ranzino on the third watch, correct?
3    A.  Correct.
4    Q.  Okay.  And describe what your role was at
5 that time on the third watch.
6    A.  I was a deputy.
7    Q.  Okay.  And what was Ranzino's role on the
8 third watch?
9    A.  He was one of three chiefs.
10    Q.  So he was the next chain of command above
11 you as a deputy chief.  Is that correct?
12    A.  Correct.
13    Q.  Okay.  And what was -- describe your
14 interactions with Ranzino at that time when you were
15 on the third watch.
16    A.  At that time I still essentially assumed
17 the same responsibilities of monitoring dispatch.  My
18 hours were 4:00 to 12:00.  I'd check in with him when
19 I got there, and he went about his business, I went
20 about my business and that was about it.
21    Q.  So he was your supervisor, correct?
22    A.  Yes, ma'am.
23    Q.  And would you describe him as a hands-on
24 supervisor?

Page 65

1    MR. WHITE:  Object to form.
2      You can answer.
3    THE WITNESS:  You're going to have to
4 elaborate on hands-on.
5 BY MS. KRAUCHUN:
6    Q.  You understand what that term hands-on
7 means, correct?
8    A.  In context with law enforcement or in
9 context with construction work?  When you say
10 hands-on, honestly, was he hands-on?  I don't know.
11 You're going to have to...
12    Q.  I'm just trying to ask like was he
13 involved?  Did he oversee your work?
14    A.  Oh, yes.  Yes, ma'am.
15    Q.  Okay.  He wasn't just sitting in his
16 office all day.  He was involved with what you were
17 doing and the supervision that you were giving to the
18 people below you?
19    MR. WHITE:  Object to form.
20      You can answer.
21    THE WITNESS:  Yes.
22 BY MS. KRAUCHUN:
23    Q.  Okay.  And as a supervisor, did you
24 have -- describe him as a supervisor.  I guess his

Page 66

1 style, supervising style if that makes sense.
2    A.  At that juncture -- he was difficult.
3    Q.  What do you mean by difficult?
4    A.  It's hard to explain.  At that time the
5 entire unit was under a tremendous amount of pressure
6 based on short staffing, budget restraints.  We had a
7 change essentially from being our own entity and, you
8 know, having our own command staff to now reporting
9 to the jail which didn't quite have in my opinion a
10 good working understanding of how the unit runs and
11 they were making a lot of operational changes and it
12 was difficult for everybody.
13      Some of the supervision responded in
14 a positive light and tried to keep plugging forward.
15 Others, for lack of better terms, became difficult,
16 crabby, stressed I guess is probably the best way I
17 can elaborate on that.
18    Q.  So you would classify Ranzino as one of
19 those supervisors that was difficult, correct?
20    A.  Yes, ma'am.
21    Q.  What other supervisors could you identify
22 were difficult, as you said, at that time?
23    MR. WHITE:  Objection to foundation.
24

Page 67

1 BY MS. KRAUCHUN:
2    Q.  Sorry, Chris.  Do you understand my
3 question?
4    A.  Yeah, I do understand the question.  At
5 that time I was only dealing with Ranzino, with Acey,
6 and with Neal.
7      I think all of us felt some sort of
8 stress or pressure which obviously affected your
9 demeanor, but I can't compare apples and oranges.
10 Chief Ranzino was a completely different person than
11 Chief Neal.  Chief Neal was a completely different
12 person than Chief Acey, you know, I mean.
13    MS. KRAUCHUN:  Ethan, I'm just looking at the
14 clock.  It's 11:42.  Do you want to -- do we want to
15 break for lunch now?
16    MR. WHITE:  Yeah.  I mean, I've got a few
17 minutes anyway, so, yeah, that works for me and then
18 I should be back by, yeah, like 11:20 latest --
19 12:20.
20      (Whereupon, a short break
21      was taken.)
22 BY MS. KRAUCHUN:
23    Q.  So I meant to ask this at the beginning
24 but, Chris, do you have -- you don't have a son named



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1279 of 1503 PageID #:1670
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 68

1 Christopher Rohloff, do you?
2    **A. No, I don't.**
3    Q. Okay. Because we had a former client
4 that was Christopher Rohloff and I just wanted to
5 make sure that there was no connection there.
6    **A. That's unusual. The last name is not**
7 **that common.**
8    Q. I know. I'm telling you. We found an
9 old file. I just wanted to make sure that it wasn't
10 you or a child or anything like that. Perfect.
11    MS. KRAUCHUN: So I'm going to move -- if we
12 can get Exhibit A back up on the screen, please? And
13 if you can scroll to page 8, that would be great.
14 BY MS. KRAUCHUN:
15    Q. And, Chris, I'm going to ask if can you
16 see No. 23 there where it's circled.
17    **A. Okay.**
18    Q. This basically just states that Ranzino
19 was the chief of patrol on the third watch in the EM
20 unit. And the answer was that you lacked knowledge,
21 defendants lack knowledge to admit or deny.
22      Do you have any reason to believe
23 that Joseph Ranzino was not the chief of patrol on
24 the third watch in EM in the year 2015?

Page 69

1    MR. WHITE: I'm just going to object for the
2 record. The basis for that answer was that we didn't
3 know the relevant time period.
4      But go ahead and answer.
5    THE WITNESS: At that time he was not the
6 chief of patrol because the patrol section, it was --
7 again, it was not divided by sections.
8 BY MS. KRAUCHUN:
9    Q. So in 2015 he was just a chief on the
10 third watch. Is that correct?
11    **A. That's correct. Yes, it is.**
12    MS. KRAUCHUN: Okay. And then if you can
13 scroll down to No. 24 for me, please.
14 BY MS. KRAUCHUN:
15    Q. I'm just going to ask you, was Ranzino
16 the chief in the EM unit in 2016?
17    **A. I don't remember. He got moved. I don't**
18 **remember when it was.**
19    Q. Okay. And then here No. 24, Gregory
20 Shields was the executive director of EM. Do you
21 have any reason to believe that he was not the
22 executive director in 2015?
23    **A. I don't believe he was the executive**
24 **director in 2015. I believe he was simply a**

Page 70

1 director.
2    Q. Okay. In 2016 do you have any reason to
3 believe Shields was not the executive director?
4    **A. Again, I don't recall if he was promoted**
5 **to executive director or if he was still director.**
6    Q. Okay. And then the same for 2017,
7 executive director or director?
8    **A. 2017, yeah, I do not recall to be**
9 **perfectly honest.**
10    MS. KRAUCHUN: Okay. And then if you can
11 scroll down to No. 25, please.
12 BY MS. KRAUCHUN:
13    Q. Defendant Neal, do you have any reason to
14 believe he was not a chief in 2015 in the EM unit?
15    **A. He was -- if the document reads chief of**
16 **patrol, again the same with Ranzino. Yes, he was a**
17 **chief on the third watch.**
18    Q. Okay. Perfect. And that was in 2015.
19 Was he a chief in 2016?
20    **A. I haven't got a clue.**
21    Q. Okay. And what about 2017?
22    **A. Neal retired -- or actually, Neal went on**
23 **disability. I don't recall when that was and I**
24 **honestly don't recall when he retired, so I can't**

Page 71

1 **answer to time frames. I apologize.**
2    MS. KRAUCHUN: Okay. And then if you can
3 just scroll down to 26.
4 BY MS. KRAUCHUN:
5    Q. And I think we've talked about this quite
6 a bit, Chris, but during 2015 you were a deputy chief
7 in the EM on the third watch, correct?
8    **A. That is correct.**
9    Q. And in 2016 you were the same, a deputy
10 chief on the third watch in the EM unit?
11    **A. That is correct.**
12    Q. Okay. And then 2017 the same thing?
13    **A. 2017 I was injured on the job on June 7th**
14 **of 2017.**
15    Q. Okay.
16    **A. Yeah.**
17    Q. And so have you been on temporary
18 disability since that time?
19    **A. I was on temporary disability from**
20 **June 7th of '17 to May 7th of '19. I went back in a**
21 **light-duty capacity from May 7th to February 2nd of**
22 **2020, and I am now on the total temporary duty**
23 **disability.**
24    Q. Okay. Perfect.



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1280 of 1503 PageID #:1671
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    MS. KRAUCHUN:  And that's it for that
2 exhibit, so if we can switch then to what is labeled
3 as Exhibit H, please.  Okay.  And then if you can
4 scroll to page 3 for me.  Okay.
5 BY MS. KRAUCHUN:
6    Q.  So you testified earlier about Ranzino
7 being your chief, but in here you also identify
8 Chiefs Acey and Neal, so I just wanted to ask you
9 some questions about Chief Acey.  Did you directly
10 report to Acey?
11    **A.  I reported to Acey.  I reported equally.**
12 **They were all three my equal supervisors.  But, yes,**
13 **Acey I reported to.**
14    Q.  So Acey, Ranzino, and Neal.  Were all
15 three of them third watch chiefs?
16    **A.  Yes.**
17    MS. KRAUCHUN:  Okay.  If you can scroll down
18 to No. 5, please, to the response.  Perfect.
19 BY MS. KRAUCHUN:
20    Q.  Okay.  So do you see in this how it says
21 Acey is a former EMU chief who may have information
22 concerning the claims or defenses?
23       Can you describe any information
24 that you believe Acey may have?

Page 72

1    **A.  The question -- what is the response to?**
2    MS. KRAUCHUN:  I'm sorry.  Can you scroll up
3 to the question for us?  Thank you.
4    THE WITNESS:  In reference to Acey is Chief
5 Acey was a -- my superior and a peer of Chiefs
6 Ranzino and Neal, and accordingly he was present
7 for -- he would be able to answer some of these --
8 well, he was on the same hours that they were on.  I
9 think that he would be able to answer some of these
10 questions as well.
11       Actually, he probably would have,
12 based on his hours being 3:00 to 11:00 along with
13 Neal and Ranzino, he would be -- may be able to
14 answer some of the questions that you posed to me
15 that I don't have a clue about.
16 BY MS. KRAUCHUN:
17    Q.  Okay.  And when you say some of the
18 questions or issues, what specifically do you mean by
19 that?
20    **A.  Work relationships, things like that.**
21    Q.  Okay.  And what was your relationship
22 like with Acey?
23    **A.  It was a good, professional relationship.**
24    Q.  And how would you describe him as a

Page 73

1 supervisor?
2    **A.  He was a good supervisor.**
3    Q.  Good meaning fair?
4    **A.  I believe all the supervision was fair.**
5    MS. KRAUCHUN:  If we can scroll down to
6 page 9.  Yeah, No. 17 right there.
7 BY MS. KRAUCHUN:
8    Q.  So if you can just read that question,
9 Chris, please.
10    **A.  Okay.**
11    Q.  Do you understand what that question is
12 asking?
13    **A.  I do.**
14    Q.  Okay.  So in your answer you respond that
15 this was, you know -- you objected that it was vague,
16 overly broad.  But you understand what policies and
17 practices are, correct?
18    **A.  That's correct.**
19    Q.  Okay.  And the sheriff's department has
20 general orders, right?
21    **A.  Correct.**
22    Q.  And those would be considered policies,
23 correct?
24    **A.  Yes, ma'am.**

Page 74

1    MR. WHITE:  Objection.  Legal conclusion,
2 foundation.
3       You can answer.
4 BY MS. KRAUCHUN:
5    Q.  Sorry.  Your answer to that, Chris?
6    **A.  Yes.  That's correct.**
7    Q.  And you also -- are you aware of any
8 discrimination or harassment policies that the
9 sheriff's department has?
10    **A.  I'm aware of policies, yes.**
11    Q.  Okay.  And did you receive any training
12 on any discrimination or harassment policies?
13    **A.  I'm sure I did.  I don't recall.**
14    Q.  Over time like during the course of your
15 time at the sheriff's department, were you required
16 to go to training for anything, for any types of
17 training?
18    **A.  Yes, ma'am.**
19    Q.  Okay.  And do you recall specifically
20 going to discrimination and harassment training?
21    **A.  I remember sexual harassment was a huge**
22 **thing that was pounded into our in-service training**
23 **on a yearly basis.  Do I remember it specifically,**
24 **no, but I'm positive that there was training issued.**

Page 75



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1281 of 1503 PageID #:1672

1  Q.  But you have no independent recollection
2  of doing that training?
3      A.  No, I honestly don't.
4      Q.  Typically how were trainings done at the
5  sheriff's department?  Was it online?  Was it in
6  person?
7      A.  It was in person probably up until about
8  three or four years ago.
9      Q.  Okay.  And then about three or four years
10  ago, then how were trainings done?
11     A.  It changed to online.
12     Q.  Okay.  And were you required to do
13  trainings annually?
14     A.  Yes.
15     Q.  And what would happen if you didn't
16  complete trainings?
17     A.  When it was in person, it never happened
18  to me, so I really don't know.  If I'm not mistaken,
19  people that missed training, in-service training were
20  de-deputized meaning they couldn't carry their
21  revolver and their duties changed.  Since online
22  classes have been instituted.  I want to say if you
23  didn't do it, after numerous reminders you would be
24  issued discipline.

Page 76

1      Q.  And do you believe that the sheriff's
2  department has a discrimination policy?
3      A.  Yes, it has.
4      Q.  And if you can describe to me, what is
5  your understanding of the sheriff's policy on
6  discrimination?
7      A.  Not to discriminate a person based on an
8  excluded classification which would be sexual
9  orientation, gender, race, religion.
10     Q.  And do you believe that the sheriff's
11  department has a policy on harassment?
12     A.  I'm sure they do.
13     Q.  And what is your understanding --
14     A.  What type of harassment, I mean?  I know
15  there's a sexual harassment policy.  I mean, that's a
16  very broad question.
17     Q.  So is it your understanding that the
18  sheriff's department has a policy on harassment
19  related to one's race?
20     A.  I believe they do.
21     Q.  And what is your understanding of what
22  that policy means?
23     A.  You cannot be discriminated against or
24  harassed based on race.

Page 77

1      Q.  And do you know what the term retaliation
2  is?
3      A.  Yes, ma'am.
4      Q.  And do you believe that the sheriff's
5  department has a policy regarding retaliation?
6      A.  I believe we do have that policy.
7      Q.  And what is your understanding of what
8  that policy is?
9      A.  That you can't take action against
10  someone based on -- based on their -- you can't take
11  action against someone based on their race, and you
12  can't take action on someone for, I guess the best
13  term I can think of is whistle blowing or complaining
14  or... Yeah, I mean, that's pretty well the best way
15  I can put it.
16     Q.  You said complaining.  Would you consider
17  someone filing a grievance complaining?
18     A.  No, I don't think that's the intent of
19  the contract.  The intent of the contracts which stem
20  which in turn cause a grievance is the -- I don't
21  think it's complaining.  I think it's trying to solve
22  a problem to be perfectly honest with you.
23     Q.  But you would agree that under a
24  Collective Bargaining Agreement, a grievance is a

Page 78

1  right that is given to the parties, the union
2  members, correct?
3      MR. WHITE:  Objection to foundation.
4      THE WITNESS:  The answer was -- or the
5  question was what?
6          Court Reporter, could you read it
7  back?
8          (Whereupon, the record was
9           read as requested.)
10     THE WITNESS:  Yes, that is correct.
11 BY MS. KRAUCHUN:
12     Q.  And during your time as the deputy chief,
13  did you ever experience any employees acting
14  inconsistently with any of these policies?
15     MR. WHITE:  Objection to form and foundation.
16     THE WITNESS:  Acting inconsistently with any
17  policies?  What policies and...
18 BY MS. KRAUCHUN:
19     Q.  So specifically the ones we just talked
20  about, discrimination, harassment, retaliation.
21         Your understanding of those
22  policies, did you ever witness any fellow deputy
23  chiefs, chiefs, anybody violate those policies?
24     A.  No, I didn't.

Page 79



Christopher Rohloff - 9/15/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1282 of 1503 PageID #:1673

Q. If you were to witness them, what would you be required to do under the policy?

A. I believe you would be -- that the policy would state that -- I keep going back. I apologize, but again sexual harassment was pounded into our heads so strongly. I believe that I would have to generate an OPR complaint on behalf of the person making that complaint, but I honestly don't know. I think sexual harassment is different in policy from workplace. I don't know. I really don't know.

Q. So you don't know what you were required to do if you had witnessed any acts of discrimination. Is that what you mean?

A. Well, if I had witnessed acts of discrimination or if I had been made aware of that, I would have referenced the policy which didn't occur. I didn't witness this, so I never -- I mean, we've got -- the policies within the sheriff's office, there's thousands and thousands and thousands of pages of them. It's difficult to remember the specific language pertinent to one policy.

So typically when I would encounter whatever infraction it may be, whether it be a gentleman that's got his shirt on backwards or

Page 80

someone that decided he wanted to shoot his gun out the window of the squad car, I would have to reference the policy to decide what the best of course of action is in accordance with that policy.

Q. So it's your testimony that you've never witnessed anybody violating any policies of the sheriff's office?

MR. WHITE: Objection. It misstates testimony.

THE WITNESS: Certainly. I mean, I've been a supervisor. Of course I've witnessed people violate policies but -- I've been written up for violating policies, I mean.

BY MS. KRAUCHUN:

Q. Okay. So your response in this interrogatory was that, you know, you couldn't identify policies or that it was overly broad.

Can you give me some examples of policies that you've witnessed being violated and the steps you took in regard to those?

MR. WHITE: Objection to foundation.

THE WITNESS: I think the broadest policy would be rules of conduct, and if I remember correctly, that could include -- I believe it

Page 81

included about 50 infractions ranging from tardiness on duty to being under the influence of alcohol or drugs while on duty. It's a very broad, broad policy, and the infractions are numbered, and so of course, I mean, I've -- gentlemen or investigators, officers that are tardy on duty, not calling in, no call, no show, not showing up to work, not calling in medical, calling in medical late, not maintaining County-issued equipment properly. Things along those lines. I mean, the accidental discharge of a firearm, accidental discharge of a -- or now it's deemed negligent discharge of a firearm or negligent discharge of a Taser. Those are the types of infractions that I recall dealing with.

BY MS. KRAUCHUN:

Q. So as a deputy chief, it was your responsibility to fill out a discipline action form when there was a policy violation, correct?

A. Yes, ma'am.

Q. Okay. So you, as a deputy chief, would be the person that would initiate that document, discipline action form, and then what would happen with that document?

MR. WHITE: Objection to form and foundation.

Page 82

THE WITNESS: Yeah, I would initiate a discipline -- well, I mean, in accordance with the Collective Bargaining Agreement, there would first be a counseling which is an informal nondisciplinary action that states that the union representative, the party that's -- you know, the investigator that had the infraction and myself and another supervisor would sit down and discuss that action with them and how to correct it, and then if that same action happened again, I'm going to use tardy for duty as a good example, then it became in accordance with their Collective Bargaining Agreement progressive discipline. Progressive discipline would be -- the next one would be an actual form of reprimand, then it would be a one-day suspension, two-day suspension, three-day suspense, and then from there it then became what's called a major cause which I believe was handled by Internal Affairs, OPR or what have you.

BY MS. KRAUCHUN:

Q. Okay. So you said the first step -- I just want to break that down. The first step would be counseling. Is that correct?

A. Yes, ma'am.

Page 83



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1283 of 1503 PageID #:1674
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Q. So that's just a conversation, correct?

A. That's a conversation.

Q. Okay. And then that should occur before you write up a disciplinary action form. Is that your understanding?

MR. WHITE: Objection to foundation.

THE WITNESS: It's dependent on the infraction. Again, I mean, you would have to tell me the actual infraction. I keep referencing tardy for duty because that was typically one of the most dealt with infractions and that was a less serious conduct in the rules of conduct and that did indeed dictate progressive discipline.

There's other infractions that are deemed major causing infractions and with those we simply document them and forward them to Internal Affairs -- or actually I stand corrected. Now it is -- it's changed so many times. It was Internal Affairs, then it became OPR, and then it became Employee Discipline. I don't know what they're even called now.

BY MS. KRAUCHUN:

Q. So let me ask you this. If an officer was asked for his shave card.

A. A good example.

Q. I'm just looking at your beard. I wonder if you ever got one of those, no.

If an officer is asked for their shave card and they didn't have it, would that warrant a counseling? Would that warrant a written discipline action form? What kind of a violation would you classify that as?

MR. WHITE: Objection to form, foundation, it calls for speculation.

THE WITNESS: Should I answer?

MR. WHITE: Yes, you can answer.

THE WITNESS: Okay. Regarding the shave card yes, I have a religious exemption shave card, but secondly with shave cards, and this is -- that is something that was dealt with very commonly. And to be perfectly honest with you, if a particular individual shave for -- honestly, in all sincerity, you would tell them, hey, go shave, or, hey, tomorrow please come in shaven.

I mean, it wouldn't even -- me personally as a supervisor, I would say to Jim Shoe, hey, Investigator Shoe, you're supposed to be clean shaven here. Do you have a shave card? No, I don't.

Okay. Come in shaved tomorrow. He'd come in without -- you know, not shaved tomorrow. I would assume you don't have a shave card yet. I would speak with someone in an informal manner numerous times before it became a formal thing in the form of counseling, and the no shave card is a less serious infraction, so that would accordingly be dealt with progressive discipline.

But again, things have changed so much I don't even know -- and you can keep in mind, I've been on duty disability for three some years, you know, with the interim of going back in that light-duty capacity for a little while. I don't even know what the policy is any longer. I don't know how discipline works any longer. I can only reference the time frame I was there.

BY MS. KRAUCHUN:

Q. So based on what you just said, you would agree with me that it wouldn't be common then for a supervisor to fill out a disciplinary action form for an investigator not having a shave card, correct?

MR. WHITE: Objection to form, foundation. Hold on, Chris. Let me make my objections. Objection to form, foundation.

Go ahead.

THE WITNESS: I can't speculate what another supervisor would do, and I was never privy to those things. I can only tell you what I had done in the past.

BY MS. KRAUCHUN:

Q. Right, but you would agree with me though that typically wouldn't warrant a disciplinary action form, correct?

MR. WHITE: Objection. Asked and answered, form, foundation, calls for speculation.

THE WITNESS: The policy indicated that it did.

BY MS. KRAUCHUN:

Q. So if the policy indicates that it requires a disciplinary action form, I guess I'm confused. Is it your testimony then that the supervisors didn't follow the policy if the policy required that they write up a disciplinary action form?

A. It's in accordance with the contractual agreements. It's progressive discipline which starts with the counseling and then goes into a progressive discipline action form. I don't know what it is now.



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1284 of 1503 PageID #:1675
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 88

1  Is it my opinion that other staff members did not
2  follow policy, that they altered from that, I can't
3  answer that question. I honestly don't know.
4          I do know that in the specific
5  instance of shave cards, shaving exemptions, things
6  like that, I would absolutely pull a guy aside and
7  tell them, hey, you know, you can't come in here
8  looking like that, and so on and so forth. And
9  sometimes a fellow would look at me and say, hey, I'm
10 sorry. I was up all night with the baby. I woke up
11 ten minutes before I had to leave for work. I didn't
12 have a chance to shave. Okay, cool.
13         And then in some instances you had
14 guys that simply didn't want to shave, and I would
15 talk to them three or four times and they would tell
16 me that for whatever medical reason or religious
17 reason that they don't -- they are now not going to
18 shave, and I would tell them what they would have to
19 do. I would tell them, okay, here is the policy.
20 You need now to go get a shave card. Some of them
21 chose to do that, some of them chose not to.
22         And accordingly, if they chose not
23 to get the shave card and they chose not to shave,
24 they would be disciplined in accordance with policy

Page 89

1  and the Collective Bargaining Agreement, and then
2  typically it resolved. You know, I mean, I can't
3  remember who the investigator was, but I remember the
4  shaving was an issue. I know it wasn't any of the
5  plaintiffs, but it was an issue with shaving, and
6  basically at the counseling, you know, I contacted
7  his union representative and told him, okay, we're
8  going to have a formal counseling on this date.
9  Please make yourself available. And I've got a
10 fairly good working relationship with the union reps,
11 and what's it about? I say, the guy doesn't want to
12 shave. I've told him five, six guys. And, okay.
13 The guy showed up to the counseling shaved, and that
14 was it. Okay. I tore the counseling up, threw it in
15 the garbage and said thank you.
16     Q.  So based on everything that you've just
17 said, you would agree with me then that whether a
18 disciplinary action form is filled out or is formally
19 written up is really at the supervisor's discretion,
20 correct?
21     MR. WHITE: Objection misstates the
22 testimony.
23         You can answer.
24     THE WITNESS: It depends on the

Page 90

1  transgression. I mean, Counsel, you're asking me
2  such a broad question about how -- there's hundreds
3  if not thousands of policies. And again, I'd like to
4  think as a good supervisor that I should have the
5  discretion to say, okay, you were tardy one time in
6  the past four months and, you know, you said that you
7  got caught by a train or you were running late
8  picking up your children or, you know, you had to do
9  that. There's a big difference between that and a
10 big difference between someone that has an inmate
11 escape from him because of not following procedure
12 and handcuffing or someone that accidentally
13 discharges his firearm at the training range or
14 someone that accidentally discharges a Taser. I
15 mean, we're talking difference of public safety. You
16 know, I mean, do you understand what I'm saying?
17 BY MS. KRAUCHUN:
18     Q.  I do. So basically as a supervisor, you
19 use discretion?
20     MR. WHITE: Objection. It misstates
21 testimony.
22     THE WITNESS: Again, I use -- dependent on
23 the infraction.
24

Page 91

1  BY MS. KRAUCHUN:
2      Q.  Okay. Thank you.
3      MS. KRAUCHUN: So if we can scroll down to
4  No. 19, please.
5  BY MS. KRAUCHUN:
6      Q.  And then, Chris, if you can just read No.
7  19 and let me know when you're done.
8      A.  Okay.
9          Okay. I'm ready.
10     MS. KRAUCHUN: Sorry. If you can just scroll
11 down so we can read the response now. Thank you.
12 BY MS. KRAUCHUN:
13     Q.  So you see your answer here. The
14 response is that you know that in-house counsel was
15 involved in the investigation. Do you know who that
16 person was?
17     A.  No, I honestly don't know.
18     Q.  And did you speak with that in-house
19 counsel?
20     A.  I don't believe it was pertinent to this
21 lawsuit.
22     Q.  Okay. But the question it asks, this
23 interrogatory is asking is the events underlying this
24 lawsuit. So the question is very specific. Did you



Christopher Rohloff  -  9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1285 of 1503 PageID #:1676
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 speak to one of the in-house counsel regarding the
2 investigation?
3       A.  Give me a moment.  I'm trying to recall.
4             These specific allegations of this
5 lawsuit I do not believe that I was ever interviewed
6 by an in-house attorney, OPR, Internal Affairs.  I
7 know for a fact I was not interviewed by OPR and
8 Internal Affairs.  And as far as an in-house
9 attorney, I'm positive, I'm about 99.9 percent
10 positive it was a completely unrelated matter.
11       Q.  Okay.  So if I understand that, you do
12 not believe you spoke with anybody at OPR regarding
13 the allegations in this lawsuit.  Is that correct?
14       A.  I'm a hundred percent positive.
15       Q.  Okay.  And you're almost positive that
16 you didn't speak with any of the in-house counsel at
17 the sheriff's department regarding the allegations in
18 this complaint?
19       A.  I am almost positive, yes.
20       Q.  Okay.  Perfect.  Just give me a minute.
21 I'm just looking at my notes here.
22       MS. KRAUCHUN:  If you can scroll down to No.
23 22 for me, please.
24

1 BY MS. KRAUCHUN:
2       Q.  And then, Chris, if you don't mind
3 reading that for me, and let me know when you're
4 done.
5       THE WITNESS:  Can you give me the last
6 sentence of the response, please?  I'm sorry, not
7 last.  Okay.
8 BY MS. KRAUCHUN:
9       Q.  Okay.  So you understand what this
10 interrogatory is asking you, correct?
11       A.  I do.
12       Q.  Okay.  So the question asks if you know
13 of -- if you or any of the other supervisory
14 personnel have ever heard or witnessed any racial
15 statements or stereotypical statements.
16             So is it your testimony that you've
17 never been made aware of any of that, anything of
18 that nature?
19       MR. WHITE:  I'm going to object.  You
20 misstated what the interrogatory is asking, and he's
21 already answered it with the objection.  I don't know
22 how you answer that.
23       MS. KRAUCHUN:  I'm sorry.  What's your
24 objection, Ethan?

1       MR. WHITE:  You took the entire
2 interrogatory, you said this is asking X which is
3 completely inconsistent with what the interrogatory
4 says.
5 BY MS. KRAUCHUN:
6       Q.  Chris, do you understand what the
7 interrogatory is asking you?  I'm sorry.  Did you
8 hear that, Chris?
9       A.  I did.  I'm reading it again.  I don't
10 want to assume that -- I mean...
11       Q.  So I guess my question is, what part of
12 this interrogatory is unduly burdensome?  Can you
13 explain your response that this is unduly burdensome?
14       A.  I personally have not heard anything
15 that -- in reference to this suit that is racial,
16 stereotypical, ridicule, or joking.  I mean, I've
17 heard -- to be perfectly honest with you, I hear the
18 African-American employees use the term, the N term
19 amongst themselves referring to each over.  You know,
20 that's I guess -- I don't know how to answer it.  I
21 really don't.
22       Q.  Okay.  So let me see if I understand what
23 you're saying.  So is it your understanding that just
24 the N word is a racial comment?  Is that what you're

1 saying?
2       A.  No.  I mean, you're asking me again such
3 a very broad question.  I'm sure there's many, many
4 other things that could be said that could be
5 construed as racist or whatever the case may be.  I
6 personally haven't heard any.
7       Q.  Okay.  And so I guess I'm trying to
8 understand that you can't give any specific incidents
9 of when you've heard any kind of racial language in
10 the 20 something years you were at the sheriff's
11 department, or either that or unduly burdensome means
12 it happened so much you can't be specific.  Can you
13 classify that for me?
14       MR. WHITE:  Objection to foundation.  It also
15 misstates testimony.
16             Go ahead.
17       THE WITNESS:  No, I can't think of any
18 specific circumstances related to this that I've
19 heard.  No, I don't.
20 BY MS. KRAUCHUN:
21       Q.  So you've read the complaint in this
22 case, correct?
23       A.  Yes, ma'am.
24       Q.  Okay.  And did you read -- do you recall



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1286 of 1503 PageID #:1677

1 the paragraph that alleges that Chief Ranzino used
2 the term, you all look alike at roll call?
3     **A.  I did not hear.  You have to take into**
4 **consideration again that I was not at roll call until**
5 **Chief Ranzino -- my hours were 4:00 to 12:00.  Chief**
6 **Ranzino, Chief Acey and Chief Neal's hours and all**
7 **the investigators' hours were 3:00 to 11:00.  Roll**
8 **call was typically held between 3:00 and 3:30.**
9         **I was not at any of those roll calls**
10 **when that accusation was made based on my hours.  My**
11 **hours changed to 3:00 to 11:00 after Chief Ranzino**
12 **was reassigned based on this suit, I would assume.**
13     Q.  So that wasn't my question though.  My
14 question was:  Did you read the complaint and did you
15 read the allegation that Chief Ranzino said to the
16 African-American investigators in roll call, you all
17 look alike?
18     **A.  Yes, I did.**
19     Q.  Okay.  And as a supervisor, would you
20 consider that term, you all look alike, as a racial
21 statement?
22     MR. WHITE:  Objection to form.
23     THE WITNESS:  I wasn't there, Counsel.  I
24 don't know the context.  I don't know what was going
Page 96

1 on.  I don't know.  I don't know if anything
2 happened.  I don't know.
3 BY MS. KRAUCHUN:
4     Q.  So when did you first learn of this
5 allegation against Ranzino?
6     **A.  Probably when I read the complaint.**
7     Q.  So prior to that, you had no knowledge
8 that Legrain Winston filed a complaint against
9 Ranzino for those words being spoken?
10     **A.  I know that things were filed.  What they**
11 **were filed for, I don't know.  That's confidential.**
12 **I mean, if that was handled on an OPR level, I was**
13 **not interviewed by OPR regarding this.  I don't know.**
14 **I can't answer that.**
15     Q.  Okay.  So I guess I'm trying to
16 understand.  So before the lawsuit, you had no idea
17 that that was said at roll call?
18     MR. WHITE:  Objection to form, foundation.
19 BY MS. KRAUCHUN:
20     Q.  I'm sorry.  I didn't get your answer,
21 Chris.
22     **A.  No, I did not.**
23     Q.  Okay.
24     **A.  Not that I recall.  No, I don't.  No, I**
Page 97

1 **don't.**
2     Q.  And you testified earlier about all the
3 plaintiffs, I believe Ferguson and Walker and Winston
4 and Williams and that you had great relationships
5 with them.  Do you have any reason to believe that
6 they would lie and say that Ranzino said that when he
7 didn't?
8     MR. WHITE:  Objection.  Form, foundation, it
9 calls for speculation, assumes facts not in evidence.
10        You can answer.
11     THE WITNESS:  I don't know what motivates a
12 person so I can't -- I don't -- I mean, in my
13 opinion, these -- for the most part, these are hard
14 working gentlemen and, no.  I don't know.  I don't
15 think they would lie to me, but again, I don't know
16 what motivates a man.  You know, I'm not a
17 psychiatrist, psychologist.  I'm not a...
18 BY MS. KRAUCHUN:
19     Q.  But based on your working career with
20 them, you testified that they were good workers and
21 good people, right?
22     **A.  That's correct.**
23     MS. KRAUCHUN:  If we can move to No. 25,
24 please.
Page 98

1 BY MS. KRAUCHUN:
2     Q.  And if you can just read that, Chris, and
3 let me know when you're done.
4     THE WITNESS:  Will you give me the last
5 couple sentences, please?  Okay.
6 BY MS. KRAUCHUN:
7     Q.  Do you understand what this interrogatory
8 is asking you?
9     **A.  I understand what the question is.**
10     Q.  Okay.  You made some objections that this
11 was vague and overly broad and unduly burdensome and
12 not limited in, you know, time.
13        Can you -- specifically from the
14 time you were a deputy chief onwards, what if any
15 steps did you take to prevent any racial
16 discrimination or harassment in the workplace?
17     MR. WHITE:  Objection to form and foundation.
18     THE WITNESS:  I mean, I treated everyone
19 fairly irregardless of creed, color, sex, religion,
20 whatever the case may be.
21 BY MS. KRAUCHUN:
22     Q.  And you would agree with me that if you
23 had witnessed some sort of harassment or
24 discrimination, you would have reported it?
Page 99



Christopher Rohloff - 9/15/2020

Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1287 of 1503 PageID #:1678

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1     A.  I likely would have.  Yes, ma'am.
2     Ms. KRAUCHUN:  Okay.  I'm done with this
3  exhibit.  If we can turn to Exhibit C, please.
4  BY MS. KRAUCHUN:
5     Q.  And if you want to take a minute and look
6  this over and let me know when you're done.
7     MR. LEINENWEBER:  Kelly, is there a Bates
8  number?
9     MS. KRAUCHUN:  I'm sorry?
10     MR. LEINENWEBER:  This is Justin.  Is there a
11  Bates number?
12     MS. KRAUCHUN:  The Bates number is PO0O211.
13     THE WITNESS:  Can we bring it down?  I'm
14  having a hard time reading this, Guys.  Okay.
15  BY MS. KRAUCHUN:
16     Q.  Do you recognize this document, Chris?
17     A.  I've never seen this document.
18     Q.  So at the top do you see where it's
19  addressed to Chief Rohloff?  That would be you,
20  correct?
21     A.  I'm deputy Rohloff.
22     Q.  Okay.  So is it your testimony you've
23  never seen this document before?
24     A.  I don't recall ever seeing this document

Page 100

1  before.
2     Q.  Okay.  And are you aware of the incident
3  with Winston and Ferguson in regards to a court
4  subpoena and a tour of duty?
5     A.  I've heard of it.
6     Q.  And during your time in the EM unit, did
7  you ever get a court subpoena?
8     A.  Absolutely.
9     Q.  Okay.  And did you ever use a court
10  subpoena in lieu of your tour of duty?
11     A.  I believe I have.
12     Q.  Okay.  And if you used your court
13  subpoena in lieu of your -- if you didn't -- strike
14  that.
15          If you didn't use your court
16  subpoena in lieu of your tour of duty, could you
17  submit that subpoena for overtime?
18     A.  Yes.
19     Q.  Okay.  And where is that written down
20  that that's a procedure or a process?
21     A.  I don't know.
22     Q.  Do you believe it's a policy?
23     A.  I can't answer that.  I don't know.
24     Q.  But you agree with me that was just

Page 101

1  something that was done, correct?
2     A.  I can't answer on the process.
3     MS. KRAUCHUN:  Okay.  You can take this
4  exhibit down.  If we can go to Exhibit D, please.
5  BY MS. KRAUCHUN:
6     Q.  Okay.  And, Chris, have you ever seen
7  this document before?
8     A.  I may have.  I don't remember the
9  context.  I would have to look at more of it.  It
10  looks like a PowerPoint to me.
11     Q.  So to the best of your recollection, do
12  you know if you've ever participated in a training
13  where this PowerPoint was presented?
14     A.  I honestly don't know.
15     Q.  Okay.  And if you can turn to -- and I'm
16  sorry.  I have to figure out what page this is.
17  They're not labeled.
18          So just your independent
19  understanding, Chris, if you were to witness
20  discrimination under the policy -- you said you would
21  have to look it up under the policy, correct?
22     A.  That's correct.
23     Q.  Okay.  On how to handle that, right?
24     A.  Yes, ma'am.

Page 102

1     MS. KRAUCHUN:  So you can scroll to -- it's
2  Bates stamped at the bottom 130 -- sorry, not 130.
3  146.  There you go.
4  BY MS. KRAUCHUN:
5     Q.  So if you can just read that.
6          So you would agree with me that this
7  appears to be the sheriff's policy, correct?
8     MR. WHITE:  Hey, Kelly, I'm looking
9  at Exhibit -- we're in Exhibit D, right?
10     MS. KRAUCHUN:  Yes.
11     MR. WHITE:  Okay.  Because the Bates stamps
12  at the bottom are not sequential, so there's pages
13  omitted from this exhibit.  I just want to make that
14  record clear.  This is not...
15     MS. KRAUCHUN:  Yeah, I don't know what the
16  reason for that is.  This is the documents you guys
17  gave us in discovery, so.
18     MR. WHITE:  Well, no.  We would have produced
19  them sequentially.  So, you know, this goes from 155
20  to 164 to 165 to 168.  I mean, we didn't omit Bates
21  documents.  I want to make our record clear.  This is
22  not the entirety of this document that we've
23  produced.
24     MS. KRAUCHUN:  Okay.  And I'm just asking

Page 103



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1288 of 1503 PageID #:1679

1 specific questions on specific pages, so to the
2 extent it's not an entire document.
3 BY MS. KRAUCHUN:
4     Q. So my question to you, Chris, you would
5 have to look up what the policy requires you to do in
6 regards to reporting discrimination or harassment,
7 correct?
8     **A. Yes, ma'am.**
9     Q. Okay. So do you see here on this page
10 officers' responsibilities? You see what we're
11 looking at? Do you see the part where it says inform
12 OPR?
13     **A. I do.**
14     Q. Okay. And it says and your supervisor,
15 if you'd like, correct?
16     **A. Correct.**
17     Q. Okay. So if you pulled up this
18 document -- you witness harassment and you pulled up
19 this document, based on your reading of this
20 document, where do you think you're supposed to make
21 a report to?
22     MR. WHITE: Objection to foundation.
23     THE WITNESS: I have no idea what this
24 document is and I certainly -- one thing I do know is

Page 104

1 I certainly know this is not a general order. This
2 is not a directive. This is likely a PowerPoint
3 summary of a directive order that -- that was
4 probably likely used in the training academy,
5 possibly online. I don't know, but I certainly would
6 not reference this document to take any action if I
7 was made aware of harassment or witnessed harassment.
8 BY MS. KRAUCHUN:
9     Q. So I'm confused. So are you saying this
10 document -- you've never seen this before. Your
11 counsel tendered this to us in discovery.
12     **A. I don't know what this is.**
13     Q. Okay. As a supervisor, you don't know if
14 you've ever seen this before?
15     **A. I don't know if I've ever seen this**
16 **before, and I could safely say that this document is**
17 **a training tool which is summarizing a very specific**
18 **policy.**
19     MS. KRAUCHUN: Okay. If you can go back to
20 the first page of this, please.
21 BY MS. KRAUCHUN:
22     Q. So you agree with me that the badge in
23 the left-hand corner says Cook County Sheriff,
24 correct?

Page 105

1     **A. Yes, ma'am.**
2     Q. And you agree with me that this says
3 harassment training, correct?
4     **A. Yes, ma'am.**
5     MS. KRAUCHUN: Okay. You can take this
6 exhibit down. And if you can pull up Exhibit E for
7 me, please. And if you can go to the page that's
8 Bates stamped P000025.
9 BY MS. KRAUCHUN:
10     Q. And if you can just read that section
11 there, Chris, and then let me know when you're done.
12     **A. What are we reading, all of it?**
13     Q. No, sorry. If you go back down the next
14 page, that one on the right side there. The
15 paragraph.
16     **A. Legrain Winston?**
17     Q. Yeah.
18     **A. Okay.**
19     Q. And you would agree this appears to be an
20 e-mail sent from Legrain Winston to Robert Smith,
21 correct?
22     **A. Yes, it is.**
23     MR. WHITE: Objection to foundation, calls
24 for speculation.

Page 106

1 BY MS. KRAUCHUN:
2     Q. I'm sorry, Chris. What was your answer?
3     **A. Yes. It says that it's from Legrain**
4 **Winston to Robert Smith.**
5     Q. And you agree with me that it says it was
6 sent on June 4, 2017?
7     **A. Sure.**
8     Q. Okay. And you're identified in here. Do
9 you recall this incident with Legrain Winston?
10     MR. WHITE: Objection to foundation.
11     THE WITNESS: No, I don't.
12 BY MS. KRAUCHUN:
13     Q. Okay. You testified earlier about the
14 importance of working with a steady partner, correct?
15     **A. Yes, I did.**
16     Q. Okay. And do you believe -- well, strike
17 that.
18     It appears here that Legrain is
19 complaining about being split up with his partner of
20 ten years, correct?
21     **A. That's what it indicates, yes.**
22     Q. Okay. And you would agree with me that
23 is -- that alters his workday or his tour of duty
24 when he's split from his partner, correct?

Page 107



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1289 of 1503 PageID #:1680
Legrain Winston, et al. vs. Sheriff of Cook County, Thomas J. Dart, et al.

1    MR. WHITE:  Object to form.

2    THE WITNESS:  No, I don't believe it alters

3  his workday or his duties.  No, I don't believe that.

4  I believe -- no, I don't believe that.

5  BY MS. KRAUCHUN:

6    Q.  Yeah, let me ask a better question than

7  that.

8        You agree with me that splitting

9  partners up can cause problems or put one in danger?

10    MR. WHITE:  Objection to form, foundation, it

11  calls for speculation.

12        You can answer.

13    THE WITNESS:  I don't agree with that either.

14  BY MS. KRAUCHUN:

15    Q.  Okay.  So you don't -- so you're

16  referenced in this e-mail.  You don't recall talking

17  to Legrain about speaking with Smith?

18    MR. WHITE:  Objection.  Asked and answered.

19    THE WITNESS:  No, I don't recall this

20  conversation that he's referencing.

21  BY MS. KRAUCHUN:

22    Q.  And can you tell me who exactly is Robert

23  Smith?

24    **A.  Robert Smith was a lieutenant detailed to**

1  **electronic monitoring.**

2    Q.  And do you know roughly when he came to

3  the EM unit?

4    **A.  No, ma'am.  I don't.**

5    Q.  You agree with me that it's not unusual

6  for someone to request to work with a specific

7  partner, right?

8    **A.  Yes, I agree.**

9    MR. WHITE:  Objection.  Asked and answer.

10  BY MS. KRAUCHUN:

11    Q.  And you agree with me that it was a

12  policy to attempt to put partners together, right?

13    MR. WHITE:  Objection to foundation.

14        Chris, you have to slow down a

15  little bit.

16    THE WITNESS:  No, it was not policy.

17  BY MS. KRAUCHUN:

18    Q.  Okay.  But you agree with me that you

19  testified earlier when you were in charge of making

20  the roster sheets that you would put one person and,

21  for example, Legrain in a position, and you would

22  take his partner and assign him to that same

23  assignment, correct?

24    MR. WHITE:  Objection.  It misstates

1  testimony.

2        You can answer.

3    THE WITNESS:  Yes, I would do that, but that

4  was certainly not policy.  That was done simply in an

5  effort to make -- based on requests typically.  I

6  mean...

7  BY MS. KRAUCHUN:

8    Q.  You would agree that that was a regular

9  practice, right?

10    **A.  When I did the roster to make the**

11  **assignments, yes.**

12    Q.  Have you ever split up partners?

13    **A.  Yes.**

14    Q.  And what would be the circumstances why

15  you would split up partners?

16    **A.  Staffing requirements.**

17    MS. KRAUCHUN:  You can take this exhibit

18  down.

19  BY MS. KRAUCHUN:

20    Q.  I'm sorry?

21    **A.  No, you went silent for a moment.**

22    MS. KRAUCHUN:  You know what, can we take a

23  quick five-minute break, Guys?

24    MR. WHITE:  Yeah, That's fine.

1        (Whereupon, a short break

2            was taken.)

3    MS. KRAUCHUN:  If we can put Exhibit F up

4  there, please.  And if you can just scroll down to

5  the narrative part of this document.

6  BY MS. KRAUCHUN:

7    Q.  And then, Chris, if you can just read the

8  middle paragraph and let me know when you're done.

9    **A.  The middle paragraph?**

10    Q.  Yeah, beginning -- there you go.

11    **A.  Okay.**

12    Q.  And specifically I want to ask you, have

13  you ever heard anybody call any of the plaintiffs the

14  term boy?

15    **A.  No, ma'am.**

16    Q.  So you've never heard anybody refer to

17  boy.  If you did, would you think of that as an

18  offensive term?

19    MR. WHITE:  Objection to form, foundation.

20  It calls for speculation.

21    THE WITNESS:  I would have to hear the

22  context.  I never heard it.  I don't know.

23  BY MS. KRAUCHUN:

24    Q.  Okay.  Did you ever hear anybody address



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1290 of 1503 PageID #:1681
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 any of the plaintiffs as dumb ass N?

2 **A. No.**

3 Q. Did you ever come to learn that anybody
4 called any of the plaintiffs that name that way?

5 **A. No.**

6 Q. Did you ever hear that any of the
7 defendants called any of the plaintiffs crooks?

8 **A. No.**

9 Q. At any time did you come to learn that
10 that happened?

11 **A. No.**

12 Q. And did you hear that Ranzino said, you
13 all look alike, at roll call?

14 MR. WHITE: Objection.

15 THE WITNESS: I did not hear it, no.

16 BY MS. KRAUCHUN:

17 Q. But you agree with me that you came to
18 learn that that happened, correct?

19 MR. WHITE: Objection to foundation.

20 THE WITNESS: I heard rumblings of an
21 investigation that was based on that statement.

22 BY MS. KRAUCHUN:

23 Q. Have you ever been interviewed regarding
24 any racial discrimination complaints that were made?

1 **A. No.**

2 Q. So you've never given any statements to
3 OPR about any racial discrimination complaints?

4 **A. I don't believe so. Not in this matter,**
5 **no.**

6 Q. I'm not just talking about this matter
7 though, in any matter, any racial discrimination
8 complaints. Have you ever had to give an interview
9 to OPR?

10 MR. WHITE: Objection.

11 THE WITNESS: I have been interviewed by OPR.
12 It had nothing to do with racial discrimination.

13 BY MS. KRAUCHUN:

14 Q. So tell me what you had to give an
15 interview to OPR about?

16 **A. In which instance, ma'am? I mean, you**
17 **know.**

18 Q. So you've given numerous statements to
19 OPR?

20 **A. I've been -- as a supervisor, yeah. I**
21 **mean, that's part of your job is when you initiate**
22 **discipline or whatnot, yes.**

23 Q. So when you initiate discipline as a
24 supervisor, you have to give a statement to OPR. Is

1 that correct?

2 MR. WHITE: Objection to foundation.

3 Chris, try to slow down.

4 THE WITNESS: I'd have to hear the question
5 again.

6 (Whereupon, the record was
7 read as requested.)

8 THE WITNESS: In instances of major cause,
9 yes, there has been occasions that I've had to be
10 interviewed by OPR.

11 BY MS. KRAUCHUN:

12 Q. And can you tell me every case where
13 there was a race allegation made that you gave a
14 statement to OPR about?

15 **A. I'm not aware of any, no.**

16 Q. Can you tell me every case where you gave
17 a statement to OPR regarding a hostile work
18 environment?

19 **A. There was one where I believe it was -- I**
20 **honestly don't even remember who filed it, and it was**
21 **regarding -- I don't even remember if it was hostile**
22 **work environment. It was regarding Greg Shields**
23 **and -- something to do with -- I suppose it was a**
24 **hostile work environment. I was interviewed one time**

1 about it.

2 Q. And explain more of the facts surrounding
3 that.

4 **A. Counsel, it was so long ago. I'm trying**
5 **to refresh my memory. It was along the lines of**
6 **there was an allegation made that he was being**
7 **blow-harded in his position based on his personal**
8 **relationship with the sheriff. That's really all I**
9 **can remember. I don't remember specifics. I don't.**

10 Q. I just want you to clarify. The term you
11 just used, did you say blow-harded?

12 **A. Arrogant. Bullying might be the best**
13 **term in that particular instance.**

14 Q. And that was an allegation that was made
15 against Shields. Is that correct?

16 **A. Yes, ma'am.**

17 Q. And that was by another EM investigator?

18 **A. I honestly don't remember. I can't**
19 **remember. I don't know if it was an investigator.**
20 **It may have been a supervisor. And again, this is**
21 **not -- I don't know, but I'm thinking it may have**
22 **been a supervisor that filed that complaint. I don't**
23 **remember though.**

24 Q. And if I can clarify, you said that the

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-15 Filed: 12/21/20 Page 1291 of 1503 PageID #:1682

1 allegation -- or something to do with being arrogant
2 in his position because he was friendly with the
3 sheriff.  Is that what you just testified to?
4     MR. WHITE:  Objection.  It misstates
5 testimony.
6        You can answer.
7     THE WITNESS:  That I believe was the gist of
8 the OPR investigation, correct.
9 BY MS. KRAUCHUN:
10     Q.  And that was because of Shields' personal
11 relationship with the sheriff?
12     MR. WHITE:  Objection.  Speculation.
13     THE WITNESS:  I don't know if they have a
14 relationship or not.  I have no clue.
15 BY MS. KRAUCHUN:
16     Q.  But is that your understanding of what
17 the beef was about?
18     A.  Yes, ma'am.
19     Q.  Okay.  And it was a supervisor that made
20 that beef against Shields, correct?
21     MR. WHITE:  Objection.  It misstates
22 testimony.
23     THE WITNESS:  I don't -- I honestly -- in the
24 back -- again, this is quite, quite some time ago.

Page 116

1 If I remember -- I vaguely remember it and it was --
2 yeah, I think it was about -- I think it was made
3 about Shields, and I think it was made by a
4 supervisor.  I don't remember to be perfectly honest
5 with you.
6 BY MS. KRAUCHUN:
7     Q.  In roughly what year do you think that
8 happened?
9     A.  Oh, my God.  It's -- let me think.  2011,
10 '12, '13.  I don't remember.
11     Q.  And have you ever heard anybody in the EM
12 unit use the N word?
13     A.  Yes, I have.  I've heard numerous people.
14     Q.  Who?
15     A.  African-Americans.  With slang language I
16 heard -- people that are named as plaintiffs in this
17 suit use that term.  I've heard -- yeah, I've heard
18 that.  Honestly, it's fairly -- it's almost like it's
19 used as a term of endearment amongst their peers.
20 That's the best way I can explain it.
21     Q.  And when you say their peers, who are you
22 referring to?
23     A.  Amongst the African-American
24 investigators.

Page 117

1     Q.  As a supervisor, you would agree with me
2 that the N word is actually a derogatory, offensive
3 racial term, correct?
4     MR. WHITE:  Objection to form, foundation.
5     THE WITNESS:  If you would ask me that
6 question tens years ago, yes, I would have.  Now
7 given music and the way it's loosely used amongst
8 African-Americans, I don't know how to answer that
9 question.  Again, in context, you know, when you see
10 two people greet each other and use the term while
11 they shake hands or hugging, I don't think it's
12 intended to be interrogatory.
13 BY MS. KRAUCHUN:
14     Q.  But I'm not talking about in the context
15 of music.  I'm talking about in the context of a
16 place of employment.  You agree that the N word is
17 offensive language, correct?
18     A.  Again you're asking for my personal
19 opinion, and in context of as this report says, dumb
20 ass N, yes, of course that's offensive.  However,
21 when I see Investigator Main Street shake
22 Investigator Jim Shoe's hand and the term, what up my
23 N, how are you doing, do I find that interrogatory?
24 No, I don't.  Again it's in context of what's going

Page 118

1 on in my opinion.
2     Q.  Well, what about in the context of around
3 other employees?  Would it be offensive?
4     MR. WHITE:  Objection.  Foundation.
5     THE WITNESS:  Around other employees?  It was
6 never -- if I -- when I heard it in the context of
7 what up, you know, that type of thing, no one ever
8 brought it to my attention.
9        You have to understand, these are
10 people that we've worked with for many, many years,
11 and you sit with them, spend eight to ten hours with
12 them, you form some sort of relationship and you get
13 to know these fellows and they get to know each
14 other.
15        If someone was offended by that, I
16 would assume that they would bring that to the
17 attention of someone.  I mean, there's been instances
18 that I have been called the N word in a friendly
19 context much like I've said, you know, a guy, hey,
20 man, how have you been, what up my N?  Do I take
21 offense to it, no, I don't.  It's...
22 BY MS. KRAUCHUN:
23     Q.  Do you agree with me that if you
24 addressed any of the plaintiffs by using the N word,

Page 119



Christopher Rohloff  -  9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1292 of 1503 PageID #:1683
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 that would be racially inappropriate, that would be
2 offensive, that could constitute harassment?
3 Correct?
4      MR. WHITE:  Objection to form.
5           You can answer.
6      THE WITNESS:  I never have, so but -- and I
7 never would.  So, yes, I would say that that's
8 inappropriate.
9 BY MS. KRAUCHUN:
10      Q.  And that could cause, you know, issues in
11 the workplace, correct?
12      MR. WHITE:  Objection.  It calls for
13 speculation.
14      THE WITNESS:  Again, context.  I don't know.
15 What is the context?  I've never done it, so I don't
16 know.  I don't know.  You're asking me to answer
17 questions based on speculation and opinion.  I mean,
18 I...
19 BY MS. KRAUCHUN:
20      Q.  So you're aware that the N word was used
21 in the workplace, and you never reported that to
22 anybody, correct?
23      MR. WHITE:  Objection.  Foundation.
24      THE WITNESS:  Not as it pertains to this

Page 120

1 case.
2 BY MS. KRAUCHUN:
3      Q.  But not just this case.  Any time.  You
4 heard the N word being used in the workplace, and you
5 never reported that, correct?
6      A.  Yes, ma'am.
7      Q.  How many times roughly do you think
8 you've heard the N word used in the workplace?
9      A.  I don't know.  I haven't got a clue.
10      Q.  More than ten?
11      A.  Again, it wasn't used -- when I heard it,
12 it wasn't used in a derogatory fashion.  It was
13 typically used by gentlemen or these fellows, you
14 know, the guys that work with me and for me talking
15 amongst themselves or whatever, so I never took note
16 of it.  You know, I don't know.  It might be one
17 time, it might be a hundred.  I can't answer that
18 question.  I don't know.
19      Q.  But you would agree with me it's
20 definitely been more than one time?
21      A.  No, I'm not going to agree with that.  I
22 said I don't know.
23      Q.  And you never reported any of those
24 times, correct?

Page 121

1      A.  No, ma'am.  I didn't.
2      MS. KRAUCHUN:  We can take down Exhibit F,
3 and I'm going to turn to Exhibit G, please.
4 BY MS. KRAUCHUN:
5      Q.  And, Chris, I'm just going to ask you to
6 review this document.  When you're done, let me know.
7      THE WITNESS:  Okay.  Can we scroll up?  Keep
8 going, Guys.  Who is this -- I...  Oh, this is mine.
9 Okay.  Go ahead.  Hang on.  Slow down.  Slow down.
10 BY MS. KRAUCHUN:
11      Q.  So can you describe what this SPR
12 number -- I believe it's SPR16-1723 at the top.  Can
13 you tell me what this is about?
14      A.  This was -- let's see here.  Oh, this was
15 an issue that -- essentially the sheriff's office was
16 saying that the lieutenants, in this particular case
17 Lieutenant Smith, were now above the deputy chiefs in
18 the rank structure, and accordingly would make
19 assignments for the deputy chiefs in the rank
20 structure.  And on this particular time he altered my
21 assignment and I told him, no, I'm not going to go to
22 that assignment.  You don't tell me what to do.
23 You're a lieutenant.  You're not a chief, and that's
24 that.

Page 122

1      Q.  And what assignment was it that he
2 ordered you to go to?
3      A.  Technical services section.
4      Q.  And you agree that's not a great
5 assignment, right?
6      A.  Not at all.  I had other responsibilities
7 that needed to be filled.
8      Q.  And so you refused to go to TSS.  Is that
9 correct?
10      A.  I told him I'm not going there because I
11 had other responsibilities that I had been carrying
12 out for some years.
13      Q.  Is it fair to say that you were written
14 up then for refusing that order?
15      A.  Yes, it is.
16      Q.  And what type of discipline -- strike
17 that.
18           Did that lieutenant write you a
19 disciplinary action form based on that?
20      A.  He did.
21      Q.  And what was the recommendation in that
22 disciplinary action form for discipline?
23      A.  I don't remember to be honest with you.
24      Q.  But you agree that you didn't take any

Page 123



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1293 of 1503 PageID #:1684
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 suspension days for that refusal, correct?
2     A. I don't -- yeah, I think I did.
3     MS. KRAUCHUN: So if you can just scroll down
4 where it says second occurrence, written reprimand.
5 BY MS. KRAUCHUN:
6     Q. You would agree with me that a written
7 reprimand is the lowest punishment available?
8     A. Correct.
9     MS. KRAUCHUN: If you can scroll down to, I
10 believe it's the fourth page.
11 BY MS. KRAUCHUN:
12     Q. And do you see this is SPR No. 2016-2561?
13     A. Okay.
14     Q. Is this the same incident that you were
15 just talking about? Well, actually, read the
16 narrative there and then let me know.
17     A. Yeah, I'm not remembering here. I think
18 it is, yeah. I believe so.
19     Q. Okay. And this was the disciplinary
20 action form that was written up by Lieutenant Smith,
21 correct, that you just talked about?
22     A. I don't remember. You'd have to show me
23 on the bottom of this. Yep.
24     Q. Okay. And you agree that you filed a

Page 124

1 grievance in regards to this disciplinary action
2 form, correct?
3     A. I believe so, yes.
4     Q. And do you recall what the outcome of
5 that grievance was?
6     A. Now that I've seen this document, yes, I
7 do. It went to arbitration and the arbitrator ruled
8 in the County's favor, however, he changed the
9 discipline from a ten-day suspension to a two-day
10 suspension.
11     Q. With options, correct?
12     A. No, it was not with options. It was
13 unpaid.
14     Q. You were never retaliated against for
15 filing this grievance, were you?
16     A. Not that I'm aware of.
17     Q. You agree with me that everyone has a
18 right to file a grievance, correct?
19     MR. WHITE: Objection to form and foundation.
20 BY MS. KRAUCHUN:
21     Q. I'm sorry, Chris.
22     A. Are we ready, Guys? Sorry.
23     I absolutely do, yes.
24     MS. KRAUCHUN: And then if we can scroll down

Page 125

1 to the second -- or, sorry, the third from last page.
2 BY MS. KRAUCHUN:
3     Q. So you agree this is a disciplinary
4 action form that was issued to you, correct?
5     A. Yes.
6     Q. And if you just want to read the
7 description and let me know when you're done.
8     A. I'm done.
9     Q. So this disciplinary action form was
10 written because you were unshaven, correct?
11     A. Correct.
12     Q. And you failed to produce a shave card?
13     A. Correct. Yeah.
14     Q. Do you recall what the outcome of this
15 disciplinary action form was?
16     A. No, I honestly don't. I think I went --
17 I think this may have stemmed -- I can't recall. Can
18 I see who wrote this form? John Webb.
19     I honestly don't. I think this may
20 have stemmed from training, when I was at training,
21 the training academy. I don't recall.
22     Q. You agree with me on the bottom though
23 there's an X checked that a grievance was filed?
24     A. Yes.

Page 126

1     MS. KRAUCHUN: Okay. We can take down that
2 exhibit.
3     MR. WHITE: Hey, Kelly?
4     MS. KRAUCHUN: Yeah.
5     MR. WHITE: I know that Chris is in a lot of
6 pain and obviously you're entitled to your time, but
7 I wonder if I -- if we can just take five minutes and
8 I can talk to him and make sure that he's okay to
9 continue.
10     MS. KRAUCHUN: Yeah, that's fine.
11     MR. WHITE: Let's go off for five minutes.
12     (Whereupon, a short break
13     was taken.)
14     MR. WHITE: So we, Justin and I, have spoken
15 to Chris and because of his medical issues, we're
16 going to have to postpone the remainder of the dep.
17     We've spoken with Kelly. Everybody
18 agrees she's entitled to four more hours to the
19 extent she needs it, and we will figure out a day,
20 hopefully the week -- next week, September 21st to
21 hopefully fit in the remaining portion of
22 Mr. Rohloff's deposition.
23     Kelly, do you have anything to add
24 to that?

Page 127



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1294 of 1503 PageID #:1685

1      MS. KRAUCHUN:  I have nothing to add to that.

2  That's perfect.

3            And, Mr. Rohloff, go ahead and get

4  some rest, and we hope you feel better.

5      THE WITNESS:  Thank you, Guys.

6      MR. WHITE:  We'll reconvene soon.

7        (FURTHER DEPONENT SAITH NOT.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 128



Christopher Rohloff - 9/15/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1295 of 1503 PageID #:1686

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1                    REPORTER'S CERTIFICATE

2

3          I, Brenda S. Hall, CSR No. 084-003359,

4    Certified Shorthand Reporter of said state, do hereby

5    certify:

6          That previous to the commencement of the

7    examination of the witness, the witness was duly

8    sworn to testify the whole truth concerning the

9    matters herein;

10         That the foregoing remote deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15         That the said remote deposition was taken

16   before me at the time specified;

17         That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24



Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1296 of 1503 PageID #:1687
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              IN WITNESS WHEREOF, I do hereunto set my hand

 2     at Chicago, Illinois, this 12th day of October, 2020.

 3

 4

 5                      _____

 6                      Certified Shorthand Reporter

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1297 of 1503 PageID #:1688

## WORD INDEX

**< 0 >**
**06** 25:23
**07** 25:22, 23
**084-003359** 1:24
  129:3

**< 1 >**
**10** 14:8 52:4
**10:00** 2:1
**10:45** 27:21
**100** 2:6 3:10
**102** 3:10
**106** 3:10
**11:00** 24:22, 24
  43:14, 15 58:17, 18
  61:4 73:12 96:7, 11
**11:20** 67:18
**11:42** 67:14
**111** 3:10
**12** 117:10
**12:00** 24:22 43:15
  58:18, 19 64:18
  96:5
**12:20** 67:19
**120** 2:18
**122** 3:10
**12th** 130:2
**13** 117:10
**130** 103:2
**146** 103:3
**15** 2:1 14:8 52:5
**155** 103:19
**164** 103:20
**165** 103:20
**168** 103:20
**17** 48:11 59:6
  71:20 74:6
**18** 1:9 4:6 59:6
  61:11
**19** 61:11 71:20
  91:4, 7
**1992** 8:2, 14, 15
**1996** 8:15
**1999** 9:24 10:1
  15:13
**1st** 9:16

**< 2 >**

**2** 7:14 39:18, 19,
  20 40:5, 15
**20** 20:14 42:6, 7
  50:23 54:6 56:24
  58:2 95:10
**200** 2:12
**2000** 2:18 22:13
**2000s** 21:17 55:1
  61:15 62:18
**2001** 22:13, 14
**2002** 22:8
**2006** 25:22
**2008** 31:22 37:19
**2009** 31:22 37:19
**2011** 117:9
**2015** 68:24 69:9,
  22, 24 70:14, 18
  71:6
**2016** 69:16 70:2,
  19 71:9
**2016-2561** 124:12
**2017** 70:6, 8, 21
  71:12, 13, 14 107:6
**2020** 2:1 7:14
  71:22 130:2
**206** 2:6
**21st** 127:20
**22** 92:23
**2201** 2:12
**23** 68:16
**24** 69:13, 19
**25** 70:11 98:23
**26** 71:3
**2nd** 71:21

**< 3 >**
**3** 72:4
**3:00** 24:22 35:7
  43:14, 15 58:17, 18
  61:4 73:12 96:7, 8,
  11
**3:30** 96:8
**312** 2:7
**31st** 13:18 21:5, 21
**3417** 48:10
**3418** 48:2, 9
**38** 3:10

**< 4 >**
**4** 3:1 107:6

**4:00** 24:21 43:15
  58:17, 19 64:18
  96:5

**< 5 >**
**5** 72:18
**50** 29:15 82:1
**50/50** 12:20
**5726** 4:6

**< 6 >**
**60523** 2:13
**60602** 2:19
**60661** 2:7
**630** 2:13
**655-7660** 2:7

**< 7 >**
**7** 16:3 20:17, 20
**7:00** 24:24 35:7
**72** 3:10
**786-3705** 2:19
**7th** 71:13, 20, 21

**< 8 >**
**8** 68:13
**8:00** 24:23
**866** 2:19

**< 9 >**
**9** 74:6
**9009** 6:23
**90s** 20:23 21:17
**984-0339** 2:13
**99.9** 92:9

**< A >**
**a.m** 2:1
**ability** 32:14
**able** 46:19 59:15
  60:5, 7 73:7, 9, 13
**above-entitled** 1:22
**absence** 48:17
**absolutely** 88:6
  101:8 125:23
**academy** 9:9, 13
  105:4 126:21
**accidental** 82:10, 11
**accidentally** 90:12,
  14

**accurate** 17:9, 10
**accusation** 96:10
**Acey** 46:18 67:5,
  12 72:8, 9, 10, 11,
  13, 14, 21, 24 73:4,
  5, 22 96:6
**act** 17:2, 3 26:10
**acted** 55:24
**acting** 26:2, 4 28:7,
  10, 15 31:7, 18
  32:2 55:16, 19
  61:18, 20, 21, 22
  79:13, 16
**action** 5:7 13:12
  29:23 41:5, 7
  44:16 78:9, 11, 12
  81:4 82:17, 22
  83:5, 8, 9 84:4
  85:7 86:20 87:8,
  16, 19, 24 89:18
  105:6 123:19, 22
  124:20 125:1
  126:4, 9, 15 129:21
**actively** 38:19
**acts** 80:12, 14
**actual** 83:14 84:9
**add** 127:23 128:1
**additional** 24:19
**address** 111:24
**addressed** 100:19
  119:24
**addresses** 12:3
**admit** 68:21
**Affairs** 83:18
  84:17, 19 92:6, 8
**affirmative** 40:1
**African-American**
  94:18 96:16 117:23
**African-Americans**
  117:15 118:8
**afternoon** 43:13
**afternoons** 38:6, 10
  53:9 57:10
**ago** 5:14, 16 20:14
  50:23 52:5 76:8,
  10 115:4 116:24
  118:6
**agree** 17:11 22:8
  44:6 56:17 57:17
  58:22 60:8 78:23
  86:19 87:7 89:17

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1298 of 1503 PageID #:1689

99:22 101:*24*
103:6 105:22
106:2, *19* 107:5, *22*
108:8, *13* 109:5, *8,*
*11, 18* 110:8
112:*17* 118:*1, 16*
119:*23* 121:*19, 21*
123:*4, 24* 124:6, *24*
125:*17* 126:3, *22*
**agreement** 38:*1, 13*
78:*24* 83:3, *12* 89:*1*
**agreements** 87:22
**agrees** 127:*18*
**ahead** 23:*23* 40:*3*
69:*4* 87:*1* 95:*16*
122:*9* 128:*3*
**alarms** 15:*24*
**alcohol** 82:2
**alerts** 14:5
**alike** 96:2, *17, 20*
112:*13*
**allegation** 96:*15*
97:5 114:*13* 115:6,
*14* 116:*1*
**allegations** 40:*18*
92:*4, 13, 17*
**alleges** 96:*1*
**alphabetical** 47:*18*
**alphabetically**
47:*24* 48:*1, 6, 8*
**Alston** 47:*20, 23*
**alter** 32:*4*
**altered** 24:*20* 88:2
122:*20*
**alters** 107:*23* 108:2
**amount** 66:5
**annually** 76:*13*
**answer** 6:6, *12*
10:8 15:*24* 17:*16*
18:*16, 22* 19:*20*
22:*21* 25:*12* 26:*12*
30:6, *9* 39:*21, 24*
40:8, *24* 43:5 47:*4*
48:*24* 50:*19, 21*
51:8 55:*18* 56:6,
*13* 65:2, *20* 68:*20*
69:2, *4* 71:*1* 73:*7,*
*9, 14* 74:*14* 75:3, *5*
79:4 85:*11, 12*
88:*3* 89:*23* 91:*13*
93:22 94:*20* 97:*14,*

20 98:*10* 101:*23*
102:2 107:2
108:*12* 109:*9*
110:2 116:6 118:*8*
120:5, *16* 121:*17*
**answered** 87:*10*
93:*21* 108:*18*
**answering** 29:*18*
**ANTHONY** 1:*6*
**anticipate** 6:6 17:*1*
**anybody** 79:*23*
81:6 92:*12* 111:*13,*
*16, 24* 112:*3*
117:*11* 120:22
**anyway** 67:*17*
**apologize** 19:*21*
28:*17* 39:7 40:*4*
71:*1* 80:*4*
**APPEARANCES**
2:*4*
**Appeared** 2:*9, 15,*
*21*
**appears** 103:7
106:*19* 107:*18*
**apples** 67:*9*
**application** 10:22
23:*17*
**applied** 8:22 9:*6*
**apply** 23:*10*
**appointed** 10:*16, 17*
26:*10*
**appointment** 10:*20*
**approached** 23:*19*
38:*8*
**approximately**
31:*20*
**arbitration** 125:7
**arbitrator** 125:7
**area** 16:2 18:2, *3,*
*4, 7* 19:*13* 20:8, *15,*
*17, 20*
**areas** 18:*13, 20*
20:*19* 48:*13, 19, 22*
49:*1, 2*
**Arrogant** 115:*12*
116:*1*
**aside** 88:*6*
**asked** 9:2 10:*14*
22:22 23:7 26:*19,*
*23* 27:3 37:*13*
50:22 59:*10* 84:*24*

85:4 87:*10* 108:*18*
109:*9*
**asking** 20:*13* 21:*16*
62:22 74:*12* 90:*1*
91:23 93:*10, 20*
94:2, 7 95:2 99:*8*
103:24 118:*18*
120:*16*
**asks** 91:22 93:*12*
**ass** 112:*1* 118:*20*
**assign** 18:*12* 19:2,
*4* 48:*12, 18* 49:*7,*
*10* 109:22
**assigned** 9:*15* 16:7,
*10* 18:*3, 8* 19:*10*
20:2, *4, 9, 11* 21:*13,*
*24* 29:*11* 32:6
42:*15* 48:*4* 53:*20*
**assigning** 13:5
18:*19*
**assignment** 19:*14*
49:*3, 14* 55:*8*
57:*11* 109:*23*
122:*21, 22* 123:*1, 5*
**assignments** 14:6
15:*18* 18:*1* 29:*18*
30:2, *12* 31:*3* 46:6,
*13, 16, 24* 47:2, *13,*
*17* 49:*16* 110:*11*
122:*19*
**associate's** 8:*10*
**assume** 24:*15* 86:*3*
94:*10* 96:*12* 119:*16*
**assumed** 22:*17*
31:*8* 36:*9* 64:*16*
**assumes** 98:*9*
**assuming** 28:*20*
56:*3*
**attempt** 109:*12*
**attendance** 47:*16,*
*18*
**attention** 119:*8, 17*
**attorney** 92:6, *9*
129:*18, 19*
**audio** 8:*23*
**available** 89:*9*
124:*7*
**aware** 10:*19* 75:7,
*10* 80:*15* 93:*17*
101:2 105:*7*

114:*15* 120:*20*
125:*16*

**< B >**
**baby** 88:*10*
**back** 9:*3* 11:*9*
14:*8* 16:*1* 18:*24*
20:*23* 27:*21* 28:*4*
36:*15, 19* 49:*20*
55:*1* 61:*14, 21*
67:*18* 68:*12* 71:*20*
79:*7* 80:*4* 86:*12*
105:*19* 106:*13*
116:*24*
**background** 35:*21*
**backwards** 80:*24*
**badge** 105:22
**bargained** 32:*13*
**Bargaining** 32:*12*
78:*24* 83:3, *12* 89:*1*
**BARONI** 2:*17*
**Barron** 47:*19*
**Barron's** 47:*21*
**based** 47:*1* 53:22
55:6 66:6 73:*12*
77:7, *24* 78:*10, 11*
86:*18* 89:*16* 96:*10,*
*12* 98:*19* 104:*19*
110:5 112:*21*
115:7 120:*17*
123:*19*
**basement** 13:*19*
**basically** 68:*18*
89:6 90:*18*
**basis** 40:*19* 41:8
50:*10* 55:*10* 69:2
75:23
**Bates** 100:7, *11, 12*
103:2, *11, 20* 106:8
**beard** 85:2
**beat** 48:*3*
**becoming** 10:*12*
**beef** 116:*17, 20*
**began** 11:*20* 13:*15*
**beginning** 59:5
67:*23* 111:*10*
**behalf** 2:*9, 15, 21*
80:*7*
**believe** 5:*19* 8:*18*
9:*24* 11:*3* 16:*21*
17:*17* 22:*3* 23:*12,*

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1299 of 1503 PageID #:1690
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

24 25:2 27:13
29:14 33:19, 22
34:10, 13, 14, 18
35:7, 10 37:9, 12
41:1, 10 47:23
48:2 50:2 53:1
55:23 61:10 63:16,
18 68:22 69:21, 23,
24 70:3, 14 72:24
74:4 77:1, 10, 20
78:4, 6 80:3, 6
81:24 83:17 91:20
92:5, 12 98:3, 5
101:11, 22 107:16
108:2, 3, 4 113:4
114:19 116:7
122:12 124:10, 18
125:3
**benefit** 25:1, 3, 7, 8
**benefits** 24:19
**Bennett** 17:23
**best** 66:16 78:12,
14 81:3 102:11
115:12 117:20
**bet** 59:6
**better** 66:15 108:6
128:4
**bid** 10:5 32:14, 16
37:24 38:3 50:9,
11, 12 51:12
**bidding** 32:15
**big** 57:5 90:9, 10
**bit** 33:11 39:20
71:6 109:15
**blow-harded** 115:7,
11
**blowing** 78:13
**board** 37:10, 11
**book** 18:24 47:16,
18, 19
**born** 22:12
**bosses** 27:6
**bottom** 103:2, 12
124:23 126:22
**boy** 16:2 25:18
111:14, 17
**break** 6:10, 13
27:17 28:2 33:10
67:15, 20 83:22
110:23 111:1
127:12

**Brenda** 1:23 6:8
9:3 129:3
**briefly** 50:6
**bring** 39:9 100:13
119:16
**broad** 74:16 77:16
81:17 82:3 90:2
95:3 99:11
**broadest** 81:22
**broke** 31:11 32:22
**broken** 16:5
**Brook** 2:13
**brought** 119:8
**budget** 66:6
**building** 13:19, 20
21:8
**built** 17:8
**Bullying** 115:12
**Burbank** 8:17
**burdensome** 94:12,
13 95:11 99:11
**business** 25:4
64:19, 20
**Byrne** 11:1
**Byrne's** 11:2

**< C >**
**California** 13:18
21:5, 21
**call** 7:1 13:20, 21
14:1, 8 15:12, 18
21:7 43:24 46:23
47:2, 9, 12 49:16
82:7 96:2, 4, 8, 16
97:17 111:13
112:13
**called** 4:9 7:2
12:2 52:14 62:15
83:17 84:21 112:4,
7 119:18
**calling** 52:14 82:6,
7, 8
**calls** 40:21 43:11
85:10 87:11 96:9
98:9 106:23
108:11 111:20
120:12
**Capacity** 1:11, 13,
14, 16, 17 71:21
86:13

**car** 15:20 16:8
17:4 48:2 55:2
81:2
**card** 84:24 85:5,
13, 14, 24 86:3, 6,
21 88:20, 23 126:12
**cards** 85:15 88:5
**care** 20:15 38:11
**career** 24:16 25:6
98:19
**Carl** 44:13
**carry** 76:20
**carrying** 123:11
**case** 5:18 41:17
46:21 95:5, 22
99:20 114:12, 16
121:1, 3 122:16
**casual** 25:3
**caught** 90:7
**cause** 1:22 78:20
83:17 108:9 114:8
120:10
**caused** 8:22
**causing** 84:15
**CECIL** 1:6 44:14,
15, 21 45:2, 5, 19
46:4, 13 48:10
49:21 57:20, 21
**Cedric** 38:6, 7
**center** 13:1 29:9
**certain** 18:4, 13, 19
44:1 48:21, 22
**Certainly** 81:10
104:24 105:1, 5
110:4
**CERTIFICATE**
129:1
**Certified** 1:23
129:4 130:6
**certify** 129:5
**chain** 14:11, 15, 18
30:14, 17 64:10
**chance** 88:12
**change** 24:10, 11
25:24 37:8 66:7
**changed** 11:9, 11
15:14 25:21 32:1,
9 35:20, 24 51:1
55:9 61:4 76:11,
21 84:18 86:9

96:11 125:8
**changes** 66:11
**charge** 29:24
109:19
**check** 12:4 15:24
64:18
**checked** 11:24
126:23
**Chicago** 2:7, 19
7:20 19:24 21:9
130:2
**chief** 14:3, 20, 21,
22, 23 26:2, 4, 6, 15
28:7, 11, 15, 20, 24
29:1 31:7, 10, 13,
15, 16, 18, 24 32:2,
3, 7, 8 33:4, 6, 7, 8,
9, 12, 13, 18, 21, 24
34:2, 4, 14, 18, 24
35:2, 4, 12, 14, 18
36:4, 8, 23 37:17
38:15 42:20 45:15
49:15 55:16, 19
56:4, 10 61:15, 16,
17, 19, 21, 22, 23
62:3, 18, 23 63:9,
14 64:11 67:10, 11,
12 68:19, 23 69:6,
9, 16 70:14, 15, 17,
19 71:6, 10 72:7, 9,
21 73:4 79:12
82:16, 20 96:1, 5, 6,
11, 15 99:14
100:19 122:23
**chiefs** 27:12 33:16
34:11, 15, 16 35:6,
9 37:10, 15, 19
43:13 46:17 64:9
72:8, 15 73:5
79:23 122:17, 19
**child** 38:11 68:10
**children** 90:8
**chose** 88:21, 22, 23
**Chris** 6:21 7:1, 2,
18 18:16 19:17
23:23 36:18 39:23
40:24 52:24 56:15
67:2, 24 68:15
71:6 74:9 75:5
86:23 91:6 93:2
94:6, 8 97:21 99:2

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1300 of 1503 PageID #:1691

100:*16* 102:6, *19* 104:*4* 106:*11* 107:2 109:*14* 111:7 114:*3* 122:5 125:2*1* 127:5, *15*

**CHRISTOPHER**
1:*16, 21* 3:*1* 4:*4, 8, 16* 68:*1, 4*
**Cicero** 5:*19*
**circled** 68:*16*
**circumstances** 95:*18* 110:*14*
**city** 20:5 21:8
**Civil** 4:7
**civilian** 29:*20* 32:4
**civilians** 29:*15* 30:*1* 53:*20*
**claims** 72:22
**clarify** 115:*10, 24*
**clarifying** 15:*16*
**classes** 76:22
**classification** 77:8
**classify** 66:*18* 85:8 95:*13*
**clean** 6:9 85:*23*
**clear** 6:*17* 103:*14, 21*
**client** 68:*3*
**clock** 67:*14*
**close** 43:*8*
**clothes** 25:*4*
**clue** 15:*10* 70:*20* 73:*15* 116:*14* 121:9
**cocktails** 59:*14*
**codefendants** 61:6
**Collective** 32:*11* 78:24 83:*3, 12* 89:*1*
**college** 8:*4, 5, 6, 7*
**color** 99:*19*
**come** 8:*19* 10:6 26:*10* 38:6 46:22 85:20 86:*1* 88:7 112:*3, 9*
**comfortable** 54:*1*
**command** 14:*11, 15, 19* 27:5 30:*15, 17* 64:*10* 66:8
**commander** 14:*17, 19* 30:*18, 20, 22* 31:*1*

**commanders** 29:*13, 24*
**commencement** 129:6
**comment** 52:*20* 53:*23* 94:*24*
**common** 16:*14, 18* 68:7 86:*19*
**commonly** 85:*16*
**communicated** 56:9
**Community** 32:*19*
**compare** 67:9
**compensation** 24:*10*
**complaining** 78:*13, 16, 17, 21* 107:*19*
**complaint** 40:9 41:*16, 20* 80:7, 8 92:*18* 95:21 96:*14* 97:6, 8 115:22
**complaints** 112:24 113:*3, 8*
**complete** 8:5, 9 76:*16*
**completely** 36:*14* 67:*10, 11* 92:*10* 94:*3*
**concerning** 72:22 129:8
**conclusion** 40:22 75:*1*
**conduct** 46:22 81:23 84:*11, 12*
**conference** 8:*23*
**confide** 58:7
**confidential** 97:*11*
**confused** 87:*17* 105:9
**confusing** 49:*5*
**connection** 68:5
**consider** 54:9 78:*16* 96:*20*
**consideration** 22:2 96:*4*
**considered** 18:*19* 74:22
**considering** 15:*13*
**consisted** 29:*10, 12, 13*
**constitute** 120:2
**constitutes** 129:*13*

**construction** 65:9
**construed** 95:5
**contacted** 89:6
**contagious** 21:8
**context** 16:*19* 65:8, 9 96:24 102:9 111:22 118:9, *14, 15, 19, 24* 119:2, 6, 19* 120:*14, 15*
**continue** 127:9
**continued** 35:22 55:7
**continues** 36:*16*
**contract** 78:*19*
**contracts** 78:*19*
**contractual** 38:*1* 87:*21*
**conversation** 23:*3, 5, 9* 84:*1, 2* 108:20
**COOK** 1:*10, 18* 4:5 5:7 20:*1, 18, 21* 105:*23*
**cool** 27:*23* 88:*12*
**Corcoran** 6:*23*
**C-o-r-c-o-r-a-n** 6:*23*
**corner** 105:*23*
**correct** 5:24 9:*10* 11:6 13:22, *23* 14:*12* 15:*12, 13* 16:9 17:*13* 19:8, 9 22:5 28:*12* 30:*16* 31:5, 6 32:8 33:*15* 34:*3, 20* 35:*3* 36:23 40:*13* 41:*17* 42:22 44:7, *16* 45:*16* 46:*1* 47:9 48:*15, 20* 49:8, 9, *11, 16, 19* 55:*13, 16, 24* 61:*19, 20* 63:*10, 24* 64:2, 3, 11, 12, 21* 65:7 66:*19* 69:*10, 11* 71:7, 8, *11* 74:*17, 18, 21, 23* 75:6 79:2, *10* 82:18 83:9, *23* 84:*1* 86:21 87:9 89:20 92:*13* 93:*10* 95:22 98:22 100:20 102:1, *21, 22* 103:7 104:7, *15, 16* 105:24 106:*3,*

21 107:*14, 20, 24* 109:*23* 112:*18* 114:*1* 115:*15* 116:8, *20* 118:*3, 17* 120:*3, 11, 22* 121:5, *24* 123:9 124:*1, 8, 21* 125:2, *11, 18* 126:4, *10, 11, 13*
**corrected** 61:22 84:*17*
**correctional** 11:*10*
**correctly** 22:6 81:*24*
**correspond** 46:8
**counsel** 6:*14, 16* 8:24 90:*1* 91:*14, 19* 92:*1, 16* 96:23 105:*11* 115:4 129:18, 19*
**counseling** 83:4, *23* 85:6 86:6 87:*23* 89:6, 8, 13, 14*
**COUNTY** 1:*10, 18* 4:5 5:7 16:*4, 5* 18:5 19:2, 4 20:*1, 12, 18, 21* 21:*1, 2* 105:*23*
**County-issued** 82:9
**County's** 125:*8*
**couple** 12:*11* 26:22 99:5
**course** 27:*1, 12* 43:*3* 48:22 51:2, *3* 75:*14* 81:4, *11* 82:5 118:*20*
**COURT** 1:*1* 6:*8, 17* 9:*15, 17, 18, 20* 11:5, *10, 17* 27:*18, 19* 79:6 101:*3, 7, 9, 12, 15*
**Courtroom** 9:*20* 10:*11*
**coworkers** 41:*13*
**crabby** 66:*16*
**credentials** 26:6
**creed** 41:*11* 99:*19*
**crooks** 112:7
**CSR** 1:*24* 129:*3*
**currently** 6:22 7:*4, 6*

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1301 of 1503 PageID #:1692

CV 4:*6*
CV-05726 1:*9*

< D >
DAFFADA 2:*17*
daily 55:*10*
Dan 17:*23*
danger 108:*9*
DART 1:*11* 32:*21*
data 13:*13* 29:*21*
date 89:*8*
daughter 22:*12*
DAVID 1:*6* 57:*22*
58:*1, 4, 11, 22*
day 18:*6* 21:*14*
31:*3* 32:*17* 47:*16*
65:*16* 127:*19* 130:*2*
days 6:*4* 19:*1*
21:*14* 22:*2* 35:*6, 9*
38:*7* 46:*20* 53:*9,*
*12, 13* 63:*21* 124:*1*
DCSI 27:*15* 32:*20*
dealing 43:*9* 53:*17,*
*19* 67:*5* 82:*14*
dealt 84:*10* 85:*16*
86:*7*
decide 81:*3*
decided 81:*1*
de-deputized 76:*20*
deem 29:*10*
deemed 11:*23*
82:*12* 84:*15*
defendant 4:*4* 5:*6,*
*10* 70:*13*
Defendants 1:*19*
2:*15, 21* 40:*8, 18*
68:*21* 112:*7*
defendant's 39:*24*
defenses 40:*1* 72:*22*
definitely 25:*1*
121:*20*
degree 8:*10*
demeanor 67:*9*
dental 8:*17*
deny 40:*18* 68:*21*
denying 40:*19*
dep 127:*16*
department 7:*8*
8:*13, 20* 9:*10, 14*
26:*23* 31:*9* 32:*19,*
*21* 36:*10* 74:*19*

75:*9, 15* 76:*5* 77:*2,*
*11, 18* 78:*5* 92:*17*
95:*11*
dependent 39:*5*
84:*7* 90:*22*
depends 89:*24*
DEPONENT 128:*7*
deposition 1:*21*
3:*10* 4:*4, 6, 19, 22*
5:*3, 15, 24* 127:*22*
129:*10, 15*
depositions 6:*3*
deputies 11:*11*
33:*20*
deputy 9:*15, 17, 19*
10:*12* 11:*5, 18*
14:*3, 20, 21, 24*
15:*1, 4, 5* 22:*22*
23:*1* 26:*2, 4, 6, 15*
27:*9, 12* 28:*7, 11,*
*15, 20, 24* 29:*1*
31:*7, 10, 13, 14, 16,*
*18, 24* 32:*2, 7, 8*
33:*4, 6, 7, 8, 9, 12,*
*13, 16, 17, 21, 24*
34:*2, 4, 11, 15, 16,*
*18, 24* 35:*1, 4, 6, 8,*
*12, 14, 17* 36:*4, 8,*
*23* 37:*10, 15, 16, 19*
38:*15* 42:*20* 45:*15*
49:*15* 55:*16, 19*
56:*3, 10* 61:*15, 17,*
*19, 20, 22* 64:*6, 11*
71:*6, 9* 79:*12, 22*
82:*16, 20* 99:*14*
100:*21* 122:*17, 19*
derogatory 118:*2*
121:*12*
describe 11:*21*
13:*2, 24* 15:*19*
18:*7* 28:*23* 29:*6*
43:*22* 46:*3, 15*
50:*14, 15* 52:*8*
54:*7, 11, 22* 57:*7*
60:*24* 61:*12* 62:*11*
64:*4, 13, 23* 65:*24*
72:*23* 73:*24* 77:*4*
122:*11*
description 126:*7*
detailed 108:*24*

determining 13:*11*
develop 16:*24*
devices 29:*22*
dictate 84:*12*
difference 30:*21, 23*
90:*9, 10, 15*
different 6:*4* 32:*22*
33:*14* 48:*13, 19*
49:*7, 10* 62:*19*
63:*20* 67:*10, 11*
80:*9*
difficult 66:*2, 3, 12,*
*15, 19, 22* 80:*20*
difficulties 8:*23*
digressing 41:*15*
direction 13:*14*
29:*22* 129:*13*
directive 105:*2, 3*
directly 53:*24* 72:*9*
129:*20*
director 11:*3*
14:*24* 15:*1, 2, 3, 4,*
*6, 7, 9* 22:*22* 23:*1*
27:*7, 10, 12, 13, 15*
69:*20, 22, 24* 70:*1,*
*3, 5, 7*
disability 7:*6, 8, 9,*
*11, 13, 15* 70:*23*
71:*18, 19, 23* 86:*11*
discharge 82:*10, 11,*
*12, 13*
discharges 90:*13, 14*
disciplinary 84:*4*
86:*20* 87:*8, 16, 19*
89:*18* 123:*19, 22*
124:*19* 125:*1*
126:*3, 9, 15*
discipline 76:*24*
82:*17, 22* 83:*2, 13*
84:*13, 20* 85:*7*
86:*8, 15* 87:*22, 24*
113:*22, 23* 123:*16,*
*22* 125:*9*
disciplined 88:*24*
discovery 4:*4*
103:*17* 105:*11*
discretion 89:*19*
90:*5, 19*
discriminate 77:*7*
discriminated 77:*23*

discrimination 75:*8,*
*12, 20* 77:*2, 6*
79:*20* 80:*13, 15*
99:*16, 24* 102:*20*
104:*6* 112:*24*
113:*3, 7, 12*
discuss 83:*8*
discussions 56:*2*
disease 21:*8*
dispatch 12:*22, 23*
13:*3* 21:*4, 13*
29:*10, 12, 16* 32:*5,*
*16* 34:*4, 5* 35:*21*
37:*2* 48:*14* 53:*20*
64:*17*
dispatching 29:*17*
dissolved 32:*21*
DISTRICT 1:*1*
9:*16*
divided 69:*7*
DIVISION 1:*2*
document 23:*15*
40:*10, 12* 70:*15*
82:*21, 23* 84:*16*
100:*16, 17, 23, 24*
102:*7* 103:*22*
104:*2, 18, 19, 20, 24*
105:*6, 10, 16* 111:*5*
122:*6* 125:*6*
documents 103:*16,*
*21*
doing 4:*13* 12:*5, 6,*
*7* 35:*23* 41:*12*
49:*6, 14* 65:*17*
76:*2* 118:*23*
drink 54:*20*
drinks 54:*14, 21*
57:*5* 58:*9, 15*
driving 38:*8*
drugs 82:*3*
due 7:*15*
duly 4:*2* 129:*7*
dumb 112:*1* 118:*19*
duties 9:*18* 11:*21*
13:*3, 7* 28:*24*
31:*23* 35:*19, 20*
76:*21* 108:*3*
duty 7:*6, 9, 11, 13*
13:*16, 17, 22* 47:*16*
71:*22* 82:*2, 3, 6*

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1302 of 1503 PageID #:1693
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

83:*10* 84:*10* 86:*11*
101:*4, 10, 16* 107:*23*
**dynamic** 17:*13*
**dynamics** 6:*3*

**< E >**
**earlier** 16:*23, 24*
29:*17* 48:*13* 72:*6*
98:2 107:*13* 109:*19*
**early** 21:*17* 46:22
55:*1* 61:*14* 62:*18*
**east** 20:*5*
**EASTERN** 1:2
**effort** 110:*5*
**eight** 17:*4* 119:*11*
**either** 46:*13* 95:*11*
108:*13*
**elaborate** 49:2
65:*4* 66:*17*
**electronic** 10:2
11:*4, 24* 20:24
22:*23* 53:*18* 109:*1*
**eliminated** 32:*24*
55:*15, 20, 23*
**EM** 10:*6* 11:*13*
12:*9* 22:*15* 33:*14*
34:*8* 50:*14* 68:*19,
24* 69:*16, 20* 70:*14*
71:*7, 10* 101:*6*
109:*3* 115:*17*
117:*11*
**e-mail** 39:2 106:*20*
108:*16*
**EMERY** 2:*11*
**employed** 7:*5*
**employee** 44:*7, 8*
53:*1* 58:*23* 60:*9*
84:20 129:*17, 18*
**employees** 30:*3*
79:*13* 94:*18* 119:*3,
5*
**employment** 5:*4*
8:*16* 41:*5, 6* 118:*16*
**EMU** 72:*21*
**encounter** 80:22
**endearment** 117:*19*
**ended** 10:*13* 52:*14*
**enforcement** 16:*19*
17:*13* 65:*8*
**entailed** 29:*7*

**entire** 28:*19* 66:*5*
94:*1* 104:*2*
**entirety** 103:*22*
**entitled** 127:*6, 18*
**entity** 66:*7*
**environment** 55:*10*
114:*18, 22, 24*
**equal** 72:*12*
**equally** 72:*11*
**equipment** 12:*4*
13:*10* 48:*4* 82:*9*
**error** 60:*7*
**escape** 90:*11*
**essentially** 9:*21*
35:*23* 47:*9, 24*
55:*3, 9, 15* 64:*16*
66:*7* 122:*15*
**established** 16:*17*
**estimate** 12:*15*
**ETHAN** 2:*11*
36:*19* 38:23 39:*11*
67:*13* 93:24
**evenly** 20:*11*
**event** 46:*21*
**events** 91:*23*
**everybody** 38:2
66:*12* 127:*17*
**evidence** 98:9
**ewhite@emerylawltd
.com** 2:*14*
**exact** 4:*23* 5:*21*
12:*10* 23:*5*
**exactly** 5:*18* 13:*7*
108:22
**EXAMINATION**
3:*1* 4:*11* 129:*7*
**examined** 4:*9*
**example** 83:*11*
85:*1* 109:*21*
**examples** 81:*18*
**excellent** 60:*10*
**exception** 34:*23*
**excluded** 77:*8*
**executive** 15:*4, 6, 7,
8* 27:*7, 9, 14* 69:*20,
22, 23* 70:*3, 5, 7*
**exemption** 85:*14*
**exemptions** 88:*5*
**Exhibit** 3:*10* 38:22
39:*9* 68:*12* 72:*2, 3*
100:*3* 102:*4* 103:*9,*

*13* 106:*6* 110:*17*
111:*3* 122:*2, 3*
127:*2*
**exist** 20:*16*
**experience** 20:*6*
79:*13*
**explain** 8:*20* 9:*18*
14:*10* 23:*3* 26:*3*
40:*19* 66:*4* 94:*13*
115:*2* 117:*20*
**extent** 40:*21* 55:*2*
104:*2* 127:*19*

**< F >**
**facility** 9:*20*
**fact** 60:*2* 92:*7*
**factors** 18:*12, 18*
**facts** 98:*9* 115:*2*
**failed** 126:*12*
**fair** 5:*23* 10:*13*
17:*7* 19:*15* 21:*3*
33:*14* 36:*1, 2* 45:*8*
52:*16* 74:*3, 4*
123:*13*
**fairly** 20:*6* 23:*14*
24:*5* 47:*6* 62:*4, 5,
13* 63:*1* 89:*10*
99:*19* 117:*18*
**familiar** 5:*23* 19:*1,
3, 23, 24*
**far** 92:*8*
**fashion** 121:*12*
**favor** 125:*8*
**February** 7:*14*
71:*21*
**Federal** 4:*7*
**feedback** 36:*14*
**feel** 54:*1* 128:*4*
**fellow** 27:*8* 44:*13*
48:*7* 58:*9* 59:*14*
79:22 88:*9*
**fellows** 59:*9*
119:*13* 121:*13*
**felt** 5:*20* 67:*7*
**Ferg** 57:*5, 10, 19*
**FERGUSON** 1:*5*
56:*21* 57:*2, 8, 15*
98:*3* 101:*3*
**field** 29:*18* 46:*6*
**figure** 102:*16*

127:*19*
**file** 68:*9* 125:*18*
**filed** 40:*1, 13*
41:*16, 20* 60:*3*
97:*8, 10, 11* 114:*20*
115:22 124:*24*
126:*23*
**filing** 78:*17* 125:*15*
**fill** 10:22 23:*16*
82:*17* 86:*20*
**filled** 47:*8, 12* 48:*9*
89:*18* 123:*7*
**filling** 49:*18*
**find** 48:*5, 6, 10*
118:*23*
**fine** 7:*3* 27:*24*
110:*24* 127:*10*
**finish** 6:*7*
**finished** 6:*16*
**firearm** 82:*11, 12*
90:*13*
**FIRM** 2:*5*
**first** 6:*13* 9:*13*
31:*14* 35:*15* 47:*20*
48:*1* 83:*3, 21, 22*
97:*4* 105:*20*
**fit** 127:*21*
**five** 5:*12, 16* 25:*19*
45:*11* 89:*12* 127:*7,
11*
**five-minute** 110:*23*
**follow** 87:*18* 88:*2*
**following** 90:*11*
**follows** 4:*10*
**foregoing** 129:*10*
**forgot** 39:*12*
**form** 10:*7* 17:*14*
18:*14* 22:*19* 23:22
30:*5* 47:*3* 48:*23*
50:*18* 51:*7, 15*
52:22 55:*17* 56:*5*
65:*1, 19* 79:*15*
82:*17, 22, 24* 83:*14*
84:*4* 85:*7, 9* 86:*5,
20, 22, 24* 87:*9, 11,
16, 20, 24* 89:*18*
96:22 97:*18* 98:*8*
99:*17* 108:*1, 10*
111:*19* 118:*4*
119:*12* 120:*4*
123:*19, 22* 124:*20*

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1303 of 1503 PageID #:1694

125:2, *19* 126:*4, 9,
15, 18*
**formal** 86:*5* 89:*8*
**formally** 23:*10*
89:*18*
**former** 68:*3* 72:*21*
**Fort** 17:*23*
**forth** 17:*2* 46:*10*
48:*11* 88:*8*
**forward** 24:*15*
25:6 66:*14* 84:*16*
**found** 68:*8*
**foundation** 18:*14*
19:*17, 19* 26:*11*
43:*4* 47:*3* 51:*7*
55:*17* 56:*12* 66:*23*
75:2 79:*3, 15*
81:*21* 82:*24* 84:*6*
85:*9* 86:*22, 24*
87:*11* 95:*14* 97:*18*
98:*8* 99:*17* 104:*22*
106:*23* 107:*10*
108:*10* 109:*13*
111:*19* 112:*19*
114:*2* 118:*4* 119:*4*
120:*23* 125:*19*
**Four** 5:*16* 21:*18*
22:2 33:*19, 22*
34:*16* 35:6 76:*8, 9*
88:*15* 90:6 127:*18*
**fourth** 124:*10*
**frame** 34:*21* 43:*16*
86:*16*
**frames** 28:*17*
45:*13* 50:7 62:*18*
71:*1*
**Frank** 17:*23*
**Fred** 35:*10*
**friend** 54:*9*
**friendly** 116:*2*
119:*18*
**friends** 62:*8*
**friendship** 54:*16*
59:*16*
**fugitive** 33:*8* 34:*15,
23* 48:*15, 17*
**function** 30:*22*
53:*18* 55:*3*
**functions** 46:*7*
**further** 13:*12* 128:*7*

< G >
**garbage** 89:*15*
**gender** 41:*11* 77:*9*
**general** 26:*23*
74:*20* 105:*1*
**generate** 80:*7*
**generated** 13:*9*
**gentleman** 80:*24*
**gentlemen** 82:*5*
98:*14* 121:*13*
**getting** 8:*19* 28:*11,
20* 36:*13* 43:*9*
59:*12*
**gist** 116:*7*
**give** 5:*3* 12:*15*
30:2 34:*21* 44:*5*
47:*12* 62:*17* 81:*18*
92:*3, 20* 93:*5* 95:*8*
99:*4* 113:*8, 14, 24*
**given** 4:*18, 21* 12:2
18:*1* 26:*5* 47:*2*
79:*1* 113:*2, 18*
118:*7* 129:*14*
**giving** 5:*24* 6:*3*
30:*11* 46:*12, 16*
65:*17*
**glasses** 40:*2*
**go** 7:*21* 8:*4, 6, 7*
9:*9* 12:*4* 14:*4*
15:*24* 23:*23* 37:*8*
40:2, *3* 41:*23*
47:*19, 20* 48:*4, 6*
49:*20* 58:*21* 62:*9*
69:*4* 75:*16* 85:*19*
87:*1* 88:*20* 95:*16*
102:*4* 103:*3*
105:*19* 106:*7, 13*
111:*10* 122:*9, 21*
123:2, *8* 127:*11*
128:*3*
**God** 117:*9*
**goes** 87:*23* 103:*19*
**go-getter** 26:*20*
**going** 4:*3* 6:*5*
13:*4, 8, 9* 14:*4, 14,
18* 17:2, *3* 18:*24*
19:*15* 27:20, *22*
38:*9* 39:*23* 41:*22*
45:*12* 46:*21* 49:*2*
50:*20* 54:*15* 58:*8,

16* 65:*3, 11* 68:*11,
15* 69:*1, 15* 75:*20*
80:*4* 83:*10* 86:*12*
88:*17* 89:*8* 93:*19*
96:*24* 118:*24*
121:*21* 122:*3, 5, 8,
21* 123:*10* 127:*16*
**good** 23:6 26:*21*
27:*17* 28:*16* 42:*12*
44:*5, 7, 8* 45:*13*
52:*10, 12, 17* 53:*1*
56:*18* 57:*5, 13, 17,
19* 58:*21, 23* 60:*8*
62:*5* 66:*10* 73:*23*
74:2, *3* 83:*11* 85:*1*
89:*10* 90:*4* 98:*20,
21*
**gossip** 51:*6*
**graduate** 7:*24*
**graduated** 8:*3* 9:*12*
**great** 39:*10* 56:*19*
58:*5* 59:*10* 68:*13*
98:*4* 123:*4*
**greet** 118:*10*
**Greg** 114:*22*
**GREGORY** 1:*13*
69:*19*
**grew** 7:*20*
**grievance** 60:*3*
78:*17, 20, 24* 125:*1,
5, 15, 18* 126:*23*
**grievances** 59:*24*
**ground** 6:*2*
**group** 22:2 32:*17*
**groups** 21:*15*
**grow** 7:*19*
**guess** 33:*12* 65:*24*
66:*16* 78:*12* 87:*16*
94:*11, 20* 95:*7*
97:*15*
**guidelines** 6:*19*
**gun** 81:*1*
**guy** 26:*20* 88:*6*
89:*11, 13* 119:*19*
**Guys** 27:*17, 19*
28:*1* 37:*14* 50:*12*
54:*19* 55:*11* 88:*14*
89:*12* 100:*14*
103:*16* 110:*23*
121:*14* 122:*8*

125:*22* 128:*5*

< H >
**half** 28:*17*
**Hall** 1:*23* 129:*3*
**hand** 14:*5* 46:*23*
118:*22* 130:*1*
**handcuffing** 90:*12*
**handle** 46:*10*
102:*23*
**handled** 44:*1, 2*
83:*18* 97:*12*
**hands** 118:*11*
**hands-on** 64:*23*
65:*4, 6, 10*
**Hang** 122:*9*
**happen** 13:*24*
76:*15* 82:*22*
**happened** 23:*4*
32:*19* 37:*18* 63:*11*
76:*17* 83:*10* 95:*12*
97:*2* 112:*10, 18*
117:*8*
**harassed** 77:*24*
**harassment** 75:*8,
12, 20, 21* 77:*11, 14,
15, 18* 79:*20* 80:*5,
9* 99:*16, 23* 104:*6,
18* 105:*7* 106:*3*
120:*2*
**hard** 66:*4* 98:*13*
100:*14*
**head** 35:*13*
**heads** 80:*6*
**hear** 51:*5, 13* 94:*8,
17* 96:*3* 111:*21, 24*
112:*6, 12, 15* 114:*4*
**heard** 10:*14, 15*
51:*11* 93:*14* 94:*14,
17* 95:*6, 9, 19*
101:*5* 111:*13, 16,
22* 112:*20* 117:*11,
13, 16, 17* 119:*6*
121:*4, 8, 11*
**He'd** 86:*1*
**held** 9:*13* 15:*12, 17*
38:*19* 96:*8*
**helpful** 39:*2, 4*
**helps** 36:*14*
**HERBERT** 2:*5*

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1304 of 1503 PageID #:1695

hereto 129:*20*
hereunto 130:*1*
hey 85:*19, 20, 23* 88:*7, 9* 103:*8* 119:*19* 127:*3*
hierarchy 14:*10*
high 7:*21* 8:*3*
highest 29:*14*
highlighted 40:*6*
hired 8:*20* 9:*7*
hits 12:2 15:*22, 24*
hold 19:*18* 86:*23*
holidays 50:*24*
home 29:*21*
Hometown 6:*24*
honest 60:*17* 70:*9* 78:22 85:*17* 94:*17* 117:*4* 123:*23*
honestly 4:*23* 10:9 11:*19* 20:*13* 23:24 25:*14* 35:*11* 39:*12* 41:*12* 65:*10* 70:24 76:*3* 80:*8* 85:*18* 88:*3* 91:*17* 102:*14* 114:*20* 115:*18* 116:*23* 117:*18* 126:*16, 19*
hope 128:*4*
hopefully 127:*20, 21*
hoping 27:*18*
hostile 114:*17, 21, 24*
hour 24:*20* 46:*22*
hours 17:*4* 24:*20* 43:*13* 61:*3* 64:*18* 73:8, *12* 96:*5, 6, 7, 10, 11* 119:*11* 127:*18*
house 13:*10*
houses 15:*24*
Hudson 35:*11*
huge 75:*21*
hugging 118:*11*
hundred 92:*14* 121:*17*
hundreds 90:*2*
hurt 59:*12*

**< I >**
I.V 1:*4* 53:*2, 3, 4,* 7, 8, 11, 23
ID 3:*10*
idea 97:*16* 104:*23*
identified 107:*8*
identify 18:*4* 66:*21* 72:7 81:*17*
ill 52:*14*
ILLINOIS 1:*1, 18, 24* 2:*7, 13, 19* 6:24 8:*18* 130:*2*
impact 41:*2*
impersonal 50:*17*
importance 107:*14*
important 16:*20* 17:*5, 13*
inappropriate 120:*1, 8*
Inaudible 8:*22*
incarcerated 5:*21*
incentive 24:*13*
incident 101:2 107:*9* 124:*14*
incidents 15:*22, 23* 95:*8*
include 81:*24*
included 34:5 82:*1*
inconsistent 94:*3*
inconsistently 79:*14, 16*
increase 24:*18*
independent 76:*1* 102:*18*
indicated 16:*23* 24:6 33:*3* 87:*12*
indicates 87:*15* 107:*21*
indicative 19:*14*
indirectly 129:*20*
individual 85:*18*
Individually 1:*12, 14, 15, 17*
influence 82:*2*
inform 104:*11*
informal 83:*4* 86:*4*
information 72:*21, 23*
infraction 80:*23* 83:7 84:*8, 9* 86:7 90:*23*
infractions 82:*1, 4, 14* 84:*11, 14, 15*

in-house 91:*14, 18* 92:*1, 6, 8, 16*
initiate 82:*21* 83:*1* 113:*21, 23*
injured 38:*17* 71:*13*
injuries 7:*16, 17*
inmate 5:*20* 90:*10*
inmates 11:*24* 12:*3* 13:*10*
in-service 75:22 76:*19*
instance 88:5 113:*16* 115:*13*
instances 88:*13* 114:*8* 119:*17*
instituted 76:22
intended 118:*12*
intent 23:*13, 20* 78:*18, 19*
interact 57:*12*
interaction 43:*2, 6, 16, 18* 45:5 51:*3, 18* 53:*9, 14* 62:*1, 20* 63:*1*
interactions 43:22 46:*3* 52:*16, 17* 53:6 54:22 57:7 58:*13* 60:24 62:*11* 63:4 64:*14*
interchangeable 30:*21*
interest 23:*13* 24:*4*
interested 22:*23* 23:8 26:*24* 38:*9* 129:*20*
interesting 21:*10*
interim 37:9 86:*12*
Internal 83:*18* 84:*16, 18* 92:*6, 8*
interpreting 29:*21*
interrogatory 81:*16* 91:*23* 93:*10, 20* 94:*2, 3, 7, 12* 99:7 118:*12, 23*
Intervention 32:*20*
interview 10:*23* 113:*8, 15*
interviewed 10:*24* 92:*5, 7* 97:*13*

112:*23* 113:*11* 114:*10, 24*
investigation 91:*15* 92:2 112:*21* 116:*8*
investigator 10:2, *12* 11:*14, 21* 14:*12, 13* 22:16 24:*10, 14* 25:*17* 26:*19* 42:24 43:*1* 83:6 85:*23* 86:*21* 89:*3* 115:*17, 19* 118:*21, 22*
investigators 16:*16* 21:*12, 23* 29:*11* 30:*3* 32:*11* 37:*20* 43:*14* 49:*8, 10* 53:*10, 14* 82:5 96:*7, 16* 117:*24*
involved 5:*2* 65:*13, 16* 91:*15*
irregardless 99:*19*
issue 41:6 89:*4, 5* 122:*15*
issued 75:24 76:24 126:*4*
issues 33:*1* 38:*11* 59:*12, 18, 19* 60:6 73:*18* 120:*10* 127:*15*

**< J >**
Jack 11:*1, 2*
jail 46:7 66:*9*
Jefferson 2:*6*
Jessie 35:*10*
Jim 85:22 118:22
job 7:*16, 17* 12:*16* 49:*15* 52:*21* 55:*9* 56:*18, 19* 57:*18, 19* 58:23 71:*13* 113:*21*
Joe 27:*8*
John 35:*11* 126:*18*
joking 26:8 94:*16*
JOSEPH 1:*12* 61:7 68:*23*
JR 1:*5*
judges 20:*23*
judicial 20:22
jump 27:*17*
juncture 30:*19* 32:23 61:*14* 66:2

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1305 of 1503 PageID #:1696
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**June** 71:*13*, *20*
107:*6*
**JUSTIN** 2:*17*
100:*10* 127:*14*
justin@ilesq.com
2:*20*

**< K >**
**keep** 36:*13* 66:*14*
80:*4* 84:9 86:*10*
122:*7*
**KELLY** 2:*5* 100:*7*
103:*8* 127:*3*, *17*, *23*
kelly.krauchun@dan
herbertlaw.com 2:*8*
**Kendall** 21:*1*
**kid** 25:*5*
**kind** 17:*7* 41:*15*,
*22* 49:*5* 50:*16*
51:*5*, *12* 55:*24*
85:*7* 95:*9*
**knew** 38:*10*
**know** 4:*23* 5:*9*
6:*5*, *11* 10:*21*, *24*
11:*19* 17:*1* 19:*22*
20:*3*, *4* 21:*1*, *17*
24:*20* 25:*6*, *14*
26:*18*, *19*, *20*, *21*, *24*
27:*14*, *20* 29:*11*
32:*9*, *12* 36:*18*
38:*3* 39:*5* 41:*19*,
*23* 44:*1*, *3*, *15*, *18*,
*20*, *21*, *23*, *24* 45:*2*,
*11* 46:*9*, *19* 49:*21*
50:*3*, *12*, *21*, *24*
51:*24* 52:*13* 53:*3*,
*4* 54:*3*, *10*, *14*, *16*
56:*21* 57:*22* 58:*16*,
*18* 59:*1*, *14*, *21*, *22*
60:*6*, *12* 61:*7*, *9*
62:*15* 63:*11*, *14*
65:*10* 66:*8* 67:*12*
68:*8* 69:*3* 74:*15*
76:*18* 77:*14* 78:*1*
80:*8*, *10*, *11* 81:*16*
83:*6* 84:*20* 86:*2*,
*10*, *12*, *14* 87:*24*
88:*3*, *4*, *7* 89:*2*, *4*, *6*
90:*6*, *8*, *16* 91:*7*, *14*,
*15*, *17* 92:*7* 93:*3*,
*12*, *21* 94:*19*, *20*

96:*24* 97:*1*, *2*, *10*,
*11*, *13* 98:*11*, *14*, *15*,
*16* 99:*3*, *12* 100:*6*
101:*21*, *23* 102:*12*,
*14* 103:*15*, *19*
104:*24* 105:*1*, *5*, *12*,
*13*, *15* 106:*11*
109:*2* 110:*22*
111:*8*, *22* 113:*17*
115:*19*, *21* 116:*13*
118:*8*, *9* 119:*7*, *13*,
*19* 120:*10*, *14*, *16*
121:*9*, *14*, *16*, *18*, *22*
122:*6* 124:*16*
126:*7* 127:*5*
**knowledge** 18:*11*,
*18* 47:*1* 50:*11*
68:*20*, *21* 97:*7*
**known** 45:*4* 52:*3*
54:*5* 56:*23* 58:*1*
59:*4* 60:*14*
**KRAUCHUN** 2:*5*
3:*1* 4:*3*, *12* 9:*1*, *8*
10:*10* 17:*15* 18:*15*
19:*6* 20:*7* 22:*20*
24:*8* 25:*15* 27:*2*,
*16* 28:*1*, *4*, *5* 30:*7*
36:*17* 38:*21* 39:*2*,
*7*, *14*, *17*, *22* 40:*23*
43:*21* 47:*7* 49:*4*
51:*4*, *10*, *16* 52:*23*
55:*21* 56:*8*, *14*
65:*5*, *22* 67:*1*, *13*,
*22* 68:*11*, *14* 69:*8*,
*12*, *14* 70:*10*, *12*
71:*2*, *4* 72:*1*, *5*, *17*,
*19* 73:*2*, *16* 74:*5*, *7*
75:*4* 79:*11*, *18*
81:*14* 82:*15* 83:*20*
84:*22* 86:*17* 87:*6*,
*14* 90:*17* 91:*1*, *3*, *5*,
*10*, *12* 92:*22* 93:*1*,
*8*, *23* 94:*5* 95:*20*
97:*3*, *19* 98:*18*, *23*
99:*1*, *6*, *21* 100:*2*, *4*,
*9*, *12*, *15* 102:*3*, *5*
103:*1*, *4*, *10*, *15*, *24*
104:*3* 105:*8*, *19*, *21*
106:*5*, *9* 107:*1*, *12*
108:*5*, *14*, *21*
109:*10*, *17* 110:*7*,

*17*, *19*, *22* 111:*3*, *6*,
*23* 112:*16*, *22*
113:*13* 114:*11*
116:*9*, *15* 117:*6*
118:*13* 119:*22*
120:*9*, *19* 121:*2*
122:*2*, *4*, *10* 124:*3*,
*5*, *9*, *11* 125:*20*, *24*
126:*2* 127:*1*, *4*, *10*
128:*1*

**< L >**
**labeled** 72:*2* 102:*17*
**labor** 37:*10*, *11*
**lack** 66:*15* 68:*21*
**lacked** 68:*20*
**language** 80:*21*
95:*9* 117:*15* 118:*17*
**larger** 50:*16*
**LaSalle** 2:*18*
**lasted** 14:*8*
**late** 43:*10* 52:*11*
82:*8* 90:*7*
**latest** 67:*18*
**LAW** 2:*5*, *11*
16:*19* 17:*13* 65:*8*
**lawsuit** 91:*21*, *24*
92:*5*, *13* 97:*16*
**learn** 10:*6* 97:*4*
112:*3*, *9*, *18*
**leave** 88:*11*
**left** 28:*6* 38:*4*, *5*
50:*8*
**left-hand** 105:*23*
**legal** 40:*22* 75:*1*
**LEGRAIN** 1:*2*
41:*23*, *24* 42:*2*, *5*,
*10*, *15*, *21*, *23* 43:*3*,
*19*, *23* 44:*6*, *9*, *11*,
*12*, *19* 46:*5*, *13*
48:*8*, *10* 97:*8*
106:*16*, *20* 107:*3*, *9*,
*18* 108:*17* 109:*21*
**Legrain's** 42:*13*
**LEINENWEBER**
2:*17* 100:*7*, *10*
**letter** 23:*12* 38:*13*
**level** 57:*4* 97:*12*
**License** 1:*24*
**lie** 98:*6*, *15*
**lieu** 101:*10*, *13*, *16*

**lieutenant** 108:*24*
122:*17*, *23* 123:*18*
124:*20*
**lieutenants** 122:*16*
**life** 54:*15* 58:*8*
**light** 66:*14*
**light-duty** 71:*21*
86:*13*
**LIMITED** 2:*11*
53:*10*, *15* 62:*13*
63:*2* 99:*12*
**line** 14:*15* 48:*6*
**lines** 13:*12* 26:*18*
82:*10* 115:*5*
**list** 12:*3*
**litigation** 5:*2*
**little** 6:*4* 33:*10*
39:*20* 86:*13* 109:*15*
**live** 6:*22*
**lived** 19:*13* 20:*3*
**LLC** 2:*17*
**located** 21:*4*, *20*
**log** 36:*15*, *19*
**Logan** 38:*6*
**logistically** 13:*15*
21:*4*, *20*
**Logue** 27:*8*
**long** 5:*14* 7:*12*
9:*22* 12:*8* 25:*16*
27:*19* 28:*14* 36:*3*
38:*15* 44:*18* 45:*4*
52:*3* 54:*5* 56:*23*
58:*1* 59:*4* 60:*14*
61:*9* 115:*4*
**longer** 20:*16* 32:*10*
33:*6* 34:*20*, *22*
86:*14*, *15*
**look** 39:*4* 47:*21*
88:*9* 96:*2*, *17*, *20*
100:*5* 102:*9*, *21*
104:*5* 112:*13*
**looked** 15:*19* 41:*10*
**looking** 56:*10*
67:*13* 85:*2* 88:*8*
92:*21* 103:*8* 104:*11*
**looks** 102:*10*
**loosely** 118:*7*
**lost** 20:*18*
**lot** 28:*1* 33:*2*
66:*11* 127:*5*

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1306 of 1503 PageID #:1697
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

lowest 124:7
lunch 54:13 67:15

< M >
ma'am 5:11 6:20
28:9 30:10 31:19
36:24 40:14 41:18
42:8, 14 44:17, 23
45:17 46:2 49:12
52:18 56:1 57:16
58:12 60:23 61:8
63:10 64:22 65:14
66:20 74:24 75:18
78:3 82:19 83:24
95:23 100:1
102:24 104:8
106:1, 4 109:4
111:15 113:16
115:16 116:18
121:6 122:1
Main 118:21
maintaining 82:8
major 83:17 84:15
114:8
majority 12:19
making 6:14, 16
66:11 80:8 109:19
man 98:16 119:20
manner 86:4
MANNING 1:6
map 18:24 32:13
37:21, 22
Marist 7:23 8:1
MARKED 3:10
matter 39:3 48:22
60:2 92:10 113:4,
6, 7
matters 129:9
MCGHEE 1:7
59:1, 17 60:8
mean 11:9 17:2
18:24 19:21 20:1,
14 27:4 41:4, 12
49:1, 6, 13 53:15
54:12 58:18 66:3
67:12, 16 73:18
77:14, 15 78:14
80:13, 17 81:10, 13
82:5, 10 83:2 84:8
85:21 89:2 90:1,
15, 16 94:10, 16

95:2 97:12 98:12
99:18 103:20
110:6 113:16, 21
119:17 120:17
meaning 59:22
74:3 76:20
means 65:7 77:22
95:11
meant 67:23
medical 82:8 88:16
127:15
meet 54:17, 19
member 37:23
members 27:5
37:14 79:2 88:1
memorandum
23:13, 20 24:5
memory 115:5
mentioned 51:11
mentioning 60:3
Merchanson 44:13
messages 13:9
met 45:14
Michael 10:18 23:2
MICHELLE 1:4
49:22 50:1
middle 111:8, 9
midnight 24:23
midnights 11:22
12:9 24:23 42:24
Midwest 2:12
mind 7:1 21:14
86:10 93:2
mine 122:8
minuscule 59:22
minute 41:15
92:20 100:5
minutes 14:8
67:17 88:11 127:7,
11
missed 76:19
misstated 93:20
misstates 25:10
81:8 89:21 90:20
95:15 109:24
116:4, 21
mistaken 24:3, 21
27:11 53:11 76:18
moment 92:3
110:21
monitor 61:16

monitoring 10:3
11:4, 24 12:22
13:1, 6, 10 20:24
21:19, 20, 24 22:23
26:15 29:2, 5, 8, 9,
12, 13, 20, 22 32:3,
5, 7, 16 33:6 34:1,
2, 5, 6 35:21 37:2
48:14 53:17, 18
55:8 61:15, 18, 23
62:3, 19, 23 63:9,
14 64:17 109:1
month 50:6
months 34:22 50:6
90:6
Moraine 8:8
morning 24:24
motivates 98:11, 16
move 10:1, 5 25:6
26:18 68:11 98:23
moved 11:3 63:8,
13, 14 69:17
moving 56:20
multiple 33:16
music 118:7, 15

< N >
name 4:15 49:23
68:6 112:4
named 5:6, 10
27:8 44:13 67:24
117:16
narrative 111:5
124:16
nature 5:17, 21
23:18 45:18 46:9
60:1, 18 93:18
NEAL 1:15 46:18
67:6, 11 70:13, 22
72:8, 14 73:6, 13
Neal's 96:6
need 6:10 88:20
needed 13:12 123:7
needs 127:19
negative 63:3
negligent 82:12
never 35:20 41:10
45:21 53:24 55:9
56:9 76:17 80:17
81:5 87:3 93:17
100:17, 23 105:10

111:16, 22 113:2
119:6 120:6, 7, 15,
21 121:5, 15, 23
125:14
new 14:7 20:6
NEWSON 1:5 53:2
Newson's 53:23
Nichols 47:22
night 38:8 44:5
57:13 58:21 88:10
nondisciplinary
83:4
nonsense 55:7
normal 51:5
North 2:18 19:1, 3
20:5
NORTHERN 1:1
20:5
note 121:15
notes 92:21
notice 2:2
NUMBER 3:10
4:23 48:11 100:8,
11, 12 122:12
numbered 82:4
numbers 16:6 44:5
48:3
numerous 4:24
76:23 86:4 113:18
117:13

< O >
Oak 2:13
Object 10:7 17:14
22:19 23:22 40:21
48:23 50:18 51:7,
15 65:1, 19 69:1
93:19 108:1
objected 74:15
Objection 18:14, 21
19:17, 18 25:10
26:11 30:5 43:4
47:3 52:22 55:17
56:5, 12 66:23
75:1 79:3, 15 81:8,
21 82:24 84:6
85:9 86:22, 24
87:10 89:21 90:20
93:21, 24 95:14
96:22 97:18 98:8
99:17 104:22

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1307 of 1503 PageID #:1698
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

106:23  107:10
108:10, 18  109:9,
13, 24  111:19
112:14, 19  113:10
114:2  116:4, 12, 21
118:4  119:4  120:4,
12, 23  125:19
**objections**  6:15, 16
86:23  99:10
**Obviously**  6:3
29:23  41:16  67:8
127:6
**occasion**  47:10
49:17  51:9
**occasions**  46:14, 15
47:11  114:9
**occur**  80:16  84:3
**occurrence**  124:4
**October**  130:2
**odd**  20:14
**offended**  119:15
**offense**  119:21
**offensive**  111:18
118:2, 17, 20  119:3
120:2
**offer**  50:20
**office**  8:17  21:6, 7
55:10  62:16  65:16
80:18  81:7  122:15
**officer**  14:5  84:23
85:4
**officers**  11:10
18:19  82:6  104:10
**Official**  1:11, 13, 14,
16, 17
**Oh**  11:9  16:2
24:24  25:18  31:17
50:14  65:14  117:9
122:8, 14
**Okay**  5:9, 14, 17
6:2, 21  7:10, 12, 15,
21  8:9, 19  9:12, 22
10:4  11:13, 20
12:8  13:2, 6  14:14,
18  15:11  16:7, 10,
13  17:18  20:20
21:19  22:3  25:16,
21, 24  26:3  28:10,
14, 19, 23  29:6
30:11  31:4, 7, 17,
20, 23  32:6  33:10,

17, 21, 24  34:7, 17
35:1, 8  36:3, 7, 21
37:4, 7, 22  38:14,
18, 21  40:4, 8, 15,
17  41:8, 22  42:20
44:18, 21  45:7, 18,
21  47:11, 19  48:12,
17, 21  49:13, 20, 24
50:10, 14  51:17, 20
52:8  53:2  54:22
55:14, 22  56:2, 17,
20  58:20  62:1
63:19, 23  64:1, 4, 7,
13  65:15, 23  68:3,
17  69:12, 19  70:2,
6, 10, 18, 21  71:2,
12, 15, 24  72:3, 4,
17, 20  73:17, 21
74:10, 14, 19  75:11,
19  76:9, 12  81:15
82:20  83:21  84:3
85:13  86:1  88:12,
19  89:7, 12, 14
90:5  91:2, 8, 9, 22
92:11, 15, 20  93:7,
9, 12  94:22  95:7,
24  96:19  97:15, 23
99:5, 10  100:2, 14,
22  101:2, 9, 12, 19
102:3, 6, 15, 23
103:11, 24  104:9,
14, 17  105:13, 19
106:5, 18  107:8, 13,
16, 22  108:15
109:18  111:11, 24
116:19  122:7, 9
124:13, 19, 24
127:1, 8
**old**  21:8  68:9
**omit**  103:20
**omitted**  103:13
**once**  9:12  12:9
31:24  34:17  37:22
38:14  55:14
**one-day**  83:15
**ones**  15:23  34:8
79:19
**one's**  77:19
**online**  76:5, 11, 21
105:5

**onwards**  99:14
**open**  24:2
**opened**  38:3
**operational**  66:11
**operations**  29:2
**opinion**  41:9  50:21
66:9  88:1  98:13
118:19  119:1
120:17
**opportunity**  10:6
**opposed**  26:4
**OPR**  80:7  83:18
84:19  92:6, 7, 12
97:12, 13  104:12
113:3, 9, 11, 15, 19,
24  114:10, 14, 17
116:8
**options**  125:11, 12
**oranges**  67:9
**order**  105:1, 3
123:14
**ordered**  123:2
**orders**  26:23  74:20
**orientation**  77:9
**outcome**  125:4
126:14  129:21
**outside**  20:21  54:17
**overly**  74:16  81:17
99:11
**oversaw**  29:2
**oversee**  31:4  65:13
**overseeing**  29:3
**oversight**  39:11
**overtime**  101:17

**< P >**
**P000025**  106:8
**PAGE**  1:5  39:18
54:2, 3  55:24
56:17  57:3  68:13
72:4  74:6  102:16
104:9  105:20
106:7, 14  124:10
126:1
**pages**  80:20
103:12  104:1
**paid**  28:21  31:24
33:11  37:16
**pain**  127:6
**paper**  23:7  26:20

30:24
**paperwork**  44:4
**paragraph**  39:19,
20  40:5, 20  96:1
106:15  111:8, 9
**part**  11:6, 14  37:19
94:11  98:13
104:11  111:5
113:21
**participated**  102:12
**particular**  18:24
31:3  49:3  85:17
115:13  122:16, 20
**particularly**  20:15
**parties**  79:1  129:19
**partner**  15:22
16:13, 14, 20  17:12,
19, 21  42:13  44:9,
12, 14  47:21  48:5
58:11  107:14, 19,
24  109:7, 22
**partnered**  44:12
45:22  52:6  57:14
60:21
**partners**  14:6
17:22  44:19  55:2
108:9  109:12
110:12, 15
**party**  83:6
**passed**  55:5
**patrol**  11:23  12:13,
17, 21, 23  13:16
15:16  16:15  17:18
22:4  32:8, 15  33:4,
7, 18  42:24  48:14
49:8  68:19, 23
69:6  70:16
**pay**  24:18  28:12
31:13, 16
**payrolls**  32:22
**peer**  73:5
**peers**  24:4  41:13
117:19, 21
**pending**  6:12
**people**  21:1, 18
30:12  48:18, 21
50:24  65:18  76:19
81:11  98:21
117:13, 16  118:10
119:10
**percent**  92:9, 14



Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1308 of 1503 PageID #:1699

**Perfect** 7:4, *18*
38:*14* 68:*10* 70:*18*
71:*24* 72:*18* 92:*20*
128:*2*
**perfectly** 70:*9*
78:*22* 85:*17* 94:*17*
117:*4*
**performance** 52:*21*
53:*23*
**performing** 55:*3*, *8*
**period** 16:*17* 69:*3*
**permanent** 7:*7*
**person** 17:*1*, *5*
30:*15* 67:*10*, *12*
76:*6*, *7*, *17* 77:*7*
80:*7* 82:*21* 91:*16*
98:*12* 109:*20*
**personal** 51:*17*
53:*6* 54:*15* 57:*4*
58:*6*, *8* 59:*15* 62:*6*
115:*7* 116:*10*
118:*18* 129:*12*
**personally** 19:*23*
41:*1* 54:*10*, *11*
58:*5* 85:*22* 94:*14*
95:*6*
**personnel** 93:*14*
**pertains** 120:*24*
**pertinent** 80:*21*
91:*20*
**pet** 8:*18*
**phone** 43:*8*, *19*
**phonetic** 17:*23*
27:*8*
**picking** 90:*8*
**place** 48:*1* 118:*16*
**placed** 21:*1*
**placements** 20:*23*
**plaintiff** 60:*4*
**Plaintiffs** 1:*8* 2:*9*
40:*9* 41:*19* 44:*16*
89:*5* 98:*3* 111:*13*
112:*1*, *4*, *7* 117:*16*
119:*24*
**please** 39:*18* 68:*12*
69:*13* 70:*11* 72:*3*,
*18* 74:*9* 85:*20*
89:*9* 91:*4* 92:*23*
93:*6* 98:*24* 99:*5*
100:*3* 102:*4*

105:*20* 106:*7*
111:*4* 122:*3*
**plug** 47:*17* 48:*5*, *9*,
*11*
**plugging** 66:*14*
**PO0O211** 100:*12*
**point** 29:*14* 45:*14*
63:*6*, *7*
**policies** 74:*16*, *22*
75:*8*, *10*, *12* 79:*14*,
*17*, *22*, *23* 80:*18*
81:*6*, *12*, *13*, *17*, *19*
90:*3*
**policy** 77:*2*, *5*, *11*,
*15*, *18*, *22* 78:*5*, *6*, *8*
80:*2*, *3*, *9*, *16*, *21*
81:*3*, *4*, *22* 82:*4*, *18*
86:*14* 87:*12*, *15*, *18*
88:*2*, *19*, *24* 101:*22*
102:*20*, *21* 103:*7*
104:*5* 105:*18*
109:*12*, *16* 110:*4*
**portion** 127:*21*
**posed** 73:*14*
**position** 9:*13*
10:*13*, *16*, *17* 22:*24*
23:*8*, *11* 24:*2* 25:*9*,
*21*, *24* 26:*16*, *24*
30:*20* 32:*2*, *24*
37:*2* 38:*18* 52:*20*
55:*20*, *23* 63:*9*
109:*21* 115:*7* 116:*2*
**positions** 33:*5* 38:*3*
**positive** 23:*14* 24:*5*
66:*14* 75:*24* 92:*9*,
*10*, *14*, *15*, *19*
**possibly** 28:*18*
105:*5*
**postpone** 127:*16*
**pounded** 75:*22*
80:*5*
**PowerPoint** 102:*10*,
*13* 105:*2*
**practice** 110:*9*
**practices** 74:*17*
**predominately**
53:*17*
**present** 73:*6*
**presented** 102:*13*
**pressure** 66:*5* 67:*8*

**Pretty** 13:*13* 20:*19*
37:*3* 53:*16* 58:*20*
78:*14*
**prevent** 99:*15*
**previous** 129:*6*
**prior** 33:*11*, *13*
43:*9* 55:*20* 57:*11*
58:*16* 59:*11* 97:*7*
**privy** 87:*3*
**Probably** 25:*23*
27:*16* 45:*11* 52:*4*
59:*21* 60:*15* 61:*11*
66:*16* 73:*11* 76:*7*
97:*6* 105:*4*
**problem** 62:*14*
78:*22*
**problems** 38:*8*
108:*9*
**Procedure** 4:*7*
90:*11* 101:*20*
**proceedings** 129:*14*
**process** 5:*24* 8:*21*
10:*23* 23:*16* 37:*24*
101:*20* 102:*2*
**produce** 126:*12*
**produced** 103:*18*, *23*
**professional** 42:*11*,
*12* 45:*20* 52:*10*, *13*
57:*4* 58:*6* 59:*10*
60:*20* 62:*4*, *5* 73:*23*
**professionally** 54:*10*
**program** 12:*1*, *4*
**progression** 24:*15*
**progressive** 83:*12*,
*13* 84:*13* 86:*8*
87:*22*, *23*
**promoted** 70:*4*
**properly** 82:*9*
**psychiatrist** 98:*17*
**psychologist** 98:*17*
**public** 90:*15*
**pull** 39:*19* 88:*6*
106:*6*
**pulled** 104:*17*, *18*
**punishment** 124:*7*
**pursuant** 2:*2* 4:*7*
**pushing** 13:*13*
29:*22*
**put** 47:*22* 48:*22*
78:*15* 108:*9*

109:*12*, *20* 111:*3*

**< Q >**
**quality** 51:*21* 52:*20*
**quantifiable** 25:*8*
**question** 6:*7*, *12*
8:*24* 18:*17* 47:*6*
49:*6* 50:*23* 62:*16*
67:*3*, *4* 73:*1*, *3*
74:*8*, *11* 77:*16*
79:*5* 88:*3* 90:*2*
91:*22*, *24* 93:*12*
94:*11* 95:*3* 96:*13*,
*14* 99:*9* 104:*4*
108:*6* 114:*4* 118:*6*,
*9* 121:*18*
**questions** 6:*6*
39:*24* 72:*9* 73:*10*,
*14*, *18* 104:*1* 120:*17*
**quick** 50:*8* 110:*23*
**quite** 59:*12* 66:*9*
71:*5* 116:*24*

**< R >**
**race** 41:*1*, *11* 77:*9*,
*19*, *24* 78:*11* 114:*13*
**racial** 93:*14* 94:*15*,
*24* 95:*9* 96:*20*
99:*15* 112:*24*
113:*3*, *7*, *12* 118:*3*
**racially** 120:*1*
**racist** 95:*5*
**radio** 43:*10*, *19*
46:*8* 57:*12* 58:*15*
61:*2*
**radios** 15:*21* 16:*10*
**raise** 28:*12*
**random** 12:*2*
**range** 90:*13*
**ranging** 82:*1*
**rank** 122:*18*, *19*
**RANZINO** 1:*12*
46:*18* 61:*7*, *9*, *13*
62:*2*, *7* 63:*8*, *13*
64:*2*, *14* 66:*18*
67:*5*, *10* 68:*18*, *23*
69:*15* 70:*16* 72:*6*,
*14* 73:*6*, *13* 96:*1*, *5*,
*6*, *11*, *15* 97:*5*, *9*
98:*6* 112:*12*

Christopher Rohloff - 9/15/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1309 of 1503 PageID #:1700

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Ranzino's** 64:7
**raw** 13:13 29:21
**react** 17:3
**read** 9:3, 5 40:16
74:8 79:6, 9 91:6,
11 95:21, 24 96:14,
15 97:6 99:2
103:5 106:10
111:7 114:7
124:15 126:6
**reading** 93:3 94:9
100:14 104:19
106:12
**reads** 70:15
**ready** 91:9 125:22
**really** 17:12 19:14
20:3 25:4 30:21,
23 36:19 39:11
51:22 53:24 76:18
80:10 89:19 94:21
115:8
**reason** 68:22 69:21
70:2, 13 88:16, 17
98:5 103:16
**reassigned** 96:12
**recall** 10:9, 11, 14
23:13 24:1, 3, 7
25:20 27:3 34:13
35:11 36:6 47:23
50:7 53:8 56:16
60:16 70:4, 8, 23,
24 75:13, 19 82:14
92:3 95:24 97:24
100:24 107:9
108:16, 19 125:4
126:14, 17, 21
**receive** 24:18 75:11
**received** 25:8
**recognize** 40:9
100:16
**recollection** 76:1
102:11
**recommendation**
123:21
**reconvene** 128:6
**record** 4:15 6:9, 17
9:4 28:4 69:2
79:8 103:14, 21
114:6 129:13
**records** 32:15 33:7

63:16, 17
**reduced** 129:12
**refer** 33:12 111:16
**reference** 73:4
81:3 86:15 94:15
105:6
**referenced** 80:16
108:16
**referencing** 84:9
108:20
**referring** 94:19
117:22
**refresh** 115:5
**refusal** 124:1
**refused** 123:8
**refusing** 123:14
**regard** 20:23 81:20
**regarding** 20:24
78:5 85:13 92:1,
12, 17 97:13
112:23 114:17, 21,
22
**regards** 5:4, 18
101:3 104:6 125:1
**regular** 16:14, 20
17:12, 19, 22 44:9
110:8
**related** 5:5 7:16,
17 59:13 77:19
95:18
**relationship** 16:24
17:8 42:9, 11, 12
45:19 52:9, 11, 13
54:7 57:1, 6 58:3,
6, 7 59:7, 11 60:19
61:12 62:5, 6
73:21, 23 89:10
115:8 116:11, 14
119:12
**relationships** 16:17
73:20 98:4
**relative** 129:17, 18
**relevant** 69:3
**relied** 18:12
**religion** 77:9 99:19
**religious** 85:14
88:16
**remainder** 127:16
**remaining** 127:21
**remember** 5:21
9:1 10:15 11:12

12:10, 18 16:3
18:23 20:13, 14, 15,
19 21:11 22:6, 10,
12 23:5, 6, 9 24:1,
4, 5 25:14 26:14
27:4, 9 28:16
32:23 33:3 35:13
38:4, 5, 12 43:8
49:23 51:19, 22
59:23 60:5, 15
61:10 69:17, 18
75:21, 23 80:20
81:23 89:3 102:8
114:20, 21 115:9,
18, 19, 23 117:1, 4,
10 123:23 124:22
**remembering**
124:17
**reminders** 76:23
**REMOTE** 2:4
129:10, 15
**remotely** 2:9, 15, 21
**rep** 59:11
**Repeat** 18:17
**report** 13:21 72:10
104:21 118:19
**reported** 72:11, 13
99:24 120:21
121:5, 23 129:11
**Reporter** 1:23 6:8,
17 79:6 129:4
130:6
**REPORTER'S**
129:1
**reporting** 63:4
66:8 104:6
**representative** 83:5
89:7
**reprimand** 83:14
124:4, 7
**reps** 89:10
**request** 109:6
**requested** 9:5 37:6
79:9 114:7
**requesting** 37:8
**requests** 110:5
**required** 48:12, 18
75:15 76:12 80:2,
11 87:19
**requirements**
110:16

**requires** 87:16
104:5
**resolve** 59:18 60:5
**resolved** 59:12
60:7 89:2
**respond** 6:8 74:14
**responded** 66:13
**response** 72:18
73:1 81:15 91:11,
14 93:6 94:13
**responsibilities**
26:5 32:3 64:17
104:10 123:6, 11
**responsibility** 82:17
**responsible** 29:15,
16, 17, 21 30:11
31:3 46:12
**rest** 16:5 128:4
**restraints** 66:6
**retaliated** 125:14
**retaliation** 78:1, 5
79:20
**retired** 24:3 26:14,
16 70:22, 24
**retrospect** 25:2
**review** 122:6
**reviewed** 40:12
**revolver** 76:21
**Richard** 4:16
**Rickey** 23:2
**rid** 32:21
**ridicule** 94:16
**right** 7:9 15:15
16:8, 11 28:8 32:9
35:2 39:8 48:19
49:7 50:5 55:12
56:18 57:21 61:7
74:6, 20 79:1 87:7
98:21 102:23
103:9 106:14
109:7, 12 110:9
123:5 125:18
**Road** 2:12 6:23
**Robert** 106:20
107:4 108:22, 24
**ROHLOFF** 1:16,
21 3:1, 10 4:4, 8,
13, 16, 18 68:1, 4
100:19, 21 128:3
**R-o-h-l-o-f-f** 4:17
**Rohloff's** 127:22

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1310 of 1503 PageID #:1701

role 9:23 10:1 22:14, 18 25:17 26:9, 10 28:7, 20 29:7 31:4, 8 32:3 36:9 38:16 53:16 55:7, 15, 24 56:4, 10 64:4, 7

roles 31:23 34:19, 22 35:18 37:1

roll 13:20, 21 14:1, 8 15:12, 18 43:11 46:23 47:2, 9, 12 49:16 96:2, 4, 7, 9, 16 97:17 112:13

roster 47:14, 15 48:5 49:7, 14 109:20 110:10

rotation 21:16, 17 22:1

roughly 12:16 22:4, 8 37:18 42:4 44:18 45:7 63:11 109:2 117:7 121:7

ruled 37:11 125:7

Rules 4:7 6:2, 19 81:23 84:12

rumblings 112:20

running 90:7

runs 66:10

< S >

safely 105:16

safety 14:5 90:15

SAITH 128:7

salaried 31:16

salary 24:11 26:6

Sam 54:3, 9, 17, 23, 24 55:5, 7, 23 56:3, 9, 17, 19 57:3

SAMUEL 1:5 54:2

saying 23:6 48:7 50:12 90:16 94:23 95:1 105:9 122:16

says 40:16, 18 72:20 94:4 104:11, 14 105:23 106:2 107:3, 5 118:19 124:4

Schaumburg 20:4

school 7:22 8:3

screen 39:6 68:12

scroll 39:14, 16, 18 68:13 69:13 70:11 71:3 72:4, 17 73:2 74:5 91:3, 10 92:22 103:1 111:4 122:7 124:3, 9 125:24

se 16:4 43:1

search 5:5

second 21:22 31:12 34:10 35:16, 17, 18 36:4, 8 63:23 124:4 126:1

secondly 85:15

section 29:9 32:14 33:14 34:10, 12, 15 69:6 106:10 123:3

sections 32:10 33:16 34:8, 19 69:7

security 9:20

see 26:13 36:15 39:20 40:5 43:19 47:16 58:19 68:16 72:20 91:13 94:22 100:18 104:9, 10, 11 118:9, 21 122:14 124:12 126:18

seeing 100:24

seen 41:16 100:17, 23 102:6 105:10, 14, 15 125:6

seizure 5:5

semantics 24:1

send 38:23 39:7

sense 66:1

sent 106:20 107:6

sentence 93:6

sentences 99:5

separated 34:19, 23 48:16

September 2:1 127:20

sequential 103:12

sequentially 103:19

serious 84:11 86:6

serve 25:16 28:14

services 9:15, 17, 18 10:12 11:5, 10, 18 32:15 34:12 123:3

set 130:1

seven 25:19

sex 99:19

sexual 75:21 77:8, 15 80:5, 9

shake 118:11, 21

share 54:14

shared 50:24

shave 84:24 85:5, 13, 14, 15, 18, 19, 24 86:3, 6, 21 88:5, 12, 14, 18, 20, 23 89:12 126:12

shaved 86:1, 2 89:13

shaven 85:20, 24

shaving 88:5 89:4, 5

Sheahan 10:18

sheets 49:7, 15 109:20

SHERIFF 1:10 4:5 10:18 32:21 105:23 115:8 116:3, 11

sheriff's 7:8 8:13, 20 9:10, 14 31:9 36:10 74:19 75:9, 15 76:5 77:1, 5, 10, 18 78:4 80:18 81:7 92:17 95:10 103:7 122:15

SHIELDS 1:13 69:20 70:3 114:22 115:15 116:10, 20 117:3

shift 30:18 32:16 33:9 34:24 36:11 37:8 43:9, 13, 20 44:4 46:11, 18 50:4, 5 55:1 57:13 58:20 61:3 62:21 63:22

shirt 80:24

Shoe 85:22, 23

Shoe's 118:22

shoot 27:20, 21 81:1

short 28:2 66:6 67:20 111:1 127:12

Shorthand 1:23 129:4 130:6

shortly 32:18

show 82:7 124:22

showed 89:13

showing 82:7

side 19:2, 3, 4, 5, 11, 23, 24 20:1, 2 106:14

sider 19:7

significantly 15:14

silent 110:21

similar 57:3, 9 59:9

simply 32:16 34:24 36:11 69:24 84:16 88:14 110:4

sincerity 85:19

sit 14:2 47:14, 15 83:8 119:11

sitting 65:15

six 21:18 22:2 25:18, 19 34:22 45:11 89:12

slang 117:15

SLAUGHTER 1:7 60:11, 12

slightly 35:24

slot 47:20, 22 48:2

slow 109:14 114:3 122:9

small 50:15, 23

Smith 106:20 107:4 108:17, 23, 24 122:17 124:20

social 51:2

socializing 41:13

solidified 27:14

solve 78:21

son 67:24

soon 128:6

sorry 7:2 18:17 24:22 30:8 31:11 35:17 38:5, 23 39:17 52:24 56:15 57:21 58:17 61:21 67:2 73:2 75:5 88:10 91:10 93:6, 23 94:7 97:20 100:9 102:16 103:2 106:13

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1311 of 1503 PageID #:1702

107:2 110:20
125:21, 22 126:1
**sort** 23:15 67:7
99:23 119:12
**South** 2:6 19:4, 5,
7, 11, 23, 24 20:1, 2,
6
**speak** 19:22 43:7
51:20 86:4 91:18
92:1, 16
**speaking** 13:15
21:20 108:17
**specific** 18:3, 20
20:8 35:2 80:21
88:4 91:24 92:4
95:8, 12, 18 104:1
105:17 109:6
**specifically** 15:15
40:15 41:4 59:19,
21 62:22 73:18
75:19, 23 79:19
99:13 111:12
**specifics** 23:9 60:5
115:9
**specified** 129:16
**speculate** 87:2
**speculation** 85:10
87:11 98:9 106:24
108:11 111:20
116:12 120:13, 17
**spend** 17:4 119:11
**spent** 25:3 26:22
**split** 107:19, 24
110:12, 15
**splitting** 108:8
**spoke** 92:12
**spoken** 97:9
127:14, 17
**spot** 48:11
**SPR** 122:11 124:12
**SPR16-1723** 122:12
**squad** 15:20 16:8
55:2 81:2
**staff** 29:20 32:5
66:8 88:1
**staffing** 66:6
110:16
**stamped** 103:2
106:8
**stamps** 103:11

**stand** 61:22 84:17
**started** 45:5
**starters** 32:11
**starts** 87:22
**State** 1:24 4:15
80:4 129:4
**statement** 96:21
112:21 113:24
114:14, 17
**statements** 93:15
113:2, 18
**STATES** 1:1 68:18
83:5
**status** 27:18
**statutes** 20:24
**stay** 38:2
**steady** 107:14
**stem** 78:19
**stemmed** 126:17, 20
**stenographically**
129:11
**step** 14:11 22:11
83:21, 22
**steps** 81:20 99:15
**stereotypical** 93:15
94:16
**steward** 52:12
**store** 8:18
**story** 21:22
**Street** 2:6, 18
43:17 118:21
**stress** 67:8
**stressed** 66:16
**STRICKLAND** 1:4
49:22 50:1 51:12,
18
**Strictly** 45:20
60:20
**strike** 18:10 26:7
63:7 101:13
107:16 123:16
**strongly** 80:6
**structure** 122:18, 20
**stuff** 51:12
**style** 66:1
**submit** 23:17
101:17
**subpoena** 101:4, 7,
10, 13, 16, 17
**suburbs** 20:5

**suit** 5:22 94:15
96:12 117:17
**Suite** 2:6, 12, 18
**summarizing** 105:17
**summary** 105:3
**superior** 73:5
**supervised** 30:12
53:24
**Supervising** 14:13
22:16 24:9, 14
25:17 26:18 66:1
**supervision** 32:4,
20 55:4 65:17
66:13 74:4
**supervisor** 14:16
22:11, 16 23:17
26:17 30:13, 14, 19,
20, 24 31:2 32:24
33:4 55:6, 15 56:4
61:24 62:2, 19, 23
64:21, 24 65:23, 24
74:1, 2 81:11 83:7
85:22 86:20 87:3
90:4, 18 96:19
104:14 105:13
113:20, 24 115:20,
22 116:19 117:4
118:1
**supervisors** 14:3, 9,
11 15:12, 17 18:12
29:3, 5, 12, 23 31:5
32:5 54:24 55:11,
14 66:19, 21 72:12
87:18
**supervisor's** 55:8,
20, 22 89:19
**supervisory** 93:13
**suppose** 25:8
114:23
**supposed** 12:5, 6
85:23 104:20
**Sure** 6:1, 8, 15
12:5 40:3 57:24
59:3 68:5, 9 75:13
77:12 95:3 107:7
127:8
**surrounding** 115:2
**suspense** 83:16
**suspension** 83:15
124:1 125:9, 10

**switch** 72:2
**switching** 38:10
**sworn** 4:2 129:8

**< T >**
**take** 6:9, 10, 13
15:21 22:14 27:17
48:1 61:21 78:9,
10, 12 96:3 99:15
100:5 102:3 105:6
106:5 109:22
110:17, 22 119:20
122:2 123:24
127:1, 7
**taken** 1:22 4:6
22:1 28:3 55:6
67:21 111:2
127:13 129:15
**talk** 27:4 58:8
59:15 88:15 127:8
**talked** 18:2 34:8
48:13 57:21 71:5
79:19 124:21
**talking** 15:15
27:12 28:7 49:21
59:20 90:15
108:16 113:6
118:14, 15 121:14
124:15
**tardiness** 82:1
**tardy** 82:6 83:10
84:9 90:5
**Taser** 82:13 90:14
**Teamsters** 32:12
**tech** 39:9, 17 40:5
**technical** 8:23
32:15 34:12 123:3
**telephone** 43:10
46:8 57:12 58:15
61:2
**telephones** 29:19
**tell** 5:1, 17 6:21
7:18 14:6 15:20
16:1 84:8 85:19
87:4 88:7, 15, 18,
19 108:22 113:14
114:12, 16 122:13,
22
**telling** 68:8
**temporary** 7:9, 11
71:17, 19, 22

Christopher Rohloff - 9/15/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1312 of 1503 PageID #:1703

**ten** 17:*4* 45:*8, 10, 12* 88:*11* 107:*20* 119:*11* 121:*10*
**ten-day** 125:*9*
**tendered** 105:*11*
**tens** 118:*6*
**Terel** 47:*22*
**term** 65:*6* 78:*1, 13* 94:*18* 96:*2, 20* 111:*14, 18* 115:*10, 13* 117:*17, 19* 118:*3, 10, 22*
**terminology** 16:*3* 18:*4*
**terms** 66:*15*
**tested** 9:*6*
**testified** 4:*10* 15:*11* 22:*3* 23:*21* 47:*8* 72:*6* 98:*2, 20* 107:*13* 109:*19* 116:*3*
**testify** 129:*8*
**testimony** 6:*18* 25:*11* 81:*5, 9* 87:*17* 89:*22* 90:*21* 93:*16* 95:*15* 100:*22* 110:*1* 116:*5, 22* 129:*14*
**text** 27:*21*
**thank** 15:*16* 57:*13* 73:*3* 89:*15* 91:*2, 11* 128:*5*
**Thanks** 28:*1* 58:*20*
**thing** 35:*24* 44:*3* 71:*12* 75:*22* 86:*5* 104:*24* 119:*7*
**things** 14:*5* 15:*14* 21:*2* 23:*18* 32:*9* 44:*2* 51:*1* 54:*14* 58:*7, 9* 59:*13, 15, 24* 73:*20* 82:*9* 86:*9* 87:*4* 88:*5* 95:*4* 97:*10*
**think** 13:*19* 16:*2, 24* 17:*5* 18:*2* 22:*9* 24:*2* 25:*18* 27:*16* 28:*6* 44:*2* 45:*10, 11* 48:*14* 52:*12* 53:*11* 58:*5* 59:*10* 60:*4* 67:*7* 71:*5* 73:*9* 78:*13, 18, 21*

**80:***9* 81:*22* 90:*4* 95:*17* 98:*15* 104:*20* 111:*17* 117:*2, 3, 7, 9* 118:*11* 121:*7* 124:*2, 17* 126:*16, 17, 19*
**thinking** 115:*21*
**third** 36:*11, 12, 22* 37:*5, 24* 38:*15* 42:*19, 21, 23* 45:*6, 24* 50:*2* 62:*21* 64:*2, 5, 8, 15* 68:*19, 24* 69:*10* 70:*17* 71:*7, 10* 72:*15* 126:*1*
**THOMAS** 1:*11, 15*
**thousand** 22:*9*
**thousands** 80:*19* 90:*3*
**three** 12:*10, 17* 22:*4, 7* 28:*18* 33:*19, 22* 35:*6* 46:*17* 64:*9* 72:*12, 15* 76:*8, 9* 86:*11* 88:*15*
**three-day** 83:*16*
**threw** 89:*14*
**tight-knit** 50:*16, 24*
**time** 6:*11* 11:*4, 22* 12:*1, 12, 19* 13:*18* 14:*2* 15:*14, 17* 16:*17* 17:*18* 26:*1, 17* 27:*7, 15, 17* 28:*17, 19* 29:*1, 4, 8* 31:*24* 32:*1, 10, 13* 33:*11, 13* 34:*16, 21* 35:*5, 7, 9, 12* 36:*7* 42:*20* 43:*16* 45:*13, 15, 22* 48:*3* 50:*5, 7* 51:*2, 3* 57:*11* 61:*17, 23* 62:*2, 13, 17, 24* 63:*5* 64:*5, 14, 16* 66:*4, 22* 67:*5* 69:*3, 5* 71:*1, 18* 75:*14, 15* 79:*12* 86:*16* 90:*5* 99:*12, 14* 100:*14* 101:*6* 112:*9* 114:*24* 116:*24* 121:*3, 17,*

**20** 122:*20* 127:*6* 129:*16*
**times** 4:*21, 24* 5:*9* 11:*11* 12:*11* 84:*18* 86:*5* 88:*15* 121:*7, 24*
**TIMS** 1:*4* 51:*24* 52:*1*
**title** 11:*2* 35:*24* 36:*9* 55:*6*
**today** 4:*13* 6:*18*
**told** 23:*20* 89:*7, 12* 122:*21* 123:*10*
**tolerate** 17:*6*
**Tom** 46:*18*
**tomorrow** 85:*20* 86:*1, 2*
**tool** 105:*17*
**top** 35:*13* 100:*18* 122:*12*
**tore** 89:*14*
**total** 7:*6, 11* 71:*22*
**tour** 13:*16, 17, 22* 101:*4, 10, 16* 107:*23*
**traffic** 27:*19*
**train** 90:*7*
**training** 75:*11, 16, 17, 20, 22, 24* 76:*2, 19* 90:*13* 102:*12* 105:*4, 17* 106:*3* 126:*20, 21*
**trainings** 76:*4, 10, 13, 16*
**transaction** 61:*2, 3*
**transcript** 129:*11*
**transfer** 37:*13*
**transferred** 36:*11* 37:*4* 43:*12* 45:*6* 50:*4*
**transgression** 90:*1*
**transitioned** 33:*5*
**treated** 99:*18*
**tremendous** 66:*5*
**tried** 66:*14*
**Triton** 8:*8*
**true** 129:*13*
**trust** 17:*8, 12*
**truth** 129:*8*
**try** 36:*19* 114:*3*
**trying** 22:*10* 25:*18* 26:*14* 33:*2* 43:*8*

**59:***22* 65:*12* 78:*21* 92:*3* 95:*7* 97:*15* 115:*4*
**TSS** 33:*8, 21* 48:*14* 49:*11* 123:*8*
**Tuesday** 2:*1*
**turn** 44:*4* 78:*20* 100:*3* 102:*15* 122:*3*
**Two** 12:*10, 17* 14:*3* 17:*22* 22:*4, 7, 9* 28:*17* 34:*11, 13, 14* 36:*5* 47:*22* 48:*11* 50:*6* 118:*10*
**two-day** 83:*15* 125:*9*
**type** 5:*1* 41:*2* 44:*3* 77:*14* 119:*7* 123:*16*
**types** 59:*19* 75:*16* 82:*13*
**typewriting** 129:*12*
**typically** 5:*5* 14:*8* 19:*2, 10* 22:*1* 43:*16, 18, 24* 46:*5* 47:*17* 53:*19* 57:*10* 76:*4* 80:*22* 84:*10* 87:*8* 89:*2* 96:*8* 110:*5* 121:*13*
**TYRONE** 1:*7* 59:*1, 2, 5, 8, 11, 17*

**< U >**
**Uh-huh** 16:*12*
**underlying** 91:*23*
**underneath** 30:*3*
**understand** 6:*18* 23:*21* 47:*5* 48:*24* 65:*6* 67:*2, 4* 74:*11, 16* 90:*16* 92:*11* 93:*9* 94:*6, 22* 95:*8* 97:*16* 99:*7, 9* 119:*9*
**understanding** 24:*17* 66:*10* 77:*5, 13, 17, 21* 78:*7* 79:*21* 84:*5* 94:*23* 102:*19* 116:*16*
**understood** 50:*8*
**unduly** 94:*12, 13* 95:*11* 99:*11*
**uniform** 25:*1*
**uniforms** 25:*4*

Christopher Rohloff   -   9/15/2020

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1313 of 1503 PageID #:1704

**union** 11:*6*, *8*, *15*,
*17* 33:*1* 37:*12*, *13*,
*14*, *20*, *23* 38:*13*
52:*11* 55:*7* 59:*11*,
*13*, *18*, *19* 79:*1*
83:*5* 89:*7*, *10*
**unionized** 37:*11*
**unions** 11:*11*
**unit** 10:*3* 11:*14*
22:*15* 26:*21* 27:*5*
32:*12* 48:*3* 50:*3*, *5*,
*8*, *15*, *16*, *17*, *24*
52:*4* 53:*18*, *21*
60:*16* 61:*11* 66:*5*,
*10* 68:*20* 69:*16*
70:*14* 71:*10* 101:*6*
109:*3* 117:*12*
**UNITED** 1:*1*
**units** 29:*18* 32:*22*
**unpaid** 125:*13*
**unrelated** 92:*10*
**unshaven** 126:*10*
**unusual** 68:*6* 109:*5*
**use** 83:*10* 90:*19*,
*22* 94:*18* 101:*9*, *15*
117:*12*, *17* 118:*10*
**usually** 18:*8*

**< V >**
**vacated** 26:*17*
**vacation** 46:*20*
**vacations** 21:*15*
**vague** 47:*6* 74:*15*
99:*11*
**vaguely** 49:*23*
117:*1*
**valid** 20:*3*
**Valley** 8:*8*
**varied** 18:*9*
**vehicles** 13:*5*
**Vernagus** 17:*24*
**VERNELL** 1:*4*
51:*24* 52:*1*, *3*, *4*
**VICTOR** 1:*7*
60:*11*, *12*, *14*, *15*, *19*
**video** 6:*5* 8:*23*
**violate** 79:*23* 81:*11*
**violated** 12:*1* 81:*19*
**violating** 81:*6*, *12*
**violation** 82:*18*

85:*7*
**violations** 13:*4*, *11*
**vision** 38:*8*
**voicing** 24:*4*
**vs** 1:*9*

**< W >**
**wait** 6:*7*, *15*
**WALKER** 1:*6*
35:*10* 57:*22*, *23*
58:*1*, *4*, *11*, *23* 98:*3*
**want** 26:*16* 27:*7*, *8*
29:*9*, *10*, *14* 44:*1*,
*12* 46:*9*, *10* 67:*14*
76:*22* 83:*22* 88:*14*
89:*11* 94:*10* 100:*5*
103:*13*, *21* 111:*12*
115:*10* 126:*6*
**wanted** 25:*5* 38:*6*,
*7* 68:*4*, *9* 72:*8* 81:*1*
**warrant** 85:*6* 87:*8*
**watch** 14:*17*, *19*
21:*12*, *24* 29:*13*, *24*
30:*17*, *18*, *19*, *22*
31:*1* 35:*2*, *4*, *15*, *16*,
*17*, *18* 36:*4*, *8*, *12*,
*22* 37:*5*, *24* 38:*15*
42:*16*, *18*, *19*, *21*, *23*
45:*6*, *24* 50:*3*
62:*21* 63:*19*, *20*, *23*
64:*2*, *5*, *8*, *15* 68:*19*,
*24* 69:*10* 70:*17*
71:*7*, *10* 72:*15*
**way** 26:*21* 33:*12*
66:*16* 78:*14* 112:*4*
117:*20* 118:*7*
**Webb** 35:*11* 126:*18*
**week** 127:*20*
**weird** 36:*13*, *19*
**well** 4:*14* 29:*16*
32:*10* 44:*22*, *24*
45:*2* 57:*6*, *20* 73:*8*,
*10* 78:*14* 80:*14*
83:*2* 103:*18*
107:*16* 119:*2*
124:*15*
**went** 10:*23* 11:*23*
15:*23* 36:*22* 37:*10*
63:*15*, *16* 64:*19*
70:*22* 71:*20*

110:*21* 125:*7*
126:*16*
**we're** 18:*24* 28:*4*
37:*21* 89:*7* 90:*15*
103:*9* 104:*10*
127:*15*
**west** 20:*5*
**We've** 27:*6* 52:*12*
54:*13* 57:*20* 71:*5*
80:*17* 103:*22*
119:*10* 127:*17*
**whatnot** 62:*17*
113:*22*
**WHEREOF** 130:*1*
**whistle** 78:*13*
**WHITE** 2:*11* 10:*7*
17:*14* 18:*14*, *21*
19:*17* 22:*19* 23:*22*
25:*10* 26:*11* 27:*24*
30:*5* 36:*13* 39:*1*, *4*,
*12* 40:*21* 43:*4*
47:*3* 48:*23* 50:*18*
51:*7*, *15* 52:*22*
55:*17* 56:*5*, *12*
65:*1*, *19* 66:*23*
67:*16* 69:*1* 75:*1*
79:*3*, *15* 81:*8*, *21*
82:*24* 84:*6* 85:*9*,
*12* 86:*22* 87:*10*
89:*21* 90:*20* 93:*19*
94:*1* 95:*14* 96:*22*
97:*18* 98:*8* 99:*17*
103:*8*, *11*, *18*
104:*22* 106:*23*
107:*10* 108:*1*, *10*,
*18* 109:*9*, *13*, *24*
110:*24* 111:*19*
112:*14*, *19* 113:*10*
114:*2* 116:*4*, *12*, *21*
118:*4* 119:*4* 120:*4*,
*12*, *23* 125:*19*
127:*3*, *5*, *11*, *14*
128:*6*
**wife** 52:*14*
**WILFORD** 1:*5*
56:*20*
**WILLIAMS** 1:*6*
44:*14*, *15*, *19*, *21*
45:*2*, *15*, *19* 46:*4*,
*13* 49:*21* 57:*20*

98:*4*
**window** 81:*2*
**WINSTON** 1:*2* 4:*5*
41:*23* 97:*8* 98:*3*
101:*3* 106:*16*, *20*
107:*4*, *9*
**WITNESS** 3:*1* 4:*1*,
*9* 9:*6* 10:*9* 18:*23*
19:*21* 23:*24* 25:*13*
26:*13* 39:*16* 43:*6*
47:*5* 49:*1* 50:*20*
51:*9* 55:*19* 56:*7*
65:*3*, *21* 69:*5* 73:*4*
79:*4*, *10*, *16*, *22*
80:*1*, *17* 81:*10*, *22*
83:*1* 84:*7* 85:*11*,
*13* 87:*2*, *12* 89:*24*
90:*22* 93:*5* 95:*17*
96:*23* 98:*11* 99:*4*,
*18* 100:*13* 102:*19*
104:*18*, *23* 107:*11*
108:*2*, *13*, *19*
109:*16* 110:*3*
111:*21* 112:*15*, *20*
113:*11* 114:*4*, *8*
116:*7*, *13*, *23* 118:*5*
119:*5* 120:*6*, *14*, *24*
122:*7* 128:*5* 129:*7*
130:*1*
**witnessed** 80:*12*, *14*
81:*6*, *11*, *19* 93:*14*
99:*23* 105:*7*
**woke** 88:*10*
**wonder** 85:*2* 127:*7*
**word** 31:*14* 94:*24*
117:*12* 118:*2*, *16*
119:*18*, *24* 120:*20*
121:*4*, *8*
**words** 97:*9*
**work** 5:*5* 23:*6*, *7*
26:*7* 27:*20* 36:*3*
42:*13* 45:*3* 49:*24*
51:*21* 53:*23* 54:*17*,
*23* 57:*8* 58:*14*
61:*1*, *13* 62:*9*, *12*
65:*9*, *13* 73:*20*
82:*7* 88:*11* 109:*6*
114:*17*, *22*, *24*
121:*14*
**workday** 107:*23*
108:*3*

Christopher Rohloff - 9/15/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1314 of 1503 PageID #:1705
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

worked  8:*17, 18*
  11:*22*  24:*1*  35:*7*
  42:2, *5, 21*  43:*14,*
  *15*  44:*10*  55:*9*
  59:*18*  64:*1*  119:*10*
worker  60:*9*
workers  98:*20*
working  8:*12*  21:*3*
  24:*21*  38:*19*  43:*17,*
  *18*  52:*10*  57:6
  61:*12*  66:*10*  89:*10*
  98:*14, 19*  107:*14*
workplace  51:6, *13*
  80:*10*  99:*16*
  120:*11, 21*  121:*4, 8*
works  67:*17*  86:*15*
worries  39:*12*
write  23:*12, 14, 20*
  84:*4*  87:*19*  123:*18*
writing  24:*5*  26:22
written  81:*12*  85:6
  89:*19*  101:*19*
  123:*13*  124:*4, 6, 20*
  126:*10*
wrongfully  5:*20*
wrote  38:*11*  126:*18*

**< Y >**
yeah  5:*8*  7:*17*
  14:*4, 7*  18:*6*  25:5
  27:*24*  36:*18*  38:*4,*
  *5*  39:7  42:*23*  44:*8*
  45:*12*  49:5  50:*23*
  53:*4*  57:5, *21*
  58:*20, 24*  59:6
  60:2, *3*  61:*4, 14, 20*
  67:*4, 16, 17, 18*
  70:8  71:*16*  74:6
  78:*14*  83:*1*  103:*15*
  106:*17*  108:6
  110:*24*  111:*10*
  113:*20*  117:2, *17*
  124:2, *17, 18*
  126:*13*  127:*4, 10*
year  7:*24*  22:12
  31:*20*  32:23  34:22
  36:*5*  68:*24*  117:7
yearly  75:*23*
years  5:*16*  12:*11,*
  *17*  20:*14, 17*  22:*4,*
  *7*  25:*19*  26:22

27:6  28:*18*  36:*5*
  42:*3, 4, 7*  43:*3*
  44:*11, 13*  45:*8, 10,*
  *11*  50:*22, 23*  52:5
  54:6  55:5  56:*24*
  58:2  59:6  61:*11*
  76:*8, 9*  86:*11*
  95:*10*  107:*20*
  118:6  119:*10*
  123:*12*
Yep  124:*23*
young  25:5  26:*19*

**< Z >**
zone  16:2, *3*  18:2, *3*
zones  20:*19*
Zoom  2:*1*

# Exhibit O

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1316 of 1503 PageID #:1707

1

           IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION
3

4    LEGRAIN WINSTON,              )
     MICHELLE STRICKLAND,          )
5    VERNELL TIMS, I.V.            )
     NEWSON, JR., SAMUEL           )
6    PAGE, WILFORD FERGUSON,       )
     CECIL WILLIAMS, ANTHONY       )
7    MANNING, DAVID WALKER,        )
     TYRONE MCGHEE and VICTOR      )
8    SLAUGHTER,                    )
                                   )
9          Plaintiffs,             )
                                   )
10         vs.                     ) No. 18-cv-05726
                                   )
11   SHERIFF OF COOK COUNTY        )
     THOMAS J. DART, in his        )
12   Official Capacity,           )
     JOSEPH RANZINO,               )
13   Individually and in his      )
     Official Capacity,           )
14   GREGORY SHIELDS,              )
     Individually and in his      )
15   Official Capacity,           )
     THOMAS NEAL,                  )
16   Individually and in his      )
     Official Capacity,           )
17   CHRISTOPHER ROHLOFF,          )
     Individually and in his      )
18   Official Capacity, and       )
     COUNTY OF COOK,               )
19   ILLINOIS,                     )
                                   )
20         Defendants.             )

21

22         The remote deposition of THOMAS NEAL,

23   taken in the above-entitled cause, before

24   Brenda S. Hall, Certified Shorthand Reporter of the

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1317 of 1503 PageID #:1708

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1    State of Illinois, CSR License No. 084-003359, on

 2    Wednesday, September 16, 2020, at 10:00 a.m., via

 3    Zoom, pursuant to notice.


 4


 5    REMOTE APPEARANCES:

 6              HERBERT LAW FIRM, INC.
                BY:  MR. DANIEL Q. HERBERT
 7                   MS. KELLY A. KRAUCHUN
                206 South Jefferson Street
 8              Suite 100
                Chicago, Illinois  60661
 9              (312) 655-7660
                dan.herbert@danherbertlaw.com
10              kelly.krauchun@danherbertlaw.com

11                   Appeared remotely on behalf of
                     Plaintiffs;
12
                LEINENWEBER BARONI & DAFFADA, LLC
13              BY:  MR. JUSTIN L. LEINENWEBER
                120 North LaSalle Street
14              Suite 2000
                Chicago, Illinois  60602
15              (866) 786-3705
                justin@ilesq.com
16
                     Appeared remotely on behalf of
17                   Defendants;

18              EMERY LAW LIMITED
                BY:  MR. ETHAN E. WHITE
19              2201 Midwest Road
                Suite 200
20              Oak Brook, Illinois  60523
                (630) 984-0339
21              ewhite@emerylawltd.com

22                   Appeared remotely on behalf of
                     Defendants.
23

24                   *    *    *
```



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
1                    I N D E X
    WITNESS                          EXAMINATION
2
    THOMAS NEAL
3
       By Mr. Herbert                        5
4

5

6

7

8

9
                  E X H I B I T S
10  NUMBER                          MARKED FOR ID

11  NEAL Deposition Exhibit

12     B                                67

13     C                                83

14     E                                95

15     H                               111

16     J                               123

17

18

19

20

21

22

23

24
```

Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1319 of 1503 PageID #:1710
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1        (Whereupon, the witness was
2        duly sworn.)
3    MR. HERBERT:  And good morning, Mr. Neal.
4    THE WITNESS:  Good morning.
5    MR. HERBERT:  My name is Dan Herbert, and
6 I am one of the lawyers representing the plaintiffs
7 in this case, and Kelly Krauchun is on here as well.
8      So let me ask you, have you ever
9 given a deposition before?
10    THE WITNESS:  Yes.
11    MR. HERBERT:  How many times?
12    THE WITNESS:  Maybe once or twice.
13    MR. HERBERT:  Okay.  Were they cases that
14 involved your employment with the Cook County
15 Sheriff's Office?
16    THE WITNESS:  No.
17    MR. HERBERT:  Okay.  I'll just go over a
18 couple of ground rules especially since we're doing
19 it on Zoom.  It makes it a little more problematic
20 for you, for me, kind of everybody.
21      But, you know, you can take a break
22 at any point that you want.  I would just ask that if
23 there's a question pending, that you answer the
24 question first, okay?

1    THE WITNESS:  Okay.
2    MR. HERBERT:  And then a big thing is we
3 obviously need to have verbal answers here because
4 the court reporter is transcribing it.  So I just ask
5 that, you know, you answer verbally as opposed to
6 with a shake of the head or things like that, okay?
7    THE WITNESS:  Okay.
8    MR. HERBERT:  And obviously if you don't
9 understand a question I've asked, feel free to ask me
10 again or have me ask the question again.
11      And also important, if I'm asking a
12 question and you can anticipate what the question is
13 and as humans we feel the need to jump in and give
14 the answer, I would just ask that you allow me to
15 finish the question and then give the answer so that
16 it's clear for the court reporter and everyone else.
17    THE WITNESS:  Okay.
18       THOMAS NEAL,
19 called as a witness herein, was examined and
20 testified as follows:
21      DIRECT EXAMINATION
22 BY MR. HERBERT:
23    Q.  Okay.  So, Mr. Neal, how old of a man are
24 you?

1    A.  67.
2    Q.  And are you retired from the Cook County
3 Sheriff's Office?
4    A.  I am, yes.
5    Q.  And where do you currently reside?
6    A.  The City of Chicago.  You need an exact
7 address?
8    Q.  I can get that from your lawyers.  We
9 probably have it anyways.  But are you a lifelong
10 Chicagoan?
11    A.  I am.
12    Q.  And where did you grow up, what
13 neighborhood?
14    A.  The south side of Chicago.
15    Q.  Where did you go to high school?
16    A.  I went to Parker.  I went to Brother
17 Rice.  I went to Cosmopolitan.
18    Q.  Okay.  And when did you get out of high
19 school?
20    A.  1969, I believe it was.
21    Q.  Okay.  What about your -- did you have
22 any family members that were employed with the Cook
23 County Sheriff's?
24    A.  I did.  My sister worked for the

1 sheriff's department.
2    Q.  Okay.  What did you do after high school?
3    A.  Military.
4    Q.  Okay.  Your sister, how long did she work
5 for the sheriff?
6    A.  She -- I'm not sure when she started, but
7 she just retired.
8    Q.  And what was her position when she
9 retired?
10    A.  Correctional officer.
11    Q.  Okay.  And you said you went to the
12 service, correct?
13    A.  Yes.
14    Q.  What years were you there, and what
15 branch were you in?
16    A.  Let's see.  Let me think back.  At
17 Kennedy-King College in 1969, and in 1970 I went into
18 the Air Force.  I was in the Air Force for about a
19 year and they moved me to the Air Force Reserve.  I
20 was there for about a year.  It was a school program,
21 so I was back in school, and that was about a year,
22 and then I went into the U.S. Army.
23    Q.  Okay.  And how long did you serve there?
24    A.  Oh, from probably '72 to 1980.  Then I



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1320 of 1503 PageID #:1711
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 8**

1  went into -- after that went into the Army Reserves.

2  Q. Okay. And how long were you in the

3  Reserves?

4  A. I've got 20 years of service so,

5  collectively.

6  Q. Okay. So are you still active with the

7  Reserves?

8  A. No, I'm retired.

9  Q. Okay. Did you receive honorable

10  discharges from either the Air Force or Army?

11  A. Every one of them.

12  Q. Good. Good for you. When did you start

13  working for the Cook County Sheriff's Office?

14  A. June 1988.

15  Q. And I see that you got out of the Army in

16  1980, and then you were in the Reserves, correct?

17  A. Correct.

18  Q. What did you do prior to joining the Cook

19  County Sheriff?

20  A. I was loss prevention manager for the

21  Zayre stores and Venture stores.

22  Q. And how long did you do that?

23  A. Well, when I came home from overseas in

24  the '80s, I went to work for them and I did that

**Page 9**

1  until I went into the sheriff's department.

2  Q. Okay. You weren't terminated from either

3  of those -- from any of those positions?

4  A. No.

5  Q. Great. And how is it that you came to

6  work for the sheriff's office? Strike that. That's

7  a bad question.

8  Did you apply to become a Cook

9  County Sheriff?

10  A. Yes.

11  Q. Okay. Why did you apply to be a sheriff?

12  Was that a goal of yours?

13  A. I've been in law enforcement my whole

14  life including military, so it was just an obvious

15  career.

16  Q. Okay. Did you have any friends or

17  mentors in the Cook County Sheriff's Department at

18  the time at which you applied to join?

19  A. Yeah, I knew people that were on the

20  sheriff's department.

21  Q. Did you know any supervisors on the

22  sheriff's department at the point that you applied?

23  A. Any supervisors?

24  Q. Yes.

**Page 10**

1  A. Yeah, I knew quite a few.

2  Q. Did you know the sheriff?

3  A. No.

4  Q. What supervisors did you know? What was

5  the ranked supervisor that you knew at the time you

6  applied?

7  A. Sergeant.

8  Q. Okay. And when you applied, how long

9  after that were you selected for employment,

10  approximately?

11  A. I believe two years.

12  Q. Okay. So what year? 1988 is when you --

13  did you go to the police training academy?

14  A. Yes.

15  Q. And what was your first assignment after

16  getting out of the academy?

17  A. Well, actually, I didn't go to the

18  academy for a year. I worked as a cadet in

19  Division 4, and after almost a year then I went into

20  the academy, and after that I went to RCDC receiving

21  and diagnostic center.

22  Q. I'm sorry. Can you say it again?

23  A. I said that was the receiving and

24  diagnostic center.

**Page 11**

1  Q. Okay. And so would this have been in

2  approximately 1989 when you went to the academy and

3  then went to RCDC?

4  A. Correct.

5  Q. Okay. And how is it that you were

6  assigned to RCDC?

7  A. I was -- I mean, that was my assignment.

8  Q. Did you request it, I guess is what I'm

9  asking?

10  A. No.

11  Q. They just assigned you there?

12  A. Yes.

13  Q. And tell me about that unit. What did

14  that unit -- what type of work --

15  A. That was intake for the jail. Everyone

16  that was processed into the jail had to come through

17  receiving and the diagnostic center to be -- you

18  know, get there, get booked in.

19  Q. Okay. How long did you work there?

20  A. I think it was about six months.

21  Q. And then what happened?

22  A. I was transferred to Division 4.

23  Q. Okay. And what were your duties in

24  Division 4, correctional officer?

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1321 of 1503 PageID #:1712
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

A.  I worked -- I worked a tier, a double tier where the officer's station was.  At the time they were overcrowded, so I had two tiers, maybe 40 to 50 to 60 people on each side.

Q.  Okay.  How long did you do that before you had some change in your employment?

A.  I did that -- you know what, I take that back.  I was doing that before I went to receiving when I was a cadet.

Q.  Okay.  You were working in Division 4 --

A.  And then I went to receiving, and from receiving I went to EM.

Q.  Okay.  So when did you go to -- and EM is obviously electronic monitoring?

A.  Yes.

Q.  When did you go to the EM unit?

A.  March of 1989.

Q.  And were you transferred to EM, or did you request to go there?

A.  I was promoted and put into EM.

Q.  Okay.  So you were promoted to the rank of investigator?

A.  Investigator, yes.

Q.  Did you have to take a test for that

Page 12

promotion?

A.  No, they just promoted me and put me in there.

Q.  Okay.  Had you expressed interest in joining the EM unit and being promoted to investigator?

A.  I had no knowledge of what the EM unit was and never heard of it.

Q.  Okay.

A.  It had just started.  Who transferred me, I have no idea.  No one's ever claimed it.  The only thing I can suggest is because while I was a cadet, I had six people that I captured.

Q.  Okay.  That could be it then.

A.  I'm pretty sure it was.

Q.  Okay.  So how long were you an investigator in the electronic monitoring unit?

A.  From 1989 to 2002.

Q.  Okay.  And when you started in the electronic monitoring unit, what were the various assignments within that unit?  Do you understand my question?

A.  I believe I do.

Q.  Okay.

Page 13

A.  I was -- at the time the unit was -- pretty much had chiefs and deputy chiefs, and the dispatcher pretty much was an acting supervisor, even though it wasn't a title that was recognized, but it was dependent on him to give the assignments out, accept the jobs and dispatch the car.  So I was a dispatcher.

Q.  Okay.  And what assignments did you dispatch out?  What were the assignments there?

A.  Well, at that time we only had 40 people in the program, so any alarms we would send them to, home checks.  I mean, some of the detainees were getting checked three or four times a night by shift because we only had 40 detainees on the program.

Q.  Okay.  So when you were the dispatcher, how is it that you would make an assignment?  In other words, if somebody in the field had to be -- an investigator needed to go out to the field, how would you make the determination as to which investigator went where?

A.  The cars were assigned by area, so wherever the assignment was, the car that handled that area would be dispatched to it.  Now, if it happened that we were shorthanded, I might pull a car

Page 14

from another area and send them.

Q.  Okay.  But the policy was basically if there is a car that's assigned to the south side area and they are free and cleared for service, if you got a call to the south side, you would send that car, correct?

A.  Yes.  That's correct.

Q.  Okay.  And so when you were a dispatcher, you would get like a roster with everyone's assignments?

A.  Yes.

Q.  And what other assignments were there other than -- well, strike that.

Speaking of the areas, would it be fair to say that there was like a south, a central, and a north area that --

A.  Yes.

Q.  -- cars were assigned to?

A.  Yes.

Q.  Okay.  What other assignments were there in the EM unit other than these three areas?

A.  Oh, there was -- which was actually another section of EM.  There was the equipment.  We didn't -- I didn't per se handle that, but equipment

Page 15



Thomas Neal   -   9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1322 of 1503 PageID #:1713
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 16**

1  pick up, equipment maintenance.

2  Q.  Okay.  Would you consider that like an

3  office assignment?

4  A.  No.  No.  That was a field assignment.

5  Q.  Got it.

6  A.  Investigators would be dispatched to pick

7  up equipment.  Someone maybe got off the program or

8  they would, you know, go replace equipment on a

9  person if it was malfunctioning.

10  Q.  Okay.  Any other field assignments while

11  you were there?

12  A.  Well, you had your major incidents.

13  Q.  And what were those?

14  A.  You had --

15  Q.  Go ahead.

16  A.  Well, that can be anywhere from the

17  detainees practicing their chosen trade and they're

18  still selling drugs at the house.  We had a few get

19  shot and killed.  We even had some that were

20  committing robberies.

21  Q.  Mr. Neal, you said that you were -- I'm

22  sorry.  Go ahead if you're not finished.

23  A.  No, I'm fine.

24  Q.  Okay.  How long were you the -- did you

**Page 17**

1  work as the dispatcher?  Would it have been until you

2  were promoted?

3  A.  No.  No.  I actually worked in the field

4  too as a patrol investigator.  I worked in dispatch.

5  I pretty much worked just about everywhere in the

6  unit.

7  Q.  And you did that -- you were in that

8  position until 2002.  Is that correct?

9  A.  That's correct.

10  Q.  Okay.  And what other positions were

11  there that -- we talked about the field positions,

12  dispatch.  What else?  What other positions?

13  A.  I worked in records.  I worked in leads,

14  NCIC, and, I mean, to explain those -- I don't know

15  if you know what leads is.

16  Q.  I do.

17  A.  Okay.

18  Q.  It's fair to say those are office jobs?

19  A.  Yes.

20  Q.  Okay.  Was there any other office jobs

21  there during this time period for EM?

22  A.  Just records, I mean.

23  Q.  Do you know if you worked one assignment

24  more than another assignment?

**Page 18**

1  A.  I don't understand that question.

2  Q.  That's okay.  You're going to probably

3  not understand several of my questions, so allow me

4  to repeat it.

5  Did you have a preference as to

6  which assignment you preferred working out of all

7  those assignments we've just talked about?

8  A.  Probably.  Probably, but I just went

9  where I was sent.

10  Q.  And your preference was dispatch?

11  A.  No, patrol.

12  Q.  Patrol.  Field work?

13  A.  Yes.

14  Q.  Yeah.  Better than being in an office,

15  I'm assuming?

16  A.  It depends on the perspective of the

17  individual.  I mean, some people didn't want to go

18  out in the streets, some people preferred staying in

19  the office.  I was an operations guy.  I preferred

20  the streets.

21  Q.  Okay.  And you worked mostly -- more in

22  the streets than you did in the office, right?

23  A.  Well, from '89 -- I was in records quite

24  a few years.

**Page 19**

1  Q.  And when you say you were in records

2  quite a few years, does that mean that you were

3  assigned to records and you worked every day in

4  records?

5  A.  Correct.

6  Q.  Okay.  And that was like a bid position?

7  A.  That was where they assigned me.

8  Q.  Okay.  And I'm just trying to figure that

9  out.  So was it a formal assignment, or was it like

10  every day you would come in and you would see that

11  you were assigned to say records, or did you know in

12  advance that --

13  A.  It was a permanent assignment.

14  Q.  And when you say permanent, how long is

15  it that you -- like, do you go into the beginning of

16  the year and they say, all right, you're assigned to

17  records, you're going to be there for the next year?

18  A.  Thinking back, I was assigned to dispatch

19  and then they -- I went to patrol, and one day they

20  said -- I got orders to be assigned to records.

21  There was a separate supervisor that was over records

22  and I reported to him.  So I went to records on the

23  afternoon shift and stayed there forever.

24  Q.  I'm sorry.  I didn't get the last part.

Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1323 of 1503 PageID #:1714
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A. No, I said I got assigned to records
2  which wasn't my preference.
3    Q. I'm sorry. It was your preference?
4    A. Wasn't.
5    Q. Was not?
6    A. It was not my preference.
7    Q. Okay.
8    A. But that's where I was assigned, so
9  that's where I went.
10   Q. Okay. And did you tell anyone, any of
11 your supervisors, man, I don't want to be in records,
12 I want to be in patrol, or anything like that?
13   A. I'm a military man. I wasn't a whiner.
14 I went where I was told.
15   Q. Okay. And how long did you work in
16 records for, or I should say how long were you
17 assigned to records?
18   A. It could be ten years. I would have to
19 think about it, but pretty much my whole time other
20 than the short time I was on patrol.
21   Q. Okay. So basically the entire '90s that
22 you were there, you were in records?
23   A. Yes.
24   Q. Okay. And then 2002, what happened in

Page 20

1  2002?
2    A. I was promoted to chief of records.
3    Q. Okay. And how is it -- did you -- strike
4  that.
5        Did you apply for the chief
6  position?
7    A. No. The chief that was there, I was
8  already his assistant. I was a supervisor, and he
9  retired.
10   Q. Okay. Who was that? Do you remember his
11 name?
12   A. Nick Zavadin.
13   Q. Okay. Do you know how to spell the last
14 name?
15   A. Yeah, Z-a-v-a-d-i-n.
16   Q. Okay. So was this your first -- I'm
17 sorry. Was your rank investigator before you were
18 promoted to chief records, chief of records?
19   A. I was a supervisor when I was promoted to
20 chief.
21   Q. Okay. And when did you become a
22 supervisor?
23   A. Let's see. Say the early '90s I went to
24 records. Maybe five years later I became a

Page 21

1  supervisor on the midnight shift and...
2    Q. What year would that have been, roughly?
3    A. I couldn't swear to it, but I'd say
4  roughly '95 maybe.
5    Q. Okay. And so you were a supervisor in
6  midnights in the records division?
7    A. That's correct.
8    Q. Okay. And then you did that. Did you
9  stay on the midnight shift all the way until you were
10 promoted to chief?
11   A. Yes.
12   Q. Okay. And did you apply to become chief
13 of the records division? I may have asked that, but.
14   A. No. No. It was just attrition. The
15 other chief had gone, and I was basically next in
16 line as far as seniority.
17   Q. Got you. So in 2002 when you became the
18 chief of records, who was the chief of electronic
19 monitoring?
20   A. You mean the director?
21   Q. Director. I'm sorry.
22   A. Mike Rickey (phonetic) and -- Mike Rickey
23 was the deputy director, and I forget the director's
24 name.

Page 22

1    Q. That's okay. So would Rickey have been
2  your -- when you were promoted to chief of records,
3  would Rickey have been your direct supervisor?
4    A. No. EM was under DCSI, so there was a
5  DCSI chief who was actually over EM and DCSI. Under
6  the DCSI umbrella you had day reporting, you know,
7  the other programs. So he was like the chief of both
8  programs, so I reported to him, and that was Odell
9  Anderson.
10   Q. Okay. So would Anderson have been a
11 higher rank than Rickey?
12   A. No. No.
13   Q. Okay.
14   A. Rickey was a deputy director.
15   Q. Okay. I'm sorry. What was the title of
16 Mr. Anderson?
17   A. Chief.
18   Q. Chief. Okay. And then who worked below
19 you? Who was the next lowest rank below you when you
20 were chief of records?
21   A. I had a deputy chief of -- Olson, Diane
22 Olson was my deputy chief, and I had supervisors
23 under her.
24   Q. Okay. And how long did you serve as

Page 23

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1324 of 1503 PageID #:1715

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 chief of records?

2     **A. Let's see. 2002 I was promoted, '04. I**

3 **was there until Chief Anderson retired, and I would**

4 **say that's probably a couple years, so.**

5     Q. What happened, were you promoted again?

6     **A. I was supposed to be promoted. I was**

7 **told I was getting promoted, but it went to someone**

8 **else.**

9     Q. Okay. So what year would this be, like

10 2004?

11     **A. Probably.**

12     Q. And you were told you were being promoted

13 to what rank?

14     **A. Well, DCSI chief.**

15     Q. Okay. And do you remember who told you

16 that?

17     **A. I believe it was the -- well, pretty much**

18 **at the south campus, all the directors and, you know.**

19 **I was being groomed by Chief Anderson to take his**

20 **spot when he left. I was going to all the meetings**

21 **that he went to when he started getting ready to**

22 **retire, and I was -- the meetings with the directors**

23 **and the executive directors, I was going to those**

24 **meetings.**

Page 24

1     Q. Go ahead.

2     **A. I thought it was sure, but apparently**

3 **not.**

4     Q. Who got that position?

5     **A. Chief Ranzino.**

6     Q. And had Ranzino done any work in the

7 records division prior to getting that assignment?

8     MR. LEINENWEBER: Objection form and

9 foundation.

10     You can go ahead. Just to be clear,

11 Tom, I'll occasionally make objections, but you can

12 go ahead and answer unless I instruct you not to

13 answer, okay?

14     THE WITNESS: Okay.

15     Joe Ranzino did some work in

16 records, yes.

17 BY MR. HERBERT:

18     Q. But you thought you were much more

19 qualified for that position than Joe Ranzino?

20     **A. Well, he was in patrol at the time, so I**

21 **was already in records, so.**

22     Q. So why did he get the job and you didn't?

23     MR. LEINENWEBER: Objection to form and

24 foundation.

Page 25

1     THE WITNESS: I don't know.

2 BY MR. HERBERT:

3     Q. What do you think?

4     MR. LEINENWEBER: The same objections.

5     THE WITNESS: I prefer not to speculate. I

6 mean, I don't know why he got it and I didn't.

7 BY MR. HERBERT:

8     Q. Well, he's white, correct?

9     **A. Yes, he is.**

10     Q. Do you think that was a reason why he got

11 the position and you didn't?

12     MR. LEINENWEBER: The same objections.

13     THE WITNESS: Are you objecting, or am I

14 answering that?

15     MR. LEINENWEBER: Oh, sorry. Yeah. Yeah,

16 you can go ahead. I objected, but you can go ahead.

17     THE WITNESS: Oh, okay.

18     No, actually if I had to guess, I

19 would just say that he knew more people than me.

20 BY MR. HERBERT:

21     Q. Okay. He had a little more clout than

22 you?

23     **A. Yes.**

24     Q. Okay. And that's pretty common knowledge

Page 26

1 that clout or knowing people while working for the

2 sheriff, that certainly helped your career path,

3 correct?

4     MR. LEINENWEBER: Objection to form and

5 foundation.

6     THE WITNESS: O'Grady was pretty political.

7 BY MR. HERBERT:

8     Q. Yeah. And you knew a lot of supervisors

9 that did political work for him?

10     **A. Yeah. There were a few.**

11     Q. All right. So Ranzino gets the job in

12 2004, so do you keep your position then as chief of

13 records?

14     **A. I kept the DCSI chief job for a little**

15 **bit. Nobody wanted to tell me I didn't get the**

16 **position including Joe Ranzino.**

17     Q. Okay. So I'm sorry. So you actually

18 were doing the job of DCSI director?

19     **A. DCSI chief. Yeah, I was in the big**

20 **office and answering all the calls, and my directors**

21 **never told me that -- they didn't cut any orders.**

22 **They didn't tell me anything. Nobody told me that I**

23 **didn't get the position. Actually, I kicked Joe out**

24 **of his office.**

Page 27



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1325 of 1503 PageID #:1716
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  Q.  Out of your office?

2  A.  Yeah, out of my office, but it was

3 actually his office because he got the promotion, but

4 he didn't want to tell me, so I'm like, get the hell

5 out of here, because he was making suggestions that I

6 didn't like.

7  Q.  So were you the acting chief?

8  A.  Yes.

9  Q.  Okay.  So nothing came out formally that

10 you were the chief.  You were just the acting chief

11 waiting for it to become formal?

12  A.  Correct.

13  Q.  And then how long did you serve as like

14 the acting chief before you found out Ranzino was

15 taking your spot?

16  A.  It was a good while.  I mean -- it was a

17 good while that I was in the position.

18  Q.  How long, years or months?

19  A.  Probably months because Chief Anderson

20 had retired.  I was doing the job, and I'm just

21 waiting on the pay.  I'm already a chief, so I'm just

22 waiting to get kicked up to the Grade 20 pay.

23  Q.  Did you ever get up to that pay?

24  A.  Eventually.

1  Q.  I mean, as far as you being the acting

2 DCSI chief, did you ever receive --

3  A.  No.  No.

4  Q.  Okay.  And did you know Ranzino at this

5 point, at the point in --

6  A.  Yes.

7  Q.  Okay.  Had you worked with him?

8  A.  We actually were friends outside of work.

9  Q.  Okay.  Are you still friends?

10  A.  Yes, we are.

11  Q.  Okay.  Do you guys meet socially?

12  A.  Well, not now, but we did.  We did then.

13  Q.  Okay.  You had a crew of people that you

14 were social with, right?

15  A.  Yes.  Pretty much all the chiefs,

16 O'Malley, me, Ranzino, the Director Shields.

17  Q.  Okay.  So Shields was certainly part of

18 your social group, right?

19  A.  Yes.

20  Q.  And Ranzino was obviously, right?

21  A.  Yes.

22  Q.  How about Christopher Rohloff, was he

23 part of it?

24  A.  No.

1  Q.  How about --

2  A.  He worked for me.

3  Q.  How about Webb, was he part of your

4 social group?

5  A.  No.

6  Q.  Okay.  So tell me what happens in your

7 next job change.

8  A.  When I got -- I left.  I actually left

9 records and went to patrol, and I was a chief in

10 patrol.

11  Q.  So is that a lateral assignment?

12  A.  Yes.

13  Q.  Okay.  And when did you become chief of

14 patrol?

15  A.  2008.

16  Q.  I'm sorry.  2008 did you say?

17  A.  Yes.  The chief in records, and we went

18 through the whole thing.  And I was in records for

19 quite a few years, and maybe 2008, 2009 I went to

20 patrol.  Pretty much I got acclimated, but when I

21 came back I went to patrol.

22  Q.  I'm sorry.  You're breaking up a little

23 bit.

24  A.  I'm sorry.  I said...

1      (Whereupon, the witness's

2       dog was barking.)

3 BY MR. HERBERT:

4  Q.  Go ahead.  Do you have to take her out or

5 something?

6  A.  No.  I think the mailman is in the

7 neighborhood, so they're getting frisky.

8  Q.  All right.  So you were breaking up a

9 little bit.  I just want to make sure I got it right.

10 So you went to patrol in like 2008?

11  A.  I think it was around 2008, 2009.

12  Q.  Okay.  And how long did you serve as

13 chief of patrol then?

14  A.  Until my retirement.

15  Q.  And when was that?  I'm sorry.

16  A.  August 2017.

17  Q.  Okay.  And as chief of patrol, were you

18 assigned to any particular watch?

19  A.  Third watch.

20  Q.  Okay.  And who was your direct supervisor

21 during that time?

22  A.  John Webb.

23  Q.  Okay.  How long was John Webb your direct

24 supervisor?  Was it the entire time that you were the

Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1326 of 1503 PageID #:1717
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 32

1 chief of patrol?

2    **A. There were other deputy directors in**

3 **there. John Webb was promoted somewhere along the**

4 **line.**

5    Q. Okay. And who did John Webb report to

6 while you were the chief of patrol?

7    **A. Greg Shields.**

8    Q. Okay. And what was Shields' rank or

9 title when you were chief of patrol?

10    **A. Director. Director of EM.**

11    Q. Okay. And was he the director of EM all

12 the way until the point in which you retired?

13    **A. No, he got promoted up to an executive**

14 **director, and John Webb was promoted to director.**

15    Q. Okay. Did you work with Shields prior to

16 you being promoted? Did you work with him in the EM

17 unit?

18    **A. No.**

19    Q. Was he always the supervisor the entire

20 time that you were in the EM?

21    **A. No. No. In fact, I believe I was in EM**

22 **before him. Pretty much I was in EM before any of**

23 **them since I got there in '89. They all started**

24 **coming in in the '90s. But he was an investigator**

Page 33

1 **over in technical services.**

2    Q. Okay. Did you know him then?

3    **A. And they handled the equipment. I'd seen**

4 **him. We didn't socialize.**

5    Q. Got you. When did you start socializing

6 with him?

7    **A. Probably when I became a chief.**

8    Q. Okay. Shields had a pretty meteoric rise

9 through the sheriff's department or in the EM unit.

10 You would agree with me on that, and you know what

11 I'm talking about?

12    **A. Yes, he did.**

13    MR. LEINENWEBER: Objection to form and

14 foundation.

15    THE WITNESS: Yes, he did.

16 BY MR. HERBERT:

17    Q. And he was promoted -- or strike that.

18    You know why he had the meteoric

19 rise, don't you, why he was promoted so high and so

20 quickly?

21    MR. LEINENWEBER: The same objections.

22    THE WITNESS: I couldn't tell you why, but he

23 was.

24

Page 34

1 BY MR. HERBERT:

2    Q. Well, he had a special relationship with

3 the sheriff, right?

4    MR. LEINENWEBER: The same objections.

5    THE WITNESS: So they say.

6 BY MR. HERBERT:

7    Q. And when you say so they say, everyone

8 kind of knew that in the sheriff's department, that

9 Shields was buddy-buddy with the sheriff, right?

10    MR. LEINENWEBER: The same objections.

11    THE WITNESS: Well, I mean, I don't know if

12 he was buddy-buddy with him. I've never seen them

13 together like that. But I mean, it was my

14 understanding that his wife knew the sheriff's wife,

15 but other than that I don't know what relationship

16 Greg had with the sheriff.

17 BY MR. HERBERT:

18    Q. And you would agree with me that pretty

19 much everyone in the EM unit knew that Shields had

20 this relationship with the sheriff, fair to say?

21    MR. LEINENWEBER: The same objections.

22    THE WITNESS: As I said, I don't know what

23 type of relationship they had. I mean...

24

Page 35

1 BY MR. HERBERT:

2    Q. Okay.

3    **A. He didn't call him in my presence or...**

4 **Nothing out of the ordinary but being in his position**

5 **and how he dealt with the sheriff.**

6    Q. I've got you. Okay.

7    **A. There's all kind of rumors.**

8    Q. Tell me about the rumors. What are the

9 rumors that you hear? And I know you don't --

10    **A. I can't -- I can't pass on things that**

11 **are not factual that I know of, so. I mean, I could**

12 **tell you rumors all day about employees at the**

13 **sheriff's department, but they're just rumors.**

14    Q. Right. Well, what were some of the

15 rumors about Shields?

16    **A. Just that he's moving up.**

17    Q. What else?

18    **A. That's pretty much it. Well, we all knew**

19 **more than him.**

20    Q. As far as the job goes, you guys knew

21 more than him?

22    **A. Correct.**

23    Q. Okay. But you guys all knew he was -- he

24 was the guy because he was moving up quickly, right?



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1327 of 1503 PageID #:1718
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    MR. LEINENWEBER:  The same objections.
2    THE WITNESS:  He was our boss.
3  BY MR. HERBERT:
4    Q.  Okay.  And you knew that he could -- he
5  can make life difficult for you as the boss, right?
6    MR. LEINENWEBER:  The same objections.
7    THE WITNESS:  I can't say that for me.
8  BY MR. HERBERT:
9    Q.  No, no.  I know.
10    A.  Pardon me?
11    Q.  You were friends with him, right?  I'm
12  just saying, you know --
13    A.  No, that had nothing to do with it.
14    Q.  Okay.  But the director -- go ahead.
15    A.  I'm a pretty direct guy, and I kind of
16  demanded respect.  You're not going to talk to me any
17  kind of way, so.  I don't care who you are.  I have
18  principles, and if I have to leave a job because of
19  my principles, I will.  I mean, these are just things
20  I learned in the military.  I'm going to respect you,
21  I'm going to respect your rank, but you are going to
22  respect me because I'm going to do my job.
23    Q.  And that's all you wanted to do is do
24  your job and be left alone, right?

Page 36

1    A.  That's correct.
2    Q.  Okay.  As chief of patrol, what were your
3  duties?
4    A.  I oversaw the third watch, the monitoring
5  office, the civilian techs who actually did the
6  monitoring, the dispatcher who dispatched the
7  vehicles.  I oversaw the equipment, the radios, the
8  Tasers, you know, make sure the inventory, they were
9  all in workable condition.  I scheduled schools,
10  classes for investigators.  I gave disciplinary.  I
11  gave time off.  I awarded for accolades.
12        And since I was the operations
13  chief, I was out there on the streets with them.  I
14  answered all the major incidents and I backed them up
15  on calls.
16    Q.  Okay.  Who was the supervisor that
17  reported directly to you when you were chief of
18  patrol?
19    A.  Chris Rohloff.
20    Q.  Okay.  And you talked about how --
21    A.  And Sam Page, when they were supervisors,
22  we had them.  All the supervisors from the third
23  watch would report to me.  We had several, Walker,
24  Page.

Page 37

1    Q.  Okay.  You talked about how you oversaw
2  all the units, you would go out and ride in the field
3  sometimes and you gave people commendations,
4  recognized good work, right?
5    A.  Yes.  Yes.
6    Q.  And then you'd -- part of your job was
7  disciplinary and you had to give people time off,
8  right?
9    A.  Yes.
10    Q.  Okay.  And any supervisor can discipline
11  a subordinate, correct?
12    MR. LEINENWEBER:  Objection to form and
13  foundation.
14    THE WITNESS:  No.
15  BY MR. HERBERT:
16    Q.  What supervisors cannot discipline a
17  subordinate?
18    A.  Well, Page and Walker and those people
19  who were designated supervisors, they were the same
20  pay grade, so they could not -- they could only
21  recommend disciplinary to the chief or the deputy
22  chief.
23    Q.  Got it.  But if they were a lower grade,
24  then they could be -- or I'm sorry, disciplined by

Page 38

1  somebody that's a higher grade?
2    MR. LEINENWEBER:  Objection to form,
3  foundation.
4    THE WITNESS:  Correct.
5  BY MR. HERBERT:
6    Q.  Okay.  So if somebody was a lieutenant,
7  obviously they're a higher grade than an
8  investigator, correct?
9    A.  Yes.
10    Q.  So a lieutenant could discipline an
11  investigator, correct?
12    MR. LEINENWEBER:  The same objections.
13    THE WITNESS:  Yes.
14  BY MR. HERBERT:
15    Q.  And a chief can discipline a deputy chief
16  as well as an investigator and a lieutenant, right?
17    MR. LEINENWEBER:  The same objections.
18    THE WITNESS:  Yes.
19  BY MR. HERBERT:
20    Q.  Okay.  And this would be independent
21  of -- it could be dependent of OPR investigations,
22  correct?  Do you know what I'm talking about with
23  that?
24    A.  Correct.  Yes.

Page 39



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1328 of 1503 PageID #:1719

**Page 40**

BY MR. HERBERT:

Q. In other words, discipline can go through OPR, or discipline can be handled in-house by the supervisor?

MR. LEINENWEBER: The same objections.

THE WITNESS: Yeah, depending on the severity of the charge.

BY MR. HERBERT:

Q. And as you served as the chief of patrol, I imagine you had to dole out discipline on numerous occasions that you handled in-house, right?

A. Yes. I mean, I wouldn't say numerous occasions. Everybody had different styles of management.

Q. All right. How would you say -- what was Shields' style of management?

MR. LEINENWEBER: Objection to form and foundation.

Go ahead.

THE WITNESS: Well, Shields basically shouldn't have been giving out any since he had chiefs that would do it, so I don't know -- I don't know of anybody he's actually written up except me. He wrote me up, but.

**Page 41**

BY MR. HERBERT:

Q. So you're saying Shields shouldn't have been giving out any discipline because that was below his pay grade. He had chiefs to do that, right?

A. Basically, yes.

Q. Yeah.

A. I mean, not that he couldn't do it, but I don't know how -- you know, if it was something work related, that would be on the chief or deputy chief.

Q. So your years in the sheriff's department, it was pretty odd for a director of a unit that had chiefs below them to be doling out discipline themselves?

MR. LEINENWEBER: The same objections.

THE WITNESS: Well, no. He could -- I mean, that's his option. He can discipline somebody. It depends on what the charge was. I mean, if it's something work related, more likely the chief will do it or the deputy chief, but if it's something personal between him and that person, let's say something he observed, then he would have to do it. Obviously, I wouldn't write somebody up on something he observed.

**Page 42**

BY MR. HERBERT:

Q. Right. And that was kind of the policy within the sheriff's department, right? Somebody that --

A. No, I couldn't say that's policy. There's no general order that says that. I mean, he can write him up. I know he was -- we had less write-ups then the DOC, and they were -- I knew there was a meeting where they wanted to know what was our management style because our write-up -- they wanted more write-ups out of our unit.

Q. And when you say they, you're talking the higher ranking sheriffs, they wanted more discipline out of the EM unit?

A. Yeah. Yeah. They couldn't figure out why we weren't writing everybody up. Because we were a hard working unit.

Q. When do you think this took place where the bosses -- when I'm saying the bosses, we're talking the high ranking members of the sheriff's department at this point telling you guys you need to start writing people up?

MR. LEINENWEBER: Objection to form and foundation.

**Page 43**

THE WITNESS: Yeah.

BY MR. HERBERT:

Q. Do you remember approximately when that was?

A. I don't know that they wanted us to start writing people up per se. What they was saying, they wanted to know why we had less write-ups than them. Obviously, we're a smaller unit than the DOC.

Q. And when was this that they were making these inquiries? Was it when Shields was director?

A. I'd say probably around the time that they were trying to get rid of our ranks.

Q. When was that?

A. In order to go to the merit system.

Q. When was that?

A. Pardon me?

Q. When did they try to get away with the merit system? I'm trying to figure out when they made these inquiries about the EM unit not having many write-ups?

A. Probably 2013.

Q. Okay. So Shields was either the -- was he the deputy director at that point?

A. He was director.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1329 of 1503 PageID #:1720

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 44**

1   Q. He was a director. He was a boss?

2   A. Yeah.

3   Q. Okay. And do you remember who it was

4 that made these inquiries from the sheriff's office?

5   **A. It was the jail's brass.**

6   Q. If you know their names, that would be

7 great. But do you know what their titles were?

8   **A. They were all directors. I mean, I can't**

9 **say for sure. That was just a basic of what was**

10 **coming down the pipe, you know. You guys, they're**

11 **going to change your ranks to a lieutenant or**

12 **something, get rid of all the chief ranks.**

13   Q. Okay. As far as the discipline goes,

14 were you told to start writing people up more?

15   **A. I can't say that because like I said, I**

16 **had a different relationship with my men. I mean, I**

17 **wasn't heavy on the pen. I was more of a counseling**

18 **to correct the bad behavior or behavior that I**

19 **thought was unsatisfactory.**

20   Q. Because you had a lot of discretion as a

21 boss how you wanted to handle discipline, right?

22   **A. Yes.**

23   Q. You could write people up, or you could

24 choose to counsel them, correct?

**Page 45**

1   **A. Correct. That's correct.**

2   Q. Or even choose to train them if you want?

3   **A. Well, retraining was always part of the**

4 **disciplinary.**

5   Q. Okay. Well, let me ask you directly.

6 Were you told to write up more people that worked for

7 you?

8   **A. Well, it was suggested that I start**

9 **writing these guys up for some of these infractions.**

10   Q. And by whom was it suggested?

11   **A. The director.**

12   Q. Shields?

13   **A. Whoever the director was. I mean, it**

14 **could have been Shields. It could have been the**

15 **other deputy directors. I mean, we had a few.**

16   Q. Okay. And do you know if the other --

17 there was other chiefs within the EM unit at this

18 time other than you as the chief of patrol, correct?

19   **A. Yes.**

20   Q. And were those chiefs, were they told to

21 start writing guys up more?

22   MR. LEINENWEBER: Objection. Foundation.

23   THE WITNESS: I don't know what they were

24 told. I mean...

**Page 46**

1   MR. LEINENWEBER: Yeah, go ahead.

2   THE WITNESS: I don't know what they were

3 told. I don't know what they were told. Like I say,

4 it's a different management style. Joe was more a

5 stickler for the general orders, the rules.

6 BY MR. HERBERT:

7   Q. And was Joe, was he encouraged to start

8 writing guys up more?

9   MR. LEINENWEBER: The same objections.

10   THE WITNESS: I have no idea. He was always

11 a stickler for the rules.

12 BY MR. HERBERT:

13   Q. Okay. But you told me that you were

14 encouraged to write people up more. My question is:

15 Was anyone else, that you know of, in the EM unit

16 encouraged to write people up more?

17   MR. LEINENWEBER: Objection to form,

18 foundation. Also misstates prior testimony.

19   Go ahead.

20   THE WITNESS: I mean, it wasn't an open

21 meeting saying, hey, you know. It's just that, hey,

22 you guys need to -- you guys need to start writing

23 these guys up for these infractions.

24

**Page 47**

1 BY MR. HERBERT:

2   Q. Okay. And that was given to all the

3 supervisors, that message?

4   **A. It was given to me. I didn't see all the**

5 **supervisors. You have to keep in mind, I'm on the**

6 **third watch. I don't know what's going on on the**

7 **first watch or the second watch.**

8 BY MR. HERBERT:

9   Q. But did you guys ever have -- were any

10 messages ever delivered to you while you were with

11 Ranzino and some of the other bosses where they told

12 all of you, hey, start writing these guys up more?

13   MR. LEINENWEBER: Objection to form and

14 foundation.

15   THE WITNESS: I couldn't put my finger on any

16 instance where we were told collectively. I mean, it

17 was...

18 BY MR. HERBERT:

19   Q. The message was conveyed to you?

20   **A. It was kind of the thing if you already**

21 **knew, you didn't have to be told.**

22   Q. Okay. And you said that Rohloff was the

23 supervisor that directly reported to you as the

24 chief, correct?



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1330 of 1503 PageID #:1721
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1      A.   Yes.

2      Q.   Okay. And who made the daily assignment?

3 Who was responsible for assigning the investigators

4 to their various positions, you or the chief?

5      A.   Well, with the rotating days off, it

6 could be anybody. It could be Rohloff. It could be

7 me. It could be Chief Acey. It could be Chief

8 Ranzino. It could be Lieutenant Smith. We had

9 several supervisors on the watch who had different

10 functions. Dennis Smith, Chief Acey, Rohloff, they

11 basically were all in the office, so one of them

12 would do the next day's roster.

13      Q.   Okay. So it wasn't anyone's particular

14 assignment to do that. It was just a supervisor that

15 was there working that day would have to be -- make

16 the assignments for the subsequent day?

17      A.   That's correct. I mean, you have to keep

18 in mind, it was always a last minute thing because

19 you never know what the medicals are going to be,

20 what cars were going to be out of service. You

21 couldn't set this up ahead of time.

22      We may change the roster all the way

23 up until roll call time and sometimes after roll

24 call. At least I did because the guys would come

1 into the office, chief, can I work such and such, can

2 I work this area, can I work that area, or I've got

3 to see my mom, she's sick, can I go work this area

4 because I want to run by the hospital and stop and

5 see her. You know, rather than him coming from the

6 north suburb to the south side or vice versa, I tried

7 to accommodate the men if I could. If I couldn't,

8 some days I couldn't. I would say, I can't do it,

9 but for the most part I accommodated most of the guys

10 when I could.

11      Q.   Okay. And you accommodated them by

12 trying to give them the assignments that they

13 preferred working in?

14      A.   Yes, that's correct. We had guys that

15 didn't want to go out. They'd volunteer for the

16 technical services down in the basement over in

17 receiving. Hey, put me over there, you know.

18 Especially they all -- let me tell you this. These

19 guys will cry. If it's a rainy day, I want to work

20 in the basement. If it's a snowy, icy day, I want to

21 work in the basement. If it's a sunny day, I want to

22 work on the street. You know, it was constant

23 begging for different assignments. And actually, you

24 can work anywhere that you're assigned. Some of them

1 would complain, I don't want to work there. Well,

2 I'm sorry. That's where you're assigned today, you

3 know.

4      Q.   Got you. And there was some people that

5 just wanted to be inside all the time, right?

6      A.   Yes.

7      Q.   And there was some people that didn't

8 want to ever be inside?

9      A.   Well, most of the youngsters wanted to be

10 outside. They wanted to police. The older guys,

11 they wanted inside. They wanted to come in, not wear

12 all their gear, just a polo and sit around the office

13 and drink coffee and do their job.

14      Q.   And you say the older guys --

15      A.   And some people were sick.

16      Q.   You say the older guys, guys with more

17 time on the job, right?

18      A.   Correct.

19      Q.   And I imagine you would factor in

20 seniority when you're making an assignment, like if a

21 younger guy wanted to work outside and an older guy

22 wanted to work outside, everything else being equal,

23 my guess is you gave it to the older guy because of

24 seniority?

1      MR. LEINENWEBER: Objection to form and

2 foundation.

3      You can go ahead.

4      THE WITNESS: No. No. I made my assignments

5 by getting the mission done. I put the best people

6 in the best spots where I needed them.

7      You know, I tried -- honestly, I

8 tried that, giving them all what they want all the

9 time, and it just disrupted the whole shift. We need

10 to get things done. I tell them, look, you're going

11 to go work in the basement because you're the best

12 I've got. But if I had to take a hit for giving a

13 day off when we had a shortage, I would work the spot

14 and I would give them the day off. But, you know,

15 everybody wanted what they wanted when they wanted.

16 BY MR. HERBERT:

17      Q.   Go ahead and finish. I'm sorry.

18      A.   No, I'm saying the guys, they all ask for

19 different things. I never knew what they wanted. It

20 changes every day. I need to work on the north side.

21 I need to work on the south side. There was no

22 specific assignment.

23      Q.   Okay. And it's not uncommon for people

24 to want to work with a particular partner?



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1331 of 1503 PageID #:1722
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  Oh, that was definitely a request.

2    Q.  And as a supervisor -- go ahead.

3    A.  If you're happy to work with a person,
4 you do better work.

5    Q.  And you tried to --

6    A.  That couldn't always happen.

7    Q.  Right.  But when it could happen, you
8 tried to put them with their partners if you could?

9    A.  We all did always.  They pretty much had
10 permanent partners, but if their partner was off on
11 vacation or sick or a day off, obviously they had to
12 work with someone else.

13    Q.  Okay.  And that was you and all the
14 supervisors that worked below you, that was pretty
15 much the understanding?  Hey, the guy's want to work
16 with a partner, let him work with a partner unless
17 you can't do it?

18    A.  Yes.  That was pretty much my standing
19 order.

20    Q.  Okay.  And if a guy wants to work outside
21 and everything -- and he's qualified to work outside
22 and there's no manpower shortage, put him outside?

23    A.  I didn't always do the roster.  The
24 supervisor that was doing the roster, he made the

Page 52

1 arrangements he wanted to make.  I mean, we had some
2 times supervisors from another shift who did not know
3 who worked together and they put them with whoever.

4    Q.  All right.  So the assignments were --
5 they were done differently depending on who was
6 making the particular assignments that day?

7    A.  That's correct, but I would say
8 99 percent of the time the guys worked with their
9 regular partner, just -- but there were times when he
10 might, but they were so minute that it was
11 insignificant.

12    Q.  Did you try to rotate guys from the
13 various assignments, inside, outside?  Did you try to
14 rotate them on any consistency basis?

15    A.  I set up a roster for rotating people in
16 the basement, in dispatch, so that it would be fair.
17 The guys had a fit and went to the union on me.

18    Q.  Because they didn't think they were being
19 rotated fairly, right?

20    A.  Because they didn't want to go where I
21 sent them.

22    Q.  And were these --

23    A.  It wasn't about fairness.  Pardon me?

24    Q.  The guys who went to the union, were they

Page 53

1 the plaintiffs in this case?

2    A.  Yeah.

3    Q.  And they're all African-American?

4    A.  Some of them.  Not all of them.  Not all
5 of them, some of them.

6    Q.  When you said not all of them, what did
7 you mean by that?

8    A.  Personally, I've never had a problem with
9 anybody on the Complaint.  I've written people up on
10 there but, I mean, it was -- they knew they were
11 wrong, and I've never had a problem with any of them,
12 but.  So I was really shocked to see some of the
13 names on there but, you know.

14    Q.  All these guys are black, right, and
15 gals -- gal?

16    A.  Yes.

17    Q.  Okay.  Were you aware of any white
18 investigators that were complaining about their job
19 assignments?

20    A.  I had them complain too.  Everybody
21 complained.

22    Q.  Okay.  Would you say that the blacks were
23 complaining more about their work assignments than
24 the white investigators?

Page 54

1    A.  Yeah.  Yeah.

2    Q.  Quite a bit --

3    A.  Well, you have to keep in mind that my
4 watch was predominantly black.

5    Q.  Okay.

6    A.  I had more black investigators than I had
7 white.

8    Q.  Okay.  And did any of the whites complain
9 about their job assignment that worked for you?

10    MR. LEINENWEBER:  Objection.  Asked and
11 answered.

12    THE WITNESS:  I had a couple.

13 BY MR. HERBERT:

14    Q.  Okay.  Did they make any union complaints
15 against you about their work assignments?

16    MR. LEINENWEBER:  Objection.  Form and
17 foundation.

18    THE WITNESS:  If they did, I wasn't aware of
19 it.

20 BY MR. HERBERT:

21    Q.  Okay.  So the only people that you're
22 aware of making formal complaints with the union are
23 black investigators, fair to say?

24    A.  Yeah, but, I mean, there weren't that

Page 55



Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1332 of 1503 PageID #:1723
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 many union issues.  I've had a couple that I
2 resolved, but there weren't actually that many
3 complaints.  There was the day-to-day groaning.
4 Pardon me?
5     Q.  You can finish.  I'm sorry.
6     A.  I was just saying there was the
7 day-to-day groaning.  And to be honest, everything
8 was racial.
9     Q.  What do you mean by that?
10     A.  Well, a guy would come to me with a
11 complaint and it was always racial.
12     Q.  Give me an example, please.
13     A.  Chief, they're just doing this shit
14 because I'm black.  I'm like, I'm black.  You know,
15 if it was an issue with a white supervisor, I would
16 go to him and find out what it was.
17     Q.  And there was a history with Ranzino as a
18 supervisor, right?
19     MR. LEINENWEBER:  Objection to form and
20 foundation.
21     THE WITNESS:  Ranzino, his management style
22 was strict.  He treated all of them --
23 BY MR. HERBERT:
24     Q.  Go ahead.
Page 56

1     A.  You know, I didn't too particular like
2 the way Joe handled the men.  He would (Inaudible
3 caused by video conference audio technical
4 difficulties).
5     Q.  You know what, I'm sorry.  You broke up.
6 Mr. Neal, if you can just repeat?
7     A.  I said I didn't particularly like the
8 way --
9     Q.  Go ahead.
10     A.  I said we all had different management
11 styles.  I didn't prefer Joe's style of management,
12 you know, but it was within his right to do it, you
13 know.  He was following the general orders, but he
14 would let them get under his skin.  (Inaudible caused
15 by video conference audio technical difficulties).
16     MR. LEINENWEBER:  So, Tom, we've had this
17 problem with a couple people when we've been doing
18 the dep, and what we've done is had them call in with
19 their phone in addition to having like the iPad open.
20     Would you be able to do that, do you
21 think, just kind of call into a phone number as well?
22     THE WITNESS:  Sure.
23     (Whereupon, a short break
24     was taken.)
Page 57

1 BY MR. HERBERT:
2     Q.  So if we can go back to, you were talking
3 about there was always -- everything was racism, you
4 know, like the complaints that were coming in.
5 People were making racial complaints.
6     A.  Well, let me rephrase that.  When the
7 investigators complained about an issue, it was, ah,
8 he's doing that because we black or I'm black, but
9 there was never, to my knowledge, a formal complaint
10 of a specific thing.  You know, it was just talk,
11 shoptalk.
12     Q.  Right.  And if I understand correct,
13 you're saying like a formal complaint versus just an
14 informal notification.  Like a formal complaint would
15 be something --
16     A.  No, it wasn't a notification.  It was
17 just, this is bullshit, you know, this is -- I always
18 cautioned everyone, if you come to me with the issue,
19 you better put it on paper because I'm obligated to
20 forward it.  So like I said, I had a pretty good
21 relationship with everybody, my whole staff.
22 Actually, everybody in the unit.  But when it came
23 around to the supervisors and losing their positions,
24 we were more upset than them, but that was a
Page 58

1 management decision.
2     Q.  What were you guys upset about, I'm
3 sorry?
4     A.  We lost the supervisors.  They were a big
5 help to us.
6     Q.  But some of these gripes and beefs that
7 you heard where you said it was all racist, some of
8 those gripes and beefs were about Ranzino, right?
9     MR. LEINENWEBER:  Objection to form and
10 foundation, also misstates prior testimony.
11     You can answer.
12     THE WITNESS:  Not a lot of them liked
13 Ranzino.
14 BY MR. HERBERT:
15     Q.  But some of those gripes about -- that
16 were racist gripes, those were, you know, that
17 Ranzino was missing with them because they were
18 black?
19     MR. LEINENWEBER:  The same objections.
20     THE WITNESS:  No, I never got that from any
21 of others.  They didn't like the assignment or
22 Ranzino would write them up.  But unfortunately, they
23 were bothered by the write-ups.  I mean, what can I
24 say?
Page 59

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1333 of 1503 PageID #:1724

BY MR. HERBERT:

Q. Ranzino conducted roll calls sometimes, right?

A. He did.

Q. I mean, that was part of his duties, right?

A. Yes.

Q. And certainly people told you that they weren't happy about the way he was conducting roll call sometimes, right?

A. Normally if I was there, I conducted the roll call, so if Ranzino was conducting it, it was probably because I wasn't there.

Q. Right. But my question is more, you know, people didn't like things that he said at the roll calls, fair to say?

MR. LEINENWEBER: Objection to form and foundation.

You can go ahead.

THE WITNESS: I'm trying to think of an instance where someone said something. I mean, I can't really think of an instance where there was something specific, though I did hear rumors of somebody said that -- he said they all look alike,

Page 60

they all look alike, somebody said that. I don't know whether that was founded or not or what context it was said if it was said.

BY MR. HERBERT:

Q. Did you ever talk to Ranzino about that?

A. Not really because -- well, several reasons. Ranzino and all the other chiefs, directors and whatever knew that I would not stand for that.

Q. For what? For what, racial...

A. Yeah. So if something was said, it would never be said in front of me.

Q. Right. You heard Ranzino told a couple of the black investigators, ah, you guys all look alike? You heard about that, right?

A. I heard rumors about it.

Q. Yeah. And what were your feelings when you heard those rumors as a black man?

A. No. I, I know Ranzino. I know he can be a little -- he's not really -- he's not a people person, but I wouldn't have taken it -- I don't know in what context it could have been said if it was said.

I know it was not in a racial, all you black people look the same, or like all you

Page 61

Orientals look the same, in that -- you know, in that context. So I don't know if it was even said or... they didn't like the guy.

Q. Well, you said you really didn't like his management style, he wasn't a people person, Ranzino. He spoke his mind, fair to say?

A. Yeah. Well, he would write you up if you did wrong.

Q. And sometimes he would say things that he shouldn't have said, right?

MR. LEINENWEBER: Objection. Form and foundation.

THE WITNESS: I can't say that. I can't say that. Like I said, if I was there, I would correct anyone who said the wrong thing, but I don't know any specifics where something was said that was -- you know, that shouldn't have been said.

BY MR. HERBERT:

Q. Okay. And I get you don't know the specifics, but you certainly heard rumors about white supervisors using the N word in the workplace?

MR. LEINENWEBER: Objection to form and foundation.

THE WITNESS: No. They're my friends, no.

Page 62

BY MR. HERBERT:

Q. You never heard that?

A. No.

Q. I'm not saying you directly. I'm talking you heard rumors that supervisors were using the N word routinely in the workplace?

A. To be honest with you, I think probably they might have lost blood if that was ever said. I don't think anyone has ever had the nerve to say that.

Q. Okay. Well, I think chief -- Mr. Rohloff talked that, you know, on numerous occasions he heard the N word being used?

MR. LEINENWEBER: Objection to form and foundation. Also assumes facts not in evidence and misstates prior testimony.

THE WITNESS: No one made me aware of that. That would have been an issue with me.

BY MR. HERBERT:

Q. Because you were a chief, right?

A. Yeah, because I'm a black man.

Q. And you're a black man. And you would have taken action to make sure that there wasn't any racial hostility in your workplace, right?

Page 63



Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1334 of 1503 PageID #:1725
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1     A. Absolutely.

2     Q. Did you ever hear any rumors about any of

3 the white supervisors referring to the black

4 investigators as crooks?

5     A. Yes. Actually, I said that to Winston in

6 one heated argument one day.

7     Q. I'm sorry. Who did you say that to?

8     A. Investigator Winston.

9     Q. Okay. You called him a crook?

10     A. No. I said, your family is a crook.

11     Q. Okay. And that was in the station?

12     A. No. No. We were in the gas station.

13     Q. Were you guys on duty?

14     A. Yeah. I went over there to use the gas

15 card to fill up all the vehicles, and I pulled him to

16 the side and said, hey, look, Cook, Investigator Cook

17 is saying things about you, and you need to get with

18 him to take care of that because if what he said gets

19 to OPR, I said, you guys are going to have some

20 problems, all of you are.

21     Q. Who were you referring to about all of

22 you?

23     A. Well, it appeared that all the

24 investigators had got into some type of buying houses

1 and flipping them or something, and they were all in

2 it and some of them got out because they thought

3 there were some improprieties going on.

4     Q. Okay. Legrain worked for you, correct?

5     A. He did.

6     Q. And you know Michelle Strickland? She

7 also worked for you?

8     A. Yes, she did.

9     Q. And Vernell Tims?

10     A. No, he was on a different watch. I knew

11 him though.

12     Q. Okay. You knew him from work or outside

13 of work?

14     A. From work.

15     Q. Okay. I.V. Newson?

16     A. Yeah. He was on a different shift.

17     Q. But you knew him?

18     A. Yeah. They all at some point in time

19 worked overtime and it spilled over to my watch.

20     Q. Okay. And all the plaintiffs here, Cecil

21 Williams, Anthony -- well, not Anthony Manning, David

22 Walker, Tyrone McGhee, Victor Slaughter, you know all

23 those guys from work?

24     A. Yes, I do.

1     Q. Okay. And how would you characterize

2 them as workers?

3     A. I would say each and every one of them

4 including Winston and Williams his partner were damn

5 good investigators when they did their job.

6     Q. Okay.

7     A. They were very -- they were all

8 knowledgeable. I probably worked with each and every

9 one of them, but as I said, when you screw up, they

10 all knew you're probably going to get hollered at by

11 Chief Neal.

12     Q. Okay. You became aware that these guys

13 were complaining about their work assignments, right?

14     MR. LEINENWEBER: Objection. Form and

15 foundation.

16     Go ahead.

17     THE WITNESS: That was -- I didn't know that

18 there was any collaboration of the guys getting

19 together like that, but that was every single day of

20 my 29 years at the sheriff's department, guys

21 complaining about what they wanted to do and what

22 they didn't want to do. That was every single day.

23 BY MR. HERBERT:

24     Q. One of the complaints was, hey, we're not

1 getting rotated equally. Those white guys are

2 getting their assignments a lot more than we are.

3     MR. LEINENWEBER: Objection. Form and

4 foundation.

5     Go ahead.

6     THE WITNESS: As I said --

7 BY MR. HERBERT:

8     Q. Go ahead. I'm sorry.

9     A. Yeah. As I said, I tried that and they

10 had a fit. They didn't want to rotate.

11     Q. Okay. Did you ever look to see if the

12 white investigators were assigned to their preferred

13 positions more than the black investigators were

14 assigned to their preferred positions?

15     A. To be honest with you, most of them -- I

16 didn't have the white investigators ask me about a

17 particular assignment. All I had was maybe one

18 Hispanic. Nobody wanted to work with him, so they

19 would complain, don't put me with him, Chief, put me

20 in a one-man car. But the white guys, most of them

21 were low seniority. They just went where you sent

22 them.

23     Q. Okay. If I can go to what we have marked

24 as Exhibit B, please.

Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1335 of 1503 PageID #:1726
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1   A.  Uh-huh.

2   Q.  And we're going to pull that up on the

3 screen for you.  Okay.  Mr. Neal, you're going to see

4 that if we can scroll down a little bit, these are

5 your answers to the interrogatories.  Do you remember

6 this document?

7   A.  Yes, I remember it.

8   Q.  And if we can go to the second to the

9 last page of that document, you signed a verification

10 form that indicates that all your answers --

11   MR. HERBERT:  There we go.  Thank you.

12 BY MR. HERBERT:

13   Q.  Do you see that signature there?

14   A.  Yes, I do.

15   Q.  Okay.  And that's -- you're verifying

16 that all the answers you provided in the

17 interrogatories are honest and true to the best of

18 your knowledge, true and accurate?

19   A.  Well, that looks like a DocuSign signed

20 signature, but I didn't look at it entirely but,

21 yeah, everything.

22   MR. LEINENWEBER:  Yeah.  And, Dan, if I can

23 interject to represent that's an electronic signature

24 and the last page of the document gives the details

Page 68

1 about when it was electronically signed.

2   MR. HERBERT:  Okay.  Very good.

3     If we can go to page 4 of that

4 document, at the bottom of the document.

5 BY MR. HERBERT:

6   Q.  Okay.  And it talks about, "State whether

7 you believe you've been adequately trained by the

8 Cook County Sheriff's Office with respect to each of

9 the following subjects."  The first one is racial

10 discrimination and harassment based on race.

11     Let me ask you, were you trained by

12 the sheriff's department on racial and harassment

13 based upon race?

14   A.  Well, I took some courses in sensitivity

15 training and domestic, sexual harassment, probably

16 one in -- probably one in racial -- you know, I'm

17 only guessing because pretty much I've had all this

18 training in the military and so it just -- it's

19 there, and I'm trying to think of any specific class

20 that I took.  I took numerous management courses and

21 I couldn't point to any particular course that was

22 strictly on racial.  I knew I took one or two on

23 sexual harassment.

24   Q.  Okay.  But no courses that you took

Page 69

1 specifically with racial harassment, right, that you

2 remember?

3   A.  Not off the top of my head.

4   Q.  Was there any -- was there any policy --

5 well, I guess like did the sheriff have a policy

6 regarding race and sex harassment and hostile work

7 environment?

8   A.  Yes, there was.  There's probably a few

9 guys that got in serious trouble with OPR for things

10 that was said throughout the jail and the department,

11 so it's pretty well known that you don't want to get

12 caught up like that.

13   Q.  And you're talking about like people

14 making racial comments and sexual harassment?

15   A.  Yeah.  OPR took that pretty seriously.

16   Q.  Okay.

17   A.  Don't get me wrong.  I'm not saying it

18 never happened.  I'm just saying I wouldn't tolerate

19 it, and I thought we had a pretty tight-knit group

20 over at EM.  We were a smaller unit.  We were away

21 from the jail.  We didn't want to be a part of the

22 jail.

23   Q.  Got it.  And when you say it didn't

24 happen, you're not saying that, you know, hostile

Page 70

1 work environments didn't happen, right?

2   MR. LEINENWEBER:  Objection to form and

3 foundation.

4   THE WITNESS:  No, I'm not saying they didn't.

5 I'm saying I didn't observe it.

6 BY MR. HERBERT:

7   Q.  Okay.  I've got it.  Have you ever

8 been -- you're a defendant in this lawsuit as per

9 your employment with the sheriff.  Have you ever been

10 sued at any other point in your role as a Cook County

11 Sheriff employee?

12   A.  No.

13   Q.  Okay.  Has anyone ever made complaints

14 about you to the EEOC or to the sheriff?

15   A.  I made a complaint against the sheriff's

16 department with the EEOC.

17   Q.  And tell me about that, please.

18   A.  Again it's back to the promotion.  I was

19 promoted to chief.  I worked it from 2002 to 2012

20 without getting the money.

21   Q.  Okay.  So this wasn't the situation we

22 talked about where Ranzino got your position, is it?

23   A.  Yes.  It's one of them.

24   Q.  Okay.  And you made a complaint to the

Page 71



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1336 of 1503 PageID #:1727
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 EEOC about that, right?

2 A. Well, not particularly about Ranzino,

3 about when I was promoted to chief, I wasn't given

4 the money. I was just the name only, and five chiefs

5 who were white got promoted to chief and got the

6 money, so I went to the EEOC.

7 Q. And you went to the EEOC because you

8 believe that you didn't get the money because you're

9 black?

10 A. No, because of politics.

11 Q. Okay. You were on the wrong side of the

12 politics? That's what you believe?

13 A. I would say I don't really know.

14 Q. That's what you complained of though,

15 right? You complained that the white guys got their

16 pay, I didn't get my pay and it was because I was on

17 the wrong side of the politics as the white guys?

18 A. Well, they got the money, I didn't.

19 Whatever the reason is, I don't know but...

20 Q. But you went to the EEOC and you

21 complained that they did this for an illegal reason,

22 right? You didn't say --

23 A. Well, I went to OPR first and there was

24 an arbitration, and the arbitrator came out saying,

Page 72

1 yes, I have been done wrong, but unfortunately I

2 didn't mention it when I should have. I never

3 understood what that meant, so at that point I went

4 to EEOC.

5 Q. And you told the EEOC that you were done

6 wrong, you were harmed because you were a black guy

7 that didn't get the pay and the white guys did,

8 right?

9 MR. LEINENWEBER: Objection. Form and

10 foundation.

11 THE WITNESS: Well, I told them that I was a

12 chief and didn't get the pay, and five other chiefs

13 got promoted and was given the pay.

14 BY MR. HERBERT:

15 Q. And you told the EEOC that the five other

16 guys were white, right?

17 A. Yeah, I believe I did.

18 MR. LEINENWEBER: Objection to form and

19 foundation, also asked and answered.

20 BY MR. HERBERT:

21 Q. You thought that might have been a

22 reason? That was part of your concern was that they

23 didn't give you the money because you were black?

24 A. No, my concern was that I didn't get the

Page 73

1 money because I thought they were more political.

2 Q. Okay. You though you were being treated

3 different than the white employees, right?

4 MR. LEINENWEBER: Objection. Form and

5 foundation.

6 BY MR. HERBERT:

7 Q. You can answer.

8 A. Yeah, I thought I was being treated

9 differently than the five chiefs that got promoted

10 who happened to be white.

11 Q. Okay. And what happened with that case?

12 A. The EEOC investigator came back with,

13 you're going to have to -- they should promote me to

14 the right pay grade and they should give some

15 training on this, and basically they didn't give me

16 the pay right away. I eventually did get it though.

17 Q. Okay. And who were the five white guys

18 that were given the pay that you were not?

19 A. Ranzino was one -- no. After I found out

20 Ranzino hadn't gotten the money either. He got the

21 visit. But they were all people who were in patrol

22 or the fugitive unit. They were in the unit, but

23 they weren't, you know, in my immediate unit.

24 Q. Do you remember any of their names other

Page 74

1 than Ranzino?

2 A. I have it written down somewhere but --

3 let me see. I think Murphy.

4 Q. Was Greg Shields one of them?

5 A. Murphy. No, Greg Shields wouldn't have

6 been in that. He was already a director or

7 something.

8 Q. Okay. Well, let me ask you about, you

9 said that Winston made a complaint against you to the

10 sheriff, correct?

11 A. Not to my knowledge. He made a complaint

12 about -- something about I denied him the right to go

13 to OPR.

14 Q. Okay. And you were named as an accused

15 in that, right?

16 A. Yes.

17 Q. And did you deny him the opportunity to

18 go to OPR?

19 A. I did.

20 Q. Okay. And why? Why did you deny it?

21 A. Well, I had a priority assignment. All

22 the units were out on the street. I don't know if

23 you're aware, we had those priority inmates. They

24 were, let's say people like rapists, priorities out

Page 75



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1337 of 1503 PageID #:1728
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 there in the south suburb who they tried to rape a
2 lady. You know, people who had serious charges, and
3 they were our priority inmates.
4        So I had to assign -- Winston was
5 the south car, so I assigned it to his car. When I
6 came up front to dispatch about 20, 30 minutes into
7 the shift, I'm asking, what's going on with the
8 priority guy? I haven't got in touch with the car
9 yet. So I'm like, who is the car? Winston and
10 William. Where are they at? I don't know, Chief.
11 So now I'm a little upset. You know, full up with
12 gas, go get coffee, get their equipment. They're
13 taking their time about getting to the assignment. I
14 was a little upset. And all of a sudden Winston
15 comes walking through the hallway, I'm like, where
16 were you at? I said, you are supposed to be on this
17 assignment. You know, and I'm kind of busting him
18 out about not being at the assignment. He said, I
19 want to go to OPR.
20      Q. Did he tell you why he wanted to go to
21 OPR?
22      A. No, he didn't. I thought he wanted to go
23 and see OPR because I was telling him to get to his
24 assignment. He never told me that he -- I didn't
Page 76

1 find until a long time later that he was arguing with
2 the director. He never told me that. He said, I
3 want to go to OPR. I'm like, you can go on your
4 lunchtime or you can go after this assignment.
5      Q. You found out that he wanted to go to OPR
6 to complain about him and Shields having an argument?
7      A. No, I thought he wanted to go to OPR
8 because of what I had said to him about his not
9 getting to the assignment.
10      Q. Right. But you found out he wanted to
11 make a complaint about Shields?
12      MR. LEINENWEBER: Objection. Asked and
13 answered.
14      THE WITNESS: That's what I was told later
15 on, that the reason he wasn't out at that assignment
16 is because he was in there with Director Shields.
17 BY MR. HERBERT:
18      Q. Okay. So you gave him an order that he
19 couldn't go to OPR, fair to say?
20      A. I didn't give him an order. I told him
21 to go take care of the assignment. I can't give a
22 person an order not to go to OPR. He can go any time
23 he wants. I told him he needs to take care of this
24 assignment.
Page 77

1      Q. Okay. And certainly it's an employee's
2 right to make a complaint when they want to, correct?
3      A. Yes, it is.
4      Q. And it's their right to go make that
5 complaint to OPR directly, correct?
6      A. Correct.
7      Q. Okay.
8      A. Keep in mind, there are boundaries. I
9 mean, we're on the job --
10      MR. LEINENWEBER: Hang on a second, Tom.
11 Hang on. There's no question.
12      MR. HERBERT: Yeah.
13      If we can go to page 10,
14 interrogatory No. 20.
15      MR. LEINENWEBER: And, Dan, just for planning
16 purposes, can we stop at like noon for like 15,
17 20 minutes for a break?
18      MR. HERBERT: Absolutely. Absolutely.
19      MR. LEINENWEBER: Okay. Cool.
20      MR. HERBERT: Just tell me when.
21      MR. LEINENWEBER: It's 11:50. So do you want
22 to go until noon and then just take a quick one?
23      MR. HERBERT: Yeah. Let me go through this,
24 and then we'll be done.
Page 78

1      MR. LEINENWEBER: Okay.
2      MR. HERBERT: Okay. If we can go to page 10,
3 there we go, No. 20.
4 BY MR. HERBERT:
5      Q. Do you see that question there? "Please
6 state whether the defendant, you, has ever received a
7 complaint of racial discrimination." And then if you
8 can look at your response, the last sentence, "Never
9 received any formal complaints of racial
10 discrimination while employed at the Cook County
11 Sheriff's Office." Do you see that?
12      A. That's correct.
13      Q. Okay. Have you ever received any
14 informal complaints about racial discrimination? You
15 talked earlier about everything was race related or
16 something along those lines.
17      MR. LEINENWEBER: Objection. Form, misstates
18 previous testimony.
19      Go ahead.
20      THE WITNESS: Well, I've never got an
21 informal. I've had -- oh, the guys were -- they were
22 in conversation in some cases. It wasn't every day
23 but not even informal. They didn't come and say,
24 hey, this happened. Because as I said, if you tell
Page 79



Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1338 of 1503 PageID #:1729
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 me, it's going on paper.  Put it in paper or don't
2 tell me about it because you cannot tell me anything
3 and me not do nothing about it.  So you're going to
4 have to put it in writing and we'll forward it just
5 like we're supposed to do.  The guys never handed me
6 with anything like that seriously.
7 BY MR. HERBERT:
8     Q.  Right.  And you told them if you make a
9 complaint, we're going to put that in writing, right?
10     **A.  Correct.**
11     Q.  Okay.  And people did come with issues,
12 racial issues, right, but it just never rose to a
13 formal complaint?  Is that fair to say?
14     MR. LEINENWEBER:  Objection to form and
15 foundation.
16     THE WITNESS:  No.  No.  They never came with
17 racial issues.  They would -- maybe I shouldn't even
18 mention it because it's just complaints.  It wasn't
19 about anybody in specific.
20 BY MR. HERBERT:
21     Q.  Right.  And I don't want to get hung up
22 on the word complaint.  I understand that has
23 significance.  But just talk about race, there was
24 various people, there were beefs about race by the
Page 80

1     **A.  No one has ever come to me, if this is**
2 **where you're getting, and said deputy chief or chief**
3 **or supervisor or investigator called me a name they**
4 **shouldn't have.**
5     Q.  Because if they did come to you with that
6 information, you would be required to conduct a
7 formal investigation, right?
8     **A.  Absolutely.**
9     Q.  And you would tell the guys that, hey,
10 you come to me with that, we're going to make it
11 formal, right?
12     MR. LEINENWEBER:  Objection to form,
13 foundation.
14     THE WITNESS:  Well, if it's something of that
15 nature, I would have made it formal.
16 BY MR. HERBERT:
17     Q.  Okay.  Are you aware of any -- strike
18 that.  We went through it.
19         Why don't we -- we'll take our
20 break.  How's that?
21     MR. LEINENWEBER:  Yeah, that's fine.  When do
22 you want us to come back?
23     MR. HERBERT:  Want to do 12:15?
24     MR. LEINENWEBER:  Yeah, that works.
Page 82

1 black investigators, fair to say?
2     **A.  I would say I can probably count them on**
3 **one hand.**
4     Q.  What was the nature of those beefs?
5     **A.  Any time they didn't get what they**
6 **wanted.**
7     Q.  You mean as far as like a work
8 assignment?
9     **A.  Yes.**
10     Q.  And those were the black employees?
11     **A.  Yes.**
12     Q.  And any other beefs other than not
13 getting the assignments that they wanted?
14     **A.  You know, I want to -- you say black**
15 **employees.  It was only a couple.  They complained**
16 **all the time.**
17     Q.  Okay.
18     **A.  For the most part, you know, it wasn't**
19 **everybody.  It was just a couple who always**
20 **complained, always.**
21     Q.  I've got you.  And aside from, you know,
22 beefs about their work assignments, any other beefs
23 about, you know, supervisors or anything along those
24 lines?
Page 81

1     MR. HERBERT:  Okay.
2         (Whereupon, a short break
3             was taken.)
4     MR. HERBERT:  Okay.  Let's go back on the
5 record then.
6         And if I could show the witness
7 Exhibit C, what's marked as Neal Exhibit C.
8 BY MR. HERBERT:
9     Q.  Okay, Mr. Neal, do you see this document
10 on the screen?
11     **A.  Yes, I do.**
12     Q.  Okay.  And it indicates that it's the
13 comprehensive officer history for you, correct?
14     **A.  Okay.**
15     Q.  Do you see your name there in the second
16 line?
17     **A.  Yes.**
18     Q.  Okay.  And if we can go to that first
19 bolded point where use of force.  Do you see that
20 there?
21     **A.  I do.**
22     Q.  Okay.  And then it talks about there was
23 an incident on -- and I don't know how you're
24 involved in this but January -- or I'm sorry,
Page 83



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1339 of 1503 PageID #:1730
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

July 20th, 2009 there was an allegation about Robert
Brown striking his girlfriend in front of
Division 10.  Do you remember that incident?

    **A.  No, I have no knowledge of it.**

    Q.  Okay.  Yeah, I don't know if it's -- I
don't see your name linked to that at all, but do you
know who Robert Brown is?

    **A.  Yes, I do.**

    Q.  Okay.  Were you ever involved in -- were
you aware of the fact that he was alleged to have
struck his girlfriend in front of Division 10 at some
point?

    **A.  No.  No, I wasn't.**

    Q.  Okay.  Did he work for you, Robert Brown?

    **A.  He worked a different shift.**

    Q.  Okay.  And if we can go to page 2 of that
same document, and towards the bottom of the page
where it says -- it says summary punishment IA No.
SPR 20101464, and then if we can go to the following
page, about halfway down the page is a summary.  Do
you see that summary there, Mr. Neal?

    **A.  Yes, I do.**

    Q.  Okay.  This was an investigation into
you, correct?

    MR. LEINENWEBER:  Objection to form and
foundation.

BY MR. HERBERT:

    Q.  It's a bad question.

    The summary says, "Detective
Pietrowski reports that Chief Neal called in medical
on 29 April to 15 May 2010, but had no medical time
available.  Do you see that?

    **A.  Yes, I do.**

    Q.  Okay.  And that was sustained, correct?

    **A.  I basically don't remember the incident.**

    MR. HERBERT:  If we can scroll up just a
little bit to the top.

BY MR. HERBERT:

    Q.  If you see down the bottom there where it
says allegations -- or I'm sorry.  Yeah, towards the
top allegations, May 21, 2010 sustained.  Do you see
that?

    **A.  Yes.**

    Q.  Okay.  So that grievance against you was
sustained, correct?

    MR. LEINENWEBER:  Objection to form,
foundation.

    Go ahead.

    THE WITNESS:  If it says it, I'm assuming.  I
don't remember the incident.

BY MR. HERBERT:

    Q.  All right.

    **A.  I knew by then I was in the hospital for
a while.**

    Q.  And you were given a reprimand below
that, actions taken, correct?

    **A.  Okay.**

    Q.  Is that correct, you were given a
reprimand?

    **A.  I honestly don't remember the incident.**

    Q.  Okay.

    **A.  This may have been an administrative
thing while I was off.  I was in the hospital.  I
don't recall being presented with the reprimand.**

    Q.  Okay.  Well, you would agree with me that
a reprimand is the lowest level of discipline?

    **A.  Yes.**

    Q.  Okay.  And essentially what the
allegation was, just from reading it, is that you put
in for the medical on days that you were sick, but
you did not have the medical time available.  Is that
correct?

    **A.  Yes.  That's what it would probably
reference if I got a reprimand for it.  That's not
actually the lowest.  Verbal is the lowest.  A
reprimand is written.**

    Q.  Okay.  And you had -- we'll go through
this.  You had different situations in which you were
also accused of being -- using medical time when in
fact you didn't have any medical time?

    **A.  Yeah.  I had FMLA.**

    Q.  Okay.  So when you called in for medical,
you received your full pay, correct?

    MR. LEINENWEBER:  Objection to form and
foundation.

    THE WITNESS:  No.

BY MR. HERBERT:

    Q.  Did you say yes?

    **A.  No.  If you don't have any medical time,
you don't get paid.**

    Q.  Okay.  We can move on to the next page
and this is a -- it's a drug test.  Essentially on
May 18, 2010, you tested positive for codeine --

    **A.  Yes.**

    Q.  -- and the reading was seven times the
acceptable level.  Do you remember that?



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1340 of 1503 PageID #:1731

**A. Yes, I do.**

Q. And you were de-deputized as a result of
that?

**A. I believe I was until I brought in my**
**medical documentation.**

Q. Okay. And what were you on codeine for?

**A. I had back surgery.**

Q. Okay.

MR. HERBERT: All right. If we can move on
to page 5 of that document, so I think it's the next
page. Towards the bottom there.

BY MR. HERBERT:

Q. Okay. And you see here IA number, use of
force incident, January -- or June 20, 2011, and in
the following page is the summary which talks about
detainee John Melton was drunk and disorderly upon
arrival at the residence for re-incarceration. He
was combative and resisted restraints. Detainee was
restrained physically. He was placed inside a car
and started kicking?

**A. Yes.**

Q. So you remember that incident?

**A. Yeah, and I think he kicked out the**
**windows of the car on the expressway.**

Page 88

Q. Okay. And did you have to use force on
that individual?

**A. No, I didn't. I was just the supervisor**
**in charge.**

Q. Okay. Well, was there an allegation that
somebody used excessive force on him?

**A. Not to my knowledge.**

Q. Okay. What else do you remember about
that incident other than that?

**A. I remember, if this is the incident in**
**question, I remember getting a call from the unit**
**that they had a combative subject and he had kicked**
**the windows out of the car and they were on the**
**expressway and he was jumping out of the window.**

MR. HERBERT: Okay. If we can go to page 9
of that document, so Bates stamped 70 at the bottom.
70. Great.

BY MR. HERBERT:

Q. And if you can see that second bolded
point where it talks entered by Mary Chessin,
August 30, 2012. Do you see that?

**A. Yes.**

Q. And if we scroll down to the bottom of
that page, and you see the summary there.

Page 89

"December 16, 2014, Lieutenant Neal was absent with
no sick time." Do you see that?

**A. Yes, I do.**

Q. And you see right above that you received
a reprimand for that, correct?

**A. Yes.**

Q. Okay. So was this the same offense as
the previous offense that we talked about?

**A. Well, the thing is, I had FMLA and I**
**don't remember any of this being sustained because I**
**had FMLA. I remember some type of charges until I**
**brought in the medical documentation and then they**
**was supposed to remove it.**

Q. You were on FMLA for this incident?

**A. Yeah. I got injured at work in 2004 and**
**I was off for close to a -- maybe a year, and I've**
**had two back surgeries since then from that incident.**

Q. The first incident --

**A. You know, I was taking time off to go to**
**the hospital and rehab.**

Q. So is it your testimony that on this
December 16, 2014 date that you were on FMLA time?

**A. Well, I'm not sure when I got the FMLA.**
**Yeah, I'm pretty sure. Yeah, I absolutely had it in**

Page 90

2014.

Q. Okay. And why is it that you were --
that it was sustained if you were on FMLA?

MR. LEINENWEBER: Objection to form and
foundation.

THE WITNESS: That's a good question. I
wasn't aware that any of that was sustained.

BY MR. HERBERT:

Q. Okay. Well, now you are, I guess, right?

**A. Yeah.**

Q. You never received a report that you were
given a reprimand for not having -- being absent
without sick time?

**A. No.**

MR. HERBERT: Okay. If we can go to page 11
of that document. Okay. And go to the bottom.

BY MR. HERBERT:

Q. And do you see that? We talked a little
bit about this earlier. This is the instance where
Winston wanted to go to OPR and you told him he
couldn't. Do you remember talking about that?

**A. I don't believe that date is correct**
**because my last day of work, I had an incident with a**
**shooting, a young man that got shot, and I intervened**

Page 91



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1341 of 1503 PageID #:1732

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 92**

1 and injured my back again, and I think May of 2015
2 was my last day of work. I never went back.

3    Q.   All right. Then that's very important
4 for the next point. If we go to page 13 then, and
5 about midway down where we look at the summary, do
6 you see that there where it says on February 2, 2016,
7 you were alleged to have failed to properly supervise
8 and sign off on the electronic control weapon
9 issuance lot resulting in a loss? Do you see that?
10 Do you see that?

11    A.   I see it, but that's not correct. I
12 wasn't even there then.

13    Q.   You weren't even there?

14    A.   No.

15    Q.   And it says that you were -- above that
16 it says that that allegation was sustained and you
17 were given a one-day suspension?

18    A.   Those dates are incorrect.

19    Q.   Okay. Do you remember this incident?

20    A.   Yeah. One of the supervisors discharged
21 his Taser in the office and I got suspended because I
22 was the supervisor.

23    Q.   Okay. But this talks about -- and when
24 did that take place?

**Page 93**

1    A.   It was before 2015.

2    Q.   Okay. But looking at the summary --

3    A.   I think whoever wrote this was guessing.

4    Q.   Okay. What was the name of the
5 individual?

6    A.   Sergeant Major. What was his name? I
7 can't think of his name right now.

8    Q.   That's all right. Well, looking at the
9 summary, that summary does not -- it's not speaking
10 to that incident. You would agree with me on that,
11 right?

12    A.   Probably -- "Neal failed to properly
13 supervise and sign off on the electronic control
14 weapon issuance resulting in a loss." No, no, no,
15 no, no.

16    Q.   What do you mean by that? You chuckled
17 and said no, no, no. What do you mean by that?

18    A.   Somebody lost a piece of equipment, and
19 the supervisors are supposed to go in and inventory
20 the equipment. Well, they went back a whole month
21 and found sheets that didn't have no signature on it
22 and I guess they chose the supervisor to put it on,
23 but it says I got -- I never got any time off for
24 that.

**Page 94**

1    Q.   Okay.

2    A.   And I definitely wasn't at work in the
3 year 2016. Wait a minute. Let me think. Yes, 2015,
4 May 25, 2015 I no longer went back to that job.

5    Q.   Okay.

6    A.   I think they're guessing the dates.

7    Q.   Okay. You think they're guessing the
8 dates?

9    A.   Yeah, but if you have a document that
10 date, something is wrong with that.

11    Q.   Okay. When you were talking earlier
12 about the sheets, that you found the inventory sheets
13 were not signed, do you remember talking about that?

14    A.   Yes.

15    Q.   And that was the inventory for the
16 equipment in the EM unit?

17    A.   That's correct.

18    Q.   So things were not documented properly
19 when equipment came in and was taken out, right?

20    MR. LEINENWEBER: Objection to form and
21 foundation.

22    THE WITNESS: Well, let me kind of explain it
23 to you. There were like four supervisors on the
24 shift, me, Ranzino, Smith, Rohloff, but I was the

**Page 95**

1 watch commander. So if something's wrong, it's
2 probably going to fall on me.

3 BY MR. HERBERT:

4    Q.   Well, did you find out --

5    A.   Someone lost, misplaced a piece of
6 equipment which was later located and nobody signed
7 the receipt, the supervisor's spot at the bottom
8 logging it in, but that was in 2016.

9    Q.   Okay. And those were your supervisors
10 that worked under you that failed to sign the sheets?

11    MR. LEINENWEBER: Object to form and
12 foundation.

13    THE WITNESS: Not really. Ranzino was of
14 equal rank.

15 BY MR. HERBERT:

16    Q.   Okay. All right. I'm done with that
17 document. Perhaps we can go to Exhibit E.

18    MR. LEINENWEBER: Can I just clarify, which
19 exhibit are we supposed to be on here?

20    MR. HERBERT: E as in Eddie.

21    MR. LEINENWEBER: E. I thought you said D as
22 in dog. Okay. All right. I'm with you.

23 BY MR. HERBERT:

24    Q.   Okay. I'll represent to you, Mr. Neal,



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1342 of 1503 PageID #:1733

**Page 96**

1  that this is -- it's a complaint filed by Legrain
2  Winston to -- it appears to be addressed to Director
3  Miller. Do you know Director Miller?
4      A. Yes.
5      Q. And who is Director Miller?
6      A. He was in the DOC. He was director of
7  operations and over EM when they put us back under
8  the jail.
9      Q. Okay. And if you can look at this
10  document, and in there, the second sentence, "I've
11  been subjected to continuous something of harassment
12  and total disregard of CBA agreement by Chief Neal."
13  Do you see that there?
14      A. I have been subjected to continuous bouts
15  of harassment -- I'm assuming he's saying I totally
16  disregarded the Collective Bargaining Agreement.
17      Q. Yeah. The next sentence might give you
18  more clarity where he is complaining about blatant
19  disregard about the CBA agreement and had me working
20  numerous mandated days within the same period without
21  proper rotation. Do you see that?
22      A. Yes, I see that.
23      Q. Okay. And that was a complaint that was
24  being made by Investigator Winston about not being

**Page 97**

1  properly rotated through the assignments, correct?
2      MR. LEINENWEBER: Objection to form and
3  foundation.
4      You can go ahead.
5      THE WITNESS: Okay. Do you want me to
6  explain that?
7  BY MR. HERBERT:
8      Q. Well, that's what -- it's similar or
9  that's exactly what we were talking about earlier
10  when you said that Winston and the other black
11  employees, many of the other black employees were
12  complaining about their work assignments?
13      MR. LEINENWEBER: Objection to form,
14  foundation. Also misstates prior testimony.
15      Go ahead.
16      THE WITNESS: Yeah. Yeah, we mandated
17  overtime when we had an overflow of detainees that
18  were going to be put out on electronic monitoring.
19  So if we've got a hundred people, we mandated the
20  shift because we couldn't just pick. We had to
21  mandate the whole shift.
22  BY MR. HERBERT:
23      Q. Okay. If you can look down to, I think
24  it's the sixth line. See where it says, "Chief Neal

**Page 98**

1  made numerous threats of a personal nature in regard
2  to my family." Do you see that?
3      A. Yes. He's talking about the one incident
4  where I said, you guys are a bunch of crooks, because
5  of the illegal activity that I had considered turning
6  over to OPR, but the defendant in it did not want to
7  take it any further.
8      Q. So you referred to Winston's family as a
9  bunch of crooks?
10      A. Well, I don't know if he wants you
11  discussing it, but Winston's sister was dating
12  Investigator Cook and they were buying houses and
13  putting them in Cook's name because Cook had probably
14  an 800 credit score. It turns out they took money
15  out and Cook got left with the bill. He ended up
16  having to file a bankruptcy.
17      Q. And who is Investigator Cook?
18      A. Cook is a white guy that worked -- one of
19  the investigators that worked for me.
20      Q. Okay. What was his title? He was an
21  investigator?
22      A. He was an investigator. But see, he's
23  referring back to the one incident where I said,
24  yeah, they're a bunch of crooks.

**Page 99**

1      Q. Who were you referring to when you said
2  that?
3      A. His sister.
4      Q. Okay. And what information did you have
5  to believe that his sister was a crook at the time
6  you made that statement?
7      A. Well, the thing is, she was dating Cook
8  and had him sign his name on all this property and
9  they were taking the money and Cook got stuck with
10  the bill.
11      Q. Okay. Any other information that you had
12  to support your inference that his sister was a
13  crook?
14      A. Well, it was a figure of speech. I mean,
15  cook went into it with his eyes open, so. But the
16  fact that the other investigators on your list were
17  also involved in that flipping houses and they all
18  got out because they said something was going wrong.
19  They never discussed what it was, it was just that,
20  oh, man, I had to get out of that.
21      Q. So you became aware of this, this
22  criminal conduct?
23      MR. LEINENWEBER: Objection. Objection to
24  form and foundation.

Thomas Neal  -  9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1343 of 1503 PageID #:1734

1    Go ahead.
2    THE WITNESS:  Cook told me that he -- I
3 didn't have the specifics, but Cook told me that he
4 had got ripped off a lot of money.
5 BY MR. HERBERT:
6    Q.  Okay.  So when did you become aware of
7 the fact that there was some possible criminal
8 activity going on?
9    MR. LEINENWEBER:  The same objections.
10    THE WITNESS:  I didn't know if it was
11 criminal activity or him just getting the bad end of
12 a deal because he put his name on it.
13 BY MR. HERBERT:
14    Q.  What did Cook tell you, and when did he
15 tell you this?
16    **A.  Oh, I don't remember what year it was.**
17 **Like a day before the -- the same day as the gas**
18 **station incident when he said, yeah, Winston owed me**
19 **some money and he's supposed to be giving it to me.**
20 **Can you talk to him?  I'll ask him about it.  And I**
21 **said, why?  What's going on?  He told me that he has**
22 **to file bankruptcy because he's got like four houses**
23 **in his name and nobody is paying for them and**
24 **whatever.**
                                              Page 100

1    Q.  Okay.  So at the time Cook told you this,
2 was he an investigator, or was he a different rank?
3    **A.  He was an investigator.**
4    Q.  Okay.  And he's white, correct?
5    **A.  Yes.**
6    Q.  And he told you about this incident where
7 he had to declare bankruptcy, correct?
8    **A.  Yes.**
9    Q.  And then you went -- or I'm sorry.  And
10 you believe that it was, the way he described it,
11 something possibly criminal that happened?
12    **A.  No, I think he just got by him dating**
13 **Winston's sister, I think they just ripped him off.**
14 **That's my own personal opinion.**
15    Q.  Well, you said ripped him off, like bad
16 business deal, or did they -- did you believe they --
17 hold on.  Did you believe they committed criminal
18 acts?
19    **A.  Well, a bad business deal.**
20    Q.  Okay.  Unrelated to the -- his work as a
21 sheriff, right?
22    **A.  Correct.  Yeah, that's correct.**
23    Q.  Okay.  And then based upon that, you went
24 and had a conversation with Investigator Winston?
                                              Page 101

1    **A.  Yes.**
2    Q.  And that's when you referred to Winston's
3 family as crooks?
4    **A.  Yeah.  I think we were talking about it,**
5 **and I said -- and Winston agreed and he's going to**
6 **give Cook some money back, and then he said something**
7 **derogatory to me, I'm like, they ain't nothing but a**
8 **bunch of crooks and I walked off.**
9    Q.  Who were you referring to, they ain't
10 nothing but a bunch of crooks?
11    MR. LEINENWEBER:  Objection.  Asked and
12 answered.
13    THE WITNESS:  Whoever did the house deal.
14 BY MR. HERBERT:
15    Q.  Well, were you aware of who was on the
16 house deal at the time that you made that statement?
17    **A.  Not really.**
18    Q.  But you knew that it was more than one
19 person?
20    **A.  Yes.**
21    Q.  Okay.  And you knew that that involved Cook,
22 correct?
23    **A.  Yes.**
24    Q.  And you knew that it involved Winston's
                                              Page 102

1 sister, correct?
2    **A.  Yes.**
3    Q.  And you were referring to at least those
4 two as crooks, right?
5    MR. LEINENWEBER:  Objection to form,
6 foundation.
7    THE WITNESS:  No.  I didn't say Cook was a
8 crook.
9 BY MR. HERBERT:
10    Q.  Okay.  Did you report this information to
11 anyone, any of your supervisors, the information you
12 had about this potential criminal activity?
13    MR. LEINENWEBER:  Objection.  Form,
14 foundation.
15    Go ahead.
16    THE WITNESS:  There was nobody to report it
17 to.  Cook would have had to have made a complaint.
18 He didn't complain of any criminal activity.  He
19 complained of being stuck with a several hundred
20 thousand dollar bill.
21 BY MR. HERBERT:
22    Q.  Right.  But then you went and talked to
23 Winston at his direction, and you referred to her as
24 a crook for that involvement with Cook, correct?
                                              Page 103



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1344 of 1503 PageID #:1735

1   MR. LEINENWEBER:  The same objections.

2   THE WITNESS:  Yeah.  I made the statement.

3   BY MR. HERBERT:

4       Q.   So doesn't that indicate that you

5   believed there was criminal activity that took place?

6       A.   Well, I can believe a lot of things but,

7   I mean, I have no details.  I have no documents.  I

8   don't know what's going on.  All I know is that one

9   of my investigators got stuck with a three or

10  $400,000 bill for a bunch of houses that they all

11  went in together on and his name is the only one on

12  the document and he's the one that has to pay it.

13  BY MR. HERBERT:

14      Q.   Okay.  Did Cook continue to work for you?

15      A.   Cook was on another shift too, but Cook

16  had worked for me throughout the years ever since

17  we've been there.

18      Q.   Do you know if there was any type of

19  investigation into criminal conduct by Cook with

20  regard to that situation?

21      A.   No, I don't.

22      Q.   Did you ever tell anyone about Cook being

23  involved in something where he may or may not have

24  been a victim of criminal activity?

Page 104

---

1       A.   No, I didn't.

2       Q.   Okay.  If you can go down, it's about ten

3   lines from the bottom and it starts, "Once again,

4   Chief Neal went outside scope."  Do you see that?

5   Winston's saying that you told him, I can't stand

6   your dumb ass.  Do you see that?

7       A.   That comment was never made.

8       Q.   And also I'm going to get you fired,

9   right?

10      A.   That comment was never made.

11      Q.   Okay.  You never made a statement to

12  him -- did you ever refer to Winston as being dumb in

13  any way?

14      A.   No.

15      Q.   Did you ever threaten to get him fired?

16      A.   No.  As I said, Winston was a good

17  investigator when he was on his job.

18      Q.   Did you ever have reason to believe that

19  Winston was not a credible individual?

20      A.   Well, I do now.

21      Q.   Based upon the --

22      A.   These are just blatant lies.

23      Q.   The allegations in the Complaint are

24  blatant lies?

Page 105

---

1       A.   Pardon me?

2       Q.   You're saying the allegations in the

3   Complaint are blatant lies?

4       A.   Yes.  I always thought that me and

5   Winston had a good relationship.

6       Q.   Aside from what you believe are blatant

7   lies concerning what's in the Complaint, had you ever

8   had reason to doubt the credibility of Winston at any

9   time prior to this?

10      A.   Let me put it like this.  I don't know

11  who was Winston's juice, but Winston had some heavy

12  juice.

13      Q.   When you say juice, you're talking

14  about --

15      A.   Yeah.

16      Q.   Why do you believe he had heavy juice?

17      A.   Because he flaunted it all the time who

18  he knew and who his juice was.

19      Q.   Who did he say his juice --

20      A.   And it's kind of common knowledge, it

21  wasn't easy to get into EM.  If you're in EM,

22  somebody probably helped you.

23      Q.   Okay.  A phone call unit, I mean have you

24  heard that expression before?

Page 106

---

1       MR. LEINENWEBER:  Objection to form,

2   foundation.

3       THE WITNESS:  Phone call unit?

4   BY MR. HERBERT:

5       Q.   You had to be sponsored by somebody to

6   get into that unit?

7       A.   I have never heard that expression.

8       Q.   So it's fair to say that the EM unit, you

9   had to know somebody to get into that unit, right?

10      MR. LEINENWEBER:  The same objections.

11      THE WITNESS:  I didn't.  I didn't, but I got

12  in.  Somebody got me over there.

13  BY MR. HERBERT:

14      Q.   Who did Winston claim was his juice?

15      A.   I have no idea, and I didn't care because

16  I treated everybody the same.

17      Q.   What did he tell you that made you --

18  that supports his statement that he would always say,

19  you know, he's got juice.

20      A.   I couldn't recall.

21      Q.   Take your time.  Tell me anything you

22  remember to support the statement that Winston

23  bragged about having juice.

24      A.   I think he used to work for some alderman

Page 107

---



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1345 of 1503 PageID #:1736

Thomas Neal   -   9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 or something. I don't know who it was.

2    Q. Would he tell you that?

3    **A. Probably not because it was general**

4 **knowledge. Everybody over there knew somebody.**

5    Q. Okay. And you knew people, right?

6    MR. LEINENWEBER: Objection to form,

7 foundation.

8    THE WITNESS: I knew of -- pardon me?

9 BY MR. HERBERT:

10    Q. You were friends with Chief Shields,

11 right?

12    MR. LEINENWEBER: Objection to form,

13 foundation.

14    THE WITNESS: Not that kind of friend.

15 BY MR. HERBERT:

16    Q. But you knew big people in big places

17 though, right?

18    MR. LEINENWEBER: The same objections.

19    THE WITNESS: Yeah.

20 BY MR. HERBERT:

21    Q. You did, correct?

22    **A. Yeah.**

23    Q. Okay.

24    **A. Not when I came to the job.**

Page 108

1    Q. Well, and you told Winston that. You

2 told him, hey, I know big people in big places,

3 right?

4    MR. LEINENWEBER: Objection to form and

5 foundation.

6    THE WITNESS: No, absolutely not.

7 BY MR. HERBERT:

8    Q. Okay. Well, what complaints do you

9 remember Neal -- or I'm sorry, Winston making about

10 you?

11    MR. LEINENWEBER: Objection to form and

12 foundation.

13    THE WITNESS: The only thing I knew Winston

14 mentioned about me was that I told him he couldn't go

15 to OPR at that time. That is the only thing I'm

16 aware of.

17 BY MR. HERBERT:

18    Q. Okay.

19    **A. All these other things are new to me.**

20    Q. All the other plaintiffs that we talked

21 about earlier, did you have any reason to question

22 the credibility of these plaintiffs at any point that

23 you supervised them?

24    **A. Did I have any reason to what now?**

Page 109

1    Q. To doubt the credibility of any of the

2 plaintiffs while they worked for you in the EM unit.

3    **A. Not really. I was aware of the fact that**

4 **they complained all the time. You know, if it wasn't**

5 **one thing, it was another. I don't know any job that**

6 **the workers don't complain about the supervisors.**

7    Q. Okay. And, I mean, you as a supervisor,

8 you have a duty to report misconduct or infractions

9 concerning any of your employees, correct?

10    MR. LEINENWEBER: Objection to form and

11 foundation.

12    THE WITNESS: And when you say infractions,

13 what do you mean, any criminal infractions or just

14 infractions period?

15 BY MR. HERBERT:

16    Q. Well, why don't we say any violations of

17 department policy. If you become aware of any of

18 your employees that have violated department policy,

19 you have a duty to report that, correct?

20    **A. No.**

21    Q. You don't?

22    **A. I have discretion. If a guy came in**

23 **late, I wouldn't run it up the chain he was late.**

24    Q. Okay. And the supervisors that worked

Page 110

1 below you, they had discretion too, right?

2    MR. LEINENWEBER: The same objections.

3    THE WITNESS: Like I said, it depends on

4 what.

5 BY MR. HERBERT:

6    Q. Well, does it depend on what race the

7 person was that committed the policy violation?

8    MR. LEINENWEBER: The same objection.

9    THE WITNESS: Not to my knowledge.

10 BY MR. HERBERT:

11    Q. Okay. And you don't know what the other

12 supervisors, what went into their thought process

13 when making decisions about the discretion that they

14 had, correct?

15    MR. LEINENWEBER: Objection to form and

16 foundation.

17    THE WITNESS: I knew what they was supposed

18 to be doing.

19 BY MR. HERBERT:

20    Q. I've got you. All right. If we can go

21 to -- and I don't think we're too far away from being

22 over, but for some reason I don't see a sticker on

23 this but it's the -- it must be the last -- or wait a

24 minute. I'm sorry. Could Exhibit H be a multiple

Page 111



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1346 of 1503 PageID #:1737

Thomas Neal  -  9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 page exhibit?

2 MR. LEINENWEBER:  Is it a memo?

3 MR. HERBERT:  Yeah, but it's...

4 MR. LEINENWEBER:  August 12th.

5 MR. HERBERT:  That's H, but what I'm looking

6 at, Justin, I apologize, it's the OPR investigative

7 file on 2015-286 which is the one that -- it's the

8 investigative case into the instance where Winston

9 complained about going to OPR and not being able to

10 go there.  Do you guys have that or no?

11 MR. LEINENWEBER:  Do you have a Bates number

12 at the bottom of it?

13 MR. HERBERT:  17439.

14 MR. LEINENWEBER:  Let me ask you this way,

15 actually.  So you think it's Exhibit H that Kelly

16 would have sent over to me or no?

17 MR. HERBERT:  I don't know if it was part

18 of -- well, let's see.

19 Kelly, are you on?

20 MS. KRAUCHUN:  I am.  I'm muted, Guys.

21 Sorry.

22 MR. HERBERT:  Did you hear what I --

23 MS. KRAUCHUN:  Yeah, you're looking for H.

24 MR. HERBERT:  Well, no, it's the OPR

Page 112

1 investigative file into Shields and Neal regarding

2 Winston's complaint.  I had it in that stack that you

3 gave me, but there's no exhibit number.

4 MR. LEINENWEBER:  That's a pretty thick

5 document, isn't it, or no?

6 MR. HERBERT:  It is.

7 MR. LEINENWEBER:  Yeah.  I'm not seeing it in

8 the stuff that Kelly sent me.  I mean, I would have

9 it somewhere here but obviously Mr. Neal won't.

10 MR. HERBERT:  How about the court reporters

11 or the tech guy?

12 THE EXHIBIT TECH:  This is the Exhibit Tech.

13 I have Exhibits A through L, and I'm not seeing a

14 document as that described.

15 MR. HERBERT:  Okay.  You know what, maybe we

16 can just try it without the document.

17 BY MR. HERBERT:

18 Q.  Ready to go, Mr. Neal?

19 A.  Yes.

20 Q.  Okay.  Remember earlier we talked about

21 that incident where Winston wanted to go to OPR to

22 complain about Shields and --

23 A.  No.

24 MR. LEINENWEBER:  Hang on.  Let him ask his

Page 113

1 question.

2 THE WITNESS:  I didn't have that knowledge.

3 I'm sorry.

4 BY MR. HERBERT:

5 Q.  Got you.  Got you.  But you know what I'm

6 talking about, right?

7 A.  Yes.

8 Q.  All right.  When you say you didn't have

9 that knowledge, you didn't have the knowledge that

10 Shields had just yelled at him?

11 A.  Yes, that's correct.  I didn't know where

12 he was.  He didn't inform me.

13 Q.  Okay.  And why is that significant, that

14 you didn't know that Shields had -- I mean, you know

15 now what Shields --

16 A.  Well, had I known he was in with the

17 director, I wouldn't have been upset about him not

18 going to the assignment and I would have assigned it

19 to another car.

20 Q.  Okay.  Would you have let him go to OPR

21 if you knew that Shields had just yelled and screamed

22 at him?

23 A.  If he ever came up and told me he had

24 just got into a confrontation with the director, I

Page 114

1 would let him go to OPR immediately if that's what he

2 wanted.

3 Q.  Okay.  Because that would be a very

4 important thing for somebody to be able to report

5 immediately if they just got yelled and screamed at

6 by the director in their workplace, that would

7 warrant immediate notification, right?

8 MR. LEINENWEBER:  Objection to form and

9 foundation.

10 THE WITNESS:  Well, they can go to OPR for

11 anything.  So, I mean -- if he wants to go to OPR, go

12 to OPR.

13 BY MR. HERBERT:

14 Q.  Okay.  And he has a right to go to OPR,

15 correct?

16 MR. LEINENWEBER:  Objection to form, asked

17 and answered.

18 THE WITNESS:  Yes.

19 BY MR. HERBERT:

20 Q.  Okay.  And you were interviewed as part

21 of that investigation, correct?

22 A.  That's correct.

23 Q.  And in fact, you were an accused in that

24 investigation for not allowing Winston to go to OPR,

Page 115

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1347 of 1503 PageID #:1738
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 116**

1 correct?

2     **A. That's correct.**

3     Q. All right. And you said, well, I didn't

4 know that he was in there with the director, and

5 that's why you didn't allow him to go to OPR,

6 correct? Forget that. That's a bad question.

7     **A. Yeah.**

8     Q. All right. So you gave a statement in

9 that case, and in there you said that the shift had

10 just begun and Winston asked you if he could go to

11 OPR. That sounds correct, right?

12     **A. Well, the shift had just begun. He had a**

13 **priority assignment, and he disappeared on me. How**

14 **he got back in the back office with the director, I**

15 **don't know. I was looking for him and I was about to**

16 **assign the job to another car when he came walking**

17 **down the hall and I asked him, where were you? I've**

18 **been looking for you. I've been calling you on the**

19 **radio, and he said, I want to go to OPR. I'm like,**

20 **you can go to OPR on your lunch. Right now get to**

21 **your assignment. He didn't argue with me. He walked**

22 **on and left, and I told him he can go to OPR after**

23 **the assignment, or he went to OPR. I don't know**

24 **which one he did.**

**Page 117**

1     Q. Did Shields know that you had given him

2 that assignment?

3     **A. No, I don't give them assignments**

4 **personally. The dispatcher gives them the**

5 **assignments.**

6     Q. Well, do you know if Shields knew whether

7 or not he was dispatched to that assignment?

8     **A. I doubt it. I still to this day don't**

9 **how he even got back there, whether he was summoned**

10 **by Shields or if he went back there to talk to him.**

11     Q. All right. And in your statement you

12 said that you asked Winston was it an emergency. Do

13 you remember saying that?

14     **A. Did I ask him if it was an emergency to**

15 **go to OPR?**

16     Q. Yes.

17     **A. I don't recall that.**

18     Q. Okay. And you told him -- you told the

19 investigator that you told Winston because you could

20 have went before work, after work, or even on your

21 lunch period. Do you remember saying that?

22     **A. I do remember saying that.**

23     Q. Okay. And then you stated that you were

24 not aware that Investigator Winston and Director

**Page 118**

1 Shields had just had a confrontation, correct?

2     **A. That's correct. I thought he was**

3 **referring to my incident with him, telling him to go**

4 **to his assignment. I thought he was trying to get**

5 **out of the assignment.**

6     Q. And what's your knowledge, as you sit

7 here today, about the confrontation between Shields

8 and Winston?

9     **A. I have no -- no one has discussed it with**

10 **me, not Winston, not Shields, not anybody.**

11     Q. Okay. And you're familiar with the

12 grievance process?

13     **A. Yes.**

14     Q. Okay. And there's a second step, a third

15 step in the grievance process, correct?

16     **A. Yes.**

17     Q. Okay. And are you aware of the fact that

18 in this case Director Shields sat on the second stage

19 of the grievance process concerning this case?

20     MR. LEINENWEBER: Objection to form and

21 foundation.

22     THE WITNESS: I wasn't aware of it, but if

23 you say so, I'll accept that.

24

**Page 119**

1 BY MR. HERBERT:

2     Q. Well, you gave -- in your statement to

3 OPR, you said that second step grievances could be

4 heard by the deputy chief or the chief of the

5 electronic monitoring unit but never by the director

6 of the electronic monitoring unit. Do you remember

7 saying that?

8     MR. LEINENWEBER: The same objections.

9     THE WITNESS: I don't remember saying that,

10 but that sounds like that could be correct, I mean.

11 BY MR. HERBERT:

12     Q. Okay. And you became aware of the fact

13 that Shields, as the director of the electronic

14 monitoring unit, sat in on the second step of the

15 grievance for Winston in this case, right?

16     MR. LEINENWEBER: The same objection.

17     THE WITNESS: Who sat in on it?

18 BY MR. HERBERT:

19     Q. Shields.

20     **A. I don't know anything about the case at**

21 **all.**

22     Q. But you were asked about this issue

23 and you to OPR said that the second step grievances,

24 they could be heard by the deputy chief or the chief



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1348 of 1503 PageID #:1739

1 but never the director of electronic monitoring,
2 correct?
3     MR. LEINENWEBER: The same objection. Also
4 asked and answered.
5     THE WITNESS: I don't know if I said never.
6 I imagine it's discretion, but it's not a common
7 practice.
8 BY MR. HERBERT:
9     Q. Certainly it's not a common practice to
10 have the accused sit on a grievance where they're the
11 accused, right?
12     **A. I would agree with that.**
13     Q. Yeah, I mean that's -- because the person
14 that sits on the second step in a grievance, they
15 could influence the grievance process one way or the
16 other, right?
17     MR. LEINENWEBER: The same objections.
18     THE WITNESS: Yeah, I don't think so.
19 BY MR. HERBERT:
20     Q. Well, did you find out that Shields
21 was -- yeah, Shields, that the complaint against him,
22 OPR sustained it? You're aware of that, right?
23     MR. LEINENWEBER: Objection to form and
24 foundation. Also assumes facts not in evidence.

Page 120

1 BY MR. HERBERT:
2     Q. Go ahead.
3     **A. No, I wasn't.**
4     Q. I'm sorry?
5     **A. You asked me was I aware of it, I said**
6 **no.**
7     Q. Is this the first time you're hearing
8 that the allegations were sustained against Shields
9 with respect to that incident?
10     **A. Yes.**
11     MR. LEINENWEBER: The same objections. Also
12 assumes facts not in evidence.
13 BY MR. HERBERT:
14     Q. Well, I'll tell you that Shields was
15 found to have violated department policy, being
16 disrespectful or discriminatory treatment of any
17 member of the public or any member of the Cook County
18 Sheriff's Office. Were you aware of that?
19     MR. LEINENWEBER: Objection to form,
20 foundation, and also assumes facts not in evidence.
21     THE WITNESS: No.
22 BY MR. HERBERT:
23     Q. No, you weren't aware of that?
24     **A. No.**

Page 121

1     Q. You know what, I think we're getting
2 close. Maybe if we can take like a ten-minute break
3 and I'll check with Kelly, and then we'll come back
4 and wrap this baby up.
5     MR. LEINENWEBER: Okay. That sounds good to
6 me.
7         (Whereupon, a short break
8         was taken.)
9 BY MR. HERBERT:
10     Q. All right. Mr. Neal, earlier today I
11 believe you said, and correct me if I'm wrong, but I
12 believe you said that you did not work in the EM unit
13 after May 2015?
14     **A. You know, I thought it was May 2015, but**
15 **it could have been a later date.**
16     Q. Okay. Well, you're aware of the
17 allegations against Winston and a couple of the other
18 plaintiffs here about using -- their attempt to use
19 their court time for a tour of duty?
20     **A. You know, I did hear about that, but that**
21 **happened on the second watch and I was not involved**
22 **in any disciplinary or any investigation into it.**
23 **They were assigned to me, but they came in on the**
24 **second watch to go to court.**

Page 122

1     Q. Okay. So since it was second watch, you
2 would have no role in that investigation?
3     **A. Not -- the only way I would is if I was**
4 **put into the step process of the grievance, but I**
5 **wasn't.**
6     Q. Okay. So you don't think you had any
7 involvement in the investigation in this case at all?
8     **A. No, I know I didn't.**
9     Q. Okay. Well, let me show you --
10     MR. HERBERT: If we can show Exhibit J.
11 BY MR. HERBERT:
12     Q. Do you see that document there?
13     **A. Yes.**
14     Q. And it indicates that -- it has your name
15 at the top, right?
16     **A. It certainly does.**
17     Q. Okay. And you're listed as a complainant
18 on this complaint register, correct?
19     **A. Yes, I am.**
20     MR. HERBERT: And then if we can scroll to
21 the second page at the bottom, yeah, right at the
22 bottom.
23 BY MR. HERBERT:
24     Q. You see that that information is blank,

Page 123



Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1349 of 1503 PageID #:1740
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  correct, as far as the --
2     A.  Yes.
3     MR. HERBERT:  Okay.  And then if we can go to
4  the second page -- I'm sorry, the third page.  Right
5  there.
6
7  BY MR. HERBERT:
8     Q.  Complainant's signature.  There is no
9  signature there, right?
10    A.  Correct.
11    Q.  And it's because you never signed this
12 document, right?
13    MR. LEINENWEBER:  Objection to form and
14 foundation.
15    THE WITNESS:  My signature's not on it.
16 BY MR. HERBERT:
17    Q.  Well, let me ask you this.  Have you ever
18 seen this form before?
19    A.  I don't believe I have.  I didn't really
20 read it.  You would have to go back up.
21    Q.  That's fine.
22    A.  If that's about that court stuff, I had
23 nothing to do with that.
24    Q.  Okay.  Do you have any idea, as we sit

Page 124

1  here today, who would have prepared this document?
2  Mr. Neal?
3     A.  Yeah, I'm reading it.
4     Q.  Oh, I'm sorry.  Take your time.
5     A.  Yeah.
6        I don't know who prepared that.
7     Q.  But you know it wasn't you?
8     A.  Yes, I do know that.
9     Q.  Okay.  And you're familiar with the
10 complaint register process, and if you were the
11 complainant and there was an OPR investigation, you
12 would be interviewed as part of that investigation,
13 right, the complainant?
14    A.  Yes.
15    Q.  And you were never interviewed by OPR on
16 this case, right?
17    A.  I don't recall being interviewed.  I
18 recall being summoned to OPR about something, but I
19 do not remember this.  Well, I knew anything
20 involving Ferguson I hadn't been involved in anything
21 because he wasn't assigned to me.  Well, he was, but
22 he worked in TSS.
23    Q.  I'll report to you that I have the
24 investigative file on this and it indicates in there

Page 125

1  the people that were interviewed by OPR, and I'll
2  represent to you that your name is not listed as
3  somebody that was interviewed.
4     A.  Yeah.
5     Q.  So based upon that, it's fair to say you
6  were never interviewed by OPR about this incident,
7  right?
8     A.  No.
9     MR. LEINENWEBER:  Objection to form and
10 foundation.
11       Go ahead.
12 BY MR. HERBERT:
13    Q.  And you would agree with me that when you
14 were the chief, investigators were allowed to use
15 court time in lieu of their tour of duty in certain
16 situations, right?
17    A.  Yes.  If we were going to have a guy
18 working too many hours, we'd just let him use their
19 court in lieu of their duty hours.
20    Q.  Well, you know Chief Logan, right?
21    A.  Yes.  Deputy Chief Logan?
22    Q.  Yeah.  And Chief Logan, if he were to
23 have said that investigators are allowed to use court
24 time in lieu of their tour of duty.  As long as

Page 126

1  there's no shortage on the shift, most supervisors
2  would allow that.  You would agree with Chief Logan
3  on that?
4     A.  Well, I would say they would have to talk
5  to me before you -- you know, start taking my
6  personnel and making me short and causing me to, you
7  know, to cause overtime.
8     Q.  But you certainly became aware of the
9  fact that investigators had used their court time in
10 lieu of their tour of duty at times when you were the
11 chief, correct?
12    A.  Well, let me explain it.  If an
13 investigator went to court, he was there for an hour,
14 it was kind of a general thing.  I would give him
15 four hours because, you know, they had to get up,
16 they had to get to work.  You give them four hours of
17 time, but the whole day was not a norm.
18    Q.  Okay.  Not a norm, but it happened?
19    A.  Yeah, it could happen.  I've actually
20 been in court nearly a whole day, so.
21    Q.  Okay.
22    A.  But if I was there an hour or two, I
23 would never put in for eight hours.
24    MR. HERBERT:  Okay.  All right.  I don't

Page 127



Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1350 of 1503 PageID #:1741

1  think I have anything else.

2       Kelly, unless I missed something.

3       MS. KRAUCHUN:  No, I think we're good, Dan.

4       MR. LEINENWEBER:  I do have one or two

5  questions, but I just need a quick break.  Sorry,

6  Guys.  So if we take about five minutes probably.

7       MR. HERBERT:  Whatever you need.

8           (Whereupon, a short break

9            was taken.)

10      MR. LEINENWEBER:  No questions.

11      Ethan, have we been waiving or

12 reserving signature?

13      MR. WHITE:  Yeah, we've been waiving.

14 Waived.

15     (FURTHER DEPONENT SAITH NOT...)

16

17

18

19

20

21

22

23

24

Page 128



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1351 of 1503 PageID #:1742

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1                  REPORTER'S CERTIFICATE

2

3          I, Brenda S. Hall, CSR No. 084-003359,

4    Certified Shorthand Reporter of said state, do hereby

5    certify:

6          That previous to the commencement of the

7    examination of the witness, the witness was duly

8    sworn to testify the whole truth concerning the

9    matters herein;

10         That the foregoing remote deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15         That the said remote deposition was taken

16   before me at the time and place specified;

17         That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1352 of 1503 PageID #:1743
Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 7th day of October, 2020.

3

4

5          _____

6                Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Thomas Neal - 9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1353 of 1503 PageID #:1744

## WORD INDEX

**< $ >**
**$400,000** 104:*10*

**< 0 >**
**04** 24:*2*
**084-003359** 2:*1*
*129:3*

**< 1 >**
**1** 61:*18*
**10** 78:*13* 79:2
*84:3, 11*
**10:00** 2:*2*
**100** 2:*8*
**11** 91:*15*
**11:50** 78:*21*
**111** 3:*15*
**12:15** 82:*23*
**120** 2:*13*
**123** 3:*16*
**12th** 112:*4*
**13** 92:*4*
**15** 78:*16* 85:7
**16** 2:2 90:*1, 22*
**17439** 112:*13*
**18** 87:*21*
**18-cv-05726** 1:*10*
**1969** 6:*20* 7:*17*
**1970** 7:*17*
**1980** 7:*24* 8:*16*
**1988** 8:*14* 10:*12*
**1989** 11:2 12:*17*
*13:18*

**< 2 >**
**2** 84:*16* 92:6
**20** 8:*4* 28:22 76:6
*78:14, 17* 79:*3*
*88:14*
**200** 2:*19*
**2000** 2:*14*
**2002** 13:*18* 17:8
*20:24* 21:*1* 22:*17*
*24:2* 71:*19*
**2004** 24:*10* 27:*12*
*90:15*
**2008** 30:*15, 16, 19*
*31:10, 11*

**2009** 30:*19* 31:*11*
*84:1*
**2010** 85:*7, 17* 87:*21*
**20101464** 84:*19*
**2011** 88:*14*
**2012** 71:*19* 89:*21*
**2013** 43:*21*
**2014** 90:*1, 22* 91:*1*
**2015** 92:*1* 93:*1*
*94:3, 4* 122:*13, 14*
**2015-286** 112:*7*
**2016** 92:6 94:*3*
*95:8*
**2017** 31:*16*
**2020** 2:2 130:*2*
**206** 2:*7*
**20th** 84:*1*
**21** 85:*17*
**2201** 2:*19*
**25** 94:*4*
**29** 66:*20* 85:7

**< 3 >**
**30** 76:6 89:*21*
**312** 2:*9*

**< 4 >**
**4** 10:*19* 11:22, 24
*12:10* 69:*3*
**40** 12:3 14:*10, 14*

**< 5 >**
**5** 3:*1* 88:*10*
**50** 12:4

**< 6 >**
**60** 12:4
**60523** 2:*20*
**60602** 2:*14*
**60661** 2:*8*
**630** 2:*20*
**655-7660** 2:*9*
**67** 3:*12* 6:*1*

**< 7 >**
**70** 89:*16, 17*
**72** 7:*24*
**786-3705** 2:*15*
**7th** 130:*2*

**< 8 >**
**800** 98:*14*
**80s** 8:*24*
**83** 3:*13*
**866** 2:*15*
**89** 18:*23* 32:*23*

**< 9 >**
**9** 89:*15*
**90s** 20:2*1* 21:*23*
*32:24*
**95** 3:*14* 22:*4*
**984-0339** 2:*20*
**99** 53:*8*

**< A >**
**a.m** 2:*2*
**able** 57:*20* 112:*9*
*115:4*
**above-entitled** 1:*23*
**absent** 90:*1* 91:*12*
**Absolutely** 64:*1*
*78:18* 82:8 90:*24*
*109:6*
**academy** 10:*13, 16,*
*18, 20* 11:*2*
**accept** 14:6 118:*23*
**acceptable** 87:*24*
**acclimated** 30:*20*
**accolades** 37:*11*
**accommodate** 49:*7*
**accommodated**
*49:9, 11*
**accurate** 68:*18*
**accused** 75:*14* 87:7
*115:23* 120:*10, 11*
**Acey** 48:*7, 10*
**acting** 14:*3* 28:*7,*
*10, 14* 29:*1*
**action** 63:*23*
*129:21*
**actions** 86:*8*
**active** 8:*6*
**activity** 98:*5* 100:*8,*
*11* 103:*12, 18*
*104:5, 24*
**acts** 101:*18*
**addition** 57:*19*
**address** 6:*7*
**addressed** 96:2
**adequately** 69:*7*

**administrative**
*86:14*
**advance** 19:*12*
**African-American**
*54:3*
**afternoon** 19:*23*
**agree** 33:*10* 34:*18*
*86:17* 93:*10*
*120:12* 126:*13*
*127:2*
**agreed** 102:*5*
**agreement** 96:*12,*
*16, 19*
**ah** 58:7 61:*13*
**ahead** 16:*15, 22*
*25:1, 10, 12* 26:*16*
*31:4* 36:*14* 40:*18*
*46:1, 19* 48:2*1*
*51:3, 17* 52:*2*
*56:24* 57:9 60:*19*
*66:16* 67:5, 8
*79:19* 85:*24* 97:*4,*
*15* 100:*1* 103:*15*
*121:2* 126:*11*
**ain't** 102:*7, 9*
**Air** 7:*18, 19* 8:*10*
**alarms** 14:*11*
**alderman** 107:*24*
**alike** 60:*24* 61:*1, 14*
**allegation** 84:*1*
*86:21* 89:*5* 92:*16*
**allegations** 85:*16,*
*17* 105:*23* 106:2
*121:8* 122:*17*
**alleged** 84:*10* 92:*7*
**allow** 5:*14* 18:*3*
*116:5* 127:*2*
**allowed** 126:*14, 23*
**allowing** 115:*24*
**Anderson** 23:*9, 10,*
*16* 24:*3, 19* 28:*19*
**answer** 4:*23* 5:*5,*
*14, 15* 25:*12, 13*
*59:11* 74:*7*
**answered** 37:*14*
*55:11* 73:*19* 77:*13*
*102:12* 115:*17*
*120:4*
**answering** 26:*14*
*27:20*

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1354 of 1503 PageID #:1745
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

answers 5:*3* 68:*5*, *10*, *16*
ANTHONY 1:*6* 65:*21*
anticipate 5:*12*
anybody 40:*22* 48:*6* 54:*9* 80:*19* 118:*10*
anyone's 48:*13*
anyways 6:*9*
apologize 112:*6*
apparently 25:*2*
APPEARANCES 2:*5*
Appeared 2:*11*, *15*, *22* 64:*23*
appears 96:*2*
applied 9:*18*, *22* 10:*6*, *8*
apply 9:*8*, *11* 21:*5* 22:*12*
approximately 10:*10* 11:*2* 43:*3*
April 85:*7*
arbitration 72:*24*
arbitrator 72:*24*
area 14:*21*, *23* 15:*1*, *3*, *16* 49:*2*, *3*
areas 15:*14*, *21*
argue 116:*21*
arguing 77:*1*
argument 64:*6* 77:*6*
Army 7:*22* 8:*1*, *10*, *15*
arrangements 53:*1*
arrival 88:*17*
aside 81:*21* 106:*6*
asked 5:*9* 22:*13* 55:*10* 73:*19* 77:*12* 102:*11* 115:*16* 116:*10*, *17* 117:*12* 119:*22* 120:*4* 121:*5*
asking 5:*11* 11:*9* 76:*7*
ass 105:*6*
assign 76:*4* 116:*16*
assigned 11:*6*, *11* 14:*21* 15:*3*, *18* 19:*3*, *7*, *11*, *16*, *18*, *20* 20:*1*, *8*, *17*

31:*18* 49:*24* 50:*2* 67:*12*, *14* 76:*5* 114:*18* 122:*23* 125:*21*
assigning 48:*3*
assignment 10:*15* 11:*7* 14:*16*, *22* 16:*3*, *4* 17:*23*, *24* 18:*6* 19:*9*, *13* 25:*7* 30:*11* 48:*2*, *14* 50:*20* 51:*22* 55:*9* 59:*21* 67:*17* 75:*21* 76:*13*, *17*, *18*, *24* 77:*4*, *9*, *15*, *21*, *24* 81:*8* 114:*18* 116:*13*, *21*, *23* 117:*2*, *7* 118:*4*, *5*
assignments 13:*21* 14:*5*, *8*, *9* 15:*10*, *12*, *20* 16:*10* 18:*7* 48:*16* 49:*12*, *23* 51:*4* 53:*4*, *6*, *13* 54:*19*, *23* 55:*15* 66:*13* 67:*2* 81:*13*, *22* 97:*1*, *12* 117:*3*, *5*
assistant 21:*8*
assumes 63:*15* 120:*24* 121:*12*, *20*
assuming 18:*15* 86:*1* 96:*15*
attempt 122:*18*
attorney 129:*18*, *19*
attrition 22:*14*
audio 57:*3*, *15*
August 31:*16* 89:*21* 112:*4*
available 85:*8* 86:*23*
awarded 37:*11*
aware 54:*17* 55:*18*, *22* 63:*17* 66:*12* 75:*23* 82:*17* 84:*10* 91:*7* 99:*21* 100:*6* 102:*15* 109:*16* 110:*3*, *17* 117:*24* 118:*17*, *22* 119:*12* 120:*22* 121:*5*, *18*, *23* 122:*16* 127:*8*

< B >
baby 122:*4*

back 7:*16*, *21* 12:*8* 19:*18* 30:*21* 58:*2* 71:*18* 74:*12* 82:*22* 83:*4* 88:*7* 90:*17* 92:*1*, *2* 93:*20* 94:*4* 96:*7* 98:*23* 102:*6* 116:*14* 117:*9*, *10* 122:*3* 124:*20*
backed 37:*14*
bad 9:*7* 44:*18* 85:*4* 100:*11* 101:*15*, *19* 116:*6*
bankruptcy 98:*16* 100:*22* 101:*7*
Bargaining 96:*16*
barking 31:*2*
BARONI 2:*11*
based 69:*10*, *13* 101:*23* 105:*21* 126:*5*
basement 49:*16*, *20*, *21* 51:*11* 53:*16*
basic 44:*9*
basically 15:*2* 20:*21* 22:*15* 40:*19* 41:*5* 48:*11* 74:*15* 85:*11*
basis 53:*14*
Bates 89:*16* 112:*11*
beefs 59:*6*, *8* 80:*24* 81:*4*, *12*, *22*
begging 49:*23*
beginning 19:*15*
begun 116:*10*, *12*
behalf 2:*11*, *15*, *22*
behavior 44:*18*
believe 6:*20* 10:*11* 13:*23* 24:*17* 32:*21* 69:*7* 72:*8*, *12* 73:*17* 88:*4* 91:*22* 99:*5* 101:*10*, *16*, *17* 104:*6* 105:*18* 106:*6*, *16* 122:*11*, *12* 124:*19*
believed 104:*5*
best 51:*5*, *6*, *11* 68:*17*
Better 18:*14* 52:*4* 58:*19*
bid 19:*6*

big 5:*2* 27:*19* 59:*4* 108:*16* 109:*2*
bill 98:*15* 99:*10* 103:*20* 104:*10*
bit 27:*15* 30:*23* 31:*9* 55:*2* 68:*4* 85:*13* 91:*19*
black 54:*14* 55:*4*, *6*, *23* 56:*14* 58:*8* 59:*18* 61:*13*, *17*, *24* 63:*21*, *22* 64:*3* 67:*13* 72:*9* 73:*6*, *23* 81:*1*, *10*, *14* 97:*10*, *11*
blacks 54:*22*
blank 123:*24*
blatant 96:*18* 105:*22*, *24* 106:*3*, *6*
blood 63:*8*
bolded 83:*19* 89:*19*
booked 11:*18*
boss 36:*2*, *5* 44:*1*, *21*
bosses 42:*19* 47:*11*
bothered 59:*23*
bottom 69:*4* 84:*17* 85:*15* 88:*11* 89:*16*, *23* 91:*16* 95:*7* 105:*3* 112:*12* 123:*21*, *22*
boundaries 78:*8*
bouts 96:*14*
bragged 107:*23*
branch 7:*15*
brass 44:*5*
break 4:*21* 57:*23* 78:*17* 82:*20* 83:*2* 122:*2*, *7* 128:*5*, *8*
breaking 30:*22* 31:*8*
Brenda 1:*24* 129:*3*
broke 57:*5*
Brook 2:*20*
Brother 6:*16*
brought 88:*4* 90:*12*
Brown 84:*2*, *7*, *14*
buddy-buddy 34:*9*, *12*
bullshit 58:*17*
bunch 98:*4*, *9*, *24*

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1355 of 1503 PageID #:1746
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

102:*8*, *10* 104:*10*
**business** 101:*16*, *19*
**busting** 76:*17*
**buying** 64:*24* 98:*12*

**< C >**
**cadet** 10:*18* 12:*9*
13:*12*
**call** 15:*5* 35:*3*
48:*23*, *24* 57:*18*, *21*
60:*10*, *12* 89:*11*
106:*23* 107:*3*
**called** 5:*19* 64:*9*
82:*3* 85:*6* 87:*10*
**calling** 116:*18*
**calls** 27:*20* 37:*15*
60:*2*, *16*
**campus** 24:*18*
**Capacity** 1:*12*, *13*,
*15*, *16*, *18*
**captured** 13:*13*
**car** 14:*6*, *22*, *24*
15:*3*, *5* 67:*20* 76:*5*,
*8*, *9* 88:*19*, *24*
89:*13* 114:*19*
116:*16*
**card** 64:*15*
**care** 36:*17* 64:*18*
77:*21*, *23* 107:*15*
**career** 9:*15* 27:*2*
**cars** 14:*21* 15:*18*
48:*20*
**case** 4:*7* 54:*1*
74:*11* 112:*8* 116:*9*
118:*18*, *19* 119:*15*,
*20* 123:*7* 125:*16*
**cases** 4:*13* 79:*22*
**caught** 70:*12*
**cause** 1:*23* 127:*7*
**caused** 57:*3*, *14*
**causing** 127:*6*
**cautioned** 58:*18*
**CBA** 96:*12*, *19*
**CECIL** 1:*6* 65:*20*
**center** 10:*21*, *24*
11:*17*
**central** 15:*15*
**certain** 126:*15*
**certainly** 27:*2*
29:*17* 60:*8* 62:*20*

78:*1* 120:*9* 123:*16*
127:*8*
**CERTIFICATE**
129:*1*
**Certified** 1:*24*
129:*4* 130:*6*
**certify** 129:*5*
**chain** 110:*23*
**change** 12:*6* 30:*7*
44:*11* 48:*22*
**changes** 51:*20*
**characterize** 66:*1*
**charge** 40:*6* 41:*17*
89:*4*
**charges** 76:*2* 90:*11*
**check** 122:*3*
**checked** 14:*13*
**checks** 14:*12*
**Chessin** 89:*20*
**Chicago** 2:*8*, *14*
6:*6*, *14* 130:*2*
**Chicagoan** 6:*10*
**chief** 21:*2*, *5*, *7*, *18*,
*20* 22:*10*, *12*, *15*, *18*
23:*2*, *5*, *7*, *17*, *18*, *20*,
*21*, *22* 24:*1*, *3*, *14*,
*19* 25:*5* 27:*12*, *14*,
*19* 28:*7*, *10*, *14*, *19*,
*21* 29:*2* 30:*9*, *13*,
*17* 31:*13*, *17* 32:*1*,
*6*, *9* 33:*7* 37:*2*, *13*,
*17* 38:*21*, *22* 39:*15*
40:*8* 41:*9*, *18*, *19*
44:*12* 45:*18* 47:*24*
48:*4*, *7*, *10* 49:*1*
56:*13* 63:*11*, *20*
66:*11* 67:*19* 71:*19*
72:*3*, *5* 73:*12*
76:*10* 82:*2* 85:*6*
96:*12* 97:*24* 105:*4*
108:*10* 119:*4*, *24*
126:*14*, *20*, *21*, *22*
127:*2*, *11*
**chiefs** 14:*2* 29:*15*
40:*21* 41:*4*, *12*
45:*17*, *20* 61:*7*
72:*4* 73:*12* 74:*9*
**choose** 44:*24* 45:*2*
**chose** 93:*22*
**chosen** 16:*17*
**Chris** 37:*19*

**CHRISTOPHER**
1:*17* 29:*22*
**chuckled** 93:*16*
**City** 6:*6*
**civilian** 37:*5*
**claim** 107:*14*
**claimed** 13:*11*
**clarify** 95:*18*
**clarity** 96:*18*
**class** 69:*19*
**classes** 37:*10*
**clear** 5:*16* 25:*10*
**cleared** 15:*4*
**close** 90:*16* 122:*2*
**clout** 26:*21* 27:*1*
**codeine** 87:*21* 88:*6*
**coffee** 50:*13* 76:*12*
**collaboration** 66:*18*
**Collective** 96:*16*
**collectively** 8:*5*
47:*16*
**College** 7:*17*
**combative** 88:*18*
89:*12*
**come** 11:*16* 19:*10*
48:*24* 50:*11* 56:*10*
58:*18* 79:*23* 80:*11*
82:*1*, *5*, *10*, *22* 122:*3*
**comes** 76:*15*
**coming** 32:*24*
44:*10* 49:*5* 58:*4*
**commander** 95:*1*
**commencement**
129:*6*
**commendations**
38:*3*
**comment** 105:*7*, *10*
**comments** 70:*14*
**committed** 101:*17*
111:*7*
**committing** 16:*20*
**common** 26:*24*
106:*20* 120:*6*, *9*
**complain** 50:*1*
54:*20* 55:*8* 67:*19*
77:*6* 103:*18* 110:*6*
113:*22*
**complainant** 123:*17*
125:*11*, *13*
**Complainant's**
124:*8*

**complained** 54:*21*
58:*7* 72:*14*, *15*, *21*
81:*15*, *20* 103:*19*
110:*4* 112:*9*
**complaining** 54:*18*,
*23* 66:*13*, *21* 96:*18*
97:*12*
**Complaint** 54:*9*
56:*11* 58:*9*, *13*, *14*
71:*15*, *24* 75:*9*, *11*
77:*11* 78:*2*, *5* 79:*7*
80:*9*, *13*, *22* 96:*1*,
*23* 103:*17* 105:*23*
106:*3*, *7* 113:*2*
120:*21* 123:*18*
125:*10*
**complaints** 55:*14*,
*22* 56:*3* 58:*4*, *5*
66:*24* 71:*13* 79:*9*,
*14* 80:*18* 109:*8*
**comprehensive**
83:*13*
**concern** 73:*22*, *24*
**concerning** 106:*7*
110:*9* 118:*19* 129:*8*
**condition** 37:*9*
**conduct** 82:*6*
99:*22* 104:*19*
**conducted** 60:*2*, *11*
**conducting** 60:*9*, *12*
**conference** 57:*3*, *15*
**confrontation**
114:*24* 118:*1*, *7*
**consider** 16:*2*
**considered** 98:*5*
**consistency** 53:*14*
**constant** 49:*22*
**constitutes** 129:*13*
**context** 61:*2*, *21*
62:*2*
**continue** 104:*14*
**continuous** 96:*11*,
*14*
**control** 92:*8* 93:*13*
**conversation** 79:*22*
101:*24*
**conveyed** 47:*19*
**COOK** 1:*11*, *18*
4:*14* 6:*2*, *22* 8:*13*,
*18* 9:*8*, *17* 64:*16*
69:*8* 71:*10* 79:*10*

Thomas Neal   -   9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1356 of 1503 PageID #:1747
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

98:*12, 13, 15, 17, 18*
99:*7, 9, 15*  100:*2, 3, 14*  101:*1*  102:*6, 21*
103:*7, 17, 24*
104:*14, 15, 19, 22*
121:*17*
**Cook's**  98:*13*
**Cool**  78:*19*
**correct**  7:*12*  8:*16, 17*  11:*4*  15:6, *7*
17:8, *9*  19:*5*  22:*7*
26:*8*  27:*3*  28:*12*
35:*22*  37:*1*  38:*11*
39:*4, 8, 11, 22, 24*
44:*18, 24*  45:*1, 18*
47:*24*  48:*17*  49:*14*
50:*18*  53:*7*  58:*12*
62:*14*  65:*4*  75:*10*
78:2, *5, 6*  79:*12*
80:*10*  83:*13*  84:*24*
85:*10, 21*  86:*8, 10, 24*  87:*11*  90:*5*
91:*22*  92:*11*  94:*17*
97:*1*  101:*4, 7, 22*
102:*22*  103:*1, 24*
108:*21*  110:*9, 19*
111:*14*  114:*11*
115:*15, 21, 22*
116:*1, 2, 6, 11*
118:*1, 2, 15*  119:*10*
120:*2*  122:*11*
123:*18*  124:*1, 10*
127:*11*
**Correctional**  7:*10*
11:*24*
**Cosmopolitan**  6:*17*
**counsel**  44:*24*
129:*18, 19*
**counseling**  44:*17*
**count**  81:*2*
**COUNTY**  1:*11, 18*
4:*14*  6:*2, 23*  8:*13, 19*  9:*9, 17*  69:*8*
71:*10*  79:*10*  121:*17*
**couple**  4:*18*  24:*4*
55:*12*  56:*1*  57:*17*
61:*12*  81:*15, 19*
122:*17*
**course**  69:*21*
**courses**  69:*14, 20, 24*

**COURT**  1:*1*  5:*4, 16*  113:*10*  122:*19, 24*  124:*22*  126:*15, 19, 23*  127:*9, 13, 20*
**credibility**  106:*8*
109:*22*  110:*1*
**credible**  105:*19*
**credit**  98:*14*
**crew**  29:*13*
**criminal**  99:*22*
100:*7, 11*  101:*11, 17*  103:*12, 18*
104:*5, 19, 24*  110:*13*
**crook**  64:*9, 10*
99:*5, 13*  103:*8, 24*
**crooks**  64:*4*  98:*4, 9, 24*  102:*3, 8, 10*
103:*4*
**cry**  49:*19*
**CSR**  2:*1*  129:*3*
**currently**  6:*5*
**cut**  27:*21*

**< D >**
**DAFFADA**  2:*11*
**daily**  48:*2*
**damn**  66:*4*
**Dan**  4:*5*  68:*22*
78:*15*  128:*3*
**dan.herbert@danher
bertlaw.com**  2:*9*
**DANIEL**  2:*6*
**DART**  1:*11*
**date**  90:*22*  91:*22*
94:*10*  122:*15*
**dates**  92:*18*  94:*6, 8*
**dating**  98:*11*  99:*7*
101:*12*
**DAVID**  1:*7*  65:*21*
**day**  19:*3, 10, 19*
23:*6*  35:*12*  48:*15, 16*  49:*19, 20, 21*
51:*13, 14, 20*  52:*11*
53:*6*  64:*6*  66:*19, 22*  79:*22*  91:*23*
92:*2*  100:*17*  117:*8*
127:*17, 20*  130:*2*
**days**  48:*5*  49:*8*
86:*22*  96:*20*
**day's**  48:*12*
**day-to-day**  56:*3, 7*

**DCSI**  23:*4, 5, 6*
24:*14*  27:*14, 18, 19*
29:*2*
**deal**  100:*12*  101:*16, 19*  102:*13, 16*
**dealt**  35:*5*
**December**  90:*1, 22*
**decision**  59:*1*
**decisions**  111:*13*
**declare**  101:*7*
**de-deputized**  88:*2*
**defendant**  71:*8*
79:*6*  98:*6*
**Defendants**  1:*20*
2:*17, 22*
**definitely**  52:*1*  94:*2*
**delivered**  47:*10*
**demanded**  36:*16*
**denied**  75:*12*
**Dennis**  48:*10*
**deny**  75:*17, 20*
**dep**  57:*18*
**department**  7:*1*
9:*1, 17, 20, 22*  33:*9*
34:*8*  35:*13*  41:*11*
42:*3, 21*  66:*20*
69:*12*  70:*10*  71:*16*
110:*17, 18*  121:*15*
**depend**  111:*6*
**dependent**  14:*5*
39:*21*
**depending**  40:*5*
53:*5*
**depends**  18:*16*
41:*17*  111:*3*
**DEPONENT**  128:*15*
**deposition**  1:*22*
3:*11*  4:*9*  129:*10, 15*
**deputy**  14:*2*  22:*23*
23:*14, 21, 22*  32:*2*
38:*21*  39:*15*  41:*9, 19*  43:*23*  45:*15*
82:*2*  119:*4, 24*
126:*21*
**derogatory**  102:*7*
**described**  101:*10*
113:*14*
**designated**  38:*19*
**details**  68:*24*  104:*7*
**detainee**  88:*16, 18*

**detainees**  14:*12, 14*
16:*17*  97:*17*
**Detective**  85:*5*
**determination**  14:*19*
**diagnostic**  10:*21, 24*
11:*17*
**Diane**  23:*21*
**different**  40:*12*
44:*16*  46:*4*  48:*9*
49:*23*  51:*19*  57:*10*
65:*10, 16*  74:*3*
84:*15*  87:*6*  101:*2*
**differently**  53:*5*
74:*9*
**difficult**  36:*5*
**difficulties**  57:*4, 15*
**DIRECT**  5:*21*
23:*3*  31:*20, 23*
36:*15*
**direction**  103:*23*
129:*13*
**directly**  37:*17*  45:*5*
47:*23*  63:*4*  78:*5*
129:*20*
**director**  22:*20, 21, 23*  23:*14*  27:*18*
29:*16*  32:*10, 11, 14*
36:*14*  41:*11*  43:*10, 23, 24*  44:*1*  45:*11, 13*  75:*6*  77:*2, 16*
96:*2, 3, 5, 6*  114:*17, 24*  115:*6*  116:*4, 14*
117:*24*  118:*18*
119:*5, 13*  120:*1*
**directors**  24:*18, 22, 23*  27:*20*  32:*2*
44:*8*  45:*15*  61:*7*
**director's**  22:*23*
**disappeared**  116:*13*
**discharged**  92:*20*
**discharges**  8:*10*
**disciplinary**  37:*10*
38:*7, 21*  45:*4*
122:*22*
**discipline**  38:*10, 16*
39:*10, 15*  40:*1, 2, 9*
41:*3, 13, 16*  42:*13*
44:*13, 21*  86:*18*
**disciplined**  38:*24*

Thomas Neal  -  9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1357 of 1503 PageID #:1748
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**discretion** 44:*20*
110:*22* 111:*1, 13*
120:*6*
**discrimination**
69:*10* 79:*7, 10, 14*
**discriminatory**
121:*16*
**discussed** 99:*19*
118:*9*
**discussing** 98:*11*
**disorderly** 88:*16*
**dispatch** 14:6, *9*
17:*4, 12* 18:*10*
19:*18* 53:*16* 76:*6*
**dispatched** 14:*23*
16:*6* 37:6 117:*7*
**dispatcher** 14:*3, 7,*
*15* 15:*8* 17:*1* 37:6
117:*4*
**disregard** 96:*12, 19*
**disregarded** 96:*16*
**disrespectful** 121:*16*
**disrupted** 51:*9*
**DISTRICT** 1:*1, 2*
**DIVISION** 1:2
10:*19* 11:22, *24*
12:*10* 22:6, *13*
25:7 84:*3, 11*
**DOC** 42:8 43:8
96:6
**document** 68:6, *9,*
*24* 69:*4* 83:*9*
84:*17* 88:*10* 89:*16*
91:*16* 94:9 95:*17*
96:*10* 104:*12*
113:5, *14, 16*
123:*12* 124:*12*
125:*1*
**documentation**
88:*5* 90:*12*
**documented** 94:*18*
**documents** 104:*7*
**DocuSign** 68:*19*
**dog** 31:2 95:22
**doing** 4:*18* 12:8
27:*18* 28:20 52:24
56:*13* 57:*17* 58:8
111:*18*
**dole** 40:*9*
**doling** 41:*12*

**dollar** 103:*20*
**domestic** 69:*15*
**double** 12:*1*
**doubt** 106:8 110:*1*
117:*8*
**drink** 50:*13*
**drug** 87:20
**drugs** 16:*18*
**drunk** 88:*16*
**duly** 4:2 129:7
**dumb** 105:6, *12*
**duties** 11:*23* 37:*3*
60:*5*
**duty** 64:*13* 110:*8,*
*19* 122:*19* 126:*15,*
*19, 24* 127:*10*

< E >
**earlier** 79:*15* 91:*19*
94:*11* 97:9 109:*21*
113:*20* 122:*10*
**early** 21:*23*
**EASTERN** 1:2
**easy** 106:*21*
**Eddie** 95:*20*
**EEOC** 71:*14, 16*
72:*1, 6, 7, 20* 73:*4,*
*5, 15* 74:*12*
**eight** 127:*23*
**either** 8:*10* 9:2
43:22 74:*20*
**electronic** 12:*14*
13:*17, 20* 22:*18*
68:*23* 92:8 93:*13*
97:*18* 119:5, *6, 13*
120:*1*
**electronically** 69:*1*
**EM** 12:*12, 13, 16,*
*18, 20* 13:5, *7*
15:*21, 23* 17:*21*
23:*4, 5* 32:*10, 11,*
*16, 20, 21, 22* 33:9
34:*19* 42:*14* 43:*19*
45:*17* 46:*15* 70:*20*
94:*16* 96:7 106:*21*
107:*8* 110:2 122:*12*
**emergency** 117:*12,*
*14*
**EMERY** 2:*18*
**employed** 6:*22*
79:*10*

**employee** 71:*11*
129:*17, 18*
**employees** 35:*12*
74:*3* 81:*10, 15*
97:*11* 110:*9, 18*
**employee's** 78:*1*
**employment** 4:*14*
10:9 12:6 71:9
**encouraged** 46:*7,*
*14, 16*
**ended** 98:*15*
**enforcement** 9:*13*
**entered** 89:*20*
**entire** 20:*21* 31:*24*
32:*19*
**entirely** 68:*20*
**environment** 70:7
**environments** 71:*1*
**equal** 50:22 95:*14*
**equally** 67:*1*
**equipment** 15:*23,*
*24* 16:*1, 7, 8* 33:*3*
37:7 76:*12* 93:*18,*
*20* 94:*16, 19* 95:6
**especially** 4:*18*
49:*18*
**essentially** 86:*20*
87:*20*
**ETHAN** 2:*18*
128:*11*
**Eventually** 28:*24*
74:*16*
**everybody** 4:*20*
40:*12* 42:*16* 51:*15*
54:20 58:*21, 22*
81:*19* 107:*16* 108:*4*
**everyone's** 15:9
**evidence** 63:*15*
120:*24* 121:*12, 20*
**ewhite@emerylawltd**
**.com** 2:*21*
**exact** 6:6
**exactly** 97:9
**EXAMINATION**
3:*1* 5:*21* 129:7
**examined** 5:*19*
**example** 56:*12*
**excessive** 89:*6*
**executive** 24:*23*
32:*13*

**Exhibit** 3:*11* 67:*24*
83:7 95:*17, 19*
111:*24* 112:*1, 15*
113:*3, 12* 123:*10*
**Exhibits** 113:*13*
**explain** 17:*14*
94:22 97:6 127:*12*
**expressed** 13:*4*
**expression** 106:*24*
107:*7*
**expressway** 88:*24*
89:*14*
**eyes** 99:*15*

< F >
**fact** 32:*21* 84:*10*
87:8 99:*16* 100:*7*
110:*3* 115:*23*
118:*17* 119:*12*
127:*9*
**factor** 50:*19*
**facts** 63:*15* 120:*24*
121:*12, 20*
**factual** 35:*11*
**failed** 92:7 93:*12*
95:*10*
**fair** 15:*15* 17:*18*
34:20 53:*16* 55:*23*
60:*16* 62:6 77:*19*
80:*13* 81:*1* 107:8
126:*5*
**fairly** 53:*19*
**fairness** 53:*23*
**fall** 95:*2*
**familiar** 118:*11*
125:*9*
**family** 6:22 64:*10*
98:*2, 8* 102:*3*
**far** 22:*16* 29:*1*
35:20 44:*13* 81:7
111:*21* 124:*1*
**February** 92:6
**feel** 5:9, *13*
**feelings** 61:*16*
**FERGUSON** 1:*6*
125:*20*
**field** 14:*17, 18*
16:*4, 10* 17:*3, 11*
18:*12* 38:2
**figure** 19:8 42:*15*
43:*18* 99:*14*



Thomas Neal   -   9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1358 of 1503 PageID #:1749

**file** 98:*16* 100:22
112:7 113:*1* 125:24
**filed** 96:*1*
**fill** 64:*15*
**find** 56:*16* 77:*1*
95:*4* 120:20
**fine** 16:*23* 82:*21*
124:*21*
**finger** 47:*15*
**finish** 5:*15* 51:*17*
56:*5*
**finished** 16:22
**fired** 105:8, *15*
**FIRM** 2:*6*
**first** 4:*24* 10:*15*
21:*16* 47:*7* 69:*9*
72:*23* 83:*18* 90:*18*
121:*7*
**fit** 53:*17* 67:*10*
**five** 21:*24* 72:*4*
73:*12*, *15* 74:*9*, *17*
128:*6*
**flaunted** 106:*17*
**flipping** 65:*1* 99:*17*
**FMLA** 87:*9* 90:*9*,
*11*, *14*, *22*, *23* 91:*3*
**following** 57:*13*
69:*9* 84:*19* 88:*15*
**follows** 5:*20*
**Force** 7:*18*, *19*
8:*10* 83:*19* 88:*14*
89:*1*, *6*
**foregoing** 129:*10*
**forever** 19:*23*
**forget** 22:*23* 116:*6*
**form** 25:8, *23* 27:*4*
33:*13* 38:*12* 39:*2*
40:*16* 42:*23* 46:*17*
47:*13* 51:*1* 55:*16*
56:*19* 59:*9* 60:*17*
62:*11*, *22* 63:*14*
66:*14* 67:*3* 68:*10*
71:*2* 73:*9*, *18* 74:*4*
79:*17* 80:*14* 82:*12*
85:*1*, *22* 87:*12*
91:*4* 94:20 95:*11*
97:*2*, *13* 99:*24*
103:*5*, *13* 107:*1*
108:*6*, *12* 109:*4*, *11*
110:*10* 111:*15*
115:*8*, *16* 118:*20*

**formal** 19:*9* 28:*11*
55:*22* 58:*9*, *13*, *14*
79:*9* 80:*13* 82:*7*,
*11*, *15*
**formally** 28:*9*
**forward** 58:*20* 80:*4*
**found** 28:*14* 74:*19*
77:*5*, *10* 93:*21*
94:*12* 121:*15*
**foundation** 25:*9*, *24*
27:*5* 33:*14* 38:*13*
39:*3* 40:*17* 42:*24*
45:*22* 46:*18* 47:*14*
51:*2* 55:*17* 56:*20*
59:*10* 60:*18* 62:*12*,
*23* 63:*15* 66:*15*
67:*4* 71:*3* 73:*10*,
*19* 74:*5* 80:*15*
82:*13* 85:*2*, *23*
87:*13* 91:*5* 94:*21*
95:*12* 97:*3*, *14*
99:*24* 103:*6*, *14*
107:*2* 108:*7*, *13*
109:*5*, *12* 110:*11*
111:*16* 115:*9*
118:*21* 120:*24*
121:*20* 124:*14*
126:*10*
**founded** 61:*2*
**four** 14:*13* 94:*23*
100:*22* 127:*15*, *16*
**free** 5:*9* 15:*4*
**friend** 108:*14*
**friends** 9:*16* 29:*8*,
*9* 36:*11* 62:*24*
108:*10*
**frisky** 31:*7*
**front** 61:*11* 76:*6*
84:2, *11*
**fugitive** 74:22
**full** 76:*11* 87:*11*
**functions** 48:*10*
**further** 98:*7* 128:*15*

**< G >**
**gal** 54:*15*
**gals** 54:*15*
**gas** 64:*12*, *14*

**gear** 50:*12*
**general** 42:*6* 46:*5*
57:*13* 108:*3* 127:*14*
**getting** 10:*16*
14:*13* 24:*7*, *21*
25:*7* 31:*7* 51:*5*
66:*18* 67:*1*, *2*
71:20 76:*13* 77:*9*
81:*13* 82:*2* 89:*11*
100:*11* 122:*1*
**girlfriend** 84:*2*, *11*
**give** 5:*13*, *15* 14:*5*
38:*7* 49:*12* 51:*14*
56:*12* 73:23 74:*14*,
*15* 77:20, *21* 96:*17*
102:*6* 117:*3*
127:*14*, *16*
**given** 4:*9* 47:*2*, *4*
72:*3* 73:*13* 74:*18*
86:*7*, *10* 91:*12*
92:*17* 117:*1* 129:*14*
**gives** 68:*24* 117:*4*
**giving** 40:20 41:*3*
51:*8*, *12* 100:*19*
**go** 4:*17* 6:*15*
10:*13*, *17* 12:*13*, *16*,
*19* 14:*18* 16:8, *15*,
*22* 18:*17* 19:*15*
25:*1*, *10*, *12* 26:*16*
31:*4* 36:*14* 38:*2*
40:*1*, *18* 43:*14*
46:*1*, *19* 49:*3*, *15*
51:*3*, *11*, *17* 52:*2*
53:20 56:*16*, *24*
57:*9* 58:*2* 60:*19*
66:*16* 67:*5*, *8*, *23*
68:*8*, *11* 69:*3*
75:*12*, *18* 76:*12*, *19*,
*20*, *22* 77:*3*, *4*, *5*, *7*,
*19*, *21*, *22* 78:*4*, *13*,
*22*, *23* 79:*2*, *3*, *19*
83:*4*, *18* 84:*16*, *19*
85:*24* 87:*5* 89:*15*
90:*19* 91:*15*, *16*, *20*
92:*4* 93:*19* 95:*17*
97:*4*, *15* 100:*1*
103:*15* 105:*2*
109:*14* 111:*20*
112:*10* 113:*18*, *21*
114:*20* 115:*1*, *10*,

*11*, *14*, *24* 116:*5*, *10*,
*19*, *20*, *22* 117:*15*
118:*3* 121:*2*
122:*24* 124:*3*, *20*
126:*11*
**goal** 9:*12*
**goes** 35:20 44:*13*
**going** 18:*2* 19:*17*
24:*20*, *23* 36:*16*, *20*,
*21*, *22* 44:*11* 47:*6*
48:*19*, *20* 51:*10*
64:*19* 65:*3* 66:*10*
68:*2*, *3* 74:*13* 76:*7*
80:*1*, *3*, *9* 82:*10*
95:*2* 97:*18* 99:*18*
100:*8*, *21* 102:*5*
104:*8* 105:*8* 112:*9*
114:*18* 126:*17*
**good** 4:*3*, *4* 8:*12*
28:*16*, *17* 38:*4*
58:20 66:*5* 69:*2*
91:*6* 105:*16* 106:*5*
122:*5* 128:*3*
**gotten** 74:20
**Grade** 28:22 38:2*0*,
*23* 39:*1*, *7* 41:*4*
74:*14*
**Great** 9:*5* 44:*7*
89:*17*
**Greg** 32:*7* 34:*16*
75:*4*, *5*
**GREGORY** 1:*14*
**grievance** 85:20
118:*12*, *15*, *19*
119:*15* 120:*10*, *14*,
*15* 123:*4*
**grievances** 119:*3*, *23*
**gripes** 59:6, *8*, *15*, *16*
**groaning** 56:*3*, *7*
**groomed** 24:*19*
**ground** 4:*18*
**group** 29:*18* 30:*4*
70:*19*
**grow** 6:*12*
**guess** 11:*8* 26:*18*
50:*23* 70:*5* 91:*9*
93:*22*
**guessing** 69:*17*
93:*3* 94:*6*, *7*
**guy** 18:*19* 35:*24*
36:*15* 50:*21*, *23*

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1359 of 1503 PageID #:1750
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

52:20 56:10 62:3
73:6 76:8 98:18
110:22 113:11
126:17
**guys** 29:11 35:20,
23 42:21 44:10
45:9, 21 46:8, 22,
23 47:9, 12 48:24
49:9, 14, 19 50:10,
14, 16 51:18 53:8,
12, 17, 24 54:14
59:2 61:13 64:13,
19 65:23 66:12, 18,
20 67:1, 20 70:9
72:15, 17 73:7, 16
74:17 79:21 80:5
82:9 98:4 112:10,
20 128:6
**guy's** 52:15

**< H >**
**halfway** 84:20
**Hall** 1:24 116:17
129:3
**hallway** 76:15
**hand** 81:3 130:1
**handed** 80:5
**handle** 15:24 44:21
**handled** 14:22
33:3 40:2, 10 57:2
**Hang** 78:10, 11
113:24
**happen** 52:6, 7
70:24 71:1 127:19
**happened** 11:21
14:24 20:24 24:5
70:18 74:10, 11
79:24 101:11
122:21 127:18
**happens** 30:6
**happy** 52:3 60:9
**harassment** 69:10,
12, 15, 23 70:1, 6,
14 96:11, 15
**hard** 42:17
**harmed** 73:6
**head** 5:6 70:3
**hear** 35:9 60:23
64:2 112:22 122:20
**heard** 13:8 59:7
61:12, 14, 15, 17

62:20 63:2, 5, 12
106:24 107:7
119:4, 24
**hearing** 121:7
**heated** 64:6
**heavy** 44:17
106:11, 16
**hell** 28:4
**help** 59:5
**helped** 27:2 106:22
**HERBERT** 2:6
3:1 4:3, 5, 11, 13,
17 5:2, 8, 22 25:17
26:2, 7, 20 27:7
31:3 33:16 34:1, 6,
17 35:1 36:3, 8
38:15 39:5, 14, 19
40:7 41:1 42:1
43:2 46:6, 12 47:1,
8, 18 51:16 55:13,
20 56:23 58:1
59:14 60:1 61:4
62:18 63:1, 19
66:23 67:7 68:11,
12 69:2, 5 71:6
73:14, 20 74:6
77:17 78:12, 18, 20,
23 79:2, 4 80:7, 20
82:16, 23 83:1, 4, 8
85:3, 12, 14 86:3
87:15 88:9, 12
89:15, 18 91:8, 15,
17 95:3, 15, 20, 23
97:7, 22 100:5, 13
102:14 103:9, 21
104:3, 13 107:4, 13
108:9, 15, 20 109:7,
17 110:15 111:5,
10, 19 112:3, 5, 13,
17, 22, 24 113:6, 10,
15, 17 114:4
115:13, 19 119:1,
11, 18 120:8, 19
121:1, 13, 22 122:9
123:10, 11, 20, 23
124:3, 7, 16 126:12
127:24 128:7
**hereto** 129:20
**hereunto** 130:1
**hey** 46:21 47:12
49:17 52:15 64:16

66:24 79:24 82:9
109:2
**high** 6:15, 18 7:2
33:19 42:20
**higher** 23:11 39:1,
7 42:13
**Hispanic** 67:18
**history** 56:17 83:13
**hit** 51:12
**hold** 101:17
**hollered** 66:10
**home** 8:23 14:12
**honest** 56:7 63:7
67:15 68:17
**honestly** 51:7 86:12
**honorable** 8:9
**hospital** 49:4 86:5,
15 90:20
**hostile** 70:6, 24
**hostility** 63:24
**hour** 127:13, 22
**hours** 126:18, 19
127:15, 16, 23
**house** 16:18
102:13, 16
**houses** 64:24 98:12
99:17 100:22
104:10
**How's** 82:20
**humans** 5:13
**hundred** 97:19
103:19
**hung** 80:21

**< I >**
**I.V** 1:5 65:15
**IA** 84:18 88:13
**icy** 49:20
**ID** 3:10
**idea** 13:11 46:10
107:15 124:24
**illegal** 72:21 98:5
**ILLINOIS** 1:2, 19
2:1, 8, 14, 20 130:2
**imagine** 40:9
50:19 120:6
**immediate** 74:23
115:7
**immediately** 115:1,
5

**important** 5:11
92:3 115:4
**improprieties** 65:3
**Inaudible** 57:2, 14
**incident** 83:23
84:3 85:11 86:2,
12 88:14, 22 89:9,
10 90:14, 17, 18
91:23 92:19 93:10
98:3, 23 100:18
101:6 113:21
118:3 121:9 126:6
**incidents** 16:12
37:14
**including** 9:14
27:16 66:4
**incorrect** 92:18
**independent** 39:20
**indicate** 104:4
**indicates** 68:10
83:12 123:14
125:24
**indirectly** 129:20
**individual** 18:17
89:2 93:5 105:19
**Individually** 1:13,
14, 16, 17
**inference** 99:12
**influence** 120:15
**inform** 114:12
**informal** 58:14
79:14, 21, 23
**information** 82:6
99:4, 11 103:10, 11
123:24
**infractions** 45:9
46:23 110:8, 12, 13,
14
**in-house** 40:2, 10
**injured** 90:15 92:1
**inmates** 75:23 76:3
**inquiries** 43:10, 19
44:4
**inside** 50:5, 8, 11
53:13 88:19
**insignificant** 53:11
**instance** 47:16
60:21, 22 91:19
112:8
**instruct** 25:12

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1360 of 1503 PageID #:1751
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**intake** 11:*15*
**interest** 13:*4*
**interested** 129:*20*
**interject** 68:*23*
**interrogatories** 68:*5, 17*
**interrogatory** 78:*14*
**intervened** 91:*24*
**interviewed** 115:*20*
125:*12, 15, 17*
126:*1, 3, 6*
**inventory** 37:*8*
93:*19* 94:*12, 15*
**investigation** 82:*7*
84:*23* 104:*19*
115:*21, 24* 122:*22*
123:*2, 7* 125:*11, 12*
**investigations** 39:*21*
**investigative** 112:*6, 8* 113:*1* 125:*24*
**investigator** 12:*22, 23* 13:*6, 17* 14:*18, 19* 17:*4* 21:*17*
32:*24* 39:*8, 11, 16*
64:*8, 16* 74:*12*
82:*3* 96:*24* 98:*12, 17, 21, 22* 101:*2, 3, 24* 105:*17* 117:*19, 24* 127:*13*
**Investigators** 16:*6*
37:*10* 48:*3* 54:*18, 24* 55:*6, 23* 58:*7*
61:*13* 64:*4, 24*
66:*5* 67:*12, 13, 16*
81:*1* 98:*19* 99:*16*
104:*9* 126:*14, 23*
127:*9*
**involved** 4:*14*
83:*24* 84:*9* 99:*17*
102:*21, 24* 104:*23*
122:*21* 125:*20*
**involvement** 103:*24*
123:*7*
**involving** 125:*20*
**iPad** 57:*19*
**issuance** 92:*9* 93:*14*
**issue** 56:*15* 58:*7, 18* 63:*18* 119:*22*
**issues** 56:*1* 80:*11, 12, 17*

**< J >**
**jail** 11:*15, 16*
70:*10, 21, 22* 96:*8*
**jail's** 44:*5*
**January** 83:*24*
88:*14*
**Jefferson** 2:*7*
**job** 25:22 27:*11, 14, 18* 28:20 30:7
35:20 36:*18, 22, 24*
38:6 50:*13, 17*
54:*18* 55:9 66:5
78:9 94:4 105:*17*
108:*24* 110:5
116:*16*
**jobs** 14:6 17:*18, 20*
**Joe** 25:*15, 19*
27:*16, 23* 46:*4, 7*
57:2
**Joe's** 57:*11*
**John** 31:22, *23*
32:*3, 5, 14* 88:*16*
**join** 9:*18*
**joining** 8:*18* 13:5
**JOSEPH** 1:*12*
**JR** 1:*5*
**juice** 106:*11, 12, 13, 16, 18, 19* 107:*14, 19, 23*
**July** 84:*1*
**jump** 5:*13*
**jumping** 89:*14*
**June** 8:*14* 88:*14*
**JUSTIN** 2:*13* 112:*6*
**justin@ilesq.com**
2:*15*

**< K >**
**keep** 27:*12* 47:*5*
48:*17* 55:*3* 78:*8*
**KELLY** 2:*7* 4:*7*
112:*15, 19* 113:*8*
122:*3* 128:*2*
**kelly.krauchun@dan**
**herbertlaw.com**
2:*10*
**Kennedy-King** 7:*17*
**kept** 27:*14*
**kicked** 27:*23* 28:22

88:*23* 89:*12*
**kicking** 88:*20*
**killed** 16:*19*
**kind** 4:20 34:*8*
35:7 36:*15, 17*
42:2 47:20 57:*21*
76:17 94:22
106:*20* 108:*14*
127:*14*
**knew** 9:*19* 10:*1, 5*
26:19 27:8 34:*8, 14, 19* 35:*18, 20, 23*
36:4 42:8 47:*21*
51:*19* 54:*10* 61:8
65:*10, 12, 17* 66:*10*
69:22 86:5 102:*18, 21, 24* 106:*18*
108:*4, 5, 8, 16*
109:*13* 111:*17*
114:*21* 117:*6*
125:*19*
**know** 4:*21* 5:5
9:*21* 10:2, *4* 11:*18*
12:7 16:*8* 17:*14, 15, 23* 19:*11* 21:*13*
23:6 24:*18* 26:*1, 6*
29:*4* 33:2, *10, 18*
34:*11, 15, 22* 35:*9, 11* 36:*9, 12* 37:*8*
39:22 40:*21, 22*
41:*8* 42:*7, 9* 43:*5, 7* 44:*6, 7, 10* 45:*16, 23* 46:*2, 3, 15, 21*
47:*6* 48:*19* 49:*5, 17, 22* 50:*3* 51:*7, 14* 53:*2* 54:*13*
56:*14* 57:*1, 5, 12, 13* 58:*4, 10, 17*
59:*16* 60:*15* 61:*2, 18, 20, 23* 62:*1, 2, 15, 17, 19* 63:*12*
65:*6, 22* 66:*17*
69:*16* 70:*24* 72:*13, 19* 74:*23* 75:*22*
76:*2, 10, 11, 17*
81:*14, 18, 21, 23*
83:*23* 84:*5, 7*
90:*19* 96:*3* 98:*10*
100:*10* 104:*8, 18*
106:*10* 107:*9, 19*
108:*1* 109:*2* 110:*4,*

5 111:*11* 112:*17*
113:*15* 114:*5, 11, 14* 116:*4, 15, 23*
117:*1, 6* 119:*20*
120:*5* 122:*1, 14, 20*
123:*8* 125:*6, 7, 8*
126:*20* 127:*5, 7, 15*
**knowing** 27:*1*
**knowledge** 13:7
26:24 58:9 68:*18*
75:*11* 84:4 89:*7*
106:20 108:*4*
111:9 114:*2, 9*
118:*6*
**knowledgeable** 66:8
**known** 70:*11*
114:*16*
**KRAUCHUN** 2:*7*
4:*7* 112:*20, 23*
128:*3*

**< L >**
**lady** 76:2
**LaSalle** 2:*13*
**late** 110:*23*
**lateral** 30:*11*
**LAW** 2:*6, 18* 9:*13*
**lawsuit** 71:*8*
**lawyers** 4:*6* 6:*8*
**leads** 17:*13, 15*
**learned** 36:*20*
**leave** 36:*18*
**left** 24:*20* 30:*8*
36:*24* 98:*15* 116:*22*
**LEGRAIN** 1:*4*
65:*4* 96:*1*
**LEINENWEBER**
2:*11, 13* 25:*8, 23*
26:*4, 12, 15* 27:*4*
33:*13, 21* 34:*4, 10, 21* 36:*1, 6* 38:*12*
39:*2, 12, 17* 40:*4, 16* 41:*14* 42:*23*
45:*22* 46:*1, 9, 17*
47:*13* 51:*1* 55:*10, 16* 56:*19* 57:*16*
59:*9, 19* 60:*17*
62:*11, 22* 63:*14*
66:*14* 67:*3* 68:*22*
71:*2* 73:*9, 18* 74:*4*
77:*12* 78:*10, 15, 19,*

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1361 of 1503 PageID #:1752
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

21 79:1, 17 80:14
82:12, 21, 24 85:1,
22 87:12 91:4
94:20 95:11, 18, 21
97:2, 13 99:23
100:9 102:11
103:5, 13 104:1
107:1, 10 108:6, 12,
18 109:4, 11
110:10 111:2, 8, 15
112:2, 4, 11, 14
113:4, 7, 24 115:8,
16 118:20 119:8,
16 120:3, 17, 23
121:11, 19 122:5
124:13 126:9
128:4, 10
**level** 86:18 87:24
**License** 2:1
**lies** 105:22, 24
106:3, 7
**lieu** 126:15, 19, 24
127:10
**lieutenant** 39:6, 10,
16 44:11 48:8 90:1
**life** 9:14 36:5
**lifelong** 6:9
**liked** 59:12
**LIMITED** 2:18
**line** 22:16 32:4
83:16 97:24
**lines** 79:16 81:24
105:3
**linked** 84:6
**list** 99:16
**listed** 123:17 126:2
**little** 4:19 26:21
27:14 30:22 31:9
61:19 68:4 76:11,
14 85:13 91:18
**LLC** 2:11
**located** 95:6
**Logan** 126:20, 21,
22 127:2
**logging** 95:8
**long** 7:4, 23 8:2, 22
10:8 11:19 12:5
13:16 16:24 19:14
20:15, 16 23:24
28:13, 18 31:12, 23

77:1 126:24
**longer** 94:4
**look** 51:10 60:24
61:1, 13, 24 62:1
64:16 67:11 68:20
79:8 92:5 96:9
97:23
**looking** 93:2, 8
112:5, 23 116:15, 18
**looks** 68:19
**losing** 58:23
**loss** 8:20 92:9
93:14
**lost** 59:4 63:8
93:18 95:5
**lot** 27:8 44:20
59:12 67:2 92:9
100:4 104:6
**low** 67:21
**lower** 38:23
**lowest** 23:19 86:18
87:3
**lunch** 116:20
117:21
**lunchtime** 77:4

**< M >**
**mailman** 31:6
**maintenance** 16:1
**major** 16:12 37:14
93:6
**making** 28:5 43:9
50:20 53:6 55:22
58:5 70:14 109:9
111:13 127:6
**malfunctioning** 16:9
**man** 5:23 20:11,
13 61:17 63:21, 22
91:24 99:20
**management** 40:13,
15 42:10 46:4
56:21 57:10, 11
59:1 62:5 69:20
**manager** 8:20
**mandate** 97:21
**mandated** 96:20
97:16, 19
**MANNING** 1:7
65:21
**manpower** 52:22
**March** 12:17

**MARKED** 3:10
67:23 83:7
**Mary** 89:20
**matters** 129:9
**MCGHEE** 1:7
65:22
**mean** 11:7 14:12
17:14, 22 18:17
19:2 22:20 26:6
28:16 29:1 34:11,
13, 23 35:11 36:19
40:11 41:7, 15, 17
42:6 44:8, 16
45:13, 15, 24 46:20
47:16 48:17 53:1
54:7, 10 55:24
56:9 59:23 60:5,
21 78:9 81:7
93:16, 17 99:14
104:7 106:23
110:7, 13 113:8
114:14 115:11
119:10 120:13
**meant** 73:3
**medical** 85:6, 7
86:22, 23 87:7, 8,
10, 17 88:5 90:12
**medicals** 48:19
**meet** 29:11
**meeting** 42:9 46:21
**meetings** 24:20, 22,
24
**Melton** 88:16
**member** 121:17
**members** 6:22
42:20
**memo** 112:2
**men** 44:16 49:7
57:2
**mention** 73:2 80:18
**mentioned** 109:14
**mentors** 9:17
**merit** 43:14, 18
**message** 47:3, 19
**messages** 47:10
**meteoric** 33:8, 18
**MICHELLE** 1:4
65:6
**midnight** 22:1, 9
**midnights** 22:6

**midway** 92:5
**Midwest** 2:19
**Mike** 22:22
**Military** 7:3 9:14
20:13 36:20 69:18
**Miller** 96:3, 5
**mind** 47:5 48:18
55:3 62:6 78:8
**minute** 48:18
53:10 94:3 111:24
**minutes** 76:6
78:17 128:6
**misconduct** 110:8
**misplaced** 95:5
**missed** 128:2
**missing** 59:17
**mission** 51:5
**misstates** 46:18
59:10 63:16 79:17
97:14
**mom** 49:3
**money** 71:20 72:4,
6, 8, 18 73:23 74:1,
20 98:14 99:9
100:4, 19 102:6
**monitoring** 12:14
13:17, 20 22:19
37:4, 6 97:18
119:5, 6, 14 120:1
**month** 93:20
**months** 11:20
28:18, 19
**morning** 4:3, 4
**move** 87:19 88:9
**moved** 7:19
**moving** 35:16, 24
**multiple** 111:24
**Murphy** 75:3, 5
**muted** 112:20

**< N >**
**name** 4:5 21:11, 14
22:24 72:4 82:3
83:15 84:6 93:4, 6,
7 98:13 99:8
100:12, 23 104:11
123:14 126:2
**named** 75:14
**names** 44:6 54:13
74:24

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1362 of 1503 PageID #:1753
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

nature 81:4 82:15
98:1
NCIC 17:14
NEAL 1:15, 22 3:1,
11 4:3 5:18, 23
16:21 57:6 66:11
68:3 83:7, 9 84:21
85:6 90:1 93:12
95:24 96:12 97:24
105:4 109:9 113:1,
9, 18 122:10 125:2
nearly 127:20
need 5:3, 13 6:6
42:21 46:22 51:9,
20, 21 64:17 128:5,
7
needed 14:18 51:6
needs 77:23
neighborhood 6:13
31:7
nerve 63:9
never 13:8 27:21
34:12 48:19 51:19
54:8, 11 58:9
59:20 61:11 63:2
70:18 73:2 76:24
77:2 79:8, 20 80:5,
12, 16 91:11 92:2
93:23 99:19 105:7,
10, 11 107:7 119:5
120:1, 5 124:11
125:15 126:6
127:23
new 109:19
NEWSON 1:5
65:15
Nick 21:12
night 14:13
noon 78:16, 22
norm 127:17, 18
Normally 60:11
North 2:13 15:16
49:6 51:20
NORTHERN 1:2
notice 2:3
notification 58:14,
16 115:7
NUMBER 3:10
57:21 88:13
112:11 113:3

numerous 40:9, 11
63:12 69:20 96:20
98:1

< O >
Oak 2:20
Object 95:11
objected 26:16
objecting 26:13
Objection 25:8, 23
27:4 33:13 38:12
39:2 40:16 42:23
45:22 46:17 47:13
51:1 55:10, 16
56:19 59:9 60:17
62:11, 22 63:14
66:14 67:3 71:2
73:9, 18 74:4
77:12 79:17 80:14
82:12 85:1, 22
87:12 91:4 94:20
97:2, 13 99:23
102:11 103:5, 13
107:1 108:6, 12
109:4, 11 110:10
111:8, 15 115:8, 16
118:20 119:16
120:3, 23 121:19
124:13 126:9
objections 25:11
26:4, 12 33:21
34:4, 10, 21 36:1, 6
39:12, 17 40:4
41:14 46:9 59:19
100:9 104:1
107:10 108:18
111:2 119:8
120:17 121:11
obligated 58:19
observe 71:5
observed 41:21, 23
obvious 9:14
obviously 5:3, 8
12:14 29:20 39:7
41:22 43:8 52:11
113:9
occasionally 25:11
occasions 40:10, 12
63:12
October 130:2

odd 41:11
Odell 23:8
offense 90:7, 8
Office 4:15 6:3
8:13 9:6 16:3
17:18, 20 18:14, 19,
22 27:20, 24 28:1,
2, 3 37:5 44:4
48:11 49:1 50:12
69:8 79:11 92:21
116:14 121:18
officer 7:10 11:24
83:13
officer's 12:2
Official 1:12, 13, 15,
16, 18
O'Grady 27:6
Oh 7:24 15:22
26:15, 17 52:1
79:21 99:20
100:16 125:4
Okay 4:13, 17, 24
5:1, 6, 7, 17, 23
6:18, 21 7:2, 4, 11,
23 8:2, 6, 9 9:2, 11,
16 10:8, 12 11:1, 5,
19, 23 12:5, 10, 13,
21 13:4, 9, 14, 16,
19, 24 14:8, 15
15:2, 8, 20 16:2, 10,
24 17:10, 17, 20
18:2, 21 19:6, 8
20:7, 10, 15, 21, 24
21:3, 10, 13, 16, 21
22:5, 8, 12 23:1, 10,
13, 15, 18, 24 24:9,
15 25:13, 14 26:17,
21, 24 27:17 28:9
29:4, 7, 9, 11, 13, 17
30:6, 13 31:12, 17,
20, 23 32:5, 8, 11,
15 33:2, 8 35:2, 6,
23 36:4, 14 37:2,
16, 20 38:1, 10
39:6, 20 43:22
44:3, 13 45:5, 16
46:13 47:2, 22
48:2, 13 49:11
51:23 52:13, 20
54:17, 22 55:5, 8,
14, 21 62:19 63:11

64:9, 11 65:4, 12,
15, 20 66:1, 6, 12
67:11, 23 68:3, 15
69:2, 6, 24 70:16
71:7, 13, 21, 24
72:11 74:2, 11, 17
75:8, 14, 20 77:18
78:1, 7, 19 79:1, 2,
13 80:11 81:17
82:17 83:1, 4, 9, 12,
14, 18, 22 84:5, 9,
14, 16, 23 85:10, 20
86:9, 13, 17, 20
87:5, 10, 19 88:6, 8,
13 89:1, 5, 8, 15
90:7, 18 91:2, 9, 15,
16 92:19, 23 93:2,
4 94:1, 5, 7, 11
95:9, 16, 22, 24
96:9, 23 97:5, 23
98:20 99:4, 11
100:6 101:1, 4, 20,
23 102:21 103:10
104:14 105:2, 11
106:23 108:5, 23
109:8, 18 110:7, 24
111:11 113:15, 20
114:13, 20 115:3,
14, 20 117:18, 23
118:11, 14, 17
119:12 122:5, 16
123:1, 6, 9, 17
124:3, 24 125:9
127:18, 21, 24
old 5:23
older 50:10, 14, 16,
21, 23
Olson 23:21, 22
O'Malley 29:16
once 4:12 105:3
one-day 92:17
one-man 67:20
one's 13:11
open 46:20 57:19
99:15
operations 18:19
37:12 96:7
opinion 101:14
opportunity 75:17
opposed 5:5

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1363 of 1503 PageID #:1754
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**OPR** 39:*21* 40:*2* 64:*19* 70:*9, 15* 72:*23* 75:*13, 18* 76:*19, 21, 23* 77:*3, 5, 7, 19, 22* 78:*5* 91:*20* 98:*6* 109:*15* 112:*6, 9, 24* 113:*21* 114:*20* 115:*1, 10, 11, 12, 14, 24* 116:*5, 11, 19, 20, 22, 23* 117:*15* 119:*3, 23* 120:*22* 125:*11, 15, 18* 126:*1, 6*
**option** 41:*16*
**order** 42:*6* 43:*14* 52:*19* 77:*18, 20, 22*
**orders** 19:*20* 27:*21* 46:*5* 57:*13*
**ordinary** 35:*4*
**Orientals** 62:*1*
**outcome** 129:*21*
**outside** 29:*8* 50:*10, 21, 22* 52:*20, 21, 22* 53:*13* 65:*12* 105:*4*
**overcrowded** 12:*3*
**overflow** 97:*17*
**oversaw** 37:*4, 7* 38:*1*
**overseas** 8:*23*
**overtime** 65:*19* 97:*17* 127:*7*
**owed** 100:*18*

**< P >**
**PAGE** 1:*6* 37:*21, 24* 38:*18* 68:*9, 24* 69:*3* 78:*13* 79:*2* 84:*16, 17, 20* 87:*19* 88:*10, 11, 15* 89:*15, 24* 91:*15* 92:*4* 112:*1* 123:*21* 124:*4*
**paid** 87:*18*
**paper** 58:*19* 80:*1*
**Pardon** 36:*10* 43:*16* 53:*23* 56:*4* 106:*1* 108:*8*
**Parker** 6:*16*
**part** 19:*24* 29:*17, 23* 30:*3* 38:*6* 45:*3* 49:*9* 60:*5* 70:*21* 73:*22* 81:*18*

**112:*17* 115:*20* 125:*12*
**particular** 31:*18* 48:*13* 51:*24* 53:*6* 57:*1* 67:*17* 69:*21*
**particularly** 57:*7* 72:*2*
**parties** 129:*19*
**partner** 51:*24* 52:*10, 16* 53:*9* 66:*4*
**partners** 52:*8, 10*
**pass** 35:*10*
**path** 27:*2*
**patrol** 17:*4* 18:*11, 12* 19:*19* 20:*12, 20* 25:*20* 30:*9, 10, 14, 20, 21* 31:*10, 13, 17* 32:*1, 6, 9* 37:*2, 18* 40:*8* 45:*18* 74:*21*
**pay** 28:*21, 22, 23* 38:*20* 41:*4* 72:*16* 73:*7, 12, 13* 74:*14, 16, 18* 87:*11* 104:*12*
**paying** 100:*23*
**pen** 44:*17*
**pending** 4:*23*
**people** 9:*19* 12:*4* 13:*13* 14:*10* 18:*17, 18* 26:*19* 27:*1* 29:*13* 38:*3, 7, 18* 42:*22* 43:*6* 44:*14, 23* 45:*6* 46:*14, 16* 50:*4, 7, 15* 51:*5, 23* 53:*15* 54:*9* 55:*21* 57:*17* 58:*5* 60:*8, 15* 61:*19, 24* 62:*5* 70:*13* 74:*21* 75:*24* 76:*2* 80:*11, 24* 97:*19* 108:*5, 16* 109:*2* 126:*1*
**percent** 53:*8*
**period** 17:*21* 96:*20* 110:*14* 117:*21*
**permanent** 19:*13, 14* 52:*10*
**person** 16:*9* 41:*20* 52:*3* 61:*20* 62:*5* 77:*22* 102:*19* 111:*7* 120:*13*
**personal** 41:*20* 98:*1* 101:*14* 129:*12*

**Personally** 54:*8* 117:*4*
**personnel** 127:*6*
**perspective** 18:*16*
**phone** 57:*19, 21* 106:*23* 107:*3*
**phonetic** 22:*22*
**physically** 88:*19*
**pick** 16:*1, 6* 97:*20*
**piece** 93:*18* 95:*5*
**Pietrowski** 85:*6*
**pipe** 44:*10*
**place** 42:*18* 92:*24* 104:*5* 129:*16*
**placed** 88:*19*
**places** 108:*16* 109:*2*
**Plaintiffs** 1:*9* 2:*11* 4:*6* 54:*1* 65:*20* 109:*20, 22* 110:*2* 122:*18*
**planning** 78:*15*
**please** 56:*12* 67:*24* 71:*17* 79:*5*
**point** 4:*22* 9:*22* 29:*5* 32:*12* 42:*21* 43:*23* 65:*18* 69:*21* 71:*10* 73:*3* 83:*19* 84:*12* 89:*20* 92:*4* 109:*22*
**police** 10:*13* 50:*10*
**policy** 15:*2* 42:*2, 5* 70:*4, 5* 110:*17, 18* 111:*7* 121:*15*
**political** 27:*6, 9* 74:*1*
**politics** 72:*10, 12, 17*
**polo** 50:*12*
**position** 7:*8* 17:*8* 19:*6* 21:*6* 25:*4, 19* 26:*11* 27:*12, 16, 23* 28:*17* 35:*4* 71:*22*
**positions** 9:*3* 17:*10, 11, 12* 48:*4* 58:*23* 67:*13, 14*
**positive** 87:*21*
**possible** 100:*7*
**possibly** 101:*11*
**potential** 103:*12*
**practice** 120:*7, 9*

**practicing** 16:*17*
**predominantly** 55:*4*
**prefer** 26:*5* 57:*11*
**preference** 18:*5, 10* 20:*2, 3, 6*
**preferred** 18:*6, 18, 19* 49:*13* 67:*12, 14*
**prepared** 125:*1, 6*
**presence** 35:*3*
**presented** 86:*16*
**pretty** 13:*15* 14:*2, 3* 17:*5* 20:*19* 24:*17* 26:*24* 27:*6* 29:*15* 30:*20* 32:*22* 33:*8* 34:*18* 35:*18* 36:*15* 41:*11* 52:*9, 14, 18* 58:*20* 69:*17* 70:*11, 15, 19* 90:*24* 113:*4*
**prevention** 8:*20*
**previous** 79:*18* 90:*8* 129:*6*
**principles** 36:*18, 19*
**prior** 8:*18* 25:*7* 32:*15* 46:*18* 59:*10* 63:*16* 97:*14* 106:*9*
**priorities** 75:*24*
**priority** 75:*21, 23* 76:*3, 8* 116:*13*
**probably** 6:*9* 7:*24* 18:*2, 8* 24:*4, 11* 28:*19* 33:*7* 43:*11, 21* 60:*13* 63:*7* 66:*8, 10* 69:*15, 16* 70:*8* 81:*2* 87:*1* 93:*12* 95:*2* 98:*13* 106:*22* 108:*3* 128:*6*
**problem** 54:*8, 11* 57:*17*
**problematic** 4:*19*
**problems** 64:*20*
**proceedings** 129:*14*
**process** 111:*12* 118:*12, 15, 19* 120:*15* 123:*4* 125:*10*
**processed** 11:*16*
**program** 7:*20* 14:*11, 14* 16:*7*
**programs** 23:*7, 8*
**promote** 74:*13*

Thomas Neal — 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1364 of 1503 PageID #:1755
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**promoted** 12:20, 21
13:2, 5 17:2 21:2,
18, 19 22:10 23:2
24:2, 5, 6, 7, 12
32:3, 13, 14, 16
33:17, 19 71:19
72:3, 5 73:13 74:9
**promotion** 13:1
28:3 71:18
**proper** 96:21
**properly** 92:7
93:12 94:18 97:1
**property** 99:8
**provided** 68:16
**public** 121:17
**pull** 14:24 68:2
**pulled** 64:15
**punishment** 84:18
**purposes** 78:16
**pursuant** 2:3
**put** 12:20 13:2
47:15 49:17 51:5
52:8, 22 53:3
58:19 67:19 80:1,
4, 9 86:21 93:22
96:7 97:18 100:12
106:10 123:4
127:23
**putting** 98:13

**< Q >**
**qualified** 25:19
52:21
**question** 4:23, 24
5:9, 10, 12, 15 9:7
13:22 18:1 46:14
60:14 78:11 79:5
85:4 89:11 91:6
109:21 114:1 116:6
**questions** 18:3
128:5, 10
**quick** 78:22 128:5
**quickly** 33:20
35:24
**quite** 10:1 18:23
19:2 30:19 55:2

**< R >**
**race** 69:10, 13 70:6
79:15 80:23, 24
111:6

**racial** 56:8, 11
58:5 61:9, 23
63:24 69:9, 12, 16,
22 70:1, 14 79:7, 9,
14 80:12, 17
**racism** 58:3
**racist** 59:7, 16
**radio** 116:19
**radios** 37:7
**rainy** 49:19
**rank** 12:21 21:17
23:11, 19 24:13
32:8 36:21 95:14
101:2
**ranked** 10:5
**ranking** 42:13, 20
**ranks** 43:12 44:11,
12
**RANZINO** 1:12
25:5, 6, 15, 19
27:11, 16 28:14
29:4, 16, 20 47:11
48:8 56:17, 21
59:8, 13, 17, 22
60:2, 12 61:5, 7, 12,
18 62:5 71:22
72:2 74:19, 20
75:1 94:24 95:13
**rape** 76:1
**rapists** 75:24
**RCDC** 10:20 11:3,
6
**read** 124:20
**reading** 86:21
87:23 125:3
**ready** 24:21 113:18
**really** 54:12 60:22
61:6, 19 62:4
72:13 95:13
102:17 110:3
124:19
**reason** 26:10 72:19,
21 73:22 77:15
105:18 106:8
109:21, 24 111:22
**reasons** 61:7
**recall** 86:16
107:20 117:17
125:17, 18
**receipt** 95:7
**receive** 8:9 29:2

**received** 79:6, 9, 13
87:11 90:4 91:11
**receiving** 10:20, 23
11:17 12:8, 11, 12
49:17
**recognized** 14:4
38:4
**recommend** 38:21
**record** 83:5 129:13
**records** 17:13, 22
18:23 19:1, 3, 4, 11,
17, 20, 21, 22 20:1,
11, 16, 17, 22 21:2,
18, 24 22:6, 13, 18
23:2, 20 24:1 25:7,
16, 21 27:13 30:9,
17, 18
**reduced** 129:12
**refer** 105:12
**reference** 87:2
**referred** 98:8
102:2 103:23
**referring** 64:3, 21
98:23 99:1 102:9
103:3 118:3
**regard** 98:1 104:20
**regarding** 70:6
113:1
**register** 123:18
125:10
**regular** 53:9
**rehab** 90:20
**re-incarceration**
88:17
**related** 41:9, 18
79:15
**relationship** 34:2,
15, 20, 23 44:16
58:21 106:5
**relative** 129:17, 18
**remember** 21:10
24:15 43:3 44:3
68:5, 7 70:2 74:24
84:3 85:11 86:2,
12 87:24 88:22
89:8, 10, 11 90:10,
11 91:21 92:19
94:13 100:16
107:22 109:9
113:20 117:13, 21,
22 119:6, 9 125:19

**remote** 1:22 2:5
129:10, 15
**remotely** 2:11, 15,
22
**remove** 90:13
**repeat** 18:4 57:6
**rephrase** 58:6
**replace** 16:8
**report** 32:5 37:23
91:11 103:10, 16
110:8, 19 115:4
125:23
**reported** 19:22
23:8 37:17 47:23
129:11
**Reporter** 1:24 5:4,
16 129:4 130:6
**reporters** 113:10
**REPORTER'S**
129:1
**reporting** 23:6
**reports** 85:6
**represent** 68:23
95:24 126:2
**representing** 4:6
**reprimand** 86:7, 11,
16, 18 87:2, 4 90:5
91:12
**request** 11:8 12:19
52:1
**required** 82:6
**Reserve** 7:19
**Reserves** 8:1, 3, 7,
16
**reserving** 128:12
**reside** 6:5
**residence** 88:17
**resisted** 88:18
**resolved** 56:2
**respect** 36:16, 20,
21, 22 69:8 121:9
**response** 79:8
**responsible** 48:3
**restrained** 88:19
**restraints** 88:18
**result** 88:2
**resulting** 92:9
93:14
**retire** 24:22

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1365 of 1503 PageID #:1756

retired 6:2 7:7, 9
8:8 21:9 24:3
28:20 32:12
retirement 31:14
retraining 45:3
Rice 6:17
Rickey 22:22 23:1,
3, 11, 14
rid 43:12 44:12
ride 38:2
right 18:22 19:16
27:11 29:14, 18, 20
31:8, 9 34:3, 9
35:14, 24 36:5, 11,
24 38:4, 8 39:16
40:10, 14 41:4
42:2, 3 44:21 50:5,
17 52:7 53:4, 19
54:14 56:18 57:12
58:12 59:8 60:3, 6,
10, 14 61:12, 14
62:10 63:20, 24
66:13 70:1 71:1
72:1, 15, 22 73:8,
16 74:3, 14, 16
75:12, 15 77:10
78:2, 4 80:8, 9, 12,
21 82:7, 11 86:4
88:9 90:4 91:9
92:3 93:7, 8, 11
94:19 95:16, 22
101:21 103:4, 22
105:9 107:9 108:5,
11, 17 109:3 111:1,
20 114:6, 8 115:7,
14 116:3, 8, 11, 20
117:11 119:15
120:11, 16, 22
122:10 123:15, 21
124:4, 9, 12 125:13,
16 126:7, 16, 20
127:24
ripped 100:4
101:13, 15
rise 33:8, 19
Road 2:19
robberies 16:20
Robert 84:1, 7, 14
ROHLOFF 1:17
29:22 37:19 47:22

48:6, 10 63:11
94:24
role 71:10 123:2
roll 48:23 60:2, 9,
12, 16
rose 80:12
roster 15:9 48:12,
22 52:23, 24 53:15
rotate 53:12, 14
67:10
rotated 53:19 67:1
97:1
rotating 48:5 53:15
rotation 96:21
roughly 22:2, 4
routinely 63:6
rules 4:18 46:5, 11
rumors 35:7, 8, 9,
12, 13, 15 60:23
61:15, 17 62:20
63:5 64:2
run 49:4 110:23

< S >
SAITH 128:15
Sam 37:21
SAMUEL 1:5
sat 118:18 119:14,
17
saying 36:12 41:2
42:19 43:6 46:21
51:18 56:6 58:13
63:4 64:17 70:17,
18, 24 71:4, 5
72:24 96:15 105:5
106:2 117:13, 21,
22 119:7, 9
says 42:6 84:18
85:5, 16 86:1 92:6,
15, 16 93:23 97:24
scheduled 37:9
school 6:15, 19 7:2,
20, 21
schools 37:9
scope 105:4
score 98:14
screamed 114:21
115:5
screen 68:3 83:10
screw 66:9

scroll 68:4 85:12
89:23 123:20
se 15:24 43:6
second 47:7 68:8
78:10 83:15 89:19
96:10 118:14, 18
119:3, 14, 23
120:14 122:21, 24
123:1, 21 124:4
section 15:23
see 7:16 8:15
19:10 21:23 24:2
47:4 49:3, 5 54:12
67:11 68:3, 13
75:3 76:23 79:5,
11 83:9, 15, 19
84:6, 21 85:8, 15,
17 88:13 89:19, 21,
24 90:2, 4 91:18
92:6, 9, 10, 11
96:13, 21, 22 97:24
98:2, 22 105:4, 6
111:22 112:18
123:12, 24
seeing 113:7, 13
seen 33:3 34:12
124:18
selected 10:9
selling 16:18
send 14:11 15:1, 5
seniority 22:16
50:20, 24 67:21
sensitivity 69:14
sent 18:9 53:21
67:21 112:16 113:8
sentence 79:8
96:10, 17
separate 19:21
September 2:2
Sergeant 10:7 93:6
serious 70:9 76:2
seriously 70:15
80:6
serve 7:23 23:24
28:13 31:12
served 40:8
service 7:12 8:4
15:4 48:20
services 33:1 49:16
set 48:21 53:15

130:1
seven 87:23
severity 40:5
sex 70:6
sexual 69:15, 23
70:14
shake 5:6
sheets 93:21 94:12
95:10
SHERIFF 1:11 7:5
8:19 9:9, 11 10:2
27:2 34:3, 9, 16, 20
35:5 70:5 71:9, 11,
14 75:10 101:21
sheriffs 42:13
Sheriff's 4:15 6:3,
23 7:13 8:13 9:1, 6,
17, 20, 22 33:9
34:8, 14 35:13
41:10 42:3, 20
44:4 66:20 69:8,
12 71:15 79:11
121:18
SHIELDS 1:14
29:16, 17 32:7, 8,
15 33:8 34:9, 19
35:15 40:15, 19
41:2 43:10, 22
45:12, 14 75:4, 5
77:6, 11, 16 108:10
113:1, 22 114:10,
14, 15, 21 117:1, 6,
10 118:1, 7, 10, 18
119:13, 19 120:20,
21 121:8, 14
shift 14:13 19:23
22:1, 9 51:9 53:2
65:16 76:7 84:15
94:24 97:20, 21
104:15 116:9, 12
127:1
shit 56:13
shocked 54:12
shooting 91:24
shoptalk 58:11
short 20:20 57:23
83:2 122:7 127:6
128:8
shortage 51:13
52:22 127:1

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1366 of 1503 PageID #:1757
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Shorthand** 1:*24*
129:*4* 130:*6*
**shorthanded** 14:*24*
**shot** 16:*19* 91:*24*
**show** 83:*6* 123:*9*,
*10*
**sick** 49:*3* 50:*15*
52:*11* 86:*22* 90:*2*
91:*13*
**side** 6:*14* 12:*4*
15:*3, 5* 49:*6* 51:*20*,
*21* 64:*16* 72:*11*, *17*
**sign** 92:*8* 93:*13*
95:*10* 99:*8*
**signature** 68:*13*, *20*,
*23* 93:*21* 124:*8*, *9*
128:*12*
**signature's** 124:*15*
**signed** 68:*9*, *19*
69:*1* 94:*13* 95:*6*
124:*11*
**significance** 80:*23*
**significant** 114:*13*
**similar** 97:*8*
**single** 66:*19*, *22*
**sister** 6:*24* 7:*4*
98:*11* 99:*3*, *5*, *12*
101:*13* 103:*1*
**sit** 50:*12* 118:*6*
120:*10* 124:*24*
**sits** 120:*14*
**situation** 71:*21*
104:*20*
**situations** 87:*6*
126:*16*
**six** 11:*20* 13:*13*
**sixth** 97:*24*
**skin** 57:*14*
**SLAUGHTER** 1:*8*
65:*22*
**smaller** 43:*8* 70:*20*
**Smith** 48:*8*, *10*
94:*24*
**snowy** 49:*20*
**social** 29:*14*, *18*
30:*4*
**socialize** 33:*4*
**socializing** 33:*5*
**socially** 29:*11*
**somebody** 14:*17*
39:*1*, *6* 41:*16*, *22*

42:*3* 60:*24* 61:*1*
89:*6* 93:*18* 106:*22*
107:*5*, *9*, *12* 108:*4*
115:*4* 126:*3*
**something's** 95:*1*
**sorry** 10:*22* 16:*22*
19:*24* 20:*3* 21:*17*
22:*21* 23:*15* 26:*15*
27:*17* 30:*16*, *22*, *24*
31:*15* 38:*24* 50:*2*
51:*17* 56:*5* 57:*5*
59:*3* 64:*7* 67:*8*
83:*24* 85:*16* 101:*9*
109:*9* 111:*24*
112:*21* 114:*3*
121:*4* 124:*4* 125:*4*
128:*5*
**sounds** 116:*11*
119:*10* 122:*5*
**South** 2:*7* 6:*14*
15:*3*, *5*, *15* 24:*18*
49:*6* 51:*21* 76:*1*, *5*
**Speaking** 15:*14*
93:*9*
**special** 34:*2*
**specific** 51:*22*
58:*10* 60:*23* 69:*19*
80:*19*
**specifically** 70:*1*
**specifics** 62:*16*, *20*
100:*3*
**specified** 129:*16*
**speculate** 26:*5*
**speech** 99:*14*
**spell** 21:*13*
**spilled** 65:*19*
**spoke** 62:*6*
**sponsored** 107:*5*
**spot** 24:*20* 28:*15*
51:*13* 95:*7*
**spots** 51:*6*
**SPR** 84:*19*
**stack** 113:*2*
**staff** 58:*21*
**stage** 118:*18*
**stamped** 89:*16*
**stand** 61:*8* 105:*5*
**standing** 52:*18*
**start** 8:*12* 33:*5*
42:*22* 43:*5* 44:*14*

45:*8*, *21* 46:*7*, *22*
47:*12* 127:*5*
**started** 7:*6* 13:*10*,
*19* 24:*21* 32:*23*
88:*20*
**starts** 105:*3*
**State** 2:*1* 69:*6*
79:*6* 129:*4*
**stated** 117:*23*
**statement** 99:*6*
102:*16* 104:*2*
105:*11* 107:*18*, *22*
116:*8* 117:*11* 119:*2*
**STATES** 1:*1*
**station** 12:*2* 64:*11*,
*12* 100:*18*
**stay** 22:*9*
**stayed** 19:*23*
**staying** 18:*18*
**stenographically**
129:*11*
**step** 118:*14*, *15*
119:*3*, *14*, *23*
120:*14* 123:*4*
**sticker** 111:*22*
**stickler** 46:*5*, *11*
**stop** 49:*4* 78:*16*
**stores** 8:*21*
**Street** 2:*7*, *13*
49:*22* 75:*22*
**streets** 18:*18*, *20*, *22*
37:*13*
**STRICKLAND** 1:*4*
65:*6*
**strict** 56:*22*
**strictly** 69:*22*
**Strike** 9:*6* 15:*13*
21:*3* 33:*17* 82:*17*
**striking** 84:*2*
**struck** 84:*11*
**stuck** 99:*9* 103:*19*
104:*9*
**stuff** 113:*8* 124:*22*
**style** 40:*15* 42:*10*
46:*4* 56:*21* 57:*11*
62:*5*
**styles** 40:*12* 57:*11*
**subject** 89:*12*
**subjected** 96:*11*, *14*
**subjects** 69:*9*

**subordinate** 38:*11*,
*17*
**subsequent** 48:*16*
**suburb** 49:*6* 76:*1*
**sudden** 76:*14*
**sued** 71:*10*
**suggest** 13:*12*
**suggested** 45:*8*, *10*
**suggestions** 28:*5*
**Suite** 2:*8*, *14*, *19*
**summary** 84:*18*, *20*,
*21* 85:*5* 88:*15*
89:*24* 92:*5* 93:*2*, *9*
**summoned** 117:*9*
125:*18*
**sunny** 49:*21*
**supervise** 92:*7*
93:*13*
**supervised** 109:*23*
**supervisor** 10:*5*
14:*3* 19:*21* 21:*8*,
*19*, *22* 22:*1*, *5* 23:*3*
31:*20*, *24* 32:*19*
37:*16* 38:*10* 40:*3*
47:*23* 48:*14* 52:*2*,
*24* 56:*15*, *18* 82:*3*
89:*3* 92:*22* 93:*22*
110:*7*
**supervisors** 9:*21*,
*23* 10:*4* 20:*11*
23:*22* 27:*8* 37:*21*,
*22* 38:*16*, *19* 47:*3*,
*5* 48:*9* 52:*14* 53:*2*
58:*23* 59:*4* 62:*21*
63:*5* 64:*3* 81:*23*
92:*20* 93:*19* 94:*23*
95:*9* 103:*11* 110:*6*,
*24* 111:*12* 127:*1*
**supervisor's** 95:*7*
**support** 99:*12*
107:*22*
**supports** 107:*18*
**supposed** 24:*6*
76:*16* 80:*5* 90:*13*
93:*19* 95:*19*
100:*19* 111:*17*
**sure** 7:*6* 13:*15*
25:*2* 31:*9* 37:*8*
44:*9* 57:*22* 63:*23*
90:*23*, *24*

Thomas Neal  -  9/16/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1367 of 1503 PageID #:1758

surgeries  90:*17*
surgery  88:*7*
suspended  92:*21*
suspension  92:*17*
sustained  85:*10*, *17*,
*21*  90:*10*  91:*3*, *7*
92:*16*  120:*22*  121:*8*
swear  22:*3*
sworn  4:*2*  129:*8*
system  43:*14*, *18*

< T >
take  4:*21*  12:*7*, *24*
24:*19*  31:*4*  51:*12*
64:*18*  77:*21*, *23*
78:*22*  82:*19*  92:*24*
98:*7*  107:*21*  122:*2*
125:*4*  128:*6*
taken  1:*23*  57:*24*
61:*20*  63:*23*  83:*3*
86:*8*  94:*19*  122:*8*
128:*9*  129:*15*
talk  36:*16*  58:*10*
61:*5*  80:*23*  100:*20*
117:*10*  127:*4*
talked  17:*11*  18:*7*
37:*20*  38:*1*  63:*12*
71:*22*  79:*15*  90:*8*
91:*18*  103:*22*
109:*20*  113:*20*
talking  33:*11*
39:*22*  42:*12*, *20*
58:*2*  63:*4*  70:*13*
91:*21*  94:*11*, *13*
97:*9*  98:*3*  102:*4*
106:*13*  114:*6*
talks  69:*6*  83:*22*
88:*15*  89:*20*  92:*23*
Taser  92:*21*
Tasers  37:*8*
tech  113:*11*, *12*
technical  33:*1*
49:*16*  57:*3*, *15*
techs  37:*5*
tell  11:*13*  20:*10*
27:*15*, *22*  28:*4*
30:*6*  33:*22*  35:*8*,
*12*  49:*18*  51:*10*
71:*17*  76:*20*  78:*20*
79:*24*  80:*2*  82:*9*
100:*14*, *15*  104:*22*

107:*17*, *21*  108:*2*
121:*14*
telling  42:*21*  76:*23*
118:*3*
ten  20:*18*  105:*2*
ten-minute  122:*2*
terminated  9:*2*
test  12:*24*  87:*20*
tested  87:*21*
testified  5:*20*
testify  129:*8*
testimony  46:*18*
59:*10*  63:*16*  79:*18*
90:*21*  97:*14*  129:*14*
Thank  68:*11*
thick  113:*4*
thing  5:*2*  13:*12*
30:*18*  47:*20*  48:*18*
58:*10*  62:*15*  86:*15*
90:*9*  99:*7*  109:*13*,
*15*  110:*5*  115:*4*
127:*14*
things  5:*6*  35:*10*
36:*19*  51:*10*, *19*
60:*15*  62:*9*  64:*17*
70:*9*  94:*18*  104:*6*
109:*19*
think  7:*16*  11:*20*
20:*19*  26:*3*, *10*
31:*6*, *11*  42:*18*
53:*18*  57:*21*  60:*20*,
*22*  63:*7*, *9*, *11*
69:*19*  75:*3*  88:*10*,
*23*  92:*1*  93:*3*, *7*
94:*3*, *6*, *7*  97:*23*
101:*12*, *13*  102:*4*
107:*24*  111:*21*
112:*15*  120:*18*
122:*1*  123:*6*  128:*1*,
*3*
Thinking  19:*18*
Third  31:*19*  37:*4*,
22  47:*6*  118:*14*
124:*4*
THOMAS  1:*11*, *15*,
22  3:*1*  5:*18*
thought  25:*2*, *18*
44:*19*  65:*2*  70:*19*
73:*21*  74:*1*, *2*, *8*
76:*22*  77:*7*  95:*21*

106:*4*  111:*12*
118:*2*, *4*  122:*14*
thousand  103:*20*
threaten  105:*15*
threats  98:*1*
three  14:*13*  15:*21*
104:*9*
tier  12:*1*, *2*
tiers  12:*3*
tight-knit  70:*19*
time  9:*18*  10:*5*
12:*2*  14:*1*, *10*
17:*21*  20:*19*, *20*
25:*20*  31:*21*, *24*
32:*20*  37:*11*  38:*7*
43:*11*  45:*18*  48:*21*,
*23*  50:*5*, *17*  51:*9*
53:*8*  65:*18*  76:*13*
77:*1*, *22*  81:*5*, *16*
85:*7*  86:*23*  87:*7*, *8*,
*17*  90:*2*, *19*, *22*
91:*13*  93:*23*  99:*5*
101:*1*  102:*16*
106:*9*, *17*  107:*21*
109:*15*  110:*4*
121:*7*  122:*19*
125:*4*  126:*15*, *24*
127:*9*, *17*  129:*16*
times  4:*11*  14:*13*
53:*2*, 9  87:*23*
127:*10*
TIMS  1:*5*  65:*9*
title  14:*4*  23:*15*
32:*9*  98:*20*
titles  44:*7*
today  50:*2*  118:*7*
122:*10*  125:*1*
told  20:*14*  24:*7*, *12*,
*15*  27:*21*, *22*  44:*14*
45:*6*, *20*, *24*  46:*3*,
*13*  47:*11*, *16*, *21*
60:*8*  61:*12*  73:*5*,
*11*, *15*  76:*24*  77:*2*,
*14*, *20*, *23*  80:*8*
91:*20*  100:*2*, *3*, *21*
101:*1*, 6  105:*5*
109:*1*, *2*, *14*  114:*23*
116:*22*  117:*18*, *19*
tolerate  70:*18*
Tom  25:*11*  57:*16*
78:*10*

top  70:*3*  85:*13*, *17*
123:*15*
total  96:*12*
totally  96:*15*
touch  76:*8*
tour  122:*19*  126:*15*,
*24*  127:*10*
trade  16:*17*
train  45:*2*
trained  69:*7*, *11*
training  10:*13*
69:*15*, *18*  74:*15*
transcribing  5:*4*
transcript  129:*11*
transferred  11:*22*
12:*18*  13:*10*
treated  56:*22*  74:*2*,
8  107:*16*
treatment  121:*16*
tried  49:*6*  51:*7*, *8*
52:*5*, *8*  67:*9*  76:*1*
trouble  70:*9*
true  68:*17*, *18*
129:*13*
truth  129:*8*
try  43:*17*  53:*12*, *13*
113:*16*
trying  19:*8*  43:*12*,
*18*  49:*12*  60:*20*
69:*19*  118:*4*
TSS  125:*22*
turning  98:*5*
turns  98:*14*
twice  4:*12*
two  10:*11*  12:*3*
69:*22*  90:*17*  103:*4*
127:*22*  128:*4*
type  11:*14*  34:*23*
64:*24*  90:*11*  104:*18*
typewriting  129:*12*
TYRONE  1:*7*
65:*22*

< U >
U.S  7:*22*
Uh-huh  68:*1*
umbrella  23:*6*
uncommon  51:*23*
understand  5:*9*
13:*21*  18:*1*, *3*
58:*12*  80:*22*

Thomas Neal - 9/16/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1368 of 1503 PageID #:1759
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

understanding
34:*14* 52:*15*
understood 73:*3*
unfortunately
59:*22* 73:*1*
union 53:*17*, *24*
55:*14*, *22* 56:*1*
unit 11:*13*, *14*
12:*16* 13:*5*, *7*, *17*,
*20*, *21* 14:*1* 15:*21*
17:*6* 32:*17* 33:*9*
34:*19* 41:*12* 42:*11*,
*14*, *17* 43:*8*, *19*
45:*17* 46:*15* 58:*22*
70:*20* 74:*22*, *23*
89:*11* 94:*16*
106:*23* 107:*3*, *6*, *8*,
*9* 110:*2* 119:*5*, *6*,
*14* 122:*12*
UNITED 1:*1*
units 38:*2* 75:*22*
Unrelated 101:*20*
unsatisfactory 44:*19*
upset 58:*24* 59:*2*
76:*11*, *14* 114:*17*
use 64:*14* 83:*19*
88:*13* 89:*1* 122:*18*
126:*14*, *18*, *23*

**< V >**
vacation 52:*11*
various 13:*20* 48:*4*
53:*13* 80:*24*
vehicles 37:*7* 64:*15*
Venture 8:*21*
verbal 5:*3* 87:*3*
verbally 5:*5*
verification 68:*9*
verifying 68:*15*
VERNELL 1:*5*
65:*9*
versa 49:*6*
versus 58:*13*
vice 49:*6*
victim 104:*24*
VICTOR 1:*7* 65:*22*
video 57:*3*, *15*
violated 110:*18*
121:*15*
violation 111:*7*

violations 110:*16*
visit 74:*21*
volunteer 49:*15*
vs 1:*10*

**< W >**
Wait 94:*3* 111:*23*
waiting 28:*11*, *21*,
*22*
Waived 128:*14*
waiving 128:*11*, *13*
walked 102:*8*
116:*21*
WALKER 1:*7*
37:*23* 38:*18* 65:*22*
walking 76:*15*
116:*16*
want 4:*22* 18:*17*
20:*11*, *12* 28:*4*
31:*9* 45:*2* 49:*4*, *15*,
*19*, *20*, *21* 50:*1*, *8*
51:*8*, *24* 52:*15*
53:*20* 66:*22* 67:*10*
70:*11*, *21* 76:*19*
77:*3* 78:*2*, *21*
80:*21* 81:*14* 82:*22*,
*23* 97:*5* 98:*6*
116:*19*
wanted 27:*15*
36:*23* 42:*9*, *10*, *13*
43:*5*, *7* 44:*21* 50:*5*,
*9*, *10*, *11*, *21*, *22*
51:*15*, *19* 53:*1*
66:*21* 67:*18* 76:*20*,
*22* 77:*5*, *7*, *10* 81:*6*,
*13* 91:*20* 113:*21*
115:*2*
wants 52:*20* 77:*23*
98:*10* 115:*11*
warrant 115:*7*
watch 31:*18*, *19*
37:*4*, *23* 47:*6*, *7*
48:*9* 55:*4* 65:*10*,
*19* 95:*1* 122:*21*, *24*
123:*1*
way 22:*9* 32:*12*
36:*17* 48:*22* 57:*2*,
*8* 60:*9* 101:*10*
105:*13* 112:*14*
120:*15* 123:*3*

weapon 92:*8* 93:*14*
wear 50:*11*
Webb 30:*3* 31:*22*,
*23* 32:*3*, *5*, *14*
Wednesday 2:*2*
well 4:*7* 8:*23*
10:*17* 14:*10* 15:*13*
16:*12*, *16* 18:*23*
24:*14*, *17* 25:*20*
26:*8* 29:*12* 34:*2*,
*11* 35:*14*, *18* 38:*18*
39:*16* 40:*19* 41:*15*
45:*3*, *5*, *8* 48:*5*
50:*1*, *9* 55:*3* 56:*10*
57:*21* 58:*6* 61:*6*
62:*4*, *7* 63:*11*
64:*23* 65:*21* 68:*19*
69:*14* 70:*5*, *11*
72:*2*, *18*, *23* 73:*11*
75:*8*, *21* 79:*20*
82:*14* 86:*17* 89:*5*
90:*9*, *23* 91:*9* 93:*8*,
*20* 94:*22* 95:*4*
97:*8* 98:*10* 99:*7*,
*14* 101:*15*, *19*
102:*15* 104:*6*
105:*20* 109:*1*, *8*
110:*16* 111:*6*
112:*18*, *24* 114:*16*
115:*10* 116:*3*, *12*
117:*6* 119:*2*
120:*20* 121:*14*
122:*16* 123:*9*
124:*17* 125:*19*, *21*
126:*20* 127:*4*, *12*
went 6:*16*, *17* 7:*11*,
*17*, *22* 8:*1*, *24* 9:*1*
10:*19*, *20* 11:*2*, *3*
12:*8*, *11*, *12* 14:*20*
18:*8* 19:*19*, *22*
20:*9*, *14* 21:*23*
24:*7*, *21* 30:*9*, *17*,
*19*, *21* 31:*10* 53:*17*,
*24* 64:*14* 67:*21*
72:*6*, *7*, *20*, *23* 73:*3*
82:*18* 92:*2* 93:*20*
94:*4* 99:*15* 101:*9*,
*23* 103:*22* 104:*11*
105:*4* 111:*12*
116:*23* 117:*10*, *20*
127:*13*

we're 4:*18* 42:*19*
43:*8* 66:*24* 68:*2*
78:*9* 80:*5*, *9* 82:*10*
111:*21* 122:*1* 128:*3*
we've 18:*7* 57:*16*,
*17*, *18* 97:*19*
104:*17* 128:*13*
WHEREOF 130:*1*
whiner 20:*13*
WHITE 2:*18* 26:*8*
54:*17*, *24* 55:*7*
56:*15* 62:*20* 64:*3*
67:*1*, *12*, *16*, *20*
72:*5*, *15*, *17* 73:*7*,
*16* 74:*3*, *10*, *17*
98:*18* 101:*4* 128:*13*
whites 55:*8*
wife 34:*14*
WILFORD 1:*6*
William 76:*10*
WILLIAMS 1:*6*
65:*21* 66:*4*
window 89:*14*
windows 88:*24*
89:*13*
WINSTON 1:*4*
64:*5*, *8* 66:*4* 75:*9*
76:*4*, *9*, *14* 91:*20*
96:*2*, *24* 97:*10*
100:*18* 101:*24*
102:*5* 103:*23*
105:*12*, *16*, *19*
106:*5*, *8*, *11* 107:*14*,
*22* 109:*1*, *9*, *13*
112:*8* 113:*21*
115:*24* 116:*10*
117:*12*, *19*, *24*
118:*8*, *10* 119:*15*
122:*17*
Winston's 98:*8*, *11*
101:*13* 102:*2*, *24*
105:*5* 106:*11* 113:*2*
WITNESS 3:*1* 4:*1*,
*4*, *10*, *12*, *16* 5:*1*, *7*,
*17*, *19* 25:*14* 26:*1*,
*5*, *13*, *17* 27:*6*
33:*15*, *22* 34:*5*, *11*,
*22* 36:*2*, *7* 38:*14*
39:*4*, *13*, *18* 40:*5*,
*19* 41:*15* 43:*1*
45:*23* 46:*2*, *10*, *20*

47:*15* 51:*4* 55:*12, 18* 56:*21* 57:*22*
59:*12, 20* 60:*20*
62:*13, 24* 63:*17*
66:*17* 67:*6* 71:*4*
73:*11* 77:*14* 79:*20*
80:*16* 82:*14* 83:*6*
86:*1* 87:*14* 91:*6*
94:*22* 95:*13* 97:*5, 16* 100:*2, 10*
102:*13* 103:*7, 16*
104:*2* 107:*3, 11*
108:*8, 14, 19* 109:*6, 13* 110:*12* 111:*3, 9, 17* 114:*2* 115:*10, 18* 118:*22* 119:*9, 17* 120:*5, 18*
121:*21* 124:*15*
129:*7* 130:*1*
**witness's** 31:*1*
**word** 62:*21* 63:*6, 13* 80:*22*
**words** 14:*17* 40:*1*
**work** 7:*4* 8:*24* 9:*6*
11:*14, 19* 17:*1*
18:*12* 20:*15* 25:*6, 15* 27:*9* 29:*8*
32:*15, 16* 38:*4*
41:*8, 18* 49:*1, 2, 3, 19, 21, 22, 24* 50:*1, 21, 22* 51:*11, 13, 20, 21, 24* 52:*3, 4, 12, 15, 16, 20, 21* 54:*23*
55:*15* 65:*12, 13, 14, 23* 66:*13* 67:*18*
70:*6* 71:*1* 81:*7, 22*
84:*14* 90:*15* 91:*23*
92:*2* 94:*2* 97:*12*
101:*20* 104:*14*
107:*24* 117:*20*
122:*12* 127:*16*
**workable** 37:*9*
**worked** 6:*24* 10:*18*
12:*1* 17:*3, 4, 5, 13, 23* 18:*21* 19:*3*
23:*18* 29:*7* 30:*2*
45:*6* 52:*14* 53:*3, 8*
55:*9* 65:*4, 7, 19*
66:*8* 71:*19* 84:*15*
95:*10* 98:*18, 19*

104:*16* 110:*2, 24*
125:*22*
**workers** 66:*2* 110:*6*
**working** 8:*13*
12:*10* 18:*6* 27:*1*
42:*17* 48:*15* 49:*13*
96:*19* 126:*18*
**workplace** 62:*21*
63:*6, 24* 115:*6*
**works** 82:*24*
**wrap** 122:*4*
**write** 41:*22* 42:*7*
44:*23* 45:*6* 46:*14, 16* 59:*22* 62:*7*
**write-up** 42:*10*
**write-ups** 42:*8, 11*
43:*7, 20* 59:*23*
**writing** 42:*16, 22*
43:*6* 44:*14* 45:*9, 21* 46:*8, 22* 47:*12*
80:*4, 9*
**written** 40:*22* 54:*9*
75:*2* 87:*4*
**wrong** 54:*11* 62:*8, 15* 70:*17* 72:*11, 17*
73:*1, 6* 94:*10* 95:*1*
99:*18* 122:*11*
**wrote** 40:*23* 93:*3*

**< Y >**
**Yeah** 9:*19* 10:*1*
18:*14* 21:*15* 26:*15*
27:*8, 10, 19* 28:*2*
40:*5* 41:*6* 42:*15*
43:*1* 44:*2* 46:*1*
54:*2* 55:*1, 24*
61:*10, 16* 62:*7*
63:*21* 64:*14* 65:*16, 18* 67:*9* 68:*21, 22*
70:*15* 73:*17* 74:*8*
78:*12, 23* 82:*21, 24*
84:*5* 85:*16* 87:*9*
88:*23* 90:*15, 24*
91:*10* 92:*20* 94:*9*
96:*17* 97:*16* 98:*24*
100:*18* 101:*22*
102:*4* 104:*2*
106:*15* 108:*19, 22*
112:*3, 23* 113:*7*
116:*7* 120:*13, 18, 21* 123:*21* 125:*3, 5*

126:*4, 22* 127:*19*
128:*13*
**year** 7:*19, 20, 21*
10:*12, 18, 19* 19:*16, 17* 22:*2* 24:*9*
90:*16* 94:*3* 100:*16*
**years** 7:*14* 8:*4*
10:*11* 18:*24* 19:*2*
20:*18* 21:*24* 24:*4*
28:*18* 30:*19* 41:*10*
66:*20* 104:*16*
**yelled** 114:*10, 21*
115:*5*
**young** 91:*24*
**younger** 50:*21*
**youngsters** 50:*9*

**< Z >**
**Zavadin** 21:*12*
**Z-a-v-a-d-i-n** 21:*15*
**Zayre** 8:*21*
**Zoom** 2:*3* 4:*19*

# Exhibit P

Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1371 of 1503 PageID #:1762
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   LEGRAIN WINSTON,              )
     MICHELLE STRICKLAND,          )
 4   VERNELL TIMS, I.V.            )
     NEWSON, JR., SAMUEL           )
 5   PAGE, WILFORD FERGUSON,       )
     CECIL WILLIAMS, ANTHONY       )
 6   MANNING, DAVID WALKER,        )
     TYRONE MCGHEE, and            )
 7   VICTOR SLAUGHTER,             )
                                   )
 8        Plaintiffs,              )
                                   )
 9        vs.                      ) No. 18-cv-05726
                                   )
10   SHERIFF OF COOK COUNTY        )
     THOMAS J. DART, in his        )
11   Official Capacity,           )
     JOSEPH RANZINO,               )
12   Individually and in his       )
     Official Capacity,            )
13   GREGORY SHIELDS,              )
     Individually and in his       )
14   Official Capacity,            )
     THOMAS NEAL,                  )
15   Individually and in his       )
     Official Capacity,            )
16   CHRISTOPHER ROHLOFF,          )
     Individually and in his       )
17   Official Capacity, and        )
     COUNTY OF COOK,               )
18   ILLINOIS,                     )
                                   )
19        Defendants.              )

20

21             The remote deposition of MICHAEL BRADY,

22   taken in the above-entitled cause, before

23   Brenda S. Hall, Certified Shorthand Reporter of the

24   State of Illinois, CSR License No. 084-003359, on
```

Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1372 of 1503 PageID #:1763
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1   Thursday, September 17, 2020, at 10:08 a.m., via

 2   Zoom, pursuant to notice.

 3

 4   REMOTE APPEARANCES:

 5             HERBERT LAW FIRM, INC.
              BY:  MR. DANIEL Q. HERBERT
 6                 MS. KELLY A. KRAUCHUN
              206 South Jefferson Street
 7            Suite 100
              Chicago, Illinois  60661
 8            (312) 655-7660
              dan.herbert@danherbertlaw.com
 9            kelly.krauchun@danherbertlaw.com

10                 Appeared remotely on behalf of
                   Plaintiffs;
11

12            LEINENWEBER BARONI & DAFFADA, LLC
              BY:  MR. JUSTIN L. LEINENWEBER
13            120 North LaSalle Street
              Suite 2000
14            Chicago, Illinois  60602
              (866) 786-3705
15            justin@ilesq.com

16                 Appeared remotely on behalf of
                   Defendants;
17

18            EMERY LAW LIMITED
              BY:  MR. ETHAN E. WHITE
19            2201 Midwest Road
              Suite 200
20            Oak Brook, Illinois  60523
              (630) 984-0339
21            ewhite@emerylawltd.com

22                 Appeared remotely on behalf of
                   Defendants.
23

24                      *    *    *
```



Michael Brady - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1373 of 1503 PageID #:1764

```
 1                    I N D E X
    WITNESS                            EXAMINATION
 2
    MICHAEL BRADY
 3
        By Mr. Herbert                          4
 4
        By Mr. Leinenweber                     31
 5

 6

 7

 8

 9

10                  E X H I B I T S
    NUMBER                         MARKED FOR ID
11
    Brady Deposition Exhibit
12
                    (NO EXHIBITS MARKED.)
13

14

15

16

17

18

19

20

21

22

23

24
```

Michael Brady  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1374 of 1503 PageID #:1765
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    (Whereupon, the witness was
2    duly sworn.)
3        MICHAEL BRADY,
4 called as a witness herein, was examined and
5 testified via Zoom as follows:
6        EXAMINATION
7 BY MR. HERBERT:
8    Q.  Good morning, Mr. Brady.  How are you?
9    A.  Good.  How are you doing today?
10    Q.  Good.  My name is Dan Herbert and I'm one
11 of the lawyers representing the plaintiffs in this
12 case where -- have you seen the lawsuit in this case?
13    A.  No, sir.
14    Q.  Okay.  I'm representing Legrain Winston,
15 Michelle Strickland, Vernell Tims, I.V. Newson,
16 Samuel Page, Wilford Ferguson, Cecil Williams, David
17 Walker, Tyrone Mcghee, and Victor Slaughter.  Do you
18 know those individuals?
19    A.  I -- excuse me, Dan.  I knew them when I
20 worked over at EM which was a very short time, and I
21 do not know or have not had any contact with them
22 since I left EM.
23    Q.  Okay.  Are you currently working for the
24 sheriff?
                                        Page 4

1    A.  Yes, sir.  I am.
2    Q.  What's your job title?
3    A.  My job title is director of the
4 counter-reaction team.
5    Q.  And how long have you been employed by
6 the Cook County Sheriff's?
7    A.  The Cook County Sheriff's Office, I came
8 over in 1990.
9    Q.  Okay.  And when were you in the EM unit?
10    A.  The EM unit, I believe I was there in the
11 early part of either '15 or '17.
12    Q.  2016, 2017?
13    A.  Yes, sir.
14    Q.  Okay.
15    A.  A short amount of time.
16    Q.  And what was your position over there,
17 your rank?
18    A.  My rank, I was a deputy director.
19    Q.  Okay.  And so you would have -- you would
20 have reported to the director who was your direct
21 supervisor?
22    A.  Greg Shields, yes.
23    Q.  Okay.  And what's your relationship with
24 Greg Shields right now?
                                        Page 5

1    A.  I haven't seen Greg since he left the
2 sheriff's office.
3    Q.  Would you consider yourself in a friendly
4 relationship with Greg Shields when you were working
5 in EM?
6    A.  Yes.
7    Q.  Okay.  Did Greg Shields bring you over to
8 the electronic monitoring unit?
9    A.  No, sir.
10    Q.  How is it that you ended up there?
11    A.  I was assigned by the sheriff executive
12 staff.  Exactly who I don't know, but I was assigned
13 over there.
14    Q.  Okay.  And when you left the EM unit,
15 where did you go?
16    A.  When I left the EM unit, I went back over
17 to the jail and was assigned different positions over
18 there.
19    Q.  Okay.  It sounds like you were kind of
20 happy to get out of the EM unit?
21    MR. LEINENWEBER:  Objection.  Form and
22 foundation.
23    THE WITNESS:  I didn't hear you, Dan.  Please
24 repeat.
                                        Page 6

1 BY MR. HERBERT:
2    Q.  Were you happy to get out of the EM unit?
3    MR. LEINENWEBER:  The same objections.
4    THE WITNESS:  Yes and no.
5    MR. LEINENWEBER:  You can go ahead and
6 answer.  If I make an objection, you can go ahead and
7 answer, Mike, just to clarify.
8    THE WITNESS:  Yes and no.
9 BY MR. HERBERT:
10    Q.  Explain.
11    A.  Like I said, yes and no, you know, but I
12 take my marching orders and I move on.
13    Q.  Got it.  How would you characterize the
14 EM unit as far as compared to other units that you've
15 worked in within the sheriff's department when you
16 worked there?
17    A.  It was a street unit, a lot of good
18 officers, a lot of good civilians.  I respected them,
19 they respected me, and I had no complaints with the
20 officers or the civilians when I asked them to do
21 something or carry out policy.
22    Q.  Okay.  And what was your -- what were
23 your duties as the deputy director in the EM unit?
24    A.  I would conduct roll call.  I would
                                        Page 7



Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1375 of 1503 PageID #:1766
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 review reports. I would get a handle on the
2 operations and check out equipment, just see what the
3 operation was, and then any other situations that
4 arose that needed addressing to from a director or
5 guidance, I would be doing that.
6 Q. Okay. And then who reported to you?
7 Aside from the investigators, who reported to you as
8 the deputy director?
9 A. I had reporting to me would pretty much
10 be the people upstairs in the office. And when you
11 say report, that's a little vague. I would have
12 investigators or civilians or ranking people come up
13 to me and tell me what their day activities were,
14 where their assignment is going to be, or I'd go
15 across to the jail and see how we were getting people
16 assigned to EM, the process and that kind of
17 formality.
18 Q. Okay. Yeah, I wasn't real clear on what
19 I meant. More so on like, you know, the ranks that
20 would directly report to you, lieutenants?
21 A. Directly report to me, I would say that's
22 a little vague on there, but when I did the day
23 shift, I would get reports from people coming off
24 midnights, the supervisors.

Page 8

1 When I worked days, I'd get reports
2 from the investigators, the computer operators.
3 Shields would tell me, you know, we're looking at
4 this or we're doing this, meaning high profile cases
5 or other projects going on in EM. It was that type
6 of system.
7 Q. Who were the supervisors in the unit when
8 you were in the EM unit?
9 A. Let's see. Greg Shields, Mr. Webb, then
10 we had the rank structure. I may not remember all
11 the names or titles, but we had a John O'Malley who
12 is retired, we had Chris Rohloff, we had a -- Duran
13 was up there, and then we had O'Neal, and then I had
14 one other supervisor up in the unit. I forget his
15 name right now.
16 Q. Okay. Was Lieutenant Ranzino, was he
17 there when you were in EM?
18 A. I don't believe so.
19 Q. Okay. Do you know Ranzino?
20 A. I used to know him back, back years ago,
21 but I haven't had contact with Mr. Ranzino in years.
22 Q. Okay. Were you ever made aware of any
23 complaints by any of the investigators about problems
24 within the workplace?

Page 9

1 MR. LEINENWEBER: Object to form.
2 THE WITNESS: That's a loaded question
3 because --
4 BY MR. HERBERT:
5 Q. That's what I'm paid to do is ask the
6 loaded ones.
7 A. Yeah, and you want to get a loaded answer
8 from me, Dan.
9 Q. Yeah, and here, if you don't understand a
10 question, please feel free to ask me to rephrase it.
11 A. No, what I'm getting at is the type of my
12 personality. The officers, investigators, they would
13 come up to me and put in complaints about the cars,
14 the equipment, the workload, they couldn't get a day
15 off. You know, the usual, you know, see what we can
16 do, see if we can straighten stuff out type of
17 openness, and then I tried to address it for them,
18 training and equipment, stuff like that, Dan.
19 MR. LEINENWEBER: I think we lost Dan. Mike
20 stand by for a second. We lost Dan.
21 (Short interruption.)
22 BY MR. HERBERT:
23 Q. So, Mr. Brady, I think where we ended,
24 I was asking you about people that -- any complaints

Page 10

1 in the workplace, I guess, as far as, you know,
2 working conditions, and you talked about people would
3 come with complaints and you guys would see what you
4 could do to see if you could address the complaints.
5 Is that an accurate summary somewhat?
6 A. Yeah, that's very accurate, Dan.
7 Q. Okay. So some of these complaints, would
8 they be about working assignments?
9 A. It would be a broad picture of
10 complaints, working assignments because the way EM --
11 and I don't know if you have a history of EM, but how
12 it's done, people would be on this electronic
13 monitoring device by a judge, and then you go check
14 on if they violated or if they -- say, they're
15 supposed to report to work and they don't show up,
16 and the employee would call us. We would go out and
17 look for the gentleman or the lady. You know, that
18 type of assignments, Dan.
19 Q. Got it. Yeah, just from talking to a
20 bunch of people in this case, I think we all have a
21 decent understanding of the unit and how it worked.
22 Obviously, not as good as you, but.
23 There was different job assignments
24 within the EM unit, correct?

Page 11



Michael Brady  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1376 of 1503 PageID #:1767
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  **A.  Correct.**

2  Q.  And it's fair to say that you would

3  receive complaints from people about working various

4  assignments versus the preferred assignments that

5  they wanted?

6  MR. LEINENWEBER:  Objection to form.

7  Go ahead.

8  THE WITNESS:  Yes and no, and what I mean by

9  that is the investigators knew what they were

10  assigned to do.  The people working the computers

11  knew that this is how they were supposed to do it

12  including the civilians.

13  Sometimes we'd get overloaded

14  because the judges would put so many people on EM

15  that we would have to go out, deliver the equipment,

16  deliver the men, and then there would be other times

17  when due to people being off or medical that I would

18  send you and Justin, I'll just say to Glenview, but

19  then you would have to turn around and come back and

20  go to 79th and Halsted.  You would hear the, I hate

21  this job or this is unsafe.  I really didn't get that

22  kind of stuff, sir.

23  BY MR. HERBERT:

24  Q.  Okay.  Well, I told you who our

Page 12

1  plaintiffs were in our case.  Do you remember them

2  complaining about -- or strike that.

3  Did they ever complain to you about

4  any issues that they had in the workplace?

5  **A.  I can't specifically say a name or this**

6  **was done but, I mean, some of the men, which they do**

7  **all the time in different units and in the private**

8  **and the public sector, you know, just questioning**

9  **really not their assignments but, you know, like I**

10  **say, a car or the radio wasn't working properly, that**

11  **type of stuff.**

12  Q.  As far as the assignments went,

13  Mr. Brady, was it your policy to try and put

14  employees, investigators in the positions that they

15  preferred if you could do it?

16  MR. LEINENWEBER:  Objection to form.

17  Go ahead.

18  THE WITNESS:  I didn't hear you, Justin.

19  What?

20  MR. LEINENWEBER:  I said objection to form.

21  Go ahead and answer.

22  THE WITNESS:  Not really with me because each

23  day there was a roster assigned out and the men would

24  fill that, and then they would pick up their

Page 13

1  assignments and they would go do it.  That's how it

2  was pretty well done.

3  BY MR. HERBERT:

4  Q.  But were you in charge of making the

5  assignments?

6  **A.  No.**

7  Q.  And who was?  Not the person, but who was

8  in charge of that?  Whose duties did that fall upon?

9  MR. LEINENWEBER:  Objection to form and

10  foundation.

11  Go ahead.

12  THE WITNESS:  Go ahead and answer?

13  MR. LEINENWEBER:  Yes.

14  THE WITNESS:  I know my watch was John

15  O'Malley.  John knew the men better than I did.  He

16  knew the system better than I because I was still a

17  new person up there, and so he would put a roster out

18  and say, I've got these two officers working here,

19  I've got these two officers working here, and I would

20  say, okay, fine.  You know, as long as I know where

21  they're at, what they're doing, I was fine with that.

22  BY MR. HERBERT:

23  Q.  Okay.  Would you have to approve like the

24  daily assignments after, say, O'Malley made them?

Page 14

1  Would you have to formally approve them and then they

2  would be provided to the investigators?

3  **A.  Greg Shields would always look them over.**

4  Q.  Okay.  Greg Shields would look over the

5  daily assignment sheets?

6  **A.  Yes.**

7  Q.  And would he sign off on those?

8  MR. LEINENWEBER:  Objection to form and

9  foundation.

10  Go ahead.

11  THE WITNESS:  I believe he would.

12  BY MR. HERBERT:

13  Q.  Okay.  Have you ever had a director in

14  the other units that you've worked over, have you

15  ever had a director review and sign off on the daily

16  assignments on a daily basis?

17  MR. LEINENWEBER:  Object to form and

18  foundation.

19  You can go ahead.

20  THE WITNESS:  No, because the units I ran I

21  usually was the, if you want to call it the highest

22  ranking member even though I had the title of

23  director over there.  Greg was the executive

24  director, I believe, so he was a little higher than

Page 15



**Michael Brady - 9/17/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1377 of 1503 PageID #:1768
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

me.

BY MR. HERBERT:

Q. So Greg would have the final say on who was assigned on any particular day, fair to say?

MR. LEINENWEBER: Object to form and foundation.

You can go ahead.

THE WITNESS: Pretty much so.

BY MR. HERBERT:

Q. Okay. And are you aware of situations where Director Shields changed some of the assignments that may have been put in by a subordinate such as O'Malley like you spoke of?

A. I can't recall, no.

Q. Okay. Within the unit there was inside jobs and outside jobs, right, in the EM unit?

A. Correct.

Q. Okay. It's fair to say that the majority of the unit preferred working in the field, outside?

MR. LEINENWEBER: Object to form and foundation.

You can go ahead.

THE WITNESS: That's fair to say.

Page 16

BY MR. HERBERT:

Q. I'm sure there was some people that preferred to work inside, correct?

A. That's fair to say.

Q. Okay. But the vast majority preferred working in the field, right?

MR. LEINENWEBER: Object to form, foundation.

Go ahead.

THE WITNESS: Yes.

BY MR. HERBERT:

Q. Okay. And do you know whether or not the investigators worked the assignments consistent with all the other investigators? That's not a very good question. Hold on. I'm on my first cup of coffee. Let me reask that again.

Were the assignments, were they doled out on a consistent basis, in other words, you tried to make sure everyone kind of worked inside as much as everyone else?

MR. LEINENWEBER: Object to form, foundation, also a compound question.

Go ahead.

THE WITNESS: No, the way I believe it was set up, Dan, was if I was assigned to take the phone

Page 17

calls for the EM person, either goes to court, work, or school, that would be my assignment. Then I had investigators or officers that were assigned to the computer to help keep tabs on people. We didn't take, say, Dan Herbert off the computer and put him in a car with Mike Brady. It was like everybody was assigned. They sort of constantly kept that assignment. So if I was a street officer, I would be on the street the majority of the time. If I was working inside, I would be inside the majority of the time.

BY MR. HERBERT:

Q. I get. I guess who decides -- what determines if somebody is an inside person versus an outside person?

A. The only way I can really answer that very openly is that was established before I got there, and I know that the union at times played part in it. But when I got up there, that's the way it was set up.

Q. Okay. But when you were there, it wasn't -- they didn't bid for their assignments, did they?

A. I couldn't hear you. Please repeat.

Page 18

Q. I know -- my understanding, and correct me if I'm wrong, but my understanding was that at one point the investigators bid for their watch and assignment and then that changed at some point, and it's my understanding that in 2016, 2017 the investigators did not bid for those assignments. The assignments were strictly determined by the supervisors within the unit.

A. The only thing I can repeat on that, Dan, is when I got up there, the officers I met and worked with me or with me, their assignments -- the majority of the time they kept the assignments they were assigned to.

Now, I'm not saying that, using you as an example, hey, Dan's taking off today. Okay. I've got to put Justin in Dan's spot. But it wouldn't be Dan works Tuesday, Justin Wednesday. They pretty much had their assignments because of the bidding and it's just the way it was set up when I got up there.

Q. Okay. Very good. Did you ever hear any rumors about people complaining about being discriminated against because of their race?

A. No, sir.

Page 19

Michael Brady   -   9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1378 of 1503 PageID #:1769
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 20

1   Q.  Okay.  Did you ever become aware that
2 some of the black investigators were complaining that
3 they were being given assignments and discipline that
4 was contrary to their white coworkers?
5   A.  No, sir.
6   Q.  Did you ever hear about any allegations
7 about the N word being used in the workplace?  And
8 when I say the N word, you know what I'm talking
9 about, correct?
10   A.  Correct.
11   Q.  Okay.  Did you ever hear any rumors or
12 beefs or complaints, maybe not directly to you, but
13 did you ever hear about anything along those lines?
14   A.  No, sir.
15   Q.  Okay.  Let me direct your attention.  You
16 were working in April 2017 for the EM unit, correct?
17   A.  Yes, sir.
18   Q.  And there was an incident where there was
19 a disturbance with Investigator Winston and Director
20 Brady.  Do you remember that incident -- I'm sorry,
21 Director Shields?
22   A.  Oh, because I was going to answer no to
23 your first question.
24   Q.  Do you know what I'm talking about, the

Page 21

1 incident with Shields and Winston?
2   A.  Yes, sir.
3   Q.  Okay.  Tell me what happened, what you
4 remember.
5   A.  Okay.  This is just -- what I heard
6 possibly is hearsay, but I was back by my office and
7 I heard some rather loud voices, not screaming, not
8 hysterical but just loud voices, and when I stepped
9 out of my office, Director Shields and Officer
10 Winston were loudly talking to each other about a
11 situation that I didn't have any information about,
12 and I said -- they went back and forth with each
13 other.  No racial tones, no sexual tones, no threats,
14 and then I tried to just calm it down and ask what
15 was going on.
16   Q.  And then what happened when you did that?
17   A.  It calmed down.  I brought Director
18 Shields into his office.  Let's calm down.  This
19 isn't the way we conduct business in front of
20 everybody, and just stay in our office, and then I
21 went out and talked to Mr. Winston, Officer Winston.
22   Q.  And you said you brought Shields into his
23 office.  Did you put your hands on Director Shields
24 in any way?

Page 22

1   A.  No, it was more like, come on, Greg.
2 This isn't the way to conduct business.  Let's go in
3 here, because the door to his office is right there.
4 I wasn't walking down a hallway or anything like
5 that.
6   Q.  Okay.  And did Shields come into the
7 office with you?
8   A.  Yes, sir.  He did.
9   Q.  Okay.  Do you know who walked in first,
10 you or him?
11   A.  I believe he did.
12   Q.  Okay.  Did you kind of grab him by the
13 arm and just gently walk him into the office,
14 something like that?
15   A.  I don't think I grabbed him by the arm.
16 It could be a light ushering or, come on, let's go,
17 let's just walk in here.
18   Q.  Okay.  You touched his body in an attempt
19 to kind of get him into the office, fair to say?
20   A.  Well, yes and no.  It's not like I had to
21 use force to get him in there.  It was like, just
22 come on, let's go in the office, and as I walked, he
23 walked.
24   Q.  Got it.  Was Shields, was he angry did he

Page 23

1 look?
2   MR. LEINENWEBER:  Objection to form,
3 foundation.
4   THE WITNESS:  I don't think he was angry.  I
5 think he looked more flustered and -- you know, he
6 went in with me and we talked, so.  You know, that's
7 all I can say.
8 BY MR. HERBERT:
9   Q.  How long did you talk to him do you think
10 after you went into the office?
11   A.  Oh 7, 12 minutes, even if that, Dan.  It
12 could have been, hey, just calm down, don't address
13 it this way and just relax, you know, stuff like
14 that.  No hard core threats or discipline or anything
15 like that.  It was more, let's get a common factor in
16 this whole situation.
17   Q.  Were there other people around when you
18 came out of your office after hearing the loud
19 voices?
20   A.  Well, Officer Winston was.
21   Q.  Okay.
22   A.  And I believe there was some
23 investigators up in the office area.
24   Q.  Okay.  And when you say loud voices, it's



Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1379 of 1503 PageID #:1770
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 fair enough that the voices were from Winston and
2 Shields?
3     A.  Yes.
4     Q.  Okay.  And had you heard Shields ever
5 getting into an argument with any employees other
6 than this situation?
7     A.  No.
8     Q.  Okay.  Have you ever seen a situation
9 where a supervisor and a subordinate were kind of
10 squared off while they were yelling at each other?
11     MR. LEINENWEBER:  Objection to form,
12 foundation.
13     Go ahead.
14 BY MR. HERBERT:
15     Q.  In the workplace obviously.
16     **A.  Okay.  There's one like that -- that's a**
17 **loaded because I've been involved in law enforcement**
18 **for 43 years, so when you say squared off, my head**
19 **goes to ready to fight, ready to go at it, and they**
20 **weren't even that close to each other.  Did they**
21 **exchange some words in a loud tone?  Yes, they did.**
22 **Was there any threats or stuff going on like that or**
23 **approaching each other to start fighting?  No.**
24
                                          Page 24

1 BY MR. HERBERT:
2     Q.  Well, didn't you say that they were -- at
3 one point didn't you say they were nose to nose?
4     MR. LEINENWEBER:  Object to form, foundation.
5 Also misstates prior testimony.
6     You can go ahead.
7     THE WITNESS:  I might have said they were
8 close to each other, but nose to nose -- they were
9 very close, but I would say nothing like when you
10 said squared off.  I put it in, you know, I've got my
11 fists flinched, I'm ready to fight you, you know.
12 BY MR. HERBERT:
13     Q.  Okay.  But it was clearly -- it was a
14 confrontational position by both of them?  It wasn't
15 standing face to face having a normal conversation.
16 It was a bit more confrontational.  You would agree?
17     A.  Yes, sir.
18     Q.  Okay.  Did you find out what the argument
19 was about?
20     **A.  My understanding was that Director**
21 **Shields and Officer Winston had a prior discussion**
22 **out of my hearing and I think everybody else, and it**
23 **was about discipline or an assignment, and then**
24 **Director Shields said something that Officer Winston**
                                          Page 25

1 **didn't appreciate and then he responded to it.**
2     Q.  Do you know what it was that Shields said
3 that Winston didn't appreciate?
4     **A.  I think it was something but not**
5 **verbatim, have a good day, good luck, take care of**
6 **yourself, something like that, and Officer Winston**
7 **didn't appreciate it because he thought it was**
8 **unnecessary.**
9     Q.  But what about saying have a good day,
10 why would that cause that reaction?  I guess I'm not
11 understanding why that would cause Winston to be
12 upset.
13     MR. LEINENWEBER:  Object to form, foundation.
14     You can go ahead.
15     THE WITNESS:  Okay.  What I believe, Dan,
16 would be, say I'm disciplining you and I say you're
17 taking -- and this is just me saying this, Dan,
18 you're taking three or four days' suspension, five
19 days, I'm taking time from you, I'm taking this, and
20 as you're disgruntally (sic) upset about it, and I
21 turn to you and, say, well, you know what, Dan, have
22 a good day.
23 BY MR. HERBERT:
24     Q.  Okay.  So kind of in a sarcastic manner?
                                          Page 26

1     A.  Yes.
2     Q.  Okay.  And that's your understanding of
3 what happened in this situation with Shields making
4 that comment to Winston?
5     A.  Yes, sir.
6     Q.  Okay.  And I think you said Winston went
7 in there and was talking about his discipline and his
8 work assignments.  Is that what you said?
9     **A.  That's what I assumed, you know, to have**
10 **it go the way it did.**
11     Q.  Yeah.  So it's fair to say that he was
12 complaining about receiving discipline different than
13 other people?
14     MR. LEINENWEBER:  Object to form, foundation.
15 It also calls for speculation and assumes facts not
16 in evidence.
17     Go ahead.
18     THE WITNESS:  I really can't judge on what
19 Officer Winston was thinking.  Whatever it was, he
20 didn't appreciate it and he responded back.
21 BY MR. HERBERT:
22     Q.  Okay.  Are you aware that -- are you
23 aware of the fact that the sheriff had put in to
24 terminate Winston along with others regarding --
                                          Page 27



Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1380 of 1503 PageID #:1771
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 regarding an attempt to use court time in lieu of a
2 tour of duty?
3 **A. No, sir.**
4 Q. Okay. When you were in EM, do you -- did
5 any employees, would they go to court on an
6 occasional basis?
7 **A. Yes, sir.**
8 Q. You know what, strike that. That's a
9 poor question.
10 Let me just ask you directly. When
11 I say the phrase use court time in lieu of a tour of
12 duty, do you know what I'm talking about with respect
13 to work at the sheriff's office?
14 MR. LEINENWEBER: Object to form, foundation.
15 Go ahead.
16 THE WITNESS: I assume that if I'm supposed
17 to work and I'm just saying 7:00 o'clock until 3:15
18 and I get called to 26th and Cal before Judge Gaughan
19 and I'm there for five hours and then I take my lunch
20 and then I say this is my tour of duty, sometimes
21 that's approved and you can be done because that's
22 what it's considered. In this case, I'm not sure
23 about court hours or where.
24

*Page 28*

BY MR. HERBERT:
2 Q. Okay. But, you know, in the other --
3 it's not uncommon for officers to use court time in
4 lieu of their tour of duty while you've been employed
5 with the Cook County Sheriff's Department?
6 MR. LEINENWEBER: Object to form, foundation.
7 Go ahead.
8 THE WITNESS: I cannot answer that because
9 there's 7,000 employees and I don't know what they
10 all do or their policies.
11 BY MR. HERBERT:
12 Q. I've got it. But it's fair to say you've
13 used court time in lieu of a tour of duty in the
14 past?
15 MR. LEINENWEBER: Object to form and
16 foundation.
17 Go ahead.
18 THE WITNESS: Repeat the question, Dan. You
19 broke up.
20 BY MR. HERBERT:
21 Q. Sure. It's fair to say that you've used
22 court time in lieu of a tour of duty in all your
23 years with the sheriff, correct?
24 MR. LEINENWEBER: The same objection.

*Page 29*

1 You can go ahead.
2 THE WITNESS: I'm trying to figure that one
3 out. I would say no because when I get done with
4 court, I usually go back to work to my position and
5 that's just because of the hours. I don't do eight
6 hours.
7 BY MR. HERBERT:
8 Q. But certainly you've approved officers
9 that work for you, you've allowed them to use court
10 time in lieu of a tour of duty in the past, correct?
11 MR. LEINENWEBER: The same objections.
12 THE WITNESS: I believe so. I believe so.
13 MR. HERBERT: Okay. If I can have just one
14 second. I'm going to just put mute on my phone, talk
15 to Kelly, and I think I'm wrapping up and I might be
16 done, so give me one second, okay?
17 **A. Okay.**
18 MR. LEINENWEBER: It sounds good.
19 (Whereupon, a short break
20 was had.)
21 MR. HERBERT: All right. We'll go back on
22 the record, and I have no more questions, and I
23 appreciate your time.
24 MR. LEINENWEBER: Hey, Mike, I do, I have one

*Page 30*

1 question. Brenda, so if we can stay on the record
2 for just a second.
3 EXAMINATION
4 BY MR. LEINENWEBER:
5 Q. I just want to clarify the interaction
6 with Shields and Winston that you described earlier
7 when Mr. Herbert was questioning you. Just to
8 clarify, did you have to use any kind of force to get
9 Mr. Shields into his office?
10 **A. No.**
11 MR. LEINENWEBER: Okay. Thanks. That was my
12 only question. We'll waive.
13 (FURTHER DEPONENT SAITH NOT.)
14
15
16
17
18
19
20
21
22
23
24

*Page 31*

Michael Brady   -   9/17/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1381 of 1503 PageID #:1772

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1                    REPORTER'S CERTIFICATE

2

3            I, Brenda S. Hall, CSR No. 084-003359,

4    Certified Shorthand Reporter of said state, do hereby

5    certify:

6            That previous to the commencement of the

7    examination of the witness, the witness was duly

8    sworn to testify the whole truth concerning the

9    matters herein;

10            That the foregoing remote deposition

11    transcript was reported stenographically by me, was

12    thereafter reduced to typewriting under my personal

13    direction and constitutes a true record of the

14    testimony given and the proceedings had;

15            That the said remote deposition was taken

16    before me at the time specified;

17            That I am not a relative or employee or

18    attorney or counsel, nor a relative or employee of

19    such attorney or counsel for any of the parties

20    hereto, nor interested directly or indirectly in the

21    outcome of this action.

22

23

24



Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1382 of 1503 PageID #:1773
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 9th day of October, 2020.

3

4

5                    _____

6                    Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Michael Brady - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1383 of 1503 PageID #:1774

## WORD INDEX

**< 0 >**
**084-003359** 1:24
32:3

**< 1 >**
**10:08** 2:1
**100** 2:7
**12** 23:11
**120** 2:13
**15** 5:11
**17** 2:1 5:11
**18-cv-05726** 1:9
**1990** 5:8

**< 2 >**
**200** 2:19
**2000** 2:13
**2016** 5:12 19:5
**2017** 5:12 19:5
20:16
**2020** 2:1 33:2
**206** 2:6
**2201** 2:19
**26th** 28:18

**< 3 >**
**3:15** 28:17
**31** 3:1
**312** 2:8

**< 4 >**
**4** 3:1
**43** 24:18

**< 6 >**
**60523** 2:20
**60602** 2:14
**60661** 2:7
**630** 2:20
**655-7660** 2:8

**< 7 >**
**7** 23:11
**7,000** 29:9
**7:00** 28:17
**786-3705** 2:14
**79th** 12:20

**< 8 >**
**866** 2:14

**< 9 >**
**984-0339** 2:20
**9th** 33:2

**< A >**
**a.m** 2:1
**above-entitled** 1:22
**accurate** 11:5, 6
**action** 32:21
**activities** 8:13
**address** 10:17 11:4
23:12
**addressing** 8:4
**ago** 9:20
**agree** 25:16
**ahead** 7:5, 6 12:7
13:17, 21 14:11, 12
15:10, 19 16:7, 22
17:8, 22 24:13
25:6 26:14 27:17
28:15 29:7, 17 30:1
**allegations** 20:6
**allowed** 30:9
**amount** 5:15
**angry** 22:24 23:4
**answer** 7:6, 7 10:7
13:21 14:12 18:16
20:22 29:8
**ANTHONY** 1:5
**APPEARANCES**
2:4
**Appeared** 2:10, 16,
22
**appreciate** 26:1, 3,
7 27:20 30:23
**approaching** 24:23
**approve** 14:23 15:1
**approved** 28:21
30:8
**April** 20:16
**area** 23:23
**argument** 24:5
25:18
**arm** 22:13, 15
**arose** 8:4
**Aside** 8:7
**asked** 7:20
**asking** 10:24

**assigned** 6:11, 12,
17 8:16 12:10
13:23 16:4 17:24
18:3, 7 19:13
**assignment** 8:14
15:5 18:2, 8 19:4
25:23
**assignments** 11:8,
10, 18, 23 12:4
13:9, 12 14:1, 5, 24
15:16 16:12 17:12,
16 18:22 19:6, 7,
11, 12, 18 20:3 27:8
**assume** 28:16
**assumed** 27:9
**assumes** 27:15
**attempt** 22:18 28:1
**attention** 20:15
**attorney** 32:18, 19
**aware** 9:22 16:10
20:1 27:22, 23

**< B >**
**back** 6:16 9:20
12:19 21:6, 12
27:20 30:4, 21
**BARONI** 2:12
**basis** 15:16 17:17
28:6
**beefs** 20:12
**behalf** 2:10, 16, 22
**believe** 5:10 9:18
15:11, 24 17:23
22:11 23:22 26:15
30:12
**better** 14:15, 16
**bid** 18:22 19:3, 6
**bidding** 19:19
**bit** 25:16
**black** 20:2
**body** 22:18
**BRADY** 1:21 3:1,
10 4:3, 8 10:23
13:13 18:6 20:20
**break** 30:19
**Brenda** 1:23 31:1
32:3
**bring** 6:7
**broad** 11:9
**broke** 29:19

**Brook** 2:20
**brought** 21:17, 22
**bunch** 11:20
**business** 21:19 22:2

**< C >**
**Cal** 28:18
**call** 7:24 11:16
15:21
**called** 4:4 28:18
**calls** 18:1 27:15
**calm** 21:14, 18
23:12
**calmed** 21:17
**Capacity** 1:11, 12,
14, 15, 17
**car** 13:10 18:6
**care** 26:5
**carry** 7:21
**cars** 10:13
**case** 4:12 11:20
13:1 28:22
**cases** 9:4
**cause** 1:22 26:10,
11
**CECIL** 1:5 4:16
**certainly** 30:8
**CERTIFICATE**
32:1
**Certified** 1:23 32:4
33:6
**certify** 32:5
**changed** 16:11 19:4
**characterize** 7:13
**charge** 14:4, 8
**check** 8:2 11:13
**Chicago** 2:7, 14
33:2
**Chris** 9:12
**CHRISTOPHER**
1:16
**civilians** 7:18, 20
8:12 12:12
**clarify** 7:7 31:5, 8
**clear** 8:18
**clearly** 25:13
**close** 24:20 25:8, 9
**coffee** 17:14
**come** 8:12 10:13
11:3 12:19 22:1, 6,

Michael Brady   -   9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1384 of 1503 PageID #:1775
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

16, 22
**coming** 8:23
**commencement**
32:6
**comment** 27:4
**common** 23:15
**compared** 7:14
**complain** 13:3
**complaining** 13:2
19:22 20:2 27:12
**complaints** 7:19
9:23 10:13, 24
11:3, 4, 7, 10 12:3
20:12
**compound** 17:21
**computer** 9:2 18:4,
5
**computers** 12:10
**concerning** 32:8
**conditions** 11:2
**conduct** 7:24
21:19 22:2
**confrontational**
25:14, 16
**consider** 6:3
**considered** 28:22
**consistent** 17:12, 17
**constantly** 18:7
**constitutes** 32:13
**contact** 4:21 9:21
**contrary** 20:4
**conversation** 25:15
**COOK** 1:10, 17
5:6, 7 29:5
**core** 23:14
**correct** 11:24 12:1
16:17 17:3 19:1
20:9, 10, 16 29:23
30:10
**counsel** 32:18, 19
**counter-reaction** 5:4
**COUNTY** 1:10, 17
5:6, 7 29:5
**COURT** 1:1 18:1
28:1, 5, 11, 23 29:3,
13, 22 30:4, 9
**coworkers** 20:4
**CSR** 1:24 32:3
**cup** 17:14
**currently** 4:23

**< D >**
**DAFFADA** 2:12
**daily** 14:24 15:5,
15, 16
**Dan** 4:10, 19 6:23
10:8, 18, 19, 20
11:6, 18 17:24
18:5 19:9, 17
23:11 26:15, 17, 21
29:18
dan.herbert@danher
bertlaw.com 2:8
**DANIEL** 2:5
**Dan's** 19:15, 16
**DART** 1:10
**DAVID** 1:6 4:16
**day** 8:13, 22 10:14
13:23 16:4 26:5, 9,
22 33:2
**days** 9:1 26:18, 19
**decent** 11:21
**decides** 18:13
**Defendants** 1:19
2:16, 22
**deliver** 12:15, 16
**department** 7:15
29:5
**DEPONENT** 31:13
**deposition** 1:21
3:10 32:10, 15
**deputy** 5:18 7:23
8:8
**described** 31:6
**determined** 19:7
**determines** 18:14
**device** 11:13
**different** 6:17
11:23 13:7 27:12
**direct** 5:20 20:15
**direction** 32:13
**directly** 8:20, 21
20:12 28:10 32:20
**director** 5:3, 18, 20
7:23 8:4, 8 15:13,
15, 23, 24 16:11
20:19, 21 21:9, 17,
23 25:20, 24
**discipline** 20:3
23:14 25:23 27:7,

12
**disciplining** 26:16
**discriminated** 19:23
**discussion** 25:21
**disgruntally** 26:20
**DISTRICT** 1:1
**disturbance** 20:19
**DIVISION** 1:2
**doing** 4:9 8:5 9:4
14:21
**doled** 17:17
**door** 22:3
**due** 12:17
**duly** 4:2 32:7
**Duran** 9:12
**duties** 7:23 14:8
**duty** 28:2, 12, 20
29:4, 13, 22 30:10

**< E >**
**earlier** 31:6
**early** 5:11
**EASTERN** 1:2
**eight** 30:5
**either** 5:11 18:1
**electronic** 6:8
11:12
**EM** 4:20, 22 5:9,
10 6:5, 14, 16, 20
7:2, 14, 23 8:16
9:5, 8, 17 11:10, 11,
24 12:14 16:16
18:1 20:16 28:4
**EMERY** 2:18
**employed** 5:5 29:4
**employee** 11:16
32:17, 18
**employees** 13:14
24:5 28:5 29:9
**ended** 6:10 10:23
**enforcement** 24:17
**equipment** 8:2
10:14, 18 12:15
**established** 18:17
**ETHAN** 2:18
**everybody** 18:6
21:20 25:22
**evidence** 27:16
ewhite@emerylawltd
.com 2:21
**Exactly** 6:12

**EXAMINATION**
3:1 4:6 31:3 32:7
**examined** 4:4
**example** 19:15
**exchange** 24:21
**excuse** 4:19
**executive** 6:11
15:23
**Exhibit** 3:10
**EXHIBITS** 3:10
**Explain** 7:10

**< F >**
**face** 25:15
**fact** 27:23
**factor** 23:15
**facts** 27:15
**fair** 12:2 16:4, 18,
23 17:4 22:19
24:1 27:11 29:12,
21
**fall** 14:8
**far** 7:14 11:1
13:12
**feel** 10:10
**FERGUSON** 1:5
4:16
**field** 16:19 17:6
**fight** 24:19 25:11
**fighting** 24:23
**figure** 30:2
**fill** 13:24
**final** 16:3
**find** 25:18
**fine** 14:20, 21
**FIRM** 2:5
**first** 17:14 20:23
22:9
**fists** 25:11
**five** 26:18 28:19
**flinched** 25:11
**flustered** 23:5
**follows** 4:5
**force** 22:21 31:8
**foregoing** 32:10
**forget** 9:14
**Form** 6:21 10:1
12:6 13:16, 20
14:9 15:8, 17 16:5,
20 17:7, 20 23:2
24:11 25:4 26:13

**Michael Brady - 9/17/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1385 of 1503 PageID #:1776
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

27:*14*  28:*14*  29:*6,*
*15*
**formality**  8:*17*
**formally**  15:*1*
**forth**  21:*12*
**foundation**  6:*22*
  14:*10*  15:*9, 18*
  16:*6, 21*  17:*7, 20*
  23:*3*  24:*12*  25:*4*
  26:*13*  27:*14*  28:*14*
  29:*6, 16*
**four**  26:*18*
**free**  10:*10*
**friendly**  6:*3*
**front**  21:*19*
**FURTHER**  31:*13*

**< G >**
**Gaughan**  28:*18*
**gentleman**  11:*17*
**gently**  22:*13*
**getting**  8:*15*  10:*11*
  24:*5*
**give**  30:*16*
**given**  20:*3*  32:*14*
**Glenview**  12:*18*
**go**  6:*15*  7:*5, 6*
  8:*14*  11:*13, 16*
  12:*7, 15, 20*  13:*17,*
  *21*  14:*1, 11, 12*
  15:*10, 19*  16:*7, 22*
  17:*8, 22*  22:*2, 16,*
  *22*  24:*13, 19*  25:*6*
  26:*14*  27:*10, 17*
  28:*5, 15*  29:*7, 17*
  30:*1, 4, 21*
**goes**  18:*1*  24:*19*
**going**  8:*14*  9:*5*
  20:*22*  21:*15*  24:*22*
  30:*14*
**Good**  4:*8, 9, 10*
  7:*17, 18*  11:*22*
  17:*13*  19:*21*  26:*5,*
  *9, 22*  30:*18*
**grab**  22:*12*
**grabbed**  22:*15*
**Greg**  5:*22, 24*  6:*1,*
  *4, 7*  9:*9*  15:*3, 4, 23*
  16:*3*  22:*1*
**GREGORY**  1:*13*

**guess**  11:*1*  18:*13*
  26:*10*
**guidance**  8:*5*
**guys**  11:*3*

**< H >**
**Hall**  1:*23*  32:*3*
**hallway**  22:*4*
**Halsted**  12:*20*
**hand**  33:*1*
**handle**  8:*1*
**hands**  21:*23*
**happened**  21:*3, 16*
  27:*3*
**happy**  6:*20*  7:*2*
**hard**  23:*14*
**hate**  12:*20*
**head**  24:*18*
**hear**  6:*23*  12:*20*
  13:*18*  18:*24*  19:*21*
  20:*6, 11, 13*
**heard**  21:*5, 7*  24:*4*
**hearing**  23:*18*
  25:*22*
**hearsay**  21:*6*
**help**  18:*4*
**HERBERT**  2:*5*
  3:*1*  4:*7, 10*  7:*1, 9*
  10:*4, 22*  12:*23*
  14:*3, 22*  15:*12*
  16:*2, 9*  17:*1, 10*
  18:*5, 12*  23:*8*
  24:*14*  25:*1, 12*
  26:*23*  27:*21*  29:*1,*
  *11, 20*  30:*7, 13, 21*
  31:*7*
**hereto**  32:*20*
**hereunto**  33:*1*
**hey**  19:*15*  23:*12*
  30:*24*
**high**  9:*4*
**higher**  15:*24*
**highest**  15:*21*
**history**  11:*11*
**Hold**  17:*14*
**hours**  28:*19, 23*
  30:*5, 6*
**hysterical**  21:*8*

**< I >**

**I.V**  1:*4*  4:*15*
**ID**  3:*10*
**ILLINOIS**  1:*1, 18,*
  *24*  2:*7, 14, 20*  33:*2*
**incident**  20:*18, 20*
  21:*1*
**including**  12:*12*
**indirectly**  32:*20*
**Individually**  1:*12,*
  *13, 15, 16*
**individuals**  4:*18*
**information**  21:*17*
**inside**  16:*15*  17:*3,*
  *18*  18:*10, 14*
**interaction**  31:*5*
**interested**  32:*20*
**interruption**  10:*21*
**Investigator**  20:*19*
**investigators**  8:*7,*
  *12*  9:*2, 23*  10:*12*
  12:*9*  13:*14*  15:*2*
  17:*12, 13*  18:*3*
  19:*3, 6*  20:*2*  23:*23*
**involved**  24:*17*
**issues**  13:*4*

**< J >**
**jail**  6:*17*  8:*15*
**Jefferson**  2:*6*
**job**  5:*2, 3*  11:*23*
  12:*21*
**jobs**  16:*16*
**John**  9:*11*  14:*14,*
  *15*
**JOSEPH**  1:*11*
**JR**  1:*4*
**judge**  11:*13*  27:*18*
  28:*18*
**judges**  12:*14*
**JUSTIN**  2:*12*
  12:*18*  13:*18*  19:*16,*
  *17*
**justin@ilesq.com**
  2:*15*

**< K >**
**keep**  18:*4*
**KELLY**  2:*6*  30:*15*
**kelly.krauchun@dan**
**herbertlaw.com**  2:*9*
**kept**  18:*7*  19:*12*

**kind**  6:*19*  8:*16*
  12:*22*  17:*18*  22:*12,*
  *19*  24:*9*  26:*24*  31:*8*
**knew**  4:*19*  12:*9, 11*
  14:*15, 16*
**know**  4:*18, 21*  6:*12*
  7:*11*  8:*19*  9:*3, 19,*
  *20*  10:*15*  11:*1, 11,*
  *17*  13:*8, 9*  14:*14,*
  *20*  17:*11*  18:*18*
  19:*1*  20:*8, 24*  22:*9*
  23:*5, 6, 13*  25:*10,*
  *11*  26:*2, 21*  27:*9*
  28:*8, 12*  29:*2, 9*
**KRAUCHUN**  2:*6*

**< L >**
**lady**  11:*17*
**LaSalle**  2:*13*
**LAW**  2:*5, 18*  24:*17*
**lawsuit**  4:*12*
**lawyers**  4:*11*
**left**  4:*22*  6:*1, 14, 16*
**LEGRAIN**  1:*3*
  4:*14*
**LEINENWEBER**
  2:*12*  3:*1*  6:*21*  7:*3,*
  *5*  10:*1, 19*  12:*6*
  13:*16, 20*  14:*9, 13*
  15:*8, 17*  16:*5, 20*
  17:*7, 20*  23:*2*
  24:*11*  25:*4*  26:*13*
  27:*14*  28:*14*  29:*6,*
  *15, 24*  30:*11, 18, 24*
  31:*4, 11*
**License**  1:*24*
**lieu**  28:*1, 11*  29:*4,*
  *13, 22*  30:*10*
**Lieutenant**  9:*16*
**lieutenants**  8:*20*
**light**  22:*16*
**LIMITED**  2:*18*
**lines**  20:*13*
**little**  8:*11, 22*  15:*24*
**LLC**  2:*12*
**loaded**  10:*2, 6, 7*
  24:*17*
**long**  5:*5*  14:*20*
  23:*9*
**look**  11:*17*  15:*3, 4*

Michael Brady - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1386 of 1503 PageID #:1777
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

23:1
**looked** 23:5
**looking** 9:3
**lost** 10:19, 20
**lot** 7:17, 18
**loud** 21:7, 8 23:18, 24 24:21
**loudly** 21:10
**luck** 26:5
**lunch** 28:19

**< M >**
**majority** 16:18 17:5 18:9, 10 19:11
**making** 14:4 27:3
**manner** 26:24
**MANNING** 1:6
**marching** 7:12
**MARKED** 3:10
**matters** 32:9
**MCGHEE** 1:6 4:17
**mean** 12:8 13:6
**meaning** 9:4
**meant** 8:19
**medical** 12:17
**member** 15:22
**men** 12:16 13:6, 23 14:15
**met** 19:10
**MICHAEL** 1:21 3:1 4:3
**MICHELLE** 1:3 4:15
**midnights** 8:24
**Midwest** 2:19
**Mike** 7:7 10:19 18:6 30:24
**minutes** 23:11
**misstates** 25:5
**monitoring** 6:8 11:13
**morning** 4:8
**move** 7:12
**mute** 30:14

**< N >**
**name** 4:10 9:15 13:5
**names** 9:11
**NEAL** 1:14

**needed** 8:4
**new** 14:17
**NEWSON** 1:4 4:15
**normal** 25:15
**North** 2:13
**NORTHERN** 1:1
**nose** 25:3, 8
**notice** 2:2
**NUMBER** 3:10

**< O >**
**Oak** 2:20
**Object** 10:1 15:17 16:5, 20 17:7, 20 25:4 26:13 27:14 28:14 29:6, 15
**Objection** 6:21 7:6 12:6 13:16, 20 14:9 15:8 23:2 24:11 29:24
**objections** 7:3 30:11
**Obviously** 11:22 24:15
**occasional** 28:6
**o'clock** 28:17
**October** 33:2
**Office** 5:7 6:2 8:10 21:6, 9, 18, 20, 23 22:3, 7, 13, 19, 22 23:10, 18, 23 28:13 31:9
**officer** 18:8 21:9, 21 23:20 25:21, 24 26:6 27:19
**officers** 7:18, 20 10:12 14:18, 19 18:3 19:10 29:3 30:8
**Official** 1:11, 12, 14, 15, 17
**Oh** 20:22 23:11
**Okay** 4:14, 23 5:9, 14, 19, 23 6:7, 14, 19 7:22 8:6, 18 9:16, 19, 22 11:7 12:24 14:20, 23 15:4, 13 16:10, 15, 18 17:5, 11 18:21 19:15, 21 20:1, 11, 15 21:3, 5 22:6, 9,

12, 18 23:21, 24 24:4, 8, 16 25:13, 18 26:15, 24 27:2, 6, 22 28:4 29:2 30:13, 16, 17 31:11
**O'Malley** 9:11 14:15, 24 16:13
**O'Neal** 9:13
**ones** 10:6
**openly** 18:17
**openness** 10:17
**operation** 8:3
**operations** 8:2
**operators** 9:2
**orders** 7:12
**outcome** 32:21
**outside** 16:16, 19 18:15
**overloaded** 12:13

**< P >**
**PAGE** 1:5 4:16
**paid** 10:5
**part** 5:11 18:18
**particular** 16:4
**parties** 32:19
**people** 8:10, 12, 15, 23 10:24 11:2, 12, 20 12:3, 10, 14, 17 17:2 18:4 19:22 23:17 27:13
**person** 14:7, 17 18:1, 14, 15
**personal** 32:12
**personality** 10:12
**phone** 17:24 30:14
**phrase** 28:11
**pick** 13:24
**picture** 11:9
**Plaintiffs** 1:8 2:10 4:11 13:1
**played** 18:18
**Please** 6:23 10:10 18:24
**point** 19:3, 4 25:3
**policies** 29:10
**policy** 7:21 13:13
**poor** 28:9
**position** 5:16 25:14 30:4

**positions** 6:17 13:14
**possibly** 21:6
**preferred** 12:4 13:15 16:19 17:3, 5
**pretty** 8:9 14:2 16:8 19:18
**previous** 32:6
**prior** 25:5, 21
**private** 13:7
**problems** 9:23
**proceedings** 32:14
**process** 8:16
**profile** 9:4
**projects** 9:5
**properly** 13:10
**provided** 15:2
**public** 13:8
**pursuant** 2:2
**put** 10:13 12:14 13:13 14:17 16:12 18:5 19:16 21:23 25:10 27:23 30:14

**< Q >**
**question** 10:2, 10 17:14, 21 20:23 28:9 29:18 31:1, 12
**questioning** 13:8 31:7
**questions** 30:22

**< R >**
**race** 19:23
**racial** 21:13
**radio** 13:10
**ran** 15:20
**rank** 5:17, 18 9:10
**ranking** 8:12 15:22
**ranks** 8:19
**RANZINO** 1:11 9:16, 19, 21
**reaction** 26:10
**ready** 24:19 25:11
**real** 8:18
**really** 12:21 13:9, 22 18:16 27:18
**reask** 17:15
**recall** 16:14
**receive** 12:3
**receiving** 27:12



Michael Brady - 9/17/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1387 of 1503 PageID #:1778
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

record 30:22 31:1
32:13
reduced 32:12
regarding 27:24
28:1
relationship 5:23
6:4
relative 32:17, 18
relax 23:13
remember 9:10
13:1 20:20 21:4
remote 1:21 2:4
32:10, 15
remotely 2:10, 16,
22
repeat 6:24 18:24
19:9 29:18
rephrase 10:10
report 8:11, 20, 21
11:15
reported 5:20 8:6,
7 32:11
Reporter 1:23
32:4 33:6
REPORTER'S 32:1
reporting 8:9
reports 8:1, 23 9:1
representing 4:11,
14
respect 28:12
respected 7:18, 19
responded 26:1
27:20
retired 9:12
review 8:1 15:15
right 5:24 9:15
16:16 17:6 22:3
30:21
Road 2:19
ROHLOFF 1:16
9:12
roll 7:24
roster 13:23 14:17
rumors 19:22
20:11

< S >
SAITH 31:13
SAMUEL 1:4 4:16
sarcastic 26:24

saying 19:14 26:9,
17 28:17
school 18:2
screaming 21:7
second 10:20
30:14, 16 31:2
sector 13:8
see 8:2, 15 9:9
10:15, 16 11:3, 4
seen 4:12 6:1 24:8
send 12:18
September 2:1
set 17:24 18:20
19:19 33:1
sexual 21:13
sheets 15:5
SHERIFF 1:10
4:24 6:11 27:23
29:23
Sheriff's 5:6, 7 6:2
7:15 28:13 29:5
SHIELDS 1:13
5:22, 24 6:4, 7 9:3,
9 15:3, 4 16:11
20:21 21:1, 9, 18,
22, 23 22:6, 24
24:2, 4 25:21, 24
26:2 27:3 31:6, 9
shift 8:23
short 4:20 5:15
10:21 30:19
Shorthand 1:23
32:4 33:6
show 11:15
sic 26:20
sign 15:7, 15
sir 4:13 5:1, 13
6:9 12:22 19:24
20:5, 14, 17 21:2
22:8 25:17 27:5
28:3, 7
situation 21:11
23:16 24:6, 8 27:3
situations 8:3
16:10
SLAUGHTER 1:7
4:17
somebody 18:14
somewhat 11:5
sorry 20:20

sort 18:7
sounds 6:19 30:18
South 2:6
specifically 13:5
specified 32:16
speculation 27:15
spoke 16:13
spot 19:16
squared 24:10, 18
25:10
staff 6:12
stand 10:20
standing 25:15
start 24:23
State 1:24 32:4
STATES 1:1
stay 21:20 31:1
stenographically
32:11
stepped 21:8
straighten 10:16
Street 2:6, 13 7:17
18:8, 9
STRICKLAND 1:3
4:15
strictly 19:7
strike 13:2 28:8
structure 9:10
stuff 10:16, 18
12:22 13:11 23:13
24:22
subordinate 16:13
24:9
Suite 2:7, 13, 19
summary 11:5
supervisor 5:21
9:14 24:9
supervisors 8:24
9:7 19:8
supposed 11:15
12:11 28:16
sure 17:2, 18 28:22
29:21
suspension 26:18
sworn 4:2 32:8
system 9:6 14:16

< T >
tabs 18:4
take 7:12 17:24

18:5 26:5 28:19
taken 1:22 32:15
talk 23:9 30:14
talked 11:2 21:21
23:6
talking 11:19 20:8,
24 21:10 27:7
28:12
team 5:4
tell 8:13 9:3 21:3
terminate 27:24
testified 4:5
testify 32:8
testimony 25:5
32:14
Thanks 31:11
thing 19:9
think 10:19, 23
11:20 22:15 23:4,
5, 9 25:22 26:4
27:6 30:15
thinking 27:19
THOMAS 1:10, 14
thought 26:7
threats 21:13
23:14 24:22
three 26:18
Thursday 2:1
time 4:20 5:15
13:7 18:9, 11
19:12 26:19 28:1,
11 29:3, 13, 22
30:10, 23 32:16
times 12:16 18:18
TIMS 1:4 4:15
title 5:2, 3 15:22
titles 9:11
today 4:9 19:15
told 12:24
tone 24:21
tones 21:13
touched 22:18
tour 28:2, 11, 20
29:4, 13, 22 30:10
training 10:18
transcript 32:11
tried 10:17 17:18
21:14
true 32:13
truth 32:8

Michael Brady - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1388 of 1503 PageID #:1779

try 13:*13*
trying 30:*2*
Tuesday 19:*17*
turn 12:*19* 26:*21*
two 14:*18, 19*
type 9:*5* 10:*11, 16*
  11:*18* 13:*11*
typewriting 32:*12*
TYRONE 1:*6* 4:*17*

< U >
uncommon 29:*3*
understand 10:*9*
understanding
  11:*21* 19:*1, 2, 5*
  25:*20* 26:*11* 27:*2*
union 18:*18*
unit 5:*9, 10* 6:*8, 14,
  16, 20* 7:*2, 14, 17,
  23* 9:*7, 8, 14* 11:*21,
  24* 16:*15, 16, 19*
  19:*8* 20:*16*
UNITED 1:*1*
units 7:*14* 13:*7*
  15:*14, 20*
unnecessary 26:*8*
unsafe 12:*21*
upset 26:*12, 20*
upstairs 8:*10*
use 22:*21* 28:*1, 11*
  29:*3* 30:*9* 31:*8*
ushering 22:*16*
usual 10:*15*
usually 15:*21* 30:*4*

< V >
vague 8:*11, 22*
various 12:*3*
vast 17:*5*
verbatim 26:*5*
VERNELL 1:*4*
  4:*15*
versus 12:*4* 18:*14*
VICTOR 1:*7* 4:*17*
violated 11:*14*
voices 21:*7, 8*
  23:*19, 24* 24:*1*
vs 1:*9*

< W >

waive 31:*12*
walk 22:*13, 17*
walked 22:*9, 22, 23*
WALKER 1:*6* 4:*17*
walking 22:*4*
want 10:*7* 15:*21*
  31:*5*
wanted 12:*5*
watch 14:*14* 19:*3*
way 11:*10* 17:*23*
  18:*16, 19* 19:*19*
  21:*19, 24* 22:*2*
  23:*13* 27:*10*
Webb 9:*9*
Wednesday 19:*17*
Well 12:*24* 14:*2*
  22:*20* 23:*20* 25:*2*
  26:*21*
went 6:*16* 13:*12*
  21:*12, 21* 23:*6, 10*
  27:*6*
we're 9:*3, 4*
WHEREOF 33:*1*
WHITE 2:*18* 20:*4*
WILFORD 1:*5*
  4:*16*
WILLIAMS 1:*5*
  4:*16*
WINSTON 1:*3*
  4:*14* 20:*19* 21:*1,
  10, 21* 23:*20* 24:*1*
  25:*21, 24* 26:*3, 6,
  11* 27:*4, 6, 19, 24*
  31:*6*
WITNESS 3:*1* 4:*1,
  4* 6:*23* 7:*4, 8* 10:*2*
  12:*8* 13:*18, 22*
  14:*12, 14* 15:*11, 20*
  16:*8, 23* 17:*9, 23*
  23:*4* 25:*7* 26:*15*
  27:*18* 28:*16* 29:*8,
  18* 30:*2, 12* 32:*7*
  33:*1*
word 20:*7, 8*
words 17:*17* 24:*21*
work 11:*15* 17:*3*
  18:*1* 27:*8* 28:*13,
  17* 30:*4, 9*
worked 4:*20* 7:*15,
  16* 9:*1* 11:*21*

15:*14* 17:*12, 18*
  19:*10*
working 4:*23* 6:*4*
  11:*2, 8, 10* 12:*3, 10*
  13:*10* 14:*18, 19*
  16:*19* 17:*6* 18:*10*
  20:*16*
workload 10:*14*
workplace 9:*24*
  11:*1* 13:*4* 20:*7*
  24:*15*
works 19:*17*
wrapping 30:*15*
wrong 19:*2*

< Y >
Yeah 8:*18* 10:*7, 9*
  11:*6, 19* 27:*11*
years 9:*20, 21*
  24:*18* 29:*23*
yelling 24:*10*

< Z >
Zoom 2:*2* 4:*5*

# Exhibit Q

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1390 of 1503 PageID #:1781
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3    LEGRAIN WINSTON,              )
      MICHELLE STRICKLAND,          )
 4    VERNELL TIMS, I.V.            )
      NEWSON, JR., SAMUEL           )
 5    PAGE, WILFORD FERGUSON,       )
      CECIL WILLIAMS, ANTHONY       )
 6    MANNING, DAVID WALKER,        )
      TYRONE MCGHEE, and            )
 7    VICTOR SLAUGHTER,             )
                                    )
 8         Plaintiffs,              )
                                    )
 9         vs.                      ) No. 18-cv-05726
                                    )
10    SHERIFF OF COOK COUNTY        )
      THOMAS J. DART, in his        )
11    Official Capacity,           )
      JOSEPH RANZINO,               )
12    Individually and in his       )
      Official Capacity,           )
13    GREGORY SHIELDS,              )
      Individually and in his       )
14    Official Capacity,           )
      THOMAS NEAL,                  )
15    Individually and in his       )
      Official Capacity,           )
16    CHRISTOPHER ROHLOFF,          )
      Individually and in his       )
17    Official Capacity, and        )
      COUNTY OF COOK,               )
18    ILLINOIS,                     )
                                    )
19         Defendants.              )

20

21              The deposition of JOHN WEBB, taken in the

22    above-entitled cause, before Brenda S. Hall,

23    Certified Shorthand Reporter of the State of

24    Illinois, CSR License No. 084-003359, on Thursday,
```

```
 1   September 17, 2020, at 11:05 a.m., via Zoom, pursuant

 2   to notice.

 3

 4   REMOTE APPEARANCES:

 5             HERBERT LAW FIRM, INC.
             BY:  MR. DANIEL Q. HERBERT
 6                 MS. KELLY A. KRAUCHUN
             206 South Jefferson Street
 7           Suite 100
             Chicago, Illinois  60661
 8           (312) 655-7660
             dan.herbert@danherbertlaw.com
 9           kelly.krauchun@danherbertlaw.com

10               Appeared remotely on behalf of
                 Plaintiffs;
11

12           LEINENWEBER BARONI & DAFFADA, LLC
             BY:  MR. JUSTIN L. LEINENWEBER
13           120 North LaSalle Street
             Suite 2000
14           Chicago, Illinois  60602
             (866) 786-3705
15           justin@ilesq.com

16               Appeared remotely on behalf of
                 Defendants;
17

18           EMERY LAW LIMITED
             BY:  MR. ETHAN E. WHITE
19           2201 Midwest Road
             Suite 200
20           Oak Brook, Illinois  60523
             (630) 984-0339
21           ewhite@emerylawltd.com

22               Appeared remotely on behalf of
                 Defendants.
23

24                   *    *    *
```



```
 1                        I N D E X
       WITNESS                              EXAMINATION
 2
       JOHN WEBB
 3
          By Mr. Herbert                           4
 4

 5

 6

 7

 8                     E X H I B I T S
       NUMBER                              MARKED FOR ID
 9
       Webb Deposition Exhibit
10
         A                                     64
11
         B                                     69
12
         C                                     83
13
         D                                     90
14
         H                                    132
15
         I                                    139
16
         J                                    148
17
         K                                    120
18

19

20

21

22

23

24
```

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1393 of 1503 PageID #:1784

1    (Whereupon, the witness was
2    duly sworn.)
3    JOHN WEBB,
4  called as a witness herein, was examined and
5  testified via Zoom as follows:
6    EXAMINATION
7  BY MR. HERBERT:
8    Q.  Hi, Mr. Webb.  How are you?
9    A.  I'm fine.  How are you?
10    Q.  I'm well.  Thank you.  My name is Dan
11  Herbert and I am one of the attorneys representing
12  the plaintiffs in this case.
13    Have you seen a copy of the
14  complaint in this case, the lawsuit?
15    A.  The original lawsuit, yeah, maybe a
16  couple of years ago.  Yeah, I believe I did.
17    Q.  Okay.  This is the lawsuit where the
18  plaintiffs in this case are Legrain Winston, Michelle
19  Strickland, Vernell Tims, I.V. Newson, Samuel Page,
20  Wilford Ferguson, Cecil Williams, David Walker,
21  Tyrone Mcghee, and Victor Slaughter.
22    My question is:  Do you know those
23  individuals?
24    A.  Yes, I know all of them and recall most

Page 4

1  of them working for me in the electronic monitoring
2  unit with the exception of Michelle Strickland.  She
3  was only there for maybe a couple months if I recall.
4  That was years ago.  And I believe there's one name
5  in there that you said that I -- I didn't recognize.
6    Q.  Which one was that?  Do you know?
7    A.  Can you repeat the names again for me,
8  please?
9    Q.  You know what, it's not important unless
10  your attorney -- I don't need to get into it.
11    A.  Okay.
12    Q.  The lawsuit is against the Sheriff of
13  Cook County as well as individual defendants, Joe
14  Ranzino, Gregory Shields, Thomas Neal and Christopher
15  Rohloff.  Do you know those individuals?
16    A.  Yes, I do.
17    Q.  Okay.  And have you given a deposition
18  before?
19    A.  Yes, I have.
20    Q.  Approximately how many times?
21    A.  Maybe -- probably maybe about ten times,
22  approximately.
23    Q.  Okay.  And were they all for work-related
24  depositions?

Page 5

1    A.  Yes.
2    Q.  Okay.  Were you a defendant in any of
3  those depositions?
4    A.  No.  I was either just the supervisor on
5  duty or somebody that might have had knowledge of
6  something.  I have not been personally named in any
7  lawsuits to the best of my recollection.
8    Q.  Okay.  Have you given a deposition in any
9  cases that alleged that there was some discrimination
10  in the workplace?
11    A.  I do not recall giving a deposition to
12  that, no.
13    Q.  Do you remember the cases that you
14  provided a deposition in?
15    A.  Just the most recent one.
16    Q.  Which is what?
17    A.  I believe it was -- I forgot the
18  defendant's name, but it was a lawsuit against the
19  sheriff's office.  I was a supervisor that filed a
20  complaint affidavit.  I've forgot the case or the
21  alleged lawsuit person.
22    Q.  Okay.  You don't know who the plaintiff
23  was, who filed the complaint?
24    A.  I've forgot the person's name.

Page 6

1    Q.  Okay.  What unit did that person work in?
2    A.  In the electronic monitoring unit.
3    Q.  Okay.  And what rank is that person?
4    A.  The individual involved I do recall.  The
5  individual's name was Houston, Investigator Houston.
6  I don't know the name of the person that filed the
7  lawsuit, but it was against an individual
8  investigator.
9    Q.  Okay.  And Houston, how was Houston
10  involved in it?  I'm sorry?
11    A.  He was alleged to do wrongdoing while --
12  official misconduct while on duty.
13    Q.  Okay.  Houston was alleged to have done
14  wrongdoing?
15    A.  Yes.
16    Q.  Okay.  Houston, was he a supervisor in
17  the electronic monitoring unit?
18    A.  No, he was an investigator.
19    Q.  Okay.  What was the wrongdoing that he
20  was accused of doing?
21    A.  Inappropriate sexual relations while he
22  was on duty.
23    Q.  Okay.  With another employee?
24    A.  With a person that was in the sheriff's

Page 7

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1394 of 1503 PageID #:1785
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 8**

1   custody.

2       Q.   Okay.  What other cases work related have

3   you given a deposition in?

4       A.   I really don't recall the names.

5       Q.   Do you recall the subject matters of any

6   of them?

7       A.   I have been with the department for

8   24 years.  I really don't recall all of them.  I've

9   been in court numerous times.  I've testified as an

10  arresting officer, as a supervisor.  I've been to

11  depositions.  I've been to grand juries.  I really

12  don't recall specific ones.

13      Q.   Okay.  Well, have you testified in any

14  cases where people have alleged a hostile work

15  environment?

16      A.   No.  To the best of my recollection, no.

17      Q.   Have you testified in any proceedings

18  where somebody has alleged that they've been treated

19  differently at work?

20      MR. LEINENWEBER:  Object to form, foundation.

21          You can go ahead and answer.

22      THE WITNESS:  No.  To the best of my

23  recollection, no.

24

**Page 9**

1   BY MR. HERBERT:

2       Q.   Okay.  Have you ever testified about

3   anyone that complained about being discriminated

4   against because of their race?

5       A.   Your question is for testifying in court

6   or in a deposition on it?

7       Q.   Yeah.  Just what you've said.  You said

8   in your 24 years, you've testified in depositions,

9   you've testified in court.  So, yeah, based on that.

10      A.   No, not to the best of my recollection.

11      Q.   Just so we're good with the deposition,

12  it's hard with video.  It makes it tougher for you,

13  for me, for everyone involved in this, so I just ask

14  that you let me finish my question even if you know

15  what the question is going to be before you give an

16  answer, okay?

17      A.   I will do my best.  Delay.  I'll do my

18  best.

19      Q.   I know.  It's a pain, but we're going to

20  get through it.  And just obviously, you have to give

21  verbal answers, okay?

22      A.   No problem.  Yes.

23      Q.   Okay.  And are you alone in the room, or

24  do you have counsel with you?

**Page 10**

1       A.   No, I'm alone.  This is my office.  The

2   office door is locked.

3       Q.   Got it.

4       MR. LEINENWEBER:  Just for the record, myself

5   and Ethan, we are representing Mr. Webb in this dep.

6       MR. HERBERT:  Okay.

7   BY MR. HERBERT:

8       Q.   So did you prepare anything or did you

9   review anything in preparation for this deposition?

10      A.   Yes, I talked to Counsel Justin prior to

11  this.

12      Q.   Okay.  And did you review any documents?

13      A.   No, I didn't review documents.  We

14  verbally talked over the phone.

15      Q.   Okay.  Where are you currently working?

16      A.   I'm the director of the sheriff's

17  fugitive unit.

18      Q.   Okay.  And how long have you been in that

19  unit?

20      A.   I've been in charge of the unit since

21  approximately 2017.  I was also the director of the

22  EM unit at the same time.  I officially transitioned

23  over here and with only these responsibilities in

24  June of 2019.

**Page 11**

1       Q.   How long were you the director of the EM

2   unit or for what years, actually?

3       A.   I was director of the EM unit March of

4   2016 until June of 2019.

5       Q.   And was Greg Shields in the EM unit

6   during those time periods?

7       A.   He was the executive director of

8   community corrections.  He was my supervisor.

9       Q.   Okay.  And where did you work before the

10  EM unit?

11      A.   I worked in the EM unit since

12  approximately June of 2002, I believe.  Prior to that

13  I was a drill instructor for the boot camp of the

14  sheriff's office, and I started as a correctional

15  officer in 1996.

16      Q.   Okay.  So you went to the EM unit in

17  approximately June of 2002, correct?

18      A.   Yes.

19      Q.   Okay.  And did you go there as an

20  investigator?

21      A.   Yes.  So I tested and applied, and I was

22  promoted to an EM investigator.  I became a

23  supervising investigator.  I was a deputy chief

24  there, I was a chief, and then I was a director.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1395 of 1503 PageID #:1786

John Webb - 9/17/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Q. Great. And when did you become a supervisor?

A. I believe it was approximately 2003 or so.

Q. And then when did you become a deputy chief?

A. The years go by quick. I believe that it was right about 2005.

Q. Okay. And then you were the deputy chief until you became chief?

A. Yes.

Q. And when did you become chief?

A. Chief was 2007, and then I was a chief from 2007 until 2016 when I was a director.

Q. Got it. And how is it that you were promoted to supervisor?

A. At that time back then you were -- basically you came to work. You worked hard. They were -- this is prior to Shakman, and individuals would get promoted based on whoever the director was or executive director, whoever promoted you.

Q. Okay. And that's how you got promoted is the director promoted you?

A. I don't know who the actual person was.

Page 12

I believe it was the deputy director that might have signed the document. Back then I believe there was 30 or 40 supervisors at the time.

Q. Who was the one that signed the document for your promotion, do you know?

A. I think it was a deputy director. I think. I'm not sure. I don't recall.

Q. Do you know who it was?

A. It would have been Randy Petrowski.

Q. And you said he signed the document. Who was the one responsible for you being the supervisor?

A. That I don't know.

Q. Well, did you ask anyone to become a supervisor?

A. No.

Q. All right. How about deputy chief, when you were promoted there, how is it you were promoted to deputy chief?

A. I came to work and I was promoted.

Q. Who was the one that told you that you're going to be promoted?

A. Harvey Reddy.

Q. Had you requested to be a deputy chief?

A. I've never requested to be promoted to

Page 13

anything. Unfortunately, they promote you when you come to work and you work hard. I don't know if it's a good thing or a bad thing.

Q. And was Greg Shields the director in 2005 when you were promoted to deputy chief?

A. No.

Q. What was his title?

A. I don't recall what his title was at that time.

Q. Do you know who the director was of EM at that time?

A. The director was Harvey Reddy.

Q. Okay. Was there an executive director at that time as well?

A. At that time there was an executive director, an assistant executive director, a director, a deputy director.

Q. Who was the executive director?

A. I don't really recall. It changed over the years. There were several.

Q. Greg Shields was your supervisor at various points, correct?

A. He was only my supervisor when he was the director of the EM unit and I was a chief, and then

Page 14

when he was the executive director and I was the director of EM.

Q. Were you ever coworkers with Greg Shields, meaning you guys were the same rank in the same unit?

A. No, not to my knowledge. We might have been deputy chiefs at the same time, but there was a couple hundred guys in the unit. I really don't recall.

Q. Okay. And did Greg Shields, did he ever take any steps to get you promoted that you know of?

A. Personally, no.

Q. What do you mean personally, no?

A. Like if I know that he did?

Q. Yeah.

A. No.

Q. Did you ever ask him to be promoted?

A. No, I've -- no, I've never been asked.

Q. Did you ever talk to Greg Shields about a promotion in any way?

MR. LEINENWEBER: Object to form, foundation. You can answer.

THE WITNESS: Not to my recollection, no.

Page 15

John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1396 of 1503 PageID #:1787
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

2   Q.  Do you know if Greg Shields ever

3 recommended you for promotion?

4   A.  I would -- I don't know.

5   Q.  Well, you know how the process works,

6 right, as far as how somebody gets promoted?

7   MR. LEINENWEBER:  Object to form, foundation.

8       You can answer.

9   THE WITNESS:  I know the process, but

10 ultimately with a Shakman exempt position, I believe

11 that it has to come from the sheriff's

12 administration. I don't know who makes that final

13 decision. I don't know if it's the sheriff, the

14 under sheriff, the executive director. I'm not sure

15 who makes that final decision. I don't know.

16 BY MR. HERBERT:

17   Q.  Right. Before the final decision is

18 made, there has to be a recommendation about somebody

19 to be promoted, correct?

20   MR. LEINENWEBER:  The same objections.

21   THE WITNESS:  I would assume so.

22 BY MR. HERBERT:

23   Q.  Okay. And who do you think recommended

24 you for your promotions?

Page 16

---

1   MR. LEINENWEBER:  The same objections.

2 BY MR. HERBERT:

3   Q.  Strike that. Strike that.

4       Do you think Greg Shields ever

5 recommended you for any promotions?

6   MR. LEINENWEBER:  The same objections, also I

7 believe asked and answered.

8       Go ahead.

9   THE WITNESS:  Factually I do not know if he

10 did or other people did or numerous people did or if

11 somebody did it writing. I don't know.

12 BY MR. HERBERT:

13   Q.  Okay. You said that you know -- you know

14 the plaintiffs, but you don't know -- you didn't

15 recognize one of their names. I think I probably am

16 going to go through this again with you.

17       Do you know Legrain Winston?

18   A.  Yes.

19   Q.  Did he work for you?

20   A.  He worked in the unit, but I do believe

21 he was not directly under my command on a specific

22 shift.

23   Q.  Okay. How would you characterize Legrain

24 Winston as an employee?

Page 17

---

1   A.  He is a substandard employee who I have

2 disciplined in the past, continued to discipline

3 throughout his career. He was problematic, and I

4 wouldn't speak highly or favorably of him.

5   Q.  And you said he didn't work for you, so

6 my question is: How is it that you know that he was

7 a substandard employee?

8   A.  Because I would handle the grievance

9 process through discipline, and I also caught him and

10 disciplined him and wrote him up for lying on

11 official documentations to which he received a

12 ten-day suspension.

13   Q.  And what was that document that he lied

14 on?

15   A.  He was -- him and his partner -- I was

16 normally the day shift supervisor. I came in on the

17 midnight shift to -- because there was no midnight

18 supervisor, and I split the shift with the third

19 watch supervisor who stayed over, so half of the

20 shift was mine. So I basically worked a shift and a

21 half.

22       And him and his partner went down on

23 an assignment, I believe it was Chicago Heights, and

24 they coded out the job as if they were there. I saw

Page 18

---

1 them outside the building, outside our office. I

2 called them over the radio, asked him if he was just

3 leaving -- if they were leaving the job in Chicago

4 Heights or -- I believe it was Chicago Heights, and

5 then I walked up to the squad car and asked them how

6 they got here so quick from Chicago Heights.

7       Their paperwork was fraudulent. I

8 signed their documentation. They refused to give me

9 their paperwork initially, and on that documentation

10 they had assignments that they were going to that

11 they already had written down that didn't even happen

12 yet in there.

13       They were filling out their daily

14 activity sheets ahead of time and not going to

15 assignments, and they were lying on their

16 documentation to which he received -- and he was the

17 union steward who was the other employee I wrote up a

18 discipline on. And then they went to the grievance

19 process. I testified in the arbitration for Winston,

20 and Winston received a ten-day suspension based on

21 it.

22   Q.  Okay. And do you remember what year that

23 the fraudulent activity took place? And we'll

24 probably get into it, but if you know it, that would

Page 19

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1397 of 1503 PageID #:1788

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 be great.

2    A. 2013, '14, '15, somewhere around there.

3    Q.  Okay.  And you talked about the grievance

4 process.  Is it fair to say that when an employee

5 files a grievance, that information becomes known to

6 you as a director?

7    MR. LEINENWEBER:  Object to form and

8 foundation.

9       You can answer.

10    THE WITNESS:  Yes.

11 BY MR. HERBERT:

12    Q.  Okay.  And the grievance -- all the

13 supervisors in the unit are put on notice about

14 grievances that are filed by various investigators,

15 correct?

16    MR. LEINENWEBER:  The same objections.

17    THE WITNESS:  Not all the supervisors are

18 made aware of grievances.

19 BY MR. HERBERT:

20    Q.  Well, if it's a grievance by an employee

21 that falls under the supervision of various

22 supervisors, you would agree that those supervisors

23 would become aware of the grievance?

24    MR. LEINENWEBER:  The same objections.

Page 20

1       Go ahead.

2    THE WITNESS:  They may or may not.  Sometimes

3 the grievant would submit a grievance to their

4 immediate supervisor, or they might file a grievance

5 through the union, or they might file a grievance to

6 another supervisor on another shift.

7 BY MR. HERBERT:

8    Q.  But if somebody is accusing a supervisor

9 of some misconduct, at some point that supervisor

10 becomes aware of it, correct?

11    MR. LEINENWEBER:  The same objections.

12    THE WITNESS:  That would not normally be a

13 grievance.  That would be a complaint that would go

14 to the Office of Professional Review or Internal

15 Affairs depending on what year it happened.

16 BY MR. HERBERT:

17    Q.  What if it was a grievance, would that

18 supervisor become aware of it?

19    MR. LEINENWEBER:  The same objections.

20       Go ahead.

21    THE WITNESS:  I'm not sure.  I don't know.

22 BY MR. HERBERT:

23    Q.  Were you ever made aware of a grievance

24 that was filed by any of the plaintiffs in this case?

Page 21

1    A.  A grievance for what?

2    Q.  Were you ever made aware of a grievance

3 that was filed by any of the plaintiffs in this case?

4    A.  Yes, I've heard grievances from them, but

5 they were all discipline related.

6    Q.  And those -- you heard them, so you would

7 be part of the disciplinary process?

8    A.  Yes.

9    Q.  Okay.  And what was your role in that

10 disciplinary process for those grievances?

11    A.  Depending on the years, I was either the

12 first step grievance officer or the second step

13 grievance officer.

14    Q.  And what would be -- what authority did

15 you have as a first step grievance officer?  What

16 could you do?

17    A.  I could rectify the situation if it was

18 something I could handle.  I could reduce the

19 discipline.  I could throw out the discipline, but I

20 could not increase discipline.

21    Q.  Got it.  How about at the second step of

22 the grievance, what authority did you have there?

23    A.  The same authority.

24    Q.  Okay.  What's the difference between

Page 22

1 first step and second step?

2    A.  Just based on where the union had --

3 wherever they decided it was going.  First step was

4 usually the immediate supervisor, but I was usually

5 the delegate that was assigned to it, and then at

6 some point during the union contracts they got rid of

7 the first step and there was only a second step, so

8 then by default I was the second step person.

9    Q.  Okay.  And was this while you were the

10 director that you would serve as either first or

11 second step in the grievance process?

12    A.  I did it as a chief and as a director.

13    Q.  Okay.  And who else in the EM unit while

14 you worked there, who else would be a first or a

15 second step in the grievance process?  Who else would

16 sit there?

17    A.  It was different for -- depending on what

18 year it was.  I mean, there was numerous people over

19 the years.

20    Q.  All right.  How about when you were the

21 director -- I'm sorry, yeah.  You became the director

22 what, in 2016?

23    A.  Yes.

24    Q.  Okay.  And then how about when you were

Page 23



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1398 of 1503 PageID #:1789
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 the chief?  Who would -- any supervisors other than

2 you that would take part in the grievance process,

3 such as the step one, step two that you spoke of?

4      A.  When I was chief, yeah, it could have

5 been anybody.  It could have been the shift commander

6 on the shift because chiefs were assigned to a shift.

7 It could have been whoever the shift commander was

8 for that shift.  It could have been assigned to

9 somebody just because there was timelines in the

10 union grievance where it needed to be heard.  There

11 could have been several people throughout the years

12 that could have heard it.

13      Q.  How about when you were a director, did

14 you ever take part in the grievance process sitting

15 on step one or step two?

16      A.  Yes.

17      Q.  Okay.  Who makes the decision as to who

18 sits on the grievances?

19      A.  I would say probably towards the end it

20 was pretty much always me that was doing it.  I

21 believe there might have been some communication with

22 the union where I was the person handling all the

23 grievances at our unit level.  I believe that's when

24 it went to I was the second step.  I believe, to the

1 best of my recollection.  Towards the end I was the

2 only one internally doing it, and then it would go to

3 the Employee Discipline unit that handled it.

4      Q.  When you say towards the end you were the

5 only one, when are you talking about?

6      A.  I couldn't tell you the exact dates.  The

7 union, when they got rid of the first step grievance,

8 I don't recall when it was, but I believe --

9 (Simultaneous cross talk between witness and

10 counsel.)

11      MR. LEINENWEBER:  I didn't get that question.

12 I'm sorry.  It was garbled.

13      MR. HERBERT:  Oh, I'm sorry.  I'll repeat it.

14 BY MR. HERBERT:

15      Q.  Do you remember what year it was that it

16 was changed?

17      A.  Not to my recollection.  I'm not sure.

18      Q.  Okay.  Prior to that, who made the

19 decision as to who sat on the grievance --

20 grievances, the step one, step two?

21      A.  It could have been the director of the EM

22 unit.  It could have been the executive director or

23 assistant executive director of DCSI.

24      Depending on who was involved or

1 what shift it was because the unit contract was, I

2 believe the first step, because it changed over the

3 years, the first step was listed as immediate

4 supervisor and/or designee, so it all depended on

5 when it occurred and what the union agreed to.

6      Q.  Why did you sit on so many of these

7 grievances when you were not the first level

8 supervisor?

9      A.  Well, it was or designee, so there was a

10 lot of times I did it.  I actually thought I was a

11 fair and impartial person and I had no problem doing

12 it, and whenever I was asked to handle it, I just

13 handled it.

14      Q.  Well, that's what I'm trying to find out.

15 Who asked you to handle these grievances?

16      A.  It could have been the director, the

17 deputy director, the executive director.

18      Q.  I understand while it could have been, but

19 I'm asking you, as you sit here today, do you

20 remember who directed you to sit on these grievances?

21      MR. LEINENWEBER:  Object to form and

22 foundation.

23      You can answer if you can.

24      THE WITNESS:  I don't remember.  I've heard

1 numerous grievances over the years, and I couldn't

2 tell you exactly who told me on this specific

3 grievance, who was I told to do this, was I told not

4 to hear it.  I don't recall.

5 BY MR. HERBERT:

6      Q.  Tell me anyone that you remember ever

7 telling you to sit on a grievance.

8      A.  I believe Tom Hansy told me to.

9      Q.  When did Tom Hansy tell you to?

10      A.  I don't recall because Tom Hansy

11 handled -- I believe he handled the third step

12 grievances.  The grievance process changed over the

13 years through the union and under DCSI.  I'm not

14 sure.

15      Q.  I'm not too concerned right now about the

16 specifics of the grievance process.  I'm asking you,

17 when did Tom Hansy assign you to sit on the grievance

18 panel?

19      A.  I do not recall.

20      MR. LEINENWEBER:  Objection to form and

21 foundation on that.

22 BY MR. HERBERT:

23      Q.  Do you have any idea as to what years

24 that may have taken place or what your rank was when

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1399 of 1503 PageID #:1790

1  he directed you to do that?
2      A.  I was probably a chief because I believe
3  he retired I think before I was director.  I believe
4  I would have been a chief.  Somewhere between 2007
5  and 2015.
6      Q.  Okay.  Do you remember anyone else that
7  ever directed you to be part of a grievance
8  proceeding?
9      A.  Not specifically.  It all kind of blends
10  in after the years.  I just know Tansy would handle a
11  lot of the grievances with the union attorney, and I
12  remember getting stuff from him and telling me to
13  handle stuff.
14      Q.  So as you sit here today, you cannot
15  remember a single name of a person that directed you
16  to sit on a grievance panel other than Tom Hansy.  Is
17  that your testimony?
18      MR. LEINENWEBER:  I'm just going to object to
19  form and foundation.
20      THE WITNESS:  To the best of my recollection,
21  I don't remember a specific grievance being told do
22  this, do this.  You handle this grievance hearing.
23  I've done so many over the years, I don't really
24  remember.

Page 28

1  BY MR. HERBERT:
2      Q.  Yeah, and I just want to make it clear
3  that you're understanding my question.
4          I'm not asking you to name the name
5  of somebody that told you to hear a specific
6  grievance.  I'm asking you, other than Tom Hansy, is
7  it your testimony that nobody else ever directed you
8  or told you to be part of a grievance panel?
9      MR. LEINENWEBER:  Object to form and
10  foundation, also misstates prior testimony.
11          You can go ahead.
12      THE WITNESS:  It could have been Dave Deban,
13  William Wallace, Tom Hansy, Randy Petrowski, Harvey
14  Reddy, Joseph Logue.  It could have been any of those
15  individuals that asked me, or Director Shields could
16  have even asked me.  Any one of those individuals at
17  any time during the years that I did grievance
18  hearings.  They could have assigned me to do a
19  grievance.
20  BY MR. HERBERT:
21      Q.  And that's what I'm confused on as far as
22  they could have.  They could have because they had
23  the authority to do that, correct, as part of their
24  rank?

Page 29

1      MR. LEINENWEBER:  Object to form and
2  foundation.
3      THE WITNESS:  Yes.
4  BY MR. HERBERT:
5      Q.  Okay.  And again, I'm not asking who
6  could do that.  I'm asking who did do that for you,
7  who did direct you.
8          Other than Tom Hansy, did any of
9  those people that you just named that you said could
10  have directed me, did any of them direct you to sit
11  on a grievance?
12      MR. LEINENWEBER:  The same objections.  Also
13  asked and answered several times.
14          You can go ahead.
15      THE WITNESS:  It could have been any one of
16  those individuals.
17  BY MR. HERBERT:
18      Q.  Okay.  Do you remember if every one of
19  those individuals directed you to sit on a grievance
20  as you sit here today?
21      MR. LEINENWEBER:  The same objections.
22      THE WITNESS:  No, I do not remember a
23  specific one.
24

Page 30

1  BY MR. HERBERT:
2      Q.  Do you remember if Greg Shields ever
3  directed you to sit on a grievance panel?
4      MR. LEINENWEBER:  The same objections.
5      THE WITNESS:  I do not remember a single
6  specific one.
7  BY MR. HERBERT:
8      Q.  I'm not asking for a single specific one.
9  I'm asking, do you remember if he ever at any point
10  directed or told you to sit on a grievance panel?
11      MR. LEINENWEBER:  The same objections.
12      THE WITNESS:  At any given time throughout my
13  career handling grievances as previously stated, any
14  one of those individuals could have assigned that
15  task to me.  I do not recall a specific grievance or
16  hearing or a specific date or time or individual that
17  gave me that direct order to do so.  It could have
18  been any one of those.
19  BY MR. HERBERT:
20      Q.  So as you sit here today, you cannot
21  think of a single situation in which Greg Shields
22  directed you or told you to be part of a grievance
23  proceeding?
24      MR. LEINENWEBER:  Object to form, foundation.

Page 31



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1400 of 1503 PageID #:1791
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  Also asked and answered.

2      You can go ahead and answer again.

3  THE WITNESS:  As previously stated, any one

4  of those individuals could have asked me, and I don't

5  recall a specific one.

6  BY MR. HERBERT:

7      Q.  Listen to my question though.  As you sit

8  here today, is it your testimony that Greg Shields

9  never directed or told you to sit on a grievance

10  panel?

11      MR. LEINENWEBER:  The same objections.  Also

12  asked and answered.  Also misstates his prior

13  testimony.

14      THE WITNESS:  I refer to the same statement

15  that I've already made.

16  BY MR. HERBERT:

17      Q.  Well, you're not answering my question.

18  Do you not understand my question?

19      **A.  I completely understand your question.  I**

20  **cannot give you a specific incident, time, date,**

21  **person.  I gave you several names of people that**

22  **could have at any point advised me to do that, but I**

23  **do not remember any specific grievance I was told to**

24  **handle that way.**

Page 32

1      Q.  But I'm not asking you about a specific

2  grievance, okay?  You're clear on that, right?

3      **A.  Yes.**

4      Q.  Okay.  I'm not asking you to tell me that

5  Greg Shields told me to sit on Legrain Winston's

6  grievance on September 2, 2006.  I'm not asking that.

7  Do you understand that?

8      **A.  Yes.**

9      Q.  What I'm asking is, do you remember -- or

10  strike that.

11      Did Greg Shields -- strike that.

12      Can you think of any situation

13  specifically where Greg Shields directed you to be on

14  a grievance proceeding?

15      MR. LEINENWEBER:  Object to form, foundation.

16  Also asked and answered.

17      THE WITNESS:  I refer to my previous answer

18  where I stated any one of those individuals could

19  have done it.  I do not remember a specific one.

20  BY MR. HERBERT:

21      Q.  Do you remember any one of those

22  direct -- any one of those individuals directing you

23  to sit on a grievance panel at any point?

24      MR. LEINENWEBER:  The same objections.

Page 33

1      Go ahead.

2      THE WITNESS:  At any given time any one of

3  those individuals could have and probably told me to

4  handle a grievance, but I don't recall when or who

5  specifically told me to handle what grievance what

6  date, who the grievant was, what the offense was or

7  anything.  There's a possibility any one of those

8  individuals as they being my supervisors could have

9  had me handle a grievance.

10  BY MR. HERBERT:

11      Q.  Okay.  And do you think that it's -- that

12  Greg Shields probably then directed you to sit on a

13  grievance?

14      **A.  As I previously stated, any one of those**

15  **individuals --**

16      Q.  I'm not asking.  Hold on.

17      **A.  I have to finish the question (sic) too,**

18  **please.**

19      Q.  Here.  I'm not looking for an answer

20  about anyone else.  I just want to make sure that

21  you're understanding my question because it's really

22  an easy question here.

23      You said that probably one of -- any

24  one of those individuals could have assigned me to a

Page 34

1  grievance panel over the years.  I'm not asking about

2  any one of those other individuals.

3      I'm asking based on your statement,

4  did Greg Shields probably assign you to sit on a

5  grievance panel?

6      MR. LEINENWEBER:  Object to form, foundation.

7      You can answer.

8      THE WITNESS:  As previously stated as my

9  supervisor, he could have done that.

10  BY MR. HERBERT:

11      Q.  Okay.  Good enough.  Is Greg Shields a

12  friend of yours?

13      **A.  I would say as a work relationship and**

14  **friend, yes, I would say.**

15      Q.  How about outside of work, do you

16  socialize with Greg Shields?

17      **A.  I've talked to Greg Shields I -- since**

18  **he's retired.  I don't believe I've even met him in**

19  **person.**

20      Q.  How about when you worked with him, did

21  you get together socially with him?

22      **A.  Maybe over the years maybe a couple times**

23  **I went to lunch with him or something as a coworker.**

24      Q.  Have you ever been to his house?

Page 35



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1401 of 1503 PageID #:1792

John Webb   -   9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  I believe once.  I believe once I went to
2  his house.  I believe once.
3    Q.  Has he ever been to your house?
4    A.  He's never been inside my house.  I
5  believe he maybe picked me up at my house or -- I
6  remember him coming to my house.  He dropped off his
7  car and left his car at my house.  I believe he left
8  his car at my house because I live by the airport,
9  and he left his car there.
10    Q.  Okay.  Has he ever been to a party that
11  you hosted?
12    A.  No.
13    Q.  Okay.  When you were the chief -- okay.
14  I'm sorry.  So you were chief and then director.
15  Chief in 2007, director in 2016, correct?
16    A.  Yes.
17    Q.  Okay.  Michelle Strickland, do you know
18  Michelle Strickland?
19    MR. LEINENWEBER:  Objection.  Asked and
20  answered.
21        Go ahead.
22    THE WITNESS:  I recall her working for the EM
23  unit, not for a long period of time though.  Vaguely.
24  I couldn't recognize her if I saw her.
                                          Page 36

1  BY MR. HERBERT:
2    Q.  I've got you.  And I'm going through
3  these names again because you said there was one name
4  that you didn't recognize, so I guess I'm trying to
5  find that out right now.
6        How would you characterize Michelle
7  Strickland as an employee?
8    A.  As I recall, I might have disciplined her
9  for leaving her car in the parking lot when she was
10  going out of town.
11    Q.  Okay.  Other than that, how would you
12  characterize her as an employee?
13    A.  I really don't -- I don't remember her
14  much.  I don't believe she was there very long.
15    Q.  Okay.  How about Vernell Tims?  Do you
16  know Vernell Tims?
17    A.  Yes.
18    Q.  Okay.  Were you ever Vernell Tims' direct
19  supervisor?
20    A.  Yes, on -- when he was on the second
21  watch and I was the second watch watch commander,
22  yes.
23    Q.  Okay.  And how long was that period?
24    A.  I don't recall because usually yearly or
                                          Page 37

1  so they have a unit bid.  He might have changed
2  shifts.  I don't remember how long he was under my
3  direct supervision.
4    Q.  Do you know if it was more than a year?
5    A.  Probably.
6    Q.  Do you know if it was more than two
7  years?
8    A.  It could have been.
9    Q.  Could it have been ten years?
10    A.  It could have been because he was on -- I
11  believe he was on days for a while.  I think he was
12  on days for a while.
13    Q.  How would you characterize Vernell as a
14  worker?
15    A.  He came to work and I believe he had some
16  discipline issues, otherwise I don't have an opinion
17  either pro or con for him.
18    Q.  Okay.  How about Samuel Page -- or I'm
19  sorry.  How about I.V. Newson?  Do you know I.V.
20  Newson?
21    A.  Yes.
22    Q.  Were you ever I.V. Newson's direct
23  supervisor?
24    A.  Yes.
                                          Page 38

1    Q.  And from what years or time period were
2  you his direct supervisor?
3    A.  The same thing when he was on -- he was
4  on day shift, I was his direct supervisor.  I don't
5  recall.  It could have been a couple years.  For the
6  most part, I believe Tims and I.V. were partners
7  usually for the most part.
8    Q.  Okay.  And how would you characterize
9  I.V.'s duty or work ability?
10    A.  He did the minimum required of him.  If
11  he had to do three jobs, he would do three jobs.  If
12  I told him to do two jobs, he would do two jobs.  He
13  came to work.  He did his eight hours.  I wouldn't
14  recommend him as being a good employee.  I have no
15  personal opinion whether -- either way for him.
16    Q.  Okay.  Samuel Page, do you know Samuel
17  Page?
18    A.  Yes.
19    Q.  Were you ever Samuel Page's direct
20  supervisor?
21    A.  I don't recall being his.  I believe for
22  most of his career, I believe he was a third watch
23  person.  He was on afternoons, and I don't believe I
24  was ever like his direct supervisor.  And I believe
                                          Page 39



John Webb   -   9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1402 of 1503 PageID #:1793
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 he retired before I was a director.

2   Q.   Okay.  Do you have an opinion about
3 Samuel Page, his ability to work or his quality of
4 work as a sheriff?

5       A.   His not being a direct subordinate of
6 mine, I have no opinion either pro or con for him.

7   Q.   Okay.  Wilford Ferguson, do you know
8 Wilford Ferguson?

9       A.   Yes.

10   Q.   Were you ever Wilford Ferguson's direct
11 supervisor?

12       A.   There might have been a time when I
13 believe he was on day shift for a little while, and I
14 would have been his supervisor.

15   Q.   Do you know when that took place?

16       A.   I don't recall what years it was.

17   Q.   Do you remember how many years it was?

18       A.   No.

19   Q.   Do you remember if it was -- could it
20 have been ten years?

21       A.   I don't think so.  I believe he was more
22 of a third watch guy, an afternoon guy.

23   Q.   Okay.  Do you have an opinion about the
24 quality of work that Samuel -- or I'm sorry, that

Page 40

1 Wilford Ferguson did as a sheriff?

2       A.   I do know he had several discipline
3 issues.  He had investigations that were going to the
4 merit board.  He had an allegation where he was
5 stealing time for an accounting.  I knew he had
6 numerous discipline related issues, and I would think
7 he would be a substandard employee.

8   Q.   Okay.  Cecil Williams, do you know Cecil
9 Williams?

10       A.   Yes.

11   Q.   And were you ever Cecil Williams' direct
12 supervisor?

13       A.   I don't recall.  I believe the same thing
14 with him.  I believe he was pretty much mostly a
15 third watch employee, and I don't -- I don't think I
16 was his direct supervisor on a shift.

17   Q.   Well, did you ever work as a third watch
18 supervisor?

19       A.   Yeah, I might have worked at -- there was
20 times where I might have worked a half shift or I got
21 stuck working a double and I would be the third watch
22 supervisor because I had to work a double, but I
23 pretty much was always on day shift.  But I'm sure
24 there were times when I was stuck working over, but

Page 41

1 not on a regular basis.

2   Q.   Okay.  And those would be contained
3 within your employee records, right?  It would show
4 where you were assigned on which particular days?

5       A.   Yes, it should be.

6   Q.   Okay.  And do you have an opinion about
7 the quality of work that was done by Cecil Williams?

8       A.   I believe Cecil Williams also had
9 numerous discipline related issues over the years and
10 he was a substandard employee.  Otherwise, I have no
11 other personal opinions, just professional.

12   Q.   And would that be based upon your direct
13 supervision of Cecil Williams that you came to that
14 conclusion?

15       A.   He had grievances.  I believe I might
16 have heard some of his grievances.  I know he had an
17 OPR investigation where he left a voicemail on a
18 lieutenant's phone.  I believe it was a threat, and I
19 believe he received discipline for that.

20   Q.   But my question was, your opinion about
21 his quality of work as a sheriff, was that based upon
22 your direct supervision of him or based upon other
23 factors?

24       A.   I believe it would be other factors.

Page 42

1   Q.   Okay.  Because if you didn't supervise
2 him, like you said with Samuel Page, him not working
3 for you, you really didn't have an opinion on Samuel
4 Page's character of work, correct?

5       A.   Correct.

6   Q.   The same thing with Cecil Williams,
7 right, as far as your opinion on the quality of work
8 that he performed, you really wouldn't have one since
9 you didn't directly supervise him on a sustained
10 basis?

11       A.   I wouldn't say the same thing because his
12 name would come up on discipline related issues,
13 complaints.  I might have sent him over to OPR for
14 interviews and just historically reviewing body
15 camera footage and seeing stuff he did.  I would say
16 he was a substandard employee.

17   Q.   Did Greg Shields ever direct you to
18 conduct an investigation into any of the plaintiffs?

19       MR. LEINENWEBER:  Object to form, foundation.

20           You can answer.

21       THE WITNESS:  An investigation for what?  I
22 mean, he might have -- he might have told me to, you
23 know, make sure everybody is coming to work, doing
24 their job.  I don't know about an actual

Page 43



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1403 of 1503 PageID #:1794

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 investigation. I don't think I've ever been assigned
2 to an investigation.
3 BY MR. HERBERT:
4    Q. Okay. Did Greg Shields ever ask you to
5 discipline any of the plaintiffs?
6    **A. Not to my recollection. I don't think he**
7 **did.**
8    Q. Take your time. Can you think of any
9 times that he told you or directed you to discipline
10 any of the plaintiffs in this case?
11    **A. I never did any specific investigation.**
12 **The only time I can think of is with Ferguson and**
13 **Winston, I believe, I don't know if Rico was one of**
14 **those people and Shador (phonetic). There was an**
15 **instance where all four of them were alleged to have**
16 **-- putting in false documentation for work being at**
17 **court. I think that might have been the only time I**
18 **was looking at anything that those names that you**
19 **gave me, I think.**
20    Q. Yeah. And I asked you -- so Shields told
21 you to look into the -- or to discipline those
22 individuals?
23    MR. LEINENWEBER: Object to form, foundation.
24    Go ahead.

Page 44

1    THE WITNESS: No, I believe I started it
2 myself when I received court time cards that I
3 believed to be fraudulent.
4 BY MR. HERBERT:
5    Q. Okay. My question originally though was
6 can you think of any situations in which Director
7 Shields told you to discipline any of the plaintiffs,
8 and that's when you said I couldn't think of
9 anything, I told you to take your time, and then you
10 brought up this incident with the court time.
11    So my question based on that, did
12 Shields tell you to discipline for the infraction
13 that you just spoke of, the court incident?
14    MR. LEINENWEBER: Object to form, foundation.
15    Go ahead.
16    THE WITNESS: I do believe I didn't do any of
17 the discipline on it. I believe the chief on the
18 watch, Tom Neal, is the one that actually did the
19 discipline, but I was the one that originated it when
20 I received the time cards.
21 BY MR. HERBERT:
22    Q. Okay. And you originated it because
23 Shields told you to begin -- or Shields directed you
24 to originate this complaint, fair to say?

Page 45

1    MR. LEINENWEBER: Object to form, foundation.
2 Misstates prior testimony.
3    Go ahead.
4    THE WITNESS: I don't believe -- to the best
5 of my recollection, I don't think he told me to do
6 it. I believe I came to him with the problem and I
7 started looking into it.
8 BY MR. HERBERT:
9    Q. Okay. So is your answer no then, you
10 can't think of a single situation in which Director
11 Shields told you or directed you to discipline any of
12 the plaintiffs here?
13    **A. To the best of my recollection, I don't**
14 **recall him ever telling me to do that.**
15    Q. Okay. David Walker, do you know David
16 Walker?
17    **A. Yes.**
18    Q. Were you ever his direct supervisor?
19    **A. I believe, yeah, he was on day shift,**
20 **maybe for the last two or three years when I was**
21 **director of the unit.**
22    Q. And do you have an opinion about the
23 quality of work that David Walker did while in the EM
24 unit?

Page 46

1    **A. I've never had an issue with David**
2 **Walker, either discipline related or performance**
3 **related. I've never had a problem with him.**
4    Q. Okay. Tyrone Mcghee, do you know Tyrone
5 Mcghee?
6    **A. Yes, I do.**
7    Q. Were you ever Tyrone Mcghee's direct
8 supervisor?
9    **A. If I stayed over on the third watch or**
10 **the midnight shift as previously stated when I had**
11 **the incident with Winston where I disciplined him,**
12 **Mcghee and Winston were in the vehicle together when**
13 **I disciplined both of them for the fraudulent**
14 **paperwork.**
15    Q. Okay. Victor Slaughter, do you know
16 Victor Slaughter?
17    **A. Yes.**
18    Q. Okay. Were you Victor Slaughter's direct
19 supervisor ever?
20    **A. I probably was. I don't recall exactly**
21 **what years, but I believe for the most part he was a**
22 **third watch guy, however, I never had an issue with**
23 **Slaughter. He actually worked pretty well. He was**
24 **working in our technical service section, and I would**

Page 47



John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1404 of 1503 PageID #:1795

1 actually count on him to do stuff over there to
2 improve operations and I asked him, and he was
3 actually -- we had an FTO process, he applied, and he
4 was one of our field training officers that we
5 selected.
6     Q.  Okay.  So a favorable opinion of Victor
7 Slaughter?
8     A.  Yes.
9     Q.  As far as his quality of work?
10     A.  Yes.  I've had no issues with him.  He
11 was a good employee.
12     Q.  Okay.  And that's all of our plaintiffs.
13 So when you said there was a name there that you
14 didn't recognize, apparently you know them all now,
15 right?
16     A.  Yeah.  I thought when you went through
17 the names, I thought there was like a name there that
18 you -- I believe that when the -- when I might have
19 saw this lawsuit a couple years ago, I believe there
20 was another person's name in it.
21     Q.  There was, yeah, and that person was
22 stricken.
23     A.  Okay.  Maybe that's what I was thinking
24 of because I remember there was somebody that I had

Page 48

1 no idea who they were.  I never heard of them.
2     Q.  Okay.  So you have seen the lawsuit in
3 this case?
4     A.  Yeah, it was a couple years ago I believe
5 when it first happened.  Yeah, because I remember
6 there was somebody's name in there that I don't
7 remember.
8     Q.  Tell me about the EM unit, and we'll talk
9 about when you were -- from the time you were a chief
10 to the time that you were a director, were there
11 various assignments within the EM unit?
12     A.  Yes.
13     Q.  Okay.  And as a chief, what were your
14 duty assignments?
15     A.  Like my normal daily duty tasks?
16     Q.  Yeah.
17     A.  It depends on when it was because I was
18 the second watch chief.  I was also a chief of our
19 research section.  I was in different roles over the
20 years.  I could have been writing policy.  I could
21 have been just -- the shift commander, giving out
22 daily assignments for people, doing attendance,
23 handling discipline, setting up training.
24     Q.  Okay.  So as a chief, one of your duties

Page 49

1 would be to make daily assignments?
2     A.  Yes.
3     Q.  Okay.  And how about when you became the
4 director, was that responsibility still that of the
5 chiefs?
6     A.  It would have been -- whoever the shift
7 commander was.  Historically chiefs were in charge of
8 a section, then it became chiefs became in charge of
9 a shift.  So as a director, I really had no influence
10 on whatever the daily assignments were.  I left it to
11 whoever the shift supervisor was.
12     Q.  Okay.  So as a director, you were not
13 involved in any way with the daily assignments,
14 correct?
15     A.  Yeah, unless somebody, you know, they
16 asked you, you know, hey, I twisted my ankle or
17 something and, hey, can I stay in the office for two
18 weeks or something.  I might have accommodated
19 somebody, you know, if they came to me like, hey, you
20 know, can I work in the office, can I work in the
21 street.  If they asked me or if the union came to me
22 and asked me something, I might have helped with
23 that, but that's about it.  On a daily basis I never
24 personally assigned where people went.

Page 50

1     Q.  Okay.  So when you were chief, you
2 would -- when you were making out the assignments,
3 how is it that you would make out the assignments?
4 What factors would you use to determine who was
5 placed in which spots?
6     A.  Based on, you know, usually their
7 ability, and for the most part I always tried to keep
8 everybody happy.  There are people that like being
9 house mouses, they like working in the office and
10 they were good in the office, so I'd keep them in the
11 office.  If they were -- if they like to be out on
12 the street, I'd put them out on the street.  Some
13 people like working by themselves, some people had,
14 you know, good coworkers they liked to work with, and
15 for the most I tried to keep everybody happy because
16 if they were happy, they were more productive.
17     Q.  Well, let's talk about happy when you
18 were there as a chief.  Were there employees that
19 were unhappy with their daily assignments?
20     A.  Oh, yeah, there was always somebody that,
21 you know, may not want to work with somebody or they
22 don't want to work north, they don't want to south,
23 but at the same time there was no method to the men.
24 They may like it, they may dislike it.  You couldn't

Page 51



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1405 of 1503 PageID #:1796

John Webb   -   9/17/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 52**

1  keep everybody happy.  I believe there was about 30,
2  40 people on a shift.
3      Q.   Okay.  But you would try to accommodate
4  the people as best as you can?
5      A.   Oh, yes.
6      Q.   And if somebody didn't like working
7  inside, you would try to keep them out in the field
8  the best as you can?
9      A.   Yeah.  As long as they were working and
10 it wasn't for, you know, ulterior motives.  You know,
11 maybe they want to go out on the street because they
12 don't want to do any work.  I don't know.  There's
13 people that like to work in the office, but at the
14 same time I may have to keep you in the office
15 because that's the only way I can get any work out of
16 you.
17          I mean, I try to do my best to
18 accommodate people but at the same time as
19 management, I have to make sure in the best interest
20 of our department that people are productive and
21 doing what they're supposed to be doing.
22     Q.   So would you put people inside because
23 you didn't think they were being productive in the
24 field?

**Page 53**

1      A.   Yeah, there was -- yeah, I can think
2  of -- yeah.  Yes.
3      Q.   Okay.  Kind of as a way to motivate them,
4  I guess?
5      A.   Or they could be an issue with the
6  public.  I've had people I kept in the office that I
7  knew they couldn't interact with the public.
8      Q.   Have you ever kept somebody in the office
9  because you wanted to motivate them to be better out
10 in the field?
11     A.   I don't think so.  No, I'd usually just
12 try to talk to them and, you know, find out if there
13 was an issue.  I try to keep everybody as happy as
14 possible and at the same time trying to maintain the
15 goals of the department.
16     Q.   Did you ever put somebody in the basement
17 that didn't want to be in the basement?  Did you ever
18 do that?
19     A.   What is the basement?
20     Q.   Well, let's just say the office.  Did you
21 ever assign somebody to the office when you knew that
22 person did not want to be assigned to the office?
23     A.   Yes.
24     Q.   Did you ever do that to the plaintiffs in

**Page 54**

1  this case?
2      A.   No.  No.
3      Q.   You never assigned the plaintiffs to the
4  office?
5      A.   Oh, at some point they might have been
6  assigned to the office, but I don't recall having an
7  issue where I tried to keep them in the office.  I
8  have a person in mind that I'm thinking of that has
9  nothing to do with this lawsuit.  That's what I'm
10 thinking of.
11     Q.   Who's that?
12     A.   Alan Joa.
13     Q.   Okay.  And then when you make out the
14 assignments, you make them out on an assignment
15 roster, I'm assuming?
16     A.   Yes.
17     Q.   And what happens after you make out that
18 assignment roster?
19     A.   We have roll call.  I distribute the
20 rosters, and tell everybody what their assignments
21 were.
22     Q.   Okay.  So you make it out the day before
23 for the following day's shift?
24     A.   Yeah.  Historically I would always do it

**Page 55**

1  the day before when I was a shift commander.  I can't
2  speak to what everybody else did, but I would always
3  do it at least one or two days ahead of time.  And
4  then I would call in in the morning.  I'd call the
5  midnight supervisor and find out who was medical, and
6  I'd have to adjust my roster.  So, hey, can you move
7  this guy with this guy, or take this person, move him
8  because I had to do staffing.
9      Q.   Did you ever have to get the assignments
10 approved by any supervisor?
11     A.   No.  As the watch commander, the shift
12 commander, it was my responsibility for my shift.
13     Q.   Okay.  Did Greg Shields when you
14 worked -- when you worked under his command, was he
15 ever involved in any way in the daily assignments of
16 investigators?
17     A.   No, not to my recollection.  I don't
18 recall him ever telling me to put anybody
19 specifically somewhere or -- it was pretty much me or
20 one of the other supervisors.  If it was my off day,
21 another supervisor would do it, and then I'd come to
22 work and I'd look at the roster and go, okay, well,
23 this guy is off today, this guy's got personal, and I
24 would have to move it around.

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1406 of 1503 PageID #:1797
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 But whoever was on duty the day
2 before usually ran the roster the day before on that
3 shift. I don't recall anybody else telling me to
4 specifically put anybody somewhere.
5 Q. Okay. Did you ever show Greg Shields a
6 daily assignment sheet before you had it published at
7 a roll call?
8 A. Yeah, I'm sure I did. Yeah.
9 Q. And what were the reasons for you doing
10 that?
11 A. He might just ask for the roster for the
12 day. So what we would do is we would give the roster
13 out. I would give it to the dispatch desk so
14 everybody knew who to dispatch cars to. I would give
15 it to the office personnel, and he would come in on a
16 regular basis and ask, hey, can you give me the
17 roster for the day?
18 Q. Director Shields would come in and ask
19 for the roster on a regular basis? Is that what you
20 testified to?
21 A. Not on a regular basis, but he has asked
22 for it. It's not uncommon for any of the bosses to
23 ask for a roster of the day.
24 Q. Did Greg Shields ever make changes to the
Page 56

1 roster that you had prepared?
2 A. I don't think he ever did, no.
3 Q. Take your time.
4 A. I don't think he ever did. I don't
5 recall him ever telling me to change or move somebody
6 somewhere.
7 Q. Okay. As a director of EM, you testified
8 that you were not involved in the daily assignments
9 of individuals at all, correct?
10 A. The only time I would be with the
11 assignment is when like if we had new employees. I
12 would assign somebody new with an FTO, say, hey, this
13 guy I need him to work or her, you're going to work
14 in the office for two, three weeks, then you're going
15 to work in our technical service section, then you're
16 going to work patrol. That's where I would lay out
17 like a training process for individuals. But on a
18 regular daily basis I wouldn't specifically say where
19 to put somebody or anything. Like I said, unless
20 somebody came to me with a request or the union says,
21 hey, can -- you know, this guy doesn't have any
22 medical time. He doesn't want to go on disability.
23 Can we keep him in the office? I've had people with
24 injuries, brought people back to work on limited
Page 57

1 disability so they could work inside. So I did my
2 best to try to keep everybody happy at the same time
3 and meet our goals and objectives.
4 Q. You did your best to kind of rotate
5 assignments equally amongst all the employees as far
6 as assignments that they didn't like. You would try
7 to minimize it as much as you can and make sure that
8 it's done on kind of an even basis with employees?
9 MR. LEINENWEBER: Object to form, foundation.
10 Also a compound question.
11 THE WITNESS: I would -- I do my best more as
12 a supervisor -- as a chief do it. As a director,
13 like I said, unless somebody came to me with an issue
14 or if they didn't want to work with somebody or they
15 felt safe with somebody. I've had issues before
16 where people said they felt unsafe working with
17 somebody, they have personal issues, they don't work
18 with somebody, you know, and avoid any confrontations
19 and avoid any issues. I would try to do my best to
20 accommodate the union, the employee, and the
21 organization at the same time.
22 BY MR. HERBERT:
23 Q. Okay. With all things being equal,
24 employee A and employee B, if they didn't like
Page 58

1 working inside, I'm sure there's situations where you
2 would have to put somebody inside, correct?
3 MR. LEINENWEBER: Object to form, foundation.
4 Also a compound question.
5 Go ahead.
6 THE WITNESS: Yeah, due to staffing. I have
7 five people on duty, I have to man the office, I have
8 to man the desk, the dispatch desk. Somebody has to
9 do it.
10 BY MR. HERBERT:
11 Q. And in that scenario you would try to
12 make sure that you were not putting employee A in an
13 office job more so than employee B since they both
14 didn't want to work in the office, fair to say?
15 MR. LEINENWEBER: The same objections.
16 THE WITNESS: Yes, for the most part I did my
17 best to try to keep people happy and not put them in
18 a place that they did not want to work.
19 BY MR. HERBERT:
20 Q. Well, did you ever look at the roster
21 sheets to determine whether or not you were putting
22 black employees in assignments that they didn't want
23 to work more than you were doing it to white
24 employees?
Page 59



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1407 of 1503 PageID #:1798

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    MR. LEINENWEBER:  The same objections.

2    THE WITNESS:  I would never do anything like

3 that, and the vast majority, I believe that over

4 60 percent of our employees, maybe 70 percent of the

5 employees in the unit might have been

6 African-American and there were times when -- I've

7 never had race come into play in anything that I

8 would do, any gender, race on an assignment.  That

9 would have nothing to do with it.

10 BY MR. HERBERT:

11    Q.  Okay.  I get that, but my question is:

12 Did you ever look to see, oh, maybe I was putting

13 black employees in a less desirable spot more than

14 white employees?  Did you ever do anything to audit

15 that situation?

16    MR. LEINENWEBER:  Object to form, foundation.

17 Also a compound question.

18        Go ahead.

19    THE WITNESS:  Yes, I did.

20 BY MR. HERBERT:

21    Q.  Okay.  Tell me about that.

22    **A.  I believe some of those individuals in**

23 **the lawsuit and people that are not involved in this**

24 **lawsuit that we're referencing here today filed an**

Page 60

1 **EEOC complaint and we had to furnish probably six,**

2 **nine months of daily rosters to the sheriff's EEOC**

3 **attorney, and we went through there with a specific**

4 **question of asking, do we as a department put**

5 **African-Americans in a certain position.  So I was**

6 **asked to audit and supply that information to legal**

7 **counsel for the sheriff's office.**

8    Q.  And what did that audit determine?

9    **A.  I don't know what the final outcome of it**

10 **was.  I supplied a lot of documents, a lot of**

11 **rosters, but I can't -- I can't function as a unit,**

12 **as a department when over half of my employees are**

13 **African-American if not more.  Race has nothing to do**

14 **with it because we have a job that we have to do and**

15 **I can't pick and choose who's going anywhere, and**

16 **race, gender should never have anything to do with**

17 **any of your assignments.**

18    Q.  Because that would discrimination,

19 correct?

20    **A.  Definitely.  A hundred percent**

21 **discrimination.**

22    Q.  Okay.  Well, you said you were directed

23 to conduct an audit and then you turned over sheets.

24 What did your audit, what did it reveal with respect

Page 61

1 to the plaintiffs in this case?  Did you find that

2 they were working assignments that they didn't want

3 to work more so than any white employees?

4    MR. LEINENWEBER:  I'm going to insert an

5 objection here to the extent that this request was

6 made at the behest of the sheriff's office legal

7 counsel.  I believe it could be covered by

8 attorney-client privilege or a work product

9 privilege.  So for the time being, I'm going to

10 direct the witness not to answer that question.

11        Just for the record, Dan, when --

12 Ethan had to step away for a little bit, so I'm

13 willing to revisit this issue.  I'm not saying we

14 will not let him testify about it today.  I'm just

15 saying for the time being, I would like to pin into

16 that if we can come back to it.

17    MR. HERBERT:  Well, we're definitely going to

18 come back to it and you, know, if there is an audit

19 that has been done, we need to see that.

20    MR. LEINENWEBER:  Well, not if it's work

21 product you don't.  If it's prepared in response to

22 an EEOC lawsuit that has been filed, that is work

23 product.

24    MR. HERBERT:  Well, I think we need -- I

Page 62

1 think you need to show to us that it's work product.

2 And again, we don't know what it is, we don't know

3 what it shows, we don't know who is involved, we

4 don't know if it was -- we don't know if it's work

5 product I guess is what we're saying.

6        We are going to make a request for

7 that which I think we already did.  But, yeah, I

8 agree.  We'll revisit that when we get there.

9    MR. LEINENWEBER:  Just to respond briefly,

10 you'd have to direct me to a request where that

11 information was requested because I'm not aware of

12 it.

13    MR. HERBERT:  I think we did.  We asked for

14 the redacted -- what did we ask for, Kelly?

15    MR. LEINENWEBER:  I'm talking about the issue

16 of the privilege log.  I'm talking about you're going

17 to have to direct me to a discovery request where you

18 asked for that information.

19    MR. HERBERT:  Okay.  We're looking it up

20 right now.

21 BY MR. HERBERT:

22    Q.  Well, you were -- you were interviewed by

23 an attorney several times concerning the EEOC

24 complaints made by the plaintiffs, correct?  And

Page 63



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1408 of 1503 PageID #:1799

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 right now I'm not asking you to tell me anything
2 about the interviews.
3      **A.  I'm asking legal counsel if I should**
4 **answer the question.**
5      MR. LEINENWEBER:  Yeah, so I'll just say that
6 it would be fine to say that you did or did not have
7 a meeting with legal counsel.  The date, the length
8 of it, things of that nature would be fine.  I would
9 instruct you not to disclose the content of anything
10 you discussed with legal counsel.
11           So with that directive maybe, Dan,
12 if you ask the question again just so we can be...
13      MR. HERBERT:  You know what, let's go to
14 Exhibit A, please.
15 BY MR. HERBERT:
16      Q.  Okay.  And this is an e-mail that you
17 prepared, correct?
18      **A.  Let me read it first.**
19      Q.  Sure.
20      **A.  I can't see all of it because the**
21 **screen --**
22      MR. LEINENWEBER:  Yeah, John, whoever's
23 controlling it will be able to direct you to
24 different portions of it or make it larger or smaller

Page 64

1 as needed, so just take your time and direct them to
2 do that if you need it.
3 BY MR. HERBERT:
4      Q.  And I can represent to you that is the
5 entire document.  I mean, that's the entire text of
6 the document.
7      **A.  Yeah, I do recall it.**
8      Q.  Okay.  And in there, the third -- well,
9 the second sentence, "As you are aware, Winston has
10 filed both an EEOC complaint and an OPR complaint
11 naming Director Shields, myself and several other EM
12 command staff members.  I along with Shields and
13 several command members have been interviewed by both
14 OPR and sheriff's legal on several occasions over the
15 last year and a half with no conclusion to the
16 investigation."  Do you see that?
17      **A.  Yes, I see it.**
18      Q.  Okay.  And you wrote that, correct?
19      **A.  Yeah --**
20      MR. LEINENWEBER:  Objection.  Asked and
21 answered.
22 BY MR. HERBERT:
23      Q.  And when you say several occasions, do
24 you know how many occasions you met with legal

Page 65

1 concerning the EEOC complaints made?
2      **A.  I don't recall how many times.**
3      Q.  Would it have been more than five?
4      **A.  It could have been.**
5      Q.  Could it have been more than ten?
6      **A.  I don't think it was that many times.**
7      Q.  So somewhere between five and ten?
8      **A.  To the best of my recollection, I would**
9 **say probably less than ten.**
10      Q.  Okay.  And when you met with counsel,
11 were you with Director Shields as well?
12      **A.  I do recall one time, yes, when we were**
13 **together.**
14      Q.  Okay.  Other than that one time, were you
15 ever with Director Shields during any of these
16 meetings with counsel?
17      MR. LEINENWEBER:  Object to asked and
18 answered.
19      THE WITNESS:  I remember specifically the one
20 time.  There could have been other times where we met
21 at the same time.  This is an ongoing investigation.
22 There were several investigations I might have met --
23 he might have been with me once, twice.  I don't
24 recall.

Page 66

1 BY MR. HERBERT:
2      Q.  Okay.  But I'm talking about this
3 investigation though, the EEOC investigation just so
4 that we're clear.
5      MR. LEINENWEBER:  Object to form, foundation.
6           Go ahead.
7      THE WITNESS:  I don't recall.  I've been to
8 OPR.  I've talked to legal counsel numerous times
9 over the years.  I've been involved in
10 investigations.  There's times when Shields was with
11 me.  I don't recall specifically with this
12 investigation whether or not he was with me absent
13 the one time I specifically remember because I asked
14 for when they were asking us saying that we were
15 peace officers, that they needed to provide us with
16 our rights because this investigation could result in
17 discipline and/or termination.
18 BY MR. HERBERT:
19      Q.  Okay.  Other than you and Shields and the
20 attorney, who else was present on that one time that
21 you remember being with Shields?
22      **A.  I believe there was another -- I believe**
23 **there might have been two sheriff's legal counsel**
24 **people that were there.**

Page 67



John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1409 of 1503 PageID #:1800

Q. Okay. Do you remember their names?

A. I forgot the -- a female attorney that represented the sheriff's office. I don't recall her name, and I believe there might have been -- I forgot his name. There's been so many attorneys here over the years. I don't recall what his name was. I believe there were two attorneys here with there.

Q. Okay. Were there any non-attorneys at the meeting other than you and Mr. Shields?

A. I don't think so.

Q. Were you ever at a meeting with legal counsel where there was anyone there that was not an attorney?

MR. LEINENWEBER: Object to form, also asked and answered.

THE WITNESS: I don't think so. I don't recall. I'm not sure.

BY MR. HERBERT:

Q. Okay. Do you remember being at a meeting with legal counsel concerning these EEOC allegations with anyone other than Director Shields?

A. I don't recall. I don't think so. I'm not sure.

Q. Okay. And the date on this is October 4,

Page 68

2017, correct?

A. That's what it says on the document, yes.

Q. Okay. Do you remember when the EEOC complaint was filed?

A. No, I don't.

MR. HERBERT: Okay. If we can go to Exhibit B, please. I guess we'll mark this as Webb B.

BY MR. HERBERT:

Q. Okay. And the date on there is on the top portion. It's November 3, 2017, correct?

A. That's what it says on the document, yes.

Q. Okay. And then the next one, this appears to be from you to Fabio Valentini dated November 2, 2017, correct?

A. That's what the document says, yes.

Q. Okay. And if you want to read the document and tell me if you recognize that that's a document that you sent. Just let me know when you're ready. Take your time.

A. I'm just reading it to make sure.

Q. Absolutely.

MR. LEINENWEBER: Dan, when you finish with this document, can we take a brief break?

MR. HERBERT: Yes.

Page 69

MR. LEINENWEBER: Thank you.

THE WITNESS: Yes, to the best of my recollection, I do remember this document.

BY MR. HERBERT:

Q. Okay. And who is Fabio Valentini?

A. At that time he was the executive -- I believe his title was executive director of the Office of Professional Review.

Q. Not an attorney, as far as you know?

A. I think he's an attorney because he came from the State's Attorney's office, so I believe he is.

Q. Was he involved in any of those meetings that you spoke of earlier when you said you spoke with attorneys concerning the EEOC complaint?

A. I don't believe he was. I don't believe he was present at those, no.

Q. Okay. And if you can look at the second -- or I'm sorry, the third sentence. "I along with Shields and several command members have been interviewed by both OPR and sheriff's legal on several occasions over the last two years with no conclusion to the investigations." Do you see that there?

Page 70

A. Yes.

Q. Who were the other command members that you were talking about that have been interviewed?

A. I believe it was Tom Neal, Christopher Rohloff, Joe Ranzino. I don't know if Cedric Logan was interviewed. I think he might have been. I think Lieutenant Lasharm Collins might have been interviewed. I'm not sure.

Q. I'm sorry?

A. I'm not sure who all was interviewed, but I just -- I remember that there were several of them that were being interviewed over -- being either called over to be interviewed or somebody from OPR was talking to somebody or I'd have to send a supervisor somewhere to OPR to be interviewed.

Q. Okay. Were you ever in interviews with any of those individuals that you just mentioned?

A. I don't -- I don't think I was. I believe the only time I was with anybody else was when I was with Shields.

Q. Okay.

A. I don't recall being in an interview with any of those other people at the same time.

Q. So how did you know that several command

Page 71



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1410 of 1503 PageID #:1801
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 members had been interviewed at the time you wrote
2 this e-mail?
3   **A.  People said so, and I might have -- being**
4 **a director, I would get, say, an e-mail or a phone**
5 **call saying send supervisor over so and so or**
6 **somebody to be interviewed either by legal counsel or**
7 **by OPR.**
8   Q.  Okay.  And if you can go to the first
9 sentence of the second paragraph there.  "He is a
10 subpar employee as evidenced by his disciplinary
11 history."  You wrote that, correct?
12   **A.  Yes.**
13   Q.  Okay.  And why is it that you informed
14 Mr. Valentini that Winston was a subpar employee?
15   **A.  Based on the factual basis of his**
16 **discipline and his history that I personally**
17 **observed, I disciplined him for, I've heard**
18 **grievances on and he continued to make department**
19 **infractions and at the same time in his grievances**
20 **claiming he's being harassed and in my opinion as**
21 **being an excuse for his subpar employment actions.**
22   Q.  Okay.  And that's why you told Valentini
23 that, because you thought Winston was just using that
24 as an excuse?

                                              Page 72

1   **A.  I was afraid.  My ultimate goal was to**
2 **protect the department, and I didn't want any issues**
3 **to happen with him with the general public, another**
4 **employee, a detainee while in custody, and I just**
5 **wanted to make sure the executive director of OPR was**
6 **properly advised of a problem employee just to cover**
7 **my position, to make sure in case anything happened**
8 **in the future, to make sure they were aware of what**
9 **was going on.**
10   Q.  So you were concerned about the sheriff,
11 so you felt that it was necessary for you to inform
12 Mr. Valentini that Winston was a subpar employee?
13   **A.  And that in his grievance he was claiming**
14 **he's being harassed, and per department policy, I**
15 **have to report that.**
16   Q.  Okay.  Was it an attempt to dirty up the
17 character of Winston when you sent this information?
18   MR. LEINENWEBER:  Object to form, foundation.
19     You can go ahead.
20   THE WITNESS:  No, it was to present facts to
21 the executive director of the Office of Professional
22 Review in an effort to protect our department.  To
23 prevent him from doing anything wrong in the future,
24 I wanted his disciplinary history be properly

                                              Page 73

1 documented and to show that his supervisor was
2 attempting to correct the behavior.
3 BY MR. HERBERT:
4   Q.  Was it an attempt to show that Winston's
5 complaints lacked merit?
6   **A.  It's not my determination whether or not**
7 **they lack merit.  My only decision is to make sure**
8 **that I still have discipline.  He openly admitting he**
9 **violated the department policy, affixed his signature**
10 **to the documents, the grievance accepting discipline**
11 **and continued his subpar behavior.**
12   Q.  So you said it wasn't your decision to
13 determine whether or not his complaints lacked merit.
14 When you wrote this e-mail, did you believe that his
15 complaints did lack merit?
16   **A.  Based on what I knew of it, I did not**
17 **review all the documents.  I did not know everything**
18 **that was going on.  From what I knew of it, I**
19 **believed that there was not merit.**
20   Q.  And what was the basis for your opinion
21 at that point when you believed it was not -- it did
22 not have merit?
23   **A.  I knew of no harassment that was actually**
24 **occurring.  I've heard no hearsay or people saying**

                                              Page 74

1 anything that any of this was true.  I did not
2 **personally witness any of this, and he continued -- I**
3 **personally had a history of disciplining the**
4 **individual, hearing grievances and resolving his**
5 **grievances for the last several years.**
6   Q.  Did you conduct any investigation to
7 determine whether or not his complaints or any of
8 these complaints in the EEOC lacked merit or --
9 strike that.
10     Did you conduct any investigation to
11 determine whether or not any of the allegations in
12 the EEOC were in fact -- had merit?
13   MR. LEINENWEBER:  Object to form, foundation.
14     You can answer.
15   THE WITNESS:  I did not come to a conclusion.
16 I did not have a summary finding of the
17 investigation.  I merely provided documentation, and
18 what I had seen through the documents I provided and
19 what I knew of the investigation, it did not have
20 merit.
21 BY MR. HERBERT:
22   Q.  Okay.  But my question was, did you
23 conduct any investigation other than simply handing
24 over documents?

                                              Page 75



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1411 of 1503 PageID #:1802

John Webb - 9/17/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 76**

1    MR. LEINENWEBER: Object to form, foundation.

2 Also asked and answered.

3    THE WITNESS: In regards to the EEOC

4 complaint and the harassment, I did not complete an

5 investigation. I merely took documents, provided

6 them to either legal counsel or the Office of

7 Professional Review and provided those documents.

8 BY MR. HERBERT:

9    Q. Did you conduct any investigation? You

10 said you didn't complete one. Did you conduct any

11 investigation?

12    MR. LEINENWEBER: The same objections.

13    Go ahead.

14    THE WITNESS: I merely went through

15 everything that was requested. I looked at the

16 documents. Based on my review and my history being a

17 supervisor handling grievances, looking into

18 discipline, understanding the discipline, looking at

19 complaints in the history, I did not see there was

20 merit in there. I did not do a complete

21 investigation, and information was provided to legal

22 and OPR to make their final conclusion and submit it

23 to the EEOC.

24

**Page 77**

1 BY MR. HERBERT:

2    Q. Okay. So your investigation was you

3 looked at the prior complaints of these employees

4 that made the EEOC complaints?

5    MR. LEINENWEBER: Object to form, foundation.

6 Also misstates prior testimony.

7    Go ahead.

8    THE WITNESS: When I was interviewed, I do

9 believe we looked at the complaints, yes.

10 BY MR. HERBERT:

11    Q. Okay. Other than looking at the prior

12 complaints of the complainants in the EEOC, what

13 steps in an investigation did you take?

14    **A. In regards to only this harassment,**

15 **correct?**

16    Q. Yes, this EEOC.

17    MR. LEINENWEBER: Object to form and

18 foundation.

19    Go ahead.

20    THE WITNESS: I collected documents, provided

21 any information I had. I never interviewed anybody.

22 It was all handled by legal and by OPR, and I

23 provided whatever they needed.

24

**Page 78**

1 BY MR. HERBERT:

2    Q. Okay. So you came to a conclusion that

3 the allegations lacked merit based upon you looking

4 at the prior disciplinary history of the

5 complainants?

6    MR. LEINENWEBER: Object to form, foundation.

7 Also misstates his prior testimony.

8    THE WITNESS: I'm not talking of all the

9 complainants. Are you asking me specifically about

10 Winston with this e-mail I provided in front of me?

11 BY MR. HERBERT:

12    Q. Yes.

13    MR. LEINENWEBER: The same objections.

14    THE WITNESS: In regards to Winston, based on

15 his history, the documents provided and it being

16 mathematically impossible to harass an

17 African-American employee based on the fact that

18 there are more African-American employees in the unit

19 than any other type of employee, that it would be

20 mathematically impossible to harass anybody because

21 you would have to put people into specific positions

22 and if you did it based on race, you would not be

23 able to conduct your job on a daily basis.

24

**Page 79**

1 BY MR. HERBERT:

2    Q. Did you determine that blacks were put in

3 positions that they didn't want to be in more so than

4 nonblack employees?

5    MR. LEINENWEBER: I object to the answer

6 (sic) based on attorney-client privilege and also

7 work product doctrine and instruct the witness not to

8 answer.

9    THE WITNESS: Based on legal counsel's

10 advice, I will not answer the question.

11 BY MR. HERBERT:

12    Q. I thought you talked about you conducted

13 an investigation outside of the EEOC complaint.

14 Didn't you look into the allegations and gather the

15 disciplinary history of Winston? Wasn't that part of

16 your own investigation?

17    MR. LEINENWEBER: Object to form, foundation.

18 It also misstates prior testimony.

19    You can answer.

20    THE WITNESS: I did not complete an

21 investigation. I think what's getting confused is

22 there's two separate things. You're asking me about

23 the harassment, or are you talking to me about the

24 merit board case where they're stealing time?

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1412 of 1503 PageID #:1803

John Webb - 9/17/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 BY MR. HERBERT:

2    Q.  I'm going to move on to the two sentences

3 after in the second paragraph. It begins, "Prior to

4 Winston filing any complaints, EM command staff filed

5 a complaint affidavit under OPR case 2015-0310 in

6 which it determined that he should be terminated in

7 February of 2017." Do you see that?

8    **A. Yes, I do.**

9    Q.  And that was for an incident that

10 occurred in August 2015, right?

11    MR. LEINENWEBER: Object to form, foundation.

12 Also I would just like to clarify that when you

13 quoted the text, you misquoted it.

14    MR. HERBERT: Oh, I'm sorry.

15    MR. LEINENWEBER: That's all right. It was

16 just you left out "in which it was determined." You

17 said in. Sorry.

18 BY MR. HERBERT:

19    Q.  Do you remember the question?

20    **A. No. Can you please ask it again?**

21    Q.  Yeah. You know about this -- here, you

22 obviously know about it because you sent this to

23 Mr. Valentini. You're saying that there was a 2015

24 case that OPR recommended that Winston be terminated,

1 right?

2    **A. Yes.**

3    Q.  And that was for an incident that

4 occurred in 2015, correct?

5    **A. Yes.**

6    Q.  And the investigation into -- or I'm

7 sorry.

8    MR. HERBERT: You know what, we can take a

9 break right there because we're going to get into

10 that probably with a different document. But if you

11 want to take a break, that's fine.

12    MR. LEINENWEBER: Yeah, that's fine. Okay.

13    MR. HERBERT: How long do you want?

14    MR. LEINENWEBER: Give me 15 minutes and I'll

15 just explore this issue and talk to Ethan and then

16 hopefully we'll have some direction. So do you want

17 to just take -- it's 12:40 now. Do you want to just

18 take until 12:55?

19    MR. HERBERT: That's great.

20    (Whereupon, a short break

21    was taken.)

22    MR. LEINENWEBER: Brenda, so we're ready to

23 go back on the record. This is Justin speaking, the

24 attorney for the defendants in this case.

1    We've just had a chance to reflect

2 on the objection we made earlier regarding

3 attorney-client privilege and work product doctrine,

4 and we just want to lay a couple things out for the

5 record.

6    Defendants are taking the position

7 that any conversation, any of the -- sorry, strike

8 that. Any of the conversation that Mr. Webb had with

9 attorneys for the sheriff's office or requests that

10 the attorneys made of him related to their

11 investigation or actions that he took as a result of

12 those requests is privileged and precluded from

13 disclosure and we'll instruct him not to provide that

14 info.

15    We are not aware of any kind of an

16 audit or report that was prepared as Mr. Webb had

17 used that word audit, and we are also taking the

18 position though that Mr. Webb's knowledge, his

19 personal knowledge of these events is free to be

20 explored by the plaintiffs subject to that

21 instruction regarding privilege.

22    So with that, Dan, unless you have

23 any questions or, Ethan, if I misstated anything and

24 you want to add anything. I'm happy to turn it back

1 over to you, Dan, to continue the dep.

2    MR. HERBERT: Yeah. I think just in response

3 we will agree not to go into those areas with

4 Mr. Webb, but we reserve -- we will not waive the

5 right to challenge. We will not recognize -- or

6 waive the right to recognize that we don't believe a

7 privilege exists depending on what we get further

8 down the road if that makes any sense.

9    MR. LEINENWEBER: Understood.

10    MR. HERBERT: Okay. All right.

11 BY MR. HERBERT:

12    Q.  We were looking at exhibits earlier, A

13 and B, and we don't have to put those up, but do you

14 remember the dates on there for the e-mails, one

15 was -- Exhibit A was October 4, 2017, and then

16 Exhibit B was November 2nd and November 3rd, 2017.

17 Do you remember that?

18    **A. I remember the exhibits you posted, yes.**

19    MR. HERBERT: Okay. And if we can show what

20 we will mark as Webb Exhibit C.

21 BY MR. HERBERT:

22    Q.  Okay. Do you see this document?

23    **A. Yes.**

24    MR. HERBERT: Okay. And if you can scroll

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1413 of 1503 PageID #:1804

1 down, please.
2 BY MR. HERBERT:
3    Q.   Is this your signature?
4    A.   Yes, it is.
5    Q.   Okay.  Do you need to read this document,
6 or have you already reviewed it?
7    A.   I'm reading it now.
8    Q.   Go ahead.  Take your time.
9    A.   Okay.
10    Q.   Okay.  So this is -- you were part of the
11 disciplinary process for this incident which has
12 been -- which is identified as SPAR No. 17-2133,
13 correct?
14    A.   I was -- I believe I handled the
15 grievance of it.  I would have to see the
16 disciplinary action form to see exactly what the
17 discipline was.
18    Q.   Okay.  So as you sit here, you don't know
19 what this incident was?
20    A.   I would have to refresh my memory.  I
21 would have to look at the disciplinary action form
22 that would have been attached to that or with the
23 grievance response to it.  There would have been a
24 response that came with this where the union would
Page 84

1 have signed off on it, I would have signed off of it,
2 and the grievant would have signed off on it.
3    Q.   And this document regards discipline of
4 Legrain Winston, correct?
5    A.   Yes.
6    Q.   And you would have been part of the
7 grievance concerning the discipline of Legrain
8 Winston, correct?
9    A.   Yes.
10    Q.   And you would have -- as part of your
11 duties on that grievance, you had the ability to
12 adjust the discipline in some -- you had the ability
13 to assess the validity or the justification of the
14 discipline?
15    A.   My job is to resolve the grievance and
16 resolve the discipline.
17    Q.   Okay.  And by doing that you look at the
18 merits of the investigation, correct?
19    A.   Yes.
20    MR. LEINENWEBER:  Object to form.
21        Go ahead.
22 BY MR. HERBERT:
23    Q.   Okay.  You look at the facts to determine
24 whether or not Legrain should have been disciplined
Page 85

1 or not, right?
2    A.   Yes.
3    Q.   And then in here you determined that he
4 should have been disciplined, correct?
5    A.   Yes.
6    Q.   And you sent this form to Reginald Baker
7 and Fabio Valentini the follow day, correct?
8    A.   I don't recall doing that.  If that was
9 attached to that e-mail.  I don't know if that was an
10 attachment to that e-mail that you showed earlier.
11    Q.   I will represent to you that it was.  And
12 then this was -- the reason that you sent it --
13 strike that.
14        When you sent this document to
15 Reginald Baker and Fabio Valentini, there was already
16 an investigation being conducted into the EEOC
17 charges filed by Legrain Winston, correct?
18    A.   Yes.
19    Q.   And you determined, as you testified
20 earlier, that Legrain Winston was a subpar employee,
21 correct?
22    A.   Yes.
23    Q.   And you provided that information to
24 Mr. Valentini because you believed that it showed
Page 86

1 that his allegations were not with merit, I believe
2 is what you testified to?
3    MR. LEINENWEBER:  Object to form, foundation.
4 Also misstates prior testimony.
5        You can answer.
6    THE WITNESS:  I stated -- this is one page of
7 a few different -- this is a total document.  There
8 should be additional pages to it.  I believe the
9 reason I sent that is because he had information in
10 the grievance.  I would have to see the attached
11 document to refresh my memory that goes with this
12 page because there's more than one page to it that
13 stated that he was being harassed.
14 BY MR. HERBERT:
15    Q.   So you're saying that the discipline that
16 is reflected in Exhibit C was in part based upon
17 Legrain Winston complaining that he was being
18 discriminated against?
19    MR. LEINENWEBER:  Object to form, foundation.
20 Also misstates prior testimony.
21    THE WITNESS:  I believe to answer the
22 question properly I have to look at all the pages
23 that go along with this one single page of this
24 document.  There should be additional pages to it.
Page 87



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1414 of 1503 PageID #:1805

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 BY MR. HERBERT:

2    Q.  Okay.  Give me one sec.

3        Well, I can tell you that Legrain

4 filed a grievance concerning him getting a SPAR for

5 this incident.  Does that sound familiar?  Is that

6 the documents that you're talking about?

7    MR. LEINENWEBER:  Object to form, foundation,

8 a compound question.

9        You can answer.

10    THE WITNESS:  Yes.  So in the document in

11 front of me it says you subsequently filed a

12 grievance, so attached to this document in front of

13 me, this page there should be a grievance.  In order

14 to properly answer the question, I would like to look

15 at that grievance in order to answer the question.

16 BY MR. HERBERT:

17    Q.  Yeah.  Well, we didn't send it over to

18 you.  I could, but I can tell you that he's

19 basically -- he's complaining about being disciplined

20 for this incident.  Does that sound about right?

21    MR. LEINENWEBER:  The same objections.

22        Go ahead.

23    THE WITNESS:  A grievant states that he -- a

24 grievant says that there's a violation of the union

Page 88

1 contract?

2 BY MR. HERBERT:

3    Q.  Right, by being unfairly disciplined.

4    **A.  And a violation of the union contract is**

5 **what the grievance should be for.**

6    Q.  Okay.  And so your letter here, Exhibit

7 C, that is not only assigning discipline to Legrain

8 Winston, it's also denying his grievance that the

9 discipline was unfair?

10    MR. LEINENWEBER:  The same objections.

11        Go ahead.

12    THE WITNESS:  It is not denying the

13 grievance.  It is resolving the grievance.

14 BY MR. HERBERT:

15    Q.  Okay.  And you resolved it by saying his

16 grievance had no merit?

17    MR. LEINENWEBER:  Object to form, foundation.

18        You can answer.

19    THE WITNESS:  In order to properly answer the

20 question, I need the additional pages that go with

21 this because there's a signed document from me, the

22 union steward, and the grievant that states exactly

23 what happened and why the discipline was being

24 reduced, resolved.  I can't answer that because this

Page 89

1 is just one page of several documents.

2 BY MR. HERBERT:

3    Q.  I've got it.  But you would agree with me

4 that Fabio Valentini was not involved in the

5 grievance in any way referenced in this exhibit,

6 Exhibit C, right?

7    MR. LEINENWEBER:  The same objections.

8        Go ahead.

9    THE WITNESS:  Can you scroll down so I could

10 see the cc's on the bottom?  I'm not sure who's cc'd

11 on there.

12        So he would have been involved

13 because it was cc'd to the Office of Professional

14 Review.

15    MR. HERBERT:  Okay.  Let's go to Exhibit D,

16 please.

17    MR. LEINENWEBER:  D as in dog?

18    MR. HERBERT:  Yes.

19    MR. LEINENWEBER:  Okay.

20 BY MR. HERBERT:

21    Q.  And if you want to take a moment to look

22 at that and tell me if you recognize what this

23 document is.

24    **A.  Okay.  I can only see the top half of it.**

Page 90

1 **It ends where on April 9th?**

2    Q.  Yeah.  And it's a two-page document, so

3 when you're done with that page, I'm going to ask

4 that you look at the second page as well.

5    **A.  Okay.  Okay.  You can go to the next**

6 **page.  Okay.  I've finished reading it.**

7    Q.  Okay.  Mr. Webb, have you ever seen this

8 document before?

9    **A.  I might have seen it.  I don't think I**

10 **have though.**

11    Q.  Okay.  It's a report from a human

12 resources investigation.  Is that what it looks like

13 to you?

14    **A.  Joe Consolo was an attorney that worked**

15 **for the sheriff's office.**

16    MR. HERBERT:  Okay.  And if we can go to

17 page 1 on that.

18 BY MR. HERBERT:

19    Q.  Do you see that first paragraph in the

20 summary?  Below is a summary.  "April 9, 2015, Chief

21 Ranzino asked if Investigator Mcghee was on duty

22 during roll call.  Investigator Winston responded

23 that Investigator Mcghee was on RDO, regular day

24 off," correct?

Page 91



John Webb   -   9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1415 of 1503 PageID #:1806

1   **A.   That's what it says, yeah.**

2   Q.   Okay.  Chief Ranzino stated that he meant

3   Investigator McCall.  Chief Ranzino further stated,

4   you know you all look alike."  Do you see that there?

5   **A.   Yes, I do.**

6   Q.   Are you familiar with that allegation and

7   what happened with respect to that?

8   **A.   I am familiar with the allegation, yes.**

9   Q.   Okay.  Tell me your -- how you became

10   aware of the allegation.

11   **A.   I believe it was part of the EEOC**

12   **complaint documents.**

13   Q.   Okay.  And it's an allegation of a racial

14   complaint, correct, against Ranzino?

15   MR. LEINENWEBER:  Object form, foundation.

16   You can answer.

17   THE WITNESS:  I don't see race, the word race

18   discussed in that.

19   BY MR. HERBERT:

20   Q.   Well, certainly David -- or I'm sorry,

21   Mcghee is black, correct?

22   **A.   I can't testify to his ethnicity.  I**

23   **believe he's African-American.**

24   Q.   Okay.  Well, is it your understanding

Page 92

1   that this incident did not result in somebody

2   complaining about being in a -- or an inappropriate

3   racial comment being made?

4   **A.   In this document he says discriminatory**

5   **things.**

6   Q.   Right.  I'm talking about you became

7   aware of this incident and you were aware that people

8   were complaining that when Ranzino said, you know you

9   all look alike, he was talking about all you black

10   people look alike.  You know that was the nature of

11   the complaints, right?

12   MR. LEINENWEBER:  Object to form, foundation.

13   Also a compound question.

14   Go ahead.

15   THE WITNESS:  That was their complaint, but I

16   don't know if he's talking about everybody wearing

17   blue uniforms or race or all on the same shift.  I

18   don't know what he means by you all look alike.

19   BY MR. HERBERT:

20   Q.   Right.  But you know that several of the

21   black investigators heard it and believed it was

22   meant in the manner that you all -- you black people

23   look alike?

24   MR. LEINENWEBER:  The same objections.

Page 93

1   Go ahead.

2   THE WITNESS:  Based on this document and from

3   what I know from the EEOC complaint, the allegation

4   was alleged that African-Americans were being singled

5   out, you know you all look alike.

6   BY MR. HERBERT:

7   Q.   Okay.  And you were Chief Ranzino's

8   supervisor on April 9, 2015, correct?

9   MR. LEINENWEBER:  Objection to form and

10   foundation.

11   THE WITNESS:  No, I was not.

12   BY MR. HERBERT:

13   Q.   Were you employed by the electronic

14   monitoring unit at that time?

15   **A.   Yes, I was.**

16   Q.   And it's your testimony -- was Chief

17   Ranzino a higher rank than you?

18   **A.   No, we were both equal ranks at the same**

19   **time.**

20   Q.   Okay.  And you conducted roll calls

21   during that time period in 2015?

22   **A.   Yes, I did.**

23   Q.   Okay.  And what was your involvement in

24   this investigation if you had any?

Page 94

1   **A.   Providing documents to sheriff's legal**

2   **with the roll call, with the daily rosters.**

3   MR. LEINENWEBER:  Can I stop?  Can I stop a

4   second because I want to make sure we're not

5   conflating two issues here because this document, in

6   my understanding, is related specifically to the OPR

7   and human resources' response to the Ranzino comment

8   and not the EEOC complaint.  Is that what we're

9   talking about, Dan, because otherwise I think we get

10   into those privilege issues.

11   MR. HERBERT:  I'll be honest, I don't know.

12   I don't know if this -- well, it's 2015 and wasn't --

13   wasn't what you were claiming was privileged, wasn't

14   that after that, 2017?

15   MR. LEINENWEBER:  Yeah.  My understanding was

16   we were talking about an EEOC charge has been filed

17   and there's -- you know, legal comes in and does

18   their thing.  So if this is just related to the OPR,

19   human resources issue with all you guys look alike, I

20   just want to clarify that that's what he should be

21   thinking of.

22   MR. HERBERT:  Yes.  Yes.

23   MR. LEINENWEBER:  Okay.

24

Page 95

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1416 of 1503 PageID #:1807

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q. I have no idea what I asked you.

MR. LEINENWEBER: What was your role in the investigation, I think. I'll defer to Brenda though because she's obviously got a much better grasp than I do.

MR. HERBERT: I'll ask another question.

BY MR. HERBERT:

Q. Mr. Webb, what was your role in the investigation into whether or not an offensive comment was made during a roll call?

A. My only role is when I was interviewed with the EEOC complaint, which as counsel stated I believe this is the same thing.

Q. Okay. Other than that, you had no role in any investigation into this matter whatsoever?

A. Only to provide documents.

Q. Okay. And documents what, being like roll call sheets or attendance sheets to see who was present?

MR. LEINENWEBER: I'm just going to object to the extent that you're asking him to reveal what legal asked him for. And again, I think we're getting into two different things. And I apologize

Page 96

for, you know, talking, but I think that Mr. Webb is referring to the EEOC investigation and, Dan, I think you're referring to the OPR, human resources, the Ranzino, you all look alike in a box at that time.

MR. HERBERT: Yeah. Yeah.

BY MR. HERBERT:

Q. So I'm not asking you about an EEOC privileged communication you may have had with the attorney. I'm talking about -- and I understand maybe it did go into this subject matter as well, but clearly this was investigated by OPR separate and apart from any EEOC applications.

MR. LEINENWEBER: Yeah.

BY MR. HERBERT:

Q. So that being said --

MR. HERBERT: You did it again, Justin. Now I forget my question.

MR. LEINENWEBER: That's the strategy.

BY MR. HERBERT:

Q. Other than you produced documents, I believe is what you said. And my question was, were these documents, were they attendance sheets, or what were the documents?

A. To the best of my recollection, I have

Page 97

only provided daily rosters.

Q. For what reason though? I'm trying to figure out the significance of that.

MR. LEINENWEBER: Yeah, I don't want you to testify as to what you believe the attorneys were asking you for. So if you provided OPR with documents or if you provided HR with documents related to the Ranzino you all look alike issue, that's one thing. If you provided documents to legal related to the EEOC charge, that's separate and that's the one we want to keep in a box and is off limits.

So if you provided something to OPR or to HR asking you for them related to this Ranzino you all look alike comment as exhibited in Exhibit D, testify to that.

THE WITNESS: I can honestly state I don't recall because this was all together as one investigation. I don't know if this was -- anything I provided or stated was to OPR, to the EEOC complaint. I don't believe I had anything to do with this informal inquiry with this document. To the best of my recollection, I don't believe I had anything to do with this.

Page 98

BY MR. HERBERT:

Q. Okay. Do you know whether or not, as you sit here today, do you know whether or not Ranzino said that comment at a roll call, you know you all look alike?

A. I was not present and I couldn't say if he said it or did not say it.

Q. Okay. And you would agree that if he said it to a black person, that that would be inappropriate?

A. I can't say what he meant by you all look alike, so I don't know what his reason was for saying that. I don't know what he was saying.

Q. Well, would you have made a comment to a black person saying, you know you all look alike?

A. I don't know what context you would say that in. If everybody is wearing a blue uniform, everybody looks alike because they're all in a blue uniform.

Q. Okay. So it's your opinion saying you know you all look alike to a black person, that could be perfectly acceptable, correct?

MR. LEINENWEBER: Object to form, foundation. Also misstates prior testimony.

Page 99



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1417 of 1503 PageID #:1808

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  You can answer.
2  THE WITNESS: Anything you say to somebody
3 can be misconstrued or taken a different way
4 depending on the person. I can't attest to how a
5 person would take any comment.
6 BY MR. HERBERT:
7  Q. Well, could you see a scenario in which a
8 black person receiving this from a white supervisor
9 would take it in an offensive way?
10  **A. I could see anybody taking offense to**
11 **anything a supervisor tells them depending on how**
12 **they take it.**
13  Q. Well, did Ranzino ever say things that
14 were offensive in your presence?
15  **A. Not to my knowledge.**
16  Q. Did you ever hear rumors about Ranzino
17 saying anything offensive in the workplace?
18  **A. Only once these rumors came out with this**
19 **allegation.**
20  Q. Okay. What other rumors did you hear
21 about him making offensive comments in the workplace?
22  **A. With this allegation. That's what I'm**
23 **referencing.**
24  Q. Okay. So nothing -- you've never heard

Page 100

1 any rumors about any offensive comments made by
2 Ranzino other than this comment in April 2015?
3  **A. I don't recall anything outside of this.**
4  Q. Okay. Did you ever hear any complaints
5 about offensive language or racial language being
6 used in the workplace by anyone when you were there
7 at EM?
8  MR. LEINENWEBER: Object to form and
9 foundation.
10  You can answer.
11  THE WITNESS: I don't recall a specific
12 instance where somebody made any allegations unless
13 it was in writing. I don't recall any hearsay.
14 BY MR. HERBERT:
15  Q. Okay. Well, do you remember any that
16 were made in writing?
17  **A. No, I don't -- I don't recall.**
18  Q. Okay. Well, you can see that Winston was
19 complaining that Ranzino was making the stress level
20 very high for everyone. My question is: Were you
21 aware of the fact that people were complaining about
22 Ranzino apart from this instance?
23  MR. LEINENWEBER: Object to form, foundation.
24  You can answer.

Page 101

1  THE WITNESS: Can you rephrase the question?
2 BY MR. HERBERT:
3  Q. Sure. Other than this instance, were you
4 aware of the fact that people were -- that
5 investigators were claiming that Ranzino was causing
6 them to be working in a stressful environment?
7  **A. I don't recall anybody making allegations**
8 **about a stressful environment.**
9  Q. But people were complaining about
10 Ranzino. You're aware of that aside from this
11 instance?
12  MR. LEINENWEBER: Object to form, foundation.
13  THE WITNESS: I don't -- I don't recall open
14 complaints about him.
15 BY MR. HERBERT:
16  Q. Did you ever hear Ranzino claim that he
17 was connected?
18  **A. Connected to what?**
19  Q. Have you ever heard him make a statement
20 that he was connected, you know, to people within the
21 sheriff's department?
22  **A. I don't understand what you mean by**
23 **connected to people in the sheriff's department. I**
24 **don't understand the question.**

Page 102

1  Q. You would agree with me that people in
2 the sheriff's office, they might have a supervisor
3 that they're friendly with and because of that
4 relationship they get promoted quicker or they're not
5 subject to discipline. You're familiar with that,
6 correct?
7  MR. LEINENWEBER: Object to form, foundation,
8 assumes facts not in evidence, and also a compound
9 question.
10  Go ahead.
11  THE WITNESS: I'm not familiar with that.
12 When you say connected, are you talking he had
13 family?
14 BY MR. HERBERT:
15  Q. No, connected as somebody's got --
16 somebody's heavy. Somebody has a lot of clout. You
17 know what I'm talking about, don't you?
18  **A. I'm not sure what you're referencing.**
19  Q. Okay. You may be the only sheriff that
20 doesn't know what I'm talking about when I refer to
21 somebody having clout or being connected.
22  **A. Connected I interrupt as --**
23  MR. LEINENWEBER: That's not a question,
24 John. That's a statement.

Page 103



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1418 of 1503 PageID #:1809
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q. Well, you know Greg Shields, right?

A. I know him, yes.

Q. Okay. You know that Greg Shields had a connection with the sheriff, right?

MR. LEINENWEBER: Object to form, foundation.

You can answer.

THE WITNESS: I don't understand what you mean by connection.

BY MR. HERBERT:

Q. You know that he had a personal relationship with the sheriff?

MR. LEINENWEBER: The same objections.

THE WITNESS: I don't know about personal relationship. I know they talk to each other. He was a supervisor, he's a sheriff.

MR. HERBERT: I don't think Mr. Webb is on video now.

MR. LEINENWEBER: Yeah, he's there. I see him. You might need to re-position something, but he's there.

BY MR. HERBERT:

Q. Well, would you agree with me that Shields has clout because of his relationship with

*Page 104*

the sheriff?

MR. LEINENWEBER: The same objections.

Go ahead.

THE WITNESS: I can't agree or disagree with the question that you stated.

BY MR. HERBERT:

Q. Okay. Did Ranzino ever tell you that he's friendly with the sheriff?

A. Not to my recollection, no.

Q. Did Ranzino ever tell you that any of his promotions were because he was friendly with the sheriff?

A. Not to my recollection. I believe he was promoted under Sheahan and not the current sheriff.

Q. Have you ever had a situation where you've recommended discipline for somebody and it was -- it was dismissed by a supervisor at a higher level than you?

MR. LEINENWEBER: Object to form, foundation.

You can answer.

THE WITNESS: Are you asking in reference to the grievance process?

BY MR. HERBERT:

Q. Any process. Is there another form of

*Page 105*

disciplinary process?

A. Yes. Through the grievance process there's been discipline that if it went to the second, third, fourth step, supervisors above me may draw up discipline.

Q. Okay. Have you ever heard Ranzino refer to a black employee as boy?

A. I have never personally heard him say that.

Q. Okay. When you say you never personally heard him, have you heard rumors about him referring to black employees as boy?

A. I believe it's in the document that's in front of me.

Q. Okay. Other than the document that's in front of you referring to this incident, have you heard any other rumors about Ranzino referring to a black employee as boy?

A. Not to my recollection.

Q. And you would agree with me that a white supervisor referring to a black investigator as boy, that would be an offensive comment, correct?

A. As previously stated, you could say anything to anyone and how they take it and how they

*Page 106*

interpret it is their own interpretation. If you're a male employee and you're a boy, you're technically a boy. If you're female, you're a girl.

Q. I'm asking you what you would believe. If a white employee called a black investigator boy, would you believe that that was inappropriate?

A. In my opinion I would say it's inappropriate.

Q. Okay. What about the sheriff's policy? Do you know what the sheriff's policy is referring to a black employee by a white supervisor as boy?

MR. LEINENWEBER: Object to form and foundation.

You can answer.

THE WITNESS: To the best of my knowledge, I don't believe that specific term is included in the sheriff's policy.

BY MR. HERBERT:

Q. Okay. So it's not -- it wouldn't violate department policy to call a black employee boy because it's not in the policy. Is that your testimony?

MR. LEINENWEBER: Object to form, foundation. It also misstates his testimony.

*Page 107*



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1419 of 1503 PageID #:1810
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    THE WITNESS:  That's not my testimony.
2  Anybody that -- however you feel that you're being
3  targeted unfairly or wrongly based on your race,
4  gender, or religion, however you interpret that,
5  whatever the statement is that makes you feel that
6  way, it's your right to file a complaint with the
7  Office of Professional Review.
8  BY MR. HERBERT:
9    Q.  Okay.  And boy, that would be -- or
10  strike that.
11      Boy, that would be offensive to a
12  black person because it kind of connotes slave
13  language, right?
14    **A.  I'm not sure what somebody would call a**
15  **slave.  I wasn't around when slavery existed.**
16    Q.  Did you ever call a black employee boy?
17    **A.  Not to my recollection.**
18    Q.  Did you ever hear any supervisors call a
19  black employee boy?
20    **A.  Not to my recollection.**
21    Q.  Have you ever heard of any supervisors or
22  anyone refer to a black employee as boy?
23    MR. LEINENWEBER:  Object to form, asked and
24  answered.

Page 108

1    Go ahead.
2    THE WITNESS:  Not to my recollection.
3  BY MR. HERBERT:
4    Q.  Have you ever heard the term boy used to
5  refer to a black person?
6    MR. LEINENWEBER:  Object to form, foundation.
7  Also asked and answered.
8      You can answer.
9    THE WITNESS:  Yes.  Yes, in this document
10  here provided and what you have told me is referring
11  to boy.
12  BY MR. HERBERT:
13    Q.  Did you ever hear Ranzino threaten to get
14  an employee fired?
15    **A.  Not to my recollection.**
16    Q.  You would agree with me that threatening
17  to get employees fired would be against -- or would
18  be offensive, correct?
19    MR. LEINENWEBER:  Object to form and
20  foundation.
21      You can answer.
22    THE WITNESS:  Yes.
23  BY MR. HERBERT:
24    Q.  It certainly could create a hostile work

Page 109

1  environment, correct?
2    MR. LEINENWEBER:  Object to form, foundation.
3  Also calls for a legal conclusion.
4      You can answer.
5    THE WITNESS:  Well, I'm not an attorney.  I
6  would assume that it would be construed that way.
7  BY MR. HERBERT:
8    Q.  Okay.  Did you allow Chief Ranzino to --
9  or strike that.
10      Ranzino, did he make the assignments
11  while you were the chief, the daily assignments for
12  the investigators?
13    **A.  He would have made the daily assignments**
14  **for third watch investigators.  There might have been**
15  **some times he did it for another shift, but he would**
16  **have done third watch.**
17    Q.  Got it.  Have you heard any employees
18  complain or investigators complain about Ranzino
19  speaking to them in an offensive manner other than
20  the incident that we just referenced?
21    **A.  I believe he had OPR complaints against**
22  **him that I was aware of.**
23    Q.  Okay.  And that was about mistreating
24  employees, right?

Page 110

1    MR. LEINENWEBER:  Object to form, foundation.
2      You can answer.
3    THE WITNESS:  Yes.
4  BY MR. HERBERT:
5    Q.  And despite these complaints, he was
6  still allowed to conduct the same duties that he did
7  despite these complaints, agreed?
8    MR. LEINENWEBER:  Object to form, foundation.
9  Also assumes facts not in evidence.
10      You can answer.
11    THE WITNESS:  I don't know what the findings
12  of all the investigations were, and I was his equal.
13  I was a chief on the second watch, he was a chief on
14  the third watch, so I don't know what the
15  determinations were.
16  BY MR. HERBERT:
17    Q.  The TSS assignment, you're familiar with
18  that?
19    **A.  Yes.**
20    Q.  And that's an assignment that's in the
21  basement of the building?
22    **A.  It's in the receiving and classification**
23  **area Division 5 of the Cook County Jail.**
24    Q.  Did you ever have any people complain

Page 111



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1420 of 1503 PageID #:1811
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 about not wanting to work in the basement in the TSS
2 unit?
3     A. Not to -- I'm sure there probably was
4 somebody somewhere along the line that said they
5 didn't want to work there or didn't want to be
6 assigned there. I can't remember a specific
7 instance.
8     Q. Well, were you aware that that was
9 generally considered a spot that investigators didn't
10 want to work in?
11     MR. LEINENWEBER: Object to form and
12 foundation.
13         You can answer.
14     THE WITNESS: It's actually a desirable
15 assignment based on the employees. The employees
16 like working there. A lot of the employees that
17 worked there were able to get out earlier than other
18 employees.
19 BY MR. HERBERT:
20     Q. And the employees that liked to work
21 there, you tried to put them there, right?
22     A. Yes. Previously you used to bid for
23 shift, detail and assignment, and TSS used to be a
24 bided assignment until the union determined you could

Page 112

1 not bid for assignments anymore.
2     Q. Right. And then along those same lines,
3 if somebody didn't want to work in the TSS unit, you
4 would try not to put them there, correct?
5     A. Yes.
6     Q. Okay. Without getting into the specifics
7 of what you found out about the assignments, you
8 would agree with me that the plaintiffs in this case,
9 they were assigned to places that they specifically
10 requested not to be assigned to rather routinely?
11     MR. LEINENWEBER: Object to form, foundation.
12 Also a compound question.
13         You can answer.
14     THE WITNESS: I don't know if they ever
15 expressed in writing or verbally to a supervisor that
16 they did not want to work there. I don't know. The
17 majority of the information you're asking is on third
18 watch. I can attest to when I was a supervisor on
19 the second watch, people assigned to TSS for the most
20 part all wanted to be there.
21 BY MR. HERBERT:
22     Q. Okay. So let me see if I understand your
23 policy with respect to assignments. It's you try to
24 put people in the assignments that they wanted to be

Page 113

1 in, correct?
2     A. Correct.
3     Q. And that the only reason why somebody
4 would not get the assignment that they wanted was
5 because there was some manpower issue that required
6 that person to work in the assignment that they did
7 not want to work in?
8     MR. LEINENWEBER: Object to form, foundation.
9 Also misstates prior testimony.
10     THE WITNESS: It could have been due to an
11 injury, somebody has a stomachache, they need to be
12 near a bathroom. There could be numerous reasons why
13 they may or may not go to an assignment. It could be
14 for manpower. It could be because they want to leave
15 early and they can't be on a two-man car. There
16 could be numerous reasons why somebody may not work
17 on an assignment on a specific day.
18 BY MR. HERBERT:
19     Q. Okay. Other than those reasons, is there
20 any other reason why somebody would be required to
21 work an assignment that they did not want to work in?
22     MR. LEINENWEBER: Object to form, foundation,
23 misstates prior testimony.
24         Go ahead.

Page 114

1     THE WITNESS: Well, based on the union's
2 argument that you bid for a shift and not an
3 assignment, you would actually have no reason to
4 complain about where you were because you didn't have
5 any ability to pick your assignments.
6 BY MR. HERBERT:
7     Q. Okay. So after the union came out with
8 that language that it was the policy, then you would
9 just put people wherever you wanted to put them and
10 they didn't have any say in the matter?
11     A. Well, as I stated earlier, I tried my
12 best to try to keep people in positions that they
13 were good at, that they produced at and wanted to be
14 in. Granted there may be manpower issues or other
15 outlying issues that might cause them -- that I can't
16 put you somewhere.
17         But ultimately when it comes down to
18 it, the union CBA governs where you're assigned, and
19 when they took away the ability to bid for shift
20 detail and assignment, management had the right to
21 place people wherever they deemed fit based on
22 manpower and productivity standards.
23     Q. Right, but they couldn't do it just
24 because they liked one person more than another

Page 115



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1421 of 1503 PageID #:1812
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 116**

1 person. That couldn't be a basis for determining
2 assignments, correct?
3     MR. LEINENWEBER: Object to form, foundation.
4     THE WITNESS: Your personal opinion shouldn't
5 come into play when you're assigning.
6 BY MR. HERBERT:
7     Q. And the race of somebody shouldn't come
8 into play when you're assigning them, correct?
9     A. No.
10     Q. Well, why is it then that the plaintiffs
11 here who are all black, why were they put in
12 positions that they didn't want to work in?
13     MR. LEINENWEBER: Object to form, foundation.
14       You can answer.
15     THE WITNESS: I don't know.
16 BY MR. HERBERT:
17     Q. Well, you made the assignments. Why
18 would you not know why they were put into assignments
19 that they didn't want to work in?
20     MR. LEINENWEBER: Object to form, foundation.
21 Also presents facts not in evidence.
22       Go ahead.
23     THE WITNESS: The majority of the people that
24 you're talking of there all worked on the third

**Page 117**

1 watch. I can only talk about the second watch. None
2 of those people told me they did not want to work
3 there.
4 BY MR. HERBERT:
5     Q. Yeah, but you became aware of the fact
6 that they didn't want to work there and you placed
7 them there anyways, right?
8     MR. LEINENWEBER: The same objections.
9     THE WITNESS: I didn't place them there. The
10 individuals in this -- who were working afternoons.
11 I don't even believe Strickland even worked in TSS.
12 She was only there for a few months. I don't -- I.V.
13 Newson never -- anybody that worked on the day shift,
14 I didn't have any issues with them working down
15 there.
16 BY MR. HERBERT:
17     Q. Okay. So the complaints that were made
18 about the working assignments by our plaintiffs, it's
19 your testimony that you never became aware of their
20 complaints about their assignments until after this
21 lawsuit?
22     A. Yes.
23     Q. Okay. I want to go to an event that --
24 between Greg Shields and Legrain Winston where they

**Page 118**

1 got into an argument in the workplace. Do you
2 remember that incident?
3     A. Yes.
4     Q. Okay. And you gave a statement in that
5 incident, correct?
6     A. Yes.
7     Q. That was to OPR, correct?
8     A. Yes.
9     Q. Okay. And you witnessed this event,
10 correct?
11     A. I believe I witnessed portions of the
12 allegation, not the entire event.
13     Q. Okay. Tell me what you remember about
14 it.
15     A. I would have to review my statement to
16 give a proper answer.
17     Q. Well, I'm just asking you now, what do
18 you remember about it?
19     A. Director Shields and Investigator
20 Winston, I believe Chief Neal was there, Director
21 Brady, there was an issue about something with the
22 court time. In order to give a proper statement, I
23 would have to review my document.
24     Q. Okay. So as you sit here today, you

**Page 119**

1 don't remember anything about the incident other than
2 what you just testified to?
3     A. Yeah, there were statements that I put in
4 there. I believe this was five years ago. I would
5 have to review my statement that I made to OPR in
6 order to give a good answer.
7     Q. July 30, 2015. Does that sound about
8 right?
9     A. Roughly, yeah.
10     Q. Okay. And you witnessed an argument
11 between Shields and Winston, correct?
12     A. I don't recall. I don't remember what
13 the exact term was, if it was an argument,
14 discussion, debate. I don't remember exactly the
15 term that was used.
16     Q. Okay. But I'm not asking the term that
17 was used. I'm asking what you remember. How would
18 you characterize it?
19     A. An employee that was being insubordinate.
20     Q. Okay. Did you see any actions that Greg
21 Shields was being inappropriate in any way with
22 respect to Winston?
23     A. I'd have to review my statement in order
24 to give a proper answer.

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1422 of 1503 PageID #:1813

1  Q.  As you sit here today, you don't know if
2  Greg Shields, if you witnessed him being
3  inappropriate in any way with his interaction with
4  Investigator Winston?
5  **A.  In order to give a proper answer to that,**
6  **I would have to read the statement.  To the best of**
7  **my recollection, there was discussion and he left the**
8  **room.  I would have to look at exactly what -- this**
9  **is over five years ago.**
10  Q.  Okay.  Didn't you review any documents
11  before you testified today?
12  MR. LEINENWEBER:  Objection.  Asked and
13  answered.
14  THE WITNESS:  I did review documents.  I
15  didn't review the statement that I gave.  I don't
16  recall reviewing that document.
17  MR. HERBERT:  Okay.  Well, if we can show
18  what's been marked as or we'll mark as Exhibit K,
19  Webb Exhibit K.  And if we can go to page 9 of that
20  document.  Yeah, I think it's two more pages down.
21  It says page 4 on there.  The next page.  Thank you
22  very much.
23  BY MR. HERBERT:
24  Q.  And if you can look at that second

Page 120

1  paragraph -- I'm sorry, the third paragraph, the
2  second under witness statement.  And would you agree
3  with me that that is a synopsis of what you told OPR
4  regarding your memory of the incident?
5  **A.  It's a synopsis, but there should be an**
6  **actual statement that I signed, I believe.**
7  Q.  Well, does that look different than what
8  you signed -- or strike that.
9       Reading that statement, does that
10  refresh your recollection as to what happened during
11  that incident?
12  **A.  I'm reading it.  Okay.  What is your**
13  **question?**
14  Q.  Does that refresh your memory as to what
15  happened in that incident?
16  **A.  Yes, it does.**
17  Q.  Okay.  Tell me what you remember about
18  the incident then.
19  **A.  Investigator Winston stated, are you**
20  **threatening me?  Director Shields said, we are**
21  **done -- I'm done, and turned and left his office.**
22  Q.  Okay.  Anything else that you remember
23  about it after reading that?
24  **A.  It seemed like Investigator Winston was**

Page 121

1  making a scene.
2  Q.  Okay.  And so you still believe that --
3  after reading that you still believe that you didn't
4  see Shields do anything inappropriate in any way?
5  **A.  Not from what I saw in my statement.**
6  Q.  Okay.  But anything that you saw that
7  evening or that day?
8  **A.  No.**
9  Q.  Okay.  Are you aware of the fact that OPR
10  concluded that Shields did violate department policy
11  pursuant to the actions that you witnessed?
12  MR. LEINENWEBER:  Object to form, foundation.
13  Also assumes facts not in evidence.
14       Go ahead.
15  THE WITNESS:  I don't know what the outcome
16  of it was.  I just know it was investigated and he
17  was my supervisor.  I don't know what the outcome
18  was.
19  BY MR. HERBERT:
20  Q.  Well, they concluded that portions of the
21  allegations were sustained and they determined that
22  Director Shields' behavior was inappropriate with
23  respect to Investigator Winston.
24  MR. LEINENWEBER:  Objection.

Page 122

1  BY MR. HERBERT:
2  Q.  That being said, you would agree that OPR
3  had a different take on it than you did?
4  MR. LEINENWEBER:  Object to form, foundation.
5  Also assumes facts not in evidence.
6       You can answer.
7  THE WITNESS:  Whatever OPR's determination
8  was, that was their determination.  What I observed
9  and what I stated, I didn't observe any inappropriate
10  behavior.
11  BY MR. HERBERT:
12  Q.  And you said that partially because
13  Shields was your boss, right?
14  MR. LEINENWEBER:  Object to form, foundation.
15       You can answer.
16  THE WITNESS:  I stated that based on what I
17  saw as a sworn officer to tell the truth.
18  BY MR. HERBERT:
19  Q.  Based on what you saw of your boss and
20  somebody that you were friends with, right?
21  MR. LEINENWEBER:  The same objections.
22  THE WITNESS:  Who was I friends with?
23  BY MR. HERBERT:
24  Q.  Shields.

Page 123



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1423 of 1503 PageID #:1814
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1      A. Can you ask the question again?

2      Q. Yeah. Based on what you saw from actions

3 of your boss and your friend, Greg Shields?

4      MR. LEINENWEBER: The same objections.

5      THE WITNESS: Based on a sworn officer in

6 this department and their actions, what they did, I

7 had no belief that it was inappropriate.

8 BY MR. HERBERT:

9      Q. Okay. And based upon what you saw with

10 your supervisor and friend, Shields, and his

11 confrontation with a black investigator, Legrain

12 Winston, right?

13      MR. LEINENWEBER: Object to form, foundation.

14 It's also argumentative.

15      THE WITNESS: I previously stated OPR made

16 their conclusions, not me.

17 BY MR. HERBERT:

18      Q. Right. But when you witnessed this, you

19 knew that Legrain Winston had made complaints against

20 you, correct?

21      MR. LEINENWEBER: Object to form, foundation.

22 It also includes facts not in evidence and it's

23 argumentative.

24      You can answer.

Page 124

1      THE WITNESS: I actually don't recall if

2 Winston actually named me in a complaint.

3 BY MR. HERBERT:

4      Q. Okay. Well, you tried to help your

5 friend Shields in this investigation. You would

6 agree with me on that?

7      MR. LEINENWEBER: Object to form, foundation,

8 assumes facts not in evidence. It's also

9 argumentative.

10      THE WITNESS: I gave a statement based on the

11 facts and what I observed.

12 BY MR. HERBERT:

13      Q. Okay. And you also tried to dirty up

14 Legrain Winston to make him look not credible, right?

15      MR. LEINENWEBER: Object to form, foundation.

16 It assumes facts not in evidence and it's all

17 argumentative.

18      You can answer.

19      THE WITNESS: I provided documentation and

20 facts of an employee that was violating department

21 policy.

22 BY MR. HERBERT:

23      Q. And that employee was Legrain Winston in

24 your opinion?

Page 125

1      A. Not my opinion, the facts.

2      Q. But you concluded that he was violating

3 policy?

4      A. You said to dirty him up. You're talking

5 in reference to the e-mail that I sent, correct?

6      Q. No. We'll move on.

7      This complaint was made on August 3,

8 2015 -- or I'm sorry, the investigation began on

9 August 3, 2015 into this incident. Does that sound

10 about right?

11      A. What were the dates again?

12      Q. August 3, 2015.

13      A. Okay. Maybe I'm confusing my dates. So

14 on this statement it says on May 31, 2017. That's

15 where I'm being interviewed, correct?

16      Q. That's where you're being interviewed,

17 yes.

18      A. Okay. So can you ask the question again?

19      Q. Sure. The incident happened on July 30,

20 2015. Does that sound right?

21      A. Approximately the date, yes.

22      Q. Okay. And the investigation started on

23 August 3, 2015 into the complaint?

24      A. I don't know the date of when the

Page 126

1 complaint was started to be investigated.

2      MR. HERBERT: If we can scroll up two pages,

3 please. Thank you.

4 BY MR. HERBERT:

5      Q. At the very top do you see where that

6 says the investigation was initiated on August 3,

7 2015?

8      A. Yes, I see it.

9      Q. Okay. What does that mean?

10      MR. LEINENWEBER: Object to form, foundation.

11      You can answer.

12      THE WITNESS: The investigation was initiated

13 on August 3, 2015 according to this document.

14 BY MR. HERBERT:

15      Q. Okay. And in August 2015 were you

16 assigned to the second watch?

17      A. Yes.

18      Q. Okay. And do you know what watch Legrain

19 Winston was assigned to?

20      A. If I recall, I think he was third watch.

21 He was a third watch investigator.

22      Q. Okay. And what were your hours as a

23 second watch supervisor?

24      A. I'm supposed to work 7:00 to 3:00.

Page 127



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1424 of 1503 PageID #:1815
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  Sometimes I might be there at 3:00, 4:00 o'clock in
2  the morning.  I might be there until 5:00, 6:00
3  o'clock at night.  But duty hours were 7:00 to 3:00
4  or 8:00 to 4:00.
5       Q.  Okay.  Do you know if you ever worked the
6  third watch during the month of August 2015?
7       A.  I don't recall a specific time, but as I
8  previously stated there were times when I might have
9  stayed over and worked on the third watch or just
10  because I was a boss I may stay and have nothing to
11  do with the third watch.  I might be there for an
12  hour or two past my shift.
13      Q.  Okay.  Can you think of any situations
14  that you would have been there during the third watch
15  in August of 2015?
16      A.  I can't remember a specific reason why I
17  would be there, but it wouldn't be uncommon for me to
18  be there past 3:00 o'clock, 4:00 o'clock.
19      Q.  Okay.  But if you were assigned to the
20  third watch, that would be reflected in your
21  assignment sheets, correct?
22      A.  Yes.  If I was a third watch supervisor,
23  it would have been on the roster.
24      Q.  Okay.  And you talked about how --

Page 128

1  which you confronted Mr. Winston about his
2  activities?
3       A.  Yes.
4       Q.  Were you assigned to the midnight shift
5  at that point?
6       A.  Yes.
7       Q.  So your daily assignment sheets will show
8  that you were assigned to the midnight shift on the
9  date in which you had this interaction with
10  Mr. Winston?
11      A.  Yes, it should.
12      Q.  Okay.  And August 26 -- I'm sorry.
13  August 26, 2015 -- or I'm sorry.
14          August 4, 2015, is that the date in
15  which you confronted Legrain Winston about that fraud
16  that you characterized it as?
17      MR. LEINENWEBER:  Object to form.
18          You can answer.
19      THE WITNESS:  No, I didn't -- this is a
20  separate instance.  The issue with Chicago Heights I
21  believe happened like 2013 or so.
22  BY MR. HERBERT:
23      Q.  I'm talking about the one in Calumet
24  City.

Page 130

1  earlier in the deposition today you talked about how
2  you witnessed some fraudulent activity being done by
3  Winston and his partner with respect to Calumet City?
4       A.  Yeah, I believe -- Calumet City, Chicago
5  Heights, one of those south suburbs.
6       Q.  Well, tell me what happened with that.
7  Tell me what your involvement was and what you found
8  out.
9       MR. LEINENWEBER:  Objection.  Asked and
10  answered.
11          You can answer.
12      THE WITNESS:  I'd reference my statement that
13  I gave earlier.  I believe I answered that question
14  already.
15  BY MR. HERBERT:
16      Q.  What time did this -- what time did you
17  have interaction with Winston regarding that?
18      A.  And you're referencing which incident
19  again, the -- where I disciplined him?
20      Q.  Yes.
21      A.  It was on the midnight shift.  It was
22  3:00, 4:00, 5:00 o'clock in the morning.
23      Q.  Okay.  Why were you -- or strike that.
24          Were you on duty at the time in

Page 129

1       A.  Where they were filing false paperwork,
2  correct?
3       Q.  Yeah.  Isn't that what we're talking
4  about?
5       A.  You just said 2015.
6       Q.  Okay.  Is it your testimony that the
7  incident in Calumet City occurred in 2013?
8       A.  I believe I answered the question
9  earlier.  To the best of my recollection, I believe
10  it was 2013, '14, '15, somewhere around those years.
11      Q.  Okay.  I'm asking about 2015.  Here, I
12  have information that it occurred in and around
13  August 2015.  Does that sound right?
14      A.  Not when I -- it was before this.
15      Q.  Before what?
16      A.  Before August of 2015.  The incident I'm
17  talking of is when I was a midnight shift supervisor.
18  I split the shift.  I came in early, and Investigator
19  Mcghee and Investigator Winston were assigned to a
20  job on the south side in the south suburbs, and I
21  disciplined them and I testified in an arbitration
22  hearing for Winston.
23      Q.  Okay.  And you made that -- you're
24  required to report that, the infraction shortly after

Page 131



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1425 of 1503 PageID #:1816
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 it happens, correct?
2 MR. LEINENWEBER: Object to form, foundation.
3 It assumes facts not in evidence.
4 You can go ahead.
5 THE WITNESS: At the time it would change
6 throughout the years, but discipline had to be
7 initiated depending on the severity within a certain
8 time frame, depending on when the union contract was
9 in effect at the time, and when the discipline --
10 when I would have to serve the discipline.
11 BY MR. HERBERT:
12 Q. Well, when did you document the
13 discipline with respect to this incident that we're
14 talking about?
15 MR. LEINENWEBER: Object to form, foundation.
16 THE WITNESS: To the best of my recollection,
17 I believe it was the same day if not the following
18 day.
19 BY MR. HERBERT:
20 Q. Okay. If you did it later than that --
21 well, strike that.
22 MR. HERBERT: Okay. If we can go to Exhibit
23 H, please. Okay. If we can go down to about the
24 middle, the middle of the page.
Page 132

1 You can answer.
2 THE WITNESS: I don't know if he was
3 complaining about his work assignment. I thought he
4 had an issue with Chief Ranzino.
5 BY MR. HERBERT:
6 Q. Well, he did. Didn't a lot of the
7 employees have an issue with Chief Ranzino?
8 MR. LEINENWEBER: Object to form, foundation.
9 Also asked and answered.
10 THE WITNESS: Anybody that filed a complaint
11 with OPR or anything with HR, those are the employees
12 that had problems with him.
13 BY MR. HERBERT:
14 Q. Well, you became aware of the fact that
15 Slaughter, aside from his complaints about Ranzino
16 and the racial comments he was making, he was also
17 complaining about being assigned to the TSS basement
18 area consistently?
19 MR. LEINENWEBER: Object to form, foundation.
20 Also assumes facts not in evidence.
21 THE WITNESS: I don't know when he made that
22 complaint, but I would like to reference again the
23 EEOC information, and that's when I knew about it.
24
Page 134

1 BY MR. HERBERT:
2 Q. Okay. And in there if you can read where
3 it says hello, Investigator Slaughter. Just read
4 that to yourself, and I'm going to ask you a
5 question.
6 A. Okay. I've read it.
7 Q. And you knew Investigator
8 Slaughter, correct?
9 A. Yes.
10 Q. And he worked under your command,
11 correct?
12 A. As a director in the unit, yes, he would
13 have been under my command but not as a first line
14 supervisor.
15 Q. Okay. And you knew that Investigator
16 Slaughter here on or around this time was complaining
17 about his work assignments, correct?
18 A. I don't remember when the time was. I
19 couldn't tell you what the date was when he was
20 complaining.
21 Q. Okay. I didn't ask you that though. I
22 said, you became aware that Investigator Slaughter
23 was complaining about his work assignment, right?
24 MR. LEINENWEBER: Object to form, foundation.
Page 133

1 BY MR. HERBERT:
2 Q. And did you -- did you assign
3 Slaughter to the basement area in the TSS unit at any
4 point when you were making out assignments?
5 A. There's a possibility that he worked
6 there, and I thought he liked working there.
7 Q. My question though is: Would you have
8 assigned him to the TSS basement department?
9 A. There's a possibility I might have
10 assigned him there, yes.
11 Q. Okay. Well, you did the assignments for
12 that watch, correct?
13 MR. LEINENWEBER: Object to form, foundation.
14 THE WITNESS: Yes.
15 BY MR. HERBERT:
16 Q. So if you didn't do it on a day that you
17 were there, who else would have done it?
18 A. It could have been any supervisor in the
19 unit that did the roster that day.
20 Q. Okay. And you assigned Slaughter to the
21 TSS unit because you believe he liked it?
22 MR. LEINENWEBER: Object to form, foundation.
23 You can answer.
24 THE WITNESS: Yeah, he liked it and he was a
Page 135



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1426 of 1503 PageID #:1817

John Webb - 9/17/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 field training officer that specifically trained
2 people down there and he wanted to work there to the
3 best of my recollection. He even helped redesign the
4 section down there.
5 BY MR. HERBERT:
6     Q.   If you had become aware that Slaughter
7 did not want to work there, is it fair to say you
8 would not have assigned him there?
9     MR. LEINENWEBER: Object to form, foundation.
10     THE WITNESS: Based on staffing and
11 management needs, I would do my best. I never had a
12 problem with Slaughter. He was a good employee. He
13 worked hard.
14 BY MR. HERBERT:
15     Q.   Well, did you find out that he was
16 assigned to the basement the majority of the time?
17     MR. LEINENWEBER: Object to form, foundation.
18 Also assumes facts not in evidence.
19     THE WITNESS: I'd like to say I've never
20 heard the term basement until this investigation,
21 until this information has come out. It's always
22 been called TSS.
23        To the best of my knowledge, I
24 thought he liked working there. I never had an issue

Page 136

1 with him.
2 BY MR. HERBERT:
3     Q.   Well, you certainly found out at some
4 point later that Slaughter didn't like working in the
5 TSS basement area, right?
6     MR. LEINENWEBER: Object to form, foundation.
7     THE WITNESS: Only with this complaint, but
8 he was a field training officer after this and he
9 would specifically train people to work there because
10 he was good at it.
11 BY MR. HERBERT:
12     Q.   When did you first become aware of his
13 complaint about being forced to work in the basement
14 TSS unit?
15     **A.   I don't recall when it was or any of the**
16 **information. He's a good employee. I thought he**
17 **liked working there.**
18     Q.   But after you received a complaint that
19 he didn't like working there, you continued to assign
20 him there, correct?
21     MR. LEINENWEBER: Object to form, foundation.
22 It assumes facts not in evidence, and also
23 argumentative.
24        You can answer.

Page 137

1     THE WITNESS: He was specifically assigned to
2 train people in a position he was good at and liked
3 working there.
4 BY MR. HERBERT:
5     Q.   But you just said you found out about a
6 complaint that he made that he didn't want to work
7 there and you assigned him there anyways?
8     MR. LEINENWEBER: Object to form, foundation,
9 misstates previous testimony, and also argumentative.
10        You can answer.
11     THE WITNESS: I wouldn't personally on a
12 daily basis assign him there. It would have been the
13 person on the watch. When this complaint came
14 through, I was already the director of the unit and I
15 wouldn't give daily assignments.
16        As I stated earlier in my testimony,
17 I talked about when he was selected as a field
18 training officer to which he applied. He was
19 selected and received that assignment which he
20 received additional pay, and he specifically helped
21 in the technical service section and made better
22 employees of people because he was good at it down
23 there.
24

Page 138

1 BY MR. HERBERT:
2     Q.   Okay. So it's your testimony he was
3 assigned there because he wanted to be there and
4 because he was good at it?
5     **A.   Yes.**
6     Q.   And you made sure that he was assigned
7 there because he wanted to be there, correct?
8     MR. LEINENWEBER: Objection to form,
9 foundation. It's also argumentative.
10     THE WITNESS: I did not make sure he was
11 assigned there. When we were doing the field
12 training officer process for new employees, he helped
13 us design a curriculum for people to work down there,
14 so he would train them on how to process people.
15     MR. HERBERT: Okay. If we can go to Exhibit
16 I, please. Okay. And if we can scroll down to about
17 the middle.
18 BY MR. HERBERT:
19     Q.   This is an e-mail here that is sent from
20 you, correct, June 15, 2017?
21     MR. LEINENWEBER: I just ask that the witness
22 be allowed to look through it. It's a multi-page
23 document.
24     MR. HERBERT: Absolutely.

Page 139



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1427 of 1503 PageID #:1818

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 When you get to the -- I'm sorry.
2 Maybe we can start at the top, and then we can go to
3 page 2 when he's ready.
4 THE WITNESS: Can you scroll down to the
5 bottom so I can go from the first one all the way up
6 so they're going sequential?
7 BY MR. HERBERT:
8 Q. That is it right there. That's the first
9 one. Right there.
10 **A. Okay. I've read that page. Okay. I've**
11 **read that. Okay.**
12 Q. Okay. Do you remember sending and
13 receiving these e-mails?
14 **A. I don't remember exactly sending them. I**
15 **send thousands and thousands of e-mails. I kind of**
16 **remember doing this.**
17 Q. Okay. Well, you remember that it's about
18 complaints that Legrain Winston had made about being
19 split up from his partner?
20 **A. Based on this e-mail, yes.**
21 Q. Okay. And you became aware of the fact
22 that he was split up from his partner, correct?
23 **A. Yes.**
24 Q. And you already testified that you tried

Page 140

1 to put people together with their partners when they
2 wanted to, correct?
3 **A. Yes.**
4 Q. And were you the one responsible for
5 splitting up Legrain Winston from his partner?
6 **A. No, that would have been done at the**
7 **shift level.**
8 Q. And who was the person that was
9 responsible for splitting up Winston and his partner?
10 **A. It could have been Lieutenant Smith,**
11 **Lieutenant Collins, Chief Rohloff.**
12 Q. Do you know who it is?
13 **A. No. Any of the supervisors on the shift.**
14 Q. I've got you. Do you know who it is, as
15 you sit here today, that split up the partnership
16 with Legrain and his partner?
17 **A. On a specific day?**
18 Q. Well, during this time period, June 2017,
19 Legrain is complaining that he is not allowed to work
20 with his partner, correct? That's the complaint?
21 MR. LEINENWEBER: Object to form, foundation.
22 You can answer.
23 THE WITNESS: That's what the e-mail states,
24 yes.

Page 141

1 BY MR. HERBERT:
2 Q. Okay. And did you find out if in fact he
3 was split up from working with his partner during
4 that time?
5 **A. I probably asked one of the supervisors**
6 **on the shift what happened, what's going on.**
7 Q. And what did you find out when you made
8 that request?
9 **A. Based on my e-mail here, it looks like we**
10 **were short-staffed and we had to move people around.**
11 Q. Who did you ask about the partnership
12 being split up?
13 **A. It was -- it could have been -- it was**
14 **probably Lieutenant Collins.**
15 Q. Lieutenant Collins, was that the person
16 that made the decision to split up Legrain from his
17 partner?
18 **A. It could have been.**
19 Q. Well, do you know?
20 **A. No, I don't know. Every day is a**
21 **different roster. Every day is a different shift,**
22 **and it could have been any of the supervisors on the**
23 **shift. It could have been Lieutenant Smith,**
24 **Lieutenant Collins, Deputy Chief Rohloff. It could**

Page 142

1 **have been any supervisor on the shift that did it.**
2 Q. Do you know if any other partnerships
3 were split up other than Legrain and his partner?
4 **A. Oh, people are split up all the time from**
5 **their partners.**
6 Q. During this time period, do you know of
7 any people that were split up from their partners
8 other than Legrain?
9 **A. I couldn't think off the top of my head,**
10 **but it happens every single day.**
11 Q. Did you look to see whether or not any
12 other partners were being split up other than Legrain
13 and his partner?
14 **A. There's a possibility I could have.**
15 Q. And what did you find out?
16 **A. I don't recall. There's employees that**
17 **always complain that they're not with their partner**
18 **for whatever reason. We can't accommodate everybody.**
19 **We have to do the best that we can based on staffing**
20 **and who works well.**
21 Q. Okay. If there was a partnership that
22 wasn't broken up during that time period -- or strike
23 that.
24 Before you split up partners, say

Page 143



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1428 of 1503 PageID #:1819

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 there's three groups of partners and you have to
2 split up one partnership, what factors would you
3 consider to be reasonable to determine which
4 partnership to split up?
5     MR. LEINENWEBER: Objection to form,
6 foundation. It's also an incomplete hypothetical.
7     You can answer.
8     THE WITNESS: I just need a human body to
9 work somewhere. As long as I've got a person to put
10 into a spot and they're good at that position, I'm
11 going to move them around, whatever management teams
12 fit to produce the best.
13 BY MR. HERBERT:
14     Q. What about seniority, did that factor
15 into your decision at all? And I'll give you an
16 example. If there is a partnership with two people
17 that they've been employed for three years in the EM
18 unit and then a partnership where the employees have
19 been employed for ten years in the EM unit, would
20 that factor into your decision into which partnership
21 you needed to break up?
22     A. If it was just for a day or for the
23 shift, I wouldn't care about seniority. You need to
24 put people where you're going to produce the best, so

Page 144

1 if one person has ten years, twenty years, the other
2 person has three. I need to assign people to get the
3 job done. Seniority doesn't -- the union doesn't
4 recognize seniority in assignments.
5     Q. Right, but do you recognize it at all?
6 Do you give it any consideration if you're going to
7 -- if you need to put somebody in a position that
8 they don't want to be in and it's between two people,
9 does seniority factor in at all to your decision?
10     A. It might have in the past, but it doesn't
11 really matter. If it's just for a shift, sometimes
12 you just have to work wherever your boss puts you
13 that day.
14     MR. HERBERT: Okay. And then if we can
15 scroll up to the page before that, the first page.
16 And I'm sorry. If we can scroll down a little bit.
17 Thank you. Not that much up there. There you go.
18 BY MR. HERBERT:
19     Q. So you become aware of the complaints
20 that were made by Legrain about his partnership being
21 split up, and this is your response to that, correct?
22     A. That's my response, yes.
23     Q. Being split up from a partner, that's a
24 legitimate complaint, correct?

Page 145

1     MR. LEINENWEBER: Object to form, foundation.
2     You can answer.
3     THE WITNESS: No. No, I don't believe it to
4 be a legitimate complaint because you bid for shift
5 and detail, not assignment and not partner.
6 BY MR. HERBERT:
7     Q. Okay. Did you allow white partners to
8 work together when you had enough manpower?
9     MR. LEINENWEBER: Objection. Form,
10 foundation. It's also argumentative.
11     THE WITNESS: I don't understand the
12 questioning. Regardless of race, I put people
13 together whoever worked together good to the best of
14 my ability.
15 BY MR. HERBERT:
16     Q. Did you ever allow white partners to work
17 together?
18     MR. LEINENWEBER: The same objections.
19     THE WITNESS: When you say together, are you
20 talking in the same squad car, in the same office, in
21 the same environment?
22 BY MR. HERBERT:
23     Q. Partnership. You know what I'm talking
24 about. Did you allow white partners to work

Page 146

1 together?
2     MR. LEINENWEBER: The same objections.
3     THE WITNESS: I don't understand what you're
4 asking. Are you talking about two people physically
5 in a squad car together driving together? Is that
6 what you're asking?
7 BY MR. HERBERT:
8     Q. You talked about Legrain was split up
9 from his partner. What does that mean?
10     A. You can have a partner in the office,
11 there could be people working together. There's
12 several different office assignments where people
13 work together. You could work dispatch together, me
14 and other employee. There could be two other
15 employees working work school in the office. There
16 could be employees working together in technical
17 services. There can be employees working together in
18 a squad car on the street together.
19     Q. Did you ever have a white employee
20 request to work with a partner?
21     MR. LEINENWEBER: The same objections.
22     THE WITNESS: Yes, I'm sure I have.
23 BY MR. HERBERT:
24     Q. Did you ever respond to the white

Page 147



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1429 of 1503 PageID #:1820
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 employee's request to work with a partner as
2 characterizing that as ridiculous?
3    MR. LEINENWEBER:  Objection to form,
4 foundation.  Also an incomplete hypothetical.  It's
5 also argumentative.
6    THE WITNESS:  I might have made a statement
7 like that when there was two employees that were
8 married together, a female and a male employee and I
9 refused to put them together in the same squad car.
10 I might have made a statement like that.  They were
11 both Caucasians, both white people working together
12 and married.
13 BY MR. HERBERT:
14    Q.  I'm not sure what that was in answer to.
15 It certainly wasn't my question, but we'll move on,
16 Mr. Webb.
17    MR. HERBERT:  If we can go to Exhibit J,
18 please.
19 BY MR. HERBERT:
20    Q.  And I'm going to represent to you that
21 it's a three-page document, e-mails, and you could
22 probably go through it the same way that you did last
23 time if you want to starting with the last page.
24    **A.  I do not see anything.  Okay.**
                                                        Page 148

1    Q.  They're quick, but they're not that
2 quick.  So if we can go to page 3 of that document,
3 and if you just want to read -- when you're done with
4 this paragraph, you can ask to move to page 2 and go
5 from there.
6    THE WITNESS:  Okay.  You can scroll up.
7 Okay.  Scroll up.  Okay.  You can scroll up.  Okay.
8 BY MR. HERBERT:
9    Q.  And that I believe is the end.  Okay.  So
10 you've reviewed those e-mails?
11    **A.  Yes.**
12    Q.  Okay.  And this is in June 2017?
13    **A.  Yes, that's what it says.  Yes.**
14    Q.  Okay.  And Legrain had already filed EEOC
15 complaints against the department, correct?
16    MR. LEINENWEBER:  Object to form, foundation.
17 It assumes facts not in evidence.
18    THE WITNESS:  As I stated earlier, I don't
19 remember when they were filed.  I believe it was
20 before this date.
21 BY MR. HERBERT:
22    Q.  Okay.  And so were you concerned that
23 Legrain was being discriminated against because he
24 filed an EEOC complaint?
                                                        Page 149

1    MR. LEINENWEBER:  The same objections.
2    THE WITNESS:  Can you say that again?
3 BY MR. HERBERT:
4    Q.  Sure.  Were you concerned that Legrain
5 was being discriminated against by being split up
6 from his partner as a result of him filing complaints
7 with the EEOC?
8    **A.  I don't think I was concerned about him
9 being split up because of complaints.**
10    Q.  I'm sorry.  I did not understand that
11 answer.
12    **A.  I don't think I was concerned about it
13 because of him filing complaints.**
14    Q.  Well, were you concerned that Legrain
15 would be discriminated against or treated differently
16 as a result of him filing EEOC complaints?
17    MR. LEINENWEBER:  Object to form, foundation.
18       You can answer.
19    THE WITNESS:  I would be concerned if anybody
20 was being retaliated against.
21 BY MR. HERBERT:
22    Q.  Okay.  And you see that Legrain here, he
23 was talking about how him and his partner had been
24 split up not just for one assignment but for a couple
                                                        Page 150

1 of weeks, right?
2    **A.  Yes.  And I also see in there I discussed
3 Rivera having the same issue.**
4    Q.  Okay.  The first e-mail was a complaint
5 made to Robert Smith.  Robert Smith, that's an
6 individual that worked under your command in June
7 of 2017?
8    **A.  Yes.  He was a lieutenant on the third
9 watch.**
10    Q.  Okay.  And did you speak to him regarding
11 Legrain's complaints in June of 2017?
12    **A.  I don't remember if I talked to him in
13 person or if it was through these e-mails, if I
14 talked to him over the phone.  I don't recall, but
15 I'm sure I discussed it with him.**
16    Q.  Did you find out why or did you find out
17 that in fact Legrain had been split up from his
18 partner?
19    **A.  Based on these e-mails, yeah, that's what
20 it appears, he was split from his partner.  I don't
21 know if it was one day, a week, or how long it was.
22 I don't recall.**
23    Q.  He said it was over two weeks.  Is that
24 fair to say that it was at least over two weeks by
                                                        Page 151



John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1430 of 1503 PageID #:1821

1 looking at this document?

2 MR. LEINENWEBER: Objection to form,

3 foundation. Also assumes facts not in evidence.

4 THE WITNESS: Factually I can't say. That's

5 his statement, how long it was. I do recall at the

6 same time Rivera and Ahulek (phonetic) were officers

7 on days that had the same issue that was brought up

8 to me. Rivera is a Hispanic on day shift, and

9 William Ahulek was a white Caucasian man who also

10 were partners on days who had the same issue, and I

11 remember this when he came to me and talked to me

12 about it.

13 BY MR. HERBERT:

14 Q. Did you look to see how long Legrain --

15 strike that.

16 Well, did you ever look to see how

17 long Legrain had been split up from his partner?

18 **A. I might have. I don't recall how long,**

19 **if I looked at how long it was or if it was a day or**

20 **not.**

21 Q. Did you find out why he was split up from

22 his partner?

23 **A. I believe it was because of staffing. I**

24 **can't 100 percent say exactly what it was for, but**

Page 152

1 **usually for the most part it's just staffing for the**

2 **day.**

3 Q. Well, did you look to see if the

4 reason being staffing was in fact the reason that he

5 was split up from his partner?

6 **A. I don't know if I ever determined what**

7 **the reason was. I don't recall.**

8 Q. Did you ever look to see what the reason

9 was?

10 **A. I probably did. I don't remember exactly**

11 **what it was. Like I said earlier, people always make**

12 **complaints of where they're -- who their partner is**

13 **or whatever for the day because I want to go home two**

14 **hours early or whatever it is. I've looked at these**

15 **many times throughout the years.**

16 Q. If what Legrain said is actually true,

17 certainly you could find that by looking at the

18 assignment documents, correct?

19 MR. LEINENWEBER: Object to form, foundation.

20 You can answer.

21 THE WITNESS: Which partner is he talking of?

22 BY MR. HERBERT:

23 Q. That's not my question. Certainly, you

24 could find out if he was split up from his partner by

Page 153

1 looking at the assignment sheets, right?

2 **A. I can look on an assignment sheet and see**

3 **who he was assigned with on a daily basis.**

4 Q. Yeah. And did you do that in this case?

5 **A. As I stated earlier, I might have. I**

6 **don't recall if I did or if I talked to the**

7 **supervisor on the shift and asked them.**

8 Q. Certainly it would have been a very easy

9 step to determine if in fact he was split up with his

10 partner and for how long he was split up with his

11 partner by just looking at the sheets, correct?

12 MR. LEINENWEBER: Object to form, foundation.

13 It's also argumentative.

14 THE WITNESS: As a director of the unit, I

15 leave the assignments up to the supervisor on the

16 shift. Whether or not I would take the time to look

17 at a week, two weeks, a month of sheets of daily

18 rosters to determine whether or not an employee has a

19 legitimate complaint doesn't really matter because

20 you bid for shift and detail, not assignment per the

21 union contract.

22 BY MR. HERBERT:

23 Q. So Legrain is complaining that he was

24 split up from his partner unfairly because he's

Page 154

1 black, because he was making complaints to the EEOC.

2 And it's your testimony that you did not take the

3 time to look at the sheets to determine if his

4 complaints were valid?

5 MR. LEINENWEBER: I'm going to need a couple

6 seconds for that one. Objection to form, foundation.

7 It's also a compound question. It also assumes many

8 facts not in evidence and misstates the documents,

9 and it's also highly argumentative.

10 To the extent you understand it, you

11 can answer it.

12 THE WITNESS: I really don't understand the

13 question. If you could give me one question at a

14 time.

15 BY MR. HERBERT:

16 Q. Sure. You said that your -- as a

17 director of a unit, you didn't have time to go

18 through the sheets and you left that up to the people

19 that work below you, correct?

20 MR. LEINENWEBER: Objection to form,

21 misstates prior testimony.

22 You can answer.

23 THE WITNESS: As previously stated, I said I

24 might have done that. I might have looked through

Page 155



John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1431 of 1503 PageID #:1822

1 that --
2 BY MR. HERBERT:
3     Q.  I'm asking --
4     MR. LEINENWEBER:  I just ask that he be able
5 to finish his -- I know you're not doing it
6 intentionally, but just let him finish.
7     THE WITNESS:  I might have looked at the
8 sheets.  I might have asked a supervisor on the shift
9 to look at the sheets.  I might have looked at it
10 myself.  I don't know.  I do know that we gave all
11 these documents and there was an ongoing
12 investigation outside of our unit that was making
13 these determinations.
14 BY MR. HERBERT:
15     Q.  Well, do you remember if you found out if
16 any nonblack employees on the third watch were not
17 split up from their partners?
18     MR. LEINENWEBER:  Object to form, foundation.
19     THE WITNESS:  As stated earlier in this
20 e-mail, Investigator Rivera made the same complaint
21 of not working with his white coworker.
22 BY MR. HERBERT:
23     Q.  Okay.  My question is:  Did you determine
24 whether any nonblack employees had their -- their
Page 156

1 partnerships were not broken up on the second watch
2 during the time period that Legrain Winston was
3 broken up?
4     MR. LEINENWEBER:  Object to form, foundation.
5 It's also asked and answered.
6     THE WITNESS:  I'd refer to my previous
7 statement that I've already given.
8 BY MR. HERBERT:
9     Q.  Okay.  Well, answer the question, please,
10 because that's a new question.
11     **A.  Can you please restate it?**
12     Q.  Sure.  Did you find any situations where
13 nonblack employees were allowed to work with their
14 partner during the time period of the second watch in
15 which Legrain Winston was split up from his partner?
16     MR. LEINENWEBER:  Objection to form,
17 foundation, and asked and answered.
18     THE WITNESS:  You're asking for nonwhite
19 employees being separated from each other on the
20 second watch, correct?
21 BY MR. HERBERT:
22     Q.  Yes.
23     **A.  I could not -- to the best of my**
24 **recollection, I don't know if any other employees did**
Page 157

1 that, what their race was or if they said anything
2 **absent this e-mail which I remember my discussion**
3 **with Investigator Willie Rivera who's Hispanic.**
4     MR. HERBERT:  Okay.  If we can go to page 2
5 of that same document.  Yeah, the first sentence
6 there.  Well, let's look at the second sentence.
7 BY MR. HERBERT:
8     Q.  You state to Robert Smith, "Now it's
9 becoming a hostile work environment."
10     MR. LEINENWEBER:  Object to form, foundation.
11 Also misstates the document.  You have the to/from
12 wrong.
13 BY MR. HERBERT:
14     Q.  Oh, I'm sorry.  From you -- I'm sorry.
15 From Robert Smith to you, correct?
16     **A.  That e-mail is from Robert Smith to me,**
17 **yes.**
18     Q.  Okay.  And do you know what Robert Smith
19 was referring to when he said, now it's becoming a
20 hostile work environment?
21     **A.  I believe he's referring to the e-mail**
22 **that's below from Legrain Winston alleging a hostile**
23 **work environment.**
24     Q.  Okay.  Were you concerned that there was
Page 158

1 a hostile work environment as a result of Legrain's
2 complaints?  That's a bad question.
3         Were you concerned that there was a
4 hostile work environment in light of receiving
5 Legrain's complaints?
6     **A.  Yes, I would be concerned if any employee**
7 **would make that.**
8     Q.  Well, I'm asking you about this.  Were
9 you concerned in this situation that there could be a
10 hostile work environment based on the complaints made
11 by Legrain?
12     **A.  He's already alleging that there is one**
13 **and that's why it was being investigated.**
14     Q.  And you took steps to investigate to
15 determine whether or not there was a hostile work
16 environment happening, correct?
17     MR. LEINENWEBER:  Object to form, foundation.
18 Also misstates prior testimony.
19     THE WITNESS:  OPR, the Office of Professional
20 Review, and the EEOC investigation is what was
21 looking into this.  All I was doing was just
22 referring and handling those documents and sending
23 information to OPR.
24
Page 159



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1432 of 1503 PageID #:1823
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q.   Okay.  But Legrain's complaints if true,
certainly would become a hostile work environment in
your opinion, right?

MR. LEINENWEBER:  Object to form, foundation.
It assumes facts not in evidence, and also calls for
a legal conclusion.

THE WITNESS:  As I stated, I'm not an
attorney, but based on this e-mail that it's stated
in here that he's allegedly separated from his
partner.  As previously stated, you bid for shift and
detail, not assignment, not partners, so this would
not be construed as a tangible employment action.

BY MR. HERBERT:

Q.   Were you ever trained on a hostile work
environment while you were with the sheriff?

A.   Yes.

Q.   Was the training about creating a safe
working environment for your employees?

A.   When you mean safe, what do you mean by
safe?

Q.   I don't know.  Was that taught to you in
the training regarding hostile work environment?

A.   I don't know about the term safe.  Are

Page 160

you talking is it a safe building where the heating
and air conditioning works?  I don't understand what
you're asking.

Q.   Well, tell me what you were trained with
respect to promoting a hostile work environment.

MR. LEINENWEBER:  Object to form.

You can answer.

THE WITNESS:  I believe probably on -- we've
had it before where we've gone to discrimination and
harassment training within the department.  I believe
we've had online training.  I believe we've had
attorneys from the department that have talked to us,
and it was about reporting any type of sexual
harassment, harassment, the supervisors'
responsibilities and what you're supposed to do per
the department policy.

BY MR. HERBERT:

Q.   Okay.  And aside from reporting it, you
have a duty to prevent it, correct?

MR. LEINENWEBER:  Object to form, foundation.
Assumes facts not in evidence.

You can answer.

THE WITNESS:  We have a duty to prevent it
from occurring, and if it occurs that we're supposed

Page 161

to report it and handle it through the department
policy.

BY MR. HERBERT:

Q.   Okay.  What steps did you take to ensure
that there was no discrimination or hostile work
going on in the EM unit when you were the director?

A.   I believe in the e-mail I said when I
received written documentation of it, I sent it to
the executive director of OPR, and this was an
ongoing investigation through sheriff's legal, HR.
Certain documents were provided, and in the best
interest of our department was to handle -- have
somebody outside of our unit to look into
information.

Q.   Other than you forwarding the information
on as you said, what steps, if any, did you take to
ensure that there was not a hostile work environment
in the EM unit while you were the director?

MR. LEINENWEBER:  Objection to form,
foundation, misstates prior testimony.  It also
assumes facts not in evidence.

You can answer.

THE WITNESS:  I don't recall exactly a
specific instance where I tried to prevent a hostile

Page 162

work environment, but like I said earlier, I tried to
do the best I could to make sure everybody was happy,
they enjoyed coming to work, they liked being there,
they liked working with their partners, they did the
best -- I tried to promote an environment of harmony
with everybody.  I try to do that on a daily basis.
I try to keep everybody as happy as possible at the
same time maintaining the goals of the organization
and the department.

BY MR. HERBERT:

Q.   Okay.  You talked about if something is
in writing, then you forward it to OPR, right?

A.   Yes.

MR. LEINENWEBER:  Objection to form,
foundation.

BY MR. HERBERT:

Q.   And that's your duty.  If something is in
writing, you've got to forward that on?

MR. LEINENWEBER:  The same objection.

THE WITNESS:  Or if an employee makes an
allegation and fails to file a complaint on their
own, it's the supervisor to file a complaint on their
behalf.

Page 163



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1433 of 1503 PageID #:1824
John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 164**

1  BY MR. HERBERT:

2  Q.  Right.  So a supervisor is required to

3  file a complaint in writing even if the complaint is

4  not made in writing by the complainant?

5  MR. LEINENWEBER:  Objection.  Form,

6  foundation.

7  THE WITNESS:  Yes.  That's correct.

8  MR. HERBERT:  Let's take a break now.  Let's

9  take five minutes.

10  (Whereupon, a short break

11  was taken.)

12  BY MR. HERBERT:

13  Q.  All right.  Mr. Webb, you talked earlier

14  about the grievance proceeding and kind of how that

15  worked sitting on step one, step two.  Are you

16  familiar with the command channel review process in

17  discipline?

18  A.  Yes.

19  Q.  Tell me about that.

20  A.  I know it's changed throughout the years,

21  but usually once OPR makes a determination, they send

22  it back usually to the unit director or department

23  head for -- based on their recommendation, or

24  depending on what level it was, it would go to the

**Page 165**

1  undersheriff, executive director.  It depends on who

2  was involved.

3  Q.  Okay.  And the purpose of that is what,

4  to see if the various supervisors agree with the

5  recommendation by OPR?

6  A.  Yeah.

7  Q.  Okay.  And then those supervisors can

8  agree with it, correct?

9  A.  Agree, yes, disagree, or I believe they

10  can make an alternative recommendation.

11  Q.  Right.  Concur or not concur are the two

12  boxes, correct?

13  A.  I would have to look at it, but to the

14  best of my recollection, it's what it sounds like,

15  yeah.

16  Q.  And if they concur, that's it.  There's

17  no further steps that they need to take, correct?

18  A.  Yeah.  They just concur and send it off

19  to whoever else it's supposed to go to.

20  Q.  Okay.  And if they don't concur, they

21  don't concur for the reason that either they don't

22  believe the allegations have been proven or that they

23  don't believe that the recommended penalty is

24  appropriate, right?

**Page 166**

1  A.  Correct.

2  Q.  Okay.  And would it be appropriate -- or

3  strike that.

4  What is the sheriff's policy with

5  regards to having somebody that was an accused --

6  strike that.

7  Are there situations where the

8  department policy is that somebody should recuse

9  themselves from some disciplinary processes based

10  upon having maybe a conflict of interest?

11  MR. LEINENWEBER:  Object to form, foundation.

12  You can answer.

13  THE WITNESS:  Yeah, it would be the

14  employee's responsibility if there was some conflict

15  of interest, if they were related to the person, you

16  know, a personal relationship or whatever that would

17  affect their opinion, they should, you know, defer

18  it.

19  BY MR. HERBERT:

20  Q.  And have you ever participated in a

21  command channel review?

22  A.  Yeah, I believe so.

23  Q.  Have you ever not concurred with a

24  recommendation?

**Page 167**

1  A.  I don't recall.  I might have not

2  concurred, but I believe I usually agree with the

3  findings.

4  Q.  And have you ever recused yourself from

5  command channel review because of some type of

6  conflict?

7  A.  I'm trying to remember.  I recused myself

8  from something, but I don't believe it was a command

9  channel review.  It might have been a grievance or

10  something.

11  Q.  And what was the reason why you recused

12  yourself?

13  A.  I'm trying to remember.  I know I did it

14  for something.  I know I just brought it up, but I

15  believe I did for something, but I don't remember.

16  It sounds familiar.  I'd have to go through my stuff.

17  Q.  Okay.  Well, you're aware of the fact

18  that the sheriff has filed charges and recommended

19  the termination of two of our plaintiffs here,

20  Mr. Ferguson and Mr. Winston.  You're aware of that?

21  A.  On which complaint?  We're talking about

22  the court incident?

23  Q.  Yes.

24  A.  Yes, I'm familiar with Ferguson and



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1434 of 1503 PageID #:1825
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 Winston, and there was two other employees that were
2 found to have terminations but -- Brian Shador and
3 Efan Rico, all four of them.
4    Q.  I'm sorry.  Go ahead.
5    A.  All four of them had the same
6 determination with termination.
7    Q.  Okay.  And what role, if any, did you
8 play in this investigation?
9    A.  I believe I answered it earlier, but when
10 the -- I believe it was Rico came to work with the
11 court cards, the three part forms as we call them,
12 and I was the one that initiated the beginning
13 because I was looking for the employees.  I was
14 looking for Ferguson and Winston because they were
15 supposed to come to work on the third watch.
16    Q.  Were you assigned to the third watch that
17 day?
18    A.  No.  I was a second watch supervisor, and
19 since I was a supervisor, whoever's the supervisor on
20 duty would usually on day shift, they would give
21 their three part forms for court when they were at
22 court.
23    Q.  Okay.  And you said you were looking for
24 Winston and Ferguson?

Page 168

1 called and then told him to come to work because he
2 couldn't do that.
3    Q.  And you said this was towards the end of
4 the shift.  Towards the end of the third watch shift?
5    A.  No, day shift.  So they're coming on the
6 start -- they were all third watch guys, the four
7 people involved.  I was there until 3:00 as the
8 second watch supervisor, and Rico gave me the three
9 parts, so they should have been coming to Rico.
10    Q.  Was Rico assigned to the second watch or
11 the third watch?
12    A.  Third watch.  All four of them employees
13 were third watch employees.
14    Q.  Okay.  And after Rico gave you this form,
15 that's when you went in and made the phone calls with
16 Shields?
17    A.  Yes.
18    Q.  So it would have been close to 3:00
19 o'clock at this point?
20    A.  Yes.
21    Q.  And what happened to Rico that day?
22    A.  I believe he worked the third watch that
23 day.  He worked and he put in overtime for being at
24 court.

Page 170

1    A.  Yeah, because when Rico gave me the three
2 cards, I believe he gave me his, Winston, and
3 Ferguson, and I asked him where they were.  We're
4 going back two years, and I believe he said I had to
5 ask -- you're going to have to ask them where they're
6 at or something along those lines.
7    Q.  Okay.  And then you said that you began
8 looking for them?
9    A.  I believe we called.  I believe I went in
10 and I told the Director Shields about these guys
11 giving me the three part forms, and I believe me and
12 Shields called Ferguson.  We called him, he answered
13 the phone, and it was close to the start of the
14 shift.  He started of 3:00 o'clock.  I remember
15 calling Ferguson and he was on the phone and asking
16 where he was, and he said he was home.  I believe he
17 lived in Olympia Fields, far out south, and I asked
18 him how he got from 26th Street to Olympia Fields if
19 he just left court I believe he was putting
20 in court for his tour of duty as if he was at court
21 for eight hours.
22         I believe on that phone call, it was
23 myself and Director Shields were on the phone.  I
24 believe we were on speaker phone when we did it.  We

Page 169

1    Q.  Okay.  How much overtime did he put in
2 for being at court?
3    A.  I don't recall the exact amount of hours.
4    Q.  And would that be at time and a half?
5    A.  Yes.
6    Q.  So if he was there for four hours, he
7 would get credit for six hours of overtime?
8    A.  If he put in for time or he might have
9 put in for pay.  I don't know what he put in for.
10    Q.  Regardless, it would be either six hours
11 of time or six hours of pay for four hours of court?
12    A.  Yeah.
13    Q.  Okay.  And he did that in this case,
14 Rico?
15    A.  He put in -- like I said, I don't
16 remember the amount of time, but he put in a three
17 part stating he was at court.
18    Q.  Okay.  You didn't work the third watch
19 that day, did you?
20    A.  I don't think so.  It would have been --
21 I don't think I stayed over and worked the watch that
22 day.
23    Q.  Who was in charge of the third watch that
24 day?

Page 171

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1435 of 1503 PageID #:1826

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  I believe it was Tom Neal.

2    Q.  And did you talk to Neal about the

3  whereabouts of Winston and Ferguson?

4    A.  I believe I -- I might have.  I think

5  Director Shields is the one that talked to him.  I

6  might have talked to Tom Neal, but I believe Shields

7  is the one that talked to him.

8    Q.  Did you check to see what the manpower

9  was like on the third watch prior to you going in and

10  speaking to Shields?

11    A.  I might have.  I'm not sure.

12    Q.  You don't know as you sit here today?

13    A.  I can't say a hundred percent whether I

14  checked it or not.  I do believe I checked the roster

15  to see if they were scheduled for duty.  I don't know

16  if I looked at how many people were on duty.  I

17  assume I probably did.

18    Q.  Okay.  Are you aware of any special

19  circumstances on the third watch that day that

20  required extra manpower?

21    A.  I don't remember.  Extra manpower needed?

22  We were always short-staffed, so we needed everybody

23  every day.

24    Q.  Okay.  Do you know where they were

Page 172

1  assigned that day, Winston and Ferguson?

2    A.  Their specific assignment, no.  I just

3  knew that that was their regular scheduled day, that

4  they were supposed to report to work.

5    Q.  Prior to talking to Shields, had you

6  spoken to Neal about the manpower that day?

7    A.  I don't recall doing that, no.

8    Q.  Okay.  And is it your understanding that

9  Winston's and Ferguson's attendance that day was

10  critical to the needs of the department?

11    MR. LEINENWEBER:  Object to form, foundation.

12    You can answer.

13    THE WITNESS:  Every day we needed as many

14  staff as possible.  We were short-staffed for several

15  years.

16  BY MR. HERBERT:

17    Q.  And you would agree with me just about

18  every day somebody cancels for one reason or another,

19  one of the workers, right?

20    A.  What do you mean cancels, like call in

21  sick?

22    Q.  Yeah, call in sick.

23    A.  Yeah.  It happens all the time.

24    Q.  Takes voluntary compensatory time?

Page 173

1    MR. LEINENWEBER:  Object to form, foundation.

2    You can answer.

3    THE WITNESS:  Compensatory time needed to be

4  submitted at least 24 hours in advance.

5  BY MR. HERBERT:

6    Q.  Okay.  And in those situations where, I

7  remember reading in the newspaper, Super Bowl Sunday,

8  like 50 percent of the sheriffs called in sick or

9  something that day.  Do you remember that?

10    A.  I remember Super Bowl, Mother's Day,

11  whatever holiday.  There's always a manpower issue.

12    Q.  Right.  And the job gets done regardless

13  of how much manpower you have, right?

14    MR. LEINENWEBER:  Object to form, foundation.

15  It also calls for speculation.

16    THE WITNESS:  The job is never done.  Every

17  day we work the best that we can to do what we can.

18  There was always a long list of jobs that needed to

19  be done.  Our dispatch screen has never been at zero.

20  There's always been a call pending.

21  BY MR. HERBERT:

22    Q.  That's not good.  You need more sheriffs.

23    Okay.  So what was Shields' reaction

24  when you told him that Winston and Ferguson were not

Page 174

1  there?

2    A.  I don't remember his specific reaction,

3  but I believe that -- I don't know like his facial

4  expressions or how he was or anything, but I remember

5  that's when we needed to call them and find out where

6  they were because they needed to come to work because

7  normally if you were going to be at court all day,

8  which was very rare unless you were going to trial,

9  you would come to work on your tour of duty.

10    Q.  Okay.  I'm sorry.  What was that

11  individual's name that gave you the three part form?

12    A.  Efan Rico.

13    Q.  Okay.  And you said Rico came in and gave

14  you the three part form, and that was essentially at

15  the end of the tour in the second watch, right?

16    A.  It was -- yeah, it was probably between

17  2:00 and 3:00 o'clock sometime.

18    Q.  Okay.  Was Torano, was he ever

19  disciplined in this case?

20    A.  What's the name?

21    Q.  I'm sorry.  Rico.

22    A.  Yes, he was -- also went to the merit

23  board and he was the determination to be terminated.

24    Q.  Rico.  Okay.  So did Rico -- never mind.

Page 175



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1436 of 1503 PageID #:1827
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 Strike that.

2      Had you ever had a situation in the

3 past where an individual used court time in lieu of

4 their tour of duty?

5    **A.** **On very rare occasions.**

6    **Q.** When you say very rare, what do you mean?

7 How many times?

8    **A.** **I couldn't give you an exact number. I**

9 **couldn't tell you less than five, more than five,**

10 **less than 20. I couldn't give you an exact number.**

11 **It was very rare.**

12    **Q.** Could it be more than 20 times?

13    **A.** **Where I was involved, I doubt it if it**

14 **was that many. They were very, very rare.**

15    **Q.** That you're aware of, could it have been

16 20 times where somebody may have utilized a tour of

17 duty -- or I'm sorry, their court time as a tour of

18 duty?

19    **A.** **I doubt it.**

20    **Q.** You doubt that it's ever happened?

21    **A.** **I thought you said more than 20. I doubt**

22 **that. It's very rare.**

23    **Q.** Okay. Are you aware of any situations in

24 which somebody was allowed to use their court time or

Page 176

1 tour of duty when it was court time less than six

2 hours?

3    **A.** **No.**

4    **Q.** So it would have to be court time of

5 eight hours for them to be allowed to have -- to be

6 considered as a tour of duty?

7    **A.** **You could have gone to court, say, for**

8 **two or three hours and there have been instances**

9 **where somebody would go to court -- I'll give you,**

10 **for instance, say somebody on the midnight shift was**

11 **subpoenaed to go to court. They go to court in the**

12 **morning. They were done with court after, say, two**

13 **hours. They would contact me or the shift commander**

14 **and say, hey, can I work my tour of duty on the**

15 **second watch? They would report to us, whoever the**

16 **shift commander was, usually me, and then I would**

17 **give them assignments and the assignments to**

18 **complete, I'd give them jobs to do, and they would**

19 **complete their tour of duty on the shift and then**

20 **they would work 7:00 to 3:00.**

21      **It would be adjusted and reflected**

22 **on the attendance sheets, and it would also be in**

23 **accordance with the supervisor on the shift. The**

24 **midnight shift would have to agree so we didn't**

Page 177

1 **shortchange a shift, and then the day shift**

2 **supervisor usually was me, the watch commander. I**

3 **didn't want to short the other shifts, so I would --**

4 **it was a planned thing unusually ahead of time.**

5    **Q.** Okay. What about a situation where

6 somebody is in court for eight hours, would they be

7 allowed to use that as a tour of duty?

8    **A.** **As long as they contacted the on-duty**

9 **shift supervisor which in that day that would have**

10 **been me and that would be only if they were**

11 **testifying usually in a trial.**

12    **I've been stuck at court until 6:00,**

13 **7:00 o'clock at night sometimes, and that's rare**

14 **where everybody would have to do that, but it could**

15 **happen. As long as they notify a supervisor.**

16    **Q.** As long as they notify the supervisor

17 even if they were in court for four hours, the

18 supervisor could say, sure, that's a tour?

19    MR. LEINENWEBER: Object to form, foundation.

20    THE WITNESS: They could say that, but it

21 would be violating department policies, the

22 attendance timekeeping records.

23 BY MR. HERBERT:

24    **Q.** Yeah, but it was done, wasn't it?

Page 178

1    MR. LEINENWEBER: The same objections.

2    THE WITNESS: Not to my knowledge.

3 BY MR. HERBERT:

4    **Q.** Well, if somebody was in court for eight

5 hours, wouldn't they be entitled to 12 hours of pay?

6    **A.** **Only if they reported to work that same**

7 **day. If it's a regular scheduled day, then you would**

8 **have to put in eight hours of overtime for being at**

9 **court, then you would come to work and work 3:00 to**

10 **11:00. Say in that instance that day, Rico would be**

11 **at court. He's alleging he's at court all day. He**

12 **came to work and worked his normal tour, 3:00 o'clock**

13 **to 11:00 o'clock, and then he would be compensated**

14 **for the time he was at court outside his normal tour**

15 **of duty.**

16    **Q.** All right. So if he was there from 9:00

17 to 3:00, that would be six hours' court time,

18 correct?

19    **A.** **Yes.**

20    **Q.** And then is it your testimony that if

21 that individual worked third watch, that they would

22 have to work the shift on the third watch?

23    **A.** **Yes.**

24    **Q.** Okay. So they would get their regular

Page 179



John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1437 of 1503 PageID #:1828

1 pay for the eight hours that they work on third
2 watch, correct?
3    **A.  Yes.**
4    Q.  And then they would be given an
5 additional nine hours of pay for the overtime that
6 they work, correct?
7    **A.  Six hours and at time and a half, yes.**
8    Q.  Okay.  So couldn't somebody just use
9 compensatory time and say, you know what, I want to
10 -- here, I just made nine hours.  I want to use eight
11 of them and take the tour off.  I'm very tired.
12 Couldn't they just do that?
13    MR. LEINENWEBER:  Object to form, foundation.
14 An incomplete hypothetical.
15       You can answer.
16    THE WITNESS:  It would normally be 24 hours
17 ahead of time for the union contract and agreement
18 with the shift supervisor, and it's on the shift that
19 the individual is assigned on.
20 BY MR. HERBERT:
21    Q.  Okay.  But that could happen, right?
22 Have you ever seen that where somebody came in from
23 court and they said, listen, I just made nine hours,
24 I'm tired, I want to go home, you can take my eight

Page 180

1 hours for my shift, take it out of my compensatory
2 time?
3    **A.  Not putting in overtime because -- you**
4 **couldn't get overtime on the same day that you took a**
5 **day off.**
6    Q.  Why not if it was outside of your work
7 hours?  Why would you not get overtime?
8    **A.  I don't think -- no, but you would have**
9 **to put in the attendance.  You would have to put in**
10 **the day off ahead of time, get approved it.  Yes, yes**
11 **you could.  Yes, you could.**
12    Q.  Okay.  And so after you told Shields,
13 what was his reaction when you told him that Winston
14 and Ferguson were missing?
15    MR. LEINENWEBER:  Objection to form,
16 foundation.  Also asked and answered.
17    THE WITNESS:  I believe I answered earlier.
18 I don't recall his exact expression or how he
19 stated it or how he acted.  I just remember calling
20 Ferguson on the phone to find out where he was.
21       And I do believe somebody else
22 called, I don't know if it was Deputy Chief Rohloff
23 or Tom Neal to locate Legrain Winston.
24

Page 181

1 BY MR. HERBERT:
2    Q.  And who is the fourth individual that you
3 said, Rico, Shore?
4    **A.  Brian Shador.**
5    Q.  Did Shields call him?
6    **A.  No, it was his off day.  He wasn't**
7 **supposed to work that day.**
8    Q.  So the only phone call that Shields made
9 was for Ferguson?
10    MR. LEINENWEBER:  Object to form, foundation.
11 It misstates prior testimony.
12       You can answer.
13    THE WITNESS:  I don't know if he also called
14 Winston or if Tom Neal called Winston or if Rohloff
15 called.  Somebody called Winston.
16 BY MR. HERBERT:
17    Q.  Okay.
18    **A.  That's what I recollect.**
19    Q.  But when you were with Shields, the only
20 phone call he made was Ferguson?
21    MR. LEINENWEBER:  The same objections.
22    THE WITNESS:  Yeah, I believe that the only
23 person that we called was Ferguson.
24

Page 182

1 BY MR. HERBERT:
2    Q.  Okay.  And what happened next after you
3 made these phone calls?
4    **A.  I believe a person in -- I believe both**
5 **of them wound up coming into work later that day.**
6    Q.  Okay.  Were you still there when they
7 came into work?
8    **A.  I think I was gone already when they came**
9 **in.**
10    Q.  Okay.  What time did you leave?  Do you
11 know?
12    **A.  I don't remember the exact time I left.**
13    Q.  Well, do you remember if it was after
14 your tour had ended?
15    **A.  Oh, yeah.  It was after 3:00 o'clock**
16 **because I never left at 3:00.  I was stuck there a**
17 **half hour, an hour later.  You never know.**
18    Q.  Did you put in for overtime that day?
19    **A.  I don't know.  I don't think so.  I don't**
20 **recall putting in overtime, and I didn't put in**
21 **overtime a lot of times when I got stuck staying**
22 **there.**
23    Q.  And then what if anything further did you
24 have in the investigation into this matter?

Page 183



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1438 of 1503 PageID #:1829
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1      A.  I was interviewed by OPR in the matter.

2      Q.  Okay.  Do you remember what you told

3  them?

4      A.  I do believe I gave them a statement

5  about how overtime was granted and approved on --

6  when you're at court and what the past practice was

7  on it.

8      Q.  Right.  You told them the past practice

9  was that they could -- that court time came to you in

10  lieu of your normal detail if agreed to by the shift

11  commanders?

12      A.  I'd have to look at the documents to see

13  exactly what I said, but that sounds about right.

14      Q.  Okay.  And the shift commander in this

15  case would have been Commander Neal, correct?

16      A.  It would have been me and whoever the

17  third watch supervisor was because I would have to

18  amend my time sheets for the day to say that that

19  person worked on day shift, it showed him working

20  7:00 to 3:00 on the day shift and then they'd be

21  adjusted -- because I would have to put them on my

22  rosters for my attendance.

23      Q.  Well, you knew that they were going to

24  court prior to that, prior to them -- prior to that

Page 184

1  day, you knew that they had court, didn't you?

2      MR. LEINENWEBER:  Object to form, assumes

3  facts not in evidence.

4          You can answer.

5      THE WITNESS:  I don't remember specifically

6  if I specifically knew that.  I usually gave

7  subpoenas to people all the time.  Rohloff was the

8  person that gave the subpoenas to everybody to show

9  up to court.  It wasn't uncommon for me to know about

10  it.  I don't recall if I knew specifically if they

11  were going that day or not.  I might have known.  I'm

12  not sure.

13  BY MR. HERBERT:

14      Q.  Did you put them on your roster that day?

15      A.  No.

16      Q.  And that's because they were assigned to

17  the third watch?

18      A.  Correct.

19      MR. HERBERT:  I don't think I have anything

20  else.  Oh, wait a minute.  I'm sorry.  Maybe.

21      MR. LEINENWEBER:  Too late.  Kidding.

22  BY MR. HERBERT:

23      Q.  Do you know who became the complainant in

24  this OPR investigation?

Page 185

1      A.  To the best of my recollection, I believe

2  it was Tom Neal that filed the OPR complaint.

3      Q.  Okay.  And he files that by formally

4  filing a complaint, correct?

5      A.  Yes.  He files a complaint register with

6  OPR and they notarize it.

7      Q.  Okay.  Well, I'll represent to you that

8  we had Mr. Neal the other day and we showed him a

9  complaint register that was -- it wasn't signed by

10  him and it wasn't notarized, and he said he had never

11  seen that before.  Would that surprise you?

12      MR. LEINENWEBER:  Object to form, foundation.

13  It calls for speculation and also misstates prior

14  testimony and assumes facts not in evidence.  Sorry.

15          Go ahead.

16      THE WITNESS:  Nothing surprises me what

17  anybody says.  I don't know what he would state or

18  why he would say that.

19  BY MR. HERBERT:

20      Q.  Well, would it surprise you if somebody

21  listed him as a complainant and then filled out

22  information purporting it to be from him and it

23  wasn't from him?  Would that surprise you?

24      MR. LEINENWEBER:  The same objections.  Also

Page 186

1  argumentative.

2      THE WITNESS:  I don't know if you've got a

3  signed document.  If he signed it, then he's stating

4  it's his words.  I don't know.

5  BY MR. HERBERT:

6      Q.  Right.  But we have something that's

7  unsigned which he's already said those aren't my

8  words.  He wasn't the complainant.  Would that

9  surprise you?

10      MR. LEINENWEBER:  Object to form, foundation.

11  It misstates prior testimony, assumes facts not in

12  evidence.

13      THE WITNESS:  It would surprise me because

14  the individual shouldn't be terminated on a complaint

15  that wasn't filed appropriately.

16  BY MR. HERBERT:

17      Q.  Perhaps you should notify the sheriff

18  then about the improper filing of charges in this

19  case based upon that fact.

20      MR. LEINENWEBER:  John, that's not a

21  question.  That's a statement.

22  BY MR. HERBERT:

23      Q.  Well...

24      MR. LEINENWEBER:  And perhaps you should

Page 187



John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1439 of 1503 PageID #:1830
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  contact Mr. Winston's attorney representing him

2  before the merit board or at the Loudermill hearing

3  which appells the complaint.

4      MR. HERBERT:  Okay.  I get it.  But the

5  supervisor of the unit is on notice about this

6  document that's not proper.  I would think somebody

7  in the sheriff's department would be concerned about

8  that.  But that's not for me to worry about,

9  Mr. Webb.  I appreciate your time, and I'm done.

10      MR. LEINENWEBER:  I may have one or two

11  questions.  Could we just take like a two-minute

12  break?  I just want to check with Ethan.  There's a

13  couple things I want to confer with him, and I'll be

14  back as soon as possible.

15          John, just sit tight for a sec.

16  Don't hang up or anything, just mute yourself, and I

17  will be right back as soon as possible, okay?

18      THE WITNESS:  Okay.

19      MR. LEINENWEBER:  I do not have anything

20  further, so I think we're done.

21      MR. HERBERT:  All righty.

22      MR. LEINENWEBER:  Brenda, we'll waive

23  signature and I'll let you know about ordering.

24          (FURTHER DEPONENT SAITH NOT...)

                                    Page 188



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1440 of 1503 PageID #:1831

John Webb - 9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

```
 1              REPORTER'S CERTIFICATE

 2

 3         I, Brenda S. Hall, CSR No. 084-003359,

 4   Certified Shorthand Reporter of said state, do hereby

 5   certify:

 6         That previous to the commencement of the

 7   examination of the witness, the witness was duly

 8   sworn to testify the whole truth concerning the

 9   matters herein;

10         That the foregoing remote deposition

11   transcript was reported stenographically by me, was

12   thereafter reduced to typewriting under my personal

13   direction and constitutes a true record of the

14   testimony given and the proceedings had;

15         That the said remote deposition was taken

16   before me at the time specified;

17         That I am not a relative or employee or

18   attorney or counsel, nor a relative or employee of

19   such attorney or counsel for any of the parties

20   hereto, nor interested directly or indirectly in the

21   outcome of this action.

22

23

24
```



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1441 of 1503 PageID #:1832

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 14th day of October, 2020.

3

4

5          _____

6               Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1442 of 1503 PageID #:1833
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

## WORD INDEX

**< 0 >**
**084-003359** 1:*24*
189:*3*

**< 1 >**
**1** 91:*17*
**100** 2:*7* 152:*24*
**11:00** 179:*10, 13*
**11:05** 2:*1*
**12** 179:*5*
**12:40** 81:*17*
**12:55** 81:*18*
**120** 2:*13* 3:*8*
**132** 3:*8*
**139** 3:*8*
**14** 20:*2* 131:*10*
**148** 3:*8*
**14th** 190:*2*
**15** 20:*2* 81:*14*
131:*10* 139:*20*
**17** 2:*1*
**17-2133** 84:*12*
**18-cv-05726** 1:*9*
**1996** 11:*15*

**< 2 >**
**2** 33:*6* 69:*14*
140:*3* 149:*4* 158:*4*
**2:00** 175:*17*
**20** 176:*10, 12, 16, 21*
**200** 2:*19*
**2000** 2:*13*
**2002** 11:*12, 17*
**2003** 12:*3*
**2005** 12:*8* 14:*4*
**2006** 33:*6*
**2007** 12:*13, 14*
28:*4* 36:*15*
**2013** 20:*2* 130:*21*
131:*7, 10*
**2015** 28:*5* 80:*10,*
*23* 81:*4* 91:*20*
94:*8, 21* 95:*12*
101:*2* 119:*7* 126:*8,*
*9, 12, 20, 23* 127:*7,*
*13, 15* 128:*6, 15*
130:*13, 14* 131:*5,*
*11, 13, 16*
**2015-0310** 80:*5*

**2016** 11:*4* 12:*14*
23:*22* 36:*15*
**2017** 10:*21* 69:*1,*
*10, 14* 80:*7* 83:*15,*
*16* 95:*14* 126:*14*
139:*20* 141:*18*
149:*12* 151:*7, 11*
**2019** 10:*24* 11:*4*
**2020** 2:*1* 190:*2*
**206** 2:*6*
**2201** 2:*19*
**24** 8:*8* 9:*8* 174:*4*
180:*16*
**26** 130:*12, 13*
**26th** 169:*18*
**2nd** 83:*16*

**< 3 >**
**3** 69:*10* 126:*7, 9,*
*12, 23* 127:*6, 13*
149:*2*
**3:00** 127:*24* 128:*1,*
*3, 18* 129:*22*
169:*14* 170:*7, 18*
175:*17* 177:*20*
179:*9, 12, 17*
183:*15, 16* 184:*20*
**30** 13:*3* 52:*1*
119:*7* 126:*19*
**31** 126:*14*
**312** 2:*8*
**3rd** 83:*16*

**< 4 >**
**4** 3:*1* 68:*24* 83:*15*
120:*21* 130:*14*
**4:00** 128:*1, 4, 18*
129:*22*
**40** 13:*3* 52:*2*

**< 5 >**
**5** 111:*23*
**5:00** 128:*2* 129:*22*
**50** 174:*8*

**< 6 >**
**6:00** 128:*2* 178:*12*
**60** 60:*4*
**60523** 2:*20*
**60602** 2:*14*

**60661** 2:*7*
**630** 2:*20*
**64** 3:*8*
**655-7660** 2:*8*
**69** 3:*8*

**< 7 >**
**7:00** 127:*24* 128:*3*
177:*20* 178:*13*
184:*20*
**70** 60:*4*
**786-3705** 2:*14*

**< 8 >**
**8:00** 128:*4*
**83** 3:*8*
**866** 2:*14*

**< 9 >**
**9** 91:*20* 94:*8*
120:*19*
**9:00** 179:*16*
**90** 3:*8*
**984-0339** 2:*20*
**9th** 91:*1*

**< A >**
**a.m** 2:*1*
**ability** 39:*9* 40:*3*
51:*7* 85:*11, 12*
115:*5, 19* 146:*14*
**able** 64:*23* 78:*23*
112:*17* 156:*4*
**above-entitled** 1:*22*
**absent** 67:*12* 158:*2*
**Absolutely** 69:*21*
139:*24*
**acceptable** 99:*22*
**accepting** 74:*10*
**accommodate** 52:*3,*
*18* 58:*20* 143:*18*
**accommodated**
50:*18*
**accounting** 41:*5*
**accused** 7:*20* 166:*5*
**accusing** 21:*8*
**acted** 181:*19*
**action** 84:*16, 21*
160:*13* 189:*21*

**actions** 72:*21*
82:*11* 119:*20*
122:*11* 124:*2, 6*
**activities** 130:*2*
**activity** 19:*14, 23*
129:*2*
**actual** 12:*24* 43:*24*
121:*6*
**add** 82:*24*
**additional** 87:*8, 24*
89:*20* 138:*20* 180:*5*
**adjust** 55:*6* 85:*12*
**adjusted** 177:*21*
184:*21*
**administration**
16:*12*
**admitting** 74:*8*
**advance** 174:*4*
**advice** 79:*10*
**advised** 32:*22* 73:*6*
**Affairs** 21:*15*
**affect** 166:*17*
**affidavit** 6:*20* 80:*5*
**affixed** 74:*9*
**afraid** 73:*1*
**African-American**
60:*6* 61:*13* 78:*17,*
*18* 92:*23*
**African-Americans**
61:*5* 94:*4*
**afternoon** 40:*22*
**afternoons** 39:*23*
117:*10*
**ago** 4:*16* 5:*4*
48:*19* 49:*4* 119:*4*
120:*9*
**agree** 20:*22* 63:*8*
83:*3* 90:*3* 99:*8*
103:*1* 104:*23*
105:*4* 106:*20*
109:*16* 113:*8*
121:*2* 123:*2* 125:*6*
165:*4, 8, 9* 167:*2*
173:*17* 177:*24*
**agreed** 26:*5* 111:*7*
184:*10*
**agreement** 180:*17*
**ahead** 8:*21* 17:*8*
19:*14* 21:*1, 20*
29:*11* 30:*14* 32:*2*
34:*1* 36:*21* 44:*24*

**John Webb - 9/17/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1443 of 1503 PageID #:1834
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

45:15  46:3  55:3
59:5  60:18  67:6
73:19  76:13  77:7,
19  84:8  85:21
88:22  89:11  90:8
93:14  94:1  103:10
105:3  109:1
114:24  116:22
122:14  132:4
168:4  178:4
180:17  181:10
186:15
**Ahulek**  152:6, 9
**air**  161:2
**airport**  36:8
**Alan**  54:12
**alike**  92:4  93:9, 10,
18, 23  94:5  95:19
97:4  98:8, 15  99:5,
12, 15, 18, 21
**allegation**  41:4
92:6, 8, 10, 13  94:3
100:19, 22  118:12
163:21
**allegations**  68:20
75:11  78:3  79:14
87:1  101:12  102:7
122:21  165:22
**alleged**  6:9, 21
7:11, 13  8:14, 18
44:15  94:4
**allegedly**  160:10
**alleging**  158:22
159:12  179:11
**allow**  110:8  146:7,
16, 24
**allowed**  111:6
139:22  141:19
157:13  176:24
177:5  178:7
**alternative**  165:10
**amend**  184:18
**amount**  171:3, 16
**and/or**  26:4  67:17
**ankle**  50:16
**answer**  8:21  9:16
15:22  16:8  20:9
26:23  32:2  33:17
34:19  35:7  43:20
46:9  62:10  64:4
75:14  79:5, 8, 10,

19  87:5, 21  88:9,
14, 15  89:18, 19, 24
92:16  100:1
101:10, 24  104:7
105:20  107:14
109:8, 21  110:4
111:2, 10  112:13
113:13  116:14
118:16  119:6, 24
120:5  123:6, 15
124:24  125:18
127:11  129:11
130:18  134:1
135:23  137:24
138:10  141:22
144:7  146:2
148:14  150:11, 18
153:20  155:11, 22
157:9  161:7, 22
162:22  166:12
173:12  174:2
180:15  182:12
185:4
**answered**  17:7
30:13  32:1, 12
33:16  36:20  65:21
66:18  68:15  76:2
108:24  109:7
120:13  129:10, 13
131:8  134:9  157:5,
17  168:9  169:12
181:16, 17
**answering**  32:17
**answers**  9:21
**ANTHONY**  1:5
**anybody**  24:5
55:18  56:3, 4
71:19  77:21  78:20
100:10  102:7
108:2  117:13
134:10  150:19
186:17
**anymore**  113:1
**anyways**  117:7
138:7
**apart**  97:12  101:22
**apologize**  96:24
**apparently**  48:14
**APPEARANCES**
2:4

**Appeared**  2:10, 16,
22
**appears**  69:13
151:20
**appells**  188:3
**applications**  97:12
**applied**  11:21  48:3
138:18
**appreciate**  188:9
**appropriate**  165:24
166:2
**appropriately**
187:15
**approved**  55:10
181:10  184:5
**Approximately**
5:20, 22  10:21
11:12, 17  12:3
126:21
**April**  91:1, 20  94:8
101:2
**arbitration**  19:19
131:21
**area**  111:23
134:18  135:3  137:5
**areas**  83:3
**argument**  115:2
118:1  119:10, 13
**argumentative**
124:14, 23  125:9,
17  137:23  138:9
139:9  146:10
148:5  154:13
155:9  187:1
**arresting**  8:10
**aside**  102:10
134:15  161:18
**asked**  15:18  17:7
19:2, 5  26:12, 15
29:15, 16  30:13
32:1, 4, 12  33:16
36:19  44:20  48:2
50:16, 21, 22  56:21
61:6  63:13, 18
65:20  66:17  67:13
68:14  76:2  91:21
96:2, 23  108:23
109:7  120:12
129:9  134:9  142:5
154:7  156:8  157:5,
17  169:3, 17  181:16

**asking**  26:19  27:16
29:4, 6  30:5, 6
31:8, 9  33:1, 4, 6, 9
34:16  35:1, 3  61:4
64:1, 3  67:14  78:9
79:22  96:22  97:7
98:6, 14  105:21
107:4  113:17
118:17  119:16, 17
131:11  147:4, 6
156:3  157:18
159:8  161:3  169:15
**assess**  85:13
**assign**  27:17  35:4
53:21  57:12  135:2
137:19  138:12
145:2
**assigned**  23:5  24:6,
8  29:18  31:14
34:24  42:4  44:1
50:24  53:22  54:3,
6  112:6  113:9, 10,
19  115:18  127:16,
19  128:19  130:4, 8
131:19  134:17
135:8, 10, 20  136:8,
16  138:1, 7  139:3,
6, 11  154:3  168:16
170:10  173:1
180:19  185:16
**assigning**  89:7
116:5, 8
**assignment**  18:23
54:14, 18  56:6
57:11  60:8  111:17,
20  112:15, 23, 24
114:4, 6, 13, 17, 21
115:3, 20  128:21
130:7  133:23
134:3  138:19
146:5  150:24
153:18  154:1, 2, 20
160:12  173:2
**assignments**  19:10,
15  49:11, 14, 22
50:1, 10, 13  51:2, 3,
19  54:14, 20  55:9,
15  57:8  58:5, 6
59:22  61:17  62:2
110:10, 11, 13
113:1, 7, 23, 24

John Webb    -    9/17/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1444 of 1503 PageID #:1835

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

115:5  116:2, 17, 18
117:18, 20  133:17
135:4, 11  138:15
145:4  147:12
154:15  177:17
assistant  14:16
25:23
assume  16:21
110:6  172:17
assumes  103:8
111:9  122:13
123:5  125:8, 16
132:3  134:20
136:18  137:22
149:17  152:3
155:7  160:6
161:21  162:21
185:2  186:14
187:11
assuming  54:15
attached  84:22
86:9  87:10  88:12
attachment  86:10
attempt  73:16  74:4
attempting  74:2
attendance  49:22
96:19  97:22  173:9
177:22  178:22
181:9  184:22
attest  100:4  113:18
attorney  5:10
28:11  61:3  63:23
67:20  68:2, 13
70:9, 10  81:24
91:14  97:9  110:5
160:9  188:1
189:18, 19
attorney-client  62:8
79:6  82:3
attorneys  4:11
68:5, 7  70:15  82:9,
10  98:5  161:12
Attorney's  70:11
audit  60:14  61:6, 8,
23, 24  62:18  82:16,
17
August  80:10
126:7, 9, 12, 23
127:6, 13, 15  128:6,
15  130:12, 13, 14
131:13, 16

authority  22:14, 22,
23  29:23
avoid  58:18, 19
aware  20:18, 23
21:10, 18, 23  22:2
63:11  65:9  73:8
82:15  92:10  93:7
101:21  102:4, 10
110:22  112:8
117:5, 19  122:9
133:22  134:14
136:6  137:12
140:21  145:19
167:17, 20  172:18
176:15, 23

< B >
back  12:17  13:2
57:24  62:16, 18
81:23  82:24
164:22  169:4
188:14, 17
bad  14:3  159:2
Baker  86:6, 15
BARONI  2:12
based  9:9  12:20
19:20  23:2  35:3
42:12, 21, 22  45:11
51:6  72:15  74:16
76:16  78:3, 14, 17,
22  79:6, 9  87:16
94:2  108:3  112:15
115:1, 21  123:16,
19  124:2, 5, 9
125:10  136:10
140:20  142:9
143:19  151:19
159:10  160:9
164:23  166:9
187:19
basement  53:16, 17,
19  111:21  112:1
134:17  135:3, 8
136:16, 20  137:5, 13
basically  12:18
18:20  88:19
basis  42:1  43:10
50:23  56:16, 19, 21
57:18  58:8  72:15
74:20  78:23  116:1

138:12  154:3  163:6
bathroom  114:12
becoming  158:9, 19
began  126:8  169:7
beginning  168:12
begins  80:3
behalf  2:10, 16, 22
163:23
behavior  74:2, 11
122:22  123:10
behest  62:6
belief  124:7
believe  4:16  5:4
6:17  11:12  12:3, 7
13:1, 2  16:10  17:7,
20  18:23  19:4
24:21, 23, 24  25:8
26:2  27:8, 11  28:2,
3  35:18  36:1, 2, 5,
7  37:14  38:11, 15
39:6, 21, 22, 23, 24
40:13, 21  41:13, 14
42:8, 15, 18, 19, 24
44:13  45:1, 16, 17
46:4, 6, 19  47:21
48:18, 19  49:4
52:1  60:3, 22  62:7
67:22  68:4, 7  70:7,
11, 16  71:4, 19
74:14  77:9  83:6
84:14  87:1, 8, 21
92:11, 23  96:14
97:21  98:5, 21, 23
105:13  106:13
107:4, 6, 16  110:21
117:11  118:11, 20
119:4  121:6  122:2,
3  129:4, 13  130:21
131:8, 9  132:17
135:21  146:3
149:9, 19  152:23
158:21  161:8, 10,
11  162:7  165:9, 22,
23  166:22  167:2, 8,
15  168:9, 10  169:2,
4, 9, 11, 16, 19, 22,
24  170:22  172:1, 4,
6, 14  175:3  181:17,
21  182:22  183:4
184:4  186:1

believed  45:3
74:19, 21  86:24
93:21
best  6:7  8:16, 22
9:10, 17, 18  25:1
28:20  46:4, 13
52:4, 8, 17, 19  58:2,
4, 11, 19  59:17
66:8  70:2  97:24
98:23  107:15
115:12  120:6
131:9  132:16
136:3, 11, 23
143:19  144:12, 24
146:13  157:23
162:11  163:2, 5
165:14  174:17
186:1
better  53:9  96:5
138:21
bid  38:1  112:22
113:1  115:2, 19
146:4  154:20
160:11
bided  112:24
bit  62:12  145:16
black  59:22  60:13
92:21  93:9, 21, 22
99:9, 15, 21  100:8
106:7, 12, 18, 21
107:5, 11, 20
108:12, 16, 19, 22
109:5  116:11
124:11  155:1
blacks  79:2
blends  28:9
blue  93:17  99:17,
18
board  41:4  79:24
175:23  188:2
body  43:14  144:8
boot  11:13
boss  123:13, 19
124:3  128:10
145:12
bosses  56:22
bottom  90:10  140:5
Bowl  174:7, 10
box  97:4  98:11
boxes  165:12

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1445 of 1503 PageID #:1836
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**boy** 106:7, *12, 18, 21* 107:2, *3, 5, 11, 20* 108:9, *11, 16, 19, 22* 109:4, *11*
**Brady** 118:*21*
**break** 69:*23* 81:9, *11, 20* 144:21 164:8, *10* 188:*12*
**Brenda** 1:*22* 81:22 96:*4* 188:22 189:*3*
**Brian** 168:2 182:*4*
**brief** 69:*23*
**briefly** 63:*9*
**broken** 143:22 157:1, *3*
**Brook** 2:*20*
**brought** 45:*10* 57:24 152:7 167:*14*
**building** 19:*1* 111:*21* 161:*1*

**< C >**
**call** 54:*19* 55:*4* 56:7 72:5 91:22 95:2 96:*11, 19* 99:4 107:*20* 108:*14, 16, 18* 168:*11* 169:22 173:*20, 22* 174:*20* 175:5 182:5, *8, 20*
**called** 4:*4* 19:2 71:*13* 107:5 136:22 169:*9, 12* 170:*1* 174:*8* 181:22 182:*13, 14, 15, 23*
**calling** 169:*15* 181:*19*
**calls** 94:*20* 110:*3* 160:6 170:*15* 174:*15* 183:*3* 186:*13*
**Calumet** 129:*3, 4* 130:*23* 131:7
**camera** 43:*15*
**camp** 11:*13*
**cancels** 173:*18, 20*
**Capacity** 1:*11, 12, 14, 15, 17*
**car** 19:*5* 36:7, *8, 9* 37:*9* 114:*15*

146:*20* 147:*5, 18* 148:*9*
**cards** 45:*2, 20* 168:*11* 169:*2*
**care** 144:*23*
**career** 18:*3* 31:*13* 39:22
**cars** 56:*14*
**case** 4:*12, 14, 18* 6:*20* 21:*24* 22:*3* 44:*10* 49:*3* 54:*1* 62:*1* 73:7 79:*24* 80:5, *24* 81:*24* 113:8 154:*4* 171:*13* 175:*19* 184:*15* 187:*19*
**cases** 6:*9, 13* 8:*2, 14*
**Caucasian** 152:*9*
**Caucasians** 148:*11*
**caught** 18:*9*
**cause** 1:*22* 115:*15*
**causing** 102:*5*
**CBA** 115:*18*
**cc'd** 90:*10, 13*
**cc's** 90:*10*
**CECIL** 1:*5* 4:*20* 41:*8, 11* 42:*7, 8, 13* 43:*6*
**Cedric** 71:*5*
**certain** 61:*5* 132:*7* 162:*11*
**certainly** 92:*20* 109:*24* 137:*3* 148:*15* 153:*17, 23* 154:8 160:*3*
**CERTIFICATE** 189:*1*
**Certified** 1:*23* 189:*4* 190:*6*
**certify** 189:*5*
**challenge** 83:*5*
**chance** 82:*1*
**change** 57:*5* 132:*5*
**changed** 14:*19* 25:*16* 26:2 27:*12* 38:*1* 164:*20*
**changes** 56:*24*
**channel** 164:*16* 166:*21* 167:5, *9*

**character** 43:*4* 73:*17*
**characterize** 17:*23* 37:6, *12* 38:*13* 39:*8* 119:*18*
**characterized** 130:*16*
**characterizing** 148:*2*
**charge** 10:*20* 50:7, *8* 95:*16* 98:*10* 171:*23*
**charges** 86:*17* 167:*18* 187:*18*
**check** 172:*8* 188:*12*
**checked** 172:*14*
**Chicago** 2:*7, 14* 18:*23* 19:*3, 4, 6* 129:*4* 130:*20* 190:*2*
**chief** 11:*23, 24* 12:*6, 9, 10, 12, 13* 13:*16, 18, 23* 14:*5, 24* 23:*12* 24:*1, 4* 28:*2, 4* 36:*13, 14, 15* 45:*17* 49:*9, 13, 18, 24* 51:*1, 18* 58:*12* 91:*20* 92:*2, 3* 94:*7, 16* 110:*8, 11* 111:*13* 118:*20* 134:*4, 7* 141:*11* 142:*24* 181:*22*
**chiefs** 15:*7* 24:*6* 50:*5, 7, 8*
**choose** 61:*15*
**CHRISTOPHER** 1:*16* 5:*14* 71:*4*
**circumstances** 172:*19*
**City** 129:*3, 4* 130:*24* 131:*7*
**claim** 102:*16*
**claiming** 72:*20* 73:*13* 95:*13* 102:*5*
**clarify** 80:*12* 95:*20*
**classification** 111:*22*
**clear** 29:2 33:2 67:*4*
**clearly** 97:*11*
**close** 169:*13* 170:*18*
**clout** 103:*16, 21*

104:*24*
**coded** 18:*24*
**collected** 77:*20*
**Collins** 71:*7* 141:*11* 142:*14, 15, 24*
**come** 14:2 16:*11* 43:*12* 55:*21* 56:*15, 18* 60:*7* 62:*16, 18* 75:*15* 116:5, *7* 136:*21* 168:*15* 170:*1* 175:*6, 9* 179:*9*
**comes** 95:*17* 115:*17*
**coming** 36:6 43:*23* 163:*3* 170:5, *9* 183:*5*
**command** 17:*21* 55:*14* 65:*12, 13* 70:*20* 71:*2, 24* 80:*4* 133:*10, 13* 151:6 164:*16* 166:*21* 167:*5, 8*
**commander** 24:*5, 7* 37:*21* 49:*21* 50:*7* 55:*1, 11, 12* 177:*13, 16* 178:*2* 184:*14, 15*
**commanders** 184:*11*
**commencement** 189:*6*
**comment** 93:*3* 95:*7* 96:*11* 98:*15* 99:*4, 14* 100:*5* 101:2 106:*22*
**comments** 100:*21* 101:*1* 134:*16*
**communication** 24:*21* 97:*8*
**community** 11:*8*
**compensated** 179:*13*
**compensatory** 173:*24* 174:*3* 180:*9* 181:*1*
**complain** 110:*18* 111:*24* 115:*4* 143:*17*
**complainant** 164:*4* 185:*23* 186:*21* 187:*8*
**complainants** 77:*12*



John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1446 of 1503 PageID #:1837
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

78:5, *9*
**complained** 9:*3*
**complaining** 87:*17*
88:*19* 93:2, *8*
101:*19*, *21* 102:*9*
133:*16*, *20*, *23*
134:*3*, *17* 141:*19*
154:*23*
**complaint** 4:*14*
6:*20*, *23* 21:*13*
45:*24* 61:*1* 65:*10*
69:*4* 70:*15* 76:*4*
79:*13* 80:*5* 92:*12*,
*14* 93:*15* 94:*3*
95:*8* 96:*13* 98:*21*
108:*6* 125:*2* 126:*7*,
*23* 127:*1* 134:*10*,
*22* 137:*7*, *13*, *18*
138:*6*, *13* 141:*20*
145:*24* 146:*4*
149:*24* 151:*4*
154:*19* 156:*20*
163:*21*, *22* 164:*3*
167:*21* 186:2, *4*, *5*,
*9* 187:*14* 188:*3*
**complaints** 43:*13*
63:*24* 66:*1* 74:5,
*13*, *15* 75:7, *8*
76:*19* 77:*3*, *4*, *9*, *12*
80:*4* 93:*11* 101:*4*
102:*14* 110:2*1*
111:5, *7* 117:*17*, *20*
124:*19* 134:*15*
140:*18* 145:*19*
149:*15* 150:6, *9*, *13*,
*16* 151:*11* 153:*12*
155:*1*, *4* 159:2, *5*,
*10* 160:2
**complete** 76:4, *10*,
*20* 79:*20* 177:*18*, *19*
**completely** 32:*19*
**compound** 58:*10*
59:*4* 60:*17* 88:8
93:*13* 103:8
113:*12* 155:7
**con** 38:*17* 40:*6*
**concerned** 27:*15*
73:*10* 149:*22*
150:*4*, *8*, *12*, *14*, *19*
158:*24* 159:*3*, *6*, *9*
188:*7*

**concerning** 63:*23*
66:*1* 68:*20* 70:*15*
85:*7* 88:*4* 189:*8*
**concluded** 122:*10*,
*20* 126:2
**conclusion** 42:*14*
65:*15* 70:*23* 75:*15*
76:*22* 78:2* 110:*3*
160:*7*
**conclusions** 124:*16*
**Concur** 165:*11*, *16*,
*18*, *20*, *21*
**concurred** 166:*23*
167:2
**conditioning** 161:2
**conduct** 43:*18*
61:*23* 75:6, *10*, *23*
76:9, *10* 78:*23*
111:*6*
**conducted** 79:*12*
86:*16* 94:*20*
**confer** 188:*13*
**conflating** 95:*5*
**conflict** 166:*10*, *14*
167:*6*
**confrontation**
124:*11*
**confrontations**
58:*18*
**confronted** 130:*1*,
*15*
**confused** 29:*21*
79:*21*
**confusing** 126:*13*
**connected** 102:*17*,
*18*, *20*, *23* 103:*12*,
*15*, *21*, *22*
**connection** 104:5, *9*
**connotes** 108:*12*
**consider** 144:*3*
**consideration** 145:*6*
**considered** 112:*9*
177:*6*
**consistently** 134:*18*
**Consolo** 91:*14*
**constitutes** 189:*13*
**construed** 110:*6*
160:*13*
**contact** 177:*13*
188:*1*

**contacted** 178:*8*
**contained** 42:2
**content** 64:*9*
**context** 99:*16*
**continue** 83:*1*
**continued** 18:2
72:*18* 74:*11* 75:2
137:*19*
**contract** 26:*1* 89:*1*,
*4* 132:8* 154:*21*
180:*17*
**contracts** 23:*6*
**controlling** 64:*23*
**conversation** 82:7, *8*
**COOK** 1:*10*, *17*
5:*13* 111:*23*
**copy** 4:*13*
**correct** 11:*17*
14:*22* 16:*19* 20:*15*
21:*10* 29:*23* 36:*15*
43:*4*, *5* 50:*14* 57:*9*
59:2* 61:*19* 63:*24*
64:*17* 65:*18* 69:*1*,
*10*, *14* 72:*11* 74:2
77:*15* 81:*4* 84:*13*
85:*4*, *8*, *18* 86:*4*, *7*,
*17*, *21* 91:*24* 92:*14*,
*21* 94:8* 99:*22*
103:*6* 106:*22*
109:*18* 110:*1*
113:*4* 114:*1*, *2*
116:*2*, *8* 118:5, *7*,
*10* 119:*11* 124:*20*
126:5, *15* 128:*21*
131:2* 132:*1* 133:*8*,
*11*, *17* 135:*12*
137:*20* 139:7, *20*
140:*22* 141:2, *20*
145:*21*, *24* 149:*15*
153:*18* 154:*11*
155:*19* 157:*20*
158:*15* 159:*16*
161:*19* 164:*7*
165:*8*, *12*, *17* 166:*1*
179:*18* 180:2, *6*
184:*15* 185:*18*
186:*4*
**correctional** 11:*14*
**corrections** 11:*8*
**counsel** 9:*24* 10:*10*
25:*10* 61:*7* 62:*7*

64:*3*, *7*, *10* 66:*10*,
*16* 67:*8*, *23* 68:*12*,
*20* 72:6* 76:*6*
96:*13* 189:*18*, *19*
**counsel's** 79:*9*
**count** 48:*1*
**COUNTY** 1:*10*, *17*
5:*13* 111:*23*
**couple** 4:*16* 5:*3*
15:*8* 35:*22* 39:*5*
48:*19* 49:*4* 82:*4*
150:*24* 155:*5*
188:*13*
**COURT** 1:*1* 8:*9*
9:*5*, *9* 44:*17* 45:2,
*10*, *13* 118:*22*
167:*22* 168:*11*, *21*,
*22* 169:*19*, *20*
170:*24* 171:*2*, *11*,
*17* 175:*7* 176:*3*, *17*,
*24* 177:*1*, *4*, *7*, *9*, *11*,
*12* 178:*6*, *12*, *17*
179:*4*, *9*, *11*, *14*, *17*
180:*23* 184:*6*, *9*, *24*
185:*1*, *9*
**cover** 73:*6*
**covered** 62:*7*
**coworker** 35:*23*
156:*21*
**coworkers** 15:*3*
51:*14*
**create** 109:*24*
**creating** 160:*18*
**credible** 125:*14*
**credit** 171:*7*
**critical** 173:*10*
**cross** 25:*9*
**CSR** 1:*24* 189:*3*
**current** 105:*14*
**currently** 10:*15*
**curriculum** 139:*13*
**custody** 8:*1* 73:*4*

**< D >**
**DAFFADA** 2:*12*
**daily** 19:*13* 49:*15*,
*22* 50:*1*, *10*, *13*, *23*
51:*19* 55:*15* 56:*6*
57:*8*, *18* 61:*2*
78:*23* 95:*2* 98:*1*
110:*11*, *13* 130:*7*



**John Webb - 9/17/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1447 of 1503 PageID #:1838
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

138:*12, 15* 154:*3,
17* 163:6
**Dan** 4:*10* 62:*11*
64:*11* 69:22 82:22
83:*1* 95:9 97:2
**dan.herbert@danher**
**bertlaw.com** 2:8
**DANIEL** 2:5
**DART** 1:*10*
**date** 31:*16* 32:20
34:6 64:7 68:*24*
69:9 126:*21, 24*
130:9, *14* 133:*19*
149:*20*
**dated** 69:*13*
**dates** 25:6 83:*14*
126:*11, 13*
**Dave** 29:*12*
**DAVID** 1:6 4:*20*
46:*15, 23* 47:*1*
92:*20*
**day** 18:*16* 39:*4*
40:*13* 41:*23* 46:*19*
54:22 55:*1, 20*
56:*1, 2, 12, 17, 23*
86:7 91:*23* 114:*17*
117:*13* 122:7
132:*17, 18* 135:*16,
19* 141:*17* 142:*20,
21* 143:*10* 144:22
145:*13* 151:*21*
152:8, *19* 153:*2, 13*
168:*17, 20* 170:5,
*21, 23* 171:*19, 22,
24* 172:*19, 23*
173:*1, 3, 6, 9, 13, 18*
174:9, *10, 17* 175:7
178:*1, 9* 179:7, *10,
11* 181:*4, 5, 10*
182:6, *7* 183:*5, 18*
184:*18, 19, 20*
185:*1, 11, 14* 186:8
190:2
**days** 38:*11, 12*
42:4 55:*3* 152:7, *10*
**day's** 54:*23*
**DCSI** 25:*23* 27:*13*
**Deban** 29:*12*
**debate** 119:*14*
**decided** 23:*3*

**decision** 16:*13, 15,
17* 24:*17* 25:*19*
74:7, *12* 142:*16*
144:*15, 20* 145:9
**deemed** 115:*21*
**default** 23:8
**defendant** 6:2
**Defendants** 1:*19*
2:*16, 22* 5:*13*
81:*24* 82:6
**defendant's** 6:*18*
**defer** 96:*4* 166:*17*
**Definitely** 61:*20*
62:*17*
**Delay** 9:*17*
**delegate** 23:5
**denying** 89:8, *12*
**dep** 10:5 83:*1*
**department** 8:7
52:20 53:*15* 61:*4,
12* 72:*18* 73:2, *14,
22* 74:9 102:*21, 23*
107:*20* 122:*10*
124:6 125:*20*
135:8 149:*15*
161:*10, 12, 16*
162:*1, 12* 163:9
164:22 166:8
173:*10* 178:*21*
188:7
**depended** 26:*4*
**depending** 21:*15*
22:*11* 23:*17* 25:*24*
83:7 100:*4, 11*
132:7, 8 164:*24*
**depends** 49:*17*
165:*1*
**DEPONENT** 188:*24*
**deposition** 1:*21*
3:8 5:*17* 6:8, *11,
14* 8:3 9:6, *11*
10:9 129:*1* 189:*10,
15*
**depositions** 5:*24*
6:3 8:*11* 9:8
**deputy** 11:*23* 12:5,
*9* 13:*1, 6, 16, 18, 23*
14:5, *17* 15:7
26:*17* 142:*24*
181:*22*

**design** 139:*13*
**designee** 26:*4, 9*
**desirable** 60:*13*
112:*14*
**desk** 56:*13* 59:8
**despite** 111:5, *7*
**detail** 112:*23*
115:20 146:5
154:20 160:*12*
184:*10*
**detainee** 73:*4*
**determination** 74:6
123:7, 8 164:*21*
168:6 175:*23*
**determinations**
111:*15* 156:*13*
**determine** 51:*4*
59:*21* 61:8 74:*13*
75:7, *11* 79:2
85:*23* 144:*3* 154:9,
*18* 155:*3* 156:*23*
159:*15*
**determined** 80:6, *16*
86:*3, 19* 112:*24*
122:*21* 153:6
**determining** 116:*1*
**difference** 22:*24*
**different** 23:*17*
49:*19* 64:*24* 81:*10*
87:7 96:*24* 100:*3*
121:7 123:*3*
142:*21* 147:*12*
**differently** 8:*19*
150:*15*
**direct** 30:7, *10*
31:*17* 33:22 37:*18*
38:*3, 22* 39:*2, 4, 19,
24* 40:5, *10* 41:*11,
16* 42:*12, 22* 43:*17*
46:*18* 47:7, *18*
62:*10* 63:*10, 17*
64:*23* 65:*1*
**directed** 26:*20*
28:*1, 7, 15* 29:7
30:*10, 19* 31:*3, 10,
22* 32:9 33:*13*
34:*12* 44:9 45:*23*
46:*11* 61:22
**directing** 33:*22*
**direction** 81:*16*

189:*13*
**directive** 64:*11*
**directly** 17:*21* 43:9
189:*20*
**director** 10:*16, 21*
11:*1, 3, 7, 24* 12:*14,
20, 21, 23* 13:*1, 6*
14:*4, 10, 12, 13, 16,
17, 18, 24* 15:*1, 2*
16:*14* 20:6 23:*10,
12, 21* 24:*13* 25:*21,
22, 23* 26:*16, 17*
28:*3* 29:*15* 36:*14,
15* 40:*1* 45:6
46:*10, 21* 49:*10*
50:*4, 9, 12* 56:*18*
57:7 58:*12* 65:*11*
66:*11, 15* 68:*21*
70:7 72:*4* 73:5, *21*
118:*19, 20* 121:*20*
122:*22* 133:*12*
138:*14* 154:*14*
155:*17* 162:6, *9, 18*
164:22 165:*1*
169:*10, 23* 172:*5*
**dirty** 73:*16* 125:*13*
126:*4*
**disability** 57:22
58:*1*
**disagree** 105:*4*
165:9
**disciplinary** 22:7,
*10* 72:*10* 73:24
78:*4* 79:*15* 84:*11,
16, 21* 106:*1* 166:9
**discipline** 18:2, *9*
19:*18* 22:5, *19, 20*
25:*3* 38:*16* 41:2, *6*
42:9, *19* 43:*12*
44:5, *9, 21* 45:7, *12,
17, 19* 46:*11* 47:2
49:*23* 67:*17* 72:*16*
74:8, *10* 76:*18*
84:*17* 85:*3, 7, 12,
14, 16* 87:*15* 89:7,
*9, 23* 103:5 105:*16*
106:*3, 5* 132:6, *9,
10, 13* 164:*17*
**disciplined** 18:2, *10*
37:8 47:*11, 13*
72:*17* 85:24 86:*4*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1448 of 1503 PageID #:1839
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

88:*19* 89:*3* 129:*19*
131:*21* 175:*19*
**disciplining** 75:*3*
**disclose** 64:*9*
**disclosure** 82:*13*
**discovery** 63:*17*
**discriminated** 9:*3*
87:*18* 149:*23*
150:*5, 15*
**discrimination** 6:*9*
61:*18, 21* 161:*9*
162:*5*
**discriminatory** 93:*4*
**discussed** 64:*10*
92:*18* 151:2, *15*
**discussion** 119:*14*
120:*7* 158:*2*
**dislike** 51:*24*
**dismissed** 105:*17*
**dispatch** 56:*13, 14*
59:*8* 147:*13* 174:*19*
**distribute** 54:*19*
**DISTRICT** 1:*1*
**DIVISION** 1:2
111:*23*
**doctrine** 79:7 82:*3*
**document** 13:2, *4,*
*10* 18:*13* 65:5, *6*
69:*2, 11, 15, 17, 18,*
*23* 70:*3* 81:*10*
83:22 84:5 85:*3*
86:*14* 87:7, *11, 24*
88:*10, 12* 89:*21*
90:*23* 91:2, *8* 93:*4*
94:2 95:5 98:22
106:*13, 15* 109:*9*
118:*23* 120:*16, 20*
127:*13* 132:*12*
139:*23* 148:*21*
149:2 152:*1* 158:5,
*11* 187:*3* 188:*6*
**documentation**
19:*8, 9, 16* 44:*16*
75:*17* 125:*19* 162:8
**documentations**
18:*11*
**documented** 74:*1*
**documents** 10:*12,*
*13* 61:*10* 74:*10, 17*
75:*18, 24* 76:5, *7,*
*16* 77:20 78:15

88:6 90:*1* 92:*12*
95:*1* 96:*17, 18*
97:*20, 22, 23* 98:7,
*9* 120:*10, 14*
153:*18* 155:8
156:*11* 159:22
162:*11* 184:*12*
**dog** 90:*17*
**doing** 7:20 24:*20*
25:2 26:*11* 43:*23*
49:22 52:*21* 56:9
59:*23* 73:*23* 85:*17*
86:8 139:*11*
140:*16* 156:5
159:*21* 173:7
**door** 10:2
**double** 41:*21, 22*
**doubt** 176:*13, 19,*
*20, 21*
**draw** 106:*5*
**drill** 11:*13*
**driving** 147:*5*
**dropped** 36:*6*
**due** 59:6 114:*10*
**duly** 4:2 189:*7*
**duties** 49:*24* 85:*11*
111:*6*
**duty** 6:5 7:*12, 22*
39:9 49:*14, 15*
56:*1* 59:7 91:*21*
128:*3* 129:*24*
161:*19, 23* 163:*17*
168:*20* 169:*20*
172:*15, 16* 175:9
176:*4, 17, 18* 177:*1,*
*6, 14, 19* 178:7
179:*15*

**< E >**
**earlier** 70:*14* 82:2
83:*12* 86:*10, 20*
112:*17* 115:*11*
129:*1, 13* 131:9
138:*16* 149:*18*
153:*11* 154:*5*
156:*19* 163:*1*
164:*13* 168:9
181:*17*
**early** 114:*15*
131:*18* 153:*14*

**EASTERN** 1:2
**easy** 34:22 154:*8*
**EEOC** 61:*1, 2*
62:22 63:*23* 65:*10*
66:*1* 67:*3* 68:*20*
69:*3* 70:*15* 75:8,
*12* 76:*3, 23* 77:*4,*
*12, 16* 79:*13* 86:*16*
92:*11* 94:*3* 95:8,
*16* 96:*13* 97:2, *7,*
*12* 98:*10, 20*
134:*23* 149:*14, 24*
150:*7, 16* 155:*1*
159:*20*
**Efan** 168:*3* 175:*12*
**effect** 132:*9*
**effort** 73:22
**eight** 39:*13* 169:*21*
177:*5* 178:6 179:*4,*
*8* 180:*1, 10, 24*
**either** 6:4 22:*11*
23:*10* 38:*17* 39:*15*
40:6 47:2 71:*12*
72:6 76:6 165:*21*
171:*10*
**electronic** 5:*1* 7:2,
*17* 94:*13*
**EM** 10:22 11:*1, 3,*
*5, 10, 11, 16, 22*
14:*10, 24* 15:2
23:*13* 25:*21* 36:22
46:*23* 49:*8, 11*
57:7 65:*11* 80:4
101:7 144:*17, 19*
162:6, *18*
**e-mail** 64:*16* 72:2,
*4* 74:*14* 78:*10*
86:9, *10* 126:*5*
139:*19* 140:*20*
141:*23* 142:9
151:*4* 156:*20*
158:2, *16, 21* 160:9
162:7
**e-mails** 83:*14*
140:*13, 15* 148:*21*
149:*10* 151:*13, 19*
**EMERY** 2:*18*
**employed** 94:*13*
144:*17, 19*
**employee** 7:*23*
17:*24* 18:*1, 7*

19:*17* 20:*4, 20*
25:*3* 37:7, *12*
39:*14* 41:7, *15*
42:*3, 10* 43:*16*
48:*11* 58:*20, 24*
59:*12, 13* 72:*10, 14*
73:*4, 6, 12* 78:*17,*
*19* 86:*20* 106:7, *18*
107:2, *5, 11, 20*
108:*16, 19, 22*
109:*14* 119:*19*
125:*20, 23* 136:*12*
137:*16* 147:*14, 19*
148:*8* 154:*18*
159:6 163:*20*
189:*17, 18*
**employees** 51:*18*
57:*11* 58:5, *8*
59:22, *24* 60:*4, 5,*
*13, 14* 61:*12* 62:*3*
77:*3* 78:*18* 79:*4*
106:*12* 109:*17*
110:*17, 24* 112:*15,*
*16, 18, 20* 134:7, *11*
138:22 139:*12*
143:*16* 144:*18*
147:*15, 16, 17*
148:7 156:*16, 24*
157:*13, 19, 24*
160:*19* 168:*1, 13*
170:*12, 13*
**employee's** 148:*1*
166:*14*
**employment** 72:*21*
160:*13*
**ended** 183:*14*
**ends** 91:*1*
**enjoyed** 163:*3*
**ensure** 162:*4, 17*
**entire** 65:*5* 118:*12*
**entitled** 179:*5*
**environment** 8:*15*
102:6, *8* 110:*1*
146:*21* 158:9, *20,*
*23* 159:*1, 4, 10, 16*
160:*3, 16, 19, 23*
161:5 162:*17*
163:*1, 5*
**equal** 58:*23* 94:*18*
111:*12*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1449 of 1503 PageID #:1840
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**equally** 58:5
**essentially** 175:14
**ETHAN** 2:18 10:5
62:12 81:15 82:23
188:12
**ethnicity** 92:22
**evening** 122:7
**event** 117:23 118:9,
12
**events** 82:19
**everybody** 43:23
51:8, 15 52:1
53:13 54:20 55:2
56:14 58:2 93:16
99:17, 18 143:18
163:2, 6, 7 172:22
178:14 185:8
**evidence** 103:8
111:9 116:21
122:13 123:5
124:22 125:8, 16
132:3 134:20
136:18 137:22
149:17 152:3
155:8 160:6
161:21 162:21
185:3 186:14
187:12
**evidenced** 72:10
**ewhite@emerylawltd**
**.com** 2:21
**exact** 25:6 119:13
171:3 176:8, 10
181:18 183:12
**exactly** 27:2 47:20
84:16 89:22
119:14 120:8
140:14 152:24
153:10 162:23
181:18 184:13
**EXAMINATION**
3:1 4:6 189:7
**examined** 4:4
**example** 144:16
**exception** 5:2
**excuse** 72:21, 24
**executive** 11:7
12:21 14:13, 15, 16,
18 15:1 16:14
25:22, 23 26:17

70:6, 7 73:5, 21
162:9 165:1
**exempt** 16:10
**Exhibit** 3:8 64:14
69:6 83:15, 16, 20
87:16 89:6 90:5, 6,
15 98:15 120:18,
19 132:22 139:15
148:17
**exhibited** 98:15
**exhibits** 83:12, 18
**existed** 108:15
**exists** 83:7
**explore** 81:15
**explored** 82:20
**expressed** 113:15
**expression** 181:18
**expressions** 175:4
**extent** 62:5 96:22
155:10
**extra** 172:20, 21

**< F >**
**Fabio** 69:13 70:5
86:7, 15 90:4
**facial** 175:3
**fact** 75:12 78:17
101:21 102:4
117:5 122:9
134:14 140:21
142:2 151:17
153:4 154:9
167:17 187:19
**factor** 144:14, 20
145:9
**factors** 42:23, 24
51:4 144:2
**facts** 73:20 85:23
103:8 111:9
116:21 122:13
123:5 124:22
125:8, 11, 16, 20
126:1 132:3
134:20 136:18
137:22 149:17
152:3 155:8 160:6
161:21 162:21
185:3 186:14
187:11
**factual** 72:15

**Factually** 17:9
152:4
**fails** 163:21
**fair** 20:4 26:11
45:24 59:14 136:7
151:24
**falls** 20:21
**false** 44:16 131:1
**familiar** 88:5 92:6,
8 103:5, 11 111:17
164:16 167:16, 24
**family** 103:13
**far** 16:6 29:21
43:7 48:9 58:5
70:9 169:17
**favorable** 48:6
**favorably** 18:4
**February** 80:7
**feel** 108:2, 5
**felt** 58:15, 16 73:11
**female** 68:2 107:3
148:8
**FERGUSON** 1:5
4:20 40:7, 8 41:1
44:12 167:20, 24
168:14, 24 169:3,
12, 15 172:3 173:1
174:24 181:14, 20
182:9, 20, 23
**Ferguson's** 40:10
173:9
**field** 48:4 52:7, 24
53:10 136:1 137:8
138:17 139:11
**Fields** 169:17, 18
**figure** 98:3
**file** 21:4, 5 108:6
163:21, 22 164:3
**filed** 6:19, 23 7:6
20:14 21:24 22:3
60:24 62:22 65:10
69:4 80:4 86:17
88:4, 11 95:16
134:10 149:14, 19,
24 167:18 186:2
187:15
**files** 20:5 186:3, 5
**filing** 80:4 131:1
150:6, 13, 16 186:4
187:18

**filled** 186:21
**filling** 19:13
**final** 16:12, 15, 17
61:9 76:22
**find** 26:14 37:5
53:12 55:5 62:1
136:15 142:2, 7
143:15 151:16
152:21 153:17, 24
157:12 175:5
181:20
**finding** 75:16
**findings** 111:11
167:3
**fine** 4:9 64:6, 8
81:11, 12
**finish** 9:14 34:17
69:22 156:5, 6
**finished** 91:6
**fired** 109:14, 17
**FIRM** 2:5
**first** 22:12, 15 23:1,
3, 7, 10, 14 25:7
26:2, 3, 7 49:5
64:18 72:8 91:19
133:13 137:12
140:5, 8 145:15
151:4 158:5
**fit** 115:21 144:12
**five** 59:7 66:3, 7
119:4 120:9 164:9
176:9
**follow** 86:7
**following** 54:23
132:17
**follows** 4:5
**footage** 43:15
**forced** 137:13
**foregoing** 189:10
**forget** 97:17
**forgot** 6:17, 20, 24
68:2, 4
**form** 8:20 15:21
16:7 20:7 26:21
27:20 28:19 29:9
30:1 31:24 33:15
35:6 43:19 44:23
45:14 46:1 58:9
59:3 60:16 67:5
68:14 73:18 75:13
76:1 77:5, 17 78:6

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1450 of 1503 PageID #:1841
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

79:17  80:11  84:16,
21  85:20  86:6
87:3, 19  88:7
89:17  92:15  93:12
94:9  99:23  101:8,
23  102:12  103:7
104:6  105:19, 24
107:12, 23  108:23
109:6, 19  110:2
111:1, 8  112:11
113:11  114:8, 22
116:3, 13, 20
122:12  123:4, 14
124:13, 21  125:7,
15  127:10  130:17
132:2, 15  133:24
134:8, 19  135:13,
22  136:9, 17  137:6,
21  138:8  139:8
141:21  144:5
146:1, 9  148:3
149:16  150:17
152:2  153:19
154:12  155:6, 20
156:18  157:4, 16
158:10  159:17
160:5  161:6, 20
162:19  163:14
164:5  166:11
170:14  173:11
174:1, 14  175:11,
14  178:19  180:13
181:15  182:10
185:2  186:12
187:10
**formally**  186:3
**forms**  168:11, 21
169:11
**forward**  163:12, 18
**forwarding**  162:15
**found**  113:7  129:7
137:3  138:5
156:15  168:2
**foundation**  8:20
15:21  16:7  20:8
26:22  27:21  28:19
29:10  30:2  31:24
33:15  35:6  43:19
44:23  45:14  46:1
58:9  59:3  60:16
67:5  73:18  75:13

76:1  77:5, 18  78:6
79:17  80:11  87:3,
19  88:7  89:17
92:15  93:12  94:10
99:23  101:9, 23
102:12  103:7
104:6  105:19
107:13, 23  109:6,
20  110:2  111:1, 8
112:12  113:11
114:8, 22  116:3, 13,
20  122:12  123:4,
14  124:13, 21
125:7, 15  127:10
132:2, 15  133:24
134:8, 19  135:13,
22  136:9, 17  137:6,
21  138:8  139:9
141:21  144:6
146:1, 10  148:4
149:16  150:17
152:3  153:19
154:12  155:6
156:18  157:4, 17
158:10  159:17
160:5  161:20
162:20  163:15
164:6  166:11
173:11  174:1, 14
178:19  180:13
181:16  182:10
186:12  187:10
**four**  44:15  168:3, 5
170:6, 12  171:6, 11
178:17
**fourth**  106:4  182:2
**frame**  132:8
**fraud**  130:15
**fraudulent**  19:7, 23
45:3  47:13  129:2
**free**  82:19
**friend**  35:12, 14
124:3, 10  125:5
**friendly**  103:3
105:8, 11
**friends**  123:20, 22
**front**  78:10  88:11,
12  106:14, 16
**FTO**  48:3  57:12
**fugitive**  10:17

**function**  61:11
**furnish**  61:1
**further**  83:7  92:3
165:17  183:23
188:20, 24
**future**  19:12  73:8,
23

**< G >**
**garbled**  25:12
**gather**  79:14
**gender**  60:8  61:16
108:4
**general**  73:3
**generally**  112:9
**getting**  28:12
79:21  88:4  96:24
113:6
**girl**  107:3
**give**  9:15, 20  19:8
32:20  56:12, 13, 14,
16  81:14  88:2
118:16, 22  119:6,
24  120:5  138:15
144:15  145:6
155:13  168:20
176:8, 10  177:9, 17,
18
**given**  5:17  6:8  8:3
31:12  34:2  157:7
180:4  189:14
**giving**  6:11  49:21
169:11
**go**  8:21  11:19
12:7  17:8, 16  21:1,
13, 20  25:2  29:11
30:14  32:2  34:1
36:21  44:24  45:15
46:3  52:11  55:22
57:22  59:5  60:18
64:13  67:6  69:6
72:8  73:19  76:13
77:7, 19  81:23
83:3  84:8  85:21
87:23  88:22  89:11,
20  90:8, 15  91:5,
16  93:14  94:1
97:10  103:10
105:3  109:1
114:13, 24  116:22
117:23  120:19

122:14  132:4, 22,
23  139:15  140:2, 5
145:17  148:17, 22
149:2, 4  153:13
155:17  158:4
164:24  165:19
167:16  168:4
177:9, 11  180:24
186:15
**goal**  73:1
**goals**  53:15  58:3
163:8
**goes**  87:11
**going**  9:15, 19
13:21  17:16  19:10,
14  23:3  28:18
37:2, 10  41:3
57:13, 14, 16  61:15
62:4, 9, 17  63:6, 16
73:9  74:18  80:2
81:9  91:3  96:21
133:4  140:6  142:6
144:11, 24  145:6
148:20  155:5
162:6  169:4, 5
172:9  175:7, 8
184:23  185:11
**good**  9:11  14:3
35:11  39:14  48:11
51:10, 14  115:13
119:6  136:12
137:10, 16  138:2,
22  139:4  144:10
146:13  174:22
**governs**  115:18
**grand**  8:11
**Granted**  115:14
184:5
**grasp**  96:5
**Great**  12:1  20:1
81:19
**Greg**  11:5  14:4, 21
15:3, 10, 19  16:2
17:4  31:2, 21  32:8
33:5, 11, 13  34:12
35:4, 11, 16, 17
43:17  44:4  55:13
56:5, 24  104:2, 4
117:24  119:20
120:2  124:3

John Webb   -   9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1451 of 1503 PageID #:1842
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**GREGORY** 1:*13* 5:*14*

**grievance** 18:*8* 19:*18* 20:*3, 5, 12, 20, 23* 21:*3, 4, 5, 13, 17, 23* 22:*1, 2, 12, 13, 15, 22* 23:*11, 15* 24:*2, 10, 14* 25:*7, 19* 27:*3, 7, 12, 16, 17* 28:*7, 16, 21, 22* 29:*6, 8, 17, 19* 30:*11, 19* 31:*3, 10, 15, 22* 32:*9, 23* 33:*2, 6, 14, 23* 34:*4, 5, 9, 13* 35:*1, 5* 73:*13* 74:*10* 84:*15, 23* 85:*7, 11, 15* 87:*10* 88:*4, 12, 13, 15* 89:*5, 8, 13, 16* 90:*5* 105:*22* 106:*2* 164:*14* 167:*9*

**grievances** 20:*14, 18* 22:*4, 10* 24:*18, 23* 25:*20* 26:*7, 15, 20* 27:*1, 12* 28:*11* 31:*13* 42:*15, 16* 72:*18, 19* 75:*4, 5* 76:*17*

**grievant** 21:*3* 34:*6* 85:*2* 88:*23, 24* 89:*22*

**groups** 144:*1*

**guess** 37:*4* 53:*4* 63:*5* 69:*7*

**guy** 40:*22* 47:*22* 55:*7, 23* 57:*13, 21*

**guys** 15:*4, 8* 95:*19* 169:*10* 170:*6*

**guy's** 55:*23*

**< H >**

**half** 18:*19, 21* 41:*20* 61:*12* 65:*15* 90:*24* 171:*4* 180:*7* 183:*17*

**Hall** 1:*22* 189:*3*

**hand** 190:*1*

**handing** 75:*23*

**handle** 18:*8* 22:*18* 26:*12, 15* 28:*10, 13,*

**22** 32:*24* 34:*4, 5, 9* 162:*1, 12*

**handled** 25:*3* 26:*13* 27:*11* 77:*22* 84:*14*

**handling** 24:*22* 31:*13* 49:*23* 76:*17* 159:*22*

**hang** 188:*16*

**Hansy** 27:*8, 9, 10, 17* 28:*16* 29:*6, 13* 30:*8*

**happen** 19:*11* 73:*3* 178:*15* 180:*21*

**happened** 21:*15* 49:*5* 73:*7* 89:*23* 92:*7* 121:*10, 15* 126:*19* 129:*6* 130:*21* 142:*6* 170:*21* 176:*20* 183:*2*

**happening** 159:*16*

**happens** 54:*17* 132:*1* 143:*10* 173:*23*

**happy** 51:*8, 15, 16, 17* 52:*1* 53:*13* 58:*2* 59:*17* 82:*24* 163:*2, 7*

**harass** 78:*16, 20*

**harassed** 72:*20* 73:*14* 87:*13*

**harassment** 74:*23* 76:*4* 77:*14* 79:*23* 161:*10, 14*

**hard** 9:*12* 12:*18* 14:*2* 136:*13*

**harmony** 163:*5*

**Harvey** 13:*22* 14:*12* 29:*13*

**head** 143:*9* 164:*23*

**hear** 27:*4* 29:*5* 100:*16, 20* 101:*4* 102:*16* 108:*18* 109:*13*

**heard** 22:*4, 6* 24:*10, 12* 26:*24* 42:*16* 49:*1* 72:*17* 74:*24* 93:*21* 100:*24* 102:*19* 106:*6, 8, 11, 17*

108:*21* 109:*4* 110:*17* 136:*20*

**hearing** 28:*22* 31:*16* 75:*4* 131:*22* 188:*2*

**hearings** 29:*18*

**hearsay** 74:*24* 101:*13*

**heating** 161:*1*

**heavy** 103:*16*

**Heights** 18:*23* 19:*4, 6* 129:*5* 130:*20*

**hello** 133:*3*

**help** 125:*4*

**helped** 50:*22* 136:*3* 138:*20* 139:*12*

**HERBERT** 2:*5* 3:*1* 4:*7, 11* 9:*1* 10:*6, 7* 16:*1, 16, 22* 17:*2, 12* 20:*11, 19* 21:*7, 16, 22* 25:*13, 14* 27:*5, 22* 29:*1, 20* 30:*4, 17* 31:*1, 7, 19* 32:*6, 16* 33:*20* 34:*10* 35:*10* 37:*1* 44:*3* 45:*4, 21* 46:*8* 58:*22* 59:*10, 19* 60:*10, 20* 62:*17, 24* 63:*13, 19, 21* 64:*13, 15* 65:*3, 22* 67:*1, 18* 68:*18* 69:*6, 8, 24* 70:*4* 74:*3* 75:*21* 76:*8* 77:*1, 10* 78:*1, 11* 79:*1, 11* 80:*1, 14, 18* 81:*8, 13, 19* 83:*2, 10, 11, 19, 21, 24* 84:*2* 85:*22* 87:*14* 88:*1, 16* 89:*2, 14* 90:*2, 15, 18, 20* 91:*16, 18* 92:*19* 93:*19* 94:*6, 12* 95:*11, 22* 96:*1, 7, 8* 97:*5, 6, 14, 16, 19* 99:*1* 100:*6* 101:*14* 102:*2, 15* 103:*14* 104:*1, 10, 17, 22* 105:*6, 23* 107:*18* 108:*8* 109:*3, 12, 23* 110:*7* 111:*4, 16* 112:*19* 113:*21*

**114:***18* 115:*6* 116:*6, 16* 117:*4, 16* 120:*17, 23* 122:*19* 123:*1, 11, 18, 23* 124:*8, 17* 125:*3, 12, 22* 127:*2, 4, 14* 129:*15* 130:*22* 132:*11, 19, 22* 133:*1* 134:*5, 13* 135:*1, 15* 136:*5, 14* 137:*2, 11* 138:*4* 139:*1, 15, 18, 24* 140:*7* 142:*1* 144:*13* 145:*14, 18* 146:*6, 15, 22* 147:*7, 23* 148:*13, 17, 19* 149:*8, 21* 150:*3, 21* 152:*13* 153:*22* 154:*22* 155:*15* 156:*2, 14, 22* 157:*8, 21* 158:*4, 7, 13* 160:*1, 14* 161:*17* 162:*3* 163:*10, 16* 164:*1, 8, 12* 166:*19* 173:*16* 174:*5, 21* 178:*23* 179:*3* 180:*20* 182:*1, 16* 183:*1* 185:*13, 19, 22* 186:*19* 187:*5, 16, 22* 188:*4, 21*

**hereto** 189:*20*

**hereunto** 190:*1*

**hey** 50:*16, 17, 19* 55:*6* 56:*16* 57:*12, 21* 177:*14*

**Hi** 4:*8*

**high** 101:*20*

**higher** 94:*17* 105:*17*

**highly** 18:*4* 155:*9*

**Hispanic** 152:*8* 158:*3*

**historically** 43:*14* 50:*7* 54:*24*

**history** 72:*11, 16* 73:*24* 75:*3* 76:*16, 19* 78:*4, 15* 79:*15*

**Hold** 34:*16*

**holiday** 174:*11*

**home** 153:*13*

John Webb  -  9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1452 of 1503 PageID #:1843
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

169:16  180:24
**honest**  95:11
**honestly**  98:17
**hopefully**  81:16
**hosted**  36:11
**hostile**  8:14  109:24
158:9, 20, 22  159:1,
4, 10, 15  160:3, 15,
23  161:5  162:5, 17,
24
**hour**  128:12  183:17
**hours**  39:13
127:22  128:3
153:14  169:21
171:3, 6, 7, 10, 11
174:4  177:2, 5, 8,
13  178:6, 17  179:5,
8, 17  180:1, 5, 7, 10,
16, 23  181:1, 7
**house**  35:24  36:2,
3, 4, 5, 6, 7, 8  51:9
**Houston**  7:5, 9, 13,
16
**HR**  98:7, 14
134:11  162:10
**human**  91:11  95:7,
19  97:3  144:8
**hundred**  15:8
61:20  172:13
**hypothetical**  144:6
148:4  180:14

< I >
**I.V**  1:4  4:19
38:19, 22  39:6
117:12
**I.V.'s**  39:9
**ID**  3:8
**idea**  27:23  49:1
96:2
**identified**  84:12
**ILLINOIS**  1:1, 18,
24  2:7, 14, 20  190:2
**immediate**  21:4
23:4  26:3
**impartial**  26:11
**important**  5:9
**impossible**  78:16, 20
**improper**  187:18
**improve**  48:2

**Inappropriate**  7:21
93:2  99:10  107:6,
8  119:21  120:3
122:4, 22  123:9
124:7
**incident**  32:20
45:10, 13  47:11
80:9  81:3  84:11,
19  88:5, 20  93:1, 7
106:16  110:20
118:2, 5  119:1
121:4, 11, 15, 18
126:9, 19  129:18
131:7, 16  132:13
167:22
**included**  107:16
**includes**  124:22
**incomplete**  144:6
148:4  180:14
**increase**  22:20
**indirectly**  189:20
**individual**  5:13  7:4,
7  31:16  75:4
151:6  176:3
179:21  180:19
182:2  187:14
**Individually**  1:12,
13, 15, 16
**individuals**  4:23
5:15  12:19  29:15,
16  30:16, 19  31:14
32:4  33:18, 22
34:3, 8, 15, 24  35:2
44:22  57:9, 17
60:22  71:17  117:10
**individual's**  7:5
175:11
**influence**  50:9
**info**  82:14
**inform**  73:11
**informal**  98:22
**information**  20:5
61:6  63:11, 18
73:17  76:21  77:21
86:23  87:9  113:17
131:12  134:23
136:21  137:16
159:23  162:14, 15
186:22
**informed**  72:13

**infraction**  45:12
131:24
**infractions**  72:19
**initially**  19:9
**initiated**  127:6, 12
132:7  168:12
**injuries**  57:24
**injury**  114:11
**inquiry**  98:22
**insert**  62:4
**inside**  36:4  52:7,
22  58:1  59:1, 2
**instance**  44:15
101:12, 22  102:3,
11  112:7  130:20
162:24  177:10
179:10
**instances**  177:8
**instruct**  64:9  79:7
82:13
**instruction**  82:21
**instructor**  11:13
**insubordinate**
119:19
**intentionally**  156:6
**interact**  53:7
**interaction**  120:3
129:17  130:9
**interest**  52:19
162:12  166:10, 15
**interested**  189:20
**Internal**  21:14
**internally**  25:2
**interpret**  107:1
108:4
**interpretation**  107:1
**interrupt**  103:22
**interview**  71:22
**interviewed**  63:22
65:13  70:21  71:3,
6, 8, 10, 12, 13, 15
72:1, 6  77:8, 21
96:12  126:15, 16
184:1
**interviews**  43:14
64:2  71:16
**investigate**  159:14
**investigated**  97:11
122:16  127:1
159:13

**investigation**  42:17
43:18, 21  44:1, 2,
11  65:16  66:21
67:3, 12, 16  75:6,
10, 17, 19, 23  76:5,
9, 11, 21  77:2, 13
79:13, 16, 21  81:6
82:11  85:18  86:16
91:12  94:24  96:4,
10, 16  97:2  98:19
125:5  126:8, 22
127:6, 12  136:20
156:12  159:20
162:10  168:8
183:24  185:24
**investigations**  41:3
66:22  67:10  70:23
111:12
**Investigator**  7:5, 8,
18  11:20, 22, 23
91:21, 22, 23  92:3
106:21  107:5
118:19  120:4
121:19, 24  122:23
124:11  127:21
131:18, 19  133:3, 7,
15, 22  156:20  158:3
**investigators**  20:14
55:16  93:21  102:5
110:12, 14, 18  112:9
**involved**  7:4, 10
9:13  25:24  50:13
55:15  57:8  60:23
63:3  67:9  70:13
90:4, 12  165:2
170:7  176:13
**involvement**  94:23
129:7
**issue**  47:1, 22  53:5,
13  54:7  58:13
62:13  63:15  81:15
95:19  98:8  114:5
118:21  130:20
134:4, 7  136:24
151:3  152:7, 10
174:11
**issues**  38:16  41:3,
6  42:9  43:12
48:10  58:15, 17, 19
73:2  95:5, 10

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1453 of 1503 PageID #:1844
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

115:*14*, *15*  117:*14*

**< J >**
**Jail** 111:*23*
**Jefferson** 2:*6*
**Joa** 54:*12*
**job** 18:*24*  19:*3*
43:*24*  59:*13*  61:*14*
78:*23*  85:*15*
131:*20*  145:*3*
174:*12*, *16*
**jobs** 39:*11*, *12*
174:*18*  177:*18*
**Joe** 5:*13*  71:*5*
91:*14*
**JOHN** 1:*21*  3:*1*
4:*3*  64:*22*  103:*24*
187:*20*  188:*15*
**JOSEPH** 1:*11*
29:*14*
**JR** 1:*4*
**July** 119:*7*  126:*19*
**June** 10:*24*  11:*4*,
*12*, *17*  139:*20*
141:*18*  149:*12*
151:*6*, *11*
**juries** 8:*11*
**justification** 85:*13*
**JUSTIN** 2:*12*
10:*10*  81:*23*  97:*16*
justin@ilesq.com
2:*15*

**< K >**
**keep** 51:*7*, *10*, *15*
52:*1*, *7*, *14*  53:*13*
54:*7*  57:*23*  58:*2*
59:*17*  98:*11*
115:*12*  163:*7*
**KELLY** 2:*6*  63:*14*
kelly.krauchun@dan
herbertlaw.com 2:*9*
**kept** 53:*6*, *8*
**Kidding** 185:*21*
**kind** 28:*9*  53:*3*
58:*4*, *8*  82:*15*
108:*12*  140:*15*
164:*14*
**knew** 41:*5*  53:*7*, *21*
56:*14*  74:*16*, *18*, *23*
75:*19*  124:*19*

133:*7*, *15*  134:*23*
173:*3*  184:*23*
185:*1*, *6*, *10*
**know** 4:22, *24*  5:*6*,
*9*, *15*  6:22  7:*6*
9:*14*, *19*  12:*24*
13:*5*, *8*, *12*  14:*2*, *10*
15:*11*, *14*  16:*2*, *4*, *5*,
*9*, *12*, *13*, *15*  17:*9*,
*11*, *13*, *14*, *17*  18:*6*
19:*24*  21:*21*  28:*10*
36:*17*  37:*16*  38:*4*,
*6*, *19*  39:*16*  40:*7*,
*15*  41:*2*, *8*  42:*16*
43:*23*, *24*  44:*13*
46:*15*  47:*4*, *15*
48:*14*  50:*15*, *16*, *19*,
*20*  51:*6*, *14*, *21*
52:*10*, *12*  53:*12*
57:*21*  58:*18*  61:*9*
62:*18*  63:*2*, *3*, *4*
64:*13*  65:*24*  69:*18*
70:*9*  71:*5*, *24*
74:*17*  80:*21*, *22*
81:*8*  84:*18*  86:*9*
92:*4*  93:*8*, *10*, *16*,
*18*, *20*  94:*3*, *5*
95:*11*, *12*, *17*  97:*1*
98:*19*  99:*2*, *3*, *4*, *12*,
*13*, *15*, *16*, *21*
102:*20*  103:*17*, *20*
104:*2*, *3*, *4*, *11*, *14*,
*15*  107:*10*  111:*11*,
*14*  113:*14*, *16*
116:*15*, *18*  120:*1*
122:*15*, *16*, *17*
126:*24*  127:*18*
128:*5*  134:*2*, *21*
141:*12*, *14*  142:*19*,
*20*  143:*2*, *6*  146:*23*
151:*21*  153:*6*
156:*5*, *10*  157:*24*
158:*18*  160:*22*, *24*
164:*20*  166:*16*, *17*
167:*13*, *14*  171:*9*
172:*12*, *15*, *24*
175:*3*  180:*9*
181:*22*  182:*13*
183:*11*, *17*, *19*
185:*9*, *23*  186:*17*
187:*2*, *4*  188:*23*

**knowledge** 6:*5*
15:*6*  82:*18*, *19*
100:*15*  107:*15*
136:*23*  179:*2*
**known** 20:*5*  185:*11*
**KRAUCHUN** 2:*6*

**< L >**
**lack** 74:*7*, *15*
**lacked** 74:*5*, *13*
75:*8*  78:*3*
**language** 101:*5*
108:*13*  115:*8*
**larger** 64:*24*
**LaSalle** 2:*13*
**Lasharm** 71:*7*
**late** 185:*21*
**LAW** 2:*5*, *18*
**lawsuit** 4:*14*, *15*, *17*
5:*12*  6:*18*, *21*  7:*7*
48:*19*  49:*2*  54:*9*
60:*23*, *24*  62:*22*
117:*21*
**lawsuits** 6:*7*
**lay** 57:*16*  82:*4*
**leave** 114:*14*
154:*15*  183:*10*
**leaving** 19:*3*  37:*9*
**left** 36:*7*, *9*  42:*17*
50:*10*  80:*16*  120:*7*
121:*21*  155:*18*
169:*19*  183:*12*, *16*
**legal** 61:*6*  62:*6*
64:*3*, *7*, *10*  65:*14*,
*24*  67:*8*, *23*  68:*11*,
*20*  70:*21*  72:*6*
76:*6*, *21*  77:*22*
79:*9*  95:*1*, *17*
96:*23*  98:*9*  110:*3*
160:*7*  162:*10*
**legitimate** 145:*24*
146:*4*  154:*19*
**LEGRAIN** 1:*3*
4:*18*  17:*17*, *23*
33:*5*  85:*4*, *7*, *24*
86:*17*, *20*  87:*17*
88:*3*  89:*7*  117:*24*
124:*11*, *19*  125:*14*,
*23*  127:*18*  130:*15*
140:*18*  141:*5*, *16*,
*19*  142:*16*  143:*3*, *8*,

*12*  145:*20*  147:*8*
149:*14*, *23*  150:*4*,
*14*, *22*  151:*17*
152:*14*, *17*  153:*16*
154:*23*  157:*2*, *15*
158:*22*  159:*11*
181:*23*
**Legrain's** 151:*11*
159:*1*, *5*  160:*2*
**LEINENWEBER**
2:*12*  8:*20*  10:*4*
15:*21*  16:*7*, *20*
17:*1*, *6*  20:*7*, *16*, *24*
21:*11*, *19*  25:*11*
26:*21*  27:*20*  28:*18*
29:*9*  30:*1*, *12*, *21*
31:*4*, *11*, *24*  32:*11*
33:*15*, *24*  35:*6*
36:*19*  43:*19*  44:*23*
45:*14*  46:*1*  58:*9*
59:*3*, *15*  60:*1*, *16*
62:*4*, *20*  63:*9*, *15*
64:*5*, *22*  65:*20*
66:*17*  67:*5*  68:*14*
69:*22*  70:*1*  73:*18*
75:*13*  76:*1*, *12*
77:*5*, *17*  78:*6*, *13*
79:*5*, *17*  80:*11*, *15*
81:*12*, *14*, *22*  83:*9*
85:*20*  87:*3*, *19*
88:*7*, *21*  89:*10*, *17*
90:*7*, *17*, *19*  92:*15*
93:*12*, *24*  94:*9*
95:*3*, *15*, *23*  96:*3*,
*21*  97:*13*, *18*  98:*4*
99:*23*  101:*8*, *23*
102:*12*  103:*7*, *23*
104:*6*, *13*, *19*  105:*2*,
*19*  107:*12*, *23*
108:*23*  109:*6*, *19*
110:*2*  111:*1*, *8*
112:*11*  113:*11*
114:*8*, *22*  116:*3*, *13*,
*20*  117:*8*  120:*12*
122:*12*, *24*  123:*4*,
*14*, *21*  124:*4*, *13*, *21*
125:*7*, *15*  127:*10*
129:*9*  130:*17*
132:*2*, *15*  133:*24*
134:*8*, *19*  135:*13*,
*22*  136:*9*, *17*  137:*6*,

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1454 of 1503 PageID #:1845
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

*21* 138:*8* 139:*8, 21*
141:*21* 144:*5*
146:*1, 9, 18* 147:*2,*
*21* 148:*3* 149:*16*
150:*1, 17* 152:2
153:*19* 154:*12*
155:*5, 20* 156:*4, 18*
157:*4, 16* 158:*10*
159:*17* 160:*5*
161:*6, 20* 162:*19*
163:*14, 19* 164:*5*
166:*11* 173:*11*
174:*1, 14* 178:*19*
179:*1* 180:*13*
181:*15* 182:*10, 21*
185:*2, 21* 186:*12,*
*24* 187:*10, 20, 24*
188:*10, 19, 22*
**length** 64:*7*
**letter** 89:*6*
**level** 24:*23* 26:*7*
101:*19* 105:*18*
141:*7* 164:*24*
**License** 1:*24*
**lied** 18:*13*
**lieu** 176:*3* 184:*10*
**Lieutenant** 71:*7*
141:*10, 11* 142:*14,*
*15, 23, 24* 151:*8*
**lieutenant's** 42:*18*
**light** 159:*4*
**liked** 51:*14* 112:*20*
115:*24* 135:*6, 21,*
*24* 136:*24* 137:*17*
138:*2* 163:*3, 4*
**LIMITED** 2:*18*
57:*24*
**limits** 98:*12*
**line** 112:*4* 133:*13*
**lines** 113:*2* 169:*6*
**list** 174:*18*
**listed** 26:*3* 186:*21*
**Listen** 32:*7* 180:*23*
**little** 40:*13* 62:*12*
145:*16*
**live** 36:*8*
**lived** 169:*17*
**LLC** 2:*12*
**locate** 181:*23*
**locked** 10:*2*

**log** 63:*16*
**Logan** 71:*5*
**Logue** 29:*14*
**long** 10:*18* 11:*1*
36:*23* 37:*14, 23*
38:*2* 52:*9* 81:*13*
144:*9* 151:*21*
152:*5, 14, 17, 18, 19*
154:*10* 174:*18*
178:*8, 15, 16*
**look** 44:*21* 55:*22*
59:*20* 60:*12* 70:*18*
79:*14* 84:*21* 85:*17,*
*23* 87:*22* 88:*14*
90:*21* 91:*4* 92:*4*
93:*9, 10, 18, 23*
94:*5* 95:*19* 97:*4*
98:*8, 15* 99:*5, 11,*
*15, 21* 120:*8, 24*
121:*7* 125:*14*
139:*22* 143:*11*
152:*14, 16* 153:*3, 8*
154:*2, 16* 155:*3*
156:*9* 158:*6*
162:*13* 165:*13*
184:*12*
**looked** 76:*15* 77:*3,*
*9* 152:*19* 153:*14*
155:*24* 156:*7, 9*
172:*16*
**looking** 34:*19*
44:*18* 46:*7* 63:*19*
76:*17, 18* 77:*11*
78:*3* 83:*12* 152:*1*
153:*17* 154:*1, 11*
159:*21* 168:*13, 14,*
*23* 169:*8*
**looks** 91:*12* 99:*18*
142:*9*
**lot** 26:*10* 28:*11*
37:*9* 61:*10* 103:*16*
112:*16* 134:*6*
183:*21*
**Loudermill** 188:*2*
**lunch** 35:*23*
**lying** 18:*10* 19:*15*

**< M >**
**maintain** 53:*14*
**maintaining** 163:*8*

**majority** 60:*3*
113:*17* 116:*23*
136:*16*
**making** 51:2
100:*21* 101:*19*
102:*7* 122:*1*
134:*16* 135:*4*
155:*1* 156:*12*
**male** 107:2 148:*8*
**man** 59:*7, 8* 152:*9*
**management** 52:*19*
115:*20* 136:*11*
144:*11*
**manner** 93:22
110:*19*
**MANNING** 1:*6*
**manpower** 114:*5,*
*14* 115:*14, 22*
146:*8* 172:*8, 20, 21*
173:*6* 174:*11, 13*
**March** 11:*3*
**mark** 69:*7* 83:*20*
120:*18*
**MARKED** 3:*8*
120:*18*
**married** 148:*8, 12*
**mathematically**
78:*16, 20*
**matter** 96:*16*
97:*10* 115:*10*
145:*11* 154:*19*
183:*24* 184:*1*
**matters** 8:*5* 189:*9*
**McCall** 92:*3*
**MCGHEE** 1:*6*
4:*21* 47:*4, 5, 12*
91:*21, 23* 92:*21*
131:*19*
**Mcghee's** 47:*7*
**mean** 15:*13* 23:*18*
43:22 52:*17* 65:*5*
102:22 104:*9*
127:*9* 147:*9*
160:*20* 173:*20*
176:*6*
**meaning** 15:*4*
**means** 93:*18*
**meant** 92:2 93:22
99:*11*
**medical** 55:*5* 57:22
**meet** 58:*3*

**meeting** 64:7 68:*9,*
*11, 19*
**meetings** 66:*16*
70:*13*
**members** 65:*12, 13*
70:20 71:2 72:*1*
**memory** 84:*20*
87:*11* 121:*4, 14*
**men** 51:*23*
**mentioned** 71:*17*
**merely** 75:*17* 76:*5,*
*14*
**merit** 41:*4* 74:*5, 7,*
*13, 15, 19, 22* 75:*8,*
*12, 20* 76:20 78:*3*
79:*24* 87:*1* 89:*16*
175:22 188:2
**merits** 85:*18*
**met** 35:*18* 65:*24*
66:*10, 20, 22*
**method** 51:*23*
**MICHELLE** 1:*3*
4:*18* 5:2 36:*17, 18*
37:*6*
**middle** 132:*24*
139:*17*
**midnight** 18:*17*
47:*10* 55:5 129:*21*
130:*4, 8* 131:*17*
177:*10, 24*
**Midwest** 2:*19*
**mind** 54:*8* 175:*24*
**mine** 18:20 40:*6*
**minimize** 58:*7*
**minimum** 39:*10*
**minute** 185:*20*
**minutes** 81:*14*
164:*9*
**misconduct** 7:*12*
21:*9*
**misconstrued** 100:*3*
**misquoted** 80:*13*
**missing** 181:*14*
**misstated** 82:*23*
**misstates** 29:*10*
32:*12* 46:2 77:*6*
78:*7* 79:*18* 87:*4,*
*20* 99:*24* 107:*24*
114:*9, 23* 138:*9*
155:*8, 21* 158:*11*
159:*18* 162:*20*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1455 of 1503 PageID #:1846
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

182:*11*  186:*13*
187:*11*
**mistreating**  110:*23*
**moment**  90:*21*
**monitoring**  5:*1*  7:*2,*
*17*  94:*14*
**month**  128:*6*
154:*17*
**months**  5:*3*  61:*2*
117:*12*
**morning**  55:*4*
128:*2*  129:*22*
177:*12*
**Mother's**  174:*10*
**motivate**  53:*3, 9*
**motives**  52:*10*
**mouses**  51:*9*
**move**  55:*6, 7, 24*
57:*5*  80:*2*  126:*6*
142:*10*  144:*11*
148:*15*  149:*4*
**multi-page**  139:*22*
**mute**  188:*16*

**< N >**
**name**  4:*10*  5:*4*
6:*18, 24*  7:*5, 6*
28:*15*  29:*4*  37:*3*
43:*12*  48:*13, 17, 20*
49:*6*  68:*4, 5, 6*
175:*11, 20*
**named**  6:*6*  30:*9*
125:*2*
**names**  5:*7*  8:*4*
17:*15*  32:*21*  37:*3*
44:*18*  48:*17*  68:*1*
**naming**  65:*11*
**nature**  64:*8*  93:*10*
**NEAL**  1:*14*  5:*14*
45:*18*  71:*4*  118:*20*
172:*1, 2, 6*  173:*6*
181:*23*  182:*14*
184:*15*  186:*2, 8*
**near**  114:*12*
**necessary**  73:*11*
**need**  5:*10*  57:*13*
62:*19, 24*  63:*1*
65:*2*  84:*5*  89:*20*
104:*20*  114:*11*
144:*8, 23*  145:*2, 7*

155:*5*  165:*17*
174:*22*
**needed**  24:*10*  65:*1*
67:*15*  77:*23*
144:*21*  172:*21, 22*
173:*13*  174:*3, 18*
175:*5, 6*
**needs**  136:*11*
173:*10*
**never**  13:*24*  15:*18*
32:*9*  36:*4*  44:*11*
47:*1, 3, 22*  49:*1*
50:*23*  54:*3*  60:*2, 7*
61:*16*  77:*21*
100:*24*  106:*8, 10*
117:*13, 19*  136:*11,*
*19, 24*  174:*16, 19*
175:*24*  183:*16, 17*
186:*10*
**new**  57:*11, 12*
139:*12*  157:*10*
**NEWSON**  1:*4*
4:*19*  38:*19, 20*
117:*13*
**Newson's**  38:*22*
**newspaper**  174:*7*
**night**  128:*3*  178:*13*
**nine**  61:*2*  180:*5, 10,*
*23*
**non-attorneys**  68:*8*
**nonblack**  79:*4*
156:*16, 24*  157:*13*
**nonwhite**  157:*18*
**normal**  49:*15*
179:*12, 14*  184:*10*
**normally**  18:*16*
21:*12*  175:*7*  180:*16*
**North**  2:*13*  51:*22*
**NORTHERN**  1:*1*
**notarize**  186:*6*
**notarized**  186:*10*
**notice**  2:*2*  20:*13*
188:*5*
**notify**  178:*15, 16*
187:*17*
**November**  69:*10,*
*14*  83:*16*
**NUMBER**  3:*8*
176:*8, 10*
**numerous**  8:*9*
17:*10*  23:*18*  27:*1*

41:*6*  42:*9*  67:*8*
114:*12, 16*

**< O >**
**Oak**  2:*20*
**Object**  8:*20*  15:*21*
16:*7*  20:*7*  26:*21*
28:*18*  29:*9*  30:*1*
31:*24*  33:*15*  35:*6*
43:*19*  44:*23*  45:*14*
46:*1*  58:*9*  59:*3*
60:*16*  66:*17*  67:*5*
68:*14*  73:*18*  75:*13*
76:*1*  77:*5, 17*  78:*6*
79:*5, 17*  80:*11*
85:*20*  87:*3, 19*
88:*7*  89:*17*  92:*15*
93:*12*  96:*21*  99:*23*
101:*8, 23*  102:*12*
103:*7*  104:*6*
105:*19*  107:*12, 23*
108:*23*  109:*6, 19*
110:*2*  111:*1, 8*
112:*11*  113:*11*
114:*8, 22*  116:*3, 13,*
*20*  122:*12*  123:*4,*
*14*  124:*13, 21*
125:*7, 15*  127:*10*
130:*17*  132:*2, 15*
133:*24*  134:*8, 19*
135:*13, 22*  136:*9,*
*17*  137:*6, 21*  138:*8*
141:*21*  146:*1*
149:*16*  150:*17*
153:*19*  154:*12*
156:*18*  157:*4*
158:*10*  159:*17*
160:*5*  161:*6, 20*
166:*11*  173:*11*
174:*1, 14*  178:*19*
180:*13*  182:*10*
185:*2*  186:*12*
187:*10*
**Objection**  27:*20*
36:*19*  62:*5*  65:*20*
82:*2*  94:*9*  120:*12*
122:*24*  129:*9*
139:*8*  144:*5*  146:*9*
148:*3*  152:*2*  155:*6,*
*20*  157:*16*  162:*19*

163:*14, 19*  164:*5*
181:*15*
**objections**  16:*20*
17:*1, 6*  20:*16, 24*
21:*11, 19*  30:*12, 21*
31:*4, 11*  32:*11*
33:*24*  59:*15*  60:*1*
76:*12*  78:*13*  88:*21*
89:*10*  90:*7*  93:*24*
104:*13*  105:*2*
117:*8*  123:*21*
124:*4*  146:*18*
147:*2, 21*  150:*1*
179:*1*  182:*21*
186:*24*
**objectives**  58:*3*
**observe**  123:*9*
**observed**  72:*17*
123:*8*  125:*11*
**obviously**  9:*20*
80:*22*  96:*5*
**occasions**  65:*14, 23,*
*24*  70:*22*  176:*5*
**occurred**  26:*5*
80:*10*  81:*4*  131:*7,*
*12*
**occurring**  74:*24*
161:*24*
**occurs**  161:*24*
**o'clock**  128:*1, 3, 18*
129:*22*  169:*14*
170:*19*  175:*17*
178:*13*  179:*12, 13*
183:*15*
**October**  68:*24*
83:*15*  190:*2*
**offense**  34:*6*  100:*10*
**offensive**  96:*10*
100:*9, 14, 17, 21*
101:*1, 5*  106:*22*
108:*11*  109:*18*
110:*19*
**office**  6:*19*  10:*1, 2*
11:*14*  19:*1*  21:*14*
50:*17, 20*  51:*9, 10,*
*11*  52:*13, 14*  53:*6,*
*8, 20, 21, 22*  54:*4, 6,*
*7*  56:*15*  57:*14, 23*
59:*7, 13, 14*  61:*7*
62:*6*  68:*3*  70:*8, 11*
73:*21*  76:*6*  82:*9*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1456 of 1503 PageID #:1847
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

90:*13* 91:*15* 103:*2*
108:*7* 121:*21*
146:*20* 147:*10, 12,*
*15* 159:*19*
**officer** 8:*10* 11:*15*
22:*12, 13, 15*
123:*17* 124:*5*
136:*1* 137:*8*
138:*18* 139:*12*
**officers** 48:*4* 67:*15*
152:*6*
**Official** 1:*11, 12, 14,*
*15, 17* 7:*12* 18:*11*
**officially** 10:*22*
**Oh** 25:*13* 51:*20*
52:*5* 54:*5* 60:*12*
80:*14* 143:*4*
158:*14* 183:*15*
185:*20*
**Okay** 4:*17* 5:*11, 17,*
*23* 6:*2, 8, 22* 7:*1, 3,*
*9, 13, 16, 19, 23* 8:*2,*
*13* 9:*2, 16, 21, 23*
10:*6, 12, 15, 18*
11:*9, 16, 19* 12:*9,*
*22* 14:*13* 15:*10*
16:*23* 17:*13, 23*
19:*22* 20:*3, 12*
22:*9, 24* 23:*9, 13,*
*24* 24:*17* 25:*18*
28:*6* 30:*5, 18* 33:*2,*
*4* 34:*11* 35:*11*
36:*10, 13, 17* 37:*11,*
*15, 18, 23* 38:*18*
39:*8, 16* 40:*2, 7, 23*
41:*8* 42:*2, 6* 43:*1*
44:*4* 45:*5, 22* 46:*9,*
*15* 47:*4, 15, 18*
48:*6, 12, 23* 49:*2,*
*13, 24* 50:*3, 12*
51:*1* 52:*3* 53:*3*
54:*13, 22* 55:*13, 22*
56:*5* 57:*7* 58:*23*
60:*11, 21* 61:*22*
63:*19* 64:*16* 65:*8,*
*18* 66:*10, 14* 67:*2,*
*19* 68:*1, 8, 19, 24*
69:*3, 6, 9, 12, 16*
70:*5, 18* 71:*16, 21*
72:*8, 13, 22* 73:*16*
75:*22* 77:*2, 11*

78:*2* 81:*12* 83:*10,*
*19, 22, 24* 84:*5, 9,*
*10, 18* 85:*17, 23*
88:*2* 89:*6, 15*
90:*15, 19, 24* 91:*5,*
*6, 7, 11, 16* 92:*2, 9,*
*13, 24* 94:*7, 20, 23*
95:*23* 96:*15, 18*
99:*2, 8, 20* 100:*20,*
*24* 101:*4, 15, 18*
103:*19* 104:*4*
105:*7* 106:*6, 10, 15*
107:*9, 19* 108:*9*
110:*8, 23* 113:*6, 22*
114:*19* 115:*7*
117:*17, 23* 118:*4, 7,*
*9, 13, 24* 119:*10, 16,*
*20* 120:*10, 17*
121:*12, 17, 22*
122:*2, 6, 9* 124:*19*
125:*4, 13* 126:*13,*
*18, 22* 127:*9, 15, 18,*
*22* 128:*5, 13, 19, 24*
129:*23* 130:*12*
131:*6, 11, 23*
132:*20, 22, 23*
133:*2, 6, 7, 15, 21*
135:*11, 20* 139:*2,*
*15, 16* 140:*10, 11,*
*12, 17, 21* 142:*2*
143:*21* 145:*14*
146:*7* 148:*24*
149:*6, 7, 9, 12, 14,*
*22* 150:*22* 151:*4,*
*10* 156:*23* 157:*9*
158:*4, 18, 24* 160:*2*
161:*18* 162:*4*
163:*11* 165:*3, 7, 20*
166:*2* 167:*17*
168:*7, 23* 169:*7*
170:*14* 171:*1, 13,*
*18* 172:*18, 24*
173:*8* 174:*6, 23*
175:*10, 13, 18, 24*
176:*23* 178:*5*
179:*24* 180:*8, 21*
181:*12* 182:*17*
183:*2, 6, 10* 184:*2,*
*14* 186:*3, 7* 188:*4,*
*17, 18*
**Olympia** 169:*17, 18*

**once** 36:*1, 2* 66:*23*
100:*18* 164:*21*
**on-duty** 178:*8*
**ones** 8:*12*
**ongoing** 66:*21*
156:*11* 162:*10*
**online** 161:*11*
**open** 102:*13*
**openly** 74:*8*
**operations** 48:*2*
**opinion** 38:*16*
39:*15* 40:*2, 6, 23*
42:*6, 20* 43:*3, 7*
46:*22* 48:*6* 72:*20*
74:*20* 99:*20* 107:*7*
116:*4* 125:*24*
126:*1* 160:*4* 166:*17*
**opinions** 42:*11*
**OPR** 42:*17* 43:*13*
65:*10, 14* 67:*8*
70:*21* 71:*13, 15*
72:*7* 73:*5* 76:*22*
77:*22* 80:*5, 24*
95:*6, 18* 97:*3, 11*
98:*6, 13, 20* 110:*21*
118:*7* 119:*5* 121:*3*
122:*9* 123:*2*
124:*15* 134:*11*
159:*19, 23* 162:*9*
163:*12* 164:*21*
165:*5* 184:*1*
185:*24* 186:*2, 6*
**OPR's** 123:*7*
**order** 31:*17* 88:*13,*
*15* 89:*19* 118:*22*
119:*6, 23* 120:*5*
**ordering** 188:*23*
**organization** 58:*21*
163:*8*
**original** 4:*15*
**originally** 45:*5*
**originate** 45:*24*
**originated** 45:*19, 22*
**outcome** 61:*9*
122:*15, 17* 189:*21*
**outlying** 115:*15*
**outside** 19:*1* 35:*15*
79:*13* 101:*3*
156:*12* 162:*13*
179:*14* 181:*6*

**overtime** 170:*23*
171:*1, 7* 179:*8*
180:*5* 181:*3, 4, 7*
183:*18, 20, 21* 184:*5*

**< P >**
**PAGE** 1:*5* 4:*19*
38:*18* 39:*16, 17*
40:*3* 43:*2* 87:*6, 12,*
*23* 88:*13* 90:*1*
91:*3, 4, 6, 17*
120:*19, 21* 132:*24*
140:*3, 10* 145:*15*
148:*23* 149:*2, 4*
158:*4*
**pages** 87:*8, 22, 24*
89:*20* 120:*20* 127:*2*
**Page's** 39:*19* 43:*4*
**pain** 9:*19*
**panel** 27:*18* 28:*16*
29:*8* 31:*3, 10*
32:*10* 33:*23* 35:*1, 5*
**paperwork** 19:*7, 9*
47:*14* 131:*1*
**paragraph** 72:*9*
80:*3* 91:*19* 121:*1*
149:*4*
**parking** 37:*9*
**part** 22:*7* 24:*2, 14*
28:*7* 29:*8, 23*
31:*22* 39:*6, 7*
47:*21* 51:*7* 59:*16*
79:*15* 84:*10* 85:*6,*
*10* 87:*16* 92:*11*
113:*20* 153:*1*
168:*11, 21* 169:*11*
171:*17* 175:*11, 14*
**partially** 123:*12*
**participated** 166:*20*
**particular** 42:*4*
**parties** 189:*19*
**partner** 18:*15, 22*
129:*3* 140:*19, 22*
141:*5, 9, 16, 20*
142:*3, 17* 143:*3, 13,*
*17* 145:*23* 146:*5*
147:*9, 10, 20* 148:*1*
150:*6, 23* 151:*18,*
*20* 152:*17, 22*
153:*5, 12, 21, 24*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1457 of 1503 PageID #:1848
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

154:*10, 11, 24*
157:*14, 15*  160:*11*
**partners**  39:*6*
141:*1*  143:*5, 7, 12,*
*24*  144:*1*  146:*7, 16,*
*24*  152:*10*  156:*17*
160:*12*  163:*4*
**partnership**  141:*15*
142:*11*  143:*21*
144:*2, 4, 16, 18, 20*
145:*20*  146:*23*
**partnerships**  143:*2*
157:*1*
**parts**  170:*9*
**party**  36:*10*
**patrol**  57:*16*
**pay**  138:*20*  171:*9,*
*11*  179:*5*  180:*1, 5*
**peace**  67:*15*
**penalty**  165:*23*
**pending**  174:*20*
**people**  8:*14*  17:*10*
23:*18*  24:*11*  30:*9*
32:*21*  44:*14*  49:*22*
50:*24*  51:*8, 13*
52:*2, 4, 13, 18, 20,*
*22*  53:*6*  57:*23, 24*
58:*16*  59:*7, 17*
60:*23*  67:*24*  71:*23*
72:*3*  74:*24*  78:*21*
93:*7, 10, 22*  101:*21*
102:*4, 9, 20, 23*
103:*1*  111:*24*
113:*19, 24*  115:*9,*
*12, 21*  116:*23*
117:*2*  136:*2*  137:*9*
138:*2, 22*  139:*13,*
*14*  141:*1*  142:*10*
143:*4, 7*  144:*16, 24*
145:*2, 8*  146:*12*
147:*4, 11, 12*
148:*11*  153:*11*
155:*18*  170:*7*
172:*16*  185:*7*
**percent**  60:*4*  61:*20*
152:*24*  172:*13*
174:*8*
**perfectly**  99:*22*
**performance**  47:*2*
**performed**  43:*8*

**period**  36:*23*  37:*23*
39:*1*  94:*21*  141:*18*
143:*6, 22*  157:*2, 14*
**periods**  11:*6*
**person**  6:*21*  7:*1, 3,*
*6, 24*  12:*24*  23:*8*
24:*22*  26:*11*  28:*15*
32:*21*  35:*19*  39:*23*
48:*21*  53:*22*  54:*8*
55:*7*  99:*9, 15, 21*
100:*4, 5, 8*  108:*12*
109:*5*  114:*6*
115:*24*  116:*1*
138:*13*  141:*8*
142:*15*  144:*9*
145:*1, 2*  151:*13*
166:*15*  182:*23*
183:*4*  184:*19*  185:*8*
**personal**  39:*15*
42:*11*  55:*23*  58:*17*
82:*19*  104:*11, 14*
116:*4*  166:*16*
189:*12*
**personally**  6:*6*
15:*12, 13*  50:*24*
72:*16*  75:*2, 3*
106:*8, 10*  138:*11*
**personnel**  56:*15*
**person's**  6:*24*  48:*20*
**Petrowski**  13:*9*
29:*13*
**phone**  10:*14*  42:*18*
72:*4*  151:*14*
169:*13, 15, 22, 23,*
*24*  170:*15*  181:*20*
182:*8, 20*  183:*3*
**phonetic**  44:*14*
152:*6*
**physically**  147:*4*
**pick**  61:*15*  115:*5*
**picked**  36:*5*
**pin**  62:*15*
**place**  19:*23*  27:*24*
40:*15*  59:*18*
115:*21*  117:*9*
**placed**  51:*5*  117:*6*
**places**  113:*9*
**plaintiff**  6:*22*
**Plaintiffs**  1:*8*  2:*10*
4:*12, 18*  17:*14*
21:*24*  22:*3*  43:*18*

44:*5, 10*  45:*7*
46:*12*  48:*12*  53:*24*
54:*3*  62:*1*  63:*24*
82:*20*  113:*8*
116:*10*  117:*18*
167:*19*
**planned**  178:*4*
**play**  60:*7*  116:*5, 8*
168:*8*
**please**  5:*8*  34:*18*
64:*14*  69:*7*  80:*20*
84:*1*  90:*16*  127:*3*
132:*23*  139:*16*
148:*18*  157:*9, 11*
**point**  21:*9*  23:*6*
31:*9*  32:*22*  33:*23*
54:*5*  74:*21*  130:*5*
135:*4*  137:*4*  170:*19*
**points**  14:*22*
**policies**  178:*21*
**policy**  49:*20*  73:*14*
74:*9*  107:*9, 10, 17,*
*20, 21*  113:*23*
115:*8*  122:*10*
125:*21*  126:*3*
161:*16*  162:*2*
166:*4, 8*
**portion**  69:*10*
**portions**  64:*24*
118:*11*  122:*20*
**position**  16:*10*
61:*5*  73:*7*  82:*6, 18*
138:*2*  144:*10*  145:*7*
**positions**  78:*21*
79:*3*  115:*12*  116:*12*
**possibility**  34:*7*
135:*5, 9*  143:*14*
**possible**  53:*14*
163:*7*  173:*14*
188:*14, 17*
**posted**  83:*18*
**practice**  184:*6, 8*
**precluded**  82:*12*
**preparation**  10:*9*
**prepare**  10:*8*
**prepared**  57:*1*
62:*21*  64:*17*  82:*16*
**presence**  100:*14*
**present**  67:*20*
70:*17*  73:*20*  96:*20*

99:*6*
**presents**  116:*21*
**pretty**  24:*20*  41:*14,*
*23*  47:*23*  55:*19*
**prevent**  73:*23*
161:*19, 23*  162:*24*
**previous**  33:*17*
138:*9*  157:*6*  189:*6*
**previously**  31:*13*
32:*3*  34:*14*  35:*8*
47:*10*  106:*23*
112:*22*  124:*15*
128:*8*  155:*23*
160:*11*
**prior**  10:*10*  11:*12*
12:*19*  25:*18*  29:*10*
32:*12*  46:*2*  77:*3, 6,*
*11*  78:*4, 7*  79:*18*
80:*3*  87:*4, 20*
99:*24*  114:*9, 23*
155:*21*  159:*18*
162:*20*  172:*9*
173:*5*  182:*11*
184:*24*  186:*13*
187:*11*
**privilege**  62:*8, 9*
63:*16*  79:*6*  82:*3,*
*21*  83:*7*  95:*10*
**privileged**  82:*12*
95:*13*  97:*8*
**pro**  38:*17*  40:*6*
**probably**  5:*21*
17:*15*  19:*24*  24:*19*
28:*2*  34:*3, 12, 23*
35:*4*  38:*5*  47:*20*
61:*1*  66:*9*  81:*10*
112:*3*  142:*5, 14*
148:*22*  153:*10*
161:*8*  172:*17*
175:*16*
**problem**  9:*22*
26:*11*  46:*6*  47:*3*
73:*6*  136:*12*
**problematic**  18:*3*
**problems**  134:*12*
**proceeding**  28:*8*
31:*23*  33:*14*  164:*14*
**proceedings**  8:*17*
189:*14*
**process**  16:*5, 9*
18:*9*  19:*19*  20:*4*

John Webb · 9/17/2020

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1458 of 1503 PageID #:1849

Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

22:7, *10* 23:*11, 15*
24:2, *14* 27:*12, 16*
48:*3* 57:*17* 84:*11*
105:22, *24* 106:*1, 2*
139:*12, 14* 164:*16*
**processes** 166:*9*
**produce** 144:*12, 24*
**produced** 97:*20*
115:*13*
**product** 62:*8, 21,*
*23* 63:*1, 5* 79:*7*
82:*3*
**productive** 51:*16*
52:20, *23*
**productivity** 115:*22*
**Professional** 21:*14*
42:*11* 70:8 73:*21*
76:7 90:*13* 108:7
159:*19*
**promote** 14:*1* 163:*5*
**promoted** 11:22
12:*16, 20, 21, 22, 23*
13:*17, 19, 21, 24*
14:*5* 15:*11, 17*
16:*6, 19* 103:*4*
105:*14*
**promoting** 161:*5*
**promotion** 13:*5*
15:20 16:*3*
**promotions** 16:*24*
17:*5* 105:*11*
**proper** 118:*16, 22*
119:*24* 120:*5* 188:*6*
**properly** 73:*6, 24*
87:22 88:*14* 89:*19*
**protect** 73:*2, 22*
**proven** 165:22
**provide** 67:*15*
82:*13* 96:*17*
**provided** 6:*14*
75:*17, 18* 76:*5, 7,*
*21* 77:*20, 23* 78:*10,*
*15* 86:*23* 98:*1, 6, 7,*
*9, 13, 20* 109:*10*
125:*19* 162:*11*
**Providing** 95:*1*
**public** 53:*6, 7* 73:*3*
**published** 56:*6*
**purporting** 186:22
**purpose** 165:*3*

**pursuant** 2:*1*
122:*11*
**put** 20:*13* 51:*12*
52:22 53:*16* 55:*18*
56:*4* 57:*19* 59:*2,*
*17* 61:*4* 78:*21*
79:2 83:*13* 112:*21*
113:*4, 24* 115:*9, 16*
116:*11, 18* 119:*3*
141:*1* 144:*9, 24*
145:*7* 146:*12*
148:*9* 170:*23*
171:*1, 8, 9, 15, 16*
179:*8* 181:*9*
183:*18, 20* 184:*21*
185:*14*
**puts** 145:*12*
**putting** 44:*16*
59:*12, 21* 60:*12*
169:*19* 181:*3*
183:*20*

**< Q >**
**quality** 40:*3, 24*
42:*7, 21* 43:*7*
46:*23* 48:*9*
**question** 4:22 9:*5,*
*14, 15* 18:*6* 25:*11*
29:*3* 32:*7, 17, 18,*
*19* 34:*17, 21, 22*
42:*20* 45:*5, 11*
58:*10* 59:*4* 60:*11,*
*17* 61:*4* 62:*10*
64:*4, 12* 75:22
79:*10* 80:*19* 87:22
88:*8, 14, 15* 89:*20*
93:*13* 96:7 97:*17,*
*21* 101:*20* 102:*1,*
*24* 103:*9, 23* 105:*5*
113:*12* 121:*13*
124:*1* 126:*18*
129:*13* 131:*8*
133:*5* 135:*7*
148:*15* 153:*23*
155:*7, 13* 156:*23*
157:*9, 10* 159:*2*
187:*21*
**questioning** 146:*12*
**questions** 82:*23*
188:*11*

**quick** 12:*7* 19:*6*
149:*1, 2*
**quicker** 103:*4*
**quoted** 80:*13*

**< R >**
**race** 9:*4* 60:*7, 8*
61:*13, 16* 78:22
92:*17* 93:*17* 108:*3*
116:*7* 146:*12* 158:*1*
**racial** 92:*13* 93:*3*
101:*5* 134:*16*
**radio** 19:*2*
**Randy** 13:*9* 29:*13*
**rank** 7:*3* 15:*4*
27:24 29:*24* 94:*17*
**ranks** 94:*18*
**RANZINO** 1:*11*
5:*14* 71:*5* 91:*21*
92:*2, 3, 14* 93:*8*
94:*17* 95:*7* 97:*4*
98:*8, 14* 99:*3*
100:*13, 16* 101:*2,*
*19, 22* 102:*5, 10, 16*
105:*7, 10* 106:*6, 17*
109:*13* 110:*8, 10,*
*18* 134:*4, 7, 15*
**Ranzino's** 94:*7*
**rare** 175:*8* 176:*5, 6,*
*11, 14, 22* 178:*13*
**RDO** 91:*23*
**reaction** 174:*23*
175:*2* 181:*13*
**read** 64:*18* 69:*16*
84:*5* 120:*6* 133:*2,*
*3, 6* 140:*10, 11*
149:*3*
**reading** 69:*20* 84:*7*
91:*6* 121:*9, 12, 23*
122:*3* 174:*7*
**ready** 69:*19* 81:22
140:*3*
**really** 8:*4, 8, 11*
14:*19* 15:*8* 28:*23*
34:*21* 37:*13* 43:*3,*
*8* 50:*9* 145:*11*
154:*19* 155:*12*
**reason** 86:*12* 87:*9*
98:*2* 99:*12* 114:*3,*
*20* 115:*3* 128:*16*
143:*18* 153:*4, 7, 8*

165:*21* 167:*11*
173:*18*
**reasonable** 144:*3*
**reasons** 56:*9*
114:*12, 16, 19*
**recall** 4:*24* 5:*3*
6:*11* 7:*4* 8:*4, 5, 8,*
*12* 13:*7* 14:*8, 19*
15:*9* 25:*8* 27:*4, 10,*
*19* 31:*15* 32:*5*
34:*4* 36:22 37:*8,*
*24* 39:*5, 21* 40:*16*
41:*13* 46:*14* 47:*20*
54:*6* 55:*18* 56:*3*
57:*5* 65:*7* 66:*2, 12,*
*24* 67:*7, 11* 68:*3, 6,*
*17, 22* 71:22 86:*8*
98:*18* 101:*3, 11, 13,*
*17* 102:*7, 13*
119:*12* 120:*16*
125:*1* 127:*20*
128:*7* 137:*15*
143:*16* 151:*14, 22*
152:*5, 18* 153:*7*
154:*6* 162:*23*
167:*1* 171:*3* 173:*7*
181:*18* 183:*20*
185:*10*
**received** 18:*11*
19:*16, 20* 42:*19*
45:*2, 20* 137:*18*
138:*19, 20* 162:*8*
**receiving** 100:*8*
111:22 140:*13*
159:*4*
**recognize** 5:*5*
17:*15* 36:*24* 37:*4*
48:*14* 69:*17* 83:*5,*
*6* 90:22 145:*4, 5*
**recollect** 182:*18*
**recollection** 6:*7*
8:*16, 23* 9:*10*
15:*23* 25:*1, 17*
28:*20* 44:*6* 46:*5,*
*13* 55:*17* 66:*8*
70:*3* 97:*24* 98:*23*
105:*9, 13* 106:*19*
108:*17, 20* 109:*2,*
*15* 120:*7* 121:*10*
131:*9* 132:*16*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1459 of 1503 PageID #:1850
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

136:*3* 157:*24*
165:*14* 186:*1*
**recommend** 39:*14*
**recommendation**
16:*18* 164:*23*
165:*5, 10* 166:*24*
**recommended** 16:*3,*
*23* 17:*5* 80:*24*
105:*16* 165:*23*
167:*18*
**record** 10:*4* 62:*11*
81:*23* 82:*5* 189:*13*
**records** 42:*3*
178:*22*
**rectify** 22:*17*
**recuse** 166:*8*
**recused** 167:*4, 7, 11*
**redacted** 63:*14*
**Reddy** 13:*22* 14:*12*
29:*14*
**redesign** 136:*3*
**reduce** 22:*18*
**reduced** 89:*24*
189:*12*
**refer** 32:*14* 33:*17*
103:*20* 106:*6*
108:*22* 109:*5* 157:*6*
**reference** 105:*21*
126:*5* 129:*12*
134:*22*
**referenced** 90:*5*
110:*20*
**referencing** 60:*24*
100:*23* 103:*18*
129:*18*
**referring** 97:*2, 3*
106:*11, 16, 17, 21*
107:*10* 109:*10*
158:*19, 21* 159:*22*
**reflect** 82:*1*
**reflected** 87:*16*
128:*20* 177:*21*
**refresh** 84:*20*
87:*11* 121:*10, 14*
**refused** 19:*8* 148:*9*
**regarding** 82:*2, 21*
121:*4* 129:*17*
151:*10* 160:*23*
**Regardless** 146:*12*
171:*10* 174:*12*

**regards** 76:*3* 77:*14*
78:*14* 85:*3* 166:*5*
**Reginald** 86:*6, 15*
**register** 186:*5, 9*
**regular** 42:*1* 56:*16,*
*19, 21* 57:*18* 91:*23*
173:*3* 179:*7, 24*
**related** 8:*2* 22:*5*
41:*6* 42:*9* 43:*12*
47:*2, 3* 82:*10* 95:*6,*
*18* 98:*8, 10, 14*
166:*15*
**relations** 7:*21*
**relationship** 35:*13*
103:*4* 104:*12, 15,*
*24* 166:*16*
**relative** 189:*17, 18*
**religion** 108:*4*
**remember** 6:*13*
19:*22* 25:*15* 26:*20,*
*24* 27:*6* 28:*6, 12,*
*15, 21, 24* 30:*18, 22*
31:*2, 5, 9* 32:*23*
33:*9, 19, 21* 36:*6*
37:*13* 38:*2* 40:*17,*
*19* 48:*24* 49:*5, 7*
66:*19* 67:*13, 21*
68:*1, 19* 69:*3* 70:*3*
71:*11* 80:*19* 83:*14,*
*17, 18* 101:*15*
112:*6* 118:*2, 13, 18*
119:*1, 12, 14, 17*
121:*17, 22* 128:*16*
133:*18* 140:*12, 14,*
*16, 17* 149:*19*
151:*12* 152:*11*
153:*10* 156:*15*
158:*2* 167:*7, 13, 15*
169:*14* 171:*16*
172:*21* 174:*7, 9, 10*
175:*2, 4* 181:*19*
183:*12, 13* 184:*2*
185:*5*
**REMOTE** 2:*4*
189:*10, 15*
**remotely** 2:*10, 16,*
*22*
**repeat** 5:*7* 25:*13*
**rephrase** 102:*1*

**report** 73:*15* 82:*16*
91:*11* 131:*24*
162:*1* 173:*4* 177:*15*
**reported** 179:*6*
189:*11*
**Reporter** 1:*23*
189:*4* 190:*6*
**REPORTER'S**
189:*1*
**reporting** 161:*13, 18*
**re-position** 104:*20*
**represent** 65:*4*
86:*11* 148:*20* 186:*7*
**represented** 68:*3*
**representing** 4:*11*
10:*5* 188:*1*
**request** 57:*20* 62:*5*
63:*6, 10, 17* 142:*8*
147:*20* 148:*1*
**requested** 13:*23, 24*
63:*11* 76:*15* 113:*10*
**requests** 82:*9, 12*
**required** 39:*10*
114:*5, 20* 131:*24*
164:*2* 172:*20*
**research** 49:*19*
**reserve** 83:*4*
**resolve** 85:*15, 16*
**resolved** 89:*15, 24*
**resolving** 75:*4*
89:*13*
**resources** 91:*12*
95:*7, 19* 97:*3*
**respect** 61:*24* 92:*7*
113:*23* 119:*22*
122:*23* 129:*3*
132:*13* 161:*5*
**respond** 63:*9*
147:*24*
**responded** 91:*22*
**response** 62:*21*
83:*2* 84:*23, 24*
95:*7* 145:*21, 22*
**responsibilities**
10:*23* 161:*15*
**responsibility** 50:*4*
55:*12* 166:*14*
**responsible** 13:*11*
141:*4, 9*
**restate** 157:*11*

**result** 67:*16* 82:*11*
93:*1* 150:*6, 16*
159:*1*
**retaliated** 150:*20*
**retired** 28:*3* 35:*18*
40:*1*
**reveal** 61:*24* 96:*22*
**review** 10:*9, 12, 13*
21:*14* 70:*8* 73:*22*
74:*17* 76:*7, 16*
90:*14* 108:*7*
118:*15, 23* 119:*5,*
*23* 120:*10, 14, 15*
159:*20* 164:*16*
166:*21* 167:*5, 9*
**reviewed** 84:*6*
149:*10*
**reviewing** 43:*14*
120:*16*
**revisit** 62:*13* 63:*8*
**Rico** 44:*13* 168:*3,*
*10* 169:*1* 170:*8, 9,*
*10, 14, 21* 171:*14*
175:*12, 13, 21, 24*
179:*10* 182:*3*
**rid** 23:*6* 25:*7*
**ridiculous** 148:*2*
**right** 12:*8* 13:*16*
16:*6, 17* 23:*20*
27:*15* 33:*2* 37:*5*
42:*3* 43:*7* 48:*15*
63:*20* 64:*1* 80:*10,*
*15* 81:*1, 9* 83:*5, 6,*
*10* 86:*1* 88:*20*
89:*3* 90:*6* 93:*6, 11,*
*20* 104:*2, 5* 108:*6,*
*13* 110:*24* 112:*21*
113:*2* 115:*20, 23*
117:*7* 119:*8*
123:*13, 20* 124:*12,*
*18* 125:*14* 126:*10,*
*20* 131:*13* 133:*23*
137:*5* 140:*8, 9*
145:*5* 151:*1* 154:*1*
160:*4* 163:*12*
164:*2, 13* 165:*11,*
*24* 173:*19* 174:*12,*
*13* 175:*15* 179:*16*
180:*21* 184:*8, 13*
187:*6* 188:*17*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1460 of 1503 PageID #:1851
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

rights 67:16
righty 188:21
Rivera 151:3
152:6, 8 156:20
158:3
Road 2:19 83:8
Robert 151:5
158:8, 15, 16, 18
ROHLOFF 1:16
5:15 71:5 141:11
142:24 181:22
182:14 185:7
role 22:9 96:3, 9,
12, 15 168:7
roles 49:19
roll 54:19 56:7
91:22 94:20 95:2
96:11, 19 99:4
room 9:23 120:8
roster 54:15, 18
55:6, 22 56:2, 11,
12, 17, 19, 23 57:1
59:20 128:23
135:19 142:21
172:14 185:14
rosters 54:20 61:2,
11 95:2 98:1
154:18 184:22
rotate 58:4
Roughly 119:9
routinely 113:10
rumors 100:16, 18,
20 101:1 106:11, 17

< S >
safe 58:15 160:18,
20, 21, 24 161:1
SAITH 188:24
SAMUEL 1:4 4:19
38:18 39:16, 19
40:3, 24 43:2, 3
sat 25:19
saw 18:24 36:24
48:19 122:5, 6
123:17, 19 124:2, 9
saying 62:13, 15
63:5 67:14 72:5
74:24 80:23 87:15
89:15 99:12, 13, 15,
20 100:17

says 57:20 69:2, 11,
15 88:11, 24 92:1
93:4 120:21
126:14 127:6
133:3 149:13
186:17
scenario 59:11
100:7
scene 122:1
scheduled 172:15
173:3 179:7
school 147:15
screen 64:21
174:19
scroll 83:24 90:9
127:2 139:16
140:4 145:15, 16
149:6, 7
sec 88:2 188:15
second 22:12, 21
23:1, 7, 8, 11, 15
24:24 37:20, 21
49:18 65:9 70:19
72:9 80:3 91:4
95:4 106:4 111:13
113:19 117:1
120:24 121:2
127:16, 23 157:1,
14, 20 158:6
168:18 170:8, 10
175:15 177:15
seconds 155:6
section 47:24
49:19 50:8 57:15
136:4 138:21
see 60:12 62:19
64:20 65:16, 17
70:23 76:19 80:7
83:22 84:15, 16
87:10 90:10, 24
91:19 92:4, 17
96:19 100:7, 10
101:18 104:19
113:22 119:20
122:4 127:5, 8
143:11 148:24
150:22 151:2
152:14, 16 153:3, 8
154:2 165:4 172:8,
15 184:12
seeing 43:15

seen 4:13 49:2
75:18 91:7, 9
180:22 186:11
selected 48:5
138:17, 19
send 71:14 72:5
88:17 140:15
164:21 165:18
sending 140:12, 14
159:22
seniority 144:14, 23
145:3, 4, 9
sense 83:8
sent 43:13 69:18
73:17 80:22 86:6,
12, 14 87:9 126:5
139:19 162:8
sentence 65:9
70:19 72:9 158:5, 6
sentences 80:2
separate 79:22
97:11 98:10 130:20
separated 157:19
160:10
September 2:1 33:6
sequential 140:6
serve 23:10 132:10
service 47:24
57:15 138:21
services 147:17
set 190:1
setting 49:23
severity 132:7
sexual 7:21 161:13
Shador 44:14
168:2 182:4
Shakman 12:19
16:10
Sheahan 105:14
sheet 56:6 154:2
sheets 19:14 59:21
61:23 96:19 97:22
128:21 130:7
154:1, 11, 17 155:3,
18 156:8, 9 177:22
184:18
SHERIFF 1:10
5:12 16:13, 14
40:4 41:1 42:21
73:10 103:19
104:5, 12, 16 105:1,

8, 12, 14 160:16
167:18 187:17
sheriffs 174:8, 22
sheriff's 6:19 7:24
10:16 11:14 16:11
61:2, 7 62:6 65:14
67:23 68:3 70:21
82:9 91:15 95:1
102:21, 23 103:2
107:9, 10, 17
162:10 166:4 188:7
SHIELDS 1:13
5:14 11:5 14:4, 21
15:4, 10, 19 16:2
17:4 29:15 31:2,
21 32:8 33:5, 11,
13 34:12 35:4, 11,
16, 17 43:17 44:4,
20 45:7, 12, 23
46:11 55:13 56:5,
18, 24 65:11, 12
66:11, 15 67:10, 19,
21 68:9, 21 70:20
71:20 104:2, 4, 24
117:24 118:19
119:11, 21 120:2
121:20 122:4, 10,
22 123:13, 24
124:3, 10 125:5
169:10, 12, 23
170:16 172:5, 6, 10
173:5 174:23
181:12 182:5, 8, 19
shift 17:22 18:16,
17, 18, 20 21:6
24:5, 6, 7, 8 26:1
39:4 40:13 41:16,
20, 23 46:19 47:10
49:21 50:6, 9, 11
52:2 54:23 55:1,
11, 12 56:3 93:17
110:15 112:23
115:2, 19 117:13
128:12 129:21
130:4, 8 131:17, 18
141:7, 13 142:6, 21,
23 143:1 144:23
145:11 146:4
152:8 154:7, 16, 20
156:8 160:11
168:20 169:14

John Webb  -  9/17/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1461 of 1503 PageID #:1852

170:*4*, *5*  177:*10*, *13*, *16*, *19*, *23*, *24*  178:*1*, *9*  179:22  180:*18*  181:*1*  184:*10*, *14*, *19*, *20*

**shifts**  38:2  178:*3*

**Shore**  182:*3*

**short**  81:*20*  164:*10*  178:*3*

**shortchange**  178:*1*

**Shorthand**  1:*23*  189:*4*  190:*6*

**shortly**  131:*24*

**short-staffed**  142:*10*  172:22  173:*14*

**show**  42:*3*  56:*5*  63:*1*  74:*1*, *4*  83:*19*  120:*17*  130:7  185:8

**showed**  86:*10*, *24*  184:*19*  186:8

**shows**  63:*3*

**sic**  34:*17*  79:*6*

**sick**  173:*21*, *22*  174:8

**side**  131:*20*

**signature**  74:9  84:*3*  188:*23*

**signed**  13:2, *4*, *10*  19:8  85:*1*, *2*  89:*21*  121:*6*, *8*  186:9  187:*3*

**significance**  98:*3*

**simply**  75:*23*

**Simultaneous**  25:9

**single**  28:*15*  31:*5*, 8, *21*  46:*10*  87:*23*  143:*10*

**singled**  94:*4*

**sit**  23:*16*  26:*6*, *19*, *20*  27:7, *17*  28:*14*, *16*  30:*10*, *19*, *20*  31:*3*, *10*, *20*  32:7, *9*  33:*5*, *23*  34:*12*  35:*4*  84:*18*  99:*3*  118:*24*  120:*1*  141:*15*  172:*12*  188:*15*

**sits**  24:*18*

**sitting**  24:*14*  164:*15*

situation  22:*17*  31:*21*  33:*12*  46:*10*  60:*15*  105:*15*  159:9  176:*2*  178:*5*

**situations**  45:*6*  59:*1*  128:*13*  157:*12*  166:7  174:*6*  176:*23*

**six**  61:*1*  171:*7*, *10*, *11*  177:*1*  179:*17*  180:*7*

**SLAUGHTER**  1:*7*  4:*21*  47:*15*, *16*, *23*  48:*7*  133:*3*, *8*, *16*, *22*  134:*15*  135:*3*, *20*  136:*6*, *12*  137:*4*

**Slaughter's**  47:*18*

**slave**  108:*12*, *15*

**slavery**  108:*15*

**smaller**  64:*24*

**Smith**  141:*10*  142:*23*  151:*5*  158:8, *15*, *16*, *18*

**socialize**  35:*16*

**socially**  35:*21*

**somebody**  6:*5*  8:*18*  16:*6*, *18*  17:*11*  21:8  24:9  29:*5*  48:*24*  50:*15*, *19*  51:*20*, *21*  52:*6*  53:8, *16*, *21*  57:*5*, *12*, *19*, *20*  58:*13*, *14*, *15*, *17*, *18*  59:*2*, 8  71:*13*, *14*  72:*6*  93:*1*  100:*2*  101:*12*  103:*16*, *21*  105:*16*  108:*14*  112:*4*  113:*3*  114:*3*, *11*, *16*, *20*  116:*7*  123:*20*  145:*7*  162:*13*  166:*5*, 8  173:*18*  176:*16*, *24*  177:*9*, *10*  178:*6*  179:*4*  180:*8*, *22*  181:*21*  182:*15*  186:*20*  188:*6*

**somebody's**  49:*6*  103:*15*, *16*

**soon**  188:*14*, *17*

**sorry**  7:*10*  23:*21*  25:*12*, *13*  36:*14*

38:*19*  40:*24*  70:*19*  71:9  80:*14*, *17*  81:*7*  82:*7*  92:*20*  121:*1*  126:8  130:*12*, *13*  140:*1*  145:*16*  150:*10*  158:*14*  168:*4*  175:*10*, *21*  176:*17*  185:*20*  186:*14*

**sound**  88:*5*, *20*  119:*7*  126:*9*, *20*  131:*13*

**sounds**  165:*14*  167:*16*  184:*13*

**South**  2:*6*  51:*22*  129:*5*  131:*20*  169:*17*

**SPAR**  84:*12*  88:*4*

**speak**  18:*4*  55:*2*  151:*10*

**speaker**  169:*24*

**speaking**  81:*23*  110:*19*  172:*10*

**special**  172:*18*

**specific**  8:*12*  17:*21*  27:*2*  28:*21*  29:*5*  30:*23*  31:*6*, *8*, *15*, *16*  32:*5*, *20*, *23*  33:*1*, *19*  44:*11*  61:*3*  78:*21*  101:*11*  107:*16*  112:*6*  114:*17*  128:*7*, *16*  141:*17*  162:*24*  173:*2*  175:*2*

**specifically**  28:*9*  33:*13*  34:*5*  55:*19*  56:*4*  57:*18*  66:*19*  67:*11*, *13*  78:9  95:*6*  113:9  136:*1*  137:9  138:*1*, *20*  185:*5*, *6*, *10*

**specifics**  27:*16*  113:*6*

**specified**  189:*16*

**speculation**  174:*15*  186:*13*

**split**  18:*18*  131:*18*  140:*19*, *22*  141:*15*  142:*3*, *12*, *16*  143:*3*, *4*, *7*, *12*, *24*  144:*2*, *4*  145:*21*, *23*  147:*8*

150:*5*, *9*, *24*  151:*17*, *20*  152:*17*, *21*  153:*5*, *24*  154:*9*, *10*, *24*  156:*17*  157:*15*

**splitting**  141:*5*, *9*

**spoke**  24:*3*  45:*13*  70:*14*

**spoken**  173:*6*

**spot**  60:*13*  112:*9*  144:*10*

**spots**  51:*5*

**squad**  19:*5*  146:*20*  147:*5*, *18*  148:9

**staff**  65:*12*  80:*4*  173:*14*

**staffing**  55:*8*  59:*6*  136:*10*  143:*19*  152:*23*  153:*1*, *4*

**standards**  115:*22*

**start**  140:2  169:*13*  170:*6*

**started**  11:*14*  45:*1*  46:*7*  126:22  127:*1*  169:*14*

**starting**  148:*23*

**State**  1:*23*  98:*17*  158:8  186:*17*  189:*4*

**stated**  31:*13*  32:*3*  33:*18*  34:*14*  35:8  47:*10*  87:*6*, *13*  92:*2*, *3*  96:*13*  98:*20*  105:*5*  106:*23*  115:*11*  121:*19*  123:*9*, *16*  124:*15*  128:*8*  138:*16*  149:*18*  154:*5*  155:*23*  156:*19*  160:*8*, *9*, *11*  181:*19*

**statement**  32:*14*  35:*3*  102:*19*  103:*24*  108:*5*  118:*4*, *15*, *22*  119:*5*, *23*  120:*6*, *15*  121:*2*, *6*, *9*  122:*5*  125:*10*  126:*14*  129:*12*  148:*6*, *10*  152:*5*  157:*7*  184:*4*  187:*21*

**statements**  119:*3*

**STATES**  1:*1*  88:*23*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1462 of 1503 PageID #:1853
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

89:22  141:23
**State's**  70:11
**stating**  171:17
187:3
**stay**  50:17  128:10
**stayed**  18:19  47:9
128:9  171:21
**staying**  183:21
**stealing**  41:5  79:24
**stenographically**
189:11
**step**  22:12, 15, 21
23:1, 3, 7, 8, 11, 15
24:3, 15, 24  25:7,
20  26:2, 3  27:11
62:12  106:4  154:9
164:15
**steps**  15:11  77:13
159:14  162:4, 16
165:17
**steward**  19:17
89:22
**stomachache**  114:11
**stop**  95:3
**strategy**  97:18
**Street**  2:6, 13
50:21  51:12  52:11
147:18  169:18
**stress**  101:19
**stressful**  102:6, 8
**stricken**  48:22
**STRICKLAND**  1:3
4:19  5:2  36:17, 18
37:7  117:11
**Strike**  17:3  33:10,
11  75:9  82:7
86:13  108:10
110:9  121:8
129:23  132:21
143:22  152:15
166:3, 6  176:1
**stuck**  41:21, 24
178:12  183:16, 21
**stuff**  28:12, 13
43:15  48:1  167:16
**subject**  8:5  82:20
97:10  103:5
**submit**  21:3  76:22
**submitted**  174:4
**subordinate**  40:5

**subpar**  72:10, 14,
21  73:12  74:11
86:20
**subpoenaed**  177:11
**subpoenas**  185:7, 8
**subsequently**  88:11
**substandard**  18:1, 7
41:7  42:10  43:16
**suburbs**  129:5
131:20
**Suite**  2:7, 13, 19
**summary**  75:16
91:20
**Sunday**  174:7
**Super**  174:7, 10
**supervise**  43:1, 9
**supervising**  11:23
**supervision**  20:21
38:3  42:13, 22
**supervisor**  6:4, 19
7:16  8:10  11:8
12:2, 16  13:11, 14
14:21, 23  18:16, 18,
19  21:4, 6, 8, 9, 18
23:4  26:4, 8  35:9
37:19  38:23  39:2,
4, 20, 24  40:11, 14
41:12, 16, 18, 22
46:18  47:8, 19
50:11  55:5, 10, 21
58:12  71:15  72:5
74:1  76:17  94:8
100:8, 11  103:2
104:16  105:17
106:21  107:11
113:15, 18  122:17
124:10  127:23
128:22  131:17
133:14  135:18
143:1  154:7, 15
156:8  163:22
164:2  168:18, 19
170:8  177:23
178:2, 9, 15, 16, 18
180:18  184:17
188:5
**supervisors**  13:3
20:13, 17, 22  24:1
34:8  55:20  106:4
108:18, 21  141:13

142:5, 22  161:14
165:4, 7
**supplied**  61:10
**supply**  61:6
**supposed**  52:21
127:24  161:15, 24
165:19  168:15
173:4  182:7
**sure**  13:7  16:14
21:21  25:17  27:14
34:20  41:23  43:23
52:19  56:8  58:7
59:1, 12  64:19
68:17, 23  69:20
71:8, 10  73:5, 7, 8
74:7  90:10  95:4
102:3  103:18
108:14  112:3
126:19  139:6, 10
147:22  148:14
150:4  151:15
155:16  157:12
163:2  172:11
178:18  185:12
**surprise**  186:11, 20,
23  187:9, 13
**surprises**  186:16
**suspension**  18:12
19:20
**sustained**  43:9
122:21
**sworn**  4:2  123:17
124:5  189:8
**synopsis**  121:3, 5

< T >
**take**  15:11  24:2, 14
44:8  45:9  55:7
57:3  65:1  69:19,
23  77:13  81:8, 11,
17, 18  84:8  90:21
100:5, 9, 12  106:24
123:3  154:16
155:2  162:4, 16
164:8, 9  165:17
180:11, 24  181:1
188:11
**taken**  1:21  27:24
81:21  100:3
164:11  189:15
**Takes**  173:24

**talk**  15:19  25:9
49:8  51:17  53:12
81:15  104:15
117:1  172:2
**talked**  10:10, 14
20:3  35:17  67:8
79:12  128:24
129:1  138:17
147:8  151:12, 14
152:11  154:6
161:12  163:11
164:13  172:5, 6, 7
**talking**  25:5  63:15,
16  67:2  71:3, 14
78:8  79:23  88:6
93:6, 9, 16  95:9, 16
97:1, 9  103:12, 17,
20  116:24  126:4
130:23  131:3, 17
132:14  146:20, 23
147:4  150:23
153:21  161:1
167:21  173:5
**tangible**  160:13
**Tansy**  28:10
**targeted**  108:3
**task**  31:15
**tasks**  49:15
**taught**  160:22
**teams**  144:11
**technical**  47:24
57:15  138:21
147:16
**technically**  107:2
**tell**  25:6  27:2, 6, 9
33:4  45:12  49:8
54:20  60:21  64:1
69:17  88:3, 18
90:22  92:9  105:7,
10  118:13  121:17
123:17  129:6, 7
133:19  161:4
164:19  176:9
**telling**  27:7  28:12
46:14  55:18  56:3
57:5
**tells**  100:11
**ten**  5:21  38:9
40:20  66:5, 7, 9
144:19  145:1

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1463 of 1503 PageID #:1854
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**ten-day** 18:*12*
19:*20*
**term** 107:*16* 109:*4*
119:*13, 15, 16*
136:*20* 160:*24*
**terminated** 80:*6, 24*
175:*23* 187:*14*
**termination** 67:*17*
167:*19* 168:*6*
**terminations** 168:*2*
**tested** 11:*21*
**testified** 4:*5* 8:*9,*
*13, 17* 9:*2, 8, 9*
19:*19* 56:*20* 57:*7*
86:*19* 87:*2* 119:*2*
120:*11* 131:*21*
140:*24*
**testify** 62:*14* 92:*22*
98:*5, 16* 189:*8*
**testifying** 9:*5*
178:*11*
**testimony** 28:*17*
29:*7, 10* 32:*8, 13*
46:*2* 77:*6* 78:*7*
79:*18* 87:*4, 20*
94:*16* 99:*24*
107:*22, 24* 108:*1*
114:*9, 23* 117:*19*
131:*6* 138:*9, 16*
139:*2* 155:*2, 21*
159:*18* 162:*20*
179:*20* 182:*11*
186:*14* 187:*11*
189:*14*
**text** 65:*5* 80:*13*
**Thank** 4:*10* 70:*1*
120:*21* 127:*3*
145:*17*
**thing** 14:*3* 39:*3*
41:*13* 43:*6, 11*
95:*18* 96:*14* 98:*9*
178:*4*
**things** 58:*23* 64:*8*
79:*22* 82:*4* 93:*5*
96:*24* 100:*13*
188:*13*
**think** 13:*6, 7* 16:*23*
17:*4, 15* 28:*3*
31:*21* 33:*12* 34:*11*
38:*11* 40:*21* 41:*6,*
*15* 44:*1, 6, 8, 12, 17,*

*19* 45:*6, 8* 46:*5, 10*
52:*23* 53:*1, 11*
57:*2, 4* 62:*24* 63:*1,*
*7, 13* 66:*6* 68:*10,*
*16, 22* 70:*10* 71:*6,*
*7, 18* 79:*21* 83:*2*
91:*9* 95:*9* 96:*4, 23*
97:*1, 2* 104:*17*
120:*20* 127:*20*
128:*13* 143:*9*
150:*8, 12* 171:*20,*
*21* 172:*4* 181:*8*
183:*8, 19* 185:*19*
188:*6, 20*
**thinking** 48:*23*
54:*8, 10* 95:*21*
**third** 18:*18* 27:*11*
39:*22* 40:*22* 41:*15,*
*17, 21* 47:*9, 22*
65:*8* 70:*19* 106:*4*
110:*14, 16* 111:*14*
113:*17* 116:*24*
121:*1* 127:*20, 21*
128:*6, 9, 11, 14, 20,*
*22* 151:*8* 156:*16*
168:*15, 16* 170:*4, 6,*
*11, 12, 13, 22*
171:*18, 23* 172:*9,*
*19* 179:*21, 22*
180:*1* 184:*17*
185:*17*
**THOMAS** 1:*10, 14*
5:*14*
**thought** 26:*10*
48:*16, 17* 72:*23*
79:*12* 134:*3* 135:*6*
136:*24* 137:*16*
176:*21*
**thousands** 140:*15*
**threat** 42:*18*
**threaten** 109:*13*
**threatening** 109:*16*
121:*20*
**three** 39:*11* 46:*20*
57:*14* 144:*1, 17*
145:*2* 168:*11, 21*
169:*1, 11* 170:*8*
171:*16* 175:*11, 14*
177:*8*
**three-page** 148:*21*

**throw** 22:*19*
**Thursday** 1:*24*
**tight** 188:*15*
**time** 10:*22* 11:*6*
12:*17* 13:*3* 14:*9,*
*11, 14, 15* 15:*7*
19:*14* 29:*17* 31:*12,*
*16* 32:*20* 34:*2*
36:*23* 39:*1* 40:*12*
41:*5* 44:*8, 12, 17*
45:*2, 9, 10, 20* 49:*9,*
*10* 51:*23* 52:*14, 18*
53:*14* 55:*3* 57:*3,*
*10, 22* 58:*2, 21*
62:*9, 15* 65:*1*
66:*12, 14, 20, 21*
67:*13, 20* 69:*19*
70:*6* 71:*19, 23*
72:*1, 19* 79:*24*
84:*8* 94:*14, 19, 21*
97:*4* 118:*22* 128:*7*
129:*16, 24* 132:*5, 8,*
*9* 133:*16, 18*
136:*16* 141:*18*
142:*4* 143:*4, 6, 22*
148:*23* 152:*6*
154:*16* 155:*3, 14,*
*17* 157:*2, 14* 163:*8*
171:*4, 8, 11, 16*
173:*23, 24* 174:*3*
176:*3, 17, 24* 177:*1,*
*4* 178:*4* 179:*14, 17*
180:*7, 9, 17* 181:*2,*
*10* 183:*10, 12*
184:*9, 18* 185:*7*
188:*9* 189:*16*
**timekeeping** 178:*22*
**timelines** 24:*9*
**times** 5:*20, 21* 8:*9*
26:*10* 30:*13* 35:*22*
41:*20, 24* 44:*9*
60:*6* 63:*23* 66:*2, 6,*
*20* 67:*8, 10* 110:*15*
128:*8* 153:*15*
176:*7, 12, 16* 183:*21*
**TIMS** 1:*4* 4:*19*
37:*15, 16, 18* 39:*6*
**tired** 180:*11, 24*
**title** 14:*7, 8* 70:*7*
**to/from** 158:*11*

**today** 26:*19* 28:*14*
30:*20* 31:*20* 32:*8*
55:*23* 60:*24* 62:*14*
99:*3* 118:*24* 120:*1,*
*11* 129:*1* 141:*15*
172:*12*
**told** 13:*20* 27:*2, 3,*
*8* 28:*21* 29:*5, 8*
31:*10, 22* 32:*9, 23*
33:*5* 34:*3, 5* 39:*12*
43:*22* 44:*9, 20*
45:*7, 9, 23* 46:*5, 11*
72:*22* 109:*10*
117:*2* 121:*3*
169:*10* 170:*1*
174:*24* 181:*12, 13*
184:*2, 8*
**Tom** 27:*8, 9, 10, 17*
28:*16* 29:*6, 13*
30:*8* 45:*18* 71:*4*
172:*1, 6* 181:*23*
182:*14* 186:*2*
**top** 69:*10* 90:*24*
127:*5* 140:*2* 143:*9*
**Torano** 175:*18*
**total** 87:*7*
**tougher** 9:*12*
**tour** 169:*20* 175:*9,*
*15* 176:*4, 16, 17*
177:*1, 6, 14, 19*
178:*7, 18* 179:*12,*
*14* 180:*11* 183:*14*
**town** 37:*10*
**train** 137:*9* 138:*2*
139:*14*
**trained** 136:*1*
160:*15* 161:*4*
**training** 48:*4*
49:*13* 57:*17* 136:*1*
137:*8* 138:*18*
139:*12* 160:*18, 23*
161:*10, 11*
**transcript** 189:*11*
**transitioned** 10:*22*
**treated** 8:*18* 150:*15*
**trial** 175:*8* 178:*11*
**tried** 51:*7, 15* 54:*7*
112:*21* 115:*11*
125:*4, 13* 140:*24*
162:*24* 163:*1, 5*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1464 of 1503 PageID #:1855
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**true** 75:*1* 153:*16*
160:*2* 189:*13*
**truth** 123:*17* 189:*8*
**try** 52:*3, 7, 17*
53:*12, 13* 58:*2, 6,*
*19* 59:*11, 17* 113:*4,*
*23* 115:*12* 163:*6, 7*
**trying** 26:*14* 37:*4*
53:*14* 98:*2* 167:*7,*
*13*
**TSS** 111:*17* 112:*1,*
*23* 113:*3, 19*
117:*11* 134:*17*
135:*3, 8, 21* 136:*22*
137:*5, 14*
**turn** 82:*24*
**turned** 61:*23*
121:*21*
**twenty** 145:*1*
**twice** 66:*23*
**twisted** 50:*16*
**two** 24:*3, 15* 25:*20*
38:*6* 39:*12* 46:*20*
50:*17* 55:*3* 57:*14*
67:*23* 68:*7* 70:*22*
79:*22* 80:*2* 95:*5*
96:*24* 120:*20*
127:*2* 128:*12*
144:*16* 145:*8*
147:*4, 14* 148:*7*
151:*23, 24* 153:*13*
154:*17* 164:*15*
165:*11* 167:*19*
168:*1* 169:*4* 177:*8,*
*12* 188:*10*
**two-man** 114:*15*
**two-minute** 188:*11*
**two-page** 91:*2*
**type** 78:*19* 161:*13*
167:*5*
**typewriting** 189:*12*
**TYRONE** 1:*6* 4:*21*
47:*4, 7*

**< U >**
**ulterior** 52:*10*
**ultimate** 73:*1*
**ultimately** 16:*10*
115:*17*
**uncommon** 56:*22*

128:*17* 185:*9*
**undersheriff** 165:*1*
**understand** 26:*18*
32:*18, 19* 33:*7*
97:*9* 102:*22, 24*
104:*8* 113:*22*
146:*11* 147:*3*
150:*10* 155:*10, 12*
161:*2*
**understanding** 29:*3*
34:*21* 76:*18* 92:*24*
95:*6, 15* 173:*8*
**Understood** 83:*9*
**unfair** 89:*9*
**unfairly** 89:*3*
108:*3* 154:*24*
**Unfortunately** 14:*1*
**unhappy** 51:*19*
**uniform** 99:*17, 19*
**uniforms** 93:*17*
**union** 19:*17* 21:*5*
23:2, *6* 24:*10, 22*
25:*7* 26:*5* 27:*13*
28:*11* 50:*21* 57:*20*
58:*20* 84:*24* 88:*24*
89:*4, 22* 112:*24*
115:*7, 18* 132:*8*
145:*3* 154:*21*
180:*17*
**union's** 115:*1*
**unit** 5:*2* 7:*1, 2, 17*
10:*17, 19, 20, 22*
11:*2, 3, 5, 10, 11, 16*
14:*24* 15:*5, 8*
17:*20* 20:*13* 23:*13*
24:*23* 25:*3, 22*
26:*1* 36:*23* 38:*1*
46:*21, 24* 49:*8, 11*
60:*5* 61:*11* 78:*18*
94:*14* 112:*2* 113:*3*
133:*12* 135:*3, 19,*
*21* 137:*14* 138:*14*
144:*18, 19* 154:*14*
155:*17* 156:*12*
162:*6, 13, 18*
164:*22* 188:*5*
**UNITED** 1:*1*
**unsafe** 58:*16*
**unsigned** 187:*7*
**unusually** 178:*4*

**use** 51:*4* 176:*24*
178:*7* 180:*8, 10*
**usually** 23:*4* 37:*24*
39:*7* 51:*6* 53:*11*
56:*2* 153:*1* 164:*21,*
*22* 167:*2* 168:*20*
177:*16* 178:*2, 11*
185:*6*
**utilized** 176:*16*

**< V >**
**Vaguely** 36:*23*
**Valentini** 69:*13*
70:*5* 72:*14, 22*
73:*12* 80:*23* 86:*7,*
*15, 24* 90:*4*
**valid** 155:*4*
**validity** 85:*13*
**various** 14:*22*
20:*14, 21* 49:*11*
165:*4*
**vast** 60:*3*
**vehicle** 47:*12*
**verbal** 9:*21*
**verbally** 10:*14*
113:*15*
**VERNELL** 1:*4*
4:*19* 37:*15, 16, 18*
38:*13*
**VICTOR** 1:*7* 4:*21*
47:*15, 16, 18* 48:*6*
**video** 9:*12* 104:*18*
**violate** 107:*19*
122:*10*
**violated** 74:*9*
**violating** 125:*20*
126:*2* 178:*21*
**violation** 88:*24*
89:*4*
**voicemail** 42:*17*
**voluntary** 173:*24*
**vs** 1:*9*

**< W >**
**wait** 185:*20*
**waive** 83:*4, 6*
188:*22*
**walked** 19:*5*
**WALKER** 1:*6*
4:*20* 46:*15, 16, 23*

47:*2*
**Wallace** 29:*13*
**want** 29:*2* 34:*20*
51:*21, 22* 52:*11, 12*
53:*17, 22* 57:*22*
58:*14* 59:*14, 18, 22*
62:*2* 69:*16* 73:*2*
79:*3* 81:*11, 13, 16,*
*17* 82:*4, 24* 90:*21*
95:*4, 20* 98:*4, 11*
112:*5, 10* 113:*3, 16*
114:*7, 14, 21*
116:*12, 19* 117:*2, 6,*
*23* 136:*7* 138:*6*
145:*8* 148:*23*
149:*3* 153:*13*
178:*3* 180:*9, 10, 24*
188:*12, 13*
**wanted** 53:*9* 73:*5,*
*24* 113:*20, 24*
114:*4* 115:*9, 13*
136:*2* 139:*3, 7*
141:*2*
**wanting** 112:*1*
**watch** 18:*19* 37:*21*
39:*22* 40:*22* 41:*15,*
*17, 21* 45:*18* 47:*9,*
*22* 49:*18* 55:*11*
110:*14, 16* 111:*13,*
*14* 113:*18, 19*
117:*1* 127:*16, 18,*
*20, 21, 23* 128:*6, 9,*
*11, 14, 20, 22*
135:*12* 138:*13*
151:*9* 156:*16*
157:*1, 14, 20*
168:*15, 16, 18*
170:*4, 6, 8, 10, 11,*
*12, 13, 22* 171:*18,*
*21, 23* 172:*9, 19*
175:*15* 177:*15*
178:*2* 179:*21, 22*
180:*2* 184:*17*
185:*17*
**way** 15:*20* 32:*24*
39:*15* 50:*13* 52:*15*
53:*3* 55:*15* 90:*5*
100:*3, 9* 108:*6*
110:*6* 119:*21*
120:*3* 122:*4* 140:*5*
148:*22*

John Webb - 9/17/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1465 of 1503 PageID #:1856
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

wearing 93:*16*
99:*17*
**WEBB** 1:*21* 3:*1, 8*
4:*3, 8* 10:*5* 69:*7*
82:*8, 16* 83:*4, 20*
91:*7* 96:*9* 97:*1*
104:*17* 120:*19*
148:*16* 164:*13*
188:*9*
**Webb's** 82:*18*
**week** 151:*21*
154:*17*
**weeks** 50:*18* 57:*14*
151:*1, 23, 24* 154:*17*
**well** 4:*10* 5:*13*
8:*13* 13:*13* 14:*14*
16:*5* 20:*20* 26:*9,*
*14* 32:*17* 41:*17*
47:*23* 51:*17* 53:*20*
55:*22* 59:*20* 61:*22*
62:*17, 20, 24* 63:*22*
65:*8* 66:*11* 88:*3,*
*17* 91:*4* 92:*20, 24*
95:*12* 97:*10* 99:*14*
100:*7, 13* 101:*15,*
*18* 104:*2, 23* 110:*5*
112:*8* 115:*1, 11*
116:*10, 17* 118:*17*
120:*17* 121:*7*
122:*20* 125:*4*
129:*6* 132:*12, 21*
134:*6, 14* 135:*11*
136:*15* 137:*3*
140:*17* 141:*18*
142:*19* 143:*20*
150:*14* 152:*16*
153:*3* 156:*15*
157:*9* 158:*6* 159:*8*
161:*4* 167:*17*
179:*4* 183:*13*
184:*23* 186:*7, 20*
187:*23*
**went** 11:*16* 18:*22*
19:*18* 24:*24* 35:*23*
36:*1* 48:*16* 50:*24*
61:*3* 76:*14* 106:*3*
169:*9* 170:*15*
175:*22*
**we're** 9:*11, 19*
60:*24* 62:*17* 63:*5,*
*19* 67:*4* 81:*9, 22*

95:*4, 8* 96:*23*
131:*3* 132:*13*
161:*24* 167:*21*
169:*3* 188:*20*
**We've** 82:*1* 161:*8,*
*9, 11*
whatsoever 96:*16*
whereabouts 172:*3*
**WHEREOF** 190:*1*
**WHITE** 2:*18*
59:*23* 60:*14* 62:*3*
80:*8* 106:*20*
107:*5, 11* 146:*7, 16,*
*24* 147:*19, 24*
148:*11* 152:*9*
156:*21*
whoever's 64:*22*
168:*19*
**WILFORD** 1:*5*
4:*20* 40:*7, 8, 10*
41:*1*
**William** 29:*13*
152:*9*
**WILLIAMS** 1:*5*
4:*20* 41:*8, 9, 11*
42:*7, 8, 13* 43:*6*
**Willie** 158:*3*
willing 62:*13*
**WINSTON** 1:*3*
4:*18* 17:*17, 24*
19:*19, 20* 44:*13*
47:*11, 12* 65:*9*
72:*14, 23* 73:*12, 17*
78:*10, 14* 79:*15*
80:*4, 24* 85:*4, 8*
86:*17, 20* 87:*17*
89:*8* 91:*22* 101:*18*
117:*24* 118:*20*
119:*11, 22* 120:*4*
121:*19, 24* 122:*23*
124:*12, 19* 125:*2,*
*14, 23* 127:*19*
129:*3, 17* 130:*1, 10,*
*15* 131:*19, 22*
140:*18* 141:*5, 9*
157:*2, 15* 158:*22*
167:*20* 168:*1, 14,*
*24* 169:*2* 172:*3*
173:*1* 174:*24*
181:*13, 23* 182:*14,*
*15*

**Winston's** 33:*5*
74:*4* 173:*9* 188:*1*
**WITNESS** 3:*1* 4:*1,*
*4* 8:*22* 15:*23* 16:*9,*
*21* 17:*9* 20:*10, 17*
21:*2, 12, 21* 25:*9*
26:*24* 28:*20* 29:*12*
30:*3, 15, 22* 31:*5,*
*12* 32:*3, 14* 33:*17*
34:*2* 35:*8* 36:*22*
43:*21* 45:*1, 16*
46:*4* 58:*11* 59:*6,*
*16* 60:*2, 19* 62:*10*
66:*19* 67:*7* 68:*16*
70:*2* 73:*20* 75:*2,*
*15* 76:*3, 14* 77:*8,*
*20* 78:*8, 14* 79:*7, 9,*
*20* 87:*6, 21* 88:*10,*
*23* 89:*12, 19* 90:*9*
92:*17* 93:*15* 94:*2,*
*11* 98:*17* 100:*2*
101:*11* 102:*1, 13*
103:*11* 104:*8, 14*
105:*4, 21* 107:*15*
108:*1* 109:*2, 9, 22*
110:*5* 111:*3, 11*
112:*14* 113:*14*
114:*10* 115:*1*
116:*4, 15, 23* 117:*9*
120:*14* 121:*2*
122:*15* 123:*7, 16,*
*22* 124:*5, 15* 125:*1,*
*10, 19* 127:*12*
129:*12* 130:*19*
132:*5, 16* 134:*2, 10,*
*21* 135:*14, 24*
136:*10, 19* 137:*7*
138:*1, 11* 139:*10,*
*21* 140:*4* 141:*23*
144:*8* 146:*3, 11, 19*
147:*3, 22* 148:*6*
149:*6, 18* 150:*2, 19*
152:*4* 153:*21*
154:*14* 155:*12, 23*
156:*7, 19* 157:*6, 18*
159:*19* 160:*8*
161:*8, 23* 162:*23*
163:*20* 164:*7*
166:*13* 173:*13*
174:*3, 16* 178:*20*
179:*2* 180:*16*

181:*17* 182:*13, 22*
185:*5* 186:*16*
187:*2, 13* 188:*18*
189:*7* 190:*1*
witnessed 118:*9, 11*
119:*10* 120:*2*
122:*11* 124:*18*
129:*2*
**word** 82:*17* 92:*17*
**words** 187:*4, 8*
**work** 7:*1* 8:*2, 14,*
*19* 11:*9* 12:*18*
13:*19* 14:*2* 17:*19*
18:*5* 35:*13, 15*
38:*15* 39:*9, 13*
40:*3, 4, 24* 41:*17,*
*22* 42:*7, 21* 43:*4, 7,*
*23* 44:*16* 46:*23*
48:*9* 50:*20* 51:*14,*
*21, 22* 52:*12, 13, 15*
55:*22* 57:*13, 15, 16,*
*24* 58:*1, 14, 17*
59:*14, 18, 23* 62:*3,*
*8, 20, 22* 63:*1, 4*
79:*7* 82:*3* 109:*24*
112:*1, 5, 10, 20*
113:*3, 16* 114:*6, 7,*
*16, 21* 116:*12, 19*
117:*2, 6* 127:*24*
133:*17, 23* 134:*3*
136:*2, 7* 137:*9, 21*
138:*6* 139:*13*
141:*19* 144:*9*
145:*12* 146:*8, 16,*
*24* 147:*13, 15, 20*
148:*1* 155:*19*
157:*13* 158:*9, 20,*
*23* 159:*1, 4, 10, 15*
160:*3, 15, 23* 161:*5*
162:*5, 17* 163:*1, 3*
168:*10, 15* 170:*1*
171:*18* 173:*4*
174:*17* 175:*6, 9*
177:*14, 20* 179:*6, 9,*
*12, 22* 180:*1, 6*
181:*6* 182:*7* 183:*5,*
*7*
**worked** 11:*11*
12:*18* 17:*20* 18:*20*
23:*14* 35:*20* 41:*19,*
*20* 47:*23* 55:*14*

91:*14*  112:*17*
116:*24*  117:*11, 13*
128:*5, 9*  133:*10*
135:*5*  136:*13*
146:*13*  151:6
164:*15*  170:22, *23*
171:*21*  179:*12, 21*
184:*19*
**worker**  38:*14*
**workers**  173:*19*
**working**  5:*1*  10:*15*
36:22  41:*21, 24*
43:2  47:*24*  51:*9,*
*13*  52:*6, 9*  58:*16*
59:*1*  62:2  102:6
112:*16*  117:*10, 14,*
*18*  135:6  136:*24*
137:*4, 17, 19*  138:3
142:*3*  147:*11, 15,*
*16, 17*  148:*11*
156:*21*  160:*19*
163:*4*  184:*19*
**workplace**  6:*10*
100:*17, 21*  101:6
118:*1*
**work-related**  5:*23*
**works**  16:*5*  143:*20*
161:2
**worry**  188:*8*
**wound**  183:*5*
**writing**  17:*11*
49:*20*  101:*13, 16*
113:*15*  163:*12, 18*
164:*3, 4*
**written**  19:*11*  162:*8*
**wrong**  73:*23*
158:*12*
**wrongdoing**  7:*11,*
*14, 19*
**wrongly**  108:*3*
**wrote**  18:*10*  19:*17*
65:*18*  72:*1, 11*
74:*14*

**< Y >**
**yeah**  4:*15, 16*  9:*7,*
*9*  15:*15*  23:*21*
24:*4*  29:2  41:*19*
44:20  46:*19*  48:*16,*
*21*  49:*4, 5, 16*
50:*15*  51:20  52:9

53:*1, 2*  54:*24*  56:*8*
59:*6*  63:*7*  64:*5, 22*
65:*7, 19*  80:*21*
81:*12*  83:2  88:*17*
91:2  92:*1*  95:*15*
97:*5, 13*  98:*4*
104:*19*  117:*5*
119:*3, 9*  120:*20*
124:2  129:*4*  131:*3*
135:*24*  151:*19*
154:*4*  158:*5*  165:*6,*
*15, 18*  166:*13, 22*
169:*1*  171:*12*
173:22, *23*  175:*16*
178:*24*  182:22
183:*15*
**year**  19:22  21:*15*
23:*18*  25:*15*  38:*4*
65:*15*
**yearly**  37:*24*
**years**  4:*16*  5:*4*  8:*8*
9:*8*  11:*2*  12:*7*
14:*20*  22:*11*  23:*19*
24:*11*  26:*3*  27:*1,*
*13, 23*  28:*10, 23*
29:*17*  35:*1, 22*
38:*7, 9*  39:*1, 5*
40:*16, 17, 20*  42:*9*
46:*20*  47:*21*  48:*19*
49:*4, 20*  67:*9*  68:*6*
70:22  75:*5*  119:*4*
120:*9*  131:*10*
132:*6*  144:*17, 19*
145:*1*  153:*15*
164:*20*  169:*4*
173:*15*

**< Z >**
**zero**  174:*19*
**Zoom**  2:*1*  4:*5*

# Exhibit R

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1468 of 1503 PageID #:1859

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3   LEGRAIN WINSTON,             )
     MICHELLE STRICKLAND,         )
 4   VERNELL TIMS, I.V.           )
     NEWSON, JR., SAMUEL          )
 5   PAGE, WILFORD FERGUSON,      )
     CECIL WILLIAMS, ANTHONY      )
 6   MANNING, DAVID WALKER,       )
     TYRONE MCGHEE and VICTOR     )
 7   SLAUGHTER,                   )
                                  )
 8        Plaintiffs,             )
                                  )
 9        vs.                     ) No. 18-CV-05726
                                  )
10   SHERIFF OF COOK COUNTY       )
     THOMAS J. DART, in his       )
11   Official Capacity,          )
     JOSEPH RANZINO,              )
12   Individually and in his      )
     Official Capacity,          )
13   GREGORY SHIELDS,             )
     Individually  and in his    )
14   Official Capacity,          )
     THOMAS NEAL,                 )
15   Individually and in his      )
     Official Capacity,          )
16   CHRISTOPHER ROHLOFF,         )
     Individually and in his      )
17   Official Capacity, and      )
     COUNTY OF COOK,              )
18   ILLINOIS,                    )
                                  )
19        Defendants.             )

20                     VOLUME II

21        The deposition of CHRISTOPHER ROHLOFF,

22   taken in the above-entitled cause, before

23   Brenda S. Hall, Certified Shorthand Reporter of the

24   State of Illinois, CSR License No. 084-003359, on
```

Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1469 of 1503 PageID #:1860

1    Thursday, September 24, 2020, at 10:00 a.m., via

2    Zoom, pursuant to notice.

3

4    REMOTE APPEARANCES:

5              HERBERT LAW FIRM, INC.
               BY:  MR. DANIEL Q. HERBERT
6              206 South Jefferson Street
               Suite 100
7              Chicago, Illinois  60661
               (312) 655-7660
8              dan.herbert@danherbertlaw.com

9                  Appeared remotely on behalf of
                   Plaintiffs;
10

11             EMERY LAW LIMITED
               BY:  MR. ETHAN E. WHITE
12             2201 Midwest Road
               Suite 200
13             Oak Brook, Illinois  60523
               (630) 984-0339
14             ewhite@emerylawltd.com

15                 Appeared remotely on behalf of
                   Defendants;
16

17             LEINENWEBER BARONI & DAFFADA, LLC
               BY:  MR. JUSTIN L. LEINENWEBER
18             120 North LaSalle Street
               Suite 2000
19             Chicago, Illinois  60602
               (866) 786-3705
20             justin@ilesq.com

21                 Appeared remotely on behalf of
                   Defendants.
22

23
                        *    *    *
24

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1470 of 1503 PageID #:1861

```
1                          I N D E X
     WITNESS                                    EXAMINATION
2
     CHRISTOPHER ROHLOFF
3
          By Mr. Herbert                             4
4

5

6

7

8

9

10

11                     E X H I B I T S
     NUMBER                                  MARKED FOR ID
12
     Rohloff Deposition Exhibit
13
      I                                            4
14

15

16

17

18

19

20

21

22

23

24
```

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1471 of 1503 PageID #:1862
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1              (Whereupon, the witness was
2                   duly sworn.)
3         CHRISTOPHER ROHLOFF,
4  called as a witness herein, was examined and
5  testified via Zoom as follows:
6              EXAMINATION
7  BY MR. HERBERT:
8      Q.  Good morning, Mr. Rohloff.  How are you?
9      A.  Good morning.  I'm well.  How are you?
10     Q.  Good.  Good.  I know you did a deposition
11 with one of my colleagues, and so I'm going to finish
12 up the deposition and try not to go over the stuff
13 that you've already gone through, okay?
14     A.  Okay.
15     Q.  Okay.  With that being said, what I would
16 like to do is to go to Exhibit I, Rohloff Exhibit I.
17     A.  I'm going to go grab my glasses, Guys.  I
18 forgot them.
19     Q.  No problem.
20              (Whereupon, a short break
21                   was taken.)
22 BY MR. HERBERT:
23     Q.  Okay.  Mr. Rohloff, do you see that
24 there?
                                        Page 4

1      A.  I do.
2      Q.  Okay.  And this is -- we're marking as
3  Rohloff Exhibit I, and this appears to be the
4  disciplinary history for you while at the Cook County
5  Sheriff's Office, correct?
6      A.  Okay.  I've never seen this before but,
7  yeah.
8      Q.  You've never seen this document before?
9      A.  No, I have not.
10     Q.  Okay.  Do you have reason to believe that
11 it's an accurate document as far as your discipline
12 goes?
13     A.  I would have to go through -- all I see
14 is one page.
15     Q.  That's a good point, so let's go through
16 that then.
17     MR. HERBERT:  If we go to page 3 of that
18 document which should be Bates stamped 77, and if we
19 can go right to the top there.  Perfect.
20 BY MR. HERBERT:
21     Q.  Do you see this is a -- the bolded line
22 that starts with summary punishment?
23     A.  Okay.
24     Q.  Right there.  Do you see that is a --
                                        Page 5

1  it's a SPR investigation received against you on
2  August 26, 2013.  Do you see that?
3      A.  Yes.  I do see that, sir.
4      Q.  And if we can scroll down and towards the
5  bottom, the allegations where it says failed to
6  comply with department policies, and that action was
7  sustained.  Do you see that?
8      A.  Yes.  Yes, I do.
9      Q.  And right at the bottom is the summary
10 which should explain what the violation was.  Do you
11 see that?
12     A.  Yes, I do.
13     Q.  Okay.  So do you remember this incident?
14 Mr. Rohloff?
15     MR. WHITE:  Did his screen freeze?
16     MR. HERBERT:  It looks like it.
17     MR. WHITE:  Off to a good start.
18     MR. LEINENWEBER:  You know, Kelly never would
19 have let this happen, I'm just saying.
20     MR. WHITE:  Chris, are you back?  You froze
21 for a minute.
22     THE WITNESS:  I don't know what happened,
23 Guys.
24
                                        Page 6

1  BY MR. HERBERT:
2      Q.  Okay.  Well, we've got you back now it
3  looks like.
4      A.  Okay.  I had answered that twice, but you
5  guys were frozen.  No, I honestly don't remember
6  this.
7      Q.  Okay.  Well, the allegation's that you
8  were on unauthorized FMLA on the 2nd of April 2013,
9  and that was offense No. 2.  Do you see that?
10     A.  Yes, sir.  I see that.
11     Q.  And were you on FMLA?
12     A.  Yes.
13     Q.  Okay.  And do you know what offense No. 2
14 means?  Does that mean it was the second time that
15 you were on unauthorized FMLA?
16     MR. WHITE:  Objection to form.
17     THE WITNESS:  Offense -- I would have to
18 actually see the forms.  Offense No. 2 could be the
19 number of the offense or it could be the times of
20 occurrence.
21 BY MR. HERBERT:
22     Q.  Okay.  So the number of offense meaning
23 the second time that you would have allegedly
24 committed the same offense?
                                        Page 7



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1472 of 1503 PageID #:1863
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**Page 8**

1    A.  It could, yeah.  Again, without actually

2 seeing the actual discipline action form, it could

3 mean -- the offense could be offense No. 2 -- or

4 No. 2 in the policy would be the failure to comply

5 with department policies which was the allegation, or

6 it could be the second time this occurred.  I don't

7 remember.  This is seven years ago.

8    Q.  Okay.  Have you any experience with

9 situations in the sheriff's department where somebody

10 was on unauthorized FMLA?

11    A.  I don't remember specifics but, yeah, I'm

12 sure I had.

13    Q.  Okay.  And it's fair to say that what the

14 sheriff is alleging here is that you took off from

15 work on days and you were paid for those days because

16 you reported to be on FMLA.  Is that fair to say?

17    A.  Yes.

18    MR. WHITE:  Object to form, foundation.  It

19 calls for speculation.

20    THE WITNESS:  I believe that would be the

21 occasion, yes.

22    MR. HERBERT:  Okay.  And if we can go to the

23 next page, please, about midway down through the

24 document.

**Page 9**

1 BY MR. HERBERT:

2    Q.  And I'm going to talk about the bolded

3 part which talks about the SPR number received on

4 December 15, 2014.  Do you see that?

5    A.  Okay.

6    Q.  So this would have been a year after the

7 last incident.  And if I can -- if I can go to the

8 next page which will give a summary of this SPR

9 number, and do you see it there?  On November 23,

10 2014 Rohloff failed to provide prompt, correct, and

11 it should be courtesy service, offense No. 1.  Do you

12 see that?

13    A.  Yes.

14    MR. WHITE:  Objection to form.

15 BY MR. HERBERT:

16    Q.  Do you remember that incident?

17    A.  Yes, I do.

18    Q.  Okay.  And tell me about that, please.

19    A.  That was -- an investigator came to me

20 and said that he was unable to access his uniforms

21 because the locker room which he was not supposed to

22 be in in the first place was closed because the

23 floors were being waxed.  I suggested to him that he

24 go talk to building security and arrange to get his

**Page 10**

1 uniform somehow because he needed to be in uniform

2 for duty, and in that instance instead of talking to

3 anyone, he opted to walk on the waxed floors and get

4 his uniforms.

5    Q.  Okay.  And then what happened?

6    A.  Well, I apparently -- maybe waxed floors

7 isn't the right word.  It was -- was maybe

8 refinishing the floors or whatnot.  Apparently it

9 caused damage to the floors, and I was written up

10 for, as it says, not providing better guidance, I

11 guess is the best term.

12    Q.  Okay.  And you said that the floors were

13 damaged?

14    A.  Again, I don't know if they were or not,

15 but I was informed that the floors -- again, waxing

16 isn't the term.  I guess they were glazing them or

17 refinishing them and that the glaze and/or finish

18 was -- had footprints in it.

19    Q.  Got it.

20    A.  As a result of that person walking on it.

21    Q.  Okay.  And it looks like this was

22 sustained, and no discipline was recommended.  Does

23 that sound right?

24    MR. WHITE:  Objection to form and foundation.

**Page 11**

1    THE WITNESS:  I know no discipline was

2 issued, but I don't remember -- I don't believe it

3 was sustained.

4 BY MR. HERBERT:

5    Q.  Well, if you can look up to the conduct

6 unbecoming, the fourth line from the top, at the top

7 of the page, December 15, 2014 sustained.  Do you see

8 that?

9    A.  Correct.  I see that.

10    Q.  Okay.  So do you believe it was sustained

11 then as a result of seeing that?

12    MR. WHITE:  Objection to form.

13    THE WITNESS:  Again, my recollection is, is

14 that the entire matter was unfounded.  This is the

15 first time I've ever seen this document that says

16 that it was sustained.

17 BY MR. HERBERT:

18    Q.  But regardless, you were never

19 disciplined for it, correct?

20    A.  No, I was not disciplined.

21    MR. HERBERT:  Okay.  And if we can go to the

22 next page.

23 BY MR. HERBERT:

24    Q.  Okay.  Right at the top there, this is a



Christopher Rohloff, Vol. II - 9/24/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1473 of 1503 PageID #:1864

1 -- let me make sure this is not the same one.  Okay.
2 So this is a separate SPR number from, as you see
3 there the date it was entered, December 15, 2014.  Do
4 you see that?
5     A.  I see it.
6     Q.  Okay.
7     MR. HERBERT:  And then if we can scroll right
8 to the bottom of the page which provides a summary.
9 BY MR. HERBERT:
10    Q.  And then it says on 3/24/15, DC Rohloff
11 was in violation of grooming policy.  Offense No. 1.
12 Do you see that?
13    A.  Yes, sir.
14    Q.  Do you remember this incident?
15    A.  No, I don't.
16    Q.  Okay.  Were you ever -- do you remember
17 ever being disciplined for a violation of the
18 grooming policy?
19    A.  Yes, I do.
20    Q.  And tell me about your memory of that,
21 and multiple incidents if there are.
22    A.  Grooming policy was typically shaving
23 issues.
24    Q.  Okay.  And what was the issue with your
Page 12

1 grooming policy issue?
2    A.  I'm not referencing this.  I would have
3 to again see the actual form, but I'm assuming that
4 it is -- I was unshaven.
5    Q.  Okay.  And what was the sheriff's policy
6 with respect to shaving?
7    A.  I can't recall.  You're supposed to -- I
8 can't recall the exact specifics, but without a
9 shaving exemption card, you were supposed to be
10 cleanly shaven with the exception of mustache,
11 sideburns.  Again, the specifics of facial hair
12 growth I'm not very familiar with right now.  It's
13 been some time since I've looked at the policy.
14    Q.  Okay.  But you were written up for the
15 grooming policy and it was based upon you being
16 unshaven.  Is that fair to say?
17    A.  I have been in the past, yes.  I don't
18 know if that is what this is for.  I'm assuming
19 that's what this is for.
20    Q.  Do you know how many times you've been
21 written up for the grooming policy, being unshaven?
22    A.  No, I honestly don't.
23    Q.  Multiple times it's fair to say?
24    MR. WHITE:  Objection.  Foundation.
Page 13

1    THE WITNESS:  I don't believe so because if I
2 remember correctly -- well, not if I remember
3 correctly.  I've had a shave exemption card for quite
4 some time.
5 BY MR. HERBERT:
6    Q.  Okay.  Have you ever written anyone up
7 for not being cleanly shaven?
8    A.  I don't recall.
9    Q.  Was it your discretion as a supervisor to
10 determine if somebody was cleanly shaven?
11    A.  Was it my discretion?
12    Q.  Yeah.  I mean, in other words, what was
13 the policy with respect to what constituted cleanly
14 shaven versus not cleanly shaven?
15    MR. WHITE:  Objection to form, foundation.
16 BY MR. HERBERT:
17    Q.  Do you understand the question?
18    A.  Again without looking at the policy, as I
19 said, I'm not sure on the specifics, but as a
20 supervisor your question, yes, I would absolutely use
21 discretion.
22    Q.  And what would that discretion entail?
23    A.  As I said before in the last deposition
24 is if a guy was -- an investigator, an officer was to
Page 14

1 come in and he was unshaven, I typically speak with
2 them numerous times and say, hey, you know, can you
3 please clean up the beard or shave, things along
4 those lines and typically -- or go get your shave
5 card if necessary, and that typically resolved it.
6    Q.  Okay.  So it's fair to say you didn't
7 consider it a very -- a big deal if somebody came in
8 unshaven one day, correct?
9    MR. WHITE:  Objection to form.
10    THE WITNESS:  Did I consider it a big deal?
11 BY MR. HERBERT:
12    Q.  Yeah.
13    A.  Honestly, no, I didn't.
14    Q.  Okay.  And you were in this instance, if
15 you can see above that, it says that the actions were
16 sustained against you and you were given a reprimand?
17    MR. WHITE:  Objection to foundation.
18    THE WITNESS:  I'm trying to find where it
19 says that.
20 BY MR. HERBERT:
21    Q.  Actions taken, April 3, 2015.
22    A.  Okay.  Yes, I see that.
23    Q.  Okay.  So sustained, and you were given a
24 reprimand, right?
Page 15



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1474 of 1503 PageID #:1865
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  MR. WHITE:  Objection to foundation.

2  THE WITNESS:  I don't see anywhere where it

3  says sustained.

4  BY MR. HERBERT:

5      Q.  Well, if you look right above the

6  highlighted portion where it says sustained.

7      A.  Yes, I see that.

8      Q.  Okay.  So you would agree with me that

9  this was sustained, and you were given a reprimand as

10  a result of this infraction, correct?

11      A.  Yes, sir.

12  MR. WHITE:  Object to form and foundation.

13  BY MR. HERBERT:

14      Q.  Okay.  And a reprimand is the lowest form

15  of discipline that can be given, correct?

16      A.  The reprimand is the first step in the

17  summary punishment.

18      Q.  Okay.  And it's the lowest form of

19  discipline, right?

20      A.  That is correct.

21  MR. HERBERT:  Okay.  If we can move on to the

22  following page, and we'll scroll down about halfway

23  down where it says, entered by Sharon Nolter on

24  April 3, 2015.

Page 16

1  BY MR. HERBERT:

2      Q.  Do you see that?

3      A.  Yes, I see that.

4      Q.  Okay.  And then if we can -- we'll go to

5  the next page and we'll look at the summary there

6  where it says, "ARU reports that on 4/22/15 DC

7  Rohloff was absent, no sick time.  Offense 2."

8          Do you see that?

9      A.  I see that.

10      Q.  Okay.  Do you remember this incident?

11      A.  No, I do not.

12      Q.  Do you know if you were absent without

13  sick time on April 22, 2015?

14  MR. WHITE:  Objection.  Asked and answered.

15  THE WITNESS:  I don't recall that, no.

16  BY MR. HERBERT:

17      Q.  Do you know if you were ever accused of

18  being absent without any sick time?

19      A.  I do remember, yes.  Again, I don't

20  remember specifics.

21      Q.  Well, tell me about the incident that you

22  remember where you were accused of being absent

23  without sick time.

Page 17

1      A.  I have a handicapped daughter, and I

2  remember one time having to take time off that I did

3  not have to care for my child.

4      Q.  Okay.  And so you were -- you took time

5  off, and you didn't have the actual time when you

6  took it off, correct?

7      A.  I would assume that.  I don't remember if

8  it was --

9      Q.  Yeah, a bad question.  It's a bad

10  question.  I'll ask a better one.

11          So is it fair to say that you would

12  have -- you would have called off or put a slip in

13  for eight hours of compensatory time in lieu of you

14  going to work that day?

15  MR. WHITE:  Objection to foundation.

16  THE WITNESS:  On that day if that's what

17  they're writing me up, yeah.

18  BY MR. HERBERT:

19      Q.  Okay.  And by looking at these

20  allegations, it looks like you were given the day

21  off, correct?

22  MR. WHITE:  Objection to foundation.

23  THE WITNESS:  Given the day off, no.  If I

24  was penalized for it, no, I wasn't paid, so I wasn't

Page 18

1  given the day off.

2  BY MR. HERBERT:

3      Q.  Okay.  But this was -- the allegation was

4  made after you were given the -- after you had taken

5  the day off, correct?

6  MR. WHITE:  Objection to foundation, it calls

7  for speculation.

8  THE WITNESS:  Your interpretation of day off

9  is probably different than mine in that a day off to

10  me is a paid day off.  This -- based on what you're

11  presenting to me, absent no sick time and then

12  corresponding discipline does not indicate a day off.

13  No, I did not report for duty that day based on this

14  document.

15  BY MR. HERBERT:

16      Q.  Okay.  And is it your testimony that once

17  the sheriff found out that you didn't have any sick

18  time that you were then docked eight hours' pay?

19      A.  That's correct.

20      Q.  Okay.  And you were given a reprimand for

21  this, correct?

22      A.  I'd have to take a -- let's see here.

23      Q.  If you can look right above the

24  highlighted portion where it says summary.

Page 19



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1475 of 1503 PageID #:1866
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    A.  Yes, sir.  That's what it says.

2    Q.  Okay.  Reprimand -- or strike that.

3        If we can go down to the bottom of

4  that page, and here this looks to be less than a

5  month later.  May 4, 2015, this is another

6  allegation.

7    MR. WHITE:  I'm going to object to

8  foundation.  It also misstates the document.

9  BY MR. HERBERT:

10    Q.  If we can go to the next page and we'll

11  show the summary, towards the bottom of the page.

12        In there it says on 2/2/16, "Deputy

13  Chief Rohloff failed to properly supervise the return

14  of department-issued equipment."  Do you see that

15  there?

16    A.  I see it.

17    Q.  And do you remember this incident?

18    A.  No, I do not.

19    Q.  Okay.  Do you know if you were ever

20  accused of failing to properly supervise the return

21  of department-issued equipment?

22    A.  I don't recall this incident, no.

23    Q.  Do you have any idea what that would be

24  as far as -- or strike that.

Page 20

1        When you were working with the

2  sheriff in your capacity, what type of equipment

3  would you be responsible to properly supervise the

4  return of?

5    A.  Radios, Tasers, body-worn cameras,

6  vehicle keys, gas cards.  I think that's about it.

7    Q.  Okay.  And you don't remember if you were

8  ever accused of failing to properly supervise any of

9  that type of equipment?

10    A.  I do not recall that, no.

11    Q.  Okay.  It's fair to say that looking at

12  this, you certainly were accused of failing to

13  properly supervise the return of some type of

14  department-issued equipment, right?

15    MR. WHITE:  Objection to form, foundation.

16  It calls for speculation.

17    THE WITNESS:  Based on this document, yes,

18  sir.  I see that accusation.

19  BY MR. HERBERT:

20    Q.  Okay.  And that would have been something

21  went missing, a Taser, something else that you were

22  responsible for supervising the return of.  It went

23  missing.  Is that fair to say?

24    MR. WHITE:  Objection to foundation, calls

Page 21

1  for speculation.

2    THE WITNESS:  Again, yeah, I'm assuming

3  that's what it is.

4  BY MR. HERBERT:

5    Q.  Okay.  Did you ever write anyone up for

6  failing to properly supervise the return of

7  department-issued equipment?

8    A.  To fail -- I don't recall.  I honestly

9  don't recall.

10    Q.  Okay.  And if we can go up a little bit

11  where it says actions taken, May 3, 2016 suspension

12  days, one inattention to duty, and then below

13  reduced, written reprimand.  Do you see that?

14    A.  Yes, sir.

15    Q.  And do you know what that means with

16  respect to this case?

17    A.  I do.

18    Q.  I'm sorry.  You do?

19    A.  Yes, sir.  I do.

20    Q.  Okay.  Tell me what that is, please.

21    A.  The discipline that was recommended was

22  that I be suspended one day and that after the

23  grievance was heard, the discipline was reduced to a

24  written reprimand and then the written reprimand was

Page 22

1  my discipline.

2    Q.  Okay.  And it was a grievance at the

3  first step is what occurred in this case, correct?

4    MR. WHITE:  Objection.  Foundation.

5

6  BY MR. HERBERT:

7    Q.  I'm sorry.  I didn't get your answer.

8    A.  That's what it indicates, yes.

9    Q.  Okay.  Do you know who -- what supervisor

10  sat on the step one of the grievance that reduced it

11  from a one-day suspension to a written reprimand?

12    A.  I don't even remember this instance.

13    Q.  Okay.  Do you know who typically sat on

14  the first step of grievances that involved

15  supervisors such as you?

16    A.  It's altered in recent years.  If I'm not

17  mistaken, this was in what year?  2016?

18    Q.  Yes.

19    A.  If I'm not mistaken, in that time frame

20  first step grievances were heard by a chief.

21    Q.  Okay.  Who would have been the chiefs

22  that were there during that time period?

23    A.  We would have had -- oh, boy.  I don't

24  know.  During that time period, I don't even remember

Page 23



Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1476 of 1503 PageID #:1867

1 who was there. I know -- I believe Ray Duran was a
2 chief at the time. I don't know if -- I don't know
3 if Joe Ranzino was there at the time. I don't
4 remember if Barry Acey was there at the time. I
5 don't remember if Tom Neal was there at the time. I
6 believe Tony Boyle was there at the time.
7     Q. How many chiefs were there,
8 approximately, in 2016 in the EM unit?
9     A. I don't recall. That's -- I don't
10 recall.
11     Q. Okay. And it would have been a chief
12 that would have sat on the first stage of the
13 grievance because they would have been a direct
14 supervisor of you. Is that fair to say?
15     A. That is correct.
16     Q. Okay. And that's how the policy was with
17 the sheriff's department, that it would be -- the
18 step one of the grievance would be the direct
19 supervisor?
20     MR. WHITE: Object to form and foundation.
21     THE WITNESS: I actually believe that was
22 contractual.
23 BY MR. HERBERT:
24     Q. Okay. Did Greg Shields ever -- did he

Page 24

1 ever sit on any grievances concerning disciplinary
2 instances with you?
3     MR. WHITE: Objection to form.
4 BY MR. HERBERT:
5     Q. Mr. Rohloff?
6     A. Yes. I indicated I don't remember.
7 Guys, I think I'm losing you.
8     MR. WHITE: We can still hear you, Chris.
9     THE WITNESS: Okay. It said that my internet
10 was unstable. I don't recall if Greg Shields ever
11 sat on any of my grievance hearings.
12 BY MR. HERBERT:
13     Q. Okay. If we can go to the following page
14 and we'll go midway down. Summary punishment. And
15 this talks about an incident on August 26, 2016, as
16 far as it being received on that date. Do you see
17 that?
18     A. I do.
19     Q. Okay. And if we can go to the following
20 page which will give you the summary right at the
21 top, and there it says "ARU reports that on
22 8/17/2016, deputy chief had no compensatory time.
23 Offense No. 2." Do you see that?
24     A. I do.

Page 25

1     Q. And do you remember this incident?
2     A. Vaguely I do.
3     Q. Tell me about that, please.
4     A. I put in for preapproved time off. That
5 time was granted. I did not report to work that day,
6 but I indeed did not have the time on the books that
7 I requested to take the time off.
8     Q. Okay. The same thing for the last
9 incident that we talked about, the incident with
10 your -- where you had to take off for your daughter?
11     MR. WHITE: Objection to form.
12     THE WITNESS: No, that's -- there's a
13 difference between asking for preapproved time and
14 calling in medical.
15 BY MR. HERBERT:
16     Q. Okay. So in the last instance where
17 you -- is it your testimony that the incident with
18 your daughter that we spoke of, that you called in
19 for medical time? Is that what you're telling us?
20     A. That's what the document indicated.
21     Q. Okay. Well, you have unlimited medical
22 time, do you not?
23     A. No, sir.
24     Q. No?

Page 26

1     A. No. We're not the Chicago Police.
2     Q. I get it. So you have sick time, and you
3 have compensatory time, correct?
4     A. Yes, sir. That's correct.
5     Q. Okay. And just briefly tell me what the
6 difference between those two are.
7     A. Sick time is just that, medical time. We
8 earn -- medical time is earned on a biweekly basis.
9 I don't know the actual -- I used to, but I don't
10 know the actual calculations. I believe it's -- your
11 .48 something hours every pay period. Compensatory
12 time can include vacation time, it can include
13 personal time, it can include time accrued, time due
14 on the books, it could include holiday time.
15     When you submit for any type of
16 compensatory time, you have to specify which type of
17 time you're requesting to take off, whether it be
18 personal time, holiday time, vacation time, or
19 compensatory time in the form of time due which is
20 overtime banked.
21     Q. Okay. And sticking along the overtime
22 bank, so if you were to go to court when you weren't
23 on duty, you would get overtime for that?
24     MR. WHITE: Objection to form, foundation.

Page 27



Christopher Rohloff, Vol. II  -  9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1477 of 1503 PageID #:1868
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1    THE WITNESS:  If you request the time for
2  court, yes.
3  BY MR. HERBERT:
4    Q.  Okay.  As opposed to requesting the
5  money?
6    **A.  As opposed to requesting the money, yes.**
7    Q.  Okay.  And that -- if you requested time
8  for your court time, that would be compensatory time,
9  correct?
10    **A.  Correct.**
11    Q.  And it would be put into your
12  compensatory time bank?
13    **A.  Correct.**
14    Q.  Okay.  So on this instance, you put in
15  for a tour of duty to be off and you indicated that
16  you had compensatory time that can be used to get you
17  the day off.  Is that fair to say?
18    MR. WHITE:  Objection to form.
19    THE WITNESS:  I believe so.  I don't recall
20  if I asked for compensatory time, personal time,
21  holiday time, or vacation time.
22  BY MR. HERBERT:
23    Q.  Okay.  But regardless, when you asked,
24  you were given the following day off, correct?

Page 28

1    MR. WHITE:  Objection to form and foundation.
2    THE WITNESS:  I don't recall if it was the
3  following day.  I mean, we can submit time off
4  30 days in advance.
5  BY MR. HERBERT:
6    Q.  Okay.  Well, do you know if you were
7  given -- if you were given the day off for the
8  compensatory time in this situation?
9    **A.  It was approved.  Yes, sir.**
10    Q.  Okay.  You say it was approved.  Does
11  that mean that you got the day off?
12    **A.  Correct.**
13    Q.  Okay.  Do you know if you were ever
14  docked for pay for that incident?
15    **A.  I believe I was.**
16    Q.  So this is the second time that you
17  received a day off when you didn't have the
18  appropriate time in your time bank to get that day
19  off.  Is that fair to say?
20    MR. WHITE:  Object to form.
21    THE WITNESS:  Based on these documents, yes.
22  BY MR. HERBERT:
23    Q.  Okay.  And if we can go back to the
24  previous page, right at the bottom there where we see

Page 29

1  the allegations, and it says on August 26, 2016 that
2  these allegations were sustained against you.  Do you
3  see that?
4    **A.  I see it.**
5    Q.  And then the actions taken were a
6  reprimand, correct?
7    **A.  I see it.**
8    MR. WHITE:  Objection to foundation.
9    THE WITNESS:  I do see that.
10  BY MR. HERBERT:
11    Q.  Okay.  So despite this being your second
12  infraction of a similar nature, you still received
13  the lowest form of discipline possible, correct?
14    MR. WHITE:  Objection to foundation, form.
15  It calls for speculation.
16    THE WITNESS:  That's what the document
17  indicates.
18  BY MR. HERBERT:
19    Q.  And is that what happened?
20    **A.  I don't -- is this -- this is the first**
21  **incident or the second incident?**
22    Q.  This is the second incident.  This is one
23  where you tried to use comp time, not sick time.
24    MR. WHITE:  Objection to foundation, form.

Page 30

1    THE WITNESS:  The document indicates that I
2  was issued a reprimand in this instance.
3  BY MR. HERBERT:
4    Q.  Well, do you know how many times you were
5  accused of requesting time off when you didn't have
6  adequate time, be it compensatory time or sick time?
7    **A.  I don't recall, sir.**
8    Q.  Okay.  Did you ever discipline somebody
9  for -- while you worked in the sheriff's EM unit, did
10  you ever discipline a subordinate for taking time off
11  when they didn't have the adequate amount of time in
12  their bank?
13    **A.  I'm sure I have.**
14    Q.  Okay.  It's fairly common for this to
15  occur while you were in EM?
16    MR. WHITE:  Objection to form.
17    THE WITNESS:  Fairly common, I mean...
18  BY MR. HERBERT:
19    Q.  It happens?
20    **A.  Yes.  Yes.  Yes, it does happen.**
21    Q.  Not a big deal.  Would you agree with me?
22    MR. WHITE:  Objection to form.
23    THE WITNESS:  It is.  Yes, I think it's a
24  pretty big deal.

Page 31

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1478 of 1503 PageID #:1869
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

BY MR. HERBERT:

Q.  Did you ever give anyone -- did you ever recommend discipline against somebody that took a day off and didn't have the appropriate amount of compensatory time in their bank?

A.  You would have to give me specifics, Counsel, because the policy has changed so many times over the course of the years.

Q.  Okay.  Give me an example of how the policy changed.

A.  Discipline -- yeah, I don't recall when this was altered, but I believe it was some time ago. I believe it was maybe two thousand -- 2015, 2016.

Discipline was no longer -- recommendations for the action to be taken, meaning whether it was a written reprimand, a one-day suspension, a two-day suspension, a three-day suspension, that was no longer the option or at the discretion of first line supervision or any supervision of that officer's chain of command.

The discipline forms were simply filled out with the infraction and the details.  They were forwarded then to Employee Discipline and/or Internal Affairs/OPR, and those discipline forms

Page 32

would then be sent back to us with the recommendations for the type of discipline, whether it be written reprimand, suspension, whatever the case may be.

Q.  Okay.  And do you know -- and prior to that change, is it your testimony that the discipline was handled in-house, in other words, it didn't have to go to OPR?

A.  Yes, sir.

MR. WHITE:  Object to form and foundation.

BY MR. HERBERT:

Q.  And when do you think that change took place?

A.  As I indicated before, I believe sometime in 2015, 2016.  I can't give you a specific time or date.  I don't recall.

Q.  Okay.  And just so I'm clear, so after that change, then the policy is that a supervisor can write up somebody for an infraction, but they don't make any recommendation as to the discipline that needed to be taken?

A.  That is correct.

Q.  Okay.  So the supervisor's role was simply to document the infraction, correct?

Page 33

A.  Correct.

Q.  And then send it to OPR for them to determine the appropriate penalty?

A.  Employee Discipline or OPR.

Q.  And what is Employee Discipline?

A.  It is a unit that was formed by -- I'm assuming.  I'm speculating.  It's a unit within the sheriff's department that is strictly responsible for dealing with these issues, with discipline.

Q.  Okay.  And are they separate and apart from OPR?

A.  I don't know.  They were in a separate building, yes.

Q.  Okay.  And what was the policy regarding which unit would be sent the discipline?

MR. WHITE:  Objection to foundation.

BY MR. HERBERT:

Q.  Do you understand the question?

A.  I do understand your question.  Honestly, I don't recall.  I would have to sit down with the policy to take a look at it.  I don't know.

Q.  Okay.

A.  Off the top of my head, I don't know.

Q.  Okay.  Well, do you know if you ever sent

Page 34

notification of discipline to employee -- the Employee Discipline unit?

A.  I believe I have, yes.

Q.  And do you know if you've sent any notifications of that nature to OPR?

A.  I believe I have, yes.

Q.  And do you know when you did that -- or strike that.

Was it -- strike that.

How did you decide whether to send it to Employee Discipline or OPR?

A.  If I'm not mistaken, I would have referred to written policy.

Q.  Okay.  So you believe that it was a written policy where specific types of allegations of discipline had to go to Employee Discipline and certain types of employee discipline had to go to OPR?

A.  I believe so.  Yes, sir.

Q.  Okay.  And I know I'm testing your memory here, but do you know what the criteria was for which type of allegations went to OPR and which went to Employee Discipline?

MR. WHITE:  Objection.  Asked and answered.

Page 35



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1479 of 1503 PageID #:1870
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  THE WITNESS: No, I honestly don't recall. I
2  don't.
3  BY MR. HERBERT:
4     Q. Okay. Would it be fair to say that the
5  more serious allegations would go to OPR versus the
6  less serious allegations?
7     A. Yes.
8     Q. Okay. And who would determine the
9  serious nature of the allegations when deciding which
10 unit to send it to?
11    A. Policy.
12    Q. Okay. And just tell me. I know you
13 don't have the policy memorized, I'm assuming. Fair
14 to say?
15    A. No, I don't have the policy memorized.
16    Q. Okay. Just tell me what your
17 understanding of that policy is with respect to
18 determinations as to what forms of discipline went to
19 which investigative bodies?
20    MR. WHITE: Objection to foundation.
21    THE WITNESS: As I had -- in the last day's
22 deposition I said that there is a big difference
23 between a negligent discharge of a firearm or a
24 Taser. That's obviously a more serious infraction as

Page 36

1  opposed to per se someone that -- his uniform is not
2  properly pressed or he's not -- his name tag isn't
3  being displayed.
4  BY MR. HERBERT:
5     Q. Or they weren't cleanly shaven?
6     MR. WHITE: Objection to form and foundation.
7     THE WITNESS: I would agree, yeah. Cleanly
8  shaven is, yes, a less serious transgression.
9  BY MR. HERBERT:
10    Q. That you would have sent to the Employee
11 Discipline unit, correct?
12    MR. WHITE: Objection to foundation.
13    THE WITNESS: Again, within the time frame,
14 yeah, that would probably have gone to -- yes, it
15 would have gone to Employee Discipline, correct.
16 BY MR. HERBERT:
17    Q. And the incidents about requesting comp
18 time when you didn't have comp time, a scenario like
19 that would have gone to Employee Discipline versus
20 OPR, correct?
21    MR. WHITE: Objection. Foundation.
22    THE WITNESS: Correct.
23 BY MR. HERBERT:
24    Q. Because those are minor incidents,

Page 37

1  correct?
2     A. That's correct.
3     MR. HERBERT: Okay. If we go to -- I'm
4  sorry. If you could scroll down. Are we on Bates
5  stamp 84? Very good. If we can go to 85, please,
6  towards the bottom of the page.
7  MR. HERBERT:
8     Q. And right there we'll again look at that
9  summary punishment received on November 4, 2016. Do
10 you see that?
11    A. I see it.
12    Q. Okay. Below that it talks about the
13 officers involved, and that being you, correct?
14    A. Yes, sir.
15    MR. HERBERT: Okay. And if we can scroll to
16 the next page.
17 BY MR. HERBERT:
18    Q. And do you see the allegations there,
19 attendance, failure to comply with department
20 policies, and November 4, 2016 sustained, correct?
21    A. I see that. Yes, sir.
22    Q. Okay. And below that it says that you
23 were given a reprimand, correct?
24    MR. WHITE: Objection to foundation.

Page 38

1  THE WITNESS: I see that, yes.
2  BY MR. HERBERT:
3     Q. Okay. And that summary below, "ARU
4  reports that on 10/23/16 Deputy Chief Rohloff was
5  absent, no vacation time. Offense 3." Do you see
6  that?
7     A. I see that.
8     Q. And do you remember this incident?
9     A. No.
10    Q. You have no memory of this incident, of
11 being accused of being absent without vacation time?
12    A. No, I don't. This is actually -- a lot
13 of this is a shock to me. I don't recall a lot of
14 this.
15    Q. An offense 3, would that mean a third
16 time committing the same infraction?
17    MR. WHITE: Objection to foundation, calls
18 for speculation.
19    THE WITNESS: I would assume so, sir.
20 BY MR. HERBERT:
21    Q. Okay. And so here, the summary is again
22 you were absent in a situation where you didn't have
23 vacation time, correct?
24    A. That's what the document indicates.

Page 39



Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1480 of 1503 PageID #:1871

1  Q.  Okay.  And your testimony is you never
2  received any information that you -- that this
3  allegation was sustained against you?
4    MR. WHITE:  Objection.  It misstates
5  testimony.
6    THE WITNESS:  I don't recall this incident.
7  I recall -- I recall one incident of -- similar to
8  this and we had already spoke about this earlier in
9  this testimony.
10 BY MR. HERBERT:
11 Q.  Okay.  So you remember one -- this is the
12 third incident, according to these documents, where
13 you were off when you didn't have the either vacation
14 time, compensatory time, or sick time, correct?
15   MR. WHITE:  Objection to form, foundation.
16 It misstates the document.
17     You can answer.
18 BY MR. HERBERT:
19 Q.  Mr. Rohloff?
20   MR. WHITE:  It looks like he froze again.
21 BY MR. HERBERT:
22 Q.  Mr. Rohloff, if you can hear us, let us
23 know, but I think we have a frozen screen here.
24   MR. HERBERT:  Do you want to call him, Ethan?

Page 40

1  I'm pretty close to being done, I think.
2    MR. WHITE:  Let's give it an awkward
3  15 seconds here and see if he comes back.
4    MR. LEINENWEBER:  I'll shoot him a text as
5  well.
6    MR. WHITE:  He may have just dropped
7  entirely.  I think he did.  Maybe he's coming back.
8    THE WITNESS:  I think I'm back, Guys.
9  BY MR. HERBERT:
10 Q.  Welcome back.
11 A.  Thank you.
12   MR. HERBERT:  Brenda, I'm sorry.  I don't
13 know if -- I don't think we got an answer from
14 Mr. Rohloff, but would you mind repeating that last
15 question?
16     (Whereupon, the record was
17       read as requested.)
18   THE WITNESS:  Yeah, that's what this document
19 indicates.  I don't recall the incidents personally
20 though.
21 BY MR. HERBERT:
22 Q.  Okay.
23 A.  I recall one.
24 Q.  Okay.  But you're not stating that these

Page 41

1  documents are in error, correct?
2    MR. WHITE:  Objection to form and foundation,
3  also calls for speculation.
4      You can answer.
5    THE WITNESS:  I don't know if they are or
6  not.  I've never seen these documents before in my
7  life.
8  BY MR. HERBERT:
9  Q.  Okay.  But it's possible that you were
10 disciplined three times for failing to have the
11 appropriate time when you took off, fair to say, as
12 these documents allege?
13 A.  Yes, sir.
14   MR. WHITE:  Objection.  It calls for
15 speculation, foundation.
16 BY MR. HERBERT:
17 Q.  Okay.  And again, you were given a
18 reprimand for this incident, correct?
19   MR. WHITE:  Objection to foundation.
20   THE WITNESS:  That's what the document says,
21 yes.
22 BY MR. HERBERT:
23 Q.  Does the sheriff -- was the policy that
24 when disciplining they were to utilize a progressive

Page 42

1  discipline system?
2  A.  The policy was progressive discipline,
3  but it was also restrained by time frame, I believe.
4  Q.  And tell me what progressive discipline,
5  what that meant concerning the sheriff's policy.
6  A.  You're asking me very specific questions
7  about a written policy that I don't have in front of
8  me.  I don't recall.  I mean, I can try and summarize
9  that to the best of my knowledge.
10 Q.  Yeah, that's all I'm asking.  Obviously
11 I'm not giving you -- I don't know if there is a
12 policy on progressive discipline written, but what
13 was your understanding of the policy regarding
14 progressive discipline?
15 A.  The first infraction was a counseling
16 which is not disciplinary in nature.  Second was a
17 written reprimand.  Third was a one-day suspension
18 and then accordingly two and three.  After that I
19 don't recall.  I believe -- I don't recall the
20 recommendations after that.
21 Q.  Okay.  So based upon what we just talked
22 about with this case, you should have received a
23 one-day suspension based upon the progressive
24 disciplinary system that you just described?

Page 43

Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1481 of 1503 PageID #:1872

1 MR. WHITE: Objection to form and foundation.

2 THE WITNESS: I would have to sit down and

3 reference the policy and the time frames to answer

4 that question.

5 BY MR. HERBERT:

6 Q. Okay. But if this were your third

7 infraction of the same type of an infraction, then

8 you would agree with me that you should have received

9 a one-day suspension as opposed to a reprimand,

10 correct?

11 MR. WHITE: Objection to form and foundation.

12 THE WITNESS: Again, I would have to look at

13 the time frames.

14 BY MR. HERBERT:

15 Q. Yeah. I'm not clear what that means,

16 what you mean by that.

17 **A. Again, without having the policy in front**

18 **of me or presented to me, if I'm not mistaken, when**

19 **it comes to attendance review -- ARU stands for**

20 **Attendance Review Unit which is also part of the**

21 **Employee Discipline unit if I'm not mistaken.**

22 **Their policy indicates that**

23 **attendance-related infractions, so to speak, and then**

24 **there's also contractual obligations irregardless of**

Page 44

1 **the policy. There's contractual things here, but if**

2 **I'm not mistaken, there's time frames of maybe 12,**

3 **12 months that the slate is wiped clean, so to speak**

4 **contractually.**

5 **If I'm not mistaken, you presented**

6 **me with something from 2013. Now you're presenting**

7 **me with something from 2016. Without looking at all**

8 **of these documents, the original documents, the**

9 **original dates on infraction policy and contractual**

10 **agreements with the County and the sheriff's**

11 **department, I can't answer those questions honestly**

12 **and accurately.**

13 Q. Okay. But based upon that and what we've

14 just reviewed, what we've just reviewed where it

15 indicates that this is the third offense of a similar

16 nature and the fact that you received a reprimand, is

17 it your testimony that during this time period that

18 the previous disciplinary cases would not be utilized

19 in the progressive discipline system?

20 MR. WHITE: Objection to form, foundation.

21 It calls for speculation, misstates testimony.

22 You can answer.

23 THE WITNESS: Again, I would have to refer --

24 I can't -- I don't know how to -- if I could answer

Page 45

1 you, Counsel, I would. I don't know how to answer

2 you without looking at all these things, without

3 looking at the policy, without looking at every

4 single date and -- of these three offenses that are

5 being presented to me and without -- without looking

6 at the policy, my contract at the time and all three

7 offenses, I don't -- I can't answer. I don't know.

8 I don't know what the answer is.

9 BY MR. HERBERT:

10 Q. And I get it. But you would agree with

11 me that based upon your review of this document --

12 let's assume that this document accurately summarizes

13 the discipline with respect to the October 23, 2016

14 date. This document indicates that it's the third

15 time that you were off without the appropriate time

16 and you were given a reprimand, correct?

17 MR. WHITE: Objection. Form, foundation, it

18 calls for speculation. Also asked and answered.

19 THE WITNESS: That's what this document

20 states.

21 BY MR. HERBERT:

22 Q. Okay. And your testimony is that a

23 third -- that at some point a third infraction would

24 result in a one-day suspension, correct?

Page 46

1 MR. WHITE: Objection. Foundation, misstates

2 testimony.

3 THE WITNESS: Again it depends on what the

4 time frame is.

5 BY MR. HERBERT:

6 Q. Right. But you testified that for

7 progressive discipline, the third infraction at some

8 point resulted in a one-day suspension, correct?

9 **A. Say that again. I didn't hear you. I'm**

10 **sorry.**

11 Q. I'm just asking about your earlier

12 testimony where you said that a third sustained

13 finding for the same infraction, in other words,

14 offense No. 3, that would be a one-day suspension.

15 That was the policy, correct?

16 MR. WHITE: Objection to form, misstates

17 testimony.

18 THE WITNESS: As long as it's within a time

19 frame.

20 BY MR. HERBERT:

21 Q. Got it. And do you know what that time

22 frame is --

23 MR. WHITE: Objection to form.

24

Page 47



Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1482 of 1503 PageID #:1873

BY MR. HERBERT:

Q. -- as you sit here today?

A. I don't recall. I don't remember. Did you ask as of today?

Q. Well, let's say as of November 4, 2016.

A. I don't remember.

Q. Okay. Do you know when that -- do you know what the policy is now with respect to progressive discipline?

A. No, sir. I haven't been at work for some time.

Q. Okay. When you left, do you know what the policy was with respect to progressive discipline? And I'm sorry. I don't know what year you stopped working.

A. I'd have to refer to the policy. No, I was not familiar with what the policy said.

Q. Okay. But I'm sorry. What year did you stop working?

A. I was injured on duty on June 7th of 2017. I was off for two years, 23 months to be exact. I went back on a light-duty capacity on May 7th of 2019, and then I then went back on duty disability for the same reasons on February 2nd,

2020.

Q. Okay. And what was the sheriff's policy regarding progressive discipline in February 2020?

MR. WHITE: Objection. Asked and answered.

THE WITNESS: I don't recall.

BY MR. HERBERT:

Q. Do you know if it was the same as what you testified earlier where the third offense would result in a one-day suspension?

A. I do not know, sir.

Q. Is it possible that it -- that was the policy? Fair to say?

MR. WHITE: Objection. It calls for speculation.

THE WITNESS: I don't know. I'm not -- these are written policies. Typically, if I needed guidance, I refer to those policies. Accordingly, I'm going to guess to answer your question, sir.

BY MR. HERBERT:

Q. I get you. And when you talk about -- well, strike that. I think we've got enough out of that.

Okay. If we can move on to the following page, and this is an incident,

insubordination against you, correct, is the heading right up at the top?

A. Correct.

Q. Okay. And I think you talked about this a little bit in your deposition last time. If we can go to the bottom of the page. The summary there, do you see that?

A. Yes.

Q. So on November 13th, 2016, you were given an assignment to report to the technical service section but refused to go, correct?

A. That is correct.

Q. Okay. And do you remember if you were disciplined for that?

A. There was discipline recommended.

Q. And do you know who it was that recommended the discipline?

A. I do not recall.

Q. Well -- go ahead.

A. Rather than say I don't recall, I don't know at that time if the discipline was being recommended by Employee Discipline or at that time if it was still being recommended on an in-house level.

Q. Okay. Well, if you can take a look up

at November -- actions taken there, November 23, 2016, days, hours suspended, assessed, there's the number ten there. Do you see that?

A. Yes, I see that.

Q. And do you remember being -- do you remember this case resulting in a sustained finding?

A. Yes, I do.

Q. Do you remember being given a ten-day suspension?

A. No, sir. It was an arbitrator dropped that to a two-day suspension.

Q. Okay. But originally it was recommended that -- or I'm sorry. The finding was sustained and it was a ten-day suspension, correct?

MR. WHITE: Objection. Foundation.

THE WITNESS: No, that's not correct.

BY MR. HERBERT:

Q. Tell me about -- when it's a ten-day suspension, who recommended that? Do you know?

A. As I indicated before, I don't know at that time if it was recommended -- the type of discipline was recommended in-house or if it was done by Employee Discipline. I don't know.

Q. But it would have been either in-house or



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1483 of 1503 PageID #:1874
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1 Employee Discipline, correct?

2 **A. That's correct.**

3 Q. It would not have been OPR, correct?

4 **A. I don't know.**

5 MR. WHITE: Objection to foundation.

6 BY MR. HERBERT:

7 Q. Well, OPR would handle -- you talked

8 earlier about how they would handle serious cases

9 such as, you know, discharging a Taser.

10 Based upon your experience with the

11 disciplinary system in the sheriff's department, this

12 incident would not be one that would normally go to

13 OPR, correct?

14 MR. WHITE: Objection to form, foundation.

15 It calls for speculation.

16 THE WITNESS: I would have to refer to the

17 policy, Counsel.

18 BY MR. HERBERT:

19 Q. But I'm asking what you think though.

20 Based upon your understanding and knowledge of the

21 system, is it your belief that an incident such as

22 this would be investigated by OPR or Employee

23 Discipline?

24 **A. An incident like this, based on a ten-day**

1 **recommendation, I would -- I don't know. I don't**

2 **know if OPR handled this. This case in my opinion,**

3 **no, it wouldn't be handled by OPR.**

4 Q. Okay. And do you know who it is that

5 recommended that you get -- I mean, do you know the

6 person, I guess is what I'm asking, the person that

7 recommended that you get a ten-day suspension?

8 MR. WHITE: Objection. Asked and answered.

9 THE WITNESS: No, I don't.

10 BY MR. HERBERT:

11 Q. Okay. And I'm sorry if I asked this.

12 And you don't know if that was from somebody in-house

13 or somebody at Employee Discipline that recommended

14 that suspension?

15 **A. No, sir. I do not know.**

16 Q. Okay. And if it would have been

17 in-house, who would that have been?

18 **A. Typically if it was done in-house, it**

19 **would have been the person that issued the discipline**

20 **form, Robert Smith.**

21 Q. Okay. And just what is your

22 understanding of the in-house versus going to

23 Employee Discipline or going to OPR?

24 MR. WHITE: Objection to form.

1 BY MR. HERBERT:

2 Q. Do you understand that question?

3 **A. I do understand the question. In-house**

4 **would indicate that we would issue the -- we would**

5 **fill out the documents and we would make the**

6 **recommendation for discipline in accordance with**

7 **contractual agreements and policy as opposed to -- I**

8 **don't know what in God's name Employee Discipline**

9 **does or how they handle their business.**

10 Q. Okay. And why is that you -- or let

11 me ask you, did you refuse to go to technical

12 services on that date?

13 **A. Yes, I did.**

14 Q. And you were assigned to go to technical

15 services. Is that correct?

16 **A. Yes, I was.**

17 Q. And that was on an assignment sheet?

18 MR. WHITE: Objection to foundation.

19 THE WITNESS: I don't recall. I don't

20 recall.

21 BY MR. HERBERT:

22 Q. Well, your assignment from a day-to-day

23 basis, were those listed on an assignment sheet, a

24 roster sheet?

1 MR. WHITE: Objection to form.

2 THE WITNESS: During that time frame, I don't

3 remember if they were or not.

4 BY MR. HERBERT:

5 Q. At some point they were listed on an

6 assignment roster sheet?

7 **A. Yes.**

8 Q. And then at some point you're saying that

9 they weren't listed on an assignment roster sheet?

10 **A. That's correct.**

11 Q. And do you know at what point -- which

12 one was first? Was it first that they weren't listed

13 on an assignment sheet and then the policy changed to

14 that it was listed on an assignment sheet or vice

15 versa?

16 MR. WHITE: Objection to foundation and form.

17 THE WITNESS: It, honestly, altered numerous

18 times. Yeah, it would have obviously started not

19 being listed to listed. I believe it's been not

20 listed to listed. It changes quite frequently or it

21 has changed quite frequently.

22 BY MR. HERBERT:

23 Q. Okay. On November 13, 2016, do you know

24 if you went to a roll call on that day?



Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1484 of 1503 PageID #:1875
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

1  A.  I don't recall if I did or not.

2  Q.  Okay.  Would your assignments be given to

3 you at roll call during that time period?

4  **A.  Not to me, no.**

5  Q.  Okay.  And how is it that you received

6 your -- how did you know where to report on any given

7 day, let's say in November 2016?

8  **A.  I had been performing the same duties,**

9 **the same function at the same desk for many, many,**

10 **many years, ten plus years, and in reference to this**

11 **instance, they were trying to alter the rank**

12 **structure for the sheriff's department and say that a**

13 **lieutenant was going to tell a deputy chief what to**

14 **do.**

15  Q.  And is that what happened in this case?

16  **A.  Yes.**

17  Q.  Who is the lieutenant that assigned you

18 to technical service section?

19  **A.  Robert Smith.**

20  Q.  And were you his supervisor?

21  **A.  At one juncture I was.  Yes, sir.**

22  Q.  How about in 2016, were you his

23 supervisor in November 2016?

24  **A.  I don't know if that was ever established**

1 **to be perfectly honest with you.**

2  Q.  Okay.  Was Robert Smith in charge of

3 making assignments on a daily basis back in November

4 of 2016?

5  **A.  Yes.**

6  Q.  And would that be assignments for

7 everyone in the unit or just for you?

8  **A.  That would be everyone.**

9  Q.  Okay.  And do you know why it is that

10 Robert Smith assigned you to the technical service

11 section on November 13, 2016?

12  **A.  Probably -- and again, this is**

13 **speculation.  This is my assumption.  It had to do**

14 **with the labor board dealings and the union dealings**

15 **for the deputy chiefs at the time and their assertion**

16 **or the administration's assertion that they wanted to**

17 **alter the rank structure putting a lieutenant in**

18 **charge of a deputy chief.**

19  Q.  Okay.  My question is a little bit more

20 specific though.  Do you know why it is that Robert

21 Smith assigned you to the technical service section

22 on that day?

23  **A.  No, I don't.**

24  MR. WHITE:  Objection to foundation, it calls

1 for speculation.

2 BY MR. HERBERT:

3  Q.  Well, you talked earlier that it was --

4 you thought it was because they were trying to

5 essentially put lieutenants in charge of assigning

6 deputy chiefs.  Is that what your testimony was?  I

7 probably butchered that, but.

8  **A.  Correct.**

9  Q.  Okay.  Why is it that they wanted to make

10 this change?

11  MR. WHITE:  Objection to foundation, it calls

12 for speculation.

13  THE WITNESS:  I haven't got a clue.

14 BY MR. HERBERT:

15  Q.  Well, how did you find out that they

16 wanted to make this change?

17  **A.  In dealings with contractual, with the**

18 **MAP union and labor negotiations.**

19  Q.  And when I say they, and I guess when you

20 say they, who are you referring to?  Who wanted to

21 make this change?

22  **A.  That would have been my administrative**

23 **supervisors, that would have been the director of**

24 **electronic monitoring, Greg Shields, the executive**

1 **director of the Department of Corrections, Mike**

2 **Miller, and as far as I know, it was the wishes of**

3 **the Sheriff of Cook County.  It was my understanding**

4 **they wanted to eliminate our rank altogether.**

5  Q.  Okay.  When you say our rank, you mean

6 the deputy chief rank?

7  **A.  That is correct.**

8  Q.  And as deputy chief, were you in a higher

9 pay grade than a lieutenant?

10  **A.  Yes, I was.**

11  Q.  And do you know why they wanted to

12 eliminate the deputy chief rank?

13  **A.  My understanding was it was a complete**

14 **restructuring of the sheriff's office and that rather**

15 **than departments having a director, they wanted to**

16 **make departments have chiefs which were then**

17 **identified as bureau chiefs, and rather than deputy**

18 **directors, they wanted bureau deputy chiefs, and**

19 **that's why they wanted to eliminate us.**

20  Q.  Okay.  And I'm assuming that they were

21 not successful in eliminating deputy chiefs, correct?

22  **A.  Through negotiations, no, but the title**

23 **will die when I die.**

24  Q.  You're the only deputy chief currently



Christopher Rohloff, Vol. II  -  9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1485 of 1503 PageID #:1876
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Page 60

1 with the Cook County Sheriff's Department?

2 **A. There are currently myself and one more**

3 **deputy chief left in this -- in my capacity. There**

4 **are, again as I indicated earlier, there's bureau**

5 **deputy chiefs, but in my capacity, yes, I am -- it's**

6 **myself and Cedric Logan, and I believe he's retiring**

7 **shortly.**

8 Q. Okay. So in November 2016, you were

9 given an assignment by Robert Smith, correct?

10 **A. Correct.**

11 Q. And he was lieutenant, correct?

12 **A. Correct.**

13 Q. And you didn't believe he had the

14 authority to give you an assignment, correct?

15 **A. Correct.**

16 Q. And you were not happy that you were

17 given the assignment to the technical service section

18 by Robert Smith, correct?

19 **A. No, that's incorrect.**

20 Q. Tell me why it is that you -- here, you

21 refused to go. Is that fair to say?

22 **A. Yes, sir. That is fair to say. That is**

23 **correct.**

24 Q. Okay. So you were assigned to the

Page 61

1 technical service section on November 13, 2016, and

2 you did not report to the technical service section

3 on that day, correct?

4 **A. That is correct.**

5 Q. And where did you report to on that day?

6 **A. I continued to perform the duties that I**

7 **had been performing for some ten years in the**

8 **monitoring center.**

9 Q. Okay. Did you inform anyone that you

10 were not going to -- that you were not going to work

11 that day on the technical service section?

12 **A. I believe I informed Lieutenant Smith, I**

13 **believe.**

14 Q. Okay. Did Lieutenant Smith give you any

15 reason as to why he made that assignment on that

16 particular day?

17 **A. He indicated that Greg Shields wanted me**

18 **moved.**

19 Q. Did you ever talk to Shields about it?

20 **A. No, sir.**

21 Q. And do you have any idea why Shields

22 would have wanted to have you moved?

23 **A. Again, it's an assumption of essentially**

24 **a restructuring of the chain of command.**

Page 62

1 Q. Did you look at it as a -- you were not

2 happy about being assigned to the technical service

3 section, correct?

4 MR. WHITE: Objection. Asked and answered.

5 THE WITNESS: It's not that I -- I had,

6 again, ten years of -- it's not a matter of being

7 happy or unhappy. I've got a job to do that I had

8 been performing for numerous, numerous, numerous

9 years, and that particular day I was probably --

10 probably had about six hours of accountability to

11 report that I had to do on a weekly basis that needed

12 to be completed by 8:00 a.m. the next day for Sheriff

13 Tom Dart.

14 BY MR. HERBERT:

15 Q. And you could not have done that if you

16 reported to the technical service section on that

17 day?

18 **A. That is correct.**

19 Q. Okay. Did Smith give you any indication

20 that you were needed in technical services on that

21 day because of some type of manpower shortage?

22 MR. WHITE: Object to form.

23 THE WITNESS: No, sir.

24 BY MR. HERBERT:

Page 63

1 Q. Did he ever provide you with any

2 explanation as to why you were assigned to the

3 technical service section on that day other than

4 because Shields wanted to put you there?

5 **A. No, sir.**

6 Q. And do you believe that Shields was

7 trying to discipline you in some way by putting you

8 in the technical services section?

9 **A. No.**

10 Q. Do you believe that Shields knew you did

11 not want to report to the technical service section

12 on that day?

13 **A. No.**

14 Q. Do you believe Smith knew that you didn't

15 want to report to the technical service section on

16 that day when he made the assignment?

17 **A. I told him that.**

18 Q. Okay. And despite that, he did not

19 change your assignment, correct?

20 **A. That is correct.**

21 MR. HERBERT: I think I'm done. I appreciate

22 it, Mr. Rohloff.

23 MR. WHITE: Dan, give me just like five

24 minutes and, hopefully, we can wrap up, okay?

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1486 of 1503 PageID #:1877

1    MR. HERBERT:  Okay.  Real good.

2    MR. WHITE:  We're taking a five minute break.

3                (Whereupon, a short break

4                 was taken.)

5    MR. WHITE:  Back on the record.

6        Mr. Rohloff, I don't have any

7    questions for you, so you are all done.  Thank you

8    for accommodating Part 2.

9    THE WITNESS:  Yes, sir.

10    MR. WHITE:  Brenda, we will waive signature.

11        (FURTHER DEPONENT SAITH NOT.)

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 64



Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1487 of 1503 PageID #:1878

```
 1                  REPORTER'S CERTIFICATE

 2           I, Brenda S. Hall, CSR No. 084-003359,

 3   Certified Shorthand Reporter of said state, do hereby

 4   certify:

 5           That previous to the commencement of the

 6   examination of the witness, the witness was duly

 7   sworn to testify the whole truth concerning the

 8   matters herein;

 9           That the foregoing remote deposition

10   transcript was reported stenographically by me, was

11   thereafter reduced to typewriting under my personal

12   direction and constitutes a true record of the

13   testimony given and the proceedings had;

14           That the said remote deposition was taken

15   before me at the time specified;

16           That I am not a relative or employee or

17   attorney or counsel, nor a relative or employee of

18   such attorney or counsel for any of the parties

19   hereto, nor interested directly or indirectly in the

20   outcome of this action.

21

22

23

24
```

Christopher Rohloff, Vol. II - 9/24/2020
Legram Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1488 of 1503 PageID #:1879

1          IN WITNESS WHEREOF, I do hereunto set my hand

2     at Chicago, Illinois, this 12th day of October, 2020.

3

4

5          _____

6          Certified Shorthand Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1489 of 1503 PageID #:1880
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

## WORD INDEX

**< 0 >**
**084-003359** 1:*24*
65:2

**< 1 >**
**1** 9:*11* 12:*11*
**10/23/16** 39:*4*
**10:00** 2:*1*
**100** 2:6
**12** 45:*2, 3*
**120** 2:*18*
**12th** 66:2
**13** 55:*23* 57:*11*
61:*1*
**13th** 50:*9*
**15** 9:*4* 11:*7* 12:*3*
41:*3*
**18-CV-05726** 1:*9*

**< 2 >**
**2** 7:*9, 13, 18* 8:*3, 4*
17:*8* 25:*23* 64:*8*
**2/2/16** 20:*12*
**200** 2:*12*
**2000** 2:*18*
**2013** 6:2 7:*8* 45:*6*
**2014** 9:*4, 10* 11:*7*
12:*3*
**2015** 15:*21* 16:*24*
17:*14* 20:*5* 32:*13*
33:*15*
**2016** 22:*11* 23:*17*
24:*8* 25:*15* 30:*1*
32:*13* 33:*15* 38:*9,*
*20* 45:*7* 46:*13*
48:*5* 50:*9* 51:*2*
55:*23* 56:*7, 22, 23*
57:*4, 11* 60:*8* 61:*1*
**2017** 48:*21*
**2019** 48:*23*
**2020** 2:*1* 49:*1, 3*
66:2
**206** 2:6
**22** 17:*14*
**2201** 2:*12*
**23** 9:*9* 46:*13*
48:*21* 51:*1*
**24** 2:*1*

**26** 6:2 25:*15* 30:*1*
**2nd** 7:*8* 48:*24*

**< 3 >**
**3** 5:*17* 15:*21*
16:*24* 22:*11* 39:*5,*
*15* 47:*14*
**3/24/15** 12:*10*
**30** 29:*4*
**312** 2:7

**< 4 >**
**4** 3:*1, 11* 20:*5*
38:*9, 20* 48:*5*
**4/22/15** 17:*7*
**48** 27:*11*

**< 6 >**
**60523** 2:*13*
**60602** 2:*19*
**60661** 2:7
**630** 2:*13*
**655-7660** 2:7

**< 7 >**
**77** 5:*18*
**786-3705** 2:*19*
**7th** 48:*20, 23*

**< 8 >**
**8/17/2016** 25:22
**8:00** 62:*12*
**84** 38:*5*
**85** 38:*5*
**866** 2:*19*

**< 9 >**
**984-0339** 2:*13*

**< A >**
**a.m** 2:*1* 62:*12*
**above-entitled** 1:*22*
**absent** 17:*8, 13, 19,*
*23* 19:*11* 39:*5, 11,*
*22*
**absolutely** 14:*20*
**access** 9:*20*
**accommodating**
64:*8*
**accountability** 62:*10*

**accrued** 27:*13*
**accurate** 5:*11*
**accurately** 45:*12*
46:*12*
**accusation** 21:*18*
**accused** 17:*18, 23*
20:*20* 21:*8, 12*
31:*5* 39:*11*
**Acey** 24:*4*
**action** 6:6 8:*2*
32:*15* 65:*20*
**actions** 15:*15, 21*
22:*11* 30:*5* 51:*1*
**actual** 8:*2* 13:*3*
18:*5* 27:*9, 10*
**adequate** 31:*6, 11*
**administration's**
57:*16*
**administrative**
58:*22*
**advance** 29:*4*
**Affairs/OPR** 32:*24*
**ago** 8:*7* 32:*12*
**agree** 16:*8* 31:*21*
37:*7* 44:*8* 46:*10*
**agreements** 45:*10*
54:*7*
**ahead** 50:*19*
**allegation** 8:*5* 19:*3*
20:*6* 40:*3*
**allegations** 6:*5*
18:*20* 30:*1, 2*
35:*15, 22* 36:*5, 6, 9*
38:*18*
**allegation's** 7:*7*
**allege** 42:*12*
**allegedly** 7:*23*
**alleging** 8:*14*
**alter** 56:*11* 57:*17*
**altered** 23:*16*
32:*12* 55:*17*
**altogether** 59:*4*
**amount** 31:*11* 32:*4*
**and/or** 10:*17* 32:*23*
**answer** 23:7 40:*17*
41:*13* 42:*4* 44:*3*
45:*11, 22, 24* 46:*1,*
*7, 8* 49:*18*
**answered** 7:*4*
17:*15* 35:*24* 46:*18*

49:*4* 53:*8* 62:*4*
**ANTHONY** 1:*5*
**apart** 34:*10*
**apparently** 10:*6, 8*
**APPEARANCES**
2:*4*
**Appeared** 2:*9, 15,*
*21*
**appears** 5:*3*
**appreciate** 63:*21*
**appropriate** 29:*18*
32:*4* 34:*3* 42:*11*
46:*15*
**approved** 29:*9, 10*
**approximately** 24:*8*
**April** 7:*8* 15:*21*
16:*24* 17:*14*
**arbitrator** 51:*10*
**arrange** 9:*24*
**ARU** 17:*7* 25:*21*
39:*3* 44:*19*
**Asked** 17:*15* 28:*20,*
*23* 35:*24* 46:*18*
49:*4* 53:*8, 11* 62:*4*
**asking** 26:*13* 43:*6,*
*10* 47:*11* 52:*19*
53:*6*
**assertion** 57:*15, 16*
**assessed** 51:*2*
**assigned** 54:*14*
56:*17* 57:*10, 21*
60:*24* 62:*2* 63:*2*
**assigning** 58:*5*
**assignment** 50:*10*
54:*17, 22, 23* 55:*6,*
*9, 13, 14* 60:*9, 14,*
*17* 61:*15* 63:*16, 19*
**assignments** 56:*2*
57:*3, 6*
**assume** 18:*7* 39:*19*
46:*12*
**assuming** 13:*3, 18*
22:*2* 34:*7* 36:*13*
59:*20*
**assumption** 57:*13*
61:*23*
**attendance** 38:*19*
44:*19, 20*
**attendance-related**
44:*23*
**attorney** 65:*17, 18*

Christopher Rohloff, Vol. II - 9/24/2020
Legran Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1490 of 1503 PageID #:1881

August 6:2 25:15
30:1
authority 60:14
awkward 41:2

< B >
back 6:20 7:2
29:23 33:1 41:3, 7,
8, 10 48:22, 23
57:3 64:5
bad 18:9
bank 27:22 28:12
29:18 31:12 32:5
banked 27:20
BARONI 2:17
Barry 24:4
based 13:15 19:10,
13 21:17 29:21
43:21, 23 45:13
46:11 52:10, 20, 24
basis 27:8 54:23
57:3 62:11
Bates 5:18 38:4
beard 15:3
behalf 2:9, 15, 21
belief 52:21
believe 5:10 8:20
11:2, 10 14:1 24:1,
6, 21 27:10 28:19
29:15 32:12, 13
33:14 35:3, 6, 14,
19 43:3, 19 55:19
60:6, 13 61:12, 13
63:6, 10, 14
best 10:11 43:9
better 10:10 18:10
big 15:7, 10 31:21,
24 36:22
bit 22:10 50:5
57:19
biweekly 27:8
board 57:14
bodies 36:19
body-worn 21:5
bolded 5:21 9:2
books 26:6 27:14
bottom 6:5, 9 12:8
20:3, 11 29:24
38:6 50:6
boy 23:23

Boyle 24:6
break 4:20 64:2, 3
Brenda 1:23 41:12
64:10 65:2
briefly 27:5
Brook 2:13
building 9:24 34:13
bureau 59:17, 18
60:4
business 54:9
butchered 58:7

< C >
calculations 27:10
call 40:24 55:24
56:3
called 4:4 18:12
26:18
calling 26:14
calls 8:19 19:6
21:16, 24 30:15
39:17 42:3, 14
45:21 46:18 49:13
52:15 57:24 58:11
cameras 21:5
Capacity 1:11, 12,
14, 15, 17 21:2
48:22 60:3, 5
card 13:9 14:3
15:5
cards 21:6
care 18:3
case 22:16 23:3
33:4 43:22 51:6
53:2 56:15
cases 45:18 52:8
cause 1:22
caused 10:9
CECIL 1:5
Cedric 60:6
center 61:8
certain 35:17
certainly 21:12
CERTIFICATE
65:1
Certified 1:23 65:3
66:6
certify 65:4
chain 32:20 61:24
change 33:6, 12, 18
58:10, 16, 21 63:19

changed 32:7, 10
55:13, 21
changes 55:20
charge 57:2, 18
58:5
Chicago 2:7, 19
27:1 66:2
Chief 20:13 23:20
24:2, 11 25:22
39:4 56:13 57:18
59:6, 8, 12, 24 60:3
chiefs 23:21 24:7
57:15 58:6 59:16,
17, 18, 21 60:5
child 18:3
Chris 6:20 25:8
CHRISTOPHER
1:16, 21 3:1 4:3
clean 15:3 45:3
cleanly 13:10 14:7,
10, 13, 14 37:5, 7
clear 33:17 44:15
close 41:1
closed 9:22
clue 58:13
colleagues 4:11
come 15:1
comes 41:3 44:19
coming 41:7
command 32:20
61:24
commencement
65:5
committed 7:24
committing 39:16
common 31:14, 17
comp 30:23 37:17,
18
compensatory
18:13 25:22 27:3,
11, 16, 19 28:8, 12,
16, 20 29:8 31:6
32:5 40:14
complete 59:13
completed 62:12
comply 6:6 8:4
38:19
concerning 25:1
43:5 65:7
conduct 11:5

consider 15:7, 10
constituted 14:13
constitutes 65:12
continued 61:6
contract 46:6
contractual 24:22
44:24 45:1, 9 54:7
58:17
contractually 45:4
COOK 1:10, 17
5:4 59:3 60:1
correct 5:5 9:10
11:9, 19 15:8
16:10, 15, 20 18:6,
21 19:5, 19, 21
23:3 24:15 27:3, 4
28:9, 10, 13, 24
29:12 30:6, 13
33:22, 24 34:1
37:11, 15, 20, 22
38:1, 2, 13, 20, 23
39:23 40:14 42:1,
18 44:10 46:16, 24
47:8, 15 50:1, 3, 11,
12 51:14, 16 52:1,
2, 3, 13 54:15
55:10 58:8 59:7,
21 60:9, 10, 11, 12,
14, 15, 18, 23 61:3,
4 62:3, 18 63:19, 20
Corrections 59:1
correctly 14:2, 3
corresponding
19:12
Counsel 32:7 46:1
52:17 65:17, 18
counseling 43:15
COUNTY 1:10, 17
5:4 45:10 59:3
60:1
course 32:8
COURT 1:1 27:22
28:2, 8
courtesy 9:11
criteria 35:21
CSR 1:24 65:2
currently 59:24
60:2

< D >

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1491 of 1503 PageID #:1882
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

DAFFADA 2:*17*

daily 57:*3*

damage 10:*9*

damaged 10:*13*

Dan 63:*23*

dan.herbert@danher
bertlaw.com 2:*8*

DANIEL 2:*5*

DART 1:*10* 62:*13*

date 12:*3* 25:*16*
33:*16* 46:*4, 14*
54:*12*

dates 45:*9*

daughter 18:*1*
26:*10, 18*

DAVID 1:*6*

day 15:*8* 18:*14, 16,
20, 23* 19:*1, 5, 8, 9,
10, 12, 13* 22:*22*
26:*5* 28:*17, 24*
29:*3, 7, 11, 17, 18*
32:*3* 55:*24* 56:*7*
57:*22* 61:*3, 5, 11,
16* 62:*9, 12, 17, 21*
63:*3, 12, 16* 66:*2*

days 8:*15* 22:*12*
29:*4* 51:*2*

day's 36:*21*

day-to-day 54:*22*

DC 12:*10* 17:*7*

deal 15:*7, 10* 31:*21,
24*

dealing 34:*9*

dealings 57:*14*
58:*17*

December 9:*4* 11:*7*
12:*3*

decide 35:*10*

deciding 36:*9*

Defendants 1:*19*
2:*15, 21*

department 6:*6*
8:*5, 9* 24:*17* 34:*8*
38:*19* 45:*11* 52:*11*
56:*12* 59:*1* 60:*1*

department-issued
20:*14, 21* 21:*14*
22:*7*

departments 59:*15,
16*

depends 47:*3*

DEPONENT 64:*11*

deposition 1:*21*
3:*11* 4:*10, 12*
14:*23* 36:*22* 50:*5*
65:*9, 14*

Deputy 20:*12*
25:*22* 39:*4* 56:*13*
57:*15, 18* 58:*6*
59:*6, 8, 12, 17, 18,
21, 24* 60:*3, 5*

described 43:*24*

desk 56:*9*

despite 30:*11* 63:*18*

details 32:*22*

determinations
36:*18*

determine 14:*10*
34:*3* 36:*8*

die 59:*23*

difference 26:*13*
27:*6* 36:*22*

different 19:*9*

direct 24:*13, 18*

direction 65:*12*

directly 65:*19*

director 58:*23*
59:*1, 15*

directors 59:*18*

disability 48:*24*

discharge 36:*23*

discharging 52:*9*

disciplinary 5:*4*
25:*1* 43:*16, 24*
45:*18* 52:*11*

discipline 5:*11* 8:*2*
10:*22* 11:*1* 16:*15,
19* 19:*12* 22:*21, 23*
23:*1* 30:*13* 31:*8,
10* 32:*3, 11, 14, 21,
23, 24* 33:*2, 6, 20*
34:*4, 5, 9, 15* 35:*1,
2, 11, 16, 17, 23*
36:*18* 37:*11, 15, 19*
43:*1, 2, 4, 12, 14*
44:*21* 45:*19* 46:*13*
47:*7* 48:*9, 14* 49:*3*
50:*15, 17, 21, 22*
51:*22, 23* 52:*1, 23*
53:*13, 19, 23* 54:*6,
8* 63:*7*

disciplined 11:*19,
20* 12:*17* 42:*10*
50:*14*

disciplining 42:*24*

discretion 14:*9, 11,
21, 22* 32:*19*

displayed 37:*3*

DISTRICT 1:*1*

DIVISION 1:*2*

docked 19:*18* 29:*14*

document 5:*8, 11,
18* 8:*24* 11:*15*
19:*14* 20:*8* 21:*17*
26:*20* 30:*16* 31:*1*
33:*24* 39:*24* 40:*16*
41:*18* 42:*20* 46:*11,
12, 14, 19*

documents 29:*21*
40:*12* 42:*1, 6, 12*
45:*8* 54:*5*

dropped 41:*6*
51:*10*

due 27:*13, 19*

duly 4:*2* 65:*6*

Duran 24:*1*

duties 56:*8* 61:*6*

duty 10:*2* 19:*13*
22:*12* 27:*23* 28:*15*
48:*20, 23*

< E >

earlier 40:*8* 47:*11*
49:*8* 52:*8* 58:*3*
60:*4*

earn 27:*8*

earned 27:*8*

EASTERN 1:*2*

eight 18:*13* 19:*18*

either 40:*13* 51:*24*

electronic 58:*24*

eliminate 59:*4, 12,
19*

eliminating 59:*21*

EM 24:*8* 31:*9, 15*

EMERY 2:*11*

Employee 32:*23*
34:*4, 5* 35:*1, 2, 11,
16, 17, 23* 37:*10, 15,
19* 44:*21* 50:*22*
51:*23* 52:*1, 22*

53:*13, 23* 54:*8*
65:*16, 17*

entail 14:*22*

entered 12:*3* 16:*23*

entire 11:*14*

entirely 41:*7*

equipment 20:*14,
21* 21:*2, 9, 14* 22:*7*

error 42:*1*

essentially 58:*5*
61:*23*

established 56:*24*

ETHAN 2:*11* 40:*24*
ewhite@emerylawltd
.com 2:*14*

exact 13:*8* 48:*22*

EXAMINATION
3:*1* 4:*6* 65:*6*

examined 4:*4*

example 32:*9*

exception 13:*10*

executive 58:*24*

exemption 13:*9*
14:*3*

Exhibit 3:*11* 4:*16*
5:*3*

experience 8:*8*
52:*10*

explain 6:*10*

explanation 63:*2*

< F >

facial 13:*11*

fact 45:*16*

fail 22:*8*

failed 6:*5* 9:*10*
20:*13*

failing 20:*20* 21:*8,
12* 22:*6* 42:*10*

failure 8:*4* 38:*19*

fair 8:*13, 16* 13:*16,
23* 15:*6* 18:*11*
21:*11, 23* 24:*14*
28:*17* 29:*19* 36:*4,
13* 42:*11* 49:*12*
60:*21, 22*

fairly 31:*14, 17*

familiar 13:*12*
48:*17*

far 5:*11* 20:*24*
25:*16* 59:*2*

Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1492 of 1503 PageID #:1883

**February** 48:*24* 49:*3*
**FERGUSON** 1:*5*
**fill** 54:*5*
**filled** 32:22
**find** 15:*18* 58:*15*
**finding** 47:*13* 51:*6, 13*
**finish** 4:*11* 10:*17*
**firearm** 36:*23*
**FIRM** 2:*5*
**first** 9:22 11:*15* 16:*16* 23:*3, 14, 20* 24:*12* 30:20 32:*19* 43:*15* 55:*12*
**five** 63:*23* 64:*2*
**floors** 9:*23* 10:*3, 6, 8, 9, 12, 15*
**FMLA** 7:*8, 11, 15* 8:*10, 16*
**following** 16:22 25:*13, 19* 28:*24* 29:*3* 49:*24*
**follows** 4:*5*
**footprints** 10:*18*
**foregoing** 65:*9*
**forgot** 4:*18*
**form** 7:*16* 8:2, *18* 9:*14* 10:*24* 11:*12* 13:*3* 14:*15* 15:*9* 16:*12, 14, 18* 21:*15* 24:20 25:*3* 26:*11* 27:*19, 24* 28:*18* 29:*1, 20* 30:*13, 14, 24* 31:*16, 22* 33:*10* 37:*6* 40:*15* 42:2 44:*1, 11* 45:20 46:*17* 47:*16, 23* 52:*14* 53:20, *24* 55:*1, 16* 62:22
**formed** 34:*6*
**forms** 7:*18* 32:*21, 24* 36:*18*
**forwarded** 32:*23*
**found** 19:*17*
**foundation** 8:*18* 10:*24* 13:*24* 14:*15* 15:*17* 16:*1, 12* 18:*15, 22* 19:*6* 20:*8* 21:*15, 24* 23:*4* 24:*20* 27:*24*

**29:*1* 30:*8, 14, 24* 33:*10* 34:*16* 36:20 37:*6, 12, 21* 38:*24* 39:*17* 40:*15* 42:2, 15, 19* 44:*1, 11* 45:20 46:*17* 47:*1* 51:*15* 52:5, *14* 54:*18* 55:*16* 57:*24* 58:*11*
**fourth** 11:*6*
**frame** 23:*19* 37:*13* 43:*3* 47:*4, 19, 22* 55:*2*
**frames** 44:*3, 13* 45:*2*
**freeze** 6:*15*
**frequently** 55:*20, 21*
**front** 43:*7* 44:*17*
**froze** 6:*20* 40:*20*
**frozen** 7:*5* 40:*23*
**function** 56:*9*
**FURTHER** 64:*11*

**< G >**
**gas** 21:*6*
**give** 9:*8* 25:*20* 32:2, *6, 9* 33:*15* 41:*2* 60:*14* 61:*14* 62:*19* 63:*23*
**given** 15:*16, 23* 16:*9, 15* 18:20, *23* 19:*1, 4, 20* 28:*24* 29:*7* 38:*23* 42:*17* 46:*16* 50:*9* 51:*8* 56:2, *6* 60:*9, 17* 65:*13*
**giving** 43:*11*
**glasses** 4:*17*
**glaze** 10:*17*
**glazing** 10:*16*
**go** 4:*12, 16, 17* 5:*13, 15, 17, 19* 8:*22* 9:*7, 24* 11:*21* 15:*4* 17:*5* 20:*3, 10* 22:*10* 25:*13, 14, 19* 27:22 29:*23* 33:*8* 35:*16, 17* 36:*5* 38:*3, 5* 50:*6, 11, 19* 52:*12* 54:*11, 14* 60:*21*

**God's** 54:*8*
**goes** 5:*12*
**going** 4:*11, 17* 9:*2* 18:*14* 20:*7* 49:*18* 53:22, *23* 56:*13* 61:*10*
**Good** 4:*8, 9, 10* 5:*15* 6:*17* 38:*5* 64:*1*
**grab** 4:*17*
**grade** 59:*9*
**granted** 26:*5*
**Greg** 24:*24* 25:*10* 58:*24* 61:*17*
**GREGORY** 1:*13*
**grievance** 22:*23* 23:2, *10* 24:*13, 18* 25:*11*
**grievances** 23:*14, 20* 25:*1*
**grooming** 12:*11, 18, 22* 13:*1, 15, 21*
**growth** 13:*12*
**guess** 10:*11, 16* 49:*18* 53:*6* 58:*19*
**guidance** 10:*10* 49:*17*
**guy** 14:*24*
**Guys** 4:*17* 6:*23* 7:*5* 25:*7* 41:*8*

**< H >**
**hair** 13:*11*
**halfway** 16:22
**Hall** 1:*23* 65:*2*
**hand** 66:*1*
**handicapped** 18:*1*
**handle** 52:*7, 8* 54:*9*
**handled** 33:*7* 53:2, *3*
**happen** 6:*19* 31:20
**happened** 6:22 10:*5* 30:*19* 56:*15*
**happens** 31:*19*
**happy** 60:*16* 62:2, *7*
**head** 34:*23*
**heading** 50:*1*
**hear** 25:*8* 40:22 47:*9*

**heard** 22:*23* 23:20
**hearings** 25:*11*
**HERBERT** 2:*5* 3:*1* 4:*7*, 22 5:*17, 20* 6:*16* 7:*1, 21* 8:22 9:*1, 15* 11:*4, 17, 21, 23* 12:*7, 9* 14:*5, 16* 15:*11, 20* 16:*4, 13, 21* 17:2, *17* 18:*18* 19:2, *15* 20:*9* 21:*19* 22:*4* 23:*6* 24:*23* 25:*4, 12* 26:*15* 28:*3, 22* 29:*5, 22* 30:*10, 18* 31:*3, 18* 32:*1* 33:*11* 34:*17* 36:*3* 37:*4, 9, 16, 23* 38:*3, 7, 15, 17* 39:*2, 20* 40:*10, 18, 21, 24* 41:*9, 12, 21* 42:*8, 16*, 22 44:*5, 14* 46:*9, 21* 47:*5, 20* 48:*1* 49:*6, 19* 51:*17* 52:*6, 18* 53:*10* 54:*1, 21* 55:*4, 22* 58:2, *14* 62:*14, 24* 63:*21* 64:*1*
**hereto** 65:*19*
**hereunto** 66:*1*
**hey** 15:*2*
**higher** 59:*8*
**highlighted** 16:*6* 19:*24*
**history** 5:*4*
**holiday** 27:*14, 18* 28:*21*
**honest** 57:*1*
**honestly** 7:*5* 13:22 15:*13* 22:*8* 34:*19* 36:*1* 45:*11* 55:*17*
**hopefully** 63:*24*
**hours** 18:*13* 19:*18* 27:*11* 51:*2* 62:*10*

**< I >**
**I.V** 1:*4*
**ID** 3:*11*
**idea** 20:*23* 61:*21*
**identified** 59:*17*
**II** 1:*20*

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1493 of 1503 PageID #:1884
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**ILLINOIS** 1:*1*, *18*, *24* 2:*7*, *13*, *19* 66:2
**inattention** 22:*12*
**incident** 6:*13* 9:7, *16* 12:*14* 17:*11*, *22* 20:*17*, *22* 25:*15* 26:*1*, *9*, *17* 29:*14* 30:*21*, *22* 39:*8*, *10* 40:*6*, *7*, *12* 42:*18* 49:*24* 52:*12*, *21*, *24*
**incidents** 12:*21* 37:*17*, *24* 41:*19*
**include** 27:*12*, *13*, *14*
**incorrect** 60:*19*
**indicate** 19:*12* 54:*4*
**indicated** 25:*6* 26:*20* 28:*15* 33:*14* 51:*20* 60:*4* 61:*17*
**indicates** 23:*8* 30:*17* 31:*1* 39:*24* 41:*19* 44:*22* 45:*15* 46:*14*
**indication** 62:*19*
**indirectly** 65:*19*
**Individually** 1:*12*, *13*, *15*, *16*
**inform** 61:*9*
**information** 40:2
**informed** 10:*15* 61:*12*
**infraction** 16:*10* 30:*12* 32:22 33:*19*, *24* 36:24 39:*16* 43:*15* 44:7 45:*9* 46:23 47:*7*, *13*
**infractions** 44:*23*
**in-house** 33:7 50:*23* 51:22, *24* 53:*12*, *17*, *18*, *22* 54:*3*
**injured** 48:*20*
**instance** 10:2 15:*14* 23:*12* 26:*16* 28:*14* 31:2 56:*11*
**instances** 25:2
**insubordination** 50:*1*
**interested** 65:*19*
**Internal** 32:*24*
**internet** 25:9

**interpretation** 19:*8*
**investigated** 52:22
**investigation** 6:*1*
**investigative** 36:*19*
**investigator** 9:*19* 14:*24*
**involved** 23:*14* 38:*13*
**irregardless** 44:*24*
**issue** 12:*24* 13:*1* 54:*4*
**issued** 11:2 31:2 53:*19*
**issues** 12:*23* 34:9

**< J >**
**Jefferson** 2:*6*
**job** 62:7
**Joe** 24:*3*
**JOSEPH** 1:*11*
**JR** 1:*4*
**juncture** 56:*21*
**June** 48:*20*
**JUSTIN** 2:*17*
**justin@ilesq.com** 2:*20*

**< K >**
**Kelly** 6:*18*
**keys** 21:*6*
**knew** 63:*10*, *14*
**know** 4:*10* 6:*18*, 22 7:*13* 10:*14* 11:*1* 13:*18*, *20* 15:2 17:*13*, *18* 20:*19* 22:*15* 23:*9*, *13*, *24* 24:*1*, *2* 27:*9*, *10* 29:*6*, *13* 31:*4* 33:*5* 34:*12*, *21*, *23*, *24* 35:*4*, *7*, *20*, *21* 36:*12* 40:*23* 41:*13* 42:*5* 43:*11* 45:*24* 46:*1*, *7*, *8* 47:*21* 48:*7*, *8*, *12*, *14* 49:*7*, *10*, *15* 50:*16*, *21* 51:*19*, *20*, *23* 52:*4*, *9* 53:*1*, *2*, *4*, *5*, *12*, *15* 54:*8* 55:*11*, *23* 56:*6*, *24* 57:*9*, *20* 59:*2*, *11*

**knowledge** 43:*9* 52:*20*

**< L >**
**labor** 57:*14* 58:*18*
**LaSalle** 2:*18*
**LAW** 2:*5*, *11*
**left** 48:*12* 60:*3*
**LEGRAIN** 1:*3*
**LEINENWEBER** 2:*17* 6:*18* 41:*4*
**level** 50:*23*
**License** 1:*24*
**lieu** 18:*13*
**lieutenant** 56:*13*, *17* 57:*17* 59:*9* 60:*11* 61:*12*, *14*
**lieutenants** 58:*5*
**life** 42:7
**light-duty** 48:22
**LIMITED** 2:*11*
**line** 5:*21* 11:*6* 32:*19*
**lines** 15:*4*
**listed** 54:*23* 55:*5*, *9*, *12*, *14*, *19*, *20*
**little** 22:*10* 50:*5* 57:*19*
**LLC** 2:*17*
**locker** 9:*21*
**Logan** 60:*6*
**long** 47:*18*
**longer** 32:*14*, *18*
**look** 11:*5* 16:*5* 17:*6* 19:*23* 34:*21* 38:*8* 44:*12* 50:*24* 62:*1*
**looked** 13:*13*
**looking** 14:*18* 18:*19* 21:*11* 45:*7* 46:*2*, *3*, *5*
**looks** 6:*16* 7:*3* 10:*21* 18:*20* 20:*4* 40:*20*
**losing** 25:7
**lot** 39:*12*, *13*
**lowest** 16:*14*, *18* 30:*13*

**< M >**

**making** 57:*3*
**MANNING** 1:*6*
**manpower** 62:*21*
**MAP** 58:*18*
**MARKED** 3:*11*
**marking** 5:2
**matter** 11:*14* 62:*6*
**matters** 65:*8*
**MCGHEE** 1:*6*
**mean** 7:*14* 8:*3* 14:*12* 29:*3*, *11* 31:*17* 39:*15* 43:*8* 44:*16* 53:*5* 59:*5*
**meaning** 7:22 32:*15*
**means** 7:*14* 22:*15* 44:*15*
**meant** 43:*5*
**medical** 26:*14*, *19*, *21* 27:*7*, *8*
**memorized** 36:*13*, *15*
**memory** 12:*20* 35:*20* 39:*10*
**MICHELLE** 1:*3*
**midway** 8:*23* 25:*14*
**Midwest** 2:*12*
**Mike** 59:*1*
**Miller** 59:2
**mind** 41:*14*
**mine** 19:*9*
**minor** 37:*24*
**minute** 6:*21* 64:2
**minutes** 63:*24*
**missing** 21:*21*, *23*
**misstates** 20:*8* 40:*4*, *16* 45:*21* 47:*1*, *16*
**mistaken** 23:*17*, *19* 35:*12* 44:*18*, *21* 45:*2*, *5*
**money** 28:*5*, *6*
**monitoring** 58:*24* 61:*8*
**month** 20:*5*
**months** 45:*3* 48:*21*
**morning** 4:*8*, *9*
**move** 16:*21* 49:*23*
**moved** 61:*18*, *22*
**multiple** 12:*21*

Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1494 of 1503 PageID #:1885

13:*23*

mustache  13:*10*

**< N >**
name  37:*2*  54:*8*
nature  30:*12*  35:*5*
36:*9*  43:*16*  45:*16*
NEAL  1:*14*  24:*5*
necessary  15:*5*
needed  10:*1*  33:*21*
49:*16*  62:*11*, *20*
negligent  36:*23*
negotiations  58:*18*
59:*22*
never  5:*6*, *8*  6:*18*
11:*18*  40:*1*  42:*6*
NEWSON  1:*4*
Nolter  16:*23*
normally  52:*12*
North  2:*18*
NORTHERN  1:*1*
notice  2:*2*
notification  35:*1*
notifications  35:*5*
November  9:*9*
38:*9*, *20*  48:*5*  50:*9*
51:*1*  55:*23*  56:*7*,
*23*  57:*3*, *11*  60:*8*
61:*1*
NUMBER  3:*11*
7:*19*, *22*  9:*3*, *9*
12:*2*  51:*3*
numerous  15:*2*
55:*17*  62:*8*

**< O >**
Oak  2:*13*
Object  8:*18*  16:*12*
20:*7*  24:*20*  29:*20*
33:*10*  62:*22*
Objection  7:*16*
9:*14*  10:*24*  11:*12*
13:*24*  14:*15*  15:*9*,
*17*  16:*1*  17:*15*
18:*15*, *22*  19:*6*
21:*15*, *24*  23:*4*
25:*3*  26:*11*  27:*24*
28:*18*  29:*1*  30:*8*,
*14*, *24*  31:*16*, *22*
34:*16*  35:*24*  36:*20*
37:*6*, *12*, *21*  38:*24*

39:*17*  40:*4*, *15*
42:*2*, *14*, *19*  44:*1*,
*11*  45:*20*  46:*17*
47:*1*, *16*, *23*  49:*4*,
*13*  51:*15*  52:*5*, *14*
53:*8*, *24*  54:*18*
55:*1*, *16*  57:*24*
58:*11*  62:*4*
obligations  44:*24*
obviously  36:*24*
43:*10*  55:*18*
occasion  8:*21*
occur  31:*15*
occurred  8:*6*  23:*3*
occurrence  7:*20*
October  46:*13*  66:*2*
offense  7:*9*, *13*, *17*,
*18*, *19*, *22*, *24*  8:*3*
9:*11*  12:*11*  17:*8*
25:*23*  39:*5*, *15*
45:*15*  47:*14*  49:*8*
offenses  46:*4*, *7*
Office  5:*5*  59:*14*
officer  14:*24*
officers  38:*13*
officer's  32:*20*
Official  1:*11*, *12*, *14*,
*15*, *17*
oh  23:*23*
okay  4:*13*, *14*, *15*,
*23*  5:*2*, *6*, *10*, *23*
6:*13*  7:*2*, *4*, *7*, *13*,
*22*  8:*8*, *13*, *22*  9:*5*,
*18*  10:*5*, *12*, *21*
11:*10*, *21*, *24*  12:*1*,
*6*, *16*, *24*  13:*5*, *14*
14:*6*  15:*6*, *14*, *22*,
*23*  16:*8*, *14*, *18*, *21*
17:*5*, *11*  18:*4*, *19*
19:*3*, *16*, *20*  20:*2*,
*19*  21:*7*, *11*, *20*
22:*5*, *10*, *20*  23:*2*, *9*,
*13*, *21*  24:*11*, *16*, *24*
25:*9*, *13*, *19*  26:*8*,
*16*, *21*  27:*5*, *21*
28:*4*, *7*, *14*, *23*  29:*6*,
*10*, *13*, *23*  30:*11*
31:*8*, *14*  32:*9*  33:*5*,
*17*, *23*  34:*10*, *14*, *22*,
*24*  35:*14*, *20*  36:*4*,
*8*, *12*, *16*  38:*3*, *12*,

*15*, *22*  39:*3*, *21*
40:*1*, *11*  41:*22*, *24*
42:*9*, *17*  43:*21*
44:*6*  45:*13*  46:*22*
48:*7*, *12*, *18*  49:*2*,
*23*  50:*4*, *13*, *24*
51:*12*  53:*4*, *11*, *16*,
*21*  54:*10*  55:*23*
56:*2*, *5*  57:*2*, *9*, *19*
58:*9*  59:*5*, *20*  60:*8*,
*24*  61:*9*, *14*  62:*19*
63:*18*, *24*  64:*1*
once  19:*16*
one-day  23:*11*
32:*16*  43:*17*, *23*
44:*9*  46:*24*  47:*8*,
*14*  49:*9*
opinion  53:*2*
opposed  28:*4*, *6*
37:*1*  44:*9*  54:*7*
OPR  33:*8*  34:*2*, *4*,
*11*  35:*5*, *11*, *18*, *22*
36:*5*  37:*20*  52:*3*, *7*,
*13*, *22*  53:*2*, *3*, *23*
opted  10:*3*
option  32:*18*
original  45:*8*, *9*
originally  51:*12*
outcome  65:*20*
overtime  27:*20*, *21*,
*23*

**< P >**
PAGE  1:*5*  5:*14*, *17*
8:*23*  9:*8*  11:*7*, *22*
12:*8*  16:*22*  17:*6*
20:*4*, *10*, *11*  25:*13*,
*20*  29:*24*  38:*6*, *16*
49:*24*  50:*6*
paid  8:*15*  18:*24*
19:*10*
part  9:*3*  44:*20*
64:*8*
particular  61:*16*
62:*9*
parties  65:*18*
pay  19:*18*  27:*11*
29:*14*  59:*9*
penalized  18:*24*
penalty  34:*3*

Perfect  5:*19*
perfectly  57:*1*
perform  61:*6*
performing  56:*8*
61:*7*  62:*8*
period  23:22, *24*
27:*11*  45:*17*  56:*3*
person  10:*20*  53:*6*,
*19*
personal  27:*13*, *18*
28:*20*  65:*11*
personally  41:*19*
place  9:*22*  33:*13*
Plaintiffs  1:*8*  2:*9*
please  8:*23*  9:*18*
15:*3*  22:*20*  26:*3*
38:*5*
plus  56:*10*
point  5:*15*  46:*23*
47:*8*  55:*5*, *8*, *11*
Police  27:*1*
policies  6:*6*  8:*5*
38:*20*  49:*16*, *17*
policy  8:*4*  12:*11*,
*18*, *22*  13:*1*, *5*, *13*,
*15*, *21*  14:*13*, *18*
24:*16*  32:*7*, *10*
33:*18*  34:*14*, *21*
35:*13*, *15*  36:*11*, *13*,
*15*, *17*  42:*23*  43:*2*,
*5*, *7*, *12*, *13*  44:*3*, *17*,
*22*  45:*1*, *9*  46:*3*, *6*
47:*15*  48:*8*, *13*, *16*,
*17*  49:*2*, *12*  52:*17*
54:*7*  55:*13*
portion  16:*6*  19:*24*
possible  30:*13*
42:*9*  49:*11*
preapproved  26:*4*,
*13*
presented  44:*18*
45:*5*  46:*5*
presenting  19:*11*
45:*6*
pressed  37:*2*
pretty  31:*24*  41:*1*
previous  29:*24*
45:*18*  65:*5*
prior  33:*5*

Christopher Rohloff, Vol. II - 9/24/2020
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1495 of 1503 PageID #:1886
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**probably** 19:9
37:14 57:12 58:7
62:9, 10
**problem** 4:19
**proceedings** 65:13
**progressive** 42:24
43:2, 4, 12, 14, 23
45:19 47:7 48:9,
13 49:3
**prompt** 9:10
**properly** 20:13, 20
21:3, 8, 13 22:6
37:2
**provide** 9:10 63:1
**provides** 12:8
**providing** 10:10
**punishment** 5:22
16:17 25:14 38:9
**pursuant** 2:2
**put** 18:12 26:4
28:11, 14 58:5 63:4
**putting** 57:17 63:7

**< Q >**
**question** 14:17, 20
18:9, 10 34:18, 19
41:15 44:4 49:18
54:2, 3 57:19
**questions** 43:6
45:11 64:7
**quite** 14:3 55:20,
21

**< R >**
**Radios** 21:5
**rank** 56:11 57:17
59:4, 5, 6, 12
**RANZINO** 1:11
24:3
**Ray** 24:1
**read** 41:17
**Real** 64:1
**reason** 5:10 61:15
**reasons** 48:24
**recall** 13:7, 8 14:8
17:16 20:22 21:10
22:8, 9 24:9, 10
25:10 28:19 29:2
31:7 32:11 33:16
34:20 36:1 39:13
40:6, 7 41:19, 23

43:8, 19 48:3 49:5
50:18, 20 54:19, 20
56:1
**received** 6:1 9:3
25:16 29:17 30:12
38:9 40:2 43:22
44:8 45:16 56:5
**recollection** 11:13
**recommend** 32:3
**recommendation**
33:20 53:1 54:6
**recommendations**
32:15 33:2 43:20
**recommended**
10:22 22:21 50:15,
17, 22, 23 51:13, 19,
21, 22 53:5, 7, 13
**record** 41:16 64:5
65:12
**reduced** 22:13, 23
23:10 65:11
**refer** 45:23 48:16
49:17 52:16
**reference** 44:3
56:10
**referencing** 13:2
**referred** 35:13
**referring** 58:20
**refinishing** 10:8, 17
**refuse** 54:11
**refused** 50:11
60:21
**regarding** 34:14
43:13 49:3
**regardless** 11:18
28:23
**relative** 65:16, 17
**remember** 6:13
7:5 8:7, 11 9:16
11:2 12:14, 16
14:2 17:11, 20, 21,
23 18:2, 7 20:17
21:7 23:12, 24
24:4, 5 25:6 26:1
39:8 40:11 48:3, 6
50:13 51:5, 6, 8
55:3
**REMOTE** 2:4
65:9, 14
**remotely** 2:9, 15, 21
**repeating** 41:14

**report** 19:13 26:5
50:10 56:6 61:2, 5
62:11 63:11, 15
**reported** 8:16
62:16 65:10
**Reporter** 1:23
65:3 66:6
**REPORTER'S** 65:1
**reports** 17:7 25:21
39:4
**reprimand** 15:16,
24 16:9, 14, 16
19:20 20:2 22:13,
24 23:11 30:6
31:2 32:16 33:3
38:23 42:18 43:17
44:9 45:16 46:16
**request** 28:1
**requested** 26:7
28:7 41:17
**requesting** 27:17
28:4, 6 31:5 37:17
**resolved** 15:5
**respect** 13:6 14:13
22:16 36:17 46:13
48:8, 13
**responsible** 21:3, 22
34:8
**restrained** 43:3
**restructuring** 59:14
61:24
**result** 10:20 11:11
16:10 46:24 49:9
**resulted** 47:8
**resulting** 51:6
**retiring** 60:6
**return** 20:13, 20
21:4, 13, 22 22:6
**review** 44:19, 20
46:11
**reviewed** 45:14
**right** 5:19, 24 6:9
10:7, 23 11:24
12:7 13:12 15:24
16:5, 19 19:23
21:14 25:20 29:24
38:8 47:6 50:2
**Road** 2:12
**Robert** 53:20
56:19 57:2, 10, 20
60:9, 18

**ROHLOFF** 1:16,
21 3:1, 11 4:3, 8,
16, 23 5:3 6:14
9:10 12:10 17:8
20:13 25:5 39:4
40:19, 22 41:14
63:22 64:6
**role** 33:23
**roll** 55:24 56:3
**room** 9:21
**roster** 54:24 55:6, 9

**< S >**
**SAITH** 64:11
**SAMUEL** 1:4
**sat** 23:10, 13 24:12
25:11
**saying** 6:19 55:8
**says** 6:5 10:10
11:15 12:10 15:15,
19 16:3, 6, 23 17:7
19:24 20:1, 12
22:11 25:21 30:1
38:22 42:20
**scenario** 37:18
**screen** 6:15 40:23
**scroll** 6:4 12:7
16:22 38:4, 15
**se** 37:1
**second** 7:14, 23
8:6 29:16 30:11,
21, 22 43:16
**seconds** 41:3
**section** 50:11
56:18 57:11, 21
60:17 61:1, 2, 11
62:3, 16 63:3, 8, 11,
15
**security** 9:24
**see** 4:23 5:13, 21,
24 6:2, 3, 7, 11 7:9,
10, 18 9:4, 9, 12
11:7, 9 12:2, 4, 5,
12 13:3 15:15, 22
16:2, 7 17:3, 4, 9,
10 19:22 20:14, 16
21:18 22:13 25:16,
23 29:24 30:3, 4, 7,
9 38:10, 11, 18, 21
39:1, 5, 7 41:3

Christopher Rohloff, Vol. II - 9/24/2020
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1496 of 1503 PageID #:1887

50:7  51:3, 4
**seeing**  8:2  11:11
**seen**  5:6, 8  11:15
   42:6
**send**  34:2  35:10
   36:10
**sent**  33:1  34:15, 24
   35:4  37:10
**separate**  12:2
   34:10, 12
**September**  2:1
**serious**  36:5, 6, 9,
   24  37:8  52:8
**service**  9:11  50:10
   56:18  57:10, 21
   60:17  61:1, 2, 11
   62:2, 16  63:3, 11, 15
**services**  54:12, 15
   62:20  63:8
**set**  66:1
**seven**  8:7
**Sharon**  16:23
**shave**  14:3  15:3, 4
**shaven**  13:10  14:7,
   10, 14  37:5, 8
**shaving**  12:22  13:6,
   9
**sheet**  54:17, 23, 24
   55:6, 9, 13, 14
**SHERIFF**  1:10
   8:14  19:17  21:2
   42:23  59:3  62:12
**Sheriff's**  5:5  8:9
   13:5  24:17  31:9
   34:8  43:5  45:10
   49:2  52:11  56:12
   59:14  60:1
**SHIELDS**  1:13
   24:24  25:10  58:24
   61:17, 19, 21  63:4,
   6, 10
**shock**  39:13
**shoot**  41:4
**short**  4:20  64:3
**shortage**  62:21
**Shorthand**  1:23
   65:3  66:6
**shortly**  60:7
**show**  20:11

**sick**  17:8, 14, 19, 24
   19:11, 17  27:2, 7
   30:23  31:6  40:14
**sideburns**  13:11
**signature**  64:10
**similar**  30:12  40:7
   45:15
**simply**  32:21  33:24
**single**  46:4
**sir**  6:3  7:10  12:13
   16:11  20:1  21:18
   22:14, 19  26:23
   27:4  29:9  31:7
   33:9  35:19  38:14,
   21  39:19  42:13
   48:10  49:10, 18
   51:10  53:15  56:21
   60:22  61:20  62:23
   63:5  64:9
**sit**  25:1  34:20
   44:2  48:2
**situation**  29:8
   39:22
**situations**  8:9
**six**  62:10
**slate**  45:3
**SLAUGHTER**  1:7
**slip**  18:12
**Smith**  53:20  56:19
   57:2, 10, 21  60:9,
   18  61:12, 14  62:19
   63:14
**somebody**  8:9
   14:10  15:7  31:8
   32:3  33:19  53:12,
   13
**sorry**  22:18  23:7
   38:4  41:12  47:10
   48:14, 18  51:13
   53:11
**sound**  10:23
**South**  2:6
**speak**  15:1  44:23
   45:3
**specific**  33:15
   35:15  43:6  57:20
**specifics**  8:11  13:8,
   11  14:19  17:21
   32:6
**specified**  65:15

**specify**  27:16
**speculating**  34:7
**speculation**  8:19
   19:7  21:16  22:1
   30:15  39:18  42:3,
   15  45:21  46:18
   49:14  52:15  57:13
   58:1, 12
**spoke**  26:18  40:8
**SPR**  6:1  9:3, 8
   12:2
**stage**  24:12
**stamp**  38:5
**stamped**  5:18
**stands**  44:19
**start**  6:17
**started**  55:18
**starts**  5:22
**State**  1:24  65:3
**STATES**  1:1  46:20
**stating**  41:24
**stenographically**
   65:10
**step**  16:16  23:3, 10,
   14, 20  24:18
**sticking**  27:21
**stop**  48:19
**stopped**  48:15
**Street**  2:6, 18
**STRICKLAND**  1:3
**strictly**  34:8
**strike**  20:2, 24
   35:8, 9  49:21
**structure**  56:12
   57:17
**stuff**  4:12
**submit**  27:15  29:3
**subordinate**  31:10
**successful**  59:21
**suggested**  9:23
**Suite**  2:6, 12, 18
**summarize**  43:8
**summarizes**  46:12
**summary**  5:22  6:9
   9:8  12:8  16:17
   17:6  19:24  20:11
   25:14, 20  38:9
   39:3, 21  50:6
**supervise**  20:13, 20
   21:3, 8, 13  22:6
**supervising**  21:22

**supervision**  32:19,
   20
**supervisor**  14:9, 20
   23:9  24:14, 19
   33:18  56:20, 23
**supervisors**  23:15
   58:23
**supervisor's**  33:23
**supposed**  9:21
   13:7, 9
**sure**  8:12  12:1
   14:19  31:13
**suspended**  22:22
   51:2
**suspension**  22:11
   23:11  32:17, 18
   33:3  43:17, 23
   44:9  46:24  47:8,
   14  49:9  51:9, 11,
   14, 19  53:7, 14
**sustained**  6:7
   10:22  11:3, 7, 10,
   16  15:16, 23  16:3,
   6, 9  30:2  38:20
   40:3  47:12  51:6, 14
**sworn**  4:2  65:7
**system**  43:1, 24
   45:19  52:11, 21

**< T >**
**tag**  37:2
**take**  18:2  19:22
   26:7, 10  27:17
   34:21  50:24
**taken**  1:22  4:21
   15:21  19:4  22:11
   30:5  32:15  33:21
   51:1  64:4  65:14
**talk**  9:2, 24  49:20
   61:19
**talked**  26:9  43:21
   50:4  52:7  58:3
**talking**  10:2
**talks**  9:3  25:15
   38:12
**Taser**  21:21  36:24
   52:9
**Tasers**  21:5
**technical**  50:10
   54:11, 14  56:18
   57:10, 21  60:17



**Christopher Rohloff, Vol. II - 9/24/2020**
Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1497 of 1503 PageID #:1888
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

61:*1, 2, 11*  62:2, *16,*
*20*  63:*3, 8, 11, 15*
**tell**  9:*18*  12:20
17:22  22:20  26:*3*
27:5  36:*12, 16*
43:4  51:*18*  56:13
60:*20*
**telling**  26:*19*
**ten**  51:*3*  56:*10*
61:7  62:6
**ten-day**  51:*8, 14, 18*
52:*24*  53:7
**term**  10:*11, 16*
**testified**  4:5  47:*6*
49:8
**testify**  65:7
**testimony**  19:*16*
26:*17*  33:6  40:*1, 5,*
*9*  45:*17, 21*  46:22
47:2, *12, 17*  58:*6*
65:*13*
**testing**  35:*20*
**text**  41:*4*
**Thank**  41:*11*  64:7
**thing**  26:8
**things**  15:*3*  45:*1*
46:2
**think**  21:6  25:7
31:*23*  33:*12*  40:*23*
41:*1, 7, 8, 13*  49:*21*
50:*4*  52:*19*  63:*21*
**third**  39:*15*  40:*12*
43:*17*  44:6  45:*15*
46:*14, 23*  47:7, *12*
49:8
**THOMAS**  1:*10, 14*
**thought**  58:*4*
**thousand**  32:*13*
**three**  42:*10*  43:*18*
46:*4, 6*
**three-day**  32:*17*
**Thursday**  2:*1*
**time**  7:*14, 23*  8:6
11:*15*  13:*13*  14:4
17:8, *14, 19, 24*
18:2, *4, 5, 13*  19:*11,*
*18*  23:*19, 22, 24*
24:2, *3, 4, 5, 6*
25:22  26:*4, 5, 6, 7,*
*13, 19, 22*  27:2, *3, 7,*
*8, 12, 13, 14, 16, 17,*

*18, 19*  28:*1, 7, 8, 12,*
*16, 20, 21*  29:*3, 8,*
*16, 18*  30:23  31:5,
*6, 10, 11*  32:5, *12*
33:*15*  37:*13, 18*
39:*5, 11, 16, 23*
40:*14*  42:*11*  43:*3*
44:*3, 13*  45:2, *17*
46:6, *15*  47:4, *18,*
*21*  48:*11*  50:5, *21,*
*22*  51:*21*  55:2
56:*3*  57:*15*  65:*15*
**times**  7:*19*  13:2*0,*
*23*  15:2  31:4  32:7
42:*10*  55:*18*
**TIMS**  1:*4*
**title**  59:22
**today**  48:2, *4*
**told**  63:*17*
**Tom**  24:5  62:*13*
**Tony**  24:6
**top**  5:*19*  11:6, *24*
25:*21*  34:*23*  50:2
**tour**  28:*15*
**transcript**  65:*10*
**transgression**  37:8
**tried**  30:2*3*
**true**  65:*12*
**truth**  65:7
**try**  4:*12*  43:8
**trying**  15:*18*  56:*11*
58:*4*  63:7
**twice**  7:4
**two**  27:6  32:*13*
43:*18*  48:2*1*
**two-day**  32:*17*
51:*11*
**type**  21:2, *9, 13*
27:*15, 16*  33:2
35:22  44:7  51:*21*
62:*21*
**types**  35:*15, 17*
**typewriting**  65:*11*
**typically**  12:22
15:*1, 4, 5*  23:*13*
49:*16*  53:*18*
**TYRONE**  1:*6*

< U >
**unable**  9:*20*

**unauthorized**  7:*8,*
*15*  8:*10*
**unbecoming**  11:6
**understand**  14:*17*
34:*18, 19*  54:2, *3*
**understanding**
36:*17*  43:*13*  52:20
53:22  59:*3, 13*
**unfounded**  11:*14*
**unhappy**  62:7
**uniform**  10:*1*  37:*1*
**uniforms**  9:20  10:4
**union**  57:*14*  58:*18*
**unit**  24:*8*  31:9
34:6, *7, 15*  35:2
36:*10*  37:*11*  44:2*0,*
*21*  57:7
**UNITED**  1:*1*
**unlimited**  26:2*1*
**unshaven**  13:*4, 16,*
*21*  15:*1, 8*
**unstable**  25:*10*
**use**  14:2*0*  30:2*3*
**utilize**  42:24
**utilized**  45:*18*

< V >
**vacation**  27:*12, 18*
28:2*1*  39:5, *11, 23*
40:*13*
**Vaguely**  26:2
**vehicle**  21:6
**VERNELL**  1:*4*
**versa**  55:*15*
**versus**  14:*14*  36:5
37:*19*  53:22
**vice**  55:*14*
**VICTOR**  1:6
**violation**  6:*10*
12:*11, 17*
**VOLUME**  1:2*0*
**vs**  1:9

< W >
**waive**  64:*10*
**walk**  10:3
**WALKER**  1:6
**walking**  10:2*0*
**want**  40:2*4*  63:*11,*
*15*

**wanted**  57:*16*  58:*9,*
*16, 20*  59:*4, 11, 15,*
*18, 19*  61:*17, 22*
63:*4*
**waxed**  9:*23*  10:*3, 6*
**waxing**  10:*15*
**way**  63:7
**weekly**  62:*11*
**Welcome**  41:*10*
**well**  4:*9*  7:2, *7*
10:6  11:*5*  14:2
16:*5*  17:22  26:2*1*
29:6  31:*4*  34:*24*
41:*5*  48:*5*  49:2*1*
50:*19, 24*  52:7
54:22  58:*3, 15*
**went**  21:2*1, 22*
35:22  36:*18*  48:*22,*
*23*  55:*24*
**we're**  5:2  27:*1*
64:2
**we've**  7:2  45:*13,*
*14*  49:2*1*
**whatnot**  10:8
**WHEREOF**  66:*1*
**WHITE**  2:*11*  6:*15,*
*17, 20*  7:*16*  8:*18*
9:*14*  10:*24*  11:*12*
13:*24*  14:*15*  15:*9,*
*17*  16:*1, 12*  17:*15*
18:*15, 22*  19:*6*
20:*7*  21:*15, 24*
23:*4*  24:2*0*  25:*3, 8*
26:*11*  27:2*4*  28:*18*
29:*1, 20*  30:*8, 14,*
*24*  31:*16, 22*  33:*10*
34:*16*  35:2*4*  36:2*0*
37:6, *12, 21*  38:2*4*
39:*17*  40:*4, 15, 20*
41:*2, 6*  42:*2, 14, 19*
44:*1, 11*  45:2*0*
46:*17*  47:*1, 16, 23*
49:*4, 13*  51:*15*
52:*5, 14*  53:*8, 24*
54:*18*  55:*1, 16*
57:2*4*  58:*11*  62:*4,*
*22*  63:2*3*  64:2, *5, 10*
**WILFORD**  1:*5*
**WILLIAMS**  1:*5*
**WINSTON**  1:*3*

Case: 1:18-cv-05726 Document #: 109-1 Filed: 12/21/20 Page 1498 of 1503 PageID #:1889

**Christopher Rohloff, Vol. II - 9/24/2020**
Legrain Winston, et al. vs. Sheriff of Cook County Thomas J. Dart, et al.

**wiped** 45:*3*
**wishes** 59:*2*
**WITNESS** 3:*1* 4:*1*,
*4* 6:*22* 7:*17* 8:*20*
11:*1, 13* 14:*1*
15:*10, 18* 16:*2*
17:*16* 18:*16, 23*
19:*8* 21:*17* 22:*2*
24:*21* 25:*9* 26:*12*
28:*1, 19* 29:*2, 21*
30:*9, 16* 31:*1, 17,*
*23* 36:*1, 21* 37:*7,*
*13, 22* 39:*1, 19*
40:*6* 41:*8, 18* 42:*5,*
*20* 44:*2, 12* 45:*23*
46:*19* 47:*3, 18*
49:*5, 15* 51:*16*
52:*16* 53:*9* 54:*19*
55:*2, 17* 58:*13*
62:*5, 23* 64:*9* 65:*6*
66:*1*
**word** 10:*7*
**words** 14:*12* 33:*7*
47:*13*
**work** 8:*15* 18:*14*
26:*5* 48:*10* 61:*10*
**worked** 31:*9*
**working** 21:*1*
48:*15, 19*
**wrap** 63:*24*
**write** 22:*5* 33:*19*
**writing** 18:*17*
**written** 10:*9* 13:*14,*
*21* 14:*6* 22:*13, 24*
23:*11* 32:*16* 33:*3*
35:*13, 15* 43:*7, 12,*
*17* 49:*16*

**< Y >**
**yeah** 5:*7* 8:*1, 11*
14:*12* 15:*12* 18:*9,*
*17* 22:*2* 32:*11*
37:*7, 14* 41:*18*
43:*10* 44:*15* 55:*18*
**year** 9:*6* 23:*17*
48:*14, 18*
**years** 8:*7* 23:*16*
32:*8* 48:*21* 56:*10*
61:*7* 62:*6, 9*

**< Z >**
**Zoom** 2:*2* 4:*5*

# Exhibit S

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LEGRAIN WINSTON, et al.          )
                                 )
            Plaintiffs,          )          No. 18 CV 5726
                                 )
    v.                           )
                                 )          Hon. Judge Matthew F. Kennelly
SHERIFF OF COOK COUNTY THOMAS    )
J. DART, in his Official Capacity, et al. )
                                 )
            Defendants.          )
                                 )

### DECLARATION OF JOHN WEBB

I, John Webb, pursuant to 28 U.S.C. §1746, depose and state the following based on my

personal and first-hand knowledge:

1.      I am over 18 years of age and am currently employed as the Director of the

Fugitive Unit at the Cook County Sheriff's Office ("CCSO").

2.      I have been employed by the CCSO since June of 1996.

3.      In June 2002, I joined the CCSO's Electronic Monitoring Unit ("EM") as an

Investigator.  I became a supervising Investigator in 2003, a deputy chief in 2005, and from 2007

until March 2016, I served as a Chief in EM.  Between March 2016 and June 2019, I served as

the Director of CCSO's Electronic Monitoring Unit ("EM").

4.      Within the Department of Community Corrections (previously known as the

Department of Community Supervision and Intervention), the EM Unit administers and oversees

the EM Program, a pre-trial monitoring program created to ease overcrowding in the Cook

County Department of Corrections.  The monitoring program is used as a community-based

1

alternative incarceration concept that allows pre-trial, and short-time sentenced inmates to remain in the community instead of being incarcerated in jail.

5.      Investigators in EM could work in any of three main assignments: (1) Technical Services Section ("TSS"), which involves interviewing program participants, reviewing criminal backgrounds, contacting homeowners and leaseholders to verify that the participant can stay there, assigning equipment to participants, and installing ankle monitors; (2) Patrol, which involves delivering plan participants, performing home checks, swapping monitoring equipment, investigating potential violations, and responding to program alarms; and (3)Office, which includes "work/school" where movement of participants is verified and approved, and dispatch which involves assigning jobs for investigators to perform on the street.

6.      Investigators are expected to be able to perform any of these assignments, and do not have the select their assignments.  Pursuant to Section 14.2 of the Collective Bargaining Agreement between Teamsters Local 700 and the CCSO, "The Employer has the exclusive right to permanently or temporarily assign any employee within the same division/unit."  Investigators are only able to bid for shift (hours of work) and detail (off day group).

7.      Consistency of assignment provides an operational benefit because they develop the skills for the position, establish relationships with detainees, jail employees, and are familiar with the required documentation.

8.      In my role as a Director in EM, I was responsible for overseeing the administrative aspects of the unit, including approximately 150 employees, drafting and revising policies and procedures, analyzing manpower needs and allocation civilian and sworn staff, perform strategic planning, collaborate with employee unions to resolve grievances, coordinate with the third-party monitoring company, procuring monitoring equipment, as well as being

2

responsible for coordinating between the CCSO and the Office of the Chief Judge of Cook County, and the State's Attorney's Office.

9. Based on my experience in EM I am familiar with the roles and responsibilities of the various positions within EM including Deputy Chiefs, Chiefs, Directors, and the Executive Director.

10. Deputy Chiefs, Chiefs, Directors, and the Executive Director of the Department of Community Corrections, do not have the authority to hire, fire, promote, demote, or transfer EM Investigators.

11. The determination of what discipline an EM Investigator shall receive for a rule infractions is made by the Employee Discipline Unit within the Office of Professional Review ("OPR").

12. CCSO established a selection process for the EM Sergeant position in 2016, and I personally participated in the development of that application process and the recruiting of applicants for that promotion.

13. The process for promotion to EM Sergeant included: posting the open position(s) on a bulletin board in EM and online (in accordance with the Sheriff's Employment Action Manual Article Q), and I also attended EM rollcalls and invited all Investigators to apply for the position.

14. Applicants for the EM Sergeant position were required to: (1) submit an application, resume, and documents outlining any specialized training; (2) pass a physical test; (3) sit for an oral interview; (4) pass a written examination; and (5) review the employees' attendance history.

15. Between 2016 and 2017, EM had seven available EM Sergeant positions open and funded, but was only able to promote six investigators because of a lack of qualifying applicants. Those six investigators who were promoted included three Caucasians, one Hispanic, and two African American employee.

16. Of the Plaintiffs in this lawsuit, only David Walker applied for the EM Sergeant position, but he failed the physical test and could not be promoted.

17. CCSO has a policy prohibiting discrimination, harassment and retaliation, and provides that employees who believe they have been subject to or witnessed discrimination, harassment, or retaliation should report it to their supervisor, or have the option of reporting it directly to Human Resources or OPR.

18. On April 9, 2015, Investigator Winston accused Chief Joseph Ranzino of making inappropriate comments to him, on April 22, 2015, Chief Ranzino was transferred out of the EM Unit to the Court Liaison Unit.

***

I declare under penalty of perjury that the foregoing is true and correct.


FURTHER DECLARANT SAYETH NOT

Dated this **21**ˢᵗ day of December 2020.


_____

John Webb

4