**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

LEGRAIN WINSTON,              )
MICHELLE STRICKLAND,      )
VERNELL TIMS, I.V. NEWSON, Jr., )
SAMUEL PAGE, WILFORD FERGUSON, )
CECIL WILLIAMS, ANTHONY     )       Case No. 18 cv-05726
MANNING, DAVID WALKER,      )
TYRONE MCGHEE and VICTOR    )       Hon. Matthew F. Kennelly
SLAUGHTER,                )
                      )
      Plaintiffs,         )
                      )
vs.                       )
                      )
SHERIFF OF COOK COUNTY      )
THOMAS J. DART, in his        )
Official Capacity, JOSEPH RANZINO, )
Individually and in his Official Capacity, )
GREGORY SHIELDS, Individually and in )
his Official Capacity, THOMAS NEAL, )
Individually and in his Official Capacity, )
CHRISTOPHER ROHLOFF, Individually )
and in his Official Capacity, and    )
COUNTY OF COOK, ILLINOIS,    )
                      )
      Defendants.        )

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

      Defendant Sheriff of Cook County Thomas J. Dart, in his official capacity, Joseph

Ranzino, Gregory Shields, Thomas Neal, and Christopher Rohloff, individually and in their

official capacities, and County of Cook, Illinois (collectively "Defendants") pursuant to Federal

Rule of Civil Procedure 56 and Local Rule 56.1(a)(3), submit the following Statement of

Material Facts as to Which There is No Genuine Issue:

I.    **Jurisdiction, Venue, and Parties**[1]

1.    Plaintiff Legrain Winston is an African-American who has been employed as an Investigator within the Electronic Monitoring Unit ("EM") of the Cook County Sheriff's Office ("CCSO") since 1994. Dkt. No. 1, Compl. at ¶10; 8/28/2020 Legrain Winston Dep. at 13:16-20, 15:1-3, attached hereto as Ex. I.[2]

2.    Plaintiff Michelle Strickland is an African-American employed by CCSO who formerly worked as an Investigator in EM for 13 months from March 2014 to April 2015. Dkt. No. 1 Compl. ¶11; 8/21/2020 Michelle Strickland Dep. at 17:12-23, attached hereto as Ex. F.

3.    Plaintiff I.V. Newson, Jr., is an African-American who worked as an Investigator in CCSO's EM unit from 2005 until his retirement on November 31, 2019. Dkt. No. 1, Compl. at ¶13; 7/6/2020 I.V. Newson Dep. at 15:19-16:2, 17:4-5, attached hereto as Ex. A.

4.    Plaintiff Samuel Page is an African-American who worked as an Investigator in EM from 1992 until he retired on September 1, 2018. Dkt. No. 1, Compl. at ¶14; 8/10/2020 Samuel Page Dep. at 15:1-24, attached hereto as Ex. D.

5.    Plaintiff Wilford Ferguson is an African-American who has worked as an Investigator in CCSO's EM since from December 27, 1992. Dkt. No. 1, Compl. at ¶15; 8/31/2020 Wilford Ferguson Dep. Vol. I at 14:24-15:5, 16:21-23, attached hereto as Ex. J.

6.    Plaintiff Cecil Williams is an African-American who has worked as an Investigator in CCSO's EM unit since 2005. Dkt. No. 1, Compl. at ¶16; 7/14/2020 Cecil Williams Dep. at 16:1-3. 19:2-10, attached hereto as Ex. C.

---

[1] Anthony Manning and Vernell Tims voluntarily dismissed their claims. *See* Dkt. Nos. 92 and 103.
[2] The Exhibits referenced herein are contained in the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment, being filed concurrently herewith.

7.      Plaintiff David Walker is an African-American who has worked as an Investigator in CCSO's EM unit since November 5, 1992. Dkt. No. 1, Compl. at ¶18; 7/13/2020 David A. Walker Dep. at 14:21-24, 15:17-23, attached hereto as Ex. B.

8.      Plaintiff Tyrone McGhee is an African-American who has worked as an Investigator in CCSO's EM unit since 2002 or 2003. Dkt. No. 1, Compl. at ¶19; 8/24/2020 Tyrone McGhee Dep. at 10:4-7, attached hereto as Ex. G.

9.      Plaintiff Victor Slaughter is an African-American who has worked as an Investigator in CCSO's EM unit since 2005. Dkt. No. 1, Compl. at ¶20; 8/12/2020 Victor Slaughter Dep. at 10:10-12, attached hereto as Ex. E.

