# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LEGRAIN WINSTON, MICHELLE STRICKLAND, I.V. NEWSON, JR., SAMUEL PAGE, WILFORD FERGUSON, CECIL WILLIAMS, DAVID WALKER, TYRONE MCGHEE, and VICTOR SLAUGHTER, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 18 C 5726 |
| THOMAS J. DART, Sheriff of Cook County, JOSEPH RANZINO, GREGORY SHIELDS, THOMAS NEAL, CHRISTOPHER ROHLOFF, and COUNTY OF COOK, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case are African-American former and current officers in the Electronic Monitoring Unit (EMU) in the Cook County Sheriff's Department. They sued the sheriff, Thomas J. Dart, and four individual supervisors—Thomas Neal, Joseph Ranzino, Christopher Rohloff, and Gregory Shields—for violations of 42 U.S.C. § 1981, Title VII, and the Illinois Human Rights Act (IHRA). The plaintiffs have also sued the Cook County Sheriff's Department under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), contending that the Sheriff's policies caused violations of their constitutional rights. The plaintiffs' complaint includes nine claims, including federal law claims of race discrimination based on denial of promotions,

hostile work environment based on racial harassment, and retaliation, as well as state law claims of negligent retention and respondeat superior. The plaintiffs also seek declaratory relief based on the defendants' alleged Title VII and IHRA violations.

The defendants previously moved to dismiss all nine counts. On June 4, 2019, the Court ruled on the defendants' motion to dismiss the complaint, *see* dkt. no. 59; it granted the motion with respect to the section 1981 official-capacity claims, but denied the motion as to the plaintiffs' Title VII, IHRA, and section 1981 individual-capacity claims. The defendants have now moved for summary judgment on the plaintiffs' remaining claims. For the reasons set forth below, the Court grants the motion with respect to all of the plaintiffs' claims except for Winston and Strickland's hostile work environment claims.

## Background

The Court assumes familiarity with the case's factual and procedural background, which the Court has described in its prior written opinions. *See Winston v. Dart*, No. 18 C 5726, 2019 WL 2357046 (N.D. Ill. June 4, 2019). The following facts are undisputed except where otherwise noted.

All nine plaintiffs are current or former investigators with the Electronic Monitoring Unit of the Cook County Sheriff's Department. Plaintiffs LeGrain Winston, I.V. Newson, Jr., Samuel Page, Wilford Ferguson, Cecil Williams, David Walker, Tyrone McGhee, and Victor Slaughter are African-American men. One plaintiff, Michelle Strickland, is an African-American woman. Winston, Ferguson, Williams, Walker, McGhee, and Slaughter are currently working in the EMU. Newson retired in 2019, and Page retired in 2018. Strickland worked in the EMU from March 2014 to April 2015. Defendant Dart

is the Cook County Sheriff.  Defendant Thomas Neal was a chief in the EMU until he retired in August 2017.  Defendant Ranzino was also a chief in the EMU until his removal on April 22, 2015.  Defendant Christopher Rohloff is currently a deputy chief in the EMU.  Defendant Shields was the executive director of the EMU until he retired on December 31, 2019.

Winston, Page, and Slaughter timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) on or about July 25, 2016, alleging that they experienced race discrimination, harassment, and retaliation for engaging in protected activities.  Plaintiff Newson filed a charge with the EEOC on October 11, 2017.  They received their right-to-sue letters from the EEOC on May 23, 2018,[1] and they and the other plaintiffs filed the present lawsuit on August 21, 2018.

## A.  The EMU

EMU investigators work in any of three main assignments: (1) the Technical Services Section (TSS), which involves interviewing program participants, reviewing criminal backgrounds, assigning equipment to participants, and installing ankle monitors; (2) patrol, which involves delivering plan participants, performing home checks, and responding to program alarms; and (3) office, which includes dispatching others for job assignments.  The parties agree that pursuant to an applicable collective bargaining agreement, the Sheriff's Department has the exclusive right to assign any

---

[1] Although the other plaintiffs never filed a charge with the EEOC, the Court ruled in the order on the motion to dismiss that the plaintiffs who failed to exhaust their administrative remedies could proceed via the single-filing rule because their allegations of discriminatory conduct are sufficiently similar to the factual contentions plaintiffs Winston, Page, Slaughter, and Newson alleged in their EEOC charges. *Winston*, 2019 WL 2357046 at *2 ("The charges filed by Winston, Page, Slaughter, and Newson put the sheriff's office on notice of the relevant allegations. . . .").

employee permanently or temporarily within the same division or unit. Investigators may bid for certain shifts or off days.

The defendants contend that none of the individual defendants other than Sheriff Dart had the power to hire, fire, promote, demote, or transfer EMU investigators because deputy chiefs, chiefs, and the executive director do not have the power to do so. The plaintiffs disagree; they contend that the individual defendants (Ranzino, Shields, Neal, and Rohloff) controlled the promotion process, prevented them from being promoted, and assigned them work.

The defendants also contend that the Cook County Sheriff's Department has a policy that prohibits discrimination, harassment, and retaliation, and provides that employees should report instances of prohibited conduct to their supervisor, Human Resources, or the Office of Professional Review (OPR); they further contend that all the plaintiffs understood these policy provisions. The defendants also contend that the majority of the investigators in the EMU are African-American. The plaintiffs dispute all these contentions, in part based on hearsay objections and also based on contradictory deposition testimonies. *See* Pls' Resp. to Defs.' Stat. of Facts, ¶ 24 (hearsay objection), ¶ 25 (stating that plaintiff Strickland "denied that the majority of EM investigators were African-American" during her deposition), ¶ 27 (testimony that defendant Neal "did not remember receiving any training from the Sheriff's office concerning racial harassment in the workplace" during his deposition) (dkt. no. 114).

## B.    Evidence of discrimination

The evidence in this case concerns racially offensive conduct by different individual defendants against different individual plaintiffs. For clarity's sake, the Court

4

will address the claims on a plaintiff-by-plaintiff basis.