10.     Defendant Thomas J. Dart is the elected Sheriff of Cook County, who is sued in his official capacity. Dkt. No. 54, Answer at ¶¶21-22.

11.     Defendant Joseph Ranzino was employed by CCSO as a Chief in the EM unit, until he was removed from that position on April 22, 2015. Dkt. No. 54, Answer at ¶23; 9/8/2020 Joseph Ranzino Dep. at 146:22-147:11, attached hereto as Ex. K; and Decl. of John Webb, attached hereto as Ex. S at ¶18.

12.     Defendant Gregory Shields was employed by CCSO as the Executive Director of the EM unit until his retirement on December 31, 2019. Dkt. No. 54, Answer at ¶24; 8/27/2020 Gregory Shields Dep. at 24:22-25:3, attached hereto as Ex. H.

13.     Defendant Thomas Neal was employed by CCSO as a Chief in the EM unit, until he retired from that position. Dkt. No. 54, Answer at ¶25; 9/16/2020 Thomas Neal Dep. at 6:2-4, attached hereto as Ex. O.

14.     Defendant Christopher Rohloff works as Deputy Chief in the CCSO's EM unit. Dkt. No. 54, Answer at ¶26.

15.     Defendant Cook County is a local public entity under the laws of the State of Illinois. Dkt. No. 54, Answer at ¶27.[3]

16.     Plaintiffs Winston, Page, and Slaughter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about July 25, 2016, and Plaintiff Newson filed a charge with the EEOC on October 11, 2017, all of which were dismissed on May 23, 2018, alleging that they suffered discrimination and harassment because of their race, and retaliation. Dkt. No. 1, Compl. ¶6; Dkt. No. 1, Compl., Exs. B, C, D, E, F, G, and H.

17.     On August 21, 2018, Plaintiffs filed a Complaint alleging claims of: (1) race discrimination and harassment under Section 1981 of the Civil Rights Act of 1866 (Count I), Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e et seq. ("Title VII"), as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981a (Count III), and the Illinois Human Rights Act, 775 ILCS 5/1-101 et. seq. ("IHRA") (Count V); (2) retaliation under Title VII (Count IV) and the IHRA (Count VI); (3) *Monell* claim under 42 U.S.C. §1983 (Count II); and (4) negligent retention (Count VII). Dkt. No. 1, Compl. at Counts I-VII.[4]

18.     The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§1331, 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367; and venue is proper pursuant to 28 U.S.C. §1391. Dkt. No. 54, Answer at ¶¶4-5.

---

[3] Cook County remains a defendant only as a potential indemnitor under *Carver v. LaSalle County*, 787 N.E.2d 127 (Ill. 2003).  *See* Dkt. No. 43, 3/19/19 Minute Entry.
[4] The Court dismissed Plaintiffs' claims under Section 1981 against Defendants in their official capacity. *See* Dkt. No. 59, 6/4/2019 Mem. Op. and Order at p. 5.

## II. **Factual Background**

### A. **The Electronic Monitoring Unit**

19.     Within the Department of Community Corrections (previously known as the Department of Community Supervision and Intervention), the EM Unit administers and over*Sees* the EM Program, a pre-trial monitoring program created to ease overcrowding in the Cook County Department of Corrections.  The monitoring program is used as a community-based alternative incarceration concept that allows pre-trial, and short-time sentenced inmates to remain in the community instead of being incarcerated in jail. *See* Declaration of John Webb, attached hereto as Ex. S at ¶4.

20.     Investigators in EM could work in any of three main assignments: (1) Technical Services Section ("TSS"), which involves interviewing program participants, reviewing criminal backgrounds, contacting homeowners and leaseholders to verify that the participant can stay there, assigning equipment to participants, and installing ankle monitors; (2) Patrol, which involves delivering plan participants, performing home checks, swapping monitoring equipment, investigating potential violations, and responding to program alarms; and (3) Office, which includes "work/school" where movement of participants is verified and approved, and dispatch which involves assigning jobs for Investigators to perform on the street. *See* Ex. S at ¶5; Ex. K at 40:8-41:5; Ex. H at 104:20-105:13.