## 1. Racially discriminatory conduct

The plaintiffs contend that the individual defendants—Neal, Ranzino, Rohloff, and Shields—used racial epithets and engaged in other racially offensive conduct against them. Some plaintiffs also witnessed the defendants commit this conduct against other plaintiffs.

### a. Racist comments

Winston testified that defendant Neal called him a "crook" in 2011 when they were discussing overtime work. Defs.' Ex. I, Winston Dep. 108:5-109:4. Winston did not report this incident to anyone. Williams testified during his deposition that defendant Rohloff used the term "you people" to him. Defs.' Ex. C, Williams Dep. 94:14-95:2. Williams's testimony suggested that the use of the term was racially hostile and derogatory. He did not report the incident to anyone. *See id.*

Several plaintiffs testified about inappropriate racist comments by defendant Ranzino. Winston testified that Ranzino called him the N-word once and used the word "boy" or "boys" numerous times to address African-American investigators during roll call; it is unclear from the record when these incidents occurred. Winston Dep. 90:22-94:10. Winston further testified that defendant Ranzino stated that "all of you look alike," in reference to African-American investigators in the EMU, on April 9, 2015. *Id.* at 88:6-89:16. Based on this incident, Winston filed a complaint with OPR on April 20, 2015. *Id.*; *see also* Defs.' Ex. I, Winston Complaint Register (ECF page ID #1024). Walker and Slaughter gave statements about the April 9 incident to Human Resources. Defs.' Ex. B, Walker Dep. 159:19-162:3; Defs.' Ex. E, Slaughter Dep. 83:5-84:7. Walker

also heard defendant Ranzino make these comments.  Walker Dep. 159:19-169:24.

In addition, Walker testified that Ranzino used the N-word approximately two or three times over the course of Walker's thirty-year career; Walker never notified any supervisors or reported these incidents to anyone.  Walker Dep. 90:24-96:19.  He testified that he never reported the use of any racist language by any supervisor.  *Id.* at 90:7-18, 93:12-95:24.  Newson testified that defendant Ranzino used the N-word in front of his partner, but Newson did not personally witness the incident or report it. Defs.' Ex. A, Newson Dep. 45:5-7; 53-56:9.  Page testified that Ranzino used the term "you people" in reference to African-American investigators.  Defs.' Ex. D, Page Dep. 103:13-104:5, 134:20-135:12, 184:4-191:4.

Williams filed a complaint with OPR, claiming that on April 16, 2015, Ranzino told him "[I'm] not scared of you" in a threatening voice.  Williams Dep. 246:6-247:5; Defs.' Stat. of Facts. ¶ 37.  Williams also testified that Ranzino said to him, "are you sure you wanna mess with me" in a threatening voice.  Williams Dep. 240:3-16, 244:5-247:18, 248:16-252:9.  Williams did not report any instances of anything he characterized as racism.  In April 2015, Ranzino was transferred out of the EMU.  Ranzino testified that he did not know why he was transferred.  Defs.' Ex. K, Ranzino Dep. 73:8-12.

Turning to evidence involving defendant Shields, Winston testified and Strickland corroborated during her deposition testimony that Shields called her "nappy head"—a racist description of an African-American person's hair.  Defs.' Ex. F, Strickland Dep. 129:19-130:4; 132:9-19.  Winston also testified that Shields told him that he would try his best to get him fired, sometime in August 2015.  Winston Dep. 99:16-20.  Ferguson also testified that Shields used the N-word "all the time" in "casual conversation, such

as, 'what's up my [N-word]s,' meaning 'Like, hey, how are you all doing?'" Pls.' Resp. to Defs.' Stat. of Facts. ¶ 28; Defs.' Ex. J, Ferguson Dep. 147:2-148:1, 149:13-150:14. Ferguson did not report this to OPR.

### b. Hostile working conditions

Certain plaintiffs also testified about harassing conduct that they believe created a racially hostile work environment. Page testified that he believes that Ranzino created a hostile work environment by telling him to "[g]et it done," "[g]et it right," or "[y]ou're not finished yet? Hurry up." Defs.' Stat. of Facts ¶ 34 (dkt. no. 110); Page Dep. 147:15-148:20 (internal quotations omitted). Page also testified that he believed that Ranzino's attitude toward him was hostile and negative. *Id.* at 148:6-10. Furthermore, he said that supervisors would respond harshly when African-American investigators asked questions during roll call. *Id.* at 189:22-190:18. Likewise, Strickland testified that the work environment was hostile because it made her feel alienated, outcasted, and treated differently. Strickland Dep. 21:16-24. Newson testified that he found the work environment hostile because African-American investigators were assigned to high-incident areas of Cook County, whereas white investigators were assigned to the suburbs. Newson Dep. 65:11-66:23.

Numerous plaintiffs testified that they faced what they characterized as racially-motivated discipline or retaliation for filing grievances and complaints. For instance, many plaintiffs testified that they were disproportionately disciplined and written up compared to non-African-American investigators in the EMU. These plaintiffs contend that disciplinary action was based on race and/or retaliation for participation in protected activities, such as filing complaints and grievances against certain supervisors. The

plaintiffs point out that defendant Neal testified during his deposition that EMU supervisors were aware of the plaintiffs' complaints regarding discrimination in work assignments and disciplinary write-ups.

Page testified that he was threatened with write-ups because of his race, but he also testified that he was never *actually* written up.  Page Dep. 105:24-106:22.  Winston testified that supervisors yell at African-American investigators, write them up for discipline, and characterize them as argumentative but that they do not treat non-African-American investigators the same way.  Winston Dep. 269:2-286:22.  With respect to disciplinary action, Slaughter testified that he received two instances of discipline; the first was reduced and the second was eliminated.  Slaughter Dep. 66:11-13, 68:22-69:5, 71:10-13.  He also testified that defendant Rohloff did not allow him to partner with another African-American employee, but white employees were allowed to partner together.  *Id.* at 95:6-24.