21.     Investigators are expected to be able to perform any of these assignments, and do not have the right to select their assignments.  Pursuant to Section 14.2 of the Collective Bargaining Agreement between Teamsters Local 700 and the CCSO, "The Employer has the exclusive right to permanently or temporarily assign any employee within the same division/unit."  Investigators are only able to bid for shift (hours of work) and detail (off day

group).  *See* Ex. S at ¶6; *See* Ex. E at 28:20-29:7; *See* Ex. G at 25:10-13, 26:14-24; Ex. F at 110:3-7, Ex. H at 142:7-143:21, 119:13-14, 238:15-239:6, 243:17-21; Ex. N at 32:12-17; Ex. I at 20:1-21; and Ex. K at 38:9-39:15, 44:12-46:2.

22.     Fifty percent of the work done in EM is performed inside the office (as opposed to on the street) and includes performing clerical work, but Investigators work the same hours and are paid the same no matter which assignment they receive.  *See* Ex. K at 24:12-19, 48:11-49:9; Ex. A at 136:10-17; Ex. E at 168:10-13; Ex. F at 109:4-8; and Ex. D at 77:19-22.

23.     Consistency of assignment provides an operational benefit because Investigators develop the skills for the position, establish relationships with detainees, jail employees, and are familiar with the required documentation.  *See* Ex. S at ¶7.

24.     Deputy Chiefs, Chiefs,  Deputy Directors, and the Executive Director of the Department of Community Corrections, do not have the authority to hire, fire, promote, demote, or transfer EM Investigators.  *See* Ex. S at ¶10.

25.     The majority of Investigators in EM are African American. *See* Ex. A at 133:5-8; *See* Ex. E at 94:22-24; *See* Ex. O at 55:2-7; *See* Ex. Q at 59:20-60:9.

**B.      CCSO's Discrimination, Harassment and Retaliation Policy**

26.     CCSO has a policy prohibiting discrimination, harassment and retaliation, and provides that employees who believe they have been subject to or witnessed discrimination, harassment, or retaliation should report it to their supervisor, or have the option of reporting it directly to Human Resources or Office of Professional Review ("OPR").  *See* Ex. S at 17.

27.     Plaintiffs Newson, Slaughter, McGhee, Strickland, Ferguson, Page, Walker, Williams, and Winston understood that CCSO's discrimination, harassment, and retaliation policy provides that employees are to report such instances to their supervisor, and, if necessary,

further up the chain of command, but that they also have the right to make such reports directly to Human Resources or the OPR. *See* Ex. A at 18:12-23; Ex. E at 14:18-15:6; Ex. G at 13:2-14; Ex. J at 48:14-20, 51:17-21, 53:10-18; Ex. D at 28:9-19, 28:23-29:18, 30:12-19; Ex. B at 21:10-22:24; Ex. C at 27:1-28:18; Ex. I at 27:15-24, 28:14-20, 30:18-24; *See* Ex. O at 115:10-12.

        **C.**    **Plaintiffs' Harassment Allegations**

28.      Ferguson testified that Director Shields used the N-word in casual conversation such as, "what's up my N-words," meaning "Like, hey, how are you all doing?", but never reported that Shields used the N-word to any supervisors or to OPR, and never heard Neal or Rohloff use a racist word like the N-word. *See* 9/11/2020 Wilford Ferguson Dep. Vol. II at 147:2-148:1, 149:13-150:14, attached hereto as Ex. M.

29.      Ferguson believes his workplace was hostile based only on the environmental conditions of working in TSS including: an unclean workplace, vents being dusty, toilets having feces in them, leaks on rainy days, and the presence of bugs. *See* Ex. M at 157:7-11.

30.      Winston testified that he experienced verbal harassment in that: Ranzino would use the words "boy," or "boys," to address the Investigators in rollcall; in or around summer of 2012, Ranzino called him the N-word; in 2011 Neal called him a "crook,"; in 2011, Ranzino called him a "stupid motherfucker"; in 2012, Neal called him a "dumb ass"; but he never reported any of this to OPR, or filed a grievance, and never heard Shields make any racist comments. *See* Ex. I at 103:13-24, 136:7-15; 262:17-263:2.

31.      On April 9, 2015, during rollcall, Ranzino stated to Winston, "all of you look alike," when he mistakenly referred to one investigator instead of another, and Winston filed a complaint documenting the comment to OPR on April 20, 2015. *See* Ex. I at 196:6-14, Dep. Ex. 12, OPR Complaint Register Form.

32.     Winston did not think it was a big deal that Ranzino was removed from EM, never even discussed that fact with other Investigators, and the day he realized Ranzino was gone was "just another day at work."  *See* Ex. I at 179:10-180:24, 181:1-24.