In July 2015, there was an incident involving Ferguson and Winston.  They were erroneously subpoenaed to come to court.  Ferguson Dep. 55:2-59:20.  Because of the error, which was no fault of their own, they used court time as a tour of duty, apparently without authorization.  Court time includes assignments where investigators are scheduled to appear in court for criminal proceedings.  A tour of duty, in contrast, refers to the time investigators spend stationed or assigned to a particular area of Cook County to provide assistance or protection.  The record suggests that Shields suspected that Winston and Ferguson falsely recorded that they were on court duty, which prompted him to investigate whether they committed "time theft."  Winston testified that Shields wrote a false complaint against him for timecard fraud, but no discipline appears

to have followed.  Winston Dep. 127:20-132:13, 171:10-16.  Ferguson testified that a white investigator who was investigated for committing timecard fraud during the same incident was paid for his court time; neither Winston nor Ferguson were paid for the date just discussed.  Ferguson Dep. 55:2-56:9.

Some plaintiffs also testified that African-American personnel received less desirable work assignments on account of their race or as retaliation for protected activities.  For instance, Ferguson testified that Ranzino would intimidate him and threaten to put him in TSS, and that he (Ferguson) believed assignments to TSS were a punishment to African-American investigators.  Defs.' Ex. M, Ferguson Dep. Vol. II, 158:19-159:1.  Other plaintiffs corroborated Ferguson's testimony that TSS was an undesirable assignment.  Strickland testified that receiving TSS assignments was a form of discipline.  Strickland Dep. 63:23-64:2, 108:17-22.

Moreover, certain plaintiffs were removed from supervisory roles or the EMU altogether; some attribute their removal to discrimination.  Page stopped working as an EMU supervisor in either 2013 or 2014; he does not know who made the decision to remove him.  Page Dep. 62:1-20, 64:14-16.  Ferguson testified that he believes he was removed from EMU because of this lawsuit.  Ferguson Dep. Vol. II 120:17-122:16.  Walker, a former supervisor, does not know who decided to move his supervisor title but he says it happened in 2002 or 2003.  Walker Dep. 62:3-63:23.

### c.     Promotion denial

Several plaintiffs also complained about the lack of promotional opportunities for African-American investigators, but only some plaintiffs attribute this to race.  Walker applied for one promotion, but he failed the physical test required for the job.  Walker

Dep. 67:20-70:2. Winston testified that he requested a promotion, but Shields denied it; Winston appears to theorize that he was denied the promotion because of his race. His testimony regarding the denial was otherwise conclusory.

### 2. Other evidence

Some plaintiffs believe they did not face any racially-motivated discipline, hostile working conditions, or retaliation in the EMU. Newson, for example, testified that the discipline he faced was not based on race. Newson Dep. 95:11-21, 106:1-9, 124:23-125:2, 157:17-19, 21:1-5. The plaintiffs do not argue otherwise in opposing summary judgment. Slaughter also testified that he believed TSS assignments were a form of discipline, although he believed that non-African-American officers also received TSS assignments as disciplinary action. Slaughter Dep. 30:14-19, 31:10-15, 43:4-5, 55:1-3, 59:15-19, 130:3-18, 170:22-171:15. Further, Slaughter testified that he faced no retaliation as a result of this lawsuit. *Id.* at 41:9-15.

Strickland received three instances of discipline, all of which were reduced by Shields or other supervisor through grievance process; she does not believe she was disciplined because of her race. Strickland Dep. 93:2-9, 95:18-20, 96:9-16, 97:17-22, 99:20-100:4, 105:6-23, 106:9-11, 130:5-8, 142:17-143:11. Ferguson testified that he thought the work environment in TSS was hostile because it was unsanitary, not because of anything having to do with race. Ferguson Dep. Vol II 157:7-158:11; Ferguson Dep. 37:2-11; 38:8-40; 158:3-7. Williams complained about being assigned to TSS, but he said it was a punishment for making errors or for lack of productivity and not attributable to race. Williams Dep. 84:21-85:7. McGhee offered similar testimony. Defs.' Ex. G, McGhee Dep. 57:11-22. McGhee testified that being assigned to TSS was

no better or worse than being assigned to street patrol but that health conditions are worse in TSS than patrol. *Id.* at 31:6-8; 31:6-10. McGhee also testified that Ranzino made assignment decisions based on friendships, not race. *Id.* 59:22-60:9.

Williams testified that he received a one-day suspension in 2014, but it was not based on race; he was disciplined for walking on a freshly-waxed floor. He received another suspension for taking vehicle keys home. Williams Dep. 75:6-20, 78:15-19, 77:10-15, 79:21-24, 80:6-13, 83:4-8, 96:7-24, 124:17-125:7.

## C. Municipal liability

The plaintiffs contend that the Sheriff's Department is liable under *Monell* because the misconduct committed by EMU supervisors was based on its policy and practice of failing to discipline, supervise, and control supervisors, including Neal, Ranzino, Rohloff, and Shields. The record does not appear to include any factual evidence regarding the existence of an express municipal policy or custom on the part of the Cook County Sheriff's Department; nor does it include evidence indicating that the misconduct was caused by an official with final policy-making authority, such as Sheriff Dart. Rather, the evidence underlying the plaintiffs' *Monell* claim against Cook County concerns the misconduct committed by the individual supervisor defendants.

Relatedly, the plaintiffs contend that Dart and Cook County are liable under state law for the negligent retention of defendants Neal, Ranzino, Rohloff, and Shields. The plaintiffs describe these individual defendants as unfit supervisors. The plaintiffs also appear to advance a respondeat superior theory with respect to their state law tort claim. The plaintiffs say that the individual defendants were agents of Cook County acting within the scope of their employment when they committed discriminatory acts

against African-American investigators in the EMU. The record, however, does not appear to include any evidence that could establish any of the elements of these state law claims, such as an injury proximately caused by the Sheriff Department's alleged breach.