33.     None of the Defendants used any racist or derogatory language with Page, other than a single instance where Ranzino said, "you people," and he never heard any of the Defendants use racist language with any of the Plaintiffs.  *See* Ex. D at 103:13-104:5, 134:20-135:12, 184:4-191:4.

34.     Page believes Ranzino created a hostile work environment occasionally when Page would work in the EM office by telling him (Page) to "Get it done," or "Get it right," or "You're not finished yet? Hurry up."  *See* Ex. D at 147:15-148:20.

35.     Walker heard Ranzino tell Winston "all you guys look alike," on April 9, 2015, and gave two statements regarding that incident: (1) Walker told Human Resources, "Chief Ranzino is the same with everyone.  Chief [Ranzino] is consistent no matter who he is talking to" (*See* Ex. B at 158:9-162:21; 165:11-166:11, Dep. Ex. 4, Apr. 29, 2015 Informal Inquiry of Inv. David Walker); and (2) Walker told OPR, "Ranzino never used [the N-word] in a conversation at work," and that, "Chief Ranzino often talks down to investigators in the unit, and he couldn't name one investigator in the unit, black or white, who actually like Chief Ranzino." *See* Ex. B at Dep. Ex. 5, Feb. 9, 2016 Witness Statement of Inv. David Walker.

36.     Walker testified that he never heard any of the Defendants use racist language with him, but did testify that Ranzino used the N-word approximately 2-3 times over the course of Walker's 30-year career, but he never notified any supervisors or reported it to anyone.  *See* Ex. B at 90:7-18, 93:12-95:24.

37.     On April 17, 2015, Williams filed a complaint with OPR in which he claimed that on April 16, 2015, Ranzino said "[I'm] not scared of you" in a threatening voice, but did not report that Ranzino (or any other Defendant) used any racist or derogatory language towards him. *See* Ex. C at 240:3-16, Dep. Ex. 4, OPR Complaint Register, 244:5-247:18, Dep. Ex. 5, CCSO Discrimination/ Harassment/Sexual Harassment Complaint Form, and 248:16-252:9, Dep. Ex. 6, Informal Inquiry.

38.     Williams testified that Shields and Neal did not use any racist or derogatory language with him, but that Rohloff said "you people," and Ranzino said "you [people all] look alike" and called him the N-word in April 2015, but did not report any of that to any supervisors or OPR. *See* Ex. J at 90:15-92:6, 93:9-22, 94:14-95:12; and SOF 34 *supra*.

39.     McGhee heard Ranzino tell Winston "You people all look alike," but did not report it to anyone, and never heard any of the Defendants use any racist or derogatory language like the N-word. *See* Ex. G at 40:21-43:16, 67:14-19.

40.     Newson cannot identify a single instance in which any Defendant "used offensive, derogatory, or racist language" towards him. *See* Ex. A at 45:5-12, 62:22-63:2, 66:21-67:6, 124:11-14. Newson believes his work environment is hostile based solely on his belief that African-American Investigators are assigned to what he believes are high-incident areas of Cook County. *See* Ex. A at 65:15-23.

41.     Slaughter heard Ranzino tell Winston, "Oh, well, all you guys look alike," "You boys are always complaining," and "You boys are nothing but Keystone cops," but did not report that to anyone, and never heard the Defendants use any other racist or derogatory language like the N-word. *See* Ex. E, 83:8-84:18, 113:1-114:18, 115:3-20.

42.     Strickland never heard Shields, Ranzino or Rohloff use the N-word, and believes her hostile work environment was "being discriminated against," but swore under penalty of perjury that she was subjected to hostile work environment beginning in September 2017, more than two years after she transferred out of EM.  *See* Ex. F at 21:16-18, 17:19-21, 29:19-31:2, 38:14-17, 80:7-8.

43.     Director Shields has not, at any point, been told by the Plaintiffs that they were experiencing harassment or discrimination in the workplace, and never heard the N-word used in EM and is not aware of *any* complaints about racial statements or stereotypical comments, other than complaints against Chief Ranzino whom he believes was transferred out of the unit as a result of those complaints. *See* Ex. H at 277:7-16, 285:10-23, 248:14-17, 273:12-18; Ex. L at 18:4-6, 20:10-18, 31:17-32:4.

44.     Chief Rohloff never witnessed or was made aware of any racial discrimination in the workplace, and has not heard any racial jokes, ridicule, or stereotypical comments, though he has heard some African-American Investigators use the N-word loosely in referring to each other as a term of endearment, not in a derogatory manner. *See* Ex. N at 80:14-17, 94:11-95:6, 111:12-112:11, 117:11-20, 118:1-119:20, 121:11-12.