On December 21, 2020, the defendants moved for summary judgment on the plaintiffs' claims.

## Discussion

To prevail on their summary judgment motion, the defendants must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010) (quotation marks omitted). The Court views the evidence and draws all inferences in favor of the nonmoving party. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019). The plaintiffs must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes*, 914 F.3d at 564.

The Court will apply the same analysis to the plaintiffs' Title VII, IHRA, and section 1981 discrimination claims. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 892 n.1 (7th Cir. 2018); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403

(7th Cir. 2007).  As explained below, the plaintiffs' section 1981 claims are individual-capacity claims, which the Court construes as arising under 42 U.S.C. § 1983.  *See Smith v. Chief Judge of Cir. Ct. of Cook Cty.*, No. 17 C 8341, 2021 WL 767624, at *1 n.2 (N.D. Ill. Feb. 26, 2021).

## A.    Webb declaration

Prior to addressing the merits of the defendants' motion for summary judgment, the Court must address the plaintiffs' argument that a declaration was improperly submitted by the defendants.  In short, the plaintiffs argue in their response brief that the a declaration from an EMU supervisor, John Webb, who is not a defendant in this case, is improper under Federal Rule of Civil Procedure 56(e) because it is not based on personal knowledge.  *See* Pls.' Resp. Br. at 2 (dkt. no. 116).  The plaintiffs' argument actually concerns Federal Rule of Civil Procedure 56(c)(4), which provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge."  Webb's four-page declaration concerns the EMU's policies, programs, assignments; his role and responsibilities as an EMU director; promotional processes; and one sentence regarding Ranzino's transfer out of the EMU following Winston's complaint.  *See* Defs.' Ex. S, Webb Decl. (dkt. no. 109-1).  In reviewing the declaration, the Court concludes that it meets the criteria set out in Rule 56(c)(4) and denies the plaintiffs' request to strike it under the Rule.

The plaintiffs also contend that the defendants did not disclose Webb as a witness as required under Federal Rule of Civil Procedure 26.  Pls.' Resp. Br. at 2-4.  But the defendants submitted into evidence an e-mail identifying Webb as a witness in an amended disclosure in February 2020.  *See* dkt. no. 117, ECF page ID #2152-53.

Moreover, the plaintiffs took Webb's deposition. The plaintiffs' argument based on Rule 26 lacks merit. The Court denies their request to strike the declaration on this basis.

**B.     Administrative remedies**

The defendants seek dismissal of the plaintiffs' IHRA claim for failure to exhaust administrative remedies with the Illinois Department of Human Rights (IDHR). Accordingly, the defendants argue that this Court lacks jurisdiction over the IHRA claims—hostile work environment, race discrimination, and retaliation—which are in count 5 and 6 of the plaintiffs' complaint.

The plaintiffs contend that this Court has jurisdiction over the IHRA claims and describe the steps they took to exhaust their administrative remedies with respect to their EEOC and IHRA claims. *See* Pls.' Resp. Br. at 18. Specifically, Winston, Page, and Slaughter cross-filed EEOC and IDHR charges on July 25, 2016. Those plaintiffs received right-to-sue letters from the EEOC on May 23, 2018, which gave them ninety days to file a federal lawsuit. The plaintiffs filed this complaint on August 1, 2018. The plaintiffs contend that because of the cross-filing, they have now exhausted their administrative remedies with respect to their IHRA claims.

The plaintiffs' argument lacks merit. The right-to-sue letters issued by the EEOC in 2018 address the plaintiffs' Title VII claims, not the IHRA claims. Although the IDHR and EEOC have a workshare agreement whereby a charge filed with one is automatically cross-filed with the other, *see Carlson v. Christian Bros. Servs.*, 840 F.3d 366, 367 (7th Cir. 2016) (describing cross-filing arrangement), the IHRA requires plaintiffs to complete additional administrative remedies. *See* 775 Ill. Comp. Stat. § 5/8-111(D). Hence, the EEOC letters "cannot be used as a substitute" for exhaustion of

IHRA administrative remedies. *Principe v. Village of Melrose Park*, No. 20 C 1545, 2020 WL 4815908, at *5 (N.D. Ill. Aug. 18, 2020) (citing *Perez v. Cook County Sheriff's Office*, No. 19 C 1788, 2020 WL 777288, at *3 (N.D. Ill. Feb. 18, 2020)); *see also Anderson v. Centers for New Horizons, Inc.*, 891 F. Supp. 2d 956, 960 (N.D. Ill. 2012) ("plaintiff cannot rely on the EEOC right to sue letters that she received to establish a right to sue under the IHRA"). This Court cannot exercise jurisdiction over the plaintiffs' IHRA claims unless and until they obtain a final order from the IDHR.

In this case, there is no evidence of a final order issued by the IDHR to any of the plaintiffs. The Court therefore concludes that the plaintiffs have not exhausted their administrative remedies with respect to their IHRA claims in count 5 and 6. Accordingly, the IHRA claims—concerning hostile work environment, race discrimination, and retaliation—are dismissed for lack of jurisdiction.

## C. Race discrimination claims

In count 1 and count 3, the plaintiffs assert race discrimination claims based on two different federal statutes. *See* Compl. ¶¶ 87-92, 98-104. In count 1, the plaintiffs assert a race discrimination and hostile work environment claim under the Civil Rights Act of 1866, which is codified at 42 U.S.C. § 1981. In count 3, they assert race discrimination in promotions claims and hostile work environment claims under Title VII. This Court evaluates discrimination claims brought under these statutes based on the same standard. *See Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601 (7th Cir. 2020) (explaining that these claims "stand or fall together").

Section 1981 prohibits race discrimination and specifically states that the rights it protects "are protected against . . . impairment under color of State law." 42 U.S.C. §

1981(c).  In this case, the plaintiffs' claims against the individual defendants—Dart, Neal

Ranzino, Rohloff, Shields—are based on the rights conferred in section 1981.  But the

remedy for a violation of section 1981 by a state actor is provided by 42 U.S.C. § 1983.