45.     On April 9, 2015, Investigator Winston accused Chief Joseph Ranzino of making inappropriate comments to him, and on April 22, 2015, Chief Ranzino was transferred out of the EM Unit to the Court Liaison Unit.  *See* Ex. S at ¶18.

46.     Walker "got along pretty good" with Rohloff and does not have "much negativity to say."  *See* Ex. B at 206:22-207:4.

47.     Chief Neal never heard anyone use the N-word in the workplace.  *See* Ex. O at 62:19-63:10.

48. Walker believes Neal "was a great supervisor" and "had a pretty good relationship with him . . . ." *See* Ex. B at 202:20-24, 204:10-14.

49. Ranzino never heard the N-word used while he was working, and if anyone had reported that to him he would have immediately contacted OPR and made a report. *See* Ex. K at 93:18-21, 96:12-20.

50. Page, Newson, and Ferguson never heard Ranzino call them the N-word. *See* Ex. D at 103:13-24; Ex. A at 44:11-12; and Ex. M at 149:13-150:14.

~~51.~~ McGhee heard Chief Ranzino say "you people all look alike," but did not report it to anyone in CCSO, including OPR. *See* Ex. G at 41:4-6, 42:4-18~~.~~

**D.** **Discipline**

52. The discipline and grievance process, including "protections" for Investigators, are negotiated by the union and controlled by the Investigators' union contract. *See* Ex. A at 79:8-22, Ex. E at 17:23-18:1; *See* Ex. G at 21:22-23:7.

53. EM management does not determine the level of discipline, they simply write up the infraction and the Employee Discipline Unit within OPR decides how much discipline to impose. *See* Ex. H at 207-1-11, 209:16-21, 225:3-4, 249:14-20, 250:21-251:7; Ex. L at 23:8-9; Ex. R at 32:21-34:1; and Ex. I at 37:9-24; Ex. S at ¶11.

54. The grievance process allows EM Investigators to challenge discipline, which can ultimately be decided by an arbitrator outside of EM. *See* Ex. G at 17:15-18, 20:14-20.

55. Newson does not believe any of the discipline he received was racially motivated, and all of the initially recommended discipline he received was reduced through the union grievance process, and he "never pretty much got written up" in the 14 years he was in EM. *See* Ex. A at 95:11-21, 106:1-9, 124:23-125:2, 157:17-19; Ex. A at 21:1-5.

56. Slaughter received two instances of discipline, the first of which was reduced to his liking, and the second of which was reduced to no discipline at all. *See* Ex. E at 66:11-13, 68:22-69:5, 71:10-13.

57. Strickland received three instances of discipline, all of which were reduced through the grievance process by Director Shields or another director, and none of which resulted in any days off, and she does not believe she received any discipline because of her race. *See* Ex. F at 93:2-9, 95:18-20, 96:9-16, 97:17-22, 99:20-100:4, 105:6-23, 106:9-11, 130:5-8, 142:17-143:11; Ex. H at 226:22-6.

58. CCSO is *See*king to terminate Ferguson and Winston, along with non-plaintiff Investigators Efran Rico (Hispanic) and Brian Shedor (Caucasian), before the Cook County Sheriff's Merit Board related to July 2015 time theft, but they have not yet received any discipline, and are unable to identify any similarly situated white Investigators who were treated more favorably than they were. *See* Ex. J at 55:7-11, 58:23-59:3, 60:3-8, 60:15-61:8; Ex. M at 102:2-21; *See* Ex. I at 134:1-135:11, 186:2-9, 191:11-17.

59. Winston received a 10-day suspension for reporting over the radio that he was at an assignment in Dalton, Illinois, when he was actually in a parked car at the EM Office on Rockwell in Chicago, which he unsuccessfully grieved, and for which he is unable to identify any similarly situated white Investigators who did not receive discipline. *See* Ex. I at 138:15-140:7, 186:2-9, 191:11-17.

60. Page does not claim he received any discipline that was discriminatory. *See* Ex. D at 106:5-22, 146:5-14.

61. Walker has "been kind of free of any discipline," and the only discipline he received which he contends was because of his race is a one-day suspension in 2016 for

discharging his taser in the hallway outside of the room where EM roll call is conducted that he did not grieve, and for which he is unable to identify any similarly situated white employees who were treated more favorably.  *See* Ex. B at 79:23-80:23, 84:19-85:10, 86:5-87:6, 87:14-88:8, 109:22-110:9.