*Campbell v. Forest Preserve District of Cook County*, 752 F.3d 665, 666, 671 (7th Cir.

2014).  In light of this precedent, this Court ruled in a prior order that it would construe

the plaintiffs' section 1981 individual-capacity claims under section 1983.  *See Winston*,

2019 WL 2357046, at *3.  The Court also explained that section 1981 does not allow

official-capacity claims.  *Id.*  Thus, the Court dismissed the plaintiffs' official-capacity

claims, leaving only their individual-capacity claims; the Court will refer to these claims

as section 1983 claims.[2]  *Id.*

The plaintiffs contend with respect to both the section 1983 and Title VII claims

that the defendants subjected them to race discrimination by denying them promotions

and fostered a hostile work environment by "subjecting them to ongoing intimidation,

ridicule, disproportionate disciplinary action, insults based upon their race and

disproportionate duty assignments based upon their race."  *Id.* ¶ 99.

The Seventh Circuit has held that when an employer moves for summary

judgment in a Title VII employment discrimination case, "the singular question for the

district court is whether the plaintiff has introduced evidence that would permit a

---

[2] The Court also pointed out in the prior order that the Seventh Circuit has not weighed in on whether an individual-capacity section 1981 claim, brought under section 1983, is viable if the plaintiffs' contentions concern government employee action committed within the scope of employment.  Another judge of this Court has suggested that such claims are not viable.  In *Edmond v. City of Chicago*, No. 17 C 4858, 2018 WL 5994929 (N.D. Ill. Nov. 15, 2018), Judge Gottschall held that that individual-capacity claims based on section 1981 are only appropriate where the defendants' conduct in violation of section 1981 "is not fairly attributable to the state."  *Id.* at *9.  Because the Court is construing the claims under section 1983, it need not reach a decision on this point.

reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Purtue*, 963 F.3d at 602 (internal quotations omitted).  In assessing a discrimination claim, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  The Seventh Circuit instructs district courts to apply the *Ortiz* framework "regardless of whether the court also analyzes the evidence pursuant to [the] *McDonnell Douglas* [framework]." *Ortiz*, 834 F.3d at 765.  The *McDonnell Douglas* burden-shifting method of proof requires the plaintiff to meet four distinct elements of a prima facie case, upon which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, and then back to the plaintiff to show that the proffered reason is pretextual.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Among the prima facie elements under *McDonnell Douglas* is comparator evidence—i.e., the plaintiff must show that similarly situated employees who are not members of the protected class were treated more favorably.  In this case, there is no record evidence of any comparators, and the plaintiffs do not appear to advance any argument concerning comparator employees.  For this reason, the Court will exclusively evaluate the evidence pursuant to the *Ortiz* rubric.

The Court notes that certain factual allegations in the plaintiffs' complaint are inconsistent with the evidence obtained in discovery.  In the complaint, for example, the plaintiffs allege that "Director Shields and his subordinate supervisors regularly called Plaintiffs words such as '[n-word], crooks' and other derogatory and racist comments."

17

Compl. ¶ 80.  The record evidence, however, references four distinct occurrences of racist and derogatory comments from different supervisors, which were directed at different plaintiffs at different times.

First, defendant Shields is alleged to have referred to plaintiff Strickland as a "nappy head"—a derogatory description of African-American persons' hair—somewhere between 2013 and 2016.  Defendant Ranzino is alleged to have made three derogatory comments.  He called Winston the N-word sometime in 2012.  He also referred to Winston and other African-American investigators "boy" or "boys" sometime in 2012.  Finally, Ranzino stated to African-American investigators that "all of you look alike" on April 9, 2015.  Defendant Ranzino was transferred out of the EMU less than two weeks later—on April 22—after Winston complained that Ranzino made inappropriate comments.

### 1.    Denial of promotions

Certain plaintiffs complained that there were no promotional opportunities for African-American investigators.  Winston contends that defendant Shields denied him a promotion because of his race, but there is no evidence in the record of any promotion decision regarding Winston's employment, let alone one that was based on his race or in any way linked to the discriminatory remarks uttered to him by Ranzino or Shields.  In reviewing Winston's deposition testimony, it is not clear to the Court when Winston supposedly asked Shields for a promotion and when or on what basis.  Shields denied the request.

The record shows that Walker applied for a promotion, but he failed the physical fitness test, which was required by the promotion.  There is no evidence that would

permit a reasonable jury to find that the denial was based on his race. Likewise, as previously mentioned, the plaintiffs contend that Winston asked Shields for a promotion. The evidence, even taken in the light most favorable to the plaintiffs, falls somewhat short of this. Winston testified that he "just expressed interest that I wouldn't mind being a chief" to Neal; it is not clear from the record whether Neal directly responded to Winston's expression of interest. Winston Dep. 85:14-18. He also told Shields "I wouldn't mind being a chief or maybe a higher position." *Id.* at 85:23-86:2. Winston testified that Shields responded "[t]hat's not going to happen." *Id.* at 86:3-4. This would not permit a reasonable jury to find that he actually applied for a promotion and that one was denied; at most, he made an expression of interest in a higher position, and neither Neal nor Shields's response amounted to denial of a promotion. All in all, there is no evidence that Shields or any other defendant denied Winston or any other plaintiff a promotion because they are African-American. In sum, no reasonable jury could find in the plaintiffs' favor on their promotion denial claims. The defendants are therefore entitled to summary judgment on the denial of promotion claims under Title VII and section 1983.

### 2. Racially hostile work environment

Turning to the plaintiffs' racially hostile work environment claims, the law provides that "[s]ubjecting an employee to a hostile work environment counts as an adverse action ('unlawful employment practice') within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C. § 2000e-2(a)." *Gates v. Bd. of Educ. of the City of Chicago*, 916 F.3d 631, 636 (7th Cir. 2019). Specifically, plaintiff must show that "(1) he was subject to unwelcome harassment"; "(2) the harassment was based on race (or

another protected category)"; "(3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment"; "and (4) there is a basis for employer liability." *Id.* (quoting *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018)).