62.     Williams received a 1-day suspension in 2014 for walking on a freshly waxed floor, but is not aware of any similarly situated white Investigators who were treated more favorably.  *See* Ex. C at 75:6-20, 78:15-19, 96:7-24, 124:17-125:7.

63.     Williams also received a 1-day suspension in 2014 or 2015 for taking vehicle keys home, and a written warning in 2013 or 2014 after successfully grieving discipline related to an escapee.  *See* Ex. C at 77:10-15, 79:21-24, 80:6-13, 83:4-8.

**E.     Assignments**

64.     Any of the chiefs or lieutenants on duty in EM could have made the roster of assignments, which might change up until the roll call time and even after roll call due to Investigators being out or equipment being out of service.  *See* Ex. O at 48:2-24.

65.     Chief Neal made assignments based solely on putting the best people in the best spots where he needed them to get the mission done.  *See* Ex. O at 50:19-51:15.

66.     Investigators were constantly begging for different assignments, and Neal explained that on rainy or snowy days Investigators often wanted to work in TSS, while on sunny days they wanted to work on the street in patrol.  *See* Ex. O at 49:11-50:3.

67.     Neal once tried to make assignments based on what the Investigators wanted and rotating people, but it disrupted the whole shift because "everybody wanted what they wanted when they wanted" and "didn't want to go where [Neal] sent them."  *See* Ex. O at 50:19-51:15, 53:12-21.

13

68.     White Investigators complained to Neal about their assignments and Neal explained that "everybody complained."  *See* Ex. O at 54:17-21.

69.     Ranzino made assignments in EM based on the idea of getting the job done and putting people where he was confident they had the proper knowledge for the assignment, though he tried to accommodate Investigators' requests when able to.  *See* Ex. K at  44:3-6, 44:23-45:11, 49:11-50:8.

70.     John Webb, who served as a Chief in EM from 2007 to March 2016 when he was promoted to Director of EM, testified that as a Chief in EM, he would make assignments based on Investigators' abilities, and tried to keep everybody happy because some Investigators preferred to work in the office, while others preferred to work out on the street.  *See* Ex. Q at 49:24-50:2, 51:1-16; Ex. S at ¶3.

71.     Webb sometimes had to assign Investigators to work inside because they were not being productive in the field, and race had nothing to do with assignments.  *See* Ex. Q at 52:6-53:2; 59:20-60:9.

72.     Director Shields had nothing to do with making assignment decisions on any given day, which were determined by workload only, and has nothing to do with race. *See* Ex. H at 136:6-9, 144:22-145:2, 158:16-20, 177:14-19, 183:21-23, 240:22-241:2, 247:12-21; Ex. Q at 55:13-24.

73.     McGhee believes Ranzino made assignment decisions based on whether an investigator was his friend or not, rather than based on their race – "[i]f you were good with him, you got an easy assignment. If you were not, you got the rougher stuff." Ex. G at 59:22-60:9.

74.     Dispatch would assign jobs to Investigators on patrol depending on factors including the limited number of cars, how many Investigators were available and the workload for the night.  *See* Ex. K at 69:10-23.

75.     There were more assignments in areas where more detainees were living.  *See* Ex. K at 93:8-16.

76.     Investigators' work in TSS (or the "basement") was as equally dangerous as work on patrol, most of which are "high incident areas," which Plaintiffs believe are areas where most crime is committed. *See* Ex. A at 106:10-12, 107:17-22, 111:8-10, and Dep. Ex. 4, Newson's Response to Shields's Interrogatory No. 3; *See* Ex. E at 45:23-46:5; *See* Ex. G at 30:14-17; Ex. F at 107:19-108:1; Ex. H at 235:17-236:2.

77.     To McGhee, being assigned to TSS was no better or worse than being assigned to street patrol. *See* Ex. G at 31:6-8.

78.     Newson, Slaughter, and McGhee have no idea how assignment decisions are made, only that supervisors are responsible for the decision. *See* Ex. A at 110:12-19, 112:1-4; *See* Ex. E at 40:1-6, 64:22-24; Ex. G at 88:5-10.

79.     Ferguson does not know what factors supervisors considered when deciding which investigator would go to which various assignments and does not know what role, if any, the director or executive director had in creating the roster of assignments.  *See* Ex. M at 88:20-89:8, 96:6-16.

80.     Page does not know what factors went into a supervisors' decision regarding who would be assigned where.  *See* Ex. D at 51:9-12; 95:15-20.