Several plaintiffs contend that there is evidence of disproportionate disciplinary action towards African-American investigators, assigning African-American investigators to undesirable or unsafe assignments, and threats of discipline. For instance, Newson testified that African-American investigators were assigned to high-incident areas because of their race. Ferguson testified that being assigned to TSS was a punishment based on race. Slaughter testified that he was disciplined based on his race, but the first instance of discipline was reduced and the second was eliminated; there is no other evidence about discipline Slaughter faced, such as why it occurred or why the instances were reduced and eliminated. Moreover, Page testified that he was threatened with write-ups because of his race, but he was never written up and therefore no adverse employment action ever occurred.

There is no evidentiary foundation for Ferguson and Newson's contentions with respect to the EMU's assignment process; their beliefs regarding the motivations of others are not properly admissible in evidence, and they have offered nothing else to support these contentions. Slaughter and Page's testimony is conclusory and vague. "We acknowledge that uncorroborated, self-serving testimony may suffice to prevent summary judgment in some circumstances . . . but [the plaintiffs'] stated beliefs cannot create a genuine issue of material fact when those beliefs lack a foundation of personal knowledge." *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 395-96 (internal

citations omitted) (7th Cir. 2010). "[M]ere conclusory allegations do not constitute evidence." *Id.* at 389. The law is clear: before any of the plaintiffs "can benefit from a favorable view of evidence, [they] must first actually place evidence before the courts." *Id.* There is no evidence that supports these plaintiffs' claim of a racially hostile work environment. Rather, the record indicates that only two plaintiffs—Winston and Strickland—have evidence that supports an actionable hostile work environment claim. As mentioned, Shields referred to Strickland as a "nappy head" in front of several other investigators and Ranzino made three derogatory comments to Winston, including the n-word.

In their opening brief, the defendants first argue that there is no basis for employer liability, which is the fourth element of a hostile work environment claim, contending that the individual defendants—Neal, Ranzino, Rohloff, and Shields—did not have the power to hire, fire, or promote the plaintiffs. Defs.' Opening Mem. at 2-3. Title VII provides that employers are strictly liable for the discriminatory acts perpetrated by supervisors. *Johnson*, 892 F.3d at 904.

The defendants' own deposition testimony contradicts the assertion that they were not supervisors within the meaning of Title VII. For instance, Shields, who was EMU's executive director before retiring, testified that the EMU's management, including himself and the other defendants, who were chiefs or deputy chiefs, "put people in positions to fulfill the wants and needs of the department." Shields Dep. 134:22-135:11. Ranzino, a chief, similarly testified that he "was one of the people responsible" for assigning work responsibilities in the EMU. Ranzino Dep. 43:1-46:20. There is also sufficient evidence in the record of defendants Ranzino and Shields invoking their

authority as supervisors to threaten discipline against EMU investigators via write-ups or complaints; they also invoked their authority in some instances to increase or reduce disciplinary action. The defendants' contention that the plaintiffs lack evidence to impose liability on the Cook County Sheriff's Department thus lacks merit; there is at least a genuine factual dispute on this point.  A jury reasonably could find that Ranzino and Shields had the "power to directly affect the terms and conditions of employment" because they "supervise[d] and control[led] the employees."  *Johnson*, 892 F.3d at 905.

The testimony submitted by certain plaintiffs—namely Strickland and Winston— reviewed in the light most favorable to the plaintiffs, certainly "reflects a racist attitude" on the part of defendants Ranzino and Shields.  "A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally."  *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 935 (7th Cir. 2020).

Relatedly, although the Seventh Circuit has indicated "that one or two utterances of the N-word are not severe or pervasive enough to rise to the level of establishing liability absent an unusually severe, physically threatening, or humiliating incident," *Gates*, 916 F.3d at 637-38 (internal quotation marks omitted), there is a "critical" distinction between hostile work environment claims based on co-workers uttering racially offensive language and cases involving such conduct by supervisors.  *Id.* at 638. In this case, the offensive conduct involves supervisors, which the Seventh Circuit regards as more serious.  "We have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's."  *Id.*

The Court concludes that a reasonable jury could find comments toward Winston and Strickland—including Ranzino's use of the N-word, statement that the African-

American investigators all look alike, and reference to African-American investigators as "boy" or "boys," as well as Shields's use of "nappy-headed" to describe Strickland's hair in front of her and other investigators—to amount to harassment based on race, thereby satisfying the first two elements of a hostile work environment claim. "Given American history, we recognize that the [N-word] . . . can have a highly disturbing impact on the listener." *Johnson*, 892 F.3d at 903. Moreover, the Seventh Circuit has held that even where "[t]he plaintiffs' evidence that the harassment altered the terms of their employment is thin . . . it is enough to survive summary judgment." *Id.* "A reasonable jury could find that these words, among them one of the most racially derogatory word in the English language, that the plaintiffs heard were unwelcome. . . ." *Id.*

None of the other plaintiffs, however, have introduced any evidence that they experienced inappropriate remarks that could be construed as unwelcome race-based harassment by a reasonable factfinder, and thus they cannot establish the first two elements of their hostile work environment claims. The defendants are entitled to summary judgment on those plaintiffs' claims.

Turning to the third element of Winston and Strickland's hostile work environment claims, the Court must determine whether a reasonable jury could find the racial harassment they faced was so severe or pervasive that it altered the conditions of employment and created as hostile work environment. In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993), the Supreme Court explained what could be actionable in the context of a hostile work environment claim:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees

> from remaining on the job, or keep them from advancing in their careers . . . The appalling conduct alleged in *Meritor*, and the reference in that case to environments "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers," merely present some especially egregious examples of harassment. They do not mark the boundary of what is actionable.