81.     Patrol Investigators had to go "wherever the incident occurred," and the majority of patrol assignments are in areas that Page considers to be the high incident areas.  *See* Ex. D at 98:8-22.  *See* Ex. D at 101:13-15.

82.     David Walker believes it is possible that supervisors were putting people they believed were good at TSS in that assignment, and is "quite sure they might have thought that, but eventually, you going to burn your good people out."  *See* Ex. B at 79:4-15.

83.     Winston does not know what goes into supervisors' decision as to what area of Cook County to assign an investigator to.  *See* Ex. I at 78:10-24.

84.     Ferguson wanted to be assigned to TSS, "[t]hat's where he wanted to be." *See* Ex. E at 124:15-125:5; Ex. H at 172:21-22.

85.     When Ferguson was able to bid for assignments he bid for TSS and believes he was good at the TSS assignment because he was "trained to do" TSS, and "did everything [he] was supposed to do, as far as put the band on, explain the program, help the guys fill out the information sheet, verify the information sheet with the host . . . ."  *See* Ex. J at 25:19-22; Ex. M at 81:18-82:2.

86.     Victor Slaughter applied for and was selected to be a Field Training Officer in TSS where he helped design a curriculum for people to work in TSS and would train employees to work in TSS.  *See* Ex. Q at 47:18-48:5, 135:20-136:4, 139:6-14.

87.     Slaughter and Strickland believe assignments to TSS were a form of discipline for, as an example, "speaking up and questioning" supervisors, "simply [having] a difference of opinion" with a supervisor, or "when someone would get upset with you," rather than being based on race. *See* Ex. E at 30:14-19, 31:10-15, 43:4-5, 59:15-19, 130:3-18, 170:22-171:15; Ex. F at 63:23-64:2, 108:17-22.

88.     Ferguson believes that he was assigned to TSS when he would make mistakes or if his paperwork was not good.  *See* Ex. J at 41:12-16.

89.     Williams, McGhee, Walker, Winston complained about being assigned to TSS as a punishment for errors or lack of productivity, rather than being based on their race. *See* Ex. C at 84:21-85:7; Ex. E at 126:19-127:11, 129:9-18, 137:6-21; Ex. G at 57:11-22; Ex. I at 50:8-51:6, 53:21-54:10.

90.     Slaughter and Ferguson believe that other, non-African American officers, including Brian Shedor (Caucasian) were assigned to TSS as punishment for errors or lack of productivity, not on the basis of their race. *See* Ex. E at 55:1-3; Ex. M at 179:14-19.

91.     Chief Rohloff, Director Shields, Chief Ranzino, Chief Neal and Lieutenant Collins told Winston that he was being placed in TSS due to his not having had enough productivity on patrol.  *See* Ex. I at 58:6-9, 60:11-14, 61:1-5, 70:3-19, 71:14-16.

92.     Areas of Cook County that have more gang and drug activity have more detainees.  *See* Ex. D at 93:24-94:3.

93.     Walker believes that some Investigators wanted to have patrol assignments closer to their house or neighborhood that they knew.  *See* Ex. B at 212:16-20.

94.     Walker agreed that certain areas have more reincarcerations that need to be processed than other areas of Cook County, and it is reasonable for CCSO to put more resources where they're needed.  *See* Ex. B at 225:8-16.

95.     Williams believes that he should be able to receive more favorable assignments based on his seniority, and that is the way it used to be, but they took that away and Investigators no longer bid for assignment.  *See* Ex. C at 169:12-170:2.

**F.**     **Promotions**

96. CCSO established a selection process for the EM Sergeant position in 2016, and Webb personally participated in the development of that application process and the recruiting of applicants for that promotion. *See* Ex. S at ¶12.

97. The process for promotion to EM Sergeant included: posting the open position(s) on a bulletin board in EM and online (in accordance with the Sheriff's Employment Action Manual Article Q), and Webb also attended EM rollcalls and invited all Investigators to apply for the position. *See* Ex. S at ¶13.

98. Applicants for the EM Sergeant position were required to: (1) submit an application, resume, and documents outlining any specialized training; (2) pass a physical test; (3) sit for an oral interview; (4) pass a written examination; and (5) review the employees' attendance history. *See* Ex. S at ¶14.

99. Between 2016 and 2017, EM had seven available EM Sergeant positions open and funded, but was only able to promote six Investigators because of a lack of qualifying applicants. Those six Investigators who were promoted included three Caucasians, one Hispanic, and two African American employee. *See* Ex. S at ¶15.