*Id.* at 22 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)); *see also Gates*, 916 F.3d at 637 (quoting the same passage from *Harris*). The third element—the requirement to show "severe and pervasive" conduct—includes both an objective and subjective component. The conduct must "create an objectively hostile or abusive work environment—an environment that a reasonable person [in the plaintiff's position] would find hostile or abusive," and the victim must "subjectively perceive the environment to be abusive." *See Harris*, 510 U.S. at 21.

The record evidence of racial harassment faced by Strickland appears to exclusively concern Shields's racist comment about her hair. There is no other evidence of racial harassment toward her on the part of Shields or anyone else. Strickland did, however, testify during her deposition that the single incident involving Shields caused her to have a significant emotional reaction, in part because several other officers witnessed the incident and repeatedly discussed it with her. Strickland Dep. 48:21-58:3. A reasonable jury could find, based on Strickland's testimony, that she in fact subjectively perceived the EMU work environment to be abusive because of Shields's conduct toward her.

Moreover, the evidence would allow a reasonable jury to conclude that the environment was objectively hostile. "A jury would likely have a difficult time concluding that a supervisor calling his employee ["nappy-head"] . . . w[as] not [an] example[] of [a] harassing comment[] motivated by race." *See Gates*, 916 F.3d at 641. The *Gates* case

emphasizes that under Seventh Circuit law, the use of the N-word by supervisors has a "particularly severe impact on work environments" and "[t]his is particularly true when supervisors address these derogatory and humiliating remarks directly to the employees in question." *Id.* at 638 (referencing *Dandy v. United Parcel Serv.*, 388 F.3d 263, 271 (7th Cir. 2004)). Moreover, although the record appears to show that Shields's "conduct was . . . infrequent and not 'physically threatening' or 'humiliating' in a public setting," a reasonable jury could conclude that "it was severe and humiliating" because it impacted her psychologically, occurred in the presence of other co-workers, and was racially derogatory. *Gates*, 916 F.3d at 641.

Winston, likewise, has introduced sufficient evidence with respect to the element of severe or pervasive conduct perpetrated by Ranzino. As previously mentioned, Ranzino, a supervisor, made racially offensive comments toward Winston on three separate occasions, and in some instances in the presence of other African-American investigators. Winston's deposition testimony would allow a reasonable jury to conclude that he subjectively perceived Ranzino's conduct as severe or pervasive enough to create an abusive work environment. Specifically, Winston testified that he and other African-American investigators asked Ranzino multiple times to stop engaging in discriminatory conduct towards them, Winston Dep. 91:9-92:7; he complained to the Union and supervisors about Ranzino's conduct, *Id.* at 107:1-21; and he was appalled when Ranzino called him the N-word and discussed the incident with Walker. *Id.* at 105:2-107:3. A reasonable jury could find this conduct sufficient to meet both the subjective and objective components of the hostile work environment standard.

In sum, Winston and Strickland have identified specific, admissible evidence that

would support a jury finding on their favor with respect to all four elements of their Title VII claims as well as their section 1983 claims against Ranzino and Shields. The Court therefore denies the defendants' motion for summary judgment with respect to these claims.

## E.     Retaliation

Next, the Court turns to the plaintiffs' retaliation claims in count 4, which they assert under Title VII. In their complaint, the plaintiffs contend that they "engaged in or were engaging in protected activity under federal law," such as "filing internal complaints, grievances, memorandums and incident reports." Compl. ¶ 106. They allege that they were "subjected to the adverse employment actions," including "failure to provide Plaintiffs a safe working environment," because "of their participation in filing internal complaints, grievances, memorandums, and incident reports that drew attention to various violations within Defendants' control." *Id.* ¶¶ 107-08. Accordingly, the plaintiffs contend, the defendants' adverse employment actions "would not have occurred but for" their protected activities, and they allege that they have suffered "severe and substantial damages" because of the defendants' retaliatory conduct. *Id.* ¶¶ 109-110.

To prevail on a retaliation claim under Title VII, the plaintiffs must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

The plaintiffs' purported evidence of retaliation is challenging to follow, in part because they cite several distinct parts of the record. The plaintiffs argue that "Shields

knew about the EEOC charges filed against him by Winston prior to charges seeking his termination were filed" and they cite Shields's deposition testimony to back this contention. Pls.' Resp. Br. at 17. But the plaintiffs' contentions are not supported by their citation to Shields's testimony, and there does not appear to be support for their contention elsewhere in the record. Shields testified that he was "not sure when" he "became aware" of the EEOC complaints that certain plaintiffs filed with the EEOC in July 2016. Defs.' Ex. L, Shields Dep. Vol. II 9:8-15. Contrary to the plaintiffs' argument, Shields did not testify when he became aware of Winston's EEOC complaint; he testified only that he became aware of it at some point. Pls.' Resp. Br. at 17. Furthermore, the record evidence does not support the plaintiffs' contention that Shields fabricated a complaint of time theft fraud against certain plaintiffs. *Id.* at 7. Rather, it appears that Winston and Ferguson were erroneously subpoenaed to come to Court by the state's attorney and this mishap prompted Shields to investigate whether they committed timecard fraud. The record—including Winston and Ferguson's own testimony—reflects that neither of them were subjected to any actual discipline by Shields or anyone else as a result of this incident.

Next, the plaintiffs argue that Neal testified that African-American workers complained about the workplace to him. Pls.' Resp. Br. at 17. That's all well and good, but Neal did not testify that these complaints in any way resulted in retaliation, and the plaintiffs offer no other evidence connecting their complaints to retaliatory action. The rest of the plaintiffs' citations to deposition testimony do not support their contention that supervisors subjected the plaintiffs to adverse employment decisions because they filed grievances. *Id.*

The defendants' argument that the plaintiffs' retaliation claims cannot survive summary judgment because there is no evidence of a nexus between protected activities and adverse actions is therefore persuasive. Defs.' Opening Mem. at 17. Without evidence of a causal connection between instances of protected activities, such as grievances and complaints filed by the plaintiffs, or adverse actions taken by any of the defendants, the plaintiffs' retaliation claims fall short of raising genuine disputes of material fact for trial. There is no evidence from which a reasonable jury could return a verdict in their favor on these claims. The defendants are therefore entitled to summary judgment on the plaintiffs' retaliation claims.