100. Newson, Slaughter, McGhee, Strickland, Page, Williams, Ferguson, and Winston were never considered for any promotions because they admittedly never applied for any promotions. *See* Ex. A at 137:4-6, 151:19-21, 152:4-6; *See* Ex. E at 82:4-10; Ex. G at 88:16-18, 90:19-21; *See* Ex. F at 152:4-7; Ex. D at 56:1-4; Ex. C at 73:13-23; and Ex. M at 98:15-99:5; *See* Ex. I at 287:20-288:3; and Ex. S at ¶16.

101. David Walker applied for one promotion in 2015 but failed the running portion of the physical test applicable to the promotion. *See* Ex. B at 67:20-68:21; and Ex. S at ¶16.

102.     Page stopped working as an EM supervisor in 2013 or 2014, but he does not know who made the decision to remove him from the supervisor position or why they made that decision.  *See* Ex. D at 21:2-9, 62:1-20; 64:14-16.

103.     David Walker does not know who made the decision to remove his EM supervisor title, but that it happened in about 2002 or 2003.  *See* Ex. B at 62:3-63:23.

104.     All EM supervisors were removed from the supervisor position at the same time. *See* Ex. D at 63:8-18.

105.     Plaintiffs Ferguson, McGhee, Newson, and Williams, all answered, "*See* Complaint," when asked to identify the protected activities for which they claim to have experienced retaliation.  Ex. M at 167:15-168:13, Dep. Ex. 2, Ferguson Resp. to Shields's Interrogatories at 6; Ex. G at 32:9-24, Dep. Ex. 2, McGhee Resp. to Shields's Interrogatories at 6-7; Ex. A at 114:15-115:17, Dep. Ex. 4, Newson Resp. to Shields's Interrogatories at 7; Ex. C at 123:3-124:3, Dep. Ex. 2, Williams Resp. to Shields's Interrogatories at 7.

106.     Plaintiffs Page, and Walker, each answered "Investigation Continues," when asked to identify the protected activities for which they claim to have experienced retaliation. *See* Ex. D at 108:13-109:16, Page Resp. to Shield's Interrogatories at 8-9; Ex. B at 113:1-114:6, Dep. Ex. 2, Walker Resp. to Shields's Interrogatories at 7.

107.     Plaintiff Slaughter answered "None," when asked to identify the retaliation he alleges he experienced in this lawsuit.  Ex. E at 41:9-15, Dep. Ex. 2, Slaughter Resp. to Shield's Interrogatories at 9.

108.     Plaintiff Strickland identified filing an EEOC charge as her protected activity in this case, however she filed that charge in July 2016, more than a year after she left the EM

19

department in April 2015. Ex. F at 23:11-19, Dep. Ex. 7, Strickland Response to Shields's Interrogatories at p. 8.

109. Investigators used to be able to bid on their assignment, but around 2011 the union negotiated that out of their contract against EM management's wishes, and there is now no contractual right to any assignment. *See* Ex. E at 28:20-29:7; *See* Ex. G at 25:10-13; Ex. F at 110:3-7, Ex. H at 142:7-143:21; Ex. N at 32:12-17; Ex. I at 20:1-21; and Ex. K at 38:9-39:15.

Dated: December 21, 2020          SHERIFF OF COOK COUNTY THOMAS J. DART, in his official capacity, JOSEPH RANZINO, GREGORY SHIELDS, THOMAS NEAL, and CHRISTOPHER ROHLOFF, individually and in their official capacities, and COUNTY OF COOK, ILLINOIS

By: /s/ Justin L. Leinenweber
**LEINENWEBER BARONI & DAFFADA LLC**
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(866) 786-3705
justin@ilesq.com

*Special State's Attorney for Defendants*

By: /s/ Ethan E. White
**EMERY LAW, LTD.**
2021 Midwest Road, Suite 200
Oak Brook, Illinois 60523
(630) 984-0339 (direct)
ewhite@emerylawltd.com

*Special State's Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, being first duly sworn upon oath, depose, and say that I caused to be served the foregoing document by electronically filing the same with the Clerk for the U.S. District Court for the Northern District of Illinois, Eastern Division, a copy of which was then forwarded to each attorney of record by CM/ECF on December 21, 2020.

Dated: December 21, 2020        By: <u>/s/ Justin L. Leinenweber</u>

**LEINENWEBER BARONI & DAFFADA LLC**
120 North LaSalle Street, Suite 2000
Chicago, Illinois 60602
(866) 786-3705
justin@ilesq.com