## F.  *Monell*

In their complaint, the plaintiffs allege that the "misconduct" described elsewhere in the complaint "was undertaken with willful indifference to Plaintiffs' rights" and "was undertaken pursuant to the policy and practice of Defendants." Compl. ¶¶ 95-96. Specifically, the plaintiffs contend that Dart, as Cook County Sheriff, "fails to adequately discipline, supervise and control its supervisory officers, and that its failure to do so manifests deliberate indifference"; "fails to properly and fully investigate misconduct by Cook County Sheriff supervisory officers"; "facilitates the type of misconduct here by failing to adequately punish and discipline prior instances of similar misconduct"; and "has failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here." *Id.* ¶ 96.

In their response brief, the plaintiffs do not point to any evidence—neither deposition testimony or anything else—that would support a jury finding either an

express policy of discrimination, an established practice or custom or discrimination, or discriminatory conduct by an official with final policy-making authority, namely Sheriff Dart.  *See* Pls.' Resp. Br. 19-20.  In fact, the section of the plaintiffs' brief that concerns the *Monell* claim consists entirely of a description of when a *Monell* claim is actionable; they make no effort to point to evidence that would permit a reasonable jury to find in their favor on a *Monell* claim in this case.  *See id.*  To the extent that the plaintiffs suggest that the Sheriff's Department should be liable because it "employ[s] individuals who engage in wrongdoing," this is insufficient under *Monell*.  "[F]or liability to attach, a plaintiff must demonstrate that the municipality *itself* caused or participated in the deprivation of his or her constitutional rights."  *Conwell v. Johnson*, No. 12 C 10062, 2016 WL 6661169, at *21 (quoting *Monell*, 436 U.S. at 691).

The defendants argue that plaintiffs have identified no evidence to support their *Monell* claim.  Defs.' Opening Mem. at 18-19.  They are right.  Because the plaintiffs have not shown the existence of a genuine dispute of fact with respect to the threshold element of a *Monell* claim—a policy of the Sheriff—the claim cannot proceed.  The Sheriff's Department is entitled to summary judgment on the *Monell* claim.

**G.    State claims**

Finally, the plaintiffs assert several claims under state law.  In count 7, the plaintiffs contend that defendants Dart and the Cook County Sheriff's Department committed the tort of negligent retention by retaining Neal, Ranzino, Rohloff, and Shields in supervisory positions despite the fact that knew or should have known of their unfitness.  *See* Compl. ¶¶ 123-26.  In count 8, the plaintiffs contend that Cook County is liable based on respondeat superior for the alleged tortious acts committed by Neal,

Ranzino, Rohloff, and Shields because they were agents of Cook County at all relevant times and acted within the scope of their employment. *See* Compl. ¶¶ 127-29. In count 9, the plaintiffs seek a declaratory judgment, namely a "judicial declaration" that the defendants "violated their rights under Title VII and the IDHR." Compl. ¶¶ 130-31.

The plaintiffs' discussion of their negligent retention, respondeat superior, and declaratory judgment claims comprises five sentences—none of which suggests the existence of a genuine dispute of material fact with respect to any of these claims. Illinois law provides:

> An action for negligent hiring or retention of an employee requires the plaintiff to plead and prove (1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury.

*McComb v. Bugarin*, 20 F. Supp. 3d 676, 682 (N.D. Ill. 2014) (quotations omitted). The plaintiffs point to no evidence to support a claim that any of the defendants were unfit for their supervisory positions, let alone whether Cook County knew or should have known of their supposed unfitness. Nor do they discuss the point in their brief. They have essentially forfeited these claims by failing to argue them. "'A party forfeits an argument . . . by raising it in a perfunctory or general matter.'" *Empire Indus. Inc. v. Winslyn Indus., LLC*, No. 18 C 698, 2021 WL 1172653, at *5 (N.D. Ill. Mar. 29, 2021) (quoting *United States v. Sheth*, 924 F.3d 425, 435 (7th Cir. 2019)).

Turning to the plaintiffs' respondeat superior theory, which they assert as an independent claim, Illinois law is clear: "vicarious liability is not itself a claim or cause of action." *Wilson v. Edward Hosp.*, 2012 IL 112898 ¶ 24. Without a viable underlying tort

claim, the plaintiffs' respondeat superior "claim" cannot stand alone. Accordingly, the defendants are entitled to summary judgment with respect to count 8 of the complaint.

Finally, the plaintiffs appear to seek relief under the Declaratory Judgment Act, 22 U.S.C. § 2201(a), but their contentions are unclear and conclusory. The plaintiffs do not cite any evidence in support of their request for a declaratory judgment in fact, their argument concerning this claim consists of one sentence. *See* Pls.' Resp. Br. at 21 ("Declaratory relief of the respective parties' rights and duties."). This argument is also forfeited. In any event, a request for declaratory relief is not an independent cause of action. *Sieving v. Continental Cas. Co.*, --- F. Supp. 3d ---, 2021 WL 1614516, at *7 (N.D. Ill. Apr. 26, 2021). "The purpose of declaratory judgment is to deprive the defendant of delay as a weapon by declaring the parties' legal rights in anticipation of some future conduct." *Thompson v. Ortiz*, 619 F. App'x 542, 544 (7th Cir. 2015). Accordingly, the defendants are entitled to summary judgment with respect to the plaintiffs' "declaratory relief" claim in count 9 of the complaint.

### Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 108] on all of the plaintiffs' claims (counts 1 through 9), except for count 3 of the complaint to the extent it includes plaintiffs Winston and Strickland's hostile work environment claims under Title VII, and count 1 to the extent it includes those same plaintiffs' claims under 42 U.S.C. §§ 1981/1983 against defendants Shields and Ranzino.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 24, 2021